## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

☐ SUPERSEDING

### OFFENSE CHARGED

PLEASE SEE ATTACHMENT

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY:  PLEASE SEE ATTACHMENT

### DEFENDANT - U.S

▶ ROBERT T. BROCKMAN

**FILED**

Oct 01 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

DISTRICT COURT NUMBER
3:20-cr-00371 WHA

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

INTERNAL REVENUE SERVICE

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY  ☐ DEFENSE
} SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant
☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under
} MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form     DAVID L. ANDERSON

☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)     Michael G. Pitman, AUSA

### DEFENDANT

**IS NOT IN CUSTODY**
1) ☒ Has not been arrested, pending outcome this proceeding.
   If not detained give date any prior summons was served on above charges ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)
_____

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction
} ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution
_____

Has detainer been filed?  ☐ Yes  ☒ No
} If "Yes" give date filed _____

**DATE OF ARREST** ▶     Month/Day/Year _____

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶     Month/Day/Year _____

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☒ SUMMONS  ☐ NO PROCESS*  ☐ WARRANT     Bail Amount: _____

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time: _____     Before Judge: _____

Comments:

Attachment to Indictment Penalty Sheet
ROBERT T. BROCKMAN

18 U.S.C. § 371 – Conspiracy
     5 yrs prison, $250k fine, 3 yrs sup. rel., $100 special assessment;

26 U.S.C. § 7201 – Tax Evasion
     5 yrs prison, $250k fine, 3 yrs sup. rel., $100 special assessment, costs of prosecution;

31 U.S.C. §§ 5314 & 5322(b) –FBAR Violations
     10 yrs prison, $500k fine, 3 yrs sup. rel., $100 special assessment;

18 U.S.C. § 1343 – Wire Fraud Affecting a Financial Institution;
     30 yrs prison, $1M fine, 5 yrs sup. rel., $100 special assessment;

18 U.S.C. § 1956(a)(1)(B)(i) – Concealment Money Laundering;
     20 yrs prison, $500k fine or twice the gross gain or loss (whichever is greater), 3 yrs sup. rel.,
     $100 special assessment;

18 U.S.C. § 1956(a)(1)(A)(ii) – Tax Evasion Money Laundering;
     20 yrs prison, $500k fine or twice the gross gain or loss (whichever is greater), 3 yrs sup. rel.,
     $100 special assessment;

18 U.S.C. § 1956(a)(2)(B)(i) – International Concealment Money Laundering;
     20 yrs prison, $500k fine or twice the gross gain or loss (whichever is greater), 3 yrs sup. rel.,
     $100 special assessment;

18 U.S.C. § 1512(b)(2)(B) – Evidence Tampering;
     20 yrs prison, $250k fine, 3 yrs sup. rel., $100 special assessment;

18 U.S.C. § 1512(c)(1) – Destruction of Evidence;
     20 yrs prison, $250k fine, 3 yrs sup. rel., $100 special assessment;

# United States District Court

## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

## VENUE: SAN FRANCISCO

**FILED**

Oct 01 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

---

## UNITED STATES OF AMERICA,

## V.

### ROBERT T. BROCKMAN

## DEFENDANT(S).

---

**INDICTMENT**

18 U.S.C. § 371 – Conspiracy
26 U.S.C. § 7201 – Tax Evasion
31 U.S.C. §§ 5314 & 5322(b) –FBAR Violations
18 U.S.C. § 1343 – Wire Fraud Affecting a Financial Institution;
18 U.S.C. § 1956(a)(1)(B)(i) – Concealment Money Laundering;
18 U.S.C. § 1956(a)(1)(A)(ii) – Tax Evasion Money Laundering;
18 U.S.C. § 1956(a)(2)(B)(i) – International Concealment Money Laundering;
18 U.S.C. § 1512(b)(2)(B) – Evidence Tampering;
18 U.S.C. § 1512(c)(1) – Destruction of Evidence

---

A true bill.

_/s/ Foreperson of the Grand Jury_
Foreman

Filed in open court this ___1st___ day of

___October 2020___.

Clerk

Bail, $_____ Summons

Hon. Nathanael Cousins, United States Magistrate Judge

**FILED**

Oct 01 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

DAVID L. ANDERSON (CABN 149604)
United States Attorney

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>   v.<br><br>ROBERT T. BROCKMAN,<br><br>      Defendant. | CASE NO. 3:20-cr-00371 WHA<br><br>VIOLATIONS:<br>18 U.S.C. § 371 – Conspiracy to Defraud the United States and Commit Tax Evasion;<br>26 U.S.C. § 7201 – Tax Evasion;<br>31 U.S.C. §§ 5314 & 5322(b) – FBAR Violations;<br>18 U.S.C. § 1343 – Wire Fraud Affecting a Financial Institution;<br>18 U.S.C. § 1956(a)(1)(B)(i) – Concealment Money Laundering;<br>18 U.S.C. § 1956(a)(1)(A)(ii) – Tax Evasion Money Laundering;<br>18 U.S.C. § 1956(a)(2)(B)(i) – International Concealment Money Laundering;<br>18 U.S.C. § 1512(b)(2)(B) – Evidence Tampering;<br>18 U.S.C. § 1512(c)(1) – Destruction of Evidence; and<br>18 U.S.C. §§ 982(a)(1), 982(a)(2)(A) & 28 U.S.C. § 2461(c) – Forfeiture Allegations<br><br>SAN FRANCISCO VENUE<br><br>████████████ |

# I N D I C T M E N T

The Grand Jury charges:

INDICTMENT

**Introduction**

At all times relevant to this Indictment:

1.     Defendant ROBERT T. BROCKMAN was a United States citizen residing in Houston, Texas and Pitkin County, Colorado.

2.     Universal Computer Systems Holding, Inc. ("UCSH"), was a Delaware corporation. UCSH was the holding company for a group of companies involved in the software business. During all relevant periods, BROCKMAN was the Chief Executive Officer of UCSH.

3.     Universal Computer Systems, Inc. ("UCS"), which had offices in Houston, Texas, was a subsidiary of UCSH and was in the business of servicing the software needs of automobile dealerships. During all relevant periods, BROCKMAN was the Chief Executive Officer of UCS.

4.     Dealer Computer Services, Inc. ("DCS"), another UCSH subsidiary, was a Delaware corporation. During all relevant periods, BROCKMAN was the Chief Executive Officer of DCS.

5.     The Reynolds and Reynolds Company ("Reynolds & Reynolds") was an Ohio corporation. Reynolds & Reynolds was in the business of servicing the software needs of automobile dealerships. In or about 2006, UCS and Reynolds & Reynolds merged, retaining the name Reynolds & Reynolds. The stock of the new Reynolds & Reynolds was held by UCSH. Beginning in approximately August 2006, BROCKMAN was the Chief Executive Officer of Reynolds & Reynolds.

6.     The A. Eugene Brockman Charitable Trust ("AEBCT"), formerly the A. Eugene Brockman Children's Trust, was a trust settled on or about May 26, 1981 in Bermuda. The four named beneficiaries were BROCKMAN, BROCKMAN's wife, BROCKMAN's brother, and BROCKMAN's sister-in-law.

7.     Spanish Steps Holdings, LLC, was a Nevisian company, originally formed by BROCKMAN in or about 1997 in Nevis and wholly owned by the AEBCT. Spanish Steps Holdings, Ltd., was a British Virgin Islands ("BVI") company, originally formed by BROCKMAN in or about 1989 in the BVI, whose shares were wholly owned by Spanish Steps Holdings, LLC (collectively "Spanish Steps"). Spanish Steps owned 93% of the shares of UCSH, as well as 100% of the investment shares of Point Investments, Ltd.

8. Point Investments, Ltd., was a Bermudian entity, originally incorporated by BROCKMAN on or about July 14, 1999 in the BVI. On or about November 30, 2009, BROCKMAN re-incorporated Point Investments, Ltd., in Bermuda. After that date, Point Investments, Ltd., was wholly owned by the Point Purpose Trust, a Bermudian trust (collectively "Point"), and Spanish Steps. Point had bank accounts in Bermuda and Switzerland. Point was created to invest in private equity funds managed by Vista Equity Partners ("Vista"), a private equity firm which was formed in or about March 2000 by Individual Two, and which maintained its principal place of business in the Northern District of California. Vista invested primarily in United States–based software companies ("portfolio companies"). A portion of the capital that BROCKMAN invested, through Point, in various Vista funds came from UCS's retained earnings.

9. On or about March 6, 1995, BROCKMAN created The St. John's Trust Company ("SJTC"), a Bermudian entity, to act as the Trustee for the AEBCT. BROCKMAN caused various individuals to be appointed and serve as the Directors of SJTC. In or about 2010, BROCKMAN caused Individual One to become a Director of SJTC.

10. From 1995 through the date of this Indictment, BROCKMAN's foreign entities ("offshore structure"), were managed by various individuals, each of whom was appointed by, and answerable to, BROCKMAN. In or about 2007, AEBCT, Spanish Steps, SJTC, and Point were all managed, in part or in whole, by Individual One. Individual One was compensated on an annual basis by BROCKMAN for his management of BROCKMAN's offshore structure and had periodic performance and salary reviews.

11. Edge Capital Investments, Ltd. ("Edge"), was a Nevisian corporation. Edge was managed by Individual One to create the appearance that Edge was not associated with BROCKMAN in any way. In reality, Individual One was employed, paid, and supervised by BROCKMAN, and BROCKMAN retained full dominion and control over Edge.

12. Cabot Global Investments, Ltd. ("Cabot"), was a Nevisian corporation. Cabot was managed by Individual One to create the appearance that Cabot was not associated with BROCKMAN in any way. In reality, Individual One was employed, paid, and supervised by BROCKMAN, and BROCKMAN retained full dominion and control over Cabot.

INDICTMENT 3

13.     Tangarra Consultants, Ltd. ("Tangarra"), was a Bermudian corporation.  Tangarra was organized, formed, and managed by Individual One.

14.     In or about March 2000, BROCKMAN, through Point, committed $300 million to Vista's first private equity fund – Vista Equity Fund II ("VEF II").  In or about 2004, this commitment to VEF II was increased to $1 billion.

15.     BROCKMAN, through Point and Edge, was the only limited partner in VEF II.

16.     BROCKMAN, through Point, invested in numerous Vista funds in addition to VEF II. BROCKMAN only invested in Vista funds that were organized outside the United States.

17.     In the private equity fund industry, when profits are distributed to investors, the amount distributed to each investor is determined based on each investor's share of the total investment in the underlying fund, as reflected in the applicable Partnership Agreement, and is termed a "Waterfall Calculation," or simply "the Waterfall."

18.     In or about 2006, DCS borrowed $2.4 billion to finance the merger of UCS and Reynolds & Reynolds ("the Debt").

19.     Deutsche Bank Securities, Inc., together with its subsidiaries including Deutsche Bank Trust Company Americas (collectively "Deutsche Bank"), was the Administrative Agent for the Debt, and acted as a Joint Lead Arranger and Joint Book Manager for the Debt.

20.     The Debt was a syndicated loan, also known as a syndicated bank facility, meaning that the financing was offered by a group of lenders – referred to as a syndicate – who worked together to fund the loan.

21.     The Debt was issued in three different tiers, also known as tranches.  Among other things, the tiers had different rates of return and conditions for repayment in the event of default.

22.     Each of the three different tiers of the Debt was controlled by a separate contract ("Credit Agreement").

23.     All three of the Credit Agreements were dated October 26, 2006, and all three Credit Agreements were signed by BROCKMAN as Chief Executive Officer of DCS and, under a separate signature block, by BROCKMAN as Chief Executive Officer of UCSH.

24. All three Credit Agreements contemplated that the Debt would be traded on the secondary market after it had been issued, and all three Credit Agreements included restrictions on which individuals and entities would be permitted to purchase the Debt on the secondary market. Among other things, all three of the Credit Agreements contained a material provision excluding any "Affiliate" of DCS from purchasing the Debt on the secondary market.

25. All three of the Credit Agreements defined an "Affiliate" of DCS to include any individual or entity directly or indirectly under common control with DCS. Because BROCKMAN was the Chief Executive Officer of DCS, and retained full dominion and control over Edge, Edge was an "Affiliate" of DCS under all three of the Credit Agreements.

26. All three of the Credit Agreements required DCS to periodically provide Deutsche Bank with certain financial information, including audited financial statements for UCSH and its subsidiaries, and quarterly compliance certificates; the Agreements further required Deutsche Bank to promptly distribute that financial information to holders of the Debt.

27. United States citizens who had authority over certain foreign bank accounts, and/or a financial interest in such foreign bank accounts, had reporting obligations to the United States. The Bank Secrecy Act and its implementing regulations required United States citizens to report to the United States Treasury any financial interest in, or signatory authority over, any bank account or other financial account held in foreign countries, for every calendar year in which the aggregate balance of all such foreign accounts exceeded $10,000 at any point during the year, using United States Treasury Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts. This form is commonly known as a Foreign Bank Account Report, or "FBAR." The FBAR for an applicable year was due by June 30 of the following year.

COUNT ONE:        (18 U.S.C. § 371 – Conspiracy to Defraud the United States & Commit
                        Tax Evasion)

28. The allegations set forth in paragraphs 1 through 27 of this Indictment are re-alleged and incorporated as if set forth fully herein.

29. From on or about December 1, 1999, and continuing through on or about October 15, 2019, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

with others known and unknown to the grand jury, did unlawfully, voluntarily, and willfully conspire to: (a) defraud the United States government through dishonest and deceitful means, to wit: the Department of the Treasury, Internal Revenue Service ("IRS"), in the ascertainment, assessment, computation, and collection of revenue, particularly individual federal income taxes due and owing by BROCKMAN for the tax years 2000 through and including 2018; and (b) commit tax evasion, in violation of Title 26, United States Code, Section 7201, of the individual federal income taxes due and owing by BROCKMAN for the tax years 2000 through and including 2018.

**Objective of the Conspiracy**

30. The objective of the conspiracy was for BROCKMAN, from December 1, 1999, through October 15, 2019, to conceal from the IRS capital gain income BROCKMAN earned as a result of his investments in Vista funds through Point; deposit some of this income in unreported foreign bank accounts; and evade the payment of United States federal income tax on this income.

31. It was further the objective of the conspiracy for BROCKMAN, using nominees, including Individual One, to create a false paper trail regarding his offshore structure, including by filing materially false United States Individual Income Tax Returns, Forms 1040, to give the appearance that BROCKMAN did not own or control AEBCT, Spanish Steps, SJTC, and Point, when, in reality, BROCKMAN had complete dominion and control over these entities, their Directors, Officers, and Trustees, and received the benefit of all the income deposited into the foreign bank accounts in these entities' names.

32. It was further the objective of the conspiracy for BROCKMAN, using nominees, including Individual One, to create a false paper trail giving the appearance that BROCKMAN did not have any relationship with Point, Edge, or Cabot, when, in reality, BROCKMAN exercised full dominion and control over Point, Edge, and Cabot, and used them to purchase the "Frying Pan Canyon Ranch," the "Mountain Queen" vacation home, and the luxury yacht "Turmoil" (later renamed "Albula") with unreported taxable income, for his personal use, and to conceal BROCKMAN's control over Point, Edge, and Cabot from the IRS by failing to file truthful and accurate FBARs.

**Manner and Means**

The manner and means by which BROCKMAN and his co-conspirators sought to achieve these objectives included, among others, the following:

33. It was part of the conspiracy and scheme and artifice to defraud that, in an attempt to conceal a portion of his taxable income, primarily capital gains earned as a result of his investments in Vista funds through Point, in or about 2000, BROCKMAN, with assistance from other individuals known and unknown to the Grand Jury, created a complex network of offshore companies and trusts, and appointed nominees to manage these entities for him. These nominees were compensated and employed by BROCKMAN to act as Directors, Officers, and Trustees of BROCKMAN's offshore structure, when, in reality, BROCKMAN completely controlled these entities and made all substantive decisions in their regard.

34. It was further part of the conspiracy and scheme and artifice to defraud that BROCKMAN created and used a proprietary, encrypted email system to communicate with the nominees he appointed and employed to manage his offshore structure and foreign entities. Each of the users of this encrypted email system was given a code name to be used when communicating with BROCKMAN and each other. BROCKMAN's email code name was "Permit" or "Permit1." Individual One's code name was "Redfish." Other code names given by BROCKMAN to nominees he appointed to manage his offshore structure included "King," "Bonefish," and "Snapper." Individual Two was given the code name "Steelhead." In these encrypted emails, BROCKMAN often referred to the IRS as "the house."

35. It was further part of the conspiracy and scheme and artifice to defraud that, "on paper," Spanish Steps owned approximately 93% of the preferred stock, or investment shares, of BROCKMAN's company UCSH. Since Spanish Steps was owned by the AEBCT, the Trustee of which was the SJTC, this arrangement created the appearance that Directors of the SJTC controlled UCSH, UCS, and Reynolds & Reynolds. In reality, Directors of the SJTC were employed by, and served at the pleasure of, BROCKMAN. BROCKMAN made all substantive decisions regarding UCSH, UCS, and Reynolds & Reynolds. From 2010, and continuing through about September 2018, Individual One was a Director of SJTC.

INDICTMENT                                    7

36.     It was further part of the conspiracy and scheme and artifice to defraud that, in or about March 2000, BROCKMAN, through Point and in agreement with Individual Two, committed approximately $300 million to VEF II.  Subsequently, in or about 2004, this commitment was increased to $1 billion.  From 2000, and continuing through 2014, funds were invested by BROCKMAN, through Point, in VEF II, as needed to purchase portfolio companies.  BROCKMAN funded these investments, in part, using retained earnings from UCS.

37.     It was further part of the conspiracy and scheme and artifice to defraud that, in addition to investments in VEF II, BROCKMAN, through Point, invested in numerous other Vista funds.

38.     It was further part of the conspiracy and scheme and artifice to defraud that BROCKMAN earned approximately $2 billion in capital gains as a result of his investments in Vista funds through Point.

39.     It was further part of the conspiracy and scheme and artifice to defraud that the capital gains distributed by Vista to Point for BROCKMAN's benefit were directed by BROCKMAN and his nominees, including Individual One, to be wired from Vista's bank accounts in the Northern District of California and elsewhere, to bank accounts in Point's name in Bermuda and Switzerland.

40.     It was further part of the conspiracy and scheme and artifice to defraud that capital gains BROCKMAN earned as a result of his investments in Vista funds through Point, as directed by BROCKMAN, were not reported to the IRS by BROCKMAN on his United States Individual Income Tax Returns, Forms 1040, although BROCKMAN enjoyed complete dominion and control over these earnings.  No United States federal income tax was paid on these capital gains.

41.     It was further part of the conspiracy and scheme and artifice to defraud that, in an attempt to conceal BROCKMAN's ownership and control over foreign bank accounts held in the name of Point, BROCKMAN did not report his interest and ownership over those foreign bank accounts as required by Title 31, United States Code, Sections 5314 & 5322 and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b), despite the fact that BROCKMAN enjoyed complete dominion and control over those accounts.

42.     It was further part of the conspiracy and scheme and artifice to defraud that, in an attempt to conceal BROCKMAN's ownership and control over foreign bank accounts held in the name of Edge

and Cabot, BROCKMAN did not report his interest and ownership over those foreign bank accounts as required by Title 31, United States Code, Sections 5314 & 5322 and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b), despite the fact that BROCKMAN enjoyed complete dominion and control over those accounts.

### Overt Acts

In furtherance of the conspiracy, and to effect the objectives thereof, the following overt acts were committed within the Northern District of California and elsewhere:

43.     In or about September 1999, BROCKMAN directed and caused the opening of a bank account for Point at the Bermuda Commercial Bank, account number ***4132, with an initial deposit of more than $10 million.

44.     On or about July 7, 2004, BROCKMAN directed and caused a transaction to be completed, code named "Hotrod," in which approximately $635 million of UCS's retained earnings were distributed to Spanish Steps, for transfer to Point and eventual investment in Vista funds, without properly reporting the transactions to the IRS.

45.     On or about August 27, 2006, BROCKMAN, using his encrypted email system, informed his nominees, code named "Bonefish" and "Redfish," that he had read the United States Senate's Permanent Subcommittee on Investigations' report entitled "Tax Haven Abuses: The Enablers, The Tools and Secrecy" and, based on this report, BROCKMAN subsequently directed his nominees to change the name of the "A. Eugene Brockman Children's Trust" to the "A. Eugene Brockman Charitable Trust."

46.     On or about September 23, 2006, BROCKMAN instructed Individual One that BROCKMAN was to be given: 1) quarterly reports on "all portfolio companies;" 2) amendments to the VEF II partnership agreement; and 3) copies of annual audits of VEF II and another Vista fund named Vista Equity Fund III.

47.     On or about June 3, 2007, BROCKMAN, using his encrypted email system, directed Individual One to purchase a computer program called "Evidence Eliminator" for Individual One's computers.

48. On or about July 23, 2008, BROCKMAN, using his encrypted email system, directed Individual One on the methods necessary to create more convincing backdated documents. BROCKMAN notified Individual One that "[a]s a reminder - we need to also remember that all copy machine/laser printer paper has encoded into it the manufacturer of that paper as well as the year and month of manufacture. For that reason I always set aside some packets of copy paper with dates on them - for potential future use."

49. On or about August 2, 2008, BROCKMAN, using his encrypted email system, directed Individual One "to eliminate direct calls to [the BVI and Cayman Islands] from landline or cell phones." He further directed Individual One to have a BVI resident establish multiple Vonage accounts for their use which "will have the effect of looking like a BVI person on the road calling back to the BVI . . . which when the house scans all of the Vonage activity will look innocent."

50. On or about December 11, 2009, BROCKMAN, using his encrypted email system, instructed Individual One that BROCKMAN wanted to authorize any expenses relating to the "Mountain Queen" property that exceeded $2,000, and BROCKMAN did, in fact, subsequently review and approve such expenditures.

51. On or about February 19, 2010, BROCKMAN, using his encrypted email system, directed Individual One to pursue the purchase of a "fishing lot" for $500,000 through an entity named "Henke Properties."

52. On or about February 26, 2010, BROCKMAN, using his encrypted email system, instructed Individual One that he should not pay more than $500,000 for the fishing lot property through Henke Properties.

53. On or before April 30, 2010, BROCKMAN directed Individual One, together with a second nominee, to open a bank account at Mirabaud & Cie Banquiers Prives, Geneva, Switzerland ("Mirabaud Bank") in the name of Point, account number ***463. BROCKMAN further directed that Individual One was to be a signatory on this bank account.

54. On or about May 20, 2010, BROCKMAN directed Individual One to move most of the remaining balance of funds on deposit in the Point account at Bermuda Commercial Bank, account ***4132, approximately $1 million, to the Point Mirabaud Bank account ***463 in Switzerland.

INDICTMENT 10

55. On or about May 24, 2010, BROCKMAN directed that a distribution from Vista to Point, in the amount of $799,008,883, from VEF II's sale of a portfolio company, was to be deposited in the Point account at Mirabaud Bank.

56. On or about May 26, 2010, BROCKMAN, using his encrypted email system, directed Individual One to make specific edits, changes, and amendments to the VEF II Limited Partnership Agreement on behalf of Point.

57. On or about May 27, 2010, BROCKMAN, using his encrypted email system, instructed Individual One to pose questions to Individual Two regarding fees payable from Point to Vista in association with the sale of a portfolio company.

58. On or about June 5, 2010, at BROCKMAN's direction, Individual One provided BROCKMAN with the user identification and password to directly access the Point bank account at Mirabaud Bank, account ***463.

59. On or about July 8, 2010, BROCKMAN, using his encrypted email system, directed an additional investment, through Point, of $3,163,833 in a Vista fund named Vista Equity Partners Fund III.

60. On or about July 13, 2010, BROCKMAN, using his encrypted email system, informed Individual One that due to the "Ventyx transaction," he wished to restructure "two major structures," which "cleans up these two structures forever – yet leaves them available for charitable giving, investment management fee income, investments in real estate, investments in companies, and in the case of dire emergency – for loans to individuals or other entities."

61. On or about July 23, 2010, BROCKMAN, using his encrypted email system, instructed Individual One that Edge and Cabot should not be added under the AEBCT umbrella because, "[w]e never can tell what crazy things the house is going to do – and the AEBCT is exposed to them."

62. On or about August 30, 2010, BROCKMAN, using his encrypted email system, directed Individual One to become a Director of SJTC.

63. On or about September 27, 2010, BROCKMAN, using his encrypted email system, gave Individual One instructions regarding Point's investment in VEF II. Specifically, with regard to the purchase of a portfolio company called Sunquest, BROCKMAN told Individual One that he was not

satisfied with the proposed "management and programming structure," and that the proposed purchase was not a "reasonable thing for us to be involved [in]."

64. On or about October 30, 2010, BROCKMAN, using his encrypted email system, corresponded with Individual One about using Point to purchase a "Swiss private bank."

65. On or about November 1, 2010, BROCKMAN, using his encrypted email system, corresponded with Individual One about Point's August 24, 2004 purchase of Edge's investment in VEF II for $154,582,366, and the destruction of records at Vista reflecting the purchase.

66. On or about November 10, 2010, BROCKMAN, using his encrypted email system, directed Individual One to invest $50 million, through Point, in a Vista fund named Vista Foundation Fund.

67. On or about December 6, 2010, BROCKMAN, using his encrypted email system, notified Individual One that Point had approximately $1,414,658,673 in assets, which differed from internal reports, and directed Individual One to make several corrections to Point's financial statements.

68. On or about December 28, 2010, BROCKMAN directed Individual One to fabricate a backdated memorandum memorializing a fictitious conversation with a deceased former nominee "where he resigns and concurs with your suggestion as [a replacement nominee] – provide an original wet-ink signed copy of this memo to Bob."

69. On or about July 12, 2011, BROCKMAN, using his encrypted email system, directed Individual One to prepare for BROCKMAN a monthly "Significant Transaction Report" regarding Point, and to include any transaction exceeding $100,000.

70. On or about October 20, 2011, BROCKMAN, using his encrypted email system, directed Individual One to attend a money laundering conference "if possible under an assumed identity."

71. On or about January 7, 2012, BROCKMAN, using his encrypted email system, directed Individual One to make additional investments, through Point, in Vista funds named Vista Equity Partners Fund IV, Vista Foundation Fund I, and Vista Equity Partners Fund III.

72. On or about February 14, 2012, BROCKMAN, using his encrypted email system, informed Individual One that he was interested in investing, through Point, $400 million in a Vista fund named Vista Equity Partners Fund IV, provided Point obtained a percentage of direct ownership in the

company purchased as part of the deal.

73.     On or about May 1, 2012, BROCKMAN, using his encrypted email system, instructed Individual One on how to structure BROCKMAN'S investment in the "debt market" in such a way to avoid IRS scrutiny of the AEBCT.

74.     On or about May 3, 2012, BROCKMAN directed Individual One to invest, through Point, $400 million in a Vista fund named Vista Equity Partners Fund IV.

75.     On or about August 12, 2012, BROCKMAN, using his encrypted email system, directed Individual One to invest, through Point, $16.71 million in a Vista fund named Vista Equity Partners Fund IV, to which BROCKMAN, through Point, had already committed $600 million.

76.     On or about November 25, 2012, BROCKMAN, using his encrypted email system, instructed Individual One to "register our disappointment" with a Vista employee regarding tax withholding on expected dividends from Vista.

77.     On or about December 9, 2012, BROCKMAN, using his encrypted email system, directed Individual One to change the structure in which the shares of Point were held, moving them to a "purpose trust" with a "dressed up charitable purpose" to avoid inquiries from banks and "the house" about the "ultimate beneficial owners" of Point.

78.     On or about February 17, 2013, BROCKMAN, using his encrypted email system, provided Individual One talking points regarding the negotiation of a gift from BROCKMAN to Centre College in the name of the AEBCT.

79.     On or about March 19, 2013, BROCKMAN instructed Individual One: 1) that if Point were to invest directly in a United States company, it needed to do so through a private equity manager; and 2) to secure a "wet-ink signed letter of resignation and appointment of a new trust protector" and send the document to BROCKMAN.

80.     On or about May 2, 2013, BROCKMAN, using his encrypted email system, directed Individual One to commit, through Point, $50 million to a Vista fund named Vista Foundation Fund II.

81.     On or about July 12, 2013, BROCKMAN, using his encrypted email system, directed over $7 million of additional investments, through Point, to various Vista funds.

82.     On or about July 24, 2013, BROCKMAN, using his encrypted email system, instructed Individual One on a press release for a contemplated $250 million gift from BROCKMAN to Centre College in the name of the AEBCT.

83.     On or about August 22, 2013, BROCKMAN, using his encrypted email system, sent Individual One detailed instructions regarding a gift from BROCKMAN to Centre College in the name of the AEBCT, including talking points, and directed Individual One to threaten to "pull[] the plug on the project" if BROCKMAN's demands were not met.

84.     On or about August 31, 2013, BROCKMAN, using his encrypted email system, instructed Individual One to cancel the gift to Centre College, and instructed Individual One what to tell Centre College as to why the gift was cancelled.

85.     On or about November 19, 2013, BROCKMAN, using his encrypted email system, instructed Individual One not to make a commitment, through Point, to a Vista fund named Vista Equity Partners Fund V, and that an existing investment commitment, through Point, must be "reeled back to $100 million," from $150 million.

86.     On or about December 1, 2013, BROCKMAN, using his encrypted email system, gave Individual One specific instructions to correct the record for distributions of profits from Vista to Point - "the waterfall."  Specifically, BROCKMAN directed that the return of capital in a specific distribution should be $8,489,317, and the total return should be $41,364,185.

87.     On or about January 23, 2014, BROCKMAN, using his encrypted email system, directed Individual One to make additional investments, through Point, in Vista funds named Vista Foundation Fund I, Vista Equity Partners Fund IV, and Vista Foundation Fund II.

88.     On or about February 16, 2014, BROCKMAN directed Individual One to draft a letter to BROCKMAN on behalf of SJTC requesting that BROCKMAN negotiate a sale of Reynolds & Reynolds to Vista.

89.     On or about April 5, 2014, Individual One requested BROCKMAN purchase a house for Individual One in Australia where Individual One's family could live if Individual One were to "be subjected to proceedings."

INDICTMENT                                    14

90.     On or about May 2, 2014, BROCKMAN, using his encrypted email system, sent Individual One a memorandum informing Individual One of BROCKMAN's decisions regarding Individual One's annual bonus and a loan to Individual One to purchase a home in Sydney, Australia.

91.     On or about May 4, 2014, BROCKMAN, using his encrypted email system, instructed Individual One that BROCKMAN's annual salary from Reynolds & Reynolds must be increased to permit him to "charter" the luxury yacht "Turmoil" (later renamed "Albula") for 10 weeks per year at $150,000 per week plus fuel.

92.     On or about May 10, 2014, BROCKMAN, using his encrypted email system, instructed Individual One to open a bank account in Switzerland for the AEBCT and to respond to inquiries regarding BROCKMAN's relationship to the AEBCT and the derivation of its assets.  BROCKMAN also informed Individual One that his initial investment in VEF II came from a "substantial dividend" without the payment of any withholding tax.

93.     On or about June 29, 2014, BROCKMAN, using his encrypted email system, agreed to provide Individual One with $3 million to purchase a home in Australia.

94.     On or about July 21, 2014, BROCKMAN authorized a $75 million loan from BROCKMAN to Individual Two.

95.      On or about October 3, 2014, BROCKMAN, using his encrypted email system, instructed Individual One regarding "buying out" Vista's investment in Reynolds & Reynolds.

96.     On or about October 9, 2014, BROCKMAN, using his encrypted email system, requested and received from Individual One the username and password necessary to access the secure Vista website, which allowed him to download "all financials, calls and distribution notices etc."

97.     On or about December 26, 2014, BROCKMAN, using his encrypted email system, directed Individual One to invest, through Point, $63.89 million in a Vista fund named Vista Equity Partners Fund V.

98.     On or about January 2, 2015, BROCKMAN, using his encrypted email system, directed Individual One to make additional investments, through Point, in Vista funds named Vista Equity Partnership Fund IV, Vista Foundation Fund I, and Vista Foundation Fund II.

99.     On or about January 18, 2015, BROCKMAN directed Individual One to explore having BROCKMAN'S son renounce his United States citizenship and assume management of the offshore structure.

100.     On or about May 9, 2015, BROCKMAN, using his encrypted email system, directed Individual One to make an additional investment, through Point, in a Vista fund named Vista Equity Partners Fund IV.

101.     On or about June 2, 2015, BROCKMAN, using his encrypted email system, instructed Individual One to determine the value of Point's investment in Vista Equity Partners Fund IV, and why it was reported as about 11% of the fund (or about $40 million), when BROCKMAN recalled that Point's investment in the fund was 17.9% (valued at approximately $70 million).

102.     On or about February 13, 2016, BROCKMAN, using his encrypted email system, directed Individual One to invest, through Point, $33.08 million in a Vista fund named Vista Equity Partners Fund IV.

103.     On or about February 24, 2016, BROCKMAN, using his encrypted email system, directed Individual One to purchase, through Cabot and Edge, $20 million of "first lien debt in a Vista software company."

104.     On or about April 18, 2016, BROCKMAN, using his encrypted email system, directed Individual One to make an additional investment, through Point, in a Vista fund named Vista Foundation Fund II-A.

105.     On or about June 9, 2016, BROCKMAN, using his encrypted email system, instructed Individual One that before Individual One committed to make an additional investment, through Point, in a Vista fund named Vista Equity Partners Fund IV for the purpose of purchasing a company named Misys, BROCKMAN needed a list of additional information including: 1) complete details about the current operation of Misys; 2) complete details about the sale of Misys; 3) documentation as to the valuation of Misys; and 4) a seven-year forecast of the operation proformas of Misys.

106.     On or about July 3, 2017, BROCKMAN, using his encrypted email system, directed Individual One to make additional investments, through Point, in Vista funds named Vista Equity Partners Fund III, Vista Equity Partners Fund IV, Vista Equity Partners Fund VI, Vista Foundation Fund

I, and Vista Foundation Fund II-A.

107. On or about July 26, 2017, BROCKMAN, using his encrypted email system, directed Individual One how to playact an upcoming "negotiation" with BROCKMAN including which points to contest and which points to concede. BROCKMAN directed Individual One to "continue to gripe about co-invests - but then give in."

108. On or about December 25, 2017, BROCKMAN, using his encrypted email system, directed Individual One to position the luxury yacht "Albula" in Barcelona for BROCKMAN'S upcoming vacation so that BROCKMAN did not get billed for the costs of moving the yacht. BROCKMAN further directed Individual One "[f]or appearances sake it would probably be good for you [and your family] to take some vacation in that time frame before we get there."

109. On or about April 20, 2018, BROCKMAN directed and caused the creation of a private equity fund named "Falcata Tech Investment Fund I, L.P.," and directed Individual One to commit, through Point, approximately $1 billion to the fund.

110. On or about May 17, 2005, BROCKMAN directed and caused a transfer of approximately $15 million from a bank account at VP Bank in the BVI, account ***221, in the name of Edge Investment Fund, Ltd., to bank account ***690 at VP Bank in the BVI in the name of Regency Management, Ltd., for the purchase of the "Mountain Queen" property located in Pitkin County, Colorado for BROCKMAN's personal use.

111. On or about December 16, 2010, BROCKMAN directed Individual One to transfer approximately $15 million from a bank account at Bermuda Commercial Bank, account ***703-01, in the name of Edge, to another bank account at Bermuda Commercial Bank, account ***717-01, in the name of Regency Management, Ltd., for the purchase of the "Frying Pan Canyon Ranch" property located in Pitkin County, Colorado for BROCKMAN's personal use.

112. On or about March 9, 2012, BROCKMAN was informed by email that the IRS required reporting of "foreign assets" through the filing of FBARs.

113. On or about April 16, 2013, BROCKMAN caused Individual One to transfer approximately $80 million from a bank account at Bermuda Commercial Bank, account ***703-01, in the name of Edge, to bank account ***951 at Mirabaud Bank in Switzerland, also in the name of Edge.

114.     On or about January 24, 2014, BROCKMAN caused Individual One to transfer $75,000 from a bank account at Bermuda Commercial Bank in Bermuda, account ***717-01, in the name of Regency Management, Ltd., to a bank account at Wells Fargo Bank, account ***891, to be used for the maintenance of "Mountain Queen" for BROCKMAN's personal use.

115.     In or about January 2014 and continuing through December 2014, BROCKMAN directed Individual One to transfer approximately $8.2 million from a bank account at Bermuda Commercial Bank, account ***717-01, in the name of Regency Management, Ltd., to a bank account at Wells Fargo Bank, account ***8029, in the name of Henke Properties, to be used primarily for the improvement of the "Frying Pan Canyon Ranch" for BROCKMAN's personal use.

116.     On or about November 8, 2016, BROCKMAN directed Individual One to transfer approximately $3.5 million from a bank account at Mirabaud Bank in Switzerland, account ***017, in the name of Cabot, to bank account ***800 at Florida Community Bank, NA, for the purchase of the luxury yacht "Turmoil" (later renamed "Albula") for BROCKMAN's personal use.

117.     On or about December 22, 2016, BROCKMAN directed Individual One to transfer approximately $ 29,345,705 from a bank account at Mirabaud Bank in Switzerland, account ***017, in the name of Cabot, to bank account ***800 at Florida Community Bank, NA, for the purchase of the luxury yacht "Turmoil" (later renamed "Albula") for BROCKMAN's personal use.

118.     On or about June 11, 2017, BROCKMAN directed Individual One to forward to him a "Significant Transaction Report," which Individual One had been maintaining for BROCKMAN since 2011, which detailed every transfer of funds involving $100,000 or more regarding the foreign bank accounts of Point, Edge, and Cabot.

119.     On or about February 26, 2011, BROCKMAN, using his encrypted email system, prepared and delivered a "Performance Review" to Individual One, in which BROCKMAN reviewed Individual One's work during the 2010 year, and described expectations and goals for the 2011 year. Namely, BROCKMAN directed Individual One to "take over the accounting and reporting processes for Point" and "maintain the same processes as are currently in effect."

120.     On or about February 26, 2011, BROCKMAN, using his encrypted email system, increased Individual One's annual salary from $325,000 to $420,000, and granted Individual One a

bonus of $275,000.

121. On or about April 5, 2012, BROCKMAN prepared and delivered a "Performance Review" to Individual One in which BROCKMAN reviewed Individual One's work during the 2011 year and described expectations and goals for the 2012 year. Namely, BROCKMAN directed Individual One: "investments should be made directly by Point;" to maintain minimum bank balances in Bermuda to avoid Bermuda freezing assets; to build new banking relationships in Switzerland; and "maintain files for each Vista Fund."

122. On or about April 5, 2012, BROCKMAN granted Individual One a bonus of $225,000.

123. On or about April 7, 2013, BROCKMAN, using his encrypted email system, prepared and delivered a "Performance Review" to Individual One in which BROCKMAN reviewed Individual One's work during the 2012 year and described expectations and goals for the 2013 year. Namely, BROCKMAN directed Individual One: to review the "Doomsday Materials" – undated letters of resignation for all nominees for BROCKMAN's offshore structure; move funds out of Bermuda Commercial Bank; and continue to monitor and keep files on Point's investments in Vista funds.

124. On or about April 7, 2013, BROCKMAN granted Individual One a bonus of $225,000.

125. On or about April 6, 2014, BROCKMAN granted Individual One a bonus of $325,000.

126. On or about April 6, 2014, BROCKMAN, using his encrypted email system, prepared and delivered a "Performance Review" to Individual One in which BROCKMAN reviewed Individual One's work during the 2013 year and described expectations and goals for the 2014 year. Namely, BROCKMAN directed Individual One to: maintain files for each Vista fund; provide a monthly report of business expenses; create a new computer layout including encrypted email servers; and "[o]perate as much as possible in a paperless manner – such that if someone were to come in your door unannounced everything would be in encrypted digital form."

127. On or about January 18, 2015, BROCKMAN sent Individual One a "To Do List" which included: 1) begin the formation of a new Private Equity Management Company and Private Equity Fund that BROCKMAN and his son would manage; 2) notice that BROCKMAN will lease the luxury yacht "Turmoil" (later renamed "Albula") for 10 weeks a year for $150,000 per week plus fuel; and 3) "find a way that someone else runs Point in order to satisfy the auditors."

128.    On or about October 14, 2013, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2012, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain income he earned as a result of his investments in Vista funds through Point during the 2012 calendar year.

129.    On or about October 11, 2014, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2013, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain income he earned as a result of his investments in Vista funds through Point during the 2013 calendar year.

130.    On or about October 14, 2015, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2014, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain income he earned as a result of his investments in Vista funds through Point during the 2014 calendar year.

131.    On or about October 14, 2016, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2015, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain income he earned as a result of his investments in Vista funds through Point during the 2015 calendar year.

132.    On or about October 24, 2017, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2016, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain income he earned as a result of his investments in Vista funds through Point during the 2016 calendar year.

133.    On or about October 15, 2018, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2017, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain

1    income he earned as a result of his investments in Vista funds through Point during the 2017 calendar

2    year.

3          134.    On or about October 15, 2019, BROCKMAN directed and caused to be prepared and

4    filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2018, which he

5    knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain

6    income he earned as a result of his investments in Vista funds through Point during the 2018 calendar

7    year.

8          All in violation of Title 18, United States Code, Section 371.

9    COUNT TWO:          (26 U.S.C. § 7201 – Tax Evasion – 2012)

10         135.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

11   Indictment are re-alleged and incorporated as if set forth fully herein.

12         136.    From on or about December 1, 1999, and continuing through on or about October 14,

13   2013 in the Northern District of California and elsewhere, the defendant,

14                              ROBERT T. BROCKMAN,

15   willfully attempted to evade and defeat income tax due and owing to the United States of America, for

16   the tax year 2012, by committing the following affirmative acts, among others:

17                a.    The acts described in paragraphs 43 through 134 of this Indictment; and

18                b.    On or about October 14, 2013, preparing and causing to be prepared, and signing

19   and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form

20   1040, for the calendar year 2012, which was submitted to the IRS.

21         All in violation of Title 26, United States Code, Section 7201.

22   COUNT THREE:          (26 U.S.C. § 7201 – Tax Evasion – 2013)

23         137.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

24   Indictment are re-alleged and incorporated as if set forth fully herein.

25         138.    From on or about December 1, 1999, and continuing through on or about October 11,

26   2014 in the Northern District of California and elsewhere, the defendant,

27                              ROBERT T. BROCKMAN,

28   willfully attempted to evade and defeat income tax due and owing to the United States of America, for

INDICTMENT                    21

the tax year 2013, by committing the following affirmative acts, among others:

        a.      The acts described in paragraphs 43 through 134 of this Indictment; and

        b.      On or about October 11, 2014, preparing and causing to be prepared, and signing and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form 1040, for the calendar year 2013, which was submitted to the IRS.

All in violation of Title 26, United States Code, Section 7201.

<u>COUNT FOUR</u>:      (26 U.S.C. § 7201 – Tax Evasion – 2014)

139.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if set forth fully herein.

140.    From on or about December 1, 1999, and continuing through on or about October 14, 2015 in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

willfully attempted to evade and defeat income tax due and owing to the United States of America, for the tax year 2014, by committing the following affirmative acts, among others:

        a.      The acts described in paragraphs 43 through 134 of this Indictment; and

        b.      On or about October 14, 2015, preparing and causing to be prepared, and signing and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form 1040, for the calendar year 2014, which was submitted to the IRS.

All in violation of Title 26, United States Code, Section 7201.

<u>COUNT FIVE</u>:      (26 U.S.C. § 7201 – Tax Evasion – 2015)

141.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if set forth fully herein.

142.    From on or about December 1, 1999, and continuing through on or about October 14, 2016 in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

willfully attempted to evade and defeat income tax due and owing to the United States of America, for the tax year 2015, by committing the following affirmative acts, among others:

        a.      The acts described in paragraphs 43 through 134 of this Indictment; and

b. On or about October 14, 2016, preparing and causing to be prepared, and signing and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form 1040, for the calendar year 2015, which was submitted to the IRS.

All in violation of Title 26, United States Code, Section 7201.

<u>COUNT SIX</u>: (26 U.S.C. § 7201 – Tax Evasion – 2016)

143. The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if set forth fully herein.

144. From on or about December 1, 1999, and continuing through on or about October 24, 2017 in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

willfully attempted to evade and defeat income tax due and owing to the United States of America, for the tax year 2016, by committing the following affirmative acts, among others:

a. The acts described in paragraphs 43 through 134 of this Indictment; and

b. On or about October 24, 2017, preparing and causing to be prepared, and signing and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form 1040, for the calendar year 2016, which was submitted to the IRS.

All in violation of Title 26, United States Code, Section 7201.

<u>COUNT SEVEN</u>: (26 U.S.C. § 7201 – Tax Evasion – 2017)

145. The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if set forth fully herein.

146. From on or about December 1, 1999, and continuing through on or about October 15, 2018 in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

willfully attempted to evade and defeat income tax due and owing to the United States of America, for the tax year 2017, by committing the following affirmative acts, among others:

a. The acts described in paragraphs 43 through 134 of this Indictment; and

b. On or about October 15, 2018, preparing and causing to be prepared, and signing and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form

1040, for the calendar year 2017, which was submitted to the IRS.

All in violation of Title 26, United States Code, Section 7201.

COUNT EIGHT:        (26 U.S.C. § 7201 – Tax Evasion – 2018)

147.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if set forth fully herein.

148.    From on or about December 1, 1999, and continuing through on or about October 15, 2019 in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

willfully attempted to evade and defeat income tax due and owing to the United States of America, for the tax year 2018, by committing the following affirmative acts, among others:

a.    The acts described in paragraphs 43 through 134 of this Indictment; and

b.    On or about October 15, 2019, preparing and causing to be prepared, and signing and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form 1040, for the calendar year 2018, which was submitted to the IRS.

All in violation of Title 26, United States Code, Section 7201.

COUNT NINE:        (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2013)

149.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if fully set forth here.

150.    On or about June 30, 2014, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury, an FBAR for the 2013 calendar year disclosing that he had a financial interest in, and signatory and other authority over, bank, securities, and other financial accounts in foreign countries which had aggregate values of more than $10,000, while violating another law of the United States and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at Mirabaud Bank in Switzerland and Bermuda Commercial Bank in Bermuda, in the names of Edge and Point.

All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

COUNT TEN:       (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2014)

151.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if fully set forth here.

152.    On or about June 30, 2015, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury, an FBAR for the 2014 calendar year disclosing that he had a financial interest in, and signatory and other authority over, bank, securities, and other financial accounts in foreign countries which had aggregate values of more than $10,000, while violating another law of the United States and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at Mirabaud Bank in Switzerland and Bermuda Commercial Bank in Bermuda, in the names of Edge, Cabot and Point.

All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

COUNT ELEVEN:    (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2015)

153.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if fully set forth here.

154.    On or about June 30, 2016, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury, an FBAR for the 2015 calendar year disclosing that he had a financial interest in, and signatory and other authority over, bank, securities, and other financial accounts in foreign countries which had

aggregate values of more than $10,000, while violating another law of the United States and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at Mirabaud Bank in Switzerland, and Bermuda Commercial Bank in Bermuda in the name of Edge, Cabot and Point.

All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

COUNT TWELVE:   (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2016)

155.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if fully set forth here.

156.    On or about April 15, 2017, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury, an FBAR for the 2016 calendar year disclosing that he had a financial interest in, and signatory and other authority over, bank, securities, and other financial accounts in foreign countries which had aggregate values of more than $10,000, while violating another law of the United States and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at Mirabaud Bank in Switzerland and Bermuda Commercial Bank in Bermuda, in the name of Edge, Cabot and Point.

All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

COUNT THIRTEEN: (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2017)

157.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if fully set forth here.

158.    On or about April 15, 2018, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury, an FBAR for the 2017 calendar year disclosing that he had a financial interest in, and signatory and other authority over, bank, securities, and other financial accounts in foreign countries which had aggregate values of more than $10,000, while violating another law of the United States and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at Mirabaud Bank in Switzerland and Bermuda Commercial Bank in Bermuda, in the name of Edge, Cabot and Point.

All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

COUNT FOURTEEN:      (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2018)

159.     The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if fully set forth here.

160.     On or about April 15, 2019, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury, an FBAR for the 2018 calendar year disclosing that he had a financial interest in, and signatory and other authority over, bank, securities, and other financial accounts in foreign countries which had aggregate values of more than $10,000, while violating another law of the United States and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at Mirabaud Bank in Switzerland, in the name of Edge, Cabot and Point.

All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

\\

\\

INDICTMENT                    27

COUNTS FIFTEEN TO THIRTY-FOUR:          (18 U.S.C. § 1343 – Wire Fraud Affecting a

Financial Institution)

161.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

Indictment are re-alleged and incorporated as if set forth fully herein.

162.    From on or about October 8, 2008, and continuing through on or about April 21, 2010, in

the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did knowingly, and with the intent to defraud, participate in, devise, and intend to devise, a scheme and

artifice to defraud purchasers and sellers of the Debt as to a material matter, and to obtain money and

property by means of materially false and fraudulent pretenses, representations, and promises, and by

means of omission and concealment of material facts with a duty to disclose, all affecting a financial

institution, to wit: Deutsche Bank.

163.    On or about October 8, 2008, a Deutsche Bank employee advised BROCKMAN by email

that there was an opportunity to purchase a portion of the Debt at a discount.  At the time, timely interest

payments were being made by Reynolds & Reynolds, UCSH, and DCS on the Debt as required by the

Credit Agreements.

164.    On or about November 24, 2008, a Reynolds & Reynolds employee emailed a Deutsche

Bank employee and advised that BROCKMAN "would like to find a way to purchase the 2nd & 3rd lien

debt" and was willing to invest $300 million.

165.    From on or about October 8, 2008, and continuing through on or about April 21, 2010,

BROCKMAN, together with others known and unknown to the Grand Jury, engaged in a fraudulent

scheme to deceive the purchasers and sellers of the Debt, through the Administrative Agent Deutsche

Bank, using Edge and Tangarra to purchase Debt, and concealing the fact that Edge, Tangarra, and

Individual One were controlled by BROCKMAN, and otherwise affiliated with DCS, UCSH and

Reynolds & Reynolds.

**The Scheme and Artifice to Defraud**

166.    It was part of the scheme and artifice to defraud for BROCKMAN, through Individual

One, to affirmatively conceal from sellers of the Debt the valuable economic information that the Debt

purchasers Edge and Tangarra were under common control with DCS, by BROCKMAN, by making material misrepresentations to Deutsche Bank.

167.    It was further part of the scheme and artifice to defraud for BROCKMAN to circumvent material provisions of the Credit Agreements, which prohibited any individual or entity directly or indirectly under common control with DCS and Reynolds & Reynolds from purchasing any of the Debt without prior notice, full disclosure, and amendments to the Credit Agreements.

168.    It was further part of the scheme and artifice to defraud for BROCKMAN to cause sellers of the Debt to sell portions of the Debt without informing them that the ultimate purchasers of the Debt were affiliated with DCS, Reynolds & Reynolds, and BROCKMAN.

169.    It was further part of the scheme and artifice to defraud for BROCKMAN to use material, non-public information about Reynolds & Reynolds to make decisions about purchasing portions of the Debt through Edge and Tangarra.

170.    It was further part of the scheme and artifice to defraud for BROCKMAN to cause and direct DCS, UCSH, and Reynolds & Reynolds to provide Deutsche Bank misleading financial information for distribution to holders of the Debt, including audited financial statements for UCSH and its subsidiaries, as well as quarterly compliance certificates, concealing the fact that an entity under common control with DCS and Reynolds & Reynolds had purchased portions of the Debt.

171.    It was further part of the scheme and artifice to defraud for BROCKMAN to expose sellers of the Debt, including Deutsche Bank, to multiple risks, including civil and regulatory liability, as well as reputational damage.

172.    It was further part of the scheme and artifice to defraud that, from on or about October 8, 2008, and continuing through on or about April 21, 2010, and thereafter, BROCKMAN used a proprietary, encrypted email system to communicate with Individual One and others.

173.    It was further part of the scheme and artifice to defraud that, on or about December 29, 2008, BROCKMAN, having noticed that the price for all three tiers of the Debt on the secondary market had dropped significantly, sent Individual One an encrypted email indicating that BROCKMAN wanted to purchase second and third tiers of the Debt using Edge as the purchasing entity.

INDICTMENT                                  29

174. It was further part of the scheme and artifice to defraud that, on or about January 9, 2009, BROCKMAN sent Individual One an encrypted email indicating that Reynolds & Reynolds was likely to incur an accounting loss of approximately $1 billion for the 2008 calendar year which would cause the price of the Debt to drop further. On January 9, 2009, this fact was not available to the public

175. It was further part of the scheme and artifice to defraud that, on or about January 10, 2009, BROCKMAN sent Individual One an encrypted email instructing Individual One to open an account with Deutsche Bank and purchase the second and third tiers of the Debt using Edge as the purchasing entity, and informed Individual One that BROCKMAN hoped to eventually purchase all of the second and third tiers of the Debt, which had a face value of $770 million.

176. It was further part of the scheme and artifice to defraud that, in or about January 2009, Individual One falsely represented to employees of Deutsche Bank that he represented a Swiss client interested in purchasing debt of United States companies, particularly the Debt. As part of these false representations, Individual One sent Deutsche Bank employees at least three emails purporting to describe the ownership and control of Edge and Tangarra, none of which identified BROCKMAN as the person in control of Edge and Tangarra. Individual One never disclosed to Deutsche Bank that Individual One was employed by BROCKMAN, or that BROCKMAN retained full dominion and control over Edge and Tangarra with respect to transactions involving the Debt.

177. It was further part of the scheme and artifice to defraud that, on or about January 26, 2009, BROCKMAN directed and caused Individual One to open an account at Deutsche Bank for Edge.

178. It was further part of the scheme and artifice to defraud that, on or about March 5, 2009, BROCKMAN directed and caused Individual One to use Edge to purchase portions of the third tier of the Debt with a face value of $10,228,750. Edge purchased this portion of the Debt from Deutsche Bank, which had purchased it from an investor in the Northern District of California specifically to sell it to Edge.

179. It was further part of the scheme and artifice to defraud that, on or about March 9, 2009, BROCKMAN directed and caused Individual One to use Edge to purchase portions of the third tier of the Debt with a face value of $6,921,500. Edge purchased this portion of the Debt from Deutsche Bank, which had purchased it from an investor in the Northern District of California specifically to sell it to

Edge.

180.    It was further part of the scheme and artifice to defraud that, on or about April 6, 2009, in connection with the trades on March 5, 2009, and March 9, 2009, Individual One executed an "Assignment and Assumption" on behalf of Edge, falsely certifying that Edge was an "Eligible Assignee" under the third lien Credit Agreement.

181.    It was further part of the scheme and artifice to defraud that, on or about March 9, 2009, BROCKMAN sent Individual One an encrypted email indicating that he wanted to purchase all of the second and third tiers of the Debt.

182.    It was further part of the scheme and artifice to defraud that, on or about March 11, 2009, a Deutsche Bank employee emailed BROCKMAN a seven-page presentation entitled, "Loan Repurchase Follow-Up Discussion Materials." The presentation discussed various strategies through which Reynolds & Reynolds, or an affiliated entity, could purchase portions of the Debt in compliance with the applicable Credit Agreements, and noted that ownership of the second and third tiers of the Debt was concentrated among several investors, including an investor located in the Northern District of California. At this time, Deutsche Bank was unaware that BROCKMAN had already purchased portions of the second and third tiers of the Debt through Individual One, Edge, and Tangarra.

183.    It was further part of the scheme and artifice to defraud that, on or about March 30, 2009, BROCKMAN directed and caused Individual One to use Edge to purchase portions of the second tier of the Debt with a face value of $3 million. Edge purchased this Debt from Deutsche Bank, which had purchased it from an investor in the Northern District of California specifically to sell it to Edge.

184.    It was further part of the scheme and artifice to defraud that, on or about August 7, 2009, in connection with the trade on March 30, 2009, Individual One executed an "Assignment and Assumption" on behalf of Edge, falsely certifying that Edge was an "Eligible Assignee" under the second lien Credit Agreement.

185.    It was further part of the scheme and artifice to defraud that, from on or about March 5, 2009, and continuing through on or about April 22, 2009, BROCKMAN directed and caused Individual One to use Edge to purchase portions of the second and third tiers of the Debt with an aggregate face value of more than $67 million.

186. It was further part of the scheme and artifice to defraud that, from about April 2009, and continuing through April 2010, BROCKMAN directed and caused materially false information about Reynolds & Reynolds's financial performance to be distributed to holders of the Debt, including holders in the Northern District of California. Specifically, each of the following documents, made available to all holders of the Debt on the dates indicated, were materially false because they did not disclose the fact that Edge, an Affiliate of DCS and Reynolds & Reynolds, and under the dominion and control of BROCKMAN, had purchased portions of the Debt, contrary to the terms of the Credit Agreements:

| Date | Description |
|---|---|
| April 1, 2009 | Reynolds & Reynolds's 2008 Audited Financial Statements |
| May 14, 2009 | Reynolds & Reynolds's March 31, 2009 Quarterly Compliance Certificate |
| August 11, 2009 | Reynolds & Reynolds's June 30, 2009 Quarterly Compliance Certificate |
| November 12, 2009 | Reynolds & Reynolds's September 30, 2009 Quarterly Compliance Certificate |
| March 24, 2010 | Reynolds & Reynolds's December 31, 2009 Quarterly Compliance Certificate |
| April 6, 2010 | Reynolds & Reynolds's 2009 Audited Financial Statements |

187. It was further part of the scheme and artifice to defraud that, on or about April 21, 2010, pursuant to a complete refinancing of the Debt through Deutsche Bank, the Debt was repaid in its entirety, at full face value, including a payment of approximately $67,835,129 to Edge.

188. It was further part of the scheme and artifice to defraud that, on or about April 21, 2010, BROCKMAN had full dominion and control over the approximately $67,835,129 paid to Edge in connection with the retirement of the portions of the Debt purchased by Edge.

**The Use of the Wires**

189. It was further part of the scheme and artifice to defraud that, on or about the dates set forth below, in the Northern District of California and elsewhere, for the purpose of executing the aforementioned scheme, and attempting to do so, the defendant,

ROBERT T. BROCKMAN,

did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of a wire communication, certain writings, signs, signals, pictures, and sounds, specifically:

INDICTMENT 32

| Count | Date | Description |
|-------|------|-------------|
| FIFTEEN | March 12, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| SIXTEEN | March 12, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| SEVENTEEN | March 16, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| EIGHTEEN | March 9, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| NINETEEN | March 9, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| TWENTY | March 9, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| TWENTY-ONE | March 11, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| TWENTY-TWO | March 12, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| TWENTY-THREE | March 31, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |
| TWENTY-FOUR | April 1, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |
| TWENTY-FIVE | April 1, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |
| TWENTY-SIX | April 1, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |

INDICTMENT                                      33

| TWENTY-SEVEN | April 7, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |
|---|---|---|
| TWENTY-EIGHT | April 7, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |
| TWENTY-NINE | April 1, 2009 | IntraLinks wire transmission of Reynolds & Reynolds's 2008 Audited Financial Statements to Entity One in the Northern District of California |
| THIRTY | May 14, 2009 | IntraLinks wire transmission of Reynolds & Reynolds's March 31, 2009 Quarterly Financial Statements to Entity One in the Northern District of California |
| THIRTY-ONE | August 11, 2009 | IntraLinks wire transmission of Reynolds & Reynolds's June 30, 2009 Quarterly Financial Statements to Entity One in the Northern District of California |
| THIRTY-TWO | November 12, 2009 | IntraLinks wire transmission of Reynolds & Reynolds's September 30, 2009 Quarterly Financial Statements to Entity One in the Northern District of California |
| THIRTY-THREE | March 24, 2010 | IntraLinks wire transmission of Reynolds & Reynolds's December 31, 2009 Quarterly Financial Statements to Entity One in the Northern District of California |
| THIRTY-FOUR | April 6, 2010 | IntraLinks wire transmission of Reynolds & Reynolds's 2009 Audited Financial Statements to Entity One in the Northern District of California |

All in violation of Title 18, United States Code, Section 1343.

COUNTS THIRTY-FIVE AND THIRTY-SIX:   (18 U.S.C. § 1956(a)(1)(B)(i) – Concealment Money Laundering); (18 U.S.C. § 1956(a)(1)(A)(ii) – Tax Evasion Money Laundering)

190.   The allegations set forth in paragraphs 1 through 27, 30 through 134, and 163 through 189 of this Indictment are re-alleged and incorporated as if fully set forth here.

191.   Among other transactions, on or about March 2, 2016, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did knowingly conduct and attempt to conduct the financial transactions described below on the dates and the amounts indicated, affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, namely violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1344 (Bank Fraud), knowing that the property involved in these financial transaction represented the proceeds of some form of unlawful activity, with the intent to: (A) conceal and disguise the nature, source, ownership and control of the proceeds of said specified unlawful activity; and (B) to engage in conduct constituting a violation of 26 U.S.C. §§ 7201 and 7206(1).

In furtherance of his objectives, BROCKMAN, among others, intentionally and knowingly directed, caused, and engaged in the following financial transactions:

a.     BROCKMAN engaged in a scheme and artifice to defraud purchasers and sellers of the Debt, including financial institutions whose deposits are insured by the Federal Deposit Insurance Corporation ("FDIC"), Deutsche Bank, and others, which included the financial transactions described in COUNTS FIFTEEN through THIRTY-FOUR, paragraphs 163 through 189, of this Indictment;

b.     On or about April 21, 2010, BROCKMAN directed and otherwise caused the Debt to be refinanced by Deutsche Bank in the approximate amount of $1.8 billion, resulting in a payment to Edge in the approximate amount of $67,835,129, which amount was deposited in Edge's account at Bermuda Commercial Bank, account number ***703-01, as more particularly described in paragraphs 187 and 188 of this Indictment ("the Proceeds");

c.     On or about December 16, 2010, BROCKMAN directed and otherwise caused approximately $15 million of the Proceeds to be transferred from the Edge account at Bermuda Commercial Bank, account number ***703-01, to the Regency Management, Ltd., account at Bermuda Commercial Bank, account ***717-01, to be used for the December 28, 2010 purchase and subsequent development of the "Frying Pan Canyon Ranch" in Pitkin County, Colorado;

d.     On or about November 16, 2012, BROCKMAN directed and otherwise caused approximately $49,100,000 of the Proceeds to be transferred from Edge's account at Bermuda Commercial Bank, account ***703-01, to an account in the United States at Bank of America, for investment in a Vista Equity Partners Fund III-Parallel ("VEPF III-Parallel") portfolio company named Sumtotal;

e.     On or about November 19, 2012, BROCKMAN directed and otherwise caused approximately $26,369,672 of capital gains and profits payable on BROCKMAN's investment, through Point, in Sumtotal to be paid from the VEPF III-Parallel account at First Caribbean International Bank ("FCIB"), account ***696, to Point's account at Mirabaud Bank in Switzerland, account ***463, said amount representing a portion of the Proceeds previously invested by BROCKMAN, through Edge and VEPF III-Parallel, in Sumtotal on November 16, 2012;

f.     On or about December 3, 2012, BROCKMAN directed and otherwise caused approximately $14,282,618 of the Proceeds to be transferred from Point's account at Mirabaud Bank in Switzerland, account ***463, to an account held in the name of a Vista fund named Vista Equity Partners Fund IV-Parallel ("VEPF IV-Parallel"), at FCIB, account ***960, for investment in a VEPF IV-Parallel portfolio company named Sovos;

g.     On or about March 2, 2016, BROCKMAN, as more particularly described below, directed and otherwise caused approximately $47,686,187 of capital gains and profits payable on BROCKMAN's investment, through Point, in Sovos, and derived from the Proceeds, to be paid from the VEPF IV-Parallel account at First Republic Bank in San Francisco, account ***447, to VEPF IV-Parallel's account at FCIB, account ***960, concealing BROCKMAN's dominion and control over the Proceeds, Point, and his liability to the IRS for income taxes due and owing on the capital gains realized by him through Point; and

h.     On or about March 2, 2016, BROCKMAN, as more particularly described below, directed and otherwise caused approximately $41,545,359 of capital gains and profits payable on BROCKMAN's investment, through Point, in Sovos, and derived from the Proceeds, to be paid from the VEPF IV-Parallel account at FCIB, account ***960, to Point's account at Mirabaud Bank in Switzerland, account ***463, concealing BROCKMAN's dominion and control over these proceeds, Point, and his liability to the IRS for income taxes due and owing on capital gains realized by him through Point.

\\

\\

\\

INDICTMENT                           36

| Count | Date | Amount | Origin of Proceeds | Destination of Proceeds |
|-------|------|--------|--------------------|-----------------------|
| THIRTY-FIVE | March 2, 2016 | $47,686,187 | VEPF IV-Parallel First Republic Bank, Account No ***447 | VEPF IV-Parallel FCIB, Account No. ***960 |
| THIRTY-SIX | March 2, 2016 | $41,545,359 | VEPF IV-Parallel FCIB, Account No. ***960 | Point Investment, Ltd., Mirabaud Bank, Account No. ***463 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(ii), 1956(a)(1)(B)(i), and 2.

COUNT THIRTY-SEVEN:   (18 U.S.C. § 1956(a)(2)(B)(i) – International Concealment

Money Laundering)

The allegations set forth in paragraphs 1 through 27, 30 through 134, 163 through 189, and 191 of this Indictment are re-alleged and incorporated as if fully set forth here.

192.    Among other transactions, on or about March 2, 2016, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did knowingly transfer and attempt to transfer funds, that is $41,545,359, from a place in the United States, namely San Francisco, California, to a place outside the United States, namely, Switzerland, in a series of financial transactions, as described in COUNTS THIRTY-FIVE and THIRTY-SIX, paragraph 191 of this Indictment, knowing that the funds involved in the transfer represented the proceeds of some form of unlawful activity, and knowing that the transfer was designed in whole and in part to conceal and disguise, the nature, ownership, and control of the proceeds of specified unlawful activity, namely violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1344 (Bank Fraud).

All in violation of Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2.

COUNT THIRTY-EIGHT:          (18 U.S.C. § 1512(b)(2)(B) – Evidence Tampering)

193.    The allegations set forth in paragraphs 1 through 27, 30 through 134, 163 through 189, and 191 of this Indictment are re-alleged and incorporated as if fully set forth here.

194.    In or about June 2016, BROCKMAN knew it was likely that there would be a federal grand jury investigation in the Northern District of California to determine whether violations of, among other things, Title 26, United States Code, Section 7201, had been committed involving Point. BROCKMAN further knew that his relationship to AEBCT, Spanish Steps, SJTC, and Point, and their Directors, Officers, and Trustees, would be material to that investigation.

195.    From on or about June 10, 2016, and continuing through on or about October 14, 2016, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did knowingly and corruptly persuade Individual One to alter, destroy, and mutilate documents and computer evidence with the intent to impair their integrity and availability for use in an official proceeding, to wit: a federal grand jury investigation in the Northern District of California.

196.    BROCKMAN's corrupt actions included:

a.      In or about June 2016, BROCKMAN learned that Individual Three, who was the widow of a former nominee, was in possession of materials including documents and electronic media which could reveal that BROCKMAN had complete dominion and control over AEBCT, Spanish Steps, SJTC, and Point, as well as their Directors, Officers, and Trustees, and that BROCKMAN received the benefit of all the income deposited into the bank accounts in these entities' names;

b.      Beginning in or about June 2016, and continuing until in or about October 2016, BROCKMAN engaged in a scheme to obstruct justice by destroying evidence, and causing others to destroy evidence, in an effort to prevent law enforcement authorities from learning of BROCKMAN's true relationship with AEBCT, Spanish Steps, SJTC, and Point, as well as their Directors, Officers, and Trustees;

c.      BROCKMAN engaged in multiple instances of obstructive conduct, including: causing Individual One to make several trips from places outside the United States into the United States for the purpose of destroying documents and electronic media; causing Individual One to physically destroy documents and electronic media, which Individual One did using shredders, hammers, and other means; and causing Individual One to transfer documents and electronic media from Individual Three's possession to BROCKMAN's possession.

1  All in violation of Title 18, United States Code, Sections 1512(b)(2)(B) and 2.

2  COUNT THIRTY-NINE:          (18 U.S.C. § 1512(c)(1) – Destruction of Evidence)

3  197.  The allegations set forth in paragraphs 1 through 27, 30 through 134, 163 through 189,

4  191 and 196 of this Indictment are re-alleged and incorporated as if fully set forth here.

5  198.  From on or about June 10, 2016, and continuing through on or about October 14, 2016, in

6  the Northern District of California and elsewhere, the defendant

7  ROBERT T. BROCKMAN,

8  did knowingly and corruptly alter, destroy, and mutilate documents and computer evidence, with the

9  intent to impair their integrity and availability for use in an official proceeding, to wit: a federal grand

10  jury investigation in the Northern District of California.

11  All in violation of Title 18, United States Code, Sections 1512(c)(1).

12  FORFEITURE ALLEGATION:          (18 U.S.C. 982(a)(2)(A) and 28 U.S.C. § 2461(c) (Forfeiture of

13  Wire Fraud Proceeds))

14  199.  The allegations contained in this Indictment are re-alleged and incorporated by reference

15  for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(2)(A) and

16  Title 28, United States Code, Section 2461(c).

17  200.  Upon conviction for any of the offenses alleged in COUNTS FIFTEEN through

18  THIRTY-FOUR, the defendant,

19  ROBERT T. BROCKMAN,

20  shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A) and

21  Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes, or is

22  derived from, proceeds the defendant obtained, directly or indirectly, as a result of said offenses.  Such

23  property shall include approximately $67,835,129 in United States currency.

24  201.  If any of the property described in paragraph 200 above, as a result of any act or omission

25  of the defendant:

26  a.  cannot be located upon the exercise of due diligence;

27  b.  has been transferred or sold to, or deposited with a third party;

28  c.  has been placed beyond the jurisdiction of this Court;

INDICTMENT                                    39

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty,

it is the intention of the United States, pursuant to 18 U.S.C. § 982(b) and 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendant's up to the value of the property described above.

All pursuant to Title 18, United States Code, Section 982(a)(2)(A) and Title 28, United States Code, Section 2461(c), and Federal Rule of Criminal Procedure 32.2.

FORFEITURE ALLEGATION:       (18 U.S.C. § 982(a)(1) and 28 U.S.C. § 2461(c) (Forfeiture of
Money Laundering Proceeds))

202.    The allegations contained in this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28, United States Code, Section 2461(c).

203.    Upon conviction for any of the offenses alleged in COUNTS THIRTY-FIVE through THIRTY-SEVEN, the defendant,

ROBERT T. BROCKMAN,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28, United States Code, Section 2461(c), all property, real or personal, involved in such an offense, or any property traceable to such property.  Such property shall include approximately $47,686,187 in United States currency.

204.    If any of the property described in paragraph 203 above, as a result of any act or omission of the defendant:

a.      cannot be located upon exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty,

INDICTMENT                          40

1  the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21,

2  United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

3       All pursuant to Title 18, United States Code, Section 982(a)(1), Title 28, United States Code,

4  Section 2461(c), and Federal Rule of Criminal Procedure 32.2.

6  DATED: October 1, 2020                    A TRUE BILL.

                                            /s/
                                            _____
                                            FOREPERSON

10 DAVID L. ANDERSON
   United States Attorney

   Corey J. Smith by mp
13 COREY J. SMITH
   Senior Litigation Counsel
14 Tax Division

17 MICHAEL G. PITMAN
   Assistant United States Attorney

INDICTMENT                      41

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**FILED**

Oct 01 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

# CRIMINAL COVER SHEET

**Instructions:** *Effective November 1, 2016, this Criminal Cover Sheet must be completed and submitted, along with the Defendant Information Form, for each new criminal case.*

**CASE NAME:**      **CASE NUMBER:**

**USA v.** ROBERT T. BROCKMAN      **CR** 3:20-cr-00371 WHA

| | | | |
|---|---|---|---|
| **Is This Case Under Seal?** | Yes | ✓ No | |
| **Total Number of Defendants:** | 1 ✓ | 2-7 | 8 or more |
| **Does this case involve ONLY charges under 8 U.S.C. § 1325 and/or 1326?** | Yes | No ✓ | |
| **Venue (Per Crim. L.R. 18-1):** | SF ✓ | OAK | SJ |
| **Is this a potential high-cost case?** | Yes ✓ | No | |
| **Is any defendant charged with a death-penalty-eligible crime?** | Yes | No ✓ | |
| **Is this a RICO Act gang case?** | Yes | No ✓ | |

**Assigned AUSA (Lead Attorney):** MICHAEL G. PITMAN, AUSA    **Date Submitted:** 10-1-20

**Comments:**

RESET FORM      SAVE PDF

AO 458 (Rev. 06/09) Appearance of Counsel

# UNITED STATES DISTRICT COURT

## for the

### Northern District of California

| | | |
|---|---|---|
| United States | ) | |
| *Plaintiff* | ) | |
| v. | ) | Case No.   20-cr-371 |
| Robert T. Brockman | ) | |
| *Defendant* | ) | |

## APPEARANCE OF COUNSEL

To:    The clerk of court and all parties of record

I am admitted or otherwise authorized to practice in this court, and I appear in this case as counsel for:

the United States                                                      .

Date:    10/14/2020

*/s/ Corey Smith*
*Attorney's signature*

Corey Smith, 553615 (Massachusetts)
*Printed name and bar number*

U.S. Department of Justice
Tax Division, Western Criminal Enforcement Section
150 M Street NE, Room 2.208
Washington, DC 20002
*Address*

corey.smith@usdoj.gov
*E-mail address*

(202) 514-5230
*Telephone number*

(202) 514-9623
*FAX number*

AO 458 (Rev. 06/09)  Appearance of Counsel

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | | |
|---|---|---|
| United States | ) | |
| *Plaintiff* | ) | |
| v. | ) | Case No.  20-cr-371 |
| Robert T. Brockman | ) | |
| *Defendant* | ) | |

## APPEARANCE OF COUNSEL

To:     The clerk of court and all parties of record

I am admitted or otherwise authorized to practice in this court, and I appear in this case as counsel for:

the United States                                                                                      .

Date:      10/14/2020

/s/ Christopher Magnani
*Attorney's signature*

Christopher Magnani, N/A (Maryland)
*Printed name and bar number*

U.S. Department of Justice
Tax Division, Western Criminal Enforcement Section
150 M Street NE, Room 2.120
Washington, DC 20002
*Address*

christopher.magnani@usdoj.gov
*E-mail address*

(202) 307-6408
*Telephone number*

(202) 514-9623
*FAX number*

AO 458 (Rev. 06/09) Appearance of Counsel

# UNITED STATES DISTRICT COURT

## for the

Northern District of California

| | | |
|---|---|---|
| United States | ) | |
| *Plaintiff* | ) | |
| v. | ) | Case No.   20-cr-371 |
| Robert T. Brockman | ) | |
| *Defendant* | ) | |

## APPEARANCE OF COUNSEL

To:     The clerk of court and all parties of record

I am admitted or otherwise authorized to practice in this court, and I appear in this case as counsel for:

the United States                                                                                                          .

Date:     10/14/2020

/s/ Lee Langston
*Attorney's signature*

Lee Langston, 4910311 (New York)
*Printed name and bar number*

U.S. Department of Justice
Tax Division, Western Criminal Enforcement Section
150 M Street NE, Room 2.802
Washington, DC 20002
*Address*

lee.f.langston@usdoj.gov
*E-mail address*

(202) 353-0036
*Telephone number*

(202) 514-9623
*FAX number*

| DOCUMENTS UNDER SEAL ☐ | | | | TOTAL TIME (mins): 42 mins | | |

| **MAGISTRATE JUDGE** **MINUTE ORDER** | DEPUTY CLERK Lili M. Harrell | | | REPORTER/FTR Lee-Anne Shortridge (12:16pm-12:58pm) | | |
|---|---|---|---|---|---|---|
| MAGISTRATE JUDGE Nathanael Cousins | DATE October 15, 2020 | | | NEW CASE ☐ | CASE NUMBER 3:20-cr-0371 WHA | |

## APPEARANCES

| DEFENDANT Robert Brockman | | AGE | CUST N | P/NP P | ATTORNEY FOR DEFENDANT Neal Stephens, Jason Varnado | PD. ☐ RET. ☒ APPT. ☐ |
|---|---|---|---|---|---|---|
| U.S. ATTORNEY Michael Pitman | | INTERPRETER | | ☐ FIN. AFFT SUBMITTED | | ☐ COUNSEL APPT'D |
| PROBATION OFFICER | PRETRIAL SERVICES OFFICER Jay Christian | | | DEF ELIGIBLE FOR APPT'D COUNSEL ☐ | PARTIAL PAYMENT OF CJA FEES ☐ | |

## PROCEEDINGS SCHEDULED TO OCCUR

| ☒ INITIAL APPEAR | ☐ PRELIM HRG | ☐ MOTION | ☐ JUGM'T & SENTG | ☐ STATUS ☐ TRIAL SET |
|---|---|---|---|---|
| ☐ I.D. COUNSEL | ☒ ARRAIGNMENT | ☐ BOND HEARING | ☐ IA REV PROB. or or S/R | ☐ OTHER |
| ☐ DETENTION HRG | ☐ ID / REMOV HRG | ☐ CHANGE PLEA | ☐ PROB. REVOC. | ☐ ATTY APPT HEARING |

## INITIAL APPEARANCE

| ☒ ADVISED OF RIGHTS | ☒ ADVISED OF CHARGES | ☒ NAME AS CHARGED IS TRUE NAME | ☐ TRUE NAME: |
|---|---|---|---|

## ARRAIGNMENT

| ☐ ARRAIGNED ON INFORMATION | ☒ ARRAIGNED ON INDICTMENT | ☒ READING WAIVED SUBSTANCE | ☐ WAIVER OF INDICTMENT FILED |
|---|---|---|---|

## RELEASE

| ☐ RELEASED ON O/R | ☒ ISSUED APPEARANCE BOND | AMT OF SECURITY $ 1,000,000 | SPECIAL NOTES Unsecured | ☒ PASSPORT SURRENDERED DATE:10/19/20 |
|---|---|---|---|---|
| PROPERTY TO BE POSTED ☐ CASH $ | | CORPORATE SECURITY ☐ | | REAL PROPERTY: ☐ |
| ☐ MOTION FOR DETENTION | ☒ PRETRIAL SERVICES post bail REPORT | ☐ DETAINED ☐ RELEASED | ☐ DETENTION HEARING AND FORMAL FINDINGS WAIVED | ☐ REMANDED TO CUSTODY |

ORDER REMOVED TO THE DISTRICT OF

## PLEA

| ☐ CONSENT ENTERED | ☒ NOT GUILTY | ☐ GUILTY | GUILTY TO COUNTS: ☐ |
|---|---|---|---|
| ☐ PRESENTENCE REPORT ORDERED | ☐ CHANGE OF PLEA | ☐ PLEA AGREEMENT FILED | OTHER: |

## CONTINUANCE

| TO: 11/14/2020 | ☐ ATTY APPT HEARING | ☐ BOND HEARING | ☐ STATUS RE: CONSENT | ☐ TRIAL SET |
|---|---|---|---|---|
| AT: 2:00 pm | ☐ SUBMIT FINAN. AFFIDAVIT | ☐ PRELIMINARY HEARING | ☐ CHANGE OF PLEA | ☒ STATUS |
| BEFORE HON. Alsup | ☐ DETENTION HEARING | ☐ ARRAIGNMENT | ☐ MOTIONS | ☐ JUDGMENT & SENTENCING |
| ☐ TIME WAIVED | ☒ TIME EXCLUDABLE UNDER 18 § USC 3161 | ☐ IDENTITY / REMOVAL HEARING | ☐ PRETRIAL CONFERENCE | ☐ PROB/SUP REV. HEARING |

## ADDITIONAL PROCEEDINGS

Proceedings held via Zoom. Defendant consents to video appearance. Defendant to report to USMS in Houston for processing. Case also set for 10/29/2020 at 10:30 am by Zoom videoconference before Judge Cousins for further review of conditions of release.

DOCUMENT NUMBER:

1   DAVID L. ANDERSON (CABN 149604)
    United States Attorney

2

3   HALLIE HOFFMAN (CABN 210020)
    Chief, Criminal Division

4   MICHAEL G. PITMAN (DCBN 484164)
    Assistant United States Attorney

5   150 Almaden Boulevard, Suite 900
    San Jose, California 95113

6   Telephone: (408) 535-5040
    Facsimile:  (408) 535-5081

7   michael.pitman@usdoj.gov

8   COREY J. SMITH (MABN 553615)
    Senior Litigation Counsel

9   LEE F. LANGSTON (NYBN 4910311)
    CHRISTOPHER M. MAGNANI (Maryland)

10  Trial Attorneys
    United States Department of Justice, Tax Division

11

12  Attorneys for the United States of America

13                  UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15                  SAN FRANCISCO DIVISION

16  UNITED STATES OF AMERICA,          Case No.: 3:20-cr-00371-WHA

17      Plaintiff,                     STIPULATION TO EXCLUDE TIME
                                       FROM OCTOBER 15, 2020 THROUGH
18      v.                             NOVEMBER 17, 2020 AND [PROPOSED] ORDER

19  ROBERT T. BROCKMAN,

20      Defendant.

21

22      It is hereby stipulated by and between counsel for the United States and counsel for the

23  defendant Robert T. Brockman, that time be excluded under the Speedy Trial Act from October 15,

24  2020 through November 17, 2020.

25      At the initial appearance held on October 15, 2020, the government and counsel for the

26  defendant agreed that time be excluded under the Speedy Trial Act so that defense counsel could

27  continue to prepare, including by reviewing the discovery to be produced.  For this reason and as further

28  stated on the record at the initial appearance, the parties stipulate and agree that excluding time until

1    November 17, 2020 will allow for the effective preparation of counsel. *See* 18 U.S.C. §

2    3161(h)(7)(B)(iv). The parties further stipulate and agree that the ends of justice served by excluding

3    the time from October 15, 2020 through November 17, 2020 from computation under the Speedy Trial

4    Act outweigh the best interests of the public and the defendant in a speedy trial. 18 U.S.C. §

5    3161(h)(7)(A), (B)(iv).

6         The undersigned Assistant United States Attorney certifies that he has obtained approval from

7    counsel for the defendant to file this stipulation and proposed order.

8

9    IT IS SO STIPULATED.

10                      DAVID L. ANDERSON
                        United States Attorney

11

12                      s/ Michael G. Pitman
                        COREY J. SMITH

13                         Senior Litigation Counsel
                        MICHAEL G. PITMAN

14                         Assistant United States Attorney

15                      Attorneys for United States of America

16

17

18                      s/ Neal J. Stephens
                        NEAL J. STEPHENS

19                         Counsel for Defendant ROBERT T. BROCKMAN

20

21

22                      [PROPOSED] ORDER

23         Based upon the facts set forth in the stipulation of the parties and the representations made to the

24    Court on October 15, 2020 and for good cause shown, the Court finds that failing to exclude the time

25    from October 15, 2020 through November 17, 2020 would unreasonably deny defense counsel and the

26    defendant the reasonable time necessary for effective preparation, taking into account the exercise of

27    due diligence. 18 U.S.C. § 3161(h)(7)(B)(iv). The Court further finds that the ends of justice served by

28    excluding the time from October 15, 2020 to November 17, 2020 from computation under the Speedy

1   Trial Act outweigh the best interests of the public and the defendant in a speedy trial.  Therefore, and

2   with the consent of the parties, IT IS HEREBY ORDERED that the time from October 15, 2020 through

3   November 17, 2020 shall be excluded from computation under the Speedy Trial Act. 18 U.S.C. §

4   3161(h)(7)(A), (B)(iv).

5

6   IT IS SO ORDERED.

7

8   DATED: _____

9                                                                          _____
                                                                           NATHANAEL M. COUSINS
                                                                           United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   DAVID L. ANDERSON (CABN 149604)
    United States Attorney
2
    HALLIE HOFFMAN (CABN 210020)
3   Chief, Criminal Division

4   MICHAEL G. PITMAN (DCBN 484164)
    Assistant United States Attorney
5   150 Almaden Boulevard, Suite 900
    San Jose, California 95113
6   Telephone: (408) 535-5040
    Facsimile: (408) 535-5081
7   michael.pitman@usdoj.gov

8   COREY J. SMITH (MABN 553615)
    Senior Litigation Counsel
9   LEE F. LANGSTON (NYBN 4910311)
    CHRISTOPHER M. MAGNANI (Maryland)
10  Trial Attorneys
    United States Department of Justice, Tax Division
11

12  Attorneys for the United States of America

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15               SAN FRANCISCO DIVISION

16  UNITED STATES OF AMERICA,          Case No.: 3:20-cr-00371-WHA

17          Plaintiff,                 STIPULATION TO EXCLUDE TIME
                                        FROM OCTOBER 15, 2020 THROUGH
18      v.                             NOVEMBER 17, 2020 AND ORDER

19  ROBERT T. BROCKMAN,

20          Defendant.

21

22          It is hereby stipulated by and between counsel for the United States and counsel for the

23  defendant Robert T. Brockman, that time be excluded under the Speedy Trial Act from October 15,

24  2020 through November 17, 2020.

25          At the initial appearance held on October 15, 2020, the government and counsel for the

26  defendant agreed that time be excluded under the Speedy Trial Act so that defense counsel could

27  continue to prepare, including by reviewing the discovery to be produced. For this reason and as further

28  stated on the record at the initial appearance, the parties stipulate and agree that excluding time until

1  November 17, 2020 will allow for the effective preparation of counsel.  *See* 18 U.S.C. §

2  3161(h)(7)(B)(iv).  The parties further stipulate and agree that the ends of justice served by excluding

3  the time from October 15, 2020 through November 17, 2020 from computation under the Speedy Trial

4  Act outweigh the best interests of the public and the defendant in a speedy trial. 18 U.S.C. §

5  3161(h)(7)(A), (B)(iv).

6  　　　The undersigned Assistant United States Attorney certifies that he has obtained approval from

7  counsel for the defendant to file this stipulation and proposed order.

8

9  IT IS SO STIPULATED.

10  　　　　　　　　　　　　　　　　　　　　DAVID L. ANDERSON
                                                                    United States Attorney

11
                                                                    s/ Michael G. Pitman
12                                                                   COREY J. SMITH
                                                                    Senior Litigation Counsel
13                                                                   MICHAEL G. PITMAN
                                                                    Assistant United States Attorney
14
                                                                    Attorneys for United States of America
15

16

17

18                                                                   s/ Neal J. Stephens
                                                                    NEAL J. STEPHENS
19                                                                   Counsel for Defendant ROBERT T. BROCKMAN

20

21

22  　　　　　　　　　　　　　　　　　　　　　ORDER

23  　　　Based upon the facts set forth in the stipulation of the parties and the representations made to the

24  Court on October 15, 2020 and for good cause shown, the Court finds that failing to exclude the time

25  from October 15, 2020 through November 17, 2020 would unreasonably deny defense counsel and the

26  defendant the reasonable time necessary for effective preparation, taking into account the exercise of

27  due diligence.  18 U.S.C. § 3161(h)(7)(B)(iv).  The Court further finds that the ends of justice served by

28  excluding the time from October 15, 2020 to November 17, 2020 from computation under the Speedy

1  Trial Act outweigh the best interests of the public and the defendant in a speedy trial. Therefore, and

2  with the consent of the parties, IT IS HEREBY ORDERED that the time from October 15, 2020 through

3  November 17, 2020 shall be excluded from computation under the Speedy Trial Act. 18 U.S.C. §

4  3161(h)(7)(A), (B)(iv).

5

6  IT IS SO ORDERED.

7

8  DATED:    October 19, 2020

9



NATHA
United S
Judge Nathanael M. Cousins

1   Neal J. Stephens (State Bar No. 152071)
    JONES DAY
2   1755 Embarcadero Road
    Palo Alto, CA 94303
3   Telephone:   +1.650.739.3939
    Facsimile:   +1.650.739.3900
4   nstephens@jonesday.com

5   Attorney for Defendant
    ROBERT BROCKMAN
6

7

8                      UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                        SAN FRANCISCO DIVISION

11

12   UNITED STATES OF AMERICA,          Case No.: 3:20-cr-00371-WHA

13              Plaintiff,              STIPULATION TO MOVE BAIL
                                        HEARING FROM OCTOBER 29, 2020
14        v.                            TO NOVEMBER 12, 2020 AND
                                        [PROPOSED] ORDER
15   ROBERT BROCKMAN,

16              Defendant.

17

18        It is hereby stipulated by and between counsel for Robert Brockman and counsel for the

19   United States, that the tentative hearing on Mr. Brockman's bail conditions scheduled for October

20   29, 2020 be moved to November 12, 2020.

21        At the initial appearance held on October 15, 2020, the Court scheduled a tentative

22   hearing on Mr. Brockman's bail conditions for Thursday, October 29, 2020.  The Court ordered

23   Pre-Trial Services to interview Mr. Brockman and file a report with the Court so the Court could

24   determine whether any further hearing was required related to the initial bond conditions set by

25   the Court on October 15, 2020.  Immediately thereafter, counsel for Mr. Brockman contacted Pre-

26   Trial Services and scheduled an interview to take place on October 21, 2020.  Pre-Trial Services

27   subsequently contacted defense counsel to request that the interview be moved to October 29,

28   2020.  To provide Pre-Trial Services enough time to draft the report and the Court to review it,

STIPULATION TO MOVE BAIL HEARING FROM
OCTOBER 29, 2020 TO NOVEMBER 12, 2020 AND
[PROPOSED} ORDER

1    the parties request that the tentative hearing regarding bond conditions currently scheduled for

2    October 29, 2020 be moved to November 12, 2020 at 10:00 a.m.

3          The undersigned certifies that he has obtained approval from AUSA Pittman, counsel for

4    the government, to file this stipulation and proposed order.

5

6    IT IS SO STIPULATED.

7    DATED:  October 23, 2020              By: /s/ Neal Stephens
                                               Neal J. Stephens
8
                                               Counsel for Defendant ROBERT T.
9                                              BROCKMAN

10

11                                             DAVID L. ANDERSON
                                               United States Attorney
12
     DATED:   October 23, 2020             By:  /s/ Michael G. Pitman
13                                              COREY J. SMITH
                                                Senior Litigation Counsel
14                                              MICHAEL G. PITMAN
                                                Assistant United States Attorney
15
                                                Attorneys for UNITED STATES OF
16                                              AMERICA

17

18

19

20

21

22

23

24

25

26

27

28

1

**Certification of Compliance with N.D. Cal. L.R. 5.1(i)(3)**

2       I hereby certify that pursuant to N.D. Cal. L.R. 5.1(i)(3), I have obtained the authorization

3   from the above signatory to file the above-referenced document, and that the above signatory

4   concurs in the filing's content.

5       I certify under penalty of perjury under the laws of the United States of America that the

6   foregoing is true and correct. Executed on October 23, 2020 in Palo Alto, California.

7

8

9                               By: */s/ Neal J. Stephens*
                                 Neal J. Stephens
10                               Counsel for Defendant
                                 ROBERT BROCKMAN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**[PROPOSED] ORDER**

Based on the facts set forth in the stipulation of the parties and for good cause shown, the Court finds that the hearing on Mr. Brockman's bail conditions scheduled for October 29, 2020 be moved to November 12, 2020 at 10:00 a.m. Therefore, and with the consent of the parties, IT IS HEREBY ORDERED that the hearing shall be moved from October 29, 2020 to November 12, 2020 at 10:00 a.m.

**IT IS SO ORDERED.**

DATED: _____, 2020

_____
NATHANAEL M. COUSINS
United States Magistrate Judge

**FILED**

Oct 23 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

1  Neal J. Stephens (State Bar No. 152071)
   JONES DAY
2  1755 Embarcadero Road
   Palo Alto, CA 94303
3  Telephone:   +1.650.739.3939
   Facsimile:    +1.650.739.3900
4  nstephens@jonesday.com

5  Attorney for Defendant
   ROBERT BROCKMAN
6

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10              SAN FRANCISCO DIVISION

11

12  UNITED STATES OF AMERICA,          Case No.: 3:20-cr-00371-WHA

13              Plaintiff,              STIPULATION TO MOVE BAIL
                                        HEARING FROM OCTOBER 29, 2020
14          v.                          TO NOVEMBER 12, 2020 AND ORDER

15  ROBERT BROCKMAN,

16              Defendant.

17

18          It is hereby stipulated by and between counsel for Robert Brockman and counsel for the

19  United States, that the tentative hearing on Mr. Brockman's bail conditions scheduled for October

20  29, 2020 be moved to November 12, 2020.

21          At the initial appearance held on October 15, 2020, the Court scheduled a tentative

22  hearing on Mr. Brockman's bail conditions for Thursday, October 29, 2020.  The Court ordered

23  Pre-Trial Services to interview Mr. Brockman and file a report with the Court so the Court could

24  determine whether any further hearing was required related to the initial bond conditions set by

25  the Court on October 15, 2020.  Immediately thereafter, counsel for Mr. Brockman contacted Pre-

26  Trial Services and scheduled an interview to take place on October 21, 2020.  Pre-Trial Services

27  subsequently contacted defense counsel to request that the interview be moved to October 29,

28  2020.  To provide Pre-Trial Services enough time to draft the report and the Court to review it,

1    the parties request that the tentative hearing regarding bond conditions currently scheduled for

2    October 29, 2020 be moved to November 12, 2020 at 10:00 a.m.

3          The undersigned certifies that he has obtained approval from AUSA Pittman, counsel for

4    the government, to file this stipulation and proposed order.

5

6    IT IS SO STIPULATED.

7    DATED:  October 23, 2020          By: /s/ Neal Stephens
                                           Neal J. Stephens
8
                                       Counsel for Defendant ROBERT T.
9                                      BROCKMAN

10

11                                     DAVID L. ANDERSON
                                       United States Attorney
12
     DATED:   October 23, 2020         By: /s/ Michael G. Pitman
13                                         COREY J. SMITH
                                           Senior Litigation Counsel
14                                         MICHAEL G. PITMAN
                                           Assistant United States Attorney
15
                                       Attorneys for UNITED STATES OF
16                                     AMERICA

17

18

19

20

21

22

23

24

25

26

27

28

1

2 **Certification of Compliance with N.D. Cal. L.R. 5.1(i)(3)**

3       I hereby certify that pursuant to N.D. Cal. L.R. 5.1(i)(3), I have obtained the authorization

4 from the above signatory to file the above-referenced document, and that the above signatory

5 concurs in the filing's content.

6       I certify under penalty of perjury under the laws of the United States of America that the

7 foregoing is true and correct. Executed on October 23, 2020 in Palo Alto, California.

8

9

10                            By: */s/ Neal J. Stephens*
                           Neal J. Stephens

11                            Counsel for Defendant
                           ROBERT BROCKMAN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ORDER**

Based on the facts set forth in the stipulation of the parties and for good cause shown, the Court finds that the hearing on Mr. Brockman's bail conditions scheduled for October 29, 2020 be moved to November 12, 2020 at **9:30 a.m**. Therefore, and with the consent of the parties, IT IS HEREBY ORDERED that the hearing shall be moved from October 29, 2020 to November 12, 2020 at **9:30 a.m. by Zoom**.

**IT IS SO ORDERED.**

DATED: October 23, 2020

NATHANAEL
United St

GRANTED

Judge Nathanael M. Cousins

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Case 3:20-cr-00371-WHA   Document 15   Filed 10/26/20   Page 1 of 2

**TRANSCRIPT ORDER**
Please use one form per court reporter.
*CJA counsel please use Form CJA24*
*Please read instructions on next page.*

COURT USE ONLY
**DUE DATE:**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
CAND 435
(CAND Rev. 08/2018)

1a. CONTACT PERSON FOR THIS ORDER
Anna Oak

2a. CONTACT PHONE NUMBER
(202) 367-7731

3. CONTACT EMAIL ADDRESS
aoak@kellogghansen.com

1b. ATTORNEY NAME (if different)
Daniel V. Dorris

2b. ATTORNEY PHONE NUMBER
(202) 326-7900

3. ATTORNEY EMAIL ADDRESS
ddorris@kellogghansen.com

4. MAILING ADDRESS (INCLUDE LAW FIRM NAME, IF APPLICABLE)
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036

5. CASE NAME
USA v. Robert T. Brockman

6. CASE NUMBER
3:20-cr-00371

8. THIS TRANSCRIPT ORDER IS FOR:
☐ APPEAL            ☑ CRIMINAL
☐ NON-APPEAL        ☐ CIVIL

☐ In forma pauperis (NOTE: Court order for transcripts must be attached)
CJA: Do not use this form: use Form CJA24.

7. COURT REPORTER NAME ( FOR FTR, LEAVE BLANK AND CHECK BOX)→ ☐ FTR
Lee-Anne Shortridge

9. TRANSCRIPT(S) REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested), format(s) & quantity and delivery type:

a. HEARING(S) (OR PORTIONS OF HEARINGS)

b. SELECT FORMAT(S) (NOTE: ECF access is included with purchase of PDF, text, paper or condensed.)

c. DELIVERY TYPE (Choose one per line)

| DATE | JUDGE (initials) | TYPE (e.g. CMC) | PORTION If requesting less than full hearing, specify portion (e.g. witness or time) | PDF (email) | TEXT/ASCII (email) | PAPER | CONDENSED (email) | ECF ACCESS (web) | ORDINARY (30-day) | 14-Day | EXPEDITED (7-day) | 3-DAY | DAILY (Next day) | HOURLY (2 hrs) | REALTIME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/15/2020 | NMC | initial ➕ | | ● | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

10. ADDITIONAL COMMENTS, INSTRUCTIONS, QUESTIONS, ETC:
TYPE = initial appearance

ORDER & CERTIFICATION (11. & 12.) By signing below, I certify that I will pay all charges (deposit plus additional).

11. SIGNATURE
/s/ Daniel V. Dorris

12. DATE
10/26/2020

Clear Form

Save as new PDF

CAND 435
(Rev. 08/2018)

## INSTRUCTIONS

Use this form to order the transcription of a record of proceedings. **CJA counsel should use Form CJA24.** Before completing this form, please visit cand.uscourts.gov/transcripts for complete transcript ordering information. **THESE INSTRUCTIONS SUPPLEMENT THE WEBSITE INFORMATION.**

1.  Complete a separate order form for each case number for which transcripts are ordered.
2.  Complete a separate order form for each court reporter who reported proceedings in the case.
3.  Complete Items 1-12. Keep a copy of your completed order form for your records.
4.  E-file this form in the U.S. District Court CM/ECF system. **Exceptions to e-filing:** (a) sealed cases/proceedings; (b) non-parties; (c) pro se parties who are not e-filers. In such cases, mail or hand-deliver a hard copy addressed to the court reporter supervisor (email list available at cand.uscourts.gov/transcripts/contact) at the Court division where the proceeding was held.
5.  Next, the court reporter/transcriber will contact you to confirm estimated costs and delivery options. Deliver payment to the court reporter/transcriber promptly. Upon receipt of the deposit, the court reporter/transcriber will begin work on the transcript.
6.  Unless prepayment is waived, delivery time is computed from the date the court reporter/transcriber receives the deposit, authorized CJA 24 Form, authorization from Federal Public Defender's Office or, for transcripts ordered by the U.S. government, from the date of receipt of the DCN number.
7.  The deposit fee is an estimate. Any overage will be refunded; any shortage will be due from you.

### ITEM-BY-ITEM INSTRUCTIONS (ITEMS 1-12):

Items 1-3   In fields 1a, 2a & 3a, please provide the contact name and information for the person responsible for ordering the transcript. In a law office, this is usually a paralegal or administrative assistant, not the attorney. In fields 1b, 2b & 3b, provide the attorney name and contact info, if the attorney is not the contact person.

Items 5-6.  Only one case number may be listed per order.

Item 7.     Visit cand.uscourts.gov/transcripts for instructions for determining the name of the court reporter who reported the proceeding or if the proceeding was audio-recorded. If minutes have not been filed, contact the court reporter supervisor at the division where the hearing was held.

Item 8.     Check appeal OR non-appeal AND criminal OR civil. **In forma pauperis:** a court order specifically authorizing transcripts is required before transcripts may be ordered **in forma pauperis.**

Item 9a.    List specific date(s) of the proceedings for which transcript is requested. A transcript of only a portion of a proceeding may be ordered, if the description is clearly written to facilitate processing. Under "type," indicate briefly what type of proceeding it was, such as "motion," "sentencing," or "CMC."

Item 9b.    Select desired **FORMAT(S)** for transcript. There is an additional charge for each format ordered. Visit cand.uscourts.gov/transcripts/rates for details. Unlock ECF/web access is included at no extra charge with each of the other formats.

Item 9c.    There are 7 **DELIVERY TYPES** to choose from (times are computed from date of receipt of the deposit fee or DCN number). **NOTE:** Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within 7 calendar days, the 14-day delivery rate would be charged.

**TRANSCRIPT DELIVERY TIMES:**

- ORDINARY — 30 calendar days.
- 14-DAY — 14 calendar days.
- EXPEDITED — 7 calendar days.
- 3-DAY — 3 calendar days
- DAILY (NEXT DAY) — Following adjournment and prior to the normal opening hour of the court on the following morning whether or not it actually is a court day.
- HOURLY (SAME DAY) — within two (2) hours.
- REALTIME — A draft unedited, uncertified transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

Item 11.    Sign in this space to certify that you will pay all charges (the deposit plus any additional charges.) An electronic or conformed (/s/) signature is acceptable.

Item 12.    Enter the date of signing the order and certification.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
CAND 435
(CAND Rev. 08/2018)

**TRANSCRIPT ORDER**
Please use one form per court reporter.
*CJA counsel please use Form CJA24*
*Please read instructions on next page.*

COURT USE ONLY
**DUE DATE:**

1a. CONTACT PERSON FOR THIS ORDER
Dave Michaels

2a. CONTACT PHONE NUMBER
(202) 680-9911

3. CONTACT EMAIL ADDRESS
dave.michaels@wsj.com

1b. ATTORNEY NAME (if different)

2b. ATTORNEY PHONE NUMBER

3. ATTORNEY EMAIL ADDRESS

4. MAILING ADDRESS (INCLUDE LAW FIRM NAME, IF APPLICABLE)
712 A Street SE, Washington, DC 20003

5. CASE NAME
United States v. Brockman

6. CASE NUMBER
20-cr-371

7. COURT REPORTER NAME ( FOR FTR, LEAVE BLANK AND CHECK BOX)→ ☐ FTR
Lee-Anne Shortridge

8. THIS TRANSCRIPT ORDER IS FOR:
☐ APPEAL          ☑ CRIMINAL
☐ NON-APPEAL    ☐ CIVIL

☐ In forma pauperis (NOTE: Court order for transcripts must be attached)
CJA: Do not use this form: use Form CJA24.

9. TRANSCRIPT(S) REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested), format(s) & quantity and delivery type:

a. HEARING(S) (OR PORTIONS OF HEARINGS)

b. SELECT FORMAT(S) *(NOTE: ECF access is included with purchase of PDF, text, paper or condensed.)*

c. DELIVERY TYPE (Choose one per line)

| DATE | JUDGE (initials) | TYPE (e.g. CMC) | PORTION If requesting less than full hearing, specify portion (e.g. witness or time) | PDF (email) | TEXT/ASCII (email) | PAPER | CONDENSED (email) | ECF ACCESS (web) | ORDINARY (30 day) | 14-Day | EXPEDITED (7-day) | 3-DAY | DAILY (Next day) | HOURLY (2 hrs) | REALTIME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/15/2020 | NC | arraign ☐ | full | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

10. ADDITIONAL COMMENTS, INSTRUCTIONS, QUESTIONS, ETC:

ORDER & CERTIFICATION (11. & 12.) By signing below, I certify that I will pay all charges (deposit plus additional).

11. SIGNATURE
Dave Michaels

12. DATE
10/28/2020

Clear Form

Save as new PDF

CAND 435
(Rev. 08/2018)

## INSTRUCTIONS

Use this form to order the transcription of a record of proceedings. **CJA counsel should use Form CJA24.** Before completing this form, please visit cand.uscourts.gov/transcripts for complete transcript ordering information. **THESE INSTRUCTIONS SUPPLEMENT THE WEBSITE INFORMATION.**

1. Complete a separate order form for each case number for which transcripts are ordered.
2. Complete a separate order form for each court reporter who reported proceedings in the case.
3. Complete Items 1-12. Keep a copy of your completed order form for your records.
4. E-file this form in the U.S. District Court CM/ECF system. **Exceptions to e-filing:** (a) sealed cases/proceedings; (b) non-parties; (c) pro se parties who are not e-filers. In such cases, mail or hand-deliver a hard copy addressed to the court reporter supervisor (email list available at cand.uscourts.gov/transcripts/contact) at the Court division where the proceeding was held.
5. Next, the court reporter/transcriber will contact you to confirm estimated costs and delivery options. Deliver payment to the court reporter/transcriber promptly. Upon receipt of the deposit, the court reporter/transcriber will begin work on the transcript.
6. Unless prepayment is waived, delivery time is computed from the date the court reporter/transcriber receives the deposit, authorized CJA 24 Form, authorization from Federal Public Defender's Office or, for transcripts ordered by the U.S. government, from the date of receipt of the DCN number.
7. The deposit fee is an estimate. Any overage will be refunded; any shortage will be due from you.

### ITEM-BY-ITEM INSTRUCTIONS (ITEMS 1-12):

Items 1-3   In fields 1a, 2a & 3a, please provide the contact name and information for the person responsible for ordering the transcript. In a law office, this is usually a paralegal or administrative assistant, not the attorney. In fields 1b, 2b & 3b, provide the attorney name and contact info, if the attorney is not the contact person.

Items 5-6.   Only one case number may be listed per order.

Item 7.   Visit cand.uscourts.gov/transcripts for instructions for determining the name of the court reporter who reported the proceeding or if the proceeding was audio-recorded. If minutes have not been filed, contact the court reporter supervisor at the division where the hearing was held.

Item 8.   Check appeal OR non-appeal AND criminal OR civil. **In forma pauperis:** a court order specifically authorizing transcripts is required before transcripts may be ordered **in forma pauperis.**

Item 9a.   List specific date(s) of the proceedings for which transcript is requested. A transcript of only a portion of a proceeding may be ordered, if the description is clearly written to facilitate processing. Under "type," indicate briefly what type of proceeding it was, such as "motion," "sentencing," or "CMC."

Item 9b.   Select desired **FORMAT(S)** for transcript. There is an additional charge for each format ordered. Visit cand.uscourts.gov/transcripts/rates for details. Unlock ECF/web access is included at no extra charge with each of the other formats.

Item 9c.   There are 7 **DELIVERY TYPES** to choose from (times are computed from date of receipt of the deposit fee or DCN number). **NOTE:** Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within 7 calendar days, the 14-day delivery rate would be charged.

**TRANSCRIPT DELIVERY TIMES:**

- ORDINARY — 30 calendar days.
- 14-DAY — 14 calendar days.
- EXPEDITED — 7 calendar days.
- 3-DAY — 3 calendar days
- DAILY (NEXT DAY) — Following adjournment and prior to the normal opening hour of the court on the following morning whether or not it actually is a court day.
- HOURLY (SAME DAY) — within two (2) hours.
- REALTIME — A draft unedited, uncertified transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

Item 11.   Sign in this space to certify that you will pay all charges (the deposit plus any additional charges.) An electronic or conformed (/s/) signature is acceptable.

Item 12.   Enter the date of signing the order and certification.

**Case 3:20-cr-00371-WHA   Document 18   Filed 10/28/20   Page 1 of 2**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
CAND 435
(CAND Rev. 08/2018)

**TRANSCRIPT ORDER**
Please use one form per court reporter.
*CJA counsel please use Form CJA24*
Please read instructions on next page.

COURT USE ONLY
**DUE DATE:**

1a. CONTACT PERSON FOR THIS ORDER
Lindsay VanHulle

2a. CONTACT PHONE NUMBER
(313) 446-0374

3. CONTACT EMAIL ADDRESS
lvanhulle@crain.com

1b. ATTORNEY NAME (if different)

2b. ATTORNEY PHONE NUMBER

3. ATTORNEY EMAIL ADDRESS

4. MAILING ADDRESS (INCLUDE LAW FIRM NAME, IF APPLICABLE)
1155 Gratiot Ave.
Detroit, MI 48207

5. CASE NAME
USA v. Brockman

6. CASE NUMBER
3:20-cr-00371

7. COURT REPORTER NAME ( FOR FTR, LEAVE BLANK AND CHECK BOX)→ ☐ FTR
Lee-Anne Shortridge

8. THIS TRANSCRIPT ORDER IS FOR:
☐ APPEAL   ☑ CRIMINAL
☐ NON-APPEAL   ☐ CIVIL

☐ In forma pauperis (NOTE: Court order for transcripts must be attached)
CJA: Do not use this form: use Form CJA24.

9. TRANSCRIPT(S) REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested), format(s) & quantity and delivery type:

a. HEARING(S) (OR PORTIONS OF HEARINGS)

b. SELECT FORMAT(S) *(NOTE: ECF access is included with purchase of PDF, text, paper or condensed.)*

c. DELIVERY TYPE (Choose one per line)

| DATE | JUDGE (initials) | TYPE (e.g. CMC) | PORTION If requesting less than full hearing, specify portion (e.g. witness or time) | PDF (email) | TEXT/ASCII (email) | PAPER | CONDENSED (email) | ECF ACCESS (web) | ORDINARY (30-day) | 14-Day | EXPEDITED (7-day) | 3-DAY | DAILY (Next day) | HOURLY (2 hrs) | REALTIME |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 10/15/2020 | NC | arraign | | ● | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

10. ADDITIONAL COMMENTS, INSTRUCTIONS, QUESTIONS, ETC:

ORDER & CERTIFICATION (11. & 12.) By signing below, I certify that I will pay all charges (deposit plus additional).

11. SIGNATURE
Lindsay VanHulle

12. DATE
10/28/2020

Clear Form

Save as new PDF

Case 3:20-cr-00371-WHA   Document 18   Filed 10/28/20   Page 2 of 2

CAND 435
(Rev. 08/2018)

# INSTRUCTIONS

Use this form to order the transcription of a record of proceedings. *CJA counsel should use Form CJA24.* Before completing this form, please visit cand.uscourts.gov/transcripts for complete transcript ordering information. **THESE INSTRUCTIONS SUPPLEMENT THE WEBSITE INFORMATION.**

1.  Complete a separate order form for each case number for which transcripts are ordered.
2.  Complete a separate order form for each court reporter who reported proceedings in the case.
3.  Complete Items 1-12. Keep a copy of your completed order form for your records.
4.  E-file this form in the U.S. District Court CM/ECF system. *Exceptions to e-filing:* (a) sealed cases/proceedings; (b) non-parties; (c) pro se parties who are not e-filers. In such cases, mail or hand-deliver a hard copy addressed to the court reporter supervisor (email list available at cand.uscourts.gov/transcripts/contact) at the Court division where the proceeding was held.
5.  Next, the court reporter/transcriber will contact you to confirm estimated costs and delivery options. Deliver payment to the court reporter/transcriber promptly. Upon receipt of the deposit, the court reporter/transcriber will begin work on the transcript.
6.  Unless prepayment is waived, delivery time is computed from the date the court reporter/transcriber receives the deposit, authorized CJA 24 Form, authorization from Federal Public Defender's Office or, for transcripts ordered by the U.S. government, from the date of receipt of the DCN number.
7.  The deposit fee is an estimate. Any overage will be refunded; any shortage will be due from you.

## ITEM-BY-ITEM INSTRUCTIONS (ITEMS 1-12):

Items 1-3    In fields 1a, 2a & 3a, please provide the contact name and information for the person responsible for ordering the transcript. In a law office, this is usually a paralegal or administrative assistant, not the attorney. In fields 1b, 2b & 3b, provide the attorney name and contact info, if the attorney is not the contact person.

Items 5-6.   Only one case number may be listed per order.

Item 7.      Visit cand.uscourts.gov/transcripts for instructions for determining the name of the court reporter who reported the proceeding or if the proceeding was audio-recorded. If minutes have not been filed, contact the court reporter supervisor at the division where the hearing was held.

Item 8.      Check appeal OR non-appeal AND criminal OR civil. *In forma pauperis:* a court order specifically authorizing transcripts is required before transcripts may be ordered *in forma pauperis.*

Item 9a.     List specific date(s) of the proceedings for which transcript is requested. A transcript of only a portion of a proceeding may be ordered, if the description is clearly written to facilitate processing. Under "type," indicate briefly what type of proceeding it was, such as "motion," "sentencing," or "CMC."

Item 9b.     Select desired **FORMAT(S)** for transcript. There is an additional charge for each format ordered. Visit cand.uscourts.gov/transcripts/rates for details. Unlock ECF/web access is included at no extra charge with each of the other formats.

Item 9c.     There are 7 **DELIVERY TYPES** to choose from (times are computed from date of receipt of the deposit fee or DCN number). **NOTE:** Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within 7 calendar days, the 14-day *delivery rate* would be charged.

**TRANSCRIPT DELIVERY TIMES:**
   ▪ **ORDINARY** — 30 calendar days.
   ▪ **14-DAY** — 14 calendar days.
   ▪ **EXPEDITED** — 7 calendar days.
   ▪ **3-DAY** — 3 calendar days
   ▪ **DAILY (NEXT DAY)** — Following adjournment and prior to the normal opening hour of the court on the following morning whether or not it actually is a court day.
   ▪ **HOURLY (SAME DAY)** — within two (2) hours.
   ▪ **REALTIME** — A draft unedited, uncertified transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

Item 11.     Sign in this space to certify that you will pay all charges (the deposit plus any additional charges.) An electronic or conformed (/s/) signature is acceptable.

Item 12.     Enter the date of signing the order and certification.

Case 3:20-cr-00371-WHA  Document 19  Filed 10/28/20  Page 1 of 2

**TRANSCRIPT ORDER**
Please use one form per court reporter.
*CJA counsel: please use Form CJA24*
*Please read instructions on next page.*

COURT USE ONLY
**DUE DATE:**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
CAND 435
(CAND Rev. 08/2018)

**1a.** CONTACT PERSON FOR THIS ORDER
Kathy Tat

**1b.** ATTORNEY NAME (if different)
Michael Pitman

**2a.** CONTACT PHONE NUMBER
(415) 436-6999

**2b.** ATTORNEY PHONE NUMBER
(408) 535-5040

**3.** CONTACT EMAIL ADDRESS
kathy.tat@usdoj.gov

**3.** ATTORNEY EMAIL ADDRESS
Michael.Pitman@usdoj.gov

**4.** MAILING ADDRESS (INCLUDE LAW FIRM NAME, IF APPLICABLE)
U.S. Attorney's Office
150 Almaden Blvd., Ste #900, San Jose, CA 95113

**5.** CASE NAME
US v Robert Brockman

**6.** CASE NUMBER
20-CR-00371

**7.** COURT REPORTER NAME. ( FOR FTR, LEAVE BLANK AND CHECK BOX)→ ☐ FTR
Lee-Anne Shortridge Court Reporter

**8.** THIS TRANSCRIPT ORDER IS FOR:
☐ APPEAL   ☑ CRIMINAL
☐ NON-APPEAL   ☐ CIVIL

☐ In forma pauperis (NOTE: Court order for transcripts must be attached)
CJA: Do not use this form: use Form CJA24.

**9.** TRANSCRIPT(S) REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested), format(s) & quantity and delivery type:

**a.** HEARING(S) (OR PORTIONS OF HEARINGS)

**b.** SELECT FORMAT(S) *(NOTE: ECF access is included with purchase of PDF, text, paper or condensed.)*

**c.** DELIVERY TYPE (Choose one per line)

| DATE | JUDGE (initials) | TYPE (e.g. CMC) | PORTION If requesting less than full hearing, specify portion (e.g. witness or time) | PDF (email) | TEXT/ASCII (email) | PAPER | CONDENSED (email) | ECF ACCESS (web) | ORDINARY (30day) | 14-Day | EXPEDITED (7-day) | 3-DAY | DAILY (Next day) | HOURLY (2 hrs) | REALTIME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/15/2020 | NMC | Initial | | ● | ○ | ○ | ○ | ○ | ■ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

**10.** ADDITIONAL COMMENTS, INSTRUCTIONS, QUESTIONS, ETC:

**ORDER & CERTIFICATION (11. & 12.)** By signing below, I certify that I will pay all charges (deposit plus additional).

**11.** SIGNATURE
/s/ Michael Pitman, AUSA

**12.** DATE
10/28/2020

Save as new PDF

Clear Form

CAND 435
(Rev. 08/2018)

## INSTRUCTIONS

Use this form to order the transcription of a record of proceedings. *CJA counsel should use Form CJA24.* Before completing this form, please visit cand.uscourts.gov/transcripts for complete transcript ordering information. **THESE INSTRUCTIONS SUPPLEMENT THE WEBSITE INFORMATION.**

1.  Complete a separate order form for each case number for which transcripts are ordered.

2.  Complete a separate order form for each court reporter who reported proceedings in the case.

3.  Complete Items 1-12. Keep a copy of your completed order form for your records.

4.  E-file this form in the U.S. District Court CM/ECF system. *Exceptions to e-filing:* (a) sealed cases/proceedings; (b) non-parties; (c) pro se parties who are not e-filers. In such cases, mail or hand-deliver a hard copy addressed to the court reporter supervisor (email list available at cand.uscourts.gov/transcripts/contact) at the Court division where the proceeding was held.

5.  Next, the court reporter/transcriber will contact you to confirm estimated costs and delivery options. Deliver payment to the court reporter/transcriber promptly. Upon receipt of the deposit, the court reporter/transcriber will begin work on the transcript.

6.  Unless prepayment is waived, delivery time is computed from the date the court reporter/transcriber receives the deposit, authorized CJA 24 Form, authorization from Federal Public Defender's Office or, for transcripts ordered by the U.S. government, from the date of receipt of the DCN number.

7.  The deposit fee is an estimate. Any overage will be refunded; any shortage will be due from you.

### ITEM-BY-ITEM INSTRUCTIONS (ITEMS 1-12):

Items 1-3   In fields 1a, 2a & 3a, please provide the contact name and information for the person responsible for ordering the transcript. In a law office, this is usually a paralegal or administrative assistant, not the attorney. In fields 1b, 2b & 3b, provide the attorney name and contact info, if the attorney is not the contact person.

Items 5-6.  Only one case number may be listed per order.

Item 7.     Visit cand.uscourts.gov/transcripts for instructions for determining the name of the court reporter who reported the proceeding or if the proceeding was audio-recorded. If minutes have not been filed, contact the court reporter supervisor at the division where the hearing was held.

Item 8.     Check appeal OR non-appeal AND criminal OR civil. *In forma pauperis:* a court order specifically authorizing transcripts is required before transcripts may be ordered *in forma pauperis*.

Item 9a.    List specific date(s) of the proceedings for which transcript is requested. A transcript of only a portion of a proceeding may be ordered, if the description is clearly written to facilitate processing. Under "type," indicate briefly what type of proceeding it was, such as "motion," "sentencing," or "CMC."

Item 9b.    Select desired **FORMAT(S)** for transcript. There is an additional charge for each format ordered. Visit cand.uscourts.gov/transcripts/rates for details. Unlock ECF/web access is included at no extra charge with each of the other formats.

Item 9c.    There are 7 **DELIVERY TYPES** to choose from (times are computed from date of receipt of the deposit fee or DCN number). **NOTE:** Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within 7 calendar days, the 14-day *delivery* rate would be charged.

**TRANSCRIPT DELIVERY TIMES:**

- ORDINARY — 30 calendar days.
- 14-DAY — 14 calendar days.
- EXPEDITED — 7 calendar days.
- 3-DAY — 3 calendar days
- DAILY (NEXT DAY) — Following adjournment and prior to the normal opening hour of the court on the following morning whether or not it actually is a court day.
- HOURLY (SAME DAY) — within two (2) hours.
- REALTIME — A draft unedited, uncertified transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

Item 11.    Sign in this space to certify that you will pay all charges (the deposit plus any additional charges.) An electronic or conformed (/s/) signature is acceptable.

Item 12.    Enter the date of signing the order and certification.

Case 3:20-cr-00371-WHA   Document 20   Filed 10/29/20   Page 1 of 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
(CAND 435)
(CAND Rev. 08/2018)

**TRANSCRIPT ORDER**
Please use one form per court reporter.
CJA counsel please use Form CJA24
Please read instructions on next page.

COURT USE ONLY
**DUE DATE:**

1a. CONTACT PERSON FOR THIS ORDER
DAVID VONKROS

1b. ATTORNEY NAME (if different)

2a. CONTACT PHONE NUMBER
201 417-8444

2b. ATTORNEY PHONE NUMBER

3. CONTACT EMAIL ADDRESS
DVONKROSQ BLOOMBERG.NET

3. ATTORNEY EMAIL ADDRESS

4. MAILING ADDRESS (INCLUDE LAW FIRM NAME, IF APPLICABLE)
731 LEXINGTON AVE
NEW YORK, NY 10022

5. CASE NAME
USA V. Brockman

6. CASE NUMBER
20cr371

7. COURT REPORTER NAME (FOR FTR, LEAVE BLANK AND CHECK BOX)→ ☐ FTR
LEE-ANNE SHORTRIDGE

8. THIS TRANSCRIPT ORDER IS FOR:
☐ APPEAL        ☑ CRIMINAL
☐ NON-APPEAL    ☐ CIVIL
☐ In forma pauperis (NOTE: Court order for transcripts must be attached)
CJA - Do not use this form; use Form CJA24

9. TRANSCRIPT(S) REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested), format(s) & quantity and delivery type

a. HEARING(S) (OR PORTIONS OF HEARINGS)

b. SELECT FORMAT(S) (NOTE: ECF access is included with purchase of PDF, text, paper or condensed.)

c. DELIVERY TYPE (Choose one per line)

| DATE | JUDGE (initials) | TYPE (e.g. CMC) | PORTION If requesting less than full hearing, specify portion (e.g. witness or time) | PDF (email) | TEXT/ASCII (email) | PAPER | CONDENSED (email) | ECF ACCESS (web) | ORDINARY (30-day) | 14-Day | EXPEDITED (7-day) | 3-DAY | DAILY (Next day) | HOURLY (2 hrs) | REALTIME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/15/20 | WHA | | ENTIRE TRANSCRIPT | ✺ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

10. ADDITIONAL COMMENTS, INSTRUCTIONS, QUESTIONS, ETC.
I WOULD LIKE TO ORDER THE 33-PAGE TRANSCRIPT FOR THE 10/15/20 HEARING. I UNDERSTAND THE COST IS $39.90. I WILL MAIL A CHECK.

ORDER & CERTIFICATION (11 & 12) By signing below, I certify that I will pay all charges (deposit plus additional).

11. SIGNATURE

12. DATE
10/28/20

Save as new PDF

Clear Form

1  Neal J. Stephens (State Bar No. 152071)
   JONES DAY
2  1755 Embarcadero Road
   Palo Alto, CA 94303
3  Telephone:    +1.650.739.3939
   Facsimile:    +1.650.739.3900
4  nstephens@jonesday.com

5  Attorney for Defendant
   ROBERT T. BROCKMAN
6

7

8                UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                SAN FRANCISCO DIVISION

11

12  UNITED STATES OF AMERICA,            Case No.: 3:20-cr-00371-WHA

13            Plaintiff,                 DEFENDANT ROBERT
                                         BROCKMAN'S NOTICE OF MOTION
14        v.                             AND MOTION FOR CHANGE OF
                                         VENUE ON COUNTS TWO THROUGH
15  ROBERT T. BROCKMAN,                  EIGHT

16            Defendant.                 Date:      November 17, 2020
                                         Time:      2:00 p.m.
17                                       Judge:     Hon. William Alsup

18

19              __NOTICE OF MOTION AND MOTION__

20        PLEASE TAKE NOTICE THAT on November 17, 2020, at 2:00 p.m., or as soon

21  thereafter as the matter may be heard, in the courtroom of the Honorable William Alsup, located

22  at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Robert Brockman will,

23  and hereby does, respectfully move pursuant to 18 U.S.C. § 3237(b) and Fed. R. Crim. P. 7(c)(1)

24  and (f) to transfer venue for Counts Two through Eight of the Indictment to the United States

25  District Court for the Southern District of Texas, or in the alternative for a bill of particulars

26  relating to the venue motion.

27        This motion is based on the attached memorandum of points and authorities.

28

                                                      Defendant Robert Brockman's Motion
                          - 1 -                                  for Change of Venue

1   Dated: November 2, 2020                     Respectfully submitted,

2                                               JONES DAY

3

4                                               *s/ Neal J. Stephens*
                                                _____
5                                               NEAL J. STEPHENS

6                                               Counsel for Defendant ROBERT T.
                                                BROCKMAN
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        Defendant Robert Brockman's Motion
                                                for Change of Venue

**MOTION FOR CHANGE OF VENUE**

Pursuant to 18 U.S.C. § 3237(b) and Fed. R. Crim. P. 7(c)(1) and (f), Robert Brockman respectfully moves this Court to transfer venue for Counts Two through Eight of the Indictment, charging tax evasion in violation of 26 U.S.C. § 7201, to the United States District Court for the Southern District of Texas, or in the alternative, for a bill of particulars necessary to fully litigate this motion. The Indictment fails to state the basis for venue in this District for Counts Two through Eight, and instead merely repeats conclusory allegations. Because § 3237(b) requires that this motion be "filed within twenty days after arraignment of the defendant upon indictment or information," Mr. Brockman files this Motion to preserve his statutory right for change of venue.[1] For the reasons stated below, the Motion should be granted on the face of the Indictment, or in the alternative, this Court should order that the government file a bill of particulars alleging the basis for venue in this District for Counts Two through Eight, so as to allow full argument under 18 U.S.C. § 3237(b). Defense counsel met and conferred with government counsel, who opposes the relief sought in this motion.

**I.     INTRODUCTION**

On October 1, 2020, the Indictment in this case was filed under seal in the United States District Court for the Northern District of California. Among other charges, the Indictment alleges that Mr. Brockman committed tax evasion in violation of 26 U.S.C. § 7201. Counts Two through Eight of the Indictment allege that Mr. Brockman committed tax evasion by "preparing and causing to be prepared, and signing and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form 1040" for 2012 through 2018. The Indictment alleges that these tax returns were then submitted to the IRS, but is silent as to where they were filed and received by the IRS. Ind. ¶¶ 136–48 (ECF No. 1). Mr. Brockman's initial appearance and arraignment were held before Judge Nathanael Cousins on October 15, 2020, and he entered a plea of not guilty to all charges. (ECF No. 9.)

---

[1] By moving to transfer venue pursuant to 18 U.S.C. § 3237(b) at this time to meet the statutory deadline, Mr. Brockman does not waive any other arguments regarding venue, a further bill of particulars, or other motions that Mr. Brockman intends to make on a schedule to be set by the Court. To the contrary, among other motions, the defense anticipates filing a prompt motion pursuant to Rules 12, 18, 21(a) and (b) for transfer of the entire case to the Southern District of Texas for several reasons, including Mr. Brockman's serious health issues.

Defendant Robert Brockman's Motion
for Change of Venue

1   Mr. Brockman has been a resident of Houston for over forty years, including during the

2   time of the alleged offenses described in Counts Two through Eight of the Indictment.  See Ind.

3   ¶ 1.[2]  Mr. Brockman has never resided in this District.  Under 18 U.S.C. § 3237(b), Mr. Brockman

4   is entitled to transfer Counts Two through Eight to the Southern District of Texas.

5   **II.    ARGUMENT**

6   The Constitution requires that venue for a criminal trial shall be in the state and district

7   where the offense was committed.  U.S. Const. Art. III, § 2, cl. 3; U.S. Const. Amend. VI; *see*

8   *also* Fed. R. Crim. P. 18.  "The burden of establishing proper venue by a preponderance of the

9   evidence rests with the government."  *United States v. Chi Tong Kuok*, 671 F.3d 931, 937 (9th

10  Cir. 2012) (citation omitted).

11  When an offense against the United States is "begun in one district and completed in

12  another, or committed in more than one district," the government has discretion to prosecute the

13  offense "in any district in which such offense was begun, continued, or completed."  18 U.S.C.

14  § 3237(a).  However, alleged violations of 26 U.S.C. § 7201, such as those set out in Counts Two

15  through Eight, are excepted from this discretionary choice of venue for alleged continuing

16  offenses.  Section 3237(b) provides:

17  
18          Notwithstanding subsection (a), where venue for prosecution of an
        offense described in section 7201 [of the Internal Revenue
        Code]. . . is based solely on a mailing to the Internal Revenue
19          Service, and prosecution is begun in a judicial district other than the
        judicial district in which the defendant resides, he may upon motion
        filed in the district in which the prosecution is begun, elect to be
20          tried in ***the district in which he was residing at the time the alleged
        offense was committed***[.]
21  

22  18 U.S.C. § 3237(b) (emphasis added).

23  The purpose of Section 3237(b) is to prevent the IRS from compelling a taxpayer to face

24  charges far from his home district.  *See, e.g., United States v. U.S. Dist. Court for S. Dist. of*

25  *California*, 693 F.2d 68, 69 (9th Cir. 1982) (explaining that the purpose of § 3237(b) is "to

26  prevent government abuse of such situations, where the prosecution was brought in a district far

27  

28  
    [2] The Indictment also alleges that Mr. Brockman is a resident of Pitkin County, Colorado, which is
immaterial to this Motion.  *See* Ind. ¶ 1.

Defendant Robert Brockman's Motion
for Change of Venue

- 4 -

1   from the taxpayer's home simply because of the location of the IRS office."); *see also United*

2   *States v. Melvan*, 676 F. Supp. 997, 999 (C.D. Cal. 1987). In addition, it is also the policy of the

3   Department of Justice "generally to attempt to establish venue for a criminal tax prosecution in

4   the judicial district of the taxpayer's residence or principal place of business[.]" U.S. Dep't of

5   Justice, Criminal Tax Manual § 6.01[2] (2012).

6           Section 3237(b) prescribes a statutory deadline for a defendant to move to transfer venue

7   on this ground, providing that such a motion "must be filed within twenty days after arraignment

8   of the defendant upon indictment or information." *Id.* By its plain terms, § 3237(b) "provides

9   defendants with an absolute right to transfer tax offenses to their home district." *United States v.*

10  *Nathanson*, 813 F. Supp. 1433, 1436 (E.D. Cal. 1993); *see also United States v. Ostrer*, 458 F.

11  Supp. 540, 541 (S.D.N.Y. 1978) (explaining that § 3237(b) has "been interpreted to give

12  defendants charged with the enumerated offenses an absolute right to have the charges tried in the

13  district of their residence"). Counts Two through Eight allege that Mr. Brockman committed tax

14  evasion in violation of 26 U.S.C. § 7201, an offense specifically enumerated in § 3237(b) and

15  thus eligible for transfer. *See* Ind. ¶¶ 136–48. The government elected to prosecute this case in

16  the Northern District of California, but Mr. Brockman has lived in Houston since at least 1981,

17  including during the time of the alleged offenses described in Counts Two through Eight. *See*

18  *United States v. Scott*, 472 F. Supp. 1073, 1077 (N.D. Ill. 1979), *aff'd*, 618 F.2d 109 (7th Cir.

19  1980) (determining residence for § 3237(b) motion based on factors such as defendant's present

20  residence with wife and residence at the time of alleged offenses, among other factors).

21          In Counts Two through Eight, the Indictment repeats boilerplate allegations that Mr.

22  Brockman is responsible for "preparing and causing to be prepared, and signing and causing to be

23  signed," false and fraudulent tax returns that were submitted to the IRS. In addition, the

24  Indictment *does not* allege the basis for venue in this District. Ind. ¶¶ 136–48. The Indictment

25  does not allege that Mr. Brockman mailed these returns in this District, or set out that he caused

26  the returns to be filed in this District, or that the IRS received the returns in this District.[3] On the

27

28      [3] "An allegation of the use of the mails in the indictment is not a condition to the invocation of § 3237(b)."
*United States v. Youse*, 387 F. Supp. 132, 134 (E.D. Wis. 1975); *see also United States v. Turkish*, 458 F. Supp. 874,
878 n.5 (S.D.N.Y. 1978) (rejecting the government's argument that § 3237(b) motion be denied because "the

Defendant Robert Brockman's Motion
for Change of Venue

- 5 -

1    contrary, the Indictment fails to allege where any of these actions occurred. Such information is

2    key to whether or not venue is proper in this District, and whether Mr. Brockman has a statutory

3    right to invoke Section 3237(b).

4        Mr. Brockman brings this motion at this time to preserve his statutory right to transfer.

5    Mr. Brockman's arraignment was held on October 15, 2020, and § 3237(b)'s statutory deadline

6    for transfer is unqualified. *See United States v. Snipes*, 611 F.3d 855, 864 (11th Cir. 2010)

7    ("Section 3237(b)'s twenty-day statutory deadline for an elective transfer is unambiguous and

8    unqualified.").

9    **III.    CONCLUSION**

10        For the foregoing reasons, Mr. Brockman respectfully requests that this Court (i) transfer

11    Counts Two through Eight of the Indictment to the United States District Court for the Southern

12    District of Texas, or (ii) in the alternative, order a bill of particulars as to the allegation of venue

13    for Counts Two through Eight, and allow further argument of this motion on the basis of such

14    particulars.

15    Dated: November 2, 2020                    Respectfully submitted,

16                                              JONES DAY

17

18                                              *s/ Neal J. Stephens*
                                                NEAL J. STEPHENS
19
                                                Counsel for Defendant ROBERT T.
20                                              BROCKMAN

21

22

23

24

25

26

27

28    indictment does not allege any use of the mails and defendants have not submitted affidavits indicating that the mails
      were used to commit the crime with which they are charged").

Defendant Robert Brockman's Motion
for Change of Venue

# CERTIFICATE OF SERVICE

I, Mari Reyes, declare:

I am a citizen of the United States and employed in Santa Clara County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is Silicon Valley Office, 1755 Embarcadero Road, Palo Alto, California 94303. On November 2, 2020, I served a copy of the Defendant Robert Brockman's Notice Of Motion and Motion for Change of Venue on Counts Two Through Eight by electronic transmission.

I am familiar with the USDC Northern District's Civil Local Rules 5-1 and 5-5. Under those rules, documents are electronically filed with the court. The court's CM/ECF system will generate a Notice of Electronic Filing (NEF) to the filing party, the assigned judge, and any registered users in the case. The NEF will constitute service of the document. Registration as a CM/ECF user constitutes consent to electronic service through the court's transmission facilities.

To the extent government counsel is not registered in the court's CM/ECF system, I further provided an electronic copy of this document on counsel, as listed below, via electronic mail:

| Attorney | Email Address |
|---|---|
| Michael G. Pitman | Michael.pitman@usdoj.gov |
| Corey J. Smith | Corey.smith@usdoj.gov |
| Lee F. Langston | Lee.f.langston@usdoj.gov |
| Christopher M. Magnani | Christopher.magnani@usdoj.gov |

Executed on November 2, 2020, at Palo Alto, California.

*/s/ Mari Reyes*_____
Mari Reyes

NAI-1514836240v4

Defendant Robert Brockman's Motion
for Change of Venue

Neal J. Stephens (State Bar No. 152071)
nstephens@jonesday.com
JONES DAY
Silicon Valley Office
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone: +1.650.739.3939
Facsimile: +1.650.739.3900

Attorneys for Defendant
ROBERT T. BROCKMAN

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:20-cr-00371-WHA |
| Plaintiff, | **[PROPOSED] ORDER GRANTING DEFENDANT ROBERT BROCKMAN'S MOTION FOR CHANGE OF VENUE ON COUNTS TWO THROUGH EIGHT** |
| v. | |
| ROBERT T. BROCKMAN, | |
| Defendant. | Date:      November 17, 2020 |
| | Time:      2:00 p.m. |
| | Judge:     Hon. William Alsup |

1         Having considered Defendant Robert Brockman's Motion for Change of Venue on Counts

2  Two through Eight, other documents in support of and in opposition to the motion and in the

3  record in this matter, the arguments of counsel at the hearing on the motion, and good cause

4  appearing therefore,

5         Mr. Brockman's Motion for Change of Venue on Counts Two through Eight is

6  **GRANTED**.  As of the date of this order, Counts Two through Eight are transferred to the United

7  States District Court for the Southern District of Texas.

8         **IT IS SO ORDERED.**

9  DATED: _____

10

11                          By: _____

12                              HONORABLE WILLIAM ALSUP
                                 United States District Court Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[Proposed] Order Granting Defendant Robert
Brockman's Motion for Change of Venue

1     **CERTIFICATE OF SERVICE**

2          I, Mari Reyes, declare:

3          I am a citizen of the United States and employed in Santa Clara County, California.  I am

4     over the age of eighteen years and not a party to the within-entitled action.  My business address

5     is Silicon Valley Office, 1755 Embarcadero Road, Palo Alto, California 94303.  On November 2,

6     2020, I served a copy of the Defendant Robert Brockman's [Proposed] Order Granting Defendant

7     Robert Brockman's Motion for Change of Venue by electronic transmission.

8          I am familiar with the USDC Northern District's Civil Local Rules 5-1 and 5-5.  Under

9     those rules, documents are electronically filed with the court.  The court's CM/ECF system will

10    generate a Notice of Electronic Filing (NEF) to the filing party, the assigned judge, and any

11    registered users in the case.  The NEF will constitute service of the document.  Registration as a

12    CM/ECF user constitutes consent to electronic service through the court's transmission facilities.

13         To the extent government counsel is not registered in the court's CM/ECF system, I

14    further provided an electronic copy of this document on counsel, as listed below, via electronic

15    mail:

16

| Attorney | Email Address |
|---|---|
| Michael G. Pitman | Michael.pitman@usdoj.gov |
| Corey J. Smith | Corey.smith@usdoj.gov |
| Lee F. Langston | Lee.f.langston@usdoj.gov |
| Christopher M. Magnani | Christopher.magnani@usdoj.gov |

21         Executed on November 2, 2020, at Palo Alto, California.

22                                                    */s/ Mari Reyes*_____
23                                                    Mari Reyes

24    NAI-1514844769v1

25

26

27

28

- 3 -

[Proposed] Order Granting Defendant Robert
Brockman's Motion for Change of Venue

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
CAND 435
(CAND Rev. 08/2018)

**TRANSCRIPT ORDER**
Please use one form per court reporter.
*CJA counsel please use Form CJA24*
*Please read instructions on next page.*

COURT USE ONLY
**DUE DATE:**

1a. CONTACT PERSON FOR THIS ORDER
Francois Pilet

2a. CONTACT PHONE NUMBER
+41794745422

3. CONTACT EMAIL ADDRESS
francois@gothamcity.ch

1b. ATTORNEY NAME (if different)

2b. ATTORNEY PHONE NUMBER

3. ATTORNEY EMAIL ADDRESS

4. MAILING ADDRESS (INCLUDE LAW FIRM NAME, IF APPLICABLE)
Av. C.-F. Ramuz 53
CH-1009 Pully
Switzerland

5. CASE NAME
United States v. Brockman

6. CASE NUMBER
20-cr-371

8. THIS TRANSCRIPT ORDER IS FOR:
☐ APPEAL   ☑ CRIMINAL   ☐ In forma pauperis (NOTE: Court order for transcripts must be attached)
☐ NON-APPEAL   ☐ CIVIL   CJA: **Do not use this form; use Form CJA24.**

7. COURT REPORTER NAME, ( FOR FTR, LEAVE BLANK AND CHECK BOX)→ ☐ FTR
Lee-Anne Shortridge

9. TRANSCRIPT(S) REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested), format(s) & quantity and delivery type:

a. HEARING(S) (OR PORTIONS OF HEARINGS)
b. SELECT FORMAT(S) *(NOTE: ECF access is included with purchase of PDF, text, paper or condensed.)*
c. DELIVERY TYPE (Choose one per line)

| DATE | JUDGE (initials) | TYPE (e.g. CMC) | PORTION If requesting less than full hearing, specify portion (e.g. witness or time) | PDF (email) | TEXT/ASCII (email) | PAPER | CONDENSED (email) | ECF ACCESS (web) | ORDINARY (30day) | 14-Day | EXPEDITED (7-day) | 3-DAY | DAILY (Next day) | HOURLY (2 hrs) | REALTIME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/15/20 | NC | arraignm | full | ● | O | O | O | O | O | O | O | O | O | O | O |
|  |  |  |  | O | O | O | O | O | O | O | O | O | O | O | O |
|  |  |  |  | O | O | O | O | O | O | O | O | O | O | O | O |
|  |  |  |  | O | O | O | O | O | O | O | O | O | O | O | O |
|  |  |  |  | O | O | O | O | O | O | O | O | O | O | O | O |
|  |  |  |  | O | O | O | O | O | O | O | O | O | O | O | O |

10. ADDITIONAL COMMENTS, INSTRUCTIONS, QUESTIONS, ETC:

ORDER & CERTIFICATION (11. & 12.) By signing below, I certify that I will pay all charges (deposit plus additional).

11. SIGNATURE  Francois Pilet

12. DATE
11/3/20

Save as new PDF

Clear Form

CAND 435
(Rev. 08/2018)

Case 3:20-cr-00371-WHA   Document 22   Filed 11/03/20   Page 2 of 2

# INSTRUCTIONS

Use this form to order the transcription of a record of proceedings. *CJA counsel should use Form CJA24.* Before completing this form, please visit cand.uscourts.gov/transcripts for complete transcript ordering information. **THESE INSTRUCTIONS SUPPLEMENT THE WEBSITE INFORMATION.**

1. Complete a separate order form for each case number for which transcripts are ordered.
2. Complete a separate order form for each court reporter who reported proceedings in the case.
3. Complete Items 1-12. Keep a copy of your completed order form for your records.
4. E-file this form in the U.S. District Court CM/ECF system. *Exceptions to e-filing:* (a) sealed cases/proceedings; (b) non-parties; (c) pro se parties who are not e-filers. In such cases, mail or hand-deliver a hard copy addressed to the court reporter supervisor (email list available at cand.uscourts.gov/transcripts/contact) at the Court division where the proceeding was held.
5. Next, the court reporter/transcriber will contact you to confirm estimated costs and delivery options. Deliver payment to the court reporter/transcriber promptly. Upon receipt of the deposit, the court reporter/transcriber will begin work on the transcript.
6. Unless prepayment is waived, delivery time is computed from the date the court reporter/transcriber receives the deposit, authorized CJA 24 Form, authorization from Federal Public Defender's Office or, for transcripts ordered by the U.S. government, from the date of receipt of the DCN number.
7. The deposit fee is an estimate. Any overage will be refunded; any shortage will be due from you.

## ITEM-BY-ITEM INSTRUCTIONS (ITEMS 1-12):

| | |
|---|---|
| Items 1-3 | In fields 1a, 2a & 3a, please provide the contact name and information for the person responsible for ordering the transcript. In a law office, this is usually a paralegal or administrative assistant, not the attorney. In fields 1b, 2b & 3b, provide the attorney name and contact info, if the attorney is not the contact person. |
| Items 5-6. | Only one case number may be listed per order. |
| Item 7. | Visit cand.uscourts.gov/transcripts for instructions for determining the name of the court reporter who reported the proceeding or if the proceeding was audio-recorded. If minutes have not been filed, contact the court reporter supervisor at the division where the hearing was held. |
| Item 8. | Check appeal OR non-appeal AND criminal OR civil. *In forma pauperis:* a court order specifically authorizing transcripts is required before transcripts may be ordered *in forma pauperis.* |
| Item 9a. | List specific date(s) of the proceedings for which transcript is requested. A transcript of only a portion of a proceeding may be ordered, if the description is clearly written to facilitate processing. Under "type," indicate briefly what type of proceeding it was, such as "motion," "sentencing," or "CMC." |
| Item 9b. | Select desired **FORMAT(S)** for transcript. There is an additional charge for each format ordered. Visit cand.uscourts.gov/transcripts/rates for details. Unlock ECF/web access is included at no extra charge with each of the other formats. |
| Item 9c. | There are 7 **DELIVERY TYPES** to choose from (times are computed from date of receipt of the deposit fee or DCN number). **NOTE:** Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within 7 calendar days, the 14-day *delivery* rate would be charged. |

**TRANSCRIPT DELIVERY TIMES:**

- **ORDINARY** — 30 calendar days.
- **14-DAY** — 14 calendar days.
- **EXPEDITED** — 7 calendar days.
- **3-DAY** — 3 calendar days
- **DAILY (NEXT DAY)** — Following adjournment and prior to the normal opening hour of the court on the following morning whether or not it actually is a court day.
- **HOURLY (SAME DAY)** — within two (2) hours.
- **REALTIME** — A draft unedited, uncertified transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

| | |
|---|---|
| Item 11. | Sign in this space to certify that you will pay all charges (the deposit plus any additional charges.) An electronic or conformed (/s/) signature is acceptable. |
| Item 12. | Enter the date of signing the order and certification. |

1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney

2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  MICHAEL G. PITMAN (DCBN 484164)
   Assistant United States Attorney
5  150 Almaden Boulevard, Suite 900
   San Jose, California 95113
6  Telephone: (408) 535-5040
   Facsimile:  (408) 535-5081
7  michael.pitman@usdoj.gov

8  COREY J. SMITH (MABN 553615)
   Senior Litigation Counsel
9  LEE F. LANGSTON (NYBN 4910311)
   CHRISTOPHER M. MAGNANI (Maryland)
10 Trial Attorneys
   United States Department of Justice, Tax Division

11

12 Attorneys for the United States of America

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15                SAN FRANCISCO DIVISION

16 UNITED STATES OF AMERICA,            Case No.: 3:20-cr-00371-WHA

17         Plaintiff,                   UNITED STATES' OPPOSITION TO
                                        DEFENDANT'S MOTION FOR CHANGE
18    v.                               OF VENUE ON COUNTS TWO THROUGH EIGHT
                                        AND IN THE ALTERNATIVE, BILL OF
19 ROBERT T. BROCKMAN,                  PARTICULARS

20         Defendant.                   Date:    December 1, 2020
                                        Time:    12:00 PM
21

22

23         The United States opposes Defendant's Motion for Change of Venue on Counts Two through

24 Eight and, alternatively, for a Bill of Particulars.  (ECF No. 21) (the "Motion").

25         Venue

26         Defendant moves to transfer the tax evasion counts to his home district under 18 U.S.C.

27 § 3237(b).  This statute, however, is inapplicable to this Indictment.  Section 3237(b) only applies to tax

28
   UNITED STATES' OPPOSITION TO DEFENDANT'S          1
   MOTION FOR CHANGE OF VENUE ON COUNTS TWO
   THROUGH EIGHT
   Case No.: 3:20-CR-00371-WHA

1    evasion charges when venue "is based solely on a mailing to the Internal Revenue Service." 18 U.S.C.

2    § 3237(b). Venue in this case is not based on mailings to the IRS—it could not be, as Defendant's tax

3    returns were not mailed to the Northern District of California.

4    The statute at issue, 18 U.S.C. § 3237(b), was passed in 1958 to prevent the government from

5    charging defendants far from their homes "simply because of the location of the IRS office."[1,2] *United*

6    *States v. U.S. Dist. Court for the S. Dist. Of California*, 693 F.2d 68, 69 (9th Cir. 1982). The original

7    language, however, was so broad that it required transfer even in circumstances that were not intended

8    by Congress. *See, e.g.*, *id.* at 69-70.[3] The Ninth Circuit acknowledged as much, noting that "[i]f the

9    result in this case is disturbing . . . application for the amendment of the statute must be made to

10   Congress, not to this Court." *Id.* at 70-71. In 1984, Congress amended the statute to the language that

11   exists today, clarifying that relief under Section 3237(b) in tax evasion prosecutions applies only when

12   venue is based *solely* on mailings sent to the IRS. *Melvan*, 676 F. Supp. at 1001.

13   Generally, venue is proper in any judicial district in which a criminal offense "was begun,

14   continued, or [was] completed." 18 U.S.C. § 3237(a); *see also United States v. Ruelas-Arreguin*, 219

15   F.3d 1056, 1060 (9th Cir. 2000). It is generally recognized that the crime of tax evasion is a "continuing

16   offense" which can span many judicial districts. *See United States v. Sluts*ky, 487 F.2d 832, 839 (2d Cir.

17   1973); *United States v. Yagman*, 2007 WL 9724388, at *15-18 (C.D. Cal. May 3, 2007) (affirmative acts

18   in CDCA provide venue for tax evasion scheme involving several Districts). *See also United States v.*

19   *Bridges*, 2003 WL 27386843, at *1-2 (W.D. Wa. Feb. 28 2003) (Section 3237(b) provides no basis to

20   transfer of venue in national tax evasion scheme where venue not based on mailing of tax returns but

21   upon financial transactions within WDWA conducted by defendants).

22   Venue need only be proved by a preponderance of the evidence. *See United States v.*

23   *Maldonado-Rivera*, 922 F.2d 934, 968 (2d Cir. 1990); *United States v. Jones,* 231 F.3d 508, 516 (9th

24

25   ───────────────

26   [1] The concern is hardly trivial. Consider, for example, that a Rhode Island taxpayer wishing to mail a
     standard U.S. Individual Income Tax Return, Form 1040, must mail the return to Utah or Kentucky. *See*
     https://www.irs.gov/filing/where-to-file-addresses-for-taxpayers-and-tax-professionals-filing-form-1040

27   [2] *In re United States (Clemente)*, 608 F.2d 76, 79-80 (2d Cir. 1979) describes the legislative history.

28   [3] *United States v. Melvan*, 676 F. Supp. 997, 999-1000 (C.D. Cal. 1987) recounts other examples.

Cir. 2000).  Direct proof of venue is not necessary where circumstantial evidence in the record, as a whole, supports the inference that the crime was committed in the district where venue was laid.  *See Jones*, 231 F.3d at 516.

Defendant is charged in Counts 2 – 8 with tax evasion, in violation of 26 U.S.C. § 7201, for the tax years 2012 – 2018.  The Indictment incorporates by reference paragraphs 1 through 134 of Count 1 into Counts 2 – 8, and specifically identifies and incorporates paragraphs 43 through 134 of Count 1 as *affirmative acts of evasion* in each of the Counts 2 – 8.   Paragraphs 1 through 134 of Count 1 describe an elaborate scheme, implemented and controlled by Defendant, to invest capital with Vista Equity Funds, headquartered here in the Northern District of California, to conceal these investments under the nominee name of the Bermuda company Point Investments, and distribute gains earned from these investments to bank accounts in Switzerland; all without reporting any of these gains to the IRS, or paying any income tax on them.

The gravamen of these allegations is that the income earned from these investments was in reality, "owned and controlled" by Defendant, and taxable to him.   The Indictment alleges that Defendant, either directly or through agents, assigns or employees, directed, or caused to be directed, this investment activity with Vista over an eighteen year period, and specifically directed that the gains from these investments be distributed to the Point bank accounts in Switzerland, which he unilaterally controlled.[4]  This scheme, involving the investment of hundreds of millions of dollars under Defendant's control, was international in scope, and had significant ongoing contacts with the Northern District of California; arguably the most significant contacts were with this District.  Vista, here in the Northern District of California, was the source of the unreported income which is the foundation of Counts 1 – 8 of the Indictment.  From 2000 through 2018 Defendant had continued and frequent contact with this District as he, through his agents and employees, managed and controlled his investments with Vista.  But for Defendant's direction to Vista regarding these investments, including the distribution and concealment of unreported income in this scheme, the alleged crime of tax evasion would not have been

---

[4] The government directs the Court to Count 1, paragraphs 39, 40, 71, 72, 74, 80, 91, 85-87, 97,98, 100, 102, 104-106.

UNITED STATES' OPPOSITION TO DEFENDANT'S
MOTION FOR CHANGE OF VENUE ON COUNTS TWO
THROUGH EIGHT
Case No.: 3:20-CR-00371-WHA

3

completed.  The crime with which Defendant has been charged clearly "went through" this District. The alleged affirmative acts contained in the Indictment, committed within the Northern District of California, satisfy statutory venue under Section 3237(a).

Accordingly, venue here is not *solely* based on mailings sent to the IRS, as the gating question to application of Section 3237(b).  Instead, venue is based on Defendant's investment activity with Vista, and his directions to Vista regarding the distribution of unreported income, which the Indictment alleges is taxable to Defendant.  The government expects that evidence of these contacts will include testimony, emails, and other correspondence.  Since Defendant did not mail any of his income tax returns to the Northern District of California, Section 3237(b) is inapplicable to this case and Defendant's Motion must be denied.

<u>Motion for Bill of Particulars</u>

Defendant alternatively seeks a Bill of Particulars, which the Motion claims is "necessary to fully litigate this motion."  Given the detail contained within the Indictment a Bill of Particulars is unnecessary.   The purpose of a Bill of Particulars is to provide Defendant with information regarding the specific charges against him necessary to the preparation of his defense, to avoid or minimize the danger of surprise at trial, and to protect against double jeopardy.  *See United States v. Ayers*, 924 F.2d 1468, 1483-84 (9th Cir. 1991).  The power to grant a Bill of Particulars is within the discretionary power of the court.  *See United States v. Hartlerode*, 467 F.2d 1280, 1282 (9th Cir. 1972).  When the language of the Indictment itself provides this information, a Bill of Particulars is not required.  *See United States v. Robertson*, 15 F.3d 862, 873-74 (9th Cir. 1994), *rev'd on other grounds*, 514 U.S. 669 (1995).

Furthermore, a Bill of Particulars is not a tool for a defendant "to obtain a detailed disclosure of the government's evidence prior to trial."  *See United States v. Kilrain*, 566 F.2d 979, 985 (5th Cir. 1978); *see also United States v. Ryland*, 806 F.2d 941, 942 (9th Cir. 1986) (finding that before trial a defendant "is not entitled to know all the evidence the government intends to produce but only the theory of the government's case.").  In other words, a Bill of Particulars is not to be used for generalized discovery. *See United States v. Anderson*, 799 F.2d 1438 (11th Cir. 1986).  To allow a Bill of Particulars to serve as discovery would frustrate the purposes of Federal Rule of Criminal Procedure 16.  *Id*.

UNITED STATES' OPPOSITION TO DEFENDANT'S
MOTION FOR CHANGE OF VENUE ON COUNTS TWO
THROUGH EIGHT
Case No.: 3:20-CR-00371-WHA

4

In seeking a Bill of Particulars, Defendant claims that "the Indictment repeats boilerplate allegations" that Defendant prepared and signed false tax returns. The Motion, however, ignores paragraphs 1 through 134 of the Indictment which, as stated above, are incorporated by reference into Counts 2 – 8, and, which describe a complex scheme to control and conceal approximately $2 billion in capital gains income Defendant earned from his investments in Vista. The detail contained within paragraphs 1 through 134 of the Indictment is more than sufficient to notify Defendant of the details of the allegations against him, and prepare his defense. Moreover, discovery in this case will very voluminous, containing internal financial data from Vista and Defendant's nominee entities, including hundreds of emails, which will further illuminate the details of these charges.

The Motion should be denied in its entirety.

Respectfully submitted,

Date: November 9, 2020

DAVID L. ANDERSON
United States Attorney

*/s/Corey J. Smith*
Senior Litigation Counsel
MICHAEL G. PITMAN
Assistant United States Attorney

Attorneys for United States of America

UNITED STATES' OPPOSITION TO DEFENDANT'S
MOTION FOR CHANGE OF VENUE ON COUNTS TWO
THROUGH EIGHT
Case No.: 3:20-CR-00371-WHA

5

CERTIFICATE OF SERVICE

It is hereby certified that service of the foregoing UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR CHANGE OF VENUE ON COUNTS TWO THROUGH EIGHT has been made this day through the Court's ECF system to Defendant's attorneys of record.


Date:   November 9, 2020

*s/ Corey J. Smith*
Senior Litigation Counsel
United States Department of Justice,
Tax Division
Corey.Smith@usdoj.gov
(202)514-5230

1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney

2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  MICHAEL G. PITMAN (DCBN 484164)
   Assistant United States Attorney
5  150 Almaden Boulevard, Suite 900
   San Jose, California 95113
6  Telephone: (408) 535-5040
   Facsimile:  (408) 535-5081
7  michael.pitman@usdoj.gov

8  COREY J. SMITH (MABN 553615)
   Senior Litigation Counsel
9  LEE F. LANGSTON (NYBN 4910311)
   CHRISTOPHER M. MAGNANI (Maryland)
10 Trial Attorneys
   United States Department of Justice, Tax Division
11
   Attorneys for the United States of America
12
                    UNITED STATES DISTRICT COURT
13
                   NORTHERN DISTRICT OF CALIFORNIA
14
                      SAN FRANCISCO DIVISION
15

16 | UNITED STATES OF AMERICA, | Criminal No. 3:20-cr-00371-WHA |
|---|---|
17 | Plaintiff, | UNITED STATES' MOTION FOR PROTECTIVE ORDER AND AN ORDER |
18 | v. | AUTHORIZING DISCLOSURE OF TAXPAYER RETURN INFORMATION AND |
19 | ROBERT T. BROCKMAN, | [PROPOSED] PROTECTIVE ORDER |
20 | Defendant. | Hearing.:        11/17/2020 |
21 |  | Time:            2:00 PM Place:           Courtroom 12 |

22

23         The United States of America, by and through its counsel of record, pursuant to Fed R. Crim. P

24 16(d), hereby respectfully moves the Court for a Protective Order regarding discovery in this case,

25 incorporating an Order permitting the government to disclose third party tax return information pursuant

26 to 26 U.S.C. § 6103(h)(4)(D), in order for the government to comply with its obligations pursuant to 18

27 U.S.C. § 3500, Rule 16 of the Federal Rules of Criminal Procedure, and *Brady v. Maryland* and its

28

UNITED STATES' MOTION FOR PROTECTIVE ORDER
AND AN ORDER AUTHORIZING DISCLOSURE OF
TAXPAYER RETURN INFORMATION AND [PROPOSED]
PROTECTIVE ORDER
Case No. 3:20-cr-00371-WHA

1

1   progeny.  As grounds for this motion, the government states as follows:

2        1.     On October 1, 2020, a federal grand jury in the Northern District of California returned an

3   Indictment charging the Defendant with: conspiracy to defraud the United States, in violation of 18

4   U.S.C. § 371; tax evasion, in violation of 26 U.S.C. § 7201; FBAR reporting violations, in violation of 31

5   U.S.C. §§ 5314 and 5322; wire fraud, in violation of 18 U.S.C. § 1343; money laundering, in violation of

6   18 U.S.C. §§ 1956(a)(1)(A)(ii), (a)(1)(B)(i), and (a)(2)(B)(i); evidence tampering, in violation of 18

7   U.S.C. § 1512(b)(2)(B); and destruction of evidence, in violation of 18 U.S.C. 1512(c)(1).

8        2.     Having received a discovery request under Fed. R. Crim. P. 16, the United States will

9   produce documents and other materials pertaining to Defendant and the charged offenses to defense

10  counsel.  The discovery to be provided includes documents or other materials falling into one or more of

11  the following categories (collectively, "Protected Information"):

12              a.     Personal Identifying Information of individuals (other than his or her name),

13                     including the person's date of birth, social security number, residence or business

14                     address, telephone numbers, email addresses, driver's license number, professional

15                     license number, family members names, or criminal histories ("Personal

16                     Identifying Information");

17              b.     Financial information of individuals or businesses, including bank account

18                     numbers, credit or debit card numbers, account passwords, contact information,

19                     and taxpayer identification numbers ("Financial Information");

20              c.     Medical records or other patient information of individuals covered by the Health

21                     Insurance Portability and Accountability Act of 1996 (HIPAA) ("Medical

22                     Information"); and

23              d.     Tax return information, as defined by Title 26, United States, Code, Section

24                     6103(b)(1) and (2), pertaining to third parties.

25       3.     The Rule 16 evidence to be produced by the government will include:

26              a.     sensitive internal financial and proprietary information from Vista Equity Funds, a

27                     large San Francisco based private equity fund in which Defendant was a major

28

UNITED STATES' MOTION FOR PROTECTIVE ORDER                    2
AND AN ORDER AUTHORIZING DISCLOSURE OF
TAXPAYER RETURN INFORMATION AND [PROPOSED]
PROTECTIVE ORDER
Case No. 3:20-cr-00371-WHA

investor, and from which it is alleged a majority of his unreported income was

derived;

    b.    domestic and foreign bank records from accounts held in the names of third

parties;

    c.    witnesses' sensitive personal financial information;

    d.    witnesses' sensitive email correspondence;

    e.    witnesses' sensitive personal information; and

    f.    witnesses' federal income tax returns and federal income tax returns of related

entities.

4.    26 U.S.C. § 6103(a) generally prohibits, with certain exceptions, the disclosure of tax "return or return information."

5.    Sections 6103(b)(1) and 6103(b)(2) define "return" and "return information" broadly to include, inter alia, all tax and information returns filed pursuant to Title 26 and any information regarding a taxpayer's identity, the nature and source of a taxpayer's income and expenses, tax liability, tax deficiency, tax payments, and "any other data, received by, recorded by, prepared by, furnished to, or collected by" the Secretary of the Treasury.

6.    Section 6103(b)(3) defines "taxpayer return information" as "return information" that is filed with or furnished to the Secretary of the Treasury by or on behalf of the taxpayer to whom the return information relates.

7.    Tax returns and return information may be disclosed in a federal proceeding pertaining to tax administration "to the extent required by an order of a court pursuant to Section 3500 of Title 18, United States Code, or Rule 16 of the Federal Rules of Criminal Procedure, such court being authorized in the issuance of such an order to give due consideration to congressional policy favoring the confidentiality of returns and return information. . . ."  26 U.S.C. § 6103(h)(4)(D).

8.    This criminal case is a federal judicial proceeding pertaining to tax administration within the meaning of Section 6103(h)(4).  *See* 26 U.S.C. § 6103(b)(4) (defining "tax administration").

UNITED STATES' MOTION FOR PROTECTIVE ORDER
AND AN ORDER AUTHORIZING DISCLOSURE OF
TAXPAYER RETURN INFORMATION AND [PROPOSED]
PROTECTIVE ORDER
Case No. 3:20-cr-00371-WHA

3

9. According to the Indictment, the Defendant conspired with others to commit tax evasion, and committed tax evasion, using a complex foreign structure of trusts and limited liability companies, to conceal taxable income he earned from investments with Vista.

10. The Indictment also alleges that the Defendant used a surrogate to purchase debt instruments of Reynolds & Reynolds on the secondary debt market, through a broker, from other private equity and institutional investors in the Northern Judicial District of California.

11. The evidence in this case will include a large volume of internal financial records, correspondence, and bank records obtained from Vista, and other institutional investors, through the issuance of grand jury subpoenas. Some of this evidence contains information regarding internal operations, banking, and investment practices. This information is proprietary and very sensitive. The Vista evidence also includes financial and banking information of other Vista investors and employees. The government, and its expected witnesses, have a compelling need for this information not to be disseminated beyond the parties to this case.

12. The evidence will also include sensitive financial, banking, and federal income tax return information of other witnesses relevant to this case. These witnesses also have a compelling need for their sensitive personal information not to be disseminated beyond the parties to this case.

13. The government seeks to disclose this sensitive evidence to Defendant, including "returns" and "return information," to satisfy the government's obligations under 18 U.S.C. § 3500, Rule 16 of the Federal Rules of Criminal Procedure, and *Brady v. Maryland* and its progeny, under a Protective Order that will make it a violation of that Order for Defendant, his counsel, or witnesses, to disseminate any discovery provided by the government in this case to any person or entity not directly associated with this case.

14. WHEREFORE, the United States hereby respectfully moves this Court for an Order:

a. Authorizing the disclosure, pursuant to 26 U.S.C. § 6103(h)(4)(D), of relevant "returns" and "return information" of third parties gathered during the course of this investigation; and

b. Prohibiting, pursuant to Rule 16(d)(1) of the Federal Rules of Criminal Procedure, the unauthorized dissemination of any personal or financial information of third parties provided to

UNITED STATES' MOTION FOR PROTECTIVE ORDER
AND AN ORDER AUTHORIZING DISCLOSURE OF
TAXPAYER RETURN INFORMATION AND [PROPOSED]
PROTECTIVE ORDER
Case No. 3:20-cr-00371-WHA

4

1   Defendant and Defendant's counsel by the government in connection with this matter.  A proposed Order

2   is filed herewith.

3

4   Respectfully submitted this 9th day of November, 2020,

5                                           DAVID L. ANDERSON
                                            United States Attorney
6
                                            *s/ Corey J. Smith*
7                                           COREY J. SMITH
                                            Senior Litigation Counsel
8                                           MICHAEL G. PITMAN
                                            Assistant United States Attorney
9
                                            Attorneys for United States of America
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney
2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  MICHAEL G. PITMAN (DCBN 484164)
   Assistant United States Attorney
5  150 Almaden Boulevard, Suite 900
   San Jose, California 95113
6  Telephone: (408) 535-5040
   Facsimile:  (408) 535-5081
7  michael.pitman@usdoj.gov

8  COREY J. SMITH (MABN 553615)
   Senior Litigation Counsel
9  LEE F. LANGSTON (NYBN 4910311)
   CHRISTOPHER M. MAGNANI (Maryland)
10 Trial Attorneys
   United States Department of Justice, Tax Division
11
12 Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 3:20-cr-00371-WHA |
| Plaintiff, | [PROPOSED] PROTECTIVE ORDER |
| v. | |
| ROBERT T. BROCKMAN, | |
| Defendant. | |

The Court, having been satisfied that discovery in this case will include sensitive proprietary, financial, banking, and tax return information, including the following categories of evidence: (collectively, "Protected Information"):

1. Personal Identifying Information of individuals (other than his or her name), including the person's date of birth, social security number, residence or business address, telephone numbers, email addresses, driver's license number, professional license number, family members names, or criminal histories ("Personal Identifying Information");

2. Financial information of individuals or businesses, including bank account numbers, credit or debit card numbers, account passwords, contact information, and taxpayer identification numbers ("Financial Information");

3. Medical records or other patient information of individuals covered by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) ("Medical Information"); and

4. Tax Return Information, as defined by Title 26, United States, Code, Section 6103(b)(1) and (2), pertaining to third parties.

To ensure that Protected Information is not subject to unauthorized disclosure or misuse,

**IT IS HEREBY ORDERED** that pursuant to Fed. R. Crim. P. 16(d)(1), Defendant, defense counsel of record, their investigators, assistants, and employees (collectively, "the defense team") may review with the Defendant all discovery material produced by the government, but shall not provide anyone other than the defense team with copies of, or permit anyone other than the defense team to make copies of, or have unsupervised access to, any discovery material produced by the government that contains Protected Information, unless the Personal Identifying Information, Financial Information, and/or Medical Information has first been **entirely redacted** from the discovery materials. The government and defense counsel are ordered to work together to ensure that these materials are protected, but that Defendant has as much access to the materials as can be provided consistent with this Court's order. Discovery material that clearly pertains to Defendant and does not contain Protected Information regarding any other person (*e.g.*, Defendant's own bank records, telephone records, and business records) may be provided to the Defendant unredacted.

Defense counsel may also provide unredacted copies of Protected Information to any experts retained to assist with the preparation of the defense in the captioned case. Defendant, all members of the defense team, and any experts who receive discovery under this Order shall be provided a copy of this Order along with those materials and shall initial and date the order reflecting their agreement to be bound by it.

The materials provided pursuant to this protective order may only be used for the specific purpose of preparing or presenting a defense in this matter, unless specifically authorized by the Court.

This Order shall also apply to any copies made of any materials covered by this Order.

1    **IT IS FURTHER ORDERED** that discovery material provided by the government that includes

2    tax return information of third parties, as defined by 26 U.S.C. 6103(b)(1) and (2), is provided pursuant

3    26 U.S.C. 6103(h)(4) and: 1) pertains to Defendant; 2) is related to items contained within Defendant's

4    income tax returns; 3) is relevant to a transaction involving Defendant and a third party taxpayer; or 4) is

5    otherwise required to be disclosed under 18 U.S.C. § 3500.   Defendant and his counsel shall maintain

6    the confidentiality of all tax return information provided by the government in discovery in accordance

7    with 26 U.S.C. 6103(a) and this Order, other than material that clearly pertains to Defendant and does

8    not contain tax return information regarding any other person.

9    **IT IS FURTHER ORDERED** that neither Defendant nor any member of the defense team shall

10   provide copies of any discovery material produced by the government—whether or not the material

11   constitutes or contains Protected Information within the meaning of this Order—to any third party (*i.e.*,

12   any person who is not a member of the defense team) or make any public disclosure of the same, other

13   than in a court filing, without the government's express written permission or further order of this Court.

14   No provision of this Order shall prevent defense counsel from discussing, and showing, discovery

15   provided by the government with potential trial witnesses, as necessary to prepare for trial.  If a party

16   files a pleading that references or contains or attaches Protected Information subject to this Order, that

17   filing must be under seal.[1]

18   **IT IS FURTHER ORDERED** that defense counsel shall return materials subject to this

19   Protective Order (including any copies) to the United States within 14 days after whichever event occurs

20   last in time: dismissal of all charges against Defendant; Defendant's acquittal; Defendant's sentencing;

21   or the conclusion of any direct appeal.  After the United States receives documents and materials subject

22   to this Order, it shall maintain those documents and materials until the period for filing a motion under

23   28 U.S.C. § 2255 has expired.  After the statutory period for filing a motion under 28 U.S.C. § 2255 has

24   expired, the United States is free to destroy documents and materials subject to this Order.  If Defendant

25   is represented by counsel and files a motion pursuant to 28 U.S.C. § 2255, the United States will provide

26   counsel with the documents and materials subject to this Protective Order under the terms of this Order.

27   
_____

28   [1] This Order authorizes such filings under seal and the parties are not required to seek additional authorization from the Court to do so.

Defendant's attorney in any motion under 28 U.S.C. § 2255 shall return the documents and materials subject to this Protective Order within 14 days after the district court's ruling on the motion or 14 days after the conclusion of any direct appeal of the district court's order denying the motion, whichever is later. This stipulation is without prejudice to either party applying to the Court to modify the terms of any protective order. This Court shall retain jurisdiction to modify this Order upon motion of either party even after the conclusion of district court proceedings in this case.

IT IS SO ORDERED.

Dated:                                   _____
                                         WILLIAM ALSUP
                                         United States District Judge

1   DAVID L. ANDERSON (CABN 149604)
     United States Attorney

2

3   HALLIE HOFFMAN (CABN 210020)
     Chief, Criminal Division

4   MICHAEL G. PITMAN (DCBN 484164)
     Assistant United States Attorney

5   150 Almaden Boulevard, Suite 900
     San Jose, California 95113

6   Telephone: (408) 535-5040
     Facsimile: (408) 535-5081

7   michael.pitman@usdoj.gov

8   COREY J. SMITH (MABN 553615)
     Senior Litigation Counsel

9   LEE F. LANGSTON (NYBN 4910311)
     CHRISTOPHER M. MAGNANI (Maryland)

10   Trial Attorneys
     United States Department of Justice, Tax Division

11

12   Attorneys for the United States of America

13                 UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15                SAN FRANCISCO DIVISION

| | |
|---|---|
| 16   UNITED STATES OF AMERICA, | Case No.: 3:20-cr-00371-WHA |
| 17       Plaintiff, | UNITED STATES' STATUS CONFERENCE STATEMENT |
| 18     v. | Date:   November 17, 2020 |
| 19   ROBERT T. BROCKMAN, | Time:   2:00 PM |
| 20       Defendant. | |

21

22         The United States of America hereby respectfully provides the following statement in

23   anticipation of the status conference currently scheduled for November 17, 2020:

24         On October 1, 2020, a federal grand jury in the Northern District of California returned an

25   Indictment charging the Defendant with: conspiracy to defraud the United States, in violation of 18

26   U.S.C. § 371; tax evasion, in violation of 26 U.S.C. § 7201; FBAR reporting violations, in violation of

27   31 U.S.C. §§ 5314 and 5322; wire fraud, in violation of 18 U.S.C. § 1343; money laundering, in

28   violation of 18 U.S.C. §§ 1956(a)(1)(A)(ii), (a)(1)(B)(i), and (a)(2)(B)(i); evidence tampering, in

1    violation of 18 U.S.C. § 1512(b)(2)(B); and destruction of evidence, in violation of 18 U.S.C.

2    1512(c)(1).

3        The Defendant made his initial appearance before the Honorable Nathanael M. Cousins on

4    October 15, and entered not guilty pleas to all counts. Time was excluded under the Speedy Trial Act

5    from October 15, 2020 through November 17, 2020.

6        The government has received a discovery request pursuant to Fed. R. Crim. P. 16, but has yet to

7    begin producing discovery. It is the government's position that protective orders will be required to

8    protect multiple different categories of discovery to be produced. The government and defense counsel

9    have met a conferred regarding a general protective order designed to cover the majority of the

10    discovery, and are currently negotiating in an effort to formulate a stipulated protective order for the

11    Court's review.

12        The government and defense counsel have also met a conferred regarding a proposed scheduling

13    order for this case, and are currently negotiating in an effort to formulate a stipulated scheduling order

14    for the Court's review.

15        Additionally, the government respectfully provides notice to the Court that Defendant's counsel

16    have indicated that they expect to request a determination under 18 U.S.C. § 4241 whether Defendant is

17    mentally competent to stand trial in this matter.

18

19    Respectfully submitted,                DAVID L. ANDERSON
                                            United States Attorney

20

21    Date: November 9, 2020                */s/Corey J. Smith*
                                            Senior Litigation Counsel

22                                           MICHAEL G. PITMAN
                                          Assistant United States Attorney

23                                           Attorneys for United States of America

24

25

26

27

28

CERTIFICATE OF SERVICE

It is hereby certified that service of the foregoing UNITED STATES' STATUS CONFERENCE STATEMENT has been made this day through the Court's ECF system to Defendant's attorneys of record.


Date:   November 9, 2020

*s/ Corey J. Smith*
Senior Litigation Counsel
United States Department of Justice,
Tax Division
Corey.Smith@usdoj.gov
(202)514-5230

1  Neal J. Stephens (State Bar No. 152071)
   JONES DAY
2  1755 Embarcadero Road
   Palo Alto, CA 94303
3  Telephone:  +1.650.739.3939
   Facsimile:   +1.650.739.3900
4  nstephens@jonesday.com

5  Attorney for Defendant
   ROBERT BROCKMAN
6

7

8                  UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                   SAN FRANCISCO DIVISION

11

12  UNITED STATES OF AMERICA,        Case No.: 3:20-cr-00371-WHA

13              Plaintiff,           STIPULATION TO TAKE BAIL
                                     HEARING ON NOVEMBER 12, 2020
14        v.                         OFF CALENDAR AND [PROPOSED]
                                     ORDER
15  ROBERT BROCKMAN,

16              Defendant.

17

18        It is hereby stipulated by and between counsel for Robert Brockman and counsel for the

19  United States, that the tentative hearing on Mr. Brockman's bail conditions scheduled for

20  November 12, 2020 be taken off calendar.

21        At the initial appearance held on October 15, 2020, the Court ordered Pre-Trial Services

22  to interview Mr. Brockman and file a report with the Court so the Court could determine whether

23  any further hearing was required related to the initial bond conditions set by the Court on October

24  15, 2020.  The Court set a tentative hearing on November 12, 2020 to review the matter if Pre-

25  Trial Services recommended any revisions to Mr. Brockman's bail conditions.  On November 10,

26  2020, Pre-Trial services notified the parties that it does not recommend any revisions to Mr.

27  Brockman's bail conditions.  As a result, the parties stipulate that the tentative hearing set for

28  November 12 can be taken off calendar and hereby request that the Court enter the attached order,

1    which maintains the status quo on Mr. Brockman's existing bail conditions.

2           The undersigned certifies that he has obtained approval from AUSA Pittman, counsel for

3    the government, to file this stipulation and proposed order.

4

5    IT IS SO STIPULATED.

6    DATED:  November 11, 2020              By: */s/ Neal Stephens*
                                            Neal J. Stephens
7
                                            Counsel for Defendant ROBERT T.
8                                           BROCKMAN

9

10                                          DAVID L. ANDERSON
                                            United States Attorney
11
12   DATED:   November 11, 2020             By:  */s/ Michael G. Pitman*
                                            COREY J. SMITH
                                            Senior Litigation Counsel
13                                          MICHAEL G. PITMAN
                                            Assistant United States Attorney
14
                                            Attorneys for UNITED STATES OF
15                                          AMERICA

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Certification of Compliance with N.D. Cal. L.R. 5.1(i)(3)**

2      I hereby certify that pursuant to N.D. Cal. L.R. 5.1(i)(3), I have obtained the authorization

3  from the above signatory to file the above-referenced document, and that the above signatory

4  concurs in the filing's content.

5      I certify under penalty of perjury under the laws of the United States of America that the

6  foregoing is true and correct. Executed on November 11, 2020 in Palo Alto, California.

7

8

9                    By: */s/ Neal J. Stephens*
                    Neal J. Stephens
10                   Counsel for Defendant
                    ROBERT BROCKMAN
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**[PROPOSED] ORDER**

Based on the facts set forth in the stipulation of the parties and for good cause shown, the Court finds that the hearing on Mr. Brockman's bail conditions scheduled for November 12, 2020 shall be taken off calendar. Therefore, and with the consent of the parties, IT IS HEREBY ORDERED that the hearing on November 12, 2020 at 10:00 a.m. is taken off calendar and Mr. Brockman's bail conditions remain as the Court ordered on October 15, 2020.

**IT IS SO ORDERED.**

DATED: _____, 2020

_____
NATHANAEL M. COUSINS
United States Magistrate Judge

NAI-1514934662v1

1   Neal J. Stephens (State Bar No. 152071)
    JONES DAY
2   1755 Embarcadero Road
    Palo Alto, CA 94303
3   Telephone:   +1.650.739.3939
    Facsimile:   +1.650.739.3900
4   nstephens@jonesday.com

5   Attorney for Defendant
    ROBERT BROCKMAN
6

7

8                       UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                        SAN FRANCISCO DIVISION

11

12  UNITED STATES OF AMERICA,          Case No.: 3:20-cr-00371-WHA

13              Plaintiff,             STIPULATION TO TAKE BAIL
                                       HEARING ON NOVEMBER 12, 2020
14       v.                            OFF CALENDAR AND ORDER

15  ROBERT BROCKMAN,

16              Defendant.

17

18       It is hereby stipulated by and between counsel for Robert Brockman and counsel for the

19  United States, that the tentative hearing on Mr. Brockman's bail conditions scheduled for

20  November 12, 2020 be taken off calendar.

21       At the initial appearance held on October 15, 2020, the Court ordered Pre-Trial Services

22  to interview Mr. Brockman and file a report with the Court so the Court could determine whether

23  any further hearing was required related to the initial bond conditions set by the Court on October

24  15, 2020.  The Court set a tentative hearing on November 12, 2020 to review the matter if Pre-

25  Trial Services recommended any revisions to Mr. Brockman's bail conditions.  On November 10,

26  2020, Pre-Trial services notified the parties that it does not recommend any revisions to Mr.

27  Brockman's bail conditions.  As a result, the parties stipulate that the tentative hearing set for

28  November 12 can be taken off calendar and hereby request that the Court enter the attached order,

1    which maintains the status quo on Mr. Brockman's existing bail conditions.

2        The undersigned certifies that he has obtained approval from AUSA Pittman, counsel for

3    the government, to file this stipulation and proposed order.

4

5    IT IS SO STIPULATED.

6    DATED:  November 11, 2020        By: /s/ Neal Stephens
                                    Neal J. Stephens

7

8                                  Counsel for Defendant ROBERT T.
                                  BROCKMAN

9

10                               DAVID L. ANDERSON
                               United States Attorney

11

12   DATED:   November 11, 2020      By: /s/ Michael G. Pitman
                               COREY J. SMITH
                               Senior Litigation Counsel

13                               MICHAEL G. PITMAN
                               Assistant United States Attorney

14

15                               Attorneys for UNITED STATES OF
                               AMERICA

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Certification of Compliance with N.D. Cal. L.R. 5.1(i)(3)**

2   I hereby certify that pursuant to N.D. Cal. L.R. 5.1(i)(3), I have obtained the authorization

3  from the above signatory to file the above-referenced document, and that the above signatory

4  concurs in the filing's content.

5   I certify under penalty of perjury under the laws of the United States of America that the

6  foregoing is true and correct. Executed on November 11, 2020 in Palo Alto, California.

7

8

9        By: */s/ Neal J. Stephens*

Neal J. Stephens

10         Counsel for Defendant

ROBERT BROCKMAN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ORDER**

Based on the facts set forth in the stipulation of the parties and for good cause shown, the Court finds that the hearing on Mr. Brockman's bail conditions scheduled for November 12, 2020 shall be taken off calendar.  Therefore, and with the consent of the parties, IT IS HEREBY ORDERED that the hearing on November 12, 2020 at 10:00 a.m. is taken off calendar and Mr. Brockman's bail conditions remain as the Court ordered on October 15, 2020.

**IT IS SO ORDERED.**

DATED:  November 11, 2020

NATH[...]
United Stat[...]

GRANTED

Judge Nathanael M. Cousins

NAI-1514934662v1

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Case No: 3:20-cr-00371-WHA |
| Plaintiff(s), | ) **APPLICATION FOR ADMISSION** |
| | ) **OF ATTORNEY PRO HAC VICE** |
| v. | ) (CIVIL LOCAL RULE 11-3) |
| ROBERT BROCKMAN | ) |
| Defendant(s). | ) |

I, Kathryn Keneally, an active member in good standing of the bar of New York, hereby respectfully apply for admission to practice *pro hac vice* in the Northern District of California representing: Robert Brockman in the above-entitled action. My local co-counsel in this case is Neal J. Stephens, an attorney who is a member of the bar of this Court in good standing and who maintains an office within the State of California.

| MY ADDRESS OF RECORD: | LOCAL CO-COUNSEL'S ADDRESS OF RECORD: |
|---|---|
| 250 Vesey Street<br>New York, New York 10281-1047 | 1755 Embarcadero Road<br>Palo Alto, CA 94303 |
| MY TELEPHONE # OF RECORD: | LOCAL CO-COUNSEL'S TELEPHONE # OF RECORD: |
| (212) 326-3939 | (650) 739-3939 |
| MY EMAIL ADDRESS OF RECORD: | LOCAL CO-COUNSEL'S EMAIL ADDRESS OF RECORD: |
| kkeneally@jonesday.com | nstephens@jonesday.com |

I am an active member in good standing of a United States Court or of the highest court of another State or the District of Columbia, as indicated above; my bar number is: 1866250.

A true and correct copy of a certificate of good standing or equivalent official document from said bar is attached to this application.

I agree to familiarize myself with, and abide by, the Local Rules of this Court, especially the Standards of Professional Conduct for attorneys and the Alternative Dispute Resolution Local Rules.

*I declare under penalty of perjury that the foregoing is true and correct.*

Dated: 11/11/20

Kathryn Keneally

APPLICANT

## ORDER GRANTING APPLICATION
## FOR ADMISSION OF ATTORNEY PRO HAC VICE

IT IS HEREBY ORDERED THAT the application of Kathryn Keneally is granted, subject to the terms and conditions of Civil L.R. 11-3. All papers filed by the attorney must indicate appearance *pro hac vice*. Service of papers upon, and communication with, local co-counsel designated in the application will constitute notice to the party.

Dated:

UNITED STATES DISTRICT/MAGISTRATE JUDGE

**Appellate Division of the Supreme Court
of the State of New York
First Judicial Department**

I, Susanna Rojas, Clerk of the Appellate Division of
the Supreme Court of the State of New York, First Judicial
Department, certify that

# Kathryn Marie Keneally

was duly licensed and admitted to practice as an Attorney and
Counsellor at Law in all the courts of the State of New York on
May 23, 1983, has duly taken and subscribed the oath of office
prescribed by law, has been enrolled in the Roll of Attorneys and
Counsellors at Law on file in my office, has duly registered with the
administrative office of the courts, and according to the records of
this court is in good standing as an attorney and counsellor at law.

In Witness Thereof, I have hereunto set my
hand and affixed the seal of this court on
November 12, 2020

_____
Clerk of the Court

7976

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 20-cr-00371-WHA-1 |
| Plaintiff, | |
| v. | **ORDER DENYING PRO HAC VICE APPLICATION** |
| ROBERT T. BROCKMAN, | Re: Dkt. No. 30 |
| Defendant. | |

The pro hac vice application of Attorney Kathryn Keneally Re: Dkt. No. 30 is **Denied** for failing to comply with Civil Local Rule 11-3. That rule requires an applicant to certify that "he or she is an active member in good standing of the bar of a *United States Court or of the highest court of another State or the District of Columbia*, specifying such bar" (emphasis added). Filling out the pro hac vice form from the district court website such that it identifies only the state of bar membership — e.g., "the bar of New York" — is inadequate under the rule because it fails to identify a specific court. While the application fee does not need to be paid again, the application cannot be processed until a corrected form is submitted.

**IT IS SO ORDERED.**

Dated: November 12, 2020

WILLIAM ALSUP
United States District Judge

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

                Plaintiff(s),

v.

ROBERT BROCKMAN

                Defendant(s).

Case No: 3:20-CR-00371-WHA

**APPLICATION FOR ADMISSION OF ATTORNEY PRO HAC VICE**
(CIVIL LOCAL RULE 11-3)

    I, <u>Kathryn Keneally</u>, an active member in good standing of the bar of <u>Appellate Division of the Supreme Court of the State of New York</u>, hereby respectfully apply for admission to practice *pro hac vice* in the Northern District of California representing: <u>Robert Brockman</u> in the above-entitled action. My local co-counsel in this case is <u>Neal Stephens</u>, an attorney who is a member of the bar of this Court in good standing and who maintains an office within the State of California.

| MY ADDRESS OF RECORD: | LOCAL CO-COUNSEL'S ADDRESS OF RECORD: |
|---|---|
| 250 Vesey Street<br>New York, New York 10281-1047 | 1755 Embarcadero Road<br>Palo Alto, CA 94303 |
| MY TELEPHONE # OF RECORD: | LOCAL CO-COUNSEL'S TELEPHONE # OF RECORD: |
| 212-326-3939 | 650-739-3939 |
| MY EMAIL ADDRESS OF RECORD: | LOCAL CO-COUNSEL'S EMAIL ADDRESS OF RECORD: |
| kkeneally@jonesday.com | nstephens@jonesday.com |

    I am an active member in good standing of a United States Court or of the highest court of another State or the District of Columbia, as indicated above; my bar number is: <u>1866250</u>.

    A true and correct copy of a certificate of good standing or equivalent official document from said bar is attached to this application.

    I agree to familiarize myself with, and abide by, the Local Rules of this Court, especially the Standards of Professional Conduct for attorneys and the Alternative Dispute Resolution Local Rules.

    ***I declare under penalty of perjury that the foregoing is true and correct***.

Dated: November 12, 2020

                          /s/ Kathryn Keneally
                          APPLICANT

---

### ORDER GRANTING APPLICATION
### FOR ADMISSION OF ATTORNEY PRO HAC VICE

    IT IS HEREBY ORDERED THAT the application of <u>Kathryn Keneally</u> is granted, subject to the terms and conditions of Civil L.R. 11-3. All papers filed by the attorney must indicate appearance pro hac vice. Service of papers upon, and communication with, local co-counsel designated in the application will constitute notice to the party.

Dated:

                          UNITED STATES DISTRICT/MAGISTRATE JUDGE

## Appellate Division of the Supreme Court
## of the State of New York
### First Judicial Department

I, Susanna Rojas, Clerk of the Appellate Division of the Supreme Court of the State of New York, First Judicial Department, certify that

# Kathryn Marie Keneally

was duly licensed and admitted to practice as an Attorney and Counsellor at Law in all the courts of the State of New York on May 23, 1983, has duly taken and subscribed the oath of office prescribed by law, has been enrolled in the Roll of Attorneys and Counsellors at Law on file in my office, has duly registered with the administrative office of the courts, and according to the records of this court is in good standing as an attorney and counsellor at law.

In Witness Thereof, I have hereunto set my hand and affixed the seal of this court on November 12, 2020

Clerk of the Court

7976

1

**UNITED STATES DISTRICT COURT**

2

**NORTHERN DISTRICT OF CALIFORNIA**

3

4

UNITED STATES OF AMERICA

Plaintiff(s),

Case No: 3:20-CR-00371-WHA

5

6

v.

ROBERT BROCKMAN

**APPLICATION FOR ADMISSION OF ATTORNEY PRO HAC VICE**
(CIVIL LOCAL RULE 11-3)

7

8

Defendant(s).

9

10

11

12

I, Kathryn Keneally, an active member in good standing of the bar of Appellate Division of the Supreme Court of the State of New York, hereby respectfully apply for admission to practice *pro hac vice* in the Northern District of California representing: Robert Brockman in the above-entitled action. My local co-counsel in this case is Neal Stephens, an attorney who is a member of the bar of this Court in good standing and who maintains an office within the State of California.

13

14

| MY ADDRESS OF RECORD: | LOCAL CO-COUNSEL'S ADDRESS OF RECORD: |
|---|---|
| 250 Vesey Street<br>New York, New York 10281-1047 | 1755 Embarcadero Road<br>Palo Alto, CA 94303 |
| MY TELEPHONE # OF RECORD: | LOCAL CO-COUNSEL'S TELEPHONE # OF RECORD: |
| 212-326-3939 | 650-739-3939 |
| MY EMAIL ADDRESS OF RECORD: | LOCAL CO-COUNSEL'S EMAIL ADDRESS OF RECORD: |
| kkeneally@jonesday.com | nstephens@jonesday.com |

15

16

17

18

I am an active member in good standing of a United States Court or of the highest court of another State or the District of Columbia, as indicated above; my bar number is: 1866250.

19

A true and correct copy of a certificate of good standing or equivalent official document from said bar is attached to this application.

20

21

I agree to familiarize myself with, and abide by, the Local Rules of this Court, especially the Standards of Professional Conduct for attorneys and the Alternative Dispute Resolution Local Rules.

22

***I declare under penalty of perjury that the foregoing is true and correct.***

23

Dated: November 12, 2020

/s/ Kathryn Keneally
APPLICANT

24

25

**ORDER GRANTING APPLICATION
FOR ADMISSION OF ATTORNEY PRO HAC VICE**

26

27

IT IS HEREBY ORDERED THAT the application of Kathryn Keneally is granted, subject to the terms and conditions of Civil L.R. 11-3. All papers filed by the attorney must indicate appearance pro hac vice. Service of papers upon, and communication with, local co-counsel designated in the application will constitute notice to the party.

28

Dated: November 13, 2020

UNITED STATES DISTRICT/MAGISTRATE JUDGE

| | | |
|---|---|---|
| 1 | Jason Varnado (State Bar No. 211067) | Kathryn Keneally (Appearance *pro hac vice*) |
| | jvarnado@jonesday.com | New York State Bar No. 1866250 |
| 2 | JONES DAY | kkeneally@jonesday.com |
| | 717 Texas, Suite 3300 | JONES DAY |
| 3 | Houston, TX 77002 | 250 Vesey Street |
| | Telephone +1-832-239-3939 | New York, NY 10281-047 |
| 4 | Facsimile +1-832-239-3600 | Telephone: +1-212-326-3939 |
| | | Facsimile: +1-212-755-7306 |

1 Jason Varnado (State Bar No. 211067)
jvarnado@jonesday.com
2 JONES DAY
717 Texas, Suite 3300
3 Houston, TX 77002
Telephone +1-832-239-3939
4 Facsimile +1-832-239-3600

Kathryn Keneally (Appearance *pro hac vice*)
New York State Bar No. 1866250
kkeneally@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281-047
Telephone: +1-212-326-3939
Facsimile: +1-212-755-7306

5 Neal J. Stephens (State Bar No. 152071)
nstephens@jonesday.com
6 Vincent Doctor (State Bar No. 319408)
vdoctor@jonesday.com
7 JONES DAY
1755 Embarcadero Road
8 Palo Alto, CA 94303
Telephone: +1.650.739.3939
9 Facsimile: +1.650.739.3900

10 Attorneys for Defendant
ROBERT BROCKMAN

11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:20-cr-00371-WHA |
| Plaintiff, | NOTICE OF APPEARANCE |
| v. | Judge: Hon. William Alsup |
| ROBERT BROCKMAN, | |
| Defendant. | |

**TO THE CLERK OF THIS COURT AND EACH PARTY IN INTEREST:**

PLEASE TAKE NOTICE that Vincent Doctor of the law firm Jones Day, 1755 Embarcadero Road, Palo Alto, CA 94303, telephone: (650) 739-3939, facsimile: (650) 739-3900, hereby enters an appearance as counsel of record in the above-captioned matter for Robert Brockman.

/ / /

/ / /

1    Dated: November 13, 2020                    Respectfully submitted,

2                                                Jones Day

3

4                                               By:/s/ Vincent Doctor
                                                     Vincent Doctor
5
                                                Counsel for Defendant
6                                               ROBERT BROCKMAN

7    NAI-1515003717v1

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jason Varnado (State Bar No. 211067)
jvarnado@jonesday.com
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
Telephone +1-832-239-3939
Facsimile +1-832-239-3600

Neal J. Stephens (State Bar No. 152071)
nstephens@jonesday.com
Vincent Doctor (State Bar No. 319408)
vdoctor@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone:   +1.650.739.3939
Facsimile:    +1.650.739.3900

Kathryn Keneally (appearance *pro hac vice*)
New York State Bar No. 1866250
kkeneally@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281-047
Telephone:  +1-212-326-3939
Facsimile:    +1-212-755-7306

Attorney for Defendant
ROBERT BROCKMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>      v.<br><br>ROBERT BROCKMAN,<br><br>              Defendant. | Case No.: 3.20-cr-00371-WHA<br><br>ROBERT BROCKMAN'S REPLY IN SUPPORT OF MOTION FOR CHANGE OF VENUE ON COUNTS TWO THROUGH EIGHT<br><br>Date:  December 1, 2020<br>Time:  12:00 p.m.<br>Judge:  Hon. William Alsup |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### REPLY IN SUPPORT OF MOTION FOR CHANGE OF VENUE

The Motion for Change of Venue for Counts Two through Eight should be granted on the face of the Indictment pursuant to 18 U.S.C. § 3237(b). Counts Two through Eight allege tax evasion for each of the years 2012 through 2018. *See* Ind. ¶¶ 136–48 (ECF No. 1). Counts Two through Eight do not set out a basis for venue in this District, and the government's Opposition fails to assert otherwise.

Rather than pointing to specific allegations in Counts Two through Eight that establish a basis for venue, the government's Opposition makes sweeping references to the supposed "gravamen" of the claims contained in Count One in "paragraphs 1 through 134." Gov't Resp. in Opp'n at 3 (ECF No. 24). The government contends that its vague allegations in Count One to "an elaborate scheme, implemented and controlled by Defendant, to invest capital with Vista Equity Funds, headquartered here in the Northern District of California, to conceal these investments . . . and distribute gains" is a substitute for a clear statement of venue for Counts Two through Eight. *Id.* It is not. Moreover, the assertion that the "government expects that evidence" will prove venue, *id.* at 4, is insufficient to satisfy the constitutional and statutory requirement that the indictment allege on its face a proper basis for establishing venue. *See* U.S. Const. Art. III, § 2, cl. 3; U.S. Const. Amend. VI; *see also* Fed. R. Crim. P. 18.

The only specific allegation in the Indictment as to venue requires transfer to the United States District Court for the Southern District of Texas, where Mr. Brockman has "resid[ed] in Houston" at all relevant times. Ind. ¶ 1. Indeed, transferring Counts Two through Eight of the Indictment also satisfies the purpose of § 3237(b), and complies with the Department of Justice's own policy favoring prosecutions in the taxpayer's home district. *See, e.g.*, *United States v. U.S. Dist. Court for S. Dist. of California*, 693 F.2d 68, 69 (9th Cir. 1982); *see also* U.S. Dep't of Justice, Criminal Tax Manual § 6.01[2] (2012) (explaining general policy to "attempt to establish venue for a criminal tax prosecution in the judicial district of the taxpayer's residence").

Mr. Brockman also requests, as alternative relief, a bill of particulars as to the allegation of venue for Counts Two through Eight. Boilerplate allegations, coupled with the government's indiscriminate references to "paragraphs 1 through 134 of the Indictment" and vague generalities,

ROBERT BROCKMAN'S REPLY IN SUPPORT OF
MOTION FOR CHANGE OF VENUE ON COUNTS
TWO THROUGH EIGHT 3:20-cr-00371-WHA

1    do not give adequate notice of the venue element of the offense.  Mr. Brockman's request for a bill

2    of particulars is not an effort to get discovery of the government's evidence, but is rather a narrowly

3    tailored request for allegations sufficient to meet the constitutional and statutory requirements for

4    venue for Counts Two through Eight of the Indictment.

5

6    Dated: November 13, 2020          Respectfully submitted,

                                  JONES DAY

7

8                            /s/ *Neal J. Stephens*

9                            NEAL J. STEPHENS

10                         Counsel for ROBERT BROCKMAN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBERT BROCKMAN'S REPLY IN SUPPORT OF
MOTION FOR CHANGE OF VENUE ON COUNTS
TWO THROUGH EIGHT 3:20-cr-00371-WHA

1   Jason Varnado (State Bar No. 211067)      Kathryn Keneally (appearance *pro hac vice*)
     jvarnado@jonesday.com               New York State Bar No. 1866250
2   JONES DAY                       kkeneally@jonesday.com
     717 Texas, Suite 3300            JONES DAY
3   Houston, TX 77002             250 Vesey Street
     Telephone +1-832-239-3939      New York, NY 10281-047
4   Facsimile +1-832-239-3600      Telephone: +1-212-326-3939
                                 Facsimile: +1-212-755-7306
5   Neal J. Stephens (State Bar No. 152071)
     nstephens@jonesday.com
6   Vincent Doctor (State Bar No. 319408)
     vdoctor@jonesday.com
7   JONES DAY
     1755 Embarcadero Road
8   Palo Alto, CA 94303
     Telephone: +1.650.739.3939
9   Facsimile: +1.650.739.3900

10   Attorneys for Defendant
     ROBERT T. BROCKMAN

11                   UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                      SAN FRANCISCO DIVISION

14

15

16   UNITED STATES OF AMERICA,        Case No. 3:20-cr-00371-WHA

             Plaintiff,             ROBERT T. BROCKMAN'S MOTION
17                             FOR PROTECTIVE ORDER AND
         v.                      OPPOSITION TO UNITED STATES'
18                             PROTECTIVE ORDER
     ROBERT T. BROCKMAN,
19
            Defendant.
20                             Date:        12/1/2020
                                Time:        12:00 PM
21                              Judge:     Hon. William Alsup

22   **I.**     **INTRODUCTION**

23           The Indictment in this matter was returned under seal on October 1, 2020. It was first

24   disclosed to defense counsel in a telephone call at 4:00 pm on Saturday, October 10, 2020, and a

25   copy provided on October 13, 2020. It was announced for the television cameras at the U.S.

26   Attorney's press conference on Thursday, October 15, 2020.

27           The government has yet to commence production of the 1.1. terabytes (the equivalent of

28

Robert T. Brockman's Motion for Protective Order
and Opposition to United States' Protective Order
3:20-cr-00371-WHA

22 million pages) of discovery that it estimates will be produced to the defense. Stephens Decl. ¶3-4.[1] Instead, the government delays the progress of this case by litigating an unnecessary proposed protective order that is overbroad, contrary to law, and would seriously hamper the preparation of the defense.

Protective orders regulating discovery are appropriate only if, and to the extent that, "good cause" is shown. Fed. R. Crim. P. 16(d)(1).[2] The only "good cause" in this case is to protect several narrow, legitimate interests. The Court should adopt the Defendant's proposed protective order to accomplish these ends, and reject the government's sweeping protective order, with leave for the government to apply for further restrictions if specific issues warrant.

## II.    ARGUMENT

### A.  The legal standard

"Good cause" for a protective order in discovery in a criminal case under Rule 16(d)(1) "is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure. The injury must be shown with specificity. Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing." *United States v Wecht*, 484 F.3d 194, 211 (3d Cir. 2007), *quoting Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (affirming denial of prosecution's protective order to cover personnel records of a case agent in a criminal case; "the District Court acted well within its authority" in concluding "there was not 'good cause'"); *relied upon by United States v. Arredondo*, No. CR-12-1055-PHX-FJM, 2012 WL 1946955, at *1 (D. Ariz. May 30, 2012).

---

[1]  "Stephens Decl." refers to the Declaration of Neal J. Stephens affirmed November 16, 2020 and submitted in support of this Motion.

[2]  Federal Rule of Criminal Procedure 16(d)(1) provides: "At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal."

Robert T. Brockman's Motion for Protective Order
and Opposition to DOJ's Proposed Protective Order
3:20-cr-00371-WHA

Good cause requires a showing that the absence of a protective order "will work a clearly defined and serious injury." *United States v. Arredondo*, 2012 WL 1946955, at \*1. When the government is the party asserting good cause, it "'bears the burden, *for each particular document it seeks to protect, of showing that specific prejudice or harm will result if no protective order is granted.'" Id.*, quoting *Foltz v. State Farm Mut. Auto. Ins. Co.* 331 F.3d 1122, 1130 (9th Cir. 2003) (emphasis in *Arredondo*).[3]

Separately from Rule 16 discretionary protective orders for "good cause", Rule 49.1 provides "Privacy Protection For Filings Made with the Court." Fed. R. Crim. P. 49.1. "Unless the court orders otherwise, in an electronic or paper filing with the court" certain sensitive personal information is to be disguised by various means. *Id.* Rule 49.1(a).[4]

**B. "Good cause" supports only Mr. Brockman's proposed protective order**

With these principles in mind, the defense has proposed, and the government has rejected, that any protective order preserve only specific legitimate interests that have been identified to justify a protective order in this case. Stephens Decl. ¶5.

First, the defense can accept that portion of the government's proposed order that provides: "The materials provided pursuant to this protective order *may only be used for the specific purpose of preparing or presenting a defense in this matter,* unless specifically authorized by the Court." Gov't Order at 2:26-27 (emphasis added). The government's proposed additional, specific restrictions on the defense's use of discovery materials are unnecessary, and interfere with the ability of Mr. Brockman and his counsel to prepare a defense.

---

[3] Like the Third Circuit in *Wecht* and as illustrated in the District of Arizona by *Arredondo*, criminal cases in the Ninth Circuit refer to cases interpreting Federal Rule of Civil Procedure 26(c) to analyze the "good cause" requirement in criminal Rule 16(d)(1). *See also, United States v. Patkar*, 2008 WL 233062, \*4 (D. Haw. January 28, 2008).

[4] "an individual's social-security number, taxpayer-identification number, or birth date, the name of an individual known to be a minor, a financial-account number, or the home address of an individual, a party or nonparty." Rule 49.1(a).

Robert T. Brockman's Motion for Protective Order
and Opposition to DOJ's Proposed Protective Order
3:20-cr-00371-WHA

- 3 -

Second, Mr. Brockman in particular has no objection to an order that limits the use of "tax return information of third parties" to the "specific purpose of preparing a defense in this matter," which should be sufficient to meet the government's belief that this is necessary to permit it to meet its Rule 16, *Brady* and Jenks Act disclosure obligations.  Gov't Order at 3:1-5.  Mr. Brockman does not oppose the government's motion, pursuant to 26 U.S.C. §6103(h)(4), to obtain authorization from the Court to disclose taxpayer return information to Mr. Brockman as part of the government's disclosure obligations.

Third, this Court should order that the parties apply the privacy measures of Rule 49.1(a) to "electronic or paper *filing with the court.*"  But there is no need, and instead only an unfair burden on the defense, to impose those restrictions on every use that counsel makes of such documents in preparation of the case.

Fourth and Fifth, this Court should order that if a party makes a filing with the Court that includes a tax "return" or "return information", as defined by 26 U.S.C. § 6103(b)(1) & (2), or medical records or other patient information protected by the Health Insurance Portability and Accountability Act of 1996 (HIPPA), such information must be redacted or filed under seal.

Finally, as goes without saying, both parties should negotiate between themselves, and be allowed further application to this Court, if specific circumstances demonstrate "good cause" for a further protective order.  That will be sufficient to protect purported commercial-proprietary information that the government may have collected from others, and other materials deserving further protection, *when and if* the government identifies specific documents in its production and proposes appropriate restrictions.

### C.  There is no "good cause" shown for DOJ's proposed protective order

The government's motion makes no specific showing of good cause—the government has not identified any clearly defined and serious injury that is at risk in this case.  Instead the

Robert T. Brockman's Motion for Protective Order
and Opposition to DOJ's Proposed Protective Order
3:20-cr-00371-WHA

government makes only broad assertions that the discovery will include "internal financial records, correspondence and bank records" from various third parties, and "*some* of this evidence contains information regarding internal operations, banking and investment practices." Motion at 4:7-10. (emphasis added). The government further states, without any specification, that "this information is proprietary and very sensitive." As noted by the court in *Arredondo*, this type of general claim of potential harm lacks the specificity required to establish good cause under Rule 16(d)(1). 2012 WL 1946955, at *1-2 (finding as insufficient a claim to protect "[c]onfidential and sensitive information related to other investigations (both closed and ongoing)").

On this flimsy basis the government proposes particular restrictions on the defense's use of four sweeping categories of information: "Personal Identifying Information", "Financial Information", "Medical records" and "Tax return information", as described in Govt. Order at  1:25 through 2:7. To the extent these categories are deserving of protection on their face, and without further specification, they are adequately addressed in Rule 49.1(a) and Mr. Brockman's proposed order. The government's proposed order would impose unnecessary further limitations that hamper Mr. Brockman's defense.

Proper investigation and preparation of the defense case will require that counsel share discovery materials not only with the Mr. Brockman, but also with potential experts and trial witnesses, parties and their counsel who share a common interest privilege with Mr. Brockman, and other persons who may have information helpful to the defense. As the Supreme Court has recognized in an analogous context, "the general policy against invading the privacy of an attorney's course of preparation is so well recognized and so essential to an orderly working of our system of legal procedure that a burden rests on the one who would invade that privacy to establish adequate reasons to justify production through a subpoena or court order." *Hickman v. Taylor*, 329 U.S. 495, 512 (1947) (discussing the workproduct protection). The government's

- 5 -

Robert T. Brockman's Motion for Protective Order
and Opposition to DOJ's Proposed Protective Order
3:20-cr-00371-WHA

proposed protective order interferes in numerous respects with not only that privacy, but with the "course of preparation" itself, by several inconsistent and self-contradictory provisions:

- The defense could not provide copies "to anyone other than the defense team" of *any* discovery unless the broad categories of "Personal Identifying Information, Financial Information, and/or Medical Information" have "first been **entirely redacted** from the discovery materials." Govt. Order at 2:9-15 (emphasis in Govt. Order). The legitimate privacy interest in such materials is adequately protected by the defense's proposed order for court filings. The redactions proposed by the government unduly burden the defense, and may in fact defeat the very purpose of showing the discovery to a party who may have information helpful to the defense.

- To the extent that discovery material covered by a protective order is shown to third parties, it is sufficient that they be advised of the protective order and instructed that they are bound by it. The government's added requirement that such persons "shall initial and date the order reflecting their agreement to be bound", Govt. Order at 2:22-25, is burdensome and unnecessary.

- 26 U.S.C. 6103(a) on its face does not apply to Mr. Brockman, and there is no need to import these confidentiality restrictions applicable to the government into a protective order. Govt Order at 3:1-8. The agreed limitation that discovery documents "may only be used for the specific purpose of preparing or presenting a defense in this matter" is sufficient protection for these materials.

- The limitation that the defense shall not "provide copies of any discovery material . . . to any third party . . . without the government's express written permission or further order of this Court", with a narrow exception only for "potential trial witnesses", is a bald attempt to snoop upon and interfere with defense preparation. Govt Order at 3:9-17.

- The government's convoluted deadlines for *return* of discovery material are premature in principle, and as worded would apply before Mr. Brockman's

Robert T. Brockman's Motion for Protective Order
and Opposition to DOJ's Proposed Protective Order
3:20-cr-00371-WHA

- 6 -

1           appellate rights are fully exhausted.  Govt Order at 3:18-23.

2  **III.**    **CONCLUSION**

3        This is a tax case.  There is no threat of violence, no risk to trade secrets or financial data,

4  no suggestion of computer hacking that may imply an elevated risk to individuals' personal data

5  that requires greater protections than Rule 49.1.  The government should get on with production

6  of the 1.1 terabytes of discovery that are admittedly owing to the defense.

7        For the reasons stated above, Mr. Brockman respectfully requests that the Court enter Mr.

8  Brockman's proposed protective order and deny the government's motion to enter the

9  government proposed protective order.

10

11  Dated: November 16, 2020          Respectfully submitted,

12                                Jones Day

13

14                                By:*/s/ Kathryn Keneally*

15                                   Kathryn Keneally

16                              Counsel for Defendant
                                    ROBERT BROCKMAN

17

18  NAI-1515017601v1

19

20

21

22

23

24

25

26

27

28

Robert T. Brockman's Motion for Protective Order
and Opposition to DOJ's Proposed Protective Order
3:20-cr-00371-WHA

- 7 -

1  Jason Varnado (State Bar No. 211067)
   jvarnado@jonesday.com
2  JONES DAY
   717 Texas, Suite 3300
3  Houston, TX 77002
   Telephone +1-832-239-3939
4  Facsimile +1-832-239-3600

5  Neal J. Stephens (State Bar No. 152071)
   nstephens@jonesday.com
6  Vincent Doctor (State Bar No. 319408)
   vdoctor@jonesday.com
7  JONES DAY
   1755 Embarcadero Road
8  Palo Alto, CA 94303
   Telephone:  +1.650.739.3939
9  Facsimile:  +1.650.739.3900

Kathryn Keneally (appearance *pro hac vice*)
New York State Bar No. 1866250
kkeneally@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281-047
Telephone:  +1-212-326-3939
Facsimile:   +1-212-755-7306

10 Attorneys for Defendant
   ROBERT BROCKMAN

11

12 UNITED STATES DISTRICT COURT

   NORTHERN DISTRICT OF CALIFORNIA
13
   SAN FRANCISCO DIVISION
14

15

16 UNITED STATES OF AMERICA,          Case No. 3:20-cr-00371-WHA

17              Plaintiff,            DECLARATION OF NEAL J.
                                      STEPHENS IN SUPPORT OF ROBERT
18       v.                           T. BROCKMAN'S MOTION FOR
                                      PROTECTIVE ORDER AND
19 ROBERT BROCKMAN,                   OPPOSITION TO UNITED STATES'
                                      MOTION FOR PROTECTIVE ORDER
20              Defendant.
                                      Date:       12/1/2020
21                                    Time:       12:00 PM
                                      Judge:      Hon. William Alsup
22

23          **<u>DECLARATION OF NEAL J. STEPHENS</u>**

24       I, Neal J. Stephens, hereby declare as follows:

25       1.       I am a partner in the law firm of Jones Day and serve as counsel of record for

26 Robert Brockman.  I am a member of the Bar of the State of California and of this Court.  I have

27 personal knowledge of the matters stated in this declaration and would testify truthfully to them if

28 called upon to do so.

2.      Attached as Exhibit A is a proposed protective order for the Court's consideration.

3.      On October 26, 2020, Kathryn Keneally and I spoke with AUSA Michael Pitman and Corey Smith, from DOJ-Tax, regarding the government's proposed protective order. During the call, government counsel confirmed that they would be producing 1.1 terabytes of data in discovery once the Court had entered a protective order.

4.      Following our discussion with government counsel, I checked with my e-discovery vendor who estimated that 1.1 terabytes of data should equate to approximately 22 million pages of material based on an assumption of 4000 documents per gigabyte and 5 pages per document.

5.      On November 5, 2020, Ms. Keneally shared an alternative proposed protective order with government counsel but we could not reach agreement with government counsel to use it in this matter.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of November 2020, in Palo Alto, California.

*/s/ Neal J. Stephens*

Neal J. Stephens

NAI-1515017643v1

Decl. of Neal J. Stephens in Support of Opp. to United States' Mot. for Protective Order 3:20-cr-00371-WHA

# EXHIBIT A

Jason Varnado (State Bar No. 211067)
jvarnado@jonesday.com
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
Telephone +1-832-239-3939
Facsimile +1-832-239-3600

Neal J. Stephens (State Bar No. 152071)
nstephens@jonesday.com
Vincent Doctor (State Bar No. 319408)
vdoctor@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone: +1.650.739.3939
Facsimile: +1.650.739.3900

Kathryn Keneally (appearance *pro hac vice*)
New York State Bar No. 1866250
kkeneally@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281-047
Telephone: +1-212-326-3939
Facsimile:    +1-212-755-7306

Attorneys for Defendant
ROBERT T. BROCKMAN

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT T. BROCKMAN,<br><br>Defendant. | Case No.: 3:20-cr-00371-WHA<br><br>[PROPOSED] PROTECTIVE ORDER |

The Court enters the following Protective Order:

1.     On October 1, 2020, a federal grand jury in the Northern District of California returned an indictment against Mr. Brockman.  Having received a discovery request from defense counsel pursuant to Fed.R.Crim.P. 16, the United States will produce documents and other materials pertaining to Mr. Brockman and the charged offenses to defense counsel.

2.     Government counsel estimates that they will produce 1.1 terabytes of material to defense counsel.  Defense counsel estimates that 1.1 terabytes of material will likely exceed 20 million pages of material.

<table>
<tr><td>1</td><td>3.      The materials provided in discovery order may only be used for the specific</td></tr>
</table>

1          3.      The materials provided in discovery order may only be used for the specific

2  purpose of preparing or presenting a defense in this matter, unless specifically authorized by the

3  Court.  Anyone to whom disclosure is made shall be and advised of this protective order and that

4  they are bound by its terms.

5          4.      The government is directed to provide "return" and "return information," as

6  defined by 26 U.S.C. 6103(b)(1) & (2),  pursuant 26 U.S.C. 6103(h)(4) generally, and is

7  specifically directed to provide "return" and "return information" to meet its disclosure

8  obligations under Fed.R.Crim.P. 16 and 18 U.S.C. § 3500.

9  5.     The Judicial Conference of the United States has implemented policies to protect sensitive

10  private information about parties, witnesses, and others involved in a criminal case consistent

11  with Fed.R.Crim.P. 49.1.  To that end, all documents filed with the Court and made available to

12  the public, whether electronically or on paper, should limit certain information as follows:

13          • for Social Security numbers, driver's license numbers, bank account numbers, taxpayer

14  identification numbers, as well as credit and debit card numbers, the parties shall use only the last

15  four digits;

16             • for names of minor children, the parties shall use only their initials;

17             • for dates of birth, the parties shall use only the year; and

18             • for home addresses, use only the city and state.

19          6.      Any filings containing medical records or other patient information of individuals

20  that constitutes information protected by the Health Insurance Portability and Accountability Act

21  of 1996 (HIPAA) ("Medical Information"), and any filings that contain a "return" or "return

22  information" as defined by 26 U.S.C. § 6103(b)(1) & (2), shall be filed under seal.[1]

23  / / /

24  / / /

25  / / /

26

27

28      [1] This Order authorizes such filings under seal and the parties are not required to seek additional authorization from the Court to do so.

[PROPOSED] PROTECTIVE ORDER
3:20-cr-00371-WHA

7.    Should any issues arise as to the scope or application of this Protective Order, the parties are directed to negotiate in good faith between themselves to resolve them.  Either party may apply on notice for extension of this Protective Order to additional materials for good cause, and otherwise for modifications of this Protective Order.

IT IS SO ORDERED.

Dated: _____

_____
THE HONORABLE WILLIAM H. ALSUP

NAI-1515017697v1

[PROPOSED] PROTECTIVE ORDER
3:20-cr-00371-WHA

Case 3:20-cr-00371-WHA   Document 38   Filed 11/18/20   Page 1 of 1

**TRANSCRIPT ORDER**
Please use one form per court reporter.
*CJA counsel please use Form CJA24*
Please read instructions on next page.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
CAND 435
(CAND Rev. 08/2018)

COURT USE ONLY
**DUE DATE:**

1a. CONTACT PERSON FOR THIS ORDER
Trudy Carney

2a. CONTACT PHONE NUMBER
(650) 739-3939

3. CONTACT EMAIL ADDRESS
tcarney@jonesday.com

1b. ATTORNEY NAME (if different)
Neal Stephens

2b. ATTORNEY PHONE NUMBER
(650) 739-3939

3. ATTORNEY EMAIL ADDRESS
nstephens@jonesday.com

4. MAILING ADDRESS (INCLUDE LAW FIRM NAME, IF APPLICABLE)
Jones Day
1755 Embarcadero Road
Palo Alto, CA 94303

5. CASE NAME
United States v. Brockman

6. CASE NUMBER
3:20-cr-00371

7. COURT REPORTER NAME ( FOR FTR, LEAVE BLANK AND CHECK BOX)→ ☐ FTR
Ruth Levine Ekhaus

8. THIS TRANSCRIPT ORDER IS FOR:
☐ APPEAL          ☑ CRIMINAL
☐ NON-APPEAL    ☐ CIVIL

☐ In forma pauperis (NOTE: Court order for transcripts must be attached)

CJA: Do not use this form: use Form CJA24.

9. TRANSCRIPT(S) REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested), format(s) & quantity and delivery type:

a. HEARING(S) (OR PORTIONS OF HEARINGS)

b. SELECT FORMAT(S) (NOTE: ECF access is included with purchase of PDF, text, paper or condensed.)

c. DELIVERY TYPE (Choose one per line)

| DATE | JUDGE (initials) | TYPE (e.g. CMC) | PORTION If requesting less than full hearing, specify portion (e.g. witness or time) | PDF (email) | TEXT/ASCII (email) | PAPER | CONDENSED (email) | ECF ACCESS (web) | ORDINARY (30-day) | 14-Day | EXPEDITED (7-day) | 3-DAY | DAILY (Next day) | HOURLY (2 hrs) | REALTIME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/17/2020 | WHA | Status | | ● | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

10. ADDITIONAL COMMENTS, INSTRUCTIONS, QUESTIONS, ETC:

ORDER & CERTIFICATION (11. & 12.) By signing below, I certify that I will pay all charges (deposit plus additional).

11. SIGNATURE   /s/ Neal Stephens

12. DATE   11/18/2020

Save as new PDF

Clear Form

**TRANSCRIPT ORDER**
Please use one form per court reporter.
*CJA counsel please use Form CJA24*
*Please read instructions on next page.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
CAND 435
(CAND Rev. 08/2018)

**COURT USE ONLY**
**DUE DATE:**

1a. CONTACT PERSON FOR THIS ORDER
Anna Oak

2a. CONTACT PHONE NUMBER
(202) 367-7731

3. CONTACT EMAIL ADDRESS
aoak@kellogghansen.com

1b. ATTORNEY NAME (if different)
Daniel V. Dorris

2b. ATTORNEY PHONE NUMBER
(202) 326-7900

3. ATTORNEY EMAIL ADDRESS
ddorris@kellogghansen.com

4. MAILING ADDRESS (INCLUDE LAW FIRM NAME, IF APPLICABLE)
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036

5. CASE NAME
USA v. Robert T. Brockman

6. CASE NUMBER
3:20-cr-00371

7. COURT REPORTER NAME ( FOR FTR, LEAVE BLANK AND CHECK BOX)→ ☐ FTR
Ruth Levine Ekhaus

8. THIS TRANSCRIPT ORDER IS FOR:
☐ APPEAL  ☑ CRIMINAL
☐ NON-APPEAL  ☐ CIVIL
☐ In forma pauperis (NOTE: Court order for transcripts must be attached)
CJA: *Do not use this form: use Form CJA24.*

9. TRANSCRIPT(S) REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested), format(s) & quantity and delivery type:

a. HEARING(S) (OR PORTIONS OF HEARINGS)

b. SELECT FORMAT(S) (*NOTE: ECF access is included with purchase of PDF, text, paper or condensed.*)

c. DELIVERY TYPE (Choose one per line)

| DATE | JUDGE (initials) | TYPE (e.g. CMC) | PORTION If requesting less than full hearing, specify portion (e.g. witness or time) | PDF (email) | TEXT/ASCII (email) | PAPER | CONDENSED (email) | ECF ACCESS (web) | ORDINARY (30-day) | 14-Day | EXPEDITED (7-day) | 3-DAY | DAILY (Next day) | HOURLY (2 hrs) | REALTIME |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 11/17/2020 | JWA | Status | | ● | ○ | ○ | ○ | ○ | ▣ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

10. ADDITIONAL COMMENTS, INSTRUCTIONS, QUESTIONS, ETC:

ORDER & CERTIFICATION (11. & 12.) By signing below, I certify that I will pay all charges (deposit plus additional).

11. SIGNATURE
/s/ Daniel V. Dorris

12. DATE
11/18/2020

Save as new PDF

Clear Form

CAND 435
(Rev. 08/2018)

## INSTRUCTIONS

Use this form to order the transcription of a record of proceedings. **CJA counsel should use Form CJA24.** Before completing this form, please visit cand.uscourts.gov/transcripts for complete transcript ordering information. **THESE INSTRUCTIONS SUPPLEMENT THE WEBSITE INFORMATION.**

1. Complete a separate order form for each case number for which transcripts are ordered.
2. Complete a separate order form for each court reporter who reported proceedings in the case.
3. Complete Items 1-12. Keep a copy of your completed order form for your records.
4. E-file this form in the U.S. District Court CM/ECF system. **Exceptions to e-filing:** (a) sealed cases/proceedings; (b) non-parties; (c) pro se parties who are not e-filers. In such cases, mail or hand-deliver a hard copy addressed to the court reporter supervisor (email list available at cand.uscourts.gov/transcripts/contact) at the Court division where the proceeding was held.
5. Next, the court reporter/transcriber will contact you to confirm estimated costs and delivery options. Deliver payment to the court reporter/transcriber promptly. Upon receipt of the deposit, the court reporter/transcriber will begin work on the transcript.
6. Unless prepayment is waived, delivery time is computed from the date the court reporter/transcriber receives the deposit, authorized CJA 24 Form, authorization from Federal Public Defender's Office or, for transcripts ordered by the U.S. government, from the date of receipt of the DCN number.
7. The deposit fee is an estimate. Any overage will be refunded; any shortage will be due from you.

## ITEM-BY-ITEM INSTRUCTIONS (ITEMS 1-12):

Items 1-3    In fields 1a, 2a & 3a, please provide the contact name and information for the person responsible for ordering the transcript. In a law office, this is usually a paralegal or administrative assistant, not the attorney. In fields 1b, 2b & 3b, provide the attorney name and contact info, if the attorney is not the contact person.

Items 5-6.   Only one case number may be listed per order.

Item 7.      Visit cand.uscourts.gov/transcripts for instructions for determining the name of the court reporter who reported the proceeding or if the proceeding was audio-recorded. If minutes have not been filed, contact the court reporter supervisor at the division where the hearing was held.

Item 8.      Check appeal OR non-appeal AND criminal OR civil. **In forma pauperis:** a court order specifically authorizing transcripts is required before transcripts may be ordered in forma pauperis.

Item 9a.     List specific date(s) of the proceedings for which transcript is requested. A transcript of only a portion of a proceeding may be ordered, if the description is clearly written to facilitate processing. Under "type," indicate briefly what type of proceeding it was, such as "motion," "sentencing," or "CMC."

Item 9b.     Select desired **FORMAT(S)** for transcript. There is an additional charge for each format ordered. Visit cand.uscourts.gov/transcripts/rates for details. Unlock ECF/web access is included at no extra charge with each of the other formats.

Item 9c.     There are 7 **DELIVERY TYPES** to choose from (times are computed from date of receipt of the deposit fee or DCN number). **NOTE:** Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within 7 calendar days, the 14-day delivery rate would be charged.

**TRANSCRIPT DELIVERY TIMES:**
- ORDINARY — 30 calendar days.
- 14-DAY — 14 calendar days.
- EXPEDITED — 7 calendar days.
- 3-DAY — 3 calendar days
- DAILY (NEXT DAY) — Following adjournment and prior to the normal opening hour of the court on the following morning whether or not it actually is a court day.
- HOURLY (SAME DAY) — within two (2) hours.
- REALTIME — A draft unedited, uncertified transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

Item 11.     Sign in this space to indicate that you will pay all charges (the deposit plus any additional charges.) An electronic or conformed (/s/) signature is acceptable.

Item 12.     Enter the date of signing the order and certification.

1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney
2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  MICHAEL G. PITMAN (DCBN 484164)
   Assistant United States Attorney
5  150 Almaden Boulevard, Suite 900
   San Jose, California 95113
6  Telephone: (408) 535-5040
   Facsimile:  (408) 535-5081
7  michael.pitman@usdoj.gov

8  COREY J. SMITH (MABN 553615)
   Senior Litigation Counsel
9  LEE F. LANGSTON (NYBN 4910311)
   CHRISTOPHER M. MAGNANI (Maryland)
10 Trial Attorneys
   United States Department of Justice, Tax Division
11
12 Attorneys for the United States of America

13                    UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15                      SAN FRANCISCO DIVISION

16 UNITED STATES OF AMERICA,              Case No.: 3:20-cr-00371-WHA

17         Plaintiff,                     STIPULATION TO EXCLUDE TIME
                                          FROM NOVEMBER 17, 2020 THROUGH
18     v.                                 DECEMBER 1, 2020 AND [PROPOSED] ORDER

19 ROBERT T. BROCKMAN,

20         Defendant.

21

22         It is hereby stipulated by and between counsel for the United States and counsel for the

23 defendant Robert T. Brockman, that time be excluded under the Speedy Trial Act from November 17,

24 2020 through December 1, 2020.

25         At the status conference held on November 17, 2020, the government and counsel for the

26 defendant agreed that this matter is complex, as defined in 18 U.S.C. § 3161(h)(7)(B)(ii), due to the

27 breadth and duration of the conduct alleged in the Indictment, and the government's representation that

28 discovery will be voluminous.  The government and counsel for the defendant agreed that time be

1    excluded under the Speedy Trial Act because of the complexity of the case, because of pending motions,

2    and so that defense counsel could continue to prepare, including by reviewing the discovery to be

3    produced.  For this reason and as further stated on the record at the status conference, the parties

4    stipulate and agree to exclude time until December 1, 2020, and further stipulate and agree that the ends

5    of justice served by excluding the time from November 17, 2020 through December 1, 2020 from

6    computation under the Speedy Trial Act outweigh the best interests of the public and the defendant in a

7    speedy trial. 18 U.S.C. §§ 3161(h)(1)(D), (h)(7)(A), (h) (7)(B)(ii), (h)(7)(B)(iv).

8         The undersigned Assistant United States Attorney certifies that he has obtained approval from

9    counsel for the defendant to file this stipulation and proposed order.

10

11   IT IS SO STIPULATED.

12                                    DAVID L. ANDERSON
                                      United States Attorney
13
                                      s/ Michael G. Pitman
14                                    COREY J. SMITH
                                      Senior Litigation Counsel
15                                    MICHAEL G. PITMAN
                                      Assistant United States Attorney
16
                                      Attorneys for United States of America
17

18

19                                    s/ Neal J. Stephens
20                                    NEAL J. STEPHENS
                                      Counsel for Defendant ROBERT T. BROCKMAN
21

22

23

24                              [PROPOSED] ORDER

25        Based upon the facts set forth in the stipulation of the parties and the representations made to the

26   Court on November 17, 2020 and for good cause shown, the Court finds that time should be excluded

27   from November 17, 2020 through December 1, 2020 under the Speedy Trial Act because of the

28   complexity of the case, because of pending motions, and so that defense counsel could continue to

1   prepare, including by reviewing the discovery to be produced, taking into account the exercise of due

2   diligence.  18 U.S.C. §§ 3161(h)(1)(D), (h)(7)(A), (h) (7)(B)(ii), (h)(7)(B)(iv).  The Court further finds

3   that the ends of justice served by excluding the time from November 17, 2020 to December 1, 2020

4   from computation under the Speedy Trial Act outweigh the best interests of the public and the defendant

5   in a speedy trial.  Therefore, and with the consent of the parties, IT IS HEREBY ORDERED that the

6   time from November 17, 2020 through December 1, 2020 shall be excluded from computation under the

7   Speedy Trial Act.

8

9   IT IS SO ORDERED.

10

11  DATED: _____          _____

12                                          WILLIAM ALSUP
                                            United States District Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   DAVID L. ANDERSON (CABN 149604)
    United States Attorney
2
    HALLIE HOFFMAN (CABN 210020)
3   Chief, Criminal Division

4   MICHAEL G. PITMAN (DCBN 484164)
    Assistant United States Attorney
5   150 Almaden Boulevard, Suite 900
    San Jose, California 95113
6   Telephone: (408) 535-5040
    Facsimile:  (408) 535-5081
7   michael.pitman@usdoj.gov

8   COREY J. SMITH (MABN 553615)
    Senior Litigation Counsel
9   LEE F. LANGSTON (NYBN 4910311)
    CHRISTOPHER M. MAGNANI (Maryland)
10  Trial Attorneys
    United States Department of Justice, Tax Division
11

12  Attorneys for the United States of America

13                     UNITED STATES DISTRICT COURT

14                   NORTHERN DISTRICT OF CALIFORNIA

15                        SAN FRANCISCO DIVISION

16  UNITED STATES OF AMERICA,            Case No.: 3:20-cr-00371-WHA

17        Plaintiff,                     STIPULATION TO EXCLUDE TIME
                                         FROM NOVEMBER 17, 2020 THROUGH
18     v.                                DECEMBER 1, 2020 AND [PROPOSED] ORDER

19  ROBERT T. BROCKMAN,

20        Defendant.

21

22        It is hereby stipulated by and between counsel for the United States and counsel for the

23  defendant Robert T. Brockman, that time be excluded under the Speedy Trial Act from November 17,

24  2020 through December 1, 2020.

25        At the status conference held on November 17, 2020, the government and counsel for the

26  defendant agreed that this matter is complex, as defined in 18 U.S.C. § 3161(h)(7)(B)(ii), due to the

27  breadth and duration of the conduct alleged in the Indictment, and the government's representation that

28  discovery will be voluminous.  The government and counsel for the defendant agreed that time be

1  excluded under the Speedy Trial Act because of the complexity of the case, because of pending motions,

2  and so that defense counsel could continue to prepare, including by reviewing the discovery to be

3  produced.  For this reason and as further stated on the record at the status conference, the parties

4  stipulate and agree to exclude time until December 1, 2020, and further stipulate and agree that the ends

5  of justice served by excluding the time from November 17, 2020 through December 1, 2020 from

6  computation under the Speedy Trial Act outweigh the best interests of the public and the defendant in a

7  speedy trial. 18 U.S.C. §§ 3161(h)(1)(D), (h)(7)(A), (h) (7)(B)(ii), (h)(7)(B)(iv).

8      The undersigned Assistant United States Attorney certifies that he has obtained approval from

9  counsel for the defendant to file this stipulation and proposed order.

10

11  IT IS SO STIPULATED.

12                                              DAVID L. ANDERSON
                                                United States Attorney
13
                                                s/ Michael G. Pitman
14                                              COREY J. SMITH
                                                Senior Litigation Counsel
15                                              MICHAEL G. PITMAN
                                                Assistant United States Attorney
16
                                                Attorneys for United States of America
17

18

19
                                                s/ Neal J. Stephens
20                                              NEAL J. STEPHENS
                                                Counsel for Defendant ROBERT T. BROCKMAN
21

22

23

24                                  [PROPOSED] ORDER

25      Based upon the facts set forth in the stipulation of the parties and the representations made to the

26  Court on November 17, 2020 and for good cause shown, the Court finds that time should be excluded

27  from November 17, 2020 through December 1, 2020 under the Speedy Trial Act because of the

28  complexity of the case, because of pending motions, and so that defense counsel could continue to

prepare, including by reviewing the discovery to be produced, taking into account the exercise of due diligence. 18 U.S.C. §§ 3161(h)(1)(D), (h)(7)(A), (h) (7)(B)(ii), (h)(7)(B)(iv). The Court further finds that the ends of justice served by excluding the time from November 17, 2020 to December 1, 2020 from computation under the Speedy Trial Act outweigh the best interests of the public and the defendant in a speedy trial. Therefore, and with the consent of the parties, IT IS HEREBY ORDERED that the time from November 17, 2020 through December 1, 2020 shall be excluded from computation under the Speedy Trial Act.

IT IS SO ORDERED.

DATED:     November 18, 2020

WILLIAM ALSUP
United States District Judge

STIPULATION TO EXCLUDE TIME FROM
NOVEMBER 17, 2020 THROUGH DECEMBER 1, 2020
AND [PROPOSED] ORDER
Case No.: 3:20-CR-00371-WHA

3

Case 3:20-cr-00371-WHA Document 42 Filed 11/18/20 Page 1 of 1

**TRANSCRIPT ORDER**
Please use one form per court reporter.
*CJA counsel please use Form CJA24*
*Please read instructions on next page.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
(CAND 435)
(CAND Rev. 08/2018)

COURT USE ONLY
**DUE DATE:**

1a. CONTACT PERSON FOR THIS ORDER
DAVID VOEPLES

2a. CONTACT PHONE NUMBER
201 417 8444

3. CONTACT EMAIL ADDRESS
DVOPPEKCES @ BLOOMBERG.NET

1b. ATTORNEY NAME (if different)

2b. ATTORNEY PHONE NUMBER

3. ATTORNEY EMAIL ADDRESS

4. MAILING ADDRESS (INCLUDE LAW FIRM NAME, IF APPLICABLE)
BLOOMBERG NEWS
731 LEXINGTON AVE
NEW YORK, NY 10022

5. CASE NAME
US v BLOCKMAN

6. CASE NUMBER
20-cR-371

7. COURT REPORTER NAME (FOR FTR, LEAVE BLANK AND CHECK BOX) → ☐ FTR
RUTH LEVINE EKHAUS

8. THIS TRANSCRIPT ORDER IS FOR:
☐ APPEAL          ☒ CRIMINAL
☐ NON-APPEAL      ☐ CIVIL

☐ In forma pauperis (NOTE: Court order for transcripts must be attached)
CJA: Do not use this form; use Form CJA24.

9. TRANSCRIPT(S) REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested), format(s) & quantity and delivery type:

| | | | | b. SELECT FORMAT(S) (NOTE: ECF access is included with purchase of PDF, text, paper or condensed.) | | | | | | c. DELIVERY TYPE (Choose one per line) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| a. HEARING(S) (OR PORTIONS OF HEARINGS) | | | | PDF (emails) | TEXT/ASCII (emails) | PAPER | CONDENSED (emails) | ECF ACCESS (web) | | ORDINARY (30-day) | 14-Day | EXPEDITED (7-day) | 3-DAY | DAILY (next day) | HOURLY (2 hrs) | REALTIME |
| DATE | JUDGE (initials) | TYPE (e.g. CMC) | PORTION If requesting less than full hearing, specify portion (e.g. witness or time) | | | | | | | | | | | | | |
| 11/12/20 | WA | | FULL HEARING | ☒ | ○ | ○ | ○ | ○ | | ○ | ○ | ☒ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

10. ADDITIONAL COMMENTS, INSTRUCTIONS, QUESTIONS, ETC:

ORDER & CERTIFICATION (11. & 12.) By signing below, I certify that I will pay all charges (deposit plus additional).

11. SIGNATURE

12. DATE
11/18/20

Clear Form

Save as new PDF

1   DAVID L. ANDERSON (CABN 149604)
    United States Attorney

2

3   HALLIE HOFFMAN (CABN 210020)
    Chief, Criminal Division

4   MICHAEL G. PITMAN (DCBN 484164)
    Assistant United States Attorney

5   150 Almaden Boulevard, Suite 900
    San Jose, California 95113

6   Telephone: (408) 535-5040
    Facsimile: (408) 535-5081

7   michael.pitman@usdoj.gov

8   COREY J. SMITH (MABN 553615)
    Senior Litigation Counsel

9   LEE F. LANGSTON (NYBN 4910311)
    CHRISTOPHER M. MAGNANI (Maryland)

10   Trial Attorneys
    United States Department of Justice, Tax Division

11

12   Attorneys for the United States of America

13                UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15               SAN FRANCISCO DIVISION

16   UNITED STATES OF AMERICA,      Case No.: 3:20-cr-00371-WHA

17        Plaintiff,                STIPULATION AND [PROPOSED]
                                      SCHEDULING ORDER

18     v.

19   ROBERT T. BROCKMAN,

20        Defendant.

21

22       With the agreement of the parties, the Court enters the following Scheduling Order:

23       All motions to transfer venue must be filed by NOVEMBER 30, 2021.

24       All motions for a determination pursuant to 18 U.S.C. § 4241(a) must be filed by DECEMBER

25   8, 2021.

26       All motions to dismiss or to sever based on the face of the operative indictment or any other

27   motion based on the face of the operative indictment must be filed by JANUARY 25, 2021.

28

1   All Rule 8 motions, motions for bills of particulars, or motions for discovery of jury composition

2   records must be filed by FEBRUARY 8, 2021.

3   Any motion by the government to keep secret the names and identities of civilian witnesses, who

4   otherwise shall be disclosed as set forth hereafter, must be filed by FEBRUARY 8, 2021. Any such

5   motion must be specific as to the risks and reasons by individual witness and may be under seal and ex

6   parte. Abbreviated memoranda and declarations must be served on defense counsel allowing them to at

7   least know the themes advanced under seal and ex parte. The submissions must address whether a

8   protective order restricting use of the information would suffice. Any of the aforementioned Rule 16

9   materials that may require sealing must still be produced by the deadline with the names and identities

10  of the civilians in questions redacted.

11  A status conference and hearing on any motion filed by February 8, 2021 is hereby set for TWO

12  P.M. ON FEBRUARY 23, 2021.

13  By MARCH 1, 2021, all materials required under Rule 16 to be produced by the government

14  must be produced to any defendant that has made a written Rule 16 request. All such Rule 16 materials

15  acquired thereafter by the government or any of its agents subject to Rule 16 must be produced within

16  FOURTEEN CALENDAR DAYS of receipt or acquisition by government counsel or its agent (but,

17  again, only to a defendant who has made a timely written request). Failure to so produce will preclude

18  use of any such evidence by the government (other than for impeachment or rebuttal). As to any such

19  Rule 16 material produced after said date, the burden shall be on the government to demonstrate

20  compliance with the fourteen-day exception.

21  All motions to suppress must be filed by MAY 24, 2021. All motions alleging any defect in

22  instituting the prosecution, motions for disclosure of informants, or motions alleging selective

23  prosecution must be filed by MAY 24, 2021.

24  By JUNE 4, 2021, all government expert reports and summaries shall be produced to defense

25  counsel.

26  By JULY 9, 2021, all Rule 16 defense reciprocal disclosures, including expert reports and

27  summaries, must be produced to the government and all Rule 12.1 and 12.2 defense notices must be

28  given, if any. All rebuttal expert reports and summaries by the government shall be due SEVEN

1    CALENDAR DAYS before the final pretrial conference. Any mental examinations shall occur on a

2    schedule to be set by motion.

3        By JULY 9, 2021, all translations or transcripts of conversations or statements to be shown to the

4    jury must be provided to defendants and any motions directed to their accuracy shall be heard at the final

5    pretrial conference.

6        By AUGUST 27, 2021, the government must provide a trial exhibit list and a final list of

7    witnesses for its case-in-chief, including civilian witnesses except to the extent a prior court order has

8    allowed a postponement of such disclosure.

9        All *Daubert* or other motions directed at government reports must be filed by JUNE 29, 2021.

10        By SEPTEMBER 3, 2021, the government shall advise the Court that it has produced all *Brady-*

11    *Giglio* information in its possession and will continue to produce any the government subsequently

12    discovers.

13        On SEPTEMBER 24, 2021, the final pretrial conference shall be held at 8:00 A.M. All motions

14    for the final pretrial conference shall be due FOURTEEN CALENDAR DAYS before the conference

15    with oppositions due seven calendar days before the conference.

16        For the final pretrial conference, defendants and the government must file any motions *in limine*

17    as well as any of the following:

18        1.      Motions to exclude co-conspirator statements.

19        2.      Government *Daubert* motions or other motions directed at defense experts.

20        3.      Motions to exclude/include Rule 404(b) acts; to tee this up, the government

21                must disclose all proposed Rule 404(b) material 35 CALENDAR DAYS before

22                the final pretrial conference, and any motion to exclude must be filed

23                fourteen calendar days before the final pretrial conference.

24        4.      Motions directed at the accuracy of transcripts of recordings to be shown to

25                the jury.

26        On NOVEMBER 15, 2021, trial shall commence at 7:30 A.M. with jury selection.

27        Unless otherwise indicated, all motions filed in accordance with this scheduling order will be

28    heard fourteen days after the motion is filed.

1       Unless it covers all defendants, no Rule 11(c)(1)(C) plea agreement will be accepted within two

2  months of the final pretrial conference. Open pleas, however, will be allowed at any time.

3       The undersigned attorney for the government certifies that he has obtained approval from

4  counsel for the defendant to file this stipulation and proposed order.

5

6  IT IS SO STIPULATED.                          DAVID L. ANDERSON
                                                 United States Attorney
7
                                                 s/ Michael G. Pitman
8                                                COREY J. SMITH
                                                 Senior Litigation Counsel
9                                                MICHAEL G. PITMAN
                                                 Assistant United States Attorney
10
                                                 Attorneys for United States of America
11

12

13                                               s/ Neal J. Stephens
                                                 NEAL J. STEPHENS
14                                               Counsel for Defendant ROBERT T. BROCKMAN

15

16  IT IS SO ORDERED.

17

18  Dated:                                       _____

19                                               WILLIAM ALSUP
                                                 United States District Judge
20

21

22

23

24

25

26

27

28

DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

MICHAEL G. PITMAN (DCBN 484164)
Assistant United States Attorney
150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5040
Facsimile:  (408) 535-5081
michael.pitman@usdoj.gov

COREY J. SMITH (MABN 553615)
Senior Litigation Counsel
LEE F. LANGSTON (NYBN 4910311)
CHRISTOPHER M. MAGNANI (Maryland)
Trial Attorneys
United States Department of Justice, Tax Division

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 3:20-cr-00371-WHA |
| Plaintiff, | STIPULATION AND [PROPOSED] PROTECTIVE ORDER |
| v. | |
| ROBERT T. BROCKMAN, | |
| Defendant. | |

With the agreement of the parties, the Court enters the following Protective Order:

On October 1, 2020, a federal grand jury in the Northern District of California returned an

Indictment charging the Defendant with: conspiracy to defraud the United States, in violation of 18

U.S.C. § 371; tax evasion, in violation of 26 U.S.C. § 7201; FBAR reporting violations, in violation of

31 U.S.C. §§ 5314 and 5322; wire fraud, in violation of 18 U.S.C. § 1343; money laundering, in

violation of 18 U.S.C. §§ 1956(a)(1)(A)(ii), (a)(1)(B)(i), and (a)(2)(B)(i); evidence tampering, in

violation of 18 U.S.C. § 1512(b)(2)(B); and destruction of evidence, in violation of 18 U.S.C.

1512(c)(1). Having received a discovery request under Fed. R. Crim. P. 16, the United States will

produce documents and other materials pertaining to the defendant and the charged offenses to defense

counsel. The discovery to be provided includes documents or other materials falling into one or more of

the following categories (collectively, "Protected Information"):

1. Personal Identifying Information of individuals (other than his or her name), including the

   person's date of birth, social security number, residence or business address, telephone

   numbers, email addresses, driver's license number, professional license number, family

   members names, or criminal histories ("Personal Identifying Information");

2. Financial information of individuals or businesses, including bank account numbers, credit or

   debit card numbers, account passwords, contact information, and taxpayer identification

   numbers ("Financial Information");

3. Medical records or other patient information of individuals covered by the Health Insurance

   Portability and Accountability Act of 1996 (HIPAA) ("Medical Information"); and

4. Tax Return Information, as defined by Title 26, United States, Code, Section 6103(b)(1) and

   (2), pertaining to third parties.

To ensure that Protected Information is not subject to unauthorized disclosure or misuse,

**IT IS HEREBY ORDERED** that pursuant to Fed. R. Crim. P. 16(d)(1), the defendant, defense

counsel of record, their investigators, assistants, and employees (collectively, "the defense team") may

review with the defendant all discovery material produced by the government, but shall not provide

anyone other than the defense team with copies of, or permit anyone other than the defense team to

make copies of, or have unsupervised access to, any discovery material produced by the government that

contains Protected Information, unless the Personal Identifying Information, Financial Information,

and/or Medical Information has first been **entirely redacted** from the discovery materials. The

government and defense counsel are ordered to work together to ensure that these materials are

protected, but that the defendant has as much access to the materials as can be provided consistent with

this Court's order. Discovery material that clearly pertains to the defendant and does not contain

Protected Information regarding any other person (*e.g.*, defendant's own bank records, telephone

records, and business records) may be provided to the defendant unredacted.

1       Defense counsel may also provide unredacted copies of Protected Information to any experts or

2  consultants retained to assist with the preparation of the defense in the captioned case.  The defendant,

3  all members of the defense team, and any experts or consultants who receive discovery under this Order

4  shall be provided a copy of this Order along with those materials and shall initial and date the order

5  reflecting their agreement to be bound by it.

6       The materials provided pursuant to this protective order may only be used for the specific

7  purpose of preparing or presenting a defense in this matter, unless specifically authorized by the Court.

8       This Order shall also apply to any copies made of any materials covered by this Order.

9       **IT IS FURTHER ORDERED** that discovery material provided by the government that includes

10  Tax Return Information of third parties, as defined by 26 U.S.C. 6103(b)(1) and (2), is provided

11  pursuant 26 U.S.C. 6103(h)(4) and: 1) pertains to the defendant; 2) is related to items contained within

12  the defendant's income tax returns; 3) is relevant to a transaction involving the defendant and a third

13  party taxpayer; or 4) is otherwise required to be disclosed under 18 U.S.C. § 3500.   The defendant, all

14  members of the defense team, and any experts or consultants who receive discovery under this Order

15  shall maintain the confidentiality of all Tax Return Information provided by the government in

16  discovery in accordance with 26 U.S.C. 6103(a) and this Order, other than material that clearly pertains

17  to the defendant and does not contain Tax Return Information regarding any other person.

18       **IT IS FURTHER ORDERED** that neither the defendant nor any member of the defense team

19  shall provide copies of any discovery material produced by the government—whether or not the material

20  constitutes or contains Protected Information within the meaning of this Order—to any third party (*i.e.*,

21  any person who is not a member of the defense team) or make any public disclosure of the same, other

22  than in a court filing, without the government's express written permission or further order of this Court.

23  No provision of this Order shall prevent defense counsel from discussing, and showing, discovery

24  provided by the government with potential trial witnesses and their counsel, as necessary to prepare for

25  trial.  If a party files a pleading that references or contains or attaches Protected Information subject to

26  this Order, that filing must comply with Fed. R. Crim. P. 49.1.  If a party files a pleading that references

27  or contains or attaches Medical Information or Tax Return Information regarding any person other than

28

1    defendant, that pleading, reference, or attachment must be made under seal.[1]

2      **IT IS FURTHER ORDERED** that defense counsel shall return materials subject to this

3 Protective Order (including any copies) to the United States within 14 days after whichever event occurs

4 last in time: dismissal of all charges against the defendant; defendant's acquittal; defendant's sentencing;

5 or the conclusion of any direct appeal.  After the United States receives documents and materials subject

6 to this Order, it shall maintain those documents and materials until the period for filing a motion under

7 28 U.S.C. § 2255 has expired.  After the statutory period for filing a motion under 28 U.S.C. § 2255 has

8 expired, the United States is free to destroy documents and materials subject to this Order.  If defendant

9 is represented by counsel and files a motion pursuant to 28 U.S.C. § 2255, the United States will provide

10 counsel with the documents and materials subject to this Protective Order under the terms of this Order.

11 Defendant's attorney in any motion under 28 U.S.C. § 2255 shall return the documents and materials

12 subject to this Protective Order within 14 days after the district court's ruling on the motion or 14 days

13 after the conclusion of any direct appeal of the district court's order denying the motion, whichever is

14 later.  This stipulation is without prejudice to either party applying to the Court to modify the terms of

15 any protective order.  This Court shall retain jurisdiction to modify this Order upon motion of either

16 party even after the conclusion of district court proceedings in this case.

17      The undersigned Attorney for the United States certifies that he has obtained approval from

18 counsel for the defendant to file this stipulation and proposed order.

19

20    IT IS SO STIPULATED.
                  DAVID L. ANDERSON
                  United States Attorney

21

22                                   s/ Michael G. Pitman
                  COREY J. SMITH

23                   Senior Litigation Counsel
                  MICHAEL G. PITMAN

24                   Assistant United States Attorney

25                   Attorneys for United States of America

26

27

                                                                     

28   _____

[1] This Order authorizes such filings under seal and the parties are not required to seek additional authorization from the Court to do so.

1

2 s/ Neal J. Stephens
 NEAL J. STEPHENS

3 Counsel for Defendant ROBERT T. BROCKMAN

4

5 IT IS SO ORDERED.

6

7 Dated:          _____

8           WILLIAM ALSUP
           United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case 3:20-cr-00371-WHA Document 45 Filed 11/19/20 Page 1 of 2

Clear Form

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
CAND 435
(CAND Rev. 02/2015)

**TRANSCRIPT ORDER**
Please use one form per court reporter.
CJA counsel please use Form CJA24
Please read instructions on next page.

COURT USE ONLY
**DUE DATE:**

1a. CONTACT PERSON FOR THIS ORDER
Jessica Leung

2a. CONTACT PHONE NUMBER
(408) 535-5588

3. CONTACT EMAIL ADDRESS
jessica.leung@usdoj.gov

1b. ATTORNEY NAME (if different)
Michael Pitman

2b. ATTORNEY PHONE NUMBER
(408) 535-5040

3. ATTORNEY EMAIL ADDRESS
michael.pitman@usdoj.gov

4. MAILING ADDRESS (INCLUDE LAW FIRM NAME, IF APPLICABLE)
U.S. Attorney's Office
150 Almaden Blvd, Suite 900
San Jose CA 95113

5. CASE NAME
USA v. Robert T. Brockman

6. CASE NUMBER
3:20-cr-00371

8. THIS TRANSCRIPT ORDER IS FOR:
☐ APPEAL      ☑ CRIMINAL
☐ NON-APPEAL   ☐ CIVIL

☐ In forma pauperis (NOTE: Court order for transcripts must be attached)
CJA: Do not use this form; use Form CJA24.

7. COURT REPORTER NAME ( FOR FTR, LEAVE BLANK AND CHECK BOX)—▸ ☐ FTR
Ruth Levine Ekhaus

9. TRANSCRIPT(S) REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested), format(s), & quantity and delivery type:

a. HEARING(S) (OR PORTIONS OF HEARINGS)

b. SELECT FORMAT(S) (NOTE: ECF access is included with purchase of PDF, text, paper or condensed.)

c. DELIVERY TYPE (Choose one per line)

| DATE | JUDGE (initials) | TYPE (e.g. CMC) | PORTION If requesting less than full hearing, specify portion (e.g. witness or time) | PDF (email) | TEXT/ASCII (email) | PAPER | CONDENSED (email) | ECF ACCESS (web) | ORDINARY (30-day) | 14-Day | EXPEDITED (7-day) | DAILY (Next day) | HOURLY (2 hrs) | REALTIME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/17/2020 | JWA | Status☑ | | ● | ○ | ○ | ○ | ○ | ● | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

10. ADDITIONAL COMMENTS, INSTRUCTIONS, QUESTIONS, ETC:

ORDER & CERTIFICATION (11. & 12.) By signing below, I certify that I will pay all charges (deposit plus additional).

11. SIGNATURE   /s/

12. DATE   11/19/2020

DISTRIBUTION:   ☐ COURT COPY   ☐ ORDER RECEIPT   ☐ TRANSCRIPTION COPY   ☐ ORDER COPY

Case 3:20-cr-00371-WHA   Document 45   Filed 11/19/20   Page 2 of 2

CAND 435
(Rev. 02/2015)

## INSTRUCTIONS

Use this form to order the transcription of proceedings. **CJA counsel should use Form CJA24.** Before completing this form, please visit cand.uscourts.gov/transcripts for complete transcript ordering information. THESE INSTRUCTIONS SUPPLEMENT THE WEBSITE INFORMATION.

1. Complete a separate order form for each case number for which transcripts are ordered.
2. Complete a separate order form for each court reporter who reported proceedings in the case.
3. Complete items 1-12. Keep a copy of your completed order form for your records.
4. E-file this form in the U.S. District Court CM/ECF system. **Exceptions to e-filing:** (a) sealed cases/proceedings; (b) non-parties; (c) pro se parties who are not e-filers. In such cases, mail or hand-deliver a hard copy addressed to the court reporter c/o the Clerk's Office at the Court division where the proceeding was held.
5. Email the court reporter (email list available at cand.uscourts.gov/courtreportercontact) promptly after this Transcript Order Form is e-filed to obtain the amount of the required deposit. Deliver payment to the court reporter promptly. Upon receipt of the deposit, the court reporter will begin work on the transcript. **Exceptions:** (a) orders for FTR transcripts and (b) daily trial transcript orders.
6. Unless prepayment is waived, delivery time is computed from the date the court reporter receives the deposit, authorized CJA 24 Form, authorization from Federal Public Defender's Office or, for transcripts ordered by the U.S. government, from the date of receipt of the DCN number.
7. The deposit fee is an estimate. Any overage will be refunded; any shortage will be due from you.

## ITEM-BY-ITEM INSTRUCTIONS (ITEMS 1-12):

Items 1-3   In fields 1a, 2a & 3a, please provide the contact name and information for the person responsible for ordering the transcript. In a law office, this is usually a paralegal or administrative assistant, not the attorney. In fields 1b, 2b & 3b, provide the attorney name and contact info, if the attorney is not the contact person.

Items 5-6.   Only one case number may be listed per order.

Item 7.   Visit cand.uscourts.gov/transcripts for instructions for determining the name of the court reporter who reported the proceeding or if the proceeding was audiorecorded. If minutes have not been filed, contact judge's courtroom deputy.

Item 8.   Check appeal OR non-appeal AND criminal OR civil. **In forma pauperis:** a court order specifically authorizing transcripts is required before transcripts may be ordered in forma pauperis.

Item 9a.   List specific date(s) of the proceedings for which transcript is requested. A transcript of only a portion of a proceeding may be ordered, if the description is clearly written to facilitate processing. Under "type," indicate briefly what type of proceeding it was, such as "motion," "sentencing," or "CMC."

em 9b.   Select desired FORMAT(S) for transcript. There is an additional charge for each format ordered. Visit cand.uscourts.gov/transcriptrates for details. Unlock ECF/web access is included at no extra charge with each of the other formats.

Item 9c.   There are 6 **DELIVERY TYPES** to choose from (times are computed from date of receipt of the deposit fee or DCN number). **NOTE:** Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within 7 calendar days, the 14-day delivery rate would be charged.

TRANSCRIPT DELIVERY TIMES:

ORDINARY — 30 calendar days.

14-DAY — 14 calendar days.

EXPEDITED — 7 calendar days.

DAILY (NEXT DAY) — Following adjournment and prior to the normal opening hour of the court on the following morning whether or not it actually is a court day.

HOURLY (SAME DAY) — within two (2) hours.

REALTIME — A draft unedited, uncertified transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

Item 11.   Sign in this space to certify that you will pay all charges (the deposit plus any additional charges). An electronic or conformed (/s/) signature is acceptable.

Item 12.   Enter the date of signing the order and certification.

Case 3:20-cr-00371-WHA   Document 46   Filed 11/19/20   Page 1 of 2

**TRANSCRIPT ORDER**

Please use one form per court reporter.
*CJA counsel please use Form CJA24*
*Please read instructions on next page.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**CAND 435**
(CAND Rev. 08/2018)

| | |
|---|---|
| **1a.** CONTACT PERSON FOR THIS ORDER<br>Lindsay VanHulle | **2a.** CONTACT PHONE NUMBER<br>**(313) 446-0374** |
| **1b.** ATTORNEY NAME (if different) | **2b.** ATTORNEY PHONE NUMBER |

**3.** CONTACT EMAIL ADDRESS
lvanhulle@crain.com

**3.** ATTORNEY EMAIL ADDRESS

COURT USE ONLY
**DUE DATE:**

| | |
|---|---|
| **4.** MAILING ADDRESS (INCLUDE LAW FIRM NAME, IF APPLICABLE)<br>Automotive News<br>1155 Gratiot Ave.<br>Detroit, MI 48207 | **5.** CASE NAME<br>USA v. Brockman |

**6.** CASE NUMBER
3:20-cr-00371

**7.** COURT REPORTER NAME ( FOR FTR, LEAVE BLANK AND CHECK BOX)→ ☐ FTR
Ruth Levine Ekhaus

**8.** THIS TRANSCRIPT ORDER IS FOR:
☐ APPEAL      ☑ CRIMINAL
☐ NON-APPEAL   ☐ CIVIL

☐ In forma pauperis (NOTE: Court order for transcripts must be attached)

CJA: **Do not use this form; use Form CJA24.**

**9.** TRANSCRIPT(S) REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested), format(s) & quantity and delivery type:

**a.** HEARING(S) (OR PORTIONS OF HEARINGS)

**b.** SELECT FORMAT(S)  *(NOTE: ECF access is included with purchase of PDF, text, paper or condensed.)*

**c.** DELIVERY TYPE (Choose one per line)

| DATE | JUDGE (initials) | TYPE (e.g. CMC) | PORTION If requesting less than full hearing, specify portion (e.g. witness or time) | PDF (email) | TEXT/ASCII (email) | PAPER | CONDENSED (email) | ECF ACCESS (web) | ORDINARY (30-day) | 14-Day | EXPEDITED (7-day) | 3-DAY | DAILY (Next day) | HOURLY (2 hrs) | REALTIME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/17/2020 | WA | status | full hearing | 🔵 | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

**10.** ADDITIONAL COMMENTS, INSTRUCTIONS, QUESTIONS, ETC:

ORDER & CERTIFICATION (11. & 12.) By signing below, I certify that I will pay all charges (deposit plus additional).

**11.** SIGNATURE
Lindsay VanHulle

**12.** DATE
11/19/2020

Save as new PDF

Clear Form

Case 3:20-cr-00371-WHA Document 46 Filed 11/19/20 Page 2 of 2

CAND 435
(Rev. 08/2018)

## INSTRUCTIONS

Use this form to order the transcription of a record of proceedings. **CJA counsel should use Form CJA24.** Before completing this form, please visit cand.uscourts.gov/transcripts for complete transcript ordering information. **THESE INSTRUCTIONS SUPPLEMENT THE WEBSITE INFORMATION.**

1. Complete a separate order form for each case number for which transcripts are ordered.
2. Complete a separate order form for each court reporter who reported proceedings in the case.
3. Complete Items 1-12. Keep a copy of your completed order form for your records.
4. E-file this form in the U.S. District Court CM/ECF system. **Exceptions to e-filing:** (a) sealed cases/proceedings; (b) non-parties; (c) pro se parties who are not e-filers. In such cases, mail or hand-deliver a hard copy addressed to the court reporter supervisor (email list available at cand.uscourts.gov/transcripts/contact) at the Court division where the proceeding was held.
5. Next, the court reporter/transcriber will contact you to confirm estimated costs and delivery options. Deliver payment to the court reporter/transcriber promptly. Upon receipt of the deposit, the court reporter/transcriber will begin work on the transcript.
6. Unless prepayment is waived, delivery time is computed from the date the court reporter/transcriber receives the deposit, authorized CJA 24 Form, authorization from Federal Public Defender's Office or, for transcripts ordered by the U.S. government, from the date of receipt of the DCN number.
7. The deposit fee is an estimate. Any overage will be refunded; any shortage will be due from you.

### ITEM-BY-ITEM INSTRUCTIONS (ITEMS 1-12):

Items 1-3    In fields 1a, 2a & 3a, please provide the contact name and information for the person responsible for ordering the transcript. In a law office, this is usually a paralegal or administrative assistant, not the attorney. In fields 1b, 2b & 3b, provide the attorney name and contact info, if the attorney is not the contact person.

Items 5-6.   Only one case number may be listed per order.

Item 7.      Visit cand.uscourts.gov/transcripts for instructions for determining the name of the court reporter who reported the proceeding or if the proceeding was audio-recorded. If minutes have not been filed, contact the court reporter supervisor at the division where the hearing was held.

Item 8.      Check appeal OR non-appeal AND criminal OR civil. **In forma pauperis:** a court order specifically authorizing transcripts is required before transcripts may be ordered in forma pauperis.

Item 9a.     List specific date(s) of the proceedings for which transcript is requested. A transcript of only a portion of a proceeding may be ordered, if the description is clearly written to facilitate processing. Under "type," indicate briefly what type of proceeding it was, such as "motion," "sentencing," or "CMC."

Item 9b.     Select desired **FORMAT(S)** for transcript. There is an additional charge for each format ordered. Visit cand.uscourts.gov/transcripts/rates for details. Unlock ECF/web access is included at no extra charge with each of the other formats.

Item 9c.     There are 7 **DELIVERY TYPES** to choose from (times are computed from date of receipt of the deposit fee or DCN number). **NOTE:** Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within 7 calendar days, the 14-day delivery rate would be charged.

**TRANSCRIPT DELIVERY TIMES:**

- **ORDINARY** — 30 calendar days.
- **14-DAY** — 14 calendar days.
- **EXPEDITED** — 7 calendar days.
- **3-DAY** — 3 calendar days
- **DAILY (NEXT DAY)** — Following adjournment and prior to the normal opening hour of the court on the following morning whether or not it actually is a court day.
- **HOURLY (SAME DAY)** — within two (2) hours.
- **REALTIME** — A draft unedited, uncertified transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

Item 11.     Sign in this space to certify that you will pay all charges (the deposit plus any additional charges.) An electronic or conformed (/s/) signature is acceptable.

Item 12.     Enter the date of signing the order and certification.

1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7

8                    NORTHERN DISTRICT OF CALIFORNIA

9

10   UNITED STATES OF AMERICA,

11                  Plaintiff,                    No.  CR 20-00371 WHA

12          v.

13   ROBERT T. BROCKMAN,                          **ORDER RE PARTIES' STIPULATED
                                                  REQUEST FOR PROTECTIVE
14                  Defendants.                   ORDER AND THE GOVERNMENT'S
                                                  MOTION FOR DISCLOSURE
15                                                UNDER § 6103(h)(4)(D)**

16

17

18          Defendant Robert Brockman and the United States of America, by and through its

19   counsel of record, both move for a protective order in this case, pursuant to Federal Rules of

20   Criminal Procedure 16(d).  The government additionally moves for an order permitting it to

21   disclose third party tax information pursuant to 26 U.S.C. Section 6103(h)(4)(D).  **The

22   foregoing order addresses parties' request, with modifications both formatted in bold

23   and underlined.**

     On October 1, 2020, a federal grand jury in the Northern District of California returned

24   an Indictment charging defendant with:  conspiracy to defraud the United States, in violation of

25   18 U.S.C. § 371; tax evasion, in violation of 26 U.S.C. § 7201; FBAR reporting violations, in

26   violation of 31 U.S.C. §§ 5314 and 5322; wire fraud, in violation of 18 U.S.C. § 1343; money

27   laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(ii), (a)(1)(B)(i), and (a)(2)(B)(i);

28

United States District Court
Northern District of California

evidence tampering, in violation of 18 U.S.C. § 1512(b)(2)(B); and destruction of evidence, in violation of 18 U.S.C. 1512(c)(1). Having received a discovery request under Fed. R. Crim. P. 16, the United States will produce documents and other materials pertaining to defendant and the charged offenses to defense counsel. The discovery to be provided includes documents or other materials falling into one or more of the following categories (collectively, "protected information"):

1. Personal identifying information of individuals **(other than individuals' names)**, including the person's date of birth, social security number, residence or business address, telephone numbers, email addresses, driver's license number, professional license number, family members names, or criminal histories ("personal identifying information");

2. Financial information of individuals or businesses, including bank account numbers, credit or debit card numbers, account passwords, contact information, and taxpayer identification numbers ("financial information"), **but not including parties names**;

3. Medical records or other patient information of individuals covered by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) ("medical information"); and

4. Tax return information, as defined by Title 26, United States, Code, Section 6103(b)(1) and (2), pertaining to third parties, **but excluding third parties' names**.

To ensure that protected information is not subject to unauthorized disclosure or misuse,

**IT IS HEREBY ORDERED** that, pursuant to Fed. R. Crim. P. 16(d)(1), defendant, defense counsel of record, their investigators, assistants, and employees (collectively, "the defense team") may review with defendant all discovery material produced by the government, but shall not provide anyone other than the defense team with copies of, or permit anyone other than the defense team to make copies of, or have unsupervised access to, any discovery

2

material produced by the government that contains protected information.  **Defense team may provide documents to witnesses if** the personal identifying information, financial information, and/or medical information has first been *entirely redacted* from the discovery materials.  The government and defense counsel are ordered to work together to ensure that these materials are protected, but that the **defense team** has as much access to the materials as can be provided consistent with this Court's order.  Discovery material that clearly pertains to defendant and does not contain protected information regarding any other person (*e.g.*, defendant's own bank records, telephone records, and business records) may be provided to defendant unredacted.

Defense counsel may also provide unredacted copies of protected information to any experts or consultants retained to assist with the preparation of the defense in the captioned case.  Defendant, all members of the defense team, and any experts or consultants who receive discovery under this order shall be provided a copy of this order along with those materials and shall**, in advance of receiving the copies,** initial and date the order reflecting their agreement to be bound by it.

The materials provided pursuant to this protective order may only be used for the specific purpose of preparing or presenting a defense in this matter, unless specifically authorized by the Court.

This order shall also apply to any copies made of any materials covered by this order.

**IT IS FURTHER ORDERED** **that the government's discovery disclosures to defendant, shall contain** information that includes tax return information of third parties, as defined by 26 U.S.C. 6103(b)(1) and (2), pursuant 26 U.S.C. 6103(h)(4) **so long as it**:  1) pertains to defendant; 2) is related to items contained within defendant's income tax returns; 3) is relevant to a transaction involving defendant and a third party taxpayer; or 4) is otherwise required to be disclosed under 18 U.S.C. § 3500.  Defendant, all members of the defense team, and any experts or consultants who receive discovery under this order shall maintain the

United States District Court
Northern District of California

confidentiality of all tax return information provided by the government in discovery in accordance with 26 U.S.C. 6103(a) and this order, other than material that clearly pertains to defendant and does not contain tax return information regarding any other person.

**IT IS FURTHER ORDERED** that neither defendant nor any member of the defense team shall provide copies of any discovery material produced by the government ~~whether or not the material constitutes or contains Protected Information within the meaning of this Order~~ **if that material contains protected information within the meaning of this order,** to any third party (*i.e.*, any person who is not a member of the defense team)**. Nor may parties** make any public disclosure of the same, other than in a court filing, without ~~the government's express written permission or~~ further order of the Court. No provision of this order shall prevent defense counsel from discussing, and showing, discovery provided by the government with potential trial witnesses and their counsel, as necessary to prepare for trial. **If a specific problem arises, either party may bring the issue to the Court.** If a party files a pleading that references or contains or attaches protected information subject to this order, that filing must comply with Fed. R. Crim. P. 49.1. If a party files a pleading that references or contains or attaches medical information or tax return information regarding any person other than defendant, that pleading, reference, or attachment must be made under seal. This order authorizes such filings under seal and the parties are not required to seek additional authorization from the Court to do so.

**IT IS FURTHER ORDERED** that defense counsel shall return materials subject to this protective order (including any copies) to the United States within **28** ~~14~~ days after whichever event occurs last in time: dismissal of all charges against defendant; defendant's acquittal; defendant's sentencing; or the conclusion of any direct appeal. After the United States receives documents and materials subject to this order, it shall maintain those documents and materials until the period for filing a motion under 28 U.S.C. § 2255 has expired. After the statutory period for filing a motion under 28 U.S.C. § 2255 has expired, the United States is free to destroy documents and materials subject to this order. If defendant is represented by

United States District Court
Northern District of California

counsel and files a motion pursuant to 28 U.S.C. § 2255, the United States will provide **defense** counsel with the documents and materials subject to this protective order under the terms of this order. Defendant's attorney in any motion under 28 U.S.C. § 2255 shall return the documents and materials subject to this protective order within **28** ~~14~~ days after the district court's ruling on the motion or **28** ~~14~~ days after the conclusion of any direct appeal of the district court's order denying the motion, whichever is later. This stipulation is without prejudice to either party applying to the Court to modify the terms of any protective order. This court shall retain jurisdiction to modify this order upon motion of either party even after the conclusion of district court proceedings in this case.

     **IT IS SO ORDERED.**

Dated:

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

1   Jason Varnado (State Bar No. 211067)        Kathryn Keneally
    jvarnado@jonesday.com                       (appearance *pro hac vice*)
2   JONES DAY                                   New York State Bar No. 1866250
    717 Texas, Suite 3300                       kkeneally@jonesday.com
3   Houston, TX 77002                           JONES DAY
    Telephone +1-832-239-3939                   250 Vesey Street
4   Facsimile +1-832-239-3600                   New York, NY 10281-047
                                                Telephone: +1-212-326-3939
5   Neal J. Stephens (State Bar No. 152071)     Facsimile:    +1-212-755-7306
    nstephens@jonesday.com
6   Vincent Doctor (State Bar No. 319408)
    vdoctor@jonesday.com
7   JONES DAY
    1755 Embarcadero Road
8   Palo Alto, CA 94303
    Telephone:   +1.650.739.3939
9   Facsimile:   +1.650.739.3900

10  Attorneys for Defendant
    ROBERT T. BROCKMAN

11

12                        UNITED STATES DISTRICT COURT

13                     NORTHERN DISTRICT OF CALIFORNIA

14                          SAN FRANCISCO DIVISION

15  UNITED STATES OF AMERICA,              Case No. 3:20-cr-00371-WHA

16                 Plaintiff,              DEFENDANT ROBERT T.
                                           BROCKMAN'S NOTICE OF MOTION
17         v.                              AND MOTION TO DISMISS IN PART
                                           FOR LACK OF VENUE AND TO
18  ROBERT T. BROCKMAN,                    TRANSFER TO THE SOUTHERN
                                           DISTRICT OF TEXAS
19                 Defendant.
                                           Date:      December 15, 2020
20                                         Time:      12:00 p.m.
                                           Judge:     Hon. William Alsup
21                                         Place:     Courtroom 12

22
                        **NOTICE OF MOTION AND MOTION**
23

24         PLEASE TAKE NOTICE THAT on December 15, 2020, at 12:00 p.m., in the courtroom

25  of the Honorable William Alsup, located at 450 Golden Gate Avenue, San Francisco, California

26  94102, Defendant Robert T. Brockman will, and hereby does, respectfully move (i) pursuant to

27  Federal Rule of Criminal Procedure 21(b) to transfer this case from the Northern District of

28  California to the Southern District of Texas, and (ii) to dismiss Counts Nine through Fourteen of

the Indictment under Federal Rule of Criminal Procedure 12(b)(3)(A)(i) for improper venue, or in

the alternative, to transfer Counts Nine through Fourteen to the Southern District of Texas.

This motion is based on the attached memorandum of points and authorities.

Dated: November 30, 2020                    Respectfully submitted,

                                            JONES DAY


                                            *s/ Neal J. Stephens*
                                            NEAL J. STEPHENS

                                            Counsel for Defendant
                                            ROBERT T. BROCKMAN

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ........................................................................................................ 1

II.    FACTS ........................................................................................................................ 4

   A.   Indictment .......................................................................................................... 4

      1.   The charges ................................................................................................. 4

      2.   Allegations relevant to venue ..................................................................... 5

III.   ARGUMENT .............................................................................................................. 7

   A.   This case should be transferred in full to the Southern District of Texas ..................... 7

   B.   Mr. Brockman's Houston "location" supports transfer to the Southern District of Texas ("*Platt* factor" #1) ...................................................................................... 8

      1.   Mr. Brockman's residence is in Houston ..................................................... 8

      2.   Mr. Brockman's failing health underscores the need for a transfer to the district where he is resident ........................................................................ 9

   C.   The "location of possible witnesses" favors Houston over San Francisco ("*Platt* factor" #2) ...................................................................................................... 10

   D.   The "location of events likely to be in issue" is substantially in Houston and the rest of the world, but least of all in this District ("*Platt* factor" #3)......................... 13

   E.   The "disruption" factor favors transfer ("*Platt* factor" #5) .......................................... 14

   F.   The "location of counsel" weighs equally between San Francisco and Houston ("*Platt* factor" #7) ...................................................................................................... 14

   G.   "Docket conditions in each district involved" favor the Southern District of Texas ("*Platt* factor" #9) ...................................................................................................... 14

   H.   The remaining three particularized factors – "location of documents and records likely to be involved," ("*Platt* factor" #4) "expense to the parties," ("*Platt* factor" #6) and "relative accessibility of place of trial" ("*Platt* factor" #8) – are neutral or favor transfer...................................................................................................... 16

   I.   This case presents "other special elements" as contemplated by *Platt* ("*Platt* factor" #10) ...................................................................................................... 16

IV.   THIRTEEN COUNTS MUST BE DISMISSED OR TRANSFERRED FOR SEPARATE REASONS ...................................................................................................... 16

   A.   The FBAR Counts Nine through Fourteen must be dismissed in this District for improper venue, and if not dismissed, must be transferred to the Southern District of Texas ...................................................................................................... 16

1

**TABLE OF CONTENTS**
**(continued)**

2

                                                                                       Page

3     B.      The tax evasion Counts Two through Eight must be transferred ................................ 18

4     V.      CONCLUSION ............................................................................................................. 18

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

Page

3   C<small>ASES</small>

4   *In re Balsimo*,
5       68 F.3d 185 (7th Cir. 1995) .................................................................................9

6   *Johnston v. United States*,
        351 U.S. 215 (1956) .........................................................................................19
7

8   *Platt v. Minnesota Min. & Mfg. Co.*,
        376 U.S. 240 (1964) ..................................................................................... *passim*

9   *Sturgis v. Goldsmith*,
10      796 F.2d 1103 (9th Cir. 1986) ..........................................................................14

11  *TRW Inc. v. Andrews*,
        534 U.S. 19 (2001) ...........................................................................................14
12

13  *United States v. Benson*,
        2015 WL 1869476 (N.D. Cal. Apr. 22, 2015) ..................................................14

14  *United States v. Bowdoin*,
15      770 F. Supp. 2d 133 (D.D.C. 2011) ..................................................................11

16  *United States v. Bugai*,
        162 F.3d 1162, 1998 WL 553168 (6th Cir. 1998) (unpublished table opinion) ....................20
17

18  *United States v. Chun*,
        2019 WL 6683878 (E.D. Mich. Dec. 6, 2019) ...................................................14

19  *United States v. Clinton*,
20      574 F.2d 464 (9th Cir. 1978) ......................................................................19, 20

21  *United States v. Cooper*,
        2019 WL 404962 (D. Haw. Jan. 31, 2019) .....................................................9, 10
22

23  *United States v. DiJames*,
        731 F.2d 758 (11th Cir. 1984) ..........................................................................19

24  *United States v. Fannin*,
        2017 WL 9401160 (E.D. Ky. Aug. 15, 2017) (magistrate recommendation),
25      *adopted by* 2017 WL 5451751 (E.D. Ky. Nov. 14, 2017) ....................................15

26  *United States v. Fritts*,
        2005 WL 3299834 (N.D. Cal. Dec. 6, 2005) (Alsup, J.) .............................. *passim*
27

28

*United States v. Garman*,
748 F.2d 218 (4th Cir. 1984)............................................................................19

*United States v. Hassanshahi*,
185 F. Supp. 3d 55 (D.D.C. 2016) ...................................................................20

*United States v. Hicks*,
947 F.2d 1356 (9th Cir. 1991)..........................................................................19

*United States v. Miller*,
314 F.R.D. 574 (S.D. Ohio 2016) .....................................................................18

*United States v. Shayota*,
2015 WL 9311922 (N.D. Cal. Dec. 23, 2015) ..................................................18

*United States v. Testa*,
548 F.2d 847 (9th Cir. 1977)..............................................................................9

*United States v. Weaver*,
2013 WL 12438331 (S.D. Fla. Feb. 22, 2013)..................................................10

*United States v. Williams*,
2013 WL 4510599 (D. Haw. Aug. 22, 2013).......................................................9

**STATUTES**

18 U.S.C. § 371 ...........................................................................................................4

18 U.S.C. § 1343 .........................................................................................................5

18 U.S.C. § 1512(b)(2)(B) ...........................................................................................6

18 U.S.C. § 1512(c)(1) .................................................................................................6

18 U.S.C. §§ 1956(a)(1)(A)(ii), (a)(1)(B)(i) and (a)(2)(B)(i) ......................................5

18 U.S.C. § 3237(b) .............................................................................................1, 21

18 U.S.C. § 4241(a) .........................................................................................2, 13, 14

18 U.S.C. § 4247(d) ...................................................................................................14

26 U.S.C. § 7201 .........................................................................................................4

31 U.S.C. §§ 5314 and 5322 ........................................................................................5

CARES Act § 15002(b) ..............................................................................................14

**OTHER AUTHORITIES**

Fed. R. Crim. P. 18 ........................................................................................................19

Fed. R. Crim. P. 12(b)(3)(A)(i) .......................................................................1, 2, 21

Fed. R. Crim. P. 21(b) ........................................................................... *passim*

U.S. Const. Amend. VI ...................................................................................19

U.S. Const. Art. III, § 2 ...................................................................................19

U.S. Dep't of Justice, Criminal Tax Manual § 6.01[2] (2012) ......................10

**DEFENDANT ROBERT T. BROCKMAN'S MOTION TO DISMISS IN PART FOR LACK OF VENUE AND TO TRANSFER TO THE SOUTHERN DISTRICT OF TEXAS**

To the Honorable United States District Judge William Alsup:

The Defendant Robert T. Brockman moves (i) pursuant to Federal Rule of Criminal Procedure 21(b) to transfer this case from the Northern District of California to the Southern District of Texas, and (ii) to dismiss Counts Nine through Fourteen of the Indictment under Federal Rule of Criminal Procedure 12(b)(3)(A)(i) for improper venue, or in the alternative, to transfer Counts Nine through Fourteen to the Southern District of Texas.[1]  Defense counsel met and conferred with government counsel, who oppose the relief sought in this Motion.

In support of this Motion, the Defendant states as follows.

**I.      INTRODUCTION**

This Court has recognized that there is no presumption favoring the prosecution's choice of venue.  United States v. Fritts, 2005 WL 3299834, at *2 (N.D. Cal. Dec. 6, 2005) (Alsup, J.).  The Supreme Court has set out a ten-factor test to determine when to transfer a criminal proceeding pursuant to Rule 21(b).  Platt v. Minnesota Min. & Mfg. Co., 376 U.S. 240, 243-44 (1964).  The most significant factors strongly favor transferring this case to the Southern District of Texas, and the remaining factors are neutral between the two venues.  Moreover, there is no basis for venue in this District as to six counts in the Indictment.

Robert T. Brockman, the sole defendant in this criminal case, is a 79-year-old resident of Houston, Texas.  The Indictment against him does not allege that he was physically present or personally committed any act in the Northern District of California.  Rather, it relies on allegations of financial transactions in which funds purportedly moved through accounts located here, materials that were allegedly sent to individuals here, and the presence of the grand jury in this District.  The three potential witnesses identified in the Indictment as Individuals One, Two,

---

[1] There is already pending before the Court Defendant Robert T. Brockman's Notice of Motion And Motion For Change of Venue on Counts Two Through Eight, made pursuant to 18 U.S.C. § 3237(b), filed November 2, 2020 ("Defendant's § 3237(b) Motion").  Def.'s Mot. for Change of Venue, ECF No. 21.  If that motion is denied under § 3237(b), transfer to the Southern District of Texas should be granted pursuant to Rule 21(b) for all the reasons stated in this Motion.

and Three are located in England or Bermuda; Austin, Texas; and Oxford, Mississippi; and the Indictment does not allege that their involvement took place in this District. Although the Indictment pleads some impact in this District for certain counts, it is clear that the gravamen of the alleged offenses lies elsewhere, and the central events and the location of the witnesses are more strongly tied to the Southern District of Texas.

As to Counts Nine through Fourteen of the Indictment alleging failure to file Foreign Bank Account Reports ("FBARs"), there is a complete absence of venue in this District. Those counts must be dismissed on the face of the Indictment under Federal Rule of Criminal Procedure 12(b)(3)(A)(i), and can only be brought in the Southern District of Texas, where Mr. Brockman resides, or in the Northern District of Virginia, where the filings were purportedly due to be made.

Additional circumstances specific to this case compel that it proceed in the Southern District of Texas. Foremost, Mr. Brockman is in failing health, and counsel for Mr. Brockman will be making a motion pursuant to 18 U.S.C. § 4241(a) for a hearing to determine whether Mr. Brockman lacks the ability to assist in his own defense. All of the witnesses relevant to that determination, including medical professionals, are located in Houston.[2]

As will be set out in more detail in the motion addressed to the specific issue of Mr. Brockman's ability to assist in his defense, Mr. Brockman began to raise concerns about memory deficiencies with his oncologist in 2018. *See* Pool Decl. ¶ 3.[3] That doctor referred him to Dr. James Pool, a primary care physician affiliated with the Baylor College of Medicine in Houston, who made a preliminary diagnosis of Parkinson's disease, with resulting cognitive loss. Pool Decl. ¶ 3. Dr. Pool in turn referred Mr. Brockman to Dr. Joseph Jankovic and Dr. Melissa Yu, both medical doctors, and to Dr. Michele York, a neuropsychologist, all Houston-based doctors specializing in movement disorders. Pool Decl. ¶ 4. In late 2018 and early 2019, these medical professionals diagnosed that Mr. Brockman's symptoms were consistent with

---

[2] At the hearing on November 17, 2020, counsel for the defense advised the Court of our intention to make a motion pursuant to 18 U.S.C. § 4241(a), which the Court directed to be filed by December 8, 2020.

[3] "Pool Decl." refers to the Declaration of James L. Pool, M.D., affirmed November 25, 2020 and submitted in support of this Motion.

Parkinson's disease, parkinsonism, or Lewy body dementia, or some combination of the three.[4] Pool Decl. ¶ 5. A precise diagnosis of these conditions can be confirmed only post-mortem. Pool Decl. ¶ 5. All are characterized by progressive dementia. While some symptoms may be alleviated, Mr. Brockman's condition is not curable. Pool Decl. ¶ 5.

Mr. Brockman undertook these medical consultations for reasons of his personal health, without notice to any lawyer and not for any legal reason. Mr. Brockman first disclosed his medical condition to counsel in July 2019. Keneally Decl. ¶ 6.[5] Counsel subsequently obtained each doctor's contemporaneous medical reports, and in some instances obtained follow-up letters to address the impact of Mr. Brockman's medical condition on his ability to assist in his defense. Keneally Decl. ¶¶ 7, 8. Each of these doctors has concluded that Mr. Brockman is not capable of assisting in the defense of a criminal case against him. Keneally Decl. ¶¶ 11, 12; Pool Decl. ¶ 7.[6]

In early October 2020, prior to being notified of the Indictment, Mr. Brockman returned for his annual examination with Dr. Pool. At counsel's request, Dr. Pool conducted cognitive tests, and again referred Mr. Brockman to Dr. York for the same battery of tests administered previously. The results of these examinations confirm that Mr. Brockman's impairment is progressive and renders him unable to assist in his defense. Keneally Decl. ¶ 13.

Mr. Brockman's medical issues, in and of themselves, support transfer to his resident district. The hearing and other proceedings necessary to determine whether Mr. Brockman can even stand trial should take place in Houston.

For these reasons and the reasons explained below, certain counts of the Indictment must be dismissed for lack of venue, the Southern District of Texas is a more appropriate forum for the

---

[4] Parkinson's disease is a progressive nervous system disorder that affects movement and may cause dementia. Parkinsonism is a term used to describe a condition that causes a combination of the movement abnormalities seen in Parkinson's disease, especially resulting from the loss of dopamine-containing neurons. Lewy body dementia results from protein deposits, called Lewy bodies, that develop in nerve cells in the brain regions involved in thinking, memory, and movement.

[5] "Keneally Decl." refers to the Declaration of Kathryn Keneally, affirmed November 30, 2020 and submitted in support of this Motion.

[6] Counsel provided the medical reports, supporting letters, and the results of the forensic tests to the government in April 2020, and encouraged the government to investigate this issue by direct contact to these physicians, but the government made no attempt to explore Mr. Brockman's condition with his medical providers prior to securing the Indictment. Keneally Decl. ¶ 8.

1   entire matter, and Mr. Brockman respectfully moves for a transfer to that district under Federal

2   Rule of Criminal Procedure 21(b).

3   **II.     FACTS**

4        **A.     Indictment**

5             **1.     The charges**

6        On October 15, 2020, the government unsealed the Indictment against Mr. Brockman

7   dated October 1, 2020, in advance of his arraignment,[7] charging:

8        (a)     <u>Count One</u>:  conspiracy to defraud the United States and to commit tax evasion, in
             violation of 18 U.S.C. § 371; and <u>Counts Two through Eight:</u>  tax evasion for the
9             years 2012 through 2018, in violation of 26 U.S.C. § 7201.

10       The Indictment alleges that Mr. Brockman conspired "to conceal from the IRS capital

11  gain income BROCKMAN earned as a result of his investments in Vista funds through Point" by

12  means of a "false paper trail regarding his offshore structure" to obscure his "full dominion and

13  control" over various entities, Indictment ¶¶ 30-32, and filed false tax returns in 2012 through

14  2018, because he purportedly "failed to accurately report and pay income tax on capital gain

15  income he earned as a result of his investments in Vista funds through Point."  Indictment ¶¶ 128-

16  34.  The Indictment describes how the A. Eugene Brockman Charitable Trust (the "AEBCT"), a

17  Bermudian trust settled by Mr. Brockman's father, indirectly held an ownership interest in Point

18  Investments, Ltd. ("Point").  Indictment ¶¶ 6, 7.  The Indictment alleges that Mr. Brockman

19  controlled the AEBCT, and thereby controlled Point, and as a result should be charged with the

20  income from Vista earned by Point.

21       (b)     <u>Counts Nine through Fourteen</u>:  failure to file FBARs for the years 2013 through
             2018, in violation of 31 U.S.C. §§ 5314 and 5322.
22

23       The Indictment alleges that Mr. Brockman controlled entities called Edge Capital

24  Investments, Ltd.("Edge") and Cabot Global Investments, Ltd. ("Cabot").  Indictment ¶¶ 11, 12.

25  The Indictment recites that Mr. Brockman had an obligation to file FBARs reporting whether he

26  had "a financial interest in, and signatory and other authority over" financial accounts in foreign

27  ───────────────────

28       [7] The Indictment and the non-prosecution agreement of a related witness were the subject of media reports
     prior to the arraignment.

1   countries with an aggregate value in excess of $10,000, and that he allegedly willfully failed to

2   meet this reporting obligation concerning Point and Edge for the years 2013 through 2018, and

3   also for Cabot for the latter five of those years.  Indictment ¶¶ 149-60.

4           (c)     Counts Fifteen through Thirty-Four:  wire fraud affecting a financial institution, in
                    violation of 18 U.S.C. § 1343.
5

6           These twenty wire fraud counts are based on a single alleged scheme, with each count

7   citing a separate wire transmission.  Stated at their simplest, these counts contend that Edge

8   purchased the debt of Dealer Computer Services, Inc. ("DCS"), the company of which

9   Mr. Brockman was formerly Chairman and CEO, in violation of contract provisions that

10  restricted the purchase of that debt by a party "affiliated" with DCS.  Indictment ¶¶ 4, 161-89.

11          (d)     Counts Thirty-Five through Thirty-Seven:  money laundering in violation of 18
                    U.S.C. §§ 1956(a)(1)(A)(ii), (a)(1)(B)(i) and (a)(2)(B)(i).
12

13          The three money laundering charges are derivative of the wire fraud allegations.

    Indictment ¶¶ 190-92.

14          (e)     Counts Thirty-Eight and Thirty-Nine:  evidence tampering in violation of 18
                    U.S.C. § 1512(b)(2)(B) and destruction of evidence in violation of § 1512(c)(1).
15

16          These counts allege that Mr. Brockman caused "Individual One" to destroy evidence,

17  including evidence in the possession of "Individual Three."  Indictment ¶¶ 193-98.

18                  **2.      Allegations relevant to venue**

19          The Indictment states:  "At all times relevant to this Indictment," Mr. Brockman "was a

20  United States citizen residing in Houston, Texas and Pitkin County, Colorado."  Indictment ¶ 1.

21  The Indictment nowhere alleges that Mr. Brockman personally acted in, or communicated to or

22  from, the Northern District of California, nor in or from any place other than Houston.

23          Three potential witnesses are referenced in the Indictment.

24          "Individual One" is recognizable as Evatt Tamine, who in the government's

25  characterization became a manager of "BROCKMAN's foreign entities" in 2007, Indictment

26  ¶ 10, and in 2010 became a "director" of the Bermuda entity that acted as trustee for the

27  Bermuda-based AEBCT.  Indictment ¶¶ 6, 9.  The conspiracy Count One charges ninety-one

28  overt acts by Mr. Brockman between 1999 and 2019, Indictment ¶¶ 43-88, 90-134, including

dozens by which he allegedly "directed" or "instructed" Tamine by "encrypted email" to take various actions with respect to the AEBCT and other entities.

The Indictment does not allege where Mr. Brockman was when he gave such "directions," or that he did so from anywhere other than his residence city of Houston. Nor do any of the 142 references to "Individual One" allege where Tamine acted, except for "several trips from places outside the United States into the United States" (but apparently not to this District) allegedly for the destruction of records. Indictment ¶ 196(c). The Indictment omits to mention that at all relevant times Tamine himself was based in Bermuda, although he also bought a house in Sydney, Australia, and we understand also had homes at various times in England, Switzerland and other locations in Europe. Indictment ¶¶ 89-90; Keneally Decl. Ex. C, at 2.[8]

"Individual Two" is Robert Smith, who formed the private equity firm Vista. Indictment ¶ 8.[9] The government relies on the allegation that Vista "maintained its principal place of business" in this District. Indictment ¶ 8. However, this has not been true for almost ten years. According to its own website and press accounts, Smith moved Vista's headquarters in 2011 to Austin, Texas, where Smith resides, "seeking to escape the Silicon Valley bubble." Keneally Decl. Ex. G, Ex. H, at 7. Today, Vista's LinkedIn and Pitchbook Profiles both reflect that Vista remains primarily based in Austin. Keneally Decl. Ex. I, Ex. J. The Indictment's references to Smith have nothing to do with activity in this District. Indictment ¶¶ 8, 34, 36, 57, 94.

"Individual Three" is the widow of a deceased colleague of Mr. Brockman, from whom Tamine allegedly recovered and destroyed records in 2016. Indictment ¶ 196.a and 196.c. Individual Three is retired and lives in Oxford, Mississippi. Keneally Decl. ¶ 30.

Apart from certain Vista bank account transactions, Indictment ¶ 39, the only other

---

[8] On August 29, 2018, the Bermuda Police Service obtained and subsequently executed a warrant to search Tamine's Bermuda home for evidence of criminal activity. Keneally Decl. Ex. D. On October 2, 2018, Tamine signed a letter agreement with the Department of Justice ("DOJ") by which he promised "continued long-term cooperation with the government's investigation of Robert Smith [Individual Two], Robert Brockman and other related persons and entities," in return for statutory immunity. Keneally Decl. Ex. E.

[9] The government publicly released Smith's Non-Prosecution Agreement, dated October 9, 2020, with an accompanying Statement of Facts, shortly before the arraignment in this case. Keneally Decl. Ex. M. To avoid prosecution, Smith promised to render assistance "pursuant to the specific instructions and control of the United States and its designated investigators," including by testifying against Mr. Brockman. Keneally Decl. Ex. M, at ¶¶ 3(b) and (f).

1   allegations concerning transactions with any tie to California are three references to "an investor

2   in the Northern District of California," Indictment ¶¶ 178-79, 183, and multiple references to

3   "Entity One" and "Entity Two." Indictment ¶¶ 189. Specifically, as part of the wire fraud

4   counts, the Indictment alleges that debt that was purchased by Deutsche Bank for resale to Edge

5   was acquired from "an investor in the Northern District of California," Indictment ¶¶ 178-79,

6   183, and that "Entity One" and "Entity Two" received emails and IntraLink transmissions

7   concerning the sale of the debt and financial information concerning Houston- and Ohio-based

8   Reynolds & Reynolds. Indictment ¶ 189.

9       The final counts of the Indictment allege that Mr. Brockman "knew it was likely that there

10  would be a federal grand jury investigation in the Northern District of California," Indictment

11  ¶ 194, and during June through October 2016 did himself and through "Individual One" destroy

12  evidence, including by collecting records from "Individual Three," who lives in Mississippi.

13  Indictment ¶¶ 193-98. These counts do not allege that any specific act occurred in this District.

14      In fact, measured by the number of references in the Indictment, the weight of activity and

15  evidence in this case comes from far beyond this District: Bermuda (13 references); Switzerland

16  (11); Colorado (5); British Virgin Islands (3); Australia (3); Nevis (3); Delaware (2); Houston (2);

17  Barcelona, Cayman Islands, Florida, and Ohio (1 each). Keneally Decl. ¶ 37 (collecting citations

18  to Indictment). By no measure is there a "center of gravity" in this District for this case, which

19  should be transferred to the Southern District of Texas. *See Fritts*, 2005 WL 3299834, at *5-6

20  (granting Rule 21(b) transfer of indictment alleging personal tax evasion from sale of advice and

21  services to create trusts and sell offshore investments).

22  **III.    ARGUMENT**

23          **A.    This case should be transferred in full to the Southern District of Texas**

24      "[T]here is no presumption in criminal cases in favor of the government's choice of

25  forum." *Fritts*, 2005 WL 3299834, at *2. Instead, under Rule 21 of the Federal Rules of

26  Criminal Procedure, the court may "transfer the proceeding, or one or more counts, against the

27  defendant to another district for the convenience of the parties, any victim, and the witnesses, and

28  in the interest of justice." Fed. R. Crim. P. 21(b). Courts should grant Rule 21(b) motions if, "all

1   relevant things considered, the case would be better off transferred to another district." *In re*

2   *Balsimo*, 68 F.3d 185, 187 (7th Cir. 1995) (citing *Platt*, 376 U.S. at 243-44); *United States v.*

3   *Cooper*, 2019 WL 404962, *2 (D. Haw. Jan. 31, 2019); *see also, e.g.*, *Fritts*, 2005 WL 3299834,

4   at *6 (transferring case because "trial in the District of Oregon would be more convenient for the

5   parties and for the witnesses, on balance, and would be in the interests of justice"). However the

6   standard is expressed, this case belongs in the Southern District of Texas.

7   When considering Rule 21(b) motions, courts assess the following ten factors specified by

8   the Supreme Court in *Platt*: "(1) location of [the] defendant; (2) location of possible witnesses;

9   (3) location of events likely to be in issue; (4) location of documents and records likely to be

10  involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the

11  parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of

12  each district or division involved; and (10) any other special elements which might affect the

13  transfer." *Platt*, 376 U.S. at 243-44; *see also, e.g.*, *Fritts*, 2005 WL 3299834, at *2*; *United States*

14  *v. Testa*, 548 F.2d 847, 856-57 (9th Cir. 1977) (both applying *Platt* factors in cases with

15  individual defendants). Insofar as they apply in this case, the most important of these factors all

16  favor the Southern District of Texas. And *none* of the ten factors counsel for keeping this case in

17  the Northern District of California.

18      **B.      Mr. Brockman's Houston "location" supports transfer to the Southern**
19              **District of Texas ("*Platt* factor" #1)**

20          **1.      Mr. Brockman's residence is in Houston**

21          "'[A]s a matter of policy, a defendant should ordinarily be tried, whenever possible, where

22  he resides.'" *United States v. Williams*, 2013 WL 4510599, at *2 (D. Haw. Aug. 22, 2013)

23  (quoting *United States v. Aronoff*, 463 F. Supp. 454, 457 (S.D.N.Y. 1978)). It is also the policy of

24  the Department of Justice "generally to attempt to establish venue for a criminal tax prosecution in the

25  judicial district of the taxpayer's residence or principal place of business." U.S. Dep't of Justice,

26  Criminal Tax Manual § 6.01[2] (2012). Indeed, even the Constitution's restrictions on venue,

27  which require a trial to take place where the crime was committed, reflect the reality that "'most

28  crimes usually take place in the district where the defendant resides,'" such that the constitutional

1    "'venue provisions try to reduce the difficulties to the defendant that would be caused by a trial at

2    a distance from his home and friends.'" *United States v. Weaver*, 2013 WL 12438331, at *6 (S.D.

3    Fla. Feb. 22, 2013) (quoting *United States v. DiJames*, 731 F.2d 758, 762 (11th Cir. 1984)).

4         Mr. Brockman is released on bond and living at home in Houston, 7.4 driving miles from

5    the U.S. District Court for the Southern District of Texas. Keneally Decl. Ex. A. By contrast,

6    this Court in San Francisco is 1,642 air miles from Houston. Keneally Decl. Ex. B.

7    Mr. Brockman's residence thus strongly favors a transfer to Texas. *See, e.g.*, *Fritts*, 2005 WL

8    3299834, at *3 (concluding that this factor favored transfer when defendant lived "at least 400

9    miles from San Francisco").

10        This factor deserves extra weight given the likely length of any trial in this case. *See, e.g.*,

11   *Cooper*, 2019 WL 404962, *2 (noting that a longer trial makes the location of the defendant's

12   home more important). The Indictment spans decades, depicts multiple sets of financial

13   transactions, references numerous individuals and entities, and describes events in many

14   locations. The government has estimated that it will produce 1.1. terabytes (the equivalent of 22

15   million pages) of discovery. Trial will not be a quick affair.

16                    **2.    Mr. Brockman's failing health underscores the need for a transfer to**
17                    **the district where he is resident**

18        Mr. Brockman's diagnostic and treating physicians have diagnosed him as having

19   Parkinson's disease, vascular parkinsonism, or Lewy body dementia. He manifests symptoms

20   that include movement disorders and cognitive impairment. His treating physician advises that

21   these and other health conditions could be made worse by facing legal proceedings in a location

22   distant from his home, stating: "Unfamiliar environments, stimulating surroundings, and changes

23   in routine would be especially stressful for a person with Mr. Brockman's diminished capacity,

24   creating a risk to his existing cardiac condition, and could exacerbate the overall progression of

25   his symptoms." Pool Decl. ¶ 10. When a defendant's "ill health would prevent a defendant from

26   full participation at his own trial, a transfer should be granted." *United States v. Bowdoin*, 770 F.

27   Supp. 2d 133, 142 (D.D.C. 2011). Transfer to the Southern District of Texas is necessary to

28   mitigate the risk that the very defense of these proceedings itself becomes punishment for

offenses not yet proven.

C.    The "location of possible witnesses" favors Houston over San Francisco ("*Platt* factor" #2)

The government has yet to commence production of the 1.1 terabytes of data that it estimates are owed to the defense.  Keneally Decl. ¶ 38.  As a result, the defense's insight into the witnesses likely to testify is limited.  Since the government announced at the pretrial conference on November 17, 2020 that it is ready for trial, it should be required to provide and explain its witness list for analysis of this Motion, in order for the defense to respond in its reply.  For now, the following may be said as to witnesses, recognizing that "[n]ot all witnesses . . . have equal value in this venue-transfer analysis." *Fritts*, 2005 WL 3299834, at *3.

First, "Individual One" Evatt Tamine, whether a resident of Bermuda, England, or Australia, and "Individual Two" Robert Smith, a resident of Austin, Texas, cannot claim greater convenience by a trial in San Francisco, nor any "inconvenience" by a trial in Houston.  Keneally Decl. Ex. C, Ex. F, Ex. M at Statement of Facts ¶ 1.  Apart from geography, given that each avoided prosecution by agreeing, in the words of Smith's deal, to render assistance "pursuant to the specific instructions and control of the United States and its designated investigators," they will show up when and where they are told.  *See* Keneally Decl. Ex. E, Ex. M at ¶ 3(b).  No less than "IRS agents and the government attorney who are potential witnesses," they "are effectively part of the prosecution team.  If they are still so employed, they will be paid for their inconvenience." *Fritts*, 2005 WL 3299834, at *3.

Second, the same can be said for Vista, the firm of which Smith is founder, CEO, and controlling owner.  We address the role of Vista in the Indictment under "the location of events likely to be in issue" below. *See infra* at Part III.D.  But no matter how extensive or important the evidence of Vista transactions, the government can count on Vista's ready cooperation wherever this case may be tried.  Even if Vista did not have this special incentive, Vista's headquarters at 401 Congress Street, Austin, Texas are 146 air miles or 163 driving miles (estimated 2 hours 34 minutes) from the Southern District of Texas courthouse at 515 Rusk Street, Houston, Texas.  Keneally Decl. Ex. K, Ex. L.  Vista can hardly claim undue inconvenience if the trial is moved to Houston from San Francisco.

Third, the only other likely witnesses identified in this District to date are "custodians of records [who] sometimes are not called at trial because the parties stipulate to the authenticity of and foundation for the records." *Fritts*, 2005 WL 3299834, at *3. This is true of the one or two "investor[s] in the Northern District of California," Indictment ¶¶ 178-79, and "Entity One" and "Entity Two," Indictment ¶¶ 183, 189, which sold DCS debt to Deutsche Bank eleven years ago with no knowledge of or dealings with Evatt Tamine, Mr. Brockman, or the counter-party to whom Deutsche Bank might sell the debt. The same is true of the banks that wired funds at Vista's direction to some entity that is alleged in the Indictment, as any such transfers were anonymous and indistinguishable to the banks from hundreds of other such transfers.

Fourth, and by contrast, the Statement of Facts made by Smith ("Individual Two") in connection with his Non-Prosecution Agreement describes the extensive role of "Individual B, a lawyer in private practice in Houston, Texas who specializes in foreign trusts and 'asset protection' planning," whom the defense recognizes to be Carlos Kepke. Keneally Decl. Ex. M at Statement of Facts ¶ 5. Mr. Kepke's practice is located in Houston, Texas, as reflected on his website, his LinkedIn Profile, and the State Bar of Texas lawyer profile. Keneally Decl. Ex. N, Ex. O, Ex. P. The defense is not aware of Mr. Kepke's role in this investigation, but he is an obvious potential witness.

Fifth, counsel is aware of at least 17 subpoenas that have been presented to individuals and entities located in and around Houston. Keneally Decl. ¶ 36. The Indictment's first eight counts charge conspiracy to evade tax and tax evasion. Mr. Brockman's return preparer is located in Houston, and his tax returns are filed from his residence there. Keneally Decl. ¶ 35. These witnesses do not owe the same fealty to this prosecution, and do not have the same travel flexibility, as Tamine, Smith and Vista, and therefore would suffer genuine inconvenience by a trial in San Francisco.

Sixth, and critical before we get to trial in this case, the location of witnesses who will address Mr. Brockman's health and his inability to assist in his defense mandates a hearing in Houston. As addressed with the Court at the November 17, 2020 appearance, the defense will be filing a motion by December 8, 2020, pursuant to 18 U.S.C. § 4241(a), for a hearing to determine

1   whether Mr. Brockman can assist in his defense.  Section 4241(a) requires such a hearing "if
2   there is reasonable cause to believe that" a defendant "may presently be . . . mentally incompetent
3   to the extent that he is unable to understand the nature and consequences of the proceedings
4   against him or to assist properly in his defense."  Four highly qualified doctors, all based in
5   Houston, examined Mr. Brockman in connection with his medical care, and all four have
6   concluded that Mr. Brockman cannot assist in his defense.  Keneally Decl. ¶¶ 8-13; *see* Pool
7   Decl. ¶¶ 3-5, 7.  Further proceedings to decide this issue are likely to be lengthy and complex.[10]
8   None of the witnesses or evidence to be presented in such proceedings are in this District.

9        It would be difficult under ordinary circumstances for the Houston-based medical
10  witnesses to travel to San Francisco for a hearing.  As Dr. Pool explains, during the pendency of
11  the COVID-19 pandemic, these doctors would be confronted with the increased risk of exposure
12  and the potential need to quarantine before and after travel, which would have a detrimental
13  impact on other patients.  Pool Decl. ¶ 8.  Dr. Pool also advises that Mr. Brockman's age and
14  medical conditions put him at increased risk for severe illness were he to contract COVID-19.
15  Pool Decl. ¶ 9.

16       The defense will call upon other Houston-based witnesses as well, including
17  Mr. Brockman's wife of fifty-one years, and friends and colleagues who have observed
18  Mr. Brockman in recent years.  *See* 18 U.S.C. § 4247(d) (requiring that defendant "be afforded an
19  opportunity to testify, to present evidence, [and] to subpoena witnesses on his behalf" at
20  competency hearing); *United States v. Benson*, 2015 WL 1869476, *18 (N.D. Cal. Apr. 22, 2015)

---

21       [10] Any hearings regarding Mr. Brockman's competency must be held in person, rather than over video
22  conferencing, notwithstanding the COVID-19 pandemic.  Under the Coronavirus Aid, Relief, and Economic Security
    Act ("CARES Act"), video teleconferencing can be used for certain specified criminal proceedings during the present
23  national emergency, including "Detention hearings under section 3142 of title 18," "Initial appearances under Rule 5
    of the Federal Rules of Criminal Procedure," and "Preliminary hearings under Rule 5.1 of the Federal Rules of
24  Criminal Procedure," among others.  CARES Act § 15002(b).  The list of proceedings for which the use of video
    teleconferencing is authorized, however, is detailed and specific, and does not include competency hearings under
25  18 U.S.C. § 4241(a).  Thus, under the principle of "*expressio unius est exclusio alterius*," the "most natural reading"
    of the CARES Act is that video teleconferencing is not permitted for § 4241(a) hearings.  *TRW Inc. v. Andrews*,
26  534 U.S. 19, 28 (2001) (citation omitted).  Moreover, video teleconferencing would be inappropriate for such a
    hearing, given that the "defendant's demeanor and behavior in the courtroom can often be as probative on the issue of
27  his competence as the testimony of expert witnesses."  *Sturgis v. Goldsmith*, 796 F.2d 1103, 1109 (9th Cir. 1986)
    (holding that because "the interests underlying the right to be present at trial apply to the right to be present at a
28  pretrial competency hearing" a defendant has "a constitutional right to be present" at such a hearing).  An in-person
    competency hearing is therefore indispensable.

1   (describing competency testimony of "eight lay witnesses," including colleagues and family

2   members, in addition to medical experts); *United States v. Chun*, 2019 WL 6683878, *11 (E.D.

3   Mich. Dec. 6, 2019) (lay witnesses including wife); *United States v. Fannin*, 2017 WL 9401160,

4   * 5 (E.D. Ky. Aug. 15, 2017) (magistrate recommendation), *adopted by* 2017 WL 5451751 (E.D.

5   Ky. Nov. 14, 2017) (same). Similar to the doctors, these witnesses will face challenges if asked

6   to participate in proceedings in San Francisco, but would be readily present in Houston.

7           In sum, the compelling necessity, and not just the "convenience," of many identifiable

8   witnesses overwhelmingly favors Houston. We predict that the government cannot demonstrate

9   countervailing "witness convenience" in the Northern District of California.

10          **D.      The "location of events likely to be in issue" is substantially in Houston and**
11                  **the rest of the world, but least of all in this District ("*Platt* factor" #3)**

12          As summarized above, the events put in issue by the Indictment took place largely

13   between Mr. Brockman in Houston and Evatt Tamine in Bermuda and other places outside the

14   United States. One by one, some activities allegedly involved Switzerland, the British Virgin

15   Islands, Australia, Nevis, Barcelona, the Cayman Islands, and several states of the United States

16   outside this District. Keneally Decl. ¶ 37.

17          The Indictment makes much of allegations that "BROCKMAN, through Point, invested in

18   numerous Vista funds" and "[f]rom 2000, and continuing through 2014, funds were invested by

19   BROCKMAN, through Point, in VEF II, as needed to purchase portfolio companies," Indictment

20   ¶¶ 16, 36, often by alleged "directions" to Tamine "to make additional investments." *E.g.*,

21   Indictment ¶ 87. But tellingly for venue purposes, none of these transactions are alleged to have

22   anything to do with the Northern District of California. To the contrary, the government alleges

23   that Mr. Brockman "only invested in Vista funds that were organized outside the United States,"

24   and not in this District. Indictment ¶ 16. The Indictment alleges that "the capital gains

25   distributed by Vista . . . were directed by BROCKMAN . . . to be wired from Vista's bank

26   accounts" in this District, Indictment ¶ 39, but makes no other reference to any conduct that took

27   place at Vista's San Francisco location.

28          In terms of the extent of evidence to be presented, the alleged contacts with the Northern

District of California are nothing more than a make-weight hook to permit the government to make the most threadbare claim to venue in this District. *See supra* at Part II.A.2. The "location of events likely to be in issue" favors transfer to Houston.

### E. The "disruption" factor favors transfer ("*Platt* factor" #5)

The "disruption of defendant's business unless the case is transferred" is among the factors to be weighed. *Platt*, 376 U.S. at 244. Due to his deteriorating health, Mr. Brockman is now fully retired. Keneally Decl. ¶ 14. Today his only "business" is preserving his deteriorating health, which will be best served in Houston, where he will be near his doctors, and in the familiar environment of his home and family. Pool Decl. ¶ 10.

### F. The "location of counsel" weighs equally between San Francisco and Houston ("*Platt* factor" #7)

Of course the government appears in this District by an Assistant United States Attorney from the local office, no doubt a full partner in this prosecution. But tellingly, the immunity bargains struck with Evatt Tamine and Robert Smith are on the letterhead from the DOJ Tax Division in Washington, whose attorneys are assigned responsibility and are prepared to try cases in any district. Keneally Decl. Ex. E, Ex. M. Like the government, Mr. Brockman's law firm has lawyers resident in both districts, but the attorneys who have met with him in person throughout this investigation are located in Houston, New York, and Washington, D.C., and those meetings were always conducted in Houston, with one exception in Colorado. Keneally Decl. ¶ 39. The convenience of counsel is in balance between Houston and San Francisco.

### G. "Docket conditions in each district involved" favor the Southern District of Texas ("*Platt* factor" #9)

Relative docket congestion suggests a speedier disposition of this matter in the Southern District of Texas, according to June 2020 statistics:[11]

---

[11] *See* Federal Court Management Statistics, Administrative Office of the Courts, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0630.2020.pdf at 36, 66 (last visited Nov. 19, 2020).

| | NDCA | SD Texas |
|---|---|---|
| Total number of active judges | 14 | 19 |
| Cases pending per judge | 870 cases | 761 cases |
| Median time from filing to disposition in felony cases | 11.2 months | 4.0 months |
| Average time from filing to trial in civil cases | 29.3 months | 24.9 months |

The Southern District of Texas is the third-fastest jurisdiction in the country for felony cases, while the Northern District of California is ranked fifty-ninth.[12]  Although no statistics are available for the time from filing to trial in criminal cases, civil cases in the Southern District of Texas reach trial five months faster than civil cases in the Northern District of California, on average.[13]  All available statistics therefore suggest that this case will proceed more expeditiously in the Southern District of Texas than in this District.

Even more important in terms of judicial economy, venue is improper in the Northern District of California for the tax evasion and FBAR counts, 13 out of 39 counts of the Indictment, all of which may be tried in the Southern District of Texas.  *See infra* at Part IV.  If the government is serious about trying all of these charges, transfer to the Southern District of Texas is the only way to avoid two complete trials in two districts of all the same facts.  This is reason enough by itself to compel transfer.  *See, e.g.*, *United States v. Shayota*, 2015 WL 9311922, at *4 (N.D. Cal. Dec. 23, 2015) (applying the *Platt* factors and noting "'the significant efficiency gained by having one trial (or even several) in one location rather than two'" (quoting *United States v. Napoli*, 2011 WL 1303571, *2 (N.D. Cal. Apr. 5, 2011)); *United States v. Miller*, 314 F.R.D. 574, 578-79 (S.D. Ohio 2016) (explaining in its *Platt* analysis that "given the scope of the related case [pending in the requested transfer district], this Court sees no reason why [that district] would not be the most convenient and logical location for prosecution of all charges.")

---

[12] *Id.*

[13] *Id.*

(emphasis in original).

**H.**  **The remaining three particularized factors – "location of documents and records likely to be involved," ("*Platt* factor" #4) "expense to the parties," ("*Platt* factor" #6) and "relative accessibility of place of trial" ("*Platt* factor" #8) – are neutral or favor transfer**

The Court in *Platt* listed "location of documents and records likely to be involved," "expense to the parties," and "relative accessibility of place of trial" as the fourth, sixth, and eighth of its ten itemized factors.  *Platt*, 376 U.S. at 244.  The criteria to be considered on each of these factors would appear to be co-extensive with the particularized factors already discussed:  to the extent that the location of witnesses and the locus of events favors Houston, it is potentially a less expensive and more convenient, and at least as accessible, venue as this District.

**I.**  **This case presents "other special elements" as contemplated by *Platt* ("*Platt* factor" #10)**

The final *Platt* factor informs courts to consider "any other special elements which might affect the transfer."  *Platt*, 376 U.S. at 244.  This factor takes us back to the beginning of the analysis.  As set out in detail above, Mr. Brockman's health, coupled with the need for a hearing to determine whether he is capable of assisting in his own defense, are the special elements of this case that simply compel transfer to the Southern District of Texas, where he lives and where his doctors are.  In striking contrast, no factor supports venue in the Northern District of California.

## IV.  THIRTEEN COUNTS MUST BE DISMISSED OR TRANSFERRED FOR SEPARATE REASONS

On the face of the Indictment, the charges for failure to file FBARs (Counts Nine through Fourteen) allege no basis for venue in this District, but may be brought in the district of the defendant's residence.  In addition, the charges for tax evasion (Counts Two through Eight) must be transferred pursuant to 18 U.S.C. § 3237(b).

**A.**  **The FBAR Counts Nine through Fourteen must be dismissed in this District for improper venue, and if not dismissed, must be transferred to the Southern District of Texas**

In Counts Nine through Fourteen, the Indictment alleges that Mr. Brockman "had a financial interest in . . . bank, securities, and other financial accounts in foreign countries" that

1    required the annual filing of an FBAR, and that he committed felonies by failure to file FBARs

2    for each of the years 2013 through 2018. Indictment ¶¶ 149-60. There is no venue in the

3    Northern District of California for these offenses, which may be brought only in the district where

4    the defendant resides, or in the Eastern District of Virginia where FBARs are due to be received.

5         Criminal trials must be held where the alleged offense was committed. U.S. Const. Art.

6    III, § 2; U.S. Const. Amend. VI; Fed. R. Crim. P. 18. "[W]here the crime charged is a failure to

7    do a legally required act, the place fixed for its performance fixes the situs of the crime."

8    *Johnston v. United States*, 351 U.S. 215, 220 (1956) (footnote omitted; statutory language

9    supported venue in the district where conscientious objectors failed to perform alternative to

10   military service). For example, the Ninth Circuit has held that the failure to file a tax return

11   legally occurs "either at the defendant's place of residence, or at the collection point where the

12   return should have been filed." *United States v. Clinton*, 574 F.2d 464, 465 (9th Cir. 1978)

13   (citations omitted). Criminal venue for the non-filing would thus be proper in either location.

14   *See id.*[14]

15        Since tax year 2013 – the first year the Indictment alleges that Mr. Brockman failed to file

16   an FBAR – filers have been required to use the Bank Secrecy Act ("BSA") E-Filing System to

17   file FBARs.[15] That system "supports secure electronic transmission of BSA data to the Financial

18   Crimes Enforcement Network (FinCEN)."[16] Because FBARs could only be filed directly with

19   FinCEN, the "collection point" where the FBARs allegedly "should have been filed" is FinCEN

20   headquarters, located in Vienna, Virginia.[17] *See United States v. Hassanshahi*, 185 F. Supp. 3d

21   55, 58 (D.D.C. 2016) (finding that the "place of performance" for a filing that can be performed

---

[14] *See also United States v. Hicks*, 947 F.2d 1356, 1361 (9th Cir. 1991) (reaffirming *Clinton*); *United States v. Garman*, 748 F.2d 218, 220–21 (4th Cir. 1984) (venue proper for failure to file tax returns "either in the district of [the defendant's] residence or the district where the service center is located"); *DiJames*, 731 F.2d at 763 (vacating failure-to-file conviction for lack of venue where filing was required in District of Columbia, rather than Northern District of Georgia where prosecution was brought); *United States v. Bugai*, 162 F.3d 1162, 1998 WL 553168, *2 (6th Cir. 1998) (unpublished table opinion) (venue proper for failure to file tax returns in "district of one's legal residence" or where taxpayer required to file returns).

[15] *See* IRS FBAR Reference Guide at 1, *available at* https://www.irs.gov/pub/irs-utl/irsfbarreferenceguide.pdf.

[16] *See* https://bsaefiling.fincen.treas.gov/AboutBsa.html.

[17] *See, e.g.*, https://www.fincen.gov/sites/default/files/advisory/advis11a.pdf.

online is the receiving agency's headquarters (emphasis omitted)). Under *Clinton*, then, venue would be proper for these counts either in the Eastern District of Virginia or "at the defendant's place of residence" in the Southern District of Texas. 574 F.2d at 465.

There is no basis for venue for the FBAR charges in the Northern District of California. Mr. Brockman has never resided here. Nor is the Northern District of California a "collection point" for FBARs, given the centralized collection mandated by the BSA E-Filing System. That alone disqualifies the Northern District of California as a potential venue for these charges under *Clinton*. *See id.*

Counts Nine through Fourteen must be dismissed in this District. If not dismissed, they should be transferred to the Southern District of Texas for the same reasons as the rest of the case.

## B. The tax evasion Counts Two through Eight must be transferred

For the reasons explained in Defendant's § 3237(b) Motion pending before this Court, these charges must be transferred to the Southern District of Texas, where Mr. Brockman has his home and filed his tax returns. If they are not ordered transferred by reason of § 3237, they must be transferred with the rest of the case pursuant to Rule 21(b), for all the reasons stated in this Motion.

## V. CONCLUSION

For the reasons set forth above and in Defendant's § 3237(b) Motion, this Court should (i) transfer this case pursuant to Federal Rule of Criminal Procedure 21(b) and 18 U.S.C. § 3237(b) from the Northern District of California to the Southern District of Texas, and (ii) dismiss Counts Nine through Fourteen of the Indictment under Federal Rule of Criminal Procedure 12(b)(3)(A)(i) for improper venue, or in the alternative, transfer Counts Nine through Fourteen to the Southern District of Texas.

Dated: November 30, 2020

Respectfully submitted,

JONES DAY

*s/ Neal J. Stephens*
NEAL J. STEPHENS
Counsel for Defendant
ROBERT T. BROCKMAN

1    Jason Varnado (State Bar No. 211067)     Kathryn Keneally (appearance *pro hac vice*)
     jvarnado@jonesday.com                 New York State Bar No. 1866250

2    JONES DAY                       kkeneally@jonesday.com
     717 Texas, Suite 3300               JONES DAY

3    Houston, TX 77002                 250 Vesey Street
     Telephone +1-832-239-3939        New York, NY 10281-047

4    Facsimile +1-832-239-3600         Telephone: +1-212-326-3939
                                     Facsimile: +1-212-755-7306

5    Neal J. Stephens (State Bar No. 152071)
     nstephens@jonesday.com

6    Vincent Doctor (State Bar No. 319408)
     vdoctor@jonesday.com

7    JONES DAY
     1755 Embarcadero Road

8    Palo Alto, CA 94303
     Telephone: +1.650.739.3939

9    Facsimile: +1.650.739.3900

10   Attorneys for Defendant
     ROBERT T. BROCKMAN

11

12                    UNITED STATES DISTRICT COURT

                 NORTHERN DISTRICT OF CALIFORNIA

13

                     SAN FRANCISCO DIVISION

14

15

16   UNITED STATES OF AMERICA,       Case No. 3.20-cr-00371-WHA

17              Plaintiff,             DECLARATION OF KATHRYN
                                    KENEALLY IN SUPPORT OF ROBERT

18       v.                          T. BROCKMAN'S MOTION TO
                                    DISMISS IN PART FOR LACK OF

19   ROBERT T. BROCKMAN,            VENUE AND TRANSFER TO THE
                                    SOUTHERN DISTRICT OF TEXAS

             Defendant.

20

21                   **DECLARATION OF KATHRYN KENEALLY**

22   I, Kathryn Keneally, declare as follows:

23        1.      I am a member of the bar of the State of New York and a partner of the law firm

24   Jones Day, counsel for the defendant Robert T. Brockman. I make this Declaration in support of

25   Defendant Robert T. Brockman's Motion to Dismiss in Part for Lack of Venue and Transfer to

26   the Southern District of Texas.

27        2.      Robert T. Brockman, the sole defendant in this criminal case, is a 79-year-old

28   resident of Houston, Texas.

3.      Attached hereto as Exhibit A is a webpage printout from Google Maps route planning, showing that Mr. Brockman's home in Houston is 7.4 driving miles from the United States District Court for the Southern District of Texas.  We have redacted Mr. Brockman's address for privacy reasons.

4.      Attached hereto as Exhibit B is a webpage printout using https://check-distance.com/route/houston-tx/san-francisco-ca, showing that San Francisco is 1,642 air miles from Houston.

5.      Mr. Brockman is in failing health, with memory loss and other cognitive issues.  As my partner, Neal Stephens, advised the Court during the hearing on November 17, 2020, the defense intends to move pursuant to 18 U.S.C. § 4241(a), for a hearing to determine whether Mr. Brockman lacks the ability to assist in his own defense.  The Court directed that this motion be filed by December 8, 2020.

6.      Mr. Brockman first disclosed his medical condition and cognitive challenges to counsel in July 2019.

7.      Mr. Brockman subsequently provided us with medical reports from four doctors who had examined him for diagnostic and treatment purposes in late 2018 and early 2019:  Dr. James Pool, a primary care physician affiliated with the Baylor College of Medicine in Houston; Dr. Joseph Jankovic, Director of the Parkinson's Disease Center and Movement Disorders Clinic at Baylor College of Medicine; Dr. Melissa Yu, Associate Medical Director for Baylor Clinic of Neurology and Associate Director, Clinical Operations, for Baylor Alzheimer's Disease and Memory Disorders Centers; and Dr. Michele York, the head of the Section of Neuropsychology at Baylor College of Medicine.

8.      I have spoken with each of these doctors on multiple occasions.  I also obtained the contemporaneous medical reports made by each of the doctors, and in some instances obtained follow up letters to address the specific issue of the impact of Mr. Brockman's medical condition on his ability to assist in his defense.  Dr. York, the neuropsychologist, recommended that she conduct a different series of tests that she described as providing forensic conclusions, which reached the same results as the diagnostic examinations.  I provided copies of all of the

1  reports and correspondence to the government by letter dated April 9, 2020.  The defense

2  encouraged the government to investigate these medical opinions by providing the necessary

3  waivers from Mr. Brockman (since revoked post-indictment) to allow the prosecutors to contact

4  the physicians separately, without participation by the defense.  I understand from recent

5  discussions with these doctors that the government did not reach out to any of them prior to

6  securing the Indictment.

7         9.     Dr. Pool has provided a declaration in support of the instant motion to transfer this

8  proceeding to the Southern District of Texas.  As he summarizes, in late 2018 and early 2019, all

9  four medical professionals – Dr. Pool, Dr. Jankovic, Dr. Yu, and Dr. York – concurred that Mr.

10  Brockman's symptoms are consistent with Parkinson's disease, parkinsonism, or Lewy body

11  dementia, or some combination of the three.  This is consistent with what each of the doctors told

12  me in separate discussions.

13        10.    It is my best understanding, based on my discussions with these doctors, that

14  Parkinson's disease is a progressive nervous system disorder that affects movement and may

15  cause dementia; parkinsonism is a term used to describe a condition that causes a combination of

16  the movement abnormalities seen in Parkinson's disease, especially resulting from the loss of

17  dopamine-containing neurons; and Lewy body dementia results from protein deposits, called

18  Lewy bodies, that develop in nerve cells in the brain regions involved in thinking, memory and

19  movement.

20        11.    As Dr. Pool states in his declaration:  (1) a precise diagnosis of these conditions

21  can only be confirmed post-mortem; (2) all four conditions are characterized by progressive

22  dementia; and (3) Mr. Brockman's condition is not curable.  See Pool Decl. ¶ 5.

23        12.    Dr. Pool's statements were also confirmed in my discussions with each of Dr.

24  Jankovic, Dr. Yu, and Dr. York.  Each of these doctors has stated to me and in writing that Mr.

25  Brockman is not capable of assisting in the defense of a criminal case against him.  This

26  conclusion is succinctly set out in Dr. Pool's declaration; as he states: "Mr. Brockman's

27  progressive dementia impairs his cognitive ability in several respects.  These include short term

28

Decl. of Kathryn Keneally in Support of Mot. to Dismiss in Part for Lack of
Venue and Transfer to the Southern District of Texas 3:20-cr-00371-WHA

1  memory limitations.  In addition, his condition renders long-term memory inaccessible and
2  defective." Pool Decl. ¶ 7.

3     13. In early October 2020, prior to being notified of the Indictment, Mr. Brockman
4  returned for his annual examination with Dr. Pool.  When I learned that Mr. Brockman had made
5  this appointment, I asked Dr. Pool again to conduct cognitive tests, and to refer Mr. Brockman to
6  Dr. York for an updated set of forensic testing.  I have spoken separately with each of Dr. Pool
7  and Dr. York.  They have both stated that the results of these examinations confirm that Mr.
8  Brockman's impairment is progressive, and render him unable to assist in his defense.

9     14. Due to his deteriorating health, Mr. Brockman is now fully retired.

10     15. We anticipate submitting copies of the medical reports and correspondence from
11  all four doctors as part of our § 4241(a) motion for a hearing to determine whether Mr. Brockman
12  lacks the ability to assist in his own defense.

13     16. We also anticipate calling each of these four doctors as witnesses in a hearing to
14  determine whether Mr. Brockman is capable of assisting in his defense.

15     17. All four doctors practice and are affiliated with medical facilities in Houston,
16  Texas.

17     18. We also anticipate calling other witnesses located in the Houston area to establish
18  that Mr. Brockman has demonstrable cognitive and memory challenges, including his wife,
19  Dorothy Brockman, and other friends and colleagues.

20     19. Three potential witnesses are referenced in the Indictment.  Based on the
21  description in the Indictment, I believe that Individual One is Evatt A. Tamine.  On information
22  and belief, it is my understanding that, during the relevant time period, Tamine was based in
23  either Bermuda or Switzerland; in November 2019, he lived for some period in England and
24  acquired a home in Sydney, Australia; and he has had homes at various times in other locations in
25  Europe.  Attached hereto as Exhibit C is a copy of a November 18, 2019 article in the Australian
26  Financial Review titled, "Point Piper's Most Expensive Block of Rubble Sells for $22m (again)"
27  stating, among other things, "Balmain's suburb high has been reset by the Victorian Italianate
28  mansion Hexham thanks to $7.5 million buyers, returning Bermuda-based expat lawyers Evatt

1  Tamine and Sophie Tod." Attached hereto as Exhibit D is a copy of a search warrant dated

2  August 29, 2018, obtained by the Bermuda Police Service to search Tamine's Bermuda home for

3  evidence of criminal activity.

4      20.    Attached hereto as Exhibit E is a copy of a letter agreement dated October 2, 2018,

5  between Tamine and the Department of Justice, providing him with statutory immunity in

6  exchange for his agreement to cooperate in "the government's investigation of Robert Smith,

7  Robert Brockman," and others.

8      21.    Based on the description in the Indictment, I believe that "Individual Two" is

9  Robert F. Smith.

10      22.    Attached hereto as Exhibit F is a screenshot taken on November 28, 2020. at 11:53

11  a.m. of Smith's LinkedIn Profile, identifying Smith as being located in Austin, Texas.

12      23.    Attached hereto as Exhibit G is a screenshot taken on November 28, 2020, at

13  12:08 p.m. of Vista's website, stating that in 2011, Vista's "HQ moves to Austin."

14      24.    Attached hereto as Exhibit H is a copy of a March 6, 2018 article in Forbes titled,

15  "Richer Than Oprah: How The Nation's Wealthiest African-American Conquered Tech And Wall

16  Street" stating, among other things, "In 2011, seeking to escape the Silicon Valley bubble, Smith

17  moved Vista's headquarters to Austin, Texas."

18      25.    Attached hereto as Exhibit I is a screenshot taken on November 28, 2020, at 11:55

19  a.m. of Vista's LinkedIn Profile, identifying Vista as being located in Austin, Texas.

20      26.    Attached hereto as Exhibit J is a webpage printout of Vista's profile on

21  Pitchbook.com at November 28, 2020, at 12:10 p.m., identifying Vista's "primary office" as 401

22  Congress Avenue, Suite 3100, Austin, TX 78701.

23      27.    Attached hereto as Exhibit K is a webpage printout from Google Maps route

24  planning, showing that Vista's headquarters at 401 Congress Street, Austin, Texas is 163 driving

25  miles (estimated 2 hours 34 minutes) from the United States District Court for the Southern

26  District of Texas.

27      28.    Attached hereto as Exhibit L is a webpage printout using https://check-

28  distance.com/route/austin-tx/houston-tx, showing that Austin is 146 air miles from Houston.

- 5 -

Decl. of Kathryn Keneally in Support of Mot. to Dismiss in Part for Lack of
Venue and Transfer to the Southern District of Texas 3:20-cr-00371-WHA

1    29.    Attached hereto as Exhibit M is a copy of the Non-Prosecution Agreement dated

2    October 9, 2020, between Smith and the U.S. Department of Justice, Tax Division, including the

3    Statement of Facts appended thereto.

4    30.    Based on the description in the Indictment, I believe that "Individual Three" is the

5    widow of a deceased colleague of Mr. Brockman, who is retired and lives in Oxford, Mississippi.

6    31.    The Statement of Facts made by Smith as part of his Non-Prosecution Agreement

7    describes the role of "Individual B, a lawyer in private practice in Houston, Texas who specializes

8    in foreign trusts and 'asset protection' planning." See Ex. M, hereto. Based on the description in

9    the Statement of Facts, I believe that "Individual B" is Carlos E. Kepke.

10   32.    Attached hereto as Exhibit N is a screenshot taken on November 29, 2020, at 7

11   a.m. of Carlos Kepke's website, identifying Mr. Kepke's law office as 149 Sage Road, Houston,

12   Texas 77056-1417.

13   33.    Attached hereto as Exhibit O is a screenshot taken on November 29, 2020, at 7:17

14   a.m. of Kepke's LinkedIn Profile, identifying him as being based in Houston, Texas.

15   34.    Attached hereto as Exhibit P is a screenshot taken on November 29, 2020, at 7:13

16   a.m. of the website for the State Bar of Texas, listing Kepke as based in Houston, Texas.

17   35.    Mr. Brockman's return preparer for the relevant years is located in Houston,

18   Texas.

19   36.    While we do not know the entire scope of the investigation, we are aware of at

20   least 17 subpoenas that have been presented to individuals and entities located in and around

21   Houston.

22   37.    Measured by the number of references in the Indictment, the weight of activity and

23   evidence in this case comes from far beyond this District: Bermuda (13 references), Indictment

24   ¶¶ 6, 8, 9, 13, 39, 43, 54, 111, 113-115, 121, 123; Switzerland (11 references), Indictment ¶¶ 8,

25   39, 53-55, 58, 64, 92, 113, 117, 121; Colorado (5 references), Indictment ¶¶ 50, 110, 111, 114,

26   115; British Virgin Islands (3 references), Indictment ¶¶ 7, 49, 1110; Australia (3 references),

27   Indictment ¶¶ 89, 90, 93; Nevis (3 references), Indictment ¶¶ 7, 11, 12; Delaware (2 references),

28

- 6 -

Decl. of Kathryn Keneally in Support of Mot. to Dismiss in Part for Lack of
Venue and Transfer to the Southern District of Texas 3:20-cr-00371-WHA

1   Indictment ¶¶ 2, 4; Houston (2 references), Indictment ¶¶ 1, 3; Barcelona, Cayman Islands,

2   Florida and Ohio (1 reference each), Indictment ¶¶ 5, 49, 108, 117.

3         38.    The government has estimated that it will produce 1.1. terabytes (the equivalent of

4   22 million pages) of discovery. To date, nothing has been produced to the defense.

5         39.    The attorneys with my firm who have met with Mr. Brockman personally during

6   the course of this investigation are based in Houston, Washington, D.C., and New York, and all

7   but one of those meetings took place at Mr. Brockman's home in Houston. One of these meetings

8   took place in Colorado, where Mr. Brockman was residing during the summer of 2019.

9         40.    Based on the foregoing, I respectfully submit this Declaration in support of Mr.

10  Brockman's Motion to Dismiss in Part for Lack of Venue and Transfer Proceedings to the United

11  States District Court for the Southern District of Texas. This Court should transfer this case

12  pursuant to Federal Rule of Criminal Procedure 21(b) and 18 U.S.C. § 3237(b) from the Northern

13  District of California to the Southern District of Texas, and dismiss Counts Nine through

14  Fourteen of the Indictment under Federal Rule of Criminal Procedure 12(b)(3)(A)(i) for improper

15  venue, or in the alternative, transfer Counts Nine through Fourteen to the Southern District of

16  Texas.

17        41.    I declare under penalty of perjury that the foregoing is true and correct.

18  Executed in New York, New York on November 30, 2020.

19

20                                        _____

21                                        Kathryn Keneally

22

23

24

25

26

27

28

Decl. of Kathryn Keneally in Support of Mot. to Dismiss in Part for Lack of
Venue and Transfer to the Southern District of Texas 3:20-cr-00371-WHA

# EXHIBIT A

Google Maps

[Address Redacted], Houston, TX 77024 to United States District Courthouse

Drive 7.4 miles, 18 min



Map data ©2020    1 mi

| | via Memorial Dr | 18 min |
|---|---|---|
| | Best route now, avoids road closure on Bagby St due to construction ⚠️ This route has restricted usage or private roads. | 7.4 miles |

| | via I-10 E | 18 min |
|---|---|---|
| | | 9.5 miles |

| | via Westcott St and Memorial Dr | 19 min |
|---|---|---|
| | | 8.3 miles |

## Explore United States District Courthouse


Restaurants


Hotels


Gas stations


Parking Lots


Less

# EXHIBIT B

Check-Distance.com

## Try other cities

A

B

Let's GO!

## Distance from Houston, TX to San Francisco, CA

Driving distance from Houston, TX to San Francisco, CA is **1929** miles (**3105** km). How far is it from Houston, TX to San Francisco, CA? It's a **29 hours 37 minutes** drive by car. Flight distance is approximately **1642** miles (**2643** km) and flight time from Houston, TX to San Francisco, CA is **03 hours 18 minutes**. Don't forget to check out our "Gas cost calculator" option. It will calculate cost of driving this particular distance. See the map below for the visual display of the upcoming road trip.

### Driving distance
**1929 Miles** / 3105 Km



### Gas consumption
**77.16 Gallons** 294.98 Litres



### Flight distance
**1642 Miles** / 2643 Km



# EXHIBIT C

# Point Piper's most expensive block of rubble sells for $22m (again)

AFR Online

November 18, 2019 Monday 08:03 AM GMT

Copyright 2019 Fairfax Media Publications Pty. Limited All Rights Reserved

**Length:** 646 words

**Byline:** Lucy Macken
**Highlight:** This is the 740 square metres of Wolseley Road real estate that was bought by Hugh Huang in 2013 for $14.35 million.

## Body

Australia's most expensive pile of housing rubble has sold on the Point Piper waterfront for the second time in a year.

This is the 740 square metres of Wolseley Road real estate that was bought by Hugh Huang, son of Shanghai shipping magnate Shannian Huang, in 2013 for $14.35 million from Sydney FC chairman Scott Barlow with DA-approved plans for a Tzannes Associates-designed residence.

The only improvement he made to the block was to demolish the house - unless you also count the awkwardly positioned tree that has accidentally fallen into the harbour - before he sold it last December for $22.5 million to a mystery buyer from the lower north shore. Bill Malouf, of LJ Hooker Double Bay, declined to offer up the latest buyer's identity or the sale result, but Malouf was asking $22 million to $24 million, and sources say it sold in that range.

From contemporary to historic

Insurance mogul and outgoing president of the Insurance Council of Australia Richard Enthoven and his wife Karen are set to swap their contemporary Point Piper home for historic Greenoaks Cottage in Darling Point.

The couple's $18 million purchase comes five months after they sold their Point Piper waterfront for about $21.8 million to developer Barrie Nesbitt and his wife Emma, the latter of whom sold their Bellevue Hill home last weekend above the $10 million to $11 million guide through Ray White Double Bay's Elliott Placks.

The Enthovens' new home is the 1850s-built mansion owned by recruitment boss Phil Kerry and his wife, 1984 Olympic Games gymnast Anne-Marie Kerry. The sale comes just a week after Kerry's brother and K2 Recruitment co-founder Mark Kerry and his wife, interior designer Lynda Kerry sold their nearby Darling Point home for about $18 million.

Point Piper's most expensive block of rubble sells for $22m (again)

Agent Alison Coopes declined to confirm the widely rumoured figure, but was asking $18 million-plus when she listed it and it sold after negotiations with buyer's agent Deb West, of SydneySlice.

Mayo's move pays off in Bellevue Hill

The Bellevue Hill home of Anna Mayo, of the Mayo Hardware family, and BNP Paribas executive Ian Perkins has sold on the quiet for $12 million.

At that level, the sale - through D'Leanne Lewis, of Laing + Simmons Double Bay - is a credit to the renovation undertaken by Mayo given it more than doubles the $5.5 million she paid for it in 2010 and tops a street record of $10.3 million set by Lewis just last month for the house next door of heritage home advocate Susanna Press.

Mayo is not moving far for her next home renovation. Fittingly, she was the more than $9 million buyer of BNP Paribas' nearby Sydney executive residence.

BNP Paribas has held the Victoria Road house since 1960 when it was sold by dentist Henry Spiegel and his wife Rose for $138,000. Lewis declined to reveal the result, but scored more than her $9 million ask.

Hexham hits the heights in Balmain

**Balmain's suburb high has been reset by the Victorian Italianate mansion Hexham thanks to $7.5 million buyers, returning Bermuda-based expat lawyers Evatt Tamine and Sophie Tod**.

The landmark residence built in 1897 for Lewy Pattinson, founder of the Soul Pattinson chemist empire, is set on a whopping 750 square metres (huge by Balmain standards) and last traded in 2001 for $2.1 million when sold by meat merchant Alan East to lawyer Chris Brierley and his wife Kim.

Pillinger's Brad Pillinger made his way out of the eastern suburbs to list the residence last year, and given no comment from the agent, the rumours of the record high were only verified when it settled.

Meanwhile, the Mosman house Tamine bought as an investment in 2014 for $3.9 million has hit the market.

The six-bedroom residence on Balmoral slopes has been renovated and extended to include a guest suite in recent years. Expect to pay $5.5 million to $6 million at the December 7 auction through The Agency's Jon Snead.

This story first appeared at Domain.

**Load-Date:** November 17, 2019

# EXHIBIT D

**WARRANT TO ENTER AND SEARCH PREMISES:**
**PROCEEDS OF CRIME ACT 1997 - SECTION 39:**

**BERMUDA ISLANDS}**

To the Police Constables of Bermuda.

An application having been made on this day by **Paul RIDLEY, Detective Sergeant 2210** of the Organized and Economic Crime Department of the Bermuda Police Service;

I am satisfied that;

(a)     There are reasonable grounds for suspecting that **Evatt Tamine** has benefited from criminal conduct; and

(b)     There are reasonable grounds for suspecting that there is on the premises to which the application applies, any such material relating;

   (i)     to the specified person;

   (ii)     to whether that person has benefited from criminal conduct; or

   (iii)     to locating the proceeds of said criminal conduct,

   as is likely to be of substantial value (whether by itself or together with other material) to the investigation for the purpose of which the application is made, but that the material cannot at the time of the application be particularized; and

(c)     That;

   (i)     it is not practicable to communicate with any person entitled to grant entry to the premises and

   (ii)     entry to the premises will not be granted unless a warrant is produced and

   (iii)     the investigation for the purpose of which the application is made might be seriously prejudiced unless a Police Officer arriving at the premises could secure immediate entry to them

**THE MATERIAL TO WHICH THIS APPLICATION APPLIES IS:**

**Any material relating to the operation, management or control of entities used to evade or attempt to evade the payment of tax. To include, but is not limited to any documentation relating to account opening, account statements, written correspondence including memorandums, accounting statements, business records, foreign currency transactions, trust documentation, financial transaction slips, documentation pertaining to due-diligence, wire transfers, ledgers whether maintained electrically or otherwise, company minutes, email correspondence, voice mail, computers, tablets, laptops, USB sticks or any other forms or electronic storage or any other material not particularized but not subject to legal privilege relating to the evasion of payment of tax or money laundering or to establish whether any person has benefited from criminal conduct or to establish the whereabouts of any criminal conduct.**

**THE PREMISES TO WHICH THIS APPLICATION APPLIES ARE:**

**2 Hidden Lane, Pembroke HM 06, Bermuda.**

And that a warrant is appropriate by reason of **Section 39 of the Proceeds of Crime Act, 1997:**

> **Authority is hereby given for any Police Officer, accompanied by any officer or agent belonging to the United States Internal Revenue Service.**
> **to enter the said premises and to search them for the material in respect of which this application is made.**

\* It is not necessary to identify person accompanying by name. A description such as 'Official Receiver' will suffice.

DISCLOSURE OF INFORMATION ABOUT THIS INVESTIGATION MAY CONTRAVENE SECTION 42 OF THE PROCEEDS OF CRIME ACT, 1997. IF YOU ARE CONTACTED BY ANYONE IN CONNECTION WITH THIS SEARCH WARRANT YOU MAY WISH TO SEEK LEGAL ADVICE, OR CONTACT [Chief Inspector Nicholas Pedro, Officer in Charge of the Organized and Economic Crime Department], BEFORE ANY DISCLOSURE IS MADE.

Taken before me this 29th day of August, 2018

N. Hayg

**Chief Justice**
**Supreme Court of Bermuda.**

1

# EXHIBIT E



**U.S. Department of Justice**

**Tax Division**

*Washington, D.C. 20530*

REZ:LJW:CJSmith
5-11-23920
20162011033

October 2, 2018

BY EMAIL
Scott S. Balber
Herbert Smith Freehills
450 Lexington Avenue 14th Floor
New York, NY 10017

Re:     Evatt Tamine
        Statutory Immunity - Agreement

Dear Mr. Balber:

In accordance with our prior phone conversations, emails, and attorney proffer conducted by you and members of your firm on Thursday September 27, 2018, the government has agreed to grant your client, Evatt Tamine, statutory immunity pursuant to Title 18 U.S.C. § 6003. It is the government's understanding that pursuant to this grant of immunity, Mr. Tamine has agreed to continued long-term cooperation with the government's investigation of Robert Smith, Robert Brockman, and other related persons and entities. Mr. Tamine's cooperation to include: meeting with investigators and prosecutors as requested; providing truthful statements and testimony regarding relevant facts known to him; being available to appear and testify before the Grand Jury, at trial, and at any other relevant court proceeding in the United States; and providing relevant documents within his custody and control. Mr. Tamine understands that a failure to provide truthful testimony, or to otherwise provide false information to the government, can result in his prosecution for perjury or obstruction of justice, and that his grant of immunity does not prevent any such prosecution.

Sincerely,

*s/COREY J. SMITH*
Senior Litigation Counsel

We have read this letter, and have reviewed it carefully together. We understand the terms of this letter, and we agree to these terms.

Evatt Tamine
Dated: 2 October 2018

Scott S. Balber
Counsel for Evatt Tamine
Dated: October 2, 2018

25

# EXHIBIT F

Screenshot taken on November 28, 2020 at 11:53 AM ET of the following website:

https://www.linkedin.com/in/robertfredericksmith/



# EXHIBIT G

**Screenshot taken on November 28, 2020 at 12:08 PM ET of the following website:**

https://www.vistaequitypartners.com/about/



THE HISTORY OF VISTA

**2011**

HQ moves to Austin

PitchBook recognizes firm as a Top SaaS Investor

Berkery Noyes identifies firm as the most active financial investor in the software industry

**2012**

**2013**

Expands global footprint with first international investment (Misys)

Flagship Fund IV closes at $3.5BN

# EXHIBIT H

Mar 6, 2018, 07:15am EST

# Richer Than Oprah: How The Nation's Wealthiest African-American Conquered Tech And Wall Street



**Nathan Vardi** Forbes Staff

Hedge Funds & Private Equity

*Following the money trail*

---

🕐 **This article is more than 2 years old.**

This story appears in the March 31, 2018 issue of Forbes. Subscribe



It's a Saturday afternoon, at the height of vacation season, in one of South Beach's hottest hotels, and Robert Smith, the founder of Vista Equity Partners, is dressed like exactly no one within a 100-mile radius of Miami: in a three-piece suit. His signature outfit--today, it's gray plaid, accented by an indigo tie and a pink paisley pocket square--apparently doesn't take a day

off, and Smith isn't taking one now either. He's gathered dozens of CEOs from his portfolio companies, software firms all, for a semiannual weekend off-site to drill them in the ways he expects his companies to operate.

It's not just the suit that's unusual. Private equity firms almost never treat their portfolio companies, transactional chits by design, like an organic cohort. And until recently, PE, a field built on borrowing against cash-generating assets, wouldn't touch software firms, which offer little that's tangible to collateralize. Yet Smith has invested only in software over Vista's 18-year history, as evidenced by the CEOs, like Andre Durand of the security-software maker Ping Identity and Hardeep Gulati of the education-management software company PowerSchool, who have been summoned to Miami Beach, waiting to swap insights about artificial intelligence and other pressing topics. And Smith deploys more than 100 full-time consultants to improve his companies.

"Nobody ever taught these guys the blocking and tackling of running a software company," says Smith, an engineer by training, as he takes a lunch break at South Beach's 1 Hotel to nibble on a plant-based burger. "And we do it better than any other institution on the planet."

Smith includes the likes of Oracle and Microsoft in that boast, and his numbers back up the braggadocio. Since the Austin-based firm's inception in 2000, Vista's private equity funds have returned 22% net of fees annually to limited partners, according to PitchBook data. Smith's annual realized returns, which reflect exits, stand at a staggering 31% net. His funds have already made distributions of $14 billion, including $4 billion in the last year alone.

Not surprisingly given those numbers, Vista has become America's fastest-growing private equity firm, managing $31 billion across a range of buyout, credit and hedge funds. Smith is putting all that money to work at a breakneck pace, with 204 software acquisitions since 2010, more than any tech company or financial firm in the world. After finishing an $11 billion

fundraising for its latest flagship buyout fund last year, Smith has already deployed more than half of it, focusing as usual on business-to-business software. "They recognize it's a kind of central nervous system," says Michael Milken, whose bond-market innovations basically birthed the modern private equity industry and who has been a co-investor in two Vista deals. Taken together, Vista's portfolio, with 55,000 employees and more than $15 billion in revenue, ranks as the fourth-largest enterprise software company in the world.



Smith deploys quickly for a simple reason: While the rest of private equity basically relies on identifying and rectifying inefficient companies, Vista bets that it can improve the operations of even well-run firms--and claims that it's never lost money on a buyout transaction in its 18-year history. "I am most proud of our system being a loss-prevention mechanism," Smith says.

Perpetual wins translate into mammoth personal gains. With an estimated net worth of $4.4 billion, Smith has now eclipsed Oprah Winfrey as the nation's wealthiest black person. Vista has created another billionaire, Brian Sheth, the firm's 42-year-old president and dealmaker extraordinaire, who has a fortune estimated at $2 billion.

Ever since Forbes outed Smith as a billionaire in 2015, there has been a steady stream of press about him, from the lowest-brow (tabloid interest in his marriage to a former Playboy playmate) to the highest (coverage of his philanthropy, including his Giving Pledge commitment and his stint as the chairman of Carnegie Hall).



But neither Smith nor Sheth has ever before delved into Vista's secret formula, which has as many or more lessons for entrepreneurs and operators as it does for financiers. "We do something no one else does," Smith says.

On paper, Robert Smith's journey was a textbook American success story: A fourth-generation Coloradan, he was the son of two Ph.D.'s who became Denver school principals and put education first at home. "Their father and I stressed the need for both of our sons to persevere once they identified and pursued a goal," say Smith's mother, Sylvia. "Robert understood that preparation, hard work and dedication were key to success in his classes." In 1981 Smith headed to Cornell University to study chemical engineering, spending many nights and weekends in a three-person study group that met in the basement of the engineering school's Olin Hall. During summers, Smith worked at Bell Labs back home in Denver--a college internship he landed as a high school student after persistent cold-calling.

After graduating from Cornell in 1985, Smith took engineering jobs, first at a Goodyear Tire & Rubber chemical plant outside Buffalo, New York, and later at Air Products & Chemicals in Allentown, Pennsylvania. In 1990 Smith moved to Kraft General Foods, where he focused on coffee-machine technology. His efforts won him two patents: one for a stainless-steel filter and another for a brewing process that makes crema, the layer of foam on top of espresso. In 1992 Smith entered Columbia Business School. He was deftly acquiring the kinds of skills that would prove invaluable as the tech revolution exploded.

But Smith's rise was also incredibly abnormal. Even today, as the 155th-richest person in America and the 480th in the world, he faces constant, if often unwitting, racism. At a recent dinner in New York City with a group of senior Wall Street types, including a high-level executive of an investment bank, Smith moved to pick up the check for dinner, but the senior banker stopped him. "I can't have a black guy buy me dinner," he chortled.



The sting of such incidents, whether offhand remarks or doors more overtly shut to him, had an effect on Smith. "It meant we had to work harder," he says. "And that's what we did."

From his college days, when he joined the nation's preeminent black fraternity, Alpha Phi Alpha, known for its bookish but professionally ambitious members like Thurgood Marshall and Martin Luther King Jr., Smith had support. A crucial mentor: John Utendahl, who founded a pioneering black-run investment bank and happened to speak at Smith's Columbia graduation. Soon after, Utendahl, currently a vice chairman at Bank of America, took Smith to lunch and over tuna sandwiches persuaded him to ditch his M.B.A. focus of marketing to work on Wall Street. "There is a spark, a poise, even a wisdom that you can't teach or learn. Some people are just blessed to have it," Utendahl says. "That's how I felt when I met Robert as a young man."

**SMITH LANDED IN GOLDMAN SACHS'** mergers-and-acquisitions department, eventually moving to San Francisco to advise companies like Microsoft and eBay and becoming cohead of enterprise systems and storage. He was part of the team that helped Apple recruit Steve Jobs back.

For all his prominent clients, it was a little-known Houston company specializing in software for auto dealerships, Universal Computer Systems, that caught Smith's eye. Its margins were higher than any business Smith had advised, and he was stunned to learn the company's owners were plowing its cash into certificates of deposits. Why not acquire other mature software companies, Smith asked, and apply their best business practices there too? Great advice, but the owners insisted that Smith roll up his

sleeves and execute the plan for them. They backed up their offer with a commitment of $1 billion of the company's cash, as the sole investor, if he started a private equity fund. "I had one of those in-the-mirror moments," Smith says. "I looked at myself and asked, 'If I don't do this, how will I feel about it ten years from now?' "

The short answer: regretful. And so in 1999 Smith left Goldman and soon began recruiting cofounders, notably a business-school classmate, Stephen Davis, and a young analyst who worked under him at Goldman, Brian Sheth. The son of an Indian-immigrant father with experience in tech marketing and an Irish-Catholic mother who worked as a reinsurance analyst, Sheth would provide the yang to Smith's yin, focusing on acquisitions and divestitures, so that his boss could concentrate on investors and the companies themselves. Their relationship would become ironclad: "When something is happening with our families we are each other's first call," says Sheth, who vacations with Smith and served as best man at his wedding.

When Smith quit, most of his colleagues thought he'd lost his mind. He was on a partnership track at Goldman, which meant he was set to receive a multimillion-dollar windfall given the firm's impending initial public offering. What's more, banks didn't lend against software companies because they didn't have hard assets. How could Smith run a leveraged-buyout business in software without leverage? The concentration risk also seemed huge--investing in a single industry where a few innovative lines of code from a competitor could make a business obsolete overnight.



Brian N. Sheth, the co-founder and President of Vista Equity Partners. TIM

But Smith saw things differently. Software was eating the world. Soon every company would become a software company, its business digitized. A portfolio of software companies serving 50 industries would be diversified with a stream of

PANNELL

recurring revenue, given the shift to "software as a service." Smith's bet: Wall Street would soon realize that software companies not only gushed cash but actually had terrific assets to lend against--those ironclad maintenance contracts.

"Software contracts are better than first-lien debt," Smith says. "You realize a company will not pay the interest payment on their first lien until after they pay their software maintenance or subscription fee. We get paid our money first. Who has the better credit? He can't run his business without our software."

In 2000 Smith opened Vista's doors in San Francisco. His first acquisitions were all equity. As the firm went from one profitable deal to another, Smith eventually got lenders to finance Vista's purchase of Applied Systems, an insurance software maker, in 2004, Vista's first leveraged buyout. In 2007 Vista merged software companies serving utilities and created Ventyx, increasing the number of products it sold to existing customers substantially--a subsequent sale to ABB resulted in a profit of nearly $1 billion.

When the dust settled, Smith's first buyout fund returned 29.2% annually net of fees. Smith raised money for a second fund from institutional investors, returning a net 27.7% annually. In 2011, seeking to escape the Silicon Valley bubble, Smith moved Vista's headquarters to Austin, Texas. He could, by this point in his career, do pretty much anything he pleased.

"I still experience racism in my professional life," Smith says. But by being smarter and working harder, Smith proved the American Dream extended to the finance industry, where he became the first self-made Wall Street billionaire who wasn't a white male.

**WHEN VISTA SELLS** a company, Smith reverts to engineer mode, often giving its CEO an expensive Swiss or German watch. "It is not about being generous," Smith says. "It is a function of the process and focusing on the

detail of finding the person who is going to be the best at making that one gear."

To Smith the watch represents that "we created a system." And it's that system that has allowed Vista to gobble up enterprise software companies, confident that it can almost always make them better. When Smith started shopping for software companies, he found that many were run by former programmers and other technologists who were not formally trained in business and grew rapidly by sheer strength of product launches, with little analysis of whether they made sense.

Drawing on his background as an engineer and a Goldman vet, Smith began writing what amounted to user manuals for running enterprise software companies. The manuals weren't just about efficiency but also incorporated cost-cutting measures and fee-generating ideas. Eventually, Smith's playbook became the Vista Standard Operating Procedures--VSOPs. These were later renamed a more generic and user-friendly Vista Best Practices.

"If you are a software executive, how do you build your commission structures or run your go-to-market strategy? How do you find and train talent? Who teaches you those things?" Smith asks.

To implement his playbook, Smith created an in-house McKinsey: Vista Consulting Group. These employees, now 100 strong, help portfolio companies implement the best practices, also 100 strong, most of which run three to ten pages, with reams of attachments and examples. Printed out, they fill binders. They are stored in a password-protected online library, available only to authorized portfolio company managers.

"I just had an employee get a promotion," says Kristin Nimsger, CEO of Social Solutions, a cloud company providing data-management software for nonprofits like the United Way of Metro Chicago. "He was super-excited to get a log-in."

The playbook includes exhaustive details on things like contract administration and steps needed to ensure a company is being paid for all the code or services its customers use. In one case, a company Vista bought charged customers only for inbound support calls, neglecting to charge a minimum amount for ongoing support. Vista canceled all the contracts and got 100% of the customers to enter into new deals with higher minimum support payments.

Another set of playbook commandments revolve around sales, including incentives for salespeople cross-selling and upselling additional products. In one case, a portfolio company was rewarding salespeople the same way whether they brought in one-year contracts or longer-term ones.

In isolation, many of the playbook's best practices seem mundane. But software companies are often rife with eccentricities and legacy processes endemic to startup culture. Things like weekly deal-pipeline meetings, commonplace at B-school-driven corporations like IBM and Procter & Gamble, are often absent. By sticking to the rules in Smith's playbook, his software companies are transformed. Add some modest leverage, and, voilà, Vista got amazing returns.

Smith's playbook is ever evolving, and Vista partners and portfolio companies are welcome to make suggestions. "One of the things I am most proud of is that we are going to add ten new best practices to the group," says Reggie Aggarwal, the CEO of Cvent, a company that makes software for managing events and meetings.

Of course, critics argue that companies swallowed up by Vista are in no way immune to the traditional private equity slash and burn. Lawrence Coburn, CEO of Cvent competitor DoubleDutch, blasted Vista after the purchase, saying, "They eliminate duplication, slash R&D, optimize for financial performance and raise debt."

Smith's playbook goes well beyond corporate to-do lists. When Vista buys a company, all employees and recruits are required to take a personality-and-aptitude test, like one first developed by IBM. The hour-long test assesses technical and social skills, and attempts to gauge analytical and leadership potential. For Smith the test is particularly important because it attempts to bypass inherent biases, such as where people grew up or went to school, not to mention race or gender. Vista says 35% of the employees at its portfolio companies are women. Last year Vista companies administered 850,000 tests to hire 6,000.

"The meritocratic system creates loyalty," Smith says. "People from all over the country from different places all take the test. We all know something about each other, that we came through this meritocratic system."

The Vista test also identifies roles that fit personality profiles. A woman who ran a Domino's Pizza franchise in North Carolina was deemed to be a good sales trainer and was promoted to do so for a Vista company. Another from the mailroom, for example, scored high on Vista's test and became a programmer. "To write code you need to be creative," Sheth says. "How much of that is going to happen if you all have the same background?"

After Vista has people where it wants them, there are boot camps that train employees, not just for two weeks but for six to nine months. In the past three years, Vista has put 12,000 new hires through these boot camps. They start by giving employees the big picture: how the Vista company makes money and the way customers use its products. The focus later shifts to specific corporate roles. Vista University provides "nanodegrees," like one now being offered in artificial intelligence. Monthly meetings designed to cross-pollinate best practices among Vista employees from different companies in similar roles--from cybersecurity to HR and product development--are held.

All of this is run by Smith's consulting group, which operates like a seasoned special-forces unit. "Financial performance of a company is just a trail in the

sand of the operational performance," Smith says. "The more standardized the input, the more standardized the output. You have to design your system, and you have to believe in it."

**WITH THE REST OF PRIVATE** equity getting turned on to enterprise software deals, Vista's system is about to get a major test. While bargains are much harder to come by, Vista's goals for each buyout will remain the same: three times its money. Smith expects to hold on to his portfolio companies longer, identifying each acquisition target based on how much the Vista playbook can juice results.

"We don't underwrite to hope. We underwrite based on critical factors for success under our control," Smith says. "What we need to change, we have changed before, so we know how to do it." On average, Vista doubles the Ebitda of its companies within five years.

A lot of the responsibility will fall to Sheth, who has previously made a practice of racing to the exit door. For example, Vista bought Transfirst, a payments-processing software maker, for $1.5 billion in 2014, then sold it for $2.35 billion in just over a year, tripling Vista's money once leverage was factored in. In January, Vista sold its majority stake in Trintech, which makes software for financial professionals, after it doubled revenues in two years. On average Vista's exits tend to occur 4.7 years after purchase, compared with 5.7 for Blackstone.

While it would be easy enough for Smith to fall back on his philanthropy--recent pledges include $20 million to the new National Museum of African American History & Culture and $50 million from a foundation linked to Vista's first fund to help Cornell boost the representation of women and minorities in scientific research--numbers like that keep Smith feeling upbeat, even cocky, regarding Vista. Nearly two years ago, at the Milken Institute's annual Global Conference, Smith found himself shoulder-to-shoulder onstage with the old-guard billionaires of the buyout business, including David Rubenstein, Leon Black and Jonathan Nelson. Titans he no

doubt read about in B-school and who probably wouldn't have given him a second glance a decade ago.

When Carlyle's Rubenstein said his investors had been conditioned to accept lower returns given the high price of assets, Smith shifted in his chair and parried, "I got to go get some of his [investors]." He then turned to Rubenstein and, with the brio of someone who knows he's arrived, quipped: "Let me know where you are flying next. I will go with you."

---

## Mr. Smith's Software Empire

Move over Larry Ellison. Vista owns 48 enterprise software companies servicing 20 industries ranging from energy to law to higher education and live events.

- **Tibco Software,** which makes business-intelligence software, was purchased by Vista in 2014 for $4.3 billion.

- **Solera Holdings** makes software for auto and home insurers and was purchased by Vista in 2015 in a $6.5 billion deal.

- **Cvent,** which makes software for managing and planning corporate events, was purchased by Vista in 2016 in a $1.7 billion deal.

- **Finastra** makes risk management software for banks and financial firms. It was created by Vista in 2017 through the merger of D+H and Misys.

- **PowerSchool** makes education-management software. It was purchased in 2015 for $350 million. It's spent another $1 billion on add-on acquisitions.

- **Marketo** is a giant in cloud-based marketing automation software. It was purchased by Vista in 2016 for $1.8 billion.

- **Ping Identity** makes identity-security software and was purchased by Vista for $600 million in 2016.

---

## A New Path to Profits

There was a time when buyout firms like KKR and Apollo could be successful simply by piling debt on a company, cutting costs and then letting the magic of leverage and compounding do its work. But what worked in the past may no longer be viable. There is now more than $1 trillion of private equity cash chasing deals and bidding up prices. According to DealLogic, private equity firms did $58 billion of tech transactions in 2016, a third of all U.S. deals.

Even Vista has had to pivot from buying legacy software companies to acquiring higher-growth operations, often at big prices and valuations.

Vista's acquisition of Marketo, a marketing automation software leader based in San Mateo, California, is a good example. After investors became disenchanted with its less than stellar 30% to 40% revenue growth rate, Marketo's share price plummeted by some 50% in early 2016. Then in May 2016, Vista swooped in to buy the company, putting up $1.3 billion in cash in a $1.8 billion deal. It was a generous 64% premium, but Vista knew that before long an operational overhaul, coupled with the small amount of debt it added to its balance sheet, would turn the cloud-based marketing software company into a winner. Recently, Marketo's cash flow (Ebitda) has turned positive. -- N.V.



*Must Read: Little Black Book Of Billionaire Secrets*

## Sophisticated Hedge Fund Analysis & Strategies

Forbes Billionaire's Pro Perspectives discusses how global macro-economic trends impact your investments.

| Enter e-mail address | Sign up |

You may opt out any time. Terms and Conditions and Privacy Policy



**Nathan Vardi**

Follow

Case 4:21-cv-00009 Document 1-2 Filed on 01/04/21 in TXSD Page 225 of 269

I am a senior editor at Forbes who likes digging into Wall Street, hedge funds and private equity firms, looking for both the good and the bad. I also focus on the...

**Read More**

Reprints & Permissions

ADVERTISEMENT

# EXHIBIT I

**Screenshot taken on November 28, 2020 at 11:55 AM ET of the following website:**

https://www.linkedin.com/company/vista-equity-partners/



# EXHIBIT J

Log in  Request a free trial

# Vista Equity Partners 

## Vista Equity Partners Overview



[ Update this profile ]

**Investor Type**

# PE/Buyout

**Status**

# Active

This is a profile preview from the PitchBook Platform.

[ Request a free trial ]

**Professionals**

# 164



**Investments**

# 406

**Portfolio**

# 69

**Exits**

# 63



### Data on this profile

| Overview |
| Investments |
| Exits |
| Investments Analytics |
| Team |

 **PitchBook also tracks**

Fund Performance

Limited Partners

Lead Partners on Deals

## Vista Equity Partners General Information

### Description

Founded in 2000, Vista Equity Partners is a private equity firm headquartered in Austin, Texas. The firm focuses on investing in software, agriculture, construction, education, energy, financial services, government, healthcare, hospitality, insurance, legal, marketing, media, entertainment, real estate, retail, security, telecom, transportation, and technology-enabled business sectors. The firm employs private equity, permanent capital, credit, and public equity investment strategies. The firm has additional offices in San Francisco, California; Oakland, California, New York, New York, and Chicago, Illinois.

Board Members
Service Providers
Investment
Preferences

## Contact Information

**Website**
www.vistaequit...

**Year Founded**
2000

**Investor Status**
Actively Seeking...

**Trade Association**
Principles for R...

**Primary Investor Type**
PE/Buyout

**Other Investor Types**
Growth/Expans...

**Primary Office**
401 Congress Avenue
Suite 3100
Austin, TX 78701
United States
+1 (512) 000-0000

in

---

# Vista Equity Partners Investments & Acquisitions (406)

| Company Name | Deal Date | Deal Type | Deal Size | Industry |
|---|---|---|---|---|
| 000000 | 24-Nov-2020 | 0000000000 | | Business/Productivity Sc |
| 0000000000 | 17-Nov-2020 | 0000000000 | | Business/Productivity Sc |
| 0000 0000000 00000 | 17-Nov-2020 | 0000000000 | | Business/Productivity Sc |
| 00000 00000000 | 12-Nov-2020 | 00000 00000 | 00000 | Network Management S |
| Pipedrive | 12-Nov-2020 | Buyout/LBO | | Business/Productivity Sc |

You're viewing 5 of 406 investments and acquisitions. Get the full list »

Want detailed data on 3M+ companies?
What you see here scratches the surface

Want to dig into this profile?
We'll help you find what you need

Request a free trial

Learn more

## Vista Equity Partners Exits (63)

| Company Name | Exit Date | Exit Type | Exit Size |
|---|---|---|---|
| 0000 | 20-Nov-2020 | 000000000 00000000 | 00000 |
| 0000 0000 00000000 | 23-Oct-2020 | 00 000000000000000 | |
| 00000 | 21-Oct-2020 | 000 | 00000 |
| 00000000 | 08-Sep-2020 | 00 000000000000000 | |
| SecureLink (USA) | 08-Sep-2020 | Buyout/LBO | |

You're viewing 5 of 63 exits. Get the full list »

## Vista Equity Partners Investments by Industry, Year, and Region



**Investments by Industry**

**Investments by Year**

**Investments by Region**

## Vista Equity Partners Team (245)

| Name | Title | Deals | Funds | E |
|---|---|---|---|---|

| Name | Title | Deals | Funds | E |
|------|-------|-------|-------|---|
| Robert Smith | Co-Founder, Chairman, & Chief Executive Officer | 000 | 00 | ( |
| David Flannery | Senior Managing Director & President | 0 | | |
| Brian Sheth | Senior Managing Director, Co-Founder, & President | 000 | 00 | ( |
| Read Simmons Ph.D | President, Consulting | | | |
| John Warnken-Brill | Senior Managing Director & Chief Financial Officer | | 0 | |

You're viewing 5 of 245 team members. Get the full list »

## PRODUCTS

PitchBook Desktop

PitchBook Mobile

Excel Plugin

Direct Data

CRM Integration

Chrome Extension

Institutional Research Group

Product Releases

## SOLUTIONS

Private Market Intel

Fundraising

Deal Sourcing

Due Diligence

Business Development

Networking

Deal Execution

## DATA

Companies

Investors

Deals

M&A

Limited Partners

Funds

Financials

Advisors

Professionals

Debt and Lenders

Profile Previews

## NEWS & ANALYSIS

Industry Reports

Blog

Subscribe to Newsletter

Advertise with Us

## BLOG

## ABOUT

Partnerships

Careers

Events

Press Inquiries

Video Library

What Sets Us Apart

## FOLLOW US

   



## US HEADQUARTERS

+1 (206) 623.1986
901 Fifth Avenue
Suite 1200
Seattle, WA 98164

## EUROPEAN HEADQUARTERS

+44 020 8037 2308
1st Floor Saffron House
6-10 Kirby Street
London EC1N 8TS
United Kingdom

## NEW YORK

+1 (206) 623.1986
315 Park Avenue South
14th Floor
New York, NY 10010

## CONTACT US

info@pitchbook.com
Request Research
Request your Profile
Submit your Deal

© 2020 PitchBook Data. All rights reserved. PitchBook is a financial technology company that provides data on the capital markets.

Site Map    Terms of Use    Privacy Policy    California Consumer: Do Not Sell My Info

# EXHIBIT K

**401 Congress Ave, Austin, TX 78701 to 515 Rusk Street, Houston, Texas**

Drive 163 miles, 2 hr 34 min



Map data ©2020 Google, INEGI          10 mi

---

🚗 **via US-290 E and US-290 E**          **2 hr 34 min**

Fastest route now, avoids road          163 miles
closures on I-10 E due to
construction

⚠️ This route has tolls.

---

🚗 **via TX-71 E and I-10 E**          **2 hr 38 min**

166 miles

---

🚗 **via US-290 E**          **2 hr 55 min**

169 miles

---

## Explore 515 Rusk St

                                        

Restaurants          Hotels          Gas stations          Parking Lots          More

# EXHIBIT L

Check-Distance.com

## Try other cities

| A |
| --- |

| B |
| --- |

| Let's GO! |
| --- |

## Distance from Austin, TX to Houston, TX

Driving distance from Austin, TX to Houston, TX is **162** miles (**261** km). How far is it from Austin, TX to Houston, TX? It's a **02 hours 44 minutes** drive by car. Flight distance is approximately **146** miles (**235** km) and flight time from Austin, TX to Houston, TX is **17 minutes**. Don't forget to check out our "Gas cost calculator" option. It will calculate cost of driving this particular distance. See the map below for the visual display of the upcoming road trip.

**Driving distance**

**162 Miles** / 261 Km 

**Gas consumption**

**6.48 Gallons** 24.80 Litres 

**Flight distance**

**146 Miles** / 235 Km 

# EXHIBIT M



**U.S. Department of Justice**

Tax Division

*Western Criminal Enforcement Section*
*P.O. Box 972*
*Washington, D.C. 20044*
*202-514-5762 (v)*
*202-514-9623(f)*

REZ:LJW:CJSmith
DJ 5-11-24264
CMN 2019200585

October 9, 2020

Mark Filip
Kirkland & Ellis, LLP
1301 Pennsylvania Avenue, NW
Washington, D.C. 20004

                    Re:    Robert F. Smith – Non-Prosecution Agreement

        Dear Mr. Filip,

        As you know, the U.S. Department of Justice Tax Division, the United States Attorney's
Office for the Northern District of California, and the Internal Revenue Service-Criminal
Investigation ("IRS-CI") have been investigating your client, Robert F. Smith, in regard to
suspected criminal violations of the Internal Revenue, Title 26, United States Code and
related violations of Title 31, Report of Foreign Bank and Financial Accounts ("FBAR"). After
careful consideration of Robert F. Smith's conduct and all of the surrounding circumstances, the
Tax Division and the United States Attorney's Office for the Northern District of California
hereby extends this Non-Prosecution Agreement (the "Agreement") to Robert F. Smith per the
following terms and conditions:

        1.      **Term of the Agreement.** The term of this Agreement shall be five (5) years,
beginning on the date of signing this agreement, unless there is a breach as set forth in paragraph
4 and 5. Obligations hereunder survive the term of this Agreement only where this Agreement
expressly so provides.

        2.      **Acknowledgment of Facts.** Robert F. Smith acknowledges and agrees that the
Statement of Facts as set forth in Attachment A, is truthful and accurate. He acknowledges and
agrees that the Statement of Facts accurately describes the tax evasion scheme in which he
participated, namely that he used the Excelsior Trust and Flash Holdings entities to willfully
conceal taxable income paid to those entities, that he completely and unilaterally controlled said
income which he knew was taxable to him, and further, that he affirmatively acted to conceal
the income from the Internal Revenue Service ("IRS") (the "Scheme"). In addition, Robert F.
Smith acknowledges that as a part of the Scheme, he willfully did not timely and accurately

report to the IRS and the United States his financial interest in, and signatory authority over, the foreign bank accounts described in the Statement of Facts.

    3.    **Cooperation**. It is understood that during and under the terms of this Agreement Robert F. Smith shall continue to cooperate by:

    (a) truthfully and completely disclosing all information with respect to the activities of himself, and others, concerning all matters about which the United States including but not limited to the Department of Justice Tax Division, IRS-CI, and the United States Attorney's Office for the Northern District of California inquires of him, which information can be used for any purpose;

    (b) truthfully and completely providing full and meaningful cooperation to the United States, including but not limited to the Department of Justice, IRS-CI, and the United States Attorney's Office for the Northern District of California regarding other individuals involved in the Scheme, and other similar schemes of which he has knowledge, and such other matters that the United States may inquire of him. Any assistance Robert F. Smith may provide to federal criminal investigators shall be pursuant to the specific instructions and control of the United States and its designated investigators. Robert F. Smith's cooperation under this Agreement shall continue for a period of five (5) years from the date this Agreement is fully executed, however, he shall cooperate fully with the United States in all matters the United States inquires of him during this Agreement until the conclusion of such matters, whether those matters are concluded within the five-year term of this Agreement;

    (c) withdrawing from any and all joint defense agreements previously entered into with other individuals who were involved in the Scheme, or were involved in similar schemes;

    (d) attending all meetings at which the United States requests his presence, at a mutually convenient location;

    (e) providing to the United States, upon request, any document, record, or other tangible evidence, except for those subject to valid claims of attorney-client privilege, work product protections, or other privileges, if any, other than those expressly waived including those described in Paragraph 3(g), relating to matters about which the United States, or any designated law enforcement agencies, inquire of him;

    (f) truthfully testifying before the grand jury, at any trial, and other court proceeding as requested by the United States, except for testimony subject to valid claims of attorney-client privilege, work product protections, or other privileges, if any, other than those expressly waived including those described in Paragraph 3(g);

    (g) withdrawing, and otherwise waiving, any and all objections in proceedings involving the review of evidence, both electronic and documentary, seized by IRS-CI including signing and filing in the respective federal district courts at the time of execution of this Agreement, the attached pleadings entitled, "Robert Smith's Withdrawal of Objections and Waiver of Privilege" (Attachments B and C), said pleadings intended to constitute a full waiver of any and all attorney/ client and attorney work product privileges applicable to this evidence, and otherwise abandoning any litigation contesting the United States' requests for this evidence, and waiving attorney-client privilege, work product protection, and other applicable privileges, if any, as to the Scheme, including the creation, operation and concealment of the Excelsior / Flash structure and to any aspect of his relationship or dealings with Individuals A and B, as defined in

Attachment A – Statement of Facts. For avoidance of doubt, nothing herein shall be construed as a waiver of attorney-client privilege, work product protection, or other applicable privileges, if any, during the representation of Robert F. Smith by any of the counsel or law firms that have advised him in this criminal investigation;

(h) paying all federal income tax, penalties, and interest owed to the IRS, as determined by the IRS, pursuant to his participation in the Scheme, in the amount of $56,278,125 for calendar years 2000 through 2014, and waiving any objection to the imposition of the civil fraud penalty, under Title 26 U.S.C. § 6663, on the tax due as determined by the IRS. A partial payment to the United States totaling one-half of this amount owed to the IRS shall be made at or before the execution of this Agreement with equal quarterly payments made thereafter to the United States, and payment in full no later than eighteen (18) months after the execution of this Agreement. The amount of tax, penalty, and interest due pursuant to this sub-paragraph shall not be reduced by a carryback, deduction, loss, credit, or other tax benefit of any kind which is, or may become available. A separate payment of tax associated with the 2015 calendar year will be made by Robert F. Smith to the IRS, together with an Amended Income Tax Return for the 2015 calendar year, reflecting previously unreported income from the Scheme. Robert F. Smith shall also waive any objection to the imposition of the civil fraud penalty, under Title 26, U.S.C. § 6663, on the additional tax due and paid for the 2015 calendar year as reflected on the Amended Income Tax Return that Robert F. Smith will file.

(i) paying all penalties and interest computed by the IRS, pursuant to Title 31 U.S.C. §§5314 and 5322, in the amount of $82,930,165, related to Robert F. Smith's failure to timely file truthful and accurate Foreign Bank Account Reporting Forms TD F 90-22.1 ("FBARs"), reporting his financial interest in the foreign bank accounts referenced in the Statement of Facts for the calendar years 2012, 2013, and 2014. A partial payment to the United States totaling one-half of this amount of the FBAR penalties and interest shall be made at or before the execution of this Agreement with equal quarterly payments made thereafter to the United States, and payment in full no later than eighteen (18) months after the execution of this Agreement. The amount of tax, penalty, and interest due pursuant to this sub-paragraph shall not be reduced by a carryback, deduction, loss, credit, or other tax benefit of any kind which is, or may become available.

(j) beginning in 2019, fully and accurately reporting to the IRS and United States all of his offshore financial interests, transactions, and income, as required by United States statutes and regulations;

(k) abandoning his protective, or tentative, claims for refund totaling $182,138,000 filed with the IRS consisting of a (i) a protective refund claim submitted to the IRS on May 12, 2017 for amounts paid in connection with the submission pursuant to the Streamlined Domestic Offshore Procedures, and (ii) protective refund claims filed with the IRS for charitable contribution deductions on September 21, 2018, and October 11, 2019, in connection with the contributions to Fund II Foundation, and any other claims related to the disposition of unreported income that was part of the Scheme, and take no further direct or indirect tax benefit from such claims;

(l) cooperating with the IRS, including signing at the time of execution of this Agreement the attached closing agreements with the IRS relating to his tax liabilities and FBAR liabilities (Attachments D and E), and cooperating with the IRS in all audits of Robert F. Smith's federal income tax returns, to ensure Robert F. Smith is in full compliance with all applicable federal income tax statutes;

(m) bringing to the Department of Justice Tax Division's or the United States' attention

all other crimes, in addition to those committed as part of the Scheme, which Robert F. Smith has committed, and all other criminal proceedings, investigations, or prosecutions in which he has been or is a subject, target, party, or witness; and

(n) committing no crimes whatsoever.

4.    **Violation of Agreement**.    It is understood that should the Department of Justice Tax Division or the United States Attorney's Office for the Northern District of California determine in its sole discretion that Robert F. Smith has knowingly given false, incomplete, or misleading testimony or information, or otherwise violated any provision of this Agreement, then:

(a) Robert F. Smith shall thereafter be subject to prosecution for any federal criminal violation of which the United States has knowledge, including crimes relating to the Scheme set forth in the Statement of Facts (Attachment A), perjury, and obstruction of justice; and any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecution. It is the intent of this Agreement for Robert F. Smith to waive all defenses based on the statute of limitations and the Speedy Trial Act (18 U.S.C. § 3161) with respect to any prosecution that is not time-barred on the date that this Agreement is signed. Robert F. Smith further agrees to the tolling of any applicable statute of limitations from August 13, 2020 until all the terms of this Agreement are fulfilled.

(b) All statements made by Robert F. Smith to the United States, or other designated law enforcement agents, and any testimony given by Robert F. Smith before a grand jury or other tribunal, whether prior or subsequent to the signing of this Agreement, and any leads from such statements or testimony shall be admissible in evidence in any criminal proceeding brought against Robert F. Smith.

(c) Robert F. Smith shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule or regulation that such statements or any leads derived therefrom should be suppressed. It is the intent of this Agreement to waive all rights in the foregoing respects.

(d) Robert F. Smith agrees to be subject to the jurisdiction of, and venue in, the United States District Court for the Northern District of California for any perjury, obstruction of justice, or false statement prosecutions related to any testimony or oral or written statements given in accordance with this Agreement. Robert F. Smith appoints his attorney, Mark Filip, as his agent to accept service of legal process, including subpoenas and summonses, in any proceeding instituted by the United States or IRS, or to which the United States or IRS is a party with respect to the crimes described above.

5.    **No Repudiation or Contradiction of Statement of Facts**. Robert F. Smith agrees that he shall not, himself or through any agent or representative, make any statement, in litigation or otherwise, repudiating or contradicting the Statement of Facts associated with this Agreement (Attachment A). Any contradictory statement by Robert F. Smith or his agent shall constitute a violation of this Agreement. If such a contradictory statement is determined to constitute a violation of this Agreement, then Robert F. Smith thereafter shall be subject to

prosecution for his participation in the Scheme, as described in the Statement of Facts (Attachment A), and waives his right to contest or object to these facts set forth therein. The decision as to whether any contradictory statement will be imputed to Robert F. Smith for the purpose of determining whether Robert F. Smith has committed a violation of this Agreement shall be at the sole discretion of the United States. Upon the United States reaching a determination that a contradictory statement has been made by Robert F. Smith, the United States shall promptly notify Robert F. Smith in writing, and Robert F. Smith may avoid a violation of this Agreement by repudiating the statement in question both to the recipient of the statement and to the United States within seven (7) days after Robert F. Smith's receipt of notice. Robert F. Smith consents to the public release by the United States, in its sole discretion, of any repudiation.

6.      **Public Record**. Robert F. Smith and the United States agree that upon execution of this Agreement, the Agreement and the associated Statement of Facts (Attachment A) and Closing Agreements with the IRS (Attachments D and E) shall be a matter of public record. Moreover, Robert F. Smith agrees to waive any and all statutory rights afforded to him under Title 26 U.S.C. § 6103 regarding the public disclosure of information contained in the Statement of Facts.

7.      **Agreement Not to Prosecute**. If the Department of Justice Tax Division and the United States Attorney's Office for the Northern District of California determine that Robert F. Smith has fully complied with the terms of this Agreement, then the Department of Justice Tax Division and the United States Attorney's Office for the Northern District of California agree not to criminally prosecute Robert F. Smith for any federal crimes arising from the Scheme, as generally described in the Statement of Facts (Attachment A) to include (i) any attempt to defraud the United States, evade or defeat tax, or any fraud or false statements on any documents subscribed to the Internal Revenue Service ("IRS") for the tax years 2000 through 2015; and (ii) Robert F. Smith's failure to timely file truthful and accurate Foreign Bank Account Reporting Forms TD F 90-22.1 ("FBARs"), reporting his financial interest in the foreign bank accounts for the calendar years 2012 through 2019. This Agreement does not provide any protection against prosecution for any future conduct by Robert F. Smith, or for any misconduct not disclosed by Robert F. Smith during this investigation.

8.      **Limits on this Agreement.**   Other than the Department of Justice Tax Division, the United States Attorney's Office for the Northern District of California, and IRS-CI, this Agreement does not bind any other component of the Department of Justice or any other federal, state, or local law enforcement or regulatory authority.

9.      **Totality of this Agreement**. This Agreement sets forth all of the terms of the Non-Prosecution Agreement between Robert F. Smith and the United States. It constitutes the complete and final agreement between the United States and Robert F. Smith in this matter. There are no other agreements, written or otherwise, modifying the terms, conditions, or obligations of this Agreement. No future modifications or additions of this Agreement, in whole or in part, shall be valid unless they are set forth in writing and signed by the United States, Robert F. Smith, and Robert F. Smith's counsel.

*Robert F. Smith*
*Non-Prosecution Agreement*
*Page - 6 -*


Date  10/10/2020

**RICHARD E. ZUCKERMAN**
**Principal Deputy Assistant**
**Attorney General**
**Tax Division**


Date  10/13/2020

**DAVID L. ANDERSON**
**United States Attorney**
**Northern District of**
**California**


AGREED AND CONSENTED TO:


Robert F. Smith

Date  OCT 9, 2020


APPROVED:


Mark Filip
Kirkland & Ellis LLP
Attorney for Robert F. Smith

Date signed  Oct 9, 2020


W. Neil Eggleston
Kirkland & Ellis LLP
Attorney for Robert F. Smith

Date signed  Oct 9, 2020


Emily P. Hughes
Kirkland & Ellis LLP
Attorney for Robert F. Smith

Date signed  October 9, 2020

*Robert F. Smith*
*Non-Prosecution Agreement*
*Page - 7 -*

**Mark E. Matthews**
**Caplin & Drysdale, Chartered**
**Attorney for Robert F. Smith**

Date signed     Oct 9, 2020

**Scott D. Michel**
**Caplin & Drysdale, Chartered**
**Attorney for Robert F. Smith**

Date signed     OCTOBER 9, 2020

## EXHIBIT A TO ROBERT F. SMITH
## NON-PROSECUTION AGREEMENT

## STATEMENT OF FACTS

1.     Robert F. Smith ("Smith"), age 57, is a resident of Austin, Texas and a citizen of the United States. From 2000 through May 2015, Smith engaged in an illegal scheme to conceal income and evade taxes he owed by using an offshore trust structure with related foreign corporations and offshore bank accounts, and by willfully filing a series of false documents with the Internal Revenue Service ("IRS") and the Treasury Department.

2.     Beginning in or about 1997, while working as an investment banker at a leading global investment bank and securities firm, Smith met and developed a business relationship with Individual A, the CEO of a corporation that produces and markets computer software ("Company A"), located in Houston, Texas. Smith, who received an MBA from Columbia University in 1994, worked extensively with Individual A in 1997 and 1998 regarding the potential sale of Company A. During that process, Smith learned that Company A was purportedly owned by a foreign holding company that, in turn, was purportedly owned by a foreign trust located in Bermuda. Individual A told Smith that the foreign trust was created by Individual A's father in the 1980s. Individual A, and others who worked for Individual A, told Smith that because Company A was owned by the offshore trust, no United States income tax would be owed on the profits gained from the sale of Company A's stock.

3.     The contemplated sale of Company A did not occur. Instead, Individual A approached Smith about the prospect of creating a private equity fund ("Fund 1") in which Individual A would be the sole limited partner investor, through his foreign trust structure. Smith left his employment with the investment bank and in 2000, founded a private equity firm located in San Francisco, California. Smith has been the CEO of the private equity firm since that time. Individual A initially made a $300 million commitment to Fund 1, which was later increased to $1 billion. Although the Fund 1 partnership agreement listed Individual A's foreign trust entity as its sole limited partner, it became apparent to Smith that Individual A completely controlled this foreign trust structure and made all final and substantive decisions regarding its investments in Fund 1.

4.     Individual A personally dictated the terms under which he would invest in Fund 1, including that Fund 1 had to be located in the Cayman Islands and that Smith hold half his carried interest in Fund 1 through a "perfected foreign trust" similar to the one used by Individual A. Specifically, Smith would personally receive an 8 percent general partnership interest in Fund 1, holding 4 percent through his LLC and the other 4 percent through an offshore trust that Smith controlled. All Fund 1 profits Smith earned were to be paid through these entities. Individual A told Smith that a portion of the general partner income and distributions from Fund 1 had to be held offshore because Individual A did not want to bring his foreign trust, and related foreign companies, into United States courts to litigate claims if Fund 1 failed to perform. Smith understood from Individual A, that Individual A did not want the United States Internal Revenue Service ("IRS") to know about his own foreign trust's participation in Fund 1. Individual A presented this unconventional business proposal as a "take-it-or-leave-it" offer, dictating the unique terms and unorthodox structure to the arrangement. Despite any misgivings, Smith

accepted Individual A's offer, viewing it as a unique business opportunity he eagerly wanted to pursue. It became apparent to Smith that despite paperwork that indicated to the contrary, Individual A completely controlled Individual A's foreign trust and related foreign companies, and made all substantive decisions regarding all of its transactions and investments.

5.  For the purpose of forming a similar foreign trust, Individual A referred Smith to Individual B, a lawyer in private practice in Houston, Texas who specialized in foreign trusts and "asset protection" planning. Smith understood that Individual B previously assisted Individual A's father in creating Individual A's trust in the 1980s.

6.  Individual B told Smith that he could form a foreign trust that could hold assets for Smith, and that Smith could use and benefit from these assets without paying United States income tax. In order to avoid United States income and estate tax, Smith was to have a foreign U.K. relative of his then-spouse ("nominee settlor") appear to fund the creation of the foreign trust with an initial "donation" of $7,500. Individual B told Smith that he and his family could be named beneficiaries of the foreign trust, and that the foreign trust must also include charitable beneficiaries in order to assure the tax-free nature of the trust. Despite representations and paperwork to the contrary, the charitable aspects of the trust were discretionary, not mandatory. Individual B also told Smith that the paperwork he and Smith prepared would make it appear as if the income and assets of the trust were not owned or taxable to Smith. Smith knew that the nominee settlor would not be involved in the creation of this foreign trust, and would neither contribute assets to the trust, nor pay any fees. Despite appearing too good to be true, Smith did not consult with other reputable tax attorneys or legal advisors he knew and trusted to verify the validity, or legal soundness, of what Individual B told him. In fact, Individual A told Smith that aside from Individual B, he should not to discuss his offshore structure with other attorneys.

7.  Smith paid nearly all the costs and fees associated with the trust. In 2000, Smith purported to have the nominee settlor settle his Belizean trust, called Excelsior Trust ("Excelsior"). Smith personally paid nearly half the $7,500 to settle the trust and paid the entire $30,000 in administrative fees required to form and create Excelsior. Smith's foreign relative, the nominee settlor of Excelsior, paid none of the administrative fees. Further, from 2000 through 2014, Smith paid annual fees of approximately $5,000 to maintain Excelsior in Belize. The nominee settlor was not involved in the payment of these fees. From 2000 through 2014, Smith also paid Individual B approximately $800,000 in fees for Individual B's assistance with the creation of a false paper trail, regarding the maintenance and operation of Excelsior and its related entities. Smith falsely told the Belizean nominee trustee that the initial donation of $7,500 came from the nominee settlor to create the false impression that Excelsior was an independent foreign trust being created and formed by someone other than Smith.

8.  Individual B further told Smith that the foreign trust could own foreign corporations to hold various assets in foreign jurisdictions, similar to Individual A's foreign trust. Smith understood from Individual B that although assets would be held and titled under the foreign trust and foreign corporate names, Smith could continue to control the assets and use them for his personal benefit.

9.  With the assistance of Individual B, Smith created a foreign limited liability company named Flash Holdings, LLC ("Flash"), in Nevis. At Individual B's direction, Smith

falsely represented to the Belizean nominee trustee for Excelsior that Flash was formed under the direction of the nominee settlor, using bearer shares, and that Flash was purportedly owned by Excelsior.[1] In reality, Smith paid the fees and costs to form Flash and made all substantive decisions regarding Flash's operations, transactions, income, investments, and assets.

10.     Following the formation of Excelsior and Flash, Smith held a 4% general partnership interest in Fund 1 under his own name and a 4% general partnership interest in the name of Flash. Smith was at all times in control of and the beneficial owner of Flash's 4% general partnership interest in Fund 1. Smith understood from Individual B that he controlled both the investment decisions for Flash and its assets, but he felt obligated to honor any claims Individual A made against Flash's tax-free funds held in a foreign jurisdiction if Fund 1 was not successful. Smith understood that Individual A could assert claims over the assets of Fund 1 if the fund were to lose money. Individual A had the power to remove Smith and the general partners from Fund 1 by forcing a sale of general partner interests to Individual A at Individual A's valuation.

11.     In 2000, when Smith formed Excelsior and Flash, Smith knew that Excelsior and Flash were intended, and would be used, to avoid the payment of United States income tax on income earned from investments in Fund 1 and other private equity funds. Smith knowingly and intentionally used Excelsior and Flash and their associated foreign bank accounts to conceal from the IRS, and the United States Treasury Department, income earned and/or distributed to Flash from Fund 1 and other private equity funds.

12.     At all times from their formation, Smith knowingly and intentionally controlled Excelsior and Flash for his use, benefit, and enjoyment, subject only to a claim Individual A could assert to Fund 1. Although Excelsior had a nominee trustee in Belize, that trustee exercised no independent judgment and made no decisions regarding Excelsior other than those that Smith directed. Similarly, although Flash had a nominee corporate manager and resident agent in Nevis, these managers and agents exercised no independent judgment over Flash, and made no decisions regarding Flash other than those that Smith directed.

13.     Individual B recommended that Smith work through him to create a paper record for purposes of creating a false impression that Excelsior's trustees and Flash's managers made independent decisions for these entities when in fact, Smith made all substantive decisions in their regard. Individual B advised Smith to communicate with the nominee trustees and nominee managers of Excelsior and Flash through Individual B for greater confidentiality, which Individual B knew was intended to, and did, conceal Smith's control and beneficial ownership of the income concealed in bank accounts under Flash's name.

14.     Beginning in approximately 2005, Flash began to earn and receive general partnership carried interest income from Fund 1. Distributions of this income were initially made to Flash's bank account at bank in the British Virgin Islands ("BVI Account"). Although Smith was not a signatory on the BVI Account, Smith was its beneficial owner and controlled all transactions concerning the account through Flash's nominee manager. Smith did not report this

---

[1] A bearer instrument is a document that entitles the holder of the document rights of ownership or title to the underlying property.

income to the IRS.

15.    In 2007, Smith caused an account in Flash's name to be opened at Banque Bonhôte in Switzerland into which additional carried interest income earned by Flash from Fund 1 and later from additional private equity funds were deposited (the "Bonhôte Account"). At all times, Smith was the sole signatory on the Bonhôte Account, fully controlled the Bonhôte Account, and was listed in Banque Bonhôte records as the beneficial owner of the Bonhôte Account. Smith was, in fact, the beneficial owner of the Bonhôte Account.

16.    In 2005, Smith and his then-wife purchased a vacation home in Sonoma, California. Smith titled the property they selected in Flash's name. Smith directed that the purchase price of $2.5 million be paid with untaxed funds from the BVI Account. Smith and his then-wife renovated the Sonoma property and paid for the renovation costs with untaxed funds deposited in the BVI Account and the Bonhôte Account. Smith and his family used the Sonoma property and had unfettered access to it from 2005 to 2014. Smith knowingly and willfully neither timely reported to the IRS nor timely paid income tax on these funds.

17.    In 2010, after Smith and his then-wife moved to Switzerland, they acquired two ski properties in Megève, France and later a Megève commercial property using untaxed funds to make the purchases, and with Individual B's advice, titled the properties in the names of foreign entities. Smith directed the payment of more than 13 million Euros from the Bonhôte Account to purchase and furnish the properties. Smith and his family had control of the Megève ski properties and had priority access to them from 2010 to 2014 unless rented to third parties. Smith knowingly and willfully neither timely reported to the IRS, nor timely paid income tax on these funds.

18.    From 2005 to 2013, Smith withdrew untaxed funds from the BVI Account and the Bonhôte Account for his personal use and benefit. In 2011 and 2012, Smith transferred more than $13 million from the Bonhôte Account to a United States bank account for his benefit. Smith used these funds to build a home and make improvements to property that he owned in Colorado and to fund charitable activities on that property for inner city children and wounded veterans. Smith knowingly and willfully neither timely reported to the IRS, nor timely paid income tax on these funds.

19.    From 2000 until 2014, Smith knowingly and intentionally did not advise his tax return preparer about Excelsior, Flash, and the BVI Account and the Bonhôte Account. Smith knowingly and intentionally did not tell his return preparer that he controlled these entities and bank accounts and that he had placed a portion of his general partnership income from Fund 1 and other private equity funds into those entities and accounts. Smith knowingly and intentionally did not tell his return preparer that he used untaxed income deposited into these foreign accounts for his own personal benefit.

20.    From in or about 2006 through 2015, Smith willfully filed false United States Individual Income Tax Returns, Forms 1040, for the tax years 2005 through 2014 in which he failed to disclose his beneficial interest in, and control over the BVI Account and the Bonhôte Account. In addition, Smith willfully failed to report on these income tax returns the income he earned from Fund 1, and other private equity funds, a portion of which he directed to be deposited into the BVI Account and Bonhôte Account. Smith willfully understated his income on these tax

returns and willfully evaded more than $43,000,000 in U.S. federal income taxes for the tax years 2005 through 2014.

21.    Smith knew that United States laws and regulations require United States citizens who have signatory authority over, or a financial interest in, a foreign bank account[s] to annually file a Foreign Bank Account Reporting Form TD F 90-22.1 ("FBAR"), with the United States government reporting either this signatory authority and/or financial interest. Prior to 2011, Smith knowingly and intentionally did not file an FBAR as required by law. In or around September 2011, Smith filed an FBAR for the 2010 calendar year that willfully failed to report his financial interest in the BVI Account and the Bonhôte Account Smith also willfully failed to file an FBAR for 2011 as required by law. In or around June 2013, Smith filed an FBAR for 2012 calendar year that willfully failed to report his financial interest in the BVI Account and the Bonhôte Account for purposes of concealing his ownership and control of these accounts.

22.    In or around November 2013 and January 2014, Smith received letters from Banque Bonhôte regarding the bank's intended participation in the United States Department of Justice "Swiss Bank Program" which required participant banks to report all United States-related accounts to the United States government (the "Bank Program Letters"). Smith received these letters relating to the Bonhôte Account. The Bank Program Letters noted that the Bonhôte Account was held by a United States person, and requested Smith to waive Swiss bank secrecy related to it. It further recommended that Smith consider applying to the IRS's Offshore Voluntary Disclosure Program ("OVDP") to report his non-compliance. The Bank Program Letters also informed Smith that if he failed to take one of these actions that Banque Bonhôte would close the Bonhôte Account. In March 2014, Smith filed a preclearance request with the IRS seeking entry into OVDP. In April 2014, the IRS denied Smith's preclearance application into OVDP.

23.    In or around June 2014, after receiving the OVDP preclearance denial, Smith willfully filed a false 2013 FBAR. Smith listed both the BVI Account and the Bonhôte Account on the 2013 FBAR, but only reported signature authority over these accounts while willfully omitting both his financial and beneficial interest in the accounts as well. Smith willfully omitted these disclosures to further conceal his taxable income deposited into these accounts.

24.    In or around October 15, 2014, Smith willfully filed a false United States Individual Income Tax Return, Form 1040, for the tax year 2013, with the IRS, which misrepresented and willfully failed to disclose his income from, beneficial interest in, and control over Excelsior and Flash. Smith's 2013 federal income tax return also willfully failed to disclose Smith's financial interest in the BVI Account and Bonhôte Account. In addition, Smith willfully filed a false Form 8275, attached to his income tax return, in which he represented that the Excelsior / Flash structure had corporate trustees and managers and willfully concealed his control over those entities. Smith attempted to conceal from the IRS that he controlled and beneficially owned the offshore entities Excelsior and Flash. Smith also willfully failed to disclose on the Form 8275 his beneficial ownership of the BVI Account and Bonhôte Account and falsely claimed that income distributed to Flash from Fund 1, and other private equity funds, was required to be donated to charity.

25.    In December 2014, Smith directed Excelsior to contribute all of the shares of Flash, and all of its assets, to a U.S. 501(c)(3) charitable organization. Smith knowingly and intentionally falsely claimed that this charitable contribution was required as part of an agreement with Individual A, the limited partner investor in Fund 1.

26.     In or around May 2015, Smith willfully filed false FBARs for the calendar years 2008 through 2013 ("Streamlined FBARs") and false amended United States Individual Income Tax Returns, Forms 1040X, for tax years 2010 through 2013 ("Streamlined Tax Returns") as part of the Streamlined Domestic Offshore Procedures. Smith's Streamlined FBARs continued to represent that Smith only had signatory authority over the BVI Account and Bonhôte Account, while willfully omitting Smith's true beneficial ownership of these accounts.

27.     Smith's Streamlined Tax Returns continued to willfully include a false Form 8275 which concealed his true beneficial ownership and control of Excelsior and Flash. Smith's Streamlined Tax Returns falsely reported that only small portions of income distributed to him in the United States from Flash's foreign bank accounts, were taxable to him. Smith willfully failed to report on his Streamlined Tax Returns over $200 million of partnership income distributed to Flash from Fund 1 and other private equity funds, over which Smith had beneficial ownership during the calendar years 2005 through 2014. Smith knew that the earned income attributed to Flash was in fact taxable to him when he filed the Streamlined Tax Returns.

28.     The acts taken by Smith, including acts described above, were done willfully and knowingly with the specific intent to violate United States law. Smith acknowledges that the foregoing statement of facts does not describe all of his conduct relating to the offenses stated herein and does not identify all of the persons with whom he may have engaged in unlawful conduct.

29.     The foregoing is a summary of relevant facts and is not a complete recitation of every relevant fact known.


**AGREED AND CONSENTED TO:**

_____          Date signed   _OCT 9, 2020_____
Robert F. Smith

_____          Date signed   _OCT. 9, 2020_____
Mark Filip
Kirkland & Ellis LLP
Attorney for Robert F. Smith

_____          Date signed   _Oct 9 2020_____
W. Neil Eggleston
Kirkland & Ellis LLP
Attorney for Robert F. Smith


Page 6 of 6

Date signed  October 9, 2020

**Emily P. Hughes**
**Kirkland & Ellis LLP**
**Attorney for Robert F. Smith**

Date signed  Oct 9, 2020

**Mark E. Matthews**
**Caplin & Drysdale, Chartered**
**Attorney for Robert F. Smith**

Date signed  october 9, 2020

**Scott D. Michel**
**Caplin & Drysdale, Chartered**
**Attorney for Robert F. Smith**

Date signed  10/10/2020

**Richard E. Zuckerman,**
**Principal Deputy Assistant Attorney General**
**Department of Justice**
**Tax Division**

Page 7 of 6

# EXHIBIT N

**Screenshots taken on November 29, 2020 at 7 AM ET of the following website:**

http://www.kepkelaw.com



## About Kepke Law

The Law Office of Carlos E. Kepke began operations in 1992. It is a boutique law firm engaged in only one practice area--the use of foreign structures for United States ("U.S.") tax savings and/or asset protection. It only accepts clients who are U. S. citizens who have as objectives the mitigation of U. S. income and/or estate taxes and/or asset protection.

The principal in the firm is Carlos E. Kepke who for many years was a partner in and the head of the international tax section of a major law firm in Houston, Texas. After leaving the Houston firm, Mr. Kepke opened his own law office. Mr. Kepke has been specializing in this area of the law for over thirty (30) years. Mr. Kepke has published numerous articles related to his specialty and is a frequent speaker at seminars around the world.

To see Mr. Kepke's resume please send an e-mail to  CEK4334@sbcglobal.net or call 713-626-0612

(713) 626-0612
149 Sage Road Houston, TX 77056-1417

KepkeLaw.com



## Contact Kepke Law

| Law Office of Carlos E. Kepke | |
|---|---|
| **Address:** | 149 Sage Road |
| | Houston, Texas 77056-1417 |
| **Phone:** | (713) 626-0612 {voice} |
| | (713) 626-0613 {fax} |
| **Email:** | CEK4334@sbcglobal.net |

# EXHIBIT O

**Screenshot taken on November 29, 2020 at 7:17 AM ET of the following website:**

https://www.linkedin.com/in/carlos-kepke-4aaab91a/



# EXHIBIT P

**Screenshot taken on November 29, 2020 at 7:13 AM ET of the following website:**

https://www.texasbar.com/AM/Template.cfm?Section=Find_A_Lawyer&template=/Customsource/MemberDirectory/MemberDirectoryDetail.cfm&ContactID=213481



1    Jason Varnado (State Bar No. 211067)           Kathryn Keneally (appearance *pro hac vice*)
     jvarnado@jonesday.com                          New York State Bar No. 1866250
2    JONES DAY                                      kkeneally@jonesday.com
     717 Texas, Suite 3300                          JONES DAY
3    Houston, TX  77002                             250 Vesey Street
     Telephone +1-832-239-3939                      New York, NY 10281-047
4    Facsimile +1-832-239-3600                      Telephone:  +1-212-326-3939
                                                    Facsimile:   +1-212-755-7306
5    Neal J. Stephens (State Bar No. 152071)
     nstephens@jonesday.com
6    Vincent Doctor (State Bar No. 319408)
     vdoctor@jonesday.com
7    JONES DAY
     1755 Embarcadero Road
8    Palo Alto, CA  94303
     Telephone:    +1.650.739.3939
9    Facsimile:    +1.650.739.3900

10   Attorneys for Defendant
     ROBERT T. BROCKMAN
11
                        UNITED STATES DISTRICT COURT
12
                     NORTHERN DISTRICT OF CALIFORNIA
13
                           SAN FRANCISCO DIVISION
14

15
     UNITED STATES OF AMERICA,                      Case No. 3.20-cr-00371-WHA
16
                    Plaintiff,                      DECLARATION OF JAMES L. POOL,
17                                                  M.D., IN SUPPORT OF ROBERT T.
            v.                                      BROCKMAN'S MOTION TO
18                                                  TRANSFER PROCEEDINGS
     ROBERT T. BROCKMAN,
19
                    Defendant.
20

21                    **DECLARATION OF JAMES L. POOL, M.D.**

22   I, James L. Pool, M.D., declare as follows:

23          1.      I am a Professor in the Departments of Medicine and Pharmacology and a treating

24   internal medicine physician at the Baylor College of Medicine, in Houston, Texas, where I hold

25   the James L. Pool Presidential Endowed Chair in Clinical Pharmacology.

26          2.      I make this Declaration at the request of his counsel in support of Mr. Brockman's

27   Motion to Transfer Proceedings to the United States District Court for the Southern District of

28   Texas.

3.      Mr. Brockman was referred to me by Dr. Seth P. Lerner (Baylor College of Medicine, Department of Urology), who had previously treated Mr. Brockman for bladder cancer. I conducted a complete physical examination of Mr. Brockman on December 11, 2018. It became evident from my examination that Mr. Brockman was experiencing movement disorders and cognitive problems that are consistent with Parkinson's disease or parkinsonism.

4.      I referred Mr. Brockman to three other medical professionals: Joseph Jankovic, M.D., a neurologist and specialist in Parkinson's disease and other movement disorders; Melissa Yu, M.D., a neurologist and specialist in Alzheimer's Disease and other memory disorders; and Michele K. York, Ph.D., a neuropsychologist, all with Baylor College of Medicine.

5.      Each of these doctors provided me with reports following their examinations. Their conclusions support that Mr. Brockman presented symptoms that are consistent with Parkinson's Disease, parkinsonism, Lewy body dementia, or some combination. These diagnoses cannot be totally confirmed except at autopsy. None of these conditions are curable, and each may result in rigid muscles, slow movements, and tremors. All are characterized by progressive dementia, and in Mr. Brockman's case, the medical reports confirm cognitive impairment, which includes, but is not limited to, both short and long term memory loss.

6.      I examined Mr. Brockman again on October 6, 2020. At that time, I conducted cognitive tests, and again referred Mr. Brockman to Dr. York for a further battery of tests. The results of these examinations confirm that Mr. Brockman's impairment is progressive.

7.      At this stage, Mr. Brockman may be oriented in time and place, aware of persons in his company, able to engage in social conversation, and capable of functioning in familiar tasks. However, Mr. Brockman's progressive dementia impairs his cognitive ability in several respects. These include short term memory limitations. In addition, his condition renders long-term memory inaccessible and defective. For these reasons, I concur with the medical position that Mr. Brockman cannot assist his attorneys in his defense.

8.      I understand that Mr. Brockman's counsel will make a motion for a hearing to determine that Mr. Brockman cannot assist in his defense, and that this motion will be supported by the medical reports and letters previously provided to them by me, Dr. Jankovic, Dr. Yu, and

Dr. York. I also understand that counsel will want to present testimony from each of us to explain how we reached our conclusions. We are all based in Houston. Under ordinary circumstances, it would be difficult for us to be present for a hearing in San Francisco, where this court is located. Under the current circumstances of the COVID-19 pandemic, we would be confronted with the increased risk of exposure at a time when the Centers for Disease Control and Prevention and other medical advisors are counseling against travel, the potential need to quarantine before and after travel, and the detrimental impact any absence or illness may have on our other patients.

9. It is also not medically advisable for Mr. Brockman to travel to San Francisco for a hearing or for trial. Mr. Brockman is 79 years old and suffers from underlying medical conditions that put him at increased risk for severe illness if he were to contract COVID-19.

10. Additionally, requiring Mr. Brockman to face legal proceedings in a location distant from his home will be disorienting in a manner that could accelerate the deterioration of his mental condition. Unfamiliar environments, stimulating surroundings, and changes in routine would be especially stressful for a person with Mr. Brockman's diminished capacity, creating a risk to his existing cardiac condition, and could exacerbate the overall progression of his symptoms.

11. Based on the foregoing, I respectfully submit this Declaration in support of Mr. Brockman's Motion to Transfer Proceedings to the United States District Court for the Southern District of Texas.

12. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Houston, Texas on November 25, 2020.


_James L. Pool, MD_
James L. Pool, M.D.

- 3 -

1  Jason Varnado (State Bar No. 211067)
   jvarnado@jonesday.com
2  JONES DAY
   717 Texas, Suite 3300
3  Houston, TX 77002
   Telephone +1-832-239-3939
4  Facsimile +1-832-239-3600

5  Neal J. Stephens (State Bar No. 152071)
   nstephens@jonesday.com
6  Vincent Doctor (State Bar No. 319408)
   vdoctor@jonesday.com
7  JONES DAY
   Silicon Valley Office
8  1755 Embarcadero Road
   Palo Alto, CA 94303
9  Telephone:   +1.650.739.3939
   Facsimile:   +1.650.739.3900

10

11 Attorneys for Defendant
   ROBERT T. BROCKMAN

Kathryn Keneally
(appearance *pro hac vice*)
New York State Bar No. 1866250
kkeneally@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281-047
Telephone:  +1-212-326-3939
Facsimile:   +1-212-755-7306

12                  UNITED STATES DISTRICT COURT

13                NORTHERN DISTRICT OF CALIFORNIA

14                   SAN FRANCISCO DIVISION

15

16 UNITED STATES OF AMERICA,

17                    Plaintiff,

18          v.

19 ROBERT T. BROCKMAN,

20                    Defendant.

21

22

Case No. 3:20-cr-00371-WHA

[PROPOSED] ORDER GRANTING
DEFENDANT ROBERT T.
BROCKMAN'S MOTION TO DISMISS
IN PART FOR LACK OF VENUE AND
TO TRANSFER TO THE SOUTHERN
DISTRICT OF TEXAS

Date:           December 15, 2020
Time:           12:00 p.m.
Judge:          Hon. William Alsup
Place:          Courtroom 12

23

24

25

26

27

28

1    Having considered Defendant Robert Brockman's Motion to Dismiss in Part for Lack of

2    Venue and Transfer to the Southern District of Texas, other documents in support of and in

3    opposition to the motion and in the record in this matter, the arguments of counsel at the hearing

4    on the motion, and good cause appearing therefore,

5    Mr. Brockman's Motion to Dismiss in Part for Lack of Venue and Transfer to the

6    Southern District of Texas is **GRANTED**.  As of the date of this order, Counts Nine through

7    Fourteen are dismissed, and this case is transferred to the United States District Court for the

8    Southern District of Texas.

9    **IT IS SO ORDERED.**

10   DATED: _____

11

12                                     By: _____

13                                          HONORABLE WILLIAM ALSUP
                                            United States District Court Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[Proposed] Order Granting Mot. to Dismiss in Part
and Transfer Case No: 3:20-cr-00371-WHA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

ROBERT T. BROCKMAN,

        Defendants.

No. CR 20-00371 WHA

**ORDER RE PARTIES' STIPULATED REQUEST FOR PROTECTIVE ORDER AND THE GOVERNMENT'S MOTION FOR DISCLOSURE UNDER § 6103(h)(4)(D)**

Defendant Robert Brockman and the United States of America, by and through its counsel of record, both move for a protective order in this case, pursuant to Federal Rules of Criminal Procedure 16(d). The government additionally moves for an order permitting it to disclose third party tax information pursuant to 26 U.S.C. Section 6103(h)(4)(D). **The foregoing order addresses parties' request, with modifications both formatted in bold and underlined.**

On October 1, 2020, a federal grand jury in the Northern District of California returned an Indictment charging defendant with: conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; tax evasion, in violation of 26 U.S.C. § 7201; FBAR reporting violations, in violation of 31 U.S.C. §§ 5314 and 5322; wire fraud, in violation of 18 U.S.C. § 1343; money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(ii), (a)(1)(B)(i), and (a)(2)(B)(i);

evidence tampering, in violation of 18 U.S.C. § 1512(b)(2)(B); and destruction of evidence, in violation of 18 U.S.C. 1512(c)(1). Having received a discovery request under Fed. R. Crim. P. 16, the United States will produce documents and other materials pertaining to defendant and the charged offenses to defense counsel. The discovery to be provided includes documents or other materials falling into one or more of the following categories (collectively, "protected information"):

1. Personal identifying information of individuals **(other than individuals' names)**, including the person's date of birth, social security number, residence or business address, telephone numbers, email addresses, driver's license number, professional license number, family members names, or criminal histories ("personal identifying information");

2. Financial information of individuals or businesses, including bank account numbers, credit or debit card numbers, account passwords, contact information, and taxpayer identification numbers ("financial information"), **but not including parties names**;

3. Medical records or other patient information of individuals covered by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) ("medical information"); and

4. Tax return information, as defined by Title 26, United States, Code, Section 6103(b)(1) and (2), pertaining to third parties, **but excluding third parties' names**.

To ensure that protected information is not subject to unauthorized disclosure or misuse,

**IT IS HEREBY ORDERED** that, pursuant to Fed. R. Crim. P. 16(d)(1), defendant, defense counsel of record, their investigators, assistants, and employees (collectively, "the defense team") may review with defendant all discovery material produced by the government, but shall not provide anyone other than the defense team with copies of, or permit anyone other than the defense team to make copies of, or have unsupervised access to, any discovery

2

material produced by the government that contains protected information. **Defense team may provide documents to witnesses if** the personal identifying information, financial information, and/or medical information has first been *entirely redacted* from the discovery materials. The government and defense counsel are ordered to work together to ensure that these materials are protected, but that the **defense team** has as much access to the materials as can be provided consistent with this Court's order. Discovery material that clearly pertains to defendant and does not contain protected information regarding any other person (*e.g.*, defendant's own bank records, telephone records, and business records) may be provided to defendant unredacted.

Defense counsel may also provide unredacted copies of protected information to any experts or consultants retained to assist with the preparation of the defense in the captioned case. Defendant, all members of the defense team, and any experts or consultants who receive discovery under this order shall be provided a copy of this order along with those materials and shall**, in advance of receiving the copies,** initial and date the order reflecting their agreement to be bound by it.

The materials provided pursuant to this protective order may only be used for the specific purpose of preparing or presenting a defense in this matter, unless specifically authorized by the Court.

This order shall also apply to any copies made of any materials covered by this order.

**IT IS FURTHER ORDERED that the government's discovery disclosures to defendant, shall contain** information that includes tax return information of third parties, as defined by 26 U.S.C. 6103(b)(1) and (2), pursuant 26 U.S.C. 6103(h)(4) **so long as it**: 1) pertains to defendant; 2) is related to items contained within defendant's income tax returns; 3) is relevant to a transaction involving defendant and a third party taxpayer; or 4) is otherwise required to be disclosed under 18 U.S.C. § 3500. Defendant, all members of the defense team, and any experts or consultants who receive discovery under this order shall maintain the

3

United States District Court
Northern District of California

1   confidentiality of all tax return information provided by the government in discovery in

2   accordance with 26 U.S.C. 6103(a) and this order, other than material that clearly pertains to

3   defendant and does not contain tax return information regarding any other person.

4        **IT IS FURTHER ORDERED** that neither defendant nor any member of the defense team

5   shall provide copies of any discovery material produced by the government ~~whether or not~~

6   ~~the material constitutes or contains Protected Information within the meaning of this Order~~ **if**

7   **that material contains protected information within the meaning of this order,** to any third

8   party (*i.e.*, any person who is not a member of the defense team)**. Nor may parties** make any

9   public disclosure of the same, other than in a court filing, without ~~the government's express~~

10  ~~written permission or~~ further order of the Court. No provision of this order shall prevent defense

11  counsel from discussing, and showing, discovery provided by the government with potential trial

12  witnesses and their counsel, as necessary to prepare for trial. **If a specific problem arises, either**

13  **party may bring the issue to the Court.** If a party files a pleading that references or contains

14  or attaches protected information subject to this order, that filing must comply with Fed. R. Crim.

15  P. 49.1. If a party files a pleading that references or contains or attaches medical information or

16  tax return information regarding any person other than defendant, that pleading, reference, or

17  attachment must be made under seal. This order authorizes such filings under seal and the parties

18  are not required to seek additional authorization from the Court to do so.

19       **IT IS FURTHER ORDERED** that defense counsel shall return materials subject to this

20  protective order (including any copies) to the United States within **28** ~~14~~ days after whichever

21  event occurs last in time: dismissal of all charges against defendant; defendant's acquittal;

22  defendant's sentencing; or the conclusion of any direct appeal. After the United States

23  receives documents and materials subject to this order, it shall maintain those documents and

24  materials until the period for filing a motion under 28 U.S.C. § 2255 has expired. After the

25  statutory period for filing a motion under 28 U.S.C. § 2255 has expired, the United States is

26  free to destroy documents and materials subject to this order. If defendant is represented by

27

28                                         4

counsel and files a motion pursuant to 28 U.S.C. § 2255, the United States will provide **defense** counsel with the documents and materials subject to this protective order under the terms of this order. Defendant's attorney in any motion under 28 U.S.C. § 2255 shall return the documents and materials subject to this protective order within **28** ~~14~~ days after the district court's ruling on the motion or **28** ~~14~~ days after the conclusion of any direct appeal of the district court's order denying the motion, whichever is later. This stipulation is without prejudice to either party applying to the Court to modify the terms of any protective order. This court shall retain jurisdiction to modify this order upon motion of either party even after the conclusion of district court proceedings in this case.

    **IT IS SO ORDERED.**

Dated:   November 30, 2020

    WILLIAM ALSUP
    UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

5