Reset Form

CAND Pay.gov Application for Refund (rev. 10/19)

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

## APPLICATION FOR REFUND (USDC-CAND PAY.GOV)

### PAY.GOV TRANSACTION DETAILS

***IMPORTANT***:

- *Complete all required fields (shown in red*); otherwise, your request may be denied and require resubmission.*
- *In fields **3-6**, enter the information for the **incorrect** transaction (the one for which you are requesting a refund), not the **correct** transaction that appears on the docket. This information can be found in the Pay.gov screen receipt or confirmation email.*

| | |
|---|---|
| **1. Your Name:*** Jacqueline Peters | **7. Your Phone Number:** (650) 739-3982 |
| **2. Your Email Address: *** jpeters@jonesday.com | **8. Full Case Number (if applicable):** 3:20-cr-00371 |
| **3. Receipt Number:*** 0971-15180351 | **9. Fee Type:*** ☐ Attorney Admission ☐ Civil Case Filing ☐ FTR Audio Recording ☐ Notice of Appeal ☑ Pro Hac Vice ☐ Writ of Habeas Corpus |
| **4. Transaction Date:*** 12/01/2020 | |
| **5. Transaction Time:*** 1:10 pm | |
| **6. Transaction Amount (Amount to be refunded):*** $ 310.00 | |

**10. Reason for Refund Request:*** *Explain in detail what happened to cause duplicate charges or no fee required.*

- *For a duplicate charge, provide the **correct** receipt number in this field.*
- *If you paid a filing fee in an abandoned case number, note that case number here (but e-file the refund request in the **open** case).*

We filed a Pro Hac Vice and paid the $310 but it was denied so we refiled it and said we had already paid it and on the docket it says it was not charged but it was on our credit card and is listed being paid twice on the Internet Payment History. Thank you.

✓ ***Efile this form using*** **OTHER FILINGS → OTHER DOCUMENTS → APPLICATION FOR REFUND.**

*View detailed instructions at: cand.uscourts.gov/ecf/payments. For assistance, contact the ECF Help Desk at 1-866-638-7829 or ecfhelpdesk@cand.uscourts.gov Monday -Friday 9:00 a.m.-4:00 p.m.*

| **FOR U.S. DISTRICT COURT USE ONLY** | |
|---|---|
| Refund request: ☐ Approved ☐ Denied ☐ Denied — Resubmit amended application (see reason for denial) | |
| Approval/denial date: | Request approved/denied by: |
| Pay.gov refund tracking ID refunded: | Agency refund tracking ID number: 0971- |
| Date refund processed: | Refund processed by: |
| Reason for denial (if applicable): | |
| Referred for OSC date (if applicable): | |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

ROBERT T. BROCKMAN,

Defendant.

No. CR 20-00371 WHA

**ORDER RE MOTION FOR CHANGE OF VENUE ON COUNTS TWO THROUGH EIGHT**

Defendant has moved for change of venue as to counts two through eight under 18 U.S.C. Section 3237(b) and Federal Rules of Criminal Procedure 7(c)(1) and (f). In the alternative, he moves for a bill of particulars relating to venue. For the foregoing reasons, the motion is **DENIED**.

Counts two through eight of the indictment allege tax evasion, in violation of 18 U.S.C. Section 7201. Venue is proper in a jurisdiction in which defendant "began, continued, or completed" his alleged crimes. 18 U.S.C. § 3237(a). Section 3237(b) provides, however:

> where venue for prosecution of an offense described in section . . . is based ***solely*** on a mailing to the Internal Revenue Service, and prosecution is begun in a judicial district other than the judicial district in which the defendant resides, [defendant] may upon motion filed in the district in which the prosecution is begun, elect to be tried in the district in which he was residing at the time the alleged offense was committed. 18 U.S.C.A. § 3237(b) (emphasis added).

Relief from Section 3237(b) is available to defendant only if the government claims venue "solely" on the mailing of tax return(s) to the Northern District of California. It does not. The

indictment alleges that the defendant used Vista Equity Partners, "a private equity firm which was founded in March 2000 . . . and which maintained its principle place of business in San Francisco," to manage his investments. It also alleges that the proceeds of Vista-managed investments made up the unreported income referenced in counts two through eight (Ind. ¶¶ 8, 128–134).

Since Section 3237(b) addresses scenarios in which venue is only established through the location to which a tax return was mailed, the motion is **DENIED**. Defendant may challenge venue on other grounds.

Defendant also seeks a bill of particulars pursuant to Federal Rules of Criminal Procedure 7(f). A bill of particulars:

> has three functions: 'to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, to avoid or minimize the danger of surprise at the time of trial, and to enable him to plead his acquittal or conviction in bar of another prosecution for the same offense when the indictment itself is too vague, and indefinite for such purposes.'

*United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979), quoting *United States v. Birmley*, 529 F.2d 103, 108 (6th Cir. 1976). Defendant argues that the government's grounds for venue, as stated in the indictment, fall short. The indictment clearly states that Vista Equity Partners maintained its headquarters in San Francisco. This suffices to enable defendant to prepare for trial as well as pretrial motions (Ind. ¶¶ 1–134). The request for a bill of particulars is **DENIED**.

**IT IS SO ORDERED.**

Dated: December 2, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
CAND 435
(CAND Rev. 08/2018)

**TRANSCRIPT ORDER**
**Please use one form per court reporter.**
***CJA counsel please use Form CJA24***
*Please read instructions on next page.*

COURT USE ONLY
**DUE DATE:**

1a. CONTACT PERSON FOR THIS ORDER
Trudy Carney

2a. CONTACT PHONE NUMBER
(650) 739-3939

3. CONTACT EMAIL ADDRESS
tcarney@jonesday.com

1b. ATTORNEY NAME (if different)
Neal Stephens

2b. ATTORNEY PHONE NUMBER
(650) 739-3939

3. ATTORNEY EMAIL ADDRESS
nstephens@jonesday.com

4. MAILING ADDRESS (INCLUDE LAW FIRM NAME, IF APPLICABLE)
Jones Day
1755 Embarcadero Road
Palo Alto, California 94303

5. CASE NAME
United Staes v. Brockman

6. CASE NUMBER
3:20-cr-00371

7. COURT REPORTER NAME ( FOR FTR, LEAVE BLANK AND CHECK BOX)→ ☐ FTR
Katherine Sullivan

8. THIS TRANSCRIPT ORDER IS FOR:
☐ APPEAL ☑ CRIMINAL ☐ In forma pauperis (NOTE: Court order for transcripts must be attached)
☐ NON-APPEAL ☐ CIVIL CJA: Do not use this form; use Form CJA24.

9. TRANSCRIPT(S) REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested), format(s) & quantity and delivery type:

| a. HEARING(S) (OR PORTIONS OF HEARINGS) | | | | b. SELECT FORMAT(S) (*NOTE: ECF access is included with purchase of PDF, text, paper or condensed.*) | | | | | c. DELIVERY TYPE (Choose one per line) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | JUDGE (initials) | TYPE (e.g. CMC) | PORTION If requesting less than full hearing, specify portion (e.g. witness or time) | PDF (email) | TEXT/ASCII (email) | PAPER | CONDENSED (email) | ECF ACCESS (web) | ORDINARY (30-day) | 14-Day | EXPEDITED (7-day) | 3-DAY | DAILY (Next day) | HOURLY (2 hrs) | REALTIME |
| 12/01/2020 | WHA | Motion | | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

10. ADDITIONAL COMMENTS, INSTRUCTIONS, QUESTIONS, ETC:

ORDER & CERTIFICATION (11. & 12.) By signing below, I certify that I will pay all charges (deposit plus additional).

11. SIGNATURE /s/ Neal Stephens

12. DATE 12/02/2020

Clear Form

Save as new PDF

Reset Form

CAND Pay.gov Application for Refund (rev. 10/19)

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

## APPLICATION FOR REFUND (USDC-CAND PAY.GOV)

### PAY.GOV TRANSACTION DETAILS

***IMPORTANT*:**

- *Complete all required fields (shown in red*); otherwise, your request may be denied and require resubmission.*
- *In fields 3-6, enter the information for the **incorrect** transaction (the one for which you are requesting a refund), not the **correct** transaction that appears on the docket. This information can be found in the Pay.gov screen receipt or confirmation email.*

| | |
|---|---|
| **1. Your Name:*** Jacqueline Peters | **7. Your Phone Number:** (650) 739-3982 |
| **2. Your Email Address: *** jpeters@jonesday.com | **8. Full Case Number (if applicable):** 3:20-cr-00371 |
| **3. Receipt Number:*** 0971-15180351 | **9. Fee Type:*** ☐ Attorney Admission ☐ Civil Case Filing ☐ FTR Audio Recording ☐ Notice of Appeal ☑ Pro Hac Vice ☐ Writ of Habeas Corpus |
| **4. Transaction Date:*** 12/01/2020 | |
| **5. Transaction Time:*** 1:10 pm | |
| **6. Transaction Amount (Amount to be refunded):*** $ 310.00 | |

**10. Reason for Refund Request:*** *Explain in detail what happened to cause duplicate charges or no fee required.*

- ***For a duplicate charge, provide the correct receipt number in this field.***
- *If you paid a filing fee in an abandoned case number, note that case number here (but e-file the refund request in the **open** case).*

We filed a Pro Hac Vice and paid the $310 but it was denied so we refiled it and said we had already paid it and on the docket it says it was not charged but it was on our credit card and is listed being paid twice on the Internet Payment History. Thank you.

✓ ***Efile this form using*** **OTHER FILINGS → OTHER DOCUMENTS → APPLICATION FOR REFUND.**

*View detailed instructions at: cand.uscourts.gov/ecf/payments. For assistance, contact the ECF Help Desk at 1-866-638-7829 or ecfhelpdesk@cand.uscourts.gov Monday -Friday 9:00 a.m.-4:00 p.m.*

| FOR U.S. DISTRICT COURT USE ONLY | |
|---|---|
| Refund request: ☐ Approved ☐ Denied ☒ Denied — Resubmit amended application (see reason for denial) | |
| Approval/denial date: 12/1/2020 | Request approved/denied by: Ana P Banares |
| Pay.gov refund tracking ID refunded: | Agency refund tracking ID number: 0971- |
| Date refund processed: | Refund processed by: |
| Reason for denial (if applicable): Please provide the correct receipt number in #10 | |
| Referred for OSC date (if applicable): | |

Case 3:20-cr-00371-WHA Document 57 Filed 12/02/20 Page 1 of 1

Clear Form

| UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>CAND 435<br>(CAND Rev. 02/2015) | TRANSCRIPT ORDER<br>Please use one form per court reporter.<br>*CJA counsel please use Form CJA24*<br>*Please read instructions on next page.* | COURT USE ONLY<br>**DUE DATE:** |
|---|---|---|

| 1a. CONTACT PERSON FOR THIS ORDER | 2a. CONTACT PHONE NUMBER | 3. CONTACT EMAIL ADDRESS |
|---|---|---|
| Jessica Leung | (408) 535-5588 | jessica.leung@usdoj.gov |
| 1b. ATTORNEY NAME (if different) | 2b. ATTORNEY PHONE NUMBER | 3. ATTORNEY EMAIL ADDRESS |
| Michael Pitman | (408) 535-5040 | michael.pitman@usdoj.gov |

| 4. MAILING ADDRESS (INCLUDE LAW FIRM NAME, IF APPLICABLE) | 5. CASE NAME | 6. CASE NUMBER |
|---|---|---|
| U.S. Attorney's Office<br>150 Almaden Blvd, Suite 900<br>San Jose CA 95113 | USA v. Robert T. Brockman | 3:20-cr-00371 |

7. COURT REPORTER NAME ( FOR FTR, LEAVE BLANK AND CHECK BOX)→ ❒ FTR

Katherine Sullivan

8. THIS TRANSCRIPT ORDER IS FOR:

❒ APPEAL ☑ CRIMINAL ❒ In forma pauperis (NOTE: Court order for transcripts must be attached)

❒ NON-APPEAL ❒ CIVIL CJA: Do not use this form; use Form CJA24.

9. TRANSCRIPT(S) REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested), format(s) & quantity and delivery type:

a. HEARING(S) (OR PORTIONS OF HEARINGS)

b. SELECT FORMAT(S) (*NOTE: ECF access is included with purchase of PDF, text, paper or condensed.)*

c. DELIVERY TYPE (Choose one per line)

| DATE | JUDGE (initials) | TYPE (e.g. CMC) | PORTION If requesting less than full hearing, specify portion (e.g. witness or time) | PDF (email) | TEXT/ASCII (email) | PAPER | CONDENSED (email) | ECF ACCESS (web) | ORDINARY (30-day) | 14-Day | EXPEDITED (7-day) | DAILY (Next day) | HOURLY (2 hrs) | REALTIME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/01/2020 | WHA | Motion | | ● | ○ | ○ | ○ | ○ | ● | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

10. ADDITIONAL COMMENTS, INSTRUCTIONS, QUESTIONS, ETC:

ORDER & CERTIFICATION (11. & 12.) By signing below, I certify that I will pay all charges (deposit plus additional).

11. SIGNATURE /s/

12. DATE 12/02/2020

DISTRIBUTION: ❒ COURT COPY ❒ TRANSCRIPTION COPY ❒ ORDER RECEIPT ❒ ORDER COPY

CAND 435
(Rev. 02/2015)

## INSTRUCTIONS

Use this form to order the transcription of proceedings. ***CJA counsel should use Form CJA24.*** Before completing this form, please visit cand.uscourts.gov/transcripts for complete transcript ordering information. THESE INSTRUCTIONS SUPPLEMENT THE WEBSITE INFORMATION.

1. Complete a separate order form for each case number for which transcripts are ordered.
2. Complete a separate order form for each court reporter who reported proceedings in the case.
3. Complete Items 1-12. Keep a copy of your completed order form for your records.
4. E-file this form in the U.S. District Court CM/ECF system. ***Exceptions to e-filing***: (a) sealed cases/proceedings; (b) non-parties; (c) pro se parties who are not e-filers. In such cases, mail or hand-deliver a hard copy addressed to the court reporter c/o the Clerk's Office at the Court division where the proceeding was held.
5. Email the court reporter (email list available at cand.uscourts.gov/courtreportercontact) promptly after this Transcript Order Form is e-filed to obtain the amount of the required deposit. Deliver payment to the court reporter promptly. Upon receipt of the deposit, the court reporter will begin work on the transcript. ***Exceptions:*** (a) orders for FTR transcripts and (b) daily trial transcript orders.
6. Unless prepayment is waived, delivery time is computed from the date the court reporter receives the deposit, authorized CJA 24 Form, authorization from Federal Public Defender's Office or, for transcripts ordered by the U.S. government, from the date of receipt of the DCN number.
7. The deposit fee is an estimate. Any overage will be refunded; any shortage will be due from you.

### ITEM-BY-ITEM INSTRUCTIONS (ITEMS 1-12):

Items 1-3 In fields 1a, 2a & 3a, please provide the contact name and information for the person responsible for ordering the transcript. In a law office, this is usually a paralegal or administrative assistant, not the attorney. In fields 1b, 2b & 3b, provide the attorney name and contact info, if the attorney is not the contact person.

Items 5-6. Only one case number may be listed per order.

Item 7. Visit cand.uscourts.gov/transcripts for instructions for determining the name of the court reporter who reported the proceeding or if the proceeding was audiorecorded. If minutes have not been filed, contact judge's courtroom deputy.

Item 8. Check appeal OR non-appeal AND criminal OR civil. ***In forma pauperis***: a court order specifically authorizing transcripts is required before transcripts may be ordered *in forma pauperis*.

Item 9a. List specific date(s) of the proceedings for which transcript is requested. A transcript of only a portion of a proceeding may be ordered, if the description is clearly written to facilitate processing. Under "type," indicate briefly what type of proceeding it was, such as "motion," "sentencing," or "CMC."

Item 9b. Select desired FORMAT(S) for transcript. There is an additional charge for each format ordered. Visit cand.uscourts.gov/transcriptrates for details. Unlock ECF/web access is included at no extra charge with each of the other formats.

Item 9c. There are 6 DELIVERY TYPES to choose from (times are computed from date of receipt of the deposit fee or DCN number). **NOTE**: Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within 7 calendar days, the 14-day *delivery* rate would be charged.

TRANSCRIPT DELIVERY TIMES:

ORDINARY — 30 calendar days.

14-DAY — 14 calendar days.

EXPEDITED — 7 calendar days.

DAILY (NEXT DAY) — Following adjournment and prior to the normal opening hour of the court on the following morning whether or not it actually is a court day.

HOURLY (SAME DAY) — within two (2) hours.

REALTIME — A draft unedited, uncertified transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

Item 11. Sign in this space to certify that you will pay all charges (the deposit plus any additional charges.) An electronic or conformed (/s/) signature is acceptable.

Item 12. Enter the date of signing the order and certification.

DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

MICHAEL G. PITMAN (DCBN 484164)
Assistant United States Attorney
150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5040
Facsimile: (408) 535-5081
michael.pitman@usdoj.gov

COREY J. SMITH (MABN 553615)
Senior Litigation Counsel
LEE F. LANGSTON (NYBN 4910311)
CHRISTOPHER M. MAGNANI (Maryland)
Trial Attorneys
United States Department of Justice, Tax Division

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT T. BROCKMAN,<br><br>Defendant. | Case No.: 3:20-cr-00371-WHA<br><br>STIPULATION TO EXCLUDE TIME FROM DECEMBER 1, 2020 THROUGH DECEMBER 15, 2020 AND [PROPOSED] ORDER |

It is hereby stipulated by and between counsel for the United States and counsel for the defendant Robert T. Brockman, that time be excluded under the Speedy Trial Act from December 1, 2020 through December 15, 2020.

At the hearing held on December 1, 2020, the government and counsel for the defendant agreed that time be excluded under the Speedy Trial Act because of the complexity of the case, because of pending motions, and so that defense counsel could continue to prepare, including by reviewing the discovery to be produced. For this reason and as further stated on the record at the hearing, the parties

stipulate and agree to exclude time until December 15, 2020, and further stipulate and agree that the ends of justice served by excluding the time from December 1, 2020 through December 15, 2020 from computation under the Speedy Trial Act outweigh the best interests of the public and the defendant in a speedy trial. 18 U.S.C. §§ 3161(h)(1)(D), (h)(7)(A), (h) (7)(B)(ii), (h)(7)(B)(iv).

The undersigned Assistant United States Attorney certifies that he has obtained approval from counsel for the defendant to file this stipulation and proposed order.

IT IS SO STIPULATED.

DAVID L. ANDERSON
United States Attorney

s/ Michael G. Pitman
COREY J. SMITH
Senior Litigation Counsel
MICHAEL G. PITMAN
Assistant United States Attorney

Attorneys for United States of America

s/ Neal J. Stephens
NEAL J. STEPHENS
Counsel for Defendant ROBERT T. BROCKMAN

[PROPOSED] ORDER

Based upon the facts set forth in the stipulation of the parties and the representations made to the Court on December 1, 2020 and for good cause shown, the Court finds that time should be excluded from December 1, 2020through December 15, 2020 under the Speedy Trial Act because of the complexity of the case, because of pending motions, and so that defense counsel could continue to prepare, including by reviewing the discovery to be produced, taking into account the exercise of due diligence. 18 U.S.C. §§ 3161(h)(1)(D), (h)(7)(A), (h) (7)(B)(ii), (h)(7)(B)(iv). The Court further finds that the ends of justice served by excluding the time from December 1, 2020 to December 15, 2020 from

computation under the Speedy Trial Act outweigh the best interests of the public and the defendant in a speedy trial. Therefore, and with the consent of the parties, IT IS HEREBY ORDERED that the time from December 1, 2020 through December 15, 2020 shall be excluded from computation under the Speedy Trial Act.

IT IS SO ORDERED.

DATED: ____________________

______________________________
WILLIAM ALSUP
United States District Judge

DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

MICHAEL G. PITMAN (DCBN 484164)
Assistant United States Attorney
150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5040
Facsimile: (408) 535-5081
michael.pitman@usdoj.gov

COREY J. SMITH (MABN 553615)
Senior Litigation Counsel
LEE F. LANGSTON (NYBN 4910311)
CHRISTOPHER M. MAGNANI (Maryland)
Trial Attorneys
United States Department of Justice, Tax Division

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

ROBERT T. BROCKMAN,

Defendant.

Case No.: 3:20-cr-00371-WHA

STIPULATION TO EXCLUDE TIME FROM DECEMBER 1, 2020 THROUGH DECEMBER 15, 2020 AND ~~[PROPOSED]~~ ORDER

It is hereby stipulated by and between counsel for the United States and counsel for the defendant Robert T. Brockman, that time be excluded under the Speedy Trial Act from December 1, 2020 through December 15, 2020.

At the hearing held on December 1, 2020, the government and counsel for the defendant agreed that time be excluded under the Speedy Trial Act because of the complexity of the case, because of pending motions, and so that defense counsel could continue to prepare, including by reviewing the discovery to be produced. For this reason and as further stated on the record at the hearing, the parties

stipulate and agree to exclude time until December 15, 2020, and further stipulate and agree that the ends of justice served by excluding the time from December 1, 2020 through December 15, 2020 from computation under the Speedy Trial Act outweigh the best interests of the public and the defendant in a speedy trial. 18 U.S.C. §§ 3161(h)(1)(D), (h)(7)(A), (h) (7)(B)(ii), (h)(7)(B)(iv).

The undersigned Assistant United States Attorney certifies that he has obtained approval from counsel for the defendant to file this stipulation and proposed order.

IT IS SO STIPULATED.

DAVID L. ANDERSON
United States Attorney

s/ Michael G. Pitman
COREY J. SMITH
Senior Litigation Counsel
MICHAEL G. PITMAN
Assistant United States Attorney

Attorneys for United States of America

s/ Neal J. Stephens
NEAL J. STEPHENS
Counsel for Defendant ROBERT T. BROCKMAN

~~[PROPOSED]~~ ORDER

Based upon the facts set forth in the stipulation of the parties and the representations made to the Court on December 1, 2020 and for good cause shown, the Court finds that time should be excluded from December 1, 2020through December 15, 2020 under the Speedy Trial Act because of the complexity of the case, because of pending motions, and so that defense counsel could continue to prepare, including by reviewing the discovery to be produced, taking into account the exercise of due diligence. 18 U.S.C. §§ 3161(h)(1)(D), (h)(7)(A), (h) (7)(B)(ii), (h)(7)(B)(iv). The Court further finds that the ends of justice served by excluding the time from December 1, 2020 to December 15, 2020 from

computation under the Speedy Trial Act outweigh the best interests of the public and the defendant in a speedy trial. Therefore, and with the consent of the parties, IT IS HEREBY ORDERED that the time from December 1, 2020 through December 15, 2020 shall be excluded from computation under the Speedy Trial Act.

IT IS SO ORDERED.

DATED: December 4, 2020

WILLIAM ALSUP
United States District Judge

STIPULATION TO EXCLUDE TIME FROM DECEMBER 1, 2020 THROUGH DECEMBER 15, 2020 AND ~~[PROPOSED]~~ ORDER
Case No.: 3:20-CR-00371-WHA
3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
CAND 435
(CAND Rev. 08/2018)

**TRANSCRIPT ORDER**
**Please use one form per court reporter.**
***CJA counsel please use Form CJA24***
*Please read instructions on next page.*

COURT USE ONLY
**DUE DATE:**

1a. CONTACT PERSON FOR THIS ORDER: Anna Oak
2a. CONTACT PHONE NUMBER: (202) 367-7731
3. CONTACT EMAIL ADDRESS: aoak@kellogghansen.com

1b. ATTORNEY NAME (if different): Daniel V. Dorris
2b. ATTORNEY PHONE NUMBER: (202) 326-7900
3. ATTORNEY EMAIL ADDRESS: ddorris@kellogghansen.com

4. MAILING ADDRESS (INCLUDE LAW FIRM NAME, IF APPLICABLE)
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036

5. CASE NAME: USA v. Robert T. Brockman
6. CASE NUMBER: 3:20-cr-00371

7. COURT REPORTER NAME ( FOR FTR, LEAVE BLANK AND CHECK BOX)→ ☐ FTR
Katherine Sullivan

8. THIS TRANSCRIPT ORDER IS FOR:
☐ APPEAL ☑ CRIMINAL ☐ In forma pauperis (NOTE: Court order for transcripts must be attached)
☐ NON-APPEAL ☐ CIVIL CJA: Do not use this form; use Form CJA24.

9. TRANSCRIPT(S) REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested), format(s) & quantity and delivery type:

a. HEARING(S) (OR PORTIONS OF HEARINGS)
b. SELECT FORMAT(S) (*NOTE: ECF access is included with purchase of PDF, text, paper or condensed.*)
c. DELIVERY TYPE (Choose one per line)

| DATE | JUDGE (initials) | TYPE (e.g. CMC) | PORTION If requesting less than full hearing, specify portion (e.g. witness or time) | PDF (email) | TEXT/ASCII (email) | PAPER | CONDENSED (email) | ECF ACCESS (web) | ORDINARY (30-day) | 14-Day | EXPEDITED (7-day) | 3-DAY | DAILY (Next day) | HOURLY (2 hrs) | REALTIME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/01/2020 | WHA | Mtn | | ● | ○ | ○ | ○ | ○ | ■ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

10. ADDITIONAL COMMENTS, INSTRUCTIONS, QUESTIONS, ETC:

ORDER & CERTIFICATION (11. & 12.) By signing below, I certify that I will pay all charges (deposit plus additional).

11. SIGNATURE /s/ Daniel V. Dorris

12. DATE 12/07/2020

Clear Form

Save as new PDF

Case 3:20-cr-00371-WHA Document 33-1 Filed 12/21/20 Page 2 of 2

CAND 435
(Rev. 08/2018)

# INSTRUCTIONS

Use this form to order the transcription of a record of proceedings. ***CJA counsel should use Form CJA24.*** Before completing this form, please visit cand.uscourts.gov/transcripts for complete transcript ordering information. THESE INSTRUCTIONS SUPPLEMENT THE WEBSITE INFORMATION.

1. Complete a separate order form for each case number for which transcripts are ordered.
2. Complete a separate order form for each court reporter who reported proceedings in the case.
3. Complete Items 1-12. Keep a copy of your completed order form for your records.
4. E-file this form in the U.S. District Court CM/ECF system. ***Exceptions to e-filing***: (a) sealed cases/proceedings; (b) non-parties; (c) pro se parties who are not e-filers. In such cases, mail or hand-deliver a hard copy addressed to the court reporter supervisor (email list available at cand.uscourts.gov/transcripts/contact) at the Court division where the proceeding was held.
5. Next, the court reporter/transcriber will contact you to confirm estimated costs and delivery options. Deliver payment to the court reporter/transcriber promptly. Upon receipt of the deposit, the court reporter/transcriber will begin work on the transcript.
6. Unless prepayment is waived, delivery time is computed from the date the court reporter/transcriber receives the deposit, authorized CJA 24 Form, authorization from Federal Public Defender's Office or, for transcripts ordered by the U.S. government, from the date of receipt of the DCN number.
7. The deposit fee is an estimate. Any overage will be refunded; any shortage will be due from you.

## ITEM-BY-ITEM INSTRUCTIONS (ITEMS 1-12):

Items 1-3 In fields 1a, 2a & 3a, please provide the contact name and information for the person responsible for ordering the transcript. In a law office, this is usually a paralegal or administrative assistant, not the attorney. In fields 1b, 2b & 3b, provide the attorney name and contact info, if the attorney is not the contact person.

Items 5-6. Only one case number may be listed per order.

Item 7. Visit cand.uscourts.gov/transcripts for instructions for determining the name of the court reporter who reported the proceeding or if the proceeding was audio-recorded. If minutes have not been filed, contact the court reporter supervisor at the division where the hearing was held.

Item 8. Check appeal OR non-appeal AND criminal OR civil. ***In forma pauperis***: a court order specifically authorizing transcripts is required before transcripts may be ordered *in forma pauperis*.

Item 9a. List specific date(s) of the proceedings for which transcript is requested. A transcript of only a portion of a proceeding may be ordered, if the description is clearly written to facilitate processing. Under "type," indicate briefly what type of proceeding it was, such as "motion," "sentencing," or "CMC."

Item 9b. Select desired FORMAT(S) for transcript. There is an additional charge for each format ordered. Visit cand.uscourts.gov/transcripts/rates for details. Unlock ECF/web access is included at no extra charge with each of the other formats.

Item 9c. There are 7 DELIVERY TYPES to choose from (times are computed from date of receipt of the deposit fee or DCN number). **NOTE**: Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within 7 calendar days, the 14-day *delivery* rate would be charged.

TRANSCRIPT DELIVERY TIMES:

- ORDINARY — 30 calendar days.
- 14-DAY — 14 calendar days.
- EXPEDITED — 7 calendar days.
- 3-DAY — 3 calendar days
- DAILY (NEXT DAY) — Following adjournment and prior to the normal opening hour of the court on the following morning whether or not it actually is a court day.
- HOURLY (SAME DAY) — within two (2) hours.
- REALTIME — A draft unedited, uncertified transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

Item 11. Sign in this space to certify that you will pay all charges (the deposit plus any additional charges.) An electronic or conformed (/s/) signature is acceptable.

Item 12. Enter the date of signing the order and certification.

DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

MICHAEL G. PITMAN (DCBN 484164)
Assistant United States Attorney
150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5040
Facsimile: (408) 535-5081
michael.pitman@usdoj.gov

COREY J. SMITH (MABN 553615)
Senior Litigation Counsel
LEE F. LANGSTON (NYBN 4910311)
CHRISTOPHER M. MAGNANI (Maryland)
Trial Attorneys
United States Department of Justice, Tax Division

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT T. BROCKMAN,<br><br>Defendant. | Case No.: 3:20-cr-00371-WHA<br><br>UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, IN PART, AND TO TRANSFER VENUE<br><br>Date: December 15, 2020<br>Time: 12:00 PM |

The United States respectfully opposes Defendant's Motion to Dismiss in Part for Lack of Venue and to Transfer to the Southern District of Texas, filed on November 30, 2020 (ECF No. 49) (the "Motion").

**I. Every Count of the Indictment is Properly Venued in the Northern District of California**

Criminal defendants have a Constitutional right to be tried in, and by a jury drawn from, a district in which the crime was committed. *See United States v. Cabrales*, 524 U.S. 1, 6 (1998) (citing U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI); *United States v. Ruelas-Arreguin*, 219 F.3d 1056,

1060 (9th Cir. 2000). Rule 18 of the Federal Rules of Criminal Procedure similarly provides that the government generally "must prosecute an offense in a district where the offense was committed." The government bears the burden of proving venue, by a preponderance of the evidence, at trial. *See United States v. Trenary*, 473 F.2d 680, 682 (9th Cir. 1973); *see also United States v. Jensen*, 93 F.3d 667, 669 n.2 (9th Cir. 1996) (citing *United States v. Kaytso*, 868 F.2d 1020, 1021 (9th Cir. 1988)). Generally, venue is proper in any judicial district in which a criminal offense was begun, continued, or completed. *See* 18 U.S.C. § 3237(a); *Ruelas-Arreguin*, 219 F.3d at 1061. In this case, the Indictment covers several schemes comprised of crimes committed in the Northern District of California.

### ***A. Defendant's Conspiracy & Tax Evasion Scheme - Counts 1 through 8:***

Tax evasion and conspiracy are both continuing offenses for venue purposes, and venue is proper "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). Tax evasion is properly venued in any district in which an affirmative act of evasion was begun, continued, or completed, *see United States v. Strawberry*, 892 F. Supp. 519, 521 (S.D.N.Y. 1995) (citing *United States v. Slutsky*, 487 F.2d 832, 839 (2d Cir. 1973)), and any potentially misleading or concealing conduct undertaken with a tax evasion motive can be an affirmative act of evasion, including directing funds to nominee accounts. *See United States v. Carlson*, 235 F.3d 466, 468-69 (9th Cir. 2000) (citing *Spies v. United States*, 317 U.S. 492, 499 (1943); *Edwards v. United States*, 375 F.2d 862, 866 (9th Cir. 1967)). Conspiracy is properly venued in any district in which one member of the conspiracy committed an overt act. *See United States v. Ahumada-Avalos*, 875 F.2d 681, 682-83 (9th Cir. 1989); *United States v. Meyers*, 847 F.2d 1408, 1411 (9th Cir. 1988).

Defendant's tax evasion and conspiracy scheme was a machine built of two components. One component was a complex network of offshore entities, nominees, and secret foreign accounts, which allowed Defendant to conceal his income and assets, and this component was necessarily largely offshore. The other component was an investment vehicle through which Defendant secretly funded his offshore structure. That vehicle was Vista Equity Partners.

Vista is a private equity firm. It was founded in San Francisco in 2000 as the result of a collaboration between Defendant and Individual Two, and Defendant was the sole investor in Vista's first private equity fund. From the very beginning and throughout the entire conspiracy, Defendant

worked with his co-conspirators to ensure that his investments in Vista funds would be illegally concealed using nominee entities including Point Investments, and that Defendant could thus evade the income tax he owed on any profits. Over the following two decades, Defendant made investments (through Point) in several Vista funds, yielding gains of approximately $2 billion, none of which Defendant (or anyone else) reported as income.

The scheme involved continuous contacts with Vista employees located in the Northern District. It required Defendant to make commitments to Vista funds, Vista to call capital as required, Defendant to fund those capital calls, and Vista to receive, invest, and account for Defendant's capital. Once an investment matured, the scheme required Vista to sell the investment, calculate the waterfall, issue distribution notices, and prepare wire instructions (some of which were sent to banks in the Northern District) based on instructions received from Defendant's nominees to move money into Defendant's offshore structure. All of these steps were repeated several times for each Vista fund in which the Defendant invested (and he invested in many of them), and local Vista employees performed each of the functions described above. Although it began opening offices outside the Northern District a decade after it was founded, Vista's core finance and accounting functions have always been located in the Northern District (in San Francisco, and, beginning in 2016, also in Oakland). Thus, Defendant's conspiracy and tax evasion flowed through Vista's offices in the Northern District.

More fundamentally, when he began his scheme in 1999, Defendant was well aware that Vista was going to be located in the Northern District. In essence, Defendant decided to build a complex, tax evasion machine, and he made the conscious choice to put the engine in San Francisco. The Motion's suggestions that the Indictment makes no reference to conduct that took place at Vista's San Francisco location, Motion at 13, that the Indictment's references to Vista personnel have nothing to do with activity in the Northern District, Motion at 6, and that relevant Vista functions and employees have not been located in the Northern District since 2011, Motion at 6 & 10, are all wrong. In fact, no district was more integral to Defendant's tax evasion and conspiracy than the Northern District of California, and the scheme could not have existed but for contacts with the Northern District.

**B.** ***Defendant's FBAR Violations - Counts 9 through 14:***

The FBAR Counts do not merely charge Defendant with failing to file FBARs. Rather, they charge Defendant with aggravated FBAR felonies in violation of 31 U.S.C. §§ 5314 & 5322(b). Section 5322(b) includes enhanced penalties for failing to file an FBAR "while violating another law of the United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period." Here, the illegal activity at issue is Defendant's tax evasion and conspiracy, and the government anticipates bearing the burden of proving at trial that funds tainted by those crimes moved through Defendant's secret foreign accounts. Because Defendant's tax evasion and conspiracy occurred in the Northern District, the FBAR Counts, which will require proof of those crimes, are properly venued here.

Venue would be proper for the FBAR Counts regardless because FBAR charges can be brought in any district, so long as constitutional safeguards are not violated. In *United States v. Bradley*, 644 F.3d 1213 (11th Cir. 2011), the defendant was prosecuted for failing to file an FBAR. In evaluating the defendant's claim that the prosecution was improperly venued in the district where his tax returns were prepared rather than the district where he lived, the court noted that, for Sixth Amendment venue purposes, the crime of failing to file a required report is "committed in the district or districts where the report is to be filed." *Id*. at 1252. Because the FBAR form in question allowed filing in "any local office" of the IRS, "for purposes of venue, the form is 'required' to be filed in any and every district that houses a local IRS office. So long as its choice does not create a constitutional hardship, the Government may choose, from among those districts, one where it is most convenient to pursue an indictment." *Bradley*, 644 F.3d at 1252-53. "Presumably, the Government may choose any district that would not be unfair to the defendant or create a hardship." *Id*. at 1252 n.82.

Similarly, in *United States v. Clines*, 958 F.2d 578 (4th Cir. 1992), the defendant was also prosecuted for failing to file an FBAR. The prosecution was venued in Maryland, where the defendant's tax returns were prepared, although he lived in Virginia. *Id*. at 583-84. The court found that - because FBARs could be filed in any local office of the IRS, and because the defendant was not unfairly burdened - venue was proper in Maryland under the Sixth Amendment. *Id*. The court also recognized that its ruling could permit nationwide venue for FBAR prosecutions, but seemed unfazed by the possibility (unless the government engaged in forum shopping). *Id*. at 584 n.3.

The Motion fails to cite *Bradley* or *Clines*, relying instead on *United States v. Clinton*, 574 F.2d 464 (9th Cir. 1978), and other decisions addressing the proper venue for the misdemeanor of failing to file a federal tax return in violation of 26 U.S.C. § 7203. But these decisions only buttress the principle that failing to file a required document occurs in any district where the document was supposed to be filed. *See, e.g., United States v. Hicks*, 947 F.2d 1356, 1361 (9th Cir. 1991) ("Failure to file a tax return is an offense either at the defendant's place of residence, or at the collection point where the return should have been filed"). That principle results in different conclusion in the context of tax returns, as opposed to FBARs, because tax returns (unlike FBARs) have to be filed in specific places. *See* 26 U.S.C. § 6091. Additionally, when evaluating decisions addressing Section 7203, it is noteworthy that Congress has expressed a concern regarding defendants being charged under Section 7203 in forums distant from their homes, *see* 18 U.S.C. 3237(b), but has not expressed a similar concern regarding FBAR charges. Thus, *Clinton* and *Hicks*, both of which were decided before both *Bradley* and *Clines* and were available to the courts who wrote them, do not change the result.

It is true that the rules for filing FBARs changed after *Bradley* and *Clines* were decided. Before 2013, FBAR forms could be filed in any IRS office, and this fact is cited in both *Bradley* and *Clines*. But beginning on July 1, 2013, FBARs had to be filed electronically, and not in any office of the IRS as before. Now FBARs can be filed electronically from anywhere. The Motion's argument that this change should affect the analysis is based on non-binding authority interpreting a different statute.

Litigating the FBAR Counts in the Northern District would not offend the Sixth Amendment because the Defendant committed aggravated FBAR felonies here, because the FBAR Counts were not brought here as an exercise in forum shopping, and because trying them here will create no unfairness or undue hardship to Defendant. Accordingly, the FBAR Counts should not be dismissed under Federal Rule of Criminal Procedure 12(b)(3)(A)(i), or transferred under Rule 21(b). Defendant will have an opportunity to hold the government to its burden of establishing venue at trial.

***C. <u>Defendant's Fraud & Money Laundering Scheme - Counts 15 through 37:</u>***

Wire fraud is a "continuing offense" for venue purposes, and is properly venued "in all of the places where any part was accomplished." *United States v. Pace*, 314 F.3d 344, 350 (9th Cir. 2002). Money laundering is also a continuing offense for venue purposes, *see United States v. Angotti*, 105 F.3d

539, 544-45 (9th Cir. 1997), and is triable in "any district in which the financial or monetary transaction is conducted;" or "any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted." 18 U.S.C. § 1956(i). Defendant's fraud and money laundering scheme was facilitated by multiple emails into, and a wire transfer out of, the Northern District. Nothing more is required, and the Motion does not argue otherwise.

### *D. Defendant's Obstruction of Justice Scheme - Counts 38 & 39:*

Prosecution under Section 1512 "may be brought in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected or in the district in which the conduct constituting the alleged offense occurred." 18 U.S.C. § 1512(i). Because the federal grand jury investigation he sought to obstruct was conducted by a Northern District Grand Jury, Defendant's scheme to obstruct justice is properly venued here.

## II. The *Platt* Factors Overwhelming Weigh Against Transfer Pursuant to Rule 21

The Motion argues that this prosecution should be moved, in whole or in part, to the Southern District of Texas under Federal Rule of Criminal Procedure 21(b). Rule 21(b) provides that, "[u]pon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." "[T]he Defendant bears the burden of showing why transfer is warranted." *United States v. Napoli*, 10-CR-00642-CRB, 2011 WL 1303571, at *1 (N.D. Cal. Apr. 5, 2011) (Breyer, J.) (citing *United States v. Testa*, 548 F.2d 847, 856 (9th Cir. 1977)). "'A district court has broad discretion in ruling on a motion for change of venue, [and only] in rare instances have appellate courts overridden a trial court's decision not to transfer.'" *United States v. Shayota*, 15-CR-00264-LHK, 2015 WL 9311922, at *1 (N.D. Cal. Dec. 23 2015) (Koh, J.) (quoting *United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir. 1996); *United States v. Ward*, 878 F.2d 387, 1989 WL 69897, at *1 (9th Cir. 1989) (unpublished)).

The Supreme Court enumerated ten factors to be considered when deciding whether to transfer a case in *Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240 (1964): (1) location of corporate defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of

documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division involved; and (10) any other special elements which might affect the transfer. *Id*. at 243-44. These factors have been adapted to non-corporate defendants as well. *See United States v. Fritts*, 05-CR-00216-WHA, 2005 WL 3299834, at *2 (N.D. Cal. Dec. 6, 2005) (Alsup, J.). No single *Platt* factor is determinative. Courts try to strike a balance based on the relative importance of the factors. *See United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990) (citing *United States v. Stephenson*, 895 F.2d 867, 875 (2d Cir. 1990)).

These factors apply, in this matter, as follows:

***Factor 1 - Location of Defendant***

While it is true that Defendant can be said to reside more in Houston than anywhere else, he is not particularly tethered to the Southern District of Texas. In 2019, alone, private jet records and other evidence indicate Defendant visited the following destinations:

- Houston, Texas
- Fort Lauderdale, Florida
- San Francisco, California
- Nassau, Bahamas
- Aspen, Colorado (for a routine, annual three-month trip to a vacation home for the summer)
- Anchorage, Alaska (for a routine, annual fishing trip)
- Washington, DC
- Cordoba, Argentina (for a routine, annual hunting trip)
- Salt Lake City, Utah
- Dayton, Ohio

This travel history is difficult to square with the Motion's suggestion that the trip from Houston to San Francisco for trial would be a hardship. The majority of pretrial proceedings in this matter are likely to be conducted remotely, and will probably not require Defendant (or anyone else) to travel. *See Napoli*, 2011 WL 1303571, at *1 ("[B]ecause the Court has waived Defendant Napoli's presence at all non-essential court appearances, the time and financial burden on him has been mitigated."). If he is capable

of traveling great distances to hunt and fish, and to stay away from home for months at a time for vacation, then he is capable of traveling to the Northern District for trial. Defendant has not carried his burden with respect to this factor.

***<u>Factor 2 - Location of Possible Witnesses</u>***

The Motion does not identify a single defense trial witness from Houston, much less allege that any such witness would be unwilling or unable to travel to the Northern District for trial. This failure, alone, is sufficient to tip this factor against transfer. *See, e.g.*, *Shayota*, 2015 WL 9311922, at *1 ("[T]he moving Defendants have not specified to what their witnesses will testify and how these witnesses are essential to the resolution of this case. The Ninth Circuit addressed a similar situation in *United States v. Testa*, 548 F.2d 847, 857 (9th Cir. 1977) . . . [and] determined that the defendant had failed to demonstrate that transfer was warranted."); *see also United States v. Blakstad*, 19-CR-486-ER, 2020 WL 5992347, at *4 (S.D.N.Y. Oct. 9, 2020) ("As the burden of justifying a transfer rests on Blakstad, he must specifically describe how particular witnesses would be entirely prevented from testifying at trial in the Southern District of New York.") (citing *United States v. Spy Factory, Inc*., 951 F. Supp. 450, 456-57 (S.D.N.Y. 1997) (Sotomayor, J.)); *United States v. Calk*, 19-CR-366-LGS, 2020 WL 703391, at *3 (S.D.N.Y Feb. 12, 2020) ("Defendant does not allege that any of the prospective witnesses will be unable to testify in this District or even that they would be significantly inconvenienced by such testimony, and the Government represents that it will pay or reimburse the travel and lodging costs of any witnesses it calls who reside outside the New York area. Based on this information, this factor does not weigh in favor of transfer.").

Conversely, the Motion glosses over the fact that there are at least two victim entities - Entity One and Entity Two in the Indictment - in the Northern District. Rule 21(b), as amended in 2010, requires the Court consider the convenience of victims, *see United States v. Larsen*, 13-CR-688-JMF, 2014 WL 177411, at *2 n.2 (S.D.N.Y. Jan. 16, 2016), and the government expects to call at least one witness from each of the victim entities at trial. In addition, the government expects to call at least one, and possible as many as three, local Vista facts witnesses at trial. Moving the case to convenience compensated experts at the expense victims and third-party witnesses would be perverse.

The Motion does identify, and relies heavily upon, the location of witnesses Defendant expects to call at his anticipated competency motion, including several expert witnesses. Even if it is appropriate to consider the location of these witnesses although they are likely to be witnesses in a pretrial proceeding initiated by Defendant, and not at trial, such consideration would not change the result. Although the Indictment alleges, and the government expects to prove at trial, that Defendant knew or should have known in June 2016 that it was likely there would be a federal grand jury investigation into his conduct, there can be no doubt that Defendant knew that he was the target of an investigation in the Northern District by late 2018 when Individual One, Defendant's primary offshore nominee, began cooperating with the government. *See* Immunity Letter dated October 2, 2018, attached to Ms. Keneally's Declaration in support of the Motion (ECF No. 49-1) as Exhibit E. Apparently, it was around this time that Defendant first began to complain of the amorphous malaise described in the Motion. *See* Declaration of James L. Pool M.D., attached to Ms. Keneally's Declaration as Exhibit P, at ¶ 3 ("I conducted a complete physical examination of Mr. Brockman on December 11, 2018."). Although he knew he was under investigation by authorities in the Northern District, and despite the fact that there are renowned medical institutions within the Northern District, Defendant elected to draw the medical professionals upon whom he relies exclusively from one institution, the Baylor College of Medicine in Houston (an institution Defendant has endowed with tens of millions of dollars). Naturally, any patient should select their physicians based on criteria of their own choosing. But having elected to hire exclusively Houston-based medical professionals, Defendant should not be permitted to force this prosecution to move to Houston as a result. Moreover, to the extent the Motion suggests that Defendant's anticipated competency hearing must be conducted entirely in-person, Motion at 12 n.2, it is wrong: Witnesses and experts regularly appear remotely at competency hearings. Defendant may seek to force his own experts, wife, friends, and colleagues to appear in-person at any competency hearing, but it would be odd bootstrapping to allow that tactic to weigh heavily in favor of transfer.

***Factor 3 - Location of Events Likely to be in Issue***

The Motion's suggestion that the central events described in the Indictment are more closely tied to the Southern District of Texas than to the Northern District, Motion at 2, is curious, since the Motion itself, in attempting to tally the locus of events described in the Indictment, identifies only two tied to

Houston. *See* Motion at 7. In fact, venue for several Counts in the Indictment could fail completely in the Southern District of Texas. That failure technically does not preclude transfer, since Defendant has now implicitly waived any objection to venue in the Southern District of Texas, *see United States v. Aronoff*, 463 F. Supp. 454, 457 n.2 (S.D.N.Y. 1978), but it certainly indicates that this *Platt* factor does not support transfer. The Motion's argument to the contrary, Motion at 7, is based on its tally which simply omits events which occurred in the Northern District. It is telling that the Motion must resort to a balancing test with weight on only one side of the scale to reach its erroneous conclusion that the center of gravity for this case is not in the Northern District.

***Factor 4 - Location of Documents and Records Likely to be Involved***

The relevant documents and records are either already in the Northern District or are electronically accessible, which weighs against transfer. *See Shayota*, 2015 WL 9311922, at *3.

***Factor 5 - Disruption of Defendant's Business***

Although he was the CEO of a multi-billion company until November 2020 (a few weeks after the Indictment became public, and almost two years after he began to lay the foundations for his incompetence defense), Defendant claims to now be retired. This factor does not favor transfer.

***Factor 6 - Expense to the Parties***

Transferring only a portion of this case would be enormously expensive. Although the Indictment covers a broad swath of criminal conduct, the various Counts share common evidence. For instance, Defendant's relationship with Individual One is significant to every Count in the Indictment. Similarly, Defendant's relationship with and control over multiple offshore entities, including the A. Eugene Brockman Charitable Trust, Spanish Steps, and Point Investments, is crucial to the conspiracy, tax evasion, FBAR, fraud, and money laundering Counts. Effectively severing the Counts by transferring only some of them, even just the FBAR Counts, would necessitate two largely overlapping trials in different districts, dramatically increasing the expense to the parties, witnesses, and courts. Additionally, since both trials would have evidence in common, they could not proceed simultaneously, which would delay the ultimate resolution of this matter until the trailing case was complete. This is a result to be avoided. *See Shayota*, 2015 WL 9311922, at *4 ("The Ninth Circuit has discouraged transfer in cases where transfer would result in duplicative trials, and other circuit courts are in

accord."); *see also Napoli*, 2011 WL 1303571, at *2 ("The best reasons for denying transfer concern the significant efficiency gained by having one trial (or even several) in one location rather than two."). While there is no basis for transferring this case in its entirety, transferring only part of it would be particularly inefficient.

***Factor 7 - Location of Counsel***

Of the attorneys who have entered appearances in this matter, only one (Mr. Varnado) is based in Houston, while three (Messrs. Stephens, Doctor, and Pitman) are based in the Northern District. Although three of the four prosecutors are based in Washington, DC, the other one is a local AUSA who is not a fungible local counsel, but rather has been actively involved in this matter (the investigation of which was conducted exclusively by a Northern District Grand Jury) since 2016. Defendant has not carried his burden with respect to this factor.

***Factor 8 - Relative Accessibility of Place of Trial***

The Northern District is easily accessible. *See Shayota*, 2015 WL 9311922, at *6; *Napoli*, 2011 WL 1303571, at *2.

***Factor 9 - Docket Conditions***

The Court has entered a stipulated schedule in this matter, adopting the trial date to which Defendant has agreed. Because this is not a case in which the Defendant seeks a trial date earlier than can be accommodated by the Northern District, this factor does not weigh in favor of transfer. *See Shayota*, 2015 WL 9311922, at *5. Additionally, given the progress that has already been made in the Northern District, it is not certain that a newly transferred case would progress to trial in the Southern District of Texas any sooner than November 2021, the trial date already set in this matter.

***Factor 10 - Special Elements***

Although we are all hopeful that effective treatments and vaccines may be available soon, the entire country is currently suffering the effects of the COVID-19 pandemic. The Motion argues that Defendant is particularly susceptible to the virus, but "this is an argument against holding any trial at all, rather than *where* to hold the trial." *United States v. Blakstad*, 19-CR-486-ER, 2020 WL 5992347, at *6 (S.D.N.Y. Oct. 9, 2020); *see also United States v. Yates*, 19-CR-266-AWT, 2020 WL 3316053, at *7 (D. Conn. June 18, 2020). Moreover, although the numbers are in constant flux and will certainly change

before trial, as of the date of this writing (according to Johns Hopkins) Harris County's per capita COVID infection rate is more than double San Francisco County's.[1] Thus, the current data suggest that Defendant and all other trial participants (including the jury) are likely to be safer if the Motion is denied, and also that safe jury trials are more likely to resume more quickly in the Northern District than in the Southern District of Texas. It would not serve the interests of justice to require the victims and witnesses who are from neither district to travel to Houston where their chances of infection (as of today) would be significantly greater than in the Northern District, for trial. To the extent the Court is inclined to consider this factor, it weighs against transfer.

## CONCLUSION

The Motion boils down to a request that the Court exercise its discretion to uproot this prosecution from the Northern District based on little more than Defendant's personal preference. The Motion does seek to add weight by pointing to the location of Defendant's expert witnesses, but it surely cannot be the law that wealthy defendants can buy their venue simply by hiring experts. And once the experts are stripped out of the equation, there is almost nothing left supporting the relief requested in the Motion. The countervailing considerations (including the absence of any defect in venue, local victims and witnesses, and the fact that the Court and government are likely to hire their own, local experts) are overpowering. Having elected to commit his crimes in the Northern District, Defendant should not now be heard to complain about being held to account here. The Motion should be denied in its entirety.

Respectfully submitted this 7th day of December 2020,

DAVID L ANDERSON
United States Attorney

s/ Michael G. Pitman
COREY J. SMITH
Senior Litigation Counsel
MICHAEL G. PITMAN
Assistant United States Attorney

Attorneys for United States of America

[1] *See* https://coronavirus.jhu.edu/us-map (last visited December 7, 2020) (County Cases Per 100K Population: Harris County, Texas = 4,234; San Francisco County, California = 1,900).

Jason Varnado (State Bar No. 211067)
jvarnado@jonesday.com
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
Telephone +1-832-239-3939
Facsimile +1-832-239-3600

Neal J. Stephens (State Bar No. 152071)
nstephens@jonesday.com
Vincent Doctor (State Bar No. 319408)
vdoctor@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone: +1-650-739-3939
Facsimile: +1-650-739-3900

Kathryn Keneally (appearance *pro hac vice*)
New York State Bar No. 1866250
kkeneally@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281-047
Telephone: +1-212-326-3939
Facsimile: +1-212-755-7306

Attorneys for Defendant
ROBERT T. BROCKMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ROBERT T. BROCKMAN,<br>Defendant. | Case No. 3:20-cr-00371-WHA<br><br>DEFENDANT ROBERT T. BROCKMAN'S NOTICE OF MOTION AND MOTION FOR A HEARING TO DETERMINE WHETHER MR. BROCKMAN IS COMPETENT TO ASSIST IN HIS DEFENSE<br><br>Date: January 12, 2021<br>Time: 2 p.m.<br>Judge: Hon. William Alsup<br>Place: Courtroom 12 |

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE THAT on January 12, 2021, at 2 p.m., in the courtroom of the Honorable William Alsup, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Robert T. Brockman will, and hereby does, respectfully move pursuant to 18 U.S.C. § 4241(a) for a hearing to determine whether Mr. Brockman is competent to assist in his own defense.

This Motion is based on the attached memorandum of points and authorities.

Dated: December 8, 2020

Respectfully submitted,

JONES DAY

*s/ Neal J. Stephens*
NEAL J. STEPHENS

Counsel for Defendant
ROBERT T. BROCKMAN

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........ 1
II. BACKGROUND ........ 3
A. Mr. Brockman's dementia prevents him from assisting in his defense ........ 5
1. The medical diagnoses show deficiencies in Mr. Brockman's critical cognitive abilities ........ 5
2. Mr. Brockman's cognitive impairment has been repeatedly confirmed through medical testing ........ 6
(a) Diagnostic testing results ........ 8
(b) Forensic testing results ........ 9
3. Mr. Brockman has experienced hallucinations consistent with Lewy body dementia ........ 12
4. Mr. Brockman's medical tests measured for and ruled out malingering ........ 12
5. Mr. Brockman's dementia causes him to lose insight into his own cognitive impairment ........ 13
6. While Mr. Brockman may continue to function in familiar activities and settings, medical evidence establishes that he cannot assist in the defense of this case ........ 13
7. The medical experts all agree that Mr. Brockman's dementia makes him incapable of assisting in his defense ........ 14
B. Mr. Brockman's retirement ........ 14
C. Non-medical evidence ........ 15
III. ARGUMENT ........ 15
A. The record far exceeds a showing of "reasonable cause" to require a competency hearing ........ 15
B. The evidence of Mr. Brockman's cognitive challenges is particularly compelling given the stage and nature of this case ........ 18
IV. CONCLUSION ........ 20

# TABLE OF AUTHORITIES

**Cases** **Page**

*Deere v. Woodford*,
339 F.3d 1084 (9th Cir. 2003)....16

*Drope v. Missouri*,
420 U.S. 162 (1975)....1, 2, 15, 19

*Medina v. California*,
505 U.S. 437 (1992)....17

*Moore v. United States*,
464 F.2d 663 (9th Cir. 1972)....16

*Odle v. Woodford*,
238 F.3d 1084 (9th Cir. 2001)....16, 18

*Smith v. Ylst*,
862 F.2d 872 (9th Cir. 1987)....16

*Torres v. Prunty*,
223 F.3d 1103 (9th Cir. 2000)....17

*United States v. Bohol*,
419 Fed. App'x 730 (9th Cir. 2011)....17

*United States v. Brugnara*,
2015 WL 6126781 (N.D. Cal. Oct. 19, 2015) (Alsup, J.), *aff'd*, 856 F.3d 1198 (9th Cir. 2017)....18

*United States v. Chandler*,
2020 WL 2735917 (M.D. Fla. May 5, 2020), adopted by 2020 WL 2735424 (M.D. Fla. May 26, 2020)....17

*United States v. Chun*,
2019 WL 6683878 (E.D. Mich. Dec. 6, 2019)....17

*United States v. Dreyer*,
705 F.3d 951 (9th Cir. 2013)....18

*United States v. Duncan*,
643 F.3d 1242 (9th Cir. 2011)....16

*United States v. Garza*,
751 F.3d 1130 (9th Cir. 2014)....2

*United States v. Helmsley*, 733 F. Supp. 600 (S.D.N.Y. 1989) ........ 18

*United States v. Hernandez*, 2018 WL 2738880 (N.D. Ohio June 7, 2018) ........ 17

*United States v. Mason*, 52 F.3d 1286 (4th Cir. 1995) ........ 16

**STATUTES**

18 U.S.C. § 4241 ........ 19

18 U.S.C. § 4241(a) ........ *passim*

18 U.S.C. § 4241(b) ........ 19

18 U.S.C. § 4247(b)–(c) ........ 19

Health Insurance Portability and Accountability Act ........ 4, 11

**OTHER AUTHORITIES**

https://www.mayoclinic.org/diseases-conditions/parkinsons-disease/symptoms-causes/syc-20376055 ........ 1

https://www.mayoclinic.org/diseases-conditions/parkinsons-disease/expert-answers/parkinsonism/faq-20058490. ........ 1

https://www.mayoclinic.org/diseases-conditions/lewy-body-dementia/symptoms-causes/syc-20352025 ........ 1

**MOTION FOR A HEARING TO DETERMINE WHETHER MR. BROCKMAN IS COMPETENT TO ASSIST IN HIS DEFENSE**

To the Honorable United States District Judge William Alsup:

The Defendant Robert T. Brockman moves under 18 U.S.C. § 4241(a) for a hearing to determine his mental competency to stand trial. Defense counsel met and conferred with government counsel, who oppose the relief sought in this Motion.

In support of this Motion, the Defendant states as follows.

## I. INTRODUCTION

This Court is asked to make one decision on this motion: whether there is "reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and the consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). Upon a showing of reasonable cause, § 4241(a) mandates that "[t]he court shall grant the motion" for a hearing.

Mr. Brockman has dementia. The causes and impact of dementia may vary. In Mr. Brockman's case, his treating and diagnostic doctors have concluded that his current cognitive impairment and other symptoms are consistent with Parkinson's disease,[1] parkinsonism,[2] or Lewy body dementia,[3] or some combination of the three.

Four highly qualified doctors in Houston, Texas, have examined Mr. Brockman on multiple occasions over a twenty-two month timespan, and concluded that his dementia makes him incapable of assisting in his defense. This alone is more than "reasonable cause" to compel a hearing. *See Drope v. Missouri*, 420 U.S. 162, 180 (1975).

---

[1] Parkinson's disease is a progressive nervous system disorder that affects movement and may cause dementia. *See* https://www.mayoclinic.org/diseases-conditions/parkinsons-disease/symptoms-causes/syc-20376055.

[2] Parkinsonism is a term used to describe a condition that causes a combination of the movement abnormalities seen in Parkinson's disease, especially resulting from the loss of dopamine-containing neurons. *See* https://www.mayoclinic.org/diseases-conditions/parkinsons-disease/expert-answers/parkinsonism/faq-20058490.

[3] Lewy body dementia results from protein deposits, called Lewy bodies, that develop in nerve cells in the brain regions involved in thinking, memory and movement. Lewy body dementia is incurable, progressive, and terminal, with death resulting on average approximately eight years after the onset of symptoms. *See* https://www.mayoclinic.org/diseases-conditions/lewy-body-dementia/symptoms-causes/syc-20352025.

Mr. Brockman began to raise concerns about cognitive problems at least as early as 2017, and sought medical attention in mid-2018. He was examined by three doctors and a neuropsychologist in late 2018 and early 2019, for the purpose of obtaining a diagnosis and course of treatment. Mr. Brockman did not seek out these doctors as a response to this investigation, and in fact only informed his counsel about their conclusions in July 2019, to explain that he may be having difficulty in understanding questions and information provided to him.

Mr. Brockman's doctors have concluded that his medical condition makes him unable to access information, renders him unable to make connections between questions that he is being asked and his recollection of events, and manifests as significant long- and short-term memory deficiencies. As detailed below, Mr. Brockman's cognitive limitations go well beyond memory loss or forgetfulness. The doctors describe the impact of Mr. Brockman's medical condition as characterized by what they refer to as "confabulation": when asked a question, Mr. Brockman's dementia will cause his brain to fabricate information to fill in for gaps in his memory. He will believe that the information that he is providing is correct, but it will be the result of distortions in how his brain is functioning.

A defendant who "lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope*, 420 U.S. at 171. The Ninth Circuit has instructed that, when deciding whether to conduct a competency hearing, courts should consider evidence from three broad categories: "medical history, the defendant's behavior in and out of court, and defense counsel's statements about the defendant's competency." *United States v. Garza*, 751 F.3d 1130, 1134 (9th Cir. 2014) (citing *United States v. Marks*, 530 F.3d 799, 814 (9th Cir. 2008)). Questions about the defendant's competency in any one of these categories may require a hearing. *Drope*, 420 U.S. at 180. The conclusions reached by Mr. Brockman's diagnostic and treating doctors more than meet the standard for "reasonable cause" that mandates a hearing pursuant to § 4241(a), *see id.*, and will be supported by witnesses, including counsel, who can describe Mr. Brockman's day-to-day behavior and the experience of counsel.

## II. BACKGROUND

In May 2017, Mr. Brockman sent an email to his friend, Dr. Stuart Yudofsky, stating that his son and wife "are after me to consult with the right doctor regarding my loss of my sense of smell. They are afraid that it is an early sign of alzheimer's or dementia. I am feeling good but am having increasing memory problems." Keneally Decl. Ex. A.[4] In September 2018, Mr. Brockman had a routine appointment with Seth P. Lerner, M.D., who had been monitoring Mr. Brockman in the years following his treatment for bladder cancer in 2006. During that examination, Mr. Brockman told Dr. Lerner that he had not been feeling well for several months. Dr. Lerner referred him to James L. Pool, M.D., who like Dr. Lerner is a professor and treating physician with Baylor College of Medicine, for a general physical examination.[5]

Dr. Pool examined Mr. Brockman in December 2018, diagnosed him as having dementia, and referred him to three medical experts to determine the cause and a course of treatment: Joseph Jankovic, M.D.,[6] a neurologist and specialist in Parkinson's disease and other movement disorders; Melissa Yu, M.D.,[7] a neurologist and specialist in Alzheimer's Disease and other memory disorders; and Michele K. York, Ph.D.,[8] a neuropsychologist, all with Baylor College of Medicine in Houston, Texas. Keneally Decl. Ex. G at ¶ 4.[9]

These doctors completed their examinations by March 2019. Dr. Jankovic found that Mr. Brockman presented symptoms that are consistent with Parkinson's disease or vascular parkinsonism. Keneally Decl. Ex. H at 5. Dr. York and Dr. Yu agreed that Mr. Brockman's movements are consistent with Parkinson's disease or parkinsonism, but they concluded that his cognitive impairment is more consistent with Lewy body dementia. Keneally Decl. Ex. I at 4-5,

---

4 "Keneally Decl." refers to the Declaration of Kathryn Keneally, affirmed December 8, 2020, and submitted in support of this Motion.

5 Dr. Lerner's and Dr. Pool's biographies are submitted at Keneally Decl. Ex. B and Ex. C, respectively.

6 Dr. Jankovic's biography is submitted at Keneally Decl. Ex. D.

7 Dr. Yu's biography is submitted at Keneally Decl. Ex. E.

8 Dr. York's biography is submitted at Keneally Decl. Ex. F.

9 Dr. Pool provided a declaration dated November 25, 2020 in support of Mr. Brockman's Motion to Dismiss in Part and Transfer Proceedings to the United States District Court for the Southern District of Texas, which for the Court's convenience is submitted again at Keneally Decl. Ex. G.

Ex. J at 7. The exact diagnosis can only be confirmed post-mortem. Keneally Decl. Ex. G at ¶ 5.

Mr. Brockman did not inform his counsel of his health issues until July 2019 – ten months after he first raised the issue with Dr. Lerner and two years after his email to Dr. Yudofsky. Even then, he did so to ask for understanding that he may need things repeated or explained more simply; he never asked if this would have an impact on the then on-going investigation. Romatowski Decl. ¶¶ 7-8;[10] Keneally Decl. ¶ 5. This news was consistent with, and went a long way to explain, counsel's experience with Mr. Brockman. Romatowski Decl. ¶¶ 10, 13; Keneally Decl. ¶ 6.

Counsel subsequently obtained the medical reports and spoke with each of the doctors. Keneally Decl. ¶¶ 18-19. The three medical doctors sent follow-up letters to clarify certain points in response to questions from counsel. Keneally Decl. ¶¶ 22-25, Ex. L, Ex. M, Ex. N. Dr. York, the neuropsychologist who first tested Mr. Brockman in March 2019, advised that she should perform what she described as forensic tests; she has now done so twice, resulting in reports for examinations conducted on December 3, 2019, and October 7, 2020. Keneally Decl. ¶¶ 26, 33, Ex. O, Ex. R.

Defense counsel provided the doctors' medical reports and letters, and Dr. York's clinical and first forensic reports, to the government on April 9, 2020. Keneally Decl. ¶ 28. In a telephone conference on April 23, 2020, defense counsel urged the prosecutors to consider Mr. Brockman's inability to assist in his defense, and to investigate this issue before reaching any decision whether to seek an indictment. Keneally Decl. ¶ 28. In particular, the defense asked that the government interview the doctors, with a pledge that the defense would not participate, either by preparation of the witnesses in advance or attendance at the interviews, and provided waivers pursuant to the Health Insurance Portability and Accountability Act ("HIPAA waivers") to allow such interviews. Keneally Decl. ¶ 28. We know from the doctors that they were never contacted. Keneally Decl. ¶ 31. The government's only response was to seek the Indictment returned by the grand jury on October 1, 2020. So now this is a matter for the Court.

[10] "Romatowski Decl." refers to the Declaration of Peter J. Romatowski, affirmed December 8, 2020, and submitted in support of this Motion.

The sole decision before this Court is whether to proceed with a hearing. Section 4241(a) provides that "[t]he court shall grant the motion [for a competency hearing], or shall order such a hearing on its own motion" upon a showing of "reasonable cause to believe" that the defendant may not be competent "to assist properly in his defense."

The conclusions of Mr. Brockman's doctors, as well as the first-hand experiences of Mr. Brockman's wife, friends and colleagues, and counsel, evidence that he is not competent to assist in his defense, easily meet the "reasonable cause" standard, and merit consideration at a hearing.

### A. Mr. Brockman's dementia prevents him from assisting in his defense

#### 1. The medical diagnoses show deficiencies in Mr. Brockman's critical cognitive abilities

Mr. Brockman's form of dementia has severe cognitive consequences, one aspect of which is an inability to access his memories in a manner that will enable him reliably to respond to questions about past events.

In her January 21, 2020 letter to counsel, Dr. Yu specifically distinguished dementia from mere memory loss, noting: "The impact of dementia includes visual spatial function, language, memory, and executive function—in essence, all aspects of thought and cognitive function." Keneally Decl. Ex. N.

Dr. Jankovic's January 14, 2020 letter addressed the manner in which Mr. Brockman's dementia makes him unable to recall information and to respond accurately to inquiries. Dr. Jankovic stated that Mr. Brockman has "trouble accessing information" and "making connections between questions that he is being asked and his recollection of events." Keneally Decl. Ex. M at 1.

Dr. Jankovic also noted that a characteristic of Mr. Brockman's cognitive impairment is a tendency toward confabulation. Dr. Jankovic described this medical condition as causing someone to "sometimes make up stories or provide information about something that has not occurred." Keneally Decl. Ex. M at 1. Dr. Jankovic distinguished this from lying, explaining that confabulation is "a symptom of cognitive impairment, and is not voluntary." A cognitively

impaired person will believe that he is reporting truthfully when nonetheless confabulating. Keneally Decl. Ex. M at 1-2.

Dr. Pool's January 14, 2020 letter summarized how Mr. Brockman's cognitive impairments would affect his ability to participate in his defense:

> Quite simply, if information is presented to him, he will be unable to comprehend what is being asked of him and to respond appropriately. In addition, his ability to report on past events may be distorted by the high risk of confabulation. When a person has dementia, his memory function will attempt to fill in gaps to enable him to respond to questions or to report on past events. While the story may sound logical, it will not be based on fact or accurate memory. The speaker will believe the story to be true, but it is not. In essence, for a person such as Mr. Brockman, dementia will render long-term memory inaccessible and defective. Even if he can remember past events, he cannot accurately relate them to the question that he is being asked in the present or assimilate the information to report it accurately. If he can compose a response at all, it will likely be the product of such confabulation, rather than genuine memory.

Keneally Decl. Ex. L at 2.

At bottom, Mr. Brockman cannot do the one thing that is most essential to his defense: understand his lawyers' questions about the events at issue and reliably respond.

**2. Mr. Brockman's cognitive impairment has been repeatedly confirmed through medical testing**

Dr. York, a neuropsychologist, conducts clinical tests to assist medical doctors in forming their diagnoses. Dr. York examined Mr. Brockman three times: first on March 1, 2019, to conduct cognitive tests to assist Dr. Yu in reaching a diagnosis, Keneally Decl. Ex. I at 1; a second time on December 3, 2019, at the request of counsel for the specific purpose of evaluating Mr. Brockman's ability to assist in his defense, Keneally Decl. ¶ 26, Ex O at 1; and a third time on October 7, 2020, for the purpose of evaluating changes since the December 3, 2019 evaluation. Keneally Decl. ¶ 33, Ex. R.

Dr. York's December 3, 2019 and October 7, 2020 forensic reports include a simple, graphic illustration of Mr. Brockman's cognitive impairment: he cannot draw a clock. Keneally Decl. Ex. O at 6, Ex. R at 6.

Asking a patient to draw a clock is one of the basic tests to determine cognitive

impairment. Dr. York's initial forensic report included the drawing of a clock that Mr. Brockman made during her examinations of him on March 1, 2019, and the result was sufficiently shocking to Mr. Brockman and his family that he practiced drawing various figures, including clocks, following her examination. Keneally Decl. Ex. J at 2, Ex. O at 3-4. Nonetheless, when tested again on December 3, 2019, Mr. Brockman again failed at this basic task.

During her October 7, 2020 examination, Dr. York gave Mr. Brockman three more chances at drawing a clock. Her most recent report sets out five clock drawings, done across a period of 19 months, side-by-side in her most recent report:

**Clock Drawing "10 after 11"**

03/01/2019

12/03/2019

10/07/2020

10/07/2020

10/07/2020

Keneally Decl. Ex. S at 1.

Even on his third try of the day, knowing in advance that he would be asked to draw a clock and having practiced doing so, Mr. Brockman could not draw a clock face showing the requested time, with correctly placed numbers, or even with the numbers written within the circle for the clock. *See* Keneally Decl. Ex. K at 1 (Dr. Pool's October 1, 2019 medical report with clock drawing with misplaced grid and lines), Ex. Q at 1 (Dr. Pool's October 5, 2020 medical

report with clock drawing with three hands).

### (a) Diagnostic testing results

Dr. York's March 1, 2019 clinical report set out her behavioral observations of Mr. Brockman during the testing, noting that he showed a "moderately decreased ability to follow directions," that he "frequently needed repetition of directions and to be reoriented to task," that he "perseverated to previous tasks" (meaning that he repeated prior responses out of context), that "[t]he examiner needed to be concrete for him to understand the task instructions," that his "processing speed was extremely" slow, and that his "handwriting was micrographic." Keneally Decl. Ex. I at 2.

Dr. York's March 1, 2019 report listed the large number of tests that she administered over several hours, followed by a summary of the results in clinical terms, many of which make apparent his cognitive shortcomings. Keneally Decl. Ex. I at 2-4. She also reported that Mr. Brockman was unable to complete certain tests "due to cognitive/behavioral problems." Keneally Decl. Ex. I at 2.

Dr. York determined that Mr. Brockman – a man who founded and built a highly successful business – "currently operates in the low average range of general intellectual functioning (WIAS-IV FSIQ = 87), which is a decline from his estimated premorbid intellectual functioning in the above average range." Keneally Decl. Ex. I at 4. She continued, in somewhat clinical terms: "Mr. Brockman demonstrated borderline impaired to deficient performances on measures of sustained attention/concentration, learning and recall of prose material and a word list, learning and recall of visual material, semantic fluency, executive functions (set shifting, inhibition, working memory, and problem solving), and visuoconstruction," adding: "[t]hese impaired performances were found within the low average to average ranges on measures of basic attention, fund of information, verbal and visual abstract reasoning, verbal fluency and naming." Keneally Decl. Ex. I at 4.

Dr. York determined that Mr. Brockman's performance on the clinical tests indicated "a dementia of mild to moderate severity." Keneally Decl. Ex. I at 4. Based on her battery of tests and clinical observations, Dr. York concluded: "his pattern of cognitive impairments is consistent

with Dementia with Lewy Bodies." Keneally Decl. Ex. I at 5.

Dr. York's recommendations are themselves jarring indications of Mr. Brockman's impairment. She advised, for example, that he have a large-type calendar in a highly visible location to assist him in "temporal orientation" and a large dry-erase board in a prominent spot to help him keep track of important information such as the location of family members, that information be presented to him in a written format so that he can refer to it over time, and that he exercise caution when operating household appliances. Keneally Decl. Ex. I at 5-6.

Dr. Yu conducted an examination of Mr. Brockman on March 20, 2019, and reviewed Dr. York's clinical findings. Dr. Yu summarized: "Pattern indicates a dementia of mild to moderate severity with deficits in areas of visuospatial functioning, verbal and nonverbal episodic memory and executive functioning, with mild functional declines." Keneally Decl. Ex. J at 6. She concluded that Mr. Brockman's symptoms are "consistent with dementia with Lewy Bodies." Keneally Decl. Ex. J at 6, 7. She recommended that Mr. Brockman stop driving, and she advised him "on diagnosis of a neurodegenerative disorder with cognitive impairment and possible implications on his work and advised he discuss further with his family." Keneally Decl. Ex. J at 7.

Dr. Yu was also able to review the results of a DaTscan that had been ordered by Dr. Jankovic. A DaTscan measures the number of dopamine transporters in the brain regions critical for movement and cognition. In Mr. Brockman's case, the critical neurons responsible for producing dopamine are irrevocably damaged. Keneally Decl. Ex. J at 7, Ex. P. In other words, Mr. Brockman has significant, measurable changes to his brain structure that can be seen as the basis for his dementia.

**(b) Forensic testing results**

The diagnostic reports prepared by each of the doctors were written in technical medical terms. Counsel contacted each of the doctors to get a better understanding, in lay terms, of the impact of Mr. Brockman's condition. When counsel contacted Dr. York, she explained that there is a different battery of tests, which she described as forensic testing, that she would perform to enable her to render an opinion in a legal proceeding. Keneally Decl. ¶ 26. She conducted that

examination on December 3, 2019. Keneally Decl. Ex. O.

Dr. York's forensic report summarized her prior examination, as well as the medical reports prepared by Dr. Jankovic and Dr. Yu. Keneally Decl. Ex. O at 1–4. She also provided her behavioral observations of Mr. Brockman during the December 3, 2019 testing. She noted that Mr. Brockman's "cognition tended to fluctuate throughout the testing session," that he "appeared to be confused at times" and had difficulty completing tasks even after starting out well, and that he "showed mildly decreased ability to follow directions, and he occasionally needed repetition of directions and lost place during set task." Keneally Decl. Ex. O at 4.

As with her March 1, 2019 clinical evaluation, Dr. York again listed the tests that she administered, as well as the tests that Mr. Brockman was unable to complete "as he was unable to comprehend task instructions and maintain task set independently," and set out her neurological findings in clinical terms. Keneally Decl. Ex. O at 4–5.

Dr. York found that Mr. Brockman had improved in some areas from the results of her prior testing, while declining in other areas. Keneally Decl. Ex. O at 7–8. Dr. York summarized:

> It is noted that Mr. Brockman's cognition fluctuated significantly throughout the evaluation. He demonstrated improvements on a few measures; however, during several tasks, he became more confused and demonstrated a blank stare expression. These fluctuations were more apparent during this evaluation as compared to his previous evaluation in March 2019. Mr. Brockman's pattern of neuropsychological performance indicates a dementia of mild to moderate severity characterized by deficits in the areas of verbal and nonverbal episodic memory, processing speed, executive functioning, and visuospatial functioning with significant functional declines.

Keneally Decl. Ex. O at 8. Dr. York concluded: "His dementia falls under the diagnostic category of Lewy Body Dementias." Keneally Decl. Ex. O at 8.

Dr. York repeated her forensic examination of Mr. Brockman on October 7, 2020.[11]

[11] Having had no response since Mr. Brockman's offer in April to allow the government access to the doctors with a commitment that counsel would not take steps to prepare them or participate in any government interviews, counsel spoke with the lead prosecutors on September 30, 2020 to let them know that Mr. Brockman would again be examined by Dr. Pool and Dr. York, and that counsel planned to speak with both doctors about those examinations. Keneally Decl. ¶ 30. The prosecutors did not inform counsel that they planned to seek an Indictment in this matter on the following day. The prosecutors next contacted defense counsel to arrange a call for Saturday, October 10, 2020, during which they disclosed that there was a sealed Indictment (which is dated October 1) and asked for assurance that Mr. Brockman would attend an arraignment to be scheduled on the following Thursday, October 15, 2020. Keneally Decl. ¶ 30. Mr. Brockman subsequently revoked the HIPAA waivers. Keneally Decl. ¶ 31.

Keneally Decl. ¶ 33, Ex. R. Dr. York reported that Mr. Brockman stated that he is "unsure of his medication regimen as . . . his wife manages his medication box," "his short-term memory and his working memory have declined and his processing speed is slower," he has experienced "declines in his decision making abilities," he "forgets names of familiar individuals," "is disoriented to month and day of the week," and "repeats himself and asks the same question again without insight." Keneally Decl. Ex. R at 3. Dr. York's October 2020 forensic report included detailed behavioral observations, noting that Mr. Brockman's "cognition fluctuated throughout the testing session," that he sometimes became "confused" during "tasks that he originally was completing accurately," and that while his "[c]onversational speech was coherent," his speech was "tangential without insight." Keneally Decl. Ex. R at 5. She again listed tests that Mr. Brockman was unable to complete "due to cognitive/behavioral problems." Keneally Decl. Ex. R at 5.

Dr. York found that Mr. Brockman's "cognitive profile demonstrated interim cognitive declines across all domains assessed" relative to her prior evaluations. Keneally Decl. Ex. R at 8. As examples, she noted that Mr. Brockman's WAIS-IV FSIQ estimate declined to 80 from a prior score of 96, that Mr. Brockman "demonstrated difficulties with set shifting, drawing a cube, and placing the hands on a clock face," and was able to identify only "2/3 pictured animals," that when he was asked to memorize word lists, his "delayed recall was in the deficient range with 0.0% retention," and that when presented with basic geographic figures, Mr. Brockman's "[i]mmediate recall . . . was borderline impaired," "[d]elayed recall of the designs was deficient," and "[r]etention of the initially learned material was 0.0%." Keneally Decl. Ex. R at 6.

In sum, the DaTscan performed in early 2019 showed structural changes in Mr. Brockman's brain sufficient to explain his cognitive impairment, which was confirmed by Dr. York's clinical tests in March 2019 and forensic tests in December 2019. Now we know from Dr. York's October 7, 2020 report that Mr. Brockman's dementia progressed, and his cognitive abilities declined, in the ten-month period between Dr. York's two sets of forensic testing. And, based on Dr. York's analyses, it is likely that Mr. Brockman's mental condition has gotten worse in the two months since her last examination.

### 3. Mr. Brockman has experienced hallucinations consistent with Lewy body dementia

Hallucinations are a hallmark of Lewy body dementia. Dr. York reported two incidents of hallucination that support her conclusion that this is the correct diagnosis.

In her diagnostic examination of Mr. Brockman in March 2019, she personally observed Mr. Brockman experiencing an hallucination. As Dr. York reported: "He saw a bug on the floor of the testing room that was not present." Keneally Decl. Ex. I at 2, 5.

Then in her October 7, 2020 report following her second set of forensic testing, Dr. York described what she considered to be a "delusional incident" or hallucination: Mr. Brockman believed that he heard someone leaving his house at about 5 a.m., thought that he saw his son's car driving away, and claimed that his computer was open to sites that Mr. Brockman described as "from the dark web and suicidal information." Keneally Decl. Ex. R at 3. In fact, Mr. Brockman's son was not at his parents' home at that hour, there was no sign of a break-in, and pictures that Mr. Brockman took of the computer screens during the incident showed Yahoo answer pages not related to the dark web or suicide. Keneally Decl. Ex. R at 3.

These incidents are further medical indicia of Mr. Brockman's cognitive impairment.

### 4. Mr. Brockman's medical tests measured for and ruled out malingering

Dr. York's December 3, 2019 examination specifically included tests to determine whether Mr. Brockman was malingering, that is, faking impaired cognition. As stated in her report: "He passed several embedded and stand-alone measures of performance validity; therefore, the following results are thought to be an accurate estimation of his current cognitive abilities." Keneally Decl. Ex. O at 4. In fact, Mr. Brockman was so startled by his inability to draw a clock, that he practiced before subsequent examinations in an effort to improve. Keneally Decl. Ex. J at 2, Ex. O at 3-4. Dr. York concluded: "It is this examiner's opinion based on the testing conducted and behavioral observations that Mr. Brockman was putting forth full effort and was not exaggerating or embellishing the nature and extent of his cognitive impairment." Keneally Decl. Ex. O at 7.

### 5. Mr. Brockman's dementia causes him to lose insight into his own cognitive impairment

Dr. Yu explained in her January 21, 2020 letter that patients with dementia will "experience anosognosia, which means that they will lose insight into the cognitive limitations of their disease." Keneally Decl. Ex. N. She continued: "Individuals with dementia may perceive themselves as functioning normally, even well." Keneally Decl. Ex. N.

Dr. York's March 1, 2019 clinical report observed this in Mr. Brockman: "He lacked insight into his cognitive problems," noting that he "said he was not doing well, but he appeared very surprised." Keneally Decl. Ex. I at 2.

In other words, to an important degree, Mr. Brockman cannot recognize that his impaired cognition interferes with his ability to assist in his defense.

### 6. While Mr. Brockman may continue to function in familiar activities and settings, medical evidence establishes that he cannot assist in the defense of this case

Even as Mr. Brockman's illness has progressed, he has made efforts to remain socially active and to continue working. As Dr. Pool explained in his letter to counsel, while severe dementia will be characterized by a person's inability to know where he is or with whom he is speaking, a person with mild to moderate dementia has some recognition of what is going on around him, and an individual who enjoyed high intelligence and a high level of functioning prior to the onset of dementia may be able to conceal his limitations under certain circumstances. Keneally Decl. Ex. L at 2.

Dr. Yu similarly described how others may also fail to perceive someone's cognitive limitations, noting that "[i]ndividuals with dementia, who have good social instincts and expansive vocabulary may appear to function well on a surface level." Keneally Decl. Ex. N. She referred to this as the ability to retain "social niceties" despite cognitive impairment, and further noted that "individuals who have been in business or professionally active for a long time may be able to speak on business issues in a way that appears functional, but will face difficulties when pressed for decisions or specifics." Keneally Decl. Ex. N. Dr. Yu noted that it is a specific characteristic of Lewy body dementia that a person will experience day-to-day and even hour-to-

hour fluctuations in the ability to function. Keneally Decl. Ex. N.

**7. The medical experts all agree that Mr. Brockman's dementia makes him incapable of assisting in his defense**

The four doctors' results of examination deserve to be considered in full and in context along with other evidence at a hearing. Without in any way diminishing the importance of that full context, their expert opinion is clear that Mr. Brockman cannot assist in his defense:

As Dr. Yu has stated, Mr. Brockman's dementia affects "all aspects of thought and cognitive function." Keneally Decl. Ex. N.

Responding to counsel's inquiry, Dr. Jankovic stated: "I understand that you are asking whether Mr. Brockman can assist you in preparing a legal defense. It is my view that his cognitive impairment will prevent him from doing so." Keneally Decl. Ex. M at 1.

Dr. York stated in her October 7, 2020 forensic report: "Based on the current cognitive findings, his diagnosis of dementia, and the breadth and severity of his cognitive impairments and fluctuations, it remains my opinion that Mr. Brockman is unable to participate and aid in his own defense." She continued in detail: "Due to the neurodegenerative nature of this disease and the lack of effective treatments, his prognosis is for continued cognitive decline. He is unable to recall and demonstrate a thorough understanding of the relevant elements of the issues surrounding the case and manipulate this information in a logical manner that will allow him to make comparisons and weigh his options." Keneally Decl. Ex. R at 8.

And Dr. Pool concluded: "I concur with the medical position that Mr. Brockman cannot assist his attorneys in his defense, if criminal charges were to be brought against him." Keneally Decl. Ex. L at 2.

**B. Mr. Brockman's retirement**

Mr. Brockman fully retired on November 6, 2020. Keneally Decl. ¶ 36.

For as long as he could, Mr. Brockman tried to rely on his former high intellect and decades of experience, as well as the support and assistance of his wife and business colleagues, in an effort to continue to lead or at least contribute to the business that he built. *See* Keneally Decl. Ex. L at 2, Ex. N. He knows now that he can no longer do so.

### C. Non-medical evidence

Counsel for Mr. Brockman will present testimony from people who interact with him, sometimes on a near-daily basis, to corroborate the observations made by the doctors. Keneally Decl. ¶ 35. In particular, Mr. Brockman's wife of 52 years will attest to the steady progression of his cognitive impairment. Keneally Decl. ¶ 35.

Mr. Brockman's counsel can also directly confirm what the experts predicted: Mr. Brockman's cognitive impairment makes him incapable of assisting in his defense. Romatowski Decl. ¶¶ 9-15; Keneally Decl. ¶¶ 4, 6, 20-21. Counsel's interactions with Mr. Brockman have been consistent with the medical findings described above. Romatowski Decl. ¶ 13; Keneally Decl. ¶¶ 6, 20. Mr. Brockman has been unable to relate important information from the past, to review and evaluate documents, or to retain information that counsel tells him. Romatowski Decl. ¶ 11; Keneally Decl. ¶ 6. He repeatedly provides the same information, regardless of relevance. Romatowski Decl. ¶¶ 11-14; Keneally Decl. ¶ 6. When counsel provides him with information, he will sometimes report it back in his next discussion with counsel as if it is news that he thinks he should provide to counsel or something that he has recently remembered, in effect confabulating what he once may have known and what he has recently been told. Romatowski Decl. ¶ 11; Keneally Decl. ¶ 6.

## III. ARGUMENT

Due process guarantees "a defendant's right not to be tried or convicted while incompetent to stand trial." *Drope*, 420 U.S. at 172. This principle is embodied in 18 U.S.C. § 4241(a), which requires a competency hearing upon a showing of reasonable cause to believe that a defendant is unable to assist properly in his defense.

### A. The record far exceeds a showing of "reasonable cause" to require a competency hearing

The present record requires a § 4241(a) hearing on Mr. Brockman's competency.

Because the narrow question at this stage is only whether to hold a competency hearing, and not whether the defendant is competent, courts do not weigh the reliability of the evidence in this phase. Instead, "the trial court must look at the record as a whole and accept as true all

evidence of possible incompetence" when deciding whether to hold a hearing. *Smith v. Ylst*, 862 F.2d 872, 877 (9th Cir. 1987) (citing *Chavez v. United States*, 641 F.2d 1253, 1258 (9th Cir. 1981)). Nor may the court refuse a hearing on the basis of conflicting evidence. If substantial evidence of incompetence exists "from *any source*, there is a doubt that cannot be dispelled by resort to conflicting evidence." *Moore v. United States*, 464 F.2d 663, 666 (9th Cir. 1972) (emphasis added).

Based on multiple examinations conducted over a nearly two-year period, the medical professionals are unequivocal in their assessment that Mr. Brockman has progressive dementia that will prevent him from assisting in his defense. Keneally Decl. Ex. L at 2, Ex. M at 1, Ex. N, Ex. O at 8, Ex. R. at 7-8. "Medical opinions are 'usually persuasive evidence on the question of whether a sufficient doubt exists' as to the defendant's competence." *United States v. Mason*, 52 F.3d 1286, 1290 (4th Cir. 1995) (quoting *Griffin v. Lockhart*, 935 F.2d 926, 930 (8th Cir. 1991)). Medical evidence can mandate a hearing even when the defendant has "appeared calm in the courtroom" and has not had his competence previously questioned by his counsel. *Odle v. Woodford*, 238 F.3d 1084, 1088 (9th Cir. 2001); *see also Deere v. Woodford*, 339 F.3d 1084, 1086-87 (9th Cir. 2003) (holding that hearing was required when two medical experts opined that defendant was incompetent).

In *United States v. Duncan*, 643 F.3d 1242 (9th Cir. 2011), the Ninth Circuit held that the district court erred by failing to hold a full competency hearing prior to sentencing based on medical evidence of incompetence in that case that is comparable to the evidence available here: reports from three experts, all well established and highly regarded in the field of neuropsychiatry, "who had examined Defendant personally and . . . formed the same opinion that . . . Defendant's 'mental diseases and defects render him . . . incompetent,'" which were supported by brain scans establishing that the defendant had "'an unusual brain structure' consistent with [his] behavioral deficits in 'the ability to make rational plans and modulate emotions.'" *Id.* at 1249. Contrary medical opinions were not a reason to refuse a hearing; "[w]e express no opinion on which of the experts has the better of the argument . . . . We hold only the evidence [was] such that § 4241(a) required a full competency hearing before the district court

could reach a decision." *Id.* at 1250.

The medical evidence here is at least as compelling. Mr. Brockman's cognitive decline has been apparent to his family, and ultimately to him, for several years. Keneally Decl. Ex. H. at 1-2, Ex. I at 1, Ex. J at 1-2, Ex. L at 1, Ex. O at 2-3. He did not seek medical evaluations for the purpose of this case, but to be diagnosed and treated. He did not even tell his lawyers that he was struggling with cognitive issues until four months after these medical examinations were concluded. Keneally Decl. ¶¶ 5-6. Brain scans have revealed structural abnormalities that explain his dementia symptoms. Keneally Decl. Ex. P. He has twice submitted to a battery of forensic testing, which Dr. York recommended to enable her to answer the exact question as to whether he can assist in his defense, and also whether he was participating in the examination in good faith or malingering to obtain a desired result. Keneally Decl. Ex. R at 4-5.[12]

Moreover, as the Supreme Court has noted, "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense." *Medina v. California*, 505 U.S. 437, 450 (1992) (citations omitted); *see also Torres v. Prunty*, 223 F.3d 1103, 1109 (9th Cir. 2000) (recommendations by defense counsel "should [be] considered seriously by the court" (citing *Medina*, 505 U.S. at 540)). Counsel's experience directly aligns with the medical findings: Mr. Brockman has been unable to relate important information from the past or to review and evaluate documents. Romatowski Decl. ¶ 11. And he has confabulated information told to him by counsel, recalling it later as if he just remembered rather than was recently told. Romatowski Decl. ¶ 11; Keneally Decl. ¶ 6.

Mr. Brockman's cognitive impairment, as detailed by his doctors, goes directly to what is required to assist in his defense: he cannot reliably access memories, meaningfully process new information, or to compare the two. Keneally Decl. Ex. L at 2, Ex. R. at 7-8. He has only partial

[12] *See also United States v. Bohol*, 419 Fed. App'x 730, 731 (9th Cir. 2011) (affirming decision that defendant was mentally incompetent where based on report and testimony provided by forensic psychologist); *United States v. Chandler*, 2020 WL 2735917, *16 (M.D. Fla. May 5, 2020) (noting the propriety of giving "somewhat more weight to the testimony of a forensic psychologist" in competency determinations), adopted by 2020 WL 2735424 (M.D. Fla. May 26, 2020); *United States v. Chun*, 2019 WL 6683878, *9 (E.D. Mich. Dec. 6, 2019) (noting importance of testing for malingering to ensure the validity of test results); *United States v. Hernandez*, 2018 WL 2738880, *8–15 (N.D. Ohio June 7, 2018) (relying on forensic testing to conclude defendant was incompetent to stand trial and not malingering).

insight into his limitations, and may respond to questions by "confabulating" erroneous information that he genuinely believes to be true. Keneally Decl. Ex. L at 2, Ex. M at 1-2.

Taken together, the medical opinions and counsel's experience more than sufficiently establishes reasonable cause for this Court to hear from these and other witnesses, and consider all the evidence on the issue of whether Mr. Brockman may fairly be put to trial.

**B. The evidence of Mr. Brockman's cognitive challenges is particularly compelling given the stage and nature of this case**

"Although the level of competency mandated by due process does not vary based on the specific stage of the criminal proceeding, the defendant's ability to participate or assist his counsel must be evaluated in light of the type of participation required." *United States v. Dreyer*, 705 F.3d 951, 961 (9th Cir. 2013) (citation omitted), applied in *United States v. Brugnara*, 2015 WL 6126781, at *2 (N.D. Cal. Oct. 19, 2015) (Alsup, J.), *aff'd*, 856 F.3d 1198 (9th Cir. 2017). This motion is being filed less than two months after arraignment. We are at the very beginning of a criminal prosecution. The charges sweep broadly and span decades of numerous alleged financial transactions and structures across multiple countries. The government has estimated that it will produce what may amount to tens of millions of documents. Keneally Decl. ¶ 37. Mr. Brockman cannot help counsel to understand the charges or the evidence. Romatowski Decl. ¶¶ 11-15; Keneally Decl. ¶¶ 4, 6, 20-21.

Nor would Mr. Brockman's impairment become less problematic at trial. "After all, competence to stand trial does not consist merely of passively observing the proceedings. Rather, it requires the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense." *Odle*, 238 F.3d at 1089 (citing *Dusky v. United States*, 362 U.S. 402, 402 (1960)); *see also United States v. Helmsley*, 733 F. Supp. 600, 604 (S.D.N.Y. 1989) (emphasizing importance of defendant's competence in a complex, lengthy trial). To assist counsel at trial, Mr. Brockman would need to be able to retain newly presented information, compare it to his own recollections, and process all this so as to provide "assistance in counsel's cross-examination of witnesses, in the selection and preparation of defense witnesses, and in the decision whether the defendant should take the stand." *Helmsley*,

733 F. Supp. at 605. The medical reports, forensic reports, and letters from his diagnostic and treating doctors make clear that, specifically, Mr. Brockman cannot retain new information, compare it to remembered information, and thereby assist his counsel in his defense. Keneally Decl. Ex. L at 2, Ex. M at 1, Ex. N, Ex. O at 8, Ex. R. at 7-8. Counsel has confirmed based on his experience of Mr. Brockman, as compared to his career experience with witnesses and defendants who can effectively assist in the defense of a complex case, that Mr. Brockman cannot do so. Romatowski Decl. ¶¶ 2-4, 8-15.

Again, the Court is not asked at this stage to decide the ultimate question of competence based on the current proffer, which we nonetheless submit is compelling. The question before the Court is merely whether a hearing should occur—and it should. Prior to any hearing, "the court may order that a psychiatric or psychological examination of the defendant be conducted" by an independent expert. 18 U.S.C. § 4241(b); *see also* 18 U.S.C. § 4247(b)–(c) (describing how the examination is to be conducted and information to be included in any psychiatric or psychological report). Prior to the return of the Indictment, defense counsel offered the government the opportunity to have Mr. Brockman examined independently, and certainly will agree to an independent expert selected by the court, asking only that the examination take place proximate to Mr. Brockman's home in Houston.[13] To the extent the government questions the defense's showing concerning Mr. Brockman's competency, it may cross-examine the doctors and other witnesses, and present its evidence.

The only issue for today is whether Mr. Brockman has a right to a hearing, so that the Court may hear from the witnesses and consider the evidence. The express language of 18 U.S.C. § 4241 and core right to due process answers this question in the affirmative. *Drope*, 420 U.S. at 172.

/ / /

/ / /

[13] Mr. Brockman has also filed a motion seeking to transfer this matter to the Southern District of Texas based on several reasons, including that the required hearing on his competency should take place in the district where he resides and his doctors are located. ECF No. 49.

## IV. CONCLUSION

Mr. Brockman therefore respectfully asks that the Court hold a hearing under 18 U.S.C. § 4241 to determine whether he lacks the capacity to assist in his defense.

Dated: December 8, 2020

Respectfully submitted,

Jones Day

*s/ Neal J. Stephens*
NEAL J. STEPHENS

Counsel for Defendant
ROBERT T. BROCKMAN

Jason Varnado (State Bar No. 211067)
jvarnado@jonesday.com
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
Telephone +1-832-239-3939
Facsimile +1-832-239-3600

Neal J. Stephens (State Bar No. 152071)
nstephens@jonesday.com
Vincent Doctor (State Bar No. 319408)
vdoctor@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone: +1-650-739-3939
Facsimile: +1-650-739-3900

Kathryn Keneally (appearance *pro hac vice*)
New York State Bar No. 1866250
kkeneally@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281-047
Telephone: +1-212-326-3939
Facsimile: +1-212-755-7306

Attorneys for Defendant
ROBERT T. BROCKMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

ROBERT T. BROCKMAN,

Defendant.

Case No. 3.20-cr-00371-WHA

DECLARATION OF KATHRYN KENEALLY IN SUPPORT OF DEFENDANT ROBERT T. BROCKMAN'S MOTION FOR A HEARING TO DETERMINE WHETHER MR. BROCKMAN IS COMPETENT TO ASSIST IN HIS DEFENSE

**DECLARATION OF KATHRYN KENEALLY**

I, Kathryn Keneally, declare as follows:

1. I am a member of the bar of the State of New York, the United States Supreme Court, and various other federal courts. I am a partner of the law firm Jones Day, counsel for the defendant Robert T. Brockman. I make this Declaration in support of Defendant Robert T. Brockman's Motion For a Hearing to Determine Whether Mr. Brockman is Competent to Assist in His Defense.

2. Upon graduation from law school in 1982, I served as a law clerk to the Honorable Edward R. Neaher, for the U.S. District Court for the Eastern District of New York. From April 2012 to June 2014, I served as the Assistant Attorney General for the Department of Justice Tax Division. At all other times, I have been in private practice, focused primarily on tax controversy and criminal tax defense. I am a fellow of the American College of Tax Counsel.

3. I do not, and do not intend, to waive Mr. Brockman's attorney-client privilege or work product protection by this declaration or otherwise. I am not disclosing any communications with Mr. Brockman in which he sought or we provided legal advice. I disclose below only discussions between Mr. Brockman and me concerning his medical condition, and my observations concerning his health and ability to assist in his defense.

4. Based on my professional experience, I know that it is vital to have the assistance of a client in understanding the complex and far-reaching allegations at issue in this case. It is my firm belief that Mr. Brockman cannot provide this assistance.

5. I first learned from Mr. Brockman that he had been diagnosed with Parkinson's disease and dementia on July 18, 2019. Mr. Brockman was meeting with Peter J. Romatowski of my firm. I participated in that meeting by conference call. I recall that Mr. Brockman said that he was surprised by these diagnoses. He said that this may explain why he had some difficulties in our discussions with him. He asked that we address issues with him more slowly, and said that he may have some difficulty remembering and that he may need to review things several times to understand what he needed to know. He did not ask whether this would have any impact on the investigation.

6. Unlike Mr. Brockman, I was not surprised by the diagnoses that he described during the July 18, 2019 conference. By that time, I had observed that Mr. Brockman had been unable to provide us with information as to past events at issue in the then on-going investigation. He would forget discussions that we would have, or relate back to us information that we had provided to him as if he had remembered it rather than having heard it from us. For me, his discussion of his medical diagnoses made immediate sense of these experiences.

7. During a telephone call with Mr. Brockman within a few days of the July 18, 2019 discussion, I asked him to send us copies of the medical reports. He did so several weeks later, in late September 2019, following multiple requests from me.

8. Attached hereto as Exhibit A is a copy of an email exchange between Mr. Brockman and Dr. Stuart Yudofsky dated May 3-4, 2017.

9. Attached hereto as Exhibit B is a copy of the biography for Seth Lerner, M.D.

10. Attached hereto as Exhibit Cis a copy of the biography for James Pool, M.D.

11. Attached hereto as Exhibit D is a copy of the biography for Joseph Jankovic, M.D.

12. Attached hereto as Exhibit E is a copy of the biography for Melissa Yu, M.D.

13. Attached hereto as Exhibit F is a copy of the biography for Michele York, Ph.D.

14. Dr. Pool previously provided a Declaration dated November 25, 2020, in support of Mr. Brockman's Motion to Transfer Proceedings to the United States District Court for the Southern District of Texas. ECF No. 49-2. For the Court's convenience, another copy of Dr. Pool's Declaration is attached hereto as Exhibit G.

15. Attached hereto as Exhibit H is a copy of the medical report for the examination of Mr. Brockman conducted by Dr. Jankovic on January 30, 2019.

16. Attached hereto as Exhibit I is a copy of the neuropsychological evaluation Mr. Brockman conducted by Dr. York on March 1, 2019.

17. Attached hereto as Exhibit J is a copy of the medical report for the examination of Mr. Brockman conducted by Dr. Yu on March 20, 2019.

18. Shortly after sending us his medical reports, Mr. Brockman also sent me Dr. Pool's report from his annual physical, conducted on October 1, 2019, a copy of which is attached hereto as Exhibit K.

19. After reviewing the medical reports, I spoke with each of Dr. Pool, Dr. Jankovic, Dr. Yu, and Dr. York. I learned from Dr. Pool, Dr. Yu, and Dr. York that they thought that the more likely diagnosis should be Lewy body dementia. I also learned that the precise diagnosis cannot be confirmed ante-mortem.

20. I explained to each of the doctors that my firm represented Mr. Brockman in a criminal investigation by the U.S. Department of Justice. I asked questions to help me better understand their medical reports and information generally about each of their diagnoses. The information that I learned in my discussions with these doctors resonated fully with my experience in working with Mr. Brockman.

21. I asked each of the doctors for his or her opinion as to whether Mr. Brockman's dementia would prevent him from assisting with his defense. Dr. Pool, Dr. Jankovic, and Dr. Yu, who are all medical doctors, each responded in words to the effect that Mr. Brockman could not access his memories reliably to be able to assist in his defense.

22. I asked Dr. Pool, Dr. Jankovic, and Dr. Yu to provide me with letters that summarized our discussions, and explained to each of them that I planned to provide these letters to the Department of Justice.

23. Attached hereto as Exhibit L is a copy of Dr. Pool's letter to me dated January 14, 2020.

24. Attached hereto as Exhibit M is a copy of Dr. Jankovic's letter to me dated January 14, 2020.

25. Attached hereto as Exhibit N is a copy of Dr. Yu's letter to me dated January 21, 2020.

26. When I spoke with Dr. York, she said that as a neuropsychologist she should perform a different battery of tests, that she referred to as forensic tests, which she said she administered when asked to provide an opinion in a legal proceeding. She agreed to perform this additional battery of tests to evaluate Mr. Brockman. Attached hereto as Exhibit O is a copy of her neuropsychological report in connection with this evaluation, which was done on December 3, 2019.

27. Attached hereto as Exhibit P is a copy of the diagnostic report and images of a DaTscan performed on Mr. Brockman on February 14, 2019.

28. I provided copies of the doctors' medical reports and letters, Dr. York's two neuropsychological reports, and the DaTscan to the government as part of a letter submission

dated April 9, 2020. In a telephone conference on April 23, 2020, we urged the prosecutors to consider Mr. Brockman's inability to assist in his defense, and to investigate this issue before reaching any decision whether to seek an indictment. We offered to make Mr. Brockman available to be examined by a doctor of the government's choosing. We asked that the government interview Mr. Brockman's doctors. I volunteered that we would not prepare these witnesses for any interviews, nor would we require that defense counsel be present. Following the call, I obtained waivers pursuant to the Health Insurance Portability and Accountability Act ("HIPAA waivers") from Mr. Brockman, which I forwarded to the government to facilitate any interviews.

29. In September 2020, I learned from Mr. Brockman that he had scheduled his annual examination with Dr. Pool. By this time, based on my experience in speaking with Mr. Brockman, it was my perception that his ability to understand the information that I provided or to respond to my inquiries had diminished noticeably. I concluded that we should take the opportunity of Mr. Brockman's scheduled examination to get updated evaluations of his cognitive abilities.

30. I spoke with the lead prosecutors on September 30, 2020. I let them know that Mr. Brockman would again be examined by Dr. Pool, and that I planned to ask Dr. Pool to refer him to Dr. York for an updated evaluation, and to follow up with both doctors. I explained that, in light of my commitment not to interfere with any interviews that the government may want to conduct of the doctors, I wanted them to know that I would be speaking again with Dr. Pool and Dr. York. The prosecutors next contacted me by email on Friday, October 9, to arrange a call for Saturday, October 10, 2020. During that call, they disclosed that there was a sealed Indictment, which I later learned is dated October 1, 2020, and they asked for assurance that Mr. Brockman would attend an arraignment to be scheduled on the following Thursday, October 15, 2020.

31. Following Mr. Brockman's arraignment, I spoke again with each of the four doctors. None of them had been contacted by the government prior to the Indictment. On October 21, 2020, I informed the prosecutors by email that Mr. Brockman had revoked the HIPAA waivers.

32. In advance of Mr. Brockman's annual examination, I asked Dr. Pool to provide me with updated findings concerning Mr. Brockman's dementia. Attached hereto as Exhibit Q is a copy of Dr. Pool's report of that examination, which was performed on October 5, 2020.

33. On my request, Dr. Pool referred Mr. Brockman to Dr. York for an updated evaluation. I asked Dr. York to repeat the battery of tests that she had previously performed on December 3, 2019. Attached hereto as Exhibit R is a copy of her neuropsychological report in connection with this evaluation, which was done on October 7, 2020.

34. I asked Dr. York to prepare a composite of one aspect of all three of her examinations of Mr. Brockman, in which she asked him to draw a clock. Attached hereto as Exhibit S is a copy of that composite.

35. The defense has identified other witnesses, including Mr. Brockman's wife, and others who know him on a day-to-day basis, who will provide first-hand experience of his cognitive limitations at a hearing in this matter.

36. Mr. Brockman fully retired on November 6, 2020.

37. The government has estimated that it will produce 1.1 terabytes (the equivalent of 22 million pages) of discovery.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York on December 8, 2020.

Kathryn Keneally

- 6 -

Decl. of Kathryn Keneally in Support of Mot. For Hearing to Determine Whether Mr. Brockman is Competent to Assist in His Defense 3:20-cr-00371-WHA

# EXHIBIT A

**To:** Bob Brockman[bob_brockman@reyrey.com]
**From:** Stuart Yudofsky[stuart.yudofsky@gmail.com]
**Sent:** Thur 5/4/2017 12:27:18 AM (UTC)
**Subject:** Anosmia

Good evening, Bob:

There are dozens of potential causes of anosmia--as there are for memory loss.

If you are comfortable doing so, I suggest that you begin by meeting with me. That will help me assess the severity and significance of your memory symptoms, as well as utilize this information to direct you to the best professional-- discipline, person, and/or system--for assessment and, as required, care.

As you know, Bob, I am a neuropsychiatrist and have extensive hands-on experience with memory and cognitive changes.

I am available in the mornings from 9 AM until noon over the next several days, and can be available at any time over the weekend.

Please let me know how you would like to proceed.

Warmest regards,

Stuart

On May 3, 2017, at 4:27 PM, Bob Brockman <bob_brockman@reyrey.com> wrote:

> Stuart,
>
> Robert and Dorothy are after me to consult with the right doctor regarding my loss of my sense of smell.
>
> They are afraid that it is an early sign of alzheimer's or dementia.
>
> I am feeling good but am having increasing memory problems.
>
> Is there a doctor that you can recommend?
>
> Bob

# EXHIBIT B



Seth Paul Lerner, M.D., FACS | BCM

## COVID-19 Response

Access our COVID-19 Response homepage, with more information and resources during the COVID-19 pandemic, including what to do if you're experiencing symptoms.

Healthcare Education Research Community About

Baylor College of Medicine > Find a Person > Seth Lerner

Baylor College of Medicine
Seth P. Lerner, M.D., F.A.C.S.
Scott Department of Urology

# Seth Paul Lerner, M.D., FACS

Professor
713-798-4001

Request Clinical Appointment

## Email

slerner@bcm.edu

## Positions

https://www.bcm.edu/people-search/seth-lerner-25263[12/3/2020 5:04:18 PM]



**Professor**

Urology
Baylor College of Medicine
Houston, TX US
Beth and Dave Swalm Chair in Urologic Oncology Director of Urologic Oncology Director of the Multidisciplinary Bladder Cancer Program

# Addresses

**Baylor College of Medicine Medical Center (Clinic)**

7200 Cambridge, Suite 10B
Houston, TX 77030
United States
(713) 798-4001

# Education

**B.A. from University Of Texas At Austin**

01/1979 - Austin, TX United States

**M.D. from Baylor College Of Medicine**

01/1984 - Houston, TX United States

**Internship at Virginia Mason Hospital**

01/1985 - Seattle, Washington United States

**Residency at Virginia Mason Hospital**

06/1986 - Seattle, Washington United States

General Surgery

**Residency at Baylor College of Medicine**

06/1990 - Houston, Texas United States

Urology

**Fellowship at University Of Southern California**

06/1992 - Los Angeles, California United States

Urologic Oncology

# Certifications

American Board of Urology

# Professional Interests

- Urologic Oncology and Reconstructive Surgery with Interest in Minimally Invasive Surgery

# Professional Statement

Seth P. Lerner, MD, is Professor of Urology and holds the Beth and Dave Swalm Chair in Urologic Oncology, in the Scott Department of Urology, Baylor College of Medicine. He is Director of Urologic Oncology and the Multidisciplinary Bladder Cancer Program and Faculty Group Practice Medical Director for the Urology Clinic.

He earned his medical degree from Baylor College of Medicine, completed a surgical internship at Virginia Mason Hospital in Seattle, and returned to Baylor for his residency training. He completed a two-year fellowship at the University of Southern California in urologic oncology and reconstructive surgery under Peter Jones and Don Skinner before returning to join the full-time Baylor faculty in 1992. His clinical practice, education, and research activities are devoted to urologic oncology and particularly lower and upper tract urothelial cancer.

Dr. Lerner is author of over190 peer-reviewed articles, and co-editor of a comprehensive Textbook of Bladder Cancer. He is the founding co-editor-in-chief of the Bladder Cancer journal. He established and directs the multi-disciplinary Bladder Cancer Research Program at Baylor and his research interests include use of selective estrogen receptor modulators for treatment of bladder cancer, gene therapy, integrated genomic analysis of bladder and upper urinary tract cancers, and outcomes of radical cystectomy and pelvic lymphadenectomy. He has 26 years experience as a clinical investigator for both NCI and industry funded clinical trials. He is the PI of the ongoing SWOG NCI Phase III trial comparing extended vs. standard pelvic lymphadenectomy at time of radical cystectomy. He is active in the leadership of several national bladder cancer research enterprises including chair of the Local Bladder Cancer committee of SWOG, founding and former co-chair of the NCI Bladder Cancer Task Force and current co-chair of the NCI CTEP Genitourinary Steering Committee, and he has co-chaired the Analysis Working Group of The Cancer Genome Atlas Project

for muscle invasive bladder cancer for the past 7 years. He is very active in the Bladder Cancer Advocacy Network (BCAN) as a member of the Board of Directors, past chair of the Bladder Cancer Think Tank and co-chair of the management committee of the Bladder Cancer Research Network. Dr. Lerner is an active member of the prestigious American Association of Genitourinary Surgeons and is listed routinely among “America’s Top Doctors” and “Best Doctors in America.

# Websites

Scott Department of Urology

Dr. Lerner's Research

VIICTR Research Database

BCM MyChart

# Selected Publications

- Levitt JM, Jian W, Lerner SP, Sonpavde G "A conventional preclinical schedule of cisplatin is more effective than a metronomic frequent bolus schedule for urothelial carcinoma.." *Urol. Oncol..* 2013 February ; 31 (2): 234-40. Pubmed PMID: 21723160
- Burke JM, Lamm DL, Meng MV, Nemunaitis JJ, Stephenson JJ, Arseneau JC, Aimi J, Lerner S, Yeung AW, Kazarian T, Maslyar DJ, McKiernan JM "A First in Human Phase 1 Study of CG0070, a GM-CSF Expressing Oncolytic Adenovirus, for the Treatment of Nonmuscle Invasive Bladder Cancer.." *J. Urol..* 2012 December ; 188 (6): 2391-7. Pubmed PMID: 23088985
- Meeks JJ, Bellmunt J, Bochner BH, Clarke NW, Daneshmand S, Galsky MD, Hahn NM, Lerner SP, Mason M, Powles T, Sternberg CN, Sonpavde G "A Systematic Review of Neoadjuvant and Adjuvant Chemotherapy for Muscle-invasive Bladder Cancer.." *Eur. Urol..* 2012 September ; 62 (3): 523-33. Pubmed PMID: 22677572
- Jian PY, Godoy G, Coburn M, Lynch G, Ro JY, Zhai QJ, Nishino M, Lerner SP "Adenocarcinoma following urinary diversion.." *Can Urol Assoc J.* 2012 April ; 6 (2): E77-80. Pubmed PMID: 22511440

Show 16 more selected publications

# Memberships

**American Association of Genitourinary Surgeons**

Member

**American Urological Association**

Member

**American Association for Cancer Research**

Member

**American Association for the Advancement of Science**

Member

**American College of Surgeons**

Fellow

**American Medical Association**

Member

**American Society of Clinical Oncology**

Member

**American Society of Gene Therapy**

Member

**American Association of Clinical Urologists**

Member

**Harris County Medical Society**

Member

**International Bladder Cancer Network**

Member

**Society of Basic Urologic Research**

Member

**Société International D'Urologie**

Member

**Society of Laparoendoscopic Surgeons**

Member

**South Central Section of the American Urological Association**

Member

**Society of University Urologists**

Member

**Southwest Oncology Group**

Member

**Texas Urological Society**

Member

**Texas Medical Association**

Member

# Skills

**Research Interests**

Bladder Cancer Collaborative Research Program: Role of estrogen receptors and the use of selective estrogen receptor modulators (e.g., tamoxifen) for treatment of bladder cancer; novel targeted therapeutics and gene therapy for treatment of non-muscle-invasive and invasive disease; outcome of treatments for non-muscle-invasive bladder cancer and radical cystectomy and development of predictive models; genomic characterization and integrated analysis of bladder and upper tract cancers

**Clinical Interests**

Urologic oncology and urinary tract reconstruction; management of patients with bladder, prostate, testis and kidney cancer; Director, Bladder Cancer Multidisciplinary Clinical Program

**Clinical Trials**

Bladder cancer; prostate cancer; kidney cancer

Log In to edit your profile

Follow Us |

Case 4:21-cr-00009 Document 1-3 Filed on 01/04/21 in TXSD Page 68 of 771

HEALTHCARE

- Specialties
- MyChart Login
- For Patients & Visitors
- For Health Professionals
- Clinical Trials
- Find a Physician

EDUCATION

- Programs & Admissions
- Student & Trainee Resources
- Faculty Resources
- School of Medicine
- Graduate School of Biomedical Sciences
- National School of Tropical Medicine
- School of Health Professions
- Tuition & Fees
- Financial Aid

RESEARCH

- Our Research
- Core Labs
- Faculty Labs
- Research Centers
- Research Offices

COMMUNITY

- Healthcare Outreach
- Education Outreach
- Global Outreach
- Community Events

ABOUT

- Our Campus
- Departments
- Academic Centers
- Administrative Offices
- Affiliates
- Leadership

**RESOURCE LINKS**

- Contact Us
- Find a Person
- Careers
- BCM Team Shop
- News

BCM Ventures

Giving

Alumni

Title IX Office

Compliance

©1998-2020 Baylor College of Medicine® | One Baylor Plaza, Houston, Texas 77030 | (713)798-4951

Have an edit or suggestion for this page?

Compliance

Privacy

Intranet

# EXHIBIT C

James L Pool, M.D. | BCM

COVID-19 Response

Access our COVID-19 Response homepage, with more information and resources during the COVID-19 pandemic, including what to do if you're experiencing symptoms.

Healthcare Education Research Community About

Baylor College of Medicine > Find a Person > James Pool

# James L Pool, M.D.

Professor
713-798-5800

## Email

jpool@bcm.edu

## Positions

https://www.bcm.edu/people-search/james-pool-28820[12/3/2020 5:05:38 PM]



**Professor**

Medicine-Hypertension
Baylor College of Medicine
Houston, TX US

**James L. Pool Presidential Endowed Chair in Clinical Pharmacology**

Baylor College of Medicine
Houston, Texas United States

# Addresses

**Baylor Comprehensive Healthcare Clinic (Clinic)**

1977 Butler Blvd. E6.150
Houston, TX 77030
United States
(713) 798-0180

# Education

**MD from University Of Oklahoma School of Medicine**

06/1972 - Oklahoma City, Oklahoma United States

**Internship at Duke University Medical Center**

01/1973 - Durham, North Carolina United States
Internal Medicine

**Residency at Duke University Medical Center**

01/1975 - Durham, North Carolina United States
Internal Medicine

**Fellowship at Duke University Medical Center**

01/1976 - Durham, North Carolina United States
Endocrinology

# Certifications

**Internal Medicine**

American Board of Internal Medicine

**Diplomate**

American Board of Endocrinology and Metabolism

**Diplomate**

American Board of Clinical Pharmacology

# Professional Interests

- Cardiovascular Pharmacology
- Alteration of Lipid Metabolism by Antihypertensive Drugs
- Autonomic Nervous System Dysfunction

# Websites

VIICTR Publications List

Cardiovascular Disease Prevention Care Center

# Selected Publications

- Taylor AA, Pool JL "Clinical role of direct Renin inhibition in hypertension.." *Am J Ther.* 2012 May ; 19 (3): 204-10. Pubmed PMID: 21317620
- Perlstein TS, Henry RR, Mather KJ, Rickels MR, Abate NI, Grundy SM, Mai Y, Albu JB, Marks JB, Pool JL, Creager MA "Effect of angiotensin receptor blockade on insulin sensitivity and endothelial function in abdominally obese hypertensive patients with impaired fasting glucose.." *Clin. Sci..* 2012 February 1; 122 (4): 193-202. Pubmed PMID: 21861845
- Hyman DJ, Pavlik VN, Greisinger AJ, Chan W, Bayona J, Mansyur C, Simms V, Pool J "Effect of a physician uncertainty reduction intervention on blood pressure in uncontrolled hypertensives-a cluster randomized trial.." *J Gen Intern Med.* 2012 April ; 27 (4): 413-9. Pubmed PMID: 22033742
- Clement S, Brohan E, Sayce L, Pool J, Thornicroft G "Disability hate crime and targeted violence and hostility: A mental health and discrimination perspective.." *J Ment Health.* 2011 June ; 20 (3):

James L Pool, M.D. | BCM

219-25. Pubmed PMID: 21574788

Show 1 more selected publications

Log In to edit your profile

Follow Us

HEALTHCARE
- Specialties
- MyChart Login
- For Patients & Visitors
- For Health Professionals
- Clinical Trials
- Find a Physician

EDUCATION
- Programs & Admissions
- Student & Trainee Resources
- Faculty Resources
- School of Medicine
- Graduate School of Biomedical Sciences
- National School of Tropical Medicine
- School of Health Professions
- Tuition & Fees
- Financial Aid

RESEARCH
- Our Research
- Core Labs
- Faculty Labs
- Research Centers
- Research Offices

COMMUNITY
- Healthcare Outreach
- Education Outreach
- Global Outreach
- Community Events

https://www.bcm.edu/people-search/james-pool-28820[12/3/2020 5:05:38 PM]

James L Pool, M.D. | BCM

ABOUT

- Our Campus
- Departments
- Academic Centers
- Administrative Offices
- Affiliates
- Leadership
- BCM Ventures
- Giving
- Alumni

**RESOURCE LINKS**

- Contact Us
- Find a Person
- Careers
- BCM Team Shop
- News
- Title IX Office
- Compliance

©1998-2020 Baylor College of Medicine® | One Baylor Plaza, Houston, Texas 77030 | (713)798-4951

Have an edit or suggestion for this page?

Compliance Privacy Intranet

https://www.bcm.edu/people-search/james-pool-28820[12/3/2020 5:05:38 PM]

# EXHIBIT D

Joseph Jankovic, M.D. | BCM

## COVID-19 Response

Access our COVID-19 Response homepage, with more information and resources during the COVID-19 pandemic, including what to do if you're experiencing symptoms.

Healthcare Education Research Community About

Baylor College of Medicine > Find a Person > Joseph Jankovic

# Joseph Jankovic, M.D.

Professor
713-798-6556

Request Clinical Appointment

## Email

pdcmdc@bcm.edu

## Positions

https://www.bcm.edu/people-search/joseph-jankovic-23852[12/3/2020 5:02:12 PM]



**Professor**

Neurology
Baylor College of Medicine

**Distinguished Chair in Movement Disorders**

Baylor College of Medicine

**Director**

Parkinson's Disease Center and Movement Disorders Clinic
Baylor College of Medicine

**Director, Centers of Excellence**

National Parkinson Foundation

Huntington's Disease Society of America Tourette Syndrome Association

**Program Director**

Movement Disorders Fellowship
Baylor College of Medicine

# Addresses

**Parkinson's Disease Center and Movement Disorders Clinic (Clinic)**

Baylor College of Medicine Medical Center
7200 Cambridge St., 9th Floor, MS: BCM609
Houston, TX 77030
United States
(713) 798-2273
Neurology Site

# Education

**MD from University of Arizona College of Medicine**

06/1973 - Tucson, Arizona United States

**Internship at Baylor College of Medicine**

06/1974 - Houston, Texas United States

Internal Medicine

**Residency at The Neurological Institute, Columbia University**

06/1977 - New York, NY United States

Neurology

# Certifications

American Board of Psychiatry and Neurology, Neurology

# Honors & Awards

**Past President**

International Parkinson and Movement Disorder Society (01/1994 - 01/1996)

**Honorary Member**

American Neurological Association Australian Association of Neurologists European Federation of Neurological Societies French Neurological Society International Parkinson and Movement Disorder Society

**Great Teacher Award**

National Institutes of Health

**Movement Disorders Research Award**

Sponsored by the Parkinson's Disease Foundation

American Academy or Neurology

**Distinguished Service Award**

National Parkinson Foundation

**Guthrie Family Humanitarian Award**

Huntington's Disease Society of America

**Lifetime Achievement Award**

Tourette Syndrome Association

**Distinguished Service Award**

Dystonia Medical Research Foundation

**Distinguished Faculty Award**

Baylor College of Medicine Alumni Association

**Fulbright and Jaworski Faculty Excellence Award**

Baylor College of Medicine

**Master Clinician Lifetime Award**

Baylor College of Medicine

**Past President**

International Neurotoxin Association (01/2015 - 12/2017)

# Professional Interests

- Neurology
- Movement Disorders
- Parkinson's Disease and related neurodegenerative disorders
- Tremors
- Dystonia
- Tics
- Tourette's syndrome
- Chorea
- Huntington's disease
- Restless leg syndrome
- Tardive dyskinesias
- Paroxysmal dyskinesias
- Ataxia

# Professional Statement

Joseph Jankovic, M.D. is Professor of Neurology, Distinguished Chair in Movement Disorders, and Founder and Director of the Parkinson's Disease Center and Movement Disorders Clinic (PDCMDC), Department of Neurology, Baylor College of Medicine, Houston, Texas. After completing his Neurology training at Columbia University, New York City, he joined the faculty of Baylor College of

Medicine in 1977. Since that time he has led clinical and research team that focuses on etiology, pathophysiology, and experimental therapeutics of Parkinson's disease and related neurodegenerative and movement disorders such as tremors, dystonia, Tourette syndrome, Huntington disease, restless legs syndrome, tardive dyskinesia, and paroxysmal dyskinesias. Under the direction of Dr. Jankovic the PDCMDC has been recognized as "Center of Excellence" by the Parkinson's Foundation, the Huntington Disease Society of America, the Tourette Association of America, and the Wilson Disease Association.

Past president of the International Parkinson and Movement Disorder Society and of the International Neurotoxin Association, Dr. Jankovic is the recipient of many awards including the American Academy of Neurology Movement Disorders Research Award, First National Parkinson Foundation Distinguished Service Award, Huntington's Disease Society of America Guthrie Family Humanitarian Award, Tourette Syndrome Association Lifetime Achievement Award, Dystonia Medical Research Foundation Distinguished Service Award, Benign Essential Blepharospasm Research Foundation Award, and Lifetime Achievement Award from the International Neurotoxin Association,

Dr. Jankovic has published over 1,200 original articles and over 55 books, is included among "Highly Cited Researchers", and has been ranked #1 expert in the world in movement disorders and in botulinum toxins (http://expertscape.com/).

He has served as the principal investigator in hundreds of clinical trials and his pioneering research on drugs for parkinsonian disorders and hyperkinetic movement disorders has led to their approval by the Food and Drug Administration. Dr. Jankovic is current or past member of many scientific and medical advisory boards and has served on the executive scientific advisory boards of the Michael J. Fox Foundation for Parkinson's Research and the National Parkinson Foundation. Dr. Jankovic has mentored numerous fellows and other trainees many of whom have become leaders in the field of neurology and movement disorders. For further information visit www.jankovic.org.

# Websites

Parkinson's Disease Center and Movement Disorders Clinic

In the News

Dr. Jankovic's Bibliography

Comprehensive list of publications and presentations

Dr. Jankovic's Research

VIICTR Research Database

Download CV

# Videos

Joseph Jankovic, M.D. - Giving Life to Possible

Joseph Jankovic, M.D. is board certified in psychiatry and neurology specializing in movement disorders and Parkinson's disease. His clinical interests include: movement disorders, Parkinson's disease and related neurodegenerative disorders.

Log In to edit your profile

Follow Us |

HEALTHCARE

- Specialties
- MyChart Login
- For Patients & Visitors
- For Health Professionals
- Clinical Trials
- Find a Physician

EDUCATION

- Programs & Admissions
- Student & Trainee Resources
- Faculty Resources
- School of Medicine
- Graduate School of Biomedical Sciences
- National School of Tropical Medicine
- School of Health Professions
- Tuition & Fees
- Financial Aid

RESEARCH

- Our Research
- Core Labs

COMMUNITY

- Healthcare Outreach
- Education Outreach

Joseph Jankovic, M.D. | BCM
Case 4:21-cr-00009 Document 1-3 Filed on 01/04/21 in TXSD Page 83 of 771

Faculty Labs

Research Centers

Research Offices

Global Outreach

Community Events

ABOUT

- Our Campus
- Departments
- Academic Centers
- Administrative Offices
- Affiliates
- Leadership
- BCM Ventures
- Giving
- Alumni

**RESOURCE LINKS**

- Contact Us
- Find a Person
- Careers
- BCM Team Shop
- News
- Title IX Office
- Compliance

©1998-2020 Baylor College of Medicine® | One Baylor Plaza, Houston, Texas 77030 | (713)798-4951

Have an edit or suggestion for this page?

Compliance Privacy Intranet

https://www.bcm.edu/people-search/joseph-jankovic-23852[12/3/2020 5:02:12 PM]

# EXHIBIT E

Melissa Michelle Yu, M.D., FAAN | BCM

## COVID-19 Response

Access our COVID-19 Response homepage, with more information and resources during the COVID-19 pandemic, including what to do if you're experiencing symptoms.

Healthcare Education Research Community About

Baylor College of Medicine > Find a Person > Melissa Yu

# Melissa Michelle Yu, M.D., FAAN

Associate Professor
713-798-2273

Request Clinical Appointment

## Positions

**Associate Professor**
Neurology
Baylor College of Medicine

https://www.bcm.edu/people-search/melissa-yu-33620[12/3/2020 5:00:32 PM]



**Associate Medical Director**

Baylor Clinic
Neurology
Baylor College of Medicine

**Associate Director, Clinical Operations**

Alzheimer's Disease and Memory Disorders Center
Baylor College of Medicine
Houston, Texas

**Faculty Senator**

Baylor College of Medicine
Houston, Texas United States

**Physician Informaticist**

Baylor College of Medicine

# Addresses

**Baylor Neurology - Alzheimer's Disease and Memory Disorders Center (Clinic)**

7200 Cambridge St., 9th Floor
McNair Campus
Houston, TX 77030
United States
(713) 798-4734
https://www.bcm.edu/healthcare/care-centers/neurology

# Education

**MD from Mt. Sinai School of Medicine**

05/2000 - New York City, New York United States

**Internship at St. Luke's-Roosevelt Hospital Center**

06/2001 - New York City, New York United States

Internal Medicine

**Residency at Baylor College of Medicine**

06/2004 - Houston, Texas United States

Neurology

**Graduate Certificate at Jesse H. Jones Graduate School of Management of Rice University**

03/2014 - Houston, Texas United States

Healthcare Management

**Graduate Certificate at University of Texas, School of Biomedical Informatics**

12/2016 - Houston, Texas United States

Healthcare Informatics

# Certifications

**Neurology**

American Board of Psychiatry and Neurology

**Clinical Informatics**

American Board of Preventive Medicine

# Professional Interests

- Memory disorders
- Healthcare Management
- Electronic Medical Records
- Process Improvement
- Quality Improvement
- Healthcare Informatics

# Memberships

**American Academy of Neurology**

# Languages

Melissa Michelle Yu, M.D., FAAN | BCM

Spanish

Log In to edit your profile

Follow Us

HEALTHCARE

- Specialties
- MyChart Login
- For Patients & Visitors
- For Health Professionals
- Clinical Trials
- Find a Physician

EDUCATION

- Programs & Admissions
- Student & Trainee Resources
- Faculty Resources
- School of Medicine
- Graduate School of Biomedical Sciences
- National School of Tropical Medicine
- School of Health Professions
- Tuition & Fees
- Financial Aid

RESEARCH

- Our Research
- Core Labs
- Faculty Labs
- Research Centers
- Research Offices

COMMUNITY

- Healthcare Outreach
- Education Outreach
- Global Outreach
- Community Events

https://www.bcm.edu/people-search/melissa-yu-33620[12/3/2020 5:00:32 PM]

Melissa Michelle Yu, M.D., FAAN | BCM

ABOUT

- Our Campus
- Departments
- Academic Centers
- Administrative Offices
- Affiliates
- Leadership
- BCM Ventures
- Giving
- Alumni

**RESOURCE LINKS**

- Contact Us
- Find a Person
- Careers
- BCM Team Shop
- News
- Title IX Office
- Compliance

©1998-2020 Baylor College of Medicine® | One Baylor Plaza, Houston, Texas 77030 | (713)798-4951

Have an edit or suggestion for this page?

Compliance Privacy Intranet

https://www.bcm.edu/people-search/melissa-yu-33620[12/3/2020 5:00:32 PM]

# EXHIBIT F

Michele K York, Ph.D., ABPP-CN | BCM

## COVID-19 Response

Access our COVID-19 Response homepage, with more information and resources during the COVID-19 pandemic, including what to do if you're experiencing symptoms.

Healthcare Education Research Community About

Baylor College of Medicine > Find a Person > Michele York

Baylor College of Medicine
hele York, PhD
Neurology

# Michele K York, Ph.D., ABPP-CN

Professor
713-798-8673

Request Clinical Appointment

## Email

myork@bcm.edu

## Positions

https://www.bcm.edu/people-search/michele-york-33439[12/3/2020 5:02:41 PM]



**Professor**

Neurology and Psychiatry and Behavioral Sciences
Baylor College of Medicine

**Head**

Section of Neuropsychology
Baylor College of Medicine

# Addresses

**Baylor College of Medicine Medical Center (Clinic)**

7200 Cambridge St., 9th Floor
Houston, TX 77030
United States
(713) 798-8673

# Education

**Internship at Baylor College Of Medicine**

01/2000 - Houston, Texas United States

Clinical Psychology

**PhD from Vanderbilt University**

01/1998 - Nashville, Tennessee United States

**MA from Vanderbilt University**

01/1996 - Nashville, Tennessee United States

**BA from Vanderbilt University**

01/1993 - Nashville, Tennessee United States

# Certifications

**Clinical Neuropsychology**

American Board of Professional Psychology

# Honors & Awards

**Fulbright and Jaworski LLP Faculty Excellence Award for Teaching and Evaluation**
Baylor College of Medicine (01/2012)

**Fulbright and Jawroski LLP Faculty Excellence Award for Enduring Materials**
Baylor College of Medicine (09/2012)

**Norton Rose Fulbright LLP Faculty Education Award for Teaching and Evaluation**
Baylor College of Medicine (09/2018)

**Norton Rose Fulbright LLP Faculty Education Award for Enduring Materials**
Baylor College of Medicine (01/2019)

**Star Award for Clinical Excellence**
Baylor College of Medicine (01/2019)

# Websites

VIICTR Publications List

Neuropsychology

In the News

Dr. York's Bibliography

Comprehensive list of publications and presentations

Download CV

# Selected Publications

- Hack N, Akbar U, Thompson-Avila A, Fayad SM, Hastings EM, Moro E, et al "Impulsive and Compulsive Behaviors in Parkinson Study Group (PSG) Centers Performing Deep Brain Stimulation Surgery." *J Parkinsons Dis.* 2014 January 1; 4 (4): 591-8. Pubmed PMID: 25035311
- Rothlind JC, York MK, Carlson K, Luo P, Marks WJ, Jr, et al "Neuropsychological changes following deep brain stimulation surgery for Parkinson's disease: comparisons of treatment at

Michele K York, Ph.D., ABPP-CN | BCM

pallidal and subthalamic targets versus best medical therapy." *J Neurol Neurosurg Psychiatry.* 2014 September 2; : Pubmed PMID: 25185211

- Fridley J, Adams G, Sun P, York M, Atassi F, Lai E, et al "Effect of subthalamic nucleus or globus pallidus interna stimulation on oculomotor function in patients with Parkinson's disease." *Stereotact Funct Neurosurg.* 2013 91 (2): 113-21. Pubmed PMID: 23343617
- Calleo J, Burrows C, Levin H, Marsh L, Lai E, York MK "Cognitive rehabilitation for executive dysfunction in Parkinson's disease: application and current directions.." *Parkinsons Dis.* 2012 2012 : 512892. Pubmed PMID: 22135762

Show 34 more selected publications

# Memberships

**Academy of Distinguished Educators**
Member (01/2012)

**American Academy of Neurology**

**Movement Disorders Society**

**International Neuropsychological Society**

**Parkinson Study Group**

**American Congress of Rehabilitation Medicine**
Co-Chair Elect (09/2018)

Log In to edit your profile

Follow Us

HEALTHCARE

EDUCATION

https://www.bcm.edu/people-search/michele-york-33439[12/3/2020 5:02:41 PM]

Specialties

MyChart Login

For Patients & Visitors

For Health Professionals

Clinical Trials

Find a Physician

Programs & Admissions

Student & Trainee Resources

Faculty Resources

School of Medicine

Graduate School of Biomedical Sciences

National School of Tropical Medicine

School of Health Professions

Tuition & Fees

Financial Aid

RESEARCH

Our Research

Core Labs

Faculty Labs

Research Centers

Research Offices

COMMUNITY

Healthcare Outreach

Education Outreach

Global Outreach

Community Events

ABOUT

Our Campus

Departments

Academic Centers

Administrative Offices

Affiliates

Leadership

BCM Ventures

Giving

Alumni

**RESOURCE LINKS**

Contact Us

Find a Person

Careers

BCM Team Shop

News

Title IX Office

Compliance

©1998-2020 Baylor College of Medicine® | One Baylor Plaza, Houston, Texas 77030 | (713)798-4951

Have an edit or suggestion for this page?

Compliance

Privacy

Intranet

# EXHIBIT G

Jason Varnado (State Bar No. 211067)
jvarnado@jonesday.com
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
Telephone +1-832-239-3939
Facsimile +1-832-239-3600

Neal J. Stephens (State Bar No. 152071)
nstephens@jonesday.com
Vincent Doctor (State Bar No. 319408)
vdoctor@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone: +1.650.739.3939
Facsimile: +1.650.739.3900

Kathryn Keneally (appearance *pro hac vice*)
New York State Bar No. 1866250
kkeneally@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281-047
Telephone: +1-212-326-3939
Facsimile: +1-212-755-7306

Attorneys for Defendant
ROBERT T. BROCKMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

ROBERT T. BROCKMAN,

Defendant.

Case No. 3.20-cr-00371-WHA

DECLARATION OF JAMES L. POOL, M.D., IN SUPPORT OF ROBERT T. BROCKMAN'S MOTION TO TRANSFER PROCEEDINGS

**DECLARATION OF JAMES L. POOL, M.D.**

I, James L. Pool, M.D., declare as follows:

1. I am a Professor in the Departments of Medicine and Pharmacology and a treating internal medicine physician at the Baylor College of Medicine, in Houston, Texas, where I hold the James L. Pool Presidential Endowed Chair in Clinical Pharmacology.

2. I make this Declaration at the request of his counsel in support of Mr. Brockman's Motion to Transfer Proceedings to the United States District Court for the Southern District of Texas.

3. Mr. Brockman was referred to me by Dr. Seth P. Lerner (Baylor College of Medicine, Department of Urology), who had previously treated Mr. Brockman for bladder cancer. I conducted a complete physical examination of Mr. Brockman on December 11, 2018. It became evident from my examination that Mr. Brockman was experiencing movement disorders and cognitive problems that are consistent with Parkinson's disease or parkinsonism.

4. I referred Mr. Brockman to three other medical professionals: Joseph Jankovic, M.D., a neurologist and specialist in Parkinson's disease and other movement disorders; Melissa Yu, M.D., a neurologist and specialist in Alzheimer's Disease and other memory disorders; and Michele K. York, Ph.D., a neuropsychologist, all with Baylor College of Medicine.

5. Each of these doctors provided me with reports following their examinations. Their conclusions support that Mr. Brockman presented symptoms that are consistent with Parkinson's Disease, parkinsonism, Lewy body dementia, or some combination. These diagnoses cannot be totally confirmed except at autopsy. None of these conditions are curable, and each may result in rigid muscles, slow movements, and tremors. All are characterized by progressive dementia, and in Mr. Brockman's case, the medical reports confirm cognitive impairment, which includes, but is not limited to, both short and long term memory loss.

6. I examined Mr. Brockman again on October 6, 2020. At that time, I conducted cognitive tests, and again referred Mr. Brockman to Dr. York for a further battery of tests. The results of these examinations confirm that Mr. Brockman's impairment is progressive.

7. At this stage, Mr. Brockman may be oriented in time and place, aware of persons in his company, able to engage in social conversation, and capable of functioning in familiar tasks. However, Mr. Brockman's progressive dementia impairs his cognitive ability in several respects. These include short term memory limitations. In addition, his condition renders long-term memory inaccessible and defective. For these reasons, I concur with the medical position that Mr. Brockman cannot assist his attorneys in his defense.

8. I understand that Mr. Brockman's counsel will make a motion for a hearing to determine that Mr. Brockman cannot assist in his defense, and that this motion will be supported by the medical reports and letters previously provided to them by me, Dr. Jankovic, Dr. Yu, and

Dr. York. I also understand that counsel will want to present testimony from each of us to explain how we reached our conclusions. We are all based in Houston. Under ordinary circumstances, it would be difficult for us to be present for a hearing in San Francisco, where this court is located. Under the current circumstances of the COVID-19 pandemic, we would be confronted with the increased risk of exposure at a time when the Centers for Disease Control and Prevention and other medical advisors are counseling against travel, the potential need to quarantine before and after travel, and the detrimental impact any absence or illness may have on our other patients.

9. It is also not medically advisable for Mr. Brockman to travel to San Francisco for a hearing or for trial. Mr. Brockman is 79 years old and suffers from underlying medical conditions that put him at increased risk for severe illness if he were to contract COVID-19.

10. Additionally, requiring Mr. Brockman to face legal proceedings in a location distant from his home will be disorienting in a manner that could accelerate the deterioration of his mental condition. Unfamiliar environments, stimulating surroundings, and changes in routine would be especially stressful for a person with Mr. Brockman's diminished capacity, creating a risk to his existing cardiac condition, and could exacerbate the overall progression of his symptoms.

11. Based on the foregoing, I respectfully submit this Declaration in support of Mr. Brockman's Motion to Transfer Proceedings to the United States District Court for the Southern District of Texas.

12. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Houston, Texas on November 25, 2020.

James L. Pool, MD

James L. Pool, M.D.

# EXHIBIT H

# Brockman, Robert Theron

MRN: 0300937767

**Office Visit** 1/30/2019
Baylor College of Medicine - Neurology Associates

Provider: Jankovic, Joseph, MD (Neurology)
Primary diagnosis: PD (Parkinson's disease)
Reason for Visit: Movement Disorder; Referred by Pool, James L, MD

## Additional Documentation

Vitals: BP 136/79 (BP Location: left arm, Patient Position: Sitting, Cuff Size: regular) Pulse 53 Ht 6' 1" (1.854 m) BMI 25.07 kg/m² BSA 2.11 m² More Vitals

Flowsheets: MDS UPDRS

Encounter Info: Billing Info, History, Allergies, Detailed Report

## Media

Scan on 1/31/2019 9:44 AM by Garcia, Karen, CMA: Montreal Cognitive Assessment ( MOCA )

## Progress notes

### Savitt, Daniel, DO at 2/8/2019 1:50 PM

Author Type: Fellow Status: Addendum
Editor: Savitt, Daniel, DO (Fellow)

**PT NAME:** Robert Theron Brockman
**MRN:** 0300937767
**DOB:** [redacted]

**INITIAL NEUROLOGICAL EVALUATION:** 1/30/2019

**REFERRING PHYSICIAN:** Pool, James L, MD and Stuart Yudofsky, MD

**REASON FOR EVALUATION:**
We had the pleasure of evaluating Mr. Brockman at the Parkinson's Disease Center and Movement Disorders Clinic at Baylor College of Medicine on 1/30/2019. He presents for evaluation and treatment of Parkinson's disease.

**HISTORY OF PRESENT ILLNESS:**
Mr. Brockman is a 77 year old ambidextrous man, the CEO of a computer software company, who presents for evaluation of possible Parkinson's disease.

The onset of symptoms began 1.5 years ago with concentration and memory difficulty. He developed depressive symptoms about 6 months ago for which bupropion was started 2 months ago. Since that time, he has noticed an improvement in his thinking and memory. He also noticed difficulty with his balance about 1.5 years ago. For example, he enjoys fly-fishing as a hobby and has more difficulty standing even in calm waters. He takes shorter steps and has a stooped posture with walking. There is no freezing and no change in his arm swing.

He has stiffness when he does not exercise. He is moving more slowly in general as well. His handwriting is messier and smaller and for this reason, he has stopped signing employee certificates. He has not noticed a significant tremor. He has some difficulty with



tasks requiring fine motor movements such as buttoning certain buttons and starting the line for his fly-fishing.

He has developed near absence of sense of smell about 10 years ago. He also began acting out his dreams at nighttime 2-3 years ago, kicking and punching in his sleep. He generally sleeps well, although recent work stress has disrupted his sleep and he now takes melatonin. He has increased urinary frequency (he goes hourly) and urgency but without incontinence or retention. He had constipation when he started Cardizem 2.5 years ago, that resolved with stool softeners. He does not have hypophonia but his wife notices slower speech. He has excessive salivation. For the past 6-8 months, he has had difficulty swallowing food and medications, coughs with swallowing. He has reduction in his hearing but does not want to wear hearing aids.

He has never been prescribed antiemaetics or antipsychotics and has never been treated for these symptoms.

**DIAGNOSTIC TESTS:**

*MRI brain* (11/2/19): Unremarkable

**RESPONSE TO TREATMENT:**

None

**ALLERGY:** No Known Allergies

**Current Outpatient Medications**

| Medication | Sig | Dispense | Refill |
|---|---|---|---|
| • buPROPion (WELLBUTRIN SR) 100 MG SR tablet | Take 100 mg by mouth two times daily. 200mg each morning and 100mg each evening | | |
| • diltiazem (DILTIAZEM CD) 120 MG ER capsule | Take 120 mg by mouth daily. | | |
| • ELIQUIS 2.5 MG TABS | TAKE 1 TABLET TWICE DAILY | | 2 |
| • ezetimibe-simvastatin (VYTORIN) 10-40 MG per tablet | Take 1 Tab by mouth every evening. | | |
| • levothyroxine (SYNTHROID) 75 MCG tablet | Take 75 mcg by mouth daily. | | |
| • Multiple Vitamins-Minerals (MULTIVITAMIN ADULT OR) | Take by mouth. | | |
| • Testosterone (ANDROGEL) 50 MG/5GM GEL | Place onto the skin. | | |

No current facility-administered medications for this visit.

**PAST MEDICAL HISTORY:**

**Past Medical History:**

| Diagnosis | Date |
|---|---|
| • Atrial fibrillation | |

| | Date |
|---|---|
| • Basal cell carcinoma | |
| • Bladder cancer | |
| • Depression | |
| • Hypercholesteremia | |
| • Melanoma | |
| • Ocular migraine *lasted ~30 minutes* | 1/2012 |
| • Prostatitis | 1980 |
| • Prostatitis | |
| • Pseudoexfoliation glaucoma(365.52) | |
| • Thyroid disease | |
| • UTI (lower urinary tract infection) | |

**PAST SURGICAL HISTORY:**

**Past Surgical History:**

| Procedure | Laterality | Date |
|---|---|---|
| • HX BLADDER TUMOR EXCISION | | 2006 |
| • HX DENTAL SURGERY *infected tooth* | | |
| • HX TONSILLECTOMY | | 1945 |

**FAMILY HISTORY:**
Heritage: Caucasian
*Mother*: Diabetes. She had a mediastinal mass that was inoperable (possibly lymphoma) but deferred treatment.
*Father*: COPD

There is no family history of Parkinson's disease or tremor.

**SOCIAL HISTORY:**
Marital Status: Married
Education: 1 year of graduate school
Occupation: CEO/founder of a computer software company
Lives with his wife.
**Social History**

Tobacco Use

| | |
|---|---|
| • Smoking status: | Never Smoker |
| • Smokeless tobacco: | Never Used |

Substance Use Topics

| | |
|---|---|
| • Alcohol use: | Yes |

**REVIEW OF SYSTEMS:**
**GENERAL:** The patient denies fevers, chills, weight loss, or weight gain.
**EYES:** The patient denies dry eyes, blurry vision, double vision, or vision loss.
**EARS/NOSE/THROAT:** The patient denies hearing loss, voice changes, rhinorrhea, dry mouth, or sore throat.
**CARDIOVASCULAR:** The patient denies chest pain, palpitations, irregular heartbeat, or lightheadedness.
**RESPIRATORY:** The patient denies cough, shortness of breath, or asthma.
**GI:** The patient denies nausea, vomiting, diarrhea, constipation, bowel incontinence, ulcers, or reflux.

**GU:** The patient denies bladder incontinence, dysuria, urinary urgency, or frequency.
**HEME:** The patient denies anemia, easy bruising, easy bleeding, or a clotting disorder.
**DERMATOLOGIC:** The patient denies rash, suspicious lesions, or change in skin color.
**ENDOCRINE:** Patient denies heat or cold intolerance, hair loss, diabetes, or thyroid problems.
**MUSCULOSKELETAL:** The patient denies joint or back pain, joint swelling, arthritis, ankle swelling, or muscle aches.
**PSYCHIATRIC:** The patient denies hallucinations, delusions, insomnia, or a history of bipolar disorder, OCD, ADD, ADHD. The patient has depression, anxiety, and memory loss.
**NEUROLOGIC:** The patient denies tremor, headaches, seizures, strokes, paresthesias, weakness, or sexual dysfunction. The patient has stiffness, gait imbalance, and hearing abnormalities.

**PHYSICAL EXAMINATION:**

| | **Sitting** |
|---|---|
| Vitals: | |
| | 01/30/19 0911 |
| BP: | 136/79 |
| BP Location: | left arm |
| Patient Position: | Sitting |
| Cuff Size: | regular |
| Pulse: | 53 |
| Height: | 6' 1" (1.854 m) |

**General**: The patient is well appearing and in no distress.
**Skin**: No rashes.
**HEENT**: Normocephalic and atraumatic.
**Neck**: Supple to palpation.
**Cardiovascular**: Regular rate and rhythm.
**Lungs**: Clear to auscultation bilaterally.
**Peripheral Vascular System**: No edema and normal distal pulses.
**Abdomen**: Nontender, soft.
**Extremities:** No cyanosis or edema.
**Visual**: No visual field abnormalities.
**Psychiatric**: There is appropriate mood and affect.
**Musculoskeletal**: No arthritic signs.

**NEUROLOGICAL EXAMINATION:**
**Mental Status**: The patient is alert and oriented to person, time, and place. Speech is fluent with good comprehension. There are no abnormal perceptions, hallucinations, delusions, or illusions. The patient is able to follow three-step commands. There is no right/left disorientation, ideomotor or constructional apraxia, or evidence of ADHD or OCD. A MoCA examination was administered and the patient received a score of 19/30.
**Cranial Nerve Examination**: Pupils are equal, round, and reactive to light. Visual fields are full. Non-dilated funduscopic examination revealed normal retinal and vascular anatomy. No evidence of Kayser-Fleischer rings. Ocular movements are full with no evidence of nystagmus or abnormal saccades. There are no square-wave jerks. Normal light touch within the distribution of the fifth cranial nerve. No facial asymmetry or dysarthria. Hearing is normal to finger rub bilaterally. Tongue and palate are in the midline. 5/5 trapezius strength.

**Motor Examination**: The patient has normal bulk, and 5/5 strength in the upper and lower extremities.
*Rigidity*: 2+ in each leg.
*Bradykinesia*: Mild bradykinesia worse on the right.
**Involuntary Movements**: There is no evidence of myoclonus, tics, chorea, or dystonic postures.
*Tremor*: 2+ kinetic tremor and 1+ postural tremor in each arm.
**Reflexes**: 2/4 and symmetric in the biceps, triceps, brachioradialis, quadriceps, and ankle jerks. Plantar response is flexor.
**Sensation**: Normal to joint position, temperature, light touch, and vibration in all the extremities.
**Coordination**: The patient has normal finger-nose-finger and heel-to-shin. There is no evidence of dysdiadochokinesis with rapid alternating movements.
**Gait, Balance and Posture:** The patient is able to arise from a chair without hesitation. There is reduced stride length, stooped posture, absent arm swing and en bloc turning. Romberg is normal. There is 1+ postural instability.
**Rating Scales:** MDS- UPDRS was completed in the electronic chart.

**IMPRESSION:** Mr. Brockman is a 77 year old ambidextrous man, the CEO of a computer software company, who presents for evaluation of Parkinson's disease. The onset of symptoms began 1.5 years ago with walking and balance difficulty. He developed shorter steps, stooped posture, and more difficulty maintaining balance, especially when standing in water while fishing. He has also noticed slowness of movement, difficulty with dexterity, micrographia, anosmia, and dream-acting behavior (REM-Behavioral Disorder). He had an MRI brain in 11/2018 that was unremarkable. His examination is significant for a MoCA of 19/30, 2+ leg rigidity, mild bradykinesia, and a parkinsonian gait. His history and examination are consistent with the diagnosis of postural instability gait difficulty (PIGD) type Parkinson's disease. Vascular parkinsonism is also a possible consideration given his lower body predominant symptoms and presence of vascular risk factors that include atrial fibrillation hypertension, and hyperlipidemia.

**RECOMMENDATIONS:**
1. The diagnosis of Parkinson's disease or possible vascular parkinsonism was discussed with the patient and his wife.
2. An information packet was provided about Parkinson's disease.
3. The following tests were requested:
- DaTscan to evaluate for dopaminergic deficiency and differentiate between vascular parkinsonism and idiopathic Parkinson's disease.
- Has appointment scheduled for neuropsychiatric testing.
- Will place referral to Stromatt driving evaluation due to concerns for safety with driving.
4. We prescribed the following medications and treatments:
- Start carbidopa/levodopa 25/100 and titrate to 2 tablets three times daily. Written titration instructions were provided.
5. We would like to see the patient for follow-up in 4 months.

We discussed with the patient the indications and potential side effects of the prescribed treatment.

I personally interviewed and examined the patient, and agree with the above report. It has been our privilege to evaluate this patient.

This report was electronically signed by:
Joseph Jankovic, M.D./ Daniel Savitt, D.O.
Professor of Neurology/ Movement Disorders Fellow

**Joseph Jankovic, MD**
Professor of Neurology
Distinguished Chair in Movement Disorders
Director, Parkinson's Disease Center
and Movement Disorders Clinic
Baylor College of Medicine
Department of Neurology
Baylor St. Luke's Medical Center at the McNair Campus
7200 Cambridge, 9th Floor, Suite 9A
Houston, TX 77030-4202
Tel: 713-798-2273
www.jankovic.org

cc:
Dr. James Poole
6620 Main St.
Houston, TX 77030
713-798-0180

Dr. Stuart Yudofsky
1 Baylor Plz #115D
Houston, TX 77030
713-798-4945

Revision History

**Jankovic, Joseph, MD at 1/30/2019 11:16 AM**

Author Type: Physician Status: Signed
Editor: Jankovic, Joseph, MD (Physician)

I personally saw and evaluated the patient, and reviewed the Vitals, History, Allergies and Medications sections of the electronic medical record. I agree with the findings as written by the fellow, resident, nurse practitioner.

**JOSEPH JANKOVIC, M.D.**
Professor of Neurology
Distinguished Chair in Movement Disorders
Director, Parkinson's Disease Center
and Movement Disorders Clinic
Baylor College of Medicine
Department of Neurology
7200 Cambridge, Suite 9A, MS: BCM 609
Houston, TX 77030-4202
Tel: 713-798-2273 or -6556

Fax: 713-798-6808

Web: www.jankovic.org

No questionnaires available.

## Patient Instructions

1. We discussed the diagnosis of Parkinson's disease.

2. We ordered a DaTscan to evaluate for dopamine deficiency related to Parkinson's disease.

3. You have been prescribed Sinemet 25/100mg tablets.
- Please take this medication with food unless otherwise instructed.
- Common potential side effects may include nausea, sleepiness, dizziness, or hallucinations.
Please call 713-798-7438 if you experience these or other side effects.

| | BRKFST | LUNCH | DINNER |
|---|---|---|---|
| WEEK 1 | 1 | | 1 |
| WEEK 2 | 1 | 1 | 1 |
| WEEK 3 | 2 | 2 | 2 |

4. We will also send a referral for an independent driving evaluation.

## AVS Reports

| Date/Time | Report | Action | User |
|---|---|---|---|
| 1/30/2019 11:27 AM | After Visit Summary | Printed | Savitt, Daniel, DO |
| 1/30/2019 11:16 AM | After Visit Summary | Automatically Generated | Jankovic, Joseph, MD |

## Follow-up and Disposition

Return in about 3 months (around 4/30/2019).

## Orders Placed

NM DATSCAN BRAIN SPECT (Resulted 2/14/2019)

## Medication Changes

As of 1/30/2019 11:27 AM

| | Refills | Start Date | End Date |
|---|---|---|---|
| **Added: carbidopa-levodopa (SINEMET) 25-100 MG per tablet**<br>Take 2 Tabs by mouth 3 times daily. - ORAL | 1 | 1/30/2019 | |
| **Apixaban**<br>**Discontinued or Completed: Apixaban (ELIQUIS OR)** | | | |



| | Refills | Start Date | End Date |
|---|---|---|---|
| **Unchanged: ELIQUIS 2.5 MG TABS**<br>TAKE 1 TABLET TWICE DAILY | 2 | 8/4/2018 | |
| **Discontinued or Completed: diltiazem (CARDIZEM SR) 60 MG SR capsule** | | | |
| **Discontinued or Completed: doxycycline (VIBRAMYCIN) 100 MG capsule** | | | |
| **Discontinued or Completed: levofloxacin (LEVAQUIN) 750 MG tablet** | | | |
| **Discontinued or Completed: Metoprolol Succinate (TOPROL XL OR)** | | | |
| **Discontinued or Completed: nitrofurantoin (MACRODANTIN) 100 MG capsule** | | | |

## Visit Diagnoses

PD (Parkinson's disease) G20
Cognitive decline R41.89
RBD (REM behavioral disorder) G47.52

# EXHIBIT I

Baylor College of Medicine
GIVING LIFE TO POSSIBLE

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

# CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION

| | |
|---|---|
| Patient Name: | Robert Brockman |
| Date of Birth (Age): | [redacted] 77 yr.) |
| Date(s) of Evaluation: | 03/01/2019 |
| Evaluation Location: | BCM Medical Center, McNair Campus, 9th Floor |
| Referred by: | James Pool, MD |
| Referral Question: | Differential Diagnosis |
| CPT Code: | 96116 (60 mins) 96121 (120 mins) 96136 (30 mins) 96137 (180 mins) 96132 (60 mins) 96133 (180 mins) |

## BACKGROUND AND REFERRAL INFORMATION

Mr. Brockman is a 77 year-old, right-hand dominant, Caucasian male with a two to three year history of short-term memory loss. He was referred by his physician for neuropsychological evaluation of his current cognitive, behavioral, and emotional functioning with the aim of informing medical differential diagnosis and facilitating clinical decision making. The following information was obtained during a clinical interview with Mr. Brockman and from available medical records.

**Current Concerns and General Condition:** Mr. Brockman and his spouse participated in the clinical interview. He was able to act as a reliable informant. Mr. Brockman reported declines in his short-term memory over the past 2 to 3 years. He reported that he is repeating himself, losing possession, and losing his train of thought and is more tangential. He forgets names of new individual and of familiar locations. He also finds it more difficult to complete tasks. His wife noted that he is clumsy getting out of the car and has hit curbs while driving and parking. He has increased difficulties with following directions. His wife noted spelling changes and mild stuttering in his speech. His speech is slowed and he has slowed response latencies. His decision making is also slowed, and he has difficulties multi-tasking.

Mr. Brockman reproted that he began taking Wellbutrin which has improved his mood. He noted that "It is clear that he is working too much." He denied anhedonia, depressed mood, heightened general anxiety, personality or behavioral changes, suicidal ideation, and auditory hallucinations. Sleep was described as adequate but he is a night owl and dozes off during the day. His wife reported that he began to act out his dreams a couple of years ago. He has decreased appetite and has lost weight. His wife noted that he does not speak as much. He reported that he has floaters in his visual fields. He denied visual hallucinations, but it is noted that later he pointed out a bug on the testing room floor that was not present to either the examiner or his wife.

**Medical History:** Medical history is remarkable for hypothyroidism, atrial fibrillation, bladder cancer with recurrence, tremor, micrographia, and back problems. He currently has plantar fasciitis, so he is not walking for exercise. He reported that he was hospitalized for a prostate infection four years ago and pericarditis. He reported an episode of vision changes in which he saw a bar of color on a spectrum that was moving. He noted he had this visual illusion for 20 minutes and then it went away. He was told that he might have had a visual headache. He began taking levodopa one month ago. His wife noted an improvement when he first started on the medication, but since the medication was increased, she reported that he has increasing clumsiness. He is scheduled to be evaluated by Dr. Jankovic for his movement disorder. Surgical history is notable for tonsillectomy, cataract surgery, and excision of a melanoma. He reported that when he was in the sixth grade he was hit on the top of the head with a hammer and may have suffered a concussion. He did not lose consciousness Familial medical

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

history is unremarkable for movement disorders or dementia. Psychiatric history is notable for depression. He has been taking bupropion for two months, which has reportedly improved his mood significantly. He is taking trazodone to aid his sleep and reducing his REM Behavior Disorder. Mr. Brockman denied current use of tobacco or illicit drugs or a remote history of substance misuse/abuse. He quit drinking alcohol two to three years ago secondary to his atrial fibrillation. He denied a history of seizures, TIA/stroke, or migraines. Please refer to his chart for a listing of his current medications. He is on a large regimen of supplements and vitamins.

**Social History:** Mr. Brockman has been married for 50 years and they have one son. He currently lives with his spouse in their private residence. He earned a BA in Business and attended graduate school for one year in Marketing at The University of Florida. He reported that he was a good student. He is Chairman and CEO of Reynolds and Reynolds Company.

**Behavioral Observations:** Mr. Brockman was tested during a single session as an outpatient. He arrived on time and was accompanied by his spouse who participated in the clinical interview. General appearance was neat and clean. He exhibited shuffling and slow gait, slowed motor behavior, and a right hand tremor. His mood was neutral, and he had a flat affect. He had a masked face. Eye movements were normal. Vision (with corrective lenses) and hearing were adequate for the testing session. Conversational speech was coherent and goal-directed, but it was sparse with short phrases. There was no evidence of paraphasias. He evidence a slight stutter at times. He showed moderately decreased ability to follow directions, and he frequently needed repetition of directions and to be reoriented to task. He perseverated to previous tasks. The examiner needed to be concrete for him to understand the task instructions. His processing speed was exremely sloewd. He was cooperative but evidenced surrendering test-taking behavior. His attitude towards the examiner was appropriate and friendly. He lacked insight into his cognitive problems. During testing, the patient said he was not doing well, but he appeared very surprised. His handwriting was micrographic. He saw a bug on the floor of the testing room that was not present. The following results are thought to be an accurate estimation of his current cognitive abilities.

## MEASURES ADMINISTERED

Montréal Cognitive Assessment (MoCA); Caregiver Neuropsychiatric Inventory (NPI-Q); Clock Drawing Test; Controlled Oral Word Association Test (COWAT version: FAS); General Anxiety Disorder 7-item Scale; Geriatric Depression Scale; Hopkins Verbal Learning Test-Revised (HVLT-R); Neuropsychological Assessment Battery (NAB subtest: Naming); Praxis Examination; Rey Complex Figure Test-Meyers Version; Semantic Fluency Test; Stroop Color-Word Interference Test (Stroop subtests: Color, Color-Word, and Word); Test of Premorbid Functioning (TOPF); Trail Making Test (TMT subtest: Trails A); Verbal Series Attention Test (VSAT); Wechsler Adult Intelligence Scale-IV (WAIS-IV subtests: Coding, Digit Span, Information, Similarities, and Visual Puzzles); Wechsler Memory Scale-4th Edition (WMS-IV subtests: Logical Memory II-Older Adult, Logical Memory I-Older Adult, Logical Memory Recognition-Older Adult, Visual Reproduction I, Visual Reproduction II, and Visual Reproduction Recognition); Instrumental Activities of Daily Living Scale (IADLS); Lawton and Brody Physical Self-Maintenance Scale (PSMS). Clinical Interview with patient and his spouse.

Mr. Brockman did not complete the Trail Making Test (TMT subtest: Trails B) and Wisconsin Card Sorting Test (WCST) measures due to cognitive/behavioral problems.

Informant questionnaires were sent home and completed by the patient's spouse. They were not returned by the time of the evaluation.

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

## NEUROPSYCHOLOGICAL FINDINGS

*The following clinical descriptors identify performance with the range of Standard Scores (average=100, standard deviation=15) indicated in parentheses: Very Superior (>130), Superior (120-129), High Average (110-119), Average, (90-109), Low Average (80-89), Borderline (70-79), and Deficient (<69). For diagnostic purposes, a cognitive deficit is considered a performance score that is >1.5 standard deviations away from the mean in the direction of poor performance compared to the reference group for that measure (i.e., Z-score) based on peers of similar age, gender, and education background as appropriate. This criterion is equivalent to a Standard Score <78, T-score <35, or a Scaled Score of <5).*

**Mental Status:** Evaluation of Mr. Brockman's general mental status on the MoCA revealed a score of 19/30, which is below expectation. He was oriented (6/6) and short-term recall was 2/5. He was aided by category cueing for one word. He demonstrated difficulties with set shifting, drawing a cube, drawing a clock face with numbers and hands placed accurately, repeating one sentence, and with serial 7's and verbal fluency.

**Intellectual:** Premorbid level of intellectual functioning was estimated to be in the high average range (TOPF SS=114), based on single, atypical word reading skills. Mr. Brockman noted that the first word presented for him to read outloud was not a word ("two"). He was able to state the letters, but noted that he did not think that was a word and then stated he guessed it was two. Mr. Brockman was administered subtests from a measure of general intellectual functioning (WAIS-IV) and obtained scores ranging from borderline to high average yielding a pro-rated Full Scale IQ estimate of 87, which is in the low average range.

**Attention/Concentration:** Attention and mental tracking for overlearned verbal sequences was deficient for speed and for accuracy. Immediate auditory attention span for digits was low average with 7 digits forward, 3 digits backward, and 2 digits when re-ordering them in ascending sequence. Speed of single word reading and speed of color naming were deficient. Mental processing speed for manual code transcription was borderline impaired. Performance on a simple visual-motor sequencing task requiring scanning and mental tracking was borderline impaired with 0 errors.

**Executive:** Mr. Brockman's ability to inhibit a dominant verbal response in the face of incongruent visual stimuli was deficient. His abstract verbal reasoning was high average. Performance on a complex visual-motor sequencing task requiring scanning, tracking, and set-shifting was impaired and the task was discontinued.

**Memory:** Recall of culturally-based general knowledge was average. Immediate recall of verbally presented contextual material was deficient (SS=3). Delayed recall of the stories was deficient (SS=3). Retention of initially learned material was 11.1%. Recognition memory was average (16/23). Mr. Brockman began describing the WMS VR figures during LM immediate recall. Incremental learning for a semantically-categorized word list across 3 trials was borderline impaired (2, 5, and 6 words per trial), and delayed recall was in the deficient range with 0.0% retention which falls within the deficient range. On recognition memory assessment, 9/12 target words were correctly identified, 5 false positive errors were committed, with discrimination accuracy in the deficient range.

Immediate recall of basic geometric figures was deficient (SS=1). Delayed recall of the designs was deficient (SS=2). Retention of the initially learned material was 0.0%. Recognition memory was borderline impaired (1/7).

**Language:** Lexical fluency was low average with between 9 and 13 words per trial. Semantic fluency was deficient with 8 exemplars generated. Confrontation naming of pictured objects was average (29/31).

**Visual-Perceptual:** His drawing of a complex geometric design scored in the deficient range. His spatial reasoning ability to mentally arrange puzzle pieces was low average. Visuoconceptual ability to draw a clock was impaired

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

to command (CDT=3/10). He drew a micrographic clock face. The examiner produced a clock face for him, but he was unable to place the numbers accurately and drew a hand to the 10 and the 6 for 10 after 11. His copy of a clock was also impaired (CDT=6/10). He drew the clock face but the numbers were drawn in only the right side of the face and the hand size differentiation was not maintained.

**Mood / Personality:** On a self-report measure of anxiety, his responses fell in the mild range (GAD-7=7/21). On a face valid measure used to assess cognitive, emotional and physical symptoms of depression, Mr. Brockman endorsed the following, suggestive of within normal limits (GDS=8): boredom, feeling as though something negative is going to occur, preferring to stay home, worry about the future, declines in memory, poor energy, difficulties with concentration, and preferring to avoid social gatherings.

**Activities of Daily Living:** His spouse served as the informant completing a questionnaire regarding the patient's ability to complete basic and instrumental activities of daily living. Mr. Brockman reportedly has difficulties with self-care ADLs (PSMS=7/30) including ambulation. He requires mild assistance with instrumental activities of daily living (IADLs=9/31), most notably housekeeping. Although his wife did not report many functional declines, Mr. Brockman requires mild aid with his more complex ADLs.

**Neurobehavioral:** The patient's spouse completed an inventory assessing for the presence of neurobehavioral symptoms commonly associated with dementia, reportedly observing mild problems with agitation, anxiety, apathy, irritability, nighttime behaviors, and changes in appetite with moderate depression (NPI-Q severity=8; distress=11) which produce an overall minimal level of familial distress, with the exception of his depression and agitation which produces moderate distress.

## SUMMARY AND IMPRESSION

Mr. Brockman is a 77 year-old, right-hand dominant, Caucasian male who was referred by his physician for evaluation of his current neuropsychological, behavioral, and emotional status. He currently operates in the low average range of general intellectual functioning (WAIS-IV FSIQ=87), which is a decline from his estimated premorbid intellectual functioning in the above average range. His MoCA was 19/30 (total), 6/6 (orientation), and 2/5 (short-term recall), which was significantly below expectation. Self-report of depression was within normal limits (GDS=8). Self-care ADLs (PSMS) were 7/30 and instrumental ADLs were 9/31. The NPI-Q (severity=8; distress=11) indicated problems with agitation, anxiety, apathy, irritability, nighttime behaviors, and changes in appetite, and depression for an overall minimal level of familial distress, with the exception of his depression and agitation which produces moderate distress.

Mr. Brockman demonstrated borderline impaired to deficient performances on measures of sustained attention/concentration, learning and recall of prose material and a word list, learning and recall of visual material, semantic fluency, executive functions (set shifting, inhibition, working memory, and problem solving), and visuoconstruction. Praxis was impaired for intransitive praxis tasks. These impaired performances were found within the low average to average ranges on measures of basic attention, fund of information, verbal and visual abstract reasoning, verbal fluency and naming,

This pattern of neuropsychological performance indicates a dementia of mild to moderate severity characterized by deficits in the areas of visuospatial functioning, verbal and nonverbal episodic memory, and executive functioning, with mild functional declines. To my knowledge, Mr. Brockman has not been diagnosed with a movement disorder. However, he demonstrates movements that may be consistent with a Parkinsonism. These

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

abnormal movements taken together with his current diagnosis of dementia, new onset visual hallucinations and potential visual illusions, and REM Behavior Disorder, his pattern of cognitive impairments is consistent with Dementia with Lewy Bodies.

## RECOMMENDATIONS

**General:**

- Mr. Brockman and his family should receive feedback regarding his current level of cognitive functioning.
- Continued pharmacologic treatment of his depression appears warranted.
- Mr. Brockman should be monitored for episodes of visual hallucinations. Although he did not report hallucinations on interview, he saw a bug on the floor in the testing room which was not present.
- You may wish to consider referring the patient and his family to psychoeducational counseling with the goal of developing appropriate coping strategies, maximization of current strengths to mitigate identified weaknesses, and assist in future life planning.
- Mr. Brockman does not pose a significant safety risk and as such, he should receive occasional supervision for self-care ADLs for safety and to monitor for future changes in his ability status. He should also receive occasional review of instrumental activities of daily living to monitor for future changes in his ability status, particularly for medication and personal financial management.

**Memory Compensatory Strategies:**

- Mr. Brockman should exercise caution when operating potentially dangerous household appliances (e.g., stove/range, irons, food processors, etc.). Using models with automatic shut-off features would be ideal.
- Mr. Brockman should refrain from cooking activities involving potentially dangerous appliances (e.g., stove, food processor, etc.).
- The use of a smartphone is recommended for recording important information, setting reminders, and is maintaining and organized schedule. Applications such as Google calendar, Remember the Milk, and the Reminders application for the iPhone or similar techniques may be helpful.
- It may be helpful to have a mobile phone or smartphone with him to allow easy access to telephone number he could contact in an emergency or when he cannot recall this information.
- Placing a large-type calendar or clock that includes the date in a highly visible location may assist him in maintaining better temporal orientation.
- The patient may benefit from the placement of a large dry-erase board in a prominent spot in the home where important information can be posted such as the date, the day's or week's schedule, the whereabouts of his spouse/family members, their time to return, or important telephone numbers.
- The patient's family may wish to consider presenting important information that Mr. Brockman needs to recall in a written format when possible to allow him to refer to and review the information as necessary.
- Mr. Brockman and his family should consider establishing a 'memory station' where he would consistently place personal items such as his keys, checkbook/wallet, glasses, etc. to help prevent future memory failures regarding lost objects and to reduce anxiety and misattributions regarding the occurrence of these events. He is also encouraged to use external memory aids such as shopping lists, calendars, timers, a pill minder, and "to do" lists whenever possible to mitigate common, everyday memory failures.
- To the extent possible, he should try to avoid distracting environments when performing detailed tasks such as financial management. Breaking tasks down into more manageable units to prevent overtaxing attentional resources is another possibility. In this way, a large task can be achieved a little at a time over a week instead of an overwhelming task all in one evening, for instance.

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

**Social Activities and Other Intellectual Stimulation:**

- The patient is encouraged to maintain or increase (to the extent safely possible) his current level of intellectual and physical stimulation to help improve stamina, buoy his mood, and maintain his current level of quality of life.
- Mr. Brockman may benefit from engaging in intellectual stimulation such as reading, assembling jigsaw puzzles, and other activities such as word search puzzles, crosswords, or Sudoku. Computer-based activities such as www.Lumosity.com or www.happyneuron-corp.com are options as well. Board games and familiar card or other games (e.g., dominoes, bridge, solitaire, etc.) may also be enjoyable.
- Regular physical exercise is recommended for its beneficial effects on brain health and cognitive maintenance.

**Driving:**

- Neuropsychological tests are an imperfect predictor of real-world driving abilities; however, given his deficits in memory, attention/concentration, executive functions, visuospatial abilities, and his recent diagnosis of DLB, he should be encouraged to discontinue driving given concerns over his safety, that of others on the roadways, and legal liability issues that could arise for the patient should he become involved in a motor vehicle crash.

**Legal:**

- If not already in place, a family member should obtain Durable Power of Attorney for healthcare and financial matters.

**Patient and Caregiver Resources:**

- The Alzheimer's Association (www.alz.org/texas; 713-314-1314) provides useful information and resources for family members of patients with Alzheimer's and other types of dementia.
- Mr. Brockman and his family may benefit from community resources for seniors in the Houston area at www.HoustonTx.gov/Health/Aging and through the Houston Area Parkinson's Society (hapsonline.org).

The current results will be useful as a baseline to which findings from subsequent evaluations may be compared. Neuropsychological re-evaluation is recommended in one year (or sooner if his condition appears to change rapidly or if he and/or his family have additional concerns) to monitor neuropsychological, mood, and personality changes and to update recommendations.

Thank you for allowing me to participate in the care of Mr. Brockman. Please do not hesitate to contact me if you have any further questions.

Michele K York, PhD

Michele K. York, PhD, ABPP-CN
Board Certified Clinical Neuropsychologist

**N.B.** This assessment was conducted as a clinical evaluation and not as a forensic assessment. This fact was verbally confirmed with the patient at the outset of testing.

# EXHIBIT J

# Brockman, Robert Theron

MRN: 0300937767

**Office Visit** 3/20/2019
Baylor College of Medicine
Neurology

Provider: Yu, Melissa, MD (Neurology)
Primary diagnosis: Dementia with Parkinsonism
Reason for Visit: Memory Loss; Referred by Pool, James L, MD

## Additional Documentation

Vitals: BP 135/70 (BP Location: left arm, Patient Position: Standing) Pulse 58
Ht 5' 11.75" (1.822 m) Wt 189 lb (85.7 kg) BMI 25.81 kg/m² BSA 2.08 m² More Vitals

Flowsheets: Mini-Mental State

Encounter Info: Billing Info, History, Allergies, Detailed Report

## Communications

Chart Routed to Pool, James L, MD

## Media

Scan on 3/19/2019 9:30 AM by Hudson, Kendra: ADMDC Packet
Scan on 3/20/2019 2:35 PM by Seedanee, Demonica: Clocks

## Progress notes

### Yu, Melissa, MD at 3/20/2019 4:58 PM

Author Type: Physician Status: Signed
Editor: Yu, Melissa, MD (Physician)

**Consult requested by: James L Pool, MD**
**1977 Butler Blvd**
**Suite E6.150**
**Houston, TX 77030**

**Chief Concern:**

**Chief Complaint**
Patient presents with
- Memory Loss

**HPI:**
Robert Theron Brockman is a 77 y.o. male who presents for evaluation of memory loss with his husband and his son.

Memory loss is reported beginning at least back to November 2017 in a Fondren Orthopedics progress note scanned into the chart.

He was recently seen in the PDMDC by Dr. Jankovic at which time he reported a 1.5 year history of cognitive difficulty along with balance difficulty. Anosmia was noted dating back about 10 years, and dream enactment behavior for the past 3 years. Increased tone and tremor was noted as well as reduced arm swing and stride length. Parkinson's disease was

suspected and DATSCAN was performed showing significant loss of dopaminergic signal. He was started on sinemet with motor improvement and started on Exelon patch on 3/13.

He now presents for memory disorders evaluation. He reports always having "superior memory." He reports onset of symptoms about 2 years ago. His wife reports some symptoms about 3 years ago with "slowing down" and then symptoms became much more obvious about 9 months ago associated with a stressful life event. His son notes that he repeats himself at times. He reports mild progression since that time.

He reports always misplacing objects. He reports minimal word finding issues but difficulty with spelling. He reports minimal difficulty with names. He reports some difficulty remembering to take his medications. He has stopped driving at his physician's request. No driving incidents were reported but his wife notes that he drives slower. He reports no trouble managing finances. He never cooks. He notes some difficulty with planning out tasks at work, family notes that he doesn't initiate activity like he used to.

He lost his sense of smell about 10 years ago. He describes his mood as "pretty good" but notes feeling shaken about his neuropsychological test results. His son reports that his ability fluctuates (he's had him draw clocks at various times). He reports episodes of "blankness" associated with less interaction alternating with improved cognition. His son notes significant fluctuations in terms of his decision making abilities, with good days and bad days. His son reports he's not as angry as he used to be.

The patient reports good sleep. At least four episodes of dream enactment behavior is reported and snoring - both have improved with trazodone. He reports awakening feeling refreshed. He does not nap. His family notes he has been more fatigued since being on diltiazem. He sleeps 7-8 hours/night.

He reports one episode of visual disturbance - saw a rainbow/possible visual aura about 8 years ago. No other visual phenomena are reported with the exception of a possible hallucination during neuropsychological testing - wife notes it was a "bad day". No auditory hallucinations are reported.

Motor symptoms began a few years ago with a stooped posture noted by his son. His son also noted increased tone in his back. His gait began to deteriorate in July 2018. He reports no falls. He reports urgency and frequency of urine but no incontinence. He reports some decline in his handwriting and family notes micrographia and decreased facial expression. He reports no sensory changes with the exception of mild tingling in two toes. No visual agnosia is reported.

Gait symptoms improved some with levodopa, particularly on one tab TID. Increase in dose to two tabs TID led to more cognitive decline but family reports he seems to have stabilized in this regard. Cognitively he has improved some with the Exelon patch as well. He reports minimal side effects except feeling spacy at times.

**Past Neurological History:**
**History of Learning Disability**: absent. BS Business. CEO and owner of large automotive dealership software company.
**Previous diagnosis of neurological disease: None**
**Illness which could affect mentation: None**
**History of head injury: None**
**History of visual symptoms: as above**
**History of hearing symptoms: Decreased Acuity Both. Date of onset: uncertain**
**History of abnormal movements: None**

**Previous stroke or TIA: None**
**Previous seizure: None**

**Past Medical History:**

**Past Medical History:**

| Diagnosis | Date |
|---|---|
| • Atrial fibrillation | 2016 |
| • Basal cell carcinoma | |
| • Bladder cancer | |
| • Depression | |
| • Hypercholesteremia | |
| • Melanoma | |
| • Ocular migraine<br>*lasted ~30 minutes* | 1/2012 |
| • Prostatitis | 1980 |
| • Prostatitis | |
| • Pseudoexfoliation glaucoma(365.52) | |
| • Thyroid disease | |
| • UTI (lower urinary tract infection) | |

**Past Surgical History:**

**Past Surgical History:**

| Procedure | Laterality | Date |
|---|---|---|
| • HX BLADDER TUMOR EXCISION | | 2006 |
| • HX CATARACT REMOVAL | | |
| • HX DENTAL SURGERY<br>*infected tooth* | | |
| • HX TONSILLECTOMY | | 1945 |

**Allergies:**
No Known Allergies

**Medications:**

| | |
|---|---|
| • buPROPion (WELLBUTRIN SR) 100 MG SR tablet | Take 100 mg by mouth two times daily. 200mg each morning and 100mg each evening |
| • carbidopa-levodopa (SINEMET) 25-100 MG per tablet | Take 2 Tabs by mouth 3 times daily. |
| • diltiazem (DILTIAZEM CD) 120 MG ER capsule | Take 120 mg by mouth daily. |
| • ELIQUIS 2.5 MG TABS | TAKE 1 TABLET TWICE DAILY |
| • ezetimibe-simvastatin (VYTORIN) 10-40 MG per tablet | Take 1 Tab by mouth every evening. |
| • levothyroxine (SYNTHROID) 75 MCG tablet | Take 75 mcg by mouth daily. |
| • rivastigmine (EXELON) 4.6 MG/24HR PT24 | Apply 1 patch to skin every 24 hrs x 1 month then increase to 2 patches thereafter |

- Testosterone (ANDROGEL) 50 MG/5GM GEL — Place onto the skin.
- trazodone (DESYREL) 50 MG tablet — Take 1 Tab by mouth at bedtime.

**Social History:**
**Social History**

Tobacco Use
- Smoking status: Never Smoker
- Smokeless tobacco: Never Used

Substance Use Topics
- Alcohol use: No
  - Frequency: Never
  - *Comment: none for 3 years, previous occasional heavy drinking (not regularly)*
- Drug use: No

Occupation: As above
Marital Status: Married, one son who is Neuroscience graduate student

**Family History:**

**Family History**

| Problem | Relation | Name | Age of Onset |
|---|---|---|---|
| • Lymphoma | Mother | | |
| • COPD | Father | | |
| • Other (aspergers) | Brother | | |

Neurological disorders: as above

**Review of Systems: see health assessment - reviewed with patient**

**Constitutional**: No weight change, fever, chills, fatigue
**Eyes**: No diplopia, blurry vision, dry eyes, cataracts, macular degeneration except history of cataract removal
**ENT**: No headache, sinus issues, hearing loss, tinnitus, dry mouth, vertigo except hearing loss reported
**Cardiovascular**: No chest pain, tachycardia, bradycardia. Reports history of angina.
**Respiratory**: No difficulty breathing
**GI**: No abdominal pain, constipation/diarrhea, nausea, incontinence
**GU**: No pain on urination, incontinence, kidney stones. Reports history of bladder cancer, occasional incontinence
**Skin/Teg**: No rash, lacerations, easy bruising. Reports history of basal cell CA and melanoma.
**Musculoskeletal:** No significant neck or back pain, history of arthritis, broken bones except history of osteopenia and arthritis.
**Psychiatric**: No anxiety, reports history of depression
**Endocrine**: No thyroid abnormalities, DM except reports hypothyroidism on synthroid.
**Hematologic**: No anemia, transfusions
**Immunologic**: No recent infections
**Neurologic**: See above

**Vital Signs:**

**Vitals:**

| | 03/20/19 1304 | 03/20/19 1307 |
|---|---|---|
| BP: | 140/73 | 135/70 |
| BP Location: | left arm | left arm |
| Patient Position: | Sitting | Standing |
| Pulse: | 53 | 58 |
| Weight: | 189 lb (85.7 kg) | |
| Height: | 5' 11.75" (1.822 m) | |

**General Physical Examination:**

Gen: Well developed, well nourished in no apparent distress. Awake and alert.

Neck: supple, full range of motion. No carotid bruits

Cardiac: Rate and rhythm regular without any murmurs and with normal S1 and S2 sounds.

Chest: clear to auscultation, no wheezes, rales or rhonchi, symmetric air entry

Abdomen: soft, nontender, nondistended, no masses or organomegaly

Extremities: no pedal edema

Skin: Intact

**NEUROLOGICAL EXAMINATION:**
**(120 mins post levodopa)**
MMSE 26/30 (7s), 25/30 (spelling) Definite visual issues noted with significant issues noted drawing clock and intersecting pentagons.
Clock drawing 2/4 (circle, numbers, unable to indicate correct time. Numbers on outside of clock)
General behavior: cooperative. Repetitive.
Deficit Anosognosia: Minimizes
Judgement: fair , estimated from: history and observation
Apraxia: absent

**Speech:**
Spontaneous speech: normal
Comprehension: normal
Repetition: normal
Word finding difficulty: present
Dysarthria: absent

**Cranial Nerves**
II: Acuity deferred. VFF. Fundus: No papilledema
III, IV, VI: PERRL, EOMI, no nystagmus
V1-V3: intact to light touch bilaterally
VII: face symmetric
VIII: diminished to finger rub bilaterally
IX, X: palate elevates equally and symmetrically
XI: SCM 5/5

XII: tongue movements symmetric and midline. No fibrillations or atrophy.

**General Motor Survey**

Posture: stooped
Tone: increased in BUE with distraction
Atrophy: absent

**Motor Examination**

Power 5/5 throughout.

**Deep Tendon Reflexes**

| DTRs | Bic | Tric | BR | Pat | Ankle | Babinski |
|---|---|---|---|---|---|---|
| Right | 2+ | 2+ | 2+ | 1+ | 1+ | flexor |
| Left | 2+ | 2+ | 2+ | 1+ | 1+ | flexor |

Abnormal reflexes: glabellar and snout and jaw jerk

**Sensory Examination**

Vibration: Normal in both legs except decreased in the toes bilaterally
Joint Position: Normal in both legs except in the toes bilaterally
Light Touch: Normal in all 4 extremities
Pinprick: Normal in all 4 extremities

**Coordination**

Finger to nose: mild action tremor noted bilaterally
Heel to shin: Normal bilaterally

**Movement:**

Bradykinesia: slow rapid alternating movements noted bilaterally, more pronounced on left. Hypomimia and mild bradyphrenia noted.

Tremor: no rest tremor noted. Mild postural tremor noted in left more than right hand.

Other abnormal movements: Single myoclonic jerk (trunk) noted during examination

**Gait and Station**

Gait and posture: stooped posture with minimal arm swing, short steps with en bloc turning noted

Romberg testing: Normal

Posture: significant postural instability noted with minimal stimulus

Able to rise from chair without use of arms

**Review of Medical Records:**

Neuropsychological testing (3/1/19, York):

***IMPRESSION***: Pattern indicates a dementia of mild to moderate severity with deficits in areas of visuospatial functioning, verbal and nonverbal episodic memory and executive functioning, with mild functional declines. Parkinsonism combined with dementia, new onset visual hallucinations, potential visual illusions and REM Behavior disorder are consistent with dementia with Lewy Bodies. Driving cessation recommended.

Prior labs:
Normal: RPR, HIV, homocysteine, CMP, folate, B12, lipid panel, MMA, D, SPEP, A1C, TFTs, CBC, ESR

MRI of the brain 11/2018:

No intracranial abnormalities, particularly no disproportionate lobar atrophy
Reviewed by me: Mild generalized atrophy, two microhemorrhages in left frontal lobe.

DATSCAN 1/2019:
Severe loss of dopaminergic neuronal function in the bilateral dorsal striata with loss greater on the right compared to the left.
Reviewed by me: Agree

**Physician Estimate of symptom duration (derived using ADMDC methods):**
At least 3 years

**Impression:**
Robert Theron Brockman is a 77 y.o. male with history of atrial fibrillation and bladder cancer who presents for evaluation today with a 3 year history of cognitive dysfunction along with changes in gait, worse over the past 9 months associated with a significant life stressor. Examination is significant for deficits noted on MMSE, visual spatial dysfunction and parkinsonism. Imaging demonstrates loss of dopaminergic function without significant vascular burden. Differential includes Dementia with Lewy Bodies or Parkinson's Disease with dementia. Time course and fluctuations in cognition are more suggestive of DLB.

**Plan:**
I recommended the patient continue the sinemet at the current dose and increase Exelon patch to 9.5mg after one month on the lower dose. I recommended a course of PT for balance and gait. Imaging and laboratory data discussed with patient and family at length. Will get ApoE testing for completeness. Discussed lifestyle changes and maintenance of physical and social activity. Advised patient on diagnosis of a neurodegenerative disorder with cognitive impairment and possible implications on his work and advised he discuss further with his family. Patient and family will return for a counseling session with Dr. Kenan in the future. Patient will return for follow up in 3 months to review effects of Exelon patch.

90 minutes were spent with patient, >50% spent in counseling and coordination of care including education regarding appropriate evaluation and workup for cognitive disorders.

**Thank you for the opportunity to participate in the care of your patient.**

**CC:James L Pool, MD**
**1977 Butler Blvd**
**Suite E6.150**
**Houston, TX 77030**

---

**Melissa Yu, M.D.**
**Associate Professor**
**Department of Neurology**
**Baylor College of Medicine**
**Houston, TX 77030**

No questionnaires available.

## Patient Instructions

1. After one month, increase the patch to 9.5mg daily (new prescription)
2. Go to physical therapy
3. Kendra will call you to set up an appointment with Dr. Kenan

Follow up with me is recommended in 3 months to see how you're doing.

## AVS Reports

| Date/Time | Report | Action | User |
|---|---|---|---|
| 3/20/2019 2:33 PM | After Visit Summary | Printed | Yu, Melissa, MD |

## Follow-up and Dispositions

- Return in about 3 months (around 6/20/2019).

## Orders Placed

APOLIPOPROTEIN E MUTATION - CARDIAC (Resulted 3/20/2019)
AMB REF TO PT EXTERNAL Closed

## Medication Changes

As of 3/20/2019 2:24 PM

| | Refills | Start Date | End Date |
|---|---|---|---|
| **Added: rivastigmine 9.5 MG/24HR PT24**<br>Place 9.5 mg onto the skin daily. - Transdermal | 5 | 3/20/2019 | |
| **traZODone HCl** | | | |
| **Discontinued or Completed: TRAZODONE HCL OR** | | | |
| **Unchanged: trazodone (DESYREL) 50 MG tablet**<br>Take 1 Tab by mouth at bedtime. - ORAL | 3 | 3/13/2019 | |

## Visit Diagnoses

Dementia with Parkinsonism G31.83, F02.80

# EXHIBIT K

BROCKMAN, ROBERT

Patient ID: 0300937767 DOB: [redacted] Age: 78 Gender: M Date: October 01, 2019

| SCORE | TODAY |
|---|---|
| 3-WORD MEMORY | 0 |
| ORIENTATION | 6 |
| SEQUENCE MEMORY | 4 |
| TIME | 2 |
| TOTAL SCORE | 12 |

CLOCK DRAWING: TODAY

## Background

This patient is a 78 year-old man who lives independently in the community. The patient's cognitive functioning is being evaluated due to cognitive complaints by the patient, a family member, or a community observer.

## Test Results

This patient has received a score of 12 of 29 points. This score falls below the cutoff for dementia in patients of this age and educational level and is typically associated with Major Neurocognitive Disorder, moderate (formerly Moderate Dementia). In our research database of 3500 patients, no patients in this score range had normal cognition, 2% had Mild Cognitive Impairment (MCI), and 98% had dementia.

The test administrator agrees with the results of this test.

## Results Over Time

12
October 2019

## Plan

No plan.

**BROCKMAN, ROBERT**

Patient ID: 0300937767 DOB: [redacted] Age: 78 Gender: M

Donna Ansualda

Disclaimer: This test has high levels of sensitivity, specificity and reliability, but does not replace comprehensive neuropsychological and medical evaluation. Our recommendations are based on current research and extensive clinical experience with this population. The CogniSense™ tool has been validated in English speaking adults ages 60 to 92 in a community-based primary care setting.

References:

Clionsky, M and Clionsky E, "Development and Validation of the Memory Orientation Screening Test," American Journal of Alzheimer's Disease & Other Dementias, 2010, 25 (8), 650-656

Clionsky, M and Clionsky E, "Identifying Cognitive Impairment in the Annual Wellness Visit: Who Can You Trust?,"The Journal of Family Practice, 2011, 60: 653-659

Clionsky, M and Clionsky E, "The Memory Orientation Screening Test (MOST®) accurately separates normal from MCI and demented elders in a prevalence-stratified sample,"Alzheimer's Disease & Parkinsonism, 2013, 3:1

# EXHIBIT L

James L. Pool, M.D.
Professor, Departments of Medicine and Pharmacology
Baylor Comprehensive Healthcare Clinic
Jamail Specialty Care Center
1977 Butler Blvd - 6th Floor, Suite E6.150
Houston, TX 77030-4101
Tel 713-798-0180 • Fax 713-798-0174
E-mail address: jpool@bcm.edu

January 14, 2020

Kathryn Keneally
Jones Day
250 Vesey Street
New York, NY 10281

Re: Robert Theron Brockman

Dear Ms. Keneally:

I have been asked to provide this letter by counsel for Robert T. Brockman. I understand that this letter will be included by counsel as part of a submission to the U.S. Department of Justice on the issue of Mr. Brockman's cognitive impairment.

I am a Professor in the Departments of Medicine and Pharmacology and a treating internal medicine physician at the Baylor College of Medicine (BCM), where I hold the James L. Pool Presidential Endowed Chair in Clinical Pharmacology.

I conducted a complete physical examination of Mr. Brockman on December 11, 2018. Mr. Brockman was referred to me by Dr. Seth P. Lerner (BCM Department of Urology) who has been treating Mr. Brockman in connection with an incidence of urinary bladder cancer several years earlier.

As part of my examination of Mr. Brockman, I also met with his wife, Dorothy Brockman, and their adult son, Robert Brockman. It became evident from my examination and from our discussions that Mr. Brockman has experiencing cognitive problems that have been noticeable for approximately three years. For this reason, Mr. Brockman was referred to Joseph Jankovic, M.D., a BCM neurologist and specialist in Parkinson's Disease and other movement disorders, Melissa Yu, M.D., a BCM neurologist and specialist in Alzheimer's Disease and other memory disorders, and Michele K. York, Ph.D., a BCM neuropsychologist and specialist is memory disorders, all with Baylor Medical College.

Each of these doctors provided me with reports following their examinations. Dr. Jankovic examined Mr. Brockman in January 2019. He conducted a physical examination, and concluded that Mr. Brockman presents symptoms that are consistent with Parkinson's Disease (or Vascular Parkinsonism). Dr. York conducted a neuropsychological evaluation of Mr. Brockman on March 1, 2019, which Dr. Yu relied on during her examination of Mr. Brockman on March 20, 2019, and in her subsequent



diagnosis. Dr. York and Dr. Yu concluded that Mr. Brockman's movements are consistent with Parkinson's Disease (or Vascular Parkinsonism). They also concluded his ongoing cognitive impairment is consistent with Lewy Body Dementia. These diagnoses cannot be totally confirmed except at autopsy of the brain after the death of the patient.

Parkinson's Disease (or Vascular Parkinsonism) and Lewy Body Dementia may each cause cognitive impairment and dementia. In Mr. Brockman's case, his recent neurological tests show mild to moderate dementia. In contrast to severe dementia, which will manifest as an inability of an individual to know where he is, what he is doing, or with whom he may be speaking, a person with mild to moderate dementia has some recognition of what is going on around him, and may function at a level at which he can cover-up his limitations. In a case such as Mr. Brockman, where an individual had superior, pre-morbid intelligence and functioned at a high level prior to the onset of dementia, he may be able to cover-up his limitations in social and business settings. In Mr. Brockman's case in particular, it became clear from my discussions with his wife and son that he has had a long-standing, excellent support network that enables him to appear to be continuing in his routine activities.

At this stage, Mr. Brockman has undeniable short-term memory limitations. Quite simply, if information is presented to him, he will be unable to comprehend what is being asked of him and to respond appropriately. In addition, his ability to report on past events may be distorted by the high risk of confabulation. When a person has dementia, his memory function will attempt to fill in gaps to enable him to respond to questions or to report on past events. While the story may sound logical, it will not be based on fact or accurate memory. The speaker will believe the story to be true, but is not. In essence, for a person such as Mr. Brockman, dementia will render long-term memory inaccessible and defective. Even if he can remember past events, he cannot accurately relate them to the question that he is being asked in the present or assimilate the information to report it accurately. If he can compose a response at all, it will likely be the product of such confabulation, rather than genuine memory.

For these reasons, I concur with the medical position that Mr. Brockman cannot assist his attorneys in his defense, if criminal charges were to be brought against him.

Sincerely,

James L. Pool, M.D.
Professor of Medicine and Pharmacology
Baylor College of Medicine, Houston, TX

# EXHIBIT M

Baylor College of Medicine
DEPARTMENT OF NEUROLOGY

**Joseph Jankovic, MD**
Professor of Neurology, Distinguished Chair in Movement Disorders
Director, Parkinson's Disease Center and Movement Disorders Clinic
Director, Center of Excellence for Parkinson's Foundation
and Tourette Association of America
**Parkinson's Disease Center and Movement Disorders Clinic**
7200 Cambridge Street, 9th Floor, Suite 9A ▪ Houston, Texas 77030
713-798-2273 phone ▪ 713-798-6808 fax ▪ www.jankovic.org

January 14, 2020

Kathryn Keneally
Jones Day
250 Vesey Street
New York, NY 10281

Re: Robert Theron Brockman

Dear Ms. Keneally:

You have asked me to provide this letter for inclusion in a presentation that you plan to make to the U.S. Department of Justice on the issue of Robert Theron Brockman's cognitive impairment. You have let me know that you have reviewed the report that I prepared with regard to my examination of Mr. Brockman dated January 30, 2019, and that you will also be providing that report to the Department of Justice.

Specifically, I understand that you are asking whether Mr. Brockman can assist you in preparing a legal defense. It is my view that his cognitive impairment will prevent him from doing so.

My report discusses my diagnosis of Parkinson's disease or vascular parkinsonism. Based on my examination, and my understanding of subsequent examinations conducted by Dr. Melissa Yu and Dr. Michele York, I concur that Mr. Brockman has dementia.

Dr. Yu and Dr. York report that Mr. Brockman's symptoms support a diagnosis of Lewy body dementia. While I understand their reasoning, during my examination Mr. Brockman denied experiencing hallucinations, which are a hallmark indicator of Lewy body dementia. Notably there is no test that can be administered prior to autopsy that can confirm a diagnosis of either Parkinson's disease or Lewy body dementia.

It is characteristic that a person with dementia, such as Mr. Brockman, will be unable to recall information that is needed to respond accurately when asked questions. As a result of Mr. Brockman's cognitive impairment, he has trouble accessing information and making connections between questions that he is being asked and his recollection of events. It is a characteristic of this dementia that Mr. Brockman may engage in confabulation, in which the brain will attempt to fill in missing information, causing him to sometimes make up stories or provide information about something that has not occurred. Confabulation differs from prevarication or lying. Confabulation is a symptom of cognitive impairment, and is not voluntary. A cognitively impaired person who



engages in confabulation will believe that he is reporting truthfully. A person with Mr. Brockman's cognitive impairment may appear to be engaged in a normal discussion, but any information that he may provide may be partial and not complete or accurate.

In summary, Mr. Brockman's dementia leaves him unable to provide accurate information about past events.

Sincerely,

Joseph Jankovic, MD

# EXHIBIT N



**Melissa Yu M.D.,FAAN**

**Alzheimer's Disease & Memory Disorders Center**
**7200 Cambridge St, 9th Floor, Ste 9B**
**Houston, TX 77030**
**Phone: (713) 798-2273**
**Fax: (713) 798-7434**
www.bcm.edu

January 21, 2020

Kathryn Keneally
Jones Day
250 Vesey Street
New York, NY 10281

Re: Robert T. Brockman

Dear Ms. Keneally:

At your request, I am providing this letter to respond to questions that you raised concerning my examination of Robert Brockman. I understand that you will provide a copy of my report dated February 20, 2019, and this letter to the U.S. Department of Justice.

You asked specifically about the comments made by Mr. Brockman's son that Mr. Brockman experiences fluctuations in decision-making ability. Patients with most forms of dementia experience anosognosia, which means that they lose insight into the cognitive limitations of their disease. Individuals with dementia may perceive themselves as functioning normally, even well. Individuals with dementia, who have good social instincts and expansive vocabulary may appear to function well on a surface level, and will retain "social niceties" despite sometimes-significant levels of cognitive impairment. Similarly, individuals who have been in business or professionally active for a long time may be able to speak on business issues in a way that appears functional, but will face difficulties when pressed for decisions or specifics. Patients with Lewy body dementia will often experience day-to-day and even hour-to-hour fluctuations in their ability to function.

Dementia of any kind is more than simple memory loss. The impact of dementia includes visual spatial function, language, memory, and executive function – in essence, all aspects of thought and cognitive function. As an example, if a requested action requires three steps, a person with dementia will have difficulty paying attention to the request, remembering each step, and resisting distraction while completing the action.

Sincerely,

Melissa Yu, M.D., FAAN

# EXHIBIT O



**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

# CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION

| | |
|---|---|
| Patient Name: | Robert Brockman |
| Date of Birth (Age): | [redacted] (78 yr.) |
| Date(s) of Evaluation: | 12/03/2019 |
| Evaluation Location: | BCM Medical Center, McNair Campus, 9th Floor |
| Referred by: | James Pool, MD |
| Referral Question: | Independent Neuropsychological Examination |

## BACKGROUND AND REFERRAL INFORMATION

Mr. Brockman is a 78 year-old, right-hand dominant, Caucasian male with a two to three-year history of short-term memory loss. The neuropsychological evaluation of his current cognitive, behavioral, and emotional functioning was conducted by request by Kathy Keneally, Partner, Jones Day (New York). The following information was obtained during an interview with Mr. Brockman and his wife, his previous clinical neuropsychological evaluation conducted on 03/01/2019 and limited review of medical records.

Declarations: A forensic evaluation differs from a clinical evaluation in that there is no traditional doctor-patient relationship between the psychologist and the person being evaluated. The purpose of the evaluation is to assist Ms. Keneally in defense for Mr. Brockman's legal tax case; therefore, establishing a treatment relationship would create a potential conflict between the psychologist's role as an objective evaluator versus an advocate for the patient. Consequently, it is important that a retained expert avoid the role of treatment provider. This standard is mandate by the laws of the State of Texas (Texas Administrative code) as well as the Code of Ethics of the American Psychological Association (2010), and it represents the official position of the National Academy of Neuropsychology (Bush, 2005).

Dr. York was retained for a neuropsychological evaluation by Kathy Keneally of Jones Day. As explained above, she is excluded from providing any direct treatment to Mr. Brockman. Consequently, Dr. York's role was necessarily restricted to that of a forensic consultant rather than a treating doctor in this context. Mr. Brockman was informed of these conditions and consented to the evaluation and to his ability to understand these limitations.

Opinions reached in this report are based on direct interview and results of my neuropsychological evaluation and a review of his provided medical records to clarify the timeline of her medical procedures and hospitalizations. These opinions are based on current neuropsychological assessment techniques and research. Opinions are based upon reasonable neuropsychological probability and are subject to modification based on provision of additional information. The data from this evaluation is contained in Dr. York's confidential files.

**Previous Neuropsychological Assessment:** Mr. Brockman underwent a clinical neuropsychological evaluation with Dr. York on 03/01/2019. His general intellectual functioning (WAIS-IV FSIQ=87) fell within the low average range, which was a decline from his estimated premorbid intellectual functioning in the above average range. His MoCA was 19/30 (total), 6/6 (orientation), and 2/5 (short-term recall), which was significantly below expectation. Mr. Brockman demonstrated borderline impaired to deficient performances on measures of sustained attention/concentration, learning and recall of prose material and a word list, learning and recall of visual material, semantic fluency, executive functions (set shifting, inhibition, working memory, and problem solving), and visuoconstruction. Praxis was impaired for intransitive praxis tasks. These impaired performances were found

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

within the low average to average ranges on measures of basic attention, fund of information, verbal and visual abstract reasoning, verbal fluency and naming, This pattern of neuropsychological performance indicated a dementia of mild to moderate severity characterized by deficits in the areas of visuospatial functioning, verbal and nonverbal episodic memory, and executive functioning, with mild functional declines. Self-report of depression was within normal limits (GDS=8). Self-care ADLs (PSMS) were 7/30 and instrumental ADLs were 9/31. The NPI-Q (severity=8; distress=11) indicated problems with agitation, anxiety, apathy, irritability, nighttime behaviors, changes in appetite, and depression for an overall minimal level of familial distress, with the exception of his depression and agitation which produced moderate familial distress. He demonstrated movements that were consistent with a parkinsonism disorder. These abnormal movements taken together with his current diagnosis of dementia, and REM Behavior Disorder, his pattern of cognitive impairments was reported as consistent with Dementia with Lewy Bodies (DLB).

**Current Concerns and General Condition:** Mr. Brockman and his spouse participated in the clinical interview. Mr. Brockman reported that his balance has declined over the past year. He has been using a balance board at the Houstonian but is not making any progress. He denied any falls.

On direct inquiry, he reported that his tax issues are about a small company that he sold to a family trust in 1981. He noted that the government is "mad at him" but "they don't say why," and they want to "confiscate the trust." He said the government is information gathering and talking to people he used to work with. He is concerned that the company will be "ruined" and this will affect the people who work there. He noted that he is starting to think about who will run the company. He reported that he thinks he can continue to be the chairman.

Mrs. Brockman described that her husband's cognition fluctuates on a daily basis from minute to minute. She described that he has "blank times" that he appears more confused. His wife noted that he was having difficulties at work and she had to help him type all of his employee performance reviews. She reported that he has increased initiation problems. He reported that he does not go into the office as much as he did in March 2019. He noted that it takes him longer to process information at work. His wife described that he sits at work for many, but he does not accomplish his tasks described. His short-term memory has continued to decline, and he is repeating himself more often. He is unable to recall details from his daily activities even later in the day. His procedural memory has also declined as he has forgotten how to tie a tie or to use a remote control for their television. She noted that he does not recall the code to unlock his telephone. He has difficulties completing tasks. His wife drives him to the office. She noted that he has declines in his spelling ability particularly while typing. He is unable to multi-task.

Emotional Functioning: Mr. Brockman reported that he began taking Wellbutrin which has improved his mood, but he continues to feel "slightly depressed." He noted that his diagnosis brings him "more down than before." He noted that he has realized that "all of sudden I am old." He denied heightened general anxiety, personality or behavioral changes, suicidal ideation, and auditory hallucinations. Sleep was described as adequate but he is harder to wake up. He is more violently acting out his dreams and has been kicking. He takes trazadone to aid his sleep. He has decreased appetite and has lost 20lbs over the past several months. His wife reported that he began to act out his dreams at least three years ago. He reported that he has floaters in his visual fields. He continued to deny visual hallucinations. It is noted that he had a previous visual illusion described below and a visual hallucination of a bug on the testing room floor that was not present to either the examiner or his wife during his evaluation in March 2019.

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

**Previous Cognitive Complaints:** Mr. Brockman reported declines in his short-term memory over the past 2 to 3 years. He and his wife reported that he is repeating himself, losing possessions, losing his train of thought and is more tangential. He forgets names of new individual and of familiar locations. He also finds it more difficult to complete tasks. His wife noted that he is clumsy getting out of the car and has hit curbs while driving and parking. He has increased difficulties with following directions. His wife noted spelling changes and mild stuttering in his speech. His speech is slowed and he has slowed response latencies. His decision making is also slowed, and he has difficulties multi-tasking.

**Medical History:** Medical history is remarkable for hypothyroidism, atrial fibrillation, bladder cancer with recurrence, hypercholesteremia, glaucoma (mild), erectile dysfunction, tremor, micrographia, and back problems. He has plantar fasciitis, which reduces his exercise ability. He reported that he was hospitalized for a prostate infection and pericarditis four years ago. He reported an episode of vision changes in which he saw a bar of color on a spectrum that was moving. He noted he had this visual illusion for 20 minutes and then it went away. He was told that he might have had a visual headache. He began taking levodopa in February 2019. His wife noted a mild motor improvement when he first started on the medication, but when the medication was increased, he had increasing clumsiness. Surgical history is notable for tonsillectomy, cataract surgery, and excision of a melanoma. He reported that when he was in the sixth grade he was hit on the top of the head with a hammer and may have suffered a concussion. He did not lose consciousness. Familial medical history is unremarkable for movement disorders or dementia. Psychiatric history is notable for depression. Mr. Brockman denied current use of tobacco or illicit drugs or a remote history of substance misuse/abuse. He quit drinking alcohol two to three years ago secondary to his atrial fibrillation. He denied a history of seizures, TIA/stroke, or migraines.

**Medications:** Wellbutrin 100mg tid, trazodone 50mg at night, Synthyroid .75mg, Eliquis 2.5mg bid, aspirin, carbidopa/levodopa25/100mg 2 tablets tid, stool softener, Exelon 2 patches. He noted that he also takes a regimen of vitamins and supplements.

**Social History:** Mr. Brockman has been married for 50 years, and they have one son. He currently lives with his spouse in their private residence. He earned a BA in Business and attended graduate school for one year in Marketing at The University of Florida. He reported that he was a good student. He is Chairman and CEO of Reynolds and Reynolds Company.

## REVIEW OF LIMITED MEDICAL RECORDS

Dr. Joseph Jankovic Evaluation: Mr. Brockman was evaluated by Dr. Joseph Jankovic on March 13, 2019 for his movement disorder. He was diagnosed with postural instability gait disorder subtype (PIGD) of parkinsonism. Dr. Jankovic noted that because Mr. Brockman denied hallucinations and cognitive fluctuations that he does not meet criteria for DLB; however, he acknowledged that he meets criteria for dementia. Mr. Brockman noted that he was worse physically and mentally despite taking levodopa, with a “zombie-like effect” as described by his wife.

Dr. Melissa Yu Evaluation: Mr. Brockman was evaluated by Dr. Melissa Yu on March 20, 2019 for his memory loss. Memory loss was dated to November 2017 in a medical chart note. Dr. Yu medical note stated that a DATSCAN was performed showing significant loss of dopaminergic signal, and he was started on Sinemet and the Exelon patch on 3/13/2019. Anosmia was reported for 10 years. Memory, word finding, and slowed processing speed were reported by his wife and son. His son noted that his father’s cognitive ability fluctuates, with episodes of “blankness” associated with less interaction alternating with improved cognition. His son also noted cognitive fluctuations in his father’s decision making abilities with good and bad days. It was noted that his son has him

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

practice clock drawing to test his functioning. Dr. Yu's differential diagnoses included Dementia with Lewy Bodies or Parkinson's Disease Dementia. It was noted that the time course and fluctuations in cognition were more suggestive of DLB.

**BEHAVIORAL OBSERVATIONS:** Mr. Brockman was tested during a single session as an outpatient. He arrived on time and was accompanied by his spouse who participated in the clinical interview. General appearance was neat and clean. The patient exhibited slowed motor behavior and gait and a mild tremor which was notable on drawings but did not interfere with his performances. He evidenced slowed response latencies. His mood was pleasant, but his affect was flat. Eye movements were normal. Vision (with corrective lenses) and hearing were adequate for the testing session. Conversational speech was coherent but was tangential in conversational speech. There was no evidence of paraphasias. His cognition tended to fluctuate throughout the testing session. He appeared to be confused at times even in the middle of tasks that he originally was completing accurately. He showed mildly decreased ability to follow directions, and he occasionally needed repetition of directions and lost place during set task. He exhibited cooperative test-taking behavior. His attitude towards the examiner was appropriate and friendly. He tended to minimize his cognitive impairments. He passed several embedded and stand-alone measures of performance validity; therefore, the following results are thought to be an accurate estimation of his current cognitive abilities.

## MEASURES ADMINISTERED

Montréal Cognitive Assessment (MoCA); Caregiver Neuropsychiatric Inventory (NPI-Q); Clock Drawing Test; Controlled Oral Word Association Test (COWAT version: FAS); General Anxiety Disorder 7-item Scale; Geriatric Depression Scale; Hopkins Verbal Learning Test-Revised (HVLT-R); Neuropsychological Assessment Battery (NAB subtests: Daily Living Memory-Delayed, Daily Living Memory-Immediate, Daily Living Memory-Recognition, Naming, Numbers and Letters, and Visual Discrimination); Praxis Examination; Rey Complex Figure Test-Meyers Version; Semantic Verbal Fluency Test; Stroop Color-Word Interference Test (Stroop subtests: Color, Color-Word, and Word); Trail Making Test (TMT subtest: Trails A); Verbal Series Attention Test (VSAT); Wechsler Adult Intelligence Scale-IV (WAIS-IV subtests: Arithmetic, Coding, Digit Span, Information, Similarities, and Visual Puzzles); Wechsler Memory Scale-4th Edition (WMS-IV subtests: Logical Memory II-Older Adult, Logical Memory I-Older Adult, Logical Memory Recognition-Older Adult, Visual Reproduction I, Visual Reproduction II, and Visual Reproduction Recognition); Wide Range Achievement Test (WRAT-4 subtest: Math Computation); Wisconsin Card Sorting Test (WCST); Instrumental Activities of Daily Living Scale (IADLS); Lawton and Brody Physical Self-Maintenance Scale (PSMS). Clinical Interview with patient and his spouse.

Mr. Brockman did not complete the Trail Making Test (TMT subtest: Trails B) measure as he was unable to comprehend task instructions and maintain task set independently. Informant questionnaires were completed by the patient's spouse.

## NEUROPSYCHOLOGICAL FINDINGS

*The following clinical descriptors identify performance with the range of Standard Scores (average=100, standard deviation=15) indicated in parentheses: Very Superior (>130), Superior (120-129), High Average (110-119), Average, (90-109), Low Average (80-89), Borderline (70-79), and Deficient (<69). For diagnostic purposes, a cognitive deficit is considered a performance score that is >1.5 standard deviations away from the mean in the direction of poor performance compared to the reference group for that measure (i.e., Z-score) based on peers of similar age, gender, and education background as appropriate. This criterion is equivalent to a Standard Score <78, T-score <35, or a Scaled Score of <5).*

**Mental Status:** Evaluation of Mr. Brockman's general mental status on the MoCA revealed a score of 19/30, which is moderately below expectation. He was fully oriented (6/6). He demonstrated difficulties with set shifting,

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

visuospatial construction, sustained attention, repeating one sentence, serial subtractions, and with verbal fluency. He did not recall any words (0/5) and was not aided by category cueing. He was aided by multiple choice cueing for 4/5 words.

**Intellectual:** Mr. Brockman was administered subtests from a measure of general intellectual functioning (WAIS-IV) and obtained scores ranging from low average to high average yielding a pro-rated Full Scale IQ estimate of 96, which is in the average range.

**Attention/Concentration:** Attention and mental tracking for overlearned verbal sequences was deficient for speed and for accuracy. Immediate auditory attention span for digits was average with 6 digits forward, 4 digits backward, and 5 digits when re-ordering them in ascending sequence. Speed of single word reading and speed of color naming were deficient. Mental processing speed for manual code transcription was low average. Performance on a simple visual-motor sequencing task requiring scanning and mental tracking was deficient with 0 errors. Written math computation revealed a 5.6 grade equivalent. It is noted that he was unable to perform simple addition, multiplication and division arithmetic problems (e.g., 3X4=7, 14/3).

**Executive:** Mr. Brockman's ability to inhibit a dominant verbal response in the face of incongruent visual stimuli was borderline impaired. His abstract verbal reasoning was average. Working memory to perform mental arithmetic was average. Performance on a complex visual-motor sequencing task requiring scanning, tracking, and set-shifting was impaired and the task was discontinued as he was unable to comprehend the task instructions and he was unable to set shift independently. Performance on a novel task of problem-solving and hypothesis testing fell in the low average range (11-16th percentile) with 1 correct category achieved by the end of the task. He made numerous "Other" responses that did not match to any of the 3 possible correct categories. He lost set one time and had to be reminded of the instructions after each card so that he would not match to the wrong set of cards. His performance fluctuated during this task.

**Memory:** Recall of culturally-based general knowledge was high average. Immediate recall of verbally presented contextual material was average (SS=8). Delayed recall of the stories was low average (SS=7). Retention of initially learned material was 50.0%. Recognition memory was average (16/23). Incremental learning for a semantically-categorized word list across 3 trials was deficient (1, 4, and 4 words per trial), and delayed recall was in the deficient range with 25.0% retention which falls within the deficient range. On recognition memory assessment, 10/12 target words were correctly identified, 3 false positive errors were committed, with discrimination accuracy in the borderline impaired range.

Immediate recall of basic geometric figures was borderline impaired (SS=4). Delayed recall of the designs was deficient (SS=2). Retention of the initially learned material was 0.0%. Recognition memory was average (2/7).

**Language:** Lexical fluency was borderline impaired with between 5 to 8 words per trial. Semantic fluency was low average with 14 exemplars generated. Confrontation naming of pictured objects was average (NAB Form 1; 29/31). He made an error of transitive limb praxis which was improved with imitation

**Visual-Perceptual:** His drawing of a complex geometric design scored in the low average range. He demonstrated a mild tremor but it did not interfere with his drawing ability. He maintained the overall gestalt but he distorted or omitted several of the internal details. His spatial reasoning ability to mentally arrange puzzle pieces was low average. Visuoconceptual ability to draw a clock was within normal limits to command (CDT=10/10) and impaired

Case 4:21-cr-00009 Document 1-3 Filed on 01/04/21 in TXSD Page 143 of 771

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

when copying a model (CDT=8/10). He drew the clock face and began placing the numbers accurately but then the numbers ended in the middle of the clock face. He placed the hands accurately to where he drew the numbers.

**Examples of visuospatial performances highlighting Mr. Brockman's fluctuating cognitive functioning.**

**Rey Complex Figure Test – Copy of a Design**

**03/01/2019** **12/03/2019**

**Clock Drawing**

**03/01/2019** **12/03/2019**

**Mood / Personality:** On a self-report measure of anxiety, his responses fell in the minimal range (GAD-7=4/21). On a face valid measure used to assess cognitive, emotional and physical symptoms of depression, Mr. Brockman endorsed the following, suggestive of probable depression (GDS=19): presently unsatisfied with life, terminating activities and/or lack of interest, lack of hope regarding the future, ruminating thoughts, feeling as though something negative is going to occur, unhappiness, helplessness, preferring to stay home, worry about the future, declines in memory, downhearted and blue, lack of excitement for life, difficulty beginning new projects, poor energy, hopelessness, difficulties with concentration, difficulties with decision making, and general declines in thinking skills.

**Activities of Daily Living:** His spouse served as the informant completing a questionnaire regarding the patient's ability to complete basic and instrumental activities of daily living. Mr. Brockman reportedly has difficulties with self-care ADLs (PSMS=7/30). It was noted that he is constipated and goes to the restroom every half hour; he eats, dresses, grooms, and bathes very slowly. He requires assistance with ambulation. He requires assistance with instrumental activities of daily living (IADLs=14/31) including telephone use, shopping, food preparation,

7200 Cambridge • 9th Floor • Houston, Texas 77030 • (713) 798-8673 • (713) 798-8573 Fax
Neuropsychology@bcm.edu

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

transportation, and finances. His wife noted that he seldom uses his phone. He fluctuates in his ability to handle money even with day-to-day expenses. She has to remind him to take his medications, and if she does not then she notices that he has forgotten to take doses.

**Neurobehavioral:** The patient's spouse completed an inventory assessing for the presence of neurobehavioral symptoms commonly associated with dementia, reportedly observing mild problems with disinhibition and motor disturbance and moderate problems with agitation, depression, apathy, irritability, nighttime behaviors, and changes in appetite (NPI-Q severity=12; distress=25) which produce an overall moderate to extreme level of familial distress.

## SUMMARY AND IMPRESSION

Mr. Brockman is a 78 year-old, right-hand dominant, Caucasian male who underwent an independent neuropsychological evaluation as a component of a forensic evaluation. The factual matters stated in this report are, as far as I know, true, and the opinions in the report are genuinely held by me and the report contains reference to all matters I consider significant.

It is this examiner's opinion based on the testing conducted and behavioral observations that Mr. Brockman was putting forth full effort and was not exaggerating or embellishing the nature and extent of his cognitive impairment. It is noted that neuropsychological tests were chosen to best assess Mr. Brockman's cognitive abilities. The testing environment was optimal and the following results are considered a valid estimate of his current neuropsychological and emotional status.

Mr. Brockman currently operates in the average range of general intellectual functioning (WAIS-IV FSIQ=96), which is a significant decline from his estimated premorbid intellectual functioning in the high average range (TOPF=114, from March 2019 evaluation). His MoCA was 19/30 (total), 6/6 (orientation), and 0/5 (short-term recall), which is moderately impaired. Self-care ADLs (PSMS) were 7/30 and instrumental ADLs were 14/30, and his wife indicated a significant decline in his functional ability.

Self-report of depression was elevated (GDS=19), but he did not endorse elevated levels of anxiety (GAD-7=4). The NPI-Q completed by his wife (severity=12; distress=25) indicated problems with disinhibition, motor disturbance, agitation, depression, apathy, irritability, nighttime behaviors, and changes in appetite for an overall moderate to extreme level of familial distress.

Mr. Brockman demonstrated borderline impaired to deficient performances on measures of oral and written processing speed, executive functions (including working memory, problem solving, inhibition, set shifting, and verbal fluency), learning and recall of a word list, learning and recall of visual material, and basic visuospatial functioning. His intellectual functioning subtest scores remained within the broadly average range (low average to high average). It is noted that his verbal memory was aided by context with average learning of a story, but he only retained 50% of the material he originally learned after a brief delay (low average). His written arithmetic performance was a 5.6 grade equivalent with difficulties noted in performing basic addition, multiplication and division problems. His basic attention and language (naming and semantic fluency) performances were average.

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

Comparison with prior results obtained on 03/01/2019 revealed the following pattern of interim changes:

**Declines were found in the areas of:**

- Verbal fluency (low average to borderline impaired)
- Graphomotor sequencing (borderline impaired to deficient)
- Learning of a word list (borderline impaired to deficient)
- Decreased functional abilities

**Improvements were found in the areas of:**

- Sequencing of digits (deficient to average)
- Learning and recall of contextual information (deficient to average and low average with only 50% retention)
- Clock drawing (impairments remain)
- Visuospatial construction of a complex figure

It is noted that Mr. Brockman's cognition fluctuated significantly throughout the evaluation. He demonstrated improvements on a few measures; however, during several tasks, he became more confused and demonstrated a blank stare expression. These fluctuations were more apparent during this evaluation as compared to his previous evaluation in March 2019. Mr. Brockman's pattern of neuropsychological performance indicates a dementia of mild to moderate severity characterized by deficits in the areas of verbal and nonverbal episodic memory, processing speed, executive functioning, and visuospatial functioning with significant functional declines. Mr. Brockman's current cognitive pattern and his parkinsonism, taken together with his dementia at the time of diagnosis of his movement disorder, cognitive fluctuations, and REM Behavior Disorder are consistent with a diagnosis of Dementia with Lewy Bodies (DLB). Visual hallucinations are a hallmark of DLB; however, up to 30% of patients with DLB do not demonstrate visual hallucinations particularly at the early stages of the disorder. Mr. Brockman reported a previous visual illusion and a mild visual hallucination was present during neuropsychological testing in March 2019, which further supports this diagnosis. His dementia falls under the diagnostic category of Lewy Body Dementias.

Based on the current cognitive findings, his diagnosis of dementia, and the breadth and severity of his cognitive impairments and fluctuations, it is my opinion that Mr. Brockman is unable to participate and aid in his own defense. He is unable to recall and demonstrate a thorough understanding of the relevant elements of the issues surrounding the case and manipulate this information in a logical manner that will allow him to make comparisons and weigh his options.

Michele K York, PhD

Michele K. York, PhD, ABPP-CN
Board Certified Clinical Neuropsychologist
TX License #31159

# EXHIBIT P

## Patient Information

**Name:** ROBERT THERON BROCKMAN
**Medical Record Number:** 0300937767
**Sex Code:** M
**BirthDate:** [redacted]

## Exam Information

**Accession Number:** 201902140001
**Modality:** NM
**Body Part:** HEAD
**Description:** NM DATSCAN BRAIN SPECT
**Performed Date:** 2/14/2019 11:22:21
**Patient History:** G20

## Final Report

Dopamine Transporter Imaging (DaTscan)
Brain Imaging, tomographic (SPECT)

Reason for exam: G20: Parkinson's disease

Report: The patient received Lugol?s solution 10 drops in 30 mL of water for thyroid blockade 30 minutes prior to injection of the radiopharmaceutical. I-123 ioflupane 4.5 mCi was administered intravenously. Tomographic images of the head were obtained at approximately 4 hours post administration of the radiopharmaceutical.

Tracer activity is visually absent in the bilateral putamina. Tracer accumulation is markedly decreased in the caudate nuclei relative to background tracer activity. Decrease of tracer is slightly greater in the right caudate nucleus compared to the left.

Impression:

Severe loss of dopaminergic neuronal function in the bilateral dorsal striata with loss greater on the right compared to the left.

Semi-quantitative analysis using the DaTQUANT program supports the above interpretation. The DaTQUANT report is included with the images on PACS.

Signed by: Dr. Julie Wendt, M.D. on 2/15/2019 7:22 AM

## Principal Interpreter

**Name:** Provider JWENDT
**Provider ID:** JWENDT

BROCKMAN, ROBERT THERON 0300937767
2/14/2019 11:22:21 AM
BRAIN DATSCAN
Baylor Clinic AV
Row A - DATSCAN BRAIN [Recon - NoAC]
Transverse
15 16 17 18 19 20 21
22 23 24 25 26 27 28
29 30 31 32 33 34 35
36 37 38 39 40 41 42
%
95
4
Right
Anterior
Posterior
Left
Bottom to Top
A: (B:4%,T:95%)

Case 3:20-cr-00371-WHA Document 44-2 Filed 12/08/20 Page 91 of 108

Patient Name: BROCKMAN, ROBERT THERON
Patient ID: 0300937767
DOB:
Sex: M
Study Name: BRAIN DATSCAN
Study Date: 2/14/2019
Study Time: 11:22:21 AM
Baylor Clinic AV
Row A - DATSCAN BRAIN [Recon - NoAC ]
Transverse
%
81
6
Anterior
Posterior
Right
Left
Bottom to Top
A: (B:6%,T:81%)

**Patient Name :** BROCKMAN ROBERT THERON
**Patient ID :** 0300937767
**Exam Description :** Tomo_Transaxials
**Exam Date :** Feb 14, 2019
**Referring Physician :**
**Reading Physician :** Julie Wendt
**Data :** IRNC REGISTERED
**Age (Years) :** 77
**Camera :** IP2
**Collimator Name** * **:** LEHR
**Collimator Type :** Parallel
**Counts (kCounts) :** 2074.1
**Dose (mCi)** * **:** 4.5
**Gender :** Male
**Radiopharmaceutical** * **:** DaTscan
**Reconstruction Type :** OSEM
**Corrections :** No Correction
**Normal DB :** GE OSEM NC NDB
GE normals database for OSEM with no correction

*Manually Modified

| | Measured | Mean (±1 SD) | Deviation | Z-Score |
|---|---|---|---|---|
| Striatum Right SBR | +0.46 | +1.79 (±0.33) | -74% | -3.98 |
| Striatum Left SBR | +0.49 | +1.73 (±0.35) | -72% | -3.50 |
| Putamen Right SBR | +0.36 | +1.70 (±0.33) | -79% | -4.09 |
| Putamen Left SBR | +0.43 | +1.63 (±0.35) | -74% | -3.47 |
| Caudatus Right SBR | +0.68 | +2.01 (±0.40) | -66% | -3.35 |
| Caudatus Left SBR | +0.62 | +1.94 (±0.42) | -68% | -3.13 |
| Striatum Asymmetry | +0.02 | +0.03 (±0.02) | -26% | -0.37 |
| Putamen Asymmetry | +0.05 | +0.03 (±0.03) | +36% | +0.47 |
| Caudatus Asymmetry | +0.03 | +0.05 (±0.04) | -24% | -0.30 |

Report Created : Feb 14, 2019

# EXHIBIT Q

Brockman, Robert
Patient ID: 03527911 DOB: [redacted] Age: 79 Gender: M Date: October 05, 2020

| SCORE | TODAY |
|---|---|
| 3-WORD MEMORY | 2 |
| ORIENTATION | 4 |
| SEQUENCE MEMORY | 4 |
| TIME | 3 |
| TOTAL SCORE | 13 |

CLOCK DRAWING: TODAY

## Background

This 79 year-old man with Parkinson's Disease and dementia has been tested today in clinic during his annual physical examination to monitor objective changes with these computerized metrics in his cognitive function. His wife (Dorothy) and son (Robert) report deteriorations in cognitive functions.

## Test Results:

Total score is 13 of 29 points. This score falls below the cutoff for dementia in patients of this age and educational level and is typically associated with Major Neurocognitive Disorder, moderate (formerly Moderate Dementia). In the CogniSense research database of 3,500 patients, no patients in this score range had normal cognition, 2% had Mild Cognitive Impairment (MCI), and 98% had dementia.

The test administrator agrees with the results of this test.

## Results Over Time

12
13
October 2019
October 2020

## Plan

1. Repeat comprehensive annual neuropsychological testing by Dr. Michele York is scheduled.

James L. Pool, MD



Brockman, Robert
Patient ID: 03527911 DOB: [redacted] Age: 79 Gender: M

Donna Ansualda

Disclaimer: This test has high levels of sensitivity, specificity and reliability, but does not replace comprehensive neuropsychological and medical evaluation. Our recommendations are based on current research and extensive clinical experience with this population. The CogniSense™ tool has been validated in English speaking adults ages 60 to 92 in a community-based primary care setting.

References:

Clionsky, M and Clionsky E, "Development and Validation of the Memory Orientation Screening Test," American Journal of Alzheimer's Disease & Other Dementias, 2010, 25 (8), 650-656

Clionsky, M and Clionsky E, "Identifying Cognitive Impairment in the Annual Wellness Visit: Who Can You Trust?,"The Journal of Family Practice, 2011, 60: 653-659

Clionsky, M and Clionsky E, "The Memory Orientation Screening Test (MOST®) accurately separates normal from MCI and demented elders in a prevalence-stratified sample,"Alzheimer's Disease & Parkinsonism, 2013, 3:1

# EXHIBIT R



**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Professor
**Department of Neurology**

# CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION

Patient Name: Robert Brockman
Date of Birth (Age): [redacted] (79 yr.)
Date(s) of Evaluation: 10/07/2020
Evaluation Location: BCM Medical Center, McNair Campus, 9th Floor
Referred by: James Pool, MD/Kathy Keneally, Jones Day
Referral Question: Independent Neuropsychological Examination

## BACKGROUND AND REFERRAL INFORMATION

Mr. Brockman is a 79 year-old, right-hand dominant, Caucasian male with a three to four-year history of cognitive and behavioral decline. The neuropsychological evaluation of his current cognitive, behavioral, and emotional functioning was conducted by request by Kathy Keneally, Partner, Jones Day (New York) and Dr. James Pool. The following information was obtained during an interview with Mr. Brockman and his son, Robert, his previous clinical neuropsychological evaluation conducted on 03/01/2019 and his previous forensic evaluation conducted on 2019 and limited review of medical records.

Declarations: A forensic evaluation differs from a clinical evaluation in that there is no traditional doctor-patient relationship between the psychologist and the person being evaluated. The purpose of the evaluation is to assist Ms. Keneally in defense for Mr. Brockman's legal tax case; therefore, establishing a treatment relationship would create a potential conflict between the psychologist's role as an objective evaluator versus an advocate for the patient. Consequently, it is important that a retained expert avoid the role of treatment provider. This standard is mandate by the laws of the State of Texas (Texas Administrative code) as well as the Code of Ethics of the American Psychological Association (2010), and it represents the official position of the National Academy of Neuropsychology (Bush, 2005).

Dr. York was retained for a neuropsychological evaluation by Kathy Keneally of Jones Day. As explained above, she is excluded from providing any direct treatment to Mr. Brockman. Consequently, Dr. York's role was necessarily restricted to that of a forensic consultant rather than a treating doctor in this context. Mr. Brockman was informed of these conditions and consented to the evaluation and to his ability to understand these limitations.

Opinions reached in this report are based on direct interview and results of my neuropsychological evaluation including an interview with Mr. Brockman and his son, Robert, and a review of his provided medical records to clarify the timeline of his medical procedures and hospitalizations. These opinions are based on current neuropsychological assessment techniques and research. Opinions are based upon reasonable neuropsychological probability and are subject to modification based on provision of additional information. The data from this evaluation is contained in Dr. York's confidential files.

**Previous Neuropsychological Assessments:** Mr. Brockman underwent a clinical neuropsychological evaluation with Dr. York on 03/01/2019. In 2019, his general intellectual functioning (WAIS-IV FSIQ=87) fell within the low average range, which was a decline from his estimated premorbid intellectual functioning in the above average range. His MoCA was 19/30 (total), 6/6 (orientation), and 2/5 (short-term recall), which was significantly below expectation. Mr. Brockman demonstrated borderline impaired to deficient performances on measures of

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Professor
**Department of Neurology**

sustained attention/concentration, learning and recall of prose material and a word list, learning and recall of visual material, semantic fluency, executive functions (set shifting, inhibition, working memory, and problem solving), and visuoconstruction. Praxis was impaired for intransitive praxis tasks. These impaired performances were found within the low average to average ranges on measures of basic attention, fund of information, verbal and visual abstract reasoning, verbal fluency and naming, This pattern of neuropsychological performance indicated a dementia of mild to moderate severity characterized by deficits in the areas of visuospatial functioning, verbal and nonverbal episodic memory, and executive functioning, with mild functional declines. Self-report of depression was within normal limits (GDS=8). Self-care ADLs (PSMS) were 7/30 and instrumental ADLs were 9/31. The NPI-Q (severity=8; distress=11) indicated problems with agitation, anxiety, apathy, irritability, nighttime behaviors, changes in appetite, and depression for an overall minimal level of familial distress, with the exception of his depression and agitation which produced moderate familial distress. He demonstrated movements that were consistent with a parkinsonism disorder. These abnormal movements taken together with his current diagnosis of dementia, and REM Behavior Disorder, his pattern of cognitive impairments was reported as consistent with Dementia with Lewy Bodies (DLB).

Mr. Brockman underwent a second neuropsychological evaluation on 12/03/2019. This evaluation revealed average general intellectual functioning (WAIS-IV FSIQ=96), which is a significant decline from his estimated premorbid intellectual functioning in the high average range (TOPF=114, from March 2019 evaluation). His MoCA was 19/30, which is a moderately impaired performance. Mr. Brockman demonstrated borderline impaired to deficient performances on measures of oral and written processing speed, executive functions (including working memory, problem solving, inhibition, set shifting, and verbal fluency), learning and recall of a word list, learning and recall of visual material, and basic visuospatial functioning. His written arithmetic performance was a 5.6 grade equivalent with difficulties noted in performing basic addition, multiplication and division problems. His basic attention and language (naming and semantic fluency) performances were average. Self-care ADLs (PSMS) were 7/30 and instrumental ADLs were 14/30, and his wife indicated a significant decline in his functional ability.

Comparison with prior results obtained on 03/01/2019 revealed declines on measures of verbal fluency (low average to borderline impaired), graphomotor sequencing (borderline impaired to deficient), learning of a word list (borderline impaired to deficient), and decreased functional abilities. He demonstrated improvements in the areas of sequencing of digits (deficient to average), learning and recall of contextual information (deficient to average and low average with only 50% retention), and visuospatial construction of a complex figure, suggesting cognitive fluctuations. Confusion and a blank stare expression was noted during the evaluation.

Self-report of depression was elevated (GDS=19), but he did not endorse elevated levels of anxiety (GAD-7=4). The NPI-Q completed by his wife (severity=12; distress=25) indicated problems with disinhibition, motor disturbance, agitation, depression, apathy, irritability, nighttime behaviors, and changes in appetite for an overall moderate to extreme level of familial distress.

Mr. Brockman's pattern of neuropsychological performance indicated dementia of mild to moderate severity characterized by deficits in the areas of verbal and nonverbal episodic memory, processing speed, executive functioning, and visuospatial functioning with significant functional declines. His dementia taken together with his parkinsonism, cognitive fluctuations, and REM Behavior Disorder remained consistent with a diagnosis of a Lewy Body Dementia (Dementia with Lewy Body or Parkinson's Disease Dementia). Based on his cognitive findings, his diagnosis of dementia, and the breadth and severity of his cognitive impairments and fluctuations, it was opined that Mr. Brockman was unable to participate and aid in his own defense, and he was unable to recall

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Professor
**Department of Neurology**

and demonstrate a thorough understanding of the relevant elements of the issues surrounding the case and manipulate this information in a logical manner that would allow him to make comparisons and weigh his options.

**Current Concerns and General Condition:** Mr. Brockman and his son, Robert, participated in the clinical interview. Mr. Brockman reported that his right hand tremor has progressed. He reported overall muscle weakness in his legs and an issue with his rotator cuff from tension and lifting weights. He noted that he discontinued taking his testosterone on his own. He is taking levodopa but he was unsure of his medication regimen as he noted his wife manages his medication box. He noted that he is continuing to use his balance board, but he tends to fall backwards and catch himself. He has not had any actual falls in which he has injured himself.

Mr. Brockman and his son described that his cognition has declined since December 2019 when he was last evaluated. He noted, in particular, his short-term memory and his working memory have declined and his processing speed is slower. He noted declines in his decision making abilities. He repeats himself and asks the same question again without insight. He forgot the passcode to unlock his phone, and he lost his phone. He forgets names of familiar individuals. He is disoriented to month and day of the week, which his family has noted when he is attempting to complete forms. He stopped driving 1 ½ years ago. He has increased word finding difficulties and attempts to google to find the word for which he is searching.

Emotional Functioning: Mr. Brockman reported that his mood is “not good.” He described that business has been difficult and his “morale is not what it used to be.” He is more apathetic. Due to COVID-19, his activities have been limited. He continues to work from home. He noted that the company did not have to lay anyone off and they have transitioned to working remotely. He is continuing to take Wellbutrin which has stabilized his mood. He denied heightened general anxiety, personality or behavioral changes, suicidal ideation, and auditory hallucinations. Sleep was described as adequate but he wakes up more often at 3am and is unable to get back to sleep due to anxiety. He relies on a sleeping aid (trazadone) a couple of times per week. He stated that he was yelling out in his sleep more often. He has decreased appetite with weight loss of 11lbs. He craves ice cream. He denied well-formed visual hallucinations, but he described that he will see things that look like bugs on a shirt, the floor, or a table and wait to see if it moves.

During a telephone call on 11/10/2020, Mr. Brockman’s son, Robbie, described a delusional incident that occurred on 10/17/2020 and 10/18/2020 with his father. Robbie reported that he went to visit his father on Saturday night for a couple of hours. He left the house around 7pm. His father woke up at 5am on Sunday and heard an external door opening and closing and his son’s car driving away. Mr. Brockman went to his office and reported that his computer was on and was unlocked. He stated that the computer was open to pages from the dark web and suicidal information. Mr. Brockman took pictures of the screens, which were actually Yahoo answer pages not related to the dark web or suicide. He was convinced that his son had returned to the house during the night and had broken into his computer. Once he was told otherwise, he thought someone else had entered the house and broken into his computer. The alarm had not been tampered with and there was no one on video entering or exiting the residence during the evening. The family had the computer hard drive analyzed by a third party and did not find any evidence of any tampering or that anyone had visited inappropriate websites. During this time, Mr. Brockman became overly concerned with when he would get his computer back asking numerous times per day.

**Previous Cognitive Complaints:** Mr. Brockman reported declines in his short-term memory over the past 3 to 4 years. Previously, he and his family reported that he repeats himself, loses possessions, loses his train of thought

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Professor
**Department of Neurology**

and is tangential. He forgets names of new individuals and of familiar locations. He also finds it more difficult to complete tasks. His wife noted that he is clumsy getting out of the car and hits curbs while driving and parking (He stopped driving 1 ½ year ago). He has increased difficulties with following directions. His wife noted spelling changes and mild stuttering in his speech. His speech is slowed and he has slowed response latencies. His decision making is also slowed, and he has difficulties multi-tasking. Mrs. Brockman described that her husband's cognition fluctuates on a daily basis from minute to minute. She described that he has "blank times" that he appears more confused. His wife noted that he was having difficulties at work and she had to help him type all of his employee performance reviews. She reported that he has increased initiation problems. He noted that it takes him longer to process information at work. His wife described that he sits at work for many, but he does not accomplish his tasks. His short-term memory has continued to decline, and he is repeating himself more often. He is unable to recall details from his daily activities even later in the day. His procedural memory has also declined as he has forgotten how to tie a tie or to use a remote control for their television. She noted that he does not recall the code to unlock his telephone. He is unable to multi-task.

**Medical History:** Medical history is remarkable for hypothyroidism, atrial fibrillation, bladder cancer with recurrence, hypercholesteremia, glaucoma (mild), erectile dysfunction, tremor, micrographia, back problems and increased balance problems. He has plantar fasciitis, which reduces his exercise ability. He reported that he was hospitalized for a prostate infection and pericarditis four years ago. He reported an episode of vision changes in which he saw a bar of color on a spectrum that was moving. He noted he had this visual illusion for 20 minutes and then it went away. He was told that he might have had a visual headache. He began taking levodopa in February 2019. His wife noted a mild motor improvement when he first started on the medication, but when the medication was increased, he had increasing clumsiness. Surgical history is notable for tonsillectomy, cataract surgery, and excision of a melanoma. He reported that when he was in the sixth grade he was hit on the top of the head with a hammer and may have suffered a concussion. He did not lose consciousness. Familial medical history is unremarkable for movement disorders or dementia. Psychiatric history is notable for depression. Mr. Brockman denied current use of tobacco or illicit drugs or a remote history of substance misuse/abuse. He quit drinking alcohol two to three years ago secondary to his atrial fibrillation. He denied a history of seizures, TIA/stroke, or migraines.

Dr. Joseph Jankovic Evaluation: Mr. Brockman was evaluated by Dr. Joseph Jankovic on March 13, 2019 for his movement disorder. He was diagnosed with postural instability gait disorder subtype (PIGD) of parkinsonism. Dr. Jankovic noted that because Mr. Brockman denied hallucinations and cognitive fluctuations that he does not meet criteria for DLB; however, he acknowledged that he meets criteria for dementia. Mr. Brockman noted that he was worse physically and mentally despite taking levodopa, with a "zombie-like effect" as described by his wife.

Dr. Melissa Yu Evaluation: Mr. Brockman was evaluated by Dr. Melissa Yu on March 20, 2019 for his memory loss. Memory loss was dated to November 2017 in a medical chart note. Dr. Yu medical note stated that a DATSCAN was performed showing significant loss of dopaminergic signal, and he was started on Sinemet and the Exelon patch on 3/13/2019. Anosmia was reported for 10 years. Memory, word finding, and slowed processing speed were reported by his wife and son. His son noted that his father's cognitive ability fluctuates, with episodes of "blankness" associated with less interaction alternating with improved cognition. His son also noted cognitive fluctuations in his father's decision making abilities with good and bad days. It was noted that his son has him practice clock drawing to test his functioning. Dr. Yu's differential diagnoses included Dementia with Lewy Bodies or Parkinson's Disease Dementia. It was noted that the time course and fluctuations in cognition were more suggestive of Dementia with Lewy Bodies.

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Professor
**Department of Neurology**

**Medications:** Wellbutrin 100mg tid, trazodone 50mg at night, Synthyroid .75mg, Eliquis 2.5mg bid, aspirin, carbidopa/levodopa25/100mg 2 tablets tid, stool softener, Exelon 2 patches. He noted that he also takes a regimen of vitamins and supplements.

**Social History:** Mr. Brockman has been married for over 50 years, and they have one son, who is reported to have a diagnosis of an Autism Spectrum Disorder. He currently lives with his spouse in their private residence. He earned a BA in Business and attended graduate school for one year in Marketing at The University of Florida. He reported that he was a good student. He is Chairman and CEO of Reynolds and Reynolds Company.

**Behavioral Observations:** Mr. Brockman was tested during a single session as an outpatient. He arrived on time and was accompanied by his son who participated in the clinical interview. General appearance was neat and clean. He exhibited slowed, unsteady gait and slowed motor behavior. He evidenced a mild tremor which was notable on drawings but did not interfere with his performances. His mood was pleasant, and affect was appropriate but somewhat flat. Eye movements were unremarkable. Vision (with corrective lenses) and hearing were adequate for the testing session. His cognition fluctuated throughout the testing session. He appeared to be confused at times even in the middle of tasks that he originally was completing accurately. Conversational speech was coherent, but at times he appeared confused, particularly with following directions, and he was tangential without insight. There was no evidence of paraphasias. He showed moderately decreased ability to follow directions, and he often needed repetition of directions due to confusion. He lost place frequently during set task. He exhibited cooperative test-taking behavior, and his attitude towards the examiner was appropriate and friendly. He lacked insight into the severity of his cognitive impairments. The following results are thought to be an accurate estimation of his current cognitive abilities. He passed embedded measures of performance validity; therefore, the following results are thought to be an accurate estimation of his current cognitive abilities.

## MEASURES ADMINISTERED

Montréal Cognitive Assessment (MoCA); Clock Drawing Test; Controlled Oral Word Association Test (COWAT version: FAS); General Anxiety Disorder 7-item Scale; Geriatric Depression Scale; Hopkins Verbal Learning Test-Revised (HVLT-R); Neuropsychological Assessment Battery (NAB subtest: Naming); Praxis Examination; Rey Complex Figure Test-Meyers Version; Semantic Verbal Fluency Test (SVF version: Animals); Stroop Color-Word Interference Test (Stroop subtests: Color, Color-Word, and Word); Trail Making Test (TMT subtest: Trails A); Verbal Series Attention Test (VSAT); Wechsler Adult Intelligence Scale-IV (WAIS-IV subtests: Coding, Digit Span, Information, Similarities, and Visual Puzzles); Wechsler Memory Scale-4th Edition (WMS-IV subtests: Logical Memory II-Older Adult, Logical Memory I-Older Adult, Logical Memory Recognition-Older Adult, Visual Reproduction I, Visual Reproduction II, and Visual Reproduction Recognition). Clinical Interview with patient and his son. Mr. Brockman did not complete the Trail Making Test (TMT subtest: Trails B) measure due to cognitive/behavioral problems.

## NEUROPSYCHOLOGICAL FINDINGS

*The following clinical descriptors identify performance with the range of Standard Scores (average=100, standard deviation=15) indicated in parentheses: Very Superior (>130), Superior (120-129), High Average (110-119), Average, (90-109), Low Average (80-89), Borderline (70-79), and Deficient (<69). For diagnostic purposes, a cognitive deficit is considered a performance score that is >1.5 standard deviations away from the mean in the direction of poor performance compared to the reference group for that measure (i.e., Z-score) based on peers of similar age, gender, and education background as appropriate. This criterion is equivalent to a Standard Score <78, T-score <35, or a Scaled Score of <5).*

**Mental Status:** Evaluation of Mr. Brockman's general mental status on the MoCA revealed a score of 19/30, which is below expectation. He was incompletely oriented (5/6, missing the date) and short-term recall was 0/5. He

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Professor
**Department of Neurology**

was aided by category cueing for one word and multiple choice cueing for 3 words. He demonstrated difficulties with set shifting, drawing a cube, and placing the hands on a clock face. These three tasks took him 15 minutes to complete, and he attempted the drawing of the cube twice unsuccessfully. He named 2/3 pictured animals. He also had difficulties with serial subtractions and verbal fluency.

**Intellectual:** Mr. Brockman was administered subtests from a measure of general intellectual functioning (WAIS-IV) and obtained scores ranging from extremely low to average yielding a pro-rated Full Scale IQ estimate of 80 which is in the low average range.

**Attention / Concentration:** Attention and mental tracking for overlearned verbal sequences was deficient for speed and for accuracy. Immediate auditory attention span for digits was borderline with 5 digits forward, 3 digits backward, and 3 digits when re-ordering them in ascending sequence. Speed of single word reading and speed of color naming were deficient. Mental processing speed for manual code transcription was extremely low. Performance on a simple visual-motor sequencing task requiring scanning and mental tracking was deficient with 1 error.

**Executive:** Mr. Brockman's ability to inhibit a dominant verbal response in the face of incongruent visual stimuli was deficient. His abstract verbal reasoning was average. Performance on a complex visual-motor sequencing task requiring scanning, tracking, and set-shifting was impaired and the task was discontinued.

**Memory:** Recall of culturally-based general knowledge was average. Immediate recall of verbally presented contextual material was borderline impaired (SS=5). Delayed recall of the stories was borderline impaired (SS=4). Retention of initially learned material was 33.3%. Recognition memory was high average (20/23). Incremental learning for a semantically-categorized word list across 3 trials was deficient (3, 3, and 6 words per trial), and delayed recall was in the deficient range with 0.0% retention which falls within the deficient range. On recognition memory assessment, 9/12 target words were correctly identified, 5 false positive errors were committed, with discrimination accuracy in the deficient range.

Immediate recall of basic geometric figures was borderline impaired (SS=5). Delayed recall of the designs was deficient (SS=2). Retention of the initially learned material was 0.0%. Recognition memory was borderline impaired (1/7).

**Language:** Lexical fluency was low average with between 8 to 12 words generated per trial. Semantic fluency was deficient with 9 exemplars generated. Confrontation naming of pictured objects was high average (NAB Form 1; 30/31).

**Visual-Perceptual:** His drawing of a complex geometric design scored in the deficient range. Time required to copy design was borderline impaired. After 5 minutes of attempting to copy this design, the gestalt was not present, and he reported that he was unable to perform this task. His spatial reasoning ability to mentally arrange puzzle pieces was low average. Visuoconceptual ability to draw a clock was impaired to command (CDT=6/10) and impaired when copying a model (CDT=7/10). On command clock on the MoCA, he drew the hands to the 10 and the 11 for "10 after 11," and he attempted to place the hands first prior to writing in the numbers. When later asked to draw a clock, he drew a clock face and the numbers 12, 3 and 5, with 13 tic marks and two hands pointing to the second and third tic mark for "10 after 11." When asked to copy a clock, he omitted the number 10 and wrote the numbers 12-7 in the right half of the clock. He did not maintain the hand size differentiation.

7200 Cambridge • 9th Floor • Houston, Texas 77030 • (713) 798-8673 • (713) 798-8573 Fax
Neuropsychology@bcm.edu

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Professor
**Department of Neurology**

**Motor Functioning:** Mr. Brockman is right-hand dominant. On formal examination, buccofacial, transitive, and intransitive classes of praxis were intact.

**Mood / Personality:** On a self-report measure of anxiety, his responses fell in the mild range (GAD-7=5/21). On a face valid measure used to assess cognitive, emotional and physical symptoms of depression, Mr. Brockman endorsed the following, suggestive of probable depression (GDS=20): presently unsatisfied with life, terminating activities and/or lack of interest, boredom, lack of hope regarding the future, generally poor spirit/mood, feeling as though something negative is going to occur, unhappiness, helplessness, preferring to stay home, worry about the future, declines in memory, downhearted and blue, worthlessness, lack of excitement for life, difficulty beginning new projects, poor energy, difficulties with concentration, lack of enjoyment first thing in the morning, and general declines in thinking skills.

## SUMMARY AND IMPRESSION

Mr. Brockman is a 78 year-old, right-hand dominant, Caucasian male who underwent an independent neuropsychological evaluation as a component of a forensic evaluation. The factual matters stated in this report are, as far as I know, true, and the opinions in the report are genuinely held by me and the report contains reference to all matters I consider significant.

It is this examiner's opinion based on the testing conducted and behavioral observations that Mr. Brockman was putting forth full effort and was not exaggerating or embellishing the nature and extent of his cognitive impairment. It is noted that neuropsychological tests were chosen to best assess Mr. Brockman's cognitive abilities. The testing environment was optimal and the following results are considered a valid estimate of his current neuropsychological and emotional status.

Mr. Brockman currently operates in the low average range of general intellectual functioning (WAIS-IV FSIQ=80), which is a significant decline from his estimated premorbid intellectual functioning in the high average range (TOPF=114, from March 2019 evaluation). His MoCA was 19/30 (total), 5/6 (orientation), and 0/5 (short-term recall), which is moderately impaired. Self-report of depression was elevated (GDS=20), and anxiety was mildly elevated (GAD-7=5).

Mr. Brockman demonstrated borderline impaired to deficient performances on measures of basic attention, oral and written processing speed, executive functions (including working memory, problem solving, inhibition, and set shifting), learning and recall of prose material and a word list, learning and recall of visual material, and basic and complex visuospatial functioning. His intellectual functioning subtest scores declined from his last evaluation ranging from the deficient to the average range. He continues to demonstrate average scores on fund of information, naming, verbal fluency, and verbal and visual reasoning.

Comparison with prior results obtained on 12/03/2019 revealed the following pattern of interim changes:

**Declines were found in the areas of:**

- Intellectual functioning (Full Scale Index: average to low average)
- Semantic fluency (low average to deficient)
- Inhibition (borderline impaired to deficient)
- Graphomotor sequencing (further in deficient range)

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Professor
**Department of Neurology**

- Basic attention (forward and backward: average to low average; sequencing: average to bordelrine impaired)
- Learning of prose material (average to borderline impaired)
- Delayed recall of prose material (low average to borderline impaired)
- Visuospatial construction (Clock drawing and Rey-O)

**No interim Improvements were found as compared to his performance on 12/03/2019.**

Mr. Brockman's current cognitive functioning was impaired across all domains assessed, with significant interim declines noted from his evaluation in March 2019. He continued to demonstrate significant cognitive fluctuations throughout the evaluation with confusion and impaired abilities to follow instructions. Mr. Brockman's pattern of neuropsychological performance continues to indicate a dementia of mild to moderate severity characterized by deficits in the areas of verbal and nonverbal episodic memory, processing speed, executive functioning, and visuospatial functioning with significant functional declines. Mr. Brockman denies experiencing well-formed visual hallucinations; however, he has experienced visual illusions, brief visual hallucinations, and a recent delusional episode. His current cognitive pattern and his parkinsonism, taken together with his dementia at the time of diagnosis of his movement disorder, cognitive fluctuations, and REM Behavior Disorder continue to suggest Dementia with Lewy Bodies. His cognitive profile demonstrated interim cognitive declines across all domains assessed.

Based on the current cognitive findings, his diagnosis of dementia, and the breadth and severity of his cognitive impairments and fluctuations, it remains my opinion that Mr. Brockman is unable to participate and aid in his own defense. Due to the neurodegenerative nature of this disease and the lack of effective treatments, his prognosis is for continued cognitive decline. He is unable to recall and demonstrate a thorough understanding of the relevant elements of the issues surrounding the case and manipulate this information in a logical manner that will allow him to make comparisons and weigh his options.

It is this examiner's opinion based on record review, behavioral observations, patient interview, and current and previous neuropsychological assessments.

Michele K York, PhD

Michele K. York, PhD, ABPP-CN
Board Certified Neuropsychologist License #31159

# EXHIBIT S



**Examples of visuospatial performances for Mr. Brockman**

**Rey Complex Figure Test – Copy of a Design**

**03/01/2019** **12/03/2019** **10/07/2020**

**Clock Drawing "10 after 11"**

**03/01/2019** **12/03/2019**

**10/07/2020** **10/07/2020** **10/07/2020**

**Copy**

**Copy of a cube 10/07/2020**

**1st Attempt**

**Copy of a cube 10/07/2020**

**2nd Attempt**

Jason Varnado (State Bar No. 211067)
jvarnado@jonesday.com
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
Telephone +1-832-239-3939
Facsimile +1-832-239-3600

Neal J. Stephens (State Bar No. 152071)
nstephens@jonesday.com
Vincent Doctor (State Bar No. 319408)
vdoctor@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone: +1-650-739-3939
Facsimile: +1-650-739-3900

Kathryn Keneally
(appearance *pro hac vice*)
New York State Bar No. 1866250
kkeneally@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281-047
Telephone: +1-212-326-3939
Facsimile: +1-212-755-7306

Attorneys for Defendant
ROBERT T. BROCKMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

ROBERT T. BROCKMAN,

Defendant.

Case No. 3.20-cr-00371-WHA

DECLARATION OF PETER J. ROMATOWSKI IN SUPPORT OF DEFENDANT ROBERT T. BROCKMAN'S MOTION FOR A HEARING TO DETERMINE WHETHER MR. BROCKMAN IS COMPETENT TO ASSIST IN HIS DEFENSE

**DECLARATION OF PETER J. ROMATOWSKI**

I, Peter J. Romatowski, declare as follows:

1. I am a member of the bars of the District of Columbia, the states of Montana and New York, the United States Supreme Court and various other federal courts. I am of counsel to the law firm Jones Day, counsel for the defendant Robert T. Brockman. I make this Declaration in support of Defendant Robert T. Brockman's Motion For a Hearing to Determine Whether Mr. Brockman is Competent to Assist in His Defense.

2. I served from 1979 to 1986 as an assistant United States attorney. In that role I investigated, prosecuted and tried cases involving the full range of federal offenses, with a particular focus on securities fraud. *See, e.g.*, *United States v. Winans,* 612 F. Supp. 827 (S.D.N.Y. 1985), *aff'd in part, rev'd in part part sub nom. United States v. Carpenter*, 791 F.2d 1024 (2d Cir. 1986), *aff'd sub nom. Carpenter v. United States,* 484 U.S. 19 (1987). Since 1986, I have been engaged in the private practice of law, specializing almost exclusively in white collar criminal defense, and defense of regulatory investigations and enforcement actions by the U.S. Securities and Exchange Commission. I am a fellow of the American College of Trial Lawyers.

3. In the course of that experience, I have engaged with hundreds of witnesses, in order to gain their assistance in the prosecution or defense of federal criminal cases. This includes clients, one of whom was approximately Mr. Brockman's age, who assisted effectively in their own successful defense of complex regulatory charges in federal criminal jury trials. I have testified in a federal grand jury (as a law student) and in a federal criminal jury trial (while in private practice, called as a witness by the government). I believe that I recognize those cognitive and other skills that enable individuals to assist effectively in the prosecution or defense of such cases, whether as a witness or a defendant. It is my firm opinion that Mr. Brockman cannot do so.

4. From that experience, I also have an appreciation of the participation that is necessary from knowledgeable witnesses in order to assemble and present in court a case of the complexity of this one, whether on behalf of the prosecution or the defense. Mr. Brockman's assistance is indispensable to the defense of the Indictment, and he is unable to render it.

5. I first met Mr. Brockman when my firm was retained as his counsel in September 2018. Between that date and March 2020 when the pandemic prevented further meetings in person, my colleagues and I met with Mr. Brockman ten times at his home in Houston, and once at a summer residence in Colorado. Each of these meetings was several hours in length. In addition, we have had countless meetings with Mr. Brockman by telephone.

6. By this declaration, I do not and do not intend to waive Mr. Brockman's attorney-client privilege or work product protection. I have not disclosed any conversation by which Mr. Brockman requested or we gave legal advice. I disclose below only that part of a conversation on July 18, 2019 which Mr. Brockman initiated for another purpose, to convey information to us concerning his medical condition, and my personal observations of his physical and cognitive condition.

7. On July 18, 2019, I met with Mr. Brockman at a summer residence in Aspen, Colorado. Two other Jones Day attorneys, Kathryn Keneally and Georgina Druce, participated in that meeting by conference call.

8. At the outset of the July 18, 2019 meeting, Mr. Brockman told us that he had an issue that he wanted to raise. He showed me a binder that contained medical reports. He explained that he had been diagnosed with Parkinson's disease and dementia. He expressed surprise concerning this diagnosis. He explained that he wanted us to understand that he may need us to address issues with him more slowly, that he may have some difficulty remembering what we told him, and that he may need to review things several times to understand what he needed to know. He never suggested or asked whether this medical condition would have any legal consequence for the criminal investigation.

9. We subsequently obtained the medical reports from Mr. Brockman. I now understand that Mr. Brockman's doctors diagnosed that he has cognitive impairment and other symptoms consistent with Parkinson's disease, parkinsonism, or Lewy body dementia, or some combination of the three.

10. The information provided in the medical reports is consistent with and helped me to better understand my experience with Mr. Brockman throughout this representation.

11. In my experience in communicating with Mr. Brockman, I have found that he has consistently been unable to assist in his defense, either by providing his own account of past events, or by providing leads to other evidence. He is unable to review and evaluate documents. I have also experienced repeated instances in which he did not retain information that we had provided to him. In certain instances, when we would provide him with information, he would

report it back to us a few days later, often in garbled form, as if it were something that he remembered separate from and without regard to having heard it from us. In other instances, he repeatedly provides us the same information, regardless of relevance.

12. I do not believe that this experience has been the product of any deliberate deception on Mr. Brockman's part. There have been many occasions where Mr. Brockman understood our questions sufficiently to recognize that an obvious answer – or any answer at all – would better serve his interests. Yet he is unable to provide any answer.

13. My experience with Mr. Brockman is consistent with – in fact is well explained by – the findings that I have read in the medical reports from his treating physicians.

14. Further, it has been my layman's observation that Mr. Brockman's disabilities have worsened over time. He has become more physically frail. He has slowed down in many respects, from his walking gait to his response time in ordinary conversation. He is having increasingly greater difficulty in understanding information that we provide or inquiries that we put to him.

15. Stated at its simplest, Mr. Brockman has proven unable to assist us in his defense.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in McLean, Virginia, on December 8, 2020.

Peter J. Romatowski

Jason Varnado (State Bar No. 211067)
jvarnado@jonesday.com
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
Telephone +1-832-239-3939
Facsimile +1-832-239-3600

Neal J. Stephens (State Bar No. 152071)
nstephens@jonesday.com
Vincent Doctor (State Bar No. 319408)
vdoctor@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone: +1-650-739-3939
Facsimile: +1-650-739-3900

Kathryn Keneally (appearance *pro hac vice*)
New York State Bar No. 1866250
kkeneally@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281-047
Telephone: +1-212-326-3939
Facsimile: +1-212-755-7306

Attorneys for Defendant
ROBERT T. BROCKMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

ROBERT T. BROCKMAN,

Defendant.

Case No. 3:20-cr-00371-WHA

[PROPOSED] ORDER GRANTING DEFENDANT ROBERT T. BROCKMAN'S MOTION FOR A HEARING TO DETERMINE WHETHER MR. BROCKMAN IS COMPETENT TO ASSIST IN HIS DEFENSE

Date: January 12, 2021
Time: 2:00 p.m.
Judge: Hon. William Alsup
Place: Courtroom 12

[Proposed] Order Granting Defendant Robert Brockman's Motion for a Hearing to Determine Whether Mr. Brockman is Competent to Assist in His Defense 3:20-cr-00371-WHA

Having considered Defendant Robert T. Brockman's Motion for a Hearing to Determine Whether Mr. Brockman is Competent to Assist in His Defense, other documents in support of and in opposition to the motion and in the record in this matter, the arguments of counsel at the hearing on the motion, and good cause appearing therefore,

Mr. Brockman's Motion for a Hearing to Determine Whether Mr. Brockman is Competent to Assist in His Defense is **GRANTED**. A Competency Hearing on this matter shall be conducted on ___________________, 2021, Courtroom 12, before Judge William Alsup, pursuant to 18 U.S.C. §§ 4241(c) and 4247(d).

**IT IS SO ORDERED.**

DATED: __________________________

By: ___________________________________
HONORABLE WILLIAM ALSUP
United States District Court Judge

- 2 -

[Proposed] Order Granting Defendant Robert Brockman's Motion for a Hearing to Determine Whether Mr. Brockman is Competent to Assist in His Defense 3:20-cr-00371-WHA

Jason Varnado (State Bar No. 211067)
jvarnado@jonesday.com
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
Telephone +1-832-239-3939
Facsimile +1-832-239-3600

Neal J. Stephens (State Bar No. 152071)
nstephens@jonesday.com
Vincent Doctor (State Bar No. 319408)
vdoctor@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone: +1-650-739-3939
Facsimile: +1-650-739-3900

Kathryn Keneally (appearance *pro hac vice*)
New York State Bar No. 1866250
kkeneally@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281-047
Telephone: +1-212-326-3939
Facsimile: +1-212-755-7306

Attorneys for Defendant
ROBERT T. BROCKMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

ROBERT T. BROCKMAN,

Defendant.

Case No. 3:20-cr-00371-WHA

DEFENDANT ROBERT T. BROCKMAN'S REPLY IN SUPPORT OF MOTION TO DISMISS IN PART FOR LACK OF VENUE AND TO TRANSFER TO THE SOUTHERN DISTRICT OF TEXAS

Date: December 15, 2020
Time: 12:00 p.m.
Judge: Hon. William Alsup
Place: Courtroom 12

# TABLE OF CONTENTS

**Page**

I. THE FOREIGN BANK ACCOUNT REPORT ("FBAR") COUNTS NINE THROUGH FOURTEEN MUST BE DISMISSED IN THIS DISTRICT FOR IMPROPER VENUE ..... 1

II. THE *PLATT* FACTORS FAVOR TRANSFER, AS SEVERAL FACTORS SUPPORT TRANSFER AND NO FACTOR SUPPORTS TRIAL IN THIS DISTRICT ..... 5

- A. "*Platt* factor" # 1: the location of the defendant ..... 6
- B. "*Platt* factor" # 2: the location of possible witnesses ..... 7
- C. "*Platt* factor" # 3: location of events likely to be in issue ..... 10
- D. "*Platt* factor" # 4: location of records ..... 11
- E. "*Platt* factor" # 5: disruption to the defendant's business ..... 11
- F. "*Platt* factor" # 6: expense to the parties ..... 11
- G. "*Platt* factor" # 7: location of counsel ..... 12
- H. "*Platt* factor" # 8: relative accessibility of place of trial ..... 12
- I. "*Platt* factor" # 9: docket condition of each district or division involved ..... 12
- J. "*Platt* factor" # 10: "Special Elements" ..... 14

III. CONCLUSION ..... 14

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Johnston v. United States*,
351 U.S. 215 (1956) ....................................................... 1

*Platt v. Minnesota Min. & Mfg. Co.*,
376 U.S. 240 (1964) ....................................................... *passim*

*Sturgis v. Goldsmith*,
796 F.2d 1103 (9th Cir. 1986) ....................................................... 10

*United States v. Blakstad*,
2020 WL 5992347 (S.D.N.Y. Oct. 9, 2020) ....................................................... 9

*United States v. Bowdoin*,
770 F. Supp. 2d 133 (D.D.C. 2011) ....................................................... 7

*United States v. Bradley*,
644 F.3d 1213 (11th Cir. 2011) ....................................................... 3, 4

*United States v. Cabrales*,
524 U.S. 1 (1998) ....................................................... 1, 2

*United States v. Calk*,
2020 WL 703391 (S.D.N.Y. Feb. 12, 2020) ....................................................... 9

*United States v. Clines*,
958 F.2d 578 (4th Cir. 1992) ....................................................... 3, 4

*United States v. Clinton*,
574 F.2d 464 (9th Cir. 1978) ....................................................... 2

*United States v. Coffee*,
113 F. Supp. 2d 751 (E.D. Pa. 2000) ....................................................... 11

*United States v. Cooper*,
2019 WL 404962 (D. Haw. Jan. 31, 2019) ....................................................... 6

*United States v. Daewoo Indus. Co.*,
591 F. Supp. 157 (D. Ore. 1984) ....................................................... 7

*United States v. Francis*,
2008 WL 1711543 (D. Nev. Apr. 11, 2008) ....................................................... 8

*United States v. Fritts*,
2005 WL 3299834 (N.D. Cal. Dec. 6, 2005) ........ 5, 6, 8

*United States v. Hassanshahi*,
185 F. Supp. 3d 55 (D.D.C. 2016) ........ 4

*United States v. Lombardo*,
241 U.S. 73 (1916) ........ 4

*United States v. Prasad*,
2018 WL 3706836 (E.D. Cal. Aug. 3, 2018) ........ 9

*United States v. Shayota*,
2015 WL 9311922 (N.D. Cal. Dec. 23, 2015) ........ 9

*United States v. Spy Factory, Inc.*,
951 F. Supp. 450 (S.D.N.Y. 1997) ........ 9

*United States v. Testa*,
548 F.2d 847 (9th Cir. 1977) ........ 9

*United States v. Williams*,
2013 WL 4510599 (D. Haw. Aug. 22, 2013) ........ 6

**STATUTES**

31 U.S.C. § 5314 ........ 1, 3

31 U.S.C. § 5322 ........ 3

**OTHER AUTHORITIES**

28 C.F.R. 0.70 ........ 12

31 C.F.R. § 1010.350 ........ 1, 2

Fed. R. Crim. P. 12 ........ 14

Fed. R. Crim. P. 18 ........ 1

Fed. R. Crim. P. 21 ........ 7, 8, 14

U.S. Const. Amend. VI ........ 1

U.S. Const. Art. III, § 2 ........ 1

**DEFENDANT ROBERT T. BROCKMAN'S REPLY IN SUPPORT OF MOTION TO DISMISS IN PART FOR LACK OF VENUE AND TO TRANSFER TO THE SOUTHERN DISTRICT OF TEXAS**

Defendant Robert T. Brockman's Motion to Dismiss in Part for Lack of Venue and to Transfer to the Southern District of Texas (the "Motion"), ECF No. 49, should be granted.

Foremost, there is no basis for venue in this District for Counts Nine through Fourteen of the Indictment, and those counts must be dismissed if this case remains here. Moreover, the factors relevant to venue strongly favor transfer of the entire case to the Southern District of Texas, where Mr. Brockman has long lived, relevant witnesses and events are likely to be centered, and docket conditions will allow the case to proceed more expeditiously.

**I. THE FOREIGN BANK ACCOUNT REPORT ("FBAR") COUNTS NINE THROUGH FOURTEEN MUST BE DISMISSED IN THIS DISTRICT FOR IMPROPER VENUE**

Even the government must acknowledge the "law that is not in doubt: Both Rule 18 of the Federal Rules of Criminal Procedure and the Constitution require that a person be tried for an offense where that offense is committed; also, the site of a charged offense 'must be determined from the nature of the crime alleged and the location of the act or acts constituting it.'" *United States v. Cabrales*, 524 U.S. 1, 5 (1998) (citations and internal quotations omitted); *see also* Def.'s Mot. at 17; Gov't Opp'n at 1 (the "Opposition"), ECF No. 63; U.S. Const. Art. III, § 2; U.S. Const. Amend. VI; Fed. R. Crim. P. 18.

The offense charged in Counts Nine through Fourteen is defined in 31 C.F.R. § 1010.350(a), enacted under 31 U.S.C. § 5314:

> Each United States person having a financial interest in . . . a bank, securities, or other financial account in a foreign country shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists and shall provide such information as . . . specified in . . . the Report of Foreign Bank and Financial Accounts[.]

Courts have uniformly held that venue for charges for failure to perform such a required act lies in one of two places: where the required act should have been performed or a required filing should have been received, *see, e.g.*, *Johnston v. United States*, 351 U.S. 215, 220 (1956) (failure to perform alternatives to military service), or the resident district of the defendant. *See,*

Reply in Support of Motion to Dismiss in Part for Lack of Venue and Transfer to the Southern District of Texas 3:20-cr-00371-WHA

- 1 -

*e.g.*, *United States v. Clinton*, 574 F.2d 464, 465 (9th Cir. 1978) (failure to file tax returns). In this case, neither of these places is the Northern District of California.

The government erroneously contends the FBAR counts may be brought in this District because (1) venue is proper here for the tax and conspiracy charges in the Indictment, Gov't Opp'n at 4-5; (2) "FBAR charges can be brought in any district," Gov't Opp'n at 4; and (3) the FBAR counts "were not brought here as an exercise in forum shopping, and because trying them here will create no unfairness or undue hardship to Defendant." Gov't Opp'n at 5. The government offers no law in support of any of these unprecedented positions.

(1) First, the government contends that, because each of the FBAR counts contains the bare allegation that Mr. Brockman failed to file FBARs "while violating another law of the United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period," it somehow can bring charges for failure to file FBARs anywhere that the illegal activity is alleged to have occurred. Gov't Opp'n at 4. The government's single paragraph on this point is strikingly devoid of any legal citation, and the law is to the contrary.

The government ignores the fundamental rule that "[t]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Cabrales*, 524 U.S. at 6-7 (quotation marks and citation omitted). The Supreme Court in *Cabrales* rejected the government's argument that, because an element of the crime of money laundering is that the funds be derived from specified unlawful activity, venue was permitted in the district where the specified unlawful activity took place. *Id.* As the Court stated, the "nature of the crime alleged" was "defined in statutory proscriptions that interdict only the *financial transactions*," which occurred in one district, and not "the *anterior criminal conduct* [which occurred in another district] that yielded the funds allegedly laundered." *Id*. at 6–7 (internal citations omitted) (emphasis added).

So too in this case, the regulation that defines the legal duty, and creates an offense for failure to comply, requires simply that each person with an interest in a financial account in a foreign country "shall *report* such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists." 31 C.F.R. § 1010.350(a) (emphasis added). The venue

Reply in Support of Motion to Dismiss in Part for Lack of Venue
and Transfer to the Southern District of Texas 3:20-cr-00371-WHA
- 2 -

for that reporting offense lies in the district where the defendant resides (the Southern District of Texas), or in the district where the FBAR was due to be received (the Eastern District of Virginia).

Separate and apart from that definition of the offense in the regulation adopted under 31 U.S.C. § 5314, Section 5322 is captioned "Criminal Penalties," and sets out escalating sanctions depending upon the presence (or absence) of aggravating factors: Subsection (a) provides a $250,000 fine or up to five years imprisonment for the ordinary violation, and Subsection (b) increases this to $500,000 or 10 years for violators who fail to report "while violating another law of the United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period." 31 U.S.C. § 5322.

But the government cites no court that has held that this separate *sentencing enhancement* creates expansive venue for the *failure to report* offense itself. This Court should not be the first.

(2) The government makes the extravagant claim that "FBAR charges can be brought in any district." Gov't Opp'n at 4, relying on *United States v. Bradley*, 644 F.3d 1213 (11th Cir. 2011) and *United States v. Clines*, 958 F.2d 578 (4th Cir. 1992). That argument is as disingenuous as it is out-of-date.

At the time of the offenses alleged in *Bradley* and *Clines*, "[t]he form in question, Form 90–22.1, could be filed either by mailing it to the IRS in Detroit, Michigan, or *by hand-delivering it to any local IRS office*." *Bradley*, 644 F.3d at 1252 (emphasis added); *see also Clines*, 958 F.2d at 583. Those cases found this latter alternative dispositive in favor of nationwide venue. "Thus, for purposes of venue, the form [was] 'required' to be filed in any and every district that houses a local IRS office." *Bradley*, 644 F.3d at 1252; *see also Clines*, 958 F.2d at 583 ("Because [the FBAR form] also provides that filing may occur in any local office, we conclude that venue in the District of Maryland was proper.").

The best that can be said for the "nationwide venue" argument is that the IRS wrote it out of the law in 2013—the first year the Indictment alleges that Mr. Brockman failed to file an FBAR. Since tax year 2013, the IRS has required that FBARs be filed electronically, directly with the Financial Crimes Enforcement Network (FinCEN) located in Vienna, Virginia. Def.'s Mot. at

17.[1] The government admits that "beginning on July 1, 2013, FBARs had to be filed electronically, and not in any office of the IRS as before," Gov't Opp'n at 5, but fails to acknowledge that the change renders *Bradley* and *Clines* irrelevant as precedent.

The government leaves dangling the observation that "[n]ow FBAR forms can be filed electronically from anywhere," as if that might imply that "FBAR charges can be brought anywhere." Gov't Opp'n at 5. Worse than the stale argument from *Bradley* and *Clines*, the illogic of that *non-sequitur* was rejected by the Supreme Court 104 years ago. In *United States v. Lombardo*, 241 U.S. 73 (1916), the defendant in Seattle was charged with failure to file a report required to be filed in Washington, D.C. with the Commissioner of General Immigration. The Supreme Court rejected the government's contention that prosecution for failure to file was proper in Seattle because "the filing of the statement need not be at the office in Washington, but may be deposited in the postoffice of the United States," so as to provide venue wherever there was a post office. *Id.* at 76.

Although fewer cases have addressed this issue since the switch to electronic filing, the result is the same: the place fixed for performance is where the filing was to be *received*, not every possible location from which a filing could be sent. *See, e.g.*, *United States v. Hassanshahi*, 185 F. Supp. 3d 55, 58 (D.D.C. 2016) (finding in failure-to-file case that proper venue was "the place of *performance* of the request," meaning the place where "application must be sent to, received by, and then approved . . . regardless of from where that request is sent") (emphasis in original). The fact that this authority construed "a different statute," as the government remarks, is meaningless, as even the government cannot explain why the FBAR statute should be analyzed any differently. Gov't Opp'n at 5.

(3) The government's final attempt at articulating its position—that the FBAR charges may remain in this District because, per the government's phrasing, the charges "were not brought here as an exercise in forum shopping, and because trying them here will create no unfairness or undue hardship to Defendant," Gov't Opp'n at 5—does not cure the lack of venue

[1] *See also* https://www.fincen.gov/how-do-i-file-fbar; https://www.fincen.gov/sites/default/files/shared/FBAR%20Line%20Item%20Filing%20Instructions.pdf, at *8.

Reply in Support of Motion to Dismiss in Part for Lack of Venue and Transfer to the Southern District of Texas 3:20-cr-00371-WHA

- 4 -

for the FBAR counts, and flatly contradicts the reality of this case.

The government has two choices for venue for the FBAR charges: the Southern District of Texas, the place where Mr. Brockman has lived for over five decades and where, if in fact and law he was required to file, any failure to do so took place; or the Eastern District of Virginia, where any required FBAR filing would have been received. The government's attempt, without any authority, to keep the FBAR counts in this District lacks legal support and is an improper attempt to keep this case at a location distant from Mr. Brockman's residence.

The government would have this Court do what no court has done: find that there is venue for failure to file an FBAR in a district other than where the filing would have been received or where the defendant resides. And the government is seeking to put this stake down in a case in which, independent of the FBAR venue issue, the facts and law amply support transfer of the entire case to a district where venue would also clearly lie for the FBAR counts. But if this case remains in this District, Counts Nine through Fourteen must be dismissed.

## II. THE *PLATT* FACTORS FAVOR TRANSFER, AS SEVERAL FACTORS SUPPORT TRANSFER AND NO FACTOR SUPPORTS TRIAL IN THIS DISTRICT

As this Court has observed, and as the government does not dispute, there is no presumption favoring the prosecution's choice of venue in criminal cases. *See United States v. Fritts*, 2005 WL 3299834, at *2 (N.D. Cal. Dec. 6, 2005) (Alsup, J.). The government expends roughly half of its Opposition in a misdirected argument exaggerating the basis for venue in this district. Gov't Opp'n at 1-6. Apart from the FBAR counts, for which there is no venue in this District, the issue on this Motion is not whether there is *any* basis for venue in this District, but whether this case would be better moved to another district.

As no one can dispute, the test for deciding whether to transfer venue is determined by the ten factors set forth by the Supreme Court in *Platt v. Minnesota Min. & Mfg. Co.*, 376 U.S. 240, 243-44 (1964). Def.'s Mot. at 8; Gov't Opp'n at 6-7. To reiterate, those factors are: "(1) location of [the] defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of [the] defendant's business unless the case is transferred; (6) expense to the parties; (7) location of

counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division involved; and (10) any other special elements which might affect the transfer." *Platt*, 376 U.S. at 243-44; *see also, e.g.*, *Fritts*, 2005 WL 3299834, at *2.

Mr. Brockman's Motion was supported with detailed submissions. *See* Def.'s Mot. at 8-16; Keneally Decl. and accompanying exhibits.[2] In response, the government's Opposition offers no evidence or potential testimony when discussing the *Platt* factors,[3] nor does the government even cite the Indictment. Gov't Opp'n at 7-12. Instead, the government's *ipse dixit* seeks to gloss over or misconstrue the reasons why this case better belongs in the Southern District of Texas.

### A. "*Platt* factor" # 1: the location of the defendant

Mr. Brockman's long-time home in Houston, Texas weighs strongly in favor of transfer.

There is no dispute that Mr. Brockman currently resides in Houston, and has lived there for over five decades. The government's assertion that Mr. Brockman is "not particularly tethered" to the district where he has made a home with his wife and family and built a business, is as cavalier as it is groundless. *See* Gov't Opp'n at 7. The bland reference to "private jet records and other evidence" of travel to other locations, Gov't Opp'n at 7, in no way diminishes the paramount principle—which is even the government's stated policy for criminal tax prosecutions—that "'a defendant should ordinarily be tried, whenever possible, where he resides.'" *United States v. Williams*, 2013 WL 4510599, at *2 (D. Haw. Aug. 22, 2013) (quoting *United States v. Aronoff*, 463 F. Supp. 454, 457 (S.D.N.Y. 1978)); *see also* U.S. Dep't of Justice, Criminal Tax Manual § 6.01[2] (2012) (stating policy "generally to attempt to establish venue for a criminal tax prosecution in the judicial district of the taxpayer's residence or principal place of business."). This principle is particularly applicable in a case with a complex and likely lengthy trial. *See, e.g.*, *United States v. Cooper*, 2019 WL 404962, *2 (D. Haw. Jan. 31, 2019) (noting

[2] "Keneally Decl." refers to the Declaration of Kathryn Keneally, affirmed November 30, 2020 and submitted in support of the Motion. ECF No. 49-1.

[3] *See* Criminal L.R. 47–2 (requiring compliance with Civil L.R. 7–5, which in turn requires that "[f]actual contentions made in support of or in opposition to any motion must be supported by an affidavit or declaration and by appropriate references to the record").

Reply in Support of Motion to Dismiss in Part for Lack of Venue and Transfer to the Southern District of Texas 3:20-cr-00371-WHA

- 6 -

that a longer trial makes the location of the defendant's home more important).

Finally, nowhere in its Opposition does the government even acknowledge the gravity of Mr. Brockman's medical condition that has manifested in movement disorders and cognitive impairment. Pool Decl. ¶¶ 3-5.[4] Instead the government cynically dismisses Mr. Brockman's "amorphous malaise." Gov't Opp'n at 9. The doctors who have diagnosed and treated Mr. Brockman state that he has Parkinson's disease, parkinsonism, or Lewy body dementia, or some combination of the three. Pool Decl. ¶ 5.[5] These are degenerative, progressive, non-curable conditions that, in Mr. Brockman's case, have resulted in dementia. Pool Decl. ¶ 5. There is nothing "amorphous" about Mr. Brockman's condition, which goes far beyond "malaise."

The government simply has no answer to the attestation by Mr. Brockman's primary care physician that facing legal proceedings at some distance from his home would create a risk "to his existing cardiac condition, and could exacerbate the overall progression of his symptoms." Pool Decl. ¶ 10; *see also United States v. Bowdoin*, 770 F. Supp. 2d 133, 142 (D.D.C. 2011) (transfer should be granted when a defendant's "ill health would prevent a defendant from full participation at his own trial").

**B. "*Platt* factor" # 2: the location of possible witnesses**

From the first pretrial conference, the government has boasted that it is "ready for trial." *See* Nov. 17, 2020 Hr'g Tr. at 15:20–15:25, ECF No. 47; Dec. 1, 2020 Hr'g Tr. at 11:23–12:25, ECF No. 61. Yet the government does not identify a single witness by name, much less explain the length or importance of any witness testimony, to support its contention that this factor favors the Northern District of California. *See United States v. Daewoo Indus. Co.*, 591 F. Supp. 157, 160 (D. Ore. 1984) (granting Rule 21(b) transfer; "The Ninth Circuit has required more than a bald statement of numbers and general location of witnesses in the cases

[4] "Pool Decl." refers to the Declaration of James L. Pool, M.D., affirmed November 25, 2020 and submitted in support of the Motion. ECF No. 49-2.

[5] A total of seven diagnostic and forensic reports from three medical doctors and a neuropsychologist, based on examinations conducted over a period of nearly two years, have been submitted to this Court in support of the defense's Motion For a Hearing to Determine Whether Mr. Brockman is Competent to Assist in His Defense on December 8, 2020. *See* Declaration of Kathryn Keneally in Support of Defendant Robert T. Brockman's Motion for a Hearing to Determine Whether Mr. Brockman is Competent to Assist in His Defense, ECF No. 64-1.

Reply in Support of Motion to Dismiss in Part for Lack of Venue and Transfer to the Southern District of Texas 3:20-cr-00371-WHA

- 7 -

where the issue of witness convenience is addressed;" here "the government proposes to call fifty-six witnesses but refuses to disclose their identities or location," except by general area); *United States v. Francis*, 2008 WL 1711543, at *2 (D. Nev. Apr. 11, 2008) (granting Rule 21(b) transfer in tax evasion prosecution; "The cases require that the witnesses be identified, and the nature of their testimony described."). The potential witnesses the government identified by position are not demonstrated to be anything more significant than document custodians.

The government states that it "expects to call at least one, and possible [sic] as many as three, local Vista facts witnesses at trial," Gov't Opp'n at 8, presumably to testify to the local back-office administration of Vista's investment funds that is emphasized in the government's Opposition. *See* Gov't Opp'n at 3. Since no other role is attributed to these or any other witness in the government's Opposition, they cannot be regarded as anything more than "custodians of records [who] sometimes are not called at trial because the parties stipulate to the authenticity of and foundation for the records." *Fritts*, 2005 WL 3299834, at *3. By contrast, the government nowhere acknowledges the importance of Robert Smith ("Individual Two" in the Indictment), Vista's founder, a key witness and government cooperator who resides in Vista's headquarters city of Austin, Texas, less than 200 miles from the federal courthouse in Houston. Keneally Decl. ¶ 21, Ex. F, Ex. G, Ex. H, Ex. I, Ex. J, Ex. K, Ex. M.

The only other reference by the government under this factor is its complaint that "the Motion glosses over the fact that there are at least two victim entities – Entity One and Entity Two in the Indictment – in the Northern District." Gov't Opp'n at 8. So too does the government "gloss over" this fact, offering no description of who might testify from either Entity, or what that testimony might be, much less why it compels a trial in this District. Gov't Opp'n at 8. The Opposition ignores the defense's summary from the Indictment: at most, these two unnamed entities are alleged to have sold debt to Deutsche Bank eleven years ago with no knowledge of or dealings with Mr. Brockman, or the counter-party to whom Deutsche Bank might sell the debt. Indictment ¶¶ 178-79, 183, 189; *see* Def.'s Mot. at 6-7, 11. The government offers nothing to refute that these entities' role is no more than a thin thread by which the government has claimed a technically sufficient case for venue in this District. *Fritts*, 2005 WL 3299834, at *3.

Reply in Support of Motion to Dismiss in Part for Lack of Venue
and Transfer to the Southern District of Texas 3:20-cr-00371-WHA
- 8 -

To deflect its own default in describing the evidence, the government faults the defense for failing to identify specific trial witnesses, Gov't Opp'n at 8, after delaying until last week the first production of some of the 1.1 terabytes (the equivalent of 22 million pages) of discovery. This case is at its earliest stages, which is itself a factor that supports timely transfer. *See United States v. Testa*, 548 F.2d 847, 857 (9th Cir. 1977) (noting that it is "proper to require greater showing of inconvenience when transfer sought late in proceedings") (citing *United States v. Polizzi*, 500 F.2d 856, 901 (9th Cir. 1974)); *see also United States v. Prasad*, 2018 WL 3706836, at *7 (E.D. Cal. Aug. 3, 2018) (granting transfer in part because "transfer would not waste judicial resources" due to the early filing of the transfer motion).[6]

All that aside, the defense's Motion still contains significantly more detailed and more compelling information regarding the location of witnesses than the government's Opposition. As the defense set out, the Indictment, Mr. Smith's Statement of Facts, and counsel's knowledge of the government's investigation all indicate that trial witnesses—particularly witnesses who could address disputed questions central to the charges—are likely to be centered in and around Houston. Mr. Smith lives in Austin, a short drive from the Southern District of Texas. Keneally Decl. Ex. F, Ex. K, Ex. M at Statement of Facts ¶ 1. Mr. Smith, in turn, has alleged that Carlos Kepke, a lawyer in practice in Houston, Texas, had a central role in establishing the trusts and assisting Mr. Brockman with asset planning. Keneally Decl. Ex. M at Statement of Facts ¶ 5, Ex. N, Ex. O, Ex. P. Mr. Brockman's tax preparers are located in Houston. Keneally Decl. ¶ 35. And counsel is aware of numerous subpoenas that the government has served on individuals and entities in Houston. Keneally Decl. ¶ 36. The government's Opposition ignores all of this. Gov't Opp'n at 8-9.

But no trial can take place before Mr. Brockman is determined to be competent, and that

---

[6] In contrast, the government cites cases that were close to or on the eve of trial when the transfer motion was made. *See Testa*, 548 F.2d at 857 (defendant "moved for change of venue only eight days before trial"); *United States v. Spy Factory, Inc*., 951 F. Supp. 450, 460 (S.D.N.Y. 1997) (deciding transfer motion one month before trial was set to begin); *United States v. Shayota*, 2015 WL 9311922, at *6 (N.D. Cal. Dec. 23, 2015) (hearing scheduled to "be a trial setting" five days after the transfer motion was decided); *United States v. Calk*, 2020 WL 703391, at *1 (S.D.N.Y. Feb. 12, 2020) (deciding transfer motion nearly a year after the unsealing of the indictment); *United States v. Blakstad*, 2020 WL 5992347, at *4 (S.D.N.Y. Oct. 9, 2020) (deciding motion in October 2020 when trial was originally scheduled for November 2020 and was delayed only due to COVID-19).

Reply in Support of Motion to Dismiss in Part for Lack of Venue and Transfer to the Southern District of Texas 3:20-cr-00371-WHA
- 9 -

determination will require a competency hearing.[7] The government offers nothing to dispute that the location of witnesses essential to this hearing must be included in the *Platt* analysis. *See* Gov't Opp'n at 9. A competency hearing is a "critical stage" of a criminal trial, for which the defendant is generally entitled to the same safeguards that would apply at trial. *See, e.g.*, *Sturgis v. Goldsmith*, 796 F.2d 1103, 1109 (9th Cir. 1986).

The government's crass dismissal of Mr. Brockman's treating physicians as "compensated experts," Gov't Opp'n at 8, and an example of "wealthy defendants [buying] their venue simply by hiring experts," Gov't Opp'n at 12, crosses a line that prosecutors should not approach. It is no rebuttal to the fact that requiring the medical witnesses to testify in this District would impose an nearly insurmountable hardship. *Compare* Def.'s Mot. at 11-12 and Pool Decl. ¶ 8 *with* Gov't Opp'n at 8-9. The government also offers no support for its contention that "[w]itnesses and experts regularly appear remotely at competency hearings," Gov't Opp'n at 9, and ignores that Mr. Brockman has a right to an in-person, rather than a video-conferenced, hearing. *See* Def.'s Mot. at 12 n.10 (§ 4241(a) competency hearings not permitted under CARES Act video teleconferencing provisions for criminal proceedings).

There is only one choice that may be made between a largely remote hearing, or a hearing at which Mr. Brockman's doctors can be available to testify in person. The competency hearing is a fundamental due process safeguard, and cannot be brushed aside as facilely as the government suggests. Only a transfer to the Southern District of Texas will ensure that this hearing can be fairly held.

### C. "*Platt* factor" # 3: location of events likely to be in issue

Nowhere does the government come to grips with the fact that "the events put in issue by the Indictment took place largely between Mr. Brockman in Houston and Evatt Tamine"—"Individual One" in the Indictment—in various other locations, but never in the Northern District of California. Def.'s Mot. at 13. By contrast, the government's argument on this factor does not identify a single event that is likely to be in issue that took place in this District. Gov't Opp'n at

[7] As instructed by the Court, the defense filed its Motion For a Hearing to Determine Whether Mr. Brockman is Competent to Assist in His Defense on December 8, 2020. ECF No. 64.

Reply in Support of Motion to Dismiss in Part for Lack of Venue
and Transfer to the Southern District of Texas 3:20-cr-00371-WHA
- 10 -

9-10. The weight of this factor is not cancelled by disparaging the defense for "attempting to tally the locus of events described in the Indictment." Gov't Opp'n at 9-10. Nor is it overcome by the government's objection that "venue for several Counts in the Indictment," nowhere identified in the Opposition, "could fail completely in the Southern District of Texas." Gov't Opp'n at 10.

**D. "*Platt* factor" # 4: location of records**

Contrary to the government's contention, this factor does not "weigh[] against transfer." Gov't Opp'n at 10. The government asserts that all "relevant documents and records are either already in the Northern District or are electronically accessible." Gov't Opp'n at 10. Even if true, electronically accessible documents can be accessed just as easily in Houston as in San Francisco, and the government does not suggest it would create any burden to transport any necessary documents if the case were transferred. To the extent the government has collected documents from Houston and transported them to San Francisco—as suggested by the many subpoenas it has served on individuals and entities in Houston—those documents in particular should not be weighed against transfer. *See United States v. Coffee*, 113 F. Supp. 2d 751, 756 (E.D. Pa. 2000) ("[I]t would be odd indeed to allow the Government to create venue by its act of shipping documents, especially as they can readily be shipped back.").

**E. "*Platt* factor" # 5: disruption to the defendant's business**

The Court in *Platt* specifically addressed venue with regard to a corporate defendant in a criminal proceeding. *Platt*, 376 U.S. at 243-44. It is more than reasonable, by analogy, to consider the disruption to Mr. Brockman, who is in failing health, if he is forced to face a competency hearing and a possible trial away from his doctors, his family, and his home. As Dr. Pool attested, this disruption may have serious detrimental consequences to Mr. Brockman's already precarious physical and cognitive condition. Pool Decl. at ¶ 10.

**F. "*Platt* factor" # 6: expense to the parties**

The government states: "Transferring only a portion of this case would be enormously expensive." Gov't Opp'n at 10. This is exactly the defense's point: the FBAR counts cannot be tried in this District. Only transfer to the Southern District of Texas will allow all of the counts in

the Indictment to be addressed in a single proceeding.

**G. "*Platt* factor" # 7: location of counsel**

In listing counsel who have made appearances to date in this matter, the government identifies one attorney in the Southern District of Texas and three in the Northern District of California. Gov't Opp'n at 11. The government also candidly notes that three of the four prosecutors are based in Washington D.C. Gov't Opp'n at 11. The three D.C.-based prosecutors are with the DOJ Tax Division, which has had a lead role in the investigation and prosecution of this case, *see* Keneally Decl. Ex. E, Ex. M, and which has nationwide jurisdiction over tax prosecutions. 28 C.F.R. 0.70(b). While the government asserts that the "local AUSA . . . is not a fungible local counsel," Mr. Brockman's attorneys are no more fungible. *See* Gov't Opp'n at 11. Mr. Brockman's defense team is not limited only to those lawyers who have formally made an appearance. While defense counsel is capable of defending him in either district, all of the attorneys who have met with him in person throughout the investigation and subsequent to the Indictment are located in Houston, New York, and Washington. Keneally Decl. ¶ 39. It is fair to say that this factor is equally balanced, and should not affect the transfer analysis.

**H. "*Platt* factor" # 8: relative accessibility of place of trial**

The government does not refute that both courthouses are easily accessible. *See* Gov't Opp'n at 11. This factor is neutral.

**I. "*Platt* factor" # 9: docket condition of each district or division involved**

This penultimate factor is among the most compelling: the Southern District of Texas has more active judges, fewer pending cases per judge, a far-shorter median time from filing to disposition of felony cases, and an overall faster docket than the Northern District of California.

The defense's Motion relied on June 2020 statistics, which were the most recent that were then available, and which reflected the likelihood of a speedier disposition of this matter in the Southern District of Texas.[8] Since the Motion was filed, the Administrative Office of the Courts

[8] *See* Federal Court Management Statistics, Administrative Office of the Courts, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0630.2020.pdf at 36, 66 (last visited Nov. 19, 2020).

has published updated statistics, reflecting the operation of the courts through September 2020:[9]

| | NDCA | SD Texas |
|---|---|---|
| Total number of active judges | 14 (no change) | 19 (no change) |
| Cases pending per judge | 870 cases (no change) | 770 cases (9 case increase) |
| Median time from filing to disposition in felony cases | 12.4 months (1.2 month increase) | 4.2 months (0.2 month increase) |
| Average time from filing to trial in civil cases | 44.5 months (15.2 month *increase*) | 20.3 months (4.6 month *decrease*) |

The updated data is telling. In the midst of the COVID-19 pandemic, it is no surprise that the average time from filing to trial in civil cases lengthened significantly in this District. But despite the pandemic, the average time from filing to trial in civil cases actually *declined* by 4.6 months in the Southern District of Texas. And while the median time from filing to disposition in felony cases increased in both districts, the gap widened by one month in favor of the Southern District of Texas.[10]

These trends are likely to continue in light of the most recent orders as to court operations in each district. In this District, "all in-person, in-court proceedings" are suspended, "with a planned resumption of some limited proceedings, if possible, on January 4."[11] By contrast, the Houston courthouse of the Southern District of Texas remains open, with judges permitted to continue to hold in-person hearings.[12] Only jury trials are currently on hold in the Houston courthouse, but even they are set to resume on January 19, 2021.[13]

---

[9] *See* Federal Court Management Statistics, Administrative Office of the Courts, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2020.pdf at 36, 66 (last visited Dec. 9, 2020).

[10] *Id.*

[11] https://www.cand.uscourts.gov/ (last visited Dec. 9, 2020).

[12] *In re: Court Operations in the Houston and Galveston Divisions under the Exigent Circumstances Created by the Covid-19 Pandemic*, Special Order H-2020-24 (Nov. 19, 2020), *available at* https://www.txs.uscourts.gov/sites/txs/files/Special%20Order%20H-2020-24%20Eighth%20Supplemental%20Court%20Operations%20in%20Houston%20and%20Galveston%20During%20COVID-19.pdf (last visited Dec. 11, 2020).

[13] *Id.*

Reply in Support of Motion to Dismiss in Part for Lack of Venue and Transfer to the Southern District of Texas 3:20-cr-00371-WHA

- 13 -

All available evidence regarding docket conditions therefore continues to suggest that this case will proceed more expeditiously in the Southern District of Texas than in this District.

**J. "*Platt* factor" # 10: "Special Elements"**

The government contends that it would be safer, given the current comparative COVID-19 infection rates in San Francisco and Houston, not to transfer this case. Gov't Opp'n at 11-12. If the government is seeking to rest on current infection rates to contend that everyone involved in this matter would be better off in San Francisco, it is seeking to write on an unreliable prognostication of what will come next in the pandemic.

The irrefutable point here is that the sole defendant in this case is a 79-year-old man in failing physical health who lacks the mental competency to assist with his defense. He has lived in Houston for most of his adult life, where he also worked, prepared and filed taxes, consulted with attorneys, and attended to his health. The Indictment does not allege a single act by him in San Francisco, instead basing venue primarily on the allegation that money moved through this District before being transferred elsewhere.

Under all of the circumstances, this case should be transferred in its entirety to the Southern District of Texas.

## III. CONCLUSION

For the reasons set forth above and in Defendant's Motion to Transfer, this Court should (i) transfer this case pursuant to Federal Rule of Criminal Procedure 21(b) from the Northern District of California to the Southern District of Texas, and (ii) dismiss Counts Nine through Fourteen of the Indictment under Federal Rule of Criminal Procedure 12(b)(3)(A)(i) for improper venue, or in the alternative, transfer Counts Nine through Fourteen to the Southern District of Texas.

Dated: December 11, 2020

Respectfully submitted,
JONES DAY

*s/ Neal J. Stephens*
NEAL J. STEPHENS
Counsel for Defendant
ROBERT T. BROCKMAN

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
CAND 435
(CAND Rev. 08/2018)

**TRANSCRIPT ORDER**
**Please use one form per court reporter.**
***CJA counsel please use Form CJA24***
*Please read instructions on next page.*

COURT USE ONLY
**DUE DATE:**

1a. CONTACT PERSON FOR THIS ORDER
Mari Reyes

2a. CONTACT PHONE NUMBER
(650) 739-3939

3. CONTACT EMAIL ADDRESS
mreyes@jonesday.com

1b. ATTORNEY NAME (if different)
Neal Stephens

2b. ATTORNEY PHONE NUMBER
(650) 739-3939

3. ATTORNEY EMAIL ADDRESS
nstephens@jonesday.com

4. MAILING ADDRESS (INCLUDE LAW FIRM NAME, IF APPLICABLE)
Jones Day
1755 Embarcadero Road
Palo Alto, CA 94303

5. CASE NAME
United States v. Brockman

6. CASE NUMBER
3:20-cr-0371

7. COURT REPORTER NAME ( FOR FTR, LEAVE BLANK AND CHECK BOX)→ ☐ FTR
Ana Dub

8. THIS TRANSCRIPT ORDER IS FOR:
☐ APPEAL ☑ CRIMINAL ☐ In forma pauperis (NOTE: Court order for transcripts must be attached)
☐ NON-APPEAL ☐ CIVIL CJA: Do not use this form; use Form CJA24.

9. TRANSCRIPT(S) REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested), format(s) & quantity and delivery type:

a. HEARING(S) (OR PORTIONS OF HEARINGS) | b. SELECT FORMAT(S) (*NOTE: ECF access is included with purchase of PDF, text, paper or condensed.*) | c. DELIVERY TYPE (Choose one per line)

| DATE | JUDGE (initials) | TYPE (e.g. CMC) | PORTION If requesting less than full hearing, specify portion (e.g. witness or time) | PDF (email) | TEXT/ASCII (email) | PAPER | CONDENSED (email) | ECF ACCESS (web) | ORDINARY (30-day) | 14-Day | EXPEDITED (7-day) | 3-DAY | DAILY (Next day) | HOURLY (2 hrs) | REALTIME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/15/2020 | WHA | Motion | | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

10. ADDITIONAL COMMENTS, INSTRUCTIONS, QUESTIONS, ETC:

ORDER & CERTIFICATION (11. & 12.) By signing below, I certify that I will pay all charges (deposit plus additional).

11. SIGNATURE /s/ Neal Stephens

12. DATE 12/15/2020

Clear Form

Save as new PDF

DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

MICHAEL G. PITMAN (DCBN 484164)
Assistant United States Attorney
150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5040
Facsimile: (408) 535-5081
michael.pitman@usdoj.gov

COREY J. SMITH (MABN 553615)
Senior Litigation Counsel
LEE F. LANGSTON (NYBN 4910311)
CHRISTOPHER M. MAGNANI (Maryland)
Trial Attorneys
United States Department of Justice, Tax Division

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT T. BROCKMAN,<br><br>Defendant. | Case No.: 3:20-cr-00371-WHA<br><br>UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR A COMPETENCY HEARING<br><br>Date: January 12, 2021<br>Time: 2:00 PM |

The United States respectfully responds to Defendant's motion for a competency hearing (ECF No. 64) (the "Motion"). The government agrees that there must be a competency hearing, but the hearing should not be scheduled in isolation. Instead, the Court should issue a scheduling order that dictates when Defendant must produce competency-related discovery, how long the designated experts will have to review the discovery and evaluate Defendant, when their expert reports will be due and, finally, when the competency hearing will be held. Although the Motion correctly concludes that the Court must hold a competency hearing on its record, it omits significant legal and factual context.

## I. THE COURT MUST GRANT THE MOTION, BUT ESCHEW ITS PROPOSED ORDER

In passing the Insanity Defense Reform Act of 1984, Congress codified the procedures related to competency at 18 U.S.C. §§ 4241 & 4247, and the Court must follow this statutory framework through the adjudication of Defendant's competency claim. Section 4241(a) (and constitutional due process) requires a competency hearing whenever "there is reasonable cause to believe that a defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." As the Motion explained, the threshold for holding a competency hearing is low, and it is satisfied in this case. What the Motion did not explain is that the hearing is hardly the first step of the process. Although Defendant may prefer to hold a prompt hearing based only on the opinions of experts he retained and testimony from his wife and friends, the applicable statutory framework contemplates a more searching review of Defendant's claim. In any criminal case, but especially in a case where the defendant continued to run a multibillion-dollar company, Reynolds & Reynolds ("Reynolds"), for almost two years after his alleged diagnosis, and stepped down only after he was indicted, it would be unwise for a court to rush into a competency hearing with expert evidence from only the criminal defendant.

Section 4241(b) gives the Court discretion to "order that a psychiatric or psychological examination of the defendant be conducted," and Section 4247(b) establishes statutory requirements for such examinations. For example, competency examinations must be conducted by "a licensed or certified psychiatrist or psychologist, or, if the court finds it appropriate, by more than one such examiner." 18 U.S.C. § 4247(b). The statute also vests the Court with discretion to "commit the person to be examined for a reasonable period, but not to exceed thirty days, . . . to the custody of the Attorney General for placement in a suitable facility." *Id.* A custodial placement is appropriate in cases where malingering is a concern, as it allows trained Bureau of Prisons mental health professionals and staff to observe defendants in both clinical and non-clinical settings for a prolonged period of time. As Defendant has already retained and been evaluated by his experts, the government should have the same opportunity for its experts to evaluate Defendant. The Court should also appoint its own expert and/or remand Defendant to one of the BOP facilities that conducts competency evaluations (there is such a

facility at FMC Fort Worth in Texas). The Court should not schedule any competency hearing until it has determined which experts will have the opportunity to examine Defendant, draft expert reports, and present their finding at the hearing.

The Court as factfinder, as well as every expert that evaluates Defendant and offers a view of his competency, should be afforded the benefit of all relevant evidence in deciding this matter. Therefore, before scheduling a hearing, the Court will first need to decide associated discovery matters related to the proceedings. On November 19, 2020, the government requested relevant medical information from Defendant and, on December 10, the defense team indicated that it viewed the attachments to the Motion as the whole of its discovery and does not intend to produce anything further.[1] If Defendant persists in his insistence of hiding relevant evidence from evaluating experts and the Court, the government will issue a subpoena, and request the Court to order their production under 45 C.F.R. § 164.512(e), which excepts from HIPPA's privacy protections disclosures made in connection with "judicial and administrative proceedings," and Fed. R. Crim. P. 17(c)(1), which will allow early production to ensure evaluating experts have sufficient time to review the records before making their conclusions and writing their expert reports. Any expert evaluator will need to review the historical medical records requested by the government in order to comply with the statute's requirement of producing an expert report to the Court. *See* 18 U.S.C. § 4247(c)(1) (requiring the report to include "the person's *history* and present symptoms") (emphasis added).

In sum, the government requests that the Court issue a scheduling order for the requested competency hearing which also includes deadlines for discovery, evaluation of the discovery by experts, evaluations and testing of Defendant by government (and Court-appointed) experts, and submission of Section 4241(c) expert reports.

## II. STATUTORY POST-HEARING PROCEDURES

As discussed above, holding a competency hearing is not the first step in adjudicating competency. It is also not the last. The post-hearing procedural landscape will depend on whether the

[1] In its letter, the government also noted that it would request an order for production if Defendant did not produce them voluntarily, and recommended Defendant start gathering them in the meantime to avoid subsequent delay. Ex. 1.

Court finds Defendant competent by a preponderance of evidence. If the Court finds Defendant competent, proceedings will commence.[2] If the Court finds Defendant incompetent, under the applicable statute, it must remand him to custody for further evaluation.[3] *See* 18 U.S.C. § 4241(d) ("[T]he court shall commit the defendant to the custody of the Attorney General."). The Attorney General, in turn, "shall hospitalize the defendant for treatment in a suitable facility . . . for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward . . . ." The statute provides for further hospitalization ". . . for an additional reasonable period of time until (A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward; or (B) the pending charges against him are disposed of according to law; whichever is earlier." *Id.* In sum, § 4241(d) "provides for a mandatory commitment of a defendant, who has been deemed incompetent, for study of the defendant's potential for restorability to competence." *United States v. LKAV*, 712 F.3d 436, 441 (9th Cir. 2013) (comparing § 4241(d) to the permissive commitment, observation and study regime applicable to juveniles).

## III. FACTUAL BACKGROUND

The Motion suggests that Defendant first complained of symptoms before he developed a motive to malinger, that he has been unable to assist his attorneys and alerted them of his symptoms only to aid their working relationship, and that his symptoms are confirmed by a team of esteemed doctors. The Motion also suggests that the government acted in bad faith for declining Defendant's invitation to investigate his claims pre-indictment. Considering the context of Defendant's claims, when compared to other contemporaneous events, and the fact that Defendant remained CEO of Reynolds until after he was indicted, his claims are deserving of healthy skepticism. Only sunlight on Defendant's historical

[2] Unless Defendant raises it in time to be considered along with his competency claim, the Court should decline to entertain a future claim of physical incapacity that is brought only after the Court finds him competent. To be clear, the government does not believe Defendant suffers from physical incapacity that would bar prosecution. On the contrary, his record of pre-pandemic leisure travel suggests the opposite is true. Nonetheless, the government raises this issue now to avoid any unexpected surprises after the conclusion of the upcoming competency hearing.

[3] Unlike initial BOP competency evaluations, these competency restoration evaluations are conducted almost entirely at FMC Butner (in North Carolina) and MCFP Springfield (in Missouri).



medical records, combined with the rigors of the adversarial process, will ensure that the Court, as factfinder, will be afforded the fullest picture of the circumstances that bear on whether Defendant is truly incompetent. Although the facts informing the government's skepticism will be further developed throughout these competency proceedings, it is worth orienting the Court to some of them at the outset.

### A. The Timing of Defendant's Claims

Defendant offers only the information he wants the Court to see, and not the information to put those events in proper context. Like the instant Motion, the timeline Defendant shared with the government pre-indictment (and replicated below) omits relevant contemporaneous activities that are probative of his mental capacity and, frankly, cast doubt on Defendant's narrative.

Defendant's efforts to thwart his detection, investigation, and prosecution by law enforcement have been long-standing. As early as 2010, he directed Evatt Tamine, his professional nominee, to "[o]perate as much as possible in a paperless manner–such that if someone were to come in your door unannounced everything would be in encrypted digital form." Ex. 2 at 2. He further instructed Tamine that "[a]lthough you have several personal friends in Houston that I am sure you want to maintain, please restrict your contact with the USA generally such that except for these few–you tend to fade into the background." *Id.* at 3. Defendant even gave Tamine detailed instructions on how to smuggle

incriminating electronically stored information into Bermuda. Ex. 3 ("For sure I would expect that you would not be connecting thru the USA."). In 2011, Defendant expressed concern about his collateral exposure if Robert Smith, his business partner, had a "nasty divorce" and, in 2013, he even directed Tamine to get a key deposition transcript from the divorce proceedings. Ex. 4; Ex. 5. The Indictment, at ¶ 194, alleges that Defendant learned of the instant investigation in or about June 2016 and, when Defendant's prior nominee subsequently died, Defendant directed Tamine to make numerous trips to the former nominee's home to destroy records, which is the subject of Counts 38 & 39. Ex. 6 at 2-3.

Evidence of Defendant's early claims of neurocognitive problems cannot be appreciated without considering other events occurring at the time. For example, on September 5, 2018, the Bermuda Police Service raided Tamine's home, invading Defendant's secret offshore world. It was the very next day that Defendant reached out to his urologist, Dr. Seth Lerner, to schedule an appointment. Ex. 7. This is significant because, although Defendant has not disclosed the exact date of the appointment, Defendant claims that Dr. Lerner was the first doctor to witness his symptoms.[4] Although Defendant has thus far refused to fully disclose his historical medical records, he has apparently suffered his share of health problems over the years. It is notable that none of his doctors—not his general practitioners, oncologists, cardiologists, or anyone else—noted dementia symptoms until after the authorities executed a search warrant on Tamine's home. A fuller timeline might look like this:

Sept. 2018
Dr. Lerner exam
?
2018
Sept. 5, 2018
BPS Search Warrant at
Tamine's Home
Sept. 6, 2018
Defendant
emails Dr. Lerner
to schedule apt.
Sept. 9, 2018
Defendant contacts
counsel at
Jones Day
Sept. 19, 2018
Counsel contacts
Defendant's CPA

[4] Although counsel has not indicated when they began representing Defendant, a privilege log provided by Defendant's company shows communications between Defendant and his Jones Day attorneys as early as September 9, 2018 and, by September 18, Defendant's attorneys were in touch with his CPA. Ex. 8; Ex. 9.

**B. Defendant's Financial Ties to Baylor and Relationship with Dr. Stuart Yudofsky**

Defendant has donated tens of millions of dollars to the Baylor College of Medicine. Ex. 10. Defendant also approved another million-dollar donation from Reynolds a few days after he was examined by Dr. James Pool, which the Motion cites as the first doctor to diagnose Defendant with dementia and refer him to further specialists. Ex. 11. The bulk of Defendant's Baylor donations ($25M) were made between 2011 and 2014 to fund Dr. Stuart Yudofsky, a Baylor psychiatrist and Chairman of the Scientific Advisory Board of the Brockman Medical Research Foundation. Ex. 12 at 3-5.

Although the Indictment alleges that Defendant was aware of the current investigation in 2016, Defendant offers (and offered to the government prior to indictment) a 2017 email between him and Dr. Yudofsky as supposed evidence that he had symptoms before his motive to feign dementia ripened. The Motion describes Dr. Yudofsky, who is a neuropsychiatrist, as Defendant's "friend." However, it declines to note that he is intimately involved in Defendant's personal life, professionally indebted to Defendant, and well acquainted with Tamine.

As alleged in the Indictment, Tamine served as Defendant's professional nominee and wrote annual performance appraisals for Defendant. Indictment at ¶ 10. In his 2011 evaluation, Tamine told Defendant that his communications with Dr. Yudofsky and others were "undertaken with the requisite degree of authority, i.e. I do not believe that anyone has any basis to suggest that I am merely carrying out your instructions - whatever they might privately believe," thereby suggesting that Dr. Yudofsky knew Tamine was merely Brockman's nominee. Ex. 13 at 3. Tamine also told Defendant that his rapport-building with Dr. Yudofsky "work[s] as a strong barrier against an attack from the IRS." *Id.* In his 2016 evaluation, Tamine tells Defendant that he "helped Stuart out of a position he found very difficult and worrying"[5] and noted that his relationship with Dr. Yudofsky was "very strong." Ex. 6 at 3-4.

The years of rapport-building may have been drawn upon during a 2017 crisis. On July 30, 2017, Tamine emailed Defendant a memorandum on issues to deal with Bermuda Commercial Bank freezing Defendant's accounts. Ex. 15. One of the problems Tamine identified was that he was

[5] The issue appears to be related to who would succeed Dr. Yudofsky after he retired. Ex. 14.

becoming subjected to increased scrutiny and proposed that he no longer travel to the United States with a computer or telephone and, instead, keeping "all I need at Stuart Yudofsky's office including a phone." Ex. 16 at 4-5. Defendant concurred with the proposal. Ex. 15.

It is important to note that despite Dr. Yudofsky's expertise and close relationship with Defendant, he took no action other than the single emailed response to Defendant's email. Defendant has provided no evidence that Dr. Yudofsky examined Defendant, provided a referral, or engaged in any further correspondence on the subject. Indeed, despite Defendant's apparent concern in the May 3, 2017 email, he sought no further medical treatment or evaluation until after the search of Tamine's house in September 2018.

Defendant's and Dr. Yudofsky's inaction raise the question of whether Defendant's email was designed to seek medical advice or create a paper trail. That concern is elevated because Defendant has a significant history of generating fraudulent correspondence for use in future proceedings. For example, on June 12, 2011, Defendant wanted to explore selling Reynolds but needed to justify why he, and not the trust that owned Reynolds on paper, was running the deal. To solve this problem, he used his encrypted email system to order Tamine, the "trustee" of the trust that owns Reynolds on paper, to send Defendant a letter asking Defendant to explore the potential sale. Ex. 17. Defendant even dictated the words Tamine should use in the letter to Defendant. *Id.*

The evidence suggests that on at least one other occasion, Dr. Yudofsky was the recipient of planted correspondence orchestrated by Defendant. On August 1, 2015, Defendant sent Tamine an encrypted email asking Tamine to send Dr. Yudofsky "an open email" that Tamine had been considering the formation of a medical research foundation and inviting Dr. Yudofsky to be the chair. Ex. 18. Tamine sent an unencrypted email to Dr. Yudofsky stating exactly that on August 13, 2015. Ex. 19.

Taking all of this into account—the close personal relationship between Defendant and Dr. Yudofsky, the $25M gift by Defendant to Dr. Yudofsky's employer, the fact that Defendant felt comfortable storing Tamine's communications devices (devices that he was afraid might be seized at the U.S. border) at Dr. Yudofsky's office, and Defendant's history of planting fraudulent correspondence, Defendant's isolated email to Dr. Yudofsky in May 2017 should not be viewed as conclusive of whether Defendant actually suffered symptoms on that date.

### C. Defendant's Contemporaneous Behavior was Inconsistent with Present Claims

One of Defendant's lawyers described Defendant as a man who "has consistently been unable to assist in his defense." Romatowski Decl. (ECF No. 64-3) at ¶ 11.[6] His doctors describe Defendant as a man with an IQ in freefall. Yet, while presenting to his defense attorneys and doctors as a man of rapidly diminishing metal capacity, signs of a more robust mental acuity trail in his wake.

In between his visits with the Baylor team of doctors, Defendant engaged in significant activities related to running Reynolds.[7] The most mentally taxing may have been being deposed in January 2019 as the CEO of a multibillion-dollar company accused of engaging in anticompetitive practices. Ex. 21. In this deposition, Defendant said that he prepared with his civil attorneys for two days in advance, apparently to great effect. *Id*. at 11. In the deposition, Defendant gave cogent answers, often demonstrating a superior knowledge of the documents than the examiners themselves. *Id*.[8] Then, in September 2019, Defendant provided sworn testimony in a separate antitrust matter, again giving long and cogent answers. The attorneys who questioned him in those proceedings observed nothing unusual or out of the ordinary in Defendant's ability to respond to the questions posed, and the lawyers who represented him in those matters did not convey any of the difficulties of which current defense counsel now complains. It is noteworthy that the Defendant's sworn testimony in these antitrust matters, in January and September 2019, were within weeks of medical evaluations by Doctors Jankovic and Pool, and yet Defendant and his civil attorneys never raised Defendant's alleged mental incapacity or decline as an issue during the proceedings. Furthermore, the government does not know if Defendant shared news of his deposition performance with the doctors upon whom he now relies because Defendant has thus far refused to provide the relevant medical discovery.

---

[6] Notwithstanding, between September 2018 and March 2020, Defendant and Romatowski had eleven in-person meetings, each "several hours in length," in addition to "countless meetings . . . by telephone." *Id.* at ¶ 5.

[7] And significant leisure. Between the medical appointment he now describes, Defendant emailed his yacht captain to reminisce about the excellent tides they had on a trip over 18 months prior, Ex. 21, and arrange future travel logistics. Ex. 22; Ex. 23.

[8] The deposition is replete with examples, but some are on pp. 10-23 (explaining his trust structures); 78-79 & 312-13 (explaining relevant legal requirements); 116 (interpreting contract); 151-53 (explaining software); 160 (explaining why he only retains 6-12 months of his emails); 227-32 (explaining the inefficiency of internal accounting); 315-16 (navigating a privilege issue); 334-39 (explaining "opcodes" in detail); 350 ("As you probably can tell, I'm – I'm into the details, big time.").

Jan. 30
Dr. Jankovic exam
Mar. 1
Dr. York exam
Mar. 20
Dr. Yu exam
Oct. 1
Dr. Pool exam
Dec. 3
Dr. York exam
2019
Jan. 14-17, 2019
Defendant prepares for deposition & is deposed in a class action antitrust case
Sep. 18-19
Defendant gives sworn testimony in a separate antitrust matter

Defendant now reports further mental evaluation and a prognosis of marked decline. But the observations of his doctors are inconsistent with his continued ability, at least until he was indicted, to run his company. Throughout 2020, Defendant penned numerous emails suggesting he is still able to function on a higher level than most. In recent emails, Defendant demonstrates a command of his business. *See, e.g.*, Ex. 24 (Defendant identifies risk associated with an acquisition, noting the slowing of new car sales), Ex. 25 (Defendant discusses bid and makes teaching points to Reynolds's President), Ex. 26 (after announcing a new COO, Defendant tells him they need to talk every day about any important decision).

Defendant made it clear to Reynolds associates that he was not leaving and remained an integral part of his company. On May 10, 2020, he drafted a lengthy memo to Vice-Chairman Robert Nalley outlining his plans for the company. Ex. 27. Nalley was the first employee Defendant hired when he started the company and had been a board member and President for decades. In the email, Defendant tells Nalley that he is letting other executives take bigger roles because of "fatigue–plus recognition that I am in the final 20 percent of my life (if I am lucky)" but that he planned on working four to five years "helping teach the next generation everything I know about how to run the company efficiently." *Id.* at 1-2.

The discrepancy between the picture Defendant presented to doctors, the government, and this Court, and the manner in which he lived his life is most starkly revealed by in the June 3, 2020 reorganization of the executive structure of Reynolds. This reorganization took place almost two

months after attorneys for the defendant told the government that he was so impaired that he should not even be indicted. Evidence of such impairment, however, was entirely absent from the reorganization of Defendant's company. While other executives were shuffled around, Defendant retained the positions of Chairman and CEO. Ex. 28 at 2. While Defendant did say his focus would be on training the new leadership, he informed the new COO that "you and I should be talking every day about any decision of importance that is cooking." Ex. 26. Correspondence like this, during a period in time when his lawyers represented that Defendant was so impaired that he could not assist them, raises considerable question about Defendant's claim.

## IV. THE INAPPROPRIATENESS OF EVALUATING THIS ISSUE PRE-INDICTMENT

In passing the Insanity Defense Reform Act of 1984, Congress created a statutory framework for the evaluation of competency claims. It empowered the Courts, not prosecutors, to make competency determinations. Nevertheless, Defendant now complains that the United States declined his invitation to investigate Defendant's mental state prior to indictment. Putting aside evidence described herein, such an investigation would have been inappropriate pre-indictment. Even if the government agreed with Defendant's diagnosis, but disagreed on its forensic import (i.e. whether Defendant was capable of providing effective assistance), a pre-indictment investigation would have served as a delay tactic, as any disagreement could only be settled by the Court, as Congress intended, post-indictment. The delay would be particularly injurious in the event Defendant truly suffers from degenerative ailments. For all these reasons, the government appropriately declined.

## V. CONCLUSION

The competency statute and constitutional due process requires the Court hold a competency hearing on this record. That hearing, however, should not occur until Defendant is subjected to further evaluation by independent medical experts who are afforded the full scope of relevant information. Therefore, the Court should decline to schedule a competency hearing until after it has determined a schedule for the events that must precede such a hearing. The United States will soon file a separate motion requesting discovery and medical examinations of Defendant as described herein.

Respectfully submitted this 15th day of December, 2020,

DAVID L ANDERSON
United States Attorney

s/ Corey J. Smith
COREY J. SMITH
Senior Litigation Counsel
Department of Justice
Tax Division
MICHAEL G. PITMAN
Assistant United States Attorney

Attorneys for United States of America

**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

*(408) 535-5061*
*FAX (408) 535-5066*

November 19, 2020

**VIA EMAIL**
Neal James Stephens
Kathryn Keneally
Jason Scott Varnado
JONES DAY
nstephens@jonesday.com
jvarnado@jonesday.com
kkeneally@jonesday.com

*Re:* *United States v. Robert T. Brockman*, 3:20-cr-00371-WHA (N.D. Cal.)

Dear Counsel:

We understand you expect to file a motion in the above captioned matter asking the Court to evaluate Mr. Brockman's capacity under 18 U.S.C. § 4241. I am writing to request information that will help the government (and, ultimately, the Court) evaluate any representations the defense may make about Mr. Brockman's medical condition as part of that motion. Specifically, I would appreciate it if you would provide to the government all documents related to any medical and/or psychological treatment, diagnosis, or advice provided to Mr. Brockman by any physician or other medical professional in the last ten years, whether those records are maintained by Mr. Brockman or the provider. This request includes test results, labs, imaging, and notes, and is not limited to medical records associated with the reports you have already provided. At the very least we would expect this request to include records from the following practitioners:

- James Poole, MD,
- Michele York, PhD,
- Seth Paul Lerner, MD,
- Joseph Jankovic, MD,
- Melissa Michelle Yu, MD,
- Stuart Yudofsky, MD, and
- Mr. Brockman's general practitioners, as well as any practitioner who has diagnosed, treated, or consulted on the issues Mr. and Mrs. Brockman described to Pretrial Services ([redacted]).

We would also request that Mr. Brockman provide HIPPA waivers to replace the waivers you withdrew in October, in order to permit his providers to discuss Mr. Brockman with government personnel, including experts.

Early disclosure of this material may allow us to narrow any issues in dispute, and to bring any unresolvable disputes to the Court's attention more quickly.

Please note that we expect to ask the Court to order that the government and any retained or appointed experts be given access to the materials requested above prior to any competency determination, so you may be wise to begin collecting them now regardless of whether you intend to provide them voluntarily.

Naturally, we recognize that information provided in response to this request may be covered by HIPPA, or otherwise sensitive, and would handle it accordingly.

Please feel free to let me know if you have any questions or concerns, or if you would like to discuss further.

Very truly yours,

DAVID L. ANDERSON
United States Attorney

s/ Michael G. Pitman
MICHAEL G. PITMAN
Assistant United States Attorney

Memo to: Evatt Tamine

Date: February 5, 2010

Subject: Performance Review

**What went well:**

Once again your self evaluation is remarkably accurate. This in itself is a compliment to your logical evaluation of circumstances.

Overall you had a very excellent year which results in full attainment of your $100,000 target bonus.

**Goals for 2010**

1) Endeavor to deal with the Founding Partners and Arboria issues as best you can. This will include participating in any mediation. However there is ongoing need to be cautious about acquiring too high a profile.

2) Monitor the ongoing legislative process in the USA and other jurisdictions and facilitate whatever restructuring ends up being required.

3) Take over the financial reporting processes from James Gilbert. The goal to be achieved is:
   -establish use of an accounting software package that is a true double entry accounting system with proper journals, schedules, and general ledger with financial reports are produced
   -where the financials have columns for the previous 5 years that show all amounts for all lines on the P&L and Balance sheet – as well as for the current 6 month period

4) Conduct a semi-annual financial review of all entities face to face by the end of the first half of the year

5) Scan the box of miscellaneous documents and add them to the image database

6) Reorganize the boxes of original documents such that historical files of discontinued entities are segregated into their own box(es)

7) Request an asset ledger from Mountain Queen, Inc. that details all of the real estate, improvements, and furnishings. They should be keeping this for purposes of calculating depreciation – but they need to be asked.

8) Endeavor to continue to harden the RADMIN and email server reliability by acquiring additional UPS power sources – and if possible – provide for monitoring while you are away.

9) Continue to address the projects on the To-Do List.

10) Arrange for audited financials for those entities that need to have audits

11) Annually verify that there are letters of resignation from all trustees and that Bob has the originals

12) Update the To-Do list at least monthly

**General Goals for Every Year**

1) Continue to work to reduce the number of entities as this makes all processes simpler creating more time to focus on investment programs.

2) Continue to keep the document image database up to date constantly

3) Continue to keep the entity/significant transaction database up to date constantly

4) Publish the Cash Report monthly

13) Convert to keeping all email and financial records on an encrypted USB dongle carried in a different location in luggage when traveling abroad

14) Continue to update the accounting reports to the document image database

15) Operate as much as possible in a paperless manner – such that if someone were to come in your door unannounced everything would be in encrypted digital form

16) Complete adding the documents and significant transactions for superseded entities to the respective databases on a piecemeal basis during the year

17) Run Evidence Eliminator at least weekly on your computer

18) Keep your computer system running perfectly – get whatever you need for maximum productivity and backup

19) Get Don's computer environment operating on RADMIN

20) Continue basic education in accounting, bookkeeping, auditing, and financial controls

21) Maintain all working entities in good standing so that their legal existence can not be questioned

22) Maintain relationships with service providers – bearing in mind that not a lot should be expected from them – never take for granted that they are doing what they should be doing which will require constant monitoring of their reports, primarily their financial reporting – Gordon Howard being the key service provider that would be most problematic to replace – look to Peter Mitchell potentially being a successor to Gordon should Gordon no longer be capable

23) To the extent possible, no service provider should become crucial – always be thinking about portability and alternate providers should the need arise

24) Regardless of the level of non-performance of a service provider, a cordial professional relationship should be maintained – unless a high level policy decision to do otherwise is made

25) In the event of non-performance of a service provider or investment, the policy will always be to withdraw quietly – unless a high level policy decision to do otherwise is made

26) Continue the excellent work on the spreadsheet for expenses of each service provider such that detail entries by type of expense are kept so as to support the annual expenses for each service provider

27) Coordinate the charitable giving initiatives of the AEBCT

28) Monitor your levels of daily effort so as to avoid burn-out. Engage in a regular fitness program with proper diet so as to stay in top physical condition.

29) Other than your personal vacation travel, I recommend that you conserve the amount of travel that you do for business as your control of everything will be directly related to the amount of time you spend in front of your multi-monitor computer system at home in France.

30) Plan your life for healthy, balanced, stable, long-term productivity

31) Although you have several personal friends in Houston that I am sure you want to maintain, please restrict your contact with the USA generally such that except for these few – you tend to fade into the background

**Compensation**

Your annual remuneration for 2010 will be increased to an annual salary of $325,000 plus a bonus opportunity of $125,000.

**Conclusion**

Your continued excellent performance in all aspects of your job are noted and appreciated.

On Behalf of Spanish Steps Holding LTD

Message

**From:** Permit [permit1@lambdaprime.org]
**Sent:** 9/2/2010 4:49:57 PM
**To:** redfish@lambdaprime.org
**Subject:** RE:

Evatt,

I would try to do 3).

I would also create two copies on a Mico SD chip that are the size of less than a postage stamp.

I would then carry one concealed somewhere in luggage and I would FED-X the other with some misc correspondence to yourself in Bermuda.

I would not do 1) or 2).

Bob

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Wednesday, September 01, 2010 5:51 PM
**To:** permit1@lambdaprime.org
**Subject:** RE:

Bob,

I have no files whatsoever on the laptop itself. There are three options for me:

(1) I can place the external hard drive with all files elsewhere in my luggage. I did this on the last trip without a problem.
(2) I can transfer all files onto a USB key drive, which can be well hidden. At the Bermuda end, I can restore the files to a larger drive.
(3) Attached a drive with all files to James computer and then do a Radmin file transfer to a drive in Bermuda. This will be a long process and is dependent on everything working here in France. Once the file transfer is complete I can wipe the drive using EE.

Evatt

---

**From:** Permit [mailto:permit1@lambdaprime.org]
**Sent:** Wednesday, 1 September 2010 7:34 PM
**To:** redfish@lambdaprime.org
**Subject:** RE:

Evatt,

I will copy off all of my files and run EE on my RADMIN starting tomorrow. I will be clean by Friday morning – when I shut down to transition to Houston.

Your reply here did not address your files or the big document image file.

Bob

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Wednesday, September 01, 2010 5:16 PM

**To:** permit1@lambdaprime.org
**Subject:** RE:

Bob,

I have considered this issue. I am not going through the US. Your computer and the email server will be carried by me.

There is no issue transiting through London since I am only in the country for a few hours. The only concern in Bermuda is duty, however provided I make full declaration of the value it is unlikely I will even be stopped. I took Don's laptop and the backup email server on the trip back for Gordon's funeral and encountered not a hint of a problem.

Still, it would not hurt to transfer your files off your laptop and then restore them on Sunday.

You are right that the email server is a problem to boot. Anyone trying to do so would think the laptop broken since nothing appears on the monitor – even with the power plugged in.

The S and T drives here in France are powered, but I will need to unplug them on Friday to check the voltage. If they cannot be used on 110, then I will copy the backup files onto a smaller drive that runs off the USB without AC power.

I have a very early start on Saturday (4 am) so I will need to power down everything for packing on Friday night.

The server will probably go down from about 2 or 3 pm your time.

Is there any advice regarding the settings for the email server.

I intend connecting James Gilbert's old laptop to the internet though the Draytek router with a Radmin server set up allowing you, me or Robbie to access the router remotely should we need to check any settings.

I had James download and install the Radmin server last year so that I could work on his laptop while he was in the Cayman Islands so this should be straightforward to get working.

Evatt

---

**From:** Permit [mailto:permit1@lambdaprime.org]
**Sent:** Wednesday, 1 September 2010 7:04 PM
**To:** redfish@lambdaprime.org
**Subject:**

Evatt,

Have you considered the security issues involved in moving the laptops to Bermuda?

Especially the big documents image file.

I should hate for them to get tied up in Customs or have them seized for any reason.

For sure I would expect that you would not be connecting thru the USA.

Bob

PS: As a thought, I can easily transfer my files back to my computer here as they are relatively small. I would then PGP wipe them off my RADMIN laptop and then run EE on the entire laptop. That would solve some of the problem. I could probably do yours as well. However the big document image file could not be done that way. The email server is also problematic – although if it were seized, they might have difficulty with it since it has a rather balky reboot process.

Message

**From**: King [king@lambdaprime.org]
**Sent**: 8/18/2011 3:08:00 PM
**To**: redfish@lambdaprime.org
**Subject**:

Evatt:

Bob called concerned about the Robert Smith situation and what effect a nasty divorce might have on us. We agreed that if his business is dissected by her attorney, Point would be an initial target. I told him I would review my paper records to make sure there is nothing here to give any of Point's details. However, I need to transfer my confidential computer records to Radmin. You told me you would help me do so in a manner which would not require that I send each file separately using the file transfer method.

Please get back to me as to how I might transfer those files.

For your information, we will be flying to Houston tomorrow (Friday) for my physical and Cameron's third birthday. We will be back Tuesday evening.

Don

Message

**From**: Permit [permit@proventusconstans.com]
**Sent**: 11/21/2013 9:50:57 PM
**To**: redfish@proventusconstans.com
**Subject**:

Evatt,

Robert just sent me what was supposed to be the deposition transcript.

However as I can tell from the email trail, it is the legal secretary that is screwing it up. She has the .pdf file named as the deposition – which it is not.

She sent Robert the trust document instead – which I really did not want to see. He just forwarded what she sent him on to me.

Please see if you can get the transcript.

Bob

To: Bob Brockman

From: Evatt Tamine

Date: June 4th, 2017

Subject: 2016 Performance Evaluation

I would say that without hesitation, 2016 has been my best year . I established beyond any doubt that I can work under pressure with the added threat of detention hanging over me, all for the sake of protecting the AEBCT. At the risk of being accused of having an inflated ego, I would say that there are very few people who could have done all I did in 2016, which brought together so many skills.

I believe 2016 was probably the most difficult and challenging year since I took up this position. A number of issues came up, which required special handling. I believe I was very successful in addressing those issues, though some remain outstanding (Robert Smith's situation, for example). I gave up a great deal of family time to ensure that these issues were dealt with.

**What went well?**

1. The positive success for the year was my role in securing the purchase of the Albula. This involved establishing a relationship with Bill Schleicher and convincing him that it would be better to come to us as a buyer and not put the boat out to market. Arranging the lawyers for the purchase as well as establishing all necessary entities and all documentation to buy the boat. It made for an extremely busy final two months to an already very busy year.

2. During the acquisition of the Albula, I also built on the relationship with Graham Thomson, who will manage the boat for years to come. I worked with him on the financial systems to be implemented. Under severe time pressure, I worked with Cayman lawyers on establishing Fisheries Research Foundation Ltd to complete the acquisition.

3. The sudden death of Don was a sad time. It is hard to speak of what went well, when it starts with Don's death. I suggested and then arranged that we honor Don by establishing the chair in accounting in his name. In doing this while Don was alive and joining him in a surprise lunch, we gave Don a real joy in his final month. But for my efforts, this is something that could have lingered for years and we'd have established a memoriam for Don rather than a gift in his lifetime. This work also greatly pleased Melissa and made it less difficult to handle Don's passing shortly afterwards. It also made what followed easier when dealing with Melissa.

4. In addition to the surprise lunch for the gift to Ole Miss, I made a further six trips to Oxford. Most were at short notice and always involved at least three flights there and three flights back and included always driving from Memphis to Oxford and back. The trips were made when needed and without hesitation, generally following a call from Melissa telling me that she had found more drives, disks or documents that Don had kept. As you know, I even cut short the trip to Argentina to get back to Oxford to destroy more drives that had been discovered.

5. By my extraordinary efforts, hugely impacting my family life, I did all that was humanly possible to clean up what Don had left behind. Those efforts meant that we could rest easily that any attempt to search Don's home would be fruitless.

6. All of the foregoing was done while helping Melissa with the issues she confronted following Don's death. There wasn't a trip from Don's death onwards where I did not spend time with Melissa helping her with the personal mess she was left with. These efforts have secured Melissa's loyalty for the rest of her life, as she looks on me as a second son. She will not forget that loyalty should she ever be visited by regulators.

7. I was also engaged in doing all I could to protect the AEBCT over the Robert Smith situation. Further, I was doing all I could to also protect Robert at the same time. I have spent a great deal of time on the road meeting with Robert (so we could talk freely), meeting Carlos Kepke and Sherri Caplan. In relation to the last two people, I worked through their files and identified areas of concern. I met with Robert's lawyers in Bermuda and several times in the United States, as well as meeting Miller & Chevalier lawyers in both Washington and Houston. Once again, all this work was done without hesitation and without regard to the impact on my family life.

8. Early in the year, after receiving a complaint from Stuart Yudofsky, I travelled to Houston (again without any hesitation or regard to my family) and confronted Paul Klotman over the use of the remaining funds at Baylor. I was not overawed by his position, his intelligence or reputation. I protected the Trust's gift and helped Stuart out of a position he found very difficult and worrying. The work was clean and efficient and delivered a clear message to Dr Klotman (and an example to others) that the Trust expects the terms of any gift to be honoured.

9. Very significant time and effort was spent developing the Brockman Scholars. I travelled to College Station on several occasions to meet with the deans of the various schools. I have spoken with the president of Texas A & M and found a ground upon which we could push our approach to the scholarships without letting the university take control of the awards. I did this in a way that has led

Texas A & M to treat us as partners for a common goal. My efforts have made it easier for the University to accept our requirements.

10. Similarly, my efforts in working with Stuart Yudofsky and establish the Brockman Medical Research Foundation have proved successful. That work allowed the Scientific Advisory Board to hold its first meeting and recommend its first grants. Systems have been developed that will hold for the future. The relationship I have with Stuart is a very strong one.

11. In relation to the medical research and scholars foundations, I have completed the documentation to the extent I could. I also came up with the notion of a "Brockman Family Member" always sitting on the boards. That allows your involvement without suggesting that you control the giving.

12. The work on the Foundations was done in a way that preserves the independence of the AEBCT and the Foundations. Indeed, the way I have approached this work means that we can tell a strong story in the event of an external review by a regulator.

13. I undertook a lot of work in employing staff and dealt with people who did not quite work out (Bruce Lim, for example) without any complications. I brought Duncan on board, who appears to be working quite well. We have established offices and telephone and network systems that will hold us in order for many years to come.

14. I have identified to the software to use for the foundations as well as the development of our website. All this work goes towards establishing the AEBCT and the Foundations as genuine charities of substance. The rewards of this work will become more apparent in the event of a review by an external regulator.

15. This year I successfully worked through improving financial reporting, particularly for Point Investments Ltd. I am now very confident in the financial reporting and can efficiently produce reports. An area where I have further built on a successful 2015 is that I have been able to successfully set up far more logical accounts and produce informative and accurate financial reports. In fact, I proposed, and implemented, a number of changes to the method of accounting which have been highly helpful in producing better accounts. The audits for Point are now completed in a more timely fashion after pressuring PWC to complete them.

16. I have continued working extensively with lawyers in the United States to ensure that we are fully compliant with FATCA. This was an extensive task that saw us register a number of companies for FATCA, but managed in a way that disclosed nothing to the lawyers but the story we wanted to convey, i.e. that the various entities are all exclusively engaged in charitable activities.

17. As part of the FATCA process, I continue to work through comprehensive reviews with most of our Banks. This allowed me to re-establish the information which is before the banks - even for the older entities. I have given them our version of events. .

18. I have spent significant time with Bob Yekovich on the Rice University Opera House project. I have been very supportive of Bob while he struggles with University politics. I believe my efforts are helping to keep this project on track. I have managed to convey to Bob Yekovich your wishes without saying anything other than I am the decision maker. Obviously Bob knows the truth, but I have made it easy for him (and David Leebron) to maintain the position.

19. In relation to Founding Partners and Promise Healthcare, I continue to sit on the board of directors of the controlling company, ensuring that we have a say in the decisions being taken including any monetization strategies. I have developed a good knowledge of the hospital industry in the United States, which is helpful in making decisions on strategies going forward. A significant investment of doubtful return now has a prospect of a good return (though a full return remains highly unlikely). It might sound an excessive boast, but I do not believe that we (or any other investors) would be in this position but for my involvement.

20. I continue to become more confident in financial reporting and have also improved the accounting for Cabot and Edge.

21. The strategy of investing into debt has been successful this year, though debt opportunities have reduced because of market conditions. I have managed these investments all the way through the assignment process (without incurring any outside fees). I have good relationships with debt brokers at Deutsche Bank and Jefferies. Debt opportunities are harder to come by now with a great deal of competition, but opportunities are still regularly offered to me. I have been joining the various bank calls, which has vastly improved my knowledge on the sort of matters seen as important by those lending to businesses.

22. I continue with the production of reports on a number of topics. While we have not been able to communicate fully, these reports are still produced in a timely fashion (where the information is available) and are designed to quickly put you in a position to fully understand where we are any particular topic. Examples of these reports are the Cash Report, the Vista Transaction Report, the Significant Transaction Report, the various Debt Reports, the Fees and Expenses Report etc. I believe that I am also innovative in devising new reports and improving on existing reports.

23. I continue to enjoy a very good relationship with Robert Smith and his team at Vista. I believe that I am very strong in representing Point's interests while at the same time being responsive to the needs of Vista in carrying out their various transactions. Our need to be involved in this area is because Point owns more than 10% of two of the funds and as such is often subject to enhanced due diligence. I manage this process myself which is a lot more effective and ensures that only the information we are prepared to disclose is released.

24. I have maintained my end of our computer systems without too much trouble. Being able to work remotely and carry out changes makes maintenance and repairs much easier. I feel very confident that I can adequately address any problem that arises (with input and guidance from you, of course).

25. A key part in achieving the results I have was my willingness to give all the time necessary to get the work done. This often meant working very long hours, which I do without hesitation. It helped that I work from home so that I did not feel like I was neglecting the family. The travel this year has been particularly horrendous. There were many periods where I did not manage to spend more than 3-4 days at home before I had to travel again.

26. This year has seen me further establish my position as the figure head of the AEBCT and the other trusts.

27. I have maintained in this last year a very strong and close working relationship with Carl Linnecke. At times Carl has found himself in tricky situations, e.g. with the Aspen Valley Land Trust and Bart Chandler. I think he appreciates the support he has got from me and that has filtered down to David Finholm and the others.

28.    The reduction in the number of outside service providers or, where we still use them, the reduction in the work they do for us also means that we control the knowledge of our affairs.

29.    An important aspect to having control of our destiny and not being at the mercy of service providers is that we are less likely to suffer loss through fraud etc.  Over the past year I have seen the operation of several trust companies in Bermuda.  Unlike Grosvenor, these are trust companies run by people without the integrity of Gordon Howard.  I have seen examples of trust assets being sold without an accounting for the proceeds.  The fact is that the trust industry is filled with shady characters.  This is not so much something that I am doing well, but rather the benefit of all the work that went into creating the structures as they are today.  While it means a lot more work for me, we have better control and less fees.

30.    As I reported last year, holding the key directorships that I now do, I do not have to go out to anybody to have documents signed.  We control the information.  I manage to turn documents around in minutes using digital signatures.  I no longer have to wait for documents to be signed.  This process also fits more neatly into our database as the documents are created in the database and saved there with signed copies.  This is a very streamlined process now.

31.    I continue to document the movement of assets within the group, creating a proper commercial basis for all asset movements with the paper trail. This is also supported by the Significant Transactions Report.

32.    I have maintained very good working relationships with all key people. I stay in contact regularly with Don and Cris Ruffell Smith.

33. Maintaining the document database. I have built a very good document describing the computer set up in Bermuda.

34. Continuing the control of all companies and trusts with no compliance problems.

35. On a personal note, despite many absences though the year, I have worked hard to maintain a happy family life. The relationship with Sophie and the girls is extremely strong and we enjoy each other's company. Sophie has been trying to make sure that I eat very well and get in some exercise.

**Things that need improvement:**

1. I must exercise more. This is something that I need to be concerned about. Sophie has me eating very well. I no longer drink sodas and have very little alcohol, however making time to get on the treadmill (which is here in the house) proves difficult.

**Conclusion:**

This has been the hardest, most challenging year since I began in this role. My efforts have been huge and have signaled this as my most successful year by far.. I have carried one great burden after another and dealt with them in a way that protects the AEBCT.

I have done all this while being stopped on a regular basis when travelling into the US. I cannot now return for an unknown period.

Message

**From:** Bob Brockman [redacted]
**Sent:** 9/6/2018 7:19:54 PM
**To:** Dr. Seth Lerner [redacted] Dorothy Brockman' [redacted]

Seth,

I have been having trouble with a persistent UTI since at least mid July.

I take Levaquin (one 750mg per day) which seems to work right away and clears things up.

This last time around, I did this for 15 straight days.

Yet after doing this – I stopped for 5 days. Then the symptoms started coming back.

Last Friday, I went to Dr. Scott Lisse, my GP.

He requested a specimen – which looked absolutely horrible when I gave it.

The abnormal results from the Friday specimen were:

| | |
|---|---|
| Ketones | trace |
| Blood | 3+ |
| Protein | 3+ |
| Nitrite | positive |
| Leucocyte Esterase | 3+ |
| WBC | too numerous to count |

All the rest were in the normal range.

The culture also discovered that Levaquin is not supposed to work on the bug, but Doxycycline will.

Since the culture was not going to be available, the specimen looked horrible – and - I was leaving for Alaska on Labor Day for a one week fishing trip, I went back on Levaquin last Friday night – stopping again today. The Levaquin has temporarily reduced my symptoms apparently completely – even though the culture said it shouldn't have worked.

All of this may have some rational explanation, but seems to be somewhat bizarre at this point.

Dr. Lisse is concerned that there may be something seriously amiss inside my bladder.

I will be back from Alaska this coming Tuesday.

I am over due for "bladder washings" according to my records.

If at all possible, can you work me in for a cystoscopy on Tuesday or any day later in the week?

I would be much obliged.

Bob Brockman

Cc Dorothy Brockman

**05/11/2020 Grand Jury Subpoena Issued to Universal Computer Systems Holding Inc.**

**Privilege Log of Robert T. Brockman (Withheld Documents)**

| Log No. | Sent Date | To | From | Copyee | Description | Privilege Reason<br>(AC = Attorney-Client Privilege<br>WP = Work Product Privilege<br>CI = Common Interest<br>MP = Marital Privilege) |
|---|---|---|---|---|---|---|
| 277 | 8/21/2018 | [redacted] | Bob Brockman [bob_brockman@reyrey.com] | | [redacted] | [redacted] |
| 278 | 8/23/2018 | [redacted] | Bob Brockman [bob_brockman@reyrey.com] | | [redacted] | [redacted] |
| 279 | 8/23/2018 | [redacted] | Bob Brockman [bob_brockman@reyrey.com] | | [redacted] | [redacted] |
| 280 | 8/23/2018 | [redacted] | Bob Brockman [bob_brockman@reyrey.com] | | [redacted] | [redacted] |
| 281 | 8/24/2018 | [redacted] | Bob Brockman [bob_brockman@reyrey.com] | | [redacted] | [redacted] |
| 282 | 8/27/2018 | [redacted] | Bob Brockman [bob_brockman@reyrey.com] | | [redacted] | [redacted] |
| 283 | 8/29/2018 | 'Al Deaton' [redacted] | Bob Brockman [bob_brockman@reyrey.com] | | Confidential attorney-client communication regarding DOJ criminal investigation, and reflecting a common legal interest | AC / WP / CI |
| 284 | 8/31/2018 | [redacted] | Bob Brockman [bob_brockman@reyrey.com] | | [redacted] | [redacted] |
| 285 | 9/3/2018 | Peter Romatowski (pjromatowski@jonesday.com) [pjromatowski@jonesday.com] | Bob Brockman [bob_brockman@reyrey.com] | | Confidential attorney-client communication regarding DOJ criminal investigation | AC |
| 286 | 9/5/2018 | [redacted] | Bob Brockman [bob_brockman@reyrey.com] | | [redacted] | [redacted] |
| 287 | 9/6/2018 | 'Romatowski, Peter J.' [pjromatowski@JonesDay.com] | Bob Brockman [bob_brockman@reyrey.com] | | Confidential attorney-client communication regarding DOJ criminal investigation and reflecting a common legal interest | AC / WP / CI |
| 288 | 9/6/2018 | Peter Romatowski (pjromatowski@jonesday.com) [pjromatowski@jonesday.com] | Bob Brockman [bob_brockman@reyrey.com] | | Confidential attorney-client communication regarding DOJ criminal investigation, and reflecting a common legal interest | AC / WP / CI |
| 289 | 9/6/2018 | Peter Romatowski (pjromatowski@jonesday.com) [pjromatowski@jonesday.com] | Bob Brockman [bob_brockman@reyrey.com] | | Confidential attorney-client communication regarding DOJ criminal investigation | AC |
| 290 | 9/6/2018 | [redacted] | Bob Brockman [bob_brockman@reyrey.com] | | [redacted] | [redacted] |
| 291 | 9/8/2018 | [redacted] | Bob Brockman [bob_brockman@reyrey.com] | | [redacted] | [redacted] |
| 292 | 9/8/2018 | 'Cherry, Scott' [redacted] | Bob Brockman [bob_brockman@reyrey.com] | | Confidential attorney-client communications regarding DOJ criminal investigation, and reflecting a common legal interest. | AC / WP / CI |

**From:** Bob Brockman <[redacted]
**To:** 'Don Passmore'
**Sent:** 9/25/2018 1:34:26 AM
**Subject:** RE: Subpoena

**Don,**

**Something is causing the data stream to get snarshed.**

**Please resend.**

**Bob**

---

**From:** Don Passmore [redacted]
**Sent:** Monday, September 24, 2018 9:42 AM
**To:** 'Bob Brockman'
**Subject:** Subpoena

Bob
I have uploaded a copy of the Subpoena to your client portal account on our website www.houston-cpa.com .

Please call if you have any problems accessing your portal.

Thanks
Don

Don L. Passmore, CPA
Passmore & Associates, LLC
713-935-[redacted]
713-935-[redacted]

**CONFIDENTIALITY STATEMENT:**
This electronic message transmission contains information from Passmore & Associates, LLC and is confidential or privileged. The information is intended only for the use of the person(s) named above. If you are not the intended recipient, any use, disclosure, copying, distribution or any other action based on the contents of this email and any attachments is strictly prohibited. If you received this electronic transmission in error, this message and any attachments should be deleted immediately and please notify us by telephone at 713-935-0300.

---

**From:** Don Passmore [[redacted]
**Sent:** Monday, September 24, 2018 9:46 AM
**To:** 'Bob Brockman'
**Cc:** 'Keneally, Kathy'
**Subject:** Consent for Disclosure

Bob
You may have missed my email below.
Sorry but I was advised that you need to sign a written consent before I can discuss your tax matters with Kathy. Please print, sign and return the original or signed copies of the attached Consent for Disclosure forms. Please call if you have any questions.
Thanks
Don

Don L. Passmore, CPA
Passmore & Associates, LLC

713-935-
713-935-

**CONFIDENTIALITY STATEMENT:**
This electronic message transmission contains information from Passmore & Associates, LLC and is confidential or privileged. The information is intended only for the use of the person(s) named above. If you are not the intended recipient, any use, disclosure, copying, distribution or any other action based on the contents of this email and any attachments is strictly prohibited. If you received this electronic transmission in error, this message and any attachments should be deleted immediately and please notify us by telephone at 713-935-0300.

---

**From:** Don Passmore
**Sent:** Wednesday, September 19, 2018 6:39 PM
**To:** 'Bob Brockman'
**Subject:** Consent for Disclosure

Bob
Please print, sign and return the original or signed copies of the attached Consent for Disclosure forms. Please call if you have any questions.
Thanks
Don

Don L. Passmore, CPA
Passmore & Associates, LLC
713-935-
713-935-

**CONFIDENTIALITY STATEMENT:**
This electronic message transmission contains information from Passmore & Associates, LLC and is confidential or privileged. The information is intended only for the use of the person(s) named above. If you are not the intended recipient, any use, disclosure, copying, distribution or any other action based on the contents of this email and any attachments is strictly prohibited. If you received this electronic transmission in error, this message and any attachments should be deleted immediately and please notify us by telephone at 713-935-0300.

---

**From:** Bob Brockman
**Sent:** Wednesday, September 19, 2018 5:32 PM
**To:** 'Keneally, Kathy'; 'Don Passmore'
**Cc:** 'Romatowski, Peter J.'
**Subject:** RE: Confidential re: Bob Brockman

**Don,**

**These attorneys represent me in this matter. I confirm that I consent to these discussions.**

**Bob**

---

**From:** Keneally, Kathy
**Sent:** Wednesday, September 19, 2018 1:38 PM
**To:** Don Passmore (
**Cc:** bob_brockman; Romatowski, Peter J.
**Subject:** Confidential re: Bob Brockman

Mr. Passmore,

My partner, Pete Romatowski (copied) and I are counsel to Bob Brockman. We would like to discuss certain of his tax matters with you. I am copying Bob on this email so that he can confirm that he consents to these

discussions. Please let me know when you may be available for a call.

Bob: Please confirm your consent by "reply to all." Thank you.

Best regards,
Kathy
Kathryn Keneally
Partner

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

# CHARITABLE CONTRIBUTIONS
## April 7th, 2014

| DATE | RECIPIENT | AMOUNT |
|---|---|---|
| **2004** | | |
| 06/29/2004 | PALS | $20,000.00 |
| 06/29/2004 | Agape House | $20,000.00 |
| 06/29/2004 | The Bermuda Diabetic Association | $20,000.00 |
| **2006** | | |
| 07/31/2006 | St John's Trust Company Scholarships | $32,858.10 |
| 12/31/2006 | Bermuda International Film Fesitival | $5,000.00 |
| **2007** | | |
| 06/30/2007 | St John's Trust Company Scholarships | $40,613.53 |
| 12/31/2007 | Bermuda International Film Fesitival | $10,000.00 |
| **2008** | | |
| 03/31/2008 | St John's Trust Company Scholarships | $64,755.71 |
| **2009** | | |
| 01/14/2009 | Rice University - Brockman Hall for Physics | $5,000,000.00 |
| 06/10/2009 | Rice University - Brockman Hall for Physics | $5,000,000.00 |
| 09/30/2009 | St John's Trust Company Scholarships | $64,803.11 |
| 11/23/2009 | Rice University - Brockman Hall for Physics | $5,000,000.00 |
| 12/31/2009 | WITSA IT Conference | $5,000.00 |
| 12/31/2009 | Bermuda Society of the Arts | $5,000.00 |
| **2010** | | |
| 03/16/2010 | PALS Peter Mitchell | $500.00 |
| 04/14/2010 | Rice University - Brockman Hall for Physics | $5,000,000.00 |
| 05/31/2010 | Bermuda Documentary Film Fesitival | $5,000.00 |
| 09/30/2010 | St John's Trust Company Scholarships | $71,518.00 |
| 09/30/2010 | Bermuda Society of the Arts | $5,000.00 |
| 12/31/2010 | Rotary Club Student Exchange Programme | $16,000.00 |
| 12/31/2010 | Bermuda Society of Prevention of Cruelty to Animals | $1,000.00 |
| **2011** | | |

| | | |
|---|---|---|
| 01/17/2011 | University of Texas PET Project | $2,500,000.00 |
| 06/24/2011 | Centre College | $4,500,000.00 |
| 07/01/2011 | Baylor College of Medicine | $10,000,000.00 |
| 09/30/2011 | Bermuda Documentary Film Fesitival | $5,000.00 |
| 09/30/2011 | St John's Trust Company Scholarships | $67,357.79 |
| 10/06/2011 | Centre | $3,000,000.00 |
| 12/31/2011 | Bermuda Society of Arts | $5,000.00 |
| 12/31/2011 | Rotary Club Student Exchange Programme | $9,500.00 |
| **2012** | | |
| 01/05/2012 | Centre College | $3,000,000.00 |
| 01/16/2012 | University of Texas Health Center | $1,000,000.00 |
| 01/31/2012 | Bermuda Documentary Film Fesitival | $10,000.00 |
| 03/30/2012 | Centre College | $3,000,000.00 |
| 04/12/2012 | Baylor College of Medicine | $5,000,000.00 |
| 07/02/2012 | Centre College | $3,000,000.00 |
| 07/07/2012 | Bermuda Society of the Arts | $5,000.00 |
| 09/09/2012 | Rotary Club Student Exchange Programme | $18,500.00 |
| 09/12/2012 | St John's Trust Company Scholarships | $58,000.00 |
| 09/26/2012 | Centre College | $3,000,000.00 |
| **2013** | | |
| 03/03/2013 | St John's Trust Company Scholarships | $4,000.00 |
| 03/13/2013 | Bermuda Documentary Film Fesitival | $10,000.00 |
| 04/05/2013 | Baylor College of Medicine | $5,000,000.00 |
| 05/01/2013 | Rotary Club Student Exchange Programme | $9,000.00 |
| 05/05/2013 | University of Texas Health Center | $1,000,000.00 |
| 05/05/2013 | Centre College | $2,000,000.00 |
| 07/01/2013 | Rice University - Opera Theater - Pre-design | $500,000.00 |
| 08/08/2013 | Centre College | $4,000,000.00 |
| 10/10/2013 | Rotary Club Student Exchange Programme | $12,000.00 |
| 10/12/2013 | Salvation Army - Bermuda | $10,000.00 |
| 10/26/2013 | Centre College - Legal Fees (treated by Centre as a donation) | $302,149.86 |
| **2014** | | |
| 01/22/2014 | University of Texas Health Center | $1,000,000.00 |
| 04/07/2014 | Baylor College of Medicine | $5,000,000.00 |
| 04/24/2014 | Rotary Club Student Exchange Programme | $10,000.00 |

| | | |
|---|---|---|
| 04/25/2014 | Rice University - Opera Theater - Pre-design | $1,200,000.00 |
| 10/13/2014 | Rotary Club Student Exchange Programme | $10,000.00 |
| 10/13/2014 | University of Texas at Austin - Musical Lives Program | $100,000.00 |
| **2015** | | |
| 01/09/2015 | Rice University - Opera Theater - Pre-design | $2,400,000.00 |
| 02/15/2015 | Rotary Club Student Exchange Programme | $6,000.00 |
| 03/10/2015 | Rotary Club Student Exchange Programme | $4,000.00 |
| 04/20/2015 | Bermuda Documentary Film Fesitival | $10,000.00 |
| 04/21/2015 | Johns Hopkins | $1,000,000.00 |
| 08/31/2015 | Peter Poole - Sable Trust BVI - Donation in memory of deceased son | $100,000.00 |
| 09/27/2015 | Rotary Club Student Exchange Programme | $13,500.00 |
| Annual | St John's Trust Company Scholarships | $91,136.90 |
| **2016** | | |
| 02/17/2016 | Rotary Club Student Exchange Programme | $12,000.00 |
| 03/28/2016 | Rice University - Opera Theater - Design | $3,200,000.00 |
| 09/17/2016 | Rotary Club Student Exchange Programme | $11,000.00 |
| 10/05/2016 | Jefferson Scholars Foundation - Chair in Colonial History | $6,000,000.00 |
| 10/06/2016 | Cure FA Foundation - Mike Henry | $2,000,000.00 |
| Annual | St John's Trust Company Scholarships | $116,021.58 |
| **2017** | | |
| 04/26/2017 | Baylor College of Medicine - O'Malley and Dacso | $1,247,548.75 |
| 04/27/2017 | Rotary Club Student Exchange Programme | $9,000.00 |
| To date | St John's Trust Company Scholarships | $25,000.00 |
| 05/16/2017 | Rice University - Opera Theater | $10,000,000.00 |

Message

**From:** Bob Brockman
**Sent:** 12/16/2018 8:47:06 PM
**To:** 'Moss, Craig'

Craig,

Please make a $1M charitable contribution to:

Baylor College of Medicine
Attention Seth P. Lerner MD F.A.C.S.
Houston, TX 77030

Send to me for signature and mailing.

Bob

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

**ST. JOHN'S TRUST COMPANY (PVT) LIMITED**
**SUITE 225, 12 CHURCH STREET**
**HAMILTON HM11**
**BERMUDA**
**Tel: +1 (441) 295 0985**
**Fax: +1 (441) 295 0986**

Paul E. Klotman, M.D.
President
Baylor College of Medicine
Office of the President

Stuart C. Yudofsky, M.D.
D.C. and Irene Ellwood Professor and Chairman
Department of Psychiatry and Behavioral Sciences

One Baylor Plaza, MS 350
Houston Texas 77030
United States of America

June 5th, 2011

Dear Drs. Klotman and Yudofsky,

**Re: A. Eugene Brockman Charitable Trust ("the Trust")**

I refer to my meeting with Dr. Yudofsky in Houston on Friday May 13th, 2011 and the detailed material which I received in Bermuda soon after.

It was such a great privilege and pleasure to meet Dr. Yudofsky. Dr. Yudofsky's extraordinary intellect coupled with a rare and genuine compassion has formed the vision he holds for the proposed Psychiatric Institute at the Baylor College of Medicine.

By way of background, I am a director of the Trustee to the Trust, St John's Trust Company (PVT) Ltd. The Trust was established by A. Eugene Brockman in 1981 with the purpose of raising and maintaining a sufficient fund of assets, which could be applied to worthy charitable causes, particularly in the area of medicine, medical research and education. Mr. Brockman passed away in 1986; however his vision was

shared, and continued, by my predecessor Mr. Gordon Howard (who passed away last year). While I never met Mr. Brockman, I did have the honour of working closely with Mr. Howard for over ten years. I have become inoculated with the same vision. The Trust has actively pursued these philanthropic goals since it was established.

Both Mr. Brockman and Mr. Howard shared a strong desire to support medical research. I feel sadness that Mr. Howard, in particular, did not have the opportunity of meeting Dr. Yudofsky. I believe that, like me, Mr. Howard would also be mesmerized by the scope of Dr. Yudofsky's vision and his staggering intelligence, coming as they do from such a humble and modest man.

I should record that I first heard of Dr. Yudofsky while attending a meeting with Mr. Brockman's son, Robert T. Brockman. The Trust is ultimately the major shareholder of a corporation of which Robert T. Brockman is the Chairman, Reynolds and Reynolds, Inc. That corporation, through Dealer Computer Systems, Inc., had made a pledge to Baylor College of Medicine by way of a letter dated 16th June, 2005.

I have expressed my strong opinion to Robert T. Brockman that the pledge ought to be made by the Trust instead of the corporation.

The reason for this is very straightforward: I do not think that it would be possible for the Trust to find a more deserving recipient of support than. Dr. Yudofsky (and, of course, any institution with which he is associated). I am glad to say that Robert Brockman has agreed with my view and acceded to my request that the Trust honour the sum of the original pledge.

I stress that it is the inspirational leadership and vision of Dr. Stuart Yudofsky which is the foundation of the pledge the Trust hereby makes. Dr. Yudofsky's continuing involvement is an absolutely essential pre-condition to this pledge. Dr. Yudofsky is a rare human being. I believe that the Trust should do all it can to honour his achievements and utilize his extraordinary abilities. Particularly, I believe strongly that Dr. Yudofsky's continued leadership as Chairman of the Menninger Department of Psychiatry is essential to achieving his vision. The Trust therefore offers this gift contingent upon his remaining as Chairman.

It would be greatly appreciated if both Dr. Yudofsky and the Baylor College of Medicine would confirm their commitment to the condition I set out above. Further, the Trust does reserve the right to reconsider the continuation of, and, if required, the discontinuation of the remaining funds, should Dr. Yudofsky be removed from, or relinquish, his position as Chairman.

On behalf of the Trust, I am pleased to make the following pledge, subject to the contingencies set forth above and as follows:

I. Pledge

1. The Trust hereby pledges $25,000,000 (twenty-five million dollars) to Baylor College of Medicine for the exclusive purposes of and subject to each and every contingency listed below ("the Contingencies").

2. Upon written acceptance of the purpose and Contingencies of this pledge by the President of Baylor College of Medicine and completion of Items 1, 2, and 3 of the Contingencies, the Trust will transfer to Baylor College of Medicine the sum of $10,000,000 (ten million dollars) to be followed by three (3) annual allocations of $5,000,000 (five million dollars) on April 15th for the three successive years following the year of the initial donation.

II. Purpose

1. The funds pledged are for the purposes of the following:

   (a) $5,000,000 (five million dollars) endowment support for the Beth K. and Stuart C. Yudofsky Presidential Chair in Neuropsychiatry

   (b) $3,000,000 (three million dollars) endowment support for the Beth K. and Stuart C. Yudofsky Chair in the Neuropsychiatry of Traumatic Brain Injury (new recruit to BCM, appointed after national search)

(c) $2,000,000 (two million dollars) funding for recruitment expense, administrative support, research assistants, establishing laboratory, infrastructure support, and supplies

(d) $3,000,000 (three million dollars) endowment support for the Beth K. and Stuart C. Yudofsky Chair in the Basic Science of Neuropsychiatry (e.g. imaging; genetics; cellular and molecular biology) (new recruit to BCM, appointed after national search)

(e) $2,000,000 (two million dollars) funding for recruitment expense, administrative support, research assistants, establishing laboratory, infrastructure support, and supplies

(f) $3,000,000 (three million dollars) endowment support for the Beth K. and Stuart C. Yudofsky Chair in Interventional Neuropsychiatry (e.g. deep brain stimulation; transcranial magnetic stimulation; neuropsychopharmacology) (new recruit to BCM, appointed after national search)

(g) $2,000,000 (two million dollars) funding for recruitment expense, administrative support, research assistants, establishing laboratory, infrastructure support, and supplies

(h) $3,000,000 (three million dollars) endowment support for the Beth K. and Stuart C. Yudofsky Chair in the Neuropsychiatry of Military Post Traumatic Stress Syndrome (new recruit to BCM, appointed after national search)

i) $2,000,000 (two million dollars) funding for recruitment expense, administrative support, research assistants, establishing laboratory, infrastructure support, and supplies

Total amount of the pledge is $25,000,000.

2. The funds as they are donated and any accumulated endowment earnings generated therefrom are for the exclusive use of the Menninger Department of Psychiatry and Behavioral Sciences of Baylor College of Medicine, for the purposes described above, under the direction of Professor and Chairman, Stuart C. Yudofsky, M.D.

III. <u>Contingencies</u>

1. Designating Stuart C. Yudofsky, M.D. as Principal Investigator for the entirety of this pledge, with exclusive "sign-off" authority for allocation of any and all funds expended.

2. Maintaining this donation in confidence except as specifically authorized in writing by the Trust.

3. The Beth K. and Stuart C. Yudofsky Presidential Chair in Neuropsychiatry initially will be held by Stuart C. Yudofsky, M.D., subject to the approval of the President of Baylor College of Medicine, the Faculty Council of Baylor College of Medicine, and the Board of Trustees of Baylor College of Medicine.

4. Should Stuart C. Yudofsky die, become incapacitated or voluntarily relinquish his obligation as Principal Investigator, which obligation includes directing the use of the donated funds, Paul Klotman, M.D., President of Baylor College of Medicine, or his successor, shall, in consultation with Beth Yudofsky ,M.D., assume the role and obligations of Principal Investigator, which obligations include directing the use of the donated funds, temporarily, until such time as a suitable replacement is recommended by Dr. Klotman or his successor, following consultation with Beth Yudofsky, M.D., and approved by the Trust, which approval the Trust is free to withhold at its discretion.

Should the Trust, within its sole discretion, determine at any time and designate in writing that any of the contingencies listed above are not fulfilled, the Trust reserves the right to cancel this pledge and any and all unexpended funds derived from this pledge shall be returned to Trust within 60 days of the date of written notice and the Trust shall not be obligated to make any further contribution whatsoever.

This pledge and all details pertaining thereto are highly confidential. No information of any nature may be released without the prior written approval of the Trustee.

I wish only to add that the Trust has never before had an opportunity to support a vision such as Dr. Yudofsky's, devoted as it is to the missions of patient care, research and education. The settlor of the Trust and Mr. Howard would both have stood proudly in support of this extraordinary mission to provide better, compassionate care of the mentally ill and in advancing behavioral health. In making this pledge, the Trust achieves the purpose for which it was established and the visions of Mr. Brockman and Mr. Howard are fulfilled.

If the foregoing pledge and conditions thereto are acceptable, would you kindly execute one copy of this letter, which will constitute our Pledge Agreement. Would you then return the executed copy to me at the address above.

Yours sincerely,
**ST. JOHN'S TRUST COMPANY (PVT) LIMITED**

Evatt Tamine
Director

This Pledge and the conditions thereto are acceptable to us and will constitute the Pledge Agreement.

Paul E. Klotman, M.D.

Stuart C. Yudofsky

APPROVED AS TO FORM
Office of the General Counsel
Baylor College of Medicine
By RC 6/24/11

To: Bob Brockman

From: Evatt Tamine

Date: January 12, 2012

Subject: 2011 Performance Evaluation

This has been year of further change in terms of structures, with additional responsibility. The year has also seen consolidation which has continued in the past few years.

**What went well?**

1. At a time when investment returns are down, we have managed to invest in, and administer, a number of debt opportunities bringing good returns: Sunquest, Vision Solutions and Applied. The relationship with the players in the debt markets has expanded. In addition to Deutsche Bank and Jefferies, I now have contacts at Credit Suisse.

2. My relationship with Robert and his team at Vista is going very well. I am responsive to their needs, which has made the closing process run a little more smoothly in areas such as due diligence. The fact is that most of Vista's investors are based in the U.S. and are major institutions. It is the involvement of Point Investments, an unknown non-US investor, which generally causes the compliance issues. For example, in the recent acquisition of the division out of Thomson Reuters, regulatory and HSBC's due diligence requirements across more than 20 countries in setting up subsidiaries and accounts has been onerous. I am discharging my side of that quickly and successfully. Further, recently I had to get involved in arranging the letter of credit which saw the Ventyx escrow money released.

ABB was delaying the release, however we managed to complete the process from Point's side.

3. I have undertaken and completed a major re-structuring of the entities under my control. The number of trusts and companies have been reduced and new trusts are in place, which would make it even more difficult for an outside regulator to connect you to activities. The restructuring that started a couple of years ago is now complete. We have three new charitable trusts with new private trust companies. It is a clean start covering our tracks so that no service provider can prejudice us with information from years ago. The key however is control of our destiny.

4. Once again, a great deal of time in the year was spent successfully bring Founding Partners nearer to a commercial resolution which will see the best prospect of return. I have been the principal player in ensuring that the Federal Court in the US had made orders which have now firmly set us on the path to closing. The orders were made on 21 December. While there are still some hurdles, the fact is that all investors are looking at a return through the efforts I have made. This has meant that my profile has had to be higher than in the past however this is unavoidable as our direct dealings with the receiver have substantially increased. Notwithstanding the difficult relationship all investors and Sun Capital have had with the receiver, he seeks my opinion on a number of issues at this stage - possibly because he is concerned about what might be said to the Court about him.

5. A key part in achieving the result I did with Founding Partners (and all other successes in 2011) was my willingness to give all the time necessary to get the work done. This often meant working very long hours, which I did without hesitation. It helped that I work from home so that I did not feel like I was neglecting the family. Frankly, I do not believe that it would

be possible to find someone who could or would commit the time that I do to this role.

6. This year has seen me further establish my position as the figure head of the AEBCT following the deaths of Gordon Howard and Trevor Lloyd. My contact with outside parties, such as Dr. Gould, John Roush and Stuart Yudofsky has been undertaken with the requisite degree of authority, i.e. I do not believe that anyone has any basis to suggest that I am merely carrying out your instructions - what they might privately believe.

7. In terms of the charitable activities, I continue to make a greater contribution than Gordon had in the past. I have stayed in contact with John Roush and Richard Trollinger at Centre College and have spoken with them about visiting in the first half of this year. I immediately established a good rapport with Stuart Yudofsky and will invite he and his wife to dinner when next I am in Houston. These activities would work as a strong barrier against an attack from the IRS.

8. This year saw the departure of Grosvenor Fund Administration Limited with me assuming the responsibilities of fund administration and accounting. I have been largely successfully in doing this, though I have also addressed this area in the next section on matters which did not go well.

9. I continue to maintain a number of accounts. I believe that my skills have greatly improved in this area and I feel quite comfortable in handling most issues that come up.

10. The reduction in the number of outside service providers or, where we still use them, the reduction in the work they do for us also means that we control the knowledge of our affairs. I have also ended the relationship with Peter Poole and Sable Trust save for their role as the resident representative of the new private trust companies. That new role does not require that they have access to any financial or other data. The substantial reduction in the work they do was made on the very best terms. Peter has invited me to the BVI to remove all documents, which he holds. I hope to do this in the first half of 2012.

11. As I reported last year, holding the key directorships that I now do, I do not have to go out to anybody to have documents signed. We control the information I manage to turn documents around in minutes using digital signatures. I no longer have to wait for documents to be signed. This process also fits more neatly into our database as the documents are created in the database and saved there with signed copies. This is a very streamlined process now.

12. In the ever more complicated world of KYC and due diligence, I have managed to establish and/or maintain very good relationships with the banks: Bermuda Commercial Bank and Butterfield Bank in Bermuda and Mirabaud Private Bank in Geneva.

13. I continue to document the movement of assets within the group, creating a proper commercial basis for all asset movements with the paper trail.

14. On many occasions this year – and the number increases each year – I have successfully undertaken tricky due diligence exercises. Most enquiries are generated by Vista's investments where we are pressed on Point's beneficial ownership; however I have also dealt with several of these enquiries for

Spanish Steps, Edge and Cabot. On each occasion I have walked us through with minimal disclosure.

15.  My financial reporting is working very well now. I can turn around the cash report within a week or so of month end. While I do not always have the Point numbers, this is a vast improvement on where you were years ago. I have also added ideas to the reports which I have created. I am not content to use the same old report, but am always looking for ways to improve the quality and accuracy of the information reported.

16.  Throughout the year I have regularly updated the report on fees and expenses. You will recall that I created the detailed report for the years 2005-2009. I hope to deliver the report for 2011 (with the previous six years) sometime in late January or February, subject to the availability of information. This is something you have not regularly received in the past. It is now standard operating practice.

17.  Similarly, I have now completed the detail significant transactions report, which will also be a regular monthly report, as will the debt investment reports.

18.  I have maintained the Radmin computers and the email servers with very little disruption this year. I believe that I continue to improve my skills in the IT area. On a personal level, my computer setup had very few problems and such problems as I encountered I was usually able to fix myself. I believe that I have had some ideas which are beneficial, e.g. using two external hard drives for True Image backups. I am working as my own IT department.

19.  I have maintained very good working relationships with all key people. I stay in contact regularly with Don and Cris Ruffell Smith.

20. I continue to continue to maintain a now settled system of getting original documents to Houston with a detailed inventory. An inventory is also maintained for the Bermuda documents. A project for the next visit to Houston is the incorporation of the Bermuda documents into the Houston inventory. The documents will also be re-arranged to reflect the new coding system.

21. Maintaining the document database.

22. Continuing the control of all companies and trusts with no compliance problems.

23. Continuing in a very good relationship with Don and Melissa.

24. Per the 2011 list of goals set by you, I think most have been accomplished as per the attached spreadsheet.

25. On a personal note the year has again been highly successful. Family life has been wonderful for me. The relationship with Sophie and the girls is extremely strong and we enjoy each other's company. Sophie has been making sure that I eat very well and get in some exercise.

**Things that need improvement:**

1. I am not quite happy with my financial reporting on Point Investments Part of the problem is that I have inherited an accounting software system which is not intuitive. Further, this is exacerbated by the fact that Dan Voth had some odd ways of recording the cost of investments, i.e. buying "units" in the private equity funds. I am coming onto the audit for Point shortly, so I hope then to discuss any shortfalls more fully with the auditors. So far as I can tell my numbers are correct, however I am approaching the audit ready to accept criticism and improvement.

2. I feel that this year also saw me make some poor choices on prioritizing work. This is something that I need to work on. I believe that I delayed on delivering some projects to you because I focused on some of the less important projects.

3. I could use more exercise, as always. This has been a particularly busy year and I hope that our streamlined processes will allow me more time to get out. Coupled with the diet Sophie has me following, I hope that this is achievable this year.

**Conclusion:**

Again, this has been a very busy year in which I believe we solidified many of the changes which we went through in the past two or three years. I think that my efforts will have contributed to a successful operation for years to come while reducing our exposure to attack from regulators.

Effectively, I believe that I now successfully act in all the following areas: trust and corporate administrator, investment manager, accountant, lawyer and IT support.

I am proud of my efforts and I feel that 2011 has seen the full benefit of the work I have put in.

I have achieved my goals with the minimum of outside input, which works well for us.

## 2011 GOALS AND RESPONSES

| | 2011 GOALS | RESPONSES |
|---|---|---|
| 1 | Endeavor to deal with the Founding Partners and Arboria issues as best you can. This will include participating in any mediation. However there is ongoing need to be cautious about acquiring too high a profile. | Done and ongoing. Founding Partners draws closer to resolution, though a return might take some years to realize. |
| 2 | Monitor the ongoing legislative process in the USA and other jurisdictions and facilitate whatever restructuring ends up being required. | Done and ongoing. |
| 3 | Take over the accounting and reporting processes for Point. The goal to be achieved is:<br>-maintain the same processes as are currently in effect<br>-complete your requirements for fund administration<br>-satisfactorily continue the current audit processes | Done and ongoing. |
| 4 | With regards to accounting processes for other entities:<br>-establish use of an accounting software package that is a true double entry accounting system with proper journals, schedules, and general ledger with financial reports are produced<br>-where the financials have columns for the previous 5 years that show all amounts for all lines on the P&L and Balance sheet – as | I am trialing Peachtree as a backup system on Point. Will report further when I am well into the trial. |

| | | |
|---|---|---|
| | well as for the current 6 month period | |
| 5 | Conduct a semi-annual financial review of all entities face to face by the end of the first half of the year | Done and ongoing. |
| 6 | Reorganize the boxes of original documents such that historical files of discontinued entities are segregated into their own box(es) | Don, but need to be done again following the latest changes and taking into account the new coding system. |
| 7 | Request an asset ledger from Mountain Queen, Inc. that details all of the real estate, improvements, and furnishings. They should be keeping this for purposes of calculating depreciation – but they need to be asked. | This should have been completed by now. I will follow up with Carl Linnecke. |
| 8 | Complete the move to your new house with the following business issues addressed:<br>-UPS units for all devices including DSL modems, email server,<br>RADMIN laptops, your laptop & monitors, phone system, fax machine,<br>PDA chargers<br>-diesel generator with plenty of reserve fuel capacity<br>-fireproof data backup<br>-ample desk space<br>-good lighting for the work surfaces<br>-proper chairs<br>-air conditioning | Done. Generator is gas, however hooked to a large tank. |
| 9 | Resolve the situation with Heather as to her duties, hours, and location | Done. |

| | | |
|---|---|---|
| 10 | Vacate the apartment to reduce lease expenses | Done. |
| 11 | Continue to address the projects on the To-Do List. | Done and ongoing. |
| 12 | Arrange for audited financials for those entities that need to have audits | Done and ongoing. |
| 13 | Annually verify that there are letters of resignation from all trustees and that Bob has the originals | Done and ongoing. |
| 14 | Update the To-Do list at least monthly | Done and ongoing. |
| 15 | Create master document by entity of all bank accounts, signatories, contact persons, website logon's, account numbers, passwords, and whatever else that is needed to verify balances | Done. Need to send you an update following password changes. |
| 16 | Complete the reorganization described under **PROJECTS – TRUSTEES & TRUST PROTECTORS** and **ENTITY STRUCTURE** in the 12/28/2010 To-Do list | Done |
| 17 | Pursue reasonable investment opportunities | Done and ongoing. |
| 18 | Start and maintain a forever-to-date ledger of charitable donations from the AEBCT | Done and ongoing. |
| 19 | Foster a relationship with RTB II | Limited opportunity this year with Robbie's studies, however hoping that more opportunity will arise this coming year. |

**<u>General Goals for Every Year</u>**

| | | |
|---|---|---|
| 20 | Continue to work to reduce the number of entities as this makes all processes simpler creating more time to focus on investment programs. | Done and ongoing. |
| 22 | Continue to keep the document image database up to date constantly | Done and ongoing. |
| 23 | Continue to keep the entity/significant transaction database up to date constantly | Done and ongoing. |
| 24 | Publish the Cash Report monthly | Done and ongoing. |
| 25 | Convert to keeping all email and financial records on an encrypted Micro SD chip carried in a different location in luggage when traveling abroad – or better yet just use RADMIN | Micro SD cards on to be delivered early next week. |
| 26 | Continue to update the accounting reports to the document image database | Done and ongoing. |
| 27 | Operate as much as possible in a paperless manner – such that if someone were to come in your door unannounced everything would be in encrypted digital form | Done and ongoing. |
| 28 | Complete adding the documents and significant transactions for superseded entities to the respective databases on a piecemeal basis during the year | Done and ongoing. |
| 29 | Run Evidence Eliminator at least weekly on your computer | Done and ongoing. |

| | | |
|---|---|---|
| 30 | Keep your computer system running perfectly – get whatever you need for maximum productivity and backup | Done and ongoing. |
| 31 | Keep Don's computer activity operating on RADMIN as much as possible | Done and ongoing. |
| 32 | Continue basic education in accounting, bookkeeping, auditing, and financial controls | Done and ongoing. Most improvement is coming from hands-on experience. The Point audit will be an education in itself. |
| 33 | Maintain all working entities in good standing so that their legal existence can not be questioned | Done and ongoing. |
| 34 | Maintain relationships with the remaining service providers – bearing in mind that not a lot should be expected from them – never take for granted that they are doing what they should be doing which will require constant monitoring of their activity | Done and ongoing. |
| 35 | To the extent possible, no service provider should become crucial – always be thinking about portability and alternate providers should the need arise | Done and ongoing. |
| 36 | Regardless of the level of non-performance of a service provider, a cordial professional relationship should be maintained – unless a high level policy decision to do otherwise is made | Noted. |
| 37 | In the event of non-performance of a service provider or investment, the policy will always be to withdraw quietly – unless a high level policy decision to do otherwise is made | Noted. |

| | | |
|---|---|---|
| 38 | Continue the excellent work on the spreadsheet for expenses of each service provider such that detail entries by type of expense are kept so as to support the annual expenses for each service provider | Done and ongoing. |
| 39 | Coordinate the charitable giving initiatives of the AEBCT | Done and ongoing. 2011 report should be delivered in about two weeks. |
| 40 | Monitor your levels of daily effort so as to avoid burn-out. Engage in a regular fitness program with proper diet so as to stay in top physical condition. | Done and ongoing. |
| 41 | Other than your personal vacation travel, I recommend that you conserve the amount of travel that you do for business as your control of everything will be directly related to the amount of time you spend in front of your multi-monitor computer system at home. | Noted. |
| 42 | Plan your life for healthy, balanced, stable, long-term productivity | Noted. |
| 43 | Although you have several personal friends in Houston that I am sure you want to maintain, please restrict your contact with the USA generally such that except for these few – you tend to fade into the background | Ongoing. |
| 44 | Provide an annual report of your expenses for review – organized by month– in sufficient detail to establish the business purpose | Provided for 2010. Should be able to deliver the 2011 report before the start of February. |

ET_000005332Z

DRAFT

Paul E. Klotman, MD
President
Baylor College of Medicine
Office of the President

Stuart C. Yudofsky, MD
Beth K. and Stuart C. Yudofsky Presidential Chair in Neuropsychiatry
D.C. and Irene Ellwood Professor and Chairman
Menninger Department of Psychiatry and Behavioral Sciences
Baylor College of Medicine

One Baylor Plaza, MS 350
Houston, Texas 77030
United States of America,

December 22, 2015

Dear Drs. Klotman and Yudofsky,

I am writing regarding the appointment of the replacement for Stuart C. Yudofsky, M.D., as Principal Investigator of the gift that established and continues to support the Beth K. and Stuart C. Yudofsky Division of Neuropsychiatry (hereafter, the Division). As you will recall from my letter of June 5, 2011, I am a director of The Trust that provided this gift in recognition of the inspirational leadership and vision of Dr. Yudofsky and to honor his achievements and extraordinary abilities. It was the position of The Trust that Dr. Yudofsky's continued leadership as Chairman of the Menninger Department of Psychiatry was essential to achieving his vision for the use of our gift. Indeed, The Trust offered this gift contingent upon his remaining as Chairman. We also reserved the right to reconsider the continuation of, and, if required, the discontinuation of the remaining funds should Dr. Yudofsky be removed from, or relinquish, his position as Chairman. Additionally, any new Principle Investigator of this gift can only occur following discussion with Dr. Beth Yudofsky, and The Trust retains its rights for approval or disapproval of any new PI and/or use of these funds thereafter until such PI is approved by The Trust.

We support Dr. Yudofsky's decision to direct his energies and time to his family, whose health and happiness are our desire. At the same time, Dr. Yudofsky's retirement occasions a need to identify and effect a replacement who is an identified world-renown, certified neuropsychiatrist to direct the use of the funds provided by The Trust for the development and operations of the Division. Drs. Stuart and Beth Yudofsky and the Trust concur that a Director of the Division named in their honor can only be held by an individual with such certification, identification and background--no different from the requirement of a Division Child Psychiatry in a Department of Psychiatry or a Division of Cardiology in a Department of Medicine.

In his current role as Chairman and Director of the Division, Dr. Yudofsky, in consultation with Beth Yudofsky, M.D. and with the consultation and approval of The Trust, hereby names David B. Arciniegas, M.D., as his successor to the role of PI of the Division and director of the entirety of our gift. The trust uniformly and irrevocably supports their recommendation.

Dr. Yudofsky began recruiting Dr. Arciniegas to the Baylor College of Medicine while our agreement establishing the Beth K. and Stuart C. Yudofsky Division of Neuropsychiatry was finalized. Having known Dr. Arciniegas for many years through their work together in the American Neuropsychiatric Association and the *Journal of Neuropsychiatry and Clinical Neurosciences*, Dr. Yudofsky observed Dr. Arciniegas' remarkable work at the University of Colorado School of Medicine and rapid development as an international thought leader in neuropsychiatry. At the time The Trust pledged its support for the Division, Dr. Arciniegas had established himself as one of the world's foremost neuropsychiatrists and developed extraordinary skills as a clinician, educator, researcher, and administrator. Recognizing him as uniquely qualified to lead the development of the Division, Dr. Yudofsky approached Dr. Arciniegas at the 2011 annual meeting of the American Neuropsychiatric Association to discuss with him this opportunity. Over the course of the following six months, Dr. Arciniegas was recruited by Dr. Yudofsky into the Beth K. and Stuart C. Yudofsky Chair in Brain Injury Medicine and to serve as the Division's Executive Director.
In anticipation of Dr. Arciniegas' arrival to the Baylor College of Medicine, Dr. Arciniegas drafted the Division's mission, vision, and near-term strategic goals. Dr. Yudofsky, whose extensive duties as Department Chair have required his focused attention and leadership, deferred to Dr. Arciniegas upon his arrival in the fall of 2012 the responsibility of developing the Division. His decision to do so was a carefully considered one and consistent with his long-term vision of installing Dr. Arciniegas as Director and his successor PI of the Division.

As demonstrated amply in the remarkably thorough Program Description and Progress Report authored by Dr. Arciniegas, the three short years since his arrival are marked by the Division's rapid and strategic growth. Dr. Arciniegas skillfully and systematically deployed the resources provided by The Trust in a manner that created the administrative infrastructure required to recruit faculty into the Division's endowed chairs and related positions. He expanded his vision for the Division beyond its endowment-supported programs and created a robust academic Division within the Baylor College of Medicine and across its affiliates. In three years, he and Dr. Yudofsky have recruited 21 faculty members into the Division, including 13 whose primary appointments are within the Division and who are among the top neuropsychiatrists in the United States and internationally. According to Dr. Yudofsky and in the estimation of the Trust, Dr. Arciniegas' ability to inspire and motivate faculty enabled him to create an educational portfolio for the Division that is unmatched by any other neuropsychiatry program in our country or abroad. As evidenced by his recent presentation of this element of his work at the Tenth International Congress of the International Neuropsychiatric Association in Israel, the undergraduate, graduate, and post-graduate neuropsychiatry curriculum he and his Division faculty have created are already gaining international attention. Dr. Arciniegas commitment to compassionate patient care also led to his creating new clinical neuropsychiatry services at the Baylor Cliniic, the Michael E. DeBakey Veterans Affairs Medical Center, and TIRR Memorial Hermann, and to partnering with The Menninger Clinic on several programs in neuropsychiatry of mutual interest.

Dr. Arciniegas also has demonstrated the ability to successfully recruit world-class faculty into the Division. Shortly after his arrival to Houston, Dr. Arciniegas and Dr. Yudofsky began recruiting Ricardo Jorge, M.D. to serve as a senior partner in the Division's Brain Injury Medicine Program and to lead their brain injury research endeavors at the Michael E. DeBakey Veterans Affairs Medical Center. Dr. Jorge began his work there in the fall of 2013 and rapidly transitioned the brain injury research program into a network site for the Boston VA-based national research network, the Translational Research Center on TBI and Stress Related Disorders (TRACTS) program and a site for a multicenter clinical trial on which Dr. Arciniegas is a co-investigator and Executive Committee member. Dr. Arciniegas and Dr. Yudofsky successfully recruited Lea Steele, Ph.D., an internationally-renowned neuroepidemiologist and architect of the federal case definition of Gulf War Illness, to serve as the Beth K. and Stuart C. Yudofsky Chair in Behavioral Neuroscience. Dr. Steele began her appointment in the Division earlier this month. Dr. Arciniegas also recruited Deborah Little, PhD, a nationally known and highly-sought cognitive neuroscientist and expert in military neurotrauma and psychological health, to serve as the Beth K. and Stuart C. Yudofsky Chair in the Neuropsychiatry of MIlitary Post Traumatic Stress Syndrome. She is expected to begin her work in the Division in May 2016. Dr. Arciniegas and Dr. Yudofsky are in final negotiations with an exceptional candidate for the remaining endowed Chair, focused on Interventional Neuropsychiatry, and expect to finalize that recruitment in the coming month.

The research component of the Division has also thrived under Dr. Arciniegas's leadership. Since his arrival, Dr. Arciniegas has personally garnered more than $5 million in extramural funding for his brain injury research from the National Institute on Disability, Independent Living, and Rehabilitation Research. In combination with the faculty he has recruited, the Division's research portfolio has grown in three years to include 16 grants supported by both federal and private sources, representing more than $30 million in extramural investment in the research programs in which the Division and its local and national partners are engaged.

Concurrent to his work at the Baylor College of Medicine, Dr. Arciniegas provides leadership in the national and international neuropsychiatry and brain injury communities. He is Chair of the Training Committee of the American Neuropsychiatric Association, a longstanding member of the Executive Committee of the International Neuropsychiatric Association, the Interim Editor of the Journal of Neuropsychiatry and Clinical Neurosciences, and Chairman of the International Brain Injury Association. His contributions to the professional communities in these highly visible roles has led the Division to be recognized widely as a premier neuropsychiatry program in the United States and an international center of excellence in neuropsychiatry.

Dr. Yudofsky's extraordinary intellect and genuine compassion formed the vision for the development of the Division supported by The Trust. His acumen for identifying exceptionally talented academicians and his gifts as a mentor are exemplified by his appointment of Dr. Arciniegas as the Division's Executive Director. As predicted by Dr. Yudofsky, Dr. Arciniegas is a visionary, principled, and compassionate academician and administrator. It is clear to me and The Trust that Dr. Arciniegas will lead the Division and honor Dr. Yudofsky's legacy for years to come. In the wake of Dr. Yudofsky's departure from the Division, the Trust concludes that it would be possible for The Trust to find a more deserving recipient of support than Dr. Arciniegas.

On behalf of The Trust, we request:

1. David B. Arciniegas, M.D., be designated as Principal Investigator for the entirety of our pledge, with exclusive "sign-off" authority for allocation of any and all funds expended.

2. Subject to the approval of the President of Baylor College of Medicine, the Faculty Council of Baylor College of Medicine, and the Board of Trustees of Baylor College of Medicine, that Dr. Arciniegas be appointed the Beth K. and Stuart C. Yudofsky Presidential Chair in Neuropsychiatry.

3. Should Dr. Arciniegas voluntarily relinquish his obligation as Principal Investigator, which obligation includes directing the use of the donated funds, Paul Klotman, M.D., President of Baylor College of Medicine, or his successor, shall, in consultation with Stuart C. Yudofsky, M.D., Beth K. Yudofsky, M.D., and David Arciniegas, M.D., identify a successor Principal Investigator and develop a timely succession plan for transitioning the role and obligations of Principal Investigator, whose obligations include directing the use of the donated funds. If a suitable replacement cannot be identified prior to Dr. Arciniegas' voluntarily relinquishing his obligation as Principal Investigator, the terms of our original agreement shall remain in effect.

4. All other terms of our original agreement remain in effect but for the above requests.

The Trust stands proudly in support of the extraordinary mission, vision, and goals for the Division established by Dr. Yudofsky and his successor, Dr. Arciniegas. In making these requests, The Trust continues to achieve the purpose for which it was established and for which our pledge to Baylor College of Medicine was made. If the foregoing requests and conditions are acceptable, would you kindly execute one copy of the attached letter and return the executed copy to me at the address above.

Yours Sincerely,

**From:** Permit
**To:** "Redfish"
**Subject:** RE:
**Date:** Sunday, August 13, 2017 4:23:00 PM

---

Evatt,

I concur with all of these.

Bob

---

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Sunday, July 30, 2017 6:05 AM
**To:** 'Permit'
**Subject:**

Bob,

Here is a memorandum of issues to consider following BCB freezing accounts.

One think I did not consider, but which Sophie raised with me after my account was frozen, is her fear that BCB will try to justify their stupidity by reporting us to a regulator. They could try to cover themselves and allege suspicions about the operation of the accounts.

We need to get away from the bank as quickly as possible.

Evatt

MEMORANDUM

From: Evatt Tamine

To: File

Date: July 29th, 2017

Subject: BCB's decision to freeze accounts

---

The recent decision of BCB to freeze accounts has highlighted some shortcomings in current operations.

This memo addresses the problems and provides possible solutions. After stating the problems and solutions, I'll detail issues we'll encounter in achieving the solutions.

**PROBLEM 1:** Having all bank accounts held at the same bank has led BCB to freeze all accounts where I am a signatory. AEBCT, Cabot, Edge and Regency as well as Tangarra and my personal accounts have all been frozen.

**SOLUTION:** Establish accounts at separate banks for each group.

**PROBLEM 2:** Having all accounts and operations in a jurisdiction places us at risk of having everything in that jurisdiction frozen if a regulator takes action. The risk of this is real. If BCB tries to justify their decision to freeze accounts all they need to is allege a belief that there is something suspicious about the accounts to the BMA. That could lead to a freezing of all accounts wherever held in Bermuda.

**SOLUTION:** Set up additional banking relationships for AEBCT, Cabot, Edge and Regency in separate jurisdictions, e.g. keep Point in Switzerland and Singapore, but

move Edge to Guernsey and Cayman Islands; Cabot to Jersey and Nevis; and Regency to the BVI and the Isle of Man. There is a problem with Caribbean banks given I can't travel through the US to get there.

**PROBLEM 3:** The legacy relationships at BCB and Butterfield Bank place all accounts as being connected to Don Jones and, in the case of Butterfield Bank, to RTB.

**SOLUTION:** As we have done in Switzerland and Singapore, set up accounts in places where we get to write our own history. Kill off all reference to RTB and Don Jones.

**PROBLEM 4:** We lack a real fighting fund for legal fees and living costs. If all accounts are frozen, as BCB did, then we are restricted in accessing cash. Right now I cannot pay my American Express bill, the builder's invoices and school fees because most of my funds are held in BCB. Similarly, I could not retain a lawyer to bring an action to free the money. If we are caught like this again, in accessing accounts elsewhere, we would be disclosing where other accounts are held, possibly alerting a regulator as to where they should seek to freeze money.

**SOLUTION:** The solutions above would go part of the way to addressing this problem, but we need a hidden fund, which has nothing to do with either me or RTB, but which we could control. Glenn Ferguson, a lawyer in Australia who I know and can trust, would be a prospect to hold funds in a trust and make a "loan" for legal fees and living expenses.

**PROBLEM 5:** We don't have an escape jurisdiction with back up computer systems so that we can "flick the switch" and keep operating after a day or two.

**SOLUTION:** I made an attempt in setting up a mirror St John's in Singapore; however that fell apart when the service provider wanted full financials for all entities associated with St. John's. We need to set up redundant systems in a few places with shell companies holding operating bank accounts and, if possible, residency rights. The shell companies would be mirrors of existing companies, e.g. another St John's.

In relation to computer systems, we can set up a complete copy of the secure system at the apartment (if there is space) in the UK. Nobody would connect me to that property, which is in the name of Sophie's personal family trust. I can dismantle everything here and we can turn on the system there.

We could also look at setting up a company in Guernsey or Jersey with a residence right and a small apartment. That would make getting bank accounts easier since we have a presence. The reason I need to look at the Channel Islands is that I cannot readily travel to the Caribbean while I cannot travel through the US, which could be some years yet. Even if Robert Smith clears up his problems, the target is well fixed on me and we need to anticipate that we'll be audited at some point.

We would keep the focus on Bermuda with the Foundations established and operating here. They would be active, hopefully drawing the attention of any regulator, while we have low key back up places for me to slip into with the non-Foundation work. As long as everyone pegs me as entirely engaged by the Foundations in Bermuda, we can cover our tracks elsewhere.

**PROBLEM 6:** Jurisdictions like Bermuda, where the employee gene pool is very limited, have weak people who have lost any sense of a robust reaction to the KYC requirements being rammed down their throats. They don't care about business, only about compliance.

**SOLUTION:** Stronger jurisdictions such as Switzerland are doing all they can to comply, but they have stronger people who can still deliver a service to clients. We should look to strong jurisdictions, including considering accounts in the UK, Malta, Canada, Australia, Hong Kong etc. We might be exposed to taxation on some returns, but we could be a lot safer.

**PROBLEM 7:** The target on me is a lot larger than it was some time ago both because of Robert Smith and the Albula, which also draws a lot of attention. I don't have the sort of name that can be hidden, even though I try to maintain a very low key existence with no social media, little contact with professional people etc.

**SOLUTION:** I need to muddy the waters about where I am located. With establishing a presence in additional places such as the Channel Islands, I might be able to avoid being locked into one place. It becomes harder to track me down. This would particularly be the case since the Foundations tie me so closely to Bermuda as does being married to a Bermudian. Regulators will come to Bermuda looking for me, while we build and maintain connections elsewhere.

---

In addressing the issues above, there are a few things to consider:

- We need strong jurisdictions where they will comply, but still be robust about not taking silly actions such as BCB did in freezing the accounts.
- The time differences are important so we can maintain efficient communications.
- Need to be somewhere we I don't have to travel through the US. Even if the fear of detention is lifted, we should be careful about my traveling into the US.

Certainly, I would never again do it with a computer or telephone (if the later is possible). I could keep all I need at Stuart Yudofsky's office including a phone.

- We must have a good cover story as to why I would like to establish new relationships. In the Channel Islands, Switzerland, Malta, Cyprus etc, this should be because my daughters will soon have to go to school outside Bermuda and I wish to be nearer to them. That is not our plan, but it is something that is readily understood and accepted by all people who work those places.
- Once I gain Bermuda status after October 21st, 2017 (though the application could take up to a year to process), I can establish many of these new relationships on the back of a Bermuda passport.

**From:** Permit
**To:** "redfish@lambdaprime.org"
**Date:** Sunday, June 12, 2011 2:31:00 PM

---

Evatt,

This summer I plan to do some more investigation on the management buyout / preferred stock bailout concept.

As such I will need to be talking to some business/tax experts.

Please write me a letter as trustee and send it to me hard copy via FED-x along the following lines that you might more fully flesh out.:

Dear Bob,

Congratulations on passing your 70th birthday. I trust that proper celebrations occurred.

Further formal congratulations are in order for the recent successful refinancing of the remaining debt from the acquisition of Reynolds and Reynolds. The interest savings of some $30 million per year is substantial.

On a more serious note, as we have previously discussed, plans for transition of leadership and ownership of the group of companies owned by Universal Computer Systems Holding, Inc. need to be made. These companies are the principal assets of the A. Eugene Brockman Charitable Trust. For no other reason than diversification, this is a subject of concern.

Obviously you have begun the process of leadership transition with the appointment of Ron Lamb as President. Hopefully his performance to date has met your expectations. Our conversations around some form of eventual management buyout with Ron Lamb as the leader would seem to make sense.

I would like for you to devote further attention to manners in which the Trust might begin to liquidate its holdings in Universal Computer Systems Holding, Inc.

I look forward to talking with you further on this subject as you have further information available.

Evatt Tamine
Director

Bob

**From:** Permit
**To:** "Redfish"
**Date:** Saturday, August 1, 2015 9:56:00 PM

Evatt,

I think that it would be a good idea for you to send an open email to Stuart that you have been considering the formation of a medical research foundation somewhat along these lines.

Al Deaton has been aware of this initiative.

He has suggested your name and indicates that you would be interested in being involved in a leadership position.

This is an exciting thought.

This project is in its early stages – and I look forward to discussing it further with you.

Bob

Message

**From**: Evatt Tamine (Tangarra) [REDACTED]
**Sent**: 8/13/2015 12:01:33 PM
**To**: Stuart C. Yudofsky [REDACTED]
**Subject**:

Dear Stuart,

I hope that you are enjoying summer and that Houston is not too hot.

On behalf of the Trust, I am establishing a foundation that will support medical research. I hope that this new foundation, if established correctly from the start, would support worthy projects for generations to come.

I should be grateful for an opportunity to speak with you about joining the Board of Advisors for the new foundation.

Apart from the great enjoyment I would take in seeing you on a more regular basis in the future, I think it would be difficult to find a better person to help establish and direct the foundation.

If this is something that might interest you, please let me know when would be a good time for a call?

Kind regards

Evatt

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
                              )
IN RE: DEALER MANAGEMENT      ) MDL NO. 2817
SYSTEMS ANTITRUST             )
LITIGATION,                   ) CASE NO. 18 C 864
                              )
```

ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN

Highly Confidential - Attorneys' Eyes Only

January 16, 2019

VOLUME 1

ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN, produced as a witness at the instance of the PLAINTIFF(S), and duly sworn, was taken in the above-styled and numbered cause on the 16th day of January, 2019, from 9:30 a.m. to 2:56 p.m., via telephone, before Shauna L. Beach, RDR, CRR, CSR in and for the State of Texas, reported by machine shorthand, at the law offices of Gibbs & Bruns, LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE REYNOLDS AND REYNOLDS COMPANY AND THE WITNESS:

AUNDREA K. GULLEY
BRICE WILKINSON
Gibbs & Bruns, LLP
1100 Louisiana
Suite 5300
Houston, Texas 77002
agulley@gibbsbruns.com
bwilkinson@gibbsbruns.com

FOR THE REYNOLDS AND REYNOLDS COMPANY AND THE WITNESS:

MICHAEL P.A. COHEN
Sheppard Mullin
2099 Pennsylvania Avenue
Suite 100
Washington, D.C. 20006-6801
mcohen@sheppardmullin.com

FOR AUTHENTICOM, COX AUTOMOTIVE AND ITS NAMED PLAINTIFF SUBSIDIARIES, MDSC, AUTOLOOP AS A REPRESENTATIVE OF THE VENDOR CLASS:

MICHAEL N. NEMELKA
Kellogg Hansen Todd Figel & Frederick
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
mnemelka@kellogghansen.com
jlong@kellogghansen.com

FOR THE DEALERSHIP CLASS PLAINTIFFS:

PEGGY J. WEDGWORTH
ROBERT WALLNER (appearing telephonically)
JOHN HUGHES
Milberg Tadler Phillips Grossman, LLP
One Pennsylvania Plaza
19th Floor
New York, New York 10119
pwedgworth@milberg.com
rwallner@milberg.com

A P P E A R A N C E S

FOR CDK GLOBAL:

MARK RYAN
Mayer Brown
1999 K Street, N.W.
Washington, DC 20006-1101
mryan@mayerbrown.com

ALSO PRESENT:

SCOTT CHERRY
Vice President - General Counsel at The Reynolds and Reynolds Company

Joseph Long
Kellogg Hansen Todd Figel & Frederick

Ben Harwood, Videographer

Veritext Legal Solutions
Mid-Atlantic Region
1250 Eye Street NW - Suite 350
Washington, D.C. 20005

INDEX

| | PAGE |
| --- | --- |
| Appearances | 2 |
| ROBERT BROCKMAN | |
| Examination by Mr. Nemelka | 9 |
| Signature and Changes | 164 |
| Reporter's Certificate | 165 |

PLAINTIFF EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 636 | Brockman On the Record publication | 25 |
| Exhibit 637 | Website screenshot Fuel Ideas to Drive | 27 |
| Exhibit 638 | Article Automotive News dated February 19, 2007 | 32 |
| Exhibit 639 | Data Agreement REYMDL00716766 - REYMDL00716767 | 44 |
| Exhibit 640 | Email chain ending with email to Ronald Lamb from Bob Brockman dated September 20, 2013 REYMDL00200760 - REYMDL00200761 Highly Confidential - Attorneys' Eyes Only | 57 |
| Exhibit 641 | Email chain ending with email to Howard Gardner from Robert Schaefer dated 11/25/2013 CDK_CID_00569545 - CDK_CID_00569547 Confidential Highly Confidential | 63 |
| Exhibit 642 | Notes Long Standing issues around security REYMDL00260942 - REYMDL00260943 Highly Confidential - Attorneys' Eyes Only | 74 |
| Exhibit 643 | Email to Bob Brockman from Steve Anenen dated 7/2/2014 CDK_CID_01535307 - CDK_CID_01535308 Confidential Highly Confidential | 82 |
| Exhibit 644 | Notes - Sales Meeting - July 14, 2014 REYMDL00261631 - REYMDL 00261635 Highly Confidential - Attorneys' Eyes Only | 92 |

## PLAINTIFF EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 645 | Email chain ending with email to Ron Workman from Robert Schaefer dated 1/6/2015 CDK_CID_00242098 - CDK_CID_00242099 Confidential Highly Confidential | 106 |
| Exhibit 646 | Email chain ending with email to Bob Brockman from Robert Schaefer dated January 11, 2015 REYMDL00565070 - REYMDL00565071 Highly Confidential - Attorneys' Eyes Only | 107 |
| Exhibit 647 | Data Exchange Agreement REYMDL00014384 - REYMDL00014396 Confidential | 111 |
| Exhibit 648 | Email chain ending with email to Craig Moss from Dan Agan dated May 12, 2015 REYMDL00652128 - REYMDL00652133 Highly Confidential - Attorneys' Eyes Only | 123 |
| Exhibit 649 | Email chain ending with email to Tommy Barras from Bob Brockman dated August 22, 2015 REYMDL00044042 - REYMDL00044043 Highly Confidential - Attorneys' Eyes Only | 126 |
| Exhibit 650 | Email to Bob Brockman from Tommy Barras dated July 7, 2017 REYMDL00226199 - REYMDL00226200.002 Highly Confidential - Attorneys' Eyes Only | 129 |
| Exhibit 651 | Email to Bob Brockman from Craig Moss dated August 25, 2017 REYMDL00720415 - REYMDL00720511 Highly Confidential - Attorneys' Eyes Only | 134 |

PLAINTIFF EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 652 | Email to Robert Schaefer from Bob Brockman dated April 14, 2016 REYMDL00238133 Highly Confidential - Attorneys' Eyes Only | 141 |
| Exhibit 653 | Email chain ending with email to Schaefer from Bob Brockman dated April 19, 2017 REYMDL00138479 Highly Confidential - Attorneys' Eyes Only | 143 |
| Exhibit 654 | Email to Bob Brockman from Robert Schaefer dated November 10, 2015 REYMDL00044241 - REYMDL00044242 Highly Confidential - Attorneys' Eyes Only | 144 |
| Exhibit 655 | Email chain ending with email to Tommy Barras from Bob Brockman dated August 15, 2017 REYMDL00263558 Highly Confidential - Attorneys' Eyes Only | 153 |
| Exhibit 656 | Email chain ending with email to Keith Hill from Bob Brockman dated November 28, 2017 REYMDL00263619 Highly Confidential - Attorneys' Eyes Only | 158 |

P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning. We are on the record at 9:30 a.m. on January 16th, 2019. This is the video recorded deposition of Mr. Robert Brockman in the matter of In Re: Dealer Management Systems Antitrust Litigation in the United States District Court for the Northern District of Illinois in the Eastern Division. This deposition is being held at Gibbs & Bruns, LLP, located at 1100 Louisiana Street, Suite 5300, in Houston, Texas 77002.

My name is Ben Harwood, and I'm the videographer present on behalf of Veritext. The court reporter is Shauna Beach, also present on behalf of Veritext.

Will counsel please state their appearance and firm affiliation for the record.

MR. NEMELKA: My name is Mike Nemelka with the law firm of Kellogg Hansen Todd Figel & Frederick. I'm here on behalf of Authenticom, Cox Automotive and its named plaintiff subsidiaries, MDSC, Autoloop as a representative of the vendor class. And with me today is my colleague, Joe Long.

MS. WEDGWORTH: Peggy Wedgworth, Milberg Tadler Phillips Grossman, on behalf of the dealership class plaintiffs.

MR. HUGHES: John Hughes, Milberg Tadler Phillips Grossman on behalf of dealership class plaintiffs.

MS. GULLEY: Andi Gulley, Gibbs & Bruns, for the witness.

MR. WILKINSON: Brice Wilkinson, Gibbs & Bruns.

MR. CHERRY: Scott Cherry, general counsel for Reynolds and Reynolds.

MR. COHEN: Michael Cohen, Sheppard Mullin, for defendant the Reynolds and Reynolds Company and the witness, Mr. Brockman.

MR. RYAN: Mark Ryan from Mayer Brown on behalf of CDK Global.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness and we may proceed.

ROBERT BROCKMAN,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. NEMELKA:

Q. Good morning, Mr. Brockman. My name is Mike Nemelka. And it's my opportunity to ask you some questions today. Could you please state your full name for the record.

A. It's Robert Theron Brockman.

Q. And where do you live?
A. Houston.
Q. And what is your address?
A. 333 West Friar Tuck Lane, Houston 77024.
Q. Do you own property anywhere else?
MS. GULLEY: Objection; form.
A. My wife and I own a townhouse that our son lives in. It's 1731 Sunset.
Q. (By Mr. Nemelka) Do you own property in any other states besides Texas?
MS. GULLEY: Objection; form.
A. No.
Q. (By Mr. Nemelka) Does any entity that you have control over own property anywhere else?
MS. GULLEY: Objection; form.
A. Reynolds and Reynolds owns two locations in Ohio. One is the Reynolds and Reynolds main headquarters, and the other one is a forms manufacturing plant.
Q. (By Mr. Nemelka) Do you own property in Aspen, Colorado?
MS. GULLEY: Objection; form.
A. No.
Q. (By Mr. Nemelka) Do you have -- is there property there that you visit from time to time?

MS. GULLEY: Objection; form.
A. Yes. There's property that I lease.
Q. (By Mr. Nemelka) That you lease. And who do you lease it from?
MS. GULLEY: Objection; form.
A. It's called Mountain Queen, Inc.
Q. (By Mr. Nemelka) Do you have any ownership interest in Mountain Queen, Inc.?
A. No.
Q. Okay. Did you prepare for your deposition today?
A. Yes. I talked to my attorneys and reviewed exhibits.
MS. GULLEY: Stop. Don't reveal the subject of -- of attorney-client communication.
Q. (By Mr. Nemelka) And when did you prepare for your deposition today?
A. Yesterday and the day before.
Q. And how long each day did you meet?
A. I'm sorry, I didn't keep track of the time.
Q. Was it a full day or half day?
A. It was probably in between.
Q. So three-fourths of the day, each day?
MS. GULLEY: Objection; form.
A. Yes.

Q. (By Mr. Nemelka) And with whom did you meet? With whom did you meet?
A. Andi Gulley, Bryce, Scott Cherry, Michael.
Q. Were any attorneys for CDK present?
A. No.
Q. Was there anybody else from Reynolds present?
A. Yes. We had a -- one other attorney from Reynolds.
Q. And who was that?
A. John -- I'm blanking on his last name. He works for Scott Cherry.
Q. Okay. Any businesspeople from Reynolds present when you prepared for the deposition?
A. No.
Q. Did you talk to anybody at Reynolds about your deposition?
A. No. Other than the fact they know that I'm here.
Q. Correct. Have you ever been deposed before?
A. Yes.
Q. How many times?
A. I don't recall the last time. Some time ago.
Q. Uh-huh. Well, so this isn't your first -- first rodeo, but just a few -- few ground rules to help us get through the day efficiently. I'm going to do my

best not to talk over you, and if you will just let me finish my question, and then I'll give you time to answer it. So let's try not to talk over each other, okay?

A. Yes.

Q. And please let me know if you don't understand a question. If you answer, then we'll consider that you understood the question. Okay?

A. Yes.

Q. Your counsel may object, but you still have to answer the question unless your counsel instructs you not to. And so even though your counsel may object, unless he instructs you not to answer, please still answer my questions, okay?

A. Yes.

Q. I understand that you may have been having some -- you've had some health issues, and this is -- so this is not an endurance test. If you need a break, you can take one. Okay?

A. Yes.

Q. I would just ask that, before taking a break, if you would -- if you would just finish answering a question if a question is pending. Is that okay?

A. Yes.

Q. And -- but I'll still plan on trying to take a

break about every hour, for me as well as for you. But if you need one in shorter intervals, that's fine. Okay?

A. Thank you.

Q. Is there any reason that you can't provide truthful testimony today?

A. No.

Q. Okay. You graduated from the University of Florida, College of Business; correct?

A. Yes.

Q. Class of 1963?

A. Yes.

Q. And after graduating from the University of Florida, you worked at the Ford Motor Company for about two years; is that right?

A. Yes, a little short of two years.

Q. And then after Ford you joined IBM; is that right?

A. Yes.

Q. And you were a successful salesperson there; correct?

A. Yes.

Q. And I -- I think I understand that you sold data processing services, in part; is that right?

A. Yes.

Q. And you were at IBM until about 1970, at which point you left IBM and founded Universal Computer Services, Inc.; is that right?

A. Yes.

Q. And you -- impressively -- taught yourself computer programming around this time as well; is that right?

A. Yes.

Q. And eventually, UCS developed and provided dealership management system software to car dealerships; is that right?

A. Yes.

Q. And, in fact, you were personally involved in the programming of some of the dealership management software that was sold -- licensed to dealers; is that right?

A. Yes.

Q. And over the 1980s, 1990s and 2000s, you continued to run UCS, right?

A. Yes.

Q. UCS served, primarily, large dealerships; is that right?

A. Yes.

Q. And was the DNS that UCS marketed -- was it called the PowerDNS?

A. Not originally, but later in its existence, it was called Power.

Q. And then in August 2006, UCS acquired the Reynolds and Reynolds Company; is that right?

A. It was a different date.

Q. Different date? It was -- oh, it was in 2006, though?

A. Yes.

Q. What -- what was the month?

A. October.

Q. October. Thank you. And UCS paid 2.8 billion in cash; is that right?

A. Yes.

Q. And prior to the deal, Reynolds was a public company, right?

A. Yes.

Q. But with the acquisition, Reynolds became a wholly-owned subsidiary of UCS; correct?

A. It's -- that's not the correct company. It's called Dealer Computer Services.

Q. And Dealer Computer Services was the -- was the holding company that owned Reynolds?

A. Yes.

Q. Okay. And the top-level holding company of -- of Reynolds is Universal Computer Systems Holdings,

Inc.; is that right?

A. Yes.

Q. And the A. Eugene Brockman Charitable Trust owns about 96 percent of that holding company; is that right?

MS. GULLEY: Form.

A. No. That's not correct. The -- the ownership structure is different than that.

Q. (By Mr. Nemelka) Okay. And what is the ownership structure?

MS. GULLEY: Objection; form.

A. The Universal Computer Systems Holding, Inc., is owned by Spanish Steps.

Q. (By Mr. Nemelka) Okay. When was Spanish Steps formed?

A. I'm sorry. I -- I don't know the answer to that.

Q. And who owns Spanish Steps?

A. The A. Eugene Brockman Charitable Trust.

Q. And what percentage of Spanish Steps does the charitable trust own?

MS. GULLEY: Form.

A. Again, I don't know the answer to that. I believe it's, substantially, all.

Q. (By Mr. Nemelka) Substan- -- does 96 percent

sound about right to you?

MS. GULLEY: Objection; form.

A. Yeah, I -- I can't guess at that.

Q. (By Mr. Nemelka) Is it between -- is it -- is it in the 90s, the percentage?

MS. GULLEY: Objection; form.

A. I believe so.

Q. (By Mr. Nemelka) Are there any other owners of Spanish Steps besides the Eugene Brockman Charitable Trust?

MS. GULLEY: Objection; form.

A. Yes.

Q. (By Mr. Nemelka) And who are they?

MS. GULLEY: Form.

A. Norman Thomas Barras and Terry Jones. That's all.

Q. (By Mr. Nemelka) That's all? And do they -- their ownership interest is about .8 -- is it 0.08 percent? Is that right?

MS. GULLEY: Form.

Q. (By Mr. Nemelka) Or 0.008 percent; is that right?

A. It's 8/10ths of a percent.

MS. GULLEY: Form.

Q. (By Mr. Nemelka) 8/10ths of a percent,

correct. And there are no other owners besides those two and the charitable trust; is that right?

MS. GULLEY: Form.

A. That's correct.

Q. (By Mr. Nemelka) So 8/10ths of a percent -- so times that by -- by two, and then the rest of it is owned by the charitable trust; is that right?

MS. GULLEY: Form.

A. I believe that's correct.

Q. (By Mr. Nemelka) So we're talking upwards of 98 -- 98 percent of the -- of the company, right?

MS. GULLEY: Form.

A. That's correct.

Q. (By Mr. Nemelka) Okay. And this is an offshore trust; correct?

A. That's correct.

Q. Where is it based?

A. Bermuda.

Q. And when was the trust created?

MS. GULLEY: Objection; form.

A. 1981.

Q. (By Mr. Nemelka) Who were the trustees of the trust?

MS. GULLEY: Objection; form.

A. There's a trust company called St. Johns Trust

Company.

Q. (By Mr. Nemelka) Are they the only trustees of the trust?

A. Yes.

Q. And who appointed them as trustees of the trust?

MS. GULLEY: Objection; form.

A. They were not the original trust company. There's been a -- there's -- it was -- the original trust company was Bank of Bermuda.

Q. (By Mr. Nemelka) And who appointed the Bank of Bermuda as trustee?

MS. GULLEY: Objection; form.

A. I'm sorry. I can't give you an answer on that. I'm not familiar with how trusts -- trusts get set up.

Q. (By Mr. Nemelka) Could St. Johns Trust Company be removed as the trustee?

MS. GULLEY: Objection; form.

A. Yes.

Q. (By Mr. Nemelka) And who -- who has that authority to remove them as trustee?

MS. GULLEY: Objection; form.

A. I -- I don't know the name of the person, but there is the -- there is a trust protector.

Q. (By Mr. Nemelka) And who is the trust

protector?

A. I'm sorry. It's an individual. I don't know the person's name.

Q. And who appointed the trust protector?

MS. GULLEY: Objection; form.

A. I'm sorry. I -- I don't know.

Q. (By Mr. Nemelka) And can the trust protector be removed?

MS. GULLEY: Objection; form.

A. Again, this is an area of law that I'm -- I'm not familiar with.

Q. (By Mr. Nemelka) And who are the beneficiaries of the trust?

MS. GULLEY: Objection; form.

A. There is myself, my wife, my brother, his wife and all the charities of Bermuda, United States, United Kingdom.

Q. (By Mr. Nemelka) Excuse me. What was that last one? All charities?

A. All -- all charities in the United States and all charities in the United Kingdom.

Q. What does that mean, "all charities"? Every -- every 501c3 organization?

A. Every one of them is -- is a potential beneficiary.

Q. I see. Does the -- does the trust distribute income to the beneficiaries?

MS. GULLEY: Objection; form.

A. Yes.

Q. (By Mr. Nemelka) How often?

MS. GULLEY: Objection; form.

A. It depends upon what charitable project that is -- is -- is underway. You know, the only -- the only distributions have been to charitable entities.

Q. (By Mr. Nemelka) Those have been the only distributions? To charitable entities?

A. Yes, sir.

Q. Have you -- have you received any charitable -- I mean -- excuse me -- have you received any distributions from the trust?

A. No.

Q. And how much cash does the trust have?

MS. GULLEY: Objection; form.

A. I'm sorry. I don't know.

Q. (By Mr. Nemelka) Does the trust have any day-to-day oversight responsibilities of the running of the Reynolds and Reynolds Company?

MS. GULLEY: Objection; form.

A. No.

Q. (By Mr. Nemelka) You're the chairman and CEO

of Reynolds; correct?

A. Correct.

Q. And as -- your role as chairman and CEO of Reynolds, you have ultimate decision-making authority with respect to the company's practices and policies; is that right?

MS. GULLEY: Objection; form.

A. Yes.

Q. (By Mr. Nemelka) Let's talk a little bit about Reynolds, Mr. Brockman. Reynolds offers dealer management system software to automotive dealers; correct?

A. Yes.

Q. And it offers two different type of DMSs: ERA-IGNITE and Power; correct?

A. Yes.

Q. And in the DMS market, CDK is your largest competitor, right?

A. Yes.

Q. It's fair to say that CDK is Reynolds' chief rival in the DMS market, right?

A. Yes.

MS. GULLEY: Form.

Q. (By Mr. Nemelka) And together you control approximately 75 percent of the DS market for franchised

dealerships; isn't that right?
MS. GULLEY: Objection; form.
A. I -- I don't know -- or know how to keep track of exactly what the percentages are, but -- but I would say in that general area.
Q. (By Mr. Nemelka) At Reynolds, the DMS has a database component where dealers store their data, right?
MS. GULLEY: Objection; form.
A. Yes.
Q. (By Mr. Nemelka) And dealers generate a lot of data in the course of operating their business; correct?
A. Yes.
Q. Sales transactions, right?
MS. GULLEY: Objection; form.
A. Yes.
Q. (By Mr. Nemelka) Vehicle inventory?
A. Yes.
MS. GULLEY: Objection; form.
Q. (By Mr. Nemelka) Parts inventory?
MS. GULLEY: Objection; form.
A. Yes.
Q. (By Mr. Nemelka) Information about the dealership's customers, right?
MS. GULLEY: Objection; form.

A. Yes.
Q. (By Mr. Nemelka) And data from their service departments; correct?
MS. GULLEY: Objection; form.
A. Yes.
Q. (By Mr. Nemelka) And you agree that the data that dealers generate in running their business is the dealer's, right?
MS. GULLEY: Objection; form.
A. Yes.
Q. (By Mr. Nemelka) You've publicly stated the dealers own their data, right?
MS. GULLEY: Objection; form.
A. Yes.
Q. (By Mr. Nemelka) And you agree that dealers should choose who has access to their data, right?
MS. GULLEY: Objection; form.
A. Yes.
Q. (By Mr. Nemelka) You've publicly told dealers you own your data and choose who you allow access to it, right?
MS. GULLEY: Objection; form.
A. I'm sorry. I don't remember saying that specific statement.
(Exhibit 636 was marked for

identification.)

Q. (By Mr. Nemelka) I've marked Plaintiff's Exhibit 636, which I will hand you. Mr. Brockman, do you recognize this document?

A. Yes.

Q. Was this an -- a public advertisement that you -- that Reynolds issued to the public?

A. This was done approximately 12 years ago.

Q. And was it issued to the public?

A. Yes.

Q. And if you look at the first bullet point there, you say, "You own your data and choose who you allow access to it," right?

A. Yes.

Q. You also told dealers with respect to their data, quote, "You're the boss." If you look above that; correct?

A. Yes.

Q. And that's a picture of you, there, on that advertisement?

A. Yes. Good picture, I might add.

Q. Very nice one.

And that's your signature at the end?

A. Yes.

Q. Identifying you as the chairman and CEO of

Reynolds?

A. Correct.

Q. You can put that aside.

Reynolds also made similar representations on its website; correct?

MS. GULLEY: Objection; form.

A. Sorry. I'm not familiar with that.

(Exhibit 637 was marked for identification.)

Q. (By Mr. Nemelka) I've handed you a document I've marked as Exhibit -- Plaintiff's Exhibit 637. Mr. Brockman, this is a printout from the Reynolds website. Does that look familiar to you?

MS. GULLEY: Objection; form.

A. It says it's Reynolds. I'm -- I'm personally not familiar with what goes on our website. That's not something I pay attention to.

Q. (By Mr. Nemelka) And if you look at the first -- at the top of the -- of the text of this -- of this webpage, it says, "Your Data, Your Way." Do you see that?

A. Yes.

Q. And then it says, "You own your data. Reynolds recognizes that you need to share that data outside your dealership." Do you see that?

MS. GULLEY: Objection; form.
A. Yes, I see that.
Q. (By Mr. Nemelka) So this is consistent with your public statement that -- that business -- excuse me -- strike that.
This is consistent with your public statement that we just looked at, that -- that data that dealers generate in operating their business belongs to the dealers, right?
MS. GULLEY: Form.
A. Yes. It -- you know, where it says, "You own your data. Reynolds recognizes" -- I see that statement.
Q. (By Mr. Nemelka) Thank you. You can put that aside.
You're familiar with -- that Reynolds has a standard DMS contract with its dealers; correct?
A. Yes.
Q. And the Reynolds standard DMS contract also recognizes that the dealers own their data; correct?
A. Yes.
Q. It says, quote, Reynolds acknowledges that your business data belongs to you," end quote; correct?
MS. GULLEY: Objection; form.
A. Yes.

Q. (By Mr. Nemelka) Dealers use a lot of software applications besides DMS; correct?

A. I wouldn't characterize it as "a lot." They certainly use some.

Q. Applications like customer relationship management software, right?

MS. GULLEY: Form.

A. Yes.

Q. (By Mr. Nemelka) Inventory management; correct?

MS. GULLEY: Form.

A. Umm, are you referring to parts inventory or vehicle inventory?

MS. GULLEY: Form.

Q. (By Mr. Nemelka) Both. Vehic- -- let's do vehicle inventory first.

MS. GULLEY: Form.

A. Yes.

Q. (By Mr. Nemelka) They use software to help them in their service lane; correct?

MS. GULLEY: Form.

A. Yes.

Q. (By Mr. Nemelka) And their marketing efforts; correct?

A. Yes.

MS. GULLEY: Form.

Q. (By Mr. Nemelka) And these applications need access to dealer data to work, right?

MS. GULLEY: Form.

A. Correct.

Q. (By Mr. Nemelka) And above, we saw that you publicly told dealers, "You own your data and choose who you allow access to it." Remember that?

A. Yes.

Q. But that's not quite true, is it, Mr. Brockman?

MS. GULLEY: Objection; form.

A. I disagree.

Q. (By Mr. Nemelka) You don't let dealers choose who has access to their data, do you?

MS. GULLEY: Objection; form.

A. They -- the dealers have access to their data, you know, on their own. They can access it through porting facilities that we have.

Q. (By Mr. Nemelka) But Reynolds, although it's made a lot of exceptions, has taken the position that dealer -- dealers can't grant access to their data to, for example, independent integrators; is that right?

MS. GULLEY: Objection; form.

A. We have a program which is called the Reynolds Certified Interface, which is entered into -- whoever

they want to share data with, that covers protections of data from a security standpoint.

Q. (By Mr. Nemelka) You don't let independent integrators, like Authenticom, into the RCI program, do you?

A. We do not.

Q. And so if a dealer wanted to grant access to their data to Authenticom, you don't allow that, do you?

A. They're perfectly free to run reports and -- and send those reports in electronic form to Authenticom.

Q. But in terms of access to their data in an automated way, you don't allow that, do you?

MS. GULLEY: Objection; form.

A. As far as unattended access, that's correct. We do not allow that.

Q. (By Mr. Nemelka) And that's different from what CDK's position once was; correct?

MS. GULLEY: Objection; form.

A. I'm not familiar with what CDK's historical positions have been on this issue.

Q. (By Mr. Nemelka) You don't know what CDK's practices were?

A. They have lots of different practices. I'm not -- I'm not an expert in their -- their practices.

Q. You knew that CDK did let dealers use independent integrators, right?

MS. GULLEY: Objection; form.

A. Again, I'm -- I'm not knowledgeable about what CDK does or doesn't do in this regard.

Q. (By Mr. Nemelka) In fact, back in 2007, you said that, from a business standpoint, you -- you couldn't imagine that that was truly CDK's position, right?

A. I'm sorry. I don't -- I don't remember or recall -- can you give me more information?

(Exhibit 638 was marked for identification.)

Q. (By Mr. Nemelka) I've marked this Exhibit 638 -- Plaintiff's 638, which I've handed you. It's -- Automotive News article entitled "Question & Answer: Deal puts Brockman in the spotlight," dated February 9th -- 19th, 2007. Mr. Brockman, do you recognize this Automotive News article?

MS. GULLEY: Objection; form.

A. Not specifically.

MS. GULLEY: You can take a second to review it.

Q. (By Mr. Nemelka) Did you grant an interview to Automotive News around this time, Mr. Brockman?

MS. GULLEY: Objection; form.

A. I believe so.

Q. (By Mr. Nemelka) And this is an article reflecting the contents of that interview; correct?

MS. GULLEY: Objection; form.

You haven't offered him the opportunity to review it.

MR. NEMELKA: Andi, please comply with the deposition protocol order.

A. I would like to have a little bit of time to read it.

Q. (By Mr. Nemelka) Sure. Do you recognize, though, this is -- reflects an interview that you gave to Automotive News, Mr. Brockman?

MS. GULLEY: Objection; form.

A. If you let me finish reading this back page, it's got a lot of information on it.

Q. (By Mr. Nemelka) Sure. I'm -- I'm only going to ask you about one -- about one -- one question and answer.

MS. GULLEY: Objection; form.

A. Okay. What is your question?

Q. (By Mr. Nemelka) This reflects an interview -- the contents of an interview that you gave to Automotive News; correct?

MS. GULLEY: Objection; form.

A. Yes. That was approximately a month and a half after the acquisition.

Q. (By Mr. Nemelka) Correct. And if you turn to the second page, the question that -- that Automotive asked you, "ADP Dealer Services" -- now, ADP is now CDK; correct?

A. Yes.

MS. GULLEY: Objection; form.

MR. RYAN: Object to form.

Q. (By Mr. Nemelka) "ADP Dealer Services will not" -- excuse me, the ADP that's referred to here was -- the dealer services was spun off and became CDK; correct?

MR. RYAN: Objection.

A. That's my understanding.

Q. (By Mr. Nemelka) Right. So it says, "ADP Dealer Services will not prohibit dealers from providing their vendors with a user ID and password to extract data." What are your thoughts about that?

Do you see that question?

A. Yes.

Q. And you gave an answer. "I don't understand ADP's position. Other than to be obstinate, than to be opposite, I can't imagine from a business standpoint

that that's truly their position. And frankly it would be my opinion that after awhile they probably change that position." Do you see that?

A. Yes.

Q. And that accurately reflects what you said?

MS. GULLEY: Objection; form.

A. Yes.

Q. (By Mr. Nemelka) And so you knew that CDK's position was that they did not stop dealers from allowing -- they did not stop dealers from using independent integrator's automated access to their data; correct?

MS. GULLEY: Objection; form.

A. No. I don't agree with that. And that's certainly not what I said. What I said is, "I don't understand ADP's position. Other than to be obstinate, than to be opposite, I can't imagine from a business standpoint that that's truly their position. And frankly it would be my opinion that after awhile they probably change that position."

Q. (By Mr. Nemelka) And CDK did change their position on that, didn't they?

MS. GULLEY: Objection; form.

A. It's my understanding that -- that they have made changes. Now, exactly what changes they've made,

I'm not familiar with.

Q. (By Mr. Nemelka) CDK didn't change that position, though, until years later, right?

MS. GULLEY: Objection; form.

UNIDENTIFIED SPEAKER: Mike, one objection is good for both defendants, right?

MR. NEMELKA: Yes.

UNIDENTIFIED SPEAKER: Okay, thank you.

THE WITNESS: I'm sorry. Could you repeat the question?

Q. (By Mr. Nemelka) Sure. And CDK didn't change that position until years later, though; correct?

MS. GULLEY: Objection; form.

A. Again, I've not tracked what ADP has done in this regard. My guess is -- and that's there's been a series of changes.

Q. (By Mr. Nemelka) But in the meantime, before CDK changed, CDK Reynolds engaged in what you called, Mr. Brockman, "the data wars"; isn't that right?

MS. GULLEY: Objection; form.

A. I've not ever used that term, so I don't know who has.

Q. (By Mr. Nemelka) You've never used the term, "data wars"?

MS. GULLEY: Objection; form.

A. No. (Inaudible.)

Q. (By Mr. Nemelka) Now, CDK not only had an open system in the sense that it let dealers use independent integrators, but it also had its own independent integrators, like DMI and Integra Link!; correct?

MS. GULLEY: Objection; form.

A. Correct.

Q. (By Mr. Nemelka) And DMI and Integra Link! provided access to the data belonging to Reynolds' dealers; correct?

MS. GULLEY: Objection; form.

A. Yes. They -- they hacked our systems extensively.

Q. (By Mr. Nemelka) And Reynolds' dealers would grant DMI and Integra Link! access to their data by creating log-in credentials for them, right?

MS. GULLEY: Objection; form.

A. Yes.

Q. (By Mr. Nemelka) And then DMI and Integra Link! would then provide the dealer data to third-party vendors; correct?

A. Yes.

Q. Including OEMs, right?

MS. GULLEY: Form.

A. Yes.

Q. (By Mr. Nemelka) And when I say "OEMs," I mean the car manufacturers, like Ford, Chevy, Toyota, right?

MS. GULLEY: Form.

A. That's correct.

Q. (By Mr. Nemelka) You understand that's what I mean, right?

A. Yes.

Q. Mr. Brockman, I've handed you what has been previously marked as Plaintiff's Exhibit 442. I'll describe it and then you can look at it. This is an email from you, Bob Brockman, to Ron Workman and Steve Anenen, dated Sunday, June 10th, 2007. Do you see that?

MS. GULLEY: Objection; form.

A. Yes.

Q. (By Mr. Nemelka) And to this email, you attach -- you made an attachment; correct?

MS. GULLEY: Form.

Q. (By Mr. Nemelka) Have you finished reading it, Mr. Brockman?

A. Yes.

Q. Thank you. So if you look at the email that you -- you sent this email to Mr. Workman and Mr. Anenen; correct?

A. Yes.

Q. Steve Anenen was the CEO of CDK?

A. That's correct.
Q. And Ron Workman was a senior vice-president there?
A. Yes.
Q. And in the third -- third line down, you write, "Please see the attached thoughts regarding our mutual opportunities." Do you see that?
A. Yes.
Q. And then you said -- then you write, "As I said at our initial meeting on the subject at NADA" -- what is NADA?
A. It's the National Auto Dealers Association.
Q. And what does that mean, "at NADA"?
A. There's an annual convention and trade show.
Q. Is it once a year?
A. Yes.
Q. And at this convention, you -- you met with Mr. Workman?
A. Yes.
Q. And at these annual conventions, you frequently meet -- meet with executives from CDK; correct?
MS. GULLEY: Objection; form.
A. No.
Q. (By Mr. Nemelka) Is this the only time you ever met with a CDK executive at NADA?

A. No. It's not the only time, but it -- it is -- to characterize it as something that happens a lot, it's not. It's rare. And this is certainly the first time that I had ever met Steve Anenen.

Q. And then you write -- well, you said, "As I said in our initial meeting on the subject at NADA, I believe that there some attractive opportunities here that in the longer term can be quite significant." Do you see that?

MS. GULLEY: Objection; form.

A. Yes.

Q. (By Mr. Nemelka) So let's turn the page to the document that you attached. If you could go to the last section on Data Services, on the second page. And you have -- having read this -- this attachment, this was proposing a joint venture between CDK and Reynolds for the service of extracting data from dealership systems; correct?

MS. GULLEY: Objection; form.

Q. (By Mr. Nemelka) Mr. Brockman?

A. Yes.

Q. And ADP, meaning CDK, would contribute the DMI business that we just discussed; correct?

MS. GULLEY: Form.

A. Yes.

Q. (By Mr. Nemelka) And then Reynolds would contribute its technology for accessing the Reynolds DMS systems; correct?

MS. GULLEY: Form.

A. That's what was under consideration, but it -- I think it's -- it's correct to add that -- that this was a proposed process that never occurred. And further -- on further examination, subsequent to this, I decided that it would be a wrong thing to do.

Q. (By Mr. Nemelka) Why would it be a wrong thing to do?

A. I don't believe that accessing dealership systems to extract data in the manner that DMI and that their other entities were doing it to be proper.

Q. But at least here, you had proposed talking about forming a joint venture to do that; correct?

MS. GULLEY: Objection; form.

A. What I'm doing is -- is I'm -- I'm commenting on -- on their proposals.

Q. (By Mr. Nemelka) You described it as an attractive opportunity that could be quite significant in your email, didn't you?

MS. GULLEY: Objection; form.

A. On further examination, you know, that was not the case.

Q. (By Mr. Nemelka) And would other competitors to this data services joint venture be allowed to access the data for Reynolds and -- and CDK dealers, or only this joint venture?

MS. GULLEY: Objection; form.

A. Again, this was an early-on idea which was not followed up on. Specifically, we did not do anything in this regard.

Q. (By Mr. Nemelka) The thought was, though, that only the Reynolds and CDK joint venture would be able to provide data access to Reynolds and CDK, not others; correct?

MS. GULLEY: Objection; form.

A. That -- that was the -- the original proposal from CDK.

Q. (By Mr. Nemelka) So competitors like Authenticom would not be able to compete with this joint venture, right?

MS. GULLEY: Objection; form.

A. From a thought standpoint, this -- this project never got that far.

Q. (By Mr. Nemelka) But you said that was the original conception that CDK --

MS. GULLEY: Objection --

MR. NEMELKA: Let me finish my question,

Andi.

Q. (By Mr. Nemelka) You said that was the original proposal from CDK, though, right?

MS. GULLEY: Objection; form.

A. Again, there was -- there was another document, which I don't have and I don't know whether it exists, but it's -- it certainly did exist, where what ADP was proposing was -- was laid out. And this was an initial response. Again -- I'll repeat again, this project did not go anywhere. It did not happen.

Q. (By Mr. Nemelka) At this time, were you -- when you were considering this joint venture, DMI was extracting data for vendors from Reynolds' DMS; correct?

MS. GULLEY: Objection; form.

A. At this particular point in time, this -- this was approximately seven months after the acquisition of -- of a very, very large company. It was extremely busy in all kinds of operational details, and for me to know what was going on with Reynolds systems and outside third parties at that point in time was impossible. The best I could have would be, you know, hazy knowledge, but not, you know, absolute knowledge.

Q. (By Mr. Nemelka) Well, here you wrote that CDK would contribute the DMI business to this new co-entity along with the technology for accessing DMS systems,

right?

MS. GULLEY: Objection; form.

A. Again, that was in response to their proposal. And again -- I repeat again, this project went nowhere.

(Exhibit 639 was marked for identification.)

Q. (By Mr. Nemelka) I've handed you Plaintiff's Exhibit 639. And, Mr. Brockman, I'll represent to you that the metadata for this document states that, as produced by -- by your counsel, that this came from your custodial file and that it was -- date last modified was July 29th, 2012. And the file name is "ADP Data Agreement Talking Points." Okay?

MS. GULLEY: Objection; form.

Q. (By Mr. Nemelka) Did you hear that, Mr. Brockman?

A. Yes.

Q. Okay. Do you recognize these as talking points that you created for ADP Data Agreement?

MS. GULLEY: Objection; form.

A. Yes. These were talking points that would take place between myself and ADP.

Q. (By Mr. Nemelka) And who at ADP?

A. Steve Anenen.

Q. Is this a phone call?

MS. GULLEY: Objection; form.

A. Yes.

Q. (By Mr. Nemelka) And was it a phone call around the time of July 29th, 2012?

MS. GULLEY: Form.

A. I don't know what date -- I remember creating this document, thinking that a phone call was going to be imminent. It was not imminent. It was at some considerable length of time afterwards.

Q. (By Mr. Nemelka) "Considerable length of time," meaning a few weeks or months?

A. Months.

Q. A few months? And these are the talking points that you prepared for that phone conversation with Mr. Anenen?

A. Yes.

Q. And did you deliver these talking points?

MS. GULLEY: Form.

A. I'm not sure what all points were actually covered. These were the points that I wanted to cover. Whether I got them all done or not, I -- I don't think I got them quite done.

Q. (By Mr. Nemelka) I just want to ask you about a few of the bullet points here, Mr. Brockman. The first one you say, "Unattended remote access to Reynolds

systems is going to cease." Do you see that?

A. Yes.

Q. So 2012, unattended remote access was still happening on the Reynolds system, right?

A. That's correct.

Q. Including by CDK; correct?

A. That's right. CDK -- or CDK subsidiaries were identified as some of the most, you know -- they were the worst hackers out there. And -- and this first line, "Unattended remote access to Reynolds systems is going to cease," that was not a pleasant statement. That was a -- a statement of fact. The fact was pretty ugly.

Q. And -- and the data agreement, the document is titled "Data Agreement." And what was the data agreement that you envisioned entering into with CDK?

MS. GULLEY: Objection; form.

A. The -- the data agreement involved a -- a phased shutdown, as opposed to an abrupt stop.

MS. GULLEY: Objection; form.

Q. (By Mr. Nemelka) And is this a call that was initiated by you, or Mr. Anenen?

A. I -- I had requested a call. Whether he called me or I called him, I don't recall.

Q. You requested the call?

MS. GULLEY: Objection; form.
A. Yes.
Q. (By Mr. Nemelka) And this is the first time that you had discussed with Mr. Anenen having CDK stop accessing the Reynolds systems?
MS. GULLEY: Objection; form.
A. I don't recall whether or not it was the first time or not.
Q. (By Mr. Nemelka) And what did Mr. Anenen say in response?
A. It was a rather unusual call. There was about -- it was an hour-long call, and there was about 15 minutes' worth of this active discussion and then 45 minutes of -- of just unproductive conversation.
Q. What does that -- what -- why was it unproductive?
A. Mr. Anenen did not want to address the issues. He wanted to talk about other things.
Q. So on these topics, the call lasted about 15 minutes?
A. Uh-huh. (Witness answers affirmatively.)
Q. And what -- what did he respond -- how did he respond when you told him that unattended remote access to Reynolds systems is going to cease?
A. He didn't make a specific reply to that

statement.

Q. And what was his general response to your proposal here?

MS. GULLEY: Objection; form.

A. I would say it was -- it didn't make a lot of progress. You know, Steve Anenen is a very, very nice guy, and he's a person that is unlikely to say no, you know. He's just -- he's not that kind of person. But he did not make a positive response.

Q. (By Mr. Nemelka) Meaning he said that CDK would continue to access the Reynolds system?

MS. GULLEY: Objection; form.

A. No. He did not answer that specific issue. Again, he's a very nice guy.

Q. (By Mr. Nemelka) Did he give you any indication one way or the other whether he was interested in engaging in the discussions further, after this phone call?

MS. GULLEY: Objection; form.

A. At -- at that point, he did not.

Q. (By Mr. Nemelka) At this time, Reynolds was using Authenticom for -- strike that.

Reynolds has its own software application, separate from the DMS; correct?

A. I wouldn't say separate from the DMS, but

there's some things that we do that are not totally related to our own DMS.

Q. Right. Software solutions that you -- that dealers use, separate from the DMS; correct?

MS. GULLEY: Objection; form.

A. It's a very, very small, you know, part of our business.

Q. (By Mr. Nemelka) And at this time, Reynolds was using Authenticom for the data needs for those applications; correct?

MS. GULLEY: Objection; form.

A. Yes. Again, the particular data that we're talking about has to do with service reminder cards, principally, and it's a very small thing. And we use Authenticom from an expediency standpoint to, you know, get us the data.

Q. (By Mr. Nemelka) And this was data from CDK DMS; correct?

A. Yes.

Q. And if you go to the next page, you have a -- you have a -- a bullet point here where it starts with "batch type data." Do you see that?

A. Yes.

Q. It says, "Batch type data that Authenticom (or some other Reynolds agent)" -- so let me stop there. So

you considered Authenticom a Reynolds agent in collecting the data; is that right?

A. I don't --

MS. GULLEY: Objection; form.

A. I don't know if we would consider Authenticom an agent. They -- they provided a service.

Q. (By Mr. Nemelka) You say, "Batch type data that Authenticom (or some other Reynolds agent) collects from ADP sites for Reynolds to use in marketing programs that it sells to the dealer would require that this data is used for no other purpose." Do you see that?

MS. GULLEY: Objection; form.

A. Yes.

Q. (By Mr. Nemelka) So you envisioned that Reynolds would continue to use Authenticom even after this proposed data agreement with CDK; is that right?

MS. GULLEY: Objection; form.

A. I don't think that, you know, I would characterize this paragraph in that way. There's no suggestion here it's long term. Anytime that you have a process set up for a collection of data, to tear it up, you know, involves some effort. And what we're talking about that's described in this document here, there's things to be done short term. There is no implication here that long term -- you know, longer than what the

immediate, you know, time frame would be -- that we would continue to use Authenticom.

Q. (By Mr. Nemelka) This is 2012, right?

MS. GULLEY: Objection; form.

A. Yeah.

Q. (By Mr. Nemelka) Reynolds continued to use Authenticom clear to -- through 2017, right?

MS. GULLEY: Objection; form.

A. I'm not aware of -- of how long that -- that occurred.

Q. (By Mr. Nemelka) Certainly, you know, for years after this, Reynolds continued to use Authenticom, right?

MS. GULLEY: Objection; form.

A. Again, I'm not aware of what's going on.

Q. (By Mr. Nemelka) All right, well --

A. In -- in the -- in that particular regard.

Q. We have some documents on that.

MS. GULLEY: Objection; to the sidebar.

Q. (By Mr. Nemelka) You said "agents." You say here, "The use of a 3rd-party acting under contract as an agent of ADP or Reynolds is not an issue as long as the specific RCI agreement is directly between us." Do you see that?

MS. GULLEY: Objection; form.

A. Yes.

Q. (By Mr. Nemelka) What did you mean by that?

MS. GULLEY: Objection; form.

A. What the focus in this particular passage is -- and that's that we'd want to have a contract directly with the -- the owner of the data.

Q. (By Mr. Nemelka) Well, the contract with the owner of data? That would be the dealer, right?

MS. GULLEY: Objection; form.

A. Correct.

Q. (By Mr. Nemelka) And so you would consider those who go and collect the data on your behalf as your agents; correct?

MS. GULLEY: Objection; form.

A. I think what -- what we're talking about here is -- and that's that, you know, we don't use agents. What we want to do is we want to have direct contracts with the collector of the data and also the owner of the data.

Q. (By Mr. Nemelka) Well, what you write here is that "The use of a 3rd party acting under contract as an agent of ADP or Reynolds is not an issue as long as the specific RCI agreement is directly between us." Do you see that?

MS. GULLEY: Objection; form.

A. Well, I -- I think that's -- that states clearly that we -- the agreement we want is -- we want one directly between us and -- and not, you know, with any use of an agent.

Q. (By Mr. Nemelka) And "an agent" being those that go and collect data on your behalf; correct?

MS. GULLEY: No.

Objection; form. I'm sorry. It was -- I'm sorry.

MR. NEMELKA: That's improper to answer the question. I asked the witness.

MS. GULLEY: I'm so sorry, Mike.

MR. NEMELKA: It's okay.

MS. GULLEY: It was not -- not intentional.

UNIDENTIFIED: Same objection.

MR. NEMELKA: We'll just leave the record like that.

MS. GULLEY: Well, he can answer the question.

MR. NEMELKA: Sure.

Q. (By Mr. Nemelka) Do you need me to repeat the question, Mr. Brockman?

A. I need to reread this.

Q. My simple question was -- is that you have here a section called "Use of Agents." You say, "The use of

a 3rd party acting under contract as an agent of ADP or Reynolds is not an issue as long as the specific RCI agreement is directly between us -- either of us would take responsibility for their agents." Do you see that?

MS. GULLEY: Form.

A. Yes.

Q. (By Mr. Nemelka) And my question is that the agents that you're referring to are those that would go and collect the data on your behalf; correct?

A. I think I'm referring to DMI, Integra.

Q. Okay. Did you know how Authenticom accessed data on a CDK system?

MS. GULLEY: Objection; form.

A. No.

Q. (By Mr. Nemelka) Did you know that they were issued log-in credentials, just like DMI and Integra Link! were for Reynolds?

MS. GULLEY: Objection; form.

A. I'm not aware of that.

MS. GULLEY: Are you at a stopping point, Mike?

MR. NEMELKA: Sure.

MS. GULLEY: Let's take a break.

THE VIDEOGRAPHER: The time is 10:25 a.m., and we're off the record.

(Short recess 10:25 to 10:50 a.m.)

THE VIDEOGRAPHER: The time is 10:50 a.m. We're back on the record.

EXAMINATION (Continuing)

BY MR. NEMELKA:

Q. Mr. Brockman, have you heard of the phrase "whitelisting"?

MS. GULLEY: Objection; form.

A. In -- in recent years, yes.

Q. (By Mr. Nemelka) The -- where -- as I think of the term "whitelisting," that's where Reynolds issues a protected user ID that will be exempt from Reynolds' security processes.

MS. GULLEY: Object- -- hold on. Let him finish.

Q. (By Mr. Nemelka) Is that -- is that how you associate the term?

MS. GULLEY: Objection; form.

A. No.

Q. (By Mr. Nemelka) Reynolds did allow the feeding of data through protected user IDs that were exempt from the secur- -- Reynolds' security processes, right?

MS. GULLEY: Objection; form.

A. I would say the answer to that is -- is

qualified as -- as temporary access. I think it's important that, from a transitional standpoint, that's where that's been used.

Q. (By Mr. Nemelka) And it was used with CDK's access to the Reynolds system; correct?

MS. GULLEY: Objection; form.

A. The answer to that is no. The -- the only time that that was used is -- or that process was used was in the situation where everybody's agreed that they're going to stop hacking. They're going to stop being bandits. They're going to get straight. And, you know, we've seen fit to facilitate an orderly stand-down, in which case, you know, we issued user IDs that were temporary in nature.

Q. (By Mr. Nemelka) That was in 2000 --

MS. GULLEY: Are you finished Mr. Brockman?

THE WITNESS: No.

A. That's completely different than, you know, what my connotation of whitelist is. Whitelist, in my terminology, has to do with email.

I have a lot of problems with spam email. And one of the ways that you deal with spam email is -- is you decide what select group of people you'll accept email addresses from, and you -- you create a list. And that's what's called a "whitelist." You know, that's --

that's my knowledge of the use of the term.

Q. (By Mr. Nemelka) So where Reynolds issued these protected user IDs for CDK, that was -- that you were referring to, was that in connection with the 2015 wind-down agreement?

MS. GULLEY: Form.

A. That was one of the factors in that wind-down agreement. It was -- again, first and foremost, that they're -- they're going to stop hacking. They're going to stop being bandits. And this is a temporary situation, you know, where it's a wind-down.

Q. (By Mr. Nemelka) Reynolds did it for CDK long before 2015, didn't it?

MS. GULLEY: Objection; form.

A. Not to my knowledge.

Q. (By Mr. Nemelka) Okay. I've handed you Exhibit -- Plaintiff's Exhibit 640.

(Exhibit 640 was marked for identification.)

Q. (By Mr. Nemelka) And I'll describe it and then you can read it. It's an email from you, Mr. Brockman, dated Friday, February 20, 2013, to Ron Lamb. I'll give you a minute to read it.

A. I'm familiar with this issue here.

Q. Are you finished reading --

A. Let -- let me finish.

We have been -- you know, the war with the bandits and the hackers, it's been going on for a long time. And what we've done over the years is -- and that's that we've created barriers. And what happens is, in this, is sometimes the barrier blocks somebody that is -- is causing them a great deal of problem. And what we'll do is -- and that's on a temporary basis while we get the -- you know, the issue -- specific issue sorted out, we will issue a user ID temporarily.

And I think that that's reflected in -- it reads, "Obviously it is not getting communicated correctly -- or the dealership person is not listening to the description of the circumstances around the situation -- which is that a formal agreement has been reached whereby entrance into the RCI world by the OEM [involved] will begin.

"Part of this [that] agreement is to allow the feeding of data by 'bandit procedures' to continue to exist in [during] the transition period." And that's what it's all about.

Q. Will you continue to read that last sentence of your email?

MS. GULLEY: Objection; form.

A. "The new USER-ID is a special one that we know

about -- and there will be exempt from the security processes."

What's not, clearly, part of that sentence is "This is a temporary transition."

Q. (By Mr. Nemelka) Mr. Brockman, this was user IDs that were for both Integra Link! and DMI; correct?

MS. GULLEY: Objection; form.

A. Yes. I believe -- I believe, in this particular situation, they were the folks that were described -- which they're our -- our worst hackers.

Q. (By Mr. Nemelka) And this is in 2013; correct?

MS. GULLEY: Objection; form.

A. Yes. That's -- that's the date.

Q. (By Mr. Nemelka) And the bottom email is an email from a dealership to Reynolds, right?

MS. GULLEY: Objection; form.

A. Yes.

Q. (By Mr. Nemelka) Sunset -- excuse me. Sorry.

A. That's correct. The email is to Reynolds, from a customer of Reynolds.

Q. And the customer says, "I have now received three calls from the TAC" -- what is the TAC?

A. That stands for Technical Assistance Center.

Q. Of Reynolds?

A. Yes.

Q. -- "about setting up user IDs for both Integralink and DMI to allow non-regulated access to our Reynolds system."

Then he goes on, "I find it extremely hypocritical that for the better part of 3-4 years Reynolds has pretty much pissed off a large majority of your customer with 'security' enhancements that locked out these companies in one way or another. Now all of a sudden, Reynolds is calling me to set up exactly what we were told was a security problem. So my questions is how is this still not a security problem."

Do you see that?

MS. GULLEY: Form.

Q. My question is: Do you see that?

MS. GULLEY: Form.

A. I see, you know, what you have read.

Q. (By Mr. Nemelka) Did you -- do you agree with the dealer that it's hypocritical for Reynolds to be creating these protected user IDs that are exempt from its security processes?

MS. GULLEY: Form.

A. No. I -- I disagree with that statement.

MS. GULLEY: Are you --

A. And the characterization that this particular writer, this Christopher K. Upright, that we have,

quote, angered a number of our customers over the last three or four years, you know, that's way too strong of a characterization. There's no question there's been inconveniences as we have, you know, ratcheted down, you know, hackers' access. And that's exactly what happened here, and we -- we obviously dealt with it.

Q. Dealers left Reynolds over this issue of data access, didn't they?

A. There has been some, but a very small minority.

Q. And they transitioned, during this time period, to CDK over those issues; correct?

MS. GULLEY: Objection; form.

A. I don't have any, you know -- you know, knowledge of -- of the -- you know, that correlates security issues to, you know, number of dealerships that departed. I just don't have that information, if it exists.

Q. (By Mr. Nemelka) Reynolds keeps track of reasons that dealers leave it, don't -- doesn't it?

A. To the extent that we can ascertain, you know, why, we do. You know, in many, many cases, we can't.

Q. And you're aware that, in tracking, that there were many instances -- there were instances where dealers said they were leaving Reynolds for CDK because of the data access policies, right?

MS. GULLEY: Objection; form.

A. I would say that there -- there are some dealers that have left us over data access, but -- but, this is, you know, a very tiny minority.

Q. (By Mr. Nemelka) In your email about the user IDs being exempt from security processes, what does "exempt" mean?

MS. GULLEY: Objection; form.

A. I'm sorry. I'm not understanding.

Q. (By Mr. Nemelka) You wrote, "The new USER-ID is a special one that we know about -- and they" -- "and there will exempt from the security processes." What does that "exempt" mean?

MS. GULLEY: Objection; form.

A. I think it means what it says.

Q. (By Mr. Nemelka) Security processes will not apply to those protected user IDs, right?

MS. GULLEY: Objection; form.

A. The -- the specific security issue that is causing this particular customer unhappiness, that's what the new user ID will -- will exempt them from. Until such time as -- as we have our -- our piece of code -- which is actually, you know, performing the security check a little too aggressively -- until that's corrected.

Q. (By Mr. Nemelka) You can set that aside. Oh, one -- real quick. The access that DMI and Integra Link! had to the Reynolds system was automated access; correct?

MS. GULLEY: Objection; form.

Q. (By Mr. Nemelka) That was protected?

MS. GULLEY: Objection; form.

A. Again, the -- the user ID, you know, gave the ability to -- for, you know, a person to log on to the system. Exactly, you know, what they did with that, I can't tell from this.

Q. (By Mr. Nemelka) You weren't -- you're not aware that -- that -- that protected user IDs for CDK were for data access in an automated way?

MS. GULLEY: Objection; form.

A. I'm not aware of that.

Q. (By Mr. Nemelka) Okay. You can set that aside.

(Exhibit 641 was marked for identification.)

Q. (By Mr. Nemelka) I've handed you Plaintiff's Exhibit 641, which is an email -- the top email is an email from Bob Schaefer to Howard Gardner at CDK forwarding an email from you, Mr. Brockman, to Robert Schaefer on November 25th, 2013. Do you see your email

to Mr. Schaefer where you write on November 25th, 2013?

MS. GULLEY: Objection; form.

A. Sorry. If you will give me a moment to --

Q. (By Mr. Nemelka) Let me -- I'll let you review the document. I just want -- I just want to point out your email to Mr. Schaefer, if I could.

A. Please, let me read the document.

Q. Okay.

A. Again, I --

Q. Have you finished reading them?

A. Yes.

Q. Okay, thank you.

A. Please repeat the question.

Q. Yes. So you sent an email -- it's the second from the top -- you sent an email dated November 25, 2013 to Robert Schaefer where you write, "Bob, you have authority to pursue discussions with ADP on these subjects as per our conversation." Do you see that?

A. Yes.

Q. So this is you giving Mr. Schaefer -- who is a Reynolds executive; correct?

MS. GULLEY: Objection; form.

A. That is correct.

Q. (By Mr. Nemelka) -- authority to talk to CDK on the topics outlined in the email below. Right?

MS. GULLEY: Objection; form.

A. Yes. That -- that is correct.

Q. (By Mr. Nemelka) And in the email that -- it's an email that Howard Gardner sent to Mr. Schaefer. Now, Howard Gardner is the CDK executive, right?

A. I'm aware of the fact that he works for CDK. Whether or not he's considered an executive, I'm not -- I'm not familiar.

Q. And here -- the first bullet point he says, "Bob Brockman would like to work toward an agreement with ADP, and he has granted you the authority to pursue discussions on a general framework with ADP." Do you see that?

MS. GULLEY: Objection; form.

A. Yes, I do.

Q. (By Mr. Nemelka) And that's the authority that you have been granting Mr. -- that you granted Mr. Schaefer, right?

MS. GULLEY: Objection; form.

A. Yes. I gave him authority to discuss with ADP. He does not have -- this does not give him permission to actually do anything. It's permission to talk about things.

Q. (By Mr. Nemelka) Right. And one of the -- if you turn to the next page -- one of the things that --

permission to talk about is for OEMs -- if you will look, "Reynolds & Reynolds and DMI will formalize and extend our collaborative approach to helping OEMs transition to a 'protected program' to prevent future disruption of data access." Do you see that?

MS. GULLEY: Form.

A. Yes. And I think it's important to point out that what's happening here is -- and that's that ADP's two subsidiaries are the worst of the hackers and bandits --

Q. Right.

A. -- that we face. And the efforts that we're -- we're pursuing here is -- and that's a continued improvement of security by -- by, you know -- you know, planned stand-downs.

Q. The next one, you say -- or here is "Non-OEM Third Parties." So that would be, not car manufacturers, but the other applications you referred to, like, customer relationship management and so forth, right?

MS. GULLEY: Form.

Q. (By Mr. Nemelka) For the non- -- No. 2, "Non-OEM Third Parties"?

MS. GULLEY: Form.

A. Okay. We're now down to No. 2?

Q. (By Mr. Nemelka) "Non-OEM Third Parties." Do you see that?

Mr. Brockman, do you see No. 2, "Non-OEM Third Parties"?

A. Yes. I'm -- I'm trying to reabsorb that paragraph. That's a very -- that's kind of a long run-on paragraph.

Q. Well -- if I could just -- that's one reason why you're -- you know -- I'd give you the opportunity to read the whole document, but I ask you about specific sections. It's more efficient if I could point you to the sections, then I give you a chance to read the whole -- whole thing. Now -- you know, reading the whole thing really does eat up time -- of our limited time here.

MS. GULLEY: I object to the form and to the sidebar --

MR. NEMELKA: That's fine.

MS. GULLEY: -- and to the instruction as improper.

MR. NEMELKA: Okay.

Q. (By Mr. Nemelka) So No. 2. "Non-OEM Third Parties." Non-OEM third parties would be non-car manufacturers. They're parties, right?

MS. GULLEY: Objection; form.

A. Yes. That would be a proper characterization.
Q. (By Mr. Nemelka) And it says here, R&I -- "R&R" -- Reynolds -- "and DMI will jointly create and launch a 'protected program' that DMI will offer to its existing and prospective non-OEM clients." Do you see that?
MS. GULLEY: Objection; form.
A. Yes. I see that.
Q. (By Mr. Nemelka) So that -- DMI would have protected access to data that Reynolds' dealers have, not just for OEMs, but for non-OEM third parties, too; correct?
MS. GULLEY: Objection; form.
A. This is -- this is what ADP was asking for, and I -- I think that, probably after this first conversation, that they were brought to understand that we were -- that -- that we were only going to allow access for collection of data to go to specific customers, not for Reynolds and DMI to, basically, continue business as usual.
Q. (By Mr. Nemelka) And then Point 4, "Exclusivity." Here there's a sentence that says, Reynolds is -- "R&R is open to the R&R 'protected programs' becoming an exclusive offering by DMI." Do you see that?

MS. GULLEY: Objection; form.

A. Again, the -- this is Howard Gardner's wish list.

Q. (By Mr. Nemelka) You gave Mr. Schaefer authority to pursue these discussions, right, on these topics?

MS. GULLEY: Objection; form.

A. Yeah. And "discussions" does not mean yes to everything that -- that is being requested by Howard Gardner. From a background standpoint, you need to understand who Howard Gardner is.

Howard Gardner's baby is Digital Motor Works, DMI. Again, one of the worst hackers and bandits out there. There's no question what -- you know, there's items in this list of things that he would like to have continue. But we have no intention of -- of allowing that to continue to happen.

Q. (By Mr. Nemelka) One of the topics that you gave Mr. Schaefer authority to pursue discussions with ADP on had to do with market message about -- market messaging about data security, right?

MS. GULLEY: Objection; form.

A. I disagree. I -- I don't -- I don't think that -- that that's the case.

Q. (By Mr. Nemelka) If you look at the last

section here, "Market Messaging -- Data Security." Do you see that?

MS. GULLEY: Objection; form.

A. Again, this is -- this is Howard Gardner's wish list.

Q. (By Mr. Nemelka) I'm simply reading your email, Mr. Brockman. You just wrote to Mr. Schaefer, "You have authority to pursue discussions with ADP on these subjects."

MS. GULLEY: Objection.

Q. (By Mr. Nemelka) You wrote that to Mr. Schaefer, right? You saw that?

MS. GULLEY: Objection to the question and the instruction.

A. The instructions that I gave to Mr. Schaefer is on a general basis. He could -- he could discuss these general areas. It did not have anything to do with what we were going to agree to.

Q. (By Mr. Nemelka) And one of those topics was market messaging on data security; correct?

MS. GULLEY: Objection; form.

A. That -- that was one of the items on Howard Gardner's wish list.

Q. (By Mr. Nemelka) And you authorized Mr. Schaefer to talk to CDK about that, right?

MS. GULLEY: Objection; form.

A. What I authorized Mr. Schaefer to do was -- that he could discuss in general terms, generally, this list. Not every specific item.

Q. (By Mr. Nemelka) Now, as you're having -- as Reynolds is having these -- you can set that aside. As Reynolds is having these discussions with CDK, you were holding off on security enhancements that would -- that you wanted to release, right?

MS. GULLEY: Objection; form.

A. There were a series of security enhancements which were much improved in their capabilities, and we wanted to deploy these -- these security enhancements. But we did not want to do it that it would cause, kind of, Armageddon kind of situation, where all of a sudden ADP's customers would not get what their contracts called for.

Q. (By Mr. Nemelka) You said that these security enhancements were much improved in their capabilities. Is that in their capabilities in blocking this access by independent integrators?

MS. GULLEY: Objection; form.

A. Again, I -- I, first of all, take issue with, you know, the characterization of independent integrators. You know, if you mean hackers and bandits,

yes, that's what they're intended to do.

Q. (By Mr. Nemelka) Mr. Brockman, you used Authenticom for your own products, didn't you?

MS. GULLEY: Objection; form.

(By Mr. Nemelka) We already established that, right?

MS. GULLEY: Form.

A. Yes. But on a temporary basis and very, very minor.

Q. (By Mr. Nemelka) So you used a hacker and a bandit for your own products?

MS. GULLEY: Objection; form.

A. I used Authenticom to do a specific process, with the knowledge of the dealer and with our knowledge.

Q. (By Mr. Nemelka) All right. So these security enhancements that were much improved, much improved in what?

MS. GULLEY: Objection; form.

A. In their ability to detect unauthorized use -- use of our software.

Q. (By Mr. Nemelka) Unauthorized use of the -- meaning by integrators to access dealer data?

MS. GULLEY: Objection; form.

A. What we're talking about is -- and that's we're talking about, you know, very, very high-level, you

know, software enhancements to detect, you know, people coming into the -- the system that -- who we know nothing about. They're, you know, completely unauthorized. That's what we're talking about.

Q. (By Mr. Nemelka) And you held off on releasing those until you concluded your negotiations with CDK, right?

MS. GULLEY: Objection; form.

A. The exact timing of -- of that, you know, when we released the -- those enhancements -- I might add that it's -- it's clear that the enhancements are not necessarily released all at once. They're -- they're not a single thing.

You know, there -- there's a series of what we call "fixes" or "enhancements," and probably some of them we turned loose earlier than others. They weren't -- it's not a simultaneous, you know, distribution of software enhancements.

Q. (By Mr. Nemelka) Reynolds held up on a large release of security enhancements during the negotiations with CDK; correct?

MS. GULLEY: Objection; form.

A. Again, I don't know that it was all the security enhancements that we had prepared. Certainly, there were a number of them.

Q. (By Mr. Nemelka) I'm going to hand you Plaintiff's Exhibit 642.

(Exhibit 642 was marked for identification.)

Q. (By Mr. Nemelka) And, Mr. Brockman, I'll represent to you that your counsel produced this. And the metadata as produced says this came from your file. And it's dated June 23rd, 2014. I'll give you a chance to review it. There's a back page as well.

A. Oh, okay.

Q. Mr. Brockman, these are your notes; correct?

A. Yes.

Q. And you prepared these notes -- sorry.

A. This is a -- what I would refer to as a "talking paper." It is a -- a series of points that I want to make in a conversation with Steve Anenen.

Q. And one thing that you told him at the very back, if you turn over to the second page, is that "We have held up on a large release of security enhancements for over 2 months to see if there was a deal to be worked out." Do you see that?

A. Yes. I -- I see that. And that was a very important point of -- of a call, that we had a number of security enhancements that would -- would basically block the kind of access that -- that they -- they had

been using to get into our systems.

Q. And you had been holding that up?

A. Yes.

MS. GULLEY: Objection; form.

Q. (By Mr. Nemelka) And -- and that would -- the security enhancement would block, not just DMI and Integra Link!, but other integrators; correct?

MS. GULLEY: Objection; form.

A. That's an interesting issue. When we see things happening where people are breaking into our system, we have no idea who they are in most cases. There's no -- they don't have a signature on everything that says who they are when they come in. We just know that, you know, they're hacking their way in, and we're going to block it. In some cases, that would cover things that the ADP subsidiaries were doing. And in some cases, it might uncover people that we had no idea were -- were hacking into our systems.

Q. (By Mr. Nemelka) You understand for DMI and Integra Link! and Authenticom, it was the Reynolds dealers that were providing them that access; correct?

MS. GULLEY: Objection; form.

A. From -- when you say "providing that access," you know, what -- what the Reynolds dealer would do is -- and that's that they would give them a user ID to get

in, which is completely contrary to the terms of their contracts. Our contracts with our dealers specifically say, you know, no authorized -- or, no use or access to our software other than employees, you know, is -- is permitted. Unfortunately, dealers are, you know, somewhat cavalier about following that particular term of their contract.

Q. (By Mr. Nemelka) And -- and they granted that access so that they could -- they granted that -- that -- those user IDs to be used to access the dealer data; correct?

MS. GULLEY: Objection; form.

A. That's effectively what -- what would happen. You know, the dealer has, you know, very powerful reporting tools where they could do that themselves. But this is for remote unattended access.

Q. (By Mr. Nemelka) All right. Let's go to the first page. You have -- let's go to where you say, "The second point is very much a personal one." Do you see that, about midway through the -- down -- down through the page? Midway, halfway, it says, "The second point is very much a personal one." Do you see that?

A. Yes.

Q. Okay. Right under there, you say, "ADP has been extracting data out of Reynolds systems for over a

decade." Do you see that?

A. Yes. I do.

Q. And you knew that ADP was in the business of providing that data to a host of other third parties, right?

MS. GULLEY: Objection; form.

A. That -- that's my assumption. I -- I don't have direct knowledge of that.

Q. (By Mr. Nemelka) And then you say, "ADP has wrongly taken advantage of Reynolds in the marketplace over the issue of data security -- that has cost us in the millions." Do you see that?

A. Yes, I do.

Q. How was CDK taking advantage of Reynolds in the marketplace on the issue of data security?

MS. GULLEY: Objection; form.

A. ADP's posture in the marketplace was that our approach and our -- our -- you know, our belief that data security is necessary because of the fact that we have nonpublic personal information that -- that exists inside of the Reynolds system, that that manner of access, we think, is the right way to do things. We think that's what's required by law.

ADP, from a sales standpoint, their salespeople, would say that we're taking the wrong

position on the data security standpoint. And we believed that that was harmful to us in the marketplace.

Q. (By Mr. Nemelka) And it cost you in the millions because you lost DMS customers as a result?

MS. GULLEY: Objection; form.

A. That -- that is correct. And to -- to lose a customer over data security when we're doing things the right way, the way that's required by law, you know, for them to decide to switch their business to ADP, that's obviously hurt.

Q. (By Mr. Nemelka) You know that other DMSs, besides Reynolds and CDK, do not take the same view that you do; correct?

MS. GULLEY: Objection; form.

UNIDENTIFIED SPEAKER: Objection; form.

A. I believe that they take views that are -- that are different than ours.

Q. (By Mr. Nemelka) Are you saying that they are in violation of the law?

A. I believe that the -- what's required by Gramm-Leach-Bliley Act and also the Safeguards Rules -- I believe that they're not following those, you know, laws correctly.

Q. So you say it cost you -- the CDK wrongly taking advantage of Reynolds in the marketplace over the

issue of data security cost you millions because you lost DMS customers. Any other way that it cost Reynolds millions, besides losing DMS customers?

MS. GULLEY: Objection; form.

A. I would say that the -- that it wouldn't necessarily be just the loss of customers, it would also have to do with our ability to acquire new customers. And it is -- you have to understand, we've been -- I personally have been, you know, bitter competitors, you know, with ADP for a very, very, very long time, in excess of 40 years. And this was one of the things that irritated me specifically.

The software that I helped create, the Power system in Houston, is extremely, you know, strong in its data security. And from the time that I, you know, came aboard at Reynolds and Reynolds, we've been working to improve our data security. And it is vastly improved from when I first -- you know, first arrived 12 years ago.

It's still not perfect, because people think that -- you know, more, you know, inventive ways of doing it. And it's very much a cat-and-mouse situation in that the hackers figure out a new way and then we figure out a way to block it. And then they figure out another new way and we figure out a way to

block it.

Q. (By Mr. Nemelka) Now, you say at the -- here, "Therefore, I want" -- "I want a no-charge access to ADP systems for the next 20 years." So you wanted free access for the Reynolds applications for the next 20 years, but not to extract data for other third parties, like DMI and Integra Link!, right? You made that clear. And that was a difference?

MS. GULLEY: Objection; form.

UNIDENTIFIED SPEAKER: Objection; form.

A. There -- I think this particular passage indicates the level of differences between -- when I say "differences" -- you know, points of contention between us and ADP. And it is specific in that -- we have applications, for instance, like reminder cards for service, that an ADP dealership, they would like to buy that product from us, and we would have specific certified access into the ADP system to get just the data that it takes to do reminder cards.

Q. (By Mr. Nemelka) So you wanted 20 free years of that type of access to this CDK dealer data; correct?

MS. GULLEY: Objection; form.

A. Well, it says "no-charge access." That means no charge by ADP. That we would basically -- as long as we used it strictly for a product that we offered, like

service reminders, that we would have free access for 20 years.

Q. (By Mr. Nemelka) And what did you mean when you told him here that "not to be used to extract data for other 3rd parties"?

MS. GULLEY: Objection; form.

A. We are not -- never have been -- and have no intention of being in the process of extracting data from other dealership systems for the purposes of reselling. We don't do that.

Q. (By Mr. Nemelka) Like DMI and Integra Link! did?

A. We don't do that.

Q. You were considering entering into a joint venture with CDK on that, though, as we saw earlier. Correct?

MS. GULLEY: Objection; form.

A. No. That's not true. That -- that's not true. Our -- our whole discussion with ADP was about an orderly stand-down transition, to avoid creating hardships for what is our mutual customers.

Q. (By Mr. Nemelka) And here -- did you tell Mr. Anenen that you had no intention of ever entering into the business like DMI and Integra Link!?

MS. GULLEY: Objection; form.

A. I don't think I made a -- a general statement of that. I think it's pretty clear, it says, "like service reminders -- not to be used to extract data for other 3rd parties." So that comment was directly in relationship to the access that we would be granted by ADP.

Q. (By Mr. Nemelka) I've handed you Plaintiff's Exhibit 643.

(Exhibit 643 was marked for identification.)

Q. (By Mr. Nemelka) The top email is an email from Steve Anenen to you, dated July 2nd, 2015. I'll give you a chance to read it. But again, Steve Anenen is CDK's CEO, right?

A. That's correct.

Q. And this is an email to you, July 2nd, 2014. I'll give you a chance to -- to review it.

MS. GULLEY: It starts on the back.

Q. (By Mr. Nemelka) Right. It starts off with an email from you on June 30th, to Mr. Anenen; correct? Mr. Brockman?

A. Just -- just a moment. Let me -- let me read it. Yes, I've read it. Can you repeat your question?

Q. All right. So this starts off with an email from you to Mr. Anenen, dated June 30, 2014, right?

A. That's correct.
Q. And this follows up a conversation that you had with him; correct?
MS. GULLEY: Form.
A. Yes. That is correct.
Q. (By Mr. Nemelka) And those were the -- the talking points for that conversation is the document that we just -- just looked at; correct?
MS. GULLEY: Objection; form.
A. Yes. That -- that's correct. And as you can tell by the tone of this email, I'm getting a little impatient.
Q. Right.
A. More than a little impatient.
Q. Right. You write here at the end, "My data security projects have been delayed another week." Right?
A. Yes. That's what it says.
Q. You're still delaying the -- the data security projects since June 30th, 2014, right?
MS. GULLEY: Objection; form.
A. That's the date of this email. What's happening is -- and that's that Steve Anenen is employing delay tactics. And I'm impatient to get this situation of, you know, data hacking, bandits, going on

as far as our system is concerned. It's time for it to be over.

Q. (By Mr. Nemelka) And you write to him, also -- still your email, Mr. Brockman. "However given that ADP has accessed our systems for a couple of decades, my request is for more than just data access than for maintenance reminders -- both in content and duration."

So you -- here, you're saying, because CDK accessed your systems for a long time, your request here for free access is more than just for maintenance reminders, right?

MS. GULLEY: Objection; form.

A. It is for other software products that -- that we might offer to the marketplace. But still under the certified interface process --

Q. (By Mr. Nemelka) Right.

A. -- where it's clearly spelled out by contract, you know, what data that we -- we get and nothing else.

Q. And then I want to ask you about what Mr. Anenen says to that statement in particular, if you go to his email.

MS. GULLEY: I don't -- I don't think he read this first page.

MR. NEMELKA: I'm not going to ask about anything but this one email -- but this one paragraph.

Q. (By Mr. Nemelka) He says --

MS. GULLEY: I object to that.

MR. NEMELKA: Okay. I just want to point you to this one -- one paragraph that Mr. Anenen writes in response to that statement.

MS. GULLEY: I object to that.

THE WITNESS: I would like to read the email, please.

MR. NEMELKA: Okay.

MR. RYAN: So my -- my complaint is that the procedure is that if the witness wants to read the document, the witness can, right? That's certainly been the case in depositions of the witnesses that you represented. I just want to know what the ground rules are.

MR. NEMELKA: If it's going to be obstructionist, then we'll do it document by document. I will let him read this email.

MS. GULLEY: I object to that comment as well.

MR. NEMELKA: While he's reading, I'll just state for the record, we've been given limited time, here. I think it's fair to direct him to particular points in a -- in a document. I'm giving him a chance to read them. If they are longer documents, I think

it's fair for us to direct him, for efficiency purposes. If you want to take your time and ask him about other parts of the document, you're free to.

MS. GULLEY: Mr. Nemelka, you have called opposing counsel inappropriate for making statements on the record like the one that you just made. I completely object to your statement.

I also ask -- direct you to look into the depositions that you have defended and that your partner, Mr. Ho, has defended, in which he hasn't even allowed counsel to use the time that they have on the record. Everyone has the same amount of time, and this -- this -- the desire to read documents is one that you instructed your clients, repeatedly, on the record.

And if Mr. Brockman suggests that he would like to read the document -- you're asking him to opine on statements by Mr. Anenen -- he should at least be allowed to read those statements, given that they were more than four years ago.

MR. NEMELKA: You've gone beyond what's appropriate, Andi, but I'll get back to questioning.

Q. (By Mr. Nemelka) All right, Mr. Brockman, I'd like to ask you about --

THE WITNESS: Excuse me. I didn't finish reading. The amount of conversation that's been going

on across the table, I haven't had a chance to read.

MR. NEMELKA: Okay.

MS. WEDGWORTH: Can we go off the record a minute? Mr. Wallner has informed us the phone is not -- has been disconnected. Can we go off the record?

THE VIDEOGRAPHER: The time is 11:37 a.m. We are off the record.

(Short recess 11:37 to 11:50 a.m.)

THE VIDEOGRAPHER: This is the beginning of Media 2. The time is 11:50 a.m. We are back on the record.

EXAMINATION (Continuing)

BY MR. NEMELKA:

Q. Mr. Brockman, I'd like to point you to the email that you received from Mr. Anenen on July 2nd, 2014. Do you have that in front of you?

A. I do.

Q. And he wrote to you -- in the paragraph after his bullet points, he said, "I should point out that we have not been 'accessing R&R systems for decades' as you said. Our businesses that access R&R systems came to us through an acquisition." Do you see that?

MS. GULLEY: Form.

A. Yes, I do.

Q. (By Mr. Nemelka) And then he says, "In any

case, controlling data access has become a priority for R&R only within the last several years. I would be remiss not pointing out that R&R is accessing the ADP system through a contract with Authenticom, and has been doing so for quite some time without an agreement from ADP."

Is Mr. Anenen correct in that, that -- that Reynolds was accessing the ADP system through a contract with Authenticom?

MS. GULLEY: Objection; form.

A. Well, there are some things that I -- I disagree with in -- in this paragraph, starting with the first sentence. I believe that when you acquire a company and you make it part of your organization, that, you know, the history of that company kind of goes with it and becomes part of your history. And for him to, you know, basically say that because DMI and Integra Link! are organizations they acquired, you know, that doesn't count. I believe it does count.

Q. (By Mr. Nemelka) That wasn't my question, Mr. Brockman. My question was: Is he correct in pointing out that R&R is accessing that CDK system through a contract with Authenticom?

MS. GULLEY: Objection; form.

A. Yes. I'm -- I concur with that -- comma --

however, there is an issue of degree here. What's been going on -- what ADP has been doing as far as, you know, hacking our systems has been on -- on a giant scale, whereas the -- the agreement with Authenticom for information from CDK's systems, specifically around reminder cards, is -- is min- -- minuscule. And what he's doing is -- and that's, you know, this -- this is a negotiation -- a pretty heated negotiation, frankly -- or at least kind of heated on my part -- and that he's endeavoring to dodge around.

Q. (By Mr. Nemelka) You wouldn't have used Authenticom if they were insecure, would you have?

MS. GULLEY: Objection; form.

A. For reminder cards, you know, there's no nonpublic personal information. There's no accounting information. It -- again, it is -- it's not an application that's sensitive.

Q. (By Mr. Nemelka) Reynolds used Authenticom for more than just those reminders, right?

MS. GULLEY: Objection; form.

A. I think that they started to do some work for the -- the ad agency.

Q. (By Mr. Nemelka) Right. Naked Line Marketing, right?

MS. GULLEY: Objection; form.

A. Yes. That's the name of our ad agency.

Q. And Naked Line does have information -- does get information on customers; correct?

MS. GULLEY: Objection; form.

A. Again, the usage of -- that usage is -- has been extremely minor.

Q. (By Mr. Nemelka) Again, you would not have used Authenticom if they were insecure, right?

MS. GULLEY: Objection; form.

A. As far as I know, there's been -- there was no inquiry made with regards to their internal security procedures.

Q. (By Mr. Nemelka) You're not aware of any data breaches that they've had, right?

MS. GULLEY: Objection; form.

A. Not that I'm aware of.

Q. (By Mr. Nemelka) They provided a reliable service; correct?

MS. GULLEY: Objection; form.

A. And I'm not involved in -- in that part of our business. It's -- I'm not in -- in a position to say whether it's reliable or not.

Q. (By Mr. Nemelka) It's cost-effective for Reynolds to use Authenticom, right?

MS. GULLEY: Objection; form.

A. Again, I'm -- I'm not sufficiently involved in that part of the business to be able to comment on that.

Q. (By Mr. Nemelka) And then he writes at the end of that paragraph, "We need to clean this up as well." And you understood that to mean that Reynolds needed to stop using Authenticom, right?

MS. GULLEY: Objection; form.

A. Frankly, I don't recall that I've ever focused on that -- on that sentence. It's a little short one, kind of down at the end of the whole thing. And so --

Q. (By Mr. Nemelka) What do you understand him to mean by saying, "We need to clean this up as well"?

MS. GULLEY: Objection; form. Please let him finish his answers.

A. It is -- it is not clear to me what that means and, frankly, when I received this, I didn't pay much attention to that, you know, little short sentence in the next-to-the-last paragraph.

Q. (By Mr. Nemelka) Reynolds ultimately did agree to stop using Authenticom as part of its agreements with CDK, right?

MS. GULLEY: Objection; form.

A. I -- I know that -- that we stopped using Authenticom. Whether it was part of the -- of the stand-down agreement, I'm not sure.

(By Mr. Nemelka) I've handed you an exhibit marked Plaintiff's Exhibit 644.

(Exhibit 644 was marked for identification.)

Q. (By Mr. Nemelka) And I will represent to you that this was produced to us by your counsel from your custodial files, with a date of July 14th, 2014. And the file name was "Aspen Meeting 2014 State of the Union." And I'm only going to ask you about two sections.

So it's a multipage state of the union notes. So do you -- do you recognize these as your -- your notes for a state of the union meeting?

MS. GULLEY: Form.

A. The context of this is -- and that's we have an annual meeting of sales -- you know -- vice-presidents, and we discuss a number of issues of general interest.

Q. (By Mr. Nemelka) Okay. If I could just point you to the section on "Security," on the next page.

MS. GULLEY: Objection.

A. Well, I think that this -- this is a big document. I think I would prefer to, you know, spend a little more time on it than that. I -- I hesitate to, essentially, take things out of context.

Q. (By Mr. Nemelka) All right. I don't intend on

taking anything out of context. I'm just going to ask you about the sections on security. But -- you know, it is a long document. And I don't intend on asking you about most of it.

I guess, can I just ask you, first of all -- maybe I'll just do it this way. Do you recognize these as your -- your speaking notes for that -- for that address?

MS. GULLEY: Form.

A. These were, you know, talking points. They covered a number of issues of interest, a lot of which are related.

Q. (By Mr. Nemelka) I'll -- maybe if I could just ask you the questions on security, and if you feel like you need to review the rest of it to answer them, then -- then I'll give you the chance. But if I could just try to -- you know, make this more efficient by pointing you to the security section?

MS. GULLEY: Objection; form.

A. I think to make -- to make an intelligent decision as of what to do, I need to read it first.

MR. NEMELKA: All right. Well, while you do that, let's go off the record.

MS. GULLEY: Objection. We are staying on the record. That's just the procedure that's been

followed by Kellogg, so I'm just trying to make it, you know, sort of goose/gander.

MR. NEMELKA: All right. We have a jury that's going to be watching this. And I would just like to state for the record, I've asked him to -- only asked him for a few questions to make this efficient. But he wants to review the whole -- whole documents. He's recognized that -- he's acknowledged that these are speaking notes for -- for that meeting. And with that statement, Mr. Brockman, you can review the document.

MS. GULLEY: I object.

MR. RYAN: I object as well.

THE WITNESS: I'd like to speak to my attorney about this document.

MR. NEMELKA: Okay.

MS. GULLEY: Does it relate to a matter of privilege -- potential privilege?

THE WITNESS: This is very, very sensitive information. You know --

MS. GULLEY: Is there a question pending right now? So we can go off the record? There is not. There is not a question pending.

MR. RYAN: There is no question.

MS. GULLEY: Okay. Thanks. Let's go off the record.

THE VIDEOGRAPHER: The time is 12:01 p.m. We're off the record.

(Short recess 12:01 to 12:02 p.m.)

THE VIDEOGRAPHER: Back on the record at 12:02 p.m.

MS. GULLEY: Thank you for that short break. Mr. Brockman had a question about the protective order. And in light of the sensitive nature of this document, we ask that I remind everyone that this has been marked "Attorneys' Eyes Only," that this entire deposition is "Attorneys' Eyes Only." In particular, to remind Mr. Ryan that executives within his company and all the parties are not to know about or be told about any of this document or the subject of this testimony. Thank you.

EXAMINATION (Continuing)

BY MR. NEMELKA:

Q. Can I ask you some questions now, Mr. Brockman?

A. I'm almost done reading it.

Q. Okay.

A. Yes.

Q. If you can go to the section on "Security," which is on the -- after the first page, on the back of the first page. Do you see that bottom-of-the-page section on Security?

A. Yes.

Q. I want to ask you about a few bullet points that start with "ADP" -- and CDK -- "has approached us about doing the same -- we are in the early stages of negotiating a similar agreement." Do you see that?

A. Yes. I see that.

Q. So is it CDK that approached Reynolds about entering into an agreement with respect to its -- its data access on Reynolds system?

MS. GULLEY: Form.

A. It's hard for me to -- to recall exactly how that, you know, came about, because I was not the first person to actually talk, you know, to CDK. And whether or not one of their people talked to one of our people, or one of our people talked to one of their people, I -- I don't know the answer to that.

Q. (By Mr. Nemelka) At least -- these notes, though, you -- you seem to indicate that ADP has approached "us," meaning CDK approached Reynolds, right?

MS. GULLEY: Form.

A. Yes. The -- that's what it says, but -- you know, as far as my, you know, hard knowledge, you know, behind that -- that statement, I don't have hard knowledge as to what actually -- and frankly, I don't think that's important.

Q. (By Mr. Nemelka) And then you write here, fourth bullet point, "This could put the security wars very much behind us." Do you see that?

MS. GULLEY: Form.

A. Certainly, those two entities that belong to ADP are by far the worst and, matter of fact, probably -- in total, probably the amount of data hacking that goes on, they equal everybody else combined and more.

Q. (By Mr. Nemelka) That wasn't my question. The question here is: Do you see that you wrote that "This could put the security wars very much behind us"? Do you see that?

MS. GULLEY: Objection; form.

A. Yeah. What I'm talking about there is -- and that's that, you know, the volume of hacking would be substantially reduced.

Q. (By Mr. Nemelka) So you -- earlier this morning, you said that you never used the phrase "security wars." Does this refresh your recollection that you actually do -- did?

MS. GULLEY: Objection; form.

A. Well, it -- it looks like that -- that I actually have used it once. I will admit, it's in lower case. And when I write documents like this, it's just

very much kind of stream of consciousness, because I'm trying to give the best picture to the people that are listening to it. Because they're my top people, and also the most expensive people.

Q. (By Mr. Nemelka) And you felt that you had been in a security war with CDK, right?

MS. GULLEY: Objection; form.

A. I definitely had been in -- I had long-term issues with CDK over -- over, you know, just ban- -- plain old banditry as far as our system is concerned.

Q. (By Mr. Nemelka) This wasn't just about the access of your system, though, this was also about CDK's own policies, right?

MS. GULLEY: Objection; form.

A. It also included, you know, the fact that they had outright lied to manufacturers about what data they were extracting from our systems. And particularly, General Motors. We discovered that they were fulfilling a request by General Motors for data, and they were talking to dealers saying, "This needs to be done because it's General Motors." Well, the fact of the matter is, they were collecting way more than what General Motors ever asked for.

MS. GULLEY: Wait. Let him finish.

A. And so that is kind of -- the whole general

area is what I'm referring to.

Q. (By Mr. Nemelka) That's not what I asked. What I'm saying is, this was not just about CDK's access on the Reynolds system. It was also about CDK's own policies with respect to access on the CDK system, right?

MS. GULLEY: Objection to the form.

A. No. It was -- it was -- it refers to situations where they were accessing dealership systems on behalf of OEMs.

Q. (By Mr. Nemelka) The next bullet point, you write, "Since we have no idea of how ADP is going to charge 3rd parties for their version of RCI -- we will likely continue to have the issue of customers complaining that their costs from 3rd party vendors are more expensive with a DMS from Reynolds than ADP."

I wanted to ask you: How did you know that CDK would have a version of RCI, like you did?

MS. GULLEY: Objection; form.

A. I think at that point in time, it -- it looked -- it had become apparent -- it wasn't done, but it had become apparent that there was going to be a -- an orderly stand-down agreement with ADP. That's -- that's what I'm saying here.

Q. (By Mr. Nemelka) All right. I'm not talking

about the wind-down agreement. What you write is, "Since we have no idea of how ADP is going to charge 3rd parties for their version of RCI."

And my question is: How did you know that CDK was going to have their version of an RCI?

MS. GULLEY: Objection; form.

A. I think at that point, we were also understanding that we were going to be able to have RCI access into ADP dealership customers, not for the purposes of being a redistributor, but for the purposes of using it within one of our product offerings. And there was going to be a charge associated with that.

Q. (By Mr. Nemelka) Reynolds was going to be getting five free years of access, no -- no charge to -- to Reynolds, right?

MS. GULLEY: Objection; form.

MR. RYAN: Objection; form.

A. That -- that was -- that was what ended up being -- being part of the agreement. However, we had no, you know, specific idea that our usage would be limited to 600 dealerships. It -- it would be -- it would be other products. You know, their -- this marketplace is -- is constantly, you know, building more products.

And actually, in, you know, looking back,

it's fortunate that we were able to achieve this kind of access as part of the agreement, because we bought an organization called Reverse Risk, which is a business intelligence system that has over 1,000 dealerships that are CDK dealerships, that through an RCI type agreement, you know, with CDK, you know, we -- you know -- we downloaded accounting information for the purposes of making comparisons.

Q. (By Mr. Nemelka) That wasn't my question, Mr. Brockman.

I'm asking you why, after you say it's going to be an end to the security wars, you list that ADP is going to have their own version of RCI? What is the connection?

MS. GULLEY: Objection; form.

A. Again, I -- their -- their own version of RCI is -- is part of what the stand-down agreement is all about.

Q. (By Mr. Nemelka) You don't talk about -- in that bullet point, you don't talk about the stand-down agreement. You talk about third parties for their version of RCI, right?

MS. GULLEY: Objection; form.

A. Well, again, I'm trying to tell you what I was thinking about when I wrote this thing and what I was

trying to communicate.

Q. (By Mr. Nemelka) And I'm just saying I'm just reading your words, "charge 3rd parties" -- not "charge Reynolds" -- "charge 3rd parties for their version of RCI."

MS. GULLEY: Objection; form.

Q. (By Mr. Nemelka) And so my question is --

MS. GULLEY: Let him finish his question.

THE WITNESS: Yeah.

Q. (By Mr. Nemelka) Go ahead and answer.

MS. GULLEY: Answer what?

Q. (By Mr. Nemelka) Mr. Brockman wants to talk.

MS. GULLEY: Just wait for a question.

MR. RYAN: Wait for a question.

Q. (By Mr. Nemelka) My question is -- is: You're not talking about what -- what CDK is going to charge Reynolds. You're talking about what CDK is going to charge third parties for their version of RCI; correct?

MS. GULLEY: Objection; form.

A. In -- in that context, I believe that I'm, you know, characterizing Reynolds as a third party.

Q. (By Mr. Nemelka) You're not talking about all of the other vendors?

A. I -- I don't think that I'm -- I know, specifically, that I'm talking about, at least,

Reynolds.

Q. Well, you go on, Mr. Brockman, "We will likely continue to have the issue of customers complaining that their costs from 3rd party vendors are more expensive with a DMS from Reynolds than ADP." Are you referring only to the Reynolds applications?

MS. GULLEY: Objection; form.

A. What I'm referring to is, in this, that, you know, we get beat up in the marketplace over, you know, third parties having to pay for a Reynolds-certified interface, and it looks like -- it looks like the way it's going is -- and that's that CDK is going to do it the same way.

Q. (By Mr. Nemelka) All right. Let's go to the first page. I want to ask you about a bullet point here.

MS. GULLEY: I'm sorry. So we're on 644. You're talking about something other than the "Security" section?

MR. NEMELKA: Andi, make your objections. I'm on the first --

MS. GULLEY: I'm trying to figure out --

MR. NEMELKA: I'm on the first page. I'm on the first page. That's not what you're doing.

MS. GULLEY: Mr. Nemelka, I'm asking:

Are -- we're on the first page of what document?

MR. NEMELKA: The document that's right in front of him, Andi.

MS. GULLEY: Could you identify the exhibit for the record, please.

MR. NEMELKA: This is Exhibit 644.

MS. GULLEY: Thank you.

Q. (By Mr. Nemelka) Under the section on "Acquisitions" -- since you read the whole document -- I wanted to ask you about a sentence here where you write, "We need to quit talking about DMS systems and focus on RMS and the massive financial advantages of our offering."

And my first question is: "RMS" stands for Retail Management Ser- -- is that Retail Management Services or Retail Management System?

MS. GULLEY: Objection; form.

A. Retail Management System.

Q. (By Mr. Nemelka) Okay. And you said you need to -- and this is a speech to your salespeople; is that right?

MS. GULLEY: Objection; form.

A. That's correct.

Q. (By Mr. Nemelka) And you say they -- they need to quit talking about DMS systems and focus instead on

RMS. What did you mean by that?

MS. GULLEY: Form.

A. What I mean by that is -- and that's the DMS systems are the -- the traditional, you know, applications of -- of accounting, payroll, parts, you know, service, finance, vehicle inventory, factory communications. That is a suite of applications which has been under long development and, frankly, it's gotten to the point where it's so good that there's nothing much more we can do to it. I know that sounds a little strange but, I mean, that's the truth. The level of requests we have for software enhancement in those application areas is, you know, been kind of like this (indicating) for a long time.

The retail management system takes into consideration all of the other applications that surround the DMS, which is under active development. For instance, our docuPAD application and our imaging systems, our advanced service products have been under, you know, steady improvement. And we have considerable competitive advantage in those areas. And so what I'm encouraging them to do is -- and that's to not focus on, you know, the older applications where we -- where everybody is kind of caught up. To be focused -- to focus, instead, on the retail management system, which

includes all of the other applications that integrate to the central core applications.

Q. Thank you for that explanation.

(Exhibit 645 was marked for identification.)

Q. (By Mr. Nemelka) I've handed you Plaintiff's Exhibit 645. And if you recognize -- the top email is an email from Mr. Schaefer to Ron Workman, dated January 6, 2015. But the chain starts with an email from you to Mr. Brockman, also dated January 6, 2015. So do you recognize this document?

A. I've got to -- I've got to read it. Okay.

Q. So I need to ask you about your email where you write to Mr. Anenen -- this is now January 2015 -- "We have held off on a series of major security enhancements to our DMS systems at your request." So are these the same security enhancements that we saw from 2014 that Reynolds had been holding off on?

MS. GULLEY: Objection; form.

A. I'm sorry. I don't know what specific ones are involved. I don't -- I'm not a programmer.

Q. (By Mr. Nemelka) But still -- Reynolds is still holding off on security enhancements, though, right?

MS. GULLEY: Objection; form.

A. They're -- that's what I was saying to Steve Anenen in this -- in this email. There's no question -- you can tell my -- my frustration is increasing and, you know, this is -- this is an or-else kind of email.

Q. (By Mr. Nemelka) Right. And you say, "We must proceed with the release of our security enhancements." You say that at the end, right?

A. That's correct.

Q. And these have been pending for a long time, given the documents we've been looking at, right?

MS. GULLEY: Form.

A. That's correct. It's been a very frustrating, you know, process.

Q. (By Mr. Nemelka) And the security enhancements that you are going to release -- strike that.

MS. GULLEY: For the room, the lunch is here.

MR. NEMELKA: I want to ask him about one more document. It might be more than one.

(Exhibit 646 was marked for identification.)

Q. (By Mr. Nemelka) I've handed you Plaintiff's Exhibit 646, which is an email from Bob Schaefer to you, Mr. Brockman, dated January 11, 2015. Do you recognize receiving this email from Mr. Schaefer?

MS. GULLEY: Form.
A. Give me a chance to -- to read it. I'll be with you shortly.
Q. (By Mr. Nemelka) Okay.
A. Okay.
Q. Okay, I want to ask you just about one issue here that he references. First of all, do you recall getting this email from Mr. Schaefer, Mr. Brockman?
A. Yes.
Q. And the -- an issue -- and it's about the continuing negotiations between CDK and Reynolds; correct?
MS. GULLEY: Form.
A. Yes.
Q. (By Mr. Nemelka) And an issue that -- I mean, I've identified is -- I'm quoting -- "CDK committing to NEVER accessing the Reynolds DMS again." Do you see that at the bottom of the first page?
MS. GULLEY: Form.
Q. (By Mr. Nemelka) At bottom of the first page, the very last line.
MS. GULLEY: Objection; form.
Q. (By Mr. Nemelka) Are you there with me, Mr. Brockman?
A. I see that, and I'm -- and I'm looking at --

what the reply was.

Q. And --

MS. GULLEY: Objection; form.

Q. (By Mr. Nemelka) What Mr. Schaefer explains to you is, is that -- and I want to ask you, Mr. Brockman, about the next page, Mr. -- what Mr. Schaefer writes to you about that issue. Second-to-last sentence of that first paragraph up top, he says, "We have added" -- meaning Reynolds -- "have added after the 5 years they cannot access the system on behalf of any 3rd party forever." Do you see that?

MS. GULLEY: Form.

A. Yes.

Q. (By Mr. Nemelka) And that's what Reynolds wanted, is for CDK to agree to never access the Reynolds system again on behalf of any third party, right?

MS. GULLEY: Form.

A. That's certainly what we wanted to happen.

Q. (By Mr. Nemelka) And CDK said, at least -- current state of the negotiation was for five years. We'll have this wind-down period, but after that, we don't want to agree to the forever, right?

MS. GULLEY: Objection; form.

A. That -- that was my understanding. And this whole -- I've not been involved at this level of detail

in this negotiation, which is basically formalizing what the stand-down agreement consists of. And I know what we asked for and -- and they're -- they're not agreeing.

Q. (By Mr. Nemelka) Okay. Reynolds was insisting on forever never accessing. And CDK, at least, wanted to keep that to five years, right?

MS. GULLEY: Objection; form.

Q. (By Mr. Nemelka) Right? What was that -- what was the answer?

MS. GULLEY: Objection; form.

A. That's my understanding. That's what this is all about.

Q. (By Mr. Nemelka) And in fact, in the wind-down agreement, it is forever, right?

MS. GULLEY: Objection --

MR. NEMELKA: Let me finish answering my question -- asking my question.

Q. (By Mr. Nemelka) In fact, it is forever, correct, that CDK agreed to never access the Reynolds system, right?

MS. GULLEY: Objection; form. This is improper.

A. I would want to go look at that document, but I don't believe it says that.

MR. NEMELKA: All right. Let's pull it

out.

(Exhibit 647 marked for identification.)

Q. (By Mr. Nemelka) Mr. Brockman, I've handed you Plaintiff's Exhibit 647, which is the data exchange agreement between CDK and Reynolds. And the first thing I'm going to do is point you to where you -- you -- first of all, you signed this agreement, right, on behalf of Reynolds?

MS. GULLEY: Objection; form.

A. Yes, I did.

Q. (By Mr. Nemelka) So let's go there. This is on Page -- on Page 11 of 13. 11 of 13, do you see that, Mr. Brockman, your signature there?

A. Yes.

Q. Dated February 18, 2015?

A. That's correct.

Q. And do you typically read contracts before you sign them?

MS. GULLEY: Objection; form.

A. Umm, it depends. In this particular case, I did not read this one extensively. I felt that the -- you know, this particular issue had -- or, you know, a stand-down had -- had been, you know, worked on, negotiated at length. And this one, I was ready to get done. And so I was -- I had already made up my mind not

to go ask for any further changes and to agree to, you know, what CDK wanted, just to get it off the table so I could get on with the next project.

Q. (By Mr. Nemelka) Did you read this before you signed it?

MS. GULLEY: Form.

A. I did not read it. I -- I -- I skimmed it.

Q. (By Mr. Nemelka) Okay. So let's go to Section 4.5. And the Section 4.5 is "Prohibition on Knowledge Transfer and DMS Access." Do you see that?

MS. GULLEY: Form.

A. Yes, I see that paragraph.

Q. (By Mr. Nemelka) All right. And in this paragraph, CDK and Reynolds agreed to two things.

MS. GULLEY: Form.

Q. (By Mr. Nemelka) Let's look at the first. "Each of Reynolds and CDK further covenants and agrees not to sell, transfer, or assign to any affiliate or third party any technology, business process, or other such knowledge regarding integration with the other party's DMS or take any other steps to assist any person that it reasonably believes to have plans to access or integrate with the other party's DMS without other party's written consent." Do you see that?

MS. GULLEY: Form.

A. Yes, I see that. And that -- that's a very important provision.

Q. (By Mr. Nemelka) And -- and what --

MS. GULLEY: Objection.

Q. (By Mr. Nemelka) What did you agree to there?

MS. GULLEY: I'm sorry. Were you finished answering the last question?

THE WITNESS: Would you please repeat the last question?

Q. (By Mr. Nemelka) My question is -- is -- was -- was: Did you see that? You said, "Yes." So my que- -- my pending question is: What did you agree to there with CDK?

MS. GULLEY: Objection; form. He was not done answering the last question before that.

A. Okay. What -- what's at work here is -- and that's that as a result of the, you know, the stand-down, you know, that -- to accomplish that, would require, you know, knowledge of how access is gained to a dealership system. And so what we're doing is -- and that's we're -- we're jointly agreeing with each other that we will not turn loose any kind of knowledge or technology that enables somebody to do that.

Q. All right. And then the next sentence is, "For the avoidance of doubt, this Section 4.5 is not intended

as a 'covenant not to compete,' but rather as a contractual restriction of access and attempted access intended to protect the operational and data security integrity of the Reynolds DMS and the CDK DMS and protection of intellectual property."

And so my question is: It was a contractual restriction of access that CDK and Reynolds agreed to, right?

MS. GULLEY: Objection; form.

A. Well, okay. I'm not -- I'm not -- I'm not seeing that here. What -- what's intended here is -- and that's that -- you know, what's happening is -- and that's that, you know, we're going to gain knowledge about how to get -- how to get into our systems, and they're going to get some knowledge about how to get into ours, okay? We're agreeing not to disseminate that knowledge, okay?

And what we're further saying is -- is look, you know, this is an IP protection provision. It is not intended as a covenant not to compete, you know. We're going to compete. But we're not going to -- we're not going to share, you know, the IP to other third parties or fourth parties, you know, as a result of -- of this agreement.

Q. (By Mr. Nemelka) Now, you just saw a document

where Mr. Schaefer said to you that -- and you testified that Reynolds wanted CDK to agree to never access the Reynolds DMS again, right?

MS. GULLEY: Objection; form.

MR. RYAN: Do you have an exhibit number?

A. There -- there -- that provision did not make it into the final agreement, I don't believe.

Q. (By Mr. Nemelka) So what is this contractual restriction of access that we're looking at here in 4.5?

MS. GULLEY: Objection; form.

A. It is not restriction of access. It's restriction of the -- not to disseminate knowledge about how to access.

Q. (By Mr. Nemelka) Mr. Brockman, it says --

A. It was --

Q. -- "contractual restriction of access and attempted access." Correct?

MS. GULLEY: Objection; form.

A. But -- but if you look at the heading for 4.5, it's "Provision on Knowledge Transfer" --

Q. Finish reading the -- the --

MS. GULLEY: Objection; form.

A. -- "and DMS Access."

MR. NEMELKA: Let -- let me finish my question.

Q. (By Mr. Nemelka) Please finish reading the entire title of 4.5, Mr. Brockman.

MS. GULLEY: Objection; form. Just give me a chance to object, Mr. Brockman.

A. It says "Prohibition on Knowledge Transfer and DMS Access."

Q. (By Mr. Nemelka) All right.

A. And -- and you know, what -- what it's intended to mean is -- and that's that each party is going to have access to intellectual property of the other and that we're both jointly, you know, agreeing not to disclose that. But, you know, it's not intended to be a covenant not to compete. It's -- it's simply an issue of intellectual property.

Q. After covenant not to pete -- compete, it doesn't say it's simply an issue of intellectual property, does it?

MS. GULLEY: Objection; form.

A. Yeah, I -- I think the 4.5 heading, you know, goes a long ways towards accomplishing that.

Q. (By Mr. Nemelka) 4.5 heading says "Prohibition of Knowledge Transfer and DMS Access"; correct?

MS. GULLEY: Objection; form.

A. I believe that -- I believe that that's all one issue. It's not two separate issues.

Q. (By Mr. Nemelka) Prohibition on DMS access?

MS. GULLEY: Objection; form.

A. I believe it's prohibition on knowledge transfer. Yeah, that's what it's all about.

Q. (By Mr. Nemelka) But there's an "and" there, isn't there?

MS. GULLEY: Objection; form.

A. I'm sorry. I have to plead a little bit that I'm not a lawyer like you are, and -- and, you know, this document has got lots of words in it. And I do not believe that that was the intent of the drafter.

Q. (By Mr. Nemelka) Even though -- well, if we go back to the document where -- well, this is -- what you testified is that CDK agreed not to access for five years. It was just the "forever" part that they didn't agree to, right?

MS. GULLEY: Objection; form. What's the exhibit, as Mr. Ryan asked a while back.

MR. NEMELKA: 646.

Q. (By Mr. Nemelka) I'm reminding Mr. Brockman of his testimony.

MS. GULLEY: Objection. That is not correct. Objection to that statement.

Q. (By Mr. Nemelka) It says here, that we just saw, "We have added" -- as we've -- as we've already

done, "We have added after the 5 years they cannot access the system on behalf of any 3rd party forever." Do you recall that?

MS. GULLEY: Objection; form.

A. That -- that's what it says. That's what we're asking for. We did not get that provision.

Q. (By Mr. Nemelka) Are you aware of how long Section 4.5 lasts?

MS. GULLEY: Objection; form.

A. Again, I'll confess that I'm not an attorney and I -- you know, as far as the duration of provisions, I don't know what it says.

Q. (By Mr. Nemelka) All right. Let's go to Section 6.1 of the agreement. Are you there with me? 6.1?

A. I'm sorry. I thought I was.

Q. Are you there with me?

A. Yes.

Q. "With the exception of the obligations set forth in Sections 4.5" -- that was the section we were just looking at, right, Mr. Brockman?

MS. GULLEY: Objection; form.

Q. (By Mr. Nemelka) 4.5 is the section we were just looking at; correct?

MS. GULLEY: Form.

A. Yes. "Prohibition of Knowledge Transfer."

Q. (By Mr. Nemelka) "And DMS Access." I know you want to leave off the last part. But it says "and DMS access"; correct?

MS. GULLEY: Objection; form.

MR. RYAN: Object to form.

MS. GULLEY: And move to strike the instruction.

Q. (By Mr. Nemelka) "With the exception of the obligations set forth in Sections 4.5" -- and it even identifies it as "[Prohibition on Knowledge Transfer and DMS Access]...this Agreement shall terminate at the end of the Wind Down Period."

MS. GULLEY: Objection.

Q. (By Mr. Nemelka) So --

A. I see what you're saying, but I've got to reiterate again, okay? It's been a long war with ADP. The long war is -- has finally settled, okay? I heave a sigh of relief. My guys, their guys, our attorneys, their attorneys, they build this document. It comes to me for signature. And I said, "My God, I'm -- I'm happy -- I'm happy to sign this damn thing and have it off the list." You know, I did not read it, certainly not at the level of detail that you're talking about.

You know, I would further support that the

stand-down worked. You know, they, in fact, you know, got out of our systems. They quit -- they quit hacking them, you know. They quit -- quit being bandits. They got out.

And we accomplished the transition such that none of -- none of our mutual customers -- the dealerships that are our mutual customers, where we got the DMS but, you know, they've got a third party that's been doing something else -- nobody got mad. Nobody got -- I didn't get any letters. I didn't get any angry phone calls. So, you know, whatever this document is and whatever shortcomings it might have, it worked.

MR. NEMELKA: We can take lunch.

MS. GULLEY: Let's go off the record.

THE VIDEOGRAPHER: The time is 12:38 p.m. We're off the record.

(Short recess 12:38 to 1:42 p.m.)

THE VIDEOGRAPHER: The time is 1:42 p.m. We're back from lunch and we're back on the record.

EXAMINATION (Continuing)

BY MR. NEMELKA:

Q. Good afternoon, Mr. Brockman.

A. I'm sorry we don't have a prettier day for you-all.

Q. It's still beautiful views.

A. It has been really pretty.

Q. So after Reynolds and CDK concluded the -- the wind-down agreement, Reynolds then did release those security enhancements that it had been holding off on; correct?

MS. GULLEY: Form.

A. I'm not personally aware, but that's my -- that's my belief.

Q. (By Mr. Nemelka) And after the agreement, Reynolds protected the user IDs that CDK was using to access the Reynolds system; is that right?

MS. GULLEY: Objection; form.

A. That was part of the stand-down agreement, and it's my understanding that's now all over.

Q. (By Mr. Nemelka) So the security enhancements did not affect CDK's access to the sys- -- to the Reynolds system, right?

MS. GULLEY: Form.

A. That's correct. The whole goal of -- of the stand-down agreement was to provide for an orderly stand-down, and that -- and that meant enabling their customers to operate without issue during the stand-down period.

Q. (By Mr. Nemelka) But those security enhancements did affect Authenticom, right?

MS. GULLEY: Objection; form.

A. I -- I'm not aware.

Q. (By Mr. Nemelka) They were intended to, right?

MS. GULLEY: Objection; form.

A. No. Again, our security enhancements are -- are not specifically aimed at any individual entity. The problem is, we can't, because when we see things happening, people coming into our system, we don't know who they are and -- and we can't track who they are. And therefore, unless they have put in their user ID, something that identifies them, we don't know who they are.

Q. (By Mr. Nemelka) After you entered into this agreement with CDK, you started to approve some -- strike that.

After you entered into the agreement with CDK, you believed that the logic had shifted somewhat with respect to pricing that you offered dealers who were coming on board, right?

MS. GULLEY: Objection; form.

A. I -- I disagree with that. I think that our -- our position, as far as negotiating the discounts and whatever raised all the time. And it depends a lot on the overall macroeconomic situation that we're facing nationwide or, specifically, what the -- the certain

states, certain market areas go through periods of tougher times, discounting various -- all over the point.

Q. (By Mr. Nemelka) The logic had shifted somewhat due to you getting the CDK RCI business, right?

MS. GULLEY: Form.

A. I don't believe that's the case at all. I think that -- since I'm the one that's personally in charge of -- of approving this percentage discounts, they're part of the market conditions. The -- our competitors go through cycles. If you can watch, for instance, CDK -- CDK in the month or two before their year-end -- their fiscal year-end, they'll be much more aggressive in discounting.

Other competitors have other, you know, closing of sales quota deadlines. And they get really aggressive just before the deadline, because they're trying to, you know, meet their quotas so they get their bonuses. And that's the drivers behind percentage discounts.

(Exhibit 648 marked for identification?)

Q. Mr. Schaefer, I've handed you Plaintiff's Exhibit 648 --

MS. GULLEY: Brockman.

MR. NEMELKA: Sorry. Mr. Brockman. What

did I say? Schaefer?

Q. (By Mr. Nemelka) Mr. Brockman, I've handed you Plaintiff's Exhibit 648. And the email I'm focusing on is your email dated Thursday, May 7th, 2015 to Agan, where you write, "The logic has shifted somewhat due to us getting the CDK RCI business (and soon to get Authenticomas [sic] well)." Do you see where you wrote that?

MS. GULLEY: Form.

A. Yes, I do.

Q. (By Mr. Nemelka) And then you wrote, "A deal with numbers of dealerships will have a number of additional RCI 3rd parties where we get that revenue if we have those dealership's DMS systems." Do you see that?

MS. GULLEY: Form.

A. Yes, I do.

Q. (By Mr. Nemelka) So the logic had shifted a little bit, because now you're going to be getting the additional RCI revenue if the dealers are using your DMS, right?

MS. GULLEY: Objection; form.

A. I don't think this has anything to do with the percentage discounts on deals. This is obviously talking about customers.

Q. (By Mr. Nemelka) Right. DMS customers; correct?

A. Yes.

Q. If you turn to the next page, I believe that Mr. Agan is asking you for your approval at the bottom. "Are you okay with a 55.38% discount?"

MS. GULLEY: Form.

Q. (By Mr. Nemelka) Do you see where he says that?

A. I see that --

MS. GULLEY: Objection; form.

A. -- but I'm -- I'm reading the rest of it to see what, in context, that's all about. Could you repeat your question, please?

Q. (By Mr. Nemelka) Sure. Mr. Agan asked you if you would approve of 55.38 percent discount for this dealer that you were trying to sign; correct?

MS. GULLEY: Form.

A. That's correct.

Q. (By Mr. Nemelka) You approved it, because the logic had shifted somewhat, due to you getting the CDK RCI business and Authenticom's as well, right?

MS. GULLEY: Objection; form.

A. I think I've already, you know, said that those two sentences you said, that I see them.

Q. (By Mr. Nemelka) Okay. Your contract with CDK -- you can set that aside Mr. Brockman -- your contract with CDK required Reynolds to take over all of CDK's existing third-party relationships, regardless of size; isn't that right?

MS. GULLEY: Form.

A. Third-party relationships where they were, you know, hacking our systems, that's when I was talking about.

Q. (By Mr. Nemelka) "Third parties," meaning the vendors to whom CDK was providing Reynolds dealer data, right?

MS. GULLEY: Form.

A. Yes, that's correct.

Q. (By Mr. Nemelka) You also wanted to take every Authenticom customer that came to you, regardless of size; correct?

MS. GULLEY: Objection; form.

A. I -- I don't think that's correct.

(Exhibit 649 was marked for identification.)

Q. (By Mr. Nemelka) I've handed you what I've marked as Plaintiff's Exhibit 649, which is an email chain between you and Tommy Barras and Bob Schaefer. And the email I want to focus on, Mr. Brockman, is the

one that you sent on Friday, August 21st, 2015, at the bottom, to Tommy Barras, where you write, "We also want to take every Authenticom customer that comes to us, regardless of size." It's at the bottom of that page. Do you see that?

MS. GULLEY: Objection; form.

A. I think what's going on here is in -- as the -- our agreement with CDK requires us to take over all their existing third-party relationships. That's an integral part of this stand-down.

Generally speaking, you know, we're not interested in just anything, as far as size is concerned. You know, small dealers are not, you know, what our target market is. You know, we're -- we live more in the larger dealer -- or larger group marketplace. And so therefore, you know, the comments as far as Authenticom is concerned, you know, they all relate to size more than anything else.

Q. (By Mr. Nemelka) You wrote here, "We also want to take every Authenticom customer that comes to us, regardless of size"; correct?

MS. GULLEY: Objection; form.

Q. (By Mr. Nemelka) Very bottom, last -- the last thing on the page.

MS. GULLEY: Objection; form.

Q. (By Mr. Nemelka) You wrote that; correct?

MS. GULLEY: Form.

A. Yes, I did. But I think that that was at -- at a point in time that that's not been our policy ongoing, regardless of size -- to take people -- take customers that are -- regardless of size. You can look at our -- our customer base, you know, we're predominantly larger dealerships.

Q. (By Mr. Nemelka) Authenticom customers are the -- are not dealerships. They're -- they're ven- -- they're vendors, right?

MS. GULLEY: Form.

Q. (By Mr. Nemelka) Well, they're both, but the customers you're talking about here are the vendors that need access to dealer data, right?

MS. GULLEY: Form.

A. Yeah, but I think the -- certainly, you know, those types of customers vary greatly in size as well.

Q. (By Mr. Nemelka) And so if -- if a vendor is small and doesn't serve that many dealers, you're not interested in -- in serving them, then?

MS. GULLEY: Form.

A. It's a matter of priority. We have, you know, great development resources, but all development resources are not without limit. And therefore, from

time to time, we get really busy and we get really behind. And therefore, our -- our appetite for, you know, small situations, you know, varies.

Q. (By Mr. Nemelka) In fact, after this agreement with CDK, you had a lot of -- a lot of work to bring on all of the former CDK customers into the RCI program, right?

MS. GULLEY: Objection; form.

A. That's correct.

Q. (By Mr. Nemelka) You wrote that you had a mountain of work ahead of you, with over 100 RCI customers to convert, right?

MS. GULLEY: Form.

A. I believe at one point in time, that I -- I made that statement because that was the case.

Q. (By Mr. Nemelka) And by mid-2017, two years later, Reynolds had successfully converted many of those former CDK vendors into the RCI program, right?

MS. GULLEY: Form.

A. I'm not sure about that specific date. But I do know we made steady progress and... (Pause.)

(Exhibit 650 was marked for identification.)

Q. (By Mr. Nemelka) I've handed you Plaintiff's Exhibit 650, which is an email from Tommy Barras to you,

dated Friday, July 7th, 2017. Who is Tommy Barras?

MS. GULLEY: Form.

A. Tommy Barras is head of our -- our software group.

Q. (By Mr. Nemelka) And he wrote to you about CDK vendors that moved into the RCI program, right?

A. That's correct.

Q. And he writes, "Bob, In 2015 you challenged DEV" -- what is DEV, a development?

A. Development.

Q. Software development?

A. Yes.

Q. -- "and DSV" -- is that data services?

A. That's correct.

Q. -- "(Schaefer) with absorbing 157 CDK vendors into the RCI program." Do you see that?

A. That's correct.

Q. Now, these are not vendors that CDK owned. These are former CDK customers, right?

MS. GULLEY: Form.

A. That's correct. These -- these are companies that had been employing CDK to enter our system as, you know, hackers.

Q. (By Mr. Nemelka) And as part of the wind-down, CDK worked with you to transition those customers to

Reynolds so that they could join the RCI program; correct?

MS. GULLEY: Objection; form.

A. That's correct.

Q. (By Mr. Nemelka) And it was CDK's access to the Reynolds system on behalf of those customers that you protected during that five-year wind-down period, correct?

MS. GULLEY: Objection; form.

A. That's correct.

Q. (By Mr. Nemelka) You asked Mr. Schaefer to calculate the amount of revenue that Reynolds was supposed to realize out of this agreement with CDK, right?

MS. GULLEY: Objection; form.

A. I don't know that I asked that specifically of Bob Schaefer.

Q. (By Mr. Nemelka) You asked -- you asked somebody on -- on your team to calculate the amount of revenue that Reynolds was supposed to realize out of the CDK deal, right?

MS. GULLEY: Objection; form.

A. I don't recall who that was, but it may well have -- it may well have occurred.

Q. (By Mr. Nemelka) Regardless of who it was, you

made that request. You wanted to know how much Reynolds -- how much -- the amount of revenue that Reynolds was supposed to realize out of the deal, right?

MS. GULLEY: Objection; form.

A. That's correct. We -- we had -- as I think we've -- before lunch, I talked about the fact that we had -- CDK had cost us a lot of -- a lot. And, you know, we were hoping to make back these, you know, third-party vendors coming directly to us through the RCI program as opposed to going through CDK. That was our way to ultimately dig out of the hole, you know, from a -- a money standpoint that we had been put through by CDK.

Q. (By Mr. Nemelka) You testified earlier they cost you millions in this form of -- market -- market messaging about data security and losing dealer customers, right?

A. It's cust- --

MS. GULLEY: Objection; form.

You just have to let him finish his question and then you can answer.

A. That consists of the revenue we lost by customers that we should have been able to sell but couldn't sell, or customers -- which was the -- the more minor group, customers that actually left us because

Case 4:21-cr-00009 Document 1-3 Filed on 01/04/21 in TXSD Page 398 of 771

of -- because of security.

Q. (By Mr. Nemelka) And those customers you're referring to are the dealers, not --

A. That's right.

MS. GULLEY: Objection; form.

Just -- just -- for the court reporter and for the record, he'll ask his question and then you answer.

MR. NEMELKA: We're doing okay, but --

Q. (By Mr. Nemelka) And -- excuse me -- your team did calculate the val- -- the amount of revenue that Reynolds was supposed to realize out of the CDK deal, right?

MS. GULLEY: Form.

A. I see that you're referring to documents that I'm not -- I'm not having the opportunity to look at.

Q. (By Mr. Nemelka) Well, I'm just wondering -- you remember if you made this request, and your team did actually make that calculation; correct?

MS. GULLEY: Objection; form.

A. Yes, I believe they did. It looks like -- if that's what you're looking at. It's not being shared with me, which -- which I find, you know, a little unusual.

Q. (By Mr. Nemelka) All right. I'm just trying

Case 4:21-cr-00009 Document 1-3 Filed on 01/04/21 in TXSD Page 399 of 771

to get -- get through this efficiently. I'm not trying to do anything else.

MS. GULLEY: Objection to the statement.

Q. (By Mr. Nemelka) Okay. Well, then, let's do --

MR. NEMELKA: 69.

(Exhibit 651 was marked for identification.)

Q. (By Mr. Nemelka) I truly am only going to show you that one part about the -- this is a big, long document -- I'm only going to show you -- or ask you about the part that we just talked about, which is the team calculating the value of the CDK deal with you. If you intend on reading this whole thing, then I'll just skip. So I'm --

THE WITNESS: What's that about?

MS. GULLEY: I object to everything you just said: Statements, instructions, et cetera. But first of all, can you at least hand it to him?

Q. (By Mr. Nemelka) I'd like to mark Exhibit -- Plaintiff's Exhibit 651, which is an email from Craig Moss to you, Mr. Brockman, dated Friday, August 25th, 2017, the subject being "July 2017 Financials." Do you see that that's the subject, at least, of this?

MS. GULLEY: Form.

Q. (By Mr. Nemelka) Mr. Brockman?
MS. GULLEY: Form.
A. If I can just kind of leaf through what -- what this... (Pause.)
This appears to be part of our confidential internal financial information. And so, therefore, it's okay that I don't have to read every page of it.
Q. (By Mr. Nemelka) Thank you. So you received monthly financials like this from Mr. Moss?
MS. GULLEY: Form.
A. They're not financial statements. They're management reports concerning the finances. That's the technically accurate description.
Q. (By Mr. Nemelka) And this is one from July 2017, that you received?
MS. GULLEY: Form.
A. Yes.
Q. (By Mr. Nemelka) And if you could turn with me to Page 17. There you are. On the bottom-highlighted part, which is how it was produced to us -- you see the bottom-highlighted part that says, "We are expecting an annual revenue of approximately $30 million (original $21M, plus additional dealers, added interfaces and price increases, etc) generated from the CDK Deal."
A. Yeah, that means that --

MS. GULLEY: Objection; form.

A. -- in 10 to 12 years, we might break out.

Q. (By Mr. Nemelka) What do you mean by that?

MS. GULLEY: Form.

A. Well, as -- as I've stated before, CDK's position, as far as hacking our customers, has cost us millions. And, you know, based upon this amount of money, we got a ways to go.

Q. (By Mr. Nemelka) The annual revenue, though, is 30 million, that they calculated, correct?

MS. GULLEY: Objection; form.

A. That's what it says.

Q. (By Mr. Nemelka) And that includes added interfaces, which means additional RCI customers, right?

MS. GULLEY: Form.

A. No. I don't think that -- "additional interfaces" means additional datasets that third parties would want out of Reynolds systems.

Q. (By Mr. Nemelka) That they were getting from CDK before?

MS. GULLEY: Form.

A. No. It's kind of like pitter-patter, like the rain. Either OEMs or various third parties want more data or different types of data, and it's not related to the -- the stand-down agreement at all. It's just part

of their, you know, their desire for more data.

Q. (By Mr. Nemelka) And now that they're customers of Reynolds, you get the financial benefit of that; correct?

MS. GULLEY: Form.

A. That's correct.

Q. (By Mr. Nemelka) I skipped one. "Plus additional dealers," meaning -- what -- what does that mean?

MS. GULLEY: Objection; form.

A. Well, what I believe that means is -- and that's that there's constant movement as far as ownership of dealerships. And if we have a group that has dealerships in it and they're all on Reynolds, if that dealer buys another dealer, so they -- he now has 11, what's going to happen is -- and that's if that dealer is not already on Reynolds -- he's going to convert to Reynolds, likely, and vice versa.

If there's a group of -- of ten dealerships, all of which are on CDK, and they buy another dealership that's on Reynolds, you know, the odds are very, very, very high that that dealership will be converted to CDK. And all that has some impact on what's going on in the world.

Q. (By Mr. Nemelka) And then you list price,

here -- what is listed here is price increases. So price increases for -- for DMS and RCI?

MS. GULLEY: Objection; form.

A. It's just -- it's part of our standard pricing-based process.

Q. (By Mr. Nemelka) But the price increases here would have referred to price increases for DMS, right?

MS. GULLEY: Objection; form.

A. Our price increase policy covers all -- all products, you know, all services.

Q. (By Mr. Nemelka) What is your price increase policy?

MS. GULLEY: Objection; form.

A. It is -- you know, typically CPI plus 2, which represents the normal rate of CPI plus those things that cost us extra, because we're in the high tech business. Principally, salaries.

Q. (By Mr. Nemelka) So you -- so for your DMS business, your standard price increases every year is CPI plus 2 percent?

A. That's correct.

MS. GULLEY: Form.

Q. (By Mr. Nemelka) And for -- okay.

And this 30 million is an annual number, it's not -- you said over 10 to 12 years. That -- that

30 million is not over 10 to 12 years. That 30 million is an annual number, right?

A. That's not what I meant at all. When I say that CDK has cost us in the millions, I'm not talking about the 30 or 40 or 50 million, I'm talking in the hundreds of millions, over time. And, you know, so it takes a while before $30 million worth of revenue out of this particular situation even begins to make up for what they've done.

Q. You said 10 to 12 years, so 30 times 10, about 300 to $360 million?

A. Absolutely.

MS. GULLEY: Objection; form.

A. Absolutely.

Q. (By Mr. Nemelka) Is what CDK cost you as a result of them -- their data access on the Reynolds system?

A. Yeah, and the fact that they badmouthed, you know, our process, I think, unjustifiably. And they -- and they did that, you know, high and wide, you know, in the -- in the market.

Q. Badmouthing your data access policies in the market; is that right?

MS. GULLEY: Objection; form.

A. That's correct.

Q. (By Mr. Nemelka) CDK doesn't badmouth your data access policies anymore, does it?

MS. GULLEY: Objection; form.

A. It's not been as prevalent as it was before.

Q. (By Mr. Nemelka) That badmouthing large- -- largely stopped after you entered into this agreement with them, right?

MS. GULLEY: Objection; form.

A. Again, I have no way of measuring that.

Q. (By Mr. Nemelka) It wasn't just CDK and Authenticom that you wanted to get -- get rid of. You wanted to get rid of all independent data integrators that dealers were using for automated access to the Reynolds -- Reynolds system; correct?

MR. RYAN: Object to form.

A. I -- I definitely want to eliminate, you know, completely, you know, all automated access to Reynolds systems. It's -- it is a classic security breach.

Q. (By Mr. Nemelka) Could Reynolds -- could CDK access your system today with their independent integrators?

MS. GULLEY: Objection; form.

MR. RYAN: Objection; form.

A. When you say "independent integrators," I don't recognize that term.

Q. (By Mr. Nemelka) Meaning DMI and Integra Link!.

MS. GULLEY: Objection; form.

A. The people -- the guys that are in the hacking business, the bandits?

Q. (By Mr. Nemelka) Yeah.

A. Yeah, I don't know. As I've said before, you know, security is a cat-and-mouse game, and it could well be that they, you know, figured out some new way, and it's -- where I -- it's not discernible to us who it actually is. It could be in there today and -- because that's the nature of it, of -- of the situation.

You know, somebody on the outside figures out a new way to come in. We don't know who it is. You know, we figure out how to block it. You know, the only way we know for sure, you know, was when somebody squawks.

Q. One of the independent integrators was StoneEagle; correct?

MS. GULLEY: Objection; form.

A. Yes.

Q. (By Mr. Nemelka) I've handed you Plaintiff's Exhibit 652.

(Exhibit 652 was marked for identification.)

Q. (By Mr. Nemelka) This is an email from you to Mr. Schaefer, dated April 14, 2016. And your question is: "Bob, When do we get rid of StoneEagle?" And that's referring to not allowing them to access dealer data on the Reynolds DMS anymore, right?

MS. GULLEY: Objection; form.

A. That -- that's correct. We are -- we are now, finally -- you know, StoneEagle has joined the RCI program, and they had to make a -- a number of changes in their software, and all that's been accomplished. And they're now a -- in a peaceful situation as far as we're concerned. They're -- they're in the RCI program. They're getting their data. They're getting their business done.

Q. (By Mr. Nemelka) For a while, Reynolds had been protecting their access to the -- to -- to the system; correct?

MS. GULLEY: Objection; form.

A. It -- it is -- it is typical in the situation where we have a -- a -- a party, which is doing like StoneEagle was, which is, basically, hacking in. And they say, "Oh, well, we're sorry. We'll do better. We'll sign up for RCI." And they do, but they don't get it done. They -- they don't -- they don't make the changes in on their side that's necessary for them to

access through the RCI program, and so they linger in this, you know, this -- this in-between mode. And, you know, of all the -- the one's where that issue came up, StoneEagle was the worst. And it is with a sigh of relief that that's fixed, done, over with.

(Exhibit 653 was marked for identification.)

Q. (By Mr. Nemelka) I've handed you Plaintiff's Exhibit 653, which is an email from you to Mr. Schaefer, dated Wednesday, April 19, 2017, where you write to Mr. Schaefer, "Bob, Give them written notice that we will shut down their current method of access for security reasons on June 1, 2017." And that referred to StoneEagle; correct?

A. That first email doesn't say that it's StoneEagle, but I believe in context with the second email, it does indicate that it is StoneEagle.

Q. And up to the time, and for -- for several years, their method of access had been protected while they were applying for the RCI program, right?

MS. GULLEY: Objection; form.

A. That's correct.

Q. (By Mr. Nemelka) And their method of access was -- I'm sorry, Mr. Brockman.

A. I don't understand their method of access. It

was their method. They -- they were doing it all on their own. You know, this indicates, you know, what I've been saying all along. We were very, very frustrated by these people. And I think this one line here, which says, "I think its 2 years now we've been strung out......." -- we were not happy.

Q. Mr. Brockman, in 2015, you asked Mr. Schaefer about -- questions about the state of affairs before Authenticom got cut -- got shut off. You wanted to know how many DMS providers' data does Authenticom provide Reynolds. Two, and how many dealerships for each DMS providers was Authenticom serving Reynolds apps with? Do you recall asking Mr. Schaefer to compile that information?

MS. GULLEY: Objection; form.

A. Not specifically, but I would -- not be unusual for me to ask that.

(Exhibit 654 was marked for identification.)

Q. (By Mr. Nemelka) Mr. Brockman, I've handed you Plaintiff's Exhibit 654, which is an email from Mr. Schaefer to you, dated Friday, November 20th, 2015. I will give you a chance to look at it, but your email to him starts the chain on the back page.

A. I'm looking on the back page. If you recall,

earlier today, I mentioned the term "ReminderTrax."

Q. Mm-hmm.

A. It's a -- it's a service reminder program for dealerships, to remind their -- their customers to come back in and have oil changed or other routine preventative maintenance. And I said that, you know, that was a very minor thing that was going on, and it talks -- right here, it says, "16 CDK dealers," which, in the scope of things, is -- is a very, very small situation.

Q. Mr. Sch- -- Brockman, if you look at the first page, though, it's identified "ReminderTrax." There's 199 CDK connections that Authenticom provides. Do you see that?

MS. GULLEY: Objection; form.

A. Can you point that one out to me?

Q. (By Mr. Nemelka) Sure.

A. I'm not --

Q. Right there (indicating).

A. Okay.

MS. GULLEY: Objection; form.

A. Okay, I stand corrected.

Q. (By Mr. Nemelka) And what's listed here are the various Reynolds applications -- are the -- are the columns, MMS, AIMDATA, ReminderTrax, IMN and so

forth, right?

MS. GULLEY: Form.

Q. (By Mr. Nemelka) Those are the columns?

MS. GULLEY: Form.

Q. (By Mr. Nemelka) Is that right?

MS. GULLEY: Form.

A. Okay. Would you repeat that again?

Q. (By Mr. Nemelka) Sure. These datas along these -- companies along the top, MMS, AIMDATA, ReminderTrax, IMN, Xtream, OnlineD and KeyTrack, those are Reynolds applications; correct?

A. Correct.

Q. And on the left are the DMSs that dealers use; correct?

A. Yes. Okay. I -- I understand that now.

Q. And what this is showing is the connections that Authenticom provides to the dealers using these DMSs; correct?

MS. GULLEY: Objection; form.

Q. (By Mr. Nemelka) For -- for these various applications?

MS. GULLEY: Objection; form.

Q. (By Mr. Nemelka) Is that correct?

MS. GULLEY: Form.

A. For instance, if he looks at the CDK line,

that's where the 199 number is. And I -- I'm afraid I'm not getting what you're trying to get at as far as this -- this chart is concerned.

Q. (By Mr. Nemelka) All right. Well, just -- what Mr. Schaefer is reflecting here are the number of -- he's answering your question, which is: "What DMS provider's data does Authenticom provide to us? How many dealerships are there from each DMS provider?" Those are the questions that you asked on the email that we looked at, right?

MS. GULLEY: Form.

A. You -- you keep referring to the CDK line. What's that got to do with Authenticom?

Q. (By Mr. Nemelka) These are the CDK -- numbers of -- that the dealers that use CDK for whom Authenticom is providing access to that data for these Reynolds applications.

MS. GULLEY: Objection; form. Is that a question?

Form.

Q. (By Mr. Nemelka) If you look back at your que- -- at your email, you say, "Bob, Questions on the state of affairs before Authenticom got shutoff....." Do you see that? Your email to Mr. Schaefer?

A. Yes.

Q. And you say, "What DMS provider's data does Authenticom provide to us?" Do you see that?

A. Yeah, but, you know, you keep referring to the CDK line, and that's not the Authenticom line.

Q. Right. But -- but your question was: How many dealerships are there from each DMS provider that Authenticom provides you with access?

A. Okay. But --

MS. GULLEY: Objection; form.

A. Okay. But the point that I'm -- I'm not -- I'm not getting is -- is what does Authenticom have to do with the CDK line on -- on this -- on this chart? These are -- it appears to me, that these are dealership's data that CDK is providing to ReminderTrax. For instance, that 199 number. ReminderTrax is -- is the Reynolds application, and the 199 is -- is the dealerships that -- where CDK has been -- has been serving up -- up to that application. Authenticom is -- is not related to that line.

Q. (By Mr. Nemelka) Well, we can ask Mr. Schaefer what he did here. My understanding was that he is providing with you the number -- he's answering your questions, which is: "The state of affairs before Authenticom got cut off," "What DMS provider's data does Authenticom provide to us?" and "How many dealerships

are there from each DMS provider" for that?

MS. GULLEY: Objection to that.

A. Okay.

MS. GULLEY: There's no question.

A. I -- I understand the question. I just don't see where that answer is -- the CDK line on the first page.

Q. (By Mr. Nemelka) Okay. We'll ask Mr. Schaefer about that. You can put that aside.

Mr. Schaefer, are you aware --

MS. GULLEY: Mr. Brockman.

MR. NEMELKA: I'm sorry. Strike that.

Q. (By Mr. Nemelka) Mr. Brockman, are you aware that -- that Reynolds has an ERA DMS expiration opportunity close date list with respect to dealer customers?

MS. GULLEY: Objection; form.

A. An ERA EXT?

Q. An ERA DMS expirations and opportunity close dates.

MS. GULLEY: Objection; form.

A. I'm -- I'm not familiar with any kind of list with that kind of nomenclature. We've got lots of lists, but...

Q. (By Mr. Nemelka) All right. A list of those

dealers that have DMS contracts coming up for renewal within the next six months?

A. Okay. You're talking about, you know, contract expiration.

Q. Yes.

A. Okay. Okay, I understand that term.

Q. And Reynolds keeps a list of those dealers that are coming up for renewal in six months, right?

A. That's right.

Q. And Reynolds has protected those dealers who use independent integrators like Authenticom from any type of interference with that during that six-month window; correct?

MS. GULLEY: Form.

A. I -- I think we have done some of that. I don't know that policy is still in place, but I know as part of the -- the process of unwinding hacker-type kind of relationships, that what we've done is, is we've -- we've taken measures to keep the things quiet from a customer's standpoint while we're in -- you know, contract renewal negotiation process.

Q. (By Mr. Nemelka) And then once you close on that contract, then you stop that dealer from using the independent integrators, right?

MS. GULLEY: Objection; form.

A. I think at that point in time, we -- we recommend more -- more strongly that they -- that they look at their -- their data security policies.

Q. (By Mr. Nemelka) After closing of the contract?

MS. GULLEY: Objection; form.

A. It's an opportune time for that discussion to occur.

Q. (By Mr. Nemelka) And if they want to continue to use independent integrators after the closing of the contract, did you -- did you let them?

MS. GULLEY: Objection; form.

A. Not over a long period.

Q. (By Mr. Nemelka) Mr. Brockman, what is syscheck? Syscheck, s-y-s-c-h-e-c-k?

MS. GULLEY: Form.

A. I understand about this one. The -- the operating system that we use on the computers that operate the Arrow system -- it's Linux -- and Linux has an interesting attribute in that -- let's say you have a 30-user system. Linux will allow you to start running 30 -- what we call "batch jobs." This will be, like, end-of-month, general ledger, schedules, parts ordering, that sort of thing.

What's happens is -- and that's that the

customer is -- is allowed to, unknowingly, kind of step off into a hole where response time is going to be terrible throughout the whole system because they let too many things get going.

And what -- what this is -- is this typically is a battle between the accounting department and the parts and service departments. Because the accounting department's end-of-month, they have all manner of big, long, huge reports they want to run, and they can basically gobble the capacity of the -- of the server completely so that the people in the parts department, when they're doing -- they're selling parts, printing invoices, whatnot, service advisors are writing repair orders and printing service invoices -- their response time is terrible.

So there is a -- a place inside the Linux operating system where you can go and interrogate and see how busy the whole system is. And syscheck, what it does is in essence that it goes and checks that area, you know, meter -- think of it as a meter -- checks that meter to see how busy things are. Things are too busy, it will not let somebody -- a user start a batch job, because if they do, they're going to destroy, you know, response times for the parts department and the service department. That's what syscheck is all about. It

works really good.

Q. (By Mr. Nemelka) And you wrote that syscheck would be a way that we randomly cause Authenticom some grief. How would you cause Authenticom grief through syscheck?

MS. GULLEY: Objection; form.

A. Because the -- they run batch jobs in order to, you know, get their -- get their business done, and syscheck does not know that it's -- it's -- it's Authenticom doing things. All they know is that somebody is asking for a batch job and the system is already too busy.

(Exhibit 655 was marked for identification.)

Q. (By Mr. Nemelka) I've handed you Plaintiff's Exhibit 655, which is an email from you to Tommy Barras, dated August 15, 2017. And the subject of the email is "Great day," and he's giving you an update on exemption numbers; correct?

A. That's correct.

Q. And these exemptions are user IDs that Reynolds had exempted for various data access points; correct?

MS. GULLEY: Form.

A. That's correct.

Q. (By Mr. Nemelka) And what he says is, "Today

is a good day from the security standpoint. Number of exemption dropped from 932 to 526 in one week." So as -- in August 14, 2017, you still had 932 exempt user IDs, but that dropped to 527 in one week? Is that what he's saying here?

MS. GULLEY: Form.

A. That's correct.

Q. (By Mr. Nemelka) And then, at the end he writes, "Been a long road but we went from 12,000[+] exemptions at the beginning to just over 500 ten years later." Do you see that?

MS. GULLEY: Form.

A. Yes, I do.

Q. (By Mr. Nemelka) And then you respond, "I agree - it has been a long pull - good to get there." Right?

MS. GULLEY: Form.

A. Umm... (Pause.)

Q. (By Mr. Nemelka) Your email at the very top?

A. Okay. Yes. That -- that's what it says. It has been a very long haul.

Q. All right.

A. A long haul. And frankly, by now -- it's now down -- I think it's 300 or less.

Q. Today?

A. Today, uh-huh. I will not be completely happy until it's zero.

Q. And these exemptions are the protected user IDs, right?

MS. GULLEY: Objection; form.

A. That's correct.

Q. (By Mr. Nemelka) Mr. Brockman, you believed that for vendors to truly make their apps work, they're going to require RCI interface forever from Reynolds, and the equivalent from CDK as well, right?

MS. GULLEY: Form.

A. I -- I think that would depend entirely on the type of interface. And by that, there is -- there are certain interfaces that are what we call "batch jobs." And -- you know, these are situations where our reporting software will, you know, with ease, you know, create the data extracts that the dealer's looking for for these types of -- of batch jobs, where they can -- they can run that batch job, you know, themselves and send it off themselves to whoev- -- you know, we -- there's no restriction on that.

But if they want it to be done conveniently and happen every day with hands off, or whatever, that's where RCI interface takes place.

Now, there's -- there's a second type of

interface which is where the third party is -- is asking something to be done within our software. And the classic example of that is Xtime. You know, Xtime, in order for their software to work, they have to be able to create reservation records. And they have to be able to look at, you know, service history.

Those types of applications, since they're actually part of our software, in order -- you know, for their application to -- to work, you know, their RCI to work, they got to keep doing it forever. As long as Xtime does what Xtime does, you know, they have to do it within our system.

Q. (By Mr. Nemelka) And what if they were to get cut off by Reynolds? What -- what -- how would they -- how would they operate?

MS. GULLEY: Objection; form.

A. Well, since their -- their -- their stuff actually runs inside our software, you know, they would basically be unable to use our software to accomplish, you know, what they do today.

Q. (By Mr. Nemelka) You believe that the Reynolds DMS product is -- is a sticky product, right?

MS. GULLEY: Objection; form.

A. I don't think I've ever used that term in relationship to the DMS. I've used that -- that term in

relationship to specific products. By "stickiness," what I mean is -- is they're so advantageous to the dealership from a financial standpoint that they would be -- they would have to think hard about changing to another DMS provider.

Q. (By Mr. Nemelka) And what you're referring to is the collection of the DMS, along with docuPAD and the other applications, as you were describing, that form the -- the retail management system; correct?

MS. GULLEY: Objection; form.

A. That's -- that's close. Okay? That's not exactly correct, but it's pretty close.

Q. (By Mr. Nemelka) Okay. So finish it for me. What did I miss?

MS. GULLEY: Form.

A. Well, we talk about stickiness in regards to specific products, like docuPAD, for instance. You know, we don't refer to the RMS itself as being -- which is the collection of everything -- as being sticky. We talk about specific products.

MS. GULLEY: Were you done with your answer?

THE WITNESS: Yeah.

MS. GULLEY: Okay.

MR. NEMELKA: I wasn't starting to ask a

question.

Q. (By Mr. Nemelka) And you believe that the value in your sticky products is so huge as to overcome any economic advantage offered by CDK and Cox in their offerings; correct?

MS. GULLEY: Objection to the form.

A. I believe that statement to be correct.

Q. (By Mr. Nemelka) Let's go off the record.

THE VIDEOGRAPHER: This is the end of Media 2. The time is 2:34 -- I'm sorry, 2:35 p.m. We're off the record.

(Short recess 2:35 to 2:50 p.m.)

THE VIDEOGRAPHER: This is the beginning of Media 3. The time is 2:50 p.m. We're back on the record.

(Exhibit 656 was marked for identification.)

Q. (By Mr. Nemelka) Mr. Brockman, I just wanted to show you the document where you made that statement about stickiness. It's Plaintiff's Exhibit 656.

MS. GULLEY: I object to the statement.

Q. (By Mr. Nemelka) This is an email that you sent to Keith Hill, Tuesday, November 28, 2017. Do you see that?

MS. GULLEY: Objection; form.

A. Yeah, November 28th, 2017?

Q. (By Mr. Nemelka) Yes.

A. Yes.

Q. And the second sentence says you -- or third sentence -- whatever -- second line of your email is, "The value in our sticky products is so huge as to overcome any economic advantage offered by CDK and Cox." Do you see that?

MS. GULLEY: Objection; form.

A. And what I'm talking about is -- and that's you take, for instance, docuPAD. Average increase in gross profit per sale -- per new unit sold, docuPAD, is right at $200. If you take a -- a typical finance manager will do 70-plus transactions a month. That's $14,000 a month worth of additional gross. Now, if you got -- if you got five finance managers, that's 14,000 times 5. The numbers are crazy.

And that's -- the -- the stickiness issue is -- we're not, you know -- no, we're not putting sticky stuff on people. It's -- it's the additional gross profit to the dealership is -- is compelling.

And -- and, you know, you perhaps have seen, you know, in Automotive News, where we run ads. These are direct quotes from people that you can call on the phone where they say, you know, "Reynolds product,

docuPAD, pays my entire bill."

Q. (By Mr. Nemelka) And they have to have the Reynolds DMS in order to use docuPAD; correct?

A. That's correct.

Q. So that helps with the stickiness of the Reynolds DMS; correct?

MS. GULLEY: Objection; form.

A. That's correct.

Q. (By Mr. Nemelka) Okay. You can set that aside.

Mr. Brockman, my last few questions are just about your -- your email accounts. You -- you've seen that we have an email account for -- for your Reynolds business, right?

A. I only have one email account, period.

Q. You don't have -- do you have any other -- do you have, like, a Gmail account?

A. No.

Q. The only email account you use is the -- is the single Reynolds?

A. That has all of my personal data in it.

Q. And -- so all of your personal emails go through your -- your Reynolds email account as well?

A. Yeah, I'm -- I've been planning now for several months to change that, but it is -- you know, the

notification of senders is a big issue. And I haven't been able to find the time to bite down and get that done.

Q. And so do you have a doc- -- do your emails get preserved -- that -- for your Reynolds email account?

MS. GULLEY: Objection; form.

A. They are all being preserved, at this point.

Q. (By Mr. Nemelka) And were they preserved back in 2016, 2015?

MS. GULLEY: Objection; form.

A. My retention was somewhere between six -- six months and a year. Now, based upon how full my Outlook.pst file was getting -- and I get mountains of email. I mean, I spend half my life looking at email. And I don't smile at this, because I'm not intending it to be a joke, it's real.

In our organization, there's a lot of hunting, and a lot fishing goes on. And, you know, in my organization, almost all my friends are inside the organization, and we're hunting and fishing buddies, and we swap fish pictures and hunting pictures. And they're 10 meg, and they're high res, and a good fish picture deserves a really high res picture, and all that takes up space. And so therefore, I -- I find that I have to go back and delete --

Q. (By Mr. Nemelka) Do you have a laptop that you use for business-related matters?

MS. GULLEY: Form.

A. I just have one computer.

Q. (By Mr. Nemelka) And is that a -- is that a laptop?

A. Yes.

Q. And do you download your email on to the laptop?

A. Correct.

Q. And did you do that back in 2016, 2015?

A. I've always done it that way.

Q. And do you have your emails backed up -- your historical emails backed up, then, on that laptop?

A. No. I don't. When -- when the things get purged, I'm -- I'm a -- still the old school. I -- I confess, it's perhaps my age; I like paper. And so anything that's -- that's worth keeping long term is printed and put in a file.

Q. So you print out your emails and documents that are worth preserving and they're put in files?

A. Yes.

Q. Okay. Has Reynolds ever issued any external backup drive to either back up your -- your laptop?

A. No. They did not.

Q. Apart from printing them out, do you print them out yourself or do you have your assistant print them out?

A. I do it myself.

Q. Are those files kept at your home or in your office at Reynolds?

A. At home.

Q. Do you use any other method, besides that printout, to back up your emails or documents?

A. No.

Q. Do you use any tablets or mobile phones?

A. I have a mobile phone.

Q. Mobile phone. Any tablets?

A. No.

Q. And did your attorneys provide you with a litigation hold notice?

MS. GULLEY: Objection; form.

A. Yes, they did.

MR. NEMELKA: All right. I have no further questions today.

MS. GULLEY: Okay. Let's go off.

THE VIDEOGRAPHER: This concludes today's proceeding for Mr. Robert Brockman. The time is 2:56 p.m., and we're off the record.

(Deposition adjourned at 2:56 p.m.)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| | ) | |
| IN RE: DEALER MANAGEMENT | ) | MDL NO. 2817 |
| SYSTEMS ANTITRUST | ) | |
| LITIGATION, | ) | CASE NO. 18 C 864 |
| | ) | |

REPORTER'S CERTIFICATION

ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN

January 16, 2019

Volume 1

I, SHAUNA L. BEACH, Certified Shorthand Reporter in and for the State of Texas, do hereby certify to the following:

That the witness, ROBERT BROCKMAN, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(e)(1) that the signature of the deponent:

_X_ was requested by the deponent or a party before the completion of the deposition and is to be returned within 30 days from the date of receipt of the transcript. If returned, the attached Changes and

Signature Page contains any changes and the reasons therefor;

___ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys to the action in which this proceeding was taken. Further, I am not a relative or employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

Subscribed and sworn to on this

25th of January, 2019.

Shauna L. Beach

____________________________________

SHAUNA L. BEACH, RDR, CRR, CSR #8408

Expiration Date: 12/31/2019

In Re: Dealer Management Systems Antitrust Litigation v.

Robert Brockman

INSTRUCTIONS TO THE WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

3185059

In Re: Dealer Management Systems Antitrust Litigation v.

Robert Brockman

E R R A T A

\- - - - -

PAGE LINE CHANGE

___ ___ ____________________

Reason:______________________________________

___ ___ ____________________

Reason:______________________________________

___ ___ ____________________

Reason:______________________________________

___ ___ ____________________

Reason:______________________________________

___ ___ ____________________

Reason:______________________________________

___ ___ ____________________

Reason:______________________________________

___ ___ ____________________

Reason:______________________________________

___ ___ ____________________

Reason:______________________________________

3185059

In Re: Dealer Management Systems Antitrust Litigation v. Robert Brockman

ACKNOWLEDGMENT OF DEPONENT

I, ______________________, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

__________ ________________________

DATE SIGNATURE

3185059

**&**

**&** 1:20 2:4,14 3:9 8:8,18 9:4,6 32:16 66:2

**0**

**0.008** 18:21
**0.08** 18:18
**00242098** 6:4
**00242099** 6:4
**00261635** 5:22
**00569545** 5:13
**00569547** 5:13
**01535307** 5:19
**01535308** 5:19

**1**

**1** 1:11 143:13 164:11,21
**1,000** 101:4
**1/6/2015** 6:3
**10** 7:9 136:2 138:25 139:1,10 139:10 161:22
**100** 2:10 129:11
**10119** 2:22
**106** 6:2
**107** 6:6
**10:25** 54:24 55:1
**10:50** 55:1,2
**10th** 38:12
**11** 6:7 107:24 111:12,12 137:16
**11/25/2013** 5:12
**1100** 1:20 2:4 8:9
**111** 6:9
**11:37** 87:6,8
**11:50** 87:8,10
**12** 6:12 26:8 79:18 136:2 138:25 139:1,10
**12,000** 154:9
**12/31/2019** 165:17
**123** 6:11
**1250** 3:21
**126** 6:15
**129** 6:18
**12:01** 95:1,3
**12:02** 95:3,5
**12:38** 120:15,17
**13** 111:12,12
**134** 6:21
**14** 5:21 7:3 142:2 154:3
**14,000** 159:14,16
**141** 7:2
**143** 7:5
**144** 7:9
**14th** 92:7
**15** 7:13 47:13,19 153:17
**153** 7:12
**157** 130:15
**158** 7:15
**16** 1:10 145:8 164:10
**1615** 2:15
**164** 4:6
**165** 4:7
**16953** 165:15
**16th** 1:16 8:3
**17** 135:19
**1731** 10:8
**18** 1:4 111:15 164:4
**19** 5:5 7:6 143:10
**1963** 14:11
**1970** 15:1
**1980s** 15:18
**1981** 19:21
**199** 145:13 147:1 148:15,16
**1990s** 15:18
**1999** 3:4
**19th** 2:21 32:18
**1:42** 120:17,18

**2**

**2** 4:2 66:22,25 67:3,22 74:20 87:10 138:14,20 144:5 158:10
**2.8** 16:11
**20** 5:9 57:22 80:4 80:5,20 81:1
**200** 159:13
**2000** 56:15
**20005** 3:22
**20006-1101** 3:4
**20006-6801** 2:10
**2000s** 15:18
**20036** 2:16
**2006** 16:3,6
**2007** 5:5 32:6,18 38:12
**2012** 44:12 45:4 46:3 51:3
**2013** 5:9 57:22 59:11 63:25 64:1 64:16
**2014** 5:22 74:8 82:16,25 83:20 87:16 92:7,8 106:17
**2015** 6:7,12,16 7:9 57:4,13 82:12 106:9,10,14 107:24 111:15 124:4 127:1 130:8 144:7,22 161:9 162:11
**2016** 7:3 142:2 161:9 162:11
**2017** 6:19,22 7:6 7:13,16 51:7 129:16 130:1 134:23,23 135:15 143:10,13 153:17 154:3 158:23 159:1
**2019** 1:10,17 8:3 164:10 165:12
**2099** 2:9
**20th** 144:22
**21m** 135:23
**21st** 127:1
**22** 6:16
**23rd** 74:8
**25** 5:2 6:22 64:15
**25th** 63:25 64:1 134:22 165:12
**27** 5:3
**28** 7:16 158:23
**2817** 1:3 164:3
**28th** 159:1
**29th** 44:12 45:4
**2:34** 158:10
**2:35** 158:10,12
**2:50** 158:12,14
**2nd** 82:12,16 87:15

**3**

**3** 158:14
**3-4** 60:5
**30** 82:25 135:22 136:10 138:24 139:1,1,5,7,10 151:21,22 164:21 164:24 166:16
**300** 139:11 154:24
**30th** 82:20 83:20
**3185059** 166:24 167:24 168:24

**32** 5:5
**333** 10:4
**350** 3:21
**360** 139:11
**3rd** 51:21 52:21 54:1 81:5 82:4 99:13,15 100:2 102:3,4 103:4 109:10 118:2 124:13

**4**

**4** 68:21
**4.5** 112:9 113:25 115:9,19 116:2,19 116:21 118:8,20 118:23 119:10
**4.5.** 112:9
**40** 79:11 139:5
**400** 2:15
**44** 5:6
**442** 38:9
**45** 47:13

**5**

**5** 109:9 118:1 159:16
**50** 139:5
**500** 154:10
**501c3** 21:23
**526** 154:2
**527** 154:4
**5300** 1:21 2:5 8:9
**55.38** 125:6,16
**57** 5:8

**6**

**6** 106:9,10
**6.1** 118:14,15
**600** 100:21
**63** 5:11
**636** 5:2 25:25 26:3
**637** 5:3 27:8,11
**638** 5:5 32:12,15 32:15
**639** 5:6 44:5,8
**640** 5:8 57:17,18
**641** 5:11 63:19,22
**642** 5:15 74:2,3
**643** 5:18 82:8,9
**644** 5:21 92:2,3 103:17 104:6
**645** 6:2 106:4,7
**646** 6:6 107:20,23 117:19
**647** 6:9 111:2,4
**648** 6:11 123:21,23 124:3
**649** 6:15 126:20,23
**650** 6:18 129:22,25
**651** 6:21 134:7,21
**652** 7:2 141:23,24
**653** 7:5 143:6,9
**654** 7:9 144:18,21
**655** 7:12 153:13,16
**656** 7:15 158:16,20
**69** 134:6

**7**

**7** 6:19
**7/2/2014** 5:19
**70** 159:14
**74** 5:15
**75** 23:25
**77002** 1:21 2:5 8:10
**77024** 10:4
**7th** 124:4 130:1

**8**

**8** 18:18
**8/10ths** 18:23,25 19:5
**82** 5:18
**8408** 165:17
**864** 1:4 164:4

**9**

**9** 4:5
**90s** 18:5
**92** 5:21
**932** 154:2,3
**96** 17:4,25
**98** 19:11,11
**9:30** 1:17 8:3
**9th** 32:18

**a**

**a.m.** 1:17 8:3 54:24 55:1,2 87:6 87:8,10
**ability** 63:9 72:19 79:7
**able** 42:10,17 91:2 100:8 101:1 132:23 156:4,5 161:2
**aboard** 79:16
**abrupt** 46:19
**absolute** 43:22
**absolutely** 139:12 139:14
**absorbing** 130:15
**accept** 56:23
**access** 25:16,20 26:13 30:3,8,14,16 30:17,21 31:7,12 31:15 35:11 37:9 37:15 42:2,11 45:25 46:3,10 47:23 48:11 56:1 56:5 60:2 61:5,8 61:25 62:3 63:2,3 63:14 66:5 68:10 68:18 71:20 72:22 74:25 75:21,23 76:3,9,10,16 77:22 80:3,5,18,21,23 81:1 82:5 84:6,10 87:21 88:1 96:9 98:12 99:3,5 100:9,14 101:2 109:10,15 110:19 112:10,22 113:19 114:2,2,7 115:2,9 115:11,13,16,17 115:23 116:6,10 116:22 117:1,14 118:2 119:2,4,12 121:11,16 128:15 131:5 139:16,22 140:2,13,17,20 142:4,16 143:1,12 143:19,23,25 147:16 148:7 153:22
**accessed** 54:11 84:5,9
**accessing** 41:2,12 43:25 47:5 87:20 88:3,8,22 99:9 108:17 110:5
**accomplish** 113:18 156:19
**accomplished** 120:5 142:10
**accomplishing** 116:20
**account** 160:13,15 160:17,19,23 161:5
**accounting** 89:15 101:7 105:5 152:6 152:8
**accounts** 160:12

**accurate** 135:13 166:19
**accurately** 35:5
**achieve** 101:1
**acknowledged** 94:8
**acknowledges** 28:22
**acknowledgment** 168:3
**acquire** 79:7 88:13
**acquired** 16:3 88:18
**acquisition** 16:17 34:3 43:16 87:22
**acquisitions** 104:9
**act** 78:21
**acting** 51:21 52:21 54:1
**action** 165:7,10
**active** 47:13 105:17
**ad** 89:22 90:1
**add** 26:21 41:6 73:10
**added** 109:8,9 117:25 118:1 135:23 136:13
**additional** 124:13 124:20 135:23 136:14,16,17 137:8 159:15,20
**address** 10:3 47:17 93:8
**addresses** 56:24
**adjourned** 163:25
**admit** 97:24
**adp** 34:6,6,11,12 34:17 36:14 40:22 43:7 44:12,19,22 44:23 50:9 51:22 52:22 54:1 64:17 65:11,12,20 68:14 69:20 70:8 75:16 76:24 77:3,9,24 78:9 79:10 80:3 80:14,16,18,24 81:19 82:6 84:4 88:3,6,8 89:2 96:3 96:18 97:6 99:12 99:16,23 100:2,9 101:13 103:5 119:17
**adp's** 34:24 35:16 66:8 71:16 77:17
**ads** 159:23
**advanced** 105:19
**advantage** 77:10 77:14 78:25 105:21 158:4 159:7
**advantageous** 157:2
**advantages** 104:12
**advertisement** 26:6,20
**advisors** 152:13
**affairs** 144:8 147:23 148:23
**affect** 121:16,25
**affiliate** 112:18
**affiliation** 8:16
**affirmatively** 47:21
**afraid** 147:1
**afternoon** 120:22
**agan** 6:12 124:4 125:5,15
**age** 162:17
**agency** 89:22 90:1
**agent** 49:25 50:1,6 50:8 51:22 52:22 53:4,5 54:1
**agents** 51:20 52:13 52:16 53:25 54:4 54:8
**aggressive** 123:14 123:17
**aggressively** 62:24
**ago** 12:22 26:8 79:19 86:19
**agree** 25:6,15 35:14 60:17 70:18 91:19 109:15,22 112:1 113:5,12 115:2 117:16 154:15
**agreed** 56:9 110:19 112:14 114:8 117:14
**agreeing** 110:3 113:21 114:16 116:11
**agreement** 5:6 6:9 44:13,19 46:14,15 46:16,18 50:16 51:23 52:23 53:2 54:3 57:5,8 58:15 58:18 65:10 88:5 89:4 91:25 96:5,8 99:23 100:1,19 101:2,5,17,21 110:2,14 111:5,7 114:24 115:7 118:14 119:12 121:3,9,13,20 122:14,16 127:8 129:4 131:13 136:25 140:6
**agreements** 91:20
**agrees** 112:17
**agulley** 2:6
**ahead** 102:10 129:11
**aimdata** 145:25 146:9
**aimed** 122:6
**allow** 25:20 26:13 30:8 31:8,13,16 55:20 58:18 60:2 68:17 151:21
**allowed** 42:2 86:11,18 152:1
**allowing** 35:10 69:17 142:4
**amount** 86:12,25 97:7 131:12,19 132:2 133:11 136:7
**andi** 9:4 12:3 33:8 43:1 86:21 103:20 104:3
**anenen** 5:19 38:12 38:23,25 40:4 44:24 45:15 46:22 47:4,9,17 48:6 74:16 81:23 82:12 82:13,20,25 83:23 84:20 85:4 86:17 87:15 88:7 106:14 107:2
**angered** 61:1
**angry** 120:10
**annual** 39:14,20 92:16 135:22 136:9 138:24 139:2
**answer** 13:3,7,11 13:13,14 17:16,23 20:14 32:16 33:20 34:23 48:13 53:10 53:18 55:25 56:7 93:15 96:16

102:10,11 110:9 132:21 133:8 149:6 157:22
**answering** 13:22 110:16 113:7,15 147:6 148:22
**answers** 47:21 91:14 168:7
**antitrust** 1:4 8:5 164:4 166:1 167:1 168:1
**anybody** 12:6,15
**anymore** 140:2 142:5
**anytime** 50:20
**apart** 163:1
**apparent** 99:21,22
**appearance** 8:15
**appearances** 4:2
**appearing** 2:19
**appears** 135:5 148:13
**appetite** 129:2
**application** 48:23 89:17 105:13,18 148:16,18 156:9
**applications** 29:2 29:5 30:2 49:10 66:18 80:5,15 103:6 105:5,7,16 105:23 106:1,2 145:24 146:11,21 147:17 156:7 157:8
**apply** 62:17
**applying** 143:20
**appointed** 20:5,11 21:4
**approach** 66:3 77:18
**approached** 96:3 96:7,19,19
**appropriate** 86:21 166:7
**approval** 125:5
**approve** 122:14 125:16
**approved** 125:20
**approving** 123:9
**approximately** 23:25 26:8 34:2 43:16 135:22
**apps** 144:12 155:8
**april** 7:3,6 142:2 143:10
**area** 21:10 24:5 99:1 152:19
**areas** 70:17 105:13,21 123:1
**armageddon** 71:15
**arrived** 79:18
**arrow** 151:19
**article** 5:5 32:16 32:19 33:3
**ascertain** 61:20
**aside** 27:3 28:15 63:1,18 71:6 126:2 149:9 160:10
**asked** 34:6 53:11 94:5,5 98:23 99:2 110:3 117:18 125:15 131:11,16 131:18,18 144:7 147:9
**asking** 68:14 86:16 93:3 101:11 103:25 110:17 118:6 125:5 144:13 153:11
156:1
**aspen** 10:20 92:8
**assign** 112:18
**assist** 112:21
**assistance** 59:23
**assistant** 163:2
**associate** 55:17
**associated** 100:12
**association** 39:12
**assumption** 77:7
**atlantic** 3:21
**attach** 38:16
**attached** 1:23 39:6 40:13 164:25 166:13 168:10
**attachment** 38:16 40:15
**attempted** 114:2 115:17
**attention** 27:17 91:17
**attorney** 11:15 12:7 94:14 118:10 165:9 166:16
**attorneys** 1:9 5:10 5:17,23 6:8,13,17 6:20,23 7:4,7,10 7:14,17 11:12 12:4 95:10,11 119:19,20 163:15 165:7
**attractive** 40:7 41:21
**attribute** 151:20
**august** 6:16,22 7:13 16:3 127:1 134:22 153:17 154:3
**aundrea** 2:3
**authenticom** 2:12 8:19 31:4,8,11 42:17 48:22 49:9 49:15,24 50:1,5,8 50:15 51:2,7,12 54:11 72:3,13 75:20 88:4,9,23 89:4,12,18 90:8,24 91:6,20,24 121:25 126:16 127:3,17 127:20 128:9 140:11 144:9,10 144:12 145:13 146:17 147:7,13 147:15,23 148:2,4 148:7,11,18,24,25 150:11 153:3,4,10
**authenticom's** 125:22
**authenticomas** 124:7
**authority** 20:21 23:4 64:17,24 65:11,16,20 69:5 69:19 70:8
**authorized** 70:24 71:2 76:3
**auto** 39:12
**autoloop** 2:12 8:20
**automated** 31:13 35:11 63:3,14 140:13,17
**automotive** 2:12 5:5 8:19 23:11 32:16,19,25 33:14 33:24 34:5 159:23
**avenue** 2:9
**average** 159:11
**avoid** 81:20
**avoidance** 113:25
**aware** 51:9,15 54:19 61:22 63:13 63:16 65:6 90:13

90:16 118:7 121:7 122:2 149:10,13
**awhile** 35:2,19

**b**

**baby** 69:12
**back** 32:6 33:16 55:3 74:9,18 82:18 86:21 87:10 95:4,23 100:25 117:13,18 120:19 120:19 132:8 144:24,25 145:5 147:21 158:14 161:8,25 162:11 162:24 163:9
**backed** 162:13,14
**background** 69:10
**backup** 162:24
**badmouth** 140:1
**badmouthed** 139:18
**badmouthing** 139:22 140:5
**ban** 98:9
**bandit** 58:19 72:11
**banditry** 98:10
**bandits** 56:11 57:10 58:3 66:10 69:13 71:25 83:25 120:3 141:5
**bank** 20:10,11
**barras** 6:15,19 7:12 18:15 126:24 127:2 129:25 130:1,3 153:16
**barrier** 58:6
**barriers** 58:5
**base** 128:7
**based** 19:17 136:7 138:5 161:12
**basically** 68:19 74:24 80:24 88:17 110:1 142:21 152:10 156:19
**basis** 58:8 70:16 72:8
**batch** 49:22,24 50:7 151:22 152:22 153:7,11 155:14,18,19
**battle** 152:6
**beach** 1:18 8:13 164:13 165:17
**beat** 103:9
**beautiful** 120:25
**becoming** 68:24
**beginning** 87:9 154:10 158:13
**begins** 139:8
**behalf** 8:12,13,19 8:24 9:2,14 52:12 53:6 54:9 99:10 109:10,16 111:8 118:2 131:6
**belief** 77:18 121:8
**believe** 17:24 18:7 19:9 33:2 40:7 41:12 59:8,8 78:16,20,22 88:13 88:19 102:20 110:24 115:7 116:24,24 117:3 117:11 123:7 125:4 129:14 133:21 137:11 143:16 156:21 158:2,7
**believed** 78:2 122:17 155:7
**believes** 112:22
**belong** 97:5
**belonging** 37:9
**belongs** 28:8,23
**ben** 3:10 8:11
**beneficiaries** 21:12 22:2
**beneficiary** 21:25
**benefit** 137:3
**bermuda** 19:18 20:10,12 21:16
**best** 13:1 43:21 98:2
**better** 60:5 142:22
**beyond** 86:20
**big** 92:21 134:10 152:9 161:1
**bill** 160:1
**billion** 16:11
**bit** 23:9 33:10 117:8 124:19
**bite** 161:2
**bitter** 79:9
**blanking** 12:10
**bliley** 78:21
**block** 74:25 75:6 75:15 79:24 80:1 141:15
**blocking** 71:20
**blocks** 58:6
**board** 122:19
**bob** 5:8,18 6:6,15 6:18,21 7:2,6,9,12 7:16 38:11 63:23 64:16 65:10 107:23 126:24 130:8 131:17 142:3 143:11 147:22
**bonuses** 123:19
**boss** 26:16
**bottom** 59:14 95:24 108:18,20 125:5 127:2,4,23 135:19,21
**bought** 101:2
**breach** 140:18
**breaches** 90:14
**break** 13:18,21 14:1 54:23 95:7 136:2
**breaking** 75:10
**brice** 2:3 9:6
**bring** 129:5
**brockman** 1:8,13 4:4 5:2,8,18 6:6 6:15,18,21 7:3,6,9 7:12,16 8:4 9:12 9:17,21,25 17:3,19 18:9 23:10 26:3 27:12 30:10 32:17 32:18,25 33:14 36:19 38:8,11,19 40:20 44:8,16 45:24 53:22 55:6 56:16 57:21 59:5 63:24 65:10 67:3 70:7 72:2 74:5,11 82:21 84:4 86:15 86:22 87:14 88:21 94:10 95:7,18 101:10 102:12 103:2 106:10 107:24 108:8,24 109:5 111:3,13 115:14 116:2,4 117:20 118:21 120:22 123:24,25 124:2 126:2,25 134:22 135:1 143:24 144:7,20 145:11 149:11,13

151:14 155:7 158:18 160:11 163:23 164:9,16 166:2 167:2 168:2
**brother** 21:15
**brought** 68:16
**brown** 3:3 9:13
**bruns** 1:20 2:4 8:8 9:4,7
**bryce** 12:3
**buddies** 161:20
**build** 119:20
**building** 100:23
**bullet** 26:11 45:24 49:21 65:9 87:19 96:2 97:2 99:11 101:20 103:15
**business** 14:9 24:12 25:7 28:4,8 28:23 32:7 34:25 35:17 40:23 43:24 49:7 68:20 77:3 78:9 81:24 90:21 91:2 101:3 112:19 123:5 124:6 125:22 138:16,19 141:5 142:14 153:8 160:14 162:2
**businesses** 87:21
**businesspeople** 12:12
**busy** 43:18 129:1 152:18,21,21 153:12
**buy** 80:16 137:20
**buys** 137:15
**bwilkinson** 2:6

**c**

**c** 1:4 2:1 3:1 8:1 151:15,15 164:4
**calculate** 131:12 131:19 133:11
**calculated** 136:10
**calculating** 134:13
**calculation** 133:19
**call** 44:25 45:3,7 46:21,23,25 47:11 47:12,19 48:18 73:15 74:23 151:22 155:14 159:24
**called** 11:6 15:25 16:2,20 19:25 30:24 36:18 46:23 46:24 53:25 56:25 71:17 86:4 101:3
**calling** 60:9
**calls** 59:22 120:11
**capabilities** 71:12 71:19,20
**capacity** 152:10
**car** 15:10 38:2 66:17 67:23
**cards** 49:13 80:15 80:19 89:6,14
**carefully** 166:5
**case** 1:4 41:25 56:13 69:24 85:13 88:1 97:25 111:20 123:7 129:15 164:4
**cases** 61:21 75:11 75:15,17
**cash** 16:12 22:17
**cat** 79:22 141:8
**caught** 105:24
**cause** 1:16 71:14 153:3,4 165:9
**causing** 58:7 62:20
**cavalier** 76:6
**cdk** 3:2 5:13,13,19 5:19 6:4,4 9:14 12:4 23:17,20 32:1,5 34:6,13 35:21 36:2,11,18 36:18 37:2 38:25 39:21,25 40:16,22 42:3,10,11,15,23 43:3,23 46:6,7,7 46:16 47:4 48:10 49:17 50:16 54:12 57:3,12 61:11,24 63:13,23 64:24 65:5,6 70:25 71:7 73:6,21 77:14 78:12,24 80:21 81:15 84:8 88:22 91:21 96:3,7,13,19 98:6,9 99:5,18 100:5 101:5,6 102:16,17 103:12 108:11,16 109:15 109:19 110:5,19 111:5 112:2,14,17 113:13 114:4,7 115:2 117:14 121:2,10 122:14 122:17 123:5,12 123:12 124:6 125:21 126:2,3,11 127:8 129:5,6,18 130:5,15,18,19,22 130:25 131:13,21 132:7,10,13 133:12 134:13 135:24 136:20 137:20,23 139:4 139:15 140:1,10 140:19 145:8,13 146:25 147:12,14 147:15 148:4,12 148:14,17 149:6 155:10 158:4 159:7
**cdk's** 31:18,20,22 32:8 35:8 56:4 82:14 89:5 98:12 99:3,4 121:16 126:4 131:5 136:5
**cease** 46:1,11 47:24
**center** 59:23
**central** 106:2
**ceo** 22:25 23:3 26:25 38:25 82:14
**certain** 122:25 123:1 155:14
**certainly** 29:4 35:15 40:3 43:7 51:11 73:24 85:12 97:5 109:18 119:23 128:17
**certificate** 4:7
**certification** 164:8
**certified** 30:25 80:18 84:15 103:10 164:13
**certify** 164:15,20 165:5 168:5
**cetera** 134:18
**chain** 5:8,11 6:2,6 6:11,15 7:5,12,15 106:9 126:24 144:24
**chairman** 22:25 23:3 26:25
**challenged** 130:8
**chance** 67:12 74:8 82:13,17 85:24 87:1 93:16 108:2

116:4 144:23
**change** 35:2,20,21 36:2,11 160:25 167:5
**changed** 36:18 145:5
**changes** 4:6 35:25 35:25 36:16 112:1 142:9,25 164:25 165:1 166:12 168:9
**changing** 157:4
**characterization** 60:24 61:3 68:1 71:24
**characterize** 29:3 40:2 50:19
**characterizing** 102:21
**charge** 80:3,23,24 99:13 100:2,12,14 102:3,3,4,16,18 123:9
**charitable** 17:3,19 17:21 18:9 19:2,7 22:7,9,11,13
**charities** 21:16,19 21:20,21,22
**chart** 147:3 148:12
**check** 62:24
**checks** 152:19,20
**cherry** 3:7 9:8,8 12:3,11
**chevy** 38:2
**chief** 23:20
**choose** 25:16,20 26:12 30:7,13
**christopher** 60:25
**cid** 5:13,13,19,19 6:4,4
**circumstances** 58:14
**civil** 1:22
**class** 2:13,18 8:21 8:25 9:2 14:11
**classic** 140:18 156:3
**clean** 91:4,12
**clear** 51:7 73:11 80:7 82:2 91:15
**clearly** 53:2 59:3 84:17
**client** 11:15
**clients** 68:5 86:14
**close** 149:15,19 150:22 157:11,12
**closing** 123:16 151:4,10
**code** 62:23
**cohen** 2:8 9:10,10
**collaborative** 66:3
**colleague** 8:22
**collect** 52:12 53:6 54:9
**collecting** 50:2 98:22
**collection** 50:21 68:18 157:7,19
**collector** 52:18
**collects** 50:8
**college** 14:9
**colorado** 10:21
**columns** 145:25 146:3
**combined** 97:8
**come** 75:13 141:14 145:4
**comes** 119:20 127:3,20
**coming** 73:2 122:8 122:19 132:9
150:1,8
**comma** 88:25
**comment** 82:4 85:19 91:2
**commenting** 41:18
**comments** 127:16
**committing** 108:16
**communicate** 102:1
**communicated** 58:12
**communication** 11:15
**communications** 105:7
**companies** 60:8 130:21 146:9
**company** 2:2,7 3:8 9:11 14:14 16:4 16:15,19,22,24 17:4 19:11,25 20:1,8,10,16 22:22 43:17 88:14,15 95:12
**company's** 23:5
**comparisons** 101:8
**compelling** 159:21
**compete** 42:17 114:1,20,21 116:13,15
**competitive** 105:21
**competitor** 23:18
**competitors** 42:1 42:16 79:9 123:11 123:15
**compile** 144:13
**complaining** 99:15 103:3
**complaint** 85:10
**completely** 56:18 73:3 76:1 86:7 140:17 152:11 155:1
**completion** 164:23 165:4
**comply** 33:8
**component** 24:7
**computer** 15:2,6 16:20,21,25 17:12 162:4
**computers** 151:18
**conception** 42:23
**concerned** 84:1 98:10 127:13,17 142:12 147:3
**concerning** 135:12
**concluded** 73:6 121:2
**concludes** 163:22
**concur** 88:25
**conditions** 123:10
**confess** 118:10 162:17
**confidential** 1:9 5:10,13,14,17,20 5:20,23 6:4,5,8,10 6:13,17,20,23 7:4 7:7,10,14,17 135:5
**connection** 57:4 101:14
**connections** 145:13 146:16
**connotation** 56:19
**consciousness** 98:1
**consent** 112:24
**consider** 13:7 50:5 52:11

**considerable** 45:9 45:10 105:20
**consideration** 41:5 105:16
**considered** 50:1 65:7
**considering** 43:12 81:14
**consistent** 28:3,6
**consists** 110:2 132:22
**constant** 137:12
**constantly** 100:23
**contains** 165:1
**content** 84:7
**contention** 80:13
**contents** 33:4,24
**context** 92:15,24 93:1 102:20 125:13 143:16
**continue** 48:11 50:15 51:2 58:19 58:22 68:20 69:16 69:17 99:14 103:3 151:9
**continued** 15:19 51:6,12 66:13
**continuing** 55:4 87:12 95:16 108:11 120:20
**contract** 28:17,19 51:21 52:5,7,21 54:1 76:7 84:17 88:4,8,23 126:1,3 150:3,21,23 151:5 151:11
**contracts** 52:17 71:16 76:2,2 111:17 150:1
**contractual** 114:2 114:7 115:8,16
**contrary** 76:1
**contribute** 40:22 41:2 43:24
**control** 10:14 23:24
**controlling** 88:1
**conveniently** 155:22
**convention** 39:14 39:17
**conventions** 39:20
**conversation** 45:14 47:14 64:18 68:16 74:16 83:2 83:7 86:25
**convert** 129:12 137:18
**converted** 129:17 137:23
**core** 106:2
**correct** 12:19 14:9 14:21 16:18,19 17:7 19:1,4,9,13 19:15,16 23:1,2,12 23:15 24:12 25:3 26:17 27:2,5 28:17,20,23 29:2 29:10,20,24 30:5 31:15,18 33:4,25 34:4,7,14 35:12 36:12 37:5,7,10,21 38:4,16,23 39:1,21 40:18,23 41:3,6,16 42:12 43:13 46:5 46:6 48:24 49:4 49:10,18 52:10,13 53:6 54:9 56:5 59:6,11,19 61:11 63:4 64:21,23 65:2 68:12 70:20 73:21 74:11 75:7 75:21 76:11 78:6 78:13 80:21 81:16 82:15,20 83:1,3,5 83:8,10 88:7,21 90:3,18 102:18 104:23 107:8,12 108:12 110:19 111:16 115:17 116:22 117:23 118:24 119:4 121:5,19 125:2,17 125:19 126:14,17 126:19 127:21 128:1 129:9 130:7 130:14,17,21 131:2,4,8,10 132:5 133:19 136:10 137:4,6 138:21 139:25 140:14 141:19 142:7,17 143:14,22 146:11 146:12,14,18,23 150:13 153:19,20 153:22,24 154:7 155:6 157:9,12 158:5,7 160:3,4,6 160:8 162:10 168:6
**corrected** 62:25 145:22
**corrections** 166:5 166:8 168:9
**correctly** 58:13 78:23
**correlates** 61:14
**cost** 77:11 78:3,24 79:1,2 90:23 132:7,15 136:6 138:16 139:4,15
**costs** 99:15 103:4
**counsel** 3:7 8:15 9:8 13:10,11,12 44:10 74:6 86:5 86:11 92:6 165:5
**count** 88:19,19
**couple** 84:5
**course** 24:12
**court** 1:1 8:6,12 9:15 133:6 164:1 166:20
**covenant** 114:1,20 116:13,15
**covenants** 112:17
**cover** 45:20 75:15
**covered** 45:20 93:11
**covers** 31:1 138:9
**cox** 2:12 8:19 158:4 159:7
**cpi** 138:14,15,20
**craig** 6:12,21 134:21
**crazy** 159:17
**create** 56:24 68:3 79:13 155:17 156:5
**created** 19:19 44:19 58:5
**creating** 37:16 45:6 60:19 81:20
**credentials** 37:16 54:16
**crr** 1:18 165:17
**csr** 1:18 165:17
**current** 109:20 143:12
**cust** 132:18
**custodial** 44:11 92:7
**customer** 29:5 59:20,21 60:7

62:20 66:19 78:7 126:16 127:3,20 128:7 152:1
**customer's** 150:20
**customers** 24:24 61:1 68:19 71:16 78:4 79:2,3,6,7 81:21 90:3 99:14 100:9 103:3 120:6 120:7 121:22 124:25 125:1 128:5,9,14,18 129:6,12 130:19 130:25 131:6 132:17,23,24,25 133:2 136:6,14 137:3 145:4 149:16
**cut** 144:9 148:24 156:14
**cycles** 123:11

**d**

**d** 8:1
**d.c.** 2:10,16 3:22
**damn** 119:22
**dan** 6:12
**data** 5:6 6:9 14:24 24:7,12 25:2,6,12 25:16,20 26:12,16 27:20,23,24 28:7 28:12,20,23 30:3,7 30:14,16,21 31:1,2 31:8,12 34:20 35:11 36:19,24 37:9,15,20 40:14 40:17 41:13 42:2 42:3,11 43:13 44:12,19 46:14,15 46:15,18 49:9,12 49:16,17,22,24 50:2,7,10,16,21 52:6,8,12,18,19 53:6 54:9,12 55:21 58:19 61:7 61:25 62:3 63:14 66:5 68:10,18 69:21 70:1,20 72:22 76:11,25 77:4,11,15,19 78:1 78:7 79:1,15,17 80:6,19,21 81:4,8 82:3 83:15,19,25 84:6,18 88:1 90:13 96:9 97:7 98:16,19 111:4 114:3 126:11 128:15 130:13 132:16 136:24,24 137:1 139:16,22 140:2,12 142:5,13 144:10 147:7,16 148:1,14,24 151:3 153:22 155:17 160:21
**database** 24:7
**datas** 146:8
**datasets** 136:17
**date** 16:5,6 44:11 45:6 59:13 83:22 92:7 129:20 149:15 164:24 165:17 166:10 168:14
**dated** 5:5,8,12,19 6:3,7,12,16,19,22 7:3,6,9,13,16 32:17 38:12 57:22 64:15 74:8 82:12 82:25 106:8,10 107:24 111:15 124:4 130:1 134:22 142:2 143:10 144:22 153:17
**dates** 149:20
**day** 1:16 11:18,19 11:21,21,23,23 12:25 22:21,21 120:23 153:18 154:1 155:23
**days** 164:24 166:16
**dc** 3:4
**deadline** 123:17
**deadlines** 123:16
**deal** 16:14 32:17 56:22 58:7 74:20 124:11 131:21 132:3 133:12 134:13 135:24
**dealer** 1:3 8:5 16:20,21 23:10 30:3,21 31:7 34:6 34:11,13,18 37:20 50:10 52:8 60:18 72:14,22 75:24 76:10,14 80:21 125:17 126:11 127:15 128:15 132:16 137:15,15 137:17 142:4 149:15 150:23 164:3 166:1 167:1 168:1
**dealer's** 25:8 155:17
**dealers** 15:15 23:11 24:7,11 25:7,12,15,19 26:15 28:8,9,17,20 29:1 30:7,13,16,21 32:1 34:18 35:9 35:10 37:3,10,14 39:12 42:3 49:4 61:7,19,24 62:3 68:10 75:21 76:2 76:5 98:20 122:18 124:20 127:13 128:20 133:3 135:23 137:8 140:13 145:8 146:13,17 147:15 150:1,7,10
**dealership** 2:18 8:24 9:2 15:10,14 27:25 40:17 41:12 58:13 59:15 80:16 81:9 99:9 100:9 113:20 137:21,22 157:3 159:21
**dealership's** 24:24 124:14 148:13
**dealerships** 15:11 15:21 24:1 61:15 100:21 101:4,5 120:7 124:12 128:8,10 137:13 137:14,20 144:11 145:4 147:8 148:6 148:17,25
**deals** 124:24
**dealt** 61:6
**decade** 77:1
**decades** 84:5 87:20
**decide** 56:23 78:9
**decided** 41:9
**decision** 23:4 93:21
**deemed** 166:19
**defendant** 9:11
**defendants** 36:6
**defended** 86:9,10

**definitely** 98:8 140:16
**degree** 89:1
**delay** 83:24
**delayed** 83:16
**delaying** 83:19
**delete** 161:25
**deliver** 45:17
**departed** 61:16
**department** 152:6 152:12,24,25
**department's** 152:8
**departments** 25:3 152:7
**depend** 155:12
**depends** 22:7 111:20 122:23
**deploy** 71:13
**deponent** 164:21 164:22 165:3 168:3
**deposed** 12:19
**deposing** 166:15
**deposition** 1:8,13 8:4,8 11:10,17 12:13,16 33:9 95:11 163:25 164:9,18,23 165:4 166:4,13,17,18
**depositions** 85:13 86:9
**describe** 38:10 57:20
**described** 41:20 50:23 59:10
**describing** 157:8
**description** 5:1 6:1 7:1 58:14 135:13
**deserves** 161:23
**desire** 86:13 137:1
**destroy** 152:23
**detail** 109:25 119:24
**details** 43:18
**detect** 72:19 73:1
**dev** 130:9,9
**developed** 15:9
**development** 105:8,17 128:24 128:24 130:9,10 130:11
**difference** 80:8
**differences** 80:12 80:13
**different** 16:5,6 17:8 23:14 31:17 31:24 56:18 78:17 136:24
**dig** 132:11
**digital** 69:12
**direct** 52:17 77:8 85:23 86:1,8 159:24
**directly** 51:23 52:5,23 53:3 54:3 82:4 132:9
**disagree** 30:12 60:22 69:23 88:12 122:21
**discernible** 141:10
**disclose** 116:12
**disconnected** 87:5
**discount** 125:6,16
**discounting** 123:2 123:14
**discounts** 122:22 123:9,20 124:24
**discovered** 98:18
**discuss** 65:20 70:16 71:3 92:17
**discussed** 40:23 47:4
**discussion** 47:13 81:19 151:7
**discussions** 48:17 64:17 65:12 69:5 69:8,19 70:8 71:7
**disruption** 66:5
**disseminate** 114:16 115:12
**distribute** 22:1
**distribution** 73:18
**distributions** 22:9 22:11,15
**district** 1:1,1 8:6,7 164:1,1
**division** 1:2 8:7 164:2
**dmi** 37:5,8,15,19 40:22 41:13 43:12 43:24 54:10,16 59:6 60:2 63:2 66:2 68:3,4,9,19 68:24 69:13 75:6 75:19 80:7 81:11 81:24 88:17 141:1
**dms** 23:17,21 24:6 28:17,19 29:2 41:2 43:13,25 48:24,25 49:2,4,18 78:4 79:2,3 99:16 103:5 104:11,25 105:3,17 106:16 108:17 112:10,21 112:23 114:4,4 115:3,23 116:6,22 117:1 119:2,3,12 120:8 124:14,21 125:1 138:2,7,18 142:5 144:10,11 147:6,8 148:1,6,24 149:1,14,19 150:1 156:22,25 157:5,7 160:3,6
**dmss** 23:14 78:11 146:13,18
**dns** 15:24
**doc** 161:4
**document** 26:4 27:10 40:13 43:5 44:9 45:7 46:14 50:23 64:5,7 67:10 83:7 85:12 85:17,17,24 86:3 86:16 92:22 93:3 94:10,14 95:9,14 104:1,2,9 106:11 107:19 110:23 114:25 117:10,13 119:20 120:11 134:11 158:19
**documents** 51:18 85:25 86:13 94:7 97:25 107:10 133:15 162:20 163:9
**docupad** 105:18 157:7,17 159:11 159:12 160:1,3
**dodge** 89:10
**doing** 41:14,18 75:16 78:7 79:22 88:5 89:2,7 96:4 103:24 113:20 120:9 133:9 142:20 144:1 152:12 153:10 156:10 166:9
**doubt** 113:25

**download** 162:8
**downloaded** 101:7
**downs** 66:15
**drafter** 117:11
**drive** 5:4 162:24
**drivers** 123:19
**dropped** 154:2,4
**ds** 23:25
**dsv** 130:13
**due** 123:5 124:5 125:21
**duly** 1:15 9:18 164:16
**duration** 84:7 118:11

**e**

**e** 2:1,1 3:1,1 8:1,1 151:15 164:21 167:3
**earlier** 73:16 81:15 97:18 132:14 145:1
**early** 42:6 96:4
**ease** 155:16
**eastern** 1:2 8:7 164:2
**eat** 67:14
**economic** 158:4 159:7
**effective** 90:23
**effectively** 76:13
**efficiency** 86:1
**efficient** 67:11 93:17 94:6
**efficiently** 12:25 134:1
**effort** 50:22
**efforts** 29:23 66:12
**either** 54:3 136:23 162:24
**electronic** 31:10
**eliminate** 140:16
**email** 5:8,8,11,11 5:18 6:2,2,6,6,11 6:11,15,15,18,21 7:2,5,5,9,12,12,15 7:15 38:11,15,21 38:22 41:22 56:20 56:21,22,24 57:21 58:23 59:14,15,19 62:5 63:22,22,23 63:24,25 64:6,14 64:15,25 65:3,4 70:7 82:11,11,16 82:20,24 83:11,22 84:4,21,25 85:8,18 87:15 106:7,8,9,13 107:2,4,23,25 108:8 124:3,4 126:23,25 129:25 134:21 142:1 143:9,15,17 144:21,23 147:9 147:22,24 153:16 153:17 154:19 158:22 159:5 160:12,13,15,19 160:23 161:5,14 161:14 162:8
**emails** 160:22 161:4 162:13,14 162:20 163:9
**employed** 165:6
**employee** 165:8
**employees** 76:4
**employing** 83:24 130:22
**enables** 113:23
**enabling** 121:21
**encouraging** 105:22
**endeavoring** 89:10
**ended** 100:18
**endurance** 13:18
**engaged** 36:18
**engaging** 48:17
**enhancement** 75:6 105:12
**enhancements** 60:7 71:8,11,13,19 72:16 73:1,10,11 73:15,18,20,24 74:19,24 106:15 106:17,23 107:6 107:14 121:4,15 121:25 122:5
**enter** 130:22
**entered** 30:25 122:13,16 140:6
**entering** 46:16 81:14,23 96:8
**entire** 95:10 116:2 160:1
**entirely** 155:12
**entities** 22:9,11 41:14 97:5
**entitled** 32:16
**entity** 10:13 43:24 122:6
**entrance** 58:16
**envisioned** 46:16 50:14
**equal** 97:8
**equivalent** 155:10
**era** 23:15 149:14 149:18,19
**errata** 166:7,9,12 166:15 168:11
**essence** 152:19
**essentially** 92:24
**established** 72:5
**et** 134:18
**eugene** 17:3,19 18:9
**eventually** 15:9
**everybody** 97:8 105:24
**everybody's** 56:9
**exact** 73:9
**exactly** 24:4 35:25 60:9 61:5 63:10 96:11 157:12
**examination** 4:5 9:19 41:8,24 55:4 87:12 95:16 120:20
**example** 30:22 156:3
**exception** 118:19 119:9
**exceptions** 30:20
**excess** 79:11
**exchange** 6:9 111:4
**exclusive** 68:24
**exclusivity** 68:22
**excuse** 21:18 22:14 28:4 34:12 59:18 86:24 133:10
**executive** 39:25 64:21 65:5,7
**executives** 39:21 95:12
**exempt** 55:12,22 59:1 60:19 62:6,7 62:12,13,21 154:3
**exempted** 153:22
**exemption** 153:18 154:2
**exemptions** 153:21 154:10

155:3
**exhibit** 5:2,3,5,6,8 5:11,15,18,21 6:2 6:6,9,11,15,18,21 7:2,5,9,12,15 25:25 26:3 27:8 27:11,11 32:12,14 38:9 44:5,8 57:17 57:17,18 63:19,22 74:2,3 82:8,9 92:2 92:2,3 104:4,6 106:4,7 107:20,23 111:2,4 115:5 117:18 123:21,23 124:3 126:20,23 129:22,25 134:7 134:20,21 141:23 141:24 143:6,9 144:18,21 153:13 153:16 158:16,20
**exhibits** 5:1 6:1 7:1 11:13
**exist** 43:7 58:20
**existence** 16:1
**existing** 68:5 126:4 127:9
**exists** 43:6 61:17 77:20
**expecting** 135:21
**expediency** 49:15
**expensive** 98:4 99:16 103:4
**expert** 31:25
**expiration** 149:14 150:4 165:17
**expirations** 149:19
**explains** 109:4
**explanation** 106:3
**ext** 149:18
**extend** 66:3
**extensively** 37:13 111:21
**extent** 61:20
**external** 162:23
**extra** 138:16
**extract** 34:19 41:13 80:6 81:4 82:3
**extracting** 40:17 43:13 76:25 81:8 98:17
**extracts** 155:17
**extremely** 43:17 60:4 79:14 90:6
**eye** 3:21
**eyes** 1:9 5:10,17 5:23 6:8,14,17,20 6:23 7:4,8,11,14 7:18 95:10,11

**f**

**face** 66:12
**facilitate** 56:12
**facilities** 30:18
**facing** 122:24
**fact** 12:17 15:13 32:6 46:12,12 65:6 77:19 97:6 98:15,21 110:13 110:18 120:1 129:4 132:6 139:18
**factors** 57:7
**factory** 105:6
**fail** 166:18
**fair** 23:20 85:23 86:1
**familiar** 20:15 21:11 27:7,13,16 28:16 31:20 36:1 57:24 65:8 149:22
**far** 31:15 42:21 84:1 89:2 90:10 96:22 97:6 98:10 118:11 122:22 127:12,17 136:6 137:12 142:11 147:2
**february** 5:5 32:17 57:22 111:15
**federal** 1:22
**feeding** 55:21 58:19
**feel** 93:14
**felt** 98:5 111:21
**figel** 2:14 3:9 8:18
**figure** 79:23,24,25 79:25 103:22 141:15
**figured** 141:9
**figures** 141:13
**file** 44:11,12 74:7 92:8 161:13 162:19
**files** 92:7 162:21 163:5
**final** 115:7
**finally** 119:18 142:8
**finance** 105:6 159:13,16
**finances** 135:12
**financial** 104:12 135:6,11 137:3 157:3
**financially** 165:9
**financials** 134:23 135:9
**find** 60:4 133:23 161:2,24
**fine** 14:2 67:18
**finish** 13:2,22 33:16 42:25 55:15 58:1 86:24 91:14 98:24 102:8 110:16 115:21,24 116:1 132:20 157:13
**finished** 38:18 56:16 57:25 64:10 113:6
**firm** 8:16,18
**first** 9:18 12:23,24 26:11 27:19 29:16 40:3 45:25 46:9 47:3,7 57:8 65:9 68:15 71:23 76:18 79:18,18 84:23 88:13 93:5,21 95:23,24 96:12 103:15,21,23,24 104:1,14 108:7,18 108:20 109:8 111:5,7 112:16 134:19 143:15 145:11 149:6
**fiscal** 123:13
**fish** 161:21,22
**fishing** 161:18,20
**fit** 56:12
**five** 100:14 109:20 110:6 117:14 131:7 159:16
**fixed** 143:5
**fixes** 73:15
**floor** 2:21
**florida** 14:9,14
**focus** 52:4 104:11 104:25 105:22,25 126:25

**focused** 91:8 105:24
**focusing** 124:3
**folks** 59:9
**followed** 42:7 94:1
**following** 76:6 78:22 164:15
**follows** 9:18 83:2
**ford** 14:14,17 38:2
**foregoing** 168:5
**foremost** 57:8
**forever** 109:11,22 110:5,14,18 117:15 118:2 155:9 156:10
**form** 10:6,11,15 10:22 11:1,5,24 17:6,11,22 18:2,6 18:11,14,20,24 19:3,8,12,20,24 20:7,13,18,22 21:5 21:9,14 22:3,6,18 22:23 23:7,23 24:2,9,15,19,21,25 25:4,9,13,17,22 27:6,14 28:1,10,24 29:7,11,14,17,21 30:1,4,11,15,23 31:10,14,19 32:3 32:20 33:1,5,15,21 34:1,9,10 35:6,13 35:23 36:4,13,20 36:25 37:6,11,17 37:24 38:3,13,17 39:22 40:10,19,24 41:4,17,23 42:5,13 42:19 43:4,14 44:2,14,20 45:1,5 45:18 46:17,20 47:1,6 48:4,12,19 49:5,11 50:4,12,17 51:4,8,14,25 52:3 52:9,14,25 53:8 54:5,13,18 55:8,18 55:24 56:6 57:6 57:14 58:24 59:7 59:12,16 60:13,15 60:21 61:12 62:1 62:8,14,18 63:5,7 63:15 64:2,22 65:1,14,19 66:6,21 66:24 67:16,25 68:7,13 69:1,7,22 70:3,21 71:1,10,22 72:4,7,12,18,23 73:8,22 75:4,8,22 76:12 77:6,16 78:5,14,15 79:4 80:9,10,22 81:6,17 81:25 83:4,9,21 84:12 87:23 88:10 88:24 89:13,20,25 90:4,9,15,19,25 91:7,13,22 92:14 93:9,19 96:10,20 97:4,14,22 98:7,14 99:7,19 100:6,16 100:17 101:15,23 102:6,19 103:7 104:17,22 105:2 106:19,25 107:11 108:1,13,19,22 109:3,12,17,23 110:7,10,21 111:9 111:19 112:6,11 112:15,25 113:14 114:9 115:4,10,18 115:22 116:3,18 116:23 117:2,7,17 118:4,9,22,25 119:5,6 121:6,12 121:18 122:1,4,20 123:6 124:9,16,22 125:7,11,18,23 126:6,13,18 127:6 127:22,25 128:2 128:12,16,22 129:8,13,19 130:2 130:20 131:3,9,15 131:22 132:4,15 132:19 133:5,14 133:20 134:25 135:2,10,16 136:1 136:4,11,15,21 137:5,10 138:3,8 138:13,22 139:13 139:24 140:3,8,15 140:22,23 141:3 141:20 142:6,18 143:21 144:15 145:15,21 146:2,4 146:6,19,22,24 147:11,18,20 148:9 149:17,21 150:14,25 151:6 151:12,16 153:6 153:23 154:6,12 154:17 155:5,11 156:16,23 157:8 157:10,15 158:6 158:25 159:9 160:7 161:6,10 162:3 163:17 168:9
**formal** 58:15
**formalize** 66:2
**formalizing** 110:1
**formed** 17:15
**former** 129:6,18 130:19
**forming** 41:16
**forms** 10:18
**forth** 66:19 118:20 119:10 146:1
**fortunate** 101:1
**forwarding** 63:24
**founded** 15:2
**four** 61:2 86:19
**fourth** 97:2 114:23
**fourths** 11:23
**frame** 51:1
**framework** 65:12
**franchised** 23:25
**frankly** 35:1,19 89:8 91:8,16 96:24 105:8 154:23
**frcp** 164:20
**frederick** 2:14 3:9 8:18
**free** 31:9 80:4,20 81:1 84:10 86:3 100:14
**frequently** 39:20
**friar** 10:4
**friday** 57:22 127:1 130:1 134:22 144:22
**friends** 161:19
**front** 87:16 104:3
**frustrated** 144:4
**frustrating** 107:12
**frustration** 107:3
**fuel** 5:3
**fulfilling** 98:18
**full** 9:23 11:21 161:12
**further** 41:8,8,24 48:17 112:1,17 114:18 119:25 163:19 164:20 165:5,8

**future** 66:4

**g**

**g** 8:1
**gain** 114:13
**gained** 113:19
**game** 141:8
**gander** 94:2
**gardner** 5:12 63:23 65:4,5 69:10,11
**gardner's** 69:2,12 70:4,23
**general** 3:7 9:8 24:5 48:2 65:12 70:16,17 71:3 82:1 92:17 98:18 98:19,21,23,25 151:23
**generally** 71:3 127:11
**generate** 24:11 25:7 28:8
**generated** 135:24
**getting** 58:12 83:11 100:14 108:8 123:5 124:6 124:19 125:21 136:19 142:13,13 147:2 148:11 161:13
**giant** 89:3
**gibbs** 1:20 2:4 8:8 9:4,6
**gibbsbruns.com** 2:6,6
**give** 13:2 20:14 32:11 48:15 57:22 64:3 65:21 67:9 67:12 74:8 75:25 82:13,17 93:16 98:2 108:2 116:3 143:11 144:23
**given** 84:4 85:22 86:18 107:10 164:18 168:7
**giving** 64:20 85:24 153:18
**global** 3:2 9:14
**gmail** 160:17
**go** 40:13 43:10 49:20 52:12 53:6 54:8 68:18 76:17 76:18 84:21 87:3 87:5 93:23 94:21 94:24 95:22 102:10 103:2,14 110:23 111:11 112:1,8 117:12 118:13 120:14 123:1,11 136:8 152:17 158:8 160:22 161:25 163:21
**goal** 121:19
**gobble** 152:10
**god** 119:21
**goes** 27:16 60:4 88:15 97:8 116:20 152:19 161:18
**going** 12:25 33:18 43:19 45:7 46:1 46:11 47:24 51:15 56:10,10,11 57:9,9 58:3 68:17 70:18 74:1 75:15 83:25 84:24 85:16 86:25 89:2 92:9 93:1 94:4 99:12,22 100:2,5,8,12,13 101:12,13 102:16 102:17 103:12,12 107:15 111:6 114:13,15,21,21 114:22 116:9 124:19 127:7 132:10 134:9,11 137:16,17,24 145:7 152:2,4,23 155:9
**good** 8:2 9:21 26:21 36:6 105:9 120:22 153:1 154:1,15 161:22
**goose** 94:2
**gotten** 105:9
**graduated** 14:8
**graduating** 14:13
**gramm** 78:21
**grant** 30:21 31:7 32:24 37:15
**granted** 65:11,17 76:8,9 82:5
**granting** 65:17
**great** 58:7 128:24 153:18
**greatly** 128:18
**grief** 153:4,4
**gross** 159:11,15,21
**grossman** 2:20 8:24 9:2
**ground** 12:24 85:14
**group** 56:23 127:15 130:4 132:25 137:13,19
**guess** 18:3 36:15 93:5
**gulley** 2:3 9:4,4 10:6,11,15,22 11:1 11:5,14,24 12:3 17:6,11,22 18:2,6 18:11,14,20,24 19:3,8,12,20,24 20:7,13,18,22 21:5 21:9,14 22:3,6,18 22:23 23:7,23 24:2,9,15,19,21,25 25:4,9,13,17,22 27:6,14 28:1,10,24 29:7,11,14,17,21 30:1,4,11,15,23 31:14,19 32:3,20 32:22 33:1,5,15,21 34:1,9 35:6,13,23 36:4,13,20,25 37:6 37:11,17,24 38:3 38:13,17 39:22 40:10,19,24 41:4 41:17,23 42:5,13 42:19,24 43:4,14 44:2,14,20 45:1,5 45:18 46:17,20 47:1,6 48:4,12,19 49:5,11 50:4,12,17 51:4,8,14,19,25 52:3,9,14,25 53:7 53:12,14,18 54:5 54:13,18,20,23 55:8,14,18,24 56:6 56:16 57:6,14 58:24 59:7,12,16 60:13,15,21,23 61:12 62:1,8,14,18 63:5,7,15 64:2,22 65:1,14,19 66:6,21 66:24 67:16,19,25 68:7,13 69:1,7,22 70:3,10,13,21 71:1 71:10,22 72:4,7,12 72:18,23 73:8,22 75:4,8,22 76:12 77:6,16 78:5,14 79:4 80:9,22 81:6 81:17,25 82:18

83:4,9,21 84:12,22 85:2,6,19 86:4 87:23 88:10,24 89:13,20,25 90:4,9 90:15,19,25 91:7 91:13,22 92:14,20 93:9,19,24 94:11 94:16,20,24 95:6 96:10,20 97:4,14 97:22 98:7,14,24 99:7,19 100:6,16 101:15,23 102:6,8 102:11,13,19 103:7,17,22,25 104:4,7,17,22 105:2 106:19,25 107:11,16 108:1 108:13,19,22 109:3,12,17,23 110:7,10,15,21 111:9,19 112:6,11 112:15,25 113:4,6 113:14 114:9 115:4,10,18,22 116:3,18,23 117:2 117:7,17,22 118:4 118:9,22,25 119:5 119:7,14 120:14 121:6,12,18 122:1 122:4,20 123:6,24 124:9,16,22 125:7 125:11,18,23 126:6,13,18 127:6 127:22,25 128:2 128:12,16,22 129:8,13,19 130:2 130:20 131:3,9,15 131:22 132:4,19 133:5,14,20 134:3 134:17,25 135:2 135:10,16 136:1,4 136:11,15,21 137:5,10 138:3,8 138:13,22 139:13 139:24 140:3,8,22 141:3,20 142:6,18 143:21 144:15 145:15,21 146:2,4 146:6,19,22,24 147:11,18 148:9 149:2,4,11,17,21 150:14,25 151:6 151:12,16 153:6 153:23 154:6,12 154:17 155:5,11 156:16,23 157:10 157:15,21,24 158:6,21,25 159:9 160:7 161:6,10 162:3 163:17,21

**guy** 48:7,14

**guys** 119:19,19 141:4

**h**

**h** 151:15

**hacked** 37:12

**hacker** 72:10 150:17

**hackers** 46:9 58:3 59:10 61:5 66:9 69:13 71:25 79:23 130:23

**hacking** 56:10 57:9 75:14,18 83:25 89:3 97:8 97:16 120:2 126:8 136:6 141:4 142:21

**half** 11:21 34:2 161:14

**halfway** 76:21

**hand** 26:3 74:1 134:19

**handed** 27:10 32:15 38:8 44:7 57:16 63:21 82:7 92:1 106:6 107:22 111:3 123:22 124:2 126:22 129:24 141:22 143:8 144:20 153:15

**hands** 155:23

**hansen** 2:14 3:9 8:18

**happen** 43:10 69:17 76:13 109:18 137:16 155:23

**happened** 61:5

**happening** 46:4 66:8 75:10 83:23 114:12 122:8

**happens** 40:2 58:5 151:25

**happy** 119:22,22 144:6 155:1

**hard** 96:11,22,23 157:4

**hardships** 81:21

**harmful** 78:2

**harwood** 3:10 8:11

**haul** 154:21,23

**hazy** 43:21

**he'll** 133:7

**head** 130:3

**heading** 115:19 116:19,21

**headquarters** 10:18

**health** 13:17

**hear** 44:15

**heard** 55:6

**heated** 89:8,9

**heave** 119:18

**held** 8:8 73:5,19 74:19 106:15

**help** 12:24 29:19

**helped** 79:13

**helping** 66:3

**helps** 160:5

**hereto** 1:23

**hesitate** 92:23

**high** 72:25 137:22 138:16 139:20 161:22,23

**highlighted** 135:19,21

**highly** 1:9 5:10,14 5:17,20,23 6:5,8 6:13,17,20,23 7:4 7:7,10,14,17

**hill** 7:16 158:23

**historical** 31:20 162:14

**history** 88:15,16 156:6

**hmm** 145:2

**ho** 86:10

**hold** 55:14 163:16

**holding** 16:22,24 17:4,12 71:8 75:2 106:18,23 121:4

**holdings** 16:25

**hole** 132:11 152:2

**home** 163:5,7

**hoping** 132:8

**host** 77:4

**hour** 14:1 47:12

**houston** 1:21 2:5 8:10 10:2,4 79:14

**howard** 5:12 63:23 65:4,5 69:2 69:9,11,12 70:4,22
**huge** 152:9 158:3 159:6
**hughes** 2:20 9:1,1
**huh** 12:23 47:21 155:1
**hundreds** 139:6
**hunting** 161:18,20 161:21
**hurt** 78:10
**hypocritical** 60:5 60:18

**i**

**ibm** 14:17 15:1,2
**idea** 42:6 75:11,17 99:12 100:2,20
**ideas** 5:3
**identification** 26:1 27:9 32:13 44:6 57:19 63:20 74:4 82:10 92:4 106:5 107:21 111:2 123:21 126:21 129:23 134:8 141:25 143:7 144:19 153:14 158:17
**identified** 46:8 108:16 145:12
**identifies** 119:11 122:11
**identify** 104:4
**identifying** 26:25
**ids** 55:21 56:13 57:3 59:6 60:1,19 62:6,17 63:13 76:10 121:10 153:21 154:4 155:4
**ignite** 23:15
**illinois** 1:1 8:7 164:1
**imagine** 32:8 34:25 35:17
**imaging** 105:18
**immediate** 51:1
**imminent** 45:8,8
**imn** 145:25 146:10
**impact** 137:23
**impatient** 83:12 83:14,24
**imperative** 166:14
**implication** 50:24
**important** 56:2 66:7 74:23 96:25 113:2
**impossible** 43:20
**impressively** 15:5
**improper** 53:10 67:20 110:22
**improve** 79:17
**improved** 71:12 71:19 72:16,16 79:18
**improvement** 66:14 105:20
**inappropriate** 86:5
**inaudible** 37:1
**included** 98:15
**includes** 106:1 136:13
**including** 37:23 46:6
**income** 22:2
**inconveniences** 61:4
**increase** 138:9,11 159:11
**increases** 135:24 138:1,2,6,7,19
**increasing** 107:3
**independent** 30:22 31:3 32:2 35:11 37:3,4 71:21,24 140:12,20,24 141:18 150:11,24 151:10
**index** 4:1
**indicate** 96:18 143:17
**indicates** 80:12 144:2
**indicating** 105:14 145:19
**indication** 48:16
**individual** 21:2 122:6
**information** 24:23 32:11 33:17 61:16 77:20 89:5,15,16 90:2,3 94:19 101:7 135:6 144:14
**informed** 87:4
**initial** 39:10 40:6 43:8
**initiated** 46:22
**inquiry** 90:11
**insecure** 89:12 90:8
**inside** 77:21 152:16 156:18 161:19
**insisting** 110:4
**instance** 1:14 80:15 105:18 123:12 146:25 148:15 157:17 159:11
**instances** 61:23,23
**instructed** 86:14
**instruction** 67:19 70:14 119:8
**instructions** 70:15 134:18 166:3
**instructs** 13:11,13
**integra** 37:5,8,15 37:19 54:10,16 59:6 63:2 75:7,20 80:7 81:11,24 88:17 141:1
**integral** 127:10
**integralink** 60:2
**integrate** 106:1 112:23
**integration** 112:20
**integrator's** 35:11
**integrators** 30:22 31:4 32:2 37:4,5 71:21,25 72:22 75:7 140:12,21,24 141:18 150:11,24 151:10
**integrity** 114:4
**intellectual** 114:5 116:10,14,16
**intelligence** 101:4
**intelligent** 93:20
**intend** 92:25 93:3 134:14
**intended** 72:1 113:25 114:3,11 114:20 116:8,12 122:3
**intending** 161:15
**intent** 117:11
**intention** 69:16 81:8,23
**intentional** 53:14

**interest** 11:8 18:18 92:17 93:11
**interested** 48:17 127:12 128:21 165:10
**interesting** 75:9 151:20
**interface** 30:25 84:15 103:11 155:9,13,24 156:1
**interfaces** 135:23 136:14,17 155:14
**interference** 150:12
**internal** 90:11 135:6
**interrogate** 152:17
**intervals** 14:2
**interview** 32:24 33:4,13,23,24
**inventive** 79:21
**inventory** 24:17 24:20 29:9,12,13 29:16 105:6
**invoices** 152:13,14
**involved** 15:13 46:18 58:17 90:20 91:1 106:21 109:25
**involves** 50:22
**ip** 114:19,22
**irritated** 79:12
**issue** 31:21 48:13 51:22 52:22 54:2 57:24 58:9,10,10 61:7 62:19 71:23 75:9 77:11,15 79:1 89:1 99:14 103:3 108:6,10,15 109:7 111:22 116:13,16,25 121:22 143:3 159:18 161:1
**issued** 26:7,9 54:16 56:13 57:2 162:23
**issues** 5:15 13:17 47:17 55:11 61:11 61:15 92:17 93:11 98:9 116:25
**item** 71:4
**items** 69:15 70:22

**j**

**j** 2:19
**january** 1:10,17 6:7 8:3 106:8,10 106:14 107:24 164:10 165:12
**jlong** 2:17
**job** 152:22 153:11 155:19
**jobs** 151:22 153:7 155:14,18
**joe** 8:22
**john** 2:20 9:1 12:10
**johns** 19:25 20:16
**join** 131:1
**joined** 14:17 142:8
**joint** 40:16 41:16 42:2,4,10,17 43:12 81:14
**jointly** 68:3 113:21 116:11
**joke** 161:16
**jones** 18:15
**joseph** 3:9
**july** 5:21 6:19 44:12 45:4 82:12 82:16 87:15 92:7 130:1 134:23 135:14
**june** 38:12 74:8 82:20,25 83:20 143:13
**jury** 94:3

**k**

**k** 2:3 3:4 60:25 151:15
**keep** 11:20 24:3 110:6 147:12 148:3 150:19 156:10
**keeping** 162:18
**keeps** 61:18 150:7
**keith** 7:16 158:23
**kellogg** 2:14 3:9 8:18 94:1
**kellogghansen.c...** 2:16,17
**kept** 163:5
**keytrack** 146:10
**kind** 48:8 67:6 71:14,15 74:25 88:15 89:9 91:10 98:1,25 101:1 105:13,24 107:4 113:22 135:3 136:22 149:22,23 150:17 152:1
**kinds** 43:18
**kingdom** 21:17,21
**knew** 32:1 35:8 77:3
**know** 12:17 13:6 17:16,23 20:23 21:2,6 22:8,19 24:3,3 28:11 30:17 31:22 36:21 41:24 43:6,19,21 43:22 45:6 46:8 48:6,8 49:6,15 50:5,18,22,25 51:1 51:11 52:16 53:3 54:11,15 56:11,13 56:18,25 57:11 58:2,9,25 60:16 61:2,4,5,13,13,14 61:15,20,21 62:4 62:11,23 63:8,9,10 66:14,14 67:9,13 69:14 71:24,25 72:25 73:1,1,2,3,9 73:14,17,23 75:13 75:14,24 76:3,4,5 76:14,14 77:18 78:8,11,22 79:9,10 79:14,16,18,21,21 80:13 83:25 84:18 85:14 88:15,17,18 89:2,7,14 90:10 91:17,23 92:16,22 93:2,10,17 94:2,19 95:13 96:12,13,16 96:22,22,22 97:16 98:9,15 99:17 100:4,20,22,23,25 101:6,6,6 102:21 102:24 103:9,9 105:4,6,10,13,20 105:23 106:20 107:4,13 110:2 111:22,22,23 112:2 113:17,18 113:19 114:12,13 114:19,20,22,23 116:8,11,12,19 117:9 118:11,12 119:2,23,25 120:1 120:1,3,8,11 122:8 122:11 123:15,18 125:24 126:8 127:11,13,13,14 127:16,17 128:7

128:17,23 129:3,3 129:21 130:23 131:16 132:1,8,8 132:11 133:23 136:7 137:1,21 138:10,14 139:6 139:19,20,20 140:16,17 141:7,8 141:9,13,14,15,15 141:16,16 142:8 143:2,3 144:2,2,9 145:6 148:3 150:3 150:16,16,20 152:20,23 153:8,9 153:10 155:15,16 155:16,19,20 156:3,6,8,9,11,18 156:20 157:18 159:19,22,23,25 160:25 161:18
**knowledge** 43:21 43:22 57:1,15 61:14 72:14,14 77:8 96:22,24 112:9,20 113:19 113:22 114:13,15 114:17 115:12,20 116:5,22 117:3 119:1,11
**knowledgeable** 32:4

**l**

**l** 1:18 164:13 165:17
**laid** 43:8
**lamb** 5:8 57:22
**lane** 10:4 29:20
**laptop** 162:1,6,9 162:14,24
**large** 15:21 43:17 60:6 73:19 74:19 140:5
**largely** 140:6
**larger** 127:15,15 128:7
**largest** 23:17
**lasted** 47:19
**lasts** 118:8
**launch** 68:4
**law** 1:20 8:18 21:10 77:23 78:8 78:19
**laws** 78:23
**lawyer** 117:9
**leach** 78:21
**leaf** 135:3
**lease** 11:2,3,4
**leave** 53:16 61:19 119:3
**leaving** 61:24
**ledger** 151:23
**left** 15:2 61:7 62:3 132:25 146:13
**legal** 3:21
**length** 45:9,10 111:24
**letters** 120:10
**level** 16:24 72:25 80:12 105:11 109:25 119:24
**licensed** 15:15
**lied** 98:16
**life** 161:14
**light** 95:8
**limit** 128:25
**limited** 67:14 85:22 100:21
**line** 39:5 46:10 89:23 90:2 108:21 144:4 146:25 147:12 148:4,4,12 148:19 149:6
159:5 167:5
**linger** 143:1
**link** 37:5,9,15,20 54:17 59:6 63:3 75:7,20 80:7 81:12,24 88:18 141:2
**linux** 151:19,19,21 152:16
**list** 56:24 69:3,15 70:5,23 71:4 101:12 119:23 137:25 149:15,23 149:25 150:7
**listed** 138:1 145:23
**listening** 58:13 98:3
**lists** 149:24
**litigation** 1:4 8:6 163:16 164:4 166:1 167:1 168:1
**little** 14:16 23:9 33:10 62:24 83:11 83:14 91:9,17 92:23 105:11 117:8 124:19 133:23
**live** 10:1 127:14
**lives** 10:8
**llp** 1:20 2:4,20 8:8
**located** 8:9
**locations** 10:16
**locked** 60:7
**log** 37:16 54:16 63:9
**logic** 122:17 123:4 124:5,18 125:21
**long** 3:9 5:15 8:22 11:19 47:12 50:20 50:25 51:9,22
52:22 54:2 57:12 58:3 67:6 79:10 80:24 84:9 93:3 98:8 105:8,14 107:9 116:20 118:7 119:17,18 134:10 151:13 152:9 154:9,15,21 154:23 156:10 162:18
**longer** 40:8 50:25 85:25
**look** 26:11,16 27:13,18 38:10,21 66:2 69:25 86:8 110:23 112:16 114:19 115:19 128:6 133:16 144:23 145:11 147:21 151:3 156:6
**looked** 28:7 83:8 99:21 147:10
**looking** 100:25 107:10 108:25 115:9 118:21,24 133:22 144:25 155:17 161:14
**looks** 97:23 103:11 103:11 133:21 146:25
**loose** 73:16 113:22
**lose** 78:6
**losing** 79:3 132:16
**loss** 79:6
**lost** 78:4 79:2 132:22
**lot** 24:11 29:1,3 30:20 33:17 40:2 48:5 56:21 93:11 122:23 129:5,5

132:7,7 161:17,18
**lots** 31:24 117:10 149:23
**louisiana** 1:21 2:4 8:9
**lower** 97:24
**lunch** 107:16 120:13,19 132:6

**m**

**m** 2:15
**machine** 1:19
**macroeconomic** 122:24
**mad** 120:9
**main** 10:17
**maintenance** 84:7 84:10 145:6
**major** 106:15
**majority** 60:6
**making** 23:4 86:5 101:8
**management** 1:3 8:5 15:10,14 23:11 29:6,9 66:19 104:15,15 104:16,18 105:15 105:25 135:12 157:9 164:3 166:1 167:1 168:1
**manager** 159:13
**managers** 159:16
**manner** 41:13 77:21 152:9
**manufacturers** 38:2 66:18 67:24 98:16
**manufacturing** 10:18
**mark** 3:3 9:13 134:20
**marked** 25:25 26:2 27:8,11 32:12,14 38:9 44:5 57:18 63:19 74:3 82:9 92:2,3 95:10 106:4 107:20 111:2 123:21 126:20,23 129:22 134:7 141:24 143:6 144:18 153:13 158:16
**market** 23:17,21 23:25 69:20,20 70:1,20 123:1,10 127:14 132:15,15 139:21,23
**marketed** 15:24
**marketing** 29:23 50:9 89:23
**marketplace** 77:10,15,17 78:2 78:25 84:14 100:23 103:9 127:16
**massive** 104:12
**matter** 8:5 94:16 97:6 98:22 128:23
**matters** 162:2
**mayer** 3:3 9:13
**mayerbrown.com** 3:5
**mcohen** 2:11
**mdl** 1:3 164:3
**mdsc** 2:12 8:20
**mean** 21:22 22:14 38:1,6 39:13 52:2 62:7,13 69:8 71:25 81:3 91:5 91:12 105:1,3,11 108:15 116:9
136:3 137:9 157:2 161:14
**meaning** 40:22 45:11 48:10 72:22 96:19 109:9 126:10 137:8 141:1
**means** 62:15 80:23 91:15 135:25 136:14,17 137:11
**meant** 121:21 139:3
**measures** 150:19
**measuring** 140:9
**media** 87:10 158:9 158:14
**meet** 11:19 12:1,2 39:21,21 123:18
**meeting** 5:21 39:10 40:6 92:8 92:13,16 94:9
**meg** 161:22
**mentioned** 145:1
**message** 69:20
**messaging** 69:21 70:1,20 132:16
**met** 39:17,25 40:4
**metadata** 44:9 74:7
**meter** 152:20,20 152:21
**method** 143:12,19 143:23,25 144:1 163:8
**michael** 2:8,14 9:10 12:3
**mid** 3:21 129:16
**midway** 76:20,21
**mike** 8:17 9:21 36:5 53:12 54:21
**milberg** 2:20 8:23 9:1
**milberg.com** 2:22 2:23
**million** 135:22 136:10 138:24 139:1,1,5,7,11
**millions** 77:12 78:4 79:1,3 132:15 136:7 139:4,6
**min** 89:6
**mind** 111:25
**minor** 72:9 90:6 132:25 145:7
**minority** 61:9 62:4
**minuscule** 89:6
**minute** 57:23 87:4
**minutes** 47:13,14 47:20
**mm** 145:2
**mms** 145:25 146:9
**mnemelka** 2:16
**mobile** 163:11,12 163:13
**mode** 143:2
**modified** 44:11
**moment** 64:3 82:22
**money** 132:12 136:8
**month** 16:9 34:2 123:12 150:12 151:23 152:8 159:14,15
**monthly** 135:9
**months** 43:16 45:11,12,13 74:20 150:2,8 160:25 161:12

**morning** 8:2 9:21 97:19
**moss** 6:12,22 134:22 135:9
**motor** 14:14 69:12
**motors** 98:18,19 98:21,23
**mountain** 11:6,8 129:11
**mountains** 161:13
**mouse** 79:22 141:8
**move** 119:7
**moved** 130:6
**movement** 137:12
**mryan** 3:5
**mullin** 2:9 9:10
**multipage** 92:11
**mutual** 39:6 81:21 120:6,7

**n**

**n** 2:1,14 3:1 8:1
**n.w.** 2:15 3:4
**nada** 39:10,11,13 39:25 40:6
**naked** 89:23 90:2
**name** 8:11,17 9:21 9:23 12:10 20:23 21:3 44:12 90:1 92:8
**named** 2:12 8:20
**national** 39:12
**nationwide** 122:25
**nature** 56:14 95:8 141:12
**necessarily** 73:12 79:6
**necessary** 77:19 142:25 166:5
**need** 13:18 14:2 27:24 30:2 53:21 53:23 69:10 91:4 91:12 93:15,21 104:11,19,24 106:13 128:15
**needed** 91:5
**needs** 49:9 98:20
**negotiated** 111:24
**negotiating** 96:5 122:22
**negotiation** 89:8,8 109:20 110:1 150:21
**negotiations** 73:6 73:20 108:11
**neither** 165:5
**nemelka** 2:14 4:5 8:17,17 9:20,22 10:9,13,20,24 11:3 11:7,16 12:1 17:9 17:14,25 18:4,8,13 18:17,21,25 19:5 19:10,14,22 20:2 20:11,16,20,25 21:7,12,18 22:5,10 22:20,25 23:9,24 24:6,11,17,20,23 25:2,6,11,15,19 26:2 27:10,18 28:3,14 29:1,9,15 29:19,23 30:2,6,13 30:19 31:3,17,22 32:6,14,24 33:3,8 33:12,18,23 34:4 34:11,17 35:8,21 36:2,7,11,17,23 37:2,8,14,19 38:1 38:5,15,18 39:24 40:12,20 41:1,10 41:20 42:1,9,16,22 42:25 43:2,11,23 44:7,15,23 45:3,10 45:23 46:21 47:3 47:9 48:10,15,21 49:8,17 50:7,14 51:3,6,11,16,20 52:2,7,11,20 53:5 53:10,13,16,20,21 54:7,15,22 55:5,10 55:16,20 56:4,15 57:2,12,16,20 59:5 59:11,14,18 60:17 61:18 62:5,10,16 63:1,6,12,17,21 64:4,24 65:3,16,24 66:22 67:1,18,21 67:22 68:2,9,21 69:4,18,25 70:6,11 70:19,24 71:5,18 72:2,5,10,15,21 73:5,19 74:1,5 75:5,19 76:8,17 77:9 78:3,11,18 80:2,20 81:3,11,22 82:7,11,19 83:6 84:3,16,24 85:1,3 85:9,16,21 86:4,20 86:22 87:2,13,25 88:20 89:11,18,23 90:7,13,17,23 91:3 91:11,19 92:1,5,18 92:25 93:13,22 94:3,15 95:17 96:17 97:1,10,18 98:5,11 99:2,11,25 100:13 101:9,19 102:2,7,10,12,15 102:22 103:14,20 103:23,25 104:2,6 104:8,19,24 106:6 106:22 107:5,14 107:18,22 108:4 108:15,20,23 109:4,14,19 110:4 110:8,13,16,18,25 111:3,11 112:4,8 112:13,16 113:3,5 113:10 114:25 115:8,14,24 116:1 116:7,21 117:1,5 117:12,19,20,24 118:7,13,23 119:2 119:9,15 120:13 120:21 121:9,15 121:24 122:3,13 123:4,25 124:2,11 124:18 125:1,8,15 125:20 126:1,10 126:15,22 127:19 127:23 128:1,9,13 128:19 129:4,10 129:16,24 130:5 130:24 131:5,11 131:18,25 132:14 133:2,9,10,17,25 134:4,6,9,20 135:1 135:8,14,18 136:3 136:9,13,19 137:2 137:7,25 138:6,11 138:18,23 139:15 140:1,5,10,19 141:1,6,22 142:1 142:15 143:8,23 144:20 145:17,23 146:3,5,8,20,23 147:4,14,21 148:20 149:8,12 149:13,25 150:22 151:4,9,14 153:2 153:15,25 154:8 154:14,19 155:7 156:13,21 157:6 157:13,25 158:2,8 158:18,22 159:2 160:2,9 161:8

162:1,5 163:19
**never** 36:23 41:7 42:21 81:7 97:19 108:17 109:15 110:5,19 115:2
**new** 2:22,22 43:24 58:25 62:10,21 79:7,23,25 141:9 141:14 159:12
**news** 5:5 32:16,19 32:25 33:14,25 159:23
**nice** 26:22 48:6,14
**nomenclature** 149:23
**non** 60:2 66:16,22 66:23 67:1,3,22,23 67:23 68:5,11
**nonpublic** 77:20 89:15
**normal** 138:15
**norman** 18:15
**northern** 1:1 8:7 164:1
**noted** 166:12 168:10
**notes** 5:15,21 74:11,13 92:12,13 93:7 94:9 96:17
**notice** 143:11 163:16
**notification** 161:1
**november** 7:9,16 63:25 64:1,15 144:22 158:23 159:1
**number** 61:1,15 73:25 74:23 92:17 93:11 115:5 124:12 138:24 139:2 142:9 147:1 147:5 148:15,22 154:1
**numbered** 1:16
**numbers** 124:12 147:14 153:19 159:17
**nw** 3:21

**o**

**o** 8:1
**object** 13:10,12 34:10 55:14 67:16 85:2,6,19 86:7 94:11,12 116:4 119:6 134:17 140:15 158:21
**objection** 10:6,11 10:15,22 11:1,5,24 17:11 18:2,6,11 19:20,24 20:7,13 20:18,22 21:5,9,14 22:3,6,18,23 23:7 24:2,9,15,19,21,25 25:4,9,13,17,22 27:6,14 28:1,24 30:11,15,23 31:14 31:19 32:3,20 33:1,5,15,21 34:1 34:9,15 35:6,13,23 36:4,5,13,20,25 37:6,11,17 38:13 39:22 40:10,19 41:17,23 42:5,13 42:19,24 43:4,14 44:2,14,20 45:1 46:17,20 47:1,6 48:4,12,19 49:5,11 50:4,12,17 51:4,8 51:14,19,25 52:3,9 52:14,25 53:8,15 54:13,18 55:8,18 55:24 56:6 57:14 58:24 59:7,12,16 61:12 62:1,8,14,18 63:5,7,15 64:2,22 65:1,14,19 67:25 68:7,13 69:1,7,22 70:3,10,13,21 71:1 71:10,22 72:4,12 72:18,23 73:8,22 75:4,8,22 76:12 77:6,16 78:5,14,15 79:4 80:9,10,22 81:6,17,25 83:9,21 84:12 88:10,24 89:13,20,25 90:4,9 90:15,19,25 91:7 91:13,22 92:20 93:19,24 97:14,22 98:7,14 99:7,19 100:6,16,17 101:15,23 102:6 102:19 103:7 104:17,22 106:19 106:25 108:22 109:3,23 110:7,10 110:15,21 111:9 111:19 113:4,14 114:9 115:4,10,18 115:22 116:3,18 116:23 117:2,7,17 117:22,23 118:4,9 118:22 119:5,14 121:12 122:1,4,20 124:22 125:11,23 126:18 127:6,22 127:25 129:8 131:3,9,15,22 132:4,19 133:5,20 134:3 136:1,11 137:10 138:3,8,13 139:13,24 140:3,8 140:22,23 141:3 141:20 142:6,18 143:21 144:15 145:15,21 146:19 146:22 147:18 148:9 149:2,17,21 150:25 151:6,12 153:6 155:5 156:16,23 157:10 158:6,25 159:9 160:7 161:6,10 163:17
**objections** 103:20
**obligations** 118:19 119:10
**obstinate** 34:24 35:16
**obstructionist** 85:17
**obviously** 58:12 61:6 78:10 124:24
**occur** 151:8
**occurred** 41:7 51:10 131:24
**october** 16:10,11
**odds** 137:22
**oem** 58:16 66:16 66:23 67:1,3,22,23 68:5,11
**oems** 37:23 38:1 66:1,3 68:11 99:10 136:23
**offer** 68:4 84:14
**offered** 33:6 80:25 122:18 158:4 159:7
**offering** 68:24 104:13
**offerings** 100:11 158:5
**offers** 23:10,14

**office** 163:6
**officer** 164:17
**offices** 1:20
**offshore** 19:15
**oh** 16:6 63:1 74:10 142:22
**ohio** 10:17
**oil** 145:5
**okay** 11:10 12:12 13:4,8,14,19,23 14:3,8 16:24 17:9 17:14 19:14 33:22 36:8 44:13,18 53:13 54:11 57:16 63:17 64:8,12 66:25 67:21 74:10 76:24 85:3,9 87:2 92:18 94:15,24 95:20 104:19 106:12 108:4,5,6 110:4 112:8 113:16 114:10,16 114:17 119:17,18 125:6 126:1 133:9 134:4 135:7 138:23 145:20,22 146:7,15 148:8,10 149:3,8 150:3,6,6 154:20 157:11,13 157:24 160:9 162:23 163:21
**old** 98:10 162:16
**older** 105:23
**once** 31:18 39:15 73:12 97:24 150:22
**one's** 143:3
**ones** 106:20
**ongoing** 128:4
**onlined** 146:10
**open** 37:2 68:23
**operate** 121:22 151:19 156:15
**operating** 24:12 28:8 151:18 152:17
**operational** 43:18 114:3
**opine** 86:16
**opinion** 35:2,19
**opportune** 151:7
**opportunities** 39:7 40:7
**opportunity** 9:22 33:6 41:21 67:9 133:16 149:15,19
**opposed** 46:19 132:10
**opposing** 86:5
**opposite** 34:25 35:17
**oral** 1:8,13 164:9 164:17
**order** 33:9 95:8 153:7 156:4,8 160:3
**ordering** 151:23
**orderly** 56:12 81:20 99:23 121:20
**orders** 152:14
**organization** 21:23 88:14 101:3 161:17,19,20
**organizations** 88:18
**original** 20:8,9 42:14,23 43:3 135:22 166:15
**originally** 16:1
**outcome** 165:10
**outlined** 64:25
**outlook.pst** 161:13
**outright** 98:16
**outside** 27:24 43:19 141:13
**overall** 122:24
**overcome** 158:3 159:7
**oversight** 22:21
**owned** 16:18,22 17:13 19:7 130:18
**owner** 52:6,8,18
**owners** 18:8 19:1
**ownership** 11:7 17:7,10 18:18 137:13
**owns** 10:16 17:4 17:18

**p**

**p** 2:1,1 3:1,1 8:1
**p.a.** 2:8
**p.m.** 1:17 95:1,3,5 120:15,17,18 158:10,12,14 163:24,25
**page** 4:1 5:1 6:1 7:1 33:16 34:5 40:12,14 49:20 65:25 74:9,18 76:18,21 84:23 92:19 95:23,24,24 103:15,23,24 104:1 108:18,20 109:6 111:12,12 125:4 127:4,24 135:7,19 144:24 144:25 145:12 149:7 165:1 167:5
**pages** 168:6
**paid** 16:11
**paper** 74:15 162:17
**paragraph** 50:19 67:6,7 84:25 85:4 87:18 88:12 91:4 91:18 109:8 112:12,14
**part** 14:24 49:6 58:18 59:3 60:5 88:14,16 89:9 90:20 91:2,20,24 100:19 101:2,17 117:15 119:3 121:13 123:10 127:10 130:24 134:10,12 135:5 135:20,21 136:25 138:4 150:17 156:8
**particular** 43:15 49:12 51:17 52:4 59:9 60:24 62:20 76:6 80:11 84:20 85:23 95:11 111:20,22 139:8
**particularly** 98:17
**parties** 43:20 66:17,23 67:1,4,23 67:23,24 68:11 77:4 80:6 81:5 82:4 95:13 99:13 100:3 101:21 102:3,4,18 103:10 114:23,23 124:13 126:10 136:17,23 165:6
**partner** 86:10
**parts** 24:20 29:12 86:3 105:5 151:23 152:7,11,12,24

**party** 37:20 51:21 52:21 54:1 99:15 102:21 103:4 109:10,16 112:19 116:9 118:2 120:8 126:4,7 127:9 132:9 142:20 156:1 164:22 165:4
**party's** 112:21,23 112:24
**passage** 52:4 80:11
**password** 34:19
**patter** 136:22
**pause** 129:21 135:4 154:18
**pay** 27:17 91:16 103:10
**payroll** 105:5
**pays** 160:1
**peaceful** 142:11
**peggy** 2:19 8:23
**pending** 13:23 94:20,22 107:9 113:12
**pennsylvania** 2:9 2:21
**people** 56:23 73:1 75:10,17 79:20 96:14,14,15,15 98:2,3,4 122:8 128:5 141:4 144:4 152:11 159:20,24
**percent** 17:4,25 18:19,21,23,25 19:5,11 23:25 125:16 138:20
**percentage** 17:20 18:5 123:9,19 124:24
**percentages** 24:4
**perfect** 79:20
**perfectly** 31:9
**performing** 62:23
**period** 58:20 61:10 109:21 119:13 121:23 131:7 151:13 160:15
**periods** 123:1
**permission** 65:21 65:22 66:1
**permitted** 76:5
**person** 20:23 48:7 48:8 58:13 63:9 96:13 112:21
**person's** 21:3
**personal** 76:19,22 77:20 89:15 160:21,22
**personally** 15:13 27:15 79:9 121:7 123:8
**pete** 116:15
**phased** 46:19
**phillips** 2:20 8:24 9:2
**phone** 44:25 45:3 45:7,14 48:18 87:4 120:11 159:25 163:12,13
**phones** 163:11
**phrase** 55:6 97:19
**picture** 26:19,21 98:2 161:22,23
**pictures** 161:21,21
**piece** 62:22
**pissed** 60:6
**pitter** 136:22
**place** 44:22 150:16 152:16 155:24
**plain** 98:10
**plaintiff** 1:15 2:12 5:1 6:1 7:1 8:20
**plaintiff's** 26:2 27:11 32:15 38:9 44:7 57:17 63:21 74:2 82:7 92:2 106:6 107:22 111:4 123:22 124:3 126:23 129:24 134:21 141:22 143:8 144:21 153:15 158:20
**plaintiffs** 2:18 8:25 9:3
**plan** 13:25
**planned** 66:15
**planning** 160:24
**plans** 112:22
**plant** 10:19
**plaza** 2:21
**plead** 117:8
**pleasant** 46:11
**please** 8:15 9:16 9:23 13:6,13 33:8 39:6 64:7,13 85:8 91:13 104:5 113:8 116:1 125:14 166:4,9
**plus** 135:23 137:7 138:14,15,20 159:14
**point** 15:2 26:11 43:15,20 48:20 49:21 54:20 64:5 65:9 66:7 67:11 68:21 74:23 76:19 76:21 85:3 87:14 87:19 92:18 97:2 99:11,20 100:7 101:20 103:15 105:9 111:6 123:3 128:4 129:14 145:16 148:10 151:1 161:7
**pointing** 88:3,22 93:18
**points** 44:13,18,21 45:13,17,19,20,24 74:15 80:13 83:7 85:24 87:19 93:10 96:2 153:22
**policies** 23:5 61:25 98:13 99:5 139:22 140:2 151:3
**policy** 128:4 138:9 138:12 150:16
**porting** 30:18
**position** 30:20 31:18 32:8 34:24 35:1,3,9,16,18,20 35:22 36:3,12 78:1 90:21 122:22 136:6
**positions** 31:21
**positive** 48:9
**posture** 77:17
**potential** 21:24 94:17
**power** 16:2 23:15 79:14
**powerdns** 15:25
**powerful** 76:14
**practices** 23:5 31:23,24,25
**predominantly** 128:7
**prefer** 92:22
**prepare** 11:10,16
**prepared** 12:13 45:14 73:24 74:13

**present** 3:6 8:12 8:13 12:4,6,12
**preserved** 161:5,7 161:8
**preserving** 162:21
**president** 3:7 39:2
**presidents** 92:16
**prettier** 120:23
**pretty** 46:12 60:6 82:2 89:8 121:1 157:12
**prevalent** 140:4
**prevent** 66:4
**preventative** 145:6
**previously** 38:9
**price** 135:24 137:25 138:1,2,6,7 138:9,11,19
**pricing** 122:18 138:5
**primarily** 15:21
**principally** 49:14 138:17
**print** 162:20 163:1 163:2
**printed** 162:19
**printing** 152:13,14 163:1
**printout** 27:12 163:9
**prior** 16:14
**priority** 88:1 128:23
**privilege** 94:17,17
**probably** 11:22 35:2,20 68:15 73:15 97:7,7
**problem** 58:7 60:10,11 122:7
**problems** 56:21
**procedure** 1:22 85:11 93:25
**procedures** 58:19 90:12
**proceed** 9:16 107:6
**proceeding** 163:23 165:7
**process** 41:7 50:21 56:8 72:13 81:8 84:15 107:13 112:19 138:5 139:19 150:17,21
**processes** 55:13,22 59:2 60:20 62:6 62:12,16
**processing** 14:24
**produced** 1:14 44:10 74:6,7 92:6 135:20
**product** 80:17,25 100:11 156:22,22 159:25
**products** 72:3,11 84:13 100:22,24 105:19 138:10 157:1,17,20 158:3 159:6
**profit** 159:12,21
**program** 30:24 31:4 66:4 68:4 129:6,18 130:6,16 131:1 132:10 142:9,12 143:1,20 145:3
**programmer** 106:21
**programming** 15:6,14
**programs** 50:9 68:24
**progress** 48:6 129:21
**prohibit** 34:18
**prohibition** 112:9 116:5,21 117:1,3 119:1,11
**project** 22:7 42:20 43:9 44:4 112:3
**projects** 83:16,20
**proper** 41:14 68:1
**property** 10:5,9 10:14,20,25 11:2 114:5 116:10,14 116:17
**proposal** 42:14 43:3 44:3 48:3
**proposals** 41:19
**proposed** 41:7,15 50:16
**proposing** 40:16 43:8
**propounded** 168:8
**prospective** 68:5
**protect** 114:3
**protected** 55:12 55:21 57:3 60:19 62:17 63:6,13 66:4 68:4,10,23 121:10 131:7 143:19 150:10 155:3
**protecting** 142:16
**protection** 114:5 114:19
**protections** 31:1
**protective** 95:7
**protector** 20:24 21:1,4,7
**protocol** 33:9
**provide** 14:5 37:20 42:11 121:20 144:10 147:7 148:2,25 163:15
**provided** 15:9 37:9 50:6 90:17
**provider** 147:8 148:6 149:1 157:5
**provider's** 147:7 148:1,24
**providers** 144:10 144:12
**provides** 145:13 146:17 148:7
**providing** 34:18 75:21,23 77:4 126:11 147:16 148:14,22
**provision** 113:2 114:19 115:6,20 118:6
**provisions** 1:22 118:11
**public** 16:14 26:6 26:7,9 28:4,6
**publication** 5:2
**publicly** 25:11,19 30:7
**pull** 110:25 154:15
**purged** 162:16
**purpose** 50:11
**purposes** 81:9 86:1 100:10,10 101:7
**pursuant** 1:21 164:20
**pursue** 64:17 65:11 69:5,19 70:8

**pursuing** 66:13
**put** 27:3 28:14 97:2,12 122:10 132:12 149:9 162:19,21
**puts** 32:17
**putting** 159:19
**pwedgworth** 2:22

**q**

**qualified** 56:1
**que** 113:12 147:22
**queen** 11:6,8
**question** 13:2,7,8 13:11,23,23 32:16 33:19,22 34:5,21 36:10 42:25 53:11 53:19,22,24 54:7 60:14 61:3 64:13 69:14 70:13 82:23 88:20,21 94:20,22 94:23 95:7 97:10 97:11 100:4 101:9 102:7,8,13,14,15 104:14 107:2 110:17,17 113:7,9 113:10,12,15 114:6 115:25 125:14 132:21 133:7 142:2 147:6 147:19 148:5 149:4,5 158:1
**questioning** 86:21
**questions** 9:23 13:14 60:10 93:14 94:6 95:18 144:8 147:9,22 148:23 160:11 163:20 168:8
**quick** 63:2
**quiet** 150:19
**quit** 104:11,25 120:2,2,3,3
**quite** 30:10 40:8 41:21 45:22 88:5
**quota** 123:16
**quotas** 123:18
**quote** 26:16 28:22 28:23 61:1
**quotes** 159:24
**quoting** 108:16

**r**

**r** 2:1 3:1 8:1 167:3 167:3
**r&i** 68:2
**r&r** 68:3,23,23 87:20,21 88:2,3,22
**rain** 136:23
**raised** 122:23
**randomly** 153:3
**rare** 40:3
**ratcheted** 61:4
**rate** 138:15
**rci** 31:4 51:23 52:23 54:2 58:16 99:13,18 100:3,5,8 101:5,13,16,22 102:5,18 123:5 124:6,13,20 125:22 129:6,11 129:18 130:6,16 131:1 132:10 136:14 138:2 142:8,12,23 143:1 143:20 155:9,24 156:9
**rdr** 1:18 165:17
**reabsorb** 67:5
**reached** 58:16
**read** 33:11 40:15 57:21,23 58:22 60:16 64:7 67:10 67:12 82:13,22,23 84:23 85:7,11,18 85:25 86:13,16,18 87:1 93:21 104:9 106:12 108:2 111:17,21 112:4,7 119:23 135:7 166:4 168:5
**reading** 33:16 38:18 57:25 64:10 67:13 70:6 85:21 86:25 95:19 102:3 115:21 116:1 125:12 134:14
**reads** 58:12
**ready** 111:24
**real** 63:2 161:16
**realize** 131:13,20 132:3 133:12
**really** 67:14 121:1 123:16 129:1,1 153:1 161:23
**reason** 14:5 67:8 166:6 167:7,9,11 167:13,15,17,19 167:21,23
**reasonably** 112:22
**reasons** 61:19 143:13 165:1
**recall** 12:22 32:11 46:24 47:7 91:8 96:11 108:7 118:3 131:23 144:13,25
**receipt** 164:24 166:16
**received** 22:13,14 59:21 87:15 91:16 135:8,15
**receiving** 107:25
**recess** 55:1 87:8 95:3 120:17 158:12
**recognize** 26:4 32:18 33:12 44:18 92:12 93:6 106:7 106:11 107:24 140:25
**recognized** 94:8
**recognizes** 27:24 28:12,20
**recollection** 97:20
**recommend** 151:2
**record** 1:23 5:2 8:3,16 9:24 53:16 54:25 55:3 85:22 86:6,12,14 87:3,5 87:7,11 93:23,25 94:5,21,25 95:2,4 104:5 120:14,16 120:19 133:7 158:8,11,15 163:24 164:18 165:9
**recorded** 8:4
**records** 156:5
**redistributor** 100:10
**reduced** 97:17
**refer** 74:14 157:18
**references** 108:7
**referred** 34:12 66:18 138:7 143:13
**referring** 29:12 54:8,10 57:4 99:1 103:5,8 133:3,15 142:4 147:12 148:3 157:6
**refers** 99:8
**reflected** 58:11
**reflecting** 33:4 147:5

**reflects** 33:13,23 35:5
**refresh** 97:20
**regard** 32:5 36:15 42:8 51:17
**regarding** 39:6 112:20
**regardless** 126:4 126:16 127:4,21 128:5,6 131:25
**regards** 90:11 157:16
**region** 3:21
**regulated** 60:2
**reiterate** 119:17
**relate** 94:16 127:18
**related** 49:2 93:12 136:24 148:19 162:2 165:6
**relationship** 29:5 66:19 82:5 156:25 157:1
**relationships** 126:4,7 127:9 150:18
**relative** 165:8
**release** 71:9 73:20 74:19 107:6,15 121:3
**released** 73:10,12
**releasing** 73:5
**reliable** 90:17,22
**relief** 119:19 143:5
**remember** 25:23 30:8 32:10 45:6 133:18
**remind** 95:9,12 145:4
**reminder** 49:13 80:15,19 89:6,14 145:3
**reminders** 81:1 82:3 84:7,11 89:19
**remindertrax** 145:1,12,25 146:10 148:14,15
**reminding** 117:20
**remiss** 88:3
**remote** 45:25 46:3 46:10 47:23 76:16
**remove** 20:21
**removed** 20:17 21:8
**renewal** 150:1,8 150:21
**repair** 152:14
**repeat** 36:9 43:9 44:4 53:21 64:13 82:23 113:8 125:13 146:7
**repeatedly** 86:14
**reply** 47:25 109:1
**reported** 1:19
**reporter** 8:13 9:15 133:6 164:14
**reporter's** 4:7 164:8
**reporting** 76:15 155:16
**reports** 31:9,10 135:12 152:9
**represent** 44:8 74:6 92:5
**representations** 27:4
**representative** 2:12 8:21
**represented** 85:14
**represents** 138:15
**request** 84:6,9 98:19 106:16 132:1 133:18
**requested** 46:23 46:25 69:9 164:22 165:3
**requests** 105:12
**require** 50:10 113:19 155:9
**required** 77:23 78:8,20 126:3
**requires** 127:8
**reread** 53:23
**res** 161:22,23
**reselling** 81:10
**reservation** 156:5
**resources** 128:24 128:25
**respect** 23:5 26:15 96:8 99:5 122:18 149:15
**respond** 47:22,23 154:14
**response** 43:9 44:3 47:10 48:2,9 85:5 152:2,15,24
**responsibilities** 22:21
**responsibility** 54:4
**rest** 19:6 93:15 125:12
**restriction** 114:2,7 115:9,11,12,16 155:21
**result** 78:4 113:17 114:23 139:16
**retail** 104:15,15,16 104:18 105:15,25 157:9
**retention** 161:11
**return** 166:14
**returned** 164:24 164:25
**reveal** 11:14
**revenue** 124:13,20 131:12,20 132:2 132:22 133:11 135:22 136:9 139:7
**reverse** 101:3
**review** 32:23 33:7 64:4 74:9 82:17 93:15 94:7,10
**reviewed** 11:12
**reymdl** 5:22
**reymdl00014384** 6:10
**reymdl00014396** 6:10
**reymdl00044042** 6:16
**reymdl00044043** 6:16
**reymdl00044241** 7:10
**reymdl00044242** 7:10
**reymdl00138479** 7:7
**reymdl00200760** 5:9
**reymdl00200761** 5:9
**reymdl00226199** 6:19
**reymdl0022620...** 6:19
**reymdl00238133** 7:3

**reymdl00260942** 5:16
**reymdl00260943** 5:16
**reymdl00261631** 5:22
**reymdl00263558** 7:13
**reymdl00263619** 7:17
**reymdl00565070** 6:7
**reymdl00565071** 6:7
**reymdl00652128** 6:13
**reymdl00652133** 6:13
**reymdl00716766** 5:7
**reymdl00716767** 5:7
**reymdl00720415** 6:22
**reymdl00720511** 6:22
**reynolds** 2:2,2,7,7 3:7,8 9:9,9,11,11 10:16,16,17,17 12:6,8,12,15 16:4 16:4,14,17,22,25 22:22,22 23:1,4,10 23:10,20 24:6 26:7 27:1,4,12,15 27:23 28:12,16,19 28:22 30:19,24 36:18 37:9,14 40:16 41:1,2 42:3 42:10,11 43:13,19 45:25 46:4,10 47:5,24 48:11,21 48:23 49:8,25 50:1,8,9,15 51:6 51:12,22 52:22 54:2,17 55:11,12 55:20,22 56:5 57:2,12 59:15,19 59:20,24 60:3,6,9 60:18 61:7,18,24 63:3 64:21 66:2,2 68:3,10,19,23 71:6 71:7 73:19 75:20 75:24 76:25 77:10 77:14,21 78:12,25 79:2,16,16 80:5 88:8 89:18 90:24 91:5,19 96:7,9,19 99:4,16 100:13,15 102:4,17,21 103:1 103:5,6,10 106:18 106:22 108:11,17 109:9,14,15 110:4 110:19 111:5,8 112:14,17 114:4,7 115:2,3 121:2,3,10 121:11,17 126:3 126:11 129:17 131:1,6,12,20 132:2,3 133:12 136:18 137:3,14 137:17,18,21 139:16 140:14,14 140:17,19 142:5 142:15 144:11,12 145:24 146:11 147:16 148:16 149:14 150:7,10 153:21 155:9 156:14,21 159:25 160:3,6,14,20,23 161:5 162:23 163:6
**rid** 140:11,12 142:3
**right** 14:15,18,24 15:3,7,11,16,19,22 16:4,12,15 17:1,5 18:1,19,22 19:2,7 19:11 23:6,18,21 24:1,8,14,24 25:8 25:12,16,21 26:13 28:9 29:6 30:3,22 32:2,9 34:17 36:3 36:6,19 37:16,23 38:2,6 42:18 43:3 44:1 46:4,7 49:3 50:2,16 51:3,7,13 51:16 52:8 55:23 59:15 61:25 62:17 64:25 65:5,18,24 66:11,20 67:24 69:5,21 70:12,25 71:9 72:6,15 73:7 76:17,24 77:5,22 78:8 80:7 82:14 82:19,24,25 83:13 83:15,17,20 84:11 84:16 85:12 86:22 89:19,23,24 90:8 90:14,24 91:6,21 92:25 93:22 94:3 94:21 96:19 98:6 98:13 99:6,25 100:15 101:22 103:14 104:2,21 106:24 107:5,7,10 109:16,22 110:6,8 110:14,20,25 111:7 112:13 113:24 114:8 115:3 116:7 117:16 118:13,21 121:11,17,25 122:3,19 123:5 124:21 125:1,22 126:5,12 128:11 128:15 129:7,12 129:18 130:6,19 131:14,21 132:3 132:17 133:4,13 133:25 136:14 138:7 139:2,23 140:7 142:5 143:20 145:8,19 146:1,5 147:4,10 148:5 149:25 150:8,9,24 154:16 154:22 155:4,10 156:22 159:12 160:14 163:19
**risk** 101:3
**rival** 23:21
**rms** 104:12,14 105:1 157:18
**road** 154:9
**robert** 1:8,13 2:19 4:4 5:12 6:3,6 7:2 7:9 8:4 9:17,25 63:24 64:16 163:23 164:9,16 166:2 167:2 168:2
**rodeo** 12:24
**role** 23:3
**ron** 6:3 38:11 39:2 57:22 106:8
**ronald** 5:8
**room** 107:16
**routine** 145:5
**rule** 164:20
**rules** 1:22 12:24 78:21 85:14
**run** 15:19 31:9 67:7 152:9 153:7 155:19 159:23

**running** 22:21 25:7 151:21
**runs** 156:18
**rwallner** 2:23
**ryan** 3:3 9:13,13 34:10,15 85:10 94:12,23 95:12 100:17 102:14 115:5 117:18 119:6 140:15,23

**s**

**s** 1:15 2:1 3:1 8:1 151:15,15
**safeguards** 78:21
**salaries** 138:17
**sale** 159:12
**sales** 5:21 24:14 77:24 92:16 123:16
**salespeople** 77:25 104:20
**salesperson** 14:20
**saw** 30:6 70:12 81:15 106:17 114:25 117:25
**saying** 25:23 78:18 84:8 91:12 98:20 99:3,24 102:2 107:1 114:18 119:16 144:3 154:5
**says** 27:15,20,23 28:11,22 34:17 49:24 59:21 62:15 65:9 68:2,22 74:7 75:13 76:21 80:23 82:2 83:18 84:20 85:1 87:25 96:21 109:8 110:24 115:14 116:5,21 117:24 118:5,12 119:3 125:8 135:21 136:12 144:5 145:8 153:25 154:20 159:4
**scale** 89:3
**sch** 145:11
**schaefer** 5:12 6:3 6:6 7:2,6,9 63:23 63:25 64:1,6,16,20 65:4,18 69:4,19 70:7,12,15,25 71:2 106:8 107:23,25 108:8 109:4,6 115:1 123:22 124:1 126:24 130:15 131:11,17 142:2 143:9,11 144:7,13,22 147:5 147:24 148:20 149:8,10
**schedules** 151:23
**school** 162:16
**scope** 145:9
**scott** 3:7 9:8 12:3 12:11
**screenshot** 5:3
**second** 32:22 34:5 40:14 64:14 74:18 76:19,21 109:7 143:16 155:25 159:4,5
**section** 40:14 53:25 70:1 92:19 93:18 95:22,25 103:19 104:8 112:8,9 113:25 118:8,14,20,23
**sections** 67:11,12 92:10 93:2 118:20 119:10
**secur** 55:22
**security** 5:16 31:2 55:13,22 59:1 60:7,10,11,20 61:15 62:6,12,16 62:19,24 66:14 69:21 70:1,20 71:8,11,13,18 72:15 73:20,24 74:19,24 75:6 77:11,15,19 78:1,7 79:1,15,17 83:16 83:19 90:11 92:19 93:2,14,18 95:22 95:25 97:2,12,20 98:6 101:12 103:18 106:15,17 106:23 107:6,14 114:3 121:4,15,24 122:5 132:16 133:1 140:18 141:8 143:13 151:3 154:1
**see** 22:1 27:21,25 28:2,12 34:21 35:3 38:12 39:6,7 40:9 46:1 49:22 50:11 51:24 52:24 54:4 60:12,14,16 63:25 64:18 65:13 66:5 67:2,3 68:5,8 68:25 70:2 74:20 74:21,22 75:9 76:19,22 77:1,12 87:22 95:24 96:5 96:6 97:3,11,13 108:17,25 109:11 111:12 112:10,12 112:24 113:1,11 119:16 122:7 124:7,14 125:8,10 125:12,25 127:5 130:16 133:15 134:24 135:20 145:14 147:24 148:2 149:6 152:18,21 154:11 158:24 159:8
**seeing** 114:11
**seen** 56:12 159:23 160:13
**select** 56:23
**sell** 112:18 132:23 132:24
**selling** 152:12
**sells** 50:10
**send** 31:10 155:20
**senders** 161:1
**senior** 39:2
**sense** 37:3
**sensitive** 89:17 94:18 95:8
**sent** 38:22 64:14 64:15 65:4 127:1 158:23
**sentence** 58:22 59:3 68:22 88:13 91:9,17 104:10 109:7 113:24 159:4,5
**sentences** 125:25
**separate** 48:24,25 49:4 116:25
**september** 5:9
**ser** 104:15
**series** 36:16 71:11 73:14 74:15 106:15
**serve** 128:20
**served** 15:21
**server** 152:11

Case 4:21-cr-00009 Document 1-3 Filed on 01/04/21 in TXSD Page 461 of 771

**service** 25:2 29:20 40:17 49:13 50:6 80:16 81:1 82:3 90:18 105:6,19 145:3 152:7,13,14 152:24 156:6
**services** 14:24 15:3 16:20,21 34:6,11,13,18 40:14 42:2 104:16 130:13 138:10
**serving** 128:21 144:12 148:18
**set** 20:15 50:21 60:9 63:1,17 71:6 118:19 119:10 126:2 160:9
**setting** 60:1
**settled** 119:18
**seven** 43:16
**share** 27:24 31:1 114:22
**shared** 133:22
**shauna** 1:18 8:13 164:13 165:17
**sheet** 166:7,10,12 166:15 168:11
**sheppard** 2:9 9:10
**sheppardmullin....** 2:11
**shifted** 122:17 123:4 124:5,18 125:21
**short** 14:16 50:24 55:1 87:8 91:9,17 95:3,6 120:17 158:12
**shortcomings** 120:12
**shorter** 14:2
**shorthand** 1:19 164:13
**shortly** 108:3
**show** 39:14 134:9 134:11 158:19
**showing** 146:16
**shut** 143:12 144:9
**shutdown** 46:19
**shutoff** 147:23
**sic** 124:7
**side** 142:25
**sidebar** 51:19 67:17
**sigh** 119:19 143:4
**sign** 111:18 119:22 125:17 142:23 166:9
**signature** 4:6 26:23 75:12 111:13 119:21 164:21 165:1,15 168:14
**signed** 111:7 112:5
**significant** 40:8 41:22
**signing** 166:11
**similar** 27:4 96:5
**simple** 53:24
**simply** 70:6 116:13,16
**simultaneous** 73:17
**single** 73:13 160:20
**sir** 22:12
**sites** 50:9
**situation** 56:9 57:11 58:15 59:9 71:15 79:23 83:25 122:24 139:8 141:12 142:11,19 145:10
**situations** 99:9 129:3 155:15
**six** 150:2,8,12 161:11,11
**size** 126:5,17 127:4,12,18,21 128:5,6,18
**skimmed** 112:7
**skip** 134:15
**skipped** 137:7
**small** 49:6,14 61:9 127:13 128:20 129:3 145:9
**smile** 161:15
**software** 15:10,15 23:11 29:1,6,19 48:23 49:3 72:20 73:1,18 76:4 79:13 84:13 105:12 130:3,11 142:10 155:16 156:2,4,8,18,19
**sold** 14:23 15:15 159:12
**solutions** 3:21 49:3
**somebody** 58:6 113:23 131:19 141:13,16 152:22 153:11
**somewhat** 76:6 122:17 123:5 124:5 125:21
**son** 10:7
**soon** 124:6
**sorry** 11:20 17:16 20:14 21:2,6 22:19 25:23 27:7 32:10 36:9 53:8,9 53:12 59:18 62:9 64:3 74:13 103:17 106:20 113:6 117:8 118:16 120:23 123:25 142:22 143:24 149:12 158:10
**sort** 94:2 151:24
**sorted** 58:10
**sound** 18:1
**sounds** 105:10
**space** 161:24 166:7
**spam** 56:21,22
**spanish** 17:13,14 17:18,20 18:9
**speak** 94:13
**speaker** 36:5,8 78:15 80:10
**speaking** 93:7 94:9 127:11
**special** 58:25 62:11
**specific** 25:24 47:25 48:13 51:23 52:23 54:2 58:9 62:19 67:10 68:18 71:4 72:13 80:14 80:17 100:20 106:20 129:20 157:1,17,20
**specifically** 32:21 42:7 76:2 79:12 89:5 102:25 122:6 122:25 131:16 144:16
**speech** 104:20
**spelled** 84:17
**spend** 92:22 161:14
**spotlight** 32:17

**spun** 34:13
**square** 2:15
**squawks** 141:17
**st** 19:25 20:16
**stages** 96:4
**stand** 56:12 66:15 81:20 91:25 99:23 101:17,20 110:2 111:23 113:18 120:1 121:13,20 121:21,22 127:10 136:25 145:22
**standard** 28:17,19 138:4,19
**standing** 5:15
**standpoint** 31:2 32:7 34:25 35:18 42:20 49:15 56:2 69:10 77:24 78:1 132:12 150:20 154:1 157:3
**stands** 59:23 104:14
**start** 96:3 151:21 152:22
**started** 89:21 122:14
**starting** 88:12 157:25
**starts** 49:21 82:18 82:19,24 106:9 144:24
**state** 1:19 8:15 9:23 85:22 92:8 92:11,13 94:5 109:20 144:8 147:23 148:23 164:14 166:6
**stated** 1:23 25:11 136:5
**statement** 25:24 28:4,7,13 46:11,12 48:1 60:22 82:1 84:20 85:5 86:7 94:10 96:23 117:23 129:15 134:3 158:7,19,21
**statements** 86:5 86:17,18 134:18 135:11
**states** 1:1 8:6 10:10 21:16,20 44:9 53:1 123:1 164:1
**staying** 93:24
**steady** 105:20 129:21
**step** 152:1
**steps** 17:13,14,18 17:20 18:9 112:21
**steve** 5:18 38:11 38:25 40:4 44:24 48:6 74:16 82:12 82:13 83:23 107:1
**stickiness** 157:1 157:16 158:20 159:18 160:5
**sticky** 156:22 157:19 158:3 159:6,20
**stoneeagle** 141:19 142:3,8,21 143:4 143:14,16,17
**stop** 11:14 35:9,10 46:19 47:4 49:25 56:10,10 57:9,10 91:6,20 150:23
**stopped** 91:23 140:6
**stopping** 54:20
**store** 24:7
**straight** 56:11
**strange** 105:11
**stream** 98:1
**street** 2:15 3:4,21 8:9
**strictly** 80:25
**strike** 28:5 48:22 107:15 119:7 122:15 149:12
**strong** 61:2 79:14
**strongly** 151:2
**structure** 17:8,10
**strung** 144:6
**stuff** 156:17 159:20
**styled** 1:16
**subject** 11:15 39:10 40:6 95:14 134:23,24 153:17 166:11
**subjects** 64:18 70:9
**subscribed** 165:11
**subsequent** 41:8
**subsidiaries** 2:12 8:20 46:7 66:9 75:16
**subsidiary** 16:18
**substan** 17:25
**substance** 168:10
**substantially** 17:24 97:17
**successful** 14:20
**successfully** 129:17
**sudden** 60:9 71:15
**sufficiently** 91:1
**suggestion** 50:20
**suggests** 86:15
**suite** 1:21 2:5,10 2:15 3:21 8:9 105:7
**sumner** 2:15
**sunday** 38:12
**sunset** 10:8 59:18
**support** 119:25
**supposed** 131:13 131:20 132:3 133:12
**sure** 33:12,18 36:11 45:19 53:20 54:22 91:25 125:15 129:20 141:16 145:17 146:8
**surround** 105:17
**swap** 161:21
**swear** 9:16
**switch** 78:9
**sworn** 1:15 9:18 164:17 165:11
**sys** 121:16
**syscheck** 151:15 151:15 152:18,25 153:2,5,9
**system** 15:10 23:11 37:3 46:4 48:11 54:12 56:5 60:3 63:3,10 73:2 75:11 77:21 79:14 80:18 84:1 88:4,8 88:22 96:9 98:10 98:12 99:4,5 101:4 104:16,18 105:15,25 109:10 109:16 110:20 113:20 118:2 121:11,17 122:8 130:22 131:6 139:17 140:14,20

142:17 151:18,19 151:21 152:3,17 152:18 153:11 156:12 157:9
**systems** 1:4 8:5 16:25 17:12 37:12 40:18 41:3,13 43:19,25 46:1,10 47:5,24 75:1,18 76:25 80:4 81:9 84:5,9 87:20,21 89:3,5 98:17 99:9 104:11,25 105:4 105:19 106:16 114:14 120:2 124:14 126:8 136:18 140:18 164:4 166:1 167:1 168:1

**t**

**t** 167:3
**table** 87:1 112:2
**tablets** 163:11,13
**tac** 59:22,22
**tactics** 83:24
**tadler** 2:20 8:24 9:1
**take** 13:19,25 32:22 44:21 54:4 54:23 71:23 78:12 78:16 86:2 92:24 112:21 120:13 126:3,15 127:3,8 127:20 128:5,5 159:11,13
**taken** 1:15 30:20 77:10 150:19 165:8
**takes** 80:19 105:15 139:7 155:24 161:23
**talk** 12:15 13:1,3 23:9 47:18 64:24 65:22 66:1 70:25 96:13 101:19,20 101:21 102:12 157:16,20
**talked** 11:12 96:14 96:15 132:6 134:12
**talking** 19:10 41:15 44:13,18,21 45:13,17 49:13 50:22 52:15 72:24 72:25 73:4 74:15 83:7 93:10 97:15 98:20 99:25 102:16,17,22,25 103:18 104:11,25 119:24 124:25 126:8 128:14 139:4,5 150:3 159:10
**talks** 145:8
**target** 127:14
**taught** 15:5
**team** 131:19 133:10,18 134:13
**tear** 50:21
**tech** 138:16
**technical** 59:23
**technically** 135:13
**technology** 41:2 43:25 112:19 113:23
**telephone** 1:18
**telephonically** 2:19
**tell** 63:11 81:22 83:11 101:24 107:3
**temporarily** 58:10
**temporary** 56:1 56:14 57:10 58:8 59:4 72:8
**ten** 137:19 154:10
**term** 36:21,23 40:8 50:20,24,25 55:11,17 57:1 76:6 98:8 140:25 145:1 150:6 156:24,25 162:18
**terminate** 119:12
**terminology** 56:20
**terms** 31:12 71:3 76:1
**terrible** 152:3,15
**terry** 18:15
**test** 13:18
**testified** 9:18 115:1 117:14 132:14
**testimony** 14:6 95:14 117:21 164:18
**texas** 1:19,21 2:5 8:10 10:10 164:14
**text** 27:19
**thank** 14:4 16:11 28:14 36:8 38:21 64:12 95:6,15 104:7 106:3 135:8
**thanks** 94:24
**therefor** 165:2
**theron** 9:25
**thing** 41:9,10 49:14 67:13,14 73:13 74:17 91:10 101:25 111:5 119:22 127:24 134:14 145:7 151:24
**things** 47:18 49:1 50:24 65:23,25 69:15 75:10,16 77:22 78:7 79:11 88:11 92:24 112:14 122:7 138:15 145:9 150:19 152:4,21 152:21 153:10 162:15
**think** 14:23 41:6 45:21 50:18 52:15 53:1 54:10 55:10 56:1 58:11 62:15 66:7 68:15 69:23 77:22,23 79:21 80:11 82:1,2 84:22 85:23,25 89:21 92:21,22 93:20 96:25 99:20 100:7 102:24 116:19 122:21 123:8 124:23 125:24 126:19 127:7 128:3,17 132:5 136:16 139:19 144:4,5 150:15 151:1 152:20 154:24 155:12 156:24 157:4
**thinking** 45:7 101:25
**third** 37:20 39:5,5 43:20 66:17,23 67:1,4,22,23 68:11 77:4 80:6 101:21 102:18,21 103:10 109:16 112:19 114:22 120:8 126:4,7,10 127:9

132:9 136:17,23 156:1 159:4
**thirty** 166:16
**thomas** 18:15
**thought** 42:9,20 118:16
**thoughts** 34:20 39:6
**three** 11:23 59:22 61:2
**thursday** 124:4
**time** 10:25,25 11:20 12:22,22 13:2 15:6 32:25 33:10 39:24 40:1 40:3 43:11,15,20 45:4,9,11 47:3,8 48:21 49:8 51:1 54:24 55:2 56:7 58:4 61:10 62:22 67:14,15 79:10,15 84:1,9 85:22 86:2 86:11,12 87:6,10 88:5 92:23 95:1 99:20 105:14 107:9 120:15,18 122:23 128:4 129:1,1,14 139:6 143:18 151:1,7 152:2,15 158:10 158:14 161:2 163:23
**times** 12:21 19:6 123:2 139:10 152:24 159:16
**timing** 73:9
**tiny** 62:4
**title** 116:2
**titled** 46:15
**today** 8:21 9:23 11:11,17 14:6 140:20 141:11 145:1 153:25 154:25 155:1 156:20 163:20
**today's** 163:22
**todd** 2:14 3:9 8:18
**told** 25:19 26:15 30:7 47:23 60:10 74:17 81:4 95:13
**tommy** 6:15,18 7:12 126:24 127:2 129:25 130:1,3 153:16
**tone** 83:11
**tools** 76:15
**top** 16:24 27:19 63:22 64:15 82:11 98:3 106:7 109:8 146:9 154:19
**topics** 47:19 64:25 69:6,18 70:19
**total** 97:7
**totally** 49:1
**tougher** 123:2
**townhouse** 10:7
**toyota** 38:2
**track** 11:20 24:3 61:18 122:9
**tracked** 36:14
**tracking** 61:22
**trade** 39:14
**traditional** 105:4
**transactions** 24:14 159:14
**transcript** 164:17 164:25 166:17,18
**transcription** 168:7
**transfer** 112:10,18 115:20 116:5,22 117:4 119:1,11
**transition** 58:20 59:4 66:4 81:20 120:5 130:25
**transitional** 56:2
**transitioned** 61:10
**true** 30:10 81:18 81:18 164:18
**truly** 32:8 35:1,18 134:9 155:8
**trust** 17:3,19,21 18:10 19:2,7,15,19 19:23,25,25 20:3,6 20:8,10,16,24,25 21:4,7,13 22:1,15 22:17,20
**trustee** 20:12,17 20:21
**trustees** 19:22 20:2,5
**trusts** 20:15,15
**truth** 105:11
**truthful** 14:6
**try** 13:3 93:17
**trying** 13:25 67:5 94:1 98:2 101:24 102:1 103:22 123:18 125:17 133:25 134:1 147:2
**tuck** 10:4
**tuesday** 158:23
**turn** 34:4 40:12 65:25 74:18 113:22 125:4 135:18
**turned** 73:16
**two** 10:16 14:15 14:16 19:2,6 23:14 66:9 92:9 97:5 112:14 116:25 123:12 125:25 129:16 144:11
**type** 23:14 49:22 49:24 50:7 80:21 101:5 150:12,17 155:13,25
**types** 128:18 136:24 155:18 156:7
**typical** 142:19 159:13
**typically** 111:17 138:14 152:6

**u**

**ucs** 15:9,19,21,24 16:3,11,18
**ugly** 46:13
**uh** 12:23 47:21 155:1
**ultimate** 23:4
**ultimately** 91:19 132:11
**umm** 29:12 111:20 154:18
**unable** 156:19
**unattended** 31:15 45:25 46:3,10 47:23 76:16
**unauthorized** 72:19,21 73:4
**uncover** 75:17
**understand** 13:6 13:16 14:23 34:23 35:16 38:5 68:16 69:11 75:19 79:8 91:11 143:25 146:15 149:5 150:6 151:17
**understanding** 34:16 35:24 62:9 100:8 109:24

110:11 121:14 148:21
**understood** 13:8 91:5
**underway** 22:8
**unfortunately** 76:5
**unhappiness** 62:20
**unidentified** 36:5 36:8 53:15 78:15 80:10
**union** 92:9,11,13
**unit** 159:12
**united** 1:1 8:6 21:16,16,20,21 164:1
**universal** 15:2 16:25 17:12
**university** 14:8,13
**unjustifiably** 139:19
**unknowingly** 152:1
**unproductive** 47:14,16
**unusual** 47:11 133:24 144:16
**unwinding** 150:17
**update** 153:18
**upright** 60:25
**upwards** 19:10
**usage** 90:5,5 100:20
**use** 29:1,4,19 32:1 37:3 49:4,14 50:9 50:15 51:2,6,12,21 52:16,21 53:4,25 53:25 57:1 72:19 72:20,21 76:3 86:11 90:24
146:13 147:15 150:11 151:10,18 156:19 160:3,19 162:2 163:8,11
**user** 34:19 55:12 55:21 56:13 57:3 58:10,25 59:5 60:1,19 62:5,10,17 62:21 63:8,13 75:25 76:10 121:10 122:10 151:21 152:22 153:21 154:3 155:3
**usual** 68:20

**v**

**v** 166:1 167:1 168:1
**val** 133:11
**value** 134:13 158:3 159:6
**varies** 129:3
**various** 123:2 136:23 145:24 146:20 153:22
**vary** 128:18
**vastly** 79:17
**vehic** 29:15
**vehicle** 24:17 29:13,16 105:6
**ven** 128:10
**vendor** 2:13 8:21 128:19
**vendors** 34:19 37:21 43:13 99:15 102:23 103:4 126:11 128:11,14 129:18 130:6,15 130:18 132:9 155:8
**venture** 40:16 41:16 42:2,4,10,18 43:12 81:15
**veritext** 3:21 8:12 8:14
**versa** 137:18
**version** 99:13,18 100:3,5 101:13,16 101:22 102:4,18
**vice** 3:7 39:2 92:16 137:18
**video** 8:4
**videographer** 3:10 8:2,12 9:15 54:24 55:2 87:6,9 95:1,4 120:15,18 158:9 158:13 163:22
**videotaped** 1:8,13 164:9
**view** 78:12
**views** 78:16 120:25
**violation** 78:19
**visit** 10:25
**volume** 1:11 97:16 164:11

**w**

**wait** 98:24 102:13 102:14
**wallner** 2:19 87:4
**want** 31:1 45:23 47:17 52:5,17,17 53:2,2 64:5,5 71:14 74:16 80:3 80:3 84:19 85:3 85:14 86:2 96:2 103:15 107:18 108:6 109:5,22 110:23 119:3 126:25 127:2,19 136:18,23 140:16
151:9 152:9 155:22
**wanted** 31:7 45:20 47:18 71:9,13 80:4,20 99:17 104:10 109:15,18 110:5 112:2 115:2 126:15 132:1 140:11,12 144:9 158:18
**wants** 85:11 94:7 102:12
**war** 58:2 98:6 119:17,18
**wars** 36:19,24 97:2,12,20 101:12
**washington** 2:10 2:16 3:4,22
**watch** 123:11
**watching** 94:4
**way** 27:20 31:13 48:16 50:19 60:8 61:2 63:14 75:14 77:22 78:8,8 79:2 79:23,24,25,25 93:6 98:22 103:11 103:13 132:11 140:9 141:9,14,16 153:3 162:12
**ways** 56:22 79:21 116:20 136:8
**we've** 56:12 58:4,5 79:8,16 85:22 107:10 117:25,25 132:6 144:5 149:23 150:18,18 150:19
**webpage** 27:20
**website** 5:3 27:5 27:13,16

**wedgworth** 2:19 8:23,23 87:3
**wednesday** 143:10
**week** 83:16 154:2 154:4
**weeks** 45:11
**went** 44:4 154:9
**west** 10:4
**whatnot** 152:13
**whitelist** 56:19,19 56:25
**whitelisting** 55:7 55:11
**whoev** 155:20
**wholly** 16:18
**wide** 139:20
**wife** 10:7 21:15,15
**wilkinson** 2:3 9:6 9:6
**wind** 57:5,7,11 100:1 109:21 110:13 119:13 121:3 130:24 131:7
**window** 150:13
**wish** 69:2 70:4,23
**witness** 1:14 2:2,7 9:5,12,16 36:9 47:21 53:11 56:17 85:7,11,12 86:24 94:13,18 102:9 113:8 134:16 157:23 164:16,19 166:3
**witnesses** 85:13
**wondering** 133:17
**words** 102:3 117:10
**work** 30:3 65:10 89:21 113:16 129:5,11 155:8
156:4,9,10
**worked** 14:14 74:21 111:23 120:1,12 130:25
**working** 79:17
**workman** 6:3 38:11,22 39:2,18 106:8
**works** 12:11 65:6 69:13 153:1
**world** 58:16 137:24
**worst** 46:9 59:10 66:9 69:13 97:6 143:4
**worth** 47:13 139:7 159:15 162:18,21
**write** 39:5,9 40:5 52:20 64:1,16 83:15 84:3 97:1 97:25 99:12 100:1 104:10 106:14 124:5 127:2 143:10
**writer** 60:25
**writes** 85:4 91:3 109:6 130:8 154:9
**writing** 152:13
**written** 112:24 143:11
**wrong** 41:9,10 77:25
**wrongly** 77:10 78:24
**wrote** 43:23 62:10 70:7,11 87:18 97:11 101:25 124:7,11 127:19 128:1 129:10 130:5 153:2

**x**

**x** 164:22
**xtime** 156:3,3,11 156:11
**xtream** 146:10

**y**

**y** 151:15
**yeah** 18:3 51:5 69:8 97:15 102:9 116:19 117:4 128:17 135:25 139:18 141:6,7 148:3 157:23 159:1 160:24
**year** 39:15 123:13 123:13 131:7 138:19 161:12
**years** 14:15,16 26:8 36:3,12 51:12 55:9 58:4 60:5 61:2 79:11 79:19 80:4,6,20 81:2 86:19 88:2 100:14 109:9,20 110:6 117:15 118:1 129:16 136:2 138:25 139:1,10 143:19 144:5 154:10
**yesterday** 11:18
**york** 2:22,22

**z**

**zero** 155:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:   THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.   PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| | ) | |
| IN RE: DEALER MANAGEMENT | ) | MDL NO. 2817 |
| SYSTEMS ANTITRUST | ) | |
| LITIGATION, | ) | CASE NO. 18 C 864 |
| | ) | |

ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN, VOL 2
Highly Confidential - Attorneys' Eyes Only
January 17, 2019

ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN, VOLUME 2, produced as a witness at the instance of the PLAINTIFF(S), and duly sworn, was taken in the above-styled and numbered cause on the 17th day of January, 2019, from 9:07 a.m. to 4:43 p.m., via telephone, before Shauna L. Beach, RDR, CRR, CSR in and for the State of Texas, reported by machine shorthand, at the law offices of Gibbs & Bruns, LLP, 1100 Louisiana, Suite 5300, Houston Texas 77002, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE WITNESS:

AUNDREA K. GULLEY
BRICE WILKINSON
Gibbs & Bruns, LLP
1100 Louisiana
Suite 5300
Houston, Texas 77002
agulley@gibbsbruns.com
bwilkinson@gibbsbruns.com

FOR AUTHENTICOM, COX AUTOMOTIVE AND IT'S NAMED PLAINTIFF SUBSIDIARIES, MDSC, AUTOLOOP AS A REPRESENTATIVE OF THE VENDOR CLASS:

MICHAEL N. NEMELKA
JOSEPH LONG
Kellogg Hansen Todd Figel & Frederick
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
mnemelka@kellogghansen.com
jlong@kellogghansen.com

FOR THE DEALERSHIP CLASS PLAINTIFFS:

PEGGY J. WEDGWORTH
ROBERT WALLNER (appearing telephonically)
JOHN HUGHES
Milberg Tadler Phillips Grossman, LLP
One Pennsylvania Plaza
19th Floor
New York, New York 10119
pwedgworth@milberg.com
rwallner@milberg.com

FOR CDK GLOBAL:

MARK RYAN
Mayer Brown
1999 K Street, N.W.
Washington, DC 20006-1101
mryan@mayerbrown.com

A P P E A R A N C E S

FOR THE WITNESS:

MICHAEL P.A. COHEN
Sheppard Mullin
2099 Pennsylvania Avenue
Suite 100
Washington, D.C. 20006-6801
mcohen@sheppardmullin.com

ALSO PRESENT:

SCOTT CHERRY
Vice President - General Counsel at The Reynolds and Reynolds Company

Ben Harwood, Videographer

INDEX

PAGE

Appearances 176

ROBERT BROCKMAN

Examination by Ms. Wedgworth 176

Examination by Mr. Nemelka 289

Examination by Ms. Gulley 300

Further Examination by Mr. Nemelka 354

Further Examination by Ms. Wedgworth 357

Signature and Changes 369

Reporter's Certificate 370

It came to our attention earlier today that there was an inadvertent mis-numbering of exhibits at the deposition of Ronald Lamb, causing a duplication of exhibits “Plaintiffs‘-670” through “Plaintiffs‘-679.” Accordingly, Veritext will be adjusting the numbering of the duplicate exhibits to reflect the deponent

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 274 | Email chain ending with email to Robert Theron Brockman, II from Bob Brockman dated November 9, 2016 REYMDL00263304 Highly Confidential - Attorneys' Eyes Only | 318 |
| Exhibit 275 | Email chain ending with email to Christopher Rulon from Bob Brockman dated September 17, 2013 REYMDL00611282 - REYMDL00611284 Highly Confidential - Attorneys' Eyes Only | 321 |
| Exhibit 657 | Email chain ending with email to Bob Brockman from Ronald Lamb dated September 2, 2015 REYMDL00244021 - REYMDL00244025 Highly Confidential - Attorneys' Eyes Only | 184 |
| Exhibit 658 | Email chain ending with email to Robert Schaefer from Bob Brockman dated April 30, 2015 REYMDL00045348 Highly Confidential - Attorneys' Eyes Only | 201 |
| Exhibit 659 | Email chain ending with email to Bob Brockman from Ron Workman dated December 24, 2015 CDK-CID-00963942 Confidential Highly Confidential | 213 |
| Exhibit 660 | Reynolds and Reynolds January 2016 Financial Package REYMDL00719700 - REYMDL00719787 Highly Confidential - Attorneys' Eyes Only | 221 |
| Exhibit 661 | Email chain ending with email to Bob Brockman from Robert Schaefer dated January 5, 2016 REYMDL00045556 | 229 |

Highly Confidential - Attorneys'Eyes Only

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 662 | Email chain ending with email to Robert Schaefer from Craig Moss dated October 7, 2016 REYMDL00590725 - REYMDL00590727 Highly Confidential - Attorneys' Eyes Only | 234 |
| Exhibit 663 | Email chain ending with email to Keith Hill from Bob Brockman dated November 28, 2017 REYMDL00661495 - REYMDL00661497 Highly Confidential - Attorneys' Eyes Only | 237 |
| Exhibit 664 | Email chain ending with email to Dan Agan from Jonathan Strawsburg dated April 21, 2016 REYMDL00333091 - REYMDL00333092 Highly Confidential - Attorneys' Eyes Only | 240 |
| Exhibit 665 | Email chain ending with email to Bob Brockman from Robert Schaefer dated May 8, 2016 REYMDL00050127 Highly Confidential - Attorneys' Eyes Only | 244 |
| Exhibit 666 | Email chain ending with email to Robert Schaefer from Bob Brockman dated May 31, 2016 REYMDL00045445 Highly Confidential - Attorneys' Eyes Only | 247 |
| Exhibit 667 | Email chain ending with email to Chris H. Hellyer from Robert Schaefer dated June 1, 2016 REYMDL00068321 - REYMDL00068325 Highly Confidential - Attorneys' Eyes Only | 252 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 668 | Email chain ending with email to Robert Schaefer from Bob Brockman dated June 2, 2016 REYMDL00071272 - REYMDL00071273 Highly Confidential - Attorneys' Eyes Only | 256 |
| Exhibit 669 | Email chain ending with email to Robert Schaefer from Bob Brockman dated August 12, 2016 REYMDL00238490 - REYMDL00238491 Highly Confidential - Attorneys' Eyes Only | 256 |
| Exhibit 670 Brockman | Email chain ending with email to Robert Schafer from Bob Brockman dated August 12, 201 REYMDL00238492 - REYMDL00238493 Highly Confidential - Attorneys' Eyes Only | 259 |
| Exhibit 671 Brockman | Email chain ending with email to Bob Brockman from Jonathan Strawsburg dated June 20, 2017 REYMDL00263065 - REYMDL00263066 Highly Confidential - Attorneys' Eyes Only | 262 |
| Exhibit 672 Brockman | Email chain ending with email to Robert Schaefer from Bob Brockman dated July 4, 2016 REYCID0074420 - REYCID0074422 Highly Confidential - Attorneys' Eyes Only | 268 |
| Exhibit 673 Brockman | Email chain ending with email to Jon Martin from Robert Schaefer dated May 9, 2017 REYMDL00470609 Highly Confidential - Attorneys' Eyes Only | 271 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 674 Brockman | Email chain ending with email to Tommy Barras from Jonathan Strawsburg dated July 19, 2017 REYMDL00503332 - REYMDL00503335 Highly Confidential - Attorneys' Eyes Only | 276 |
| Exhibit 675 Brockman | Reynolds and Reynolds July 2018 Financial Analysis Package REYMDL00723521 - REYMDL00723612 Highly Confidential - Attorneys' Eyes Only | 284 |
| Exhibit 676 Brockman | Reynolds and Reynolds December YTD 2017 Financial Analysis Package REYMDL00722459 - REYMDL00722550 Highly Confidential - Attorneys' Eyes Only | 288 |
| Exhibit 677 Brockman | Email chain ending with email to Robert Schafer from Bob Brockman dated February 7, 2015 REYMDL00061987 - REYMDL00061988 Highly Confidential - Attorneys' Eyes Only | 289 |
| Exhibit 678 Brockman | Email chain ending with email to Ron Lamb from Bob Brockman dated June 30, 2015 REYMDL00583889 - REYMDL00583890 Highly Confidential - Attorneys' Eyes Only | 292 |
| Exhibit 679 Brockman | Email chain ending with email to Robert Schaefer from Bob Brockman dated July 1, 2017 REYMDL00045179 Highly Confidential - Attorneys' Eyes Only | 296 |

P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning. Today is January 17th, 2019. We're on the record at 9:07 a.m. This is the continued recorded deposition of Mr. Robert Brockman in the matter of In Re: Dealer Management Systems Antitrust Litigation in the United States District Court for the Northern District of Illinois in the Eastern Division.

My name is Ben Harwood, and I'm the videographer present on behalf of Veritext. The court reporter is Shauna Beach, also present on behalf of Veritext. This deposition is being held at Gibbs & Bruns, LLP, located at 1100 Louisiana Street, Suite 5300, in Houston, Texas, ZIP Code 77002.

Will counsel please state their appearance and firm affiliation for the record.

MS. WEDGWORTH: Peggy Wedgworth, from Milberg Tadler Phillips Grossman, on behalf of Dealership Class Plaintiffs.

MR. HUGHES: John Hughes, Milberg Tadler Phillips Grossman, representing Dealership Class Plaintiffs.

MR. NEMELKA: Mike Nemelka from Kellogg Hansen, representing the Individual and Dealership Class Plaintiffs, and with my colleague, Joe Long.

MS. GULLEY: Andi Gulley, from Gibbs & Bruns, representing Mr. Brockman and the Reynolds and Reynolds Company.

MR. WILKINSON: Brice Wilkinson, also with Gibbs & Bruns.

MR. COHEN: Michael Cohen, with Sheppard Mullin, representing the defendant, the Reynolds and Reynolds Company and the witness, Mr. Brockman.

MR. RYAN: Mark Ryan, from Mayer Brown, on behalf of CDK Global.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness and we may proceed.

ROBERT THERON BROCKMAN,

having been first duly sworn, testified as follows:

EXAMINATION

BY MS. WEDGWORTH:

Q. Good morning, Mr. Brockman. As we started yesterday, I'll just ask you -- all of the rules we put in place yesterday, are you okay with continuing those same rules today?

A. Yes, ma'am.

Q. So if you answer a question, I'll assume you understand the question. Is that fair?

A. Yes, ma'am.

Q. And if you don't understand, please, let me

know and I'll restate the question. And if you need to take a break at any time, please, let me know. I'm happy to take a break as long as there's a question not pending. I'll ask that you answer the question before we take a break, if that -- can you agree to that?

A. Yes, ma'am.

Q. Okay. I wanted to start today on a different topic of converting dealerships. When they convert DMSs, does Reynolds track all dealerships who convert DMSs -- or switch DMSs?

MS. GULLEY: Form.

A. I'm sorry. I don't understand.

Q. (By Ms. Wedgworth) Well, when a dealership switches, say, from a Reynolds DMS to a CDK DMS, does Reynolds track that conversion?

MS. GULLEY: Form.

A. That's not -- we consider that a -- a lost customer. The concept of conversion is not part of anything that we keep track of.

Q. (By Ms. Wedgworth) So Reynolds --

A. When you lose a customer, I mean, it's implied that there's a -- obviously, there has to be a conversion involved, I suppose, so we don't think about it -- it in those terms. And therefore, I can't say that -- that we track conversions. We track lost

customers.

Q. When a dealership -- do you call it "converts" or "switches"?

A. We use either term.

Q. So when a dealership converts DMS, there are risks, correct, to the dealership?

MS. GULLEY: Objection; form.

A. A risk?

Q. (By Ms. Wedgworth) Risk, yes. Risk in loss of sales, loss of customers, loss of employees, are there risks when a DMS switches -- when a dealership switches DMS?

MS. GULLEY: Objection; form.

A. I don't know that I would characterize it as risk. There's certain overhead that is involved, because the dealership's employees have to learn new software. And I'm sure you've been through situations where you had to change from one software package to another software package.

You know, you've got to learn how -- it's kind of like I have a new iPhone, and I -- I've never had iPhones before. I've always had Androids. And it's, you know, quite different. And so therefore, there's overhead. I wouldn't call that "risk."

Q. (By Ms. Wedgworth) Is it fair to say that in

the first year or two after a DMS conversion by a dealership, there is employee turnover at the dealership in nearly all cases?

MS. GULLEY: Objection; form.

A. I would not agree that that has anything to do with conversions. Turnover in dealerships is astronomical. For instance, in the sales department in the dealership, 100 percent turnover a year is quite common. It's not that high a percentage in other parts of the dealership, but as an industry, the turnover by -- by my standards is horrible.

Q. (By Ms. Wedgworth) And is some of that turnover for some dealerships a factor of a DMS conversion?

MS. GULLEY: Objection; form.

A. Ma'am, I -- I don't know that I can say that. You know, certainly a conversion that -- that goes poorly -- frankly, the principal reason for a conversion going poorly is the people refuse to learn the new software.

Q. (By Ms. Wedgworth) And that's a cost for the dealership; correct?

MS. GULLEY: Form.

A. Certainly if the dealership personnel will not learn the new software, which causes the conversion to

not go as smoothly as it should, certainly that's a cost to the dealership.

Q. (By Ms. Wedgworth) Is it fair to say that for some dealerships, switching DMS can take years to recover from?

MS. GULLEY: Objection; form.

A. I think that that would be not a fair statement. There's certainly -- that has happened, you know -- you know, several times in my experience in the business, but it's not -- it does not generally happen.

Q. (By Ms. Wedgworth) Is it fair to say that there is employee turnover after a dealership switches DMS?

MS. GULLEY: Objection; form.

A. I personally don't believe that, any more than usual, which is horrible. The turnover by itself, absent anything, is -- is unsatisfactory, in my opinion.

Q. (By Ms. Wedgworth) Is it fair to say there's customer disruption after a dealership switches DMS?

MS. GULLEY: Objection; form.

A. Again, I think the source of disruption would -- would occur not because the conversion itself, but because of the -- the poor attention that dealership employees pay to learning the new system. It is -- it's one of our -- our chief problems in the business.

Q. (By Ms. Wedgworth) So when a dealership is considering switching DMS, they have to consider whether or not their employees can efficiently integrate into the new system; is that correct?

MS. GULLEY: Objection; form.

A. That is a correct statement.

Q. (By Ms. Wedgworth) Is it fair to say that if a dealership does choose to convert, that that conversion cannot be done quickly?

MS. GULLEY: Objection; form.

A. No, I don't agree with that. The -- the conversion process, you know, properly done, where the dealership personnel do what they're supposed to do as far as learning the new system, that -- that conversion can go very quickly. And again, I'll repeat again, if they're not diligent in learning the new software, conversion process can drag on until they finally, you know, give up and decide to accept the new system and to learn it.

Q. (By Ms. Wedgworth) And when you say "drag on," sometimes that can be up to two years; correct?

MS. GULLEY: Objection; form.

A. No, I think that would be more -- more -- more on the line of two to three months.

Q. (By Ms. Wedgworth) So when you say "drag on,"

you don't mean longer than two or three months?

MS. GULLEY: Objection; form.

A. That's correct, ma'am.

Q. (By Ms. Wedgworth) If a dealership changes DMS, they may have to acquire new servers; correct?

A. That's correct.

Q. And they may have to acquire new printers; correct?

A. Typically not new printers. Printers are pretty much universal pieces of equipment and, especially since everything is laser printers now, laser printers are very standard.

Q. So it's not typical when you change DMS that you would have to, as a dealer, acquire new printers?

A. That's correct.

Q. And are -- is there other equipment that dealers would have to acquire when they change DMSs?

MR. RYAN: Object to the form.

A. No. PCs are, again, you know, very much standardized, and whatever PCs they've got, work. I personally think that it's very advantageous to acquire a second monitor for users -- second monitors are $200. We don't even sell them. Efficiency goes way up when you go from, you know, one monitor to two monitors. And that happens a lot in our installations, but it's just

because we -- we -- you know, tell the dealer, look, if you want to have 20 percent more productivity, give people a second monitor. But that's not a requirement.

Q. (By Ms. Wedgworth) If a dealership changes DMS, they also have to get their data transferred from the old DMS to the new DMS; correct?

A. That's correct.

Q. And it can take months for the staff at a dealership to get comfortable with that new DMS once the data is transferred over; correct?

MS. GULLEY: Form.

A. Again, I -- I think that varies greatly by individual. But in -- from a general statement, dealership personnel don't stand up and cheer -- jump up and down about having to learn a new system any more than you would. It -- it's something that you -- you got to concentrate on, you got to pay attention and you got to do it.

Q. (By Ms. Wedgworth) It's a complicated process; is that fair?

MS. GULLEY: Form.

A. It's not a complicated process. The complexity isn't -- people just are sitting in a chair and doing it.

Q. (By Ms. Wedgworth) Mr. Brockman, I'll show you

what's been marked as Plaintiff's Exhibit 657.

(Exhibit 657 was marked for identification.)

MS. WEDGWORTH: And for the record, it's a document Bates-stamped REYMDL00244021 through 025. Have you had a chance to review the document?

A. Yes, ma'am.

Q. (By Ms. Wedgworth) Is -- is this an email you wrote to Mr. Lamb around September 1st, 2015?

A. Yes, ma'am.

Q. And in this email, did you try to be truthful and accurate?

A. Yes, ma'am.

Q. So the attachment to the email is a letter dated November 24, 2014, addressed to Mr. Rick Hendrick and is signed by Ron Lamb. Do you remember reviewing this letter?

A. Yes, ma'am.

Q. And is Mr. Hendrick an owner of the largest automotive group -- I'm sorry -- the largest client of Reynolds?

A. I'm not sure it's the largest client. It, for sure, is the largest privately owned group in the country.

Q. Are you aware of any client for Reynolds that's

larger than Hendrick?

A. I believe at that point in time, the Penske organization is -- and still is, because they're the second largest publicly owned group in the country.

Q. And if we look at your email at the 1st to Mr. Lamb, you write, "Ron, the first half of this letter is brilliant. I made just a slight addition." Do you see that, at the email you wrote to Mr. Lamb? First sentence?

"The first half of this letter is brilliant. I made just a slight addition." Do you see that?

A. I saw it. But now I'm trying to --

Q. On the first page, right under the --

A. Okay. Yes, I found -- I found it.

Q. And -- and you say, "The first half of the letter is brilliant. I made just a slight addition." And then you say, "However starting with 'Upgrade and Grow', it loses fire." Do you see that?

A. Yes, ma'am.

Q. So if we go to the letter, the first page of the letter, under the heading -- this is a letter that Mr. Lamb wrote to Mr. Hendrick at a time when Hendrick was considering moving from Reynolds to CDK; is that correct?

MS. GULLEY: Objection; form.

A. Yes, ma'am.

Q. (By Ms. Wedgworth) And, in trying to keep the business, Mr. Lamb sends this letter to Mr. Hendrick; is that correct?

A. Yes, ma'am. I think it was primarily intended for Mr. Brown. Mr. Hendrick, at that point in time, was not actively involved in -- in this process. He was the -- the titular head.

But as you may or may not be aware, he's very involved in stock car racing and, at this point in time, he was fully consumed in running the stock car racing operation, not the dealership management operation. Mr. Brown was in -- in charge of that.

Q. And Mr. Brown's title at Hendrick is -- do you know?

A. He was president of the automotive group.

Q. And in trying to keep the business of the Hendrick automotive group, Mr. Lamb writes this letter to Mr. -- I'm sorry -- Mr. Lamb writes the letter to Mr. Hendrick and Mr. Brown; correct?

A. Yes.

Q. And in this letter, on the first page, halfway down the page, there are "Convert with Risks" where Mr. Lamb writes, "Converting 95 dealerships and 29

collision centers is a major project with serious risks." Do you agree with that statement?

MS. GULLEY: Objection; form.

A. Yes, ma'am. The sheer size of it is -- is what makes it, you know, challenging. It's one thing to convert one dealer or two dealers or four dealers or a dozen dealers, whatever, but to convert 95 and 29 collision centers, the sheer scale, you know, causes it to be a -- a very serious project and with risks.

Q. (By Ms. Wedgworth) One of those risks is it would take -- likely take years to recover?

MS. GULLEY: Form.

A. Well, again, the issue is -- as I've -- as I've previously stated, is that the training and education of personnel is -- is the biggest problem, by far, in conversions. And if you have, you know, 95 sets of personnel, with each dealership has its own personnel structure that has to be, you know, taught, they have to, you know, accept the fact that change is going to happen. Get serious about learning the new software. Again, if you take that project for one dealer or two dealers or five dealers -- it's just way greater if it's 95. And that -- that causes, you know, the risk quotient to go up.

Q. (By Ms. Wedgworth) Even at one dealer, though,

you have the same issue of training the personnel; correct?

A. Yes. But it's much smaller. It could be, for instance, the number of people around this table.

Q. Well, it also depends on the size of that dealership originally as well; correct?

A. That's correct.

Q. But here, Mr. Lamb says, "It will likely take years to recover." You agree with that, right?

MS. GULLEY: Form.

A. In this particular situation, the level of risk was such that, because of the number of people that have to be trained, it could take -- assuming it went wrong, it could take quite a while.

Q. (By Ms. Wedgworth) The last sentence on this page says -- Mr. Lamb writes, "Reynolds tracks all dealerships who convert using publicly available data." Do you see that?

A. Yes, I do.

Q. Do you agree with that statement?

A. I think that -- that the statement is -- is somewhat less than complete, because publicly available data -- I think that the -- the number of dealerships that are public is less than ten. I think the number is actually, like, seven. And so while "Reynolds tracks

all dealerships who convert using publicly available data" -- it sounds like a lot of dealers, but it's not. It's -- it's really only seven or eight.

Q. So in this letter that Mr. Lamb writes to the Hendrick Automotive, he's less than complete on this statement?

MS. GULLEY: Objection; form.

A. No. I think the -- the state- -- the statement as written is true, okay?

Q. (By Ms. Wedgworth) And complete?

MS. GULLEY: Objection; form.

A. Well, when you say "complete," as a sentence, it certainly is complete. Is it -- is it a paragraph, or is it a page that describes everything that go -- goes into this statement? No, it's not.

Q. (By Ms. Wedgworth) Well, you commented that the first half of this letter was brilliant. Do you still stand by that?

MS. GULLEY: Objection; form.

A. Well, first of all, I didn't detect any spelling errors and, you know, that pleased me a lot. Salespeople are not necessarily the greatest as far as grammar and, you know, punctuation and spelling and that sort of thing.

I thought it was brilliant in that it

identified the key issues, specifically, the fact that we had a windows-based DMS. And even more specifically, that it talks about the products that we have that are extremely profitable for the dealer, which are -- docuPAD is, perhaps, the leading one.

Q. (By Ms. Wedgworth) If we go to the next page of the letter, at the top, it says, "Here are examples of when a group converts from Reynolds." Do you see the chart at the top of the page?

And then underneath -- and it lists Herb's -- Herb Chambers, Prestige Management Services and Ed Morse and other auto dealerships. Do you see that?

A. Yes, I do.

Q. And then Mr. Lamb writes, "In nearly all cases, there is a significant drop in sales, which is expected the first year or two of a conversion given all the employee turnover and customer disruption." Do you see that?

A. Yes, I do.

Q. Do you agree with that statement?

A. I think, certainly, you can pick out cases where, you know, that -- that has been a -- a true statement. And certainly in these cases here -- I know some of these customers. Their problem was -- and

that's they had, you know, turnover at the top, change in -- in dealership, you know, leaders. I don't know that that's the case in all of them, but I believe from a statistical standpoint, you know, the stats that are shown here are true. But to say that they're -- they're completely the result of -- of a conversion, it could be true; it could not be true.

Q. Well, you stand by the statement Mr. Lamb wrote in this letter, don't you?

MS. GULLEY: Objection; form.

A. Yes, I do. These -- these statistics -- or these particular dealerships are a matter of public record.

Q. (By Ms. Wedgworth) So is it fair to say, in nearly all cases, there is a significant drop in sales, which is expected the first year or two of a conversion, given all the employee turnover and customer disruption?

MS. GULLEY: Objection; form.

A. I -- I think that -- that there's no question that the statistics that are shown for these dealerships are true. I don't agree that one can necessarily infer that all situations, that, you know, that's what's happening.

Q. (By Ms. Wedgworth) Well, you approved this letter in this statement going to Hendrick Automotive

Group; correct?

MS. GULLEY: Objection; form.

A. Yes, I did.

Q. (By Ms. Wedgworth) The next sentence says, "What is really surprising is these groups have not recovered." Do you see that?

A. Yes.

Q. And do you recall that these groups listed above, where they drop in sales from one year over the next, have yet to recover?

A. That, I -- I don't have knowledge of.

Q. So the last one on the chart, Gordon Auto Group, it had a conversion year in 2009. Do you see that?

A. Yes, I do.

Q. And then last year Aut- -- Automotive News ranked them as 110. And in 2014, which is -- appears to be the most recent data for this letter -- they're at 142 with a change, according to this chart, of going down 32 places. Do you see that?

A. Yes, I do.

Q. Okay. And in this chart, Mr. Lamb is representing to Hendrick Automotive Group that the conversion had something to do with their lowering in rank of sales; correct?

A. That's what it's saying. I have a little bit different belief as far as changes in Automotive News ranking. Dealerships are inherently very competitive people. And the -- the standard of measurement between dealerships is typically number of cars sold, number of vehicles sold.

It happens continuously in this industry where a dealer will want to have his name in lights as far as his ranking is concerned, and so he'll do whatever it takes to sell more cars, which means he cuts price. And he gets his name in lights, and he gets his Automotive News ranking up, and then he decides he's not making enough money. And then he decides to tighten up on discounting and not to try to sell everybody every car.

But his -- so the sales numbers go down, but his profit -- his internal profit numbers -- go way up. And then they kind of -- like this (indicating).

Q. And in spite of all that, Mr. Lamb -- with your approval, saying it was "brilliant" -- quotes Automotive News ranking with regard to sales in order to convince Hendrick to not convert; is that correct?

MS. GULLEY: Form.

A. What I'm saying is -- and that's that, certainly, conversion issues, particularly with -- with

big conversions, are a problem. But what I'm saying is there's -- there's other factors that have to do with Automotive News ranking, and other motivations, other reasons.

Q. (By Ms. Wedgworth) Is it fair to say that, for some dealerships who convert, it takes at least one to two years to recover?

A. Certainly if they don't educate their people properly. If they don't force their people to learn the new software promptly, you know, that can occur.

Q. You mentioned docuPAD in your previous answer and some yesterday. If a dealership buys a docuPAD, is it -- is the price for that purchase and installation somewhere around $10,000 per unit?

MS. GULLEY: Form.

A. Yes, it is.

Q. (By Ms. Wedgworth) And is there a monthly maintenance fee per docuPAD of $1,000 a month?

A. Yes, ma'am.

Q. And as to any change on any form used on the docuPAD, is there a cost of -- of around $300 for any change?

A. I disagree that that's for any change. A whole brand-new document, like, for instance, a new finance contract, the charge would be in that area. But to say

that any change is in that area, that would not be correct.

Q. Can any change with regard to any docuPAD document be made for free at Reynolds?

A. To the best of my knowledge, unless we have done something in error, in which case we would adjust, or if -- if the entity that produced the contract in the first place, if it was not working, you know, correctly after installation, we would fix that at no charge. But other than those kind of situations, it would be a charge.

Q. Is the average charge for any change on any document or form with regard to docuPAD roughly $300?

A. I -- I don't know that there is an average. We don't keep that. You know, there's not a stat that -- you know, that I know of or ever seen.

Q. Well, would it surprise you to say that -- I've heard dealers say that, for any change, when you use the docuPAD, everything is $300?

A. Ma'am, dealers will say most anything on any given day.

Q. Well, does it surprise you they say any change is $300 on a docuPAD form or document?

MS. GULLEY: Objection. I'm sorry.

Objection; form.

DEFENSE COUNSEL: Objection. (Inaudible.)

A. Again, ma'am, you know, dealers are prone day to day to say almost anything. And I -- I have been in this business now -- the 10th of January this year, I've been at it 53 years. And I -- I haven't seen it all, but I've seen a lot. And one of the things is -- is dealers will say most anything.

Q. (By Ms. Wedgworth) If a dealership has Reynolds DMS and switches out of Reynolds, can they return the docuPAD and get a credit on an account?

A. No, ma'am.

Q. Can they sell the docuPAD?

A. Yes, ma'am.

Q. To -- can they sell it to another dealership who could then use it?

A. Yes, ma'am.

Q. And are you aware of any -- any incidences like that?

A. I think I've been exposed to just one. You know, docuPAD is a -- an amazing profit producer. I don't know whether you've ever bought a car, you know, and been through the docuPAD experience and contrast that with a typical, you know, finance and information manager's, you know, closing techniques.

You know, docuPAD takes that all away. It

is completely user driven in that you interact with -- you know, the screen, with the stylus. And you make your choices with no pressure, you know, from the finance manager. And customers love it. The reason why dealerships love it is -- and that's because customers have a chance to choose. And a miracle occurs; they buy more.

And that's the reason why docuPAD produces, you know, profits on the average of $200 per trans- -- per vehicle sales transaction. And if you have a -- a typical finance manager will handle on the order of 70 transactions a month. At $200 additional profit, that's $14,000 a month, which means that you recover the initial cost of docuPAD very, very quickly. And then from that point on, it is a massive generator of profits.

We have dealers that are willing to, you know, have their picture in Automotive News and advertisements and say, "docuPAD paid for my entire Reynolds bill," which is --

You know, I didn't invent docuPAD, but I saw it and bought it. And the results of -- are nigh on miraculous.

MS. WEDGWORTH: Move to strike.

Q. (By Ms. Wedgworth) Mr. Brockman, my question

was simply: Are you aware of any incidents like that, where a dealership can sell their docuPAD? That was my question. It was -- it was straightforward. "Yes" or "no"?

MS. GULLEY: Form.

A. Yes.

Q. (By Ms. Wedgworth) And you said there was one occasion; is that right?

MS. GULLEY: Form.

A. Well, there's one that I know of.

Q. (By Ms. Wedgworth) Now, you've had a chance to review this letter that was sent by Mr. Lamb to Hendrick Automotive Group. Is there anything in the letter that you're aware of that's inaccurate?

MS. GULLEY: Objection; form.

A. I would want to read it again.

Q. (By Ms. Wedgworth) Well, I'm not asking you to read it again. As you reviewed it, did -- did anything stick out as being inaccurate to you?

MS. GULLEY: Objection to the form and instruction.

A. Ma'am, I would really like to read it one more time.

Q. (By Ms. Wedgworth) Well, then let's put it aside and we can go on to the next document.

With regard to the Reynolds DMS contract, do you know the average length of the -- the DMS contract that a dealer signs today?

A. We don't keep an average number. That's not a stat that I keep or have kept. What we see is -- and this is just a general, you know, observation, it's not at all a scientific average. Typically, you know, five years to seven years. It is rarely less than that.

Q. Does Reynolds offer a contract -- DMS contract to dealers less than five years?

A. We don't offer one. In some cases, you know, we end up negotiating the one that -- where the length of contract relates to the whole process of -- of buying a DMS system is -- and that's the -- the level of discount that the dealership will achieve, it will be based upon the length of the contract. And that short-term contracts -- we'll say a 36-month contract -- of the discount is appreciably less. And the dealer has a choice. They can go for a short-term contract, or they can go for a long-term contract; they get a better discount.

Q. Are there any DMS contracts at Reynolds longer than seven years?

A. Yes, ma'am.

Q. What's the longest contract that Reynolds has

with the dealership concerning DMS?

MS. GULLEY: Objection; form.

A. I -- I can't speak to what's the longest. I have seen them ten years and, in some cases, a little over ten years. But that's not a -- that's not a complete statement, because I don't see every contract. I just see some.

Q. (By Ms. Wedgworth) Does Reynolds track the tenure that a dealership stays with Reynolds?

A. No. We have no process for doing that. The only way to know is -- and that's to go to the contract file and see what prior contracts are in the contract file. We don't -- we don't produce any reports in -- in that regard.

Q. And have you ever tried to determine the average tenure of a Reynolds dealership?

A. No, ma'am, I have not.

Q. Anyone at Reynolds tried that?

MS. GULLEY: Objection; form.

A. Again, no way of knowing.

Q. (By Ms. Wedgworth) Well, you said you could look at the contracts and make that determination?

MS. GULLEY: Objection; form.

A. Yes, ma'am.

Q. (By Ms. Wedgworth) And no one at Reynolds has

done that?

A. There's not been any --

MS. GULLEY: Objection; form.

A. -- any, you know, orchestrated plan or project to go determine, you know, what the tenure is. On an individual basis, at contract renewal time, it may come up that this customer has been a customer for 22 years.

Q. (By Ms. Wedgworth) Mr. Brockman, I'll show you what's been marked as Plaintiff's Exhibit 658.

(Exhibit 658 was marked for identification.)

MS. WEDGWORTH: Which is Bates-stamped REYMDL00045348.

Q. (By Ms. Wedgworth) Have you had a chance to review the document?

A. Yes, ma'am.

Q. Is GuesTraq a third party here?

A. Yes, I believe they are a third party.

Q. And does this email reflect -- is this an email you wrote to Mr. Schaefer in response to an email he sent you on or about April 23rd, 2015 and April 30th, 2015?

A. It appears to -- that to be correct. Frankly, I don't remember this particular situation.

Q. So GuesTraq doesn't ring a bell to you as you

sit here?
A. No, ma'am.
Q. Do you have any reason to believe this -- that you didn't receive and write this email?
MS. GULLEY: Objection; form.
A. No, ma'am. I -- I presume it is. It's not a forgery. I -- I have no reason to -- to believe that it's not accurate. But I -- I don't remember anything about -- GuesTraq is -- must be some very minor entity, because I sure don't remember anything about it. I don't know what it does.
Q. (By Ms. Wedgworth) Is this an example of you granting exemption -- an exemption to a third party?
MS. GULLEY: Objection; form.
A. I'd say, based on -- on what's in bold -- what I'm saying here -- and that's that I don't want to invest the time and trouble right now which, I would presume, that applies to an RCI interface.
Q. (By Ms. Wedgworth) So it's fair to say that you are granting an exemption to GuesTraq here?
MS. GULLEY: Objection; form.
A. Well, there's -- there's -- to discuss that, you've got to look at this next-to-the-last sentence, where it talks about Query Builder. Query Builder is a -- a piece of software. It is -- it's a reporting

software. It's not really very good. It's been around for quite a while. And we're -- we've created a much better set of reporting software, and we're endeavoring to, you know, get Query Builder phased out.

And in that kind of situation, there's -- there's always times when it arises when somebody is using Query Builder and we'd rather they not use Query Builder because we want to get rid of all Query Builder usage. We want to delete that software, because we have better software. We don't want to continue to maintain, you know, very, very old and obsolete-type -- type software.

And so the question is, typically: Do these people convert to an RCI? And that's what it looks like is the case here. And what I'm saying is -- in this -- I don't want to put them through RCI, you know, because that's -- that's a development effort. Instead, for the time being, let them continue operating the way they're operating.

Q. (By Ms. Wedgworth) So you approve the ongoing exemption for GuesTraq; correct?

A. Yeah. Temporarily.

Q. And do you limit the time of the exemption in this email?

A. Not in this email. I worked very closely with

Mr. Schaefer, and he understands what I'm doing is -- and that's that I -- I'm being forced into a situation of expediency due to development processes.

Q. You can set that aside. I want to talk a little bit about ODE, Open Dealer Exchange. Are you familiar with that organization?

A. Yes, ma'am.

Q. And it's a joint venture between Reynolds and CDK; is that correct?

A. That's correct.

Q. Do Reynolds and CDK each own 50 percent of ODE?

A. That's correct.

Q. How did that come about, ODE?

MS. GULLEY: Objection; form.

Q. (By Ms. Wedgworth) How did ODE come about?

MS. GULLEY: Objection; form.

A. I think it came about by the fact that there's a -- a process in the -- in the dealership world. It's like this: You have a prospect that comes into the dealership. They're looking for a certain kind of vehicle. You have some of those type that they're looking for: different colors, different trim levels, different options. You go out and you -- you walk the inventory. And they get to visit the green one and the red one and the blue one and the silver one. And

they -- they have different types of interiors, you know, more leather and less leather.

But any rate, the prospect finally decides, "I like this one here." And the car salesman's heart kind of takes a leap for the good. They go back inside to see if they can work out a deal. Well, an inherent part of -- you know, a giant percentage of car sales involves financing. I don't know what the number is, but I wouldn't be surprised by an 80 or 90 percent car sales transactions that involve financing where the dealership has -- has to help get done.

So what happens is -- and that's the car salesperson gets an authorization form signed by the prospect to pull their credit. They pull their credit and get their FICO score. And then they go shopping for financing. And Dealertrack has built up a -- a nifty application, and it's enjoyed very considerable success with it. And what it does is -- and that's that you enter the -- you know, the information about this potential transaction, what kind of vehicle it is --

Q. (By Ms. Wedgworth) I'm focusing on ODE, not Dealertrack.

MS. GULLEY: Just let him finish his answer.

A. But you're asking me why ODE got started.

Q. (By Ms. Wedgworth) How ODE got started.

MS. GULLEY: Just let him finish his previous answer.

Just go ahead and finish the answer.

A. The how, the first part about it is -- implies the why. Okay?

Q. (By Ms. Wedgworth) Actually, it doesn't. It's a how.

MS. GULLEY: Just let him finish.

MR. RYAN: Let me -- let me just -- I know my object- -- her objections are good for me, but I believe the question was: How did it come about? And I think he's answering that question.

MS. GULLEY: Correct.

A. That's certainly what I'm trying to do.

MS. GULLEY: Go ahead and continue your response.

A. In any rate, at this point, the salesperson inputs the -- you know, the facts of the -- of the transaction, which is the -- you know, the type of car, what the sales price is, you know, what the down payment is, what -- what the consumer's FICO score is. And they can, with a -- not much more than a press of a button, send that package of information to a potential lender. And the lender can look at it and say "Yes" or "No" or

"Maybe," or "Maybe with a little more down payment, it will work." Or "We need to have some more proof of employment."

And it facilitates, you know, the whole financing process. And Dealertrack has done a very good job of -- of building that -- that product and has, basically, a near monopoly on that process. And so ODE's goal was, was to be able to replicate that process and become successful in that marketplace.

Q. (By Ms. Wedgworth) Were you the decision maker to enter ODE as a joint venture with CDK?

A. I was responsible for the Reynolds side.

Q. Did you contact CDK or did CDK contact you, initially?

A. I don't specifically recall that, but I -- my -- my belief is -- and that's they contacted us.

Q. Who contacted you at CDK?

A. I don't think that the contact was directly with me. It was -- it -- it was somebody else in our organization.

Q. Who did you speak with about the joint venture from CDK, initially?

MS. GULLEY: Objection; form.

A. I -- I would say that the -- the first conversation, again, was not between me and CDK. It

was with other people in our organization, principally over in the product planning area. And it was only after that, that I had conversation. And the name that I recall I had a conversation with was Ron Workman. He was a senior vice-president.

Q. (By Ms. Wedgworth) Who at Reynolds, in product planning, spoke to CDK concerning forming ODE?

A. Certainly one of the people that would have been involved was Jon Strawsburg.

Q. Anyone other than Mr. Strawsburg?

A. I'm sure there was, but I can't remember specifically.

Q. You -- you said yesterday that CDK is your largest competitor; is that a fair statement?

A. That's correct.

Q. Why did Reynolds en- -- enter into a joint venture with its largest competitor?

A. Well, it wasn't because they were our largest competitor, I can assure you that. But in the situation like this, one has to decide, is the opportunity, you know, worth it? In this particular case, it appeared to be worth it.

The other principal factor is -- and that's that if you don't do it, what else might, you know, CDK do. Who might they partner up with? Might they partner

up with somebody else, which would mean that we would be forever locked out of this very attractive business that Dealertrack has. And so the decision was -- and that's we ought to proceed, but proceed carefully, investigating, you know, the potential with ADP.

Q. Was ODE founded around 2009?

A. I don't remember the exact date, but it's been a while.

Q. And the decision to proceed with CDK was made by you?

A. Yes.

Q. And in making that decision, you said you spoke to Mr. Workman at CDK?

MS. GULLEY: Objection; form.

A. That was one of the people that -- that I talked to.

Q. (By Ms. Wedgworth) Who else at CDK did you speak to?

MS. GULLEY: Objection; form.

A. I'm sorry. I -- I don't remember the names. You know, I think that there's -- you know, there's been -- I know there's been turnover in that organization, but Ron Workman was the consistent person throughout.

MS. GULLEY: Is this a good time for a

break?

MS. WEDGWORTH: Yes. Let's take a break.

THE VIDEOGRAPHER: The time is 9:57 a.m., and we're off the record.

(Short recess 9:57 to 10:17 a.m.)

THE VIDEOGRAPHER: The time is 10:17 a.m., and we're back on the record.

EXAMINATION (Continuing)

BY MS. WEDGWORTH:

Q. Mr. Brockman, focusing you back on ODE, have CDK and Reynolds had meetings in person regarding ODE?

A. Yes, ma'am.

Q. How many?

A. Well, I -- I think in order to give the correct answer on that -- are -- are we talking about meetings where everybody that's involved are all together? Or where some of the folks that are involved are all together and some are on the phone? You know, which definition of -- of "meeting," you know, would you like me to answer?

Q. Well, ODE has board of directors' meetings; correct?

A. That's correct.

Q. And are those board of directors' meetings in person or by phone?

A. Typically, by phone.
Q. And are those -- how often do those board of directors' meetings occur?
A. There -- there's not a -- a fixed schedule, but my -- my guess is -- and that would be probably on -- on a quarterly basis, you know, three or four times a year.
Q. So on a quarterly basis, ODE holds telephonic board of directors' meetings; is this correct?
A. Not -- generally on a quarterly basis. It's not a fixed, you know, first quarter, second quarter, third quarter, you know.
Q. And have you participated in meetings with CDK concerning ODE in person?
A. I have, but rarely.
Q. Approximately how many times?
MS. GULLEY: Form.
A. No more than once a year, if that. It -- it typically revolves around NADA, because we are -- we tend to all parties be present at NADA, and so we'll sit down and talk for half an hour.
Q. (By Ms. Wedgworth) So at the NADA meetings, which are -- that's an annual conference?
A. Yes, ma'am.
Q. Held in, usually, late January, coming up?
A. Coming up. I understand it's going to be Super

Bowl Weekend. It's going to be in San Francisco.

Q. So normally, at the NADA meetings, you meet with CDK people con- -- to discuss ODE?

MS. GULLEY: Form.

A. Yes. And that meeting tends to be a very informal meeting, because we're -- there's not -- there's no fixed agenda, there's no, you know, special place or whatever. We just find time to, you know, get together, you know, for a half hour or so.

Q. (By Ms. Wedgworth) And when you -- the last time you met with CDK, who did you meet with?

MS. GULLEY: Objection; form.

A. The only person whose name I -- there's two people: It was Steve Anenen and Ron Workman.

Q. (By Ms. Wedgworth) And other than you meeting in person with CDK, do Reynolds people meet with CDK people regarding ODE in person?

A. Yes. Yes.

Q. How often?

A. Again, there's no fixed schedule. It depends on, you know, what projects are at hand. You know, so it could be once or twice a year. It could be five, six, seven times a year.

Q. Have you met with anyone from ODE at places other than the NADA convention?

A. I think that I have, but I can't recall a specific, you know, time or place. Steve Lloyds is the -- is the, you know, the CEO of ODE. I talk to him mostly on the phone or, you know, over Skype. But as far as other people, I think I've -- I've been on telephone calls with their head of software development, Tom -- and I can't remember his last name right now. That -- you know, maybe once a year.

(Exhibit 659 was marked for identification.)

Q. (By Ms. Wedgworth) I'd like to show you what's been marked as Plaintiff's Exhibit 659. My initial question is: Have you seen this document before?

A. No, ma'am.

Q. You have not?

A. Not this specific document, I don't believe.

Q. The cover email says that Mr. Workman sent it to you on December 24th, 2015. The cover email. Is this an email you received from Mr. Workman on or about December 24th, 2015?

MS. GULLEY: Objection; form.

A. Again, you know, this -- this cover email with -- would tend to indicate that, but I honestly don't recall, yeah, this specific email.

Q. (By Ms. Wedgworth) Do you have any reason to

believe that this is not the board meeting minutes of ODE for December 2015?

MS. GULLEY: Form.

A. Ma'am, I don't have, you know -- you know, clear enough memory of -- of that particular time, you know, several years back. That's three years back. This -- these are exactly what went on at -- it looks like it, but... (Pause.)

Q. (By Ms. Wedgworth) There's someone here you haven't mentioned for CDK: Bihner -- Bihner, B-i-h-n-e-r. Do you know Mr. Bihner?

A. I have been on telephone conversations with him, but I don't know. I think his first name is Joe. But I've -- I've -- and I may have met him at NADA and shaken hands with him, but I -- I couldn't pick him out of a crowed.

Q. And Mr. Bihner is a CDK person?

A. Yes.

Q. Manager?

A. I would think, maybe, perhaps he might even be an officer.

Q. And for R&R, on these board meeting minutes has Mr. Pontis listed. Is he also someone from Reynolds who interacts with CDK concerning ODE?

A. Yes. He works for Jon Strawsburg.

Q. You can put that aside.
Is there any reason to believe that these minutes are inaccurate?
MS. GULLEY: Objection; form.
A. No, ma'am.
Q. (By Ms. Wedgworth) Now, Reynolds also has a relationship with CDK concerning CDR; correct?
MS. GULLEY: Form.
A. Yes, ma'am.
Q. (By Ms. Wedgworth) And that relationship is, again, a joint venture between Reynolds and CDK?
A. That's my understanding. I -- I'm not -- generally much less familiar with CVR, because that is something that was entered into considerably before my time at Reynolds. And it is, you know, completely controlled by CDK, because they have the -- the dominant ownership interest.
Q. And CVR is 80 percent owned by CDK and 20 percent owned by Reynolds; is that correct?
A. That's my understanding. Although I'm not in a position where I can say for sure that's exactly how it is, because I was not there when it was -- when it was founded.
Q. So other than ODE and CVR, does Reynolds have any other formal relationships with CDK?

MR. RYAN: Objection.

A. I don't think so.

Q. (By Ms. Wedgworth) Does Reynolds have any informal relationships with CDK currently?

MS. GULLEY: Objection; form.

A. Yes. Probably one.

Q. (By Ms. Wedgworth) What is that?

A. It is a -- again, this is something that, you know, began considerably before my time. But I came -- became aware of its existence, you know, after we acquired Reynolds. It has to do with -- when a customer decides to leave, you know, one of us, as long as that customer pays all their bills, honors all of their contractual obligations, we will turn over to the assuming company copies of data files for that dealership.

Q. And that relationship, you have with CDK?

A. Yes, ma'am.

Q. And --

A. And I might add that it is unwritten, informal. And I wouldn't go so far as to characterize it as a relationship. What it is -- it is a practice. And it -- it has no specified duration. It's something that, you know, either one of us could, you know, quit tomorrow.

Q. So you would not call it an informal relationship?
A. No, ma'am. I would call it a practice.
Q. Is the inform- -- the practice reciprocal?
MS. GULLEY: Objection; form.
A. Yes, ma'am.
Q. (By Ms. Wedgworth) Who for CDK -- who for Reynolds implements this reciprocal practice?
MS. GULLEY: Form.
Q. (By Ms. Wedgworth) Between CDK and Reynolds?
MS. GULLEY: Form.
A. I honestly don't know which department actually handles it. It's my belief that it gets done but, you know, exactly where in the organization it occurs, I -- I can't tell you.
Q. (By Ms. Wedgworth) Would it be under Mr. Schaefer's role? His team?
A. It could be. But for some reason, I think that -- that that's not where it happens. I think it -- it's more likely to happen over in part of the operations department of the organization.
Q. Do you have a similar reciprocal relationship with any other DMS providers?
A. Do not.
Q. So the only reciprocal relationship you have

regarding this DMS agreement is with CDK?

MS. GULLEY: Objection; form.

A. That -- that's correct.

Q. (By Ms. Wedgworth) I'd like to show you what's been previously marked as Exhibit 504. I don't think we have to mark it again.

MS. GULLEY: You don't.

Q. (By Ms. Wedgworth) Previously marked Exhibit 504, Mr. Brockman. Document Bates-stamped REYMDL00263055. Have you had time to review the document, Mr. Brockman?

A. I've never seen this before. Could you give me just a moment more?

Q. Yes.

A. Yes.

Q. Is this an email you received and responded to on or around May 30, 2017?

A. Yes, ma'am, it appears to be that.

Q. And was it your intent to be truthful and accurate in writing the email?

MR. RYAN: Objection.

A. Yes, ma'am.

Q. (By Ms. Wedgworth) And here you're responding to a question from Mr. Strawsburg; correct?

A. That's correct.

Q. And in the email you write, "Other than our informal relationship with CDK, we provide no assistance to any third party." Do you see that?

A. Yes.

Q. Is this the informal relationship with CDK you just testified about?

A. Yes, ma'am.

Q. So in -- in the response to Mr. Strawsburg, you referred to it as an informal relationship?

A. Yes, ma'am, in that case, I did.

Q. And did this informal relationship with CDK allow CDK to access Reynolds software in May 2017?

MS. GULLEY: Objection; form.

A. The answer to that is "not correct."

Q. (By Ms. Wedgworth) Did this informal relationship with CDK allow CDK to -- to work with Reynolds regarding the -- both DMS systems?

MS. GULLEY: Objection; form.

A. There -- we need to talk some more about, you know, what, you know, the informal relationship -- or this involves. We receive notification, typically from the customer, that they're -- that they're converting to CDK. And our first question is -- is: "Well, have you decided when?" And with that information, we also ask them to -- to notify CDK --

actually, CDK is notifying them as to when their conversion is going to take place.

And there's a scheduling process that takes place where -- when the conversion data is going to be outputted on to a tape, and that tape is -- can then -- then be given, you know, to CDK. They don't actually access our systems at all.

There -- there's an inter- -- intermediate step in there where the accounts receivable position of -- of the customer is verified by our accounting department. And it's not just, you know, what they might be currently due, but also what's going to be due by the time the conversion occurs. And so there's -- there then -- there's then a dollar amount which represents the total remaining obligation of the customer, and that's from a financial standpoint. And before the tape is actually cut, we get a check for their remaining financial obligation.

Q. (By Ms. Wedgworth) And then CDK and Reynolds have a conversation; is that correct?

A. No. There -- there's been a conversation prior to that, but it will be a -- a subsequent conversation. It -- it's a multistep, and I -- I'm not in a position, from a knowledge standpoint, to describe that with perfect accuracy. But generally, that's what happens.

Q. And Reynolds does not have that relationship with any other DMS provider; is that correct?

MS. GULLEY: Objection; form.

A. That's correct. What the other -- other providers have to do is -- and that's they have to ask the customer to, you know, run reports of things like parts inventory and vehicle inventory and general ledger balances, for the -- for the customer to copy those reports out to a -- a thumb drive or a small hard disk and -- and give that to the vendor that they're going to, that they're converting to. And then those reports are run through data conversion programs to accomplish the same thing.

MS. WEDGWORTH: Move to strike everything after "That's correct."

Q. (By Ms. Wedgworth) You can set that document aside, Mr. Brockman. Mr. Brockman, I'll show you what's been marked as Plaintiff's Exhibit 660.

(Exhibit 660 was marked for identification.)

Q. (By Ms. Wedgworth) I believe yesterday you testified this type of document is a management report concerning finances at Reynolds; is that correct?

A. That -- that's correct.

Q. And do you receive these reports on a monthly

basis?

A. Yes, ma'am.

Q. And the purpose of this report is for Reynolds to understand the financial analysis going on, overall, at the company; is that correct?

A. That's correct. It's prepared for senior level vice-presidents. And it -- it's not financial statements, but it's financial information. And to say that it's used to run the company is probably a mischaracterization.

I get this report once a month. I probably spend 30 minutes on it. And the reason why I only spend 30 minutes on it is because it's historical information. It is -- has been -- very little bearing as what I should be doing on a day-to-day. Reynolds is the type of company where what happened five years ago has way more impact on what we see in here than what happened -- than what's happened in the last month.

Q. And these reports show that -- whether or not Reynolds is -- what their sales are; is that correct?

MS. GULLEY: Form.

A. Yes. That -- that is one of the sta- -- statistics that it provides. But, again, from an important standpoint, as far as running the company, this report is very little used by me. I'm much more

interested in who we've hired, the customers we've sold, what projects we're accomplishing as far as new product development. Those are all way more -- way more important for the success of the organization.

Q. (By Ms. Wedgworth) Well, these are prepared by Reynolds at least on a monthly basis; correct?

A. That's correct.

Q. And they are sent to you at least on a monthly basis?

A. That's correct.

Q. And it's -- there is a team at Reynolds who prepares these financials; is that correct?

A. That's correct.

Q. If we go to Page 12 of this document, which has a Bates ending 712. And this document, at the top, is "NA DMS Product Solution Data Services P&L." Do you see that at the top?

A. Yes, ma'am.

Q. Under the "One Time Revenue" for RCI, you'll see that there's a variance of 354 percent here. Do you see that?

A. I'm sorry that I'm not quite -- could you --

Q. So it would be the third line of numbers down.

A. Okay. Yes. Okay. I see the third line of numbers down.

Q. Where it looks like in January of 2015 there were 150 RCI customers. And then for 2016, there's 681 customers. Do you see that? Or sales?

MS. GULLEY: Objection; form.

A. I'm seeing that. I'm not sure that it says that's customers.

Q. (By Ms. Wedgworth) Or sales -- of 150 sales versus 681 in 2016?

MS. GULLEY: Objection; form.

A. What my issue is -- and that's -- it's just I'm not really familiar with this report. I don't know whether that means -- whether that's a sales number or whether that's a customer number.

Q. (By Ms. Wedgworth) In either event, it's increased 354 percent; you would agree?

MS. GULLEY: Objection; form.

A. Whatever it is, it's got "354%" beside it.

Q. So the heading on the left-hand side says, "One Time Revenue." Do you see the heading?

MS. GULLEY: Objection; form.

A. Yes, I see that.

Q. (By Ms. Wedgworth) And so for RCI, for January 2016, it's 681 versus 150 in the month a year earlier.

MS. GULLEY: Form.

A. Yes, that's what it looks like. You're

obviously more familiar with this report than I am.

Q. (By Ms. Wedgworth) Well --

MS. GULLEY: Move to strike. It's a joke. I'm sorry.

Q. (By Ms. Wedgworth) Going -- going down to the recurring revenue, for the RCI number, it's -- appears to be $5,910,000 for 2016, whereas the previous year, for 2015, was $3,104,000. Do you see that?

MS. GULLEY: Form.

A. I wonder if somebody has a straightedge. I'm 77 years old, and my vision is not as good as it used to be.

MS. WEDGWORTH: Well, even at my age, which I won't put it on the record -- I highlighted. To keep my -- I'm mean, that's how I read it. But -- but you didn't have the highlight. So I -- what I'm saying is, I need aid, too.

MS. GULLEY: Which line are we, I'm sorry.

MS. WEDGWORTH: So RCI, "Recurring Revenue."

MS. GULLEY: Got it.

Q. (By Ms. Wedgworth) Of $5,910,000 versus $3,104,000 the previous year. Do you see that?

A. Thanks to the straightedge, yes, I do.

Q. And that's an increase of 90 percent? Do you

see that?
A. Yes, I see that.
Q. Okay. So is it fair to say that, after the February 2015 agreements, that revenue for RCI jumped dramatically?
MS. GULLEY: Objection; form.
A. Well, when you referred to agreements, I'm -- I'm -- can you describe which agreement that you're talking about?
Q. (By Ms. Wedgworth) Well, the data exchange agreements and the other two agreements in February of 2015. We looked at the exhibit yesterday that you signed.
A. Okay. The --
MS. GULLEY: Objection; form.
A. -- this -- this is the stand-down agreement, you know, with CDK.
Q. (By Ms. Wedgworth) Okay. So after the stand-down agreement, is it fair to say that RCI revenues jumped?
MS. GULLEY: Objection; form.
MR. RYAN: Objection.
A. Again, I -- I would not think that a percentage basis -- that they jumped that much. So I would be surprised if there's not some other, you know,

customers, you know, third parties that -- that have come under RCI contracts. I don't think it's just those ones that came to us as a result of the stand-down agreement. Again, looking at this, I can't tell.

Q. (By Ms. Wedgworth) Has RCI been profitable in 2016?

MS. GULLEY: Objection; form.

A. We -- we don't have profit numbers on RCI. And I need to explain some about -- we don't have any internal cost accounting.

Q. (By Ms. Wedgworth) So you don't know if RCI is profitable?

MS. GULLEY: Wait a minute. He's going to finish his answer.

A. What I'm saying is -- and that's that if RCI is profitable, I have no way of knowing, you know, if it is or how much. The reason why is because we don't have internal cost accounting. And organizationally -- and I realize for somebody that's used to dealing with larger corporations, you know, that sounds kind of crazy.

But you have to remember that I came from a very small organization, and I'm very sensitive to, you know, the use -- efficient use of personnel, of overhead. And the cost accounting imposes an overhead -- much like in a law firm, you know, you have

to keep time accounting records, you know, billing records and that sort of thing. That takes probably 5 or 6 percent. Well, if we were to have cost accounting, it would do the same thing to us. And I, frankly, would rather have the productivity, you know, than the information.

And that's the reason why that -- I -- I don't have a number as far as profitability for RCI. It's part of the overall, you know, organizational numbers, because you don't have, you know, one piece that operates as a whole entity. We keep track of sales numbers but not profit numbers, because we don't have any profit numbers.

Q. (By Ms. Wedgworth) I'd like to show you what was marked yesterday as Plaintiff's Exhibit 651, on Page 17. And yesterday, I think we looked at the footnote on Page 17 that says, "We are expecting an annual revenue of approximately $30 million from" -- "generated from the CDK Deal." Do you see that?

A. Yes, ma'am.

Q. Is that a number that you asked to be tracked?

A. I did not.

Q. Were you interested in the annual revenue concerning the CDK deal?

A. Revenue-wise, yes.

Q. And when you say "CDK Deal," what do you refer to?

A. That is the -- the stand-down agreement where they agreed to cease and desist hacking our systems.

Q. So due to the CDK deal, Reynolds expects annual revenue of approximately $30 million; is that correct?

MS. GULLEY: Objection; form.

A. That's what this says --

Q. Is there any reason to --

MS. GULLEY: Let him finish his answer.

A. That -- that is not -- not my expectation, though, this is something our chief financial officer, you know, decided he would throw in. But it's -- again, it's not a number that I would routinely track.

Q. (By Ms. Wedgworth) Was that a number you were interested in?

A. Yes, ma'am.

Q. Is that a number that you -- you asked your CFO and/or Mr. Schaefer to analyze and come up with?

A. No --

MS. GULLEY: Objection; form.

A. -- I did not. I thought -- I just said that I -- I didn't ask, for instance, for this footnote to be inserted.

(Exhibit 661 was marked for

identification.)

Q. (By Ms. Wedgworth) I'd like to show you what's been marked as Plaintiff's Exhibit 661, a one-paged document, Bates-stamped REYMDL00045556.

Mr. Brockman, have you had time to review the document?

A. Yes, ma'am.

Q. Have you seen it before?

A. Yes, ma'am.

Q. Did you write this email to Mr. Schaefer on or about January 5th, 2016?

A. Yes, I did.

Q. The subject line, when you write the email, is blank. And then you write, "Bob, From a policy standpoint, the term 'profitability' (and any of its variants) in relation to RCI are never to be uttered in front of anyone inside or outside the company. Your people need to understand this as well. Bob."

Is that an accurate statement of what you wrote to Mr. Schaefer and Mr. Lamb?

A. Yes, ma'am. And the reason why that I -- I wrote it is because we don't track profitability, because we don't have cost accounting. Without cost accounting, it's impossible to accurately track profitability.

Secondly, you know, from a policy standpoint, Reynolds is run very, very much like a small company where, you know, the CEO, which is me, and a handful of other people actually understand how profitable the company is. We keep that information very closely held. It's nobody's business.

It -- which is completely different than the way Reynolds used to be operated. Of course, as a public company, everybody had access to the -- to the financials, because they were -- they were publicly -- published.

I believe that, from an operating standpoint, that that is very deleterious to the successful operation of the business. And the reason why I feel that way is because everything we do, you know, is involved in long-term success. For example, a -- a software package, you know, may take five years to develop, get into the marketplace and have -- become accepted in the marketplace. You know, that -- that's a direct expense to profit. You know, if you don't understand, you know, how the company operates, you're liable to think that things aren't doing well. Well, the reality is, we're developing a lot of software, which costs a lot.

So I think that, you know, having profit

numbers being thrown around the company -- and particularly in this case, where we don't have any cost accounting to support what profit might be, is -- is dangerous for morale, for the whole organization. I have followed that policy religiously. And as a result, you know, Reynolds is a -- a -- a very profitable company.

Q. Is there any reason you limited this email concerning your prohibition on discussing profitability to RCI?

A. That -- that's where I saw the most recent violation.

Q. What violation did you see?

A. I saw someone in Bob Schaefer's organization mumbling about profitability when they're in no position to do so because -- since we have no cost accounting, they don't know how profitable it is -- or unprofitable, for that matter.

Q. Who was the person commenting on profitability concerning RCI in Mr. Schaefer's organization?

A. I'm sorry. I don't remember the name of the person.

Q. And what was the comment?

A. The comment was something in regard to RCI being, you know, very, very profitable. Well, there's

no way to know, in the first place. And secondly, the discussion of profits openly at that level is -- you know, we don't do that.

Q. But you're certainly interested in RCI revenue; correct?

MS. GULLEY: Objection; form.

A. Yes, ma'am. And the reason why I'm interested in RCI revenue, particularly in regards to the CDK stand-down agreement, is because CDK's attitude and, you know, talk and discussion in the marketplace regarding data security, and specifically our data security procedures, has been very hurtful over the years. And I'm looking forward to, you know, recovering from some of the hurt that we endured over a number of years.

Q. (By Ms. Wedgworth) So you specifically do want to track revenue at RCI as it relates to the stand-down agreement with CDK?

MS. GULLEY: Objection; form.

A. Yes, ma'am. I made inquiries about that. Since that's over with now, it's of less importance, you know, currently. I -- I really don't follow it that much anymore. But during this time period, I was.

Q. (By Ms. Wedgworth) Well, Reynolds currently follows that; correct?

MS. GULLEY: Objection; form.

Q. (By Ms. Wedgworth) In the financial statements?

MS. GULLEY: Form.

A. They do not follow any financial statements, you know, incomes, to that level of detail. You know, there is a -- a gross, you know, revenue number that goes in the audits -- goes in -- which is where the financial statements are.

Q. (By Ms. Wedgworth) You said the comment that someone made in Mr. Schaefer's organization was that RCI is very, very profitable; is that correct?

MS. GULLEY: Objection; form.

A. That -- that's what gave rise to this particular email.

Q. (By Ms. Wedgworth) And you don't recall who that person is?

MS. GULLEY: Objection; form.

A. No, ma'am.

Q. (By Ms. Wedgworth) I'd like to show you what's been marked as Plaintiff's Exhibit 662.

(Exhibit 662 was marked for identification.)

MS. WEDGWORTH: Can I have one back?

Q. (By Ms. Wedgworth) Mr. Brockman, as you read, I'm going to let you know that I'm going to reference

questions to the second page of the document where -- where you write in it.

Mr. Brockman, have you had a chance to review the document?

A. I'm almost there. Yes, ma'am.

Q. And on the second page, where you wrote an email in response to Mr. Schaefer and Mr. Schaefer wrote you back, did you write this email in ordinary course of your business around August 9th, 2016?

A. Okay. Is this -- can you point out specifically --

Q. Your email, kind of in the middle of the page.

A. Okay. It's the one in bold print?

Q. Yes.

A. Okay.

Q. And you wrote it to Mr. Schaefer on about August 9, 2016?

A. Yes, ma'am. That's -- that's what the email says. I don't remember specifically but, you know, that's what it says.

Q. And the email says, "I am still needing an answer as to where we stand on the amount of revenue that we were supposed to realize out of the CDK deal." Do you see that?

A. Yes.

Q. And the CDK deal you're referring to there is what you call the "stand-down agreement"?

A. That's correct.

Q. And you're asking Mr. Schaefer, here, to answer a question you -- you're waiting on concerning the revenue realized from that stand-down deal; is that correct?

MS. GULLEY: Objection; form.

A. That's correct. And as I pointed out previously, the reason why I'm interested in that is because I believe that we suffered greatly from ADP's actions over the years. And one of -- one of the reasons why I'm concerned about this revenue is because this is a recompense for the things that they did to us. And I'm -- I'm curious as to this coming out at -- as the way that it was planned to come out.

Q. (By Ms. Wedgworth) Meaning it was planned to come out to -- to generate revenue?

MS. GULLEY: Objection; form.

A. That's -- that's correct. That was one of our -- our motivations for, you know, the whole stand-down agreement in the first place. It was to stop, you know, ADP from hacking in, banditing our systems and to, you know, recompense us for the damage they've done to us over the years on the subject of data

security.

MS. GULLEY: Thank you. Robert emailed me and said he was disconnected. Just letting you know.

MS. WEDGWORTH: Can we go off the record?

THE VIDEOGRAPHER: This is the end of Media 1. The time is 11:02 a.m., and we are off the record.

(Short recess 11:02 to 11:09 a.m.)

THE VIDEOGRAPHER: This is the beginning of Media 2. The time is 11:09 a.m. We're back on the record.

EXAMINATION (Continuing)

(Exhibit 663 was marked for identification.)

BY MS. WEDGWORTH:

Q. Mr. Brockman, I'll show you what's been marked as Plaintiff's Exhibit 663. Have you had an opportunity to review it?

A. I'm almost done. Yes.

Q. Are there any awards at Reynolds that are given to reward high-performing teams?

A. Yes, there are.

Q. What are those awards?

A. The rewards are numerically, you know, principally, individual awards.

Q. I asked just for teams, team awards.

A. Teams? There's really only one team award that's been in place for quite a while, which is a department of the year. And we give that out twice. We give it once in Dayton and we give it once in Houston.

Q. Dayton is toward the end of the year?

A. No, they're both -- one of them is on a Wednesday in November and on a Friday, the following Friday.

Q. And is there any monetary compensation for the team with -- that goes with that award?

A. No.

Q. Is there any trip or -- or benefit to that award for the team?

A. There -- there's no direct prize or -- you know, as there are with some of our awards, individual awards. This particular award, there's no prize. There's a plaque. You know, there's no trip. However, people that are in that department, especially our key people in that department are -- in due course, and -- and because it's the right thing to do, they will inevitably, you know, receive better salary increases than -- than they otherwise might. It's a very prestigious award to get, the department of the year.

Q. In Plaintiff's Exhibit 663, is this an email you received from Mr. Schaefer around November 10, 2016

where he writes to you to make a pitch that his team win that 2016 team -- team award.

A. Yes. That's what it is.

Q. And did you receive this email?

A. Yes, ma'am.

Q. The second paragraph of this email that Mr. Schaefer writes to you says, "This organiza-" -- well, the first paragraph says, "Several years ago (about 9) you met with the Data Services team" -- which is also known as DSV; correct?

A. That's correct.

Q. -- "you met with the Data Services team and we discussed our role with[in] the company. At this [the] time, we were just starting the security enhancements, RCI was just in it's infancy in the new company. We discussed our role and at the time you quoted the following to the team:

"'This organization is like the CIA, I (meaning you) understand what this organization is and will be doing but we cannot communicate to the rest of organization what specifically is being done, how it is being done and any the successes that are accomplished. You will receive[d] medals behind the scenes. Someday, we will be able to communicate and celebrate your successes. I can assure you of that!'"

Did you say that?

A. Yes, I did.

Q. You can put that document aside. Did Mr. Schaefer's team win the 2016 team award?

A. I honestly can't remember. I don't -- I don't think they did.

Q. Has Mr. Schaefer's DSV team ever won the award?

A. I don't remember clearly yes or no, but -- I -- my belief would be, no.

Q. Mr. Schaefer would know for sure, I presume?

A. I know for sure he would. And I might add, I get a number of letters like this from all corners of the company.

MS. WEDGWORTH: Why don't we take a break now. Can we take a 10-minute break?

MS. GULLEY: That's fine.

THE VIDEOGRAPHER: The time is 11:15 a.m., and we're off the record.

(Short recess 11:15 to 11:31 a.m.)

THE VIDEOGRAPHER: Back on the record at 11:31 a.m.

EXAMINATION (Continuing)

(Exhibit 664 was marked for identification.)

BY MS. WEDGWORTH:

Q. Mr. Brockman, I'll show you what's been marked as Plaintiff's Exhibit 664.

A. May I tell you the news first?

Q. Yes. Well, off the record, then.

MS. GULLEY: Let's just stay on the record. We'll do this in a little bit. Let's proceed with --

MS. WEDGWORTH: Sadly, we're on the record. So if you will take a look at the exhibit.

(Brief discussion.)

A. 664 is the one we're supposed to be looking at it?

Q. (By Ms. Wedgworth) Yes.

MS. GULLEY: Thank you.

Q. (By Ms. Wedgworth) A document Bates-stamped REYMDL00333091 through 092. And Mr. Brockman, as you review the document, I'll let you know my questions relate to the second page of the document.

Mr. Brockman, have you had a chance to review --

A. Yes, ma'am.

Q. -- Exhibit 664? Did you receive and write this email on or about April 19, 2016?

A. Yes, that -- I believe that's what it says.

Q. And if we start on the second page of the email where Mr. Bauer writes to you and some others. The

subject is: "Draft ASB: New Features for MMS Data Synchronization (Sync) - Review Due by April 26." Do you recognize this email?

A. Yes, ma'am. But I -- I -- I'm sitting here searching my mind, and I -- I don't recall, frankly, what I was talking about. It was talking about something having to do with Data Sync, but what it's talking about, I don't remember.

Q. Well, Mr. Bauer writes to you and others, "Please review the attached draft ASB announcing New Features for MMS Data Synchronization (Sync). Forward any edits/comments to my attention."

And then you respond, "Tom, This is absolutely not to be released. I have no idea why it was ever built. The policy all along has been to not make further enhancements to MMS that make the dealer's DMS data more valuable - so it is easier to leave us and not feel the pain. Notify all of those concerned. Bob."

Did you write that?

A. Yes, ma'am, I did. But the point I'm trying to make is -- is whatever the feature was, I can't tell you. I don't remember.

Q. Is it fair to say that you did not approve of further MMS enhancements to the dealer's DMS data?

MS. GULLEY: Objection; form.

A. What -- that's correct. What -- what's happening here is --

Q. (By Ms. Wedgworth) Actually, there's no question pending.

Is it fair to say that the policy at Reynolds was to not make further enhancements to the MMS to make the dealer's data more valuable?

MS. GULLEY: Objection; form.

A. That's what I'm -- I'm endeavoring to explain.

Q. (By Ms. Wedgworth) And I just asked a yes-or-no question.

MS. GULLEY: You can answer the question.

MR. RYAN: I object to cutting the witness off.

MS. GULLEY: Go ahead and answer.

A. Well, okay. There -- there's two databases. There's -- there's the DMS database, which every dealership has. MMS is -- is a marketing database, which we sell under the Naked Lime Marketing MS tag, and these databases are -- are different in -- in the amount of data that they contain.

As we, you know, make investments to improve the product offering for Naked Lime Marketing, which is the MMS database, we want to do that

so that product will sell more. That's -- that's what our investment is -- is, you know, based upon.

What's happened here appears -- and that's we have done something that's an enhancement to MMS. And for some reason, you know, we have, in the synchronization process, you know, made that -- made that information, which we're buying and building on our own, we're moving that over to the dealership's DMS. And we don't intend to do that. So what's happened is -- is the development is going to stray from what is logical from a business standpoint.

Q. (By Ms. Wedgworth) You -- so the developer -- did you say "developer" or "development"?

A. Somebody in the development area.

Q. And this is your email reining that development -- or developer back in?

MS. GULLEY: Form.

A. That's correct. It says, "This is absolutely not to be released."

Q. (By Ms. Wedgworth) Mr. Brockman, I'd like to show you what's been marked as Plaintiff's Exhibit 665.

(Exhibit 665 was marked for identification.)

Q. (By Ms. Wedgworth) Have you had a chance to review Plaintiff's Exhibit 665?

A. I'm just about there. Yes, ma'am.

Q. Did you write this email on or -- and its attachment on or about May 8, 2016?

A. I -- I'm sorry. I'm not seeing where -- where I -- I wrote it. Unless it's this little short email down at the bottom of Page 1 that you're talking about.

Q. Yes. Yes.

A. Yes, I understand and I -- I did write that.

Q. Page 2 of the document, did you write this as well, dated May 9, 2019, entitled "Security Improvements"?

A. I don't think I actually wrote that. I think that it was written by somebody else, and I attached it on to my email.

Q. And in your email that has no subject, you write, "This is what needs to be done"; is that correct?

A. That's correct.

Q. And in the attachment, which is entitled "Security Improvements," are these security improvements that you wanted Reynolds to implement in the May 2016 time frame?

A. Yes, ma'am. Specifically, what -- what's involved here is -- and that's that we're endeavoring, as part of our research, to figure out what third-party hackers, bandits, look like. And one of the things they

look like is -- and that's they come in in the middle of the night. And we're -- we're very suspicious about people coming in in the middle of the night. That's just doesn't look like ordinary business use of the software. It looks like something foreign.

And what they're saying is -- and that's that we want them to enter CAPTCHA individually, which has been a -- a pretty successful way to turn back, you know, interlopers. They even have gone so far -- and this is hard to believe -- they'll have the software -- their software, when they come across CAPTCHA, which they can't fix with their software -- they can't detect.

You know, when you look at a CAPTCHA, a series of pictures. You know, humans can pick them out pretty well, so what they'll do is -- and that's they'll send a quickie message to some place in India. And some place in India, somebody is staying up all night or all day and, you know, they'll look at the CAPTCHA on their screen and they can answer it. And then they -- they send that back to -- where all of this is occurring in the U.S. And they get in. I mean, it's -- it's -- they've gone to that extreme to try and dig their way in.

Q. So in these security improvements that you've -- want Reynolds to implement, one of those

security improvements is CAPTCHA would have to be entered individually for each report to be exported; correct?

A. That's correct.

Q. And the other security improvement would be that no exports could be done from 7 p.m. Saturday until 8 a.m. Monday; correct?

A. Correct. And it says, you know, "Bulk export functionality has been removed for data security reasons." That's the error message.

Q. And the additional time limit, also, was that no exports could be done, of any kind, from 7 p.m. to 8 a.m.; correct?

A. That's correct.

Q. And Reynolds implemented these security improvements at the end of May; correct?

A. I'm not sure, you know, what got done when. I'm not -- I'm not in the loop at that part.

Q. Is it fair to say, when these security improvements were implemented, your main concern was security?

A. Absolutely.

(Exhibit 666 was marked for identification.)

Q. (By Ms. Wedgworth) I'd like to show you what's

been marked as Plaintiff's Exhibit 666.

Mr. Brockman, have you had a chance to review Plaintiff's Exhibit 666?

A. Yes.

Q. And is this an email you received and wrote in May 31, 2016?

A. Yes.

Q. And this email concerns security enhancements; correct?

A. What it concerns is -- and that's that, as I've testified, you know, previously -- yesterday, that the detection of the techniques that, you know, bandits use to get in our system is not a perfect process. In other words, we can't look at what they're doing and say, "Okay, that's a bad guy and, you know, what's happening is wrong."

We -- in the course of continuing to improve our -- our security controls, we make them a little too tight, and it's because there's things happening that we don't -- we had not anticipated. For instance, here it talks about the fact that, you know, people come in early to run reports. And I never perceived that that would actually be happening.

Q. You never understood that?

A. No. I did not understand in the -- in the

dealership world, that people would come in at 5 a.m. in the morning and run reports. I just didn't perceive that. And sure enough, that was a little too tight. And so what we're doing here is -- and that's where we're -- we're issuing, you know, temporary rollbacks for specific dealers of -- of that particular security change until such time as we can, you know, make it an overall change to -- to the -- to the security process.

Q. And you gave temporary exemptions to all of these major accounts listed in Exhibit 666 with regard to your security improvements; correct?

MS. GULLEY: Objection; form.

A. These are -- these are the people that -- you know, that call our support center and -- and register, you know, what we consider to be a valid complaint. And therefore, these people, we issued a -- a temporary bypass to this particular security change.

Q. (By Ms. Wedgworth) And the groups listed here are major accounts; is that a fair statement?

A. I've not looked at each specific one.

Q. Well, you don't have any reason to believe that Mr. Bates is inaccurate when he says, "Terry and Willie, Below is a list of Major Accounts who have expressed frustration and disappointment with the changes that have occurred." Do you see that?

A. Yeah. Mr. Bates is a -- a -- a credible person.

Q. So it's fair to say this list below is of major accounts at Reynolds?

A. Yeah, based on Dave Bates' opinion, yeah, I would agree. His opinion would be a good opinion.

Q. And so the major accounts at Reynolds were given exemptions for the new security enhancements; is that correct?

MR. RYAN: Object to form.

A. No. Just these specific ones.

Q. (By Ms. Wedgworth) The major accounts listed in Exhibit 666 --

A. Yes.

MS. GULLEY: Objection.

Q. (By Ms. Wedgworth) -- are the ones who received exemptions to the security enhancements?

MS. GULLEY: Objection; form.

A. Just the people on this list.

Q. (By Ms. Wedgworth) Do you recall, when the security enhancement was put into place, it was done over the weekend?

MS. GULLEY: Objection; form.

A. I'm sorry. I -- I don't recall and I -- I would not know.

Q. (By Ms. Wedgworth) Do -- do you recall that dealers were not informed of these security enhancements in advance?

MS. GULLEY: Objection; form.

A. I would say it's our general policy not to announce security enhancements in advance.

Q. (By Ms. Wedgworth) With regard to these security enhancements that were put in place at the end of May 2016, they were ultimately withdrawn, weren't they?

MS. GULLEY: Form.

A. I'm not in a position to be able to say. I -- I don't know.

Q. (By Ms. Wedgworth) Do you recall during this time period that Reynolds received a lot of complaints from dealerships concerning the -- the security enhancements that Reynolds released at this time?

A. Ma'am, I'm not aware of -- you know, of what went on in that period of time, other than if I would be notified, such as this email right here.

Q. You would be notified?

A. I would only be notified of situations like this one here.

Q. Would Mr. Schaefer be notified on a -- on a normal basis concerning this?

A. Yeah, he would be more likely to than I.

(Exhibit 667 was marked for identification.)

Q. (By Ms. Wedgworth) Mr. Schaefer, I'll show you what's been marked as Plaintiff's Exhibit 667.

A. You mean me?

Q. Mr. Brockman.

A. Okay.

Q. I'm trying to see if I can outdo Mr. Nemelka.

Mr. Brockman, have you reviewed Plaintiff's Exhibit 667?

A. Not quite. It's five pages.

Q. The good news is the last two are screenshots, I think.

A. You're right.

Q. Have you had a chance to review Exhibit 667?

A. Yes, ma'am.

Q. And did you receive and write this email on or about May 31st, 2016?

MS. GULLEY: Form.

A. Yes, ma'am.

Q. (By Ms. Wedgworth) And in all your emails that you wrote, do you try to be truthful and accurate?

A. Yes, ma'am.

Q. On the first page, where the subject is "Data

Security impact," and the earlier emails are May 31st, with your email being May 31st. And then Mr. Schaefer ultimately responding on June 1st, where you -- where the email from Mr. Agan, before yours, says, "Bob, I'm hearing from several AVPs that whatever action we took recently has got a number of customers quite upset. There is an email from the IT Support Director for John Eagle dealerships below. Dan." Are you familiar with John Eagle dealerships?

A. Not very much beforehand but, certainly, this one here -- this dear lady -- and I'll refer to her as a "dear lady" -- "I leave my house before 5am to get to the store before 6am." And -- and she's coming in to be there at 6 a.m., and the list of reports that she's running manually is remarkable. She's clearly a very dedicated person.

Q. Referring to your email, on the front page, about her remarkable abilities, you write, "Bob, This" is one -- "This one is worthy of an exception even considering the CarFax 3rd party usage." Do you see that?

A. Yes.

Q. Do you know what the CarFax third-party usage reference is?

MS. GULLEY: Objection; form.

A. I don't know specifically what's going on there, but my decision was based on what takes up most of the second page. It's -- this one was clearly worthy of an exception, period.

Q. (By Ms. Wedgworth) So you granted this exception; is that correct?

MS. GULLEY: Form.

A. Yes, ma'am. And I -- the -- I don't know -- this happened back in 2016, two -- two and a half years ago. I don't know exactly what the state of affairs is regarding data security in this particular area, but I do know that, you know, this has quieted down and is no longer an issue. And Ms. Lisa Wood continues to be our friend and good customer.

Q. (By Ms. Wedgworth) Well, on the "quieted down and no longer an issue," let me show you what we're marking as Plaintiff's Exhibit 668.

(Exhibit 668 was marked for identification.)

Q. (By Ms. Wedgworth) Have you reviewed Plaintiff's Exhibit 668?

A. Not quite through, but so far I'm really enjoying it. I'm serious. Yes, ma'am.

Q. Did you receive and write this email on or about June 2nd, 2016?

A. Yes, I did.

Q. And you write to Mr. Schaefer, "Please see changes that I have made." And this attachment is "DRAFT - CAPTCHA Suspension Talk Track."

If we go to the second page of the document, "Sales Breaking News," it says, "We have suspended the CAPTCHA and time restriction updates released earlier this week. Read below for the authorized talk track to discuss with customers."

Does this refresh your recollection that in early June 2016, Reynolds suspended the security enhancements they had put in place late May?

MS. GULLEY: Objection; form.

A. Yes. That -- that is correct. And certainly, you know, the whole rest of what I wrote here is -- is worth going through.

Q. (By Ms. Wedgworth) I just want to focus on the last bullet point to get to the end of the story. "Effective immediately the two enhancements regarding restricted hours and CAPTCHA have been suspended." Were both suspended on or around June 1, 2016?

MS. GULLEY: Object to the form and the instruction.

A. I'm not aware of the exact date that that was done, but I would presume sometime in that time frame.

Q. (By Ms. Wedgworth) And in that bullet referencing two enhancements, that references the security enhancements; correct?

A. I think it represents two of the security -- security enhancements and, probably, it's not likely all of them because, you know, we do them in batches. We don't do them individually. So there -- there's more than likely others which, you know, stayed in place.

Q. This does not reference any, does it?

MS. GULLEY: Form.

A. No, it does not.

Q. (By Ms. Wedgworth) So this "Sales Breaking News" talking points references two data security enhancements that were being suspended; correct?

MS. GULLEY: Objection; form.

A. Yeah, but it primarily references the reasons why that we do what we do and the reasons why we operate the way we do.

(Exhibit 669 was marked for identification.)

Q. (By Ms. Wedgworth) I'd like to show you what we've marked as Plaintiff's Exhibit 669. Mr. Brockman, have you had a chance to review Plaintiff's Exhibit 669?

A. I'm just about there. Yes.

Q. Did you receive and write this email on or

about August 12th, 2016 that is Plaintiff's Exhibit 669?

A. Yes, ma'am.

Q. I take it you are familiar with AutoAlert as a third-party vendor?

A. In name only. I've never been to their place. Never talked to them.

Q. Does the Reynolds contract with vendors prevent the vendor from disclosing data integration fees to the dealerships?

MS. GULLEY: Objection; form.

A. That -- that contract specifies that they -- they cannot specifically, you know, cite what our monthly fee is to them, which is what appears to have occurred in this particular case.

Q. (By Ms. Wedgworth) And you have -- Mr. Strawsburg writes to you about this particular case of AutoAlert?

A. Yes.

MS. GULLEY: Objection; form.

A. And I'd like to point out as well, this is not an ordinary RCI, you know, application. It was a very special one where it actually, you know, requires us to, you know, insert into our mainline software the functionality that they're asking here.

Because they -- they cite "Repair orders

will now be in real-time, which will enable the system to identify upgrade opportunities in the timeliest fashion," which makes the AutoAlert product a whale of a lot better. And so we're doing a lot more than just providing data to them. We're actually inserting functionality into our operating software that makes their product better.

Q. (By Ms. Wedgworth) In the top email, you write, "They are clearly over the line. Exercise our termination for convenience." Is this you request- -- ordering that AutoAlert's contract be terminated?

A. That's correct.

Q. And are you ordering that their contract be terminated due to the fact that they're informing dealerships of their monthly data integration fee that they are passing along to the dealers?

MS. GULLEY: Objection; form.

A. That's correct. That is clearly prohibited in our contract. Now, they are perfectly within their rights to disclose the cost of their -- of their product, you know, the price that they charge the dealer. You know, they are not permitted, underneath our contract, to -- you know, publish the price that we charge them.

Q. (By Ms. Wedgworth) You would agree with me

that the vendor market is compet- -- is a competitive market; correct?

A. When it comes to car sales, yes, that's necessarily true.

Q. I'd like to show you what's been marked as Plaintiff's Exhibit 670.

(Exhibit 670 Brockman was marked for identification.)

Q. (By Ms. Wedgworth) Mr. Brockman, have you reviewed Exhibit 670 Brockman?

A. Yes, ma'am.

Q. And did you receive and write this email around August 12th, 2016?

A. Yes, ma'am.

Q. And -- and if you will note the previous Exhibit, 669, was on the same day as well.

A. That -- that's correct. And since there's reference to that -- that's important -- is the reason I just pulled it back out of the pile, so I can open it up and look at it again.

Q. So at this time, meaning August 12th, 2016, did AutoAlert have a "real-time service drive lead feature"?

A. No, they did not. They were not even certified. They were not even part of RCI at that point.

Q. Your email at the top says, "Take away the RO's" -- RO's means repair orders?

A. Yes. That's what it means, but what -- what's important is -- is the paragraph just below that, in bold, where it says, "They're not even certified???" Good God. And now yet in -- in their June 27th, you know, notification, you know, they're -- they're bragging about the fact they're now associated with -- we've "completed the process to become RCI certified with your DMS provider, Reynolds & Reynolds. As you know, the RCI certification program was designed to ensure the highest level of data security for you and your customers, and our certification has been a request by many of our dealers."

But they haven't got it.

Q. Well, they do have -- real time has been opened for them, right?

MS. GULLEY: Objection; form.

A. No.

Q. (By Ms. Wedgworth) Well, you -- you say, "Take away the RO's opened real time," so something must be in place for AutoAlert; correct?

MS. GULLEY: Objection; form.

A. What's happening is -- certainly appears, you know, from -- from the documents in front of me --

that they are using it from a sales standpoint the fact that they are certified -- RCI certified. And they're not RCI certified. They haven't achieved certification yet.

And so therefore, I'm saying that, going forward, for a third-party to do this means that -- that they're not really quite straightforward-kind-of folks. And therefore, what we're going to do is -- and that's we're not going to give them their real-time repair order opening, because that is a special thing that's over and above what a normal RCI -- normal RCI would be just for data movement.

The real-time opening of repair orders means that they're now into our mainline software, and they're writing on our software to -- to feed to them the repair order has just been opened, real time. And what's happening is -- and that's that I'm -- I'm directing Bob Schaefer: When somebody is -- is basically being dishonest with us, there's no way we're going to let them into our main software.

Q. (By Ms. Wedgworth) When you write, "Take away the ROs opened real time from them," you've already given them something; is that correct?

MS. GULLEY: Objection; form.

A. The contract which has obviously not been done

yet -- it it's not finished, they're not RCI certified. We have decided rather than to go forward as we had planned, based upon their actions, we're not.

Q. (By Ms. Wedgworth) Did AutoAlert become RCI certified?

A. I'm not aware of whether they have or not. I -- I would presume they did, but I don't know.

Q. Mr. Brockman, have any data breaches of dealer DMS occurred in the past three years?

MS. GULLEY: Objection; form.

A. I believe so. There's -- there's one that I recall involving DealerBuilt that was pretty substantial.

Q. (By Ms. Wedgworth) Is that the only one you recall?

MS. GULLEY: Objection; form.

A. Of size, you know, that's the only one that, you know, that was a very, very good-sized one. It was huge.

(Exhibit 671 Brockman was marked for identification.)

Q. (By Ms. Wedgworth) Mr. Brockman, I'll show you what's been marked as Plaintiff's Exhibit 671. Mr. Brockman, have you had time to review Plaintiff's Exhibit 671?

A. Not quite yet, ma'am, but very close. Yes, ma'am.

Q. Did you receive this email on or about June 20th, 2017?

A. Yes.

Q. Do you recall if you approved this deal?

A. I don't have any direct recollection of that. As I read it, it's probably likely that I did, because the ShowroomMagnet actually is -- is a -- is part of the company that we acquired. It's a product. And so therefore, doing something for that particular product area would be something that I would likely approve.

Q. Naked Lime -- ShowroomMagnet is part of the Naked Lime entity?

MS. GULLEY: Objection; form.

A. Yes. What ShowroomMagnet is, as I recall, it -- it is a marketing system which is employed to motivate people that come in and get a test drive. And to basically show up in the showroom and talk to a salesperson and take a test drive for which they get a -- a small, you know, cash payment. And it's -- it has been found to be fairly decently and effective way to get people to come into the dealership and take a test drive.

Q. (By Ms. Wedgworth) And the situation described

at the top, "ShowroomMagnet has been utilizing a data broker for the extraction of DMS transactional data for clients. The purpose of this data is for market area evaluations."

Did Reynolds, with regard to ShowroomMagnet, agree to eliminate the use of a data broker to access CDK DMS?

MS. GULLEY: Objection; form.

A. I -- I don't recall, you know, that specific action. But I know it was our intention to, where possible, use -- get -- get data feeds directly from CDK. And my reason for doing that is -- and that's that, as I think is -- is readily apparent, there's some substantial potential liabilities involved. Anytime that you start, you know, moving data around, that potentially has personal- -- personally identifiable information. I want to be doing business with people that, if there is some kind of lawsuit, they can -- if they're found liable, you know, that they can pay the judgment.

Q. Do you know that the data broker mentioned here was Authenticom?

MS. GULLEY: Objection; form.

A. I'm not aware of that. This is a general policy decision.

Q. (By Ms. Wedgworth) Where does it say that?
MS. GULLEY: Objection; form.
A. That's my belief.
MS. GULLEY: Peggy, if you're between documents, lunch has been here about 30 minutes.
MS. WEDGWORTH: It's here?
MS. GULLEY: Yeah, it is.
MS. WEDGWORTH: Yeah, let's break for lunch. Thank you.
THE VIDEOGRAPHER: This is the end of Media 2. The time is 12:17 p.m. We're off the record.
(Lunch recess 12:17 to 1:36 p.m.)
THE VIDEOGRAPHER: We're back from lunch. This is the beginning of Media 3. The time is 1:36 p.m. We're back on the record.

EXAMINATION (Continuing)

BY MS. WEDGWORTH:
Q. Good afternoon, Mr. Brockman. Does Reynolds' service product have real-time repair order functionality?
MS. GULLEY: Objection; form.
A. Does Reynolds' service product have real-time --
Q. (By Ms. Wedgworth) Repair order functionality?
A. Yes. And that's an integral part of it.

MS. GULLEY: Objection.
Q. (By Ms. Wedgworth) I'm sorry?
A. That's an integral part of it.
Q. Does Reynolds currently allow third part- -- any third party to have real-time repair order functionality?
MS. GULLEY: Objection; form.
A. When you talk about functionality, I know we have some interfaces that allow look-only repair work. But there is -- you know, there's no, outside of our application software, actually creating repair orders or updating repair orders.
Q. (By Ms. Wedgworth) So is that a "no" to the question?
MS. GULLEY: Objection; form.
A. No. I think my answer is my answer. And I understand that's a little bit long but, I mean, I can't say it yes or no.
Q. (By Ms. Wedgworth) So does -- does any third party have the same ability with regard to real-time repair order in the Reynolds system as Reynolds does?
MS. GULLEY: Objection; form.
A. That's a much better restatement.
Q. (By Ms. Wedgworth) Thank you.
A. And -- yeah. And the answer is, no. There's

no outside third party that has identical access or has identical functionality. We do -- because remember, you know, repair order -- you know, functionality, that's an integral part. That's what the service system does, is it creates repair orders. And, you know, uses them to, you know, process the information and help run the shop. It's not an interface at all. That's -- that's it.

Q. Has any third party other than AutoAlert had real-time repair order functionality?

MS. GULLEY: Objection; form.

A. Again, you know, repair order functionality, as you're using it, is a very broad statement, okay? There is certainly some functionality that, you know, other third parties have in terms of, you know, looked-at kind of access. But to actually start a repair order -- you know, make a repair order -- what you call "repair order functionality," that's the integral part of -- of the service system. And no other third party has that.

Q. (By Ms. Wedgworth) The functionality you're speaking about is to create and edit a repair order?

MS. GULLEY: Objection; form.

A. There is the -- the way that I describe it is -- and that's there's -- there's repair order functionality, using a broad word like -- like you -- like you stated. Only, you know, Reynolds software has

that, because that is the integral part, you know. That's the center functions of Reynolds service software, okay? Any other access to repair order functions is -- is much more limited. It's limited to look only, that type of access. That's the kind of access the third party had -- have. None of them have, you know, the first type of access, which is the guts of Reynolds service system.

Q. (By Ms. Wedgworth) With regard to pricing in June of 2016, did Reynolds implement a transaction fee with regard to RCI to their vendors?

MS. GULLEY: Objection; form.

A. The time frame was when?

Q. (By Ms. Wedgworth) Mid-2016.

MS. GULLEY: Form.

A. Is that around the date of -- of the Xtime issue?

Q. (By Ms. Wedgworth) You'd know that better than me, so I don't know the answer to the question. But I will show you a document that will be Plaintiff's Exhibit 672.

(Exhibit 672 Brockman was marked for identification.)

Q. (By Ms. Wedgworth) I'll show you what's been marked as Plaintiff's Exhibit 672.

Mr. Brockman, have you reviewed Plaintiff's Exhibit 672?

A. Yes. And which is very helpful, as a matter of fact, because it does, you know, allow correct focus on -- on the timelines in that, you know -- this particular document is partially in reference to exactly what I thought, which is around the Xtime incident -- subsequent to the Xtime incident.

Q. So is it fair to say that in mid-2016, Reynolds raised RCI pricing?

MS. GULLEY: Objection; form.

A. No. That's not correct.

Q. (By Ms. Wedgworth) Is it fair to say that they implemented a transaction fee?

MS. GULLEY: Objection; form.

A. No. That's not correct. You know, what happened was -- and that's that -- and this affects only a very small number of RCI, you know, customers. Again, it also -- it only affects those that actually try to have update capability that could cause the kind of problem that occurred with Xtime.

Q. (By Ms. Wedgworth) So with regard to those vendors who were subject to the transaction fee, is that something sometimes called a "ping fee"?

MS. GULLEY: Objection; form.

A. No. It -- it is called -- and I don't even know that we call it a "transaction fee." It is -- it is a fee for each time a record is -- is added, changed or deleted. And it's only where they have write-back access. You know, in order to talk about this, it's important to talk about what happened to Xtime and --

Q. (By Ms. Wedgworth) Actually, I didn't ask that question. I'm just simply asking if there was a transaction fee implemented in mid-2016.

A. The answer to that is -- and that's no. That's not the case.

Q. A transaction fee was not implemented to vendors with write-back interface?

MS. GULLEY: Objection; form.

A. It's a transaction fee only if they did an add, change or delete.

Q. (By Ms. Wedgworth) And was that fee five cents per transaction?

A. That's correct.

Q. And a year later, was that five-cent-per-transaction fee increased?

A. Yes, it was increased as part of our -- our normal, you know, annual price increase.

Q. Are you the ultimate decision maker on that price increase?

MR. RYAN: Object to the form.
A. Yes and no. The answer is general -- in general terms, yes. I do not actually, you know -- I'm not involved in the actual price increase of each individual, you know, item number that we sell. My involvement has only to do with, you know, what the general percentage is going to be, which is CPI plus 2. And, you know, this year it's -- CPI plus 2 is 4.1 percent.
Q. (By Ms. Wedgworth) Did you receive and write this email, 672, on or about July 4, 2016?
A. Yes, I did.
(Exhibit 673 Brockman was marked for identification.)
Q. (By Ms. Wedgworth) Mr. Brockman, I'll show you what's been marked as Plaintiff's Exhibit 673.
A. Yes.
Q. Did you receive and write this email in 673 on or about May 9, 2017?
A. Yes, that's correct.
Q. And does this document reflect your approval of a price increase with regard to the transaction fee?
MS. GULLEY: Objection; form.
A. I don't see that it -- okay. It does address the per transaction price increase.

Q. (By Ms. Wedgworth) And you approved that price increase?

A. Yes, I did.

Q. Do you know how the price increase of a quarter of a cent was determined?

MS. GULLEY: Objection; form.

A. It looks to me like -- it says here, it was a -- a 5 percent -- which was CPI plus 2 -- for that year.

Q. (By Ms. Wedgworth) Does Reynolds track RCI cost in any way?

MS. GULLEY: Objection; form.

A. We do not.

Q. (By Ms. Wedgworth) I'm sorry?

A. We do not.

Q. With regard to RCI cost, do those -- do the costs include the developing of interfaces?

A. Yes, that would be one of the costs.

Q. Is another cost server maintenance?

A. Server maintenance, server heat, light, power, server amortization, server repair, replacement, you know, the -- the manpower it takes to supervise all that. I'm sure that there's more factors than that, but those are the ones that come right off the top of my head.

Q. Is one of the costs of RCI the DSV personnel compensation?

A. Yes.

Q. Is Bob Schaefer's salary part of RCI costs?

A. I would imagine so. But, again, I repeat which I talked about several times, we do not have cost accounting.

Q. I understand.

A. But -- but from a theoretical standpoint, yes, you know, his compensation would -- would be something that would -- it would be -- would be included, you know, if we had cost accounting, which we don't.

Q. Are there any other RCI costs you're aware of, other than the developing of interfaces, the service -- server maintenance costs, the DSV personnel comp, such as Mr. Schaefer's salary? Anything else for RCI costs?

MS. GULLEY: Form.

A. I think it's a considerable more number of things. Because, you know, for instance, Internet bandwidth is -- would be an important, you know, component, because all these transactions flow through what we refer to as "the hub." And it -- in itself is a completely separate system. It's designed for -- for moving packets of data between servers.

We have the issue of -- of fire

insurance -- there's probably -- if I had an opportunity to sit down and think about it for a while, I -- I could build a much longer list. But it's -- it's much more in terms of numbers of the things to be considered than what you have there.

Q. (By Ms. Wedgworth) And no one at Reynolds has done this list of costs with regard to RCI?

MS. GULLEY: Objection; form.

A. That's correct. We do not have cost accounting.

Q. (By Ms. Wedgworth) Do dealers, as part of their Reynolds contracts, pay Reynolds for storage of their data?

A. Only in -- in certain situations. We have a -- a product offering, which is called -- the acronym for it is RBDR. And what it does is -- and that's that it provides for backup of -- of dealership's data on a remote automatic basis. This -- if -- if the customer has their own server, they have to have an employee which is charged with running the backups every night and filing the tape away in a fireproof vault.

The RBDR product, you know, takes the responsibility of remotely accessing the dealership's server and backing up its data files into our Dayton, Ohio research park office. And that -- that service

also provides for -- in the event of disaster recovery, will air freight them a -- a new server and load it with their most recent backup data so they can get back in business.

Q. So if the dealership has their own server for storage of their data, is there any cost to the dealership from Reyn- -- that they must pay to Reynolds?

MS. GULLEY: Objection; form.

A. I'm not -- not quite understanding. Could you --

Q. (By Ms. Wedgworth) So -- so if the dealership stores their own data and doesn't use RBDR, is there a cost to the dealership that Reynolds charges?

MS. GULLEY: Object to form.

A. There -- there's a maintenance charge for -- for that server. And what that covers is -- that covers onsite maintenance repair and replacement.

Q. (By Ms. Wedgworth) So that's a monthly charge?

MS. GULLEY: Form.

A. Yes.

Q. (By Ms. Wedgworth) To the dealership?

A. Yes, that's correct.

Q. And that monthly charge to the dealership is for dealer storage of their own data on their own server; is that correct?

MS. GULLEY: Objection; form.

A. No. It's not a charge for dealership -- it's charged for hardware maintenance for -- for that server.

Q. (By Ms. Wedgworth) If a dealership doesn't use the RBDR program you described, is there any cost to the dealership to -- to store the data?

MS. GULLEY: Objection; form.

A. Again, the -- the charge for the server is for hardware maintenance. There are software monthly fees, which are under contract. Each element of software generally has some requirement to store data, but there's no, you know, fee that is identified as -- as data storage.

(Exhibit 674 Brockman was marked for identification.)

Q. (By Ms. Wedgworth) Mr. Brockman, I'll show you what's been marked as Plaintiff's Exhibit 674. It's Bates number: REYMDL00503332 through 35.

Mr. Brockman have you had a chance to review Plaintiff's Exhibit 674?

A. Yes, ma'am. My comment to this one is really getting down to the weeds. It's going to take a while to talk about this one.

Q. I'm going to try to stay high-level on this one.

A. I don't know that's going to be possible.

Q. Well, we'll give it a whirl.

So did you write and receive this email on or about July 19th, 2017?

MS. GULLEY: Objection; form.

Q. (By Ms. Wedgworth) Let me try it again.

Did you write and receive this email on about the time period of July 16 through July 19, 2017?

MS. GULLEY: Form.

A. Well, there's -- I've got to go back. There -- there's lots of emails on this string. And if you give me a moment, I'll try and count the ones that -- that -- I actually sent.

Q. (By Ms. Wedgworth) I think the one you sent was on the first page.

MS. GULLEY: Form.

Q. (By Ms. Wedgworth) And my question -- we'll just limit it to that -- the email on the first page, July 18, 2017. Did you write this?

A. Is this July 18th?

Q. Yes.

A. Yes. That -- That's correct. What's saying here is -- and that's that we're concerned about -- you know, caps. Daily caps, monthly caps. What -- what this relates to is -- and that's that we have a -- a

product called "Consumer Reach." That's what you see abbreviated as CR.

Q. Mr. Brockman, there's no question pending right now.

A. Well, I -- I guess if you're interested in knowing what's going on --

Q. I -- I'm definitely interested in some things, but -- but the way it works is I ask the question and you answer. It's just the way the process works.

So my question is: Is this part of Reynolds' suite of products to allow email blasts on the part of dealers to customers?

MS. GULLEY: Objection; form. And to the prior thing.

A. It relates to a -- a Reynolds product, which is being misused by the customer, which is resulting in great dislocation, both to Reynolds and to the customer. Their email traffic is blacklisted, which means it falls in a black hole. They don't know if it's transmitted or not. It's a very serious issue.

Q. (By Ms. Wedgworth) Has Reynolds ever attempted to limit or reduce the number of recipients of a dealer's email blast?

MS. GULLEY: Objection; form.

A. Yeah, prior to this, we had not. Okay? But

what's happened is -- and that's they're buying outside direct mail lists that have bad email addresses in them. And then they send out an email blast. And the email, you know, provider gets upset about that, and they blacklist the address. They blacklist the -- you know, the -- the dealership's address. And in this case, what they're doing is they're getting ours blacklisted, which means that we have a whole bunch of customers that get disabled, you know, because one dealer has done something stupid.

Q. (By Ms. Wedgworth) And is it fair to say somebody at Reynolds says the problem can be solved by contacting a Reynolds product called Naked Lime?

MS. GULLEY: Objection; form.

A. If you will point that out to me.

Q. (By Ms. Wedgworth) The first paragraph at the bottom, Mr. Barras writes to you.

MS. GULLEY: Objection; form.

A. That's correct. That's what it says. The Naked Lime product has a more sophisticated way of handling emails than the consumer reach product. The consumer reach product is a very old product. And the -- the Naked Lime product, it has license built into it that since -- when email service provider is throwing away emails and -- to stop the whole process before

blacklisting occurs.

Q. (By Ms. Wedgworth) So you respond to Mr. Barras by saying, "I think there should be daily caps as well as monthly caps"; is that correct?

MS. GULLEY: Objection; form.

A. Yes. And that -- that's a -- again, this is -- in an effort to stop sending junk to the email service provider, to avoid getting blacklisted.

Q. (By Ms. Wedgworth) So Reynolds did limit the number of recipients of a dealer's email blast; correct?

MS. GULLEY: Objection; form.

A. I'm not sure, you know, what the final disposition was of this problem. I know that -- I do know that now it's no longer the issue it was when this happened. When this happened it was a disaster.

Q. (By Ms. Wedgworth) Was the quota done to both legacy and new customers?

MS. GULLEY: Objection; form.

A. I -- I don't know exactly, you know, what the -- what the final resolution was. You know, these emails relate to a moment in time when the product was, you know -- or when the problem was at its worse.

Q. (By Ms. Wedgworth) Well, there was no recommendation to put a quota on Naked Lime; correct?

MS. GULLEY: Objection; form.

A. It's my understanding that Naked Lime did not suffer from the problem.

Q. (By Ms. Wedgworth) So there was no quota put on Naked Lime?

MS. GULLEY: Objection; form.

A. Again, I don't know, you know, what was done, you know, subsequent to this email. I'm -- it is a -- it is -- it's one of, you know, of the issues that goes on in the company with 5,000 employees and tens of thousands of customers. And I -- I see moments in time, but I -- I don't know everything that's going on.

Q. (By Ms. Wedgworth) Mr. Brockman, I'll show you what has been previously marked as Plaintiff's Exhibit 226. I'm going to focus you on the last page to ask you if it's your handwriting.

A. You said the last -- the last, last page?

Q. Yes.

MS. GULLEY: Objection; form.

Q. (By Ms. Wedgworth) Is this your handwriting, Mr. Brockman?

A. Yes, it is.

Q. And at the top of the page, it says, "AutoAlert Irvine California." And then the handwriting you have in the middle of the page, "per dealer installation fee," the typewritten is "150." It -- it's scratched

out to "300." Is that you scratching out "150" and inserting "300"?

MS. GULLEY: Objection; form.

A. Yes, ma'am.

Q. (By Ms. Wedgworth) Is that true for all the other numbers that are handwritten?

A. Yes, ma'am.

MS. GULLEY: Form.

Q. (By Ms. Wedgworth) And then handwritten, "For installation of monthly support fees for Canadian dealers," it's -- "20%" is crossed out. "30%" -- is that your handwriting?

A. Yes, it is.

Q. And then "Per dealer install fee is per the table," your handwriting again?

A. Yes, that's correct.

Q. How did you determine to raise the per dealer installation fee for package going from $150 to $300?

MS. GULLEY: Objection; form.

A. This particular customer has a number of -- of real-time interfaces, which means they're very heavily dependent upon, you know, our software functionality to, you know, get done what they want to have done. Every time that we do one of these, we run into the issue of increasing the complexity in our application software.

And part of -- part of my decision-making responsibility is -- and that's that there is all kinds of requests for, you know, this and that to be done to our application software.

Now, if I say yes to them all, in the last act, everybody goes crazy, because it's become too big and too complex. It's my job to actually think about all the time, you know, what is it that we're doing that's going to increase complexity in our application software? In this particular case, I believe that the -- the complexity load that this particular customer was going to put on us, you know, really required a little bit higher price.

And -- you know, that's just, you know, the sum and substance of it. You know, we cannot do, you know, everything that everybody likes -- would like to have without cost, which means we've got to increase the prices a little bit.

Q. (By Ms. Wedgworth) Was one of the real-time interfaces for AutoAlert the repair order?

MS. GULLEY: Objection; form.

A. It is the -- it is the publish repair order, which is taking the -- the -- it's notifying the third party that there's been activity on a repair order. It's either been opened or closed. And they want to --

they want to know that, really, right at the instant that it occurs, it's real time.

Q. (By Ms. Wedgworth) Did you consult any particular documents, or specific information, when you made these changes?

A. No.

Q. Did you speak to anyone, specifically, about making these changes?

A. Not that I recall.

Q. Mr. Brockman, I'll show you what's been marked as Plaintiff's Exhibit 675.

(Exhibit 675 Brockman was marked for identification.)

Q. (By Ms. Wedgworth) Which is the July 2018 financial page -- package. And I'm going to ask you to turn to Page 16 of the document which is, again, going down under the RCI numbers for July through 2000- -- 2018, there's a "14%" on "Recurring Revenue" for RCI?

MS. GULLEY: Objection.

Q. (By Ms. Wedgworth) From the previous year?

MS. GULLEY: Objection; form.

A. Thank you very much.

Q. (By Ms. Wedgworth) It's about six lines down from the top. RCI "Recurring" -- "Recurring Revenue" -- further up.

MS. GULLEY: Is there a question?
Q. (By Ms. Wedgworth) Do you see the "14%"?
MS. GULLEY: Objection; form.
A. I'm not seeing a -- a percentage on the line that I'm looking at anywhere.
Q. (By Ms. Wedgworth) If you start at the top of the page and go six lines down.
A. Oh, the top of the page?
Q. Yes.
A. I'm sorry, I was distracted by the highlighting that you have. It's further down towards the bottom of the page.
Q. So there's "One Time Revenue," and beneath it is "Recurring Revenue." Keep going down to RCI, under "Recurring Revenue." Not "One Time," but "Recurring."
A. Okay. I -- I found --
Q. Do you see the "14%"?
MS. GULLEY: Objection; form.
A. Yes.
Q. (By Ms. Wedgworth) And does that -- is this a number that you would look at on a monthly basis?
A. Not really. As I've stated before, I spend, on this particular package that comes out once a month, half-hour or less. Because this is not where the action is as far as I'm concerned. I'm much more interested in

new projects, new software, new hires, new customer relationships. Those are much more important to me than these detailed numbers.

Q. At the bottom of this page where there are three asterisks, at the very bottom, beneath the highlighted numbers that you looked at earlier, there's a note with three asterisks. "Legal Fees for Data Services are $1,034k in July, $10,690k YTD or $18.3M annualized. Case to date (Aug 2017-current) costs total $16.3M." Do you see that?

MS. GULLEY: Objection; form.

A. Yes, I do.

Q. (By Ms. Wedgworth) Have you looked at that before?

A. I think I've actually -- probably as a thumbed through, I probably noticed that one.

Q. Are those -- are those costs with regard to the current litigation we're in now?

MS. GULLEY: Objection; form.

A. I believe that to be the case. Though it doesn't specifically say that, but that -- I would think that would probably be true.

Q. (By Ms. Wedgworth) Is this a -- a figure you've requested to be put in the data?

MS. GULLEY: Objection; form.

A. No, it is not.

MS. WEDGWORTH: If we just a very short break, I want to confer with co-counsel for just a minute. Off the record.

MS. GULLEY: Off the record.

THE VIDEOGRAPHER: Off the record at 2:15 p.m.

(Short recess 2:15 to 2:21 p.m.)

THE VIDEOGRAPHER: Time is 2:21 p.m. We're back on the record.

EXAMINATION (Continuing)

BY MS. WEDGWORTH:

Q. Mr. Brockman, other than the ODE relationship, the CBR relationship and the informal relationship you spoke about earlier today, does Reynolds have any other relationships with CDK?

MS. GULLEY: Objection; form.

A. If you could repeat that list? It's OD relationship...

Q. (By Ms. Wedgworth) CBR.

A. CBR.

Q. And the informal relationship you discussed today.

MS. GULLEY: Objection; form.

A. That's all that I'm aware of.

Q. (By Ms. Wedgworth) Are you aware of any other relationships before -- that existed with CDK that no longer exist?

MS. GULLEY: Objection; form.

A. Not that I'm aware of.

Q. (By Ms. Wedgworth) I want to show you Plaintiff's Exhibit 676, which is the last financial statement we'll look at. And it's "December YTD 2017." And I just have a simple question: Is -- this -- did you receive this document in the ordinary course of your job after December 2017?

MS. GULLEY: Objection; form.

(Exhibit 676 Brockman was marked for identification.)

A. I -- I don't know what the legal definition is of "in the ordinary course of my job."

Q. (By Ms. Wedgworth) Well, as part of your job, did you -- it -- was this the document you would receive on a regular basis?

A. Yeah. Stated that way --

MS. GULLEY: Form.

A. -- yes, I agree.

MS. WEDGWORTH: At this point, I'm going to reserve my remaining time. And I think Mr. Nemelka has a couple of questions.

MS. GULLEY: Could I just ask you a question? When you say you reserve you're remaining time, do you -- you mean reserve whatever remaining time there is after Mr. Nemelka, right?

MR. NEMELKA: Right.

MS. WEDGWORTH: Yes.

MS. GULLEY: Just to clarify.

EXAMINATION

BY MR. NEMELKA:

Q. Good afternoon, Mr. Brockman. Mike Nemelka.

A. Good morning. (Inaudible.)

Q. I just have a few questions for you about just a few documents here at the end of the day. I'd hand you Plaintiff's Exhibit 677, which is an email from you to Mr. Schaefer, forwarding a correspondence that you had with Mr. Anenen in February of 2013. I'll give you a moment to read it.

(Exhibit 677 Brockman was marked for identification.)

A. Yes.

Q. (By Mr. Nemelka) Thank you. So the bottom email is an email from you to Mr. Steve Anenen dated February 5th [sic], 2015; correct?

A. Yes.

Q. And this was around the time when CDK and

Reynolds were negotiating the wind-down agreement; is that right?

MS. GULLEY: Objection; form.

A. I believe that's correct.

Q. (By Mr. Nemelka) And here, the second sentence that you write is, "We need to conclude our deal -- or not -- as I have issues that can no longer wait to be dealt with." Are those issues the security enhancements that you've been holding off on?

A. That's correct.

Q. And then you relate to him that some "bright, mostly young Harvard MBA-types" have been wanting to talk to you about CDK, right?

A. They really -- they start out, they want to be taught about the industry.

Q. But then they turned and wanted to talk to you about CDK?

MS. GULLEY: Objection; form.

A. Yes. That -- That's what it says and that's -- that's exactly what was happening.

Q. (By Mr. Nemelka) And what they wanted to know is -- and as you write, "What they really want to know about is CDK -- how you operate -- and not very subtly -- what could be done to improve things." That's what they wanted to talk to you about, right?

MS. GULLEY: Form.

A. These are unsolicited calls. You know, the phone rang, as I pick it up and, you know, there's somebody that wants to talk to me. And this is what was happening.

Q. (By Mr. Nemelka) And you told them, as you write here, "I am exactly the right person that you want to talk to -- but I am very busy -- and am not talking." Is that what you told them?

MS. GULLEY: Form.

A. That's correct.

Q. (By Mr. Nemelka) When you say you were exactly the right person that they wanted to talk to about CDK and how they could improve things, what did you mean?

MS. GULLEY: Form.

A. No question, I -- I've not been in this business for the number of years I have and not learned things about how to run this type of business. I don't know about other business, but I know about this kind of business.

Q. (By Mr. Nemelka) And then you conclude in your email to Mr. Anenen, "Just so you know when someone is throwing darts at you -- it isn't me providing them the ammunition."

A. Yes.

Q. So what did you mean by that?

MS. GULLEY: Form.

A. Well, I think exactly that. I mean, you know, I think Steve Anenen was under a lot of pressure from, you know -- you know, dissident stockholders who were mostly hedge fund-type kind of folks. And Steve is a very nice person. I personally like the guy. He always has been polite, gentlemanly with me, and I've tried to be so with him. And I wouldn't be in a hurry to see him be ambushed. And so I couldn't help him other than say, "Look, it ain't me, but somebody is gunning at you."

Q. (By Mr. Nemelka) Okay. You can put that aside.

(Exhibit 678 Brockman was marked for identification.)

Q. (By Mr. Nemelka) I've handed you a document -- first of all, before I do -- yesterday we talked about how certain applications would need RCI and 3PA interfaces forever from you and CDK. Do you recall when we talked about -- talked about that?

MS. GULLEY: Objection; form.

A. I think I -- I referred to the fact that, as certain applications -- like, for instance, ReverseRisk, which has a -- a substantial number of, you know, ADP or CDK DMS systems. In order to provide that particular

product to them, it would require, on a long -- because as long as they use that product, you know, in order for it to work, it has to have accounting data.

Q. (By Mr. Nemelka) And there is some Cox Automotive applications that you believe would need RCI and 3PA interfaces forever from Reynolds and CDK, right?

MS. GULLEY: Objection; form.

A. There -- there are -- again, using the ReverseRisk example, a dealership that uses the Dealertrack accounting system in order to be able to, you know, have and utilize a ReverseRisk business intelligence system would need to have some manner of -- of data access or accounting data.

Q. (By Mr. Nemelka) I've handed you Plaintiff's Exhibit 678. Which is an email from you to Ron Lamb, dated June 30, 2015, the subject being "Cox/DT Merger." And I will give you a moment to review it.

A. Yes.

Q. So this email chain between you and Mr. Lamb relates to Cox Automotive's acquisition of Dealertrack; correct?

A. That's correct.

Q. And the combining of certain applications already owned by Cox Automotive and those who are owned by Dealertrack; correct?

MS. GULLEY: Form.
A. I don't know --
Q. (By Mr. Nemelka) Strike that. I think that was a bad question.
A. Would you like to s- -- have another question?
Q. Yes, I do have another question.
A. Okay.
Q. And you recognized that there were some benefits to Cox Automotive and its ac- -- acquisition of Dealertrack in -- in combining those assets; correct?
MS. GULLEY: Objection; form.
A. I think as a -- as just a matter of normal course, when there's a major transaction happen amongst other companies that are in the same industry that we're in, I kind of -- I read those articles. And certainly, you know, any good size acquisition, such as this one was -- at the heart of it -- it had to be some manner of synergies. And that's what I said.
Q. (By Mr. Nemelka) And what you write here is that -- to Mr. Lamb -- "I think [that] there is no question that they will achieve some more market power by combining VAuto and AAX. However to make these apps really work right, they will require RCI interfaces forever from us and CDK." You wrote that, right?
MS. GULLEY: Form.

A. Yes, that's correct.
Q. (By Mr. Nemelka) And when you say "RCI interfaces," what you mean is RCI interface from Reynolds and a 3PA interface from CDK, right?
MS. GULLEY: Form.
A. That's correct. And -- and this -- and there is an opinion statement here when I say, "However to make these apps really work right." That's my opinion.
Q. (By Mr. Nemelka) Right.
A. That's not necessarily a decided fact. And -- and the fact these products continue to work as they are today -- but they could also work a little better.
Q. And it's because they have -- but in your opinion, is that they would need interfaces with RCI and 3PA forever in order to work properly; correct?
MS. GULLEY: Objection; form.
A. That's my opinion. It would be very much like the ReverseRisk product that we have today, which is an -- an accounting business intelligence software. In order to work, it relies on a continuing source of, you know, accounting data.
Q. (By Mr. Nemelka) Does VAuto need -- need accounting data in order --
MS. GULLEY: Form.
A. No. It doesn't, but -- well, I say it doesn't

need it, but it's nice.

Q. (By Mr. Nemelka) All right.

A. It -- it would be -- you know, you can keep track of what your accounting basis is from a tax standpoint, from a -- a gap accounting standpoint. You can do that by hand in the VAuto system. But it'd be a little nicer if it automatically went over and sniffed the accounting system and came back with a number and put it in VAuto system.

Q. All right. You can set that aside.

I've handed you what I've marked as Exhibit 679, which is an email from you to Bob -- to Bob Schaefer, dated July 1, 2017, with the subject being "Data Access Direction." I'll give you a moment to review.

(Exhibit 679 Brockman was marked for identification.)

Q. (By Mr. Nemelka) Finished, Mr. Brockman?

A. Yes.

Q. So Mr. Schaef- -- this -- July 1st, 2017, this was after Authenticom had filed the lawsuit against Reynolds and CDK; correct?

A. Yes, that's correct.

Q. This is after, also, the preliminary injunction hearing involving that lawsuit; correct?

A. Yes, that's correct.

Q. And Mr. Schaefer is writing you to say that Reynolds should terminate any of its relationships with Authenticom services; correct?

A. That -- that's what he's recommending.

Q. And what he says here in the first sentence is that Reynolds is still using Authenticom for MMS. And that's a Reynolds application; correct?

MS. GULLEY: Objection; form.

A. It is a Reynolds application. It's sold to a fairly small number of -- of dealers that use CDK systems.

Q. (By Mr. Nemelka) All right. And IDS ReminderTrax, that's a Reynolds application; correct?

MS. GULLEY: Objection; form.

A. That's -- that's a service reminder card. It's an application that we sell to service departments. And in some cases, those service departments are -- use CDK software.

Q. (By Mr. Nemelka) RepMan, that's also a Reynolds application; correct?

MS. GULLEY: Objection; form.

A. RepMan is really a General Motors application. It's not -- not really ours. It's reputation management.

Q. (By Mr. Nemelka) And ShowroomMagnet -- and that's a Reynolds application; correct?

MS. GULLEY: Objection; form.

A. And that's a Reynolds application. It is a -- it's a very small one. It's the one that provides a cash voucher, a motivation, to get prospective car buyers to come in and take a -- a test drive.

Q. (By Mr. Nemelka) And he says for that one, Authenticom was currently pulling data from Reynolds DMSs, right?

MS. GULLEY: Objection; form.

Q. (By Mr. Nemelka) Do you see that? After -- at Showroom Management -- or ShowroomMagnet?

MS. GULLEY: Form.

Q. (By Mr. Nemelka) He writes, "Currently pulling from Reynolds DMS." Do you see that?

MS. GULLEY: Objection; form.

A. I see that.

Q. (By Mr. Nemelka) So Reynolds was using Authenticom to pull data from Reynolds dealers; correct?

MS. GULLEY: Objection; form.

A. I think what's happening there is -- and that's this was a -- a result of an acquisition of a -- evidently, fairly recent acquisition. And it, you know -- it had, prior to us acquiring this little

product, this little company, that they had been -- they were doing business, obviously, independently with us. And so therefore, they -- since they weren't RCI certified, they were going to a third party to -- to acquire data for them. Which -- this is something I'm not ever happy to see happening. But whenever you have an acquisition, things are not operated in the most efficient manner, and there are stupid things going on. And that would be classified as a stupid thing going on.

Q. (By Mr. Nemelka) And you -- and in -- in response to Mr. Schaefer's recommendation to terminate all relationships with Authenticom after they had initiated this litigation, you wrote, "I agree -- do what needs to be done." That's what you wrote; correct?

MS. GULLEY: Objection; form.

A. Yes. And I might add on that, I obviously wasn't happy about the fact that we've been -- we were sued, in my opinion, without good reason. But it -- it's also important, I think, to do business with people, or with entities, that have substance. I don't think Authenticom has much in the way of substance. And I prefer to do business with some folks, particularly when it comes to data. If there's a lawsuit that goes on and there's a big judgement, I'm not the only one standing there.

MR. NEMELKA: I have no further questions. I'll reserve the remainder of our time.

MS. GULLEY: Thanks. I have some questions before I get started. By my count, you have six minutes.

All right. Thank you, Mr. Brockman.

Peggy, can you tell me where the exhibits are from yesterday? Are they sort of that sea of information?

MS. WEDGWORTH: I think in this area.

(Brief discussion.)

EXAMINATION

BY MS. GULLEY:

Q. Let's stick with the document Mr. Nemelka was asking you about. That would be Plaintiff's Exhibit 679. All right. Do you have Plaintiff's Exhibit 679 in front of you, sir?

A. Yes.

Q. One of Mr. Schaefer's statements to you related to having relationships directly with the DMS provider -- do you see it in parentheses? He's list DMS providers CDK, Dealertrack, Automate and Autosoft?

A. Uh-huh. (Witness answers affirmatively.) That's correct.

Q. And you -- you agreed that he should do what

needs -- you agreed that he should do what needs to be done in terms of entering into relationships with those DMS providers; correct?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. That's correct.

Q. (By Ms. Gulley) And you did, in fact, ent- -- you did, in fact, direct others to enter into relationships with the other DMS providers; correct?

MS. WEDGWORTH: Objection.

A. That's correct.

Q. (By Ms. Gulley) Now, did the other -- did Dealertrack sue Reynolds? Did -- has anybody sued Reynolds over their relationship with Dealertrack?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. Not that I'm aware of.

Q. (By Ms. Gulley) Do you know who Dealertrack's lawyer is?

MR. NEMELKA: Objection.

A. No. Am I supposed to?

Q. (By Ms. Gulley) Not necessarily. All right. You were asked some questions about the financial information that you received. Do you recall those questions, in general terms?

A. In general terms, they seem to be clustered around RCI.

Q. Okay. And one of the things that you have testified about in the last couple of days is that Reynolds does not have cost accounting; correct?

MS. WEDGWORTH: Objection.

A. That's correct.

Q. (By Ms. Gulley) And Ms. Wedgworth was asking you questions about some of the costs of RCI. There are costs associated with RCI; correct?

MS. WEDGWORTH: Objection.

A. Absolutely.

Q. (By Ms. Gulley) What -- what about Reynolds' efforts to secure its enterprise system? What are the costs associated with Reynolds' efforts to secure its enterprise system, in general terms?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. Well, probably the first category has to do with it takes a whole bunch of executive attention, mine included, to focus on the issue of data security. And deciding, you know, what needs to be done, how -- how to get it done, how to react in the marketplace to data security issues, certainly requires us to spend some more money on advertising, you know, to -- to counteract

some of the effects of what we've been -- what's been necessary to do from a data security standpoint.

You know, that's kind of, you know, the top level. And -- and to go down and enumerate a list of things, it would take -- take a little while. But that's one of the categories that we didn't talk very much about in -- in the previous, you know, questions this afternoon.

Q. (By Ms. Gulley) Have you made a conscious choice to invest in system security since the merger by acquisition with the Reynolds and Reynolds company?

MS. WEDGWORTH: Objection.

A. Yes. I come, originally, from IBM. And the IBM philosophy was very, very much oriented towards security. And in all the software design and development, you know, that I was a part of in the UCS company, data security was extremely important. And I'm very, very pleased to state that, so far as I know -- because we never know what we don't know -- that system is totally tight and enjoys that reputation in the marketplace, that it's, from a security standpoint, way ahead of everybody else.

When I got to Reynolds, it's kind of like I had been spending my life, you know, mopping and polishing the floor. And I inherited this house, and it

has two inches of water on the floor. And we don't need to think about mops and brushes, we need pumps, because that was the situation from a data security standpoint. It was just terrible.

And it's been my goal, you know, since that day that -- to get it into the right kind of shape. And it's -- it's vastly improved. Still not there, you know, there's still more work to do. And that's caused by the fact that there are people on the outside, and more of them every day, you know, that want to invade your systems. Starting from PCs up.

Q. (By Ms. Gulley) Did you keep that goal a secret in 2006 when UCS acquired the Reynolds and Reynolds company?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. Absolutely not. It's been -- it's known, you know, that that was going to be one of the goals.

Q. (By Ms. Gulley) Reporters ever ask you about it?

MS. WEDGWORTH: Objection.

A. Yes.

Q. (By Ms. Gulley) What did you tell them?

MS. WEDGWORTH: Objection.

A. I told them we were going to improve security.

Q. (By Ms. Gulley) Since that time, late Oct- -- late 2006, when the acquisition occurred, how much would you estimate you have invested in data security at the Reynolds and Reynolds company?

MS. WEDGWORTH: Objection.

A. Probably, counting everything, which would include, you know, my time, other executives' time, you know, load on the technical support center answering questions and issues, sales -- salemen's time dealing with customers over the issue of data security, additional advertising, you know, that we felt compelled to -- to do simply from a -- to keep our image up in the public, you know, marketplace, I wouldn't be surprised if the total number, if we ever sat down to figure it out, would be half a million dollars.

Q. (By Ms. Gulley) In response to some of the questions you had begun explaining about the cost of some issues related to Xtime, and you were unable to finish your answer and were told that you'd be able to finish it later -- so here is your chance -- what were you -- what were you talking about with respect to Xtime?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. Well, the issue started on -- came up on a

Monday afternoon. And we started receiving complaints from some customers saying, "What have you done?" and "Why is our system running so slowly?" and "We're" -- "We've checked around and we're not running any specific batch jobs," you know, "What is" -- "What on earth is going on?"

And, you know, we started, you know, accessing some of those systems, and we discovered there was something going on, that there was a piece of software in -- in the Reynolds server. It wasn't -- it was running, actually, in -- in the -- in the -- in the -- the outside part of the server. But what it was doing, it was -- it was adding records at a high rate to the Reynolds server in the customer's location. And we discovered what was happening was -- and that's that Xtime was -- "abusing" would be the right word -- they were just trampling their -- their permission to have access to add, change and delete records. And they were adding, you know, dummy, bo- -- bogus customer records at a high rate. And they added some 700,000. You know, just trashed customer records.

And that was what was slowing down the servers who had called and complained. Fortunately, we were able to get it shut off before it went any further.

Then came the cleanup problem, or the

cleanup issue. We found that -- that some of the -- that there were some pieces of -- of junk in -- in the -- these customer records that was consistent across all of them. And, you know, we found that it took us several days to figure this out, that we could write software and we could go read the entire customer file on those servers and find bad records and throw them out.

The problem was -- and that's that, in the meantime, the customers continued to operate. And as the customers continued to operate, they would actually transact business on some of these, you know, bogus, you know, customer records. And so we were faced with the issue of it wasn't just a matter of -- of going back and -- and deleting customer records that we could identify, we also had to identify whether or not they had had any business transacted on them. Because if we did, then we would lose that -- lose that data completely.

So we ended up having a situation where once we got done doing everything we could from the programming standpoint, the customers had to go back and find the duplicates. Because there would be a duplicate, you know, customer record that was bad, but yet it was still good, because it had some -- some --

tracking some business transactions involved.

And then in the last act, the customers were actually responsible for cleaning all of that up by hand. Now, what that's like -- it's like, you know, somebody that lives next door who's about half crazy and likes to shoot, and all they did is kill your dog, but they didn't hit you. I mean, so you could be happy about that. Well, but as somebody that's, you know, in charge of -- I'm kind of the executive in charge of loss prevention -- I'm saying, "Well, good God, what could have happened?"

Because that same kind of logic could have occurred where they deleted all of our stuff instead of adding. They could have just as well been deleting, because they had write-back access, and if they had sat and deleted, you know, they could have destroyed God knows how much, you know, information. Why did they only get at 400 or so dealerships? I don't know. You know -- you know, the grace of God. You know, it could have been thousands.

And so that's the reason why -- that I sat and thought, "How the hell can we put -- you know, we can't prevent this, because we can't stop them. But how can we fix it?" What we did was -- is we went into the software that we allowed them, you know,

delete/add/change access to, and we created journalling. And what "journalling" means is -- is we take -- let's say you've got a change, you know, function going to happen. What we do is we take a snapshot of the record before they change it, log it off, and then we take a snapshot of it after -- after -- after change and log it off. And that means that we can go back and we can tell what happened. And in many cases, probably be able to restore.

Unfortunately, we run into the situation where what happens in the time interval from when the incident occurs versus when we discovered they want to fix it -- which is business transactions happen on records in between.

Now, the -- the logging -- you know, we can tell you which ones they stepped on, but we can't fix it. We can't do an automatic fix, because there's been business transactions that happened that, you know, we don't know about.

So that's all part and parcel of -- of the Xtime story. It was a -- a rude awakening to us that -- that third-party programmers could be so -- so lax and so stupid as to let something like that happen.

Q. (By Ms. Gulley) How much did it cost you to build out this new protection?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. I don't know, because we had to go back in to every application program that we allowed read/write access to and build it in. And then we also had to build the -- the database for these log transactions. And then, of course, the -- the interesting part of these log transactions -- how long do you have to keep them?

Q. (By Ms. Gulley) So it's an ongoing expense?

MS. WEDGWORTH: Objection.

A. It's an ongoing expense, and we don't know how long we have to keep them because, in some cases that -- they could have a bust where, you know, the -- the loss was minor. But yet you could have a situation, you know, where they decided -- or not decided, but where they -- through lack of programming skill, they could -- they could walk on email addresses.

Well, you know, you might not notice that for a couple of months. And then you'd have to go and try and fix it, which means that -- we keep a lot -- lot of file stuff, I think, for retention, seven years. I hope to God we never have to go that far back to fix anything, but somebody had to make a decision as to how long we were going to keep it, so I said seven years.

Q. (By Ms. Gulley) In terms of what you've had to spend already in building the log-in functionality and the service base so far, are we talking thousands, millions?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. I would say not -- not as much as a million, but probably -- probably made a pretty good hole in 700,000 or 800,000.

Q. (By Ms. Gulley) Earlier, I had asked you --

A. And then there's the ongoing cost. I mean, there's -- you know, the stuff that you vaulted, you've got to keep it. You've got to sell on it, you've got -- you've got to spin it.

Q. Earlier, I had asked you what you -- you estimated the investment in system security, and the rec- -- the -- and we just saw the transcript looked like you had said half a million. I wanted to make sure I got that right.

A. No. It's half a billion.

MS. WEDGWORTH: Objection.

Q. (By Ms. Gulley) Say it again.

MS. WEDGWORTH: Objection.

A. Our total investment for data security forever and a day probably is in the order of half a billion.

Q. (By Ms. Gulley) How do you feel about data brokers?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. The same way I feel about the unprintable -- but, you know, certainly, in polite company --

Q. (By Ms. Gulley) "The elevator speech"?

MS. WEDGWORTH: Objection.

A. You know, the problem with data brokers is -- is -- you know, it starts off from a legal standpoint. You know, according to Gramm-Leach-Bliley, you know, dealerships are considered financial institutions. And as such, they have certain responsibilities.

There's also another act that -- that applies directly. And what it says in -- in short order is -- and that's that a dealership is considered a financial institution. And they're responsible for the security of the data that they accumulate in their process of arranging financing. If they are to use a third-party service provider, they must have a contract with that service provider, you know, that specifies who's responsible for what, who indemnifies who and what the liabilities are and so forth.

A data broker, in the -- in the simplest sense, what they're doing is they're extracting data out

of a dealership system. It's got to be a contract there. And then, you know, whoever that they send the data to, there's got to be another contract there. So there -- there's this, you know, myriad of -- of contracts that are required in order to be legal.

Data brokers is -- you know, they're -- they're little, small companies for the most part, and they don't have the resources to do that. They, in many cases, are kind of oblivious to -- to the fact that, you know, they are required to do all of these -- these things according to the law.

And so therefore, in my opinion, they're absolute outliers. Secondly, there's called a -- it's called a Computer Fraud and Abuse Act. Computer Fraud and Abuse Act is very, very clear that if you enter into a computer system, and the software on a computer system, if you're not you authorized to do so, you're in violation of that law.

Well, people don't pay a lot of attention to the fact that -- that Reynolds owns the software that's on every dealership system. If they license that software to the dealer and the license is not an unlimited license, it's very much a limited license that says that you cannot, you know, allow a third party to access or to use that software because you have no

license to do that, your license covers only your employees and direct agents.

Q. (By Ms. Gulley) How long have you had those restrictions against the use of third-party data brokers?

MS. WEDGWORTH: Objection.

A. I think in the case of UCS software, it's been at least 25 or 30 years. As far as Reynolds is concerned, when I got there 12 years ago, they were already there, and had been around for a while. But I don't know how long.

Q. (By Ms. Gulley) If -- during this deposition, we've heard you, on numerous occasion, call data brokers, like, Authenticom "hackers and bandits"; is that correct?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. That's correct.

Q. (By Ms. Gulley) Why do you feel -- what -- what are the risks to Reynolds system such that you would give them those names, "hackers and bandits"?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. Well, first of all, what they're doing is -- and that's that they have used -- and Steve Cottrell has

admitted in open court how often that he had worked, you know, gaining entrance, you know, getting passed the security barriers, to access Reynolds software. And I think that qualifies him for the name "hacker."

You know, what the big worry is -- and that's that to the extent that a third-party hacker is involved, there's a security breach and that there's going to be all hell to pay. And, you know, we've been through this. You know -- this is -- was my first -- matter of fact, that's how I met Michael. It was a Chevrolet dealership by the name of Franklin, and I don't know where they were in the company -- in the country, but the general manager of that dealership had access to a master password. And he could run any kind of reports or any kind of listings that -- that he wanted. Which, that's not unusual for, you know -- he was the onsite person in charge. He was the general manager.

Well, he used that -- that password authority to download the entire customer files of that customer -- of that dealership onto his laptop. And when he left -- and I don't know under what circumstances he left, but it kind of sounds like maybe not nice circumstances -- he saw fit to post the customer database in its entirety on the Internet.

And there were, you know, people whose names and information was posted that were not happy, and they called the FDC. And the FDC came down on that dealer and said, you know -- I don't know whether they had their guns drawn or not, but I mean, they -- they were -- it was -- it was very shocking -- and asked the dealer what on earth he had done. The dealer was, like, completely unknowledgeable of what all happened. And as they talked to him some more, he said, "Look, I understand what you're talking about. You need to talk to Reynolds. They're our computer guys, they'll know everything."

So the next thing we know, we have FTC on our door, and we don't know much about dealing with the FTC. Matter of fact, never been around them at all. And -- but fortunately -- fortunately, we got a good piece of advice from one of -- one of our outside attorneys --

MS. GULLEY: Okay. So you can't talk about privileged information. I'm sorry, sir.

THE WITNESS: Oh, okay.

Q. (By Ms. Gulley) But -- but you're talking about the FTC. You're not talking about antitrust, you're talking about the privacy people; is that right?

A. I'm talking about the privacy people. Can I

talk about that?

Q. No.

A. No?

Q. You cannot reveal privileged information.

MS. WEDGWORTH: Objection.

Q. (By Ms. Gulley) But --

A. I can say, you know, what -- what the effect was on us.

Q. What was the effect on you of the FTC's investigation into --

A. Well, we obviously --

Q. -- Franklin?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. We obviously started spending a bunch of money, a whole pile, simply to convince the FTC that we did nothing wrong. The computer system was not in any way at fault or involved.

But it doesn't take much of a leap in my mind to think about, "Well, what if the computer system was involved? What -- what if something happened that caused a breach? We better be prepared for all hell to break loose and then it would be really expensive." And so the idea of having any kind of data broker involved in any of that kind of process to me is not smart --

(Brief discussion.)

(Exhibit 274 was marked for identification.)

Q. (By Ms. Gulley) I'm marking and handing to you Defendant's Exhibit 274. Less you think the plaintiff's and defendants' numbers are widely disparate, the plaintiff's skipped numbers. Ours -- we did not. Here's Defendant's 274.

(Brief discussion.)

Q. (By Ms. Gulley) Take a minute to review Defendant's 274.

A. I'm -- I'm familiar with this.

Q. Who's Robert T. Brockman, II?

A. He's my son.

Q. We were discussing a moment ago the Franklin incident. What is -- what is this about, the -- Defendant's Exhibit 274?

MS. WEDGWORTH: Objection.

A. This one here is -- is -- I believe is DealerBuilt. DealerBuilt, if I can recall what happened on that one, they had a lot of very sizeable customers. And they were sending backups of the local server in the dealership back to a central point. And when they transmitted the data, it wasn't encrypted. And it caused the exposure of -- I want to say, like, 400,000

or so, that they know of, you know, individual customer records were exposed.

And that meant that -- in any kind of data exposure, you know, the first -- the first cost is $2 apiece it costs you per name to send a registered letter to the person whose data was exposed and to tell them that their data has been exposed and they should be cautious about, you know, what's happening. Because their -- you know, their personal information may have gotten into the wrong hands of some bad people.

And then, after that, you start dealing with the FTC, which I -- I don't have any knowledge to what that cost in this particular situation, but I bet it was a bunch. And I think this was one of the first wake-up calls of a really large data breach in the automotive business that we know about.

Because we always have to remember -- it's kind of like in -- in the banks where they have worries about bad people stealing money from the banks internally. You never hear about those. Now, maybe that's because none of them ever happen. I don't think that's the case. I think they're concerned about the publicity. I think they're concerned about bad guys getting ideas. And, you know, that's certainly what could be happening here.

Q. (By Ms. Gulley) Would you read what you sent to your son, for the record?

A. Yeah. It's short. Three words. "It finally happened. Love, Dad."

Q. What did you mean when you said that?

MS. WEDGWORTH: Objection.

A. Well, he and I have had conversations about this a lot. You know, my son has a degree in computer science from Rice University, along with a master's in electrical engineering and an MBA. And he's -- he's interested in these kind of things, so we talk about them. He's 44 years old. I don't know if he's quite grown yet, but he's getting there.

Q. (By Ms. Gulley) What do you mean by "finally"?

A. Well, I -- I've been predicting it for a long time, and so it -- it was -- while it was an unhappy situation, at least it serves the fact that I've not been worrying in vain. We have -- we have -- in terms of numbers of dealerships, you know, numbers of customer records and whatever, we obviously has vastly more than DealerBuilt did.

Q. Have you been criticized for that?

A. I've been criticized a lot for -- for data security, which is incredible. But I think what really happens in -- in the dealership world is -- and that's

that it's not the dealer. It is the -- it is the department head who, short term, you know, wants to get his -- what he wants to get done, what he wants to get done. He doesn't care about security. He may not even be around that dealership next year. He has a very short-term outlook.

He is completely -- from a liability standpoint, it's not going to be his personal liability. He's worried about getting done whatever he can get done so his bonuses at the end of the month is -- is good at -- as good as it could be. He's a very short-term thinker. And those are the people that make the most noise, you know, when -- when security enhancements take place.

Inevitably, when you -- when you get to the dealer and explain to him the liabilities that are floating around and -- and what -- what -- what's going on, what we're trying to prevent, you know, the dealer says, "Okay, we understand."

Q. I'm going to hand you Defendant's 275. Take a moment to look at that.

(Exhibit 275 was marked for identification.)

Q. (By Ms. Gulley) Have you had a chance to look at that?

A. Yes.

Q. All right. This is a series of emails and a report relating to the Randall Reed dealership. Do you recall this exchange?

MS. WEDGWORTH: Objection.

A. Yes, I do.

Q. (By Ms. Gulley) In the very top email, sent September 17, 2013, from you, you say, "Chris, the attached report shows the scheduled unattached automatically run reports being run on Randolph Reed's 345 server." Do you see that?

MR. NEMELKA: Objection.

A. Yes, I do.

Q. (By Ms. Gulley) And then what did you say?

MS. WEDGWORTH: Objection.

A. It says, "It's a wonder that this box runs at all, much less running docuPAD with acceptable response times."

Q. (By Ms. Gulley) What does that mean?

MS. WEDGWORTH: Objection.

A. Well, what's happened here in this -- the customer, this Randall Reed company has called up, you know, very, very, very unhappy that their 345 server -- and this is an older server. This is a server that probably -- the last one was manufactured 15 years ago.

It's that old. And it is overrun with batch jobs such that docuPAD response time is not as good as it ought to be. Of course, when you run this report --

Q. (By Ms. Gulley) And just for the record, you're looking at the attachment?

MR. NEMELKA: Objection.

A. These are a list of -- of -- of what we call "scheduled batch jobs." And it -- it shows the user ID that set it up in the first place, and then a description of what it is, and then how many stores it's located -- not how many -- which store numbers -- which store number -- this first one is in Store No. 9.

And then it shows whether it's a report generator or query builder or a download. And then how many hours a day did that -- did it run? It runs every 1 and 1/2 minutes, 13 and 1/2 hours a day.

So what's happened is -- and that's -- and this reports an available report on -- on every system. The customer has completely dumb-assed themselves. And -- and what they've done is they've completely ignored the fact that all computers have finite resources, and you cannot load on them, you know, immense amounts of work. And this is probably the worst example I've ever seen about this.

And it's -- typically, a lot of these --

these automatically scheduled reports, that is a sure sign of a hacker. Because what they're doing is -- and that's they want the report run at a specific time where they can go back and get it and -- and pull it off to, you know, their computer in the sky.

So I found this one interesting. I mean, it, you know -- this one's so bad, you got to laugh. Just -- it's -- it's, you know, just beyond the pale. I mean, this one here, when we have a -- a place on the wall of our computer history where we have an example of the worst use ever of remotely unattended batch jobs, this is it right here.

Q. (By Ms. Gulley) Look at the -- the -- you see that the rows are numbered -- Row 9? Maybe yours aren't numbered. So going down nine spots -- guys, I've just put an arrow -- so one, two, three, four, five -- and for the record, I've put an arrow at "Superior." That's where I want you to look.

A. Okay.

Q. Who is that? What is that? What do you think that is?

A. I think that's Phil Bautista.

Q. So is Superior Solutions a hostile data broker?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. They are. Of the worst kind.

Q. (By Ms. Gulley) Are they -- are they in the same space as Authenticom?

MR. NEMELKA: Objection.

A. Yes.

Q. (By Ms. Gulley) All right. And so how frequently was SIS accessing this Reynolds system at this time?

MS. WEDGWORTH: Objection.

A. Every two and a half minutes. And accumulating four and a half hours a day worth of compute time.

Q. (By Ms. Gulley) What impact can that have on Reynolds technology?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. It -- it overloads it. Even a really good server, you know, shouldn't have anything like that running. And you're pretty good. I didn't catch that.

MS. GULLEY: Let's go off the record and take a break. We've been going a while without a good break. I'm going to still be on when I -- when we come back.

THE VIDEOGRAPHER: This is the end of Media 3. The time is 3:16 p.m. We're off the record.

(Short recess 3:16 to 3:31 p.m.)

THE VIDEOGRAPHER: This is the beginning of Media 4. We're back on the record at 3:31 p.m.

EXAMINATION (Continuing)

BY MS. GULLEY:

Q. When we were talking about Xtime earlier, I don't think I circled around to this question. The Xtime situation that you described, how does that relate to the transaction fee issue that Ms. Wedgworth was asking you about?

A. The -- the process of -- of somebody -- some entity like Xtime doing add/change/delete write-back information, what that does is that generates a bunch of extra work we've got to do. Plus, we've got to save the before-and-after images. And we did it on a per-transaction basis simply because we believed that it would always be a number of RCI customers that don't need that, because they're not doing add/change/delete write-back.

And therefore, it would be unfair just to have a cover-blanket increase to cover the cost of doing that. We put it on -- on the third parties that are actually using that -- that facility.

Q. Do you know what the impact of that transaction fee has been on the number of write-back transactions?

MS. WEDGWORTH: Objection.

A. I -- I'm sure that it has been reduced, because I think before that, there were -- there was no -- no charge for write-back transactions. And so once there became a charge, they came back and changed how they -- how they did things. Some cases, you know, for instance, they would want to update a repair order or update a service reservation, you know, frequently. You didn't really need to do that.

Q. (By Ms. Gulley) So what's the impact on the system load now?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. It -- it improved the situation from the system load but, you know, the -- there's still the logging. You know, it is a fair amount of overhead.

Q. (By Ms. Gulley) Another topic you talked about over the last couple of days is the automated access to the Reynolds system. Does Reynolds allow its customers to provide automated access to third parties?

MS. WEDGWORTH: Objection.

Q. (By Ms. Gulley) Themselves?

MS. WEDGWORTH: Objection.

A. No. They're -- they're not allowed to do that and the security changes won't -- won't let that happen.

Q. (By Ms. Gulley) But what if an automated third

party says, "Oh, no, we're the agent of the dealer." Does Reynolds allow that?

MS. WEDGWORTH: Objection.

A. No.

Q. (By Ms. Gulley) You also mentioned, several times, Reynolds reporting functionality. Can dealers give their operational data out to third parties?

MS. WEDGWORTH: Objection.

A. Yes.

Q. (By Ms. Gulley) And so on the one hand, we talked about system access, no automated access, but they can provide their data. How can they do that?

MS. WEDGWORTH: Objection.

A. We have a -- a data reporting facility. And what they can do is -- and that's they can -- say, for instance, run a print job that's not ever printed. Instead, it's sent to disk and then they -- they transmit that data in that dataset outside in -- as far as we're concerned, you know, once they do it themselves, we're out of the track.

Q. (By Ms. Gulley) So if Authenticom was the recipient of that data from the dealer, is that permitted?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. Yes.
Q. (By Ms. Gulley) I'm sorry?
A. Yes. I think there was one -- one of the, you know, big users of -- I can't remember. It's -- it's not a good example.
Q. What -- what about CarFax? If the dealer wanted to download its information and send it to CarFax --
A. That's what I was thinking about.
MS. WEDGWORTH: Objection.
MR. NEMELKA: Objections.
A. And they do.
Q. (By Ms. Gulley) I did not know you were thinking that, by the way.
A. Yeah. They do. They use -- they use a reporting mechanism and download their data to CarFax and, as a result, CarFax is -- never became an RCI customer. And that's fine.
Q. (By Ms. Gulley) As well?
MS. WEDGWORTH: Objection.
A. Yes. (Inaudible.)
Q. (By Ms. Gulley) Is the wind-down agreement between Reynolds and CDK from 2015 still in effect?
MS. WEDGWORTH: Objection.
A. No.

Q. (By Ms. Gulley) Ms. Wedgworth had said -- or, no, I'm sorry, it was Mr. Nemelka had called it a "five-year agreement." The agreement was 2015, five years is 2020. Was it a five-year agreement?

MR. NEMELKA: Objection.

MS. WEDGWORTH: Objection.

A. No. It was an agreement until the -- the stand-down process had been -- had been completed, which it was completed, satisfactorily.

Q. (By Ms. Gulley) Ms. Wedgworth asked you about exempted user IDs in various contexts. Are exempted IDs exempted from all Reynolds security policies?

MS. WEDGWORTH: Objection.

A. No. Only for specific security policy issues.

Q. (By Ms. Gulley) Who's knowledgeable on that -- those issues?

MS. WEDGWORTH: Objection.

A. Maybe Kelly Hall.

Q. (By Ms. Gulley) All right. We've also talked about DMS competition. Do dealers change DMS providers?

A. Yes, they do.

Q. Do dealers switch away from Reynolds?

A. Yes, they do.

Q. Do dealers switch away from CDK?

MR. NEMELKA: Objection.

A. Yes, they do.

Q. (By Ms. Gulley) Do they switch away from Cox Automotive Dealertrak?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. Yes, they do.

Q. (By Ms. Gulley) Now, you had mentioned there, you do not have an agreement between Reynolds and Cox Automotive Dealertrack with respect to conversions; is that right?

MS. WEDGWORTH: Objection.

A. Correct.

Q. (By Ms. Gulley) But dealers, nevertheless, leave Cox Aut- -- are able to switch between Reynolds and Cox; correct?

MS. WEDGWORTH: Objection.

A. That's correct. That process is -- is really, you know, relatively simple. What you do is -- and that's that you -- you print off a bunch of reports -- and I say "print off" -- you run a bunch of print jobs, but don't print them off. Instead, you send them to disk. And then that disk or thumb drive goes to the assuming, you know, competitive system, and then they run a series of software programs that parse the printed information and put it into data records. And that

is -- that's how we convert any non-CDK, you know, customer. For instance, if we convert a Dealertrack customer, we do it all with print jobs, and are very familiar with it doing it. It's really very simple programming. It's Tab A, Slot B. You know, it's very, very simple programming.

Q. (By Ms. Gulley) Let me hand you what Ms. Wedgworth marked Plaintiff's 657. This is the draft letter to Hendrick discussed between you and Mr. Lamb. Do you recall that area of questioning?

A. Yes.

Q. So just now, you gave an example of a dealer -- how -- how you would convert a dealer other than a CDK dealer; is that accurate?

MS. WEDGWORTH: Objection.

A. That's right. (Inaudible.)

Q. (By Ms. Gulley) Now, in this draft letter that Mr. Lamb wrote, he discusses a -- a drop in sales and other costs of a conversion away from Reynolds. Do you remember that? And I'm looking at this -- this page with the chart ending in 023.

MS. WEDGWORTH: Objection.

A. Yes.

Q. (By Ms. Gulley) Now, would you expect a dealer that was switching away from a different DMS provider

into Reynolds to have the same sort of costs?

MS. WEDGWORTH: Objection.

A. Yes. You know, if we were converting them off of Dealertrack, you know, we would go through the same process. And I -- I've tried to make the point that the greatest variable in any kind of conversion is whether or not, you know, the dealership personnel are motivated and actually take their courses, pass their tests and learn how to new -- use the new software. And that's key. And it's more important than anything else.

Q. (By Ms. Gulley) Does Reynolds help customers do that?

MS. WEDGWORTH: Objection.

A. Yes. We have an education department and we have onsite installers, and we have remote install support people as well.

Q. (By Ms. Gulley) Would you consider yours superior or inferior to CDK's?

MS. WEDGWORTH: Objection.

A. Well, I think that without question. We're superior. But that's -- you know, that -- that's the nature of -- of our business model. What we try to do is -- is -- we're not the cheapest. Don't want to be the cheapest. We want to be the best.

Q. (By Ms. Gulley) Turn back to that first page.

So the date of this email exchange is in early September 2015. What does Hendrick do after September 2015, after this pitch was made?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. Really, really, you know, unhappy thing. They -- they issued termination notices to us and announced that they're going to CDK. And I was very disappointed.

Q. (By Ms. Gulley) Did they sign a contract with CDK?

MS. WEDGWORTH: Objection.

A. Yes, they did.

Q. (By Ms. Gulley) So they switched to CDK?

MS. GULLEY: Objection.

A. They didn't. They didn't switch yet.

Q. (By Ms. Gulley) They decided to switch?

MS. WEDGWORTH: Objection.

A. They decided to switch. They contracted to switch. And then -- which is a further, you know, longer story -- they decided to switch. And then, as the switch began, it began first with a very small dealership that was, basically, a new start. And they had all new people and it was -- you know, therefore pretty easy, pretty simple conversion job, which went

okay.

The second dealership that they converted was a monster Toyota dealer, which is within eyesight of Hendrick's headquarters. And it was a -- an absolute disaster from the conversion standpoint. But not because of the software, not because of the systems, not because of the data conversion, not because of anything like that.

There is a process that is very, very important in the service department, which it's called "opcodes." And opcodes are -- they're unique to each dealership. Each dealership has kind of built their own opcode structure. And typically, it's a two-digit or a three-digit number. And its whole purpose is -- is to save time in typing. When you're opening up a repair order, there's a tremendous amount of keystroke-kind of work that has to be done. And the opcodes shorten that dramatically.

Well, there had been an initiative inside Hendrick, which had not been accomplished or even attempted, which was to standardize opcodes amongst all 105 dealerships. And the goal -- or the reason to do that was, that way you could move a service advisor from one dealership to another dealership, and he would not have to relearn the opcodes. Because if you put a

service adviser into an environment where there's all new opcodes, he's crippled, because he has to look up whatever opcode it is. And -- and he has to keep doing that until he's finally memorized, you know, whatever the new set of opcodes are from the place he's been transferred to.

They wanted to avoid that forever and all time. Unfortunately -- and I don't know the exact -- who talked to who about what, but the upshot was -- and that's that Hendrick decided -- and -- and CDK let them change the opcodes on the day of conversion to the new system.

And the result was -- and that's that, you know -- it's always been on Monday mornings, people always bring their cars in, and they've kind of made their to-do list over the weekend and -- you know, day one is, you know, you bring your car into do this or do that. So there's a lot of -- right -- typical Monday morning.

The process of opening a repair order was absolutely crippled, because it was all new opcodes and, you know, the service advisors had to look up every opcode, which just, you know, really made it proceed at a snail's pace. Which meant that the -- the technicians who were paid on incentive programs, they did not get

work to do until almost noon. And they were not happy about that. They lost half a day's pay.

But everybody, I think, had a little bit of, you know, forgiveness built in, because, after all, they were converted to the new system and it was -- they -- they expected some things not to go right.

The second day, it didn't get any better. And by noontime, you know, the techs were absolutely up in arms. It was an absolute up rising. And they were saying -- which is absolutely true -- they were top technicians, some of them had been with Hendrick 25 years or more, and they were just wailing. And so the call for help went out to -- Mr. Hendrick needed to come and address the group, which he did. And he did a smart thing. He said, "Guys, I promise you, you're going to make 10 percent more this month than you've ever this year. Be patient with us."

The techs said, "Okay, we understand."

And then another interesting thing happened. Success of data conversions has a lot to do with the quality of personnel, experienced personnel, really. Obviously, there was -- there was some real lack of experience, because the CDK conversion group should have resisted this idea -- this crazy idea of changing opcodes on the first day of installation. So

"Mr. H.," as he's called -- he's very low-key kind of guy. And he -- he went around and just kind of talked to folks, you know, after, you know, the initial fire had been quenched. And he walked up to a -- a CDK installer and, you know, talked to him, you know, "Well, how are you? My name is Rick Hendrick." Shook his hand. Rick's -- you know, Rick's a hero figure in -- in car racing. He's one of "the" guys. And he was talking to this one young person and, you know, in the course of the conversation, he's -- he asked, well, "How long have you been with CDK?"

And the person answers, "Well, I'm not with CDK. I'm -- I'm a contractor."

"Oh, really? Okay. How long have you been a contractor?" and so forth. And he talked to several others, you know, kind of got the same answer. And he realized that he had been promised the best install team and he had not gotten it. And Rick Hendrick's the kind of person -- he's a very simple person. You only get to lie to him once.

And the next day he called us up and said, "Bob," you know, "we've got problems. If you won't punish us, we'd like to come back."

And the answer is, obviously, "Whatever our last proposal is, that's it."

And so they came back. And, you know, that's probably one of the most amazing, you know, conversion stories that I've ever heard and -- and the software, our software, had nothing to do with it. You know, CDK's software had nothing to do with it. There was nothing wrong with the hardware. Probably not that much wrong with the people. If they had just not changed opcodes.

Q. (By Ms. Gulley) Why did you lose Hendrick in the first place?

MS. WEDGWORTH: Objection.

A. Well, that's a very pertinent question. Mr. Ed Brown is, nominally, the president, is a required banker. He was with Bank of America there in Charlotte for 30 some-odd years. He retired. And he had banked Rick over the years and knew him well.

And Rick decided that he wanted to spend more time racing, and he hired Ed Brown. And Ed Brown knows nothing about computers. He probably -- by now, he knows a little bit about dealerships but, you know, that's not been -- he's definitely not what you would call a -- an experienced automotive executive. And I think what he wanted to do is he wanted to go do business with CDK because they were a big public company and we're not.

Q. (By Ms. Gulley) So he just decided to switch?
MS. WEDGWORTH: Objection.
A. So he decided to switch. And, you know, Mr. H. had promised me -- he said, "Bob, I promise you that I will never, ever let the decision of this magnitude go by without me personally being involved."
And I said, "Rick, you really need to do that."
Q. (By Ms. Gulley) Did he promise he'll stay with you?
MS. WEDGWORTH: Objection.
A. Well, he signed a five-year contract, and he has almost doubled their billing with additional stuff that they bought. They bought over 400 docuPADs.
Q. (By Ms. Gulley) Let's talk about docuPAD for a minute. Does every Reynolds dealer have a docuPAD?
MS. WEDGWORTH: Objection.
MR. NEMELKA: Objection.
A. No. That -- That's our goal, but I mean -- we've not yet achieved that.
Q. (By Ms. Gulley) Now, if dealer -- if a dealer wanted to use docuPAD with another DMS, would you consider that?
MS. WEDGWORTH: Objection.
A. There -- there's technical issues that just

prohibit that. You know, there's -- one of the -- one of the magic screens in -- in docuPAD is a screen where -- will be displayed of some add-on.

You know, for instance, like an extended warning for, you know, repair. There will be a good/better/best -- that kind of choice and -- and the consumer, with their -- with their stylus on their side of the table actually checks which one they want, and they will instantly display what their payment is in the corner.

And then they can -- they can tap on the "Better Policy," and it will change the payment for them. And then it will check -- they'll tap on the "Best Policy" and it will give them what the payment is. And they can choose which one they want or none.

They can -- they -- go back and click on the "None" button, and it will (verbally indicating) -- it will keep on changing, you know, the payment.

Well, how does he get that done? What it does is -- is it -- it is built right into the Reynolds F&I system. And, you know, therefore, we can't -- we'd like to consider selling it to, you know, non-Reynolds customers, but we can't from a technical standpoint. It would just -- the rework would be just huge.

Q. (By Ms. Gulley) Also in talking about docuPAD

with Ms. Wedgworth, you used a number of terms like "profit producer" or "revenue generator." Do you remember that discussion?

A. Yes.

MS. WEDGWORTH: Objection.

Q. (By Ms. Gulley) You called it "sticky," right?

MS. WEDGWORTH: Objection.

A. Yeah, it is -- it is so compelling from a money standpoint that we think that dealers will stick with it simply because it would make economic -- you know, it wouldn't be sensible to change.

Q. (By Ms. Gulley) So I think the -- so the record is clear -- it's not entirely clear in the record, who you're talking about. Who is making all of this revenue? Who is generating all of this -- who's producing all of this profit?

MS. WEDGWORTH: Objection.

A. The dealer is. And -- and it's occurring because of what, you know, what I think is nigh onto a miracle. Because I -- I -- in the original conception, I never dreamed it would do it.

What happens is -- and that's that the finance and insurance part of the business is typically called a "business office." And, you know, the part of the sales process of buying a car -- where it occurs is

after you've decided what car that you want. It's after you've decided what kind of financing, it's after you've decided on what trade-in value you're going to have. All that's done and everybody kind of shakes hands on the deal.

And then, after a little bit, you're sent to the business office to finalize the paperwork. Okay? That's where there's this final attempt to sell you things. And it's all kinds of things. It's extended warranties. It is tire and wheel protection. It's, you know, electronic key, locks. It's -- it's windshield cracks. It is what they call "rust and dust," which is, you know -- it's fabric protectant inside. It used to be undercoating, but nobody undercoats anymore.

But it -- it's a very, very essential profit center for the dealership. Unfortunately, it is ranked very, very high in customer dissatisfaction. And people who have been through the process are warned that what you do is you cross your arms like this (indicating) when you go in there, and the answer to everything they say is, "No." "No." "No." "No." And you do that long enough, they'll finally let you loose and you can go away with your new car.

What happens in the docuPAD situation is we completely changed that whole process. Instead, you

know, the consumer comes in, they sit on their side of the table, and there's this big flat screen that's about so high (indicating) and the whole transaction is -- takes place there. And the customer is given a stylus, and they basically -- it's a menu system. They get to pick the stuff off the menu that they want.

And the miracle is that they buy more because they don't hate the process. They're -- they're so completely disarmed, you know, they -- they go from this posture here, saying -- telling them, "No." "No." "No." Instead, they get handed a stylus, and say -- "You" -- "You run the system. You make your choices."

And that amounts to, typically, 200 bucks per transaction more gross profit to the dealer. So if you have a -- a typical finance manager who will handle 70 transactions a month at 200 bucks apiece, that's $14,000 a month in additional gross profit -- per F&I managers. If you've got five, then it's five times that a month.

Q. (By Ms. Gulley) Is that more than the -- what they're paying to license the DMS, the whole DMS?

A. Correct.

MR. NEMELKA: Objection.

A. We have customers that will stand up and swear, and take calls, you know, and go visit -- that that's

what it does. It's that good. It's one of those situations where -- I've been in this business a long time, and my daily prayer is, "Oh, Lord, please give me one more killer ap." And he gave it to me. I -- I didn't -- I didn't invent it. I can't take credit for that. But I saw it, and I said, "God, we've got to have this."

Q. (By Ms. Gulley) All right. Let's switch gears a little bit. Mr. Nemelka just shortly -- this afternoon, put in front of you an email between you and Mr. Anenen. Do you remember that?

A. Uh-huh. (Witness answers affirmatively.)

Q. How do you feel about CDK/ADP?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. Well, that is -- that is a -- a complex question. There's individual people inside CDK that are decent people. Ron Workman was a decent person. I mean, Steve Anenen is a decent person. Corporately, they're -- I don't have good feelings about them at all, and it goes back to many, many, many years ago. I've been competing against them directly in the marketplace for well in excess of 40 years. And, you know, they did some things, you know, back early on that I'm still mad about.

Q. (By Ms. Gulley) Are we talking '70s, the 1970s?

MS. WEDGWORTH: Objection.

A. 1970s. 1970s. I have very, very bad experience with them, and I'm, you know, still bent out of shape about that.

And then about -- about 20 years ago, there was a small company in Houston that, you know, copied our system and built a new one based upon -- they -- they stole our -- our screen layouts, our report layouts, our -- our field -- our field layouts, our data fields inside the field -- inside the -- inside the records, and sold it to, you know, ADP for $67 million. And for some reason -- or a reason we don't know, ADP decided to hold back $27 million out of that transaction. For some reason.

We sued ADP as a result, and I wasted a year in depositions, arbitration and whatnot. You know, finally lost. I'm still amazed that I did. But in my -- I was dispirited about that. But the Lord decided that he will help me.

And it went like this: After ADP won, they put in -- they ran a whole floor in a big office building out of Westmark in Houston. And they hired about 150 programmers. This was going to be the next

generation system. They told their sales force all about the next generation system. And they worked at it and they worked at it and they worked at it, and it all looked great, and it would run four terminals well. Four. You put 20 on it, it wouldn't work at all. And they could not scale it up.

But they worked -- they didn't stop working. They said, "Well, we can fix this. We can do this." And they worked and they worked and they worked and they worked, and finally, five years after their -- their, quote, "victory" over Bob Brockman, they scrapped the whole thing.

And as close as I can estimate that cost them, including the original purchase price, plus the legal fees for fighting me off, it cost them $250 million and cost them five years in market, because all of a sudden, they had to start over on what their next generation piece of software was going to be.

So obviously, I have a lot of very, very strong feelings about it -- about ADP or CDK. I don't like them, and I don't like them a lot.

Q. (By Ms. Gulley) Do you want help them make more profits?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. Only if -- if I make more profit, you know, right alongside them.

Q. (By Ms. Gulley) Well, in this case, the plaintiffs have alleged that you and CDK have gotten together in some sort of conspiracy. I want to kind of talk through some of that. Are you the leader of Reynolds and Reynolds?

MS. WEDGWORTH: Objection.

A. Unequivocally.

Q. (By Ms. Gulley) When did you learn that CDK was going to require vendors to access its system through the 3PA program rather than any other method?

MS. WEDGWORTH: Objection.

A. I don't know the exact day, but it was substantially after the stand-down agreement.

Q. (By Ms. Gulley) So it was after February 2015?

A. Yes.

MS. WEDGWORTH: Objection.

Q. (By Ms. Gulley) Did you personally agree with anyone at CDK that you would get together to block Authenticom?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. Did not.

Q. (By Ms. Gulley) That you would get together to

block anyone in Authenticom's business line?

MS. WEDGWORTH: Objection.

A. No. Did not.

Q. (By Ms. Gulley) Did you personally agree with anyone at CDK that you would destroy Authenticom together?

MS. WEDGWORTH: Objection.

A. Absolutely not.

Q. (By Ms. Gulley) Have you ever discussed CDK's policies about system access to their DMS with CDK?

MS. WEDGWORTH: Objection.

A. I have not.

Q. (By Ms. Gulley) Are you aware of any agreement between anyone at Reynolds and CDK to eliminate third-party data brokers, like Authenticom?

MS. WEDGWORTH: Objection.

A. I have not.

Q. (By Ms. Gulley) Did you and CDK ever meet to even discuss the two firm's data access policies?

MS. WEDGWORTH: Objection.

A. We have not.

Q. (By Ms. Gulley) Are you aware of anyone having those kind of conversations with CDK?

A. No.

MS. WEDGWORTH: Objection.

A. I -- I didn't come to understand their data access policy, really, until we bought ReverseRisk, which is -- which was a customer. They -- they acquired data downloads for accounting data from CDK, and it wasn't until that time that I understood, even, how it all worked.

Q. (By Ms. Gulley) These -- in terms of an agreement between Reynolds and CDK related to companies like Authenticom, if there was any such agreement about how the two firms were going to jointly treat somebody like Authenticom, would you know about it?

MS. WEDGWORTH: Objection.

A. Absolutely. As you probably can tell, I'm -- I'm into the details, big time. And there's no way in the world anything like that would happen without my -- without my knowledge.

Q. (By Ms. Gulley) What about any agreement between Reynolds and CDK related to the two firms' data access policies? If there were any agreement like that, would you know about it?

A. Absolutely.

MS. WEDGWORTH: Objection.

A. Absolutely.

Q. (By Ms. Gulley) Did you enter into an agreement with CDK to create a market where Reynolds

controlled all of the access to data stored on a Reynolds DMS and CDK would control all of the access to data stored on CDK's DMS?

MS. WEDGWORTH: Objection.

A. I did not.

Q. (By Ms. Gulley) Are you aware of any such agreement?

MS. WEDGWORTH: Objection.

A. There is no -- there is no such agreement.

Q. (By Ms. Gulley) As soon as we find it, I'll hand you Exhibit 644, from plaintiffs, earlier marked. It's notes from a sales meeting in Aspen. Ms. Wedgworth had asked you some questions about this. I'd like to direct you to the page ending 632. I -- I don't actually know if it was Ms. Wedgworth or Mr. Nemelka as I sit here, but do you recall looking at this document before?

A. Yes, I do.

Q. And again, these are -- I believe you testified, in sum and substance, that these are your notes in preparation of speaking to the top salespersons at Reynolds in --

MS. WEDGWORTH: Objection.

Q. (By Ms. Gulley) -- July 2014.

MS. WEDGWORTH: Objection.

A. Yes, it would be the sales VPs.

Q. (By Ms. Gulley) And how many sales VPs are there?

MS. WEDGWORTH: Objection.

A. All total, like, 12.

Q. (By Ms. Gulley) All right. There's a line here -- Bullet 1, 2, 3, 4 -- Bullet 4, "This could put the security wars very much behind us." Do you see that?

MS. WEDGWORTH: Objection.

A. Is this 632?

Q. (By Ms. Gulley) 632. Do you see where it says "Security" at the bottom?

A. Okay.

Q. And then there's a number of bullet points. I'm looking at the penultimate -- the second from the bottom. "This could put the security wars very much behind us." Do you see where I am?

MS. WEDGWORTH: Objection.

A. Yes.

Q. (By Ms. Gulley) You were asked a lot about this section in earlier questioning. I'd like you to explain what you meant by "security wars" in this document.

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. The subject of data security, when it comes to third-party data brokers, hackers, whatever you want to call them, has been, over the years, very much a cat-and-mouse kind of situation where we will detect a method by which somebody is getting into the system. And we will devise a countermeasure. And that will cause them to be unable to get into the system for a while.

And then they -- they're -- they're not -- you know, dummies. What they'll do is they'll figure out a different way. And that will work for a while, and we will, ultimately, observe that one, and we'll then go about employing countermeasures.

Now, what that is -- is that -- that's -- that's kind of a seesaw, you know, kind of back and forth like a war. And that's where the inference comes from. There's not a -- a -- we don't have a declaration of war per se. You know, we don't have a -- a, quote, "War room" with a capital W, that sort of thing. It -- it's a figure of speech. And it applies to this, you know, back and forth nature of -- of data security and -- and its countermeasures.

Q. (By Ms. Gulley) So -- so the security war was with DMI and Integra Link!! and Authenticom and SIS,

those folks? Or something else?

MS. WEDGWORTH: Objection.

MR. NEMELKA: Objection.

A. Probably, you know, Phil Bautista was -- was one of the early and one of the worst ones. And is still -- he's still regrowing his fangs.

MS. GULLEY: I thank you for your time. I have nothing further. I believe the plaintiffs have a few minutes left.

FURTHER EXAMINATION

BY MR. NEMELKA:

Q. Mr. Brockman, you testified about an -- an Xtime incident, and I have a question about that. The Xtime incident happened through the RCI interface, not because of any data integrator; correct?

MS. GULLEY: Form.

A. That's correct.

Q. (By Mr. Nemelka) So your answers with respect to the Xtime incident have nothing to do with use of data innovators, right?

MS. GULLEY: Form.

A. That particular situation, yeah, did not involve data integrator. Come, however, any data integrator that employed any kind of write-back strategy, you know, could, potentially, the same thing

happen.

Q. (By Mr. Nemelka) All right. And then Ms. Gulley put a document in front of you with your son about the DealerBuilt situation. The DealerBuilt situation also had nothing to do with dealers using data integrators, right?

A. That's correct.

Q. And so you wrote your son, "It finally happened." It had nothing -- but that had nothing to do with Data Integrators, right?

MS. GULLEY: Objection; form.

A. It has to do with a data breach situation, which is a very distinct possibility with a data integrator.

Q. (By Mr. Nemelka) But that incident with DealerBuilt had nothing to do with a data integrator, right?

MS. GULLEY: Objection; form.

A. That particular incident did not have anything to do with a data integrator.

Q. (By Mr. Nemelka) And still today, you haven't -- you're not aware of any data breach caused by Authenticom; correct?

MS. GULLEY: Objection; form.

A. That's come to my attention.

Q. (By Mr. Nemelka) You also testified about -- you estimated that you wouldn't be surprised -- I wrote it down -- you wouldn't be surprised, you said, if the number was 500 million with respect to what Reynolds had spent with respect to security. Do you recall that testimony?

MS. GULLEY: Billion. Not millions. He said billion, not million.

MR. NEMELKA: 500 billion?

MS. GULLEY: Oh, I'm sorry. Half a billion. I'm sorry, Counselor, it's late. I'm sorry, Mike.

Q. (By Mr. Nemelka) You never actually calculated that number, did you?

A. That's correct.

Q. Nobody in Reynolds actually calculated that number, have they?

MS. GULLEY: Objection; form.

A. That's correct.

Q. (By Mr. Nemelka) There are no documents reflecting that calculation, are there?

A. No.

MS. GULLEY: Form.

A. That's -- that's correct. I -- I'm making that, you know, guesstimate based on my knowledge and

experience in the business.

Q. (By Mr. Nemelka) All right. That number is just a guesstimate, right?

MS. GULLEY: Objection; form.

A. That's correct. But I think it's a pretty good one.

Q. (By Mr. Nemelka) But it's still speculative, right?

MS. GULLEY: Objection; form.

A. It's still speculative. But I would -- I would add that I'm, you know, probably uniquely qualified to be able to make that kind of guesstimate.

MR. NEMELKA: All right.

FURTHER EXAMINATION

BY MS. WEDGWORTH:

Q. Mr. Brockman, you stated earlier that the exemptions are only for specific security policy. Do you remember saying that when Ms. Gulley was asking you questions?

A. Yes, I did.

Q. If you could look at -- at Exhibit 665 of Plaintiff's. Here's 665. Mr. Brockman, this document, halfway down the page, the top email, if you'll note, is from Mr. Schaefer to you. Do you see that?

A. Yes.

Q. And the email which is dated May 8, 2016, you might recall that dealt with security enhancements that you wanted to implement and did implement that month. Do you recall that?

MS. GULLEY: Form.

A. Excuse me. Let me read this again. Yes, I -- I've read this. I'm not sure that I understand it completely, but --

Q. (By Ms. Wedgworth) So here, Mr. Schaefer asked you, toward the bottom of the email, talking about the new security enhancements to be implemented by Reynolds. It states, "I am trying to understand if there will be any exceptions? Which we have always had? For example, PAG, Hendrick, AMSI, Rahal, Wyler, etc."

PAG and Hendrick, AMSI, Rahal and Wyler, those are all dealerships; correct?

MS. GULLEY: Objection; form.

A. That's correct.

Q. (By Ms. Wedgworth) And they are large dealerships, right?

A. Yes. They are some of the largest.

Q. And here, Mr. Schaefer says that those dealerships have always had exemptions; is that correct?

MS. GULLEY: Form.

A. For certain, you know, PAG, Hendrick, AMSI, I'm

personally aware of always had some exceptions. These are very large organizations, amongst the largest, and have very extensive IT staffs of their own. And they're what I would call quite sophisticated.

Rahal and Wyler are a little smaller, but they still have -- not a large number of individuals, but they have a small number of individuals that are really, really savvy and know what they're doing.

And in those particular cases, we've always allowed them, you know, some specific exceptions as far as, you know, downloading of data and that sort of thing.

MS. GULLEY: That's -- that's the end of your time.

A. And what -- what --

Q. (By Ms. Wedgworth) Well --

A. What Bob Schaefer is doing and that's he wants to know, you know, what kind of exception is -- is going to be. And he's asking, he's saying, "Please advise."

Q. And he's saying, We have always had these exceptions for these dealerships, correct?

A. The -- the --

MS. GULLEY: Objection; form.

A. -- for these, five dealerships, there's always been some kind of exception. Without going back in to

the details, I can't tell you exactly what.

Q. (By Ms. Wedgworth) And in addition to --

MS. GULLEY: Peggy, that's the end of your time.

MS. WEDGWORTH: I'm going to continue. You took a long time, you went over a lot of topics. You covered lots of -- a lot of topics.

MS. GULLEY: You had to reserve your time for that. I'm sorry, Peggy. We're not going to continue. I told you that there was a limit to how long you could go. I just didn't cut him off when he was answering.

MS. WEDGWORTH: Nor did I when I was questioning him. So I -- I'm going to continue my questioning.

MR. NEMELKA: We have two more minutes. You're wrong about your calculation anyway, Andi.

Q. (By Ms. Wedgworth) So -- so other than the five dealerships, there's also an "etc." at the end, Mr. Brockman. Do you see that?

MS. GULLEY: Objection; form.

A. Yes, ma'am, I do.

Q. (By Ms. Wedgworth) And so that doesn't limit it to just the five dealerships who always have exemptions; is that correct?

MS. GULLEY: Objection; form.

A. Ma'am, I -- I don't know, you know, if there's one more, or no more, or multiple that more. I can't tell from looking at this. And, again, we -- I think we've also talked about in the last two days about the total number of exceptions that are out there and how that number keeps coming down, down, down, down, down. And we're not all the way there yet.

Q. (By Ms. Wedgworth) And the biggest drop of those exemptions coming down --

MS. GULLEY: Objection.

Q. (By Ms. Wedgworth) -- came after the stand-down agreement; correct?

A. That's correct.

Q. So if we now go to the first exhibit that you -- that I used with you today -- and let's see if I can find it.

MR. NEMELKA: I can try to find it for you.

MS. WEDGWORTH: Okay. It's the Ron Lamb exhibit. But I -- I'll try to do it without looking for the exhibit. It was the very first one today, which would be 657.

Q. (By Ms. Wedgworth) But it's -- it's the letter that Ms. Gulley referred you to that you reviewed, where you said Mr. Lamb has written the letter and the first

half of it was brilliant?

MS. GULLEY: Object to everything you just said.

MS. WEDGWORTH: Here's a copy of it for you. 677.

MR. NEMELKA: I found it.

MS. WEDGWORTH: 657. There we go.

Q. (By Ms. Wedgworth) Mr. Brockman, do you recall this document?

A. Yes, ma'am.

Q. So on the second page, those dealerships that are listed there, those are all privately held dealerships, correct --

MS. GULLEY: Objection; form.

Q. (By Ms. Wedgworth) -- in that box, in the chart?

MS. GULLEY: Form.

Q. (By Ms. Wedgworth) Second page.

MS. GULLEY: Form.

A. And what -- what is your question again, please, ma'am?

Q. (By Ms. Wedgworth) The dealerships listed in the chart are all privately held dealerships; is that right?

MS. GULLEY: Form.

A. Ma'am, I -- I don't know that. I -- I -- there's some of them -- Herb Chambers, I'm -- I'm familiar with. And I'm pretty sure that one is privately owned. The status of the rest of them, I -- I'm unaware.

Q. (By Ms. Wedgworth) Well, do you have -- do you have any knowledge that any of those others are publicly held companies?

A. Ma'am, I'm -- I'm sorry. I -- I just don't know.

Q. Okay. With regard to this letter, I think you answered some questions from Ms. Gulley. You -- do you stand by this letter as Mr. Ron Lamb wrote it and you edited it?

MS. GULLEY: Objection; form.

A. Yeah, I acknowledge the fact that he wrote it. This is a sales letter. And I looked at it from a topical standpoint. As I think I remember stating, I was very pleased that there were no misspellings, and punctuation also looked pretty good. But as far as the -- the exact, you know, last, you know, comment in the paragraph, I did not read it for that -- that level of content.

Q. (By Ms. Wedgworth) Well, when you say it's a sales letter --

MS. GULLEY: Ms. Wedgworth, we're way beyond your time. You can finish the -- you are way beyond your time. For the record, we have asked questions of all of our witnesses. You just did not reserve enough.

MS. WEDGWORTH: Well, I'm going to -- I'm going to keep this deposition open for many reasons. The least of which is that we -- we let him answer every single question. We let him take as long as we want. You've asked a lot of questions. He's given very long answers and we're entitled to respond to all of that. In addition, you produced over 2,000 -- 200,000 documents --

MR. NEMELKA: Pages of documents.

MS. WEDGWORTH: -- pages of documents over the weekend. And for all those reasons, we are going to --

MS. GULLEY: You knew that those documents were coming in advance, because we --

MS. WEDGWORTH: Actually, we did not. And we certainly didn't see them coming in on Friday night.

MS. GULLEY: You compelled them and the court ruled that they would be produced after the motion to compel. As you know, we're all still producing documents in response to the Court's ruling on the

motion to compel. You put these depositions on the docket in -- in any event. That's our entire point, is why plaintiffs are so far ahead of us on the number of depositions, because plaintiffs do not produce documents. And we understand that we can only take depositions once.

We are not holding the deposition open longer. You have used the entire seven hours. We split this over two days, not to give you a one-and-a-half day deposition, but rather because of health -- of attorney eyes only -- as we said before -- health considerations that mean Mr. Brockman really cannot be here any longer.

And therefore, this deposition is not going to stay here open. I was actually going to tell you we were out of time; if you would like to finish this series of questions for the next two or three minutes, that's fine, until you jumped down my throat and said you're not going to close it at all. That's nonsense. That's -- we have an agreed protocol order.

MS. WEDGWORTH: Well, I am not agreeing to it, and I will be making a motion to the court to finish this deposition.

MS. GULLEY: How much longer do you need, Ms. Wedgworth?

MS. WEDGWORTH: I'm not sure. It's

depending on his answers.

MS. GULLEY: What are you going to ask the court for, an unlimited deposition?

MS. WEDGWORTH: Nope. Not unlimited at all. I would think at least an hour could cover all of this.

MS. GULLEY: Well, I believe that we need to go off the record. You're asking me before we go off the record for an extension of one hour. Otherwise, you're filing a motion to just to be clear on the record, for the future.

MS. WEDGWORTH: Correct. Correct.

MS. GULLEY: And you'll be asking the Court for one hour, additional?

MS. WEDGWORTH: Certainly one hour, yes.

MS. GULLEY: Okay. Off the record.

THE VIDEOGRAPHER: Off the record at 4:20 p.m.

(Short recess 4:20 to 4:42 p.m.)

THE VIDEOGRAPHER: Back on the record at 4:42 p.m.

MS. GULLEY: While we were off the record, there was discussion back and forth among counsel about next steps. Counsel for plaintiffs approached me and said, you know, if we could go ten more minutes, they

would, you know, withdraw their objection to keep the deposition open. We were agreeable to that extra ten minutes, and we're willing to put Mr. Brockman on the stand for an extra ten minutes.

However, during that time period, he suffered an incident with his health, verified by a test. And unfortunately, he's unable to come back into the room to proceed for those ten minutes. My understanding is that plaintiffs are okay closing the deposition for today, subject to your statements.

MS. WEDGWORTH: We just reserve our rights to pursue whatever we may need in the future. And we certainly appreciate that his health is paramount and don't feel it appropriate. If the -- if he can't testify today, it wouldn't be appropriate to do it today, due to his health.

MR. NEMELKA: And I have no further questions.

MS. GULLEY: No, just in response to Ms. Wedgworth, obviously, Mr. Brockman is the chairman of the company, and he made himself available for the entire seven hours. We would object to keeping the deposition open in any way. I understand we've agreed to disagree on that point.

MS. WEDGWORTH: Off the record.

THE VIDEOGRAPHER: This will conclude today's deposition for Mr. Robert Brockman. We are off the record at 4:43 p.m.

(Deposition concluded at 4:43 p.m.)

CHANGES AND SIGNATURE

WITNESS NAME: ROBERT BROCKMAN    DATE: January 17, 2019

PAGE    LINE    CHANGE    REASON

_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________

I, ROBERT BROCKMAN, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____________________________________
ROBERT BROCKMAN

THE STATE OF )
COUNTY OF )

BEFORE ME, _________________________ , on this day personally appeared ROBERT BROCKMAN, known to me (or proved to me under oath or through __________________________ ) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _______ day of _________________________ ,___________ .

_____________________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ______________________
COMMISSION EXPIRES: _________________

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| | ) | |
| IN RE: DEALER MANAGEMENT | ) | MDL NO. 2817 |
| SYSTEMS ANTITRUST | ) | |
| LITIGATION, | ) | CASE NO. 18 C 864 |
| | ) | |

REPORTER'S CERTIFICATION

ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN

January 17, 2019

Volume 2

I, SHAUNA L. BEACH, Certified Shorthand Reporter in and for the State of Texas, do hereby certify to the following:

That the witness, ROBERT BROCKMAN, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(e)(1) that the signature of the deponent:

_X_ was requested by the deponent or a party before the completion of the deposition and is to be returned within 30 days from the date of receipt of the transcript. If returned, the attached Changes and

Signature Page contains any changes and the reasons therefor;

___ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys to the action in which this proceeding was taken. Further, I am not a relative or employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

Subscribed and sworn to on this

30th Day of January , 2019.

Shauna L. Beach

____________________________________

SHAUNA L. BEACH, RDR, CRR, CSR #8408

Expiration Date: 12/31/2019

**&**

**&** 167:19 168:4,10 175:12 176:1,5 260:10

**0**

**00963942** 171:18
**023** 332:21
**025** 184:5
**092** 241:15

**1**

**1** 170:1 172:21 174:1,20 237:6 245:6 255:21 296:13 323:16 352:7 370:21
**1,000** 194:18
**1,034k** 286:8
**1/2** 323:16,16
**10** 170:10 174:10 238:25 240:15 337:16
**10,000** 194:14
**10,690k** 286:8
**100** 169:4 179:8
**10119** 168:18
**105** 335:22
**10:17** 210:5,6
**10th** 196:4
**11** 170:11 174:11
**110** 192:17
**1100** 167:19 168:4 175:13
**11:02** 237:6,7
**11:09** 237:7,9
**11:15** 240:17,19
**11:31** 240:19,21
**12** 170:12 173:7,10 174:12 223:14 314:9 352:5
**12/31/2019** 371:17
**12:17** 265:11,12
**12th** 257:1 259:13 259:21
**13** 170:13 174:13 323:16
**14** 170:14 174:14 284:18 285:2,17
**14,000** 197:13 344:17
**142** 192:19
**15** 170:15 174:15 322:25
**150** 224:2,7,23 281:25 282:1,18 346:25
**16** 170:16 174:16 277:8 284:16
**16.3m.** 286:10
**1615** 168:11
**16953** 371:15
**17** 167:10 170:17 171:7 174:17 228:16,17 322:8 369:2 370:10
**176** 170:2,5
**17th** 167:15 175:3
**18** 167:4 170:18 174:18 277:19 370:4
**18.3m** 286:8
**184** 171:9
**18th** 277:20
**19** 170:19 174:3,19 241:22 277:8
**1970s** 346:2,4,4
**1999** 168:22
**19th** 168:17 277:4
**1:36** 265:12,14
**1st** 184:9 185:5 253:3 296:20

**2**

**2** 167:8,13 170:2 171:10 173:3 174:2 237:9 245:9 265:11 271:7,8 272:8 319:4 352:7 370:11
**2,000** 364:12
**20** 170:20 173:14 174:20 183:2 215:18 282:11 346:7 347:5
**200** 182:22 197:9 197:12 344:13,16
**200,000** 364:12
**2000** 284:17
**20006-1101** 168:22
**20006-6801** 169:5
**20036** 168:12
**2006** 304:13 305:2
**2009** 192:13 209:6
**201** 171:13 173:10
**2013** 171:7 289:16 322:8
**2014** 184:15 192:17 351:24
**2015** 171:10,14,17 174:13,16 184:9 201:21,22 213:18 213:20 214:2 224:1 225:8 226:4 226:12 289:23 293:16 329:23 330:3 334:2,2 348:16
**2016** 171:3,20,24 172:3,10,14,17,21 173:3,7,17 224:2,8 224:23 225:7 227:6 230:11 235:9,17 238:25 239:2 240:4 241:22 245:3,20 248:6 251:9 252:19 254:9,25 255:11,21 257:1 259:13,21 268:10 268:14 269:9 270:9 271:11 358:1
**2017** 172:7 173:14 173:21 174:3,9,20 218:17 219:12 263:4 271:19 277:4,8,19 286:9 288:8,11 296:13 296:20
**2018** 174:6 284:14 284:18
**2019** 167:10,16 175:3 245:10 369:2 370:10 371:12
**2020** 330:4
**2099** 169:4
**20th** 263:4
**21** 170:21 172:10 174:21
**213** 171:16
**22** 170:22 174:22 201:7
**221** 171:20
**226** 281:14
**229** 171:23
**23** 170:23 174:23
**234** 172:2
**237** 172:6
**23rd** 201:21
**24** 170:24 171:17 174:24 184:15

**240** 172:9
**244** 172:13
**247** 172:16
**24th** 213:18,20
**25** 170:25 174:25 314:8 337:11
**250** 347:15
**252** 172:20
**256** 173:2,6
**259** 173:9
**26** 242:2
**262** 173:13
**268** 173:16
**27** 346:15
**271** 173:20
**274** 171:2 318:2,5 318:8,11,17
**275** 171:6 321:20 321:22
**276** 174:2
**27th** 260:6
**28** 172:7
**2817** 167:3 370:3
**284** 174:6
**288** 174:9
**289** 170:5 174:12
**29** 186:25 187:7
**292** 174:15
**296** 174:19
**2:21** 287:8,9
**2nd** 254:25

**3**

**3** 170:3 174:3 265:14 325:24 352:7
**3,104,000** 225:8,23
**30** 171:14 174:16 218:17 222:12,13 228:18 229:6 265:5 282:11 293:16 314:8
339:15 370:21,24
**300** 170:6 194:21 195:13,19,23 282:1,2,18
**30th** 201:21 371:12
**31** 172:17 248:6
**318** 171:2
**31st** 252:19 253:1 253:2
**32** 192:20
**321** 171:6
**345** 322:11,23
**35** 276:18
**354** 170:6 223:20 224:15,17
**357** 170:7
**36** 199:17
**369** 170:8
**370** 170:9
**3:16** 325:24,25
**3:31** 325:25 326:2
**3pa** 292:18 293:6 295:4,15 348:12
**3rd** 253:20

**4**

**4** 170:4 173:17 174:4 271:11 326:2 352:7,7
**4.1** 271:8
**40** 345:23
**400** 168:11 308:18 340:14
**400,000** 318:25
**44** 320:12
**4:42** 366:19,21
**4:43** 167:16 368:3 368:4

**5**

**5** 170:5 171:24 174:5 228:2 249:1 272:8
**5,000** 281:9
**5,910,000** 225:7,22
**50** 204:11
**500** 356:4,9
**504** 218:5,9
**53** 196:5
**5300** 167:20 168:5 175:14
**5am** 253:12
**5th** 230:11 289:23

**6**

**6** 170:6 174:6 228:3 253:14
**632** 351:14 352:11 352:12
**644** 351:11
**651** 228:15
**657** 171:9 184:1,2 332:8 361:22 362:7
**658** 171:13 201:9 201:10
**659** 171:16 213:9 213:12
**660** 171:20 221:18 221:19
**661** 171:23 229:25 230:3
**662** 172:2 234:20 234:21
**663** 172:6 237:12 237:16 238:24
**664** 172:9 240:23 241:2,10,21
**665** 172:13 244:21 244:22,25 357:21
357:22
**666** 172:16 247:23 248:1,3 249:10 250:13
**667** 172:20 252:2,5 252:11,16
**668** 173:2 254:17 254:18,21
**669** 173:6 256:19 256:22,23 257:1 259:16
**67** 346:13
**670** 170:18 173:9 259:6,7,10
**671** 173:13 262:20 262:23,25
**672** 173:16 268:21 268:22,25 269:2 271:11
**673** 173:20 271:13 271:16,18
**674** 174:2 276:14 276:17,20
**675** 174:6 284:11 284:12
**676** 174:9 288:7,13
**677** 174:12 289:14 289:18 362:5
**678** 174:15 292:14 293:15
**679** 170:18 174:19 296:12,16 300:16 300:16
**681** 224:2,8,23
**6am** 253:13

**7**

**7** 170:7 172:3 174:13 247:6,12
**70** 197:11 344:16
**700,000** 306:20 311:9

**70s** 346:1
**712** 223:15
**77** 225:11
**77002** 167:20 168:5 175:14

**8**

**8** 170:8 172:14 174:8 245:3 247:7 247:12 358:1
**80** 205:9 215:18
**800,000** 311:9
**8408** 371:17
**864** 167:4 370:4

**9**

**9** 170:9 171:3 173:21 174:9 235:17 239:9 245:10 271:19 323:12 324:14
**90** 205:9 225:25
**95** 186:25 187:7,16 187:23
**9:07** 167:16 175:3
**9:57** 210:3,5
**9th** 235:9

**a**

**a.m.** 167:16 175:3 210:3,5,6 237:6,7 237:9 240:17,19 240:21 247:7,13 249:1 253:14
**aax** 294:22
**abbreviated** 278:2
**abilities** 253:18
**ability** 266:20
**able** 207:8 239:24 251:12 293:10 305:19 306:24 309:8 331:14 357:12
**absent** 180:17
**absolute** 313:13 335:4 337:9
**absolutely** 242:14 244:18 247:22 302:12 304:17 336:21 337:8,10 349:8 350:13,21 350:23
**abuse** 313:14,15
**abusing** 306:16
**ac** 294:9
**accept** 181:18 187:19
**acceptable** 322:17
**accepted** 231:19
**access** 219:12 220:7 231:9 264:7 267:1,15 268:3,5,6 268:7 270:5 293:13 296:14 306:18 308:15 309:1 310:5 313:25 315:3,14 327:17,19 328:11 328:11 348:11 349:10,19 350:2 350:19 351:1,2
**accessing** 274:23 306:8 325:7
**accomplish** 221:12
**accomplished** 239:22 335:20
**accomplishing** 223:2
**account** 196:10
**accounting** 220:10 227:10,18,24 228:1,3 230:23,24 232:3,16 273:7,12 274:10 293:3,10 293:13 295:19,21 295:23 296:4,5,8 302:5 350:4
**accounts** 220:9 249:10,19,23 250:4,7,12
**accumulate** 312:18
**accumulating** 325:10
**accuracy** 220:25
**accurate** 184:12 202:8 218:20 230:19 252:23 332:14
**accurately** 230:24
**achieve** 199:15 294:21
**achieved** 261:3 340:20
**acknowledge** 363:16
**acknowledged** 369:19
**acquire** 182:5,7,14 182:17,21 299:5
**acquired** 216:11 263:10 304:13 350:3
**acquiring** 298:25
**acquisition** 293:20 294:9,16 298:23 298:24 299:7 303:11 305:2
**acronym** 274:15
**act** 283:6 308:2 312:14 313:14,15
**action** 253:5 264:10 285:24 371:7,10
**actions** 236:12 262:3
**actively** 186:8
**activity** 283:24
**actual** 271:4
**add** 216:20 240:11 270:15 299:16 306:18 309:1 326:11,17 341:3 357:11
**added** 270:3 306:20
**adding** 306:13,19 308:14
**addition** 185:7,11 185:17 360:2 364:12
**additional** 197:12 247:11 305:11 340:13 344:17 366:14
**address** 271:24 279:5,6 337:14
**addressed** 184:15
**addresses** 279:2 310:18
**adjust** 195:6
**adjusting** 170:19
**admitted** 315:1
**adp** 209:5 236:23 292:24 345:13 346:13,14,17,22 347:20
**adp's** 236:11
**advance** 251:3,6 364:19
**advantageous** 182:21
**advertisements** 197:19

**advertising** 302:25 305:11
**advice** 316:17
**advise** 359:19
**adviser** 336:1
**advisor** 335:23
**advisors** 336:22
**affairs** 254:10
**affiliation** 175:16
**affirmatively** 300:23 345:12
**affix** 369:13
**afternoon** 265:18 289:10 303:8 306:1 345:10
**agan** 172:10 253:4
**age** 225:13
**agenda** 212:7
**agent** 328:1
**agents** 314:2
**ago** 222:16 239:8 254:10 314:9 318:15 322:25 345:21 346:7
**agree** 177:5 179:5 181:11 187:2 188:9,20 190:21 191:21 224:15 250:6 258:25 264:6 288:22 299:13 348:19 349:4
**agreeable** 367:2
**agreed** 229:4 300:25 301:1 365:19 367:23
**agreeing** 365:20
**agreement** 218:1 226:8,16,19 227:4 229:3 233:9,17 236:2,22 290:1 329:22 330:3,3,4,7 331:8 348:15 349:13 350:8,9,17 350:19,25 351:7,9 361:13
**agreements** 226:4 226:7,11,11
**agulley** 168:6
**ahead** 206:4,16 243:16 303:22 365:3
**aid** 225:17
**ain't** 292:11
**air** 275:2
**alleged** 348:4
**allow** 219:12,16 266:4,9 269:4 278:11 313:24 327:18 328:2
**allowed** 308:25 310:4 327:23 359:10
**alongside** 348:2
**amazed** 346:19
**amazing** 196:20 339:2
**ambushed** 292:10
**america** 339:14
**ammunition** 291:24
**amortization** 272:21
**amount** 220:14 235:22 243:21 327:15 335:16
**amounts** 323:23 344:13
**amsi** 358:14,15,25
**analysis** 174:6,9 222:4
**analyze** 229:19
**andi** 176:1 360:17
**androids** 178:22
**anenen** 212:14 289:16,22 291:22 292:4 345:11,19
**announce** 251:6
**announced** 334:8
**announcing** 242:10
**annual** 211:22 228:17,23 229:5 270:23
**annualized** 286:9
**answer** 176:22 177:4 194:11 205:24 206:3,4 210:15,20 219:14 227:14 229:10 235:22 236:4 243:13,16 246:19 266:16,16,25 268:19 270:10 271:2 278:9 305:19 338:16,24 343:20 364:8
**answered** 363:12
**answering** 206:13 305:8 360:12
**answers** 300:23 338:12 345:12 354:18 364:11 366:1
**anticipated** 248:20
**antitrust** 167:4 175:6 316:23 370:4
**anybody** 301:13
**anymore** 233:22 343:14
**anytime** 264:14
**anyway** 360:17
**ap** 345:4
**apiece** 319:5 344:16
**apparent** 264:13
**appearance** 175:15
**appearances** 170:2
**appeared** 208:21 369:17
**appearing** 168:15
**appears** 192:17 201:23 218:18 225:6 244:3 257:13 260:24
**application** 205:17 257:21 266:11 282:25 283:4,9 297:8,10,14,17,21 297:23 298:2,4 310:4
**applications** 292:18,23 293:5 293:23
**applies** 202:18 312:15 353:21
**appreciably** 199:18
**appreciate** 367:13
**approached** 366:24
**appropriate** 367:14,15
**approval** 193:20 271:21
**approve** 203:20 242:24 263:12
**approved** 191:24 263:6 272:1

**approximately** 211:15 228:18 229:6
**apps** 294:22 295:8
**april** 171:14 172:10 201:21,21 241:22 242:2
**arbitration** 346:18
**area** 194:25 195:1 208:2 244:14 254:11 263:12 264:3 300:10 332:10
**arises** 203:6
**arms** 337:9 343:19
**arranging** 312:19
**arrow** 324:16,17
**articles** 294:15
**asb** 242:1,10
**aside** 198:25 204:4 215:1 221:17 240:3 292:13 296:10
**asked** 228:21 229:18 237:25 243:11 301:23 311:10,15 316:6 330:10 338:10 351:13 352:21 358:9 364:3,10
**asking** 198:17 205:25 236:4 257:24 270:8 300:15 302:8 326:9 357:18 359:19 366:8,13
**aspen** 351:12
**assed** 323:19
**assets** 294:10
**assistance** 219:2
**associated** 260:8 302:10,15
**assume** 176:22
**assuming** 188:13 216:15 331:23
**assure** 208:19 239:25
**asterisks** 286:5,7
**astronomical** 179:7
**attached** 167:22 242:10 245:13 322:9 370:25
**attachment** 184:14 245:3,18 255:3 323:5
**attempt** 343:8
**attempted** 278:21 335:21
**attention** 170:16 180:23 183:17 242:12 302:20 313:19 355:25
**attitude** 233:9
**attorney** 365:10 371:9
**attorneys** 167:9 171:4,8,11,15,21 172:4,8,11,15,18 172:22 173:4,8,11 173:15,18,22 174:4,7,10,14,17 174:21 316:18 371:7
**attorneys'eyes** 171:25
**attractive** 209:2
**audits** 234:7
**aug** 286:9
**august** 173:7,10 235:9,17 257:1
259:13,21
**aundrea** 168:3
**aut** 192:16 331:14
**authenticom** 168:7 264:22 296:21 297:4,7 298:9,20 299:12 299:21 314:14 325:3 328:21 348:21 349:5,15 350:9,11 353:25 355:23
**authenticom's** 349:1
**authority** 315:20
**authorization** 205:13
**authorized** 255:9 313:17
**auto** 190:12 192:12
**autoalert** 257:3,17 258:3 259:22 260:22 262:4 267:8 281:22 283:20
**autoalert's** 258:11
**autoloop** 168:8
**automate** 300:22
**automated** 327:17 327:19,25 328:11
**automatic** 274:18 309:17
**automatically** 296:7 322:10 324:1
**automotive** 168:7 184:20 186:17,19 189:5 191:25 192:16,23 193:2 193:12,20 194:3
197:18 198:13 293:5,24 294:9 319:16 331:3,9 339:22
**automotive's** 293:20
**autosoft** 300:22
**available** 188:17 188:22 189:1 323:18 367:21
**avenue** 169:4
**average** 195:12,14 197:9 199:2,4,7 200:16
**avoid** 280:8 336:7
**avps** 253:5
**awakening** 309:21
**award** 238:1,10,13 238:16,23 239:2 240:4,7
**awards** 237:19,22 237:24,25 238:15 238:16
**aware** 184:25 186:10 196:17 198:1,14 216:10 251:18 255:24 262:6 264:24 273:13 287:25 288:1,5 301:17 349:13,22 351:6 355:22 359:1

**b**

**b** 214:11 332:5
**back** 205:5 210:7 210:10 214:6,6 234:23 235:8 237:9 240:20 244:16 246:8,20 254:9 259:19 265:13,15 270:4

270:13 275:3 277:10 287:10 296:8 307:14,22 308:15 309:7 310:3,23 318:23 324:4 325:22 326:2,11,18,24 327:3,4 333:25 338:23 339:1 341:16 345:21,24 346:15 353:16,22 354:24 359:25 366:20,23 367:7
**backing** 274:24
**backup** 274:17 275:3
**backups** 274:20 318:22
**bad** 248:15 279:2 294:4 307:7,24 319:10,19,23 324:7 346:4
**balances** 221:8
**banditing** 236:23
**bandits** 245:25 248:12 314:14,21
**bandwidth** 273:20
**bank** 339:14
**banked** 339:15
**banker** 339:14
**banks** 319:18,19
**barras** 174:3 279:17 280:3
**barriers** 315:3
**base** 311:3
**based** 190:2 199:16 202:15 244:2 250:5 254:2 262:3 346:9 356:25
**basically** 207:7 261:19 263:19 334:23 344:5
**basis** 201:6 211:6 211:7,9 222:1 223:6,9 226:24 251:25 274:18 285:21 288:19 296:4 326:15
**batch** 306:5 323:1 323:8 324:11
**batches** 256:6
**bates** 184:5 201:12 218:9 223:15 230:4 241:14 249:22 250:1,5 276:18
**bauer** 241:25 242:9
**bautista** 324:22 354:4
**beach** 167:17 175:11 370:13 371:17
**bearing** 222:14
**began** 216:9 334:22,22
**beginning** 237:8 265:14 326:1
**begun** 305:17
**behalf** 175:10,11 175:18 176:10
**belief** 193:2 207:16 217:13 240:9 265:3
**believe** 180:15 185:2 191:3 201:18 202:3,7 206:12 213:16 214:1 215:2 221:21 231:12
236:11 241:23 246:10 249:21 262:11 283:10 286:20 290:4 293:5 318:19 351:19 354:8 366:7
**believed** 326:15
**bell** 201:25
**ben** 169:9 175:9
**beneath** 285:13 286:5
**benefit** 238:12
**benefits** 294:9
**bent** 346:5
**best** 195:5 333:24 338:17 341:6,14
**bet** 319:13
**better** 199:20 203:3,10 238:21 258:4,7 266:23 268:18 295:12 317:22 337:7 341:6,12
**beyond** 324:8 364:2,3
**big** 194:1 283:6 299:24 315:5 329:4 339:24 344:2 346:23 350:14
**biggest** 187:15 361:9
**bihner** 214:10,10 214:11,17
**bill** 197:20
**billing** 228:1 340:13
**billion** 311:20,25 356:7,8,9,11
**bills** 216:13
**bit** 193:1 204:5 241:6 266:17 283:13,18 337:3 339:20 343:6 345:9
**black** 278:19
**blacklist** 279:5,5
**blacklisted** 278:18 279:7 280:8
**blacklisting** 280:1
**blank** 230:14
**blanket** 326:20
**blast** 278:23 279:3 280:10
**blasts** 278:11
**bliley** 312:11
**block** 348:20 349:1
**blue** 204:25
**bo** 306:19
**board** 210:21,24 211:2,8 214:1,22
**bob** 171:3,6,10,13 171:17,23 172:6 172:13,17 173:3,6 173:10,13,17 174:12,16,19 230:14,18 232:14 242:19 253:4,18 261:18 273:4 296:12,12 338:22 340:4 347:11 359:17
**bogus** 306:19 307:12
**bold** 202:15 235:13 260:5
**bonuses** 321:10
**bottom** 245:6 279:17 285:11

286:4,5 289:21 352:13,17 358:10
**bought** 196:21 197:22 340:14,14 350:2
**bowl** 212:1
**box** 322:16 362:15
**bragging** 260:8
**brand** 194:24
**breach** 315:7 317:22 319:15 355:12,22
**breaches** 262:8
**break** 177:2,3,5 210:1,2 240:14,15 265:8 287:3 317:23 325:20,21
**breaking** 255:6 256:12
**brice** 168:3 176:4
**brief** 241:9 300:11 318:1,9
**bright** 290:11
**brilliant** 185:7,11 185:17 189:17,25 193:20 362:1
**bring** 336:15,17
**broad** 267:12,24
**brockman** 167:8 167:12 170:4 171:3,3,6,10,13,17 171:23 172:6,13 172:17 173:3,6,10 173:10,13,13,17 173:17,20 174:3,7 174:9,12,12,16,16 174:19,19 175:5 176:2,8,13,17 183:25 197:25 201:8 210:10 218:9,11 221:17 221:17 230:5 234:24 235:3 237:15 241:1,15 241:18 244:20 248:2 252:7,10 256:22 259:7,9,10 262:8,20,22,24 265:18 268:22 269:1 271:13,15 276:14,16,19 278:3 281:12,20 284:10,12 287:13 288:13 289:10,18 292:14 296:16,18 300:6 318:13 347:11 354:12 357:16,22 360:20 362:8 365:12 367:3,20 368:2 369:2,12,14,17 370:9,16
**broker** 264:2,7,21 312:24 317:24 324:23
**brokers** 312:2,9 313:6 314:5,14 349:15 353:3
**brown** 168:21 176:9 186:7,14,21 339:13,18,18
**brown's** 186:15
**bruns** 167:19 168:4 175:13 176:2,5
**brushes** 304:2
**bucks** 344:13,16
**build** 274:3 309:25 310:5,6
**builder** 202:24,24 203:4,7,8,8 323:14
**building** 207:6 244:7 311:2 346:24
**built** 205:16 242:15 279:23 335:12 337:4 341:20 346:9
**bulk** 247:8
**bullet** 255:18 256:1 352:7,7,15
**bunch** 279:8 302:20 317:15 319:14 326:12 331:19,20
**business** 180:10 180:25 186:4,18 196:4 209:2 231:6 231:14 235:9 244:11 246:4 264:17 275:4 291:17,18,19,20 293:11 295:19 299:2,19,22 307:12,17 308:1 309:13,18 319:16 333:22 339:24 342:23,24 343:7 345:2 349:1 357:1
**bust** 310:14
**busy** 291:8
**button** 206:23 341:17
**buy** 197:6 344:7
**buyers** 298:7
**buying** 199:13 244:7 279:1 342:25
**buys** 194:12
**bwilkinson** 168:6
**bypass** 249:17

**c**

**c** 167:4 168:1 169:1 175:1 370:4
**calculated** 356:13 356:16
**calculation** 356:21 360:17
**california** 281:23
**call** 178:2,24 217:1 217:3 236:2 249:14 267:16 270:2 314:13 323:7 337:13 339:22 343:12 353:4 359:4
**called** 269:24 270:1 274:15 278:1 279:13 306:23 313:13,14 316:3 322:22 330:2 335:10 338:1,21 342:6,24
**calls** 213:6 291:2 319:15 344:25
**canadian** 282:10
**capability** 269:20
**capital** 353:20
**caps** 277:24,24,24 280:4,4
**captcha** 246:7,11 246:13,18 247:1 255:4,7,20
**car** 186:11,12 193:15 196:21 205:4,7,9,12 206:20 259:3 298:6 336:17 338:8 342:25 343:1,23
**card** 297:16 369:19

**care** 321:4
**carefully** 209:4
**carfax** 253:20,23 329:6,8,16,17
**cars** 193:5,10 336:15
**case** 167:4 191:3 195:6 203:15 208:21 219:10 232:2 257:14,16 270:11 279:6 283:10 286:9,20 314:7 319:22 348:3 370:4
**cases** 179:3 190:15 190:22,24 191:15 199:11 200:4 297:18 309:8 310:13 313:9 327:5 359:9
**cash** 263:21 298:6
**cat** 353:5
**catch** 325:18
**categories** 303:6
**category** 302:19
**cause** 167:15 269:20 353:8 371:9
**caused** 304:8 317:22 318:25 355:22
**causes** 179:25 187:8,23
**causing** 170:17
**cautious** 319:8
**cbr** 287:14,20,21
**cdk** 168:20 171:18 176:10 177:14 185:24 204:9,11 207:11,13,13,17 207:22,25 208:7 208:13,24 209:9 209:13,17 210:11 211:12 212:3,11 212:16,16 214:10 214:17,24 215:7 215:11,16,18,25 216:4,17 217:7,10 218:1 219:2,5,11 219:12,16,16,23 219:25 220:1,6,19 226:17 228:19,24 229:1,5 233:8,17 235:23 236:1 264:7,12 287:16 288:2 289:25 290:13,17,23 291:13 292:19,25 293:6 294:24 295:4 296:22 297:11,18 300:22 329:23 330:24 332:1,13 334:8,11 334:14 336:10 337:23 338:4,11 338:13 339:24 345:13,17 347:20 348:4,10,20 349:5 349:10,14,18,23 350:4,8,18,25 351:2
**cdk's** 233:9 333:18 339:5 349:9 351:3
**cdr** 215:7
**cease** 229:4
**celebrate** 239:24
**cent** 270:21 272:5
**center** 249:14 268:2 305:8 343:16
**centers** 187:1,8
**central** 318:23
**cents** 270:17
**ceo** 213:3 231:3
**certain** 178:15 204:20 274:14 292:18,23 293:23 312:13 358:25
**certainly** 179:17 179:24 180:1,8 189:13 190:22,24 193:25 194:8 206:15 208:8 233:4 253:10 255:14 260:24 267:13 294:15 302:24 312:6 319:24 364:21 366:15 367:13
**certificate** 170:9
**certification** 260:11,13 261:3 370:8
**certified** 259:24 260:5,9 261:2,2,3 262:1,5 299:4 370:13
**certify** 370:15,20 371:5
**cfo** 229:18
**chain** 171:2,6,9,13 171:16,23 172:2,6 172:9,13,16,20 173:2,6,9,13,16,20 174:2,12,15,19 293:19
**chair** 183:23
**chairman** 367:20
**challenging** 187:5
**chambers** 190:11 363:2
**chance** 184:6 197:6 198:11 201:14 235:3 241:18 244:24 248:2 252:16 256:23 276:19 305:20 321:24
**change** 178:18 182:13,17 187:19 191:1 192:19 194:20,22,23 195:1,3,12,18,22 249:7,8,17 270:16 306:18 309:1,3,5,6 326:11,17 330:20 336:11 341:12 342:11 369:3
**changed** 270:3 327:4 339:8 343:25
**changes** 170:8 182:4 183:4 193:2 249:24 255:3 284:5,8 327:24 369:1 370:25 371:1
**changing** 337:25 341:18
**characterize** 178:14 216:21
**charge** 186:14 194:25 195:9,11 195:12 258:21,24 275:15,18,23 276:2,8 308:9,9 315:17 327:3,4
**charged** 274:20 276:3
**charges** 275:13
**charlotte** 339:14

**chart** 190:9 192:12,19,22 332:21 362:16,23
**cheapest** 333:23 333:24
**check** 220:17 341:13
**checked** 306:4
**checks** 341:8
**cheer** 183:14
**cherry** 169:7
**chevrolet** 315:11
**chief** 180:25 229:12
**choice** 199:19 303:10 341:6
**choices** 197:3 344:12
**choose** 181:8 197:6 341:15
**chris** 172:20 322:8
**christopher** 171:6
**cia** 239:18
**cid** 171:18
**circled** 326:6
**circumstances** 315:23,24
**cite** 257:12,25
**civil** 167:21
**clarify** 289:7
**class** 168:8,14 175:19,21,24
**classified** 299:9
**cleaning** 308:3
**cleanup** 306:25 307:1
**clear** 214:5 313:15 342:13,13 366:10
**clearly** 240:8 253:15 254:3 258:9,18
**click** 341:16
**client** 184:20,22 184:25
**clients** 264:3
**close** 263:1 347:13 365:18
**closed** 283:25
**closely** 203:25 231:6
**closing** 196:24 367:9
**clustered** 302:1
**code** 175:14
**cohen** 169:3 176:6 176:6
**colleague** 175:25
**collision** 187:1,8
**colors** 204:22
**combining** 293:23 294:10,22
**come** 201:6 204:13 204:15 206:12 227:2 229:19 236:16,18 246:1 246:11 248:22 249:1 263:18,23 272:24 298:7 303:13 325:21 337:13 338:23 350:1 354:23 355:25 367:7
**comes** 204:19 259:3 285:23 299:23 344:1 353:2,17
**comfortable** 183:9
**coming** 211:24,25 236:15 246:3 253:13 361:7,10 364:19,21
**comment** 232:23 232:24 234:9 276:21 363:21
**commented** 189:16
**commenting** 232:19
**comments** 242:12
**commission** 369:24
**common** 179:9
**communicate** 239:20,24
**comp** 273:15
**companies** 294:14 313:7 350:8 363:8
**company** 169:8 176:3,8 216:15 222:5,9,16,24 230:17 231:3,5,9 231:21 232:1,7 239:13,15 240:13 263:10 281:9 299:1 303:11,17 304:14 305:4 312:6 315:12 322:22 339:24 346:8 367:21
**compel** 364:24 365:1
**compelled** 305:11 364:22
**compelling** 342:8
**compensation** 238:9 273:2,10
**compet** 259:1
**competing** 345:22
**competition** 330:20
**competitive** 193:3 259:1 331:23
**competitor** 208:14 208:17,19
**complained** 306:23
**complaint** 249:15
**complaints** 251:15 306:1
**complete** 188:22 189:5,10,12,13 200:6
**completed** 260:9 330:8,9
**completely** 191:6 197:1 215:15 231:7 273:23 307:19 316:8 321:7 323:19,20 343:25 344:9 358:8
**completion** 370:23 371:4
**complex** 283:7 345:16
**complexity** 183:22 282:25 283:9,11
**complicated** 183:19,22
**component** 273:21
**compute** 325:11
**computer** 313:14 313:14,16,16 316:11 317:17,20 320:8 324:5,10
**computers** 323:21 339:19
**con** 212:3
**concentrate** 183:17
**concept** 177:18
**conception** 342:20

**concern** 247:20
**concerned** 193:9 236:13 242:18 277:23 285:25 314:9 319:22,23 328:19
**concerning** 200:1 208:7 211:13 214:24 215:7 221:23 228:24 232:9,20 236:5 251:16,25
**concerns** 248:8,10
**conclude** 290:6 291:21 368:1
**concluded** 368:4
**confer** 287:3
**conference** 211:22
**confidential** 167:9 171:4,8,11,15,18 171:19,21,25 172:4,8,11,15,18 172:22 173:4,8,11 173:15,18,22 174:4,7,10,14,17 174:21
**conscious** 303:9
**consider** 177:17 181:2 249:15 333:17 340:23 341:22
**considerable** 205:17 273:18
**considerably** 215:14 216:9
**consideration** 369:20
**considerations** 365:11
**considered** 274:4 312:12,16
**considering** 181:2 185:24 253:20
**consistent** 209:23 307:3
**conspiracy** 348:5
**consult** 284:3
**consumed** 186:12
**consumer** 278:1 279:21,22 341:7 344:1
**consumer's** 206:22
**contact** 207:13,13 207:18
**contacted** 207:16 207:17
**contacting** 279:13
**contain** 243:22
**contains** 371:1
**content** 363:23
**contexts** 330:11
**continue** 203:10 203:18 206:16 295:11 360:5,10 360:14
**continued** 175:4 307:10,11
**continues** 254:13
**continuing** 176:19 210:8 237:11 240:22 248:17 265:16 287:11 295:20 326:3
**continuously** 193:7
**contract** 194:25 195:7 199:1,3,9,9 199:13,16,17,19 199:20,25 200:6 200:11,12 201:6 257:7,11 258:11 258:13,19,23 261:25 276:10 312:20 313:1,3 334:10 340:12
**contracted** 334:19
**contractor** 338:13 338:15
**contracts** 199:17 199:22 200:12,22 227:2 274:12 313:5
**contractual** 216:14
**contrast** 196:22
**control** 351:2
**controlled** 215:16 351:1
**controls** 248:18
**convenience** 258:10
**convention** 212:25
**conversation** 207:25 208:3,4 220:20,21,22 338:10
**conversations** 214:12 320:7 349:23
**conversion** 177:15 177:18,23 179:1 179:14,17,18,25 180:22 181:8,12 181:14,17 190:17 191:6,16 192:13 192:24 193:25 220:2,4,13 221:12 332:19 333:6 334:25 335:5,7 336:11 337:23 339:3
**conversions** 177:25 179:6 187:16 194:1 331:9 337:20
**convert** 177:8,9 181:8 186:24 187:6,7 188:17 189:1 193:22 194:6 203:14 332:1,2,13
**converted** 335:2 337:5
**converting** 177:8 186:25 219:23 221:11 333:3
**converts** 178:2,5 190:8
**convince** 193:21 317:16
**copied** 346:8
**copies** 216:15
**copy** 221:8 362:4
**corner** 341:10
**corners** 240:12
**corporately** 345:19
**corporations** 227:20
**correct** 178:6 179:22 181:4,6,21 182:3,5,6,8,15 183:6,7,10 185:25 186:5,21 188:2,6,7 192:1,25 193:22 195:2 201:23 203:21 204:9,10 204:12 206:14 208:15 210:14,22 210:23 211:8 215:7,19 218:3,24 218:25 219:14

220:20 221:2,4,15 221:23,24 222:5,6 222:20 223:6,7,10 223:12,13 229:6 233:5,24 234:11 236:3,7,9,20 239:10,11 243:2 244:18 245:16,17 247:3,4,7,8,13,14 247:16 248:9 249:11 250:9 254:6 255:14 256:3,14 258:12 258:18 259:2,17 260:22 261:23 269:4,12,16 270:19 271:20 274:9 275:22,25 277:22 279:19 280:4,10,24 282:16 289:23 290:4,10 291:11 293:21,22,25 294:10 295:1,6,15 296:22,23,25 297:1,4,8,14,21 298:2,20 299:14 300:24 301:3,6,9 301:11 302:5,7,10 314:15,18 331:12 331:15,17 344:22 354:15,17 355:7 355:23 356:15,19 356:24 357:5 358:16,18,23 359:21 360:25 361:13,14 362:13 366:12,12 369:13
**correctly** 195:8
**correspondence** 289:15
**cost** 179:21 180:1 194:21 197:14 227:10,18,24 228:3 230:23,23 232:2,16 258:20 272:11,16,19 273:6,12 274:9 275:6,13 276:5 283:17 302:5 305:17 309:24 311:11 319:4,13 326:20 347:13,15 347:16
**costs** 231:24 272:17,18 273:1,4 273:13,15,16 274:7 286:9,17 302:9,10,15 319:5 332:19 333:1
**cottrell** 314:25
**counsel** 169:8 175:15 196:1 287:3 366:23,24 371:5
**counselor** 356:11
**count** 277:12 300:4
**counteract** 302:25
**countermeasure** 353:7
**countermeasures** 353:14,23
**counting** 305:6
**country** 184:24 185:4 315:13
**county** 369:16
**couple** 288:25 302:4 310:20 327:17
**course** 231:8 235:8 238:19
248:17 288:10,16 294:13 310:7 323:3 338:9
**courses** 333:8
**court** 167:1 175:7 175:10 176:11 315:1 364:23 365:21 366:3,13 370:1
**court's** 364:25
**cover** 213:17,18 213:22 326:20,20 366:5
**covered** 360:7
**covers** 275:16,16 314:1
**cox** 168:7 293:4,16 293:20,24 294:9 331:2,8,14,15
**cpi** 271:7,8 272:8
**cr** 278:2
**cracks** 343:12
**craig** 172:3
**crazy** 227:20 283:6 308:5 337:24
**create** 267:20 350:25
**created** 203:2 309:1
**creates** 267:5
**creating** 266:11
**credible** 250:1
**credit** 196:10 205:14,14 345:5
**crippled** 336:2,21
**criticized** 320:22 320:23
**cross** 343:19
**crossed** 282:11
**crowed** 214:16
**crr** 167:17 371:17
**csr** 167:17 371:17
**curious** 236:15
**current** 286:9,18
**currently** 216:4 220:12 233:21,23 266:4 298:9,15
**customer** 177:18 177:21 180:19 190:18 191:17 201:7,7 216:11,13 219:22 220:10,16 221:6,8 224:13 254:14 274:18 278:16,17 282:20 283:11 286:1 306:19,21 307:3,6 307:13,15,24 315:20,21,25 319:1 320:19 322:22 323:19 329:18 332:2,3 343:17 344:4 350:3
**customer's** 306:14
**customers** 178:1 178:10 190:25 197:4,5 223:1 224:2,3,6 227:1 253:6 255:9 260:13 269:18 278:12 279:8 280:17 281:10 305:10 306:2 307:10,11,22 308:2 318:21 326:16 327:18 333:11 341:23 344:24

**cut** 220:17 360:11
**cuts** 193:10
**cutting** 243:14
**cvr** 215:13,18,24

**d**

**d** 175:1 239:23
**d.c.** 168:12 169:5
**dad** 320:4
**daily** 277:24 280:3 345:3
**damage** 236:24
**dan** 172:10 253:8
**dangerous** 232:4
**darts** 291:23
**data** 183:5,10 188:17,23 189:2 192:18 216:15 220:4 221:12 223:16 226:10 233:11,11 236:25 239:9,12 242:1,7 242:11,17,25 243:8,22 247:9 252:25 254:11 256:13 257:8 258:5,15 260:12 261:12 262:8 264:1,2,3,6,11,15 264:21 273:24 274:13,17,24 275:3,6,12,24 276:6,11,13 286:7 286:24 293:3,13 293:13 295:21,23 296:14 298:9,20 299:5,23 302:21 302:23 303:2,17 304:3 305:3,10 307:18 311:24 312:1,9,18,24,25 313:3,6 314:4,13 317:24 318:24 319:3,6,7,15 320:23 324:23 328:7,12,14,18,22 329:16 331:25 335:7 337:20 346:11 349:15,19 350:1,4,4,18 351:1 351:3 353:2,3,22 354:15,20,23,23 355:5,10,12,13,16 355:20,22 359:11
**database** 243:18 243:19,25 310:6 315:25
**databases** 243:17 243:21
**dataset** 328:18
**date** 209:7 255:24 268:16 286:9 334:1 369:2 370:24 371:17
**dated** 171:3,7,10 171:14,17,24 172:3,6,10,14,17 172:21 173:3,7,10 173:14,17,21 174:3,13,16,20 184:15 245:10 289:22 293:16 296:13 358:1
**dave** 250:5
**day** 167:15 195:21 196:2,3 222:15,15 246:18 259:16 289:13 304:6,10 311:25 323:15,16 325:11 336:11,16 337:7,25 338:21 348:14 365:9 369:17,21 371:12
**day's** 337:2
**days** 302:4 307:5 327:17 361:5 365:9 370:24
**dayton** 238:4,5 274:24
**dc** 168:22
**deal** 205:6 228:19 228:24 229:1,5 235:23 236:1,6 263:6 290:6 343:5
**dealer** 167:3 175:5 182:14 183:1 187:6,21,25 190:4 193:8 199:3,18 204:5 258:22 262:8 275:24 279:9 281:24 282:14,17 313:22 316:4,7,7 321:1,16 321:18 328:1,22 329:6 332:12,13 332:14,24 335:3 340:16,21,21 342:18 344:14 370:3
**dealer's** 242:16,25 243:8 278:23 280:10
**dealerbuilt** 262:12 318:20,20 320:21 355:4,4,16
**dealers** 182:17 187:6,6,7,22,22 189:2 195:18,20 196:2,7 197:17 199:10 249:6 251:2 258:16 260:14 274:11 278:12 282:11 297:11 298:20 328:6 330:20,22 330:24 331:13 342:9 355:5
**dealership** 168:14 175:19,21,24 177:13 178:2,5,6 178:11 179:2,2,8 179:10,22,24 180:2,12,19,23 181:1,8,13 182:4 183:4,9,14 186:13 187:17 188:6 191:2 194:12 196:8,14 198:2 199:15 200:1,9,16 204:18,20 205:11 216:16 243:19 249:1 263:23 275:5,7,11,13,21 275:23 276:2,4,6 293:9 312:16 313:1,21 315:11 315:13,21 318:23 320:25 321:5 322:3 333:7 334:23 335:2,12 335:12,24,24 343:16
**dealership's** 178:16 244:8 274:17,23 279:6
**dealerships** 177:8 177:9 179:6,13 180:4 186:25 188:17,23 189:1 190:12 191:12,20 193:3,5 194:6 197:5 251:16 253:8,9 257:9 258:15 308:18 312:12 320:19

335:22 339:20 358:16,20,23 359:21,24 360:19 360:24 362:11,13 362:22,23
**dealertrack** 205:16,22 207:5 209:3 293:10,20 293:25 294:10 300:22 301:13,14 331:9 332:2 333:4
**dealertrack's** 301:18
**dealertrak** 331:3
**dealing** 227:19 305:9 316:14 319:11
**dealt** 290:8 358:2
**dear** 253:11,12
**december** 171:17 174:9 213:18,20 214:2 288:8,11
**decent** 345:18,18 345:19
**decently** 263:22
**decide** 181:18 208:20
**decided** 219:24 229:13 262:2 295:10 310:16,16 334:17,19,21 336:10 339:17 340:1,3 343:1,2,3 346:15,20
**decides** 193:12,13 205:3 216:12
**deciding** 302:22
**decision** 207:10 209:3,9,12 254:2 264:25 270:24 283:1 310:24
340:5
**declaration** 353:18
**dedicated** 253:16
**defendant** 176:7
**defendant's** 318:5 318:8,11,17 321:20
**defendants** 318:6
**defense** 196:1
**definitely** 278:7 339:21
**definition** 210:19 288:15
**degree** 320:8
**delete** 203:9 270:16 306:18 309:1 326:11,17
**deleted** 270:4 308:13,16
**deleterious** 231:13
**deleting** 307:15 308:14
**department** 179:7 217:12,21 220:11 238:3,18,19,23 321:2 333:14 335:10
**departments** 297:17,18
**dependent** 282:22
**depending** 366:1
**depends** 188:5 212:20
**deponent** 170:20 370:21,22 371:3
**deposition** 167:8 167:12 170:16 175:4,12 314:12 364:7 365:7,10,13 365:22 366:3
367:2,10,23 368:2 368:4 369:13 370:9,18,23 371:4
**depositions** 346:18 365:1,4,6
**describe** 220:24 226:8 267:22
**described** 263:25 276:5 326:7
**describes** 189:14
**description** 171:1 172:1 173:1 174:1 323:10 369:18
**design** 303:15
**designed** 260:11 273:23
**desist** 229:4
**destroy** 349:5
**destroyed** 308:16
**detail** 234:5
**detailed** 286:3
**details** 350:14 360:1
**detect** 189:20 246:12 353:5
**detection** 248:12
**determination** 200:22
**determine** 200:15 201:5 282:17
**determined** 272:5
**develop** 231:18
**developer** 244:12 244:13,16
**developing** 231:23 272:17 273:14
**development** 203:17 204:3 213:6 223:3 244:10,13,14,16 303:16
**devise** 353:7
**different** 177:7 178:23 193:2 204:22,22,23 205:1 231:7 243:21 332:25 353:12
**dig** 246:22
**digit** 335:13,14
**diligent** 181:16
**direct** 231:20 238:14 263:7 279:2 301:8 314:2 351:14
**directing** 261:18
**direction** 296:14
**directly** 207:18 264:11 300:20 312:15 345:22
**director** 253:7
**directors** 210:21 210:24 211:3,8
**disabled** 279:9
**disagree** 194:23 367:24
**disappointed** 334:9
**disappointment** 249:24
**disarmed** 344:9
**disaster** 275:1 280:15 335:5
**disclose** 258:20
**disclosing** 257:8
**disconnected** 237:3
**discount** 199:15 199:18,21
**discounting** 193:14

**discovered** 306:8 306:15 309:12
**discuss** 202:22 212:3 255:9 349:19
**discussed** 239:13 239:16 287:22 332:9 349:9
**discusses** 332:18
**discussing** 232:9 318:15
**discussion** 233:2 233:10 241:9 300:11 318:1,9 342:3 366:23
**dishonest** 261:19
**disk** 221:9 328:17 331:22,22
**dislocation** 278:17
**disparate** 318:6
**dispirited** 346:20
**display** 341:9
**displayed** 341:3
**disposition** 280:13
**disruption** 180:19 180:21 190:18 191:17
**dissatisfaction** 343:17
**dissident** 292:5
**distinct** 355:13
**distracted** 285:10
**district** 167:1,1 175:7,7 370:1,1
**division** 167:2 175:8 370:2
**dmi** 353:25
**dms** 177:14,14 178:5,11,12 179:1 179:13 180:4,13 180:19 181:2 182:5,13 183:5,6,6 183:9 190:2 196:9 199:1,2,9,14,22 200:1 217:23 218:1 219:17 221:2 223:16 242:17,25 243:18 244:8 260:10 262:9 264:2,7 292:25 298:16 300:20,21 301:3,9 330:20,20 332:25 340:22 344:21,21 349:10 351:2,3
**dmss** 177:9,10,10 182:17 298:10
**docket** 365:2
**document** 184:5,6 194:24 195:4,13 195:23 198:25 201:15 213:13,16 218:9,11 221:16 221:22 223:14,15 230:4,6 235:1,4 240:3 241:14,16 241:17 245:9 255:6 268:20 269:6 271:21 284:16 288:10,18 292:16 300:14 351:16 352:24 355:3 357:22 362:9 369:19
**documents** 260:25 265:5 284:4 289:13 356:20 364:13,14,15,18 364:25 365:5
**docupad** 190:5 194:11,12,18,21 195:3,13,19,23 196:10,12,20,22 196:25 197:8,14 197:19,21 198:2 322:17 323:2 340:15,16,22 341:2,25 343:24
**docupads** 340:14
**dog** 308:6
**doing** 183:23 200:10 204:1 222:15 231:22 239:20 248:14 249:4 258:4 263:11 264:12,17 279:7 283:8 299:2 306:13 307:21 312:25 314:24 324:2 326:11,17 326:20 332:4 336:3 359:8,17
**dollar** 220:14
**dollars** 305:15
**dominant** 215:16
**door** 308:5 316:14
**doubled** 340:13
**download** 315:20 323:14 329:7,16
**downloading** 359:11
**downloads** 350:4
**dozen** 187:7
**draft** 242:1,10 255:4 332:8,17
**drag** 181:17,20,25
**dramatically** 226:5 335:18
**drawn** 316:5
**dreamed** 342:21
**drive** 221:9 259:22 263:18,20,24 298:7 331:22
**driven** 197:1
**drop** 190:16 191:15 192:9 332:18 361:9
**dsv** 239:10 240:7 273:1,15
**dt** 293:16
**due** 204:3 220:12 220:13 229:5 238:19 242:2 258:14 367:16
**duly** 167:14 176:14 370:16
**dumb** 323:19
**dummies** 353:11
**dummy** 306:19
**duplicate** 170:19 307:24
**duplicates** 307:23
**duplication** 170:17
**duration** 216:23
**dust** 343:12

**e**

**e** 168:1,1 169:1,1 175:1,1 214:11 370:21
**eagle** 253:8,9
**earlier** 170:16 224:23 253:1 255:8 286:6 287:15 311:10,15 326:5 351:11 352:22 357:16
**early** 248:22 255:11 334:1 345:24 354:5
**earth** 306:5 316:7
**easier** 242:17
**eastern** 167:2 175:8 370:2

**easy** 334:25
**economic** 342:10
**ed** 190:12 339:12 339:18,18
**edit** 267:20
**edited** 363:14
**edits** 242:12
**educate** 194:8
**education** 187:14 333:14
**effect** 317:7,9 329:23
**effective** 255:19 263:22
**effects** 303:1
**efficiency** 182:23
**efficient** 227:23 299:8
**efficiently** 181:3
**effort** 203:17 280:7
**efforts** 302:14,15
**eight** 189:3
**either** 178:4 216:24 224:14 283:25
**electrical** 320:10
**electronic** 343:11
**element** 276:10
**elevator** 312:7
**eliminate** 264:6 349:14
**email** 171:2,2,6,6 171:9,9,13,13,16 171:16,23,23 172:2,2,6,6,9,9,13 172:13,16,16,20 172:20 173:2,2,6,6 173:9,9,13,13,16 173:16,20,20 174:2,2,12,12,15 174:15,19,19 184:8,11,14 185:5 185:8 201:19,19 201:20 202:4 203:24,25 213:17 213:18,19,22,24 218:16,20 219:1 230:10,13 232:8 234:14 235:7,8,12 235:18,21 238:24 239:4,6 241:22,24 242:3 244:15 245:2,5,14,15 248:5,8 251:20 252:18 253:2,4,7 253:17 254:24 256:25 258:8 259:12 260:1 263:3 271:11,18 277:3,7,18 278:11 278:18,23 279:2,3 279:3,24 280:7,10 281:7 289:14,22 289:22 291:22 293:15,19 296:12 310:18 322:7 334:1 345:10 357:23 358:1,10
**emailed** 237:2
**emails** 252:22 253:1 277:11 279:21,25 280:21 322:2
**employed** 263:17 354:24 371:6
**employee** 179:2 180:12 190:18 191:17 274:19 371:8
**employees** 178:10 178:16 180:24 181:3 281:9 314:2
**employing** 353:14
**employment** 207:3
**en** 208:16
**enable** 258:1
**encrypted** 318:24
**endeavoring** 203:3 243:10 245:23
**ended** 307:20
**endured** 233:14
**engineering** 320:10
**enhancement** 244:4 250:21
**enhancements** 239:14 242:16,25 243:7 248:8 250:8 250:17 251:2,6,8 251:17 255:12,19 256:2,3,5,14 290:8 321:13 358:2,11
**enjoyed** 205:17
**enjoying** 254:23
**enjoys** 303:20
**ensure** 260:12
**ent** 301:7
**enter** 205:19 207:11 208:16 246:7 301:8 313:15 350:24
**entered** 215:14 247:2
**entering** 301:2
**enterprise** 302:14 302:16
**entire** 197:19 307:6 315:20 365:2,8 367:22
**entirely** 342:13
**entirety** 315:25
**entities** 299:20
**entitled** 245:10,18 364:11
**entity** 195:7 202:9 228:11 263:14 326:11
**entrance** 315:2
**enumerate** 303:4
**environment** 336:1
**equipment** 182:10 182:16
**error** 195:6 247:10
**errors** 189:21
**especially** 182:11 238:18
**essential** 343:15
**estimate** 305:3 347:13
**estimated** 311:16 356:2
**evaluations** 264:4
**event** 224:14 275:1 365:2
**everybody** 193:14 210:16 231:9 283:6,16 303:22 337:3 343:4
**evidently** 298:24
**exact** 209:7 255:24 336:8 348:14 363:21
**exactly** 214:7 215:21 217:14 254:10 269:6 280:19 290:20 291:7,12 292:3 360:1
**examination** 170:5 170:5,6,6,7 176:15

210:8 237:11 240:22 265:16 287:11 289:8 300:12 326:3 354:10 357:14
**example** 202:12 231:16 293:9 323:24 324:10 329:5 332:12 358:13
**examples** 190:7
**exception** 253:19 254:4,6 359:18,25
**exceptions** 358:13 359:1,10,21 361:6
**excess** 345:23
**exchange** 204:5 226:10 322:4 334:1
**excuse** 358:6
**executed** 369:20
**executive** 302:20 308:9 339:22
**executives** 305:7
**exempted** 330:11 330:11,12
**exemption** 202:13 202:13,20 203:21 203:23
**exemptions** 249:9 250:8,17 357:17 358:23 360:25 361:10
**exercise** 258:9
**exhibit** 171:2,6,9 171:13,16,20,23 172:2,6,9,13,16,20 173:2,6,9,13,16,20 174:2,6,9,12,15,19 184:1,2 201:9,10 213:9,12 218:5,8 221:18,19 226:12 228:15 229:25 230:3 234:20,21 237:12,16 238:24 240:23 241:2,8,21 244:21,22,25 247:23 248:1,3 249:10 250:13 252:2,5,11,16 254:17,18,21 256:19,22,23 257:1 259:6,7,10 259:16 262:20,23 262:25 268:21,22 268:25 269:2 271:13,16 276:14 276:17,20 281:13 284:11,12 288:7 288:13 289:14,18 292:14 293:15 296:11,16 300:15 300:16 318:2,5,17 321:22 351:11 357:21 361:15,20 361:21
**exhibits** 170:16,17 170:20 171:1 172:1 173:1 174:1 300:7
**exist** 288:3
**existed** 288:2
**existence** 216:10
**expect** 332:24
**expectation** 229:11
**expected** 190:16 191:16 337:6
**expecting** 228:17
**expects** 229:5
**expediency** 204:3
**expense** 231:20 310:10,12
**expensive** 317:23
**experience** 180:9 196:22 337:23 346:5 357:1
**experienced** 337:21 339:22
**expiration** 371:17
**expires** 369:24
**explain** 227:9 243:10 321:16 352:23
**explaining** 305:17
**export** 247:8
**exported** 247:2
**exports** 247:6,12
**exposed** 196:19 319:2,6,7
**exposure** 318:25 319:4
**expressed** 249:23 369:20
**extended** 341:4 343:9
**extension** 366:9
**extensive** 359:3
**extent** 315:6
**extra** 326:13 367:2 367:4
**extracting** 312:25
**extraction** 264:2
**extreme** 246:22
**extremely** 190:4 303:17
**eyes** 167:9 171:5,8 171:12,15,22 172:5,8,12,15,19 172:22 173:5,8,12 173:15,19,22 174:5,8,11,14,18 174:21 365:11
**eyesight** 335:3

**f**

**f&i** 341:21 344:17
**fabric** 343:13
**faced** 307:13
**facilitates** 207:4
**facility** 326:22 328:14
**fact** 187:19 190:1 204:17 248:21 258:14 260:8 261:1 269:4 292:22 295:10,11 299:17 301:7,8 304:9 313:9,20 315:10 316:15 320:17 323:21 363:16
**factor** 179:13 208:23
**factors** 194:2 272:23
**facts** 206:19
**fair** 176:23 178:25 180:3,7,11,18 181:7 183:20 191:14 194:5 202:19 208:14 226:3,19 242:24 243:6 247:19 249:19 250:3 269:9,13 279:11 327:15
**fairly** 263:22 297:11 298:24
**falls** 278:18
**familiar** 204:6 215:13 224:11 225:1 253:8 257:3 318:12 332:4

363:3
**fangs** 354:6
**far** 181:14 187:15 189:22 193:2,9 213:5 216:21 222:24 223:2 228:8 246:9 254:22 285:25 303:18 310:23 311:3 314:8 328:18 359:10 363:20 365:3
**fashion** 258:3
**fault** 317:18
**fdc** 316:3,3
**feature** 242:22 259:22
**features** 242:1,11
**february** 174:13 226:4,11 289:16 289:23 348:16
**federal** 167:21
**fee** 194:18 257:13 258:15 268:10 269:14,23,24 270:2,3,9,12,15,17 270:21 271:22 276:12 281:25 282:14,18 326:8 326:24
**feed** 261:15
**feeds** 264:11
**feel** 231:15 242:18 312:1,5 314:19 345:13 367:14
**feelings** 345:20 347:20
**fees** 257:8 276:9 282:10 286:7 347:15
**felt** 305:11
**fico** 205:15 206:22
**field** 346:11,11,12
**fields** 346:12
**figel** 168:10
**fighting** 347:15
**figure** 245:24 286:23 305:14 307:5 338:7 353:11,21
**file** 200:12,13 307:6 310:22
**filed** 296:21
**files** 216:15 274:24 315:20
**filing** 274:21 366:10
**final** 280:12,20 343:8
**finalize** 343:7
**finally** 181:17 205:3 320:3,14 336:4 343:22 346:19 347:10 355:8
**finance** 194:24 196:23 197:4,11 342:23 344:15
**finances** 221:23
**financial** 171:20 174:6,9 220:16,18 222:4,7,8 229:12 234:1,4,8 284:15 288:7 301:23 312:12,17
**financially** 371:9
**financials** 223:12 231:10
**financing** 205:8,10 205:16 207:5 312:19 343:2
**find** 212:8 307:7 307:23 351:10 361:17,18
**fine** 240:16 329:18 365:17
**finish** 205:23 206:2,4,9 227:14 229:10 305:19,20 364:2 365:15,21
**finished** 262:1 296:18
**finite** 323:21
**fire** 185:19 273:25 338:3
**fireproof** 274:21
**firm** 175:16 227:25
**firm's** 349:19
**firms** 350:10,18
**first** 176:14 179:1 185:6,8,10,14,16 185:21 186:23 189:17,20 190:17 191:16 195:8 206:5 207:24 211:10 214:13 219:23 233:1 236:22 239:8 241:3 252:25 268:7 277:15,18 279:16 292:17 297:6 302:19 314:24 315:9 319:4,4,14 323:9 323:12 333:25 334:22 337:25 339:10 361:15,21 361:25
**fit** 315:24
**five** 187:22 199:7 199:10 212:22
222:16 231:17 252:12 270:17,21 324:16 330:3,3,4 340:12 344:18,18 347:10,16 359:24 360:19,24
**fix** 195:9 246:12 308:24 309:13,16 309:17 310:21,23 347:8
**fixed** 211:4,10 212:7,20
**flat** 344:2
**floating** 321:17
**floor** 168:17 303:25 304:1 346:23
**flow** 273:21
**focus** 255:17 269:4 281:14 302:21
**focusing** 205:21 210:10
**folks** 210:17 261:7 292:6 299:22 338:3 354:1
**follow** 233:21 234:4
**followed** 232:5
**following** 238:7 239:17 370:15
**follows** 176:14 233:24
**footnote** 228:16 229:23
**force** 194:9 347:1
**forced** 204:2
**foregoing** 369:12 369:19
**foreign** 246:5
**forever** 209:2 292:19 293:6

294:24 295:15 311:24 336:7
**forgery** 202:7
**forgiveness** 337:4
**form** 177:11,16 178:7,13 179:4,15 179:23 180:6,14 180:20 181:5,10 181:22 182:2,18 183:11,21 186:1 187:3,12 188:10 189:7,11,19 191:10,18 192:2 193:23 194:15,20 195:13,23,25 198:5,9,15,20 200:2,19,23 201:3 202:5,14,21 204:14,16 205:13 207:23 209:14,19 211:16 212:4,12 213:21 214:3 215:4,8 216:5 217:5,9,11 218:2 219:13,18 221:3 222:21 224:4,9,16 224:20,24 225:9 226:6,15,21 227:7 229:7,21 233:6,18 233:25 234:3,12 234:17 236:8,19 243:1,9 244:17 249:12 250:10,18 250:23 251:4,11 252:20 253:25 254:7 255:13,22 256:10,15 257:10 257:19 258:17 260:18,23 261:24 262:10,16 263:15 264:8,23 265:2,21 266:7,15,22 267:10,21 268:12 268:15 269:11,15 269:25 270:14 271:1,23 272:6,12 273:17 274:8 275:8,14,19 276:1 276:7 277:5,9,16 278:13,24 279:14 279:18 280:5,11 280:18,25 281:5 281:18 282:3,8,19 283:21 284:21 285:3,18 286:11 286:19,25 287:17 287:24 288:4,12 288:21 290:3,18 291:1,10,15 292:2 292:21 293:7 294:1,11,25 295:5 295:16,24 297:9 297:15,22 298:3 298:11,14,17,21 299:15 354:16,21 355:11,18,24 356:18,23 357:4,9 358:5,17,24 359:23 360:21 361:1 362:14,17 362:19,25 363:15
**formal** 215:25
**forming** 208:7
**forth** 312:23 338:15 353:17,22 366:23
**fortunately** 306:23 316:16,16
**forward** 233:13 242:11 261:6 262:2
**forwarding** 289:15
**found** 185:15,15 263:22 264:19 285:16 307:1,4 324:6 362:6
**founded** 209:6 215:23
**four** 187:6 211:6 324:16 325:11 347:4,5
**frame** 245:21 255:25 268:13
**francisco** 212:1
**franklin** 315:11 317:12 318:15
**frankly** 179:18 201:23 228:4 242:5
**fraud** 313:14,14
**frcp** 370:20
**frederick** 168:10
**free** 195:4
**freight** 275:2
**frequently** 325:7 327:7
**friday** 238:7,8 364:21
**friend** 254:14
**front** 230:17 253:17 260:25 300:17 345:10 355:3
**frustration** 249:24
**ftc** 316:13,15,23 317:16 319:12
**ftc's** 317:9
**fully** 186:12
**function** 309:3
**functionality** 247:9 257:24
**functions** 268:2,4
**fund** 292:6
**further** 170:6,7 242:16,25 243:7 284:25 285:11 300:1 306:24 334:20 354:8,10 357:14 367:17 370:20 371:5,8
**future** 366:11 367:12

**g**

**g** 175:1
**gaining** 315:2
**gap** 296:5
**gears** 345:8
**general** 169:8 183:13 199:6 221:7 251:5 264:24 271:2,3,7 297:23 301:25 302:1,16 315:13 315:17
**generally** 180:10 211:9 215:13 220:25 276:11
**generate** 236:18
**generated** 228:18
**generates** 326:12
**generating** 342:15
**generation** 347:1 347:2,18
**generator** 197:15 323:14 342:2
**gentlemanly** 292:8

**getting** 276:22 279:7 280:8 315:2 319:24 320:13 321:9 353:6
**giant** 205:7
**gibbs** 167:19 168:4 175:12 176:1,5
**gibbsbruns.com** 168:6,6
**give** 181:18 183:2 210:14 218:12 221:10 238:3,4,4 261:9 277:2,11 289:16 293:17 296:14 314:21 328:7 341:14 345:3 365:9
**given** 190:17 191:17 195:21 220:6 237:19 250:8 261:23 344:4 364:10 369:21 370:18
**global** 168:20 176:10
**go** 180:1 181:15 182:24 185:21 187:24 189:14 190:6 193:16,17 198:25 199:19,20 200:11 201:5 204:23 205:5,15 206:4,16 216:21 223:14 237:4 243:16 255:5 262:2 277:10 285:7 303:4 307:6 307:22 309:7 310:3,20,23 324:4 325:19 333:4 337:6 339:23 340:5 341:16 343:20,23 344:9 344:25 353:14 360:11 361:15 362:7 366:8,8,25
**goal** 207:8 304:5 304:12 335:22 340:19
**goals** 304:18
**god** 260:6 308:10 308:16,19 310:23 345:6
**goes** 179:17 182:23 189:15 234:7,7 238:10 281:8 283:6 299:23 331:22 345:21
**going** 179:19 187:19 191:25 192:19 211:25 212:1 220:2,4,12 221:10 222:4 225:5,5 227:13 234:25,25 244:10 254:1 255:16 261:5,8,9,20 271:7 276:22,24 277:1 278:6 281:11,14 282:18 283:9,12 284:15,16 285:14 288:23 299:4,8,9 304:18,25 306:6,9 307:14 309:3 310:25 315:8 321:8,17,20 324:15 325:20,21 334:8 337:15 343:3 346:25 347:18 348:11 350:10 359:18,25 360:5,9,14 364:6,7 364:16 365:13,14 365:18 366:2
**good** 175:2 176:17 203:1 205:5 206:11 207:5 209:25 225:11 250:6 252:13 254:14 260:6 262:18 265:18 289:10,11 294:16 299:18 307:25 308:10 311:8 316:16 321:10,11 323:2 325:16,18 325:20 329:5 341:6 345:1,20 357:5 363:20
**gordon** 192:12
**gotten** 319:10 338:18 348:4
**grace** 308:19
**gramm** 312:11
**grammar** 189:23
**granted** 254:5
**granting** 202:13 202:20
**great** 278:17 347:4
**greater** 187:22
**greatest** 189:22 333:6
**greatly** 183:12 236:11
**green** 204:24
**gross** 234:6 344:14 344:17
**grossman** 168:16 175:18,21
**group** 184:20,23 185:4 186:17,19 190:8 192:1,13,23 198:13 337:14,23
**groups** 192:5,8 249:18
**grow** 185:19
**grown** 320:13
**guess** 211:5 278:5
**guesstimate** 356:25 357:3,12
**guestraq** 201:17 201:25 202:9,20 203:21
**gulley** 168:3 170:6 176:1,1 177:11,16 178:7,13 179:4,15 179:23 180:6,14 180:20 181:5,10 181:22 182:2 183:11,21 186:1 187:3,12 188:10 189:7,11,19 191:10,18 192:2 193:23 194:15 195:24 198:5,9,15 198:20 200:2,19 200:23 201:3 202:5,14,21 204:14,16 205:23 206:2,9,14,16 207:23 209:14,19 209:25 211:16 212:4,12 213:21 214:3 215:4,8 216:5 217:5,9,11 218:2,7 219:13,18 221:3 222:21 224:4,9,16,20,24 225:3,9,18,21 226:6,15,21 227:7 227:13 229:7,10 229:21 233:6,18

233:25 234:3,12 234:17 236:8,19 237:2 240:16 241:5,13 243:1,9 243:13,16 244:17 249:12 250:15,18 250:23 251:4,11 252:20 253:25 254:7 255:13,22 256:10,15 257:10 257:19 258:17 260:18,23 261:24 262:10,16 263:15 264:8,23 265:2,4,7 265:21 266:1,7,15 266:22 267:10,21 268:12,15 269:11 269:15,25 270:14 271:23 272:6,12 273:17 274:8 275:8,14,19 276:1 276:7 277:5,9,16 278:13,24 279:14 279:18 280:5,11 280:18,25 281:5 281:18 282:3,8,19 283:21 284:19,21 285:1,3,18 286:11 286:19,25 287:5 287:17,24 288:4 288:12,21 289:1,7 290:3,18 291:1,10 291:15 292:2,21 293:7 294:1,11,25 295:5,16,24 297:9 297:15,22 298:3 298:11,14,17,21 299:15 300:3,13 301:7,12,18,22 302:8,13 303:9 304:12,19,23 305:1,16 309:24 310:10 311:1,10 311:22 312:1,7 314:3,12,19 316:19,22 317:6 318:4,10 320:1,14 321:24 322:7,14 322:19 323:4 324:13 325:2,6,12 325:19 326:4 327:9,16,21,25 328:5,10,21 329:2 329:13,19,22 330:1,10,15,19 331:2,7,13 332:7 332:17,24 333:11 333:17,25 334:10 334:14,15,17 339:9 340:1,9,15 340:21 341:25 342:6,12 344:20 345:8 346:1 347:22 348:3,10 348:16,19,25 349:4,9,13,18,22 350:7,17,24 351:6 351:10,24 352:2,6 352:12,21 353:24 354:7,16,21 355:3 355:11,18,24 356:7,10,18,23 357:4,9,18 358:5 358:17,24 359:13 359:23 360:3,8,21 361:1,11,24 362:2 362:14,17,19,25 363:12,15 364:1 364:18,22 365:23 366:2,7,13,16,22 367:19

**gunning** 292:11
**guns** 316:5
**guts** 268:7
**guy** 248:15 292:7 338:2
**guys** 316:11 319:23 324:15 337:15 338:8

**h**

**h** 172:20 214:11 338:1 340:3
**hacker** 315:4,6 324:2
**hackers** 245:25 314:14,21 353:3
**hacking** 229:4 236:23
**half** 185:6,10,16 189:17 211:20 212:9 254:9 285:24 305:15 308:5 311:18,20 311:25 325:10,11 337:2 356:10 362:1 365:9
**halfway** 186:23 357:23
**hall** 330:18
**hand** 212:21 224:18 289:13 296:6 308:4 321:20 328:10 332:7 338:7 351:11 369:21
**handed** 292:16 293:14 296:11 344:11
**handful** 231:4
**handing** 318:4
**handle** 197:11 344:15
**handles** 217:13
**handling** 279:21
**hands** 214:15 319:10 343:4
**handwriting** 281:15,19,23 282:12,15
**handwritten** 282:6,9
**hansen** 168:10 175:24
**happen** 180:10 187:20 217:20 294:13 309:4,13 309:23 319:21 327:24 350:15 355:1
**happened** 180:8 222:16,17,18 244:3,9 254:9 269:17 270:6 279:1 280:15,15 308:11 309:8,18 316:8 317:21 318:20 320:4 322:21 323:17 337:20 354:14 355:9
**happening** 191:23 243:3 248:15,20 248:23 260:24 261:17 290:20 291:5 298:22 299:6 306:15 319:8,25
**happens** 182:25 193:7 205:12 217:19 220:25 309:11 320:25 342:22 343:24

**happy** 177:3 299:6 299:17 308:7 316:2 337:1
**hard** 221:9 246:10
**hardware** 276:3,9 339:6
**harvard** 290:12
**harwood** 169:9 175:9
**hate** 344:8
**he'll** 193:9 340:9
**head** 186:9 213:6 272:25 321:2
**heading** 185:22 224:18,19
**headquarters** 335:4
**health** 365:10,11 367:6,13,16
**hear** 319:20
**heard** 195:18 314:13 339:3
**hearing** 253:5 296:25
**heart** 205:4 294:17
**heat** 272:20
**heavily** 282:21
**hedge** 292:6
**held** 175:12 211:24 231:6 362:12,23 363:8
**hell** 308:22 315:8 317:22
**hellyer** 172:20
**help** 205:11 267:6 292:10 333:11 337:13 346:21 347:22
**helpful** 269:3
**hendrick** 184:15 184:19 185:1,23 185:23 186:4,7,15 186:19,21 189:5 191:25 192:23 193:22 198:12 332:9 334:2 335:20 336:10 337:11,13 338:6 339:9 358:14,15 358:25
**hendrick's** 335:4 338:18
**herb** 190:11 363:2
**herb's** 190:11
**hereto** 167:22
**hero** 338:7
**high** 179:9 237:20 276:24 306:13,20 343:17 344:3
**higher** 283:13
**highest** 260:12
**highlight** 225:16
**highlighted** 225:14 286:6
**highlighting** 285:10
**highly** 167:9 171:4 171:8,11,15,19,21 171:25 172:4,8,11 172:15,18,22 173:4,8,11,15,18 173:22 174:4,7,10 174:14,17,21
**hill** 172:6
**hired** 223:1 339:18 346:24
**hires** 286:1
**historical** 222:13
**history** 324:10
**hit** 308:7
**hold** 346:15
**holding** 290:9 365:7
**holds** 211:7
**hole** 278:19 311:8
**honestly** 213:23 217:12 240:5
**honors** 216:13
**hope** 310:23
**horrible** 179:11 180:16
**hostile** 324:23
**hour** 211:20 212:9 285:24 366:5,9,14 366:15
**hours** 255:20 323:15,16 325:11 365:8 367:22
**house** 253:12 303:25
**houston** 167:20 168:5 175:14 238:4 346:8,24
**hub** 273:22
**huge** 262:19 341:24
**hughes** 168:16 175:20,20
**huh** 300:23 345:12
**humans** 246:14
**hurry** 292:9
**hurt** 233:14
**hurtful** 233:12

**i**

**ibm** 303:13,14
**idea** 242:14 317:24 337:24,24
**ideas** 319:24
**identical** 267:1,2
**identifiable** 264:16
**identification** 184:3 201:11 213:10 221:20 230:1 234:22 237:13 240:24 244:23 247:24 252:3 254:19 256:20 259:8 262:21 268:23 271:14 276:15 284:13 288:14 289:19 292:15 296:17 318:3 321:23
**identified** 190:1 276:12
**identify** 258:2 307:16,16
**identity** 369:18
**ids** 297:13 330:11 330:11
**ignored** 323:21
**ii** 171:3 318:13
**illinois** 167:1 175:7 370:1
**image** 305:12
**images** 326:14
**imagine** 273:5
**immediately** 255:19
**immense** 323:23
**impact** 222:17 253:1 325:12 326:23 327:9
**implement** 245:20 246:25 268:10 358:3,3
**implemented** 247:15,20 269:14

270:9,12 358:11
**implements** 217:8
**implied** 177:21
**implies** 206:5
**importance** 233:20
**important** 222:24 223:4 259:18 260:4 270:6 273:20 286:2 299:19 303:17 333:10 335:10
**imposes** 227:24
**impossible** 230:24
**improve** 243:24 248:18 290:24 291:14 304:25
**improved** 304:7 327:13
**improvement** 247:5
**improvements** 245:11,19,19 246:24 247:1,16 247:20 249:11
**inaccurate** 198:14 198:19 215:3 249:22
**inadvertent** 170:16
**inaudible** 196:1 289:11 329:21 332:16
**incentive** 336:25
**inches** 304:1
**incidences** 196:17
**incident** 269:7,8 309:12 318:16 354:13,14,19 355:15,19 367:6
**incidents** 198:1
**include** 272:17 305:7
**included** 273:11 302:21
**including** 347:14
**incomes** 234:5
**increase** 225:25 270:23,25 271:4 271:22,25 272:2,4 283:9,17 326:20
**increased** 224:15 270:21,22
**increases** 238:21
**increasing** 282:25
**incredible** 320:24
**indemnifies** 312:22
**independently** 299:2
**index** 170:1
**india** 246:16,17
**indicate** 213:23
**indicating** 193:18 341:17 343:20 344:3
**individual** 175:24 183:13 201:6 237:24 238:15 271:5 319:1 345:17
**individually** 246:7 247:2 256:7
**individuals** 359:6 359:7
**industry** 179:10 193:7 290:15 294:14
**inevitably** 238:21 321:15
**infancy** 239:15
**infer** 191:21
**inference** 353:17
**inferior** 333:18
**inform** 217:4
**informal** 212:6 216:4,20 217:1 219:2,5,9,11,15,20 287:14,22
**information** 196:23 205:19 206:24 219:25 222:8,13 228:6 231:5 244:7 264:17 267:6 284:4 300:9 301:24 308:17 316:2,20 317:4 319:9 326:12 329:7 331:25
**informed** 251:2
**informing** 258:14
**inherent** 205:6
**inherently** 193:3
**inherited** 303:25
**initial** 197:14 213:12 338:3
**initially** 207:14,22
**initiated** 299:13
**initiative** 335:19
**injunction** 296:24
**innovators** 354:20
**inputs** 206:19
**inquiries** 233:19
**insert** 257:23
**inserted** 229:24
**inserting** 258:5 282:2
**inside** 205:5 230:17 335:19 343:13 345:17
346:12,12,12
**install** 282:14 333:15 338:17
**installation** 194:13 195:9 281:24 282:10,18 337:25
**installations** 182:25
**installer** 338:5
**installers** 333:15
**instance** 167:13 179:7 188:4 194:24 229:23 248:21 273:19 292:23 327:6 328:16 332:2 341:4
**instant** 284:1
**instantly** 341:9
**institution** 312:17
**institutions** 312:12
**instruction** 198:21 255:23
**instrument** 369:19
**insurance** 274:1 342:23
**integra** 353:25
**integral** 265:25 266:3 267:4,17 268:1
**integrate** 181:3
**integration** 257:8 258:15
**integrator** 354:15 354:23,24 355:14 355:16,20
**integrators** 355:6 355:10
**intelligence** 293:12 295:19

**intend** 244:9
**intended** 186:6
**intent** 218:19
**intention** 264:10
**inter** 220:8
**interact** 197:1
**interacts** 214:24
**interest** 215:17
**interested** 223:1 228:23 229:16 233:4,7 236:10 278:5,7 285:25 320:11 371:10
**interesting** 310:7 324:6 337:19
**interface** 202:18 267:7 270:13 295:3,4 354:14
**interfaces** 266:9 272:17 273:14 282:21 283:20 292:19 293:6 294:23 295:3,14
**interiors** 205:1
**interlopers** 246:9
**intermediate** 220:8
**internal** 193:17 227:10,18
**internally** 319:20
**internet** 273:19 315:25
**interval** 309:11
**invade** 304:10
**invent** 197:21 345:5
**inventory** 204:24 221:7,7
**invest** 202:17 303:10
**invested** 305:3
**investigating** 209:5
**investigation** 317:10
**investment** 244:2 311:16,24
**investments** 243:23
**involve** 205:10 354:23
**involved** 177:23 178:15 186:8,11 208:9 210:16,17 231:16 245:23 264:14 271:4 308:1 315:7 317:18,21,24 340:6
**involvement** 271:6
**involves** 205:8 219:21
**involving** 262:12 296:25
**iphone** 178:21
**iphones** 178:22
**irvine** 281:23
**issue** 187:13 188:1 224:10 254:13,16 268:17 273:25 278:20 280:14 282:24 302:21 305:10,25 307:1 307:14 326:8
**issued** 249:16 334:7
**issues** 190:1 193:25 281:8 290:7,8 302:24 305:9,18 330:14 330:16 340:25
**issuing** 249:5
**it'd** 296:6
**item** 271:5

**j**

**j** 168:15
**january** 167:10,16 171:20,24 175:3 196:4 211:24 224:1,22 230:11 369:2 370:10 371:12
**jlong** 168:13
**job** 207:6 283:7 288:11,16,17 328:16 334:25
**jobs** 306:5 323:1,8 324:11 331:20 332:3
**joe** 175:25 214:13
**john** 168:16 175:20 253:7,9
**joint** 204:8 207:11 207:21 208:16 215:11
**jointly** 350:10
**joke** 225:3
**jon** 173:20 208:9 214:25
**jonathan** 172:10 173:13 174:3
**joseph** 168:10
**journalling** 309:1 309:2
**judgement** 299:24
**judgment** 264:20
**july** 173:17 174:3 174:6,20 271:11 277:4,8,8,19,20 284:14,17 286:8 296:13,20 351:24
**jump** 183:14
**jumped** 226:4,20 226:24 365:17
**june** 172:21 173:3 173:14 174:16 253:3 254:25 255:11,21 260:6 263:3 268:10 293:16
**junk** 280:7 307:2

**k**

**k** 168:3,22
**keep** 177:19 186:3 186:18 195:15 199:4,5 225:14 228:1,11 231:5 285:14 296:3 304:12 305:12 310:8,13,21,25 311:13 336:3 341:18 364:7 367:1
**keeping** 367:22
**keeps** 361:7
**keith** 172:6
**kellogg** 168:10 175:23
**kellogghansen.c...** 168:12,13
**kelly** 330:18
**kept** 199:5
**key** 190:1 238:18 333:10 338:1 343:11
**keystroke** 335:16
**kill** 308:6
**killer** 345:4
**kind** 178:21 193:18 195:10 203:5 204:20 205:5,20 227:20

235:12 247:12 261:7 264:18 267:14 268:5 269:20 291:19 292:6 294:15 303:3,23 304:6 308:9,12 313:9 315:14,15,23 317:24,25 319:3 319:18 320:11 325:1 333:6 335:12,16 336:15 338:1,2,16,18 341:6 343:2,4 348:5 349:23 353:5,16,16 354:24 357:12 359:18,25
**kinds** 283:2 343:9
**knew** 339:16 364:18
**know** 177:1,2 178:14,20,23 179:16,17 180:9,9 181:12,18 182:19 182:24 183:1 186:16 187:5,8,16 187:18,19,23 189:21,23 190:23 190:24 191:1,2,2,4 191:22 194:10 195:8,14,15,16,16 196:2,20,21,21,23 196:24,25 197:2,3 197:9,18,21 198:10 199:2,6,7 199:11 200:11 201:4,5 202:11 203:4,11,17 205:2 205:7,8,19 206:10 206:19,20,21 207:4 208:21,24 209:5,21,21,22 210:18,19 211:6 211:10,11 212:7,8 212:9,21,21 213:2 213:3,4,8,22 214:4 214:4,6,11,13 215:15 216:9,10 216:12,24,24 217:12,14 219:20 219:20 220:6,11 221:6 224:11 226:17,25 227:1 227:11,16,20,23 227:25 228:1,5,9 228:10 229:13 231:1,3,16,17,19 231:20,21,25 232:6,17,25 233:1 233:3,10,13,21 234:5,5,6,25 235:19 236:21,23 236:24 237:3,23 238:15,17,21 240:10,11 241:16 243:23 244:2,5,6 246:9,13,14,18 247:8,17 248:11 248:12,15,21 249:5,7,14,15 250:25 251:13,18 253:23 254:1,8,10 254:12,12 255:15 256:6,8 257:12,21 257:22,23 258:21 258:22,23 260:7,7 260:11,25 262:7 262:17,18 263:21 264:9,10,15,19,21 266:8,10 267:3,3,5 267:6,11,13,14,16 267:25 268:1,7,18 268:19 269:4,5,16 269:18 270:2,5,23 271:3,5,6,8 272:4 272:22 273:10,12 273:19,20 274:22 276:12 277:1,24 278:19 279:4,5,9 280:12,13,14,19 280:19,20,22 281:6,6,7,8,11 282:22,23 283:3,8 283:12,14,14,15 283:16 284:1 288:15 290:21,22 291:2,3,19,19,22 292:3,5,5,24 293:2 293:11 294:2,16 295:21 296:3 298:25 301:18 302:22,25 303:3,3 303:7,16,18,19,19 303:24 304:5,8,10 304:18 305:7,8,11 305:13 306:5,7,7 306:19,20 307:4 307:12,13,24 308:4,8,16,17,18 308:19,19,19,22 308:25 309:3,15 309:18,19 310:3 310:12,14,16,19 311:12 312:6,9,10 312:11,11,21 313:2,4,6,10,24 314:11 315:2,2,5,8 315:9,12,16,22 316:1,4,4,11,13,14 317:7 319:1,1,4,8 319:9,16,24 320:8 320:12,19 321:2 321:13,18 322:23 323:22 324:5,7,8 325:17 326:23 327:5,7,14,15 328:19 329:4,13 331:18,23 332:1,5 333:3,4,7,21 334:6 334:20,24 336:4,8 336:14,16,17,22 336:23 337:4,8 338:3,3,5,5,7,9,16 338:22 339:1,2,5 339:20 340:3 341:1,4,5,18,21,22 342:10,19,24 343:11,13 344:1,9 344:25 345:23,24 346:5,8,13,14,18 348:1,14 350:11 350:20 351:15 353:11,16,19,22 354:4,25 356:25 357:11 358:25 359:8,10,11,18,18 361:2,2 363:1,10 363:21,21 364:24 366:25 367:1
**knowing** 200:20 227:16 278:6
**knowledge** 192:11 195:5 220:24 319:12 350:16 356:25 363:7
**knowledgeable** 330:15
**known** 239:10 304:17 369:17
**knows** 308:17 339:19,20

Case 4:21-cr-00009 Document 1-3 Filed on 01/04/21 in TXSD Page 698 of 771

**l**

**l** 167:17 370:13 371:17
**lack** 310:17 337:23
**lady** 253:11,12
**lamb** 170:17 171:10 174:16 184:9,16 185:6,8 185:23 186:4,19 186:20,25 188:8 188:16 189:4 190:15 191:8 192:22 193:19 198:12 230:20 293:15,19 294:20 332:9,18 361:19 361:25 363:13
**laptop** 315:21
**large** 319:15 358:19 359:2,6
**larger** 185:1 227:19
**largest** 184:19,20 184:22,23 185:4 208:14,17,18 358:21 359:2
**laser** 182:11,11
**late** 211:24 255:12 305:1,2 356:11
**laugh** 324:7
**law** 167:19 227:25 313:11,18
**lawsuit** 264:18 296:21,25 299:23
**lawyer** 301:19
**lax** 309:22
**layouts** 346:10,11 346:11
**leach** 312:11
**lead** 259:22
**leader** 348:6
**leaders** 191:2
**leading** 190:5
**leap** 205:5 317:19
**learn** 178:16,20 179:19,25 181:19 183:15 194:9 333:9 348:10
**learned** 291:17
**learning** 180:24 181:14,16 187:20
**leather** 205:2,2
**leave** 216:12 242:17 253:12 331:14
**ledger** 221:7
**left** 224:18 315:22 315:23 354:9
**legacy** 280:17
**legal** 286:7 288:15 312:10 313:5 347:15
**lender** 206:24,25
**length** 199:2,12,16
**letter** 184:14,17 185:6,10,17,21,22 185:22 186:4,19 186:20,23 189:4 189:17 190:7 191:9,25 192:18 198:12,13 319:5 332:9,17 361:23 361:25 363:11,13 363:17,25
**letters** 240:12
**letting** 237:3
**level** 188:11 199:14 222:6 233:2 234:5 260:12 276:24
303:4 363:22
**levels** 204:22
**liabilities** 264:14 312:23 321:16
**liability** 321:7,8
**liable** 231:22 264:19
**license** 279:23 313:21,22,23,23 314:1,1 344:21
**lie** 338:20
**life** 303:24
**light** 272:20
**lights** 193:8,11
**likes** 283:16 308:6
**lime** 243:20,24 263:13,14 279:13 279:20,23 280:24 281:1,4
**limit** 203:23 247:11 277:18 278:22 280:9 360:10,23
**limited** 232:8 268:4,4 313:23
**line** 181:24 223:23 223:24 225:18 230:13 258:9 285:4 349:1 352:6 369:3
**lines** 284:23 285:7
**link** 353:25
**lisa** 254:13
**list** 249:23 250:3 250:19 253:14 274:3,7 287:18 300:21 303:4 323:7 336:16
**listed** 192:8 214:23 249:10,18 250:12 362:12,22
**listings** 315:15
**lists** 190:10 279:2
**litigation** 167:4 175:6 286:18 299:13 370:4
**little** 193:1 200:4 204:5 207:1 222:14,25 241:6 245:5 248:19 249:3 266:17 283:13,18 295:12 296:7 298:25 299:1 303:5 313:7 337:3 339:20 343:6 345:9 359:5
**lives** 308:5
**lloyds** 213:2
**llp** 167:19 168:4 168:16 175:13
**load** 275:2 283:11 305:8 323:22 327:10,14
**local** 318:22
**located** 175:13 323:11
**location** 306:14
**locked** 209:2
**locks** 343:11
**log** 309:5,6 310:6 310:8 311:2
**logging** 309:15 327:14
**logic** 308:12
**logical** 244:11
**long** 168:10 175:25 177:3 199:20 216:12 231:16 266:17 293:1,2 310:8,13 310:25 314:3,11 320:15 338:10,14

343:22 345:2 360:6,10 364:9,10
**longer** 182:1 199:22 254:13,16 274:3 280:14 288:3 290:7 334:21 365:8,12 365:23
**longest** 199:25 200:3
**look** 183:1 185:5 200:22 202:23 206:25 241:8 245:25 246:1,4,13 246:18 248:14 259:20 266:9 268:5 285:21 288:8 292:11 316:9 321:21,24 324:13,18 336:2 336:22 357:21
**looked** 226:12 228:16 249:20 267:14 286:6,13 311:17 347:4 363:17,20
**looking** 204:20,22 227:4 233:13 241:10 285:5 323:5 332:20 351:16 352:16 361:4,20
**looks** 203:15 214:7 224:1,25 246:5 272:7
**loop** 247:18
**loose** 317:23 343:22
**lord** 345:3 346:20
**lose** 177:21 307:18 307:18 339:9
**loses** 185:19
**loss** 178:9,10,10 308:9 310:14
**lost** 177:17,25 337:2 346:19
**lot** 182:25 189:2 189:21 196:6 231:23,24 251:15 258:4,4 292:4 310:21,21 313:19 318:21 320:8,23 323:25 336:18 337:20 347:19,21 352:21 360:6,7 364:10
**lots** 277:11 360:7
**louisiana** 167:20 168:4 175:13
**love** 197:4,5 320:4
**low** 338:1
**lowering** 192:24
**lunch** 265:5,9,12 265:13

**m**

**m** 168:11
**ma'am** 176:21,24 177:6 179:16 182:3 184:7,10,13 184:18 185:20 186:2,6 187:4 194:19 195:20 196:2,11,13,16 198:22 199:24 200:17,24 201:16 202:2,6 204:7 210:12 211:23 213:14 214:4 215:5,9 216:18 217:3,6 218:18,22 219:7,10 222:2 223:18 228:20
229:17 230:7,9,21 233:7,19 234:18 235:5,18 239:5 241:20 242:4,21 245:1,22 251:18 252:17,21,24 254:8,23 257:2 259:11,14 263:1,2 276:21 282:4,7 360:22 361:2 362:10,21 363:1,9
**machine** 167:18
**mad** 345:24
**magic** 341:2
**magnitude** 340:5
**mail** 279:2
**main** 247:20 261:20
**mainline** 257:23 261:14
**maintain** 203:10
**maintenance** 194:18 272:19,20 273:15 275:15,17 276:3,9
**major** 187:1 249:10,19,23 250:3,7,12 294:13
**maker** 207:10 270:24
**making** 193:13 209:12 283:1 284:8 342:14 356:24 365:21
**management** 167:3 175:5 186:13 190:11 221:22 297:25 298:13 370:3
**manager** 197:4,11 214:19 315:13,18
344:15
**manager's** 196:24
**managers** 344:18
**manner** 293:12 294:17 299:8
**manpower** 272:22
**manually** 253:15
**manufactured** 322:25
**mark** 168:21 176:9 218:6
**marked** 184:1,2 201:9,10 213:9,12 218:5,8 221:18,19 228:15 229:25 230:3 234:20,21 237:12,15 240:23 241:1 244:21,22 247:23 248:1 252:2,5 254:18 256:19,22 259:5,7 262:20,23 268:22 268:25 271:13,16 276:14,17 281:13 284:10,12 288:13 289:18 292:14 296:11,16 318:2 321:22 332:8 351:11
**market** 259:1,2 264:3 294:21 347:16 350:25
**marketing** 243:19 243:20,25 263:17
**marketplace** 207:9 231:18,19 233:10 302:23 303:21 305:13 345:22
**marking** 254:17 318:4

**martin** 173:20
**massive** 197:15
**master** 315:14
**master's** 320:9
**matter** 175:5 191:12 232:18 269:3 294:12 307:14 315:10 316:15
**mayer** 168:21 176:9
**mayerbrown.com** 168:23
**mba** 290:12 320:10
**mcohen** 169:5
**mdl** 167:3 370:3
**mdsc** 168:8
**mean** 177:21 182:1 209:1 225:15 246:21 252:6 266:17 289:3 291:14 292:1,3 295:3 308:7 311:11 316:5 320:5,14 322:19 324:6,9 340:19 345:19 365:12
**meaning** 236:17 239:19 259:21
**means** 193:10 197:13 224:12 260:2,3 261:6,14 278:18 279:8 282:21 283:17 309:2,7 310:21
**meant** 319:3 336:24 352:23
**measurement** 193:4
**mechanism** 329:16
**medals** 239:23
**media** 237:5,9 265:10,14 325:23 326:2
**meet** 212:2,11,16 349:18
**meeting** 210:19 212:5,6,15 214:1 214:22 351:12
**meetings** 210:11 210:15,21,24 211:3,8,12,21 212:2
**memorized** 336:4
**memory** 214:5
**mentioned** 194:11 214:10 264:21 328:5 331:7
**menu** 344:5,6
**merger** 293:16 303:10
**message** 246:16 247:10
**met** 212:11,24 214:14 239:9,12 315:10
**method** 348:12 353:6
**michael** 168:9 169:3 176:6 315:10
**mid** 268:14 269:9 270:9
**middle** 235:12 246:1,3 281:24
**mike** 175:23 289:10 356:12
**milberg** 168:16 175:18,20
**milberg.com** 168:18,19
**million** 228:18 229:6 305:15 311:7,18 346:13 346:15 347:16 356:4,8
**millions** 311:4 356:7
**mind** 242:5 317:20
**mine** 302:20
**minor** 202:9 310:15
**minute** 227:13 240:15 287:4 318:10 340:16
**minutes** 214:1,22 215:3 222:12,13 265:5 300:5 323:16 325:10 354:9 360:16 365:16 366:25 367:3,4,8
**miracle** 197:6 342:20 344:7
**miraculous** 197:23
**mis** 170:16
**mischaracterizat...** 222:10
**misspellings** 363:19
**misused** 278:16
**mms** 242:1,11,16 242:25 243:7,19 243:25 244:4 297:7
**mnemelka** 168:12
**model** 333:22
**moment** 218:13 277:12 280:21 289:17 293:17 296:14 318:15 321:21
**moments** 281:10
**monday** 247:7 306:1 336:14,18
**monetary** 238:9
**money** 193:13 302:25 317:15 319:19 342:8
**monitor** 182:22,24 183:3
**monitors** 182:22 182:24
**monopoly** 207:7
**monster** 335:3
**month** 194:18 197:12,13 199:17 222:11,18 224:23 285:23 321:10 337:16 344:16,17 344:19 358:3
**monthly** 194:17 221:25 223:6,8 257:13 258:15 275:18,23 276:9 277:24 280:4 282:10 285:21
**months** 181:24 182:1 183:8 310:20
**mopping** 303:24
**mops** 304:2
**morale** 232:4
**morning** 175:2 176:17 249:2 289:11 336:19
**mornings** 336:14
**morse** 190:12
**moss** 172:3
**motion** 364:23 365:1,21 366:10

**motivate** 263:18
**motivated** 333:7
**motivation** 298:6
**motivations** 194:3 236:21
**motors** 297:23
**mouse** 353:5
**move** 197:24 221:14 225:3 335:23
**movement** 261:12
**moving** 185:24 244:8 264:15 273:24
**mryan** 168:23
**mullin** 169:3 176:7
**multiple** 361:3
**multistep** 220:23
**mumbling** 232:15
**myriad** 313:4

**n**

**n** 168:1,9 169:1 175:1 214:11
**n.w.** 168:11,22
**nada** 211:18,19,21 212:2,25 214:14
**naked** 243:20,24 263:13,14 279:13 279:20,23 280:24 281:1,4
**name** 175:9 193:8 193:11 208:3 212:13 213:7 214:13 232:21 257:5 315:4,11 319:5 338:6 369:2 369:19
**named** 168:7
**names** 209:20 314:21 316:2
**nature** 333:22 353:22
**near** 207:7
**nearly** 179:3 190:15 191:15
**necessarily** 189:22 191:21 259:4 295:10 301:22
**necessary** 303:2
**need** 177:1 207:2 219:19 225:17 227:9 230:18 290:6 292:18 293:5,12 295:14 295:22,22 296:1 304:1,2 316:10 326:17 327:8 340:7 365:23 366:7 367:12
**needed** 337:13
**needing** 235:21
**needs** 245:16 299:14 301:1,1 302:22
**negotiating** 199:12 290:1
**neither** 371:5
**nemelka** 168:9 170:5,6 175:23,23 252:9 288:24 289:4,5,9,10,21 290:5,21 291:6,12 291:21 292:12,16 293:4,14 294:3,19 295:2,9,22 296:2 296:18 297:13,20 298:1,8,12,15,19 299:10 300:1,14 301:5,16,20 302:18 304:16 305:24 310:2 311:6 312:4 314:17,23 317:14 322:12 323:6 324:25 325:4,15 327:12 328:25 329:11 330:2,5,25 331:5 334:5 340:18 344:23 345:9,15 347:25 348:23 351:15 353:1 354:3,11,18 355:2,15,21 356:1 356:9,13,20 357:2 357:7,13 360:16 361:18 362:6 364:14 367:17
**never** 178:21 218:12 230:16 248:22,24 257:5,6 303:19 310:23 316:15 319:20 329:17 340:5 342:21 356:13
**nevertheless** 331:13
**new** 168:18,18 178:16,21 179:19 179:25 180:24 181:4,14,16,18 182:5,7,9,14 183:6 183:9,15 187:20 194:10,24,24 223:2 239:15 242:1,10 250:8 275:2 280:17 286:1,1,1,1 309:25 333:9,9 334:23,24 336:2,5,11,21 337:5 343:23 346:9 358:11
**news** 192:16 193:2 193:12,21 194:3 197:18 241:3 252:13 255:6 256:13
**nice** 292:7 296:1 315:24
**nicer** 296:7
**nifty** 205:16
**nigh** 197:22 342:19
**night** 246:2,3,17 274:20 364:21
**nine** 324:15
**nobody's** 231:6
**noise** 321:13
**nominally** 339:13
**non** 332:1 341:22
**nonsense** 365:18
**noon** 337:1
**noontime** 337:8
**nope** 366:4
**normal** 251:25 261:11,11 270:23 294:12
**normally** 212:2
**northern** 167:1 175:7 370:1
**notary** 369:23
**note** 259:15 286:7 357:23
**noted** 369:13
**notes** 351:12,21
**notice** 310:19
**noticed** 286:16
**notices** 334:7
**notification** 219:21 260:7
**notified** 251:20,21 251:22,24

**notify** 219:25 242:18
**notifying** 220:1 283:23
**november** 171:3 172:7 184:15 238:7,25
**number** 188:4,12 188:23,24 193:5,5 199:4 205:8 224:12,13 225:6 228:8,21 229:14 229:15,18 233:14 234:6 240:12 253:6 269:18 271:5 273:18 276:18 278:22 280:10 282:20 285:21 291:17 292:24 296:8 297:11 305:14 323:12 326:16,24 335:14 342:1 352:15 356:4,14 356:17 357:2 359:6,7 361:6,7 365:3
**numbered** 167:15 324:14,15
**numbering** 170:16 170:19
**numbers** 193:16 193:17 223:23,25 227:8 228:10,12 228:12,13 232:1 274:4 282:6 284:17 286:3,6 318:6,7 320:19,19 323:11
**numerically** 237:23
**numerous** 314:13

**o**

**o** 175:1
**oath** 369:18
**object** 182:18 206:11 243:14 250:10 255:22 271:1 275:14 362:2 367:22
**objection** 178:7,13 179:4,15 180:6,14 180:20 181:5,10 181:22 182:2 186:1 187:3 189:7 189:11,19 191:10 191:18 192:2 195:24,25 196:1 198:15,20 200:2 200:19,23 201:3 202:5,14,21 204:14,16 207:23 209:14,19 212:12 213:21 215:4 216:1,5 217:5 218:2,21 219:13 219:18 221:3 224:4,9,16,20 226:6,15,21,22 227:7 229:7,21 233:6,18,25 234:12,17 236:8 236:19 243:1,9 249:12 250:15,18 250:23 251:4 253:25 255:13 256:15 257:10,19 258:17 260:18,23 261:24 262:10,16 263:15 264:8,23 265:2,21 266:1,7 266:15,22 267:10 267:21 268:12 269:11,15,25 270:14 271:23 272:6,12 274:8 275:8 276:1,7 277:5 278:13,24 279:14,18 280:5 280:11,18,25 281:5,18 282:3,19 283:21 284:19,21 285:3,18 286:11 286:19,25 287:17 287:24 288:4,12 290:3,18 292:21 293:7 294:11 295:16 297:9,15 297:22 298:3,11 298:17,21 299:15 301:4,5,10,15,16 301:20 302:6,11 302:17,18 303:12 304:15,16,21,24 305:5,23,24 310:1 310:2,11 311:5,6 311:21,23 312:3,4 312:8 314:6,16,17 314:22,23 317:5 317:13,14 318:18 320:6 322:5,12,15 322:20 323:6 324:24,25 325:4,9 325:14,15 326:25 327:11,12,20,22 328:3,8,13,24,25 329:10,20,24 330:5,6,13,17,25 331:4,5,11,16 332:15,22 333:2 333:13,19 334:4,5 334:12,15,18 339:11 340:2,11 340:17,18,24 342:5,7,17 344:23 345:14,15 346:3 347:24,25 348:8 348:13,18,22,23 349:2,7,11,16,20 349:25 350:12,22 351:4,8,23,25 352:4,10,19,25 353:1 354:2,3 355:11,18,24 356:18 357:4,9 358:17 359:23 360:21 361:1,11 362:14 363:15 367:1
**objections** 206:11 329:11
**obligation** 220:15 220:18
**obligations** 216:14
**oblivious** 313:9
**observation** 199:6
**observe** 353:13
**obsolete** 203:11
**obviously** 177:22 225:1 261:25 299:2,16 317:11 317:15 320:20 337:22 338:24 347:19 367:20
**occasion** 198:8 314:13
**occur** 180:22 194:10 211:3
**occurred** 249:25 257:14 262:9 269:21 305:2 308:13
**occurring** 246:20 342:18

**occurs** 197:6 217:14 220:13 280:1 284:2 309:12 342:25
**oct** 305:1
**october** 172:3
**od** 287:18
**odd** 339:15
**ode** 204:5,11,13,15 205:21,25 206:1 207:11 208:7 209:6 210:10,11 210:21 211:7,13 212:3,17,24 213:3 214:2,24 215:24 287:13
**ode's** 207:8
**offer** 199:9,11
**offering** 243:24 274:15
**office** 274:25 342:24 343:7 346:23 369:21
**officer** 214:21 229:12 370:17
**offices** 167:19
**oh** 285:8 316:21 328:1 338:14 345:3 356:10
**ohio** 274:25
**okay** 176:19 177:7 185:15 189:9 192:22 206:6 223:24,24 226:3 226:14,18 235:10 235:13,15 243:17 248:15 252:8 267:12 268:3 271:24 278:25 285:16 292:12 294:7 302:3 316:19,21 321:19 324:19 335:1 337:18 338:14 343:7 352:14 361:19 363:11 366:16 367:9
**old** 183:6 203:11 225:11 279:22 320:12 323:1
**older** 322:24
**once** 183:9 211:17 212:22 213:8 222:11 238:4,4 285:23 307:21 327:3 328:19 338:20 365:6
**one's** 324:7
**ones** 227:3 250:11 250:16 272:24 277:12 309:16 354:5
**ongoing** 203:20 310:10,12 311:11
**onsite** 275:17 315:17 333:15
**opcode** 335:13 336:3,23
**opcodes** 335:11,11 335:17,21,25 336:2,5,11,21 337:25 339:8
**open** 204:5 259:19 315:1 364:7 365:7 365:14 367:2,23
**opened** 260:16,21 261:16,22 283:25
**opening** 261:10,13 335:15 336:20
**openly** 233:2
**operate** 256:17 290:23 307:10,11
**operated** 231:8 299:7
**operates** 228:11 231:21
**operating** 203:18 203:19 231:12 258:6
**operation** 186:13 186:14 231:14
**operational** 328:7
**operations** 217:21
**opinion** 180:17 250:5,6,6 295:7,8 295:14,17 299:18 313:12
**opportunities** 258:2
**opportunity** 208:20 237:16 274:1
**options** 204:23
**oral** 167:8,12 370:9,17
**orchestrated** 201:4
**order** 193:21 197:11 210:14 261:10,16 265:19 265:24 266:5,21 267:3,9,11,15,16 267:16,20,23 268:3 270:5 283:20,22,24 292:25 293:2,10 295:15,20,23 311:25 312:15 313:5 327:6 335:16 336:20 365:19
**ordering** 258:11 258:13
**orders** 257:25 260:2 261:13 266:11,12 267:5
**ordinary** 235:8 246:4 257:21 288:10,16
**organiza** 239:7
**organization** 185:3 204:6 207:20 208:1 209:23 217:14,21 223:4 227:22 232:4,14,20 234:10 239:18,19 239:21
**organizational** 228:9
**organizationally** 227:18
**organizations** 359:2
**oriented** 303:14
**original** 342:20 347:14
**originally** 188:6 303:13
**ought** 209:4 323:2
**outcome** 371:10
**outdo** 252:9
**outliers** 313:13
**outlook** 321:6
**outputted** 220:5
**outside** 230:17 266:10 267:1 279:1 304:9 306:12 316:17 328:18
**overall** 222:4 228:9 249:8
**overhead** 178:15 178:24 227:24,25

327:15
**overloads** 325:16
**overrun** 323:1
**owned** 184:23 185:4 215:18,19 293:24,24 363:4
**owner** 184:19
**ownership** 215:17
**owns** 313:20

**p**

**p** 168:1,1 169:1,1 175:1
**p&l** 223:16
**p.a.** 169:3
**p.m.** 167:16 247:6 247:12 265:11,12 265:14 287:7,8,9 325:24,25 326:2 366:18,19,21 368:3,4
**pace** 336:24
**package** 171:20 174:6,9 178:18,19 206:24 231:17 282:18 284:15 285:23
**packets** 273:24
**pag** 358:14,15,25
**page** 170:1 171:1 172:1 173:1 174:1 185:14,21 186:23 186:24 188:16 189:14 190:6,9 223:14 228:15,17 235:1,6,12 241:17 241:24 245:6,9 252:25 253:17 254:3 255:5 277:15,18 281:14 281:16,22,24 284:15,16 285:7,8 285:12 286:4 332:20 333:25 351:14 357:23 362:11,18 369:3 371:1
**paged** 230:3
**pages** 252:12 364:14,15
**paid** 197:19 336:25
**pain** 242:18
**pale** 324:8
**paperwork** 343:7
**paragraph** 189:13 239:6,8 260:4 279:16 363:22
**paramount** 367:13
**parcel** 309:20
**parentheses** 300:21
**park** 274:25
**parse** 331:24
**part** 177:18 205:7 206:5 217:20 228:9 245:24 247:18 259:24 263:9,13 265:25 266:3,4 267:4,17 268:1 270:22 273:4 274:11 278:10,12 283:1,1 288:17 303:16 306:12 309:20 310:7 313:7 342:23,24
**partially** 269:6
**participated** 211:12
**particular** 188:11 191:12 201:24 208:21 214:5 234:14 238:16 249:6,17 254:11 257:14,16 263:11 269:6 282:20 283:10,11 284:4 285:23 292:25 319:13 354:22 355:19 359:9
**particularly** 193:25 232:2 233:8 299:22
**parties** 211:19 227:1 267:14 326:21 327:19 328:7 371:6
**partner** 208:25,25
**parts** 179:9 221:7
**party** 201:17,18 202:13 219:3 245:24 253:20,23 257:4 261:6 266:5 266:20 267:1,8,18 268:6 283:24 299:4 309:22 312:20 313:24 314:4 315:6 328:1 349:15 353:3 370:22 371:4
**pass** 333:8
**passed** 315:2
**passing** 258:16
**password** 315:14 315:19
**patient** 337:17
**pause** 214:8
**pay** 180:24 183:17 264:19 274:12 275:7 313:19 315:8 337:2
**paying** 344:21
**payment** 206:21 207:1 263:21 341:9,12,14,18
**pays** 216:13
**pcs** 182:19,20 304:11
**peggy** 168:15 175:17 265:4 300:7 360:3,9
**pending** 177:4 243:5 278:3
**pennsylvania** 168:17 169:4
**penske** 185:2
**penultimate** 352:16
**people** 179:19 183:3,23 188:4,12 193:4 194:8,9 203:14 208:1,8 209:15 212:3,14 212:16,17 213:5 230:18 231:4 238:18,19 246:3 248:22 249:1,13 249:16 250:19 263:18,23 264:17 299:20 304:9 313:19 316:1,24 316:25 319:10,19 321:12 333:16 334:24 336:14 339:7 343:18 345:17,18
**perceive** 249:2
**perceived** 248:23
**percent** 179:8 183:2 204:11 205:9 215:18,19 223:20 224:15 225:25 228:3

271:9 272:8 337:16
**percentage** 179:9 205:7 226:23 271:7 285:4
**perfect** 220:25 248:13
**perfectly** 258:19
**performing** 237:20
**period** 233:22 251:15,19 254:4 277:8 367:5
**permission** 306:17
**permitted** 258:22 328:23
**person** 209:23 210:11,25 211:13 212:13,16,17 214:17 232:19,22 234:16 250:2 253:16 291:7,13 292:7 315:17 319:6 338:9,12,19 338:19 345:18,19 369:19
**personal** 264:16 319:9 321:8
**personally** 180:15 182:21 264:16 292:7 340:6 348:19 349:4 359:1 369:17
**personnel** 179:24 181:13 183:14 187:15,17,17 188:1 227:23 273:1,15 333:7 337:21,21
**pertinent** 339:12
**phased** 203:4
**phil** 324:22 354:4
**phillips** 168:16 175:18,21
**philosophy** 303:14
**phone** 210:18,25 211:1 213:4 291:3
**pick** 190:22 214:15 246:14 291:3 344:6
**picture** 197:18
**pictures** 246:14
**piece** 202:25 228:11 306:9 316:17 347:18
**pieces** 182:10 307:2
**pile** 259:19 317:16
**ping** 269:24
**pitch** 239:1 334:3
**place** 176:19 195:8 212:8 213:2 220:2 220:4 233:1 236:22 238:2 246:16,17 250:21 251:8 255:12 256:8 257:5 260:22 321:14 323:9 324:9 336:5 339:10 344:4
**places** 192:20 212:24
**plaintiff** 167:14 168:7
**plaintiff's** 184:1 201:9 213:12 221:18 228:15 230:3 234:20 237:16 238:24 241:2 244:21,25 248:1,3 252:5,10
254:17,21 256:22 256:23 257:1 259:6 262:23,24 268:20,25 269:1 271:16 276:17,20 281:13 284:11 288:7 289:14 293:14 300:15,16 318:5,7 332:8 357:22
**plaintiffs** 168:14 170:18,18 175:19 175:22,25 348:4 351:11 354:8 365:3,4 366:24 367:9
**plan** 201:4
**planned** 236:16,17 262:3
**planning** 208:2,7
**plaque** 238:17
**plaza** 168:17
**please** 175:15 176:12,25 177:2 242:10 255:2 345:3 359:19 362:21
**pleased** 189:21 303:18 363:19
**plus** 271:7,8 272:8 326:13 347:14
**point** 185:2 186:7 186:11 197:15 206:18 235:10 242:21 255:18 257:20 259:25 279:15 288:23 318:23 333:5 365:2 367:24
**pointed** 236:9
**points** 256:13 352:15
**policies** 330:12 349:10,19 350:19
**policy** 230:14 231:1 232:5 242:15 243:6 251:5 264:25 330:14 341:12,14 350:2 357:17
**polishing** 303:25
**polite** 292:8 312:6
**pontis** 214:23
**poor** 180:23
**poorly** 179:18,19
**position** 215:21 220:9,23 232:15 251:12
**possibility** 355:13
**possible** 264:11 277:1
**post** 315:24
**posted** 316:2
**posture** 344:10
**potential** 205:20 206:24 209:5 264:14
**potentially** 264:16 354:25
**power** 272:20 294:21
**practice** 216:22 217:3,4,8
**prayer** 345:3
**predicting** 320:15
**prefer** 299:22
**preliminary** 296:24
**preparation** 351:21

**prepared** 222:6 223:5 317:22
**prepares** 223:12
**present** 169:6 175:10,11 211:19
**president** 169:8 186:17 208:5 339:13
**presidents** 222:7
**press** 206:23
**pressure** 197:3 292:4
**prestige** 190:11
**prestigious** 238:23
**presume** 202:6,18 240:10 255:25 262:7
**pretty** 182:10 246:8,15 262:12 311:8 325:18 334:25,25 357:5 363:3,20
**prevent** 257:7 308:23 321:18
**prevention** 308:10
**previous** 194:11 206:3 225:7,23 259:15 284:20 303:7
**previously** 187:14 218:5,8 236:10 248:11 281:13
**price** 193:11 194:13 206:21 258:21,23 270:23 270:25 271:4,22 271:25 272:1,4 283:13 347:14
**prices** 283:18
**pricing** 268:9 269:10
**primarily** 186:6 256:16
**principal** 179:18 208:23
**principally** 208:1 237:24
**print** 235:13 328:16 331:19,20 331:20,21 332:3
**printed** 328:16 331:24
**printers** 182:7,9,9 182:11,12,14
**prior** 200:12 220:21 278:14,25 298:25
**privacy** 316:24,25
**privately** 184:23 362:12,23 363:4
**privileged** 316:20 317:4
**prize** 238:14,16
**probably** 211:5 216:6 222:9,11 228:2 256:5 263:8 274:1 286:15,16 286:22 302:19 305:6 309:8 311:8 311:8,25 322:25 323:23 339:2,6,19 350:13 354:4 357:11
**problem** 187:15 190:25 194:1 269:21 279:12 280:13,22 281:2 306:25 307:9 312:9
**problems** 180:25 338:22
**procedure** 167:21
**procedures** 233:12
**proceed** 176:12 209:4,4,9 241:6 336:23 367:8
**proceeding** 371:7
**process** 181:12,17 183:19,22 186:8 199:13 200:10 204:18 207:5,7,8 220:3 244:6 248:13 249:8 260:9 267:6 278:9 279:25 312:19 317:25 326:10 330:8 331:17 333:5 335:9 336:20 342:25 343:18,25 344:8
**processes** 204:3
**produce** 200:13 365:4
**produced** 167:13 195:7 364:12,23
**producer** 196:20 342:2
**produces** 197:8
**producing** 342:16 364:24
**product** 207:6 208:2,6 223:2,16 243:24 244:1 258:3,7,21 263:10 263:11 265:19,22 274:15,22 278:1 278:15 279:13,20 279:21,22,22,23 280:21 293:1,2 295:18 299:1
**productivity** 183:2 228:5
**products** 190:3 278:11 295:11
**profit** 193:17,17 196:20 197:12 227:8 228:12,13 231:20,25 232:3 342:2,16 343:16 344:14,17 348:1
**profitability** 228:8 230:15,22,25 232:9,15,19
**profitable** 190:4 227:5,12,16 231:5 232:6,17,25 234:11
**profits** 197:9,16 233:2 347:23
**program** 260:11 276:5 310:4 348:12
**programmers** 309:22 346:25
**programming** 307:22 310:17 332:5,6
**programs** 221:12 331:24 336:25
**prohibit** 341:1
**prohibited** 258:18
**prohibition** 232:9
**project** 187:1,9,21 201:4
**projects** 212:21 223:2 286:1
**promise** 337:15 340:4,9
**promised** 338:17 340:4
**promptly** 194:10
**prone** 196:2

**proof** 207:2
**properly** 181:12 194:9 295:15
**proposal** 338:25
**prospect** 204:19 205:3,14
**prospective** 298:6
**protectant** 343:13
**protection** 309:25 343:10
**protocol** 365:19
**proved** 369:18
**provide** 219:2 292:25 327:19 328:12
**provider** 221:2 260:10 279:4,24 280:8 300:21 312:20,21 332:25
**providers** 217:23 221:5 300:22 301:3,9 330:20
**provides** 222:23 274:17 275:1 298:5
**providing** 258:5 291:23
**provisions** 167:21
**public** 188:24 191:12 231:9 305:13 339:24 369:23
**publicity** 319:23
**publicly** 185:4 188:17,22 189:1 231:10 363:7
**publish** 258:23 283:22
**published** 231:11
**pull** 205:14,14 298:20 324:4
**pulled** 259:19
**pulling** 298:9,15
**pumps** 304:2
**punctuation** 189:23 363:20
**punish** 338:23
**purchase** 194:13 347:14
**purpose** 222:3 264:3 335:14
**purposes** 369:20
**pursuant** 167:20 370:20
**pursue** 367:12
**put** 176:18 198:24 203:16 215:1 225:14 240:3 250:21 251:8 255:12 280:24 281:3 283:12 286:24 292:12 296:9 308:22 324:16,17 326:21 331:25 335:25 345:10 346:23 347:5 352:7,17 355:3 365:1 367:3
**pwedgworth** 168:18

**q**

**qualified** 357:11
**qualifies** 315:4
**quality** 337:21
**quarter** 211:10,10 211:11 272:4
**quarterly** 211:6,7 211:9
**quenched** 338:4
**query** 202:24,24 203:4,7,7,8 323:14
**question** 176:22 176:23 177:1,3,4 191:19 197:25 198:3 203:13 206:12,13 213:13 218:24 219:23 236:5 243:5,12,13 266:14 268:19 270:8 277:17 278:3,8,10 285:1 288:9 289:2 291:16 294:4,5,6 294:21 326:6 333:20 339:12 345:17 354:13 362:20 364:9
**questioning** 332:10 352:22 360:14,15
**questions** 235:1 241:16 288:25 289:12 300:1,3 301:23,25 302:9 303:7 305:9,17 351:13 357:19 363:12 364:4,10 365:16 367:18
**quickie** 246:16
**quickly** 181:9,15 197:14
**quieted** 254:12,15
**quit** 216:24
**quite** 178:23 179:8 188:14 203:2 223:22 238:2 252:12 253:6 254:22 261:7 263:1 275:9 320:12 359:4
**quota** 280:16,24 281:3
**quote** 347:11 353:19
**quoted** 239:16
**quotes** 193:20
**quotient** 187:24

**r**

**r** 168:1 169:1 175:1 214:11
**r&r** 214:22
**racing** 186:11,13 338:8 339:18
**rahal** 358:14,15 359:5
**raise** 282:17
**raised** 269:10
**ran** 346:23
**randall** 322:3,22
**randolph** 322:10
**rang** 291:3
**rank** 192:25
**ranked** 192:17 343:17
**ranking** 193:3,9 193:12,21 194:3
**rarely** 199:8 211:14
**rate** 205:3 206:18 306:13,20
**rbdr** 274:16,22 275:12 276:5
**rci** 202:18 203:14 203:16 223:19 224:2,22 225:6,19 226:4,19 227:2,5,8 227:11,15 228:8 230:16 232:10,20 232:24 233:4,8,16 234:10 239:15 257:21 259:24 260:9,11 261:2,3 261:11,11 262:1,4

268:11 269:10,18 272:10,16 273:1,4 273:13,16 274:7 284:17,18,24 285:14 292:18 293:5 294:23 295:2,3,14 299:3 302:2,9,10 326:16 329:17 354:14
**rdr** 167:17 371:17
**reach** 278:1 279:21,22
**react** 302:23
**read** 198:16,18,22 225:15 234:24 255:8 263:8 289:17 294:15 307:6 310:4 320:1 358:6,7 363:22 369:12
**readily** 264:13
**real** 258:1 259:22 260:16,21 261:9 261:13,16,22 265:19,23 266:5 266:20 267:9 282:21 283:19 284:2 337:22
**reality** 231:23
**realize** 227:19 235:23
**realized** 236:6 338:17
**really** 189:3 192:5 198:22 203:1 224:11 233:21 238:1 254:22 261:7 276:21 283:12 284:1 285:22 290:14,22 294:23 295:8
297:23,24 317:23 319:15 320:24 325:16 327:8 331:17 332:4 334:6,6 336:23 337:22 338:14 340:7 350:2 359:8 359:8 365:12
**reason** 179:18 197:4,8 202:3,7 213:25 215:2 217:18 222:12 227:17 228:7 229:9 230:21 231:14 232:8 233:7 236:10 244:5 249:21 259:18 264:12 299:18 308:21 335:22 346:14,14 346:16 369:3
**reasons** 194:4 236:13 247:10 256:16,17 364:7 364:16 371:1
**rec** 311:17
**recall** 192:8 207:15 208:4 213:1,24 234:15 242:5 250:20,24 251:1,14 262:12 262:15 263:6,16 264:9 284:9 292:19 301:24 318:20 322:4 332:10 351:16 356:5 358:2,4 362:8
**receipt** 370:24
**receivable** 220:9
**receive** 202:4 219:21 221:25 238:21 239:4,23 241:21 252:18 254:24 256:25 259:12 263:3 271:10,18 277:3,7 288:10,18
**received** 213:19 218:16 238:25 248:5 250:16 251:15 301:24
**receiving** 306:1
**recess** 210:5 237:7 240:19 265:12 287:8 325:25 366:19
**recipient** 328:22
**recipients** 278:22 280:10
**reciprocal** 217:4,8 217:22,25
**recognize** 242:3
**recognized** 294:8
**recollection** 255:10 263:7
**recommendation** 280:24 299:11
**recommending** 297:5
**recompense** 236:14,24
**record** 167:22 175:3,16 184:4 191:13 210:4,7 225:14 237:4,6,10 240:18,20 241:4,5 241:7 265:11,15 270:3 287:4,5,6,10 307:24 309:4 320:2 323:4
324:17 325:19,24 326:2 342:13,14 364:3 366:8,9,11 366:16,17,20,22 367:25 368:3 370:18 371:9
**recorded** 175:4
**records** 228:1,2 306:13,18,19,21 307:3,7,13,15 309:14 319:2 320:20 331:25 346:13
**recover** 180:5 187:11 188:9 192:10 194:7 197:13
**recovered** 192:6
**recovering** 233:13
**recovery** 275:1
**recurring** 225:6 225:19 284:18,24 284:24 285:14,15 285:15
**red** 204:25
**reduce** 278:22
**reduced** 327:1
**reed** 322:3,22
**reed's** 322:10
**refer** 229:1 253:11 273:22
**reference** 234:25 253:24 256:9 259:18 269:6
**references** 256:2 256:13,16
**referencing** 256:2
**referred** 219:9 226:7 292:22 361:24

**referring** 236:1 253:17
**reflect** 170:20 201:19 271:21
**reflecting** 356:21
**refresh** 255:10
**refuse** 179:19
**regard** 193:21 195:3,13 199:1 200:14 232:24 249:10 251:7 264:5 266:20 268:9,11 269:22 271:22 272:16 274:7 286:17 363:11
**regarding** 210:11 212:17 218:1 219:17 233:10 254:11 255:19
**regards** 233:8
**register** 249:14
**registered** 319:5
**regrowing** 354:6
**regular** 288:19
**reining** 244:15
**relate** 241:17 280:21 290:11 326:7
**related** 300:19 305:18 350:8,18 371:6
**relates** 199:13 233:16 277:25 278:15 293:20
**relating** 322:3
**relation** 230:16
**relationship** 215:7 215:10 216:17,22 217:2,22,25 219:2 219:5,9,11,16,20 221:1 287:13,14 287:14,19,22 301:14
**relationships** 215:25 216:4 286:2 287:16 288:2 297:3 299:12 300:20 301:2,9
**relative** 371:8
**relatively** 331:18
**relearn** 335:25
**released** 242:14 244:19 251:17 255:8
**relies** 295:20
**religiously** 232:5
**remainder** 300:2
**remaining** 220:15 220:18 288:24 289:2,3
**remarkable** 253:15,18
**remember** 184:16 201:24 202:8,10 208:11 209:7,20 213:7 227:21 232:21 235:19 240:5,8 242:8,23 267:2 319:17 329:4 332:20 342:3 345:11 357:18 363:18
**reminder** 297:16
**remindertrax** 297:14
**remote** 274:18 333:15
**remotely** 274:23 324:11
**removed** 247:9
**renewal** 201:6
**repair** 257:25 260:2 261:9,13,16 265:19,24 266:5,9 266:11,12,21 267:3,5,9,11,15,16 267:16,20,23 268:3 272:21 275:17 283:20,22 283:24 327:6 335:15 336:20 341:5
**repeat** 181:15 273:5 287:18
**replacement** 272:21 275:17
**replicate** 207:8
**repman** 297:20,23
**report** 221:22 222:3,11,25 224:11 225:1 247:2 322:3,9 323:3,13,18 324:3 346:10
**reported** 167:18
**reporter** 175:11 176:11 370:14
**reporter's** 170:9 370:8
**reporters** 304:19
**reporting** 202:25 203:3 328:6,14 329:16
**reports** 200:13 221:6,9,11,25 222:19 248:22 249:2 253:14 315:15 322:10 323:18 324:1 331:19
**representative** 168:8
**representing** 175:21,24 176:2,7 192:23
**represents** 220:15 256:4
**reputation** 297:24 303:20
**request** 258:10 260:13
**requested** 286:24 370:22 371:3
**requests** 283:2
**require** 293:1 294:23 348:11
**required** 283:12 313:5,10 339:13
**requirement** 183:3 276:11
**requires** 257:22 302:24
**research** 245:24 274:25
**reservation** 327:7
**reserve** 288:24 289:2,3 300:2 360:8 364:5 367:11
**resisted** 337:24
**resolution** 280:20
**resources** 313:8 323:22
**respect** 305:21 331:9 354:18 356:4,5
**respond** 242:13 280:2 364:11
**responded** 218:16
**responding** 218:23 253:3

**response** 201:20 206:17 219:8 235:7 299:11 305:16 322:17 323:2 364:25 367:19
**responsibilities** 312:13
**responsibility** 274:23 283:1
**responsible** 207:12 308:3 312:17,22
**rest** 239:20 255:15 363:4
**restate** 177:1
**restatement** 266:23
**restore** 309:9
**restricted** 255:20
**restriction** 255:7
**restrictions** 314:4
**result** 191:6 227:3 232:5 298:23 329:17 336:13 346:17
**resulting** 278:16
**results** 197:22
**retention** 310:22
**retired** 339:15
**return** 196:10
**returned** 370:24 370:25
**reveal** 317:4
**revenue** 223:19 224:19 225:6,20 226:4 228:17,23 228:25 229:6 233:4,8,16 234:6 235:22 236:6,13 236:18 284:18,24 285:13,14,15 342:2,15
**revenues** 226:20
**reverserisk** 292:23 293:9,11 295:18 350:2
**review** 184:6 198:12 201:15 218:10 230:5 235:4 237:17 241:16,19 242:2 242:10 244:25 248:3 252:16 256:23 262:24 276:20 293:17 296:15 318:10
**reviewed** 198:18 252:10 254:20 259:10 269:1 361:24
**reviewing** 184:16
**revolves** 211:18
**reward** 237:20
**rewards** 237:23
**rework** 341:24
**reycid0074420** 173:18
**reycid0074422** 173:18
**reymdl00045179** 174:20
**reymdl00045348** 171:14 201:13
**reymdl00045445** 172:18
**reymdl00045556** 171:24 230:4
**reymdl00050127** 172:14
**reymdl00061987** 174:13
**reymdl00061988** 174:13
**reymdl00068321** 172:21
**reymdl00068325** 172:21
**reymdl00071272** 173:4
**reymdl00071273** 173:4
**reymdl00238490** 173:7
**reymdl00238491** 173:7
**reymdl00238492** 173:11
**reymdl00238493** 173:11
**reymdl00244021** 171:11 184:5
**reymdl00244025** 171:11
**reymdl00263055** 218:10
**reymdl00263065** 173:14
**reymdl00263066** 173:14
**reymdl00263304** 171:4
**reymdl00333091** 172:11 241:15
**reymdl00333092** 172:11
**reymdl00470609** 173:21
**reymdl00503332** 174:4 276:18
**reymdl00503335** 174:4
**reymdl00583889** 174:17
**reymdl00583890** 174:17
**reymdl00590725** 172:4
**reymdl00590727** 172:4
**reymdl00611282** 171:7
**reymdl00611284** 171:7
**reymdl00661495** 172:7
**reymdl00661497** 172:7
**reymdl00719700** 171:21
**reymdl00719787** 171:21
**reymdl00722459** 174:10
**reymdl00722550** 174:10
**reymdl00723521** 174:7
**reymdl00723612** 174:7
**reyn** 275:7
**reynolds** 169:8,8 171:20,20 174:6,6 174:9,9 176:2,3,7 176:8 177:9,14,15 177:20 184:21,25 185:24 188:16,25 190:8 195:4 196:9 196:9 197:20 199:1,9,22,25 200:8,9,16,18,25 204:8,11 207:12 208:6,16 210:11

212:16 214:23 215:6,11,15,19,24 216:3,11 217:8,10 219:12,17 220:19 221:1,23 222:3,15 222:20 223:6,11 229:5 231:2,8 232:6 233:23 237:19 243:7 245:20 246:25 247:15 250:4,7 251:15,17 255:11 257:7 260:10,10 264:5 265:18,22 266:4,21,21 267:25 268:2,8,10 269:9 272:10 274:6,12,12 275:7 275:13 278:11,15 278:17,21 279:12 279:13 280:9 287:15 290:1 293:6 295:4 296:22 297:3,7,8 297:10,14,21 298:2,4,9,16,19,20 301:13,14 302:5 302:13,15 303:11 303:11,23 304:13 304:14 305:4,4 306:10,14 313:20 314:8,20 315:3 316:11 325:7,13 327:18,18 328:2,6 329:23 330:12,22 331:8,14 332:19 333:1,11 340:16 341:20,22 348:7,7 349:14 350:8,18 350:25 351:2,22 356:4,16 358:11

**rice** 320:9
**rick** 184:15 338:6 338:18 339:16,17 340:7
**rick's** 338:7,7
**rid** 203:8
**right** 185:14 188:9 198:8 202:17 213:7 238:20 251:20 252:15 260:17 272:24 278:3 284:1 289:4 289:5 290:2,13,25 291:7,13 293:6 294:23,24 295:4,8 295:9 296:2,10 297:13 298:10 300:6,16 301:22 304:6 306:16 311:19 316:24 322:2 324:12 325:6 330:19 331:10 332:16 336:18 337:6 341:20 342:6 345:8 348:2 352:6 354:20 355:2,6,10 355:17 357:2,3,8 357:13 358:20 362:24
**rights** 258:20 367:11
**ring** 201:25
**rise** 234:13
**rising** 337:9
**risk** 178:8,9,9,15 178:24 187:23 188:11
**risks** 178:6,11 186:24 187:2,9,10 314:20

**ro's** 260:2,2,21
**robert** 167:8,12 168:15 170:4 171:3,13,23 172:3 172:13,17,20 173:3,6,10,17,20 174:12,19 175:4 176:13 237:2 318:13 368:2 369:2,12,14,17 370:9,16
**role** 217:17 239:13 239:16
**rollbacks** 249:5
**ron** 171:17 174:16 184:16 185:6 208:4 209:23 212:14 293:15 345:18 361:19 363:13
**ronald** 170:16 171:10
**room** 353:20 367:8
**ros** 261:22
**roughly** 195:13
**routinely** 229:14
**row** 324:14
**rows** 324:14
**rude** 309:21
**rule** 370:20
**ruled** 364:23
**rules** 167:21 176:18,20
**ruling** 364:25
**rulon** 171:6
**run** 221:6,12 222:9 231:2 248:22 249:2 267:6 282:24 291:18 309:10

315:14 322:10,10 323:3,15 324:3 328:16 331:20,24 344:12 347:4
**running** 186:12 222:24 253:15 274:20 306:3,4,11 322:17 325:18
**runs** 322:16 323:15
**rust** 343:12
**rwallner** 168:19
**ryan** 168:21 176:9 176:9 182:18 206:10 216:1 218:21 226:22 243:14 250:10 271:1

**s**

**s** 167:14 168:1 169:1 175:1 294:5
**sadly** 241:7
**salary** 238:21 273:4,16
**salemen's** 305:9
**sales** 178:10 179:7 190:16 191:15 192:9,25 193:16 193:21 197:10 205:7,10 206:21 222:20 224:3,7,7 224:12 228:12 255:6 256:12 259:3 261:1 305:9 332:18 342:25 347:1 351:12 352:1,2 363:17,25
**salesman's** 205:4
**salespeople** 189:22
**salesperson** 205:13 206:18

263:20
**salespersons** 351:21
**san** 212:1
**sat** 305:14 308:15 308:21
**satisfactorily** 330:9
**saturday** 247:6
**save** 326:13 335:15
**savvy** 359:8
**saw** 185:13 197:22 232:11,14 311:17 315:24 345:6
**saying** 193:1,20,24 194:1 202:16 203:15 225:16 227:15 246:6 261:5 277:22 280:3 306:2 308:10 337:10 344:10 357:18 359:19,20
**says** 188:8,16 190:7 192:4 213:17 224:5,18 228:17 229:8 235:19,20,21 239:7,8 241:23 244:18 247:8 249:22 253:4 255:6 260:1,5 272:7 279:12,19 281:22 290:19 297:6 298:8 312:15 313:24 321:19 322:16 328:1 352:12 358:22
**scale** 187:8 347:6
**scenes** 239:23
**schaef** 296:20
**schaefer** 171:13 171:23 172:3,13 172:17,21 173:3,6 173:17,20 174:19 201:20 204:1 229:19 230:10,20 235:7,7,16 236:4 238:25 239:7 240:10 251:24 252:4 253:2 255:2 261:18 289:15 296:13 297:2 357:24 358:9,22 359:17
**schaefer's** 217:17 232:14,20 234:10 240:4,7 273:4,16 299:11 300:19
**schafer** 173:10 174:12
**schedule** 211:4 212:20
**scheduled** 322:9 323:8 324:1
**scheduling** 220:3
**science** 320:9
**scientific** 199:7
**score** 205:15 206:22
**scott** 169:7
**scrapped** 347:11
**scratched** 281:25
**scratching** 282:1
**screen** 197:2 246:19 341:2 344:2 346:10
**screens** 341:2
**screenshots** 252:13
**se** 353:19
**sea** 300:8
**seal** 369:21
**searching** 242:5
**second** 182:22,22 183:3 185:4 211:10 235:1,6 239:6 241:17,24 254:3 255:5 290:5 335:2 337:7 352:16 362:11,18
**secondly** 231:1 233:1 313:13
**secret** 304:13
**section** 352:22
**secure** 302:14,15
**security** 233:11,11 237:1 239:14 245:10,19,19 246:24 247:1,5,9 247:15,19,21 248:8,18 249:6,8 249:11,17 250:8 250:17,21 251:2,6 251:8,16 253:1 254:11 255:11 256:3,4,5,13 260:12 290:8 302:21,24 303:2 303:10,15,17,21 304:3,25 305:3,10 311:16,24 312:18 315:3,7 320:24 321:4,13 327:24 330:12,14 352:8 352:13,17,23 353:2,22,24 356:5 357:17 358:2,11
**see** 185:8,11,19 188:18 190:8,12 190:18 192:6,13 192:20 199:5 200:6,7,12 205:6 219:3 222:17 223:16,20,21,24 224:3,19,21 225:8 225:23 226:1,2 228:19 232:13 235:24 249:25 252:9 253:20 255:2 271:24 278:1 281:10 285:2,17 286:10 292:9 298:12,16 298:18 299:6 300:21 322:11 324:13 352:8,12 352:18 357:24 360:20 361:16 364:21
**seeing** 224:5 245:4 285:4
**seen** 195:16 196:5 196:6 200:4 213:13 218:12 230:8 323:24
**seesaw** 353:16
**sell** 182:23 193:10 193:14 196:12,14 198:2 243:20 244:1 271:5 297:17 311:13 343:8
**selling** 341:22
**send** 206:24 246:16,20 279:3 313:2 319:5 329:7 331:21

**sending** 280:7 318:22
**sends** 186:4
**senior** 208:5 222:6
**sense** 312:25
**sensible** 342:11
**sensitive** 227:22
**sent** 198:12 201:21 213:17 223:8 277:13,14 320:1 322:7 328:17 343:6
**sentence** 185:9 188:15 189:12 192:4 202:23 290:5 297:6
**separate** 273:23
**september** 171:7 171:10 184:9 322:8 334:1,2
**series** 246:14 322:2 331:24 365:16
**serious** 187:1,9,20 254:23 278:20
**server** 272:19,20 272:20,21,21 273:15 274:19,24 275:2,5,16,25 276:3,8 306:10,12 306:14 318:22 322:11,23,24,24 325:17
**servers** 182:5 273:24 306:23 307:7
**serves** 320:17
**service** 259:22 265:19,22 267:4 267:18 268:2,8 273:14 274:25 279:24 280:7 297:16,17,18 311:3 312:20,21 327:7 335:10,23 336:1,22
**services** 190:11 223:16 239:9,12 286:8 297:4
**set** 203:3 204:4 221:16 296:10 323:9 336:5
**sets** 187:16
**seven** 188:25 189:3 199:8,23 212:23 310:22,25 365:8 367:22
**shaken** 214:15
**shakes** 343:4
**shape** 304:6 346:6
**shauna** 167:17 175:11 370:13 371:17
**sheer** 187:4,8
**sheppard** 169:3 176:6
**sheppardmullin....** 169:5
**shocking** 316:6
**shook** 338:6
**shoot** 308:6
**shop** 267:6
**shopping** 205:15
**short** 199:17,19 210:5 237:7 240:19 245:5 287:2,8 312:15 320:3 321:2,6,11 325:25 366:19
**shorten** 335:17
**shorthand** 167:18 370:13
**shortly** 345:9
**show** 183:25 201:8 213:11 218:4 221:17 222:19 228:14 230:2 234:19 237:15 241:1 244:21 247:25 252:4 254:16 256:21 259:5 262:22 263:19 268:20,24 271:15 276:16 281:12 284:10 288:6
**shown** 191:5,20
**showroom** 263:19 298:13
**showroommagnet** 263:9,13,16 264:1 264:6 298:1,13
**shows** 322:9 323:8 323:13
**shut** 306:24
**sic** 289:23
**side** 207:12 224:18 341:7 344:1
**sign** 324:2 334:10
**signature** 170:8 369:1,13 370:21 371:1,15
**signed** 184:16 205:13 226:13 340:12
**significant** 190:16 191:15
**signs** 199:3
**silver** 204:25
**similar** 217:22
**simple** 288:9 331:18 332:4,6 334:25 338:19
**simplest** 312:24
**simply** 198:1 270:8 305:12 317:16 326:15 342:10
**single** 364:9
**sir** 300:17 316:20
**sis** 325:7 353:25
**sit** 202:1 211:19 274:2 344:1 351:16
**sitting** 183:23 242:4
**situation** 188:11 201:24 203:5 204:2 208:19 263:25 304:3 307:20 309:10 310:15 319:13 320:17 326:7 327:13 343:24 353:5 354:22 355:4,5,12
**situations** 178:17 191:22 195:10 251:22 274:14 345:2
**six** 212:23 284:23 285:7 300:4
**size** 187:4 188:5 262:17 294:16
**sizeable** 318:21
**sized** 262:18
**skill** 310:17
**skipped** 318:7
**sky** 324:5
**skype** 213:4
**slight** 185:7,11,17
**slot** 332:5
**slowing** 306:22

**slowly** 306:3
**small** 221:9 227:22 231:2 263:21 269:18 297:11 298:5 313:7 334:22 346:8 359:7
**smaller** 188:3 359:5
**smart** 317:25 337:14
**smoothly** 180:1
**snail's** 336:24
**snapshot** 309:4,6
**sniffed** 296:7
**software** 178:17 178:18,19 179:20 179:25 181:16 187:20 194:10 202:25 203:1,3,9 203:10,12 213:6 219:12 231:17,23 246:5,10,11,12 257:23 258:6 261:14,15,20 266:11 267:25 268:3 276:9,10 282:22,25 283:4 283:10 286:1 295:19 297:19 303:15 306:10 307:6 308:25 313:16,20,22,25 314:7 315:3 331:24 333:9 335:6 339:4,4,5 347:18
**sold** 193:5,6 223:1 297:10 346:13
**solution** 223:16
**solutions** 324:23
**solved** 279:12
**somebody** 203:6 207:19 209:1 225:10 227:19 244:14 245:13 246:17 261:18 279:12 291:4 292:11 308:5,8 310:24 326:10 350:10 353:6
**someday** 239:23
**somewhat** 188:22
**son** 318:14 320:2,8 355:3,8
**soon** 351:10
**sophisticated** 279:20 359:4
**sorry** 177:12 184:20 186:20 195:24 209:20 223:22 225:4,18 232:21 245:4 250:24 266:2 272:14 285:10 316:20 329:2 330:2 356:10,11 356:11 360:9 363:9
**sort** 189:24 228:2 300:8 333:1 348:5 353:20 359:11
**sounds** 189:2 227:20 315:23
**source** 180:21 295:20
**space** 325:3
**speak** 200:3 207:21 209:18 284:7
**speaking** 267:20 351:21
**special** 212:7 257:22 261:10
**specific** 213:2,16 213:24 249:6,20 250:11 264:9 284:4 306:4 324:3 330:14 357:17 359:10
**specifically** 190:1 190:2 207:15 208:12 233:11,15 235:11,19 239:21 245:22 254:1 257:12 284:7 286:21
**specified** 216:23
**specifies** 257:11 312:21
**speculative** 357:7 357:10
**speech** 312:7 353:21
**spelling** 189:21,23
**spend** 222:12,12 285:22 302:24 311:2 339:17
**spending** 303:24 317:15
**spent** 356:5
**spin** 311:14
**spite** 193:19
**split** 365:8
**spoke** 208:7 209:12 287:15
**spots** 324:15
**square** 168:11
**sta** 222:22
**staff** 183:8
**staffs** 359:3
**stamped** 184:5 201:12 218:9 230:4 241:14
**stand** 183:14 189:18 191:8 226:16,19 227:3 229:3 233:9,16 235:22 236:2,6,22 330:8 344:24 348:15 361:13 363:13 367:4
**standard** 182:12 193:4
**standardize** 335:21
**standardized** 182:20
**standards** 179:11
**standing** 299:25
**standpoint** 191:4 220:16,24 222:24 230:15 231:2,13 244:11 261:1 273:9 296:5,5 303:2,21 304:3 307:22 312:10 321:8 335:5 341:23 342:9 363:18
**start** 177:7 241:24 264:15 267:15 285:6 290:14 319:11 334:23 347:17
**started** 176:17 205:25 206:1 300:4 305:25 306:1,7 317:15
**starting** 185:18 239:14 304:11

**starts** 312:10
**stat** 195:15 199:5
**state** 167:18 175:15 189:8 254:10 303:18 369:15,23 370:14
**stated** 167:22 187:14 267:25 285:22 288:20 357:16
**statement** 180:8 181:6 183:13 187:2 188:20,21 189:6,8,15 190:21 190:24 191:8,25 200:6 208:14 230:19 249:19 267:12 288:8 295:7
**statements** 222:8 234:2,4,8 300:19 367:10
**states** 167:1 175:6 358:12 370:1
**stating** 363:18
**statistical** 191:4
**statistics** 191:11 191:20 222:23
**stats** 191:4
**status** 363:4
**stay** 241:5 276:24 340:9 365:14
**stayed** 256:8
**staying** 246:17
**stays** 200:9
**stealing** 319:19
**step** 220:9
**stepped** 309:16
**steps** 366:24
**steve** 212:14 213:2 289:22 292:4,6 314:25 345:19
**stick** 198:19 300:14 342:9
**sticky** 342:6
**stock** 186:11,12
**stockholders** 292:5
**stole** 346:10
**stop** 236:23 279:25 280:7 308:23 347:7
**storage** 274:12 275:6,24 276:13
**store** 253:13 276:6 276:11 323:11,12 323:12
**stored** 351:1,3
**stores** 275:12 323:10
**stories** 339:3
**story** 255:18 309:21 334:21
**straightedge** 225:10,24
**straightforward** 198:3 261:7
**strategy** 354:25
**strawsburg** 172:10 173:14 174:3 208:9,10 214:25 218:24 219:8 257:16
**stray** 244:10
**street** 168:11,22 175:13
**strike** 197:24 221:14 225:3 294:3
**string** 277:11
**strong** 347:20
**structure** 187:18 335:13
**stuff** 308:13 310:22 311:12 340:13 344:6
**stupid** 279:10 299:8,9 309:23
**styled** 167:15
**stylus** 197:2 341:7 344:4,11
**subject** 230:13 236:25 242:1 245:15 252:25 269:23 293:16 296:13 353:2 367:10
**subscribed** 369:19 371:11
**subsequent** 220:22 269:8 281:7
**subsidiaries** 168:8
**substance** 283:15 299:20,21 351:20
**substantial** 262:13 264:14 292:24
**substantially** 348:15
**subtly** 290:24
**success** 205:17 223:4 231:16 337:20
**successes** 239:22 239:25
**successful** 207:9 231:14 246:8
**sudden** 347:17
**sue** 301:13
**sued** 299:18 301:13 346:17
**suffer** 281:2
**suffered** 236:11 367:6
**suite** 167:20 168:5 168:11 169:4 175:13 278:11
**sum** 283:15 351:20
**sumner** 168:11
**super** 211:25
**superior** 324:17 324:23 333:18,21
**supervise** 272:22
**support** 232:3 249:14 253:7 282:10 305:8 333:16
**suppose** 177:23
**supposed** 181:13 235:23 241:10 301:21
**sure** 178:17 184:22,23 202:10 208:11 215:21 224:5 240:10,11 247:17 249:3 272:23 280:12 311:18 324:1 327:1 358:7 363:3 365:25
**surprise** 195:17,22
**surprised** 205:9 226:25 305:13 356:2,3
**surprising** 192:5
**suspended** 255:7 255:11,20,21 256:14
**suspension** 255:4
**suspicious** 246:2
**swear** 176:12 344:24

**switch** 177:10 330:22,24 331:2 331:14 334:16,17 334:19,20,21,22 340:1,3 345:8
**switched** 334:14
**switches** 177:14 178:3,11,11 180:12,19 196:9
**switching** 180:4 181:2 332:25
**sworn** 167:14 176:14 370:17 371:11
**sync** 242:2,7,11
**synchronization** 242:2,11 244:6
**synergies** 294:18
**system** 180:24 181:4,14,18 183:15 199:14 248:13 258:1 263:17 266:21 267:4,18 268:8 273:23 293:10,12 296:6,8,9 302:14 302:16 303:10,19 306:3 311:16 313:1,16,17,21 314:20 317:17,20 323:18 325:7 327:10,13,18 328:11 331:23 336:12 337:5 341:21 344:5,12 346:9 347:1,2 348:11 349:10 353:6,8
**systems** 167:4 175:6 219:17 220:7 229:4 236:24 292:25 297:12 304:11 306:8 335:6 370:4

**t**

**t** 318:13
**tab** 332:5
**table** 188:4 282:15 341:8 344:2
**tadler** 168:16 175:18,20
**tag** 243:20
**take** 177:2,3,5 180:4 183:8 187:11,11,21 188:8,13,14 210:2 220:2 231:17 240:14,15 241:8 257:3 260:1,20 261:21 263:20,23 276:22 298:7 303:5,5 309:2,4,5 317:19 318:10 321:13,20 325:20 333:8 344:25 345:5 364:9 365:5
**taken** 167:14 371:8
**takes** 193:10 194:6 196:25 205:5 220:3 228:2 254:2 272:22 274:22 302:20 344:4
**talk** 204:4 211:20 213:3 219:19 233:10 255:4,9 263:19 266:8 270:5,6 276:23 290:13,16,25 291:4,8,13 303:6 316:10,19 317:1 320:11 340:15 348:6
**talked** 209:16 257:6 273:6 292:17,20,20 316:9 327:16 328:11 330:19 336:9 338:2,5,15 361:5
**talking** 210:15 226:9 242:6,6,8 245:6 256:13 291:8 305:21 311:3 316:10,22 316:23,24,25 326:5 338:8 341:25 342:14 346:1 358:10
**talks** 190:3 202:24 248:21
**tap** 341:11,13
**tape** 220:5,5,17 274:21
**taught** 187:18 290:15
**tax** 296:4
**team** 217:17 223:11 237:25 238:1,10,13 239:1 239:2,2,9,12,17 240:4,4,7 338:17
**teams** 237:20,25 238:1
**technical** 305:8 340:25 341:23
**technicians** 336:24 337:11
**techniques** 196:24 248:12
**technology** 325:13
**techs** 337:8,18
**telephone** 167:17 213:6 214:12
**telephonic** 211:7
**telephonically** 168:15
**tell** 183:1 217:15 227:4 241:3 242:22 300:7 304:23 309:7,16 319:6 350:13 360:1 361:4 365:14
**telling** 344:10
**temporarily** 203:22
**temporary** 249:5 249:9,16
**ten** 188:24 200:4,5 366:25 367:2,4,8
**tend** 211:19 213:23
**tends** 212:5
**tens** 281:9
**tenure** 200:9,16 201:5
**term** 178:4 199:17 199:19,20 230:15 231:16 321:2,6,11
**terminals** 347:4
**terminate** 297:3 299:11
**terminated** 258:11 258:14
**termination** 258:10 334:7
**terms** 177:24 267:14 271:3 274:4 301:2,25 302:1,16 311:1 320:18 342:1 350:7

**terrible** 304:4
**terry** 249:22
**test** 263:18,20,24 298:7 367:7
**testified** 176:14 219:6 221:22 248:11 302:4 351:20 354:12 356:1
**testify** 367:15
**testimony** 356:6 370:18
**tests** 333:8
**texas** 167:18,20 168:5 175:14 370:14
**thank** 237:2 241:13 265:9 266:24 284:22 289:21 300:6 354:7
**thanks** 225:24 300:3
**theoretical** 273:9
**therefor** 371:2
**theron** 171:3 176:13
**thing** 187:5 189:24 221:13 228:2,4 238:20 261:10 278:14 299:9 316:13 334:6 337:15,19 347:12 353:20 354:25 359:12
**things** 196:6 221:6 231:22 236:14 245:25 248:19 273:19 274:4 278:7 290:24 291:14,18 299:7,8 302:3 303:5 313:11 320:11 327:5 337:6 343:9 343:9 345:24
**think** 177:23 180:7,21 181:23 182:21 183:12 186:6 188:21,23 188:24 189:8 190:22 191:19 196:19 204:17 206:13 207:18 209:21 210:14 213:1,5 214:13,20 216:2 217:18,19 218:5 226:23 227:2 228:16 231:22,25 240:6 245:12,12 252:14 256:4 264:13 266:16 273:18 274:2 277:14 280:3 283:7 286:15,21 288:24 292:3,4,22 294:3 294:12,20 298:22 299:19,21 300:10 304:2 310:22 314:7 315:4 317:20 318:5 319:14,21,22,23 320:24 324:20,22 326:6 327:2 329:3 333:20 337:3 339:23 342:9,12 342:19 357:5 361:4 363:11,18 366:5
**thinker** 321:12
**thinking** 329:9,14
**third** 201:17,18 202:13 211:11 219:3 223:23,24 227:1 245:24 253:23 257:4 261:6 266:4,5,19 267:1,8,14,18 268:6 283:23 299:4 309:22 312:20 313:24 314:4 315:6 326:21 327:19,25 328:7 349:15 353:3
**thought** 189:25 229:22 269:7 308:22
**thousands** 281:10 308:20 311:3
**three** 181:24 182:1 211:6 214:6 262:9 286:5,7 320:3 324:16 335:14 365:16
**throat** 365:17
**throw** 229:13 307:7
**throwing** 279:24 291:23
**thrown** 232:1
**thumb** 221:9 331:22
**thumbed** 286:15
**tight** 248:19 249:3 303:20
**tighten** 193:13
**time** 177:2 185:2 185:23 186:7,12 198:23 201:6 202:17 203:18,23 209:25 210:3,6 212:8,11 213:2 214:5 215:15 216:9 218:10 220:13 223:19 224:19 228:1 230:5 233:22 237:6,9 239:14,16 240:17 245:21 247:11 249:7 251:15,17,19 255:7,25 258:1 259:21,22 260:16 260:21 261:9,13 261:16,22 262:24 265:11,14,19,23 266:5,20 267:9 268:13 270:3 277:8 280:21 281:10 282:21,24 283:8,19 284:2 285:13,15 287:9 288:24 289:3,3,25 300:2 305:1,7,7,9 309:11 320:16 323:2 324:3 325:8 325:11,24 335:15 336:8 339:18 345:3 350:5,14 354:7 359:14 360:4,6,8 364:2,3 365:15 367:5
**timeliest** 258:2
**timelines** 269:5
**times** 180:9 203:6 211:6,15 212:23 273:6 322:18 328:6 344:18
**tire** 343:10
**title** 186:15
**titular** 186:9

**today** 170:16 175:2 176:20 177:7 199:3 287:15,23 295:12 295:18 355:21 361:16,21 367:10 367:15,16
**today's** 368:2
**todd** 168:10
**told** 291:6,9 304:25 305:19 347:1 360:10
**tom** 213:7 242:13
**tommy** 174:3
**tomorrow** 216:25
**top** 190:7,9 191:1 223:15,17 258:8 260:1 264:1 272:24 281:22 284:24 285:6,8 303:3 322:7 337:10 351:21 357:23
**topic** 177:8 327:16
**topical** 363:18
**topics** 360:6,7
**total** 220:15 286:9 305:14 311:24 352:5 361:6
**totally** 303:20
**toyota** 335:3
**track** 177:9,15,19 177:25,25 200:8 228:11 229:14 230:22,24 233:16 255:4,9 272:10 296:4 328:20
**tracked** 228:21
**tracking** 308:1
**tracks** 188:16,25
**trade** 343:3
**traffic** 278:18
**trained** 188:13
**training** 187:14 188:1
**trampling** 306:17
**trans** 197:9
**transact** 307:12
**transacted** 307:17
**transaction** 197:10 205:20 206:20 268:10 269:14,23 270:2,9 270:12,15,18,21 271:22,25 294:13 326:8,15,23 344:3 344:14 346:16
**transactional** 264:2
**transactions** 197:12 205:10 273:21 308:1 309:13,18 310:6,8 326:24 327:3 344:16
**transcript** 311:17 370:17,25
**transferred** 183:5 183:10 336:6
**transmit** 328:18
**transmitted** 278:19 318:24
**trashed** 306:21
**treat** 350:10
**tremendous** 335:16
**tried** 200:15,18 292:8 333:5
**trim** 204:22
**trip** 238:12,17
**trouble** 202:17
**true** 189:9 190:23 191:5,7,7,21 259:4 282:5 286:22 337:10 369:13 370:18
**truthful** 184:11 218:19 252:23
**try** 184:11 193:14 246:22 252:23 269:19 276:24 277:6,12 310:21 333:22 361:18,20
**trying** 185:13 186:3,18 206:15 242:21 252:9 321:18 358:12
**turn** 216:14 246:8 284:16 333:25
**turned** 290:16
**turnover** 179:2,6,8 179:10,13 180:12 180:16 190:18 191:1,17 209:22
**twice** 212:22 238:3
**two** 179:1 181:21 181:24 182:1,24 187:6,21 190:17 191:16 194:7 212:13 226:11 243:17 252:13 254:9,9 255:19 256:2,4,13 304:1 324:16 325:10 335:13 349:19 350:10,18 360:16 361:5 365:9,16
**type** 203:11,11 204:21 206:20 221:22 222:15 268:5,7 291:18 292:6
**types** 205:1 290:12
**typewritten** 281:25
**typical** 182:13 196:23 197:11 336:18 344:15
**typically** 182:9 193:5 199:7 203:13 211:1,18 219:21 323:25 335:13 342:23 344:13
**typing** 335:15

**u**

**u.s.** 246:21
**ucs** 303:16 304:13 314:7
**uh** 300:23 345:12
**ultimate** 270:24
**ultimately** 251:9 253:3 353:13
**unable** 305:18 353:8 367:7
**unattached** 322:9
**unattended** 324:11
**unaware** 363:5
**undercoating** 343:14
**undercoats** 343:14
**underneath** 190:10 258:22
**understand** 176:23,25 177:12 211:25 222:4 230:18 231:4,21 239:19 245:8 248:25 266:17 273:8 316:10 321:19 337:18

350:1 358:7,12 365:5 367:23
**understanding** 215:12,20 275:9 281:1 367:9
**understands** 204:1
**understood** 248:24 350:5
**unequivocally** 348:9
**unfair** 326:19
**unfortunately** 309:10 336:8 343:16 367:7
**unhappy** 320:16 322:23 334:6
**unique** 335:11
**uniquely** 357:11
**unit** 194:14
**united** 167:1 175:6 370:1
**universal** 182:10
**university** 320:9
**unknowledgeable** 316:8
**unlimited** 313:23 366:3,4
**unprintable** 312:5
**unprofitable** 232:17
**unsatisfactory** 180:17
**unsolicited** 291:2
**unusual** 315:16
**unwritten** 216:20
**update** 269:20 327:6,7
**updates** 255:7
**updating** 266:12
**upgrade** 185:18 258:2
**upset** 253:6 279:4
**upshot** 336:9
**usage** 203:9 253:20,23
**use** 178:4 195:18 196:15 203:7 227:23,23 246:4 248:12 264:6,11 275:12 276:4 293:2 297:11,18 312:19 313:25 314:4 324:11 329:15,15 333:9 340:22 354:19
**user** 197:1 323:8 330:11
**users** 182:22 329:4
**uses** 267:5 293:9
**usual** 180:16
**usually** 211:24
**utilize** 293:11
**utilizing** 264:1
**uttered** 230:16

**v**

**vain** 320:18
**valid** 249:15
**valuable** 242:17 243:8
**value** 343:3
**variable** 333:6
**variance** 223:20
**variants** 230:16
**varies** 183:12
**various** 330:11
**vastly** 304:7 320:20
**vault** 274:21
**vaulted** 311:12
**vauto** 294:22 295:22 296:6,9
**vehicle** 197:10 204:21 205:20 221:7
**vehicles** 193:6
**vendor** 168:8 221:10 257:4,8 259:1
**vendors** 257:7 268:11 269:23 270:13 348:11
**venture** 204:8 207:11,21 208:17 215:11
**verbally** 341:17
**verified** 220:10 367:6
**veritext** 170:19 175:10,12
**versus** 224:8,23 225:22 309:12
**vice** 169:8 208:5 222:7
**victory** 347:11
**videographer** 169:9 175:2,10 176:11 210:3,6 237:5,8 240:17,20 265:10,13 287:6,9 325:23 326:1 366:17,20 368:1
**videotaped** 167:8 167:12 370:9
**violation** 232:12 232:13 313:18
**vision** 225:11
**visit** 204:24 344:25
**vol** 167:8
**volume** 167:13 370:11
**voucher** 298:6
**vps** 352:1,2

**w**

**w** 353:20
**wailing** 337:12
**wait** 227:13 290:7
**waiting** 236:5
**wake** 319:15
**walk** 204:23 310:18
**walked** 338:4
**wall** 324:10
**wallner** 168:15
**want** 183:2 193:8 198:16 202:16 203:8,9,10,16 204:4 233:15 243:25 246:7,25 255:17 264:17 282:23 283:25 284:1 287:3 288:6 290:14,22 291:7 304:10 309:12 318:25 324:3,18 327:6 333:23,24 341:8,15 343:1 344:6 347:22 348:5 353:3 364:9
**wanted** 177:7 245:20 290:16,21 290:25 291:13 311:18 315:16 329:7 336:7 339:17,23,23 340:22 358:3
**wanting** 290:12
**wants** 291:4 321:2 321:3,3 359:17
**war** 353:17,19,20 353:24

**warned** 343:18
**warning** 341:5
**warranties** 343:10
**wars** 352:8,17,23
**washington** 168:12,22 169:5
**wasted** 346:17
**water** 304:1
**way** 182:23 187:22 193:17 200:11,20 203:19 222:16 223:3,3 227:16 231:8,15 233:1 236:16 246:8,22 256:18 261:19 263:22 267:22 272:11 278:8,9 279:20 288:20 299:21 303:21 312:5 317:17 329:14 335:23 350:14 353:12 361:8 364:1,2 367:23
**we've** 203:2 223:1 223:1 256:22 260:9 283:17 299:17 303:1 306:4 314:13 315:8 325:20 326:13,13 330:19 338:22 340:20 345:6 359:9 361:5 367:23
**wedgworth** 168:15 170:5,7 175:17,17 176:16 177:13,20 178:9 178:25 179:12,21 180:3,11,18 181:1 181:7,20,25 182:4 183:4,19,25 184:4 184:8 186:3 187:10,25 188:15 189:10,16 190:6 191:14,24 192:4 194:5,17 196:8 197:24,25 198:7 198:11,17,24 200:8,21,25 201:8 201:12,14 202:12 202:19 203:20 204:15 205:21 206:1,7 207:10 208:6 209:17 210:2,9 211:21 212:10,15 213:11 213:25 214:9 215:6,10 216:3,7 217:7,10,16 218:4 218:8,23 219:15 220:19 221:14,16 221:21 223:5 224:7,14,22 225:2 225:5,13,19,22 226:10,18 227:5 227:11 228:14 229:15 230:2 233:15,23 234:1,9 234:15,19,23,24 236:17 237:4,14 240:14,25 241:7 241:12,14 243:4 243:11 244:12,20 244:24 247:25 249:18 250:12,16 250:20 251:1,7,14 252:4,22 254:5,15 254:20 255:17 256:1,12,21 257:15 258:8,25 259:9 260:20 261:21 262:4,14 262:22 263:25 265:1,6,8,17,24 266:2,13,19,24 267:19 268:9,14 268:18,24 269:13 269:22 270:7,17 271:10,15 272:1 272:10,14 274:6 274:11 275:11,18 275:21 276:4,16 277:6,14,17 278:21 279:11,16 280:2,9,16,23 281:3,12,19 282:5 282:9 283:19 284:3,14,20,23 285:2,6,20 286:13 286:23 287:2,12 287:20 288:1,6,17 288:23 289:6 300:10 301:4,10 301:15 302:6,8,11 302:17 303:12 304:15,21,24 305:5,23 310:1,11 311:5,21,23 312:3 312:8 314:6,16,22 317:5,13 318:18 320:6 322:5,15,20 324:24 325:9,14 326:8,25 327:11 327:20,22 328:3,8 328:13,24 329:10 329:20,24 330:1,6 330:10,13,17 331:4,11,16 332:8 332:15,22 333:2 333:13,19 334:4 334:12,18 339:11 340:2,11,17,24 342:1,5,7,17 345:14 346:3 347:24 348:8,13 348:18,22 349:2,7 349:11,16,20,25 350:12,22 351:4,8 351:12,15,23,25 352:4,10,19,25 354:2 357:15 358:9,19 359:16 360:2,5,13,18,23 361:9,12,19,23 362:4,7,8,15,18,22 363:6,24 364:1,6 364:15,20 365:20 365:24,25 366:4 366:12,15 367:11 367:20,25
**wednesday** 238:7
**weeds** 276:22
**week** 255:8
**weekend** 212:1 250:22 336:16 364:16
**went** 188:13 214:7 251:19 296:7 306:24 308:24 334:25 337:13 338:2 346:22 360:6
**westmark** 346:24
**whale** 258:3
**whatnot** 346:18
**wheel** 343:10
**whirl** 277:2
**widely** 318:6
**wilkinson** 168:3 176:4,4
**willie** 249:22
**willing** 197:17 367:3

**win** 239:1 240:4
**wind** 290:1 329:22
**windows** 190:2
**windshield** 343:11
**wise** 228:25
**withdraw** 367:1
**withdrawn** 251:9
**witness** 167:13 168:2 169:2 176:8 176:12 243:14 300:23 316:21 345:12 369:2 370:16,19
**witnesses** 364:4
**won** 240:7 346:22
**wonder** 225:10 322:16
**wood** 254:13
**word** 267:24 306:16
**words** 248:14 320:3
**work** 182:20 205:6 207:2 219:16 266:9 293:3 294:23 295:8,11 295:12,15,20 304:8 323:23 326:13 335:17 337:1 347:5 353:12
**worked** 203:25 315:1 347:2,3,3,7 347:9,9,9,10 350:6
**working** 195:8 347:8
**workman** 171:17 208:4 209:13,23 212:14 213:17,19 345:18
**works** 214:25 278:8,9
**world** 204:18 249:1 320:25 350:15
**worried** 321:9
**worries** 319:18
**worry** 315:5
**worrying** 320:18
**worse** 280:22
**worst** 323:23 324:11 325:1 354:5
**worth** 208:21,22 255:16 325:11
**worthy** 253:19 254:3
**write** 185:6 202:4 219:1 230:10,13 230:14 235:2,8 241:21 242:20 245:2,8,9,16 252:18 253:18 254:24 255:2 256:25 258:9 259:12 261:21 270:4,13 271:10 271:18 277:3,7,19 290:6,22 291:7 294:19 307:5 308:15 310:4 326:11,18,24 327:3 354:24
**writes** 186:19,20 186:25 188:16 189:4 190:15 239:1,7 241:25 242:9 257:16 279:17 298:15
**writing** 218:20 261:15 297:2
**written** 189:9 245:13 361:25
**wrong** 188:13 248:16 317:17 319:10 339:6,7 360:17
**wrote** 184:9 185:8 185:23 191:8 201:20 230:20,22 235:6,7,16 245:5 245:12 248:5 252:23 255:15 294:24 299:13,14 332:18 355:8 356:2 363:13,16
**wyler** 358:14,15 359:5

**x**

**x** 370:22
**xtime** 268:16 269:7,8,21 270:6 305:18,22 306:16 309:21 326:5,7,11 354:13,14,19

**y**

**yeah** 203:22 213:24 250:1,5,5 252:1 256:16 265:7,8 266:25 278:25 288:20 320:3 329:15 342:8 354:22 363:16
**year** 179:1,8 190:17 191:16 192:9,13,16 196:4 211:6,17 212:22 212:23 213:8 224:23 225:7,23 238:3,5,23 270:20 271:8 272:9 284:20 321:5 330:3,4 337:17 340:12 346:18
**years** 180:4 181:21 187:11 188:9 194:7 196:5 199:8,8,10,23 200:4,5 201:7 214:6,6 222:16 225:11 231:17 233:12,14 236:12 236:25 239:8 254:9 262:9 291:17 310:22,25 314:8,9 320:12 322:25 330:4 337:12 339:15,16 345:21,23 346:7 347:10,16 353:4
**yesterday** 176:18 176:19 194:12 208:13 221:21 226:12 228:15,16 248:11 292:17 300:8
**york** 168:18,18
**young** 290:12 338:9
**ytd** 174:9 286:8 288:8

**z**

**zip** 175:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:   THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.   PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**From:** Bob Brockman <bob_brockman@reyrey.com>
**Sent:** Friday, November 16, 2018 6:00 PM
**To:** Captain M/Y Albula

**Follow Up Flag:** Follow up
**Flag Status:** Completed

Tom

Just checking in – my incredibly busy fall season is just about over.

How are things with the Albula?

Is the time slot starting the day after Christmas open for a week or so?

Bob

PS: would you look up the dates of the fishing trip to the Berry Islands that were spring before last. Those tides and the resulting fishing were awesome.

PPS: are the water depths in Biscayne Bay deep enough for the Albula?

PPPS: How long is the trip from West Palm to Bimini? Are the waters rough when crossing the Gulfstream? Is there decent anchorage in Bimini

**From:** Bob Brockman <bob_brockman@reyrey.com>
**Sent:** Saturday, February 02, 2019 8:30 PM
**To:** Captain M/Y Albula

**Follow Up Flag:** Follow up
**Flag Status:** Completed

Tom,

Please send me the plan for the two trips this spring.

Important points-

Arrive in Ft. Lauderdale to begin the trip (Day 1)
Global crew fly home commercial

Depart for Chub Cay area that afternoon – traveling overnight (Day 1)
After arrival and breakfast – start the first day of fishing (Day 2)

Second day of fishing (Day 3)
Third day of fishing (Day 4)
Fourth day of fishing (Day 5)
Fifth day of fishing (Day 6)

After the 5th day of fishing – depart for Ft. Lauderdale traveling overnight
Arriving on (Day 7)

The start dates should be as you have figured out based upon the tides.

Bob

**From:** Bob Brockman <bob_brockman@reyrey.com>
**Sent:** Friday, March 15, 2019 1:57 AM
**To:** Captain M/Y Albula
**Subject:** RE: Albula - April Chub Cay trip

Tom,

Please talk to Charlie about the date changes.

It will also cause the Dayton trip that just precedes our trip to move forward a couple of days.

If it is possible to land at Chub at the beginning of our trip and at the end – that would be great.

Charlie will likely fuel manage the trip so that on the trip home – so that we are light – which enables the Global to climb like a rocket.

Bob

---

**From:** Captain M/Y Albula [mailto:captain@myalbula.com]
**Sent:** Thursday, February 14, 2019 8:45 AM
**To:** Bob Brockman
**Subject:** Albula - April Chub Cay trip

Good morning Bob,

Apologies for the delay in further feedback – I am battling to get hold of Percy to confirm the date shift for the guides, but am confident that we will make a plan. We have the Bonefish and Tarpon Trust onboard again at the moment, and they have given me a great database of more guides for the Berries if we have a hassle.

I know that we were planning to start and finish these trips in Fort Lauderdale, but after looking into it further we have the following challenges:

1. Customs and Immigration in Lauderdale can be a challenge. They do not come to the Yacht, we have to go to them. They also are closed on Saturdays/Sundays and public holidays (So I have to assume they will be closed on Good Friday).
2. The Marina will not guarantee that we can get a berth that we can get onto on all states of the tide – this could influence our departure/Arrival and make things tight is we are delayed for any reason and we miss the high tide.
3. We have the challenges of weather in the Gulf Stream for the crossing to the Berry Islands.

I have spoken with Charlie – he is happy to fly into either Chub Cay (we have cleared in and out of immigration here and it is really easy) or Nassau (where he could leave the plane, same as our trip in 2017).

Looking forward to hearing your preferred option, Charlie and I will make the necessary arrangements.

Kind regards

Tom

**From:** Bob Brockman <bob_brockman@reyrey.com>
**Sent:** Tuesday, February 12, 2019 8:31 PM
**To:** Captain M/Y Albula <captain@myalbula.com>
**Subject:**

Tom,

Dorothy has pointed out to me that the dates for the first trip conflict with Easter (3/21).

Therefore I need to move the trip ahead 3 days so that the last day is 3/19 so that we get home on Good Friday.

Please confirm that this can be done.

Please talk to Charlie.

Bob

Message

**From:** Bob Brockman [redacted]
**Sent:** 2/13/2020 8:46:16 PM
**To:** 'tommyb[redacted]
**Subject:** RE: GoMoto

Tommy

Your comments are valid.

This is a young entity that is barely a company. That would indicate that they don't have a lot of history to dig thru – so we don't have much risk of buried bombs.

As far as paying too much – probably so.

The trade off is that we got a product that would taken us as much as a couple of years or more to define – and then reproduce.

With the slowing of new car sales, the focus will be even greater on the service department – however check in time on service customers is a barrier to more service business unless new facilities are built.

Therefore [redacted] is much more timely than usual – helping service sales keep up their profits up without having to have more people and resources.

One of your first stops at the display should be listening to the [redacted] story.

Bob

---

**From:** tommyb[redacted]
**Sent:** Thursday, February 13, 2020 12:21 PM
**To:** Bob Brockman
**Subject:** FW: [redacted]

Based on your comments from other acquisition fast is not always the best strategy – did we over pay..?

Do you have an opinion on this deal..?

Tommy

Message

**From:** Bob Brockman [REDACTED]
**Sent:** 3/1/2020 9:57:01 PM
**To:** 'tommy_[REDACTED]
**Subject:** FW: See financials and Fact Sheet to Bob

Tommy,

One of my concerns is that the key to keep the sales department from running over everyone else – is people like Schaefer and Agan before him.

Management of sales decision making is one of the most complex things that I have to teach you about.

It cannot be done quickly – as the education is focused on many, many situations – what is happening, what should the response be to the situation at hand?

Right now Schaefer is the most knowledgeable about the above rules and policies.

Rudy is the most adept at trying to find a way around the rules – which is a source of friction between the two.

Unless the situation is that Schaefer is clearly not following my rules and policies – the decision must go Schaefer's way. Otherwise Schaefer will become "broken" and give up trying to keep a lid on sales people – which will cause Sales to run amok.

If sales doesn't like a decision – let them endeavor to make their case – in writing and only with you – Rudy should not be allowed to try to move Schaefer around on his own. Then it is an educational opportunity for you and me to discuss.

Right now Schaefer undoubtedly feel like a lonely soldier. He was assigned his task. He is following my orders and what I taught him. He is dug into his position quite correctly. For sure he wonders what is going on and what is happening to him. When there are different orders and rules, he will follow orders – unless it involves giving salesmen a free pass to do whatever they want – which in his heart he would believe that to be insanity.

Bob

---

**From:** tommybarras@reyrey.com [REDACTED]
**Sent:** Saturday, February 29, 2020 8:41 AM
**To:** 'Bob Brockman'
**Subject:** RE: See financials and Fact Sheet to Bob

Bob

I hope the outcome is positive – begin to change your opinion. Only time will tell.

My comments on ExCom – Willie, Santana, Rudy sat together to build game plan (Willie is really good). The pro's and con's (the discussion) was as you envision. The "white boarding" laid out the game plan and our expectation for Rudy to follow. Very positive event – all are in agreement on the points we must have in order to have a deal. Without those we walk away

Other issue: Rudy and Schaefer at each other's throats. The negativity is not productive – both just want to battle to show up the other. Both want you to see them as the key to the future – the other must fail in order to accomplish. There is no middle ground.

Be best if you didn't intervene. I talked for a couple hours with Schaefer, an hour with Rudy. Their fighting is only hurting Reynolds – the game to prove to you who's best should not be addressed by you. Do not fan the flame – ignore it and hopefully they will get the point

Tommy

---

**From:** Bob Brockman [redacted]
**Sent:** Friday, February 28, 2020 6:52 PM
**To:** tommyb[redacted]
**Subject:** RE: See financials and Fact Sheet to Bob

Tommy

I think that it is too early to declare a "win" on this.

The OEM's are notorious for being flakey. They are just apt to say "we want to buy" – but at half the price we are proposing.

Then they get bitter that "we would not cooperate".

Another interesting outcome is that with us involved in the project – we are well positioned to get all the blame if the project doesn't work out to their satisfaction.

I have been seeing all of this happening for the last 30 years or so.

Bob

---

**From:** tommyb[redacted]
**Sent:** Friday, February 28, 2020 10:10 AM
**To:** Bob Brockman
**Subject:** FW: See financials and Fact Sheet to Bob

Bob – I have the ball. Willie, Santana, Rudy and Schaefer will settle on the parameters. We need to use this opportunity to improve relationship with OEM and improve utilization of our products with customers.

May also provide us a selling opportunity.

Lots of give & take this morning on this topic. The ExCom strategy (no one knows this term yet) will be a strong solution for the future. You need to be pleased

Tommy

---

**From:** Robert Schaefer <[redacted]
**Sent:** Thursday, February 27, 2020 9:44 PM

Message

**From:** Bob Brockman[redacted]
**Sent:** 6/3/2020 7:54:20 PM
**To:** 'tommy_b[redacted]
**Subject:** RE: Wow...I cannot explain

Tommy

To start with – you and I should be talking every day about any decision of importance that is cooking – before it is leaked or published. We need to focus on the reasons for making any decision. The reasons should be stated along with the decision.

The purpose for this is that it raises the odds in favor of making all decisions as thoughtful and correct that they can be.

This makes your record as perfect as it can be – which enhances followership.

Always remember – in virtually every case there is time to think and talk about a decision. The main thing is to do it "RIGHT" – not to do it quickly. Just because someone else is wanting a quick decision – do not let your decision be hurried !

Bob

---

**From:** tommy_b[redacted]
**Sent:** Tuesday, June 02, 2020 7:54 PM
**To:** Bob Brockman; Dorothy Brockman
**Subject:** Wow...I cannot explain

Bob, Dorothy

I cannot describe the feelings I have tonight knowing the new chapter that begins tomorrow. I still do not understand why you choose me to carry forward your mission – but I will do my best to never disappoint you.

You guys are my family. Pray for me – give me the strength needed to carry on your legacy.

Love you guys

Tommy

Memo to: Rob Nalley

From: Bob Brockman

Subject: Bob Brockman – stand down

The first reason that I am standing down at this point is largely due to fatigue – plus recognition that I am in the final 20 percent of my life (if I am lucky).

The next reason is that I am very proud of the company that I have led – and do not want to see it fall apart.

A sale effort in the early part of this year – would not have been successful.

A buyer would have looked at two aged guys (you and me) – plus a bunch of specialized VP's with no clear path to the same high levels of profitability currently enjoyed.

Buyers would have used that weakness to beat us up.

I could have gotten past this objection by signing up for a 5 year management agreement – but that would have left me chained to the email monster.

I have a lot tied up in my 1% of sales proceeds reward. It is important for me to see that a sale process occurs at a good multiple. It is even more important to you.

This is what I am going to do.

My plan going forward is to give up all my rank and title – and become Advisor to the CEO – on or before my birthday – May 28th

My intent is to work 4-5 more years helping teach the next generation everything I know about how to run the company efficiently.

This will culminate in a successful salesprocess. Along the way my goal is to help the new leadership improve EBITDA results by 50% or more.

That is my plan.

Your situation is different, but very similar in many respects.

We both are at the grandkids phase of life – where we want to see them and help them be successful at life. You are in Oregon half the month. I will be in Colorado in the summer time.

We both earn a good monthly income.

We have been friends and comrades-at-arms for half a century. I would have very good feelings about us riding out into the sundown together.

Your Plan

I believe that I have sufficientl authority left to guarantee your current annual compensation for the next five years.

My recommendation is that you resign as Vice Chairman and President and take the same title as mine – which will be Advisor to the CEO.

We then work together to help the ExComm members learn their jobs so that when we finally stand down, the company will display by far the best leadership team in our industry.

You will also have Advisory charter over the following:

- Legal must have your approval (veto power) to decide whether or not to settle any lawsuit. From a day-to-day operational standpoint, Scott Cherry will report to Craig Moss. You will be the Advisor.
- Aviation department - Aircraft operation and maintenance including new personnel will be your charter
- Charlie Zeto reports to Craig Moss with regards to reviews and salary adjustments – plus reporting. You will be the Advisor.

- Jerry Kirwan and the Documents Business will report to Tommy Barras. You will be his Advisor.

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0228644

Message

**From:** Bob Brockman [
**Sent:** 6/3/2020 5:55:40 PM
**To:** 'Arnett, Michael D (Mike)' [
**Subject:** RE: Thank You.

Mike,

Thanks for the kind words.

Bob

---

**From:** Arnett, Michael D (Mike)
**Sent:** Wednesday, June 03, 2020 8:02 AM
**To:** Brockman, Bob
**Subject:** Thank You.

Bob,
Thank you for the blood, sweat and tears you have shed to build this great company that I have been blessed to call family for 26 years so far.
I pray that God will bless you, Dorothy and especially that new grandchild as you transition to the next season before you.
Thank you again for all you do Bob,
Mike

**Mike Arnett**
**Marketing & Document Services Consultant**
**The Reynolds & Reynolds Company**

---

**From:** ReynoldsWorld
**Sent:** Wednesday, June 3, 2020 7:54 AM
**To:** All US Associates  All Canada Associates <
**Subject:** Memo from CEO Bob Brockman: Management Changes

To all Reynolds Associates:

I want to let you know about some management changes at Reynolds and Reynolds, and its affiliates, that I believe will position us to grow and thrive for many years to come.

On May 28, 2020, I celebrated my 79th birthday, which came just over six weeks after the pleasure of celebrating the 52nd anniversary of my marriage to my wonderful wife, Dorothy. She and I also welcomed the birth of our first grandchild, James Maxwell Brockman, a few short weeks ago. The two touchstones of my life have been my cherished family, and my second family at Reynolds and Reynolds.

I have been privileged to serve as steward of our company from its inception when it was Universal Computer Services, Inc. Together with you, we have built this company into a remarkable industry leader. One of the truly great strengths of our company over the years has been our ability to attract talented people who stay with us and make valuable contributions over the course of their entire careers.

It is important now that we plan for the future. I am pleased to announce that Tommy (N. Thomas) Barras has agreed to step into the role of President and Chief Operations Officer. Tommy is one of that small handful of people who have been with us for virtually our entire journey.

He has worked his way up from Shipping and Receiving to become a senior leader on whom I have relied time and again on matters large and small. Equally important, Tommy's product achievements over his forty-year career have been key to our success as UCS and now Reynolds. He understands in amazing detail the core strengths of our software and products, and the talented associates who deliver on both. Those strengths will remain our defining characteristics as an organization.

I will continue in my current position. I plan to focus my time and attention on supporting Tommy and our leadership team to position the company for transition and growth beyond my leadership.

I am also letting you know that Rob Nalley stepped down from his position as President. Rob will continue to serve the company as an Advisor and Vice Chairman until I step down as CEO.

Rob joined us as a salesman almost fifty years ago. He has served in many leadership roles throughout his career. I have thought of him as my right hand for more years than I can count. I thank him for his service as President. I am also grateful that he will continue as my trusted advisor and good friend as we move forward through this transition period.

The company today vastly exceeds my greatest expectations when we began. In recognition of our size and the diversity of our operations, I am also announcing the formation of an Executive Committee (ExCom) that will work together as the company moves forward. This committee, led by Tommy, will include seven members who will also serve as Division Heads who can provide subject matter expertise along with a collaborative future vision. In addition to Tommy, who will be Chairman of the Executive Committee, the members will be:

- Willie Daughters, Executive Vice President of Customer Support

- Eric Edwards, Executive Vice President of Technology, CTO

- Keith Hill, Executive Vice President of Sales

- Scott Santana, Executive Vice President of Product Management

- Jerry Kirwan, Executive Vice President of Document Services

- Craig Moss, Executive Vice President of Finance, CFO

- Robert Burnett, Executive Vice President of Corporate Development

Each of these individuals has been with the company for more than two decades, and in some cases for over three decades. They have contributed significantly to what makes us great today, and I am grateful that they have agreed to step up to these new responsibilities.

Leaders who report to me or Rob will begin reporting to Executive Committee leaders as declared by Tommy.

I am honored every day to work with every one of you. I thank you for your trust and support over the many years. Together we have built something to last. I ask that you join me in working together as we move forward in this time of transition, in support of this entire leadership team.

Bob

Clear Form

| UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>CAND 435<br>(CAND Rev. 02/2015) | TRANSCRIPT ORDER<br>Please use one form per court reporter.<br>*CJA counsel please use Form CJA24*<br>*Please read instructions on next page.* | COURT USE ONLY<br>DUE DATE: |
|---|---|---|

| 1a. CONTACT PERSON FOR THIS ORDER | 2a. CONTACT PHONE NUMBER | 3. CONTACT EMAIL ADDRESS |
|---|---|---|
| Jessica Leung | (408) 535-5588 | jessica.leung@usdoj.gov |
| **1b. ATTORNEY NAME (if different)** | **2b. ATTORNEY PHONE NUMBER** | **3. ATTORNEY EMAIL ADDRESS** |
| Michael Pitman | (408) 535-5040 | michael.pitman@usdoj.gov |

4. MAILING ADDRESS (INCLUDE LAW FIRM NAME, IF APPLICABLE)

U.S. Attorney's Office
150 Almaden Blvd, Suite 900
San Jose CA 95113

5. CASE NAME: US v Brockman

6. CASE NUMBER: 3:20-CR-00371

7. COURT REPORTER NAME ( FOR FTR, LEAVE BLANK AND CHECK BOX)→ ☐ FTR

Ana Dub

8. THIS TRANSCRIPT ORDER IS FOR:

☐ APPEAL ☑ CRIMINAL ☐ In forma pauperis (NOTE: Court order for transcripts must be attached)

☐ NON-APPEAL ☐ CIVIL CJA: Do not use this form; use Form CJA24.

9. TRANSCRIPT(S) REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested), format(s) & quantity and delivery type:

| a. HEARING(S) (OR PORTIONS OF HEARINGS) | | | | b. SELECT FORMAT(S) (*NOTE: ECF access is included with purchase of PDF, text, paper or condensed.*) | | | | | c. DELIVERY TYPE (Choose one per line) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | JUDGE (initials) | TYPE (e.g. CMC) | PORTION If requesting less than full hearing, specify portion (e.g. witness or time) | PDF (email) | TEXT/ASCII (email) | PAPER | CONDENSED (email) | ECF ACCESS (web) | ORDINARY (30-day) | 14-Day | EXPEDITED (7-day) | DAILY (Next day) | HOURLY (2 hrs) | REALTIME |
| 12/15/2020 | WHA | Motion | | ● | ○ | ○ | ○ | ○ | ● | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

10. ADDITIONAL COMMENTS, INSTRUCTIONS, QUESTIONS, ETC:

ORDER & CERTIFICATION (11. & 12.) By signing below, I certify that I will pay all charges (deposit plus additional).

11. SIGNATURE /s/

12. DATE 12/15/2020

DISTRIBUTION: ☐ COURT COPY ☐ TRANSCRIPTION COPY ☐ ORDER RECEIPT ☐ ORDER COPY

CAND 435
(Rev. 02/2015)

INSTRUCTIONS

Use this form to order the transcription of proceedings. ***CJA counsel should use Form CJA24.*** Before completing this form, please visit cand.uscourts.gov/transcripts for complete transcript ordering information. THESE INSTRUCTIONS SUPPLEMENT THE WEBSITE INFORMATION.

1. Complete a separate order form for each case number for which transcripts are ordered.
2. Complete a separate order form for each court reporter who reported proceedings in the case.
3. Complete Items 1-12. Keep a copy of your completed order form for your records.
4. E-file this form in the U.S. District Court CM/ECF system. ***Exceptions to e-filing***: (a) sealed cases/proceedings; (b) non-parties; (c) pro se parties who are not e-filers. In such cases, mail or hand-deliver a hard copy addressed to the court reporter c/o the Clerk's Office at the Court division where the proceeding was held.
5. Email the court reporter (email list available at cand.uscourts.gov/courtreportercontact) promptly after this Transcript Order Form is e-filed to obtain the amount of the required deposit. Deliver payment to the court reporter promptly. Upon receipt of the deposit, the court reporter will begin work on the transcript. ***Exceptions:*** (a) orders for FTR transcripts and (b) daily trial transcript orders.
6. Unless prepayment is waived, delivery time is computed from the date the court reporter receives the deposit, authorized CJA 24 Form, authorization from Federal Public Defender's Office or, for transcripts ordered by the U.S. government, from the date of receipt of the DCN number.
7. The deposit fee is an estimate. Any overage will be refunded; any shortage will be due from you.

ITEM-BY-ITEM INSTRUCTIONS (ITEMS 1-12):

Items 1-3 In fields 1a, 2a & 3a, please provide the contact name and information for the person responsible for ordering the transcript. In a law office, this is usually a paralegal or administrative assistant, not the attorney. In fields 1b, 2b & 3b, provide the attorney name and contact info, if the attorney is not the contact person.

Items 5-6. Only one case number may be listed per order.

Item 7. Visit cand.uscourts.gov/transcripts for instructions for determining the name of the court reporter who reported the proceeding or if the proceeding was audiorecorded. If minutes have not been filed, contact judge's courtroom deputy.

Item 8. Check appeal OR non-appeal AND criminal OR civil. ***In forma pauperis***: a court order specifically authorizing transcripts is required before transcripts may be ordered *in forma pauperis*.

Item 9a. List specific date(s) of the proceedings for which transcript is requested. A transcript of only a portion of a proceeding may be ordered, if the description is clearly written to facilitate processing. Under "type," indicate briefly what type of proceeding it was, such as "motion," "sentencing," or "CMC."

Item 9b. Select desired FORMAT(S) for transcript. There is an additional charge for each format ordered. Visit cand.uscourts.gov/transcriptrates for details. Unlock ECF/web access is included at no extra charge with each of the other formats.

Item 9c. There are 6 DELIVERY TYPES to choose from (times are computed from date of receipt of the deposit fee or DCN number). NOTE: Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within 7 calendar days, the 14-day *delivery* rate would be charged.

TRANSCRIPT DELIVERY TIMES:

ORDINARY — 30 calendar days.

14-DAY — 14 calendar days.

EXPEDITED — 7 calendar days.

DAILY (NEXT DAY) — Following adjournment and prior to the normal opening hour of the court on the following morning whether or not it actually is a court day.

HOURLY (SAME DAY) — within two (2) hours.

REALTIME — A draft unedited, uncertified transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

Item 11. Sign in this space to certify that you will pay all charges (the deposit plus any additional charges.) An electronic or conformed (/s/) signature is acceptable.

Item 12. Enter the date of signing the order and certification.

DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

MICHAEL G. PITMAN (DCBN 484164)
Assistant United States Attorney
150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5040
Facsimile: (408) 535-5081
michael.pitman@usdoj.gov

COREY J. SMITH (MABN 553615)
Senior Litigation Counsel
LEE F. LANGSTON (NYBN 4910311)
CHRISTOPHER M. MAGNANI (Maryland)
Trial Attorneys
United States Department of Justice, Tax Division

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

ROBERT T. BROCKMAN,

Defendant.

Case No.: 3:20-cr-00371-WHA

STIPULATION TO EXCLUDE TIME FROM DECEMBER 15, 2020 THROUGH JANUARY 12, 2021 AND [PROPOSED] ORDER

It is hereby stipulated by and between counsel for the United States and counsel for the defendant Robert T. Brockman, that time be excluded under the Speedy Trial Act from December 15, 2020 through January 12, 2021.

A motion hearing was held on December 15, 2020, and the next scheduled date in this matter is another motion hearing set for January 12, 2021. The government and counsel for the defendant agree that time should be excluded under the Speedy Trial Act because of the complexity of the case, because of pending motions, and so that defense counsel can continue to prepare, including by reviewing the

discovery the government has produced. Accordingly, the parties stipulate and agree to exclude time until January 12, 2021, and further stipulate and agree that the ends of justice served by excluding the time from December 15, 2020 through January 12, 2021 from computation under the Speedy Trial Act outweigh the best interests of the public and the defendant in a speedy trial. 18 U.S.C. §§ 3161(h)(1)(D), (h)(7)(A), (h) (7)(B)(ii), (h)(7)(B)(iv).

The undersigned Assistant United States Attorney certifies that he has obtained approval from counsel for the defendant to file this stipulation and proposed order.

IT IS SO STIPULATED.

DAVID L. ANDERSON
United States Attorney

s/ Michael G. Pitman
COREY J. SMITH
Senior Litigation Counsel
MICHAEL G. PITMAN
Assistant United States Attorney

Attorneys for United States of America

s/ Neal J. Stephens
NEAL J. STEPHENS
Counsel for Defendant ROBERT T. BROCKMAN

[PROPOSED] ORDER

Based upon the facts set forth in the stipulation of the parties and the representations made to the Court on December 15, 2020 and for good cause shown, the Court finds that time should be excluded from December 15, 2020 through January 12, 2021 under the Speedy Trial Act because of the complexity of the case, because of pending motions, and so that defense counsel could continue to prepare, including by reviewing discovery the government has produced, taking into account the exercise of due diligence. 18 U.S.C. §§ 3161(h)(1)(D), (h)(7)(A), (h) (7)(B)(ii), (h)(7)(B)(iv). The

Court further finds that the ends of justice served by excluding the time from December 15, 2020 to January 12, 2021 from computation under the Speedy Trial Act outweigh the best interests of the public and the defendant in a speedy trial. Therefore, and with the consent of the parties, IT IS HEREBY ORDERED that the time from December 15, 2020 through January 12, 2021 shall be excluded from computation under the Speedy Trial Act.

IT IS SO ORDERED.

DATED: ____________________

____________________________
WILLIAM ALSUP
United States District Judge

STIPULATION TO EXCLUDE TIME FROM
DECEMBER 15, 2020 THROUGH JANUARY 12, 2021
AND [PROPOSED] ORDER
Case No.: 3:20-CR-00371-WHA

3

DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

MICHAEL G. PITMAN (DCBN 484164)
Assistant United States Attorney
150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5040
Facsimile: (408) 535-5081
michael.pitman@usdoj.gov

COREY J. SMITH (MABN 553615)
Senior Litigation Counsel
LEE F. LANGSTON (NYBN 4910311)
CHRISTOPHER M. MAGNANI (Maryland)
Trial Attorneys
United States Department of Justice, Tax Division

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

ROBERT T. BROCKMAN,

Defendant.

Case No.: 3:20-cr-00371-WHA

STIPULATION TO EXCLUDE TIME FROM DECEMBER 15, 2020 THROUGH JANUARY 12, 2021 AND ~~[PROPOSED]~~ ORDER

It is hereby stipulated by and between counsel for the United States and counsel for the defendant Robert T. Brockman, that time be excluded under the Speedy Trial Act from December 15, 2020 through January 12, 2021.

A motion hearing was held on December 15, 2020, and the next scheduled date in this matter is another motion hearing set for January 12, 2021. The government and counsel for the defendant agree that time should be excluded under the Speedy Trial Act because of the complexity of the case, because of pending motions, and so that defense counsel can continue to prepare, including by reviewing the

discovery the government has produced. Accordingly, the parties stipulate and agree to exclude time until January 12, 2021, and further stipulate and agree that the ends of justice served by excluding the time from December 15, 2020 through January 12, 2021 from computation under the Speedy Trial Act outweigh the best interests of the public and the defendant in a speedy trial. 18 U.S.C. §§ 3161(h)(1)(D), (h)(7)(A), (h) (7)(B)(ii), (h)(7)(B)(iv).

The undersigned Assistant United States Attorney certifies that he has obtained approval from counsel for the defendant to file this stipulation and proposed order.

IT IS SO STIPULATED.

DAVID L. ANDERSON
United States Attorney

s/ Michael G. Pitman
COREY J. SMITH
Senior Litigation Counsel
MICHAEL G. PITMAN
Assistant United States Attorney

Attorneys for United States of America

s/ Neal J. Stephens
NEAL J. STEPHENS
Counsel for Defendant ROBERT T. BROCKMAN

~~[PROPOSED]~~ ORDER

Based upon the facts set forth in the stipulation of the parties and the representations made to the Court on December 15, 2020 and for good cause shown, the Court finds that time should be excluded from December 15, 2020 through January 12, 2021 under the Speedy Trial Act because of the complexity of the case, because of pending motions, and so that defense counsel could continue to prepare, including by reviewing discovery the government has produced, taking into account the exercise of due diligence. 18 U.S.C. §§ 3161(h)(1)(D), (h)(7)(A), (h) (7)(B)(ii), (h)(7)(B)(iv). The

Court further finds that the ends of justice served by excluding the time from December 15, 2020 to January 12, 2021 from computation under the Speedy Trial Act outweigh the best interests of the public and the defendant in a speedy trial. Therefore, and with the consent of the parties, IT IS HEREBY ORDERED that the time from December 15, 2020 through January 12, 2021 shall be excluded from computation under the Speedy Trial Act.

IT IS SO ORDERED.

DATED: December 17, 2020

WILLIAM ALSUP
United States District Judge

STIPULATION TO EXCLUDE TIME FROM
DECEMBER 15, 2020 THROUGH JANUARY 12, 2021
AND ~~[PROPOSED]~~ ORDER
Case No.: 3:20-CR-00371-WHA

3

Jason S. Varnado (State Bar No. 211067)
jvarnado@jonesday.com
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002.2712
Telephone: +1-832-239-3939
Facsimile: +1-832-239-3600

Neal J. Stephens (State Bar No. 152071)
nstephens@jonesday.com
Vincent Doctor (State Bar No. 319408)
vdoctor@jonesday.com
JONES DAY
Silicon Valley Office
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone: +1-650-739-3939
Facsimile: +1-650-739-3900

Kathryn Keneally (appearance *pro hac vice*)
New York State Bar No. 1866250
kkeneally@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281.1047
Telephone: +1-212-326-3939
Facsimile: +1-212-755-7306

Attorneys for Defendant
ROBERT T. BROCKMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

ROBERT T. BROCKMAN,

Defendant.

Case No. 3:20-cr-00371-WHA

DEFENDANT ROBERT T. BROCKMAN'S REPLY IN SUPPORT OF MOTION FOR A HEARING TO DETERMINE WHETHER MR. BROCKMAN IS COMPETENT TO ASSIST IN HIS DEFENSE

Date: January 12, 2021
Time: 2 p.m.
Judge: Hon. William Alsup
Place: Courtroom 12

**DEFENDANT ROBERT T. BROCKMAN'S REPLY IN SUPPORT OF MOTION FOR A HEARING TO DETERMINE WHETHER MR. BROCKMAN IS COMPETENT TO ASSIST IN HIS DEFENSE**

## I. THE GOVERNMENT HAS CONCEDED THAT THE MOTION SHOULD BE GRANTED

The government has conceded the sole issue raised on the defense's motion: pursuant to 18 U.S.C. § 4241(a), Mr. Brockman must be accorded a hearing to determine whether he is competent to assist in his own defense. Gov't Resp. at 1 (the "Response"), ECF No. 69; *see also*

Gov't Resp. at 2 ("As the Motion explained, the threshold for holding a competency hearing is low, and it is satisfied in this case.").

The government could have saved this Court's and the defense's time by agreeing to the hearing without a contested motion, and then turning to the next steps as to how the hearing should proceed. Now that the government has abandoned its indefensible position that no competency proceedings should be conducted in this case, the defense has asked the prosecutors to meet and confer over appropriate, reciprocal discovery of evidence relevant to competency and proposed for admission at a hearing, the sequence and timing of further examinations of Mr. Brockman, a proposed schedule for the actual competency hearing and other proceedings, and any other issues relevant to competency proceedings.

## II. AN INDEPENDENT EXAMINATION OF MR. BROCKMAN MUST TAKE PLACE IN A NON-CUSTODIAL SETTING

It would appear that the only remaining open issue, apart from scheduling, is the manner in which an examination of Mr. Brockman should take place.

The government had unhindered access to Mr. Brockman's medical records, and could have had an independent medical examination conducted, during a nearly six-month period prior to the Indictment: In early April 2020, defense counsel provided medical reports and letters from Mr. Brockman's four diagnostic and treating doctors, setting out their medical conclusion that Mr. Brockman lacks the ability to assist in his defense, along with the results of a DaTscan performed on Mr. Brockman, which showed irrevocable damage to critical neurons responsible for producing dopamine—a visible, measurable marker for dementia caused by Parkinson's disease or Lewy body dementia.[1] Keneally Decl. ¶ 28, Ex. J at 1–2, 7, Ex. P at 1.[2] Defense counsel asked that the government interview the doctors, with a pledge that the defense would not

---

[1] A DaTscan is "the first and only FDA-approved aid in differentiating a relatively benign condition, essential tremor, from Parkinsonian syndromes (PS)." https://www.cedars-sinai.org/programs/imaging-center/exams/nuclear-medicine/datscan.html (last visited Dec. 17, 2020); *see also* https://www.hopkinsmedicine.org/health/conditions-and-diseases/dementia/dementia-with-lewy-bodies (last visited Dec. 18, 2020) (summarizing relationship between damage to dopamine transmitters and Parkinson's disease and Lewy body dementia).

[2] "Keneally Decl." refers to the Declaration of Kathryn Keneally, affirmed December 8, 2020 and submitted in support of the Motion. ECF No. 64-1.

participate, either by preparing the witnesses in advance or attending the interviews, and provided waivers pursuant to the Health Insurance Portability and Accountability Act ("HIPAA waivers") to allow full access to Mr. Brockman's medical information. Keneally Decl. ¶ 28. Defense counsel also offered to make Mr. Brockman available for examination by medical experts of the government's choosing. Keneally Decl. ¶ 28.

Despite having access to all of this information, and the proffer of full cooperation from defense counsel, the government has never—not before Indictment and not now—identified any expert to conduct an independent examination of Mr. Brockman. Instead, citing no medical or legal basis for its position, the government now makes the stunning request that the Court invoke discretionary authority to "'commit [Mr. Brockman] to be examined for a reasonable period, but not to exceed thirty days'" for observation by "trained Bureau of Prisons mental health professionals and staff." Gov't Resp. at 2–3 (quoting 18 U.S.C. § 4247(b)); 18 U.S.C. § 4241(b).

The law is to the contrary. Due process mandates that a defendant be deprived of his liberty only if the government establishes "compelling governmental interests" that cannot be served by outpatient evaluation.[3] *United States v. Neal*, 679 F.3d 737, 741 (8th Cir. 2012); *see also United States v. Deters*, 143 F.3d 577, 582–84 (10th Cir. 1998) (explaining due process limits on custodial competency examination); *In re Newchurch*, 807 F.2d 404, 408–09 (5th Cir. 1986) (same). Such compelling interests must be substantiated by specific evidence and findings of fact following a hearing. *Neal*, 679 F.3d at 741–42; *Deters*, 143 F.3d at 582–84; *see also United States v. Song*, 530 F. App'x 255, 260–61 (4th Cir. 2013). The generalized conclusion that "'an in-custody evaluation is likely to be more comprehensive than an out-of-custody evaluation' . . . is not sufficient to demonstrate the necessity of a custodial examination." *United States v. Parks*, 2018 WL 2090821, *4 (W.D. Ky. May 4, 2018) (quoting *United States v. Krauth*, 2010 WL 428969, at *5 (N.D. Iowa Feb. 2, 2010)).

These prosecutors' desire to have Mr. Brockman remanded also contradicts Department of

[3] Due process safeguards also make orders remanding defendants for custodial evaluation under § 4241(b) subject to immediate appeal. *See, e.g.*, *United States v. Deters*, 143 F.3d 577, 581 (10th Cir. 1998) (holding commitment under § 4241(b) is immediately appealable); *United States v. Davis*, 93 F.3d 1286, 1288–89 (6th Cir. 1996) (same, reversing commitment order); *United States v. Neal*, 679 F.3d 737, 740 (8th Cir. 2012) (vacating and remanding § 4241(b) commitment order on interlocutory appeal).

Justice policy. "Since the requirements of these provisions stretch the Bureau of Prison's mental health resources to their limits, incompetency (Section 4241) and insanity (Section 4242) studies should, wherever possible, be done in the community by local psychologists/psychiatrists, with commitments to the custody of the Attorney General being reserved for those individuals who cannot safely be examined in the community." U.S. Dep't of Justice, Just. Manual, Organization and Functions Manual § 8, *available at* https://www.justice.gov/jm/organization-and-functions-manual-8-bureau-prisons (last visited Dec. 21, 2020).

The government's assertion here that "[a] custodial placement is appropriate in cases where malingering is a concern," Gov't Resp. at 2, is equally unsupported and insufficient. To the contrary, courts routinely accept non-custodial evaluations that include built-in testing to address malingering. *See United States v. Buckingham*, 2020 WL 7238273, *2–3, 10–12 (N.D. Ala. Dec. 9, 2020) (finding defendant incompetent based on outpatient evaluations that included conclusion that defendant was not malingering); *United States v. Hernandez*, 2018 WL 2738880, *8–15 (N.D. Ohio June 7, 2018) (finding outpatient evaluator's conclusion that defendant was not malingering more reliable than custodial evaluator's conclusion that defendant was malingering). Dr. York's forensic testing of Mr. Brockman included these safeguards, Keneally Decl. Ex. O at 4, 7, Ex. R. at 5, 7, and the government nowhere addresses why an independent expert cannot meet this standard in a non-custodial setting.

There is no reason, much less a compelling reason, for Mr. Brockman to be subjected to custodial examination prior to the competency hearing. First, and "[m]ost importantly," Mr. Brockman "is currently on pretrial release," and "should not lose his freedom simply by raising the issue" of competence. *Parks*, 2018 WL 2090821, at *5. Nor is there any reason to believe that a custodial evaluation could be completed more quickly than an outpatient examination. *See Krauth*, 2010 WL 428969, at *4 n.4 (noting that it is "more likely that an in-custody examination would take longer").

Further, in the midst of the COVID-19 pandemic the risk to Mr. Brockman's health far outweighs any "benefit" of incarceration. As a 79 year-old cancer survivor with a heart condition as well as progressive dementia, remanding Mr. Brockman to the custody of the Bureau of

Prisons would dramatically increase his risk of contracting the disease. *See* Keneally Decl. Ex. G at ¶ 9; *see also* https://www.bop.gov/coronavirus/ (last visited Dec. 17, 2020) (reporting that nearly a quarter of all federal inmates have been diagnosed with COVID-19 over the course of the pandemic).

The defense submits, instead, that the court-ordered examination of Mr. Brockman should occur on an out-patient basis near his home in Houston, the fourth-largest city in the United States, with over 18,000 licensed physicians.[4] Houston's Texas Medical Center is the largest medical facility in the world, and its hospitals have reliably been ranked among the nation's best.[5] Surely "the United States can locate, within a driving distance of [Mr. Brockman's] home that would allow him to travel to and from the appointment each day, a qualified psychologist or psychiatrist to conduct the forensic examination." *Parks,* 2018 WL 2090821, at *5. There is nothing to be gained, and considerable risk, by requiring Mr. Brockman to travel to a distant location, much less to be incarcerated.

## III. THE GOVERNMENT'S CONCESSION THAT A HEARING IS REQUIRED SUPPORTS THE DEFENSE'S MOTION FOR TRANSFER

The government conceded for the first time that a competency hearing is necessary in its Response filed on the evening of December 15, 2020, following a hearing *on that same day* before this Court on the defense's Motion to Dismiss in Part for Lack of Venue and to Transfer to the Southern District of Texas (the "Transfer Motion"), ECF No. 49. The defense set out, as one of many grounds supporting transfer, that a competency hearing should be held in the Southern District of Texas, where Mr. Brockman resides and where all of his doctors practice.[6] Transfer

[4] https://www.houston.org/houston-data/health-care-houston (last visited Dec. 20, 2020).

[5] https://www.tmc.edu/news/2019/07/seven-tmc-institutions-ranked-as-best-hospitals-by-u-s-news-world-report/ (last visited Dec. 20, 2020).

[6] In opposing the Transfer Motion, the government argued that venue should not be determined by the location of the defense's "experts." Gov't Opp'n to the Mot. to Dismiss in Part for Lack of Venue and to Transfer to the Southern District of Texas at 9, 12, ECF No. 63. The doctors whose medical reports were included in support of the instant Motion are not, as the government depicts, experts "retained" by the defense. *See* Gov't Resp. at 2. While the defense will present them for their expertise, they are third-party witnesses. Each doctor examined Mr. Brockman for diagnostic and treatment purposes. Keneally Decl. Ex. G at ¶ 4, Ex. H, Ex. I, Ex. J, Ex. K. Even Dr. York, a neuropsychologist, who performed subsequent forensic testing at the request of defense counsel, examined Mr. Brockman in the first instance in response to a referral by his personal doctor to determine a diagnosis and course of treatment. Keneally Decl. Ex. G at ¶ 4.

Mot. at 11–13; *see also* Reply in Supp. of Transfer Mot. at 9–10, ECF No. 66. The government's conspicuous silence concerning its decision to concede the need for a competency hearing before or during the argument on the Transfer Motion is particularly telling: this concession greatly undercuts the government's opposition to the Transfer Motion. [7]

## IV. THE BALANCE OF THE GOVERNMENT'S "RESPONSE" HAS NO BEARING ON THE ISSUES ON THIS MOTION

Given its concession on the only issue raised by the Motion, the government captions its current submission not as an "Opposition," but as a "Response," which it then uses to mischaracterize the defense's position and to "preview" its "skepticism" about the defense's medical evidence.

Having "spurned" the defense offer of a cooperative approach at each step so as to force this adversarial proceeding,[8] the government now adds gratuitous but bogus complaints that the defense is "hiding relevant evidence." Gov't Resp. at 3, 6. In addition to the unilateral discovery provided so far, the defense previously stated its support for "an independent expert selected by the court, asking only that the examination take place proximate to Mr. Brockman's home in Houston," and acknowledged the government's right to cross-examine the doctors and other witnesses and present its evidence. Def.'s Mot. at 19.

While ignoring the medical evidence, the government propounds a layman's analysis as to what may be relevant to a competency determination. Thus the government unloads for seven pages in its "Response" and 536 pages of exhibits, "the government's skepticism [that] will be further developed throughout these competency proceedings" because "it is worth orienting the Court to some of them at the outset." *See* Gov't Resp. at 4–11.

The government's "skepticism" is distorted, misleading, and at times flatly incorrect on the face of its own "evidence." It is also premature and not germane to the sole issue before this

[7] In its groundless contention that Mr. Brockman be remanded for custodial examination, the government references a facility in Fort Worth, Texas, implicitly acknowledging that Texas, where Mr. Brockman resides, is where his medical issues should be addressed. Gov't Resp. at 2–3.

[8] The Court: "is it true that they [the defense] offered to let you [the government] talk to the medical people without even the defense being there and you spurned that opportunity?" AUSA Pitman: "That is true, Your Honor." Dec. 15, 2020 Hr'g Tr. at 33:1–33:4.

REPLY IN SUPPORT OF MOT.
FOR HEARING TO DETERMINE WHETHER MR. BROCKMAN
IS COMPETENT TO ASSIST IN HIS DEFENSE 3:20-CR-00371-WHA
- 6 -

Court that the government has now conceded in its Response—a competency hearing is necessary in this matter. It is sufficient for present purposes to note that the accurate facts will be presented, and the government's version rigorously disputed—in the full evidentiary presentation at the hearing. Now that the government has dropped its strategic opposition to that hearing, the parties and the Court can get on with the proceeding guaranteed to Mr. Brockman by due process.

## V. THE GOVERNMENT IS WRONG THAT IT WOULD HAVE BEEN INAPPROPRIATE TO EVALUATE THIS ISSUE PRE-INDICTMENT

The government's final point in its Response is an attempt to assert that it would have been "inappropriate" for the government to consider Mr. Brockman's competency pre-indictment. Gov't Resp. at 11.

It is the essence of a prosecutor's job to review all of the circumstances of the government's investigation when making a decision to indict. *See* U.S. Dep't of Justice, Just. Manual § 9-27.110 & Comment; *see also* § 9-27.220, *available at* https://www.justice.gov/jm/jm-9-27000-principles-federal-prosecution (last visited Dec. 21, 2020). The Department of Justice has made clear that this fundamental responsibility extends to the consideration of an individual's health and competency: the United States Justice Manual provides that a "person's personal circumstances" should be considered in determining whether there is a substantial federal interest supporting prosecution. U.S. Dep't of Justice, Just. Manual § 9-27.230, *see also* § 9-27.220. Circumstances particular to the accused which "may suggest that prosecution is not the most appropriate response" include "advanced age, or mental or physical impairment." U.S. Dep't of Justice, Just. Manual § 9-27.230, Comment 7; *see also United States v. Lovasco*, 431 U.S. 783, 795 (1977) ("Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt."). Thus the government's contention that it is only for "the Courts, not prosecutors, to make competency determinations[,]" Gov't Resp. at 11, fails in the face of the Department's express policy.

The government has conceded at least this much: Mr. Brockman is entitled to have the issue of his competency addressed before this prosecution may proceed. Given the government's

abdication of a pre-indictment review of the evidence, the issue is now squarely for a court to decide.

## VI. CONCLUSION

The central issue for the hearing is Mr. Brockman's fundamental right to present a defense. A defendant who "lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). This principle is embodied in 18 U.S.C. § 4241(a).

Now that the government has dropped its opposition, the parties agree that a court should hold a hearing under 18 U.S.C. § 4241 to determine whether he lacks the capacity to assist in his defense. The defense is scheduled to meet and confer with the government on December 22, and will propose to the Court appropriate, reciprocal discovery of evidence relevant to competency and proposed for admission at a hearing, the sequence and timing of further examinations of Mr. Brockman, a proposed schedule for the hearing and other proceedings, and other issues relevant to competency proceedings. The defense continues to believe that the competency proceeding should take place in the Southern District of Texas, for the reasons stated in support of the Transfer Motion.

Dated: December 21, 2020

Respectfully submitted,

Jones Day

*s/ Neal J. Stephens*
NEAL J. STEPHENS

Counsel for Defendant
ROBERT T. BROCKMAN

Clear Form

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
CAND 435
(CAND Rev. 7/2013)

**TRANSCRIPT ORDER**
**Please use one form per court reporter.**
*CJA counsel please use Form CJA24*
*Please read instructions on next page.*

COURT USE ONLY
**DUE DATE:**

| 1a. CONTACT PERSON FOR THIS ORDER | 2a. CONTACT PHONE NUMBER | 3a. CONTACT EMAIL ADDRESS |
|---|---|---|
| Lindsay VanHulle | (313) 446-0374 | lvanhulle@crain.com |
| 1b. ATTORNEY NAME (if different) | 2b. ATTORNEY PHONE NUMBER | 3b. ATTORNEY EMAIL ADDRESS |
| | | |

4. MAILING ADDRESS (INCLUDE LAW FIRM NAME, IF APPLICABLE)
1155 Gratiot Ave.
Detroit, MI 48207

5. CASE NAME
USA v. Brockman

6. CASE NUMBER
3:20-cr-00371

7. COURT REPORTER NAME ( FOR FTR, LEAVE BLANK AND CHECK BOX)→ ☐ FTR
Ana Dub

8. THIS TRANSCRIPT ORDER IS FOR:
☐ APPEAL ☑ CRIMINAL ☐ In forma pauperis (NOTE: Court order for transcripts must be attached)
☐ NON-APPEAL ☐ CIVIL ■ CJA: Do not use this form; use Form CJA24

9. TRANSCRIPT(S) REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested), format(s) & quantity and delivery type:

| a. HEARING(S) (OR PORTIONS OF HEARINGS) | | | | b. SELECT FORMAT(S) (*NOTE: ECF access is included with purchase of PDF, text, paper or condensed.*) | | | | | c. DELIVERY TYPE (Choose one per line) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | JUDGE (initials) | TYPE (e.g. CMC) | PORTION If requesting less than full hearing, specify portion (e.g. witness or time) | PDF (email) | TEXT/ASCII (email) | PAPER | CONDENSED (email) | ECF ACCESS (web) | ORDINARY (30-day) | 14-Day | EXPEDITED (7-day) | DAILY (Next day) | HOURLY (2 hrs) | REALTIME |
| 12/15/20 | WA | motion | full | ● | ○ | ○ | ○ | ○ | ○ | ○ | ◉ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | | | | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

10. ADDITIONAL COMMENTS, INSTRUCTIONS, QUESTIONS, ETC:

ORDER & CERTIFICATION (11. & 12.) By signing below, I certify that I will pay all charges (deposit plus additional).

11. SIGNATURE Lindsay VanHulle

12. DATE 12/23/2020

DISTRIBUTION: ☐ COURT COPY ☐ TRANSCRIPTION COPY ☐ ORDER RECEIPT ☐ ORDER COPY

CAND 435
(Rev. 06/13)

INSTRUCTIONS

Use this form to order the transcription of proceedings. ***CJA counsel should use Form CJA24.*** Before completing this form, please visit cand.uscourts.gov/transcripts for complete transcript ordering information. THESE INSTRUCTIONS SUPPLEMENT THE WEBSITE INFORMATION.

1. Complete a separate order form for each case number for which transcripts are ordered.
2. Complete a separate order form for each court reporter who reported proceedings in the case.
3. Complete Items 1-12. Keep a copy of your completed order form for your records.
4. E-file this form in the U.S. District Court CM/ECF system. ***Exceptions to e-filing***: (a) sealed cases/proceedings; (b) non-parties; (c) pro se parties who are not e-filers. In such cases, mail or hand-deliver a hard copy addressed to the court reporter c/o the Clerk's Office at the Court division where the proceeding was held.
5. Email the court reporter (email list available at cand.uscourts.gov/courtreportercontact) promptly after this Transcript Order Form is e-filed to obtain the amount of the required deposit. Deliver payment to the court reporter promptly. Upon receipt of the deposit, the court reporter will begin work on the transcript. ***Exceptions:*** (a) orders for FTR transcripts and (b) daily trial transcript orders.
6. Unless prepayment is waived, delivery time is computed from the date the court reporter receives the deposit, authorized CJA 24 Form, authorization from Federal Public Defender's Office or, for transcripts ordered by the U.S. government, from the date of receipt of the DCN number.
7. The deposit fee is an estimate. Any overage will be refunded; any shortage will be due from you.

ITEM-BY-ITEM INSTRUCTIONS (ITEMS 1-12):

Items 1-3 In fields 1a, 2a & 3a, please provide the contact name and information for the person responsible for ordering the transcript. In a law office, this is usually a paralegal or administrative assistant, not the attorney. In fields 1b, 2b & 3b, provide the attorney name and contact info, if the attorney is not the contact person.

Items 5-6. Only one case number may be listed per order.

Item 7. Visit cand.uscourts.gov/transcripts for instructions for determining the name of the court reporter who reported the proceeding or if the proceeding was audiorecorded. If minutes have not been filed, contact judge's courtroom deputy.

Item 8. Check appeal OR non-appeal AND criminal OR civil. ***In forma pauperis***: a court order specifically authorizing transcripts is required before transcripts may be ordered *in forma pauperis*.

Item 9a. List specific date(s) of the proceedings for which transcript is requested. A transcript of only a portion of a proceeding may be ordered, if the description is clearly written to facilitate processing. Under "type," indicate briefly what type of proceeding it was, such as "motion," "sentencing," or "CMC."

Item 9b. Select desired FORMAT(S) for transcript. There is an additional charge for each format ordered. Visit cand.uscourts.gov/transcriptrates for details. Unlock ECF/web access is included at no extra charge with each of the other formats.

Item 9c. There are 6 DELIVERY TYPES to choose from (times are computed from date of receipt of the deposit fee or DCN number). **NOTE**: Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within 7 calendar days, the 14-day *delivery* rate would be charged.

TRANSCRIPT DELIVERY TIMES:

ORDINARY — 30 calendar days.

14-DAY — 14 calendar days.

EXPEDITED — 7 calendar days.

DAILY (NEXT DAY) — Following adjournment and prior to the normal opening hour of the court on the following morning whether or not it actually is a court day.

HOURLY (SAME DAY) — within two (2) hours.

REALTIME — A draft unedited, uncertified transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

Item 11. Sign in this space to certify that you will pay all charges (the deposit plus any additional charges.) An electronic or conformed (/s/) signature is acceptable.

Item 12. Enter the date of signing the order and certification.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,
Plaintiff,

v.

ROBERT T. BROCKMAN,
Defendant.

No. CR 20-00371 WHA

**ORDER GRANTING RULE 21(b) MOTION TO TRANSFER, DENYING MOTION TO DISMISS IN PART FOR LACK OF VENUE, AND ORDERING IMMEDIATE TRANSFER OF ENTIRE CRIMINAL ACTION TO THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS**

## INTRODUCTION

In this prosecution for tax evasion, FBAR violations, conspiracy, wire fraud, money laundering, and destruction of and tampering with evidence, this order **TRANSFERS** the entire criminal matter to the United States District Court for the Southern District of Texas.

## STATEMENT

Defendant Robert Brockman allegedly invested more than a billion dollars through Vista Equity Partners and sequestered his billions in capital gains abroad to evade taxation. The indictment outlines an elaborate scheme, wide-ranging in both time and place (Ind. ¶ 36–38).

Since 1999, Brockman earned interest through his investments with Vista, a firm with an office in the Northern District of California. He stands accused of concealing those capital gains

from the IRS by directing his earnings into other financial entities, real property, and accounts, many abroad. The prosecutors include three with the Tax Division (in Washington, D.C.) and one AUSA based in this district. Contrary to its written policy of prosecuting tax-evasion cases where the alleged evader lives (for deterrence purposes), the government presented this case to a grand jury in San Francisco, rather than Houston where Brockman has long resided. In October 2020, the San Francisco grand jury returned an indictment charging that Brockman failed to report his capital gains in his returns for tax years 2012–2018; engaged in a twenty-year conspiracy to defraud the United States and evade taxes; willfully failed to file Reports of Foreign Bank and Financial Accounts (FBARs) to the IRS 2013–2018; committed wire fraud affecting a financial institution (Deutsche Bank); and laundered money, primarily by direction to his nominees. These were, most notably, three people with monikers "Individual One," "Individual Two," and "Individual Three." Finally, in June 2016, Brockman is said to have learned of the government's investigation into his actions and he (or his nominees at his direction) destroyed, altered, corrupted, or tampered with evidence relevant to the grand jury investigation.

Brockman is 79 and resides in Houston, Texas. He has never lived in this district. His health now declines. In late 2018, Brockman underwent testing for abnormal cognitive and physical symptoms. In a declaration filed in support of the instant motion, Brockman's treating physician calls his symptoms "consistent with" one of three conditions, or a combination thereof: (1) Parkinson's disease, (2) Parkinsonism (a condition causing physical tremors), and (3) Lewy body dementia (a condition in which protein deposits in nerve cells cause dementia and impair movement) (Keneally Decl. ¶ 10, Pool Decl. ¶¶ 5–7, 9–10).

A grand jury indicted Brockman in October 2020:

- Count 1: Conspiracy to defraud the United States and commit tax evasion, in violation of 18 U.S.C. § 371;
- Counts 2 through 8: Tax evasion, in violation of 26 U.S.C. § 7201;
- Counts 9 through 14: Violation of Reports of Foreign Bank and Financial Accounts (FBAR) filing requirements, in violation of 31 U.S.C. §§ 5314 and 5322;

- Counts 15–34: Wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343;
- Counts 35–37: Concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), tax evasion money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(ii), and international concealment money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(i);
- Counts 38–39: Evidence tampering and destruction of evidence in violation of 18 U.S.C §§ 1512(b)(2)(B) and 1512(c)(1); and
- Forfeiture allegations, in violation of 18 U.S.C. §§ 982(a)(1) and 982(a)(2)(A), and 28 U.S.C. § 2461(c).

In November 2020, Brockman moved to change venue on the tax-evasion counts pursuant to 18 U.S.C. § 3237(b). He renews that motion here, but an order herein has since denied it (Dkt. 53). He now also moves to dismiss or transfer the FBAR counts and to transfer the entire matter to the Southern District of Texas. Since filing this motion, Brockman has moved for a competency evaluation. This order on the motion to change venue and dismiss or transfer FBAR counts follows full briefing and oral argument.

## ANALYSIS

### 1. VENUE.

In the instant motion, Brockman challenges venue on two grounds. *First*, he argues that under 18 U.S.C. § 3237(b) and Rule 7(c)(1) and (f), the tax-evasion charges should be transferred to the Southern District of Texas. Section 3237(b) enables a defendant to "elect" prosecution in his home district if the basis for venue elsewhere "solely" relies on a defendant's mailing of the tax return into the district. Brockman had previously moved under Section 3237(b) and Rule 7. That motion was denied (Dkt. 53). For the same reasons, the motion to change venue under Section 3237(b) and Rule 7 is **DENIED**.

*Second*, Brockman challenges venue for the FBAR violations and contends that the government indicted him on those counts in the wrong district. A substantial unresolved question remains as to whether venue lies in this district for the FBAR counts. The government

posits that it can prosecute FBAR charges anywhere a person can submit an FBAR online. The defense views venue as proper in either the Southern District of Texas or the district in which the FBARs are centrally received, the Northern District of Virginia.

The prosecution cites two out-of-circuit decisions addressing venue for FBAR prosecutions: *United States v. Clines*, 958 F.2d 578 (4th Cir. 1992), and *United States v. Bradley*, 644 F.3d 1213 (11th Cir. 2011). *Clines* held that venue lies in the defendant's home district, the district containing the central receiving center for the FBAR, or any district where individuals could file FBARs. *See* 958 F.2d at 583. *Bradley*, too, held that venue for an FBAR prosecution could lie anywhere that one could file FBARs (at that time, any local IRS office). *See* 644 F.3d at 1252.

Those decisions predate 2013, however, when the IRS ceased to allow FBAR filing at local IRS offices and required them to be filed online *only*. Therefore, *Bradley* and *Clines* are distinguishable. Our court of appeals has not addressed venue for FBAR counts but did tackle a similar question in *United States v. Clinton*, 574 F.2d 464 (9th Cir. 1978), with respect to a criminal failure to file tax returns. The decision held that venue for failing to file tax returns attaches "at the defendant's place of residence, or at the collection point where the return should have been filed." *Id*. at 465. The decision held that prosecution in the Western District of Washington, which contained Washington's tax "collection center" (but where the defendant did not reside) met venue requirements. Since Clinton could have filed his return at the collection center, venue was proper there.

Brockman stands accused of failing to file FBARs, annually, each year from 2013 through 2018, so the earlier IRS rules governing their place of filing do not apply here. Both sides here seem to agree that the central collection point for FBAR filings sits in Virginia and that Brockman lives in Houston. In light of *Clinton* and the IRS rule change that eliminates the foundation of *Bradley* and *Clines,* it seems doubtful that the government's position could carry the day on this point. The stronger authority from our court of appeals thus favors the defense.

The government argues, alternatively, that venue is proper as to the FBAR counts because the indictment also charges a specific FBAR penalty provision, Section 5322(b), with each

FBAR violation count. The government urges that the penalty provision lays venue for the FBAR counts. Section 5322(b) enhances penalties for FBAR violations when the defendant violated "another law of the United States" or engaged in a "pattern of illegal activity involving more than $100,000 in a 12-month period." 31 U.S.C. § 5322(b). The government argues that it will prove a "pattern," which included Brockman's conspiracy and tax evasion. Since the conspiracy and tax evasion occurred locally, the government claims, venue is supposedly proper in this district for all counts of FBAR violations. The government analogizes to *United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999), which held that a kidnapping with use of a firearm could be prosecuted wherever the kidnapping took place. This kidnapping had traversed several districts, but the gun never entered the district where trial eventually occurred. The decision held that the gun was a "circumstantial" element, and its location did not necessarily determine venue. In contrast, kidnapping was the "essential conduct element[]" and its locations did lay venue. *Id.* at 280.

Similarly, *United States v. Magassouba*, 619 F.3d 202 (2d Cir. 2010), applied *Rodriguez-Moreno* and held that when identity theft occurred "during and in relation to" a predicate crime of bank fraud, the location of the bank fraud laid venue. *Id*. at 205–06. It reasoned that predicate bank fraud was "an essential element" of aggravated identity theft. *Rodriguez-Moreno* and *Magassouba*, however, miss the mark: the failure to file an FBAR is the primary conduct and would seem to be our "essential conduct element."

In short, the law on venue for the FBAR counts seems to favor the defense. This order need not make a definitive ruling, however, because, as discussed below, convenience and the interests of justice favor transfer of all counts. The doubtfulness of venue for the FBAR counts will have a supporting role in the tenth *Platt* factor, discussed below, since it would waste resources to find venue here and proceed through trial, only to likely have the FBAR counts vacated by our court of appeals. The motion to dismiss counts nine through fourteen is **DENIED AS MOOT**.

**2. RULE 21(b).**

Brockman moves to transfer the entire criminal matter to the Southern District of Texas "for the convenience of the parties and witnesses and in the interest of justice" under Rule 21(b). Factors to balance in deciding such a motion by a defendant are: (1) location of the defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of the place of trial; and (9) docket conditions in each district involved. *See Platt v. Minn. Min. & Mfg. Co.*, 376 U.S. 240, 243–44 (1964). These factors have been applied to trials of individuals and corporations. *See, e.g.*, *United States v. Testa*, 548 F.2d 847, 856–57 (9th Cir. 1977). Our court of appeals has held that a defendant must make a sufficient showing that convenience or the interests of justice warrant a change of venue under Rule 21(b). *See Wagner v. United States*, 416 F.2d 558, 562 (9th Cir. 1969). Trial courts undertaking the analysis, however, receive wide latitude and will not be overturned unless the results "clearly indicate an abuse of discretion." *Id.* at 564. Brockman urges that the Rule 21(b) factors favor transfer. For its part, the government opposes transfer and asserts that the *Platt* factors militate in favor of our district. It does not, however, assert that the law requires deference to its choice of district.

*First* (location of the defendant), Brockman lives in Houston. Specifically, he lives 7.4 miles from the United States District Court for the Southern District of Texas. By contrast, he lives 1900 miles from here. The government concedes that in 2019 Brockman resided "more in Houston than anywhere else," but argues that he peregrinated around the globe. The year is now 2021 and travel patterns have radically changed due to the COVID-19 pandemic. More importantly, Brockman *does* reside in Houston and this *Platt* factor focuses on just that: residence. It favors transfer (Ind. ¶ 1, Keneally Decl. Exh. A, Opp. at 7).

*Second* (location of possible witnesses), the trial witnesses residing closer to this district outnumber, but only slightly, those residing closer to Houston. The government has identified three to five local trial witnesses, including at least one witness from each of the two (unspecified) local "victim entities," against whom Brockman allegedly committed wire fraud.

Although the government could not confirm that the two employees still reside in the district, it asserted at the hearing that as of late 2019, prosecutors at least met with them locally. The government will also call one to three "fact[] witnesses" from Vista's local office (Ind. ¶¶ 161–189, 191(a), Opp. at 8, 3, Ind. ¶ 39).

With respect to witnesses proximate to Houston, the government confirmed at the hearing that "Individual Two" refers to Robert Smith. He lives in Austin, Texas, has entered a non-prosecution agreement with the government, and features prominently in the indictment. The government also agreed at the hearing that "Individual Three," relevant to the accusations that Brockman altered or destroyed evidence, lives in Oxford, Mississippi. The government identified "Individual One" in the indictment as Evatt Tamine; parties agree that he currently resides abroad. Tamine, who the government stated at the hearing is now living in the United Kingdom, lies beyond the subpoena power of the Court but if a deposition of him were taken there, it would be inconvenient to both venues under consideration. Both the Austin- and Mississippi-based witnesses reside far closer to Houston than San Francisco and will have starring roles at trial if the indictment is true (Ind. ¶¶ 8–13, 31, 32, 34–36, 39, 46–54, 56–58, 61–80, 82–127, 165, 166, 172–185, 195, 196).

Brockman's counsel also declares, without further explanation, that "at least 17" subpoenas "have been presented to" parties local to Houston. We have no information as to their roles or whether they will be called at trial, so this order will ignore them. Brockman's tax preparer resides in Houston and very likely will be a witness at trial (Keneally Decl. ¶¶ 29, 22–24, Exh. H at 7, ¶¶ 19, 35–36).

Brockman has, moreover, moved for a competency hearing and his counsel name Southern District of Texas-based witnesses (four doctors, Brockman's wife, and an unspecified number of friends and colleagues) who will participate in a potentially dispositive pretrial hearing; they feature less in the central question of the trial but deserve at least some consideration for their stated roles in testifying about Brockman's changed cognitive function and, thus, in the important pretrial issue of competency (Keneally Decl. ¶¶ 5–16, Dkt. 64, Pool Decl. ¶ 8).

All told, the tally of trial witnesses favors, just barely, the Northern District of California by a count of three (possibly as many as five) to three. The possibility of more numerous local witnesses does not dramatically tip the scale against transfer, especially keeping in mind that the two of the three witnesses for whom Houston is more convenient are called out as important in the indictment itself. Factoring in, to a lesser extent, the convenience of the Houston-based competency witnesses, the location-of-witnesses factor appears evenly split between the two districts.

*Third* (location of events likely to be at issue), the events of this case occurred in Texas, Colorado, Northern California, and abroad. Per the indictment, Brockman conspired to defraud the United States in the district "and elsewhere" between 1999 and 2019, but the most significant local events occurred at the beginning of the scheme, in approximately 2000, around the time of Vista's founding. At that time, it maintained its principal place of business in San Francisco and Individual Two resided in the district as well. Brockman's actions locally included investing in Vista's very first fund; in fact, he, alone, invested. He also allegedly worked with Vista throughout the early 2000s. In 2011 however, Vista opened offices elsewhere, including in Austin, Texas. At some point, Individual Two also relocated to Texas (a fact that the government acknowledged at oral argument). The indictment alleges that over the next two decades, Vista worked at Brockman's behest, but does not name the locations of individuals at Vista who, after the company's 2011 expansion, acted on Brockman's behalf. Vista's purported work for Brockman, meanwhile, certainly implicated locations abroad: Vista invested Brockman's money in funds organized solely abroad and transferred his pre-tax capital gains to offshore accounts, among other places. Other nominees, on Brockman's behalf, made further international investments, bought real property and even a yacht abroad, all purportedly to help him avoid paying taxes on those earnings (Ind. ¶¶ 29, 6–8, 42, 14, 15, 39, 89, 91).

The counts most explicitly tied to this district allege wire fraud, which involved emails and wire transmissions to local individuals and companies as well as an unnamed local investor and two local "entities." The emails to individuals in the district dated March 2009 through April 2010 and the scheme involved six false statements to various debt-securities holders including

"ones in" this district. The alleged fraud consisted of Brockman's purchase of debt securities owed by his own software corporation: Brockman first sought to purchase debt securities from the debt administrator, Deutsche Bank, using a proxy (a nominee individual) to disguise his role. Deutsche Bank then acquired the debt securities from local "victim entities" and an investor in order to sell them to Brockman. Brockman finally purchased the debt securities through his proxy. He never revealed his role. This deceit, the government explained at the hearing, materially misled the victim entities because, had they known about Brockman's involvement, they would have viewed his offer as that of an officer of the debtor corporation and as a signal that the debtor corporation could have continued to make payments. Lacking that information, the victim entities supposedly underpriced the debt securities (Ind. ¶¶ 19, 189, 178, 179, 186, 11).

The events in the indictment also include two San Francisco-based financial transfers: Brockman directed one transfer of over $14 million of his Vista investment gains from a San Francisco bank to a Caribbean bank, and another, of more than $41 million, from a bank in San Francisco to one in Switzerland. The final connection to the district appears in the last counts of the indictment, which allege, vaguely, that Brockman interfered with evidence "[i]n" the district "and elsewhere." The transfers that the indictment identifies as being from or to this district, however, represent just a few out of a nearly two-decade period of active investments. It is true that the indictment names our district fifty-one times and San Francisco twice (in addition), but it also uses the phrase "and elsewhere" to refer to events' locations twenty-two times. Brockman indeed maintained out-of-state residences and it remains far from clear that any of Vista's actual work on his behalf "occurred" in its local office after 2011. Given the considerable doubt that remains about the locations of many events in the indictment, the location-of-events *Platt* factor either favors neither district or favors this district slightly (Ind. ¶¶ 191, 192, Keneally Decl. ¶ 35).

*Fourth* (the location of documents and records likely to be involved), this factor favors neither district. Brockman argues that records sit where the events happened, and claims that most events occurred either in the Southern District of Texas, where he maintained a residence,

or abroad. Via the grand jury and the IRS, the government already has the documents it needs. The defense will probably rely on its own records. The need to subpoena third-party records appears minimal and to the extent anyone needs to do so, those records will very likely be in electronic form and transportable to either district. This factor favors neither district.

*Fifth* (disruption of business), both sides agree that Brockman has retired. Trial will not disrupt his "business." Brockman argues that his health now is his "business" and that this *Platt* factor favors transfer. Not so. This order evaluates Brockman's health below, under the "special elements" factor (number ten). *See, e.g.*, *United States v. Bowdoin*, 770 F. Supp. 2d 133, 139 (D.D.C. 2011) (analyzing the physical health of a defendant's wife under the "special elements" factor). This factor does not favor either district.

*Sixth* (expense to the parties), the government argues that transferring a fraction of the counts (the FBAR counts) would be extraordinarily expensive. The government does not claim, however, that prosecuting the whole case in the Southern District of Texas would cost more than prosecution here. Brockman argues that trial will be less expensive if held closer to the events in the case and, therefore, that this factor is either neutral or favors transfer. To repeat, the locations of many events in the case remain unclear. The expense factor is a draw.

*Seventh* (location of counsel), Brockman admits that this factor favors neither district and that his attorneys reside in both this district and the Southern District of Texas, as well as in New York and Washington, D.C. The government states that while one local AUSA is working the case, three of the four attorneys on the case come from the Tax Division in Washington, D.C. Since each side has at least one attorney living in our district, and other attorneys residing elsewhere, the location of counsel factor is also a draw (Opp. at 11).

*Eighth* (accessibility of the location of trial), both Houston and San Francisco constitute major metropolitan areas. This factor remains neutral.

*Ninth* (docket conditions), the median time from case filing to disposition in felony cases took 12.4 months in this district compared with 4.2 months in the Southern District of Texas. *See Federal Management Statistics, Administrative Office of the Courts*, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2020.pdf (last visited Jan.

4, 2021). Although delays in trials everywhere hinge on the COVID-19 pandemic, our district has suspended all in-person proceedings for the time being due to the rate of COVID-19 transmission and the critical dearth of ICU capacity. The Southern District of Texas has also suspended jury trials, but as of early January, intended to resume them on January 19, 2021. *See* CoronaVirus Disease 2019 (COVID-19) – SDTX Related Orders and Courthouse Statuses (last updated Dec. 17, 2020), https://www.txs.uscourts.gov/. And, the Southern District of Texas does currently show substantially less docketing delay. The government argues that transfer itself will slow the case's progression and offset the benefits of a faster docket, citing *United States v. Larsen*, No. 13 CR 688 JMF, 2014 WL 177411, at *3 (S.D.N.Y. Jan. 16, 2014) (transfer unwarranted after accounting for the time necessary to execute transfer). That felony cases progress in the Southern District of Texas at nearly three times the rate here, however, renders its argument less potent. The government also argues that Brockman has not requested an earlier trial date than this district can accommodate. This factor does not turn on the defendant's request but on the relative conditions of the dockets. As circumstances now stand, the docket-conditions factor favors transfer.

*Tenth* (special elements and interests of justice), Brockman will turn 80 during this case. His cognitive ability, memory, and mobility have declined, due to what his doctors believe is either Parkinson's disease, Parkinsonism, Lewy body dementia, or "some combination" of all three. Counsel for Brockman offered the government the chance to interview Brockman's doctors prior to the indictment to understand his health for themselves. The government spurned the offer during the months in which it remained open. Now, the government seeks to try him thousands of miles from home. In support of his motion to transfer, Brockman offers his physician's opinion. Dr. James L. Pool opines that facing trial in a district other than Houston would disorient Brockman "in a manner that could accelerate the deterioration of his mental condition." By way of explanation, he declares that Brockman experiences "progressive dementia," as well as short- and long-term memory loss. (Dr. Pool also opines that a trial far from home threatens "creating a risk to his existing cardiac condition" but does not elaborate on how or on the nature of the cardiac condition.) Dr. Pool declares that it is "not medically

advisable" for Brockman to travel to San Francisco due to his advanced age and elevated risk of serious illness from the novel coronavirus (Pool Decl. ¶¶ 5, 7–9, 10).

The Rule 21(b) analysis must also examine two additional elements under the special-elements *Platt* factor: *first*, Rule 21(b) requires the court to consider victims' locations. *See* FRCrP 21, Advisory Committee Notes. Two victims, both corporations, operate in our district (and elsewhere).

*Second*, in a Rule 21(b) analysis, courts may also transfer a criminal action if the "interests of justice" so demand. FRCrP 21(b). The United States Department of Justice recommendations inform our assessment of the "interests of justice:"

> It is the policy of the Department of Justice generally to attempt to establish venue for a criminal tax prosecution in the judicial district of the taxpayer's residence or principal place of business, because prosecution in that judicial district usually has the most significant deterrent effect.

*United States Department of Justice, Criminal Tax Manual*, 6.01[2] Policy Considerations. This DOJ policy statement delineates an important interest. Houston is clearly the proper location for this case under DOJ policy. Additionally, the stronger view of mandatory venue for the FBAR counts favors the defense. It would better serve the interests of justice to keep the case together than to sever and transfer those counts. It would similarly defeat the ends of justice to try the whole case here only to have our court of appeals vacate those counts for a retrial. For the reasons stated above, such a reversal would be a realistic scenario should the case remain here. Given Brockman's age and questionable health, we do not have the luxury to try this case twice. In the interests of justice, it should be tried where venue is unquestionably proper and that is the place of his residence. The government also argues that rates of COVID-19 infection appeared worse in the Houston area than in San Francisco at the time it filed its opposition and that, therefore, the interests of justice favor trial here. The data are highly changeable and so do not sway the special-elements factor. Brockman's health, the public interest in deterrence, and the interest in a singular prosecution outweigh the location of victims in this tenth *Platt* factor. This factor clearly favors transfer.

In summary, three *Platt* factors weigh in favor of transfer (location of defendant, docket crowding, and the special factor of Brockman's illness and interests of justice). One factor militates against transfer (disruption). The location-of-events factor possibly favors this district but, if so, only slightly. Five other factors appear neutral (location of witnesses, location of documents, location of counsel, accessibility of the court, and expense). The *Platt* factors favor transfer. The Rule 21(b) motion is **GRANTED**.

**CONCLUSION**

The Clerk shall transfer this criminal action to the United States District Court for the Southern District of Texas.

**IT IS SO ORDERED.**

Dated: January 4, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

Reset Form

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

## APPLICATION FOR REFUND (USDC-CAND PAY.GOV)

### PAY.GOV TRANSACTION DETAILS

***IMPORTANT***:

- *Complete all required fields (shown in red*); otherwise, your request may be denied and require resubmission.*
- *In fields 3-6, enter the information for the **incorrect** transaction (the one for which you are requesting a refund), not the **correct** transaction that appears on the docket. This information can be found in the Pay.gov screen receipt or confirmation email.*

| | |
|---|---|
| **1. Your Name:*** Jacqueline Peters | **7. Your Phone Number:** (650) 739-3982 |
| **2. Your Email Address: *** jpeters@jonesday.com | **8. Full Case Number (if applicable):** 3:20-cr-00371 |
| **3. Receipt Number:*** 0971-15180351 | **9. Fee Type:*** ☐ Attorney Admission ☐ Civil Case Filing ☐ FTR Audio Recording ☐ Notice of Appeal ☑ Pro Hac Vice ☐ Writ of Habeas Corpus |
| **4. Transaction Date:*** 11/11/2020 | |
| **5. Transaction Time:*** 2:30 pm | |
| **6. Transaction Amount (Amount to be refunded):*** $ 310.00 | |

**10. Reason for Refund Request:*** *Explain in detail what happened to cause duplicate charges or no fee required.*

- *For a duplicate charge, provide the **correct** receipt number in this field.*
- *If you paid a filing fee in an abandoned case number, note that case number here (but e-file the refund request in the **open** case).*

We filed a Pro Hac Vice and paid the $310 but it was denied so we refiled it and said we had already paid it and on the docket and it says it was not charged but it was on our credit card again on 11/12/20 and is listed being paid twice on the Internet Payment History. The other duplicate charge is 0971-15183977 Thank you.

✓ ***Efile this form using*** **OTHER FILINGS → OTHER DOCUMENTS → APPLICATION FOR REFUND.**

*View detailed instructions at: cand.uscourts.gov/ecf/payments. For assistance, contact the ECF Help Desk at 1-866-638-7829 or ecfhelpdesk@cand.uscourts.gov Monday -Friday 9:00 a.m.-4:00 p.m.*

| **FOR U.S. DISTRICT COURT USE ONLY** | |
|---|---|
| Refund request: ☐ Approved ☐ Denied ☐ Denied — Resubmit amended application (see reason for denial) | |
| Approval/denial date: | Request approved/denied by: |
| Pay.gov refund tracking ID refunded: | Agency refund tracking ID number: 0971- |
| Date refund processed: | Refund processed by: |
| Reason for denial (if applicable): | |
| Referred for OSC date (if applicable): | |