# EXHIBIT 1

# JONES DAY

250 VESEY STREET • NEW YORK, NEW YORK 10281.1047

TELEPHONE: +1.212.326.3939 • FACSIMILE: +1.212.755.7306

DIRECT NUMBER: (212) 326-3402
KKENEALLY@JONESDAY.COM

April 9, 2020

By Federal Express and Email

Corey J. Smith
Tax Division
United States Department of Justice
150 M Street, NE
Room 2.208
Washington, DC 20004

Michael G. Pitman
Assistant United States Attorney
Office of the United States Attorney for the Northern District of California
Heritage Bank Building
150 Almaden Boulevard, Suite 900
San Jose, CA 95113

Re:   Robert T. Brockman

Dear Mr. Smith and Mr. Pitman:

We represent Robert T. Brockman.  We understand that Mr. Brockman is under investigation by a grand jury in the Northern District of California.

Bob Brockman has dementia.

Mr. Brockman will be 79 years old on May 28.  He was diagnosed with dementia based on a series of medical examinations that were conducted between December 2018 and March 2019, following observations by his family, and his own sense that he has been experiencing memory loss and other physical and cognitive challenges for at least the prior two or three years.

Mr. Brockman shared his medical reports with us in August 2019, and we have reached out to the examining doctors concerning the extent to which Mr. Brockman's dementia affects his ability to assist in his defense.  At our request, one of these experts, Michele K. York, Ph.D.,

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DETROIT
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID • MELBOURNE
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SAUDI ARABIA • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

United States Department of Justice
April 9, 2020
Page 2

conducted a second examination of Mr. Brockman for the purpose of providing a forensic expert opinion. She concluded: "Based on the current cognitive findings, his diagnosis of dementia, and the breadth and severity of his cognitive impairments and fluctuations, it is my opinion that Mr. Brockman is unable to participate and aid in his own defense."[1]

Mr. Brockman has been examined by leading experts in their fields. This letter summarizes the medical reports, and subsequent information that they provided to us. The medical reports and other information from the doctors are attached.

We understand that there is a substantial amount of detailed medical information in these reports. We can confirm that we have seen the same behaviors described by Mr. Brockman's doctors. He has been unable to recall significant events, he does not recognize documents, and we have been unable to refresh his recollection. We did not know that the challenges we were encountering as counsel were the result of dementia, however, until he shared his doctors' reports with us. It has also been our experience that Mr. Brockman's ability to address the issues in this matter has grown progressively worse. He will sometimes completely lose focus in a discussion, or he will focus on issues that are not relevant. He fails to recall discussions that we have had with to him. Quite simply, he cannot assist us in preparing his defense, nor can he assess the decisions that someone under criminal investigation is called upon to make.

Mr. Brockman also can no longer effectively serve as the chief executive officer of Reynolds and Reynolds. He has difficulty remembering significant information. He cannot put his thoughts into written form, and cannot even recall how to spell common words. He asks his wife to assist him in these tasks. He struggles to focus on tasks that he sets out to do. He routinely lacks the ability to initiate any action. He may provide short responses to emails, or with his wife's assistance, compose a longer answer, but in fact he is corresponding by email less and less.

Mr. Brockman has identified a successor chief executive officer and management team, and he will shortly step down as CEO and Chair, and assume a consulting role at the company. It is a point of pride for Mr. Brockman that he built Reynolds and Reynolds by identifying talented people who grew with the company and who have served in their jobs for many years. He entrusted them over the years with decentralized decision-making as much as possible. Mr. Brockman rarely goes into his office, and few people see him day-to-day. It is apparent now that

---

[1] Dr. York's Confidential Neuropsychological Evaluation, conducted on December 3, 2019, is attached hereto as Exhibit A, and cited to as "York Forensic Evaluation." Dr. York's biography is attached hereto as Exhibit B.

JONES DAY

United States Department of Justice
April 9, 2020
Page 3

they have increasingly been taking responsibility to continue to operate the company even as his ability to do so has diminished.

Based on the medical reports, and our experience, we submit that a prosecution against Mr. Brockman under these circumstances would be in contradiction of the principles set out in the United States Justice Manual and the fundamental principles of due process. After you have had an opportunity to review these materials, we welcome discussing with you additional steps that you may want to take to evaluate this issue.

A.     Mr. Brockman's Medical Care

All of the examining doctors concur that Mr. Brockman is cognitively impaired and that this condition is progressive. They have expressed different medical opinions as to the causes of his dementia. Their diagnoses, none of which can be confirmed ante-mortem, conclude that his symptoms may be indicative of Lewy body dementia, Parkinson's disease, parkinsonism, or some combination of these conditions.

Lewy body dementia (sometimes referred to as dementia with Lewy bodies) results from protein deposits, called Lewy bodies, that develop in nerve cells in the brain regions involved in thinking, memory and movement. Lewy body dementia may manifest in the same physical symptoms – rigid muscle, slow movement, tremors – as Parkinson's disease. Lewy body dementia results in cognitive impairment, including confusion, poor attention, visual-spatial problems, and memory loss. Lewy body dementia is incurable, progressive, and terminal, with death resulting on average approximately eight years after the onset of symptoms.[2]

Parkinson's disease is a progressive nervous system disorder that affects movement, and may result in rigid muscles, slow movement, impaired posture, and tremors. While medication may help with the physical symptoms, Parkinson's disease is incurable. The presence of Lewy bodies in the brain is a marker of Parkinson's disease. Parkinson's disease may also cause dementia, which is progressive and generally resistant to treatment.[3] Parkinsonism is a term used to describe a condition that causes a combination of the movement abnormalities seen in Parkinson's disease, especially resulting from the loss of dopamine-containing neurons.[4]

---

[2] *See* https://www.mayoclinic.org/diseases-conditions/lewy-body-dementia/symptoms-causes/syc-20352025.

[3] *See* https://www.mayoclinic.org/diseases-conditions/parkinsons-disease/symptoms-causes/syc-20376055.

[4] *See* https://www.mayoclinic.org/diseases-conditions/parkinsons-disease/expert-answers/parkinsonism/faq-20058490.

JONES DAY

United States Department of Justice
April 9, 2020
Page 4

Regardless of the specific diagnosis, as a result of his cognitive impairment, Mr. Brockman cannot recall significant events that we believe will be at issue in this case. As Dr. York states: "He is unable to recall and demonstrate a thorough understanding of the relevant elements of the issues surrounding the case and manipulate this information in a logical manner that will allow him to make comparisons and weigh his options." (Ex. A, York Forensic Evaluation at 8.) In other words, he cannot understand the underlying facts of this investigation or the charges that may be brought against him, and he cannot defend himself.

    1.    <u>Dr. Pool's Examinations and Referrals</u>

Mr. Brockman has been under the care of Seth P. Lerner, M.D., for many years. Dr. Lerner, Professor of Urology at Baylor College of Medicine, treated Mr. Brockman for bladder cancer in 2006 and has conducted follow up examinations in the years since. During an examination in September 2018, Mr. Brockman reported to Dr. Lerner that he had not been feeling well for several months. Dr. Lerner referred Mr. Brockman to James L. Pool, M.D., who is also a professor and treating physician with Baylor College of Medicine, for a general physical examination.[5]

Dr. Pool conducted a physical examination of Mr. Brockman on December 11, 2018. As part of that examination, he also met with Mr. Brockman's wife, Dorothy, and their adult son, Robert. Dr. Pool reported that Mr. Brockman's cognitive challenges had been noticeable for about three years. As a result, Dr. Pool referred Mr. Brockman to three other medical professionals: Joseph Jankovic, M.D., a neurologist and specialist in Parkinson's disease and other movement disorders, Melissa Yu, M.D., a neurologist and specialist in Alzheimer's Disease and other memory disorders, and Michele K. York, Ph.D., a neuropsychologist, all with Baylor College of Medicine.

The reports that each of these doctors provided to Dr. Pool are discussed more fully below. In summary, Dr. Jankovic found that Mr. Brockman presented symptoms that are consistent with Parkinson's disease or vascular parkinsonism. Dr. York and Dr. Yu agreed that Mr. Brockman's movements are consistent with Parkinson's disease or parkinsonism, but they concluded that his cognitive impairment is more consistent with Lewy body dementia. These diagnoses cannot be confirmed except at autopsy. All four – Dr. Pool, Dr. Jankovic, Dr. York, and Dr. Yu – agreed that Mr. Brockman has mild to moderate dementia.

---

[5] Dr. Lerner's and Dr. Pool's biographies are attached hereto as Exhibits C and D, respectively.

JONES DAY

United States Department of Justice
April 9, 2020
Page 5

Dr. Pool examined Mr. Brockman again on October 1, 2019, and had a cognitive evaluation performed.  Mr. Brockman scored 12 out of 29 points on this test.  As the report stated: "This score falls below the cutoff for dementia in patients of this age and education level and is typically associated with Major Neurocognitive Disorder, moderate (formerly Moderate Dementia)."[6]

Dr. Pool conducted his examination of Mr. Brockman and prepared his reports prior to any communication between him and Mr. Brockman's counsel.  After counsel spoke with Dr. Pool, he provided a letter to counsel summarizing this diagnosis.[7]  As Dr. Pool explained in his letter, severe dementia will be characterized by a person's inability to know where he is or with whom he is speaking, while a person with mild to moderate dementia has some recognition of what is going on around him, and may even be able to conceal his limitations.

Dr. Pool stated that, at this stage, Mr. Brockman has short-term memory limitations that prevent him from understanding what is being asked of him and responding appropriately.  (Ex. F, Pool Letter at 2.)  Dr. Pool also explained the risk of "confabulation" when Mr. Brockman tries to access long-term memory.  As Dr. Pool explained, Mr. Brockman's dementia will cause his brain to fabricate information to fill in gaps in his memory.  Mr. Brockman will believe that the information that he is providing is correct, but it will be the result of distortions in how his brain is functioning.  (Ex. F, Pool Letter at 2.)

Dr. Pool further stated that Mr. Brockman, who enjoyed a high intelligence and functioned at a high level prior to the onset of dementia, may be able to conceal his limitations in social and business settings.  In Mr. Brockman's case in particular, Dr. Pool observed from his discussions with Mr. Brockman's wife and son that Mr. Brockman has a support network that can allow him to compensate subconsciously and suppress his deficiencies in many settings.  (Ex. F, Pool Letter.)

Dr. Pool concluded:  "I concur with the medical position that Mr. Brockman cannot assist his attorneys in his defense, if criminal charges were to be brought against him."  (Ex. F, Pool Letter at 2.)

---

[6] A copy of Dr. Pool's October 1, 2019 report is attached hereto as Exhibit E, and cited to as "Pool Report."

[7] Dr. Pool's January 14, 2020 letter to counsel, prepared in connection with this submission, is attached hereto as Exhibit F, and cited to as "Pool Letter."

JONES DAY

United States Department of Justice
April 9, 2020
Page 6


    2.    Dr. Jankovic's Examination

Dr. Jankovic was the first of the medical specialists to examine Mr. Brockman following Dr. Pool's referrals. Dr. Jankovic is a Director of the Parkinson's Disease Center and Movement Disorders Clinic at Baylor College of Medicine, where he holds the Distinguished Chair in Movement Disorders.[8]

Dr. Jankovic examined Mr. Brockman on January 30, 2019.[9] His report noted that Mr. Brockman's symptoms included walking and balance difficulties, stooped posture, slowness of movement, difficulty with dexterity, micrographia (abnormally cramped handwriting), anosmia (loss of sense of smell), and dream-acting behavior, which Mr. Brockman first noticed a year and a half before Dr. Jankovic's examination. Dr. Jankovic observed that his examination showed leg rigidity, mild bradykinesia (slow movement and impaired ability to move on command), and a parkinsonian gait. (Ex. H, Jankovic Report at 5.) Dr. Jankovic concluded that Mr. Brockman's "history and examination are consistent with the diagnosis of postural instability gait difficulty (PIGD) type Parkinson's disease" and that "[v]ascular parkinsonism is also a possible consideration given his lower body predominant symptoms and presence of vascular risk factors that include atrial fibrillation hypertension, and hyperlipidemia." (Ex. H, Jankovic Report at 5.) Dr. Jankovic requested an additional test "to evaluate for dopaminergic deficiency and differentiate between vascular parkinsonism and idiopathic Parkinson's disease." (Ex. H, Jankovic Report at 5.)

Dr. Jankovic's examination and report was completed before Mr. Brockman informed counsel of his health issues. At counsel's request, Dr. Jankovic prepared a letter with some additional observations.[10] Subsequent to his examination, Dr. Jankovic received Dr. York's initial test results, and is familiar with Dr. Yu's conclusion that Mr. Brockman's symptoms support a diagnosis of Lewy body dementia. He noted in his letter that he can understand how Dr. Yu and Dr. York reached their conclusions, and that there is no determinative test that can be given to a living patient for Lewy body dementia, Parkinson's disease, or parkinsonism. He noted that hallucinations are a hallmark of Lewy body dementia, and that Mr. Brockman denied having experienced hallucinations during his examination. (Ex. I, Jankovic Letter.)

---

[8] Dr. Jankovic's biography is attached hereto as Exhibit G.

[9] Dr. Jankovic's January 30, 2019 report is attached hereto as Exhibit H, and cited to as "Jankovic Report."

[10] Dr. Jankovic's January 14, 2020 letter to counsel, prepared in connection with this submission, is attached hereto as Exhibit I, and cited to as "Jankovic Letter."

JONES DAY

United States Department of Justice
April 9, 2020
Page 7

Dr. Jankovic confirmed that during his examination of Mr. Brockman, he observed significant memory deficits and evidence of dementia. In his letter to counsel, Dr. Jankovic summarized that Mr. Brockman's dementia makes him unable to recall information and to respond accurately to inquiries. He said that Mr. Brockman has "trouble accessing information" and "making connections between questions that he is being asked and his recollection of events." (Ex. I, Jankovic Letter at 1.) Dr. Jankovic noted that a characteristic of Mr. Brockman's cognitive impairment is a tendency toward confabulation, which he described as causing someone to "sometimes make up stories or provide information about something that has not occurred." (Ex. I, Jankovic Letter at 1.) Dr. Jankovic distinguished this from lying, explaining that confabulation is "a symptom of cognitive impairment, and is not voluntary." A cognitively impaired person will believe that he is reporting truthfully when nonetheless confabulating. (Ex. I, Jankovic Letter at 1-2.) Dr. Jankovic also noted that someone with Mr. Brockman's cognitive impairment may appear to be able to carry on a discussion, but that "any information that he may provide may be partial and not complete or accurate." (Ex. I, Jankovic Letter at 2.) Dr. Jankovic stated: "I understand that you are asking whether Mr. Brockman can assist you in preparing a legal defense. It is my view that his cognitive impairment will prevent him from doing so." (Ex. I, Jankovic Letter at 1.)

3.    Dr. Yu's Examination

Dr. Pool also referred Mr. Brockman to Dr. Yu, who is an associate professor in neurology at Baylor College of Medicine, as well as Associate Medical Director for the Baylor Clinic of Neurology and Associate Director, Clinical Operations, for the Baylor Alzheimer's Disease and Memory Disorders Centers.[11]

Dr. Yu examined Mr. Brockman on March 20, 2019.[12] Her report included discussions of Dr. Jankovic's examination report, the intervening test that was performed on Dr. Jankovic's recommendation, and the first set of tests performed by Dr. York, which are discussed more fully below.

Dr. Yu met with Mr. Brockman, his wife, and their son. She summarized that Mr. Brockman described himself as "always having 'superior memory.'" (Ex. K, Yu Report at 2.) She stated that he reported that his symptoms began two years prior, but that Dorothy said that she had noted symptoms about three years ago. (Ex. K, Yu Report at 2.) Their son reported that Mr. Brockman "repeats himself at times." (Ex. K, Yu Report at 2.) Dr. York's report also noted

---

[11] Dr. Yu's biography is attached hereto as Exhibit J.

[12] Dr. Yu's March 20, 2019 report is attached as Exhibit K hereto and cited to as "Yu Report."

JONES DAY

United States Department of Justice
April 9, 2020
Page 8

that the Brockmans reported that he was "always misplacing objects," had spelling difficulties, failed to remember to take medications, had "some difficulty with planning out tasks at work," and that "family notes that he doesn't initiate activity like he used to." (Ex. K, Yu Report at 2.) Dr. Yu stated that Mr. Brockman "reports episodes of 'blankness' associated with less interaction alternating with improved cognition." (Ex. K, Yu Report at 2.) She continued: "His son notes significant fluctuations in terms of his decision making abilities, with good days and bad days." (Ex. K, Yu Report at 2.) The report also included a discussion of physical symptoms, including stooped posture, a deterioration in his gait, handwriting issues, loss of smell, and decrease in facial expression. (Ex. K, Yu Report at 2.)

Dr. Yu summarized: "Pattern indicates a dementia of mild to moderate severity with deficits in areas of visuospatial functioning, verbal and nonverbal episodic memory and executive functioning, with mild functional declines." (Ex. K, Yu Report at 6.) She also reviewed the test results requested by Dr. Jankovic for the purpose of differentiating between Parkinson's disease and Lewy body dementia. (Ex. K, Yu Report at 7.) She concluded that Mr. Brockman's symptoms are "consistent with dementia with Lewy Bodies." (Ex. K, Yu Report at 6, 7.) She recommended that Mr. Brockman stop driving, and she advised him "on diagnosis of a neurodegenerative disorder with cognitive impairment and possible implications on his work and advised he discuss further with his family." (Ex. K, Yu Report at 6, 7.)

Dr. Yu was also able to review the results of a DaTscan that had been ordered by Dr. Jankovic. A DaTscan measures the number of dopamine transporters in the brain regions critical for movement and cognition. In Mr. Brockman's case, the critical neurons responsible for producing dopamine are irrevocably damaged. Dr. Yu noted that this test showed: "Severe loss of dopaminergic neuronal function in the bilateral dorsal striata …." (Ex. K,Yu Report at 7.) In other words, Mr. Brockman has significant, measurable changes to his brain structure that can be seen as the basis for his dementia.[13]

As with Dr. Pool and Dr. Jankovic, Dr. Yu completed her examination and medical report before counsel for Mr. Brockman contacted her. At the request of counsel, Dr. Yu also provided a letter to put her report in context.[14] In addressing the observation made by Mr. Brockman's son that he experiences "fluctuations," Dr. Yu noted that it is a specific characteristic of Lewy body dementia that a person will experience day-to-day and even hour-to-hour fluctuations in the

---

[13] A copy of the Diagnostic Report of the DaTscan is attached hereto as Exhibit L, and a copy of the DaTscan images is attached hereto as Exhibit M.

[14] Dr. Yu's January 21, 2020 letter to counsel, prepared in connection with this submission, is attached hereto as Exhibit N and is cited to as "Yu Letter."

