# EXHIBIT A

# How Billionaire Robert Smith Avoided Indictment in Multimillion-Dollar Tax Case

Bloomberg News Enterprise
**Published: Feb 03 2021 06:00:12**

News Story

By   Neil Weinberg and   David Voreacos

(Bloomberg) --
U.S. prosecutors and Internal Revenue Service agents spent four years piercing the veil of secrecy that billionaire money manager Robert F. Smith wove to hide more than $200 million in income. Last year, according to people familiar with the matter, a team led by the Justice Department's top tax prosecutor argued to then-Attorney General William Barr that the evidence warranted indicting Smith, who had made headlines for pledging to pay the student debt of a Morehouse College graduating class.

But rather than expose a man worth about $7 billion to a possible prison term and potentially force him to give up control of his private equity firm, Vista Equity Partners, Barr signed off on a non-prosecution agreement. It required Smith to admit he had committed crimes, pay $139 million and cooperate against a close business associate indicted in the largest tax-evasion case in U.S. history—Texas software mogul Robert T. Brockman.

Smith, the richest Black person in the U.S. according to the Bloomberg Billionaires Index, agreed to cooperate after spending years raising his public profile as a philanthropist and advocate for racial justice. He praised the Trump administration's efforts to provide economic assistance to minority business owners amid the Covid-19 pandemic. As his wealth tripled over the past five years, he also gave away more than he had hidden abroad. All that complicated the possible prosecution of a defendant whom jurors may have viewed sympathetically.

This account of what went on behind the scenes leading up to the non-prosecution agreement is based on interviews with a dozen people involved in the negotiations or briefed on them. All requested anonymity because they aren't authorized to talk about the case. They tell a story about a man who spent freely on his defense and worked all the angles.


Smith began assembling a team of prominent attorneys after his tax problems surfaced in 2013. They included former Acting Attorney General Mark Filip and former Obama White House Counsel W. Neil Eggleston at Kirkland & Ellis, where Barr had worked before going to the Justice Department. Former IRS Commissioner Fred Goldberg was engaged, as was Mark Matthews, a former deputy commissioner.

As Justice Department tax prosecutors pushed closer to an indictment in late 2019, another issue came into



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Services

// PAGE 1

play—Smith's connection to a national security matter—according to people who heard about the discussions. The people, who don't have security clearances, said they didn't know the specifics, whether it involved Vista or how Smith might have been of assistance to the government.

A schism between tax prosecutors and national security officials led to months of wrangling. Twice the matter went up to Barr, once at the end of 2019 and again in July. Late in the game, facing an imminent indictment, Smith agreed to cooperate against Brockman, whose $1 billion investment launched his private equity career two decades earlier.

In the end, Barr intervened to settle the dispute, two of the people said. The decision to refrain from charging Smith was conveyed in a July 21 email to Filip from top tax prosecutor Richard Zuckerman reviewed by Bloomberg News. Smith's team would get what they wanted: a stay-out-of-jail card.

It would take weeks to negotiate the details of the agreement, which allowed Smith, 58, to remain at the helm of a firm that manages more than $73 billion for public pension funds and other wealthy investors. He's free to carry on with a lifestyle that has included homes in France, New York City, Colorado, California wine country, Austin, Texas, and North Palm Beach, Florida. And he can keep playing starring roles at institutions such as Cornell University, which named an engineering school after him in 2016, and Carnegie Hall, where he became chairman that year.

The agreement came at a cost. In a six-page statement of facts, Smith acknowledged evading more than $43 million in taxes over a decade and repeatedly filing false tax forms. He agreed to pay a penalty, forsake tax-deduction claims for $182 million of charitable contributions and cooperate for five years with prosecutors on investigations, including their case against Brockman, whose web of opaque Caribbean entities was allegedly used to hide $2 billion in income earned from Vista.

The Justice Department got an attention-grabbing fine and a cooperation agreement without having to risk losing at trial. But the decision to let Smith walk away unscathed by criminal charges doesn't sit well with some former prosecutors, who said it illustrates how the richest Americans can maneuver the justice system in their favor. "This case sends a message that wealthy people will be treated differently than not-so-wealthy people," said Paul Pelletier, a former Justice Department fraud section supervisor now in private practice who wasn't involved in the case. "People of lesser economic means normally don't avoid getting charged when they cooperate. The magnitude of the tax fraud here is enormous."

