# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | § |
| | § |
| **Plaintiff,** | § |
| | § **Cr. No. 4:21cr 009 GCH** |
| **v.** | § |
| | § |
| **ROBERT T. BROCKMAN,** | § |
| | § |
| **Defendant.** | § |
| | § |
| | § |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY AND APPOINT MORE EXPERTS

## **TABLE OF CONTENTS**

I.   Introduction .................................................................................................... 1

II.  The Motion Is the Latest in a String of Bad Faith Attempts to Delay the
     Competency Hearing. .................................................................................... 2

III. The Motion Recycles the Bad Faith Claim That Defendant Believed the
     Government's Experts Were Neutral Court-Appointed Experts. ............................ 3

IV.  The Government's Experts Conducted Professional and Appropriate Competency
     Examinations. ............................................................................................... 8

V.   The Request for the Appointment of Additional Experts Is Premature and Will
     Only Ensure Further Delay. ........................................................................... 10

VI.  Conclusion ................................................................................................. 13

## I.   Introduction

The United States opposes Defendant's motion to prevent the doctors hired by the United States (the "Government's Experts") from testifying and to appoint more experts (ECF #105, the "Motion").  The Motion stands on the same two legs as Defendant's recent motion to compel discovery, claiming first that although the government carries the burden of proof in competency proceedings, it cannot have its experts examine a criminal defendant, and second that the Government's Experts were appointed by the Court as neutral experts before ambushing Defendant by switching teams.  Since neither of these is correct, the Motion must fail.

The Motion is just the latest iteration of Defendant's campaign to delay his competency hearing, and its claim of ambush is disingenuous.  Pursuant to the parties' agreement, the Government's Experts were transparently designated by the Court as "the United States' experts" in May, and the record reveals that Defendant understood this was the agreement months beforehand—this was no surprise.  After designation, the Government's Experts conducted professional and appropriate competency evaluations, consistent with their decades of experience and the Court's designation.  Now, only after receiving their reports concluding that Defendant was competent and malingering, and after the Court denied Defendant's motion to continue, does Defendant object, asking the Court to blind itself to the Government's Experts' opinions and appoint yet another panel of experts.  The Court should deny the Motion because Defendant's claims are baseless and because the Government's Experts' opinions and testimony are valuable, and will help the Court make an informed competency determination in this case.

1

## II.   The Motion Is the Latest in a String of Bad Faith Attempts to Delay the Competency Hearing.

Defendant did not complain about the Government's Experts' evaluations three months ago when he received the video recordings of their interviews of him.  Instead, he waited to file this most recent attempt to force a continuance until just five weeks before the hearing, so that the briefing would not be submitted to the Court until one week before the September 13 competency hearing.  This marks Defendant's third recent attempt to delay the hearing.

The first attempt was his request to continue the hearing for eight weeks to account for the possibility that he might still be suffering delirium resulting from his June hospital stays.  His letter of June 30, ECF #73, claimed that one of his experts believed the continuance was necessary to allow more time between Defendant's hospitalization and further competency examination.  At the July 29 hearing, Defendant made the same arguments. Trans. at 5:12-19, 7:18-22.  But when he made those arguments, he concealed the fact that he had already been evaluated two weeks earlier.  *See* Experts Reports of Drs. Thomas Guilmette, ECF #101, and Marc Agronin, ECF #102 (exams on July 11, 13 & 14).  Both doctors concluded that Defendant was suffering residual delirium from his hospitalizations at the time of his July competency exams but denied that the delirium was a major contributor to his overall presentation.  ECF #101 at 63-64, ECF #102 at 37.[1]

---

[1] Defendant should not profit from his deception.  His omission was material because his apparent delirium during his July examinations may have rendered his experts' opinions invalid.  Had Defendant been candid about this in the hearing—had he told the Court that his experts already evaluated him and were concerned about his delirium's effect on the results—the Court might have reasonably granted the continuance.  Instead, he opted to hide it and then produce expert reports that downplayed the delirium.  That is the path he
(continued...)

2

The second attempt was his motion to compel discovery.  ECF #81.  Like the instant Motion, it relied on the false premise that the government cannot retain its own experts to evaluate Defendant's competency.   That this motion's true objective was to bolster Defendant's (then pending) motion to continue was revealed at the status conference. Trans. at 6:1-7.   When the Court asked how the requested discovery would impact Defendant's expert reports, Defendant had no answer.  Trans. at 25:1-22.

And now comes this Motion, which recycles the same feigned surprise and legal argument as the last one.

