```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3   UNITED STATES OF AMERICA       *   CRIMINAL NO. H-21-9
                                    *
 4   VERSUS                         *   Houston, Texas
                                    *   July 29, 2021
 5   ROBERT T. BROCKMAN             *   10:50 a.m.

 6                         STATUS CONFERENCE
                BEFORE THE HONORABLE GEORGE C. HANKS, JR.
 7                   UNITED STATES DISTRICT JUDGE

 8   For the Government:

 9           Mr. Christopher Magnani
             Mr. Corey J. Smith
10           Mr. Lee Langston
             US Dept of Justice Tax Division
11           150 M Street NE
             Room 2 120
12           Washington, DC 20002

13   For the Defendant:

14           Mr. Jason Scott Varnado
             Jones Day
15           717 Texas
             Suite 3300
16           Houston, Texas 77002

17           Mr. James P. Loonam
             Ms. Kathryn Keneally
18           Jones Day
             250 Vesey Street
19           New York, NY 10281

20

21   Court Reporter:

22           Fred Warner
             Official Court Reporter
23           515 Rusk Avenue
             Houston, Texas 77002

24
     Proceedings recorded by mechanical stenography, produced by
25   computer-aided transcription
```

1          THE COURT:  The next case on the Court's docket this
2    morning is Cause No. CR-4-21-9, the United States of America
3    versus Mr. Robert E. Brockman.
4               Can counsel just introduce themselves to the
5    Court and state the parties they represent starting with the
6    government.
7          MR. MAGNANI:  Thank you.  Good morning, Your Honor.
8    Christopher Magnani for the United States.  And I am joined
9    by Special Agent Ted Laird of IRS criminal investigations.
10   And I believe my colleagues Corey Smith and Lee Langston are
11   appearing from Washington, DC by Zoom.
12         MR. SMITH:  Good morning, Your Honor.  Corey Smith
13   for the government.
14         THE COURT:  Good morning, Mr. Smith.
15              And who is the other one, counsel?
16         MR. MAGNANI:  Lee Langston.  But I am not sure if he
17   is making an appearance, but I think he is appearing as well.
18         THE COURT:  I see his name pop up.  Welcome.
19         MR. VARNADO:  Good morning, Your Honor.  Jason
20   Varnado with my colleague James Loonam and Kathryn Keneally
21   on behalf of Mr. Brockman, and Mr. Brockman is here and
22   present as well.
23         THE COURT:  Good morning everyone.  Good morning,
24   Mr. Brockman.
25         THE DEFENDANT:  Good morning.

1          THE COURT:  We are here this morning for a status
2     report in this matter.  And I appreciate the letter, the
3     joint letter, or I guess Mr. Brockman's counsel sent the
4     letter; but I am sure that all of you have probably seen the
5     letter telling me the status of where were are in this case
6     and what needs to be done.

7          The first thing I wanted to talk to you about
8     was the request for the extension of time.  Is that all ready
9     for the Court to rule on or have the parties reached any
10    agreement on that?

11         MR. VARNADO:  Your Honor, again Jason Varnado for
12    Mr. Brockman.  The parties have not reached an agreement on
13    that.  I think first and foremost what we are here on is our
14    letter motion just docketed, No. 73, where we are seeking an
15    extension of the deadline, including the competency hearing
16    deadline, based upon some medical issues that Mr. Brockman
17    has suffered, frankly, since the government has conducted
18    their psychiatric examinations on Mr. Brockman.

19         THE COURT:  Can I hear from the government with
20    respect to that?  Are you all prepared to take up that issue
21    this morning?

22         MR. MAGNANI:  Yes, Your Honor.  We are prepared to
23    take up the issue this morning.

24         THE COURT:  Okay.  Then let me hear from Mr. Varnado
25    and then I will hear from the government.

1          MR. VARNADO:  Thank you, Your Honor.

2               Your Honor, there are actually multiple reasons

3     now for a continuance of the competency hearing deadlines.

4               I will start with the health reasons, which is

5     why we filed the letter motion in the first instance.  And if

6     I could, I hand up to the Court a docket that details some of

7     the back and forth with the government, the competency

8     testing and some of the events that Mr. Brockman has suffered

9     over the last several moment.

10          THE COURT:  Okay.  If you can hand it to my law

11    clerk.

12          MR. VARNADO:  Let me just guide the discussion

13    somewhat, Your Honor, as we go through this today.

14               Really the gravamen of the defendant's request

15    for a continuance is that after, again, earlier this Spring

16    in March of 2021 Mr. Brockman was hospitalized with a urinary

17    track infection as well as sepsis, which had reached his

18    brain, a very serious condition.  Despite that, again, Mr.

19    Brockman submitted to a sleep study.  Mr. Brockman and his

20    spouse submitted to interviews by the government's expert,

21    Dr. Darby, the court-appointed expert neurologist.  And then

22    Mr. Brockman also submitted to several days of interviews and

23    testing by two other court-appointed experts, Dr. Dietz and

24    Dr. Denney.  He also voluntarily produced medical records.

25               But then at the end of May and beginning of

1    June, for nearly a two-week period, Mr. Brockman was

2    hospitalized at Houston Methodist and treated again for the

3    UTI condition and a serious sepsis condition that was life

4    threatening.

5              After that period of time Mr. Brockman's

6    counsel submitted to interviews by court-appointed expert Dr.

7    Denney.  Both Ms. Keneally and Mr. Romatowski did that.

8              And then most recently Mr. Brockman underwent

9    what we understand under general anesthesia, a surgical

10   procedure hopefully that hopefully will eliminate the risk of

11   any future infections and hopefully sepsis episodes.

