# JONES DAY

250 VESEY STREET • NEW YORK, NEW YORK 10281.1047

TELEPHONE: +1.212.326.3939 • FACSIMILE: +1.212.755.7306

DIRECT NUMBER: (212) 326-3402
KKENEALLY@JONESDAY.COM

April 9, 2020

<u>By Federal Express and Email</u>

Corey J. Smith
Tax Division
United States Department of Justice
150 M Street, NE
Room 2.208
Washington, DC 20004

Michael G. Pitman
Assistant United States Attorney
Office of the United States Attorney for the Northern District of California
Heritage Bank Building
150 Almaden Boulevard, Suite 900
San Jose, CA 95113

Re: <u>Robert T. Brockman</u>

Dear Mr. Smith and Mr. Pitman:

We represent Robert T. Brockman. We understand that Mr. Brockman is under investigation by a grand jury in the Northern District of California.

Bob Brockman has dementia.

Mr. Brockman will be 79 years old on May 28. He was diagnosed with dementia based on a series of medical examinations that were conducted between December 2018 and March 2019, following observations by his family, and his own sense that he has been experiencing memory loss and other physical and cognitive challenges for at least the prior two or three years.

Mr. Brockman shared his medical reports with us in August 2019, and we have reached out to the examining doctors concerning the extent to which Mr. Brockman's dementia affects his ability to assist in his defense. At our request, one of these experts, Michele K. York, Ph.D.,

JONES DAY

United States Department of Justice
April 9, 2020
Page 2

conducted a second examination of Mr. Brockman for the purpose of providing a forensic expert opinion. She concluded: "Based on the current cognitive findings, his diagnosis of dementia, and the breadth and severity of his cognitive impairments and fluctuations, it is my opinion that Mr. Brockman is unable to participate and aid in his own defense."[1]

Mr. Brockman has been examined by leading experts in their fields. This letter summarizes the medical reports, and subsequent information that they provided to us. The medical reports and other information from the doctors are attached.

We understand that there is a substantial amount of detailed medical information in these reports. We can confirm that we have seen the same behaviors described by Mr. Brockman's doctors. He has been unable to recall significant events, he does not recognize documents, and we have been unable to refresh his recollection. We did not know that the challenges we were encountering as counsel were the result of dementia, however, until he shared his doctors' reports with us. It has also been our experience that Mr. Brockman's ability to address the issues in this matter has grown progressively worse. He will sometimes completely lose focus in a discussion, or he will focus on issues that are not relevant. He fails to recall discussions that we have had with to him. Quite simply, he cannot assist us in preparing his defense, nor can he assess the decisions that someone under criminal investigation is called upon to make.

Mr. Brockman also can no longer effectively serve as the chief executive officer of Reynolds and Reynolds. He has difficulty remembering significant information. He cannot put his thoughts into written form, and cannot even recall how to spell common words. He asks his wife to assist him in these tasks. He struggles to focus on tasks that he sets out to do. He routinely lacks the ability to initiate any action. He may provide short responses to emails, or with his wife's assistance, compose a longer answer, but in fact he is corresponding by email less and less.

Mr. Brockman has identified a successor chief executive officer and management team, and he will shortly step down as CEO and Chair, and assume a consulting role at the company. It is a point of pride for Mr. Brockman that he built Reynolds and Reynolds by identifying talented people who grew with the company and who have served in their jobs for many years. He entrusted them over the years with decentralized decision-making as much as possible. Mr. Brockman rarely goes into his office, and few people see him day-to-day. It is apparent now that

---

[1] Dr. York's Confidential Neuropsychological Evaluation, conducted on December 3, 2019, is attached hereto as Exhibit A, and cited to as "York Forensic Evaluation." Dr. York's biography is attached hereto as Exhibit B.

JONES DAY

United States Department of Justice
April 9, 2020
Page 3

they have increasingly been taking responsibility to continue to operate the company even as his ability to do so has diminished.

Based on the medical reports, and our experience, we submit that a prosecution against Mr. Brockman under these circumstances would be in contradiction of the principles set out in the United States Justice Manual and the fundamental principles of due process. After you have had an opportunity to review these materials, we welcome discussing with you additional steps that you may want to take to evaluate this issue.

A.  Mr. Brockman's Medical Care

All of the examining doctors concur that Mr. Brockman is cognitively impaired and that this condition is progressive. They have expressed different medical opinions as to the causes of his dementia. Their diagnoses, none of which can be confirmed ante-mortem, conclude that his symptoms may be indicative of Lewy body dementia, Parkinson's disease, parkinsonism, or some combination of these conditions.

