1                IN THE UNITED STATES DISTRICT COURT

2                FOR THE SOUTHERN DISTRICT OF TEXAS

3                        HOUSTON DIVISION

4  UNITED STATES OF AMERICA      §      CASE NO. 4:21-CR-9
                                 §      HOUSTON, TEXAS
5  VERSUS                        §      MONDAY,
                                 §      NOVEMBER 1, 2021
6  ROBERT T. BROCKMAN            §      5:06 P.M. TO 6:03 P.M.

7                STATUS CONFERENCE (VIA ZOOM)

8         BEFORE THE HONORABLE GEORGE C. HANKS, JR.
                  UNITED STATES DISTRICT JUDGE

9

10

11
   APPEARANCES:                          SEE NEXT PAGE
12
   ELECTRONIC RECORDING OFFICER:    RACHEL WILLBORG
13
   CASE MANAGER:                    BYRON THOMAS
14

15

16

17

18

19

20                TRANSCRIPTION SERVICE BY:

21         JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 Eldridge Road, #144
22              Sugar Land, TX 77478
                    281-277-5325
23          mary@judicialtranscribers.com

24
      Proceedings recorded by electronic sound recording;
25        transcript produced by transcription service.

2

1                         APPEARANCES (VIA ZOOM):

2

3   FOR THE PLAINTIFF:              US DEPARTMENT OF JUSTICE
                                    Lee F. Langston, Esq.
4                                   150 M Street NE
                                    Room 2 802
5                                   Washington, DC  20002
                                    202-353-0036
6

7

8
    FOR THE DEFENDANT:             JONES DAY
9                                  Jason S. Varnado, Esq.
                                   717 Texas, Ste. 3300
10                                 Houston, TX  77002
                                   832-239-3694
11
                                   JONES DAY
12                                 Katheryn Keneally, Esq.
                                   James P. Loonam, Esq.
13                                 250 Vesey Street
                                   New York, NY  10281
14                                 212-326-3939

15

16

17

18

19

20

21

22

23

24

25

1    HOUSTON, TEXAS; MONDAY, NOVEMBER 1, 2021; 5:06 P.M.

2        THE COURT:  Hello, Counsel.  Let's see.  The next

3    case on the Court's docket is Cause No. 4:21-CR-9, the

4    United States of America versus Mr. Robert T. Brockman.

5        (Pause in the proceedings.)

6        THE COURT:  Hello, is anyone there?

7        (Pause in the proceedings from 5:07 p.m. to 5:19 p.m.

8    to resolve Zoom issues.)

9        THE COURT:  Good afternoon, everyone.  The next

10   case on the Court's docket this afternoon is Cause

11   No. 4:21-CR-9, United States of America versus Mr. Robert T.

12   Brockman.

13       Can counsel on the line just introduce themselves

14   to the Court and state the parties they represent?  Starting

15   with the Government.

16       MR. LANGSTON:  For the United States, Lee

17   Langston.

18       THE COURT:  Okay, Mr. Langston, welcome.

19       MR. VARNADO:  Good afternoon, Your Honor.  This is

20   Jason Varnado, along with my colleagues, Kathy Keneally and

21   James Loonam, on behalf of Mr. Brockman, and I'll have our

22   colleague, Julie Kemp (phonetic), to see if she can get

23   Mr. Brockman's camera on.

24       THE COURT:  Okay, great.

25       MR. VARNADO:  She'll be assisting him.

1          THE COURT:  Great.

2          MR. VARNADO:  Okay.  So Mr. Brockman is with us,

3  as well.

4          THE COURT:  Great.  Well, welcome, everyone.

5          First of all, thank you all for your patience with

6  the Court's schedule.  We have been real extremely busy

7  lately and we weren't able to meet on Friday and then today

8  we had some other matters.  Just finishing up now, so I

9  appreciate your patience and understanding with the Court's

10  schedule.  I hope I haven't put you all out too much, but

11  thank you for that.

12          Last time we had spoken, I had said that I was

13  going to get back to you on the issue of privilege and I am

14  -- and I'm going to do that now.  I just have some questions

15  to ask both the Government and Mr. Varnado with respect to

16  some of the documents.

17          My first question is:  Is there any dispute in

18  this case whether Reynolds & Reynolds is asserting

19  attorney-client privilege to any of these emails, or is it

20  -- so in other words, is Reynolds & Reynolds asserting

21  attorney-client privilege to these emails as a corporation

22  or is only Mr. Brockman asserting attorney-client privilege?

23          MS. KENEALLY:  Your Honor, this is Kathy Keneally

24  with Mr. Brockman.

25          The privilege log that's in the motion before the

1  Court concerns only Mr. Brockman's assertion of privileges.

2  It's my understanding from memo to counsel that the

3  Government did not request a privilege log from them, so to

4  the extent they have privileged documents, they withheld

5  them.  But having said that, there may be a small number of

6  documents as to be treated as to assert a privilege where

7  Reynolds & Reynolds (indiscernible) was a party.  We have

8  asserted privilege, as well.  And then my (indiscernible) is

9  a small amount of these documents.  They have redacted some

10  of the information, but since they want our privilege log,

11  that's what it was.

