# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION



| UNITED STATES OF AMERICA, | § | Cr. No. 4:21cr 009 GCH |
|---|---|---|
| Plaintiff, | § | |
| v. | § | |
| ROBERT T. BROCKMAN, | § | |
| Defendant. | § | |

## UNITED STATES' HEARING MEMORANDUM

The United States, by and through its attorneys, respectfully submits this Memorandum summarizing its expected presentation, and highlighting anticipated evidentiary issues that may arise during the Competency Hearing in this matter scheduled for November 15, 2021.

### Table of Contents

| | | |
|---|---|---|
| I. | Procedural Posture | p2 |
| II. | Legal Standard | p4 |
| III. | Case Summary | p5 |
| IV. | Evidentiary Issues | p11 |
| | A. Emails obtained through Mutual Legal Assistance Treaty | p11 |
| | B. Evidence of Motive to Exaggerate Symptoms | p13 |
| | C. Dr. Yudofsky Expected Invocation of his Fifth Amendment Rights | p15 |
| V. | Conclusion | p17 |

I. **PROCEDURAL POSTURE**

On October 1, 2020 the Defendant was charged in a 39-count sealed indictment in the Northern District of California, charging conspiracy to defraud the United States government, tax evasion, wire fraud, money laundering and failure to file with the United States government reports of foreign banking activity ("FBAR"). *United States v. Brockman, 3:20cr371 WHA (NDCA)*. On October 13, 2020, the Indictment was unsealed, and on October 15, 2020, the Defendant entered his initial appearance before Magistrate Judge Nathanael Cousins. On December 8, 2020, Defendant filed a motion for a competency hearing pursuant to 18 U.S.C. § 4241. *See* 20-cr-371 (N.D. Cal.) ("NDCA") *Dkt. No. 64* (the "Motion"). On December 15, 2020, the government filed its response to Defendant's Motion (the "Response") agreeing that a competency hearing is appropriate in this case. *See NDCA Dkt. No. 69*. On January 4, 2021, this case was transferred from the Northern District of California to this Court. *See NDCA Dkt. No. 76*.

By agreement, on May 18, 19, and 20, 2021 the Defendant was examined and interviewed by the governments' expert witnesses – Drs. Park Dietz, Robert Denney, and Ryan Darby. Dr. Denney, a neuropsychologist, administered a cognitive test to the Defendant on May 19, 2021. Dr. Dietz, a psychiatrist, interviewed the Defendant, as did Dr. Darby, a neurologist. Dr. Darby also ordered and reviewed medical imaging (PET scans) and two sleep studies. On June 21, 2021, copies of Drs. Dietz, Denney and Darby's reports were provided to the Defendant's counsel, and on June 25, 2021 they were filed with the Court under seal. *Dkt. No 72.* Drs. Dietz, Denney and Darby all concluded that although the Defendant is suffering from Parkinson's Disease, he is competent to assist his attorneys on the pending charges, and is malingering, and/or exaggerating his symptoms of cognitive decline.

Since the Defendant filed his motion for a Competency hearing, the government is aware of the Defendant undergoing the following medical testing. Drs. Darby and Ponisio's initial and supplemental reports discuss and analyze the results of these medical tests and imaging.

| Date | Test |
|---|---|
| March 21, 2021 | FDG - Pet Scan |
| April 29, 2021 | Polysomnography Sleep Study |
| June 6, 2021 | MRI |
| July 28, 2021 | Amyloid PET Scan |
| July 30, 2021 | MRI |
| August 24, 2021 | FDG - PET Scan |
| August 12-13, 2021 | Second Polysomnography Sleep Study |
| September 2, 2021 | EEG |
| September 15, 2021 | CT Scan |

In addition, the Defendant was hospitalized on May 31, 2021 to June 11, 2021 with a urinary tract infection ("UTI"), and on June 24, 2021 underwent an elective surgical procedure called a "UroLift." The defendant was hospitalized again on September 15, 2021 with a second UTI. The government was informed the following week that the Defendant fully recovered from this second infection.

