# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Criminal No. 4:21-cr-00009** |
| | § | |
| **ROBERT T. BROCKMAN** | § | **UNDER SEAL** |

## DEFENDANT ROBERT T. BROCKMAN'S
## PRE-HEARING MEMORANDUM
## <u>REGARDING COMPETENCY DETERMINATION</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ - 1 -

LEGAL STANDARDS ....................................................................................... - 4 -

I.      Whether Mr. Brockman is Competent Must be Assessed Based on His
        Current Mental Capacity ....................................................................... - 4 -

II.     Before this Case May Proceed, the Government Must Show that
        Mr. Brockman Can Understand the Nature and Consequences of the
        Proceedings Against Him and Assist Meaningfully in His Defense ............ - 5 -

III.    Whether Mr. Brockman is Competent Must be Assessed Based on
        Factors Specific to His Cognitive Condition in the Context of this
        Proceeding ............................................................................................ - 7 -

        A.      Courts Have Identified a Range of Factors to be Considered in
                Determining a Defendant's Competency ............................................ - 7 -

        B.      Defense Counsel's Interaction with Mr. Brockman is a Factor to
                be Considered ................................................................................ - 8 -

        C.      The Complexity of the Charges in the Indictment Against
                Mr. Brockman is a Factor to be Considered ...................................... - 9 -

        D.      Dementia is a "Mental Disease or Defect" that May Render a
                Defendant Incompetent to Stand Trial ............................................. - 9 -

SUMMARY OF EVIDENCE TO BE PRESENTED ............................................ - 10 -

I.      Defense Evidence ................................................................................. - 10 -

        A.      Defense Expert Witnesses and Medical Testing ............................... - 10 -

                1.  Dr. Christopher T. Whitlow ..................................................... - 10 -

                2.  Dr. Thomas Wisniewski .......................................................... - 13 -

                3.  Dr. Thomas J. Guilmette ........................................................ - 15 -

                4.  Dr. Marc E. Agronin .............................................................. - 18 -

                5.  Dr. Maria Rosana Ponisio ....................................................... - 20 -

                6.  Scott Polus ......................................................................... - 22 -

        B.      Mr. Brockman's Treating Physicians .............................................. - 23 -

                1.  Dr. James L. Pool ................................................................. - 23 -

                2.  Dr. Eugene Lai .................................................................... - 23 -

        C.      Defense Counsel ............................................................................ - 23 -

        D.      Mr. Brockman's Caregiver ............................................................ - 24 -

# TABLE OF CONTENTS
(continued)

Page

    E.    **Mr. Brockman's Friends and Associates** ........................................... - 24 -

        1.  Reverend Dr. James L. Jackson ................................................ - 24 -

        2.  Dr. Steven Slade ...................................................................... - 25 -

II.    **Defense Summary of Anticipated Government Position** ............................ - 25 -

    A.    **Expert Witnesses to be Called by Government** ................................. - 26 -

        1.  Dr. Dietz ................................................................................... - 27 -

        2.  Dr. Denney ................................................................................ - 28 -

        3.  Dr. Darby .................................................................................. - 28 -

    B.    **Other Proposed Government Witnesses** ........................................... - 29 -

        1.  Dr. James L. Pool .................................................................... - 29 -

        2.  Dr. Stuart C. Yudofsky ............................................................ - 29 -

        3.  Evatt Tamine and John Warnken-Brill .................................... - 30 -

        4.  Craig Moss and Robert Burnett ............................................... - 30 -

        5.  Michael Nemelka and Dana Abrahamsen ............................... - 30 -

        6.  Peter Dickerman ...................................................................... - 30 -

        7.  Dr. Scott Lisse .......................................................................... - 31 -

**CONCLUSION** ...................................................................................................... - 31 -

## INTRODUCTION

Defendant Robert T. Brockman respectfully submits this Pre-Hearing Memorandum [1] (1) to set out the legal standards for a determination of whether Mr. Brockman should be found to "presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense," 18 U.S.C. § 4241(a); and (2) to provide an overview of the evidence anticipated to be presented at the competency hearing.  Attached is an Appendix of Relevant Medical Terms.

Mr. Brockman is 80 years-old and has dementia.  All of the medical witnesses agree that Mr. Brockman has Parkinson's disease—a neurodegenerative disease that often results in cognitive impairment or dementia.  *See* Dr. Darby Report, Dkt. No. 78 at 15; Dr. Denney Report, Dkt. No. 79 at 38; Dr. Dietz Report, Dkt. No. 80 at 44; Dr. Darby Suppl. Report, Dkt. No. 177 at 10; Dr. Denney Suppl. Report, Dkt. No. 179 at 20.  Recent neuroimaging and testing supports that Mr. Brockman has either or a combination of Parkinson's disease dementia, or Alzheimer's disease dementia.

Dementia resulting from Parkinson's disease or Alzheimer's disease is permanent, progressive and incurable.

The neuroimaging evidence of Mr. Brockman's brain is objective and compelling. An amyloid positron emission tomography ("amyloid PET") scan performed on July 28,

---

[1] Pursuant to this Court's October 12, 2021 Order, the competency hearing is scheduled to begin on November 15, 2021. (Dkt. No. 151). That same Order also established a post-hearing briefing schedule, under which the parties will file post-hearing briefs by December 6, 2021, and will file post-hearing opposition briefs by December 23, 2021.

2021, showed "moderate to frequent amyloid neuritic plaques," a finding consistent with the presence of Alzheimer's disease.   Dr. Wisniewski Report, Dkt. No. 99 at 5; Dr. Whitlow Report, Dkt. No. 100 at 2-4; Dr. Agronin Report, Dkt. No. 102 at 15, 34-35; Dr. Ponisio October 25, 2021 Report at 2.[2]  An August 24, 2021 fluorodeoxyglucose PET ("FDG-PET") scan, performed at the government's request, similarly showed results consistent with Alzheimer's disease.   Standing alone, the results of either of these tests supports a conclusion that Mr. Brockman has Alzheimer's disease dementia.   Combined, these test portent a devastating outcome for Mr. Brockman:  as detailed in the expert reports, a recent study has concluded that the combined effect on tests such as these correlates at nearly 100% to post-autopsy findings of Alzheimer's disease.[3]  Dr. Agronin Suppl. Report, Dkt. No. 172 at 15-16; Dr. Whitlow Suppl. Report, Dkt. No. 174 at 3; Dr. Wisniewski Suppl. Report, Dkt. No. 175 at 11.

