<pre>
1                    FEDERAL TRADE COMMISSION
2
3   In the Matter of:              )
4   CDK GLOBAL,                    )   File No.
5        a corporation,            )   171-0056
6   And                           )
7   REYNOLDS AND REYNOLDS,         )
8        a corporation.            )
9
10
11                          Wednesday, September 18, 2019
12
13                          Sheppard Mullin
14                          2099 Pennsylvania Avenue, N.W.
15                          Washington, D.C.  20006
16
17              The above-entitled matter came on for
18   investigational hearing, pursuant to notice, at 9:05
19   a.m., for the testimony of:
20
21                   ROBERT BROCKMAN
22
23
24
25   Reported by:  Deborah Wehr, RPR
</pre>



GOVERNMENT
EXHIBIT

4:21-CR-009-GCH
No. 32

FTC-0000001

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF THE FEDERAL TRADE COMMISSION:

 4        DANA F. ABRAHAMSEN, ESQUIRE

 5        J. ALEXANDER ANSALDO, ESQUIRE

 6        MICHAEL WILLIAMS, ECONOMIST

 7        Federal Trade Commission

 8        600 Pennsylvania Avenue, N.W.

 9        Washington, D.C.  20580

10        (202) 326-3695

11        dabrahamsen@ftc.gov

12

13

14   ON BEHALF OF REYNOLDS & REYNOLDS:

15        MICHAEL P.A. COHEN, ESQUIRE

16        Sheppard, Mullin, Richter & Hampton, LLC

17        2099 Pennsylvania Avenue, N.W.

18        Suite 100

19        Washington, D.C.  20006

20        (202) 747-1958

21        mcohen@sheppardmullin.com

22

23   ALSO PRESENT:

24        SCOTT CHERRY

25        JON EMMANUAL
```

FTC-0000002

```
 1                        I N D E X

 2

 3   EXAMINATION BY:                          PAGE

 4   Mr. Abrahamsen                           5

 5

 6

 7   EXHIBIT         DESCRIPTION              PAGE

 8   CX 4468         NADA e-mail              40

 9   CX 2250         ADP initial reply        47

10   CX 4043         Talking points           51

11   CX 4515         Captcha codes            67

12   CX 4004         Invalid login e-mail     73

13   CX 1151         ADP agreement            76

14   CX 4035         Talking points           99

15

16

17

18

19

20

21

22

23

24

25
```

FTC-0000003

```
 1                   P R O C E E D I N G S
 2                   -   -   -   -   -
 3          MR. ABRAHAMSEN:  This proceeding will come to
 4   order.  This hearing has been convened on Wednesday,
 5   September 18th, at approximately 9:00 a.m. at the
 6   Sheppard Mullin Law Firm at 2099 Pennsylvania Avenue,
 7   Northwest.  We will proceed under the Federal Trade
 8   Commission's rules that are applicable that we've read
 9   into the record several times.  Is that amenable to
10   you, counsel?
11          MR. COHEN:  It is.  We agree to that.  Thank
12   you.
13          MR. ABRAHAMSEN:  Mr. Brockman, are you
14   represented by counsel today?
15          MR. BROCKMAN:  Yes.
16          MR. ABRAHAMSEN:  Who is your counsel?
17          MR. COHEN:  Mr. Brockman is pointing down the
18   row.  We'll introduce ourselves for the record, if that
19   is helpful, Mr. Abrahamsen.
20          MR. ABRAHAMSEN:  Yes.
21          MR. COHEN:  My name is Michael Cohen with the
22   law firm Sheppard Mullin, and I represent Universal
23   Computer Systems, the Reynolds and Reynolds Company,
24   and Mr. Brockman today.
25          MR. NAIK:  My name is Amar Naik of Sheppard
```

FTC-0000004

1    Mullin.

2         MR. CHERRY:  Scott Cherry, general counsel of

3    the Reynolds and Reynolds Company.

4         MR. EMMANUAL:  Jon Emmanual, in-house counsel

5    for Reynolds and Reynolds Company.

6         MR. ABRAHAMSEN:  Thank you.  I'm Dana

7    Abrahamsen.  I represent the Federal Trade Commission.

8    I'll be asking most of the questions today and

9    tomorrow.  And I would ask my colleagues to introduce

10   themselves for the record.

11        MR. ANSALDO:  I'm Alex Ansaldo.  I'm also a

12   lawyer with the FTC.

13        MR. WILLIAMS:  My name is Mark Williams.  I'm

14   an economist with the Federal Trade Commission.

15        Whereupon --

16                 ROBERT BROCKMAN,

17        a witness, called for examination, having been

18   first duly sworn, was examined and testified as

19   follows:

20                 EXAMINATION

21        BY MR. ABRAHAMSEN:

22   Q.  Thank you, Mr. Brockman, very much for coming

23   to Washington to sit for this hearing.  We appreciate

24   it very much.  We'll be doing part of the hearing

25   today.  We'll finish up tomorrow morning and go until

FTC-0000005

1    1:00 today and 1:00 tomorrow afternoon, as I understand
2    the schedule.
3         You have been through this procedure before, I
4    know, so I won't spend too much time on the
5    preliminaries.  The biggest problem we have in these
6    proceedings is it's not like a normal conversation.
7    You have to wait for me to get my whole question out.
8    I have to stop so she can get the whole question down.
9    And I have to listen to your whole answer before asking
10   my next question.  If we talk over each other, she'll
11   remind us to stop doing that.
12        We will take breaks during the course of our
13   hearing today and tomorrow.  I will call for a break
14   when I get to a good stopping point or you or your
15   counsel can call for a break.  The only ground rule we
16   have there is that we don't take a break while a
17   question is pending.  We just answer the question and
18   then we take our break.
19        If I ask any questions that you don't
20   understand, you want me to rephrase it or we can have
21   her read them back, that's perfectly okay during the
22   course of our proceeding.
23        And with that, let me let you introduce
24   yourself and explain your position with your current
25   employer.

FTC-0000006

1      A.   Again, my name is Bob Brockman.  The original
2  company which lives on today as the top of a holding
3  company I started in the living room of my house with
4  my wife in 1970, 49 years ago.  As a matter of fact,
5  September 1st is what we recognize as the anniversary
6  date.
7          Before that I worked for IBM for five years
8  selling basically services.  I gravitated to car
9  dealerships because I felt comfortable around them.  My
10  specialty was parts inventory control.  It was in the
11  early days when you used to use card systems to keep
12  track of parts and you had tubs and trays and sometimes
13  slide-outs where you -- when you sold a part you had to
14  go find where it is physically in the card system and
15  record the date and how many were sold and carry
16  forward the balance.
17      Q.   So did you use your experiences at IBM to turn
18  this card-based system into a computer-based system?
19      A.   Yes.  I was a salesman, and I sold it and
20  installed it.  There was a very, very early version
21  that ran on, I believe, a 12K computer that would fill
22  up half this room.
23      Q.   And what was the name of the company that you
24  founded?
25      A.   Universal Computer Services.

FTC-0000007

 1     Q.  And I think I have seen that referred to by its
 2   initials, UCS?
 3     A.  Yes, that's correct.
 4     Q.  When did you become a maker of what we would
 5   refer to as a DMS, dealer management system software?
 6     A.  Well, to go all the way back to the beginning
 7   of how it started and why it started, I went to work
 8   for IBM in January 10, 1966, for sales training, and in
 9   Houston branch office of the IBM Service Bureau.  There
10   were a number of applications, what they call
11   preplanned software or prepackaged software in those
12   days.  They covered things like credit unions,
13   brokerage firms, CPA firms.  And then they had two
14   applications for car dealerships which I would describe
15   as version 1.  They had a parts inventory system and an
16   accounting package.
17         As I have said just a minute or so ago, I'm
18   very familiar with car dealerships.  I grew up on a
19   small used car lot with my dad, and I went with him in
20   my teenage years to things like car auctions.  I went
21   to new car dealerships to see if they had some older
22   model stuff that they would like to sell.
23         At the same time, I started reconditioning
24   cars.  Originally it was washing and waxing them, but
25   then it evolved into curing rust.  Rust was a real

FTC-0000008

1    problem in those days.

2       Q.  And would you consider the IBM software

3    packages that you just mentioned, the parts and the

4    accounting, would you consider those a DMS or did DMS

5    apply to something later?

6       A.  They were the early stages.  Those two

7    applications are key applications even yet today.

8    Accounting and parts are two of the major, probably --

9    I consider there's probably eight applications that are

10   in what is considered a DMS today.

11      Q.  So how would you describe a DMS today?

12      A.  It's an ERP system for car dealers, and it's

13   highly specialized to how car dealers operate.

14      Q.  And what was the acronym you just used?

15      A.  ERP.

16      Q.  What's that stand for?

17      A.  That stands for enterprise reporting.

18      Q.  When you were at UCS, were there particular

19   kinds of car dealerships that you tried to focus on

20   when you first entered the DMS business?

21      A.  General Motors.

22      Q.  And why was that?

23      A.  They have a very, very compact part number.

24   It's typically nine digits.  It's all numeric.  It's

25   much easier to work with than, say, Ford.  Ford has a

FTC-0000009

1    part number which can be as long as 17 characters and

2    has alphabetical components.  And the Ford system, Ford

3    dealers like that because you can look at a part number

4    and you can tell what year model, what year model Ford

5    it is, which Ford, is it a truck number, is it a

6    four-door sedan number, is it a Mustang number.

7        Q.  So the General Motors ones, being all numeric,

8    were easier to put into the computer?

9        A.  That's right.

10       Q.  In terms of -- let me ask you to fast forward

11   and tell me about the acquisition of Reynolds.

12       A.  What would you like to know?

13       Q.  Why did you buy it?

14       A.  It can be best described as I was on safari in

15   Africa, and one of my hunter fellows came and woke me

16   up in the middle of the night and said, Mr. Brockman,

17   Mr. Brockman, wake up, big tiger, get your gun.

18           And that's the reason why I did it.  They were

19   my major competitor, and the thought -- well, at first

20   it kind of terrified me.  The more I thought about it,

21   it was really feasible from a financial standpoint.

22   And it represented, again, the biggest tiger that I

23   ever faced, and that's why I did it.

24           My wife asked me, she said, tell me how our

25   life is going to be better because of this.  I said,

FTC-0000010

1    well, it's not.  She said, okay, I just wanted to

2    understand for sure.

3        Q.  So at the time UCS and Reynolds merged

4    together, who were the other companies that made DMSes?

5        A.  It was a part of ADP, a division of ADP.  There

6    was a small DMS provider out of Salt Lake City.  I

7    would say as far as a complete DMS, there was just

8    handful.

9        Q.  And in this time period, right at the time of

10   the merger, what would you estimate the market shares

11   of the various DMS players to have?

12       A.  Probably immediately after the merger, Reynolds

13   and Reynolds, we didn't abandon the old name.  We just

14   quit using it.  We used the Reynolds and Reynolds name

15   because it's 150 years old and it's well known.  But I

16   would say probably somewhere in the 40 percent area,

17   mid 40s.

18       Q.  And what about ADP's market share at that time?

19       A.  Probably like 30, 35 percent.

20       Q.  Who would have been the number 3 in the

21   industry at that time?

22       A.  I don't remember.  Those smaller companies kind

23   of come and go, and I don't remember who the other

24   ones -- there were several others, but again, very

25   small.  And they would be a borderline whether or not

FTC-0000011

1    their product really could be considered a DMS.

2        Q.  What would be it be considered if it wasn't

3    considered DMS?

4        A.  An accounting system.

5        Q.  In the time that you have been in charge of the

6    combined entities of Reynolds and UCS, have you tried

7    to focus on larger dealerships?

8        A.  Yes.  The small dealerships are marginally

9    profitable because they don't use very many software

10   packages because they are located in some small town

11   where they know everybody already and they can stand up

12   and look out the front window and see their inventory.

13   They don't need software packages for that sort of

14   thing.

15        It takes a lot of travel.  There's a lot of

16   what we call bug crushing time.  You got to go from one

17   place to another place to another.  So we focus on

18   bigger dealerships, more complex, and we find that the

19   smaller dealerships can get by with a lesser product.

20   The bigger dealers which are now more and more -- were

21   one physical person will own now five dealerships, we

22   see 10, 15, 20, 25 where they are consolidating smaller

23   dealerships to gain scale.

24        Q.  You said in that answer that the smaller

25   dealerships are marginally profitable.  Did you mean

FTC-0000012

1    for Reynolds as having them as a client?

2        A.  Yes, as well as for themselves.

3        Q.  Has Reynolds been successful in its attempt to

4    focus on large dealerships?

5        A.  Not completely, but certainly we've made some

6    real progress.  We have the number 2 largest public

7    chain which is the Penske Group.  And then we have the

8    largest private group which is Hendrick Motor Sports.

9        Q.  What would you define as the larger

10   dealerships?

11       A.  Ones that have bigger physical facilities,

12   bigger inventory, sell more cars per year, have more

13   employees.

14       Q.  Is there in your mind a number of rooftops that

15   is sort of a dividing line between larger dealerships

16   and medium-sized or smaller dealerships?

17       A.  A small dealership would be something, an

18   entity that sells less than 50 new vehicles per month.

19   That would be considered a small dealership.  A large

20   begins -- probably to be a truly large single-point

21   dealership would be somebody that sells 400 new cars a

22   month.  And one thing I would like to make sure is

23   understood, I consider rooftops a very poor measure of

24   market penetration.

25       Q.  Why is that?

FTC-0000013

```
 1        A.  Well, as a private company, the only things
 2   that count as far as I'm concerned is net profit.
 3   Sales dollars is very much less important.  The whole
 4   goal is to produce a quality product and sell it to big
 5   guys, and that means that I will forever trail
 6   rooftops, and not deservedly so.  Of course, I don't
 7   publish financial statements, so I just have to accept
 8   the fact that everybody will think that we are smaller.
 9        Q.  So the better measure for you, rather than
10   rooftops, would be the total sales that the dealership
11   has?  Would that be a factor you would look at?
12        A.  Yes, certainly a larger dealership would be a
13   better prospect for us.  They would be more apt to need
14   and want advanced software.
15        Q.  When you say advanced software in that answer,
16   what are you referring to?
17        A.  Well, the basic software was accounting, parts,
18   service, inventory, financing, factory communications,
19   payroll, human resources management, just a larger
20   number.  In some cases as many as 25 or 30 different
21   applications would be sold for an individual rooftop.
22        Q.  And what capability does Reynolds have to serve
23   these large dealerships that, say, some other DMS
24   company wouldn't have?
25        A.  We just have more, and they are better.  They
```

FTC-0000014

1    are better engineered applications.  And the goal is to

2    provide the management tools that help a dealer operate

3    profitably above all else.

4        Q.  When you say they are better engineered

5    applications, do they have proprietary software to

6    Reynolds?

7        A.  No.  We build all our own software.

8        Q.  Is there software that Reynolds provides that

9    helps a dealership that has multiple different OEMs

10   that they serve have consolidated accounting across all

11   their --

12       A.  No.  And especially what I call side-by-side

13   reporting where we have a report that's this wide and

14   you have dealership number 1 numbers, dealership number

15   2 numbers, dealership number 3 numbers and where you

16   can see what's going on kind of at a glance.  And then

17   we also consolidate for financial reporting.

18       Q.  Why is it other DMSes can't provide that kind

19   of information?

20       A.  They can but it's a struggle.  Whereas, our

21   software, you press the button and you get the display

22   instantly.  Our accounting system is instant update.

23   In management, particularly of multiple dealerships,

24   the ability to push a button and see all this on the

25   screen and print it off is very advantageous.

FTC-0000015

```
 1    Dealerships are -- they are different than your typical
 2    business in that they measure things literally by the
 3    hour.  Dealerships are very thinly profitable.  They
 4    operate on a 1-1/2, 2 percent margin.  And if we don't
 5    have good sales this Saturday, then we miss our target,
 6    we've got to take action so that we have more sales
 7    next week to make up for the fact that we didn't hit
 8    our numbers this week.  So the interest and need for
 9    realtime kind of information to drive a dealership, if
10    you think of it as a ship, daily or weekly or monthly,
11    that kind of numbers don't really cut it.  You got to
12    have right-now kind of stuff.
13        Q.  When your sales force is talking a large
14    dealership, do you explain to them that you have
15    capabilities that other DMS providers don't have?
16        A.  That's the goal.  I teach our salespeople
17    forget being a salesman because you don't sell this
18    kind of stuff.  I mean, people buy it, but you are not
19    going to hammer through and convince them to buy your
20    stuff.  What you do is you teach.  You teach how your
21    stuff works and you teach them how it can be used in
22    various segments of their business to earn more
23    profitability.
24        Q.  What would be some of the things you would be
25    teaching a dealership in terms of your DMS's capability
```

FTC-0000016

1    that is superior to other DMSes in the marketplace?

2        A.  I would say the first and probably most

3    important thing we talk about is we refer to it as

4    built as one, works as one.  So you can have multiple

5    applications, but they talk to each other, which

6    eliminates a lot of data entry.  It makes the ability

7    to produce a report that has information from multiple

8    packages all showing on a screen at once.

9        Q.  What other DMSes are most capable of also

10   servicing the large dealerships?

11       A.  It would be CDK.

12       Q.  And what is it that CDK has that, say, the

13   other ones in the market don't have?

14       A.  They have a lot of historical -- they have been

15   in business for a long time.  Again, this is back to

16   the issue of how do you define market share.  If you

17   define market share by rooftops, they will sell them

18   any size, including the little bitty ones just to get

19   rooftop counts because that's what pleases the

20   analysts.  As a public company, they have to chase that

21   number.

22       Q.  Are there arguments or teaching moments that

23   you have your sales reps do to explain what the

24   features are of the Reynolds DMS that other smaller DMS

25   companies just simply can't replicate?

FTC-0000017

1    A.   Absolutely.  I mean, that's what we are looking

2    for.  Car dealers are an interesting lot.  Over the

3    time that I have been in the business, where a car

4    dealer is born, they are born as car salesmen.  And

5    they are very successful car salesmen.  They accumulate

6    enough nest egg so they can actually buy their own

7    dealership.  They are, frankly, in most cases, have no

8    formal education past high school.  They are physically

9    attractive.  They are very people sensitive.  Their

10   whole goal is to get the person who is interested in

11   buying a car to like them and have personal rapport.

12        But so the challenge that we face is getting

13   enough teaching time.  The way that I was successful

14   back in the beginning, I was not ever a salesman.  I

15   never held myself out as a salesman.  I was an

16   inventory system consultant.  That was what my business

17   card said.  And if I could get five minutes with a

18   prospect, that would give me all the time that I need,

19   all the audience that I need because they were

20   convinced that I knew what I was talking about.

21   Q.   So aside from built as one, works as one and

22   the capability to call up more information on the

23   computer screen, what other attributes does Reynolds

24   teach the dealership about that makes its product

25   superior?

FTC-0000018

