**Administrative Offices**

2906 Lafayette
Newport Beach, CA 92663
Tel: 949-723-2211
Fax: 949-723-2212
Email:    expert@parkdietzassociates.com
Website:  www.parkdietzassociates.com

- Forensic Psychiatry
- Forensic Psychology
- Forensic Pathology
- Forensic Neurology
- Forensic Social Work
- Child Welfare
- Criminology
- Security

June 21, 2021

Corey J. Smith
Senior Litigation Counsel
U.S. Department of Justice, Tax Division
150 M Street NE, Rm 2.208
Washington, DC 20002

Re:  United States v. Robert T. Brockman

Dear Mr. Smith:

At your request, I conducted a forensic psychiatric evaluation of Mr. Robert Brockman for the purpose of providing an expert opinion as to his competence to stand trial on a 39-count indictment for violations of these statutes:

> 18 U.S.C. § 371 – Conspiracy
> 26 U.S.C. § 7201 – Tax Evasion
> 31 U.S.C. §§ 5314 & 5322(b) –FBAR Violations
> 18 U.S.C. § 1343 – Wire Fraud Affecting a Financial Institution;
> 18 U.S.C. § 1956(a)(1)(B)(i) – Concealment Money Laundering;
> 18 U.S.C. § 1956(a)(1)(A)(ii) – Tax Evasion Money Laundering;
> 18 U.S.C. § 1956(a)(2)(B)(i) – International Concealment Money Laundering;
> 18 U.S.C. § 1512(b)(2)(B) – Evidence Tampering;
> 18 U.S.C. § 1512(c)(1) – Destruction of Evidence

My evaluation of Mr. Brockman was one component of a multidisciplinary evaluation that also included evaluations by Ryan Darby, M.D., and Robert Dennery, Psy.D. Dr. Darby, Dr. Denney, and I conferred with one another by telephone on several occasions to plan logistics; to share ideas on additional investigation, testing, interviews, or studies that could clarify the defendant's diagnoses and competence; and to compare observations.

## SOURCES OF INFORMATION

In conducting my evaluation, I reviewed the following sources of information:



GOVERNMENT
EXHIBIT

4:21-CR-009-GCH

No. 83

PDA-0000025

<u>Medical Records re. Robert Brockman</u> (various dates; identified by PDF page numbers)

- Baylor College of Medicine
- Houston Methodist
- Houston Methodist, 2nd production
- Fondren Orthopedic
- UT Physicians
- Komal Copra Stoerr, M.D.
- Medical records and personal writings provided by Mr. Brockman

<u>Dated Records</u> (chronologically, by date of creation)

- Video of Mr. Brockman speaking to Reynolds and Reynolds employees in approximately September 2017 [UCSH 0207346]
- Video of Mr. Brockman speaking at the 2018 Reynolds and Reynolds Company birthday party in approximately November 2018 [UCSH 0210542]
- Transcript and video of the deposition of Robert Brockman In re. Dealer Management Systems Antitrust Litigation, 1/16/2019
- Transcript and video of the deposition of Robert Brockman In re. Dealer Management Systems Antitrust Litigation, 1/17/2019
- Report of Michele York, Ph.D., re. neuropsychological evaluation of Mr. Brockman on 3/1/19
- Transcript Mr. Brockman's testimony at Federal Trade Commission Investigational Hearing in the Matter of CDK Global and Reynolds and Reynolds, 9/18/19
- Transcript Mr. Brockman's testimony at Federal Trade Commission Investigational Hearing in the Matter of CDK Global and Reynolds and Reynolds, 9/19/19
- Video of Mr. Brockman speaking at the 2019 Reynolds & Reynolds company birthday party in approximately November 2019 [UCSH 0212042]
- Report of Michele York, Ph.D., re. neuropsychological evaluation of Mr. Brockman on 12/3/19
- Indictment in US v. Robert Brockman, Case 3:20-cr-00371-WHA, filed 10/01/20 [Document 1]
- Letter from Kathryn Keneally, et al., to Corey J. Smith, 4/9/20
- Report of Michele York, Ph.D., re. neuropsychological evaluation of Mr. Brockman on 10/7/20
- Declaration of James L. Pool, M.D., in Support of Robert T. Brockman's Motion to Transfer Proceedings, 11/25/20 [Document 49]
- Declaration of Kathryn Keneally in Support of Robert T. Brockman's Motion to Dismiss in Part for Lack of Venue and Transfer to the Southern District of Texas, 11/30/20 [Document 0049]
- Defendant Robert T. Brockman's Notice of Motion and Motion for a Hearing to Determine Whether Mr. Brockman is Competent to Assist in His Defense, 1/12/21, and Exhibits [Document 46]
- United States' Response to Defendant's Motion for a Competency Hearing, 1/12/21, and Exhibits [Document 69]

PDA-0000026

- Defendant Robert T. Brockman's Reply in Support of Motion for a Hearing to Determine Whether Mr. Brockman is Competent to Assist in His Defense, 1/12/21 [Document 74]
- United States' Motion for Discovery Order Under Rule 17(C) and 45 CFR 164.512(e)(1)(i), 1/26/21 [Document 26]
- Transcript of deposition of Kelly Hall in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 3/10/21 [redacted]
- PET Brain Metabolic Evaluation, Houston Methodist Hospital, 3/12/21
- Transcript of deposition of Robert Schaefer in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 3/18/21 [redacted]
- Transcript of deposition of Norman Thomas Barras, Jr., in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 4/15/21 [redacted]
- Polysomnography Report, Memorial Hermann Hospital Texas Medical Center, 4/29/21
- Transcript and video of Dr. Darby's interview and examination of Mr. Brockman, 5/5/21
- Dr. Darby's notes of his interview of Mrs. Brockman, 5/5/21
- Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21
- Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21
- Dr. Denney's raw test data, 5/19/20 and 5/20/21
- Dr. Denney's Interview of Kathy Keneally, 6/14/21
- Dr. Denney's Interview of Peter Romatowski, 6/15/21
- E-mail from Kathy Keneally to Corey Smith, et al., re. "US v. Brockman: update on medical issues," 6/17/21

Dr. Denney and I jointly interviewed the defendant on 5/18/21 and 5/20/21. On 5/18/21, I conducted most of the interview. On 5/20/21, Dr. Denney conducted a semi-structured interview regarding trial competence, after which I took the lead in conducting additional interviewing. Complete transcripts of these interviews are attached as Appendices 1 and 2, and the videorecording has already been provided to the parties by the videographer hired by Jones Day.

**LIMITATIONS OF EVALUATION**

Evaluations of competence to stand trial for criminal charges are based on both direct examinations of defendants, where possible, and on other sources of information, including but not limited to documents, electronic recordings, physical evidence, and interviews of witnesses.

In this instance, several potentially significant sources of information proved unavailable as of the Court-ordered deadline for this report. These include:

- Several witnesses declined to be interviewed or re-interviewed.
- Properties controlled by the defendant were not searched for documents or electronic devices.

- Medical records for which subpoenas were issued had not yet been provided to the United States.
- An initial sleep study was inadequate, and a repeat study has not yet been completed.
- Recent medical records for hospitalizations and treatment in 2021 have not all been received.

If additional information is received before the competency hearing on this matter, I will take it into account and revise my opinions if indicated.

**CONTEXT OF EVALUATION**

On 10/1/20, Mr. Brockman was charged in a 39-count federal grand jury indictment alleging the violations listed above, with additional forfeiture allegations under 18 U.S.C. §§ 982(a)(1), 982(a)(2)(A) & 28 U.S.C. § 2461(c).

Attorneys for Mr. Brockman have asserted that he is incompetent to stand trial because of dementia, and the Court ordered an examination by experts retained by the United States, including the undersigned.

Mr. Brockman is an 80-year-old man with a 53-year marriage that produced one adult son and a one-year-old grandson. Mr. Brockman had an enormously successful business career (detailed in the interviews of 5/18/21 and 5/20/21) as Chairman and CEO of Reynolds and Reynolds, from which he retired effective 1/1/21. His personal and psychosocial histories are detailed in the interviews of 5/18/21 and 5/20/21, which was videotaped and transcribed; that information is not repeated here.

Mr. Brockman's medical history is significant for bladder cancer (treated surgically in 2006); repeated urinary tract infections (two of which resulted in hospitalization for sepsis in 2021); malignant melanoma and basal cell skin cancer (treated by excision); Parkinson's disease; two episodes of atrial fibrillation (in October 2015 and June 2016[1]; successfully managed with medication and lifestyle changes); hypothyroidism (managed with medication); hyperlipidemia (managed with medication); coronary artery calcification; pseudoexfoliation glaucoma (treated surgically); depression (managed with medication); prostatitis; ocular migraine; osteopenia; gall stones; idiopathic peripheral neuropathy; and other lesser illnesses and injuries. He has not been averse to laboratory tests and biomedical studies regarding his physical health and has been carefully, perhaps exhaustively, screened for disease many times.

Most relevant to the issue before the Court is the issue of Mr. Brockman's present cognitive capacity, about which a dispute has arisen, and this issue and his competence to stand trial are the focus of the reports by Dr. Denney and Dr. Darby as well as this report. A related issue is whether he has a REM sleep disorder, the

---

[1]  Medical records and personal writings provided by Mr. Brockman from his home, pp. 1413-1414.

presence of which, if true, would be consistent with but not dispositive of the question of whether he has dementia with Lewy bodies.

**TIMELINE OF COGNITIVE FUNCTION**

A detailed analysis of cognitive functioning requires documentation, observation, or measurement at various points in time because cognitive functioning varies with age, time-limited alterations in mental state (e.g., intoxication, sleep deprivation, the effects of medications, or delirium), and disease or injury of the brain. For that reason, I provide here a detailed timeline based on the various sources of information available as of this writing, and I insert clearly marked comments to disclose my own impressions and interpretations of particular entries in the chronology.

Note that many of the entries in this chronological accounting are drawn from writings by Mr. Brockman, the content and dating of which have not been corroborated by any source. The existence of these writings was discovered only because of information Mr. Brockman volunteered in Dr. Darby's 5/15/21 interview. In responding to Dr. Darby's question about the onset of his cognitive issues, Mr. Brockman introduced the topic of a former internist that led to the revelation that Mr. Brockman had possession of previously undisclosed medical records, in this exchange:

RD:  Well, tell me a little bit about the cognitive issues that you've been having. So when did—when did those first start?

RB:  I think they actually began, oh, probably five, six, seven years ago.

RD:  Okay.

RB:  And—and the reason why that I picked that out is because I—I had a very excellent internal medicine doctor for many, many, many years.

RD:  Who was that?

RB:  His name is Bill Obenour. He's retired from practice now. And he was a—a classical single practitioner, you know, one man office with a staff. And medical records all written by hand. And I think probably the fact that he was gonna have to convert all that stuff at some point is one of the reasons why it played out. But any rate, I knew that I had, you know, big files in his office and so I asked him if I could have them because I have—wouldn't know where they would go initially or where they would continue to reside.

RD:  When he was retiring?

RB: Yeah.

RD: Okay.

RB: And initially the—the answer was, "No, I can't help you."  And then shortly before he retired the answer changed and I was able to go down and they—they—they won't all fit in a single banker's box, it's a banker's box and—and some.  I have all those records.[2]

Thereafter, these records were requested through defense counsel, but they were not received until after Dr. Denney and I had completed our examination of Mr. Brockman.  When the documents were produced, they included not only medical records from William B. Obenour, Jr., MD, and other health care providers, but also dated writings by Mr. Brockman that appear to be approximately annual health updates.  These personal writings of Mr. Brockman were found interspersed with various medical records, were not in chronological order, and are neither mentioned in nor a part of the medical records provided.  Thus, there is currently no way to determine whether they were created on or proximal to the dates listed on these personal writings or whether they were created after Mr. Brockman became aware that he was being investigated.  Because they cannot currently be corroborated, I refer to these documents below as "personal writings" and take the dates at face value for purposes of presenting this chronological listing.

December 2005

The earliest complaint of memory impairment identified in the records submitted for review is Mr. Brockman's personal writing bearing the date December 2005 in which he wrote in pertinent part:

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER DECLINE

MEMORY MUCH POORER

ABILITY TO WORK LONG HOURS STILL GOOD[3]

12/12/06

In Mr. Brockman's personal writing bearing the date 12/12/06, he used identical language:

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER DECLINE

---

[2]  Transcript and video of Dr. Darby's interview and examination of Mr. Brockman, 5/5/21, pp. 10-11.
[3]  Medical records and personal writings provided by Mr. Brockman, pp. 1375-1376.

MEMORY MUCH POORER

ABILITY TO WORK LONG HOURS STILL GOOD[4]

**COMMENT:** Although the repetition of identical or nearly identical passages in these seemingly annual personal writings suggests the use of a "cut-and-paste" technique in producing successive documents, this fact alone cannot distinguish between contemporaneous creation and ex post facto creation.

December 2007

In Mr. Brockman's personal writing bearing the date 12/12/06, he used nearly identical language:

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER DECLINE

MEMORY MUCH POORER

ABILITY TO WORK LONG HOURS STILL EXCELLENT[5]

December 2008

In Mr. Brockman's personal writing bearing the date December 2008, he wrote in pertinent part:

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER DECLINE

MEMORY MUCH POORER

ABILITY TO WORK LONG HOURS STILL EXCELLENT[6]

December 2009

In Mr. Brockman's personal writing bearing the date December 2009, he wrote in pertinent part:

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER SERIOUS DECLINE

MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.

---

[4]  Medical records and personal writings provided by Mr. Brockman, pp. 837-838 and 1377-1378.
[5]  Medical records and personal writings provided by Mr. Brockman, pp. 908-909.
[6]  Medical records and personal writings provided by Mr. Brockman, pp. 904-905.

IT IS NAMES THAT I MOST USUALLY NOTICE IT WITH, HOWEVER I AM
QUITE SURE THAT IT IS PROBABLY MEMORY OF EVERYTHING.

ABILITY TO WORK LONG HOURS STILL EXCELLENT[7]

December 2010

In Mr. Brockman's personal writing bearing the date December 2010, he wrote in
pertinent part:

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER SERIOUS
DECLINE.  I PROBABLY HAVE SOME BURNOUT – AS MY EFFICIENCY
AND EFFECTIVENESS ARE CONSIDERABLY DEGRADED.

MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF
PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.

IT IS NAMES THAT I MOST USUALLY NOTICE IT WITH, HOWEVER I AM
QUITE SURE THAT IT IS PROBABLY MEMORY OF EVERYTHING.

ABILITY TO WORK LONG HOURS STILL EXCELLENT[8]

December 2011

In Mr. Brockman's personal writing bearing the date December 2011, Mr. Brockman
wrote in pertinent part:

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER SERIOUS
DECLINE.  I PROBABLY HAVE SOME BURNOUT – AS MY EFFICIENCY
AND EFFECTIVENESS ARE CONSIDERABLY DEGRADED.  FORTUNATELY
THIS SITUATION HAS NOT WORSENED SINCE LAST YEAR.

MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF
PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.

IT IS NAMES THAT I MOST USUALLY NOTICE IT WITH, HOWEVER I AM
QUITE SURE THAT IT IS PROBABLY MEMORY OF EVERYTHING.

ABILITY TO WORK LONG HOURS STILL EXCELLENT[9]

12/19/11

---

[7]  Medical records and personal writings provided by Mr. Brockman, pp. 898-900.
[8]  Medical records and personal writings provided by Mr. Brockman, pp. 1387-1390.
[9]  Medical records and personal writings provided by Mr. Brockman, pp. 888-891.

PDA-0000032

Dr. Obenour's clinical notes of 12/19/11 in pertinent part read: "No history of syncope or significant memory loss, except for names."[10]

<u>December 2012</u>

In Mr. Brockman's personal writing bearing the date December 2012, he wrote in pertinent part:

> MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER SERIOUS DECLINE.
>
> THIS SPRING AND SUMMER I HAD SOME SERIOUS BURNOUT – AS MY EFFICIENCY AND EFFECTIVENESS WERE CONSIDERABLY DEGRADED. IT IS PROBABLY TIME FOR ME TO SELL REYNOLDS. THAT PROCESS IS CURRENTLY UNDERWAY.
>
> MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.
>
> IT IS NAMES THAT I MOST USUALLY NOTICE IT WITH, HOWEVER I AM QUITE SURE THAT IT IS PROBABLY MEMORY OF EVERYTHING.
>
> ABILITY TO WORK LONG HOURS EFFECIVELY WAS SERIOUSLY DEGRADED DURING THE SPRING AND SUMMER – BUT IS NOW RECOVERING SOMEWHAT.[11]

<u>12/14/12</u>

In his clinical notes of 12/14/12, Dr. Obenour wrote, "Age-related memory problems."[12]

<u>December 2013</u>

In Mr. Brockman's personal writing bearing the date December 2013, he wrote in pertinent part:

> MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER SERIOUS DECLINE.
>
> MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.
>
> IT IS NAMES THAT I MOST USUALLY NOTICE IT WITH, HOWEVER I AM QUITE SURE THAT IT IS PROBABLY MEMORY OF EVERYTHING.

---

[10]  Medical records and personal writings provided by Mr. Brockman, pp. 892-893.
[11]  Medical records and personal writings provided by Mr. Brockman, pp. 882-885.
[12]  Medical records and personal writings provided by Mr. Brockman, p. 881.

ABILITY TO WORK LONG HOURS EFFECTIVELY HAS PRETTY MUCH RECOVERED.[13]

## December 2014

In Mr. Brockman's personal writing bearing the date December 2014, he wrote in pertinent part:

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER SERIOUS DECLINE

MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.

IN A NEW, WEIRD PHENOMENA, - NAMES THAT I OUGHT TO REMEMBER LIKE ONE OF OUR MAIDS AND A RESTAURANT CLOSE BY THE HOUSE THAT I HAVE BEEN TO 20 TIMES OR MORE – YET I HAVE HAD REAL PROBLEMS REMEMBERING THESE TWO NAMES.

ABILITY TO WORK LONG HOURS EFFECTIVELY IS NOW PRETTY MUCH AS GOOD AS EVER NOW.[14]

## 12/16/14

On 12/16/14, Dr. Obenour wrote:

He notes some problems with name recall but in general his intellect is still intact and he still enjoys work . . .[15]

## September 2015

In Mr. Brockman's personal writing bearing the date September 2015, he wrote in pertinent part:

MY JOB AS CHAIRMAN/CEO OF REYNOLDS & REYNOLDS (5,000 EMPLOYEES) CONTINUES TO BE DEMANDING – BUT HIGHLY SUCCESSFUL AND REWARDING.

\*　　\*　　\*

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER SERIOUS DECLINE.

---

[13] Medical records and personal writings provided by Mr. Brockman, pp. 876-879.
[14] Medical records and personal writings provided by Mr. Brockman, pp. 912-915.
[15] Medical records and personal writings provided by Mr. Brockman, pp. 871-873.

PDA-0000034

MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF
PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.

IN A NEW, WEIRD PHENOMENA, - NAMES THAT I OUGHT TO
REMEMBER LIKE ONE OF OUR MAIDS AND A RESTAURANT CLOSE BY
THE HOUSE THAT I HAVE BEEN TO 20 TIMES OR MORE – YET I HAVE
HAD REAL PROBLEMS REMEMBERING THESE TWO NAMES.

ABILITY TO WORK LONG HOURS EFFECTIVELY IS NOW PRETTY MUCH
AS GOOD AS EVER NOW.

\*   \*   \*

UNFORTUNATELY I DON'T REMEMBER IF I GOT THE SHINGLES SHOT
OR NOT. (MEMORY PROBLEMS)[16]

## 11/6/15

In a clinic visit with K. Lance Gould, MD, on 11/6/15, Mr. Brockman reported
experiencing depression for the first time since taking Toprol.[17]

## 5/31/16

On 5/31/16, Mr. Brockman wrote a 2-page memorandum to Dr. Gould about his
recent bouts of atrial fibrillation.  This document, which was in the medical records
provided by the facility, resembles the writing style and formatting of Mr.
Brockman's unverified personal writings.  The document makes no mention of
memory problems and demonstrates Mr. Brockman's careful observation,
recollection, and organization and his logical approach to problem solving.[18]

## November 2016

In Mr. Brockman's personal writing bearing the date November 2016, he wrote in
pertinent part:

MY JOB AS CHAIRMAN/CEO OF REYNOLDS & REYNOLDS (5,000
EMPLOYEES) CONTINUES TO BE DEMANDING – BUT HIGHLY
SUCCESSFUL AND REWARDING.

\*   \*   \*

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER SERIOUS
DECLINE.

---

[16]  Medical records and personal writings provided by Mr. Brockman, pp. 1419-1425.
[17]  UT Physicians, pp. 57-58.
[18]  UT Physicians, pp. 44-45.

MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.

IN A NEW, WEIRD PHENOMENA, - NAMES THAT I OUGHT TO REMEMBER LIKE ONE OF OUR MAIDS AND A RESTAURANT CLOSE BY THE HOUSE THAT I HAVE BEEN TO 20 TIMES OR MORE – YET I HAVE HAD REAL PROBLEMS REMEMBERING THESE TWO NAMES.

ABILITY TO WORK LONG HOURS EFFECTIVELY IS NOW PRETTY MUCH AS GOOD AS EVER NOW.[19]

c. September 2017

In approximately September 2017, Mr. Brockman delivered a lengthy speech to Reynolds and Reynolds employees that was videotaped.  In this speech, Mr. Brockman was completely coherent, with no abnormalities of speech, no loss of attention, no lapse of memory, no misuse of language, no word searching, no loss of train of thought, and no confusion.  He did not read this speech, but he did glance at notes or the text of the talk.  His eyes swept the audience as he spoke.  His affect was appropriate to the context.  His facial movements may have been diminished, but certainly not "frozen," as for example, his small smile after finishing.  He moved carefully and slowly as he turned to his left to leave the lectern.  The content of this speech included details of his personal history and the history of the firm, the company's economic theory, which he described as his personal economic theory of small firms, including an emphasis on repetitive revenue, an exclusive focus on net profits, investment in product development, maintaining a "war chest," and other abstract concepts.  He said he sees himself as the "chief steward" of the company and works seven days a week to be the best steward he can be.  He claimed that the money is put back into the company, and that "the company looks after those who look after the company."  He said, "One of my goals is to never be in the news."[20]

> **COMMENT:**  This video contains some evidence of Parkinson's disease, at least when viewed in retrospect, but no evidence of cognitive impairment or dementia.

