# PARK DIETZ & ASSOCIATES, INC.
### Forensic Experts

**Administrative Offices**

2906 Lafayette
Newport Beach, CA  92663
Tel:  949-723-2211
Fax:  949-723-2212
Email:    expert@parkdietzassociates.com
Website:   www.parkdietzassociates.com

- **Forensic Psychiatry**
- **Forensic Psychology**
- **Forensic Pathology**
- **Forensic Neurology**
- **Forensic Social Work**
- **Child Welfare**
- **Criminology**
- **Security**

June 21, 2021

Corey J. Smith
Senior Litigation Counsel
U.S. Department of Justice, Tax Division
150 M Street NE, Rm 2.208
Washington, DC 20002

Re:  United States v. Robert T. Brockman

Dear Mr. Smith:

At your request, I conducted a forensic psychiatric evaluation of Mr. Robert Brockman for the purpose of providing an expert opinion as to his competence to stand trial on a 39-count indictment for violations of these statutes:

> 18 U.S.C. § 371 – Conspiracy
> 26 U.S.C. § 7201 – Tax Evasion
> 31 U.S.C. §§ 5314 & 5322(b) –FBAR Violations
> 18 U.S.C. § 1343 – Wire Fraud Affecting a Financial Institution;
> 18 U.S.C. § 1956(a)(1)(B)(i) – Concealment Money Laundering;
> 18 U.S.C. § 1956(a)(1)(A)(ii) – Tax Evasion Money Laundering;
> 18 U.S.C. § 1956(a)(2)(B)(i) – International Concealment Money Laundering;
> 18 U.S.C. § 1512(b)(2)(B) – Evidence Tampering;
> 18 U.S.C. § 1512(c)(1) – Destruction of Evidence

My evaluation of Mr. Brockman was one component of a multidisciplinary evaluation that also included evaluations by Ryan Darby, M.D., and Robert Dennery, Psy.D. Dr. Darby, Dr. Denney, and I conferred with one another by telephone on several occasions to plan logistics; to share ideas on additional investigation, testing, interviews, or studies that could clarify the defendant's diagnoses and competence; and to compare observations.

## SOURCES OF INFORMATION

In conducting my evaluation, I reviewed the following sources of information:



US v. Brockman
**DX-5**
Case No:  4:21-cr-0009

CONFIDENTIAL

**PDA-0000025**
Brockman_0001980

Medical Records re. Robert Brockman (various dates; identified by PDF page numbers)

- Baylor College of Medicine
- Houston Methodist
- Houston Methodist, 2nd production
- Fondren Orthopedic
- UT Physicians
- Komal Copra Stoerr, M.D.
- Medical records and personal writings provided by Mr. Brockman

Dated Records (chronologically, by date of creation)

- Video of Mr. Brockman speaking to Reynolds and Reynolds employees in approximately September 2017 [UCSH 0207346]
- Video of Mr. Brockman speaking at the 2018 Reynolds and Reynolds Company birthday party in approximately November 2018 [UCSH 0210542]
- Transcript and video of the deposition of Robert Brockman In re. Dealer Management Systems Antitrust Litigation, 1/16/2019
- Transcript and video of the deposition of Robert Brockman In re. Dealer Management Systems Antitrust Litigation, 1/17/2019
- Report of Michele York, Ph.D., re. neuropsychological evaluation of Mr. Brockman on 3/1/19
- Transcript Mr. Brockman's testimony at Federal Trade Commission Investigational Hearing in the Matter of CDK Global and Reynolds and Reynolds, 9/18/19
- Transcript Mr. Brockman's testimony at Federal Trade Commission Investigational Hearing in the Matter of CDK Global and Reynolds and Reynolds, 9/19/19
- Video of Mr. Brockman speaking at the 2019 Reynolds & Reynolds company birthday party in approximately November 2019 [UCSH 0212042]
- Report of Michele York, Ph.D., re. neuropsychological evaluation of Mr. Brockman on 12/3/19
- Indictment in US v. Robert Brockman, Case 3:20-cr-00371-WHA, filed 10/01/20 [Document 1]
- Letter from Kathryn Keneally, et al., to Corey J. Smith, 4/9/20
- Report of Michele York, Ph.D., re. neuropsychological evaluation of Mr. Brockman on 10/7/20
- Declaration of James L. Pool, M.D., in Support of Robert T. Brockman's Motion to Transfer Proceedings, 11/25/20 [Document 49]
- Declaration of Kathryn Keneally in Support of Robert T. Brockman's Motion to Dismiss in Part for Lack of Venue and Transfer to the Southern District of Texas, 11/30/20 [Document 0049]
- Defendant Robert T. Brockman's Notice of Motion and Motion for a Hearing to Determine Whether Mr. Brockman is Competent to Assist in His Defense, 1/12/21, and Exhibits [Document 46]
- United States' Response to Defendant's Motion for a Competency Hearing, 1/12/21, and Exhibits [Document 69]

2

PDA-0000026
Brockman_0001981

- Defendant Robert T. Brockman's Reply in Support of Motion for a Hearing to Determine Whether Mr. Brockman is Competent to Assist in His Defense, 1/12/21 [Document 74]
- United States' Motion for Discovery Order Under Rule 17(C) and 45 CFR 164.512(e)(1)(i), 1/26/21 [Document 26]
- Transcript of deposition of Kelly Hall in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 3/10/21 [redacted]
- PET Brain Metabolic Evaluation, Houston Methodist Hospital, 3/12/21
- Transcript of deposition of Robert Schaefer in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 3/18/21 [redacted]
- Transcript of deposition of Norman Thomas Barras, Jr., in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 4/15/21 [redacted]
- Polysomnography Report, Memorial Hermann Hospital Texas Medical Center, 4/29/21
- Transcript and video of Dr. Darby's interview and examination of Mr. Brockman, 5/5/21
- Dr. Darby's notes of his interview of Mrs. Brockman, 5/5/21
- Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21
- Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21
- Dr. Denney's raw test data, 5/19/20 and 5/20/21
- Dr. Denney's Interview of Kathy Keneally, 6/14/21
- Dr. Denney's Interview of Peter Romatowski, 6/15/21
- E-mail from Kathy Keneally to Corey Smith, et al., re. "US v. Brockman: update on medical issues," 6/17/21

Dr. Denney and I jointly interviewed the defendant on 5/18/21 and 5/20/21. On 5/18/21, I conducted most of the interview. On 5/20/21, Dr. Denney conducted a semi-structured interview regarding trial competence, after which I took the lead in conducting additional interviewing. Complete transcripts of these interviews are attached as Appendices 1 and 2, and the videorecording has already been provided to the parties by the videographer hired by Jones Day.

## LIMITATIONS OF EVALUATION

Evaluations of competence to stand trial for criminal charges are based on both direct examinations of defendants, where possible, and on other sources of information, including but not limited to documents, electronic recordings, physical evidence, and interviews of witnesses.

In this instance, several potentially significant sources of information proved unavailable as of the Court-ordered deadline for this report. These include:

- Several witnesses declined to be interviewed or re-interviewed.
- Properties controlled by the defendant were not searched for documents or electronic devices.

CONFIDENTIAL

PDA-0000027
Brockman_0001982

- Medical records for which subpoenas were issued had not yet been provided to the United States.
- An initial sleep study was inadequate, and a repeat study has not yet been completed.
- Recent medical records for hospitalizations and treatment in 2021 have not all been received.

If additional information is received before the competency hearing on this matter, I will take it into account and revise my opinions if indicated.

## CONTEXT OF EVALUATION

On 10/1/20, Mr. Brockman was charged in a 39-count federal grand jury indictment alleging the violations listed above, with additional forfeiture allegations under 18 U.S.C. §§ 982(a)(1), 982(a)(2)(A) & 28 U.S.C. § 2461(c).

Attorneys for Mr. Brockman have asserted that he is incompetent to stand trial because of dementia, and the Court ordered an examination by experts retained by the United States, including the undersigned.

Mr. Brockman is an 80-year-old man with a 53-year marriage that produced one adult son and a one-year-old grandson.  Mr. Brockman had an enormously successful business career (detailed in the interviews of 5/18/21 and 5/20/21) as Chairman and CEO of Reynolds and Reynolds, from which he retired effective 1/1/21.  His personal and psychosocial histories are detailed in the interviews of 5/18/21 and 5/20/21, which was videotaped and transcribed; that information is not repeated here.

Mr. Brockman's medical history is significant for bladder cancer (treated surgically in 2006); repeated urinary tract infections (two of which resulted in hospitalization for sepsis in 2021); malignant melanoma and basal cell skin cancer (treated by excision); Parkinson's disease; two episodes of atrial fibrillation (in October 2015 and June 2016[1]; successfully managed with medication and lifestyle changes); hypothyroidism (managed with medication); hyperlipidemia (managed with medication); coronary artery calcification; pseudoexfoliation glaucoma (treated surgically); depression (managed with medication); prostatitis; ocular migraine; osteopenia; gall stones; idiopathic peripheral neuropathy; and other lesser illnesses and injuries.  He has not been averse to laboratory tests and biomedical studies regarding his physical health and has been carefully, perhaps exhaustively, screened for disease many times.

Most relevant to the issue before the Court is the issue of Mr. Brockman's present cognitive capacity, about which a dispute has arisen, and this issue and his competence to stand trial are the focus of the reports by Dr. Denney and Dr. Darby as well as this report.  A related issue is whether he has a REM sleep disorder, the

---

[1]  Medical records and personal writings provided by Mr. Brockman from his home, pp. 1413-1414.

CONFIDENTIAL

PDA-0000028
Brockman_0001983

presence of which, if true, would be consistent with but not dispositive of the question of whether he has dementia with Lewy bodies.

## TIMELINE OF COGNITIVE FUNCTION

A detailed analysis of cognitive functioning requires documentation, observation, or measurement at various points in time because cognitive functioning varies with age, time-limited alterations in mental state (e.g., intoxication, sleep deprivation, the effects of medications, or delirium), and disease or injury of the brain.  For that reason, I provide here a detailed timeline based on the various sources of information available as of this writing, and I insert clearly marked comments to disclose my own impressions and interpretations of particular entries in the chronology.

Note that many of the entries in this chronological accounting are drawn from writings by Mr. Brockman, the content and dating of which have not been corroborated by any source.  The existence of these writings was discovered only because of information Mr. Brockman volunteered in Dr. Darby's 5/15/21 interview. In responding to Dr. Darby's question about the onset of his cognitive issues, Mr. Brockman introduced the topic of a former internist that led to the revelation that Mr. Brockman had possession of previously undisclosed medical records, in this exchange:

> RD:  Well, tell me a little bit about the cognitive issues that you've been having.  So when did—when did those first start?
>
> RB:  I think they actually began, oh, probably five, six, seven years ago.
>
> RD:  Okay.
>
> RB:  And—and the reason why that I picked that out is because I—I had a very excellent internal medicine doctor for many, many, many years.
>
> RD:  Who was that?
>
> RB:  His name is Bill Obenour.  He's retired from practice now.  And he was a—a classical single practitioner, you know, one man office with a staff.  And medical records all written by hand.  And I think probably the fact that he was gonna have to convert all that stuff at some point is one of the reasons why it played out.  But any rate, I knew that I had, you know, big files in his office and so I asked him if I could have them because I have—wouldn't know where they would go initially or where they would continue to reside.
>
> RD:  When he was retiring?

CONFIDENTIAL

PDA-0000029

Brockman_0001984

RB:   Yeah.

