

# THE FORENSIC PANEL

TEL: 212.535.9286   FAX: 212.535.3259   MICHAEL WELNER, M.D., CHAIRMAN

August 6, 2021

James Loonam, Esq.
Jones Day
250 Vesey Street
New York, New York 10281

Re: **_U.S. v. Robert T. Brockman_**

Dear Mr. Loonam,

Pursuant to your request, I have conducted a forensic psychiatric evaluation of Robert T. Brockman. Mr. Brockman, 80 years old, is accused of directing and aiding a complex, intricate scheme, requiring multiple steps and dating back to 1981, to defraud the government of taxes on billions of dollars in capital gains income, as well as engaging in a complex scheme involving the purchase of tiered debt. The charges include tax evasion, conspiracy to commit a tax evasion, willful failure to report offshore bank accounts, wire fraud, international money laundering, and obstruction of justice. The allegations in the indictment span decades and involve a labyrinth of entities, people, bank accounts, document and global financial transactions.  A description of some of the charges illustrates the complexity in this case.

The government's earliest reference point for the indictment begins with the May 26, 1981 formation of the A. Eugene Brockman Charitable Trust (AEBCT) in Bermuda, and the indictment refers to multiple other entities that came into existence at various points of time, including Spanish Steps Holdings, Ltd, Spanish Steps Holdings LLC, Multiple Vista Equity Fund Entities, Point Investments, Ltd. and St. John's Trust Company (SJTC).

The indictment charges that, from 1995 through 2019, Mr. Brockman allegedly appointed numerous individuals to manage these foreign entities. Emphasized in this indictment is the role of Individual One, who the indictment alleges managed wholly or in part, the AEBCT, Spanish Steps, SJTC, and Point starting in 2007.  Individual One allegedly created or managed Edge Capital Investment, Ltd. (Edge), Cabot Global Investments, Ltd., (Cabot), and Tangarra Consultants, Ltd. (Tangarra), entities mentioned in the indictment as part of the wire fraud and money laundering charges.

From 1999 to 2019, Mr. Brockman is accused of using nominees, including Individual One, to attempt to conceal his ownership and control of AEBCT, Spanish Steps, SJTC and Point.  The indictment asserts that Mr. Brockman used an encrypted email system involving different individuals with different codes to refer to different offshore entities.

BEHAVIORAL SCIENCES   •   FORENSIC SCIENCES   •   PEER REVIEWED ®
WWW.FORENSICPANEL.COM   EMAIL: INFO@FORENSICPANEL.COM



US v. Brockman
**DX-12**
Case No:  4:21-cr-0009

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **2** of **46**

This email system allegedly was used to instruct or direct an individual to create bank accounts, transfer and or invest money to numerous different accounts and to purchase property.

For example, Mr. Brockman is accused of opening a bank account for Point at the Bermuda Commercial bank with a deposit of more than $10 million dollars over twenty years ago in September 1999.  In March 2000, Mr. Brockman allegedly, through Point with Individual 2, committed approximately $300 million to Vista Equity Fund II.

In 2006, Dealer Computer Services, Inc. (DCS) a subsidiary of Universal Computer Holdings, Inc (UCSH) merged with Reynolds & Reynolds.  DCS, UCSH, and ultimately Reynolds and Reynolds were all owned in substantial part by the AEBCT. Mr. Brockman was the Chief Executive Officer of UCSH and DCS. DCS borrowed $2.4 billion dollars to finance this merger.  Deutsche Bank Securities Inc., was the administrative agent for this debt.  The debt was a syndicated loan, issued in three tiers, each with different rates of return and conditions for repayment in the event of default.  Each debt was a different contract known as "Credit Agreements."  All three Credit Agreements would be traded on the secondary market, with restrictions on which individuals and entities would be permitted to purchase the debt, excluding any "Affiliate" of DCS from purchasing said debt. The indictment charges that Mr. Brockman had a secret interest in an entity that bought this debt, allegedly in violation of the terms of the Credit Agreements.

The indictment adds charges of money laundering and obstruction of justice associated with these alleged schemes.

*-*

Mr. Brockman has been evaluated and treated for cognitive impairment and Parkinson's Disease at Baylor University School of Medicine and its affiliated specialty institutions. On December 8. 2020, defense attorneys filed a notice seeking a hearing on Mr. Brockman's competency to stand trial. The motion reported that ""Mr. Brockman's doctors have concluded that his medical condition makes him unable to access information, renders him unable to make connections between questions that he is being asked and his recollection of events, and manifests as significant long- and short-term memory deficiencies," and that "Mr. Brockman's cognitive limitations go well beyond memory loss or forgetfulness."

On May 10, 2021 the court-appointed three doctors to conduct an examination of Mr. Brockman, who examined him in May 2021. All three recently filed reports: psychiatrist Park Dietz, M.D. (June 21, 2021), psychologist Robert Denney, Psy.D. (June 21, 2021), and neurologist Ryan Darby, M.D. (June 18, 2021).

Dr. Dietz asserted in his report that Mr. Brockman was malingering "the severity of his cognitive impairment," did not demonstrate significant cognitive impairment consistent

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **3** of **46**

with dementia, and that Mr. Brockman intentionally and disingenuously reported these changes only after a September 2018 Bermuda raid on one Evatt Tamine, in a scheme to avoid responsibility. Dr. Dietz further opined that the Baylor University Medical Center evaluations from multiple doctors who assessed Mr. Brockman as cognitively impaired might be biased due to his VIP status. He did acknowledge that Mr. Brockman has Parkinsonism with, at worst, mild cognitive impairment, but that this would not preclude his ability to "consult with his attorneys with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him."

Dr. Denney administered neuropsychological tests and interviewed Mr. Brockman in collaboration with Dr. Dietz. He diagnosed Mr. Brockman with Neurocognitive Dysfunction, Possible Mild Neurocognitive Disorder (Mild Cognitive Impairment) associated with Parkinson's disease, and Malingering. Wrote Dr. Denney, "Robert T. Brockman may have a mild form of mental disease or defect but, nonetheless, is able to appreciate the nature and consequences of the proceedings against him and assist properly in his defense if he chooses to do so." He further added that "Malingering is not a mental illness, per se, and warrants no specific prognosis. However, it is also my opinion that Mr. Brockman has demonstrated effectively the ability to confuse examiners and, possibly even his own counsel. Given this success, and the natural course of Parkinson's disease, it is likely he will continue to attempt, what I believe to be a ruse."

With respect to Mr. Brockman's behavior during the interview, Dr. Denney stated that, "Mr. Brockman repeatedly demonstrated his appreciation for the apparent advice given him by counsel to not discuss details of his case with us. He repeatedly demonstrated restraint. There were several times during the May 20 interview that he noted his belief that our questions had strayed into details of his case that he did not wish to discuss with us. Behaving this way, Mr. Brockman demonstrated his ability to remember apparent admonitions from counsel (or at least his own concern in his own mind) as well as maintain the resistance to being led into disclosing information that could potentially endanger his defense. This reticence behavior was not consistent with the presence of dementia, particularly moderate dementia, as individuals with the condition do not remember admonitions from counsel provided days previously or even remember their own admonitions to themselves."

Dr. Darby opined that Mr. Brockman "has evidence of Parkinson's disease and mild cognitive impairment" but that this impairment did "not clearly reach the threshold of dementia." He further noted that people with Parkinson disease associated with mild cognitive impairment "maintain decision-making capacity . . . even if cognitive deficits make the process leading to these decisions harder."

You have referred this case to The Forensic Panel and to me for an assessment based on my training, qualifications and experience. Based on my own review of the available data cited in the sources, additional neuropsychological testing data, additional data from

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

collateral source interviews, additional neuroimaging data, prospective peer-oversight of highly qualified colleagues, and my own examination of Mr. Brockman, the report will address the following questions.

1) *Does Robert Brockman have a psychiatric diagnosis? What evidence is the basis of your opinion? Are there other psychiatric diagnoses referenced that Mr. Brockman does not have? Why or why not?*

2) *Is Mr. Brockman able, given the nature of the charges against him, to assist his attorneys with relevant, specific, requested facts, dates, and specifics? Is Mr. Brockman able to assist his counsel in defending his case? Why or why not?*

3) *Does Mr. Brockman reflect the mental stamina needed for a courtroom trial on the charges he faces? Why or why not?*

4) *Does the evidence reflect that Mr. Brockman is malingering cognitive incapacitation? Why or why not?*

## SOURCES OF INFORMATION

1) Declaration of Dr. James Pool, MD., November 25, 2020
2)  Declaration and exhibits of Kathryn Keneally, December 8, 2020
3) Declaration of Peter J. Romatowski, December 8, 2020
4) Draft declaration of Ryan Darby, February 28, 2021
5) U.S Expert Notice, February 17, 2021
6) Response to U.S. Expert Notice with exhibits, February 22, 2021
7) Mr. Brockman's personal writings of health concerns, December 2004-2018
8)  Metadata authenticating Mr. Brockman's personal health writings
9) Dr. Jankovic's report of office visit, January 30, 2019
10) Diagnostic Report re: NM DatScan, Brain SPECT, February 14, 2019
11) Dr. Michele York Neuropsychological evaluation, March 1, 2019
12) Dr. Yu Notes from Mr. Brockman's appointment, March 20, 2019
13) Report of Dr. Pool's Annual Physical, October 1, 2019
14) Dr. York Forensic Evaluation, December 3, 2019
15) Dr. Pool's examination, October 5, 2020
16) Dr. York's neuropsychological exam, October 7, 2020
17) Notice and Motion for Competency Hearing, December 8, 2020
18) Government's Response to Motion for Competency Hearing, December 15, 2020
19) Mr. Brockman's response & exhibits to Govt's Opposition, December 21, 2020
20) Video and transcript of Dr. Darby's evaluation, May 5, 2021
21) Dr. Ryan Darby's report, June 18, 2021

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **5** of **46**

22) Dr. Park Dietz' report, June 21, 2021
23) Dr. Robert Denney's report, June 21, 2021
24) Video & transcript of Dr. Dietz & Dr. Denney's evaluation, May 18 & 20, 2021
25) Dr. Denney test data, May 19, 2021
26) Dr. York test data, March 1, 2019, December 3, 2019, October 7, 2020
27) Mr. Brockman's speeches at Reynolds & Reynolds Company birthday, Nov. 2017-18
28) Dr. Komal Stoerr dermatology medical records, December 2018-May 2020
29) Fondren Orthopedic Group medical records July 12, 1999, April 3, 2014, November-December 2017
30) Records from the Houstonian regarding Mr. Brockman's membership, 2009-2020
31) Methodist hospital records for infectious disease, May 31-June 11, 2021
32) Methodist hospital records for infectious disease, March 15-19, 2021
33) Transcript and video of Mr. Brockman's deposition, Dealer Management Systems Antitrust Litigation, January 16 and 17, 2019
34) Transcript of Mr. Brockman's deposition -- CDK Global & Reynolds and Reynolds, September 18 and 19, 2019
35) Email between Dr. Yudofsky & Mr. Brockman re: memory problems, May 3-4, 2017
36) Dr. Yudofsky consultation notes, October 20 2018 – October 23, 2020
37) Peer oversight conference call with Thomas Guilmette, Ph.D, Michael Welner, M.D., Thomas Wisniewski, M.D., Elkhonon Goldberg, Ph.., James Seward, Ph.D., Bernice Marcopulos, Ph.D., June 24, 2021
39) Peer oversight conference call with Thomas Guilmette, Ph.D, Michael Welner, M.D., Christopher Whitlow, M.D., Thomas Wisniewski, M.D., Timothy Shepherd, Ph.D, M.D., July 30, 2021
40) Transcript of Dr. Guilmette's interview of Mr. Brockman, July 16, 2021
41) Transcript of Dr. Agronin's interview of Mr. Brockman, July 13, 2021
42) Dr. Agronin interview with Norman "Tommy" Barras, July 7, 2021
43) Dr. Agronin interview with Dorothy Brockman, July 26, 2021
44) Dr. Agronin interview with Kathryn Keneally, July 28, 2021
45) Dr. Agronin interview with Pete Romatowski, July 30, 2021
46) Dr. Agronin interview with Stephen Slade, MD, July 30, 2021
47) Peer oversight, Michael Welner, M.D.
48) Peer oversight, Thomas Guilmette, Ph.D.

