

# THE FORENSIC PANEL

TEL: 212.535.9286   FAX: 212.535.3259   MICHAEL WELNER, M.D., CHAIRMAN

James P. Loonam, Esq.
Jones Day
250 Vesey Street
New York, New York 10281

**Re: Robert T. Brockman**

August 6, 2021

Dear Mr. Loonam,

Pursuant to your request, I have conducted a forensic neuropsychological assessment of the above 80-year -old defendant. On October 1, 2020, federal prosecutors indicted Mr. Brockman on tax evasion, conspiracy to defraud in so doing, wire fraud, international money laundering, failure to file foreign bank and financial accounts report (FBAR), evidence tampering and destruction of evidence.

The indictment alleges that Mr. Brockman conspired to conceal twenty years of capital gain income earned from investments from the IRS. The indictment charges that he deposited some of this income in unreported foreign bank accounts to evade payment of federal income tax by creating false paper trails, concealing his ownership or control over financial entities, appointing nominees to manage these entities for him, and using encrypted email systems and code names to communicate with the nominees employed to manage his offshore structure and foreign entities.

Mr. Brockman is also charged with willfully failing to file an FBAR; and, that between about October 8, 2008 through about April 21, 2010, he knowingly defrauded purchasers and sellers of the debt affecting a financial institution, Deutsche Bank.

Moreover, the indictment alleges that from on or about June 10, 2016 through on or about October 14, 2016, knowing that there would be a federal grand jury investigation to determine whether criminal violations had been committed, Mr. Brockman himself altered, destroyed, and persuaded others to destroy documents and electronic media with the intent to impair their availability for use in a federal grand jury investigation.

In the course of their early meetings with him, Mr. Brockman's criminal defense attorneys individually and collectively observed him to be unable to inform them of pertinent details of his case, alternatively to give them incorrect information, and on other occasions, to distort and demonstrate misunderstanding of issues his defense team was working through. On December 8, 2020, Mr. Brockman's defense attorneys filed a motion asserting that he

BEHAVIORAL SCIENCES   •   FORENSIC SCIENCES   •   PEER REVIEWED ®
WWW.FORENSICPANEL.COM   EMAIL: INFO@FORENSICPANEL.COM



US v. Brockman
**DX-19**
Case No: 4:21-cr-0009

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **2** of **77**

was incompetent to stand trial due to his diagnosis of dementia. The court appointed Dr. Robert Denney (a neuropsychologist), Dr. Park Dietz (a psychiatrist), and Dr. Ryan Darby (a neurologist) to examine Mr. Brockman.

In June 2021, Dr. Denney, Dr. Dietz, and Dr. Darby issued reports. Dr. Denney interviewed Mr. Brockman with Dr. Dietz on May 18 and 20, 2021. In addition, he conducted a neuropsychological assessment of Mr. Brockman on May 19, 2021, which was the focus of his report. Dr. Denney opined that Mr. Brockman exhibited no evidence of dementia and instead presented with the following diagnoses: Malingering Cognitive Disorder, Possible Mild Neurocognitive Disorder (Mild Cognitive Impairment), and Parkinson's Disease (PD).

The neuropsychologist additionally wrote that that Mr. Brockman "may have a mild form of mental disease or defect but, nonetheless, is able to … assist properly in his defense if he chooses to do so."

Dr. Dietz opined that Mr. Brockman "does not appear to exhibit evidence of significant cognitive impairment," and asserted that Mr. Brockman "has malingered the severity of his cognitive deficits in a variety of settings since at least 1/30/19." The psychiatrist added that Mr. Brockman "demonstrated a rational understanding and intact memories for various elements of the allegations in the indictment about which he was asked general questions," and that he has "sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him."

Dr. Darby, who separately performed a neurology examination of Mr. Brockman on May 5, 2021, referenced Dr. Denny's and Dr. Dietz's examination and rationale in formulating his opinion that many of Mr. Brockman's cognitive issues "can be attributable to age-related changes, as well as cognitive symptoms that are common in PD patients without dementia." He added that "Mr. Brockman has evidence of Parkinson disease and mild cognitive impairment. His level of cognitive impairment does not clearly reach the threshold of dementia."

Mr. Brockman was referred to The Forensic Panel by the defense attorneys in order for me to examine, with prospective peer oversight, the following questions:

1) *Does Robert Brockman have neuropsychological impairment? What is the nature of that impairment? What evidence is the basis of your opinion?*
2) *What diagnoses are reflected in the data of the available neuropsychological testing and medical history? Are there other psychiatric diagnoses referenced that Mr. Brockman does not have? Why or why not?*

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **3** of 77

3) *Is Mr. Brockman able, given the nature of the charges against him, to assist his attorneys with relevant, specific, requested facts, dates, and specifics? Is this question informed by testing data, clinical data, or both?*

4) *Based on his performance in the testing, does Mr. Brockman demonstrate the mental stamina needed for a courtroom trial on the charges he faces? Why or why not?*

5) *Is Mr. Brockman able to assist his counsel in defending his case? Why or why not? Is this question informed by testing data, clinical data, or both?*

6) *Does the evidence reflect that Mr. Brockman is malingering cognitive incapacitation? Why or why not? How is the validity testing performed to date informative of his limitations and the nature of his effort?*

## SOURCES OF INFORMATION

1) Declaration of Dr. James Pool, MD., November 25, 2020
2) Declaration and exhibits of Kathryn Keneally, December 8, 2020
3) Declaration of Peter J. Romatowski, December 8, 2020
4) Draft declaration of Ryan Darby, February 28, 2021
5) Robert Brockman indictment, October 1, 2020
6) U.S Expert Notice, February 17, 2021
7) Response to U.S. Expert Notice with exhibits, February 22, 2021
8) Letter from Kathryn Keneally to Government, April 9, 2020
9) Mr. Brockman's personal writings of health concerns, December 2004-2018
10) Metadata authenticating Mr. Brockman's personal health writings
11) Dr. Jankovic's report of office visit, January 30, 2019
12) Diagnostic Report re: NM Datscan, Brain SPECT, February 14, 2019
13) Dr. Michele York Neuropsychological evaluation, March 1, 2019
14) Dr. Yu Notes from Mr. Brockman's appointment, March 20, 2019
15) Report of Dr. Pool's Annual Physical, October 1, 2019
16) Dr. York Forensic Evaluation, December 3, 2019
17) Dr. Pool's examination, October 5, 2020
18) Dr. York's neuropsychological exam, October 7, 2020
19) Notice and Motion for Competency Hearing, December 8, 2020
20) Government's Response to Motion for Competency Hearing, December 15, 2020
21) Mr. Brockman's reply and exhibits to Government's Opposition, December 21, 2020
22) Video and transcript of Dr. Darby's evaluation, May 5, 2021
23) Dr. Ryan Darby's report, June 18, 2021
24) Dr. Park Dietz report, June 21, 2021
25) Dr. Robert Denney's report, June 21, 2021
26) Video and transcript of Dr. Dietz and Dr. Denny's evaluation, May 18 and May

20, 2021
27) Dr. Denney test data, May 19, 2021
28) Dr. York test data, March 1, 2019, December 3, 2019, October 7, 2020
29) Mr. Brockman's speeches at Reynolds & Reynolds Company birthday,
November 2017 and 2018
30) Dr. Komal Stoerr dermatology medical records, December 2018-May 2020
31) Fondren Orthopedic Group medical records July 12, 1999, April 3, 2014,
November-December 2017
32) Records from the Houstonian regarding Mr. Brockman's membership, 2009-
2020
33) Methodist hospital records for infectious disease, May 31-June 11, 2021
34) Methodist hospital records for infectious disease, March 15-19, 2021
35) Deposition videos from RRC proceedings, January 16-17, 2019
36) Transcript of Mr. Brockman's deposition, Dealer Management Systems
Antitrust Litigation, January 16 and 17, 2019
37) Transcript of Mr. Brockman's deposition -- CDK Global & Reynolds and
Reynolds, September 18 and 19, 2019
38) Deposition of Kelly Hall, March 10, 2021
39) Deposition of Robert Schaefer, March 18, 2021
40) Deposition of Thomas Barras, April 15, 2021
41) Medical records from UT Physicians
42) PET scan results and images, March 12, 2021
43) Polysomnography/sleep study report, April 29, 2021
44) Email exchanges between Mr. Brockman, Bart Chandler, Tommy Barras, Carl
Linnecke, and Evatt Tamine
45) Separation and Release Agreement between Universal Computers Systems
Holding, inc. and Mr. Brockman, February 6, 2021
46) Houston Methodist Hospital
47) Business records of UTHealth relating to donations by Mr. Brockman
48) Consultation notes of Dr. Yudofsky, October 20, 2018 – October 23, 2020
49) Email between Dr. Yudofsky and Mr. Brockman regarding memory problems,
May 3-4, 2017
50) Peer review conference call with Michael Welner, MD., Marc Agronin, M.D.,
Bernice Marcopulos, Ph.D., James Seward, Ph.D., Elkhonon Goldberg,
Ph.D., and Thomas Wisniewski, M.D., June 24, 2021
51) Peer oversight conference call with Michael Welner, MD., James Seward,
Ph.D., Bernice Marcopulos, Ph.D., Elkhonon Goldberg, Ph.D., and
Thomas Wisniewski, M.D., July 29, 2021
52) Transcript and video of Dr. Marc Agronin's interview July 13, 2021
53) Transcript and video of Dr. Thomas Guilmette's interview, July 16, 2021
54) Amyloid PET scan, July 28, 2021
55) Brain MRI results, July 30, 2021
57) Report of Dr. Marc Agronin, M.D., August 6, 2021

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

58) UroLift surgery medical records, June 24, 2021
59) Report of Dr. Christopher Whitlow, M.D., August 6, 2021
60) Peer oversight, Dr. James Seward, Ph.D.
61) Peer oversight, Dr. Bernice Marcopulos, Ph.D
62) Peer oversight, Dr. Elkhonon Goldberg, Ph.D.
63) Peer oversight, Dr. Michael Welner, M.D.
64) Peer oversight, Dr. Marc Agronin, M.D.
65) Peer oversight, Dr. Thomas Wisniewski, M.D.

## PERTINENT BACKGROUND

Robert Brockman was born ███████ and raised in St. Petersburg, Florida. He has a brother, six years younger. His father owned a franchise to sell and install under the dash car air conditioning units, as well as a small used car lot, where Mr. Brockman relates that he worked and learned about cars.

Mr. Brockman attended public schools in St. Petersburg where he described that his grades were "about as low an A as you could get." According to Mr. Brockman, he was elected into the National Honor Society and was president of the Latin and Spanish clubs. He denies ever being suspended, expelled, or arrested as a youth.

After graduating from high school, Mr. Brockman enrolled at Centre College in Danville, Kentucky, where he also joined the Marine Corps officer candidate program. During his college years, he reports that he also ran a delivery service for picking up and dropping off other students' laundry to be cleaned in an off-campus business.

Because Centre College did not have a business program, recalls Mr. Brockman, he ultimately transferred to the University of Florida. He states that he graduated first in his business school class in 1963.

He was offered a scholarship to the University of Florida's master's program, which he accepted, and joined a Marine reserve unit rather than attend officer candidate school. He left the Marine reserves in about 1965 never having seen active duty.

Mr. Brockman left his master's program after one year. He explains that he "was tired of being poor," and wanted to enter the work world. He began with the Ford Motor Company, performing clerical work that included punching IBM computer cards for data entry. Then, he took a sales job at IBM, where he stayed for about five years and earned honors as IBM's top salesman.

In 1970, Mr. Brockman started Universal Computer Services (UCS), creating a computerized parts inventory control system for automobile dealerships. At that time, a

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **6** of **77**

dealership could have thousands of car parts in its inventory, which were kept track of manually by a clerk or the parts manager on hand-written cards. This was a very inefficient and time-consuming process.

Mr. Brockman wrote the software to replace the manual card system with a computerized system, and sold his product to dealerships. Over the years, according to Mr. Brockman, he expanded his software programs to help dealerships manage other important aspects of their businesses, such as automatizing reminders sent to customers about when their cars needed servicing, computerizing dealership's payrolls and sales records, and creating connections between the dealerships and financing options.

In 2006, UCS Holding, Inc. merged UCS with one of its main competitors, Reynolds and Reynolds, a 5000-employee company. Mr. Brockman became president and CEO. He acknowledged that improving the business practices at Reynolds required significant attention to detail and making innovative changes to the company.

In addition to devoting attention to making the company more efficient, creative, and productive, Mr. Brockman reportedly worked long hours, seven days a week. Among many priorities, Mr. Brockman explains that product development and the diligent hiring of sales representatives and other company personnel were critical. In addition, Mr. Brockman described that he was on a first name basis with all his employees and that treating people well was an important function of an executive.

Mr. Brockman has been married for over 50 years to his wife, Dorothy. They have a 47-year-old son, reportedly with Asperger's syndrome. Mr. Brockman has a 15-month-old grandson. Prior to marrying Dorothy, Mr. Brockman was married twice, with each union resulting in a child, who were later adopted by his ex-wives' second husbands.

Mr. Brockman's medical history includes surgery for bladder cancer in 2006 and in 2007 for recurrence, hypothyroidism, atrial fibrillation, basal cell carcinoma, hypercholesterolemia, melanoma, ocular migraine, prostatitis, urinary tract infections, pseudoexfoliation glaucoma, and sleep apnea.

Within the last six months, he has also been hospitalized for klebsiella pneumonia and metabolic encephalopathy with altered mental status (March 2021), acute metabolic encephalopathy with delirium and major neurocognitive disorder secondary to infectious pseudomonas (May-June 2021), and UroLift surgery with anesthesia (June 24).

In January 2005, Mr. Brockman's primary care physician, Dr. William Obenour, prescribed him Zoloft for mild depression after his mother's death. Years later, Mr. Brockman self-referred for depression to neuropsychiatrist Stuart Yudofsky, M.D. in October 2018.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **7** of **77**

## HISTORY OF PERTINENT NEUROCOGNITIVE PROBLEMS AND WORKUP

Mr. Brockman typed yearly notes from December 2004 to August 2018, that documented both medical information/concerns and some brief comments about what was happening in his personal life and in his business. Within these notes, Mr. Brockman expressed concerns about his own mentation in each note except one.[1]

The first of these records, from December 2004 (12/14/2004) noted: "mental processes not as good…memory much poorer…ability to work long hours still good."

Four notes were created in successive years, spanning December 2005 to 2008 (12/12/2005; 12/2/2006; 12/9/2007; 12/1/2008), each noting: "mental processes not as good – but no further decline – memory much poorer…ability to work long hours still good."

In December 2009 (12/13/2009), Mr. Brockman wrote: "mental processes not as good – but no further serious decline…memory continues to get poorer, especially with names of people I know well and should remember easily…it is names that I most usually notice it with, however I am quite sure that it is probably memory of everything…ability to work long hours still excellent."

In December 2010, he recorded, (12/13/2010): "mental processes not as good – but no further serious decline…I probably have some burnout – as my efficiency and effectiveness are considerably degraded…memory continues to get poorer, especially with names of people that I know well and should remember easily…it is names that I most usually notice it with, however I am quite sure that it is probably memory of everything…ability to work long hours still excellent."

In December 2011 (12/17/2011), he noted, "mental processes not as good – but no further serious decline…I probably have some burnout – as my efficiency and effectiveness are considerably degraded. Fortunately, this situation has not worsened since last year…memory continues to get poorer, especially with names of people I know well and should remember easily…it is names that I most usually notice it with, however I am quite sure that it is probably memory of everything…ability to work long hours still excellent."

A brain MRI on January 24, 2012 for ocular migraine was normal. Records reference a cognitive and neurologic workup by Dr. Julia Jones on March 30, 2012 that was normal.

---

[1] The dates created, last modified, and last saved, which are the same within each entry, are listed in parentheses.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **8** of **77**

In December 2012 (12/7/2012), Mr. Brockman wrote: "mental processes not as good – but no further serious decline…this spring and summer I had some serious burnout – as my efficiency and effectiveness were considerably degraded. It is probably time for me to sell Reynolds. That process is currently underway…memory continues to get poorer, especially with names of people I know well and should remember…it is names that I most usually notice it with, however, I am quite sure that is it probably memory of everything…ability to work long hours effectively was seriously degraded during the spring and summer – but is now somewhat recovered."

Mr. Brockman chronicled in December 2013 (12/17/2013): "mental processes not as good – but no further serious decline…memory continues to get poorer, especially with names of people that I know well and should remember easily…it is names that I most usually notice it with, however I am quite sure that it is probably memory of everything…ability to work long hours effectively has pretty much recovered."

The next year, in December 2014 (12/16/2014), he detailed: "mental processes not as good-but no further serious decline…memory continues to get poorer, especially with names of people that I know well and should remember easily…names that I ought to remember like one of our maids and a restaurant close by the house that I have been to 20 times or more – yet I have had real problems remembering these two names…ability to work long hours effectively is now pretty much as good as ever."

On December 16, 2014, the same date as when he composed the above, an unsigned medical note believed to be from William Obenour, MD summarized Mr. Brockman's annual exam with, "He notes some problems with name recall but in general his intellect is still intact and he still enjoys work…no significant memory loss."

In September 2015 (9/29/2015), Mr. Brockman noted: "mental processes not as good – but no further serious decline…memory continues to get poorer, especially with names of people that I know well and should remember easily…unfortunately I don't remember if I got the shingles shot or not (memory problems)."

Mr. Brockman wrote in November 2016 (11/13/2016): "mental processes not as good – but no further serious decline…memory continues to get poorer, especially with names of people that I know well and should remember easily…ability to work long hours effectively is now pretty much as good as ever now."

A May 3, 2017 email from Mr. Brockman to geriatric psychiatrist Stuart Yudofsky, MD, with whom Mr. Brockman was personally acquainted, disclosed, "My son and wife are after me to consult with the right doctor regarding my loss sense of smell. They are afraid it is an early sign of Alzheimer's or dementia. I am feeling good but am having increased memory problems." In a return email dated May 4, Dr. Yudofsky suggested that Mr. Brockman

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **9** of **77**

begin with a meeting with him to "assess the severity and significance of your memory symptoms." There is no record of such a meeting available.

Donna Ball was Mr. Brockman's personal assistant and secretary from 2013 to June 2020. She recounts in our interview that in the last 4-5 years of her employ, she noticed a problem with Mr. Brockman's memory, confusion with his recall, and his saying odd things.

A November 27, 2017 office note of orthopedist Jeffrey Kozak, MD, who was examining Mr. Brockman for lumbar pain, noted under neurologic symptoms, "Positive for memory loss and tingling," but also indicated negative memory loss under listed psychiatric symptoms.

Mr. Brockman noted in December 2017 (1/16/2018): "mental processes not as good – I am having more difficulty in dealing with the volume of business issues…short term memory continues to get poorer, especially with names of people that I know well and should remember easily…ability to work long hours effectively is now pretty much as good as ever now. However, my efficiency per hours less."

Rev. Jim Jackson, a friend of Mr. Brockman, has known him since 1994 and was the pastor of the Brockmans' church. Following his retirement, Rev. Jackson joined Reynolds and Reynolds in a role providing spiritual counseling to the executive staff, and was interacting with Mr. Brockman regularly. Rev. Jackson recollects that in about 2017 to 2018 he began seeing changes in Mr. Brockman that "alarmed" him. He noticed these changes at meetings, where Mr. Brockman "looked out to lunch" and not responsive.

Rev. Jackson recounts that he confronted Mr. Brockman about his concerns in June 2018, and that Mr. Brockman told him that certain litigation had been "driving him nuts." Rev. Jackson states that as a result, he initially attributed the changes he witnessed to stress.

A legal assistant at Reynolds and Reynolds, Robin Gilliland, described in an interview that in about 2018, she began to notice that when Mr. Brockman was sent legal papers to sign or comment on, they were returned to her incomplete, which was very unusual for him. She subsequently had to send more detailed and explicit instructions with the materials that he needed him to attend to in order to get them back filled out appropriately.

Mr. Brockman's personal notes of August 2018 (8/27/2018) included no comments about his cognitive status.

A September 11, 2018 office note of urologist Seth Lerner, MD, following on his bladder cancer, noted, "Now with fatigue and not feeling well for several months. Recent UTI…Patient distressed by change in his health and sense of well-being. I offered to set up consultation with (internist) Dr. Pool and he would like to do this."

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **10** of **77**

Although Mr. Brockman did not follow up on his memory concerns in 2017, an October 20, 2018 office note of geriatric psychiatrist Stuart Yudofsky, M.D. recorded that Mr. Brockman had self-referred for evaluation of depression, with a gradual onset of about a year. The record noted symptoms of diminished concentration, explaining, "I can't focus on my work the way that I have done for over 40 years." Also reported was decreased efficiency and organization that resulted in his making "more careless mistakes," diminished motivation and drive, diminished libido, sadness and decreased pleasure "in doing things I used to enjoy," mild insomnia, pessimism, and decreased self-esteem and confidence. The note also identified significant stress "related to $30 million business law suit ('unjustified') and undisclosed other legal matter." On examination, Dr. Yudofsky noted Mr. Brockman's being "motivated to be helped." He characterized him as "intelligent," and "insight and social judgement intact." However, Dr. Yudofsky also experienced Mr. Brockman to have "slowed thinking, difficulties with word retrieval," and "Memory 'not as good as it used to be.'"

