

## THE FORENSIC PANEL

TEL: 212 535 9286   FAX: 212 535 3259   MICHAEL WELNER, M D , CHAIRMAN

James P. Loonam, Esq.
Jones Day
250 Vesey Street
New York, New York 10281

**Re: Robert T. Brockman**

October 29, 2021

Dear Mr. Loonam,

Pursuant to your request, I submitted a forensic neuropsychological report on August 6, 2021 of the above 80-year-old defendant, whom I had examined on July 13 and 14, 2021. My impressions at the time of my report were that Mr. Brockman exhibited significant neuropsychological impairment in multiple cognitive domains and that his clinical history, neuroimaging results, and test profile were consistent with dementia. My evaluation also revealed some evidence for delirium over and above data that supported a diagnosis of dementia.

In that August 6 report, I concluded that Mr. Brockman was not competent to stand trial for the following reasons:

- Lack of anything more than superficial understanding of the specific charges against him;
- Lack of or incomplete memory for important entities and organizations associated with his indictment;
- Significant cognitive deficits in multiple domains such as memory and learning, sustained attention, working memory, mental processing speed, organization and problem solving, all of which would have adverse effects on his ability to consult with his attorneys in his own defense;
- Intermittent confusion;
- Fluctuating orientation;
- The presence of confabulation (e.g., the production of false, distorted, or misinterpreted memories that the person believes to be true to fill in gaps in recall).

BEHAVIORAL SCIENCES   •   FORENSIC SCIENCES   •   PEER REVIEWED ®
WWW.FORENSICPANEL.COM   EMAIL: INFO@FORENSICPANEL.COM

US v. Brockman
**DX-22**
Case No: 4:21-cr-0009

DX-22, page 1 of 43

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **2** of **43**

At the request of defense counsel, I conducted a follow-up forensic neuropsychological evaluation on October 2, 2021 to monitor Mr. Brockman's progress since my previous exam in July, to assess his current presentation relative to the history and data of periodic cognitive testing and diagnostic imaging of recent years, and to examine, with prospective peer oversight, the following questions:

1) *What does the data collected to date reflect upon the nature of Robert Brockman's neuropsychological impairment?*
2) *What diagnoses are reflected in the recent history and current neuropsychological testing?*
3) *Is Mr. Brockman able, given the nature of the charges against him, to assist his attorneys with relevant, requested facts, dates, and details?*
4) *Based on his performance in the testing, does Mr. Brockman demonstrate the mental stamina needed for a courtroom trial on the charges he faces?*
5) *Is Mr. Brockman able to assist his counsel in defending his case? Why or why not?*
6) *Does the evidence reflect that Mr. Brockman is malingering cognitive incapacitation?*

Mr. Brockman's psychosocial and medical history, the trajectory of his neurocognitive symptoms, results from prior neuropsychological testing and my impressions, test data, clinical observations, collateral information, and rationale for my opinions are detailed in my August 6, 2021 report.

Since that report, I have received additional records, there have been more recent medical issues, and Mr. Brockman has participated in more neuroimaging and other studies. This report underlines updates (rather than supplants) my findings of August 6, 2021, incorporating newly available data and any amendments to my earlier opinions. Therefore, my August 2021 report should be reviewed prior to, and in conjunction with, this supplemental report, in order to have a fully informed and accurate accounting of my findings.

**MORE RECENTLY REVIEWED SOURCES OF INFORMATION**

1) Sleep study, August 12-13, 2021
2) FDG PET scan report, August 24, 2021
3) EEG report, September 2, 2021
4) Medical records from Mr. Brockman, dates ranging from 1997-2014
5) Dr. Denney's interview notes with Kathy Keneally on June 14, 2021, Pete Romatowski on June 15, 2021
6) Dr. Darby's interview notes with Dorothy Brockman
7) Medical records from Baylor College of Medicine for Drs. Pool and Smith through to August 18, 2021
8) Houston Methodist hospitalization records, September 15-18, 2021

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **3** of **43**

9) Reports of Maria Ponisio, M.D. on neuroimaging, September 1, 2 and 5, 2021
10) Peer review conference call with Marc Agronin, M.D., Bernice Marcopulos, Ph.D., James Seward, Ph.D., Elkhonon Goldberg, Ph.D., and Michael Welner, M.D., September 30, 2021
11) Video recording and transcript of Mr. Brockman's interview, October 2, 2021
12) Video recording and transcript of Mr. Brockman's interview with Marc Agronin, M.D., October 3, 2021
13) Interview with Dorothy Brockman, October 2, 2021
14) Video recording and transcript of Thomas Wisniewski, M.D. examination, October 17, 2021
15) Video recording and transcript of Drs. Dietz and Denney's interview with Mr. Brockman, October 20, 2021
16) Dr. Lai's interview with government prosecutors, September 8, 2021
17) Government prosecutors' interview notes with Dana Abrahamsen and Burke Kappler on August 24, 2021, and September 1, 2021
18) Medical record of Dr. Lai's examination, October 7, 2021
19) Report of Marc Agronin, M.D., October 29, 2021
20) Repot of Thomas Wisniewski, M.D., October 29, 2021
21) Report of Christopher Whitlow, M.D., October 29, 2021


## SUMMARY OF FINDINGS

Mr. Brockman displays the following significant cognitive deficits that render him unable to assist in preparing and participating in his defense.

- Mr. Brockman's diagnosis is **major neurocognitive disorder (otherwise known as dementia)**.

- His presentation in testing reflects evidence for Parkinson's disease dementia, and imaging is consistent with co-occurring Alzheimer's disease dementia. The exact trajectory of Mr. Brockman's declining abilities is unclear, but what is certain is that his abilities will continue to weaken and his cognition will continue to worsen.

- His memory problems are sufficiently pronounced as to make it unlikely that he will recall or be able to provide context or explanations for past conversations, ambiguous documents, or other documentation and source material.

- His tested, reported, and demonstrated memory shows an inability to retain and recall recently learned information, such as personal events, conversations and other materials. His inability to recall the continuity of prior discussions lead to

U.S. v. Robert T. Brockman
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **4** of **43**

each encounter assuming the atmosphere of his being exposed to information for the first time.

- Mr. Brockman confabulates at times in response to unidentified gaps in his memory. Because this confabulation is detectable only when one has external sources of data available, there is a high likelihood that he would provide unreliable information when he claims to have recall. Moreover, it is difficult to identify when he provides unreliable information because he remains self-assured in his communication.

- Mr. Brockman is intermittently confused. However, he will not inform others of that confusion, because he is unaware about when he becomes cognitively disengaged from real events. In such instances, he maintains self-assuredness but is disconnected from both content and context.

- Mr. Brockman shows deficits in working memory; specifically, the ability to hold and manipulate information in one's mind while performing mental operations on it. Understanding a complex sentence, fast moving dialogue, or managing multiple ideas simultaneously all require intact working memory.

- He displays a tendency to be agreeable. This renders Mr. Brockman vulnerable to leading questions and to respond politely to please a questioner, even though he may not have a full appreciation for the accuracy of his responses or the consequences of being led along in questioning.

- In recent months, Mr. Brockman has demonstrated a significant decline in his stamina. He is now unable to attend, process information, shift from one activity to the other, and maintain focus over several hours. He cannot sustain attention for extended cognitive activities. Mr. Brockman has only a narrow window of mental stamina during which he can engage and focus on his surroundings.

- If he did not have extensive professional home care, he would likely be in a nursing home or skilled nursing facility due to the daily assistance he requires.

- Performance validity testing does not support malingering. The structural and functional neuroimaging data, which cannot be faked, provide additional confirmation that Mr. Brockman suffers from a genuine neurodegenerative brain disease.

U.S. v. Robert T. Brockman
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **5** of **43**

## RECENT STUDIES AND HISTORY

### Sleep study: August 12-13, 2021

Mr. Brockman participated in a second sleep study on August 12-13, 2021 at Memorial Hermann Hospital Texas Medical Center "for titration of continuous positive airway pressure." He had been diagnosed with severe obstructive sleep apnea based on his initial sleep study of April 29, 2021. The August evaluation demonstrated severe obstructive sleep apnea that was improved with positive airway pressure. During the monitored period there was no evidence of dream enactment behavior or other abnormal sleep movements noted. However, the study covered only a limited period of time, and therefore did not definitively resolve questions of Mr. Brockman's sleep behavior.

### Neuroimaging – FDG PET Scan, August 24, 2021

At the request of the government, a second FDG PET scan of the brain was performed on Mr. Brockman, on August 24, 2021. The study revealed mildly reduced uptake in the posterior temporal lobes and bilaterally in the parietal lobes with slightly reduced uptake in the frontal lobes. The abnormality was read by the neuroradiologist as "Findings are mild, but very suggestive of neurodegenerative disease, particularly Alzheimer's disease. Although statistically less likely, dementia with Lewy bodies or Parkinson's disease with dementia can have a similar scan pattern. The markedly abnormal uptake on the prior Amyvid PET scan [on July 28, 2021] also somewhat favors Alzheimer's disease over DLB/PDD."

On September 5, 2021, Maria Rosana Ponisio, MD, a neuroradiologist retained by the government, opined of the August 24 FDG PET Scan that "the described pattern of hypometabolism can be seen in early Alzheimer's dementia in the correct clinical setting. When compared to prior examination, there is a mildly progressive decrease of metabolic activity in the compromised brain areas."

Dr. Ponisio also reviewed the Amyvid PET Scan of July 28, 2021, and opined that "this is a positive amyloid-PET study, indicating moderate to frequent beta-amyloid neuritic plaques," which is "the amount present in patients with Alzheimer's disease." She further reported that there was "statistical significant tracer deposition in the cerebral cortex," including in the precuneus, posterior cingulate, anterior cingulate, bilateral temporal lobes, and superior parietal lobes, and inferior frontal gyrus.

The FDG PET scan of August 24 (along with the FDG PET of March 12, 2021) and the Amyloid PET of July 28, 2021 presented with pathology consistent with Alzheimer's disease (AD). A recent study found nearly 100% accuracy in detecting autopsy-confirmed

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **6** of **43**

AD when both types of PET scans are congruent (for AD), albeit in a relatively young onset study population.[1]

### Electroencephalogram (EEG) – September 2, 2021

At the request of the government, Mr. Brockman underwent an electroencephalograph (EEG) on September 2, 2021 at Houston Methodist Hospital. The electrophysiologist interpreted the findings as "mildly abnormal…characterized by diffuse slowing of the background, a non-specific indicator of global cerebral dysfunction." There was no evidence noted of epileptiform discharges or seizures.

### Acute Care and Hospitalization – September 13-18, 2021

On September 13, 2021, Mr. Brockman presented to the emergency department of Houston Methodist Hospital due to a two-week history of right elbow swelling after a "mild fall" without loss of consciousness. His neurological status was described only as "alert." He was diagnosed with olecranon bursitis of the right elbow.

Mr. Brockman was admitted to Houston Methodist Hospital from September 15 – 18, 2021 with mental status changes such as confusion, disorientation, and lethargy accompanied by fever and cough, beginning the day before admission. Urine culture grew Klebsiella. Doctors started him on antibiotics, and he displayed improved mental status over the next three days. Mr. Brockman was diagnosed with acute toxic metabolic encephalopathy, urinary tract infection, and thrombocytopenia (low blood platelets).

A head CT obtained during that hospitalization on September 16 revealed microvascular ischemic changes of the white matter and diffuse brain volume loss. The imaging showed stable prominent lateral ventricles, and no CT evidence of acute intracranial pathology.

During this hospitalization, Mr. Brockman also underwent an EEG on September 17 that was interpreted to show a diffuse disturbance in brain function. No seizure activity was detected.

### Dorothy Brockman – October 2, 2021

I interviewed Dorothy Brockman on October 2, 2021, about her husband's more recent cognitive abilities.

