## Robert L. Denney, Psy.D., LLC
Board Certified in Clinical Neuropsychology, ABPP
Board Certified in Forensic Psychology, ABPP

# Forensic Neuropsychological Report

| | |
|---|---|
| Name: | Robert T. Brockman |
| Date of Birth: | May 28, 1941 |
| Criminal No.: | 4:21-cr-00009 |
| Date of Examination: | May 18, 19, & 20, 2021 |
| Date of Report: | June 21, 2021 |

**INTRODUCTION/REASON FOR REFERRAL**

Robert T. Brockman is a 80-year-old man who has been initially charged in the United States District Court for the Northern District of California (transferred to the Southern District of Texas, Houston Division), with Conspiracy, Tax Evasion, FBAR Violations, Wire Fraud Affecting a Financial Institution, Concealment Money Laundering, Tax Evasion Money Laundering, International Concealment Money Laundering, Evidence Tampering, and Destruction of Evidence.

I was contracted by attorneys for the U.S. Department of Justice to perform a forensic neuropsychological evaluation of Mr. Brockman. The emphasis of my examination was to focus on his competency to proceed under Title 18, USC, Sections 4241 and 4247. Primary interview portions of my examination were done in collaboration with Park Dietz, M.D., MPH, Ph.D., who was also examining Mr. Brockman on behalf of the U.S. government. Mr. Brockman was examined over the course of three days.

Dr. Dietz and I both explained to Mr. Brockman the nature and purpose of our evaluations. We informed him that results of these evaluations would not be confidential as our reports would be forwarded to the Court, prosecution, and defense counsel. On the second day of the examination, I reiterated the limits of confidentiality and also instructed him to perform his best on cognitive testing because I would not be able to understand his genuine cognitive strengths or limitations if he did not put forth appropriate effort. Although told to not exaggerate his difficulties, he was instructed to not unduly minimize them either. He voiced understanding of these important issues. The purpose the examination and its inherent lack of confidentiality was also reiterated on the morning of the third day.

Springfield, Missouri – RobertDenneyPsyD@gmail.com



GOVERNMENT EXHIBIT

4:21-CR-009-GCH

No. 1

DBD-0000127

**INFORMATION SOURCES**

All interactions with Mr. Brockman occurred over a three day period in a quiet conference room within the Hampton Inn/Homewood Suites facility at 710 Crawford Street, Houston, Texas.  May 18 & 20 were predominantly interview days and were video recorded. I was largely an observer during the clinical interview performed by Dr. Dietz on May 18, although I asked a small number of questions as well. I performed neuropsychological and psychological testing on May 19 (although, Mr. Brockman sat down to start a pencil/paper questionnaire near the end of the day on May 18, and also completed a pencil/paper questionnaire on the morning of May 20). I completed the Competency Assessment Inventory-Revised, a semi-structured interview regarding competency to proceed, on the morning of May 20 with Dr. Dietz observing, and then observed Dr. Dietz perform additional interviewing of Mr. Brockman afterward; both of these latter interviews were video recorded and I expect available for the Court's review.

Overall, I interacted with Mr. Brockman for about 24 hours and 25 minutes over the course of three days (less breaks): 8.5 hours Tuesday, 8.15 hours on Wednesday, and 7.75 hours on Thursday. I also observed Mr. Brockman interacting informally with his personal aide, Frank, and occasionally also had brief informal interactions with him myself during portions of those breaks.

I requested to interview Mr. Brockman's spouse, Dorothy Brockman, but she chose not to be interviewed by me.

Mr. Brockman was administered these psychological and neuropsychological tests:

1. Connors Continuous Performance Test-3 (CPT)
2. Wechsler Adult Intelligence Scale-IV (WAIS), Digit Span, Symbol Search, Coding, and Block Design subtests
3. Reynolds Intellectual Assessment Scale-2 (RIAS)
4. Neuropsychological Assessment Battery (NAB), Memory Module and Naming Test
5. Trail Making Test, Parts A and B
6. Rey Complex Figure, Copy, 3' Recall, 30' Recall, and Recognition
7. Controlled Oral Word Association Test-FAS
8. Semantic Naming Test-Animals
9. Wisconsin Card Sorting Test
10. Sentence Repetition Test
11. Green's Word Memory Test
12. Victoria Symptom Validity Test
13. Non-Verbal Symptom Validity Test
14. Minnesota Multiphasic Personality Inventory, 3rd Edition (MMPI)

Neuropsychological Report          Page **3** of **38**
BROCKMAN, Robert T.
June 21, 2021

   15. Denney Competency Related Test (D-CRT)

Additional information came from these sources:

1. Indictment filed 10/01/2020
2. Video Recording of Mr. Brockman's Speech at Reynolds & Reynolds, November 2018 (approximately).
3. Video deposition of Mr. Brockman, January 16 & 17, 2019.
4. Mr. Brockman Testimony before the FTC Investigational, September 18 & 19, 2019.
5. Defense Notice of Motion and Motion, 01/12/2021.
6. Medical records from Baylor College of Medicine.
7. Houston Methodist Hospital records.
8. Neuropsychological Reports by Michelle York, Ph.D., ABPP, 03/01/2019, 12/03/2019, 10/07/2020.
9. Raw neuropsychological and psychological test data from Dr. York's examinations.
10. Kelly Hall deposition, 03/10/2021.
11. PET Study report, 03/12/2021.
12. Sleep Study (polysomnography sleep study) report, 04/29/2021.
13. Video recordings of the examination by Ryan Darby, M.D., Ph.D., 05/05/2021.
14. Dietz & Denney Examination Transcript, 5/18/2021.
15. Denney & Dietz Examination Transcript, 5/20/2021.
16. Various medical-related records Mr. Brockman's produced from his home.
17. Interview of Kathy Keneally, 06/14/2021.
18. Interview of Peter J. Romatowski, 06/15/2021.


## PERSONAL HISTORY AS DISCLOSED BY THE DEFENDANT (except where indicated)

The personal history interview of Mr. Brockman was largely performed by Dr. Dietz, with me observing.

### Social History

Brockman said he was born to an intact family in St. Petersburg Florida on ▮▮▮▮▮ 1941. He also volunteered that he would be 80 years of age in 10 days, thus demonstrating he was oriented to May 18, 2021, without us asking about his orientation that first morning. He remained there until he was 19 years of age. He has a younger brother by six years. He noted his father was in the US Army Air Corps as a flight trainer during the war. He ultimately developed pneumonia and was given a medical discharge from the Army and received partial disability. He died from complications related to

Neuropsychological Report          Page **4** of 38
BROCKMAN, Robert T.
June 21, 2021

theophylline treatment during his late 70s. His mother had a career as a physical therapist. His mother had significant problem with headaches and died in her 90s. Mr. Brockman said that during the day he was cared for by his grandmother, who was truly the individual who taught him to work. She had him up delivering newspapers and learning how to be productive. He noted there were some relationship issues, and his mother sounded like she was somewhat hotheaded, which ultimately cause Mr. Brockman to get hit over the head when he intervened between his mother and father. Otherwise, he described his primary family as a reasonably safe and stable home environment.

Mr. Brockman indicated he may have fathered a child as a teenager in high school, but he was not certain. He noted he had a couple serious girlfriends during his late teenage years; however the longest interview those relationships lasted was only a couple months. He suggested he may have gone out for longer lengths of time when he was in college. He met and married his wife Dorothy after he moved to Houston Texas. They have been married for 53 years, but his report. They have one adult son who is married and helps manage the financial aspects of the Brockman estate.

**Education and Vocational Background**

Mr. Brockman indicated he attended public schools in St. Petersburg. He described his grades as "about is low an A that you can have and still be an A." He said he was the president of the Latin club and also the Spanish club. He denied any significant childhood disciplinary patterns. He was involved in building hot rods, and entertaining ladies.

During the fall of his freshman year at Centre College in Danville, Kentucky, he signed into the US Marine Corps delayed enlistment program. He was in the Marine Corps for six years but was never an active duty. He was honorably discharged when he chose to go to graduate school. He remained at center College for two years, with grades good enough to make the Dean's list. He then transferred to the business school the University of Florida. He graduated first in his class within the business school in 1963. He attended graduate courses as part of a master's degree but did not complete his thesis.

Mr. Brockman indicated he was tired of being poor and took a job with Ford Motor Company. He noted he had multiple prior jobs he worked while he was in school and during the summers. He rained mean that Ford for about one year; however, it was during that year that he transferred to Houston, Texas. He then took a position at IBM, where he remained for five years. He left IBM to start his own company that dealt with computer-based parts inventory control for automotive dealerships. Ultimately, this business expanded and acquired other entities, and evolved into Reynolds & Reynolds, where he has remained CEO until his retirement at the end of 2020.

DBD-0000130

Neuropsychological Report          Page **5** of 38
BROCKMAN, Robert T.
June 21, 2021

**Brief Medical History & His Current Condition**

Mr. Brockman indicated he was largely healthy throughout his life until he developed a
cancer tumor in his bladder over 10 years ago. He said it was surgically removed. He
undergoes annual cystoscopy's and is followed by Dr. Seth Lerner. Regarding head
injuries, he was hit on the head with a golf club by his mother and also hit on the head
with a hammer by a little girl neither instance caused him to lose consciousness. He
also noted having melanoma removed from the back of his arm, and he has
precancerous spots removed from his scalp and face on, what sounded like a regular
basis. He noted that he has not seen a dermatologist for over a year. Mr. Brockman
also developed atrial fibrillation years ago, but it is apparently controlled with
medication.

Mr. Brockman said that he believed it was about the 10 year mark after his bladder
cancer that he told Dr. Lerner that he was not feeling well. Dr. Lerner referred him to Dr.
Poole. Dr. Poole performed some tests and referred him to other doctors. He indicated
that after those doctors completed tests, he was diagnosed with Parkinson's disease.
He said they also came back with the diagnosis of dementia. He said he also noticed he
was having trouble with tasks taking him longer, 2 to 4 times longer, and he reported his
wife told him he has "task initiation problems."

Mr. Brockman was recently hospitalized with urosepsis. He said that since getting out of
the hospital he believed his memory is become markedly worse. He noted he cannot
remember what he is doing when typing after he is distracted by the spell and grammar
check system. He said he can also no longer remember people's names, telephone
numbers, or telephone numbers, beyond two digits, long enough to write it down. He
said he has to transfer two digits at a time in order to write down a telephone number.
He currently has a personal assistant, Frank, who helps him with stretching exercises
and also watches out for his imbalance problem. He said he no longer has the fine
motor control sufficient to fasten his smaller buttons and cufflinks. He also said his
vision has been affected by his condition. He indicated he has difficulty recognizing
objects if they are in a particular "band of vision" within his field of view. He said he and
his wife moved to a smaller house two months ago, and he now finds himself turning the
wrong directions when heading out of a room. He described the new house is a five
bedroom, two-story, home with his bedroom on the main floor. He said he has never
gone upstairs yet but may need to do so because he is planning a fishing trip, and all of
his fishing gear is stored upstairs.

When discussing a startup company he had been funding, Mr. Brockman indicated he
had made a mistake by spending too much money as an ongoing basis with the startup.
He noted he ended about two years ago, however. He then described there were many
things going on in today's world that get people's attention regarding cybersecurity.

DBD-0000131

Neuropsychological Report          Page **6** of **38**
BROCKMAN, Robert T.
June 21, 2021

When asked if something recently happened in the news there related to cybersecurity, he said yes there was something but he "forgot." When asked if he remembered what it was about he then noted it had to do with a company whose data became encrypted until they reached an agreement with the hijackers to basically bail themselves out or lose all of their data. He noted that in the end they paid $5 million to release their system.

When asked about trazodone, he noted it helps him sleep at night. He said spontaneously, "In the sleep study, I went immediately to sleep, heavy deep snoring for two hours, and then I woke up—and I then never could go back to sleep after that." He said it was his recollection that he was told to take what occasions he normally takes at night. He said, "Which seemed reasonable to me, so that is what I did."  He also voiced recollection that the findings of the sleep study suggested he had sleep apnea and noted that a CPAP machine was on the list of things to look into. Dr. Dietz mentioned temazepam, and Mr. Brockman indicated he never took that medication even though it was listed.

He said that at one point his wife told him he's talked in his sleep, but that stopped happening once he started taking Wellbutrin. He said he does not believe he ever walked or yelled in his sleep, but he agreed that he has been told he thrashed about.  It became bad enough that they placed a pillow between them on the bed, he said, a "few years ago."  He indicated the pillow was just used over a "couple month period," he thought.  Currently, the dog uses it to sleep on.

**Psychiatric History**

Mr. Brockman suggested he had some difficulty with depression but it related to, and came about after the onset of his taxation troubles with the IRS about four years ago. When Dr. Dietz asked him some questions about the timing of his depression in relation to the tax investigation, Mr. Brockman responded in this manner:

> Yeah, because all we're supposed to be talking about is my condition, you know, not about the case itself…We've kind of, you know, veered off the side of the road a little bit.

He denied ever having panic attacks. Dr. Dietz mentioned Wellbutrin, and Mr. Brockman called it his "happy pill," which, he said, was prescribed to him by Dr. Stuart Yudofsky, about three years ago. He noted this medication suppresses mood swings such that he feels more level.

Neuropsychological Report          Page **7** of 38
BROCKMAN, Robert T.
June 21, 2021

**Substance Use History**

Mr. Brockman said he consumed alcohol a bit more heavily during his college years then his adult years. He noted that on fishing trips he would sometimes drink too much on the first night but that was about it. He suggested he is not used alcohol for several years now.

**LISTING OF INFORMATION PERTINANT TO MR. BROCKMAN'S CONDITION (LARGELY CHRONOLOGICAL)**

**Documents Provided by Mr. Brockman (Described as Medical Related Information he Produced from his Home)**

These documents included medical records from various health facilities, patient education flyers, after visit summaries, care provider notes, forms completed by the Brockman's, and typed life & health summaries ("Health Issues") presumably created by Mr. Brockman scattered throughout.

The Health Issues documents appear to have been typed by Mr. Brockman to share with William B. Obenour, Jr. MD., initially.  The earliest available Health Issues summary was dated December of 2005, although there appears to be no way to verify it was actually typed in 2005.  He included in the document that he had noticed his mental processes were not as good but did not appear to be declining further.  He thought his memory was much poorer, yet his ability to work long hours was still intact.  This same wording (sometimes exact, sometimes in meaning) was duplicated on a yearly basis each December from 2005 through 2008.  Although the summaries cover much more information, regarding cognitive functioning, he started to provide greater descriptions from 2009 on.

In 2009, he noted, "memory process are not as good—but no further serious decline; memory continues to get poorer, especially with names of people that I know well and should remember easily; it is names that I most usually notice it with, however I am quite sure that it is probably memory of everything; ability to work long hours still excellent."

Summaries from 2009 through 2018 were largely the same, although he noted his work was demanding yet successful and rewarding. He also highlighted the fact that he was not able to remember names (e.g., our maids and a restaurant close by) as well as he used to do and was concerned about it. His ability to work long hours remained as good as ever, although he was dealing with feelings of seasonal burnout. The 2018 document also noted his sense was that he was coming to the end of his full-time, fully engaged business career and was going to have to come to grips with being less active and less involved.

DBD-0000133

Neuropsychological Report          Page **8** of 38
BROCKMAN, Robert T.
June 21, 2021

On April 5, 2019, he noted that he now felt "drugged" when taking more than one Sinemet (Parkinson's medication). The note from October 1, 2019, addressed to Dr. Pool, suggested his complaint that his memory issues have become more defined and included worsening of name recall, lack of recollection of dates, reduced memory ability, reduced organizational ability, and "unless I am deeply involved with an event or issue – or it was very recent – I have no better than partial recall – and frequently no recall at all."

The above health summaries were each freestanding typed documents scattered throughout the variety of records. There was no external verification the documents were actually written on the dates referenced as they did not appear to be integrated into actual health records.

**05/03/2017, Email From Mr. Brockman to Stuart Yodofsky, MD.**

Mr. Brockman emailed his friend, Dr. Yodofsky with the words, "My son and wife are after me to consult with the right doctor regarding my loss sense of smell. They are afraid it is an early sign of Alzheimer's or dementia. I am feeling good but am having increased memory problems."

Dr. Yodofsky said he was a neuropsychiatrist and told him to come see him for an initial assessment. Interestingly, the medical record did not appear to suggest anything was done to follow up on this recommendation.

**11/27/2017 & 12/14/2017, Jeffrey A. Kozak, M.D., Office Visit at BCM**

Mr. Brockman presented with chronic lower back pain since about September 2016. Both noted listed the report "memory loss and tingling" under neurology: however, under psychiatric, they note "negative" for memory loss. Under examination, it was noted he was oriented to person, place, and time (unchanged noted in 12/14/2017), but the remainder of the examinations focused on his lumbar pain.

**10/15/2018, James L. Pool, M.D.,  Exam**

Baylor College of Medicine records suggested Mr. Brockman had an office visit with Dr. Pool on 10/15/2018, but I could find no details of this visit.  He underwent vaccinations. This office visit documentation suggested Mr. Brockman reported memory difficulties and tingling. A neuropsychological consultation was requested on 10/16/2018 for "progressive cognitive dysfunction." An MRI was also requested on 10/16/2018 for progressive cognitive dysfunction, ataxia, deterioration of handwriting and completed on 11/06/2018.

Neuropsychological Report          Page **9** of 38
BROCKMAN, Robert T.
June 21, 2021

**November 2018 (approximately), Video Recording of Mr. Brockman's Speech at Reynolds & Reynolds**

Mr. Brockman spoke from notes, but also spoke spontaneously occasionally with no apparent difficulty.  Although he appeared to move slowly, there were no cognitive problems presented.  His speech was organized, and he delivered it well, with the appropriate amount of interaction with the audience, yet staying on his outline.  There were no incoherent moments, loss of memory, confusion, word finding problems, train of thought derailments.  He introduced an award video out of the planned sequence, but corrected himself, apologized appropriately with humor, and recovered quickly.  Overall, there were no significant cognitive difficulties presented.

**January 16 & 17, 2019, Deposition of Mr. Brockman**

Mr. Brockman was a subject of a two day video deposition related to legal action against Reynolds & Reynolds. Mr. Brockman's facial features suggested masked facies, a typical facial presentation of someone who has Parkinson's disease. During this deposition, he did not appear to have significant recent memory problems. He also knew his own address in Houston, the address of a townhouse in which his son lives, and Reynolds and Reynolds owning to locations in Ohio. When he did not know the answer or could not remember, he said he did not know the answer. He indicated he did not remember the trust protector's name, in regard to beneficiaries, he was circumspect in his response suggesting that many people and charities were potential beneficiaries. He noted he leased property in Aspen, Colorado, and knew the company from which they leased it. He recalled they had met the prior day but cannot remember exactly how long the meeting lasted. He named the people with whom he met, although he did not recall the last name of one of them. He appeared mildly slow when presented with new documents, but he recovered appeared to explain and respond to questions about the documents without difficulty. He was able to explain why they did what they did in an articulate manner to the questioning. His responses became more rapid when the interchange became slightly heated. There was no indication of debilitating dementia in this deposition, even though it was just weeks after his recent evaluations that purported him to have mild to moderate Lewy body dementia, complete with visual hallucinations.

**01/30/2019, Neurological Examination by Joseph Jankovic, MD.**

Mr. Brockman was referred to Dr. Jankovic by Dr. Pool and Dr. Yodofsky. Mr. Brockman indicated the onset of his balance, concentration, and memory difficulties occurred about 1.5 years previous. He noted development of depressive symptoms six months prior for which bupropion was started two months earlier. He subsequently noticed improvement in his thinking and memory. He also noted he took shorter steps and has a stooped posture when walking, but no change in his arm swing. Also his handwriting was messier and smaller. Also noted was near absence of smell since 10 years prior.

Neuropsychological Report　　　Page **10** of **38**
BROCKMAN, Robert T.
June 21, 2021

He reportedly began acting out his dreams during the night about 2 to 3 years prior, which included kicking and punching in his sleep. The note revealed that MRI study of the brain was done on November 2, 2019, and was read as unremarkable. Neurologic examination revealed an alert and oriented person whose speech was fluent and demonstrated good comprehension. There were no abnormal perceptions, hallucinations, delusions, or illusions. He could follow three-step commands, and there was no left right disorientation, ideomotor or constructional apraxia, or evidence of attention deficit or obsessive-compulsive disorders. MoCA examination revealed a score of 19/30. He demonstrated mild motor slowing, which was worse on the right. There was reduced stride length, stooped posture, absent arm swing, and en block turning.

Under impression, it was noted his history and examination were consistent with a diagnosis of postural instability gait difficulty type of Parkinson's disease, although vascular parkinsonism was a consideration. It was noted the neuropsychological consultation was ordered, and a DaTscan scan requested. Carbidopa/levodopa was started.

**02/14/2019, DaTscan, Read by Julie Wendt, M.D.**

Dr. Wendt provided the impression of this scan to include severe loss of dopaminergic neuronal function in the bilateral dorsal striata with greater loss in the right compared to the left.

**03/01/2019, Neuropsychological Report by Michele K. York, Ph.D., ABPP-CN**

During this examination Mr. Brockman apparently reported declines in short-term memory over the past 2 to 3 years. He reported repeating himself, losing possessions, losing his train of thought and being more tangential. He noted forgetting names of new individuals and familiar locations. He got a more difficult complete task and was clumsy. He was taking trazodone, reportedly to decreased REM behavior disorder. Regarding hallucinations Dr. York wrote this, "He denied visual hallucinations, but it is noted that later he pointed out a bug on the testing room floor that was not present to either the examiner or his wife."

Behavioral observations included shuffling and slow gait, slowed motor behavior, and right hand tremor. Mood was neutral with flat affect. He demonstrated masked face. Conversational speech was coherent and goal directed although sparse with short phrases. He demonstrated no paraphasias and only a slight stutter at times. He demonstrated moderately decreased ability to follow directions and he frequently needed repetition of directions or reorientation to the task. She noted he perseverative to previous tasks. She also noted she had to be concrete with him in order for him to understand task instructions. His processing speed was extremely slowed. He was

Neuropsychological Report            Page **11** of **38**
BROCKMAN, Robert T.
June 21, 2021

considered cooperative but evidenced surrendering test taking behavior (quitting easily with little effort).

Although no freestanding performance validity measures were administered, Dr. York concluded the data were an accurate estimation of his current cognitive abilities. During the TOPF reading list, "Mr. Brockman noted that the first word presented for him to read aloud was not a word ("two")—he was able to state the letters, but noted that he did not think that was a word and then stated he guessed it was two." Nonetheless, the final TOPF standard score was 114, suggestive of above average premorbid intellectual functioning. Dr. York prorated the WAIS-IV Full Scale IQ based upon five subtests, obtaining an estimate of 87 (low average range).

Dr. York opined that the pattern of neuropsychological findings indicate a dementia of mild to moderate severity characterized by deficits in visuospatial functioning, verbal and nonverbal episodic memory, and executive functioning, with mild functional declines. She noted abnormal movements taken together with a dementia diagnosis, new onset visual hallucinations and potential visual illusions, REM behavior disorder, and pattern of cognitive impairments was consistent with dementia with Lewy bodies.

**03/20/2019, Neurological Examination Progress Note by Melissa Yu, MD.**

Dr. Yu examined Mr. Brockman at the request of Dr. Pool. Reportedly memory loss was documented in November 2017 Fondren orthopedics progress note. Dr. Yu also included this comment:

> He reports one episode of visual disturbance – saw a rainbow/possible visual aura about eight years ago. No other visual phenomena are reported with the exception of a possible hallucination during neuropsychological testing – wife notes it was a "bad day."

His gait began to deteriorate during July 2018, and family noted micrographia (making very small letters when writing) and decreased facial expression.

This appointment also included Mrs. Brockman completing a form regarding her husband.  She dated the form 3/18/2019 and apparently corrected it to 3/20/2019.  She also noted the "Approximate date of onset of major symptoms of memory loss was 10/01/2018" [*This was shortly after Mr. Brockman started working with Jones Day according to Mr. Romatowski*].  She also responded in a later section to the question of, "How many years he has had memory difficulties?," noting, "8 months."  It was apparent from this form that Mrs. Brockman believed his memory difficulties started from 5 to 8 months before 3/20/2019.

Neuropsychological Report          Page **12** of **38**
BROCKMAN, Robert T.
June 21, 2021

Under the neurological examination, Mr. Brockman obtained a minimum MMSE of 26/30 (7s), 25/30 (spelling) [*These total scores correspond to questionable to mild impairment*[1]]. She noted definite visual issues noted with significant clock drawing and intersecting pentagon difficulty. Clock drawing was 2/4. She noted his general behavior was cooperative but repetitive. He tended to minimize his condition, but his judgment was estimated as fair. No apraxia (motor incoordination or wrong sequencing) was present. Word finding difficulty was evident. She noted abnormal reflexes of glabellar, snout, and jaw jerk. He demonstrated mild action tremor bilaterally. She noted slowed rapid alternating movements bilaterally, more pronounced on the left, as well as reduced facial tone/movement (hypomimia) and slowed thinking (bradyphrenia).

Dr. Yu referenced a November 2018 MRI of the brain study that was apparently read as him not having intracranial abnormalities and particularly no disproportionate lobar atrophy. The note then suggested she reviewed the films and opined there was mild generalized atrophy and two microhemorrhages in the left frontal lobe.

She estimated his symptom duration was at least three years and his overall clinical presentation suggested differential diagnosis of dementia with Lewy bodies or Parkinson's disease with dementia; however, time course and fluctuations in cognition were more suggestive of dementia with Lewy bodies.

**July 18, 2019, Meeting with Counsel in Aspen, Colorado**

On this date, Mr. Brockman presented to his lawyers a binder at their Aspen meeting that included medical reports indicating he had dementia, and he requested his lawyers be patient and slow when working with him because of his condition, per my interview with Mr. Romatowski on 06/15/2021.

**September 18 & 19, 2019, Mr. Brockman Testimony before the Federal Trade Commission Investigational Hearing in the Matter of CDK Global and Reynolds and Reynolds**

This testimony last from about 0900 to 1300 over the course of two days.  The transcript revealed that overall, Mr. Brockman presented in a responsive and coherent manner revealing intelligence, thoughtfulness, critical thinking, and effective communication. He demonstrated no indication of cognitive fluctuations or fluctuations in alertness. The only times he would not recall details or seemed confused appeared rarely and were consistent with normal cognitive functioning of an intelligent and informed 78 year old man.  There were no indications of significant neurocognitive compromise during these undoubtedly stressful several hours. The cognitive abilities demonstrated in this

---

[1] Perneczky, R., Wagenpfeil, S., Komossa, K., Grimmer, T., Diehl, J., & Kurz, A. (2006). Mapping scores onto stages: Mini-Mental State Examination and Clinical Dementia Rating. *Journal of Geriatric Psychiatry, 14,* 139-144.

Neuropsychological Report          Page **13** of **38**
BROCKMAN, Robert T.
June 21, 2021

transcript appeared inconsistent with mild to moderate dementia; it was certainly not consistent with test results obtained by Dr. York in March 2019 or December 2019.

**12/03/2019, Neuropsychological Report by Michele K. York, Ph.D., ABPP-CN**

Dr. York completed a neuropsychological evaluation at the request of a Jones Day attorney in relation to his criminal proceedings. Dr. York noted that a forensic evaluation differs from the clinical evaluation and highlighted the ethical concerns about the role conflict between treatment provider in forensic expert. Nonetheless, Dr. York still transitioned from a treatment provider into a forensic examiner.

During this examination Mrs. Brockman noted her husband's "cognition fluctuates on a daily basis from minute to minute." She also noted he was more violently acting out his dreams had been kicking in his sleep. He continued to deny visual hallucinations.

On examination he was noted to be neat and clean. He demonstrated slowed motor behavior and gait as well as mild tremor. He demonstrated slowed response latencies. Conversational speech was coherent but tangential in conversation. She noted "his cognition tended to fluctuate throughout the testing session – he appeared to be confused at times even in the middle of tasks that he originally was completing accurately." He showed mild decreased ability to follow directions and occasionally needed repetition of directions and lost his place during a task. She noted, "He passed several embedded and standalone measures of performance validity; therefore, the following results are thought to be an accurate estimation of his current cognitive abilities."

His MoCA score was 19/30. During this examination he demonstrated an estimated prorated Full Scale IQ of 96 (average range). It was noted he was "unable to perform simple addition, multiplication, and division arithmetic problems (e.g., 3X4, 14/3)." Abstract verbal reasoning was average. Working memory to perform mental arithmetic was deemed average. Trail Making Test part B was discontinued. She noted that his overall performance during the Wisconsin Card Sorting Test fell in the average range with one correct category achieved, but he made numerous other responses and had to be "reminded of instructions after each card so that he would not match to the wrong set of cards." Regarding memory, immediate recall of verbally presented contextual material was average, and his delayed recall of that information was low average. Semantically categorized word list learning across three trials was "unable to perform with only 25% retention. Immediate recall of geometric figures was borderline, delayed recall was deficient, and retention of initially learned material was 0%. His drawing of a complex geometric design fell in the low average range. His ability to draw a clock to command was within normal limits, but his copy was impaired. Compared to visual-spatial performance during the prior neuropsychological evaluation, his performance this time was substantially improved.

Neuropsychological Report          Page **14** of **38**
BROCKMAN, Robert T.
June 21, 2021

Dr. York opined that it was her "opinion based on testing conducted and behavioral observations that Mr. Brockman was putting forth full effort and was not exaggerating or embellishing the nature and extent of his cognitive impairment."

She concluded his cognitive condition fluctuated significantly throughout the evaluation. That along with his cognitive deficits, movement disorder, and REM behavior disorder suggested dementia with Lewy bodies (DLB). She noted "visual hallucinations are a hallmark of DLB; however, up to 30% of patients with DLB do not demonstrate visual hallucinations particularly at the early stages of the disorder."

She provided this opinion:

> Based on the current cognitive findings, his diagnosis of dementia, and the breadth and severity of his cognitive impairments and fluctuations, it is my opinion that Mr. Brockman is unable to participate and aid in his own defense. He is unable to recall and demonstrate a thorough understanding of the relevant elements of the issue surrounding the case and manipulate this information in a logical manner that will allow him to make comparisons and way his options.