JONES DAY

United States Department of Justice
April 9, 2020
Page 9

ability to function.  (Ex. N, Yu Letter.)  Dr. Yu explained that patients with dementia will experience anosognosia, which means that they will lose insight into their cognitive impairment.  (Ex. N, Yu Letter.)  She described how others may also fail to perceive someone's cognitive limitations, noting that "[i]ndividuals with dementia, who have good social instincts and expansive vocabulary may appear to function well on a surface level."  (Ex. N, Yu Letter.)  She referred to this as the ability to retain "social niceties" despite cognitive impairment, and further noted that "individuals who have been in business or professionally active for a long time may be able to speak on business issues in a way that appears functional, but will face difficulties when pressed for decisions or specifics."  (Ex. N, Yu Letter.)  Dr. Yu also distinguished dementia from memory loss, noting:  "The impact of dementia includes visual spatial function, language, memory, and executive function—in essence, all aspects of thought and cognitive function."  (Ex. N, Yu Letter.)

4.      Dr. York's Examinations

Dr. York works closely with Dr. Yu, and was also included in the referrals from Dr. Pool.  Dr. York is an associate professor in neurology and psychiatry and behavioral sciences, and the head of the Section of Neuropsychology at Baylor College of Medicine.  She is certified in clinical neuropsychology.

Dr. York examined Mr. Brockman twice – first on March 1, 2019, in conjunction with the series of examinations recommended by Dr. Pool, and a second time on December 3, 2019, at the request of counsel for the specific purpose of evaluating Mr. Brockman's ability to assist in his defense.[15]  The second examination specifically included tests to determine whether Mr. Brockman was trying to fake his deficiencies.  To the contrary, he tried his best to refute that he lacks competency.

Dr. York's December 3, 2019 forensic report contained a simple, graphic illustration of Mr. Brockman's cognitive impairment:  he cannot draw a clock.  (Ex. A, York Forensic Evaluation at 6.)  Asking a patient to draw a clock is one of the basic tests to determine cognitive impairment.  Dr. York's forensic report included the drawing of a clock that Mr. Brockman made during her examination of him on March 1, 2019.  (Ex. A, York Forensic Evaluation at 6.)

Mr. Brockman and his family were sufficiently shocked by this result that, as reported by Dr. Yu, he practiced drawing various figures following Dr. Yu's initial examination.  (*See* Ex. K,

---

[15] Dr. York's Confidential Neuropsychological Evaluation, conducted on March 1, 2019, is attached hereto as Exhibit O, and cited to as "York Clinical Report."

JONES DAY

United States Department of Justice
April 9, 2020
Page 10

Yu Report at 2; Ex. A, York Forensic Evaluation at 4.)  Mr. Brockman reported to Dr. Yu that he specifically practiced drawing clocks.  Nonetheless, when tested again on December 3, 2019, Mr. Brockman again failed at this basic task.  (*See also* Ex. E, Pool Report at 1.)  Dr. York set out these two clock drawings, done nine months apart, side-by-side in her report:

**Clock Drawing**



03/01/2019                                                        12/03/2019

     a.     <u>Dr. York's Clinical Evaluation</u>

Dr. York conducted her initial evaluation of Mr. Brockman and prepared her March 1, 2019 report to assist Dr. Yu in making a medical diagnosis of his condition and determining a course of treatment.  (Ex. O, York Clinical Report at 1.)  Her March 1, 2019 report began with a summary of her interview of Bob and Dorothy Brockman, noting that they reported that for a two- to three-year period he had been experiencing short-term memory loss, a tendency to repeat himself, losing things, losing his train of thought, forgetting names of people that he recently met, forgetting familiar locations, spelling difficulties, slowed physical responses, slowed decision-making, and difficulty multi-tasking.

Dr. York next reported on her behavioral observations of Mr. Brockman during the testing, noting that he showed a "moderately decreased ability to follow directions," that he "frequently needed repetition of directions and to be reoriented to task," that he "perseverated to previous tasks" (meaning that he repeated prior responses out of context), that "[t]he examiner needed to be concrete for him to understand the task instructions," that his "processing speed was extremely" slow, and that his "handwriting was micrographic."  (Ex. O, York Clinical Report at 2.)  She added:  "He lacked insight into his cognitive problems," noting that he "said he was not doing well, but he appeared very surprised."  (Ex. O, York Clinical Report at 2.)

JONES DAY

United States Department of Justice
April 9, 2020
Page 11

Dr. York personally observed an event that ultimately supported her and Dr. Yu's conclusion that Mr. Brockman has Lewy body dementia:  during the examination, he experienced an hallucination.  As Dr. York reported:  "He saw a bug on the floor of the testing room that was not present."[16]  (Ex. O, York Clinical Report at 2, 5.)

Dr. York's March 3, 2019 report listed the large number of tests that she administered over several hours, followed by a summary of the results in clinical terms, many of which make apparent his cognitive shortcomings.  (Ex. O, York Clinical Report at 3-4.)  She also reported that Mr. Brockman was unable to complete certain tests "due to cognitive/behavioral problems." (Ex. O, York Clinical Report at 2.)

Dr. York determined that Mr. Brockman – a man who founded and built a highly successful business –  "currently operates in the low average range of general intellectual functioning (WIAS – IV FSIQ = 87), which is a decline from  his estimated premorbid intellectual functioning in the above average range."  (Ex. O, York Clinical Report at 4.)  She continued, in somewhat clinical terms:  "Mr. Brockman demonstrated borderline impaired to deficient performances on measures of sustained attention/concentration, learning and recall of prose material and a word list, learning and recall of visual material, semantic fluency, executive functions (set shifting, inhibition, working memory, and problem solving), and visuoconstruction," adding:  "[t]hese impaired performances were found within the low average to average ranges on measures of basic attention, fund of information, verbal and visual abstract reasoning, verbal fluency and naming."  (Ex. O, York Clinical Report at 4.)

Dr. York determined that Mr. Brockman's performance on the clinical tests indicated "a dementia of mild to moderate severity …."  (Ex. O, York Clinical Report at 4.)  She also noted that "he demonstrates movements that may be consistent with a Parkinsonism."  (Ex. O, York Clinical Report at 4.)  Based on her battery of tests and clinical observations, including witnessing Mr. Brockman experiencing a hallucination during the examination, Dr. York concluded:  "his pattern of cognitive impairments is consistent with Dementia with Lewy Bodies."  (Ex. O, York Clinical Report at 5.)

Dr. York's recommendations are themselves jarring indications of Mr. Brockman's impairment.  She advised, for example, that he exercise caution when operating household appliances, that he have a large-type calendar in a highly visible location to assist him in

---

[16] In her subsequent forensic report, Dr. York noted that Dorothy Brockman was also present and observed that Mr. Brockman experienced this visual hallucination of a bug that was not there.  (Ex. A, York Forensic Evaluation at 2.)

JONES DAY

United States Department of Justice
April 9, 2020
Page 12

"temporal orientation," that he have a large dry-erase board in a prominent spot to help him keep track of important information such as the location of family members, and that information be presented to him in a written format so that he can refer to it over time.  (Ex. O, York Clinical Report at 5-6.)

    b.    <u>Dr. York's Forensic Evaluation</u>

When counsel contacted Dr. York, she volunteered that she should conduct a set of tests specifically for the purpose of assessing Mr. Brockman's cognitive impairment from a forensic perspective.  She conducted that examination on December 3, 2019, and provided counsel with her report on December 20, 2019.

Dr. York again conducted a clinical interview of Bob and Dorothy Brockman.  She noted that Mr. Brockman reported a decline in balance and in short-term memory.  (Ex. A, York Forensic Evaluation at 2, 3.)  Dr. York directly asked Mr. Brockman about this investigation, and he responded that "his tax issues are about a small company that he sold to a family trust in 1981."  She continued:  "He noted that the government is 'mad at him' but 'they don't say why' and they want to 'confiscate the trust.'"  (Ex. A, York Forensic Evaluation at 2.)  Mr. Brockman also told Dr. York "that he is starting to think about who will run the company" although he "thinks he can continue to be the chairman."  (Ex. A, York Forensic Evaluation at 2.)

Dorothy Brockman told Dr. York that "her husband's cognition fluctuates on a daily basis from minute to minute."  (Ex. A, York Forensic Evaluation at 2.)  As Dr. York reported: "She described that he has 'blank times' that he appears more confused," and that "he was having difficulties at work and she had to help him type all of his employee performance reviews."  (Ex. A, York Forensic Evaluation at 2.)  She added that Mrs. Brockman described how Mr. Brockman has "increased initiation problems."  (Ex. A, York Forensic Evaluation at 2.) Mr. Brockman currently works primarily from an office in his home, and Dorothy Brockman reported to Dr. York that he "sits at work" for extended periods, but does not accomplish the tasks that he sets out to do, that his spelling ability has declined, and that he is "unable to multi-task."  (Ex. A, York Forensic Evaluation at 2.)  Mrs. Brockman reported that Mr. Brockman "fluctuates in his ability to handle money even with day-to-day expenses."  (Ex. A, York Forensic Evaluation at 7.)  She also reported that his short-term memory has continued to decline, that "he is repeating himself more often," that he is "unable to recall details from his daily activities even later in the day," and that he has forgotten how to tie a tie, use the television remote, or use a code to unlock his phone.  (Ex. A, York Forensic Evaluation at 2.)  Dorothy Brockman also reported that Mr. Brockman has been acting out his dreams – another

JONES DAY

United States Department of Justice
April 9, 2020
Page 13

characteristic of both Lewy body dementia and Parkinson's disease – for at least three years.
(Ex. A, York Forensic Evaluation at 2.)

Dr. York's forensic report summarized her prior examination, as well as the medical
reports prepared by Dr. Jankovic and Dr. Yu. (Ex. A, York Forensic Evaluation at 1-4.) She
also provided her behavioral observations of Mr. Brockman during the December 3, 2019
testing. Her observations included that Mr. Brockman's "cognition tended to fluctuate
throughout the testing session," that he "appeared to be confused at times," had difficulty
completing tasks even after starting out well, and that he "showed mildly decreased ability to
follow directions, and he occasionally needed repetition of directions and lost place during set
task." (Ex. A, York Forensic Evaluation at 4.)

As with her March 1, 2019 clinical evaluation, Dr. York again listed the tests that she
administered, as well as the tests that Mr. Brockman was unable to complete "as he was unable
to comprehend task instructions and maintain task set independently," and set out her
neurological findings in clinical terms. (Ex. A, York Forensic Evaluation at 4-5.)

Dr. York found that Mr. Brockman had improved in some areas from the results of her
prior testing, while declining in other areas. (Ex. A, York Forensic Evaluation at 7-8.) For
example, she noted that Mr. Brockman "currently operates in the average range of general
intellectual functioning (WAIS-IV FSIQ=96), which she described as a "significant decline from
his estimated premorbid intellectual functioning in the high average range," but which was an
improvement over the March 1, 2019 testing results. (*Compare* Ex. A, York Forensic Evaluation
at 7 *with* Ex. O, York Clinical Report at 4.) In contrast, she determined that Mr. Brockman's
"written arithmetic performance was a 5.6 grade equivalent with difficulties noted in performing
basic addition, multiplication and division problems." (Ex. A, York Forensic Evaluation at 7.)

Dr. York summarized:

"It is noted that Mr. Brockman's cognition fluctuated significantly throughout the
evaluation. He demonstrated improvements on a few measures; however, during
several tasks, he became more confused and demonstrated a blank stare
expression. These fluctuations were more apparent during this evaluation as
compared to his previous evaluation in March 2019. Mr. Brockman's pattern of
neuropsychological performance indicates a dementia of mild to moderate
severity characterized by deficits in the areas of verbal and nonverbal episodic
memory, processing speed, executive functioning, and visuospatial functioning
with significant functional declines." (Ex. A, York Forensic Evaluation at 8.)

JONES DAY

United States Department of Justice
April 9, 2020
Page 14

Dr. York concluded: "His dementia falls under the diagnostic category of Lewy Body Dementias." (Ex. A, York Forensic Evaluation at 8.)

Dr. York's examination specifically included tests to determine whether Mr. Brockman was malingering, that is, faking impaired cognition. As stated in her report: "He passed several embedded and stand-alone measures of performance validity; therefore, the following results are thought to be an accurate estimation of his current cognitive abilities." (Ex. A, York Forensic Evaluation at 4.) Dr. York concluded: "It is this examiner's opinion based on the testing conducted and behavioral observations that Mr. Brockman was putting forth full effort and was not exaggerating or embellishing the nature and extent of his cognitive impairment." (Ex. A, York Forensic Evaluation at 7.)

B.      Impact of Mr. Brockman's Dementia

Bob Brockman does not want it to be true that he has dementia. Dr. York observed that he "tended to minimize his cognitive impairments." (Ex. A, York Forensic Evaluation at 4.) Mr. Brockman knew that one of the tests required him to draw a clock, and that the later, second battery of tests were likely to be used by his counsel to demonstrate to the government that he should not be prosecuted. Even still, he practiced so that he could draw a better clock.

Mr. Brockman has changed his eating and exercise habits, in the hope that he can stave off the progression of his dementia. He is also, however, coming to terms with the reality of his current condition. As described in Dr. York's report, he has increasingly struggled at personal and professional tasks, and has relied on his wife's assistance to complete tasks that he can no longer perform.

As counsel, we can directly report that Mr. Brockman's cognitive impairment makes him incapable of assisting in his defense. Our interactions with Mr. Brockman are consistent with the medical findings. Mr. Brockman has been unable to relate important information from the past, to review and evaluate documents, or to retain information that we tell him. He repeats information, regardless of relevance. When we provide him with information, he will sometimes report it back to us in our next discussion as if it is news that he thinks he should provide to us or something that he has recently remembered – in effect confabulating what he once may have known and what he is hearing today.

We were not aware, however, that the challenges that we were facing in our interactions were the result of dementia until Mr. Brockman shared his medical reports with us, first in a discussion in August 2019, and then by providing the reports prepared by Dr. Jankovic, Dr. Yu,

JONES DAY

United States Department of Justice
April 9, 2020
Page 15

and Dr. York in September 2019.  Mr. Brockman did not seek out these medical reports to establish a defense in this case.[17]  He sought medical care because he and his family were increasingly concerned by what they were experiencing.  He also did not share his medical information with us because he thought that it would have an impact on your investigation, but instead so that we would better understand his limitations after almost a year of difficult efforts to prepare a response to the investigation.

It is apparent to us, now that we know of Mr. Brockman's medical issues, that Mr. Brockman lacks the capacity to assist counsel in his defense.  As discussed above, we reached out to each of the treating doctors to make sure that our understanding of the impact of his cognitive impairment is correct.  Dr. Pool, Dr. Jankovic, and Dr. Yu each provided us with letters that summarized their findings in the context of the specific question that we asked – can Mr. Brockman assist us in preparing his defense?  All three stated that he cannot.  Dr. York, who is a neuropsychologist and not a medical doctor, conducted a separate battery of tests that she identified as necessary to put her evaluation in a legal context.  Her forensic report confirmed what the three medical doctors, the Brockman family, and we as counsel know – the evidence of Mr. Brockman's cognitive impairment is overwhelming and compelling.

C.      Prosecution of Mr. Brockman Would Violate Due Process

The United States Justice Manual provides that a "person's personal circumstances" should be considered in determining whether there is a substantial federal interest supporting prosecution.  USJM § 9-27.230, *see* § 9-27.220.  Circumstances particular to the accused which "may suggest that prosecution is not the most appropriate response" include "advanced age, or mental or physical impairment."  § 9-27.230 Comment 7.

This provision is grounded in principles of due process.  *Pate v. Robinson*, 383 U.S. 375, 378 (1966).  The basic standard for competency is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding— and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960).  The "resolution of the issue of competence to

---

[17] In May 2017, long before Mr. Brockman was aware that he might be involved in an investigation, he sent an email to his friend, Dr. Stuart Yudofsky, stating that "Robert [Mr. Brockman's adult son] and Dorothy are after me to consult with the right doctor regarding my loss of sense of smell.  They are afraid that it is an early sign of alzheimer's or dementia.  I am feeling good but am having increasing memory problems."  A copy of the email exchange between Mr. Brockman and Dr. Yudofsky is attached hereto as Exhibit P.  Because we understand that Dr. Yudofsky is a potential witness represented by counsel in this matter, we have not contacted him to discuss his confidential examination of Mr. Brockman.

JONES DAY

United States Department of Justice
April 9, 2020
Page 16

stand trial at an early date best serves both the interests of fairness . . . and of sound judicial administration." *Drope v. Missouri*, 420 U.S. 162, 178 n.13 (1975) (citation omitted).

An individual's ability to assist properly in his defense "must be evaluated in light of the type of participation required." *United States v. Dreyer*, 705 F.3d 951, 961 (9th Cir. 2013). When evaluating competency, courts will consider medical evaluations and reports, defense counsel's representations and judgment about the defendant's state of mind, and the observations of others. *See Drope*, 420 U.S. at 178 n.13.

The reports from the treating physicians and the neuropsychologist, our experience as counsel, and the observations reported to the doctors by Mr. Brockman's wife and son show that he cannot participate in the most fundamental tasks of defending himself.  He lacks the capacity to remember and to relate relevant facts, names and events to his attorneys; he cannot meaningfully review and evaluate documents bearing on his case; he cannot appreciate the evidence that the government may bring against him; he lacks the ability to consider a course other than standing trial; he lacks the ability to weigh the consequences of exercising his constitutional right to testify or not; he cannot be sure that his testimony, if given, will be coherent or accurate, and not the result of confabulation; he lacks the ability to follow and recognize discrepancies in the testimony of others; and he cannot assist his counsel in preparing to examine witnesses or otherwise present or challenge evidence at trial.  *See United States v. Rothman*, 2010 WL 3259927, at *6 (S.D. Fla. Aug. 18, 2010) (discussing factors when evaluating competency of defendant with dementia); *United States v. Silva*, 2013 WL 6576788, at *10 (D. Utah July 31, 2013) (same); *see also Ryan v. Gonzales*, 568 U.S. 57, 65 (2013) (noting that "an incompetent defendant would be unable to assist counsel in identifying witnesses and deciding on a trial strategy"); *Cooper v. Oklahoma*, 517 U.S. 348, 364 (1996) (discussing risk that incompetent defendant will be unable to exercise "rights deemed essential to a fair trial," including decisions about whether to waive trial by jury, take witness stand and confront accusers, among "myriad smaller decisions concerning the course of his defense") (citations omitted); *United States v. Hemsi*, 901 F.2d 293, 295 (2d Cir. 1990) (explaining that the competency inquiry "involves an assessment of whether the accused can assist in such ways as providing accounts of the facts, names of witnesses, etc.") (quotation marks and citations omitted).  There is no alternative available to mount a response without Mr. Brockman's assistance.  As we currently understand the scope of the investigation, the events at issue span nearly forty years, the allegations and potential defenses are complex, and many potential witnesses have died or are otherwise unavailable.

As described by the doctors and by his family, and as we have observed, Mr. Brockman's condition fluctuates.  While he may have good days and bad days, these fluctuations may also be

JONES DAY

United States Department of Justice
April 9, 2020
Page 17

minute to minute.  It is a symptom of his dementia that he does not perceive the full extent of his own limitations, cannot know whether he is conveying an accurate memory or a confabulated one, and cannot even tell us whether any moment is a good or a bad one.

Mr. Brockman's dementia is progressive.  If it is the result of Parkinson's disease, it cannot be cured.  If it is the result of Lewy body dementia, then it is a part of a terminal condition with a short prognosis.  Time is on nobody's side here.