Smith, his lawyers and his company all declined to comment. So did Barr and spokespersons for the Justice Department and the IRS. Brockman has pleaded not guilty and denies wrongdoing in his case.

In the months leading up to the agreement, as his legal fate hung in the balance, Smith told Vista insiders his tax dispute was strictly a personal matter, people familiar with the conversations said. He hosted lavish holiday celebrations in December 2019 for clients and employees, including a New York-themed party celebrating his firm's 20th anniversary at an airport hangar in Smith's hometown of Austin.

But things weren't looking good. Around that time, prosecutors told Smith's lawyers they had enough evidence to bring criminal tax charges, two people with knowledge of the discussions said.

It's also when some people close to Vista say they first heard talk of a national security matter that might help Smith avoid tax charges. Smith's legal team, which had been working its way up the tax division hierarchy, swung into high gear, arguing for a civil settlement.

**Bloomberg Law**®

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Services

// PAGE 2

Vista had long counted on Kirkland, one of the world's largest law practices, as its main legal adviser. The private equity firm, which buys and sells enterprise software companies, generates annual billings for Kirkland of about $80 million, according to people with knowledge of the matter. Its chief operating officer, David Breach, who's also the firm's top lawyer, had been a partner at Kirkland. The firm represents some of the biggest corporations and private equity companies, including Blackstone, Carlyle Group and KKR. Filip, who works out of the Chicago office, has helped negotiate settlements for BP and Boeing. Another partner, Norm Champ, a former head of the Securities and Exchange Commission's investment management division, was involved in discussions about whether Smith could remain at Vista given the serious nature of the findings, two people familiar with the matter said.

In addition to attorneys from Kirkland, there were lawyers from Caplin & Drysdale, a leading U.S. tax shop, and Skadden, Arps, Slate, Meagher & Flom. Smith also retained Kenneth Wainstein, who previously led the Justice Department's national security division. Reid Weingarten, one of the country's top white-collar trial attorneys, was prepared to try the case if Smith were indicted.

By the end of 2019, Smith's lawyers secured a meeting with the department's top tax officials to make their case. It then went to Barr, who also considered the national security matter, people familiar with the discussions said. Assistant Attorney General for National Security John Demers got involved, and Barr eventually weighed in, telling tax and national security officials to resolve the dispute between their divisions, according to the people. Barr also made it clear that for Smith to avoid indictment, he would have to cooperate against Brockman and pay a hefty penalty.

Over the next few months, as the Covid-19 pandemic swept across the U.S., Smith raised his public profile. He joined President Donald Trump and Vice President Mike Pence in March to discuss the economy with fellow billionaire financiers Ken Griffin, Dan Loeb and Stephen Schwarzman. And he praised White House efforts to get Cares Act assistance to minority communities.

In a May 10 appearance on *Meet the Press*, Smith said Treasury Secretary Steven Mnuchin and Ivanka Trump were "very engaged" in the effort. He started having daily calls with Mnuchin and weekly ones with the president's daughter, the *Washington Post* reported in June, quoting her saying she'd had "very substantive discussions" with Smith about supporting businesses in minority communities. Smith "didn't have a particular agenda" and was "legitimately interested in helping the program," Mnuchin told the paper. "You know, the dynamic I've been focused on is working with the administration, with Ivanka and Secretary Mnuchin in particular, as well as on both sides of the aisle," Smith said on Fox Business on June 17.

Smith's open support of the Trump administration didn't seem to influence the Justice Department. In June, prosecutors told his lawyers they were still planning to indict Smith on charges of conspiracy and filing false tax returns, three of the people familiar with the discussions said.

Smith's lawyers continued to push for a non-prosecution agreement, and the case went to Barr a second time, people with knowledge of the matter said. Again, the attorney general drew a line: He told Zuckerman, the top tax prosecutor, that he would green-light an indictment if Smith didn't agree to cooperate fully against Brockman and pay a sizable penalty, one person said.

In July, Smith's team made a direct appeal to Barr, according to people with knowledge of the matter. It isn't known what was said in that meeting, or whether the national security matter came into play. But on July 21, Zuckerman reached out to Filip to set up a conference call, saying the Justice Department's tax division "will not be presenting the indictment of Mr. Smith to a grand jury at this time," according to an email reviewed by Bloomberg.