## III.    The Motion Recycles the Bad Faith Claim That Defendant Believed the Government's Experts Were Neutral Court-Appointed Experts.

The United States previously responded to Defendant's feigned surprise and legal arguments, *see* ECF #89 at 3-9, but now adds another point: Defendant's view that the government cannot hire doctors to evaluate him is entirely incompatible with circuit law requiring the *government* to carry the burden of proof in competency hearings.  *See United States v. Hutson*, 821 F.2d 1015, 1018 (5th Cir. 1987).  In addition, Defendant's previous reply, ECF #94, addressed only the government's view that the law allows for the designation of government experts and that government experts are routinely designated by Courts to conduct competency examinations because, absent such designation, the government has no way to evaluate a defendant without the defendant's

---

chose and, whether or not those reports are now subject to fair criticism because they depend on invalid testing, Defendant should not be rewarded with another bite at the apple (and the continuance he has long sought).

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO
EXCLUDE TESTIMONY AND APPOINT MORE EXPERTS
Case No.: 4:21-CR-0009-GCH

consent.  But nowhere has Defendant responded to the government's contention that the parties *agreed* to the procedures used in this case, which requires dismissal of Defendant's objections as waived.

Instead, invoking civil case law related to the disqualification of experts who "switch sides," the Motion repeats the same disingenuous claim and alleges that the Government's Experts were retained as neutral Court-appointed experts before being "repurposed" as government experts.  Motion at 17.  This is a refrain from Defendant's recent discovery motion which, also feigning surprise that the doctors designated as "the United States' experts" were actually the United States' experts, sought communications between the prosecution team and its experts "to evaluate the prosecutors' relationship with the examining doctors."  ECF #81 at 5.  The United States responded that "Defendant's feigned surprise that the governments experts are not neutral arms of the Court adds drama to the Motion [to compel discovery], but it is disingenuous, as revealed by a docket filled with reference to the "government's experts."  ECF #89 at 1, *see also id.* at 8 (explaining that the parties agreed to the Government's Experts examining Defendant and citing examples of both parties and the Court referring to the Government's Experts as such on the docket).  In his reply, Defendant doubled down with the drama—saying he needed the communications "to expose to the Court the improper role of the prosecutors," ECF #94 at 2—but did not dispute the fact that the parties agreed to these procedures.

Defendant's disingenuity is plain on the docket.  *See, e.g.*, Court Order at ECF #59 (adopting Defendant's proposed order) ("ORDERED that [the Government's Experts] are

4

*designated as the United States' experts* to conduct the court-ordered psychiatric or psychological examination") (emphasis added).  And that is not the only example of Court filings that betray Defendant's understanding that the Government's Experts were always the government's experts.

In the United States' very first filing on competency, it explained competency procedures in federal court and suggested the following:  "As Defendant has already retained and been evaluated by his experts, the government should have the same opportunity for its experts to evaluate Defendant.  The Court should also appoint its own expert and/or remand Defendant to one of the BOP facilities that conducts competency evaluations." *See* 20-cr-371-WHA (N.D. Cal.) ("NDCA") ECF #69 at 2-4.  The parties ultimately agreed not to proceed with both government and court-appointed evaluators, and the government did not seek a Court-appointed custodial evaluation before the competency hearing.  *See* ECF #45 at 1-2 (in an unopposed motion, Defendant asked the Court to "designate the *government's experts* to conduct [the statutory examination]") (emphasis added).  The government's recent response to Defendant's discovery motion listed additional indications that Defendant long understood that he agreed to let the *government's* experts evaluate him.  ECF #89 at 8 (citing non-exhaustive list of Defendant's references to "the government's experts").

If the filings were not enough, this matter is settled by review of emails between the prosecution team and Defendant's attorneys.[2]  For example:

- On February 22, 2021, counsel for the government emailed Defendant's attorneys to set up a call "to discuss logistics of *our experts'* interview and examination" to which Defendant's attorney responded with an early version of the proposed order Defendant ultimately filed and which the Court adopted.  Exhibit 1 (emphasis added).  Even this early draft designates the Government's Experts as "the *United States' experts*."  *Id.* (emphasis added) (highlights in email exhibits 1-5 supplied by the United States).