12             And so with that backdrop, Judge, defense is

13   concerned, given the recency of these two most recent

14   hospitalizations, that any testing that defense experts would

15   want to do of the defendant's competency would be subject to

16   criticism from the government or the court-appointed experts

17   that those results were somehow flawed; and we had sought an

18   extension of the deadlines, in light of these health

19   episodes, to ensure that that criticism could not be alleged.

20             The government acknowledged that the test could

21   potentially be subject to such criticism, but nevertheless

22   refused a continuance.  That's what led to us file the letter

23   motion seeking extension of the deadlines.

24             Now I am going to talk about some additional

25   reasons before I turn it over to Mr. Magnani.

1               There is also now, in the intervening time
2    since we submitted the letter motion, it's clear that the
3    government has not turned over certain test results and raw
4    notes that the court-appointed experts have relied up that
5    our defense experts would need in order to perform their
6    work; and under the current schedule, the deadline is August
7    6th for defense expert reports.

8               There is also now the scheduled sleep study.
9    There was an initial sleep study that you can see from the
10   chart, Your Honor, performed on April 29th.  The results of
11   that study were insufficient, given an undiagnosed sleep
12   condition suffered by Mr. Brockman; and so there is now
13   another sleep study scheduled for August 12, which is after
14   the time period in which the defendant's expert reports are
15   due.  So that's just further justification I think more to
16   the records that we're waiting on.

17              But those are really three issues that we
18   think, in addition to some others that I will talk about with
19   respect to our motion to compel.  But with respect to the
20   letter motion and the health conditions, that's what we
21   wanted to set forth today.

22         THE COURT:  Okay.  Well, before the government
23   speaks, the question I had when I was reading all this was
24   that I was trying figure out how -- and I am not a doctor, of
25   course -- but how the physical issues affected the mental

competency evaluation.  I know that physical issues can cause
stress and that sort of thing; but, I mean, kind of walk me
through how the physical ailment affects any competency
analysis.

MR. VARNADO:  And I think even the court-appointed
experts would acknowledge that there is a deprivation and a
degradation of his baseline functioning because of these very
serious hospitalizations.

So in the second hospital episode he suffered
bouts of delirium that was treated with an antipsychotic
mediation.  Again, with the sepsis reaching the brain, a
potentially life threatening situation that his treating
physicians and our medical experts say does in fact affect
the initial cognitive ability, which even the court-appointed
experts have acknowledged, he does have diminished cognitive
ability, they will even acknowledge that, after these
episodes, and even more pronounced.

So we are requesting some amount of time, and
our experts say 60 days would be an appropriate amount of
time, to try to get to a baseline from which he can do the
testing that needs to be done that would not be subject to
criticism.  Because they were so close it would be very
serious and significant health episodes that did involve,
again, sepsis reaching Mr. Brockman's brain.

THE COURT:  Are your experts pretty confidential

that in 60 days he is going to have a baseline?  Because as I
am a not I am not a doctor, the other thing I was concerned
about is what's the baseline now?  If the tests were
performed, if there were tests done, competency tests done or
some tests done or these conditions -- well, let me wait.
Hold on that thought.

Let me ask the government, and I will get back
to you, because I am just trying to figure out what the
baseline is and how we are going to determine what the
baseline is given these conditions that Mr. Brockman has.  So
let me ask the government to speak.

MR. MAGNANI:  Thank you, Your Honor.

Just preliminarily, the government is sort of
in the dark on a lot of these things.  We do not have a
medical record of these recent hospitalizations.  And
although we requested it of the defense, I still don't know
whether the defense is even in a position to meet their
deadline.

When they first asked for this continuance and
we said that we would agree to this hearing but that we would
not agree to the continuance, we suggested to them that they
proceed as if the deadlines that we all agreed to would be
met.

And so, I am not sure today if they are
prepared to do that or if essentially they're in a game of

1    chicken with the Court of, well, we haven't moved, because
2    Mr. Brockman has been out from his second hospitalization
3    since June 11th, so he got out on June 11th, and he went in
4    on May 30th, according to the defense letter.  This document
5    says the 31st, but the letter that they filed said the 30th.
6    And, frankly, I don't know because I don't have these
7    records.  But he went in the 30th.  They didn't ask for a
8    continuance then.  They didn't for it when he got out on the
9    11th.  They waited until after our expert reports were due on
10   the 21st.
11            They got this report, they sat on it and then
12   they asked for the continuance.  And the continuance, Your
13   Honor, is not based on anything.  It's not based on anything
14   other than speculation that's close in time to this
15   hospitalization and exams may be subject to some baseline
16   problems.  But it's not based on a doctor actually meeting
17   with the defendant and saying, wow, you know, he's really
18   still having some problems with his hospitalization.  I can't
19   do a reliable exam at this point.  It's not based on that.
20   And I don't know if they have done anything since then.
21            So when they asked for the continuance, I
22   called our doctors and I said, hey, what do you think?  He's
23   getting out of the hospital -- by the time they asked he had
24   already been out of the hospital about two weeks.  So I asked
25   the doctors designated by the Court, I said, you know, two

1  weeks, is that first day not valid?  They said, of course

2  not, of course it's not, the first day.  And we have no

3  access to the patient.  We can't see him.  We can't see the

4  records, but there is no first day reason.  And so that was

5  almost a month ago now.  And I don't know what they have done

6  in the intervening month to ensure that they can meet the

7  deadline.

8              So, from my perspective, Your Honor, this just

9  seems like a little bit of gamesmanship because although

10 their claim is that, well, if we do the test too soon, the

11 government will not promise not to attack the validity of the

12 test.  But if you continue this case, then the reports that

13 were done by the experts designated by this Court are just

14 going to get more and more stale.

15             So this is sort of a moving thing, and there is

16 a very good reason for the Court to expeditiously handle

17 this.  This issue has already put off this case for a very

18 long time, and my concern is that it's going to continue to

19 put it off; and we don't know what future medical things

20 might contain.