Lewy body dementia (sometimes referred to as dementia with Lewy bodies) results from protein deposits, called Lewy bodies, that develop in nerve cells in the brain regions involved in thinking, memory and movement. Lewy body dementia may manifest in the same physical symptoms – rigid muscle, slow movement, tremors – as Parkinson's disease. Lewy body dementia results in cognitive impairment, including confusion, poor attention, visual-spatial problems, and memory loss. Lewy body dementia is incurable, progressive, and terminal, with death resulting on average approximately eight years after the onset of symptoms.[2]

Parkinson's disease is a progressive nervous system disorder that affects movement, and may result in rigid muscles, slow movement, impaired posture, and tremors. While medication may help with the physical symptoms, Parkinson's disease is incurable. The presence of Lewy bodies in the brain is a marker of Parkinson's disease. Parkinson's disease may also cause dementia, which is progressive and generally resistant to treatment.[3] Parkinsonism is a term used to describe a condition that causes a combination of the movement abnormalities seen in Parkinson's disease, especially resulting from the loss of dopamine-containing neurons.[4]

---

[2] *See* https://www.mayoclinic.org/diseases-conditions/lewy-body-dementia/symptoms-causes/syc-20352025.

[3] *See* https://www.mayoclinic.org/diseases-conditions/parkinsons-disease/symptoms-causes/syc-20376055.

[4] *See* https://www.mayoclinic.org/diseases-conditions/parkinsons-disease/expert-answers/parkinsonism/faq-20058490.

JONES DAY

United States Department of Justice
April 9, 2020
Page 4

Regardless of the specific diagnosis, as a result of his cognitive impairment, Mr. Brockman cannot recall significant events that we believe will be at issue in this case. As Dr. York states: "He is unable to recall and demonstrate a thorough understanding of the relevant elements of the issues surrounding the case and manipulate this information in a logical manner that will allow him to make comparisons and weigh his options." (Ex. A, York Forensic Evaluation at 8.) In other words, he cannot understand the underlying facts of this investigation or the charges that may be brought against him, and he cannot defend himself.

1.  Dr. Pool's Examinations and Referrals

Mr. Brockman has been under the care of Seth P. Lerner, M.D., for many years. Dr. Lerner, Professor of Urology at Baylor College of Medicine, treated Mr. Brockman for bladder cancer in 2006 and has conducted follow up examinations in the years since. During an examination in September 2018, Mr. Brockman reported to Dr. Lerner that he had not been feeling well for several months. Dr. Lerner referred Mr. Brockman to James L. Pool, M.D., who is also a professor and treating physician with Baylor College of Medicine, for a general physical examination.[5]

Dr. Pool conducted a physical examination of Mr. Brockman on December 11, 2018. As part of that examination, he also met with Mr. Brockman's wife, Dorothy, and their adult son, Robert. Dr. Pool reported that Mr. Brockman's cognitive challenges had been noticeable for about three years. As a result, Dr. Pool referred Mr. Brockman to three other medical professionals: Joseph Jankovic, M.D., a neurologist and specialist in Parkinson's disease and other movement disorders, Melissa Yu, M.D., a neurologist and specialist in Alzheimer's Disease and other memory disorders, and Michele K. York, Ph.D., a neuropsychologist, all with Baylor College of Medicine.

The reports that each of these doctors provided to Dr. Pool are discussed more fully below. In summary, Dr. Jankovic found that Mr. Brockman presented symptoms that are consistent with Parkinson's disease or vascular parkinsonism. Dr. York and Dr. Yu agreed that Mr. Brockman's movements are consistent with Parkinson's disease or parkinsonism, but they concluded that his cognitive impairment is more consistent with Lewy body dementia. These diagnoses cannot be confirmed except at autopsy. All four – Dr. Pool, Dr. Jankovic, Dr. York, and Dr. Yu – agreed that Mr. Brockman has mild to moderate dementia.

---

[5] Dr. Lerner's and Dr. Pool's biographies are attached hereto as Exhibits C and D, respectively.

United States Department of Justice
April 9, 2020
Page 5

    Dr. Pool examined Mr. Brockman again on October 1, 2019, and had a cognitive evaluation performed. Mr. Brockman scored 12 out of 29 points on this test. As the report stated: "This score falls below the cutoff for dementia in patients of this age and education level and is typically associated with Major Neurocognitive Disorder, moderate (formerly Moderate Dementia)."[6]

    Dr. Pool conducted his examination of Mr. Brockman and prepared his reports prior to any communication between him and Mr. Brockman's counsel. After counsel spoke with Dr. Pool, he provided a letter to counsel summarizing this diagnosis.[7] As Dr. Pool explained in his letter, severe dementia will be characterized by a person's inability to know where he is or with whom he is speaking, while a person with mild to moderate dementia has some recognition of what is going on around him, and may even be able to conceal his limitations.

    Dr. Pool stated that, at this stage, Mr. Brockman has short-term memory limitations that prevent him from understanding what is being asked of him and responding appropriately. (Ex. F, Pool Letter at 2.) Dr. Pool also explained the risk of "confabulation" when Mr. Brockman tries to access long-term memory. As Dr. Pool explained, Mr. Brockman's dementia will cause his brain to fabricate information to fill in gaps in his memory. Mr. Brockman will believe that the information that he is providing is correct, but it will be the result of distortions in how his brain is functioning. (Ex. F, Pool Letter at 2.)