12            THE COURT:  Okay.

13            MS. KENEALLY:  If the question is, we may need to

14  follow-up with DHS and Reynolds as to whether some of these

15  documents may also be privileged.  It's a small number of

16  documents that may be used.

17            THE COURT:  Okay.  And the reason I ask that is

18  that, you know, obviously, if Mr. Brockman is seeking legal

19  advice on behalf of the corporation, the privilege belongs

20  to the corporation, it doesn't belong to Mr. Brockman

21  individually unless -- and we're going to get into that a

22  little bit later -- unless the attorneys were acting for

23  Mr. Brockman individually, rather than acting on behalf of

24  the corporation.

25            And that's why I wanted to make sure I understood

1   whether or not Reynolds & Reynolds was asserting

2   attorney-client privilege to any of these emails because in

3   the emails, it's, first of all, on their server, and second

4   of all, in some of these emails Mr. Brockman is getting

5   legal advice on behalf of the corporation, and the privilege

6   would belong to the corporation, not necessarily

7   Mr. Brockman, unless, of course -- and we'll talk about this

8   a little bit later -- there's an individual attorney-client

9   relationship between Mr. Brockman and these attorneys.

10          So that's why I needed to know about the --

11   whether or not Reynolds & Reynolds was asserting attorney-

12   client privilege.

13          The next thing I needed to ask -- let's see.

14          I need to go through a list of the attorneys and

15   find out whether these were attorneys that were hired by

16   Mr. Brockman individually or these were attorneys doing work

17   on behalf of the corporation, Reynolds & Reynolds.

18          First, Mr. Mark Harania (phonetic), was he hired

19   by Mr. Brockman or was he performing work on behalf of

20   Reynolds & Reynolds or another corporation?

21          MS. KENEALLY:  Your Honor, I'm sorry, could you

22   say which document that relates to?  Because there is enough

23   issues here that --

24          THE COURT:  Oh, well, what I have is, throughout

25   the documents, there's a list of one, two, three, four,

1    five, six attorneys that are listed as attorneys and they're

2    identified as attorneys, but what I need to know is whether

3    or not those attorneys were performing work for Reynolds &

4    Reynolds, another entity, or were they performing work for

5    Mr. Brockman individually?  And it's not clear from the

6    privilege log.

7             MS. KENEALLY:  Okay.  I apologize, Your Honor,

8    because you seem to start with one name that I'm not

9    familiar with.

10            THE COURT:  Oh, okay.

11            MS. KENEALLY:  So I'm familiar with the matter,

12   the subject matter of the email, so.

13            THE COURT:  Okay.  Let's see.

14            MS. KENEALLY:  I can look at that individual what

15   the privilege log lists.

16            THE COURT:  Okay.  Well, it's kind of hard to do

17   because I went through -- when I went through all the

18   emails, I identified all of the attorneys that were

19   identified as attorneys in the email, and I need to find out

20   whether -- and because all these emails have said that these

21   emails were sought for purposes of seeking legal advice, and

22   I need to find out whether the individuals were seeking who

23   the legal advice was sought from, were attorneys that were

24   hired for corporations.

25            Well, let's make it easier.  I have a list of four

1   names, five -- one, two, three -- five names:  Mark Harania,

2   Susan George, Gary Evans, Sherry Caplan (phonetic), John

3   Hall, and then Andrew Sutton, who may or may not be a

4   non-lawyer consultant.  I'm not sure.

5          Does Mr. Brockman have an attorney-client

6   relationship with any of those individuals?

7          MS. KENEALLY:  Your Honor, could you say the names

8   again?  I'm sorry.

9          THE COURT:  Sure.  Mark Harania, Susan George,

10   Gary Evans, Sherry Caplan, John Hall, and somebody named

11   Andrew Sutton, and I'm not sure whether Mr. Sutton is a

12   non-lawyer consultant or whether or not he's an attorney.

13          And the reason I'm asking these questions is, is

14   that in your privilege log, you assert that a number of

15   these documents were -- a lot of these emails were

16   communicated by Mr. Brockman for purposes of obtaining legal

17   advice from attorneys.  And these attorneys are listed, but

18   of course, these are all sent from email addresses of

19   Reynolds & Reynolds.  So what I'm trying to find out is

20   whether or not these -- the information -- was the legal

21   advice being sought was being sought for Mr. Brockman

22   individually or was it being sought on behalf of Reynolds &

23   Reynolds?

24          Like, for example, some of the emails, it's clear

25   that it was Mr. Brockman who was requesting the legal

1  services for him individually as a Director or Officer of

2  the corporation.  I don't have a problem with that.

3          But what I was trying to figure out is, with any

4  of these other lawyers, does Mr. Brockman have an individual

5  attorney-client relationship with?

6          So I just need to know -- and --

7          MS. KENEALLY:  Okay.

8          THE COURT:  And that's the question I need to

9  know.