On July 11, 2021, approximately three weeks after the Defendant received the government's experts' written reports, the Defendant was interviewed by his expert witness, Dr. Marc E. Agronin, a psychiatrist, and on July 14 -15, the Defendant's expert witness, Dr. Thomas J. Guilmette, a neuropsychologist, administered a cognitive test. Drs. Agronin and Guilmette prepared written reports of their interviews and testing of the Defendant, copies of which were provided to the government on August 6, 2021. Both Drs. Agronin and Guilmette concluded that the Defendant was not competent to assist his counsel in a meaningful way at trial.

On September 13, 2021, a status conference was held, during which, at the parties' request, the Court re-scheduled the Competency Hearing for November 15, 2021. *Dkt. No. 136 Court's Minute Order.* On October 20, 2021, again by agreement of the parties, Drs. Dietz and

Denney conducted a supplemental interview and examination of the Defendant. Dr. Denney completed his testing of the Defendant on October 26, 2021. On October 29, 2021, the Defendant's expert witnesses completed their expert witness reports which were filed under seal. *Dkt. Nos. 172, 173, 174, and 175.* On October 30, 2021, Drs. Dietz, Denney and Darby completed their supplemental reports which were also filed under seal with copies proved to Defendant's counsel. *Dkt. Nos. 176, 177, and 178.* On November 1st and 4th, Drs. Denney and Dietz filed revised supplemental reports respectively, copies of which were also provided to the Defendant's counsel. *Dkt. Nos. 179 and 185.* Drs. Dietz and Denney again concluded that the Defendant is competent to assist his attorneys in defense of the charges contained in the Indictment, and that he is malingering, and/or exaggerating his symptoms. Dr. Darby concluded that the Defendant exhibited signs of Parkinson disease, however, it is not likely he has progressed to "severe or end-stages of dementia." That the Defendant "continued to demonstrate cognitive impairment beyond what would be expected from his dementia based on the natural disease progression and neuroimaging findings." Dr. Darby also concluded that the Defendant's current assessments do not accurately reflect his true level of cognitive impairment, and therefore, he is unable to determine if the Defendant is competent to stand trial.

## II.     LEGAL STANDARD

The question before the Court is whether the Defendant is competent to assist his counsel in his own defense. *See* 18 U.S.C. § 4241. Inherent in this question is the ancillary issue of whether the Defendant is malingering, fabricating his condition, and/or exaggerating his symptoms of mental and cognitive decline in an attempt to avoid prosecution. It is a violation of a defendant's right to Constitutional Due Process to be tried on pending charges if said defendant is not "competent." *See United States v. Pervis*, 937 F.3d 546, 553 (5th Cir. 2019). In the Fifth Circuit, the government carries the burden of proving by a preponderance of the evidence that a defendant is competent to assist his counsel in his defense of the charges contained in an Indictment. *United States v. Hutson*, 821 F.2d 1015, 1018 (5th Cir. 1987). In making its determination, the Court may consider not only expert medical testimony, but also the Court's

own observations of the defendant, and "the observations of other individuals that have interacted with the defendant." *United States v. Pervis*, 937 F.3d at 553, *quoting United States v. Simpson*, 645 F.3d 300, 306 (5th Cir. 2011). *See also United States v. Gigante*, 166 F.3d 75, 94 (2d Cir. 1998)(despite conclusions of expert witnesses that defendant was incompetent to stand trial, based on testimony of lay witnesses, Court found defendant was malingering and competent to stand trial). A defendant's Fifth and Sixth Amendment rights are not violated by the introduction of psychiatric reports, psychological testing, or other statements made during a competency hearing. *Buchanan v. Kentucky*, 483 U.S. 402, 423, 107 S.Ct. 2906, 2918 (1987). Generally, such evidence introduced during a competency hearing is not admissible during a trial on the merits. *Id.*

### III.  CASE SUMMARY

The government expects to present evidence that the Defendant is feigning severe dementia to avoid prosecution in this case. The government contends that this ruse began in or about 2016 when the Defendant learned about the government's criminal investigation into his ownership and control of a complex web of foreign entities holding billions of dollars of unreported taxable income in foreign bank accounts. The evidence at the competency hearing will show that for the last three years the Defendant has been living a double life. In exam rooms, law offices, and courtrooms, the Defendant claims to be suffering from cognitive impairment so severe that he cannot assist his attorneys in his own defense. In the real world, however, the Defendant remained firmly at the helm of Reynolds & Reynolds, a 5,000-person, multinational company at a salary of more than $1 million per month until after he was indicted.