Notably, the government's retained neuroradiologist stated that Mr. Brockman's FDG-PET scans "show[ ] metabolic findings most consistent with early Alzheimer dementia . . . ."  Dr. Ponisio October 25, 2021 Report at 2 (emphasis added).  The clinical evidence indicates that Mr. Brockman's dementia has progressed beyond the early Alzheimer's stage and is progressing together with Mr. Brockman's Parkinson's disease dementia.  But even assuming Mr. Brockman's dementia is early Alzheimer's dementia,

---

[2] The government's retained radiologist, Dr. Maria Rosana Ponisio, prepared four reports dated September 1, September 2, September 5, and October 25, 2021.  None of these reports were filed with the Court.

[3] Lesman-Segev OH, et al., *Diagnostic Accuracy of Amyloid versus (18) F-Fluorodeoxyglucose Positron Emission Tomography in Autopsy-Confirmed Dementia*, ANN. NEUROL. 89(2):389-401 (2021).

he nonetheless is a dementia patient who is progressively getting worse every day, and is presently incompetent to proceed to trial in this complex case.

Mr. Brockman was first examined by government-retained experts in May of this year. Subsequently, Mr. Brockman was hospitalized for twelve days with sepsis resulting from a urinary tract infection, an apparent recurrence of a UTI infection and sepsis that triggered a similar hospitalization in March. During and after the second hospitalization, Mr. Brockman experienced repeated episodes of delirium. He was examined by the defense's experts in July, where by all accounts he appeared to be in far worse condition than during the May examinations. Expert reports for the defense were filed on August 6, 2021. The government ultimately raised an issue as to whether the defense experts' examinations were affected by transitory delirium. Both sets of experts examined Mr. Brockman again in October, and the parties filed supplemental expert reports.

The defense's expert reports demonstrate that Mr. Brockman has dementia to a degree that he cannot assist in his defense. This conclusion is supported by the diagnoses of Mr. Brockman's treating doctors, as well as by the experiences of counsel and individuals who are in frequent contact with him.

The government contends that Mr. Brockman is malingering—either faking or exaggerating his incompetency. The government has retained four medical experts: (1) Dr. Robert L. Denney, a forensic psychologist, who supports the government's position; (2) Dr. R. Ryan Darby, a neurologist, who stated in his supplemental report that he was unable to reach a conclusion as to whether Mr. Brockman's Alzheimer's dementia makes him unable to assist in his defense; (3) Dr. Park Dietz, a forensic psychiatrist, who has filed

three reports, first concluding on August 6, 2021 that Mr. Brockman is malingering, second stating on October 30, 2021 that he was unable to reach a conclusion regarding Mr. Brockman's competency, and then in his third try on November 4, 2021, deciding that he agreed with Dr. Denney; and (4) Dr. Maria Rosana Ponisio, a radiologist, who prepared four reports confirming that the FDG-PET and amyloid PET scans were consistent with evidence of Alzheimer's dementia.  The government has committed to calling Dr. Dietz and Dr. Darby, but has stated that it will not call Dr. Ponisio, who is now on the defense's witness list.

The allegations in the 39-count Indictment span a nearly forty-year period, with charges ranging from conspiracy to commit tax evasion to money laundering.  Before Mr. Brockman may be put to trial on these complex and serious charges, the government must prove that he is able to understand the charges against him and the consequences of the Indictment, and that he can assist in the preparation and presentation of his defense, including by meaningful participation at trial.  All of this is irretrievably beyond him now.

## LEGAL STANDARDS

### I.    Whether Mr. Brockman is Competent Must be Assessed Based on His Current Mental Capacity

A competency determination relies solely on the defendant's competency at the moment it is being evaluated:  "Competency to stand trial at a particular time goes not to the mental condition existing at the time of the alleged offense; it is concerned solely with whether the defendant is then able to confer intelligently with counsel and to competently participate in the trial of his case."  *United States v. Collins*, 491 F.2d 1050, 1053 (5th Cir.

- 4 -

1974).  Evidence that a defendant was previously competent does not answer whether he is presently competent.  As an "essential consideration in the fairness of the trial," the Court must continually assess the defendant's competency and the possibility of a decline in cognitive function, from indictment through sentencing.  *United States v. Swanson*, 572 F.2d 523, 526 n.3 (5th Cir. 1978) (explaining competency must be reevaluated "at any time during or after trial . . . with or without a motion by counsel").  "Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial."  *Drope v. Missouri*, 420 U.S. 162, 181; *see also United States v. Brown*, 147 F. Supp. 3d 312, 312-15 (E.D. Pa. 2015) (finding defendant incompetent to proceed to trial upon reevaluation less than seven months after having previously found defendant competent).

## II.     Before this Case May Proceed, the Government Must Show that Mr. Brockman Can Understand the Nature and Consequences of the Proceedings Against Him and Assist Meaningfully in His Defense

Due process guarantees "a defendant's right not to be tried or convicted while incompetent to stand trial."  *Drope*, 420 U.S. at 172.  Under longstanding Supreme Court precedent, the standard for competency to stand trial is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."  *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam). A defendant is incompetent to stand trial if his "mental condition is such that he lacks the

capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense . . . ." *Drope*, 420 U.S. at 171 (1975).

As the Supreme Court has further stated, "it is not enough for the district judge to find that the defendant is oriented to time and place and has some recollection of events" relevant to the prosecution. *Dusky*, 362 U.S. at 402 (quotation marks and brackets omitted). Mere "functional competence" is not enough to establish "competence to stand trial." *Riggins v. Nevada*, 504 U.S. 127, 141 (1992) (Kennedy, J., concurring).

Nor does "competence to stand trial . . . consist merely of passively observing the proceedings." *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001). "Rather, it requires the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense." *Id*. (citing *Dusky*, 362 U.S. at 402). "Counsel cannot effectively fulfill his role as counselor without the defendant's ability to appreciate and weigh information and advise and assist counsel in exploring and presenting an adequate defense." *McMurtrey v. Ryan*, No. CV-88-844-TUC-WFN, 2003 WL 27385072, at \*13 (D. Ariz. Mar. 4, 2003), *aff'd*, 539 F.3d 1112 (9th Cir. 2008).