```
 1      A.  Well, probably one of the more important places
 2   is car deals, transaction documents and the sale of a
 3   vehicle.  You would think you would get all that done
 4   on one page.  Well, it's more like 30 or 35 pages,
 5   especially when there's financing involved.  And from a
 6   process standpoint, when a car sale occurs 90-plus
 7   percent of the time it's going to be financed.  And a
 8   very large percentage of that group will be financed
 9   with what we call the captive finance companies.
10   That's Toyota Motor Credit, Ford Motor Credit.
11          The mechanical process is that while the forms
12   are prepared by typically an electric typewriter hooked
13   to a computer that actually types, fills in all the
14   blanks, it gets signed up, and then every day FedEx
15   packages go from the dealership to the lender.  And if
16   they are doing five lenders, well, it would be five
17   daily FedEx packages.  And it arrives into a big puddle
18   of clerks that open the FedEx packages and they take
19   out the loan documents, and they commence to go through
20   the loan documents to make sure everything is
21   completed.
22          If everything works good, the typical
23   turnaround time is 12 days before the dealer actually
24   gets the money from the finance source.  In the
25   meantime, he has to pay off his floor plan daily.  For
```

FTC-0000019

1    every car that leaves the lot, it's got to be paid off
2    within 24 hours.  So there's a big stretch in there
3    that takes a lot of working capital.
4         What happens if something is not initialled
5    properly?  It goes back in another FedEx package back
6    to the dealership.  The dealership then opens it up,
7    figures out what's wrong, and nine times out of ten,
8    they have to ask the consumer to come back to the
9    dealership to sign a new -- that is never, ever easy
10   because consumers don't want to do that.  If there's a
11   little more money involved, it's even worse.
12       Q.  So is that a procedure that the Reynolds DMS
13   can handle more seamlessly than one of the smaller DMS
14   companies?
15       A.  Exactly.  We have a product which we call
16   DocuPad.  It is about 4-1/2 feet probably and 30 inches
17   wide, and it has a 32-inch video screen.  And the whole
18   transaction takes place on the video screen.  And the
19   customer actually drives it.  They have their own
20   stylus and they click on this, click on that.  The end
21   result is you have a complete electronic document.  And
22   we know on every document where it's got to be
23   initialled, where it's got to be signed.  If it's not
24   initialled and signed, we won't let it go.  So that
25   means the flow going to the finance company is clean,

FTC-0000020

1    and you don't have where something is missing and it's
2    got to be sent back to the dealership and the consumer
3    has got to come back in.  We just cut all that out.
4        Q.  Is this DocuPad a product that Reynolds lets
5    dealerships use that are not using a Reynolds DMS?
6        A.  No.  It is actually built into Reynolds' DMS.
7    The calculations, for instance, that show on the screen
8    are really from our standard finance package, all the
9    rate calculations, the payment calculations.  It's all
10   part of our main F&I system.
11       Q.  So that would be proprietary to Reynolds?
12       A.  Yes.
13       Q.  Can you give us another example of a feature
14   that Reynolds has when you are educating the dealer
15   about why they should go with Reynolds rather than one
16   of the smaller DMS companies?
17       A.  Probably another example is actually a fairly
18   old example, but it's still really, really true.  In
19   the parts system, we actually prepare the parts
20   invoice, which means that the parts department employee
21   keys in the account number for the customer, and then
22   they key in the part number for each part that's sold
23   all in a blank.  The inventory levels are reduced on
24   those parts that have been sold.  But probably more
25   importantly is, and that's it's made possible what we

FTC-0000021

 1   call matrix pricing.

 2        Q.  What's matrix pricing?

 3        A.  It means that you end up with differing prices

 4   to the end user.

 5        Q.  Differing prices based on what?

 6        A.  Based upon what matrix that has been assigned

 7   to them.  Basically what happens is that the parts

 8   department, as things get continually squeezed, as they

 9   always do, they have put some severe thought into how

10   much it costs them to service different types of

11   customers.  The worst type of customer is the guy that

12   comes in on Saturday, he had something broken on his

13   car but he doesn't have the part number.  So he says, I

14   have got such-and-such kind of car and I need the

15   thingamabob.  And they start going through the

16   electronic parts catalogs looking at pictures, and he

17   says, there, that's the thing I want.

18            And lots of times the dealership doesn't have

19   the part, but lots of times it does and they'll

20   complete the sale.  About half the time those parts

21   come back on Monday returned for credit.

22        Q.  Is this parts system that you have built,

23   that's something you can only get with a Reynolds DMS?

24        A.  The parts invoicing system is an integral piece

25   of the whole system.  And what it does is it decides,

FTC-0000022

1  for instance, this type of customer I just described,
2  he doesn't get any discount at all.  But if there's
3  another type of customer who you are fighting with a
4  competitor to sell to, the discount is going to be very
5  finely regulated, just a hair less expensive than the
6  competitive dealership.
7      Q.  And this is a system that Reynolds has
8  developed internally?
9      A.  Over the years.  I actually developed it in a
10 system that goes back to like 1975.
11     Q.  You mentioned in a prior answer that -- I don't
12 think I followed your answer completely, but you were
13 mentioning a screen where a dealership had side-by-side
14 dealerships, I believe, is the phrase you used.
15     A.  Correct.
16     Q.  You were describing something that was going to
17 come up on the screen when they pushed one button.  I
18 don't think I followed what your explanation was.
19     A.  Again, this is specific and unique to
20 dealerships.  They have a concept called daily
21 operating control.  And what that is, that is not a
22 true financial statement but their best guess as where
23 they are at as far as sales and profit every month
24 compared to their goal where they want to be at the end
25 of the month when the formal financial statement is

FTC-0000023

1    published.

2          But they want to know -- a multi dealer, he

3    wants to know if, say, he has five dealerships, he

4    wants to know how the whole fleet is going.  And so

5    this is the ability to press the button and have the

6    daily operating control numbers, which is as close as

7    you are going to get to a financial statement

8    approximation, to have those displayed on the screen

9    simultaneously side by side.  And there's different

10   formats.  You could have instead of just one column per

11   dealer, you might have three columns per dealer.

12       Q.  And this was a process that was developed

13   internally at Reynolds?

14       A.  Yes.

15       Q.  And this is a process that you can't get if you

16   have a non-Reynolds DMS?

17       A.  The competition has varying levels in the same

18   kind of capacity.  Product development is, in our

19   world, a rat race.  What you do is you have an idea and

20   you work hard and you build it, and for a while you

21   have exclusivity, and that helps sell complete systems.

22   And then the competitors see what you are doing and

23   they copy it.  And then that cycle just continuously

24   goes on.  And it's been that way the whole time that I

25   have been in the business.

FTC-0000024

1     Q.  So in terms of this product, what would you
2  have your sales force educate the dealer about to
3  convince them to go with a Reynolds rather than some
4  other DMS?
5     A.  The DocuPad system is our sharpest, most
6  powerful, most salable, best recognized product.  That
7  would be the one that they would certainly start with.
8     Q.  In terms of going into a large dealership and
9  distinguishing Reynolds' product as uniquely positioned
10  to serve a large dealership, what would you teach the
11  owner of the dealership?
12     A.  There's an interesting phenomena that has to do
13  with the sale of after-sale products.  The typical
14  cycle of a sale of a vehicle goes like this: The
15  prospect comes in and they kind of generally know what
16  they want.  They are looking for cars or a pickup
17  truck.  The salesperson talks with them and tries to
18  get them to settle on something that they can afford
19  that's what they want.  So the negotiation takes place
20  and a, quote, deal is agreed upon.
21        Then they have -- the buyer is taken typically
22  to a reception lounge and has to wait probably
23  45 minutes to an hour to get to go to finish up the
24  paperwork.  Well, that's what the customer thinks.  But
25  what's really going on is this is now the second

FTC-0000025

1    attempt to sell a whole bunch more stuff.  This is

2    where the extended warranties are sold.  This is where

3    what they call rust and dust, it's the paint protection

4    package.  It's where they sell you specialty insurance

5    for your tires and wheels.  So if you live in a town

6    that's got lots of potholes and you have got

7    low-profile tires and aluminum wheels, you are going to

8    have a problem at some point.

9         And all this is done in the monthly payment,

10   which is critical to the buyer.  It is recalculated

11   every time something is put on or taken off.  People

12   don't like that, that process.  I remember when my son

13   went out to buy his first car, I said this is what's

14   going to happen.  When you go in that room to finish

15   the paperwork, do your arms like that, and it's no to

16   everything.

17       Q.  So how does this factor in to your ability to

18   get large dealerships to go with Reynolds?

19       A.  There's one more little tidbit.  In DocuPad, we

20   don't do the strong arm.  They have their side of the

21   DocuPad, and we present to them lots of times with

22   visual sales aids, sometimes videos, they have their

23   own stylus and they say, okay, I would like to have

24   that one.  And it recalculates what the payment is

25   going to be.  And well, that one is a little too much,

FTC-0000026

1    so I'll take that one off.  Let's do this one, and it
2    recalculates the payment.
3         The miracle is people, by themselves, will buy
4    more than happens when they are dealt with pushy
5    salesmen.
6    Q.  Is this a feature that you have found is easier
7    to explain to a large dealership?
8    A.  Yeah.
9    Q.  Why is that?
10   A.  It enables the whole transaction to take place
11   rather quickly.  And people, many, many customers, they
12   just want to get done with the process and get on with
13   life.  So they make their decisions like that.  But the
14   end is, on average, a dealership that's using DocuPad
15   will generate $200 more profit than doing it the
16   traditional way.
17   Q.  Does CDK have something comparable to DocuPad?
18   A.  They have a system that's called -- it has a
19   name, but I'm sorry, I can't recall exactly what it is,
20   where they have a menu of things that you can buy.  It
21   works on a slate, and you can check off the things you
22   want and things you don't want.  But it's not
23   integrated into the finance system so you don't get the
24   payment refresh.
25        And there is nothing out there that compares to

FTC-0000027

Brockman

1    the DocuPad and the ability to do payment refresh so
2    that as people make their choices, they see what
3    happens to their payment and they can put things on,
4    take things off.  We are the only ones that do that.
5        Q.  So I have seen mention in some of the documents
6    there's other DMS companies like Dealertrack and
7    Auto/Mate, would they have something comparable to
8    DocuPad?
9        A.  No.  We have invested I don't know how much,
10   but it's in the millions in the software to make all
11   this work.
12       Q.  And your investment in software, is it fair to
13   say it's been geared toward larger dealerships?
14       A.  Yeah.  Smaller dealerships operate at a much
15   slower pace.  For example, we just finished installing
16   this at the Penske Group which has 150 dealerships.
17   And the Penske Group, what they were spending per month
18   on FedEx to get transaction documents in from a
19   dealership into their central accounting office would
20   be enough to make a strong man weep.
21           So if you use DocuPad, everything is
22   electronic.  So it's electronic, like instantly.  So as
23   soon as the transaction is finished, you hit the finish
24   button, the whole thing, all the forms, all the
25   signatures, everything goes to the central accounting

FTC-0000028

1    office without having to use FedEx, which is a

2    significant savings.

3          Also from a manpower standpoint, since we have

4    so many computer checks for DocuPad to ensure that the

5    transaction is done properly, when you don't have

6    kickbacks from the finance sources, life becomes

7    tremendously simpler.  The whole organization can close

8    their books a couple of days earlier than what they are

9    used to closing them because they are not having to

10   wait for packages of deals to come in.  You don't get

11   them -- in the old manual way you don't get them until

12   probably a week after month close.  With DocuPad, you

13   have them right to the close and you don't have to ship

14   anything around.  All the consolidation is -- it's all

15   automatic.

16         The updates to the accounting system are all

17   done hands-off.  And to a big dealer, that's very

18   important.  As a matter of fact, we have prospects that

19   buy DocuPad more for that than they do for the fact

20   that they can sell more and then generate more profit

21   per deal.  Their big bugaboo is the working capital

22   that it takes to fund a transaction until you finally

23   get funded by the finance source.

24     Q.  And that's available to any dealership?  Not

25   just Penske?

FTC-0000029

1        A.  Any Reynolds.

2        Q.  I want to shift gears a little bit before we

3    take our first break and talk a little bit about

4    Reynolds' relationship with the car manufacturers,

5    which I'll refer to as the OEMs, if that's comfortable

6    with you.

7        A.  Yeah.

8        Q.  Can you explain how the Reynolds DMS interacts

9    with OEMs?

10       A.  Yeah.  Probably the simplest way to say is yes,

11   it does.

12       Q.  What kinds of -- I assume it's data being

13   transmitted in some form.  Can you explain what data is

14   going on and what direction it's going and what kind of

15   data it is.

16       A.  It varies by OEM, but common to all of them is

17   they want to know if the sale of a vehicle took place

18   and they want to know what the vehicle identification

19   number is of that vehicle because that helps them in

20   their production planning.

21           There is this ongoing disagreement between

22   dealers and OEMs as to who owns the customer.  Dealers

23   like to think very much that they own the customer.

24   However, the OEMs, through the software that we

25   provide, you get all the information about all the

FTC-0000030

1    customers and they build customer files on the fly.

2    And they like to think that their direct mail pieces

3    will be more effective than what the dealer does, which

4    in some cases it is because they have dealers out there

5    that don't do anything as far as customer follow-up is

6    concerned.  They are archaic.

7         Q.  Does the --

8         A.  The OEM specifies what we have to do, and they

9    have a great cloud over our heads, because if we don't

10   do exactly what they want us to do as far as taking

11   data out of the DMS and shipping to it the OEM, they'll

12   disqualify us.  And our ability to be qualified a

13   supplier of factory communications for their OEM is

14   lifeblood for us.  For instance, if General Motors

15   decides they want to have a whole bunch more stuff as

16   far as lots of data and data fields sent to them on

17   each car deal, we say, yes, sir, yes, sir, because we

18   dare not.

19        Q.  Do they pay you for this?

20        A.  No.  They actually make the dealer pay.  The

21   dealer pays us for factory communications which is --

22   the size of that bunch of software varies by OEM.

23   General Motors is probably the most demanding right

24   now.  Ford has occupied that title for a while.  But

25   again, the OEMs are kind of at a constant race, among

FTC-0000031

1    other things, to be closer to what's going on in the
2    field.
3        Q.  So just so the record is clear on this, I'll
4    tell you my understanding.  You correct me if I'm
5    wrong.  But if I go in to a General Motors dealership
6    and I buy a General Motors car, General Motors expects
7    you to take the data that I have been inputted into the
8    dealer's DMS, my name, the VIN number of the car I
9    bought, maybe other details, and they -- General Motors
10   expects Reynolds to take that data that is in the DMS
11   that the dealer has entered and ship that information
12   to General Motors; is that correct?
13       A.  You got it exactly correct.  Now, there's a few
14   more touches.  The dealer has actually authorized
15   General Motors to do that, okay.  Why would they do
16   that?  Well, every few years, there's changes to the
17   dealership agreement with the factory.  And this is not
18   a negotiated situation.  It is a "you will."  So if a
19   dealer should dissent and say, for instance, forbid us
20   to do what we do, he would start to suffer in many
21   ways.  He wouldn't get the fast-moving cars.  His
22   payments coming back from the captive finance company
23   may not be as prompt as they used to be.  It is -- you
24   might face warranty claim audits more often than the
25   typical dealership, which are painful and expensive.

FTC-0000032

1      Q.  Am I correct in my understanding that at some
2   point after UCS bought Reynolds that there was a breach
3   of contract suit that went on between Reynolds and
4   General Motors?
5      A.  I think there was something, but frankly, I
6   don't remember exactly the details of what that was all
7   about.
8      Q.  You mentioned in a prior answer that one of the
9   things you are very concerned about is the prospect of
10  having an OEM decertify Reynolds as a DMS.  What did
11  you mean by decertify in that answer?
12     A.  Decertify, again, they publish very detailed
13  specifications as to how our dealer-to-factory
14  communications has to work, what data has to be
15  provided, in what format.  And they change that stuff
16  maybe not quite yearly, but certainly every two years
17  there are changes.  And we have to reprogram to meet
18  the new specifications, and if we should fail to do
19  that, we would not be a certified provider of
20  dealer-to-factory communications for that OEM, which
21  would have disastrous effects from a business
22  standpoint.
23     Q.  You say disastrous effects from a business
24  standpoint, you mean from a Reynolds business
25  standpoint?

FTC-0000033

1      A.  Yes.

2      Q.  And would the fear there be that if you had a

3   GM -- if you were decertified by GM, all of your GM

4   dealers who use your Reynolds DMS would have to shift

5   to a different DMS?

6      A.  Correct.

7      Q.  Has Reynolds been decertified?

8      A.  No.  But they also, when they give us specs and

9   they give us the order about what has to be done, they

10  never give us enough time to build it in an orderly

11  fashion and fully test it.  There's always an extreme

12  pressure scramble.  Some manufacturers are better about

13  that.  Some are worse.  GM is one of the worst.  And

14  Mercedes is probably one of the better.  Toyota is

15  really good as far as giving us a good spec.

16         We have lots of situations with General Motors

17  where the spec is -- has conflicting instructions as

18  what's to be done, and we have to go back to General

19  Motors and say, hey, your spec has got a problem; let

20  me point that out to you.  We teach them what they did

21  wrong and then they change the spec.  And then we are

22  able to finish the programming and actually get it in

23  the field.

24     Q.  How many OEMs have certified Reynolds?

25     A.  All of them.

FTC-0000034

1      Q.  Is that also the case with some of the smaller
2   DMS companies?
3      A.  The smaller DMS companies, considering the
4   amount of grief that we go through to stay certified, I
5   don't know how the small guys do it.  I think what they
6   must do is they must focus on one OEM or maybe two.
7   Whereas, we have folks on all of them.
8      Q.  You mentioned in a prior answer that General
9   Motors makes the dealer pay for the data transfer that
10  Reynolds does to General Motors.  How is that payment
11  made?
12     A.  Part of our standard monthly bill.
13     Q.  So the bill that General Motors sends to the
14  dealer has a line item for this?
15     A.  No.  It is -- the situation is more like this.
16  They say, Mr. Dealer, you need to sign up with Reynolds
17  and Reynolds for the General Motors OEM communications
18  package.  This goes in effect December 1st.  And in
19  most cases they actually even mandate what that charge
20  will be.  Sometimes it's a monthly charge.  Sometimes
21  there's a one-time and then a monthly charge.
22          But it then looks as though we sold them
23  factory communications.  Well, it's nothing of the
24  sort.  What they did was we get that business because
25  we are certified.  And because our factory

FTC-0000035

1    communications is very tightly integrated into the DMS,
2    and trying to use the standalone factory
3    communications, the amount of key entries it would take
4    to get the data together and get it shipped to General
5    Motors would be unthinkable.
6        Q.  I'm not sure I follow exactly how the payments
7    were made.  You said it's either a monthly or a
8    one-time fee.  How is this payment made?
9        A.  It's a product amongst all the rest of our
10   products, and we invoice for it and collect it.  And
11   that's our pay for putting up with what General Motors
12   wants.
13       Q.  Does it appear as a separate line item?
14       A.  Yeah.  It will say GM Factory Communication.
15   Or if they have multiple OEMs at the dealership, a
16   similar process will take place with each OEM, and
17   we'll bill it.  It will be a standard line item for us
18   to bill.
19       Q.  I have seen on the documents reference to RCI,
20   Reynolds Certified Interface, I believe it stands for.
21   Are the OEMs part of RCI or are they part of some other
22   type of certification within Reynolds?
23       A.  The OEMs, we consider them part of RCI.  From a
24   programming standpoint they are.  The same team handles
25   that.  And that is the way that it gets into our

FTC-0000036

1    invoicing system.

2        Q.  You said in that answer, you emphasized the

3    word "we" when you said that we consider it that way.

4    Is there to some degree some different thinking on

5    whether the OEMs are RCI certified?

6        A.  Well, the "we" includes me and everybody else.

7    My position is I was the only programmer for the first

8    five years, but I have not written a line of code since

9    1992.  That's when we bought Ford Computer Services

10    from Ford Motor Company.  However, I hang out with the

11    programmers a lot.  I know them all -- not all of them

12    because there's hundreds of them.  But the key ones I

13    know very well and have worked with them for a long

14    time.

15            And in product development, what my position

16    is, there's an idea to build something and there's

17    probably several other ideas to build something.  You

18    know, there's many competing wishes for this or that or

19    whatever, and I'm the guy that decides what we will and

20    what we won't from a product development standpoint.

21    So that's my relationship to the programming

22    department.  I'm the keeper of the budget.

23        Q.  And you said the same team works on the OEMs.

24    You mean the same group of software programmers that do

25    all other RCI interfaces also are the same people that

FTC-0000037

1    work with the OEMs?

2        A.   That's a little more complicated to answer

3    because factory communications started 30 years ago.

4    And so the factory communications team was part of the

5    main programming group, which in those days, of course,

6    was much smaller.  And I can remember the factory

7    communications team is maybe like two or three

8    programmers.  They got done what needed to be done.

9            As time has gone on, it looks like those

10   programmers don't belong in the main programming group.

11   They belong off in the group that handles RCI requests

12   when it comes to OEMs.

13       Q.   You mentioned in a prior answer, I didn't quite

14   catch it, but you gave a date and you said that's when

15   we acquired, and I thought you said something about

16   Ford.  You acquired something from Ford?  I didn't

17   follow that.

18       A.   Ford Motor Company -- and they started this

19   probably in the late '60s.  They were dissatisfied --

20   Ford was dissatisfied or Ford dealers in general were

21   dissatisfied as to what was available to them from a

22   DMS perspective.  So Ford built their own DMS software

23   in a department, a fairly large department inside Ford

24   Motor Company.  But they didn't do a very good job at

25   it mainly due to some personnel practices that Ford had

FTC-0000038

1    which were -- when it comes to software development,
2    were quite insane.
3          What they did was Ford Motor Company has a
4    policy called cross-functional assignment where they
5    take managers and they move them out of their skill set
6    and they put them in other departments just for them to
7    learn how the rest of the business works.  And so the
8    programming department that was fairly large was led
9    by -- the supervisors throughout that department to a
10   man, we are not programmers.  They had never written a
11   line of code and they were put in to supervise a
12   programming team of 6, 8, 10, 15 people without a clue
13   how to evaluate what they were doing.  And therefore,
14   Ford Dealer Computer Services' DMS product did not
15   prosper.
16          The dealers kept bitching, so -- to a gentleman
17   by the name of Bob Rewey, who was vice president of
18   sales for Ford Motor Company worldwide.  And he got
19   tired of it and he said, I want to sell the goddamn
20   thing.  They put it up for bid, and we won the bid and
21   quadrupled revenues overnight, tripled personnel
22   overnight and became kind of the dominant supplier of
23   DMSes for Ford dealers.
24       Q.  Was this UCS that purchased this?
25       A.  Yes.

FTC-0000039

1      Q.   This was prior to the time you merged are

2  Reynolds?

3      A.   Yes.  Reynolds merger was 2006.  This one was

4  1972.

5           (A recess was taken.)

6           BY MR. ABRAHAMSEN:

7      Q.   We'll go back on the record.

8      A.   Can I clarify a date?

9      Q.   Yes, by all means, Mr. Brockman.

10     A.   The Ford Dealer Computer Services acquisition

11 was 1972.

12     Q.   1972?

13     A.   Yeah, 1972.

14     Q.   So that would have been just a couple years

15 after you formed UCS?

16     A.   Wait a second.  Excuse me.  It was 1992.

17     Q.   Okay.  So about a goodly amount, over 20 years

18 after you formed UCS and several years before you

19 bought Reynolds?

20     A.   Um-hum.

21     Q.   Thank you very much for clarifying the record.

22 Let me show you an exhibit we've marked as CX 4468 and

23 ask you to take a look at it.  CX 4468 has Bates number

24 REYCID0568116.  It appears to be an e-mail with an

25 attachment from the National Automobile Dealers

FTC-0000040

1    Association.  And my first question for you,
2    Mr. Brockman, is whose handwriting is on the first page
3    of the exhibit?
4        A.  That's mine.
5        Q.  And what was the occasion for you to take these
6    handwritten notes?
7        A.  I was planning to -- I personally felt like I
8    needed to attend an NADA/Reynolds data meeting.
9        Q.  What was the purpose of the Reynolds data
10   meeting?
11       A.  Well, Peter Welch, of course, is the president
12   of NADA, or was at that time, and I was very interested
13   and concerned that what we might do as far as data
14   security going forward to comply with what NADA's
15   recommendations were.
16       Q.  What were your concerns?
17       A.  Well, at this point in time, I was not really
18   fully informed as what the federal laws were as far as
19   data security is concerned, and this particular meeting
20   was really quite valuable in teaching me more about
21   what was going on as far as data security is concerned.
22   There was a gentleman, and I'm sorry I don't recall his
23   name, but he was an attorney with NADA who specialized
24   in knowing such things, and it was very, very useful to
25   listen to what he had to say.

FTC-0000041

1      Q.  Let me ask you to turn to the page that has
2  CX 4468-007.  I'll let you take a look at that page,
3  but let me -- I'm going ask questions about security
4  protocols when it comes to DMSes with regard to third
5  parties and whether or not the dealer can give a user
6  name and a password out to a third party and how this
7  document addresses that issue.
8          So I was going to ask you to look at the text
9  at the top of this page, and I'm just going to ask you
10  to give me your interpretation of footnote 19.  I'll
11  give you a chance to catch up.
12      A.  The print is small, but I have read it.
13      Q.  Is this document from NADA taking the position
14  that the dealers can be permitted to give their vendors
15  password access to their DMS?
16      A.  I don't think so.
17      Q.  How do you interpret the document?
18      A.  I interpret the document as certain safeguards
19  had to be followed when it comes to dealership data
20  because dealerships were considered to be financial
21  institutions, and therefore, to continue to qualify as
22  financial institutions, there's certain things you have
23  to do having to do with who gets access to what.  A
24  third party has to be covered by contract.  A dealer
25  has to have a contract with the third party before they

FTC-0000042

1   can have any data that they hold turned over to them.
2   All told, my perception of this document is things
3   needed to be tightened up even further than what they
4   were before.
5       Q.  Tightened up further in the sense that -- in
6   what sense?
7       A.  Well, as to who has access.  The whole
8   evolution of security with DMS systems has kind of been
9   a long and twisted trail.  Reynolds, when I arrived, as
10  far as passwords are concerned, they had evolved
11  somewhat.  Back in the beginning, a single password
12  would get into thousands of Reynolds computers, and
13  they had connected down to where it was a password by
14  region and a password by state and then ultimately an
15  individualized password because that was viewed to be
16  kind of the first line of defense.
17          Dealers don't understand passwords and
18  security.  They don't particularly want to.  Certainly
19  the managers inside the dealerships are paid off gross
20  profit, and they are interested in increasing gross
21  profit and very little else.
22      Q.  I take it the evolution of this security
23  development included a period where dealers were giving
24  out passwords to app vendors; is that correct?
25      A.  Yes.  It was widespread.

FTC-0000043

1       Q.  And is that contrary to your belief as to how
2   data should transfer out of a DMS into a third party's
3   hands?
4       A.  It absolutely is at variance with the way I
5   understand that it has to be done.
6       Q.  And your preferred approach would be for the
7   DMS and the DMS only to transfer data out of the
8   dealer's DMS; is that correct?
9       A.  That would be my preference in that handling of
10  data has substantial liabilities attached to it.  Based
11  upon my experience so far, whenever there's some kind
12  of data breach, whether or not we are responsible or
13  not, we are the first ones that get called.
14      Q.  Well, when you say a liability in that answer,
15  you are talking about potential liability for Reynolds
16  and Reynolds?
17      A.  Yes.
18      Q.  And the liability would arise -- correct me if
19  I'm wrong, but your fear is that if a dealer authorized
20  some third party to get data from the dealer's DMS, if
21  that data got into the wrong hands, you have a fear
22  that even though it was the dealer that permissioned
23  that, you would be the deep pocket and you would
24  ultimately face possible liability?
25      A.   That's correct.  At the very, very minimum, we

FTC-0000044

1    would be on the hot seat.  And we know that because we
2    have been through one significant experience.  There
3    was a dealership called Franklin Chevrolet, and they
4    had a general manager that had password access, quite
5    properly, to everything inside the dealership's
6    computer.  And I think probably unknown to the dealer,
7    because the dealer was clueless as far as security is
8    concerned, this general manager copied the entire
9    customer file to a laptop, his own laptop.  And he
10   ultimately left that company, and I don't know what the
11   circumstances were of that, but sometime after that,
12   the entire customer file for that dealership was posted
13   to the internet.

14           And a complaint was made to the FTC, quite
15   properly so.  The FTC went to the dealership and said,
16   look, this is your customer data that's been posted on
17   the internet; what's going on?  And the dealer said, I
18   don't know; that's computer stuff; go talk to my
19   computer provider.

20           And so we started meeting with the Federal
21   Trade Commission, and that's where we met Michael.  It
22   took quite a bit of discussion to get it clarified that
23   this was not a computer error or software error.  It
24   was a personnel problem.  And when we finally got that
25   straight, that was about $400,000 later in legal fees.

FTC-0000045

1   So we got kind of a rude lesson as to what the
2   potential involvement we would have because I mean,
3   just to explain, look, guys, we didn't do this, your
4   guy did it.
5       Q.  Let me ask you to -- I'm just going to follow
6   up on something you said about CX 4468.  I believe you
7   said that you took from this publication the sense that
8   Reynolds had to do more in terms of its security.  What
9   was it about the document that suggested to you that
10  Reynolds needed to do more about security?
11      A.  Well, it became pretty clear that allowing a
12  third party to have access rights to our software, to
13  pull off information and resell it to somebody else,
14  that there was ample potential for us to get wrapped up
15  in that whole thing.
16      Q.  Did you have a sense that in an ideal world if
17  you were able to have complete say over the -- what
18  NADA's position was on security, that you would seek to
19  have NADA come out with a stronger security statement
20  than this where instead of just saying that they had to
21  audit password access, that NADA might say that dealers
22  shouldn't grant people outside of their dealership
23  password access?
24      A.  I don't know that we thought about doing that.
25  Generally our attitude towards really any kind of

FTC-0000046

1   requirements as far as our software is concerned is we
2   seek a written document that we can peruse at length
3   and understand it in depth.  To go for conversation is
4   not our preferred way.  As programmers, you know, we
5   want a spec in writing.
6       Q.  And in fact, your contracts with your dealers
7   say that they can't give out their password to anyone
8   outside the company; is that correct?
9       A.  Correct.  And that has been the case -- it
10  certainly was that way at UCS.  At Reynolds it was that
11  way long before I came.  And it, in my opinion, is kind
12  of the first step in having a sensible and coherent
13  data protection strategy.  And that's one of the things
14  we do with RCI is we know exactly which data fields,
15  which records the third party gets, and we know when
16  they get them.  They can't get any more than that
17  without going through some process with us and also
18  with their customer that additional data fields are
19  appropriate or not.
20      Q.  Let me ask you to take a look at another
21  exhibit, CX 2250.  CX 2250 has Bates CDK_CID_03047915.
22  I'll ask the witness to take a look at it.  This is an
23  e-mail from Mr. Brockman to Mr. Workman and others with
24  an attachment.
25          My understanding of this document is that you

FTC-0000047

 1   had had some sort of meeting with some people from what

 2   was then ADP at an NADA meeting, and then folks from

 3   what was then ADP sent you some materials.  And this

 4   e-mail and the attachment is your response to CDK about

 5   the materials that they sent you.  Is my understanding

 6   correct?

 7       A.  Yes.

 8       Q.  I wanted to ask about something that's said on

 9   the last page of the exhibit, which is CX 2250-003.

10   And it's under the heading of Data Services.  My

11   understanding is that the materials that have been sent

12   to you from ADP had envisioned a joint venture between

13   ADP and Reynolds.  And my question is in the third

14   paragraph down under Data Services, it says, "Reynolds

15   would contribute to this Newco entity its technology

16   for accessing ERA and POWER systems plus all of its

17   current contracts for providing these services to third

18   parties."

19          What exactly was it that Reynolds would be

20   contributing to this Newco under this proposed joint

21   venture?

22       A.  Frankly, the answer to that is I'm not sure.

23   Their first submission to us was not requested and just

24   kind of came in across the threshold.  And I sat down

25   and tried to future think subject to what they were

FTC-0000048

1     talking about, some of which I was definitely more
2     interested in than others, because as you may or may
3     not be aware, there's a joint venture between us and
4     ADP.  What I'm quite sure you are not aware of is it
5     hasn't been very successful.
6            Its original goal was to -- there's a process
7     that Dealertrack has developed, and it's a good one.
8     And they basically own that market.  They have
9     effectively a complete monopoly.  How it works is that
10    in the process of the sale of a vehicle, they are
11    shopping for finance.  And that's one of the things
12    that the finance manager in the dealership does is he
13    shops for the best deal not only for the consumer, but
14    also for the dealership, because the dealership gets a
15    profit margin off of selling financing.
16           The neat thing that Dealertrack has is that
17    they have a shopping screen where they have pipes to --
18    and by pipes I mean communication capabilities with
19    over a thousand finance sources.  Some big.  Some
20    small.  But I mean, they have by far and away the most.
21    And what you can do is you can have a transaction on
22    your screen and you can hit the button and go shopping
23    at two, three, four, five, ten different finance
24    sources, which means it goes in electronically to those
25    potential lenders.  And the potential lenders, they

FTC-0000049

1    each have software where they can, you know, render an
2    up or a no decision in seconds.
3        Q.   Is this the joint venture between CDK that you
4    said wasn't successful that did a comparable service?
5        A.   Attempted to.
6        Q.   And this joint venture that's envisioned in
7    CX 2250, was the notion that Reynolds would contribute,
8    let's say, RCI to this Newco or am I off target there?
9        A.   I don't think -- I don't think it says that.
10   But one of the things that we were interested in was to
11   try and make the existing joint venture successful.
12   Amazingly, what's happened with that joint venture is
13   the ability to have pipes to many credit sources.  We
14   were unable to get finance sources interested in
15   talking to us because they said, look, what we've got
16   is working just fine; thank you; have a nice day.
17       Q.   The joint venture envisioned by the documents
18   that you are responding to in CX 2250 would have been
19   all data.  Not just finance data; is that correct?
20       A.   I don't know that it says all data.  But again,
21   it's worthwhile pointing out that as a result of this
22   exchange, nothing was ever done.
23       Q.   Why not?
24       A.   Frankly, because I was very much irritated with
25   ADP.  I have had a long-standing hatred for ADP that

FTC-0000050

1    goes back to the first year I was in business.  But
2    that's another story.
3         Q.  Let me ask you a question.  And counsel will
4    appreciate the narrowness of the question and may
5    instruct you to just answer yes or no to the question.
6    Was this joint venture something that was discussed
7    with counsel?
8         A.  I don't think so.
9         Q.  Was the idea of the joint venture the subject
10   of any further discussion between you and people at ADP
11   after this e-mail?
12        A.  No.
13        Q.  Did you communicate to ADP after you sent this
14   e-mail that you were no longer interested in pursuing a
15   joint venture?
16        A.  I don't recall.  I'm sorry.
17        Q.  Let me ask you to take a look at an exhibit
18   we've marked as CX 4043.  CX 4043 has Bates
19   REYCID0719798.  My understanding is that these are
20   notes from the 2012 time period.  And my first question
21   is on the very first set of slash marks on the top of
22   the exhibit, first page of the exhibit under
23   Background, the sentence reads, "Secondary issue is
24   data security of business information --  True Car."
25   What's the reference to True Car in this sense?

FTC-0000051

1    A.  True Car is a service that's provided basically
2    at no charge to consumers where they can electronically
3    shop multiple dealerships for price information.  And
4    True Car derives their revenue from dealerships that
5    want to be part of the True Car family and thereby
6    picking up additional sales.  Whether or not True Car
7    ultimately thrives or not remains to be seen, but it
8    certainly is developing competitors, one called
9    Carvana, you see ads on TV about where they have this
10   huge building that has a big central elevator, and you
11   can dial in which vehicle you want and press the
12   button, and it will go find it and pull it into the
13   center, bring it down.  And you can open the door and
14   drive it out.
15       Q.  What is the reference in the sentence to the
16   data security issue with True Car?
17       A.  I don't think that's directly related to the
18   line above.  We are talking about an unattended remote
19   access to Reynolds systems is going to stop.  And the
20   issue there is data security of personal information.
21       Secondarily, we are talking about business
22   information, which is pricing, competitive pricing.
23   Dealers are very sensitive about what their typical or
24   starting price would be for a specific vehicle, and
25   they worry about that getting out.

FTC-0000052

1          Then the next paragraph is all about RCI
2     interfaces.
3          Q.  Right.  And the last slash, correct me if I'm
4     wrong, but the one that begins, "Data broker situation
5     is intolerable?"
6          A.  Yes.
7          Q.  And then it goes on.  Is this the point we were
8     talking about earlier where you are concerned that if
9     the information goes into the wrong hands, that there
10    may be liability on the part of Reynolds as the deep
11    pockets?
12         A.  Yes.  And I think about this time period I was
13    becoming aware that as far as the hackers that were
14    invading our systems was predominantly two companies,
15    both owned by ADP, IntegraLink and DMI.  And their
16    entire business was all around invading systems and
17    sucking out data and then reselling data.  They have
18    been at it for a long time, but I did not understand
19    that they were -- they did more hacking than everybody
20    else combined.
21         Q.  As you sit here today, what is your sense of
22    all the third-party integration that was going on?  You
23    call it hacking.  I'll use whatever phrase you are
24    comfortable with.  As you sit here today, of all the
25    instances of that that was happening to Reynolds in

FTC-0000053

1    this 2012/2013 time period, what percent was accounted
2    for by the combination of IntegraLink and DMI?
3        A.  I don't know a percentage, but I know that far
4    and away they were the major, which would have been
5    over 50 percent, probably in, I guess, the 75 percent
6    range.
7        Q.  Who would have been -- could I use the term
8    hostile integrator?  What phrase are you most
9    comfortable with?
10       A.  We'll use hacker.
11       Q.  What company would be the next most prevalent
12   after the combination of DMI and IntegraLink?
13       A.  There was a company called SIS who was pretty
14   brazen about it.  That's the one that we had a lawsuit
15   with in federal court in Ohio and won.
16       Q.  I'm going to come back to SIS so I don't lose
17   my place in my outline, if that's all right with you.
18       A.  Sure.
19       Q.  I want to ask about one more bullet on CX 4043.
20   Two more.  It's the second-to-last one on the page
21   that's talking about indemnification, and it's making a
22   distinction, I believe, between the level of
23   indemnification that would be needed for certain types
24   of information.  This particular bullet talks about
25   batch-type data.  What was your position on the need

FTC-0000054

1    for indemnification if data was shared?

2        A.  Well, the point where it's most sensitive is

3    personal information.  If it's personal information

4    involved, that's the one where it's the most expensive

5    to sort out, and therefore, it's the part that I'm most

6    concerned from a security and from an indemnification

7    standpoint.

8            The other type of data and the classic one is

9    vehicle inventories.  Vehicle inventory data is

10   basically units that a dealership owns that they want

11   to post for sale on an internet service.  Hard to see

12   where damages comes out or anything like that because

13   there's nothing secret about it.  You can go on

14   dealership websites and see it all with no constraints

15   on access.  So therefore, indemnification for that type

16   of data is much less relevant.

17       Q.  The last entry on this exhibit which is on the

18   backside of the exhibit under Use of Agents talks about

19   the use of a third party acting under contract as an

20   agent of ADP or Reynolds.  And the sentence says that

21   it's not an issue as the specific RCI agreement is

22   directly between us.

23           What was the point you were making here about

24   the exception for third-party agents?

25       A.  As I recall, this applies to OEMs.  And OEMs,

FTC-0000055

1    frankly, don't have the manpower, skill or knowledge
2    that's necessary to interact with DMS systems.  And so
3    therefore, if an OEM had a contract, say, with ADP to
4    collect data from their dealers, that presented a
5    different kind of situation than a hacker kind of
6    situation.  And it's where the OEM would anoint ADP as
7    their agent, and so therefore, we get direct hooks into
8    the OEM if anything goes wrong because we recognize ADP
9    as a valid collector of information for that OEM.
10       Q.  How is that different than the situation which
11   you would refer to as hacking?
12       A.  Well, the situation is such that the OEM says
13   to us, look, we want to have such and such and such
14   kind of data; and our agent in the collection of this
15   data is ADP; and we would like for you to permit ADP to
16   do this data collection that we want, and you get to do
17   business directly with us, the OEM, from a contractual
18   basis.  And because CDK is an agent, they are basically
19   transparent in the whole situation because the OEM
20   signs up for the liabilities and for the
21   indemnifications whenever -- which would include any
22   acts by their agent.
23       Q.  Why wouldn't the same arrangement be
24   permissible for a dealer to sign up to have CDK act as
25   their agent to collect data?

FTC-0000056

1      A.  Which means that we are basically permitting
2   CDK an unfettered access into our stuff, in our system.
3      Q.  Well, the dealer would be the one giving the
4   permission?
5      A.  See, the dealer is unable to give that
6   permission because the dealer does not own the
7   software.  He has the rights to the software only under
8   license, and the license is very specific about what's
9   allowed and what's not allowed.  And one of the terms
10  is that it's the only people that are allowed access
11  are dealership employees.
12     Q.  I'm just trying to get the distinction straight
13  in my mind about the distinction between letting an OEM
14  use somebody like CDK as an agent versus letting the
15  dealership use somebody like CDK as an agent.
16     A.  Well, the manufacturers have an interesting
17  disadvantage and they become the biggest pocket.  Then
18  of course, OEMs are, you know, many hundreds of times
19  bigger than we are and have those people on the hook.
20  If anything goes wrong, it's an okay kind of situation.
21     Q.  CX 4043 were notes you prepared in order to
22  have a conversation with Mr. Anenen, as I understand
23  it; is that correct?
24     A.  This was the beginnings of that.  I think there
25  are subsequent documents which are more complete and

FTC-0000057

Brockman
CDK Global & Reynolds and Reynolds                    9/18/2019

1   closer to that whole thing getting settled.
2       Q.  Yes.  I'm just asking about this document.  We
3   have others in my pile that we'll get to as well.
4       A.  This would have been an early one.
5       Q.  And was the subject of indemnification
6   something you discussed with Mr. Anenen?
7       A.  That was one of the issues.
8       Q.  What was the discussion about?
9       A.  Well, the discussion was that they need to get
10  out of our software.  They are hackers.  And they got
11  no right to be in our software, invading systems and
12  using our software.  And that's the principal part of
13  what we talked about, which actually ultimately was
14  accomplished.
15      Q.  And that's the discussion that you led off
16  with, the unattended remote access to Reynolds' system
17  is going to cease?
18      A.  Yeah.  That was kind of a combination
19  promise/threat.  It was going to happen.  I had put up
20  with it for too long.
21      Q.  Was that -- would it be fair to characterize
22  your conversation with Mr. Anenen as being partially a
23  threat?
24      A.  Yeah.
25      Q.  In what sense?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1      A.  We would flip the switch and disrupt everything
2  they were doing.
3      Q.  What did Mr. Anenen reply?
4      A.  It was an interesting conversation.  It was
5  about an hour conversation, and it was by phone.
6  Fifteen minutes of it were meaningful discussion.  Then
7  45 minutes was just, you know, drivel.
8      Q.  What was the discussion that you would
9  characterize as drivel?
10      A.  Totally unrelated to the subject.
11      Q.  So in the 15 minutes you talked about this
12  subject, aside from what you characterized as a threat
13  that you would flip a switch and cut them off of the
14  system and the indemnification, what other topics were
15  covered in the 15 minutes of substance?
16      A.  I believe that it was a discussion about
17  orderly stand down, which is an important issue really
18  to both of us because the dealerships that are
19  involved, our customers as well and therefore, to
20  abruptly just pull the rug out means something that
21  what our customers wants, which is to have their data
22  sucked out and given to some third party, to provide
23  them some kind of service would be distressing to them
24  for that to occur, just bang, that the right way to do
25  it was to have a contractual stand down.  That way also

FTC-0000059

1    CDK would have time to actually notify their customers
2    that they were no longer going to be able to offer the
3    service in the manner that they had previously, which
4    was by hacking.
5        Q.  Did their customers include OEMs?
6        A.  I think in some cases they did.
7        Q.  So the wind down, would that have encompassed
8    the situation where CDK would get its -- the apps that
9    it was marketing certified by RCI?
10       A.  Yes.  One of the things that was discussed, I
11   don't know specifically, I don't have a date on this
12   document, but over a period of time there were
13   documents, discussions and so forth that we would enter
14   into RCI agreements, as we would with any third party,
15   for products that they were actually selling.  Not to
16   give them liberty to just redistribute the data but to
17   actually use the data in creation of a product that
18   they would build, maintain and support on their own.
19           And it's worked out that way.  We ended up
20   buying another company, and we pay CDK $350 a month for
21   over 800 dealers, which is quite a tidy sum, but it is
22   a business intelligence piece of software that you have
23   to have access to the total accounting information in
24   the DMS.  We have to have that in order to produce this
25   product.  And we pay a lot for it.  I'm not familiar

FTC-0000060

1  with what all we provide to them on an RCI basis, but I

2  know there's some.  I don't know it's as extensive it

3  is in the agreement we have for the company known as

4  reverse risk.

5      Q.  And part of the idea was also that Reynolds

6  would take its applications and go in through 3PA; is

7  that correct?

8      A.  Yes.  And then this reverse risk application,

9  this business intelligence application goes in

10  through 3PA, and we get that data, and we have

11  agreements with all the users of that product to get

12  that data from CDK.  And so from a confidentiality

13  standpoint, it's a tight loop.

14      Q.  So you have a contract both with the dealer who

15  is using the app and also with 3PA; is that correct?

16      A.  That's correct.

17      Q.  We've looked through these documents and seen

18  how these contracts worked, and I'm going to ask you

19  some more questions of more documents as we go forward

20  in the next two days, but I'm curious why up to this

21  point in time Reynolds had not gotten its apps on the

22  CDK dealerships through 3PA?

23      A.  Well, I'm a little embarrassed to tell you what

24  happened.  The company that we bought the reverse risk

25  product from were bandits, and they hacked CDK's

FTC-0000061

1   systems to get the data.  And we were horrified by that
2   and one of the first things we did was we went to ADP
3   and said, look, we want to be part of 3PA, and we know
4   it's going to be expensive for us to do it, but that's
5   what we want to do.
6          They said, well, fine, we'll go along with
7   that.  And fortunately, the subject of how was the data
8   gotten beforehand never came up.
9      Q.  So who was doing the integration for that
10  product when you bought them?
11     A.  It was a young lady that knew about such things
12  that just logged on and sucked down information in the
13  form of reports.  And they already had the software
14  built to parse through the reports to get the data that
15  they wanted.
16     Q.  How much more expensive was it going to be to
17  do it through 3PA?
18     A.  Well, I would have to get my calculator out and
19  calculate what $350 a month times 800 dealers times
20  12 months a year and contrast that to the salary of a
21  very intelligent young lady, which is probably in the
22  hundred thousand dollars a year category.  So it is
23  going to be more expensive, but it would be straight up
24  legal.
25     Q.  And CDK was going to put its apps in through

FTC-0000062

1    RCI.  What is your understanding of why that hadn't
2    happened prior to this 2013-2015 time period?
3        A.  Well, they didn't need to before that because
4    they had their DMI, Authenticom, busily doing it for
5    them.
6        Q.  In that answer you said DMI and Authenticom.
7    Did you mean DMI and IntegraLink?
8        A.  IntegraLink.  Excuse me.  I get names confused.
9    I know a little bit about a lot of things, and of
10   course, the corollary to that is it means over time I
11   will know everything about nothing.
12       MR. COHEN:  As Socrates said you would.
13       (A recess was taken.)
14       BY MR. ABRAHAMSEN:
15       Q.  We were speaking before the break about CX 4043
16   and the conversation you were having with Mr. Anenen in
17   this time period.  In this time period, 2012 time
18   period, was there a difference in the messaging that
19   Reynolds had vis-à-vis the CDK messaging on the issue
20   of data security?
21       A.  (No response.)
22       Q.  My understanding is that at this time period,
23   Reynolds was quite publicly saying that it was not in
24   favor of dealers using third-party apps by giving out a
25   password and user name where CDK wasn't really saying

FTC-0000063

1    that same message.  Am I correct?

2        A.  I don't have a specific knowledge on what they

3    say or don't say, but my belief was that they were not

4    saying anything like that.  They were -- their message

5    kind of continued to be, well, whatever goes, which, in

6    my opinion, was certainly based on my understanding of

7    the NADA report, what they were doing is totally

8    contrary.  And from a messaging standpoint, it was

9    really interesting that they are messaging about us and

10   against us was the fact that we were oppressive idiots,

11   which, in my opinion, was not the case at all.

12       Q.  So when you say they are messaging against you,

13   you mean they were trying to sell DMS systems by going

14   to dealers and saying that they shouldn't get Reynolds

15   because Reynolds had this bad policy on allowing third

16   parties to integrate into their DMS?

17       A.  That's correct.  As part of their sales

18   process, they held out their approach as being superior

19   and more importantly, desirable for the dealer.

20       Q.  And was that having an effect in the

21   marketplace?

22       A.  I don't know what effect, but certainly no

23   potential for good effect.

24       Q.  I mean, at this time period in 2012/2013, was

25   CDK taking market share away from Reynolds?

FTC-0000064

1     A.   In terms of rooftops, yes.  As a matter of
2  fact, ever since we bought Reynolds, there has been a
3  steady drip of the interception -- leaving and
4  converting to CDK.
5     Q.   And was one of the factors the reason they were
6  leaving was because of this messaging that we've just
7  been talking about on data security?
8     A.   I believe it was.  There's no way to quantify
9  that, but I believe it was certainly a factor.  It
10  was -- we looked at it as, well, dealers will want to
11  do what they want to do, and if they want to do it,
12  where it's a free-for-all as far as data access or
13  whatever, we don't need that business.  That's not --
14  there is nothing good going to come out of that.
15     Q.   Was that part of the discussion you had with
16  Mr. Anenen at the time the notes that we see in
17  CX 4043?
18     A.   I did not discuss that with Mr. Anenen.  That
19  was considered to be competitive market information
20  which I'm not supposed to be doing with my larger
21  competitor.
22     Q.   Well, the first bullet is that you informed
23  him, you threatened him that you were going to stop
24  allowing them, CDK, to get access to your DMS; is that
25  correct?

FTC-0000065

1      A.   That's correct.

2      Q.   And you talked to him about the need to have

3   more data security for personal information; is that

4   correct?

5      A.   Yes.  This is where the discussion which was

6   referred to earlier this morning about there's

7   different levels of security required for personal

8   information, and I think it's now called NPII as

9   opposed to things like vehicle inventories, which is

10  information that's already publicly available on each

11  dealer's website.

12     Q.   What did Mr. Anenen say when you brought up the

13  fact that some of the information is personal

14  information that's being bandied about?

15     A.   I think he was very, very clear about that.

16  Before this, I already made clear that it was the

17  personal information where we saw the giant liability

18  floating around.

19     Q.   What was his response about his potential

20  liability?

21     A.   He never made any reference or response to his

22  personal liability.  Again, CDK was a public

23  corporation.  Steve Anenen had been the manager over

24  that division back when it was a division of ADP, and

25  he had been the president since CDK had been spun off.

FTC-0000066

1    But he was a typical CEO/employee of a large publicly
2    held corporation.  Those type of people tend to have
3    different outlooks than people like me.
4         Q.  In what sense?
5         A.  Well, I'm the CEO of a private corporation, and
6    I feel really in a sense completely responsible for
7    things like this.
8         Q.  Whereas, how would you characterize
9    Mr. Anenen's feeling on that?
10        A.  Laissez-faire.
11        Q.  In this 2012/2013 time period, was it your view
12   that you would want CDK to adopt the same policy you
13   had on data security?
14        A.  No.  All I wanted them to do, only thing that
15   was ever discussed was I want them out of our software.
16        Q.  Let me ask you to take a look at an
17   Exhibit 4515.  I'll ask you to take a look at it.
18   CX 4515 has Bates REYCID0203876.  It's a series of
19   e-mails back and forth between several Reynolds
20   employees.  I don't believe Mr. Brockman's name is on
21   the document, so I'll essentially be using it as a
22   crutch to formulate my questions.
23        My first question, Mr. Brockman, is to identify
24   one of the individuals here.  The very top of the page,
25   the very first line on the exhibit says that the e-mail

FTC-0000067

1    is from Chuck Hoyt.  Who is Chuck Hoyt?

2        A.  Chuck Hoyt is the vice president of sales.  His

3    region covers probably 10 states, 12 states, and he is

4    based out of, I think, the Detroit area.  He actually

5    lives west of Detroit.

6        Q.  And the first e-mail in the chain, which means

7    the bottom e-mail on the exhibit, Tuesday, August 13,

8    2013, and the title of the e-mail, the subject line of

9    the e-mail is Captcha Codes.  Let me first ask you to

10    explain for the record what captcha codes meant in this

11    context.

12        A.  Captcha codes are a device which is intended

13    and really works pretty well to make sure that the

14    answer is being replied to by a person as opposed to a

15    computer.  And it's a way to deny automated access to

16    our software.

17        Q.  And as I understand it, in approximately this

18    time period, these captcha codes were put on the

19    Reynolds DMS; is that correct?

20        A.  Yes.

21        Q.  Was this the first time Reynolds had put

22    captcha codes on its DMS?

23        A.  Probably not, but it was the most significant

24    time.  And it was in a place where it probably impacted

25    a greater number of people, users in the dealership,

FTC-0000068

1    than before.

2        Q.  Why was it more pervasive this time than

3    before?

4        A.  Well, security is overhead for users.

5        Q.  I'm sorry?

6        A.  Users see data security as a, "god, why do we

7    need this."  That's kind of their outlook and attitude.

8    And have you ever filled out a captcha screen?

9        Q.  I believe so.  That's where you identify

10   pictures; is that correct?

11       A.  Yeah, pictures or distorted numbers or

12   distorted letters, whatever.  They are least

13   aggravating when you get them correct the first time.

14   If you don't get them correct the first time, then you

15   start to growl a little bit and about the third or the

16   fourth time, you start to throw up your hands.  Once

17   people get used to captcha, they know how to interpret

18   what the symbols are and get them over to letters and

19   numbers as intended.  But there was definitely, out of

20   the Serra organization, there was some real grumbling.

21       Q.  Who is the Serra organization?

22       A.  It's a dealership group that's based out of

23   Detroit, I think.  Certainly that area.

24       Q.  I assume -- correct me if I'm wrong.  I assume

25   the grumbling was because they had certain automated

FTC-0000069

1    access from third parties on their dealers and that
2    those captcha codes were now disabling whatever apps
3    the dealers were using; is that correct?
4         A.   I can't tell from this e-mail exchange whether
5    that was the case or whether it was simply people,
6    users that were dealership employees and legitimate
7    users having to go through the overhead of captcha.
8         Q.   Did this frustration about the captcha codes
9    percolate up to your level?
10        A.   Oh, yeah.  Particularly, Serra was a large
11   customer, and in this particular instance, I would have
12   heard about this.  And the security, it's an
13   interesting situation in that we can make things, I
14   mean, totally secure and lose all kinds of customers.
15   From a business standpoint, there's a tradeoff because
16   we find that particularly with the larger customers,
17   they basically agree with us.  The dealers basically
18   agree with us.  They know that there's a need for
19   security.  They know that a significant part of their
20   IP is tied up in their customer records.  These are
21   very valuable assets for a dealership corporation, but
22   they don't want waves made for their employees.
23            So what will happen with somebody like Serra,
24   you may have to back off a little bit and then wait a
25   month or two and then go forward, because that's what

FTC-0000070

Brockman
CDK Global & Reynolds and Reynolds                              9/18/2019

1    the dealer really wants to do.  What will happen is
2    that in that first segment of time, the users within
3    the dealership will become accustomed to captcha or
4    whatever the particular technique that we are using at
5    the time.  And once they've mastered it, then they can
6    take a little more without disrupting their life,
7    without degrading their performance from a throughput
8    standpoint regarding what they are having to do with
9    the computer screens.
10        Q.  So the security issue in putting in captcha
11   codes is there are two components to that.  There's
12   sort of a technology component and then there's also
13   sort of the business reality component; is that
14   correct?
15        A.  Yes.
16        Q.  And at this point in time in 2013, had you
17   gotten to the point where at least from a technological
18   standpoint you could pretty thoroughly block what you
19   refer to as hackers on your system?
20        A.  We made a lot of progress, but we were not in a
21   state of perfection because security, as security
22   changed or security enhancement that the third parties
23   can never find their way around is really good, but
24   there's not very many of those.  And what will happen
25   and more typically is we'll put in a new process that

FTC-0000071

1    will block an outside hacker for a while.
2         Then they do things like we've had one
3    situation where whenever -- let me see if I can
4    describe this correctly.  There's a third party comes
5    in and they are looking like a person at a terminal.
6    Then what we do is we pop up a captcha because we are
7    trying to figure out whether it's a machine or a
8    person.  They will contract somebody in Vietnam to be
9    kind of watching over the shoulders of our screens.
10   And as a human, they can figure out the captcha, and
11   that lets the third party invader in.  They have,
12   quote, defeated captcha.  Well, that's not really a
13   very good way, but a poor way is better than none.  And
14   so we have situations like that occur.
15        There's all manner of different strategies.
16   They change the classification of the person.  They'll
17   make them a systems specialist that works for the
18   dealership, and we will let -- unintentionally, we'll
19   end up letting some of those people through because
20   they have a special status and they are responsible for
21   the administration of the system, they are responsible
22   for the password -- dealer passwords for everybody in
23   the organization.
24        Q.  Was one of your concerns when you put in a
25   captcha that was widespread, was that ultimately it

FTC-0000072

1    could anger dealers so much that they might go to a
2    different DMS provider?
3        A.   Clearly.
4        Q.   Did that happen?
5        A.   I can't point to a specific instance, but I'm
6    sure it happened.  It is -- from a business standpoint,
7    we have two different extremes.  One extreme is as we
8    have lax security, it would be a hell of a lawsuit
9    versus having security that's so tight that it angers
10   customers and they leave us.  And I'm kind of in the
11   midst of that.
12       Q.   Let me show you an exhibit that we've marked as
13   CX 4004 and ask you to take a look at it.  CX 4004 has
14   Bates REYCID0042299, and it's a series of e-mails, and
15   Mr. Brockman is on at least one of them.
16            So my understanding of this exchange of e-mails
17   is that there had been integration going on with
18   IntegraLink and DMI with regard to certain vendors that
19   dealers wanted to use and that those connections had
20   been interrupted.  And then the people at DMI and
21   IntegraLink had been telling dealers that -- and I'm
22   looking at the first sentence of the top e-mail -- the
23   second sentence of the top e-mail, "Please understand
24   that R&R is one hundred percent responsible for this
25   situation."

FTC-0000073