12/14/17

Records from a 12/14/17 examination by Jeffrey A. Kozak, MD, of Fondren Ortho, were scanned into the Baylor record at the time of Dr. Yu's 3/20/19 evaluation [see below] and indicated under the review of systems that Mr. Brockman's neurological history was "Positive for Memory Loss and Tingling," but his psychiatric history was

---

[19]  Medical records and personal writings provided by Mr. Brockman, pp. 1426-1434.
[20]  Video of Mr. Brockman speaking to Reynolds & Reynolds employees in approximately September 2017 [UCSH 0207346].

"Negative for Depression, Anxiety, Memory Loss, Mental Disturbance, Suicidal Thoughts, Mood Disorders, Paranoia, Sleep Disturbances and Eating Disorder."[21]

> **COMMENT:** If Mr. Brockman sought to show Dr. Yu documentation of a history of memory impairment, why did he provide only an obscure and internally inconsistent note from an orthopedic surgeon rather than the seemingly annual catalog of self-reported memory problems that is found only among the documents provided to his lawyers as a result of Dr. Darby's inquiry after Mr. Brockman volunteered, on 5/5/21, that he had additional medical records stored at his home?

1/16/18

In Mr. Brockman's personal writing bearing the date 1/16/18, he wrote in pertinent part:

> MY JOB AS CHAIRMAN/CEO OF REYNOLDS & REYNOLDS (5,000 EMPLOYEES) CONTINUES TO BE MORE DEMANDING THAN EVER – BUT HIGHLY SUCCESSFUL AND REWARDING.
>
> *       *       *
>
> MENTAL PROCESSES NOT AS GOOD – I AM HAVING MORE DIFFICULTY IN DEALING WITH THE VOLUME OF BUSINESS ISSUES.
>
> SHORT-TERM MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.
>
> IN A NEW, WEIRD PHENOMENA, - NAMES THAT I OUGHT TO REMEMBER LIKE ONE OF OUR MAIDS AND A RESTAURANT CLOSE BY THE HOUSE THAT I HAVE BEEN TO 20 TIMES OR MORE – YET I HAVE HAD REAL PROBLEMS REMEMBERING THESE TWO NAMES. THIS CONDITION IS UNCHANGED.
>
> ABILITY TO WORK LONG HOURS EFFECTIVELY IS NOW PRETTY MUCH AS GOOD AS EVER NOW. HOWEVER MY EFFICIENCY PER HOUR IS LESS.
>
> MY SENSE IS THAT I AM COMING TO THE END OF MY FULL-TIME, FULLY-ENGAGED BUSINESS CAREER.
>
> I AM GOING TO HAVE TO COME TO GRIPS WITH BEING LESS ACTIVE AND LESS INVOLVED[22]

---

[21] Baylor College of Medicine, pp. 854-858.
[22] Medical records and personal writings provided by Mr. Brockman, pp. 1408-1418.

**9/5/18: Bermuda Police Service raided the home of Evatt Tamine**

c. November 2018

Mr. Brockman delivered a speech at the Reynolds and Reynolds Company birthday party in approximately November 2018. As Mr. Brockman began speaking, he mentioned that he doesn't often address audiences, but rather spends a lot of time at home at his desk dealing with e-mail. He described the origin of the birthday party and the stewardship they share at the company. He recognized his wife Dorothy and their 50th anniversary, the spouses of the directors in attendance, everyone who has served in the military, executives of the Hendrick Companies, newly promoted Reynolds and Reynolds officers, and Dave Bates for his 35 years of service, followed by a story about how Dave was his first promotion. Mr. Brockman sometimes spoke off script, with charm, humor, and without apparent error. He used one slide and glanced at a script or notes throughout much of his talk, often looking up to make eye contact with the audience. His entire speech was completely coherent, with no abnormalities of speech, no loss of attention, no lapse of memory, no misuse of language, no word searching, no loss of train of thought, and no confusion. He smiled at times. He moved carefully and slowly as he left the lectern and stage. While seated in the audience watching the speaker, Mr. Brockman applauded appropriately. When he walked again to the stage (c. 52:08-52:20), Mr. Brockman moved slowly, with limited associated movement. He introduced an award video, then mistakenly tried to introduce another video prematurely, acknowledged his error with self-deprecating humor, and introduced other award winners. He had to repeat one word (1:08:05-1:08:15) in reading the text for an award recipient.[23]

> **COMMENT:** This video contains some evidence of Parkinson's disease, at least when viewed in retrospect, but no evidence of cognitive impairment or dementia.

11/2/18

An MRI of the brain without contrast was interpreted by Fanny E. Moron, MD, as showing "No intracranial abnormalities, particularly no disproportionate lobar atrophy."[24]

1/16/2019

Mr. Brockman was deposed in a civil matter as Chairman and CEO of Reynolds and Reynolds on 1/16/19, and his deposition was videotaped. He was able to name the lawyers he prepared with the prior day, except the surname of one of them (John) who was not present at the deposition. Throughout the deposition he was polite and socially appropriate. He reasonably questioned the predicate to a question,

---

[23] Video of Mr. Brockman speaking at the 2018 Reynolds and Reynolds Company birthday party in approximately November 2018 [UCSH 0210542].

[24] Baylor College of Medicine, 792-793; UT Physicians, 19-20.

took the time to read documents and exhibits from start to finish before responding to questions, read aloud from an exhibit adequately, and carefully avoided going beyond what he personally knew or recalled. He answered with subtle distinctions about the meaning of terms, whether a user ID was temporary or permanent, and other details. He recalled the meaning of acronyms, such as TAC meaning Technical Assistance Center. In response to questions incorrectly suggesting that software security enhancements occurred all at once, he explained that software security enhancements are not all released simultaneously. His testimony reflected detailed recollection of past events. For example, in a discussion of Exhibit 639 he acknowledged creating a document reflecting talking points for a phone call he expected would be imminent but did not occur until months later, he recalled that that he didn't cover all of the talking points when the call did occur, showed detailed memory for the conversation and its failure to provide a clear answer on a key question, and the fact that 45 minutes of the hour-long call was unproductive. As another example of his cognitive capacity, when asked if dealers left Reynolds and Reynolds over data access issues, he pointed out that Reynolds and Reynolds doesn't always learn why dealers left, doesn't have data correlating security concerns with dealers leaving, and doesn't have reason to believe more than a small fraction of dealers left for that reason, despite efforts to track reasons for leaving when possible. His facial movement was limited, and he drank carefully and slowly from a bottle during the deposition.[25]

> **COMMENT:** This video contains some evidence of Parkinson's disease, at least when viewed in retrospect, but no evidence of cognitive impairment or dementia.

<u>1/17/2019</u>

On the second day of this civil deposition, Mr. Brockman remained polite and respectful, provided articulate, relevant answers, made subtle distinctions, and demonstrated comprehensive knowledge of the industry. He did not accept the premises of all questions, demonstrated superior intelligence, and took the time to read exhibits, putting on his glasses to do so. He once mentioned some difficulty seeing what apparently was a table of numbers in small font. Throughout his testimony, he was coherent and thoughtful, with no evidence of confusion or difficulty processing ideas, words, charts, or numerical data. Shown various documents from 2014-2017, he recalled writing or reading them, the context, what was occurring at the time, and the basis of the points made. He repeatedly demonstrated intact long-term memory and short-term memory. He demonstrated intact abstract thinking as, e.g., when he explained that Reynolds and Reynolds does not have internal cost accounting because of the overhead costs; he said he'd rather have the productivity than the profitability numbers.[26]

---

[25] Transcript and video of the deposition of Robert Brockman In re. Dealer Management Systems Antitrust Litigation, 1/16/2019.

[26] Transcript and video of the deposition of Robert Brockman In re. Dealer Management Systems Antitrust Litigation, 1/17/2019.

**COMMENT:** In this two-day deposition, Mr. Brockman did display some motor signs of Parkinson's disease but no signs or symptoms of cognitive impairment or dementia.

1/30/19

The earliest complete neurological evaluation received for review was conducted on 1/30/19 by Joseph Jankovic, MD, and Neurology Fellow Daniel Savitt, DO, on referral from James Pool, MD, and Stuart Yudofsky, MD. The portions relevant to cognitive function and possible REM sleep disorder are extracted here:

> The onset of symptoms began 1.5 years ago with concentration and memory difficulty. He developed depressive symptoms about 6 months ago for which bupropion was started 2 months ago. Since that time, he has noticed an improvement in his thinking and memory. . . .

> He also began acting out his dreams at nighttime 2-3 years ago, kicking and punching in his sleep. . . . his wife notices slower speech . . .

>                    *        *        *

> The patient denies hallucinations, delusions, insomnia . . . . The patient has depression, anxiety, and memory loss. The patient has stiffness, gait imbalance, and hearing abnormalities.

>                    *        *        *

> There is appropriate mood and affect.

>                    *        *        *

> The patient is alert and oriented to person, time, and place. Speech is fluent with good comprehension. There are no abnormal perceptions, hallucinations, delusions, or illusions. The patient is able to follow three-step commands. There is no right/left disorientation, ideomotor or constructional apraxia, or evidence of ADHD or OCD. A MoCA examination was administered and the patient received a score of 19/30.

>                    *        *        *

> He has also noticed . . . dream-acting behavior (REM-Behavioral Disorder) . . . His examination is significant for a MoCA of 19/30

>                    *        *        *

> The following tests were requested:

PDA-0000040

-DaTscan to evaluate for dopaminergic deficiency and differentiate between vascular parkinsonism and idiopathic Parkinson's disease.
-Has appointment scheduled for neuropsychiatric testing.
-Will place referral to Stromatt driving evaluation due to concerns for safety with driving.
We prescribed the following medications and treatments:
-Start carbidopa/levodopa 25/100 and titrate to 2 tablets three times daily. . .

\*     \*     \*

**Visit Diagnoses**
Parkinson's disease
Cognitive decline
REM behavioral disorder[27]

**COMMENT:** Findings of this evaluation are consistent with the presence of Parkinson's disease. This is the sole mention of "punching" found in the record in connection with inquiries for the presence of a REM behavior disorder; elsewhere, only kicking is mentioned except where subsequent evaluators relied on this evaluation. The MoCA score of 19/30 (which, if valid, would indicate mild cognitive impairment) is the first seemingly objective evidence of cognitive decline found in the record and reflects performance while cognitive function is obviously being tested.

## 2/14/2019

Dopamine Transporter Imaging (DaTscan) conducted on 2/14/19 was interpreted as showing "Severe loss of dopaminergic neuronal function in the bilateral dorsal striata with loss greater on the right compared to the left."[28]

**COMMENT:** This finding is consistent with Parkinson's disease but is uninformative about Mr. Brockman's cognitive function.

## 2/19/19

A progress note written by Joseph Jankovic, MD, on 2/19/19 reads:

I just spoke with Mr. Brockman to inquire about his response to Sinemet. He is currently taking Sinemet 25/100 2 tabs tid and is able to tolerate the medication well. He has so far noted minimal improvement in his slowness and gait and has been able to resume his exercise program. I also discussed with him the results of DaTscan,

---

[27] Medical records and personal writings provided by Mr. Brockman, pp. 36-43.
[28] Medical records and personal writings provided by Mr. Brockman, p. 90; UT Physicians, pp. 19-20.

performed on 2/14.  He understands that the scan shows evidence of severe dopaminergic deficiency especially in the R striatum.

He spoke with Dr. Yudofsky this morning and was prescribed Trazodone 50 mg qhs to help him with his insomnia and early morning awakening which he plans to initiate tonight.  He is scheduled to see Dr. York for neuropsychological assessment on 3/1/19.  He is concerned about his cognitive decline, exacerbated by recent business-related stressors.[29]

3/1/19

In the first of three neuropsychological assessments by Dr. Michelle York, Mr. Brockman reported seeing a bug on the floor during testing that neither Dr. York nor Mrs. Brockman could see.  Based largely on the testing she conducted, Dr. York diagnosed "dementia of mild to moderate severity."  Among Dr. York's recommendations in this and subsequent evaluations were that Mr. Brockman use a dry-erase board and memory station in his home and that he use jigsaw and crossword puzzles.[30]

COMMENT:  This is the earliest use of the term "dementia" to describe Mr. Brockman's condition that I was able to identify in the records received for review.  The validity of Mr. Brockman's performance in the testing that led to that diagnosis has been called into question and will be addressed in Dr. Denney's report.

3/13/19

Joseph Jankovic, MD, saw Mr. Brockman for a follow-up visit on 3/13/2019 and wrote:

The patient states he is worse mentally and physically despite levodopa.  Although he had slight improvement in his motor functioning initially with low dose levodopa his motor and mental functioning deteriorated as he gradually increased dosage.  According to wife he has a "zombie-like effect" for a few minutes after each dose of Sinemet.  He has increasing difficulties getting in and out chair and car and feels unsteady.  He avoids stairs and long-distance driving.  He is most concerned about his short-term memory.   His RBD [REM behavioral disorder] has improved since Dr. Yudofsky placed him on Trazodone.

\*       \*       \*

---

[29]  Baylor College of Medicine, p. 742.
[30]  Report of Michele York, Ph.D., re. neuropsychological evaluation of Mr. Brockman on 3/1/19.

We discussed the results of neuropsychological testing and the presence of dementia. Although Dr. York suggested DLB [dementia with Lewy bodies] he has never had hallucinations or fluctuations.[31]

<u>3/20/19</u>

On 3/20/19, Mr. Brockman was seen by Melissa Yu, MD, for a memory evaluation requested by James Pool, MD. Mrs. Brockman and their son accompanied Mr. Brockman to this appointment, and the record is silent as to which of these persons contributed to completing the patient questionnaire. Responses to the patient questionnaire completed at the time of this evaluation indicated that Mr. Brockman had been having "memory difficulties" for eight months that make every day living for the patient more difficult or complicated, including "some loss" of ability to perform household tasks, remember a short list of items, "find way about outdoors/indoors," ability to find way around familiar streets, ability to grasp situations or explanations, and ability to recall recent events. He had given up or stopped driving a car one month previously, coinciding with the onset of difficulty traveling alone.

Nonetheless, he did not forget where he left things or forget phone numbers. He did not become confused as to time, where he was, or his age or other personal information. He did not see something that was not actually there. Moreover, he did not have trouble expressing himself in words, say one word when he meant another, have trouble finding words, have trouble understanding reading, have trouble balancing a checkbook, have trouble operating a television, have trouble dialing a phone, or get lost in his own home. He was said to have used incomplete sentences, hesitated, or stopped while talking over the previous eight months.[32]

Records of Dr. Yu's evaluation read in pertinent part:

> Memory loss is reported beginning at least back to November 2017 in a Fondren Orthopedics progress note scanned into the chart.

*     *     *

> He now presents for memory disorders evaluation. He reports always having "superior memory." He reports onset of symptoms about 2 years ago. His wife reports some symptoms about 3 years ago with "slowing down" and then symptoms became much more obvious about 9 months ago associated with a stressful life event. His son notes that he repeats himself at times. He reports mild progression since that time.

> He reports always misplacing objects. He reports minimal word finding issues but difficulty with spelling. He reports minimal difficulty with

---

[31] Baylor College of Medicine, pp. 714-716.
[32] Baylor College of Medicine, pp. 684-696.

names.  He reports some difficulty remembering to take his medications.  He has stopped driving at his physician's request.  No driving incidents were reported but his wife notes that he drives slower.  He reports on trouble managing finances. . . . He notes some difficulty with planning out tasks at work, family notes that he doesn't initiate activity like he used to.

. . . He describes his mood as "pretty good" but notes feeling shaken about his neuropsychological test results.  His son reports that his ability fluctuates (he's had him draw clocks at various times).  He reports episodes of "blankness" associated with less interaction alternating with improved cognition.  His son notes significant fluctuations in terms of his decision making abilities, with good days and bad days. . . .

. . . At least four episodes of dream enactment behavior is reported and snoring – both have improved with trazodone . . .

He reports one episode of visual disturbance – saw a rainbow/possible visual aura about 8 years ago.  No other visual phenomena are reported with the exception of a possible hallucination during neuropsychological testing – wife notes it was a "bad day."  No auditory hallucinations are reported.

\*     \*     \*

MMSE 26/30 (7s), 25/30 (spelling)  Definite visual issues noted with significant issues noted drawing clock and intersecting pentagons.  Clock drawing 2/4 (circle, numbers, unable to indicate correct time.  Numbers on outside of clock)

\*     \*     \*

Differential includes Dementia with Lewy Bodies or Parkinson's Disease with dementia.  Time course and fluctuations in cognition are more suggestive of DLB.[33]

**COMMENT:**  The only compelling evidence of fluctuations in cognition reflect Mr. Brockman's markedly impaired performance when he knows his cognitive abilities are being tested.  No stressful life events that could explain his symptoms having become "much more obvious" were documented to have occurred nine months before this evaluation, but the Bermuda Police Service raid had occurred six months earlier.  This is the first description I found in the records of Mr. Brockman having difficulty remembering his medications or managing his finances; these claims happen to correspond precisely to the examples given in

---

[33] Medical records and personal writings provided by Mr. Brockman, pp. 74-80.

*DSM-5* for Criterion B of the diagnostics criteria for a diagnosis of Major Neurocognitive Disorder: "The cognitive deficits interfere with independence in everyday activities (i.e., at a minimum, requiring assistance with complex instrumental activities of daily living such as paying bills or managing medications)."[34]

4/1/19

In a clinic visit with Dr. Gould on 4/1/19, Mr. Brockman, his wife, and his son, all reported that his then-current dose of Sinemet caused "mental stunning," made him unable to focus or do simple mental tasks. Dr. Gould identified drug interactions that could cause these effects and altered the doses of these medications.[35]

> **COMMENT:** Although this was the dose of medication at the time of Dr. York's 3/1/19 testing, I believe medication-related effects are insufficient to account for test results that made Mr. Brockman appear to be demented.

4/5/19

In a 4/5/19 letter to his treating doctors seeking advice before a fishing trip, Mr. Brockman wrote:

> I am Chairman and CEO of a large tech company with over 5,000 employees and 25,000 customers so I must make endless executive decisions. My long term memory is good. It used to be almost perfect.
>
> On one Sinemet three times a day, I can perform my duties. However, on two Sinemet three times a day, I can work, but it is more difficult because I feel "drugged."[36]

7/18/19

In a meeting with counsel on 7/18/19, Mr. Brockman uncharacteristically asked to direct the meeting and presented a binder of medical reports illustrating why he was unable to assist counsel. This was the first time Mr. Romatowski had encountered a client with cognitive problems bring up the issue of his cognitive problems.[37]

---

[34] American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, 5th Ed. Arlington, VA: American Psychiatric Association, 2013, at p. 602.
[35] UT Physicians, pp. 17-18.
[36] Medical records and personal writings provided by Mr. Brockman, pp. 204-205; UT Physicians, pp. 13-14.
[37] Dr. Denney's Interview of Peter Romatowski, 6/15/21, at p. 3.

**COMMENT:** Those with severe mental impairment often minimize or deny their impairment, while malingerers often call attention to their claimed impairment.

9/18/19

On 9/18/19, Mr. Brockman testified at a Federal Trade Commission Investigational Hearing in the Matter of CDK Global and Reynolds and Reynolds. Apart from a few points noted below, Mr. Brockman was intelligent, responsive, coherent, logical, perceptive, and articulate in his answers to many hours of questioning about his business practices, Reynolds and Reynolds, its software, and its competitors and partners. There were a few instances in which Mr. Brockman did not recall details from years previously, for example:

Q: Am I correct in my understanding that at some point after UCS bought Reynolds that there was a breach of contract suit that went on between Reynolds and General Motors?

A: I think there was something, but frankly, I don't remember exactly the details of what that was all about. [P. 33]

In response to a question about an acquisition from Ford, he gave a detailed historical recollection of events that occurred in 1992, even remembering the name of a key player at the time, though he caught his own error of having incorrectly said it occurred in 1972 rather than 1992 [pp. 38-40].

Another readily corrected example of Mr. Brockman misspeaking also illustrates his superior cognitive functioning:

Q: And CDK was going to put its apps in through RCI. What is your understanding of why that hadn't happened prior to this 2013-2015 time period?

A: Well, they didn't need to before that because they had their DMI, Authenticom, busily doing it for them.

Q: In that answer you said DMI and Authenticom. Did you mean DMI and IntegraLink?

A: IntegraLink. Excuse me. I get names confused. I know a little bit about a lot of things, and of course, the corollary to that is it means over time I will know everything about nothing. [Pp. 62-63]

In one instance, Mr. Brockman said "infer" when he apparently meant "imply," which is a common usage error [p. 132].[38]

> **COMMENT:** Mr. Brockman's demonstrated cognitive abilities during this testimony are not consistent with the presence of mild or moderate dementia, despite some evidence of mild memory difficulty.

<u>10/1/19</u>

In Mr. Brockman's personal writing bearing the date 10/1/19, he wrote in pertinent part:

> Memory issues have become more defined
> -recall of names has gotten worse
> -dates are in numerous cases are almost completely gone
> -unless I was deeply involved with an event or issue – or it was very recent—I have no better than partial recall—and frequently no recall at all.
>
> *     *     *
>
> -reduced memory ability
> -reduced organizational ability.[39]

<u>c. November 2019</u>

In approximately November 2019, Mr. Brockman spoke at the 2019 Reynolds and Reynolds Company birthday party. This speech was videotaped and revealed no evidence of cognitive impairment or dementia. In the video, he appears to have a stooped posture, shuffling gait, slow movement when turning, and some difficulty with pronunciation and speech fluency [perhaps the hypokinetic dysarthria seen in Parkinson's disease]. In one instance, he said "our birthday apartment" and corrected himself to say our "our birthday event."[40]

> **COMMENT:** My observations of Mr. Brockman in this video support a diagnosis of Parkinson's disease but not a diagnosis of cognitive impairment or dementia.

<u>12/3/19</u>

Dr. York's second evaluation of Mr. Brockman, on 12/3/19, conducted as a retained expert of defense counsel, reached the same diagnosis as the previous evaluation:

---

[38] Transcript of 9/18/19 testimony at Federal Trade Commission Investigational Hearing in the Matter of CDK Global and Reynolds and Reynolds.
[39] Medical records and personal writings provided by Mr. Brockman, pp. 195-196.
[40] Video of Mr. Brockman speaking at the 2019 Reynolds and Reynolds Company birthday party in approximately November 2019 [UCSH 0212042].

"dementia of mild to moderate severity." On this occasion, which she characterized as a "forensic evaluation" in contrast to her previous "clinical evaluation," she also offered the opinion that he was "unable to participate and aid in his own defense."[41]

> **COMMENT:** Dr. York was offering an opinion as to Mr. Brockman's competency to stand trial before he had even been indicted or charged with any crime. There is no indication that she evaluated his competence to stand trial, though she did learn that he was worried that the government was asking his business associates questions about him. It appears that she relied on his testing performance to diagnose dementia and assumed this would make him "unable to participate and aid in his own defense."