RD:   Okay.

RB:   And initially the—the answer was, "No, I can't help you."  And
then shortly before he retired the answer changed and I was able
to go down and they—they—they won't all fit in a single banker's
box, it's a banker's box and—and some.  I have all those
records.[2]

Thereafter, these records were requested through defense counsel, but they were
not received until after Dr. Denney and I had completed our examination of Mr.
Brockman.  When the documents were produced, they included not only medical
records from William B. Obenour, Jr., MD, and other health care providers, but also
dated writings by Mr. Brockman that appear to be approximately annual health
updates.  These personal writings of Mr. Brockman were found interspersed with
various medical records, were not in chronological order, and are neither mentioned
in nor a part of the medical records provided.  Thus, there is currently no way to
determine whether they were created on or proximal to the dates listed on these
personal writings or whether they were created after Mr. Brockman became aware
that he was being investigated.  Because they cannot currently be corroborated, I
refer to these documents below as "personal writings" and take the dates at face
value for purposes of presenting this chronological listing.

December 2005

The earliest complaint of memory impairment identified in the records submitted for
review is Mr. Brockman's personal writing bearing the date December 2005 in
which he wrote in pertinent part:

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER DECLINE

MEMORY MUCH POORER

ABILITY TO WORK LONG HOURS STILL GOOD[3]

12/12/06

In Mr. Brockman's personal writing bearing the date 12/12/06, he used identical
language:

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER DECLINE

---

[2]   Transcript and video of Dr. Darby's interview and examination of Mr. Brockman, 5/5/21,
pp. 10-11.
[3]   Medical records and personal writings provided by Mr. Brockman, pp. 1375-1376.

CONFIDENTIAL

**PDA-0000030**
Brockman_0001985

MEMORY MUCH POORER

ABILITY TO WORK LONG HOURS STILL GOOD[4]

**COMMENT:**  Although the repetition of identical or nearly identical passages in these seemingly annual personal writings suggests the use of a "cut-and-paste" technique in producing successive documents, this fact alone cannot distinguish between contemporaneous creation and ex post facto creation.

December 2007

In Mr. Brockman's personal writing bearing the date 12/12/06, he used nearly identical language:

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER DECLINE

MEMORY MUCH POORER

ABILITY TO WORK LONG HOURS STILL EXCELLENT[5]

December 2008

In Mr. Brockman's personal writing bearing the date December 2008, he wrote in pertinent part:

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER DECLINE

MEMORY MUCH POORER

ABILITY TO WORK LONG HOURS STILL EXCELLENT[6]

December 2009

In Mr. Brockman's personal writing bearing the date December 2009, he wrote in pertinent part:

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER SERIOUS DECLINE

MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.

---

[4]  Medical records and personal writings provided by Mr. Brockman, pp. 837-838 and 1377-1378.
[5]  Medical records and personal writings provided by Mr. Brockman, pp. 908-909.
[6]  Medical records and personal writings provided by Mr. Brockman, pp. 904-905.

CONFIDENTIAL

PDA-0000031
Brockman_0001986

IT IS NAMES THAT I MOST USUALLY NOTICE IT WITH, HOWEVER I AM QUITE SURE THAT IT IS PROBABLY MEMORY OF EVERYTHING.

ABILITY TO WORK LONG HOURS STILL EXCELLENT[7]

December 2010

In Mr. Brockman's personal writing bearing the date December 2010, he wrote in pertinent part:

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER SERIOUS DECLINE.  I PROBABLY HAVE SOME BURNOUT – AS MY EFFICIENCY AND EFFECTIVENESS ARE CONSIDERABLY DEGRADED.

MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.

IT IS NAMES THAT I MOST USUALLY NOTICE IT WITH, HOWEVER I AM QUITE SURE THAT IT IS PROBABLY MEMORY OF EVERYTHING.

ABILITY TO WORK LONG HOURS STILL EXCELLENT[8]

December 2011

In Mr. Brockman's personal writing bearing the date December 2011, Mr. Brockman wrote in pertinent part:

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER SERIOUS DECLINE.  I PROBABLY HAVE SOME BURNOUT – AS MY EFFICIENCY AND EFFECTIVENESS ARE CONSIDERABLY DEGRADED.  FORTUNATELY THIS SITUATION HAS NOT WORSENED SINCE LAST YEAR.

MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.

IT IS NAMES THAT I MOST USUALLY NOTICE IT WITH, HOWEVER I AM QUITE SURE THAT IT IS PROBABLY MEMORY OF EVERYTHING.

ABILITY TO WORK LONG HOURS STILL EXCELLENT[9]

12/19/11

---

[7]  Medical records and personal writings provided by Mr. Brockman, pp. 898-900.
[8]  Medical records and personal writings provided by Mr. Brockman, pp. 1387-1390.
[9]  Medical records and personal writings provided by Mr. Brockman, pp. 888-891.

CONFIDENTIAL

DX-5, page 8 of 45

PDA-0000032
Brockman_0001987

Dr. Obenour's clinical notes of 12/19/11 in pertinent part read:  "No history of syncope or significant memory loss, except for names."[10]

December 2012

In Mr. Brockman's personal writing bearing the date December 2012, he wrote in pertinent part:

> MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER SERIOUS DECLINE.
>
> THIS SPRING AND SUMMER I HAD SOME SERIOUS BURNOUT – AS MY EFFICIENCY AND EFFECTIVENESS WERE CONSIDERABLY DEGRADED. IT IS PROBABLY TIME FOR ME TO SELL REYNOLDS.  THAT PROCESS IS CURRENTLY UNDERWAY.
>
> MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.
>
> IT IS NAMES THAT I MOST USUALLY NOTICE IT WITH, HOWEVER I AM QUITE SURE THAT IT IS PROBABLY MEMORY OF EVERYTHING.
>
> ABILITY TO WORK LONG HOURS EFFECIVELY WAS SERIOUSLY DEGRADED DURING THE SPRING AND SUMMER – BUT IS NOW RECOVERING SOMEWHAT.[11]

12/14/12

In his clinical notes of 12/14/12, Dr. Obenour wrote, "Age-related memory problems."[12]

December 2013

In Mr. Brockman's personal writing bearing the date December 2013, he wrote in pertinent part:

> MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER SERIOUS DECLINE.
>
> MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.
>
> IT IS NAMES THAT I MOST USUALLY NOTICE IT WITH, HOWEVER I AM QUITE SURE THAT IT IS PROBABLY MEMORY OF EVERYTHING.

---

[10]   Medical records and personal writings provided by Mr. Brockman, pp. 892-893.
[11]   Medical records and personal writings provided by Mr. Brockman, pp. 882-885.
[12]   Medical records and personal writings provided by Mr. Brockman, p. 881.

CONFIDENTIAL

DX-5, page 9 of 45

PDA-0000033
Brockman_0001988

ABILITY TO WORK LONG HOURS EFFECTIVELY HAS PRETTY MUCH RECOVERED.[13]

December 2014

In Mr. Brockman's personal writing bearing the date December 2014, he wrote in pertinent part:

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER SERIOUS DECLINE

MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.

IN A NEW, WEIRD PHENOMENA, - NAMES THAT I OUGHT TO REMEMBER LIKE ONE OF OUR MAIDS AND A RESTAURANT CLOSE BY THE HOUSE THAT I HAVE BEEN TO 20 TIMES OR MORE – YET I HAVE HAD REAL PROBLEMS REMEMBERING THESE TWO NAMES.

ABILITY TO WORK LONG HOURS EFFECTIVELY IS NOW PRETTY MUCH AS GOOD AS EVER NOW.[14]

12/16/14

On 12/16/14, Dr. Obenour wrote:

He notes some problems with name recall but in general his intellect is still intact and he still enjoys work . . .[15]

September 2015

In Mr. Brockman's personal writing bearing the date September 2015, he wrote in pertinent part:

MY JOB AS CHAIRMAN/CEO OF REYNOLDS & REYNOLDS (5,000 EMPLOYEES) CONTINUES TO BE DEMANDING – BUT HIGHLY SUCCESSFUL AND REWARDING.

\*       \*       \*

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER SERIOUS DECLINE.

---

[13]  Medical records and personal writings provided by Mr. Brockman, pp. 876-879.
[14]  Medical records and personal writings provided by Mr. Brockman, pp. 912-915.
[15]  Medical records and personal writings provided by Mr. Brockman, pp. 871-873.

CONFIDENTIAL

**PDA-0000034**
Brockman_0001989

MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.

IN A NEW, WEIRD PHENOMENA, - NAMES THAT I OUGHT TO REMEMBER LIKE ONE OF OUR MAIDS AND A RESTAURANT CLOSE BY THE HOUSE THAT I HAVE BEEN TO 20 TIMES OR MORE – YET I HAVE HAD REAL PROBLEMS REMEMBERING THESE TWO NAMES.

ABILITY TO WORK LONG HOURS EFFECTIVELY IS NOW PRETTY MUCH AS GOOD AS EVER NOW.

\*       \*       \*

UNFORTUNATELY I DON'T REMEMBER IF I GOT THE SHINGLES SHOT OR NOT. (MEMORY PROBLEMS)[16]

<u>11/6/15</u>

In a clinic visit with K. Lance Gould, MD, on 11/6/15, Mr. Brockman reported experiencing depression for the first time since taking Toprol.[17]

<u>5/31/16</u>

On 5/31/16, Mr. Brockman wrote a 2-page memorandum to Dr. Gould about his recent bouts of atrial fibrillation.  This document, which was in the medical records provided by the facility, resembles the writing style and formatting of Mr. Brockman's unverified personal writings.  The document makes no mention of memory problems and demonstrates Mr. Brockman's careful observation, recollection, and organization and his logical approach to problem solving.[18]

<u>November 2016</u>

In Mr. Brockman's personal writing bearing the date November 2016, he wrote in pertinent part:

MY JOB AS CHAIRMAN/CEO OF REYNOLDS & REYNOLDS (5,000 EMPLOYEES) CONTINUES TO BE DEMANDING – BUT HIGHLY SUCCESSFUL AND REWARDING.

\*       \*       \*

MENTAL PROCESSES NOT AS GOOD – BUT NO FURTHER SERIOUS DECLINE.

---

[16]   Medical records and personal writings provided by Mr. Brockman, pp. 1419-1425.
[17]   UT Physicians, pp. 57-58.
[18]   UT Physicians, pp. 44-45.

CONFIDENTIAL

**PDA-0000035**
Brockman_0001990

MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.

IN A NEW, WEIRD PHENOMENA, - NAMES THAT I OUGHT TO REMEMBER LIKE ONE OF OUR MAIDS AND A RESTAURANT CLOSE BY THE HOUSE THAT I HAVE BEEN TO 20 TIMES OR MORE – YET I HAVE HAD REAL PROBLEMS REMEMBERING THESE TWO NAMES.