## CIRCUMSTANCES LEADING TO ASSESSMENT

Attorney Kathryn Keneally first met Mr. Brockman in September 2018. In their initial meeting, he talked about how he had built his business, and left her with the impression of a very accomplished man. At the second meeting at the end of October 2018, she noticed that the attorneys were asking questions and not learning anything more from him than had been discussed before. Mr. Brockman appeared not to remember that he already told them what he was saying, and he was not picking up on the substance of what they needed to learn and not answering their questions.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **6** of **46**

Peter Romatowski, another of Mr. Brockman's attorneys, explained in our interview, "He didn't remember a lot. Granted that no one is able to remember everything about a case, and so you substitute by giving the raw material (such as the documents you get) and have the client utilize this to refresh their memories and have them help guide you, interpret them, things like that. Mr. Brockman could not participate in this process as would a client who can assist us."

Ms. Keneally remembers her concerns about his cognitive capacities particularly heightened on one occasion in either late 2018 or early 2019 where she told him that they needed some very specific information that supported a specific defense. According to Ms. Keneally, she had explained the reason very clearly to him, and she needed information available to him that he should have been able to recall.  She recounts how he looked her straight in the eye and responded, in essence, "I'm very sorry I can't help you."

According to Mr. Romatowski, Mr. Brockman would not provide specific answers as to the most relevant facts and would say he didn't know in a pervasive manner throughout their conversations, so they were not able to pin down the context. He wasn't even able to choose consistently even the favorable inferences or rebut the unfavorable inferences – there was no conscious choices to answer in his self-interest and there were even times when he clearly could have supported one inference or another and he could not do it."

Mr. Romatowski observed that examinee could not "review and evaluate documents" or "retain information," and would sometimes repeat back information that had been provided to him in a garbled form only days later.

It was not until a meeting July 18, 2019 that Mr. Romatowski and Ms. Keneally  learned that Mr. Brockman had been diagnosed with dementia. The meeting that day had been scheduled with a pre-arranged and unrelated agenda. Mr. Brockman introduced a thin binder containing bios of, Dr. Michele York and Dr. Melissa Yu, along with some reports detailing his being worked up for Parkinson's disease and diagnosed with dementia. Mr. Brockman reportedly presented this medical information to them in the expressed hopes that they would speak slower to him and would write things down for him as a means for compensating for the effects of his limitations. He did not at any time ask how this diagnosis would impact the outcome of his case.

Ms. Keneally, in response to this information, called Mr. Brockman a few days later and asked him for his medical records.   She indicates that she repeatedly asked him for the medical records, but she did not receive them until mid-September.

Ms. Keneally indicates that she began speaking to the doctors in mid-October 2019 and asked that they explain what they were seeing in examination. She asked Dr. York to test him again at the end of 2019.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **7** of **46**

Attorneys gathered his reports and sent them with a letter to the prosecutors leading the investigation on April 9, 2020. The lengthy correspondence disclosed that Mr. Brockman was diagnosed with dementia, as referenced in medical reports they provided the government, and expressed the experience that he was not capable of helping their work on his case.

At that point, Mr. Brockman was not yet under indictment. According to the defense attorneys, prosecutors told them as they followed up that they had not yet made a decision as to whether to indict.

Ms. Keneally relates that she invited investigators to speak to the Baylor doctors, offering to facilitate DOJ's own separate inquiry without preparation or participation from defense counsel.

Instead, the government ignored Ms. Keneally's request to speak to Mr. Brockman's doctors and indicted Mr. Brockman on October 1, 2020.  Mr. Brockman's counsel did not become aware of the indictment until a phone call with prosecutors on October 10.

Mr. Romatowski provided additional context to the significance of their struggles with Mr. Brockman, elaborating, "When you reconstruct some events such as a long email string in which the client is a part of that – one needs the client to recall and describe the process, correct impressions and conjectures, offer relevant facts and provide an overall context for the various facts in it. That is the essence of assisting in the case. Mr. Brockman is just not up to it."

In our interview, Ms. Keneally indicated that throughout her work with Mr. Brockman, he has not been able to recall details of the case, understand the details of his indictments, logically connect the details and then reason about his strategy. She noted that he speaks in generalizations but not details when they talk. Ms. Keneally characterizes him as passive in terms of listening to her and adds that he does not actively guide or engage in details of his defense. When queried about certain details, according to Ms. Keneally, he gets them confused or lapses into talking about aspects of his business that are not relevant to the discussion.

Over time, according to Ms. Keneally, it has become even more difficult to communicate with him.

For example, towards the end of 2020, there was one decision that needed to be made; Ms. Keneally remembers how she walked Mr. Brockman through the pros and cons of the options. He asked for a day to think about it, and the next day he said he decided as they advised him. Three to four days later, however, he had no recollection that he had made a decision and that she had guided him through it. Rather, Ms. Keneally recounts, "He had

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **8** of **46**

all sorts of questions about the issue that showed he misunderstood everything and recalled nothing."

This experience illustrates the significance of Mr. Brockton being disengaged from the facts of his situation and of how to advocate based on his awareness. There are things that only the client can decide," explains Ms. Keneally, "and Mr. Brockman can't make those decisions."

## HISTORY OF PERTINENT NEUROCOGNITIVE PROBLEMS

A chronological review of his neurocognitive status along with pertinent medical and psychiatric issues is as follows:

| DATE(s) | HISTORY |
| --- | --- |
| December-2004 through December 2017 | Mr. Brockman composed annual updates on health and personal issues that he saved on his computer beginning in late 2004. At the end of 2004, he wrote: "Mental Processes Not As Good. Memory Much Poorer." He chronicles his concerns about his cognition consistently over the next thirteen years of these annual updates. He also noted, from 2005 and continuing through 2016, "But No Further serious Decline." He further notated from 2004 through 2008 that "Ability to work long hours still as good" with improvement noted in 2013. Starting in 2008 and continuing through 2017, he reported that his short-term memory for names is particularly impaired. In 2017 he wrote, "I am having more difficulty in dealing with the volume of business issues." |
| 2014/ 2015 | Observations of Stephen Slade, M.D. Dr. Slade, an ophthalmologist and longtime family friend, reported his observations in an interview for this examination. According to Dr. Slade, beginning in 2014-15, "Bob started becoming quieter. On small party fishing trips where everyone knew one another well, Bob was normally one of the more vocal participants, but he started pulling back around then." It was then that Dr. Slade noticed that Mr. Brockman was slower in his thinking. It was subtle but a quite noticeable change to him, and he wondered if there was something medically going on. |
| May 3, 2017 | An email to Dr. Stuart Yudofsky from Robert Brockman read: "Robert (his son) and Dorothy (his wife) are after me to consult with the right doctor regarding my loss of my sense of smell. They are afraid that it is an early sign of alzheimer's or dementia. I am feeling good but am having increasing memory problems. Is there a doctor that you can recommend? Bob" |

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **9** of 46

| | |
|---|---|
| | Dr. Yudofsky[1] responded on May 4, 2017 that there are many potential causes for anosmia and memory loss and that Mr. Brockman could start by seeing him since he is a neuropsychiatrist who could assess "the severity and significance" of the memory problems. |
| November 27, 2017 | A clinical note from orthopedist Jeffrey Kozak, M.D. notes that the neurological history is positive for "Memory Loss and Tingling. A later notation under psychiatric history is negative for memory loss. |
| October 20, 2018 | Note from Dr. Yudofsky that Mr. Brockman contacted him about depression over the past year and having difficulty with concentration, decreased "efficiency" and not being able to focus on his work the way he has for the past 40 years. Also Mr. Brockman reported diminished motivation and libido, and feeling pessimistic. Insomnia was also reported with middle of the night awakening and difficulty falling back to sleep. Business was described as "great" but with "some stress over a lawsuit." Dr. Yudofsky noted slowed thinking and word retrieval difficulties. Multiple Parkinsonian features were noted. Made diagnosis of "Major Depressive Disorder, moderate" and "depressive disorder due to another medical condition (r/o Parkinson's disease)" and "Mild (to moderate) neurocognitive disorder (possibly) due to Parkinson's disease." He referred him to Dr. Joseph Jankovic for neurology / neuropsychological testing referral and Dr. James Pool for medical work-up. Dr. Yudofsky prescribed Wellbutrin IR (an antidepressant) 100 mg daily with instructions to then titrate to twice daily. |
| November 2, 2018 | An MRI of the Brain was read by Fanny Moron, MD: to the history noted "progressive cognitive dysfunction" ataxia and worse handwriting; no disproportionate atrophy; age-appropriate symmetric atrophy; minimal chronic microvascular changes; other structures OK |
| December 11, 2018 | James Pool, MD (internal medicine): Saw Mr. Brockman for evaluation and saw movement disorder and cognitive problems consistent with PD or parkinsonism. Dr. Pool referred him to Dr. Jankovic (neurologist with a specialty in Parkinson's Disease), Dr. Yu (a neurologist with specialty in Alzheimers Disease) and Dr. York (neuropsychologist) at Baylor. |
| January 18, 2019 | Dr. Yudofsky refilled Wellbutrin 200 mg / 100 mg daily. |
| January 30, 2019 | Joseph Jankovic, M.D. Neurologist: Primary Diagnosis: Parkinson's disease; referred by Dr. Pool and Dr. Stuart Yudofsky. Seen at Baylor College Movement Disorder Clinic, Mr. Brockman presented with a |

---

[1] Dr. Yudofsky is an internationally renowned neuropsychiatrist who was also a friend of Mr. Brockman's. I attempted to interview Dr. Yudofsky for this evaluation, but he was not made available.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **10** of **46**

|  | reported year and a half history of concentration and memory difficulty, and six months of depressive symptoms. Mr. Brockman told Dr. Jankovic that he had been started on bupropion SR, with improvement in thinking and memory.<br><br>Mr. Brockman reported more difficulty standing in cold water for fishing. He had smaller steps, and a stooped posture. His sense of smell had been absent for 10 years. A history of acting out dreams 2-3 years ago was also noted.<br><br>Mr. Brockman's medical history included atrial fibrillation, bladder cancer, hyperlipidemia, melanoma, basal cell carcinoma, prostatitis, glaucoma, thyoid disease, and urinary tract infection. His medicines included diltaizem (cardiac)  vytorin (cholesterol lowing) levothyroxine (thyroid supplement) multivitamin and testosterone.<br><br>On Dr. Jankovic's examination, Mr. Brockman was alert and oriented to person, place, and date. Mild slowness of movement, leg rigidity, and a parkinsonian gait were observed. The neurologist administered a Montreal Cognitive Assessment (MoCA)[2] on which Mr. Brockman scored a 19/30.[3] As a result of the evaluation, Dr. Jankovic considered the possibilities of Parkinson's Disease or vascular parkinsonism. He started Sinemet, a medication used to treat parkinsonian slowness of movement, and ordered a Dopamine Transporter Imaging (DaT) scan to provide more diagnostic clarity. |
| February 14, 2019 | The DaT scan was performed and read by Julie Wendt, M.D. It showed a loss of dopamine neuronal function in both sides of the dorsal striata with loss greater on the right. |
| March 1, 2019 | Neuropsychological evaluation by Michele York, PhD. For psychological testing. Dr. York noted a 2-3 year history of short term memory decline, slowed response time, and difficulty multi-tasking. History provided to her was that Mr. Brockman would forget names and locations, and had spelling problems. Reportedly he was stuttering, and had slower speech and lengthy response time. Dr. York documented a question of whether he had been hallucinating when reportedly seeing a bug on floor that wasn't there. There was |

---

[2] Rossetti, H.C. et al. **Normative Data for the Montreal Cognitive Assessment (MoCA) in a Population-Based Sample** Neurology 77 pp 1272-1275 2011
[3] The MoCA is a general screening test for the presence and degree of cognitive impairment, but not a diagnostic tool. According to the MoCA website (www.mocatest.org/faq/), there is overlap in scoring ranges, with 26 being the cut-off for cognitive impairment, and "18-25 = mild cognitive impairment, 10-17= moderate cognitive impairment and less than 10 = severe cognitive impairment."