In that same encounter, Dr. Yudofsky observed and documented several neurological signs that he observed to raise the likelihood of Parkinson's Disease. These included:
- Reduced facial expression.
- Simian posture (hunched)
- Shuffling gait.
- History of progressively worse micrographia.
- History of poor balance and getting progressively worse.
- Slowed motor function but no significant tremor or cogwheeling.

Dr. Yudofsky diagnosed him with major depressive disorder, moderate vs. depressive disorder due to another medical condition (to consider Parkinson's disease), and mild (to moderate) neurocognitive disorder (possibly) due to Parkinson's disease. The geriatric psychiatrist referred him to neurologist Dr. Joseph Jankovic to assess for Parkinson's disease as soon as possible, and for a full battery of neuropsychological testing, but Mr. Brockman indicated that his schedule "is packed" with job obligations through mid-January so he would wait to see him until then. Dr. Yudofsky started Mr. Brockman on the anti-depressant Wellbutrin, which he has remained on since then.

A November 2, 2018 MRI brain without contrast showed no intracranial abnormalities, particularly no disproportionate lobar atrophy.

Tommy Barras, an executive with Reynolds, reportedly told Rev. Jackson that following the Reynolds and Reynolds annual birthday party in the fall of 2018, Mr. Brockman got lost driving home and no one could locate him for an hour.

Mr. Brockman visited internist Dr. James Pool on December 11, 2018. Dr. Pool wrote in a declaration that Mr. Brockman "was experiencing movement disorders and cognitive problems that are consistent with Parkinson's disease or parkinsonism." He referred Mr.

Brockman to three other medical professionals: Joseph Jankovic, MD (neurologist and specialist in Parkinson's disease), Melissa Yu, MD (neurologist and specialist in Alzheimer's disease and other memory disorders) and Michele York, PhD (neuropsychologist).

Dr. Jankovic, a neurologist at the Parkinson's Disease Center and Movement Disorders Clinic at Baylor College of Medicine, noted Mr. Brockman's visit with him on January 30, 2019. The history described onset of symptoms 1.5 years previously with concentration and memory difficulty. Bupropion, prescribed by Dr. Yudofsky, reportedly had led to improvements in his thinking and memory. Dr. Jankovic also chronicled a history that Mr. Brockman had noticed difficulty with balance about 1.5 years earlier, took shorter steps and had stooped posture while walking, handwriting that was messier and smaller, and a near absent sense of smell about ten years previously. Mr. Brockman also reportedly began acting out his dreams at nighttime about 2-3 years ago, kicking and punching in his sleep.

No significant tremor was identified by Dr. Jankovic, but Mr. Brockman reportedly had some difficulty with fine motor movements. On that visit, Mr. Brockman scored a 19/30 on the Montreal Cognitive Assessment (MOCA). Dr. Jankovic diagnosed him with Parkinson's Disease and noted "cognitive decline" and "REM behavioral disorder." He referred Mr. Brockman for a Dopamine Transporter Imaging (DaTscan) and prescribed carbidopa/levodopa (Sinemet).

The DaTScan SPECT occurred on February 14, 2019. –. The radiologist read it as "severe loss of dopaminergic neuronal function in the bilateral dorsal striata with loss greater on the right compared to the left."

Dr. Jankovic spoke with Mr. Brockman on February 19, at which time his patient noted minimal improvement in his slowness and gait. According to Dr. Jankovic, "He is concerned about his cognitive decline, exacerbated by recent business-related stressors." Although Dr. Yudofsky recently prescribed Trazodone for Mr. Brockman's sleep problems, Dr. Yankovic noted that same day that cognitive symptoms were most likely "neurocognitive (underline his) sequelae of diagnosed Parkinson's disease."

On March 1, 2019, Michele York, PhD conducted a neuropsychological evaluation of Mr. Brockman after being referred by Dr. Pool. Current documented concerns included a decline in short-term memory for 2-3 years, along with his repeating himself, losing possessions, losing his train of thought, forgetting names of new individuals and of familiar locations, and increased difficulty completing tasks and multi-tasking.

His wife, Dorothy, told Dr. York of increased difficulty following directions, decision making, and response latencies. Mrs. Brockman also reported that her husband began to act out his dreams a couple years prior. Although he denied visual hallucinations, during the exam, according to Dr. York, "he pointed out a bug on the testing room floor that was not present to either the examiner or his wife." Dr. York diagnosed Mr. Brockman with

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

dementia of mild to moderate severity. In the Psychological Testing section below, Dr. York's battery and data are more closely reviewed.

Dr. Yudofsky followed up with Mr. Brockman on March 2, 2019. He noted Mr. Brockman's being bothered by not driving, which was based on medical and family advice, and that his difficulties included organizational problems.

Dr. Jankovic saw him again on March 13, and noted him to be feeling mentally worse despite levodopa. Dr. Jankovic wrote that he reviewed Dr. York's findings with Mr. Brockman and her diagnosis of dementia. On March 13, Mr. Brockman began an Exelon patch.

On March 20, 2019, Mr. Brockman visited the Alzheimer's Disease and Memory Disorders Center. Neurologist Melissa Yu, M.D. of Baylor College of Medicine examined Mr. Brockman at the request of Dr. Pool. Memory problems reportedly affected his ability to perform household tasks, to remember a short list of items, to find his way about outdoor/indoors, to find his way around familiar streets, to grasp situations or explanations, and to recall recent events. He reportedly exhibited a tendency to dwell on the past. At the same time, he denied forgetting where he had left things, forgetting known phone numbers, becoming confused as to the time, place, or other personal information.

Dr. Yu noted that Mr. Brockman told her of his previously "superior memory," with onset of symptoms about two years ago. His wife, who had accompanied him, described symptoms becoming more obvious after a stressful life event. He moreover reported some difficulty remembering to take his medications and had stopped driving per his physician's request, though he denied trouble handling finances. Mr. Brockman acknowledged feeling shaken about the neuropsychological test results. His son noted fluctuations with his decision-making abilities, with some good days and bad.

Dr. Yu also chronicled a history of at least four episodes of dream enactment behavior that had improved with Trazadone. In addition, Dr. Yu referenced "a possible visual hallucination during neuropsychological testing – wife notes it was a 'bad day'." Family noted that "gait symptoms improved with levodopa, particularly with one tab tid. Increase dose to two tabs tid led to more cognitive decline but family reports he seems to have stabilized in this regard. Cognitively he has improved with the Exelon patch as well. He reports minimal side effects except for feeling spacey at times."

Dr. Yu administered the Mini Mental State Exam (MMSE) and scored a 26/30. She characterized his behavior as repetitive, and noted him to "minimize deficit," although she observed his "comprehension" as normal. She concluded that Mr. Brockman showed Parkinsonism, and was considering Parkinson's with dementia or, because of his seemingly fluctuating course, dementia with Lewy bodies, also noted as (DLB). Dr. Yu "discussed

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **13** of **77**

possible implications of his work given cognitive impairment that should be discussed further with family," among other recommendations.

Rev. Jackson reported that he again expressed his concerns to Mr. Brockman in April 2019 about changes that he had noticed with Mr. Brockman's physical and cognitive functioning.

By fall of 2019, according to Rev. Jackson, some senior Reynolds & Reynolds management personnel were very concerned about Mr. Brockman's ability to moderate and speak extensively at the Reynolds' "birthday party" (a highly publicized company event viewed live and electronically by many Reynolds' employees) in November due to worries that Mr. Brockman might embarrass himself or undermine his own leadership authority because of his declining cognitive status. Rev. Jackson's account identifies impairment in Mr. Brockman's occupational functioning that peers found noticeable by 2019. According to Rev. Jackson, the concerns were such that company executives sought to limit his role in the high-exposure event.

On October 1, 2019, Dr. Pool administered the Memory Orientation Screening Test[2] (MOST) to Mr. Brockman, who scored a 12/29. The following interpretive statement was included in the medical record following Mr. Brockman's score, "This score falls below the cutoff for dementia in patients of this age and educational level and is typically associated with Major Neurocognitive Disorder, moderate (formerly moderate dementia). In the CogniSence research database of 3,500 patients, no patients in this score range had normal cognition, 2% had Mild Cognitive Impairment (MCI), and 98% had dementia."

On October 9, Mr. Brockman completed a questionnaire for neurologist Eugene Lai, MD, at Mr. Brockman's follow-up for his Parkinson's at the Methodist Neurological Institute. When asked to identify illness in close relatives and in himself, Mr. Brockman wrote "slight dementia," then crossed out "slight" and replaced it with "moderate."

Dr. York re-examined Mr. Brockman on December 3, 2019, nine months after her initial testing. This evaluation was conducted at the request of Attorney Kathryn Keneally from Mr. Brockman's legal defense team, denoting its forensic context.

In the evaluation, Mr. Brockman reported tax issues that involved "a small company that he sold to a family trust," and that "the government wants to confiscate the trust." He reported that the government is talking with people he used to work with and that he is concerned that the company will be "ruined. He has started to think about who will run the company but he thinks he can continue to be the chairman." Among other history he provided, Mr. Brockman denied behavioral or personality changes, and denied visual hallucinations.

---

[2] Clionsky, M., & Clionsky, E. **The Memory Orientation Screening Test (MOST) Accurately Separates Normal from MCI and Demented Elders in a Prevalence-Stratified Sample** Journal of Alzheimer's Disease and Parkinsonism. 3:1 2013 doi: 10.4172/2161-0460.1000109

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **14** of **77**

According to Mr. Brockman's wife, who accompanied him to the visit With Dr. York, Mr. Brockman's cognition fluctuated from minute to minute. She noted short term memory decline, and that he was reportedly unable to recall details from his daily activities even later in the day. Dorothy Brockman added that he had forgotten how to tie a tie or use the remote for the television, could not recall the code to unlock his phone, and indicated that she would drive him to the office. She described his ability to perform activities of daily living (ADL) as slow but independent, and at times requiring assistance. This included help with telephone use, shopping, finances (where his ability to handle money fluctuated from day to day), and medication reminders. Mrs. Brockman described him to be more violently acting out his dreams and to have been kicking in his sleep.

Mr. Brockman's initial evaluation with neurologist Dr. Eugene Lai was on January 8, 2020. Dr. Lai administered a MoCA, with Mr. Brockman scoring 20/30, missing five points with delayed recall. Dr. Lai considered diagnoses of Parkinson's disease with mild to moderate cognitive impairment, dementia with Lewy bodies, vascular parkinsonism, other secondary parkinsonism, or Parkinson plus syndromes.  The neurologist prescribed clonazepam .5 mg for the reported sleep agitation, and advised him to keep physically and mentally active.

Dr. Lai followed up with him on February 12, 2020. Mr. Brockman reported to be "working full time." However, his memory was noted to be 5/5 immediate; 0/5 delayed recall. Dr. Lai assessed him to have Parkinson's and mild cognitive impairment rather than dementia.

According to Ms. Ball, while acting as Mr. Brockman's personal assistant in early 2020, she began receiving calls from a senior Reynolds employee in Dayton who expressed concern that they had been sending emails to Mr. Brockman, but he kept responding to old emails that he had already replied to, rather than answering the new ones they were sending him.

In May 2020, Rev. Jackson indicated that due to his ongoing concerns about Mr. Brockman's further deterioration, he went to Mr. Brockman's home and told him that he needed a succession plan put in writing and notarized. It was then that Mr. Brockman reportedly told Rev. Jackson that he had been diagnosed with Parkinson's.

After Mr. Brockman stepped down as president, in summer 2020, Ms. Ball visited Mr. Brockman in his home, bringing a new chief of staff to meet him. She reports that he showed her a picture of his wedding but misremembered where he had gone on his honeymoon. Ms. Ball was aware of the error only because of having already been told where the honeymoon was.

Dr. Pool saw Mr. Brockman on October 5, 2020. Again, he administered a MOST – Memory Orientation Screening Test (MOST), in which Mr. Brockman scored 13/29.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **15** of **77**

Dr. York conducted follow-up psychological testing on October 7, 2020, again at the request of Ms. Keneally. In that evaluation, his son and Mr. Brockman noted further decline from their previous meeting ten months earlier, particularly with short-term memory, working memory, processing speed, and decision making.

Dr. York noted that Mr. Brockman's son, Robert, reported that on October 17 and October 18, 2020, Mr. Brockman expressed the belief that his computer had been unlocked and opened at night by his son and then by some other intruders who had posted pages from the dark web and with suicidal ideation content on his computer. Mr. Brockman took screen shots of his computer but they were actually Yahoo answer pages that were unrelated to the ones he believed were there. A review of their security system data did not reveal any evidence of intruders overnight.

According to Dr. York, on the October 7, 2020 testing, Mr. Brockman appeared confused at times "even in the middle of tasks that he originally was completing accurately." In addition, he showed markedly decreased ability to follow directions, and he lacked insight into the severity of his cognitive disabilities.

Dr. Pool wrote a declaration on November 25, 2020 in which he opined that contemplated court proceedings in San Francisco would be disorienting to Mr. Brockman because of his condition.

Dr. Lai, who saw him again on February 2, 2021, noted his memory to be impaired but stable, and diagnosed him with mild cognitive impairment.

On March 12, 2021, Mr. Brockman underwent a brain PET scan. The scan showed mildly reduced uptake in the right parietal lobe. The abnormality was read by the radiologist as "very mild," but "suggestive of early neurodegenerative disease, either Alzheimer's disease or dementia with Lewy bodies (Parkinson's disease with dementia). Findings were unlikely to represent frontotemporal dementia."

Mr. Brockman was admitted to Houston Methodist Hospital from March 15 to March 19, 2021 with klebsiella pneumonia and metabolic encephalopathy. He presented with altered mental status upon admission. Asked why he was in the emergency room, he replied "seems like a place to go fishing." Confusion, reportedly present for a day, was increasing. A head CT (3/15/21) showed no acute intracranial hemorrhage or mass effect.

Mr. Brockman underwent polysomnography or sleep study (Memorial Hermann Hospital Texas Medical Center) on April 29, 2021, in which he was diagnosed with Obstructive Sleep Apnea – severe. No REM sleep behavior disorder was recorded. However, conceded the specialist reviewing the study, "the diagnosis may have been missed," because only 29.5 minutes of REM sleep recorded.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **16** of **77**

On May 5, 2021, Dr. Ryan Darby, a court-appointed neurologist, conducted an examination and a cognitive assessment that consisted mostly of the Montreal Cognitive Assessment (MoCA), on which Mr. Brockman obtained a score of 13/30.

Psychiatrist Dr. Park Dietz collaborated with psychologist Dr. Robert Denney for the same court-appointed evaluation and interviewed Mr. Brockman with Dr. Denney on May 18 and May 20, 2021. Dr. Dietz concluded that Mr. Brockman does not appear to exhibit evidence of significant cognitive impairment. The psychiatrist also asserted that Mr. Brockman "has malingered the severity of his cognitive deficits in a variety of settings since at least 1/30/19," which was the date of his initial neurologic examination with Dr. Jankovic. He described that the two main bases for suspecting malingering are that Mr. Brockman presents in a medicolegal context in which he "evidences a marked discrepancy between his claimed disability (in test performance) and objective observations of his function as CEO and in speeches, testimony in civil law suits, and performance in interviews when not being tested."

Less significant but noted by Dr. Dietz as evidence for malingering is that he did not comply with the guidance of Dr. York to work on jigsaw or crossword puzzles or use a dry erase board and memory station, "which he denied using at his current home, or the guidance of Dr. Pool to avoid unfamiliar environments or changes in routine." Dr. Dietz added that he also based his opinion on "the atypical results of formal neuropsychological testing conducted by Dr. Denney" and "the onset of apparent of deficits during tests of cognitive functioning only after the Bermuda Police Service's raid on Evatt Tamine's Bermuda home on September 5, 2018, prior to which time Mr. Brockman evidenced only age-related memory deficits, whether one relies on his personal writings."

Dr. Dietz discounted the findings of the three neuropsychological exams by Dr. York, as well as other examiners who reported cognitive impairments evident in their exams, reasoning that as Baylor Medical Center-affiliates they were being unduly influenced by Mr. Brockman's VIP patient status.

From May 31 to June 11, 2021, Mr. Brockman was admitted to Houston Methodist Hospital with a pseudomonas infection in his urinary tract. He was characterized with confusion and agitation, physically attacking people, with staff noting he was, "Alert, talkative though answers to questions don't make sense." He required restraints in the evening due to his agitation, and was diagnosed with encephalopathy. Dorothy informed the geriatric consult that he was dependent in all activities of daily living (ADL) since March.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **17** of **77**

A June 6 MRI of the brain performed during the hospitalization showed nonspecific white matter findings reflective of more long-term microvascular changes. A head CT of June 7 showed brain atrophy with non-specific changes. The psychiatric consultant documented reports of nighttime visual hallucinations of black bugs. On June 7, Mr. Brockman scored 10/30 on the MoCA administered by the consulting psychiatrist, who diagnosed him with delirium. Mr. Brockman's delirium improved to the point that the hospital discharged him on June 11.

Mrs. Brockman, in our July 2021 interview, reported that since his sepsis, he has not returned to his baseline, and has gotten progressively worse. She also indicated that he had UroLift surgery with general anesthesia, which was confirmed in the medical record, on June 24, 2021 (nearly 3 weeks before my interview with him) that also resulted in further cognitive decline.

Specifically, Mrs. Brockman conveyed the following: Mr. Brockman expresses episodic confusion about where he is. He has thought at times that he was still at their previous home from which they moved in February, or in Aspen, or in Mexico. With prompts and cues, he usually reorients. She indicates that he has been confused about where things are located in their new house and "gets lost" there

According to Dorothy Brockman, her husband has problems recalling matters from day to day, including conversations. Sometimes, noted Mrs. Brockman, he does recall part of a conversation but not always. He will, she adds, ask her repeatedly for the same information. When asked about her husband's decision-making skills, Mrs. Brockman replied, "he doesn't have any…I do everything." She feels "he's helpless" and "can't do much." She has, for example, become responsible for the selling of their former home, took the necessary steps to buy their current home, and makes all the decisions regarding their day-to-day activities and finances. She expresses fears that he won't recover cognitively.

Rev. Jackson indicates that since Mr. Brockman's retirement, he visits Mr. Brockman about every two weeks and has noticed that he has progressively worsened over time. Although he reportedly has some days when "he's clear," most days he is "not functional at all." A few months ago, Rev. Jackson was visiting Mr. Brockman and Mr. Brockman could not identify a framed picture of his "favorite niece" that was sitting on a table. He finds that Mr. Brockman has episodes of just going "blank." Recently, he described that during a conversation Mr. Brockman rapidly changed topics and was not making sense, "like talking gibberish."

The last time he saw Mr. Brockman, remembers Rev. Jackson, was a little less than three weeks ago. Rev. Jackson reflects that seeing Mr. Brockman is like watching a building slowly collapse.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **18** of **77**

A 30-plus year friend of Mr. Brockman's, Dr. Stephen Slade, an ophthalmologist, observes that Mr. Brockman avoids conversations that are mentally challenging and that he no longer has detailed conversations with him due to his poor memory and processing ability.

On July 28, 2021 Mr. Brockman was administered a PET Amyloid study. The scan showed results diagnostic of dementia, with moderate to frequent neuritic plaques. Loss of gray-white matter distinction was more pronounced in the frontal and temporal regions as well.

A follow-up MRI of the brain performed on July 30 showed "moderate diffuse volume loss with proportional ventricular prominence. Mild chronic microvascular ischemic change." Neuroradiologist Christopher Whitlow M.D., also noted progression of Mr. Brockman's cerebral volume loss and changes of chronic microvascular ischemic disease in comparison to Mr. Brockman's MRI from November 2, 2018.

## COMPETENCY INQUIRY

Mr. Brockman has been charged in a complex, 39-count indictment that spans many years. In addition to the long timespan referenced in the indictment, there are multiple entities mentioned in the charges that have complex interrelationships among them. These include but are not limited to: Spanish Steps Holding, LLC; Point Investments Limited; St. John's Trust Company; A. Eugene Brockman Charitable Trust; Edge Capital Investments; Cabot Global Investments; Tangarra Consultants; Universal Computer Systems Holding; Vista Equity Partners, Vista Foundation Fund, Mirabaud Bank, Deutsche Bank; and Mountain Queen property. Awareness of the relationships among these entities and Mr. Brockman's recollection of his interactions within them and relevant individuals, accounting for documentation, digital evidence and dates of interest, would be integral to his informing his attorneys' efforts to assist him. In some instances, he may be the only potential informant.