---

[1] Lesman-Segev, O.H. et al **Diagnostic Accuracy of Amyloid Versus F-Fluorodeoxyglucose Positron Emission Tomography in Autopsy-Confirmed Dementia** *Annals of Neurology* 89 pp 389-401 2021.

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **7** of **43**

Mrs. Brockman noted that "his memory is pretty well shot," although she indicated that his long-term memory is better than his short-term memory. For example, she related that he always wants to know his schedule, which she tells him, and then he will ask again shortly after because he has forgotten what she has told him. Moreover, she recounted that he gives advice while she is driving about the route she should take to get to their destination, but is often wrong because he does not recall how to get to familiar places. He generally does not know the day, month, or year, she added.

Mrs. Brockman reported that he "often asks when he's going back to Houston…he does that a lot," although they already reside there. Moreover, she related that he does not recall how to get to the bathroom in the house they have been living in since February.

Observing that his thinking "gets worse with every infection," Mrs. Brockman estimated that over the past three months, her husband has had episodes of confusion (e.g., not knowing where he is, what is going on, what situation he is in) about four days out of seven. She reported that he does not participate in any decisions regarding managing the household or their finances, and now "he makes no decisions," although she does try to keep him informed of her decisions. Due to his reported limitations, she has power of attorney for him.

Mr. Brockman reportedly requires assistance with most activities of daily living (ADLs), including dressing, bathing/showering, and toileting. He has 24-hour assistance for his ADLs due to concerns about his falling and his difficulties with self-care. His wife related, for example, that Mr. Brockman has trouble figuring out how to dress himself. Said Mrs. Brockman, "we do everything for him."

According to Mrs. Brockman, her husband cannot operate his phone or the TV remote. She indicated that he is on his computer infrequently nowadays due to his difficulty recalling passwords and how to access email. Some time ago, his son unplugged his computer and Mr. Brockman could not figure out what was wrong with it.

Mr. Brockman's mood was described as depressed, which Mrs. Brockman thinks has worsened over the last 3-6 months.  His appetite was noted to be "not great." Mrs. Brockman reflected that he sleeps well with Trazadone and will fall asleep in his chair during the day. There has been no evidence of agitation or aggressiveness. She reported that there is "not too much" paranoia or suspiciousness, and that her husband does not have current issues with visual hallucinations.

Mr. Brockman's typical day, according to his wife, begins after the night shift leaves and Frank Gutierrez, his daily caregiver, arrives. Frank assists Mr. Brockman with getting out of bed and to the kitchen where he will have cereal. He will read the Wall Street Journal but she believes that he has little recall of what he reads. Frank will then assist him to shower and dress. She indicated that he does not seem to want to be alone and will follow her

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **8** of **43**

around the home. Unlike what Mr. Brockman reported to me, he does not walk their dog and is not allowed outside alone for fear that he will fall or get lost. Following lunch, Mr. Brockman may spend some time on his exercise bike or see a visitor. However, his day is generally not structured and he typically does not initiate tasks on his own. He may fall asleep in his chair in the afternoon. Following dinner, they will watch a movie or a television program although he will typically fall asleep during that activity.

### Neurology Follow-Up Visit with Eugene Lai, M.D., Ph.D. – October 7, 2021

Dr. Lai is Mr. Brockman's treating neurologist, and first evaluated him for Parkinson's disease on January 8, 2020. In that visit, Dr. Lai administered the Montreal Cognitive Assessment (MoCA)[2], on which Mr. Brockman scored a 20/30. Dr. Lai diagnosed him with mild to moderate cognitive impairment, although at the time he noted Mr. Brockman's Montreal Cognitive Assessment score raised the possibility of dementia with Lewy bodies.

Mr. Brockman most recently returned to Dr. Lai on October 7, 2021. Dr. Lai noted that Mr. Brockman's cognitive function had deteriorated since his last visit and that his neurologic exam was also worse than when previously seen. Dr. Lai also noted that Mr. Brockman needs help with most of his basic activities of daily living, that his memory is declining, he is physically weaker, has signs of peripheral neuropathy (nerve damage), and exhibits gait imbalance.

In the October 7, 2021 visit, Mr. Brockman's MoCA was 13/30, a decline from the January 2020 score of 20/30.

Dr. Lai's clinical impression was that Mr. Brockman's presentation was consistent with "Dementia associated with Parkinson's disease."

### NEUROPSYCHOLOGICAL TESTING

Mr. Brockman has undergone five previous neuropsychological evaluations beginning with his initial March 1, 2019 exam by Baylor College of Medicine neuropsychologist Dr. Michele York[3]. Originally, Mr. Brockman's primary care physician referred him to Dr. York due to cognitive concerns. Dr. York followed up with Mr. Brockman in December

---

[2] Montreal Cognitive Assessment (MoCA) is a well-established, brief measure of global cognitive functioning with a score range of 0-30. Higher scores denote more intact cognitive abilities. A MoCA score less than 21 has been found to be optimal in screening for Parkinson's disease dementia. Dalrymple-Alford, J.C. et al. **The MoCA: Well-Suited Screen for Cognitive Impairment in Parkinson Disease** *Neurology* 75 pp 1717-1725 2010.

[3] Previous neuropsychological evaluations: Dr. York: 3/1/19, 12/3/19, 10/7/20; Dr. Denney: 5/19/21; Dr. Guilmette: 7/13-14/21

U.S. v. Robert T. Brockman
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **9** of **43**

2019 and then again in October 2020 upon the request of Mr. Brockman's attorney. Upon the court's direction in the instant case, neuropsychologist Dr. Robert Denney evaluated Mr. Brockman in May 2021. At the request of Mr. Brockman's attorneys, I conducted a fifth neuropsychological evaluation in July 2021.

Across all five data sets available to me, Mr. Brockman has consistently exhibited impairments in multiple cognitive domains that reflect a significant decline from his baseline. For example, in all but one evaluation, that on December 3, 2019, the majority of his test scores have fallen below average. An average of forty-seven percent of his test scores across the five evaluations have fallen in the exceptionally low range or below the 2nd percentile meaning that more than 98% of his same age peers would have performed better on these cognitive measures than he did.

The table below illustrates the number and percentage of tests, in parentheses, at each evaluation that fell within specific score ranges according to percentiles. A percentile refers to an examinee's performance on a test that is equal to or greater than the percent of scores that were obtained by those in the normal or non-clinical normative group. So, if Mr. Brockman's score on a test fell at the 2nd percentile, it means that his score was equal to or higher than 2% of age-matched, neuro-normal peers. Conversely, 98% of his age-matched peers would have scored higher than he did.

| Descriptors | 3/1/19 (30 scores) | 12/3/19 (32 scores) | 10/7/20 (29 scores) | 5/19/21 (35 scores) | 7/13-14/21 (38 scores) |
|---|---|---|---|---|---|
| Exceptionally High ≥ 98 percentile | 0 | 0 | 0 | 0 | 0 |
| Above Average 91-97 percentile | 0 | 0 | 0 | 0 | 0 |
| High Average 75-90 percentile | 0 | 1 (3%) | 2 (7%) | 0 | 3 (8%) |
| Average 25-74 percentile | 7 (23%) | 12 (38%) | 2 (7%) | 5 (14%) | 3 (8%) |
| Low Average 9-24 percentile | 4 (13%) | 6 (19%) | 6 (21%) | 6 (17%) | 8 (21%) |
| Below Average 2-8 percentile | 5 (17%) | 4 (13%) | 5 (17%) | 2 (6%) | 5 (13%) |
| Exceptionally Low < 2 percentile | 14 (47%) | 9 (28%) | 14 (48%) | 22 (63%) | 19 (50%) |

Across Mr. Brockman's available data sets, there were some fluctuations with his performance such that at times he would perform somewhat better or worse than at other times, which is typical in repeat or serial evaluations. However, with few exceptions, Mr. Brockman consistently exhibited significant problems with memory and learning, mental processing speed, working memory, visuoconstructional abilities, and in selected aspects of

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **10** of 43

executive functions (e.g., organization/problem solving, alternating and sustained attention).

As a general trend, mental processing speed and his endurance have declined over time. However, his language functions, such as his ability to name objects, his vocabulary or word knowledge, use of syntax and grammar, and word usage have been areas of strength that have been stable with successive evaluations. Mr. Brockman has not developed or shown evidence of aphasia,[4] which can be found in some neurologic illnesses such as certain locations of stroke. In addition, his general fund of knowledge about the world, such as the names of famous authors or where things are located around the world, appears stable.

My neuropsychological assessment conducted on October 2, 2021 was to examine Mr. Brockman's thinking skills as they relate to his competence to stand trial. It took place on Saturday (10 AM – 2:30 PM) in the law offices of Jones Day in Houston, TX, where I examined him previously on July 13 and 14.

**Test Procedures**

In my previous evaluation of Mr. Brockman in July, he exhibited significantly reduced mental processing speed and stamina relative to previous assessments. He took far longer to complete tasks than he did in the first four evaluations, in which he was able to finish long assessments with multiple test procedures in just one day. By July, however, he was unable to finish in two days what he was previously able to complete in just one. He also exhibited significantly more confusion and confabulation (e.g., the production of false, distorted, or misinterpreted memories that the person believes to be true to fill in gaps in recall). He was also less attentive and required more re-direction to understand task demands than in previous evaluations.

The test procedures listed below, which are commonly used with an older adult population and in the evaluation of dementia, were chosen to assess multiple domains of neuropsychological functioning related to competence such as orientation, global cognitive status (e.g., immediate memory, visuospatial/constructions, language, attention, delayed memory), attention/mental speed/working memory, language functions, and problem solving/executive functioning. Assessment procedures were chosen that were relatively brief, in consideration of his limited endurance, stamina and duration of assessment.

Some measures were also chosen because they had been administered in the previous exams, which would allow for direct comparisons of Mr. Brockman's current performance with prior examinations. An alternate form (form B) of the Repeatable Battery for the Assessment of Neuropsychological Status (RBANS) was administered to eliminate the

---

[4] Aphasia is a language disorder that can affect verbal expression and comprehension.

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **11** of **43**

unlikely possibility of practice effects. The assessment procedures also included multiple performance validity tests in order to evaluate for potential malingering or suboptimal effort.

- Rey 15 Item Test with Recognition
- Wechsler Memory Scale-III: Orientation & Information; Mental Control subtests
- Boston Diagnostic Aphasia Exam: Complex Ideational Material subtest
- Medical Symptom Validity Test
- Wechsler Adult Intelligence Scale-IV: Digit Span subtest
- Connors Continuous Performance Test 3 (CPT3)
- Repeatable Battery for the Assessment of Neuropsychological Status – Form B (RBANS)
- Trail Making Test - A
- A-Test
- Controlled Oral Word Association Test (FAS)
- Coin-in-the-Hand Test
- Delis-Kaplan Executive Function System (D-KEFS): Twenty Questions Test

**Medications**

AZO cranberry urinary tract health, Exelon patch, Miralax, Carbidopa-Levodopa, Bupropion, Synthroid, Eliquis, Vitamin D3, acidophilus, Cephalexin, Trazadone, Rosuvastin, Qeutiapine

**Observations of Behavior**

Mr. Brockman presented for the evaluation as alert and pleasant. He arrived on time for the testing accompanied by his caregiver and "male nurse," as he described him, Frank Gutierrez. Mr. Gutierrez assisted Mr. Brockman with getting in and out of the chair, walking, and toileting but he was not present during my interview or evaluation.

Early in the evaluation, Mr. Brockman indicated that he would need his reading glasses but was not sure where they were. I spoke with Mr. Gutierrez, who indicated that Mr. Brockman had them with him but he must have put them down somewhere or misplaced them. Mr. Gutierrez gave Mr. Brockman his own reading glasses to use, and Mr. Brockman read without difficulty.