A striking finding was Mr. Brockman's response during the TOPF word reading test, where he initially said the presentation of "Two" was not a word. In the absence of a visual agnosia (inability recognize objects or pictures, which he has not demonstrated), such behavior defies credibility. Additionally, results of this examination were not consistent with the cognitive abilities demonstrated in transcripts of Mr. Brockman's testimony on September 18 & 19, 2019.

**01/14/2020, Declaration of James L. Pool, M.D.**

Dr. Pool concluded that since Mr. Brockman was believed to have dementia, and dementia includes memory problems and confabulation, that he was not able to "assist his attorneys in his defense if criminal charges were to be brought against him."

**01/14/2020, Declaration of Joseph Jankovic, M.D.**

Dr. Jankovic opined that Mr. Brockman had dementia, people with dementia are unable to recall information needed to respond accurately when questioned, may engage in confabulation, and is therefore are unable to provide accurate information about past events.

**01/14/2020, Declaration of Melissa Yu, M.D.**

Dr. Yu opined that most people who have dementia experience lack of insight into their cognitive limitations and perceive themselves as functioning normally. Dementia is more than memory loss, includes of visual-spatial function, language, memory, and if executive function, all aspects of thought and cognitive function. "As an example, if a requested action requires three steps, a person with dementia will have difficulty paying attention to the request, memory in each step, and resisting distraction while completing the action."

**Deposition of Kelly Hall, dated 03/10/2021, but referencing Mr. Brockman's Behavior Through February 2020.**

Mr. Hall worked for Reynolds & Reynolds. He noted that Mr. Brockman was involved in the details of running things and if he gave reasonable directives, they would be followed. Mr. Hall was not aware of any unreasonable directives, and he could not think of one directive that was not followed in the 35 year history of him working at Reynolds. He did not recall Mr. Brockman discussing any medical issues on trips up through February 2020. When asked if he ever noticed any cognitive deficits for Mr. Brockman up to February 2020, Mr. Hall said yes. By explanation he said, "for the last few years, he was not as attentive as he used to be – not as present, and when he was present, not as attentive."

Mr. Hall would not opine regarding whether Mr. Brockman was capable of running the company in February 2020. He noted, however, that he thought the organization was working well as ever with Mr. Brockman there to weigh in however he could. When pressed on whether he thought Mr. Brockman was no longer capable of running Reynolds in February 2020, Mr. Hall said, "I don't know." "So, from my standpoint, he was – he was providing the help we needed."  "Again for the same explanation, our department, I thought was running well." "I can't speak for the rest of the company and his involvement in that." He discussed their trips to Aspen and Argentina during 2019, and Mr. Hall appeared to attempt downplaying his time spent with Mr. Brockman in a manner that suggested he did not wish to respond to the questions about Mr. Brockman's abilities.

**10/07/2020, Neuropsychological Report by Michele K. York, Ph.D., ABPP-CN**

Dr. York performed another forensic neuropsychological examination at the request of Jones Day attorney but also noted it was referred from Dr. Pool, which again appeared to confound the clinical and forensic roles. She again highlighted the ethical concern of role conflict between treatment providers and forensic examiners and then noted she was retained by defense counsel.

Neuropsychological Report                 Page **16** of **38**
BROCKMAN, Robert T.
June 21, 2021

Mr. Brockman reported that his cognition declined since December 2019. He noted he was yelling out more often in his sleep. "He denied well-formed visual hallucinations, but he described that he will see things that look like bugs on a shirt, the floor, or a table and wait to see if it moves."

On the telephone Mr. Brockman's son described an event that occurred during mid October 2020. After he visited his father, his father woke up the next morning heard an external door open and close and believed his son's car was driving away. He went to his office and reported that his computer was on and unlocked. He stated the computer was opened to pages from the dark web including suicide information. Mr. Brockman took pictures of the screens which were actually yahoo answer pages not related to the dark web or suicide. He was fairly convinced that his son had returned to the house during the night and broken into his computer. Once he was told otherwise, he appeared to believe some other person it broke into his house. The objective house alarm information suggested no one had been in the home or tampered with their home. The family had a computer hard drive analyzed by a professional who found no evidence of tampering or inappropriate websites.

During this examination, he demonstrated slowed and unsteady gait was slowed motor behavior. He demonstrated mild tremor notable on drawings. His affect was somewhat flat. He appeared to become confused at times in the middle of tasks that he was originally completing accurately. At times he appeared confused. He was tangential without insight. He demonstrated decreased ability to follow directions and often needed repetition of directions due to confusion. He appeared to lack insight into the severity of his cognitive impairments. Dr. York concluded that he passed embedded measures of performance validity; therefore, the remaining test results were a accurate estimation of his current cognitive abilities.

Dr. York concluded that he continued to demonstrate significant cognitive fluctuations throughout the evaluation with confusion and impaired ability to follow instructions. She noted his pattern of performances continues to indicate dementia of mild to moderate severity characterized by deficits in verbal and nonverbal episodic memory, processing speed, executive functioning, and visuospatial functioning, with significant functional declines. She noted, "Mr. Brockman denies experiencing well-formed visual hallucinations; however, he has experienced visual illusions, brief visual hallucinations, and a recent delusional episode." She concluded he continues to demonstrate dementia with Lewy bodies.

Dr. York opined that Mr. Brockman was "unable to participate and aid in his own defense." "He is unable to recall and demonstrate a thorough understanding of the relevant elements of the issue surrounding the case and manipulate this information in a logical manner that will allow him to make comparisons and weigh his options."

**01/08/2020, 02/12/2020 & 02/2/2021, Neurological Office Visits by Eugene C. Lai, M.D., Ph.D.**

Mr. Brockman was referred to Dr. Lai for further neurological consultation by Dr. Pool. He reportedly presented with progressive Parkinson's disease symptoms, cognitive decline, depression, and sleep disturbance. He and/or his wife reported a 3 to 4 year history of memory decline. He reportedly had trouble repeating himself, misplacing personal objects, and losing his train of thought, multitasking, taking medications, spelling, and word finding. He also reportedly had difficulty managing his personal finances. He was considered not to initiate activities like he used to. His wife noted his capacity to make decisions fluctuated. Although advised not to drive, Mr. Brockman was continuing to drive to familiar places. Dr. Lai noted he was diagnosed with REM sleep behavior disorder and prescribed clonazepam that has helped his symptoms. He reportedly had one episode of visual disturbance when he saw a rainbow about eight years ago and was diagnosed with ocular migraine with possible visual aura. He obtained a MoCA score of 20/30.  Dr. Lai provided impression that the neurologic examination was significant for cognitive deficits, rigidity, motor slowing, sensory impairment, and unsteadiness. He opined the clinical findings were most consistent with a diagnosis of Parkinson's disease with mild to moderate cognitive impairment; however he also conceded a differential diagnoses included dementia with Lewy bodies, vascular parkinsonism, other secondary parkinsonism, or Parkinson plus syndromes. He also had signs of peripheral polyneuropathy with gait and balance difficulty and REM sleep behavior disorder.

Subsequent follow-up examination on 2/12/2020 revealed no new neurologic complaint; he was oriented to person, place, and time and followed complex verbal commands. Memory was 5/5 for immediate but 0/5 for delayed. Insight and judgment were viewed as mildly impaired. Dr. Lai continued to believe that "clinical findings [were] consistent with Parkinson's disease with mild cognitive impairment." Visit diagnoses were listed as "Parkinson's disease; mild cognitive impairment; mixed anxiety depressive disorder; and idiopathic peripheral neuropathy."

The office visit on 02/02/2021 revealed no new neurological complaint. He presented as alert and attentive as well as oriented to person place and time. He followed complex verbal commands. Memory was 4/4 immediately and 0/4 delayed. Dr. Lai had this clinical impression:

> Clinical findings are consistent with Parkinson's disease with mild cognitive impairment. He is under a lot of stress trying to still run his company by himself, and his wife is also stressed out. He has signs of mild cognitive impairment and peripheral neuropathy with gait and balance. Neurological and cognitive examinations are without notable change from last visit. Physical examination is stable.

Neuropsychological Report          Page **18** of **38**
BROCKMAN, Robert T.
June 21, 2021

Visit diagnoses remained: Parkinson's disease; mild cognitive impairment[2];
mixed anxiety/depressive disorder; and idiopathic peripheral neuropathy.

**PET Study, 03/12/2021**

Results were read by Ronald E. Fisher, MD.  The report noted mild reduction of uptake
in the right parietal lobe; this hypometabolism was the only definite metabolic
abnormality.  Uptake elsewhere in the temporal lobes and the rest of the cortex
bilaterally were normal.  Dr. Fisher provided this impression: Findings are very mild, but
suggestive of early neurodegenerative disease, either Alzheimer's disease or dementia
with Lewy Bodies (Parkinson's disease with dementia).

**Sleep Study, 04/29/2021**

Mr. Brockman underwent a polysomnography sleep study at Memorial Hermann
Hospital, Texas Medical Center. Prior to the study, he was reported to have loud
snoring, dry mouth, unrefreshed sleep, kicking during sleep, difficulty concentrating
during the day, lying in bdd worrying about sleep, and frequent nighttime awakenings.
Back pain and needing to wake to urinate were reported.  He also endorsed sleep
walking, teeth grinding, nightmares, acting out his dreams, and hallucinations when
falling asleep or waking were reported.  He endorsed items on the Epworth Sleepiness
scale that resulted in a score of 14, suggesting abnormal daytime sleepiness.

The attending physician was Ruckshanda Majid, MD.  Results were read as indicating
severe Obstructive Sleep Apnea and no REM Sleep Behavior Disorder.  The sleep
study was less than optimal because only a short amount of REM sleep was recorded
due to low sleep efficiency from back pain.  Return study was recommended at which
time CPAP could be adjusted for optimal treatment of Apnea and REM sleep could be
measured longer.

**Recent Hospitalizations**

Mr. Brockman was hospitalized at Houston Methodist Hospital from March 15-19, 2021
as a result of Klebsiella pneumoniae growing in his urine and blood cultures, which was
successfully treated with antibiotics. He then returned home.

Medical records from Houston Methodist Hospital indicated Mr. Brockman presented
their on May 31, 2021 with signs of confusion and potential urinary tract infection.

---

[2] Mild cognitive impairment (MCI) is a diagnosis suggesting mild cognitive compromise due to neurodegenerative
condition that is not severe enough to warrant the diagnosis of dementia.  It is roughly analogous to DSM-5 Mild
Neurocognitive Impairment.

DBD-0000144

Neuropsychological Report          Page **19** of **38**
BROCKMAN, Robert T.
June 21, 2021

Admitting notes indicated he was unable to provide history due to altered mental status, and family were available to assist. On the previous morning they noticed he was more tired and had taken a nap. Later he began saying things he did not make sense. Additionally, he was not eating and tended to stare off blankly.

Neurologic examination revealed him to be alert and talkative, although his answers to questions did not make sense.

A Geriatrician consult on June 6, 2021 by Sarah E. Saleck, MD, noted that he was alert and apparently oriented but easily distracted. His wife provided history of Parkinson's disease going back greater than five years with consideration for dementia going back over one year with a significant decline with the last two urinary infections to his current agitation in the hospital. He was started on Seroquel for agitation. Dr. Saleck provided recommended of starting his home medications for sleep and constipation as well as decreasing Seroquel to 25 mg or lower as he appears to be improving and with the aim of decreasing possible extrapyramidal side effects "esp since wife says no auditory nor visual hallucinations at home."

He underwent psychiatric consultation on June 7 because Mr. Brockman had intermittent agitation the prior evening, was attempting to hit staff, climb out of bed, (ultimately falling), and demonstrated worsening confusion in the evenings, which included visual hallucinations. He reportedly was seeing "black things" that move which he swats at. Mrs. Brockman reportedly said that prior to his admission in March he was independent in activities of daily living but is now dependent and all ADLs and IADLs. His caregiver provides assistance in the home during the day, and Mr. Brockman's wife assists at night.

A CT scan of the head was done on June 7 as a result of apparent minor head trauma from the fall, and it was read as "unremarkable CT of the head with no evidence of acute hemorrhage or mass effect."

## COLLATERAL INTERVIEW INFORMATION

### Mrs. Dorothy Brockman

Mrs. Brockman chose not to allow me to interview her.  She did allow Dr. Darby to interview her.  In that contact during May 2021, Mrs. Brockman noted she was shocked when she first heard the diagnosis of Parkinson's disease, suggesting she did not notice the symptoms other than a stooped posture and that he "wasn't a whole lot of fun." She noted his hallucinations "usually come out at doctor's offices."  The notes suggested she guessed his condition started in 2018, and that "once he found out about the government investigation he had a precipitous decline." Dr. Darby wrote that Mr.

Neuropsychological Report          Page **20** of **38**
BROCKMAN, Robert T.
June 21, 2021

Brockman did not appear to have clear fluctuations [presumably in arousal or cognition] according to Mrs. Brockman. She noted his current memory was terrible.

**June 14, 2021, Interview of Kathy Keneally of Jones Day**

Ms. Keneally said she started having questions about his cognitive functioning on the second or third time she met with Mr. Brockman during late 2018 or early 2019. She noted he was an impressive man at first particularly given his history and his presentation, but she started to notice that he would repeat stories. She said they would ask questions attempting to "drill down" and investigate the nature of the situation in response to the allegations, but he would respond with repetitions of something they had heard before. She indicated there was a disconnect between his responses and their attempt to obtain more detail. She noted she had vivid recollections of multiple occasions where they told him that if they had specific information from him it would be helpful in determining the scope and developing a defense, but at that point he became a "blank." She said that even though he would give them all the time they needed, and it did not feel like he was attempting to hold back, they were just not getting the information they sought. Rather, it sounded as if he would respond with generalities. She noted there were times that he would raise an issue as if it was something new when in fact, she knew it was information he had received from them. She noted that type of event occurred in the context of not only facts but also in procedural issues. She said "He had no sources but me, and yet he would repeat back information as if we had never covered it."

She noted that the difficulties began getting worse again with him acting as if he had not previously received the information they provided him. She said he was the first to raise the issue [of his cognitive diagnosis] and said they may need to slow down with him. She said, "it was a disconnect, we told him, but information was not coming forth." She said there is no indication of resistance from him because he was meeting with them, but they "were coming up empty." She said they were meeting with him regularly prior to the revelation of his problem, and to some degree met with him more frequently afterward because they had to deal with his problems. Once the pandemic shutdown occurred, the contact changed to telephone interviews. She indicated she was in almost continuous communication with him on the phone, but it was nearly always set up with Mr. Brockman's wife, Dorothy, who nearly always stayed on the phone.

Ms. Keneally indicated the bottom line was she does not have confidence in what he does and does not understand. She knows there are things he does not understand because the issues come back to her in a different manner. She noted she would explain something procedurally to him only to have him come back three days later asking how they would handle the very issue she discussed with him previously. This problem makes it quite difficult for her to dig deep into details. She indicated it is a scary problem for her as his lawyer. She noted it is his lack of recollection and apparent lack

Neuropsychological Report          Page **21** of **38**
BROCKMAN, Robert T.
June 21, 2021

of understanding rather than simply a failure of memory. She did not believe the information received from Mr. Brockman was reliable.

She said he knows who she is and the rest of the defense team working with him as well as the lead prosecutor who has been around from the beginning. He has had several conferences with the judge and appears to understand the judge in his basic role; although he appeared to have significant difficulty understanding the transition from a Magistrate to District Judge. He seemed to have less difficulty understanding the transition to the jurisdiction of Texas. She believed he fails at understanding, memory, and judgment.

She noted somewhat in summary, that the difficulty here is the indictment spans 40 years. She indicated that she could defend these allegations with the right information. She said, "It would be helpful if he could provide this or that information," because I can't put a defense together with a client with his cognitive issues, at least how those cognitive issues have manifest. "I feel like I could defend this case but am stuck." Additionally, she noted he provides information about facts that are from long ago that she knows are not accurate, "including facts that would violate space and time."

**June 15, 2021, Interview of Peter Romatowski of Jones Day**

Mr. Romatowski said he had numerous meetings with Mr. Brockman the lasted from 3 to 5 hours each from September 2018 through February 2020. He said he believed he started noticing something was not quite right during the second or third meeting with Mr. Brockman. He noted that Mr. Brockman did not appear "able to do those things that would assist a lawyer in a complex white-collar case." He did not appear able to remember facts to the extent one would expect. But memory was less than half of it, more importantly he was not able help us with information, such as documents and other information regarding potential witnesses. He said he was not able to do what other defendants could do, namely helping reconstruct what happened. Mr. Romatowski said, "a defendant can tell you how to make the inferences, which are stronger and why, in looking at documents, to highlight important things attorneys may not see." From early on, he said it was apparent that Mr. Brockman struggled to do those things, and it became progressively worse.

He noted Mr. Brockman badly wanted to help, but was "very suggestible." Mr. Romatowski noted that Mr. Brockman would repeat back and distort information he had heard previously. He noted these examples occurred regarding facts that were neutral, so it did not appear like he was trying to make his case more favorable. Mr. Romatowski said, "He cannot weigh the evidence or weigh the strength of the evidence, he just cannot do it." He noted that the more they would dig in to the details, the more Mr. Brockman would retreat to high-level anecdotes and reports of Reynolds operations or something else not related to the details with which they were dealing. Mr. Romatowski

DBD-0000147

Neuropsychological Report          Page **22** of **38**
BROCKMAN, Robert T.
June 21, 2021

believed the phenomenon worsened over time as his physical condition continued to
deteriorate. He noted the change was not sudden but happened over time. Cognitively,
he also declined in a progressive manner. Mr. Romatowski said he did not recall him
having good or bad days but rather thought of it as a gradual decline over time.

Mr. Romatowski said Mr. Brockman's difficulties were present early on and substantive
even then. He noted July 18 [2019] was "an eye-opener." He said normally the
attorneys come in and set the agenda, but on this day, Mr. Brockman started the
meeting, produced a binder of medical reports, and said with some apparent
embarrassment that he wanted to tell them he had been seeing doctors and he had
reports he wanted them to see. Mr. Romatowski said, "He wanted us to understand why
he was not able to help us." "He badly wanted to do better and wanted us to understand
why he was having these issues." It was apparent after flipping through the medical
reports that this information was important and needed further investigation.

Mr. Romatowski said, "I've never seen anyone with these problems do this before in my
career—bringing up the issue." Finally Mr. Romatowski indicated he understood what it
takes to assemble the facts and "we just struck out with Bob."

## MENTAL STATUS AND BEHAVIORAL OBSERVATIONS

Mr. Brockman was alert and in no acute distress throughout the three days of
examination. He was oriented to Dr. Dietz and myself, consistently, and demonstrated
his recollection of us throughout the three days; however, he claimed later on the third
day that he could not recall with whom he spent the entire previous day testing even
though he greeted me the morning of the third day and noted he was wearing warmer
clothes because the room had been cold when we were testing the day before.

He also spontaneously raised an issue upon sitting down with me on the morning of the
second day after I reiterated the limits of confidentiality.  He said he missed a couple
charitable contributions when discussing his contributions with us the previous day. He
said he was involved in a brand new housing project in Danville, Kentucky, that was
about 18-20 million for the first portion and about 18-22 million for a second portion.  He
also provided contributions to renovating the science building at Centre College. He
said he gave a speech there, one of his better ones, and that it was available on the
internet. His words and behavior clearly indicated he recalled being asked about his
charitable contributions the day before and that he later realized he had not
remembered all of them.

Also on the morning of the second day, Mr. Brockman spontaneously and specifically
recalled that I had shown him the pencil/paper version of MMPI at the end of the
previous day.  At that time, he was given the option of taking the test on the computer or
with pencil/paper, but he was instructed the pencil/paper option ran the risk of him

getting slightly off on the numbered items between the booklet and the answer sheet. He decided take the test using pencil/paper, but after reading the first item decided to wait until the next morning because it was at the end of the day on May 18 and he realized he was tired.  When he came in on the morning of the 19th, he had this to say:

> I thought about the MMPI and what you said yesterday.  Entering answers directly in the computer is the better method because you can't get off the number like you can with pencil and paper. So I rescind my decision to do it on paper and would like to do it on the computer.

His alertness did not appear to significantly vary during the day or across the three days. Early on the third day [May 20], he noted the date was somewhere in mid-May; he said he could not recall exactly but knew that his birthday was coming up in just a few days [May 28], and he would be turning 80 years old.  After orienting him to the exact date early in the morning, he demonstrated the ability to retain that information over 40 minutes.  Later that same day, he denied knowing the date and claimed it was now August 2021 (even though previously said he knew his birthday [May 28] was coming up in just a few days).

He was dressed casually.  His hygiene and grooming were good. His gait and posture were slightly stooped and stiff; he demonstrated little arm swing. His speech was normal in rate, content, and form; in other words, he did not jump from subject to subject in an irrational manner. His affect was normal and appeared to be mood congruent.  He demonstrated normal eye contact. He demonstrated intact verbal comprehension to questions and was able to respond to topics appropriately.  In fact, there were times when he answered questions in such a manner that he appeared to be going off in a tangential thought that lasted for more than a minute or two but was able to pull the topic back around and demonstrate how his seemingly tangential thought was needed for a backdrop to understand the overarching point he was making.  This verbal behavior demonstrated intact comprehension, reasoning, the ability to hold a complex thought in his mind while simultaneously discussing an ancillary point, and short term memory.  He rarely became lost in conversation or confused about a question. He had no difficulty understanding testing instructions.  He demonstrated no indication he was observing visual hallucinations or acting out of delusional ideas.

During his copy of the Rey Complex figure, he repeatedly rotated his answer sheet even after being instructed multiple times not to do so.  During the WCST, he repeatedly placed the next card on top of the key card or below the card stacks even after being corrected countless times.  In this, he demonstrated atypical behavior for a person who clearly was not in delirium. The behavior was also inconsistent with all but the most severe dementias during which the examinee proves untestable. It was not consistent with his ability to recall conversations from the previous day, and it defied procedural

learning principles, whereby even severely compromised people learn through rote repetition.

## TEST RESULTS

**Validity Related Issues:** Mr. Brockman was administered the WMT.  He failed the validity portions of the measure and met the mathematical rule for a possible genuine memory impaired profile; however, he produced a profile that was extremely poor.  He performed worse than the most severely impaired dementia and amnestic patients on all aspects of the measure except consistency.  Multiple choice and paired associate scores were identical, and free recall was zero percent correct.  These latter three scores were lower than they should have been in relationship to the other scales when compared to even severe dementia. The profile appeared atypical compared to dementia and was not consistent with his demonstrated cognitive performance during the two full day interviews and general behavior throughout the three day interaction.

He also failed the NV-MSVT and met the mathematical rules for a possible genuine memory impaired profile; however, he again produced an atypical pattern of scores.  He performed better than dementia reference groups on some scales, yet strikingly worse than those same reference groups on other scales. The overall pattern of scores was not consistent with the pattern repeatedly demonstrated in various different dementia comparison groups.  The disparity indicated the profile was not created by a person with dementia. Also the very poor free recall score of zero was not consistent with his demonstrated cognitive abilities and recollections during the three day examination.

Mr. Brockman performed in an atypical manner on the VSVT as well.  He produced questionable results in both easy items correct and difficult items correct.  He performed significantly poorer on the latter items.  Although labelled "easy" and "difficult," the items are really not substantially different in their difficulty levels, but only appear so to the examinee. In fact, the task is very easy for all items.  Research demonstrates that even when dementia is the issue of concern, scores below 11 are low enough to indicate poor task engagement.[3]  His score of only 8 correct was poorer than that found in dementia patients, suggesting a false positive rate very close to zero with that normative data. Importantly, the score resulted in a binomial $p$ value of 0.0758. From a probabilistic perspective, this score is lower than the score he would have achieved 92 times out of 100, if he had been blindfolded.  Contemporary research indicates this low of score on this type of test in the context of a forensic examination should be interpreted as intent to fail because he had to have known the correct score in order to

---

[3] Loring, D. W., Larrabee, G. J., Lee, G. P., & Meador, K. J. (2007). Victoria Symptom Validity Test performance in a heterogenous clinical sample. *The Clinical Neuropsychologist, 21,* 522-531; Slick, et al. (2003). Victoria Symptom Validity Test scores of patients with profound memory impairment: Nonlitigant case studies. *The Clinical Neuropsychologist, 17,* 390-394.

Neuropsychological Report          Page **25** of **38**
BROCKMAN, Robert T.
June 21, 2021

intentionally choose the incorrect score more often than what have occurred by chance.[4] In fact, it has even been termed the "smoking gun of intent."[5]

Mr. Brockman achieved an RDS imbedded score that was within expected limits. The above validity related results, when taking into consideration the context of this examination, strongly suggest Mr. Brockman was attempting to appear disingenuously more impaired than actually the case, particularly on memory related measures. Research demonstrates that when a person attempts to appear impaired on validity testing, other tests administered during that examination are not a valid reflection of the actual cognitive strengths and weaknesses.[6] Consequently, the following test results are not a valid reflection of Mr. Brockman's genuine cognitive abilities.  Results are presented here only for comparison purposes.

**Attention, Concentration, and Speed of Mental Processing:**  Mr. Brockman obtained a WAIS-IV Digit Span scale score of 8 (T33, $4.5^{th}$ percentile for full demographic), which fell in the below average range.  His performance on the CPT revealed a very high rate of random or repetitive responses, a very high rate of missed targets, yet an average rate of missed targets for a man of his age. When looking at age only norms, these findings do not appear consistent with the average age normed scale score of 8 on the Digit Span test, a measure of focused attention (25th percentile rank for age).

Mr. Brockman obtained a WAIS-IV Processing Speed Index of 68 which fell in the exceptionally low range for his age (2nd percentile). When adjusting the score to his demographic background, the score became T19 ($0.1^{st}$ percentile) and fell even lower in the exceptionally low range. He achieved a Symbol Search scale score of 5, which fell in the below average range; when adjusting it for his demographic background, the score became T27, which fell in the exceptionally low range ($1.1^{st}$ percentile). He achieved a Coding scale score of 3, which was exceptionally low, even when adjusted only for age (1st percentile), when adjusted for his full demographic, the score became even more poor at T14 ($<0.1^{st}$ percentile). On Trail Making Test-Part A, his performance fell in the exceptionally low range for his full demographic (T27, approximate 1st percentile); Trail A is also a measure of psychomotor processing speed.  On the CPT, his reaction times were significantly inconsistent.

---

[4] Binder, L. M., Larrabee, G. J., & Millis, S. R. (2014). Intent to fail: Significance testing of forced choice test results. *The Clinical Neuropsychologist, 28,* 1366-1375.
[5] Binder, L. M. & Chafetz, M. D. (2018). Determination of the smoking gun of intent: Significance testing of forced choice results in social security claimants. *The Clinical Neuropsychologist, 32,* 132-144.
[6] Bush, S. S., et al. (2005). NAN position paper: Symptom validity assessment: Practice issues and medical necessity. *Archives of Clinical Neuropsychology 20,* 419-426; Green, P. W. (2007). The pervasive influence of effort on neuropsychological tests. *Physical Medicine & Rehabilitation Clinics of North America, 18*(1), 43-68; Green, P., Rohling, M, Lees-Haley, P. & Allen, M. (2001) Effort has a greater effect on test scores than severe brain injury in compensation claimants, *Brain Injury, 15*(12),  1045-1060.

Neuropsychological Report          Page **26** of **38**
BROCKMAN, Robert T.
June 21, 2021

Overall, Mr. Brockman obtained processing speed scores that were suggestive of severe impairment, yet his focused attention was average for his age.

**Language Functioning:** Mr. Brockman obtained a NAB Naming score that fell in the average range for his age and education. His performance placed in the low average range for both letter fluency (T38, approximate 12th percentile) and semantic fluency (T40, approximate 16th percentile). These latter two scores were based on his full demographic.  He also performed within the low average range on SRT. Overall, results suggested no apparent difficulty in his language skills.

**Visuospatial Functioning:** Mr. Brockman copied the Rey Complex Figure very poorly (<1st percentile). He obtained a WAIS-IV Block Design scale score of 1, which was based on only two raw score points correct (T10, <0.1[st] percentile for his full demographic.  Mr. Brockman did not complete the exceedingly simple sample items correctly.  These scores fell in the lowest category possible, which was striking in regard to the WAIS-IV Block Design subtest as the score was extreme.

**Memory Functioning:**  The NAB Tests use age and education corrections. Mr. Brockman's performance fell in the exceptionally low range on the NAB Memory module with an index score of 58 (0.26[th] percentile). This is the lowest NAB Total Memory Module Index score I have ever seen in the 21 years I have been using the instrument in clinical and forensic practice. The protocol also included more zero responses to free recall items than I have ever seen. List Learning Immediate Recall of T19 fell in the exceptionally low range at <1st percentile.  Short Delay Recall and Long Delay Recall fell in the same range (T19 & T24, respectively, <1st percentile). He demonstrated no perseverations (tendency to repeat the same incorrect response multiple times) and only one intrusion (both of which were normal at 36th and 61st percentiles, respectively). The lack of perseverative and intrusion responses was striking, but not as striking as the demonstrated learning curve of raw scores over three trials.  He recalled 2 words after hearing the list the first time, 3 words after the second time, and 0 words the third time. The list of words presented each time is exactly the same and in the same order.  He also demonstrated no discriminatory improvement during the recognition trial. This list learning performance was atypical for people with even severe cognitive compromise.

Story Learning Immediate Recall score of T19 fell in the exceptionally low range for his age and education (<1st percentile).  The Delayed Recall score of T29 fell in the below average range (2nd percentile). While his score appeared to improve on the delayed free recall, both raw scores were 0 words recalled.  It is exceedingly rare to obtain zero points on both learning trials and the delayed trial.  Again, this performance was extreme.

In striking contrast to his verbal learning and retention, his performance on nonverbal (abstract shapes) was perfectly normal for his age and education.  Shape Learning

DBD-0000152

Neuropsychological Report          Page **27** of **38**
BROCKMAN, Robert T.
June 21, 2021

Immediate Recognition score of T45 fell in the average range (31st percentile), and the Shape Learning Delayed Recognition score of T48 also fell in the average range (42nd percentile). He obtained a Delayed Recall of the Rey Complex Figure that placed within the exceptionally low range (0 aspects recalled, <T20, <1st percentile). His recognition of Rey Figure components improved to T39 (14th percentile, low average range).