We ask that you consider this letter and the attached reports and letters to reach a decision that a prosecution against Mr. Brockman cannot proceed.  We welcome any questions that you may have.

Very truly yours,

Kathryn Keneally
Peter J. Romatowski
Jason S. Varnado

# EXHIBIT A



**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**



# Confidential Neuropsychological Evaluation

| | |
|---|---|
| Patient Name: | Robert Brockman |
| Date of Birth (Age): | 05/28/1941 (78 yr.) |
| Date(s) of Evaluation: | 12/03/2019 |
| Evaluation Location: | BCM Medical Center, McNair Campus, 9th Floor |
| Referred by: | James Pool, MD |
| Referral Question: | Independent Neuropsychological Examination |

## Background and Referral Information

Mr. Brockman is a 78 year-old, right-hand dominant, Caucasian male with a two to three-year history of short-term memory loss. The neuropsychological evaluation of his current cognitive, behavioral, and emotional functioning was conducted by request by Kathy Keneally, Partner, Jones Day (New York). The following information was obtained during an interview with Mr. Brockman and his wife, his previous clinical neuropsychological evaluation conducted on 03/01/2019 and limited review of medical records.

<u>Declarations</u>: A forensic evaluation differs from a clinical evaluation in that there is no traditional doctor-patient relationship between the psychologist and the person being evaluated. The purpose of the evaluation is to assist Ms. Keneally in defense for Mr. Brockman's legal tax case; therefore, establishing a treatment relationship would create a potential conflict between the psychologist's role as an objective evaluator versus an advocate for the patient. Consequently, it is important that a retained expert avoid the role of treatment provider. This standard is mandate by the laws of the State of Texas (Texas Administrative code) as well as the Code of Ethics of the American Psychological Association (2010), and it represents the official position of the National Academy of Neuropsychology (Bush, 2005).

Dr. York was retained for a neuropsychological evaluation by Kathy Keneally of Jones Day. As explained above, she is excluded from providing any direct treatment to Mr. Brockman. Consequently, Dr. York's role was necessarily restricted to that of a forensic consultant rather than a treating doctor in this context. Mr. Brockman was informed of these conditions and consented to the evaluation and to his ability to understand these limitations.

Opinions reached in this report are based on direct interview and results of my neuropsychological evaluation and a review of his provided medical records to clarify the timeline of her medical procedures and hospitalizations. These opinions are based on current neuropsychological assessment techniques and research. Opinions are based upon reasonable neuropsychological probability and are subject to modification based on provision of additional information. The data from this evaluation is contained in Dr. York's confidential files.

**Previous Neuropsychological Assessment:** Mr. Brockman underwent a clinical neuropsychological evaluation with Dr. York on 03/01/2019. His general intellectual functioning (WAIS-IV FSIQ=87) fell within the low average range, which was a decline from his estimated premorbid intellectual functioning in the above average range. His MoCA was 19/30 (total), 6/6 (orientation), and 2/5 (short-term recall), which was significantly below expectation. Mr. Brockman demonstrated borderline impaired to deficient performances on measures of sustained attention/concentration, learning and recall of prose material and a word list, learning and recall of visual material, semantic fluency, executive functions (set shifting, inhibition, working memory, and problem solving), and visuoconstruction. Praxis was impaired for intransitive praxis tasks. These impaired performances were found

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION
*Brockman, Robert*

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

within the low average to average ranges on measures of basic attention, fund of information, verbal and visual abstract reasoning, verbal fluency and naming, This pattern of neuropsychological performance indicated a dementia of mild to moderate severity characterized by deficits in the areas of visuospatial functioning, verbal and nonverbal episodic memory, and executive functioning, with mild functional declines. Self-report of depression was within normal limits (GDS=8). Self-care ADLs (PSMS) were 7/30 and instrumental ADLs were 9/31. The NPI-Q (severity=8; distress=11) indicated problems with agitation, anxiety, apathy, irritability, nighttime behaviors, changes in appetite, and depression for an overall minimal level of familial distress, with the exception of his depression and agitation which produced moderate familial distress. He demonstrated movements that were consistent with a parkinsonism disorder. These abnormal movements taken together with his current diagnosis of dementia, and REM Behavior Disorder, his pattern of cognitive impairments was reported as consistent with Dementia with Lewy Bodies (DLB).

**Current Concerns and General Condition:**  Mr. Brockman and his spouse participated in the clinical interview. Mr. Brockman reported that his balance has declined over the past year.  He has been using a balance board at the Houstonian but is not making any progress.  He denied any falls.

On direct inquiry, he reported that his tax issues are about a small company that he sold to a family trust in 1981. He noted that the government is "mad at him" but "they don't say why," and they want to "confiscate the trust." He said the government is information gathering and talking to people he used to work with.  He is concerned that the company will be "ruined" and this will affect the people who work there.  He noted that he is starting to think about who will run the company.  He reported that he thinks he can continue to be the chairman.

Mrs. Brockman described that her husband's cognition fluctuates on a daily basis from minute to minute.  She described that he has "blank times" that he appears more confused. His wife noted that he was having difficulties at work and she had to help him type all of his employee performance reviews. She reported that he has increased initiation problems. He reported that he does not go into the office as much as he did in March 2019.  He noted that it takes him longer to process information at work. His wife described that he sits at work for many, but he does not accomplish his tasks described.  His short-term memory has continued to decline, and he is repeating himself more often.  He is unable to recall details from his daily activities even later in the day.  His procedural memory has also declined as he has forgotten how to tie a tie or to use a remote control for their television.  She noted that he does not recall the code to unlock his telephone.  He has difficulties completing tasks. His wife drives him to the office.  She noted that he has declines in his spelling ability particularly while typing. He is unable to multi-task.

<u>Emotional Functioning:</u>  Mr. Brockman reported that he began taking Wellbutrin which has improved his mood, but he continues to feel "slightly depressed."  He noted that his diagnosis brings him "more down than before." He noted that he has realized that "all of sudden I am old."  He denied heightened general anxiety, personality or behavioral changes, suicidal ideation, and auditory hallucinations.  Sleep was described as adequate but he is harder to wake up.  He is more violently acting out his dreams and has been kicking.  He takes trazodone to aid his sleep. He has decreased appetite and has lost 20lbs over the past several months.  His wife reported that he began to act out his dreams at least three years ago.  He reported that he has floaters in his visual fields.  He continued to deny visual hallucinations.  It is noted that he had a previous visual illusion described below and a visual hallucination of a bug on the testing room floor that was not present to either the examiner or his wife during his evaluation in March 2019.

*Brockman, Robert*

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

**Previous Cognitive Complaints:**  Mr. Brockman reported declines in his short-term memory over the past 2 to 3 years.  He and his wife reported that he is repeating himself, losing possessions, losing his train of thought and is more tangential.  He forgets names of new individual and of familiar locations. He also finds it more difficult to complete tasks.  His wife noted that he is clumsy getting out of the car and has hit curbs while driving and parking. He has increased difficulties with following directions.  His wife noted spelling changes and mild stuttering in his speech.  His speech is slowed and he has slowed response latencies.  His decision making is also slowed, and he has difficulties multi-tasking.

**Medical History:**  Medical history is remarkable for hypothyroidism, atrial fibrillation, bladder cancer with recurrence, hypercholesteremia, glaucoma (mild), erectile dysfunction, tremor, micrographia, and back problems. He has plantar fasciitis, which reduces his exercise ability.  He reported that he was hospitalized for a prostate infection and pericarditis four years ago. He reported an episode of vision changes in which he saw a bar of color on a spectrum that was moving.  He noted he had this visual illusion for 20 minutes and then it went away.  He was told that he might have had a visual headache.  He began taking levodopa in February 2019.  His wife noted a mild motor improvement when he first started on the medication, but when the medication was increased, he had increasing clumsiness. Surgical history is notable for tonsillectomy, cataract surgery, and excision of a melanoma.  He reported that when he was in the sixth grade he was hit on the top of the head with a hammer and may have suffered a concussion. He did not lose consciousness. Familial medical history is unremarkable for movement disorders or dementia.  Psychiatric history is notable for depression.  Mr. Brockman denied current use of tobacco or illicit drugs or a remote history of substance misuse/abuse.  He quit drinking alcohol two to three years ago secondary to his atrial fibrillation. He denied a history of seizures, TIA/stroke, or migraines.

**Medications:**  Wellbutrin 100mg tid, trazodone 50mg at night, Synthyroid .75mg, Eliquis 2.5mg bid, aspirin, carbidopa/levodopa25/100mg 2 tablets tid, stool softener, Exelon 2 patches.  He noted that he also takes a regimen of vitamins and supplements.

**Social History:**  Mr. Brockman has been married for 50 years, and they have one son.  He currently lives with his spouse in their private residence. He earned a BA in Business and attended graduate school for one year in Marketing at The University of Florida.  He reported that he was a good student.  He is Chairman and CEO of Reynolds and Reynolds Company.

## REVIEW OF LIMITED MEDICAL RECORDS

<u>Dr. Joseph Jankovic Evaluation</u>:  Mr. Brockman was evaluated by Dr. Joseph Jankovic on March 13, 2019 for his movement disorder. He was diagnosed with postural instability gait disorder subtype (PIGD) of parkinsonism.  Dr. Jankovic noted that because Mr. Brockman denied hallucinations and cognitive fluctuations that he does not meet criteria for DLB; however, he acknowledged that he meets criteria for dementia.  Mr. Brockman noted that he was worse physically and mentally despite taking levodopa, with a "zombie-like effect" as described by his wife.

<u>Dr. Melissa Yu Evaluation</u>:  Mr. Brockman was evaluated by Dr. Melissa Yu on March 20, 2019 for his memory loss. Memory loss was dated to November 2017 in a medical chart note.  Dr. Yu medical note stated that a DATSCAN was performed showing significant loss of dopaminergic signal, and he was started on Sinemet and the Exelon patch on 3/13/2019.  Anosmia was reported for 10 years.  Memory, word finding, and slowed processing speed were reported by his wife and son.  His son noted that his father's cognitive ability fluctuates, with episodes of "blankness" associated with less interaction alternating with improved cognition. His son also noted cognitive fluctuations in his father's decision making abilities with good and bad days.  It was noted that his son has him

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION
*Brockman, Robert*

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

practice clock drawing to test his functioning.  Dr. Yu's differential diagnoses included Dementia with Lewy Bodies or Parkinson's Disease Dementia. It was noted that the time course and fluctuations in cognition were more suggestive of DLB.

**BEHAVIORAL OBSERVATIONS:**  Mr. Brockman was tested during a single session as an outpatient.  He arrived on time and was accompanied by his spouse who participated in the clinical interview.  General appearance was neat and clean.  The patient exhibited slowed motor behavior and gait and a mild tremor which was notable on drawings but did not interfere with his performances.  He evidenced slowed response latencies.  His mood was pleasant, but his affect was flat.  Eye movements were normal.  Vision (with corrective lenses) and hearing were adequate for the testing session.  Conversational speech was coherent but was tangential in conversational speech. There was no evidence of paraphasias. His cognition tended to fluctuate throughout the testing session. He appeared to be confused at times even in the middle of tasks that he originally was completing accurately. He showed mildly decreased ability to follow directions, and he occasionally needed repetition of directions and lost place during set task.  He exhibited cooperative test-taking behavior.  His attitude towards the examiner was appropriate and friendly.  He tended to minimize his cognitive impairments. He passed several embedded and stand-alone measures of performance validity; therefore, the following results are thought to be an accurate estimation of his current cognitive abilities.

## MEASURES ADMINISTERED

Montréal Cognitive Assessment (MoCA); Caregiver Neuropsychiatric Inventory (NPI-Q); Clock Drawing Test; Controlled Oral Word Association Test (COWAT version: FAS); General Anxiety Disorder 7-item Scale; Geriatric Depression Scale; Hopkins Verbal Learning Test-Revised (HVLT-R); Neuropsychological Assessment Battery (NAB subtests: Daily Living Memory-Delayed, Daily Living Memory-Immediate, Daily Living Memory-Recognition, Naming, Numbers and Letters, and Visual Discrimination); Praxis Examination; Rey Complex Figure Test-Meyers Version; Semantic Verbal Fluency Test; Stroop Color-Word Interference Test (Stroop subtests: Color, Color-Word, and Word); Trail Making Test (TMT subtest: Trails A); Verbal Series Attention Test (VSAT); Wechsler Adult Intelligence Scale-IV (WAIS-IV subtests: Arithmetic, Coding, Digit Span, Information, Similarities, and Visual Puzzles); Wechsler Memory Scale-4th Edition (WMS-IV subtests: Logical Memory II-Older Adult, Logical Memory I-Older Adult, Logical Memory Recognition-Older Adult, Visual Reproduction I, Visual Reproduction II, and Visual Reproduction Recognition); Wide Range Achievement Test (WRAT-4 subtest: Math Computation); Wisconsin Card Sorting Test (WCST); Instrumental Activities of Daily Living Scale (IADLS); Lawton and Brody Physical Self-Maintenance Scale (PSMS).  Clinical Interview with patient and his spouse.

Mr. Brockman did not complete the Trail Making Test (TMT subtest: Trails B) measure as he was unable to comprehend task instructions and maintain task set independently.  Informant questionnaires were completed by the patient's spouse.

## NEUROPSYCHOLOGICAL FINDINGS

*The following clinical descriptors identify performance with the range of Standard Scores (average=100, standard deviation=15) indicated in parentheses: Very Superior (>130), Superior (120-129), High Average (110-119), Average, (90-109), Low Average (80-89), Borderline (70-79), and Deficient (<69). For diagnostic purposes, a cognitive deficit is considered a performance score that is >1.5 standard deviations away from the mean in the direction of poor performance compared to the reference group for that measure (i.e., Z-score) based on peers of similar age, gender, and education background as appropriate. This criterion is equivalent to a Standard Score <78, a T-score <35, or a Scaled Score of <5).*

**Mental Status:**  Evaluation of Mr. Brockman's general mental status on the MoCA revealed a score of 19/30, which is moderately below expectation.  He was fully oriented (6/6).  He demonstrated difficulties with set shifting,

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION
*Brockman, Robert*

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

visuospatial construction, sustained attention, repeating one sentence, serial subtractions, and with verbal fluency. He did not recall any words (0/5) and was not aided by category cueing. He was aided by multiple choice cueing for 4/5 words.

**Intellectual:** Mr. Brockman was administered subtests from a measure of general intellectual functioning (WAIS-IV) and obtained scores ranging from low average to high average yielding a pro-rated Full Scale IQ estimate of 96, which is in the average range.

**Attention/Concentration:** Attention and mental tracking for overlearned verbal sequences was deficient for speed and for accuracy. Immediate auditory attention span for digits was average with 6 digits forward, 4 digits backward, and 5 digits when re-ordering them in ascending sequence. Speed of single word reading and speed of color naming were deficient. Mental processing speed for manual code transcription was low average. Performance on a simple visual-motor sequencing task requiring scanning and mental tracking was deficient with 0 errors. Written math computation revealed a 5.6 grade equivalent. It is noted that he was unable to perform simple addition, multiplication and division arithmetic problems (e.g., 3X4=7, 14/3).

**Executive:** Mr. Brockman's ability to inhibit a dominant verbal response in the face of incongruent visual stimuli was borderline impaired. His abstract verbal reasoning was average. Working memory to perform mental arithmetic was average. Performance on a complex visual-motor sequencing task requiring scanning, tracking, and set-shifting was impaired and the task was discontinued as he was unable to comprehend the task instructions and he was unable to set shift independently. Performance on a novel task of problem-solving and hypothesis testing fell in the low average range (11-16th percentile) with 1 correct category achieved by the end of the task. He made numerous "Other" responses that did not match to any of the 3 possible correct categories. He lost set one time and had to be reminded of the instructions after each card so that he would not match to the wrong set of cards. His performance fluctuated during this task.

**Memory:** Recall of culturally-based general knowledge was high average. Immediate recall of verbally presented contextual material was average (SS=8). Delayed recall of the stories was low average (SS=7). Retention of initially learned material was 50.0%. Recognition memory was average (16/23). Incremental learning for a semantically-categorized word list across 3 trials was deficient (1, 4, and 4 words per trial), and delayed recall was in the deficient range with 25.0% retention which falls within the deficient range. On recognition memory assessment, 10/12 target words were correctly identified, 3 false positive errors were committed, with discrimination accuracy in the borderline impaired range.

Immediate recall of basic geometric figures was borderline impaired (SS=4). Delayed recall of the designs was deficient (SS=2). Retention of the initially learned material was 0.0%. Recognition memory was average (2/7).

**Language:** Lexical fluency was borderline impaired with between 5 to 8 words per trial. Semantic fluency was low average with 14 exemplars generated. Confrontation naming of pictured objects was average (NAB Form 1; 29/31). He made an error of transitive limb praxis which was improved with imitation

**Visual-Perceptual:** His drawing of a complex geometric design scored in the low average range. He demonstrated a mild tremor but it did not interfere with his drawing ability. He maintained the overall gestalt but he distorted or omitted several of the internal details. His spatial reasoning ability to mentally arrange puzzle pieces was low average. Visuoconceptual ability to draw a clock was within normal limits to command (CDT=10/10) and impaired

Confidential Neuropsychological Evaluation
Brockman, Robert

Michele K. York, PhD, ABPP-CN
Board Certified Clinical Neuropsychologist
Associate Professor
Department of Neurology

when copying a model (CDT=8/10). He drew the clock face and began placing the numbers accurately but then the numbers ended in the middle of the clock face. He placed the hands accurately to where he drew the numbers.

**Examples of visuospatial performances highlighting Mr. Brockman's fluctuating cognitive functioning.**

**Rey Complex Figure Test – Copy of a Design**



03/01/2019                                                            12/03/2019

**Clock Drawing**

03/01/2019                                                            12/03/2019

**Mood / Personality:** On a self-report measure of anxiety, his responses fell in the minimal range (GAD-7=4/21). On a face valid measure used to assess cognitive, emotional and physical symptoms of depression, Mr. Brockman endorsed the following, suggestive of probable depression (GDS=19): presently unsatisfied with life, terminating activities and/or lack of interest, lack of hope regarding the future, ruminating thoughts, feeling as though something negative is going to occur, unhappiness, helplessness, preferring to stay home, worry about the future, declines in memory, downhearted and blue, lack of excitement for life, difficulty beginning new projects, poor energy, hopelessness, difficulties with concentration, difficulties with decision making, and general declines in thinking skills.

**Activities of Daily Living:** His spouse served as the informant completing a questionnaire regarding the patient's ability to complete basic and instrumental activities of daily living. Mr. Brockman reportedly has difficulties with self-care ADLs (PSMS=7/30). It was noted that he is constipated and goes to the restroom every half hour; he eats, dresses, grooms, and bathes very slowly. He requires assistance with ambulation. He requires assistance with instrumental activities of daily living (IADLs=14/31) including telephone use, shopping, food preparation,

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION
*Brockman, Robert*

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

transportation, and finances. His wife noted that he seldom uses his phone. He fluctuates in his ability to handle money even with day-to-day expenses. She has to remind him to take his medications, and if she does not then she notices that he has forgotten to take doses.