**Bloomberg Law®**

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Services

// PAGE 3

The call two days later was the first step in negotiations that would lead to the agreement Smith signed in early October and that the Justice Department announced later that month, along with Brockman's indictment. Barr approved the deal after tax prosecutors assured him they were satisfied with Smith's offer, according to a person familiar with the discussions. The agreement also had the advantage of keeping the national security matter under wraps.

In the weeks leading up to the announcement, Smith had pressed his legal team to obtain an assurance that the government wouldn't publicly disclose his misconduct, people familiar with the matter said. The request was denied.

"Smith committed serious crimes, but he also agreed to cooperate," David Anderson, the U.S. attorney in San Francisco, said at an Oct. 15 press conference. "Smith's agreement to cooperate has put him on a path away from indictment." Jim Lee, chief of criminal investigation for the IRS, made it clear that the alleged tax evasion by Smith and Brockman was a serious matter. "I have not seen this pattern of greed or concealment and cover-up in my 25-plus years as a special agent," he said.

The son of two Denver educators, Smith earned a degree in chemical engineering at Cornell and an MBA at Columbia University. He went to work as an investment banker at Goldman Sachs Group Inc. in 1994 and moved to Silicon Valley as part of its push into tech. A few years later he tried to arrange a buyout for Brockman, whose company, now known as Reynolds & Reynolds, was emerging as a leading provider of software used to manage auto dealerships.

On the surface, the men had little in common. Brockman, a generation older than Smith, is a former Marine Corps reservist who early in his career sold software for IBM. But both men live in Texas, have homes in Colorado and brought an engineer's eye to technology. They saw an opportunity in what became Vista's trademark—buying business software ventures and increasing their value by managing them more efficiently.

A few years after they met, Brockman offered to put up $300 million to launch Smith into the private equity business. There would be at least $700 million more. But the money came with some take-it-or-leave-it conditions. Smith had to locate his first fund in the Cayman Islands, agree to settle any disputes outside U.S. courts and set aside some of the carried interest he earned from it to protect Brockman against losses, according to the statement of facts Smith signed as part of the settlement.

Smith concluded that Brockman was structuring the deal to prevent the IRS from learning about his investment. But he saw the proposal as a unique opportunity and went along, according to the statement. He even worked with one of Brockman's lawyers to set up entities to help him dodge his own U.S. tax bill, he admitted.

Smith proved to be a private equity wizard. Vista's first fund earned a net internal rate of return of 29% over its lifetime, according to Bloomberg data. Starting around 2005, some of Smith's earnings from that fund went to a bank account in the name of Flash Holdings that Brockman's lawyer had advised him to set up in the British Virgin Islands and that Smith controlled, according to the statement. He paid the lawyer $800,000 over 15 years to create a false paper trail, Smith admitted.

Also in 2005, Smith and his wife, Suzanne McFayden, whom he met at Cornell, purchased a $2.5 million home in California's Sonoma County with untaxed income from a Caribbean bank account. A few years later they bought two ski properties and a commercial one in Megeve, France, with Smith directing that they be paid for with 13 million euros ($16 million) of untaxed funds from a Swiss bank account.

**Bloomberg Law**®     © 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Services

Smith filed a Report of Foreign Bank and Financial Accounts, or FBAR, for that year which didn't disclose his financial interest in accounts in the British Virgin Islands and Switzerland. Although American citizens with foreign holdings are required to file such reports annually, Smith failed to do so in 2011, and his 2012 submission again didn't list his interest in the Caribbean and Swiss accounts.

The following year McFayden filed for divorce, listing several homes and a private jet among the marital assets. Except for her original petition, the filings in that case are sealed. But during the contentious proceedings that followed, McFayden asserted that Smith's assets included substantial foreign holdings, according to a person familiar with the matter. It was the divorce that piqued the government's interest in Smith, two people said.

The prospect that Smith's divorce could stir up unwanted scrutiny doesn't appear to have surprised Brockman. Two years earlier Evatt Tamine, a Bermuda-based lawyer managing his offshore entities, received an email from a colleague. It said Brockman had "called concerned about the Robert Smith situation and what effect a nasty divorce might have on us," according to a 2011 email the government filed in court. Tamine, who wasn't charged with a crime and is cooperating with prosecutors, declined to comment.