- On March 1, 2021, counsel for the government emailed a letter to Defendant's attorneys to seek their position on the Government's Experts' proposed plan for evaluating Defendant.  *See* Exhibit 2.  This letter, and the accompanying declaration of Dr. Darby explaining the value of the proposed tests, should resolve any doubt that Defendant well understood the government was engaged in *ex parte* communications with its experts (the government also submitted declarations from Drs. Dietz and Denney in support of its motion to exclude Defendant's attorneys from the examination room, ECF #46).  Counsel for Defendant replied one week later, agreeing to the proposal and again referring to the Government's Experts as "the *government's experts*."  *Id.* (emphasis added).

---

[2] Further, had Defendant genuinely believed that the Court sought to appoint neutral experts, it is inconceivable that he would let the government unilaterally select them.  Nor is it likely that Defendant would remain silent after the government notified him that it was selecting experts that previously filed affidavits in support of government motions.

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO
EXCLUDE TESTIMONY AND APPOINT MORE EXPERTS
Case No.: 4:21-CR-0009-GCH

- On March 11, 2021, Dr. Darby advised counsel for Defendant to coordinate logistics directly with the centers conducting the PET scan and sleep study. *See* Exhibit 3 at 6. Counsel responded to the prosecution team, writing, "We simply cannot be responsible for reaching out to the hospitals, as Dr. Darby proposes . . . we look to you and *your experts* on these issues." *Id.* at 5 (emphasis added). In two other emails on this thread, both on March 12, defense counsel twice referred to Dr. Darby as "the *government's expert*" and "*your expert*." *Id.* at 1-2 (emphasis added). These emails also make it clear that Defendant's attorneys felt they had to go through the prosecution team in order to contact Dr. Darby, further revealing their knowledge that he was not an arm of the Court.

- In a separate email chain on March 12, 2021, counsel for Defendant emailed the prosecution team about some confusion about who would pay for the PET scan Dr. Darby ordered for Defendant. Counsel again referred to Dr. Darby as "*your expert*." Exhibit 4 (emphasis added).

- In a March 30, 2021 email to discuss a new scheduling order, counsel for the government requested to add a deadline for Defendant to identify his experts. *See* Exhibit 5. In opposing the request, defense counsel wrote, "We need flexibility to address the *government's expert* reports before designating our experts. Also there is no reason that I can see to set a deadline for Mr. Brockman to be examined by any experts that we choose." *Id.* (emphasis added).

That Defendant always knew the Government's Experts were the government's experts is beyond reasonable dispute, and Defendant has not said otherwise.  He waived his objections when he agreed to the designation of the "United States' experts" to examine him, and should not now be heard to complain.

## IV.   The Government's Experts Conducted Professional and Appropriate Competency Examinations.

Aside from its basis in bad faith, the Court should also deny the Motion's request to preclude the Government's Experts from testifying because those experts conducted valuable examinations that will help the Court analyze the competency issues in this case. The Government's Experts include experienced and accomplished medical professionals and competency evaluators, and they conducted professional and appropriate exams in this case.  *See* Declarations of Drs. Park Dietz and Robert Denney, Exhibits 6 and 7. That they "probe[d] issues in the criminal case," Motion at 12, is natural in an evaluation designed to determine whether a defendant understands the charges against him and can assist his attorneys in his defense.  Denney Decl., Exhibit 6 ¶¶ 10-11; Dietz Decl., Exhibit 7 ¶¶ 6-7.  That they did so without his attorneys present was designed to increase the efficacy of the evaluations, not to mention subject to litigation with this Court ordering that counsel not be present.  *See* ECF #45 ("Counsel requests permission to be present with Mr. Brockman during the court-ordered examination *by the government's designated experts*.") (emphasis added), ECF #46 (USA's opposition, supported by declarations from Drs. Dietz and Denney), ECF #59 (Court Order).  The importance of asking specific questions about the issues in the criminal case and exploring Defendant's

8

relationship with his attorneys is underlined by the fact that Defendant's expert asked him the same types of questions.  *See* Exhibit 8.

Like his other arguments, Defendant's complaints about the conduct of these doctors also appears to be in bad faith.  Just as discussed in Section II, *supra*, the timing of his complaints is suspicious, coming nearly three months after Defendant received the recording of these interviews.  And the complaints also depend on his feigned claim of ambush, which was addressed in Section III, *supra*.  The truth is that the parties always contemplated that Defendant would have to substantively discuss the facts of the case with the Government's Experts.  That is why the parties agreed (in Defendant's proposed order adopted by the Court) that such statements could not be used in the government's case in chief at trial.  *See* ECF #45 (proposed order) and ECF #59 (order).  Now, in his continued campaign to delay the competency hearing, Defendant points to that same language as his basis to call for a *Kastigar* hearing.  Motion at 19, n.9.