21             What the defense described as an accommodation

22 to the government in its letter was nothing of the sort at

23 all.  The first change in the schedule was in the letter they

24 mentioned a 45-day continuance.  It was a

25 two-and-a-half-month continuance.  It was a 45-day

1  continuance for the government's deadline, but the defense
2  put in another month for their expert reports.  So calling
3  that an accomodation -- and by the way, Your Honor, it was
4  based on representations made on the docket to this Court
5  from a defense-filed motion that continuing on the proposed
6  schedule, on the current schedule at this time would be not
7  humane.  Those are the words in their filed motion asking for
8  the continuance.
9          So, the government is trying to move this case
10  along, Your Honor, and it's concerned that, one, that this is
11  just gamesmanship.  Waiting for the expert reports from the
12  government to come in before asking for this, even though the
13  hospitalization happened weeks before, that's not a good
14  date.
15          And secondly, just because of the nature of
16  this moving and constantly evolving situation, the
17  government, the experts that the government has retained and
18  hired to do these very intensive deep-dive examinations in
19  May, those are now just going to be half a year old by the
20  time we get to an eventual hearing.
21          But I think the government's main point is that
22  this is just really based on nothing but speculation.  The
23  defense has not, at least to my knowledge, had someone look
24  at, had an expert look at defendant and say I can't do an
25  evaluation because the baseline is messed up.  It's just

1  based on their theory that it's potentially subject to some
2  sort of criticism.

3            And so, whether that potential is real or not
4  could be ameliorated if the defense agreed to one of the
5  things that we've asked for, which is that their exam be
6  subject to the same video reporting requirements as the
7  government's exam.  And then that way, if it subject to
8  criticism, it won't be for some hypothetical reason.

9          THE COURT:  Oh, can we just move the mic a little
10 bit closer to you.  I just needed to make sure we made the
11 record.

12         MR. MAGNANI:  Okay.

13            The government has requested that any expert
14 evaluations that the defendant conducts to sort of rebut the
15 government experts' evaluations, that they be subject to the
16 same video recording requirements of the government exams.
17 And the reason for that is that if those exams are subject to
18 criticism or if the defendant is not in any appropriate state
19 to be evaluated, at least it will be objectively criticized
20 on the merits as opposed to based on this hypothetical, our
21 doctors don't know anything, and would they say it's too
22 close in time to the hospitalization.  But that's all moot at
23 this point because the hospitalization was almost two months
24 ago.

25            And the final thing that I will say, Your

1  Honor, is I gathered the schedules of all the different
2  prosecutors and doctors, and this is going to be very hard to
3  continue.  We've had this schedule for a long time, and a lot
4  of people are depending on it.  And so one of the things I
5  just want to sort of put out in the air is that another
6  possibility would be to keep the current date but to give the
7  defendant a little bit more time to write his reports.

8          So, No. 1, the government's position is this
9  request should be denied.  But No. 2, even if some leave is
10  granted to give the defense a little bit more time to write
11  their reports, the government would be willing to have less
12  time for ourselves and our experts to review those reports if
13  it means we can keep the date that we all agreed to a long
14  time ago.

15        THE COURT:  Thank you, counsel.  And your counsel
16  highlighted the argument or the concern that I have in his
17  argument, highlighted the concern I have, counsel, which is,
18  I have nothing before me that says that these
19  hospitalizations or this treatment is somehow going to affect
20  the competency evaluation.  I mean, you said that their
21  experts agree to it.  Listening to the government, the
22  government's not agreeing to that.  Their experts clearly, it
23  sounds like their experts don't even know what to think
24  because they don't have any records to look at.

25          So how do I, as the Court, determine that this

1  medical treatment in any way affects the competency
2  evaluation?
3          MR. VARNADO:  And, Your Honor, I am going to go back
4  and check the records for the declaration submitted.  And
5  with respect to the very first, the first continuance Mr.
6  Magnani referenced, which was agreed upon, so that extended
7  the deadline.
8          THE COURT:  Right.  But that was then.  This is now.
9              I mean, before we had the conditions and I had
10 looked at it and everybody agreed we're going to put this off
11 to make sure that Mr. Brockman is in good enough shape for
12 the competency hearing.
13             This is something totally different now.  This
14 isn't the same.  Now there is all these other procedures that
15 are allegedly taking place that are causing all these
16 problems.  So I need to know how these procedures affect his
17 competency, not what his previous treatment did or would
18 affect his competency, but this treatment.
19         MR. VARNADO:  And I definitely want to answer that
20 question, Judge, and be real clear that the second episode of
21 a urinary track infection with sepsis accompanied by delirium
22 was really a recurrence of what happened in March.  So it is
23 the same type of medical condition that the parties agreed
24 would be justification for pushing the schedule.
25         THE COURT:  Let me stop one second.

1          Have you provided the government with those

2   medical records to evaluate the seriousness of what happened

3   so that their experts can say, yes, this is the same

4   situation or it's different or it's more serious or not

5   serious?  I mean --

6          MR. VARNADO:  We have sought those medical records.

7   We have also given HIPAA waivers to the government to obtain

8   any medical records they want, frankly.  And so we have

9   sought some of those hospitalization records, but we have

10  represented to them what the medical professionals have told

11  us about Mr. Brockman's second hospitalization.

12         He was released on June 11th.  What Mr. Magnani

13  is ignoring is that he actually underwent surgery two weeks

14  later, that was June 24th, hospitalized over that night to

15  the 25th under general anesthesia.

16         THE COURT:  But the problem is, I don't know what

17  that was about.  I mean, there is a lot of things he can get

18  general anesthesia for that don't require, that don't relate

19  to competency.  A colonoscopy is under anesthesia.  That's

20  not going to affect my ability to stand for competency.

21         So, I don't mean to interrupt, but I guess the

22  key one I am asking is, have all of these records, have you

23  guys gotten together and exchanged these records or provided

24  all of these records so that everybody is talking apples to

25  apples rather than apples and oranges?