    Dr. Pool further stated that Mr. Brockman, who enjoyed a high intelligence and functioned at a high level prior to the onset of dementia, may be able to conceal his limitations in social and business settings. In Mr. Brockman's case in particular, Dr. Pool observed from his discussions with Mr. Brockman's wife and son that Mr. Brockman has a support network that can allow him to compensate subconsciously and suppress his deficiencies in many settings. (Ex. F, Pool Letter.)

    Dr. Pool concluded: "I concur with the medical position that Mr. Brockman cannot assist his attorneys in his defense, if criminal charges were to be brought against him." (Ex. F, Pool Letter at 2.)

---

[6] A copy of Dr. Pool's October 1, 2019 report is attached hereto as Exhibit E, and cited to as "Pool Report."

[7] Dr. Pool's January 14, 2020 letter to counsel, prepared in connection with this submission, is attached hereto as Exhibit F, and cited to as "Pool Letter."

United States Department of Justice
April 9, 2020
Page 6

    2.    Dr. Jankovic's Examination

Dr. Jankovic was the first of the medical specialists to examine Mr. Brockman following Dr. Pool's referrals. Dr. Jankovic is a Director of the Parkinson's Disease Center and Movement Disorders Clinic at Baylor College of Medicine, where he holds the Distinguished Chair in Movement Disorders.[8]

Dr. Jankovic examined Mr. Brockman on January 30, 2019.[9] His report noted that Mr. Brockman's symptoms included walking and balance difficulties, stooped posture, slowness of movement, difficulty with dexterity, micrographia (abnormally cramped handwriting), anosmia (loss of sense of smell), and dream-acting behavior, which Mr. Brockman first noticed a year and a half before Dr. Jankovic's examination. Dr. Jankovic observed that his examination showed leg rigidity, mild bradykinesia (slow movement and impaired ability to move on command), and a parkinsonian gait. (Ex. H, Jankovic Report at 5.) Dr. Jankovic concluded that Mr. Brockman's "history and examination are consistent with the diagnosis of postural instability gait difficulty (PIGD) type Parkinson's disease" and that "[v]ascular parkinsonism is also a possible consideration given his lower body predominant symptoms and presence of vascular risk factors that include atrial fibrillation hypertension, and hyperlipidemia." (Ex. H, Jankovic Report at 5.) Dr. Jankovic requested an additional test "to evaluate for dopaminergic deficiency and differentiate between vascular parkinsonism and idiopathic Parkinson's disease." (Ex. H, Jankovic Report at 5.)

Dr. Jankovic's examination and report was completed before Mr. Brockman informed counsel of his health issues. At counsel's request, Dr. Jankovic prepared a letter with some additional observations.[10] Subsequent to his examination, Dr. Jankovic received Dr. York's initial test results, and is familiar with Dr. Yu's conclusion that Mr. Brockman's symptoms support a diagnosis of Lewy body dementia. He noted in his letter that he can understand how Dr. Yu and Dr. York reached their conclusions, and that there is no determinative test that can be given to a living patient for Lewy body dementia, Parkinson's disease, or parkinsonism. He noted that hallucinations are a hallmark of Lewy body dementia, and that Mr. Brockman denied having experienced hallucinations during his examination. (Ex. I, Jankovic Letter.)

---

[8] Dr. Jankovic's biography is attached hereto as Exhibit G.

[9] Dr. Jankovic's January 30, 2019 report is attached hereto as Exhibit H, and cited to as "Jankovic Report."

[10] Dr. Jankovic's January 14, 2020 letter to counsel, prepared in connection with this submission, is attached hereto as Exhibit I, and cited to as "Jankovic Letter."

JONES DAY

United States Department of Justice
April 9, 2020
Page 7

Dr. Jankovic confirmed that during his examination of Mr. Brockman, he observed significant memory deficits and evidence of dementia. In his letter to counsel, Dr. Jankovic summarized that Mr. Brockman's dementia makes him unable to recall information and to respond accurately to inquiries. He said that Mr. Brockman has "trouble accessing information" and "making connections between questions that he is being asked and his recollection of events." (Ex. I, Jankovic Letter at 1.) Dr. Jankovic noted that a characteristic of Mr. Brockman's cognitive impairment is a tendency toward confabulation, which he described as causing someone to "sometimes make up stories or provide information about something that has not occurred." (Ex. I, Jankovic Letter at 1.) Dr. Jankovic distinguished this from lying, explaining that confabulation is "a symptom of cognitive impairment, and is not voluntary." A cognitively impaired person will believe that he is reporting truthfully when nonetheless confabulating. (Ex. I, Jankovic Letter at 1-2.) Dr. Jankovic also noted that someone with Mr. Brockman's cognitive impairment may appear to be able to carry on a discussion, but that "any information that he may provide may be partial and not complete or accurate." (Ex. I, Jankovic Letter at 2.) Dr. Jankovic stated: "I understand that you are asking whether Mr. Brockman can assist you in preparing a legal defense. It is my view that his cognitive impairment will prevent him from doing so." (Ex. I, Jankovic Letter at 1.)