10          MS. KENEALLY:  May I respond to this, Your Honor?

11          THE COURT:  Sure.  And I know that --

12          MS. KENEALLY:  May I respond to this, Your Honor?

13          THE COURT:  Oh, I'm sorry.  I didn't --

14          MS. KENEALLY:  May I address it?

15          THE COURT:  Oh, no.  I didn't hear you.

16          MS. KENEALLY:  I was apologizing because I kept

17  track of the information on a document-per-document basis.

18          THE COURT:  Oh, okay.

19          MS. KENEALLY:  I can answer right now as to Gary

20  Evans and Sherry Caplan and Andrew Sutton.

21          THE COURT:  Okay.

22          MS. KENEALLY:  Gary Evans is an attorney who

23  provided legal advice in connection with the company

24  Hardwick, that is owned by Reynolds & Reynolds and at the

25  time was owned 1 percent by Mr. Brockman.

1              THE COURT:  Okay.

2              MS. KENEALLY:  So he was giving legal advice to

3   the common point.  He was counsel for both because he was

4   giving legal advice to Hardwick, which was owned by Reynolds

5   & Reynolds and Mr. Brockman.

6              THE COURT:  Okay.  And that was something else I

7   was curious about.  So these companies that Mr. Brockman has

8   a 1 percent interest in, when did he acquire the 1 percent

9   interest in those companies?  Do you know?  I mean, offhand?

10             MS. KENEALLY:  The only company -- I apologize.

11  The only company that I know is at issue that being

12  Hardwick.

13             THE COURT:  Okay.

14             MS. KENEALLY:  And again, precisely when he

15  acquired the interest, I don't know, but I'm sure is that

16  that's the wealth of these documents (indiscernible) getting

17  them.

18             THE COURT:  Okay, great.  So we know Mr. Evans was

19  the aviation attorney, and he was providing legal advice to

20  Hardwick Properties, which Mr. Brockman has a 1 percent

21  interest in.  Got that one, okay?

22             And then you said there was another one?

23             MS. KENEALLY:  Right.  He was giving legal advice

24  to both.

25             Sherry Caplan is -- she gives advice and

1    instruction to transactions and she may have been -- I note

2    similarly that Ms. Caplan has direct attorney-client

3    relationship with Mr. Brockman, as well as these other

4    clients.

5         THE COURT:  Okay.

6         MS. KENEALLY:  Then I actually know that she had

7    (indiscernible) so I know she is giving advice directly to

8    Mr. Brockman.

9         THE COURT:  Okay.  And was it one question -- and

10   this wasn't clear.  Was she giving advice to Mr. Brockman as

11   an individual or as a Director and Officer of Reynolds &

12   Reynolds or another corporation?

13        MS. KENEALLY:  As an individual.

14        THE COURT:  Okay.

15        MS. KENEALLY:  In connection with an anticipated

16   structure and then beyond that structure (indiscernible),

17   but to him as individual (indiscernible).

18        THE COURT:  Okay.

19        MS. KENEALLY:  And then eventually he may have

20   received the new forms.

21        THE COURT:  Okay.

22        MS. KENEALLY:  But her relationship was directly

23   with him as an individual.

24        THE COURT:  Okay, great.  Because one of the

25   things I as concerned about is the way that you guys have

1   classified or consider the attorney-client privilege is that

2   basically anytime two businessmen get together and talk

3   about a potential deal, you guys cloak that with attorney-

4   client privilege because you argue that it's in anticipation

5   of eventually putting together corporations or business

6   deals that will involve the lawyers.

7          I think that's a little bit too broad.  I don't

8   think the attorney-client privilege is that broad in scope,

9   but that's your argument and I'm going to consider it for

10  purposes of this hearing, but that's why I really wanted to

11  focus in on these folks that are lawyers.  You know, what

12  was -- who they represent?

13         So we've got Gary Evans.  We've got Sherry Caplan.

14  Anyone else?  Either Susan George or --

15         MS. KENEALLY:  Yes.

16         THE COURT:  Okay.

17         MS. KENEALLY:  Mark Reyna (phonetic) -- I want to

18  be careful about this one.  I mean, I'm careful about

19  everything, but I want to make sure I understand.

20         THE COURT:  Okay.  I guess -- well, it's a real

21  easy question.  I don't want to put you on the spot.

22         Was he providing information to Mr. Brockman?  Did

23  Mr. Brockman have an attorney-client relationship with him

24  outside of his role as a Director and Officer of either

25  Reynolds & Reynolds or any other corporation, either

1  Reynolds & Reynolds, Nehemiah Securities, Nehemiah Holdings,

2  Falcado (phonetic) Fund, Hardwick Properties, or Redstone

3  Group?

4           MS. KENEALLY:  Again, I think he's still with

5  Ms. Caplan.  My understanding is (indiscernible) Caplan in

6  that he provided advice to the parties, each in individual

7  capacities and in the structuring of the transaction and

8  then continued to represent the individuals, as well as the

9  entity, once it was formed.

10          THE COURT:  Okay.  Okay.  And then John Hall?

11          Oh, that was Mark Harania, right?

12          MS. KENEALLY:  That's Mark Harania.

13          THE COURT:  Okay.

14          MS. KENEALLY:  And I (indiscernible) until I have

15  the information.