The government will present to the Court evidence that although there is some indication that the Defendant is suffering from Parkinson's disease, and has some other medical infirmities, he is consciously exaggerating his symptoms of cognitive impairment, is malingering, and is competent to stand trial. The government's evidence will be divided into three categories: 1) the testimony of the government expert witnesses Drs. Park Dietz, Robert Denney, and Ryan Darby; 2) the observations of lay witnesses – in the form of both testimony and contemporaneous

emails; and 3) the Defendant's motivation to feign dementia to avoid prosecution.

The government's expert witnesses, Drs. Dietz, Denney and Darby are expected to testify that the Defendant does appear to be suffering from Parkinson's disease and perhaps some mild cognitive impairment ("MCI"), but that their examinations and testing reveal that the Defendant is not as impaired as he presents himself. These conclusions are based on objective medical imaging, psychological testing, interviews of the Defendant, and reviews of collateral, non-medical, evidence. Unlike the psychological testing and interviews conducted by the Defendant's medical experts, Drs. Dietz, Denney and Darby considered and reviewed: 1) some of the evidence in the criminal case; 2) the context of the initial psychological evaluations of the Defendant in 2019, which form the basis of the Defendant's Motion culminating in this hearing; and 3) the Defendant's motivation to exaggerate and/or fabricate symptoms of dementia to avoid prosecution. Dr. Darby's testimony will also be based, in part, on reports written by Dr. Maria Ponisio, a neuroradiologist, who reviewed the Defendant's medical imaging and, in collaboration with Dr. Darby, prepared a report of her findings. Unlike Drs. Dietz, Denney and Darby, Dr. Ponisio never met or interviewed the Defendant.

A review of the relevant timeline makes clear that the Defendant has been exaggerating his medical condition for years. First, the Defendant initially sought treatment for his alleged illness the day after the search warrant at his co-conspirator's house, Evatt Tamine (Individual One in the Indictment), was executed – September 5, 2018. Second, the government intends to present evidence that in 2019, contemporaneous to the medical evaluations of the Defendant by Drs. York, Yu, Pool and Jankovic, which formed the basis of the Defendant's Motion for a Competency Hearing, the Defendant was deposed in two civil cases, on January 16-17, 2019, and again on September 18-19, 2019.[1] Third, in or about November 2019, the Defendant gave a speech to his Reynolds & Reynolds employees in which he did not display the same cognitive

---

[1] These civil cases concern allegations of non-competitive pricing by the Defendant's company, Reynolds & Reynolds – the details of which, other than the Defendant's behavior and conduct at these depositions, are not material to these proceedings.

decline observed and noted by Drs. York, Yu, Pool and Jankovic. During the Defendant's depositions in 2019, the Defendant exhibited a demeanor and behavior completely different from that presented to Drs. York, Yu, Pool, and Jankovic. The January 16-17, 2019 deposition, and the speech in November in 2019, were video recorded.

The government intends to present evidence that during the Defendant's depositions in January and September 2019, which each lasted two days, the Defendant had excellent command of some very technical software and business matters, and an excellent memory of relevant historical facts. It is expected that these witnesses will testify that the Defendant provided more than satisfactory responses to the questions posed, and never raised any concerns about memory or any medical conditions that would prevent him from accurately being deposed. Moreover, the timing of these 2019 depositions makes the Defendant's behavior during his examinations by Drs. York, Yu, Pool, and Jankovic highly suspect. The depositions in which the Defendant displayed a very high level of competence were within weeks of the medical evaluations in which he convinced the examining doctors that he was legally "incompetent." See the timeline below:



The fact that the Defendant was apparently able to deceive these four doctors over a span of 12 months is extremely relevant to these proceedings, particularly since the Defendant's expert witnesses, Drs. Guilmette and Agronin, rely on these 2019 medical reports in reaching their own conclusions. The government's expert witnesses, Drs. Dietz and Denney, are expected to address the differences in the Defendant's behavior during his 2019 depositions and his 2019 medical examinations and how it influences their conclusions. The contention that the Defendant is malingering and exaggerating his symptoms will be corroborated, in part, by contemporaneous emails from his company, Reynolds & Reynolds a/k/a Universal Computer Systems Holding ("UCSH"). In addition, the government intends to introduce evidence that the timing of the Defendant's "onset" of cognitive debilitation is probative of a motive and intent to fabricate. In short, the government expects to introduce evidence that the Defendant's knowledge of this criminal investigation, awareness of the importance of the evidence received from Evatt Tamine, and his ongoing intent to conceal his dominion and control of his "trust," the A. Eugene Brockman Charitable Trust ("AEBCT") and its subsidiaries, provides a motive for his feigned mental incompetency.

The government will introduce evidence that the Defendant is likely to have learned about this criminal investigation as early as September 2016. The government's investigation began with an investigation of the Defendant's business associate Robert F. Smith, and his lawyer Carlos Kepke.[2] On September 15, 2016, a grand jury subpoena was issued to Smith's company Vista Equity Partners, in which the Defendant, through the AEBCT, and its subsidiary Point Investments Ltd. ("Point"), was the largest investor. Crucially for the Defendant, this

---

[2] The government's case against Robert F. Smith was concluded on October 9, 2020 with a Non-Prosecution Agreement under which Smith agreed to cooperate with the ongoing investigation and pay all past due income taxes, including substantial interest and penalties, totaling over $180 million. On April 15, 2021, Kepke was indicted in the Northern District of California on charges of conspiracy and aiding and abetting Smith in filing materially false income tax returns. *United States v. Kepke, 3:21cr155 JD (NDCA).*

subpoena sought information about the investors of Vista, including the Defendant. On August 15, 2018, a search warrant was executed at Kepke's home/office on Sage Road in Houston. The government will introduce evidence that the Defendant was a Kepke client for several decades, and that on the day of the Sage Road search warrant, Evatt Tamine informed the Defendant about the search warrant and told the Defendant that Tamine and the Defendant's names appeared in the warrant. Then, on September 5, 2018, the Bermuda Police Service ("BPS") executed a search warrant at the Bermuda home of Evatt Tamine.[3] The Defendant was also made aware of the BPS search warrant at Tamine's home in Bermuda.

The search of Tamine's house was a turning point for the Defendant. Tamine personally managed the Defendant's offshore trust structure and was directly employed by the Defendant from 2004 until 2018. The Defendant paid Tamine an annual salary, prepared his annual performance reviews, and gave him annual "To Do" lists directing his activities as the purported "trustee" of the AEBCT. One of Tamine primary responsibilities was to ensure that the Defendant's name was not associated with the AEBCT and its foreign subsidiaries. The AEBCT foreign subsidiaries were used to conceal, in foreign bank accounts, billions of dollars of unreported taxable income derived from economic activity in the United States, as directed by the Defendant. Tamine is expected to testify that at all times the AEBCT, and its foreign subsidiaries, were under the complete dominion and control of the Defendant, and that the Defendant made all substantive decisions in their regard – particularly with regard to Point and the investments in Vista, which netted approximately $2 billion in profit from 2000 to 2018. More importantly, Tamine's home in Bermuda, where the BPS search warrant was executed on September 5, 2018, contained computer drives and storage devices with more than fourteen years of records concerning the Defendant's scheme to evade taxes including thousands of encrypted

---

[3] On September 25, 2018 the government submitted a treaty request for copies of the documents seized by BPS. These documents underwent an extensive "privilege review" supervised by the Court in Bermuda. In or about April 2020, copies of these documents and emails were provided to the government, copies of which were also provided to the Defendant.