Sections 4241 and 4247 of Title 18 set out the standards and procedures for determining whether a defendant is incompetent to assist in his defense.[4]  Section 4241

---

[4] Section 4241(d) further provides: "If, after the hearing, the court finds by a preponderance of the evidence that the defendant is [incompetent to stand trial] . . . the court shall commit the defendant to the custody of the Attorney General.  The Attorney General shall hospitalize the defendant for treatment in a suitable facility . . . for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward . . . ."  As Mr. Brockman will address in full in his post-hearing submission, because the medical evidence is clear that Mr. Brockman's condition is degenerative, and that no available treatments can restore Mr. Brockman to competence, there is no period of time "necessary to determine whether" Mr. Brockman can attain the capacity to stand trial.  Thus, no period of hospitalization for treatment is authorized by this statute, and if the statute were applied to mandate

provides that the Court shall determine a defendant's competence by the "preponderance of the evidence" following a hearing. 18 U.S.C. § 4241(a).   The government has acknowledged that it bears the burden of proof.  Dkt. No. 113 at 3 (citing *United States v. Hutson*, 821 F.2d 1015, 1018 (5th Dir. 1987)).

III.  **Whether Mr. Brockman is Competent Must be Assessed Based on Factors Specific to His Cognitive Condition in the Context of this Proceeding**

A.  **Courts Have Identified a Range of Factors to be Considered in Determining a Defendant's Competency**

To safeguard Mr. Brockman's fundamental constitutional rights, this court must determine whether he is competent to understand the proceedings against him and meaningfully assist at every stage.   Courts have recognized that, as a baseline, a competency evaluation requires consideration of whether the defendant has:

- "the ability to decide objectively whether to exercise his constitutional right to take the stand, and if he does take the stand, the ability to testify in an intelligent, coherent and relevant manner";

- "the ability to remain sufficiently alert and responsive so as to follow and recognize any discrepancies in the testimony of witnesses";

- "the ability to discuss the testimony with his attorneys and to postulate questions to the witnesses through counsel"; and

- "the ability to consider the wisdom of taking a course other than standing trial on the merits."

---

Mr. Brockman's commitment on these facts, that commitment would violate Mr. Brockman's Due Process rights. *Jackson v. Indiana*, 406 U.S. 715 (1972).

- 7 -

*United States v. Rothman*, No. 08-208954-CR, 2010 WL 3259927, at *6 (S.D. Fla. Aug. 18, 2010) (citation omitted); *United States v. Silva*, 2013 WL 6576788, at *8-10 (D. Utah July 31, 2013); *see also Cooper v. Oklahoma*, 517 U.S. 348, 364 (1996) (discussing risk that incompetent defendant will be unable to exercise "rights deemed essential to a fair trial," including decisions about whether to waive trial by jury, take witness stand and confront accusers, among "myriad smaller decisions concerning the course of his defense") (citations omitted).

Thus in evaluating competency, courts have considered, among other factors, "the state of the defendant's memory, since he should be able to relate pertinent facts, names and events to his attorneys"; whether the defendant has "an adequate ability to review and evaluate documents and other written evidence bearing on the case"; and whether the defendant has "an appreciation of the [g]overnment's evidence against him." *Rothman*, 2010 WL 3259927, at *6; *see also United States v. Helmsley*, 733 F. Supp. 600, 604-05 (S.D.N.Y. 1989) (considering defendant's ability to provide "assistance in counsel's cross-examination of witnesses, in the selection and preparation of defense witnesses, and in the decision whether the defendant should take the stand").

## B. Defense Counsel's Interaction with Mr. Brockman is a Factor to be Considered

The Supreme Court has recognized that "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense." *Medina v. California*, 505 U.S. 437, 450 (1992). "Because legal competency is primarily a function of defendant's role in assisting counsel in conducting the defense, the defendant's attorney

is in the best position to determine whether the defendant's competency is suspect." *Watts v. Singletary*, 87 F.3d 1282, 1288 (11th Cir. 1996).

### C. The Complexity of the Charges in the Indictment Against Mr. Brockman is a Factor to be Considered

"Although the level of competency mandated by due process does not vary based on the specific stage of the criminal proceeding, the defendant's ability to participate or assist his counsel must be evaluated in light of the type of participation required." *United States v. Dreyer*, 705 F.3d 951, 961 (9th Cir. 2013) (citation omitted). Thus Mr. Brockman's competency should be evaluated in the context of the breadth and complexity of the charges against him.

### D. Dementia is a "Mental Disease or Defect" that May Render a Defendant Incompetent to Stand Trial

Dementia—regardless of its cause—is a well-recognized form of incompetence that impairs a defendant's ability to understand the proceedings against him and meaningfully participate in his defense. *United States v. Pervis*, 937 F.3d 546, 554 (5th Cir. 2019) ("Various mental defects or diseases may render a defendant incompetent to stand trial," including, among others, "vascular dementia."); *United States v. Buckingham*, 2020 WL 7238273, at *1 (N.D. Ala. Dec. 9, 2020) (finding defendant suffering from dementia incompetent to stand trial); *Silva*, 2013 WL 6576788, at *1 (same); *Rothman*, 2010 WL 3259927, at *1 (finding defendant suffering from dementia incompetent to proceed to sentencing).

Defendants suffering from dementia may lack the "ability to direct [their] attorneys as to [their] wishes, consider [their] attorney's advice, and rationally evaluate possible

courses of action"—hallmarks of an inability to meaningfully assist counsel.  *Brown*, 147 F. Supp. 3d at 325.  This may be so even where the defendant "can recall certain facts (particularly older facts) and perform abstract reasoning," if his dementia impairs his ability "to scrutinize the evidence and testimony presented during trial."  *Buckingham*, 2020 WL 7238273, at *11.

## **SUMMARY OF EVIDENCE TO BE PRESENTED**

## I.     **Defense Evidence**

As noted in the discussion of legal standards, the government bears the burden of proof to show that Mr. Brockman is competent.  In response to the evidence predicted by the government, the defense expects to present objective medical test results, the testimony of expert medical witnesses, as well as the experiences of Mr. Brockman's treating physicians, defense counsel, and other individuals with recent, close contact with Mr. Brockman, to rebut the government's contention that he is competent to understand the proceedings against him and to assist in his defense.

### A.     **Defense Expert Witnesses and Medical Testing**

#### 1.     **Dr. Christopher T. Whitlow**

Dr. Christopher T. Whitlow is a neuroradiologist at Wake Forest School of Medicine.  Neuroradiologists are medical doctors that specialize in using various imaging technologies to diagnose and characterize abnormalities of the brain.[5]  Dr. Whitlow's

---

[5] *See* https://med.stanford.edu/neuroimaging/patients.html (last visited November 10, 2021).

expert report was filed on August 6, 2021, and his supplemental expert report was filed on October 29, 2021.  Dkt. Nos. 100, 174.