```
 1            Is that an accurate reading of the e-mails?
 2       A.  Unfortunately, yes.
 3       Q.  So what is your reaction when -- this came to
 4   your attention?  Your name is on the e-mail.  What was
 5   your reaction to this position that IntegraLink and DMI
 6   were taking?
 7       A.  I was clearly not happy about that at all and
 8   which is one of the reasons why that I became more and
 9   more demanding of CDK to get out of our sites.
10       Q.  When you say more and more demanding of CDK,
11   how were you being more demanding of CDK?
12       A.  Because I was telling their CEO that I was
13   beginning to lose patience and that I was -- if
14   necessary, I was going to flip the switch and all their
15   stuff would be blocked and there would be no
16   opportunity for a rational stand down.
17       Q.  In this time period, was there also issues with
18   OEMs becoming blocked from being able to use their apps
19   because of these security enhancements?
20       A.  Not really very much.  I think in some cases
21   rather than insert a third party between us and the
22   OEM, we were dealing directly with the OEM.  And that
23   straightened the situation up a lot.
24       Q.  But were some OEMs using DMI to integrate?
25       A.  Yes.
```

FTC-0000074

1     Q.   And were they getting blocked at times?

2     A.   I would presume so.

3     Q.   Did their anger ever reach your level?

4     A.   No.

5     Q.   The OEMs?

6     A.   No, because when the subject did come up with

7     OEMs, we would say, guys, you all need to understand

8     what's going on.  Basically we are being hacked, okay.

9     And DMI is ending up with data for which they are not

10    authorized to have.  They get it out of our system

11    improperly.

12         And the OEMs understand about security a lot

13    more.  They are big corporations.  Security is a major

14    thing for them and has been.  It's not new to them.

15    They have been very sensitive all along.  And I think

16    in most cases at that point the conversation stopped.

17    Q.   Is this August 2013 time period, was this, the

18    disruptions and the messaging that's being sent out by

19    IntegraLink and DMI, did this end up resulting in more

20    conversations between Reynolds folks and CDK folks

21    about the wind down agreement?

22    A.   I would say generally not because the

23    conversation was really taking place between me and

24    Steve Anenen.

25    Q.   How often did you talk to Mr. Anenen?

FTC-0000075

1      A.  Very infrequently.  Maybe months between
2   conversations.
3      Q.  Would you call him or would he call you?
4      A.  I think in some cases both or I would call him
5   and request a call back.
6      Q.  And we are going to talk next about a meeting
7   that Mr. Schaefer had with Mr. Gardner in September of
8   2013.  Were you aware that Mr. Schaefer was going to
9   meet with Mr. Gardner?
10      A.  It was Bob Schaefer's job to interface with all
11   RCI customers and the OEMs, and as part of that he had
12   conversations, I'm sure, with CDK people.
13      Q.  We're going to show you some documents about a
14   particular meeting in September of 2013.  Do you recall
15   a situation where Mr. Schaefer informed you that he was
16   going to meet with CDK in that time period?
17      A.  I'm sorry, I don't recall specifically.
18      Q.  Let me ask you to take a look at CX 1151.
19   CX 1151 has Bates CDK_CID_01734952.  It's a series of
20   e-mails, including one to Mr. Brockman and one from
21   Mr. Brockman.
22      A.  (Reviewing document.)
23      Q.  Mr. Brockman, I would like you to take a look
24   at CX 1151-002, second page of the exhibit.  And at the
25   top of that page, there are three numbered paragraphs,

FTC-0000076

1    and I would like you to look at numbered paragraph 2.
2    And it states, "Reynolds and Reynolds indemnification
3    has been relaxed since we last exchanged documents."
4         What is your understanding of the extent to
5    which Reynolds and Reynolds had relaxed its
6    indemnification position?
7         A.  I'm sorry, I don't recall specifically what was
8    going on.  This document in general was written by Bob
9    Schaefer, is what it looks like, and covered all the
10   points that we wanted.  Exactly what we were asking for
11   as far as indemnification I don't recall.
12        Now, the interesting part about this document
13   is it's dated in September.  Well, my last really
14   serious conversation with the CDK CEO had happened much
15   earlier in the year.  And what's happening here is that
16   Howard Gardner has finally been given authority to
17   actually get serious about getting out of our systems,
18   and to which I heaved a sigh of relief because I really
19   didn't want to go through this situation where I just
20   pull the plug on everything.  I was going to, but I
21   really didn't want to.
22        Q.  Because it would have angered the dealers?
23        A.  Oh, yeah, it would have angered the dealers.
24   So the fact that this letter and what was happening
25   here was beginning to happen meant that finally Steve

FTC-0000077

1    Anenen had seen the handwriting on the wall, that I was
2    serious, and he had given authority to go ahead and
3    work out an agreement.
4        Q.   Just so the record is clear and we are clear,
5    Mr. Gardner writes the e-mail that begins at the sort
6    of bottom third of the first page of CX 1151.  So the
7    bulk of this exhibit is authored by Mr. Gardner at CDK;
8    is that correct?
9        A.   Yes.  But I think as it's written, I think that
10   there are big pieces of this that actually came out of
11   our requirements to them.  They are basically saying,
12   okay, and they are restating what they are saying okay
13   to.
14       Q.   When you said in that answer Reynolds'
15   requirements to CDK, what were you referring to?
16       A.   Well, there was other communications, I presume
17   in writing, from Bob Schaefer to people like Howard
18   Gardner saying, look, when we say get out of our
19   system, we mean all the way out.  Not only now but
20   forever out.
21       Q.   In that same paragraph that we were looking at
22   on CX 1151-002 numbered paragraph at the top of the
23   page 2, the sentence which I read part of it into the
24   record, contains a clause midway through the sentence
25   that says "since we last exchanged documents."  What

FTC-0000078

1  documents are being referenced in that paragraph?

2      A.  I'm not sure.  I would presume that there would

3  have been documents exchanged back and forth between

4  Bob Schaefer and Howard Gardner, but I had turned over

5  that process to Bob Schaefer and said, okay, they are

6  basically agreeing to our most central and most

7  strongest want; go ahead and work with them.  So I

8  presume there were other documents before this.

9      Q.  What was your most significant want?

10     A.  For them to get out of our systems and stay

11  out.

12     Q.  There is a numbered paragraph further down in

13  the same second page of this Exhibit CX 1151-002 midway

14  down the page, and it references OEMs.  And I won't

15  read the whole paragraph into the record, but it talks

16  in the first sentence about DMI will formalize and

17  extend our collaborative approach to helping OEMs.

18  What was your understanding of what the collaborative

19  approach had been with OEMs up to that point?

20     A.  It's my understanding that what we were working

21  towards is -- we'll take General Motors.  If General

22  Motors wants data out of Reynolds dealerships, we are

23  the ones that provide the data.  Likewise, if CDK wants

24  to give data to the OEMs from CDK dealerships, that's

25  fine.  That's their bailiwick.  But the important part

FTC-0000079

1    is that just because they have a contract with an OEM
2    that requires data from Reynolds dealerships, no part
3    of this agreement is going to allow that to go forward.
4    That's part of the get out and stay out.
5        Q.  So aside from maybe playing some role as an
6    agent, the idea here would be for CDK to stop doing
7    integration for the OEMs and have the OEMs have an
8    agreement with RCI; is that correct?
9        A.  Um-hum, yeah.  Yes.
10       Q.  The last clause of the last sentence in
11   numbered paragraph number 1 talks about a smooth
12   transition for each OEM to a Reynolds certified
13   interface.  And the last clause reads, "when Reynolds
14   is prepared to provide service."  What was the issue
15   with Reynolds being prepared to provide service to the
16   OEMs?
17       A.  The OEMs had special wants for data, and since
18   the RCI program that would be applicable to data
19   extraction forwarded to General Motors, there would be
20   software work that had to be done.  Simply agreeing
21   that that's going to be the situation doesn't
22   necessarily mean we got the technical work done to
23   actually effect it, make it happen.
24       Q.  So my understanding, and correct me if I'm
25   wrong, but this was a situation where if somebody like

FTC-0000080

1    DMI or IntegraLink was getting data from Reynolds'
2    dealers into the OEMs, even if there was an agreement
3    that that process would stop happening that way, there
4    was still going to be a lead time before RCI could, in
5    fact, get the data into the OEMs' hands; is that
6    correct?
7         A.   Correct.
8         Q.   Why were the OEMs using DMI to get access to
9    this data from the Reynolds DMSes?
10        A.   I would suspect that somebody from DMI was
11   knocking on the door offering it as a service.  And you
12   have to understand that the DMI's position specifically
13   with General Motors changed over time.  And one of the
14   important changes that happened was that when asked,
15   DMI would say, okay, we are collecting these pieces of
16   data, this field, this field, this field, this field.
17   Well, in fact, they were collecting a whole bunch more
18   that General Motors didn't even know about.  And then
19   they were taking this additional data that they had
20   acquired as part of a GM-authorized process and selling
21   it in the open market.
22           And when we first figured that out, General
23   Motors was really surprised.  And of course, DMI denied
24   it flat footed.  And we had the traps.  We had the data
25   traps to prove it.  And we proved it up to General

FTC-0000081

1    Motors, and they were very angry with DMI.  And
2    therefore, switching over to getting things from us
3    straight and by contract and by program we got the
4    exact fields that are going to be delivered, that and
5    nothing else, nothing more, nothing less, they were
6    ready for that.
7        Q.  Was part of the DMI pitch to an OEM that they
8    would be able to provide them the data cheaper than
9    they could get it through RCI?
10       A.  I don't think so.
11       Q.  Then --
12       A.  But I don't know what DMI's prices were like.
13   But if I had to guess, the price was not an issue as
14   far as the manufacturers are concerned.
15       Q.  So why would they go with DMI rather than go to
16   RCI originally?
17       A.  Well, all the OEMs would dearly love to have
18   all the data they need all from one source all in one
19   format, and they would prefer not to do business with
20   multiple companies.  They would rather do business with
21   just one.  So part of the DMI sales pitch is, look,
22   we'll handle it all and you will get the data you need
23   in a pipeline that's got exactly what you want.
24       Q.  So General Motors, to use that example, would
25   have dealerships that had different DMSes.  So DMI

FTC-0000082

1    could go to take the CDK data and the Reynolds data and

2    the Dealertrack data and give it all to General Motors

3    in one bundle and have all their dealers represented

4    through one report rather than through multiple

5    reports; is that correct?

6        A.  That's correct.

7        Q.  Did you discuss the OEMs transitioning to RCI

8    with Mr. Schaefer?

9        A.  I'm sure I did just because it was a topic, it

10   was a project that was open.  And so I'm sure that I

11   did, but specifically what I talked about and when, I

12   don't remember.

13       Q.  I had asked you before I showed you CX 1151 if

14   you were aware of a meeting that Mr. Schaefer had with

15   Mr. Gardner in the fall of 2013.  Having reviewed this

16   exhibit, is there anything about reading it that

17   refreshes your recollection about this particular

18   meeting that this document is discussing?

19       A.  Nothing specifically.  I mean, everything here

20   is things that I would have expected to have been

21   discussed at that meeting.

22       Q.  And by this --

23       A.  And actually, when I say that meeting, there's

24   always a series of large and smaller meetings going on,

25   some of which get reported in print, many that don't.

FTC-0000083

1    I mean, that's just the way that world works.

2        Q.  So you were aware that Mr. Schaefer was having

3    frequent communications with people at CDK on these

4    subjects?

5        A.  Yes.  I would have expected that.  It is a

6    nontrivial project because, of course, GM wants their

7    data uninterrupted, no change in format.  They don't

8    want -- they want no changes at all, and they just want

9    their data.

10       Q.  And if they couldn't get their data, would that

11   be an instance where they could decertify a provider

12   such as yourself?

13       A.  I would say in extremis, yeah.  We would be

14   very careful to get it right and did get it right.

15       Q.  The paragraph about the OEMs, the number 1

16   paragraph that we have been talking about makes

17   reference to a transition to a protected program.  It's

18   in the second line down in that paragraph.  What was

19   your understanding about what the protected program was

20   going to be?

21       A.  Well, what it meant was and that's that we

22   would continue with our security enhancements, but as

23   part of the stand down, we would turn off interruption

24   to CDK as long as they were proceeding as they are

25   supposed to through the turndown -- or not the

FTC-0000084

1    turndown, but the -- so the whole project of standing

2    down could proceed without ripples.

3        Q.  Let me see if I understand it.  Correct me if

4    I'm wrong.  Whatever security measures Reynolds was

5    going to take generally, you would carve out an

6    exception under a protected program for CDK so that

7    those security measures wouldn't block the data from

8    going to the OEMs; is that correct?

9        A.  Correct.

10           (A recess was taken.)

11           BY MR. ABRAHAMSEN:

12       Q.  Mr. Brockman, I would like to continue to look

13   at CX 1151.  Under the second numbered paragraph in the

14   lower part of the page, the heading of that paragraph

15   is Non-OEM Third Parties.  And my understanding of this

16   paragraph is this has to do primarily with applications

17   by companies that are not OEMs; is that correct?

18       A.  Yes, I believe that's correct.

19       Q.  What was your understanding of how this

20   protected program would work?

21       A.  I think this referred to, first of all, DMI and

22   IntegraLink and that -- that's my understanding.

23       Q.  So these are the applications that are on

24   Reynolds dealerships using DMI or IntegraLink to get

25   the data off of those dealers' DMSes, and that will

FTC-0000085

1   become -- they'll change their way of doing that; is

2   that correct?

3        A.  Yes.  What will happen is that all of such data

4   extractions will convert to RCI.

5        Q.  Was this what you were hoping to see from CDK

6   for some time at this point?

7        A.  Yes.  This is the goal, to get them out of our

8   hair.

9        Q.  The next paragraph down is number 3, Technology

10  Investment.  "R&R and DMI will collaborate to define

11  and invest in the development of technology-based tools

12  that automate, accelerate, simplify and streamline the

13  process of setting up and managing the protected

14  programs for OEMs and third parties."

15            Did technology investments take place?

16       A.  Presumably so, because we, in fact, were able

17  to convert OEM and non-OEM situations, and it all got

18  done.  So whatever we had to do to do that, we did.

19       Q.  Was there technology that had to be developed

20  that had not already existed in DMI and Reynolds?

21       A.  I'm sorry, I'm not knowledgeable of that.  This

22  project was a very, very difficult one to get started,

23  but once it got going, I'm on to the next one.

24       Q.  So you correct me if I'm wrong, but I'll give

25  you my understanding.  We'll see if it's accurate.

FTC-0000086

1    There was going to be work that had to be done to

2    transition OEMs and apps from using DMI and IntegraLink

3    to get data to now getting that data through RCI, and

4    that was going to be an undertaking that had to be done

5    over the course of a period of time.  But as you sit

6    here today, you are not aware of any new or additional

7    technology that had to be developed to make that

8    transition work; is that correct?

9        A.  That's correct.

10       Q.  Let me ask you to look at paragraph number 4,

11   Exclusivity.  I can read the sentence into the record.

12   "Exclusivity.  Due to the investments in technology

13   required to establish and administer protected

14   programs, R&R is open to the R&R protective programs

15   becoming an exclusive offering by DMI."

16           What was your understanding of the exclusivity

17   that was going to be offered by DMI?

18       A.  As I recall, looking at this provision, this

19   was a provision that really wasn't necessary being in

20   here at all, because as the transition gets

21   accomplished, there is no more -- when they talk about

22   investments in technology required to establish and

23   administer the protected programs, that's already all

24   done as part of the previous processes.  So I'm not

25   quite sure exactly what's implied by this because as

FTC-0000087

1    far as I know, DMI and IntegraLink and the third-party
2    users that they represent, they didn't do anything
3    more.  Once it's set up and the data is being
4    transferred as per contract, that's the end of the
5    story.  It's working.
6        Q.  Is the notion that Reynolds will enter into
7    this agreement to have the data transferred from RCI
8    and IntegraLink to Reynolds but that exclusivity refers
9    to Reynolds not entering into a similar agreement with
10   any other integrator?
11       A.  Absolutely not.  At this point I'm sure we
12   still had some third parties out there that we had not
13   reached agreement with and they had been finding ways
14   to work around the security checks.  And there is no
15   way -- at this point, my happiness with CDK has
16   increased a little bit, but it's still so far low that
17   you can't hardly measure it.
18       Q.  Did you talk to Mr. Schaefer about this
19   exclusivity provision -- we are going to look at your
20   e-mail back to Mr. Schaefer in a moment.  But is this
21   exclusivity provision something you discussed with
22   Mr. Schaefer?
23       A.  I'm sorry, I don't recall.  I may or may not.
24       Q.  Did Reynolds have a protected program to get
25   its applications on the CDK DMSes?

FTC-0000088

1      A.  As far as I know it did not, because it ended
2  up that the reverse risk occurred at some period of
3  time after this.  And the young lady that was
4  responsible for extracting data out of ADP systems, she
5  was independent.  She didn't require any help at all
6  from ADP.  And she just kept on extracting and keeping
7  that product running as it was transitioned over,
8  because you don't transition 800 dealerships overnight.
9  That had to be built.  And we had an RCI on our side
10  that used 3PA to get the data out, but then there's all
11  kinds of formatting that you got to worry about to get
12  it into the right format to go into the reverse risk
13  system.
14      Q.  Let me see if I understand the explanation.
15  When you referred to reverse risk, was it ultimately
16  the plan that Reynolds would put reverse risk on to the
17  CDK DMSes through CDK's 3PA program?
18      A.  No.  It was -- the plan was and is, it still
19  exists where we use 3PA to extract the accounting data
20  and phase it into the reverse risk system which runs in
21  the cloud to provide the capability to the dealerships
22  to, you know, one button and you get to see all kinds
23  of things.  But it was never, ever thought to be a
24  product that would actually run on an ADP DMS system.
25  That would be -- I don't understand how the ADP DMS

FTC-0000089

1  system is structured, how it's architected.  And I
2  don't want to know.  So to even think about doing
3  anything like that would have been, you know,
4  unthinkable.
5      Q.  But ultimately there were Reynolds applications
6  that went in through the 3PA program; isn't that
7  correct?
8      A.  Well, this one here is an example of that, but
9  the sole purpose was to extract data.  Not actually
10  have the product run on an ADP system.  It was purely
11  to extract data and lots of it.
12      Q.  Did it extract it through the 3PA program
13  ultimately?
14      A.  Yes.  Today it costs $350 a month per dealer.
15  Not cheap.
16      Q.  At the very bottom of the exhibit on this page,
17  CX 1151-002, the sentence reads, "ADP would be open to
18  adopting and advocating common industry standards
19  and/or recommendations."
20          What was the common industry standards that you
21  wanted ADP to be open to adopting?
22      A.  I interpret this one a little bit differently.
23  I think that ADP is making a suggestion to adopt common
24  industry standards, and that's not something we were
25  ever interested in doing because I think common

FTC-0000090

Brockman

1   industry standards, that translates to me as somebody

2   else gets to decide how things work besides us.

3          And well, this requires more explanation.

4   There has been attempts to establish common industry

5   standards, and when it first came up, we thought that

6   would be really cool.  The problem is that

7   manufacturers participate, and the manufacturers are

8   big guns, and it started almost from the very first the

9   manufacturers will say, yeah, we want to adopt industry

10  standards, however, we want this little part to be done

11  differently.  So there are many variants of what common

12  industry standards are for car dealers.  That is, as

13  far as we are concerned, madness from a programming

14  standpoint.  That means that there is that many more

15  balls we got to keep in the air.  And therefore, this

16  thought here about common industry standards, I mean,

17  that went nowhere.  It was dead on arrival.

18     Q.  Was the notion that the common industry

19  standard would be that both CDK and Reynolds would take

20  the position that data should only go from the DMS

21  provider and not be provided by a third-party

22  integrator?

23     A.  There was no discussion along those lines at

24  all.

25     Q.  That was Reynolds' position at this time; is

FTC-0000091

1    that correct?

2       A.  Well, Reynolds' position at that time was that

3    there would be no third-party access to our boxes.

4       Q.  And that's ultimately the position that CDK

5    came down with; is that correct?

6       A.  Ultimately they did.  I was surprised that they

7    made that change some period of time after all this was

8    done.

9       Q.  And that would have been a common industry

10   standard that would have been beneficial to Reynolds in

11   this 2013 time period because of the factors we've

12   talked about before, how CDK was marketing against

13   Reynolds, saying we are different, we have a different

14   standard on security, you should join us, you should

15   hire us to be your DMS provider, you should not go to

16   Reynolds, and that would be a major benefit to Reynolds

17   if that -- if they professed a different standard and

18   turned 180 degrees in the other direction and stopped

19   doing that market messaging to you?

20      A.  Again, none of that was under any consideration

21   in this whole process right here.  I fully expected to

22   have dirty tricks come out of the relationship as far

23   as this whole process is concerned with ADP.  I was

24   looking forward to being out first and foremost and not

25   thinking about anything else.

FTC-0000092

1     Q.  What was your reference to dirty tricks in the
2   answer?
3     A.  Well, a classic dirty trick in this kind of
4   situation which, fortunately, didn't happen but could
5   have happened, where they start sending data to us
6   coming out of ADP systems and stuff is transposed.  Not
7   much, but just a little.  Or some stuff is left out or
8   extra junk put in.  And it's, oh, I'm sorry, we had a
9   programmer that screwed up.  Okay, tell me about that.
10  Those are dirty tricks that happen.
11    Q.  So in that example, you are referring to a
12  situation where Reynolds would be having a Reynolds app
13  on a CDK dealer and somehow that dealer would not get
14  satisfactory results from its Reynolds app because of
15  an alleged programming issue; is that correct?
16    A.  That certainly, but what I was more focused on
17  was in this transition period where we are endeavoring
18  to get dealerships that have been getting their data by
19  extraction processes through RCI.  Well, if they mess
20  up the extraction processes while all this transition
21  is going on, that would be a dirty trick.
22    Q.  And you say pretty much everything, the
23  transition went smoothly from your perspective?
24    A.  That fear did not come to reality.
25    Q.  We are still on CX 1151 looking at the first

FTC-0000093

1     page of the exhibit.  There is in the middle of the
2     page an e-mail from Mr. Schaefer to you, and he starts
3     out his e-mail to you with the phrase, "per our
4     conversation."  Was this a conversation you had with
5     Mr. Schaefer about the substance of Mr. Gardner's
6     e-mail?
7          A.  I don't know specifically about Mr. Gardner's
8     e-mail, but it was about the whole issue and situation.
9     And what Bob Schaefer wanted is he wanted in writing
10    what he was empowered to do.  And Bob Schaefer is a
11    quite talented person.  In addition to the fact that
12    some of his basketball school records at Wright State
13    University still stand is kind of amazing.
14          But he was actually in charge of development
15    for Reynolds in the period of time before I got there.
16    And actually, when I got there, supposedly he was --
17    his neck was on the chopping block.  He was going to be
18    fired.  And the fact that I came along and I said, you
19    know, you guys got to be crazy; this guy is a bright
20    guy; he knows all kinds of stuff; he invented the hub,
21    he owns a patent on the hub, absolutely not.
22          What I think happened was there had been a huge
23    development failure at Reynolds before we got there.
24    They had decided to build a whole new DMS, and they
25    refused to allow the existing programmers at Reynolds

FTC-0000094

1    to participate in the building of this new system.
2    They felt like they had the need for programmers
3    experienced in the new ways of programming, and they
4    wouldn't let the people that really knew everything
5    participate.  They started with a whole bunch of fresh
6    programmers that didn't understand automotive at all.
7    They spent probably a quarter of a billion dollars for
8    a system which ultimately failed.
9          They actually had to withdraw it from the
10   marketplace.  They had to make special provisions to
11   basically buy dealerships out of their contracts and
12   convert them back to Era.  I would imagine probably,
13   though I have never talked to him about it in detail,
14   Bob Schaefer had some choice things to say about that
15   whole process, because what had happened was that the
16   new programmers knew how to build pretty screens,
17   pretty reports, but they had no knowledge of all the
18   interior logic that had been built up over the years.
19   And so when a dealer converted from Era to this new
20   system, things didn't work.
21        Q.  What was the new system called?
22        A.  It was called Generations.  Scott, do you
23   remember?
24             MR. CHERRY:  That's correct.
25             THE WITNESS:  Generations is correct, okay.

FTC-0000095

1    But at any rate, my observations and decisions as far

2    as Bob Schaefer is concerned turned out to be exactly

3    correct.  He's been a very is valuable person.

4         BY MR. ABRAHAMSEN:

5         Q.  And then you sent him back an e-mail which

6    says, "You have authority to pursue discussions with

7    ADP on these subjects as per our conversation."

8         A.  Yeah, this is where the point about him almost

9    getting fired when I fist got there.  Evidently, he had

10   had his legs cut out underneath him by the previous

11   administration.  And he was very, very sensitive about

12   whenever he has something to do, that he has

13   authorization to do it.  So any time somebody climbs

14   him about what he's doing, he can open his drawer and

15   say, I got the letter, see, which is a sad situation

16   for that level of lack of trust.  But he started that

17   process with me, and I felt like he was so sensitive

18   about it that we would continue that process.

19        Q.  Was it your understanding that he would then

20   pass on your e-mail to people at CDK so that they would

21   know that you had weighed in on it?

22        A.  I don't think that -- that's not what the point

23   was.  The point was that within our organization

24   anybody that questioned his authority to discuss things

25   with ADP, he's got the letter or the e-mail that says

FTC-0000096

1    that he's authorized.  It would not cover him divulging
2    things to CDK at all.
3        Q.  You mentioned in a prior answer that the market
4    messaging position that Mr. Gardner had put in his
5    e-mail was dead on arrival.  Was there some reason you
6    didn't address that in your e-mail back to
7    Mr. Schaefer, that you thought that particular
8    provision was dead on arrival?
9        A.  All this is so long ago, I don't remember if I
10   thought about it or not thought about it.
11       Q.  Did you talk to Mr. Schaefer about the
12   marketing message, the market messaging part of
13   Mr. Gardner's e-mail?
14       A.  I don't specifically recall that.
15       MR. COHEN:  Dana, I'm just going to lodge a
16   clarification.  I may be wrong, but I thought that his
17   dead on arrival testimony related to the industry
18   standards provision.  But I could be wrong about that.
19   If I'm right, then you have mischaracterized his
20   testimony.  If I'm wrong, my objection is meaningless.
21   But anyway, I simply wanted to let the record reflect
22   my understanding of that prior testimony.
23       BY MR. ABRAHAMSEN:
24       Q.  And I will try to clarify the record.  The
25   market messaging paragraph states that ADP would be

FTC-0000097

1    open to adopting and advocating common industry

2    standards.

3         MR. COHEN:  We are on the same page, then.

4         BY MR. ABRAHAMSEN:

5    Q.  So when I phrased my question as whether you

6    spoke with Mr. Schaefer about market messaging, did you

7    understand my question to encompass the part of that

8    paragraph that talked about advocating common industry

9    standards?

10   A.  Again, my answer is the same.  We are now down

11   really into the weeds, and my memory just is not that

12   good.

13   Q.  So just to make sure the record is clear on

14   this point of common industry standards, you don't

15   recall whether or not you talked to Mr. Schaefer about

16   that part of Mr. Gardner's e-mail; is that correct?

17   A.  That's correct.

18        MR. COHEN:  Thank you.  I think that was an

19   unnecessary detour on my part, but I appreciate the

20   clear record.

21        BY MR. ABRAHAMSEN:

22   Q.  I flipped the page on the market messaging

23   paragraph and realized there was a reference at the end

24   on the next page that I had overlooked when we were

25   speaking about this before in CX 1151-003.  The

FTC-0000098

1    paragraph about market messaging ends with a
2    parenthetical where Mr. Gardner is giving an example.
3    His example is "through or in conjunction with an
4    industry organization such as NADA."
5          Was there discussion between you and
6    Mr. Schaefer about whether it would be satisfactory to
7    Reynolds to do a common market messaging through NADA?
8       A.  I'm sorry, but my answer is the same.  This is
9    an exquisitely fine detail that I'm sorry I just don't
10   recall.
11      Q.  Let me ask you a broader question.  Taking our
12   eyes off this exhibit for a moment so I can broaden the
13   question, was there a time in the 2013 to 2015 time
14   period where you were interested in CDK and Reynolds
15   getting together in a public forum such as NADA and
16   making a joint announcement about market messaging as
17   it relates to data security?
18      A.  I was not really interested in doing that at
19   all.  I don't trust the people at ADP.  Never have.  I
20   have been competing robustly against them since 1975.
21   I don't want to do anything with them that I can
22   possibly avoid.  It has to be a really, really good
23   opportunity.
24      Q.  Let me ask you to take a look at an exhibit
25   we've marked as CX 4035.  I'll ask you to take a look

FTC-0000099

1    at it.  CX 4035 bears Bates REYCID0263974.

2        A.  (Reviewing document.)

3        Q.  My understanding is that these are notes that

4    you made to yourself for a telephone call with

5    Mr. Anenen; is that correct?

6        A.  That's correct.

7        Q.  There is an indentation on the first page of

8    the notes that have five subparagraphs, and I wanted to

9    ask you about the bottom of the five.  It begins with,

10   "Therefore, I want a no-charge access to ADP systems

11   for the next 20 years."  Do you see that?

12       A.  Yes.

13       Q.  And what was your ask here in terms of the

14   20 years?

15       A.  The ask was that I was to be able to -- for

16   Reynolds products, for instance, like reverse risk, the

17   reverse risk, we didn't know anything about that at the

18   time.  That was a much, much later event.  To be able

19   to access 3PA's approach to ADP's systems for no charge

20   in view of the fact that they have been taking theirs

21   and they had been paying nothing for over 20 years.

22   They've been extracting data on our systems.

23       Q.  And what did Mr. Anenen have to say about that

24   proposal?

25       A.  I don't know.  I didn't talk to him directly

FTC-0000100

1   about that proposal.  He, unsurprisingly, was not happy

2   with that.  But I was pretty adamant.

3       Q.  At the end of that same paragraph, you make the

4   point that you want it used only for a product that

5   Reynolds offers.

6       A.  Yeah, this is in no way to be considered a data

7   extraction for resale to third parties.  It was only to

8   facilitate a product that we provide to dealerships

9   that use CDK and that's it.

10      Q.  Why was that a significant point for you to

11  make?

12      A.  Well, because I would be hypocritical if I

13  acted otherwise because what I'm doing is I'm demanding

14  the rules that they have to follow.  Therefore, it's

15  appropriate that I need to follow them too.

16      Q.  The third slash down in this same indented

17  paragraph states that ADP has wrongly taken advantage

18  of Reynolds in the marketplace over the issue of data

19  security and has cost us in the millions.

20          Is that the issue we have been speaking about

21  earlier where CDK was selling against Reynolds on this

22  issue of data security?

23      A.  Yes.

24      Q.  The third slash mark from the bottom of the

25  first page of this exhibit speaks again about

FTC-0000101

1    indemnification, and it reads, "indemnification has

2    been dealt with."

3            Does this refresh your recollection at all

4    about what Reynolds had done with regard to

5    indemnification that had sort of cleared the way for

6    this -- what had previously been a stumbling block to

7    now be dealt with?

8        A.  I'm sorry, I don't recall.

9        Q.  The second page of the exhibit, CX 4035-002,

10   the first sentence on that page says, "We have held up

11   on a large release of security enhancements for over

12   two months to see if there was a deal to be worked

13   out."

14           What security enhancements were you referring

15   to?

16       A.  There were a bundle of security enhancements.

17   I don't know specifically.  As a matter of fact, I

18   don't know how any of them -- well, most security

19   enhancements, I don't understand how they work.

20   There's been a couple of simple ones such as we verify

21   that the employee status of a person that holds access

22   to a Reynolds computer system by going over the payroll

23   system and checking to see if they are on payroll.  If

24   they are not on the payroll system, that's a good

25   indication they are a third party.  So that kind of

FTC-0000102

1   security enhancements I understand.  That's pretty
2   simple and straightforward.  But the rest of them get
3   pretty exotic, and I'm frankly -- I would love to have
4   time to sit with the programmers to understand exactly
5   what they do, but that's a luxury that I don't get to
6   have.
7        Q.  And am I reading this correctly, you'll correct
8   me if I'm wrong, but you are saying you have held up
9   the security enhancements, you have held them up in the
10  hopes that you'll be able to figure out a way to not
11  apply them to the CDK integrations that are going on?
12  Is that accurate?
13       A.  Yes, because that would dislocate a lot of
14  customers and there would be a lot of heat and anger
15  over the whole situation.  These two months worth of
16  security enhancements that are being held up are the
17  ones that would finally disable them, that would
18  disable ADP access to our boxes.
19       Q.  Right.  So it was getting back to what we
20  talked about earlier this morning that the technology
21  was there to block, but the business problems were
22  still a problem.
23       A.  Exactly.
24       Q.  How did you know that -- I'm looking at the
25  second-to-last bullet on this page.  You make a

FTC-0000103

1    reference here to hundreds of third parties.  How did

2    you know how many third parties DMI and Integralink

3    were working with?

4        A.  That number had been mentioned in the

5    discussions that had been ongoing between Bob Schaefer

6    and the ADP people.  I was not -- prior to this whole

7    process, I was not aware of how many they had.  I

8    presumed it to be a pretty good size because they had

9    been in the business of doing this for 20 years or

10   more.

11       Q.  During the phone call with Mr. Anenen, did you

12   talk about other integrators that were in the market

13   such as Authenticom or any of the others?

14       A.  No.

15       Q.  At this time point, I'm going to go back to the

16   paragraph we started out talking about, the one that

17   referenced the next 20 years.  Was there any hesitancy

18   on the part of CDK to allow Reynolds to use 3PA to

19   access its apps on to the CDK DMSes?

20       A.  There's never been occasion for a conversation.

21   And frankly, when all this was going on -- and

22   remember, this is a list of talking points for a

23   telephone conversation that I had hoped was going to

24   happen within a month or two.  It didn't happen for

25   seven or eight months.  But frankly, I didn't even

FTC-0000104

1     understand that they had a 3PA process at all until
2     further on in this particular process.
3         Q.  What was your sense of why the process was
4     taking so long to play out?
5         A.  They were stalling.
6         Q.  Why would they be stalling?
7         A.  Well, frankly, they didn't want this all to
8     happen at all.  They were being forced into it.  So
9     therefore, what they did is they drug their feet.  And
10    as is typical in a negotiation that you give the other
11    party an opportunity to act in good faith presumably to
12    start with.  When it doesn't quite work out that way,
13    then it becomes much more difficult.  It becomes
14    tougher.
15        Q.  Were there instances where you threatened CDK
16    if they didn't move forward on this agreement?
17        A.  Yeah.
18        Q.  What did you threaten them with?
19        A.  I said, look, you are going to wake up one
20    morning and nothing is going to work as far as your
21    accessing of the Reynolds boxes.  And so therefore,
22    whatever you are supposed to be doing for your
23    customers, you are going to be up a tree, which is a
24    very serious decision, and I thought long and hard
25    about it, but I didn't want to cause the upset that it

FTC-0000105

1      would have caused in the marketplace generally.  My
2      wants were simple.  I wanted them out of our boxes.
3      And it took me a while to get to the point from a
4      resolution standpoint that if they didn't do it, I was
5      going to shut them off.
6           Q.  Did you make those representations about
7      shutting CDK off directly to Mr. Anenen?
8           A.  Yes.
9           Q.  Did you make those representations to anyone
10     else at CDK?
11          A.  No.
12          Q.  Did you have conversations with anyone at CDK
13     other than Mr. Anenen on the subjects that we have been
14     talking about today?
15          A.  No.
16          Q.  Did you ever talk to Mr. Workman?
17          A.  Not about these subjects.  And Ron Workman, I
18     would -- one of the few decent people in that
19     organization.  A good guy.
20          Q.  How did you know Mr. Workman?
21          A.  Well, the setting up of the ODE relationship.
22     He worked on the contracts on his side.  I worked on
23     them from our side.
24          Q.  How long have you known Mr. Workman?
25          A.  That's probably in the ten-year park.

FTC-0000106

1      Q.  I'm going to ask you a series of the same
2    questions, but I'm going to ask you whether the
3    conversations took place between Mr. Schaefer and
4    anyone at CDK.  Are you aware of whether Mr. Schaefer
5    conveyed these sort of threats, that there would be
6    blocking of the CDK DMSes if progress wasn't made on
7    the contracts that we have been talking about?
8      A.  I would feel quite certainly that he did have
9    conversations that covered those subjects because there
10   wasn't -- my meeting with Steve Anenen and then a long
11   period of silence from our side.  People on the ground
12   doing the work who were personally invested in how
13   everything worked, I'm sure that they got talked to by
14   Bob Schaefer.
15     Q.  The last bullet on the first page of CX 4035
16   makes reference to Mr. Workman and that he has
17   reported -- I understood it to mean he had reported to
18   you that your interface request could only be approved
19   by Mr. Anenen.  Am I reading that correctly?
20     A.  Yes, but as far as I don't think Ron Workman
21   reported that to me.  He probably reported it to Bob
22   Schaefer because again, I was not talking directly to
23   anybody at CDK other than Steve Anenen.
24     Q.  So Mr. Workman could have made that
25   representation to Mr. Schaefer, and then it would have

FTC-0000107

1    come up to you through Mr. Schaefer.  Is that my

2    understanding?

3        A.  That is correct.

4            (Discussion off the record.)

5            BY MR. ABRAHAMSEN:

6        Q.  A little earlier today we were talking about

7    the market message that DMS providers conveyed to the

8    market.  We were talking about Reynolds' long-standing

9    position on data security, and we talked some about how

10   CDK had a different message to the market about its

11   view, I think you used the phrase laissez-faire view on

12   market security.

13           My question is what was the message on data

14   security that was being conveyed by the other DMS

15   providers such as Dealertrack and Autosoft and so on?

16       A.  Frankly, I'm not aware.  From a DMS provider

17   standpoint, Dealertrack, their DMS is small and weak.

18   From the facility standpoint, it's kind of a get-by

19   product that works for small dealers.  We don't hear

20   much about them at all in the marketplace.

21           As far as the others, there's probably four or

22   five others, but frankly, we don't pay any attention to

23   those people because they are in a different market.

24   They are selling to small dealers who don't really need

25   very sophisticated systems.

FTC-0000108

1      Q.  Let me ask the question a slightly different
2   way.  Was there -- did you have a sense in this
3   2012/2013/2014 time period that Reynolds was unique in
4   that it was offering a market message on data security
5   about being strong and vigilant about third-party usage
6   of user IDs and passwords and so on, and it was sort of
7   alone, that all the other DMS providers had a different
8   market message?
9      A.  I understood that to be the case, that we were
10   different and we were the only ones that were
11   different.  But that's, as far as I'm concerned, a
12   perfectly satisfactory situation because I'm convinced
13   the way we are doing it is the right way.  And the
14   other folks are doing it the wrong way, and the fact
15   that there's other folks doing it the wrong way means
16   nothing to me.  Above all else, I want our stuff to be
17   right.
18      MR. ABRAHAMSEN:  Why don't we go off the record
19   for today, and we'll resume tomorrow morning at 9:00 in
20   the same location.
21      (Whereupon, the proceedings at 1:02 p.m., were
22   adjourned.)
23
24
25

FTC-0000109

1  <u>CERTIFICATE OF REPORTER</u>

2

3

4       I, Deborah Wehr, do hereby certify that the

5  foregoing proceedings were taken by me in stenotype and

6  thereafter reduced to typewriting under my supervision;

7  that I am neither counsel for, related to, nor employed

8  by any of the parties to the action in which these

9  proceedings were taken; and further, that I am not a

10  relative or employee of any attorney or counsel

11  employed by the parties hereto, nor financially or

12  otherwise interested in the outcome of the action.

13

14

15

16

17       Deborah Wehr, RPR

18       Notary Public

19

20

21

22

23

24

25

1                    FEDERAL TRADE COMMISSION

2

3    In the Matter of:              )

4    CDK GLOBAL,                    )

5         a corporation,           )    File No.

6    And                           )    171-0056

7    REYNOLDS AND REYNOLDS,        )

8         a corporation.

9

10

11                    Thursday, September 19, 2019

12

13                    Sheppard, Mullin, Richter & Hampton, LLC

14                    2099 Pennsylvania Avenue, N.W.

15                    Washington, D.C.  20006

16

17                    The above-entitled matter came on for

18   investigational hearing, pursuant to notice, at 9:05

19   a.m., for the testimony of:

20

21                    ROBERT BROCKMAN

22

23

24

25   Reported by:  Deborah Wehr, RPR



GOVERNMENT
EXHIBIT

4:21-CR-009-GCH

No. 33

FTC-0000111

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF THE FEDERAL TRADE COMMISSION:

 4          DANA F. ABRAHAMSEN, ESQUIRE

 5          WILLIAM LANNING, ESQUIRE

 6          MICHAEL WILLIAMS, ECONOMIST

 7          Federal Trade Commission

 8          600 Pennsylvania Avenue, N.W.

 9          Washington, D.C.  20580

10          (202) 326-3695

11          dabrahamsen@ftc.gov

12

13   ON BEHALF OF REYNOLDS & REYNOLDS:

14          MICHAEL P.A. COHEN, ESQUIRE

15          AMAR NAIK, ESQUIRE

16          Sheppard, Mullin, Richter & Hampton, LLC

17          2099 Pennsylvania Avenue, N.W.

18          Suite 100

19          Washington, D.C.  20006

20          (202) 747-1958

21          mcohen@sheppardmullin.com

22

23   ALSO PRESENT:

24          SCOTT CHERRY

25          JON EMMANUAL
```