Early 2020

Tommy Barras, Mr. Brockman's successor as President and, later, as CEO of Reynolds and Renolds Company, testified that in early 2020, he had no doubt about Mr. Brockman's ability to lead Reynolds and Reynolds.[42]

1/20/20

On 1/20/20, Mr. Brockman first saw treating neurologist Eugene Lai, MD, on referral from James Pool, MD. In response to a new patient questionnaire apparently completed in Mr. Brockman's handwriting, the reason for the visit was given as "Parkinson's symptoms, stiffness, memory lapses, Bradykinesia, dopamine loss as indicated by Datscan, Depression." Mr. Brockman wrote that he had been diagnosed in late 2018 or early 2019 and had been treated by Joseph Jankovic, MD with Sinemet and an Exelon patch. In his consultation notes, Dr. Lai wrote:

> . . . He has a 3-4 year history of memory decline. He is repeating himself, misplacing personal objects, and losing his train of thought. He has difficulty with multi-tasking, taking medications, spelling, and word-finding. He has difficulty managing his personal finances and he has a bookkeeper. He does not initiate activities as he used to. His wife states that his ability to make decisions fluctuates. He has episodes of blanking or tuning out associated with reduced interactions with his surroundings. He was advised not to drive by his physician, but he is still driving in closeby familiar areas. About 2½ years ago, he started slowing down with imbalance and walking changes. His steps became shorter and he developed a stooped posture. He also experienced depression later and bupropion was started which has helped to improve his thinking and memory. . . . He began snoring, kicking, punching, and acting out his dreams during sleep about 2-3

---

[41] Report of Michele York, Ph.D., re. neuropsychological evaluation of Mr. Brockman on 12/3/19.

[42] Transcript of deposition of Norman Thomas Barras, Jr., in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 4/15/21 [redacted], p. 50.

years ago.  He was diagnosed with REM sleep behavior disorder and was prescribed clonazepam that has helped his symptoms.

\*      \*      \*

Mental Status:  He is alert and oriented to person, place, time, and situation.  Montreal Cognitive Assessment (MoCA) score is 20/30, missing 2 points with visuospatial/executive function, 2 points with serial 7 subtraction, 1 point with language fluency, and 5 points with delayed recall.  Mood and affect are appropriate.  Speech is slightly hesitant.  Comprehension and expression are slower.

\*      \*      \*

IMPRESSION:  This 78-year-old man presents with a 3-year history of progressive Parkinson's disease symptoms, cognitive decline, depression, and insomnia.  His MoCA test score is 20/30.  His neurological examination is significant for cognitive deficits, rigidity, bradykinesia, sensory impairment, and unsteadiness.  Therefore, his clinical findings are more consistent with the diagnosis of Parkinson's disease with mild to moderate cognitive impairment.  Differential diagnoses include: dementia with Lewy Bodies, vascular parkinsonism, other secondary parkinsonism, or Parkinson plus syndromes.  He has signs of peripheral polyneuropathy with gait imbalance.  He also has rapid eye movement (REM) sleep behavior disorder.[43]

March 2020

Bob Schaefer testified that through March 2020, Mr. Brockman was the decision maker for the line of business Mr. Schaeffer headed, and Mr. Brockman was in control of that business.  Mr. Brockman made decisions regarding pricing; interface integration; RCI vendors; desking; any security enhancements and communications to the market about security enhancements; contract decisions and directions for all contracts; and direction for the entire data services business and desking, communicating primarily by e-mail several times a week.  While working closely with Mr. Brockman, Mr. Schaefer had no reason to think that Mr. Brockman could not lead the company, thought of him as mentally sharp and intelligent, and saw no sign of diminishing mental capacity or dementia.[44]

6/2/20

Seth P. Lerner, MD, commented in 6/2/20 clinical notes, "having some memory issues."[45]

---

[43]  Houston Methodist, pp. 118-142.
[44]  Transcript of deposition of Robert Schaefer in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 3/18/21 [redacted], pp. 59-63.
[45]  Baylor College of Medicine, pp. 160-163.

<u>6/3/20</u>

In June 2020, Tommy Barras was appointed President of Reynolds and Reynolds Company, reporting to Bob Brockman, the Chairman and CEO.[46] In an e-mail to Mr. Barras on 6/3/20, Mr. Brockman wrote that they should be talking every day about any important decision "before it is leaked or published," and Mr. Barras testified that when he was President and Mr. Brockman was CEO, they did talk about every important decision.[47] [Norman Thomas Barras, Jr., Depo., 4/15/21, p. 58].

<u>6/3/20</u>

On 6/3/20, an e-mail was sent throughout Reynolds and Reynolds Company in which Mr. Brockman announced significant management changes and wrote about continuing as CEO for the time being.[48]

**10/1/20:  Federal indictment made public.**

<u>10/7/20</u>

As a result of her third evaluation, conducted as a retained expert for defense counsel and which she characterized as "forensic," Dr. York diagnosed Mr. Brockman with "dementia of mild to moderate severity" and opined that he was "unable to participate and aid in his own defense," as she had previously.  In her report, Dr. York described a delusional episode that Mr. Brockman's son had subsequently reported to her in a telephone call as having occurred in the early morning hours of 10/19/20.

>    **COMMENT:**  As previously, Dr. York's opinions appear to be based on test performance, historical information provided by the Brockman family, and the assumption that if Mr. Brockman is demented, he must be incompetent to stand trial.  The incident reported to her by Mr. Brockman's son is not referred to in any other medical records and was not described by Mr. Brockman.

<u>10/22/20</u>

A CogniSense report dated 10/22/20 and signed by James Pool, MD, provides the background information that Mr. Brockman's "wife (Dorothy) and son (Robert) report deteriorations in cognitive functions."  The test results are reported as:

---

[46]  Transcript of deposition of Norman Thomas Barras, Jr., in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 4/15/21 [redacted], pp. 10 and 24.
[47]  *Id.*, p. 58.
[48]  E-mail to Reynolds and Reynolds, 6/3/20.

Total score is 13 out of 29 points. This score falls below the cutoff for dementia in patients of this age and educational level and is typically associated with Major Neurocognitive Disorder, moderate (formerly Moderate Dementia).[49]

November 2020

Tommy Barras testified that he was appointed Chairman and CEO of Reynolds and Reynolds in November 2020 as Bob Brockman resigned as Chairman and CEO.[50] Mr. Barras testified that he first became aware of Mr. Brockman having any illness (namely, Parkinson's disease and kidney and bladder disease) that could affect his ability to lead the company when, as he understood it, Mr. Brockman exercised the disability provision of his employment agreement in November 2020.[51] Until then, he had no reason to think that Mr. Brockman was unable to lead Reynolds and had no reason to doubt his mental capacities, even though he also testified that he had for years witnessed Mr. Brockman forgetting things, not recalling some decisions, and being unable to grasp technology discussions, all of which Mr. Barras attributed to aging and stress.[52]

November 2020

In Mr. Schaefer's opinion, Mr. Brockman did a good job running Reynolds and Reynolds as CEO until Mr. Brockman left the company.[53]

2/2/21

The most recent assessment by a treating neurologist is a 2/2/21 follow-up visit with Eugene Lai, MD, attended by Mr. and Mrs. Brockman. Dr. Lai wrote, in pertinent part:

> . . . He has retired as CEO of his software company but is still under a lot of stress. Sleep is better with trazodone and clonazepam. . . . Basic activities of daily living are independent, but slower. . . . Moods are stressed and depressed. His wife needs to help him in organizing his responsibilities and taking care of legal issues. Memory is impaired but stable. . . . He takes carbidopa/levodopa 25/100 2 tablets only 2 times a day at 8 am and 8 pm, and he typically forgets his 2 pm dose.

[49]  Baylor College of Medicine, p. 54.
[50]  Transcript of deposition of Norman Thomas Barras, Jr., in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 4/15/21 [redacted], pp. 10, 25-26, and 28.
[51]  Transcript of deposition of Norman Thomas Barras, Jr., in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 4/15/21 [redacted], pp. 51-54.
[52]  Transcript of deposition of Norman Thomas Barras, Jr., in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 4/15/21 [redacted], pp. 52 and 54-55.
[53]  Transcript of deposition of Robert Schaefer in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 3/18/21 [redacted], pp. 60-61.

There is no neurological complaint.  He has slowness, stiffness, and gait imbalance.  He lacks energy and is inactive.  He denies recent headache, dizziness, weakness, confusion, dysarthria, dysphagia.

*     *     *

They are in the process of moving to the River Oaks area closer to their son.

*     *     *

MS: He is alert and attentive. O x person, place, and time.  He follows complex verbal commands.  Memory is 4/4 immediate -> 0/4 delayed. Comprehension and expression are slower.  Insight and judgment are mildly impaired.  MoCA score (1/8/2020) = 20/30.

*     *     *

Clinical findings are consistent with Parkinson's disease with mild cognitive impairment.  He is under a lot of stress trying to still run his company by himself, and his wife is also stressed out.  He has signs of mild cognitive impairment and peripheral neuropathy with gait imbalance.  Neurological and cognitive examinations are without notable change from last visit.[54]

3/12/21

A PET brain metabolic evaluation ordered by Dr. Darby and conducted on 3/12/21 was given this interpretation, echoing the clinical history of dementia with Lewy bodies and Altzheimer's disease with early onset on which the neuroradiologist evidently relied:

Findings are very mild, but suggestive of early neurodegenerative disease, either early Alzheimer's disease or dementia with Lewy bodies (Parkinson's disease with dementia).  Findings are unlikely to represent frontotemporal dementia.[55]

**COMMENT:**  This interpretation of ambiguous "very mild" findings would appear to have been biased by the interpreter's foreknowledge of prior diagnoses of dementia, a phenomenon known as confirmation bias.

4/29/21

---

[54] Houston Methodist, pp. 30-32.
[55] PET Brain Metabolic Evaluation, Houston Methodist Hospital, 3/12/21.

A sleep study ordered by Dr. Darby and conducted on 4/29/21 documented severe obstructive sleep apnea but no evidence of REM behavior disorder; the duration of REM sleep may have been too short (29.5 minutes) to provide an adequate sample. Ruckshanda Majid, MD, recommended CPAP titration and a repeat study.[56]

> **COMMENT:** Severe obstructive sleep apnea is a treatable condition associated with premature death, daytime drowsiness, and impaired mental functioning. The repeat sleep study has been twice scheduled and twice cancelled because of hospitalizations for sepsis.

5/5/21

When interviewed by Dr. Darby on 5/5/21, Dorothy Brockman reported that her husband had memory problems consistent with those she had reported to treating doctors previously, and she stated that she had taken over management of his medications and the couple's finances. She described his having had a precipitous decline when he discovered the government was investigating. She had not observed clear fluctuations in her husband's mental functioning. She described her husband kicking her during sleep, for which he was prescribed Trazodone 4-5 years previously, with some kicking thereafter. Asked about hallucinations, she said they usually came out at doctors' offices when he sees movement of "a spec of dust." She reported having seen Dr. Beth Yudofsky for back pain.[57]

> **COMMENT:** Mrs. Brockman's reports about her husband's sleep behavior are the sole basis for a diagnosis of a REM sleep disorder, as the only objective measurement (the sleep study) was inadequate in duration and did not support this diagnosis. Moreover, Mrs. Brockman's description provided only weak support for this diagnosis. Likewise, her description of hallucinations at doctors' offices, apparently based a single event during an evaluation by Dr. York, is inadequate to support a finding that he has suffered hallucinations when not delirious. Mrs. Brockman's explanation of why she saw Dr. Beth Yudofsky is contradicted in Mr. Brockman's personal writings, which give markedly different reasons for that long-standing treatment relationship.

5/31/21

Records from Houston Methodist Hospital indicate that Mr. Brockman presented there on 5/31/21 with signs of a urinary tract infection and confusion. A note on that date reads in pertinent part:

> Pt is unable to provide much history due to altered mental status, though his family who is at bedside was able to assist. Yesterday morning, they noticed he was more tired and had taken a nap. Later

---

[56] Polysomnography Report, Memorial Hermann Hospital Texas Medical Center, 4/29/21.
[57] Dr. Darby's notes of his interview of Mrs. Brockman, 5/5/21.

on, he began saying things that didn't make sense, in addition to not eating very much, and staring off blankly. This prompted them to bring him to HMH for further evaluation. . . .

Per chart review, pt was hospitalized from 3/15/21-3/19/21 at HMH with Klebsiella pneumoniae growing in his urine and blood cultures for which he was treated with Cefazolin and discharged home on Ciprofloxacin. . . .

Results of neurological examination were described: "Alert, talkative, though answers to questions don't make sense."[58]

6/6/21

On 6/6/21, geriatric consultant on Sarah E. Seleck, MD, noted:

. . . he was alert but oriented and easily distracted today. His wife gives a history of PD going back >5 years and consideration for dementia > 1 year who has had significant decline with each of last two urine infections and now has been agitated in the hospital. He was started on Seroquel 50 (100mg was ordered but discontinued). Today he is direct-able but inattentive. His familiar caregiver and wife are present.

I would recommend consideration of starting his home meds for sleep and constipation and decreasing the Seroquel to 25mg or lower as he sounds to be improving with aim of decreasing the low potential for producing extrapyradmidal side effects esp since wife says no auditory nor visual hallucinations at home.[59]

6/7/21

On 6/7/21, psychiatric consultant Inna D'Empaire, MD, noted:

. . . The pt has had intermittent agitation including last evening when he was attempting to hit staff and climbing out of bed, ultimately falling, worsening confusion in the evenings, including visual hallucinations. Psychiatry asked to consult for agitation.

The pt is seen and evaluated. He is pleasant and calm but confused. He does not recognize his home care giver at bedside and does not recognize that he is in the hospital. He tells us that he was some place else last night. Denies pain. Reports having visual hallucinations, seeing "black things" that move that he tries to swat and he is not able to convince his wife Dorothy that they are present.

---

[58] Houston Methodist, 2nd production, pp. 3-5.
[59] Houston Methodist, 2nd production, p. 15.

> Wife states that prior to his admission in March, he was independent in ADLS but now is dependent in all ADLS and IADLS. He has a caregiver in the home during the day and the wife assists at night. . . .[60]

A CT scan of the head on 6/7/21 ordered for minor head trauma [the fall, in an elderly man taking an anti-coagulant] was read as an "Unremarkable CT of the head with no evidence of acute hemorrhage or mass effect."[61]

6/11/21

Mr. Brockman was reportedly discharged from Houston Methodist Hospital on 6/11/21,[62] but records of his hospitalization and discharge subsequent to 6/7/21 have not yet been received for review.

**EXAMINATION**

At the outset of the interview of Mr. Brockman on 5/18/21, he was informed as to the identities of the examiners, the retaining party, the lack of confidentiality, the absence of a treatment relationship, and the forensic purpose. He was told that he was free to ask for a break or to speak to his attorneys at any time and was told the expected schedule for the day. He was reminded of these on 5/20/21, as well.

Mr. Brockman arrived each interview day on time, in casual clothing, and in the company of his caretaker.

For nearly two full days of interviews, Mr. Brockman demonstrated himself to be an intelligent, charming gentleman who consistently espoused placing high value on hard work, saving, family, loyalty, stewardship, and other traditional conservative and Protestant values. He credited his maternal grandmother with having taught him to work, save, and build.[63] He credited his maternal grandmother and his mother with sparking his subsequent philanthropy.[64] Asked to describe charities he had favored over the years, he mentioned wounded military veterans, major projects at Rice University, the church, a scholarship program at Texas A&M.[65] Asked if there were others, he replied, "There's ben—there's been some other lesser contributions in the—in the medical—in the medical center. I'm trying to

---

[60] Houston Methodist, 2nd production, p. 23.
[61] Houston Methodist, 2nd production, p. 28.
[62] E-mail from Kathy Keneally to Corey Smith, et al., re. "US v. Brockman: update on medical issues," 6/17/21.
[63] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 11-12.
[64] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 65-66.
[65] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 66-68.

PDA-0000055

think.  There's—that's not all, but that's—that's principally all of it."[66]  In a later interview, he continued to minimize his contributions to Baylor Medical College:

PD: If I understand correctly, you have helped fund Dr. Yudo—Dr. Yudofsky's research program and his programs at Baylor?

RB: I have not.  You know, the trust has.

PD: The trust has?

RB: Uh-huh [affirmative].

PD: And I noticed that you didn't mention Baylor in the list of charities that you provided on Tuesday, and it wasn't on the list that you supplemented yesterday either.  Is there a reason you didn't mention Baylor?

RB: No, I just—you know, to be asked cold, you know, everything that's happened over a number of years, that one I didn't—that part I didn't get right.

PD: How much overall have you given to Baylor Medical, or the trust?

RB: I'm—I don't know just on a flatfooted basis how much, but I would believe it would be probably in the million dollar range.

PD: In the million dollar range?

RB: Uh-huh [affirmative].

PD: Could it be in the 30 million dollar range?

RB: I don't think so.  I think that that number's too big.[67]

He spoke disparagingly only of those he regarded as immoral, lazy, parasitic, or stupid and the cooperating witness he described as having betrayed him and/or stolen from him or the Trust.

He spoke intelligently about abstract business concepts, providing cogent explanations of management processes.[68]  He acknowledged remaining in contact with his successor as CEO of Reynolds and Reynolds Company, and said he

---

[66]  Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 68.

[67]  Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 80.

[68]  Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 52-54.

continues "in an advisory relationship in that he talks about things, and I give him my opinion, and he does what he wants."[69]

His remote memory was superior to the extent this could be judged or validated. For example, he mentioned his father's training on the precise, mechanical Norden Bombsight during World War II,[70] and his description is consistent with that of historical sources.[71] He described his paternal grandfather's invention of the Brockman Electric Doormat during the Depression,[72] and records from the United States Patent Office indicated that an application for a patent on an Electric Mat Switch was filed on 12/5/27 by Robert H. Brockman and Patent No. 1,776,992 was granted on 9/30/30.[73] He also said his paternal grandfather invented the differential used in all automobiles and that he had the original patent dated 1905,[74] and records from the United States Patent Office indicated that an application for a patent on a Differential Gear was filed on 7/27/04 by Robert H. Brockman and Patent No. 808,002 was granted on 12/19/05.[75]

With respect to short-term memory, he occasionally lost his train of thought[76] (but also recalled what we had been speaking about after a break[77]) and had word-finding difficulty.[78] In describing his medical history, he volunteered that three doctors had diagnosed him with dementia, the context of which is shown in this exchange:

> RB: Yeah, okay. I didn't remember the name. And then they get all the equipment laid out including the cyst—the cystoscope itself. And so when Seth Lerner walked in his first thing—his first words are, "How are you doing, Bob?" And I said, "Well, really not worth a crap. I'm—I'm not feeling good." He said, "Well, when I get—when we get done with this, let me talk to you about this." So the

---

[69] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 54.

[70] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 6.

[71] https://www.maxwell.af.mil/News/Display/Article/420450/the-enigma-of-the-norden-bombsight/; https://www.historynet.com/not-so-secret-weapon-the-norden-bombsight.htm; http://www.twinbeech.com/norden_bombsight.htm.

[72] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 13-14.

[73] https://patents.google.com/patent/US1776992.

[74] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 14.

[75] https://patentimages.storage.googleapis.com/1f/77/56/d67b217d85dcd2/US808002.pdf.

[76] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 20 and 59; Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 87.

[77] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 48.

[78] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 44 ("sepsis"), 46 ("Asperger's"), 62 ("sepsis"), 68 (name of the architect who built the opera hall at Rice University), 75 ("Parkinson's").

PDA-0000057

cystoscopy proceeded uneventfully and then after as I was getting dressed I'm—I stopped and talked to him and he said, "I—there's a—a doctor that you need to go see here. His name is—his last name is Poole, P-O-O-L-E. You need to go talk to him." So I made an appointment, went to see Dr. Poole and he said—there was a lot of hmmm, and you know, note taking and—as I described everything. And he said, "I've got a couple other doctors I think you need to see." And I don't remember their names, they're in obviously my medical records. But I went to see them and they said, "Well, we got some more tests that we would like you to take." And so I—you know, did the tests and that's where I first started being diagnosed with Parkinson's. And each one of those docs that he sent me to, they put me through more tests. And interestingly enough, you know, one—you know, not just one doctor but several doctors came back with a test that said I had dementia. And I never heard of that. And—

PD: You hadn't heard of dementia before?

RB: No. Except in—in the—you got people that are crazy or stupid or, you know, they're somehow, you know, diseased and, you know, not productive. But a person like me, I have never heard of somebody like that, you know—you know, getting the dementia reading. But all of them agreed. I think there were three doctors that did the—the initial, you know, studies on, you know, three different occasions. And that's obviously, you know, worrisome. You know, because in the business I'm in, if you don't have 100% of your faculties you can't lead. And matter of fact, everything you do becomes suspect. Not only to yourself but also to the people who work around you that, you know, "Some—something's happened to Bob, he's not as sharp as he used to be." And I begin to recognize that in my ability to deal with names, that's where it all started. You know, I could be introduced to somebody, I have their name and in ten seconds it's gone, which is aggravating. You have to enlist help. In my case my wife helps, you know, do a better job at keeping track of people, you know, than I did or I could. And that I—I found myself still able to talk very well but when it came to actually doing the work, you know, doing the spreadsheets and the forecast, all the accounting analysis reports, all the kind of stuff that, you know, top management, you know, has to—has to be involved in. I was having trouble, you know, just took me much longer, you know, two times, three times, four times longer to do something. And—or to do anything at all. And my wife said, "I know what your problem is." I said, "Well good, tell me." She said, "You have task initiation problems." I said, "What?" She says, "Look at your desk." I have a 10x10 desk that I sit in the middle of. You know, the front piece is ten feet and it's like five feet that way. She says, "You can't see your desk. It's

covered with paper." And other than make just, you know, repeated efforts, there was no way to deal with that. And over the last couple years I've had a hard time getting stuff done. And again, I can still talk a pretty good game but when you're working with people who really know they're in the guts of stuff, you know, software design, software development, specific projects, it's hard to effectively lead when you're in that situation. And unfortunately the—I think the most recent set of tests, they pegged me at 10% instead of five. By any stretch that's the wrong direction. But— and I'm not sure what it was, you know, about how I handled, you know, the test that caused the—you know, the grade to slip.

PD: So do you know what that's a rating about?