ABILITY TO WORK LONG HOURS EFFECTIVELY IS NOW PRETTY MUCH AS GOOD AS EVER NOW.[19]

c. September 2017

In approximately September 2017, Mr. Brockman delivered a lengthy speech to Reynolds and Reynolds employees that was videotaped.  In this speech, Mr. Brockman was completely coherent, with no abnormalities of speech, no loss of attention, no lapse of memory, no misuse of language, no word searching, no loss of train of thought, and no confusion.  He did not read this speech, but he did glance at notes or the text of the talk.  His eyes swept the audience as he spoke.  His affect was appropriate to the context.  His facial movements may have been diminished, but certainly not "frozen," as for example, his small smile after finishing.  He moved carefully and slowly as he turned to his left to leave the lectern.  The content of this speech included details of his personal history and the history of the firm, the company's economic theory, which he described as his personal economic theory of small firms, including an emphasis on repetitive revenue, an exclusive focus on net profits, investment in product development, maintaining a "war chest," and other abstract concepts.  He said he sees himself as the "chief steward" of the company and works seven days a week to be the best steward he can be.  He claimed that the money is put back into the company, and that "the company looks after those who look after the company."  He said, "One of my goals is to never be in the news."[20]

> **COMMENT:**  This video contains some evidence of Parkinson's disease, at least when viewed in retrospect, but no evidence of cognitive impairment or dementia.

12/14/17

Records from a 12/14/17 examination by Jeffrey A. Kozak, MD, of Fondren Ortho, were scanned into the Baylor record at the time of Dr. Yu's 3/20/19 evaluation [see below] and indicated under the review of systems that Mr. Brockman's neurological history was "Positive for Memory Loss and Tingling," but his psychiatric history was

---

[19]  Medical records and personal writings provided by Mr. Brockman, pp. 1426-1434.
[20]  Video of Mr. Brockman speaking to Reynolds & Reynolds employees in approximately September 2017 [UCSH 0207346].

CONFIDENTIAL

PDA-0000036

Brockman_0001991

"Negative for Depression, Anxiety, Memory Loss, Mental Disturbance, Suicidal Thoughts, Mood Disorders, Paranoia, Sleep Disturbances and Eating Disorder."[21]

> **COMMENT:**  If Mr. Brockman sought to show Dr. Yu documentation of a history of memory impairment, why did he provide only an obscure and internally inconsistent note from an orthopedic surgeon rather than the seemingly annual catalog of self-reported memory problems that is found only among the documents provided to his lawyers as a result of Dr. Darby's inquiry after Mr. Brockman volunteered, on 5/5/21, that he had additional medical records stored at his home?

<u>1/16/18</u>

In Mr. Brockman's personal writing bearing the date 1/16/18, he wrote in pertinent part:

> MY JOB AS CHAIRMAN/CEO OF REYNOLDS & REYNOLDS (5,000 EMPLOYEES) CONTINUES TO BE MORE DEMANDING THAN EVER – BUT HIGHLY SUCCESSFUL AND REWARDING.
>
> *        *        *
>
> MENTAL PROCESSES NOT AS GOOD – I AM HAVING MORE DIFFICULTY IN DEALING WITH THE VOLUME OF BUSINESS ISSUES.
>
> SHORT-TERM MEMORY CONTINUES TO GET POORER, ESPECIALLY WITH NAMES OF PEOPLE THAT I KNOW WELL AND SHOULD REMEMBER EASILY.
>
> IN A NEW, WEIRD PHENOMENA, - NAMES THAT I OUGHT TO REMEMBER LIKE ONE OF OUR MAIDS AND A RESTAURANT CLOSE BY THE HOUSE THAT I HAVE BEEN TO 20 TIMES OR MORE – YET I HAVE HAD REAL PROBLEMS REMEMBERING THESE TWO NAMES.  THIS CONDITION IS UNCHANGED.
>
> ABILITY TO WORK LONG HOURS EFFECTIVELY IS NOW PRETTY MUCH AS GOOD AS EVER NOW.  HOWEVER MY EFFICIENCY PER HOUR IS LESS.
>
> MY SENSE IS THAT I AM COMING TO THE END OF MY FULL-TIME, FULLY-ENGAGED BUSINESS CAREER.
>
> I AM GOING TO HAVE TO COME TO GRIPS WITH BEING LESS ACTIVE AND LESS INVOLVED[22]

---

[21] Baylor College of Medicine, pp. 854-858.
[22] Medical records and personal writings provided by Mr. Brockman, pp. 1408-1418.

CONFIDENTIAL

PDA-0000037
Brockman_0001992

**9/5/18:  Bermuda Police Service raided the home of Evatt Tamine**

c. November 2018

Mr. Brockman delivered a speech at the Reynolds and Reynolds Company birthday party in approximately November 2018.  As Mr. Brockman began speaking, he mentioned that he doesn't often address audiences, but rather spends a lot of time at home at his desk dealing with e-mail.  He described the origin of the birthday party and the stewardship they share at the company.  He recognized his wife Dorothy and their 50th anniversary, the spouses of the directors in attendance, everyone who has served in the military, executives of the Hendrick Companies, newly promoted Reynolds and Reynolds officers, and Dave Bates for his 35 years of service, followed by a story about how Dave was his first promotion.  Mr. Brockman sometimes spoke off script, with charm, humor, and without apparent error.  He used one slide and glanced at a script or notes throughout much of his talk, often looking up to make eye contact with the audience.  His entire speech was completely coherent, with no abnormalities of speech, no loss of attention, no lapse of memory, no misuse of language, no word searching, no loss of train of thought, and no confusion.  He smiled at times.  He moved carefully and slowly as he left the lectern and stage.  While seated in the audience watching the speaker, Mr. Brockman applauded appropriately.  When he walked again to the stage (c. 52:08-52:20), Mr. Brockman moved slowly, with limited associated movement.  He introduced an award video, then mistakenly tried to introduce another video prematurely, acknowledged his error with self-deprecating humor, and introduced other award winners.  He had to repeat one word (1:08:05-1:08:15) in reading the text for an award recipient.[23]

> **COMMENT:**  This video contains some evidence of Parkinson's disease, at least when viewed in retrospect, but no evidence of cognitive impairment or dementia.

11/2/18

An MRI of the brain without contrast was interpreted by Fanny E. Moron, MD, as showing "No intracranial abnormalities, particularly no disproportionate lobar atrophy."[24]

1/16/2019

Mr. Brockman was deposed in a civil matter as Chairman and CEO of Reynolds and Reynolds on 1/16/19, and his deposition was videotaped.  He was able to name the lawyers he prepared with the prior day, except the surname of one of them (John) who was not present at the deposition.  Throughout the deposition he was polite and socially appropriate.  He reasonably questioned the predicate to a question,

---

[23] Video of Mr. Brockman speaking at the 2018 Reynolds and Reynolds Company birthday party in approximately November 2018 [UCSH 0210542].
[24] Baylor College of Medicine, 792-793; UT Physicians, 19-20.

CONFIDENTIAL

**PDA-0000038**
Brockman_0001993

took the time to read documents and exhibits from start to finish before responding to questions, read aloud from an exhibit adequately, and carefully avoided going beyond what he personally knew or recalled.  He answered with subtle distinctions about the meaning of terms, whether a user ID was temporary or permanent, and other details.  He recalled the meaning of acronyms, such as TAC meaning Technical Assistance Center.  In response to questions incorrectly suggesting that software security enhancements occurred all at once, he explained that software security enhancements are not all released simultaneously.  His testimony reflected detailed recollection of past events.  For example, in a discussion of Exhibit 639 he acknowledged creating a document reflecting talking points for a phone call he expected would be imminent but did not occur until months later, he recalled that that he didn't cover all of the talking points when the call did occur, showed detailed memory for the conversation and its failure to provide a clear answer on a key question, and the fact that 45 minutes of the hour-long call was unproductive.  As another example of his cognitive capacity, when asked if dealers left Reynolds and Reynolds over data access issues, he pointed out that Reynolds and Reynolds doesn't always learn why dealers left, doesn't have data correlating security concerns with dealers leaving, and doesn't have reason to believe more than a small fraction of dealers left for that reason, despite efforts to track reasons for leaving when possible.  His facial movement was limited, and he drank carefully and slowly from a bottle during the deposition.[25]

> **COMMENT:**  This video contains some evidence of Parkinson's disease, at least when viewed in retrospect, but no evidence of cognitive impairment or dementia.

## 1/17/2019

On the second day of this civil deposition, Mr. Brockman remained polite and respectful, provided articulate, relevant answers, made subtle distinctions, and demonstrated comprehensive knowledge of the industry.  He did not accept the premises of all questions, demonstrated superior intelligence, and took the time to read exhibits, putting on his glasses to do so.  He once mentioned some difficulty seeing what apparently was a table of numbers in small font.  Throughout his testimony, he was coherent and thoughtful, with no evidence of confusion or difficulty processing ideas, words, charts, or numerical data.  Shown various documents from 2014-2017, he recalled writing or reading them, the context, what was occurring at the time, and the basis of the points made.  He repeatedly demonstrated intact long-term memory and short-term memory.  He demonstrated intact abstract thinking as, e.g., when he explained that Reynolds and Reynolds does not have internal cost accounting because of the overhead costs; he said he'd rather have the productivity than the profitability numbers.[26]

---

[25] Transcript and video of the deposition of Robert Brockman In re. Dealer Management Systems Antitrust Litigation, 1/16/2019.

[26] Transcript and video of the deposition of Robert Brockman In re. Dealer Management Systems Antitrust Litigation, 1/17/2019.

CONFIDENTIAL

**PDA-0000039**
Brockman_0001994

**COMMENT:** In this two-day deposition, Mr. Brockman did display some motor signs of Parkinson's disease but no signs or symptoms of cognitive impairment or dementia.

<u>1/30/19</u>

The earliest complete neurological evaluation received for review was conducted on 1/30/19 by Joseph Jankovic, MD, and Neurology Fellow Daniel Savitt, DO, on referral from James Pool, MD, and Stuart Yudofsky, MD. The portions relevant to cognitive function and possible REM sleep disorder are extracted here:

> The onset of symptoms began 1.5 years ago with concentration and memory difficulty. He developed depressive symptoms about 6 months ago for which bupropion was started 2 months ago. Since that time, he has noticed an improvement in his thinking and memory. . . .
>
> He also began acting out his dreams at nighttime 2-3 years ago, kicking and punching in his sleep. . . . his wife notices slower speech . . .
>
> *     *     *
>
> The patient denies hallucinations, delusions, insomnia . . . . The patient has depression, anxiety, and memory loss. The patient has stiffness, gait imbalance, and hearing abnormalities.
>
> *     *     *
>
> There is appropriate mood and affect.
>
> *     *     *
>
> The patient is alert and oriented to person, time, and place. Speech is fluent with good comprehension. There are no abnormal perceptions, hallucinations, delusions, or illusions. The patient is able to follow three-step commands. There is no right/left disorientation, ideomotor or constructional apraxia, or evidence of ADHD or OCD. A MoCA examination was administered and the patient received a score of 19/30.
>
> *     *     *
>
> He has also noticed . . . dream-acting behavior (REM-Behavioral Disorder) . . . His examination is significant for a MoCA of 19/30
>
> *     *     *
>
> The following tests were requested:

16

PDA-0000040
Brockman_0001995

-DaTscan to evaluate for dopaminergic deficiency and differentiate between vascular parkinsonism and idiopathic Parkinson's disease.
-Has appointment scheduled for neuropsychiatric testing.
-Will place referral to Stromatt driving evaluation due to concerns for safety with driving.
We prescribed the following medications and treatments:
-Start carbidopa/levodopa 25/100 and titrate to 2 tablets three times daily. . .

*      *      *

**Visit Diagnoses**
Parkinson's disease
Cognitive decline
REM behavioral disorder[27]

**COMMENT:**  Findings of this evaluation are consistent with the presence of Parkinson's disease.  This is the sole mention of "punching" found in the record in connection with inquiries for the presence of a REM behavior disorder; elsewhere, only kicking is mentioned except where subsequent evaluators relied on this evaluation.  The MoCA score of 19/30 (which, if valid, would indicate mild cognitive impairment) is the first seemingly objective evidence of cognitive decline found in the record and reflects performance while cognitive function is obviously being tested.