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

| | |
|---|---|
| | also a history of weight loss and decreased appetite. On Sinemet, Mr. Brockman described being more clumsy.<br><br>In addition to the above medical problems, Dr. York noted a history of pericarditis; plantar fasciitis; and cataract surgery. He had been treated with trazodone for sleep and REM sleep behavior disorder.<br><br>The neuropsychologist noted that he needed repetition of instructions, and difficulty following directions. His processing speed was extremely slow, and she experienced him to be perseverating.<br><br>Dr. York administered a MoCA, on which Mr. Brockman scored 19/30. When she tested the former CEO's intelligence, the full-scale IQ score (FSIQ) was 87 (low average). She also observed impaired attention and concentration, impaired set-shifting and executive function, impaired memory and difficulty with clock drawing. At the same time, she assessed him to have average to low average language abilities.<br><br>Dr. York documented Mr. Brockman to have difficulty with activities of daily living (ADLs) and noted that assistance was needed with instrumental activities of daily living (IADLs). She observed him to have mild anxiety.<br><br>Dr. York's diagnosis was mild to moderate dementia with deficits in visuospatial function, memory and executive function, all consistent with Lewy body Disease (LBD). |
| March 13, 2019 | Follow-up by Dr. Jankovic: Notes ongoing concerns about short-term memory and side effects of Sinemet ("zombie-like effect after taking pills"). REM sleep behavior disorder described as "better" on trazodone. He noted the presence of dementia based on neuropsychological testing and started him on the Exelon patch to treat dementia associated with PD. |
| March 20, 2019 | Evaluation by Dr. Melissa Yu (neurologist):   The doctor reviewed a history of Mr. Brockman's increasing difficulties with remembering things, especially his medications. He had reportedly stopped driving, and also described difficulty planning. Mr. Brockman reported fluctuations with good and bad days, and there was history of ongoing dream enactment.<br><br>Reportedly, his son notes fluctuations in his decision making and episodes of "blankness." Prescribed levodopa reportedly helped a |

| | |
|---|---|
| | little with gait. Decreased facial expression and micrographia (small writing) was noted by his family.<br><br>Dr. Yu administered a Mini-mental Status Examination, on which Mr. Brockman scored a 26/30. On examination, speech was normal with word finding difficulty. Referencing the Dat Scan, Dr. Yu noted "severe dopaminergic loss of function bilateral dorsal striata."<br><br>Her impression at that time was the pattern of Mr. Brockman "indicates a dementia of mild to moderate severity with deficits in areas of visuospatial functioning, verbal and nonverbal episodic memory and executive functioning, with mild functional declines." Her diagnosis was stated as: "Parkinsonism combined with dementia, new onset visual hallucinations, potential visual illusions and REM behavior disorder are consistent with dementia with Lewy bodies." She concluded with a differential diagnosis of Dementia with Lewy body or Parkinson's Disease with dementia. She increased the Exelon to provide more aggressive treatment for cognitive stabilization. |
| April 1, 2019 | Mr. Brockman visited Dr. Gould at the University of Texas physician's clinic with the complaint that he "cannot focus or do simple mental tasks." Dr. Gould elected to stop diltiazem, vytorin and cut sinemet and trazodone in half. |
| April 5, 2019 | Mr. Brockman wrote a letter to Drs. Pool, Gould, Jankovic and Yudofsky, expressing that "my cognitive ability dropped since I have taken the Calcium channel blocker Cardizem (diltiazem)" and a "higher dose of Sinemet."<br><br>Mr. Brockman added that he felt he was better cognitively on 3 Sinemet but "stunned" on 6 tablets a day. Dr. Gould cut Sinemet in half, and Trazodone in half to 50 mg, and kept Wellbutrin 200 /100 "which has GREATLY helped me." He noted that it is more difficult to work on Sinemet 2-3x daily because he feels "drugged." |
| October 1, 2019 | Dr. Pool met with Mr. Brockman for his Annual Physical. Dr. Pool administered the Cognisense Tool. Mr. Brockman scored 12 out of 29 points, below the cut-off for dementia. |
| December 3, 2019 | Michele York, Ph.D. met with Mr. Brockman at the request of his attorney Ms. Keneally for follow-up neuropsychological testing for forensic purposes. Mrs. Brockman, interviewed for the evaluation, described day to day cognitive fluctuations, declining short-term and procedural memory, poor multi-tasking, and blank periods.<br><br>Reportedly, Wellbutrin was helping his mood. However, history persisted that he violently acted out dreams. Mr. Brockman denied |

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **13** of **46**

| | |
|---|---|
| | visual hallucinations, but Dr. York wrote that he saw a bug on the floor during their interview that was not there in their first interview.<br><br>Apart from psychological testing, Dr. York administered a MoCA. Mr. Brockman scored a 19. She assessed him to have impaired or deficit performance on many measures, and a decline in general intellectual functioning.<br><br>Dr. York maintained the clinical impression that Mr. Brockman's presentation was consistent with Dementia with Lewy bodies (DLB). |
| January 8, 2020 | Eugene Lai, MD, a neurologist, met with Mr. Brockman for the first time for progressive Parkinson's Disease symptoms, cognitive decline, depression and sleep disturbance. Dr. Lai noted, among other complaints mentioned at other visits, "He has difficulty managing his personal finances and he has a bookkeeper…. His wife states that his ability to make decisions fluctuates."<br>Dr. Lai also administered a MoCA, on which Mr. Brockman scored a 20/30, missing 5 points on delayed recall.<br><br>Dr. Lai concluded that "his clinical findings are most consistent with the diagnosis of Parkinson's disease with mild to moderate cognitive impairment," though the neurologist considered dementia to be part of the differential of possible diagnoses. Dr. Lai added Klonopin at bedtime to treat his sleep disturbance. |
| February 12, 2020 | Mr. Brockman followed up with Dr. Lai, and was accompanied by his wife.  He reported that his sleep was better with trazodone and clonazepam. Appetite was good, and basic activities of daily living were independent. According to Mr. Brockman, he was exercising regularly three times a week. A carbidopa/levodopa drug regimen was helping with the slowness of his movements. Dr. Lai maintained the impression that Mr. Brockman had Parkinson's with mild cognitive impairment.<br><br>He continued trazodone 50 mg and clonazepam 0.5 mg at bedtime for sleep and RBD, bupropion 100 mg 2 tablets in the morning and 1 tablet at bedtime for mood stabilization and Exelon patch 9.5 mg for cognitive impairment. |
| October 5, 2020 | James Pool, MD followed up with Mr. Brockman, and noted that his patient was sent back to Dr. York for a follow-up evaluation. On this visit, Dr. Pool again administered the Cognisense Tool. Mr. Brockman scored 13 out of 29 points. |
| October 7, 2020 | Dr. York examined Mr. Brockman again on October 7, 2020, with follow up neuropsychological testing. The examinee's son, who |

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **14** of **46**

| | |
|---|---|
| | accompanied him to the evaluation, told Dr. York that Mr. Brockman had cognitively declined since the last evaluation. His appetite was diminished and he had lost eleven pounds. |
| October 23, 2020 | Notes from Dr. Yudofsky indicate he had a telephone visit with Dorothy Brockman, who expressed concern about Mr. Brockman's inability to think rapidly. |
| November 25, 2020 | Dr. Pool examined Mr. Brockman. He prepared a declaration to say that Mr. Brockman had deficits in short and long-term memory. For this reason, Dr. Pool expressed the opinion that Mr. Brockman was unable to assist his defense attorneys. |
| December 8, 2020 | Attorneys filed declarations in support of a motion for a hearing on competency. Attorneys Peter Romatowski and Kathryn Keneally cited cognitive problems including memory problems. Ms. Keneally, having spoken to his treating doctors, expressed their concerns that his memory problems would render him unable to assist the attorneys. |
| February 2, 2021 | Dr. Lai saw Mr. Brockman for follow-up with his wife, one year after his last visit. According to Dr. Lai's history that meeting, "memory is impaired but stable." |
| March 12, 2021 | An FDG Pet Scan ordered by Dr. Darby was given to Mr. Brockman, and showed mild right parietal hypometabolism. Findings were read by the neuroradiologist as "very mild, but suggestive of early neurodegenerative disease, either Alzheimer's disease or dementia with Lewy bodies (Parkinson's disease with dementia)." |
| March 15-March 19, 2021 | Mr. Brockman was admitted to Houston Methodist Hospital with altered mental status and bacteremia. He was discharged with a foley catheter and on the antibiotic ciprofloxacin. |
| April 29, 2021 | Mr. Brockman underwent a sleep study ordered by Dr. Darby. His history included reports of loud snoring, leg-kicking, unrefreshing sleep with difficulty concentrating during the day, awakening during the night, sleep walking, nightmares and acting out dreams. The study showed severe obstructive sleep apnea. Mr. Brockman showed no |

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **15** of **46**

| | |
|---|---|
| | significant periodic limb movement and no evidence of dream enactment. However, a diagnosis of REM Behavior Disorder could have been missed due to insufficient REM sleep. |
| May 31 to June 11, 2021 | Hospitalized at Houston Methodist Hospital, Mr. Brockman was hospitalized for an altered mental status and a urinary tract infection, which revealed on cultures to have been caused by bacteria. He was treated with antibiotics for complicated cystitis.<br><br>One of his treaters, Dr. Mylavarapu, noted that Mr. Brockman "is unable to provide much history due to altered mental status and agitation." On examination, Mr. Brockman was noted to be "talkative, though answers don't make sense."<br><br>Kanza Soomro, M,D., a geriatric consult for his altered mental status, noted on June 7 the history that Mr. Brockman was reportedly dependent in all of his activities of daily living (ADL) and instrumental activities of daily living (IADL) since March.<br><br>Inna D'Empaire, M.D., a psychiatric consult who examined Mr. Brockman on June 7, noted intermittent agitation in the evening, with Mr. Brockman attempting to hit staff and climbing out of bed, falling; worsening confusion in evenings including visual hallucinations. He was unable to recognize his home caregiver or being in hospital. He reportedly was seeing black things that he swatted at. On examination, Mr. Brockman scored a 10/30 on the MoCA administered to him. A CT of his brain performed June 7 showed generalized atrophy. |
| June 24-25, 2021 | Due to recurrent urosepsis with underlying severe prostatic hypertrophy (requiring daily external bladder catherizations), Mr. Brockman underwent a successful UroLift procedure to open up his urinary tract in which he received general anesthesia. |
| July 28, 2021 | Mr. Brockman underwent an Amyloid-based PET scan of the brain using Amyvid. Moderate to frequent amyloid neuritic plaques were found, along with diffuse loss of gray-white matter distinction, most pronounced in the frontal and temporal lobes. |
| July 30, 2021 | A brain MRI was obtained, and showed meaningful loss of volume compared to a brain MRI of late 2018. In particular, brain volume of the temporal lobe and diencephalon is below 25% percentile. |

Dr. Stephen Slade is an ophthalmologist currently living in Houston, Texas. He has known Robert Brockman for 30 to 35 years through Dorothy Brockman, who was his patient. Through his friendship with Dorothy he met Robert to go fishing, and sees him quite often since they live near one another. According to Dr. Slade, Mr. Brockman has undergone a

dramatic change in the past few years. He knew him originally to have a baseline personality that was very outgoing, who will "chat people up" in an elevator.

Dr. Slade indicates that 5-6 years ago, he noticed that Bob started becoming quieter, and tracks these changes to his own diagnosis and treatment for multiple myeloma in 2014 and 2015. As Dr. Slade reflects, the decline in his friend Bob was noticeable even in comparison to his own frailty while undergoing cancer treatment. For example, on small party fishing trips where everyone knew one another well, Bob was normally one of the more vocal participants, but he started pulling back around then. It was subtle but quite noticeable to him at that time that Bob had changed, and he wondered if there was something medically going on.

Now, observes Dr. Slade, he cannot have any detailed conversations with Mr. Brockman anymore. Most of the time he doesn't remember things, and his processing ability is poor.

Tommy Barras, who succeeded Mr. Brockman as CEO of Reynolds and Reynolds, has worked with Mr. Brockman for 45 years. Hired out of high school by Mr. Brockman, Mr. Barras came to relate to him as a father figure; the two hunted and fished together. Dr. Dietz, citing selected portions of a deposition transcript, wrote that prior to Mr. Brockman's resignation in November 2020, Tommy Barrass "had no reason to think that Mr. Brockman was unable to lead Reynolds and had no reason to doubt his mental capacities, even though he also testified that he (Barrass) had for years witnessed Mr. Brockman forgetting things, not recalling some decisions, and being unable to grasp technlogy discussions, all of which Mr. Barrass attributed to aging and stress." In our examination, Mr. Barras reflects that he first noticed changes from around 2010. Mr. Brockman was "forgetful, less engaged, didn't remember decisions, was not recalling what had already been decided," he recounts. By 2012 to 2014, he became "very passive," and was just "kind of there," according to Mr. Barrass. As the years passed, there were five in senior positions who "protected" Mr. Brockman as the leader, but his participation lessened by the year.