Mr. Brockman first retained Jones Day to represent him in the summer-fall of 2018. From that time until July 2019, based on my discussions with his attorneys, Kathryn Keneally and Peter Romatowski, they estimated that they had spent approximately 40 hours in meetings and multiple phone calls with Mr. Brockman.

Over that period, his attorneys report that they were unaware that Mr. Brockman was undergoing treatment for Parkinson's disease and cognitive impairment. However, the attorneys describe experiencing difficulties with his thinking that prevented him from providing meaningful and integral information to them as they prepared for his defense.

On July 18, 2019, defense attorneys met with Mr. Brockman at a scheduled conference with a pre-arranged agenda. Unexpected to the attorneys, at the beginning of the meeting, according to attorney Peter Romatowski, Mr. Brockman presented some medical reports in a binder that he apologetically explained as the reason for why Mr. Brockman was having

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **19** of **77**

difficulty in their earlier meetings with him. Mr. Romatowski recalls Mr. Brockman presenting this information with an "air of embarrassment" and asked to have things provided to him in writing, which his attorneys felt was neither realistic nor possible.

Mr. Romatowski asserts that Mr. Brockman did not raise a question of whether his medical diagnoses would have any bearing on his case. Indeed, after his disclosure, the July 18 meeting reportedly moved on to the planned agenda. Following the meeting, however, Ms. Keneally asked him for copies of his medical records, and on several occasions thereafter. Mr. Brockman did not provide these records to his attorneys until September 25, 2019.

Much of the information beneficial for his defense can only come from Mr. Brockman himself in order to establish a set of facts over a long time period. According to his attorneys Ms. Keneally and Mr. Romatowski, Mr. Brockman has been unable to provide specific details about the majority of past events related to his charges. He has reportedly been unable to reconstruct past events even when exposed to emails or other relevant data. According to Ms. Keneally, he does not typically retain information or conversations from one meeting to the next or one phone call to the next.

There have been instances in which he has been told facts by one of his attorneys and then later will parrot them back, thinking that he was the one who remembered them. Moreover, the recalled -input will be recalled in a distorted or contradictory manner. When he remembers something, according to his attorneys, he typically cannot identify the source of the memory. For this reason, according to Ms. Keneally, it is impossible to trust what Mr. Brockman recounts. His attorneys observe that despite many meetings and calls that have occurred with them, he has not provided any new information that they did not already know of.

Ms. Keneally reflects that "he doesn't know that he doesn't know," seeming unclear what attorneys are asking from him; then, after giving them information that does not help them, he expresses the belief that he is being helpful.

Mr. Brockman has also been unable to set up phone calls or meetings with his attorneys. Their requests via email or other methods have generally not been responded to or are confused by Mr. Brockman. He acknowledged that when he tries to set up meetings or contact his attorneys, "I screw things up." Consequently, if his attorneys want to set up a meeting or convey a message to him, they must now enlist his wife's assistance to do so.

On December 8, 2020, Attorney Keneally filed a declaration in support of a competency hearing. In it, Ms. Keneally indicated that based upon her experiences of working with him, learning in July 2019 that he had been diagnosed with Parkinson's Disease and dementia was not a surprise. Ms. Keneally added that he was unable to access his memories reliably to be able to assist in his defense.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **20** of 77

Attorney Romatowski submitted his own declaration on December 8, in which he disclosed that in multiple meetings, Mr. Brockman was unable to provide his own account of past events, review or evaluate documents, or retain information that had been provided to him. Moreover, he felt that Mr. Brockman's disabilities have worsened over time.

## PREVIOUS PSYCHOLOGICAL TESTING

Mr. Brockman has been administered the Montreal Cognitive Assessment (MoCA) on numerous occasions since January 30, 2019, including a very recent administration on July 11, 2021 by geriatric psychiatrist Dr. Marc Agronin, an expert for the defense.

The MoCA is a brief global measure of cognitive functions that has become increasingly popular over recent years. It is based on a 0-30 point scale (higher scores denote better cognition) and is designed to screen for deficits in orientation, memory, naming, attention, language fluency and repetition, abstraction, and visuospatial/executive functions.[3]

Found to be an accurate, brief screen for all levels of cognitive impairment in Parkinson's Disease (PD), the MoCA has suggested cut-off scores of < 26/30 for PD-mild cognitive impairment (PD-MCI) and < 21/30 for PD-dementia.[4] The first five MoCA scores listed in the table below are highly consistent. However, the three most recent scores reflect a notable decline from prior levels reflecting further cognitive deterioration.

| Date | MoCA Score (out of 30) | Examiner |
|---|---|---|
| 1/30/19 | 19 | Dr. Jankovic |
| 3/1/19 | 19 | Dr. York |
| 12/3/19 | 19 | Dr. York |
| 1/8/20 | 20 | Dr. Lai |
| 10/7/20 | 19 | Dr. York |
| 5/5/21 | 13 | Dr. Darby |
| 6/7/21 | 10 | Geriatric psychiatrist while Mr. Brockman was hospitalized with delirium. |
| 7/11/21 | 9/28[5] | Dr. Agronin |

All scores noted in the table above fell in the PD-dementia range (< 21). In addition, Dr. Pool administered a global mental status measure, the Memory Orientation Screening Tool

---

[3] Rossetti, H.C. et al. **Normative Data for the Montreal Cognitive Assessment (MoCA) in a Population-Based Sample** Neurology 77 pp 1272-1275 2011. Hoops, S. et al. **Validity of the MoCA and MMSE in the Detection of MCI and Dementia in Parkinson Disease** Neurology 73 pp 1738-1745 2009.
[4] Dalrymple-Alford, J.C. et al. **The MoCA: Well-Suited Screen for Cognitive Impairment in Parkinson Disease**. Neurology 75 pp 1717-1725 2010
[5] Dr. Agronin neglected to score Mr. Brockman on the abstraction/similarity task and so those two points were not counted in the total.

(MOST), not the MoCA, in his evaluations on October 1, 2019 and on October 5, 2020. Mr. Brockman obtained scores of 12/29 and 13/29, respectively, which are highly consistent. According to the medical record, 98% of 3,500 patients in a research database with scores in this range had dementia.

In spite of the popularity of the MoCA as a screening instrument for dementia and mild cognitive impairment (MCI), it should not be used as a sole diagnostic tool for two reasons. The first is because a PD-dementia diagnosis requires impairment in more than one cognitive domain. Such a determination is beyond the scope of a brief cognitive measure to identify. Second, deficits in daily life resulting from the cognitive impairments,[6] which are also necessary for a diagnosis of PD-dementia, are not assessed by the MoCA. Consequently, in making diagnostic decisions about MCI versus dementia a critical factor is the degree to which an individual exhibits deficits in everyday or functional abilities.

Mr. Brockman underwent three neuropsychological evaluations between March 1, 2019 and October 7, 2020 by Dr. Michelle York at Baylor College of Medicine. The first exam was requested by Dr. Pool, Mr. Brockman's primary care physician, for "evaluation of his current cognitive, behavioral, and emotional functioning with the aim of informing medical differential diagnosis and facilitating clinical decision making." The last two were conducted as forensic exams requested by Mr. Brockman's attorney, Kathryn Keneally.

Dr. Dietz opined that due to Mr. Brockman's VIP status, Dr. York "could have biased her evaluation or those of others who took his and his family's reports regarding his functioning at face value," suggesting that Dr. York was prone or susceptible to diagnosing Mr. Brockman with dementia due to his contributions to Baylor College of Medicine. However, it is unclear how a diagnosis of dementia would be a preferred or biased diagnosis for a VIP. Arguably, a more "favorable" diagnosis would be something more benign and less pathological.

As for the inclination, described by Dr. Dietz, to take the report of Mr. Brockman's family "at face value" due to his VIP status, this is what clinicians do. Dr. York was getting collateral information about Mr. Brockman from the person who knows him best, which is a standard approach in any clinical neuropsychological assessment. Unless there was a reason to doubt the veracity of Mrs. Brockman's report of her husband's functioning, which apparently there was not, then it would have been completely within the norm to rely on her description of her husband's abilities. That noted, she did have the benefit of examining Mr. Brockman on multiple occasions spanning many months, and to have also have interviewed Mr. Brockman's son as a collateral informant.

---

[6] Emre, M. et al. **Clinical Diagnostic Criteria for Dementia Associated with Parkinson's Disease**
Movement Disorders 22:12 pp 1689-1707 2007

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **22** of **77**

With minor variations all three exams conducted by Dr. York were comprised largely of the same tests.  All three of the evaluations covered the main cognitive domains typically assessed in neuropsychological assessments. The specific tests used by Dr. York were ones commonly employed in clinical and forensic exams.

In all three evaluations, Dr. York used one embedded performance validity indicator, reliable digit span, on which Mr. Brockman obtained a valid range score on each evaluation. On the second exam, which was labeled a forensic evaluation, Dr. York added a second performance validity test, the Rey 15-Item Test (without recognition), on which Mr. Brockman again produced a valid range score.

However, in forensic exams, about six performance validity indicators are the norm[7] in order to assess effort and possible malingering across multiple measures and at different times during the evaluation. In addition, the Rey 15-Item Test (without the recognition condition as was the case in Dr. York's evaluation) has been criticized for a lack of sensitivity in detecting invalid performances.[8]

Mr. Brockman was fully informed of the forensic nature of his December 2019 evaluation by Dr. York. Such an exam could have significant ramifications for a claim of incompetence. Consequently, this was an "opportunity" for Mr. Brockman to exaggerate or malinger greater neurocognitive impairment than he actually possessed by demonstrating greater cognitive deficits than his previous assessment in order to falsely promote the perception that he was incapacitated. The fact that his performance was generally improved in this second, forensic evaluation in comparison to his first clinical assessment (see also table below for additional data on this point that reveals that fewer test scores on exam 2 fell in the exceptionally low range in comparison to his other evaluations) argues against a malingering or invalid profile, as does his performance on the validity measures that Dr. York did give him.

Across all three neuropsychological evaluations by Dr. York, Mr. Brockman consistently exhibited significant cognitive impairments with attention, mental processing speed, executive functions (e.g., planning, problem solving, cognitive flexibility, organization), memory, and visuospatial abilities. His performance in these domains fell well below expectations given his estimated premorbid abilities, which were likely high average to above average, or even higher. Qualitatively, Dr. York also reported that Mr. Brockman exhibited fluctuating attention, confusion, that he was perseverative, showed difficulty following directions, and limited insight into the severity of his cognitive limitations, which Dr. York found Mr. Brockman to minimize.

---

[7] Martin, P.K., Schroeder, R.W., & Odland, A.P. **Neuropsychologists' Validity Testing Beliefs and Practices: A Survey of North American Professionals**. The Clinical Neuropsychologist 29 pp 741-766 2015
[8] Morse C.L. et al. **Utility of the Rey-15 Recognition Trial to Detect Invalid Performance in a Forensic Neuropsychological Sample**. The Clinical Neuropsychologist 27:8 pp 1395-1407 2013

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **23** of **77**

Many of Mr. Brockman's test scores in the cognitive domains identified above ranged from below average to exceptionally low, reflecting significant cognitive impairment.

In all three testing sessions, Mr. Brockman was unable to either understand the directions for or maintain his attention to Trail Making Test, Part B, a measure of alternating attention on which he had to complete an alphanumeric sequence (e.g., 1-A-2-B-3-C and so on), which necessitated discontinuing the test prior to him completing it. Also, on exams 1 and 3, but not exam 2, Mr. Brockman became too confused to complete the Wisconsin Card Sorting Test, an executive function measure of problem solving and cognitive flexibility.

Again, the fact that Mr. Brockman was able to at least complete this measure on the second, forensic exam when he could not on the first and third assessments reflected better engagement on an examination that had direct bearing on his legal defense.

Mr. Brockman exhibited relative strengths and some average scores in the areas of language, fund of general knowledge, and abstract verbal reasoning. Although there was some variability across the three exams, many of Mr. Brockman's scores were consistent, but some decline with mental processing speed was also noted across time.

Dr. York's diagnostic impression in each of her three exams from March 2019 to December 2020 was that Mr. Brockman was demonstrating dementia and more specifically, evidence for dementia with Lewy bodies. She characterized his dementia as mild to moderate.

In December 2019, addressing the forensic context, Dr. York opined, "He is unable to recall and demonstrate a thorough understanding of the relevant elements of the issues surrounding the case and manipulate this information in a logical manner that will allow him to make comparisons and weigh his options," She further opined that he was unable to aid his own defense.

In October, 2020, Dr. York maintained the above opinions on his memory and Mr. Brockman's inability to "participate and aid in his defense," due to the "breadth and severity of his cognitive impairments, and fluctuations."

In the table below, Mr. Brockman's scores have been categorized within various qualitative descriptor and percentile ranges across his three neuropsychological exams with Dr. York. As is evident, the majority of Mr. Brockman's test scores fell below the average range and nearly half fell in the exceptionally low range, with the exception of the first forensic exam on 12/3/19, which is lower than 2% of the neuro-healthy population and well below his estimated baseline. Based on test scores alone, Mr. Brockman's performance would be consistent with dementia given evidence of impairment in more than one cognitive domain. However, impairment with daily life is also a requirement for PD-dementia.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page 24 of 77

Table of Test Score Labels/Descriptors Across Dr. York's Examinations

| Descriptors | 3/1/19 (30 scores) | 12/3/19 (32 scores) | 10/7/20 (29 scores) |
|---|---|---|---|
| Exceptionally High ≥ 98 percentile | 0 | 0 | 0 |
| Above Average 91-97 percentile | 0 | 0 | 0 |
| High Average 75-90 percentile | 0 | 1 (3%) | 2 (7%) |
| Average 25-74 percentile | 7 (23%) | 12 (38%) | 2 (7%) |
| Low Average 9-24 percentile | 4 (13%) | 6 (19%) | 6 (21%) |
| Below Average 2-8 percentile | 5 (17%) | 4 (13%) | 5 (17%) |
| Exceptionally Low < 2 percentile | 14 (47%) | 9 (28%) | 14 (48%) |

Dr. York reported "mild functional declines" in her first report. She indicated that Mr. Brockman's wife described that Mr. Brockman required assistance with instrumental activities of daily living (IADLs) in her second report. In her October 2020 evaluation, Dr. York reported that there were "significant functional declines."

Determining everyday impairment is more difficult to ascertain for Mr. Brockman than for most other individuals because he has staff, and does not need to participate in maintaining his household, known as IADLs, by shopping, washing laundry, preparing meals, paying bills, or cleaning the house.

Pinpointing the chronological course of everyday functional/IADL deficits evident in Mr. Brockman's home life is further complicated because of the structure and repetition in his everyday routine, the degree to which he could rely on over-learned information and habits, the role his family may have played in supporting him, and the lack of perfect concordance between cognitive abilities and functional capabilities. Mr. Brockman's vulnerabilities and IADL deficits would no doubt have manifested themselves more readily, for example, if he lived alone and had to maintain a household without any assistance from others.

In our interview, Mrs. Brockman described that her husband has exhibited cognitive decline beginning approximately 3 years ago when he began showing physical signs of Parkinson's disease (PD). Mrs. Brockman also believes that some at Reynolds and Reynolds were aware of his cognitive decline as well.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **25** of 77

Rev. Jackson's observations, consistent with that history, reflect significant concerns about Mr. Brockman's functioning in his occupational environment beginning in about 2017 or 2018. Other collateral interviews, including that of Ms. Ball, his paralegal Robin Gilliland, and Dr. Slade echoed impressions of Mr. Brockman's functional decline.

Dr. Robert Denney, a court-appointed neuropsychologist, conducted psychological testing of Mr. Brockman on May 19, 2021.

Dr. Denney administered three stand-alone performance validity tests (e.g., tests designed specifically to evaluate effort and malingering). These included: Word Memory Test; Nonverbal – Medical Symptom Validity Test; and Victoria Symptom Validity Test (VSVT). On the first two measures, Mr. Brockman obtained scores that fell in the invalid range. However, his scores also reflected a pattern that can be found with persons who have genuine memory impairment and thus invalid range scores cannot be presumed due to malingering or inadequate effort.[9]

On the VSVT Mr. Brockman "performed in an atypical manner" and "produced questionable results in both easy items correct and difficult items correct," particularly on the latter even though they are not substantially more difficult than the easy items. Dr. Denney reported that Mr. Brockman's score on the difficult items of 8 out of 24 correct was poorer than that found in dementia patients.[10] Wrote Dr. Denney, "From a probabilistic perspective, this score is lower than the score he would have achieved 92 times out of 100, if he had been blindfolded. Contemporary research indicates this low of score on this type of test in the context of a forensic examination should be interpreted as intent to fail because he had to have known the correct score in order to intentionally choose the incorrect score more often than what would have occurred by chance. In fact, it has even been termed the 'smoking gun of intent'."

However, the VSVT manual states that a score of 8/24 in recognizing the difficult items falls in the "questionable" range (e.g., 8-15) and not below chance (0-7), and although highly infrequent, it is not classified as invalid.[11] Consistent with a score of 7 or less being considered invalid, the test manual confirms that a probability of less than chance responding is anchored at less than 5% ($p < .05$), not less than 8% ($p < .0758$), as reported

---

[9] See Dr. Denney report dated June 21, 2021 p 24

[10] Dr. Denney cited the following in support of this contention: Loring, D.W. et al. **Victoria Symptom Validity Test Performance in a Heterogenous Clinical Sample** The Clinical Neuropsychologist 21 pp 522-531 2007. However, in this same study, in a group of mixed neurologic patients that included patients with Parkinson's disease, 4% had scores of 8 on the difficult VSVT items and those patients had a mean age (47.4 years), considerably younger than Mr. Brockman.

[11] Slick, D., Hopp, G., Strauss, E., & Thompson, G.B. **Victoria Symptom Validity Test Professional Manual** Lutz, FL:PAR. 2005

in Dr. Denney's analysis. The VSVT manual also states that "the most common method of feigning observed in the VSVT research groups was low performance on difficult (but not easy) items," which was not the pattern of results obtained by Mr. Brockman who also produced an easy item score that fell in the questionable range (15/24).

Last, the manual states that "the Total Items Correct score provides the most objective and quantifiable evidence regarding whether respondents are exhibiting biased responding on the VSVT," and not on the Difficult items alone. The manual goes on to state that the "Total Items Correct score is based on the greatest number of items and, therefore, is one of the most reliable VSVT scores." Mr. Brockman's Total Correct score was 23/48, which falls in the middle of the questionable range (18-29), but not the invalid range (0-17).[12]

Mr. Brockman's scores on other validity indicators administered in Dr. Denney's test battery, such as reliable digit span, the validity indicators on the Conners Continuous Performance Test 3, the Minnesota Multiphasic Personality Inventory-3, Sentence Repetition Test, and the Denney-Competence Related Test, fell within acceptable limits.

The Denney-Competence Related Test is a forced-choice questionnaire that assessed Mr. Brockman's understanding of legal terms and procedures. Mr. Brockman's score on this questionnaire fell within acceptable limits without any evidence of exaggerated legal knowledge deficit or malingering even though it tested issues clearly and directly related to competence.

Because he only considered the explanation that Mr. Brockman failed validity testing, Dr. Denney stated that all other tests from his examination were not a credible reflection of Mr. Brockman's actual cognitive abilities and were thus uninterpretable. However, there is no reason to conclude that all test results are invalid within the context of a questionable performance on one performance validity measure.[13]

Dr. Denney subsequently listed his test scores "only for comparison purposes." I have summarized below the test results from his examination.