Casually dressed, Mr. Brockman was appropriately groomed. He walked slowly and somewhat unsteadily, particularly after sitting for an extended period, and his movements were slow. He exhibited a slight tremor with tasks requiring fine motor coordination.

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **12** of **43**

Mr. Brockman described his mood as "not particularly good" and acknowledged that there was "no question" he was sad or depressed. He rated his depression as 10/10 (0 = no depression at all; 10 = worst depression ever). Affect was restricted in range. He indicated that he sleeps "very well" and reported getting 7-8 hours of sleep the night before the evaluation. He described his appetite as "acceptable" but that he has lost 15 – 18 pounds.

Mr. Brockman's speech was fluent although somewhat monotonal and variably slow in rate, consistent with Parkinson's. There was no evidence of slurred speech or mispronunciation of words.

Although Mr. Brockman's use of syntax and vocabulary was intact, he made occasional comments during the course of the evaluation that were incorrect or contradictory. Examples of these will be described below.

Mr. Brockman's auditory comprehension was variable. He was generally able to follow simple test directives without difficulty. However, he occasionally required that instructions be repeated when the task demands were more complicated such as with the Coding subtest of the RBANS and the 6s/days condition of the Mental Control subtest of the Wechsler Memory Scale-III. In those instances, he asked for clarification or to have directions repeated if he did not understand them. In contrast, his comprehension for casual conversation (which requires far less "precision" of understanding), appeared generally adequate.

Mr. Brockman exhibited quite intact social skills. He was eager to please and did not relate in a defensive or oppositional manner. He was polite and courteous. Apart from his occasional confusion, there was no evidence of disinhibition or socially inappropriate comments or behaviors. His eye contact was appropriate and Mr. Brockman showed good speech pragmatics with turn-taking during conversations.

However, when greater specificity of past events was needed or when he was asked to clarify certain points, it then became obvious that his understanding or recall of events was much less proficient and reliable. Thus, he projected more a veneer of mental normalcy than he actually possessed. Even during those times when he was clearly confused, Mr. Brockman spoke with confidence and self-assurance.

There was no evidence of significant distractibility from environmental stimuli, such as ambient noises. He was not at all responding to internal stimuli. There was no evidence of hallucinations or psychotic thinking.

Mr. Brockman appeared to persevere and persist at tasks even though he was often slow in completing them. In the latter part of the exam decreased stamina and fatigue clearly interfered with his performance.

His stamina declined notably after lunch or by early afternoon based on his self-report and by observation. For example, during the administration of the Connors Continuous Performance Test 3 (CPT 3), a 14-minute, 360 trial computer-administered measure of sustained attention, Mr. Brockman became very inattentive and clearly lost focus. There were some periods of several seconds when he did not respond to the test stimuli at all and seemed to be staring at nothing (and later suggested that he may have fallen asleep briefly), which is highly relevant test-taking behavior reflecting substantial inattention that in my opinion invalidated the results. After the test was completed, he reported that he felt like he fell asleep during the test.

A summary of Mr. Brockman's orientation is in the table below. He was oriented to self, age, date of birth, place of birth, month, and city, but was confused in other domains.

Mr. Brockman's orientation and his awareness of space and time fell at the 3rd percentile compared to others in his age group.

Wechsler Memory Scale-III Information and Orientation Subtest Performance (+ = correct)

| Orientation Question | 10/2/21 (Saturday) |
|---|---|
| 1. Full name | + |
| 2. Age | + |
| 3. Date of birth | + |
| 4. Place of birth | + |
| 5. Mother's first name | + |
| 6. US President | + |
| 7. Previous President | + |
| 8. Year | "2012" |
| 9. Month | + |
| 10. Day of the month | "about 20th" |
| 11. Name of place | "office building-prime tenant law firm" – could not name |
| 12. City | + |
| 13. Day of week | "Thursday" |
| 14. Approximate time (within 30 minutes) | Missed by 70 minutes |
| **Total correct** | **9/14 (3rd percentile for age)** |

During the initial clinical interview on October 2, Mr. Brockman exhibited episodic confusion over recent events. With regard to his legal case, he was asked what competence to stand trial meant and he replied that it was "basically whatever you say." With further questioning, he clarified that he probably needs "to participate in conversations with attorneys, recall things."

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **14** of **43**

Mr. Brockman was asked what he was charged with and he initially replied that it was "not at all clear." However, he did eventually state that "the Department of Justice believes that I have been part of a scheme to avoid income taxes." He was aware that if found incompetent to stand trial then he would not go to trial but he would stand trial if found competent.

Mr. Brockman was able to name his attorney as Kathy Keneally. When asked if he was able to give her the information she needs for his case, he indicated that he thought probably not due to his problems remembering.

Mr. Brockman spontaneously indicated that he recognized me but thought that it was about a year ago when we met (it was July) and that I had seen him "here in Houston – and it may well have been right here at the law firm, just as we're situated today - that's just a guess." In actuality, we were meeting in the same conference room at Jones Day that I had seen him in less than three months previously but he did not seem confident of that connection.

I asked Mr. Brockman if he remembered the evaluation by Drs. Dietz and Denney and he indicated that he did, and that he had seen them a couple of years ago (they saw Mr. Brockman in May). However, he correctly recalled that they conducted an exam similar in purpose to mine but for his "opponent."

When asked for his home address, Mr. Brockman indicated that he could not recall it. He reported that he had been living in his new home for only two months (it has been eight months). He was unable to recall his previous home address either. I asked him for the last address that he could remember living at and he told me "6802 Stony Brook," which he estimated was about five years ago, but added that it was just a guess. I asked Mrs. Brockman if they had ever lived on Stony Brook and she indicated that when they were first married, in their 20s, they lived on Stony Brook although she was unsure of the street number. This is a typical response of many patients with better remote memory than short term memory who are able to recall a home address from many decades earlier but are unable to provide the address that they have lived at most recently.

Regarding his medical history, Mr. Brockman was unable to denote Parkinson's disease but was able to describe some of its symptoms ("a disease that causes you to lose body strength and also lose mental strength"). He added that it is a progressive disease with no known cure. He also described that over the summer (e.g., "June, July time frame") he contracted a UTI which "turned out to be more serious – blood poisoning." His blood poisoning (sepsis) occurred, however, on two occasions - in March and in June. Moreover, when asked when he was last hospitalized, he thought two months ago even though it was less than two weeks ago (September 15-18).

U.S. v. Robert T. Brockman
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **15** of 43

Mr. Brockman identified poor memory as the most noticeable problem with his thinking skills. He added that he didn't notice this originally but others did. He related that he used to be able to solve problems on spread sheets but that he can't do so any longer. Overall, he felt that his cognitive problems have been getting "incrementally worse."

Consistent with his report from my previous interview with him, Mr. Brockman indicated that he retired as both CEO and president of Reynolds and Reynolds on January 1 of this year even though he retired earlier than that, in June 2020 (from the President position) and November 2020 (from the CEO position).

He expressed that he was particularly frustrated with his inability to remember names. As an example, he stated that he was unsure of the name of the male nurse who accompanied him to this evaluation "either Paul or Frank" (it was Frank). According to Mr. Brockman, Mr. Gutierrez lives with him at his home 24 hours a day, although that is incorrect according to Mr. Gutierrez and Mrs. Brockman.

Mr. Brockman further elaborated that two of Frank Gutierrez's sons work with him and he is embarrassed that he has been unable to remember their names. I asked Mr. Gutierrez about this and he indicated that his sons do not work with Mr. Brockman and never have, yet Mr. Brockman continues to believe that they do even though Mr. Gutierrez has reminded him of this fact on several occasions. Thus, in spite of reminders, Mr. Brockman has continued to believe that two of his caregivers are Mr. Gutierrez's sons, which reflects the unreliability of his memory even with correction.

In addition to the above examples, there were other instances during the course of my evaluation when Mr. Brockman exhibited confusion and confabulation about my assessment or related matters.

In the administration of the *Coin-in-the-Hand Test*, Mr. Brockman watched as I held both my hands out with my palms facing toward the ceiling. I then placed a coin in the palm of one of my hands and then closed both hands simultaneously into fists. I repeated this procedure 10 times. Each time I did this, Mr. Brockman mimicked my movements by also closing both his hands into fists even though that was not at all what he was asked to do. This involuntary repetition or imitation of another person's movements is known as echopraxia, which is a sign of impaired executive functions found in neurologic and psychiatric disorders.

Near the end of my evaluation, I asked Mr. Brockman where we were. He replied, "13th or 14th floor in an office building in Houston." We were actually on the 33rd floor but I asked him if he could be more specific as to our location and he stated, "I have it written down but I can't remember it." I asked him how this location was chosen for our meeting. He

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

replied that the location "must have built in network needed and has links to the outside world," referring to the technological requirements only. He did not appear to recall or appreciate that we were in the offices of his law firm, Jones Day.

**Test Results**

Test results can be described as a percentile or as various standard scores, both of which provide information about how an examinee performed relative to a normal or neuro-healthy person of about the same age (and in some cases with the same education level). This is known as the normative group.

For example, a percentile refers to the percent of cases or people in the normative group who would have scored equal to or lower than the examinee. Thus, if a person's score falls at the 30th percentile, it means that he or she scored equal to or higher than 30% of "normals." That also means that 70% of the normative group would have scored higher than the examinee. The other standard scores include those with a mean of 100 and a standard deviation of 15 and T scores, which have a mean of 50, and a standard deviation of 10. Unless otherwise noted, the higher these standard scores, the better the performance.

Both of these types of scores provide the same information, which is where the examinee's score falls relative to the normal comparison group.

Some scores will be described as "raw scores," which refers to the actual number of items that the examinee may have responded to correctly or incorrectly. However, without a raw score being converted to a standard score or percentile, the reader cannot ascertain the meaning of that score. A table below shows the relationships among the standard scores and percentiles, which will be used to describe Mr. Brockman's performance across multiple test procedures, as well as the descriptive labels associated with them.

| Standard Scores (Mean=100; Standard Deviation = 15) | T Scores (Mean = 50; Standard Deviation = 10) | Corresponding Percentiles | Descriptive Labels |
|---|---|---|---|
| 130 and higher | 70 and higher | 98 and higher | Exceptionally High |
| 120-129 | 63-69 | 91-97 | Above Average |
| 110-119 | 57-62 | 75-90 | High Average |
| 90-109 | 43-56 | 25-74 | Average |
| 80-89 | 37-42 | 9-24 | Low Average |
| 70-79 | 30-36 | 2-8 | Below Average |
| Below 70 | Below 30 | Less than 2 | Exceptionally Low |

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **17** of **43**

## Test Validity

Performance validity tests (PVTs), or indicators, were administered to Mr. Brockman in order to obtain empirical and objective evidence of effort and possible malingering on ability tests. It is important to recognize that many PVT norms or cut-off scores used to identify invalid responding were initially established with a young to middle age population. Therefore, in an elderly population, particularly among those with some cognitive loss, an older adult may obtain an invalid PVT score due to normal or abnormal aging rather than inadequate effort.[5] Incorrectly identifying someone as malingering or putting forth inadequate effort is a false positive error, which is far more likely to occur with PVTs that do not have well established normative data and cutoff scores for older adults, including those with dementia. Thus, clinicians need to be particularly cautious about making such an error with an older, cognitively compromised population.

Validity test results are described below.

- *Medical Symptom Validity Test (MSVT)*: Mr. Brockman obtained invalid range scores on two of three indicators on the MSVT, but his profile also met criteria for possible genuine memory impairment. This means that his invalid range scores were also consistent with a genuine memory disorder. Consequently, inadequate effort cannot be concluded based on his MSVT scores alone, given that his performance can also be evident in patients with dementia.[6]

- *Rey 15-Item Test Plus Recognition (RFIT)*: The most commonly used RFIT cut-off for suspect effort has been found to produce high numbers of false positive identifications for examinees over the age of 60.[7] As such there is no one well-established cut-off score to determine validity in an older population, particularly if cognitive issues are present. However, pattern analysis of very rare scores with free recall and recognition has been suggested as pathognomonic markers of a likely disingenuous performance. Applying these criteria to Mr. Brockman's performance revealed valid range scores that were not consistent with suboptimal effort or malingering.