His Daily Living Immediate Recall score and Delayed Recall score were both T19 and fell in the exceptionally low range (<1st percentile). This learning and retention task incorporates both visual and auditory learning for two simple medication instructions and a name, address, and phone number each learned over three trials. Unlike the Rey Figure recognition, his performance during the Daily Living remained in the exceptionally low range (<1st percentile).

Overall, Mr. Brockman's scores during learning and memory did not make clinical sense, were generally severe, and were strikingly inconsistent with his demonstrated memory during clinical interviews and informal interactions during this three day examination.

**Executive Functioning:** Mr. Brockman was administered the RIAS-2 and obtained a Composite Intelligence Index of 80 (90th confidence interval: 77-84) which fell in the low average range of functioning (9th percentile). He achieved a Verbal Intelligence Index of 106, which fell in the average range (90th confidence interval: 102-109, 66th percentile). His Nonverbal Intelligence Index of 58 fell in the exceptionally low range (90th confidence interval: 55-64; 0.3rd percentile). These scores are based on age norms. This performance was substantially below the high average psychometric intelligence prediction based on TOPF performance of Mr. Brockman from Dr. York's 12/03/2019 examination along with his simple demographic variables.

Mr. Brockman completed 0 out of 6 categories during the Wisconsin Card Sorting Test, a performance that fell within the low average to below average range for men his age and education (6-10th percentile). Total Errors score of T29 fell in the below average range (2nd percentile). The Perseverative Errors score of T25 fell in the exceptionally low range (<1st percentile). He obtained a Trail Making Test-Part B score of T18, which fell in the exceptionally low range for his age and education (<1st percentile).

**Emotional Functioning:** Mr. Brockman completed all 335 items of the MMPI-3 using the administration on a laptop. He demonstrated no difficulty interfacing with the computer and using the mouse to select true or false for each item. He also had no difficulty understanding and applying the directions. His CRIN, VRIN, and TRIN scores were all normal and indicated that he was able to understand the items and responded based on item content in a manner that demonstrated a normal amount of consistency across the 335 items over about 40 minutes. The only elevation among validity scales was for RBS, but the elevation was not sufficient to suggest he was significantly

Neuropsychological Report          Page **28** of **38**
BROCKMAN, Robert T.
June 21, 2021

overreporting atypical memory complaints on this self-report inventory. Other validity scales suggested no significant over or under reporting of somatic or emotional disturbance. He elevated none of the Higher Order scales or Restructured Clinical scales.  All Somatic/Cognitive scales were within normal limits as were most of the Internalizing scales.  The only Internalizing scale he elevated was Helplessness (T65), and the score fell on the cutoff.  None of the Externalizing and Interpersonal scales were elevated to significance.  Additionally, none of the PSY-5 personality pathology scales were elevated.  Other than feeling mildly helpless in his current situation, the MMPI-3 results suggested Mr. Brockman had no emotional, psychiatric (i.e., thought dysfunction or hallucinatory experiences), cognitive, or somatic concerns.  The overall profile did not appear consistent with someone who had a severe cognitive disorder that included hallucinatory experiences and paranoid delusional ideas.

## CLINICAL FORMULATION

### Mr. Brockman, Parkinson's Disease, and DLB

Objective findings suggested Mr. Brockman started to demonstrate the physical signs of parkinsonism during fall of 2018, and formal medical assessments began thereafter to identify the cause.  Loss of sense of smell, stooped posture, masked facial presentation, slowed motor behavior, occasional tremor, and balance issues are all common indications of Parkinson's disease (PD). While some have suggested loss of sense of smell is more typical of Lewy body dementia, it is a common finding in PD.[7] All of the examination results appear consistent in revealing the findings of PD. The clinical question, therefore, is whether he has only Parkinson's disease, Parkinson's disease plus cognitive impairment, or Lewy body dementia (DLB), and most importantly the nature and severity of his cognitive condition.

According to the neurologic profession's consensus criteria,[8] DLB has these core features:

1. Fluctuating Cognition with pronounced variations in attention and alertness.
2. Recurrent visual hallucinations that are typically well formed and detailed.
3. REM sleep behavior disorder, which may precede cognitive decline.
4. One or more spontaneous cardinal features of parkinsonism: These are bradykinesia (defined as slowness of movement and decrement in amplitude or speed), rest tremor, or rigidity.

---

[7] Tarakad, A., & Jankovic, J. (2017). Anosmia and ageusia in Parkinson's disease. In K. R. Chaudhuri & N. Titova (Eds.) *Nonmotor Parkinson's: The hidden face: The many hidden faces*, Vol 133 (pp. 541-556). NY: Academic Press.
[8] DLB Consortium (2017). Diagnosis and management of dementia with Lewy bodies: Fourth consensus report of the DLB Consortium. *Neurology, 89,* 1-13.

Neuropsychological Report         Page **29** of **38**
BROCKMAN, Robert T.
June 21, 2021

Mr. Brockman demonstrates cardinal features of parkinsonism pertaining to at least motor slowness, decreased arm swing, and masked facial features.  Additionally, DaTscan results demonstrated reduced uptake of dopamine within the basal ganglia, demonstrative of PD.

Mr. Brockman did not demonstrate pronounced variations in attention and alertness during three days of face to face examination (approximately 24 hours of observation).

Mr. Brockman reportedly claimed one brief and ill-defined episode of visual hallucinatory experience while being examined by Dr. York; Mrs. Brockman noted his visual hallucinations only occur in doctors' offices.  He presented no indication of recurrent fully formed visual hallucinations during this 3-day examination.  His MMPI-3 result was also without indication of thought disorder or suggestion of presence of hallucinations. Little evidence exists to suggest Mr. Brockman has recurring, well-formed, and detailed hallucinations.

REM sleep disorder without atonia was not verified during the sleep study.  Although the study was less than optimal, the attending physician was willing to write, "no REM sleep disorder." PET results suggested hypometabolism in the right parietal lobe, but these findings were deemed very mild and apparently not specific to any one disease (although they could be consistent with Alzheimer's disease or Lewy body disease).

Given the lack of stable core features, it is my professional opinion that Mr. Brockman does not have DLB.

**Mr. Brockman and Dementia**

The more important question is whether Mr. Brockman has dementia of any kind. People with PD commonly develop cognitive deficits as the condition progresses, but a large percentage of PD patients do not do so.  These deficits can vary from mild to severe.  Mild cognitive deficits associated with PD are classified as PD-MCI.  More severe cognitive deficits associated with PD are classified as PD-dementia (PDD). In 2012, the Movement Disorder Task Force[9] produced this summary (p. 350, internal citations omitted):

> In Parkinson's disease (PD) there is a spectrum of cognitive dysfunction, ranging from mild cognitive impairment (MCI) to PD dementia (PDD). A Movement Disorder Society (MDS) commissioned task force recently evaluated the literature pertaining to mild cognitive impairment in PD (PD-MCI), and determined that MCI is common in nondemented PD patients

---

[9] Litvan et al. (2012). Diagnostic criteria for mild cognitive impairment in Parkinson's disease: Movement Disorder Society Task Force guidelines. *Movement Disorders, 27,* 349-356.

Neuropsychological Report          Page **30** of **38**
BROCKMAN, Robert T.
June 21, 2021

> and is associated with increasing age, disease duration, and disease
> severity. Moreover, PD-MCI predicts the development of dementia, which
> can occur in up to 80% of PD patients over the long term.

Dr. Lai examined Mr. Brockman over the time frame of 13 months.  Although DLB was a
consideration and differential diagnosis in January 2020, he concluded by February
2021 that the man's condition was more consistent with Parkinson's disease with Mild
Cognitive Impairment along with depression and anxiety.  Mild Cognitive Impairment is
a cognitive problem that is severe enough to cause some difficulty but is less severe
than that found in dementia. The level of cognitive impairment that can occur with PD
can be mild or it can be severe enough to warrant a diagnosis of dementia.

The records suggest Mr. Brockman had been worrying about his memory at least yearly
since 2005, but Mrs. Brockman, in the informant paperwork at Dr. Yu's office,
documented her belief that his memory difficulties did not begin until about October 1,
2018. This date is not long after Mr. Brockman began working with Jones Day in
preparation for a defense of his expected criminal charges. The video deposition during
January 2019, however, revealed intact long-term and short-term memory,
thoughtfulness, restraint, judgment, and even abstract reasoning.  There was no
marked cognitive compromise presented, although physical manifestation of
Parkinson's disease was apparent.  This deposition occurred just weeks after he was
deemed to have dementia and not be capable of assisting counsel.

Jones Day lawyers indicated they suspected something was not right regarding his
memory and thinking, but the turning point was when Mr. Brockman, himself, took
control of the July 18, 2019, Aspen meeting by starting the meeting with the point he
had something important to share.  He shared his recent reports collected in a binder,
noting the dementia diagnosis, explaining this was the reason why he had not been able
to help them very well, and asked for their patience with him and to slow down.  This is
not the way people with dementia behave.  Even Mr. Romatowski recognized the
uniqueness of this event.  Although defense characterizes him as having lack of insight
to his problems, he took the lead at the meeting and presented the evidence for his
dementia. According to what Mr. Romatowski suggested, the focus of their work then
shifted to this important issue that needed further investigation. The entire course of
events is quite atypical for people who have genuinely developed dementia; it is nearly
always others, such as family members, who bring them in for examination and highlight
the findings to others—not the patient him or herself.

The cognitive screening tests with which he was examined by various examiners
contain no performance validity measures (PVM), and they are easy to exaggerate.
Convincing exaggeration is made easier when examinees are coached on the specific
nature of specific disorders, shown how to perform on tests, or simply perform their own
internet searches.

Neuropsychological Report          Page **31** of **38**
BROCKMAN, Robert T.
June 21, 2021

Clinical neuropsychologists who perform work within the forensic setting typically incorporate multiple free standing performance validity tests as well as imbedded performance validity and symptom validity tests within their neuropsychological batteries.[10] Dr. York included no stand-alone PVMs or symptom validity measures in the first examination, although the imbedded RDS was within acceptable limits.  It was unclear what other imbedded indices she may have reviewed as they were not described.

Mr. Brockman demonstrated a significantly improved performance during the second York examination in terms of his visuospatial drawing skills as was highlighted in the Defense Motion for Competency Determination.  This change was attributable to the cognitive fluctuations inherent in DLB. I disagree. The variability of cognition found in DLB refers to variable alertness and arousal rather than significant changes between assessments done months later and that go counter to the progressive nature of the neurodegenerative condition.  Additionally, significant inconsistency between cognitive examination results and demonstrated behavior is often a sign of invalid results.

Dr. York incorporated one free standing PVM during the second neuropsychological examination, the Rey 15-Item test. Although her data summary sheet initially included a recognition score (which was surprisingly poor), she later indicated that she had not actually administered the recognition aspect of this test.  The Rey 15-Item test is widely known as a test that has poor sensitivity to malingering, which is why Dr. Boone created the recognition test to include with it. With out the recognition portion, the test has very weak capability to identifying poor task engagement (i.e., <50%),[11] particularly when using the cutoffs needed with potentially cognitively impaired elderly individuals.[12] Again, Mr. Brockman performed normally on the RDS, but it was unclear what other imbedded PVM Dr. York considered.  No apparent free standing PVM or symptom validity measures were administered during the third neuropsychological assessment.

---

[10] Heilbronner, R. L., et al. (2009). American Academy of Clinical Neuropsychology consensus conference statement on the neuropsychological assessment of effort, response bias, and malingering. *The Clinical Neuropsychologist, 23,* 1093-1129; Schroeder, R. W., Martin, P. K., & Odland, A. P. (2016). Expert beliefs and practices regarding neuropsychological validity testing. *The Clinical Neuropsychologist, 30,* 515-535; Sweet, J. J., et al. (2021). American Academy of Clinical Neuropsychology (AACN) 2021 consensus statement on validity assessment: update of the 2009 AACN consensus conference statement on neuropsychological assessment of effort, response bias, and malingering. *The Clinical Neuropsychologist,* DOI: 10.1080/13854046.2021.1896036.

[11] Boone, K. B., Salazar, X., Lu, P., Warner-Chacon, K., & Razani J. (2002). The Rey 15-Item recognition trial: A technique to enhance sensitivity of the Rey 15-Item Memorization Test. *Journal of Clinical and Experimental Neuropsychology, 24,* 561-573.

[12] Fazio, R. L., Faris, A. N., & Yamout, K. Z. (2017). Use of the Rey 15-Item Test as a performance validity test in an elderly population. *Applied Neuropsychology-Adult, 26,* 28-35.

DBD-0000157

Neuropsychological Report          Page **32** of **38**
BROCKMAN, Robert T.
June 21, 2021

As noted under the validity portion of the Test Results section above, Mr. Brockman
failed multiple free standing performance validity measures during this examination.  His
performance during two sophisticated measures suggested possible genuine memory
impaired profiles, except his pattern of scores did not appear consistent with that seen
in dementia.  He also failed one free standing PVM to a degree that was worse than
dementia reference subjects; and the score was also below an accepted cutoff to
indicate he intentionally chose the wrong answers rather than the right answers during a
portion of the test.  The VSVT is an easy test to perform.  This finding in a the context of
this type of examination is indicative to malingering in my opinion.

His behavior during this 3-day examination also suggested he was attempting to appear
disingenuously cognitively impaired.  He attempted to draw attention to his lack of
memory, for example, by noting he just could respond with any words when given word
lists to remember. He claimed when speaking with me on May 20 in this context that he
did not recall who tested him the day before (p. 40 of transcript), even though at other
times during the three days, he made it clear he recognized me and remembered what
had happened the day before (e.g., his discussion of the MMPI administration and his
report of charitable donations).

He noted he was not competent and was not as useful to his defense as he was
previously due to memory problems.  In this regard, he tried to draw attention to his
incompetence after we went through a large amount of competency questioning on May
20.  This type of behavior is not consistent with people who have dementia, and it is
certainly not consistent with the claim that he has no insight to his problems.
In addition to validity test results, Mr. Brockman demonstrated repeatedly over this three
day examination that he actually had memory for events he was claiming not to recall.
This behavior occurred between the first and second day, but also near the end of the
third day when Dr. Dietz was questioning him about recent changes that had occurred
at Reynolds & Reynolds. He was able to discuss in reasonable detail these events, but
then Dr. Dietz asked him about the current president, and Mr. Brockman said he did not
know who it was. This was another striking example of the type of behavior which
demonstrated Mr. Brockman's claimed severe memory problems were disingenuous.

The presence of Malingering Neurocognitive Dysfunction does not eliminate the
possibility that Mr. Brockman does have some genuine mild cognitive deficits.  In fact,
given the verified diagnosis of PD, I would not be surprised if he had some mild deficits.
Given his demonstrated presentation over the course of these three days, I do not
believe those potential deficits are more than just mild, however.  In this regard, Mr.
Brockman may have PD-MCI as Dr. Lai suggested, but he does not have dementia.
Last, it is not possible to definitely determine if he even has MCI without appropriate
task engagement during neuropsychological testing.  Consequently, I will list MCI as
only a potential diagnosis.

Neuropsychological Report          Page **33** of **38**
BROCKMAN, Robert T.
June 21, 2021

## DIAGNOSES

Malingering Neurocognitive Dysfunction
Possible Mild Neurocognitive Disorder (Mild Cognitive Impairment)
Parkinson's disease

## COMPETENCY RELATED ISSUES

### Mr. Brockman's Response to Competency Related Questioning

I used the Competency Assessment Instrument, Revised, as a semi-structured outline of questioning pertaining to important competency related concepts; Dr. Dietz then took the lead for the remaining portion of the interview on 5/20/2021. I believe the full transcript of both of these interviews are attached to the report of Dr. Dietz and available for the court to review (as is the video recording). Consequently, I will not go through each aspect of the interview in detail, but rather provide my conclusions here based on that information.

Prior to the beginning of the video recorded interview on May 20, but after I re-explained the purpose of our evaluation and the limits of confidentiality, I asked Mr. Brockman about the current date. He said he could not recall the exact date but believed it was sometime in June, and I then provided the corrected date for him. Mr. Brockman then completed the D-CRT using pencil and paper format, which took 25 minutes. There was then a break in order for the videographer to start the recording. I reiterated the purpose of our meeting and the limits of confidentiality again for Mr. Brockman, and he appeared to understand those issues. Mr. Brockman then provided the correct exact date nearly an hour after that information was provided to him, and an hour full of distracting cognitive activity. He further said that he should've known the date earlier because he knew he was just a few days away from turning 80 years old. The ability to provide this correct fact demonstrated he actually knew the likely date, but disingenuously provided "August."

The D-CRT is a 114 item multiple-choice questionnaire focusing on a person's understanding of basic legal principles such as roles of courtroom participants, definitions of legal terms, basic legal processes, and proper courtroom behavior. Mr. Brockman's percent correct on this measure was consistent with younger jailed individuals who scored within the competent to stand trial range on the MacArthur Competency Assessment Tool-Criminal Adjudication, and who were presumed competent to proceed (z = 0.14). The measure also contains 16 item pairs that measure the same principle and constitute a consistency index, Mr. Brockman achieved 93.8% consistency, a score commensurate to the jail normative sample (z = -0.02) and statistically more consistent than the memory clinic sample of mild cognitive impairment and dementia patients (1-sample t[37] = -6.642, $p$ = 0.000).

Neuropsychological Report          Page **34** of **38**
BROCKMAN, Robert T.
June 21, 2021

**Understanding Charges**

Mr. Brockman's appeared to have a basic understanding of the nature of the charges against him.  This understanding can be seen by the transcript of the May 20 interview, when asked about the charges against him, Mr. Brockman initially responded with an unwillingness to answer, saying, "I think that's, you know, beyond the scope of what I'm supposed to be talking about." After discussing the issue further, however, Mr. Brockman was willing to answer, "They've charged me with not filing tax returns and not remitting, you know, funds due under other, you know, various federal laws." He understood the charge was a felony and serious.

Mr. Brockman also understood that he was supposed to be innocent until proven guilty, but felt that principle had been abused based upon information disclosed to the media, allegedly by the prosecution. When discussing this general issue, Mr. Brockman again asserted his right to not discuss details of his case.

**Appreciation of Penalties**

Mr. Brockman noted that if convicted he would go to prison for a long time, "forever." Such a response appears to be reasonable given his current age and the potential length of his sentence. In regard to probation, Mr. Brockman understood that one had to stay in the country, continue to live in a certain area, not commit another crime, and check in with a control officer. He remembered that he was on such a probation-like status currently.

**Appraisal of Available Defenses**

Mr. Brockman made it apparent that he understood the basic meanings of guilty, not guilty, and also the basic principle involved in a plea bargain. He also understood that if found guilty he would go to prison, and if found not guilty he would "walk," meaning to go free. He understood that there could be mental health conditions that could alter the legal process such that a defendant would not go to prison. Mr. Brockman appeared to understand the process of a plea bargain, but when asked about specifics regarding his case, he said, "Well, I think that's a question that applies to my case and that's not something I'm supposed to be talking about." This type of ability to refrain from speaking to subjects he was undoubtedly counseled against doing, is a striking reflection of not only his memory for counsel, but more importantly, the ability to refrain from making such statements.  It has been my experience that defendants who have mild to moderate dementia have trouble governing their own words in this regard.  Unlike people with dementia, Mr. Brockman demonstrated such restraint numerous times during our interviews.

Neuropsychological Report          Page **35** of **38**
BROCKMAN, Robert T.
June 21, 2021

**Appraisal of Functions of Courtroom Participants**

Available information suggested that Mr. Brockman understood the basic roles of courtroom participants, including Judge, prosecutors, and defense lawyers. He understood the nature and role of a jury. He knew the jury must make a decision based upon information presented in court. He understood prosecutors and defense lawyers call witnesses. He understood he was the defendant.  It was apparent he understood that a competent defendant was expected to provide assistance to counsel by providing information.

**Understanding Court Procedures**

Available information suggested Mr. Brockman understood basic court procedures, particularly as it related to moving through a trial and determination of guilt. He also understood there was an appeal structure in place where other judges review a case and make determinations.

**Appraisal of Likely Outcome**

Mr. Brockman noted his understanding that the government apparently believed the case against him to be pretty strong; however, he said he did not believe it was as strong as the government apparently thought. He also noted there were facts out there that demonstrated this. He was not willing to discuss details of his case, but noted he believed he would be able to provide that information to Counsel.  Again, Mr. Brockman demonstrated restraint that is uncharacteristic of a criminal defendant with dementia in my experience.

Mr. Brockman said there is a great amount of documentation that provided information for his lawyers. He also made it clear he had tremendous confidence in his defense team saying, "I have very, very excellent defense attorneys that have been involved in this area of the law, you know, for decades, you know, very experienced."

Mr. Brockman made it clear that he understood that if found not competent to proceed, the charges could potentially be dropped.

**Ability to Cooperate Rationally with Counsel**

Mr. Brockman's responses to us during this interview suggested he was able to cooperate rationally with Counsel if he chose to do so. He was able to cooperate rationally with us during our questioning, even though he repeatedly "put his foot down" when discussing aspects of his case he did not believe he was at liberty to share. He provided no delusional sounding information during this interview.  Again, he demonstrated restraint.

DBD-0000161

Neuropsychological Report          Page **36** of **38**
BROCKMAN, Robert T.
June 21, 2021

**Capacity to Disclose Pertinent Information to Counsel**

When asked to discuss details related to his case, Mr. Brockman repeatedly refused to disclose details citing instructions from his defense team. He voiced tremendous confidence in his defense team but also appreciated their lack of knowledge regarding his particular business. In this regard, he had this to say:

> Well, my attorneys – as sharp as they are, and is not just Kathy, I mean the whole crew, they don't understand the business, you know,… What the company does and why does it… Why is this product necessary, who has them and… What the product is, there's actually many products that all live together, work together, integrate together and where they are all produced in – by a single entity, which is Reynolds & Reynolds.

He went on to say, "and those words which if you say them quick are very believable to the attorneys but you gotta' make sure that they understand how it really works." Mr. Brockman indicated that he believes he can help them understand the situation, but also, "I think that they are smart enough in the end, eventually they can figure everything out—But the fact that there is a person available that has knowledge that they can call upon certainly cuts down the amount of hours they bill." He understood it was his job to work with his attorneys and do everything he can to resolve disagreements; however, he also understood he could fire his attorneys.

Mr. Brockman suggested the nature of the charges against him are rather complex, and he was not completely able to describe the details of it even if he wanted to or was allowed to. In regard to his ability to describe those issues, he followed up with this comment:

> Not even very much. I mean it's the area of the law, of course since I know nothing about law generally, but it looks to me like it is the statutes involved in it, are complex themselves. And so, that's what I rely on my attorneys, you know, they now understand enough of my business where that's – I'm no longer, you know, crucial to what's going on…. And I'm confident that my attorneys will ultimately get the level of knowledge and understanding that I think is appropriate. But I don't know how long that's going to take.

**Capacity to Testify**

His responses during our interviews demonstrated that Mr. Brockman would be able to discuss his case if he chose to do so. This conclusion was somewhat limited because Mr. Brockman routinely reverted back to apparent advice of counsel in not discussing

Neuropsychological Report          Page **37** of **38**
BROCKMAN, Robert T.
June 21, 2021

details with us. Again the ability to put his foot down in this regard was meaningful in terms of understanding his ability to control his behavior and make decisions he believed were in his best interest.

**Capacity to Challenge Prosecution Witnesses**

Mr. Brockman demonstrated the ability to respond to questions in an articulate manner while also keeping in mind the limits of disclosure at which point he no longer wished to provide information. Aside from the question about a possible genuine severe memory disorder, Mr. Brockman demonstrated his ability to pay attention, process information, and respond to questions over extended periods of time to such a degree that it was suggestive he would be able to help counsel in challenging prosecution witnesses.

**Ability to Manifest Appropriate Courtroom Behavior**

Mr. Brockman demonstrated appropriate behavior over the course of a three day examination. There was nothing during this time that would suggest his inability to remain calm and cooperative not only with Counsel, but also in the presence of the Honorable Court.

**Discussion of Competency Findings**

Mr. Brockman repeatedly demonstrated his appreciation for the apparent advice given him by counsel to not discuss details of his case with us.  He repeatedly demonstrated restraint.  There were several times during the May 20 interview that he noted his belief that our questions had strayed into details of his case that he did not wish to discuss with us. Behaving this way, Mr. Brockman demonstrated his ability to remember apparent admonitions from counsel (or at least his own concern in his own mind) as well as maintain the resistance to being led into disclosing information that could potentially endanger his defense. This reticence behavior was not consistent with the presence of dementia, particularly moderate dementia, as individuals with the condition do not remember admonitions from counsel provided days previously or even remember their own admonitions to themselves. Additionally, Mr. Brockman demonstrated his appreciation of potentially improper disclosure of facts pertaining to his case and the personal restraint needed to keep from sharing too much information. It appeared to me that his responses were not based upon a lack of memory, as demonstrated by the first question regarding his charges. Mr. Brockman was able report the basic notion of the charges dealing with him failing to properly file tax returns and remit tax money owed the government, but only after overcoming his reticence.

My interviews with Mr. Brockman's lawyers suggested to me that they were not particularly concerned about his understanding of such things as courtroom participant roles, or even basic legal procedures.  They appeared mostly concerned about his

DBD-0000163

Neuropsychological Report          Page **38** of **38**
BROCKMAN, Robert T.
June 21, 2021

capability to assist them and felt they just "struck out" in this regard because they did not believe him capable of providing the needed information for such a complex legal case.  Mr. Brockman voiced his faith that his lawyers were very, very, excellent and capable of basically putting the pieces together.  Given the available information, it is my opinion that Mr. Brockman may have some mild neurocognitive deficits, but they do not appear severe enough to eliminate his ability to assist in his defense to the degree he is able.

**Final Opinion Regarding Competency to Proceed**

It is my opinion to a reasonable degree of scientific certainty that Robert T. Brockman may have a mild form of mental disease or defect but, nonetheless, is able to appreciate the nature and consequences of the proceedings against him and assist properly in his defense if he chooses to do so.

**<u>PROGNOSIS</u>**

Malingering is not a mental illness, per se, and warrants no specific prognosis. However, it is also my opinion that Mr. Brockman has demonstrated effectively the ability to confuse examiners and, possibly even his own counsel. Given this success, and the natural course of Parkinson's disease, it is likely he will continue to attempt, what I believe to be a ruse.

Robert L. Denney, Psy.D., ABPP
Missouri Licensed Psychologist (R0316)
Temporary Texas Psychology License (NTLP-21-003)
Board Certified in Clinical Neuropsychology
Board Certified in Forensic Psychology

Fellow, Division 40 (Society of Clinical Neuropsychology), American Psychological
  Association
Fellow and Past President (2009), National Academy of Neuropsychology

DBD-0000164

## Robert L. Denney, Psy.D., LLC
Board Certified in Clinical Neuropsychology, ABPP
Board Certified in Forensic Psychology, ABPP

# Supplemental Report

Name:                    Robert T. Brockman

Date of Birth:           May 28, 1941

Criminal No.:            4:21-cr-00009

Date of Report:          October 29, 2021

**INTRODUCTION/REASON FOR REFERRAL**

Robert T. Brockman is a 80-year-old man who has been initially charged in the United States District Court for the Northern District of California (transferred to the Southern District of Texas, Houston Division), with Conspiracy, Tax Evasion, FBAR Violations, Wire Fraud Affecting a Financial Institution, Concealment Money Laundering, Tax Evasion Money Laundering, International Concealment Money Laundering, Evidence Tampering, and Destruction of Evidence.

I performed an assessment of his competency to proceed in May 2021 at the request of attorneys for the U.S. Department of Justice to perform a forensic neuropsychological evaluation of Mr. Brockman under Title 18, USC, Sections 4241 and 4247. Defense subsequently produced expert reports. I was asked to re-examine Mr. Brockman in regard to his condition related to his competency to proceed and provide a report of my findings. Additionally, I was asked to respond to findings and opinions presented in the defense reports, particularly the August 6, 2021 report of Thomas J. Guilmette, Ph.D., ABPP.

**SOURCES OF INFORMATION**

Videos of Mr. Brockman speaking to Reynold and Reynolds employees in approximately September 2017 and November 2019 were reviewed prior to my May 2021 report but inadvertently omitted from the listing. For this examination, I also reviewed these sources:

1. Handwritten notes from Stuart Yudofsky, 10/20/18, 1/18/19, 10/23/20
2. Report of Park Dietz, 6/21/21
3. Report of Ryan Darby, 6/18/21

Springfield, Missouri – RobertDenneyPsyD@gmail.com

**GOVERNMENT EXHIBIT**

4:21-CR-009-GCH

No. 2

Neuropsychological Report       Page **2** of **21**
BROCKMAN, Robert T.
October 29, 2021

4. St. Luke's hospital records for Uro-Lift procedure, 6/23-25/21
5. Amyloid-PET scan brain, 7/28/21
6. MRI brain, 7/30/21
7. Report by Marc Agronin, MD, 8/06/21
8. Video and transcript of interview by Dr. Agronin, 7/13/21
9. Report by Thomas Guilmette, PhD, ABPP, 8/06/21
10. Video and transcript of interview by Dr. Guilmette, 7/16/21
11. Copies of raw test data from Dr. Guilmette's 7/16/21 examination
12. Report of Christopher T. Whitlow, MD, PhD, MHA, 8/06/21
13. Report of Thomas Wisniewski, MD, 8/06/21
14. Report of Scott Polus of Xact Data Discovery, 8/05/21.
15. Sleep study, 8/12/21
16. FDG-PET brain scan, 8/24/21
17. EEG brain, 9/2/21
18. Hospital records from Houston Methodist Hospital 5/31/21-6/11/21 & 3/15-19/21.
19. Neurology follow up clinic visit note from Eugene C. Lai, MD, PhD, 10/07/21.
20. Laboratory results, Quest Diagnostics, 10/20/21
21. Comprehensive report of Maria Rosana Ponisio, MD, 10/25/21

I interviewed and examined Mr. Brockman on October 20 and 26 of 2021. Dr. Dietz participated in the interview and observed competency related testing on October 20. I administered the following tests:

1. Neuropsychological Assessment Battery-Memory Module, Naming Test, and Figure Drawing Test
2. Wechsler Adult Intelligence Scale-IV (WAIS-IV)-Digit Span, Symbol Search, Coding, and Block Design
3. Controlled Oral Word Association Test (FAS & Animals)
4. Hopkins Adult Reading Test (HART), with recognition of words
5. Nonverbal Medical Symptom Validity Test (NV-MSVT)
6. Medical Symptom Validity Test (MSVT)
7. Rey-15 Item Test with recognition
8. Evaluation of Competency to Stand Trial-Revised (ECST-R)
9. Multiple choice test based on information from Mr. Brockman's indictment

## RECENT HISTORY

Mr. Brockman experienced an additional episode of urinary related infection which resulted sepsis and hospitalization May 31-June 11, 2021. Records indicated his attention and arousal were fluctuating, he had visual hallucinations, cognitive impairment, and a score of 10/30 on MoCA. His delirium improved sufficiently that he was discharged, although a screening test for delirium remained positive.