**Neurobehavioral:** The patient's spouse completed an inventory assessing for the presence of neurobehavioral symptoms commonly associated with dementia, reportedly observing mild problems with disinhibition and motor disturbance and moderate problems with agitation, depression, apathy, irritability, nighttime behaviors, and changes in appetite (NPI-Q severity=12; distress=25) which produce an overall moderate to extreme level of familial distress.

## SUMMARY AND IMPRESSION

Mr. Brockman is a 78 year-old, right-hand dominant, Caucasian male who underwent an independent neuropsychological evaluation as a component of a forensic evaluation. The factual matters stated in this report are, as far as I know, true, and the opinions in the report are genuinely held by me and the report contains reference to all matters I consider significant.

It is this examiner's opinion based on the testing conducted and behavioral observations that Mr. Brockman was putting forth full effort and was not exaggerating or embellishing the nature and extent of his cognitive impairment. It is noted that neuropsychological tests were chosen to best assess Mr. Brockman's cognitive abilities. The testing environment was optimal and the following results are considered a valid estimate of his current neuropsychological and emotional status.

Mr. Brockman currently operates in the average range of general intellectual functioning (WAIS-IV FSIQ=96), which is a significant decline from his estimated premorbid intellectual functioning in the high average range (TOPF=114, from March 2019 evaluation). His MoCA was 19/30 (total), 6/6 (orientation), and 0/5 (short-term recall), which is moderately impaired. Self-care ADLs (PSMS) were 7/30 and instrumental ADLs were 14/30, and his wife indicated a significant decline in his functional ability.

Self-report of depression was elevated (GDS=19), but he did not endorse elevated levels of anxiety (GAD-7=4). The NPI-Q completed by his wife (severity=12; distress=25) indicated problems with disinhibition, motor disturbance, agitation, depression, apathy, irritability, nighttime behaviors, and changes in appetite for an overall moderate to extreme level of familial distress.

Mr. Brockman demonstrated borderline impaired to deficient performances on measures of oral and written processing speed, executive functions (including working memory, problem solving, inhibition, set shifting, and verbal fluency), learning and recall of a word list, learning and recall of visual material, and basic visuospatial functioning. His intellectual functioning subtest scores remained within the broadly average range (low average to high average). It is noted that his verbal memory was aided by context with average learning of a story, but he only retained 50% of the material he originally learned after a brief delay (low average). His written arithmetic performance was a 5.6 grade equivalent with difficulties noted in performing basic addition, multiplication and division problems. His basic attention and language (naming and semantic fluency) performances were average.

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION
Brockman, Robert

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

Comparison with prior results obtained on 03/01/2019 revealed the following pattern of interim changes:

**Declines were found in the areas of:**
- Verbal fluency (low average to borderline impaired)
- Graphomotor sequencing (borderline impaired to deficient)
- Learning of a word list (borderline impaired to deficient)
- Decreased functional abilities

**Improvements were found in the areas of:**
- Sequencing of digits (deficient to average)
- Learning and recall of contextual information (deficient to average and low average with only 50% retention)
- Clock drawing (impairments remain)
- Visuospatial construction of a complex figure

It is noted that Mr. Brockman's cognition fluctuated significantly throughout the evaluation.  He demonstrated improvements on a few measures; however, during several tasks, he became more confused and demonstrated a blank stare expression.  These fluctuations were more apparent during this evaluation as compared to his previous evaluation in March 2019.  Mr. Brockman's pattern of neuropsychological performance indicates a dementia of mild to moderate severity characterized by deficits in the areas of verbal and nonverbal episodic memory, processing speed, executive functioning, and visuospatial functioning with significant functional declines.  Mr. Brockman's current cognitive pattern and his parkinsonism, taken together with his dementia at the time of diagnosis of his movement disorder, cognitive fluctuations, and REM Behavior Disorder are consistent with a diagnosis of Dementia with Lewy Bodies (DLB).  Visual hallucinations are a hallmark of DLB; however, up to 30% of patients with DLB do not demonstrate visual hallucinations particularly at the early stages of the disorder.  Mr. Brockman reported a previous visual illusion and a mild visual hallucination was present during neuropsychological testing in March 2019, which further supports this diagnosis.  His dementia falls under the diagnostic category of Lewy Body Dementias.

Based on the current cognitive findings, his diagnosis of dementia, and the breadth and severity of his cognitive impairments and fluctuations, it is my opinion that Mr. Brockman is unable to participate and aid in his own defense.  He is unable to recall and demonstrate a thorough understanding of the relevant elements of the issues surrounding the case and manipulate this information in a logical manner that will allow him to make comparisons and weigh his options.

*Michele K York, PhD*

_____
Michele K. York, PhD, ABPP-CN
Board Certified Clinical Neuropsychologist
TX License #31159

# EXHIBIT B



# Baylor College of Medicine

GIVING LIFE TO POSSIBLE

☐ BACK TO PEOPLE SEARCH

# Michele K York, Ph.D., ABPP-CN

People  ☐  Michele K York, Ph.D., ABPP-CN

SHARE ☐



REQUEST AN APPOINTMENT

## Email

myork@bcm.edu

## Phone

(713) 798-8673

## Addresses

Baylor College of Medicine Medical Center (Clinic)

## POSITIONS

Professor
Neurology and Psychiatry & Behavioral Sciences
Baylor College of Medicine

Head
Section of Neuropsychology
Baylor College of Medicine

## EDUCATION

Internship at Baylor College Of Medicine
01/2000 - Houston, Texas, United States
Clinical Psychology

PhD from Vanderbilt University
01/1998 - Nashville, Tennessee, United States

MA from Vanderbilt University
01/1996 - Nashville, Tennessee, United States

BA from Vanderbilt University
01/1993 - Nashville, Tennessee, United States

## SELECTED PUBLICATIONS

- Hack N, Akbar U, Thompson-Avila A, Fayad SM, Hastings EM, Moro E, et al. "Impulsive and Compulsive Behaviors in Parkinson Study Group (PSG) Centers Performing Deep Brain Stimulation Surgery." *J Parkinsons Dis.* 2014 January 1;4(4):591-8. Pubmed PMID: 25035311

- Rothlind JC, York MK, Carlson K, Luo P, Marks WJ, Jr, et al. "Neuropsychological changes following deep brain stimulation surgery for Parkinson's disease: comparisons of treatment at pallidal and subthalamic targets versus best medical therapy." *J Neurol Neurosurg Psychiatry.* 2014 September 2 Pubmed PMID: 25185211

- Fridley J, Adams G, Sun P, York M, Atassi F, Lai E, et al. "Effect of subthalamic nucleus or globus pallidus interna stimulation on oculomotor function in patients with Parkinson's disease." *Stereotact Funct Neurosurg.* 2013;91(2):113-21. Pubmed PMID:

7200 Cambridge St., 9th Floor
Houston, Texas 77030
United States
(713) 798-8673

## Websites

[VIICTR Publications List]

[Neuropsychology]

[In the News]

[Dr. York's Bibliography]

Comprehensive list of publications
and presentations

[Download CV]

IS THIS YOU?
[Log in] to edit your profile.

## CERTIFICATIONS

Clinical Neuropsychology

American Board of Professional Psychology

## HONORS & AWARDS

Fulbright & Jaworski LLP Faculty Excellence
Award for Teaching and Evaluation

Baylor College of Medicine (01/2012)

Fulbright & Jaworski LLP Faculty Excellence
Award for Enduring Materials

Baylor College of Medicine (09/2012)

Norton Rose Fulbright LLP Faculty Education
Award for Teaching and Evaluation

Baylor College of Medicine (09/2018)

Norton Rose Fulbright LLP Faculty Education
Award for Enduring Materials

Baylor College of Medicine (01/2019)

Star Award for Clinical Excellence

Baylor College of Medicine (01/2019)

[23343617]

- Calleo J, Burrows C, Levin H, Marsh L, Lai
  E, York MK. "[Cognitive rehabilitation for
  executive dysfunction in Parkinson's
  disease: application and current
  directions.]" *Parkinsons Dis.*
  2012;2012:512892. Pubmed PMID:
  [22135762]

[ ] [show 34 more selected
publications]

## MEMBERSHIPS

Academy of Distinguished Educators

Member (01/2012 - present)

The Academy of Distinguished Educators
recognizes the educational scholarship of
faculty members involved in all of the
educational missions of Baylor College of
Medicine.

American Academy of Neurology

Movement Disorders Society

International Neuropsychological Society

Parkinson Study Group

American Congress of Rehabilitation Medicine

Co-Chair Elect (09/2018 - present)

*Baylor College of Medicine is a health sciences university that creates knowledge and applies science and discoveries to further education,
healthcare and community service locally and globally.*

FIND A PHYSICIAN     DEPARTMENTS     CENTERS     CONTACT     ABOUT US     ACCREDITATION

careers     privacy     compliance     giving     alumni     shop

# EXHIBIT C



Baylor
College of
Medicine

GIVING LIFE TO
POSSIBLE

# Seth Paul Lerner, M.D., FACS

People  □  Seth Paul Lerner, M.D., FACS

SHARE □



REQUEST AN APPOINTMENT

Email

slerner@bcm.edu

Phone

## POSITIONS

Professor

Urology

Baylor College of Medicine

Houston, TX, US

Beth and Dave Swalm Chair in Urologic
Oncology

Director of Urologic Oncology

Director of the Multidisciplinary Bladder
Cancer Program

## EDUCATION

B.A. from University Of Texas At Austin

01/1979 - Austin, TX, United States

M.D. from Baylor College Of Medicine

01/1984 - Houston, TX, United States

Internship at Virginia Mason Hospital

01/1985 - Seattle, Washington, United States

Residency at Virginia Mason Hospital

06/1986 - Seattle, Washington, United States

## SELECTED PUBLICATIONS

- Levitt JM, Jian W, Lerner SP, Sonpavde G. "A conventional preclinical schedule of cisplatin is more effective than a metronomic frequent bolus schedule for urothelial carcinoma.." *Urol. Oncol.*. 2013 February;31(2):234-40. Pubmed PMID: 21723160

- Burke JM, Lamm DL, Meng MV, Nemunaitis JJ, Stephenson JJ, Arseneau JC, Aimi J, Lerner S, Yeung AW, Kazarian T, Maslyar DJ, McKiernan JM. "A First in Human Phase 1 Study of CG0070, a GM-CSF Expressing Oncolytic Adenovirus, for the Treatment of Nonmuscle Invasive Bladder Cancer.." *J. Urol.*. 2012 December;188(6):2391-7. Pubmed PMID: 23088985

- Meeks JJ, Bellmunt J, Bochner BH, Clarke NW, Daneshmand S, Galsky MD, Hahn NM, Lerner SP, Mason M, Powles T, Sternberg CN, Sonpavde G. "A Systematic Review of Neoadjuvant and Adjuvant Chemotherapy for Muscle-invasive Bladder

(713) 798-4001

## Addresses

Clinic

Baylor College of Medicine Medical Center
7200 Cambridge, Suite 10B
Houston, Texas 77030
United States
(713) 798-4001

## Websites

[Scott Department of Urology](#)

[Dr. Lerner's Research](#)

VIICTR Research Database

[BCM MyChart](#)

IS THIS YOU?
[Log in](#) to edit your profile.

General Surgery

Residency at Baylor College of Medicine
06/1990 - Houston, Texas, United States

Urology

Fellowship at University Of Southern California
06/1992 - Los Angeles, California, United States

Urologic Oncology

# CERTIFICATIONS

American Board of Urology

# PROFESSIONAL INTERESTS

- Urologic Oncology and Reconstructive Surgery with Interest in Minimally Invasive Surgery

# PROFESSIONAL STATEMENT

Seth P. Lerner, MD, is Professor of Urology and holds the Beth and Dave Swalm Chair in Urologic Oncology, in the Scott Department of Urology, Baylor College of Medicine. He is Director of Urologic Oncology and the Multidisciplinary Bladder Cancer Program and Faculty Group Practice Medical Director for the Urology Clinic.

He earned his medical degree from Baylor College of Medicine, completed a surgical internship at Virginia Mason Hospital in Seattle, and returned to Baylor for his residency training. He completed a two-year fellowship at the University of Southern California in urologic oncology and reconstructive surgery under Peter Jones and

[Cancer.](#)" *Eur. Urol.*. 2012 September;62(3):523-33. Pubmed PMID: [22677572](#)

- Jian PY, Godoy G, Coburn M, Lynch G, Ro JY, Zhai QJ, Nishino M, Lerner SP. "[Adenocarcinoma following urinary diversion.](#)" *Can Urol Assoc J.* 2012 April;6(2):E77-80. Pubmed PMID: [22511440](#)

[show 16 more selected publications](#)

# MEMBERSHIPS

American Association of Genitourinary Surgeons

Member

American Urological Association

Member

[show 17 more memberships](#)

# SKILLS

Research Interests

Bladder Cancer Collaborative Research Program: Role of estrogen receptors and the use of selective estrogen receptor modulators (e.g., tamoxifen) for treatment of bladder cancer; novel targeted therapeutics and gene therapy for treatment of non-muscle-invasive and invasive disease; outcome of treatments for non-muscle-invasive bladder cancer and radical cystectomy and development of predictive models; genomic characterization and integrated analysis of bladder and upper tract cancers

Clinical Interests

Urologic oncology and urinary tract reconstruction; management of patients with bladder, prostate, testis and kidney cancer; Director, Bladder Cancer Multidisciplinary

Don Skinner before returning to join the full-time Baylor faculty in 1992. His clinical practice, education, and research activities are devoted to urologic oncology and particularly lower and upper tract urothelial cancer.

Dr. Lerner is author of over190 peer-reviewed articles, and co-editor of a comprehensive Textbook of Bladder Cancer. He is the founding co-editor-in-chief of the Bladder Cancer journal. He established and directs the multi-disciplinary Bladder Cancer Research Program at Baylor and his research interests include use of selective estrogen receptor modulators for treatment of bladder cancer, gene therapy, integrated genomic analysis of bladder and upper urinary tract cancers, and outcomes of radical cystectomy and pelvic lymphadenectomy. He has 26 years experience as a clinical investigator for both NCI and industry funded clinical trials. He is the PI of the ongoing SWOG NCI Phase III trial comparing extended vs. standard pelvic lymphadenectomy at time of radical cystectomy. He is active in the leadership of several national bladder cancer research enterprises including chair of the Local Bladder Cancer committee of SWOG, founding and former co-chair of the NCI Bladder Cancer Task Force and current co-chair of the NCI CTEP Genitourinary Steering Committee, and he has co-chaired the Analysis Working Group of The Cancer Genome Atlas Project for muscle invasive bladder cancer for the past 7 years. He is very active in the Bladder Cancer Advocacy Network (BCAN) as a member of the Board of Directors, past chair of the Bladder Cancer Think Tank and co-chair of the management committee of the Bladder Cancer Research Network. Dr. Lerner is an active member of the prestigious American Association of Genitourinary Surgeons and is listed routinely among "America's Top Doctors" and "Best Doctors in America.

Clinical Program

Clinical Trials

Bladder cancer; prostate cancer; kidney cancer

# EXHIBIT D



Healthcare    Community    Research    Education    News    Giving    Intranet

GIVING LIFE TO
POSSIBLE

FIND A PHYSICIAN

☐  BACK TO PEOPLE SEARCH

# James L Pool, M.D.

[People](#)  ☐  [James L Pool, M.D.](#)

SHARE ☐



## Email

[jpool@bcm.edu](mailto:jpool@bcm.edu)

## Phone

[(713) 798-5800](#)

## POSITIONS

Professor

Medicine-Hypertension

Baylor College of Medicine

Houston, TX, US

James L. Pool Presidential Endowed Chair in
Clinical Pharmacology

Baylor College of Medicine

Houston, Texas, United States

## EDUCATION

MD from University Of Oklahoma School of
Medicine

06/1972 - Oklahoma City, Oklahoma, United
States

Internship at Duke University Medical Center

01/1973 - Durham, North Carolina, United
States

Internal Medicine

Residency at Duke University Medical Center

01/1975 - Durham, North Carolina, United

## PROFESSIONAL
INTERESTS

- Cardiovascular Pharmacology
- Alteration of Lipid Metabolism by
  Antihypertensive Drugs
- Autonomic Nervous System Dysfunction

## SELECTED
PUBLICATIONS

- Taylor AA, Pool JL. "[Clinical role of direct
  Renin inhibition in hypertension.](#)" *Am J
  Ther.* 2012 May;19(3):204-10. Pubmed
  PMID: [21317620](#)

- Perlstein TS, Henry RR, Mather KJ,
  Rickels MR, Abate NI, Grundy SM, Mai Y,
  Albu JB, Marks JB, Pool JL, Creager MA.
  "[Effect of angiotensin receptor blockade on
  insulin sensitivity and endothelial function
  in abdominally obese hypertensive patients
  with impaired fasting glucose.](#)" *Clin. Sci..*
  2012 February 1;122(4):193-202. Pubmed
  PMID: [21861845](#)

James L Pool, M.D. | People | Houston, Texas

# Addresses

Baylor Comprehensive Healthcare Clinic (Clinic)

1977 Butler Blvd. E6.150
Houston, Texas 77030
United States
(713) 798-0180

# Websites

VIICTR Publications List

Cardiovascular Disease Prevention Care Center

IS THIS YOU?

Log in to edit your profile.

States
Internal Medicine

Fellowship at Duke University Medical Center

01/1976 - Durham, North Carolina, United States

Endocrinology

# CERTIFICATIONS

Internal Medicine
American Board of Internal Medicine

Diplomate
American Board of Endocrinology and Metabolism

Diplomate
American Board of Clinical Pharmacology

- Hyman DJ, Pavlik VN, Greisinger AJ, Chan W, Bayona J, Mansyur C, Simms V, Pool J. "Effect of a physician uncertainty reduction intervention on blood pressure in uncontrolled hypertensives-a cluster randomized trial.." *J Gen Intern Med.* 2012 April;27(4):413-9. Pubmed PMID: 22033742

- Clement S, Brohan E, Sayce L, Pool J, Thornicroft G. "Disability hate crime and targeted violence and hostility: A mental health and discrimination perspective.." *J Ment Health.* 2011 June;20(3):219-25. Pubmed PMID: 21574788

- Ferdinand KC, Pool J, Weitzman R, Purkayastha D, Townsend R. "Peripheral and Central Blood Pressure Responses of Combination Aliskiren/Hydrochlorothiazide and Amlodipine Monotherapy in African American Patients With Stage 2 Hypertension: The ATLAAST Trial.." *J Clin Hypertens (Greenwich).* 2011 May;13(5):366-75. Pubmed PMID: 21545398

EDUCATION            HEALTHCARE            RESEARCH            COMMUNITY

*Baylor College of Medicine is a health sciences university that creates knowledge and applies science and discoveries to further education, healthcare and community service locally and globally.*

FIND A PHYSICIAN        DEPARTMENTS        CENTERS        CONTACT        ABOUT US        ACCREDITATION

careers        privacy        compliance        giving        alumni        shop

©1998 - 2020 Baylor College of Medicine® One Baylor Plaza, Houston, Texas 77030 (713) 798-4951

login

# EXHIBIT E

| SCORE | TODAY | CLOCK DRAWING: TODAY |
|---|---|---|
| 3-WORD MEMORY | 0 | |
| ORIENTATION | 6 | |
| SEQUENCE MEMORY | 4 | |
| TIME | 2 | |
| TOTAL SCORE | 12 | |



## Background

This patient is a 78 year-old man who lives independently in the community. The patient's cognitive functioning is being evaluated due to cognitive complaints by the patient, a family member, or a community observer.