Soon, pressure was building on Smith's Swiss bank, Banque Bonhote & Cie SA. It was one of dozens of Swiss banks the U.S cracked down on over accounts hidden from the IRS. Banks could reduce their financial penalties if they convinced American clients to enter an IRS amnesty program that let taxpayers avoid prosecution.

Smith applied for the amnesty program but was rejected. Typically, the IRS turns down taxpayers if it already knows about their undeclared assets. Later, Smith filed a false FBAR for 2013, again not disclosing his financial interest in the BVI and Swiss accounts.

In 2014, the same year his divorce was finalized, Smith turned to Brockman for a $75 million loan, according to prosecutors. The following year he married Hope Dworaczyk, *Playboy*'s 2010 Playmate of the Year and a *Celebrity Apprentice* participant. The couple's seven-month-old son floated down the aisle on an artificial cloud created for their wedding at a hotel on Italy's Amalfi Coast. John Legend entertained.

Around that time, Smith directed a Belize-based entity he controlled to transfer $182 million in assets to a new charitable foundation. One of its first donations was $15 million for a music education program operated by the Carnegie Hall Society. In its 2015 tax year, the foundation gave at least $149 million to the United Negro College Fund, the National Park Foundation, Cornell and other organizations, according to an IRS filing.

Smith tried to get right with tax authorities by amending past returns, but prosecutors were undeterred. In 2016, a San Francisco grand jury began investigating. It issued subpoenas to some Vista limited partners, according to a person familiar with the matter. In 2018, Brian Sheth, Vista's co-founder and president, and Tamine were asked to testify. Sheth, who wasn't a target of the investigation, declined to comment.

That August, federal authorities raided the home in Texas of the attorney who'd set up offshore entities for Smith and Brockman. A few weeks later, IRS agents and Bermudian police seized documents and encrypted electronic devices from Tamine's home.

In a letter to Vista investors after the settlement was announced, Smith wrote that "the essence of this case involves an offshore structure I created twenty years ago at the insistence of my only investor in my first private equity fund." It was, he said, a "personal tax matter," and "the Department of Justice never claimed that Vista

or any Vista funds were involved or under investigation."

Justice Department legal filings tell a more complicated story. The Brockman indictment mentions Vista more than 80 times. In one filing, the government wrote that his scheme included "a machine built of two components." One, it said, involved the offshore entities Brockman had used to conceal his income and assets. The other was "an investment vehicle through which Defendant secretly funded his offshore structure. That vehicle was Vista Equity Partners."

The two components were intertwined and "involved continuous contacts with Vista employees," the government alleges. In one 2010 transaction, Brockman directed that a $799 million distribution from Vista be deposited in a Swiss bank account in the name of Point Investments, the entity he'd set up in the British Virgin Islands a decade earlier to invest in Vista. Two years after that transfer, Tamine, Brockman's trust manager, wrote to his boss: "My relationship with Robert and his team at Vista is going very well," according to a court filing.

Smith has continued to put a positive spin on events, carrying on much as before. Shortly after the settlement was announced, he pledged $50 million to programs at historically Black colleges and universities. He also bought a pair of North Palm Beach mansions for $48 million, the *Wall Street Journal* reported. In December, Vista closed on $2.7 billion in capital commitments, according to a company presentation reviewed by Bloomberg. But Smith will have to move forward without his co-founder, Sheth, whose resignation was announced on Thanksgiving Day.

In his letter to Vista investors, Smith said the government's criminal investigation into his finances left him humbled but unbowed. "I am as committed as ever to moving forward as a CEO, an investor, a community leader, and a philanthropist—in order to continue to be a productive person trying to leave the world better than I found it," Smith wrote.

That effort may not include taking the witness stand against Brockman, who stepped down as chief executive officer of Reynolds & Reynolds in November. His lawyers said in court that the 79-year-old is suffering from dementia. They said the case should be dismissed because he's unable to assist in his own defense.

Prosecutors characterized the timing of the claim as suspicious and urged the court to regard it with "healthy skepticism." A federal judge in Houston will decide if he's competent to stand trial in the coming months.

To contact the authors of this story:
Neil Weinberg in New York at nweinberg2@bloomberg.net
David Voreacos in New York at dvoreacos@bloomberg.net

To contact the editor responsible for this story:
Tina Davis at tinadavis@bloomberg.net
Robert Friedman
Joe Schneider