Defendant's objections seem to have materialized only after the Government's Experts filed their opinions, which cut against his claims of both dementia and incompetence.  But however inconvenient to Defendant, the Court deserves the benefit of the Government's Experts' conclusions—the full picture from experts tasked with following the evidence wherever it led.  For example, the Government's Experts agree that Defendant has Parkinson's Disease ("PD") accompanied by something between age-related cognitive deficits (normal) and mild cognitive impairment ("PD-MCI").  *See* ECF #78 at 15 (Darby: "evidence of [PD-MCI]"), ECF #79 at 33 (Denney: "possible [PD-MCI]"), ECF #80 at 44 (Dietz: "either age-related memory difficulties or, at worst, [PD-

9

MCI]").  Although Defendant's initial motion for a competency hearing hinged on diagnoses of more debilitating diseases (Parkinson's Disease with Dementia ("PDD") and Dementia with Lewy Bodies ("DLB")) from a team of Baylor doctors,[3] Defendant's own treating PD physician's diagnosis aligns with the Government's Experts': PD-MCI.

The Court should deny the Motion's request to blind the Court from the Government's Experts' opinions.  The Court should receive both their reports and their testimony in evidence at the competency hearing.

## V. The Request for the Appointment of Additional Experts Is Premature and Will Only Ensure Further Delay.

As for the Motion's second request, the United States recognizes that it is the Court's prerogative to appoint its own experts, and concedes that another evaluation—particularly a custodial evaluation—could have been valuable in this case.  In fact, the United States initially sought a procedure that contemplated both sides and the Court retaining experts.  *See* NDCAL ECF #69 at 2-3.  But that is not what the parties ultimately agreed to after this case was transferred to the Southern District of Texas.  *See* Section III, *supra*.  To date, no fewer than six experts have evaluated Defendant's competency (three government experts and at least the three experts Defendant disclosed).[4]  Defendant's

---

[3] Defendant donated tens of millions of dollars to Baylor College of Medicine, including a million dollars a few days after he was examined by Dr. Pool.  NDCA ECF #69 at 7. Dr. Dietz notes that Defendant was referred for his Baylor competency evaluator as a "VIP Dr. Pool patient" needing a "VIP CAPACITY EVAL."  ECF #80 at 42.

[4] This figure includes neither the three other Baylor doctors who wrote letters to defense counsel discussing their observed limitations that would allegedly prevent Defendant from assisting his counsel (Drs. Pool, Jankovic, and Yu), *see* NDCA ECF #64-2 at 72-78, nor the seven doctors relied on by Drs. Agronin and Guilmette (Drs. Christopher Whitlow, Thomas Wisniewski, Michael Welner, Elkhonon Goldberg, James Seward,
(continued...)

10

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO
EXCLUDE TESTIMONY AND APPOINT MORE EXPERTS
Case No.: 4:21-CR-0009-GCH

attempt to seek further evaluation at this late stage reflects his concern about the content of the Government's Experts' reports, not the identity of the examiners.

All of the Government's Experts found Defendant competent, and two of them diagnosed malingering.  ECF #78 at 15 (Darby: "Mr. Brockman has the cognitive capacities to access and accurately report past memories, to comprehend, manipulate, and make appropriate judgments regarding questions asked of him, and to understand the charges against him and the role of his attorneys in defending him against these charges"; "there are no cognitive deficits that would prevent Mr. Brockman from assisting in his defense"), ECF #79 at 38 (Denney: "Mr. Brockman may have some mild neurocognitive deficits, but they do not appear severe enough to eliminate his ability to assist in his defense"; "Mr. Brockman has demonstrated effectively the ability to confuse examiners and, possibly even his own counsel.  Given this success, and the natural course of Parkinson's disease, it is likely he will continue to attempt, what I believe to be a ruse"), ECF #80 at 44-45 (Dietz: "In 2020 and 2021, Mr. Brockman has grossly exaggerated the extent of his cognitive impairment whenever he knew he was being tested, on which basis I conclude he is malingering dementia.").

Dr. Dietz based his malingering diagnosis on "three pillars of evidence."  ECF #80 at 44.  One pillar is the discrepancy between Defendant's performance in non-testing contexts versus when he knows he is being tested.  The United States highlighted an example of this in its first competency filing in this case.  *See* NDCA ECF #69 at 9-11 (at

---

Timothy Shepherd, and Bernice Marcopulos), ECF #101 at 3-5, ECF #102 at 4-5, nor Defendant's treating physician for his PD, Dr. Eugene Lai, who diagnosed PD-MCI.

the same time Defendant's Baylor team was diagnosing him as severely impaired in 2019, he was waxing eloquent on complex topics during depositions).