1    I mean, you're saying these conditions are bad,

2    these surgeries are bad, it's affecting his competency.  The

3    government is saying, we don't have any records.  We don't

4    know how bad it is.  We don't even know what procedures were

5    actually done other than to help prevent UTIs and bacterial

6    infections.

7    What I need to know is have you guys sat down

8    together and talked about or exchanged medical records so

9    that you are all talking on the same page?  And more

10   importantly, have you exchanged the medical records and have

11   your experts looked at the medical records?  Because the key

12   to this resolution of this dispute is, when your experts,

13   government, looks at them, is your experts going to look at

14   these medical records and say, well, yeah, these kinds of

15   treatment, this kind of illness is going to affect his

16   competency proceeding, because you don't have anything so far

17   from your expert saying that it would.

18   So to me the easiest thing for you to do is you

19   got to sit down, completely exchange the medical records, I

20   mean, all the medical records.  And you get a report from

21   your doctor saying either these conditions or this, based on

22   my review of the medical records, it would affect the

23   competency hearing, or it would not, or I can't tell because

24   I need to do further examination.

25   You need to provide an expert report that says

these proceedings, these medical treatments would affect the competency proceeding.  Get that back to me and then we can have a hearing on this, because I can't just decide this issue sort of out of nothing based on just arguments that -- I mean, all I know now is there were procedures, they sound serious, but none of the experts have looked at the medical records, none of the experts have been able to evaluate whether or not these procedures would or would not affect the competency hearing.

And the other thing the Court is concerned about is to a lesser extent I just don't know the timing.  I mean, the government has a good point that this issue is coming up after he has already been treated.  Well, this issues is coming up after the expert reports of the government have already been done in this matter.  And it looks like there is a lot of treatment for very serious conditions before that report was done.

So, the bottom line is, I am not going to rule on this.  What I am ordering the parties to do is I want you to sit down.  If you want to extend the deadlines, then you need to make sure that the government has all the medical records in order to evaluate the condition, and then you guys need to provide me with an expert report, not argument of counsel, but I need an expert report from the government and an expert report from Mr. Brockman stating that because of

1   this condition, this condition, these treatments, it would

2   affect a baseline or not affect a baseline for a competency

3   hearing and why.  And then I can look at that and, you know,

4   okay, yes or no, because right now all I am hearing is

5   argument of the parties.  I have got, quite frankly, no

6   expert's medical opinion to be able to base a ruling on, and

7   I am not a doctor.  I can't tell.

8           And as I said, just because you have a general

9   anesthesia doesn't mean that it's going to affect my

10  competency, a competency hearing or a competency evaluation.

11  That doesn't really tell me anything.

12          I do get that if you have sepsis accompanied by

13  delirium, but just because you're delirious doesn't mean that

14  three weeks would affect July, I mean, June, don't mean that

15  basically six weeks later after delirium is gone I am not

16  suited to have a competency hearing.

17          So, I just think you guys need to exchange the

18  information and get me expert reports and then I will rule.

19          MR. VARNADO:  Your Honor, that is the reason why as

20  soon as the -- and we mentioned the surgical procedure in

21  part because that's meant to remedy the UTI so that that

22  doesn't occur and so we're not just in a perpetual state.  No

23  one is interested in that.  And we provided this information,

24  so we have not been dragging our feet or pushing things off,

25  and Mr. Brockman has subjected himself to PET scans, food

1  study, days and days of examination by the court-appointed
2  experts.

3          This is intended to ensure that the government
4  is not going to criticize any test results from the defense
5  because they were conducted too soon in time to these
6  episodes.  And we did file the motion five days after he was
7  released from the hospital for the surgery that hopefully
8  resolves these issues so they're not recurring.  But the
9  Court's order is understood, and we will get the records.

10          I would say under the current schedule the
11  defendant's reports are due on August 6th; and that's going
12  to be a challenge to get those reports to, medical reports to
13  the government and to our experts.  Given the report you
14  need, I do think there will be some need to continue the
15  deadlines in this case.

16          In addition to the health reasons, there are
17  other reasons, including documents that we're still waiting
18  on from the government for our experts to be able to analyze
19  to complete their work, which includes, again, raw notes that
20  were relied upon by the court-appointed experts that include
21  notes of interviews of Mr. Brockman and his spouse that they
22  submitted to that the government has to date refused to turn
23  over.

24          And I also just mentioned the sleep study,
25  which the government's position is that this is one of the

1  key objective measures that's relevant to the competency

2  examination that's now set for August 12th, which is closely

3  to the date of the reports.  So I just want to mention that

4  in terms of timing for the Court.

5          THE COURT:  Okay.

6              Anything from the government?

7          MR. MAGNANI:  Only to say, Your Honor -- well, I

8  guess a couple of things.  One is, of course, any delay in

9  this case just inures to the defendant's benefit.  He's out

10 on bond in this case, and he's delayed this by a very long

11 time.

12             And although Your Honor has mentioned that you

13 heard a lot of arguments and you'd like to see evidence,

14 there is a mountain of evidence on the docket in this case to

15 support the contention that he's a malingerer; and the Court

16 shouldn't blind itself to that.  A lot of this stuff is very,

17 very objective evidence.

18             And so the government would point to a few of

19 them; but before I even do, I just want to say that we asked

20 the defense for medical records, because the Court's

21 suggestion is a very good one:  Why don't you guys share the

22 records and come to an agreement?

23             Well, here's the reason we can't.  After the

24 defense raised this issue but before they even filed their

25 motion for a competency hearing, we sent them a letter that

said, hey, can you guys please send us all your medical
records?  And their position was, you have everything,
everything is in the public docket.  That's all we have.

THE COURT:  Well, it can't be in the public docket.
There is no way.