3. Dr. Yu's Examination

Dr. Pool also referred Mr. Brockman to Dr. Yu, who is an associate professor in neurology at Baylor College of Medicine, as well as Associate Medical Director for the Baylor Clinic of Neurology and Associate Director, Clinical Operations, for the Baylor Alzheimer's Disease and Memory Disorders Centers.[11]

Dr. Yu examined Mr. Brockman on March 20, 2019.[12] Her report included discussions of Dr. Jankovic's examination report, the intervening test that was performed on Dr. Jankovic's recommendation, and the first set of tests performed by Dr. York, which are discussed more fully below.

Dr. Yu met with Mr. Brockman, his wife, and their son. She summarized that Mr. Brockman described himself as "always having 'superior memory.'" (Ex. K, Yu Report at 2.) She stated that he reported that his symptoms began two years prior, but that Dorothy said that she had noted symptoms about three years ago. (Ex. K, Yu Report at 2.) Their son reported that Mr. Brockman "repeats himself at times." (Ex. K, Yu Report at 2.) Dr. York's report also noted

---

[11] Dr. Yu's biography is attached hereto as Exhibit J.

[12] Dr. Yu's March 20, 2019 report is attached as Exhibit K hereto and cited to as "Yu Report."

JONES DAY

United States Department of Justice
April 9, 2020
Page 8

that the Brockmans reported that he was "always misplacing objects," had spelling difficulties, failed to remember to take medications, had "some difficulty with planning out tasks at work," and that "family notes that he doesn't initiate activity like he used to." (Ex. K, Yu Report at 2.) Dr. Yu stated that Mr. Brockman "reports episodes of 'blankness' associated with less interaction alternating with improved cognition." (Ex. K, Yu Report at 2.) She continued: "His son notes significant fluctuations in terms of his decision making abilities, with good days and bad days." (Ex. K, Yu Report at 2.) The report also included a discussion of physical symptoms, including stooped posture, a deterioration in his gait, handwriting issues, loss of smell, and decrease in facial expression. (Ex. K, Yu Report at 2.)

Dr. Yu summarized: "Pattern indicates a dementia of mild to moderate severity with deficits in areas of visuospatial functioning, verbal and nonverbal episodic memory and executive functioning, with mild functional declines." (Ex. K, Yu Report at 6.) She also reviewed the test results requested by Dr. Jankovic for the purpose of differentiating between Parkinson's disease and Lewy body dementia. (Ex. K, Yu Report at 7.) She concluded that Mr. Brockman's symptoms are "consistent with dementia with Lewy Bodies." (Ex. K, Yu Report at 6, 7.) She recommended that Mr. Brockman stop driving, and she advised him "on diagnosis of a neurodegenerative disorder with cognitive impairment and possible implications on his work and advised he discuss further with his family." (Ex. K, Yu Report at 6, 7.)

Dr. Yu was also able to review the results of a DaTscan that had been ordered by Dr. Jankovic. A DaTscan measures the number of dopamine transporters in the brain regions critical for movement and cognition. In Mr. Brockman's case, the critical neurons responsible for producing dopamine are irrevocably damaged. Dr. Yu noted that this test showed: "Severe loss of dopaminergic neuronal function in the bilateral dorsal striata …." (Ex. K, Yu Report at 7.) In other words, Mr. Brockman has significant, measurable changes to his brain structure that can be seen as the basis for his dementia.[13]

As with Dr. Pool and Dr. Jankovic, Dr. Yu completed her examination and medical report before counsel for Mr. Brockman contacted her. At the request of counsel, Dr. Yu also provided a letter to put her report in context.[14] In addressing the observation made by Mr. Brockman's son that he experiences "fluctuations," Dr. Yu noted that it is a specific characteristic of Lewy body dementia that a person will experience day-to-day and even hour-to-hour fluctuations in the

---

[13] A copy of the Diagnostic Report of the DaTscan is attached hereto as Exhibit L, and a copy of the DaTscan images is attached hereto as Exhibit M.

[14] Dr. Yu's January 21, 2020 letter to counsel, prepared in connection with this submission, is attached hereto as Exhibit N and is cited to as "Yu Letter."