16          Andy Sutton did represent some people.

17          THE COURT:  Oh, great.

18          MS. KENEALLY:  And to the extent that he is

19  engaged in the email exchanges for the reasons set out in

20  our explanation of the emails, but he's not (indiscernible).

21          THE COURT:  Okay.

22          MS. KENEALLY:  And --

23          THE COURT:  And then John Hall?

24          MS. KENEALLY:  Excuse me, I'm sorry, I apologize.

25  I couldn't find John Hall mixed in my notes.

1          THE COURT:  Oh, okay.

2          MS. KENEALLY:  And so (indiscernible) just like

3    that --

4          MR. VARNADO:  Kathy, did you say Ms. George or

5    Mr. Hall?

6          MS. KENEALLY:  I'm sorry, Susan George.

7          MR. VARNADO:  Yeah, okay.

8          THE COURT:  Okay.

9          MS. KENEALLY:  Susan George -- Susan George is

10   directly above Mr. Brockman, so Mr. Brockman.

11         THE COURT:  Okay.  Got it.

12         And then finally, John Hall?

13         MS. KENEALLY:  Apologize, Your Honor, I just need

14   to put him in the right context.

15         THE COURT:  Sure.

16     (Pause in the proceedings.)

17         MS. KENEALLY:  I apologize, Your Honor.  Is it

18   possible to know which document Mr. Hall is concerning?

19   Because I'm having difficulty finding him.

20         THE COURT:  I don't have it.  I just flagged the

21   names.  I went through.  One of the things I did was I went

22   through the names of everybody who appeared to be an

23   attorney and I don't have it cross-referenced to the exact

24   email for Mr. Hall.  I've got it for some of them, but not

25   Mr. Hall.  That was just a name that popped up.

1          MS. KENEALLY:  You know, I appreciate that.  And I
2     apologize because I thought the documents were in an
3     email-by-email basis.
4          THE COURT:  Oh, okay.  It's no problem.  It sounds
5     like we kind of did it both a different way.  You did it
6     email-by-email, and I have questions about specific people
7     in the emails, so the chain.
8          MS. KENEALLY:  Right.  So as I learned about
9     emails, I put information into what I understood about the
10    background.
11         THE COURT:  Okay.  No problem.  Well, don't worry
12    about Mr. Hall for right now.
13         Here's -- I've looked at these documents very,
14    very carefully and I spent a lot of time pouring through
15    them, and here's what I'm going to do:
16         I found two documents that I find that are
17    definitely privileged, which are Documents Log No. 8 and Log
18    No. 206.  There's no question in my mind that those two are
19    definitely covered by the marital privilege and are not
20    discoverable.
21         With respect to the remaining documents, the Court
22    has reviewed those documents and respectfully to the
23    Government's position, based on the competency hearing, the
24    Court does not believe that those documents are necessary
25    for considering the competency hearing.  So the Court is not

1    going to rule on the -- whether or not the attorney-client

2    privilege and work product privilege applies to those

3    documents at this time.

4           But I will take up the issue following the

5    competency hearing.

6           I have some serious questions about a number of

7    them and I think we need to have a separate hearing to flesh

8    all that out because I understand the Defendant's position,

9    but respectfully just because business people get together

10   to talk about a business deal that eventually involves

11   lawyers, doesn't mean that that conversation is encompassed

12   by the attorney-client privilege.

13          I believe that the Defendant, Mr. Brockman's

14   attorneys respectfully are viewing the attorney-client

15   privilege way broader than it should be, but I think that in

16   order to make a definitive call on that, we need a hearing

17   where I'm going to have to get into these attorneys and

18   these entities because the question is going to whether or

19   not these attorneys are providing information to the

20   corporations or whether they are providing information for

21   Mr. Brockman individually.

22          If they're providing information to the

23   corporation, the case law suggests that the privilege

24   belongs to the corporation, not Mr. Brockman.  So if the

25   privilege is going to be asserted, the corporations have to

1    be here and have to make it known whether or not they're

2    asserting the privilege.

3            Mr. Brockman may not be able to assert those

4    privileges on behalf of the corporation.

5            And with respect to the work that is done by the

6    lawyers that were involved in the case, if Mr. Brockman has

7    an individual relationship with those lawyers outside of the

8    corporation and was communicating for his own purposes, that

9    is to represent him as part of a business deal, then

10   possibly the attorney-client privilege would apply.

11           But if those lawyers were going to provide legal

12   services to a group of folks that Mr. Brockman was just a

13   member of and not specifically Mr. Brockman, then the

14   attorney-client privilege may not apply.

15           So I don't know what the circumstances are and

16   it's going to require getting into each and every email in

17   each and every transaction and find out who the lawyers

18   were, who the corporations were, whether it was

19   communications among business people to eventually seek

20   legal advice on behalf of a corporation -- a specific

21   corporation, in which case that specific corporation can

22   assert or waive the privilege, but not Mr. Brockman.

23           Or whether it was -- whether it was communicated

24   to get information specifically for Mr. Brockman, or whether

25   these lawyers specifically represented Mr. Brockman in these

1    transactions.