emails between the Defendant and Tamine, fraudulent documents supporting the scheme, and clear evidence of Defendant's control over the AEBCT and its subsidiaries. It is also expected that Tamine will testify about the Defendant's penchant for secrecy, fabrication of false "paper trails," and the Defendant's intense dislike of the United States Internal Revenue Service ("IRS"). Tamine will testify that the Defendant and Dr. Stuart Yudofsky, upon whom the Defendant bases, in part, his Motion for a Competency Hearing, have a long-standing personal relationship, which includes Dr. Yudofsky's knowledge of the Defendant's dominion and control over the AEBCT and its assets. Tamine's expected testimony will be corroborated by emails between the Defendant and Tamine.

The evidence will show that on September 6, 2018, the day after the Defendant learned of the BPS search warrant on Tamine's home in Bermuda, the Defendant reached out to Dr. Lerner and made an appointment with Dr. Lerner for later in September 2018. At the Defendant's appointment with Dr. Lerner, the Defendant made his first recorded complaints of "memory problems" in a medical setting. The Defendant's complaints to Dr. Lerner, and association with Dr. Yudofsky, led to referrals and medical evaluations by Drs. York, Yu, Pool and Jankovic.

The government acknowledges that the Defendant's demeanor, conduct and behavior in 2019, and earlier, may not be dispositive of his medical condition today, however, Tamine's testimony, and other "historical evidence," is relevant to these proceedings since it establishes when the Defendant learned of the government's criminal investigation, and provides the Defendant's motive to exaggerate and/or fabricate his symptoms to avoid prosecution. Moreover, this evidence will demonstrate that the Defendant has the capability to deceive trained medical professionals about his cognitive condition, and that he did so successfully throughout 2019 and 2020.

Tamine's testimony, together with the other pre-2021 evidence and testimony, also exposes a fatal flaw in Drs. Guilmette and Agronin's analyses and conclusions; namely, that Drs. Guilmette and Agronin's reports rely heavily on the conclusions of Drs. York, Yu, Pool, and Jankovic, while failing to address and/or consider the contrary evidence presented by the

Defendant's depositions just weeks prior to, and just after, the examinations in question.[4] In contrast, the government's expert witnesses, Drs. Dietz and Denney, address the inconsistencies in the Defendant's behavior during the 2019 depositions and in his examinations by Drs. York, Yu, Pool, and Jankovic. Drs. Dietz and Denney conclude that based, in part, on the level of cognition displayed by the Defendant during the depositions in 2019, it appears the Defendant was malingering and/or exaggerating his symptoms during medical examinations conducted during the same time-period, and continues to do so. The government submits that the Defendant's observable capacity for deception in 2019 is probative of his present mental state, and whether he continues his deception.

## IV. EVIDENTIARY ISSUES

### Emails Obtained Through Mutual Legal Assistance Treaty

As part of its case-in-chief, the Government intends to offer two sets of correspondence: (1) emails between Defendant and Tamine obtained through a Mutual Legal Assistance Treaty ("MLAT Emails"); and (2) emails obtained directly from Evatt Tamine ("Tamine Emails"). Both sets can be authenticated under Fed. R. Evid. 901(b)(1) by IRS-CI Special Agent Peter Dickerman, who obtained these emails as part of the IRS's investigation, and/or the testimony of Tamine. Both sets of correspondence are non-hearsay under Fed. R. Evid. 801(d)(2)(E) as statements of a co-conspirator made in furtherance of the conspiracy. The Government intends to offer these emails to show that (1) the Defendant and Tamine were in fact co-conspirators, engaging in a decades-long conspiracy to conceal the Defendant's dominion and control over the AEBCT, its subsidiaries, and the taxable income contained therein; (2) Defendant is feigning or exaggerating symptoms of cognitive deficiency to avoid prosecution; and (3) Defendant has demonstrated a decades long pattern of subterfuge for the purpose of concealing his dominion

---

[4] See Dr. Agronin's August 6, 2021 Report, pp4, 9-13, and Dr. Guilmette's August 6, 2021 Report, pp3, 10-15, 20-24 and 74.

and control over the AEBCT and that his exaggeration of medical symptoms is a continuation of this conduct.