Dr. Whitlow reviewed nine neuroimaging studies of Mr. Brockman's brain:

(1)     November 2, 2018 brain MRI scan conducted as part of Mr. Brockman's medical diagnosis and treatment;

(2)     February 14, 2019 DaTscan conducted as part of Mr. Brockman's medical diagnosis and treatment;

(3)     March 12, 2021 FDG-PET scan conducted at the request of the government;

(4)     June 6, 2021 brain MRI conducted during Mr. Brockman's hospitalization for a urinary tract infection;

(5)     July 28,2021 amyloid PET scan conducted at the request of the defense;

(6)     July 30, 2021 brain MRI conducted at the request of the defense;

(7)     August 24, 2021 FDG-PET scan conducted at the request of the government;

(8)     September 2, 2021 EEG conducted at the request of the government;

(9)     September 16, 2021 CT scan images conducted during Mr. Brockman's hospitalization for a urinary tract infection.

Dkt. No. 100 at 1-2; Dkt. No. 174 at 1.  Dr. Whitlow also reviewed Neuroreader reports concerning the 2018 and 2021 brain MRIs, and three reports concerning the July 28, 2021 amyloid PET scan, the March 12, 2021 FDG-PET scan, and the August 24, 2021 FDG-PET scan, prepared by Dr. Ponisio, a radiologist retained by the government.  Dkt. No. 100 at 3-4; Dkt. No. 174 at 4.

Dr. Whitlow will testify in support of the findings in his reports that the objective neuroimaging is "highly suggestive of Alzheimer's disease" and "support[s] the conclusion that [Mr. Brockman] likely has Alzheimer's disease in addition to Parkinson's disease . . . ." Dkt. No. 174 at 3.

In his August 6, 2021 report, Dr. Whitlow determined that the then-available neuroimaging studies identified structural and functional abnormalities in Mr. Brockman's brain, presenting "compelling objective evidence that an underlying neurodegenerative process is ongoing for Mr. Brockman, with Alzheimer's dementia representing a very strong possibility." Dkt. No. 100 at 5. Dr. Whitlow also found that a comparison of the 2018 MRI and the 2021 MRI showed progressive brain volume loss, and that Mr. Brockman had profound loss in areas of the brain responsible for important cognitive functions like learning and memory—findings that are "more compatible with neurodegenerative diseases associated with cognitive dysfunction and dementia rather than mild cognitive impairment." *Id.* at 3.

Dr. Whitlow's October 29, 2021 supplemental report discussed a recent study that combined qualitative results from amyloid PET scans and FDG-PET scans in diagnosing Alzheimer's disease, noting that "in this study, sensitivity and specificity for diagnosis of Alzheimer's disease approached 100% compared to gold-standard brain tissue pathology results when beta-amyloid PET was positive for cortical beta-amyloid and FDG-PET demonstrated the typical AD hypometabolism pattern." Dkt. No. 174 at 2-3.

In other words, when a review of an amyloid PET scan and FDG-PET scan combine to show the results that are seen in the testing that has been done of Mr. Brockman, there

is a near-100% correlation with post-autopsy pathological studies of individuals with

Alzheimer's disease.  As summarized by Dr. Whitlow:

> Mr. Brockman's beta-amyloid PET scan and FDG-PET scan meet the criteria
> of cortical beta-amyloid positivity and Alzheimer's disease-like anatomical
> pattern of hypometabolism that are highly suggestive of Alzheimer's disease.
> As such, these imaging findings support the conclusion that he likely has
> Alzheimer's disease in addition to Parkinson's disease, and are consistent
> with demonstrated dementia on neuropsychological testing and functional
> decline observed by those who interact with him daily.

*Id.* at 3.

Dr. Whitlow may also testify in rebuttal to expert testimony presented by the

government.

### 2.  Dr. Thomas Wisniewski

Dr. Thomas Wisniewski is a neurologist, the Gerald J. and Dorothy R. Friedman

Professor of the New York University Alzheimer's Disease Center, and the Director of the

Alzheimer's Disease Center, an Alzheimer's research centers funded by the U.S. National

Institute of Health.   A neurologist is a medical doctor with specialized training in

diagnosing, treating, and managing disorders of the brain and nervous system, including

Parkinson's disease and Alzheimer's disease, among others.[6]  Dr. Wisniewski's expert

report was filed on August 6, 2021, and his supplemental expert report was filed on October

29, 2021.  Dkt. Nos. 99, 175.

Dr. Wisniewski examined Mr. Brockman on October 17, 2021, interviewed

Mr. Brockman's wife, Dorothy, as well as his caregiver, Frank Gutierrez, and reviewed the

---

[6]   *See*   https://www.aan.com/tools-and-resources/medical-students/careers-in-neurology/what-is-a-neurologist/ (last visited November 10, 2021).

neuroimaging reports, the examination and testing results of other expert witnesses, and other medical records.  Dkt. No. 99 at 1-3; Dkt. No. 175 at 1-5.

Dr. Wisniewski is expected to testify that Mr. Brockman's "principal diagnoses are Parkinson's disease dementia (with associated depression) and co-occurring Alzheimer's disease."  Dkt. No. 175 at 10; Dkt. No. 99 at 4-5.  The consequences for Mr. Brockman's cognition have already been severe.  As stated in Dr. Wisniewski's October 29, 2021 supplemental report:

> Repeated examinations have shown evidence of a permanent, progressive and irreversible cognitive impairment that is currently in the moderately severe stage, with very significant impairments of all activities of daily living.

Dkt. No. 175 at 12.  Dr. Wisniewski continued:

> As such, it is not possible for Mr. Brockman to provide any accurate information regarding relevant, requested facts, dates or specifics. Mr. Brockman's condition will only worsen with time, as is the invariable course with all neurodegenerative disorders such as PDD and AD; this decline is typically faster with the co-occurrence of these two pathologies.

*Id.* at 12 (citation omitted).  Dr. Wisniewski concluded:

> These cognitive deficits would severely limit his ability to interact with his attorneys to any substantive, sustained degree, or to participate meaningfully in a courtroom trial.

*Id.* at 13.  Dr. Wisniewski would also testify in support of his conclusion, as stated in his August 6, 2021 report and reiterated in his October 29, 2021 supplemental report, that there is no treatment to reverse Mr. Brockman's condition; rather, Mr. Brockman's condition is permanent and progressive, and "contributes to a dismal cognitive decline."  Dkt. No. 99 at 5; Dkt. No. 175 at 12.

Dr. Wisniewski is also expected to rebut the government's contention that observations by lay witnesses, as well as by the government's proffered experts, concerning Mr. Brockman's conduct somehow undermine the medical conclusion that Mr. Brockman has dementia: "Mr. Brockman's somewhat preserved sociability, social grace, easy communication do not negate the multiple of cognitive domains and that have been repeatedly tested and demonstrated to be highly impaired." Dkt. No. 99 at 5.