FTC-0000112

```
 1                    I N D E X

 2

 3   EXAMINATION BY:                        PAGE

 4   Mr. Abrahamsen                         113

 5

 6

 7   EXHIBIT        DESCRIPTION             PAGE

 8   CX 1143        7/2/14 e-mail            114

 9   CX 4036        7/14/14 e-mail           125

10   CX 4037        9/11/14 e-mail           130

11   CX 4273        Settlement agreement     136

12   CX 4152        3PA agreement            144

13   CX 4153        Reynolds Interface Agreement 144

14   CX 4045        Data Exchange Agreement  144

15   CX 4176        2/26/15 e-mail           155

16   CX 4182        CDK Deal Information      167

17   CX 4038        3/19/15 e-mail           180

18   CX 4459        11/21/16 e-mail          185

19   CX 4420        11/2016 e-mail           188

20   CX 4463        8/1/17 e-mail            192

21

22

23

24

25
```

FTC-0000113

```
 1            P R O C E E D I N G S
 2              -    -    -    -    -
 3        MR. ABRAHAMSEN:  We will resume today our
 4   examination of Mr. Brockman.  We have as counsel for
 5   the Federal Trade Commission, William Lanning.  And
 6   Mr. Ansaldo, who was with us yesterday, is not present
 7   today.  But otherwise the attendance in the room is the
 8   same as yesterday.  And we are back on the record.
 9   Whereupon --
10              ROBERT BROCKMAN,
11        a witness, called for examination, having been
12   previously duly sworn, was examined and testified as
13   follows:
14              EXAMINATION
15        BY MR. ABRAHAMSEN:
16        Q.  Mr. Brockman, good morning.
17        A.  Good morning.
18        Q.  I remind you, you are still under oath.
19        A.  I understand.
20        Q.  We were talking yesterday about the different
21   approaches Reynolds had when it came to its idea about
22   security and how it differed from the way the
23   laissez-faire attitude that CDK had when it came to
24   security.  And I wanted to ask whether it would have
25   been beneficial for Reynolds' business if CDK changed
```

FTC-0000114

1    its philosophy.  You mentioned yesterday that CDK was

2    costing Reynolds millions of dollars by hacking in to

3    your system, and they were using the fact that you had

4    a closed system as a way to tell dealers that they

5    should switch DMSes over to the CDK DMS.  So if CDK

6    changed its business practice and adopted a practice

7    more like Reynolds' practice of not allowing third

8    parties on its system, would that benefit Reynolds?

9        A.  I hadn't really thought about that, but

10   certainly they would not be able to declare us fools

11   and idiots.  And to that extent, I'm sure it would have

12   been beneficial.  They would not have kept throwing the

13   way we were doing things up in our face in sales

14   situations.

15       Q.  And it would have vindicated your position on

16   the importance of security for data as well?

17       A.  Certainly it would.  There's no question.

18       Q.  Let me ask you to take a look at a document

19   we've labeled CX 1143 and ask you to take a look at it.

20   CX 1143 has Bates CDK_CID_01535307.  It's a two-page

21   exhibit.

22       A.  Yes, I find the next-to-the-last paragraph

23   somewhat amusing.

24       Q.  I'm sorry, you are talking about the

25   next-to-the-last paragraph of the first page of the

FTC-0000115

1  exhibit?

2       A.  Of the first page.  It's the one that says, I

3  should point out, we have not been accessing R&R

4  systems for decades, as you said.  Our business in

5  access R&R systems came to us through an acquisition.

6          I didn't think that acquiring something

7  automatically put them through the holy water.

8       Q.  I appreciate that.  His point about the number

9  of years that CDK had been accessing the Reynolds

10  system is a response to your e-mail to him; is that

11  correct?

12       A.  Yes, I believe that's correct.

13       Q.  So the record is clear, the Exhibit CX 1143 has

14  as the second page of the exhibit the first e-mail in

15  the e-mail and responsive e-mail.  And the first e-mail

16  is from Mr. Brockman to Mr. Anenen on June 30, 2014.

17  And the first sentence of your e-mail to Mr. Anenen

18  states, "I think there is some confusion surrounding

19  the issue that I called you about last week."

20          Do you see that?

21       A.  Yes.

22       Q.  So is the call that you are referring to in the

23  first sentence of the second page of this exhibit the

24  telephone conversation that we discussed yesterday?

25       A.  I'm not sure that I recall exactly what was

FTC-0000116

1     discussed yesterday as far as which telephone call, if

2     you could refresh my recollection in that.

3          Q.  I believe it's CX 4043.

4          MR. COHEN:  Here we go.  I have 4043 in front

5     of him as well.

6          THE WITNESS:  This is my list of talking points

7     for an eventual telephone conversation.

8          BY MR. ABRAHAMSEN:

9          Q.  When you said this, you are referring to

10    CX 4043?

11         A.  That's right.

12         Q.  Had you had any other telephone calls with

13    Mr. Anenen in this June 30th time period aside from the

14    one call you reference in your e-mail?

15         A.  As best as I can recall, that was the only one.

16    Mr. Anenen was a hard person to get ahold of.

17         Q.  The response from Mr. Anenen is the first page

18    of CX 1143, and I would like you to take a look at the

19    indented part of the paragraph on the first page of the

20    exhibit and the first hash mark under the sentence that

21    begins with, Based on my assumption, it starts, "For

22    ADP", do you see that sentence?

23         A.  I'm sorry, I don't know if I'm looking at the

24    right thing or the right side of it.

25         Q.  Yes, CX 1143.

FTC-0000117

1    A.  Dash 001?

2    Q.  Yes.

3    A.  Excuse me, I was on the wrong page.  And your

4    question?

5    Q.  I was going to direct your attention to the

6    paragraph that's indented, and it's the first paragraph

7    under, "Based on my assumption".

8    A.  This is the one that starts off, "For ADP to

9    provide integration to Naked Lime"?

10    Q.  Correct.  What did you interpret him to mean

11    when he talked in that paragraph about providing

12    integration to Naked Lime, having to go through a set

13    of defined, documented and thoroughly tested processes?

14    A.  I interpreted that to mean what he was

15    describing was a 3PA process.

16    Q.  And had you talked to him about having your

17    applications go through 3PA prior to receiving this

18    e-mail?

19    A.  I had not personally.  I would suspect by the

20    context that my people had been talking to his people.

21    Q.  But at this time, by the time you read this

22    e-mail, CX 1143, you, at that point, were aware that

23    CDK had a 3PA program?

24    A.  Yes, but my people had been talking about it to

25    me.

FTC-0000118

1    Q.  And he talks here about not only for Reynolds
2    and Reynolds, but he also makes reference in the first
3    sentence for ADP to provide integration to Naked Lime
4    or R&R or any third party.  What did you interpret him
5    to be meaning when he said that for any third party
6    they would have go through 3PA?
7    A.  I don't know that I paid a lot of attention to
8    that particular line.  What I was more interested in is
9    that they were, as of this date, clearly getting behind
10   the process of the stand down and they were describing
11   things that they needed to have, which I considered to
12   be reasonable as part of the soft landing.
13   Q.  So you thought it was reasonable for him to
14   expect you to go through 3PA for your apps?
15   A.  Yes.
16   Q.  And with respect to his reference, and he says
17   it twice in this paragraph, in the first line he talks
18   about how this has to apply to any third party.  And
19   then the very last sentence of this paragraph says,
20   "Every third party must operate within these
21   parameters."  Did you understand that sentence to mean
22   that CDK was no longer going to adhere to its
23   laissez-faire attitude about third parties?
24   A.  Clearly this e-mail represented -- it may not
25   have been a change, but my understanding of where they

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTC-0000119

1    were at from a security standpoint, it was obviously

2    much different than what I had seen before.

3       Q.  And what did you take his sentence in the very

4    next indented paragraph, in other words, the one that

5    begins after the second hash mark, he's talking again

6    about ADP's third-party approval and how they have been

7    developed.  And the last sentence is what I would like

8    to -- the last two sentences are what I would like to

9    point your attention to.  The second-to-last sentence

10   of the paragraph reads, "I am sure you will appreciate

11   the need to have R&R follow the same process and meet

12   the same standards.  I believe that" -- I think the

13   word "this" should be here -- that "this is the same

14   point you make publicly."

15          Did you interpret that to mean that he was

16   moving away from his position about -- his

17   laissez-faire position about allowing third parties on

18   to his system and that he was making reference to the

19   fact that this is something that you had made public

20   statements about?

21      A.  My interpretation of what this paragraph is all

22   about is that the 3PA system had been around for a

23   while but I had not known about it.  And evidently,

24   it's something that they provided to very large

25   customers, large groups, chain dealerships.  Auto

FTC-0000120

1   Nation, of course, is their largest customer because
2   it's the biggest chain dealer operator in the whole
3   country.
4        What we are seeing here is a well-developed
5   process, but I had not been aware of that before this.
6   And to see what all he wrote here, actually it's
7   comforting in that the worst situation would be if
8   there were no process at all and they would have to
9   build one from scratch.  Looking at this one, you can
10  say, well, this has been running for a while and it's
11  well documented.  It looks like it would be a
12  reasonable process to interface using what he's laying
13  out here.
14       Q.  And he's kind of making a point, if I'm
15  interpreting this correctly, that almost explaining why
16  maybe you haven't heard about it, that you have been
17  very public about your position when it comes to third
18  parties accessing your DMS, and he's kind of hinting
19  that you may not have known this because we haven't
20  made it public yet that we are going to take the same
21  position that you are going to take on third-party
22  access.  Did you interpret this e-mail that way?
23       A.  I don't know that I thought that deeply about
24  it.  It was mainly a sigh of relief on my part that we
25  weren't going to have to start from scratch to build up

FTC-0000121

1    an interface.

2        Q.  The next paragraph -- the next paragraph on the

3    first page of this paragraph that's not indented

4    begins -- and this is the one that you referenced

5    before I had even asked a question about the exhibit,

6    the "I should point out" paragraph, and I would like to

7    turn your attention to the last two sentences of that

8    paragraph.  The second-to-last sentence says, "I would

9    be remiss not pointing out that R&R is accessing the

10   ADP system through a contract with Authenticom and has

11   been doing so for quite some time without an agreement

12   from ADP.  We need to clean this up as well."

13            What did you interpret those two sentences to

14   mean?

15       A.  Well, there is no question we had been using

16   Authenticom on a very small scale to provide service

17   reminder follow-up data, addresses and names of

18   customers that own vehicles that sign up to have an oil

19   change or have a 100,000 mile checkup or whatever.

20            As far as what arrangements that Authenticom

21   had, that was beyond our vision.  We don't get to see

22   what Authenticom does or was doing at that time.  And

23   what he's saying here in so many words is that

24   Authenticom doesn't have a contract with us.

25   Authenticom is acting as a hacker into CDK's systems.

FTC-0000122

1    And he's being fairly gentle about pointing that out
2    because we truly didn't understand what Authenticom was
3    doing, what permissions they had and which ones they
4    didn't.
5         Q.  When he said "we need to clean this up as
6    well", is he suggesting that you need to stop using
7    Authenticom to access the CDK system?
8         A.  That was my interpretation.
9         Q.  And did this suggest to you that CDK was moving
10   away from its laissez-faire attitude about third
11   parties and was going to take a stricter approach in
12   terms of not allowing third parties to hack into its
13   system?
14        A.  I wouldn't say that I perceived that at this
15   point.  It wasn't until they started publicly
16   announcing 3PA that I took notice.
17        Q.  Why would he be e-mailing you that you needed
18   to clean this up as well if CDK wasn't interested in
19   stopping the use of third-party integrators on its
20   system?
21        A.  Again, I don't think I thought that deeply.
22   This was -- at this stage of this project, you know, my
23   efforts were pretty much done because I forced the
24   issue with Steve Anenen.  And after that I'm backing
25   away because I'm on to whatever the next hill is.

FTC-0000123

1     Q.  This notion that Reynolds had been using
2     Authenticom and that CDK was going to ask you to clean
3     that situation up, was that a topic that you and
4     Mr. Anenen had discussed on the telephone?
5     A.  I'm sorry, I don't recall whether we did or
6     didn't.  But it was absolutely clear what he was saying
7     in this letter.
8     Q.  That the third-party integration that had been
9     going on would not be allowed to continue?
10    A.  Yes.
11    Q.  Was that something you talked to Mr. Anenen
12    about, whether CDK was also, in addition to seeing to
13    it that Reynolds stopped using third-party integration
14    on its system that CDK was also going to stop being so
15    laissez-faire about other parties using third-party
16    integration on the CDK system?
17    A.  Again, I'm not perceiving that far deep into
18    this letter.  I'm -- again, I think I'm out of this
19    project and I'm on to the next one.
20    Q.  I can't remember how I started my question, so
21    I'm going to maybe ask the same question, but I don't
22    think so.
23         MR. COHEN:  You have asked the same question
24    for about 45 minutes in several different ways, and I
25    haven't objected once and I'm not going to.  But the

FTC-0000124

1    answer is not going to change.

2            THE WITNESS:  Can I declare a timeout?

3            (A recess was taken.)

4            BY MR. ABRAHAMSEN:

5       Q.  Before the break we were talking about CX 1143

6    and how it had followed a telephone conversation you

7    had had with Mr. Anenen.  In that telephone

8    conversation with Mr. Anenen, had he said anything that

9    led you to believe that CDK was no longer going to take

10   a laissez-faire attitude about third-party integration

11   on its DMS system and was going to be adopting a system

12   where they would no longer permit third parties to

13   integrate on its system?

14       A.  We never had any conversation about that.  When

15   I finally learned about it, I wasn't surprised because

16   I thought the way they were doing it before was really

17   stupid from a security standpoint.  And probably from a

18   general background statement, I consider really

19   everything that CDK does to be inferior.  And that's --

20   I have been competing with them now since 1975.  So

21   therefore, I don't spend any time, quote, watching what

22   CDK does.  I find it humorous that they turn over chief

23   executive officers as often as they do.  But other than

24   that, as far as operationally or technically, whatever,

25   I pay no attention to what they do.

FTC-0000125

1    Q.  You mentioned in a prior answer that you had

2    learned about CDK's 3PA program from people who report

3    to you.  Who would that have been?

4    A.  Probably Bob Schaefer.

5    Q.  Let me ask you to take a look at a document

6    we've marked as CX 4036.  The Exhibit CX 4036 has Bates

7    REYCID0264663, and my understanding is that these are

8    notes that you prepared for yourself to deliver remarks

9    at a sales meeting on July 14, 2014; is that correct?

10   A.  Yes, that's correct.

11   Q.  I wanted to ask you to take a look at the

12   second page of the Exhibit CX 4036-002, and at the

13   bottom of the page there is a paragraph titled

14   Security.  Do you see that?

15   A.  Yes.

16   Q.  The second bullet down talks about the early

17   stages of negotiating an agreement, and it says it's a

18   similar agreement.  When you say similar agreement, is

19   that a reference to the reference in the first bullet

20   that Reynolds had reached an agreement with

21   Mr. Batista?

22   A.  Yes, the most important part of which is that

23   Phil Batista, since lost in court, was no longer going

24   to be hacking Reynolds' sites and there was going to be

25   an orderly stand down.  And that was the way it looked

FTC-0000126

1    like the agreement with ADP would take place.  It would
2    be similar.
3        Q.  So you had had a court case going against
4    Mr. Batista, and then ultimately you settled that court
5    case?
6        A.  I don't know who brought it in the first place,
7    whether it was us or whether it was Mr. Batista.  And
8    the final disposition, whether it was a settlement or
9    whether it was an agreed verdict, I'm not aware.
10       Q.  And the reference in the first bullet "reached
11   an agreement where Phil is getting out of the
12   business", is that what you would call a wind down
13   agreement with Mr. Batista?
14       A.  Yes.
15       Q.  And were the terms basically that he would stop
16   doing integration on Reynolds but he would do so in a
17   way that allowed his clients to continue to do the
18   integration for a period of time until they could move
19   into the RCI program?
20       A.  Yeah.  It was an orderly stand down would be
21   the way I would characterize it.
22       Q.  And Mr. Batista, his company is SIS?
23       A.  Yes.
24       Q.  The third hash mark down under security on
25   CX 4036-002 states, "ADP seems to be becoming aware of

FTC-0000127

1    the laws and liabilities involved." Do you see that?

2        A.  This is in the last section titled Security?

3        Q.  It's the third hash mark down.

4        A.  Yes, I see that.

5        Q.  What did you mean by ADP seems to be becoming

6    aware of the laws?

7        A.  The very existence, which was in relatively

8    recent news to me, was the fact that the 3PA program

9    existed at all and the fact that they were talking

10   about that.  Again, that was new news to me or

11   relatively new.

12       Q.  What laws were you referring to?

13       A.  The ones -- and I should know the names of

14   them, but the ones that were discussed in the document

15   produced by NADA.

16       Q.  And had you talked to Mr. Anenen about the

17   applicability of those laws?

18       A.  No.  I just had disagreed with the way it was

19   interacting with our systems.

20       Q.  But you told your sales force that ADP seems to

21   be becoming aware of the laws.  What was your basis for

22   saying that?