RB: I—I don't understand the—the—the medical, you know, part of that—that diagnosis. Other than it's not good. . . .[79]

Asked what changes he recognized to himself after his hospitalization for sepsis, he replied, "My memory has gotten markedly worse."[80] He elaborated:

I was at one point in time a pretty good typist and I could type a letter without writing it in longhand first and was pretty efficient at that. And—but now what happens is I start to type something and almost immediately the spell checker says something's wrong and I gotta go figure out what—what I need to do differently to get it to pass spell check and—and it's not just spell check it's formatting, you know, the kind of stuff that's not spelling related. Whether or not you use incomplete sentences or something, you know. And so my—my productivity as far as communications has gone in the dirt. Because you know, this—the process that he's doing, you know, so wonderfully [referring to Dr. Denney inputting notes on a laptop] I can't—I can't do that anymore. You know, same with—same with people's name, telephone numbers, you know. A six-digit telephone number I used to be able to look at one and then key it into my—my phone system or my e-mail system, whatever it took to look up the person. Now what I have to do is—is I can look at a six-digit telephone number, I take two digits, and I can remember that long enough to type it in. But then I gotta go back and get the second two digits and the third two digits, each one of them separately, and I have to do that not only on telephone numbers but, you know, God forbid social security numbers, account numbers at—at, you know, various vendors. And again, I talk a pretty good game, okay, but when it comes to actually getting things done I'm a shadow of what I used to be. And slowly folks in the

[79] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 77-78.
[80] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 82.

company have—have been becoming aware, which is one of the reasons why I decided to retire first of the year.[81]

Asked if he thought any of the problems he'd described remembering names or numbers could simply be related to aging, he responded wisely, "I'm not an expert in that area so anything that I would say would be supposition based on no facts."[82] Asked to describe other cognitive problems, he described misplacing his cell phone,[83] and on further questioning said he had trouble remember the names of a thousand components of a PC, did not know how to use everything on his smart phone, and had difficulty troubleshooting his wife's iPad.[84] Although he can write e-mails, he complained of difficulty remembering passwords for all of the electronic devices in the house.[85] After a recent move to a new house, he sometimes made a wrong turn in trying to go from one room to another.[86] He commented that "I've had sufficient problems with keeping up with my medicine, but my wife has totally taken over."[87] He also complained of difficulty initiating and completing projects and keeping up with paperwork, and he volunteered that his wife had taken over power of attorney for him.[88]

In contrast to these reported deficits, he indicated that he keeps up with news about River Oaks Country Club through his buddies, decided which of his cars to sell and knew how the transactions had been accomplished, knew the current owners of the jet and yacht he formerly used and the current trustee of the Eugene Brockman Charitable Trust, voted in the 2020 election, continues to write checks, and continues to have access to his firearms, stored at multiple locations.[89] Although he did not recall the names of the companies, he was aware of recent news stories about cybersecurity breaches and was able to describe a recent ransom payment and recognized the market potential for software solutions (an industry in which he had made an unsuccessful investment),[90] consistent with the

[81] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 83.

[82] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 85.

[83] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 86.

[84] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 99.

[85] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 102.

[86] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 92-93; Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 43-44.

[87] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 35.

[88] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 36-38.

[89] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 55-67.

[90] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 98.

observation of Mr. Brockman reading a newspaper over the lunch break. He was able to give an adequate definition of "confabulation" and said that his son thinks he does that, but he does not.[91]

Asked when he experienced the onset of depression, he connected this to "tax issues," began to describe those issues, but limited his disclosures:

> PD: Your medical records mention depression and I want to ask you about that. When would you say you first experienced depression?
>
> RB: Just in the last couple years. And really it all boils down to the tax issues.
>
> PD: To the tax issues?
>
> RB: To the tax issues. And that's a terrible mess.
>
> PD: So before that, you weren't depressed?
>
> RB: No, I was busy.
>
> PD: And then what was it that came to your attention that caused you to see there was a mess?
>
> RB: Well, I—I don't understand all the legal ins and outs of taxation. I—I should've had a much better lawyer which would've, you know, undoubtedly given me different advice than that which I got. And that's gonna take a long time to—to, you know, straighten out.
>
> PD: What was the first indication you had that there was a problem?
>
> RB: It happened I think now almost four years ago. Some of the people that I did business with came under IRS scrutiny. And that's when that part of my life started getting a lot more attention. And it's pretty obvious it's gonna be years before all that gets sorted out. Every week something new, you know, gets discovered. Recently there's been a lot of knowledge come about regarding the people that I did business with that's not pleasant. They're tax attorneys, they're—basically been indicted with all kinds of malpractice and—you know, advising clients, preparation returns, that sort of thing. And I—I don't think all of it has come out yet.
>
> PD: So some tax lawyers that you relied upon have gotten in trouble?

---

[91] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 102-103.

RB: Uh-huh, yeah. With very high profile folks. I consider myself very low profile. But one of the people that they were involved with is very high profile, a black man by the name of Robert Smith.

PD: Uh-huh.

RB: And Robert Smith has got some real issues. And—which is a shame because I like the guy. He sees things a lot the way I do and he—he's a fisherman, you know, brilliant guy. And where he's most brilliant is in a room full of people, half of which are ladies. The ladies all love him. They think he's wonderful. My wife does, or did. And of course a lot of that is in the news, you know, it's a matter of record.

PD: Yes. So you indicated some people that you did business with were falling under IRS scrutiny. What was the first of those that came to your attention?

RB: I think it was Carlos Kepke. . . .

PD: So, and I'm asking because I want to date the onset of depression, which you said came after the IRS troubles.

RB: Uh-huh. Yeah, because all we're supposed to be talking about is my condition, you know, not about the case itself.

PD: Yeah. So—

RB: And we've—we've kind of, you know, veered off the side of the road a little bit.

PD: That's why I'm bringing you back to depression and when that started.[92]

Mr. Brockman takes Wellbutrin—which he calls his "happy pill"—for depression, and initially said it was first prescribed by Dr. Yudofsky[93] [Mrs. Brockman thought so, too[94]] but later said it had been prescribed by Dr. Pool and that Dr. Yudofsky had prescribed medication to help him sleep.[95]

---

[92] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 103-105.

[93] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 107.

[94] Dr. Darby's notes of his interview of Mrs. Brockman, 5/5/21.

[95] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 78.

Asked about thrashing, kicking, or hitting during sleep, Mr. Brockman said he was told of this and "I think the incidents occurred probably over a couple month period" and that this was "several years ago."[96]

The second day of interview began with Dr. Denney questioning Mr. Brockman about the elements of the Dusky standard of trial competence, during which Mr. Brockman displayed an adequate understanding of the charges against him, the roles of trial participants, courtroom procedures, and his rights.[97] He stated that he was able to share information and potentially beneficial facts with his counsel, whom he praised and in whom he expressed confidence, and he did not expect any problems in sharing details with his attorneys about the allegations in the indictment.[98] Later in the day, Mr. Brockman also stated and demonstrated that he would be able to inform his attorneys about his relationships with Evatt Tamine and Robert Smith, and he demonstrated a rational understanding and intact memories for various elements of the allegations in the indictment about which he was asked general questions.[99] He denied difficulty dealing with his lawyers or having significant problems recognizing documents he'd been shown:

> PD: Is there anything you're having difficulty dealing with your lawyers about?
>
> RB: No.
>
> PD: Have they shown you documents that you don't recognize?
>
> RB: Not a lot, but that—that has happened.
>
> PD: But most of the time you recognize the documents and understand where they came from?
>
> RB: Well, theoretically yes, but go through questions like, you know, you're raising. That means the word "all" cannot be used.
>
> PD: Sure. Do you recall any times it concerned you that you didn't recognize something, didn't know where it came from?
>
> RB: I'm sure that's happened, but I—I—I don't remember a specific instance.[100]

[96] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 110-111.
[97] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 3-41.
[98] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 20-22, 25-27, and 30-31.
[99] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 99-126.
[100] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 127-128.

Mr. Brockman sought to limit disclosures that he thought went beyond the limited purposes of a competency examination, though his understanding of those limits was unsophisticated, as in these examples:

> RD: What have they charged you with?
>
> RB: I think that's, you know, beyond the scope of what I'm supposed to be talking about. That—that doesn't have anything to do with my competence.[101]

*     *     *

> RD: Okay. So there's been—there's been information that should've remained private that's been released to the public?
>
> RB: Yeah. Well, the idea, you know, you're not innocent—the part where you're not guilty. I'm really saying that wrong. You're supposed to be innocent until proven guilty. And that's not at all the situation that I'm in. Which I'm surprised at, but evidently things have changed over the years.
>
> RD: Help me understand why—what is it that makes you feel that way?
>
> RB: Again, I—I think we're going off into an area of discussing my case, which we're not supposed to be doing.[102]

*     *     *

> RD: Would there be any—this is a conceptual kind of question, would there be any situation in your mind, in your awareness at this point, of a potential situation where you would entertain a plea bargain if—if they could like get the prosecutors to accept it and if it was—provided something good for you? I don't know.
>
> RB: Well, I think that's a question that applies to my case and that's not something I'm supposed to be talking about.[103]

*     *     *

---

[101] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 3.

[102] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 5.

[103] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 25.

PDA-0000064

RD: Okay.  What—what gave them—or what gave them pause or concern regarding your competence, do you have any idea what?

RB: Again, I don't think that's something—that's very, very specific to my case and I don't think we're supposed to be talking about that.

RD: Okay.  Well, let me rephrase that, and maybe I won't be so pointed.  I don't mean to be pointed like that.  Some—somebody's concerned about your competence.  What sort of things have come up that would make your competence at risk?

RB: Again, I don't think I can answer that without going—

RD: Okay.

RB: —over the line.[104]

        \*     \*     \*

RD: Is there any particular individual that you're concerned about that would be likely to lie about you or?

RB: Again, I think that that gets into the specifics of the case.[105]

Immediately after having demonstrated adequate competence to stand trial, Mr. Brockman offered his opinion that he was not competent to stand trial and had only limited ability to assist his attorneys.[106]

In marked contrast to his overall performance during prolonged interviews, Mr. Brockman displayed some dramatic abnormalities.  The first example of this was when, on the second day of interview, he twice reported that his first hospitalization for sepsis was in August and said he did not recall who had administered tests to him the preceding day [Dr. Denney, who was questioning him when he said this].[107] He also displayed dramatic abnormalities during mental status examination, which resembles testing in that it obviously seeks to test mental function.  The two most dramatic examples of this occurred when I transitioned from asking Mr. Brockman about his business to formal mental status examination and he seemed unable to name the President of the United States[108] and when I transitioned from questions

---

[104] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 29.
[105] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 33.
[106] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p.40.
[107] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 38-42.
[108] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 89-90.

PDA-0000065

about entities named in the indictment to asking him again to name the President.[109] The many examples of this include, without limitation, giving the date as 8/21/21 after having stated it correctly hours earlier; maintaining he would not know how to direct a taxi to his home because he did not know the address; and performing remarkably poorly in naming past presidents, spelling "world" backwards, subtracting serial sevens, subtracting serial threes, naming capital cities, and naming the Governor of Texas.[110]

He denied any psychotic symptoms, including auditory or visual hallucinations, and he disputed Dr. York's account of his having hallucinated a bug on the floor.[111]

## FINDINGS AND OPINIONS

Mr. Brockman's claim of trial incompetence rests largely on the opinions of Baylor clinicians who have treated him and some observations of defense counsel. With respect to the observations of clinicians one should note that psychiatry has long recognized problems related to the evaluation and treatment of VIPs with psychiatric impairment, as recognized in the 1973 report of the Group for the Advancement of Psychiatry[112] and subsequent publications. Among the concerns voiced in the literature are that a patient's VIP status could lead to requests for "a wealthy donor to be seen more quickly"[113] and "might trigger a loss of objectivity."[114] One must question, for example, whether Dr. Pool's 11/14/18 and 11/18/19 referrals of Mr. Brockman to Dr. York as a "VIP Dr. Pool patient" and for a "VIP CAPACITY EVAL"[115] or other information provided by colleagues or administrators about Mr. Brockman's contributions to the Baylor College of Medicine could have biased her evaluation or those of others who took his and his family's reports regarding his functioning at face value.

Malingering is defined in the *Diagnostic and Statistical Manual of Mental Disorders*, 5th Ed. (*DSM-5*) as "the intentional production of false or grossly exaggerated

---

[109] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 126.

[110] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 43-45 and 89-94.

[111] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 96-97.

[112] Committee on Government Agencies, Group for the Advancement of Psychiatry: *The VIP with Psychiatric Impairment*. New York: Charles Scribner's Sons, 1973.

[113] Gainer D, Cowan AE (2019): The very important patient. *Innovations in Clinical Neuroscience* 16(7-8): 25-28.

[114] Alfandre D, Clever S, Farber NJ, Hughes MT, Redstone P, Lehmann LS (2016): Caring for 'very important patients'—Ethical dilemmas and suggestions for practical management. American Journal of Medicine 129(2):143-147; Gainer D, Cowan AE (2019): The very important patient. *Innovations in Clinical Neuroscience* 16(7-8):25-28; Avery J, Knoepflmacher D, Mehta N, Penzner J (2016): VIP patients: An unexpectedly vulnerable population, in Parekh R, Childs EW (Eds.): *Stigma and Prejudice: Touchstones in Understanding Diversity in Healthcare*. Switzerland: Humana Press, pp. 103-111.

[115] Baylor College of Medicine, pp. 196-197 and 787.

physical or psychological symptoms, motivated by external incentives such as . . . evading criminal prosecution . . ."[116]  According to *DSM-5*:

> Malingering should be strongly suspected if any combination of the following is noted:
>
> 1. Medicolegal context of presentation (e.g., the individual is referred by an attorney to the clinician for examination, or the individual self-refers while litigation or criminal charges are pending).
>
> 2. Marked discrepancy between the individual's claimed stress or disability and the objective findings and observations.
>
> 3. Lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regimen.
>
> 4. The presence of antisocial personality disorder.[117]

The two main bases for suspecting malingering in this case are that Mr. Brockman presents in a medicolegal context and evidences a marked discrepancy between his claimed disability (in test performance) and objective observations of his function as CEO and in his speeches, testimony in civil suits, and performance in interviews when not being obviously tested.

Less significant is that he did not comply with the guidance of Dr. York to work on jigsaw or crossword puzzles or use a dry erase board[118] and memory station, which he denied using at his current home,[119] or the guidance of Dr. Pool to avoid unfamiliar environments or changes in routine.  On 11/25/20, James L. Pool, MD, signed a declaration stating that "Unfamiliar environments, stimulating surroundings, and changes in routine would be especially stressful for a person with Mr. Brockman's diminished capacity, creating a risk to his existing cardiac condition, and could exacerbate the overall progression of his symptoms."[120]  Yet some nine weeks later, on 2/1/21, Dr. Eugene C. Lai, MD, noted that Mr. and Mrs. Brockman "are in the process of moving to the River Oaks area close to their son."[121]

---

[116] American Psychiatric Association:  *Diagnostic and Statistical Manual of Mental Disorders*, 5th Ed.  Arlington, VA:  American Psychiatric Association, 2013, at p. 726.

[117] American Psychiatric Association:  *Diagnostic and Statistical Manual of Mental Disorders*, 5th Ed.  Arlington, VA:  American Psychiatric Association, 2013, at p. 727.

[118] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 53.

[119] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 86-87.

[120] Declaration of James L. Pool, M.D., in Support of Robert T. Brockman's Motion to Transfer Proceedings, 11/25/20 [Document 49], at para. 10.

[121] Baylor College of Medicine, pp. 19-21.

Not yet ripe as a basis for suspecting malingering is that except for the requirement of the onset of a conduct disorder before age 15, Mr. Brockman would meet criteria for a diagnosis of antisocial personality disorder if the indictment were proved correct regarding his repeatedly performing acts that are grounds for arrest, the allegations of deceitfulness, and the allegation that he failed to honor financial obligations to the United States, for all of which he evidenced a lack of remorse in our interview by denying knowledge of wrongdoing and by casting aspersions on cooperating witnesses.

The three pillars of evidence on which I base my opinion that Mr. Brockman has malingered the severity of his cognitive deficits in a variety of settings since at least 1/30/19 are:

(1) the marked discrepancy between Mr. Brockman's performance when he knows his cognitive functioning is being tested and his cognitive performance when lecturing, testifying, or speaking in contexts in which his cognitive functioning is not being tested;

(2) the atypical results of formal neuropsychological testing conducted by Dr. Denney;

(3) the onset of apparent deficits during tests of cognitive function only after the Bermuda Police Service's raid on Evatt Tamine's Bermuda home on 9/5/18, prior to which time Mr. Brockman evidenced only age-related memory deficits, whether or not one relies on his personal writings.

In concluding that Mr. Brockman is exaggerating the severity of his cognitive deficits, I am not saying that he has no cognitive deficits. I do not doubt that he has some difficulty remembering names, numbers, and passwords, that he misplaces objects, or that the move to a new home and two bouts of sepsis with delirium have led to moments of confusion. The diagnostic challenge is to validly judge where his cognitive functioning lies on the continuum that ranges from age-related memory changes to mild cognitive impairment to mild or moderate dementia. Unfortunately, the currently available testing data do not permit a definitive quantitative assessment of the severity of Mr. Brockman's cognitive impairment, if any. Moreover, his purported functional impairments, reported only by Mr. Brockman and his closest family members, follow the same time sequence as his testing performance, with onset only after the raid on Evatt Tamine's Bermuda home and in the context of concerns about an investigation into potential criminal activity.

Based on Mr. Brockman's performance during the May 2021 interviews, I am confident that he suffers either age-related memory difficulties or, at worst, mild cognitive impairment, in the context of Parkinson's disease. I believe the evidence is insufficient to establish dementia from any cause and that the evidence for fluctuations in mental state, hallucinations, and REM behavior disorder is insufficient to bolster a claim of dementia with Lewy bodies even if dementia were established. In 2020 and 2021, Mr. Brockman has grossly exaggerated the extent

of his cognitive impairment whenever he knew he was being tested, on which basis I conclude he is malingering dementia.

Based on the foregoing information and observations, it is my opinion that on 5/20/21, Mr. Brockman had sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him.

If you have any questions about the content of this report, please do not hesitate to contact me.

Thank you for the opportunity to conduct this evaluation.

Respectfully,


Park Dietz, M.D., M.P.H., Ph.D.
Clinical Professor of Psychiatry and Biobehavioral Sciences
David Geffen School of Medicine at U.C.L.A.
Diplomate, American Board of Psychiatry & Neurology

# PARK DIETZ & ASSOCIATES, INC.
Forensic Experts

**Administrative Offices**

2906 Lafayette
Newport Beach, CA 92663
Tel: 949-723-2211
Fax: 949-723-2212
Email: expert@parkdietzassociates.com
Website: www.parkdietzassociates.com

- **Forensic Psychiatry**
- **Forensic Psychology**
- **Forensic Pathology**
- **Forensic Neurology**
- **Forensic Social Work**
- **Child Welfare**
- **Criminology**
- **Security**

October 29, 2021

Corey J. Smith
Senior Litigation Counsel
U.S. Department of Justice, Tax Division
150 M Street NE, Rm 2.208
Washington, DC 20002

Re: <u>United States v. Robert T. Brockman</u>

Dear Mr. Smith:

This report supplements my report of June 21, 2021, regarding the competence to stand trial of Mr. Robert Brockman. Relevant new information received since that report is synopsized below, following which I provide updated opinions.

## NEWLY RECEIVED INFORMATION

<u>Houston Methodist Admission, 3/15/21–3/19/21</u>

After submitting the previous report, 490 pages of records were received from this hospitalization.

Mr. Brockman arrived by ambulance as an emergency admission on 3/15/2021 with an admitting diagnosis of altered mental status.

He was described as intermittently confused and lethargic. Asked why he was there, at one point he said, "seems like a place to go fishing." At other times he was "alert and oriented to person, place, and time" with normal thought content.

He was determined to have a Klebsiella pneumoniae urinary tract infection and positive blood cultures, which was treated.

He told an occupational therapist, "I don't know why everyone is saying I was delirious."

Delirium screenings had variable results:

1

**GOVERNMENT EXHIBIT**

4:21-CR-009-GCH

No. 84

| Date | Time | Positive or Negative |
|------|------|----------------------|
| 3/15/21 | 1813 | Positive |
| 3/15/21 | 1813 | Negative |
| 3/15/21 | 2247 | Positive |
| 3/15/21 | 2247 | Negative |
| 3/16/21 | 1145 | Positive |
| 3/16/21 | 1145 | Negative |
| 3/16/21 | 2224 | Positive |
| 3/16/21 | 2224 | Negative |
| 3/17/21 | 1846 | Positive |
| 3/17/21 | 1846 | Negative |
| 3/17/21 | 1847 | Negative |
| 3/17/21 | 2023 | Negative |
| 3/18/21 | 1212 | Negative |
| 3/18/21 | 1:47pm | Negative |
| 3/18/21 | 1705 | Negative |
| 3/18/21 | 2202 | Negative |
| 3/19/21 | 1104 | Negative |

The discharge summary note by Amitkumar Natvarial Patel reads:

> Hospital Course: Robert T Brockman is a 79 y.o. male who brought from home due to metabolic encephalopathy. Found to have severe UTI as well as bacteria from Klebsiella pneumoniae. Treated with cefazolin in house as it is pansensitive. He is now alert and oriented with no other issues. Had urinary retention for over a liter of urine. He will discharge home with a Foley catheter and follow-up with urology next week for removal. Repeat blood cultures are negative.

The final diagnoses of this admission were:

- Other gram-negative sepsis
- Metabolic encephalopathy
- Parkinson's disease
- Dementia in other diseases classified elsewhere without behavioral disturbance

He was discharged home on 3/19/21.

Records of Seth P. Lerner, M.D., 6/2/20

Dr. Lerner wrote of Mr. Brockman on 6/2/20: "working but having some memory issues."[1]

Records of Stuart Yudofsky, M.D., 10/20/18—10/23/20

---

[1]  RTBrockman_Medical_Records_0005134— RTBrockman_Medical_Records_0005138.