<u>2/14/2019</u>

Dopamine Transporter Imaging (DaTscan) conducted on 2/14/19 was interpreted as showing "Severe loss of dopaminergic neuronal function in the bilateral dorsal striata with loss greater on the right compared to the left."[28]

**COMMENT**:  This finding is consistent with Parkinson's disease but is uninformative about Mr. Brockman's cognitive function.

<u>2/19/19</u>

A progress note written by Joseph Jankovic, MD, on 2/19/19 reads:

I just spoke with Mr. Brockman to inquire about his response to Sinemet.  He is currently taking Sinemet 25/100 2 tabs tid and is able to tolerate the medication well.  He has so far noted minimal improvement in his slowness and gait and has been able to resume his exercise program.  I also discussed with him the results of DaTscan,

---

[27]  Medical records and personal writings provided by Mr. Brockman, pp. 36-43.
[28]  Medical records and personal writings provided by Mr. Brockman, p. 90; UT Physicians, pp. 19-20.

CONFIDENTIAL

PDA-0000041
Brockman_0001996

performed on 2/14.  He understands that the scan shows evidence of severe dopaminergic deficiency especially in the R striatum.

He spoke with Dr. Yudofsky this morning and was prescribed Trazodone 50 mg qhs to help him with his insomnia and early morning awakening which he plans to initiate tonight.  He is scheduled to see Dr. York for neuropsychological assessment on 3/1/19.  He is concerned about his cognitive decline, exacerbated by recent business-related stressors.[29]

3/1/19

In the first of three neuropsychological assessments by Dr. Michelle York, Mr. Brockman reported seeing a bug on the floor during testing that neither Dr. York nor Mrs. Brockman could see.  Based largely on the testing she conducted, Dr. York diagnosed "dementia of mild to moderate severity."  Among Dr. York's recommendations in this and subsequent evaluations were that Mr. Brockman use a dry-erase board and memory station in his home and that he use jigsaw and crossword puzzles.[30]

> **COMMENT:**  This is the earliest use of the term "dementia" to describe Mr. Brockman's condition that I was able to identify in the records received for review.  The validity of Mr. Brockman's performance in the testing that led to that diagnosis has been called into question and will be addressed in Dr. Denney's report.

3/13/19

Joseph Jankovic, MD, saw Mr. Brockman for a follow-up visit on 3/13/2019 and wrote:

> The patient states he is worse mentally and physically despite levodopa.  Although he had slight improvement in his motor functioning initially with low dose levodopa his motor and mental functioning deteriorated as he gradually increased dosage.  According to wife he has a "zombie-like effect" for a few minutes after each dose of Sinemet.  He has increasing difficulties getting in and out chair and car and feels unsteady.  He avoids stairs and long-distance driving.  He is most concerned about his short-term memory.   His RBD [REM behavioral disorder] has improved since Dr. Yudofsky placed him on Trazodone.

\*     \*     \*

---

[29]  Baylor College of Medicine, p. 742.
[30]  Report of Michele York, Ph.D., re. neuropsychological evaluation of Mr. Brockman on 3/1/19.

CONFIDENTIAL

**PDA-0000042**
Brockman_0001997

We discussed the results of neuropsychological testing and the
presence of dementia.  Although Dr. York suggested DLB [dementia
with Lewy bodies] he has never had hallucinations or fluctuations.[31]

<u>3/20/19</u>

On 3/20/19, Mr. Brockman was seen by Melissa Yu, MD, for a memory evaluation
requested by James Pool, MD.  Mrs. Brockman and their son accompanied Mr.
Brockman to this appointment, and the record is silent as to which of these persons
contributed to completing the patient questionnaire.  Responses to the patient
questionnaire completed at the time of this evaluation indicated that Mr. Brockman
had been having "memory difficulties" for eight months that make every day living
for the patient more difficult or complicated, including "some loss" of ability to
perform household tasks, remember a short list of items, "find way about
outdoors/indoors," ability to find way around familiar streets, ability to grasp
situations or explanations, and ability to recall recent events.  He had given up or
stopped driving a car one month previously, coinciding with the onset of difficulty
traveling alone.

Nonetheless, he did not forget where he left things or forget phone numbers.  He
did not become confused as to time, where he was, or his age or other personal
information.  He did not see something that was not actually there.  Moreover, he
did not have trouble expressing himself in words, say one word when he meant
another, have trouble finding words, have trouble understanding reading, have
trouble balancing a checkbook, have trouble operating a television, have trouble
dialing a phone, or get lost in his own home.  He was said to have used incomplete
sentences, hesitated, or stopped while talking over the previous eight months.[32]

Records of Dr. Yu's evaluation read in pertinent part:

> Memory loss is reported beginning at least back to November 2017 in
> a Fondren Orthopedics progress note scanned into the chart.

> *     *     *

> He now presents for memory disorders evaluation.  He reports always
> having "superior memory."  He reports onset of symptoms about 2
> years ago.  His wife reports some symptoms about 3 years ago with
> "slowing down" and then symptoms became much more obvious about
> 9 months ago associated with a stressful life event.  His son notes that
> he repeats himself at times.  He reports mild progression since that
> time.

> He reports always misplacing objects.  He reports minimal word finding
> issues but difficulty with spelling.  He reports minimal difficulty with

---

[31] Baylor College of Medicine, pp. 714-716.
[32] Baylor College of Medicine, pp. 684-696.

CONFIDENTIAL

**PDA-0000043**

Brockman_0001998

names.  He reports some difficulty remembering to take his medications.  He has stopped driving at his physician's request.  No driving incidents were reported but his wife notes that he drives slower.  He reports on trouble managing finances. . . . He notes some difficulty with planning out tasks at work, family notes that he doesn't initiate activity like he used to.

. . . He describes his mood as "pretty good" but notes feeling shaken about his neuropsychological test results.  His son reports that his ability fluctuates (he's had him draw clocks at various times).  He reports episodes of "blankness" associated with less interaction alternating with improved cognition.  His son notes significant fluctuations in terms of his decision making abilities, with good days and bad days. . . .

. . . At least four episodes of dream enactment behavior is reported and snoring – both have improved with trazodone . . .

He reports one episode of visual disturbance – saw a rainbow/possible visual aura about 8 years ago.  No other visual phenomena are reported with the exception of a possible hallucination during neuropsychological testing – wife notes it was a "bad day."  No auditory hallucinations are reported.

*        *        *

MMSE 26/30 (7s), 25/30 (spelling)  Definite visual issues noted with significant issues noted drawing clock and intersecting pentagons.  Clock drawing 2/4 (circle, numbers, unable to indicate correct time.  Numbers on outside of clock)

*        *        *

Differential includes Dementia with Lewy Bodies or Parkinson's Disease with dementia.  Time course and fluctuations in cognition are more suggestive of DLB.[33]

**COMMENT:**  The only compelling evidence of fluctuations in cognition reflect Mr. Brockman's markedly impaired performance when he knows his cognitive abilities are being tested.  No stressful life events that could explain his symptoms having become "much more obvious" were documented to have occurred nine months before this evaluation, but the Bermuda Police Service raid had occurred six months earlier.  This is the first description I found in the records of Mr. Brockman having difficulty remembering his medications or managing his finances; these claims happen to correspond precisely to the examples given in

---

[33] Medical records and personal writings provided by Mr. Brockman, pp. 74-80.

20

PDA-0000044

Brockman_0001999

*DSM-5* for Criterion B of the diagnostics criteria for a diagnosis of Major Neurocognitive Disorder:  "The cognitive deficits interfere with independence in everyday activities (i.e., at a minimum, requiring assistance with complex instrumental activities of daily living such as paying bills or managing medications)."[34]

<u>4/1/19</u>

In a clinic visit with Dr. Gould on 4/1/19, Mr. Brockman, his wife, and his son, all reported that his then-current dose of Sinemet caused "mental stunning," made him unable to focus or do simple mental tasks.  Dr. Gould identified drug interactions that could cause these effects and altered the doses of these medications.[35]

> **COMMENT:**  Although this was the dose of medication at the time of Dr. York's 3/1/19 testing, I believe medication-related effects are insufficient to account for test results that made Mr. Brockman appear to be demented.

<u>4/5/19</u>

In a 4/5/19 letter to his treating doctors seeking advice before a fishing trip, Mr. Brockman wrote:

> I am Chairman and CEO of a large tech company with over 5,000 employees and 25,000 customers so I must make endless executive decisions.  My long term memory is good.  It used to be almost perfect.
>
> On one Sinemet three times a day, I can perform my duties. However, on two Sinemet three times a day, I can work, but it is more difficult because I feel "drugged."[36]

<u>7/18/19</u>

In a meeting with counsel on 7/18/19, Mr. Brockman uncharacteristically asked to direct the meeting and presented a binder of medical reports illustrating why he was unable to assist counsel.  This was the first time Mr. Romatowski had encountered a client with cognitive problems bring up the issue of his cognitive problems.[37]

---

[34]  American Psychiatric Association:  *Diagnostic and Statistical Manual of Mental Disorders*, 5th Ed.  Arlington, VA:  American Psychiatric Association, 2013, at p. 602.
[35]  UT Physicians, pp. 17-18.
[36]  Medical records and personal writings provided by Mr. Brockman, pp. 204-205; UT Physicians, pp. 13-14.
[37]  Dr. Denney's Interview of Peter Romatowski, 6/15/21, at p. 3.

CONFIDENTIAL

**PDA-0000045**

Brockman_0002000

**COMMENT:** Those with severe mental impairment often minimize or deny their impairment, while malingerers often call attention to their claimed impairment.

9/18/19

On 9/18/19, Mr. Brockman testified at a Federal Trade Commission Investigational Hearing in the Matter of CDK Global and Reynolds and Reynolds. Apart from a few points noted below, Mr. Brockman was intelligent, responsive, coherent, logical, perceptive, and articulate in his answers to many hours of questioning about his business practices, Reynolds and Reynolds, its software, and its competitors and partners. There were a few instances in which Mr. Brockman did not recall details from years previously, for example:

> Q: Am I correct in my understanding that at some point after UCS bought Reynolds that there was a breach of contract suit that went on between Reynolds and General Motors?
>
> A: I think there was something, but frankly, I don't remember exactly the details of what that was all about. [P. 33]

In response to a question about an acquisition from Ford, he gave a detailed historical recollection of events that occurred in 1992, even remembering the name of a key player at the time, though he caught his own error of having incorrectly said it occurred in 1972 rather than 1992 [pp. 38-40].

Another readily corrected example of Mr. Brockman misspeaking also illustrates his superior cognitive functioning:

> Q: And CDK was going to put its apps in through RCI. What is your understanding of why that hadn't happened prior to this 2013-2015 time period?
>
> A: Well, they didn't need to before that because they had their DMI, Authenticom, busily doing it for them.
>
> Q: In that answer you said DMI and Authenticom. Did you mean DMI and IntegraLink?
>
> A: IntegraLink. Excuse me. I get names confused. I know a little bit about a lot of things, and of course, the corollary to that is it means over time I will know everything about nothing. [Pp. 62-63]

CONFIDENTIAL

**PDA-0000046**
Brockman_0002001

In one instance, Mr. Brockman said "infer" when he apparently meant "imply," which is a common usage error [p. 132].[38]

> **COMMENT:**  Mr. Brockman's demonstrated cognitive abilities during this testimony are not consistent with the presence of mild or moderate dementia, despite some evidence of mild memory difficulty.