Currently, Mrs. Dorothy Brockman describes her husband as nearly totally dependent on her and round-the-clock aides to get through the day. She reports that Mr. Brockman is confused and thinks he is in Aspen or Mexico sometimes rather than at his home in Houston. Approximately one week ago he told Dorothy that he was not in his own house but a "twin house." He will sometimes reply to questions by talking about business when not related to the question, and this has worsened since his June hospitalization for delirium and then, urological surgery under anesthesia on June 24, 2021.

In our recent interview, Dorothy also states that Mr. Brockman has not reported recent hallucinations of bugs on ground, although these happened sporadically in the past. There has been no recent anger, aggression, or agitation. He is sleeping well without significant

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **17** of **46**

movements in bed. He will regularly make smaller motions with hands, legs or feet that will sometimes wake her ("he will raise his arm in a funny motion").

## FUNCTIONAL ASSESSMENT

Mr. Brockman's current functional abilities can be assessed as "Activities of daily living (ADLs)" that are required to remain independent, and more complex "Instrumental activities of daily living (IADLs)," which are required for a person to manage one's home and daily life. Interviews with Dorothy Brockman and other collateral sources, and a review of the medical record inform the sense of Robert Brockman's current functioning.

### ADLS

*Bathing*: Able to lather self and take shower.
*Grooming*: Brushes teeth but poorly; not efficiently due to physical and cognitive reasons.
*Dressing*: Aide helps him get dressed and undressed and select clothes. Mr. Brockman has trouble physically and cognitively since sometimes he puts pants on arms and shirts on feet.
*Eating*: He feeds himself.
*Ambulaton and Transferring:* Mr. Brockman moves slowly and is unsteady and needs some supervision for safety. He needs help getting in and out of bed and then, is able to walk.
*Toileting*: Mr. Brockman needs assistance ambulating to the restroom and has needed help with catherization recently (but no longer). He is independent once on or at the toilet.

### IADLS

*Transportation / driving:* Totally dependent on others. Not able to find his way as he even gets lost when walking around the house.
*Manage medications:* Totally dependent on others. He isn't organized enough.
*Meal / menu planning, shopping and preparation:* Nearly totally dependent on others for meals but can make a small snack such as a peanut butter and jelly sandwich. Mrs. Brockman has not seen him use coffee maker recently.
*Manage finances:* Totally dependent on others. Gets the computer "messed up" and needs someone to come and fix it.
*Housekeeping:* Totally dependent on others. Never did in the past.

All IADLs are limited by cognitive impairment including short-term memory lapses, impaired executive / organizational skills (planning, sequencing, prioritizing), and impaired visuospatial skills, in addition to motor dysfunction related to Parkinson's disease.

According to his wife Dorothy, prior to his hospitalization in March 2021, Robert Brockman had greater independent function, although wasn't able to handle finances,

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **18** of **46**

operate his computer, remember passcodes, or cook. Mr. Brockman's function noticeably worsened since his June 2021 hospital stay, and has worsened ever since, and even more since recent bladder surgery.

Mrs. Brockman adds: "The caregivers and I do everything for him." He expresses a desire to do things but "he doesn't have the executive function to carry them out." What does he do all day? According to Mrs. Brockman, he sleeps a lot, reads the Wall Street Journal (but does not absorb it).

She adds that Mr. Brockman is passive except for initiating wanting ice cream. He does not make plans to do things, and has lost interest in many things except his dog and grandson. According to Dorothy, he follows around Dorothy and gets upset if she leaves.

As noted in Dr. Tom Guilmette's neuropsychological assessment, the Functional Activities Questionnaire (FAQ) rating of Mr. Brockman filled out by his wife Dorothy showed significant functional impairment at a level consistent with dementia.

## CURRENT MEDICATIONS

***Morning*** (9 AM)
Rivastigmine transdermal patch [Exelon] 9.5 mg / day
Miralax – 1 cap full
Carbidopa-levodopa [Sinemet] 25-100; two tabs
Bupropion [Wellbutrin] SR 100 mg; 2 tablets
Levothyroxine [Synthroid] 75 mcg daily
Apixaban [Eliquis] 2.5 mg daily
Stool softener, soft gels 240 mg
Vitamin D, 1 capsule 2000 IU-U

***Noon*** (12 PM)
Carbidopa-levodopa [Sinemet] 25-100; two tabs

***Afternoon*** (4 PM)
Carbidopa-levodopa [Sinemet] 25-100; two tabs

***Evening*** (8 PM / bedtime)
Trazodone [Desyrel] 50 mg
Bupropion [Wellbutrin] SR 100 mg; 1 tablet
Apixaban [Eliquis] 2.5 mg daily
Rosuvastatin [Crestor] 5 mg
Quetiapine [Seroquel] 12.5 mg and a second as needed – this medicine was added in the hospital to control his nighttime agitation.

## SOCIAL HISTORY

Mr. Brockman was born and raised in St. Petersburg, Florida. He has a younger brother. There is no known family history of neurologic conditions, Parkinson's disease or dementia. His father died at the age of 78 from emphysema and his mother died at the age of 92 with diabetes and possible lymphoma.

Mr. Brockman graduated from high school and then attended Centre College (Kentucky) for 2 years and then 2 years to University of Florida. There, he earned a degree in marketing, graduating #1 in class. He started a graduate program at Florida but left to work since he was "poor" and needed to make money.

Mr. Brockman then joined the Marine Reserve for six years but was not on active duty. He worked for Ford Motor Company and then for IBM where he was reportedly a top salesperson in the country. He then started a company providing inventory software management to car dealers. This company later merged with Reynolds & Reynolds, where he served as the Chairman and CEO until his retirement on November 6, 2020.

Married three times, Mr. Brockton has a son with each wife. He has been married to his current wife Dorothy for 53 years. He and Dorothy have one son named Robert T. Brockman, II and a grandson named James Maxwell Brockman who is 15 months old. Robert T. has a history of Asperger's syndrome.

He has no history of ever being aggressive or violent toward others, and has never engaged in reckless behaviors. Dorothy adds that he is "extremely responsible" and a workaholic. Mr. Barras describes Mr. Brockman as a father figure, loyal and trusting of others, and as someone who engaged closely with employees and took special interest in those individuals who all came on fishing and hunting excursions.

Mr. Brockman and his wife have homes in Aspen, Colorado and Houston, Texas. He lives with his wife Dorothy and has aides around the clock to help him. They are currently living in a part of Houston called River Oaks where they moved there starting February 2021 in order to downsize, save money, and live near their son.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **20** of **46**

## TESTING DATA

Neuropsychological testing was conducted on July 14-15, 2021 by Thomas J. Guilmette, PhD. Dr. Guilmette found evidence of ssignificant cognitive impairment in most domains (e.g., attention, mental speed, memory, visuospatial abilities, executive functions/problem solving). Test scores fell well below average in comparison to a normative age-appropriate group and certainly well below his estimated premorbid cognitive baseline. Many scores fell below 2nd percentile. Dr. Guilmette observed in Mr. Brockman: episodic confusion; lack of full orientation; and inability to understand some test instructions. Language was a relative area of strength.

Dorothy Brockman completed the AD8 and Functional Activities Questionnaire as part of Dr. Guilmette's overall workup. Results from both revealed significant functional limitations consistent with dementia. Dorothy's observations also revealed executive dysfunction with initiation, task persistence, working memory and organization but no evidence of impulse control problems or disinhibition.

Dr. Guilmette concluded that these results were consistent with a diagnosis of Major Neurocognitive Disorder due to PD (Parkinson's disease dementia), and possibly some elements of residual delirium. He concluded that dementia, rather than delirium was the main etiology for Mr. Brockman's substantial cognitive deficits.

## MENTAL STATUS EXAMINATION

I met with Mr. Brockman over the course of several hours in the Houston offices of Jones Day on the afternoon of July 11. We were alone in the room for the entire interview. Prior to the interview, Mr. Brockman and his wife and aide interacted with one another and had lunch, giving me an opportunity to also observe him in a more informal context. Our interview was videotaped, and I advised Mr. Brockman of the recording of the interview.

Mr. Brockman presents as an elderly man with a shuffling gait, overall slowed movements (bradykinesia), a slightly masked facial expression, stooped posture and a low tone of voice, all consistent with Parkinsonism. I did not notice any obvious tremor when he was eating a sandwich prior to the interview. He did have difficulty using a pen and his handwriting was shaky.

The examinee was casually dressed and nicely groomed. His aide Frank accompanied him into the room and to the restroom, walking at his side but not needing to hold onto him. Mr. Brockman was friendly and cooperative with the interview aside from declining to discuss his legal case. He was relatively passive and did not initiate many questions through the time we met.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **21** of **46**

Mr. Brockman had a friendly and engaging demeanor as we began to speak and I oriented him to the interview. However, he had difficulty recalling who I was and why I was interviewing him despite multiple reminders throughout the entire interview. He understood in general terms that I was an "M.D." but could not recall consistently my specialty. or the purpose of my interview. At one point he believed that I was working for his "arch enemy" which appeared to be a rival business to Reynolds and Reynolds. He could not accurately tell me the day of the week, month or date or year, the exact location other than in Houston, Texas.

Mr. Brockman engaged with me directly and made eye contact, but his ability to stay on track during the discussion and maintain a consistent focus and concentration on the topic varied quite a bit. At times he derailed to a tangent unrelated to the question and required redirection. In the exchange below, for example Mr. Brockman responded to a question without attending to the question in any way, and lapsing into an anecdote about his previous business (p. 21, lines 13-25):

> DR. AGRONIN: And what does that mean when you help your attorneys? What sorts of things would you help them with?
>
> MR. BROCKMAN: Well, the world is very complex, and while you might think that a computer system for a car dealership would be kind of nonattractive, be too small, but I believe for a long time that with the right software, everything will work. And what the competition is always interested in doing is that they want to have the qualities and byproducts for the price the competitor offers their products.

He had difficulty repeating three numbers backwards and could not do serial subtractions aside from a single number in a sequence, illustrating his impaired concentration.

Mr. Brockman's short-term memory was poor throughout the interview. He could not fully remember who I was or the purpose of my interview despite multiple reminders. He was not able to recall a list of five words, but was able to recognize four of the words with prompting.  Mr. Brockman erroneously reported that he had a procedure two days ago when in reality it was over 2 weeks ago.

On the other hand, Mr. Brockman conversed with me without obvious word-finding difficulty and errors in word choice. He did struggle to generate a list of ten words beginning with the letter "F" in 60 seconds, on a test in which a normal response is 11 or more words. His speech was generally understandable and clear, with a somewhat slowed rate and tone and relatively preserved prosody emotional fluctuation.

Mr. Brockman described feeling some sadness over his life situation but did not report significant depression or anxiety. He did not report any suicidal ideation. He displayed a neutral affect which was somewhat constricted (minimal range of emotional expression)

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **22** of **46**

and blunted (minimal emotional responsiveness) as we discussed relatively important and potentially emotional issues. The blunting effects of Parkinsonism would make interpretation of affect difficult.

Thought process was slowed. At times Mr. Brockman's responses were tangential Many of his responses to specific questions were impoverished and without much relevant detail.

He lacked a logical flow of abstract thinking. He commonly trailed conversations off into idle pleasantries or occasionally, work-related concepts. Here is an example where Mr. Brockman cannot describe my role shortly after I described it to him, and speaks in vague inanities and then adopts a tangent as I press a query (p. 11, lines 15-25; p. 12, lines 1-25, p. 13, lines 1-14):

> DR. AGRONIN: Oh, okay.· That's right. You're from Florida, okay. So can you tell me in your own words, my role and the purpose of this interview? What's your understanding of that?

> MR. BROCKMAN: I can't say I have a decent understanding. That is a situation where I have some very good and some very highly compensated attorneys, and they did whatever they do to make decisions on such matters.

> DR. AGRONIN: Yeah.

> MR. BROCKMAN: And reached in and pulled out a name and said, this is the person.

> DR. AGRONIN: And do you know why they made that decision? Why did they want me to speak to you today?

> MR. BROCKMAN: I'm not quite sure of that, but they said do it, and I said, yes, sir.

> DR. AGRONIN: Okay. So do you have any idea the purpose of my interview today?