Summary of Test Results from Dr. Denney's Examination (Interpretive Score Guidelines: T scores: Mean = 50, Standard Deviation = 10; * = Standard Scores: Mean = 100, Standard Deviation = 15; ** = Scale Scores: Mean = 10, Standard Deviation = 3; % =

---

[12] Slick, D., Hopp, G., Strauss, E., & Thompson, G.B. **Victoria Symptom Validity Test Professional Manual** Lutz, FL:PAR. 2005
[13] Loring, D.W. & Goldstein, F.C. **If Invalid PVT Scores are Obtained, Can Valid Neuropsychological Profiles be Believed?** Archives of Clinical Neuropsychology 34 pp 1192-1202 2019

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **27** of 77

percentile) Interpretations in bold under "Note" reflect scores on additional performance validity measures.

| Test | Raw Score | Interpretive Score | Note |
|---|---|---|---|
| **Connors Continuous Performance Test 3 (higher scores = worse performance)** | | | **Valid Performance** |
| Detectability | | 69T | Elevated |
| Omissions | | 90T | Very Elevated |
| Commissions | | 49T | Average |
| Perseverations | | 90T | Very Elevated |
| Hit Reaction Time (HRT) | | 75T | Atypically Slow |
| HRT Standard Deviation | | 69T | Elevated |
| Variability | | 60T | Elevated |
| HRT Block Change | | 83T | Very Elevated |
| HRT Inter-Stimulus Interval Change | | 41T | Low |
| **Wechsler Adult Intelligence Scale -IV** | | | |
| Processing Speed Index | | 68* | Exceptionally Low |
| Block Design | 2 | 1** | Exceptionally Low |
| Digit Span | 23 | 8** | Average |
| Symbol Search | 9 | 5** | Below Average |
| Coding | 10 | 3** | Exceptionally Low |
| Reliable Digit Span | 10 | N/A | **Valid range score** |
| Trails A | 80 seconds | 27T | Exceptionally Low |
| Trails B | D/C 300 secs | 18T | Exceptionally Low |
| Controlled Oral Word Association Test | 27 words | 38T | Low Average |
| Animal fluency | 14 | 40T | Low Average |
| Sentence Repetition Test | 14 | 40T | **Low Average – Valid range score** |
| Neuropsychological Assessment Battery (NAB) Naming Test | 29 | 46T | Average |
| **NAB Memory Module** | | 58* | Exceptionally Low |
| List learning total | 5 | 19T | Exceptionally Low |
| List B recall | 1 | 28T | Exceptionally Low |
| List A short delay recall | 0 | 19T | Exceptionally Low |
| List A long delay recall | 0 | 24T | Exceptionally Low |
| List A forced choice | 9 | 11%ile | Low Average |

| recognition – true positives | | | |
|---|---|---|---|
| List A forced choice recognition-false positives | 12 | <1%ile | Exceptionally Low |
| Story Learning IR | 0 | 19T | Exceptionally Low |
| Story Learning DR | 0 | 29T | Exceptionally Low |
| Daily Living IR | 14 | 19T | Exceptionally Low |
| Daily Living DR | 1 | 19T | Exceptionally Low |
| Daily Living Delayed Recognition | 2 | <1%ile | Exceptionally Low |
| Shape Learning Immediate Recognition | 13 | 45T | Average |
| Shape Learning Delayed Recognition | 5 | 48T | Average |
| **Reynolds Intellectual Assessment Scales-2** | | | |
| Verbal Intelligence Index | | 106* | Average |
| Nonverbal Intelligence Index | | 58* | Exceptionally Low |
| Composite Intelligence Index | | 80* | Low Average |
| **Wisconsin Card Sorting Test** | | | |
| Total Errors | 96 | 29T | Exceptionally Low |
| Perseverative Errors | 81 | 25T | Exceptionally Low |
| Categories Completed | 0 | 6 -10%ile | Below-Low Avg. |
| **Rey Complex Figure** | | | |
| Copy (out of 36) | 18 | ≤1%ile | Exceptionally Low |
| Immediate recall (out of 36) | 0 | <20T | Exceptionally Low |
| Delayed recall (out of 36) | 0 | <20T | Exceptionally Low |
| Recognition correct | 18 | 39T | Low Average |

Dr. Denney additionally referenced inconsistencies in Mr. Brockman's presentation and differences between his self-report and test performance that the psychologist concluded signified efforts to disingenuously appear cognitive impaired. Some of these inconsistencies included Mr. Brockman's claim that he had not remembered who had tested him on May 19th (Dr. Denney) even though he had made it clear at other times that he had recognized him and remembered what had happened the day before in other parts of the examination, that he was "able to discuss in reasonable detail" the recent changes at Reynolds and Reynolds but could not recall the current president, and that his orientation fluctuated within short periods of time.

Overall, the test results listed above reflect significant cognitive deficits in multiple domains, consistent with prior assessments. Mr. Brockman's performance on verbally-

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **29** of 77

related measures appears to be a relative area of strength particularly with naming and verbal fluency, which again is consistent with previous evaluations.

## NEUROPSYCHOLOGICAL ASSESSMENT

This neuropsychological assessment was conducted to examine Mr. Brockman's thinking skills as they relate to his competence to stand trial, specifically those domains that are under question that include attention, memory and learning, mental processing speed, language, problem solving, and executive functioning.

Mr. Brockman's neuropsychological evaluation took place on Tuesday (9 AM – 2:20 PM), July 13, and Wednesday (9 AM – 1:20 PM), July 14, 2021, in the law offices of Jones Day in Houston, TX.

### Test Procedures

The test procedures listed below were chosen to assess multiple domains of neuropsychological functioning such as orientation, global cognitive status (e.g., immediate memory, visuospatial/constructions, language, attention, delayed memory), attention/mental speed/working memory, language functions, visuospatial abilities, and abstract reasoning/problem solving/executive functioning.

Some measures were also chosen because they had been administered in the previous three or four exams, which would allow for direct comparisons of Mr. Brockman's current performance with prior examinations. The assessment procedures also include multiple performance validity tests in order to evaluate for potential malingering or suboptimal effort.

- Rey 15 Item Test with Recognition
- Wechsler Memory Scale-III: Orientation & Information; Mental Control subtests
- Boston Diagnostic Aphasia Exam: Complex Ideational Material subtest
- Medical Symptom Validity Test
- Wechsler Adult Intelligence Scale-IV: Digit Span; Similarities; Comprehension subtests
- Connors Continuous Performance Test 3 (CPT3)
- Repeatable Battery for the Assessment of Neuropsychological Status (RBANS)
- Trail Making Test - A
- Rey Complex Figure Drawing – Copy Condition
- A-Test
- Brief Test of Attention
- Test of Memory Malingering (TOMM)

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **30** of 77

- Controlled Oral Word Association Test (FAS)
- Animal Fluency
- Coin-in-the-Hand Test
- Stroop Color and Word Test (Golden Version)
- Delis-Kaplan Executive Function System (D-KEFS): Twenty Questions Test
- Iowa Gambling Task, Version 2 (IGT2)
- Behavioral Rating Inventory of Executive Function (BRIEF: self-report)
- AD8 Dementia Screening Interview (self-report)
- Personality Assessment Inventory (self-report)

## Medications

Exelon patch, Miralax, Carbidopa-Levodopa, Bupropion, Synthroid, Eliquis, Trazadone, Vytorin, Testosterone gel, Rosuvastatin Calcium, Seroquel

## Observations of Behavior

Mr. Brockman presented for the evaluation as alert and pleasant. He arrived on time for both days of the testing accompanied by his caregiver and "male nurse," as he described him, Frank Gutierrez. Mr. Gutierrez assisted Mr. Brockman with getting in and out of the chair, walking, and toileting.

Casually dressed both days, Mr. Brockman was appropriately groomed. He walked slowly and somewhat unsteadily, particularly after sitting for an extended period. His movements were slow; he exhibited a slight tremor with tasks requiring fine motor coordination.

Affect was restricted. Mr. Brockman described his mood as "not very good" and acknowledged feeling sad. He rated his depression as 5/10 (0 = no depression at all; 10 = worst depression ever). He indicated that his sleep is fine and reported getting eight hours of sleep the night before both evaluations. He described his appetite as "so-so," and indicated that he had lost 20 pounds but had gained some back.

Mr. Brockman's speech was fluent although somewhat monotonal, with low volume, and variably slow in rate, consistent with Parkinson's. There was no evidence of slurred speech or mispronunciation of words except in one instance when he used the word "priorily" for "previous," which he recognized as an error.

Although Mr. Brockman's use of syntax and vocabulary was intact, he made several comments during the course of the evaluation that were confusing or contradictory. He also tended to provide more detail than necessary to explain himself or a topic and had episodes when he was tangential and off-topic, as noted below, but responded well to being redirected to the question that was asked.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **31** of **77**

Mr. Brockman's auditory comprehension was variable. He was generally able to follow simple test directives without difficulty. However, he often required that instructions be repeated when the task demands were more complicated. In those instances, he would ask for clarification or to have directions repeated if he did not understand them. Nevertheless, at times he was unable to understand the test instructions even with my repeating or rephrasing them to him several times (e.g., Color Word condition on the Stroop Color and Word Test). In contrast, his comprehension for casual conversation (which requires far less "precision" of understanding), appeared generally adequate.

Mr. Brockman exhibited quite intact social skills. He was eager to please and did not relate in a defensive or oppositional manner. He was polite and courteous. Apart from his intermittent confusion, there was no evidence of disinhibition or socially inappropriate comments or behaviors. His eye contact was appropriate and Mr. Brockman showed good speech pragmatics with turn-taking during conversations.

When discussing some aspects of his history, his interests, or his family, he was verbally facile. On the surface of conversations, such as when describing the history of his company or his associations with long-time business acquaintances, there was little overt indication of cognitive impairment, although (and perhaps because) there was no way to fact check his accounts.

He retold several stories across all three evaluations (e.g., also with Drs. Darby and Denney/Dietz) with significant consistency. However, when greater specificity of past events was needed or when he was asked to clarify certain points, it then became obvious that his understanding or recall of events was much less proficient and reliable. Thus, he often projected far more of a veneer of mental normalcy than he actually possessed. Yet even during those times when he was clearly confused, Mr. Brockman spoke with confidence and self-assurance.

There was no evidence of significant distractibility from environmental stimuli, such as ambient noises. He was not at all responding to internal stimuli. There was no evidence of hallucinations or psychotic thinking.

Mr. Brockman appeared to persevere and persist at tasks even though he was often slow in completing them. In only two instances (Brief Test of Attention, Delis-Kaplan Executive Function System Twenty Questions Test) did Mr. Brockman indicate that he could not perform on a test prior to it being terminated by the examiner.

His stamina declined notably after lunch or by early afternoon based on his self-report and by observation. On the first day of the examination, testing was discontinued at 2:20, and on the second day at 1:20, as he was too fatigued to persist, which is not uncommon in individuals with PD. Mr. Brockman's lack of stamina was further complicated by the inefficiency of his slowed responses. For example, in May, Mr. Brockman was able to

complete Dr. Denney's entire test battery in just one day, including completing the MMPI-3, which is 330 items, in 40 minutes. He also completed all three of Dr. York's evaluations in one day. In contrast, in July, it took him two days to complete my testing and that was without his sitting for a lengthy self-report questionnaire like the MMPI.

A summary of Mr. Brockman's orientation on both dates of testing presents in the table below. He was oriented on both days to self, age, date of birth, place of birth, year, and city, but was confused in other domains.

Of particular note was evidence of perseveration (e.g., the motor or verbal repetition of a previous response to a different stimulus[14]) when, after being asked for his mother's first name, he was then asked for the US president, and he asked if I meant who was president when his parents were married. Thus, he became "mentally stuck" on the idea of his mother (parents), which influenced his response to following unrelated question. When asked what the last big holiday was, he indicated "New Year's." I asked him how long ago that was and he replied, "last year."

Wechsler Memory Scale-III Information and Orientation Subtest Performance (+ = correct)

| Orientation Question | 7/13/21 (Tuesday) | 7/14/21 (Wednesday) | Comments |
|---|---|---|---|
| 1. Full name | + | + | |
| 2. Age | + | + | |
| 3. Date of birth | + | + | |
| 4. Place of birth | + | + | |
| 5. Mother's first name | + | + | |
| 6. US President | "Roosevelt" | "At the time they got married?" No. Now. "Joe…can't recall last name" | On 7/14, after being asked for his mother's first name, he thought that I was asking for the president when his parents married. I believe that he was confused by this question on both 7/13 and 7/14, which is why he stated Roosevelt as president on 7/13. On 7/14, I gave him the prompt of 'begins with B' |

---

[14] Perseveration is an abnormal, repetitive response that is outside of a person's volitional control and is associated with many types of brain dysfunction often, but not exclusively, occurring with damage to the frontal lobes.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **33** of **77**

| | | | |
|---|---|---|---|
| | | | after he said "Joe" for the president's name. He was then able to recall Biden. |
| 7. Previous President | "McKinley – pure guess" | + | |
| 8. Year | + | + | |
| 9. Month | "September" | "September" | |
| 10. Day of the month | "7th" | "12th" | |
| 11. Name of place | "Hotel I've never been in but once before" | + "Houston head of Jones Day" | |
| 12. City | + | + | |
| 13. Day of week | "Thursday" | "Friday" | |
| 14. Approximate time (within 30 minutes) | + | Incorrect by 42 minutes | |
| **Total correct** | **8/14** | **9/14** | |

Mr. Brockman's orientation and his awareness of space and time fell below the 10th percentile compared to others in his age group.

During the initial clinical interview, Mr. Brockman exhibited episodic confusion that at times emerged rapidly. With regard to his legal case, he was asked what competence to stand trial meant and he initially replied that it had never been explained to him, which was clearly in error. However, on further questioning he indicated "that I've got answers to all the questions that, you know, they ask." When asked who "they" referred to, he replied that it was the government's attorneys.

Mr. Brockman was asked what he was charged with and he replied that it was for failure to report income. He was aware that if found incompetent to stand trial then he would not go to trial and that the judge is the one who decides that question.

When asked what kind of information he thought his lawyers needed from him, he replied that he did not know because he had not talked with them about this subject, contrary to his attorneys' assertions. In spite of that, he felt that he has been very helpful in giving them the information that they need. Specifically, when asked to estimate how helpful he thinks he has been in providing them with important information on a scale of 0 to 10 (0 = not helpful at all; 10 = exceedingly helpful), he gave himself a "99.7," which is in stark contrast to what his attorneys have conveyed. Thus, Mr. Brockman does not appreciate how his cognitive limitations adversely affect his ability to aid his attorneys in his defense.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **34** of **77**

Mr. Brockman also expressed that his attorneys believe that they need to understand the inner workings of Reynolds and Reynolds in order to defend him. However, his attorneys have been clear that the nature of the charges against him do not involve the operations of Reynolds and Reynolds. Consequently, he does not appreciate what is important for his lawyers to know in defending him – even when they tell him.

There were other times when his responses were difficult to follow logically, were incorrect, or were contradictory. Some of these instances are noted below with the corresponding page numbers of the transcription of my interview.

- Mr. Brockman thought that he was seen by Drs. Denney and Dietz 10 months ago, when it was only two months previously (7), and initially believed that their evaluation was "requested by my doctors" (9).

- Between pages 12-16, Mr. Brockman initially stated that one of his Baylor doctors communicated the results of the evaluation by Drs. Denney and Dietz to him, but upon further questioning, he indicated that the results were communicated to his lawyers. However, by the end of this line of questioning, he returned to the thought that the evaluation results were communicated through his physicians. It was clear that he did not know if or who reported any results to him but he was unable to appreciate what he did not know.

- At times Mr. Brockman was further confused about the specific roles and relationships of Drs. Dietz and Denney to the legal process, including referring to them at times as attorneys or being part of "a legal attorney practice" (19-22).

- On page 32, Mr. Brockman did not recall whom I was consulting to, even though I had explained this to him at the beginning of my interview.

- Mr. Brockman's urologist, Dr. Lerner, whom he has seen for many years in follow-up for his bladder cancer, referred him to his current primary care physician, Dr. Pool. However, in trying to describe to me how Dr. Pool became his PCP (in 2018), Mr. Brockman's explanation was at times incorrect, contradictory, or difficult to follow. For example, Mr. Brockman told the story to Drs. Darby, Denney, and Dietz that he was prepped for a cystectomy by Dr. Lerner and when Dr. Lerner asked him how he was doing, he told him that he was "not worth a crap," which prompted Dr. Lerner to refer him to Dr. Pool, which the medical record supports. However, in describing these events to me, he indicated that after telling the doctor that he was "not worth a crap," the doctor said "we need to look and see what's happening. That's how they discovered cancer the first time was he was treating me but not in regards to the urological matters. That wasn't his

specialty. His specialty was, you know, cancer." This is inaccurate as this exchange in 2018 had nothing to do with his cancer diagnosis in 2006.

Upon further questioning, Mr. Brockman indicated that he was referring to Dr. Pool rather than Dr. Lerner but then added again that Dr. Lerner got him an appointment to see Dr. Pool. He then added, "at any rate, I got involved with Dr. Lerner again as a patient," which is not at all factually correct as there had not been a time over the last 10+ years when he had not been a patient of Dr. Lerner's. This is not the same sequence of events that he described in his previous evaluations. It appeared that Mr. Brockman was at times confusing Dr. Lerner with Dr. Pool (39-41).

- Mr. Brockman was unable to name his home address (42). He changed addresses not long ago, but he would be expected to learn and to know where he was living.

- He was unable to name a medical problem that he had other than Parkinson's disease (46).

- There was confusion and inconsistency in Mr. Brockman's description of his recent hospitalizations. Initially he indicated that he had not been hospitalized this year. However, he eventually stated correctly that he was in the hospital three times but never spontaneously mentioned sepsis or confusion as the cause, which he was very specific about with Drs. Denny and Dietz in May. He also incorrectly stated that he was in the hospital until five or six days previously, "since August 1," and that he was catheterized for the first time in mid-July (47-52). These two statements were also factually incorrect.

- Mr. Brockman was confused about the caregiver who accompanied him to the evaluation. He incorrectly stated that his caregiver's name was Fred, who was not his "regular male nurse," because, he reported, his usual caregiver was unavailable to accompany him (53, 54, 67). I did speak with Frank Gutierrez who is Mr. Brockman's usual caregiver, and who accompanied him to the evaluation on both days. Mr. Gutierrez indicated that he was not surprised that Mr. Brockman confused him with someone else as this has happened previously, including Mr. Brockman occasionally thinking that Mr. Gutierrez is an employee of Reynolds and Reynolds. He also indicated that on the first day of the evaluation, Mr. Brockman was using the restroom and he was unaware of the location of his body relative to the urinal and urinated on the floor, which Mr. Brockman did not recognize until Mr. Gutierrez intervened.

- Mr. Brockman indicated initially that he retired as president and CEO of Reynolds "the first of last year," but then corrected that statement to the first of *this* year, but

then stated again that it was the first of *last* year. When pressed, he insisted incorrectly that he stepped down from both positions at the same time in January and that he held the two positions of president and CEO for the full year before he retired (61-63). However, the record indicates that he stepped down as president on June 3, 2020 and as CEO on November 5, 2020.

- On page 63, Mr. Brockman indicated that he invoked a disability clause for his retirement, which he denied in his interview with Drs. Denny and Dietz.

- Mr. Brockman was confused about the timelines of his son's two marriages (63-64). For example, he initially indicated that his son married for the first time 3 to 4 years ago and that he remarried about three years ago. When queried with this time discrepancy, he indicated that he had confused his son's divorce (3-4 years ago) with his son's first marriage, which he thought was five years ago. However, a December 2007 contemporary medical note described that his son married (and may have divorced) in that year.

Mr. Brockman also exhibited episodic confusion throughout the examination, particularly after lunch and in the early afternoon. A striking example of an episode of significant confusion is described below:

- The *A-Test* was administered on July 13, 2021 at approximately 1:10 (immediately after lunch). On this test, Mr. Brockman was read a random series of 60 letters at the rate of one letter every other second and asked to tap on the table each time he heard the letter A, but not tap for any other letter. Mr. Brockman committed 5 errors of omission, meaning that he did not tap the table five times when the letter A was read. Behaviorally, he did not appear engaged with the task, so when the test concluded I questioned him about it, leading to the following exchange:

  ○ TG: Can you tell what I just asked you to do?

  ○ RB: It would all take place and be set up. The subsidiary other than that we wouldn't worry about it which was dealing with issues with the lawsuit.

  ○ TG: What was I just doing with you?

  ○ RB: I think you were doing – to make sure everything was done properly.

  ○ TG: Did I just read you a series of letters?

  ○ RB: Yes.

  ○ TG: What did I ask you to do?

- o RB: Try to remember them.

I repeated the instructions that I had given him previously and then asked him what I was going to do.

- o RB: Whatever you need to do with PC set up and send email for whatever you want.

- o TG: Why are you here with me?

- o RB: Our forte is building software packages that are operated by people who are not top tier.

- o TG: Who am I?

- o RB: A consultant charged by my attorneys with teaching more about the software and how it works and to bring prospects and suggest customers to us.

- o TG: What is my profession?

- o RB: A doctor who deals with 3rd party firms to help firms become more productive.

I explained my role regarding his competence to stand trial and again explained the directions to the A-Test, then asked what I was going to do with him.

- o RB: You're here because our management…don't have enough smarts about what is going on to successfully deal with it – we have not only existing issues, I believe we're going to have a big battle with CDK before it's over and we'll need a higher level of knowledge that you'll bring forward.

- o TG: Can you tell me the date today?

- o RB: 12th

- o TG: Month and year?

- o RB: December 2012

- o TG: City we are in?

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

> o   RB: Houston
>
> o   TG: Place we are in?
>
> o   RB: Jones Day office building
>
> o   TG: What am I doing here?
>
> o   RB: Inspecting our files and record keeping – our organization and
>     personnel competencies are really important to what is happening.

I reiterated my role and purpose for seeing him. Also again read the directions for the A-Test twice and asked him to take the test again.  On the second administration of the A-Test he did not make any errors.

- *Brief Test of Attention* (BTA) was administered on July 14, 2021 at approximately 1:00. In the BTA, the patient is read 10 lists of letters and numbers that range from four to 18 items from a recording at the rate of 1 item/second. There are two forms. In the first form, the patient is asked to keep track of how many numbers they hear in each list. In the second form, the patient is asked to keep track of how many letters they hear in each list.