---

[5] McGuire, C., Crawford, S., & Evans, J.J. **Effort Testing in Dementia Assessment: A Systematic Review** *Archives of Clinical Neuropsychology* 34 pp 114-131 2019; Zenisek, R. et al. **Prevalence of Below-Criterion Reliable Digit Span Scores in a Clinical Sample of Older Adults** *Archives of Clinical Neuropsychology* 31 pp 426-433 2016; Fazio, R.L., Faris, A.N., & Yamout, K.Z. **Use of the Rey 15-Item Test as a Performance Validity Test in an Elderly Population** *Applied neuropsychology* 29:1 pp 28-35 2019.

[6] Singhal, A. et al. **High Specificity of the Medical Symptom Validity Test in Patients with Very Severe Memory Impairment** *Archives of Clinical Neuropsychology* 24 pp 721-728 2009; Green, P. **Medical Symptom Validity Test (MSVT): User's Manual** Edmonton, Canada: Green's Publishing Inc. 2004.

[7] Fazio, R.L., Faris, A.N., & Yamout, K.Z. **Use of the Rey 15-Item Test as a Performance Validity Test in an Elderly Population** *Applied Neuropsychology* 29:1 pp 28-35 2019.

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **18** of **43**

- *Coin-in-the-Hand Test (CHT)*: Based on what is generally an accepted cutoff for the CHT, Mr. Brockman's score fell inside the invalid range. However, research has revealed that an even lower score than his has been found in amnestic patients.[8] In patients with moderate to severe dementia, the suggested cutoff has resulted in a specificity of only 77% (e.g., identifying credible effort when credible effort is present), which translates to a false positive error rate of 23% in which the CHT identifies credible effort as non-credible.[9] Thus, in individuals with more than mild dementia, the suggested cutoff for the CHT is too stringent.

- *A-Test*: Valid range score.

- *Reliable Digit Span (RDS)*: Valid range score.

- *Connors CPT 3 Validity*: The Connors CPT assessment report stated that Mr. Brockman made an unusually high number of omission errors. This performance may indicate a clinical impairment. However, other possibilities should be considered such as fatigue, misunderstanding of the instructions, or lack of motivation to respond with full effort. As noted earlier in my report, based on my observations of Mr. Brockman during the entirety of the CPT, his fatigue at that point in the examination significantly affected his performance such that he was unable to direct his focus on this lengthy measure of sustained attention. Consequently, his scores likely underestimate his actual sustained attention but speak more to the significant effect his poor stamina has on his ability to maintain focus over time.

*Summary of Effort Testing*: As noted above, Mr. Brockman's performance on the Connors CPT was invalidated due to his fatigue. Across the remaining five performance validity indicators, three scores (Rey Fifteen Item Plus Recognition, A-Test, and Reliable Digit Span) fell in the valid range. A fourth (Medical Symptom Validity Test) fell in the invalid range but could be accounted for by genuine cognitive impairment. A fifth (Coin-in-the-Hand Test) fell in the invalid range according to the generally accepted cutoff; however, there is an unacceptably high number of false positive errors in individuals with more than mild dementia.

One failure on a PVT is not considered evidence of test invalidity given that it is "fairly common for a credible patient to fail one" performance validity test in a

---

[8] Hanley, J.R., Baker, G.A., & Ledson, S. **Detecting the Faking of Amnesia: A Comparison of the Effectiveness of Three Different Techniques for Distinguishing Simulators from Patients with Amnesia**. *Journal of Clinical and Experimental Neuropsychology* 21:1 pp 59-79 1999.
[9] McGuire, C., Crawford, S., & Evans, J.J. **Effort Testing in Dementia Assessment: A Systematic Review** *Archives of Clinical Neuropsychology* 34 pp 114-131 2019.

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **19** of 43

neuropsychological examination.[10] Thus, the PVT evidence is not suggestive of suboptimal effort or malingering.

In addition, the pattern of Mr. Brockman's memory performance in which his recognition memory [11] was superior to his free recall was consistent with the typical memory pattern found in individuals with genuine memory deficits,[12] which supports his complaints and memory test performance as being valid.

**Global Cognitive Status**

The *Repeatable Battery for the Assessment of Neuropsychological Status – Form B* (RBANS) was administered to Mr. Brockman as a global measure of neuropsychological functioning that assesses abilities in multiple cognitive domains. His subtest and index scores are listed on the table below along with his scores from the July evaluation for comparison.

On the RBANS, Mr. Brockman exhibited an overall total score that fell below the 1st percentile for his age group, reflecting that 99% of same age peers would have scored higher than he did. He obtained below average to exceptionally low scores on subtests assessing his ability to absorb new information (e.g., immediate memory). His retention and recall of newly learned information (e.g., a 10-item word list read to him four times, a short story composed of 12 idea units or details read to him twice, and a geometric figure that he was asked to copy) after a delay of about 15 minutes ranged from low average to exceptionally low.

Mr. Brockman's memory performance reflects his inability to retain and recall recently learned information, which would adversely affect his capacity to recall recent conversations with his attorneys, retain information that his lawyers convey to him, or to remember information presented at trial. His memory impairment significantly reduces the amount of new information that he can absorb and the amount of information that he can retain over time.

Although some specific delayed memory subtests appeared slightly improved from his exam in July, his overall delayed memory index did not differ statistically significantly from his prior evaluation and continued to fall well below the 1st percentile.

---

[10] Victor, T.L. et al. **Interpreting the Meaning of Multiple Symptom Validity Test Failure** *The Clinical Neuropsychologist* 23 pp 297-313 2009.

[11] In testing a person's ability to retain information after a delay or distractor, an individual is usually asked to first recall the information spontaneously (free recall) but then may also be given cues or multiple choices to see if they prompt further retrieval (recognition). In most genuine memory disorders, recognition is superior to free recall. Hence, the reason we all prefer multiple choice test questions to fill-in-the-blank.

[12] Green, P. **Medical Symptom Validity Test (MSVT): User's Manual** Edmonton, Canada: Green's Publishing Inc. 2004.

U.S. v. Robert T. Brockman
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **20** of **43**

The visuospatial/constructional index on the RBANS was lower than in July by almost a full standard deviation due to Mr. Brockman's significantly worse performance on a subtest assessing his ability to judge angles of varying degrees and his figure copy. With the latter, Mr. Brockman's attempt to copy a moderately complex design revealed a number of intrusions and perseverative errors (e.g., drawing elements of the design more than once or in a distorted fashion), reflecting his visuoperceptual and spatial deficits that are common among persons with Parkinson's disease.[13]

Other indices that assessed attention (8th percentile) and language (30th percentile) were generally unchanged from his performance of about 2 ½ months ago.

Overall, results from the RBANS continue to reveal significant impairments in multiple cognitive domains consistent with dementia.

| Repeatable Battery for the Assessment of Neuropsychological Status (RBANS) | July 13-14, 2021 | | October 2, 2021 | | |
|---|---|---|---|---|---|
| | Raw Score Form A | Standard Score or Percentile | Raw Score Form B | Standard Score or Percentile | Qualitative Descriptor |
| Immediate Memory Index | | 57 | | 61 | Exceptionally Low |
| List Learning | 3 | <1st %ile | 14 | 1st %ile | Exceptionally Low |
| Story Memory | 9 | 5th %ile | 8 | 2nd %ile | Below Average |
| Visuospatial/Constructional Index | | 69 | | 56 | Exceptionally Low |
| Figure Copy | 15 | 9th %ile | 12 | 1st %ile | Exceptionally Low |
| Line Orientation | 9 | <3rd %ile | 3 | <3rd %ile | Exceptionally Low |
| Language Index | | 83 | | 92 | Average |
| Picture Naming | 10 | >75th %ile | 10 | >75th %ile | High Average |
| Semantic Fluency | 8 | 1st %ile | 12 | 9th %ile | Low Average |
| Attention Index | | 82 | | 79 | Below Average |
| Digit Span | 11 | 84th %ile | 10 | 75th %ile | High Average |
| Coding | 7 | 1st %ile | 2 | < 1st %ile | Exceptionally Low |
| Delayed Memory Index | | 48 | | 52 | Exceptionally Low |
| List Recall | 0 | 3-9th %ile | 0 | 3-9th %ile | Below-Low Average |
| List Recognition | 14 | <3rd %ile | 12 | <3rd %ile | Below Average |
| Story Recall | 1 | 1st %ile | 4 | 9th %ile | Low Average |
| Figure Recall | 0 | <1st %ile | 5 | 9th %ile | Low Average |
| Total Scale | | 59 | | 60 | Exceptionally Low |

---

[13] Troster, A.I. & Garrett, R. **Parkinson's Disease and Other Movement Disorders** in *Textbook of Clinical Neuropsychology (2nd Ed.)* pp 507-559 2018.

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **21** of **43**

Measures of attention, mental processing speed, and working memory continued to reveal significant difficulties. For example, on the CPT 3, a measure of sustained attention or vigilance, Mr. Brockman's performance was invalid due to his level of fatigue, as noted earlier. As a result, his scores reflect substantial inattention and difficulty with focus after about three hours of testing.

The CPT 3 requires the examinee to press a space bar every time a target letter appears on a computer screen. Mr. Brockman did not respond to 56% to 81% of the targets across six time blocks reflecting substantial inattention (his average missed target percentage across all six time blocks was 75). In July his missed target percent average was 36 and in May with Dr. Denney, it was 21.

The CPT-3 was administered to him before 2 PM after starting the examination at 10 AM yet his vulnerability to fatigue and his decreased endurance rendered him unable to sustain his attention for only 14 minutes to a mundane cognitive activity. Moreover, the T scores noted in the table below do not accurately reflect how significantly worse his scores were in October compared to July because the CPT 3 gives a maximum standard score of 90T even if the examinee's performance exceeds four standard deviations from the mean (e.g., 90T), which clearly Mr. Brockman would have on a number of subtests, including measures of his reaction time. Thus, Mr. Brockman has a narrow window of mental and physical stamina during which he can engage and attend to his surroundings. His mental status fades quickly and substantially interferes with his capacity to maintain his focus and respond effectively to what is transpiring around him.

Measures of working memory (e.g., the ability to hold and manipulate information in one's "mind" while performing mental operations on it) were largely unchanged from his July examination and continued to fall mostly below average to exceptionally low. Working memory is an important cognitive function because all other mental operations build upon it. The capacity to hold a thought, an idea, a concept in your head and then to respond to it or think about it requires working memory. To understand a complex sentence, keep track of fast-moving dialogue, or synthesize multiple ideas simultaneously are also dependent on working memory, which in Mr. Brockman's case would significantly interfere with his ability to participate in a meaningful exchange of ideas with his attorneys and to participate in court proceedings.

The examinee continued to be unable to complete Trail Making Test, Part A, a simple measure of visual scanning, attention, and mental speed, that required him to connect numbers from 1-25 in ascending order under timed conditions. As with his prior exam, part way through the task, he appeared unable to determine where he was to go next or

U.S. v. Robert T. Brockman
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **22** of **43**

seemed unable to visually find the next target resulting in the test being discontinued prior to him finishing. The speed with which he was able to perform on this task fell significantly below the normal range.

The mental control subtest of the Wechsler Memory Scale-III is another test of working memory but that also has a speed component, which assesses mental efficiency or mental processing speed as well as working memory. Here, Mr. Brockman exhibited significant difficulty both with the working memory tasks themselves such as reciting the months of the year or days of the week backward but he was also slow to perform these mental operations.