Neuropsychological Report          Page **3** of **21**
BROCKMAN, Robert T.
October 29, 2021

He underwent a Uro-Lift procedure on 6/24/21, which was apparently without complications. He underwent a brain PET study using Amyvig to identify amyloid-beta, the result of which were suggestive of presence of possible Alzheimer disease process.

He was hospitalized again on September 15 with urinary tract infection and delirium. He was weak, disoriented and had decrease arousal at admission.  His mental status improved with treatment.  He was discharged on 9/18/21.

He was seen by Dr. Lai on 10/07/21. Mrs. Brockman and Frank apparently indicated a significant decline in functional abilities. He needs help organizing  his responsibilities and taking care of business and legal issues.  His memory was reportedly declining.  He sleeps better taking trazodone and quetiapine, and naps during the day. He was reportedly depressed and stressed. He denied recent headache, dizziness, weakness, confusion, dysarthria. Dr. Lai noted he was alert and attentive, and oriented to person, city, sate, and month. He followed complex verbal commands.  Memory was 4/5 immediate and 0/5 delayed. Insight and judgment were rated as poor.  Dr. Lai administered the MoCA with the result of 13/30. Dr. Lai diagnosed Parkinson's disease, dementia associated with Parkinson's disease, mixed anxiety depressive disorder, and idiopathic peripheral neuropathy.

## MARC ARGONIN, MD REPORT

Dr. Agronin noted that Mr. Brockman understood general terms such as Dr. Agronin being a physician, but he reportedly could not recall consistently the man's specialty or the purpose of the interview. The video demonstrated that at one instance he recalled Dr. Agronin's specialty as psychiatry but then indicated he did not know the specialty of Dr. Yudofsky.  Mr. Brockman was noted to not accurately report the day of the week, month, date, year, or exact location beyond Houston, Texas. His ability to stay on track during discussion and maintaining consistent focus and concentration varied "quite a bit." Dr. Agronin noted he "had difficulty repeating three numbers backwards and could not do serial subtractions aside from a single number in a sequence.  He was noted to be tangential during questioning. On the MoCA, Mr. Brockman scored 9/28 (apparently the entire test was not administered). Dr. Agronin administered no tests that would potentially identify exaggeration. During the interview, Mr. Brockman noted he was 90 years old.

Dr. Agronin diagnosed Parkinson's disease dementia, with associated depression, anxiety, and psychosis; possible comorbid Alzheimer disease; delirium from a medical condition, apathy, insomnia with obstructive sleep apnea, and possible REM sleep disorder.  As a result of dementia and delirium, Dr. Agronin opined Mr. Brockman was not competent to proceed in the legal case.

Neuropsychological Report          Page **4** of **21**
BROCKMAN, Robert T.
October 29, 2021

## THOMAS GUILMETTE, PHD EXAMINATION & REPORT

Dr. Guilmette examined Mr. Brockman over two days on July 13 and 14, 2021. His report reviewed the prior examinations.  He highlighted that during Dr. York's March 2019 examination where he denied having had visual hallucinations, he later pointed out a bug on the testing room floor that was present, and that Dr. York diagnosed mild to moderate severity dementia. He reviewed Dr. Yu's examination report from March 2019 as well; although he obtained a MoCA score of 26, the "seemingly fluctuating" course suggested dementia with Lewy bodies.  Dr. Guilmette noted that during an October 9 assessment by Dr. Lai, Mr. Brockman completed a questionnaire about his own illness, initially marking "slight dementia," then crossing out "slight" and replacing it with "moderate."  Dr. Guilmette noted that during a re-examination of the defendant by Dr. York in December 2019, Mrs. Brockman indicated his cognition "fluctuated from minute to minute."  He was reportedly even more violently acting out his dreams at night, and his diagnosis was again noted as dementia with Lewy bodies.  Dr. Guilmette noted that the defendant was examined by Dr. York again in October 2020, when "Mr. Brockman appeared confused at times 'even in the middle of tasks that he originally was completing accurately.'"  Dr. Guilmette noted that the PET amyloid scan "showed results diagnostic of dementia with moderate to frequent neuritic plaques."

Dr. Guilmette included a section in his report, "Competency Inquiry;" however, that section contained only the reports of Mr. Brockman's defense attorneys.  He did not appear to attempt a thorough questioning of legal concerns beyond his understanding of the concept of competence to stand trial, his charges, what information he thought his lawyers might need from him and how helpful he thinks he has been in providing information to his lawyers.  "He was aware that if found incompetent to stand trial then he would not go to trial and that the judge is the one who decides that question."

Dr. Guilmette indicated that several times during testing, Mr. Brockman acted confused. During the mental status examination portion of the assessment, Dr. Guilmette asked Mr. Brockman who the president was on 7/13/21, and Mr. Brockman responded "Roosevelt."  Dr. Guilmette noted that on 7/14/21 when asked this same question again, Mr. Brockman asked "at the time they got married?"—as in reference to his mother's first name in the preceding question.  Dr. Guilmette opined it was his belief this explained why Mr. Brockman responded with President Roosevelt the day before. During the A-Test instructions, Mr. Brockman was responding with non-sequitur answers that were irrelevant to the task at hand.  He made numerous errors of omission on the task during the first attempt (this task has been used successfully to identify performance invalidity in Social Security Disability settings[1]).  The test was

---

[1] Chafetz, M. D., & Abrahams, J. (2006). "A" random letter test predicts effort in the Disability Exam. New Orleans, LA: American Psychological Association. This work demonstrated that three or more errors was sufficient to identify likely malingering.

Neuropsychological Report          Page **5** of **21**
BROCKMAN, Robert T.
October 29, 2021

readministered with further directions, and Mr. Brockman then performed within normal limits demonstrating that he could have performed normally the first time if he desired to do so.  Dr. Guilmette characterized this test failure along with other validity test failures as caused by confusion, delirium, or dementia.

Dr. Guilmette administered several performance validity measures and considered imbedded ones as well.

### Free Standing Performance Validity Measures

#### MSVT

On the MSVT, Mr. Brockman produced invalid range scores but the relationship of those scores met the criteria for possible genuine memory impaired profile (GMIP). Because the GMIP is plausible in dementia, Dr. Guilmette noted "inadequate effort cannot be concluded based on the MSVT."  This conclusion is not accurate, however. Mr. Brockman performed lower on the easiest subtests than occurs in dementia groups, thus substantiating the MSVT results as positive for exaggeration.[2]  Consequently, the MVST should be considered indicative of exaggeration.

#### TOMM

Dr. Guilmette administered the TOMM, but he did not administer the test in its entirety. Omitting the Retention trial (which occurs after a delay) lessens the test sensitivity.[3] Nonetheless, Mr. Brockman scored within normal limits on the first portions of this test. This finding demonstrated that Mr. Brockman was not experiencing delirium during this examination; however, it does not eliminate the possibility that Mr. Brockman is exaggerating.

#### Rey-15 Item Test

Dr. Guilmette noted this test can have false positives for individuals over 60 years of age and that adjustments in the administration need to occur, citing Fazio, Faris, & Yamout (2019).  Even with this adjustment to the procedure, Mr. Brockman failed the Rey-15 Item test.  Additional accommodation was given with an immediate re-administration of the test, but Mr. Brockman claimed he could not recall any of the items. Such a performance on this simple task is ridiculous, yet Dr. Guilmette opined

---

[2] Cerny, B. M. et al. (2021). Examining traditional and novel validity indicators from the Medical Symptom Validity Test across levels of verbal an visual memory impairment. Published online ahead of print. Archives of Clinical Neuropsychology.  I will also discuss this finding in regard to other dementia groups below.
[3] Greve, K. W., & Bianchini, K. J. (2006). Should the Retention trial of the Test of Memory Malingering be optional? *Archives of Clinical Neuropsychology, 21*, 117-119.

Neuropsychological Report          Page **6** of **21**
BROCKMAN, Robert T.
October 29, 2021

Mr. Brockman was "mentally overwhelmed" with the task. Further, looking at the raw test data revealed that Mr. Brockman produced figures that appear to be from the MMSE after erasing 3 correct items.  He then selected 5 true positive and 3 false positives during the recognition portion of the test. This performance is positive for exaggeration no matter how one looks at it. Even the research Dr. Guilmette referenced included cutoffs for older individuals with cognitive compromise, the utilization of which indicated exaggeration again.  The only way this performance on the Rey can be justified is with the claim that he had delirium on the day of testing.  Other test results, however, eliminate that possibility.

**Coin-in-the-Hand Test**

Mr. Brockman passed this simple test.  In passing this test, he again demonstrated he was not in delirium.  Additionally, this task has extreme face validity such that clever individuals who are suspecting the potential presence of validity tests could easily see this task as trap.

**A-Test**

This is the same test mentioned above that Mr. Brockman performed poorly on his first attempt.  After re-educating him on the task, Mr. Brockman performed perfectly.  The test was failed. The only way this result can be justified as not indicative of feigning is to claim he had delirium on the day of testing.  However, completing this task successfully after educating him on it demonstrates Mr. Brockman was not delirious. Other tests (discussed below) clearly indicate he was not delirious during Dr. Guilmette's examination as well.

**Imbedded Performance Validity Measures**

**RDS**

Mr. Brockman passed the Reliable Digit Span as he has every time he has been administered the Digit Span subtest of the WAIS-IV.  This finding also demonstrated Mr. Brockman was not in delirium.

**RBANS Validity Indices**

There are two validity indices within the RBANS, the Effort Index (EI) and the Effort Scale (ES).  Both should not be considered as independent validity measures. The EI has been shown to have poor performance among dementia populations, suggesting it

Neuropsychological Report          Page **7** of **21**
BROCKMAN, Robert T.
October 29, 2021

is not useful in this population.[4]  The ES appears to be a better index for use in this population.  Mr. Brockman did not perform poorly on the ES and thus passed the validity measure of the RBANS.

**BRIEF**

Behavioral Rating Inventory of Executive Function—Self Report (BRIEF).  This is a self-report measure of executive function and self-regulation.  Dr. Guilmette correctly noted it was not a performance validity measure.  Nonetheless, Mr. Brockman did not score positive on exaggerating his executive function complaints.

**CPT-3**

Mr. Brockman failed the validity portion of this test in a similar fashion that he did during my examination in May.  The test print out highlights the fact this failure can be due to "lack of motivation to respond with full effort," yet he again, justifies the failure because of impairment.

**Summary of Dr. Guilmette's Validity Testing**

Dr. Guilmette totaled nine validity indicators and noted two of them fell in the invalid range. He opined that those two "could be accounted for by genuine cognitive impairment."  In fact, 4 of the tests were failed (MSVT, Rey-15, A-Test, and CPT-3). In my opinion, only the CPT-3 could reasonably be explained away as due to cognitive slowing effects of Parkinson's disease. The performances on the other 3 cannot be explained away, even with delirium as a justification. Delirium was not present because Mr. Brockman performed well on many tasks, not the least of which was the Iowa Gambling Task-2.  The IGT-2 is a computerized task that requires attention and decision making in excess of 15 minutes, and Mr. Brockman performed within normal limits on every scale on the test.

As Dr. Guilmette knows, one does not take the average of multiple validity tests or go with the majority.  The presence of three positive validity tests, particularly ones developed for, or having, cutoffs designed for significantly impaired populations eliminates the possibility for any conclusion except that Mr. Brockman is exaggerating his cognitive dysfunction.[5]

---

[4] Dunham, K. J., Shadi, S., Sofko, C. A., Denney, R. L., & Calloway, J. (2014). Comparison of the repeatable battery for the assessment of neuropsychological status effort scale and effort index in a dementia sample. *Archives of Clinical Neuropsychology, 29*, 633–641; McGuire, C., Crawford, S. & Evan, J. J. (2019). Effort testing in dementia assessment: A systematic review. Archives of Clinical Neuropsychology, 34, 114-131.

[5] Deloria, R., Kivisto, A. J., Swier-Vosnos, A., & Elwood, L. (2021). Optimal per test cut off scores and combinations of failure on multiple embedded performance validity tests in detecting performance invalidity in a mixed clinical sample. Applied Neuropsychology-Adult, Published online ahead of print

Neuropsychological Report        Page **8** of **21**
BROCKMAN, Robert T.
October 29, 2021


## MARIA ROSANA PONISIO, MD, COMPREHENSIVE REPORT

Dr. Ponisio reviewed the actual images of the multiple PET scans Mr. Brockman has undergone. Her conclusions indicated Lewy body or frontotemporal pathology was not likely. Results suggested Alzheimer disease process was present, including the clinical possibility of mild Alzheimer dementia. However, she also noted that positive findings such as these can be found in patients with other neurological conditions and older people with normal cognition.


## MENTAL STATUS AND BEHAVIORAL OBSERVATIONS

Mr. Brockman was initially interviewed by Dr. Dietz, starting at 9:42 AM on October 20, 2021. The limits of confidentiality were explained to Mr. Brockman.

Mr. Brockman was alert and in no acute distress during both interview and testing sessions. He said the month was December in the year 2012. He said he was feeling "between not wonderful and not terrible." He initially indicated he had been married 35-36 years, but when asked if he remembered his 50th anniversary, he said yes and then said he thought it was actually 53 years. He then noted his son has an 18 month old and it was announced just a week ago that they are pregnant again. He recalled that he had a UroLift done. He also recalled that politicians were debating a massing spending bill, which last he had heard was said to be 5 trillion dollars. He then denied knowing about additional current events when questioned beyond the fact that riots occurred on January 6. He recalled Dr. Dietz's name but not mine. He understood he was charged with tax evasion.

He was able to stay focused on testing procedures without signs of wavering attention, distraction, or topic confusion. His responses were not significantly slow. His speech was normal in rate, content, and form (in that he did not jump from subject to subject in a disorderly fashion). His affect was mildly flat which corresponded with mild masked facies. He walked in a stooped fashion with a shuffling gait.

Mr. Brockman completed a short amount of testing from 10:40 until 12:00. He then had blood drawn and provided a urine sample to the phlebotomist. Testing continued at about 1:20. He was in no distress after lunch and appeared in a good mood.

---

[https://doi.org/10.1080/23279095.2021.1973005]; Larrabee, G. J., Rohling, M, L., & Meyers, J. E. (2019). Use of multiple performance and symptom validity measures: Determining the optimal per test cutoff for determination of invalidity, analysis of skew, and inter-test correlations in valid and invalid performance groups. The Clinical Neuropsychologist, 33, 1354-1372, doi: 10.1080/13854046.2019.1614227

Neuropsychological Report          Page **9** of **21**
BROCKMAN, Robert T.
October 29, 2021

When asked the date, he said December 10, 2015 and Thursday.  He was oriented to Jones Day Offices in downtown Houston, Texas.  He said Joe Biden was president currently and Mr. Trump was before him.  He indicated he did not know who I was. I reiterated the limits of confidentiality after explaining who I was and my role.

Testing continued until approximately 4:10pm during the ECST-R, when he said, "I'm done—I don't want to talk about this….I'm tired." I then requested his counsel speak with him about continuing.  After that private discussion, we resumed until he chose to stop testing at 4:45.

Just prior to ending,  he was asked who Dr. Dietz and I were, and he said we worked for a research firm out of San Francisco on behalf of the competition to Reynolds & Reynolds.  He said the date was December 12 of 2051.  When asked if he said 2051, he answered affirmatively.  He then recounted that Joe Biden was president, and he could accurately spell WORLD backwards. When asked to subtract 3 from 20, he said he did not understand.  When explained again, he said "27," saying "it is late in the day." When re-explained, he held to 27.  Although he said he did not know the details, he admitted to recalling that there was an IRS lien against him.  He said he did not believe it was as much as 1.7 billion, but agreed it was "a big number, but not that big."  When asked what he thought happens next if he is found incompetent, he said, "I think nothing."  He again refused to continue and resume the ECST-r, he also said he did not want to get his refusal on the video.  At the end of the day, he did not appear unusually fatigued, confused, or distracted.  His arousal appeared normal.

On the morning of  October 26 at 10:00 AM, Mr. Brockman was alert and in no distress. He said, "You are lucky I am here because I just fell..Just fell, but Frank caught me." When asked how he was, he said "Good..well, not good…I'm feeling, not good, but a little less bad."

He noted that his memory is a little worse than it was a year ago and even a few months ago.  He thought it was a gradual change, "except for the fact I contracted a urinary tract infection which was deadly, I passed out." He had this to say:

> With that you stay passed out until someone does something.  I understand, from what I've been told, I was out for a total of 14-15 days; it is where the sepsis-- if it gets far enough, it attacks your brain.  That is what kills people.  Fortunately, I have some really great docs and they pulled me back.  Just this last week they had me in and ran me through some tests, my favorite one of which, they want you to hold still while they place this glass rod up here.  Overall, it does not hurt that much.

He said his doctors and his wife think [his sepsis episode] made him worse.  When asked if he uses his CPAP machine, he said "I bought it and have not taken it out of the

Neuropsychological Report          Page **10** of **21**
BROCKMAN, Robert T.
October 29, 2021

box."  When asked about access to firearms, he said, "No, I have a friend, a gentleman I worked with extensively at Reynolds & Reynolds, and when it became apparent I did not need firearms around the house, we put them under his control at his house."

When asked the date, he said 16th of December 2021.  Testing began at 10:50 AM and continued uninterrupted until I was finished at about 10:50 AM. For the last few minutes I affirmed that it was good meeting him, and he had this to say:

> You have a very good way about you.  I appreciate it.  Much better than that sidekick of yours. [Who is that now?] Dr. Dietz. [Why?] He was not nice. [He did get in your face a bit more]  Yeah, I don't know how that would benefit him or work out for him. In business we are better able to get things done with a positive friendly manner. You have a much more pleasant way about you.

## TEST RESULTS

**Validity Issues**: Mr. Brockman was administered the NV-MSVT on 10/20/21 and he again placed the validity scales in the abnormal range.  The scoring rules indicate the overall profile was consistent with a potential genuine memory impairment. However, he again created a profile pattern which appears atypical compared to genuine dementia patients because the DRV scale is not lower than the DRA, which is not typical when IR and DR fall within the severely impaired ranges.  Additionally, one can see an extreme fall off of PA and FR, the two recall scores.  The difference between the relatively better DRA and DRV compared to the recall scores (PA and FR) is not similar to genuine dementia patients.  One can see the striking drop in those scores on these graphs (there are duplicate groups in the graphs):





Neuropsychological Report          Page **12** of **21**
BROCKMAN, Robert T.
October 29, 2021

On the MSVT, Mr. Brockman also failed the validity scale portion of the test, but created a possible genuine memory impairment based upon the mathematical rules.  However, as can be seen in these graphs, his performance on the easy subtests is well below the genuine dementia patients.





Neuropsychological Report          Page **13** of **21**
BROCKMAN, Robert T.
October 29, 2021

The fact that his average of the three easy subtests (IR, DR, & CNS) is so much lower than the dementia group tells us his performance was not like that of other dementia patients.  This task is quite easy, particularly the easy subtests, such that even children not fluent in French can perform within normal limits on the easy portion.  Mr. Brockman's easy mean of 73 fell below the cut off for a newly developed validity rule for people who have severe memory impairment.[6]  To verify this finding, I compared his performance to the Easy Mean score of N=73 of the more severe dementia patients from the Dunham & Denney (2016) study (all of whom had moderately to severe RBANS Delayed Memory Index scores and were living in convalescent care facilities).  Using a one sample $t$-test, the result demonstrated his performance was statistically significantly worse than the most severe patients ($t$ = 3.9890, df = 72, p = .000).  Even though his performance meets the MSVT scoring program as a possible GMIP, the results do not correspond with that seen in genuine moderate to severe dementia.  The results indicate exaggeration.

On the Rey-15 Item Test, Mr. Brockman was shown the stimulus page for 30 seconds rather than the standard 10 seconds as implied by Fazio, Faris, & Yamout (2019).[7] He then drew what appeared to be the beginnings of a clock, which he crossed out, drew another circular figure, and then drew a more solid circle. A score of 1 recalled is a fail with a false positive rate of less than 2 in 100. I then provided him with the 30 item recognition sheet for him to circle items he remembered.  He recognized 7 items and endorsed 4 false positives.  Using the Fazio et al. combination score variable resulted in a score of 1, a positive finding for exaggeration even among dementia patients.

Mr. Brockman obtained an RDS of 7, a passing score.  He was also administered a recognition task for the HART words immediately after completing the reading test.  He obtained a 42% correct recognition result.  While not statistically significant, the score is lower than I expect for a simple recognition task, even with dementia patients and is suspicious for poor effort.

Overall, validity results indicate Mr. Brockman's performance on NV-MSVT, MSVT, and Rey 15-Item test are not consistent with genuine significant cognitive compromise.  In my opinion, his remaining neurocognitive test results are not a valid indication of his genuine cognitive abilities.

**Attention, Concentration, and Speed of Mental Processing:**  Mr.  Brockman obtained a WAIS-IV Digit Span T-score of 19 (0.1 percentile), falling in the exceptionally

---

[6] Cerny, B. M. et al. (2021). Examining traditional and novel validity indicators from the Medical Symptom Validity Test across levels of verbal an visual memory impairment. Published online ahead of print. *Archives of Clinical Neuropsychology*.

[7] Fazio, R. L., Faris, A. N., & Yamout, K. Z. (2019). Use of the Rey 15-Item Test as a performance validity test in an elderly population. Applied Neuropsychology-Adult, 26:1, 28-35, DOI: 10.1080/23279095.2017.135399

Neuropsychological Report　　　　Page **14** of **21**
BROCKMAN, Robert T.
October 29, 2021

low range.  He was shown how to perform Symbol Search but said, "Nope sorry." He would not continue with the task.  He was shown how to perform Coding as well, and entered three correct items in the sample, and one incorrect sample before saying, "Nope" to the question of if he understood the task.  He would not continue even with additional instruction.

**Language Functioning:** Mr. Brockman obtained a NAB Naming score that fell in the average range for his age and education (50th percentile). His performance placed in the low average range for letter fluency (T31, approximate 3rd percentile) and semantic fluency fell in the exceptionally low range (T10, approximate <1st percentile). These latter two scores were based on his full demographic.

On the HART, Mr. Brockman correctly pronounced 27 words. The premorbid IQ estimate given a full demographic model estimated his psychometric intelligence to be about consistent with

**Visuospatial Functioning:** Mr. Brockman did not complete even the sample block during WAIS-IV Block Design, which resulted in a zero score.  He was able to copy the NAB Figure, however, obtaining 9 raw score points after drawing several rectangles connected together in a rough approximation of the figure.  This score nonetheless falls in the exceptionally low range.

**Memory Functioning:**  Mr. Brockman complete the NAB Memory Module and obtained the exact same summary index scale score of 58 that he did in May 2021. It remains the lowest NAB Memory Module Index score I have ever seen.  Below are his subscores graphed with May's results superimposed (where you cannot see a black dot, both scores are exactly the same). Results are likely the same because so many of the raw scores cannot go lower than zero, thus, we are seeing a floor effect.

Neuropsychological Report          Page **15** of **21**
BROCKMAN, Robert T.
October 29, 2021



| Score | LLA-irc | LLB-irc | LLA-sd:drc | LLA-ld:drc | SHL-irg | SHL-drg | STL-irc:phu | STL-drc:phu | DLM-irc | DLM-drc |
|---|---|---|---|---|---|---|---|---|---|---|
| Raw Score | 4 | 1 | 0 | 0 | 11 | 4 | 0 | 0 | 12 | 3 |
| T Score | 19 | 30 | 20 | 27 | 42 | 44 | 19 | 30 | 19 | 19 |

His performance is not only atypical in its severity, but the pattern of scores on learning trials are not better than delayed recall scores, another atypical characteristic for most dementias until they are extremely severe.  While most of his scores fall below the 1st percentile, he performed within the average range for his age on Shape Learning and Recognition.  While it is not unusual to see higher shape learning scores in the dementia clinic, the contrast seen here is unusual.

## CLINICAL FORMULATION

Dementia was diagnosed and presented as the reason for lack of competence as early as 2019. Ms. Keneally noted that she first met Mr. Brockman in September of 2018. Mr. Brockman understood he was under criminal investigation prior to that time. Research reveals the base rate of exaggeration within the forensic mental health assessment context is significantly higher due to the significant secondary gain (incentive) to look impaired than is present in the typical clinical assessment and treatment context; these rates can even rise above 50% to 70% in some situations where memory or cognitive impairment is claimed.[8]

---

[8] Ardolf, B. R., Denney, R. L., & Houston, C. M. (2007). Base rates of negative response bias and malingering neurocognitive dysfunction among criminal defendants referred for neuropsychological evaluation. *The Clinical*

Neuropsychological Report          Page **16** of **21**
BROCKMAN, Robert T.
October 29, 2021

Thorough assessment of test validity was not incorporated in early examinations. Given the forensic context of those examinations (albeit possibly outside the awareness of examiners but not outside the awareness of the defendant), their results cannot be relied upon. The notion that Dr. Guilmette suggested that the examination by Dr. York, during which he was instructed it was for forensic purposes, somehow made it different than any other examination for possible cognitive impairment after a defendant knows he is under investigation defies credulity.

There is demonstrable objective information that any cognitive deficits he may have been experiencing at that time were not severe enough to rise to the level of dementia.[9] This finding further substantiates that those early test results were not valid due to exaggeration.

Initially dementia with Lewy bodies (DLB) was the explanation for his variable cognitive performance (e.g., striking differences in RCFT performance and presentations across testing sessions).  DLB was ruled out, and now delirium overlayed on top of worsened dementia appears to be the explanation for variable cognitive performance, particularly the validity test failure during Dr. Guilmette's examination and Mr. Brockman's extreme and variable behavior during both Guilmette and Agronin examinations.

To be sure, Mr. Brockman experienced episodes of delirium while hospitalized for infection. On June 7, he obtained a MoCA score of 10/30 and was diagnosed with delirium by a geriatric psychiatrist. Episodes of delirium can potentially worsen cognitive impairment for patients who are elderly and have such impairment initially, and it is possible delirium can continue for weeks in a percentage of such patients.

Results of the sleep study done on April 29, 2021, however, suggested he was not in delirium by the time of that examination.  He underwent a urologic procedure under general anesthesia on June 24, 2021. It is unlikely that an anesthesiologist would have consented to place a man in delirium under general anesthesia, and there is no objective and reliable evidence that he developed delirium due to anesthesia or that his cognitive condition worsened as a result of that procedure.

## Characteristics of Delirium

### Definition of Delirium (*Diagnostic and Statistical Manual of Mental Disorders*, 5th edition; DSM-5)

---

*Neuropsychologist, 21*, 899-916; Heilbronner, R. L., et al. (2009). American Academy of Clinical Neuropsychology consensus conference statement on the neuropsychological assessment of effort, response bias, and malingering. *The Clinical Neuropsychologist, 23*, 1093-1129.

[9] 01/16 & 17/2019 video deposition; Reynolds & Reynolds Presentations, 2017, 2018, 2019.

Neuropsychological Report          Page **17** of **21**
BROCKMAN, Robert T.
October 29, 2021

DSM-5 provides these criteria (p. 596) to diagnose delirium (all are required):

A. A disturbance in attention (i.e., reduced ability to direct, focus, sustain, and shift attention) and awareness (reduced orientation to the environment).
B. The disturbance develops over a short period of time (usually hours to a few days), represents a change from baseline attention and awareness, and tends to fluctuate in severity during the course of a day.
C. An additional disturbance in cognition (e.g., memory deficit, disorientation, language, visuospatial ability, or perception).
D. The disturbances in Criteria A and C are not better explained by another preexisting, established, or evolving neurocognitive disorder and do not occur in the context of a severe reduced level of arousal, such as coma.
E. There is evidence from the history, physical examination, or laboratory findings that the disturbance is a direct physiological consequence of another medical condition, substance intoxication or withdrawal (i.e., due to a drug of abuse or to a medication), or exposure to a toxin, or is due to multiple etiologies.

On page 599, the text explains the key feature of delirium (emphasis added):

The essential feature of delirium is a *disturbance of attention or awareness* that is accompanied by a change in base line cognition that cannot be better explained by a preexisting or evolving neurocognitive disorder (NCD).

**Defense Reports Related to Delirium**

On July 11, Dr. Argonin administered a portion of the MoCA resulting in 9/28, a score as bad or possibly worse than that obtained by Mr. Brockman when he was acutely delirious in the hospital. This finding and the tangential verbalizations of the defendant would seem to suggest possible delirium.

Dr. Agronin provided this opinion on pages 36-37:

During my interview with Mr. Brockman, he was at times inattentive to the subject of the question and would respond by digressing on a tangent or responding in a nonsensical way…..It is likely that Mr. Brockman is not fully recuperated from his delirium, and still lapses into an acute confused state.

Dr. Guilmette wrote that Mr. Brockman was alert and pleasant. Mr. Brockman's language use was intact, but Dr. Guilmette also provided this information (p. 30):

[H]e made several comments during the course of the evaluation that were confusing or contradictory. He also tended to provide more detail than necessary

Neuropsychological Report          Page **18** of **21**
BROCKMAN, Robert T.
October 29, 2021

to explain himself or a topic and had episodes when he was tangential and off-topic, as noted below, but responded well to being redirected to the question that was asked.