## Test Results

This patient has received a score of 12 of 29 points. This score falls below the cutoff for dementia in patients of this age and educational level and is typically associated with Major Neurocognitive Disorder, moderate (formerly Moderate Dementia).  In our research database of 3500 patients, no patients in this score range had normal cognition, 2% had Mild Cognitive Impairment (MCI), and 98% had dementia.

The test administrator agrees with the results of this test.

## Results Over Time



October 2019

## Plan

No plan.

**BROCKMAN, ROBERT**
Patient ID: 0300937767   DOB: 05/28/1941   Age: 78   Gender: M



Donna Ansualda

Disclaimer: This test has high levels of sensitivity, specificity and reliability, but does not replace comprehensive neuropsychological and medical evaluation. Our recommendations are based on current research and extensive clinical experience with this population. The CogniSense™ tool has been validated in English speaking adults ages 60 to 92 in a community-based primary care setting.

References:

Clionsky, M and Clionsky E, "Development and Validation of the Memory Orientation Screening Test," *American Journal of Alzheimer's Disease & Other Dementias*, 2010, 25 (8), 650-656

Clionsky, M and Clionsky E, "Identifying Cognitive Impairment in the Annual Wellness Visit: Who Can You Trust?," *The Journal of Family Practice*, 2011, 60: 653-659

Clionsky, M and Clionsky E, "The Memory Orientation Screening Test (MOST®) accurately separates normal from MCI and demented elders in a prevalence-stratified sample," *Alzheimer's Disease & Parkinsonism*, 2013, 3:1

# EXHIBIT F

James L. Pool, M.D.
Professor, Departments of Medicine and Pharmacology
Baylor Comprehensive Healthcare Clinic
Jamail Specialty Care Center
1977 Butler Blvd - 6th Floor, Suite E6.150
Houston, TX 77030-4101
Tel 713-798-0180 • Fax 713-798-0174
E-mail address: jpool@bcm.edu



January 14, 2020

Kathryn Keneally
Jones Day
250 Vesey Street
New York, NY 10281

Re: Robert Theron Brockman
    DOB: 05/28/1941
    SSN: xxx-xx-3444
    333 W Friar Tuck Lane
    Houston, TX 77024-5741

Dear Ms. Keneally:

I have been asked to provide this letter by counsel for Robert T. Brockman. I understand that this letter will be included by counsel as part of a submission to the U.S. Department of Justice on the issue of Mr. Brockman's cognitive impairment.

I am a Professor in the Departments of Medicine and Pharmacology and a treating internal medicine physician at the Baylor College of Medicine (BCM), where I hold the James L. Pool Presidential Endowed Chair in Clinical Pharmacology.

I conducted a complete physical examination of Mr. Brockman on December 11, 2018. Mr. Brockman was referred to me by Dr. Seth P. Lerner (BCM Department of Urology) who has been treating Mr. Brockman in connection with an incidence of urinary bladder cancer several years earlier.

As part of my examination of Mr. Brockman, I also met with his wife, Dorothy Brockman, and their adult son, Robert Brockman. It became evident from my examination and from our discussions that Mr. Brockman has experiencing cognitive problems that have been noticeable for approximately three years. For this reason, Mr. Brockman was referred to Joseph Jankovic, M.D., a BCM neurologist and specialist in Parkinson's Disease and other movement disorders, Melissa Yu, M.D., a BCM neurologist and specialist in Alzheimer's Disease and other memory disorders, and Michele K. York, Ph.D., a BCM neuropsychologist and specialist is memory disorders, all with Baylor Medical College.

Each of these doctors provided me with reports following their examinations. Dr. Jankovic examined Mr. Brockman in January 2019. He conducted a physical examination, and concluded that Mr. Brockman presents symptoms that are consistent with Parkinson's Disease (or Vascular Parkinsonism). Dr. York conducted a neuropsychological evaluation of Mr. Brockman on March 1, 2019, which Dr. Yu relied on during her examination of Mr. Brockman on March 20, 2019, and in her subsequent

diagnosis. Dr. York and Dr. Yu concluded that Mr. Brockman's movements are consistent with Parkinson's Disease (or Vascular Parkinsonism). They also concluded his ongoing cognitive impairment is consistent with Lewy Body Dementia. These diagnoses cannot be totally confirmed except at autopsy of the brain after the death of the patient.

Parkinson's Disease (or Vascular Parkinsonism) and Lewy Body Dementia may each cause cognitive impairment and dementia. In Mr. Brockman's case, his recent neurological tests show mild to moderate dementia. In contrast to severe dementia, which will manifest as an inability of an individual to know where he is, what he is doing, or with whom he may be speaking, a person with mild to moderate dementia has some recognition of what is going on around him, and may function at a level at which he can cover-up his limitations. In a case such as Mr. Brockman, where an individual had superior, pre-morbid intelligence and functioned at a high level prior to the onset of dementia, he may be able to cover-up his limitations in social and business settings. In Mr. Brockman's case in particular, it became clear from my discussions with his wife and son that he has had a long-standing, excellent support network that enables him to appear to be continuing in his routine activities.

At this stage, Mr. Brockman has undeniable short-term memory limitations. Quite simply, if information is presented to him, he will be unable to comprehend what is being asked of him and to respond appropriately. In addition, his ability to report on past events may be distorted by the high risk of confabulation. When a person has dementia, his memory function will attempt to fill in gaps to enable him to respond to questions or to report on past events. While the story may sound logical, it will not be based on fact or accurate memory. The speaker will believe the story to be true, but is not. In essence, for a person such as Mr. Brockman, dementia will render long-term memory inaccessible and defective. Even if he can remember past events, he cannot accurately relate them to the question that he is being asked in the present or assimilate the information to report it accurately. If he can compose a response at all, it will likely be the product of such confabulation, rather than genuine memory.

For these reasons, I concur with the medical position that Mr. Brockman cannot assist his attorneys in his defense, if criminal charges were to be brought against him.

Sincerely,

James L. Pool, M.D.
Professor of Medicine and Pharmacology
Baylor College of Medicine, Houston, TX

# EXHIBIT G



GIVING LIFE TO POSSIBLE

☐ MEET OUR TEAM

# Joseph Jankovic, M.D.

Meet Our Team - Physicians: Parkinson's Disease Center And Movement Disorders Clinic

People   ☐   Joseph Jankovic, M.D.

SHARE ☐



☐ WATCH PROFILE VIDEO

REQUEST AN APPOINTMENT

## Email

pdcmdc@bcm.edu

## Phone

(713) 798-7438

## POSITIONS

Professor
Neurology
Baylor College of Medicine

Distinguished Chair in Movement Disorders
Baylor College of Medicine

Director
Parkinson's Disease Center and Movement
Disorders Clinic
Baylor College of Medicine

Director, Centers of Excellence
National Parkinson Foundation
Huntington's Disease Society of America
Tourette Syndrome Association

Program Director
Movement Disorders Fellowship
Baylor College of Medicine

## EDUCATION

MD from University of Arizona College of Medicine
06/1973 - Tucson, Arizona, United States

Internship at Baylor College of Medicine
06/1974 - Houston, Texas, United States
Internal Medicine

Residency at The Neurological Institute, Columbia University
06/1977 - New York, NY, United States
Neurology

After receiving his MD degree from the University of Arizona College of Medicine in 1973, Dr. Jankovic completed medicine internship at Baylor College of Medicine, Houston, and residency in Neurology at the Neurological Institute, Columbia University, New York City, where he was selected as the Chief Resident and also obtained additional

## Addresses

Parkinson's Disease Center and Movement Disorders Clinic (Clinic)

Baylor College of Medicine Medical Center
7200 Cambridge St., 9th Floor, MS: BCM609
Houston, Texas 77030
United States
(713) 798-2273

Neurology Site

## Websites

Parkinson's Disease Center and Movement Disorders Clinic

In the News

Dr. Jankovic's Bibliography

Comprehensive list of publications and presentations

Dr. Jankovic's Research

VIICTR Research Database

Download CV

IS THIS YOU?
Log in to edit your profile.

## BOARD CERTIFICATIONS

American Board of Psychiatry and Neurology, Neurology

## CLINICAL INTERESTS

- Neurology
- Movement Disorders
- Parkinson's Disease and related neurodegenerative disorders
- Tremors
- Dystonia
- Tics
- Tourette's syndrome
- Chorea
- Huntington's disease
- Restless leg syndrome
- Tardive dyskinesias
- Paroxysmal dyskinesias
- Ataxia

training in movement disorders with Stanley Fahn, MD. In 1977 he joined the faculty of Baylor College of Medicine and became the founder and director of the Parkinson's Disease Center and Movement Disorders Clinic, which has since been recognized as a "Center of Excellence" by the National Parkinson Foundation, the Huntington Disease Society of America, and the Tourette Syndrome Association. Promoted to a full professor of Neurology in 1988, Dr. Jankovic currently holds the endowed Distinguished Chair in Movement Disorders.

One of the founders of the International Parkinson and Movement Disorder Society, Dr. Jankovic was elected its 3rd president in 1994. He is an Honorary Member of the American Neurological Association, Australian Association of Neurologists, European Federation of Neurological Societies, French Neurological Society, and the International Parkinson's Disease and Movement Disorders Society. Selected as a "Great Teacher" by the National Institute of Health, Dr. Jankovic is the recipient of many other honors including the American Academy of Neurology (AAN) Movement Disorders Research Award, sponsored by the Parkinson's Disease Foundation, The First National Parkinson Foundation (NPF) Distinguished Service Award, the Guthrie Family Humanitarian Award, presented by the Huntington's Disease Society of America, the Tourette Syndrome Association Lifetime Achievement Award, the Dystonia Medical Research Foundation Distinguished Service Award, the Baylor College of Medicine Alumni Association Distinguished Faculty Award, the Fulbright & Jaworski Faculty Excellence Award, and the Baylor College of Medicine Master Clinician Lifetime Award.

Dr. Jankovic had been principal investigator in over hundred clinical trials and his pioneering research on drugs for parkinsonian disorders

and hyperkinetic movement disorders, including botulinum toxin and tetrabenazine, has led to their approval by the Food and Drug Administration. Dr. Jankovic has published over 1,000 original articles and chapters, and edited or co-edited over 50 books and volumes, including several standard textbooks such as "Neurology in Clinical Practice", "Principles and Practice of Movement Disorders", and "Hyperkinetic Movement Disorders". He has been a member of numerous editorial boards including Neurology, Movement Disorders, Journal of Neurology Neurosurgery and Psychiatry, Parkinsonism and Related Disorders, Acta Neurologica Scandinavica, Journal of the Neurological Sciences, Neurology Medlink, Clinical Neuropharmacology, Neurotherapeutics, Expert Review of Neurotherapeutics, Journal of Parkinson's Disease, PeerJ, Faculty of 1000 (F1000), and other journals. Dr. Jankovic has co-directed the annual course "A Comprehensive Review of Movement Disorders", in Aspen, Colorado since 1991. Invited as a keynote speaker and an endowed lecturer in many national and international institutions and organizations, Dr. Jankovic has directed or lectured in annual AAN courses, MDS Congresses, as well as other international meetings. Dr. Jankovic has mentored numerous fellows and other trainees many of whom have become leaders in the field of neurology and movement disorders.

Certified by the American Board of Psychiatry and Neurology, Dr. Jankovic is a fellow of the AAN and an active member of many other professional organizations. He is current or past member of many scientific and medical advisory boards of national foundations including the Worldwide Education and Awareness for Movement Disorders (WEMOVE), Dystonia Medical Research Foundation, International Essential Tremor Foundation, Tourette Syndrome Association, and the World Federation of Neurology

Association of Parkinsonism and Related Disorders. Dr. Jankovic has also served on the executive scientific advisory boards, including the Michael J. Fox Foundation for Parkinson's Research and the National Parkinson Foundation Clinical and Scientific Advisory Board. Dr. Jankovic is listed in The Best Doctors in America, America's Top Doctors, Listed in US News and World Report's "Top Doctors", Who's Who in the World, and other Who's Who references.

# HONORS & AWARDS

Past President

International Parkinson and Movement Disorder Society (01/1994 - 01/1996)

Honorary Member

American Neurological Association

Australian Association of Neurologists

European Federation of Neurological Societies

French Neurological Society

International Parkinson and Movement Disorder Society

Great Teacher Award

National Institutes of Health

Movement Disorders Research Award

American Academy or Neurology

Sponsored by the Parkinson's Disease Foundation

Distinguished Service Award

National Parkinson Foundation

Guthrie Family Humanitarian Award

Huntington's Disease Society of America

Lifetime Achievement Award

Tourette Syndrome Association

Distinguished Service Award

Dystonia Medical Research Foundation

Distinguished Faculty Award

Baylor College of Medicine Alumni Association

Fulbright & Jaworski Faculty Excellence Award

Baylor College of Medicine

Master Clinician Lifetime Award

Baylor College of Medicine

EDUCATION          HEALTHCARE               RESEARCH               COMMUNITY

*Baylor College of Medicine is a health sciences university that creates knowledge and applies science and discoveries to further education, healthcare and community service locally and globally.*

FIND A PHYSICIAN     DEPARTMENTS     CENTERS     CONTACT     ABOUT US     ACCREDITATION

careers     privacy     compliance     giving     alumni     shop

©1998 - 2020 Baylor College of Medicine® One Baylor Plaza, Houston, Texas 77030 (713) 798-4951

login

# EXHIBIT H

# Brockman, Robert Theron

MRN: 0300937767

**Office Visit** 1/30/2019
Baylor College of Medicine -
Neurology Associates

Provider: Jankovic, Joseph, MD (Neurology)
Primary diagnosis: PD (Parkinson's disease)
Reason for Visit: Movement Disorder; Referred by Pool, James L, MD

## Additional Documentation

| | |
|---|---|
| Vitals: | BP 136/79 (BP Location: left arm, Patient Position: Sitting, Cuff Size: regular) Pulse 53 |
| | Ht 6' 1" (1.854 m) BMI 25.07 kg/m² BSA 2.11 m²   More Vitals |
| Flowsheets: | MDS UPDRS |
| Encounter Info: | Billing Info, History, Allergies, Detailed Report |

## Media

Scan on 1/31/2019 9:44 AM by Garcia, Karen, CMA: Montreal Cognitive Assessment ( MOCA )

## Progress notes

### Savitt, Daniel, DO at 2/8/2019 1:50 PM

Author Type: Fellow     Status: Addendum
Editor: Savitt, Daniel, DO (Fellow)

> **PT NAME:** Robert Theron Brockman
> **MRN:** 0300937767
> **DOB:** 5/28/1941
>
> **INITIAL NEUROLOGICAL EVALUATION:** 1/30/2019
>
> **REFERRING PHYSICIAN:** Pool, James L, MD and Stuart Yudofsky, MD
>
> **REASON FOR EVALUATION:**
> We had the pleasure of evaluating Mr. Brockman at the Parkinson's Disease Center and Movement Disorders Clinic at Baylor College of Medicine on 1/30/2019. He presents for evaluation and treatment of Parkinson's disease.
>
> **HISTORY OF PRESENT ILLNESS:**
> Mr. Brockman is a 77 year old ambidextrous man, the CEO of a computer software company, who presents for evaluation of possible Parkinson's disease.
>
> The onset of symptoms began 1.5 years ago with concentration and memory difficulty. He developed depressive symptoms about 6 months ago for which bupropion was started 2 months ago. Since that time, he has noticed an improvement in his thinking and memory. He also noticed difficulty with his balance about 1.5 years ago. For example, he enjoys fly-fishing as a hobby and has more difficulty standing even in calm waters. He takes shorter steps and has a stooped posture with walking. There is no freezing and no change in his arm swing.
>
> He has stiffness when he does not exercise. He is moving more slowly in general as well. His handwriting is messier and smaller and for this reason, he has stopped signing employee certificates. He has not noticed a significant tremor. He has some difficulty with

tasks requiring fine motor movements such as buttoning certain buttons and starting the line for his fly-fishing.

He has developed near absence of sense of smell about 10 years ago. He also began acting out his dreams at nighttime 2-3 years ago, kicking and punching in his sleep. He generally sleeps well, although recent work stress has disrupted his sleep and he now takes melatonin. He has increased urinary frequency (he goes hourly) and urgency but without incontinence or retention. He had constipation when he started Cardizem 2.5 years ago, that resolved with stool softeners. He does not have hypophonia but his wife notices slower speech. He has excessive salivation. For the past 6-8 months, he has had difficulty swallowing food and medications, coughs with swallowing. He has reduction in his hearing but does not want to wear hearing aids.

He has never been prescribed antiemaetics or antipsychotics and has never been treated for these symptoms.

**DIAGNOSTIC TESTS:**

*MRI brain* (11/2/19): Unremarkable

**RESPONSE TO TREATMENT:**

None

**ALLERGY:** No Known Allergies

**Current Outpatient Medications**

| Medication | Sig | Dispense | Refill |
|---|---|---|---|
| • buPROPion (WELLBUTRIN SR) 100 MG SR tablet | Take 100 mg by mouth two times daily. 200mg each morning and 100mg each evening | | |
| • diltiazem (DILTIAZEM CD) 120 MG ER capsule | Take 120 mg by mouth daily. | | |
| • ELIQUIS 2.5 MG TABS | TAKE 1 TABLET TWICE DAILY | | 2 |
| • ezetimibe-simvastatin (VYTORIN) 10-40 MG per tablet | Take 1 Tab by mouth every evening. | | |
| • levothyroxine (SYNTHROID) 75 MCG tablet | Take 75 mcg by mouth daily. | | |
| • Multiple Vitamins-Minerals (MULTIVITAMIN ADULT OR) | Take by mouth. | | |
| • Testosterone (ANDROGEL) 50 MG/5GM GEL | Place onto the skin. | | |

No current facility-administered medications for this visit.

**PAST MEDICAL HISTORY:**
**Past Medical History:**
Diagnosis                                                                 Date
• Atrial fibrillation

- Basal cell carcinoma
- Bladder cancer
- Depression
- Hypercholesteremia
- Melanoma
- Ocular migraine                                              1/2012
  *lasted ~30 minutes*
- Prostatitis                                                  1980
- Prostatitis
- Pseudoexfoliation glaucoma(365.52)
- Thyroid disease
- UTI (lower urinary tract infection)

**PAST SURGICAL HISTORY:**
**Past Surgical History:**

| Procedure | Laterality | Date |
|---|---|---|
| • HX BLADDER TUMOR EXCISION | | 2006 |
| • HX DENTAL SURGERY | | |
| *infected tooth* | | |
| • HX TONSILLECTOMY | | 1945 |

**FAMILY HISTORY:**
Heritage: Caucasian
*Mother:* Diabetes. She had a mediastinal mass that was inoperable (possibly lymphoma) but
deferred treatment.
*Father:* COPD

There is no family history of Parkinson's disease or tremor.