And although Defendant's June 2020 business emails show a CEO in firm control of a multibillion-dollar company,[5] Defendant's performance on neurocognitive tests have been consistently (and suspiciously) poor.

The second pillar is just how remarkably poor those results were when tested by Dr. Denney, who concluded that a blindfolded person guessing at random would have achieved a better score than Defendant 92% of the time, suggesting that Defendant had to know the right answers to purposely select the wrong ones.  ECF #79 at 24.  Dr. Denney's testing put Defendant in the 0.1% demographic-adjusted percentile for processing speed, *id.* at 25, and scored Defendant's memory as worse than any other person he has ever tested over his 29-year career, much of which was spent at the U.S. Medical Center in Springfield, Missouri.  *Id.* at 26, Exhibit 6 ¶¶ 3, 12.

---

[5] Although Defendant's company has yet to produce emails from after June 2020, this observation is corroborated by the sworn March 2021 testimony of Defendant's second-in-command, the current President of Defendant's company, who said he had no reason to doubt Defendant's mental capacity before Defendant stepped down in November 2020, only after he was indicted.  *See* ECF #80 at 27.

The third pillar is the timing of Defendant's competency-related complaints.  It was just one day after the Bermuda Police Service executed a search warrant on Evatt Tamine's (Individual One in the Indictment) house that Defendant reached out to his urologist to schedule the appointment where, for the first time, one of Defendant's doctors would "notice" potential cognitive problems.  NDCA ECF #69 at 6.

Defendant, his attorneys, and his experts cannot explain the gap between Defendant's forensic testing performance and his otherwise high functioning presentation.[6]  As a result, Defendant's efforts seem focused on putting as much distance as he can between the competency hearing and these revealing observations.  The Court should not indulge such tactics.  Rather than wait for yet another delay, the Court should proceed to Defendant's hearing, where the Court can hear from fact witnesses and experts from both sides.  If the Court is inclined to consider Defendant's request for the appointment of more experts, the United States suggests it defers making that decision until after the September 13 hearing.

## VI.    Conclusion

In sum, the Court should deny the Motion, which is just another delay tactic supported only by its underhanded (and hollow) allegation of prosecutorial misconduct. The Court should hear from the Government's Experts because they are experienced leaders in their fields who conducted professional and appropriate competency

---

[6] Defendant remained Chairman and CEO after a company-wide executive reorganization that occurred two months *after* Defendant's counsel informed the government that Defendant was too mentally impaired to be indicted in this case, and he did not resign his position as CEO until after his indictment.

examinations in this case.  Their opinions will assist the Court and subject the defense expert reports to the rigors of the adversarial process.  Finally, although the United States would normally decline to take a position on whether the Court exercises its discretion to appoint its own experts, the procedural backdrop counsels against doing so right now. After the competency hearing begins, the Court will have a better idea of which issues— if any—need further illumination and would benefit from further expert evaluation.

As the last status hearing made clear, Defendant fails to appreciate that a competency hearing is no ordinary adversarial hearing.  Instead, it is designed to ensure that the Court, as factfinder, can make a fully informed decision, based on all available information.  The Court should welcome the opinions and testimony of the Government's Experts, who will bring their decades of experience to bear on the issues presented, and the Court should table Defendant's request for the appointment of additional examiners until after the competency hearing.

Respectfully submitted this 20th day of August 2021,

DAVID A. HUBBERT
Acting Assistant
Attorney General
Tax Division


*/s/ Christopher Magnani*
COREY J. SMITH
Senior Litigation Counsel
Department of Justice
Tax Division
Mass Bar No. 553615
corey.smith@usdoj.gov
Tele: (202) 514-5230
LEE LANGSTON
CHRISTOPHER MAGNANI
Trial Attorneys
Department of Justice
Tax Division

Attorneys for United States of America

## <u>Certificate of Service</u>

     I the undersigned do hereby certify that on August 20, 2021, I electronically filed the foregoing with the Clerk of Court using the ECF electronic filing system, which will send notice of electronic filing to Defendant's counsel of record.

/s/ *Christopher Magnani*
Trial Attorney
Department of Justice
Tax Division
christopher.magnani@usdoj.gov
(202) 307-6408

16