MR. VARNADO:  That's not what we said, Your Honor.

MR. MAGNANI:  Okay.  So that's my representation of
what they said, but it's in a letter, that's the good news.

But here's what I can tell you.  Until their
client met with one of the court-designated doctors and told
that designated doctor that he had bankers boxes of records
in his home, the defense had not produced a single medical
record to the government in this case until their client
brought it up.  And their position had always been that they
didn't have any but that they were willing to sign HIPAA
waivers to let us get them.

THE COURT:  Oh, no.  I mean, that's not how this
works.  I mean, we exchange documents.  I mean, if you want
relief -- I mean, I don't know.  This is argument for
parties.  I mean, everybody has a different take on it, but I
will just tell you guys the ground rules.

If you request relief from the parties based on
medical evidence, then you need to produce all of the medical
records.  I mean, that's just the ground rules.  So we can't,
we're not going to say, well, you got a HIPAA release, get it

1  yourself.  If you're seeking affirmative relief, either side,

2  based on medical conditions, then you need to produce the

3  medical records.

4          MR. MAGNANI:  Of course, Your Honor.  And that's the

5  way competency disputes are handled throughout this country.

6  That's the way they're always handled.

7              But not in this case.  In this case they

8  wouldn't give us anything.  And so when our doctors did their

9  exams, they did it without complete medical records.  There

10 are still medical records they're trying to get today.  But

11 we still made the deadline.  We still did the exams.  We

12 still met the expert report date.

13             And now he's coming in here -- and again, I

14 said, it's a game of chicken.  He's saying, well, I haven't

15 done anything.  The defendant has been out from his first

16 hospitalization since June 11th.  It's been over six weeks.

17             When our first expert examined him, it was

18 about six weeks after his last hospitalization.  So the

19 defendant is not entitled to a perfect examination that is

20 completely beyond reproach, especially when the concern in

21 this case, like I said, Your Honor, it's just a hypothetical,

22 it's not actually based on a doctor looking at him and saying

23 he's not in a position to be evaluated.  And so, as our

24 doctors have said, they can't go opine on this hypothetical

25 situation.  He needs to see a patient.

1           And so the foundation, there's no foundation on
2    it.  The history with their production has been zero until
3    their client mentioned that he had bankers boxes of material.
4    And so I just don't have any confidence that continuing to
5    negotiate will make a different.

6           And also, it's sort of too late because, as I
7    said, Your Honor, if we blow up this date, it's going to hit
8    this thing potential months.  And if that happens the reports
9    that, the designated expert reports, they just get months and
10   months more stale.  And so there is a real harm in this case
11   besides just the normal harm of delaying a prosecution on
12   this issue which, at least according to the designated
13   experts, is really a non-issue because the guy was running
14   his multi-billion-dollar company until after he was indicted.

15        THE COURT:  But have you turned over -- I mean, it's
16   got to be mutual, honestly.  I mean, so you guys need to get
17   together and talk about exchanging all the information.

18           I mean, I hear, Mr. Varnado, your argument that
19   you haven't gotten documents from the government, the
20   government hasn't had documents from you guys, hasn't
21   produced documents.  You need to get together.  I mean, this
22   is a competency hearing.  Medical records need to be
23   exchanged.  All medical records need to be exchanged.

24           And especially if somebody is seeking relief
25   from the Court based on medical records, I mean, I am not

1   going to do this in the blind.  I mean, I need the medical

2   records to be exchanged, I need expert opinions as to what

3   those medical records, what's in those medical records with

4   respect to whether or not a competency hearing should or

5   should not go forward, and that means all of the records.  I

6   mean, it has to be.

7            MR. MAGNANI:  And, Your Honor, I can tell you, we

8   have given every single medical record that's been created

9   that's in the government's possession in this case.

10           The discovery motion, as Mr. Varnado mentioned,

11  is a motion that, number one, it seems pretty clear today

12  that in referencing the motion today it's really just another

13  way to bootstrap this request for a continuance by claiming

14  it didn't happen.  But the things they don't have are rough

15  notes, are notes that the experts, who have all submitted

16  expert reports, rough notes that they took during recorded,

17  video recorded sessions with the defendant, so that's one

18  thing, rough notes of a non-recorded session with the

19  defendant's attorney.

20           Ms. Keneally and Mr. Romatowski were both

21  interviewed by one of the designated experts.  And we asked

22  if that could be recorded.  The defense said no, it couldn't

23  be recorded.  And so we asked if we could send an agent to

24  take notes, but they said no.  So the designated expert took

25  notes, and two additional Jones Day attorneys were in the

room and they took notes.  So they want our expert's notes of
a meeting that they were at but they didn't allowed it to be
recorded.  These are the types of trivial requests that
should not delay this hearing.

THE COURT:  I guess why would the rough notes make
any difference in your expert reports?

MR. VARNADO:  Well, Your Honor, because the
government and the court-ordered experts relied on these
notes that we don't have.  And so under Rule 16, Dr. Darby,
the neurologist, examined the defendant and his wife and
provided those rough notes to Dr. Deeds.  Dr. Deeds says he
relies on them.  We have never seen them.  And we are
entitled to see what the court-appointed experts relied upon
in formulating their reports, because we don't know what
those notes said.

And in one instance I think the government
suggests, well, for the notes from Mr. Brockman's wife's
interview, go get them from her lawyer.  You can go that
route.  And it's really just simple Rule 16.  If the expert
relies upon it and it's listed in their report and it seems
they rely upon it and they won't turn it over, we're entitled
to it.

And then with respect to, again, the unusual
step of us making counsel available, multiple counsel to the
court-appointed experts and made them available for

1   interviews, but we don't -- and notes were taken by Dr.

2   Denney and given to Dr. Dietz, we don't know what those notes

3   say.  Although we were present, we don't know what Dr.