JONES DAY

United States Department of Justice
April 9, 2020
Page 9

ability to function. (Ex. N, Yu Letter.) Dr. Yu explained that patients with dementia will experience anosognosia, which means that they will lose insight into their cognitive impairment. (Ex. N, Yu Letter.) She described how others may also fail to perceive someone's cognitive limitations, noting that "[i]ndividuals with dementia, who have good social instincts and expansive vocabulary may appear to function well on a surface level." (Ex. N, Yu Letter.) She referred to this as the ability to retain "social niceties" despite cognitive impairment, and further noted that "individuals who have been in business or professionally active for a long time may be able to speak on business issues in a way that appears functional, but will face difficulties when pressed for decisions or specifics." (Ex. N, Yu Letter.) Dr. Yu also distinguished dementia from memory loss, noting: "The impact of dementia includes visual spatial function, language, memory, and executive function—in essence, all aspects of thought and cognitive function." (Ex. N, Yu Letter.)

   4. Dr. York's Examinations

Dr. York works closely with Dr. Yu, and was also included in the referrals from Dr. Pool. Dr. York is an associate professor in neurology and psychiatry and behavioral sciences, and the head of the Section of Neuropsychology at Baylor College of Medicine. She is certified in clinical neuropsychology.

Dr. York examined Mr. Brockman twice – first on March 1, 2019, in conjunction with the series of examinations recommended by Dr. Pool, and a second time on December 3, 2019, at the request of counsel for the specific purpose of evaluating Mr. Brockman's ability to assist in his defense.[15] The second examination specifically included tests to determine whether Mr. Brockman was trying to fake his deficiencies. To the contrary, he tried his best to refute that he lacks competency.

Dr. York's December 3, 2019 forensic report contained a simple, graphic illustration of Mr. Brockman's cognitive impairment: he cannot draw a clock. (Ex. A, York Forensic Evaluation at 6.) Asking a patient to draw a clock is one of the basic tests to determine cognitive impairment. Dr. York's forensic report included the drawing of a clock that Mr. Brockman made during her examination of him on March 1, 2019. (Ex. A, York Forensic Evaluation at 6.)

Mr. Brockman and his family were sufficiently shocked by this result that, as reported by Dr. Yu, he practiced drawing various figures following Dr. Yu's initial examination. (*See* Ex. K,

---

[15] Dr. York's Confidential Neuropsychological Evaluation, conducted on March 1, 2019, is attached hereto as Exhibit O, and cited to as "York Clinical Report."

JONES DAY

United States Department of Justice
April 9, 2020
Page 10

Yu Report at 2; Ex. A, York Forensic Evaluation at 4.) Mr. Brockman reported to Dr. Yu that he specifically practiced drawing clocks. Nonetheless, when tested again on December 3, 2019, Mr. Brockman again failed at this basic task. (*See also* Ex. E, Pool Report at 1.) Dr. York set out these two clock drawings, done nine months apart, side-by-side in her report:

**Clock Drawing**



03/01/2019                                              12/03/2019

    a.    <u>Dr. York's Clinical Evaluation</u>

Dr. York conducted her initial evaluation of Mr. Brockman and prepared her March 1, 2019 report to assist Dr. Yu in making a medical diagnosis of his condition and determining a course of treatment. (Ex. O, York Clinical Report at 1.) Her March 1, 2019 report began with a summary of her interview of Bob and Dorothy Brockman, noting that they reported that for a two- to three-year period he had been experiencing short-term memory loss, a tendency to repeat himself, losing things, losing his train of thought, forgetting names of people that he recently met, forgetting familiar locations, spelling difficulties, slowed physical responses, slowed decision-making, and difficulty multi-tasking.

Dr. York next reported on her behavioral observations of Mr. Brockman during the testing, noting that he showed a "moderately decreased ability to follow directions," that he "frequently needed repetition of directions and to be reoriented to task," that he "perseverated to previous tasks" (meaning that he repeated prior responses out of context), that "[t]he examiner needed to be concrete for him to understand the task instructions," that his "processing speed was extremely" slow, and that his "handwriting was micrographic." (Ex. O, York Clinical Report at 2.) She added: "He lacked insight into his cognitive problems," noting that he "said he was not doing well, but he appeared very surprised." (Ex. O, York Clinical Report at 2.)

JONES DAY

United States Department of Justice
April 9, 2020
Page 11

Dr. York personally observed an event that ultimately supported her and Dr. Yu's conclusion that Mr. Brockman has Lewy body dementia: during the examination, he experienced an hallucination. As Dr. York reported: "He saw a bug on the floor of the testing room that was not present."[16] (Ex. O, York Clinical Report at 2, 5.)

Dr. York's March 3, 2019 report listed the large number of tests that she administered over several hours, followed by a summary of the results in clinical terms, many of which make apparent his cognitive shortcomings. (Ex. O, York Clinical Report at 3-4.) She also reported that Mr. Brockman was unable to complete certain tests "due to cognitive/behavioral problems." (Ex. O, York Clinical Report at 2.)