2          From the privilege log and the documents I have, I

3    can't tell that.  And I looked very, very carefully to

4    figure out what's going on and it's not clear.

5          So after the competency hearing, Mr. Langston, the

6    Government can re-urge the Court's consideration of the

7    privilege log and then we're going to have to have a

8    separate hearing and get into all those facts, and it's

9    going to require testimony probably because there's no way

10   for me to figure that out without figuring out who these

11   people are and what their roles are.

12         I mean, I have the names of who they are and

13   supposedly what they did, but I don't know -- again, I don't

14   know their role in these transactions.

15         And respectfully, I do not believe the attorney-

16   client privilege is broad enough to include every time

17   business people get together to do a deal, that it's

18   eventually -- that will eventually lead to an attorney

19   getting involved, that that's covered by the attorney-client

20   privilege.  I do not believe that the privilege is that

21   broad.  So we'll have to sort it out later.

22         But for purposes of the competency hearing, Log

23   Nos. 8 and 206 are definitely privileged and will not be

24   disclosed under any circumstances.

25         The other documents, Mr. Langston, you can re-urge

1  that following the competency hearing because after

2  reviewing the documents, I do not believe that the documents

3  in the privilege log are relevant to any of the issues that

4  are going to be raised in the competency hearing before the

5  Court.  So you have permission to re-urge it.

6              MR. LANGSTON:  Thank you, Your Honor.

7              THE COURT:  Ms. Keneally?

8              MS. KENEALLY:  If I may just ask a couple of

9  questions for you?

10             Thank you, Your Honor.

11             To the extent that the documents may be the

12  privilege of other parties, to the extent that the Court is

13  indicating that, are there steps that you would like either

14  of the parties to take to notify other parties' objections

15  to notify other parties that they may have privilege issues?

16             THE COURT:  All right.  Well --

17             MS. KENEALLY:  And I'm not sure that we're in a

18  position to that with all of the potential privilege owners.

19             THE COURT:  Sure.  Well, there are four entities

20  involved -- well, five.  Reynolds & Reynolds is the primary

21  entity.  Nehemiah Securities, Nehemiah Holdings, Falcado

22  Fund, Redstone Group, and then Hardwick Properties, but it

23  sounds like Hardwick Properties, Mr. Brockman had a

24  1 percent interest in, so possibly the -- some of the

25  communications among people within the Hardwick Properties

1   and Mr. Brockman, that might be -- those communications

2   might be for attorney services for all of them together

3   because it's one entity.

4          So he might have been provided -- it's one entity,

5   but he has a 1 percent interest in.  So I'm not sure about

6   Hardwick Properties and we can take a look at those specific

7   emails later, but definitely Nehemiah Securities, Nehemiah

8   Holdings, Falcado Fund, and Redstone Group, I need to know

9   whether or not they are asserting any sort of privilege with

10  respect to any communications that involve them.

11         Because some of the communication, some of the

12  privileges may belong to them because the attorneys were

13  providing information for them, you know, those

14  corporations, but the main one I'm concerned about is

15  Reynolds & Reynolds because a lot of the emails are -- not a

16  lot, but a number of the emails are seeking information from

17  Reynolds & Reynolds for business opportunities that Reynolds

18  & Reynolds is involved in.

19         And those privileges, Mr. Brockman, from what I

20  can tell so far, is that when he was communicating in those

21  emails, he was communicating as a Director and Officer of

22  Reynolds & Reynolds, not in his individual capacity.

23         And if he's communicating as a Director and

24  Officer of Reynolds & Reynolds, then the privilege belongs

25  to the corporation, i.e., the shareholders, not to

1   Mr. Brockman individually, unless, of course, the lawyers

2   that were involved in those communications were individually

3   hired by Mr. Brockman.

4         There are some circumstances where I saw where

5   there were law firms that were hired specifically by

6   Mr. Brockman, even though he was operating as a Director or

7   Officer of the corporation.  He was -- the law firm was

8   hired for him specifically.

9         And there was an attorney-client privilege

10  specifically between him and the law firm.

11        So again, mainly I need to know whether Reynolds &

12  Reynolds is asserting attorney-client privilege as to any of

13  these documents that they appear on.

14        And then Nehemiah Securities, Nehemiah Holdings,

15  Falcado Fund, Redstone Group, and then Hardwick Properties,

16  I'm not sure about.  Find out anyway because I don't know,

17  but if Mr. Brockman was a 1 percent owner, then it could

18  technically be for his individual benefit, as well.

19        MS. KENEALLY:  Your Honor, I just wanted to get on

20  this call in order to ask because someone just

21  (indiscernible) to reach out to those other parties to

22  address this because we're not in a position to assert those

23  privileges.  And you know, they may build a defense

24  (indiscernible).

25        MR. LANGSTON:  And we're happy to have a

1  discussion with the Defense Counsel regarding this issue

2  after the competency hearing.

3          THE COURT:  Okay.  Well, talk to him about it.

4  And like I said, for right now I think you guys need to

5  focus on the competency hearing because the information in

6  the emails is not relevant to the competency hearing.  And

7  I've looked at them very carefully.

8          They may become relevant at a later date after the

9  competency hearing, but they're not relevant at this stage.