Statements of a defendant's coconspirator in furtherance of a conspiracy are not hearsay. Fed. R. Evid. 801(d)(2)(E). Before a court can admit such evidence, however, the Government must show "(1) the existence of a conspiracy; (2) the statement was made by a co-conspirator of the party; (3) the statement was made during the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." *United States v. Hall*, 500 F.3d 439, 443 (5th Cir. 2007). In determining whether the government has met this burden, the Court may consider the proffered statements as evidence of the alleged conspiracy. *See Bourjaily v. United States*, 483 U.S. 171, (1987) (Courts making preliminary findings under Rule 104(a) are not bound by the rules of evidence). In *Bourjaily*, the Court held that district courts are permitted "to consider the coconspirator statements sought to be admitted under Rule 801(d)(2)(E) in determining whether a conspiracy existed, whether the defendant and the declarant were members of the conspiracy, and whether the statements were made in the course of and in furtherance of the conspiracy." *United States v. Chestang*, 849 F.2d 528, 531 (11th Cir. 1988).

In some instances, a court will hold a *James* hearing to allow the Government to proffer evidence to show that a statement satisfies the requirements of Rule 801(d)(2)(E). *See generally United States v. James*, 590 F.2d 575 (5th Cir. 1979). But a court is *not required* to hold a *James* hearing. *United States v. Fragoso*, 978 F.2d 896, 899 (5th Cir. 1992) (discussing *James* and *Bourjaily* and noting that "*James* has never required a hearing outside the presence of the jury."). Instead, "[the Fifth Circuit] has approved district courts' practice of carrying a *James* motion through trial or at least through presentation of the government's case until a determination of the existence of the Rule 801(d)(2)(E) predicate facts can be appropriately made." *Id.* at 900

(citing *United States v. Lechuga*, 888 F.2d 1472, 1479 (5th Cir. 1989). Judicial economy may often warrant this procedure, and such matters are "committed to the broad discretion of the district court." *Id.*

A *James* hearing is not necessary in this case. The Court will have to consider the government's evidence of a conspiracy between Defendant and Evatt Tamine. Plainly, it makes no sense for the Court to conduct a separate hearing when the Court can just as easily do so during Defendant's Competency Hearing. A *James* hearing would be needlessly cumulative. The Court has discretion to reserve its ruling on the admissibility of both the MLAT and Tamine emails until the close of the government's case-in-chief. *Fragoso*, 978 F.2d at 899.

Alternatively, the United States intends to offer this evidence under Rule 807 to the extent that any of these emails constitute hearsay. The government will present evidence demonstrating that both the MLAT and Tamine emails are sufficiently probative and trustworthy under Rule 807.

Evidence of Motive to Exaggerate Symptoms

As stated above, during the Competency Hearing the government intends to introduce non-medical, collateral evidence, of the Defendant's emails, conversations, behavior and conduct from 2012 up to and including 2021. This presentation will include evidence of the Defendant's knowledge of the scope and strength of the criminal case, and his intent to conceal from the IRS his dominion and control over the AEBCT, its subsidiaries and assets. This evidence will be offered for the purpose of establishing the Defendant's motivation to fabricate and/or exaggerate his medical symptoms of mental deficiency. The Defendant's intent and ability to deceive medical professionals concerning his mental capacity and cognitive condition is corroborated by

the inconsistency between his behavior when he was examined by Drs. York, Yu, Pool and Jankovic in 2019, and his conduct throughout 2019 and 2020 until he was indicted in this case.