### 3. Dr. Thomas J. Guilmette

Dr. Thomas J. Guilmette is a clinical neuropsychologist and professor of psychology at Providence College. Clinical neuropsychologists study the relationship between the brain and behavior, particularly as it relates to the diagnosis of brain disorders and the assessment of cognitive function.[7]

Dr. Guilmette's expert report was filed on August 6, 2021, and his supplemental expert report was filed on October 29, 2021. Dkt. Nos. 101, 173. Dr. Guilmette performed forensic neuropsychological assessments to examine Mr. Brockman's cognitive abilities related to his competence to stand trial on July 13-14 and October 2, 2021. He also conducted interviews with collateral witnesses, and reviewed Mr. Brockman's medical records, neuroimaging, and the testing and reports prepared or filed in this matter. Dkt. No. 101 at 1-59; Dkt. No. 173 at 2-27.

Dr. Guilmette is expected to testify in support of his diagnosis of "major neurocognitive disorder (otherwise known as dementia)," and that testing and imaging is

---

[7] *See* https://www.apa.org/ed/graduate/specialize/neuropsychology (last visited November 10, 2021).

consistent with the co-occurrence of Parkinson's disease dementia and Alzheimer's disease dementia.  Dkt. No. 101 at 61-64; Dkt. No. 173 at 3, 30-34.  As Dr. Guilmette concludes, these conditions "are incurable, and carry with it irreversible decline."  Dkt. No. 173 at 43.

Dr. Guilmette cautions against misinterpreting Mr. Brockman's continuing facility in casual conversation, which can mask his undeniable cognitive deficits:

> Because Mr. Brockman's expressive language abilities, especially his vocabulary, remain generally intact and are a relative strength among his neuropsychological capabilities, he can often appear quite articulate during casual conversation.  Like many individuals with dementia whose premorbid IQ was above average or even exceedingly high, Mr. Brockman still has sufficient cognitive reserve that allows him to speak about some topics in detail, particularly those with which he is most familiar such as from his business, which is not related to his indictment, and family, that belies his actual cognitive capabilities.  Furthermore, he continues to exhibit refined social skills, which can be misinterpreted as evidence for a normal mental status.

Id. at 34.  Dr. Guilmette concluded, however, that neuropsychological testing confirms the severity of Mr. Brockman's dementia:

> Any perception of Mr. Brockman that presumes cognitive abilities by virtue of his less impaired social and conversational skills is inconsistent with the reality of his underlying deficits.  Yet that may not be immediately evident to the observer without proper questioning and assessment. Neuropsychological testing can, and has, revealed the severity of his cognitive impairments.

Id.

Dr. Guilmette's expected testimony will support his conclusions that Mr. Brockman's "tested, reported, and demonstrated memory shows an inability to retain and recall recently learned information, such as personal events, conversations and other materials," and that "Mr. Brockman confabulates at times in response to unidentified gaps

in his memory." *Id*. at 3-4; *see also id.* at 34-37.  He observed that Mr. Brockman speaks
in a self-assured manner even when providing unreliable information, and becomes
"intermittently confused" but is unable to inform others of his confusion "because he is
unaware about when he becomes cognitively disengaged from real events."   *Id*. at 4.
Dr. Guilmette further observed that Mr. Brockman "displays a tendency to be agreeable . . .
[that renders him] vulnerable to leading questions and to respond politely to please a
questioner, even though he may not have a full appreciation for the accuracy of his
responses or the consequences of being led along in questioning."   *Id*. at 4.  As a result of
these cognitive deficiencies, it is Dr. Guilmette's conclusion that "Mr. Brockman is not
able to assist his attorneys with relevant, requested facts, dates, and details."   *Id*. at 34.

Dr. Guilmette's October 29, 2021 supplemental report noted the decline in
Mr. Brockman's condition:  "Mr. Brockman has only a narrow window of mental stamina
during which he can engage and focus on his surroundings."   *Id*. at 4.  Dr. Guilmette
concluded:  "The exact trajectory of Mr. Brockman's declining abilities is unclear, but what
is certain is that his abilities will continue to weaken and his cognition will continue to
worsen."   *Id*. at 3.

Dr. Guilmette's testimony is also expected to rebut the government's frequently
advanced conjecture of malingering.  Dr. Guilmette will describe how he administered
specific performance validity tests ("PVTs") to assess potential malingering by
Mr. Brockman.  Dkt. No. 101 at 1, 29, 41-44, 72; Dkt. No. 173 at 39-43.  Dr. Guilmette's
expert reports also specifically refute contentions of malingering made by Dr. Denney,
noting that Dr. Denney's conclusions were based on incorrect interpretations of a limited

number of PVTs, and that Dr. Denney dismissed without justification the PVTs that

Mr. Brockman passed.  Dkt. No. 101 at 25, 75; Dkt. No. 173 at 39-43.  As Dr. Guilmette's

October 29, 2021 supplemental report notes:  "Performance validity testing does not

support malingering.  The structural and functional neuroimaging data, which cannot be

faked, provide additional confirmation that Mr. Brockman suffers from a genuine

neurodegenerative brain disease."  Dkt. No. 173 at 4.

### 4. Dr. Marc E. Agronin

Dr. Marc E. Agronin is a board-certified geriatric psychiatrist and has many roles at

Miami Jewish Health, including as the Senior Vice President for Behavioral Health, the

Chief Medical Officer for the MIND Institute,[8] and the Medical Director for Mental Health

and Clinical Research.  Geriatric psychiatry is the branch of medicine focused on treating

mental disorders in individuals aged 65 and above as they get older.

Dr. Agronin's expert report was filed on August 6, 2021, and his supplemental

expert report was filed on October 29, 2021.  Dkt. Nos. 102, 172.  Dr. Agronin conducted

a forensic psychiatric evaluation of Mr. Brockman's cognitive abilities related to his

competency to stand trial that included interview examinations of Mr. Brockman on July

11 and October 3, 2021, and the review of additional sources of data, including medical

records, neuropsychological data, collateral source interviews with six individuals,

---

[8] The MIND Institute provides services to individuals experiencing neurocognitive disorders, Alzheimer's disease, and memory changes.  *See* https://www.miamijewishhealth.org/leadership/marc-e-agronin/ (last visited November 9, 2021).

neuroimaging data, and other expert reports prepared or filed in this matter.  Dkt. No. 102 at 2-28; No. 172 at 2-4.