23       A.  The fact that I had become aware of the 3PA.

24       Q.  What did 3PA have to do with laws?

25       A.  Well, 3PA is, as we've seen in just prior

FTC-0000128

1    documents, is very organized, very structured, has
2    contracts.  The 3PA system provides for ADP to
3    understand exactly what data is being extracted from
4    systems.  And I think they probably started to become
5    aware of what was happening from a hacking standpoint
6    of their DMS system.
7       Q.  You said in a prior answer that 3PA had been
8    around for a while.  It's just that you hadn't heard of
9    it.
10      A.  Well, I made that statement based on the fact
11   that it was a pretty complete definition of how it
12   ought to be done.  And that's not typically something
13   you start with on day one.  So therefore, it was -- I
14   can't tell how mature it was, but it was certainly past
15   starting, for sure.
16      Q.  But your comments that you are going to make to
17   your salespeople are sort of -- make it sound to me
18   that because you say ADP seems to be becoming aware of
19   the laws, that there was something recent.
20      A.  It was recent knowledge to me.
21      Q.  And what was it about the existence of the 3PA
22   program that gave you insight into ADP's thinking about
23   the laws?
24      A.  Well, as far as compliance with the law, my
25   belief is that to do it legally, you got to have

FTC-0000129

1    contracts, you got to have definitions, you got to have
2    an explicit listing of what data fields are going to be
3    removed from the DMS system.  And this is -- the fact
4    that there was the existence of the 3PA at all was at
5    variance with what the status quo had been as far as my
6    knowledge is concerned.
7         And talking to the salespeople, the point I'm
8    trying to make is that, well, it kind of looks like
9    that CDK is going to have a formal process, and
10   therefore, they are not going to be able to throw rocks
11   at us for having a formal process, which the sales
12   force are the people that take the stones on this
13   particular subject.  That's why I was telling them that
14   it looked like the world is perhaps changing.
15   Q.  And you talked in this same sentence about
16   liabilities, that ADP seems to be becoming aware of the
17   laws and liabilities.  What liabilities were you
18   referencing?
19   A.  Well, the very fact that the 3PA agreement
20   meant to me that they were changing their previous
21   positions of laissez-faire, and that has -- if you
22   describe laissez-faire from a business standpoint, it's
23   treacherous because if there's a breach and you
24   don't -- you are operating without contracts and
25   without definitions of who is doing what, it makes for

FTC-0000130

1   a really messy situation as far as liability is

2   concerned.

3        Q.  Liabilities like the ones we talked about

4   yesterday where if a third party sent data into the

5   wrong hands, the DMS is the deep pocket?

6        A.  Exactly.

7        Q.  And you state in the next hash mark down, "This

8   could put the security wars very much behind us."  Is

9   this referencing back to the prior bullet about ADP

10  becoming aware of the laws and liabilities?

11       A.  I would say that would be correct.

12       Q.  Let me ask you to take a look at CX 4037.

13  CX 4037 has Bates REYCID0513201, and it appears to be

14  an e-mail from Mr. Schaefer to Mr. Brockman.  It's

15  dated September 11, 2014.

16       A.  The print on this one is really small.  Yes.

17       Q.  The exhibit has a paragraph that contains four

18  numbered paragraphs, the longest of which is number 4,

19  which starts out "CDK also wants to begin discussing

20  the tactical direction for the following."  And this

21  is -- these are subjects that are being negotiated

22  between CDK and Reynolds with regard to what ultimately

23  becomes a contract that's signed in February of 2015;

24  is that correct?

25       A.  Yes, that's correct.

FTC-0000131

1      Q.  And the paragraph B starts out "RCI pricing,
2  minimums, et cetera," and has one little subparagraph
3  under it.  And there's a reference in the -- well, it's
4  the first sentence, but it's a very long sentence and
5  there's some dashes, and it's talking about Menu
6  Advantage [sic], and then the sentence continues, Their
7  contract is not up with SIS until July 2015.
8          Was this a reference to CDK using SIS to
9  integrate Menu Advantage on Reynolds' DMSes?
10     A.  Yes, that's correct.
11     Q.  And was this integration by SIS subject to the
12  wind down agreement, as far as you know?
13     A.  I'm not sure about that.  What I think is
14  happening here is that Phil Batista and SIS, Phil is a
15  snake, and it looks to me like that CDK has finally
16  become aware of his true qualities and nature, and they
17  are deciding they want to move to a place where they
18  are not doing business with him anymore, which I'm not
19  surprised.
20     Q.  The sentence goes on and -- I know you didn't
21  write this, but I appreciate your interpreting it for
22  us.  It says that when they go with Reynolds, they'll
23  be paying Reynolds a much higher price than what SIS is
24  currently charging them.  How much higher price would
25  CDK pay Reynolds compared to what it was paying SIS?

FTC-0000132

1    A.  I don't know that.  We don't have that
2  information.  They don't tell us that, but they infer
3  that.  But as far as what prices SIS was charging, we
4  don't know.
5    Q.  Well, did you know what price you were paying
6  Authenticom to integrate apps on to the CDK system?
7    A.  I was not personally aware of that, it was such
8  a minor piece of business.  Reminder cards is not
9  really a huge deal.  I think we pay more for the
10  postcard than the rest of it.
11    Q.  Was it generally the case that the third-party
12  integrators were charging less than what 3PA and RCI
13  were going to be charging for integration?
14    A.  I don't have direct knowledge of that, but I
15  wouldn't be surprised if that was the case.
16    Q.  The next paragraph down, in other words, 4C,
17  talks about communication plan and marketing
18  announcement, and the first clause of the sentence
19  under paragraph i says, "How will the agreement be
20  announced to the market."
21      What was the issue with regard to announcing
22  the agreement to the market?
23    A.  CDK was very, very sensitive -- this was their
24  issue, was very, very sensitive about how all this was
25  going to happen.  We are not, you know, marketing kind

FTC-0000133

1    of folks.  We are programmers and technical kind of

2    folks, and this was not something that we brought up.

3    It was their issue.  And at this point we had not given

4    the slightest thought to that there would even be a

5    marketing program around an announcement, but that's

6    their deal.  So we were not opposed to that.

7        Q.  What would the announcement be if Reynolds

8    could get its -- what would Reynolds want the public

9    announcement to say?

10       A.  We would not want it to say anything as far as

11   we are concerned.  We would be just as happy if it

12   didn't exist.

13       Q.  Is this something you discussed with

14   Mr. Schaefer?  He's writing you this e-mail that

15   contains this sentence.

16       A.  I would say probably we did, and probably I

17   would have communicated exactly what I have

18   communicated to you.  We are not spinmeisters.

19       Q.  The impression I get from having read documents

20   in this matter is that Mr. Schaefer thought that a

21   public announcement was very important to you.  Do you

22   know why we would see that in the documents given what

23   you have stated about the lack of enthusiasm for a

24   public announcement that you are testifying about?

25       A.  Well, I'm sure I would have talked to Bob

FTC-0000134

1    Schaefer about this issue.  But again, a joint

2    marketing announcement with CDK is not something I get

3    all, you know, wet and tingly about.

4        Q.  The notion that there would be an announcement

5    that CDK was no longer being agnostic about third

6    parties integrating on its platform would seem to be

7    beneficial to Reynolds in the sense that it would be

8    public acknowledgment that they were no longer going to

9    be throwing rocks at you for your stance on security.

10       A.  I would think that that would be the furthest

11   thing from their mind because they are the ones that

12   want to do it, which means they are going to want it to

13   be favorable to them.  And anything that's favorable to

14   them is unfavorable to us.  Anything that's favorable

15   to us would be unfavorable to them.

16       Q.  Well, what would be favorable to you in terms

17   of an announcement?

18       A.  Nothing.  No announcement.  That would be our

19   preference.

20       Q.  You wouldn't want an announcement that CDK was

21   going to stop coming into your system unauthorized?

22       A.  I don't think that there was any way in the

23   world that CDK would admit that in a marketing

24   announcement.  I mean, it would be like a public

25   confession that they were hackers and had been hackers

FTC-0000135

1  for years.  I mean, there's no way in the world they

2  would have agreed to let that be any part of a press

3  announcement.

4      Q.  I have noticed from reading the final agreement

5  that it says that both companies will agree on press

6  releases.  Was that something Reynolds wanted the

7  agreement to say or was that --

8      A.  Well, what it is, it's a tit for tat.  They

9  would want it to say that they could agree and approve

10 it, and we would say, no, it's got to be joint which

11 means if we didn't like it, it would not happen.  It's

12 one of those kind of situations where you got two

13 parties and it has to be unanimous consent or nothing

14 happens.

15     Q.  Was that a provision that Reynolds felt

16 strongly about having in the agreement?

17     A.  Certainly I would have thought so.  I'm not

18 aware exactly how it was handled in the final

19 agreement, but I would hope that our legal department

20 would be diligent enough to not give CDK a one-sided

21 ability to approve anything.

22     Q.  Is there anything that you could have said to

23 Mr. Schaefer that would have given him the impression

24 that you were strongly in favor of a public

25 announcement about the agreement with CDK?

FTC-0000136

1      A.  I don't think so, but probably at this point
2  I'm not far enough along in thinking about how the
3  whole thing is going to wind down because again, as I
4  have said before, I was around a lot in the beginning.
5  There was a pile on my desk in the beginning, but once
6  it got past the point there wasn't a pile on my desk
7  anymore, I got other piles to work on.  At this point
8  it's in the later stage of the whole situation.
9      Q.  Right, but early on in the process is there
10  anything you could have said to Mr. Schaefer that would
11  have given him the impression that Reynolds wanted to
12  be having a public statement about the agreement with
13  CDK?
14      A.  Well, I think that there's -- Bob Schaefer
15  feels much more strongly about that than even I do.
16  And quite possibly we might have had a conversation,
17  but when it comes down to the final thing, CDK wanted
18  so much means that automatically it's good for them and
19  it's not good for us when you really in the cold, clear
20  light of day and you think about it.  But prior to the
21  cold, clear light of day, it's possible I have had
22  conversations with -- and we thought that it might have
23  been a good idea.  But when you really think about it,
24  it's not.
25      Q.  Let me ask you to take a look at CX 4273.

FTC-0000137

1    CX 4273 has Bates REYCID0675646.  It's entitled
2    Settlement Agreement, and the subtitle is The Reynolds
3    & Reynolds Company versus Superior Integrated
4    Solutions, Inc., and then it gives the court that the
5    settlement is in front of.
6         A.  (Reviewing document.)
7         Q.  Mr. Brockman, the document, the settlement
8    agreement that I have shown you at CX 4273 on page 007
9    of the document, it indicates that it was agreed to on
10   the 5th day of March 2014.  And I guess my question is,
11   is the settlement agreement the agreement you were
12   referring to in CX 4036, which was your statement to
13   the sales executives on July 14, 2014?
14        A.  Yes, I believe that's the case.
15        Q.  And you had mentioned in a prior answer that
16   Mr. Batista ran a company called SIS.  And just for the
17   record, SIS is the acronym for Superior Integrated
18   Solutions, Inc.; is that correct?
19        A.  Correct.
20        Q.  What exactly was SIS doing with regard to its
21   interactions with the Reynolds system?
22        A.  It was one of the Japanese manufacturers, I
23   think it was Subaru, had plans for building what I
24   would call a wrapper around the DMS system so that the
25   user interfaces would be exactly like Subaru wanted.

FTC-0000138

1    It would be Subaru-specific.  And what SIS had agreed
2    to do involved really getting into our system in much
3    greater detail than anybody else had ever attempted.
4    And this settlement basically we thought we killed the
5    snake here.  Unfortunately, we've not killed the snake.
6          Next time around Phil Batista got really,
7    really clever, because he was banned from the RCI
8    system forever because -- as part of this settlement.
9    But I mean, he created an absolute fraud.  He went out
10   and had another company created that achieved RCI
11   status and then he used them to collect all the data as
12   opposed to him doing it directly in contravention of
13   what he agreed to here and started selling an interface
14   for a product called Darwin, which we touched on, I
15   think, maybe perhaps the first day.
16         And what Darwin is, is a system that competes
17   in a way against DocuPad.  What it does is it handles
18   presentation of products, aftersale products to the
19   consumers.  And we mentioned the fact that its major
20   drawback is it can't recompute the payments based upon
21   what's either bought or decided not to buy as part of
22   the aftersale process, extended warranties, all that
23   manner of stuff.
24         And wildly enough, he had gotten some fairly
25   large Reynolds accounts to buy Darwin.  And we were

FTC-0000139

1    then our rights -- I mean, he clearly violated

2    everything in the book, but we couldn't shut him down

3    because of the nature of the customers that he already

4    had, which were also our customers.  Had to shut the

5    whole thing down.  So we entered into a new stand down

6    agreement, and I think it's coming up sometime early

7    next year where he stands down once again.  It's a

8    miserable deal, and I hated to settle with him, but

9    from a business standpoint, we were just compelled to.

10       Q.  You didn't want to settle with him because that

11   would mean he would get the benefit of the wind down

12   period; is that correct?

13       A.  Yeah.

14       Q.  You said from a business standpoint, you had to

15   settle with him?

16       A.  Well, because of the relationships with our --

17   his customers that's also a big customer of ours.

18       Q.  Which customer was it, if you recall?

19       A.  I'm sorry, I don't remember, but it was a

20   significant customer.  And I think there was more than

21   one.

22       Q.  Was SIS accessing the Reynolds DMS in a way

23   that was technologically different than the way, say,

24   DMI, IntegraLink and Authenticom were accessing the

25   system?

FTC-0000140

1      A.  It was different in some respects.  I can't
2   tell you specifically what they were, but Phil is much
3   smarter than the folks at CDK.  And my view of the
4   situation, I was under the impression that it was a
5   more sophisticated approach.
6      Q.  I have seen in the documents the phrase "code
7   on the box."  Are you familiar with that phrase?
8      A.  Very much so.  It is very, very unpleasant as
9   far as we are concerned.
10     Q.  Would that be an accurate description of how
11  SIS was accessing the Reynolds DMS?
12     A.  I'm not clear as to exactly from a technical
13  standpoint how that was done.  I would expect Bob
14  Schaefer to know.
15         MR. COHEN:  Mr. Abrahamsen, can we take our
16  hourly break?
17         MR. ABRAHAMSEN:  Yes.
18         (A recess was taken.)
19         BY MR. ABRAHAMSEN:
20     Q.  So we were speaking before the break at
21  CX 4273, which is the settlement agreement with SIS.
22  Was SIS integrating other third-party apps on to the
23  Reynolds system?  You mentioned the Subaru one, so
24  referring to others than the Subaru one you mentioned.
25     A.  I'm not aware that they were.  We had ample

FTC-0000141

1   evidence of Subaru.  More than enough.  So he could
2   have been doing other ones that we would not know
3   about.  We would have no practical way to understand
4   what else he might be doing.
5       Q.  Let me ask you to take a look at page 003 of
6   CX 4273, and there's a paragraph, well Roman V, so like
7   a V.  And I was looking at the first sentence of that
8   long paragraph, and there's a first clause, and then
9   the sentence continues after the parenthetical "SIS and
10  Mr. Batista, on behalf of themselves and their
11  employees and affiliates, covenant and agree not to
12  integrate with, access or attempt to integrate with or
13  access any Reynolds-brand DMS."
14      A.  Now we think we've got him.
15      Q.  So this is a prohibition on Mr. Batista and his
16  company integrating on the Reynolds DMS?
17      A.  Yes.
18      Q.  And then the next sentence states, "SIS and
19  Mr. Batista further covenant and agree not to sell,
20  transfer or assign to any affiliate or third party any
21  technology or know-how regarding integration with
22  Reynolds-brand DMS."  And it goes on.  What is this
23  prohibition aimed at?
24      A.  The same that him accessing Reynolds DMSes, DMS
25  systems in any way forever.

FTC-0000142

1      Q.  And what's the reference to third parties?

2      A.  He won't assist third parties with technology

3  or know-how.

4      Q.  And what was the concern about technology and

5  know-how with regard to third parties that you are

6  trying to address in this paragraph?

7      A.  We believed at that time and still do that Phil

8  is very smart and he is technologically the most

9  superior hacker, as far from a technology and knowledge

10  standpoint, better than DMI and IntegraLink.

11      Q.  And what third parties are you trying to

12  address in this paragraph?

13      A.  People that are doing the same thing or similar

14  things that Phil Batista is doing, which we would like

15  to think we were aware of all of them, but that's not

16  necessarily the case.

17      Q.  Then further down after there's a reference to

18  paragraph 3.A.v, and the sentence states that the

19  covenants set forth are not intended as a covenant not

20  to compete but rather as a contractual restriction of

21  access and attempted access intended to protect the

22  operational and data security -- I'm sorry, yeah, data

23  security integrity of the DMS.  What is that a

24  reference to?

25      A.  I think that that is just stating further again

FTC-0000143

1  in a different way that he's not going to access
2  Reynolds' DMS systems.  Whoever wrote this paragraph v
3  made a very serious effort to contractually lay that
4  down.  And again, we thought we had killed the snake,
5  but we didn't.
6      Q.  When you say "lay that down" in that answer,
7  you mean lay down the prohibition about Mr. Batista
8  accessing your DMS?
9      A.  That's correct.
10      Q.  And the next sentence says, "These covenants
11  are intended to extend for the life of any Reynolds DMS
12  product."  And that's just what you referenced in an
13  earlier answer, that you wanted this to extend for as
14  long as Reynolds was in the DMS business?
15      A.  Correct.
16      Q.  You mentioned in a prior answer that
17  Mr. Batista sought access to the Reynolds DMS after
18  this settlement agreement was reached, which was in
19  2014.  What was the name of the entity that later tried
20  to get access to the Reynolds DMS?
21      A.  I don't remember the name of the entity which
22  essentially was a straw entity, which is how he got
23  access.  Basically that straw entity did all the
24  accessing and fed him the data that he needed for the
25  application that he was building.  We know what that

FTC-0000144

1    entity is, but I personally don't know the name of it.

2        Q.  And is the entity you are referring to, is it

3    gaining access to the Reynolds DMS through the same

4    type of technique that SIS was using or is it going in

5    through RCI?

6        A.  It's my understanding that this straw entity

7    had an RCI agreement and essentially used the power in

8    that RCI agreement to do what Phil Batista wanted to

9    get done.  And they did it and turned everything over

10   to him on an ongoing basis the data that was required

11   for the product that he had built, which is either this

12   paragraph V is defective and the lawyer missed that

13   point or there's a case of fraud and deception.  I

14   believe it's a case of fraud and deception.

15       Q.  Let me show you three exhibits.  These are the

16   three contracts that were executed between CDK and

17   Reynolds.  We'll go through them one at a time,

18   obviously, but perhaps for the economy of time, we'll

19   just put them all on the record now and then I'll ask

20   my various questions about them as we go forward.

21       MR. COHEN:  Then we'll have them all in front

22   of him, sure.

23       MR. ABRAHAMSEN:  And they are CX 4045, which is

24   the Data Exchange Agreement; CX 4152, which is the 3PA

25   Agreement; and Exhibit 4153 which is the Reynolds

FTC-0000145

1    Interface Agreement.
2         CX 4152 has Bates REYREY0000091.  CX 4153 has
3    REYREY0000025.  And CX 4045 has Bates REYREY0000012.
4         BY MR. ABRAHAMSEN:
5      Q.  Before we plunge into the actual words in the
6    contracts, let me ask you a broader question.  Just
7    could you state for the record what your role was with
8    regard to these contracts.
9      A.  Very minimal.
10     Q.  Who was responsible for having these contracts
11   come into being for Reynolds?
12     A.  Bob Schaefer.
13     Q.  Anyone else?
14     A.  I don't know to what extent our legal
15   department played in actually constructing the
16   contracts.  Again --
17     Q.  I meant my question to kind of exclude the
18   legal department.  I'm sorry, I should have made that
19   more explicit.  And I intentionally cut you off.
20         MR. COHEN:  Thank you.  I was listening and I
21   was comfortable with Mr. Brockman's response, but I
22   appreciate your safeguarding the privilege.  And the
23   fact that he consults lawyers for legal contracts is
24   hardly earth shattering.
25         BY MR. ABRAHAMSEN:

FTC-0000146

1      Q.  But were there any other businesspeople
2    involved in negotiating these contracts with CDK other
3    than Mr. Schaefer?
4      A.  Not that I'm aware.  Certainly all discussion I
5    had about the subject was with Bob Schaefer.
6      Q.  Let me ask you to take a look at CX 4152 and
7    ask you to look at CX 4152-016.  I believe my questions
8    will continue on.  We'll have the same questions for
9    the next several pages.
10         In the first part of the document, Section 1:
11    List of Third Party Access Utilized, and then there's
12    several entries.  Extract Inventory Vehicles - Batch,
13    what is this part of the contract referring to?
14      A.  This would be they keep vehicle inventories in
15    a separate area inside their database, and the access
16    would be to -- on a batch basis.  And by batch, that's
17    when you have a program that runs that copies records
18    from one file into another file, and it does it without
19    benefit of any screen interaction.  That's why it's
20    called batch.
21      Q.  Is this part of the contract starting with
22    CX 4152-016, are these Reynolds applications that are
23    going to be integrated into the CDK DMS through 3PA?
24      A.  I'm under the impression that these are records
25    that will come out of 3PA and be used in a marketing

FTC-0000147

1    application in our marketing arm.

2        Q.  And what is your marketing arm?

3        A.  Naked Lime Marketing.

4        Q.  So Naked Lime Marketing will get data from CDK

5    DMSes through 3PA?

6        A.  Yes.

7        Q.  And could you just go through the next couple

8    of pages and just tell us what the other applications

9    are?  For instance, number 2 on CX 4152-017 appears to

10   be Naked Lime Web.

11       A.  I'm sorry, I'm not following where I'm supposed

12   to be.

13       Q.  CX 4152-017, there's a numbered paragraph in

14   the middle of the page, number 2, Application Served.

15       A.  Yes.

16       Q.  What is Naked Lime Web?

17       A.  That's where we have a service which creates

18   and maintains the website for a dealership, which is a

19   very important part of their marketing.

20       Q.  And that would now be getting data through 3PA;

21   is that correct?

22       A.  Yeah.  Vehicle inventory data, that's correct.

23       Q.  And flipping over to CX 4152-018, number 3 is

24   toward the top of the page and it's talking about

25   ReminderTRAX.  What is that?

FTC-0000148

1      A.   That is the service that prepares service
2   reminder cards to be sent out to the consumers
3   encouraging them to bring their vehicles in for
4   50,000-mile service or winterizing or de-winterizing,
5   that sort of thing.
6      Q.   And after the contract is signed, ReminderTRAX
7   would be getting data from CDK DMSes through 3PA; is
8   that correct?
9      A.   That's correct.
10     Q.   Let me ask you to flip to the first page of the
11  Exhibit CX 4152-001, and under Background in the second
12  paragraph it says, Vendor provides its application
13  programs" and then there's a parenthetical "as further
14  described in section is 2 of Exhibit 3PA-B, including
15  all subparts, the applications, close quote, to certain
16  CDK clients.  So those are the Reynolds applications we
17  were starting to look at a couple of questions ago; is
18  that correct?
19     A.   That's correct.
20     Q.   Let me ask you to look at CX 4152-004, and
21  actually it's paragraph E on that page.  And I'm going
22  to ask you whether this paragraph prohibits Reynolds
23  from using hostile integrators for its applications.
24  And I draw your attention to the first -- well, there's
25  a sentence ten lines down in subparagraph E --

FTC-0000149

1          MR. COHEN:  I'm sorry, Dana, my assistant is

2     bringing me something.

3          (Discussion off the record.)

4          BY MR. ABRAHAMSEN:

5     Q.  I'm sorry, Mr. Brockman, I'm having difficulty

6     asking you to turn your attention to the sentence I

7     want to ask you about.  It's ten lines down in

8     subparagraph E, and it begins, "Vendor agrees that it

9     will not".

10    A.  I'm sorry, I'm just not finding that.  I'm

11    quite sure it's probably here, but this paragraph is a

12    killer.

13    Q.  I'm sorry.

14    A.  Typically what I do when I'm faced with having

15    to understand something like this is I get a copy in

16    Word and I go back through and wherever I think I need

17    new paragraph ought to start, I hit a return, and I end

18    up with something that's about this long, but you can

19    read it.

20    Q.  It's ten lines down in subparagraph E.

21    A.  Okay.

22    Q.  And I'm not going to read -- it's a long

23    paragraph and this is a long sentence.  I'll ask you to

24    read that sentence and then answer my question, which

25    is whether this sentence is stating that Reynolds

FTC-0000150

1    agrees not to use hostile integrators to get onto the

2    CDK system.

3        A.  Yes, I see and understand that provision.

4        Q.  Is my statement correct that that provision

5    prohibits Reynolds from hostilely integrating onto the

6    CDK system?

7        A.  Yes, that's correct.

8        Q.  Let me ask you to take a look at the second

9    exhibit in our series of three exhibits.  It's CX 4153.

10   This is the Reynolds Interface Agreement.  I'm going to

11   direct your attention to two provisions starting with

12   definition 1.8 on CX 4153-002, Non-Approved Access.  Do

13   you see that definition?

14       A.  Yes.

15       Q.  And is that definition a provision that is

16   relevant to CDK getting direct or indirect access onto

17   the Reynolds system for applications?

18       A.  (Reviewing document.)

19       Q.  Mr. Brockman, let me ask you to take a look at

20   CX 4153-006.  The very first provision on that page is

21   paragraph 2.5.3, Compliance With Certification.

22       A.  I'm sorry, I'm a little bit lost.  Could you

23   repeat the directions again.

24       Q.  No problem.  CX 4153-006, at the very top of

25   that page, the first provision, 2.5.3.

FTC-0000151

1        A.   Okay, I have got 2.5.3.

2        Q.   Compliance With Certification.

3        A.   Yes, I see that.

4        Q.   Okay.  I'm looking at the second clause of the

5    first sentence, "CDK acknowledges that any non-approved

6    access and/or non-approved use is strictly prohibited

7    and is considered a material breach of this RCI

8    agreement."  Is this a prohibition on CDK using hostile

9    integration to get onto the Reynolds system?

10       A.   That's correct.  It's an anti-hacking

11   provision.

12       Q.   Let me ask you to turn to our third agreement,

13   CX 4045, the Data Exchange Agreement.  I'm going to ask

14   you -- you can take a look at any part of the agreement

15   you care to.  I'm going to ask you questions about

16   paragraph 4.5, which begins on the very bottom of

17   CX 4045-004.

18       A.   Okay.  I'm on the page 4 of 13.

19       Q.   Yes.

20       A.   Okay.

21       Q.   It's paragraph 4.5.  It begins at the very

22   bottom of that page, Prohibition on Knowledge Transfer

23   and DMS Access.

24       A.   Yes, I see and understand that.

25       Q.   What is this paragraph intended to apply to?

FTC-0000152

1      A.  What it is, it is an anti-hacking provision.
2   And it's pointed not at CDK, but at anybody that CDK
3   might help or share information with.  That's my
4   understanding.
5      Q.  So when you say it's anti-hacking, what is
6   the -- what was the fear that was being covered by this
7   paragraph?
8      A.  Well, what's happening in general with all
9   these agreements is that Reynolds and CDK have agreed
10  to provide RCI interfaces to each other under standard
11  terms and conditions.  And what this specific provision
12  is all about is that not only do we agree not to hack
13  each other, to only use authorized interfaces, but to
14  not help or assist or teach anybody else how to hack
15  into CDK's systems or Reynolds' systems.  That's the
16  whole thrust.
17     Q.  So at this point does this paragraph, since it
18  applies to CDK and Reynolds, is this an indication to
19  you that CDK has moved away from its laissez-faire
20  attitude and is now concerned about hackers getting
21  into their system?
22     A.  I hadn't thought about it in that light, but
23  yeah, I believe that you could see it that way.
24     Q.  Let me ask you to look at paragraph
25  CX 4045-003, and I'm looking at paragraph 4.2,

FTC-0000153

1    Third-Party Communications.  And my only purpose in
2    showing you this paragraph -- let me let you read the
3    paragraph.  Then I'll propound my question.
4        A.  4.2 is the one being referred to?
5        Q.  Yes.
6        A.  Yes.
7        Q.  We had spoken earlier about a provision that
8    the parties entered into where they would each have to
9    seek approval and gain approval from the other firm in
10   order to issue press releases.  And I just thought I
11   would show this to you, since we hadn't had the
12   document in front of us at the time we were talking
13   about, and ask you whether this is the provision that
14   you understood me to be asking about when I asked you
15   about whether the agreement contained such a provision.
16       A.  I'm afraid I'm a little lost.  Could you
17   reiterate?
18       Q.  Could you look at 4.2, the last sentence.  It's
19   a sentence that runs onto the next page, and it begins
20   three lines up from the bottom of the page.  And it
21   begins, "Prior to the dissemination of any written
22   press releases or market communications by either
23   party".  And I'm going to skip over to the end of the
24   provision on the very top of 4045-004, "such press
25   releases or market communications shall be tendered to

FTC-0000154

1    the other party for its review and approval."

2        A.  Yes, I see that.

3        Q.  Are you familiar with it?

4        A.  Frankly, not.  These documents, I was not

5    involved at all in their preparation.  I authorized

6    them to be done so that the project could be finished

7    and that we could get CDK to stop hacking into our

8    systems.  But as far as the content and the details

9    inside these contracts, I was not personally familiar

10   with -- I was not involved at all in the drafting, and

11   therefore, I can't claim or disclaim knowledge about

12   any particular piece.  They got the job done.  The

13   mission was accomplished.  And I look back on it as a

14   successful effort.

15       Q.  You know, just sitting back and not, you know,

16   staring at this document, did you have an

17   understanding -- this was signed in February of 2018.

18   So did you have an understanding in the February of

19   2015 time period that you had an agreement with CDK

20   whereby you would both have to review, say, a press

21   release before you put it out talking about the

22   agreements that you had entered into?

23       A.  Frankly, I was not thinking very much about

24   that at all.  I had moved on mentally from this project

25   at the time these documents were drafted.

FTC-0000155

1      Q.  Were there any press releases that Reynolds

2  sent out about these agreements?

3      A.  I'm sorry, I don't have any knowledge in that

4  regard.  We may or may not have.  I don't know.

5      Q.  And the same question for CDK.  Did CDK send

6  out any press releases about the agreements?

7      A.  I'm sorry, I don't know.

8      Q.  Did you come to have an understanding during

9  the time period leading up to these agreements whether

10  CDK had a message that they wanted to communicate to

11  the market about these agreements?

12      A.  I'm sorry, I have no perception of even

13  thinking about that.  I was on to the next project.

14      Q.  Did you ever become aware of any exchanges of

15  documents between Reynolds and CDK exploring whether to

16  send communications to the Reynolds sales force?

17      A.  I'm sorry, I'm not aware of any such thing.

18  Again, I was not active in this process.  I had already

19  moved on.

20          (A recess was taken.)

21          BY MR. ABRAHAMSEN:

22      Q.  I would like to show -- Mr. Brockman, I would

23  like to show you what we've marked as CX 4176 and ask

24  you to take a look at it.  It's a new exhibit.  CX 4176

25  has Bates REYCID0046837.  I would ask you to take a

FTC-0000156

1    look at it.  CX 4176 is an e-mail from Mr. Thornhill to
2    Mr. Schaefer and Mr. Martin dated February 26, 2015.
3    It's an e-mail with an attachment.
4         A.  Yes.
5         Q.  CX 4176 is entitled -- well, the subject matter
6    of the cover e-mail, I should say, is Revised
7    One-Pager - CDK.  Were you familiar with the drafting
8    of this document?
9         A.  Not at all.
10        Q.  Have you seen this document before?
11        A.  Frankly, not.  I don't believe I have.
12        Q.  Putting aside the actual physical document
13   itself, were you aware of any undertakings at Reynolds
14   to draft up a document to -- so people could
15   communicate to various audiences what the CDK/Reynolds
16   agreement contained?
17        A.  I don't believe that I was.  Again, this is now
18   substantially after the whole project got done
19   contractually, and I'm even further away from what's
20   happening in this area.  All I know is that the general
21   reports are, yep, it's working; yep, CDK is doing what
22   they promised they would do.  And therefore, not a
23   problem.  I'm on to the next subject.
24        Q.  I appreciate that, and I'm just going to use
25   the document sort of as a way to ask you questions, but

FTC-0000157

1    I'm appreciative of the fact that you haven't seen it.
2    You are not familiar with it.  And I understand your
3    explanation and I will try not to belabor this line of
4    questioning, but I would like to ask you a couple
5    questions based on the document even though you are not
6    familiar with it.
7        A.  Sure.
8        Q.  I would ask you to turn to CX 4176-004.  And
9    the first box on the page has in the far right-hand
10   column Scenario: Media outlets find out about the
11   CDK/Reynolds agreement.
12       A.  Yes.
13       Q.  To your knowledge, were the agreements ever the
14   subject of a media inquiry?
15       A.  I don't recall specifically other than I think
16   that there was something.  But exactly how big it was
17   and what all it contained, I don't remember if I ever
18   saw it.
19       Q.  Were you asked to give a statement to the
20   media?
21       A.  No.
22       Q.  The response as indicated in this same box is
23   that ensure CDK and Reynolds market message align.  Do
24   you know what that's a reference to?
25       A.  Other than what it says in that sentence, no.

FTC-0000158

1   It says what it says.  I agree that what it says was
2   appropriate, but I had no more specific knowledge about
3   it.
4       Q.  Did you ever have any communications in this
5   February 2015 time period with anyone at CDK about
6   aligning the market messaging?
7       A.  I don't believe so.
8       Q.  Did you have any discussions with anyone at
9   Reynolds about ensuring that the CDK and Reynolds
10  market message aligned?
11      A.  No, not that I recall.  And I'm sorry, but
12  February 15th was -- February three years ago or four
13  years ago was a hundred years ago as far as I'm
14  concerned.
15      Q.  The next bullet down says, "Access to DMS by
16  dealers' DMS provider only."  Do you know what that's a
17  reference to?
18      A.  Okay, this is the second block down?
19      Q.  The first block, second bullet down under
20  Response.
21      A.  Okay.  Yes, I see that.
22      Q.  Is that a reference to the Reynolds position
23  that only people who have an RCI agreement are allowed
24  to access the Reynolds DMS?
25      A.  That's correct.  That's in line with our

FTC-0000159

1    long-standing policy.

2        Q.  Was it your understanding that the position at

3    Reynolds was that if the media were to contact you,

4    that they would ensure that CDK and Reynolds were

5    aligned on that market message?

6        A.  Again, I'm not clear exactly who was doing what

7    here.  I don't disagree with what was being done, but

8    it was, as far as I was concerned, it was

9    administration-type kind of issues about a project that

10   had already been done.