Mr. Brockman consulted Dr. Yudofsky on 10/20/18 for evaluation of depression with gradual onset for "about a year" and stress from an "unjustified" business lawsuit and an "undisclosed other legal matter." His complaints included slowed thinking, word-finding difficulty, and memory "not as good as it used to be." Dr. Yudofsky observed signs of Parkinson's disease and diagnosed depression and "mild (to moderate) neurocognitive disorder (possibly) due to Parkinson's disease." He prescribed Wellbutrin and referred Mr. Brockman for an assessment for Parkinson's disease, a comprehensive medical workup, and neuropsychological testing.[2]

In a brief follow up visit on 3/2/19, Dr. Yudofsky noted mood improvement and some expressive aphasia.[3]

[Note that Dr. James Pool's records of 10/1/19 mention that Mr. Brockman reported a week-long fishing trip in Alaska with Dr. Yudofsky at an unspecified date.[4]]

On 10/23/20, Dr. Yudofsky called the Brockman home to speak to Mr. Brockman "to check mental status given stress of indictment." Dorothy Brockman answered the phone and reported that "Bob is 'doing pretty well considering stress,' but was not thinking rapidly and had difficulty initiating thoughts."[5]

Initial Appearance, 10/15/20

A transcript of Mr. Brockman's initial appearance reveals that he answered appropriately the few questions put to him, including questions as to whether he understood what he was being told and whether he agreed to abide by the conditions set. Asked to identify himself and whether he could see and hear on the Zoom platform used, he replied, "Yes, Sir. My name is Robert T. Brockman, and I can see and hear with the magical software set up here." One of his attorneys represented that Mr. Brockman had "known about this investigation for four years."[6]

Houston Methodist Hospital Admission, 5/31/21—6/11/21[7]

After submitting the previous report, an additional 1,079 pages of records were received from this hospitalization. Mr. Brockman was reportedly confused, fatigued, and weak prior to admission; treated for a serious urinary tract infection and bacteremia during the admission; and often noted to be confused, agitated, or disoriented during the course of this admission. New information in these records is synopsized below:

---

[2]   YUDOFSKY 000001—YUDOFSKY 000008.
[3]   YUDOFSKY 000016.
[4]   RTBrockman_Medical_Records_0005059
[5]   YUDOFSKY 000011.
[6]   Transcript of Initial Appearance, United States v. Robert T. Brockman, 10/15/20.
[7]   Parenthetical page numbers in this section refer to pages of a 1,664-page PDF designated "req-84016275."

On 6/6/21, a nurse described him as "confused and impulsive" and wrote that he was getting out of bed and telling his "wife to call the police" [p. 373].

On 6/7/21, he became "aggressive with the nurses then tripped and fell backwards hitting his head on the window sill" [p. 296].

On 6/8/21, after medication changes and a sleepless night, he was "more confused and delirious. He describes being targeted in a scheme and he is concerned regarding the people around him. He is less oriented compared to the day before. Initially he was stating he wanted to be discharged, however he was re-orientable and agreed to stay. He remains distracted and continues to reiterate his concerns" [p. 224].

On 6/8/21, a nursing notes reads: "Patient is very confused and agitated. He states he wants to walk home. He refused to eat breakfast, and he is not following command/directions" [p. 427].

On 6/8/21, a geriatric progress note reads: "This morning, Mr. Brockman was sitting up at the edge of the bed and demanding to leave. Caregiver Frank at bedside. Primary team was paged. He walked around the floor and refused to sit down despite nursing attempt to redirect him. Expressed to me that he 'is tired of old men and young women coming in all the time". Endorses he knows that he is in the hospital, and is demanding a phone to call 911 with. Recognizes his caregiver" [p. 515].

A psychiatry progress note by Dr. D'Empaire on 6/8/21 indicates that Mr. Brockman's chief complaint was "I was here for a business meeting," and reads: "The pt has had intermittent agitation including last evening when he was attempting to hit staff and climbing out of bed, ultimately falling, worsening confusion in the evenings, including visual hallucinations" [p. 231]. He did not believe he was in the hospital, walked into the hallway intending to leave, and did not recognize his home care giver [p. 231]. He reported having seen black objects that move [p. 233].

A psychiatry progress note by Dr. D'Empaire on 6/9/21 reads: "The pt is seen and evaluated. He is pleasant and calm. Slept better last night. More alert today. Has recognized home care giver and friend visiting at bedside. No agitation" [p. 255].

Previously, Mr. Brockman had been prescribed Klonopin (clonazepam), and the hospital recommended this be discontinued [p. 1145].

During this hospitalization, delirium screening was done on multiple occasions and was more often positive for the presence of delirium than negative:

- Negative in the Emergency Department on the day of admission, 05/31/21 at 15:00 [p. 51]
- Negative on 05/31/21 at 19:00 [p. 942]
- Negative on 05/31/21 at 20:14 [p. 890]

- Positive in a physical therapy evaluation on 06/1/21 at unspecified time [p. 111]
- Positive on 06/01/21 at 15:13 [p. 996]
- Positive on 06/01/21 at 17:15 [p. 884]
- Positive on 06/01/21 at 18:11 [p. 981]
- Positive on 06/01/21 at 19:58 [p. 876]
- Positive on 06/02/21 at 08:07 [p. 871]
- Positive on 06/02/21 at 21:36 [p. 753]
- Positive on 06/03/21 at 11:30 [p. 866]
- Positive on 06/03/21 at 22:58 [p. 858]
- Positive on 06/04/21 at 16:37 [p. 850]
- Positive on 06/04/21 at 21:07 [p. 843]
- Positive on 06/05/21 at 08:38 [p. 838]
- Positive on 06/05/21 at 21:29 [p. 830]
- Positive on 06/06/21 at 13:38 [p. 826]
- Positive on 06/06/21 at 19:21 [p. 817]
- Positive on 06/07/21 at 10:18 [p. 812]
- Positive on 06/07/21 at 19:18 [p. 805]
- Positive on 06/08/21 at 16:28 [p. 798]
- Positive on 06/08/21 at 22:19 [p. 790]
- Negative on 06/09/21 at 10:05 [p. 785]
- Negative on 06/09/21 at 23:47 [p. 780]
- Negative on 6/10/21 at 19:31 [p. 775]
- Positive on 6/10/21 at 19:58 [p. 746]
- Positive on 6/11/21 at 11:10 [p. 765]

On 6/7/21, Mr. Brockman's MOCA score was 10/30 [p. 1157].

Mr. Brockman was discharged 6/11/2021 at 4:05 PM with these discharge diagnoses:

- Acute metabolic encephalopathy secondary to infection Pseudomonas
- Acute UTI infection secondary to Pseudomonas
- Recent UTI bacteremia Klebsiella
- GNR bacteremia Pseudomonas
- Acute UTI infection Pseudomonas due to indwelling catheter CAUTI
- hypothyroidism
- Sepsis present admission
- Anemia of chronic disease
- Paroxysmal atrial fibrillation
- Parkinson's disease
- Urinary retention
- Delirium [pp. 290-291]

UroLift Implants, 6/24/21

On 6/24/21, Mr. Brockman underwent cystoscopy and UroLift implants under general anesthesia without complications.[8]

Videotaped Interview of Mr. Brockman by Marc E. Agronin, M.D., 7/13/21

Mr. Brockman presented as far more impaired in this interview than during the May 2021 interviews by Dr. Denney and me. His orientation appeared variable; his memory appeared worse; he seemed to frequently confuse the civil suit with the criminal case; he seemed to have very poor attention; and he displayed obvious confusion many times during the interview. He seemed repeatedly confused about the role of the examiner and which side had arranged for Dr. Agronin to see him. Mr. Brockman recognized that his attorneys were disappointed in his ability to assist them. He spoke clearly about frequently repeated remote topics. He would not discuss his legal case.

Videotaped Interview of Mr. Brockman by Thomas Guilmette, Ph.D., 7/13/21

Mr. Brockman presented as far more impaired in this interview than during the May 2021 interviews by Dr. Denney and me. Mr. Brockman appeared more confused, with worse memory, greater difficulty sequencing events, and less reliable about estimating how long ago his hospitalizations and the May examination had occurred. He seemed not to grasp the roles of experts appropriately and was inaccurate in describing the purpose of his hospitalizations in 2021. He recognized that he had problems with recall but appeared to overestimate his ability to assist his attorneys with information. He continued to think highly of his legal team but said he disagreed with them about their need to understand Reynolds and Reynolds.

PET-CT Amyvid, 7/28/21

A PET-CT Amyvid study conducted on 7/28/21 was read as a positive study "indicating moderate to frequent amyloid neuritic plaques."[9]

Brain MRI, 7/30/21

A brain MRI without contrast on 7/30/21 was read as showing "Moderate diffuse cerebral volume loss with proportionate ventricular prominence" and "[m]ild chronic microvascular ischemic change."[10]

---

[8] Consent Form, Anesthesia Post Op Note, Operative/Procedure Report, and medical records from Baylor-St. Luke's Medical Center, Houston, 6/24/21.
[9] PET-CT Amyvid study, Houston Methodist Hospital, 7/28/21.
[10] MRI Brain, without contrast, Houston Methodist Hospital, 7/30/21.

Norman Tommy Barras (7/7/21):  Mr. Barras reported noticing changes in Mr. Brockman as early as 2010, such as forgetting decisions he'd made and being less engaged.  The notes read:  "No litigation or projects recently.  Nothing since years ago.  2008-2009."  Mr. Barras still speaks to Mr. Brockman and his family three to four times per week and said Mr. Brockman gets facts, dates, people, and events wrong when he talks, gets confused, sometimes thinks he's in Colorado and wants to go fishing.  He said, "It's been worse in the last year . . . deterioration."  He also said, "There is no way this is fake.  His body is failing.  His mind is not the same.  You can't fake the things going on there.  It's impossible."  Mr. Brockman has no current involvement in the company.  He has spoken gibberish in phone calls and has had a blank stare during conversations or was confused at to where he was and who was with him.  Within the past few months there'd been an incident in which he "thought he was being held hostage and wanted protection with a gun."  During most visits, Mr. Barras now finds Mr. Brockman distant, confused, less talkative, and passive.  Mr. Brockman resigned in November 2020 and put Mr. Barras in charge of the company, and he had not sat alone with him since then and had no discussion of business since then.[11]

Dorothy Brockman (7/16/21):  Mrs. Brockman reported that her husband had a son with each of two wives before marrying her.  She described him as totally dependent on others to manage finances and medication and said he gets lost when walking around the house.  Before March 2021, he hadn't been able to handle his finances, operate his computers, or remember passcodes, but this had worsened since his March infection.  She said he gets confused and sometimes thinks he is in Aspen or Mexico but other times knows where he is.  He sometimes replies to questions by talking about business when the question wasn't related to business, and this has been worse since the surgery.  A week earlier, he had told her that he was not in his own house but a "twin house."  She first noticed cognitive changes with her husband before 2018, when she had to help him organize his papers.[12]

Kathryn Keneally, Connor Maloney, and James Loonam (7/28/21):  One or more of those jointly interviewed attorneys indicated that Mr. Brockman might have first suspected any investigation on 8/15/18 when the IRS searched the office and home of his attorney, Carlos Kepke, or on 9/5/18 upon the search of Evatt Tamine's home in Bermuda, but Robert Smith had been under investigation even earlier, and Mr. Brockman probably knew he was under investigation within days of the Kepke search as Reynolds and Reynolds counsel realized that Mr. Brockman needed his own attorney around that time.[13]

Dr. Stephen Slade (July 30, 2021):  A "good friend" of Mr. Brockman and his family who has known him for 30-35 years, Dr. Slade noted that Mr. Brockman's intellectual sharpness and personality had "gone away" over the past few years.

---

[11]  Brockman_0000075—Brockman_0000077.
[12]  Brockman_0000070—Brockman_0000072.
[13]  Brockman_0000065.

He noticed Mr. Brockman becoming more quiet on fishing trips around 2014 or 2015 and thought he was thinking more slowly. Recently, Mr. Brockman had been "quiet and withdrawn," deflected or avoided mentally challenging conversation, had spotty memory, mostly didn't remember things, and had poor "processing ability."[14]

Collateral Interview Notes by Thomas Guilmette, Ph.D.,[15] July 2021

Mrs. Brockman was interviewed via teleconference for approximate 70 minutes on 7/12/21 in the presence of her attorney. Mrs. Brockman described a series of cognitive declines in her husband beginning approximately three years earlier when he began showing physical signs of Parkinson's disease, though she believed that he was symptomatic before that and had observed he became less productive and wasn't keeping up with decisions regarding family finances and the trust. She reported he had not returned to his baseline functioning after his two episodes of mental status changes due to sepsis or his UroLift surgery. He is episodically confused about where he is and has at times thought he was still at their previous home, in Aspen, or in Mexico, though he usually reorients with prompts and cues. In their new house, he has been confused about where things are located and "gets lost." He has problems recalling things from day to day, including conversations, needs constant reminders about appointments, and asks her repeatedly for the same information. He has difficulty with the TV remote and his computer and doesn't know his own cell phone number. She doesn't think he retains what he reads daily in the *Wall Street Journal*. She'd recently been asked to join discussions with his attorneys because he's seldom able to provide useful information. On a recent night he'd thought there was an intruder in the home.[16]

Rev. Jim Jackson (7/28/21): Interviewed in the presence of a Reynolds and Reynolds attorney, Rev. Jackson reported having observed changes in Mr. Brockman in 2018 that "alarmed" him. He noticed these changes at meetings and at the Houstonian. Mr. Brockman sometimes "looked out to lunch" and not responsive and sometimes "looked confused." In June 2018, Rev. Jackson asked for a meeting with Mr. Brockman to share his concerns, and Mr. Brockman told him that some litigation "was driving him nuts." In the fall of 2018, Rev. Jackson was reportedly told by Tommy Barras that Mr. Brockman got lost driving home after the Reynolds and Reynolds annual birthday party. In April 2019, Rev. Jackson went to the Brockman home to discuss his observations of changes in gait and his reactions. The notes read:

> Between about September and November 2019, Rev. Jackson reported that he had frequent conversations with senior management at Reynolds about their concerns about Mr. Brockman's cognitive capabilities. They were particularly concerned with how Mr. Brockman would be able to handle the November 2019 Reynolds and Reynolds

---

[14] Brockman_0000073—Brockman_0000074.
[15] Although the author of the document was not identified in the document, its contents correspond to elements of Dr. Guilmette's report.
[16] Brockman_0000078—Brockman_0000081.

annual birthday party. Senior leadership was reportedly worried that Mr. Brockman would be unable to deliver a coherent speech and preside over this very visible company-wide meeting in an authoritative manner. There were reported concerns that he would be unable to make the type of speech and comments that had been his trademark due to his declining cognition. Leadership was reportedly trying to protect him and the employees' views of his leadership by structuring the meeting in such a way as to limit his exposure. Rev. Jackson characterized this as trying to "take things away from him" because he was viewed as unable to handle the same cognitive demands that he had previously.

Rev. Jackson indicated that he has visited Mr. Brockman about every two weeks since he retired and has noticed that he has gotten progressively worse. Although he is "clear" some days, on most days he is "not functional at all." In a visit a few months before this interview, Rev. Jackson reported, Mr. Brockman had been unable to identify a framed picture of his "favorite niece." Rev. Jackson found that Mr. Brockman has episodes of just going "blank" and recently noted that Mr. Brockman rapidly changed topics and wasn't making sense during a conversation, "like talking gibberish."[17]

Donna Ball (7/28/21): Interviewed in the presence of a Reynolds and Reynolds attorney, Ms. Ball said that in the fall of 2019, Mr. Brockman had sent requests for purchases that she could not specify that seemed unusual for him. In early 2020, she'd received calls from a senior Reynolds and Reynolds employee in Dayton who expressed concern that Mr. Brockman had been replying to old emails to which he'd already replied rather than new ones he was being sent.[18]

Robin Gilliland (7/28/21): Interviewed in the presence of a Reynolds and Reynolds attorney, Ms. Gilliland had known Mr. Brockman for 26 years and had limited interaction with him from 2017 to 2019 and none since then. Ms. Gilliland reported having noticed about three years ago that she would send him something to review and sign but he would return it only partially completed, so she'd begun providing notes or directions about what needed to be done, including stickers on documents directing him where to sign. She'd found it odd that during lunch in the company cafeteria on one occasion in 2018 or 2019 he'd spoken with employees about his plantar fasciitis rather than asking about them or speaking about the business as he usually did.[19]

Laura Douglass (7/28/21): Interviewed in the presence of her attorney, Ms. Douglass said she'd been bookkeeper to the Brockman's since 2001, working at their home for a day each week. Despite little interaction with Mr. Brockman, in the

---

[17] Brockman_0000081—Brockman_0000082.
[18] Brockman_0000082—Brockman_0000083.
[19] Brockman_0000083.

past year, she'd observed instances of his repeating himself in conversations and sitting at his desk staring at a blank computer screen.[20]

Marc E. Agronin, M.D., Report, 8/6/21

Dr. Agronin provided a lengthy and detailed report. He had collateral interviews and medical records unavailable to government experts at the time of our reports, including the 3/12/21 PET Scan, the 3/15/21—3/19/21 Houston Methodist hospitalization, the complete records of the 5/31/21—6/11/21 Houston Methodist hospitalization, the 7/28/21 PET Amyloid study, and the 7/30/31 MRI.

Dr. Agronin reported that Mr. Brockman received a MoCA score of 9/28, indicating severe cognitive impairment.[21] He explained Mr. Brockman's inattentiveness and confusion during his examination on 7/13/21 at least in part by suggesting he remained delirious since his last hospitalization: "It is likely that Mr. Brockman is not fully recuperated from his delirium, and still lapses into an acute confused state."[22]

Based on his examination and review of records Dr. Agronin diagnosed six conditions:

> 1. Parkinson's disease dementia (G20), with associated depression (F06.31), anxiety (F06.4) and psychosis (F06.2)
> 2. Possible comorbid Alzheimer's disease (G30.9)
> 3. Delirium from a medical condition (urosepsis) (F05)
> 4. Apathy (No specific ICD-10 code)
> 5. Insomnia with obstructive sleep apnea (780.51)
> 6. Possible REM Sleep Behavior Disorder (G47.53)[23]

Like me, Dr. Agronin attempted to interview Stuart Yudofsky, M.D., "but he was not made available."[24]

Dr. Agronin reached the opinion that Mr. Brockman was incompetent to stand trial based on an examination during which he thought Mr. Brockman remained delirious and demented, based on medical records and imaging studies, and based on Mr. Brockman's performance during professional interviews, testing, and day-to-day interaction in which Mr. Brockman appeared increasingly and profoundly impaired.

Thomas Guilmette, Ph.D., Report, 8/6/21

Dr. Guilmette provided a lengthy and detailed report. He had collateral interviews and medical records unavailable to government experts at the time of our reports,

---

[20] Brockman_0000083.
[21] Report of Marc E. Agronin, M.D., 8/6/21, p. 28.
[22] Report of Marc E. Agronin, M.D., 8/6/21, p. 37.
[23] Report of Marc E. Agronin, M.D., 8/6/21, p. 28.
[24] Report of Marc E. Agronin, M.D., 8/6/21, p. 9, at footnote 1.

including the 3/12/21 PET Scan, the 3/15/21—3/19/21 Houston Methodist hospitalization, the complete records of the 5/31/21—6/11/21 Houston Methodist hospitalization, the 7/28/21 PET Amyloid study, and the 7/30/31 MRI.

Like Dr. Agronin, Dr. Guilmette observed ongoing delirium at the time of his July 2021 interview: "In my evaluation with him, there was evidence for some ongoing residual delirium symptoms such as rapid onset of confusion without alterations in consciousness."[25] Despite this observation, Dr. Guilmette administered neuropsychological tests. He concluded, "[I]n my opinion, Mr. Brockman's neuropsychological test scores were valid and did not reflect evidence of malingering."[26]

Dr. Guilmette diagnosed Mr. Brockman as suffering from "major neurocognitive disorder (otherwise known as dementia) due to Parkinson's disease."[27] He also concluded that "Mr. Brockman is not able to assist his attorneys with relevant, specific, requested facts, dates, and specifics,"[28] that "Mr. Brockman does not have the mental stamina needed for a courtroom trial on the charges he faces,"[29] that "Mr. Brockman is unable to assist his counsel in defending his case,"[30] and that "Mr. Brockman is not malingering major cognitive impairment."[31]

In short, Dr. Guilmette reached the opinion that Mr. Brockman was incompetent to stand trial based on an examination and testing during which he thought Mr. Brockman remained delirious and demented, based on medical records and imaging studies, and based on Mr. Brockman's performance during professional interviews, testing, and day-to-day interaction in which Mr. Brockman appeared increasingly and profoundly impaired.

<u>Scott Polus Digital Forensics Report, 8/5/21</u>

Mr. Polus of Xact Data Discovery provided the results of an analysis of metadata from a 10/22/20 forensic image of a hard drive from a Dell Precision M6800 laptop.[32] Documents bearing dates of 2004—2018 were analyzed, and Mr. Polus reported that "The Health Issues Documents' [sic] Created, Last Modified, and Last Saved Dates show that no further modifications were made to these documents after the day they were created."[33]

---

[25] Report of Thomas Guilmette, Ph.D., 8/6/21, p. 63.
[26] Report of Thomas Guilmette, Ph.D., 8/6/21, p. 44.
[27] Report of Thomas Guilmette, Ph.D., 8/6/21, p. 61; see also p. 64.
[28] Report of Thomas Guilmette, Ph.D., 8/6/21, p. 64.
[29] Report of Thomas Guilmette, Ph.D., 8/6/21, p. 69.
[30] Report of Thomas Guilmette, Ph.D., 8/6/21, p. 70.
[31] Report of Thomas Guilmette, Ph.D., 8/6/21, p. 72.
[32] This laptop was first released in September 2013. See: https://www.engadget.com/2013-09-09-dell-m4800-m6800-precision-laptops.html, downloaded 10/24/21.
[33] Scott Polus Digital Forensics Report, 8/5/21.

<u>Thomas Wisniewski, M.D., Report, 8/6/21</u>

Dr. Wisniewski "conducted a neurology review" of materials in this matter without examining the defendant and wrote that "Robert Brockman's diagnosis is **dementia**, most likely due to Parkinson's Disease but also with possible likely co-occurrence of Alzheimer's Disease" [emphasis in original]. He wrote, "The decline reported is consistent with the accelerating decline of Robert Brockman's condition, and also reflective of how when delirium subsides in those with dementia, residual decline is commonly irreversible and additive to the pre-existing cognitive handicaps."[34]

<u>Christopher T. Whitlow, MD, PhD, MHA, Report, 8/6/21</u>

Dr. Whitlow reviewed available imaging studies and concluded, in pertinent part:

> Mr. Brockman's brain MRI demonstrates cerebral volume loss that has progressed since 2018, with diencephalon and temporal lobe volume that is lower than the 25th percentile according to an FDA approved volumetric analysis. Brain volume this low would be more compatible with neurodegenerative diseases associated with cognitive dysfunction and dementia rather than mild cognitive impairment.

*     *     *

> In summary, these imaging findings are suggestive of a progressive neurodegenerative process and support Mr. Brockman's cognitive testing results, raising concern for a neurodegenerative disease with dementia, which include common causes like Parkinson's disease, Parkinson's disease with Lewy body dementia and Alzheimer's disease. Given what we know about structural and functional abnormalities in temporal-parietal brain regions, there is compelling objective evidence that an underlying neurodegenerative process is ongoing for Mr. Brockman, with Alzheimer's dementia representing a very strong possibility.[35]

<u>Houston Methodist Emergency Care Center Visit, 9/13/21</u>

Mr. Brockman was seen two to three weeks after a fall in which he bumped his elbow. No fracture was found on X-ray, and the final diagnosis was olecranon bursitis of the right elbow.[36]

---

[34] Thomas Wisniewski, M.D., Report, 8/6/21.
[35] Christopher T. Whitlow, MD, PhD, MHA, Report, 8/6/21.
[36] RTBrockman_Medical_Records_0005765—RTBrockman_Medical_Records_0005773.