10/1/19

In Mr. Brockman's personal writing bearing the date 10/1/19, he wrote in pertinent part:

> Memory issues have become more defined
> -recall of names has gotten worse
> -dates are in numerous cases are almost completely gone
> -unless I was deeply involved with an event or issue – or it was very recent—I have no better than partial recall—and frequently no recall at all.
>
> *       *       *
>
> -reduced memory ability
> -reduced organizational ability.[39]

c. November 2019

In approximately November 2019, Mr. Brockman spoke at the 2019 Reynolds and Reynolds Company birthday party.  This speech was videotaped and revealed no evidence of cognitive impairment or dementia.  In the video, he appears to have a stooped posture, shuffling gait, slow movement when turning, and some difficulty with pronunciation and speech fluency [perhaps the hypokinetic dysarthria seen in Parkinson's disease].  In one instance, he said "our birthday apartment" and corrected himself to say our "our birthday event."[40]

> **COMMENT:**  My observations of Mr. Brockman in this video support a diagnosis of Parkinson's disease but not a diagnosis of cognitive impairment or dementia.

12/3/19

Dr. York's second evaluation of Mr. Brockman, on 12/3/19, conducted as a retained expert of defense counsel, reached the same diagnosis as the previous evaluation:

---

[38]  Transcript of 9/18/19 testimony at Federal Trade Commission Investigational Hearing in the Matter of CDK Global and Reynolds and Reynolds.

[39]  Medical records and personal writings provided by Mr. Brockman, pp. 195-196.

[40]  Video of Mr. Brockman speaking at the 2019 Reynolds and Reynolds Company birthday party in approximately November 2019 [UCSH 0212042].

23

CONFIDENTIAL

PDA-0000047

Brockman_0002002

"dementia of mild to moderate severity."  On this occasion, which she characterized as a "forensic evaluation" in contrast to her previous "clinical evaluation," she also offered the opinion that he was "unable to participate and aid in his own defense."[41]

> **COMMENT:**  Dr. York was offering an opinion as to Mr. Brockman's competency to stand trial before he had even been indicted or charged with any crime.  There is no indication that she evaluated his competence to stand trial, though she did learn that he was worried that the government was asking his business associates questions about him.  It appears that she relied on his testing performance to diagnose dementia and assumed this would make him "unable to participate and aid in his own defense."

<u>Early 2020</u>

Tommy Barras, Mr. Brockman's successor as President and, later, as CEO of Reynolds and Renolds Company, testified that in early 2020, he had no doubt about Mr. Brockman's ability to lead Reynolds and Reynolds.[42]

<u>1/20/20</u>

On 1/20/20, Mr. Brockman first saw treating neurologist Eugene Lai, MD, on referral from James Pool, MD.  In response to a new patient questionnaire apparently completed in Mr. Brockman's handwriting, the reason for the visit was given as "Parkinson's symptoms, stiffness, memory lapses, Bradykinesia, dopamine loss as indicated by Datscan, Depression."  Mr. Brockman wrote that he had been diagnosed in late 2018 or early 2019 and had been treated by Joseph Jankovic, MD with Sinemet and an Exelon patch.  In his consultation notes, Dr. Lai wrote:

> . . . He has a 3-4 year history of memory decline.  He is repeating himself, misplacing personal objects, and losing his train of thought.  He has difficulty with multi-tasking, taking medications, spelling, and word-finding.  He has difficulty managing his personal finances and he has a bookkeeper.  He does not initiate activities as he used to.  His wife states that his ability to make decisions fluctuates.  He has episodes of blanking or tuning out associated with reduced interactions with his surroundings.  He was advised not to drive by his physician, but he is still driving in closeby familiar areas.  About 2½ years ago, he started slowing down with imbalance and walking changes.  His steps became shorter and he developed a stooped posture.  He also experienced depression later and bupropion was started which has helped to improve his thinking and memory. . . . He began snoring, kicking, punching, and acting out his dreams during sleep about 2-3

---

[41]  Report of Michele York, Ph.D., re. neuropsychological evaluation of Mr. Brockman on 12/3/19.

[42]  Transcript of deposition of Norman Thomas Barras, Jr., in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 4/15/21 [redacted], p. 50.

CONFIDENTIAL

PDA-0000048

Brockman_0002003

years ago.  He was diagnosed with REM sleep behavior disorder and was prescribed clonazepam that has helped his symptoms.

*     *     *

Mental Status:  He is alert and oriented to person, place, time, and situation.  Montreal Cognitive Assessment (MoCA) score is 20/30, missing 2 points with visuospatial/executive function, 2 points with serial 7 subtraction, 1 point with language fluency, and 5 points with delayed recall.  Mood and affect are appropriate.  Speech is slightly hesitant.  Comprehension and expression are slower.

*     *     *

IMPRESSION:  This 78-year-old man presents with a 3-year history of progressive Parkinson's disease symptoms, cognitive decline, depression, and insomnia.  His MoCA test score is 20/30.  His neurological examination is significant for cognitive deficits, rigidity, bradykinesia, sensory impairment, and unsteadiness.  Therefore, his clinical findings are more consistent with the diagnosis of Parkinson's disease with mild to moderate cognitive impairment.  Differential diagnoses include: dementia with Lewy Bodies, vascular parkinsonism, other secondary parkinsonism, or Parkinson plus syndromes.  He has signs of peripheral polyneuropathy with gait imbalance.  He also has rapid eye movement (REM) sleep behavior disorder.[43]

March 2020

Bob Schaefer testified that through March 2020, Mr. Brockman was the decision maker for the line of business Mr. Schaeffer headed, and Mr. Brockman was in control of that business.  Mr. Brockman made decisions regarding pricing; interface integration; RCI vendors; desking; any security enhancements and communications to the market about security enhancements; contract decisions and directions for all contracts; and direction for the entire data services business and desking, communicating primarily by e-mail several times a week.  While working closely with Mr. Brockman, Mr. Schaefer had no reason to think that Mr. Brockman could not lead the company, thought of him as mentally sharp and intelligent, and saw no sign of diminishing mental capacity or dementia.[44]

6/2/20

Seth P. Lerner, MD, commented in 6/2/20 clinical notes, "having some memory issues."[45]

---

[43]  Houston Methodist, pp. 118-142.
[44]  Transcript of deposition of Robert Schaefer in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 3/18/21 [redacted], pp. 59-63.
[45]  Baylor College of Medicine, pp. 160-163.

CONFIDENTIAL

**PDA-0000049**
Brockman_0002004

<u>6/3/20</u>

In June 2020, Tommy Barras was appointed President of Reynolds and Reynolds Company, reporting to Bob Brockman, the Chairman and CEO.[46]  In an e-mail to Mr. Barras on 6/3/20, Mr. Brockman wrote that they should be talking every day about any important decision "before it is leaked or published," and Mr. Barras testified that when he was President and Mr. Brockman was CEO, they did talk about every important decision.[47]  [Norman Thomas Barras, Jr., Depo., 4/15/21, p. 58].

<u>6/3/20</u>

On 6/3/20, an e-mail was sent throughout Reynolds and Reynolds Company in which Mr. Brockman announced significant management changes and wrote about continuing as CEO for the time being.[48]

**10/1/20:  Federal indictment made public.**

<u>10/7/20</u>

As a result of her third evaluation, conducted as a retained expert for defense counsel and which she characterized as "forensic," Dr. York diagnosed Mr. Brockman with "dementia of mild to moderate severity" and opined that he was "unable to participate and aid in his own defense," as she had previously.  In her report, Dr. York described a delusional episode that Mr. Brockman's son had subsequently reported to her in a telephone call as having occurred in the early morning hours of 10/19/20.

> **COMMENT:**  As previously, Dr. York's opinions appear to be based on test performance, historical information provided by the Brockman family, and the assumption that if Mr. Brockman is demented, he must be incompetent to stand trial.  The incident reported to her by Mr. Brockman's son is not referred to in any other medical records and was not described by Mr. Brockman.

<u>10/22/20</u>

A CogniSense report dated 10/22/20 and signed by James Pool, MD, provides the background information that Mr. Brockman's "wife (Dorothy) and son (Robert) report deteriorations in cognitive functions."  The test results are reported as:

---

[46]  Transcript of deposition of Norman Thomas Barras, Jr., in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 4/15/21 [redacted], pp. 10 and 24.
[47]  *Id.*, p. 58.
[48]  E-mail to Reynolds and Reynolds, 6/3/20.

CONFIDENTIAL

**PDA-0000050**
Brockman_0002005

Total score is 13 out of 29 points.  This score falls below the cutoff for dementia in patients of this age and educational level and is typically associated with Major Neurocognitive Disorder, moderate (formerly Moderate Dementia).[49]

November 2020

Tommy Barras testified that he was appointed Chairman and CEO of Reynolds and Reynolds in November 2020 as Bob Brockman resigned as Chairman and CEO.[50] Mr. Barras testified that he first became aware of Mr. Brockman having any illness (namely, Parkinson's disease and kidney and bladder disease) that could affect his ability to lead the company when, as he understood it, Mr. Brockman exercised the disability provision of his employment agreement in November 2020.[51]  Until then, he had no reason to think that Mr. Brockman was unable to lead Reynolds and had no reason to doubt his mental capacities, even though he also testified that he had for years witnessed Mr. Brockman forgetting things, not recalling some decisions, and being unable to grasp technology discussions, all of which Mr. Barras attributed to aging and stress.[52]

November 2020

In Mr. Schaefer's opinion, Mr. Brockman did a good job running Reynolds and Reynolds as CEO until Mr. Brockman left the company.[53]

2/2/21

The most recent assessment by a treating neurologist is a 2/2/21 follow-up visit with Eugene Lai, MD, attended by Mr. and Mrs. Brockman.  Dr. Lai wrote, in pertinent part:

> . . . He has retired as CEO of his software company but is still under a lot of stress.  Sleep is better with trazodone and clonazepam. . . . Basic activities of daily living are independent, but slower. . . . Moods are stressed and depressed.  His wife needs to help him in organizing his responsibilities and taking care of legal issues.  Memory is impaired but stable. . . . He takes carbidopa/levodopa 25/100 2 tablets only 2 times a day at 8 am and 8 pm, and he typically forgets his 2 pm dose.

---

[49]  Baylor College of Medicine, p. 54.
[50]  Transcript of deposition of Norman Thomas Barras, Jr., in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 4/15/21 [redacted], pp. 10, 25-26, and 28.
[51]  Transcript of deposition of Norman Thomas Barras, Jr., in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 4/15/21 [redacted], pp. 51-54.
[52]  Transcript of deposition of Norman Thomas Barras, Jr., in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 4/15/21 [redacted], pp. 52 and 54-55.
[53]  Transcript of deposition of Robert Schaefer in Cox Automotive, Inc., et al., v. the Reynolds and Reynolds Co., 3/18/21 [redacted], pp. 60-61.

CONFIDENTIAL

PDA-0000051

Brockman_0002006

There is no neurological complaint.  He has slowness, stiffness, and gait imbalance.  He lacks energy and is inactive.  He denies recent headache, dizziness, weakness, confusion, dysarthria, dysphagia.

\*       \*       \*

They are in the process of moving to the River Oaks area closer to their son.