> MR. BROCKMAN: Not really.

> DR. AGRONIN: About what -- what type of doctor -- what type of profession do I have?

> MR. BROCKMAN: Well, I gather you were an M.D.

> DR. AGRONIN: Okay.

> MR. BROCKMAN: But your profession is to be M.D. like.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **23** of **46**

> DR. AGRONIN: And what does that mean?
>
> MR. BROCKMAN: Well, it means that you came up through the formal medical education.
>
> DR. AGRONIN: Um-hum.
>
> MR. BROCKMAN: I've seen kids, friends of family, stuff like that.
>
> DR. AGRONIN: Yeah.
>
> MR. BROCKMAN: You know, I've grown up and thrive on it, and I've seen other do not so well. And the amount of stuff that I hear just around a coffee table
>
> DR. AGRONIN: Yeah.
>
> MR. BROCKMAN: -- a lot of stuff that today has to be memorized and has to be instantly available
>
> DR. AGRONIN: Sure.
>
> MR. BROCKMAN: -- and I don't know how that works. That appears to me to be huge

At one point Mr. Brockman appeared suspicious of my role, suggesting I was working for his "arch-enemy." (p. 24m lines 3- 25; p. 23):

> DR. AGRONIN: Okay. Do you understand why I'm here speaking with you?
>
> MR. BROCKMAN: I would have to say somewhat.
>
> DR. AGRONIN: Tell me. What's your understanding of my role here and what I'm doing here?
>
> MR. BROCKMAN: Well, your role is and that's to interview me and, you know, reach conclusions about me.
>
> DR. AGRONIN: Yeah.
>
> MR. BROCKMAN: -- and report them to third parties, one of which is my arch enemy.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **24** of **46**

> DR. AGRONIN: So you think I'm preparing something to -- on behalf of an arch enemy or for them?
>
> MR. BROCKMAN: Yeah, on behalf.
>
> DR. AGRONIN: And who is your arch enemy?
>
> MR. BROCKMAN: I'm going to call him CDK.

This is a false idea; a fixed false idea is delusional. However, his perception of my role was not static, but at times mistaken, at times confused, at times logically correct. All expressions alternated with suspiciousness. Even as he was not delusional, he was still interpreting me or other information with random conversational retorts that were often incongruous with reality. Mr. Brockman recalled seeing some bugs on the ground but at the present time did not report seeing anything that was not present. Neither was there evidence for auditory or other hallucinations.

His general thinking was impoverished in many areas as it lacked substantive detail other than familiar stories of the past that themselves may have evolved from once-accurate memories.

Mr. Brockman illustrated grossly deficient memory. Even in areas that were familiar and altogether innocuous as it relates to his charges, his shallow and empty style of communicating revealed his inability to convey even simple details. (p. 8 (lines 21 – 25) and 9 (lines 1-25):

> DR. AGRONIN: What does Dr. Yudofsky do?
>
> MR. BROCKMAN: I don't know. I don't know.
>
> DR. AGRONIN: Do you know what kind of doctor he is?
>
> MR. BROCKMAN: He's an M.D. first of all.
>
> DR. AGRONIN: Yeah.
>
> MR. BROCKMAN: He was the (inaudible)·department and he oversees a department, and there's like 30/40/50 departments.
>
> DR. AGRONIN: I see. Where is the department? And do you know the type of department it is?·

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **25** of **46**

MR. BROCKMAN: I know some of them are here in town, and I know some are not.

DR. AGRONIN: Okay.

MR. BROCKMAN: Because I have been in on a conference call if it's remote. And otherwise, I would -- I try to do it where it's most effective as far as my time is concerned and his time, as well.

DR. AGRONIN: Yeah. He practices medicine. Do you know the type of medicine he practices?· Does he have a specialty?

MR. BROCKMAN: I know he has his books on a shelf this wide.

DR. AGRONIN: Oh, okay. So he writes, okay.

MR. BROCKMAN: Among other things, but . . .

In general, he was a poor historian regarding more contemporary events and their meaning, with limited details and incorrect timing, related in part to his general disorientation

DR. AGRONIN: Okay. What day is today? [Note: it was July 11, 2021]

MR. BROCKMAN: I guess is that it's the 18th of December.

DR. AGRONIN: You said the 18th of December?

MR. BROCKMAN: Um-hum.

DR. AGRONIN: And what year?

MR. BROCKMAN: 2022.

Mr. Brockman was unable to complete the trail making test in which he would be expected to draw a line between successive numbers and letters This test is a screening measure of executive function impairment.

Moreover, Mr. Brockman could not draw even a rudimentary clock face, placing all the numbers on one side and no coherent set of hands to tell the time (Figure 1). This test is a

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **26** of **46**

screening measure that heralds cognitive impairment even in those who are not so obviously impaired as was Mr. Brockman in our dialogue.



**Figure 1.** Clock Drawing by Mr. Brockman, July 11, 2021 (He was asked to draw the face of a clock and put on the number and the hands to read 10 minutes past 11)

He was also unable to reconstruct a 3-D cube (Figure 2), evidence for constructional apraxia and parietal lobe pathology.



**Figure 2.** Copy of 3-d Cube by Mr. Brockman, July 11, 2021

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **27** of **46**

In addition to the disorganization of his responses, Mr. Brockman also had difficulty thinking abstractly about several topics of inquiry.

Mr. Brockman's insight into his current deficits was limited as he knew he is having cognitive changes but could not relate the overall meaning and context of them.

His judgment is compromised in that he had an opportunity to demonstrate his gross cognitive deficits as they relate to trial preparation, but chose to be silent with court-appointed experts and undercut his own interests. This is akin in bad judgment to the individual who refuses to reveal certain symptoms to a doctor because of general reticence with doctors, only to have the condition become much worse because he missed an opportunity for detection of the condition. An analogous situation happened here, and played out in our interview as well.

Robert Brockman's stated refusal to discuss any matters that may relate to his case reflects his poor judgment. Ms. Keneally had reportedly instructed him at the outset to not speak with anyone about his case. However, when she informed him of the coming interviews with doctors in May 2021, according to Ms. Keneally, she specifically told him that he should be open with the forensic examiners as he was with his own doctors, because the court had a protective order in place. Ms. Keneally indicates that she explained the protective order to Mr. Brockman numerous times. He expressed an awareness to them, notes Ms. Keneally, that he understood that information yielded through the competency interviews could not be used against him in trial.

Still, when he was then queried in the Drs. Dietz and Denny and Darby interviews and in those with Dr. Guilmette and then my own, Mr. Brockman simply fell back on the idea that he was not to speak about his case.

His attorneys had wanted his disabilities to be transparent for all, just as they had approached prosecutors during the investigative phase and offered access to his doctors independent of their involvement, as well as an examination by a doctor chosen by DOJ. Thus, Mr. Brockman either did not remember his attorneys' advice about being forthright in the forensic interviews or used bad judgment in ignoring their advice.

The court-appointed experts, none of whom followed up with defense attorneys to have them facilitate his responsiveness or to understand why he declined to answer certain questions, simply lurched to the mistaken conclusion that Mr. Brockman would not discuss things with them because he was instructed to do so, and he was following his attorneys' advice when he was doing just the opposite.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **28** of **46**

Mr. Brockman scored 9 out of 28 points on the Montreal Cognitive Assessment (MoCA).[4] This score represents a dramatic decline compared to scores in the 19 out of 30 range in previous testing noted in the descriptions from clinical assessments in 2019 and 2020. While a score of 19 reflects moderate cognitive impairment, a score of 9 reveals more advanced, severe cognitive impairment. [5]

## FORENSIC PSYCHIATRIC ASSESSMENT

1) *Does Robert Brockman have a psychiatric diagnosis? What evidence is the basis of your opinion? Are there other psychiatric diagnoses referenced that Mr. Brockman does not have? Why or why not?*

Mr. Brockman is currently suffering from the following diagnoses:

1. **Parkinson's disease dementia (G20), with associated depression (F06.31), anxiety (F06.4) and psychosis (F06.2)**
2. **Possible comorbid Alzheimer's disease (G30.9)**
3. **Delirium from a medical condition (urosepsis) (F05)**
4. **Apathy (No specific ICD-10 code)**
5. **Insomnia with obstructive sleep apnea (780.51)**
6. **Possible REM Sleep Behavior Disorder (G47.53)**

### *Parkinson's disease dementia, with associated depression, anxiety and psychosis*

Mr. Brockman has a well-established history of **Parkinson's disease**, dating back to initial observations of his motor movement changes by Dr. Stuart Yudofsky in October of 2018 and then confirmed both clinically by neurologists Dr. Jankovic and Dr. Lai over the ensuing years, and by a positive Dopamine Transporter Imaging (Dat scan) scan of his brain in February of 2019. Mr. Brockman's own observations of both physical and cognitive slowing in the years leading up to 2018, including in his 2017 report to Dr. Yudofsky, are consistent with earliest subtle (known as prodromal) symptoms of the disease.[6] These changes were also noted by his friend Dr. Stephen Slade, who noted Mr. Brockman becoming slower and quieter as far back as 2014.

The diagnosis of dementia is supported by numerous in person examinations by different highly qualified clinicians, each of whom took their own history and in person

---

[4] I did not score him on the abstraction / similarity task and so those two points are not counted in the total. He missed points across the entire instrument, and his MOCA store reflected significant cognitive dysfunction.
[5] Dalrymple-Alford, J.C. et al. **The MoCA: Well-Suited Screen for Cognitive Impairment in Parkinson Disease**. Neurology 75 pp 1717-1725 2010
[6] Mahlknecht P, Seppi K, Poewe W. The Concept of Prodromal Parkinson's Disease. J Parkinsons Dis. 2015;5(4):681-97.

examinations, such as the administrations of the MoCA on which Mr. Brockman performed poorly. Neurologists and psychiatrists also relied upon neuropsychological testing by Dr. York that presented objective evidence for Mr. Brockman's dementia, even in the face of his articulate executive bearing in which he was repeatedly cited to minimize his deficits.

In some instances, doctors supplemented that history with the input of collaterals in Mr. Brockman's family, who may have expressed more pointed concerns than the examinee himself. Mr. Brockman initiated contact with Dr. Yudofsky in May 2017, according to the record, because his family was expressing concerns to him that his cognitive problems may be heralding Alzheimer's disease.

Mr. Brockman's poor performance on screening tests like the MoCA was consistent, his history consistently noted memory problems, whether they worsened or plateaued. His neuropsychological testing likewise revealed dysfunction in memory and a number of other domains, and was consistent with the history provided, findings on clinical examination, including the screening measures. The only examiners that assert Mr. Brockman's neurocognitive dysfunction is overstated are the court-appointed examiners. Yet Dr. Denney's own testing reveals significant cognitive dysfunction; he and his two colleagues electively ignored it because he interpreted Mr. Brockman's performance on validity testing as evidence for malingering. Yet the academic literature, including the test manuals themselves, reveal there to have been interpretive possibilities to these scores that are not malingering, but neurocognitive dysfunction consistent with all of the history and other testing to date. Dr. Guilmette's testing demonstrates dementia even as it demonstrates through rigorous validity testing that Mr. Brockman gave adequate efforts.

Individuals with Parkinson's disease (PD) frequently develop neuropsychiatric symptoms in addition to the motor symptoms, including depression, psychosis (both delusions and hallucinations), sleep disturbances, and neurocognitive impairment, the latter ranging from mild changes that minimally affect daily functional abilities (referred to as Parkinson's disease – Mild Cognitive Impairment or PD-MCI) to more severe symptoms that do affect daily functional abilities (called Parkinson's disease dementia or PDD).[7] In one study of patients with PD over 12 years, "the cumulative incidence of dementia increased steadily with age and disease duration reaching 80 - 90% by age 90 years." [8]

Mr. Brockman's neurocognitive impairment has progressed from mild cognitive impairment (MCI) to more significant dementia in the last several years, as evidenced by repeat neuropsychological testing by Dr. York, Dr. Denney, and the most recent report by

---

[7] Cooney JW, Stacy M. Neuropsychiatric Issues in Parkinson's Disease. Curr Neurol Neurosci Rep. 2016 May;16(5):49.
[8] Buter TC, van den Hout A, Matthews FE, Larsen JP, Brayne C, Aarsland D: **Dementia and survival in Parkinson disease: a 12-year population study**. Neurology. 2008 Mar 25; 70(13):1017-22.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **30** of **46**

Dr. Guilmette, observations of his wife, son, and close friends of his degree of neurocognitive impairment and functional decline, as well as neuroimaging that shows frank brain deterioration with significant findings such as frequent neuritic plaques and significant brain volume loss in the temporal lobe. Mr. Brockman's neurocognitive decline and progression, as well as it structural presentation, is expected based on the scientifically known course of MCI that is associated with both PD and Alzheimer's disease (AD).[9]

Mild cognitive impairment is a condition that can occur as a transitional state between normal ageing and dementia and has traditionally been used to describe patients who frequently go on to develop Alzheimer's disease (AD). An analogous concept of PD-MCI has been proposed and recent cross-sectional studies suggest that more than 20% of PD patients meet criteria for PD-MCI with a majority going on to develop PDD over time." [10] [11] What has happened to Mr. Brockman, from a clinical perspective, is therefore customary rather than improbable.