In the example, Mr. Brockman was read: "7 – B – X" and I asked him how many numbers were in the list, to which he replied "2." I asked him which two numbers were on the list and he replied, the 7 and the X. I stated, "X is not a number." He stated, "without X you don't have any options." I reminded him about the instructions again and read the second example of "F – 3 – 6." I asked him how many numbers were on this list and he stated, "two, because the fact that everybody was included with the…part of the process that's going to rely on a list, but the list changes dynamically." I asked him to clarify what he meant and he replied, "we have a situation where the bulk of the project is brand new stuff." He then began talking about satellite monitoring of a computer-based system in his business. I moved on to the following questions.

> o   TG: What is the date and where are we?
>
> o   RB: 15th November 2021. Houston. Houston office of Jones Day.
>
> o   TG: Who am I?
>
> o   RB: Consultant that's been engaged by my attorneys to first understand me
>     at kind of a nuts-and-bolts level so they can advise me on what actions
>     should be taken on my behalf.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **39** of **77**

- ○ TG: Why was I asked to see you?

- ○ RB: To evaluate my mental state or condition so that I can rationally respond to questions by opposing attorneys.

- ○ I explained the directions to the BTA again and attempted to administer the test to him. He got the first 2/10 items correct only (items increase in length and complexity as the test progresses) and he did not give any answers to the last 4 items as he appeared overwhelmed with the task. He then acknowledged that he was too tired to focus, stating "I'm tapped out." He then spontaneously stated that he had blood poisoning that had significantly affected his functioning and that "I was out for a week." I asked him how many times that happened to him and he indicated just once. I asked him when it happened and he indicated "tail end of September…August." I informed him that it was only July so it could not have happened in September or August, to which he indicated that perhaps he was wrong but the medical record should clear up the confusion, if they kept good records.

At the beginning of the second day of testing, I asked Mr. Brockman the following:

- TG: Can you please tell me who I am and what my role in seeing you?

- RB: You've been retained by my attorneys…to give me information on what might likely things might turn out to be.

- TG: Tell me more about that.

- RB: The opposition attorneys don't have unlimited time with me so I presume they're concerned with how to get that done.

- TG: What very specific issue was I asked to see you about?

- RB: The most important issue is the competency test in front of the judge.

- TG: Is my role involved in the competency issue?

- RB: I would think so.

- TG: What did we do yesterday?

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

- RB: A number of conventional paper and pencil kinds of tests.

- TG: Can you tell me any specifics?

- RB: No

- TG: About how much time did we spend?

- RB: Started about 10 and went to 5:30 [actually started at 9 and went to 2:20]

**Test Results**

Test results can be described in a number of different ways, for example as a percentile or various standard scores, although all provide the reader with information about how an examinee performed on a task relative to how a normal or neuro-healthy person would of about the same age and in some cases with the same education level as the subject (e.g., the normative group).

For example, a percentile refers to the percent of cases or people in the normative group who would have scored equal to or lower than the examinee. Thus, if a person's score falls at the 30th percentile, it means that he or she scored equal to or higher than 30% of "normals." That also means that 70% of the normative group would have scored higher than the examinee. The other standard scores include those with a mean of 100 and a standard deviation of 15 and T scores, which have a mean of 50, and a standard deviation of 10. Unless otherwise noted, the higher these standard scores, the better the performance.

Both of these types of scores provide the same information, which is where the examinee's score falls relative to the normal comparison group.

Some scores will be described as "raw scores," which refers to the actual number of items that the examinee may have responded correct or incorrect. However, without a raw score being converted to a standard score or percentile, the reader cannot ascertain the meaning of that score. A table below shows the relationships among the standard scores and percentiles, which will be used to describe Mr. Brockman's performance across multiple test procedures, as well as the descriptive labels associated with them.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **41** of **77**

| Standard Scores (Mean=100; Standard Deviation = 15) | T Scores (Mean = 50; Standard Deviation = 10) | Corresponding Percentiles | Descriptive Labels |
|---|---|---|---|
| 130  and higher | 70 and higher | 98 and higher | Exceptionally High |
| 120-129 | 63-69 | 91-97 | Above Average |
| 110-119 | 57-62 | 75-90 | High Average |
| 90-109 | 43-56 | 25-74 | Average |
| 80-89 | 37-42 | 9-24 | Low Average |
| 70-79 | 30-36 | 2-8 | Below Average |
| Below 70 | Below 30 | Less than 2 | Exceptionally Low |

**Test Validity**

Performance validity tests (PVTs) or indicators were administered to Mr. Brockman in order to obtain empirical and objective evidence of effort and possible malingering on ability tests. It is important to recognize that many PVT norms or cut-off scores used to identify invalid responding were established with a young to middle age population. Therefore, in an elderly population, particularly among those with some cognitive loss, an older adult may obtain an invalid PVT score due to normal or abnormal aging rather than inadequate effort.[15]

There are two broad types of performance validity tests. One type is referred to as a stand-alone measure that is designed specifically for and is administered only to assess effort and malingering. There is no other clinical reason for administering this type of PVT. The other type is known as an "embedded" effort test. This type of effort indicator has been developed as part of a clinically useful neuropsychological test so that effort can be assessed while also evaluating the examinee's cognitive abilities. Both types of performance validity indicators were administered to Mr. Brockman over the two-day evaluation. Validity test results are described below.

- *Medical Symptom Validity Test (MSVT)*: Mr. Brockman obtained invalid range scores on the MSVT but his profile also met criteria for possible genuine memory impairment rather than poor effort. This means that his invalid range scores were also consistent with a genuine memory disorder. Consequently, inadequate effort

---

[15] McGuire, C., Crawford, S., & Evans, J.J. **Effort Testing in Dementia Assessment: A Systematic Review Archives of Clinical Neuropsychology** 34 pp 114-131 2019; Zenisek, R. et al. **Prevalence of Below-Criterion Reliable Digit Span Scores in a Clinical Sample of Older Adults** Archives of Clinical Neuropsychology 31 pp 426-433 2016; Fazio, R.L., Faris, A.N., & Yamout, K.Z. **Use of the Rey 15-Item Test as a Performance Validity Test in an Elderly Population Applied neuropsychology** 29:1 pp 28-35 2019

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **42** of **77**

cannot be concluded based on his MSVT scores alone, given that his performance can be plausible and consistent with dementia.[16]

- *Test of Memory Malingering (TOMM: Trials 1 & 2)*: The original cut-off proposed by the TOMM manual (for Trial 2) has been shown in some studies to result in a high number of false positive errors (e.g., falsely identifying an examinee as putting forth inadequate or malingering) among the cognitively compromised elderly.[17]

  Mr. Brockman's score on the TOMM fell in the valid range on Trial 2 even without making accommodations for his age and possible cognitive status. However, there was evidence of perseveration (e.g., the repetition of a motor or verbal response to varied stimuli) on the TOMM. Specifically, during the recognition condition for Trial 1, Mr. Brockman was asked to point to or touch one of two pictures of objects that he had been shown previously.  After this task was completed, he was shown pictures of objects one at a time that he was asked to look at and memorize (Trial 2). As the first two pictures were shown to him, he reached out to touch or point to them as he had done in the previous recognition trial even though he had been instructed to just look at the pictures and try to remember them.

  Also, there was just one picture being shown to him at a time so there was no need to specifically identify the object from among others. Pointing to the pictures was a motor response that had persisted from the previous task (perseveration), even though the task demands were different.

- *Rey 15-Item Test Plus Recognition (RFIT)*: The most commonly used RFIT cut-off for suspect effort has been found to produce high numbers of false positive identifications for examinees over the age of 60.[18] As such there is no one well-established cut-off score to determine validity in an older population, particularly if cognitive issues are present. However, pattern analysis of very rare scores has been suggested as a pathognomonic marker of a likely disingenuous performance. Applying these criteria to Mr. Brockman's performance revealed valid range scores that were not consistent with suboptimal effort or malingering. Qualitatively, I exposed Mr. Brockman to the test stimuli a second time and gave him additional time to try to remember the stimuli but by this point he appeared mentally overwhelmed with the task and could not recall any of the items.

---

[16] Singhal, A. et al. **High Specificity of the Medical Symptom Validity Test in Patients with Very Severe Memory Impairment** Archives of Clinical Neuropsychology 24 pp 721-728 2009
[17] McGuire, C., Crawford, S., & Evans, J.J. **Effort Testing in Dementia Assessment: A Systematic Review Archives of Clinical Neuropsychology** 34 pp 114-131 2019
[18] Fazio, R.L., Faris, A.N., & Yamout, K.Z. **Use of the Rey 15-Item Test as a Performance Validity Test in an Elderly Population Applied neuropsychology** 29:1 pp 28-35 2019

- *Coin-in-the-Hand Test*: Valid range score.

- *A-Test*: On the first administration of the A-Test to Mr. Brockman, his score (errors) fell in the invalid range. However, due to my observations of him during the administration of the A-Test, when it was completed, I asked him a series of questions about the procedure (see Observations of Behavior section) and he was obviously confused about the task demands as well as my purpose for seeing him. Thus, in my opinion, the test administration was not valid. After a good deal of questioning and repeating the test instructions several times to him, he seemed better oriented to the moment and better able to follow the test demands. The A-Test was administered a second time, on which Mr. Brockman obtained a valid range score.

- *Reliable Digit Span (RDS)*: Valid range score.

- *Effort Index of the Repeatable Battery for the Assessment of Neuropsychological Status*: Valid range score.

- *Effort Scale of the Repeatable Battery for the Assessment of Neuropsychological Status*: Valid range score.

- *Behavioral Rating Inventory of Executive Function – Self-Report (BRIEF)*: On the BRIEF, the examinee answers 75 questions about their own views of their executive functions and self-regulation in their everyday lives. Thus, the BRIEF is not a performance or ability measure, but rather, a self-report questionnaire. As such, PVTs do not apply to questionnaires like the BRIEF, but validity indicators are "built into" the BRIEF in order to establish a person's approach to the questions and to determine whether the examinee is presenting himself in an overly negative or pathological light. Mr. Brockman's scores on these indicators fell within acceptable limits reflecting a valid BRIEF profile without evidence of symptom exaggeration or embellishment.

- *Connors CPT 3 Validity*: The Connors CPT assessment report stated that Mr. Brockman made an unusually high number of omission errors. This performance may indicate a clinical impairment. However, other possibilities should be considered such as fatigue, misunderstanding of the instructions, or lack of motivation to respond with full effort. Based on my observations of Mr. Brockman during the entirety of the CPT as well as other clinical data obtained during my evaluation, it is my professional opinion that his high number of omission errors

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

was due to his clinical impairment, particularly with his very slow reaction time, and did not reflect any issues with motivation or effort.

*Summary of Effort Testing:* Across the nine performance validity indicators, seven scores fell in the valid range. Two fell in the invalid range but could be accounted for by genuine cognitive impairment. On the BRIEF, a self-report questionnaire of executive functioning and behavioral regulation, Mr. Brockman's responses were considered valid as he did not answer questions in an unusually negative or pathological light, which reflects no effort to exaggerate or embellish symptomatology. The pattern of Mr. Brockman's memory performance in which his recognition memory [19] was superior to his free recall was consistent with the typical memory pattern found in individuals with genuine memory deficits.[20] Consequently, in my opinion, Mr. Brockman's neuropsychological test scores were valid and did not reflect evidence of malingering.

**Global Cognitive Status**

The *Repeatable Battery for the Assessment of Neuropsychological Status* (RBANS) was administered to Mr. Brockman as a global measure of neuropsychological functioning that assesses abilities in multiple cognitive domains. He obtained valid range scores on two embedded performance validity indictors on the RBANS, ensuring valid test scores. His subtest and index scores are listed on the table below.

On the RBANS, Mr. Brockman exhibited below average to exceptionally low scores on subtests assessing his ability to absorb new information as well as his ability to spontaneously recall it after a delay or distractor. This included his ability to learn and recall a 10-item word list read to him four times (total recall = 3 words; delayed recall = 0 words), a short story of 12 units of information read to him twice, from which he recalled only five units of information after the second exposure and only one unit after a delay, and his ability to recall a geometric figure that he had drawn about 15 minutes before and then asked to draw it again from memory (delayed figure recall = 0).

Recognition testing that provided him with cues or multiple choices to help with his recall facilitated retrieval somewhat but did not normalize it, which is consistent with the pattern seen in most genuine memory disorders. Overall, Mr. Brockman's immediate and delayed recall memory indices fell below the 1st percentile compared to others in his age group.

---

[19] In testing a person's ability to retain information after a delay or distractor, an individual is usually asked to first recall the information spontaneously (free recall) but then may also be given cues or multiple choices to see they prompt further retrieval (recognition). In most genuine memory disorders, recognition is superior to free recall. Hence, the reason we all prefer multiple choice test questions to fill-in-the-blank.
[20] Green, P. **Medical Symptom Validity Test (MSVT): User's Manual** Edmonton, Canada: Green's Publishing Inc. 2004

This reflects significant impairment with his ability to learn, retain, and retrieve newly learned information.

Another area of impairment was noted on visuospatial tasks requiring him to copy a moderately complex visual design and to compare/match angles of varying degrees. Here, his performance was equal to or better than only 2% of the age-matched normative group (standard score = 69). Thus, Mr. Brockman exhibited significant cognitive impairment in three of five cognitive domains assessed by the RBANS (e.g., immediate memory, delayed memory, visuospatial/constructions).

Other cognitive domain indices (e.g., language and attention) were areas of relative strength falling in the low average range or at the 12-13th percentiles, which is also well below premorbid expectations. Mr. Brockman's total scale score (standard score = 59), which reflects his overall performance on the RBANS, was lower than 99% of same age peers, which is significantly lower than expectations given his premorbid educational and occupational attainment. That is reflective of a significant cognitive disorder such as dementia.

| Repeatable Battery for the Assessment of Neuropsychological Status (RBANS) | Raw Score | Standard Score or Percentile | Qualitative Descriptor |
|---|---|---|---|
| Immediate Memory Index | | 57 | Exceptionally Low |
| List Learning | 3 | <1st %ile | Exceptionally Low |
| Story Memory | 9 | 5th %ile | Below Average |
| Visuospatial/Constructional Index | | 69 | Exceptionally Low |
| Figure Copy | 15 | 9th %ile | Low Average |
| Line Orientation | 9 | <3rd %ile | Below Average |
| Language Index | | 83 | Low Average |
| Picture Naming | 10 | >75th %ile | High Average |
| Semantic Fluency | 8 | 1st %ile | Exceptionally Low |
| Attention Index | | 82 | Low Average |
| Digit Span | 11 | 84th %ile | High Average |
| Coding | 7 | 1st %ile | Exceptionally Low |
| Delayed Memory Index | | 48 | Exceptionally Low |
| List Recall | 0 | 3-9th %ile | Below-Low Average |
| List Recognition | 14 | <3rd %ile | Below Average |
| Story Recall | 1 | 1st %ile | Exceptionally Low |
| Figure Recall | 0 | <1st %ile | Exceptionally Low |
| Total Scale | | 59 | Exceptionally Low |
| Story Recognition (11 questions with three multiple choice alternatives – not standardized) | 7/11 | | |

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **46** of **77**

## Attention/Mental Speed/Working Memory

This cognitive domain is concerned with how well Mr. Brockman is able to attend to and focus on stimuli over time without becoming distracted (vigilance or sustained attention), how rapidly he is able to process or react to stimuli (processing speed), and how well he is able to mentally hold and manipulate information in his mind while performing other cognitive operations with it (working memory).

An important cognitive ability is vigilance or sustained attention. This was assessed with the *Connors Continuous Performance Test 3 (CPT3)*, a computer-administered test that required Mr. Brockman to press the spacebar on the computer every time a target stimulus was presented. The results are expressed in T scores with a mean of 50 and a standard deviation of 10. Higher scores are associated with a worse or less efficient performance. As the table below reveals, 6 of 9 subtests fell more than two standard deviations above the normative mean and one subtest (omissions) fell four standard deviations above the mean, demonstrating significant inattention.

That score represents Mr. Brockman's failure to respond to the target stimulus when presented. He also displayed very slow response or reaction times. However, he did not exhibit impulsivity or significant perseverative responses. Overall, the CPT3 reflects a significant level of inattention and very slow reaction time. This CPT was also administered in May by Dr. Denney. Those results will be compared to this current assessment below.

The *Mental Control subtest of the Wechsler Memory Scale-III* is a combined measure of working memory and mental processing speed. On this task, Mr. Brockton was asked to recite as rapidly as he could sequences forward and backward, such as counting from 1-20, the days of the week, and the months of the year. He was able to count forward to 20, but then also added 21, 22, 23 until I asked him to stop, which was likely another example of perseveration. He lost his place while reciting the alphabet and then started counting from 20 in the middle of the task, again, a likely example of perseveration. He was able to recite the days of the week forward but made one error in reciting the months (forgetting October). He was unable to reverse the days of the week or the months without error and could not master the task of alternating adding 6's with saying the days of the week. In all, Mr. Brockman's performance fell well below average, at only the 1st percentile.

The *Brief Test of Attention* is a measure of selective attention that is described in the Observations of Behavior section of this report. Here, Mr. Brockman initially had significant difficulty understanding the task demands. However, with repetition and further discussion, he eventually seemed to understand what I was asking him to do and he was able to get the first 2 of 20 items correct. However, he was then unable to keep pace with the speed of the presentation of the stimuli and acknowledged that he could not do the task.

U.S. v. Robert T. Brockman
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **47** of 77

*Trail Making Test, Part A*, required Mr. Brockman to connect the numbers 1-25 on a sheet of paper as fast as he could. He had been able to do this task in his previous evaluations, albeit very slowly, but during my assessment, he had difficulty finding the stimuli on the page and was unable to complete the test in 300 seconds, which is when I discontinued it. I also administered a measure of working memory, *Digit Span*, in which Mr. Brockman was asked to repeat digits forward, backward, and in sequence from lowest to highest. His performance overall fell at the 5th percentile. However, he had significantly more difficulty as the working memory demands increased. For example, he was able to sequence only two digits from lowest to highest, a performance that was better than or equal to only 1% of same age peers.

Mr. Brockman was exceptionally slow in reading individual words (<15T) and naming colors (<8T) (*Stroop Color and Word Test*) within 45 seconds. He was unable to grasp the instructions to the last condition (Color Word) in which he was asked to name the color of ink that a color word was printed in (e.g., the word BLUE is printed in RED ink, so the correct answer is red).

In all, significant impairments with attention, mental processing speed, and working memory were evident across all measures.

| ATTENTION/MENTAL SPEED/WORKING MEMORY | | | |
|---|---|---|---|
| **Test** | **Raw Score** | **Standard Score or Percentile** | **Qualitative Descriptor** |
| **Connors Continuous Performance Test 3 (higher T-scores = worse performance)** | | | |
| Detectability | | 70T | Very Elevated |
| Omissions | | 90T | Very Elevated |
| Commissions | | 43T | Low |
| Perseverations | | 44T | Low |
| Hit Reaction Time (HRT) | | 83T | Atypically Slow |
| Hit Reaction Time Standard Deviation | | 84T | Very Elevated |
| Variability | | 86T | Very Elevated |
| HRT Block Change | | 76T | Very Elevated |
| HRT Inter-Stimulus Interval Change | | 66T | Elevated |
| **Wechsler Memory Scale-III** | | | |
| Mental Control | 7 | 1st %ile | Exceptionally Low |
| **Brief Test of Attention** | Unable to complete | | |
| **Trail Making Test - A** | D/C @ 300 secs. | <1st %ile | Exceptionally Low |
| **Wechsler Adult Intelligence Scale-IV** | | | |
| Digit Span | 14 | 5th %ile | Below Average |
| Digit Span Forward | 8 | 25th %ile | Average |

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page 48 of 77

| | | | |
|---|---|---|---|
| Digit Span Backward | 5 | 16th %ile | Low Average |
| Digit Span Sequence | 1 | 1st %ile | Exceptionally Low |
| **Stroop Color and Word Test** | | | |
| Word Reading | 19 | <15T | Exceptionally Low |
| Color Naming | 16 | <8T | Exceptionally Low |
| Color Word | Unable to comprehend | | |
| RBANS Attention Index | | 82 | Low Average |

**Comparison of CPT3 Performance from May to July 2021**

As noted previously, the Connors CPT3, a measure of sustained attention or vigilance, was also administered by Dr. Denney in May. Below is a list of the subtest T scores from each testing date. A higher T score is associated with a worse performance and thus less efficient attentional functions and reaction times. In comparison to Mr. Brockman's performance in May, his score on the perseverations subtest in July was improved. However, on four other subtests, his performance deteriorated significantly from May to July (see scores in bold and with two * below) with his inattention (as measured by omissions) and slower reaction times.