The attention index on the RBANS was unchanged from previously and fell below average.

| ATTENTION/MENTAL SPEED/WORKING MEMORY | | | | | |
|---|---|---|---|---|---|
| | July 13-14, 2021 | | October 2, 2021 | | |
| Test | Raw Score | Standard Score or Percentile | Raw Score | Standard Score or Percentile | Qualitative Descriptor |
| **Connors Continuous Performance Test 3 (higher T-scores = worse performance)** | | | | | |
| Detectability | | 70T | | 82T | Very Elevated |
| Omissions | | 90T | | 90T | Very Elevated |
| Commissions | | 43T | | 43T | Low |
| Perseverations | | 44T | | 56T | High Average |
| Hit Reaction Time (HRT) | | 83T | | 90T | Atypically Slow |
| Hit Reaction Time Standard Deviation | | 84T | | 90T | Very Elevated |
| Variability | | 86T | | Too few hits to be calculated | |
| HRT Block Change | | 76T | | 90T | Very Elevated |
| HRT Inter-Stimulus Interval Change | | 66T | | 90T | Very Elevated |
| **Wechsler Memory Scale-III** | | | | | |
| Mental Control | 7 | 1st %ile | 9 | 2nd %ile | Below Average |
| **Trail Making Test - A** | D/C @ 300 secs. with | <1st %ile | D/C @ 323 secs. | <1st %ile | Exceptionally Low |

U.S. v. Robert T. Brockman
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

| | 14/25 targets completed | | with 19/25 targets completed | | |
|---|---|---|---|---|---|
| **Wechsler Adult Intelligence Scale-IV** | | | | | |
| Digit Span | 14 | 5th %ile | 14 | 5th %ile | Below Average |
| Digit Span Forward | 8 | 25th %ile | 8 | 25th %ile | Average |
| Digit Span Backward | 5 | 16th %ile | 5 | 16th %ile | Low Average |
| Digit Span Sequence | 1 | 1st %ile | 1 | 1st %ile | Exceptionally Low |
| RBANS Attention Index | | 82 | | 79 | Below Average |

As with prior evaluations, Mr. Brockman's language functions appear to be a relative strength. Higher level verbal fluency fell below average and was consistent with his exam in July. However, on a measure of auditory comprehension and inference (Complex Ideational Material), Mr. Brockman's performance was significantly improved and fell in the average range (compared to the exceptionally low range previously), which I believe was due to a lessening of his acute confusion (and delirium) noted in July.

His language index from the RBANS improved from the low average to the average range, consistent with his history of relatively more proficient language abilities in comparison to his other cognitive domains.

| LANGUAGE FUNCTIONS | | | | | |
|---|---|---|---|---|---|
| | **July 13-14, 2021** | | **October 2, 2021** | | |
| **Test** | **Raw Score** | **Standard Score or Percentile** | **Raw Score** | **Standard Score or Percentile** | **Qualitative Descriptor** |
| Controlled Oral Word Association Test (FAS) | 19 | 32T | 22 | 34T | Below Average |
| Complex Ideational Material | 7/12 | 8T | 12/12 | 54T | Average |
| RBANS Language Index | | 83 | | 92 | Average |

On a measure of problem solving and executive functioning that required Mr. Brockman to think conceptually and to appreciate commonalities and differences among objects (*Delis-Kaplan Executive Function System Twenty Questions Test*), his problem-solving approach was disorganized and random.  Mr. Brockman appeared confused about how to approach

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **24** of **43**

this task. Consequently, the first two items of this test were discontinued due to the highly inefficient manner in which he was asking the questions and the last two items were not administered at all. Thus, there were no scorable responses on this measure, which was consistent with his performance on this measure in July.

**COMPARISON OF CURRENT DATA TO EARLIER TESTING**

In comparing my July and October examinations, Mr. Brockman continued to exhibit limited stamina and endurance, which has been a marked change since the May exam by Dr. Denney. He has a limited time period when he is able to focus and attend, but even when attending, his working memory and mental processing speed are deficient relative to same age peers and to his premorbid baseline.

Changes in test scores from July to October were mixed. Some scores increased (e.g., RBANS list learning and delayed figure recall, and complex ideational material [auditory comprehension]) but others declined (e.g., RBANS line orientation and figure copy, and the CPT 3). Many scores were generally unchanged. However, Mr. Brockman's clinical presentation was improved. Although he continued to exhibit episodic confusion and confabulation, these episodes interfered less with testing and there was less distortion of reality. For example, unlike some of his responses in July, Mr. Brockman did not express that I was there solely for the benefit of Reynolds and Reynolds or that Reynolds hired me to help their business. Thus, he appeared somewhat more anchored in reality in October during his confused episodes than he did in July.

Test scores from July to October fell consistently well below Mr. Brockman's estimated premorbid baseline. For example, in July 84% of his test scores fell from low average to exceptionally low and in October 82% of his scores fell in that same range. Thus, his test performance on balance remained generally unchanged.

With regard to Mr. Brockman's test performance from May (with Dr. Denney) to October, results again were mixed although in general it appears that there was more of a decline than improvement. The table below reflects the seven scores that could be directly compared between both exams. In all seven tests, Mr. Brockman obtained lower or worse scores in October than in May, reflecting a decline in working memory and processing speed.

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **25** of **43**

| Test (raw score) | 5/19/21 | 10/2/21 |
|---|---|---|
| Trails A (seconds-lower score better) | 80 | 323 d/c |
| FAS (#words) | 27 | 22 |
| Digit Span Total (raw score) | 20 | 14 |
| Digits Forward (raw) | 10 | 8 |
| Digits Backward (raw) | 7 | 5 |
| Digits Sequence (raw) | 3 | 1 |
| Reliable Digit Span | 10 | 7 |

In addition to the above test scores, Mr. Brockman had significantly more difficulty on the Coding subtest of the RBANS in October relative to his performance on the Coding subtest of the Wechsler Adult Intelligence Scale-IV in May. Although these are not necessarily directly comparable because they are from different tests, have somewhat different task demands (arguably the RBANS Coding is easier), and their time limits are different (90 vs. 120 seconds), there is considerable overlap between them and they both tap the same cognitive domain of mental processing speed. In both cases, this task requires the examinee to code (write) number-symbol associations, so there is also a motor speed component. Mr. Brockman had significant difficulty understanding the directions for this task and required several explanations for him to fully appreciate what he was to do.

He completed only two number-symbol association items in 90 seconds, which were not due to motor slowing associated with Parkinson's disease. His performance fell below the 1st percentile and in the exceptionally low range. An average score on this task for someone of his age would be to complete 33-34 items. In May, Mr. Brockman obtained a very low Coding score with Dr. Denney also but he was able to complete 10 number-symbol association items rather than just two.

Mr. Brockman's performance on the CPT 3 from May to October declined markedly although fatigue was a significant factor in his worse scores.

In comparing Mr. Brockman's test performance in October to the previous five evaluations, no test score fell above average, a marked departure from Mr. Brockman's estimated premorbid cognitive and intellectual abilities.

In all but one instance, the majority of test scores fell from below average to exceptionally low or below the 9th percentile in comparison to others of his age. This is illustrated on the table below where the number of test scores and the percent of scores (in parentheses) are listed as they correspond to specific score test score ranges. Of note, none of the CPT

U.S. v. Robert T. Brockman
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **26** of **43**

scores are listed in these data as they do not lend themselves to the same categories as most other test scores do.

| Descriptors | 3/1/19 30 scores | 12/3/19 32 scores | 10/7/20 29 scores | 5/19/21 35 scores | 7/13-14/21 38 scores | 10/2-3/21 27 scores |
|---|---|---|---|---|---|---|
| Exceptionally High ≥ 98 percentile | 0 | 0 | 0 | 0 | 0 | 0 |
| Above Average 91-97 percentile | 0 | 0 | 0 | 0 | 0 | 0 |
| High Average 75-90 percentile | 0 | 1 (3%) | 2 (7%) | 0 | 3 (8%) | 2 (7%) |
| Average 25-74 percentile | 7 (23%) | 12 (38%) | 2 (7%) | 5 (14%) | 3 (8%) | 3 (11%) |
| Low Average 9-24 percentile | 4 (13%) | 6 (19%) | 6 (21%) | 6 (17%) | 8 (21%) | 4 (15%) |
| Below Average 2-8 percentile | 5 (17%) | 4 (13%) | 5 (17%) | 2 (6%) | 5 (13%) | 7 (26%) |
| Exceptionally Low < 2 percentile | 14 (47%) | 9 (28%) | 14 (48%) | 22 (63%) | 19 (50%) | 11 (41%) |

The table above reflects the depth and range of Mr. Brockman's cognitive impairments that have been demonstrated over serial neuropsychological assessments. These cognitive limitations, particularly with memory and learning, have significant ramifications for his ability to interact reliably with his attorneys.

Within specific domains, Mr. Brockman has consistently exhibited impaired memory and learning across all evaluations. In the table below, a more direct comparison can be made across all six evaluations where the exact same tests were administered in the majority of exams. Although there is some variability in specific test scores from exam to exam, which in my experience is not an uncommon finding in serial assessments given the degree of intraindividual variability present in any one assessment,[14] the major domains of functioning such as memory, mental speed, working memory, and visuoconstruction abilities have remained consistently well below average from exam to exam.

For example, he will likely be forgetful of ambiguous documents, unclear correspondence and other documentation for which multiple explanations are available, for recent

---

[14] Hultsch, D.F. et al. **Intraindividual Variability in Cognitive Performance in Older Adults: Comparison of Adults with Mild Dementia, Adults with Arthritis, and Healthy Adults** *Neuropsychology* 14:4 pp 588-598 2000; Schretlen, D.J., Munro, C.A., Anthony, J.C., & Pearlson, G.D. **Examining the Range of Normal Intraindividual Variability in Neuropsychological Test Performance** *Journal of the International Neuropsychological Society 9* pp 864-870 2003.

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **27** of 43

conversations and for information that his attorneys discuss with him. Documents shown to him will likely be poorly recalled, or perhaps not remembered at all. He will lack the ability to recall the continuity of prior discussions about the details of his case and trial strategies such that each meeting will be as if it is the first time he is exposed to the information.

Overall, the trend of the scores over time generally reflects decreased working memory and mental processing speed. Mr. Brockman appears to be thinking more slowly and taking longer to process information, which reflects a progression of his dementia. Confrontation naming apparently remains intact, consistent with Parkinson's disease dementia, in which language skills are generally preserved. Not apparent from this table but evident from observation and his ability in earlier exams to complete testing on one day, is his declining stamina and endurance. This has significant ramifications for his ability to work with his attorneys and to participate in court-related activities, even for brief periods of time.

| Test (raw score) | 3/1/19 | 12/3/19 | 10/7/20 | 5/19/21 | 7/13/21 | 10/2/21 |
|---|---|---|---|---|---|---|
| Trails A (seconds-lower score better) | 63 | 80 | 106 | 80 | 300 d/c | 323 d/c |
| FAS (#words) | 27 | 19 | 31 | 27 | 19 | 22 |
| Animal Fluency (# words) | 8 | 14 | 9 | 14 | 11 | |
| NAB Naming (out of 31) | 29 | 29 | 30 | 29 | NA | |
| Rey Complex Figure: Copy (out of 36) | 10.5 | 31 | 7.5 | 18 | 3 | |
| Digit Span Total (raw score) | 17 | 22 | 15 | 20 | 14 | 14 |
| Digits Forward (raw) | 10 | 8 | 8 | 10 | 8 | 8 |
| Digits Bkwd (raw) | 6 | 8 | 5 | 7 | 5 | 5 |
| Digits Sequence (raw) | 1 | 6 | 2 | 3 | 1 | 1 |
| Reliable Digit Span | 8 | 8 | 7 | 10 | 7 | 7 |
| Coding (raw) | 13 | 29 | 8 | 10 | NA | 2 (RBANS) |
| WAIS-IV Similarities (raw) | 27 | 25 | 24 | NA | 17 | |
| Stroop Color & Word Test (in 45 seconds) | | | | | | |
| Word (#words) | 34 | 58 | 40 | NA | 19 | |
| Color (#colors) | 22 | 34 | 28 | NA | 16 | |
| Color Word (#color words) | 12 | 20 | 8 | NA | Unable | |

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **28** of **43**

## FORENSIC PSYCHOLOGICAL ASSESSMENT

### 1) *What does the data collected to date reflect upon the nature of Robert Brockman's neuropsychological impairment?*

Across what is now six neuropsychological evaluations spanning 2 ½ years, Mr. Brockman has consistently demonstrated well below normal functioning in multiple cognitive domains when compared with the general, neuro-healthy population in Mr. Brockman's age group and also when compared with his estimated premorbid baseline. Thus, he has experienced a significant decline in neuropsychological abilities compared to his previous level of functioning and relative to same age peers.