He noted on page 31 that Mr. Brockman was generally able to follow simple test directives; however, he had these difficulties as well:

[H]e often required that instructions be repeated when the task demands were more complicated. In those instances, he would ask for clarification or to have directions repeated if he did not understand them. Nevertheless, at times he was unable to understand the test instructions even with my repeating or rephrasing them to him several times (e.g., Color Word condition on the Stroop Color and Wort Test). In contrast, his comprehension for casual conversation (which requires far less "precision" of understanding), appeared generally adequate.

On pages 63-64, Dr. Guilmette provided these conclusions:

In my evaluation with him, there was evidence for some ongoing residual delirium symptoms such as rapid onset of confusion without alterations in consciousness.

However, even when not acutely confused, Mr. Brockman has exhibited a history of significant and measurable cognitive deficits since at least 2019. Therefore, I do not consider his residual delirium to be a significant factor in accounting for his neuropsychological presentation or in the presence of his major neurocognitive disorder.

Dr. Agronin and Dr. Guilmette suggested that not only did Mr. Brockman's condition worsen since May, his presentation during their examinations included presence of delirium.

Their conclusions that he continued to have delirium appeared to be an explanation for the variability of his test scores due to his becoming unpredictably "confused" and having "fluctuating mental status" (Guilmette pp. 69-70).

In short, ongoing delirium (and to a lesser extent significantly worsened dementia) were the explanations for very poor scores and failed validity results.  The actual findings, however, demonstrate that Mr. Brockman was not experiencing delirium and that failed validity tests were not due to dementia.

During Dr. Guilmette's examination, Mr. Brockman was able to complete many tasks in their entirety and actually did well on some difficult tasks. For example, the Iowa Gambling Task-2 is a computer administered task that requires focused attention for nearly 20 minutes.  Instructions for the task are so long they take up a regular page

Neuropsychological Report          Page **19** of **21**
BROCKMAN, Robert T.
October 29, 2021

sized card, single spaced. Yet, he understood the task. He did not produce a random performance (categories of selection were not the same, chi-square, p=.037), and he tended to choose a more favorable deck. In fact, he performed well, placing all T-scores within the average range. A man in delirium simply could not have performed this task effectively. There were additional test results within Dr. Guilmette's examination on which Mr. Brockman performed well, such as reciting 7 digits forward two times successfully during the RBANS and copying the RBANS figure as well as he did.

One of the key findings is that Mr. Brockman was able to respond to directions and stay on task for extended periods of time. Even if he obtained incorrect answers, staying on task and remembering what it was he was supposed to be doing is not consistent with delirium.

In absence of delirium the only explanation for failed validity tests within Dr. Guilmette's examination is very severe cognitive impairment, that is worse than severe dementia, or exaggeration. Comparing his validity test performances to genuine dementia patients revealed that his performances were not consistent with genuine dementia. Further, the objective radiological findings do not support a moderate to severe dementia.

The presence of variability in presentation within and between examinations is common in malingering. Consequently, there can be extreme variations as people attempt to understand just how poorly they need to perform on tests to look impaired but still believable. We see this variability on the Rey Complex Figures Mr. Brockman drew for Dr. York. While counter intuitive, consistency between test results should not be used as evidence of valid test results, even though Dr. Guilmette implied such. As can be seen in the NAB Memory Module performance between May and October 2021, many scores hit bottom. As raw scores get transformed to standard scores the same thing occurs. Consequently, relying on consistency between test sessions should not be used as an indication of validity.

Mr. Brockman has repeatedly failed validity testing across three different examinations and produced unbelievably severe and inconsistent results.

In my professional opinion, Mr. Brockman is exaggerating cognitive dysfunction for the purpose of being found not competent to proceed in his legal case. The test data suggest to me that he has been coached, or has learned for himself how to vitiate most performance validity tests; however, he appears to overdo the dysfunction to the point that his performance is not reflective of even moderate dementia and cannot consistently properly maintain the performance.

For example, during the ECST-R, he mentioned Kathy Keneally, and I had to ask him how to spell her name. Then minutes later at the end of the ECST-R, after we had discussed other legal related topics, I asked how to "spell her name again," and he

Neuropsychological Report          Page **20** of **21**
BROCKMAN, Robert T.
October 29, 2021

spelled it for me (remembering what it was that we had previously discussed).  Similarly, at the end of the examination on 10/26, he told me I had a good manner about me—not like my sidekick, who he correctly named as Dr. Dietz.  He made it quite clear that he remembered their interaction in May.  In the context of a supposed disorder, which is so severe that he cannot remember a simple pattern of letters and numbers (A-B-C, 1-2-3) immediately after viewing it for 30 seconds is ludicrous. Additional ridiculous answers include stating that the current year is 2051 and holding to 20-3=27 after repeated questioning and immediately after he spelled WORLD backward correctly.  Genuine dementia simply does not look like this.  Even for very clever people, keeping up a consistent ruse of exaggeration is very difficult.

Mr. Brockman has Parkinson's disease, and there are imaging indications that he may have an Alzheimer's disease process consistent with possible mild cognitive disorder. The presence of such imaging findings, however, do not indicate the presence of dementia, which is a clinical determination. It is possible he has sufficient cognitive difficulties that it affects his daily functioning to the extent that his diagnosis could be early dementia, but it is impossible to determine because of extreme exaggeration. If present, it would be mild given his normal confrontational naming scores and low average letter fluency. His wife and caregiver indicate his daily function skills are compromised, but their motivation may not be unsullied, and they may be responding based on his general physical debilitation from Parkinson's disease as well as his presentation when compromised by sepsis. It is also possible he is maintaining a semblance of such a ruse at home as well.  None of the new information obtained since May 2021 has changed my opinion; in fact, the new information has solidified it further.

## DIAGNOSES

Malingering Neurocognitive Dysfunction
Possible Mild Neurocognitive Disorder (Mild Cognitive Impairment)
Parkinson's disease

## COMPETENCY RELATED ISSUES

Mr. Brockman was administered a questionnaire designed to measure his recollection of his indictment.  He obtained a score of 46%, a random performance.  He was also administered the ECST-R, a semi-structured interview/test that focuses on his factual and rational understanding of the proceedings and his ability to rationally consult with counsel.  His responses to the measure suggested no indication of impaired factual or rational understanding; however, his responses were flavored with his apparent unwillingness to respond to many aspects of his case. For example, when asked what his attorney expects from in general terms, he responded with, "They tell me; I'm not capable of defining what they need—I'm not a lawyer, and I don't have legal training." Nonetheless, he made it clear that he understood the basic roles and motivations of

Neuropsychological Report          Page **21** of **21**
BROCKMAN, Robert T.
October 29, 2021

primary courtroom participants, including a jury.  He refused to discuss his charges during the ECST-R, but at another time, he noted hesitantly, but ultimately, that they revolved around tax evasion and were very serious.  Most of his responses where slightly around the issue asked in the direct question, necessitating considerable restating of the question. The impression from this interaction was unwillingness rather than lack of knowledge. There was ample indication that he trusted counsel completely and would follow their wise counsel, even if it pertained to plea agreements. He indicated he would discuss any such possibilities with his lawyers and follow their direction as he believes they have the experience and ability to direct him to what is best for him.

But for the question of severe memory disorder, there is no indication that  Mr. Brockman would not be able to provide assistance to counsel.  Even the presence of mild to moderate memory disorder does not necessarily eliminate a defendant's competency, particularly for cases in which the record is robust and fully intact such that defense can reconstruct the behaviors constituting the offense.  In my opinion, even defendants with mild dementia can be competent with the assistance of excellent counsel.

**Final Opinion Regarding Competency to Proceed**

It is my professional opinion to a reasonable degree of scientific certainty that Mr. Brockman may have a mild form of mental disease or defect but, nonetheless, appreciates the nature and consequences of the proceedings against him and can assist properly in his defense if he chooses to do so.

Robert L. Denney, Psy.D., ABPP
Missouri Licensed Psychologist (R0316)
Temporary Texas Psychology License (NTLP-21-003)
Board Certified in Clinical Neuropsychology
Board Certified in Forensic Psychology

Fellow, Division 40 (Society of Clinical Neuropsychology), American Psychological
  Association
Fellow and Past President (2009), National Academy of Neuropsychology

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 99

1
2   PD:   How are those two events related?
3
4   RB:   I think in general, you know, what the advice was that we received
5         from our attorneys—
6
7   PD:   I don't want legal advice.
8
9   RB:   Okay.
10
11  PD:   We're not entitled to hear any advice your attorneys gave you.
12
13  RB:   Okay.  Somebody who shall remain nameless, you know, began to
14        worry about what impact that might have on the business.  Which is—
15        there's no way to construe that as positive.
16
17  PD:   Yes.  True enough.
18
19  RB:   Yeah.  And what—what was the rest of your question?
20
21  PD:   What—I think you answered it.  I was trying to understand the
22        relationship between the indictment becoming public and your
23        stepping down as CEO.  Now, I think you understand part of our task
24        is to evaluate your ability to provide information to your attorneys
25        about the allegations against you.  We do not want to ask or know
26        about what your attorneys tell you or advise you, but we do need to
27        make sure you can convey information to them, that you have that
28        ability.  So I have questions about the allegations that are to try to
29        understand whether you're capable of talking to your lawyers about
30        these allegations.  And because this is a competency evaluation, what
31        you tell us can't be used by the government to prove that you're guilty
32        of anything.  They're not allowed to prove you committed a crime
33        through what you tell us in this evaluation.  But they could use it to try
34        to show whether you were or were not competent today.  That's what
35        it's about.
36
37  RB:   Uh-huh.
38
39  PD:   Your competence.  Would you be able to explain to your lawyers your
40        relationship with Evatt Tamine?
41

GOVERNMENT
EXHIBIT

4:21-CR-009-GCH

No. 5A

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 100

```
1    RB:   Yes, I think so.
2
3    PD:   You have memory of who he is?
4
5    RB:   Yes.
6
7    PD:   And of your interactions?
8
9    RB:   Yes, I wouldn't say complete memory, but I certainly have—
10
11   PD:   Sure.
12
13   RB:   —memories of.
14
15   PD:   Do you remember the transaction that led to your meeting him and
16         first dealing with him?
17
18   RB:   No.
19
20   PD:   Was there an acquisition of a company called Kalamazoo?
21
22   RB:   Yes.
23
24   PD:   Was he involved in that?
25
26   RB:   Not in the acquisition but in the operation, you know, after the
27         acquisition.
28
29   PD:   What year would that have been?
30
31   RB:   I don't—I don't—I don't remember.
32
33   PD:   And then eventually did he work for you?
34
35   RB:   Yes.  He was an attorney for the trust, and after this acquisition, you
36         know, the trustee suggested that Evatt be considered for being the
37         company attorney at Kalamazoo since by everybody's estimation the
38         lawyer at Kalamazoo was less than effective.
39
40   PD:   Well, where was Evatt a lawyer?
41
```

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 101

1   RB:   He was a lawyer in Bermuda.
2
3   PD:   In where?
4
5   RB:   In—in Bermuda.
6
7   PD:   In Bermuda?
8
9   RB:   Uh-huh.
10
11  PD:   Do you know if he was licensed anywhere else, any other countries?
12
13  RB:   No.  He may well have been, but I—not that I recall.
14
15  PD:   What is Evidence Eliminator?
16
17  RB:   It is a—a clean up program.  We—we don't know it or sense it because
18        it doesn't say it, but the Windows operating system is constantly, you
19        know, polluting your hard drive.  And—which means that over time,
20        you know, the computer works more and more slowly because it has
21        lots of demands memory-wise for the other piece of the software.  And
22        so Evidence Eliminator cleans that up.
23
24  PD:   Do you know a program called CC Cleaner?
25
26  RB:   No.
27
28  PD:   Aren't there a lot of different programs that'll clean up the junk that
29        accumulates?  Temp files and all that?
30
31  RB:   I don't know where I would characterize it as quite a number, but
32        that—I know of several.
33
34  PD:   And Evidence Eliminator has the function of cleaning up junk?
35
36  RB:   Uh-huh [affirmative].
37
38  PD:   Does it do anything else?
39
40  RB:   Well, it will—I guess cleaning up is kind of a broad term.  But certainly
41        part of that would be, you know, deleting, you know—you know, old

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 102

1     files left by programs or especially large ones, pictures will just—you
2     put enough pictures on a PC you'll kill it.
3
4  PD:  Do you remember talking to Bob Schaffer about Evidence Eliminator
5     years ago?
6
7  RB:  No, I don't remember.  Could have, but, I mean, I don't remember.
8
9  PD:  Does Spanish Steps still own UCS Holding?
10
11  RB:  I don't know the answer to that.
12
13  PD:  Pardon me?
14
15  RB:  I don't know.  I don't know the answer to that.
16
17  PD:  You don't?
18
19  RB:  Yeah.  I think that may be the case, but I—I don't know.  Not for sure.
20
21  PD:  Well, Spanish Steps is mostly owned by the Eugene Brockman
22     Charitable Trust, isn't it?
23
24  RB:  I think so.
25
26  PD:  And Tommy Barras and Tommy Jones are the other owners of Spanish
27     Steps?
28
29  RB:  Tommy Barras and Tommy Jones?
30
31  PD:  Yes, is that right?
32
33  RB:  I don't think so.
34
35  PD:  Who's the other owner besides Tommy Barras?
36
37  RB:  I don't think there's another owner.
38
39  PD:  I could have that fact wrong.  I'm not sure.
40
41  RB:  Yeah.  Well, and—

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 103

1
2   PD:   Yeah.  But 98 or 99% is owned by the Eugene Brockman Charitable
3         Trust?
4
5   RB:   Uh-huh [affirmative].
6
7   PD:   And is that trust still Bermuda based?
8
9   RB:   Yes.
10
11  PD:   How was it established?
12
13  RB:   It was established by—by my dad.
14
15  PD:   And what year did he establish it?
16
17  RB:   1981.
18
19  PD:   Do you know what his original intent was with the trust?
20
21  RB:   I think that I do.  I think it's—it has a—a charitable element and then
22        it has four beneficiaries which are not regular beneficiaries.  In other
23        words they don't have a—a share.  But the trust is—is able to give
24        them money because they're—they're what's called—it's like a
25        tentative beneficiary.  They could be a beneficiary but they're not.
26        They have no right to go knock on the door of the trust and demand
27        funds.
28
29  PD:   And who are the beneficiaries?
30
31  RB:   All the charities in the US and Bermuda.
32
33  PD:   And the UK or Bermuda?
34
35  RB:   And—and—and the UK and the US.
36
37  PD:   And any other beneficiaries?
38
39  RB:   No.  There's just, you know, kind of unlimited charitable beneficiaries
40        and then four named beneficiaries.
41

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 104

1   PD:   Four named beneficiaries?
2
3   RB:   Uh-huh [affirmative].
4
5   PD:   But neither the charities nor the named beneficiaries have a right to
6         demand?
7
8   RB:   That's correct.
9
10  PD:   Distributions from the trust?
11
12  RB:   That's correct.
13
14  PD:   Who decides on distributions from the trust?
15
16  RB:   The trust.
17
18  PD:   So the trustee controls that?
19
20  RB:   Correct.
21
22  PD:   And was your father a wealthy man when he established the trust?
23
24  RB:   I wouldn't consider him wealthy.
25
26  PD:   It sounded earlier as though he was not a wealthy man.
27
28  RB:   No, he was not a wealthy man.
29
30  PD:   Why would he set up an offshore trust?
31
32  RB:   Because I asked him to.
33
34  PD:   So you asked him to set up the—the trust?
35
36  RB:   Yeah.  I—I said, "Dad, you know, don't plan on, you know, anything
37        being left to me.  Take what you would, you know, maybe have
38        potentially have available to give to me when you pass away and
39        instead please build this trust."
40
41  PD:   Why Bermuda?

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 105

```
1
2   RB:   There was a—a tax attorney that worked for a downtown—I guess
3         you'd call it a boutique tax firm.  I can't think of the name at this
4         point.
5
6   PD:   Is St. John's Trust Company still the sole trustee of the trust?
7
8   RB:   I don't know the answer to that.  Could very well be, but I—I—I can't
9         sitting here conclusively tell you.
10
11  PD:   I think you mentioned Maples.
12
13  RB:   Yes.
14
15  PD:   Is that the trustee?
16
17  RB:   Maples is now the trustee.
18
19  PD:   Maples is now the trustee?
20
21  RB:   Uh-huh.
22
23  PD:   Is it still true that the only distributions that the Eugene Brockman
24        Charitable Trust has made have been to charities?
25
26  RB:   Yes, that's correct.
27
28  PD:   There have been no distributions to the named beneficiaries?
29
30  RB:   No.
31
32  PD:   Do you know what the approximate value is of the assets in the trust?
33
34  RB:   Well, I'd say it varies wildly.  And the reason for that is, and that's that
35        the principal asset of the trust is Reynolds & Reynolds.  And you know,
36        what's Reynolds worth?  Well, you can, you know, take some, you
37        know, multipliers of EBITDA, and that's one of the ways you can look
38        at it.  Or you could take the—the dollars amount of sales every year.
39        You can look at trend lines of those two, you know, factors, and then
40        you start applying multiplier factors on that.
41
```

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 106

1  PD:  Sure.  So valuations—
2
3  RB:  Yeah.
4
5  PD:  —a puzzle as always.
6
7  RB:  Well, and what's happening now is the stock market is crazy.  It's just
8       nuts.  And you know, we could just as well as not have a—a very, very
9       serious situation develop because they're spending way too much than
10      they're taking in, which effects valuations of companies.  And so, you
11      know, you see and you hear about, you know, valuation multiples that
12      are just crazy.  You know, they don't—they know no basis in common
13      sense, in my opinion.  And that means that from a valuation
14      standpoint you've got this low multiplier and, you know, it causes the
15      valuation to become like this [indicating].  But based on the madness
16      that you see in the market today, it could very well be this
17      [indicating].  Now, that's crazy.
18
19  PD:  Are some profits from Reynolds & Reynolds distributed to the trust?
20
21  RB:  No.
22
23  PD:  When the trust had made charitable contributions, where did it get the
24       cash?
25
26  RB:  It got the cash from, you know, successful—successful investments.
27       Primarily, you know, private equity.
28
29  PD:  How did the trust have the cash to invest in private equity or anything
30       else?
31
32  RB:  And I—I may have contradicted myself, but Reynolds has made
33       dividends to the trust.
34
35  PD:  And what—who decides what dividends to distribute to the trust?
36
37  RB:  I'm sure that I'm involved, but our—our chief financial officer would be
38       another one.  And the tax attorney that originally drew up the trust
39       would've been involved.
40

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 107

1   PD:   And does that vary from time to time what dividends will be
2         distributed?
3
4   RB:   Yes.
5
6   PD:   So it's not the same amount every quarter or every year?
7
8   RB:   No, no.
9
10  PD:   Are there distributions on a quarterly or annual basis?
11
12  RB:   No.  And the reason for that is, and that's that to assist in the growth
13        of the company we look for acquisitions and probably our first major
14        acquisition was a division of Ford Motor Company that provided
15        computer systems and software to Ford dealers.  And then the second
16        acquisition that we made that was large was Reynolds & Reynolds,
17        which was a Fortune 500 company, and we borrowed like 2.8 billion
18        dollars to help buy it.
19
20  PD:   Who borrowed it?
21
22  RB:   Reynolds & Reynolds.  No, not Reynolds & Reynolds.  No, UCS.
23
24  PD:   UCS borrowed the money—
25
26  RB:   Uh-huh [affirmative].
27
28  PD:   To buy Reynolds & Reynolds?
29
30  RB:   Uh-huh [affirmative].
31
32  PD:   Is it UCS Holdings that borrowed the money?
33
34  RB:   I think so, but I—I can't be accurate about that.
35
36  PD:   Was it borrowed from Deutsche Bank?
37
38  RB:   Yes, I believe.  It wasn't actually Deutsche Bank.  It was a—a—I guess
39        you'd call a syndicate—
40
41  PD:   Yes.

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 108

1
2   RB:   Of lenders that Deutsche Bank put together and continued to, you
3         know, be the manager of that activity.
4
5   PD:   Now, isn't the government claiming that there was something wrong
6         about how that was done with the syndicate or with Deutsche Bank?
7
8   RB:   It may very well be, but I—I'm not aware of it.
9
10  PD:   Would you like to take a break now?
11
12  RB:   Okay.
13
14  PD:   Okay.
15
16  RB:   It's 2:00?  A little past, 2:05.
17
18  PD:   Yeah.  We'll get Frank.  Wait for Frank.
19
20  RB:   Ah, man.
21
22  PD:   You got your—
23
24  RB:   Oh, thank you.
25
26  PD:   —mic on too.  Just stay by the chair until Frank's in here, please.
27
28  [Break]
29
30  PD:   Thank you.  Getting sleepy?
31
32  RB:   Yeah.
33
34  PD:   Did walking there help?
35
36  RB:   It helps wake me up.
37
38  PD:   Do you want me to send Frank for anything for you to drink?
39
40  RB:   No, that—that's okay.
41

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 109

1   PD:   We do have plenty of water here if you want.
2
3   RB:   Water would be good.
4
5   PD:   Okay.
6
7   RD:   Watch your microphone.  I need something warm.
8
9   RB:   I've already had three cups today, which is—that's over—
10
11  RD:   Oh.  I put a little coffee in here and I fill up the rest with hot water so
12        it's thin as far as caffeine goes but more water is good and it's warm.
13        Anyways.
14
15  PD:   Who owns the house that you have on the market now?  Who's—who's
16        the owner of the house that's now on the market?
17
18  RB:   I—I don't know right off hand or I don't remember, but it's either my
19        wife and I jointly or her.
20
21  PD:   So it's personally owned?
22
23  RB:   Yeah.
24
25  PD:   And how about the one that you've just moved into?
26
27  RB:   That one is owned by Dorothy.
28
29  PD:   Who or what entity owns Mountain Queen?
30
31  RB:   I don't know, but certainly Evatt Tamine knows for sure.  But other
32        than that, I—I don't know.
33
34  PD:   And what did Mountain Queen own by way of real estate?
35
36  RB:   Other than the—the site where the—the house is located, I—I don't
37        know.
38
39  PD:   So it was—it was real estate property but not the house?
40

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 110

1    RB:    The house and the real estate are all owned by some entity that's
2            under the control of Evatt Tamine.
3

4    PD:    And that's the Aspen property?
5

6    RB:    Uh-huh.
7

8    PD:    Was there also a ranch somewhere?
9

10   RB:    Yes.  It's a fishing ranch, actually.  It is a—it's on a stretch of river
11          called the—the Frying Pan River, which is—runs north out of Basalt,
12          which is a—a town that's down the road going back to Glenwood
13          Springs.
14

15   PD:    In Colorado?
16

17   RB:    In Colorado.
18

19   PD:    And that was owned by who?
20

21   RB:    An entity, you know, controlled by Evatt Tamine.
22

23   PD:    I'm sorry?
24

25   RB:    An entity, you know, owned by Evatt Tamine.
26

27   PD:    Evatt Tamine owns or owned the entity that owned the ranch, is that
28          right?
29

30   RB:    Uh-huh.  I say owned or owned and controlled or—I don't know what
31          other ways that, you know, property gets held.
32

33   PD:    You had use of the properties?
34

35   RB:    Yes.  And I very, very carefully paid fair market value.  I mean
36          [inaudible] dollars.
37

38   PD:    You would lease them?
39

40   RB:    Uh-huh.  And the leases on them are now expired.
41

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 111

1   PD:   So you don't have any continuing obligation to pay for those?
2
3   RB:   No.
4
5   PD:   So the—the indictment's quite lengthy, and I wanted to ask you about
6         some issues in it.  Again, for the purpose of understanding whether
7         you are able to communicate with your lawyers about the issues in the
8         indictment.  And I want to direct your attention to paragraphs 194 to
9         196, which are toward the very end of it, starting on page 38.
10
11  RB:   Page 38?
12
13  PD:   Page 38, yes, at the top of the page.  It's paragraph 194.  So this says
14        that in June of 2016 you knew it was likely there'd be a federal grand
15        jury investigation to determine whether violations had occurred
16        involving Point.  Do you know what Point is?
17
18  RB:   Point is an entity I believe is controlled by Evatt Tamine.
19
20  PD:   So Evatt controlled Point, you believe?
21
22  RB:   I think.  Sometimes I get them con—confused.
23
24  PD:   Which entity is which?
25
26  RB:   Yeah.  And who's owned by what and who controls what.
27
28  PD:   Yes.
29
30  RB:   And so sometimes I'd be able to answer that question, sometimes not.
31
32  PD:   And it says that you knew that your relationship to AEBCT, Spanish
33        Steps, SJTC, and Point would be material to the investigation.  Now,
34        what's AEBCT?
35
36  RB:   A. Eugene Brockman Children's Trust.  Not Children's, Charitable Trust.
37
38  PD:   And Spanish Steps is the owner of that trust?  Is that right?
39
40  RB:   I don't think I can give you an affirmative answer on that because
41        there's—I—I don't remember.

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 112

1
2   PD:   What's SJTC?
3
4   RB:   That would be St. John's Trust Company.
5
6   PD:   And Point we just talked about.
7
8   RB:   Uh-huh.
9
10  PD:   So you—you—you had knowledge of all these entities, but you say you
11        sometimes get confused about who has control of which or—
12
13  RB:   Uh-huh, true.
14
15  PD:   What owns what?
16
17  RB:   True.
18
19  PD:   Paragraph 195 says that on certain dates in 2016 you persuaded
20        individual one to alter, destroy, and mutilate documents and computer
21        evidence.  Do you know who individual one is?
22
23  RB:   I believe it's Evatt Tamine.
24
25  PD:   So they're claiming that you knowingly and corruptly persuaded
26        Tamine or someone else to alter, destroy, and mutilate documents
27        or—and computer evidence, is that correct?
28
29  RB:   No.  Matter of fact, what you see on this page is—it's—it's the work
30        product of Evatt Tamine, and I believe that is work product done for
31        the benefit of the Justice Department.  And in return, Evatt Tamine
32        basically walked.
33
34  PD:   Are you able to explain all of this to your lawyers?
35
36  RB:   When you say, "all of this," what's on this page?
37
38  PD:   Well, yeah, what's on the page.
39
40  RB:   Yeah, I think I can talk about all those.
41

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 113

| 1<br>2<br>3 | PD: | Then in paragraph 196 it talks about individual three, the widow of a former nominee. |
|---|---|---|
| 4<br>5 | RB: | Individual three? |
| 6<br>7<br>8<br>9 | PD: | Yes.  It's paragraph 196.  It says that you learned that this widow was in possession of materials that could reveal your control over AEBCT, Spanish Steps, SJTC, and Point.  Who's this widow? |
| 10<br>11 | RB: | I believe it's—it's the widow of Don Jones. |
| 12<br>13 | PD: | And who's Don Jones? |
| 14<br>15<br>16 | RB: | Don Jones originally was a—an Arthur Anderson person who moved over to be the chief financial officer of the Reynolds companies. |
| 17<br>18 | PD: | So he was your CFO? |
| 19<br>20<br>21<br>22 | RB: | Yeah, CFO.  And he retired to Bermuda and set up a consulting company there and, you know, who all he consulted about what, I don't have knowledge about that. |
| 23<br>24<br>25<br>26<br>27<br>28<br>29 | PD: | It goes on in 196b to say that during June of 2016 you engaged in a scheme to obstruct justice by destroying evidence and causing others to destroy evidence to prevent law enforcement authorities from learning of your true relationship with AEBCT, Spanish Steps, SJTC, and Point.  Do you know what it is they're accusing you of having done there? |
| 30<br>31<br>32 | RB: | I'm not sure, but I believe that the information for this document comes from Evatt Tamine. |
| 33<br>34<br>35 | PD: | So Evatt Tamine you believe told the investigators that you were trying to obstruct justice by destroying evidence? |
| 36<br>37<br>38<br>39 | RB: | Uh-huh.  And he was engaged in that activity because I believe that that was part of, you know, what he did for the Justice Department in return for them, you know, adjusting his—his charges. |
| 40<br>41 | PD: | So you think he gave them the story for his own benefit? |

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 114

1    RB:   Uh-huh [affirmative].
2
3    PD:   Have you seen e-mails asking you to go—in which you asked him to
4          deal with the widow and make sure that all that stuff was destroyed?
5
6    RB:   I've not sent any—seen any e-mails to that effect.
7
8    PD:   How were you supposedly communicating with Tamine regarding what
9          the widow had?
10
11   RB:   I would believe that it would have been by e-mail.
12
13   PD:   By e-mail?
14
15   RB:   Uh-huh.
16
17   PD:   And did you communicate with Tamine by e-mail?
18
19   RB:   Yes, I had, you know, numerous communications with Tamine by e-
20         mail.  You know, I'd be remiss in pointing out that you can create a
21         piece of paper like this without it being an e-mail.
22
23   PD:   Yes.
24
25   RB:   Without a great deal of work.
26
27   PD:   Easy to create a piece of paper that looks like an e-mail, is that what
28         you're saying?
29
30   RB:   Uh-huh, yeah.
31
32   PD:   Do you have reason to think he did that?
33
34   RB:   Again, I think, you know, what we're seeing here is a continuing effort
35         based upon his, you know, agreement with the Department of Justice
36         and that I believe that these e-mails that are being cited are done to,
37         you know, be very useful in—in helping Evatt Tamine, you know, any
38         charges against Evatt Tamine not be made.  And there may be I think
39         interesting developments about all that over time.
40
41   PD:   Would Tamine be one of the people who betrayed you?