**SOCIAL HISTORY:**
Marital Status: Married
Education:  1 year of graduate school
Occupation: CEO/founder of a computer software company
Lives with his wife.
**Social History**

Tobacco Use
- Smoking status:          Never Smoker
- Smokeless tobacco:       Never Used
Substance Use Topics
- Alcohol use:             Yes

**REVIEW OF SYSTEMS:**
**GENERAL:**  The patient denies fevers, chills, weight loss, or weight gain.
**EYES:** The patient denies dry eyes, blurry vision, double vision, or vision loss.
**EARS/NOSE/THROAT:** The patient denies hearing loss, voice changes, rhinorrhea, dry
mouth, or sore throat.
**CARDIOVASCULAR:**  The patient denies chest pain, palpitations, irregular heartbeat, or
lightheadedness.
**RESPIRATORY:**  The patient denies cough, shortness of breath, or asthma.
**GI:**  The patient denies nausea, vomiting, diarrhea, constipation, bowel incontinence, ulcers,
or reflux.

**GU:** The patient denies bladder incontinence, dysuria, urinary urgency, or frequency.
**HEME:** The patient denies anemia, easy bruising, easy bleeding, or a clotting disorder.
**DERMATOLOGIC:** The patient denies rash, suspicious lesions, or change in skin color.
**ENDOCRINE:** Patient denies heat or cold intolerance, hair loss, diabetes, or thyroid problems.
**MUSCULOSKELETAL:** The patient denies joint or back pain, joint swelling, arthritis, ankle swelling, or muscle aches.
**PSYCHIATRIC:** The patient denies hallucinations, delusions, insomnia, or a history of bipolar disorder, OCD, ADD, ADHD. The patient has depression, anxiety, and memory loss.
**NEUROLOGIC:** The patient denies tremor, headaches, seizures, strokes, paresthesias, weakness, or sexual dysfunction. The patient has stiffness, gait imbalance, and hearing abnormalities.

**PHYSICAL EXAMINATION:**

**Sitting**

Vitals:

| | 01/30/19 0911 |
|---|---|
| BP: | 136/79 |
| BP Location: | left arm |
| Patient Position: | Sitting |
| Cuff Size: | regular |
| Pulse: | 53 |
| Height: | 6' 1" (1.854 m) |

**General**: The patient is well appearing and in no distress.
**Skin**: No rashes.
**HEENT**: Normocephalic and atraumatic.
**Neck**: Supple to palpation.
**Cardiovascular**: Regular rate and rhythm.
**Lungs**: Clear to auscultation bilaterally.
**Peripheral Vascular System**: No edema and normal distal pulses.
**Abdomen**: Nontender, soft.
**Extremities:** No cyanosis or edema.
**Visual**: No visual field abnormalities.
**Psychiatric**: There is appropriate mood and affect.
**Musculoskeletal**: No arthritic signs.

**NEUROLOGICAL EXAMINATION:**
**Mental Status**: The patient is alert and oriented to person, time, and place. Speech is fluent with good comprehension. There are no abnormal perceptions, hallucinations, delusions, or illusions. The patient is able to follow three-step commands. There is no right/left disorientation, ideomotor or constructional apraxia, or evidence of ADHD or OCD. A MoCA examination was administered and the patient received a score of 19/30.
**Cranial Nerve Examination:** Pupils are equal, round, and reactive to light. Visual fields are full. Non-dilated funduscopic examination revealed normal retinal and vascular anatomy. No evidence of Kayser-Fleischer rings. Ocular movements are full with no evidence of nystagmus or abnormal saccades. There are no square-wave jerks. Normal light touch within the distribution of the fifth cranial nerve. No facial asymmetry or dysarthria. Hearing is normal to finger rub bilaterally. Tongue and palate are in the midline. 5/5 trapezius strength.

**Motor Examination**: The patient has normal bulk, and 5/5 strength in the upper and lower extremities.
*Rigidity*: 2+ in each leg.
*Bradykinesia*: Mild bradykinesia worse on the right.
**Involuntary Movements**: There is no evidence of myoclonus, tics, chorea, or dystonic postures.
*Tremor*: 2+ kinetic tremor and 1+ postural tremor in each arm.
**Reflexes**: 2/4 and symmetric in the biceps, triceps, brachioradialis, quadriceps, and ankle jerks. Plantar response is flexor.
**Sensation**: Normal to joint position, temperature, light touch, and vibration in all the extremities.
**Coordination**: The patient has normal finger-nose-finger and heel-to-shin. There is no evidence of dysdiadochokinesis with rapid alternating movements.
**Gait, Balance and Posture**: The patient is able to arise from a chair without hesitation. There is reduced stride length, stooped posture, absent arm swing and en bloc turning. Romberg is normal. There is 1+ postural instability.
**Rating Scales**: MDS- UPDRS was completed in the electronic chart.

**IMPRESSION**: Mr. Brockman is a 77 year old ambidextrous man, the CEO of a computer software company, who presents for evaluation of Parkinson's disease. The onset of symptoms began 1.5 years ago with walking and balance difficulty. He developed shorter steps, stooped posture, and more difficulty maintaining balance, especially when standing in water while fishing. He has also noticed slowness of movement, difficulty with dexterity, micrographia, anosmia, and dream-acting behavior (REM-Behavioral Disorder). He had an MRI brain in 11/2018 that was unremarkable. His examination is significant for a MoCA of 19/30, 2+ leg rigidity, mild bradykinesia, and a parkinsonian gait. His history and examination are consistent with the diagnosis of postural instability gait difficulty (PIGD) type Parkinson's disease. Vascular parkinsonism is also a possible consideration given his lower body predominant symptoms and presence of vascular risk factors that include atrial fibrillation hypertension, and hyperlipidemia.

**RECOMMENDATIONS:**
1. The diagnosis of Parkinson's disease or possible vascular parkinsonism was discussed with the patient and his wife.
2. An information packet was provided about Parkinson's disease.
3. The following tests were requested:
- DaTscan to evaluate for dopaminergic deficiency and differentiate between vascular parkinsonism and idiopathic Parkinson's disease.
- Has appointment scheduled for neuropsychiatric testing.
- Will place referral to Stromatt driving evaluation due to concerns for safety with driving.
4. We prescribed the following medications and treatments:
  - Start carbidopa/levodopa 25/100 and titrate to 2 tablets three times daily. Written titration instructions were provided.
5. We would like to see the patient for follow-up in 4 months.

We discussed with the patient the indications and potential side effects of the prescribed treatment.

I personally interviewed and examined the patient, and agree with the above report. It has been our privilege to evaluate this patient.

This report was electronically signed by:
Joseph Jankovic, M.D./ Daniel Savitt, D.O.
Professor of Neurology/ Movement Disorders Fellow

**Joseph Jankovic, MD**
Professor of Neurology
Distinguished Chair in Movement Disorders
Director, Parkinson's Disease Center
and Movement Disorders Clinic
Baylor College of Medicine
Department of Neurology
Baylor St. Luke's Medical Center at the McNair Campus
7200 Cambridge, 9th Floor, Suite 9A
Houston, TX 77030-4202
Tel: 713-798-2273
www.jankovic.org


cc:
Dr. James Poole
6620 Main St.
Houston, TX 77030
713-798-0180

Dr. Stuart Yudofsky
1 Baylor Plz #115D
Houston, TX 77030
713-798-4945

Revision History ❖

**Jankovic, Joseph, MD at 1/30/2019 11:16 AM**

Author Type: Physician        Status: Signed
Editor: Jankovic, Joseph, MD (Physician)

I personally saw and evaluated the patient, and reviewed the Vitals, History, Allergies and
Medications sections of the electronic medical record. I agree with the findings as written by
the fellow, resident, nurse practitioner.

**JOSEPH JANKOVIC, M.D.**
Professor of Neurology
Distinguished Chair in Movement Disorders
Director, Parkinson's Disease Center
and Movement Disorders Clinic
Baylor College of Medicine
Department of Neurology
7200 Cambridge, Suite 9A, MS: BCM 609
Houston, TX 77030-4202
Tel: 713-798-2273 or -6556

Fax: 713-798-6808

Web: www.jankovic.org

No questionnaires available.

## Patient Instructions

1. We discussed the diagnosis of Parkinson's disease.

2. We ordered a DaTscan to evaluate for dopamine deficiency related to Parkinson's disease.

3. You have been prescribed Sinemet 25/100mg tablets.
- Please take this medication with food unless otherwise instructed.
- Common potential side effects may include nausea, sleepiness, dizziness, or hallucinations. Please call 713-798-7438 if you experience these or other side effects.

|        | BRKFST | LUNCH | DINNER |
|--------|--------|-------|--------|
| WEEK 1 | 1      |       | 1      |
| WEEK 2 | 1      | 1     | 1      |
| WEEK 3 | 2      | 2     | 2      |

4. We will also send a referral for an independent driving evaluation.

## AVS Reports

| Date/Time | Report | Action | User |
|-----------|--------|--------|------|
| 1/30/2019 11:27 AM | After Visit Summary | Printed | Savitt, Daniel, DO |
| 1/30/2019 11:16 AM | After Visit Summary | Automatically Generated | Jankovic, Joseph, MD |

## Follow-up and Disposition

Return in about 3 months (around 4/30/2019).

## Orders Placed

NM DATSCAN BRAIN SPECT (Resulted 2/14/2019)

## Medication Changes

As of 1/30/2019 11:27 AM

|  | Refills | Start Date | End Date |
|--|---------|------------|----------|
| **Added: carbidopa-levodopa (SINEMET) 25-100 MG per tablet** | 1 | 1/30/2019 | |
| Take 2 Tabs by mouth 3 times daily. - ORAL | | | |
| **Apixaban** | | | |
| **Discontinued or Completed: Apixaban (ELIQUIS OR)** | | | |

| | Refills | Start Date | End Date |
|---|---|---|---|
| Unchanged: ELIQUIS 2.5 MG TABS<br>TAKE 1 TABLET TWICE DAILY | 2 | 8/4/2018 | |

Discontinued or Completed: diltiazem (CARDIZEM SR) 60 MG SR capsule

Discontinued or Completed: doxycycline (VIBRAMYCIN) 100 MG capsule

Discontinued or Completed: levofloxacin (LEVAQUIN) 750 MG tablet

Discontinued or Completed: Metoprolol Succinate (TOPROL XL OR)

Discontinued or Completed: nitrofurantoin (MACRODANTIN) 100 MG capsule

## Visit Diagnoses

PD (Parkinson's disease) G20
Cognitive decline R41.89
RBD (REM behavioral disorder) G47.52

# EXHIBIT I



**Joseph Jankovic, MD**
Professor of Neurology, Distinguished Chair in Movement Disorders
Director, Parkinson's Disease Center and Movement Disorders Clinic
Director, Center of Excellence for Parkinson's Foundation
and Tourette Association of America
**Parkinson's Disease Center and Movement Disorders Clinic**
7200 Cambridge Street, 9th Floor, Suite 9A ▪ Houston, Texas 77030
713-798-2273 phone ▪ 713-798-6808 fax ▪ www.jankovic.org

DEPARTMENT OF
NEUROLOGY



January 14, 2020

Kathryn Keneally
Jones Day
250 Vesey Street
New York, NY 10281

Re:     Robert Theron Brockman

Dear Ms. Keneally:

You have asked me to provide this letter for inclusion in a presentation that you plan to make to the U.S. Department of Justice on the issue of Robert Theron Brockman's cognitive impairment.  You have let me know that you have reviewed the report that I prepared with regard to my examination of Mr. Brockman dated January 30, 2019, and that you will also be providing that report to the Department of Justice.

Specifically, I understand that you are asking whether Mr. Brockman can assist you in preparing a legal defense.  It is my view that his cognitive impairment will prevent him from doing so.

My report discusses my diagnosis of Parkinson's disease or vascular parkinsonism.  Based on my examination, and my understanding of subsequent examinations conducted by Dr. Melissa Yu and Dr. Michele York, I concur that Mr. Brockman has dementia.

Dr. Yu and Dr. York report that Mr. Brockman's symptoms support a diagnosis of Lewy body dementia.  While I understand their reasoning, during my examination Mr. Brockman denied experiencing hallucinations, which are a hallmark indicator of Lewy body dementia.  Notably there is no test that can be administered prior to autopsy that can confirm a diagnosis of either Parkinson's disease or Lewy body dementia.

It is characteristic that a person with dementia, such as Mr. Brockman, will be unable to recall information that is needed to respond accurately when asked questions.  As a result of Mr. Brockman's cognitive impairment, he has trouble accessing information and making connections between questions that he is being asked and his recollection of events.  It is a characteristic of this dementia that Mr. Brockman may engage in confabulation, in which the brain will attempt to fill in missing information, causing him to sometimes make up stories or provide information about something that has not occurred.  Confabulation differs from prevarication or lying.  Confabulation is a symptom of cognitive impairment, and is not voluntary.  A cognitively impaired person who

engages in confabulation will believe that he is reporting truthfully.  A person with Mr. Brockman's cognitive impairment may appear to be engaged in a normal discussion, but any information that he may provide may be partial and not complete or accurate.

In summary, Mr. Brockman's dementia leaves him unable to provide accurate information about past events.

Sincerely,

Joseph Jankovic, MD

# EXHIBIT J



GIVING LIFE TO
POSSIBLE

☐ BACK TO PEOPLE SEARCH

# Melissa Michelle Yu, M.D., FAAN

People   ☐   Melissa Michelle Yu, M.D., FAAN

SHARE ☐



REQUEST AN APPOINTMENT

## Phone

Primary: (713) 798-4734

Secondary: (713) 798-2273

## Addresses

Baylor Neurology - Alzheimer's
Disease and Memory Disorders
Center (Clinic)

7200 Cambridge St., 9th Floor
McNair Campus

## POSITIONS

Associate Professor

Neurology

Baylor College of Medicine

Associate Medical Director

Baylor Clinic

Neurology

Baylor College of Medicine

Associate Director, Clinical Operations

Alzheimer's Disease and Memory Disorders
Center

Baylor College of Medicine

Houston, Texas

Faculty Senator

Baylor College of Medicine

Houston, Texas, United States

Physician Informaticist

Baylor College of Medicine

## EDUCATION

## CERTIFICATIONS

Neurology

American Board of Psychiatry and Neurology

Clinical Informatics

American Board of Preventive Medicine

## PROFESSIONAL
## INTERESTS

- Memory disorders

- Healthcare Management

- Electronic Medical Records

- Process Improvement

- Quality Improvement

- Healthcare Informatics

## MEMBERSHIPS

American Academy of Neurology

Houston, Texas 77030
United States
(713) 798-4734

Clinic website

**IS THIS YOU?**

Log in to edit your profile.

MD from Mt. Sinai School of Medicine

05/2000 - New York City, New York, United
States

Internship at St. Luke's-Roosevelt Hospital
Center

06/2001 - New York City, New York, United
States

Internal Medicine

Residency at Baylor College of Medicine

06/2004 - Houston, Texas, United States

Neurology

Graduate Certificate at Jesse H. Jones
Graduate School of Management of Rice
University

03/2014 - Houston, Texas, United States

Healthcare Management

Graduate Certificate at University of Texas,
School of Biomedical Informatics

12/2016 - Houston, Texas, United States

Healthcare Informatics

| EDUCATION | HEALTHCARE | RESEARCH | COMMUNITY |
|---|---|---|---|

*Baylor College of Medicine is a health sciences university that creates knowledge and applies science and discoveries to further education, healthcare and community service locally and globally.*

FIND A PHYSICIAN     DEPARTMENTS     CENTERS     CONTACT     ABOUT US     ACCREDITATION

careers     privacy     compliance     giving     alumni     shop

©1998 - 2020 Baylor College of Medicine® One Baylor Plaza, Houston, Texas 77030 (713) 798-4951

login

# **EXHIBIT K**

# Brockman, Robert Theron

**Office Visit** 3/20/2019          Provider: Yu, Melissa, MD (Neurology)
Baylor College of Medicine        Primary diagnosis: Dementia with Parkinsonism
Neurology                         Reason for Visit: Memory Loss; Referred by Pool, James L, MD

## Additional Documentation

| | |
|---|---|
| Vitals: | BP 135/70 (BP Location: left arm, Patient Position: Standing) Pulse 58 |
| | Ht 5' 11.75" (1.822 m) Wt 189 lb (85.7 kg) BMI 25.81 kg/m² BSA 2.08 m²   More Vitals |
| Flowsheets: | Mini-Mental State |
| Encounter Info: | Billing Info, History, Allergies, Detailed Report |

## Communications

⇘ Chart Routed to Pool, James L, MD

## Media

Scan on 3/19/2019 9:30 AM by Hudson, Kendra: ADMDC Packet
Scan on 3/20/2019 2:35 PM by Seedanee, Demonica: Clocks

## Progress notes

### Yu, Melissa, MD at 3/20/2019 4:58 PM

Author Type: Physician          Status: Signed
Editor: Yu, Melissa, MD (Physician)

**Consult requested by: James L Pool, MD**
**1977 Butler Blvd**
**Suite E6.150**
**Houston, TX 77030**

**Chief Concern:**

**Chief Complaint**
Patient presents with
• Memory Loss

**HPI:**
Robert Theron Brockman is a 77 y.o. male who presents for evaluation of memory loss with his husband and his son.

Memory loss is reported beginning at least back to November 2017 in a Fondren Orthopedics progress note scanned into the chart.

He was recently seen in the PDMDC by Dr. Jankovic at which time he reported a 1.5 year history of cognitive difficulty along with balance difficulty. Anosmia was noted dating back about 10 years, and dream enactment behavior for the past 3 years. Increased tone and tremor was noted as well as reduced arm swing and stride length. Parkinson's disease was

suspected and DATSCAN was performed showing significant loss of dopaminergic signal.
He was started on sinemet with motor improvement and started on Exelon patch on 3/13.

He now presents for memory disorders evaluation. He reports always having "superior
memory." He reports onset of symptoms about 2 years ago. His wife reports some
symptoms about 3 years ago with "slowing down" and then symptoms became much more
obvious about 9 months ago associated with a stressful life event. His son notes that he
repeats himself at times. He reports mild progression since that time.

He reports always misplacing objects. He reports minimal word finding issues but difficulty
with spelling. He reports minimal difficulty with names. He reports some difficulty
remembering to take his medications. He has stopped driving at his physician's request.
No driving incidents were reported but his wife notes that he drives slower. He reports no
trouble managing finances. He never cooks. He notes some difficulty with planning out
tasks at work, family notes that he doesn't initiate activity like he used to.

He lost his sense of smell about 10 years ago. He describes his mood as "pretty good" but
notes feeling shaken about his neuropsychological test results. His son reports that his
ability fluctuates (he's had him draw clocks at various times). He reports episodes of
"blankness" associated with less interaction alternating with improved cognition. His son
notes significant fluctuations in terms of his decision making abilities, with good days and bad
days. His son reports he's not as angry as he used to be.

The patient reports good sleep. At least four episodes of dream enactment behavior is
reported and snoring - both have improved with trazodone. He reports awakening feeling
refreshed. He does not nap. His family notes he has been more fatigued since being on
diltiazem. He sleeps 7-8 hours/night.