4   Denny's notes said and how Dr. Dietz relied on those.  Those

5   are some pretty fundamental principles that we should be

6   entitled to.

7            And if I could, I do want to go back to the

8   government's representation that they received no medical

9   records is preposterous.

10          THE COURT:  I mean, I am taking it that everybody

11  has their own argument as to what is or is not medical

12  records.  It happens.  I mean, it is or is not production

13  happens in all the cases.  One side says we produced a lot.

14  The other side says you haven't produced anything.  It's

15  usually somewhere in between.  It's usually they produced

16  stuff, but it's not what the other side wants or thinks is

17  relevant or sufficient, so I get all that.  I mean, we don't

18  need to go there.

19          But can you guys hold on for just one second.

20  I need to take care of something quickly.  I will be right

21  back.

22

23                     (Brief recess taken)

24

25          THE COURT:  Okay.  We are back on the record in this

1  case.

2          With respect to the request for the extension

3  of time, I am just going to rule, respectfully, the request

4  is denied at this time without prejudice to being reasserted.

5          What the parties need to do is, the deadlines

6  are in effect.  You need to exchange, since you are

7  requesting relief from the Court, you need to make sure all

8  those medical records are exchanged and you have an expert

9  report to me stating why these medical procedures are going

10  to the affect the competency hearing at this point.

11          I don't have anything to work from.  I have got

12  this timeline.  Unfortunately the timeline didn't really tell

13  me anything.  I hear you, but it doesn't.  As I said, just

14  because you are under general anesthesia don't mean that you

15  are not able to take a competency exam.  And just because you

16  were delirious basically two months ago doesn't mean that six

17  weeks later that you're incompetent and can't take a

18  competency exam now.

19          I mean, when I had the flue, I had a fever, I

20  was delirious.  Two months later I was perfectly fine.  It

21  didn't affect my competency.  So I need the expert reports.

22          So, if you want an extension, you need to

23  provide the medical records to both sides and then both

24  sides, you need to provide me with an expert report stating

25  why a competence exam is not appropriate.  I understand this

1   August 6th deadline is coming up.  I'm sorry.  I am not going
2   to rule on this until I get that information.  Other than
3   that we are keeping the deadlines in place.

4           MR. VARNADO:  Your Honor, could I maybe ask one
5   request.  Given that the sleep study is scheduled for August
6   12th -- and I think Mr. Magnani indicated the government
7   would be amenable to this -- leave the hearing date intact
8   for now until we can get you the information, but push back
9   the expert report deadline from the 6th to a week after the
10  sleep study so that that can be incorporated and we can
11  continue to move forward.

12          We are not trying to drag our feet here, and as
13  the government had indicated, push that deadline, keep the
14  hearing date, and we can continue to exchange information and
15  bring this to the Court's attention.

16          MR. MAGNANI:  I think that we would be inclined to
17  agree, but I would prefer if we could do that offline as an
18  agreement between the parties after I have had the chance to
19  talk to the rest of my team.

20          THE COURT:  Okay.  I think that's reasonable.  You
21  probably want to make sure that everybody is on the same
22  page and deal with your timing issues as well because I am
23  sure there is other deadlines that I assume that you're all
24  working with, I have no idea, with your experts or doctors.
25  So go right ahead.

1            MR. VARNADO:  Judge, just one last thing.  Just for

2    the record, we did file the letter motion for the continuance

3    just four days after he was released from the hospital for

4    that surgical procedure.

5            THE COURT:  You did file it.  And as I said, my

6    concern, the timing is a minor concern, but it's just a

7    concern.  But my main concern is I don't have the information

8    that I need to be able to evaluate a request for extension at

9    this time.

10           MR. VARNADO:  We will get that information, Judge.

11           THE COURT:  So then the motion to compel, the reply

12   is due August 3rd.  Once I get that reply then I will rule on

13   the motion to compel.  I understand the issues.  I understand

14   the issue about the raw notes.  I just want to see what the

15   reply is now that I have gotten the response.

16           MR. VARNADO:  Your Honor, if I could just flag to

17   you what will be coming in this reply because you may not

18   have had a chance since it was just done on Tuesday night.

19   The defense -- I mean, the government had filed their

20   opposition to that motion to compel.  And that is now not

21   just an issue about have they produced the records, you know,

22   should we get raw notes?  Are there testimony that they have

23   in their possession?

24               In their opposition to the motion to compel

25   they essentially conceded that the government has abandoned

any notion that the court-appointed experts are mutual arbiters and fact finders in this case and have said these are our experts.  They're actually an arm of the prosecution and they are out conducting these examinations.

Expect to find in our reply, Judge, a request for a briefing schedule on how the government has completely fallen afoul of the statutory regimen here under 18 USC 4241 and 4247 where the experts were designated by the Court and were intended to be mutual arbiters who would report back to the Court on their findings concerning the defendant's competency, and instead that's not at all what happened.

In fact, the government concedes in their opposition that they treated them solely as their experts and their advocates.  They asked for counsel not to be present when they spent days upon days interviewing our clients.  And we believe that completely falls afoul of the statutory regime here governing competency hearings.  And even the manner in which the reports were submitted, they were addressed to Mr. Smith.  Mr. Smith then provided them to the Court as opposed to them being addressed to the Court.

That's not just a semantic or logistical issues.  It also goes into the type of questions they were asking the defendant without the presence of counsel and whether he would entertain a guilty plea, how strong he thought the government's case was.

1           The entire -- again, we will respond in the
2  reply that just came in two days ago, but there are serious
3  and grave concerns as to how the government has interacted
4  with and treated the court-appointed experts who are supposed
5  to remain neutral and simply provide information to the Court
6  for its consideration concerning competency and instead are
7  being advocates for what the government is proposing their
8  concern of defendant.  And I just want to flag that for you
9  because it is coming okay.