Dr. York determined that Mr. Brockman – a man who founded and built a highly successful business – "currently operates in the low average range of general intellectual functioning (WIAS – IV FSIQ = 87), which is a decline from his estimated premorbid intellectual functioning in the above average range." (Ex. O, York Clinical Report at 4.) She continued, in somewhat clinical terms: "Mr. Brockman demonstrated borderline impaired to deficient performances on measures of sustained attention/concentration, learning and recall of prose material and a word list, learning and recall of visual material, semantic fluency, executive functions (set shifting, inhibition, working memory, and problem solving), and visuoconstruction," adding: "[t]hese impaired performances were found within the low average to average ranges on measures of basic attention, fund of information, verbal and visual abstract reasoning, verbal fluency and naming." (Ex. O, York Clinical Report at 4.)

Dr. York determined that Mr. Brockman's performance on the clinical tests indicated "a dementia of mild to moderate severity …." (Ex. O, York Clinical Report at 4.) She also noted that "he demonstrates movements that may be consistent with a Parkinsonism." (Ex. O, York Clinical Report at 4.) Based on her battery of tests and clinical observations, including witnessing Mr. Brockman experiencing a hallucination during the examination, Dr. York concluded: "his pattern of cognitive impairments is consistent with Dementia with Lewy Bodies." (Ex. O, York Clinical Report at 5.)

Dr. York's recommendations are themselves jarring indications of Mr. Brockman's impairment. She advised, for example, that he exercise caution when operating household appliances, that he have a large-type calendar in a highly visible location to assist him in

---

[16] In her subsequent forensic report, Dr. York noted that Dorothy Brockman was also present and observed that Mr. Brockman experienced this visual hallucination of a bug that was not there. (Ex. A, York Forensic Evaluation at 2.)

JONES DAY

United States Department of Justice
April 9, 2020
Page 12

"temporal orientation," that he have a large dry-erase board in a prominent spot to help him keep track of important information such as the location of family members, and that information be presented to him in a written format so that he can refer to it over time. (Ex. O, York Clinical Report at 5-6.)

      b.    Dr. York's Forensic Evaluation

When counsel contacted Dr. York, she volunteered that she should conduct a set of tests specifically for the purpose of assessing Mr. Brockman's cognitive impairment from a forensic perspective. She conducted that examination on December 3, 2019, and provided counsel with her report on December 20, 2019.

Dr. York again conducted a clinical interview of Bob and Dorothy Brockman. She noted that Mr. Brockman reported a decline in balance and in short-term memory. (Ex. A, York Forensic Evaluation at 2, 3.) Dr. York directly asked Mr. Brockman about this investigation, and he responded that "his tax issues are about a small company that he sold to a family trust in 1981." She continued: "He noted that the government is 'mad at him' but 'they don't say why' and they want to 'confiscate the trust.'" (Ex. A, York Forensic Evaluation at 2.) Mr. Brockman also told Dr. York "that he is starting to think about who will run the company" although he "thinks he can continue to be the chairman." (Ex. A, York Forensic Evaluation at 2.)

Dorothy Brockman told Dr. York that "her husband's cognition fluctuates on a daily basis from minute to minute." (Ex. A, York Forensic Evaluation at 2.) As Dr. York reported: "She described that he has 'blank times' that he appears more confused," and that "he was having difficulties at work and she had to help him type all of his employee performance reviews." (Ex. A, York Forensic Evaluation at 2.) She added that Mrs. Brockman described how Mr. Brockman has "increased initiation problems." (Ex. A, York Forensic Evaluation at 2.) Mr. Brockman currently works primarily from an office in his home, and Dorothy Brockman reported to Dr. York that he "sits at work" for extended periods, but does not accomplish the tasks that he sets out to do, that his spelling ability has declined, and that he is "unable to multi-task." (Ex. A, York Forensic Evaluation at 2.) Mrs. Brockman reported that Mr. Brockman "fluctuates in his ability to handle money even with day-to-day expenses." (Ex. A, York Forensic Evaluation at 7.) She also reported that his short-term memory has continued to decline, that "he is repeating himself more often," that he is "unable to recall details from his daily activities even later in the day," and that he has forgotten how to tie a tie, use the television remote, or use a code to unlock his phone. (Ex. A, York Forensic Evaluation at 2.) Dorothy Brockman also reported that Mr. Brockman has been acting out his dreams – another

JONES DAY

United States Department of Justice
April 9, 2020
Page 13

characteristic of both Lewy body dementia and Parkinson's disease – for at least three years. (Ex. A, York Forensic Evaluation at 2.)

Dr. York's forensic report summarized her prior examination, as well as the medical reports prepared by Dr. Jankovic and Dr. Yu. (Ex. A, York Forensic Evaluation at 1-4.) She also provided her behavioral observations of Mr. Brockman during the December 3, 2019 testing. Her observations included that Mr. Brockman's "cognition tended to fluctuate throughout the testing session," that he "appeared to be confused at times," had difficulty completing tasks even after starting out well, and that he "showed mildly decreased ability to follow directions, and he occasionally needed repetition of directions and lost place during set task." (Ex. A, York Forensic Evaluation at 4.)