10          The only ones that -- as in I can go on the Record

11  and specifically state are not discoverable under the

12  marital privilege is Log Nos. 8 and 206.  Those are

13  definitely not discoverable under any circumstances.

14          The others, it depends on the circumstances and

15  we're going to have to have -- I have to have more facts on

16  those before I can rule whether or not the privilege applies

17  or doesn't apply because unfortunately -- not unfortunately,

18  but this isn't a case where Mr. Brockman was communicating

19  directly with a lawyer.  Almost all of these emails have

20  third parties involved.

21          So the question becomes:  Is Mr. Brockman

22  communicating as a Director and Officer of the corporation

23  to seek legal advice on behalf of the corporation, which

24  means that the corporation -- for example in this case,

25  Reynolds & Reynolds -- has the privilege and it's theirs to

1  assert or waive, not Mr. Brockman -- unless, of course,

2  those cases, as I said, the attorneys have an individual

3  relationship with Mr. Brockman, and those communications

4  were made for his individual purposes, as opposed to for

5  corporate business.

6          And I don't know that based on the information

7  that's provided in the privilege log.  I need more

8  information.

9          Similarly with Nehemiah Securities and Nehemiah

10  Holdings, I don't know when they're on the call -- I mean,

11  on the email, whether or not it's just businessmen talking

12  about business deals, which this seems to be what they're

13  talking about, which eventually led to folks getting

14  attorneys involved to do business deals.

15          Or whether it was Mr. Brockman specifically

16  seeking legal advice with respect to his position in these

17  business deals.

18          I don't know which one they are.  I need to --

19  quite frankly, I need more information.

20          But at this time, as I said, this needs to be

21  handled later on down the road.  Right now you guys need to

22  focus on the competency hearing and none of the documents,

23  again, are relevant to the competency hearing.

24          MS. KENEALLY:  Sorry, Your Honor.  Thank you very

25  much.  And I will pass on that addressing the specific

1  issues now and we'll have another opportunity and it's

2  helpful to understand what role the Court will be.

3           We do have an issue related to the competency

4  hearing.

5           THE COURT:  Okay.

6           MS. KENEALLY:  We'd like to discuss briefly?

7           THE COURT:  Sure.

8           MS. KENEALLY:  So, Your Honor, we received the

9  Government's Supplemental Expert Reports on Saturday.

10          THE COURT:  Okay.

11          MS. KENEALLY:  And we looked at them at least a

12  couple of times through and the supplemental reports were --

13  we provided the Government their request and opportunity to

14  (indiscernible) Mr. Brockman again because they have

15  questions as to the change in Mr. Brockman's condition that

16  he has prevents him, and they're asking questions about the

17  (indiscernible) should post to a medical event, so again,

18  Mr. Brockman is fully examined again.

19          Two of the Government's reports leave an

20  impression for us as to whether they actually have

21  (indiscernible).  And I'll assert that that could be

22  contempt of Court in (indiscernible) negotiations than

23  (indiscernible) involved.

24          Document details, which I think everybody can

25  read, and as we discussed before the Court in between the

1   first examination by the Government and today, Mr. Brockman

2   has had two hospitalizations that resulted in

3   (indiscernible).  Under surgery and anesthesia and they have

4   these (indiscernible) issues, we've done subject to do an

5   examination that is consistent with (indiscernible)

6   Alzheimer's.  The Government's expert notes the facts and it

7   (indiscernible) to say that a gift throws into question

8   Mr. Brockman's current cognitivability and those aspects

9   could stand trial and clarify (indiscernible).  We agree.

10       (Laughter.)

11            THE COURT:  All right.

12            MS. KENEALLY:  He also then says that the

13   observations of Mr. Brockman's friends and family were to be

14   created.  He actually goes on to say I enjoin the Defense

15   experts in considering him too demented to assist counsel in

16   the course of a trial.

17            And I agree (indiscernible) true in court.

18            He then says -- the questions from the Government

19   (indiscernible) submission is whether Mr. Brockman is

20   malingering, whether this is (indiscernible) of the symptom

21   that would be subjecting him (indiscernible).

22            And he asks again -- he says that basically to one

23   of those at this level, it would be a Herculean task, but he

24   kind of eliminates that Mr. Brockman is capable of a

25   Herculean task.

1          And then he goes on to say -- at least to the

2    Court, "To my dismay, I am unable to distinguish between

3    these possibilities, but remain hopeful that the reports

4    scheduled to be exchanged today" -- which it's debatable

5    (indiscernible) -- will lend clarity.

6          And Dr. Dietz already similarly said it -- and

7    this is a quote, that "He is unable to determine whether

8    Mr. Brockman's health is (indiscernible), cognitive

9    impairments severe enough to (indiscernible)."

10         So what we have here are two expert reports that

11   we received on Saturday at the same time that our submission

12   (indiscernible) that go into testimony.

13         Which should, since they're in the Government's

14   expert reports are saying that they don't have a final

15   determination, and Dr. Dietz, in particular, is saying he's

16   hoping to look (indiscernible) with everybody exchanging

17   those (indiscernible) to see if it lends clarity.