Federal Rules of Evidence 404 states: "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character trait." The Rule, however, also provides an exception to this exclusion: "This evidence may be admissible for another purpose, such as proving ***motive***, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *FRE 404(b), emphasis added*. The Supreme Court, and nearly every Circuit Court, have ratified the admissibility of collateral evidence for the purposes enumerated in Rule 404(b). *Huddleston v. United States*, 485 U.S. 681, 690, 108 S.Ct. 1496, 1502 (1988). The Court in *Huddleston* held that "other acts" evidence is admissible upon showing of: a) proper purpose under R 404(b) - such as *motive*; b) relevance under FRE 104; c) that the probative value is substantially outweighed by potential for unfair prejudice under FRE 403; and d) a proper jury instruction under FRE 105. *Id*. In *Kinchen* the Fifth Circuit specifically addressed the admissibility of "prior act" or "other act" evidence to establish "motive" in accordance with FRE 404(b). *United States v. Kinchen*, 729 F.3d 466, 471-74 (5th Cir 2013). After applying the *Huddleston* test, the Court found that evidence of the defendant's prior possession of narcotics and prior drug use was admissible to establish motive in a case in which the defendant was charged with possession with intent to distribute narcotics. *Id*. So called "prior act" evidence is properly admissible to establish consciousness of guilt and fabrication of evidence. *United States v. Simmons*, 470 F.3d 1115, 1125 (5th Cir. 2006). In *Simmons,* the Court held that the defendant's prior state-court testimony, which included a fictitious chain of events of his interaction with his victim, was properly admissible under FRE 404(b) to establish consciousness of guilt and his motivation and intent to fabricate an alibi. *Id*.

Here, the non-medical evidence the government intends to introduce of the Defendant's "prior conduct" is not offered to establish "bad character," but as in *Kinchen* and *Simmons*, to establish a motive, intent, and capacity to fabricate and deceive. In this case, to fabricate mental incompetency. Moreover, since there will not a be a jury in these proceedings and this is not a trial on the merits, the potential for unfair prejudice is extremely low. Conversely, the probative value of this evidence is clear. A determination of legal competency cannot be made without also considering whether or not the defendant in question is malingering and/or exaggerating symptoms. As referenced above, there is substantial evidence that in 2019 the Defendant deceived at least four doctors concerning his mental acuity and his degree of cognitive decline. The Defendant's knowledge of this criminal investigation, the consequences of his conviction, his pattern of ongoing deception and concealment, and his history of misrepresenting his medical condition, are all central to these proceedings. By necessity, any evaluation of one's competency is heavily dependent on representations and statements made by the person whose competency is being evaluated. Evidence that that person has a strong motivation to fabricate, deceive and feign incompetency, and has done so in the past, must be considered in assigning weight to that person's current statements and representations.

<u>Dr. Yudofsky's Expected Invocation of his Fifth Amendment Rights</u>

The government intends to call Dr. Stuart Yudofsky, who has represented through counsel that he intends to invoke his 5th Amendment privilege to refuse to answer questions he believes may tend to incriminate him. Initially, Yudofksy refused to comply with the government's hearing subpoena at all until the Court ordered his appearance and production of documents. *Order denying Motion to Quash*, Dkt. 143. Yudofsky's counsel has now represented

to the government that Yudofsky will refuse to answer all questions posed to him beyond basic biographical inquiries.

Of course, Yudofsky has a right under the Fifth Amendment to refuse to answer a question if his response would incriminate him. But he carries the burden "of establishing entitlement to the privilege" and may invoke the privilege "[o]nly as to genuinely threatening questions." *United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir. 1976). The "privilege against self-incrimination 'applies only when the possibility of self-incrimination is a real danger, *not a remote and speculative possibility*." *United States v. Trowbridge*, No. 4:17-MC-1557, 2017 WL 5629883, at *2 (S.D. Tex. Nov. 22, 2017) (*quoting Steinbrecher v. Comm'r*, 712 F.3d 195, 197 (5th Cir. 1983)) (emphasis added).