Dr. Agronin is expected to testify in support of his diagnoses of Parkinson's disease dementia and possible comorbid diagnosis of Alzheimer's disease.  Dkt. No. 102 at 28–38; Dkt. No. 172 at 14-19, 28–38.  These diagnoses were based on the objective results of neuropsychological testing (including testing conducted by the government's experts), moderate dementia observed by Dr. Agronin and reported by numerous collateral sources, and neuroimaging showing brain deterioration with significant findings of neuritic plaques and brain volume loss.  Dkt. No. 102 at 15–18, 28–38; Dkt. No. 172 at 4–19.  Dr. Agronin is expected to testify in support of his conclusion that Mr. Brockman is unable to assist counsel in his defense due to his enduring and progressive limitations in multiple cognitive domains, including memory lapses, lack of understanding, disorientation and confusion, lack of reliability, an inability to reason, and a lack of reliable decision-making, among other limitations.  Dkt. No. 102 at 38-42; Dkt. No. 172 at 20-22.

Dr. Agronin is also expected to testify in support of the conclusion set out in his report that Mr. Brockman is not malingering.  Dkt. No. 102 at 42–45; Dkt. No. 172 at 19.  As detailed in Dr. Agronin's August 6, 2021 report, Mr. Brockman's neuropsychological test data consistently demonstrates that he suffers from dementia; Mr. Brockman has attempted to minimize his cognitive failings; and the "record of Mr. Brockman's numerous visits to numerous doctors is necessary only to obtain treatment and regain hope of normalcy, not to simply get a diagnosis and nothing more."  Dkt. No. 102 at 44.

Also, as set out in his August 6, 2021 report, Dr. Agronin will refute Dr. Dietz's speculative assertion that diagnostic and treating clinicians at Baylor College of Medicine were biased to find that Mr. Brockman was cognitively impaired based on his purported VIP status.  To the contrary, as Dr. Agronin noted, these doctors consistently "adhered to standard of care in terms of evaluating individuals with neurocognitive impairment," and follow-ups with recommended specialists often did not occur for weeks or months (hardly suggestive of VIP treatment).  Dkt. No. 102 at 33–34.  In fact, the most pivotal testing to support a diagnosis of dementia was recommended by the government's expert, not a Baylor doctor.  *Compare* Dkt. No. 80 at 42 *with* Dkt. No. 102 at 33–34.

### 5.  Dr. Maria Rosana Ponisio

Dr. Ponisio is a radiologist retained by the government.  The government has stated that it will not call Dr. Ponisio at the competency hearing, and has not filed her expert reports with the Court.  In total, the government produced four reports prepared by Dr. Ponisio to the defense.  If called by the defense, Dr. Ponisio will testify as to three of those reports.[9]

In her September 1, 2021 report, Dr. Ponisio stated that, at the request of the government, she reviewed Mr. Brockman's July 28, 2021 amyloid PET scan and fused it with the July 30, 2021 brain MRI.  Dr. Ponisio concluded that "this is a positive amyloid-PET study, indicating moderate to frequent beta-amyloid neuritic plaques."  Dr. Ponisio September 1, 2021 Report at 2.

---

[9] Dr. Ponisio submitted a fourth report on October 25, 2021, which was largely based on the three reports she submitted in September.

In her September 2, 2021 report, Dr. Ponisio stated that, at the request of the government, she reviewed Mr. Brockman's March 12, 2021 FDG-PET scan and fused it with the July 30, 20201 brain MRI.  Dr. Ponisio concluded that "the described pattern of hypometabolism can represent early Alzheimer's dementia in the correct clinical setting."  Dr. Ponisio September 2, 2021 Report at 2.

In her September 5, 2021 report, Dr. Ponisio stated that, at the request of the government, she reviewed Mr. Brockman's August 24, 2021 FDG-PET scan and fused it with the July 30, 2021 brain MRI.  She concluded that this second FDG-PET scan also showed indicia of Alzheimer's dementia, adding "when compared to the prior examination, there is a mildly progressive decrease of metabolic activity in the compromised brain areas."  Dr. Ponisio September 5, 2021 Report at 2.

In her October 25, 2021 report, Dr. Ponisio stated that, at the request of the government, she reviewed Mr. Brockman's March 12, 2021 FDG-PET scan, July 28, 2021 amyloid PET scan, August 24, 2021 FDG-PET scan and fused the PET images with the July 30, 2021 MRI examination.  She concluded that "given the pattern of metabolic abnormalities seen on FDG/PET-CT and amyloid scans, the findings are most consistent with early dementia in the correct clinical setting."  Dr. Ponisio October 25, 2021 Report at 3.

In other words, Dr. Ponisio opined that neuroimaging studies of Mr. Brockman's brain are "most consistent" with a diagnosis of dementia.

### 6.  Scott Polus

Mr. Polus is the Regional Vice President of Forensic Services for Xact Data Discovery (XDD), and a Certified Computer Examiner through the International Society of Forensic Computer Examiners.  Mr. Polus has training and experience in performing various digital forensic analyses.

At the government's request, Mr. Brockman produced personal documents concerning his medical treatment.  Included in these records were fifteen documents consisting of typed notes, with dates ranging from 2004 through 2018, that appear on their face to be annual summaries of overall health, which included descriptions of Mr. Brockman's increasing cognitive challenges.

Dr. Dietz repeatedly speculated in his June 21, 2021 report that these notes were recently fabricated.  Dkt. No. 80 at 6.  In response, the defense produced these fifteen documents to the government in an electronic form that included the metadata.

Mr. Polus analyzed the computer metadata for the fifteen documents in issue. Mr. Polus Report, Dkt. No. 97 at 1.  Mr. Polus will explain that the export of the underlying metadata for these documents shows that each document has a filename that matches or closely matches the date the document was created, and that no further modifications were made to these documents after the day they were created.  Dkt. No. 97 at 3-4.  In other words, the documents were in fact created on the dates indicated in the text of the documents, and not at some more recent date, as Dr. Dietz insinuates.

- 22 -

### B.   Mr. Brockman's Treating Physicians

#### 1.  Dr. James L. Pool

Dr. James L. Pool holds the James L. Pool Presidential Endowed Chair in Clinical Pharmacology at Baylor College of Medicine.   He is Mr. Brockman's primary care physician.  The government has also listed him as a potential witness.  Dr. Pool will testify as to Mr. Brockman's diagnosis of Parkinson's disease and dementia, his medical history over the past three years, and his course of treatment, including the impact of his dementia on his daily functioning and mental processes.

#### 2.  Dr. Eugene Lai

Dr. Eugene Lai is the Director of Neurodegenerative Diseases Clinic at Houston Methodist Hospital.   He is Mr. Brockman's treating physician for Parkinson's disease. Dr. Lai was originally listed by both the government and the defense as a potential witness, but no longer appears on the government's witness list.   Dr. Lai will testify as to Mr. Brockman's diagnosis of Parkinson's disease and dementia, and the impact of his dementia on his daily functioning and mental processes.