11       Q.  This document is dated February 26, 2015.  My

12   understanding is that the contracts were signed on

13   February 18, 2015.  So this document is eight days

14   after the contracts were signed.  But I wanted to ask

15   you, you said that you had kind of finished with this

16   project earlier.  Give me your best estimation of how

17   much earlier before this February 2015 time period

18   where you would consider yourself engaged in the

19   negotiation of these contracts.

20       A.  Unfortunately, I don't have a timeline of what

21   happened when, but I believe that I was detaching as

22   the final agreements were being drafted because the

23   reports I got back from principally Bob Schaefer was

24   all was in order, things were proceeding according to

25   our expectations and that my input was not necessary

FTC-0000160

1    anymore.

2        Q.  We looked earlier today at an e-mail exchange

3    you had with Mr. Anenen which was sort of, I believe,

4    in late June, early July of 2014.  So with that as a

5    milepost and February of 2015 when the agreements were

6    signed, can you give me any idea of where in that time

7    period you became less engaged in the actual

8    negotiations of the contracts?

9        A.  I would say probably -- I would have periodic,

10   not scheduled discussions with Bob Schaefer about

11   what's going on.  And one of my questions would be were

12   the contract negotiations reaching final stages.  So it

13   would be whenever that was happening date-wise.  That

14   would be when I was beginning to detach and move on to

15   the next project.

16       Q.  In terms of details about drafting the

17   contracts, what issues were you engaged on in that time

18   period after the July -- e-mails in July and the

19   signing of the contract?  Were there issues that came

20   to your attention that needed to be resolved?

21       A.  Not that I recall.

22       Q.  Where is your office located?

23       A.  I live at home.

24       Q.  I live at home too.

25       A.  To describe how my life works is I get up in

FTC-0000161

1   the morning and I have a big blue bathrobe, terrycloth.
2   I take the dog out for a walk.  I get a cup of coffee
3   and some toast, I sit at my desk and the day commences.
4   Much to my wife's unhappiness, many times noontime
5   comes and I'm still in the terrycloth bathrobe.
6       Q.  You'll be surprised to learn that was not
7   exactly the information I was driving at, but I
8   appreciate your answer.  My next question was going to
9   be whether you worked in physical proximity with
10  Mr. Schaefer.  That was the question I was going to get
11  to.
12      A.  He is in Dayton, Ohio.  I'm in Houston.  We
13  communicate typically by Skype when necessary.  But he
14  is a very experienced person, been around a long time,
15  knows the waterfront, if you will.  So I don't have
16  extensive communications with him.  From an
17  organizational standpoint, I have 16 direct reports,
18  which is not right, but it is.
19      Q.  Is Mr. Schaefer a direct report?
20      A.  Yes.
21      Q.  So we obviously know from reading the documents
22  that you do use e-mail to communicate with Mr. Schaefer
23  and many other people.  And you said you use Skype.
24  Any other forms of communication with Mr. Schaefer?
25      A.  Occasionally there will be a telephone call

FTC-0000162

1    when he's not in a place where he can access Skype.

2        Q.  So during this time period when the contracts

3    were being negotiated and so on, give me an estimate of

4    how frequently you are in contact with Mr. Schaefer

5    with regard to these contracts.  And I'm sure it

6    varied, but just give me an estimate.

7        A.  Probably at that stage I would have been in

8    contact with him once a week, once every ten days, two

9    weeks.

10       Q.  Let me ask you to refer back to the exhibit in

11   front of you, CX 4176, and ask you to take a look at

12   the first box on the top of CX 4176-005.

13       A.  This is the top box?

14       Q.  Yes, sir.

15       A.  Yes.

16       Q.  My first question is under Scenario, it says,

17   "New third-party vendor contacts CDK."  How are

18   third-party vendors dealt with in the contracts we

19   looked at earlier?

20       A.  Again, this was the orderly stand down period,

21   and as I recall, they got an announcement from CDK or

22   actually from DMI that they were no longer going to be

23   offering their Reynolds and Reynolds hacking services

24   and that they directed them on to us to talk about what

25   they needed to have done.

FTC-0000163

1          And I think it's important to point out that in
2    many or most cases, batch-type kind of data can be
3    handled by the dealer.  They can run reports.  They can
4    point those reports out to a PC and they can transmit
5    them into their third party, and they get all the data
6    and it works just fine.  The issue is that somebody has
7    got to remember to do it every day.  It's not one of
8    these things where you can just kind of set your watch
9    and everything is going to happen hands-off.
10          And I would think some fair number of third
11    parties were really pretty small and they really could
12    get at what they wanted as far as getting dealership
13    data by having to dealer send it to them.
14    Q.   Right.  My understanding is that for existing
15    DMI clients, they would have the choice -- once the
16    contracts were signed, they would have the choice of
17    either going into the RCI program if they wanted to
18    continue to get automated, the data in an automated
19    fashion.  Or if they did not want to go to RCI, they
20    could manually send the data.  Is my understanding
21    accurate?
22    A.   That's correct.
23    Q.   And my understanding is that some chose to go
24    into RCI and others chose not to go into RCI.  Is that
25    your understanding?

FTC-0000164

1      A.  That is correct.

2      Q.  Do you have any idea magnitude-wise how many

3   chose to go into RCI rather than not go into RCI?

4      A.  I don't have good information on that, but I do

5   know that it was some number.  It was not just one or

6   two.

7      Q.  I'm sorry, some number that did what?

8      A.  Some number that actually elected to start

9   having their dealership customers print reports and

10  transmit them to the third party as opposed to being on

11  RCI.

12     Q.  CX 4176-005 talks about a scenario where

13  there's a new third-party vendor that contacts CDK.  I

14  interpreted that as a new third-party vendor being a

15  vendor that hadn't already been subject -- had not

16  already been using DMI to integrate onto the Reynolds

17  system.  Do you know whether the -- how the contracts

18  dealt with the situation where a brand new vendor would

19  go to CDK and ask for them to use their services?

20     A.  I don't know how the contracts addressed that

21  or if they addressed that, but I think what's stated

22  here is what actually happened in that if some new

23  third party shows up and wants to access data in

24  Reynolds' DMS systems, what happened here was that if

25  they talked to CDK, CDK forwarded them on over to us.

FTC-0000165

1      Q.  What was your interpretation of the reference
2   in the fourth bullet which says "CDK and Reynolds agree
3   on the benefits of the dealers' DMS vendor providing
4   data"?
5      A.  Well, I think it is what it says it is, that
6   there are obvious advantages, one of which is that
7   using an automated fashion that all the data that's
8   supposed to be collected gets collected.  Again, the
9   key to the dealership actually printing reports and
10  transmitting them to the third party, it requires
11  somebody that is diligent and will do it every day like
12  they are supposed to or every week or every month.  And
13  one of the benefits of an RCI-type contract is that
14  personnel failure is removed from the equation.
15     Q.  The third bullet down talks about DMI
16  continuing to provide data cleansing, standardization
17  and aggregation services.  Is that a reference to DMI
18  providing a subset of services that do not include
19  actually entering into the DMS, what you have referred
20  to as hacking?
21     A.  Yes, that's my understanding.  And what they do
22  in those services I'm not aware of.  That's not a
23  business that we pursued and therefore have had no
24  occasion to come to understand what's included.  I
25  think probably one of the obvious ones is a process

FTC-0000166

1  they call de-duplication.  You end up with duplicate
2  pieces of data.  And they have to have some software, I
3  think in some cases probably fairly sophisticated
4  software, that detect the presence of dupes and
5  actually have confidence enough where they can actually
6  combine them where all that happens automatically.
7      Q.  And does the third bullet saying that DMI will
8  continue to provide those services read in conjunction
9  with the fourth bullet that CDK and Reynolds agree on
10  the benefits of the dealers' DMS vendor providing data,
11  the recitation of the fact that CDK will be moving away
12  from its laissez-faire approach to third-party
13  integration on its DMS?
14      A.  I'm afraid I'm missing the point.
15      MR. ABRAHAMSEN:  Why don't you re-read the
16  question, and then I'll probably end up rephrasing it.
17          (The record was read as requested.)
18      THE WITNESS:  Sitting here reading it today
19  after the fact, I agree that it could be understood
20  that way.  However, this particular document, I didn't
21  draft it.  So I'm unfamiliar with it.  I haven't seen
22  it.  I have seen it for the first time today.
23      BY MR. ABRAHAMSEN:
24      Q.  And I appreciate you hanging with me through
25  these questions and letting me use that as a crutch to

FTC-0000167

1    ask you questions.  Let me ask you to take a look at
2    CX 4182.  CX 4182 bears Bates REYCID0675485.
3    Mr. Brockman, have you seen the document before?
4        A.  I don't recall seeing this document ever
5    before.
6        Q.  It's entitled CDK Deal Information -
7    February 2015.
8            I would like you to turn to the third page of
9    the exhibit, which is CX 4182-003, and ask you to take
10   a look at the paragraphs -- there's two numbered
11   paragraphs under the heading that's underlined Key
12   Messages.
13       A.  Yes, I see those.
14       Q.  Then the first key message, I think we've
15   talked about the first sentence, "Reynolds has long led
16   the way in the battle on DMS security."  When you talk
17   about DMS security, aside from keeping third party,
18   what you refer to as, hackers off the system, what
19   other security measures would you say Reynolds has led
20   the way on?
21       A.  Well, there's, for example, establishment of
22   user ID records inside the DMS system.  One of the
23   things that we did that I have not heard anybody else
24   do it, since we also in most cases have the payroll
25   information, what we do is we look at the user ID, and

FTC-0000168

1  before we declare it a valid employee, we go check the
2  payroll file, which is kind of simple but you know,
3  certainly a reasonable thing to do from a security
4  standpoint.  And again, nobody else has done that that
5  we know of.
6      Q.  Would that help detect whether there is a
7  third-party integrator getting a user ID and password
8  from the DMS?
9      A.  It would certainly detect them being provided a
10  user ID and password.  There is -- I believe that
11  software also double checks that there is not two
12  people connected to a single user ID.  And again, the
13  name and user ID has to be a name in the payroll file.
14      Q.  So if somebody like Mr. Batista was given a
15  user ID and a password by a dealer to run an app on
16  their dealership's DMS, you would use that -- that
17  software would allow you to detect that Brown Chevrolet
18  does not have a Phil Batista as an employee?  Is that
19  how it works?
20      A.  Exactly.
21      Q.  Let me ask you to look at -- and I appreciate
22  I'm just using this document as a crutch to ask my
23  questions because I know you haven't seen it and you
24  didn't write it.  CX 4182-003 Key Messages sentence
25  numbered paragraph 1, second sentence, and I'll read

FTC-0000169

1    it: "In doing so, other DMS providers are finally

2    acknowledging that the fastest and correct way to move

3    data between parties is to have the DMS push the data."

4    Is the phrase "have the DMS push the data" a reference

5    to what RCI does?

6        A.  Yes.  RCI is typically, and it could be in all

7    cases, set up to actually wake up and perform program

8    instructions about what data to get, where to send it

9    to, from which dealership.  And I think in some cases

10   even the hour of the day is specified in the RCI

11   program.

12       Q.  The first clause in this sentence says "In

13   doing so, other DMS providers are finally

14   acknowledging".  What is the reference in your

15   interpretation of the other DMS providers?

16       A.  Other than what it says, other DMS providers.

17       Q.  In this February 2015 time period, obviously

18   you had -- we have been talking about CDK and its

19   position on data security.  Were you aware of any DMS

20   provider other than CDK, perhaps, that was

21   acknowledging that the safest way to move data is to

22   have the DMS push the data?

23       A.  That would be the only one that I would be

24   aware of.  Quite likely, some of the more minor DMS

25   providers had also adopted it, but I'm not aware of

FTC-0000170

1    that.

2        Q.  And the second numbered paragraph, the first

3    sentence states, "CDK is finally acknowledging that

4    they need to move forward with securing their DMS."

5    And "securing their DMS" is underlined.  What is your

6    interpretation of that?

7        A.  That's our belief, that what they are doing is

8    that they are migrating to what we have been doing all

9    along.

10        Q.  What you had been doing all along with regard

11    to securing your DMS?

12        A.  Yes.

13        Q.  And would that include adopting a position

14    where they would not permit third-party integrators to

15    get onto their DMS?

16        A.  Yes.

17        Q.  The next paragraph down is entitled Important

18    to Note.  It's underlined.  I would ask you to read the

19    paragraph and then I'll ask my questions.

20        A.  Yes.

21        Q.  Let me give you my interpretation of what the

22    paragraph is saying and then you correct me if I have

23    misinterpreted it.  It seems like now that the

24    contracts have been signed, CDK is going to provide

25    Reynolds with the identification of its clients that

FTC-0000171

1   its integrating onto the Reynolds system.  And

2   following that, once Reynolds receives those and is

3   able to protect those, Reynolds is going to put out its

4   security update, a new security update; is that

5   correct?

6        A.  Yes.

7        Q.  And the second-to-last sentence ends with the

8   clause "meaning a number of users will be broken."

9   What is your interpretation of that?

10       A.  Well, this goes back to the peaceful stand down

11  process.  Prior to that we had notified CDK that we had

12  a number of security changes that we had been holding

13  off releasing, but if they didn't finally agree to get

14  out of our boxes, quit hacking us, we were going to

15  turn loose those security changes which were going to

16  make basically all of CDK inoperative as far as

17  extracting data out of Reynolds' machines.

18       Well, once the contract was done, the agreement

19  in the stand down was that it would be an orderly stand

20  down and there would be no stand downs that would cause

21  trouble, unhappiness on the part of dealers.  Well, in

22  order to do that, we have to know who because we don't

23  know who all the ADP customers are.  We don't know who

24  all their third parties are.  So what we are talking

25  about here is that if we don't get the names, then

FTC-0000172

1  what's going to happen is as we finally turn loose this
2  next security update, there's going to be some people
3  that won't work.

4       And the fact that this even has to be said is
5  kind of amazing because it is so clear that if you are
6  not on the list, if we don't know that you are a CDK
7  customer, certainly they will get the full force of the
8  security changes that are impending.

9       Q.  And then there's a reference in the next
10  sentence that we will know immediately whether these
11  parties are supposed to be broken or not.  And I
12  interpret that to mean that you don't intend to disrupt
13  the CDK clients but that if somebody is using an
14  integrator that you are not protecting, they are
15  supposed to be blocked.  Am I interpreting it
16  correctly?

17       A.  Absolutely correct.

18       Q.  So --

19       A.  And we have no knowledge as to how many, who,
20  because an exploit that gets past or attempts to get
21  past a security change, there's no way for us to know
22  until we apply a security change and then somebody
23  hollers.  That's when we know that there's somebody new
24  that we didn't know about before.  And hopefully at
25  this point there should not have been very much of

FTC-0000173

1   that, but we don't know.

2        Q.  Well, so what happened?  At this point, as I

3   understand it, you have -- you are protecting some SIS

4   customers under their stand down, and you are

5   protecting the CDK customers under their stand down,

6   and then you put in the security change, as I

7   understand it.  And so what happened?  Were there

8   people who were disrupted?

9        A.  The answer to that is I don't know of any.  I

10  just don't know whether there were, whether there were

11  not.  I do know that there was -- I don't recall any

12  serious commotions.  Whatever it was, I don't think

13  there were very many.

14       Q.  So did there come to your attention any angry

15  phone calls or letters or other forms of communication

16  from people that were being disrupted as a result of

17  your security enhancements after this March of 2015

18  time period?

19       A.  Not that I'm aware.  Of course, since then

20  what's happened has been relatively quiet.  Not

21  completely, but relatively.  Nothing major.  But as

22  security changes go on, continue to get improved, I'm

23  sure that we'll find more.  Where there is one hacker

24  there, there are ten more behind them.

25       Q.  Just so the record is clear, I followed your

FTC-0000174

1    answer to the question.  The question was very broad,

2    so I'm going to break it down into two questions as

3    between app providers and OEMs just so the record is

4    clear about this.

5         Following this March 2015 time period, were you

6    contacted by any OEMs because they had had applications

7    that they wanted to use that were disrupted?

8         A.  Personally, I received no such contact.

9    Whether or not someone else in the organization did,

10   I'm not aware.  But I'm quite sure that I did not.

11        Q.  And with regard to app providers in this time

12   period following March of 2015, were you contacted by

13   any app providers with regard to anger over disruption

14   of their apps?

15        A.  Not me personally.

16        Q.  You mentioned in an earlier answer that, I

17   forget the exact phrase you used, but you noted that

18   CDK had had a number of CEOs or words to that effect.

19   We have been speaking today and yesterday about

20   Mr. Anenen.  Who are the other CEOs of CDK in addition

21   to Mr. Anenen that you are aware of?

22        A.  Mr. Anenen was the last true CEO because he is

23   like a 37-year veteran of the business and probably the

24   longest serving veteran CEO.  And probably I'm the only

25   one that has got more than he.  I have got 49 years.

FTC-0000175

1          But I can't recite the names to you.  The most
2     recent was a gentleman that was president of Intel.
3     And he was dismissed from Intel for an inappropriate
4     relationship.  And his new job is CEO of CDK.
5          And there were two others besides him prior.
6     And this is caused by the fact that CDK is controlled
7     by a group of hedge funds.  Hedge funds, it's my
8     understanding that they hold like 60 percent of the
9     stock of CDK.  And they are very impatient for
10    improvement in operations and the profits to be -- to
11    come about inside CDK.  So therefore, they appear to be
12    very quick on the trigger to turn over CEOs in seeking,
13    you know, improved stock valuations so they can
14    ultimately sell the stock that they hold today and make
15    a profit and get on to the next deal.  I'm sure it's
16    been disappointing to the hedge fund folks that it has
17    not already been able to occur.
18         And this is all a matter of public record and
19    probably is the only part of CDK that I pay attention
20    to.  I'm always curious as to who my counterpart is.
21    Q.  So we went through some -- we talked about some
22    conversations you had with Mr. Anenen.  Telephone
23    conversations, I believe.  Did you also meet with him
24    at NADA?
25    A.  Briefly.  NADA is, you shake hands with old

FTC-0000176

 1    friends and old enemies, but there's no serious
 2    conversation that takes place.  There's too much else
 3    going on.
 4         Q.  So you had serious conversations with
 5    Mr. Anenen over the phone, the ones we spoke about?
 6         A.  Yes.
 7         Q.  And did you have any conversations with
 8    Mr. Anenen after the contracts were signed that we
 9    looked at?
10         A.  No.  As a matter of fact, the only interaction
11    I have had with him is at the big national auto dealers
12    association convention.  He was no longer with CDK, and
13    he stopped past just to say hello.  He's a nice guy.
14         Q.  To what extent have you had conversations with
15    the CEOs at CDK who have followed Mr. Anenen?
16         A.  None.
17         Q.  You have never spoken with them on the phone?
18         A.  No.  I don't exist as far as they are
19    concerned.  Yes.  And I have not -- I got other things
20    better to do than to seek out a conversation with them.
21         Q.  And just to make sure the record is clear on
22    this, have you had occasion to meet with them
23    informally at an industry conference?
24         A.  As far as I know, the answer is no.  However,
25    what happens is that at NADA people kind of travel in

FTC-0000177

1    packs of two, three, four, five, six, seven, eight, ten

2    people.  And they come by and I would not recognize

3    them by face.  And they don't announce themselves.

4    They don't have a sign on them that says I'm CEO of

5    CDK.  So I may possibly have seen some but not

6    understood who they were.

7             (A recess was taken.)

8             BY MR. ABRAHAMSEN:

9        Q.  Mr. Brockman, we were talking yesterday, I

10   believe it was, about how the OEMs need to certify a

11   DMS provider in order for the DMS provider to have

12   their franchise dealers as using the DMS.  Do you

13   recall that?

14       A.  Yes.

15       Q.  And we talked about decertification as

16   something that would be very, very bad for the DMS

17   provider if an OEM were to do that.

18       A.  Disastrous.

19       Q.  Short of decertification, is there other things

20   that OEMs can do to the DMS to sort of influence how a

21   DMS undertakes certain policies?

22       A.  Yes.  Probably one of the ones that we see the

23   most often is -- and we'll say that Ford Motor Company

24   has a new initiative regarding a service and how that's

25   handled from a computer standpoint.  And what they do

FTC-0000178

1    is, they kind of separate it into multiple pieces.  And
2    there will be mostly old pieces but then some new
3    pieces.  And let's say that the new piece is a new
4    interface where a dealership that uses the right DMS
5    with the right certifications, they can type in a
6    vehicle identification number and get an instant
7    readback of all the warranty claims that's been made on
8    that vehicle so that you can see if, say, for instance
9    another dealership fixed something under warranty, but
10   they really didn't fix it.  So you have the right to
11   kick over to them and say, look, you guys fix it.
12         Well, if you are not on the good guy list as a
13   DMS provider, you may not get access to this special
14   new facility that Ford is making available, which is
15   very, very worthwhile and important to dealership
16   customers.  So therefore, you are in the
17   never-neverland where you are not decertified, but
18   again you are not quite fully certified either.  And
19   larger dealerships will be very, very sensitive to
20   this, which is we have a lot of customers in that
21   category.
22         And so it even comes down to dates of approval.
23   If we don't meet their schedule, their desired schedule
24   as far as the creation of the additional facilities
25   inside the factory communications, they'll say, okay,

FTC-0000179

1    you are late but we are still going to certify you, but
2    we are not going to give you that until next March.
3          That's dirty pool, but they are the guys.  And
4    we end up having to work programmers nights and
5    weekends to meet their crazy schedule as far as when
6    something is supposed to be built, tested, implemented
7    in the field by their by-god date.
8      Q.  And I'm curious, you have mentioned several
9    times in the last two days that you contemplated
10   throwing the switch on CDK and blocking their apps,
11   shutting them down.  Was there any concern that if,
12   say, you shut down CDK because you didn't have an
13   agreement with them and caused disruption to a lot of
14   dealers' use of CDK, the products that CDK was
15   integrating onto their DMSes, was there any fear that
16   OEMs would be angered by this also, the dealers would
17   complain to the OEMs and that the OEMs would take
18   actions adverse to Reynolds because of the blockage
19   that had taken place?
20     A.  That's always a possibility.  But the hopes are
21   in any kind of situation such as we went through CDK
22   that cooler heads would prevail and a reasonable
23   situation would occur as opposed to a disastrous one.
24   And historically, that's always been the case.  Now,
25   you can't say that's going to be that way on every

FTC-0000180

1    situation forever, but that's the opening expectation.

2        Q.   And in this particular instance, you did reach

3    an agreement with CDK, and the anger that would have

4    been directed to the OEMs was avoided, presumably?

5        A.   Correct.

6        Q.   Let me ask you to take a look at an Exhibit

7    CX 4038.  CX 4038 has Bates REYCID0577749.  It's an

8    e-mail with three pages of attachments.  The subject

9    line is 6240's.

10       A.   Well, I conclude that we've got a senior vice

11   president of sales that writes pretty good.

12       Q.   What do you conclude that based on?

13       A.   Well, short paragraphs, to begin with.

14       Q.   You said vice president of sales, and you are

15   referring to Keith Hill; is that correct?

16       A.   Yes, that's correct.

17       Q.   Have you seen this document before?

18       A.   No, I have not.

19       Q.   With your indulgence, I'm going to still use as

20   an effort to ask you to interpret certain things in it.

21   In his cover e-mail, he talks about some of the

22   subjects we have been talking about in the last two

23   days, data security, and he uses the phrase in the

24   sentence "unattended automated access."

25       A.   Yes.

FTC-0000181

1    Q.  How do you interpret that?

2    A.  Well, there the dividing characteristic is

3  unattended.  And the reason for that is and that's my

4  interpretation from a liability standpoint is that if a

5  dealer runs a report and then turns around and e-mails

6  that to a third party, that's perfectly within his

7  rights to do that, and there's nothing incorrect about

8  that.  But it also means that if something goes wrong

9  from a data breach standpoint, it's his problem.  It's

10  not our problem.

11         So the unattended access just crosses the line

12  to what happens over and over again, and that's an

13  unattended report will be set up and it will run, and

14  it will run faithfully every day, every week, every

15  month, and nobody knows it's running.  The actual

16  running of an unattended batch job creating a data set

17  that would be used outside the dealership, there's no

18  scream of flashing lights that says we are now

19  currently extracting payroll data.

20         But the point is that if the dealer decides to

21  extract data out of his system and then put it in his

22  PC and transmit it to somebody, that's his problem.

23  When it's automatic and we allow that to occur, all of

24  a sudden we start getting our hands in the liability

25  grease.

FTC-0000182

1      Q.  So firms like DMI, IntegraLink, they were doing
2   unattended automated access to Reynolds' DMSes?
3      A.  Correct.
4      Q.  Is there -- I'm just trying to figure out in my
5   mind whether unattended and automated are redundant.
6   Can there be automated access to a DMS that doesn't
7   inflict liability on Reynolds?
8      A.  The only one that I can conceive of -- and this
9   is a theoretical answer.  I don't know that it exists
10  in real life would be vehicle data used to populate
11  websites, because vehicle data we perceive to be --
12  since it's available on every dealership's website to
13  begin with, this is basically public data, and
14  therefore -- but also it changes all the time.  So
15  therefore, an automated unattended process for
16  consolidating and transmitting vehicle inventory data,
17  there is no liability associated with that.  But
18  anything that has name, rank, serial number, you know,
19  personal information, PII or NPPI, that has tremendous
20  liabilities associated with that, the likes of which we
21  have not begun to see.
22      Q.  To your knowledge, did Reynolds send out
23  talking points to the sales staff so that they would be
24  able to address the security issues after contracts
25  were signed?

FTC-0000183

1      A.  I think that's what this document is all about.

2      Q.  Were you aware at the time -- this is sort of

3    the March 2015 time period.  Were you aware that these

4    instructions were being sent out to the sales staff?

5      A.  No.  And I would have no occasion to be aware,

6    because Keith Hill is a senior VP of sales.  He is an

7    interesting person in that he was a mathematician, a

8    math major in college, but he also was a high school

9    football coach.  And so you have the personnel planning

10   capability he has because, of course, high school

11   football is all about that, deciding, you know, who can

12   start, who can play, who does what position, who gets

13   benched because of being unmannerly with a mathematics

14   background which means that he understands computer

15   systems.  While he's not a software person, he

16   understands from a principle standpoint how the guts of

17   the things are supposed to work.

18     Q.  Is he a direct report to you?

19     A.  Yes.  And I might add a very capable direct

20   report.  As a result, I don't spend a lot of time with

21   him.  My theory as far as personnel management is

22   concerned is when they can do as good as I can do it, I

23   need to let them do it.

24     Q.  Let me ask you to flip to the second page of

25   the exhibit, CX 4038-002.  And there's a series of hash

1    marks, and the last hash mark talks about DMI and

2    IntegraLink, and the last sentence of that hash mark

3    says, "They now see the risk inherent in facilitating

4    unattended automated data extraction."  Do you

5    interpret that as the risk inherent in the data being

6    extracted and then getting into the wrong hands?

7        A.  Yes.

8        Q.  The bullet above that says "CDK and Reynolds

9    have partnered together to push data securely.  Thus,

10   85 percent of the market is now in agreement with our

11   stance."  What do you interpret that to mean?

12       A.  Well, I interpret that to mean that as

13   knowledge of the availability of the 3PA program has

14   now become pretty widespread, and it's now obvious that

15   CDK has changed their feeling as far as data security

16   is concerned to no longer be laissez-faire but to

17   actually have a more secure policy.

18       Q.  Do you interpret that to extend to both CDK

19   agreeing to use RCI for its apps and also to restrict

20   third-party integration on its own system?

21       A.  I'm not focusing on what they do as far as

22   their own system is concerned, but the fact that they

23   understand our position and they are not going to try

24   and hack us.

25       Q.  Let me ask you to take a look at Exhibit

FTC-0000185

 1    CX 4459.  CX 4459 bears Bates REYCID0186574.  This is
 2    an e-mail dated November 21, 2016 from Tommy Barras to
 3    Mr. Schaefer and Mr. Brockman.  Who is Mr. Barras?
 4        A.  He is an executive VP of software development.
 5        Q.  Is he a direct report to you?
 6        A.  Yes.
 7        Q.  Did he -- was he working at Reynolds when UCS
 8    acquired Reynolds?
 9        A.  No.  He is originally a UCSer.  He and I have
10    worked together probably 48, 49 years.
11        Q.  And he's been doing software development with
12    you in that whole time period?
13        A.  Yes.
14        Q.  In the body of his e-mail to you at the top of
15    the first page of CX 4459, the first word in the
16    sentence is S-Y-S-C-H-E-C-K.  What is that?
17        A.  Syscheck.  I hope you'll bear with me because
18    some of the explanation of necessity has got to be a
19    little technical.  The operating system that the DMS is
20    built around is what's called a multi-user operating
21    system.  And what that means is that if you have a
22    system that has 100 PCs attached to it, each one of
23    those is a separate user as far as the operating system
24    is concerned.  And the operating system, to the extent
25    that it is set up that way, can handle 100 different

FTC-0000186

1    users pretty much simultaneously.  Well, they are not
2    exactly simultaneously.  They are kind of close.  Every
3    minute of computer power that's available, it's used by
4    many different users of the 100 that are out there.
5         Now, that's really pretty cool except for the
6    fact that people like in the accounting department that
7    have big end-of-month reports they have to create,
8    batch reports are very different in their usage
9    characteristics.  If you have a terminal-based
10   application, somebody that uses a terminal and then
11   they won't, and that frees up computer power for all of
12   the rest of the folks.  Even if you have five or six
13   people, they are not -- each one of them isn't getting
14   that big a bite of computer power.
15        But in the accounting world, we have big batch
16   programs that run at the end of the month.  Think of it
17   like a machine gun.  They just load in this infinite
18   supply of ammunition and they take the trigger down and
19   it just goes with no break.  And what that does is you
20   can actually -- not theoretically, but it actually
21   happens in practice where the accounting department
22   with six or seven users can suck up all the computer
23   power, which means people that run terminal
24   applications like parts invoices or service repair
25   orders or service invoices, they have to wait.

FTC-0000187

1     And this is a logic issue that is a little hard
2   to get around, but we devised Syscheck.  And what
3   happens is Syscheck is a dipstick into the computer
4   usage, and it knows -- you can dipstick and say, okay,
5   it's 85 percent consumed or 90 percent or 50 percent,
6   but when it gets up fairly high, and I would say
7   probably 85 or 90, it's smart enough that it suspends
8   the batch programs and lets the other 90 users in the
9   pile, it will get their answers quickly.  Because the
10  transaction base, what you hate is when you enter a
11  bunch of data entry, hit the button and then you got to
12  wait.
13     And of course, what that then leads to is users
14  accuse the DMS provider of a defective system, you are
15  forcing us to buy a bigger computer.  And our only
16  defense now, which is a pretty good defense, we turn on
17  Syscheck and people that are wanting to do something,
18  if the computer system is overloaded, they get a
19  message on their screen that says, I'm sorry, the
20  accounting department is doing you in.  Anyway, that's
21  what Syscheck is all about.
22     Q.  So what is the reference in that same sentence
23  to the AUR exemption?
24     A.  That one I'm having a little difficulty with
25  what AUR is.  I think it had something to do with where

FTC-0000188

1    we basically shut down batch reports that are consuming
2    computer time with the indication that if we want to
3    run this thing, you've got to do it at night.
4            Now, interestingly enough, all this sometimes
5    results in a power play between departments in that the
6    accounting folks will raise up and beat their chests
7    and say you guys don't let us run our reports all day
8    whenever we want to run, tough luck if payroll doesn't
9    get run on time.  And everybody gets all shaky about
10   that.  But that's the wrong answer.
11           The right answer is that the transaction-based
12   customers need to have as close as we can get to
13   instant response time because those people are
14   profit-producing people.  The dealership, finance
15   managers, service managers, they need to have the
16   capability to get their work done.  And the accounting
17   folks need to wait.  And I don't publicize my feelings
18   on that widely, but I mean, that's the truth.
19           (A recess was taken.)
20           BY MR. ABRAHAMSEN:
21       Q.  Let me show you an exhibit we've marked as
22   CX 4420 and ask you to take a look at it.  CX 4420 has
23   Bates REYCID0186518.  The exhibit is an e-mail from
24   Mr. Schaefer to Mr. Brockman in November 2016.  And the
25   subject of the document is Stone Eagle Request For

FTC-0000189

1    Changes.  Mr. Brockman, who is Stone Eagle?

2       A.  Stone Eagle is a third party that specializes

3    in analysis of vehicle sales and more especially

4    vehicle financing and aftermarket sales.  And they get

5    information on car sales, quote, deals.  A deal is what

6    we -- a term we use to apply to the facts of the whole

7    transaction and the paperwork.  The whole transaction,

8    which is kept in a file folder.  And that's what Stone

9    Eagle wants from us in terms of interface that they

10    want all the finance deals for a month.  And then they

11    go run all their analysis programs and create nice bar

12    charts and graphs and that sort of thing so that the

13    dealership will understand how well they are doing in

14    that area.  And specifically, they'll understand by

15    person, by finance manager who is doing what as opposed

16    to looking at the overall department and saying, yes,

17    it's good or bad or whatever.  It's specific

18    individuals.

19       Q.  In the e-mail that's in the middle of the first

20    page of this exhibit, there's an e-mail from

21    Mr. Schaefer to you dated March 15, 2016, and the first

22    sentence of the e-mail says, "Stone Eagle executes this

23    process today using their interface."  What interface

24    is being referred to in that sentence?

25       A.  Stone Eagle has been a customer that's like an

FTC-0000190

1   RCI customer, but it predates that.  They are a very
2   mature company.  They have been around a long time.
3   And what's happening here is that we are saying, look,
4   you got to go forward to the RCI process.  They don't
5   particularly want to do that because it involves them
6   getting involved with programming, creating a new
7   interface from the data that they want.  Their old
8   stuff, as far as they are concerned, works perfectly
9   fine.  But we've said that the old process is dying.
10  You got to go to the standard process.  And they are
11  dragging their feet, frankly.  As a matter of fact,
12  they were the worst that exhibited dragging their feet.
13  They didn't say no.  They just couldn't get it done.
14  We talked to them and they would give us a new
15  anticipated deadline, and we would go away and come
16  back when they missed the deadline.  And that had been
17  going on for literally a couple of years.  Other than
18  that, they are nice people.  They pay their bills.
19  They are not complainers.
20          And in this particular situation, they figured
21  out that the RCI interface that we had prepared for
22  them, they had left out the issue where there is a deal
23  done on paperwork and electronically, but it got
24  unwound.  In other words, it never actually happened,
25  yet the data was all recorded.  And as far as the data

FTC-0000191

1    pull that was happening here, we looked like everything

2    was just fine, but it turns out, out of the month there

3    were six deals that didn't happen, which impact the

4    numbers on the reports.