<u>Houston Methodist Hospital Admission, 9/15/21—9/18/21</u>

Mr. Brockman was admitted from 9/15/21-9/18/21 with another urinary tract infection with delirium (confused and disoriented, but not agitated). On admission, his caretaker provided a history of Alzheimer's dementia and an overnight change in mental state with fever. Mr. Brockman's EEG was consistent with diffuse encephalopathy. A head CT without contrast showed microvascular white matter changes and diffuse volume loss. Documentation of his delirium was sufficient but sparse, as no nursing notes, psychiatric consultation, or delirium screening results were received for review.[37]

<u>Records of James Pool, M.D., 10/15/18—6/14/21</u>

Dr. Pool's records include three reports of Mr. Brockman completing the Memory Orientation Screening Test, with scores of 12/29 on 10/1/19; 13/29 on 10/5/20; and 7/29 on 6/14/21, each of which falls within the range of what was previously known as severe dementia.[38]

A document cited in my earlier report at footnote 46 as "Medical records and personal writings provided by Mr. Brockman, pp. 195-196" appears in Dr. Pool's records with the date of 10/1/19.[39]

<u>Sleep Study, 8/12/21—8/13/21</u>

The repeat sleep study produced REM sleep of adequate duration to demonstrate that there were no significant periodic limb movements during sleep, no loss of normal muscle atonia during REM sleep, and no videographic evidence of dream enactment behavior or other abnormal movements. The study also demonstrated severe obstructive sleep apnea improved with positive airway pressure therapy, treatment for which was recommended.[40]

<u>FDG PET, 8/24/21</u>

Findings of an FDG PET scan on 8/24/21 were interpreted as "mild" but "very suggestive of neurodegenerative disease, particular Alzheimer's disease," though "dementia with Lewy bodies or Parkinson's disease with dementia can have a similar scan pattern."[41]

---

[37] RTBrockman_Medical_Records_0005714—RTBrockman_Medical_Records_0005764.
[38] RTBrockman_Medical_Records_0005080; RTBrockman_Medical_Records_0005080; RTBrockman_Medical_Records_0005082.
[39] RTBrockman_Medical_Records_0005057.
[40] Titration Report, Memorial Hermann Hospital, Houston, TX, 8/12/21—8/13/21.
[41] PET Brain Metabolic Evaluation, Houston Methodist Hospital, 8/24/21.

<u>EEG, 9/2/21</u>

An outpatient EEG while awake and drowsy on 9/2/21 was mildly abnormal because of "diffuse slowing of the background, a non-specific indicator of global cerebral dysfunction."[42]

<u>Records of Eugene C. Lai, M.D., Ph.D., 10/7/21</u>

Dr. Lai's chart notes for his 10/7/21 visit with Mr. Brockman adopt the history of "Parkinson's disease with associated dementia" and "REM sleep behavior disorder." Mr. Brockman's wife and caretaker accompanied him to the appointment, and someone (not specified) told Dr. Lai that Mr. Brockman's mood was "stressed and depressed," that his memory was declining, and that Dorothy Brockman had to help her husband with business and legal responsibilities. On examination, Dr. Lai found Mr. Brockman alert, attentive, oriented to person, city, state, and month, and able to follow complex commands, but his memory was 4/5 immediate and 0/5 delayed, with impaired comprehension and expression, poor insight and judgment, and a MOCA score of 13/30. Dr. Lai changed his diagnosis of Mr. Brockman to include dementia associated with Parkinson's disease and increased the dose of carbidopa/levodopa 25/100 tablets to two tablets four times daily.[43]

<u>October 20, 2021, Videotaped Examination</u>

Mr. Brockman arrived for the 10/20/21 examination on time, in casual clothing, and in the company of his caretaker. At the outset of the interview, Mr. Brockman was informed as to the identities of the examiners, the retaining party, the lack of confidentiality, the absence of a treatment relationship, and the forensic purpose. Dr. Denney and I jointly interviewed the defendant, and Dr. Denney also tested the defendant that day, during which time I was not present. The interview but not the testing was videotaped. A transcript of the interview is attached as Appendix 1, and the videorecording has already been provided to the parties by the videographer hired by Jones Day.

Early in the interview, Mr. Brockman said it was December 2012. He mentioned having been married for 35 years, but after being asked about celebrating their 50th anniversary, said he thought they'd been married 53 years. He said he didn't know his caretaker's surname and incorrectly said Frank's two sons were among his caretakers; moments later, he recalled Frank's surname. He said they'd hadn't had any offers on their old house, a response I did not hear through his mask, so I asked him if the offers had been too low, and he said they were. He appeared confused about the number of hospitalizations he'd had this year (guessing he had 10-12 hospitalizations with overnight stays), whether he was unconscious for a week during the most recent hospitalization, the UroLift procedure, and how many hospitalizations he had for urosepsis (guessing one). He appeared to have only a

---

[42] Outpatient EEG, Houston Methodist Hospital, 9/2/21.
[43] RTBrockman_Medical_Records_0005776— RTBrockman_Medical_Records_0005780.

vague and incomplete understanding of several recent highly publicized news events. He recalled my name, but not that of Dr. Denney.

Asked 52 multiple-choice questions about the Indictment against him, he answered 24 correctly and 28 incorrectly, which is consistent with random guessing (an option he was encouraged to use if he did not know the answer).

Mr. Brockman refused to complete a standardized competency assessment interview during our 10/20/21 examination or to discuss the charges against him, and I understand that Dr. Denney returned to Houston and was able to complete the test on 10/26/21. During the portion of that interview completed in my presence, Mr. Brockman's answers were those of a competent defendant who knew the roles of courtroom participants.

Toward the end of the interview, he seemed confused as to who we were and why we were seeing him. He said the date was December 12, 2051. He knew the name of the President of the U.S., spelled "world" backwards correctly, but seemed unable to subtract three serially from 20, saying that 20 minus three was 27. He did not know the name of the Governor of Texas and seemed unfamiliar with the news report days earlier of a tax lien against him in Colorado and the amount of any tax liens.

Although earlier in the interview, he'd know that a finding of incompetence would lead to a lengthy process, toward the end of the interview he said it would result in "nothing." He had mentioned being tired more than once, and the interview ended soon after 4:45 p.m.

October 20, 2021, Toxicology and Urinalysis

Samples were collected on 10/20/21 and results reported by Quest Diagnostics on 10/28/21. Toxicology results were positive for the prescribed medications trazodone, quetiapine, and a metabolite of bupropion and negative for alcohols, benzodiazepines, and other intoxicants. Urinalysis indicated a Pseudomonas infection of the urinary tract, a condition that previously eventuated in hospitalization for urosepsis and altered mental state.

Maria Rosana Ponisio, M.D., Report, 10/25/21

Dr. Ponisio reviewed Mr. Brocman's FDG PET/CT scan of 3/12/21, amyloid PET/CT scan of 7/28/21, and FDG PET/CT of 8/24/21 and performed qualitative and quantitative interpretation using MIM software. She concluded, "given the pattern of metabolic abnormalities seen on FDG/PET-CT and amyloid scans, the findings are most consistent with early dementia in the correct clinical setting."

**RESPONSE TO PERSONAL CRITICISMS BY DRS. AGRONIN AND GUILMETTE**

Dr. Agronin misrepresented my June report in this passage:

Dr. Dietz asserts in his report, "information provided by colleagues or administrators about Mr. Brockman's contributions to the Baylor College of Medicine could have biased her evaluation or those of others who took his and his family's reports regarding his functioning at face value." This is speculative. Yet Mr. Brockman saw so many doctors that even were one to cynically consider Baylor its renowned physicians to make what Dr. Dietz suggests were falsified medical diagnoses, the notion that Baylor could control so many doctors to participate in such a scheme is far-fetched and without precedent.[44]

I made no suggestion that anyone made "falsified medical diagnoses." Falsification is intentional deception, whereas bias is an unconscious process well-established in many contexts, including diagnosis and forensic opinion-formation.

Dr. Agronin repeats and expands his misrepresentation in this passage:

> Dr. Dietz sweeps aside this converging evidence by speculating a salacious explanation of a donor enlisting a range of respected doctors from a prominent research hospital to come up with a falsified diagnosis and thus, an elaborately fraudulent medical record.[45]

I neither wrote nor suggested any such thing.

Like Dr. Agronin, Dr. Guilmette highlighted my comments about Mr. Brockman's VIP status, writing, "Dr. Dietz discounted the findings of the three neuropsychological exams by Dr. York, as well as other examiners who reported cognitive impairments evident in their exams, reasoning that as Baylor Medical Center-affiliates they were being unduly influenced by Mr. Brockman's VIP patient status."[46] Although concerned about whether Mr. Brockman's VIP status could have biased Dr. York or others, I discounted the seemingly objective findings of neurocognitive testing not for this reason but because Mr. Brockman's poor performance during that testing was so clearly inconsistent with his performance during testimony and speeches during the same time frame, which are data that were not available to Dr. York or the non-forensic clinicians evaluating him, most of whom were also unaware of the detailed allegations contained in the indictment. In contrast, Dr. Agronin and Dr. Guilmette had access to all of these data and do not adequately explain the inconsistencies.

Like Dr. Agronin, Dr. Guilmette seems or pretends not to understand how bias operates, as he switches subject and object in the first clause of this passage in which he transforms my expressed concern that VIP status may have biased Dr. York or others into the misrepresentation that I offered an opinion about Dr. York having biased her evaluation:

---

[44] Report of Marc E. Agronin, M.D., 8/6/21, p. 33.
[45] Report of Marc E. Agronin, M.D., 8/6/21, pp. 43-44.
[46] Report of Thomas Guilmette, Ph.D., 8/6/21, p. 16.

Dr. Dietz opined that due to Mr. Brockman's VIP status, Dr. York "could have biased her evaluation or those of others who took his and his family's reports regarding his functioning at face value," suggesting that Dr. York was prone or susceptible to diagnosing Mr. Brockman with dementia due to his contributions to Baylor College of Medicine. However, it is unclear how a diagnosis of dementia would be a preferred or biased diagnosis for a VIP. Arguably, a more "favorable" diagnosis would be something more benign and less pathological.

As for the inclination, described by Dr. Dietz, to take the report of Mr. Brockman's family "at face value" due to his VIP status, this is what clinicians do. . . .

To be clear as to my position, the only people motivated to have Mr. Brockman found demented and incompetent are Mr. Brockman and his heirs. Dr. York and any other clinician Mr. Brockman may have deceived were doing exactly what clinicians do, which is to assume their patients are telling the truth because they want an accurate diagnosis and appropriate treatment to help them get better. Unfortunately, in forensic practice, some degree of deception is so common that examiners must consider malingering as a possible explanation of facts that don't fit the known course of a disease. Even non-forensic clinicians are familiar with malingering, but I believe they are less likely to suspect it among VIPs.

Dr. Guilmette also misrepresents what I wrote in this passage:

The diagnosis of malingering is being asserted by court-appointed experts on false and contradictory pretense. One example of this is the strong inference from Dr. Dietz that Mr. Brockman's cognitive complaints arose in the context of a 2018 Bermuda raid and its implications for Mr. Brockman legally.[47]

I did not write that Mr. Brockman's cognitive complaints arose this way, and my report contains numerous references to earlier complaints. What I wrote is that it was after the Bermuda raid that Mr. Brockman first showed deficits "during tests of cognitive function." (And, of course, Drs. Guilmette and Agronin knew perfectly well that Dr. Denney, Dr. Darby, and I were retained by the government because we told Mr. Brockman so in the videotaped interviews and addressed our reports to a prosecutor.) If there is another "example" of an alleged "false and contradictory pretense," I look forward to it being articulated, as I did not find another in Dr. Guilmette's report.

## LIMITATIONS OF EVALUATION

The limitations of the evaluation identified in my previous report have been largely remedied. To the best of my knowledge, all of the medical records for which subpoenas had been issued have now been provided to the United States and its

---

[47] Report of Thomas Guilmette, Ph.D., 8/6/21, p. 72.

experts, as have recent medical records for hospitalizations and treatment in 2021. An adequate sleep study has now been completed. Experts for the United States have now been provided synopses of the interviews of lay witnesses by experts for the defense.

The only remaining limitation of which I am aware is that as of this writing, the United States has not yet verified the original date of creation of the personal health writings provided by Mr. Brockman.

If additional information is received before any proceeding in which I am called to testify in this matter, I will take it into account and revise my opinions if indicated.

## FINDINGS AND OPINIONS

None of the newly received information changes my opinion that as of May 2021, Mr. Brockman was exaggerating the extent of his cognitive impairment, just as he had at the time of Dr. York's earlier evaluations. The newly received information does, however, throw into question Mr. Brockman's current cognitive abilities and those aspects of competence to stand trial that require adequate short-term memory, particularly in light of his more recent episodes of delirium, surgery under general anesthesia, and new evidence of brain imaging consistent with early Alzheimer's disease.

A comparison of the videotaped interviews in May 2021, July 2021, and October 2021 shows Mr. Brockman appearing least impaired in May, most impaired in July, and less impaired in October. The remarkable deterioration between May and July could have been due to any combination of greater symptom exaggeration, ongoing delirium since his 5/31/21—6/11/21 hospitalization, and/or progression of his cognitive impairment to dementia. During our October 2021 examination, delirium could be ruled out as an explanation of his performance because we observed no inattention or fluctuations in level of consciousness.

The most objective evidence of Mr. Brockman's brain functioning is provided by brain imaging studies, and these are most consistent with early Alzheimer's disease. All of the other information suggesting moderate or severe dementia and on which Drs. Agronin and Guilmette rely so heavily stems from Mr. Brockman's performance when being interviewed, when interacting with others (including his lawyers, doctors, family, and friends), and when taking neuropsychological tests. In all of these settings, he has performed in a manner that has convinced a great many people that he is severely impaired. If this performance were a reliable and valid indicator of his cognitive capacity, I would join the defense experts in considering him too demented to assist counsel in the course of trial, and I would agree that the prognosis is poor.

But it is also possible that this unusually intelligent and disciplined defendant has intentionally and knowingly misled his professional and social circle to see him as more impaired than he actually is by exaggerating the extent of his cognitive decline. This would no doubt be a Herculean task, but Mr. Brockman has previously

18

accomplished Herculean tasks. Moreover, it would not be unprecedented. I once evaluated a man of far lesser intelligence and resources than Mr. Brockman who had successfully malingered trial incompetence before many doctors and other witnesses for 10 years. Some reasons for suspecting this possibility are these:

- The absence of incontrovertible evidence of moderate or severe dementia
- Superior premorbid intelligence facilitating disciplined deception even in the face of mild cognitive impairment or early dementia
- Extreme motivation to avoid prosecution for serious charges, conviction of which would result in imprisonment for the remainder of his life and significant financial loss to Mr. Brockman and his heirs
- The marked discrepancy between his cognitive test performance and his performance in speeches, testimony, and interviews until as late as May 2021
- The discrepancy between the mild findings in brain imaging studies and Mr. Brockman's performance in the severe dementia range in neurocognitive testing
- The onset of poor cognitive test performance only after Mr. Brockman became aware of the criminal investigation and at a time when his performance in speeches, testimony, and interviews remained superior
- The availability of expert coaching and guidance from his many resources or from personal research
- The reluctance or refusal of family and friends to speak to government agents or government experts (as opposed to an eagerness to help him by sharing their observations of his decline)
- Psychological test results at various times and places that I am informed are atypical and, in some instances, more extreme than found in severely demented nursing home residents

Some of these may have innocuous explanations, and none is definitive proof that Mr. Brockman is currently exaggerating the severity of his cognitive impairment, just as none of the evidence suggesting moderate or severe dementia is definitive proof that he is genuinely impaired to that degree.

I note that none of the defense expert reports received for review as of this writing adequately addresses Mr. Brockman's motivation to avoid prosecution, the marked discrepancy between his early cognitive test results and his contemporaneous testimony and speeches, or the serious allegations of a remarkable pattern of deceptive conduct spelled out in the indictment. Moreover, none of these reports indicate that defense experts fully evaluated Mr. Brockman's competency to stand trial using either conventional forensic interviewing or standardized competency to stand trial instruments. Instead, they conclude that his cognitive functioning, particularly his memory, are too impaired for him to be competent.

In our October 20, 2021, interview, Mr. Brockman again demonstrated adequate knowledge of courtroom participants and processes, but he refused to discuss the charges against him.

If Mr. Brockman's cognitive capacity and memory have genuinely declined to the degree that he suffers moderate or severe dementia, he would be incapable of working with counsel in preparing his defense, incapable of assisting counsel in the cross-examination of witnesses, and incapable of testifying in his own defense. If, in the alternative, he has successfully exaggerated the extent of his memory and other cognitive impairments over the last several years before many witnesses, he could well remain competent to stand trial despite mild cognitive impairment or even early Alzheimer's disease or mild dementia. After all, lack of memory for the alleged crimes is insufficient grounds for incompetence. To my dismay, I am unable to distinguish between these possibilities but remain hopeful that the reports scheduled to be exchanged today will lend clarity.

If, based on the totality of the evidence, the Court were to find Mr. Brockman incompetent to stand trial, the best available strategy to determine whether competence is restorable would be a period of inpatient observation within a facility of the Bureau of Prisons as contemplated by the statute.

If you have any questions about the content of this report, please do not hesitate to contact me.

Thank you for the opportunity to conduct this evaluation.

Respectfully,

Park Dietz, M.D., M.P.H., Ph.D.
Clinical Professor of Psychiatry and Biobehavioral Sciences
David Geffen School of Medicine at U.C.L.A.
Diplomate, American Board of Psychiatry & Neurology

# Appendix 1

1  F:  Good morning.  The time is 9:40AM.  We are here in the matter of the
2      United States versus Robert T. Brockman, Case Number 4:21-CR-0009
3      in the Southern District of Texas.  Today we are here for the court
4      ordered neurological examination of Mr. Brockman to be conducted by
5      Dr. Park Dietz and Dr. Robert Denney pursuant to 18 USC 4241b.
6
7  PD:  And for the record, this is not a neurological examination but a
8      psychiatric and psychological examination.
9
10 F:  Okay.  I apologize.
11
12 RD:  Did you say 41d or 41b?
13
14 F:  41b.
15
16 RD:  "B."  Okay, very good.
17
18 PD:  Mr. Brockman, I'm Dr. Park Dietz and to my right is Dr. Robert
19      Denney.  Do you recall meeting with us in the past?
20
21 RB:  Yes.
22
23 PD:  You remember both of us?
24
25 RB:  Yes.
26
27 PD:  If you at any time have difficulty hearing either of us, please let
28      us know.  We're permitted to remove the masks to make sure
29      you can hear and—and we can try to speak more loudly if that's
30      what's needed.  Before we get into any substance, I want to
31      remind you that both Dr. Denney and I have been retained by
32      the government, that is, the prosecutors, specifically the US
33      Attorney's Office, to evaluate your competence to stand trial in
34      connection with criminal charges that were described in an
35      indictment that is now public.  Do you understand that?
36
37 RB:  Yes.
38

1   PD:   We are not here in any treatment capacity or to assist you with
2         any medical or psychological issues, but rather we're here strictly
3         to evaluate you. Do you understand that?
4
5   RB:   Yes.
6
7   PD:   And all of the results of our evaluation, including the videotape
8         that's being made, reports that I expect we'll be asked to write,
9         and any testimony we may be asked to give can be entered into
10       the public record and is not at all confidential. Do you
11       understand that?
12
13   RB:   Yes.
14
15   PD:   Do you have anything?
16
17   RD:   Al—although I would say I think that the mental health
18       evaluations are under seal.
19
20   PD:   Yes, so far.
21
22   RD:   If I recall correctly, so they're not gonna be widely disseminated
23       in the public. It's just they're not private in terms of your
24       attorneys, the judge, and the prosecuting attorneys and all that.
25
26   RB:   I understand.
27
28   RD:   That's my understanding.
29
30   PD:   I think that's correct too, but if we're asked to testify—
31
32   RD:   Oh, we may testify and I don't know how it—whether the court
33       would open that or not. We have no idea.
34
35   PD:   I would assume that if we testify it'll be public, that the
36       testimony would be.
37
38   RD:   Well, we certainly cannot say it won't be.

1
2   PD:   Correct, that's right.
3
4   RD:   Yeah.
5
6   PD:   So, we tell—tell you all of that to make sure that you're aware
7         what the context is.  You happen to recall when it was that we
8         last visited with you?
9
10  RB:   Not exactly.  I would think it would be more than a year, maybe
11        not more than two years.
12
13  PD:   More than a year, maybe two years?
14
15  RB:   Yeah.
16
17  PD:   That's what you said?
18
19  RB:   Yeah, I don't have any specific recollection.  Those are just—
20
21  PD:   You don't recall what month it was?
22
23  RB:   No.
24
25  PD:   Well, you've been through some events since we last saw you and I'll
26        refresh your memory and tell you that it was in May that we saw you.
27        Do you know what month we're in today?
28
29  RB:   December.
30
31  PD:   What's that?
32
33  RB:   December.
34
35  PD:   December?  What year?
36
37  RB:   2012.
38
39  PD:   2012?  So, today is actually October 20 of 2021, and we saw you in
40        May 2021.  Do you accept that as correct?