\*       \*       \*

MS: He is alert and attentive. O x person, place, and time.  He follows complex verbal commands.  Memory is 4/4 immediate -> 0/4 delayed.  Comprehension and expression are slower.  Insight and judgment are mildly impaired.  MoCA score (1/8/2020) = 20/30.

\*       \*       \*

Clinical findings are consistent with Parkinson's disease with mild cognitive impairment.  He is under a lot of stress trying to still run his company by himself, and his wife is also stressed out.  He has signs of mild cognitive impairment and peripheral neuropathy with gait imbalance.  Neurological and cognitive examinations are without notable change from last visit.[54]

## 3/12/21

A PET brain metabolic evaluation ordered by Dr. Darby and conducted on 3/12/21 was given this interpretation, echoing the clinical history of dementia with Lewy bodies and Alzheimer's disease with early onset on which the neuroradiologist evidently relied:

> Findings are very mild, but suggestive of early neurodegenerative disease, either early Alzheimer's disease or dementia with Lewy bodies (Parkinson's disease with dementia).  Findings are unlikely to represent frontotemporal dementia.[55]

> **COMMENT:**  This interpretation of ambiguous "very mild" findings would appear to have been biased by the interpreter's foreknowledge of prior diagnoses of dementia, a phenomenon known as confirmation bias.

## 4/29/21

---

[54] Houston Methodist, pp. 30-32.
[55] PET Brain Metabolic Evaluation, Houston Methodist Hospital, 3/12/21.

28

PDA-0000052
Brockman_0002007

A sleep study ordered by Dr. Darby and conducted on 4/29/21 documented severe obstructive sleep apnea but no evidence of REM behavior disorder; the duration of REM sleep may have been too short (29.5 minutes) to provide an adequate sample. Ruckshanda Majid, MD, recommended CPAP titration and a repeat study.[56]

> **COMMENT:**   Severe obstructive sleep apnea is a treatable condition associated with premature death, daytime drowsiness, and impaired mental functioning.  The repeat sleep study has been twice scheduled and twice cancelled because of hospitalizations for sepsis.

## 5/5/21

When interviewed by Dr. Darby on 5/5/21, Dorothy Brockman reported that her husband had memory problems consistent with those she had reported to treating doctors previously, and she stated that she had taken over management of his medications and the couple's finances.  She described his having had a precipitous decline when he discovered the government was investigating.  She had not observed clear fluctuations in her husband's mental functioning.  She described her husband kicking her during sleep, for which he was prescribed Trazodone 4-5 years previously, with some kicking thereafter.  Asked about hallucinations, she said they usually came out at doctors' offices when he sees movement of "a spec of dust."  She reported having seen Dr. Beth Yudofsky for back pain.[57]

> **COMMENT:**  Mrs. Brockman's reports about her husband's sleep behavior are the sole basis for a diagnosis of a REM sleep disorder, as the only objective measurement (the sleep study) was inadequate in duration and did not support this diagnosis.  Moreover, Mrs. Brockman's description provided only weak support for this diagnosis.  Likewise, her description of hallucinations at doctors' offices, apparently based a single event during an evaluation by Dr. York, is inadequate to support a finding that he has suffered hallucinations when not delirious.  Mrs. Brockman's explanation of why she saw Dr. Beth Yudofsky is contradicted in Mr. Brockman's personal writings, which give markedly different reasons for that long-standing treatment relationship.

## 5/31/21

Records from Houston Methodist Hospital indicate that Mr. Brockman presented there on 5/31/21 with signs of a urinary tract infection and confusion.  A note on that date reads in pertinent part:

> Pt is unable to provide much history due to altered mental status, though his family who is at bedside was able to assist.  Yesterday morning, they noticed he was more tired and had taken a nap. Later

---

[56] Polysomnography Report, Memorial Hermann Hospital Texas Medical Center, 4/29/21.
[57] Dr. Darby's notes of his interview of Mrs. Brockman, 5/5/21.

CONFIDENTIAL

PDA-0000053
Brockman_0002008

on, he began saying things that didn't make sense, in addition to not eating very much, and staring off blankly. This prompted them to bring him to HMH for further evaluation. . . .

Per chart review, pt was hospitalized from 3/15/21-3/19/21 at HMH with Klebsiella pneumoniae growing in his urine and blood cultures for which he was treated with Cefazolin and discharged home on Ciprofloxacin. . . .

Results of neurological examination were described:  "Alert, talkative, though answers to questions don't make sense."[58]

6/6/21

On 6/6/21, geriatric consultant on Sarah E. Seleck, MD, noted:

. . . he was alert but oriented and easily distracted today.  His wife gives a history of PD going back >5 years and consideration for dementia > 1 year who has had significant decline with each of last two urine infections and now has been agitated in the hospital.  He was started on Seroquel 50 (100mg was ordered but discontinued).  Today he is direct-able but inattentive.  His familiar caregiver and wife are present.

I would recommend consideration of starting his home meds for sleep and constipation and decreasing the Seroquel to 25mg or lower as he sounds to be improving with aim of decreasing the low potential for producing extrapyradmidal side effects esp since wife says no auditory nor visual hallucinations at home.[59]

6/7/21

On 6/7/21, psychiatric consultant Inna D'Empaire, MD, noted:

. . . The pt has had intermittent agitation including last evening when he was attempting to hit staff and climbing out of bed, ultimately falling, worsening confusion in the evenings, including visual hallucinations.  Psychiatry asked to consult for agitation.

The pt is seen and evaluated.  He is pleasant and calm but confused.  He does not recognize his home care giver at bedside and does not recognize he is in the hospital.  He tells us that he was some place else last night.  Denies pain.  Reports having visual hallucinations, seeing "black things" that move that he tries to swat and he is not able to convince his wife Dorothy that they are present.

---

[58] Houston Methodist, 2nd production, pp. 3-5.
[59] Houston Methodist, 2nd production, p. 15.

CONFIDENTIAL

PDA-0000054
Brockman_0002009

Wife states that prior to his admission in March, he was independent in ADLS but now is dependent in all ADLS and IADLS.  He has a caregiver in the home during the day and the wife assists at night. . . .[60]

A CT scan of the head on 6/7/21 ordered for minor head trauma [the fall, in an elderly man taking an anti-coagulant] was read as an "Unremarkable CT of the head with no evidence of acute hemorrhage or mass effect."[61]

6/11/21

Mr. Brockman was reportedly discharged from Houston Methodist Hospital on 6/11/21, [62] but records of his hospitalization and discharge subsequent to 6/7/21 have not yet been received for review.

## EXAMINATION

At the outset of the interview of Mr. Brockman on 5/18/21, he was informed as to the identities of the examiners, the retaining party, the lack of confidentiality, the absence of a treatment relationship, and the forensic purpose.  He was told that he was free to ask for a break or to speak to his attorneys at any time and was told the expected schedule for the day.  He was reminded of these on 5/20/21, as well.

Mr. Brockman arrived each interview day on time, in casual clothing, and in the company of his caretaker.

For nearly two full days of interviews, Mr. Brockman demonstrated himself to be an intelligent, charming gentleman who consistently espoused placing high value on hard work, saving, family, loyalty, stewardship, and other traditional conservative and Protestant values.  He credited his maternal grandmother with having taught him to work, save, and build.[63]  He credited his maternal grandmother and his mother with sparking his subsequent philanthropy.[64]  Asked to describe charities he had favored over the years, he mentioned wounded military veterans, major projects at Rice University, the church, a scholarship program at Texas A&M.[65]  Asked if there were others, he replied, "There's ben—there's been some other lesser contributions in the—in the medical—in the medical center.  I'm trying to

---

[60]  Houston Methodist, 2nd production, p. 23.

[61]  Houston Methodist, 2nd production, p. 28.

[62]  E-mail from Kathy Keneally to Corey Smith, et al., re. "US v. Brockman: update on medical issues," 6/17/21.

[63]  Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 11-12.

[64]  Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 65-66.

[65]  Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 66-68.

31

PDA-0000055

Brockman_0002010

think.  There's—that's not all, but that's—that's principally all of it."[66]  In a later interview, he continued to minimize his contributions to Baylor Medical College:

> PD: If I understand correctly, you have helped fund Dr. Yudo—Dr. Yudofsky's research program and his programs at Baylor?
>
> RB: I have not.  You know, the trust has.
>
> PD: The trust has?
>
> RB: Uh-huh [affirmative].
>
> PD: And I noticed that you didn't mention Baylor in the list of charities that you provided on Tuesday, and it wasn't on the list that you supplemented yesterday either.  Is there a reason you didn't mention Baylor?
>
> RB: No, I just—you know, to be asked cold, you know, everything that's happened over a number of years, that one I didn't—that part I didn't get right.
>
> PD: How much overall have you given to Baylor Medical, or the trust?
>
> RB: I'm—I don't know just on a flatfooted basis how much, but I would believe it would be probably in the million dollar range.
>
> PD: In the million dollar range?
>
> RB: Uh-huh [affirmative].
>
> PD: Could it be in the 30 million dollar range?
>
> RB: I don't think so.  I think that that number's too big.[67]

He spoke disparagingly only of those he regarded as immoral, lazy, parasitic, or stupid and the cooperating witness he described as having betrayed him and/or stolen from him or the Trust.

He spoke intelligently about abstract business concepts, providing cogent explanations of management processes.[68]  He acknowledged remaining in contact with his successor as CEO of Reynolds and Reynolds Company, and said he

---

[66]  Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 68.

[67]  Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 80.

[68]  Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 52-54.

CONFIDENTIAL

PDA-0000056

Brockman_0002011

continues "in an advisory relationship in that he talks about things, and I give him my opinion, and he does what he wants."[69]

His remote memory was superior to the extent this could be judged or validated. For example, he mentioned his father's training on the precise, mechanical Norden Bombsight during World War II,[70] and his description is consistent with that of historical sources.[71]  He described his paternal grandfather's invention of the Brockman Electric Doormat during the Depression,[72] and records from the United States Patent Office indicated that an application for a patent on an Electric Mat Switch was filed on 12/5/27 by Robert H. Brockman and Patent No. 1,776,992 was granted on 9/30/30.[73]  He also said his paternal grandfather invented the differential used in all automobiles and that he had the original patent dated 1905,[74] and records from the United States Patent Office indicated that an application for a patent on a Differential Gear was filed on 7/27/04 by Robert H. Brockman and Patent No. 808,002 was granted on 12/19/05.[75]

With respect to short-term memory, he occasionally lost his train of thought[76] (but also recalled what we had been speaking about after a break[77]) and had word-finding difficulty.[78]  In describing his medical history, he volunteered that three doctors had diagnosed him with dementia, the context of which is shown in this exchange:

> RB: Yeah, okay.  I didn't remember the name.  And then they get all the equipment laid out including the cyst—the cystoscope itself. And so when Seth Lerner walked in his first thing—his first words are, "How are you doing, Bob?"  And I said, "Well, really not worth a crap.  I'm—I'm not feeling good."  He said, "Well, when I get— when we get done with this, let me talk to you about this."  So the

---

[69]  Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 54.

[70]  Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 6.

[71]  https://www.maxwell.af.mil/News/Display/Article/420450/the-enigma-of-the-norden-bombsight/; https://www.historynet.com/not-so-secret-weapon-the-norden-bombsight.htm; http://www.twinbeech.com/norden_bombsight.htm.

[72]  Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 13-14.

[73]  https://patents.google.com/patent/US1776992.

[74]  Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 14.

[75]  https://patentimages.storage.googleapis.com/1f/77/56/d67b217d85dcd2/US808002.pdf.

[76]  Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 20 and 59; Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 87.