Mr. Brockman has several key risk factors for PDD include older age, male gender, presence of depression and/or psychosis, previous mild cognitive impairment, and more severe PD symptoms.[12]

In contrast to assertions by Dr. Denney and Dr. Darby that Mr. Brockman only has mild cognitive impairment, his clinical history and presentation meet the full general diagnostic criteria of PDD as established by the Movement Disorder Society and published in 2007. [13] These criteria and Mr. Brockman's established history meeting them are summarized in Table 1.

**Table 1** – Evidence Supporting a Diagnosis of Probable Parkinson's Disease Dementia Based on Established Diagnostic Criteria by the Movement Disorder Society

| Diagnostic Criteria | Met | Evidence for Mr. Brockman's Meeting Criteria |
|---|---|---|
| A diagnosis of PD | YES | Multiple neurological evaluations (Dr. Jankovic and Dr. Lai) support a diagnosis of PD based on motor symptoms and the positive DaTscan |

[9] *Janvin CC, Larsen JP, Aarsland D, Hugdahl K:* **Subtypes of mild cognitive impairment in Parkinson's disease: progression to dementia**. *Mov Disord. 2006 Sep; 21(9):1343-9.*
[10] *Ibid*
[11] *Caviness JN, Driver-Dunckley E, Connor DJ, Sabbagh MN, Hentz JG, Noble B, Evidente VG, Shill HA, Adler CH:* **Defining mild cognitive impairment in Parkinson's disease.** *Mov Disord. 2007 Jul 15; 22(9):1272-7.*
[12] Poewe W, Gauthier S, Aarsland D, et al. **Diagnosis and management of Parkinson's disease dementia**. *Int J Clin Pract.* 2008;62(10):1581-1587.
[13] Emre M, Aarsland D, Brown R, et al. **Clinical diagnostic criteria for dementia associated with Parkinson's disease**. *Mov Disord.* 2007;22:1689–707.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **31** of **46**

| | | |
|---|---|---|
| PD developed prior to the onset of dementia | **YES** | Clinical history details development of motor symptoms around the same time as mild cognitive changes but before these symptoms constituted an actual dementia. In addition, the presence of comorbid Alzheimer's disease (see next section) could disrupt this timeline |
| PD associated with a decreased global cognitive efficiency (MMSE < 26) | **YES** | Scores on the Montreal Cognitive Assessment have consistently shown multiple areas of impairment and been below 20. In addition, neuropsychological testing has shown decreased global cognitive efficiency |
| Cognitive deficiency severe enough to impair daily life | **YES** | A recent review of ADLs and IADLs I conducted with Dorothy Brockman indicates significant functional loss. This is supported by functional testing data obtained by Dr. Guilmette. |
| Impairment of at least two of the following domains: Attention, Executive function, Visuo-constructive ability, Memory | **YES** | ***Attention***: Inability to sustain attention on MoCA test of serial 7s<br>***Executive Function:*** Impaired trail making, word generation (lexical fluency) and clock draw test on MoCA<br>***Visuo-constructive ability:*** Impaired clock drawing and cube drawing on MoCA<br>***Memory:*** Impaired recall of word list on MoCA; longstanding history from informants of memory impairment; evidence for memory impairment in examination |

Mr. Brockman has been treated by his clinicians with the acetylcholinesterase inhibitor rivastigmine, which has shown efficacy for PDD [14] and is consistent with the treatment recommendations for PDD from the dementia section of the American Academy of Neurology's (AAN) evidence-based practice parameters. [15] This treatment does not reverse the progressive deterioration of these dementias, but may, in some, slow its progression and allow for longer quality of life before the progression of dementia completely isolates one from even intimates.

Psychiatric symptoms of anxiety and depression associated with PD are well documented in Mr. Brockman's clinical history dating back to at least 2018, after the onset of the neurological disease, and are treated successfully with the antidepressant bupropion. There is also evidence of psychosis given several instances of what appear to be transient and

---

[14] Maidment I, Fox C, Boustani M: **Cholinesterase inhibitors for Parkinson's disease dementia**. Cochrane Database Syst Rev. 2006 Jan 25; (1):CD004747.
[15] Miyasaki JM, Shannon K, Voon V, et al: **Practice Parameter: evaluation and treatment of depression, psychosis, and dementia in Parkinson disease (an evidence-based review): report of the Quality Standards Subcommittee of the American Academy of Neurology**. Quality Standards Subcommittee of the American Academy of Neurology.Neurology. 2006 Apr 11; 66(7):996-1002.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **32** of 46

mild visual hallucinations of bugs, and these could be due to either PD itself or the use of levodopa-carbidopa.[16]

Previous neurological and neuropsychological evaluations have raised the issue of Lewy-body dementia (LBD), which can closely resemble PDD and share similar neuropathological features. Core symptoms of LBD include fluctuating cognitive symptoms, visual hallucinations, and onset of motor symptoms two or more years after cognitive changes.[17] REM sleep behavior disorder and sensitivity to antipsychotic and other psychotropic medications are other associated symptoms of LBD. Although Mr. Brockman appears to meet several of these criteria, only neuropathological study of the brain would make a definitive diagnosis. A sleep study earlier this year was affected by Mr. Brockman's significant sleep apnea and did not resolve the question of REM sleep behavior disorder.

It is worth noting that Mr. Brockman's baseline intelligence is described as superior and personality as quite extroverted and sociable, reflected in the arc of his career from being the top salesman at IBM at a young age to founding and building a successful company. In his interviews with Dr. Dietz, Dr. Denney and Dr. Darby, he is able to verbalize in a socially appropriate manner and give a shallow impression of understanding things better than he actually does, leading them to suggest he has, at worst, mild cognitive impairment. It is clear even from their interviews, however, that his responses are often brief, shallow, sometimes led by questions provided to him, and do not provide relevant details that indicate his understanding, thus belying the notion that his impairment is mild – contrary to what all of his clinicians have indicated and what both Dr. Guilmette and I found in our interviews.

For example, despite multiple reminders of my role throughout the interview, Mr. Brockman can only tell me what I do in the most general terms: "It looks to me like the chief part of your mission is that's to find out exactly what's going on and report to those that you represent." (p. 101, lines 10-13). In his interviews with Dr. Dietz and Dr. Denney he often responds to complex questions with a word or two, indicating he assents to them but without actually demonstrating whether he actually understands(p. 9, lines 1-18):

> DR. DIETZ: Well, do you understand that you've been accused of certain criminal activity?

> MR. BROCKMAN: Yes.

> DR. DIETZ: And that your attorneys have asserted that you're not competent to proceed to trial, do you understand that?

---

[16] Samudra N, Patel N, Womack KB, Khemani P, Chitnis S. **Psychosis in Parkinson Disease: A Review of Etiology, Phenomenology, and Management**. *Drugs Aging.* 2016;33(12):855-863.
[17] Sanford AM. Lewy Body Dementia. Clin Geriatr Med. 2018 Nov;34(4):603-615.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **33** of **46**

> MR. BROCKMAN: Yes, I understand that.
>
> DR. DIETZ: Do you understand that because they've said that, that the government is allowed to also examine you?
>
> MR. BROCKMAN: Uh-huh, I understand that.
>
> DR. DIETZ: And that's what this is part of, this is part of that government evaluation of your competence to stand trial. And you understand that?
>
> MR. BROCKMAN: Yes, I do.

Mr. Brockman's answers do not indicate that he truly understands the purpose of the interview as they are devoid of any explanation and detail on his part. An open-ended question would have been more informative (e.g. "why are we here today?"). The first 77 pages of the Dr. Dietz interview encompasses remote memories, which are relatively well preserved through moderate stages of most forms of dementia. Many of the questions in the remainder of the interview touch on remote memory, with little review of more recent, short-term memories.

Dr. Dietz asserts in his report, "information provided by colleagues or administrators about Mr. Brockman's contributions to the Baylor College of Medicine could have biased her evaluation or those of others who took his and his family's reports regarding his functioning at face value." This is speculative. Yet Mr. Brockman saw so many doctors that even were one to cynically consider Baylor to allow its renowned physicians to make what Dr. Dietz suggests were falsified medical diagnoses, the notion that Baylor could control so many doctors to participate in such a scheme is far-fetched and without precedent.

Moreover, Mr. Brockman's seeking Dr. Gould, from the University of Texas system, demonstrates that he had no reservations about seeking clinical assistance from whomever was recommended to him. Clinicians are well acquainted with the concept of doctor shopping for opinions. In this case, the Brockman family was following up with doctors and specialists recommended to them for treating his cognitive limitations rather than seeking to adorn a disability claim. The history from the medical records is simply not there.

Dr. Denney's own testing data demonstrates a comparable degree of neuropsychological dysfunction.

All of the reports prepared by the evaluating and treating physicians at Baylor College of Medicine and Houston Methodist Hospital have adhered to standard of care in terms of evaluating individuals with neurocognitive impairment. There is no evidence of the clinical

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **34** of **46**

work-up or treatment being curtailed, exaggerated, specialized or otherwise shaped in order to treat Mr. Brockman in a unique or special way.

In some instances, Mr. Brockman was recommended to follow up with a given specialist, and that follow-up did not occur for weeks or months. This is hardly VIP treatment. Moreover, the most pivotal diagnostic testing to support dementia was in fact recommended by Dr. Darby (who inspired the PET -Amyloid study that revealed the diagnostically significant amyloid and neuritic plaques), not a Baylor doctor. Were Mr. Brockman to have been part of some VIP scheme to find him demented, of overtesting, someone along the line would have recommended him for a PET Scan with Amyloid visualization. The VIP speculation is ultimately contradicted by the totality of the record.

In the course of Parkinson's disease dementia (PDD), an individual will often show mild fluctuations in symptoms due to transient positive or negative changes in their brain and body (e.g. amount of sleep, hydration, stress, presence of infection or other medical conditions), as has been the case with Mr. Brockman. However, Parkinson's disease dementia  is a progressive and permanent condition without any available treatments that can slow it down or cure it, as is Alzheimer's Disease.  Rivastigmine, which he is taking, has not been shown to significantly reverse or slow down cognitive impairment in any way, and there are no other treatments for PDD that Mr. Brockman can take. His condition will continue to progressively worsen and remain extremely vulnerable to medical conditions such as his recent urosepsis which precipitated delirium and an overall decline in his physical and cognitive condition.

**Alzheimer's Disease** (G30.9)

In general, Mr. Brockman's clinical history and baseline diagnosis of PD clearly meets full diagnostic criteria for PDD as described in the rationale above. In addition, it is common for an individual to have both PDD and Alzheimer's disease,[18] meaning that a postmortem neuropathological examination of the brain would reveal evidence of both deposition of the toxic protein alpha-synuclein (seen in PDD) and deposition of extracellular beta-amyloid protein and intracellular hyperphosphorylated tau neurofibrillary tangles (seen in AD).[19]

We do not have actual brain tissue to look at in a living person. However, we do have evidence of brain pathology for Mr. Brockman in the form of a PET scan of his brain from July 28, 2021 which was positive for the presence of beta-amyloid and neuritic protein

---

[18] Akhtar RS, Xie SX, Brennan L, Pontecorvo MJ, Hurtig HI, Trojanowski JQ, Weintraub D, Siderowf AD. **Amyloid-Beta Positron Emission Tomography Imaging of Alzheimer's Pathology in Parkinson's Disease Dementi**a. Mov Disord Clin Pract. 2016 Jul-Aug;3(4):367-375.