Connors CPT 3 T-Scores 5/19/21 and 7/14/21 (Mean = 50, Standard Deviation = 10)

| Connors CPT 3 Subtests (higher scores denote worse performance) | 5/19/21 | 7/14/21 |
|---|---|---|
| Detectability | 69 | 70 |
| Omissions | 90 | 90 |
| Commissions | 49 | 43 |
| Perseverations | 90 | **44*** |
| Hit Reaction Time (HRT) | 75 | **83**** |
| Hit Reaction Time Standard Deviation | 69 | **84**** |
| Variability | 60 | **86**** |
| HRT Block Change | 83 | 76 |
| HRT Inter-Stimulus Interval Change | 41 | **66**** |

Note. * = significantly lower (better) score over time. ** = significantly higher (worse) score over time. Significance ($p$ < .05) based on critical values from Connors' test manual (p 104).

The figure below graphically represents the percent of omission errors that Mr. Brockman committed due to inattentiveness. The top bar represents Mr. Brockman's performance from July and the bottom bar his performance in May. The numbers in the circles are the percent of omission errors committed in each block of time. Each omission error represents a moment of inattention when a target stimulus flashed on the screen and Mr.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **49** of **77**

Brockman failed to respond to it. The fewer omission errors, the better is one's attention.



### Connors CPT 3 - % Omission Errors by Block Time

Mean % omission errors: May 2021 = 21; July 2021 = 36

Overall, Mr. Brockman's performance reflects a decline in attentiveness over time and significantly greater problems in July than May in maintaining his focus on the task. He was also much slower to respond or react to the test stimuli. Clinically, this could manifest as Mr. Brockman being inattentive and unfocused during conversations, while reading, or when listening to others speak as well as being significantly slower to react to stimuli in his environment compared to same-age peers.

**Language Functions**

As with previous evaluations, Mr. Brockman's language functions are a relative area of strength. His language index on the RBANS fell in the low average range although there was a significant discrepancy between his ability to name objects (> 75th percentile) and name fruits and vegetables in one minute (1st percentile). Another measure of *semantic fluency* or naming objects in a category (animals) in one minute fell at the 5th percentile.

A phonemic verbal fluency task, *Controlled Oral Word Association Test*, in which Mr. Brockman was asked to name words that begin with the letters F, A, and S, each within 60 second intervals fell in the below average range or at the 4th percentile. This type of verbal fluency task is also related to executive functioning and not just language. Apart from his objective score on this measure, there were some aspects of his performance that were illustrative of Mr. Brockman's thought processes.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **50** of **77**

For example, when naming words that begin with F, he stated "information – I should say information and location. Are we still in the F's?" While naming words beginning with the letter A, he stated "extreme" as an exemplar. While naming words beginning with S, Mr. Brockman stated, "system as in system programmer" and then "services as in system services," which appeared to represent an element of perseveration.

On a formal measure of auditory comprehension (*Complex Ideational Material* [CIM] from the Boston Diagnostic Aphasia Exam), Mr. Brockman was read 12 pairs of yes/no questions about common knowledge information or after hearing short passages about some topic or event. For each question within a pair, the correct answer for one question is "yes" but for the other question the correct answer is "no". Thus, in order to obtain a point for each pair, examinees have to get both questions in the pair correct to earn a point so the score range is 0-12. Mr. Brockman's score (7/12) revealed no difficulty answering simple yes/no questions but his comprehension declined significantly when asked to respond to more semantically complex verbal stimuli.

Here, his performance fell more than four standard deviations below the mean compared to healthy same-age peers. However, his performance was consistent with patients with Alzheimer's disease and vascular dementia (both means = 6.7/12).[21] It is possible that Mr. Brockman's difficulty on this measure is unrelated to comprehension, per se, and has more to do with fluctuating attention and the ability to make inferences.

In another study of dementia patients[22] in which the researchers rescored portions of the CIM that resulted in a score range of 0-16, Mr. Brockman's score of 11 was consistent with the mean score of mild dementia patients with mild periventricular and deep white matter alterations (mean = 11.63), which again categorizes his performance as reflecting dementia.

| *LANGUAGE FUNCTIONS* | | | |
|---|---|---|---|
| Test | Raw Score | Standard Score or Percentile | Qualitative Descriptor |
| Controlled Oral Word Association Test (FAS) | 19 | 32T | Below Average |
| Semantic Fluency (Animals) | 11 | 33T | Low Average |
| Complex Ideational Material | 7 | 8T | Exceptionally Low |
| RBANS Language Index | | 83 | Low Average |

---

[21] Vuorinen, E., Laine, M., & Rinne, J. **Common Pattern of Language Impairment in Vascular Dementia and in Alzheimer Disease** Alzheimer Disease and Associated Disorders 14 pp 81-86 2000
[22] Giovannetti, T., Hopkins, M.W., Crawford, J., Bettcher, B.M., Schmidt, K.S., & Libon, D.J. **Syntactic Comprehension Deficits are Associated with MRI White Matter Alterations in Dementia** Journal of the International Neuropsychological Society 14 pp 542-551 2008

**Visuospatial Functions**

Visuospatial functions were assessed based on Mr. Brockman's ability to reproduce (copy) geometric designs and to match angles of varying degrees. On the Figure Copy subtest of the RBANS, his performance fell at the 9th percentile although his ability to copy a more complex geometric design, the *Rey Complex Figure*, was much less proficient and fell below the 1st percentile (Exceptionally Low). His copy of the design contained just a few elements of the model and none in their correct location. He was also quite slow in completing his drawing. Given the significant difficulty Mr. Brockman was demonstrating with his reproduction and the time he was taking to copy the design; I discontinued the test after 10 minutes. However, the RCF was administered later in the day after lunch and thus fatigue may have been a contributing factor.

A non-motor measure of visuospatial functioning, Line Orientation from the RBANS, that required him to match angles of varying degrees fell at only the 1st percentile compared to same-age peers.

| *VISUOSPATIAL FUNCTIONS* | | | |
|---|---|---|---|
| **Test** | **Raw Score** | **Standard Score or Percentile** | **Qualitative Descriptor** |
| Rey Complex Figure (copy) | 3 | <1st %ile | Exceptionally Low |
| RBANS Visuospatial/Constructional Index | | 69 | Exceptionally Low |

**Abstract Reasoning/Problem Solving/Executive Functioning**

These cognitive functions encompass logical reasoning, conceptual/abstract thinking, the ability to think flexibly and generate possible solutions to problems based on corrective feedback. These abilities, among others, are often described as executive functions in that they integrate data from multiple sources in order to generate and organize a plan of action.

A fundamental measure of abstract verbal reasoning is the *Similarities* subtest from the *Wechsler Adult Intelligence Scale-IV (WAIS-IV),* in which Mr. Brockman was asked to describe how two things are alike, such as an apple and a banana. Performance on this task is affected by educational level. Compared to same-age peers, Mr. Brockman's abstract reasoning on this task fell in the low end of the average range and at the 25th percentile, lower than expected given his educational history. His verbal reasoning, knowledge of conventional standards of behavior and social judgment, and common sense (*Comprehension subtest from the WAIS-IV*) was more proficient and fell in the high average range (75th percentile).

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **52** of **77**

On a measure of problem solving that required Mr. Brockman to think conceptually and to appreciate commonalities and differences among objects (*D-KEFS Twenty Questions Test*), he was shown an array of 30 items and instructed to ask as few yes/no questions as he needed in order to identify the object I had in mind. It is a standardized and normed version of the game 20 questions. To do well on this task, it is important for the examinee to initially ask as broad questions as possible and then to ask more detailed questions as one narrows down the possibilities.

On the first trial, Mr. Brockman initially asked a broad question but then seemed unable to follow-up with more appropriate questions. He also tended to perseverate on some questions that did not assist him in identifying the correct object. His problem-solving approach was disorganized and random. In all, Mr. Brockman showed confusion with how to approach this task and was unable to identify the correct object in the first two trials. In addition, he took considerable time thinking of the next question to ask. Consequently, this test was discontinued without administering the last two trials so no formal score was assigned.

The *Stroop Color Word Test*, described previously, is considered a measure of executive functioning because the third, Color Word, trial requires impulse control as the examinee is asked to name the color of ink a list of words is printed in and to inhibit the more natural response of reading the words themselves. Mr. Brockman was unable to understand the task demands for this condition so it was not administered to him.

The *Iowa Gambling Task, Version 2 (IGT2)* is a measure of decision making administered to Mr. Brockman via computer. On this task, he was shown four decks of cards on the screen that when chosen would generate some "money" but could also take some away. His hypothetical winnings and earnings were always displayed on the top of the computer screen. By way of trial and error and getting immediate feedback with each card he chose from each deck, his task was to generate as much "money" as he could and avoid losses. The task ends after 100 card choices. Mr. Brockman's overall performance, Net Total, reflected that he generally made advantageous choices to increase his winnings and avoid losses. However, in his last trial of 20 cards, NET 5, his decision making became disadvantageous, perhaps secondary to fatigue, as he began to choose cards from the decks that contributed more to losses than gains. According to the manual, this task usually takes between 10-15 minutes, but Mr. Brockman required nearly 25 minutes to complete the activity, consistent with his slowed rate of processing noted on many other cognitive tasks. He likely performed more proficiently on this test than with Twenty Questions because this measure is more structured and so he did not have to think as flexibly given that his response options were already there for him to choose from.

| *ABSTRACT REASONING/PROBLEM SOLVING/EXECUTIVE FUNCTIONING* | | | |
|---|---|---|---|
| **Test** | **Raw Score** | **Standard Score or Percentile** | **Qualitative Descriptor** |
| **Wechsler Adult Intelligence Scale-IV (WAIS-IV)** | | | |
| Similarities | 17 | 25th %ile | Average |
| Comprehension | 24 | 75th %ile | High Average |
| **Delis-Kaplan Executive Function System (D-KEFS)** | | | |
| Twenty Questions Test | Unable to complete | NA | Exceptionally Low |
| **Stroop Color and Word Test** | | | |
| Word Reading | 19 | <15T | Exceptionally Low |
| Color Naming | 16 | <8T | Exceptionally Low |
| Color Word | Unable to complete | | |
| **Iowa Gambling Task, Version 2** | | | **Decision-Making** |
| NET TOTAL | 16 | 49T | Advantageous |
| NET 1 | 2 | 54T | Advantageous |
| NET 2 | 0 | 45T | Advantageous |
| NET 3 | 10 | 54T | Advantageous |
| NET 4 | 6 | 50T | Advantageous |
| NET 5 | -2 | 43T | Disadvantageous |

Mr. Brockman was administered the *Behavioral Rating Inventory of Executive Function – Self-Report (BRIEF)*. On the BRIEF, the examinee answers 75 questions about their own views of their executive functions and self-regulation in their everyday lives. Higher T scores (mean = 50, standard deviation = 10) are associated with greater executive dysfunction. The BRIEF questions were read to Mr. Brockman in order to increase the speed of his responses, and I recorded his answers on the response form. The interpretive report indicated that his responses did not reveal excessive negativity, which rules out exaggeration or embellishment of symptoms, and were thus considered valid.

Mr. Brockman's BRIEF profile revealed that compared to same-age peers, Mr. Brockman reported difficulties with his ability to adjust to changes in routine or task demands, initiate problem solving or activity, sustain working memory, plan and organize problem-solving approaches, attend to task-oriented output, and organize environment and materials. His overall behavioral and emotional regulation and impulse control were not considered problematic for him. In general, his BRIEF profile was consistent with the report from his wife, his attorneys, other collateral informants, and from his test performance. He is quite

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **54** of **77**

dependent on others to guide him through challenges and even everyday tasks, such as scheduling meetings.

Mrs. Brockman completed the BRIEF on her husband. According to the interpretative report, Mrs. Brockman's responses were not overly negative resulting in a presumed valid profile. Mrs. Brockman's description of her husband indicates that he is having more difficulty than his peers with the following executive functions: adjusting to changes in routine or task demands, working memory, planning and organizing problem-solving approaches, attending to task-oriented output, and organizing environment and materials. However, there were no significant problems noted with impulsive/disinhibited responding or modulating emotions. The table below lists the T scores for Mr. and Mrs. Brockman and the corresponding scale or index on the BRIEF. Again, high T scores denote greater difficulty. As is evident, significantly high (abnormal) scores are noted in multiple areas of executive functioning for both Mr. Brockman's self-ratings and Mrs. Brockman's ratings of her husband, reflecting significant executive dysfunction.

BRIEF T Scores (mean = 50, standard deviation = 10) for Mr. and Mrs. Brockman's Ratings

| Scale/Index | Mr. Brockman's Self-Ratings | Mrs. Brockman's Ratings of Mr. Brockman |
|---|---|---|
| Inhibit | 56T | 57T |
| Shift | 95T | 81T |
| Emotional Control | 45T | 58T |
| Self-Monitor | 57T | 72T |
| Behavioral Regulation Index | 64T | 66T |
| Initiate | 86T | 87T |
| Working Memory | 105T | 76T |
| Plan/Organize | 99T | 81T |
| Task Monitor | 83T | 69T |
| Organization of Materials | 78T | 68T |
| Metacognition Index | 98T | 79T |
| Global Executive Composite | 85T | 75T |

I administered the *AD8 Dementia Screening Interview*[23] to Mrs. Brockman by reading the questions aloud to her and asking her to respond. The AD8 is a well-established and psychometrically sound questionnaire completed by an informant or a patient to gauge an individual's problems in the areas of memory, problem-solving abilities, orientation, and daily activities due to cognitive changes "in the last several years." It is comprised of eight

---

[23] Galvin, J.E., Roe, C.M., Coats, M.A., & Morris, J.C. **Patient's Rating of Cognitive Ability** Archives of Neurology 64 pp 725-730 2007

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page 55 of 77

items and respondents indicate their endorsement as Yes (1) or No (0). Items are summed resulting in a possible range of 0-8.

The AD8 is sensitive in discriminating among normal aging, mild cognitive impairment, and dementia. It is highly correlated with results from neuropsychological testing, Clinical Dementia Rating, biomarkers of Alzheimer's Disease (AD), and neuropathologic AD.[24]  A cut-off score of $\geq 2/8$ is considered a positive screen for the presence of cognitive impairment.

Mrs. Brockman acknowledged that her husband has shown a change in the last several years in all eight cognitive areas noted on the questionnaire. These include problems with judgment, less interest in hobbies/activities, repeating himself ("a little"), trouble learning how to use a tool/appliance/gadget, forgetful about the month/year ("half the time"), trouble handling complicated financial affairs, trouble remembering appointments ("may remember he has an appointment but not with whom, the time, the reason, etc."), and daily problems with thinking and/or memory. The score of 8/8 on the AD8 is thus highly suggestive of and consistent with significant cognitive impairment, including dementia.

Mr. Brockman was also administered the AD8 on himself, on which he also endorsed all eight symptoms. However, on two questions, he seemed to rely on what he has been told rather than what he is aware of. For example, when asked if he repeats the same things over and over, he replied, "people tell me I do," which prompted him to reply yes. Also, he was asked if he has daily problems with thinking and/or memory to which he responded, "my wife says I do so I must." Thus, on at least two questions, Mr. Brockman did not evaluate his own abilities or difficulties and deferred to the views of others, which reflects some lack of insight into the degree of cognitive problems that he is experiencing.

Mrs. Brockman completed the Functional Activities Questionnaire (FAQ) to assess her views of her husband's functional abilities in managing his day-to-day affairs, also known as instrumental activities of daily living (IADLs), due to cognitive and not physical limitations. IADLs are important to consider in the diagnostic process because they require higher cognitive ability than basic activities of daily living (e.g., grooming, bathing, dressing) and are more likely to be affected earlier in the dementia process. The FAQ is administered annually to thousands of research participants as part of the National Alzheimer's Coordination Center longitudinal research study[25] and is sensitive to the effects of mild

---

[24] Morris, G.M., Holden, T.R., Weng, H., Xiong, C., Coble, D.W., Cairns, N.J., & Morris, J.C. **Comparative Performance and Neuropathologic Validation of the AD8 Screening Instrument** Alzheimer Disease and Associated Disorders 34:2 pp 112-117 2020. Razavi, M. et al. **Comparison of Two Informant Questionnaire Screening Tools for Dementia and Mild Cognitive Impairment: AD8 and IQCODE** Alzheimer Disease and Associated Disorders 28:2 pp 156-161 2014
[25] Weintraub, S et al. **The Alzheimer's Disease Centers' Uniform Data Set (UDS): The Neuropsychologic Test Battery** Alzheimer's Disease and Associated Disorders 23:2 pp 91-101 2009

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **56** of 77

cognitive impairment, Parkinson's disease, and Alzheimer's with suggested cut-off scores ranging from >2 to >6.[26]

The FAQ is composed of 10 items in which an informant (or a patient) rates the examinee's ability to manage complex daily tasks by rating him or her as dependent (3), requiring assistance (2), has difficulty but does by self (1), normal (0), never did the activity but could do now (0), or never did and would have difficulty now (1). Thus, a score range of 0-30 is possible with higher scores denoting more impaired higher functional abilities. Mrs. Brockman's ratings of her husband's IADLs are listed in table below. The total score on the FAQ is 26/30, which surpasses all established cut-off scores for the presence of significant functional impairments consistent with dementia.

Mrs. Brockman's Functional Activities Questionnaire Ratings of Mr. Brockman's IADLs

| | |
|---|---|
| 1. Writing checks, paying bills, balancing checkbook | 3 |
| 2. Assembling tax records, business affairs, or papers | 3 |
| 3. Shopping alone for clothes, household necessities, or groceries | 3 |
| 4. Playing a game of skill, working on a hobby | 3 |
| 5. Heating water, making a cup of coffee, turning off stove after use | 1 |
| 6. Preparing a balanced meal | 3 |
| 7. Keeping track of current events | 2 |
| 8. Paying attention to, understanding, discussing TV, book, magazine | 2 |
| 9. Remembering appointments, family occasions, holidays, medications | 3 |
| 10. Traveling out of neighborhood, driving, arranging to take buses | 3 |
| TOTAL SCORE: | 26 |

<u>Note</u>. Score range = 0-30. Higher scores denote greater dependence.

I attempted to administer the *Personality Assessment Inventory (PAI)* to Mr. Brockman, which is a self-report measure of psychological and emotional functioning. The PAI has 344 questions. He started to answer the questions on the PAI and very early on in the test, he spontaneously folded a napkin that was on the table to use it as a guide (like a ruler) so that he could keep the question and the answer choices in line. I then folded a piece of white paper and gave him that to use instead of the napkin. However, in doing that, Mr. Brockman became distracted and lost his place, skipping from item 18 near the bottom on one page to question 26 on the top of the next page. This took 15 minutes. Consequently, it became readily apparent that Mr. Brockman would need more time than what was available to complete the PAI and that he likely would not have had the endurance to do so. I discontinued the test when he was on item 32, although again he had skipped items

---

[26] Becker, S et al. **Quantifying Activities of Daily Living in Parkinson's Disease Using the Functional Activities Questionnaire** Neurological Sciences 2021 https://doi.org/10.1007/s10072-021-05365-1; Hacket, K et al. **Informant Reporting in Mild Cognitive Impairment: Sources of Discrepancy on Functional Activities Questionnaire** Journal of the International Neuropsychological Society 26 pp 503-514 2020

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **57** of **77**

19-25. Of note, in May Mr. Brockman completed the MMPI-3 in 40 minutes, which has 330 questions and has higher demands for reading comprehension. This reflects a considerable decline in his mental efficiency and stamina from May to July.

**Comparison of Test Scores Across Five Neuropsychological Examinations**

As noted above, Mr. Brockman's performance on the Connors CPT 3 was considerably worse on four subtests when his July scores are compared to those from May. Other tests have also been administered across all five of his evaluations or in four of them. The table below lists the raw scores of the common neuropsychological measures administered across 4-5 examinations. In bold, are the lowest raw scores that Mr. Brockman obtained in the individual assessments.

Twelve scores in my exam from July overlapped with scores from three or four previous evaluations. Mr. Brockman's performance on my exam was the worst or tied for worst in 11 of the 12 tests administered (see bold scores as worst in the table below). In the May 2021 exam with Dr. Denney, nine of his test scores could be compared across all five evaluations. In not one case, was Mr. Brockman's score worse in the May exam when compared to the four other evaluations.

In other words, Mr. Brockman performed the best on the May exam compared to the four other evaluations at least on the common tests administered, which albeit is a limited sample. This is striking given that Dr. Denney diagnosed him with malingering; an assessment of embellished cognitive deficit would be incompatible with Mr. Brockman's superior performance in May relative to all other evaluations. If Mr. Brockman was malingering when tested by the Dr. Denney, it would stand to reason that his scores should be worse at that time than in previous testing dates.

In general, although there is some variability among these common scores across time, there is more consistency than not as most fall well below average. In addition, the table illustrates that among the common scores available across all five testing sessions, Mr. Brockman obtained the lowest scores in his last (July) exam following his hospitalization for delirium in June.