The most significant and relevant neuropsychological impairments are noted below and all reflect a loss or decline in abilities relative to his baseline.

- **Orientation.** Mr. Brockman is not consistently oriented to month, date, day of week, or year. He has also been confused about his surroundings as he is not always aware of his current location. During this most recent evaluation, Mr. Brockman was unable to identify our specific setting even though it was in the office of the law firm that represents him and where he has been previously. His wife indicated that he often asks when they are going back to Houston even though they are in Houston. He cannot accurately recall his current address or where he lived prior to where he lives now. He underestimated by six months how long he has been living at his current residence. Thus, he is not consistently and correctly anchored to time and space, which adversely affects his ability to appreciate events and their temporal sequence.

- **Memory.** Mr. Brockman exhibits decreased ability to absorb, retain, and recall recent and some remote information, which includes events, conversations, and other material. This is particularly problematic with his free or spontaneous recall (e.g., when asked an open-ended question like, "tell me everything you can remember about X"). Recognition is superior to free recall so providing him with cues and prompts facilitates the retrieval of some memories but his recognition memory still remains impaired.

  In addition to a lack of memory or forgetfulness, he has episodes of unpredictable confusion when he will confabulate a response by filling in the gaps in his memory with some false or distorted information. In these instances, he often will refer to some past aspect of his business and will weave those memories into a current conversation, likely because they are so familiar to him, but he is unaware that he is doing so.

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **29** of **43**

- **Sustained attention and vigilance.** Mr. Brockman is unable to maintain his focus and respond to stimuli over extended periods of time. He loses his concentration and train of thought, making it difficult for him to follow extended conversations and events. This impairment is significantly affected by his endurance and stamina, which have deteriorated since the spring. Compared to his prior level of functioning, Mr. Brockman is now less mentally and physically able to remain alert and attentive over long time periods. He is less efficient in completing tasks and has been less able to finish testing within the same time period as he did previously.

- **Working memory.** Mr. Brockman is unable to hold and manipulate information in his mind while performing other mental operations with it. His working memory capacity has decreased. He has difficulty keeping track of more than one thing at a time. He gets mentally overwhelmed with too much information, which interferes with his comprehension and understanding.

- **Mental processing speed and reaction time.** Mr. Brockman is mentally very slow to respond and react to things in his environment. He requires additional time to formulate responses and process information. This is an area of impairment that, in my opinion, has worsened since his evaluations began.

- **Visuospatial abilities.** Problems are noted with analyzing and copying visual-spatial information. Although not directly related to competence, they do reflect on the state of his brain and provide evidence for a loss of abilities.

- **Problem solving and decision making.** As president and CEO of Reynolds and Reynolds for many years, Mr. Brockman likely experienced significant demands on his problem solving and decisional capabilities. However, his functioning in this domain is significantly compromised. Testing has revealed that his ability to think flexibly and in an organized fashion, and then to apply strategies systematically to solve problems, has deteriorated. Mrs. Brockman described that he is incapable of making decisions regarding the household and their finances so this burden has fallen exclusively on her. In addition to the limitations with Mr. Brockman's cognitive abilities, he also exhibited echopraxia (e.g., the repetition or mimicking of another's behavior or motor functioning) in this most recent assessment. While not a higher-level mental function, it is an indicator of abnormal cerebral functioning that can be associated with disinhibition and impaired executive functioning.[15]

---

[15] Rabinovici, G.G., Stephens, M.L., & Possin, K.L. **Executive Dysfunction** *Continuum* 21:3 pp 646-659 2015.

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **30** of **43**

The neuropsychological impairments referenced above are noted in the context of not only abnormal test scores but also in the decline of his functional abilities as described by Mrs. Brockman and other collateral informants noted in my prior report, as well as evidence of brain abnormalities manifested across a range of neurodiagnostic studies including brain CT and MRI scans, FDG PET, Amyloid PET, and EEGs.

### 2) *What diagnoses are reflected in the recent history and current neuropsychological testing?*

Mr. Brockman demonstrates **major neurocognitive disorder (otherwise known as dementia)** based on the following Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5) criteria,[16] which are further elaborated on below:

- Significant cognitive decline from a previous level of performance in one or more cognitive domains (e.g., learning and memory, executive function, complex attention, perceptual-motor abilities).

- The cognitive deficits interfere with independence in everyday activities.

- The cognitive deficits do not occur exclusively in the context of a delirium.

- The cognitive deficits are not better explained by another mental disorder.

*Significant cognitive decline from a previous level of performance in one or more cognitive domains.* As noted previously, Mr. Brockman's neuropsychological test results across now six examinations spanning over two years reflect significant deficits in multiple cognitive domains. For example, with only one exception, over half of his test scores fell below average and many scores were classified as exceptionally low, falling below the 2nd percentile. The deficits noted on testing clearly surpass normal aging effects and represent a substantial decline from Mr. Brockman's previous level of functioning.

*The cognitive deficits interfere with independence in everyday activities.* Mr. Brockman's cognitive deficits interfere with his everyday activities to the point where he now requires constant assistance with his self-care. Although he is able to feed himself, he is unable to dress himself due to intermittent confusion about how to manage his clothing, known as dressing apraxia. He requires supervision with showering. He is not fully oriented and can be confused about his current location and recent events, which causes concern that he could get lost if allowed outside without assistance. He no longer participates in household and financial management due to impairments with decision-making and memory. He is dependent on others to manage his medications for him. The motor

---

[16] American Psychiatric Association **Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)** 2013.

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **31** of **43**

slowing associated with his Parkinson's disease has precluded him from driving, but his slowed reaction time, inattention, and memory loss for how to get to familiar places also make him unsafe behind the wheel.

If Mr. Brockman did not have extensive professional in-home care, I believe that he would likely be in a nursing home due to the daily assistance that he now requires. Most certainly if he were living alone, he would be unable to care for himself.

### The cognitive deficits do not occur exclusively in the context of a delirium.
Although Mr. Brockman has had three episodes of delirium since March (June and September), his cognitive deficits on testing and functional impairments were apparent well before his first episode of delirium, which is consistent with a neurocognitive disorder rather than delirium.

The mental status changes that he currently exhibits are not acute and, apart from the effects of fatigue, generally do not fluctuate in severity during the course of the day, which are criteria for delirium.[17] Compared to his previous evaluation in July, at which time I believed that his clinical presentation revealed some evidence of delirium symptoms, that is not the case with this evaluation.

Although Mr. Brockman continues to be variably confused, inattentive, and confabulates, which are also symptoms of dementia, confabulation is less than previously observed and his confusion is less dramatic. This reflects an absence of the effects of delirium but it does not indicate an improvement in his dementia. Delirium is an acute mental status change, but dementia is chronic and progressive.[18]

However, his vulnerability to developing delirium with urinary tract infections, of which he has had three so far this year, reflects the fragility of his cognitive and brain functioning. Dementia and cognitive impairment are considered predisposing risk factors for delirium.[19]

### The cognitive deficits are not better explained by another mental disorder.  Mr. Brockman's cognitive deficits are not better explained by another mental disorder. There is no evidence of a psychiatric illness that could account for the history and trajectory of his clinical presentation.

In addition to the role that neuropsychological data, behavioral observations, and functional limitations support a diagnosis of dementia, structural and functional

---

[17] American Psychiatric Association **Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)** 2013.
[18] American Psychiatric Association **Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)** 2013.
[19] Bellelli, G., Brathwaite, J.S., & Mazzola, P. **Delirium: A Marker of Vulnerability in Older People** *Frontiers in Aging Neuroscience* 13 article 626127 2021.

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **32** of **43**

neuroimaging, the presence of amyloid neuritic plaques on amyloid PET, and general cerebral dysfunction noted on EEG are also consistent with dementia.

The presence of amyloid neuritic plaques observed on PET amyloid along with Mr. Brockman's history of Parkinson's disease is consistent with the known association of dementia of Parkinson's disease and of Alzheimer's disease pathology.[20] In addition, even without a clinical diagnosis of dementia with Lewy bodies, research evidence also suggests the presence of Lewy bodies as a dominant substrate in Parkinson's disease dementia (PDD).[21] Thus, the underlying pathology of his dementia is likely multifactorial, and multiple processes may be contributing to his deterioration particularly with elements of Parkinson's and Alzheimer's disease.

My opinion at this time is that Mr. Brockman's clinical and neuropsychological presentation is somewhat more consistent with dementia associated with Parkinson's disease rather than another dementia subtype but the presence of an early or emerging Alzheimer's disease remains a distinct possibility. As time passes, however, his symptoms may evolve to reveal the more pronounced effects of different or additional etiology (e.g., such as Alzheimer's). For example, the core features of dementia associated with Parkinson's disease include the following:[22]

- Diagnosis of Parkinson's disease
- A dementia syndrome with insidious onset and slow progression within the context of established PD
  - Impairment in more than one cognitive domain
  - Representing a decline from premorbid level
  - Deficits severe enough to impair daily life (social, occupational, or personal care)
- Associated clinical cognitive features
  - Impaired spontaneous and focused attention, poor performance in attentional tasks; performance may fluctuate during the day or from day to day.
  - Impaired executive functions in tasks requiring initiation, planning, concept formation, rule finding, set shifting or set maintenance. Impaired mental speed.
  - Impaired visuo-spatial functions in tasks requiring visual-spatial orientation, perception, or construction.

[20] Aarsland, D. et al. **Cognitive Decline in Parkinson Disease** *Nature Reviews/Neurology* 13 pp 217-231 2017.
[21] Painous, C. & Marti, M.J. **Cognitive Impairment in Parkinson's Disease: What We Know So Far** *Research and Review in Parkinsonism* 10 pp 7-17 2020.
[22] Emre, M. et al. **Clinical Diagnostic Criteria for Dementia Associated with Parkinson's Disease** Movement Disorders 22:12 pp 1689-1707 2007; Painous, C. & Marti, M.J. **Cognitive Impairment in Parkinson's Disease: What We Know So Far** Research and Review in Parkinsonism 10 pp 7-17 2020.

U.S. v. Robert T. Brockman
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **33** of **43**

- o Impaired memory with free recall for recent events or in tasks requiring learning of new material. Memory usually improves with cueing and recognition is usually better than free recall.
- o Language is largely preserved.

The features of Parkinson's disease dementia (PDD) described above are highly consistent with Mr. Brockman's objective test data over what is now six different evaluations. [Of note, his diagnosis of Parkinson's disease is not in doubt.] He exhibits cognitive deficits in all the domains noted above in addition to the relative sparing of his language functions, as described previously in this report, which is also a characteristic of PDD.

Mr. Brockman's neurologist, Dr. Lai diagnosed him on October 7, 2021 with Parkinson's disease dementia, citing Mr. Brockman's deteriorating neurologic and cognitive examinations.