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 115

1
2   RB:   I—yeah, I think he may be the principal one.  Or more accurately,
3         maybe Tamine and his wife.  His wife is in my opinion very, very, very
4         bright, multiples brighter than Evatt Tamine.  And she happens to be
5         a—a—an estates and trust attorney in Bermuda.  And you know,
6         practiced there, you know, extensively.
7
8   PD:   Where did they live during the time you've known them?
9
10  RB:   Since they were married I believe they've lived in a little house that's
11        on the main road going north out of town in Bermuda.
12
13  PD:   In Hamilton?  Is it in Hamilton?
14
15  RB:   Yeah.
16
17  PD:   Or out of—out of—
18
19  RB:   It's in outskirts of Hamilton.
20
21  PD:   Did you spend much time in Bermuda?
22
23  RB:   Not much.
24
25  PD:   Ever vacation there?
26
27  RB:   No.
28
29  PD:   Did they live anywhere besides Bermuda?
30
31  RB:   It's my understanding that they owned a—a flat, which is not a term
32        that I'm, you know, used to.  But evidently in the UK it serves for an
33        apartment or a condo or—
34
35  PD:   Yes.
36
37  RB:   —something like that.
38
39  PD:   Where?
40
41  RB:   In a southern part of England.

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 116

1
2   PD:   So a home in Bermuda, a flat somewhere in England; any other
3         properties?
4
5   RB:   There was another property that they owned that she bought from a
6         family member that they converted into a—a home and an office, an
7         office on the second floor.
8
9   PD:   In what country?
10
11  RB:   Bermuda.
12
13  PD:   I understood at some point that Tamine was living in Europe.  Do you
14        have any recollection on that?
15
16  RB:   I think that what happened was, and that's that they moved their
17        children out of the Bermuda school system and they wanted to be in
18        the English school system.  And that resulted in them buying a flat
19        and—and living probably the majority of the year there.
20
21  PD:   But they never lived in France or elsewhere?
22
23  RB:   Oh, they lived—they lived in France.  Because for a period of time the
24        belief was, and that's that the international schools in France, you
25        know, were superior to those in England.  I think it turned out not to
26        be true, but I think that's—was the thought at the time.
27
28  PD:   Did there come a time that they owned a home in Australia?
29
30  RB:   I don't have direct personal knowledge of that, but you know, it's
31        what—it's been quoted in the newspaper therefore it must be the
32        gospel of truth.
33
34  PD:   Did you buy them a house in—in Australia?
35
36  RB:   No.
37
38  PD:   Do you think that Tamine and his wife stole from you?
39
40  RB:   I think they—they stole from the trust.
41

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 117

1   PD:   How much do you think they stole from the trust?
2
3   RB:   I don't know, but it's in the millions.
4
5   PD:   Pardon me?
6
7   RB:   I believe it's in the millions.
8
9   PD:   Millions?
10
11   RB:   Uh-huh [affirmative].
12
13   PD:   And what is Mr. Smith's relationship to all these charges against you?
14
15   RB:   I first met Mr. Smith when UCS was being considered for—for sale.
16         And the trustee hired Goldman Sachs to overlook that operation and,
17         you know, try and get it sold.  That was not successful.
18
19   PD:   Is that something you wanted to have happen?
20
21   RB:   Yeah.  I was in favor of that.
22
23   PD:   You were prepared for the company to be sold?
24
25   RB:   Uh-huh.
26
27   PD:   And this is before the Reynolds & Reynolds acquisition?
28
29   RB:   Yes.  Yes.
30
31   PD:   What was the sticking point?  Was it the sale price?
32
33   RB:   I—I believe that's the case.
34
35   PD:   Do you recall what the offer was at the time?
36
37   RB:   No.
38
39   PD:   But you had a buyer?
40
41   RB:   No, I don't think so.  I—I think that there were a number of lookers.

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 118

1
2   PD:   And Goldman Sachs was your investment bank representing you in the
3         deal?  Or representing the company?
4
5   RB:   Representing the company, yes.
6
7   PD:   Yeah.  So some buyers were attracted but nothing ever happened?
8
9   RB:   No.  Yeah, nothing ever happened.
10
11  PD:   And what does Smith have to do with that?
12
13  RB:   Smith was Goldman Sachs' representative, and that's how I got to
14        know him.  He is an extremely capable person and also a very
15        personable person and also a pretty decent fisherman.  And he was
16        born and raised in Denver.  His parents were PhD's in the Denver
17        school system.  And he had—in his earlier years he'd done a lot of
18        fishing in the Colorado area.  And again, I was under the impression
19        that he was gonna be my friend.  I think we were friends for a while.
20        You know, what went wrong?  I don't know.  But he's obviously not my
21        friend currently.  And—but I did believe that he was a very sharp
22        person, and he had a lot of advice to give.  While he knew nothing
23        about computers, I knew nothing about finances and loans and, you
24        know, that—that part of the world.  You know, later—and I forget how
25        much time lapsed, you know, it seemed like several years, is when a
26        more serious, you know, transaction which was the Reynolds
27        transaction.  And he was very useful in understanding that whole
28        transaction and had a lot of opinions as to how it should be conducted.
29
30  PD:   Now we're talking about the acquisition?
31
32  RB:   Of Reynolds.  He helped arrange the financing.
33
34  PD:   With the syndicate?
35
36  RB:   Uh-huh [affirmative].  And that's kind of pretty much the—the whole
37        story.  You know, I don't think that without the knowledge of Robert
38        Smith and his help in terms of advice, I don't think I would've, you
39        know, gone forth with that venture.
40
41  PD:   And is he one of the people who has betrayed you?

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 119

1
2   RB:   It certainly looks that way.  And the further it goes, the more it looks
3         that way.  And again, what I think happened was—and I—this is pure
4         supposition on my part, I think that the Justice Department was after
5         him for something, and in order to save his neck he participated with
6         the—the Justice Department's project to, you know, work on me.
7
8   PD:   Was he connected to Tamine at all?
9
10  RB:   Not initially, but I think, you know, as time went on he was, you know,
11        and certainly at the very minimum at least an advisor to Tamine if not
12        a partner.
13
14  PD:   Now, do you think that Mr. Smith ever stole from you?
15
16  RB:   Hard to tell, you know, because Tamine and Robert Smith were
17        together.  Who actually did what, I—who—I'm not—I don't know.
18
19  PD:   I should've said stole from the trust.
20
21  RB:   Uh-huh [affirmative].
22
23  PD:   Neither of them ever got your personal money, it was trust money,
24        right?
25
26  RB:   Trust money.
27
28  PD:   Is there anything that you're having difficulty communicating to your
29        lawyers about regarding these two men or the allegations against you?
30
31  RB:   No, I'm not having any trouble at all.
32
33  PD:   It seems to me that you're quite capable of explaining it and
34        understanding it all.
35
36  RB:   Well, you know, as far as communicating, you know, the facts, yeah I
37        think I'm doing okay.  As far as the implications of the facts and, you
38        know, what case the government has against me, again, the amount
39        of paperwork that its generating is just massive.
40
41  PD:   Sure.

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 120

1
2   RB:   And it covers all kinds of, you know, legal things that I'm not really
3         very familiar with or—or not familiar at all with.
4
5   RD:   If I—if I may, what did—do you know what Tamine got in trouble with
6         Justice for or what—
7
8   RB:   No.
9
10  RD:   No, okay.
11
12  RB:   Tam and I—Tam—Tamine and I have not spoken in some period of
13        time.  And—and unlikely to in the future.
14
15  RD:   I just didn't know if you might've known or not.  Okay.
16
17  RB:   No.
18
19  PD:   Do you know what FBAR stands for?
20
21  RB:   I think it stands for some—some type of reporting.
22
23  PD:   So do I.  And what do you think that reporting is?
24
25  RB:   I think it has to do with bank accounts.
26
27  PD:   As I understand it, the government says that you didn't do FBAR
28        reporting that you should've.
29
30  RB:   Yeah, that—that's what it says.  I—I don't think that's accurate
31        because they're not bank accounts that I have, they're bank accounts
32        that the trust has.  The trust is not a US citizen.
33
34  PD:   The trust is not a US citizen?
35
36  RB:   Yeah.  And so therefore it doesn't have any FBAR reporting
37        requirements.  And one of the things that the Justice Department has
38        done is, and that's they have conveniently consolidated me and the
39        trust, which is—that's not what the documents say.
40

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 121

1  PD:   So the Justice Department is treating you as though you were the
2        trust?
3
4  RB:   True.
5
6  PD:   When the trust is a different entity and different individual from you?
7
8  RB:   Yes.
9
10 PD:   Is that right?
11
12 RB:   Uh-huh [affirmative].  Now, that—that's how I'm worth, you know,
13       six—I think the current one is 6 billion dollars, which is laughable.
14       Because I've never taken a distribution of any kind, you know, from
15       the trust.
16
17 PD:   Is that 6 billion dollar figure someone's idea of how much Reynolds &
18       Reynolds is worth?
19
20 RB:   That's certainly—it has to be certainly part of it.
21
22 PD:   But what's the most cash that was ever in the trust?
23
24 RB:   I can't tell you.  I don't know.
25
26 PD:   Has there ever been more than a billion in the trust at one time?
27
28 RB:   I don't know.
29
30 PD:   Who would know?
31
32 RB:   Probably the lawyers know by now.
33
34 PD:   But you didn't get regular statements of what the trust had?
35
36 RB:   I never got any.
37
38 PD:   You never had statements of the trust's assets or value?
39
40 RB:   I may have gotten some but certainly not on a regular basis over the
41       life of the trust.

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 122

1
2    PD:    Well, you owned UTC at one point.  You formed it, right?
3
4    RB:    Uh-huh.
5
6    PD:    And how did UTC Holdings get UTC?
7
8    RB:    And UTC is—stands for what?
9
10   PD:    I'm sorry.  I might have the abbreviation wrong.  The original
11          company you founded.
12
13   RD:    Is it UCS?
14
15   PD:    UCS?
16
17   RB:    Uh-huh.
18
19   PD:    Is that—yeah.  That was your company originally, right?
20
21   RB:    Originally.
22
23   PD:    And then UCS later became owned by UCS Holdings?
24
25   RB:    Yeah, I think that's correct.
26
27   PD:    How did—how did UCS Holdings gain ownership of UCS?
28
29   RB:    I sold it, made a personal sale.  I can't tell you the exact year, but
30          some—sometime a while back.  And it was back when UCS was very
31          small.
32
33   PD:    And you sold UCS to UCS Holdings, is that right?
34
35   RB:    Well, there's UCS Holdings or UCS.  I—I don't—I don't remember.
36
37   PD:    But who owned the buying company?
38
39   RB:    Who owned the buy—the trust did.  Yeah, the trust bought it.
40
41   PD:    Ah.  So the trust bought it.

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 123

1
2  RB:   Yeah, bought UCS.
3
4  PD:   And when UCS bought Reynolds, the trust then owned Reynolds?
5
6  RB:   Yes.  And those two companies were two different names.  You know,
7        UCS which was a small name, Reynolds was a huge name and had a
8        huge customer base, which is one of the reasons why that we changed
9        the name to Reynolds because UCS was unknown.
10
11 PD:   So little fish swallowed the big fish.
12
13 RB:   I guess you could say that.
14
15 PD:   And borrowed billions from the syndicate to do that?
16
17 RB:   Correct.  But the—the—the—what you describe as the little fish buying
18        the big fish, I think that's what I would've said, or as good as any.
19
20 RD:   Audacious fish.
21
22 RB:   Well, it was—I had personally been a competitor to Reynolds &
23        Reynolds for over 40 years at that point in time and I knew their
24        products very, very well on a detailed basis.  And you know, it was
25        impossible to go out and—and you know, verify what they were worth.
26        But my feelings were based on the facts if their products were as, you
27        know, were pretty sorry, you know, their—their finances had to be
28        pretty sorry too.  And sure enough, that's the way it was.
29
30 PD:   Were you really borrowing—were you really acquiring their market
31        share and their customers?
32
33 RB:   Yes.
34
35 PD:   So that was the real point?
36
37 RB:   Uh-huh [affirmative].
38
39 PD:   Did you use any of their products?
40
41 RB:   Oh, we had to for a while.

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 124

1
2   PD:   Because the customers were using them?
3
4   RB:   Yeah.  And—but that—at this point any remnants of their—their
5         software are completely gone and have been for a while.  It was a
6         interesting enough of course all this happened in the midst of just a
7         giant depression.  You know, my early operation of Reynolds was in
8         the midst of a giant depression.  And one could say that was bad
9         news, but the reality is, and that's I had thinned out the competitors
10        and had caused, you know, companies like Reynolds to really cut back
11        on their R&D, which weakened their product even further.  And I had
12        never been inside a public company but a public company—I guess
13        they can be okay—but, man, Reynolds was a mess.  I mean you know,
14        the first thing that started out was, and that's they were having about
15        30 laptops a month stolen.  And UCS probably never had a laptop
16        stolen.  And well what's the difference?  Well, they use cleaning
17        services.  I don't believe in cleaning services.  I want full time
18        employees.  That way you got a chance of things working out right.  It
19        went, you know, the—the number on stolen laptops went to zero and
20        we don't keep track anymore.  They had a contract with an office
21        supply company that all you had to do was pick up the phone, say you
22        were with Reynolds, order what you wanted and it would be delivered
23        that afternoon or the next day.  I said, "You guys never heard of a
24        stationary cabinet where you keep pencils and paper and notepads and
25        that kind of stuff?  And you order in quantity, get the best price."
26        Instead they—they relied, you know, on an office supply store and
27        there—there were—there was stuff like that coming out on and on and
28        on.  You know, the—
29
30  PD:   You found economy everywhere you looked?
31
32  RB:   Everywhere I looked.
33
34  PD:   Yeah.
35
36  RB:   The data warehouse stuff where you have a contract company that
37        holds all your—your printed data, some warehouse, big company.  I
38        sent my second in command down to Cincinnati, which is where that
39        company was located, and found that we had 64,000 banker boxes in
40        their permanent storage.
41

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 125

```
 1   PD:   64,000?
 2
 3   RB:   Yeah, 64,000.
 4
 5   PD:   Wow.
 6
 7   RB:   And you know, I guess it was a company type kind of mandate, they
 8         kept everything.  It cost them about 85 cents a box a month.  And
 9         that was a recurring every month expense.
10
11   PD:   Yeah.  I understand.  I've got over 2,000 boxes in storage.
12
13   RB:   Well, that—that's a much more moderate number.
14
15   PD:   Yeah.
16
17   RB:   But theirs was just nuts.
18
19   PD:   So how—how does a smaller company get the capital to acquire a
20         larger company?
21
22   RB:   Well, there was a pretty good chunk of—of cash that we had
23         accumulated over—over—over the life of the company, over—over the
24         life of the trust.
25
26   PD:   But it wasn't the cash that you bought it with, you borrowed billions,
27         right?
28
29   RB:   Yeah, borrowed 2.8.
30
31   PD:   So how could you collateralize over 2 billion?
32
33   RB:   Collateralize with the whole thing.  Basically, you know, they had
34         basically a contingent lien and—and what they would—let's say for
35         instance that if I screwed up, they would've foreclosed and got
36         everything, including UCS.
37
38   PD:   Now, was it the trust that borrowed the money?
39
40   RB:   Yes.
41
```

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 126

1   PD:   And the trust that had to pay it back?
2
3   RB:   Yeah.
4
5   PD:   Yeah.  And it paid it back from dividends?
6
7   RB:   I think the—the actual loan was with the corporate entity itself.  The—
8         the big—the old big Reynolds.  And that's who borrowed it and that's
9         who got paid back—got paid back out of the—the earnings of
10        Reynolds.
11
12  PD:   So it didn't have to be dividends to the trust?
13
14  RB:   No.
15
16  PD:   Reynolds borrowed the money to have itself bought?
17
18  RB:   Yeah.  I hadn't thought about it that way, but effectively that's the
19        case.
20
21  PD:   I don't know how that works.
22
23  RB:   Well, I—I think it was—it was actually classified as a merger.  I think
24        that's how it worked.
25
26  PD:   So the merged entity borrows the money.
27
28  RB:   Uh-huh [affirmative].
29
30  PD:   So the trust never owed that debt, the merged entity owed the debt
31        and paid it back?
32
33  RB:   Yes.  And I think as security they had Reynolds plus they had the UCS
34        company.
35
36  PD:   Yes.  So do you know who the President of the United States is?
37
38  RB:   No.
39
40  PD:   Do you recognize the name Joe Biden?
41

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 127

1   RB:   Yeah, that—that's him.
2
3   PD:   He's the one whose name you don't want to remember?
4
5   RB:   Exactly.  And I think that my prediction is, and that's that nothing
6         good's gonna come out of that.
7
8   PD:   Do you think he is competent to run the country?
9
10  RB:   No.
11
12  PD:   Who do you think's more competent today, Joe Biden or you?
13
14  RB:   Unfortunately, it's Joe Biden.
15
16  PD:   You think so?
17
18  RB:   Yeah, because he—he hadn't, you know, he hadn't gotten sick like me.
19
20  PD:   How do you know?
21
22  RB:   I don't.  I just—I haven't seen it in the papers so I presume not.
23
24  PD:   Do you believe everything you read in the papers?
25
26  RB:   No.  Very little, matter of fact.  Sadly.  We used to have a pretty good
27        system, but we don't anymore.
28
29  PD:   Yeah.
30
31  RB:   But there's nothing I can do about that.  That's just the way it is.  And
32        unless and until, you know, people come to their senses, that's the
33        way it's gonna be.
34
35  PD:   Is there anything you're having difficulty dealing with your lawyers
36        about?
37
38  RB:   No.
39
40  PD:   Have they shown you documents that you don't recognize?
41

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 128

1    RB:    Not a lot, but that—that has happened.
2
3    PD:    But most of the time you recognize the documents and understand
4           where they came from?
5
6    RB:    Well, theoretically yes, but go through questions like, you know, you're
7           raising.  That means the word "all" cannot be used.
8
9    PD:    Sure.  Do you recall any times it concerned you that you didn't
10          recognize something, didn't know where it came from?
11
12   RB:    I'm sure that's happened, but I—I—I don't remember a specific
13          instance.
14
15   PD:    [Sneezes]  Excuse me.  Do you have any other questions you'd like to
16          ask?
17
18   RD:    No.  No.
19
20   RB:    Thank goodness.
21
22   RD:    Yeah.
23
24   PD:    Are there any things you want to ask us about?
25
26   RB:    Not that I can think of at this point.
27
28   RD:    You know Mr. Brockman, I really appreciate talking with you, and it's
29          been very good meeting you.
30
31   RB:    Well, thank you.  I'm—I am a bit of an odd duck, but—
32
33   RD:    Well, but I—I very much, you know, respect the business success
34          you've had and your career, and it's fantastic.  And however this turns
35          out, I want to wish you the best.
36
37   RB:    Well, thank you.
38
39   RD:    Yeah.
40
41   RB:    Thank you.  It—I expect it will be a long and drawn out, but—

Examination of Robert T. Brockman by Dr. Park Dietz and Dr. Robert Denney
Case No. 4:21-CR-0009
May 20, 2021
Page 129

1
2   RD:   Sure, there's attorneys involved.
3
4   RB:   Oh, yeah.  And the attorneys' fees are crazy.
5
6   RD:   That's why it's long and drawn out.
7
8   RB:   Yeah.  Yeah.
9
10  PD:   Well, I have similar sentiments.  I very much enjoyed meeting you and
11        wish you the best regardless of the outcome of this case.
12
13  RB:   Thank you.
14
15  PD:   We will let Frank know that we're all set.

Maria Rosana Ponisio, MD
11339 Mosley Forest Dr
St. Louis, MO  63141

September 02, 2021

Corey J. Smith
Senior Litigation Counsel
Tax Division

Re: FDG-PET/CT Scan
    Brockman, Robert (███████1941)
    Scan date: 03/12/2021

As you requested, I have reviewed the FDG-PET/CT scan of the above-named individual and performed qualitatively and quantitatively interpretation using the MIM software (MIMneuro).

COMPARISON:
The PET images were fused with the brain MRI examination dated 07/30/2021 (axial MPR).

The scan was of acceptable technical quality.

The visual qualitative analysis demonstrates abnormal moderate to markedly decreased metabolic activity in the cingulate gyrus and bilateral precuneus. Mild hypometabolism is noted in the right frontoparietal lobes. In addition, there is a marked decreased FDG avidity in the bilateral caudate nucleus.

No significant decreased metabolic activity is seen in the frontal or occipital lobes.

The cerebellum demonstrates normal metabolic activity.



GOVERNMENT
EXHIBIT

4:21-CR-009-GCH
No. 6

DMP-0000007

Using MIMneuro, a quantitative analysis was performed. The patient's PET scan was compared to a library of 43 FDG Neuro Normals (19 female, 24 males) ranging from 41 to 80 years.

A statistically significant decreased tracer accumulation (Z <= -2) is seen in the caudate nuclei, anterior cingulate, posterior cingulate, and precuneus.

Accordingly, the described pattern of hypometabolism can represent early Alzheimer's dementia in the correct clinical setting.

No significant decreased metabolic activity in the frontal and occipital lobes to suggest frontotemporal dementia spectrum or Lewy body dementia.

Maria Rosana Ponisio, MD

DMP-0000008

FDG-PET



Voxel-based Analysis Result

Below are images of the voxel-based analysis result normalized to the whole brain. Fused brain MRI Z-score whole-brain axial splash :



DMP-0000010

FDG-PET Z-score whole-brain statistic parametric parameter (SSP)



DMP-0000011

Maria Rosana Ponisio, MD
11339 Mosley Forest Dr
St. Louis, MO  63141

September 01, 2021

Corey J. Smith
Senior Litigation Counsel
Tax Division

Re: Amyloid PET/CT Scan
    Brockman, Robert (            1941)
    Scan date: 07/28/2021

As you requested, I have reviewed the brain amyloid PET/CT (F-18 florbetapir, Amyloid) scan of the individual named above and performed qualitatively and quantitatively interpretation using the MIM software (MIMneuro).

COMPARISON:
The PET images were fused with the brain MRI examination dated 07/30/2021 (axial MPR).

The scan was of acceptable technical quality.

There is normal cortical white matter contrast in the cerebellum.

The visual qualitative analysis demonstrates abnormal decreased cortical-white matter contrast throughout the cerebrum.

There is increased grey matter cortical activity in the bilateral temporal, frontal, and parietal lobes. There is also increased tracer accumulation in the bilateral precuneus and posterior cingulate gyrus.



GOVERNMENT
EXHIBIT

4:21-CR-009-GCH
No. 7

DMP-0000001

Using MIMneuro, a quantitative analysis was performed. The patient's PET scan was compared to a library of 74 Amyvid Neuro Normals (26 female, 48 males) ranging from 18 to 50 years.

Statistical significant tracer deposition in the cerebral cortex (Z score <= -2) was observed in the precuneus, posterior cingulate, anterior cingulate, bilateral lateral temporal lobes, superior parietal lobes, and inferior frontal gyrus. Normal activity was noted in the cerebellum.

Accordingly, this is a positive amyloid-PET study, indicating moderate to frequent beta-amyloid neuritic plaques.

Maria Rosana Ponisio, MD

General comments on amyloid-PET INTERPRETATION:

A negative amyloid-PET study indicates sparse to no neuritic plaques and is inconsistent with Alzheimer's disease at the time of the study. A negative study reduces the likelihood that the patient's cognitive impairment is due to Alzheimer's disease. A positive amyloid-PET study indicates moderate to frequent neuritic plaques which is the amount present in patients with Alzheimer's disease. However, a positive amyloid-PET study does not establish the diagnosis of Alzheimer's disease. Moderate to frequent neuritic plaques can also be present in patients with other neurological conditions as well as in older people with normal cognition.

Amyloid PET



DMP-0000003

Voxel-based Analysis Result

Below are images of the voxel-based analysis result normalized to the whole brain. Fused brain MRI Z-score whole-brain axial splash :



PET Z-score whole-brain statistic parametric parameter (SSP)



DMP-0000005



DMP-0000006

Maria Rosana Ponisio
11339 Mosley Forest Dr
St. Louis, MO  63141

September 05, 2021

Corey J. Smith
Senior Litigation Counsel
Tax Division

Re: FDG-PET/CT Scan
    Brockman, Robert (███████1941)
    Scan date: 08/24/2021

As you requested, I have reviewed the FDG-PET/CT scan of the
individual named above and performed qualitatively and quantitatively
interpretation using the MIM software (MIMneuro).


COMPARISON:
The PET images were compared with FDG-PET/CT dated 03/12/2021
and fused with the brain MRI examination dated 07/30/2021 (axial
MPR).

The scan was of acceptable technical quality.

The visual qualitative analysis demonstrates abnormal markedly
decreased metabolic activity in the cingulate gyrus, more pronounced
in the posterior cingulate, and moderate in the bilateral precuneus.
Mild hypometabolism is noted in the right frontoparietal lobes. In
addition, there is a marked decreased FDG avidity in the bilateral
caudate nucleus.

No significant decreased metabolic activity is seen in the frontal or
occipital lobes.

The cerebellum demonstrates normal metabolic activity.



GOVERNMENT
EXHIBIT

4:21-CR-009-GCH
No. 8

DMP-0000012

Using MIMneuro, a quantitative analysis was performed. The patient's FDG-PET scan was compared to a library of 43 FDG Neuro Normals (19 female, 24 males) ranging from 41 to 80 years.

A statistically significant decreased tracer accumulation ($Z <= -2$) is seen in the caudate nuclei, posterior cingulate, left amygdala, anterior cingulate, precuneus, and superior frontal gyrus.

Accordingly, the described pattern of hypometabolism can be seen in early Alzheimer's dementia in the correct clinical setting. When compared to prior examination, there is a mildly progressive decrease of metabolic activity in the compromised brain areas.

No significant decreased metabolic activity in the frontal and occipital lobes to suggest frontotemporal dementia spectrum or Lewy body dementia.

Maria Rosana Ponisio, MD

FDG-PET/CT



DMP-0000014

Voxel-based Analysis Result

Below are images of the voxel-based analysis result normalized to the whole brain. Fused brain MRI Z-score whole-brain axial splash :



PET Z-score whole-brain statistic parametric parameter (SSP)



DMP-0000016

Memo to:      Evatt Tamine

Date:          February 5, 2010

Subject:       Performance Review

**What went well:**

Once again your self evaluation is remarkably accurate.  This in itself is a compliment to your logical evaluation of circumstances.

Overall you had a very excellent year which results in full attainment of your $100,000 target bonus.

**Goals for 2010**

1) Endeavor to deal with the Founding Partners and Arboria issues as best you can. This will include participating in any mediation.  However there is ongoing need to be cautious about acquiring too high a profile.

2) Monitor the ongoing legislative process in the USA and other jurisdictions and facilitate whatever restructuring ends up being required.

3) Take over the financial reporting processes from James Gilbert.  The goal to be achieved is:
    -establish use of an accounting software package that is a true double entry accounting system with proper journals, schedules, and general ledger with financial reports are produced
    -where the financials have columns for the previous 5 years that show all amounts for all lines on the P&L and Balance sheet – as well as for the current 6 month period

4) Conduct a semi-annual financial review of all entities face to face by the end of the first half of the year

5) Scan the box of miscellaneous documents and add them to the image database

6) Reorganize the boxes of original documents such that historical files of discontinued entities are segregated into their own box(es)

7) Request an asset ledger from Mountain Queen, Inc. that details all of the real estate, improvements, and furnishings.  They should be keeping this for purposes of calculating depreciation – but they need to be asked.



**GOVERNMENT EXHIBIT**

**4:21-CR-009-GCH**

**No. 9**

8) Endeavor to continue to harden the RADMIN and email server reliability by acquiring additional UPS power sources – and if possible – provide for monitoring while you are away.

9) Continue to address the projects on the To-Do List.

10) Arrange for audited financials for those entities that need to have audits

11)  Annually verify that there are letters of resignation from all trustees and that Bob has the originals

12) Update the To-Do list at least monthly


**General Goals for Every Year**

1) Continue to work to reduce the number of entities as this makes all processes simpler creating more time to focus on investment programs.

2)  Continue to keep the document image database up to date constantly

3)  Continue to keep the entity/significant transaction database up to date constantly

4)   Publish the Cash Report monthly

13)  Convert to keeping all email and financial records on an encrypted USB dongle carried in a different location in luggage when traveling abroad

14) Continue to update the accounting reports to the document image database

15) Operate as much as possible in a paperless manner – such that if someone were to come in your door unannounced everything would be in encrypted digital form

16) Complete adding the documents and significant transactions for superseded entities to the respective databases on a piecemeal basis during the year

17) Run Evidence Eliminator at least weekly on your computer

18) Keep your computer system running perfectly – get whatever you need for maximum productivity and backup

19) Get Don's computer environment operating on RADMIN

20) Continue basic education in accounting, bookkeeping, auditing, and financial controls

ET_0000019743

21) Maintain all working entities in good standing so that their legal existence can not be questioned

22) Maintain relationships with service providers – bearing in mind that not a lot should be expected from them – never take for granted that they are doing what they should be doing which will require constant monitoring of their reports, primarily their financial reporting – Gordon Howard being the key service provider that would be most problematic to replace – look to Peter Mitchell potentially being a successor to Gordon should Gordon no longer be capable

23) To the extent possible, no service provider should become crucial – always be thinking about portability and alternate providers should the need arise

24) Regardless of the level of non-performance of a service provider, a cordial professional relationship should be maintained – unless a high level policy decision to do otherwise is made

25) In the event of non-performance of a service provider or investment, the policy will always be to withdraw quietly – unless a high level policy decision to do otherwise is made

26) Continue the excellent work on the spreadsheet for expenses of each service provider such that detail entries by type of expense are kept so as to support the annual expenses for each service provider

27) Coordinate the charitable giving initiatives of the AEBCT

28) Monitor your levels of daily effort so as to avoid burn-out.  Engage in a regular fitness program with proper diet so as to stay in top physical condition.

29)  Other than your personal vacation travel, I recommend that you conserve the amount of travel that you do for business as your control of everything will be directly related to the amount of time you spend in front of your multi-monitor computer system at home in France.

30) Plan your life for healthy, balanced, stable, long-term productivity

31) Although you have several personal friends in Houston that I am sure you want to maintain, please restrict your contact with the USA generally such that except for these few – you tend to fade into the background

**Compensation**

Your annual remuneration for 2010 will be increased to an annual salary of $325,000 plus a bonus opportunity of $125,000.

**Conclusion**

Your continued excellent performance in all aspects of your job are noted and appreciated.