He reports one episode of visual disturbance - saw a rainbow/possible visual aura about 8
years ago. No other visual phenomena are reported with the exception of a possible
hallucination during neuropsychological testing - wife notes it was a "bad day". No auditory
hallucinations are reported.

Motor symptoms began a few years ago with a stooped posture noted by his son. His son
also noted increased tone in his back. His gait began to deteriorate in July 2018. He
reports no falls. He reports urgency and frequency of urine but no incontinence. He reports
some decline in his handwriting and family notes micrographia and decreased facial
expression. He reports no sensory changes with the exception of mild tingling in two toes.
No visual agnosia is reported.

Gait symptoms improved some with levodopa, particularly on one tab TID. Increase in dose
to two tabs TID led to more cognitive decline but family reports he seems to have stabilized
in this regard. Cognitively he has improved some with the Exelon patch as well. He reports
minimal side effects except feeling spacy at times.

**Past Neurological History:**
**History of Learning Disability**: absent. BS Business. CEO and owner of large automotive
dealership software company.
**Previous diagnosis of neurological disease: None**
**Illness which could affect mentation: None**
**History of head injury: None**
**History of visual symptoms: as above**
**History of hearing symptoms: Decreased Acuity Both. Date of onset: uncertain**
**History of abnormal movements: None**

**Previous stroke or TIA: None**
**Previous seizure: None**

**Past Medical History:**

**Past Medical History:**

| Diagnosis | Date |
|---|---|
| • Atrial fibrillation | 2016 |
| • Basal cell carcinoma | |
| • Bladder cancer | |
| • Depression | |
| • Hypercholesteremia | |
| • Melanoma | |
| • Ocular migraine | 1/2012 |
| *lasted ~30 minutes* | |
| • Prostatitis | 1980 |
| • Prostatitis | |
| • Pseudoexfoliation glaucoma(365.52) | |
| • Thyroid disease | |
| • UTI (lower urinary tract infection) | |

**Past Surgical History:**

**Past Surgical History:**

| Procedure | Laterality | Date |
|---|---|---|
| • HX BLADDER TUMOR EXCISION | | 2006 |
| • HX CATARACT REMOVAL | | |
| • HX DENTAL SURGERY *infected tooth* | | |
| • HX TONSILLECTOMY | | 1945 |

**Allergies:**
No Known Allergies

**Medications:**

- • buPROPion (WELLBUTRIN SR) 100 MG SR tablet — Take 100 mg by mouth two times daily. 200mg each morning and 100mg each evening
- • carbidopa-levodopa (SINEMET) 25-100 MG per tablet — Take 2 Tabs by mouth 3 times daily.
- • diltiazem (DILTIAZEM CD) 120 MG ER capsule — Take 120 mg by mouth daily.
- • ELIQUIS 2.5 MG TABS — TAKE 1 TABLET TWICE DAILY
- • ezetimibe-simvastatin (VYTORIN) 10-40 MG per tablet — Take 1 Tab by mouth every evening.
- • levothyroxine (SYNTHROID) 75 MCG tablet — Take 75 mcg by mouth daily.
- • rivastigmine (EXELON) 4.6 MG/24HR PT24 — Apply 1 patch to skin every 24 hrs x 1 month then increase to 2 patches thereafter

- Testosterone (ANDROGEL) 50 MG/5GM   Place onto the skin.
  GEL
- trazodone (DESYREL) 50 MG tablet      Take 1 Tab by mouth at bedtime.

## Social History:
Social History

Tobacco Use
- Smoking status:          Never Smoker
- Smokeless tobacco:       Never Used
Substance Use Topics
- Alcohol use:             No
  Frequency:               Never
  *Comment: none for 3 years, previous occasional heavy drinking (not regularly)*
- Drug use:                No

Occupation: As above
Marital Status: Married, one son who is Neuroscience graduate student

## Family History:
Family History
| Problem | Relation | Name | Age of Onset |
|---|---|---|---|
| •Lymphoma | Mother | | |
| •COPD | Father | | |
| •Other (aspergers) | Brother | | |

Neurological disorders: as above

## Review of Systems:  see health assessment - reviewed with patient

**Constitutional**: No weight change, fever, chills, fatigue
**Eyes**: No diplopia, blurry vision, dry eyes, cataracts, macular degeneration except history of cataract removal
**ENT**: No headache, sinus issues, hearing loss, tinnitus, dry mouth, vertigo except    hearing loss reported
**Cardiovascular**: No chest pain, tachycardia, bradycardia. Reports history of angina.
**Respiratory**: No difficulty breathing
**GI**: No abdominal pain, constipation/diarrhea, nausea, incontinence
**GU**: No pain on urination, incontinence, kidney stones. Reports history of bladder cancer, occasional incontinence
**Skin/Teg**: No rash, lacerations, easy bruising. Reports history of basal cell CA and melanoma.
**Musculoskeletal:** No significant neck or back pain, history of arthritis, broken bones except history of osteopenia and arthritis.
**Psychiatric**: No anxiety, reports history of depression
**Endocrine**: No thyroid abnormalities, DM except reports hypothyroidism on synthroid.
**Hematologic**: No anemia, transfusions
**Immunologic**: No recent infections
**Neurologic**: See above

## Vital Signs:

**Vitals:**

|  | 03/20/19 1304 | 03/20/19 1307 |
|---|---|---|
| BP: | 140/73 | 135/70 |
| BP Location: | left arm | left arm |
| Patient Position: | Sitting | Standing |
| Pulse: | 53 | 58 |
| Weight: | 189 lb (85.7 kg) | |
| Height: | 5' 11.75" (1.822 m) | |

## General Physical Examination:

Gen: Well developed, well nourished in no apparent distress. Awake and alert.

Neck: supple, full range of motion. No carotid bruits

Cardiac: Rate and rhythm regular without any murmurs and with normal S1 and S2 sounds.

Chest: clear to auscultation, no wheezes, rales or rhonchi, symmetric air entry

Abdomen: soft, nontender, nondistended, no masses or organomegaly

Extremities: no pedal edema

Skin: Intact

## NEUROLOGICAL EXAMINATION:
**(120 mins post levodopa)**
MMSE 26/30 (7s), 25/30 (spelling)   Definite visual issues noted with significant issues noted drawing clock and intersecting pentagons.
Clock drawing 2/4 (circle, numbers, unable to indicate correct time. Numbers on outside of clock)
General behavior: cooperative. Repetitive.
Deficit Anosognosia: Minimizes
Judgement: fair , estimated from: history and observation
Apraxia: absent

## Speech:
Spontaneous speech: normal
Comprehension: normal
Repetition: normal
Word finding difficulty: present
Dysarthria: absent

## Cranial Nerves
II: Acuity deferred. VFF. Fundus: No papilledema
III, IV, VI: PERRL, EOMI, no nystagmus
V1-V3: intact to light touch bilaterally
VII: face symmetric
VIII: diminished to finger rub bilaterally
IX, X: palate elevates equally and symmetrically
XI: SCM 5/5

XII: tongue movements symmetric and midline.  No fibrillations or atrophy.

## General Motor Survey
Posture: stooped
Tone:    increased in BUE with distraction
Atrophy:  absent

## Motor Examination
Power 5/5 throughout.

## Deep Tendon Reflexes

| DTRs | Bic | Tric | BR | Pat | Ankle | Babinski |
|------|-----|------|-----|-----|-------|----------|
| Right | 2+ | 2+ | 2+ | 1+ | 1+ | flexor |
| Left | 2+ | 2+ | 2+ | 1+ | 1+ | flexor |

Abnormal reflexes:  glabellar and snout and jaw jerk

## Sensory Examination
Vibration:         Normal in both legs except decreased in the toes bilaterally
Joint Position:    Normal in both legs except in the toes bilaterally
Light Touch:       Normal in all 4 extremities
Pinprick:          Normal in all 4 extremities

## Coordination
Finger to nose: mild action tremor noted bilaterally
Heel to shin:   Normal bilaterally

## Movement:
Bradykinesia: slow rapid alternating movements noted bilaterally, more pronounced
on left. Hypomimia and mild bradyphrenia noted.
Tremor: no rest tremor noted.  Mild postural tremor noted in left more than right hand.
Other abnormal movements:  Single myoclonic jerk (trunk) noted during examination

## Gait and Station
Gait and posture:  stooped posture with minimal arm swing, short steps with en bloc
turning noted
Romberg testing: Normal
Posture: significant postural instability noted with minimal stimulus
Able to rise from chair without use of arms

## Review of Medical Records:
Neuropsychological testing (3/1/19, York):
*IMPRESSION*:  Pattern indicates a dementia of mild to moderate severity with deficits in
areas of visuospatial functioning, verbal and nonverbal episodic memory and executive
functioning, with mild functional declines.  Parkinsonism combined with dementia, new onset
visual hallucinations, potential visual illusions and REM Behavior disorder are consistent
with dementia with Lewy Bodies.  Driving cessation recommended.

Prior labs:
Normal: RPR, HIV, homocysteine, CMP, folate, B12, lipid panel, MMA, D, SPEP, A1C,
TFTs, CBC, ESR

MRI of the brain 11/2018:

No intracranial abnormalities, particularly no disproportionate lobar atrophy
Reviewed by me: Mild generalized atrophy, two microhemorrhages in left frontal lobe.

DATSCAN 1/2019:
Severe loss of dopaminergic neuronal function in the bilateral dorsal striata with loss greater on the right compared to the left.
Reviewed by me: Agree

**Physician Estimate of symptom duration (derived using ADMDC methods):**
At least 3 years

**Impression:**
Robert Theron Brockman is a 77 y.o. male with history of atrial fibrillation and bladder cancer who presents for evaluation today with a 3 year history of cognitive dysfunction along with changes in gait, worse over the past 9 months associated with a significant life stressor. Examination is significant for deficits noted on MMSE, visual spatial dysfunction and parkinsonism. Imaging demonstrates loss of dopaminergic function without significant vascular burden. Differential includes Dementia with Lewy Bodies or Parkinson's Disease with dementia. Time course and fluctuations in cognition are more suggestive of DLB.

**Plan:**
I recommended the patient continue the sinemet at the current dose and increase Exelon patch to 9.5mg after one month on the lower dose. I recommended a course of PT for balance and gait. Imaging and laboratory data discussed with patient and family at length. Will get ApoE testing for completeness. Discussed lifestyle changes and maintenance of physical and social activity. Advised patient on diagnosis of a neurodegenerative disorder with cognitive impairment and possible implications on his work and advised he discuss further with his family. Patient and family will return for a counseling session with Dr. Kenan in the future. Patient will return for follow up in 3 months to review effects of Exelon patch.

90 minutes were spent with patient, >50% spent in counseling and coordination of care including education regarding appropriate evaluation and workup for cognitive disorders.

**Thank you for the opportunity to participate in the care of your patient.**

**CC:James L Pool, MD**
**1977 Butler Blvd**
**Suite E6.150**
**Houston, TX 77030**

_____

**Melissa Yu, M.D.**
**Associate Professor**
**Department of Neurology**
**Baylor College of Medicine**
**Houston, TX  77030**

No questionnaires available.

## Patient Instructions

1. After one month, increase the patch to 9.5mg daily (new prescription)
2. Go to physical therapy
3. Kendra will call you to set up an appointment with Dr. Kenan
Follow up with me is recommended in 3 months to see how you're doing.

## AVS Reports

| Date/Time | Report | Action | User |
|---|---|---|---|
| 3/20/2019 2:33 PM | After Visit Summary | Printed | Yu, Melissa, MD |

## Follow-up and Dispositions

· Return in about 3 months (around 6/20/2019).

## Orders Placed

APOLIPOPROTEIN E MUTATION - CARDIAC (Resulted 3/20/2019)
AMB REF TO PT EXTERNAL Closed

## Medication Changes

As of 3/20/2019 2:24 PM

| | Refills | Start Date | End Date |
|---|---|---|---|
| Added: rivastigmine 9.5 MG/24HR PT24 | 5 | 3/20/2019 | |
| Place 9.5 mg onto the skin daily. - Transdermal traZODone HCl | | | |
| Discontinued or Completed: TRAZODONE HCL OR | | | |
| Unchanged: trazodone (DESYREL) 50 MG tablet | 3 | 3/13/2019 | |
| Take 1 Tab by mouth at bedtime. - ORAL | | | |

## Visit Diagnoses

Dementia with Parkinsonism G31.83, F02.80

# EXHIBIT L

Diagnostic Report

## Patient Information

**Name:** ROBERT THERON BROCKMAN
**Medical Record Number:** 0300937767
**Sex Code:** M
**BirthDate:** 5/28/1941

## Exam Information

**Accession Number:** 201902140001
**Modality:** NM
**Body Part:** HEAD
**Description:** NM DATSCAN BRAIN SPECT
**Performed Date:** 2/14/2019 11:22:21
**Patient History:** G20

## Final Report

Dopamine Transporter Imaging (DaTscan)
Brain Imaging, tomographic (SPECT)

Reason for exam: G20: Parkinson's disease

Report: The patient received Lugol?s solution 10 drops in 30 mL of water
for thyroid blockade 30 minutes prior to injection of the
radiopharmaceutical. I-123 ioflupane 4.5 mCi was administered
intravenously. Tomographic images of the head were obtained at
approximately 4 hours post administration of the radiopharmaceutical.

Tracer activity is visually absent in the bilateral putamina. Tracer
accumulation is markedly decreased in the caudate nuclei relative to
background tracer activity. Decrease of tracer is slightly greater in the
right caudate nucleus compared to the left.

Impression:

Severe loss of dopaminergic neuronal function in the bilateral dorsal
striata with loss greater on the right compared to the left.

Semi-quantitative analysis using the DaTQUANT program supports the above
interpretation. The DaTQUANT report is included with the images on PACS.

Signed by: Dr. Julie Wendt, M.D. on 2/15/2019 7:22 AM

## Principal Interpreter

**Name:** Provider JWENDT
**Provider ID:** JWENDT

# EXHIBIT M

Row A - DATSCAN BRAIN [Recon - NoAC ]                              Transverse



A: (B:4%,T:95%)

Patient Name: BROCKMAN, ROBERT THERON
DOB: 5/28/1941
Study Name: BRAIN DATSCAN
Radiopharmaceutical 1: 0.0 MBq (0.00 mCi)
Row A - DATSCAN BRAIN [Recon - NoAC ]

Patient ID: 0300937767
Sex: M
Study Date: 2/14/2019
Study Time: 11:22:21 AM
Transverse

Baylor Clinic AV



A: (B:4%,T:56%)

Patient Name: BROCKMAN, ROBERT THERON     Patient ID: 0300937767     DOB: 5/28/1941
Sex: M     Study Name: BRAIN DATSCAN     Study Date: 2/14/2019
Study Time: 11:22:21 AM

Baylor Clinic AV

Row A - DATSCAN BRAIN [Recon - NoAC ]     Transverse



A: (B:6%,T:81%)

| Patient Name | : BROCKMAN ROBERT THERON | Patient ID | : 0300937767 |
|---|---|---|---|
| Exam Description | : Tomo_Transaxials | Exam Date | : Feb 14, 2019 |
| Referring Physician | : | Reading Physician | : Julie Wendt |
| Data | : IRNC REGISTERED | Age (Years) | : 77 |
| Camera | : IP2 | Collimator Name * | : LEHR |
| Collimator Type | : Parallel | Counts (kCounts) | : 2074.1 |
| Dose (mCi) * | : 4.5 | Gender | : Male |
| Radiopharmaceutical * | : DaTscan | Reconstruction Type | : OSEM |
| Corrections | : No Correction | Normal DB | : GE OSEM NC NDB<br>GE normals database for OSEM with no correction |

Manually Modified

## Images are for non-diagnostic, display purposes only



DFOV 54.3 cm

[ Non-Rigid Registration : Automatic Processing ]

| | Measured | Mean (±1 SD) | Deviation | Z-Score |
|---|---|---|---|---|
| Striatum Right SBR | +0.46 | +1.79 (±0.33) | -74% | -3.98 |
| Striatum Left SBR | +0.49 | +1.73 (±0.35) | -72% | -3.50 |
| Putamen Right SBR | +0.36 | +1.70 (±0.33) | -79% | -4.09 |
| Putamen Left SBR | +0.43 | +1.63 (±0.35) | -74% | -3.47 |
| Caudatus Right SBR | +0.68 | +2.01 (±0.40) | -66% | -3.35 |
| Caudatus Left SBR | +0.62 | +1.94 (±0.42) | -68% | -3.13 |
| Striatum Asymmetry | +0.02 | +0.03 (±0.02) | -26% | -0.37 |
| Putamen Asymmetry | +0.05 | +0.03 (±0.03) | +36% | +0.47 |
| Caudatus Asymmetry | +0.03 | +0.05 (±0.04) | -24% | -0.30 |



Report Created : Feb 14, 2019

# EXHIBIT N

**Melissa Yu M.D.,FAAN**

**Alzheimer's Disease & Memory Disorders
Center
7200 Cambridge St, 9th Floor, Ste 9B
Houston, TX 77030
Phone: (713) 798-2273
Fax: (713) 798-7434**
<u>www.bcm.edu</u>



January 21, 2020

Kathryn Keneally
Jones Day
250 Vesey Street
New York, NY 10281

Re:  Robert T. Brockman

Dear Ms. Keneally:

At your request, I am providing this letter to respond to questions that you raised concerning my examination of Robert Brockman.  I understand that you will provide a copy of my report dated February 20, 2019, and this letter to the U.S. Department of Justice.

You asked specifically about the comments made by Mr. Brockman's son that Mr. Brockman experiences fluctuations in decision-making ability.  Patients with most forms of dementia experience anosognosia, which means that they lose insight into the cognitive limitations of their disease.  Individuals with dementia may perceive themselves as functioning normally, even well. Individuals with dementia, who have good social instincts and expansive vocabulary may appear to function well on a surface level, and will retain "social niceties" despite sometimes-significant levels of cognitive impairment.  Similarly, individuals who have been in business or professionally active for a long time may be able to speak on business issues in a way that appears functional, but will face difficulties when pressed for decisions or specifics.  Patients with Lewy body dementia will often experience day-to-day and even hour-to-hour fluctuations in their ability to function.

Dementia of any kind is more than simple memory loss.  The impact of dementia includes visual spatial function, language, memory, and executive function – in essence, all aspects of thought and cognitive function.  As an example, if a requested action requires three steps, a person with dementia will have difficulty paying attention to the request, remembering each step, and resisting distraction while completing the action.

Sincerely,

Melissa Yu, M.D., FAAN

# EXHIBIT O



**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

# CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION

| | |
|---|---|
| Patient Name: | Robert Brockman |
| Date of Birth (Age): | 05/28/1941 (77 yr.) |
| Date(s) of Evaluation: | 03/01/2019 |
| Evaluation Location: | BCM Medical Center, McNair Campus, 9th Floor |
| Referred by: | James Pool, MD |
| Referral Question: | Differential Diagnosis |
| CPT Code: | 96116 (60 mins) 96121 (120 mins) 96136 (30 mins) 96137 (180 mins) 96132 (60 mins) 96133 (180 mins) |

## BACKGROUND AND REFERRAL INFORMATION

Mr. Brockman is a 77 year-old, right-hand dominant, Caucasian male with a two to three year history of short-term memory loss. He was referred by his physician for neuropsychological evaluation of his current cognitive, behavioral, and emotional functioning with the aim of informing medical differential diagnosis and facilitating clinical decision making. The following information was obtained during a clinical interview with Mr. Brockman and from available medical records.