10          THE COURT:  Okay.  I need to hear all that.  I mean,
11  I don't want to get into it now.  I understand that you have
12  a different take on it all, I understand that.  But I want to
13  get the reply brief, and then after I get the reply brief,
14  all of the briefing will be done and I will take the issue up
15  then.

16          But I know that you want to be heard on it, you
17  have got something to say about it, but I don't see any point
18  in arguing about it when I don't have the reply brief yet.

19          MR. MAGNANI:  Well, the government's submissions, of
20  course, dealt with this issue, so it is mostly briefed from
21  our perspective.

22          But the two things I just want to say is, one,
23  Your Honor, of course, from the beginning and in every single
24  interaction we have ever had with these experts, we told them
25  to follow the facts, to follow the evidence and to tell us

1   the truth and to tell us whatever happened, and that we don't
2   have any dog in the fight either way and that they should
3   just be as objective as possible.

4               And then the second thing is, our conduct in
5   this case is not only consistent with the cases that we cite
6   in our memo, but it's also consistent with the experiences of
7   very experienced federal prosecutors in the death penalty
8   sections and in competency hearings all the time.

9               It's also consistent with the practice and
10  experience of two of the government's experts who have been
11  doing this since before I was born and have done hundreds if
12  not thousands of competency cases.  And so there is
13  nothing -- the defendant makes a big deal about this, but
14  there is really nothing there.  And not to mention, of
15  course, that this protocol was one that the defense agreed
16  to, and the protocol allowed for the United States to
17  unilaterally select these experts.

18              And then, of course, because the experts can't
19  just go to the defendant's house and examine him, they have
20  to be designated by the Court.  So when the defense claims
21  that they are court-appointed experts, of course Your Honor
22  knows that you did not find these people, you did not appoint
23  them and pay them but that the statute did require us to get
24  your blessings, your designation under the statute so they
25  can do the Court order.

1          THE COURT:  I have done this.  This is not my first

2    rodeo.  I have done this before in death penalty cases.  I

3    understand how this works.

4          MR. VARNADO:  Your Honor, I would just say, this

5    stage of competency versus death penalty or insanity is one

6    different, and I don't think the air quotes of designation

7    are really appropriate.  That's a meaningful process that

8    puts the expert, whether they had a relationship with the

9    government before or not, they then become mutual arbiters of

10   the Court.

11         That did not happen here.  And if everything

12   was done aboveboard there should be no problem producing the

13   government's interactions with those experts, but it's

14   something that the Court needs to see because we think this

15   process was botched badly by the government in how they

16   interacted with these court-appointed -- and I'm not using

17   air quotes -- experts.

18         THE COURT:  I'll wait for the reply brief.  And as I

19   said, I am familiar with the case law.  I have done this

20   before in multiple cases, not just death penalty cases but

21   also -- I've just done it before.  So I will wait for the

22   briefing and then I will take it up at that time.

23         The next is the motion for pretrial conference

24   pursuant to the Classified Information Procedures Act.  The

25   government filed its opposition.  Defendant has filed a

1    reply.  That is now ripe, and I will get an answer back to
2    you, unless you guys have come to some agreement on this.
3              MR. VARNADO:  We have not, Your Honor.
4              THE COURT:  Then I will get an answer back to you
5    shortly.
6              And then next was the government's Rule 17
7    subpoena submissions.  I wanted to find out whether the
8    parties have gotten any agreement with respect to those
9    subpoenas.
10             MR. MAGNANI:  Well, just importantly, there have
11   been areas on which the parties have had some agreement for
12   quite sometime; and so I believe before the Court now are
13   agreed motions for issuance of Rule 17(c) subpoenas for, I
14   believe it's two witnesses; but I can double-check that, Your
15   Honor, so there is some agreement.
16             There is disagreement with respect to, I
17   believe it's five witnesses, who are people that used to work
18   with or work for Mr. Brockman.  And I think that -- I mean,
19   that has been fully briefed.  It's based -- and my
20   understanding of the argument is that it's basically whether
21   or not the government has engaged in a fishing expedition or
22   whether people that worked with him for years might have
23   something relevant to say about his mental competency.
24             MR. VARNADO:  Your Honor, I would say that issue is
25   fully briefed, and I would just draw the Court's attention

that the defendant has not opposed these Rule 17 subpoenas when they pertain to medical professionals who are going to have something to say about his competency.  We really bent over backwards, and they're more than reasonable.

But the latest submission is Document No. 71, to which we responded in Document No. 85, that really calls out the exact fishing expedition that the government's on. These aren't for medical professional records, which is how this whole sequence started.  We need Rule 17s so we can get medical records so our experts can reply upon it.  That's out the window.  It's now just these are things we'd like to have.

And in the latest submission, which again, we call out in our response -- they didn't even file a reply -- they are seeking records from someone like Mr. Brockman's pastor and seeking records of what donations he might have made to the church that that pastor was the head of.  How could that possibly be relevant to the defendant's ability to assist in his own defense at trial?

There is other misuses of Rule 17 seeking to advance their underlying case by looking for records from Art Chandler.  The motion they say is about the defendant's behavior and interactions at the time; but if you actually read the subpoena, it's about properties, you know, governed, owned by Evatt Tamine, one of the cooperators, and other

1  things that can't possibly have a bearing on the competency

2  hearing.

3            I won't belabor the issue.  It's briefed fully.

4  I would just urge the Court to read Document 85 which we

5  think this is abuse of the Rule 17 process.  We have bent

6  over backwards and agreed where appropriate on the medical

7  issues and we fleshed that out, but this is a bridge too far.

8        THE COURT:  So I am going to grant the unopposed

9  motion and then enter an order on that, and then I will enter

10 an order regarding the others later.