As with her March 1, 2019 clinical evaluation, Dr. York again listed the tests that she administered, as well as the tests that Mr. Brockman was unable to complete "as he was unable to comprehend task instructions and maintain task set independently," and set out her neurological findings in clinical terms. (Ex. A, York Forensic Evaluation at 4-5.)

Dr. York found that Mr. Brockman had improved in some areas from the results of her prior testing, while declining in other areas. (Ex. A, York Forensic Evaluation at 7-8.) For example, she noted that Mr. Brockman "currently operates in the average range of general intellectual functioning (WAIS-IV FSIQ=96), which she described as a "significant decline from his estimated premorbid intellectual functioning in the high average range," but which was an improvement over the March 1, 2019 testing results. (*Compare* Ex. A, York Forensic Evaluation at 7 *with* Ex. O, York Clinical Report at 4.) In contrast, she determined that Mr. Brockman's "written arithmetic performance was a 5.6 grade equivalent with difficulties noted in performing basic addition, multiplication and division problems." (Ex. A, York Forensic Evaluation at 7.)

Dr. York summarized:

"It is noted that Mr. Brockman's cognition fluctuated significantly throughout the evaluation. He demonstrated improvements on a few measures; however, during several tasks, he became more confused and demonstrated a blank stare expression. These fluctuations were more apparent during this evaluation as compared to his previous evaluation in March 2019. Mr. Brockman's pattern of neuropsychological performance indicates a dementia of mild to moderate severity characterized by deficits in the areas of verbal and nonverbal episodic memory, processing speed, executive functioning, and visuospatial functioning with significant functional declines." (Ex. A, York Forensic Evaluation at 8.)

Dr. York concluded: "His dementia falls under the diagnostic category of Lewy Body Dementias." (Ex. A, York Forensic Evaluation at 8.)

Dr. York's examination specifically included tests to determine whether Mr. Brockman was malingering, that is, faking impaired cognition. As stated in her report: "He passed several embedded and stand-alone measures of performance validity; therefore, the following results are thought to be an accurate estimation of his current cognitive abilities." (Ex. A, York Forensic Evaluation at 4.) Dr. York concluded: "It is this examiner's opinion based on the testing conducted and behavioral observations that Mr. Brockman was putting forth full effort and was not exaggerating or embellishing the nature and extent of his cognitive impairment." (Ex. A, York Forensic Evaluation at 7.)

B.  Impact of Mr. Brockman's Dementia

Bob Brockman does not want it to be true that he has dementia. Dr. York observed that he "tended to minimize his cognitive impairments." (Ex. A, York Forensic Evaluation at 4.) Mr. Brockman knew that one of the tests required him to draw a clock, and that the later, second battery of tests were likely to be used by his counsel to demonstrate to the government that he should not be prosecuted. Even still, he practiced so that he could draw a better clock.

Mr. Brockman has changed his eating and exercise habits, in the hope that he can stave off the progression of his dementia. He is also, however, coming to terms with the reality of his current condition. As described in Dr. York's report, he has increasingly struggled at personal and professional tasks, and has relied on his wife's assistance to complete tasks that he can no longer perform.

As counsel, we can directly report that Mr. Brockman's cognitive impairment makes him incapable of assisting in his defense. Our interactions with Mr. Brockman are consistent with the medical findings. Mr. Brockman has been unable to relate important information from the past, to review and evaluate documents, or to retain information that we tell him. He repeats information, regardless of relevance. When we provide him with information, he will sometimes report it back to us in our next discussion as if it is news that he thinks he should provide to us or something that he has recently remembered – in effect confabulating what he once may have known and what he is hearing today.

We were not aware, however, that the challenges that we were facing in our interactions were the result of dementia until Mr. Brockman shared his medical reports with us, first in a discussion in August 2019, and then by providing the reports prepared by Dr. Jankovic, Dr. Yu,

JONES DAY

United States Department of Justice
April 9, 2020
Page 15

and Dr. York in September 2019. Mr. Brockman did not seek out these medical reports to establish a defense in this case.[17] He sought medical care because he and his family were increasingly concerned by what they were experiencing. He also did not share his medical information with us because he thought that it would have an impact on your investigation, but instead so that we would better understand his limitations after almost a year of difficult efforts to prepare a response to the investigation.

It is apparent to us, now that we know of Mr. Brockman's medical issues, that Mr. Brockman lacks the capacity to assist counsel in his defense. As discussed above, we reached out to each of the treating doctors to make sure that our understanding of the impact of his cognitive impairment is correct. Dr. Pool, Dr. Jankovic, and Dr. Yu each provided us with letters that summarized their findings in the context of the specific question that we asked – can Mr. Brockman assist us in preparing his defense? All three stated that he cannot. Dr. York, who is a neuropsychologist and not a medical doctor, conducted a separate battery of tests that she identified as necessary to put her evaluation in a legal context. Her forensic report confirmed what the three medical doctors, the Brockman family, and we as counsel know – the evidence of Mr. Brockman's cognitive impairment is overwhelming and compelling.