18         So we believe the hearing today and we don't

19   actually see how a final decision by the Government's

20   expert.  If these are your final reports, if they do not

21   intend to supplement further and they intend to testify to

22   assisting (indiscernible) then I think we're fine, but the

23   -- if they're going to review further the exchange of

24   reports now, in hope of some clarity with some changed

25   positions, we are entitled to know that sufficiently to

1    prepare.

2           So I would ask that a short date be set for the

3    Government to tell us whether Dr. Dietz needs more clarity,

4    whether his position is going further in one way or the

5    other, or whether he and Dr. Darby intend to remain this

6    degree of uncertainty (indiscernible).

7           THE COURT:  Okay.  Mr. Langston, I mean, I guess I

8    listen, what I thought I heard -- and maybe I was wrong --

9    was that basically -- well, let me let you argue it 'cause

10   maybe I understood it incorrectly.

11          So present -- you may --

12          MR. LANGSTON:  Your Honor, the Government's

13   position remains that the Defendant be held

14   (indiscernible).  In this case the medical testimony is

15   somewhat complicated by the fact that the Defendant has been

16   malingering for years.  We think that the extrinsic evidence

17   in this case is going to be clear that he fooled no fewer

18   than four doctors throughout 2019, who all found him to be

19   not competent to stand trial and to have advanced body

20   dementia at the same time, he's running his company, he is

21   engaging in, you know, acts in his real life that he is

22   claiming and members of his family are claiming that the

23   doctor said he is simply not capable of doing.

24          All of the Government's experts in this case

25   believe the Defendant was competent in May.  They believe

1    that he was significantly exaggerating his symptoms in May.

2           The Defense is correct that Dr. Dietz and

3    Dr. Darby are (indiscernible) people that have their own

4    opinion based on the available evidence that we have now.

5           So if Dr. Dietz believes he is competent, we

6    believe that with the (indiscernible) the Government had the

7    opportunity present it to the Court, of course, then that

8    would (indiscernible).

9           Obviously to the extent that Dr. Dietz or

10   Dr. Darby update their opinion, we'll certain update counsel

11   and the Court.  We have no reason to believe as of today

12   they would.

13          THE COURT:  Okay.  Because what I was hearing, I

14   thought is that if there's anything further that develops,

15   then Dr. Park -- I mean, Dr. Dietz would update his report,

16   but that's what I thought I heard when you read to me the --

17   Ms. Keneally, the language from the report.

18          So I guess, Mr. Langston, the issue is if there's

19   going to be -- if based on what you know right now, the

20   experts have additional opinions, you need to, of course,

21   supplement your reports.

22          But if there's something that comes our later from

23   Mr. Brockman's experts, either in a report or I guess on the

24   stand if they testify, then your experts, of course, can

25   respond to that.

1            That's kind of what I --

2            MR. LANGSTON:  That's right.

3            THE COURT:  That's what I understood.

4            MS. KENEALLY:  May I be heard briefly?

5            THE COURT:  Sure.

6            MS. KENEALLY:  Your Honor, in Dr. Dietz's report

7     says that "He remains hopeful that the reports scheduled to

8     be exchanged today will lend clarity."  That's what he says.

9            THE COURT:  Right.

10           MS. KENEALLY:  So he's essentially saying the

11    thing that he was waiting for was to see all the other

12    expert reports.

13           THE COURT:  Right.

14           MS. KENEALLY:  The Government now has our expert

15    report --

16           THE COURT:  Ah, okay.

17           MS. KENEALLY:  -- they have only to remain

18    (indiscernible) their expert reports, they're not really

19    sure our experts before Dr. Dietz testifies because the

20    Government has been approved to go first.

21           THE COURT:  Right.

22           MS. KENEALLY:  There's been nothing more that

23    we're aware of that Dr. Dietz or Dr. Darby will receive

24    between now and two weeks from today that will alter -- will

25    provide them more information.

1            THE COURT:  Okay.

2            MS. KENEALLY:  So they don't need to acknowledged

3    that they do.  I mean, if we get more medical testing or

4    something happens because Mr. Brockman is not a well man and

5    he's seeing doctors a lot, producing more medical

6    information we provide it every day.

7            THE COURT:  Right.

8            MS. KENEALLY:  But at this point it seeks to ask

9    the Government by some date this week to provide us with a

10   written supplement from each of these experts if there is

11   going to be.  And if there's not, then we're fine with these

12   reports.  They can testify from these reports and we'll

13   cross-examine accordingly, of course.

14            But if Dr. Dietz is going to find clarity from the

15   other expert reports that he already has, I think it's time

16   for the Government to get that position defined.

17            THE COURT:  All right.  And I guess maybe,

18   Mr. Langston, can you respond?  I thought that that's what

19   everybody is going to do, but maybe I'm not hearing this

20   correctly.  It sounded like if there's anything more -- if

21   there's anything that needs to be supplemented based on what

22   you know right now, it needs to be done now.

23            But if there's any information that you receive

24   later, then you can obviously supplement later based on the

25   newly received information.