Yudofsky "is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. *It is for the court to say* whether his silence is justified." *Hoffman v. United States*, 341 U.S. 479, 486-86 (1951) (emphasis added). For an invocation to be proper, "it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Id.*

On direct examination, the government intends to inquire into Yudofsky's relationship with Defendant, both as his friend and medical provider. His impressions of the Defendant's physical and cognitive condition when Defendant began complaining of cognitive issues in September 2018. Theoretically, Yudofsky's answers to one or more of these questions may tend to incriminate him, however, Yudofsky should not be permitted to invoke his right under the Fifth Amendment to refuse to answer questions put to him during the Defendant's Competency

Hearing for the purpose of protecting the Defendant and related entities. *Couch v. United States*, 409 U.S. 322, 328, 93 S.Ct. 611, 616 (1973). *See also Bellis v. United States*, 417 U.S. 85, 88, 94 S.Ct. 2179, 2183 (1974)(improper for witness to invoke Fifth Amendment right to refuse to produce records of collective entity).

## V. **CONCLUSION**

In short, the government expects to present evidence establishing by a preponderance of the evidence that the Defendant is not as mentally impaired as he would like this Court to believe, including evidence of objective medical imaging, psychological cognitive testing, a pattern and history of previously feigning mental incompetence, and a strong motivation to fabricate and exaggerate his mental impairment. Therefore, the government will request that the Court find the Defendant competent under 18 U.S.C. § 4241 to proceed to trial on the pending Indictment.

Respectfully submitted this 10th day of November 2021,

        DAVID A. HUBBERT
        Acting Assistant
        Attorney General
        Tax Division

        *s/ Corey J. Smith*
        COREY J. SMITH
        Senior Litigation Counsel
        Department of Justice
        Tax Division
        Mass Bar No. 553615
        corey.smith@usdoj.gov
        Tele: (202) 514-5230
        LEE LANGSTON
        CHRISTOPHER MAGNANI
        Trial Attorneys
        Department of Justice
        Tax Division

        Attorneys for United States of America

## Table of Authorities

1. *United States v. Pervis*, 937 F.3d 546, 553 (5th Cir. 2019) — page 4

2. *United States v. Hutson*, 821 F.2d 1015, 1018 (5th Cir. 1987) — page 4

3. *Title 18, United States Code, Sec. 4241* — page 4

4. *United States v. Gigante*, 166 F.3d 75, 94 (2d Cir. 1998) — page 4

5. *Buchanan v. Kentucky*, 483 U.S. 402, 423, 107 S.Ct. 2906, 2918 (1987) — page 5

6. *Federal Rules of Evidence 901(b)(1)* — page 10

7. *Federal Rules of Evidence 801(d)(2)(E)* — page 11

8. *United States v. Hall*, 500 F.3d 439, 443 (5th Cir. 2007) — page 11

9. *Bourjaily v. United States*, 483 U.S. 171, (1987) — page 11

10. *United States v. Chestang*, 849 F.2d 528, 531 (11th Cir. 1988) — page 11

11. *United States v. James*, 590 F.2d 575 (5th Cir. 1979) — page 11

12. *United States v. Fragoso*, 978 F.2d 896, 899 (5th Cir. 1992) — page 12

13. *United States v. Lechuga*, 888 F.2d 1472, 1479 (5th Cir. 1989) — page 13

14. *Federal Rules of Evidence 807* — page 13

15. *Federal Rules of Evidence 404* — page 13

16. *Huddleston v. United States*, 485 U.S. 681, 690, 108 S.Ct. 1496, 1502 (1988) — page 13

17. *United States v. Kinchen*, 729 F.3d 466, 471-74 (5th Cir 2013) — page 13

18. *United States v. Simmons*, 470 F.3d 1115, 1125 (5th Cir. 2006) — page 13

19. *Couch v. United States*, 409 U.S. 322, 328, 93 S.Ct. 611, 616 (1973) — page 15

20. *Bellis v. United States*, 417 U.S. 85, 88, 94 S.Ct. 2179, 2183 (1974) — page 16

## Certificate of Service

      I the undersigned do hereby certify that on the 10th day of November 2021, I electronically filed the foregoing with the Clerk of Court using the ECF electronic filing system, which will send notice of electronic filing to Defendant's counsel of record.

      /s/ *Corey J. Smith*
Senior Litigation Counsel
Department of Justice
Tax Division
Corey.Smith@usdoj.gov
(202)514-5230