### C.   Defense Counsel

Defense counsel were interviewed as collateral witnesses by Dr. Denney, as well as by Dr. Guilmette and Dr. Agronin.  Defense counsel will address how, consistent with the medical findings, in counsel's experience, Mr. Brockman cannot relate relevant facts, names and events regarding the complex allegations in the Indictment; he cannot review

and evaluate documents bearing on the case;[10] he cannot retain important information or follow and recognize discrepancies; he cannot weigh the consequences of exercising his constitutional rights; he repeatedly provides the same irrelevant information that has no bearing on the case; and, significantly, his diminished cognitive capability has progressed substantially over time.  Defense counsel will also describe how Mr. Brockman first raised his diagnosis of dementia in an effort to explain to counsel that he may need information repeated or presented more slowly, and that at no time did he suggest that his medical issues may be used to avoid prosecution.

### D.    Mr. Brockman's Caregiver

Frank Gutierrez has provided home healthcare services to Mr. Brockman since April 2021.  Mr. Gutierrez will testify to the support that he provides for Mr. Brockman, and the impact of Mr. Brockman's cognitive limitations in his daily activities.

### E.    Mr. Brockman's Friends and Associates

### 1.  Reverend Dr. James L. Jackson

Reverend Jim Jackson first met Mr. Brockman when he was a congregant of Chapelwood United Methodist Church, where Reverend Jackson served as senior pastor for twenty years.  Reverend Jackson subsequently became a counselor at the Reynolds and Reynolds Company ("R&R"), where Mr. Brockman worked as president until June 2020 and chair and chief executive officer until November 2020.  Today Reverend Jackson serves as a board director of R&R and its parent companies.  If called, Reverend Jackson

---

[10] The government has estimated that it will produce 1.1 terabytes (the equivalent of 22 million pages) of discovery.  Dkt. 1-3 at 59.

will testify to his decades-long relationship with Mr. Brockman, his observations of Mr. Brockman in business and personal settings, and the current impact of Mr. Brockman's cognitive limitations.

### 2. Dr. Steven Slade

Dr. Steven Slade is an ophthalmologist.  He was introduced to Mr. Brockman by Dorothy Brockman, who was his patient and who also co-authored a book with Dr. Slade. Dr. Slade is a close personal friend of Mr. Brockman.  Dr. Slade will testify as to his observations of Mr. Brockman in social and personal settings, and the pervasive impact of Mr. Brockman's dementia on his everyday activities and his ability to interact with family and friends.

## II. Defense Summary of Anticipated Government Position

From its first filing concerning the issue of Mr. Brockman's competency through its recent statements before the Court, the government has consistently taken the position that Mr. Brockman is faking his dementia.  *See, e.g.*,  Dkt. No. 1-3 (N.D. Cal. Dkt. No. 69 at 9-11); Dkt. No. 113 at 11-13; Dkt. No. 184 at 27 (Nov. 1, 2021 Hearing Transcript).  The government has also postulated that the doctors who first diagnosed Mr. Brockman with dementia in 2019 were biased by his relationship with Baylor Medical College.  *See, e.g.*, Dkt. No. 1-3 (N.D. Cal. Dkt. No. 69 at 7-8).

### A.      Expert Witnesses to be Called by Government

The government has listed three expert medical witnesses:  Drs. Dietz, Denney, and Darby.[11]  All three filed expert reports on June 21, 2021, which made clear that these three doctors consulted with and relied on one another's findings.  *See* Dkt. No. 78 at 1, Dkt. No. 79 at 3; Dkt. No. 80 at 1.[12]  The government has also made clear that Drs. Dietz, Denney, and Darby coordinated with the prosecution team and acted as partisan experts.  Dkt. No. 89 at 8.

All three doctors filed supplemental reports on October 30, 2021.  Dkt. Nos. 176, 177, and 179.  Although counsel for the government stated during a status conference with the Court on November 1 that the government did not expect to file further supplemental reports, Dr. Dietz nonetheless provided a second supplemental report three days later.  Dkt. No. 185.

Mr. Brockman has cooperated fully and in every respect with all examinations requested by the government.    Dr. Darby  examined  Mr. Brockman  in  May  for approximately three hours, and Drs. Dietz and Denney conducted joint interviews, and Dr. Denney also conducted certain testing, over a three-day period in May, and then again on two days in October, for a stunning total of approximately 32 hours.  Dr. Darby also interviewed Mr. Brockman's wife, Dorothy, and Dr. Denney interviewed defense counsel. At the request of these doctors, Mr. Brockman underwent two FDG-PET scans, an EEG,

---

[11] Upon inquiry by defense counsel during the November 1, 2021 status conference, the government committed to calling Drs. Dietz and Darby as witnesses.

[12] Dr. Dietz's 45-page report as filed with the Court is not paginated.  The defense has provided the government with a paginated version of this report for use at the hearing.

two overnight sleep studies, a urine sample, and a blood draw.  Extensive medical records were provided to the government.

### 1. Dr. Dietz

In his June 21 report, Dr. Dietz acknowledged the objective, physical evidence in a March 12, 2021 FDG-PET scan conducted at the government's request, showed findings "'suggestive of early neurodegenerative disease, either early Alzheimer's disease or dementia with Lewy bodies (Parkinson's disease with dementia),'" but then dismissed this interpretation as "biased by the interpreter's foreknowledge of prior diagnoses of dementia, a phenomenon known as confirmation bias."  Dkt. No. 80 at 28.  He concluded instead that Mr. Brockman is malingering.  *Id.* at 42-45.  Dr. Dietz does not explain why an objective imaging study commissioned by the government experts should be discarded for "confirmation bias" in favor of the defense, nor how a "malingerer" could have faked these imaging results.

Next, in his first supplemental expert report on October 30, Dr. Dietz stated that:

> The newly received information does . . . throw into question Mr. Brockman's <u>current</u> cognitive abilities and those aspects of competence to stand trial that require adequate short-term memory, particularly in light of his more recent episodes of delirium, surgery under general anesthesia, and new evidence of brain imaging consistent with early Alzheimer's disease.