5          And so we've got to do -- this one is called

6    Deal Reversal Notification.  And it was one more thing

7    we had to do before we could finally get them to move

8    forward and completely get off the old interface and

9    get onto RCI.

10    Q.  In the footnote -- or I shouldn't say in the

11    footnote.  There's a sentence in the e-mail in the

12    middle of the first page of CX 4420 that says, "As a

13    footnote, we've received the latest enhancements for

14    Stone Eagle that allow us to replace the Stone Eagle

15    hostile interface."  In what way was Stone Eagle a

16    hostile interface?

17    A.  That is a misnomer.  It's not a hostile

18    interface.  It's like a hostile interface because its

19    bandit is different, but it was not hostile in the fact

20    that we definitely knew about it and condoned it,

21    probably were even selling it as a service and charged

22    them for it.  But again, it was an obsolete interface.

23    It was less secure, and we wanted to move to RCI.

24    Q.  How was it less secure?

25    A.  I don't know the details.  I just know that it

FTC-0000192

1    was -- we were concerned that it was an oddball.
2    Whenever things are oddball, nothing good comes out of
3    that.
4        Q.  Let me ask you to take a look at CX 4463.
5    CX 4463 has Bates REYCID0265394.  It's an e-mail dated
6    August 1, 2017 from Mr. Barras to Mr. Brockman on the
7    top.  And it's a series of e-mails that follow.
8        A.  Yes.
9        Q.  Mr. Brockman, in the first e-mail in the
10   exhibit, the top one -- the top one on the first page
11   of CX 4463, the second paragraph states, "Stone Eagle
12   exemptions go beyond Hendrick.  Third party has 100
13   exemptions into our ERA systems."  What exemptions are
14   being discussed here?
15       A.  What's happening here is that the Stone Eagle
16   interface process has been around for a long time.  It
17   probably dates before my time at Reynolds.  And where
18   they have a bypass around the security changes, and
19   this is not desirable.  It's a hangover.  It's a
20   cleanup.  And what's happening is Tommy Barras is
21   telling me, look, it's worse than just the current
22   Stone Eagle stuff.  There's a bunch of others with
23   exceptions laying around out there.
24           At this point we are getting more focused on --
25   we actually have reports now that list every kind of

FTC-0000193

1    exception that's in place.  And we give these
2    exceptions or are really forced to give them from major
3    customers.  For instance, here they are talking about
4    Heritage is a very big customer, Crain, DARCARS is
5    right here in D.C., and evidently we have some manner
6    of exception for those folks where they are not on RCI.
7    They are on something else that predates RCI.
8            This is another example of the situation where
9    we have power to block things, but there's also a cost.
10   The cost is customer relations with major accounts.
11       Q.  Right.  I mean, if you block them, they would
12   possibly move to a different DMS system?
13       A.  The noise would precede anything like that.
14       Q.  What noise?
15       A.  The customer just calling up and wearing
16   everybody out.
17       Q.  In the second sentence of the e-mail on the
18   very top of the first page of the exhibit, it says,
19   DSV, I think it's supposed to be "has" been talking
20   about moving for years now.  No end in sight.  What's
21   DSV?
22       A.  Data services, I believe, is what that stands
23   for.
24       Q.  So this is a department within Reynolds?
25       A.  Yeah, that reports to Bob Schaefer.  And what's

FTC-0000194

1   happening is, and as Mr. Barras is being very pointed
2   in his needling over the situation and quite properly
3   so, the amount of things that we've had to clean up
4   inside Reynolds has been huge.  And we've aggressively
5   worked at that, but it's still not done yet.
6           BY MR. LANNING:
7       Q.  Mr. Brockman, talking about this idea of
8   exemptions, were you in the habit or in the practice at
9   Reynolds to give exemptions to certain customers that
10  were using what you call hackers?
11      A.  Yes.  And these would be large customers.
12  Frankly, in a lot of cases pretty sophisticated folks.
13      Q.  Like Hendrick?
14      A.  Like Hendrick and Penske, you know, very, very
15  large folks that have quite capable IT staffs on their
16  own separate from the work we do for them.
17          These are not lightly handed out.  I mean,
18  particularly for an exemption for a very big customer,
19  they got to come to me and I got to weigh the sales
20  issues.  In accounts like this, there's some folks that
21  are just kind of obstinate, and other folks, their
22  excuse is, well, they are really busy.  And there's
23  other folks that are the delay kind of folks: Well,
24  yeah, we'll do that but we're really busy right now.
25  We'll talk about it next summer and get it done that we

FTC-0000195

1    constantly have to follow up on.  Now we actually
2    review our lists of exemptions now, which makes it a
3    lot easier.  Before we had to do a lot of legwork to
4    figure out who was doing what.
5        Q.  So in essence, you're saying that for the large
6    customers that might have those types of exemptions,
7    they have to be approved by you?
8        A.  Yeah.  And the number is steadily falling,
9    especially now that we've got a list.
10       Q.  Would Mr. Schaefer make recommendations to you
11   about whether or not an exemption for a large customer
12   should be given?
13       A.  Yes.  I wouldn't necessarily follow that up.  I
14   would talk to Keith Hill.
15       Q.  I'm going to just ask you to go back to
16   CX 4037.
17       MR. COHEN:  Bill, could you just tell me what
18   that was or where it was.
19       MR. LANNING:  That's the September 11, 2014
20   from Robert Schaefer to Bob.  It's the one-pager.
21       MR. COHEN:  Okay.  Do you know how long ago you
22   guys used it?
23       MR. LANNING:  It was this morning.
24       MR. COHEN:  Thank you.
25       BY MR. LANNING:

FTC-0000196

```
 1      Q.  Mr. Brockman, I would like to direct your
 2   attention to something we were talking about earlier
 3   today, which is if you go down near the bottom of the
 4   page where the little letter C is and it says,
 5   "Communication plan and marketing announcement" under
 6   number 4, do you see that?
 7      A.  Yes.
 8      Q.  And I believe when we talked about this earlier
 9   today, we were talking about the sentence that says,
10   "How will the agreement be announced to the market --
11   they need to get this identified and understood quickly
12   due to the CDK global announcement."
13      A.  Yes.
14      Q.  Do you see that?
15      A.  Um-hum.
16      Q.  I believe it was your testimony, of course we
17   can go back and read it, but you were saying that this
18   was CDK's issue about the marketing and the
19   communication; is that correct?
20      A.  Yes.
21      Q.  And my question to you, then, is what was CDK's
22   concern about getting an agreement where you were going
23   to either manage jointly a communication to the
24   marketplace or that you were going to at least review
25   this?
```

FTC-0000197

1    A.  Well, I think the issue is that they wanted to
2  do what they wanted to do.  They would much prefer to
3  actually have us agree to what they wanted to do, but I
4  believe in the end we did not agree.  In this case
5  here, they went ahead and did it or were going to do it
6  anyway.
7    Q.  But was there an expression of what their
8  concern was about having this in relation to their
9  announcement of going public?
10    A.  Not that I recall.  There probably was, but I
11  wasn't sensitive enough to remember.
12    Q.  And was it related in any way about a concern
13  that Reynolds might make an announcement about the
14  agreement that CDK didn't like?
15    A.  Well, I think probably that was part of it
16  because if we made the announcement the way we would
17  like, it would be very, very damaging to them.
18  Truthful, but it would be damaging.
19    Q.  What do you mean?  What would this statement
20  say that might be truthful and damaging to them?
21    A.  Well, the truthful statement would be that they
22  had been hacking into our systems for many years and
23  quite a large number of systems.  And I'm sure that
24  would have caused telephones to ring at CDK with
25  customers calling, was I one of the ones, that sort of

FTC-0000198

1    thing.

2       Q.  Was there also an element to it that Reynolds

3    might take the tack competitively that we were right

4    all along on security and now that you are joining us?

5       A.  I don't know what they were thinking about, but

6    that's one of the things they could have been thinking

7    about.

8       Q.  So did you discuss this with Mr. Schaefer?

9       A.  Not that I recall.

10      Q.  Was there any discussion that CDK did not in

11   advance of its going public want to announce that they

12   were changing their position on being open or closed?

13      A.  Again, I'm not aware of anything like that.

14      Q.  I have just two more questions on another

15   document, which is CX 4273.

16         MR. COHEN:  Would you mind telling us what that

17   is again?

18         MR. LANNING:  The SIS settlement.

19         BY MR. LANNING:

20      Q.  Could you please turn to CX 4273-003 and go

21   down to V, section V or numeral 5 that starts with the

22   exception of the wind down period for SIS.  Do you see

23   that?

24      A.  Yes.

25      Q.  I just had one question here.  If you go to the

FTC-0000199

1    sentence that's about midway down, and it says, "For
2    the avoidance of doubt, the covenants set forth in this
3    paragraph 3(a)(v) are not intended as a covenant not to
4    compete."  Do you see those?
5        A.  Yes.
6        Q.  I guess I'm curious, why was this put in the
7    SIS agreement?
8        A.  Well, I would like to be helpful, but frankly,
9    I don't know because I wasn't part of the crafting of
10   these documents.  And just looking at it today, it
11   looks to me like it was -- an attorney wanted to put in
12   some sort of blanket statement.
13       Q.  Were you competing with SIS at this time?
14       A.  SIS is a data extractor where they in bandit
15   mode go into a system.  We don't do that.  We've never
16   done that and therefore, we don't compete with them.
17   They have that market all to themselves.
18       Q.  That's why I was curious about why the language
19   was in there.  If you are not competing with them, why
20   are you concerned about it being construed as a
21   covenant not to compete?
22       A.  I have no idea.
23           MR. LANNING:  Thank you very much.  That's it
24   for me.
25           MR. COHEN:  Mr. Brockman, you do have a right

FTC-0000200

1    to clarify any testimony that you have given over the
2    past two days.  Do you have any clarifications to make?
3            THE WITNESS:  No.
4            MR. ABRAHAMSEN:  Then we will adjourn today's
5    session.  We will keep the record open.  And everybody
6    can go to lunch.
7            (Whereupon, the proceedings at 1:08 p.m., were
8    adjourned.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

FTC-0000201

1 <u>CERTIFICATE OF REPORTER</u>

2

3

4      I, Deborah Wehr, do hereby certify that the

5 foregoing proceedings were taken by me in stenotype and

6 thereafter reduced to typewriting under my supervision;

7 that I am neither counsel for, related to, nor employed

8 by any of the parties to the action in which these

9 proceedings were taken; and further, that I am not a

10 relative or employee of any attorney or counsel

11 employed by the parties hereto, nor financially or

12 otherwise interested in the outcome of the action.

13

14

15

16

17                      Deborah Wehr, RPR

18                   Notary Public

19

20

21

22

23

24

25

FTC-0000202

**Brockman, Bob**

| | |
|---|---|
| **From:** | Welch, Peter [pwelch@NADA.org] |
| **Sent:** | Friday, November 08, 2013 1:44 PM |
| **To:** | 'Robert Schaefer'; Bob Brockman (bcb_brockman@reyrey.com); forrestmcconnell@gmail.com; Miller, Bradley; O'Neill, Finbarr |
| **Subject:** | NADA/Reynolds Data Meeting |

**Attachments:** Agenda - RR 11-13-13.docx

Gentlemen:

    As I discussed with Bob Schaefer this afternoon, I will unfortunately not be able to attend next Wednesday's meeting in Dayton. The Consumer Financial Protection Bureau has abruptly decided to hold an "Auto Finance Forum" next Thursday in D.C. and my presence at that event is necessary together with lots of preparation. However, the meeting will go forward with Forrest McConnell (our Chairman-Elect) Brad Miller (from our Regulatory Affairs Dept.) and Fin O'Neill (our outside consultant) representing NADA. I have attached a proposed agenda and invite any of you to added any additional items. It's my understanding that the meeting will commence at 8:00 a.m. Please confirm the start time and also let all of us know by return email the precise location of the meeting and who our contact person should be when our team arrives.

    Thanks again for your time on this issue and if you have any questions, I can be reach at the below number.

*Peter*

Peter Welch
National Automobile Dealers Association
8400 Westpark Drive | McLean, VA 22102
(703) 821-7100 | pwelch@nada.org

NADA
The VOICE of the Dealer

*Honda/Acura*
*Montgomery, AL*
*FORREST MC CONNELL*
*BRAD MILLER*
*FIN O'NEILL*

*NADA*

11/12/2013

CONFIDENTIAL

REYCID0568116
CX4468-001

**GOVERNMENT EXHIBIT**

4:21-CR-009-GCH

No. 34

FTC-0000472



NATIONAL AUTOMOBILE DEALERS ASSOCIATION
8400 Westpark Drive • McLean, Virginia 22102
703/821-7040 • 703/821-7041

**Memo**

To:     NADA Members

From:   NADA Legal and Regulatory Affairs

Date:   August 28, 2013

Re:     Dealer Data Guidance – Sample Service Provider Contract Language

Dealers collect a large volume of information from their customers in their day-to-day operations, with much of that information categorized under federal law as highly sensitive "non-public personal information" or "NPPI." What information is NPPI is a complicated topic, but generally speaking, NPPI is any personal information that a dealer collects about an individual in connection with providing a financial product or service, that is not otherwise "publicly available."[1] This could include information such as that contained on an individual's credit application or credit report,[2] but it could also include any information that identifies that individual as having financed or leased a vehicle, such as APR, down payment, or monthly payment.[3]

This is important because the information's status as NPPI means that the dealer is subject to several obligations under federal law to protect and maintain its privacy. Even customer information that does not rise to the level of NPPI can be sensitive to the consumer and the dealer and thus should be protected closely by dealers. In addition, this customer information has tremendous commercial value to the dealer and could be deemed to be a trade secret under state law.[4] Of course, this data has value to others as well and, as a result, there are a number of entities who wish to gain access to the data.

This customer data is generally stored in the dealer DMS and related computer systems, along with a great deal of other sensitive financial data about the dealership and its employees. In today's world of online commerce, dealers, like many other small businesses, rely on a number of third party service providers to store the data or provide technical or other services

---

[1] See, e.g. https://fic.gov/privacy/glossary/glossarline.htm

[2] This could include information such as name or address if obtained via that application or report. This creates obvious difficulties when seeking to limit "sharing" of NPPI by data field.

[3] For more on finance or lease "identifiers" and why they are NPPI, see "A Dealer Guide to the Privacy Rule and the Model Privacy Notice" at www.nadauniversity.com.

[4] While each state has its own laws relating to trade secrets, a customer list or other data may be deemed a trade secret in certain circumstances although you generally have to show that you have taken steps to keep the information secret. This is yet another important reason why you want strict controls over who has access to your customer data.

CONFIDENTIAL

REYCID0568117
CX4468-002

FTC-0000473

that require access to certain data in the dealer DMS. The result is that this customer and other sensitive data (together "Dealer Data") raises difficult and sensitive issues for dealers that they must understand when they enter into contracts that could allow access to Dealer Data.

The basic problem is the inherent conflict between, on the one hand, the need to provide access to manufacturers, vendors, and other third parties who legitimately require access to portions of the Dealer Data so that they can provide a service to the dealer, and, on the other hand, the dealer's regulatory duties regarding the Dealer Data, as well as their legitimate business interests in the Dealer Data.

To properly manage this conflict, dealers must (1) understand the issues at stake; (2) understand who is seeking to access their Dealer Data, and why; (3) control and monitor that access, and (4) ensure that the contracts governing that access address the relevant issues and contain the appropriate language to protect dealers' business interests and regulatory responsibilities.

*This memo does not, and is not intended to, provide legal advice, nor advice about the business issues in dealers' vendor or other contracts. Instead, it is intended to highlight several recurring issues in contracts implicating access to Dealer Data, and the federal regulatory issues raised by them. Dealers must consult with their own counsel with respect to all contracts, as well as all federal, state, and local regulatory obligations.*

### The Regulatory Requirements

Details about the underlying regulatory requirements are complex and largely outside the scope of this memo. Dealers should review the numerous dealer guides available at www.nadauniversity.com covering the relevant federal regulatory issues including the GLB Safeguards Rule, GLB Privacy Rule and Model Privacy Notice, the Affiliate Sharing and Marketing Rules, as well as telemarketing and other guides for more details about the various rules affected by sharing or allowing access to Dealer Data, and associated issues potentially implicated by certain types of service provider contracts.

However, given the need to understand at least the basic issues at stake in order to grasp the implications of certain contractual provisions, keep in mind that dealers' duties with respect to Dealer Data are governed by two primary federal regulations – the Safeguards Rule and the Privacy Rule.[5] Broadly speaking, the Safeguards Rule requires dealers to take certain procedural and technical steps to ensure that certain customer data is protected from inadvertent disclosure or other access by third parties (such as theft, hacking, etc.) who could then use the information to steal an individual's identity or otherwise harm the consumer. Similarly, the Privacy Rule is intended to protect consumers' financial privacy and prohibits dealers from sharing NPPI with any third party unless (1) an exception applies, or (2) they first provide the customer with a privacy notice and allow the customer the chance to opt out. Dealers must also provide their customers with a notice informing the customer of their information sharing practices.[6] As a practical matter the overwhelming majority of dealers provide a notice that

---

[5] These are the shorthand names for two regulatory provisions under the Gramm-Leach-Bliley Act ("GLB").

[6] The FTC's Model Privacy Notice includes all the required notices in one form.

DEALER DATA MEMO – NOT INTENDED AS LEGAL ADVICE

REYCID0568118
CX4468-003

states that they do NOT share NPPI with any third parties.[7] Of course, this means that dealers must honor the promise not to share the customers' data.

An important issue to understand is that the FTC may consider any third party "access" to NPPI to be the equivalent of "sharing."[8] In other words, if a third party has access (via your computer network or otherwise) to NPPI or *could* access it, you may be deemed (or at least alleged) to have "shared" that data, even if the third party never actually accesses, obtains, processes, or relies upon the data.[9]

### "Service Providers"

Another important issue you must understand under both the Safeguards and Privacy Rule for the purposes of this memo is that of the "service provider." The federal regulations contemplate that entities will use the services of third parties, and may need to share or otherwise expose NPPI to those third party service providers. Section 313.13 of the Privacy Rule contains one of the "exceptions" mentioned above, and allows a dealer to share NPPI with a service provider without providing the required opt-out opportunity described above,[10] but *only if you do so pursuant to a contract* that puts specific restrictions on the service provider. The idea is that you can provide access to the sensitive information, but *only* to the extent needed to provide the service and that service provider cannot then use or share the information with anyone else.

The Safeguards Rule also contemplates the use of service providers, but again, only subject to restrictions. Under the Safeguards Rule, the dealer must (1) "[t]ak[e] reasonable steps to select and retain service providers that are capable of maintaining appropriate safeguards for the customer information at issue"; and (2) "[r]equir[e] their] service providers by contract to implement and maintain such safeguards." In addition, the FTC states that you must also "oversee their handling of customer information."[11]

The Safeguards Rule defines "service provider" as "any person or entity that receives, maintains, processes, or otherwise is permitted access to customer information through its provision of services directly to a [dealer subject to the Rule.]." This definition would include third party vendors including DMS providers, and in some circumstances could also include your manufacturer.

---

[7] The reasons for this are generally outside the scope of this memo. However, it is important to note that even if a dealer were to provide notice that it will share NPPI, it must also provide a reasonable opportunity for the individual to opt-out of that sharing. The FTC considers 30 days to be a minimum reasonable period. As a result, even if dealers were to share, they would have to ensure that they would not do so for 30 days after gathering the NPPI. As a practical matter, this would be difficult to implement, and would in many cases make the sharing of the NPPI commercially and practically unfeasible in the service provider context.

[8] NADA does not necessarily share or endorse this position, but it is important to understand what the agency's position is likely to be, and in terms of protecting yourself in your contracts you should understand this entity. Whether it is technically "sharing" under the federal regulatory requirements or not, there are good business and practical reasons to understand (and limit) third party access to your data.

[9] As noted below, the definition of "Service Provider" under the Safeguards Rule includes any entity "that receives, maintains, processes, or otherwise is permitted access to customer information."

[10] You must still provide the privacy notice, and if appropriate, that notice must disclose that you share with service providers.

[11] See http://business.ftc.gov/documents/bus54-financial-institutions-and-customer-information-complying-safeguards-rule

**DEALER DATA MEMO – NOT INTENDED AS LEGAL ADVICE**

CONFIDENTIAL

REYCID0568119
CX4468-004

**The Problem**

The primary issue under these federal regulations generally arises because of a disconnect between the duties dealers have and the promises they may have made to their customers, and the demands for access to Dealer Data sought by third parties. While every situation is different, the basic issue can arise in one of several ways. For example:

(1) The dealer wishes to engage the services of a third party service provider that requires access to Dealer Data to perform the service, but fails to ensure that the appropriate contractual provisions and other restrictions are placed on the service provider with respect to Dealer Data.

(2) A manufacturer establishes a marketing or other "program" that either directly or utilizing the services of a third party service provider requires dealers to allow access to Dealer Data, and the dealer either fails to ensure, or is prevented by the manufacturer (or its service provider) from ensuring that the appropriate contractual provisions and other restrictions are placed on the service provider.

In either event, the result is often that Dealer Data, potentially including NPPI, could be "accessed" or "accessible" to the third party vendor, and the dealer runs the risk of violating its Privacy Notice promise to its customers, its Safeguards Rule duties,[12] as well as potential violations under other federal law.[13]

Unfortunately, these scenarios do occur. While the duties and responsibilities are the same, a dealer's response to each scenario is likely to be somewhat different. In the first scenario, a dealer must be vigilant in policing and negotiating their contracts to ensure that the required contractual provisions are included in all service provider vendor contracts. There are a number of other contractual provisions that, while perhaps not required, may be worthy of consideration by the dealer and its attorney in the vendor agreement. We discuss some of those provisions below.

The second scenario often presents more difficult issues for dealers because these manufacturer "programs" are generally presented by the manufacturer to the dealer as, for all intents and purposes, requirements.[14] This means that dealers may in many cases have more limited ability to police and amend these contracts to ensure they are protected adequately against regulatory and other risks. While some contractual protections may be optional, it is

---

[12] In addition, in scenarios involving violations of the Privacy and Safeguards Rules, the FTC will also generally allege a violation of Section 5 of the FTC Act on the basis that a failure to abide by the Privacy Notice promises and the failure to maintain adequate safeguards is "unfair" and/or "deceptive." *See, e.g.* a recent FTC action brought against a dealer, alleging such violations: http://www.ftc.gov/redacted[url]623/dealxine.shtm

[13] For example, under the CAN SPAM Act, if a customer opts-out of receiving email from you, you thereafter cannot "sell, lease, exchange, or otherwise transfer or release" that email address to any third party, "including through any transaction or other transfer involving" a list that contains that email address. *See* 15 U.S.C. 7704 (a)(4)(iv). Similar issues arise with phone numbers on your company-specific "Do-Not-Call" list under federal telemarketing regulations. As a result, access to phone numbers or email addresses, even if not NPPI, raise unique and potentially difficult concerns.

[14] For example, dealers may be told that their "participation" in a particular program is required to qualify for certain incentive or other program payments, or that participation is required under the dealer franchise agreement.

**DEALER DATA MEMO -- NOT INTENDED AS LEGAL ADVICE**

CONFIDENTIAL

REYCID0568120
CX4468-005

important to remember that dealers should not agree to provide access to NPPI, even in these manufacturer programs, in violation of their Safeguards and Privacy Rule responsibilities.

This means that unless their Privacy Notices state otherwise,[15] dealers may not provide access to NPPI to anyone, *including their manufacturer*, unless they do so in connection with a contract (a) pursuant to which the manufacturer is providing a service to the dealer that requires access to the NPPI, and (b) that contains the required contractual provisions (or unless one of the other exceptions to the Privacy Rule applies).[16] NADA understands that this can put dealers in a difficult, if not untenable position. However, it is vitally important, for dealers and manufacturers alike (and ultimately for your customers) that these contractual protections be included. While the dealer is ultimately responsible for protecting and not sharing protected data, regulators and plaintiff lawyers are not likely to hesitate in looking to the manufacturer should a problem arise.

Under both scenarios it is often common for the contracting party to subcontract some of the work; that is, to use another third party to either aid in providing, or to actually provide the service itself. For example, if a third party requires access to the dealer DMS to provide services to a dealer related to their vehicle inventory, they may use another entity to actually interface with the dealer's DMS and "extract" the inventory data that they need. This is important to understand because if you do not ask you may not even be aware that this third party is in your DMS system.[17] And of course, if they have accessed your data, and are not bound by the required contractual restrictions to only take what they require, and not to store, use or share the data, then this can create regulatory compliance and other problems for the dealer (and the service provider and/or manufacturer).

Remember as well that under both scenarios, the third party (and all subcontractors) must also actually be providing the dealer a service and the data that they access must be required to provide that service. That means that you cannot allow access to NPPI just because a manufacturer requests it. For example, you cannot share any information that would identify a customer as a lease or finance customer in a retail delivery report to your manufacturer, unless the manufacturer has a legitimate business need for that information to process the transaction on behalf of the customer (a lease incentive for example.)[18]

It also means that you cannot grant access to NPPI or other sensitive data if it is not required to provide service you have contracted for. For example, if the service provider is providing a service to your parts department that requires access to parts data in your DMS, you generally cannot allow them to have access to your sales records (unless for some reason this information is required to provide the service). This means that you need to (1) understand

---

[15] If the dealer is granting access to NPPI, the required Safeguards and Privacy Rule contractual provisions must be in the contract regardless of the content of their Privacy Notice.

[16] See the NADA Dealer Guide to the Privacy Rule and the Model Privacy Notice for more.

[17] It is also important to understand as part of you obligation to conduct due diligence in selecting a service provider.

[18] It is not enough that the manufacturer itself has a business "need" for the data. This exception only applies if they need the information in order to process the transaction on behalf of the customer. If a manufacturer seeks this information, you should try to explain why you cannot share the information. You should also consider asking the manufacturer to explain to you in writing which exception to the Privacy Rule applies to the information they are seeking to obtain and why.

**DEALER DATA MEMO – NOT INTENDED AS LEGAL ADVICE**

CONFIDENTIAL

**FTC-0000477**

exactly what data a service provider needs to provide the service, and (2) take the appropriate technical steps to ensure that their access is limited to that data and that data only. Remember, it is not only the data they actually take, but the data they *could take* (have access to), that you must control. You should also audit and monitor their access to ensure they are not in breach of the contractual restrictions.[19]

### Contract Provisions

As discussed above, dealers must include the required Safeguards and Privacy Rule provisions in all vendor contracts.[20] Attached at Exhibit A are several possible sample contract provisions you may want to include in your service provider contracts to meet the requirements under the Safeguards and Privacy Rules.[21] While every service provider vendor contract is different, several other issues tend to arise in many of these contracts, and dealers should consider addressing them in their third-party service provider contracts. For example:

(1) Restrictions on non-contracting third parties. As discussed above, if the contracting service provider uses the services of another third party and that third party has access of any kind to any of to your Dealer Data, you should ensure via contract that the subcontracting third party also meets the same Safeguards and Privacy Rules restrictions you placed on the contracting party. Without a direct contractual relationship with these third parties, their access could nullify the careful steps you have taken to protect yourself with respect to access by the service provider. There are several ways to accomplish this. One potential approach would be to expressly list the subcontracting third parties in the Safeguards and Privacy Rule provisions and requiring the contracting party to warrant that any third parties with access will meet those contractual requirements.

(2) Requirement to provide reports of data accessed. Given the technical complexity of some of these issues, and the lack of visibility dealers may have in these processes, you may also want to consider asking the service provider via contract to provide you with a list of (1) all data fields that they actually extracted from the DMS or other system, and (2) all data fields they had access to, based on their password. This second issue is potentially more difficult, but remember that if they have access to the data, there is potential regulatory risk for the dealer, even if the vendor never actually obtained or accessed that data. You may want to consider including audit rights that would allow you to confirm the reports from the vendor. The feasibility and utility of this type of provision may be determined in large part by the capabilities of your DMS or other systems. You should work with your vendors to determine the best way to gather this data.

---

[19] Some of these steps are addressed below, but specifically, you could consider steps such as: (a) requiring the vendor to send you a written report detailing the data fields they have access to; (b) seeking annual certifications from your vendors stating that they have only accessed the fields outlined in the report; (c) routinely audit vendor password access, and; (d) work with your DMS and other vendors to audit what third parties have access to your system(s), and what data they are accessing.

[20] From the Privacy Rule perspective, the provision must be included if the dealer wishes to rely on the service provider exception to share the information with (or allow access to) the vendor.

[21] Again, these are examples only. This is not intended as legal advice; you should consult your attorney to finalize the language in your contracts, and to ensure that you have considered all state and local issues.

**DEALER DATA MEMO – NOT INTENDED AS LEGAL ADVICE**

CONFIDENTIAL

(3) Data breach provisions. Another issue that dealers may want to consider in any agreement with a service provider that implicates access to Dealer Data is the issue of a state law "data breach." Almost all states have a data breach statute that, broadly speaking requires a dealer to notify their customers if there is a "data breach" involving that customer's personal information. The state law definitions vary, but basically a "breach" is deemed to have occurred anytime there is unauthorized access to the data (e.g. a hacking incident) or if the dealer *loses control* of the data (e.g. a lost laptop or phone containing personal information.) It is important to note a few things about these statutes, (again broadly speaking because they all vary): (a) that the data does not actually have to be accessed or used improperly, a "loss of control" is all that is needed (that is why lost laptops are the most common types of data breaches); (b) that "personal information" can be much more broadly defined than NPPI under federal law (e.g. CA where a name and a zip code may be enough), and; (c) that in most cases a dealer can avoid the duty to notify if the data is "encrypted." It is not always clearly defined in the state statutes what "encrypted" means, however you should nevertheless consider requiring that the service provider "encrypt" any data that is accessed, transmitted, or in any other format where you or they could "lose control" of that data. It is crucial that you work with your counsel to determine your state and local law in this area (and all others addressed in this memo). You may want to consider a provision that addresses who is responsible for customer notification and related duties (and costs) in the event of a breach and you may also want to consider requiring the data to be encrypted.[28]

(4) Regulatory issues where service provided is marketing-related. If the service provider requires access to your Dealer Data in order to provide marketing services to you, a number of other regulatory requirements could arise, and you should consider whether to address them in the contract. For example:

   a. if the services include e-mail marketing services, issues could arise under CAN SPAM (governing email marketing);
   b. if the services involve phone calls or text messages, the federal telemarketing rules (the TCPA and the Telemarketing Sales Rule) could be implicated, and;
   c. if the services include "reputation management" or other services related to social media or customer comments or review, the FTC Guide to Endorsements or Testimonials and related disclosure duties could also be implicated.

Again, these issues are outside the scope of this memo, but it is obviously important in a contract implicating any of these federal duties to work with your attorney to ensure that you are protected in the event of a violation of these or other related duties. For example, if the vendor is making telemarketing calls on your behalf, who is responsible for ensuring "Do-Not-Call" compliance? How will you ensure that the vendor honors your company-specific "Do-Not-Call" list or your CAN SPAM "opt-out" list? At the end of the day, it is the dealer who faces the regulatory risk from non-compliance by the service provider. As a result, it is important again that you work with your counsel to make sure you understand the scope of the services to be performed, and that you work with the service provider to ensure compliance.

---

[28] You may also want to consider whether your vendor is required to maintain "Cyber Liability" insurance coverage. Broadly speaking, this type of insurance covers the costs associated with a data breach.

**DEALER DATA MEMO – NOT INTENDED AS LEGAL ADVICE**

CONFIDENTIAL

REYCID0568123
CX4468-008

(5) License Grant.  Generally these vendor and manufacturer service provider agreements will also contain a requirement that the dealer grant the vendor or manufacturer a license to the Dealer Data.[23]  Dealers and their counsel should carefully consider the implications of any such grant, and in particular, if the scope of the license grant exceeds the Safeguards or Privacy Rule restrictions, it could create regulatory risk for the dealer.  In other words, if you have the appropriate Safeguards and Privacy Rule provisions that limit access only to what is needed to provide the service, but the agreement also contains a broad license grant that allows access to non-necessary NPPI, it could be problematic.[24]  In some cases, a license may be justifiable, but dealers should be careful to ensure that it is needed, and if so, whether the scope of any such license is appropriate.

(6) Description of the Services/GLB Service Provider Agreement.  You may want to consider explicitly stating in the contract (a) the services that are to be provided pursuant to the agreement; (b) that the vendor is a "service provider" pursuant to GLB, and (c) the data fields the vendor needs to take (and have access to) to provide the services.

### Dealer Data "Checklist"

These are just some of the issues that routinely appear in service provider contracts.  Of course there may be others, and dealers must work with their counsel and internal compliance staff to ensure not only that their contracts contain the required protections, but that the dealership's practices and procedures also adequately protect dealer data.  In addition to the regulatory duties imposed under the Safeguards Rule, Exhibit 9 contains a non-exhaustive list of practical and other steps that dealers should consider taking with respect vendor contracts and to Dealer Data more generally.  Many of these points raise a number of complicated issues, and as always dealers should work with their attorneys, consultants, IT staff, and vendors to work through and understand the issues presented.

The bottom line is that Dealer Data is sensitive, important, and valuable.  You must have a good understanding of what you have, what the rules are, who has access (including any intermediaries who are not parties to the contract), and who is in control of these issues at your store.

---

[23] In some cases, we have seen vendor agreements include not only exceedingly broad license grants, but also provisions purporting to grant outright ownership of Dealer Data to the vendor.  Of course any such provision would be problematic for all the reasons outlined above.

[24] Many of these agreements will also seek to grant a license to Dealer Data that has been "de-identified" and/or "de-personalized."  This generally means that the data (which may or may not have been NPPI) has been stripped of any feature that could identify the customers.  This raises complicated and important legal, regulatory, and business issues, and you should carefully review any such license grant with your legal counsel.