1
2   RB:   It's mostly that I have no records with me.  Yes.
3
4   PD:   You have no records?
5
6   RB:   Yeah.
7
8   PD:   I notice you're wearing a UCS hat. What does UCS stand for?
9
10  RB:   Universal Computer Services.
11
12  PD:   Do you wear that hat often?
13
14  RB:   This one or I have a number that are identical.
15
16  PD:   You have an identical one, you switch the two?
17
18  RB:   No, I have more than that.
19
20  PD:   Ah.
21
22  RB:   Yeah, prob—probably—probably ten.
23
24  PD:   How are you feeling today?
25
26  RB:   I think I've fallen between feeling not wonderful and then not terrible.
27
28  PD:   Not wonderful and not terrible.  And how is your wife, Dorothy?
29
30  RB:   My wife Dorothy has taken on a great deal of things that I'm
31        responsible for.  And I depend upon her, you know, tremendously now
32        a days, you know, much more so than when we talked last.
33
34  PD:   Do you feel guilty about that?
35
36  RB:   I would say no I don't.
37
38  PD:   What's that?
39
40  RB:   No, I don't feel guilty about that.
41

1 PD: You don't.

2

3 RB: Yeah.  She has been amply provided for over 35 year period that
4     we've been married.

5

6 PD: How long have you been married?

7

8 RB: I think it's in the 35 to 36 year range.

9

10 PD: Do you remember celebrating a 50th anniversary?

11

12 RB: Yeah.

13

14 PD: How long would you have been married at your 50th anniversary?

15

16 RB: I think it's 53.

17

18 PD: And how's your son Robert and his family?

19

20 RB: Well, that is certainly a very bright spot in that they had one little boy,
21     his name is Zane, that was—and he's 18 months old now and just a
22     week ago they announced that she was pregnant again.  And so, he's
23     back to—

24

25 PD: You're gonna be a grandfather again.

26

27 RB: Yeah.

28

29 PD: Are you having any visitors to your home?

30

31 RB: Yes.

32

33 PD: Who visits you?

34

35 RB: We've had principally our friends from our old neighborhood.

36

37 PD: Friends from your old neighborhood come visit you?

38

39 RB: Yeah, uh-huh.

40

41 PD: Does anyone from Reynolds and Reynolds come visit you?

1
2  RB:  They have visited, but not in a formal capacity.  I have obviously
3       having worked in the organization for over 50 years, I have friends
4       that are personal friends.
5
6  PD:  Do any of them visit you?
7
8  RB:  We—I'm not understanding your question.  Yeah, I thought you asked
9       at first—
10
11 PD:  I may not have heard you properly.  But who's the last visitor you had
12      who works at Reynolds and Reynolds?
13
14 RB:  That'd probably be Tommy Barrus.
15
16 PD:  How often is Tommy visiting now?
17
18 RB:  I would say less and less.
19
20 PD:  Less and less?
21
22 RB:  Uh-huh.
23
24 PD:  Do you know how long ago it was he most recently came?
25
26 RB:  No.  It was on a personal basis; it wasn't a business basis.  We both
27      are avid watchers of football and now it's football season.
28
29 PD:  Now what?
30
31 RB:  And now it's football season.
32
33 PD:  I'm afraid I can't hear you.
34
35 RB:  When I saw Tommy Barrus last, we—we watched a football game
36      together.
37
38 PD:  Oh, you watched a football game together.
39
40 RB:  Uh-huh.
41

1   PD:   How many caretakers do you have?
2
3   RB:   I would say four.
4
5   PD:   And who are those four caretakers?
6
7   RB:   The principal one is a gentleman by the name of Frank.  I'm sorry, I
8         don't remember his last name, but he has two sons.  And so, that
9         three-man team, they're the primary caretakers.
10
11  PD:   Do you know Frank's last name?
12
13  RB:   Gutierrez.
14
15  PD:   What is it?
16
17  RB:   Gutierrez.
18
19  PD:   Has your old house sold yet?
20
21  RB:   No.
22
23  PD:   So, it's still on the market?
24
25  RB:   Yes.
26
27  PD:   Have you had some offers?
28
29  RB:   No.
30
31  PD:   Do you meet with the realtors?
32
33  RB:   No.
34
35  PD:   Who does that?
36
37  RB:   Dorothy, my wife.
38
39  PD:   So, the—were the offers too low?
40

1    RB:    I would say one was really, really blatantly ridiculous.  I can't say
2             exactly where the others have been because that real estate is
3             Dorothy's projects.  Well, I don't—I don't get in the middle of them at
4             all.  When asked, I'll say do I like A better than B or B better than A,
5             and I'll think about that and make a—make a declaration.

7    PD:    What can you tell us about your most recently hospitalization?

9    RB:    Well, starting kind of from backwards first, since I was basically
10           unconscious a lot of the time, I developed a urinary tract infection
11           which frankly I don't think we were aggressive enough in—in its
12           treatment because it turned into sepsis, blood poisoning.  And I was
13           really sick.  I was unconscious for probably the better part of a week.
14           So I'm told, because obviously I was out of it.  And I've been on very
15           heavy dosages of antibiotics and I guess after three or four weeks of
16           that I seem to have pulled back a lot as far as from an infection
17           standpoint.  I have done, you know—you know, catheters.  I don't
18           know whether you've been fortunate enough to have that experience,
19           but at any rate it—it's [inaudible 15:46] sharp things and I don't even
20           want to think about it.

22    PD:    Do you still have a catheter?

24    RB:    No.  I go back in for a follow-up where basically they—they want, you
25           know, blood from the right places so they can run the whole exam
26           again.  And so, that comes up here I think in a—in the next couple of
27           weeks.

29    PD:    What was the procedure that resulted in your being able to get rid of
30           the catheter?

32    RB:    That was antibiotics.

34    PD:    Do you remember having a procedure done not long ago?  You didn't
35           have to stay overnight in the hospital, but you had a procedure.  Do
36           you remember what it was?

38    RB:    No, I don't.

40    PD:    Have you ever heard of a UroLift?
41

1    RB:   Yes.
2
3    PD:   Are you planning to have a UroLift?
4
5    RB:   I think that was done.
6
7    PD:   You think it was already done?
8
9    RB:   Uh-huh.  Yeah, I'm—I'm sure it was already done.
10
11   PD:   I'm having some difficulty hearing you.  So, I want to stop for a
12         moment and see if we can find a resolution to that issue.  It's because
13         you're wearing a mask that I'm unable to hear you.  I don't know if
14         you're having difficulty Dr. Denney?
15
16   RD:   It—it's touchy, yeah.  It's—it's iffy.  I'm catching a lot, but not
17         everything.
18
19   RB:   Uh-huh.
20
21   PD:   And we're told that it's a requirement of the office that you wear a
22         mask, but I'm gonna see if I can do something about that.
23
24   RD:   I'll step out and ask.
25
26   PD:   Oh good, alright.
27
28   RD:   [Inaudible 18:21].  You can stay plugged in.  Julia's getting James, is
29         it, to—to talk about options.  We mentioned—Eric—Evan and I
30         mentioned if possible.  Face masks [inaudible 22:25].  She mentioned
31         well maybe we can move closer.
32
33   [Break]
34
35   RD:   Is your microphone on?  I don't see it.
36
37   PD:   Thank you.
38
39   RD:   Uh-huh.
40

1   PD:   So, we had stopped for that issue around 10:00 and it's 10:20 and
2         hopefully this problem will now be solved.  You're comfortable with the
3         shield?
4
5   RB:   Yeah.
6
7   PD:   Good.
8
9   RB:   I'm [inaudible 00:35] wearing one of these things.  He said it wouldn't
10        fog up.
11
12  PD:   It fogs up?
13
14  RB:   No, it—I've seen them fog up.
15
16  PD:   Yes.
17
18  RB:   And that would be the principle worry for this type of gear.
19
20  PD:   That's what happens with my glasses if I wear them with a mask.
21        That's why I'm not wearing them most of the time.
22
23  RB:   Okay.  Well, I'm glad to see that you're familiar with the phenomenon.
24
25  PD:   Yes.  How many times do you believe you've been in the hospital this
26        year, 2021?
27
28  RB:   Pardon me if I count on my fingers.
29
30  PD:   That's fine, you can count on your fingers.
31
32  RB:   My guess would be ten or 12.
33
34  PD:   Ten or 12?
35
36  RB:   Uh-huh.
37
38  PD:   And those are overnight stays?
39
40  RB:   Yes, unfortunately.
41

1   PD:   How many times do you think you've been hospitalized for Urosepsis,
2         a urinary tract infection that's spread?
3
4   RB:   I'd say my best guess is one.
5
6   PD:   One?
7
8   RB:   Uh-huh, yeah.  And the reason for—for that number is I—I believe
9         what's happened is, is I've had the in—infection before but it was
10        cured with a—a light dose of antibiotics.  Certainly nothing like what
11        this is all about.
12
13  PD:   Would it surprise you to know that this year you've been hospitalized
14        at Houston Methodist three times for Urosepsis?
15
16  RB:   Since a great deal of the time, especially when I'm in the hospital now
17        I'm kind of out of it.
18
19  PD:   Yeah, you are out of it when you go in the hospital.  That's true.
20
21  RB:   So, you know, probably ten plus—maybe three, four, five, six.
22
23  PD:   After you got out of the hospital, were there changes in your life?
24
25  RB:   Yes.
26
27  PD:   What changed since the last time you got out of a hospital?
28
29  RB:   Well, principally I think that, you know, they devoted so much
30        attention and so much antibiotics to me that I got well.  Which I hope
31        continues, but I—my next appointment with the doctor is very shortly,
32        I think, you know, a week or two.
33
34  PD:   Did your daily routine change after you got out of the hospital?
35
36  RB:   Yes.
37
38  PD:   What changed?
39
40  RB:   Dramatic loss of energy.
41

1    PD:   Dramatic what?
2
3    RB:   Loss of energy.
4
5    PD:   Loss of energy?
6
7    RB:   Yeah.  Loss of motivation to, you know, get anything accomplished.
8
9    PD:   What's your typical day like now?
10
11   RB:   Well, probably the most important thing is exercise.  I have one of
12         these bicycle-looking kind of things where—where the feet go like that
13         and—and that.  That type of equipment is new to me so I may not—
14         I'm not giving it names because I don't know the names.
15
16   PD:   What else do you do during the day besides exercise?
17
18   RB:   Well, I always read the newspaper.
19
20   PD:   You read the newspaper?
21
22   RB:   Yeah.
23
24   PD:   What are some of the big stories happening in the news these days?
25
26   RB:   Political or otherwise?
27
28   PD:   Let's start with political.
29
30   RB:   Well, I think that the—the feelings between the parties have if
31         anything worsened and that anything that resembles true cooperation
32         is nonexistent.
33
34   PD:   What are some of the issues that the parties disagree on?
35
36   RB:   I think that the most important one right now is, and that's the—the
37         massive spending bill.  And—
38
39   PD:   How big?
40

1    RB:   I think the last time I heard was five trillion, which is—and I'm not,
2          you know, I don't keep up with what it's being spent on.  That's
3          frankly that's more than I, you know, than my mind cares to—to deal
4          with.
5
6    PD:   Do you know what Manchin's position has been?
7
8    RB:   Manchin's?
9
10   PD:   Manchin.  Do you know that name?
11
12   RB:   No.  Is it a real estate firm?
13
14   PD:   How about Sinema, do you know that name?
15
16   RB:   How is it spelled?
17
18   PD:   S-E-N-E-M-A [*sic*], I think.
19
20   RB:   I don't recognize that name.
21
22   PD:   Are you aware of a Manchin from West Virginia?
23
24   RB:   No.
25
26   PD:   And what else do the parties in congress disagree on?
27
28   RB:   I—I think forever there's been disagreement over how much money is
29          spent on defense and how much money is spent on other things.
30
31   PD:   Has there been anything in the news recently about the border?
32
33   RB:   Not specifically.  I would imagine there's always something going on
34          about the border, but I'm not aware of it.
35
36   PD:   Is there anything going on at the Texas border with Mexico?
37
38   RB:   Yeah.
39
40   PD:   What's happening?
41

1   RB:   Well, what's happening is, and that's that our intake capabilities on the
2         border are being overrun resulting in lots of people coming in with no
3         papers and the border control facilities are incapable of keeping up.
4
5   PD:   I'm gonna ask you to speak up.
6
7   RB:   Okay.
8
9   PD:   More loudly.  Was there anything recently about a group of people who
10        crossed the border and were gathering under a bridge?  Do you
11        remember that?
12
13  RB:   No.  I'm sorry, I don't.
14
15  PD:   What country are people coming from across the Texas border?
16
17  RB:   Well, they—they all—obviously not all, but you know, principally
18        they're coming from Mexico.  You know, they may well have come
19        from some other place prior and then moved into Mexico and, you
20        know, grouped up and then came forward, you know, out of Mexico
21        under the terms of the law that lets them come out at all.
22
23  PD:   Have there been any groups arriving from Guatemala?
24
25  RB:   Yes.
26
27  PD:   How about from Haiti?
28
29  RB:   Yes.
30
31  PD:   How about from the middle east?
32
33  RB:   Not that I've heard of.
34
35  PD:   Did something important happen in the middle east recently?
36
37  RB:   Only what I would call a pitter patter of, you know, terrible acts.
38        There's nothing new going on down there other than what's been
39        going on all along.
40
41  PD:   Did anything happen in Syria?

1
2   RB:   Not that I'm aware of.
3
4   PD:   Or Egypt?
5
6   RB:   Not that I'm—not that I'm aware of.
7
8   PD:   Or Afghanistan?
9
10   RB:   Afghanistan, yes.  That company has—or that country has opened it's
11          borders and is taking in a number of people.  Actually, I think in some
12          cases they were leaving some of the backup.
13
14   PD:   Do you know how many soldiers we have in Afghanistan now?
15
16   RB:   No.  Other than it's greater than zero.
17
18   PD:   Greater than zero?
19
20   RB:   Uh-huh.  What the number is, I don't know.
21
22   PD:   Have you heard about a committee in congress that's investigating a
23          big event that happened earlier this year?
24
25   RB:   No.
26
27   PD:   Have you heard of a committee investigating the events at the Capitol
28          on January 6?
29
30   RB:   Yes, I've heard—I've—I don't know the specifics, but I've heard that
31          there is some investigation going on.
32
33   PD:   And what do you think that's about?
34
35   RB:   Bearing in mind when I say that I know something about politics,
36          there's boundaries to that.  I don't know a lot.  And I don't—I don't
37          know or maybe I never knew—
38
39   PD:   What happened to the Capitol on January 6?
40
41   RB:   You know, basically riots.

1
2    PD:    Have you heard anybody call it something worse?
3
4    RB:    No.
5
6    PD:    Do you have therapists who come to your house?
7
8    RB:    I have—I guess they refer to them as coaches because that's what
9           they're most like.  And they're—I have three, sometimes four.
10
11   PD:    What do they do with you?
12
13   RB:    Well, they have a—a set of calisthenics that involves bending and
14           stretching.  And that's consistently what they—what they work on.
15
16   PD:    Do you know when you're going to be back in court next?
17
18   RB:    Not specifically.  I would guess that it would be sometime before
19           Christmas.
20
21   PD:    Sometime what?
22
23   RB:    Sometime before Christmas.
24
25   PD:    Before Christmas.  My understanding is there is a hearing scheduled
26           before Christmas the week of November 15.  Do you know what that is
27           about?
28
29   RB:    I don't specifically, but I would expect that it has to do with going
30           before the judge.
31
32   PD:    Something to do with what?
33
34   RB:    Going before the judge.
35
36   PD:    Something before the judge?
37
38   RB:    Uh-huh.
39
40   PD:    And do you know what the issue is for that hearing?
41

1    RB:   Yes.
2
3    PD:   What's the issue?
4
5    RB:   Well, the issue is, and that's that the—the Justice Department believes
6          that I'm guilty of tax evasion.  And the—the hearing, you know,
7          principally revolves around that.
8
9    PD:   So, the Justice Department believes you're guilty of tax evasion and
10         the hearing is related to that?
11
12   RB:   That—that's my understanding.
13
14   PD:   Have you heard of the issue of competence to stand trial?
15
16   RB:   Yes.  But that is a—a smaller issue than the basic issue.
17
18   PD:   Is it possible that the hearing the week of November 15 is about
19         whether you are competent to stand trial?
20
21   RB:   It—it could very well be.
22
23   PD:   Do you know my name?
24
25   RB:   I believe it's Dietz.
26
27   PD:   Yes, it is.  And who is this?
28
29   RB:   I'm sorry, I don't remember.
30
31   PD:   So, this is Dr. Denney.  And do you know what we're here to evaluate
32         you about?
33
34   RB:   You're here to evaluate my competency to—to stand trial.
35
36   PD:   That's right.  And what would happen if the court determined that you
37         were competent to stand trial?
38
39   RB:   I would presume I'd go to trial.
40

1   PD:   And what would happen if the court determined that you were not
2         competent to stand trial?
3
4   RB:   I'm less clear as to what would happen.  Probably—my guess it would
5         be—would be a long involved process.
6
7   PD:   Would you need to go anywhere?
8
9   RB:   I don't know.
10
11  PD:   Well, I'm gonna let Dr. Denney begin to ask you questions and I'll be
12        quiet for a while until I'm invited to speak again.
13
14  RB:   Okay.  Do I have to take my mask off or leave it on or?
15
16  RD:   No, you're good.
17
18  RB:   Okay.
19
20  RD:   Yeah, you're good.  Thank you.  Let me—you know, I could just jump
21        into testing stuff.
22
23  PD:   If you like.
24
25  RD:   Because I don't know how helpful doing more general questioning is
26        gonna be, and it's 10:40.  Is that alright?
27
28  PD:   Of course it is.
29
30  RD:   Okay.  We're gonna change gears a little bit, actually, and move into
31        doing some testing things.  So, I need to talk to the comp—or the
32        recording people because that portion is not going to be recorded.
33        Okay?  So, I'll be right back.
34
35  RB:   As long as that obeys all the rules.
36
37  RD:   Right.  Oh no, that's—
38
39  RB:   Most—most of this I don't understand.
40

1    RD:   Yeah, that's—that's what's agreed upon.  And we may have to readjust
2          some things, so let's just wait until they shut that off and get off the
3          record, then we'll talk about it—how we're gonna do the layout.
4
5    [Break]
6
7    RD:   Okay, very good.  Okay Mr. Brockman, we're back onto the video and
8          we just have one procedure to go through.  It should go pretty quickly.
9          Okay?
10
11   RB:   Well, depending upon how you define pretty quickly, yeah, it's okay.
12
13   RD:   Okay.  Alright.  Yeah, yeah.  Well, it's a multiple choice questionnaire.
14         Okay.  So, I'll just read the instructions and we'll charge ahead.
15         Alright.  I—I would like to ask you some questions regarding your
16         indictment because your memory of the details of what is alleged in
17         the indictment pertaining to the charges against you are important.  I
18         realize things have changed for you in such a way as to make your
19         memory a significant concern.  I do not want you to tell me any
20         private information discussed between you and your lawyers.  I am
21         not asking about that.  All I am asking is questions about your
22         indictment.  Okay?  The document itself.  I am not asking you to tell
23         me anything that's not already in the public domain.  Because your
24         memory for these events is a concern, I wanted to document just how
25         much memory loss you have—you have in regards to your indictment.
26         Okay?  So, in—in what district court—and every question I've got has
27         got multiple choice for it.  I'm gonna ask—I'm gonna read the question
28         and I'm gonna give you the ans—give you the options.  Okay?  I'd like
29         for you to choose an option to—to the best of your memory.  And if
30         you don't remember something, I appreciate that.  Just make your
31         best guess.  Okay?  In what district court were you first indicted?
32         Eastern District of Texas or the Northern District of California?
33
34   RB:   I have no idea.
35
36   RD:   Okay.  Best guess.  Eastern District of Texas or Northern California?
37
38   RB:   I could only guess.
39
40   RD:   Sure.
41

1   RB:   I don't think I—I should be guessing.
2
3   RD:   Well, that—that's okay.  Guessing is fine.  Eastern District of Texas or
4         you think the Northern District of California?
5
6   RB:   Eastern District of Texas.
7
8   RD:   Okay.  In what division was—actually it was the Northern District of
9         California, actually.  In what division was the indictment first filed in
10        the Northern District of California?  San Francisco Division or Oakland
11        Division?
12
13  RB:   I have no idea.
14
15  RD:   Best guess.
16
17  RB:   I'd say San Francisco.
18
19  RD:   Okay.  That's right.  Over what tax years were you allegedly to have
20        evaded paying taxes, that is, tax evasion?  2000-2018 or 2006-2018?
21
22  RB:   Could you repeat that?
23
24  RD:   Sure.  Over what tax years were you alleged to have evaded paying
25        taxes?  2000-2018 or 2006-2018?
26
27  RB:   My guess would be through 2018.
28
29  RD:   I'm sorry, I didn't hear you.
30
31  RB:   My guess would be 2006-2018.
32
33  RD:   Okay.  Okay.
34
35  RB:   I—I have no knowledge of the subject.
36
37  RD:   Yeah.  No, that's—and that's fine.  That's why—I understand.  I fully
38        understand that when you don't remember you're just guessing, and
39        that's okay.  Spanish Steps Holdings was originally formed on which
40        island?  Bermuda or Nevis?
41

1   RB:   I have no idea.
2
3   RD:   Best guess.
4
5   RB:   I would say Bermuda.
6
7   RD:   Okay.  Point Investments was originally incorporated in 1999 in which
8         country?  British Virgin Islands or Bermuda?
9
10  RB:   I—I have no recollection of which one it is.
11
12  RD:   Sure.  Just best guess.
13
14  RB:   Bermuda.
15
16  RD:   Alright.  That's right, good.  Edge Capital Investments was created in
17        which country?  Bermuda or Nevis?
18
19  RB:   I have no idea.
20
21  RD:   Best guess.
22
23  RB:   I'd say Bermuda.
24
25  RD:   Alright.  Okay.  The indictment alleges that Edge Capital was managed
26        by what?  A parent company or a sole individual?
27
28  RB:   I have no idea of the correct answer on that one either.
29
30  RD:   Best guess.
31
32  RB:   I would say by an individual.
33
34  RD:   Alright.  That's right, good job.  The indictment alleges that you
35        committed how much money to Vista's first private equity fund?  That
36        is, Vista Equity Fund II.  500 Million or 300 Million?
37
38  RB:   I have no recollection.
39
40  RD:   Best guess.  500 Million or 300 Million?
41

1  RB:  300.

3  RD:  Alright.  That's right, good.  The indictment alleges this amount was
4        later raised to which amount?  1 Billion or 1.7 Billion?

6  RB:  I have no idea.

8  RD:  Best guess.  Yeah, I understand you don't—you don't—I—I understand
9        you don't have memory for the indictment very well.  That's why I'm
10       documenting this.  You don't need to say, "I don't remember."  I mean
11       that—that's okay if you do.  So, the indictment alleges this amount
12       was later raised to which amount, 1 Billion or 1.7 Billion?  Best guess.

14 RB:  I think 1 Billion.

16 RD:  Okay.  That's right, good job.  The indictment alleges there were how
17       many limited partners in the Vista Equity Fund II?  One or three?

19 RB:  I have no idea.

21 RD:  One or three?

23 RB:  Yeah, my best guess would be three.

25 RD:  Okay.  The indictment alleges that you concealed from the IRS capital
26       gain income that you earned from investments you made in Vista
27       through which entity?  Cabot Global Investment or Point Investments?

29 RB:  Neither of those.

31 RD:  Okay.  Well, the indictment says one of them.  Which one is it that the
32       indictment alleges, Cabot Global or Point Investments?

34 RB:  That'd be your guess, not mine.

36 RD:  Pardon me?

38 RB:  That—that would be your guess, not mine.

40 RD:  Well, that's what I'm—I'm asking you, if you don't remember to make
41       your best guess from what the indictment says.