[77]  Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 48.

[78]  Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 44 ("sepsis"), 46 ("Asperger's"), 62 ("sepsis"), 68 (name of the architect who built the opera hall at Rice University), 75 ("Parkinson's").

CONFIDENTIAL

**PDA-0000057**

Brockman_0002012

cystoscopy proceeded uneventfully and then after as I was getting dressed I'm—I stopped and talked to him and he said, "I—there's a—a doctor that you need to go see here.  His name is—his last name is Poole, P-O-O-L-E.  You need to go talk to him."  So I made an appointment, went to see Dr. Poole and he said—there was a lot of hmmm, and you know, note taking and—as I described everything.  And he said, "I've got a couple other doctors I think you need to see."  And I don't remember their names, they're in obviously my medical records.  But I went to see them and they said, "Well, we got some more tests that we would like you to take."  And so I—you know, did the tests and that's where I first started being diagnosed with Parkinson's.  And each one of those docs that he sent me to, they put me through more tests.  And interestingly enough, you know, one—you know, not just one doctor but several doctors came back with a test that said I had dementia.  And I never heard of that.  And—

PD: You hadn't heard of dementia before?

RB: No.  Except in—in the—you got people that are crazy or stupid or, you know, they're somehow, you know, diseased and, you know, not productive.  But a person like me, I have never heard of somebody like that, you know—you know, getting the dementia reading.  But all of them agreed.  I think there were three doctors that did the—the initial, you know, studies on, you know, three different occasions.  And that's obviously, you know, worrisome.  You know, because in the business I'm in, if you don't have 100% of your faculties you can't lead.  And matter of fact, everything you do becomes suspect.  Not only to yourself but also to the people who work around you that, you know, "Some—something's happened to Bob, he's not as sharp as he used to be."  And I begin to recognize that in my ability to deal with names, that's where it all started.  You know, I could be introduced to somebody, I have their name and in ten seconds it's gone, which is aggravating.  You have to enlist help.  In my case my wife helps, you know, do a better job at keeping track of people, you know, than I did or I could.  And that I—I found myself still able to talk very well but when it came to actually doing the work, you know, doing the spreadsheets and the forecast, all the accounting analysis reports, all the kind of stuff that, you know, top management, you know, has to—has to be involved in.  I was having trouble, you know, just took me much longer, you know, two times, three times, four times longer to do something.  And—or to do anything at all.  And my wife said, "I know what your problem is."  I said, "Well good, tell me."  She said, "You have task initiation problems."  I said, "What?"  She says, "Look at your desk."  I have a 10x10 desk that I sit in the middle of.  You know, the front piece is ten feet and it's like five feet that way.  She says, "You can't see your desk.  It's

CONFIDENTIAL

PDA-0000058

Brockman_0002013

covered with paper." And other than make just, you know, repeated efforts, there was no way to deal with that. And over the last couple years I've had a hard time getting stuff done. And again, I can still talk a pretty good game but when you're working with people who really know they're in the guts of stuff, you know, software design, software development, specific projects, it's hard to effectively lead when you're in that situation. And unfortunately the—I think the most recent set of tests, they pegged me at 10% instead of five. By any stretch that's the wrong direction. But— and I'm not sure what it was, you know, about how I handled, you know, the test that caused the—you know, the grade to slip.

PD: So do you know what that's a rating about?

RB: I—I don't understand the—the—the medical, you know, part of that—that diagnosis. Other than it's not good. . . .[79]

Asked what changes he recognized to himself after his hospitalization for sepsis, he replied, "My memory has gotten markedly worse."[80] He elaborated:

I was at one point in time a pretty good typist and I could type a letter without writing it in longhand first and was pretty efficient at that. And—but now what happens is I start to type something and almost immediately the spell checker says something's wrong and I gotta go figure out what—what I need to do differently to get it to pass spell check and—and it's not just spell check it's formatting, you know, the kind of stuff that's not spelling related. Whether or not you use incomplete sentences or something, you know. And so my—my productivity as far as communications has gone in the dirt. Because you know, this—the process that he's doing, you know, so wonderfully [referring to Dr. Denney inputting notes on a laptop] I can't—I can't do that anymore. You know, same with—same with people's name, telephone numbers, you know. A six-digit telephone number I used to be able to look at one and then key it into my—my phone system or my e-mail system, whatever it took to look up the person. Now what I have to do is—is I can look at a six-digit telephone number, I take two digits, and I can remember that long enough to type it in. But then I gotta go back and get the second two digits and the third two digits, each one of them separately, and I have to do that not only on telephone numbers but, you know, God forbid social security numbers, account numbers at—at, you know, various vendors. And again, I talk a pretty good game, okay, but when it comes to actually getting things done I'm a shadow of what I used to be. And slowly folks in the

---

[79] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 77-78.

[80] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 82.

CONFIDENTIAL

**PDA-0000059**

Brockman_0002014

company have—have been becoming aware, which is one of the reasons why I decided to retire first of the year.[81]

Asked if he thought any of the problems he'd described remembering names or numbers could simply be related to aging, he responded wisely, "I'm not an expert in that area so anything that I would say would be supposition based on no facts."[82] Asked to describe other cognitive problems, he described misplacing his cell phone,[83] and on further questioning said he had trouble remember the names of a thousand components of a PC, did not know how to use everything on his smart phone, and had difficulty troubleshooting his wife's iPad.[84] Although he can write e-mails, he complained of difficulty remembering passwords for all of the electronic devices in the house.[85] After a recent move to a new house, he sometimes made a wrong turn in trying to go from one room to another.[86] He commented that "I've had sufficient problems with keeping up with my medicine, but my wife has totally taken over."[87] He also complained of difficulty initiating and completing projects and keeping up with paperwork, and he volunteered that his wife had taken over power of attorney for him.[88]

In contrast to these reported deficits, he indicated that he keeps up with news about River Oaks Country Club through his buddies, decided which of his cars to sell and knew how the transactions had been accomplished, knew the current owners of the jet and yacht he formerly used and the current trustee of the Eugene Brockman Charitable Trust, voted in the 2020 election, continues to write checks, and continues to have access to his firearms, stored at multiple locations.[89] Although he did not recall the names of the companies, he was aware of recent news stories about cybersecurity breaches and was able to describe a recent ransom payment and recognized the market potential for software solutions (an industry in which he had made an unsuccessful investment),[90] consistent with the

---

[81] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 83.

[82] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 85.

[83] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 86.

[84] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 99.

[85] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 102.

[86] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 92-93; Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 43-44.

[87] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 35.

[88] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 36-38.

[89] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 55-67.

[90] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 98.

CONFIDENTIAL

PDA-0000060

Brockman_0002015

observation of Mr. Brockman reading a newspaper over the lunch break.  He was able to give an adequate definition of "confabulation" and said that his son thinks he does that, but he does not.[91]

Asked when he experienced the onset of depression, he connected this to "tax issues," began to describe those issues, but limited his disclosures:

PD: Your medical records mention depression and I want to ask you about that.  When would you say you first experienced depression?

RB: Just in the last couple years.  And really it all boils down to the tax issues.

PD: To the tax issues?

RB: To the tax issues.  And that's a terrible mess.

PD: So before that, you weren't depressed?

RB: No, I was busy.

PD: And then what was it that came to your attention that caused you to see there was a mess?

RB: Well, I—I don't understand all the legal ins and outs of taxation.  I—I should've had a much better lawyer which would've, you know, undoubtedly given me different advice than that which I got.  And that's gonna take a long time to—to, you know, straighten out.

PD: What was the first indication you had that there was a problem?

RB: It happened I think now almost four years ago.  Some of the people that I did business with came under IRS scrutiny.  And that's when that part of my life started getting a lot more attention.  And it's pretty obvious it's gonna be years before all that gets sorted out.  Every week something new, you know, gets discovered.  Recently there's been a lot of knowledge come about regarding the people that I did business with that's not pleasant.  They're tax attorneys, they're—basically been indicted with all kinds of malpractice and—you know, advising clients, preparation returns, that sort of thing.  And I—I don't think all of it has come out yet.

PD: So some tax lawyers that you relied upon have gotten in trouble?

---

[91]  Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 102-103.

CONFIDENTIAL

**PDA-0000061**
Brockman_0002016

RB: Uh-huh, yeah.  With very high profile folks.  I consider myself very low profile.  But one of the people that they were involved with is very high profile, a black man by the name of Robert Smith.

PD: Uh-huh.

RB: And Robert Smith has got some real issues.  And—which is a shame because I like the guy.  He sees things a lot the way I do and he—he's a fisherman, you know, brilliant guy.  And where he's most brilliant is in a room full of people, half of which are ladies.  The ladies all love him.  They think he's wonderful.  My wife does, or did.  And of course a lot of that is in the news, you know, it's a matter of record.

PD: Yes.  So you indicated some people that you did business with were falling under IRS scrutiny.  What was the first of those that came to your attention?

RB: I think it was Carlos Kepke. . . .

PD: So, and I'm asking because I want to date the onset of depression, which you said came after the IRS troubles.

RB: Uh-huh.  Yeah, because all we're supposed to be talking about is my condition, you know, not about the case itself.

PD: Yeah.  So—

RB: And we've—we've kind of, you know, veered off the side of the road a little bit.

PD: That's why I'm bringing you back to depression and when that started.[92]

Mr. Brockman takes Wellbutrin—which he calls his "happy pill"—for depression, and initially said it was first prescribed by Dr. Yudofsky[93] [Mrs. Brockman thought so, too[94]] but later said it had been prescribed by Dr. Pool and that Dr. Yudofsky had prescribed medication to help him sleep.[95]

---

[92] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 103-105.
[93] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, p. 107.
[94] Dr. Darby's notes of his interview of Mrs. Brockman, 5/5/21.
[95] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 78.

CONFIDENTIAL

PDA-0000062

Brockman_0002017

Asked about thrashing, kicking, or hitting during sleep, Mr. Brockman said he was told of this and "I think the incidents occurred probably over a couple month period" and that this was "several years ago."[96]

The second day of interview began with Dr. Denney questioning Mr. Brockman about the elements of the Dusky standard of trial competence, during which Mr. Brockman displayed an adequate understanding of the charges against him, the roles of trial participants, courtroom procedures, and his rights.[97]  He stated that he was able to share information and potentially beneficial facts with his counsel, whom he praised and in whom he expressed confidence, and he did not expect any problems in sharing details with his attorneys about the allegations in the indictment.[98]  Later in the day, Mr. Brockman also stated and demonstrated that he would be able to inform his attorneys about his relationships with Evatt Tamine and Robert Smith, and he demonstrated a rational understanding and intact memories for various elements of the allegations in the indictment about which he was asked general questions.[99]  He denied difficulty dealing with his lawyers or having significant problems recognizing documents he'd been shown:

> PD: Is there anything you're having difficulty dealing with your lawyers about?
>
> RB: No.
>
> PD: Have they shown you documents that you don't recognize?
>
> RB: Not a lot, but that—that has happened.
>
> PD: But most of the time you recognize the documents and understand where they came from?
>
> RB: Well, theoretically yes, but go through questions like, you know, you're raising.  That means the word "all" cannot be used.
>
> PD: Sure.  Do you recall any times it concerned you that you didn't recognize something, didn't know where it came from?
>
> RB: I'm sure that's happened, but I—I—I don't remember a specific instance.[100]

---

[96] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 110-111.

[97] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 3-41.

[98] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 20-22, 25-27, and 30-31.

[99] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 99-126.

[100] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 127-128.