[19] Beach TG, Monsell SE, Phillips LE, Kukull W. **Accuracy of the clinical diagnosis of Alzheimer disease at National Institute on Aging Alzheimer Disease Centers, 2005-2010.** *J Neuropathol Exp Neurol.* 2012;71(4):266-273. doi:10.1097/NEN.0b013e31824b211b

plaques at the level seen in Alzheimer's disease. In addition, his most recent brain MRI shows progressive loss of volume since 2018, particularly in the areas of the brain (e.g., diencephalon, temporal lobe) which are known to suffer significant early degeneration in AD.[20]

That Mr. Brockman has both amyloid plaques in his brain and a pattern of progressive brain loss suggests a possible comorbid diagnosis of Alzheimer's disease in addition to PDD. This is not an unusual finding, as one small study of a series of individuals with PDD found that several also had abnormal amyloid imaging indicating underlying brain structural changes as seen with Mr. Brockman. [21] Another similar study also found positive amyloid imaging in PDD patients, suggesting that "multiple underlying neuropathologies contribute to dementia in PD." [22] The authors suggest that the severity of cognitive impairment in PD may be related to both AD and PD pathology. They also found that the presence of amyloid and a diagnosis of PD-MCI "predicted a greater hazard of conversion to a more severe diagnosis . . . and worsening in executive function over time."[23]

**Delirium** (G93)

During his recent hospitalizations in spring 2021 for urosepsis, Mr. Brockman was diagnosed with acute mental status changes, also known as encephalopathy or delirium, and characterized by fluctuating symptoms, poor attention and concentration, impaired level of consciousness, and disturbances of cognition including disorientation, memory impairment, and impaired language function. Other common psychiatric symptoms associated with delirium include sleep disturbances, psychosis (delusions and hallucinations), hyper- or hypo-activity, agitation, disinhibited behaviors, and emotional fluctuations. [24]

Hospital records detail Mr. Brockman's delirium characterized by confusion, disorientation and memory impairment during his stay, with associated agitation (required restraints), sleep disturbances and visual hallucinations.

In a seminal review paper on delirium, Dr. Sharon Inouye described delirium as "acute brain failure," with multifactorial causes and reflecting an underlying vulnerable brain (with pre-existing dementia as a key risk factor) and with a risk for leading to "permanent

---

[20] Appel J, Potter E, Shen Q, et al. A comparative analysis of structural brain MRI in the diagnosis of Alzheimer's disease. *Behav Neurol*. 2009;21(1):13-19. doi:10.3233/BEN-2009-0225
[21] Ibid , Ahktar et al.
[22] Gomperts SN, Locascio JJ, Rentz D, et al. **Amyloid is linked to cognitive decline in patients with Parkinson disease without dementia**. *Neurology*. 2013;80(1):85-91.
[23] Ibid
[24] Inouye SK, Westendorp RG, Saczynski JS. **Delirium in elderly people**. *Lancet*. 2014;383(9920):911-922.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **36** of **46**

cognitive decline and dementia in some patients." [25] Mr. Brockman's underlying dementia was a predisposing factor to his developing delirium.

Mr. Brockman will also remain quite vulnerable to further bouts of delirium given his baseline dementia and any further medical or environmental stressors that impact his brain.[26]

That he has experienced delirium twice this year demonstrates that this risk is ongoing.

Not only is delirium associated with underlying dementia but with a high likelihood of never returning to baseline cognition and function following the episode.[27] In addition, delirium can persist for weeks or months following the initial episode, and in those with pre-existing dementia such as Alzheimer's disease *it can result an acceleration of decline*. [28]

During my interview with Mr. Brockman, he was at times inattentive to the subject of the question and would respond by digressing on a tangent or responding in a nonsensical way. For example, he told me that he recently had a "bug," ostensibly referring to an infection, and when I questioned him about treatment he responded in a confused manner (p. 27, lines 16-12, p. 28, lines 1-9):

> DR. AGRONIN: Do you know how that happened or why that happened? Where was the bug in you? Where was it located?

> MR. BROCKMAN: Basically in the bladder.

> DR. AGRONIN: Okay. And how did they treat it?

> MR. BROCKMAN: They treat it with -- one of the ingredients is -- basically, we'll say a list of characteristics to make a car not work right.

> DR. AGRONIN: Okay.

> MR. BROCKMAN: And so it makes it for the service advisor, for one is pretty, pretty skilled.

---

[25] Ibid
[26] Ibid, Ebersbach et al.
[27] Ebersbach G, Ip CW, Klebe S, Koschel J, Lorenzl S, Schrader C, Winkler C, Franke C. Management of delirium in Parkinson's disease. J Neural Transm (Vienna). 2019 Jul;126(7):905-912.
[28] Gross AL, Jones RN, Habtemariam DA, Fong TG, Tommet D, Quach L, Schmitt E, Yap L, Inouye SK**. Delirium and Long-term Cognitive Trajectory Among Persons With Dementia**. Arch Intern Med. 2012 Sep 24;172(17):1324-31.

DR. AGRONIN: Yeah.

MR. BROCKMAN: They can use that list against their list of what they think is going on and come out with an answer.

His overall cognitive skills have been described by his wife as significantly reduced in the past six months, with persistent disorientation to place and time, as I also found during my interview. It is likely that Mr. Brockman is not fully recuperated from his delirium, and still lapses into an acute confused state. However, his baseline of cognition and function is lower than before and explains why he is so dependent on his wife and others to help with daily life.

## Apathy

Apathy is a common neuropsychiatric condition associated with numerous neurocognitive disorders, including Parkinson's disease dementia, in which an individual demonstrates at least one of the following symptoms for at least four weeks (according to 2009 proposed diagnostic criteria): "Loss of or reduced: motivation, goal-directed behavior, goal-directed cognitive activity, emotion, with at least one of the latter three criteria present for at least 4 weeks for the majority of that time." [29]

Apathy has been seen in up to 70% of individuals with PD, and is associated with poorer treatment response, decreased quality of life, increased costs, and an increased risk of developing dementia and increased difficulty with daily decision-making. [30][31]

Clinical history and informant reports clearly describe Mr. Brockman as becoming slower, quieter and more withdrawn over time, to the point now where he has reduced motivation, goal-directed behaviors and goal-directed cognitive and emotional expressions.

Mr. Brockman's apathy manifests in his relatedness to his case as well. According to Ms. Keneally, on one occasion in which she telephoned Mr. Brockman to obtain his medical records, he replied "it sure is pretty here (in Aspen)" and related as if he were oblivious to her comments. Ms. Keneally adds that Mr. Brockman never asked whether his diagnosis would help his case. This is consistent with the lack of initiative he has shown in engaging

[29] Robert P, Onyike CU, Leentjens AF, et al: **Proposed diagnostic criteria for apathy in Alzheimer's disease and other neuropsychiatric disorders**. Eur Psychiatry. 2009 Mar; 24(2):98-104.
[30] Mele B, Van S, Holroyd-Leduc J, Ismail Z, Pringsheim T, Goodarzi Z. **Diagnosis, treatment and management of apathy in Parkinson's disease: a scoping review**. *BMJ Open.* 2020;10(9):e037632. Published 2020 Sep 9.
[31] *den Brok MG, van Dalen JW, van Gool WA, et al*: **Apathy in Parkinson's disease: A systematic review and meta-analysis.** *Mov Disord. 2015 May; 30(6):759-69.*

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **38** of **46**

the issues of his case, which parallels the apathy that is long described in his medical record for life unrelated to this litigation.

2) **Is Mr. Brockman able, given the nature of the charges against him, to assist his attorneys with relevant, specific, requested facts, dates, and specifics? Is Mr. Brockman able to assist his counsel in defending his case?**

Based on the objective results of all neuropsychological testing, my own observations and interview, a review of Dr. Guilmette's interview, the prosecution expert interviews, and the specific reports of Mr. Brockman's attorneys Kathryn Keneally and Peter Romatowski, it is clear that Mr. Brockman is not able to assist his counsel in defending his case. This conclusion is based on the following enduring and progressive cognitive limitations:

**Memory lapses** for names, events, and decisions relevant to the case, as well as for information discussed with his attorneys over time. He does not remember the origin and context of information. Even when Mr. Brockman's memory is refreshed with written information, he cannot retain it.

In one example from my interview, Mr. Brockman does not remember my role in his case even after being reminded twice, and believes I am working for an adversary (P.17, lines 922):

> DR. AGRONIN: Okay. Well, I do want to understand -- and this is what your attorneys had asked our group to understand -- is, you know, your general understanding of the case. And so I'm wondering if there's anything you can tell me about it that would be -- just so I can see what you understand about the case?

> MR. BROCKMAN: I don't think so.

> DR. AGRONIN: Okay.

> MR. BROCKMAN: And I'm sure the lawyers on your side will take it up with the lawyers on my side, and there'll be semi-armed combat.

> Only a few minutes before I had told Mr. Brockman (p, 13, lines 15-25, p. 14, lines 1-3):

> DR. AGRONIN: Well, I'm going to refresh you on what I do in my role, and then we can -- I'll ask you about that later. So I'm a psychiatrist. I specialize in working with older people and with psychiatric conditions later in life. And I work in Miami, and I was -- I'm a part of a group called The Forensic Panel that's working with your attorneys to learn more about you and your ability to participate in your trial.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **39** of **46**

> And so they asked me to speak to you to learn more about your thinking and your ability to understand your legal case. So that's my role here today.

**Lack of understanding** of advice, suggestions and strategy provided by counsel. Even when he is given written information to review, he cannot draw inferences and conclusions from it to engage in abstract conversations with his counsel. Here is an example of how he completely forgets and / or misinterprets a key piece of advice from counsel: (p. 4 line 2 – 22)

> DR. AGRONIN: Okay.· Are there certain things that you don't want to talk about, or you've been advised not to talk about during the interview?
>
> MR. BROCKMAN: I haven't been advised of anything at this point.
>
> DR. AGRONIN: Okay. You say you haven't been advised of anything at this point –
>
> MR. BROCKMAN: On the subject of confidential material, handling confidential material, what protections it has.
>
> DR. AGRONIN: Okay.
>
> MR. BROCKMAN: I've not been through a lecture on how all that works.
>
> DR. AGRONIN: Have your attorneys given you any specific do's or don'ts about these interviews?
>
> MR. BROCKMAN: No, not really. I've been expecting -- my problem is I've been sick, and I've been traveling.

Even more fundamental, despite years of repeated evaluations and discussions with multiple physicians, Mr. Brockman demonstrates a lack of insight into the origins of his cognitive changes (P. Lines):

> DR. AGRONIN:  I'm surprised that you said no doctor ever told you what was causing your change in memory and it's getting worse. Have -- have you had evaluations of your memory over time?
>
> MR. BROCKMAN: There's been some done over -- over the years, to the point that it didn't seem worthwhile to be doing anymore.
>
> DR. AGRONIN: But did you ever get an explanation what was causing the changes?

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **40** of **46**

      MR. BROCKMAN: No.

**Disorientation and confusion** over the timeline of events and discussions relevant to the case. Mr. Brockman consistently demonstrates an unreliable accounting for details, timing, and relationships between people and things, mingling unrelated ideas as presented above.

**Lack of certainty or reliability** of his recollections. He has often presented information to his counsel as if he recalled it from his own memory as his original thoughts, but it has already been presented to him from someone else, such as noted by his attorney. If an idea is the product of perseveration, a distortion, or the leading query of another, how can it inform his attorneys to the end that they can use that information with the certainty that it is real?

**Inability to reason**. He thinks and speaks in generalizations and not details, and does not reason about this information in a meaningful or even logical way. This is reflected in how he erroneously ties his charges back to his businesses, such as his assertion of the case that it "involved competition in the sales and service of computer systems for car dealerships (p. 62, lines23-25). When asked about the meaning of the lawsuit, for example, he lapses into a reference to his previous work:

      DR. AGRONIN: What's the gist of it? Can you tell me that? I mean, in general, what's the lawsuit about?  I know you said you don't want to or can't go into details, but you know, what's it about?

      MR. BROCKMAN: I guess it would be involved competition in the sales and service of computer systems for car dealerships.

      DR. AGRONIN: And are you being accused of something?

      MR. BROCKMAN: I don't -- I'm not being accused of building a really great system.

      DR. AGRONIN: So if there -- do you know what an indictment is?

      MR. BROCKMAN: I've learned some about it recently.  It's a stage in a lawsuit in which the -- the opposition convinces the judge, you know, that I should be formally charged.