Test Score Comparisons

| Test (raw score) | 3/1/19 | 12/3/19 | 10/7/20 | 5/19/21 | 7/13/21 |
|---|---|---|---|---|---|
| Trails A (seconds-lower score better) | 63 | 80 | 106 | 80 | **300 d/c** |
| Trails B | Unable | Unable | Unable | Unable | NA |
| FAS (#words) | 27 | **19** | 31 | 27 | **19** |
| Animal Fluency (# words) | **8** | 14 | 9 | 14 | 11 |
| NAB Naming | 29 | 29 | 30 | 29 | NA |

U.S. v. Robert T. Brockman
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **58** of **77**

| | | | | | |
|---|---|---|---|---|---|
| **Rey Complex Figure: Copy (out of 36)** | 10.5 | 31 | 7.5 | 18 | **3** |
| **Digit Span Total (raw score)** | 17 | 22 | 15 | 20 | **14** |
| **Digits Forward (raw)** | 10 | **8** | **8** | 10 | **8** |
| **Digits Bkwd (raw)** | 6 | 8 | **5** | 7 | **5** |
| **Digits Sequence (raw)** | **1** | 6 | 2 | 3 | **1** |
| **Reliable Digit Span** | 8 | 8 | **7** | 10 | **7** |
| **Coding (raw)** | 13 | 29 | 8 | 10 | NA |
| **WAIS-IV Similarities (raw)** | 27 | 25 | 24 | NA | **17** |
| **Stroop Color & Word Test** | | | | | |
| **Word (#words)** | 34 | 58 | 40 | NA | **19** |
| **Color (#colors)** | 22 | 34 | 28 | NA | **16** |
| **Color Word (#color words)** | 12 | 20 | 8 | NA | Unable |

Note. Worst score for each test in **bold**.

Listed in the table below are the frequencies of Mr. Brockman's scores from each exam that fall within various descriptive and percentile ranges, although the CPT scores from the last two evaluations were not included because they were examined in detail earlier.

Recall that percentiles refer to the percent of scores obtained by the healthy, normative sample that fall within that range. A direct comparison across the five exams in determining the trajectory of Mr. Brockman's impairments over time cannot be made because apart from the first three exams by Dr. York in which her test batteries were identical, the May and July evaluations were comprised of somewhat different test procedures that have various sensitivities to neuropsychological impairment.

What can be ascertained from this table is the substantial loss of cognitive abilities consistently demonstrated by Mr. Brockman, given the proportion of his neuropsychological test scores that fell from the low average to the exceptionally low range, and that no test score fell above average across all five testing sessions. In four of the five testing sessions, approximately half of Mr. Brockman's test scores fell below the 2nd percentile meaning that 98% of the normative sample would have produced scores on these tests that were higher than Mr. Brockman's. It is impossible to determine with certainty what Mr. Brockman's premorbid cognitive profile would have looked like, but given his education (e.g., graduating first in his business school class at the University of Florida) and occupational attainment (e.g., teaching himself how to write computer programs and creating a highly successful business), it is apparent that his test performances below reflect a significant decline in abilities.

| Descriptors | 3/1/19 (30 scores) | 12/3/19 (32 scores) | 10/7/20 (29 scores) | 5/19/21 (35 scores) | 7/13-14/21 (38 scores) |
|---|---|---|---|---|---|
| Exceptionally High ≥ 98 percentile | 0 | 0 | 0 | 0 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| Above Average 91-97 percentile | 0 | 0 | 0 | 0 | 0 |
| High Average 75-90 percentile | 0 | 1 (3%) | 2 (7%) | 0 | 3 (8%) |
| Average 25-74 percentile | 7 (23%) | 12 (38%) | 2 (7%) | 5 (14%) | 3 (8%) |
| Low Average 9-24 percentile | 4 (13%) | 6 (19%) | 6 (21%) | 6 (17%) | 8 (21%) |
| Below Average 2-8 percentile | 5 (17%) | 4 (13%) | 5 (17%) | 2 (6%) | 5 (13%) |
| Exceptionally Low < 2 percentile | 14 (47%) | 9 (28%) | 14 (48%) | 22 (63%) | 19 (50%) |

## FORENSIC PSYCHOLOGICAL ASSESSMENT

1) ***Does Robert Brockman have neuropsychological impairment? What is the nature of that impairment? What evidence is the basis of your opinion?***

**Yes. Mr. Brockman exhibits significant neuropsychological impairment in numerous cognitive domains. This has been consistently demonstrated across multiple neuropsychological examinations.**

The majority of Mr. Brockman's cognitive abilities fall well below normal when compared with the general population and even further below his own estimated premorbid baseline. Thus, Mr. Brockman has sustained a substantial decline of his overall mental abilities over time.

More specifically, Mr. Brockman exhibits significant impairments in the following neuropsychological domains, which in my opinion adversely affect his everyday functioning:

- Orientation. Mr. Brockman is not consistently oriented to month, date, day of week, or year. He has also been confused with spatial orientation, not always being aware of his current surroundings.

- Sustained attention and vigilance – unable to maintain his focus and respond to stimuli over extended periods of time.

- Working memory – unable to hold and manipulate information in his mind while performing other mental operations with it.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **60** of **77**

- Mental processing speed and reaction time – Mr. Brockman is mentally very slow to respond and react to things in his environment. He requires additional time to formulate responses and process information. Mental stamina is significantly reduced.

- Visuospatial abilities – problems are noted with analyzing and copying visual-spatial information.

- Memory – decreased ability to absorb, retain, and recall recent and some remote information, which includes events, conversations, and other material. This is particularly problematic with his free or spontaneous recall. Recognition is superior to free recall so as a result providing him with cues and prompts facilitates the retrieval of some memories but does not normalize his recall. He has episodes of unpredictable confusion when he loses track of conversations and the details of his circumstances. During those times, he will often refer to some past aspect of his business and will weave those memories into a current conversation but is unaware that he is doing so. There is also evidence of perseveration when he will inappropriately repeat the same verbal or motor response to stimuli that requires different responses.

- Problem solving and abstract thinking – some aspects of his thinking, such as higher-level abstraction abilities, remain grossly intact, although still likely below his premorbid baseline, but his ability to think flexibly and apply strategies systematically to solve problems is significantly compromised. He is aided by structure and predictability.

- Executive functioning – by Mr. Brockman's and his wife's report, as well as from test data and my own observations, Mr. Brockman exhibits difficulties with task initiation/persistence, organization, and working memory.

Mr. Brockman's general language functions remain relatively intact and are areas of strength. His ability to name objects (confrontation naming) has fallen consistently in the average range over time. Although aspects of his verbal fluency have been compromised, more likely due to executive rather than language dysfunction, his word usage and general conversational abilities remain intact. His vocabulary or word knowledge also remains an area of relative strength, which is a very common finding in many types of brain damage. This generally intact ability allows him to use sophisticated vocabulary and sound very articulate, at times "covering up" his deficient thought processes. Thus, his verbal faculties can contribute to the erroneous perception that Mr. Brockman is more cognitively able than he actually is.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **61** of **77**

The evidence for my opinions are the observations and collateral reports of others, particularly Mrs. Brockman and Rev. Jim Jackson, informant and self-report surveys of Mr. Brockman's functioning, prior medical reports documenting cognitive deficits, Mr. Brockman's self-report, my own observations of and interactions with Mr. Brockman, and the consistent findings of standardized neuropsychological test results from March 2019 to the present.

> 2) ***What diagnoses are reflected in the data of the available neuropsychological testing and medical history? Are there other psychiatric diagnoses referenced that Mr. Brockman does not have? Why or why not?***

**Mr. Brockman demonstrates major neurocognitive disorder (otherwise known as dementia) due to Parkinson's disease** based on the following Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)[27] criteria:

- Significant cognitive decline from a previous level of performance in one or more cognitive domains (e.g., learning and memory, executive function, complex attention, perceptual-motor abilities).
- The cognitive deficits interfere with independence in everyday activities.
- The cognitive deficits do not occur exclusively in the context of a delirium.
- The cognitive deficits are not better explained by another mental disorder.

As noted previously, Mr. Brockman's neuropsychological test results reflect significant deficits in multiple cognitive domains (e.g., nearly half of his test scores fell in the exceptionally low range and below the 2nd percentile) that clearly surpass normal aging effects and represent a substantial decline from his estimated premorbid levels.

The *Functional Activities Questionnaire* and the *AD8 Dementia Screening Interview* completed by Mrs. Brockman reflect significant functional deficits and impaired IADLs, consistent with and necessary for a diagnosis of dementia, and not mild cognitive impairment. In addition, Mr. Brockman's decline in his occupational functioning due to cognitive factors beginning in 2017 and 2018 was articulated by the report of Rev. Jim Jackson and other collateral informants.

In addition to the extensive neuropsychological data, collateral reports from many sources, my direct observations of Mr. Brockman's fluctuating cognitive capabilities, and evidence for deteriorating instrumental activities of daily living, neuroimaging results also support the diagnosis of dementia.

---

[27] American Psychiatric Association **Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)** 2013

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **62** of **77**

The presence of amyloid neuritic plaques observed on PET amyloid along with Mr. Brockman's history of Parkinson's disease is consistent with the known association of dementia of Parkinson's disease and of Alzheimer's disease pathology.[28] In addition, even without a clinical diagnosis of dementia with Lewy bodies, research evidence also suggests the presence of Lewy bodies as a dominant substrate in Parkinson's disease dementia (PDD).[29] Thus, the underlying pathology of his dementia is likely multifactorial.

The association of Mr. Brockman's dementia, with or due to Parkinson's disease is consistent with the clinical and neuropsychological data. For example, the core features of dementia associated with Parkinson's disease include the following:[30]

- Diagnosis of Parkinson's disease
- A dementia syndrome with insidious onset and slow progression within the context of established PD
    - Impairment in more than one cognitive domain
    - Representing a decline from premorbid level
    - Deficits severe enough to impair daily life (social, occupational, or personal care)
- Associated clinical cognitive features
    - Impaired spontaneous and focused attention, poor performance in attentional tasks; performance may fluctuate during the day or from day to day.
    - Impaired executive functions in tasks requiring initiation, planning, concept formation, rule finding, set shifting or set maintenance. Impaired mental speed.
    - Impaired visuo-spatial functions in tasks requiring visual-spatial orientation, perception, or construction.
    - Impaired memory with free recall for recent events or in tasks requiring learning of new material. Memory usually improves with cueing and recognition is usually better than free recall.
    - Language is largely preserved.

The features of Parkinson's disease dementia (PDD) described above are highly consistent with Mr. Brockman's objective test data over five different evaluations and his clinical presentation. He exhibits cognitive deficits in all the domains noted above in addition to the relative sparing of his language functions, as described previously in this report, which

---

[28] Aarsland, D. et al. **Cognitive Decline in Parkinson Disease** Nature Reviews/Neurology 13 pp 217-231 2017
[29] Painous, C. & Marti, M.J. **Cognitive Impairment in Parkinson's Disease: What We Know So Far** Research and Review in Parkinsonism 10 pp 7-17 2020
[30] Emre, M. et al. **Clinical Diagnostic Criteria for Dementia Associated with Parkinson's Disease** Movement Disorders 22:12 pp 1689-1707 2007; Painous, C. & Marti, M.J. **Cognitive Impairment in Parkinson's Disease: What We Know So Far** Research and Review in Parkinsonism 10 pp 7-17 2020

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **63** of **77**

is also a characteristic of PDD. Given his history of extensive neuropsychological assessments from March 2019 to July 2021, it is my opinion that further in-depth neurocognitive evaluations will not likely provide greater diagnostic clarity.

Mr. Brockman's most recent MoCAs and neuropsychological evaluation also reflect a worsening of his cognitive deficits, as would be expected with this disorder. His dementia is permanent and progressive. He will continue to deteriorate. This is also consistent with the observations of those who have known him for decades including his wife, Rev. Jackson, and Dr. Slade who all describe a worsening of his functioning over time. Unfortunately, this is not a condition for which there is a cure or that can be reversed. In addition, the presence of PD carries a 2.22-fold increase in mortality compared with the general population and patients with PD-dementia have particularly high mortality risks.[31] A very recent study concluded that even though people with dementia die prematurely, in comparison to individuals with a range of dementing disorders, those with Lewy body dementia, which includes PDD, appear to have the highest mortality rates.[32]

Mr. Brockman has also exhibited two acute mental status changes this year due to infections resulting in delirium. One episode was in March and the other in June. Following each of those episodes, he exhibited a decline in his cognitive status from which he never returned fully to his pre-delirium baseline according to his wife.

The interaction between dementia and delirium is not well understood but the association is well documented in that cognitive impairment/dementia is a prominent risk or predisposing factor for delirium and patients with delirium are prone to develop cognitive impairment or progress to dementia.[33] Thus, individuals with dementia are vulnerable to developing delirium with even slight alterations in their environment or medical conditions and there is also an increased risk of dementia in individuals who have experienced delirium.[34]

In my evaluation with him, there was evidence for some ongoing residual delirium symptoms such as rapid onset of confusion without alterations in consciousness.

However, even when not acutely confused, Mr. Brockman has exhibited a history of significant and measurable cognitive deficits since at least 2019. Therefore, I do not

---

[31] Xu, J., Gong, D.D., Man, C.F., & Fan, Y. **Parkinson's Disease and Risk of Mortality: Meta-Analysis and Systematic Review** Acta Neurologica Scandinavica 129 pp 71-79 2014

[32] Liang, C-S et al **Mortality Rates in Alzheimer's Disease and Non-Alzheimer's Dementias: A Systematic Review and Meta-Analysis** Lancet Healthy Longevity 2 pp e479-488 2021

[33] Bellelli, G., Brathwaite, J.S.,& Mazzola, P. **Delirium: A Marker of Vulnerability in Older People**. Frontiers in Aging Neuroscience 13:626127. doi: 10.3389/fnagi.2021.626127

[34] Bellelli, G., Brathwaite, J.S.,& Mazzola, P. **Delirium: A Marker of Vulnerability in Older People**. Frontiers in Aging Neuroscience 13:626127. doi: 10.3389/fnagi.2021.626127

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **64** of 77

consider his residual delirium to be a significant factor in accounting for his neuropsychological presentation or in the presence of his major neurocognitive disorder.

Mr. Brockman has Parkinson's disease that is associated with cognitive impairment and dementia. He also has had two episodes of delirium since March, which as noted previously increases the risk of further cognitive compromise. He also underwent a urological procedure under general anesthesia in late June, which carried a further risk of neurocognitive decline perhaps exacerbated by his vulnerable brain.[35]

A diagnosis of mild cognitive impairment (MCI) has been given to Mr. Brockman in earlier examinations and in Dr. Lai's last exam in February of this year, he continued to list MCI as the primary cognitive disorder. However, that diagnosis does not reflect the clinical realities of Mr. Brockman's functioning in my opinion. For example, a cardinal feature of MCI is that cognitive deficits are not sufficient to interfere with everyday functioning.[36] Mr. Brockman, however, has clearly demonstrated functional deficits since 2017-2018 with gradual worsening over time according to multiple collateral reports, particularly in the last six months.

In addition, in MCI, cognitive deficits are generally more limited in breadth and depth in comparison to dementia, as evident by the suggested cut-off scores for the MoCA for MCI (< 26/30) versus dementia (< 21/30).[37] Mr. Brockman's many MoCA scores were consistently below 20 and have declined even more (e.g., < 14) over the last series of administrations beginning in May. Thus, MCI is a much milder cognitive disorder than dementia and does not affect a person's functional capabilities in the way that dementia does.

Therefore, because of his well-established neuropsychological and progressive deficits as well as the accompanying functional decline he exhibits, it is my professional opinion that Mr. Brockman has a major neurocognitive disorder.

> ### 3) *Is Mr. Brockman able, given the nature of the charges against him, to assist his attorneys with relevant, specific, requested facts, dates, and specifics? Is this question informed by testing data, clinical data, or both?*

**Mr. Brockman is not able to assist his attorneys with relevant, specific, requested facts, dates, and specifics.**

---

[35] Vacas, S., Cole, D.J., & Cannesson, M. **Cognitive Decline Associated with Anesthesia and Surgery in Older Patients** JAMA Insights doi: 10.1001/jama.2021.4773
[36] Litvan I. et al **Diagnostic Criteria for Mild Cognitive Impairment in Parkinson's Disease: Movement Disorder Society Task Force Guidelines** Movement Disorders 27 pp 349-356 2012
[37] Dalrymple-Alford, J.C. et al **The MoCA: Well-Suited Screen for Cognitive Impairment in Parkinson Disease** Neurology 75 1717-1725 2010

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **65** of **77**

My opinion is based on Mr. Brockman's neuropsychological test performance, particularly memory testing, my observations of him, his responses to interview questions, and the evidence yielded from collateral informants and evaluations to date.

Mr. Brockman consistently demonstrated impairments with memory and learning, and gross confusion as an informant in interviews with me and with Dr. Agronin, who also interviewed him in July. Test scores reflected impaired retrieval of recently learned information. Providing him with structure and cues/prompts to recall past information increased his retrieval but only minimally. Thus, his memory abilities are demonstrably deficient.

Mr. Brockman's presentation and his responses to my interview questions are also relevant to his ability to assist, as listed below:

- Mr. Brockman was not fully oriented to time (and partially to place) during my evaluation.

- He could not recall his current or previous home address.

- He was intermittently confused about his hospitalizations this year, when they occurred, and the reasons for them. Also, his recall about those hospitalizations was inconsistent.

- Mr. Brockman could not reliably recount the evaluation conducted by Drs. Denney and Dietz just two months ago. He was confused as to when the examination took place, the reason for it, how he may have received feedback about it (if he actually did), and the relationships of Drs. Denney and Dietz to the legal process. Again, his recollection of these recent events changed with each retelling.

- Mr. Brockman's description of how in 2018 he was referred to his PCP, Dr. Pool, was inaccurate on some important details.

- There was inaccurate recall of when Mr. Brockman stepped down as president and CEO of Reynolds and Reynolds last year. He reported that he retired from both positions on January 1, which is incorrect.

- In the interview with Drs. Denney and Dietz, Mr. Brockman denied invoking a disability clause with his retirement even though he did. He was accurate with me when I asked this same question.

- Mr. Brockman was confused temporarily about which caregiver brought him to the evaluation.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **66** of **77**

- When asked about the timelines for his son's first marriage and divorce, Mr. Brockman contradicted himself and was unable to provide approximate years for these events.

- Mr. Brockman would rapidly slip between lucidity and confusion. For example, he could be responding to questions appropriately but then his thought processes would get derailed and he would make a comment that was completely unrelated to the topic. Typically, in these instances, he would confuse the current circumstances with some aspect of his business and believed that I was there with him as part of a business situation. In one instance, he mentioned CDK as an entity that he thought I was familiar with and that I could somehow help him with. Mr. Brockman would not completely forget who I was but rather would identify me as a "doctor" who could improve his business. Thus, he would "mix" memory details together and was unable to identify when his recall was accurate or not. In that way, he could not identify the "source" of his memories.

Mr. Brockman's attorneys characterize it as impossible to have any degree of confidence in what he tells them because the information he provides is replete with inaccuracies or distortions. This was also my experience with him. Such a conclusion was all the more unavoidable by his consistent quality of conveying information in a calm, self-assured, and articulate manner. So on the face of things, what Robert Brockman says always has the quality of being as he says it is. When one can cross-check factual accuracy, and only then, can one identify whether what he is saying was accurate. Thus, there was a disconnect between *how* he said something and *what* (e.g., the content) he said.

Mr. Brockman was significantly more confused when I saw him in July, only about a month after his second delirium episode, than he was in his May interviews with Drs. Denney and Dietz. However, there were inconsistencies and inaccuracies even in their interview that evoke the same questions of Mr. Brockman's ability to provide his attorneys with accurate information even when he was more intact. Some examples from the Drs. Denney and Dietz interview include:

- When asked what his most significant medical or health issue is, Mr. Brockman was unable to recall Parkinson's although he knew a symptom. He added that he had never heard of Parkinson's disease before even though, according to his wife one of best friends died of PD.

- He was discussing his diagnosis of dementia and, as he did with Dr. Darby, explained that his most recent tests had him at a "10" rather than a "5." With Dr. Darby, he stated that his dementia "percentage" had gone up to 10%. It is quite unclear what this means, what he was referring to, or how he arrived at these numbers. Drs. Denny and Dietz did not pursue what he meant by this.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **67** of **77**

- When asked about his history of atrial fibrillation, he described going to a doctor, who advocated that almost all heart disease is reversible through stress reduction, exercise, getting enough sleep, "and it retreated." He went on to describe that insurance companies now make you get a PET scan before they will pay for surgery. The records indicate that Mr. Brockman was confusing coronary artery disease with atrial fibrillation.

- Dr. Dietz then asked Mr. Brockman about a deposition in January 2019 in which with about 10 minutes left, his lawyers said that he experienced some sort of health event so the deposition was cut short. He did not remember that event but added that it probably "was related to a-fib," which is very likely a perseverative response from the previous conversation. Dr. Dietz then added that the health event was confirmed by some kind of test. Mr. Brockman again did not recall the event and did not recall ever having a medical test, such as having his blood pressure taken, at a lawyer's office or in any government building. He then spontaneously added, "Was it a hospital here in the medical center?" This last comment clearly reflected confusion about the events that they were just talking about.