The exact trajectory of Mr. Brockman's declining abilities in the future cannot be determined with certainty although there will be an irrevocable worsening of his cognitive deficits over time that will further impair his decision making, memory, attention, communication, and functional abilities. The rate at which this may occur, however, is difficult to predict given a high degree of intraindividual variability in the progression of dementia.

Dr. Denney, in his earlier report, opined that Mr. Brockman may exhibit mild cognitive impairment (MCI) or mild neurocognitive disorder, but not dementia. However, a cardinal feature of MCI is that cognitive deficits are not sufficient to interfere with everyday functioning.[23] Mr. Brockman, however, has clearly demonstrated functional deficits since 2017-2018 with gradual worsening over time to the point where he now requires constant assistance.

In addition, in MCI, cognitive deficits are more limited in breadth and depth in comparison to dementia, as evident by the suggested cut-off scores in Parkinson's disease for the MoCA[24] for MCI (< 26/30) versus dementia (< 21/30).[25] Of note, Mr. Brockman's MoCA scores have consistently fallen below 21. Mr. Brockman's cognitive deficits are not at all mild and greatly exceed the modest cognitive changes associated with MCI. Moreover, the significant data collected over several testing sessions and in evaluations with clinicians spanning many months reveal a breadth of cognitive deficits.

---

[23] Litvan I. et al **Diagnostic Criteria for Mild Cognitive Impairment in Parkinson's Disease: Movement Disorder Society Task Force Guidelines** Movement Disorders 27 pp 349-356 2012.

[24] Montreal Cognitive Assessment (MoCA) is a well-established, brief measure of global cognitive functioning with a score range of 0-30. Higher scores denote more intact cognitive abilities.

[25] Dalrymple-Alford, J.C. et al **The MoCA: Well-Suited Screen for Cognitive Impairment in Parkinson Disease** Neurology 75 1717-1725 2010.

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **34** of **43**

Therefore, given the abundant neuropsychological evidence of significant cognitive deficits, the obvious limitations of his functional/everyday capabilities, the varied neurodiagnostic measures that reflect degenerative brain changes, including the congruence of his PET scans being highly accurate in detecting AD pathology post-mortem, and the risk of developing dementia with Parkinson's disease, it is my professional opinion that Mr. Brockman has a major neurocognitive disorder.

3) *Is Mr. Brockman able, given the nature of the charges against him, to assist his attorneys with relevant, requested facts, dates, and details?*

**No. Mr. Brockman is not able to assist his attorneys with relevant, requested facts, dates, and details.**

Because Mr. Brockman's expressive language abilities, especially his vocabulary, remain generally intact and are a relative strength among his neuropsychological capabilities, he can often appear quite articulate during casual conversation. Like many individuals with dementia whose premorbid IQ was above average or even exceedingly high, Mr. Brockman still has sufficient cognitive reserve that allows him to speak about some topics in detail, particularly those with which he is most familiar such as from his business, which is not related to his indictment, and family, that belies his actual cognitive capabilities. Furthermore, he continues to exhibit refined social skills, which can be misinterpreted as evidence for a normal mental status.

Any perception of Mr. Brockman that presumes cognitive abilities by virtue of his less impaired social and conversational skills is inconsistent with the reality of his underlying deficits. Yet that may not be immediately evident to the observer without proper questioning and assessment. Neuropsychological testing can, and has, revealed the severity of his cognitive impairments. There have also been numerous examples while interacting with Mr. Brockman that further reflect his tenuous mental state, such as:

- **Memory problems.** Mr. Brockman's memory is quite impaired and unreliable. He is prone to be tangential and provide irrelevant details, and he confabulates. Mr. Brockman demonstrates both recent and remote memory impairment, even on fundamental personal history. He was unable even to recall his medical conditions, including the name Parkinson's disease, although he was able to describe some of its symptoms. Memory impairment to such a fundamental extent illustrates that key details would not be accessible to him to relate to his attorneys. Research has also found that among a group of defendants admitted to an inpatient psychiatric facility, delayed memory performance on the RBANS, similar to the scores

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **35** of **43**

obtained by Mr. Brockman, was associated with a finding of adjudicative incompetence.[26]

- **Confabulation**. Mr. Brockman's  episodic confabulation reflects a high likelihood that he would provide unreliable information or be unable to recall any information at all. This has, in fact, been the experience of the attorneys who have been working with him. Moreover, it is difficult to identify when he provides unreliable information because he remains self-assured in his communication. When in conversation he retrieves any information about past dates, details, and events, it would be impossible to determine whether his recall is accurate or not without outside verification of his recollections. Trusting the information that Mr. Brockman is able to provide to his attorneys is further complicated by the façade of competence that he is able to project with his remaining intact abilities.

- **Confusion.** Mr. Brockman is episodically confused and displays confusion on a variety of fronts. He is unaware of the confusion however, as would be the interviewer, without closer questioning, He has persisted in the belief, for example, that two of his night shift care givers are the sons of his daily nurse, Frank Gutierrez, which they are not. Mr. Brockman has been corrected about this erroneous belief by Mr. Gutierrez, according to his report, but Mr. Brockman seemingly does not remember his error. The degree of his confusion renders it impossible, without external corroboration, to validate the accuracy of what he says.

- **Disorientation to time and place.** Mr. Brockman cannot accurately recall his home address, how long he has lived there, or the address of his previous residence. He has questioned his wife about when they will be going back to Houston. He is, moreover, confused about the passage of time. For example, Mr. Brockman believed that I had seen him about a year ago rather than 2-3 months ago. He believed that he was last hospitalized about two months ago when it was less than two weeks ago. Mr. Brockman continues to assert that he retired from being both president and CEO of Reynolds and Reynolds on January 1 of this year even though he left those positions, respectively, in June and November of 2020.

  An inability to be grounded in time and place and even context handicaps him from explaining dates, pieces of evidence, events, when and why they took place, and in particular, the sequences of events.

---

[26] Arrendondo, B.C. et al. **Cognitive Functioning and Adjudicative Competence: Defendants Referred for Neuropsychological Evaluation in a Psychiatric Inpatient Setting** *The Clinical Neuropsychologist* 31(8) pp 1432-1448 2017.

U.S. v. Robert T. Brockman
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **36** of **43**

- **Inability to follow modestly complex instructions, limited organization, and inability to perform normally on measures of working memory.** Interviewing, collateral data, and psychological testing consistently illustrate these handicaps, which can have a direct bearing on his ability to process information, the shifting focus over the course of a case and trial, legal understanding, testimony at trial, and how testimony relates to available evidence and other information that may assume greater or lesser importance. He typically does not demonstrate the capacity to utilize newly developed knowledge, and often, even to retain new information. What he does retain he manages at a superficial level only. The deficits render him hapless and necessarily disengaged in the face of the trial process.

- **Limited problem-solving skills.** Interviewing, collateral data, and psychological testing consistently illustrate these handicaps, which directly bear on his ability to engage in strategic decision making and planning in a case that involves a tremendous amount of information, potential witnesses, and evidence that may be helpful in ways that only a defendant would be expected to appreciate – if he had the ability.

- **Substantially slowed mental processing speed and rate of mental operations.** Mimicking his physical slowness due to his Parkinson's disease, Mr. Brockman's speed of mental operations has also slowed considerably.   This significantly affects his ability to engage in the fine points of processing his legal case and its key points, and following proceedings at even a reasonable pace for which he would be expected to attend. Additionally, Mr. Brockman lacks the working memory to "keep in mind" details, complex sentences, multiple thoughts, or ideas that he will need to consider in discussing his case with his attorneys.

- **Limited stamina and endurance**. Testing and interview performance, as well as input from collateral sources, indicate that however marginal Mr. Brockman's cognitive function is at baseline, even that level can decline fairly rapidly and unpredictably. Mr. Brockman's ability to participate in constructive meetings with his attorneys and in the proceedings is severely impaired at baseline, but further undercut by the inability to gauge exactly when he completely cognitively fades out. Mr. Brockman exhibits significant difficulty sustaining his attention over time resulting in a lack of focus and concentration. This is substantially exacerbated by fatigue.

These examples in conjunction with the neuropsychological test data reflect the deteriorated and tenuous state of Mr. Brockman's cognitive abilities, to an end that has significant ramifications for his ability to assist his attorneys in his defense.

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **37** of **43**

The aggregate of Mr. Brockman's multiple cognitive impairments in the context of a complex legal proceeding leaves him particularly vulnerable to misunderstanding, confusion, forgetfulness, disorganization, and confabulation regarding the details of his case. Complicating his vulnerabilities is the likelihood that in many instances he would not be aware when these instances occur.

4) *Based on his performance in the testing, does Mr. Brockman demonstrate the mental stamina needed for a courtroom trial on the charges he faces?*

**In my opinion, Mr. Brockman does not demonstrate the mental stamina needed for a courtroom trial and the ongoing preparation of a defense on the charges of his indictment.**

A striking change with Mr. Brockman's functioning from May to July, and persisting into October, is a decline in his stamina. Prior to my first evaluation of him in July, in the previous four neuropsychological assessments, he had been able to complete a full battery of neuropsychological tests within one day.  However, he is now unable to attend, process information, shift from one activity to another, and maintain focus over several hours as he was able to do before.

Although he was somewhat less confused in October than he was in July, his mental stamina has not improved. This would suggest that his new baseline of stamina renders his inabilities all the more aggravated by fatigue that more readily sets in. This baseline likely reflects an overall decrease with his mental efficiency.

In my most recent assessment of Mr. Brockman, my evaluation started at 10 AM, although the first approximately 40 minutes was an interview, which is not as mentally challenging as testing. Even though during testing we took a break in the morning and for lunch, by about 1:30 Mr. Brockman appeared somewhat less attentive and by 1:50 it was apparent that he was losing focus and becoming inattentive. A 14-minute measure of sustained attention (CPT 3) administered at that time revealed significant inattention and substantially slow mental processing speed. During this task, Mr. Brockman was unable to attend to the target stimuli as his attention "drifted off" for extended periods during this test. His scores on the CPT 3 were worse than the two prior administrations of this same measure.

Mr. Brockman would have the mental stamina to attend to courtroom procedures for only a limited period of time. Even then, his decreased mental processing speed and memory would significantly interfere with his ability to keep pace with the events occurring during his trial. Given that fatigue rapidly sets in for him, after a short period there would likely be many and unpredictable instances in which he will have little appreciation for what is transpiring around him. Thus, his limited understanding and poor ability to participate in

the procedures at trial would be further undermined by his reduced mental efficiency and stamina.

   5) *Is Mr. Brockman able to assist his counsel in defending his case? Why or why not?*

**No. Mr. Brockman is not able to assist his counsel in defending his case.**

Consistent with my previous evaluation, neuropsychological testing has revealed significant deficits in areas that have direct relevance in assisting his attorneys in his defense. For example, Mr. Brockman has measurable and objective impairments with his ability to concentrate and focus, to think rapidly and efficiently, to absorb new information and retain it for future use, to think conceptually and flexibly, to apply organized problem-solving strategies in an efficient manner, and to initiate and persist at tasks. These deficits would significantly impede his ability to recreate past events and to think conceptually about transactions, relationships, and interactions that may have occurred years ago. He would have little to no ability to problem-solve with his attorneys or to inform their case preparation and to consider strategies in preparing his defense.

Mr. Brockman's attorneys recognized early in their interactions with him that although he could speak with authority and accuracy about the history of his business and other aspects of his domain he was unable to inform their understanding and to assist their review of evidence. When questioning him about various specifics, his attorneys observe that he cannot furnish necessary details, that his information proves to be unreliable when he does respond, or that his responses are vague and unrelated to the information they requested. This occurs even when the information they are seeking would be obviously helpful for his defense.