On Behalf of Spanish Steps Holding LTD

ET_0000019745

Message
_____

**From:**        Permit [permit1@lambdaprime.org]
**Sent:**        9/2/2010 4:49:57 PM
**To:**          redfish@lambdaprime.org
**Subject:**     RE:

Evatt,

I would try to do 3).

I would also create two copies on a Mico SD chip that are the size of less than a postage stamp.

I would then carry one concealed somewhere in luggage and I would FED-X the other with some misc correspondence to yourself in Bermuda.

I would not do 1) or 2).

Bob

_____

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Wednesday, September 01, 2010 5:51 PM
**To:** permit1@lambdaprime.org
**Subject:** RE:

Bob,

I have no files whatsoever on the laptop itself.  There are three options for me:

(1)      I can place the external hard drive with all files elsewhere in my luggage.  I did this on the last trip without a problem.
(2)      I can transfer all files onto a USB key drive, which can be well hidden.  At the Bermuda end, I can restore the files to a larger drive.
(3)      Attached a drive with all files to James computer and then do a Radmin file transfer to a drive in Bermuda.  This will be a long process and is dependent on everything working here in France.  Once the file transfer is complete I can wipe the drive using EE.

Evatt

_____

**From:** Permit [mailto:permit1@lambdaprime.org]
**Sent:** Wednesday, 1 September 2010 7:34 PM
**To:** redfish@lambdaprime.org
**Subject:** RE:

Evatt,

I will copy off all of my files and run EE on my RADMIN starting tomorrow.  I will be clean by Friday morning – when I shut down to transition to Houston.

Your reply here did not address your files or the big document image file.

Bob

_____

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Wednesday, September 01, 2010 5:16 PM

GOVERNMENT
EXHIBIT

4:21-CR-009-GCH
No. 10

**To:** permit1@lambdaprime.org
**Subject:** RE:

Bob,

I have considered this issue.  I am not going through the US.  Your computer and the email server will be carried by me.

There is no issue transiting through London since I am only in the country for a few hours.  The only concern in Bermuda is duty, however provided I make full declaration of the value it is unlikely I will even be stopped.  I took Don's laptop and the backup email server on the trip back for Gordon's funeral and encountered not a hint of a problem.

Still, it would not hurt to transfer your files off your laptop and then restore them on Sunday.

You are right that the email server is a problem to boot.  Anyone trying to do so would think the laptop broken since nothing appears on the monitor – even with the power plugged in.

The S and T drives here in France are powered, but I will need to unplug them on Friday to check the voltage.  If they cannot be used on 110, then I will copy the backup files onto a smaller drive that runs off the USB without AC power.

I have a very early start on Saturday (4 am) so I will need to power down everything for packing on Friday night.

The server will probably go down from about 2 or 3 pm your time.

Is there any advice regarding the settings for the email server.

I intend connecting James Gilbert's old laptop to the internet though the Draytek router with a Radmin server set up allowing you, me or Robbie to access the router remotely should we need to check any settings.

I had James download and install the Radmin server last year so that I could work on his laptop while he was in the Cayman Islands so this should be straightforward to get working.

Evatt

---

**From:** Permit [mailto:permit1@lambdaprime.org]
**Sent:** Wednesday, 1 September 2010 7:04 PM
**To:** redfish@lambdaprime.org
**Subject:**

Evatt,

Have you considered the security issues involved in moving the laptops to Bermuda?

Especially the big documents image file.

I should hate for them to get tied up in Customs or have them seized for any reason.

For sure I would expect that you would not be connecting thru the USA.

Bob

PS:  As a thought, I can easily transfer my files back to my computer here as they are relatively small.  I would then PGP wipe them off my RADMIN laptop and then run EE on the entire laptop.  That would solve some of the problem.  I could probably do yours as well.  However the big document image file could not be done that way.  The email server is also problematic – although if it were seized, they might have difficulty with it since it has a rather balky reboot process.

Message
_____

**From:**      Permit [permit@proventusconstans.com]
**Sent:**      11/21/2013 9:50:57 PM
**To:**        redfish@proventusconstans.com
**Subject:**

Evatt,

Robert just sent me what was supposed to be the deposition transcript.

However as I can tell from the email trail, it is the legal secretary that is screwing it up.  She has the .pdf file named as the deposition – which it is not.

She sent Robert the trust document instead – which I really did not want to see.  He just forwarded what she sent him on to me.

Please see if you can get the transcript.

Bob

**GOVERNMENT
EXHIBIT**

**4:21-CR-009-GCH**
**No. 11**

ET_0000058894

To:         Bob Brockman

From:       Evatt Tamine

Date:       June 4th, 2017

Subject:    2016 Performance Evaluation

I would say that without hesitation, 2016 has been my best year . I established beyond any doubt that I can work under pressure with the added threat of detention hanging over me, all for the sake of protecting the AEBCT. At the risk of being accused of having an inflated ego, I would say that there are very few people who could have done all I did in 2016, which brought together so many skills.

I believe 2016 was probably the most difficult and challenging year since I took up this position. A number of issues came up, which required special handling. I believe I was very successful in addressing those issues, though some remain outstanding (Robert Smith's situation, for example). I gave up a great deal of family time to ensure that these issues were dealt with.

**What went well?**

1.      The positive success for the year was my role in securing the purchase of the Albula. This involved establishing a relationship with Bill Schleicher and convincing him that it would be better to come to us as a buyer and not put the boat out to market. Arranging the lawyers for the purchase as well as establishing all necessary entities and all documentation to buy the boat. It made for an extremely busy final two months to an already very busy year.



GOVERNMENT EXHIBIT

4:21-CR-009-GCH

No. 12

MLATSW_020987

2.     During the acquisition of the Albula, I also built on the relationship with Graham Thomson, who will manage the boat for years to come.  I worked with him on the financial systems to be implemented.  Under severe time pressure, I worked with Cayman lawyers on establishing Fisheries Research Foundation Ltd to complete the acquisition.

3.     The sudden death of Don was a sad time.  It is hard to speak of what went well, when it starts with Don's death.  I suggested and then arranged that we honor Don by establishing the chair in accounting in his name.  In doing this while Don was alive and joining him in a surprise lunch, we gave Don a real joy in his final month.  But for my efforts, this is something that could have lingered for years and we'd have established a memoriam for Don rather than a gift in his lifetime.  This work also greatly pleased Melissa and made it less difficult to handle Don's passing shortly afterwards.  It also made what followed easier when dealing with Melissa.

4.     In addition to the surprise lunch for the gift to Ole Miss, I made a further six trips to Oxford.  Most were at short notice and always involved at least three flights there and three flights back and included always driving from Memphis to Oxford and back.  The trips were made when needed and without hesitation, generally following a call from Melissa telling me that she had found more drives, disks or documents that Don had kept.  As you know, I even cut short the trip to Argentina to get back to Oxford to destroy more drives that had been discovered.

5.     By my extraordinary efforts, hugely impacting my family life, I did all that was humanly possible to clean up what Don had left behind.  Those efforts meant that we could rest easily that any attempt to search Don's home would be fruitless.

MLATSW_020988

6.    All of the foregoing was done while helping Melissa with the issues she confronted following Don's death.  There wasn't a trip from Don's death onwards where I did not spend time with Melissa helping her with the personal mess she was left with.  These efforts have secured Melissa's loyalty for the rest of her life, as she looks on me as a second son.  She will not forget that loyalty should she ever be visited by regulators.

7.    I was also engaged in doing all I could to protect the AEBCT over the Robert Smith situation.  Further, I was doing all I could to also protect Robert at the same time.   I have spent a great deal of time on the road meeting with Robert (so we could talk freely), meeting Carlos Kepke and Sherri Caplan.  In relation to the last two people, I worked through their files and identified areas of concern.  I met with Robert's lawyers in Bermuda and several times in the United States, as well as meeting Miller & Chevalier lawyers in both Washington and Houston.  Once again, all this work was done without hesitation and without regard to the impact on my family life.

8.    Early in the year, after receiving a complaint from Stuart Yudofsky, I travelled to Houston (again without any hesitation or regard to my family) and confronted Paul Klotman over the use of the remaining funds at Baylor.  I was not overawed by his position, his intelligence or reputation.  I protected the Trust's gift and helped Stuart out of a position he found very difficult and worrying.  The work was clean and efficient and delivered a clear message to Dr Klotman (and an example to others) that the Trust expects the terms of any gift to be honoured.

9.    Very significant time and effort was spent developing the Brockman Scholars.  I travelled to College Station on several occasions to meet with the deans of the various schools.  I have spoken with the president of Texas A & M and found a ground upon which we could push our approach to the scholarships without letting the university take control of the awards.  I did this in a way that has led

Texas A & M to treat us as partners for a common goal.  My efforts have made it easier for the University to accept our requirements.

10.     Similarly, my efforts in working with Stuart Yudofsky and establish the Brockman Medical Research Foundation have proved successful.  That work allowed the Scientific Advisory Board to hold its first meeting and recommend its first grants.  Systems have been developed that will hold for the future.  The relationship I have with Stuart is a very strong one.

11.     In relation to the medical research and scholars foundations, I have completed the documentation to the extent I could.  I also came up with the notion of a "Brockman Family Member" always sitting on the boards.  That allows your involvement without suggesting that you control the giving.

12.     The work on the Foundations was done in a way that preserves the independence of the AEBCT and the Foundations.  Indeed, the way I have approached this work means that we can tell a strong story in the event of an external review by a regulator.

13.     I undertook a lot of work in employing staff and dealt with people who did not quite work out (Bruce Lim, for example) without any complications.  I brought Duncan on board, who appears to be working quite well. We have established offices and telephone and network systems that will hold us in order for many years to come.

14.     I have identified to the software to use for the foundations as well as the development of our website.  All this work goes towards establishing the AEBCT and the Foundations as genuine charities of substance.  The rewards of this work will become more apparent in the event of a review by an external regulator.

MLATSW_020990

15.     This year I successfully worked through improving financial reporting, particularly for Point Investments Ltd.  I am now very confident in the financial reporting and can efficiently produce reports.  An area where I have further built on a successful 2015 is that I have been able to successfully set up far more logical accounts and produce informative and accurate financial reports.  In fact, I proposed, and implemented, a number of changes to the method of accounting which have been highly helpful in producing better accounts.  The audits for Point are now completed in a more timely fashion after pressuring PWC to complete them.

16.     I have continued working extensively with lawyers in the United States to ensure that we are fully compliant with FATCA.  This was an extensive task that saw us register a number of companies for FATCA, but managed in a way that disclosed nothing to the lawyers but the story we wanted to convey, i.e. that the various entities are all exclusively engaged in charitable activities.

17.     As part of the FATCA process, I continue to work through comprehensive reviews with most of our Banks.  This allowed me to re-establish the information which is before the banks - even for the older entities.  I have given them our version of events.  .

18.     I have spent significant time with Bob Yekovich on the Rice University Opera House project.  I have been very supportive of Bob while he struggles with University politics.  I believe my efforts are helping to keep this project on track. I have managed to convey to Bob Yekovich your wishes without saying anything other than I am the decision maker.  Obviously Bob knows the truth, but I have made it easy for him (and David Leebron) to maintain the position.

MLATSW_020991

19.    In relation to Founding Partners and Promise Healthcare, I continue to sit on the board of directors of the controlling company, ensuring that we have a say in the decisions being taken including any monetization strategies.  I have developed a good knowledge of the hospital industry in the United States, which is helpful in making decisions on strategies going forward.  A significant investment of doubtful return now has a prospect of a good return (though a full return remains highly unlikely).  It might sound an excessive boast, but I do not believe that we (or any other investors) would be in this position but for my involvement.

20.    I continue to become more confident in financial reporting and have also improved the accounting for Cabot and Edge.

21.    The strategy of investing into debt has been successful this year, though debt opportunities have reduced because of market conditions.  I have managed these investments all the way through the assignment process (without incurring any outside fees).  I have good relationships with debt brokers at Deutsche Bank and Jefferies.  Debt opportunities are harder to come by now with a great deal of competition, but opportunities are still regularly offered to me.  I have been joining the various bank calls, which has vastly improved my knowledge on the sort of matters seen as important by those lending to businesses.

22.    I continue with the production of reports on a number of topics.  While we have not been able to communicate fully, these reports are still produced in a timely fashion (where the information is available) and are designed to quickly put you in a position to fully understand where we are any particular topic.  Examples of these reports are the Cash Report, the Vista Transaction Report, the Significant Transaction Report, the various Debt Reports, the Fees and Expenses Report etc.  I believe that I am also innovative in devising new reports and improving on existing reports.

23.     I continue to enjoy a very good relationship with Robert Smith and his team at Vista.  I believe that I am very strong in representing Point's interests while at the same time being responsive to the needs of Vista in carrying out their various transactions.  Our need to be involved in this area is because Point owns more than 10% of two of the funds and as such is often subject to enhanced due diligence.  I manage this process myself which is a lot more effective and ensures that only the information we are prepared to disclose is released.

24.     I have maintained my end of our computer systems without too much trouble.  Being able to work remotely and carry out changes makes maintenance and repairs much easier.  I feel very confident that I can adequately address any problem that arises (with input and guidance from you, of course).

25.     A key part in achieving the results I have was my willingness to give all the time necessary to get the work done.  This often meant working very long hours, which I do without hesitation.  It helped that I work from home so that I did not feel like I was neglecting the family.  The travel this year has been particularly horrendous.  There were many periods where I did not manage to spend more than 3-4 days at home before I had to travel again.

26.     This year has seen me further establish my position as the figure head of the AEBCT and the other trusts.

27.     I have maintained in this last year a very strong and close working relationship with Carl Linnecke.  At times Carl has found himself in tricky situations, e.g. with the Aspen Valley Land Trust and Bart Chandler.  I think he appreciates the support he has got from me and that has filtered down to David Finholm and the others.

MLATSW_020993

28. The reduction in the number of outside service providers or, where we still use them, the reduction in the work they do for us also means that we control the knowledge of our affairs.

29. An important aspect to having control of our destiny and not being at the mercy of service providers is that we are less likely to suffer loss through fraud etc.  Over the past year I have seen the operation of several trust companies in Bermuda.  Unlike Grosvenor, these are trust companies run by people without the integrity of Gordon Howard.  I have seen examples of trust assets being sold without an accounting for the proceeds.  The fact is that the trust industry is filled with shady characters. This is not so much something that I am doing well, but rather the benefit of all the work that went into creating the structures as they are today.  While it means a lot more work for me, we have better control and less fees.

30. As I reported last year, holding the key directorships that I now do, I do not have to go out to anybody to have documents signed.  We control the information.  I manage to turn documents around in minutes using digital signatures.  I no longer have to wait for documents to be signed.  This process also fits more neatly into our database as the documents are created in the database and saved there with signed copies.  This is a very streamlined process now.

31. I continue to document the movement of assets within the group, creating a proper commercial basis for all asset movements with the paper trail. This is also supported by the Significant Transactions Report.

32. I have maintained very good working relationships with all key people. I stay in contact regularly with Don and Cris Ruffell Smith.

33.     Maintaining the document database.  I have built a very good document describing the computer set up in Bermuda.

34.     Continuing the control of all companies and trusts with no compliance problems.

35.     On a personal note, despite many absences though the year, I have worked hard to maintain a happy family life.  The relationship with Sophie and the girls is extremely strong and we enjoy each other's company.  Sophie has been trying to make sure that I eat very well and get in some exercise.

**Things that need improvement:**

1.     I  must exercise more.  This is something that I need to be concerned about. Sophie has me eating very well.  I no longer drink sodas and have very little alcohol, however making time to get on the treadmill (which is here in the house) proves difficult.

**Conclusion:**

This has been the hardest, most challenging year since I began in this role.  My efforts have been huge and have signaled this as my most successful year by far..  I have carried one great burden after another and dealt with them in a way that protects the AEBCT.

I have done all this while being stopped on a regular basis when travelling into the US.  I cannot now return for an unknown period.

MLATSW_020995

---

Message

| | |
|---|---|
| **From**: | Permit [permit1@lambdaprime.org] |
| **Sent**: | 5/21/2011 8:30:29 PM |
| **To**: | redfish@lambdaprime.org |
| **Subject**: | RE: Proposal |

Evatt,

A couple more conditions to make sure are put into the response:

-donor is to remain anonymous
-if Stuart is to die or become incapable of performance, his place in directing the use of the donation is to be taken by Beth Yudofsky

The donation is to be $10M immediately upon acceptance by Baylor of the conditions, followed by $5M on the next three anniversaries of the original donation.

Bob

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Saturday, May 21, 2011 4:17 PM
**To:** permit1@lambdaprime.org
**Subject:** FW: Proposal

Bob,

I have received the proposal from Stuart Yudofsky.  I will draft a response along the lines of your previous letters, however with greatly varied wording so that it cannot be suggested that I have taken any lead or direction from you.

I'll send you something later today or tomorrow for your review.

Evatt

**GOVERNMENT EXHIBIT**

**4:21-CR-009-GCH**
**No. 14**

Message
_____

**From:**        Permit [permit1@lambdaprime.org]
**Sent:**        6/4/2011 10:27:56 PM
**To:**          redfish@lambdaprime.org
**Subject:**     FW:
**Attachments:** Draft Dr Yudofksy Letter.doc

Evatt,

I made two slight grammatical corrections – other than that it is good to go.

Bob

_____

**From:** redfish@lambdaprime.org [mailto:redfish@lambdaprime.org]
**Sent:** Wednesday, June 01, 2011 11:13 AM
**To:** Permit
**Subject:**

Bob,

Attached is a draft letter to Stuart Yudofsky and Baylor.  I have followed the outline of your letter, however have made some changes so that it cannot be said that I just copied your letter.

For this draft I have also referred to you as I think we probably need to say that this pledge replaces the one that DCS made in 2005.

Could you please let me know of any changes that you would like to see.

Evatt



**GOVERNMENT EXHIBIT**

**4:21-CR-009-GCH**

**No. 15**

# ST. JOHN'S TRUST COMPANY (PVT) LIMITED
### SUITE 225, 12 CHURCH STREET
### HAMILTON HM11
### BERMUDA
**Tel:**   +1 (441) 295 0985
**Fax:**   +1 (441) 295 0986

Paul E. Klotman, M.D.
President
Baylor College of Medicine
Office of the President

Stuart C. Yudofsky, M.D.
D.C. and Irene Ellwood Professor and Chairman
Department of Psychiatry and Behavioral Sciences

One Baylor Plaza, MS 350
Houston Texas 77030
United States of America

June 5th, 2011

Dear Drs. Klotman and Yudofsky,

**Re:**   **A. Eugene Brockman Charitable Trust ("the Trust")**

I refer to my meeting with Dr. Yudofsky in Houston on Friday May 13th, 2011 and the detailed material which I received in Bermuda soon after.

It was such a great privilege and pleasure to meet Dr. Yudofsky.  Dr. Yudofsky's extraordinary intellect coupled with a rare and genuine compassion has formed the vision he holds for the proposed Psychiatric Institute at the Baylor College of Medicine.

By way of background, I am a director of the Trustee to the Trust, St John's Trust Company (PVT) Ltd.   The Trust was established by A. Eugene Brockman in 1981 with the purpose of raising and maintaining a sufficient fund of assets, which could be applied to worthy charitable causes, particularly in the area of medicine, medical research and education.  Mr. Brockman passed away in 1986; however his vision was



GOVERNMENT
EXHIBIT

4:21-CR-009-GCH

No. 16

Paul E. Klotman, M.D.
Stuart C. Yudofsky, M.D.
June 5th, 2011

shared, and continued, by my predecessor Mr. Gordon Howard (who passed away last year).  While I never met Mr. Brockman, I did have the honour of working closely with Mr. Howard for over ten years.  I have become inoculated with the same vision.  The Trust has actively pursued these philanthropic goals since it was established.

Both Mr. Brockman and Mr. Howard shared a strong desire to support medical research.  I feel sadness that Mr. Howard, in particular, did not have the opportunity of meeting Dr. Yudofsky.  I believe that, like me, Mr. Howard would also be mesmerized by the scope of Dr. Yudofsky's vision and his staggering intelligence, coming as they do from such a humble and modest man.

I should record that I first heard of Dr. Yudofsky while attending a meeting with Mr. Brockman's son, Robert T. Brockman.  The Trust is ultimately the major shareholder of a corporation of which Robert T. Brockman is the Chairman, Reynolds and Reynolds, Inc.  That corporation, through Dealer Computer Systems, Inc., had made a pledge to Baylor College of Medicine by way of a letter dated 16th June, 2005.

I have expressed my strong opinion to Robert T. Brockman that the pledge ought to be made by the Trust instead of the corporation.

The reason for this is very straightforward:  I do not think that it would be possible for the Trust to find a more deserving recipient of support than. Dr. Yudofsky (and, of course, any institution with which he is associated).  I am glad to say that Robert Brockman has agreed with my view and acceded to my request that the Trust honour the sum of the original pledge.

I stress that it is the inspirational leadership and vision of Dr. Stuart Yudofsky which is the foundation of the pledge the Trust hereby makes.  Dr. Yudofsky's continuing involvement is an absolutely essential pre-condition to this pledge.  Dr. Yudofsky is a rare human being.  I believe that the Trust should do all it can to honour his achievements and utilize his extraordinary abilities.  Particularly, I believe strongly that Dr. Yudofsky's continued leadership as Chairman of the Menninger Department of Psychiatry is essential to achieving his vision.  The Trust therefore offers this gift contingent upon his remaining as Chairman.

2

ET_0001694181

Paul E. Klotman, M.D.
Stuart C. Yudofsky, M.D.
June 5th, 2011

It would be greatly appreciated if both Dr. Yudofsky and the Baylor College of Medicine would confirm their commitment to the condition I set out above. Further, the Trust does reserve the right to reconsider the continuation of, and, if required, the discontinuation of the remaining funds, should Dr. Yudofsky be removed from, or relinquish, his position as Chairman.

On behalf of the Trust, I am pleased to make the following pledge, subject to the contingencies set forth above and as follows:

I.   Pledge

    1.   The Trust hereby pledges $25,000,000 (twenty-five million dollars) to Baylor College of Medicine for the exclusive purposes of and subject to each and every contingency listed below ("the Contingencies").

    2.   Upon written acceptance of the purpose and Contingencies of this pledge by the President of Baylor College of Medicine and completion of Items 1, 2, and 3 of the Contingencies, the Trust will transfer to Baylor College of Medicine the sum of $10,000,000 (ten million dollars) to be followed by three (3) annual allocations of $5,000,000 (five million dollars) on April 15th for the three successive years following the year of the initial donation.

II.  Purpose

    1.   The funds pledged are for the purposes of the following:

        (a)   $5,000,000 (five million dollars) endowment support for the Beth K. and Stuart C. Yudofsky Presidential Chair in Neuropsychiatry

        (b)   $3,000,000 (three million dollars) endowment support for the Beth K. and Stuart C. Yudofsky Chair in the Neuropsychiatry of Traumatic Brain Injury (new recruit to BCM, appointed after national search)

3

ET_0001694182

Paul E. Klotman, M.D.
Stuart C. Yudofsky, M.D.
June 5th, 2011

(c)     $2,000,000 (two million dollars) funding for recruitment expense, administrative support, research assistants, establishing laboratory, infrastructure support, and supplies

(d)     $3,000,000 (three million dollars) endowment support for the Beth K. and Stuart C. Yudofsky Chair in the Basic Science of Neuropsychiatry (e.g. imaging; genetics; cellular and molecular biology) (new recruit to BCM, appointed after national search)

(e)     $2,000,000 (two million dollars) funding for recruitment expense, administrative support, research assistants, establishing laboratory, infrastructure support, and supplies

(f)     $3,000,000 (three million dollars) endowment support for the Beth K. and Stuart C. Yudofsky Chair in Interventional Neuropsychiatry (e.g. deep brain stimulation; transcranial magnetic stimulation; neuropsychopharmacology) (new recruit to BCM, appointed after national search)

(g)     $2,000,000 (two million dollars) funding for recruitment expense, administrative support, research assistants, establishing laboratory, infrastructure support, and supplies

(h)     $3,000,000 (three million dollars) endowment support for the Beth K. and Stuart C. Yudofsky Chair in the Neuropsychiatry of Military Post Traumatic Stress Syndrome (new recruit to BCM, appointed after national search)

i)     $2,000,000 (two million dollars) funding for recruitment expense, administrative support, research assistants, establishing laboratory, infrastructure support, and supplies

Total amount of the pledge is $25,000,000.

4

ET_0001694183

Paul E. Klotman, M.D.
Stuart C. Yudofsky, M.D.
June 5th, 2011

2. The funds as they are donated and any accumulated endowment earnings
   generated therefrom are for the exclusive use of the Menninger Department of
   Psychiatry and Behavioral Sciences of Baylor College of Medicine, for the
   purposes described above, under the direction of Professor and Chairman, Stuart
   C. Yudofsky, M.D.

III. Contingencies

1. Designating Stuart C. Yudofsky, M.D. as Principal Investigator for the entirety of
   this pledge, with exclusive "sign-off" authority for allocation of any and all funds
   expended.

2. Maintaining this donation in confidence except as specifically authorized in
   writing by the Trust.

3. The Beth K. and Stuart C. Yudofsky Presidential Chair in Neuropsychiatry
   initially will be held by Stuart C. Yudofsky, M.D., subject to the approval of the
   President of Baylor College of Medicine, the Faculty Council of Baylor College of
   Medicine, and the Board of Trustees of Baylor College of Medicine.

4. Should Stuart C. Yudofsky die, become incapacitated or voluntarily relinquish
   his obligation as Principal Investigator, which obligation includes directing the
   use of the donated funds, Paul Klotman, M.D., President of Baylor College of
   Medicine, or his successor, shall, in consultation with Beth Yudofsky ,M.D.,
   assume the role and obligations of Principal Investigator, which obligations
   include directing the use of the donated funds, temporarily, until such time as a
   suitable replacement is recommended by Dr. Klotman or his successor, following
   consultation with Beth Yudofsky, M.D., and approved by the Trust, which
   approval the Trust is free to withhold at its discretion.

Should the Trust, within its sole discretion, determine at any time and designate in
writing that any of the contingencies listed above are not fulfilled, the Trust reserves the
right to cancel this pledge and any and all unexpended funds derived from this pledge
shall be returned to Trust within 60 days of the date of written notice and the Trust shall
not be obligated to make any further contribution whatsoever.

5

ET_0001694184

Paul E. Klotman, M.D.
Stuart C. Yudofsky, M.D.
June 5th, 2011

This pledge and all details pertaining thereto are highly confidential.  No information of any nature may be released without the prior written approval of the Trustee.

I wish only to add that the Trust has never before had an opportunity to support a vision such as Dr. Yudofsky's, devoted as it is to the missions of patient care, research and education.  The settlor of the Trust and Mr. Howard would both have stood proudly in support of this extraordinary mission to provide better, compassionate care of the mentally ill and in advancing behavioral health.  In making this pledge, the Trust achieves the purpose for which it was established and the visions of Mr. Brockman and Mr. Howard are fulfilled.

If the foregoing pledge and conditions thereto are acceptable, would you kindly execute one copy of this letter, which will constitute our Pledge Agreement.  Would you then return the executed copy to me at the address above.

Yours sincerely,
**ST. JOHN'S TRUST COMPANY (PVT) LIMITED**

Evatt Tamine
Director

This Pledge and the conditions thereto are acceptable to us and will constitute the Pledge Agreement.

Paul E. Klotman, M.D.                    Stuart C. Yudofsky

APPROVED AS TO FORM
Office of the General Counsel
Baylor College of Medicine
By RC 6/24/11

6

ET_0001694185

**From:** Permit
**To:** "Redfish"
**Subject:** RE:
**Date:** Sunday, August 13, 2017 4:23:00 PM

Evatt,

I concur with all of these.

Bob

---

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Sunday, July 30, 2017 6:05 AM
**To:** 'Permit'
**Subject:**

Bob,

Here is a memorandum of issues to consider following BCB freezing accounts.

One think I did not consider, but which Sophie raised with me after my account was frozen, is her fear that BCB will try to justify their stupidity by reporting us to a regulator.  They could try to cover themselves and allege suspicions about the operation of the accounts.

We need to get away from the bank as quickly as possible.

Evatt



**GOVERNMENT EXHIBIT**

4:21-CR-009-GCH
No. 17

**MLATSW_020952**

MEMORANDUM

From:        Evatt Tamine

To:          File

Date:        July 29th, 2017

Subject:     BCB's decision to freeze accounts

---

The recent decision of BCB to freeze accounts has highlighted some shortcomings in current operations.

This memo addresses the problems and provides possible solutions.  After stating the problems and solutions, I'll detail issues we'll encounter in achieving the solutions.

**PROBLEM 1:**        Having all bank accounts held at the same bank has led BCB to freeze all accounts where I am a signatory.  AEBCT, Cabot, Edge and Regency as well as Tangarra and my personal accounts have all been frozen.

**SOLUTION:**         Establish accounts at separate banks for each group.

**PROBLEM 2:**        Having all accounts and operations in a jurisdiction places us at risk of having everything in that jurisdiction frozen if a regulator takes action.  The risk of this is real.  If BCB tries to justify their decision to freeze accounts all they need to is allege a belief that there is something suspicious about the accounts to the BMA.  That could lead to a freezing of all accounts wherever held in Bermuda.

**SOLUTION:**         Set up additional banking relationships for AEBCT, Cabot, Edge and Regency in separate jurisdictions, e.g. keep Point in Switzerland and Singapore, but



GOVERNMENT
EXHIBIT

4:21-CR-009-GCH
No. 18

**MLATSW_020907**

move Edge to Guernsey and Cayman Islands; Cabot to Jersey and Nevis; and Regency to the BVI and the Isle of Man.  There is a problem with Caribbean banks given I can't travel through the US to get there.

**PROBLEM 3:**       The legacy relationships at BCB and Butterfield Bank place all accounts as being connected to Don Jones and, in the case of Butterfield Bank, to RTB.

**SOLUTION:**       As we have done in Switzerland and Singapore, set up accounts in places where we get to write our own history.  Kill off all reference to RTB and Don Jones.

**PROBLEM 4:**       We lack a real fighting fund for legal fees and living costs.  If all accounts are frozen, as BCB did, then we are restricted in accessing cash.  Right now I cannot pay my American Express bill, the builder's invoices and school fees because most of my funds are held in BCB.  Similarly, I could not retain a lawyer to bring an action to free the money.  If we are caught like this again, in accessing accounts elsewhere, we would be disclosing where other accounts are held, possibly alerting a regulator as to where they should seek to freeze money.