**Current Concerns and General Condition:** Mr. Brockman and his spouse participated in the clinical interview. He was able to act as a reliable informant. Mr. Brockman reported declines in his short-term memory over the past 2 to 3 years. He reported that he is repeating himself, losing possession, and losing his train of thought and is more tangential. He forgets names of new individual and of familiar locations. He also finds it more difficult to complete tasks. His wife noted that he is clumsy getting out of the car and has hit curbs while driving and parking. He has increased difficulties with following directions. His wife noted spelling changes and mild stuttering in his speech. His speech is slowed and he has slowed response latencies. His decision making is also slowed, and he has difficulties multi-tasking.

Mr. Brockman reproted that he began taking Wellbutrin which has improved his mood. He noted that "It is clear that he is working too much." He denied anhedonia, depressed mood, heightened general anxiety, personality or behavioral changes, suicidal ideation, and auditory hallucinations. Sleep was described as adequate but he is a night owl and dozes off during the day. His wife reported that he began to act out his dreams a couple of years ago. He has decreased appetite and has lost weight. His wife noted that he does not speak as much. He reported that he has floaters in his visual fields. He denied visual hallucinations, but it is noted that later he pointed out a bug on the testing room floor that was not present to either the examiner or his wife.

**Medical History:** Medical history is remarkable for hypothyroidism, atrial fibrillation, bladder cancer with recurrence, tremor, micrographia, and back problems. He currently has plantar fasciitis, so he is not walking for exercise. He reported that he was hospitalized for a prostate infection four years ago and pericarditis. He reported an episode of vision changes in which he saw a bar of color on a spectrum that was moving. He noted he had this visual illusion for 20 minutes and then it went away. He was told that he might have had a visual headache. He began taking levodopa one month ago. His wife noted an improvement when he first started on the medication, but since the medication was increased, she reported that he has increasing clumsiness. He is scheduled to be evaluated by Dr. Jankovic for his movement disorder. Surgical history is notable for tonsillectomy, cataract surgery, and excision of a melanoma. He reported that when he was in the sixth grade he was hit on the top of the head with a hammer and may have suffered a concussion. He did not lose consciousness  Familial medical

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION
Brockman, Robert

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

history is unremarkable for movement disorders or dementia. Psychiatric history is notable for depression. He has been taking bupropion for two months, which has reportedly improved his mood significantly. He is taking trazodone to aid his sleep and reducing his REM Behavior Disorder. Mr. Brockman denied current use of tobacco or illicit drugs or a remote history of substance misuse/abuse. He quit drinking alcohol two to three years ago secondary to his atrial fibrillation. He denied a history of seizures, TIA/stroke, or migraines. Please refer to his chart for a listing of his current medications. He is on a large regimen of supplements and vitamins.

**Social History:** Mr. Brockman has been married for 50 years and they have one son. He currently lives with his spouse in their private residence. He earned a BA in Business and attended graduate school for one year in Marketing at The University of Florida. He reported that he was a good student. He is Chairman and CEO of Reynolds and Reynolds Company.

**Behavioral Observations:** Mr. Brockman was tested during a single session as an outpatient. He arrived on time and was accompanied by his spouse who participated in the clinical interview. General appearance was neat and clean. He exhibited shuffling and slow gait, slowed motor behavior, and a right hand tremor. His mood was neutral, and he had a flat affect. He had a masked face. Eye movements were normal. Vision (with corrective lenses) and hearing were adequate for the testing session. Conversational speech was coherent and goal-directed, but it was sparse with short phrases. There was no evidence of paraphasias. He evidence a slight stutter at times. He showed moderately decreased ability to follow directions, and he frequently needed repetition of directions and to be reoriented to task. He perseverated to previous tasks. The examiner needed to be concrete for him to understand the task instructions. His processing speed was exremely sloewd. He was cooperative but evidenced surrendering test-taking behavior. His attitude towards the examiner was appropriate and friendly. He lacked insight into his cognitive problems. During testing, the patient said he was not doing well, but he appeared very surprised. His handwriting was micrographic. He saw a bug on the floor of the testing room that was not present. The following results are thought to be an accurate estimation of his current cognitive abilities.

## MEASURES ADMINISTERED
Montréal Cognitive Assessment (MoCA); Caregiver Neuropsychiatric Inventory (NPI-Q); Clock Drawing Test; Controlled Oral Word Association Test (COWAT version: FAS); General Anxiety Disorder 7-item Scale; Geriatric Depression Scale; Hopkins Verbal Learning Test-Revised (HVLT-R); Neuropsychological Assessment Battery (NAB subtest: Naming); Praxis Examination; Rey Complex Figure Test-Meyers Version; Semantic Fluency Test; Stroop Color-Word Interference Test (Stroop subtests: Color, Color-Word, and Word); Test of Premorbid Functioning (TOPF); Trail Making Test (TMT subtest: Trails A); Verbal Series Attention Test (VSAT); Wechsler Adult Intelligence Scale-IV (WAIS-IV subtests: Coding, Digit Span, Information, Similarities, and Visual Puzzles); Wechsler Memory Scale-4th Edition (WMS-IV subtests: Logical Memory II-Older Adult, Logical Memory I-Older Adult, Logical Memory Recognition-Older Adult, Visual Reproduction I, Visual Reproduction II, and Visual Reproduction Recognition); Instrumental Activities of Daily Living Scale (IADLS); Lawton and Brody Physical Self-Maintenance Scale (PSMS). Clinical Interview with patient and his spouse.

Mr. Brockman did not complete the Trail Making Test (TMT subtest: Trails B) and Wisconsin Card Sorting Test (WCST) measures due to cognitive/behavioral problems.

Informant questionnaires were sent home and completed by the patient's spouse. They were not returned by the time of the evaluation.

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION
*Brockman, Robert*

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

## NEUROPSYCHOLOGICAL FINDINGS

*The following clinical descriptors identify performance with the range of Standard Scores (average=100, standard deviation=15) indicated in parentheses: Very Superior (>130), Superior (120-129), High Average (110-119), Average, (90-109), Low Average (80-89), Borderline (70-79), and Deficient (<69). For diagnostic purposes, a cognitive deficit is considered a performance score that is >1.5 standard deviations away from the mean in the direction of poor performance compared to the reference group for that measure (i.e., Z-score) based on peers of similar age, gender, and education background as appropriate. This criterion is equivalent to a Standard Score <78, T-score <35, or a Scaled Score of <5).*

**Mental Status:** Evaluation of Mr. Brockman's general mental status on the MoCA revealed a score of 19/30, which is below expectation. He was oriented (6/6) and short-term recall was 2/5. He was aided by category cueing for one word. He demonstrated difficulties with set shifting, drawing a cube, drawing a clock face with numbers and hands placed accurately, repeating one sentence, and with serial 7's and verbal fluency.

**Intellectual:** Premorbid level of intellectual functioning was estimated to be in the high average range (TOPF SS=114), based on single, atypical word reading skills. Mr. Brockman noted that the first word presented for him to read outloud was not a word ("two"). He was able to state the letters, but noted that he did not think that was a word and then stated he guessed it was two. Mr. Brockman was administered subtests from a measure of general intellectual functioning (WAIS-IV) and obtained scores ranging from borderline to high average yielding a pro-rated Full Scale IQ estimate of 87, which is in the low average range.

**Attention/Concentration:** Attention and mental tracking for overlearned verbal sequences was deficient for speed and for accuracy. Immediate auditory attention span for digits was low average with 7 digits forward, 3 digits backward, and 2 digits when re-ordering them in ascending sequence. Speed of single word reading and speed of color naming were deficient. Mental processing speed for manual code transcription was borderline impaired. Performance on a simple visual-motor sequencing task requiring scanning and mental tracking was borderline impaired with 0 errors.

**Executive:** Mr. Brockman's ability to inhibit a dominant verbal response in the face of incongruent visual stimuli was deficient. His abstract verbal reasoning was high average. Performance on a complex visual-motor sequencing task requiring scanning, tracking, and set-shifting was impaired and the task was discontinued.

**Memory:** Recall of culturally-based general knowledge was average. Immediate recall of verbally presented contextual material was deficient (SS=3). Delayed recall of the stories was deficient (SS=3). Retention of initially learned material was 11.1%. Recognition memory was average (16/23). Mr. Brockman began describing the WMS VR figures during LM immediate recall. Incremental learning for a semantically-categorized word list across 3 trials was borderline impaired (2, 5, and 6 words per trial), and delayed recall was in the deficient range with 0.0% retention which falls within the deficient range. On recognition memory assessment, 9/12 target words were correctly identified, 5 false positive errors were committed, with discrimination accuracy in the deficient range.

Immediate recall of basic geometric figures was deficient (SS=1). Delayed recall of the designs was deficient (SS=2). Retention of the initially learned material was 0.0%. Recognition memory was borderline impaired (1/7).

**Language:** Lexical fluency was low average with between 9 and 13 words per trial. Semantic fluency was deficient with 8 exemplars generated. Confrontation naming of pictured objects was average (29/31).

**Visual-Perceptual:** His drawing of a complex geometric design scored in the deficient range. His spatial reasoning ability to mentally arrange puzzle pieces was low average. Visuoconceptual ability to draw a clock was impaired

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION
*Brockman, Robert*

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

to command (CDT=3/10). He drew a micrographic clock face. The examiner produced a clock face for him, but he was unable to place the numbers accurately and drew a hand to the 10 and the 6 for 10 after 11. His copy of a clock was also impaired (CDT=6/10). He drew the clock face but the numbers were drawn in only the right side of the face and the hand size differentiation was not maintained.

**Mood / Personality:** On a self-report measure of anxiety, his responses fell in the mild range (GAD-7=7/21). On a face valid measure used to assess cognitive, emotional and physical symptoms of depression, Mr. Brockman endorsed the following, suggestive of within normal limits (GDS=8):  boredom, feeling as though something negative is going to occur, preferring to stay home, worry about the future, declines in memory, poor energy, difficulties with concentration, and preferring to avoid social gatherings.

**Activities of Daily Living:** His spouse served as the informant completing a questionnaire regarding the patient's ability to complete basic and instrumental activities of daily living. Mr. Brockman reportedly has difficulties with self-care ADLs (PSMS=7/30) including ambulation. He requires mild assistance with instrumental activities of daily living (IADLs=9/31), most notably housekeeping. Although his wife did not report many functional declines, Mr. Brockman requires mild aid with his more complex ADLs.

**Neurobehavioral:** The patient's spouse completed an inventory assessing for the presence of neurobehavioral symptoms commonly associated with dementia, reportedly observing mild problems with agitation, anxiety, apathy, irritability, nighttime behaviors, and changes in appetite with moderate depression (NPI-Q severity=8; distress=11) which produce an overall minimal level of familial distress, with the exception of his depression and agitation which produces moderate distress.

## SUMMARY AND IMPRESSION

Mr. Brockman is a 77 year-old, right-hand dominant, Caucasian male who was referred by his physician for evaluation of his current neuropsychological, behavioral, and emotional status. He currently operates in the low average range of general intellectual functioning (WAIS-IV FSIQ=87), which is a decline from his estimated premorbid intellectual functioning in the above average range. His MoCA was 19/30 (total), 6/6 (orientation), and 2/5 (short-term recall), which was significantly below expectation. Self-report of depression was within normal limits (GDS=8). Self-care ADLs (PSMS) were 7/30 and instrumental ADLs were 9/31. The NPI-Q (severity=8; distress=11) indicated problems with agitation, anxiety, apathy, irritability, nighttime behaviors, and changes in appetite, and depression for an overall minimal level of familial distress, with the exception of his depression and agitation which produces moderate distress.

Mr. Brockman demonstrated borderline impaired to deficient performances on measures of sustained attention/concentration, learning and recall of prose material and a word list, learning and recall of visual material, semantic fluency, executive functions (set shifting, inhibition, working memory, and problem solving), and visuoconstruction. Praxis was impaired for intransitive praxis tasks. These impaired performances were found within the low average to average ranges on measures of basic attention, fund of information, verbal and visual abstract reasoning, verbal fluency and naming,

This pattern of neuropsychological performance indicates a dementia of mild to moderate severity characterized by deficits in the areas of visuospatial functioning, verbal and nonverbal episodic memory, and executive functioning, with mild functional declines. To my knowledge, Mr. Brockman has not been diagnosed with a movement disorder. However, he demonstrates movements that may be consistent with a Parkinsonism. These

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION
*Brockman, Robert*

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

abnormal movements taken together with his current diagnosis of dementia, new onset visual hallucinations and potential visual illusions, and REM Behavior Disorder, his pattern of cognitive impairments is consistent with Dementia with Lewy Bodies.

## RECOMMENDATIONS
**General:**
- Mr. Brockman and his family should receive feedback regarding his current level of cognitive functioning.
- Continued pharmacologic treatment of his depression appears warranted.
- Mr. Brockman should be monitored for episodes of visual hallucinations. Although he did not report hallucinations on interview, he saw a bug on the floor in the testing room which was not present.
- You may wish to consider referring the patient and his family to psychoeducational counseling with the goal of developing appropriate coping strategies, maximization of current strengths to mitigate identified weaknesses, and assist in future life planning.
- Mr. Brockman does not pose a significant safety risk and as such, he should receive occasional supervision for self-care ADLs for safety and to monitor for future changes in his ability status. He should also receive occasional review of instrumental activities of daily living to monitor for future changes in his ability status, particularly for medication and personal financial management.

**Memory Compensatory Strategies:**
- Mr. Brockman should exercise caution when operating potentially dangerous household appliances (e.g., stove/range, irons, food processors, etc.). Using models with automatic shut-off features would be ideal.
- Mr. Brockman should refrain from cooking activities involving potentially dangerous appliances (e.g., stove, food processor, etc.).
- The use of a smartphone is recommended for recording important information, setting reminders, and is maintaining and organized schedule. Applications such as Google calendar, Remember the Milk, and the Reminders application for the iPhone or similar techniques may be helpful.
- It may be helpful to have a mobile phone or smartphone with him to allow easy access to telephone number he could contact in an emergency or when he cannot recall this information.
- Placing a large-type calendar or clock that includes the date in a highly visible location may assist him in maintaining better temporal orientation.
- The patient may benefit from the placement of a large dry-erase board in a prominent spot in the home where important information can be posted such as the date, the day's or week's schedule, the whereabouts of his spouse/family members, their time to return, or important telephone numbers.
- The patient's family may wish to consider presenting important information that Mr. Brockman needs to recall in a written format when possible to allow him to refer to and review the information as necessary.
- Mr. Brockman and his family should consider establishing a 'memory station' where he would consistently place personal items such as his keys, checkbook/wallet, glasses, etc. to help prevent future memory failures regarding lost objects and to reduce anxiety and misattributions regarding the occurrence of these events. He is also encouraged to use external memory aids such as shopping lists, calendars, timers, a pill minder, and "to do" lists whenever possible to mitigate common, everyday memory failures.
- To the extent possible, he should try to avoid distracting environments when performing detailed tasks such as financial management. Breaking tasks down into more manageable units to prevent overtaxing attentional resources is another possibility. In this way, a large task can be achieved a little at a time over a week instead of an overwhelming task all in one evening, for instance.

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION
*Brockman, Robert*

**Michele K. York, PhD, ABPP-CN**
Board Certified Clinical Neuropsychologist
Associate Professor
**Department of Neurology**

**Social Activities and Other Intellectual Stimulation:**
- The patient is encouraged to maintain or increase (to the extent safely possible) his current level of intellectual and physical stimulation to help improve stamina, buoy his mood, and maintain his current level of quality of life.
- Mr. Brockman may benefit from engaging in intellectual stimulation such as reading, assembling jigsaw puzzles, and other activities such as word search puzzles, crosswords, or Sudoku. Computer-based activities such as www.Lumosity.com or www.happyneuron-corp.com are options as well. Board games and familiar card or other games (e.g., dominoes, bridge, solitaire, etc.) may also be enjoyable.
- Regular physical exercise is recommended for its beneficial effects on brain health and cognitive maintenance.

**Driving:**
- Neuropsychological tests are an imperfect predictor of real-world driving abilities; however, given his deficits in memory, attention/concentration, executive functions, visuospatial abilities, and his recent diagnosis of DLB, he should be encouraged to discontinue driving given concerns over his safety, that of others on the roadways, and legal liability issues that could arise for the patient should he become involved in a motor vehicle crash.

**Legal:**
- If not already in place, a family member should obtain Durable Power of Attorney for healthcare and financial matters.

**Patient and Caregiver Resources:**
- The Alzheimer's Association (www.alz.org/texas; 713-314-1314) provides useful information and resources for family members of patients with Alzheimer's and other types of dementia.
- Mr. Brockman and his family may benefit from community resources for seniors in the Houston area at www.HoustonTx.gov/Health/Aging and through the Houston Area Parkinson's Society (hapsonline.org).

The current results will be useful as a baseline to which findings from subsequent evaluations may be compared. Neuropsychological re-evaluation is recommended in one year (or sooner if his condition appears to change rapidly or if he and/or his family have additional concerns) to monitor neuropsychological, mood, and personality changes and to update recommendations.

Thank you for allowing me to participate in the care of Mr. Brockman. Please do not hesitate to contact me if you have any further questions.

*Michele K York, PhD*

_____

Michele K. York, PhD, ABPP-CN
Board Certified Clinical Neuropsychologist

**N.B.** This assessment was conducted as a clinical evaluation and not as a forensic assessment. This fact was verbally confirmed with the patient at the outset of testing.

# EXHIBIT P

**To:**      Bob Brockman[bob_brockman@reyrey.com]
**From:**    Stuart Yudofsky[stuart.yudofsky@gmail.com]
**Sent:**    Thur 5/4/2017 12:27:18 AM (UTC)
**Subject:** Anosmia

Good evening, Bob:

There are dozens of potential causes of anosmia--as there are for memory loss.

If you are comfortable doing so, I suggest that you begin by meeting with me.  That will help me assess the severity and significance of your memory symptoms, as well as utilize this information to direct you to the best professional-- discipline, person, and/or system--for assessment and, as required, care.

As you know, Bob, I am a neuropsychiatrist and have extensive hands-on experience with memory and cognitive changes.

I am available in the mornings from 9 AM until noon over the next several days, and can be available at any time over the weekend.

Please let me know how you would like to proceed.

Warmest regards,

Stuart

On May 3, 2017, at 4:27 PM, Bob Brockman <bob_brockman@reyrey.com> wrote:

> Stuart,
>
> Robert and Dorothy are after me to consult with the right doctor regarding my loss of my sense of smell.
>
> They are afraid that it is an early sign of alzheimer's or dementia.
>
> I am feeling good but am having increasing memory problems.
>
> Is there a doctor that you can recommend?
>
> Bob