11           And I understand your argument, I have read it.

12 I understand the government's position on some of these.  I

13 just want to take a look on a couple of them.  But my

14 understanding is the government's position basically is that

15 these -- well, I understand the position, because if I state

16 it, then you guys are going to get into argument and you want

17 to argue it now, and we don't really need to do that.  I have

18 got the briefing.

19           So, anything else that we need to talk about

20 this morning?

21       MR. VARNADO:  Your Honor, maybe two brief items.  I

22 know we have been here a while, but with the Court's

23 indulgence.

24       THE COURT:  Sure.

25       MR. VARNADO:  Thank you.

1          There have been a number of sealed documents
2   filed on the docket with no explanation.  I think we now have
3   pieced together, at least three of them are the expert
4   reports that were required to be filed under seal.
5          And then there is two other items.  And I would
6   just ask that the government be instructed not to file
7   unidentified sealed documents without explaining to the
8   defense what they're filing and what it pertains to.  At
9   least there may be a reason that it's sealed and we can't
10  have access to it, but there are at least two filings that we
11  either got very belated notice or no notice at all.  And I
12  think even under the Court's procedures just filing something
13  as a sealed document is not appropriate and certainly in a
14  criminal case where we have an interest in what's being said
15  and provided on the document to the Court.
16          THE COURT:  Okay.  Well, I have ordered that those
17  documents be sealed, and they're going to remain sealed.
18          MR. VARNADO:  Okay.
19          Last issue, Judge, there is a third party
20  that's filed a motion to strike the indictment.  You know,
21  we'll wait -- I'm sorry -- to strike the apportionment and
22  surplusage in the indictment.  We will wait to see what the
23  government's response is on that.
24          But I would note in that third party motion, it
25  includes an email from one of the government's lead counsel

1    that says, yes, there is an error in this indictment and this

2    is wrong.  And we never received notice of that until this

3    third party filed that email.  And so, as the Court considers

4    that, that is of concern to us as well that there is errors

5    in the indictment that are being pointed out to third parties

6    six months ago but not to us.

7           THE COURT:  Anything from the government with

8    respect to errors in the indictment?

9           MR. MAGNANI:  No.  I think, as Mr. Varnado has

10   suggested, it would be best not to get ahead of the briefing

11   on that one, Your Honor.  We'll be filing a response, and I

12   think at that time Your Honor can consider it.

13               But if I could, I'm not trying to get into

14   anything, but it's just about the statement about subpoenaing

15   a pastor.  I just want everybody to be clear, this pastor is

16   on the board of Mr. Brockman's company.

17           THE COURT:  Okay.

18           MR. MAGNANI:  As long as that's clear to the Court.

19   This is not the United States trying to pry into a spiritual

20   relationship between a man and his pastor.  This is an

21   investigation that involves looking at people who are in the

22   board room when company decisions are being made.

23           THE COURT:  And you're trying to -- yes, I get that.

24   I get that.  I know you needed to make that clear on the

25   record.  The Court's reviewed the pleadings.  I am satisfied

that these subpoenas are not being sought for any
inappropriate purpose.

MR. VARNADO:  We would argue that if you're using
Rule 17 for impeachment purposes, that is actually
inappropriate under the case law.  But we understand the
Court has the briefing.

THE COURT:  I have got the briefing.  If I talk
about it, you guys are going to want to argue, obviously,
which is great; but I don't think I need additional argument
on the issue.

Anything else that we need to talk about this
morning?

MR. VARNADO:  No, Your Honor.  Thank you very much.

MR. MAGNANI:  The only other thing is that the
government did request that, although it seems that no
further evaluation has been done, the government thinks it's
important that if the defense is going to have its own
examiners evaluate the defendant for purposes of the
competency hearing that those evaluations be subject to the
same video recording requirement.  So this is something that
I raised with the defense when they called me and asked for
my position on continuance.  And I asked them if they would
agree to bring it up at this hearing.  They did not.

But it seems like this hearing has now taken on
a lot of issues, so I would hope that the Court could

1  consider that as well because I think it would be important
2  so that everybody from Your Honor to the United States'
3  experts can look at those evaluations objectively and have a
4  fair basis of criticism so that we're not seeking notes that
5  their doctor made during the examination.
6              THE COURT:  Okay.
7                  Is there anything further we need to talk about
8  this morning?
9              MR. VARNADO:  Not from the defense, Your Honor.
10 Thank you again.
11             THE COURT:  Not a problem.
12                 From the prosecution?
13             MR. MAGNANI:  No, Your Honor.
14             THE COURT:  I appreciate everyone's focus and time.
15 This status conference made things very easy.  If we can keep
16 doing that in the future before our status conferences, just
17 provide me, Mr. Varnado, this was perfect.  So just provide
18 me with a status letter.  It makes it easier for me to rule
19 on the issues and get answers back to you guys quickly.
20                 And on the issues that I just talked about that
21 I will rule on, I will get answers back to you shortly.
22             MR. VARNADO:  Very well.  Thank you, Your Honor.
23             THE COURT:  And thanks for your patience this
24 morning.  I know we started a little bit late.
25             MR. MAGNANI:  Thank you.

1          THE COURT:  We will stand in recess.

2

3

4                    (Conclusion of proceedings)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3

4

5              I, Fred Warner, Official Court Reporter for the

6     United States District Court for the Southern District of

7     Texas, Houston Division, do hereby certify that the foregoing

8     pages 1 through 41 are a true and correct transcript of the

9     proceedings had in the above-styled and numbered cause before

10    the Honorable GEORGE C. HANKS, JR., United States District

11    Judge, on the 29th day of July, 2021.

12             WITNESS MY OFFICIAL HAND at my office in Houston,

13    Harris County, Texas on this the 11th day of August, A.D.,

14    2021.

15

16

17

18

19                              /s/ Fred Warner
                                Fred Warner, CSR
20                              Official Court Reporter

21

22

23

24

25