C.     Prosecution of Mr. Brockman Would Violate Due Process

The United States Justice Manual provides that a "person's personal circumstances" should be considered in determining whether there is a substantial federal interest supporting prosecution. USJM § 9-27.230, *see* § 9-27.220. Circumstances particular to the accused which "may suggest that prosecution is not the most appropriate response" include "advanced age, or mental or physical impairment." § 9-27.230 Comment 7.

This provision is grounded in principles of due process. *Pate v. Robinson*, 383 U.S. 375, 378 (1966). The basic standard for competency is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding— and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960). The "resolution of the issue of competence to

---

[17] In May 2017, long before Mr. Brockman was aware that he might be involved in an investigation, he sent an email to his friend, Dr. Stuart Yudofsky, stating that "Robert [Mr. Brockman's adult son] and Dorothy are after me to consult with the right doctor regarding my loss of sense of smell. They are afraid that it is an early sign of alzheimer's or dementia. I am feeling good but am having increasing memory problems." A copy of the email exchange between Mr. Brockman and Dr. Yudofsky is attached hereto as Exhibit P. Because we understand that Dr. Yudofsky is a potential witness represented by counsel in this matter, we have not contacted him to discuss his confidential examination of Mr. Brockman.

JONES DAY

United States Department of Justice
April 9, 2020
Page 16

stand trial at an early date best serves both the interests of fairness . . . and of sound judicial administration." *Drope v. Missouri*, 420 U.S. 162, 178 n.13 (1975) (citation omitted).

An individual's ability to assist properly in his defense "must be evaluated in light of the type of participation required." *United States v. Dreyer*, 705 F.3d 951, 961 (9th Cir. 2013). When evaluating competency, courts will consider medical evaluations and reports, defense counsel's representations and judgment about the defendant's state of mind, and the observations of others. *See Drope*, 420 U.S. at 178 n.13.

The reports from the treating physicians and the neuropsychologist, our experience as counsel, and the observations reported to the doctors by Mr. Brockman's wife and son show that he cannot participate in the most fundamental tasks of defending himself. He lacks the capacity to remember and to relate relevant facts, names and events to his attorneys; he cannot meaningfully review and evaluate documents bearing on his case; he cannot appreciate the evidence that the government may bring against him; he lacks the ability to consider a course other than standing trial; he lacks the ability to weigh the consequences of exercising his constitutional right to testify or not; he cannot be sure that his testimony, if given, will be coherent or accurate, and not the result of confabulation; he lacks the ability to follow and recognize discrepancies in the testimony of others; and he cannot assist his counsel in preparing to examine witnesses or otherwise present or challenge evidence at trial. *See United States v. Rothman*, 2010 WL 3259927, at *6 (S.D. Fla. Aug. 18, 2010) (discussing factors when evaluating competency of defendant with dementia); *United States v. Silva*, 2013 WL 6576788, at *10 (D. Utah July 31, 2013) (same); *see also Ryan v. Gonzales*, 568 U.S. 57, 65 (2013) (noting that "an incompetent defendant would be unable to assist counsel in identifying witnesses and deciding on a trial strategy"); *Cooper v. Oklahoma*, 517 U.S. 348, 364 (1996) (discussing risk that incompetent defendant will be unable to exercise "rights deemed essential to a fair trial," including decisions about whether to waive trial by jury, take witness stand and confront accusers, among "myriad smaller decisions concerning the course of his defense") (citations omitted); *United States v. Hemsi*, 901 F.2d 293, 295 (2d Cir. 1990) (explaining that the competency inquiry "involves an assessment of whether the accused can assist in such ways as providing accounts of the facts, names of witnesses, etc.") (quotation marks and citations omitted). There is no alternative available to mount a response without Mr. Brockman's assistance. As we currently understand the scope of the investigation, the events at issue span nearly forty years, the allegations and potential defenses are complex, and many potential witnesses have died or are otherwise unavailable.

As described by the doctors and by his family, and as we have observed, Mr. Brockman's condition fluctuates. While he may have good days and bad days, these fluctuations may also be

JONES DAY

United States Department of Justice
April 9, 2020
Page 17

minute to minute. It is a symptom of his dementia that he does not perceive the full extent of his own limitations, cannot know whether he is conveying an accurate memory or a confabulated one, and cannot even tell us whether any moment is a good or a bad one.

Mr. Brockman's dementia is progressive. If it is the result of Parkinson's disease, it cannot be cured. If it is the result of Lewy body dementia, then it is a part of a terminal condition with a short prognosis. Time is on nobody's side here.

We ask that you consider this letter and the attached reports and letters to reach a decision that a prosecution against Mr. Brockman cannot proceed. We welcome any questions that you may have.

Very truly yours,

Kathryn Keneally
Peter J. Romatowski
Jason S. Varnado