1          So Mr. Langston, is --

2          MR. LANGSTON:  Yes.

3          THE COURT:  -- based on what you have right now,

4   do you plan on supplementing your expert reports?

5          MR. LANGSTON:  No, Your Honor.

6          THE COURT:  Okay.

7          MS. KENEALLY:  Thank you.

8          THE COURT:  Then Ms. Keneally, I think that

9   answers the question, unless, of course, there's any

10  supplemental medical records or any information provided by

11  your experts, in which case Mr. Langston's experts can

12  respond to.

13         MS. KENEALLY:  Understood, Your Honor.

14         THE COURT:  Okay.

15         MS. KENEALLY:  That completes my question.

16         THE COURT:  Okay.  That seems to make sense to me.

17         MS. KENEALLY:  Thank you.

18         THE COURT:  Okay.

19         MR. LOONAM:  I'm sorry.  Can we just confirm that

20  both Dr. Dietz and Dr. Darby will be available to testify at

21  the hearing?

22         MR. LANGSTON:  They will be.

23         MR. LOONAM:  Thank you.

24         THE COURT:  Okay.  Okay.  Is there anything else

25  we need to talk about this afternoon, status-wise?

1          Mr. Varnado?  Mr. Langston?

2          MR. LANGSTON:  I don't think so, Your Honor.

3          THE COURT:  Okay.

4          MR. VARNADO:  No, Your Honor.  Thank you very

5    much.

6          THE COURT:  Okay.

7          MS. KENEALLY:  Thank you, Your Honor.

8          THE COURT:  Okay, great.  Well, we'll set another

9    status conference possibly before the competency hearing

10   just to make sure that we're all -- we've got everybody

11   lined up as far as experts to testify and that sort of

12   things.

13         If there's a problem with anybody's schedule,

14   please let me know.  I blocked off the time for you.  I

15   won't have anything else going on, so we can get the hearing

16   done start to finish.

17         And then --

18         MR. VARNADO:  Your Honor, now that you mention

19   that, that does flag an issue I'm trying to -- Mr. Varnado

20   for Mr. Brockman.

21         We may have a witness, it's a doctor here in

22   Houston named Eugene Lye (phonetic) who may have a need to

23   testify at a particular time and it might even be like

24   5:00 p.m. on a particular day.  He's very busy.  We're all

25   busy.  This doctor has got some -- for impeachment reasons,

1  may need some kind of accommodations, so I think we

2  mentioned this before.

3          THE COURT:  Okay.

4          MR. VARNADO:  And this is a doctor that was on the

5  Government's Witness List.  They've now taken him off, so

6  we've taken steps to secure his appearance, but I wanted to

7  just flag that and mention that.  We mentioned there may be

8  some medical professionals, maybe out of order or on a date

9  certain.  I just flag that for the Court and hopefully the

10 Government will be willing to work with us on that and get

11 Dr. Lye's testimony on.  I don't think it would be really

12 tremendously lengthy, but he has asked for that

13 accommodation and I said I would raise it with the Court if

14 we could try to get a date certain.

15         THE COURT:  Sure.  Can you guys work to see if you

16 can get that agreed upon among yourselves?  You know,

17 there's no jury involved, it's just me.  So taking folks out

18 of order is not a problem.  I'll remember the testimony.

19 That's not going to be an issue.

20         So just see if you can work it out.  If you can't,

21 we'll talk about it, but I bet you can probably agree to

22 some dates and time to accommodate everyone's schedule,

23 because I mean, you-all have been around long enough, what

24 goes around, comes around.  You accommodate someone so they

25 can accommodate you later on, so that's just the way it

1   goes.

2            'Cause you may need the same favor from --

3   Mr. Langston, you may need the same favor of Mr. Varnado

4   someday, so I'm sure you guys will work it out.

5            MR. LANGSTON:  Yes, Your Honor.

6            THE COURT:  Okay.

7            MR. VARNADO:  Very good.  Thank you, Judge.

8            THE COURT:  Great.  And Mr. Loonam, did you want

9   to say something else?  You looked like you were.  Okay.

10           Great.  Ms. Keneally?

11           MS. KENEALLY:  No.  Thank you, Your Honor.

12           THE COURT:  Great.  And Mr. Langston?

13           MR. LANGSTON:  No.   Thank you, Your Honor.

14           THE COURT:  Great.  Okay.  Well, thanks again for,

15  as I said, accommodating the Court's schedule.  We've been

16  really, really busy lately and the only time we could have

17  time is after hours, so thank you for your patience and I

18  hope to see you in a couple of weeks.

19           Take care, everyone.

20       (The parties thank the Court.)

21           THE COURT:  Good-bye.

22       (Proceedings adjourned at 6:03 p.m.)

23

24

25                        *  *  *  *  *

1            *I certify that the foregoing is a correct*

2    *transcript to the best of my ability produced from the*

3    *electronic sound recording of the ZOOM/telephonic*

4    *proceedings in the above-entitled matter.*

5    */S/ MARY D. HENRY*

6    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

7    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

8    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

9    *JTT TRANSCRIPT #64761*

10   *DATE FILED:  NOVEMBER 4, 2021*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25