Dkt. No. 176 at 18 (emphasis in original).  Dr. Dietz acknowledged that the "most objective evidence of Mr. Brockman's brain functioning is provided by brain imaging studies," which are most consistent with Alzheimer's dementia.  *Id.* at 18.  Dr. Dietz then acknowledged the statements by Mr. Brockman's lawyers, doctors, family, and friends, as

- 27 -

well as his performance in neuropsychological tests, stating:  "If this <u>performance</u> were a reliable and valid indicator of his cognitive capacity, I would join the defense experts in considering him too demented to assist counsel in the course of trial, and I would agree that the prognosis is poor."  *Id.*  (emphasis in original).  Dr. Dietz conceded that, for Mr. Brockman to exaggerate to this extent "would no doubt be a Herculean task," but contended that Mr. Brockman is nonetheless capable of doing so.  *Id.* at 18-19.  In the central conclusion to his first supplemental report, Dr. Dietz stated:  "To my dismay, I am unable to distinguish between these possibilities but remain hopeful that the reports scheduled to be exchanged today will lend clarity."  *Id.* at 20.

Five days later, in his third (i.e. "second supplemental") report, Dr. Dietz found that Mr. Brockman "most likely suffers from mild cognitive impairment or mild dementia," but reverted to his contention that Mr. Brockman is nonetheless malingering and, in Dr. Dietz's view, Mr. Brockman has "sufficient present ability" to consult with his attorneys and to understand the proceedings.  Dkt. No. 185 at 3.

### 2.  Dr. Denney

Dr. Denney's initial and supplement reports contend that Mr. Brockman "may have a mild form of mental disease or defect," but that in Dr. Denney's view he is malingering as to the extent of his cognitive impairment.  Dkt. No. 179 at 20; *see* Dkt. No. 79 at 38.

### 3.  Dr. Darby

Dr. Darby's supplemental report acknowledges that "[i]t is reasonable given his hospitalizations for delirium, natural disease course, and neuroimaging that Mr. Brockman has progressed to the dementia stage."  Dkt. No. 177 at 9; *see also id.* at 11 ("[I]t is plausible

that Mr. Brockman would have progressed from the MCI to dementia stage."). Despite this finding of dementia, Dr. Darby stated he is "unable to determine whether [Mr. Brockman's] cognitive impairment is severe enough to make him incompetent to assist in his defense." Dkt. No. 177 at 11. Dr. Darby's report noted Mr. Brockman's vulnerability to future cognitive setbacks, adding: "Mr. Brockman is at increased risk for progression over time due to his history of delirium. He is also at risk for future episodes of urinary infections and delirium." *Id*.

### B.    Other Proposed Government Witnesses

It is the defense's position that, with one exception of Dr. Pool, none of the other witnesses listed by the government can testify as to Mr. Brockman's current competency to assist in his defense.

### 1.  Dr. James L. Pool

Dr. Pool is Mr. Brockman's primary care physician. The defense plans to call Dr. Pool if the government elects not to do so.

### 2.  Dr. Stuart C. Yudofsky

Dr. Yudofsky's attorney has advised Dr. Yudofsky to assert his fifth amendment privilege not to testify. The defense disputes the government's assertions concerning Dr. Yudofsky. To the extent that the Court may view his testimony as relevant, the defense would prefer that Dr. Yudofsky be granted immunity so that he may testify fully at the hearing.

### 3.  Evatt Tamine and John Warnken-Brill

During the October 25 status conference before the Court, the government proffered that Evatt Tamine, who is Individual One in the Indictment, will be called to support the government's view as to when Mr. Brockman knew about the existence of an investigation; Mr. Brockman's relationship with Dr. Yudofsky; Mr. Brockman's motivation to malinger and to create a paper trial of issues relating to his mental competency; and Mr. Brockman's "feelings about the IRS."  (Oct. 25, 2021 Hearing Transcript at 10-13.)  The government has represented that John Warnken-Brill may address some or all of these same issues, but will be called as a witness only if Mr. Tamine is unable to enter the United States.  *Id*. at 13.  Neither witness has had any contact with Mr. Brockman in over three years.

### 4.  Craig Moss and Robert Burnett

Craig Moss is the former chief financial officer of R&R, and Robert Burnett currently holds that position.  Mr. Brockman stepped down as the president of R&R in June 2020, and fully retired as the chair and chief executive officer in November 2020.

### 5.  Michael Nemelka and Dana Abrahamsen

Michael Nemelka is an attorney who conducted a deposition of Mr. Brockman in January 2019, and Dana Abrahamsen is an attorney who conducted a deposition of Mr. Brockman in September 2019.

### 6.  Peter Dickerman

Peter Dickerman is an Internal Revenue Service special agent.  To the best knowledge of the defense, he has had no personal contact with Mr. Brockman.

### 7.     Dr. Scott Lisse

The government identified Dr. Scott Lisse as a potential witness for the first time when it filed the United States' Witness List for Competency Hearing, Dkt. No. 195, five days before the commencement of the competency hearing.

### **CONCLUSION**

As the evidence at the competency hearing will show, Mr. Brockman has dementia, a condition that is permanent, progressive and incurable.  He is incapable of understanding the charges and assisting properly with his defense, and never will be competent to do so. He is legally incompetent to stand trial.

Dated:  November 11, 2021

/s/ Jason S. Varnado
Jason S. Varnado
Texas Bar No. 24034722
SDTX Ad. ID No. 32166
Email: jvarnado@jonesday.com
JONES DAY
717 Texas, Suite 3300
Houston, TX  77002
Telephone: 832-239-3939
Facsimile: 832-239-3600

Kathryn Keneally (*Admitted Pro Hac Vice*)
New York Bar No. 1866250
Email: kkeneally@jonesday.com
James P. Loonam (*Admitted Pro Hac Vice*)
New York Bar No. 4035275
Email: jloonam@jonesday.com
Sarah D. Efronson (*Admitted Pro Hac Vice*)
New York Bar No. 5217484
Email:sefronson@jonesday.com
Colleen E. O'Connor (*Admitted Pro Hac Vice*)
New York Bar No. 5764725

Email: colleenoconnor@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281-1047
Telephone: 212-326-3939
Facsimile: 212-755-7306

Irina K. Bleustein (*Admitted Pro Hac Vice*)
District of Columbia Bar No. 1044772
Email: ibleustein@jonesday.com
Conor G. Maloney (*Admitted Pro Hac Vice*)
District of Columbia Bar No. 1632584
Email: cmaloney@jonesday.com
Patrick J. Manion (*Admitted Pro Hac Vice*)
District of Columbia Bar No. 1615138
Email: pmanion@jonesday.com
Michael R. Tompkins (*Admitted Pro Hac Vice*)
District of Columbia Bar No. 1720349
Email: mtompkins@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: 202-879-3450
Facsimile: 202-626-1700

*Attorneys for Defendant*
*Robert T. Brockman*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 11th day of November, 2021, I electronically served this document on all counsel of record.

/s/ *Jason S. Varnado*
Jason S. Varnado