**DEALER DATA MEMO – NOT INTENDED AS LEGAL ADVICE**

CONFIDENTIAL

REYCID0568124
CX4468-009

<u>Exhibit A - Sample Service Provider Contract Provisions:</u>[25]

Here are several possible examples you could use to ensure that you have the contractual language required under the Safeguards and Privacy Rules in your contracts with your service providers. Some provisions in these examples may not be appropriate in every circumstance. These can and should be combined or otherwise modified as appropriate - *consult with legal counsel about appropriate language to use for your dealership:*

<u>GLB Service Provider Provision:</u> (Example)

Dealer[26] and Service Provider acknowledges that this contract constitutes a service provider agreement between Service Provider and Dealer subject to the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801, *et seq.* ("GLB Act") and its implementing regulations. Service Provider warrants and represents that access to certain customer information is required to provide the services pursuant to this Agreement ("Services"), and agrees that it will only access that customer or other data from Dealer's computer system(s) that it is authorized to access and that is required to provide those Services.

<u>Safeguards – *Required as described above*:</u> (Examples)

1. Service Provider agrees to protect and secure any and all customer and other data it receives or obtains in any way from Dealer pursuant to this Agreement as required under all applicable privacy and data security laws, and to implement and maintain physical, electronic, and procedural safeguards as provided by Dealer from time to time in Dealer's sole discretion,[27] or of which Service Provider is aware or should reasonably be aware of. Such safeguards shall, at a minimum, comply with applicable federal, state and local laws and regulations. The foregoing shall apply to all of Service Contractor's employees, as well as any subcontractors, affiliates, or other third parties with legitimate access to information and data relating to Dealer or Dealer's customers pursuant to this Agreement ("Authorized Third Parties").

---

[25] These are examples only, and you may wish to incorporate some, all, or portions of one or more of these provisions in your service provider agreements. YOU SHOULD CONSULT YOUR ATTORNEY to ensure that all federal, state and local requirements are met.

[26] All examples assume that capitalized terms are defined elsewhere in the Agreement.

[27] With language such as this, it would likely be appropriate for the dealer to have written guidelines establishing certain minimum standards for such a program, and share those standards with the vendor. For example, in a recent action against a dealer, the FTC cited the dealer for failure to institute certain specific practices including a failure to: "(1) assess the risks to the consumer personal information it collected and stored online, (2) adopt policies, such as an incident response plan, to prevent, or limit the extent of, unauthorized disclosure of personal information; (3)use reasonable methods to prevent, detect, and investigate unauthorized access to personal information on its networks, such as inspecting outgoing transmissions to the internet to identify unauthorized disclosures of personal information; (4) adequately train employees about information security to prevent unauthorized disclosures of personal information; and (5) employ reasonable measures to respond to unauthorized access to personal information on its networks or to conduct security investigations where unauthorized access to information occurred." (See here http://www.ftc.gov/os/caselist/1023099/120607jmmfinancialcmpt.pdf.) Dealer vendors should be held to at least the same security standards as the dealer themselves. Consult your attorney, review the NADA Dealer Guide and/or go to http://business.ftc.gov/documents/bus54-financial-institutions-and-customer-information-complying-safeguards-rule for more details.

CONFIDENTIAL

REYCID0568125
CX4468-010

FTC-0000481

2. Service Provider represents and warrants to Dealer that Service Provider (and any subcontractors, affiliates, or other third parties with legitimate access to information and data relating to Dealer's customers pursuant to this Agreement ("Authorized Third Parties")) presently maintains, and will continue to maintain and periodically test the efficacy of, appropriate information security programs and measures designed to ensure the security and confidentiality of "Customer Information" (as defined in 16 CFR § 314.2(b)). Such information security programs and measures shall include, at a minimum, appropriate procedures designed to (1) protect the security and confidentiality of such information, (2) protect against anticipated threats or hazards to the security or integrity of such information, and (3) protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer of Dealer. Dealer, its representatives and applicable governmental regulators may, from time to time, also audit the security programs and measures implemented by Service Provider pursuant to this Section, and Service Provider shall not impose any fees or charges on Dealer or its representatives in connection with any such audit.

Privacy Rule -- *Required as described above*: (Examples)

1. Access to NPPI not required to provide the Service:

Service Provider understands and agrees that it only has permission under this Agreement to access and use that data that is required to provide the Services; those data fields are listed at Exhibit ___. In no event will Service Provider access, store, share, disclose, or use any nonpublic personal information (as that term is defined under the Gramm-Leach-Bliley Act) from Dealer. Service Provider also agrees not to access, enhance, sell, store, share, disclose, distribute, create derivate works from, or use any data accessed from Dealer's DMS or other computer system or otherwise received from Dealer ("Dealer Data") for any reason, except as necessary to provide the Services, and only as long as required to provide the Services to Dealer. Service Provider has no ownership or other rights in the Dealer Data, and may not use Dealer Data in any form to append, trigger, update, enhance, or enrich its own data or data service or any third party data service. Dealer, its representatives and applicable governmental regulators may, from time to time, also audit the data accessed by Service Provider pursuant to this Agreement and the use of that data, and Service Provider shall not impose any fees or charges on Dealer or its representatives in connection with any such audit. The foregoing shall apply to all of Service Contractor's employees, as well as any subcontractors, affiliates, or other third parties with legitimate access to information and data relating to Dealer's customers pursuant to this Agreement ("Authorized Third Parties").

2. Certain access to NPPI required to provide the Service:

Service Provider agrees to only access and use that data that is required to provide the Services, and agrees not to access, store, share, disclose, or use nonpublic personal information (as that term is defined under the Gramm-Leach-Bliley Act) received from Dealer except as necessary to provide the Services. Service Provider also agrees not to access, enhance, sell, store, share,

DEALER DATA MEMO -- NOT INTENDED AS LEGAL ADVICE

CONFIDENTIAL

REYCID0568126
CX4468-011

disclose, distribute, create derivate works from, or use any data accessed from Dealer's DMS or other computer system or otherwise received from Dealer ("Dealer Data") for any reason, except as necessary and for the time necessary to provide the Services. Service Provider has no ownership or other rights in the Dealer Data and shall not use Dealer Data in any form to append, trigger, update, enhance, or enrich its own data or data service or any third party data service. Service Provider agrees not to share the password or other access to Dealer Systems with any other party not specifically outlined in this Agreement, and upon termination of this Agreement agrees that it will no longer access any Dealer Systems or Dealer Data, and to return and/or destroy the password. Dealer, its representatives and applicable governmental regulators may, from time to time, also audit the data accessed by Service Provider pursuant to this Agreement and the use of that data, and Service Provider shall not impose any fees or charges on Dealer or its representatives in connection with any such audit. The foregoing shall apply to all of Service Contractor's employees, as well as any subcontractors, affiliates, or other third parties with legitimate access to information and data relating to Dealer's customers pursuant to this Agreement ("Authorized Third Parties").

<u>Third Party Subcontractors:</u> (Example)

Service Provider warrants and represents that it will: (a) only engage the services of a subcontractor, affiliate, or other third party in connection with its provision of services pursuant to this Agreement ("Authorized Third Party") if required to provide the Services; (b) exercise the requisite due diligence in selecting any Authorized Third Parties to ensure that the Authorized Third Parties can and will safeguard any customer or other information in their care; (c) require any Authorized Third Parties by contract, to abide by Subsections ___*[insert Safeguards Rule subsection]*, ___*[insert Privacy Rule subsection]*,[28] ___*[insert Confidentiality subsection]*[29], and any other relevant provisions of this Agreement; (d) specify by contract that all Authorized Third Parties shall have no license or any other proprietary or intellectual property rights in the Dealer Data pursuant to their agreements with Service Provider; (e) ensure that the Authorized Third Party does not access, enhance, sell, store, share, disclose, distribute, create derivate works from, or use any Dealer Data in any way except as required under this Agreement; (e) provide a list of all Authorized Third Parties (explaining data accessed by each and explanation of role) to Dealer for approval, and seek prior written approval from Dealer before altering or adding to that list, and; (e) require Authorized Third Parties to ensure that any Dealer Data that must be transmitted or stored as part of the Service is transmitted in an encrypted fashion, and in accordance with applicable industry security standards.

---

[28] Insert the Safeguards and Privacy Rule restriction Subsections (such as those in the above examples) that apply to the Service Provider here.

[29] Insert the provision in the Agreement (if any) addressing treatment of Confidential Information.

<u>DEALER DATA MEMO – NOT INTENDED AS LEGAL ADVICE</u>

CONFIDENTIAL

REYCID0568127
CX4468-012

**Exhibit 8 – Dealer Data "Checklist"**

☐ • Know and understand who is in your systems and what they have access to:
  - Both employees and any third parties
  - Review access to your DMS any and all CRM databases, your websites, etc.
    • Work with your vendors to determine
    • Don't forget CRM or other (non-DMS) databases
      • Could contain NPPI – (*e.g.*, online credit applications) or other sensitive information
    • Websites
      • What Dealer Data is being accessed by third parties from your website?[30]
      • Work with your website provider to ensure protections against scraping /other data collection are in place.
  - Require third parties with access to provide written list of data they have access to and what they have "taken."
  - Work with your DMS provider to ensure proper controls and reporting
  - Review all current and future contracts for required language
    • Understand what they need and why
    • As discussed above, you MUST limit this via contract
    • Audit/confirm/run reports/hold them accountable/and document!
  - Remember that even if it is not NPPI
    • You still must maintain security
      • Customer relations issues
      • Employee issues
      • Non GLB regulatory duties
    • It has tremendous value
    • Trade secret implications

☐ • Understand and control remote access issues
  - Mobile devices raise tremendous data access and data breach concerns
  - Limit access
  - Control devices
  - Work with your counsel and DMS and other vendors to address the policy, security, and business implications of mobile device access.
  - Remote access from employees "home" computers
    • Also raises complicated data security, breach, trade secret and other issues
      • How do you control access/copying/sharing?
      • P2P implications? (see below)

---

[30] Remember that information you collect through internet "cookies" in connection with an inquiry about a financial product or service is considered NPPI. For example, if your dealership website accepts online credit applications, any information you gather during that process via cookies is NPPI.

**DEALER DATA MEMO – NOT INTENDED AS LEGAL ADVICE**

CONFIDENTIAL

REYCID0568128
CX4468-013

- **Consider implementing a strict data "push" system for sharing data**
  - This means that you would only share data with third parties by gathering it, and sending it to them, rather than allowing them to "take" it by accessing your systems.
    - Allows you to have control over what data is shared
    - Prevents concerns regarding access to data
    - Provides audit trail of sharing
  - Work with your DMS provider to set up
  - If no/limited IT staff or expertise, consider a vendor to help.

- **Implement password/access controls**
  - Who has authority to grant access to the DMS, and what level of access?
  - Centralize control over password access.
    - More than one person with ability to grant password access? Why?
    - If one person, then better control over access
      - less likely to be abused
      - easier to document/demonstrate compliance
  - At the least, you must know who has a password and who is using it.
    - Work with your DMS provider to monitor and audit.
  - Address Affiliate Marketing and Sharing issues via password.
    - See NADA Guide on this complicated but important topic.
  - Prohibit employees from sharing passwords.
  - Require regular changes to passwords.
  - Require employees to use "stronger" passwords for any access to sensitive data.

- **Understand "P2P"**
  - "P2P" refers to "Peer-to-Peer" networks. Go here for more: http://business.ftc.gov/documents/bus46-peer-file-sharing-guide-business
  - Have a policy and train your employees.
  - Consider prohibiting access to P2P sites.

- **Consider benefits of segregating your data**
  - By manufacturer[31]
  - "Sensitive" from "non-sensitive"
  - Either physically (different servers/systems) or by password

- **Consider the use of "dummy" or "plant" customers in your DMS**

---

[31] It has been reported to NADA that whether due to limitations in the DMS systems themselves, or because of the way the dealer utilizes the system, dealers are sometimes unable to limit access by manufacturer. For example, a dealer who is a retailer of multiple makes for multiple manufacturers, may not be able to grant access (legitimately, pursuant to an exception to the Privacy Rule) to a manufacturer to only *that manufacturer's* customers. This creates a potential problem for the reasons described above.

**DEALER DATA MEMO -- NOT INTENDED AS LEGAL ADVICE**

CONFIDENTIAL

REYCID0568129
CX4468-014

**FTC-0000485**

- Put a false customer in your DMS database with a physical and email address you can monitor. Then test what, if any, marketing information comes to that "customer."
- Can provide good insight into who may be accessing your data without your knowledge.

- ☐ • Understand your "Do-Not-Call" and CAN SPAM opt out procedures
  - Are your company-specific opt-out/"do-not-call" lists in place and updated?
    - Ensure that you do not share phone numbers or emails on your lists
  - How do you control third party access to phone numbers or email?

- ☐ • Work with OEMs and others to limit exposure
  - Find the right person at your OEM and maintain open communication

- ☐ • Understand privacy implications of your social media efforts
  - Do you gather any customer information via social media?
    - May not be NPPI, but sensitive from customer relations perspective
  - Do you have any interaction with customer comments/dealership reviews?
    - Understand the FTC Guidelines on Endorsements and Testimonials.
  - Do you engage the services of a "reputation management" vendor?
    - Understand *exactly* what they are doing, what they have access to.

- ☐ • Confirm that your Privacy Notice is accurate!
  - If you share with service providers, you must properly disclose.
    - Note that this is separate from the sharing/opt-out requirement
  - Use the Model Privacy Notice form
  - Review "A Dealer Guide to the Privacy Rule and Model Privacy Notice"
    - At www.nadauniversity.com
    - Make sure you are properly using the model notice form

- ☐ • Understand and meet your Affiliate Sharing and Marketing requirements
  - Applies if you have multiple legal entities (LLC, c corp. etc.)
  - Raises complicated and potentially difficult issues
  - Requires you to limit access to /use of customer data between affiliated entities
  - Review NADA Guides / consult with your attorney

See here for more details:
www.nadauniversity.com
http://business.ftc.gov/privacy-and-security/data-security
http://business.ftc.gov/privacy-and-security/gramm-leach-bliley-act
http://www.business.ftc.gov/documents/bus64-ftcs-privacy-rule-and-auto-dealers-faqs

<u>DEALER DATA MEMO – NOT INTENDED AS LEGAL ADVICE</u>

CONFIDENTIAL

REYCID0568130
CX4468-015

| | |
|---|---|
| **From:** | Bob Brockman [bob_brockman@reyrey.com] |
| **Sent:** | Sunday, June 10, 2007 9:00 PM |
| **To:** | Workman, Ron; Anenen, Steve; robnalley@universalcomputersys.com; 'Agan, Dan' |
| **Subject:** | ADP 070610 Initial reply.doc |
| **Attachments:** | ADP 070610 Initial reply.doc |



ADP 070610 Initial
reply.doc (...

Ron,

My apologies for not replying sooner.

Things remain quite busy in Dayton where I was all of last week. It was not until this
weekend that I had sufficient quiet time to analyze the materials that you sent.

Please see the attached thoughts regarding our mutual opportunities.

As I said in our initial meeting on the subject at NADA, I believe that there some
attractive opportunities here that in the longer term can be quite significant.


Bob Brockman

Cc Steve Anenen, Rob Nalley, Dan Agan

*Brockman*

1

**Highly Confidential**

CDK_CID_03047915

CX2250-001


FTC-0000297

**ADP – REYNOLDS & REYNOLDS PARTNERSHIP OPTIONS**

General Comment

Some of the documents that you sent are somewhat confusing in that they seem to infer the jointly owned entity sells products/services back to each of us to market on our own.

My understanding is exactly the reverse of this. We provide services to the jointly owned entity that then in turn sells products/services to third parties.

Credit Submission and Electronic Contracting

This project would entail both companies F&I systems creating electronic contracts using the Silanis approach. The principal revenue opportunity would come from creating a Registry that would hopefully become the industry standard for electronic chattel retail auto finance contracts. There would be a custodial charge per contract and a transaction charge per contract.

The ability to have our F&I systems transmit the content of completed retail finance contracts both in image form and in text string form to the various lenders should also be worth something.

Given the patent position of DealerTrack, it is less clear that there is an opportunity to do the one-to-many credit application process that they do. However there is no barrier to doing one-to-one credit applications.

Whatever further insight you have on the credit application business would be appreciated.

For this opportunity I would favor option 2 for the following reasons:

-no corporate double taxation issues
-revenue and profits gets split between the partners based upon their participation
-any losses during start up are able to be offset against income in our main corporations

Route One

From what I understand there may be a current opportunity revolving around Route One.

If we were to enhance our F&I systems in such a way that facilitated the business of Route One, they might be willing to give us a share in the transaction revenue.

They are obviously in a competitive position vs. DealerTrack and therefore might be willing to do this.

By combining forces in the partnership entity described above, we might be able to convince Route One that this was a good idea.

<u>Data Services</u>

This business is defined as the service of extracting data from dealership systems for third parties such as mailing services and manufacturers. I do not envision this business to be involved in the two-way integration that we both do with other third party software system providers such as CRM or F&I packages.

ADP would contribute the DMI business to this Newco entity along with its technology for accessing DMS systems via modem.

Reynolds would contribute to this Newco entity its technology for accessing ERA and POWER systems plus all of its current contracts for providing these services to third parties.

There would likely be some valuation issues involved in doing this.

Newco would then be the provider of extraction/collection of data from both our DMS products to all third parties.

For this opportunity I believe that option 3 is most appropriate for the following reasons:

-ADP can be given sufficient control to allow them to report the sales revenue which prevents a loss of the revenue ADP currently reports from DMI

-this revenue allocation is conditioned upon an effective split of the profits based upon the amount of data collected from our respective DMS customers

**Highly Confidential**

<u>Data Agreement</u>

<u>Background</u>

-unattended remote access to Reynolds systems is going to cease

-major issue is data security of personal information

-secondary issue is data security of business information – "True Car"

<u>Reynolds Certified Interface</u>

-RCI program governs exactly what data is extracted, when, and what it is to be used for

-charges are based upon the complexity, volume, frequency

-the data goes to single entity for use with a specific product or service that they provide

-the data cannot go to a 3rd party that in turn resells the data to other third parties as this is a breakdown in accountability

-requires contractual indemnification for data breach

-data broker situation is intolerable for the above reasons – as the data can get loose to who knows where – then when something goes wrong, the plaintiff's attorneys start looking for the deep pockets

<u>Possible Ways to Handle Data</u>

Examples of what could be tolerable:

-where ADP or Reynolds provides a specific product to a specific customer for a specific purpose – this could be covered by an RCI-type agreement for that data feed

-the level of indemnification could vary based upon the extent of PIN that is involved

-for example batch-type data that goes into a specific ADP or Reynolds product – such as vehicle inventory information into a Cobalt or Reynolds web site could be a daily feed without much indemnification since the data involved is not PIN

-batch-type data that DMI collects for an OEM where they provide substantial additional services in regards to the data – would require that this data is sent

REYCID0719798
CX4043-001

FTC-0000316

only to the OEM -- and since PIN data is involved, indemnifications would be necessary

-batch type data that Authenticom (or some other Reynolds agent) collects from ADP sites for Reynolds to use in marketing programs that it sells to the dealer would require that this data is used for no other purpose -- and since PIN data is involved, indemnifications would be necessary

Use of Agents

-the use of a 3rd party acting under contract as an agent of ADP or Reynolds is not an issue as long as the specific RCI agreement is directly between us -- either of us would take responsibility for their agents

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REYCID0719799
CX4043-002

**From:** Hoyt, Chuck
**Sent:** Wednesday, August 14, 2013 12:42 AM
**To:** 'Lamb, Ronald'
**Subject:** FW: Captcha Codes

This is just an fyi for now. We are working with Chris Hellyer regarding Stone Eagle, but this is probably going to send Joe Serra over the top. If he reaches out to you, just forward to me (unless you want to call him). I will take the bullets... I am already bloodied after only two days of this data security. A couple of more arrows won't make a difference..... ☺

**From:** Murphy, Aaron W (SALES) [mailto:Aaron_Murphy@reyrey.com]
**Sent:** Tuesday, August 13, 2013 4:02 PM
**To:** Ron Haggin
**Subject:** RE: Captcha Codes

Ron,

I sent your request over to the Data Security team and they informed me that we are no longer removing captcha codes on the systems. As you are aware, captcha codes are a standard in nearly every industry designed to protect your data from automated access in an uncontrolled environment. If you are having a specific issue with a particular vendor who is attempting to access your system via an automated method, please direct them to our RCI team for certified access. The RCI Team can be reached at 888-347-3080.

Thank you,

*Aaron Murphy*

Major Accounts Executive
Reynolds and Reynolds
Cell 740-815-6104
EFax 866-741-4562

**From:** Ron Haggin [mailto:rhaggin@serrausa.com]
**Sent:** Tuesday, August 13, 2013 2:15 PM
**To:** Murphy, Aaron W (SALES); Hoyt, Chuck; Joe Serra; Tony Nichols; Matt Daugherty; Will Kelley; Keith Harvey; Bates, David J
**Subject:** Captcha Codes

All,

The captcha codes were reinstalled on our system throughout all of our stores.

As in the past, we request that the codes are uninstalled on all of our systems.

Thanks in advance for your assistance.

Ron Haggin
Serra Automotive, Director of Operations
rhaggin@SerraUSA.com

810.603.1151 **Direct Office**
810.691.5206 **Cell ~ Texts welcome**
810.694.1720 **Main Office x1151**
www.SerraUSA.com
**Mailing Address......**3118 E. Hill Road, Grand Blanc, MI 48439

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REYCID0203876
CX4515-001

**From:** "Hill, Keith" <keith_hill@reyrey.com>
**Subject:** FW: Joel Confer Toyota - SXMTMS37094 - Invalid Login Issue

**From:** Hill, Keith
**Sent:** Friday, August 16, 2013 2:52 PM
**To:** Robert Schaefer (robert_schaefer@reyrey.com); 'Brockman, Bob'
**Subject:** FW: Joel Confer Toyota - SXMTMS37094 - Invalid Login Issue

This is the type of response customers are getting from integralink and dmi.
Devlon,

Please understand that R&R is 100% responsible for this situation. R&R tells its dealers that they should have their third party vendors become RCI certified but they tell us, DMI, that they will not allow us to become RCI certified. Your vendors most likely have already contacted Reynolds but Reynolds has not budged.
Unfortunately this leaves you, the dealer, with a decision.

1) Continue to help DMI access your R&R ERA system so that we can collect the needed data and provide it to your vendor. DMI only accesses your system using credentials that your dealership provides.
2) Push the needed data in the needed format to DMI so that we can normalize it and provide it to your vendor.
3) Discontinue participation in the program or programs that require this data.

Obviously we don't want #3 to be the outcome but I feel it's important to list as it's one of the three options that is available to you.

Please feel free to call or email me with any questions, or anything I can help with.

**Keith Hill - 281-380-9574**

**From:** Hoyt, Chuck [mailto:chuck_hoyt@reyrey.com]
**Sent:** Friday, August 16, 2013 9:48 AM
**To:** Ray Hoffman; Michael Behm; Peter Sidwell; Christopher Rulon; Chris Walsh; Rick Altvater
**Cc:** Keith Hill
**Subject:** Fwd: Joel Confer Toyota - SXMTMS37094 - Invalid Login Issue

Fyi

Sent from my iPhone.

Begin forwarded message:

> **From:** "Karloski, Ronald S (Ron)" <ronald_karloski@reyrey.com>
> **Date:** August 16, 2013, 10:44:44 AM EDT
> **To:** "Hoyt, Chuck" <Chuck_Hoyt@reyrey.com>
> **Subject:** Fwd: Joel Confer Toyota - SXMTMS37094 - Invalid Login Issue

> Note below what DMI is telling dealers. I sent to Bob Schaefer.

Sent from my iPhone
> Begin forwarded message:

>> **From:** "Tabaka, Mark C" <mark_tabaka@reyrey.com>
>> **Date:** August 16, 2013, 9:02:03 AM EDT
>> **To:** "Karloski, Ronald S (Ron)" <ronald_karloski@reyrey.com>, "Hellyer, Chris H" <chris_hellyer@reyrey.com>
>> **Subject:** Fwd: Joel Confer Toyota - SXMTMS37094 - Invalid Login Issue

>> FYI What DMI is saying

>> More to come

> Mark Tabaka

>> 412.445.9945

Sent from my iPhone
Begin forwarded message:

**From:** Devion <devionc@joelconfer.com>
**Date:** August 16, 2013, 8:50:24 AM EDT
**To:** "Tabaka, Mark C" <mark_tabaka@revrey.com>
**Subject: Fwd: Joel Confer Toyota - SXMTMS37094 - Invalid Login Issue**

So it's all Reynolds fault

Devion Cowart

Sales Manager
Joel Confer Toyota
814-237-5713
Www.joelconfer.com
Begin forwarded message:

**From:** "King, Steven" <kings@digitalmotorworks.com>
**Date:** August 16, 2013, 8:33:17 AM EDT
**To:** Devion Cowart <devionc@joelconfer.com>
**Cc:** "lifletemake@joelconfer.com" <lifletemake@joelconfer.com>, "earleby@statecollege.com"
<earleby@statecollege.com>, "safelink_support@digitalmotorworks.com"
<safelink_support@digitalmotorworks.com>, "King, Steven"
<kings@digitalmotorworks.com>
**Subject: RE: Joel Confer Toyota - SXMTMS37094 - Invalid Login Issue**

Devion,

Please understand that R&R is 100% responsible for this situation. R&R tells its
dealers that they should have their third party vendors become RCI certified but
they tell us, DMI, that they will not allow us to become RCI certified. Your
vendors most likely have already contacted Reynolds, but Reynolds has not
budged.
Unfortunately this leaves you, the dealer, with a decision.

1) Continue to help DMI access your R&R ERA system so that we can collect the
needed data and provide it to your vendor. DMI only accesses your system using
credentials that your dealership provides.
2) Push the needed data in the needed format to DMI so that we can normalize it
and provide it to your vendor.
3) Discontinue participation in the program or programs that require this data.

Obviously we don't want #3 to be the outcome but I feel it's important to list as
it's one of the three options that is available to you.

Please feel free to call or email me with any questions, or anything I can help
with.

Thank you,

Steven King
*Safelink Support – TCA I*
847.807.2046 office
614.324.7802 fax
kings@dmgcworworks.com email
<image001.jpg>

---

**From:** Devion Cowart [mailto:devionc@joelconfer.com]

**Sent:** Thursday, August 15, 2013 6:03 PM
**To:** King, Steven (DS)
**Cc:** dlokemake@joelconfer.com; earigby@statecollege.com
**Subject:** Joel Confer Toyota – SXMTMS37094 – Invalid Login Issue

Steven,

Due to the recent changes Reynolds and Reynolds has made to setting up new login accounts we will no longer be able to provide logins to 3rd parties. It is a violation of our agreement with Reynolds and Reynolds to allow 3rd parties access to our system remotely. Please contact Reynolds and Reynolds, to see what you need to do enroll in the Reynolds Certified Interface program, at 937.485.0402. If your company is unable or unwilling to enroll in the Reynolds Certified Interface program then please have the companies you are pulling data for contact Reynolds and Reynolds directly.

Please see the attached PDF. This is the warning we get when setting up new user logins.

Regards

Devlon L Cowart
Joel Confer Toyota/Scion/BMW
Sales Manager
814-237-5713

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the message and any attachments from your system.



**From:** Brockman, Bob [mailto:bob_brockman@reyrey.com]
**Sent:** Monday, November 25, 2013 12:32 PM
**To:** 'Robert Schaefer'
**Subject:** RE: R&R/ADP Agreement

Bob,

**You have authority to pursue discussions with ADP on these subjects as per our conversation.**

Bob

---

**From:** Robert Schaefer [mailto:Robert_Schaefer@reyrey.com]
**Sent:** Monday, November 25, 2013 8:28 AM
**To:** 'Brockman, Bob'
**Subject:** FW: R&R/ADP Agreement

Bob

Per our conversation, please respond back to this email giving me the authority to pursue discussions on a general framework with ADP. Once I receive your approval I will forward to the ADP team and we can begin the process.

---

**From:** Gardner, Howard [mailto:hgardner@dmotorworks.com]
**Sent:** Tuesday, November 12, 2013 1:45 PM
**To:** Schaefer, Robert G (robert_schaefer@reyrey.com)
**Subject:** R&R/ADP Agreement

Bob —

The following is a summary of the main business points we discussed on September 27th relating to a possible agreement between Reynolds & Reynolds and ADP. I've included additional detail and clarification of ADP's perspective in the summary.

If we are in agreement that these points can form the basis for further discussions, the next step is a phone meeting with you, Ron Workman, and me. Ron and I can both be available for a call this Friday, November 15th, early the week of November 25th, or the week of December 2nd. Please let me know which date works best for you.

Confidential

CDK_CID_01734952

CX1151-001

FTC-0000294

Our continuing discussions are based on certain premises and expectations:

1.  Bob Brockman would like to work toward an agreement with ADP, and he has granted you the authority to pursue discussions on a general framework with ADP.
2.  Reynolds & Reynolds indemnification has been relaxed since we last exchanged documents, and it is open for discussion/negotiation.
3.  We are conceptually in agreement on the following, which would become the starting point for further discussions.

## Application Integration – Reciprocal 3PA/RCI Access

Reynolds & Reynolds and ADP will work toward an agreement that enables bi-directional "approved" or "certified" access for certain R&R applications and services (which may include data provided by DMI) and similar reciprocal access for certain ADP applications and services. Reynolds is open to discussing inclusion of any (and all) ADP applications/services in an agreement (or agreements).

The business framework we would each use is to approve/certify applications with a process not unlike that which both Reynolds & Reynolds and ADP use today with other third parties. We discussed the concept of utilizing our respective existing 3PA or RCI contracts, processes, integration technologies, etc. as a potentially reasonable approach, although from a contracting standpoint, ADP would suggest that the parties consider utilizing a "framework" or "master" agreement containing all general terms and conditions, with specific agreed-upon integration points to be set forth in separate Statements of Work which are appended to the master. Pricing would be negotiated on a reciprocal basis (similar price for similar integration).

## DMI – "Soft Landing" for OEMs and other third parties

We will work toward agreement on a general approach for DMI data access that would include all DMI clients (current and future). The key points of the approach are:

1.  **OEMs:** Reynolds & Reynolds and DMI will formalize and extend our collaborative approach to helping OEMs transition to a "protected program" to prevent future disruption of data access. DMI will work with R&R and each participating OEM (as we have been) to smoothly transition each OEM to a Reynolds certified interface when Reynolds is prepared to provide service.

2.  **Non-OEM Third Parties:** R&R and DMI will jointly create and launch a "protected program" that DMI will offer to its existing and prospective non-OEM clients. DMI will recommend the "protected program" to existing clients; however, these clients would have the choice of continuing service through existing "unapproved" integration (which would continue to be susceptible to disruption). DMI would agree to sunset unapproved integration for new clients, and offer only the "protected program" in contracts with new clients that include R&R dealers. R&R will work with DMI to create one or more R&R approved and supported alternative data access options that enable dealers to create downloadable data files for retrieval by DMI, or transmission to DMI by the dealer. R&R is open to discussing special programs for DMI's inventory data clients that could facilitate increased adoption of R&R's supported tools for inventory data syndication.

3.  **Technology Investment:** R&R and DMI will collaborate to define and invest in the development of technology-based tools that automate, accelerate, simplify, and stream-line the process of setting up and managing the "protected programs" for OEMs and third parties.

4.  **Exclusivity:** Due to the investments in technology required to establish and administer "protected programs", R&R is open to the R&R "protected programs" becoming an exclusive offering by DMI, subject to further discussion and legal review.

5.  **Financial:** The nature of the agreement between R&R and DMI would add structure and simplicity to the process we use currently to cooperatively facilitate transition of OEMs and third parties to R&R certified interfaces. Each party (R&R and DMI) would cover our respective costs, and there would be no payments between parties related to this agreement.

## Market Messaging – Data Security

ADP would be open to adopting and advocating common industry standards and/or recommendations, although we

**Confidential**

would both have to consider the appropriate mechanism for doing so (for example, through or in conjunction with an industry organization such as NADA).

**Howard Gardner**
DVP & General Manager
Digital Motorworks Inc.
ADP Dealer Services

(512) 692-2479 | howard.gardner@adp.com

---

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the message and any attachments from your system.

**Confidential**

**CDK_CID_01734954**

CX1151-003

**FTC-0000296**

-long-standing issues around security

-the liability to Reynolds and to our dealer customers of allowing 3rd parties unfettered and uncontrolled access to Reynolds systems is such that my stated goal for years has been to end it

-we have been steadily been making a series of security changes in our software that is more and more effective at denying 3rd party access

-about two month ago Howard Gardner called Bob Schaefer

-jist of the conversation was that ADP wanted to transition out of their commitments to a hundred 3rd party firms that ADP had contracts with for extracting data from Reynolds systems.

-we had already done this with Phil Batista

-I agreed to discuss doing this with ADP on two preliminary conditions:
    -we get settled on indemnification language

-the second point is very much a personal one
    -ADP has been extracting data out of Reynolds systems for over a decade

    -ADP has been in the business of providing that data to a host of other 3rd party Firms

    -ADP has wrongly taken advantage of Reynolds in the marketplace over the issue of data security – that has cost us in the millions

    -ADP (Howard Gardner) has caused a lot of grief with OEM's, particularly GM by being downright untruthful about the amount of data they were extracting from Reynolds systems (in the name of GM) that far exceeded the GM requirements

    Therefore I want a no-charge access to ADP systems for the next 20 years – to be used only for a product that Reynolds offers – like service reminders – not to be used to extract data for other 3rd parties.

-we have been upfront about these two points since the beginning of the conversation.

-indemnification has been dealt with

-the interface request has been dealt with from a technical standpoint, however has been stalled for over a month

-Ron Workman has reported that my interface request can only be approved by you.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REYCID0263974
CX4035-001

FTC-0000304

-we have held up on a large release of security enhancements for over 2 months to see if there was a deal to be worked out on orderly transition

-I am tired of the whole thing – you need to make a decision one way or the other – do we continue to work on an orderly transition plan or not

-there is still the business issues of transitioning ADP out of their contractual obligations (to the hundred 3rd parties) to extract data out of Reynolds systems

-I need an answer on the no-charge access issue now – so the project goes ahead or gets cancelled

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REYCID0263975
CX4035-002