1
2   RB:   Could you give me the alternatives again?
3
4   RD:   Pardon me?
5
6   RB:   Could you give me the alternatives again?
7
8   RD:   Sure.  Cabot Global Investment or Point Investment?
9
10  RB:   Point.
11
12  RD:   Alright.  That's right.  The indictment alleges you made how much in
13         capital gains through investments in Vista?  1.7 Billion or 2 Billion?
14
15  RB:   I have no idea.
16
17  RD:   Okay.  I understand.  The indictment alleges how much capital gains
18         through Vista, 1.7 or 2 Billion?
19
20  RB:   1.7.
21
22  RD:   Alrighty.  Actually, they claim it was two.  "They," the indictment I
23         mean.  The indictment alleges that you hid your involvement with the
24         Vista funds in what way?  A, off—off the books transfer made by fund
25         managers, or creating a false paper trail covering up your relationship
26         with Point Investments?  Which one is it that the indictment alleges?
27
28  RB:   I have—I have no idea, but my guess would be the one where it talks
29         about covering it up.
30
31  RD:   Oh, the false paper trail covering up?
32
33  RB:   Uh-huh.
34
35  RD:   Okay.  That's what the indictment says.  The indictment alleges money
36         flowed to your control through offshore companies and trusts that
37         were what?  Completely controlled by you or not controlled by you?
38
39  RB:   Not controlled by me.
40

1 RD: Alrighty.  Actually, the indictment says that—or claims that you
2 controlled them.  The indictment alleges you communicated through
3 an e-mail system.  What was this e-mail system?  A proprietary
4 encryption e-mail system you created or a system purchased off the
5 shelf?
6
7 RB: A system purchased off the shelf.
8
9 RD: Okay.  Actually, the indictment alleged that you created a proprietary
10 system. The indictment alleges you had what code name within this e-
11 mail system?  For yourself, that is.  Permit or King?
12
13 RB: Permit.
14
15 RD: Permit.  That's right.  The indictment alleges that a code name used
16 for a manager you appointed was what?  Bonefish or Bluefish?
17
18 RB: Bonefish.
19
20 RD: That's right.  The IRS had a code name, too, based on the allegations
21 in the indictment.  What is that code name?  The House or The Club?
22
23 RB: The House.
24
25 RD: That's—that's right.  That's what the indictment says.  The indictment
26 alleges what problem related to Spanish Steps?  Spanish Steps held
27 over 90% of preferred stock in UCSH, that is Universal Computer
28 Systems Holdings, or that you actually controlled Spanish Steps
29 through your control of St. John's Trust Company, UCSH, and USC?
30
31 RB: Okay.  And the question is—is what?
32
33 RD: I'm sorry?  The indictment alleges what problems related to Spanish
34 Steps.  What was the problem alleged in the indictment, which one of
35 these, that Spanish Steps held over 90% of preferred stock in UCSH,
36 or that you actually controlled Spanish Steps through your control of
37 these other entities?
38
39 RB: I think it's the first one.
40

1  RD: The first one.  Okay. The indictment alleges that you earned
2       approximately how much money in capital gains through investments
3       in Vista through Point Investment?  1 Billion or 2 Billion?
4
5  RB: Well, here's where the—there's a very basic disagreement, which is—
6
7  RD: Well, I'm just asking about what the indictment says.  What does it—
8       what does it allege regarding your earnings?  Approximately how much
9       money in capital gains through investments in Vista through Point, 1
10      Billion or 2 Billion?
11
12 RB: One.
13
14 RD: Okay.  The indictment alleges you directed what funds to be wired
15      from Vista's bank accounts in California—I'm sorry, I misread that.
16      The indictment alleges you directed that funds be wired from Vista's
17      bank accounts in California to what country?  Luxemburg or
18      Switzerland?
19
20 RB: I have no idea.
21
22 RD: Best guess.
23
24 RB: Switzerland.
25
26 RD: Alright.  That's—that's what it said.  The indictment alleges what
27      problem in the amount of taxes paid in capital gains from these
28      earnings?  Was it that—that you—does the indictment allege that you
29      paid taxes on none of the capital gains or that you paid taxes on only
30      20% of the capital gains?
31
32 RB: I have no idea what the answer is.
33
34 RD: Best guess.  Taxes on none of it or on 20% of it?
35
36 RB: 20%.
37
38 RD: Alright.  Actually, it alleges you paid taxes on none of it.  Yeah.  The
39      indictment alleges wrongdoing by you as a result of which of these
40      issues?  One, that you did not report the accounts held under your

1       name within Luxemburg, or that you did not report your interest and
2       ownership in foreign bank accounts?
3
4   RB:   I—again, I have no idea what the right answer is.
5
6   RD:   Well, best guess as—as to what the indictment says. You did not
7       report accounts held under your name within Luxemburg or you did
8       not report interest in ownerships in foreign banks accounts in general?
9
10  RB:   The second one.
11
12  RD:   The second one. That's right, that's what it says. The indictment
13       alleges that in 2004 or that the 2004 distribution of approximately 635
14       Million of UCS's retained earnings to Spanish Steps for the purpose of
15       transfer to Point Investments had a code name. What was that code
16       name? Dragster or Hotrod?
17
18  RB:   My guess would be Hotrod.
19
20  RD:   Okay. That's what it said. The indictment alleged that you directed a
21       change in the name of the A. Eugene Brockman Children's Trust after
22       reading this book. *Offshore Affairs Tax Havens Decoded* or *Tax Haven*
23       *Abuses: The Enablers, The Tools and Secrecy*?
24
25  RB:   I have no idea.
26
27  RD:   Okay. Which one does the indictment allege? *Offshore Affairs Tax*
28       *Havens Decoded* or *Tax Haven Abuses*?
29
30  RB:   Probably *Offshore Affairs*.
31
32  RD:   *Offshore Affairs*. Okay. Actually, it—it—it claimed *Tax Haven Abuses*.
33       The indictment alleged that one of the problems related to Spanish
34       Steps was what? That Spanish Steps investments were not monitored
35       sufficiently or Spanish Steps owned a majority of UCSH investment
36       shares, a Brockman owned company?
37
38  RB:   I don't understand that one. Don't have a clue. It's a best guess type
39       kind of deal.
40
41  RD:   I'm sorry, I can't hear you.

1
2   RB:   Since I don't understand what's going on, it's a best guess kind of—
3         kind of—
4
5   RD:   Sure.  Best guess, that's fine.  Which one?  Spanish Steps investments
6         not monitored sufficiently or Spanish Steps owned a majority of UCSH
7         investment shares, a Brockman owned company?
8
9   RB:   That—the last one.
10
11  RD:   The second one?  Okay.  That's right.  That's what the indictment says.
12        Related to USCH, the indictment alleged what problem?  Directors of
13        SJTC controlled UCSH or that directors of SJTC were controlled by you?
14
15  RB:   I don't have a clue which way that one goes.
16
17  RD:   Best guess.
18
19  RB:   Can you read them off again?
20
21  RD:   Sure.  Related to USCH, the indictment alleged what problem?
22        Directors of SJTC controlled UCSH, or the directors of SJTC were
23        controlled by you?
24
25  RB:   I think it's the last one.
26
27  RD:   Okay, that's right.  That's what the indictment says.  The indictment
28        alleged that you instructed a person referred to as Individual One to
29        purchase a computer software program for his computers that was
30        designed to wipe clean computer disks.  Which program did the
31        indictment list?  Blancco Drive Eraser or Evidence Eliminator?
32
33  RB:   Again, it's just a guess.
34
35  RD:   Sure.
36
37  RB:   The guess would be Evidence Eliminator.
38
39  RD:   Evidence Eliminator.  That's what the indictment says.  The indictment
40        alleged that you communicated through the encrypted e-mail
41        regarding backdating documents.  What was the indictment alleging?

1        A, that you instructed a person referred to as Individual One that copy
2        paper was encoded with a date, or you instructed a person referred to
3        as Individual One that printer ink can be used to back trace date of
4        documents?

5

6  RB:   I'd say it's the second one.

7

8  RD:   Alrighty.  Actually, the indictment says something about paper being
9        dated.  Which of these allegations is cited in the indictment?  A, here
10       you told a person referred to as Individual One to limit calls made to
11       British Virgin Islands and Cayman Islands during regular business
12       hours, or two, you told a person referred to as Individual One to
13       eliminate direct calls to British Virgin Islands and Cayman Islands from
14       a landline or cellphone?

15

16  RB:   Again, I have no idea.  But I—my guess would be it's the last one.

17

18  RD:   Okay.  Yeah, that's what the indictment says.  In regard to phone
19       accounts, the indictment alleges that you did what?  Had a BVI
20       resident create a single Vonage account in order to keep the system
21       organized, or had a BVI resident establish multiple Vonage accounts?

22

23  RB:   I don't—I don't have any idea.

24

25  RD:   Best guess.  BVI created a single Vonage account in order to keep it
26       organized, or a BVI resident to establish multiple Vonage accounts?

27

28  RB:   I think the single.

29

30  RD:   Single.  Alrighty.  Actually, the indictment said it was multiple.  The
31       indictment alleges that you instructed an individual to purchase a
32       fishing lot for not more than how much money?  $500,000 or
33       $400,000?

34

35  RB:   I don't have a clue.

36

37  RD:   Okay.  Best guess.

38

39  RB:   I think $400,000.

40

1  RD:  Alrighty.  Actually, the indictment alleged $500,000.  The fishing lot
2       was to be purchased through what entity?  Point or Henke Properties?
3
4  RB:  I think Henke Properties.
5
6  RD:  Okay.  That's right, that's what it said.  The indictment alleges that in
7       2010 you directed a large sum of money obtained from VEF II sale of
8       portfolio company as a distribution from Vista to Point into an account
9       in which country?  Lux or—sorry, Switzerland or Luxemburg?
10
11 RB:  I have no idea.
12
13 RD:  Best guess.  Large sum of money from the portfolio company
14      distributed from Vista to Point into which country, Switzerland or
15      Luxemburg?
16
17 RB:  I'd say Switzerland.
18
19 RD:  Yeah.  That's what the indictment says, you're right.  That money was
20      allegedly deposited in which bank in Switzerland?  UBS Switzerland or
21      Mirabaud Bank?
22
23 RB:  Yeah, not—I don't know which one.  My—my guess would be
24      Mirabaud.
25
26 RD:  That's what the indictment says.  What was the approximate amount
27      allegedly deposited after the account was opened?  499 Million or 799
28      Million?
29
30 RB:  I have no idea.
31
32 RD:  Best guess.
33
34 RB:  400.
35
36 RD:  499?
37
38 RB:  Yeah, 499.
39
40 RD:  Okay.  Actually, the indictment alleged 799.  But that's okay.  The
41      indictment alleges what in regard to the Point account at Mirabaud

1        Bank?  That A, you obtained a user identification password to directly
2        access the account, or that you specifically did not have direct access
3        to this account in order to hide your involvement?

4

5   RB:   Again, I have no idea.  I have no idea.

6

7   RD:   Which do you think the indictment says in regard to Point account at
8        Mirabaud Bank?  You obtained a user ID password to directly access
9        the account, or you specifically did not have direct access to this
10      account in order to hide your involvement.  Which one do you think
11      the indictment said?

12

13  RB:   My guess is, and that's that I—I did not have direct access.

14

15  RD:   Did not have.  Okay.  Actually, the indictment claims—or alleges that
16      you obtained a user ID.  The indictment alleges that you corresponded
17      with the person referred to as Individual One regarding Point's
18      purchase of Edge's investment in VEF II.  It alleged what?  To
19      purchase Edge's investment in VEF II and destroy records at Vista
20      reflecting the purchase, or to purchase Edge's investment in VEF II for
21      500 Million?  Which one was it that the indictment alleged?

22

23  RB:   I think 500 Million.

24

25  RD:   Alright.  Actually, the indictment alleged the other one.  The
26      indictment alleged that you instructed a person referred to as
27      Individual One to create which of these; a backdated memo from
28      himself to Bob or a fictitious conversation with a deceased former
29      nominee?

30

31  RB:   I—my guess would be the second one.

32

33  RD:   Okay.  You are correct that that is what the indictment alleges.  The
34      indictment alleged that you instructed the person referred to as
35      Individual One to attend a conference about what topic?  Money
36      laundering or improving asset growth offshore?

37

38  RB:   I would think improving asset growth offshore.

39

40  RD:   Okay.  Actually, the indictment says the other one.  During that
41      conference related to money laundering, during that conference he

1    was instructed to do what?  Attend under assumed—an assumed
2    identity if possible, or to make no contact with Bob Brockman?
3
4 RB: I have no—no idea which one.
5
6 RD: Best guess.
7
8 RB: I think it would be the one about no contact with Bob Brockman.
9
10 RD: Sure.  Okay. On or about 2014 Individual One requested Brockman
11    purchase a house for his family if he were to be subjected to
12    proceedings.  Where was the proposed location of that housed—
13    house?  Australia or New Zealand?
14
15 RB: I have no idea, but my guess would be New Zealand.
16
17 RD: Alrighty.  Actually, it was Australia.  What was the city referenced in
18    regard to that house?  Melbourne or Sydney?
19
20 RB: Sydney.
21
22 RD: That is right.  That's what the indictment says.  The indictment alleged
23    that you agreed to provide Individual One with how much money for
24    that house?  5 Million or 3 Million?
25
26 RB: I have no idea.
27
28 RD: Best guess.  5 Million or 3 Million for the house in Australia?  Again,
29    what the indictment alleges.
30
31 RB: My guess is five.
32
33 RD: Alright.  The indictment alleges that in 2016 you transferred
34    $41,545,359.00 in a series of transactions from San Francisco to
35    another country to hide the proceeds of bank fraud and wire fraud.
36    The indictment alleges what country was that?  Cayman Islands or
37    Switzerland?
38
39 RB: I have no—no recollection, but my guess would be Switzerland.
40

1   RD:   That is correct.  The indictment alleges that in 2016 you learned that a
2           widow of a former nominee was in possession of materials which could
3           be harmful to your legal position and that you A, made several trips
4           for the purpose of destroying documents and electronic media and did
5           so using shredders, hammers and other means, or B, persuaded
6           someone else to travel to the United States for the purpose of
7           destroying documents and electronic media with shredders, hammers
8           and other things?  Which one is it that the indict—indictment alleges?
9

10   RB:   I would think the first one.
11

12   RD:   Okay.  Actually, it's claiming the other.  The indictment alleges that in
13         2016 you learned that a widow of a former nominee was in possession
14         of—oh, that's a copy, isn't it?  No, not quite. Pretty close, but it's not.
15         And the indictment alleges that in 2016 you learned of a widow of a
16         former nominee was in possession of materials which could be harmful
17         to your legal position and that you caused someone else to transfer
18         documents and electronic media from the widow to yourself, or to you,
19         or persuaded the widow to give you documents and electronic media?
20

21   RB:   I have no idea which one.
22

23   RD:   Okay.  Got that marked down.  "I have no idea."  Best guess?
24

25   RB:   Can you give me the—can you give me the various choices?
26

27   RD:   Options?  Sure.  Okay.  Caused someone else to transfer documents
28         and el—and electronic media from the widow to you, or persuaded the
29         widow to give you documents and electronic media?
30

31   RB:   I'd say the second one.
32

33   RD:   Okay.  The indictment alleges that you altered, destroyed, or mutilated
34         documents and computer evidence with the intent to do what?  A,
35         impair their integrity and availability for use in an audit by the IRS, or
36         impair their integrity and availability for use in federal grand jury
37         investigation?
38

39   RB:   I have no idea.
40

41   RD:   Best guess.

1
2    RB:    First one.
3
4    RD:    Okay.  The indictment says that upon conviction of any of the offenses
5           in counts 15 to 24 you shall forfeit how much money to the United
6           States?  Approximately $135,670,258 or approximately $67,835,129?
7
8    RB:    Same thing, just two different numbers.
9
10   RD:    Well, that's true.  Which number is—is from the indictment?
11
12   RB:    My guess it's the larger one.
13
14   RD:    Okay.  The indictment says that upon conviction of any of the offenses
15          in counts 35 to 37 you shall forfeit how much money to the United
16          States?  Approximately $23,843,093, or approximately $47,686,187?
17
18   RB:    I'd say the second one.
19
20   RD:    Second one.  That's right.  Okay.  That's what it says.  The indictment
21          alleges that you prepared and caused to be prepared and signed and
22          caused to be signed false and fraudulent United States individual
23          income tax returns for which calendar years?  2012-2018 or 2015-
24          2018?
25
26   RB:    Again, I don't have any idea so I'd guess the—the 2015.
27
28   RD:    Alrighty.  Last question. The indictment alleges that you failed to file
29          FBAR documents, right, concerning your financial interests in accounts
30          at Mirabaud Bank in Switzerland and Bermuda Commercial Bank in
31          Bermuda in the name of Edge, Cabot, and Point for which years?
32          2013-2016 or 2011-2014?
33
34   RB:    Again, I have no idea so I—I guess the 2011 one.
35
36   RD:    Alrighty.
37
38   PD:    What was that answer?
39
40   RD:    B.  2011, the one he said.  Did we skip any?
41

1   PD:   Nope.
2
3   RD:   Very good.  I—I did have just a couple more questions on the other
4         little test if you want to finish that.
5
6   RB:   No.
7
8   RD:   No?  Alright.  Do you have anything that you need to say?
9
10  PD:   There were a couple things I wanted to—to ask you as we finish up.
11        Do you recall who we are?
12
13  RB:   Yeah, but I don't think I can say the name.  I think that it's—it's
14        research firm.
15
16  PD:   You think what?
17
18  RB:   A research firm out—out in San Francisco.
19
20  PD:   A research firm out of San Francisco?
21
22  RB:   Yeah, where you—you do contract projects such as the one you're on
23        right now.
24
25  PD:   Why do you think we were here talking to you today?
26
27  RB:   I think that you're representing your client and asking questions.
28
29  PD:   Who is our client?
30
31  RB:   I believe ultimately, it's—it is—it's name originally was ADP, Automatic
32        Data Processing.  It's—and now it goes by a different name.
33
34  PD:   Do you think we work for the competition?
35
36  RB:   The competition of Reynolds and Reynolds?  Yes.
37
38  PD:   I'm not sure I'm hearing you correctly.
39
40  RB:   If you say competition, meaning competition to Reynolds and
41        Reynolds, I believe that to be the case.

1
2   PD:   Do you know what today's date is?  Do you know today's date?
3
4   RB:   I think it's the 12th.
5
6   PD:   The 12th of what?
7
8   RB:   December.
9
10  PD:   December?
11
12  RB:   Uh-huh.
13
14  PD:   What year?
15
16  RB:   This year, 2051.
17
18  PD:   20 what?
19
20  RB:   2051.
21
22  PD:   2059?
23
24  RD:   2051.
25
26  PD:   2051.
27
28  RD:   Did you say 2051?
29
30  RB:   Uh-huh.
31
32  PD:   And do you know who the President of the United States is?
33
34  RB:   Yes.  His name is Joe Biden.
35
36  PD:   Are you able to spell the word "world" backwards?
37
38  RB:   D-L-R-O-W.
39
40  PD:   And can you subtract 3's from 20?
41

1  RB:  Yes.
2
3  PD:  Would you do that out loud please, starting with 20?
4
5  RB:  I'm afraid I don't understand.
6
7  PD:  Start with the number 20.
8
9  RB:  Okay.
10
11 PD:  And then subtract three at a time.
12
13 RB:  Okay.
14
15 PD:  So, what's the first answer?
16
17 RB:  27.
18
19 PD:  20 minus 3 equals 27?  Is that what you said?
20
21 RB:  I'm—I'm afraid it's late in the day and—
22
23 PD:  It is late.
24
25 RD:  It is.  If you were to start at 20 and then you subtract three, what
26       would you get?
27
28 RB:  27.  Again, it's late in the day.
29
30 PD:  Do you know who the governor of Texas is?
31
32 RB:  His name is Jeff.  I'm afraid I'm drawing a blank on that one.  Good
33       guy though.
34
35 PD:  Are you aware of publicity that occurred in Colorado last week about
36       the IRS civil action against you?
37
38 RB:  No.
39
40 PD:  Do you know whether the IRS has any liens against your properties?
41

1    RB:   I believe they do.
2
3    PD:   Do you know for approximately how much the liens are in Colorado?
4
5    RB:   No, I don't.
6
7    PD:   Would it be more than 100 Million or less than 100 Million?
8
9    RB:   I don't know what the number would be.  It certainly has been moved
10         around—moving around a lot.  You know, because of liens.
11
12   PD:   Could there be an IRS lien against you in Colorado for 1.7 Billion
13        dollars?
14
15   RB:   I really don't think so.  There—there's a number and it's a big number,
16        but not that big.
17
18   PD:   It's a very big number, isn't it?
19
20   RB:   Uh-huh.
21
22   PD:   That number.  And if you were to be found incompetent, what do you
23        think happens next?
24
25   RB:   I think nothing.
26
27   PD:   What's that?
28
29   RB:   Well, my—I don't know, but my impression is nothing.
30
31   PD:   Nothing.  Do you have any additional questions?
32
33   RD:   No.  I just wish we could finish that—
34
35   RB:   I'm sorry.
36
37   RD:   That's okay.  It is what it is.
38
39   RB:   It's a quarter until 5:00.
40

1   RD:  Yeah, I don't think it would take more than 15 minutes if—if we would
2          go through it smoothly, but—
3
4   RB:  Yeah.  My mind's a little tired.
5
6   RD:  Okay. So be it.  I don't have any other questions.
7
8   PD:  Alright.  We will stop for the day then.
9
10  RB:  Okay.  Thank you.
11
12  RD:  Thank you.
13
14  PD:  Thank you.  Thanks for continuing.
15
16  RD:  I shall go.
17
18  RB:  Dr. Dietz, it's a pleasure to talk to you today and I'm—I'm glad that
19         the last half of the day looks more pleasant than the last time we had.
20         It was not pleasant.
21
22  PD:  Yes, I know that wasn't pleasant and I'm sorry it's so.  That often
23         happens.
24
25  RD:  So, you're good?
26
27  RB:  Yeah.
28
29  RD:  Alright.
30
31  RB:  No.  Yeah.  No.
32
33  PD:  Nice to see you Mr. Brockman.
34
35  RB:  No.  I—I don't think so.
36
37  RD:  Okay, yeah.
38
39  RB:  It's gotta be yours.
40
41  RD:  It looks exactly like mine, but—

1
2    RB:   But thank—thank you.
3
4    RD:   I wasn't gonna take your pen from you.
5
6    RB:   I don't know when I'll see you again, but I'm sure I will.
7
8    PD:   Perhaps.
9
10   RD:   Possibly.  Wish you the best, man.  Thank you.
11
12   M:    Let me get your microphone off.