CONFIDENTIAL

PDA-0000063

Brockman_0002018

Mr. Brockman sought to limit disclosures that he thought went beyond the limited purposes of a competency examination, though his understanding of those limits was unsophisticated, as in these examples:

RD: What have they charged you with?

RB: I think that's, you know, beyond the scope of what I'm supposed to be talking about.  That—that doesn't have anything to do with my competence.[101]

\*       \*       \*

RD: Okay.  So there's been—there's been information that should've remained private that's been released to the public?

RB: Yeah.  Well, the idea, you know, you're not innocent—the part where you're not guilty.  I'm really saying that wrong.  You're supposed to be innocent until proven guilty.  And that's not at all the situation that I'm in.  Which I'm surprised at, but evidently things have changed over the years.

RD: Help me understand why—what is it that makes you feel that way?

RB: Again, I—I think we're going off into an area of discussing my case, which we're not supposed to be doing.[102]

\*       \*       \*

RD: Would there be any—this is a conceptual kind of question, would there be any situation in your mind, in your awareness at this point, of a potential situation where you would entertain a plea bargain if—if they could like get the prosecutors to accept it and if it was—provided something good for you?  I don't know.

RB: Well, I think that's a question that applies to my case and that's not something I'm supposed to be talking about.[103]

\*       \*       \*

---

[101] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 3.

[102] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 5.

[103] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 25.

CONFIDENTIAL

**PDA-0000064**

Brockman_0002019

RD: Okay.  What—what gave them—or what gave them pause or concern regarding your competence, do you have any idea what?

RB: Again, I don't think that's something—that's very, very specific to my case and I don't think we're supposed to be talking about that.

RD: Okay.  Well, let me rephrase that, and maybe I won't be so pointed.  I don't mean to be pointed like that.  Some—somebody's concerned about your competence.  What sort of things have come up that would make your competence at risk?

RB: Again, I don't think I can answer that without going—

RD: Okay.

RB: —over the line.[104]

*         *         *

RD: Is there any particular individual that you're concerned about that would be likely to lie about you or?

RB: Again, I think that that gets into the specifics of the case.[105]

Immediately after having demonstrated adequate competence to stand trial, Mr. Brockman offered his opinion that he was not competent to stand trial and had only limited ability to assist his attorneys.[106]

In marked contrast to his overall performance during prolonged interviews, Mr. Brockman displayed some dramatic abnormalities.  The first example of this was when, on the second day of interview, he twice reported that his first hospitalization for sepsis was in August and said he did not recall who had administered tests to him the preceding day [Dr. Denney, who was questioning him when he said this].[107] He also displayed dramatic abnormalities during mental status examination, which resembles testing in that it obviously seeks to test mental function.  The two most dramatic examples of this occurred when I transitioned from asking Mr. Brockman about his business to formal mental status examination and he seemed unable to name the President of the United States[108] and when I transitioned from questions

---

[104] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 29.

[105] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 33.

[106] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p.40.

[107] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 38-42.

[108] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 89-90.

CONFIDENTIAL

PDA-0000065

Brockman_0002020

about entities named in the indictment to asking him again to name the President.[109] The many examples of this include, without limitation, giving the date as 8/21/21 after having stated it correctly hours earlier; maintaining he would not know how to direct a taxi to his home because he did not know the address; and performing remarkably poorly in naming past presidents, spelling "world" backwards, subtracting serial sevens, subtracting serial threes, naming capital cities, and naming the Governor of Texas.[110]

He denied any psychotic symptoms, including auditory or visual hallucinations, and he disputed Dr. York's account of his having hallucinated a bug on the floor.[111]

**FINDINGS AND OPINIONS**

Mr. Brockman's claim of trial incompetence rests largely on the opinions of Baylor clinicians who have treated him and some observations of defense counsel.  With respect to the observations of clinicians one should note that psychiatry has long recognized problems related to the evaluation and treatment of VIPs with psychiatric impairment, as recognized in the 1973 report of the Group for the Advancement of Psychiatry[112] and subsequent publications.  Among the concerns voiced in the literature are that a patient's VIP status could lead to requests for "a wealthy donor to be seen more quickly"[113] and "might trigger a loss of objectivity."[114]  One must question, for example, whether Dr. Pool's 11/14/18 and 11/18/19 referrals of Mr. Brockman to Dr. York as a "VIP Dr. Pool patient" and for a "VIP CAPACITY EVAL"[115] or other information provided by colleagues or administrators about Mr. Brockman's contributions to the Baylor College of Medicine could have biased her evaluation or those of others who took his and his family's reports regarding his functioning at face value.

Malingering is defined in the *Diagnostic and Statistical Manual of Mental Disorders*, 5th Ed. (*DSM-5*) as "the intentional production of false or grossly exaggerated

---

[109] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 126.
[110] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 43-45 and 89-94.
[111] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, pp. 96-97.
[112] Committee on Government Agencies, Group for the Advancement of Psychiatry:  *The VIP with Psychiatric Impairment*.  New York:  Charles Scribner's Sons, 1973.
[113] Gainer D, Cowan AE (2019):  The very important patient.  *Innovations in Clinical Neuroscience* 16(7-8):  25-28.
[114] Alfandre D, Clever S, Farber NJ, Hughes MT, Redstone P, Lehmann LS (2016):  Caring for 'very important patients'—Ethical dilemmas and suggestions for practical management.  American Journal of Medicine 129(2):143-147; Gainer D, Cowan AE (2019):  The very important patient.  *Innovations in Clinical Neuroscience* 16(7-8):25-28; Avery J, Knoepflmacher D, Mehta N, Penzner J (2016):  VIP patients: An unexpectedly vulnerable population, in Parekh R, Childs EW (Eds.): *Stigma and Prejudice:  Touchstones in Understanding Diversity in Healthcare*.  Switzerland:  Humana Press, pp. 103-111.
[115] Baylor College of Medicine, pp. 196-197 and 787.

CONFIDENTIAL

PDA-0000066
Brockman_0002021

physical or psychological symptoms, motivated by external incentives such as . . . evading criminal prosecution . . ."[116]  According to *DSM-5*:

> Malingering should be strongly suspected if any combination of the following is noted:
>
> 1. Medicolegal context of presentation (e.g., the individual is referred by an attorney to the clinician for examination, or the individual self-refers while litigation or criminal charges are pending).
>
> 2. Marked discrepancy between the individual's claimed stress or disability and the objective findings and observations.
>
> 3. Lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regimen.
>
> 4. The presence of antisocial personality disorder.[117]

The two main bases for suspecting malingering in this case are that Mr. Brockman presents in a medicolegal context and evidences a marked discrepancy between his claimed disability (in test performance) and objective observations of his function as CEO and in his speeches, testimony in civil suits, and performance in interviews when not being obviously tested.

Less significant is that he did not comply with the guidance of Dr. York to work on jigsaw or crossword puzzles or use a dry erase board[118] and memory station, which he denied using at his current home,[119] or the guidance of Dr. Pool to avoid unfamiliar environments or changes in routine.  On 11/25/20, James L. Pool, MD, signed a declaration stating that "Unfamiliar environments, stimulating surroundings, and changes in routine would be especially stressful for a person with Mr. Brockman's diminished capacity, creating a risk to his existing cardiac condition, and could exacerbate the overall progression of his symptoms."[120]  Yet some nine weeks later, on 2/1/21, Dr. Eugene C. Lai, MD, noted that Mr. and Mrs. Brockman "are in the process of moving to the River Oaks area close to their son."[121]

---

[116] American Psychiatric Association:  *Diagnostic and Statistical Manual of Mental Disorders*, 5th Ed.  Arlington, VA:  American Psychiatric Association, 2013, at p. 726.

[117] American Psychiatric Association:  *Diagnostic and Statistical Manual of Mental Disorders*, 5th Ed.  Arlington, VA:  American Psychiatric Association, 2013, at p. 727.

[118] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/20/21, p. 53.

[119] Transcript and video of Dr. Dietz and Dr. Denney's interview and examination of Mr. Brockman, 5/18/21, pp. 86-87.

[120] Declaration of James L. Pool, M.D., in Support of Robert T. Brockman's Motion to Transfer Proceedings, 11/25/20 [Document 49], at para. 10.

[121] Baylor College of Medicine, pp. 19-21.

43

CONFIDENTIAL

PDA-0000067
Brockman_0002022

Not yet ripe as a basis for suspecting malingering is that except for the requirement of the onset of a conduct disorder before age 15, Mr. Brockman would meet criteria for a diagnosis of antisocial personality disorder if the indictment were proved correct regarding his repeatedly performing acts that are grounds for arrest, the allegations of deceitfulness, and the allegation that he failed to honor financial obligations to the United States, for all of which he evidenced a lack of remorse in our interview by denying knowledge of wrongdoing and by casting aspersions on cooperating witnesses.

The three pillars of evidence on which I base my opinion that Mr. Brockman has malingered the severity of his cognitive deficits in a variety of settings since at least 1/30/19 are:

(1) the marked discrepancy between Mr. Brockman's performance when he knows his cognitive functioning is being tested and his cognitive performance when lecturing, testifying, or speaking in contexts in which his cognitive functioning is not being tested;

(2) the atypical results of formal neuropsychological testing conducted by Dr. Denney;

(3) the onset of apparent deficits during tests of cognitive function only after the Bermuda Police Service's raid on Evatt Tamine's Bermuda home on 9/5/18, prior to which time Mr. Brockman evidenced only age-related memory deficits, whether or not one relies on his personal writings.

In concluding that Mr. Brockman is exaggerating the severity of his cognitive deficits, I am not saying that he has <u>no</u> cognitive deficits. I do not doubt that he has some difficulty remembering names, numbers, and passwords, that he misplaces objects, or that the move to a new home and two bouts of sepsis with delirium have led to moments of confusion. The diagnostic challenge is to validly judge where his cognitive functioning lies on the continuum that ranges from age-related memory changes to mild cognitive impairment to mild or moderate dementia. Unfortunately, the currently available testing data do not permit a definitive quantitative assessment of the severity of Mr. Brockman's cognitive impairment, if any. Moreover, his purported functional impairments, reported only by Mr. Brockman and his closest family members, follow the same time sequence as his testing performance, with onset only after the raid on Evatt Tamine's Bermuda home and in the context of concerns about an investigation into potential criminal activity.

Based on Mr. Brockman's performance during the May 2021 interviews, I am confident that he suffers either age-related memory difficulties or, at worst, mild cognitive impairment, in the context of Parkinson's disease. I believe the evidence is insufficient to establish dementia from any cause and that the evidence for fluctuations in mental state, hallucinations, and REM behavior disorder is insufficient to bolster a claim of dementia with Lewy bodies even if dementia were established. In 2020 and 2021, Mr. Brockman has grossly exaggerated the extent

CONFIDENTIAL

PDA-0000068
Brockman_0002023

of his cognitive impairment whenever he knew he was being tested, on which basis I conclude he is malingering dementia.

Based on the foregoing information and observations, it is my opinion that on 5/20/21, Mr. Brockman had sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him.

If you have any questions about the content of this report, please do not hesitate to contact me.

Thank you for the opportunity to conduct this evaluation.

Respectfully,


Park Dietz, M.D., M.P.H., Ph.D.
Clinical Professor of Psychiatry and Biobehavioral Sciences
David Geffen School of Medicine at U.C.L.A.
Diplomate, American Board of Psychiatry & Neurology

45

CONFIDENTIAL

PDA-0000069
Brockman_0002024