      DR. AGRONIN: What are they charging you with?

      MR. BROCKMAN: That, I'm not sure.

      DR. AGRONIN: Okay.

> MR. BROCKMAN: That's something I should be able to just jump off and tell you.

> DR. AGRONIN: Yeah, because that's, I mean, and that would be public knowledge, so do you know any of the charges that you're being charged with?

> MR. BROCKMAN: I would say no. I know there are charges, and I know when I've looked at them, I've read a couple of pages (inaudible), close that up, go work on something else.

He is further befuddled when asked about his role in the case:

> DR. AGRONIN: For your current case, for this case now, what role do you see yourself playing with your attorneys? What would you do in the case?

> MR. BROCKMAN: Since I've been sued personally as well as corporately, I'm essentially duty-bound to help --

> DR. AGRONIN: And what does that mean when you help your attorneys? What sorts of things would you help them with?

> MR. BROCKMAN: Well, the world is very complex, and while you might think that a computer system for a car dealership would be kind of nonattractive, be too small, but I believe for a long time that with the right software, everything will work. And what the competition is always interested in doing is that they want to have the qualities and byproducts for the price the competitor offers their products.

**Lack of initiation** in discussing and reviewing issues relevant to the case due to his apathetic and passive approach to the case.

**Inability to work with technology** (hardware and software) necessary to communicate on this case (e.g., computer, smartphone, fax, email). As a result, he is dependent on others for all scheduling and production of paperwork.

**Lack of reliable decision-making,** rendering it impossible for attorneys to pursue strategic decisions that may not be abruptly reversed. The best example from my interview was Mr. Brockman's decision to refuse to engage in a discussion about the case, despite the instructions and reassurances from his attorneys.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **42** of 46

The unreliability of his decision-making is further reflected in his lack of consistent awareness of exactly who was interviewing him and their role, such as whether they worked for his counsel or the prosecutors.

3) ***Does Mr. Brockman reflect the mental stamina needed for a courtroom trial on the charges he faces? Why or why not?***

**No.** Mr. Brockman suffers from physical slowing and weakness related to his Parkinson's disease, which limits the time in which he can be fully alert and attentive to long days in court. In addition, his apathy (lack of motivation and initiation) on his apathy and bradyphrenia (slowed and impaired thinking and processing) from Parkinson's disease limit his ability to initiate and respond to courtroom issues and defense requirements.

The progressive nature of Mr. Brockman's Parkinson's disease and his dementia (be it related to Parkinson's, Alzheimer's, or both) means that all of the existing limitations will only impede his stamina and other abilities to assist his attorneys all the more. These are persistent, irreversible and progressive movement and cognitive deficits,

4) ***Does the evidence reflect that Mr. Brockman is malingering cognitive incapacitation? Why or why not?***

Mr. Brockman's major neurocognitive disorder is not malingered, and he is not exaggerating his mental incapacity.

Mr. Brockman does not meet the criteria for malingering as defined by the Diagnostic and Statistical Manual of Mental Disorders (DSM-5)[32]

Malingering in the context of criminal sense is conscious and motivated by the desire to assist one's case outcome. That is not consistent with Mr. Brockman's behavior here. Specifically, Mr. Romatowski notes how this highly educated executive is nevertheless unable to provide specific answers to relevant facts that make favorable inferences about his legal quandary or, rebut unfavorable inferences. Mr. Brockman has been unable to choose answers that would aid his self-interest and his legal defense. Mr. Romatowski indicates that there were times that Mr. Brockman could have supported one interpretation over another, that the advantages were clear, but that he was not capable of doing so.

Although Mr. Romatowski found him eager to help his defense attorneys, Mr. Brockman is actually not even doing that in his own favor or defense. Mr. Brockman's passive and purposeless response style contrasts to a malingering examinee who is redirecting the discussion or attention to one's embellished malady. His passivity played out in certain exchanges with court-appointed experts Dietz and Denny, when Mr. Brockman

---

[32] American Psychiatric Association **Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)** 2013

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **43** of **46**

demonstrated that he can be led by the examiner to simply agree to propositions advanced in their leading questions without accounting for the import of a given idea. It is precisely the absence of his employing strategic thinking in case-sensitive discussions such as the interviews, even agreeing to propositions that may or may not be correct because he is agreeable, that illustrate a wholly different style than malingering.

Mr. Brockman is motivated to maintain relevance, normalcy, and to relate to his dementia as something reversible. The record demonstrates that when he was informed in 2019 of his neuropsychological test data demonstrating dementia, that he was "shaken." He followed up with his medical providers to seek changes to his prescription regimen to attempt to reverse his dementia. Mr. Brockman has agreed to take prescribed medicines, including those that have potential side effects, because he wishes to get better, and exercised regularly. Mr. Brockman also noted improvements in his condition to doctors at times. These documented events in Mr. Brockman's history are customary responses of patients who want to rid themselves of a diagnosis rather than to embrace it.

The court-appointed experts asserted that Mr. Brockman did not respond to their case-related questions because he was following attorney advice to be silent. They extended their reasoning to conclude that by not speaking to them, he was concealing his abilities. Yet their evaluations never revealed a discovery of Mr. Brockman possessing any abilities to engage in the necessities of trial preparation in this highly complex case.

These examiners presumed his silence to be an expression of his malingering because they did not diligence his unwillingness to answer certain questions, and therefore did not learn that attorneys instructed him that they obtained a protective order so that statements Mr. Brockman made to court-appointed examiners could not be used against him.

The error of the court-appointed examiners in leaping to the cynical conclusion of malingering is reflective of their own inadequate adherence to standards of forensic practice, in terms of diligence. The court-appointed experts failed to query the attorneys regarding his refusal to answers case specific questions.  Attorneys were not queried, but Mr. Brockman was presumed to have motivation; Dr. Darby was willing to dismiss dementia and even to posit that Mr. Brockman's cognition could return to normal, rather than to simply order the PET Amyloid study he implicitly endorsed before arriving at his conclusions. Dr. Denney presumed malingering without accounting for the very manuals of the tests he used to present Mr. Brockman as a person who was enacting a "ruse." And the standard practice of incorporating collateral input of those who interact with Mr. Brockman and observe him could have been achieved through the records of that same collateral input having been given to numerous clinicians in authentic, recorded notes.

Contrasting to this were the many clinicians of different specialties who examined, tested, interviewed collaterals, and retested, and arrived at conclusions according to standards of practice. Dr. Dietz sweeps aside this converging evidence by speculating a salacious

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **44** of **46**

explanation of a donor enlisting a range of respected doctors from a prominent research hospital to come up with a falsified diagnosis and thus, an elaborately fraudulent medical record.

There is substantial evidence of Mr. Brockman's personal concerns of his cognitive decline going back well over a decade.  Dr. Dietz discounts Mr. Brockman's long-documented concerns in his report that "the onset of apparent deficits during tests of cognitive function only after the Bermuda Police Services raid on Evan Tamine's Bermuda home on September 5, 2018 prior to which time Mr. Brockman evidenced only age-related memory deficits, whether or not one relies on his personal writings.[33]" Based on all of the available evidence, I believe Mr. Brockman's notes document preclinical symptoms of his cognitive decline. With plaques, atrophy, severe cognitive dysfunction, and disintegration of his independent living skills, clinical experience would recognize us at a familiar place of the latter end of the long road of cognitive decline. Today's diagnoses are the latest point in the well-established trajectory of dementia from introspective beginnings.

The forensic geriatric perspective is that Mr. Brockman can barely walk – he has documented bradykinesia, he has the postural disability that makes him a fall risk, all the worsened by episodes of delirium, and unfamiliar environments are so challenging to him that he can't even urinate where he is supposed to, as his personal aide pointed out in Dr. Guilmette's meeting. The record of Mr. Brockman's numerous visits to numerous doctors is necessary only to obtain treatment and regain hope of normalcy, not to simply get a diagnosis and nothing more. He was compliant with follow-ups and with treatment, which disability seeking malingerers are not.

That Mr. Brockman did not follow his attorneys' direction to speak to the forensic examiners demonstrates his bad judgment, and the impaired judgment of a confident, once-brilliant man who has no idea he has lost it -- not malingering. DELTE

The court-appointed doctors fixated on Mr. Brockman's superficial bearings which Mr. Brockman has long practiced in business speeches and personal anecdotes he gives time and again, misinterpreted his actions as coordinated strategy as opposed to the purposeless instinct that otherwise displays itself with the randomness of his answers.

Many of his answers include Mr. Brockman minimizing his inabilities. He may acknowledge on a shallow level that he has some memory problems, but has consistently asserted that he is completely helpful to his attorneys when he is not, completely capable of participating in his defense when he is not participating AT ALL. The record and Mr. Brockman's response to the demands of the case show that he is not participating not because he won't, but because he can't.

---

[33] Report of Dr. Dietz, page 44

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **45** of **46**

This gulf of his deficient insight from reality is no different from what is described in the clinical record accompanying his neurology workup. In so normalizing his abilities to examiners, Mr. Brockman is displaying the antithesis of malingered incapacity. Rather, he uses his intact verbal skills and practiced social courtliness and executive bearing to cover his decay with a patina of his confidence and the lingering spirit of an industrious personality.

The record reflects he has practiced this maintenance of appearances outside his case, for a few years at Reynolds & Reynolds when he carried on as a person who believed he was in charge while, according to Rev. Jackson, his peers were full of trepidation about the implications of his cognitive slippage being exposed to those watching the leadership. His peers, his personal assistant, as Rev. Jackson has observed, would be far less surprised with Mr. Brockman having an 87 IQ, inability to draw a clock, inability to recall the very purpose of interviews by virtue of his decline than would Mr. Brockman, who would suggest that his only problems are some forgetfulness of names. The structure of Reynolds & Reynolds, as Mr. Barras has laid out, with executives running their respective silos and Mr. Brockman providing executive vision, enabled the examinee to maintain a role that is still so integral to his identity long after his departure from the company.

When one looks beyond the enduring capabilities of Mr. Brockman to maintain a genial conversation, converse with familiar and unfamiliar faces alike as he did the practiced, award winning salesman, my examination and experience of Mr. Brockman parallel the valid data derived from psychological testing and neuroimaging that he has a major neuropsychological dysfunction, that he has dementia. He is not malingering and there unfortunately will be no happy end in which Mr. Brockman reveals that he does not have a progressive, persistent and untreatable neurodegenerative condition and returns to the capabilities that once were a great source of pride to him. He is unable to assist his attorneys because his dementia has irreversible atrophied those necessary skills, from memory to judgment to reason.

**SUMMARY**

Mr. Brockman has a clearly established diagnosis of Parkinson's disease that was first made clinical in 2019, but had early symptoms evolving for several years prior. He has biomarker evidence from brain scanning for disturbances in dopamine activity.

- He has associated neurocognitive impairment, a finding confirmed in every single neurological and neuropsychiatric evaluation he has had since then.  Mr. Brockman meets full criteria for Parkinson's disease dementia (PDD) with moderate neurocognitive and functional impairment, and has associated psychiatric conditions including depression, anxiety, psychosis, and sleep disturbance.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Marc Agronin, M.D.
August 6, 2021

Page **46** of **46**

- Mr. Brockman's PDD is complicated by the presence of significant amyloid plaques in his brain and progressive loss of brain cells, especially in memory processing regions, which are both pathological findings seen in Alzheimer's disease (AD), This finding, in concert with clinical findings, suggests the possibility that Mr. Brockman has both PDD and AD.

- His condition has worsened in the last year with more significant decline in both cognition and function in the last six months, consistent with progressive PDD but also caused and complicated in part by acute confusion / delirium (from urosepsis) which has lingered ever since.

- As a result of his progressive decline, Mr. Brockman is dependent on his wife and aide completely for many daily functions and activities.

- Mr. Brockman's interactions with his attorneys have clearly reflected his underlying cognitive impairment and shown him to have significant enough impairment in memory, comprehension, organization, logic and other key cognitive skills to be unable to participate in his defense.

Very truly yours,

**Marc E. Agronin, MD, DFAPA, DFAAGP**

Board-certified adult and geriatric psychiatrist
Senior Vice President for Behavioral Health, Miami Jewish Health
Chief Medical Officer, MIND Institute at Miami Jewish Health, Miami FL
Affiliate Associate Professor of Psychiatry and Neurology, University of Miami Miller School of Medicine, Miami, FL
President-elect, American Association for Geriatric Psychiatry