- On May 18, 2021, Mr. Brockman reported that he had a UTI that developed into "what's that thing called…blood poisoning," which Dr. Dietz replied was "sepsis." A little later in this same interview, Mr. Brockman again referred to "this last incident, with the, what's the name of it?" Again, Dr. Dietz reminded him it was "sepsis." Then, in the interview on May 20, 20121, Mr. Brockman described that he was very ill in August (which was incorrect, it was March) due to sepsis and added, "I don't know whether you're familiar with sepsis but it's blood poisoning." He had apparently forgotten that two days before Dr. Dietz had reminded him twice of the name for blood poisoning that he could not recall.

- When discussing his melanoma surgery, Mr. Brockman indicated that they "had to go four inches deep" to remove it. This is clearly a mischaracterization of his surgery, which was not explored by Drs. Denney and Dietz.

- As noted previously, Mr. Brockman denied invoking a disability clause as part of his retirement when he actually did so.

- Mr. Brockman indicated that he was charged with not filing tax returns but that is not actually what he was charged with.

- When asked how he could assist his attorneys in his own defense, Mr. Brockman replied that they needed to understand the business, what the company does, what

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **68** of **77**

> their products are, and how it operates. However, according to his attorneys, those factors are not relevant to his case as the charges are against him, not the business, which Drs. Denney and Dietz did not query further about.

His attorneys indicated that Mr. Brockman has not been charged with not filing tax returns, which he most often cites as what he is accused of, as this is a separate crime under a separate statute. Another point he has confused is that he was *not* told by his defense team not to disclose details about his case. In fact, he was informed that there was a court order protecting him from whatever he disclosed to the court-appointed experts being used against him at trial. His reference to instructions from his defense team did not account for the instructions he had actually received.

- Mr. Brockman was asked different questions about various entities mentioned in the indictment such as Spanish Steps, Point, St. John's Trust Company, and Mountain Queen. Mr. Brockman's responses were generally vague or he indicated that he did not know the answers to the questions that Dr. Dietz was asking about these organizations or businesses.

As has been apparent in several interviews conducted with him regarding his competency, Mr. Brockman has a reservoir of factual/historical information and "life events" that he tends to repeat over and over. However, when he has to deviate from that familiar narrative, he gets lost and is unable to provide additional and meaningful information.

In all, notwithstanding how articulate Mr. Brockman appears, he produces very unreliable information about past events, or no meaningful information at all, including about events that happened very recently. His responses are at times perseverative (e.g., repetitive), distorted, or mixed with details that are unrelated to the question. The degree of his confusion and his poor command of relevant details to date render him unable able to assist his attorneys with specific information about past events, dates, or facts that can be relied upon to be valid.

Attorneys experience his communication to be the same derailed, irrelevant information that I did. It is incorrect to presume that he is merely unresponsive because he is thwarting communication. After all, his attorneys advised him that he could speak to all evaluating doctors freely, because of a protective order. Dr. Dietz and Denney did not query him to any particular degree, as noted in some of the examples noted previously in this section.

When I questioned him, he showed confusion about something as fundamental as what we were even meeting about in spite of reminders. That he can say he is charged with not filing tax returns is a shallow accounting for the charges and events in which he is implicated, and his command would be necessarily expected to be more, in order to inform

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **69** of **77**

his attorneys about details for which no others are available to explain context and inference.

When questioned by Drs. Denney and Dietz about some details of the indictment, they often asked him for *his opinion* about whether he had the ability to inform his lawyers about certain individuals, their relationships to him, the roles of various entities cited in the indictment, and other pertinent details related to his case. Mr. Brockman would sometimes answer that he was unsure of some of the details but would often answer in the affirmative, that he thought he could provide important information to his lawyers, overestimating his abilities.

When I asked him a more global question on this topic, Mr. Brockman indicated that he believed with "99.7%" certainty (out of a 0-10 scale) that he had already provided his attorneys with helpful information, which is in stark contrast to the perspective of his defense team. Thus, confirming what has been cited previously, Mr. Brockman "doesn't know what he doesn't know." His lack of awareness and insight into his inability to assist his attorneys, renders his opinion on this question misleading and inaccurate. Robert Brockman does not have that ability to assist his attorneys.

> ### 4) Based on his performance in the testing, does Mr. Brockman demonstrate the mental stamina needed for a courtroom trial on the charges he faces? Why or why not?

**Mr. Brockman does not have the mental stamina needed for a courtroom trial on the charges he faces.**
Unlike earlier evaluations that were well tolerated until later in the afternoon, Mr. Brockman exhibited much less endurance during my assessment. For example, Dr. Denney was able to administer his test battery to Mr. Brockman in one day (as did Dr. York in her three evaluations) and this included administering a 330-item and a 114-item questionnaire. However, it took Mr. Brockman two days to complete my evaluation and it was clear that he would have been unable to answer questionnaires of those lengths in a reasonable timeframe.

One reason for the difference in his performance from May to July was that he was mentally slower and less attentive, as confirmed by his scores on the Connors Continuous Performance Test 3. As a result, he required more time to process information and to formulate a response. He was also more likely to "miss" information due to his inattentiveness and lack of focus, so things needed to be repeated to him. It was also important to continually check on his mental status to make sure that he was attending to the information and that he was still understanding what he was being asked to do.

There were several instances during my evaluation, when it appeared that Mr. Brockman was attending to the task at hand but with further questioning and probing about his

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **70** of **77**

understanding of what he was doing, it became apparent that he was not. Because he would unpredictably become confused or misinterpret test instructions or questions, it was necessary to be vigilant in monitoring his mental status. This was exacerbated by fatigue and time of day, but not always. He could exhibit signs of confusion at any time during the assessment.

His fluctuating mental status has important ramifications for his competency because it reflects that he could become confused at any time without prediction, including during trial and when consulting with his attorneys.

These factors would significantly interfere with his ability to effectively understand and process testimony in the context of his own memories and earlier discussions with attorneys, to maintain his attention, process information at normal rates, formulate questions for his attorneys or respond to questions from them, to appraise new information being revealed in a timely manner, think critically about issues raised in court, and recall previous conversations. As the day would progress, Robert Brockman's cognitive functions and mental stamina will decline but not exclusively with the passage of time. Based on what he has exhibited, there would likely be multiple, repeated, and unpredicable instances when he will have little appreciation for what is transpiring around him.

> 5) *Is Mr. Brockman able to assist his counsel in defending his case? Why or why not? Is this question informed by testing data, clinical data, or both?*

**Mr. Brockman is unable to assist his counsel in defending his case.** This conclusion is based on both testing and clinical data.

Mr. Brockman is an articulate, bright, and well-spoken gentleman whose language functions (e.g., his vocabulary and use of grammar) remain an area of relative strength As a consequence, he can appear more cognitively intact than he actually is. This is especially true when discussing details of the business that he founded 50 years ago or when calling upon a reservoir of stories regarding his company that he has likely told numerous times.

However, when confronted with cognitive demands that require him to respond in very specific or limited ways, or on topics or skills for which he is not practiced, he exhibits significant vulnerabilities in many different cognitive domains. This is illustrated in the neuropsychological assessments, which is consistent with the experiences of collateral witness informants. It also manifests when questions become more penetrating in search of clarity, as opposed to allowing him to dispatch questioning with vague generalities or shallow or practiced retorts.

As noted previously, neuropsychological testing has revealed significant deficits in areas that have direct relevance in assisting his attorneys in his defense. For example, Mr. Brockman has measurable and objective impairments with his ability to attend and focus,

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **71** of **77**

to think quickly and efficiently, to absorb information and retain it for future use, to think conceptually and flexibly, to apply problem solving strategies in an efficient manner, and to initiate and persist at tasks. These deficits would significantly impede his ability to recreate past events and to think conceptually about transactions, relationships, and interactions that may have occurred years ago. He would have little to no ability to problem-solve with his attorneys or to inform their case preparation and to consider strategies in preparing his defense.

As his attorneys have described and as he demonstrated with me, Mr. Brockman continually returns to the topic of conversation that he knows best and feels most comfortable discussing, which is often the operations of Reynolds and Reynolds. Unfortunately for him, his expansive knowledge of his business has little to no bearing on his defense. However, he doesn't show any evidence that he appreciates that limitation, which makes him unable to make reasonable inferences about the likelihood of the accuracy of his memories and recollections.

There were times when he shows  awareness that he is struggling cognitively but at most other times he was not. For example, in working with him over two days, he would have moments when he said something that was completely unrelated to the task he was engaged in or he might have mis-identified me as a person who was with him to help his business, but he was unaware that his comments were inappropriate. When he made a confusing comment, a tangential remark, or a perseverative reply, he typically was unable to identify it as such unless I pointed it out to him. Thus, his awareness and insight into his mental status was limited. As a consequence, he is unable to filter whether the information he is sharing is valid or not. This puts his attorneys in the position of trying to determine Mr. Brockman's recollections and comments are based in fact or are the result of distorted or misremembered memories.

Mr. Brockman has demonstrably declined cognitively since his previous exam in May. His performance on the Connors CPT 3, as noted earlier, reflected significantly reduced sustained attention/focus and mental processing speed from May to July. The table below lists the tests given in both the May and July evaluations and although limited in number, in each case, Mr. Brockman's performance in July was worse than in May. As a result, he is much more easily confused and unable to follow even modestly complex trains of thought. He was unable to understand some test instructions and could not complete some cognitive tasks because they were too overwhelming for him. Although he may give the impression that he understands the basic rules of how a trial is conducted, he has demonstrated limited or shallow understanding of the underlying issues in his case. Given his limitations, he does not have the cognitive capacity to assist his lawyers in a complex case that requires relatively high cognitive demands on a defendant with a major neurocognitive disorder.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Comparison of Test Scores from May to July 2021

| Test (raw score) | 5/19/21 | 7/13/21 |
|---|---|---|
| **Trails A (seconds-lower score better)** | 80 | 300 Discontinued |
| **FAS (#words)** | 27 | 19 |
| **Animal Fluency (# words)** | 14 | 11 |
| **Rey Complex Figure: Copy (out of 36)** | 18 | 3 |
| **Digit Span Total (raw score)** | 20 | 14 |
| **Digits Forward (raw)** | 10 | 8 |
| **Digits Bkwd (raw)** | 7 | 5 |
| **Digits Sequence (raw)** | 3 | 1 |
| **Reliable Digit Span** | 10 | 7 |

6) *Does the evidence reflect that Mr. Brockman is malingering cognitive incapacitation? Why or why not? How is the validity testing performed to date informative of his limitations and the nature of his effort?*

**Mr. Brockman is not malingering major cognitive impairment**. There are a number of reasons underlying this conclusion.

Most importantly, the extensive testing of our two days of meeting demonstrated significant cognitive impairment across numerous domains. At the same time, Mr. Brockman's performance on numerous stand-alone and embedded validity measures confirmed that he was putting forward adequate effort and that results were a reliable account of his abilities and lack thereof. There is no evidence in my July 2021 examination that Mr. Brockman attempted to malinger neurocognitive dysfunction – only signs of considerable impairment that continues to worsen.

- The diagnosis of malingering is being asserted by court-appointed experts on false and contradictory pretense. One example of this is the strong inference from Dr. Dietz that Mr. Brockman's cognitive complaints arose in the context of a 2018 Bermuda raid and its implications for Mr. Brockman legally. However, evidence of a decline in Mr. Brockman's functioning was observed by those around him prior to the raid on Evatt Tamine's home in September 2018 and increasing impairments were noted in Mr. Brockman's work/occupational abilities as well.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **73** of **77**

- o  Mr. Brockman had been documenting memory problems and cognitive impairment for years. In May 2017, his email to Dr. Stuart Yudofsky revealed his and his family's concerns about cognitive decline.

- o  In October 2018, he sought out Dr. Stuart Yudofsky for evaluation of depression. However, Dr. Yudofsky noticed just from their initial meeting that he likely had Parkinson's Disease. Dr. Yudofsky also commented in his office note of Mr. Brockman's decreased concentration, slowed thinking, difficultly with word retrieval, and overall mild to perhaps moderate neurocognitive disorder. He referred him for serious and urgent neurologic follow-up but Mr. Brockman reported that his business obligations made it impossible for him to see a neurologist until mid-January. Putting off the neurologic assessment for three months is not consistent with a person who is looking to establish a neurologic or cognitive disorder for competency issues.

- o  The medical record, of different specialists, consistently recognized his cognitive impairments to be at different levels of severity, but to be real.

- o  Collateral informants confirm Mr. Brockman's cognitive and functional decline. Mr. Brockman's cognitive impairments observed by Rev. Jackson as far back as 2017 or 2018, concerned him to the point of talking with Mr. Brockman personally about them in June 2018. Rev. Jackson, who sees Mr. Brockman about twice a month, reported to me that he has seen a gradual deterioration of Mr. Brockman over time and that now he is not "functional."

- o  By the summer of 2019, senior leadership at Reynolds and Reynolds was reportedly brainstorming ways to try to limit Mr. Brockman's exposure at the annual Reynolds' birthday party in November for fear that he would embarrass himself or diminish the authority of his leadership.

- o  Mrs. Brockman and her son had noticed a decline in Mr. Brockman's functioning and tried to intervene to help him become more organized and productive, which had never been a problem for him previously. Other staff, from his personal secretary to a Reynolds paralegal all recognized examples of his cognitive decline and increasing disorganization.

- o  His friend of 30+ years, Dr. Stephen Slade, has described a gradual and progressive decline in Mr. Brockman's abilities over a period of several years.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **74** of **77**

There was some variability in Mr. Brockman's neuropsychological test performance with Dr. York, but the general pattern of his impairments remained relative stable. On the second evaluation by Dr. York on November 3, 2019, the first forensic assessment requested by Mr. Brockman's attorney, Mr. Brockman actually performed better than on the first assessment. Malingering refers to voluntary production of false symptoms to achieve a secondary gain. An examination with huge legal implications for Mr. Brockman was *the* setting for Mr. Brockman to malinger greater neurocognitive impairment than he actually possessed in order to "support" any goal he might have to amplify his incapacity.

The demonstrable fact that his performance was improved in this second, forensic evaluation on December 3, 2019 in comparison to his first clinical assessment in March 2019 (see table below for additional data on this point that reveals that fewer test scores on exam 2 fell in the exceptionally low range in comparison to his first evaluation) refutes a malingering or invalid profile. Instead, his performance improved overall, although impairment remained.

| Descriptors | 3/1/19 (30 scores) | 12/3/19 (32 scores) |
|---|---|---|
| Exceptionally High ≥ 98 percentile | 0 | 0 |
| Above Average 91-97 percentile | 0 | 0 |
| High Average 75-90 percentile | 0 | 1 (3%) |
| Average 25-74 percentile | 7 (23%) | 12 (38%) |
| Low Average 9-24 percentile | 4 (13%) | 6 (19%) |
| Below Average 2-8 percentile | 5 (17%) | 4 (13%) |
| Exceptionally Low < 2 percentile | 14 (47%) | 9 (28%) |

Even though Dr. York did not include multiple performance validity indicators in her assessments, Mr. Brockman showed valid performance on reliable digit span (an embedded performance validity test) and exhibited improved performance on recognition versus free recall of newly learned information, which is consistent with the profile of individuals with genuine memory disorders. By observation, Dr. York did not identify any behaviors or test indicators that reflected in her three reports any concerns with performance invalidity.

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **75** of **77**

Mr. Brockman's neuropsychological profile with Dr. Denny was consistent with his prior evaluations in which language functions remained an area of relative strength, consistent with Parkinson's disease dementia.

Of all the tests that Dr. Denney administered that were common with the other four neuropsychological exams, Mr. Brockman continued to show impairment, but did not perform worse on his exam. Again, if Mr. Brockman were going to malinger dementia, it would seem that he should perform worse on Dr. Denney's exam than on examinations that predated the criminal case context.

Dr. Denney's interpretation of Mr. Brockman's performance on the validity measures he administered does not account for explanations other than malingering. However, the test manual of the very measures he administered that he interpreted as the "smoking gun" of malingering intent, give guidelines for interpreting data differently from how Dr. Denney accounted for that data.

The invalid scores produced by Mr. Brockman can be accounted for by genuine cognitive impairment. They are rare but not significantly less than chance. In addition, other performance validity indicators administered by Dr. Denney fell in the valid range. In addition, Mr. Brockman's MMPI-3 profile did not reflect symptom exaggeration (e.g., "faking bad") or over-reporting of cognitive symptoms.

Other tests in Dr. Denny's examination that included validity indicators such as the Connors CPT 3, sentence repetition test, and the Denney-Competency Related Test produced valid range scores.

The July 2019 meeting in Aspen is when Mr. Brockman disclosed to his attorneys that he had been diagnosed with dementia. This was a meeting that was called by his attorneys and according to them, he brought that information to their attention so that they could better understand why he may need more assistance from them in managing the information he was getting. He did not raise a cognitive condition for its potential value to his defense. Then, in spite of frequent reminders by his attorney for copies of his medical records, it took almost two months for those records to be sent to them.

Dr. Denney and Dr. Dietz suggest that a person who mentions that he is worked up for dementia (as Mr. Brockman did to his attorneys on July 18, 2019) is not acting the way people with dementia are supposed to behave. From a standpoint of clinical experience and even as documented in the literature, this is a fallacy.[38] It is true that many with dementia

---

[38] Rubin, R. **Neurologist Faces his Alzheimer Diagnosis Determined to Lessen the Stigma Surrounding the Disease** Journal of the American Medical Association 325:19 pp 1926-1928 2021; Lehrner, J. et al. **Awareness of Memory Deficits in Subjective Cognitive Decline, Mild Cognitive Impairment, and Parkinson's Disease** International Psychogeriatrics 27:30 pp 357-366 2015

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **76** of 77

deny their impairment – many, on the other hand, discuss it and may even write about it. Furthermore, the record is chock full of references to Mr. Brockman touting his abilities, pertinent to his assistance of his attorneys, as unimpaired. This is the antithesis of embellishment. Given Mr. Brockman's significant pathology, it is actually reflective of his denial of infirmity and a lack of insight.

The claim that Mr. Brockman only exhibits impairments when he knows he is being tested, would be counterproductive to a goal to falsely demonstrate cognitive impairment. Certainly, a bright man like Mr. Brockman who was only mildly cognitively impaired would have known that everything he said or did in front of Drs. Denney and Dietz was being scrutinized by them and so the entire three days of interviews were tests of his competence. He certainly could have manifested and claimed greater cognitive impairments, although their interviews include numerous instances of his overstating abilities he does not have.

What is clearer from my meetings with him is that Robert Brockman was confused about the evaluation itself; a fact that transcends the idea of embellishment. For how is a person to manage impressions of something whose purpose he cannot grasp because he is too confused? In such instance, impression management is no more than his practiced courtly behavior of a person who instinctively schmoozes as does any salesman of his well-recognized talent.

"Not following treatment recommendations" is not, in my opinion, an indicator at all of malingering. In some instances, not following recommendations has a psychosocial explanation, in others patient education is inadequate. Robert Brockman was taking several neurological and psychotropic medications to improve his cognition. Each carries with it the risk of unpleasant side effects, more than less invasive exercises – that he may not have followed for his own problems with task initiation that are disease related. That is hardly non-compliance, and demonstrates a willingness to experience side effects to find remedy.

Related to the comment above, in at least two instances, Mr. Brockman reported improved memory and concentration to Dr. Jankovic on January 30, 2019 after taking Bupropion and improved cognition to Dr. Yu on March 20, 2019 after starting on Exelon. Stating improvement to his physicians from pharmacologic interventions would not support the goal if his objective was to fake dementia or brain damage. A malingering person with an agenda underscores his incapacity, no matter what treatments are provided him.

Mr. Brockman has a some intact abilities and his performance can fluctuate significantly over time. Collateral informants have recounted his quickly fluctuating performance – absent any psychological testing setting – and I witnessed his variable performance as well in his examination and with his performance on selected cognitive measures. Rev. Jackson reported that in spite of his observation of Mr. Brockman's gradual cognitive deterioration over time, he has observed moments, albeit with less frequency as time has passed, when

**U.S. v. Robert T. Brockman**
The Forensic Panel – Thomas Guilmette, Ph.D.
August 6, 2021

Page **77** of **77**

he seems "clear." Mrs. Brockman also reported significant variability with her husband's functioning from day to day, and even moment to moment.

Individuals with dementia can exhibit behavior that is atypical or idiosyncratic even for dementia patients. Robert Brockman, exhibits objective evidence for substantial and enduring cognitive impairment in various domains, corroborated functional decline, confirmed Parkinson's Disease diagnosis, and a progression of neuroimaging that together confirm dementia, and it's irreversible reality and prognosis. Peculiar behavior does not negate the enormity of dementia, and may ultimately be explained by the disease of the brain itself.

Very truly yours,

Thomas Guilmette, Ph.D.

Diplomate in Clinical Neuropsychology, American Board of Professional Psychology & American Academy of Clinical Neuropsychology