Overlearned knowledge is information that one learns and utilizes every day or that has been repeated with such frequency in the past as to make the recall of it "automatic" so that its retrieval requires very little depth of processing. That information, such as the business philosophies of Reynolds and Reynolds, or a procedure to a surgeon, may be detailed. Overlearned information may be preserved even when memory evaporates for other details and cognitive skills otherwise decline. In Mr. Brockman's case, there is a clear disconnect between his retention of overlearned knowledge regarding his business experiences and his ability to recall other details that are historical and relate to particular events. Consequently, when he becomes confused or is unsure of what is transpiring, he will rely on this overlearned knowledge as the foundation for his responses to questions even though it may be quite irrelevant to the current circumstances.

Mr. Brockman's tendency to confuse his current circumstances with his past business experiences presented in both of my evaluations. For example, in July he believed that I was hired on behalf of Reynolds to help with specific aspects of his business, including

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **39** of **43**

facilitating use of his company's technology. In my October evaluation, he stated that my purpose in seeing him was, in part, to evaluate his capabilities to function in the position from which he had retired. I have found that individuals with dementia will often confuse current events or circumstances with their past experiences relative to their previous occupation, living situation, or familial relationships (e.g., believing that an adult child is the person's sibling). In Mr. Brockman's case, given the important role that his business was to him for half a century, it would not be unusual that in his confusion he would mistakenly interpret significant personal matters through a business reference point.

Mr. Brockman's confusion during my evaluations became apparent when he was unable to understand test instructions or when he was unable to perform cognitive tasks that would have been simple for him to complete prior to his cognitive decline. However, at other times, his disorientation and confabulation were not obvious and only became evident when I asked him questions about his understanding of or beliefs about his current circumstances. Unless relevant topics are directly probed and with accurate information available as a reference point, his misperceptions and misidentifications would likely go unnoticed. In any given situation, Mr. Brockman will not inform others that he is confused about what is transpiring around him because he does not know that he is. This lack of insight would pose significant challenges for his attorneys, who during conversations with him would presume, based on his projected self-assuredness, that he is understanding the context and content of their discussion when he is not.

In my experience with Mr. Brockman, I found him to be polite and agreeable. In his interview with Drs. Denney and Dietz, my impression was that he wanted to please and provide helpful information, within the boundaries of what he thought was appropriate given the purpose of their evaluation, even though at times his responses were vague and inaccurate. This tendency to acquiesce leaves Mr. Brockman vulnerable to leading questions and responding in ways that he hopes will be helpful to his interviewers even though he may not have a full appreciation for the accuracy of his answers, or the consequences to be led along by questioning.

Testing has revealed that his organization and problem-solving abilities are markedly decreased. He exhibits significant problems thinking conceptually and flexibly. Thus, he will likely have difficulty appreciating trial strategy and weighing different conceptual approaches to the subject matter and potential approaches to his defense. Testing reveals a significant decline with his decision-making abilities.

6) *Does the evidence reflect that Mr. Brockman is malingering cognitive incapacitation?*

**No. Mr. Brockman is not malingering cognitive incapacities.**

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **40** of **43**

Of multiple neuropsychological, neurologic, psychiatric, and primary care evaluations by Drs. York, Pool, Yudofsky, Jankovic, Lai, and Yu beginning in October 2018, none reported a suspicion that Mr. Brockman's cognitive complaints or symptoms were disingenuous. The first impression of malingering cognitive disorder was proposed by Drs. Denney and Dietz, in May 2021. My previous report of August 6, 2021 outlines in detail a consideration of their impressions that should be reviewed in addition to points noted below.

A diagnosis of malingering requires that the intent of the examinee is known given that malingering is considered an *intentional* falsification of symptoms for secondary gain. As a result, malingering detection research has emphasized the need to maintain high levels of specificity (e.g., the proportion of persons who test negative for malingering and who are not malingering) because that reduces the probability of a false positive error (e.g., the proportion of persons who test positive for malingering but who are not malingering) as this is considered to be a more egregious error than identifying someone as not malingering when they are.[27] Consequently, the diagnosis of malingering needs to be made very judiciously given these factors.

Performance validity tests (PVTs) or indicators play a prominent role in malingering detection given the evidence that clinical judgment alone is often poor in these situations. However, PVTs can be failed not only because of malingering but also due to poor or inconsistent effort because of fatigue or inadequate test engagement, rather than intentionally intending to deceive the examiner.

In addition, cutoff scores established for many PVTs to determine test validity were based on generally younger adults with histories of traumatic brain injuries, and not the elderly with and without neurodegenerative brain disorders.[28] As a result, traditional PVT cutoff scores for test invalidity need to be interpreted with caution with older adults given the adverse effect that dementia and genuine memory impairment can have on PVT scores.

Across Mr. Brockman's many neuropsychological evaluations, 23 PVTs were administered that include only those measures or procedures that were directly related to effort assessment or malingering. Of these, seventeen scored in the valid range.

Four other tests (e.g., Word Memory Test, Nonverbal - Medical Symptom Validity Test, Medical Symptom Validity Test x2) produced profiles that the test publisher specifically

---

[27] Victor, T.L. et al. **Interpreting the Meaning of Multiple Symptom Validity Test Failure** *The Clinical Neuropsychologist* 23 pp 297-313 2009.
[28] Zenisek, R.A. et al. **Prevalence of Below-Criterion Reliable Digit Span Scores in a Clinical Sample of Older Adults** *Archives of Clinical Neuropsychology* 31 pp 426-433 2016.

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **41** of **43**

has cautioned could produce false positives in those with genuine memory impairment; a poor score on these tests, therefore, cannot be presumed to reflect inadequate effort or malingering.[29] And in the two remaining PVTs with invalid range scores (Victoria Symptom Validity Test [VSVT] and Coin-in-the-Hand Test [CHT]), Mr. Brockman produced scores that have been reported in patients with genuine neurologic disorders.[30] The performance validity testing over the last 2 ½ years does not support malingered cognitive incapacitation.

In addition, the Minnesota Multiphasic Personality Inventory – 3 (MMPI-3), administered by Dr. Denney, which is designed to assess for exaggeration or embellishment of symptom self-report, did not reveal evidence of symptom magnification.

Mr. Brockman's functional and everyday limitations, which have been described as significant and progressive by collateral informants, are also consistent with a progressive dementia and not malingering.

The structural and functional neuroimaging data, which cannot be faked, provide additional confirmation that Mr. Brockman suffers from a genuine neurodegenerative brain disease.

- Mr. Brockman's 2019 DaTscan demonstrated decreases in bilateral dorsal striata dopamine transporter, which is diagnostic of Parkinson's disease.

- On July 28, 2021, Mr. Brockman was administered a PET Amyloid study. The scan showed results diagnostic of dementia, with moderate to frequent neuritic plaques. Loss of gray-white matter distinction was more pronounced in the frontal and temporal regions as well. This profile is used to distinguish those likely to have Alzheimer's disease by the clinical and research community.

- An MRI of the brain performed on July 30, 2021, showed "moderate diffuse volume loss with proportionate ventricular prominence. Mild chronic microvascular ischemic change." Dr. Christopher Whitlow, neuroradiologist, noted progression of Mr. Brockman's cerebral volume loss and changes of chronic microvascular ischemic disease in comparison to Mr. Brockman's MRI from

---

[29] Note validity test score results from Dr. Denney's evaluation in May and my validity test score results from July and in this current report.
[30] VSVT: Loring, D.W. et al. **Victoria Symptom Validity Test Performance in a Heterogenous Clinical Sample** *The Clinical Neuropsychologist* 21 pp 522-531 2007; CHT: Hanley, J.R., Baker, G.A., & Ledson, S. **Detecting the Faking of Amnesia: A Comparison of the Effectiveness of Three Different Techniques for Distinguishing Simulators from Patients with Amnesia**. *Journal of Clinical and Experimental Neuropsychology* 21:1 pp 59-79 1999.

November 2, 2018. Evidence for brain volume loss provides structural corroboration of the decline of his performance on neuropsychological testing.

- Mr. Brockman's FDG Brain PET scans from both March 2021 and August 24, 2021 revealed mildly reduced uptake in the posterior temporal lobes and bilaterally in the parietal lobes with slightly reduced uptake in the frontal lobes. The abnormality was read by the neuroradiologist as "Very suggestive of neurodegenerative disease, particularly Alzheimer's disease. Although statistically less likely, dementia with Lewy bodies or Parkinson's disease with dementia can have a similar uptake pattern." Such conclusions of dementia are bolstered when converging with his poor performance on neuropsychological testing, and the deterioration shown in his MRI from 2018 to 2021.

- An additional analysis of the August 24, 2021, FDG PET scan by radiologist Maria Rosana Ponisio, MD, engaged by the government, dated September 5, 2021, reported that "the described pattern of hypometabolism can be seen in early Alzheimer's dementia in the correct clinical setting. When compared to prior examination, there is a mildly progressive decrease of metabolic activity in the compromised brain areas."

- On September 1, 2021, an analysis of Robert Brockman's amyloid PET scan from July 28, 2021 was conducted by Dr. Ponisio, who opined that "this is a positive amyloid-PET study, indicating moderate to frequent beta amyloid neuritic plaques." She further reported that there was "statistically significant tracer deposition in the cerebral cortex," including in the precuneus, posterior cingulate, anterior cingulate, bilateral temporal lobes, and superior parietal lobes, and inferior frontal gyrus.

- The consistent findings of positive AD pathology on both of Mr. Brockman's FDG and amyloid PET scans are associated with an overall accuracy rate of 97% in detecting AD neuropathology in autopsy-confirmed dementia.[31]

- Mr. Brockman underwent an electroencephalograph (EEG) on September 2, 2021, that was interpreted as "diffuse slowing of the background, a non-specific indicator of global cerebral dysfunction."

- Mr. Brockman also underwent an EEG on September 17, 2021, that was interpreted as consistent with a diffuse disturbance in brain function.

---

[31] Lesman-Segev, O.H. et al **Diagnostic Accuracy of Amyloid Versus F-Fluorodeoxyglucose Positron Emission Tomography in Autopsy-Confirmed Dementia** *Annals of Neurology* 89 pp 389-401 2021.

**U.S. v. Robert T. Brockman**
*The Forensic Panel – Thomas Guilmette, Ph.D.*
October 29, 2021

Page **43** of 43

Mr. Brockman has had three well documented hospitalizations in 2021 (March, June, and September) that have revealed episodes of confusion and delirium. There was never any indication that these episodes were malingered. In addition, as noted previously, the frequency with which Mr. Brockman experiences significant mental status changes with minor medical complications such as urinary tract infections speak to the fragility of his cognitive and brain status, and not to malingering.

Last, as noted earlier, Mr. Brockman is a gentleman of superior premorbid intellectual abilities. As a result, he still has some limited capacity to appear quite lucid and articulate at times but this should not be interpreted as ruling out dementia and reflecting malingering. Moreover, individuals with dementia can exhibit significant variability in the rate of cognitive and functional decline across time resulting in behaviors that may appear unexpected or inconsistent with dementia.[32]  This variability is an expression of that individual's dementia. Even so, the most probable dementia diagnoses of Mr. Brockman, Parkinson's and Alzheimer's disease, are incurable, and carry with it irreversible decline. Various factors impact how fast things will get worse for Mr. Brockman, including medical illnesses that lead to episodes of delirium that can accelerate that decline. His baseline is one of significant cognitive impairment borne of moderate dementia, and will continue to decline and deteriorate.

Very truly yours,

Thomas Guilmette, Ph.D.

Diplomate in Clinical Neuropsychology, American Board of Professional Psychology & American Academy of Clinical Neuropsychology
Professor of Psychology, Providence College

---

[32]Tschanz, J.T. et al **Progression of Cognitive, Functional and Neuropsychiatric Symptom Domains in a Population Cohort with Alzheimer's Dementia the Cache County Dementia Progression Study** *American Journal of Geriatric Psychiatry* 19:6 pp 532-542 2011.