**SOLUTION:**       The solutions above would go part of the way to addressing this problem, but we need a hidden fund, which has nothing to do with either me or RTB, but which we could control.  Glenn Ferguson, a lawyer in Australia who I know and can trust, would be a prospect to hold funds in a trust and make a "loan" for legal fees and living expenses.

**PROBLEM 5:**       We don't have an escape jurisdiction with back up computer systems so that we can "flick the switch" and keep operating after a day or two.

MLATSW_020908

**SOLUTION:** I made an attempt in setting up a mirror St John's in Singapore; however that fell apart when the service provider wanted full financials for all entities associated with St. John's. We need to set up redundant systems in a few places with shell companies holding operating bank accounts and, if possible, residency rights. The shell companies would be mirrors of existing companies, e.g. another St John's.

In relation to computer systems, we can set up a complete copy of the secure system at the apartment (if there is space) in the UK. Nobody would connect me to that property, which is in the name of Sophie's personal family trust. I can dismantle everything here and we can turn on the system there.

We could also look at setting up a company in Guernsey or Jersey with a residence right and a small apartment. That would make getting bank accounts easier since we have a presence. The reason I need to look at the Channel Islands is that I cannot readily travel to the Caribbean while I cannot travel through the US, which could be some years yet. Even if Robert Smith clears up his problems, the target is well fixed on me and we need to anticipate that we'll be audited at some point.

We would keep the focus on Bermuda with the Foundations established and operating here. They would be active, hopefully drawing the attention of any regulator, while we have low key back up places for me to slip into with the non-Foundation work. As long as everyone pegs me as entirely engaged by the Foundations in Bermuda, we can cover our tracks elsewhere.

**PROBLEM 6:** Jurisdictions like Bermuda, where the employee gene pool is very limited, have weak people who have lost any sense of a robust reaction to the KYC requirements being rammed down their throats. They don't care about business, only about compliance.

**SOLUTION:**      Stronger jurisdictions such as Switzerland are doing all they can to comply, but they have stronger people who can still deliver a service to clients.  We should look to strong jurisdictions, including considering accounts in the UK, Malta, Canada, Australia, Hong Kong etc.  We might be exposed to taxation on some returns, but we could be a lot safer.

**PROBLEM 7:**      The target on me is a lot larger than it was some time ago both because of Robert Smith and the Albula, which also draws a lot of attention.  I don't have the sort of name that can be hidden, even though I try to maintain a very low key existence with no social media, little contact with professional people etc.

**SOLUTION:**      I need to muddy the waters about where I am located.  With establishing a presence in additional places such as the Channel Islands, I might be able to avoid being locked into one place.  It becomes harder to track me down.  This would particularly be the case since the Foundations tie me so closely to Bermuda as does being married to a Bermudian.  Regulators will come to Bermuda looking for me, while we build and maintain connections elsewhere.

In addressing the issues above, there are a few things to consider:

- We need strong jurisdictions where they will comply, but still be robust about not taking silly actions such as BCB did in freezing the accounts.

- The time differences are important so we can maintain efficient communications.

- Need to be somewhere we I don't have to travel through the US.  Even if the fear of detention is lifted, we should be careful about my traveling into the US.

MLATSW_020910

Certainly, I would never again do it with a computer or telephone (if the later is possible). I could keep all I need at Stuart Yudofsky's office including a phone.

- We must have a good cover story as to why I would like to establish new relationships. In the Channel Islands, Switzerland, Malta, Cyprus etc, this should be because my daughters will soon have to go to school outside Bermuda and I wish to be nearer to them. That is not our plan, but it is something that is readily understood and accepted by all people who work those places.

- Once I gain Bermuda status after October 21st, 2017 (though the application could take up to a year to process), I can establish many of these new relationships on the back of a Bermuda passport.

MLATSW_020911

**From:** Permit
**To:** "redfish@lambdaprime.org"
**Date:** Sunday, June 12, 2011 2:31:00 PM

Evatt,

This summer I plan to do some more investigation on the management buyout / preferred stock bailout concept.

As such I will need to be talking to some business/tax experts.

Please write me a letter as trustee and send it to me hard copy via FED-x along the following lines that you might more fully flesh out.:

Dear Bob,

Congratulations on passing your 70th birthday.  I trust that proper celebrations occurred.

Further formal congratulations are in order for the recent successful refinancing of the remaining debt from the acquisition of Reynolds and Reynolds.  The interest savings of some $30 million per year is substantial.

On a more serious note, as we have previously discussed, plans for transition of leadership and ownership of the group of companies owned by Universal Computer Systems Holding, Inc. need to be made.  These companies are the principal assets of the A. Eugene Brockman Charitable Trust.  For no other reason than diversification, this is a subject of concern.

Obviously you have begun the process of leadership transition with the appointment of Ron Lamb as President.  Hopefully his performance to date has met your expectations.   Our conversations around some form of eventual management buyout with Ron Lamb as the leader would seem to make sense.

 I would like for you to devote further attention to manners in which the Trust might begin to liquidate its holdings in Universal Computer Systems Holding, Inc.

I look forward to talking with you further on this subject as you have further information available.


Evatt Tamine
Director



Bob



**GOVERNMENT EXHIBIT**

**4:21-CR-009-GCH**
**No. 19**

**MLATSW_002276**

# ST. JOHN'S TRUST COMPANY (PVT) LIMITED
### SUITE 225, 12 CHURCH STREET
### HAMILTON HM11
### BERMUDA
**Tel:**     **+1 (441) 295 0985**
**Fax:**     **+1 (441) 295 0986**

**PRIVATE AND CONFIDENTIAL**

Mr. Robert T. Brockman
Reynolds & Reynolds, Inc
6700 Hollister Street
Houston TX 77040
United States

June 11th, 2011

Dear Bob,

I would like very much to extend by personal congratulations on passing your 70th birthday.  I trust that proper celebrations occurred and I am sorry that I was not there to toast you.

Further formal congratulations are in order for the recent successful refinancing of the remaining debt from the acquisition of Reynolds and Reynolds.  I do not believe that I am betraying a confidence when I tell you that before he unexpectedly passed away, Gordon Howard was most concerned about the state of the industry and the debt which Reynolds was carrying.  While he had every confidence that you would perform to your usual high standards, he felt that market forces would beat you down this time.  That you have achieved what you have in these trying economic conditions is a marvel.  The interest savings of some $30 million per year is substantial.  It is a great relief to know that the Trustee need not consider any strategy forced on it by this recession.

Having said that, Gordon's death has highlighted the crucial issue that the Trust will not always have the critical benefit of your services.

GOVERNMENT
EXHIBIT

4:21-CR-009-GCH
No. 20

ET_0001694884

Robert T. Brockman
Reynolds & Reynolds, Inc.
June 11th, 2011

---

Like Gordon before me, I am greatly concerned about the Trust's continuing level of ownership should you no longer lead Reynolds.  I have no doubt that the managers who you have personally trained will prove very capable, however I must consider the Trust's position following the unquestionable dire impact of your departure.

I see two key issues from the Trust's perspective:

(a)     Plans for transition of the leadership of the group of companies owned by Universal Computer Systems Holdings, Inc.; and,

(b)     The transition of ownership of that group of companies.

As you know, these companies are the principal assets of the A. Eugene Brockman Charitable Trust.  Without your leadership, I believe that for reason of diversification alone, the Trust must consider reducing its ownership interest.

Obviously you have begun the process of leadership transition with the appointment of Ron Lamb as President.  Hopefully his performance to date has met your expectations. Our conversations around some form of eventual management buyout with Ron Lamb as the leader would seem to make sense.

I would like for you to devote further attention to manners in which the Trust might begin to liquidate its holdings in Universal Computer Systems Holding, Inc.  I believe that you are the appropriate person to discretely carry out this investigation.  You are in the unique position of being able to balance the impact on the businesses of the Trust disposing of its ownership interest with an orderly and managed transition to new leadership.

Would you please use the services of such professionals as you consider necessary in order to carry out this investigation.  Of course, I need hardly remind you of the need for absolute confidentiality in these investigations.

2

ET_0001694885

Robert T. Brockman
Reynolds & Reynolds, Inc.
June 11th, 2011

I look forward to talking with you further on this subject as you have further
information available.

Yours sincerely,
**ST. JOHN'S TRUST COMPANY (PVT) LIMITED**

Evatt Tamine
Director

3

ET_0001694886

| From: | Permit |
| To: | "Redfish" |
| Date: | Saturday, August 1, 2015 9:56:00 PM |

Evatt,

I think that it would be a good idea for you to send an open email to Stuart that you have been considering the formation of a medical research foundation somewhat along these lines.

Al Deaton has been aware of this initiative.

He has suggested your name and indicates that you would be interested in being involved in a leadership position.

This is an exciting thought.

This project is in its early stages – and I look forward to discussing it further with you.

Bob

GOVERNMENT
EXHIBIT

4:21-CR-009-GCH

No. 21

MLATSW_015369

**From:** Permit
**To:** "Redfish"
**Subject:** RE:
**Date:** Wednesday, July 26, 2017 9:05:00 PM

Evatt,

The 1.5% management fee is one thing

The trade on this should be warehoused investments as I want the Fund to be involved with cybersecurity software. I understand the valuation hassles.

I would continue to gripe about co-invests – but then give in.

Bob

---

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Saturday, July 08, 2017 12:47 PM
**To:** 'Permit'
**Subject:**

Bob,

Could you please let me know which of the points in the attached executive summary I can contest with you?

I will be pushing for a straight 1.5% on management fees reducing if committed funds remained uncalled after a certain time.

I will make noise about co-invests and be opposed back then fall back to LP consent is required.

I will oppose warehoused investments – she told me that this will be problematic as there could be regulatory/tax issues.

Is there anything else I can contest?

Evatt

GOVERNMENT EXHIBIT

4:21-CR-009-GCH

No. 23

| | |
|---|---|
| **From:** | Permit |
| **To:** | "Redfish" |
| **Subject:** | RE: Consulting Agreement |
| **Date:** | Saturday, June 20, 2015 6:29:00 AM |

Evatt,

I recommend that you proceed on this basis.

Bob

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Monday, June 15, 2015 11:55 AM
**To:** 'Permit'
**Subject:** FW: Consulting Agreement
**Importance:** High

Bob,

Please see the email that I sent to Don. This was an open email.

I will speak to Don on Silent Phone and ask him to send a response asking for a little more money.

With the payments of about $2.35 million a year for 2015 and 2016, Don will be completely bought out including his Founding Partners investments.

In return we will take the Wedge and Pilot bank balances and Don will pay about $444K for the FP shares.

All that cash will end up in the Outdoor Rehabilitation Trust unless you would like it placed elsewhere.

Evatt

**From:** Tangarra Consultants Ltd [mailto:etamine@tangarra.com]
**Sent:** Sunday, June 14, 2015 4:24 PM
**To:** 'Pilot Management Ltd'
**Subject:** Consulting Agreement
**Importance:** High

Don,

I am sorry about the delay in responding to you, however I had asked for a legal review of your consultancy agreement. That review has only just been completed. I have been considering what proposal, if any, I should make.

I believed that you understood the nature and extent of the work I asked you to



**MLATSW_015263**

undertake for St John's Trust Company (PVT) Ltd.  It appears that I was wrong.

My reading of the agreement supported my view that the parameters of the work were covered in the original agreement.

In your email of May 13th you set out the reasons – the valuation work on Reynolds being the primary one – why you believe we ought to come to a different arrangement.

While I believe that our original agreement does cover the work, I do understand your reasons.  In particular, the risk you assume in addressing the valuation of Reynolds.

As we discussed, on the one hand the CEO of Reynolds advises me of a range into which the valuation of Reynolds should fall.  On the other hand, I had a firm offer from Vista, which was about $700-900 million less than that advised by the CEO.

My reason for engaging you to undertake a valuation/industry analysis was that I was concerned about my risk in failing to accept a fair market offer for Reynolds.  It was simply not sufficient that I rely on the advice of the CEO in addition to the other information available to me.  I required an independent analysis.

Having said that I was concerned about my own risk, it seems to me to be wrong that I ask you to undertake this project without acknowledging your own risk.

On that basis, I am prepared to reconsider the terms of the agreement and increase the payments to you over the next two years.  I believe that all the work can, and should, be done in two years.  Of course, there would be an ongoing role as an advisor, but most of the heavy work should be done this year and next.

I cannot, though, offer you a percentage of the valuation of Reynolds or a percentage of the sale price of the company.  Each would result in a payment far in excess what I consider fair compensation for the work being undertaken and the risk you will assume.

I am prepared to offer you the following terms:

MLATSW_015264

1.      Backdated to the start of January 2015, the annual sum of $2.25 million.

2.      This amount will be paid for the years 2015 and 2016 only.

3.      The annual fees will be paid in two installments; one on or before January 15th and the other, on or before July 15th.

4.      An adjustment will be paid on or before June 30th in order to bring the first installment up to date.

5.      For the year 2017 onwards, a annual sum of $200,000 to be paid on or before January 31st each year.

Please advise if these terms are acceptable to you.

If so, I will prepare and amended and restated consulting agreement.

Evatt

MLATSW_015265

| | |
|---|---|
| **From:** | Redfish PC |
| **To:** | "Permit" |
| **Date:** | Tuesday, March 4, 2014 9:18:30 AM |

Bob,

I will be meeting Robert Smith's divorce lawyer in New York on March 17th.

Other than seeing Robert in person, I should not use email or phone to talk to Robert about his divorce.

If you have an opportunity of speaking with him, perhaps you could get an update and let me know before I meet the lawyer.

Evatt

**GOVERNMENT EXHIBIT**

**4:21-CR-009-GCH**

**No. 25**

MLATSW_006702

Evatt,
Don,

This article is somewhat chilling.

I think it may apply only to color printers - but one cannot be sure.  For that reason we for sure never want to use color printers.  We also need to worry about our standard laser printers.

Therefore any document that is created for signature, we must be sure that we never use the original that comes out of a laser printer.

It needs to be run through a standard copy machine first - and the copy used as an original as the copy machine does not have sufficient resolution to copy the encoded dots.

As a reminder - we need to also remember that all copy machine/laser printer paper has encoded into it the manufacturer of that paper as well as the year and month of manufacturer.  For that reason I always set aside some packets of copy paper with dates on them - for potential future use.

Bob

**GOVERNMENT EXHIBIT**

4:21-CR-009-GCH

No. 26

Message
_____

**From**:      Evatt Tamine (Tangarra) [etamine@tangarra.com]
**Sent**:      8/13/2015 12:01:33 PM
**To**:        Stuart C. Yudofsky (stuarty@bcm.tmc.edu) [stuarty@bcm.tmc.edu]
**Subject**:

Dear Stuart,

I hope that you are enjoying summer and that Houston is not too hot.

On behalf of the Trust, I am establishing a foundation that will support medical research.  I hope that this new foundation, if established correctly from the start, would support worthy projects for generations to come.

I should be grateful for an opportunity to speak with you about joining the Board of Advisors for the new foundation.

Apart from the great enjoyment I would take in seeing you on a more regular basis in the future, I think it would be difficult to find a better person to help establish and direct the foundation.

If this is something that might interest you, please let me know when would be a good time for a call?

Kind regards

Evatt



**GOVERNMENT EXHIBIT**

**4:21-CR-009-GCH**

**No. 27**

ET_0002071945

AO 110  (Rev. 06/09) Subpoena to Testify Before a Grand Jury

Thurs GJ 16-1 2016r00733 -  kt

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

## SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:  Vista Funds, LLC

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: | United States District Court<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br>Grand Jury Room A - 17th Floor | Date and Time:<br><br>10/06/2016 9:30 am |
|---|---|---|

This Grand Jury Subpoena is issued in furtherance of a Federal criminal investigation being conducted under the supervision of this office.  This is to clarify that there is sufficient reason to believe that notification of this subpoena and your compliance therewith, or disclosure of the information provided thereunder, could seriously impede and thwart this important investigation.  Therefore, you are requested to withhold disclosure/notification for an indefinite period of time.

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

Please see attachment.

In lieu of personal appearance before the Grand Jury, the documents requested in the attachment may be delivered in an electronic storage format (CD, flash storage device, etc.) to:

IRS-Criminal Investigation
Attn: Ted Lair, Special Agent
1999 Broadway Street, 27th Floor
Denver, CO 80202
Tel. (303) 603-4906



**GOVERNMENT
EXHIBIT**

**4:21-CR-009-GCH**

**No. 28**

Date:  ___09/15/2016___

*CLERK OF COURT*

Susan Y. Soong

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:

| This  subpoena is issued on application of the United States of America<br><br>BRIAN J. STRETCH<br>United States Attorney | MICHAEL PITMAN, AUSA<br>U.S. Attorney's Office<br>150 Almaden Blvd., Ste #900<br>San Jose, California 95113<br>Telephone: (408) 535-5040 | |

ATTACHMENT TO SUBPOENA ISSUED TO: Vista Funds, LLC

With respect to the entities listed in Part A please provide the documents listed in Part B from the formation of the entity through December 31, 2015, unless otherwise specified

Part A

1.  Vista Equity Partners
2.  Vista Equity Partners III, LLC
3.  Vista Equity Partners Fund III GP, LLC
4.  Vista Foundation I GP, LLC
5.  Vista Equity Partners Fund IV GP, LLC
6.  Vista Foundation Fund II GP, LLC
7.  Vista Credit Opportunities Fund I GP, LLC
8.  Vista Investment Partners Fund GP, LLC
9.  Vista Equity Fund II GP, LLC
10. Vista Equity Partners Fund IV GP (Cayman), LP

Part B

1.  Detailed General Ledger for the period January 1, 2008 through December 31, 2015

2.  Audited Financial Statements, including supporting work papers; or, if audited financial statements were not prepared, provide unaudited financial statements as of each fiscal year end for the period January 1, 2008 through December 31, 2015

3.  Copies of filed federal income tax returns, including supporting work papers for the period January 1, 2008 through December 31, 2015

4.  Articles of incorporation, partnership agreements, and any other document or correspondence, including e-mails, that discusses the formation or dissolution of the entity (excluding any documents or correspondence related to institutional investors)

5.  Any and all documents and correspondence, including bank statements, debit and credit items, and wire transfer advices, (excluding any documents or correspondence regarding institutional investors), related to: (a) the formation of the entity; (b) identity of owners/partners; (c) amount and source of initial and subsequent capital contributions; (d) distributions of income or capital; and (e) sale of ownership interests

6.  Documents referencing Flash Holdings, LLC, or Excelsior Trust.

14330489.1

As used in this attachment, the term "documents" means all records and forms of expression in your possession, custody, or control, whether originals, drafts or finished versions, or annotated or nonconforming copies, and however created, produced or stored (manually, mechanically, electronically or otherwise, and by whomever prepared, produced, sent, dated or received, including without limitation, documents, books, papers, work papers, files, permanent files, personnel files, notes, review notes, confirmations, account statements, order tickets, correspondence, memoranda, reports, records, journals, registers, analyses, plans, manuals, policies, ledger sheets, schedules, invoices, telegrams, faxes, telexes, wires, electronic mail message, telephone logs, telephone messages, message slips, minutes, notes or records or transcriptions of conversations or communications or meetings, tape recordings, disks, and other electronic media, microfilm, microfiche, storage devices, press releases, contracts, agreements, calendars, date books, appointment books, diaries, notices bank statements, summaries, wire transfers, checks, drafts for money, bills, billing files, and records of payments.

# TRIP ITINERARY



**SOLAIRUS** AVIATION

| | | | | | |
|---|---|---|---|---|---|
| Trip Number: | 3355 | Client: | Hardwick Properties, LLC | Rep: | Jeanne Zeto |
| Trip Date(s): | 9/3/2018 to 9/10/2018 | Primary Contact: | Robert Theron Brockman | Rep Phone: | 800-359-7861 |
| AC Tail Number: | N529DB | | | Fax: | 707-781-8009 |
| AC Type: | GLOBAL 6000 | | | Email: | handlers@solarius.aero |
| Regulatory: | Part 135 | | | | |

| LEG # | FROM | TO | DEPARTURE DATE | DEPARTURE DAY | ETD | ETA | ETE |
|---|---|---|---|---|---|---|---|
| 1 | KIAH / HOUSTON, TX | PANC / ANCHORAGE, AK | 9/3/2018 | Mon | 9:30 AM | 1:12 PM | 6:42 |
| 2 | PANC / ANCHORAGE, AK | KIAH / HOUSTON, TX | 9/10/2018 | Mon | 9:00 AM | 5:54 PM | 5:54 |

| Crew | 1 | 2 |
|---|---|---|
| PIC Charles Zeto 281-728-8395 | X | X |
| SIC Mark Racine 630-715-7077 | X | X |
| CSR Kathryn Maakestad 346-241-2781 | X | X |

| Passengers | 1 | 2 |
|---|---|---|
| Brockman, Robert Theron [Lead] | X | X |
| Nalley, Robert [Lead] | X | X |
| Barras, Norman | X | X |
| Cappel, Edward | X | X |
| Cooper, Carlan Max | X | X |
| Deaton, Alfred L. | X | X |
| Doggett, Joe | X | X |
| Harper, Tommy | X | X |
| Kirwan, Jerry | X | X |
| Massey, Fred | X | X |
| McCord, Charles | X | X |
| Yudofsky, Stuart | X | X |
| Total Passengers | 12 | 12 |

**GOVERNMENT EXHIBIT**

**4:21-CR-009-GCH**

**No. 29**

08/27/2018 09:42

# TRIP ITINERARY



| Trip Number: | 3355 | Client: | Hardwick Properties, LLC | Rep: | Jeanne Zeto |
|---|---|---|---|---|---|
| Trip Date(s): | 9/3/2018 to 9/10/2018 | Primary Contact: | Robert Theron Brockman | Rep Phone: | 800-359-7861 |
| AC Tail Number: | N529DB | | | Fax: | 707-781-8009 |
| AC Type: | GLOBAL 6000 | | | Email: | handlers@solairus.aero |
| Regulatory: | Part 135 | | | | |

## LEG 1

| DEPART | HOUSTON, TX (KIAH) | ARRIVE | ANCHORAGE, AK (PANC) | ETE: 6:30 | PIC: Charles E. Zeto |
|---|---|---|---|---|---|
| 9/3/2018 | George Bush Intercontinental Houston | 9/3/2018 | Ted Stevens Anchorage International | 2,832 NM | SIC: Mark L. Racine |
| 9:30 AM | ATLANTIC EXECUTIVE | 1:12 PM | SIGNATURE FLIGHT SUPPORT EXECUTIVE | TZC: -3 | CSR: Kathryn M. Maakestad |
| | 17001 JFK BLVD, Houston, TX 77032 | | 6231 S Airpark Place, Anchorage, AK 99502 | | |
| | 281-230-3600 | | +1 907 243 7627 | | |

### PASSENGERS

| | | |
|---|---|---|
| Brockman, Robert Theron  (L) | Nalley, Robert Maxey (L) | Barras, Norman  Thomas |
| Cappel, Edward Hussion | Cooper, Carlan Max | Deaton, Alfred L. |
| Doggett, Joe | Harper, Tommy | Kirwan, Jerry |
| Massey, Fred | McCord, Charles | Yudofsky, Stuart Charles |

| SERVICES KIAH | PHONE | DETAILS |
|---|---|---|
| CATERING | | BY FLIGHT ATTENDANT |
| | | > Standard Breakfast will be served |
| | | |
| | | > Make-Your-Own Sandwiches for Lunch |
| | | * Ham, Turkey, Tuna, Egg Salad |
| | | * Asst. Bread and Rolls |
| | | * Condiments & Pickles |
| | | * Potato Salad |
| | | * Cookies for Dessert |
| STATUS: Confirmed | | |
| SERVICES PANC | PHONE | DETAILS |
| GROUND TRANSPORTATION | | ARRANGED BY CLIENT |
| | | |
| | | ANCHORAGE CHARTER: Iliamna Air Taxi - 907-571-1248 (Nancy LaPorte) |
| | | |
| | | Scheduled to depart Signature Executive in Two (2) Pilatus to Nondalton at 2:00pm local |
| | | Flight time is approx 1:00 hour to fishing camp |
| | | |
| | | Pilatus will return to Nondalton on the 10th for a 7:00p deaprture back to Anchorage |
| STATUS: Confirmed | | |

# TRIP ITINERARY



| | | | | | |
|---|---|---|---|---|---|
| Trip Number: | 3355 | Client: | Hardwick Properties, LLC | Rep: | Jeanne Zeto |
| Trip Date(s): | 9/3/2018 to 9/10/2018 | Primary Contact: | Robert Theron Brockman | Rep Phone: | 800-359-7861 |
| AC Tail Number: | N529DB | | | Fax: | 707-781-8009 |
| AC Type: | GLOBAL 6000 | | | Email: | handlers@solairus.aero |
| Regulatory: | Part 135 | | | | |

## LEG 2

| DEPART | ANCHORAGE, AK (PANC) | ARRIVE | HOUSTON, TX (KIAH) | ETE: 5:42 | PIC: Charles E. Zeto |
|---|---|---|---|---|---|
| 9/10/2018 | Ted Stevens Anchorage International | 9/10/2018 | George Bush Intercontinental Houston | 2,832 NM | SIC: Mark L. Racine |
| 9:00 AM | SIGNATURE FLIGHT SUPPORT EXECUTIVE | 5:54 PM | ATLANTIC EXECUTIVE | TZC: 3 | CSR: Kathryn M. Maakestad |
| | 6231 S Airpark Place, Anchorage, AK 99502 | | 17001 JFK BLVD, Houston, TX 77032 | | |
| | +1 907 243 7627 | | 281-230-3600 | | |

PASSENGERS

| | | |
|---|---|---|
| Brockman, Robert Theron  (L) | Nalley, Robert Maxey (L) | Barras, Norman  Thomas |
| Cappel, Edward Hussion | Cooper, Carlan Max | Deaton, Alfred L. |
| Doggett, Joe | Harper, Tommy | Kirwan, Jerry |
| Massey, Fred | McCord, Charles | Yudofsky, Stuart Charles |

| SERVICES PANC | PHONE | DETAILS |
|---|---|---|
| CATERING | | BY FLIGHT ATTENDANT |
| | | > Standard Breakfast will be served |
| | | |
| | | > Make-Your-Own Sandwiches for Lunch |
| | | * Ham, Turkey, Tuna, Egg Salad |
| | | * Asst. Bread and Rolls |
| | | * Condiments & Pickles |
| | | * Potato Salad |
| | | * Cookies for Dessert |
| STATUS: Confirmed | | |
| CONFIRMATION#: BY FLIGHT ATTENDANT | | |
| GROUND TRANSPORTATION | | ARRANGED BY CLIENT |
| | | |
| | | ANCHORAGE CHARTER: Iliamna Air Taxi - 907-571-1248 (Nancy LaPorte) |
| | | |
| | | Pilatus will depart at 7:00 pm local back to Anchorage |
| STATUS: Confirmed | | |

Prohibited Items List
The following list is provided to assist in determining what items are prohibited onboard an aircraft. This is not an all-inclusive list and there may be other items found at the screening location that could easily be used as offensive or defensive weapons and should not be permitted onboard an aircraft.

- The screener must notify his/her supervisor who in turn will notify the GSC or authorized air carrier representative and ELO if the screener finds a prohibited item identified with an asterisk *
- The screening supervisor may resolve all other items
- The GSC or authorized air carrier representative may require that other items be referred to the LEO based on local laws or statues.

A. Guns and Firearms
(1) BB guns*
(2) Compressed air guns
(3) Firearms*
(4) Flare pistols*
(5) Gun lighters*
(6) Parts of guns and firearms*
(7) Pellet guns*
(8) Realistic replicas of firearms*
(9) Spear guns*
(10) Starter pistols*
(11) Stun guns/ cattle prods/ shocking devices*

C. Club-like Items
(1) Baseball bats
(2) Billy clubs*
(3) Blackjacks*
(4) Brass knuckles*
(5) Cricket bats
(6) Reserved
(7) Golf clubs
(8) Reserved
(9) Hockey sticks
(10) Lacrosse sticks
(11) Martial arts weapons, including numchucks and kubatons*
(12) Night sticks*
(13) Pool cues
(14) Ski poles
(15) Reserved

E. Incendiaries
(1) Aerosol, any, except for personal care or toiletries in limited quantities
(2) Fuels, including cooking fuels and any flammable liquid fuel
(3) Gasoline
(4) Gas torches, including micro-torches and torch lighters
(5) Lighter fluid
(6) Strike-anyway matches
(7) Turpentine and paint thinner
(8) Realistic replicas of incendiaries
(9) All lighters

G. Tools
(1) Crowbars
(2) Drills and drill bits (including: cordless portable power saws)
(3) Hammers
(4) Saws and saw blades (including: cordless portable power saws)
(5) Other tools greater than 7 inches in length (including: pliers,

B. Sharp Objects
(1) Axes and hatchets
(2) Bows and arrows*
(3) Reserved
(4) Ice axes/ ice picks
(5) Knives of any length, except rounded-blade butter and plastic cutlery
(6) Meat cleavers
(7) Razor-type blades (such as: box cutters, utility knives, and razor blades not in a cartridge) but excluding safety razors
(8) Sabers*
(9) Reserved
(10) Scissors, metal with pointed tips and a blade length greater than 4 inches as measured from the fulcrum
(11) Reserved
(12) Swords*
(13) Throwing stars (martial arts)*

D. All Explosives, including:
(1) Ammunition*
(2) Blasting caps*
(3) Dynamite*
(4) Fireworks*
(5) Flares in any form
(6) Gunpowder*
(7) Hand grenades*
(8) Plastic explosives*
(9) Realistic replicas of explosives*

F. Disabling Chemicals and Other Dangerous Items
(1) Chlorine for pools and spas
(2) Cylinders containing compressed gas, including fire extinguishers
(3) Liquid bleach
(4) Mace
(5) Pepper spray
(6) Spillable batteries, except those in wheelchairs
(7) Spray paint
(8) Tear gas*

08/27/2018 09:42