HIGHLY CONFIDENTIAL

Page 1

1              IN THE UNITED STATES DISTRICT COURT

             FOR THE NORTHERN DISTRICT OF ILLINOIS

2                      EASTERN DIVISION

3                               )

   IN RE: DEALER MANAGEMENT    ) MDL NO. 2817

4   SYSTEMS ANTITRUST          )

   LITIGATION,                 ) CASE NO. 18 C 864

5                               )

6

7

8      ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN

9         Highly Confidential - Attorneys' Eyes Only

10                    January 16, 2019

11                        VOLUME 1

12

13      ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN,

14   produced as a witness at the instance of the

15   PLAINTIFF(S), and duly sworn, was taken in the

16   above-styled and numbered cause on the 16th day of

17   January, 2019, from 9:30 a.m. to 2:56 p.m., via

18   telephone, before Shauna L. Beach, RDR, CRR, CSR in and

19   for the State of Texas, reported by machine shorthand,

20   at the law offices of Gibbs & Bruns, LLP, 1100

21   Louisiana, Suite 5300, Houston, Texas 77002, pursuant to

22   the Federal Rules of Civil Procedure and the provisions

23   stated on the record or attached hereto.

24

25



GOVERNMENT
EXHIBIT

4:21-CR-009-GCH
No. 36

FTC-0000970

HIGHLY CONFIDENTIAL

## Page 2

1  A P P E A R A N C E S
2  FOR THE REYNOLDS AND REYNOLDS COMPANY AND THE WITNESS:
3    AUNDREA K. GULLEY
      BRICE WILKINSON
4    Gibbs & Bruns, LLP
      1100 Louisiana
5    Suite 5300
      Houston, Texas  77002
6    agulley@gibbsbruns.com
      bwilkinson@gibbsbruns.com
7
     FOR THE REYNOLDS AND REYNOLDS COMPANY AND THE WITNESS:
8
      MICHAEL P.A. COHEN
9    Sheppard Mullin
      2099 Pennsylvania Avenue
10   Suite 100
      Washington, D.C. 20006-6801
11   mcohen@sheppardmullin.com
12  FOR AUTHENTICOM, COX AUTOMOTIVE AND ITS NAMED PLAINTIFF
     SUBSIDIARIES, MDSC, AUTOLOOP AS A REPRESENTATIVE OF THE
13  VENDOR CLASS:
14   MICHAEL N. NEMELKA
      Kellogg Hansen Todd Figel & Frederick
15   Sumner Square
      1615 M Street, N.W., Suite 400
16   Washington, D.C. 20036
      mnemelka@kellogghansen.com
17   jlong@kellogghansen.com
18  FOR THE DEALERSHIP CLASS PLAINTIFFS:
19   PEGGY J. WEDGWORTH
      ROBERT WALLNER (appearing telephonically)
20   JOHN HUGHES
      Milberg Tadler Phillips Grossman, LLP
21   One Pennsylvania Plaza
      19th Floor
22   New York, New York  10119
      pwedgworth@milberg.com
23   rwallner@milberg.com
24
25

## Page 3

1  A P P E A R A N C E S
2  FOR CDK GLOBAL:
3    MARK RYAN
      Mayer Brown
4    1999 K Street, N.W.
      Washington, DC 20006-1101
5    mryan@mayerbrown.com
6  ALSO PRESENT:
7    SCOTT CHERRY
      Vice President - General Counsel at The Reynolds
8    and Reynolds Company
9    Joseph Long
      Kellogg Hansen Todd Figel & Frederick
10
      Ben Harwood, Videographer
11
12
13
14
15
16
17
18
19
20
21      Veritext Legal Solutions
           Mid-Atlantic Region
           1250 Eye Street NW - Suite 350
22      Washington, D.C.  20005
23
24
25

## Page 4

1              INDEX
                            PAGE
2
     Appearances                    2
3
4  ROBERT BROCKMAN
5  Examination by Mr. Nemelka          9
6
     Signature and Changes          164
7
     Reporter's Certificate          165
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 5

1          PLAINTIFF EXHIBITS
     NO.   DESCRIPTION          PAGE
2
3  Exhibit 636 Brockman On the Record publication   25
4  Exhibit 637 Website screenshot Fuel Ideas to     27
      Drive
5  Exhibit 638 Article Automotive News dated        32
      February 19, 2007
6
     Exhibit 639 Data Agreement           44
      REYMDL00716766 - REYMDL00716767
8  Exhibit 640 Email chain ending with email to     57
      Ronald Lamb from Bob Brockman dated
9    September 20, 2013
      REYMDL00200760 - REYMDL00200761
10   Highly Confidential - Attorneys'
      Eyes Only
11
     Exhibit 641 Email chain ending with email to     63
12   Howard Gardner from Robert Schaefer
      dated 11/25/2013
13   CDK_CID_00569545 - CDK_CID_00569547
      Confidential
14   Highly Confidential
15  Exhibit 642 Notes                     74
      Long Standing issues around
16   security
      REYMDL00260942 - REYMDL00260943
17   Highly Confidential - Attorneys'
      Eyes Only
18
     Exhibit 643 Email to Bob Brockman from Steve     82
19   Anenen dated 7/2/2014
      CDK_CID_01535307 - CDK_CID_01535308
20   Confidential
      Highly Confidential
21
     Exhibit 644 Notes - Sales Meeting - July 14,     92
22   2014
      REYMDL00261631 - REYMDL00261635
23   Highly Confidential - Attorneys'
      Eyes Only
24
25

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 6

PLAINTIFF EXHIBITS
NO.    DESCRIPTION        PAGE

Exhibit 645 Email chain ending with email to    106
Ron Workman from Robert Schaefer
dated 1/6/2015
CDK_CID_00242098 - CDK_CID_00242099
Confidential
Highly Confidential

Exhibit 646 Email chain ending with email to    107
Bob Brockman from Robert Schaefer
dated January 11, 2015
REYMDL00565070 - REYMDL00565071
Highly Confidential -
Attorneys' Eyes Only

Exhibit 647 Data Exchange Agreement    111
REYMDL00014384 - REYMDL00014396
Confidential

Exhibit 648 Email chain ending with email to    123
Craig Moss from Dan Agan dated May
12, 2015
REYMDL00652128 - REYMDL00652133
Highly Confidential - Attorneys'
Eyes Only

Exhibit 649 Email chain ending with email to    126
Tommy Barras from Bob Brockman
dated August 22, 2015
REYMDL00044042 - REYMDL00044043
Highly Confidential - Attorneys'
Eyes Only

Exhibit 650 Email to Bob Brockman from Tommy    129
Barras dated July 7, 2017
REYMDL00226199 - REYMDL00226200.002
Highly Confidential - Attorneys'
Eyes Only

Exhibit 651 Email to Bob Brockman from Craig    134
Moss dated August 25, 2017
REYMDL00720415 - REYMDL00720511
Highly Confidential - Attorneys'
Eyes Only

Page 7

PLAINTIFF EXHIBITS
NO.    DESCRIPTION        PAGE

Exhibit 652 Email to Robert Schaefer from Bob    141
Brockman dated April 14, 2016
REYMDL00238133
Highly Confidential - Attorneys'
Eyes Only

Exhibit 653 Email chain ending with email to    143
Schaefer from Bob Brockman dated
April 19, 2017
REYMDL00138479
Highly Confidential - Attorneys'
Eyes Only

Exhibit 654 Email to Bob Brockman from Robert    144
Schaefer dated November 10, 2015
REYMDL00044241 - REYMDL00044242
Highly Confidential - Attorneys'
Eyes Only

Exhibit 655 Email chain ending with email to    153
Tommy Barras from Bob Brockman
dated August 15, 2017
REYMDL00263558
Highly Confidential - Attorneys'
Eyes Only

Exhibit 656 Email chain ending with email to    158
Keith Hill from Bob Brockman dated
November 28, 2017
REYMDL00263619
Highly Confidential - Attorneys'
Eyes Only

Page 8

P R O C E E D I N G S

THE VIDEOGRAPHER:  Good morning.  We are on the record at 9:30 a.m. on January 16th, 2019.  This is the video recorded deposition of Mr. Robert Brockman in the matter of In Re: Dealer Management Systems Antitrust Litigation in the United States District Court for the Northern District of Illinois in the Eastern Division. This deposition is being held at Gibbs & Bruns, LLP, located at 1100 Louisiana Street, Suite 5300, in Houston, Texas 77002.

My name is Ben Harwood, and I'm the videographer present on behalf of Veritext.  The court reporter is Shauna Beach, also present on behalf of Veritext.

Will counsel please state their appearance and firm affiliation for the record.

MR. NEMELKA:  My name is Mike Nemelka with the law firm of Kellogg Hansen Todd Figel & Frederick. I'm here on behalf of Authenticom, Cox Automotive and its named plaintiff subsidiaries, MDSC, Autoloop as a representative of the vendor class.  And with me today is my colleague, Joe Long.

MS. WEDGWORTH:  Peggy Wedgworth, Milberg Tadler Phillips Grossman, on behalf of the dealership class plaintiffs.

Page 9

MR. HUGHES:  John Hughes, Milberg Tadler Phillips Grossman on behalf of dealership class plaintiffs.

MS. GULLEY:  Andi Gulley, Gibbs & Bruns, for the witness.

MR. WILKINSON:  Brice Wilkinson, Gibbs & Bruns.

MR. CHERRY:  Scott Cherry, general counsel for Reynolds and Reynolds.

MR. COHEN:  Michael Cohen, Sheppard Mullin, for defendant the Reynolds and Reynolds Company and the witness, Mr. Brockman.

MR. RYAN:  Mark Ryan from Mayer Brown on behalf of CDK Global.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness and we may proceed.

ROBERT BROCKMAN, having been first duly sworn, testified as follows:

EXAMINATION
BY MR. NEMELKA:

Q.  Good morning, Mr. Brockman.  My name is Mike Nemelka.  And it's my opportunity to ask you some questions today.  Could you please state your full name for the record.

A.  It's Robert Theron Brockman.

3 (Pages 6 - 9)

FTC-0000972

HIGHLY CONFIDENTIAL

Page 10

1    Q. And where do you live?
2    A. Houston.
3    Q. And what is your address?
4    A. ▓▓▓▓▓▓▓ Houston 77024.
5    Q. Do you own property anywhere else?
6        MS. GULLEY: Objection; form.
7    A. My wife and I own a townhouse that our son
8 lives in. It's ▓▓▓▓▓▓
9    Q. (By Mr. Nemelka) Do you own property in any
10 other states besides Texas?
11       MS. GULLEY: Objection; form.
12   A. No.
13   Q. (By Mr. Nemelka) Does any entity that you have
14 control over own property anywhere else?
15       MS. GULLEY: Objection; form.
16   A. Reynolds and Reynolds owns two locations in
17 Ohio. One is the Reynolds and Reynolds main
18 headquarters, and the other one is a forms manufacturing
19 plant.
20   Q. (By Mr. Nemelka) Do you own property in Aspen,
21 Colorado?
22       MS. GULLEY: Objection; form.
23   A. No.
24   Q. (By Mr. Nemelka) Do you have -- is there
25 property there that you visit from time to time?

Page 11

1        MS. GULLEY: Objection; form.
2    A. Yes. There's property that I lease.
3    Q. (By Mr. Nemelka) That you lease. And who do
4 you lease it from?
5        MS. GULLEY: Objection; form.
6    A. It's called Mountain Queen, Inc.
7    Q. (By Mr. Nemelka) Do you have any ownership
8 interest in Mountain Queen, Inc.?
9    A. No.
10   Q. Okay. Did you prepare for your deposition
11 today?
12   A. Yes. I talked to my attorneys and reviewed
13 exhibits.
14       MS. GULLEY: Stop. Don't reveal the
15 subject of -- of attorney-client communication.
16   Q. (By Mr. Nemelka) And when did you prepare for
17 your deposition today?
18   A. Yesterday and the day before.
19   Q. And how long each day did you meet?
20   A. I'm sorry, I didn't keep track of the time.
21   Q. Was it a full day or half day?
22   A. It was probably in between.
23   Q. So three-fourths of the day, each day?
24       MS. GULLEY: Objection; form.
25   A. Yes.

Page 12

1    Q. (By Mr. Nemelka) And with whom did you meet?
2 With whom did you meet?
3    A. Andi Gulley, Bryce, Scott Cherry, Michael.
4    Q. Were any attorneys for CDK present?
5    A. No.
6    Q. Was there anybody else from Reynolds present?
7    A. Yes. We had a -- one other attorney from
8 Reynolds.
9    Q. And who was that?
10   A. John -- I'm blanking on his last name. He
11 works for Scott Cherry.
12   Q. Okay. Any businesspeople from Reynolds present
13 when you prepared for the deposition?
14   A. No.
15   Q. Did you talk to anybody at Reynolds about your
16 deposition?
17   A. No. Other than the fact they know that I'm
18 here.
19   Q. Correct. Have you ever been deposed before?
20   A. Yes.
21   Q. How many times?
22   A. I don't recall the last time. Some time ago.
23   Q. Uh-huh. Well, so this isn't your first --
24 first rodeo, but just a few -- few ground rules to help
25 us get through the day efficiently. I'm going to do my

Page 13

1 best not to talk over you, and if you will just let me
2 finish my question, and then I'll give you time to
3 answer it. So let's try not to talk over each other,
4 okay?
5    A. Yes.
6    Q. And please let me know if you don't understand
7 a question. If you answer, then we'll consider that you
8 understood the question. Okay?
9    A. Yes.
10   Q. Your counsel may object, but you still have to
11 answer the question unless your counsel instructs you
12 not to. And so even though your counsel may object,
13 unless he instructs you not to answer, please still
14 answer my questions, okay?
15   A. Yes.
16   Q. I understand that you may have been having
17 some -- you've had some health issues, and this is -- so
18 this is not an endurance test. If you need a break, you
19 can take one. Okay?
20   A. Yes.
21   Q. I would just ask that, before taking a break,
22 if you would -- if you would just finish answering a
23 question if a question is pending. Is that okay?
24   A. Yes.
25   Q. And -- but I'll still plan on trying to take a

4 (Pages 10 - 13)

FTC-0000973

HIGHLY CONFIDENTIAL

Page 14

1  break about every hour, for me as well as for you.  But
2  if you need one in shorter intervals, that's fine.
3  Okay?
4      A.  Thank you.
5      Q.  Is there any reason that you can't provide
6  truthful testimony today?
7      A.  No.
8      Q.  Okay.  You graduated from the University of
9  Florida, College of Business; correct?
10     A.  Yes.
11     Q.  Class of 1963?
12     A.  Yes.
13     Q.  And after graduating from the University of
14  Florida, you worked at the Ford Motor Company for about
15  two years; is that right?
16     A.  Yes, a little short of two years.
17     Q.  And then after Ford you joined IBM; is that
18  right?
19     A.  Yes.
20     Q.  And you were a successful salesperson there;
21  correct?
22     A.  Yes.
23     Q.  And I -- I think I understand that you sold
24  data processing services, in part; is that right?
25     A.  Yes.

Page 15

1      Q.  And you were at IBM until about 1970, at which
2  point you left IBM and founded Universal Computer
3  Services, Inc.; is that right?
4      A.  Yes.
5      Q.  And you -- impressively -- taught yourself
6  computer programming around this time as well; is that
7  right?
8      A.  Yes.
9      Q.  And eventually, UCS developed and provided
10  dealership management system software to car
11  dealerships; is that right?
12     A.  Yes.
13     Q.  And, in fact, you were personally involved in
14  the programming of some of the dealership management
15  software that was sold -- licensed to dealers; is that
16  right?
17     A.  Yes.
18     Q.  And over the 1980s, 1990s and 2000s, you
19  continued to run UCS, right?
20     A.  Yes.
21     Q.  UCS served, primarily, large dealerships; is
22  that right?
23     A.  Yes.
24     Q.  And was the DNS that UCS marketed -- was it
25  called the PowerDNS?

Page 16

1      A.  Not originally, but later in its existence, it
2  was called Power.
3      Q.  And then in August 2006, UCS acquired the
4  Reynolds and Reynolds Company; is that right?
5      A.  It was a different date.
6      Q.  Different date?  It was -- oh, it was in 2006,
7  though?
8      A.  Yes.
9      Q.  What -- what was the month?
10     A.  October.
11     Q.  October.  Thank you.  And UCS paid 2.8 billion
12  in cash; is that right?
13     A.  Yes.
14     Q.  And prior to the deal, Reynolds was a public
15  company, right?
16     A.  Yes.
17     Q.  But with the acquisition, Reynolds became a
18  wholly-owned subsidiary of UCS; correct?
19     A.  It's -- that's not the correct company.  It's
20  called Dealer Computer Services.
21     Q.  And Dealer Computer Services was the -- was the
22  holding company that owned Reynolds?
23     A.  Yes.
24     Q.  Okay.  And the top-level holding company of --
25  of Reynolds is Universal Computer Systems Holdings,

Page 17

1  Inc.; is that right?
2      A.  Yes.
3      Q.  And the A. Eugene Brockman Charitable Trust
4  owns about 96 percent of that holding company; is that
5  right?
6          MS. GULLEY:  Form.
7      A.  No.  That's not correct.  The -- the ownership
8  structure is different than that.
9      Q.  (By Mr. Nemelka)  Okay.  And what is the
10  ownership structure?
11         MS. GULLEY:  Objection; form.
12     A.  The Universal Computer Systems Holding, Inc.,
13  is owned by Spanish Steps.
14     Q.  (By Mr. Nemelka)  Okay.  When was Spanish Steps
15  formed?
16     A.  I'm sorry.  I -- I don't know the answer to
17  that.
18     Q.  And who owns Spanish Steps?
19     A.  The A. Eugene Brockman Charitable Trust.
20     Q.  And what percentage of Spanish Steps does the
21  charitable trust own?
22         MS. GULLEY:  Form.
23     A.  Again, I don't know the answer to that.  I
24  believe it's, substantially, all.
25     Q.  (By Mr. Nemelka)  Substan-- does 96 percent

5 (Pages 14 - 17)

FTC-0000974

HIGHLY CONFIDENTIAL

Page 18

1  sound about right to you?
2        MS. GULLEY:  Objection; form.
3     A.  Yeah, I -- I can't guess at that.
4     Q.  (By Mr. Nemelka)  Is it between -- is it -- is
5  it in the 90s, the percentage?
6        MS. GULLEY:  Objection; form.
7     A.  I believe so.
8     Q.  (By Mr. Nemelka)  Are there any other owners of
9  Spanish Steps besides the Eugene Brockman Charitable
10  Trust?
11        MS. GULLEY:  Objection; form.
12     A.  Yes.
13     Q.  (By Mr. Nemelka)  And who are they?
14        MS. GULLEY:  Form.
15     A.  Norman Thomas Barras and Terry Jones.  That's
16  all.
17     Q.  (By Mr. Nemelka)  That's all?  And do they --
18  their ownership interest is about .8 -- is it 0.08
19  percent?  Is that right?
20        MS. GULLEY:  Form.
21     Q.  (By Mr. Nemelka)  Or 0.008 percent; is that
22  right?
23     A.  It's 8/10ths of a percent.
24        MS. GULLEY:  Form.
25     Q.  (By Mr. Nemelka)  8/10ths of a percent,

Page 19

1  correct.  And there are no other owners besides those
2  two and the charitable trust; is that right?
3        MS. GULLEY:  Form.
4     A.  That's correct.
5     Q.  (By Mr. Nemelka)  So 8/10ths of a percent -- so
6  times that by -- by two, and then the rest of it is
7  owned by the charitable trust; is that right?
8        MS. GULLEY:  Form.
9     A.  I believe that's correct.
10     Q.  (By Mr. Nemelka)  So we're talking upwards of
11  98 -- 98 percent of the -- of the company, right?
12        MS. GULLEY:  Form.
13     A.  That's correct.
14     Q.  (By Mr. Nemelka)  Okay.  And this is an
15  offshore trust; correct?
16     A.  That's correct.
17     Q.  Where is it based?
18     A.  Bermuda.
19     Q.  And when was the trust created?
20        MS. GULLEY:  Objection; form.
21     A.  1981.
22     Q.  (By Mr. Nemelka)  Who were the trustees of the
23  trust?
24        MS. GULLEY:  Objection; form.
25     A.  There's a trust company called St. Johns Trust

Page 20

1  Company.
2     Q.  (By Mr. Nemelka)  Are they the only trustees of
3  the trust?
4     A.  Yes.
5     Q.  And who appointed them as trustees of the
6  trust?
7        MS. GULLEY:  Objection; form.
8     A.  They were not the original trust company.
9  There's been a -- there's -- it was -- the original
10  trust company was Bank of Bermuda.
11     Q.  (By Mr. Nemelka)  And who appointed the Bank of
12  Bermuda as trustee?
13        MS. GULLEY:  Objection; form.
14     A.  I'm sorry.  I can't give you an answer on that.
15  I'm not familiar with how trusts -- trusts get set up.
16     Q.  (By Mr. Nemelka)  Could St. Johns Trust Company
17  be removed as the trustee?
18        MS. GULLEY:  Objection; form.
19     A.  Yes.
20     Q.  (By Mr. Nemelka)  And who -- who has that
21  authority to remove them as trustee?
22        MS. GULLEY:  Objection; form.
23     A.  I -- I don't know the name of the person, but
24  there is the -- there is a trust protector.
25     Q.  (By Mr. Nemelka)  And who is the trust

Page 21

1  protector?
2     A.  I'm sorry.  It's an individual.  I don't know
3  the person's name.
4     Q.  And who appointed the trust protector?
5        MS. GULLEY:  Objection; form.
6     A.  I'm sorry.  I -- I don't know.
7     Q.  (By Mr. Nemelka)  And can the trust protector
8  be removed?
9        MS. GULLEY:  Objection; form.
10     A.  Again, this is an area of law that I'm -- I'm
11  not familiar with.
12     Q.  (By Mr. Nemelka)  And who are the beneficiaries
13  of the trust?
14        MS. GULLEY:  Objection; form.
15     A.  There is myself, my wife, my brother, his wife
16  and all the charities of Bermuda, United States, United
17  Kingdom.
18     Q.  (By Mr. Nemelka)  Excuse me.  What was that
19  last one?  All charities?
20     A.  All -- all charities in the United States and
21  all charities in the United Kingdom.
22     Q.  What does that mean, "all charities"?  Every --
23  every 501c3 organization?
24     A.  Every one of them is -- is a potential
25  beneficiary.

6 (Pages 18 - 21)

FTC-0000975

HIGHLY CONFIDENTIAL

Page 22

1    Q. I see. Does the -- does the trust distribute
2  income to the beneficiaries?
3        MS. GULLEY: Objection; form.
4    A. Yes.
5    Q. (By Mr. Nemelka) How often?
6        MS. GULLEY: Objection; form.
7    A. It depends upon what charitable project that
8  is -- is -- is underway. You know, the only -- the only
9  distributions have been to charitable entities.
10   Q. (By Mr. Nemelka) Those have been the only
11 distributions? To charitable entities?
12   A. Yes, sir.
13   Q. Have you -- have you received any charitable --
14 I mean -- excuse me -- have you received any
15 distributions from the trust?
16   A. No.
17   Q. And how much cash does the trust have?
18       MS. GULLEY: Objection; form.
19   A. I'm sorry. I don't know.
20   Q. (By Mr. Nemelka) Does the trust have any
21 day-to-day oversight responsibilities of the running of
22 the Reynolds and Reynolds Company?
23       MS. GULLEY: Objection; form.
24   A. No.
25   Q. (By Mr. Nemelka) You're the chairman and CEO

Page 23

1  of Reynolds; correct?
2    A. Correct.
3    Q. And as -- your role as chairman and CEO of
4  Reynolds, you have ultimate decision-making authority
5  with respect to the company's practices and policies; is
6  that right?
7        MS. GULLEY: Objection; form.
8    A. Yes.
9    Q. (By Mr. Nemelka) Let's talk a little bit about
10 Reynolds, Mr. Brockman. Reynolds offers dealer
11 management system software to automotive dealers;
12 correct?
13   A. Yes.
14   Q. And it offers two different type of DMSs:
15 ERA-IGNITE and Power; correct?
16   A. Yes.
17   Q. And in the DMS market, CDK is your largest
18 competitor, right?
19   A. Yes.
20   Q. It's fair to say that CDK is Reynolds' chief
21 rival in the DMS market, right?
22   A. Yes.
23       MS. GULLEY: Form.
24   Q. (By Mr. Nemelka) And together you control
25 approximately 75 percent of the DS market for franchised

Page 24

1  dealerships; isn't that right?
2        MS. GULLEY: Objection; form.
3    A. I -- I don't know -- or know how to keep track
4  of exactly what the percentages are, but -- but I would
5  say in that general area.
6    Q. (By Mr. Nemelka) At Reynolds, the DMS has a
7  database component where dealers store their data,
8  right?
9        MS. GULLEY: Objection; form.
10   A. Yes.
11   Q. (By Mr. Nemelka) And dealers generate a lot of
12 data in the course of operating their business; correct?
13   A. Yes.
14   Q. Sales transactions, right?
15       MS. GULLEY: Objection; form.
16   A. Yes.
17   Q. (By Mr. Nemelka) Vehicle inventory?
18   A. Yes.
19       MS. GULLEY: Objection; form.
20   Q. (By Mr. Nemelka) Parts inventory?
21       MS. GULLEY: Objection; form.
22   A. Yes.
23   Q. (By Mr. Nemelka) Information about the
24 dealership's customers, right?
25       MS. GULLEY: Objection; form.

Page 25

1    A. Yes.
2    Q. (By Mr. Nemelka) And data from their service
3  departments; correct?
4        MS. GULLEY: Objection; form.
5    A. Yes.
6    Q. (By Mr. Nemelka) And you agree that the data
7  that dealers generate in running their business is the
8  dealer's, right?
9        MS. GULLEY: Objection; form.
10   A. Yes.
11   Q. (By Mr. Nemelka) You've publicly stated the
12 dealers own their data, right?
13       MS. GULLEY: Objection; form.
14   A. Yes.
15   Q. (By Mr. Nemelka) And you agree that dealers
16 should choose who has access to their data, right?
17       MS. GULLEY: Objection; form.
18   A. Yes.
19   Q. (By Mr. Nemelka) You've publicly told dealers
20 you own your data and choose who you allow access to it,
21 right?
22       MS. GULLEY: Objection; form.
23   A. I'm sorry. I don't remember saying that
24 specific statement.
25       (Exhibit 636 was marked for

7 (Pages 22 - 25)

FTC-0000976

HIGHLY CONFIDENTIAL

Page 26

1        identification.)
2        Q.   (By Mr. Nemelka)  I've marked Plaintiff's
3   Exhibit 636, which I will hand you.  Mr. Brockman, do
4   you recognize this document?
5        A.   Yes.
6        Q.   Was this an -- a public advertisement that
7   you -- that Reynolds issued to the public?
8        A.   This was done approximately 12 years ago.
9        Q.   And was it issued to the public?
10       A.   Yes.
11       Q.   And if you look at the first bullet point
12   there, you say, "You own your data and choose who you
13   allow access to it," right?
14       A.   Yes.
15       Q.   You also told dealers with respect to their
16   data, quote, "You're the boss."  If you look above that;
17   correct?
18       A.   Yes.
19       Q.   And that's a picture of you, there, on that
20   advertisement?
21       A.   Yes.  Good picture, I might add.
22       Q.   Very nice one.
23            And that's your signature at the end?
24       A.   Yes.
25       Q.   Identifying you as the chairman and CEO of

Page 27

1   Reynolds?
2        A.   Correct.
3        Q.   You can put that aside.
4             Reynolds also made similar representations
5   on its website; correct?
6            MS. GULLEY:  Objection; form.
7        A.   Sorry.  I'm not familiar with that.
8            (Exhibit 637 was marked for
9             identification.)
10       Q.   (By Mr. Nemelka)  I've handed you a document
11   I've marked as Exhibit -- Plaintiff's Exhibit 637.
12   Mr. Brockman, this is a printout from the Reynolds
13   website.  Does that look familiar to you?
14           MS. GULLEY:  Objection; form.
15       A.   It says it's Reynolds.  I'm -- I'm personally
16   not familiar with what goes on our website.  That's not
17   something I pay attention to.
18       Q.   (By Mr. Nemelka)  And if you look at the
19   first -- at the top of the -- of the text of this -- of
20   this webpage, it says, "Your Data, Your Way."  Do you
21   see that?
22       A.   Yes.
23       Q.   And then it says, "You own your data.  Reynolds
24   recognizes that you need to share that data outside your
25   dealership."  Do you see that?

Page 28

1            MS. GULLEY:  Objection; form.
2        A.   Yes, I see that.
3        Q.   (By Mr. Nemelka)  So this is consistent with
4   your public statement that -- that business -- excuse
5   me -- strike that.
6            This is consistent with your public
7   statement that we just looked at, that -- that data that
8   dealers generate in operating their business belongs to
9   the dealers, right?
10           MS. GULLEY:  Form.
11       A.   Yes.  It -- you know, where it says, "You own
12   your data.  Reynolds recognizes" -- I see that
13   statement.
14       Q.   (By Mr. Nemelka)  Thank you.  You can put that
15   aside.
16           You're familiar with -- that Reynolds has a
17   standard DMS contract with its dealers; correct?
18       A.   Yes.
19       Q.   And the Reynolds standard DMS contract also
20   recognizes that the dealers own their data; correct?
21       A.   Yes.
22       Q.   It says, quote, Reynolds acknowledges that your
23   business data belongs to you," end quote; correct?
24           MS. GULLEY:  Objection; form.
25       A.   Yes.

Page 29

1        Q.   (By Mr. Nemelka)  Dealers use a lot of software
2   applications besides DMS; correct?
3        A.   I wouldn't characterize it as "a lot."  They
4   certainly use some.
5        Q.   Applications like customer relationship
6   management software, right?
7            MS. GULLEY:  Form.
8        A.   Yes.
9        Q.   (By Mr. Nemelka)  Inventory management;
10  correct?
11           MS. GULLEY:  Form.
12       A.   Umm, are you referring to parts inventory or
13  vehicle inventory?
14           MS. GULLEY:  Form.
15       Q.   (By Mr. Nemelka)  Both.  Vehic- -- let's do
16  vehicle inventory first.
17           MS. GULLEY:  Form.
18       A.   Yes.
19       Q.   (By Mr. Nemelka)  They use software to help
20  them in their service lane; correct?
21           MS. GULLEY:  Form.
22       A.   Yes.
23       Q.   (By Mr. Nemelka)  And their marketing efforts;
24  correct?
25       A.   Yes.

8 (Pages 26 - 29)

FTC-0000977

HIGHLY CONFIDENTIAL

Page 30

1          MS. GULLEY:  Form.
2      Q.  (By Mr. Nemelka)  And these applications need
3  access to dealer data to work, right?
4          MS. GULLEY:  Form.
5      A.  Correct.
6      Q.  (By Mr. Nemelka)  And above, we saw that you
7  publicly told dealers, "You own your data and choose who
8  you allow access to it."  Remember that?
9      A.  Yes.
10     Q.  But that's not quite true, is it, Mr. Brockman?
11         MS. GULLEY:  Objection; form.
12     A.  I disagree.
13     Q.  (By Mr. Nemelka)  You don't let dealers choose
14  who has access to their data, do you?
15         MS. GULLEY:  Objection; form.
16     A.  They -- the dealers have access to their data,
17  you know, on their own.  They can access it through
18  porting facilities that we have.
19     Q.  (By Mr. Nemelka)  But Reynolds, although it's
20  made a lot of exceptions, has taken the position that
21  dealer -- dealers can't grant access to their data to,
22  for example, independent integrators; is that right?
23         MS. GULLEY:  Objection; form.
24     A.  We have a program which is called the Reynolds
25  Certified Interface, which is entered into -- whoever

Page 31

1  they want to share data with, that covers protections of
2  data from a security standpoint.
3      Q.  (By Mr. Nemelka)  You don't let independent
4  integrators, like Authenticom, into the RCI program, do
5  you?
6      A.  We do not.
7      Q.  And so if a dealer wanted to grant access to
8  their data to Authenticom, you don't allow that, do you?
9      A.  They're perfectly free to run reports and --
10  and send those reports in electronic form to
11  Authenticom.
12     Q.  But in terms of access to their data in an
13  automated way, you don't allow that, do you?
14         MS. GULLEY:  Objection; form.
15     A.  As far as unattended access, that's correct.
16  We do not allow that.
17     Q.  (By Mr. Nemelka)  And that's different from
18  what CDK's position once was; correct?
19         MS. GULLEY:  Objection; form.
20     A.  I'm not familiar with what CDK's historical
21  positions have been on this issue.
22     Q.  (By Mr. Nemelka)  You don't know what CDK's
23  practices were?
24     A.  They have lots of different practices.  I'm
25  not -- I'm not an expert in their -- their practices.

Page 32

1      Q.  You knew that CDK did let dealers use
2  independent integrators, right?
3          MS. GULLEY:  Objection; form.
4      A.  Again, I'm -- I'm not knowledgeable about what
5  CDK does or doesn't do in this regard.
6      Q.  (By Mr. Nemelka)  In fact, back in 2007, you
7  said that, from a business standpoint, you -- you
8  couldn't imagine that that was truly CDK's position,
9  right?
10     A.  I'm sorry.  I don't -- I don't remember or
11  recall -- can you give me more information?
12         (Exhibit 638 was marked for
13          identification.)
14     Q.  (By Mr. Nemelka)  I've marked this Exhibit
15  638 -- Plaintiff's 638, which I've handed you.  It's --
16  Automotive News article entitled "Question & Answer:
17  Deal puts Brockman in the spotlight," dated February
18  9th -- 19th, 2007.  Mr. Brockman, do you recognize this
19  Automotive News article?
20         MS. GULLEY:  Objection; form.
21     A.  Not specifically.
22         MS. GULLEY:  You can take a second to
23  review it.
24     Q.  (By Mr. Nemelka)  Did you grant an interview to
25  Automotive News around this time, Mr. Brockman?

Page 33

1          MS. GULLEY:  Objection; form.
2      A.  I believe so.
3      Q.  (By Mr. Nemelka)  And this is an article
4  reflecting the contents of that interview; correct?
5          MS. GULLEY:  Objection; form.
6          You haven't offered him the opportunity to
7  review it.
8          MR. NEMELKA:  Andi, please comply with the
9  deposition protocol order.
10     A.  I would like to have a little bit of time to
11  read it.
12     Q.  (By Mr. Nemelka)  Sure.  Do you recognize,
13  though, this is -- reflects an interview that you gave
14  to Automotive News, Mr. Brockman?
15         MS. GULLEY:  Objection; form.
16     A.  If you let me finish reading this back page,
17  it's got a lot of information on it.
18     Q.  (By Mr. Nemelka)  Sure.  I'm -- I'm only going
19  to ask you about one -- about one -- one question and
20  answer.
21         MS. GULLEY:  Objection; form.
22     A.  Okay.  What is your question?
23     Q.  (By Mr. Nemelka)  This reflects an interview --
24  the contents of an interview that you gave to Automotive
25  News; correct?

9 (Pages 30 - 33)

FTC-0000978

HIGHLY CONFIDENTIAL

Page 34

1     MS. GULLEY: Objection; form.
2     A. Yes. That was approximately a month and a half
3  after the acquisition.
4     Q. (By Mr. Nemelka) Correct. And if you turn to
5  the second page, the question that -- that Automotive
6  asked you, "ADP Dealer Services" -- now, ADP is now CDK;
7  correct?
8     A. Yes.
9        MS. GULLEY: Objection; form.
10       MR. RYAN: Object to form.
11    Q. (By Mr. Nemelka) "ADP Dealer Services will
12  not" -- excuse me, the ADP that's referred to here was
13  -- the dealer services was spun off and became CDK;
14  correct?
15       MR. RYAN: Objection.
16    A. That's my understanding.
17    Q. (By Mr. Nemelka) Right. So it says, "ADP
18  Dealer Services will not prohibit dealers from providing
19  their vendors with a user ID and password to extract
20  data." What are your thoughts about that?
21       Do you see that question?
22    A. Yes.
23    Q. And you gave an answer. "I don't understand
24  ADP's position. Other than to be obstinate, than to be
25  opposite, I can't imagine from a business standpoint

Page 35

1  that that's truly their position. And frankly it would
2  be my opinion that after awhile they probably change
3  that position." Do you see that?
4     A. Yes.
5     Q. And that accurately reflects what you said?
6        MS. GULLEY: Objection; form.
7     A. Yes.
8     Q. (By Mr. Nemelka) And so you knew that CDK's
9  position was that they did not stop dealers from
10  allowing -- they did not stop dealers from using
11  independent integrator's automated access to their data;
12  correct?
13       MS. GULLEY: Objection; form.
14    A. No. I don't agree with that. And that's
15  certainly not what I said. What I said is, "I don't
16  understand ADP's position. Other than to be obstinate,
17  than to be opposite, I can't imagine from a business
18  standpoint that that's truly their position. And
19  frankly it would be my opinion that after awhile they
20  probably change that position."
21    Q. (By Mr. Nemelka) And CDK did change their
22  position on that, didn't they?
23       MS. GULLEY: Objection; form.
24    A. It's my understanding that -- that they have
25  made changes. Now, exactly what changes they've made,

Page 36

1  I'm not familiar with.
2     Q. (By Mr. Nemelka) CDK didn't change that
3  position, though, until years later, right?
4        MS. GULLEY: Objection; form.
5        UNIDENTIFIED SPEAKER: Mike, one objection
6  is good for both defendants, right?
7        MR. NEMELKA: Yes.
8        UNIDENTIFIED SPEAKER: Okay, thank you.
9        THE WITNESS: I'm sorry. Could you repeat
10  the question?
11    Q. (By Mr. Nemelka) Sure. And CDK didn't change
12  that position until years later, though; correct?
13       MS. GULLEY: Objection; form.
14    A. Again, I've not tracked what ADP has done in
15  this regard. My guess is -- and that's there's been a
16  series of changes.
17    Q. (By Mr. Nemelka) But in the meantime, before
18  CDK changed, CDK Reynolds engaged in what you called,
19  Mr. Brockman, "the data wars"; isn't that right?
20       MS. GULLEY: Objection; form.
21    A. I've not ever used that term, so I don't know
22  who has.
23    Q. (By Mr. Nemelka) You've never used the term,
24  "data wars"?
25       MS. GULLEY: Objection; form.

Page 37

1     A. No. (Inaudible.)
2     Q. (By Mr. Nemelka) Now, CDK not only had an open
3  system in the sense that it let dealers use independent
4  integrators, but it also had its own independent
5  integrators, like DMI and Integra Link!; correct?
6        MS. GULLEY: Objection; form.
7     A. Correct.
8     Q. (By Mr. Nemelka) And DMI and Integra
9  Link! provided access to the data belonging to Reynolds'
10  dealers; correct?
11       MS. GULLEY: Objection; form.
12    A. Yes. They -- they hacked our systems
13  extensively.
14    Q. (By Mr. Nemelka) And Reynolds' dealers would
15  grant DMI and Integra Link! access to their data by
16  creating log-in credentials for them, right?
17       MS. GULLEY: Objection; form.
18    A. Yes.
19    Q. (By Mr. Nemelka) And then DMI and Integra
20  Link! would then provide the dealer data to third-party
21  vendors; correct?
22    A. Yes.
23    Q. Including OEMs, right?
24       MS. GULLEY: Form.
25    A. Yes.

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

1    Q.  (By Mr. Nemelka)  And when I say "OEMs," I mean
2  the car manufacturers, like Ford, Chevy, Toyota, right?
3        MS. GULLEY:  Form.
4    A.  That's correct.
5    Q.  (By Mr. Nemelka)  You understand that's what I
6  mean, right?
7    A.  Yes.
8    Q.  Mr. Brockman, I've handed you what has been
9  previously marked as Plaintiff's Exhibit 442.  I'll
10  describe it and then you can look at it.  This is an
11  email from you, Bob Brockman, to Ron Workman and Steve
12  Anenen, dated Sunday, June 10th, 2007.  Do you see that?
13        MS. GULLEY:  Objection; form.
14    A.  Yes.
15    Q.  (By Mr. Nemelka)  And to this email, you
16  attach -- you made an attachment; correct?
17        MS. GULLEY:  Form.
18    Q.  (By Mr. Nemelka)  Have you finished reading it,
19  Mr. Brockman?
20    A.  Yes.
21    Q.  Thank you.  So if you look at the email that
22  you -- you sent this email to Mr. Workman and
23  Mr. Anenen; correct?
24    A.  Yes.
25    Q.  Steve Anenen was the CEO of CDK?

Page 39

1    A.  That's correct.
2    Q.  And Ron Workman was a senior vice-president
3  there?
4    A.  Yes.
5    Q.  And in the third -- third line down, you write,
6  "Please see the attached thoughts regarding our mutual
7  opportunities."  Do you see that?
8    A.  Yes.
9    Q.  And then you said -- then you write, "As I said
10  at our initial meeting on the subject at NADA" -- what
11  is NADA?
12    A.  It's the National Auto Dealers Association.
13    Q.  And what does that mean, "at NADA"?
14    A.  There's an annual convention and trade show.
15    Q.  Is it once a year?
16    A.  Yes.
17    Q.  And at this convention, you -- you met with
18  Mr. Workman?
19    A.  Yes.
20    Q.  And at these annual conventions, you frequently
21  meet -- meet with executives from CDK; correct?
22        MS. GULLEY:  Objection; form.
23    A.  No.
24    Q.  (By Mr. Nemelka)  Is this the only time you
25  ever met with a CDK executive at NADA?

Page 40

1    A.  No.  It's not the only time, but it -- it is --
2  to characterize it as something that happens a lot, it's
3  not.  It's rare.  And this is certainly the first time
4  that I had ever met Steve Anenen.
5    Q.  And then you write -- well, you said, "As I
6  said in our initial meeting on the subject at NADA, I
7  believe that there some attractive opportunities here
8  that in the longer term can be quite significant."  Do
9  you see that?
10        MS. GULLEY:  Objection; form.
11    A.  Yes.
12    Q.  (By Mr. Nemelka)  So let's turn the page to
13  the document that you attached.  If you could go to the
14  last section on Data Services, on the second page.  And
15  you have -- having read this -- this attachment, this
16  was proposing a joint venture between CDK and Reynolds
17  for the service of extracting data from dealership
18  systems; correct?
19        MS. GULLEY:  Objection; form.
20    Q.  (By Mr. Nemelka)  Mr. Brockman?
21    A.  Yes.
22    Q.  And ADP, meaning CDK, would contribute the DMI
23  business that we just discussed; correct?
24        MS. GULLEY:  Form.
25    A.  Yes.

Page 41

1    Q.  (By Mr. Nemelka)  And then Reynolds would
2  contribute its technology for accessing the Reynolds DMS
3  systems; correct?
4        MS. GULLEY:  Form.
5    A.  That's what was under consideration, but it --
6  I think it's -- it's correct to add that -- that this
7  was a proposed process that never occurred.  And
8  further -- on further examination, subsequent to this, I
9  decided that it would be a wrong thing to do.
10    Q.  (By Mr. Nemelka)  Why would it be a wrong thing
11  to do?
12    A.  I don't believe that accessing dealership
13  systems to extract data in the manner that DMI and that
14  their other entities were doing it to be proper.
15    Q.  But at least here, you had proposed talking
16  about forming a joint venture to do that; correct?
17        MS. GULLEY:  Objection; form.
18    A.  What I'm doing is -- is I'm -- I'm commenting
19  on -- on their proposals.
20    Q.  (By Mr. Nemelka)  You described it as
21  an attractive opportunity that could be quite
22  significant in your email, didn't you?
23        MS. GULLEY:  Objection; form.
24    A.  On further examination, you know, that was not
25  the case.

11 (Pages 38 - 41)

FTC-0000980

HIGHLY CONFIDENTIAL

Page 42

1    Q.  (By Mr. Nemelka)  And would other competitors
2  to this data services joint venture be allowed to access
3  the data for Reynolds and -- and CDK dealers, or only
4  this joint venture?
5         MS. GULLEY:  Objection; form.
6    A.  Again, this was an early-on idea which was not
7  followed up on.  Specifically, we did not do anything in
8  this regard.
9    Q.  (By Mr. Nemelka)  The thought was, though, that
10  only the Reynolds and CDK joint venture would be able to
11  provide data access to Reynolds and CDK, not others;
12  correct?
13         MS. GULLEY:  Objection; form.
14    A.  That -- that was the -- the original proposal
15  from CDK.
16    Q.  (By Mr. Nemelka)  So competitors like
17  Authenticom would not be able to compete with this joint
18  venture, right?
19         MS. GULLEY:  Objection; form.
20    A.  From a thought standpoint, this -- this project
21  never got that far.
22    Q.  (By Mr. Nemelka)  But you said that was the
23  original conception that CDK --
24         MS. GULLEY:  Objection --
25         MR. NEMELKA:  Let me finish my question,

Page 43

1  Andi.
2    Q.  (By Mr. Nemelka)  You said that was the
3  original proposal from CDK, though, right?
4         MS. GULLEY:  Objection; form.
5    A.  Again, there was -- there was another document,
6  which I don't have and I don't know whether it exists,
7  but it's -- it certainly did exist, where what ADP was
8  proposing was -- was laid out.  And this was an initial
9  response.  Again -- I'll repeat again, this project did
10  not go anywhere.  It did not happen.
11    Q.  (By Mr. Nemelka)  At this time, were you --
12  when you were considering this joint venture, DMI was
13  extracting data for vendors from Reynolds' DMS; correct?
14         MS. GULLEY:  Objection; form.
15    A.  At this particular point in time, this -- this
16  was approximately seven months after the acquisition
17  of -- of a very, very large company.  It was extremely
18  busy in all kinds of operational details, and for me to
19  know what was going on with Reynolds systems and outside
20  third parties at that point in time was impossible.  The
21  best I could have would be, you know, hazy knowledge,
22  but not, you know, absolute knowledge.
23    Q.  (By Mr. Nemelka)  Well, here you wrote that CDK
24  would contribute the DMI business to this new co-entity
25  along with the technology for accessing DMS systems,

Page 44

1  right?
2         MS. GULLEY:  Objection; form.
3    A.  Again, that was in response to their proposal.
4  And again -- I repeat again, this project went nowhere.
5         (Exhibit 639 was marked for
6         identification.)
7    Q.  (By Mr. Nemelka)  I've handed you Plaintiff's
8  Exhibit 639.  And, Mr. Brockman, I'll represent to you
9  that the metadata for this document states that, as
10  produced by -- by your counsel, that this came from your
11  custodial file and that it was -- date last modified was
12  July 29th, 2012.  And the file name is "ADP Data
13  Agreement Talking Points."  Okay?
14         MS. GULLEY:  Objection; form.
15    Q.  (By Mr. Nemelka)  Did you hear that,
16  Mr. Brockman?
17    A.  Yes.
18    Q.  Okay.  Do you recognize these as talking points
19  that you created for ADP Data Agreement?
20         MS. GULLEY:  Objection; form.
21    A.  Yes.  These were talking points that would take
22  place between myself and ADP.
23    Q.  (By Mr. Nemelka)  And who at ADP?
24    A.  Steve Anenen.
25    Q.  Is this a phone call?

Page 45

1         MS. GULLEY:  Objection; form.
2    A.  Yes.
3    Q.  (By Mr. Nemelka)  And was it a phone call
4  around the time of July 29th, 2012?
5         MS. GULLEY:  Form.
6    A.  I don't know what date -- I remember creating
7  this document, thinking that a phone call was going to
8  be imminent.  It was not imminent.  It was at some
9  considerable length of time afterwards.
10    Q.  (By Mr. Nemelka)  "Considerable length of
11  time," meaning a few weeks or months?
12    A.  Months.
13    Q.  A few months?  And these are the talking points
14  that you prepared for that phone conversation with
15  Mr. Anenen?
16    A.  Yes.
17    Q.  And did you deliver these talking points?
18         MS. GULLEY:  Objection; form.
19    A.  I'm not sure what all points were actually
20  covered.  These were the points that I wanted to cover.
21  Whether I got them all done or not, I -- I don't think I
22  got them quite done.
23    Q.  (By Mr. Nemelka)  I just want to ask you about
24  a few of the bullet points here, Mr. Brockman.  The
25  first one you say, "Unattended remote access to Reynolds

12 (Pages 42 - 45)

FTC-0000981

HIGHLY CONFIDENTIAL

Page 46

1 systems is going to cease." Do you see that?
2    A. Yes.
3    Q. So 2012, unattended remote access was still
4 happening on the Reynolds system, right?
5    A. That's correct.
6    Q. Including by CDK; correct?
7    A. That's right. CDK -- or CDK subsidiaries were
8 identified as some of the most, you know -- they were
9 the worst hackers out there. And -- and this first
10 line, "Unattended remote access to Reynolds systems is
11 going to cease," that was not a pleasant statement.
12 That was a -- a statement of fact. The fact was pretty
13 ugly.
14    Q. And -- and the data agreement, the document is
15 titled "Data Agreement." And what was the data
16 agreement that you envisioned entering into with CDK?
17       MS. GULLEY: Objection; form.
18    A. The -- the data agreement involved a -- a
19 phased shutdown, as opposed to an abrupt stop.
20       MS. GULLEY: Objection; form.
21    Q. (By Mr. Nemelka) And is this a call that was
22 initiated by you, or Mr. Anenen?
23    A. I -- I had requested a call. Whether he called
24 me or I called him, I don't recall.
25    Q. You requested the call?

Page 47

1       MS. GULLEY: Objection; form.
2    A. Yes.
3    Q. (By Mr. Nemelka) And this is the first time
4 that you had discussed with Mr. Anenen having CDK stop
5 accessing the Reynolds systems?
6       MS. GULLEY: Objection; form.
7    A. I don't recall whether or not it was the first
8 time or not.
9    Q. (By Mr. Nemelka) And what did Mr. Anenen say
10 in response?
11    A. It was a rather unusual call. There was
12 about -- it was an hour-long call, and there was about
13 15 minutes' worth of this active discussion and then 45
14 minutes of -- of just unproductive conversation.
15    Q. What does that -- what -- why was it
16 unproductive?
17    A. Mr. Anenen did not want to address the issues.
18 He wanted to talk about other things.
19    Q. So on these topics, the call lasted about 15
20 minutes?
21    A. Uh-huh. (Witness answers affirmatively.)
22    Q. And what -- what did he respond -- how did he
23 respond when you told him that unattended remote access
24 to Reynolds systems is going to cease?
25    A. He didn't make a specific reply to that

Page 48

1 statement.
2    Q. And what was his general response to your
3 proposal here?
4       MS. GULLEY: Objection; form.
5    A. I would say it was -- it didn't make a lot of
6 progress. You know, Steve Anenen is a very, very nice
7 guy, and he's a person that is unlikely to say no, you
8 know. He's just -- he's not that kind of person. But
9 he did not make a positive response.
10    Q. (By Mr. Nemelka) Meaning he said that CDK
11 would continue to access the Reynolds system?
12       MS. GULLEY: Objection; form.
13    A. No. He did not answer that specific issue.
14 Again, he's a very nice guy.
15    Q. (By Mr. Nemelka) Did he give you any
16 indication one way or the other whether he was
17 interested in engaging in the discussions further, after
18 this phone call?
19       MS. GULLEY: Objection; form.
20    A. At -- at that point, he did not.
21    Q. (By Mr. Nemelka) At this time, Reynolds was
22 using Authenticom for -- strike that.
23       Reynolds has its own software application,
24 separate from the DMS; correct?
25    A. I wouldn't say separate from the DMS, but

Page 49

1 there's some things that we do that are not totally
2 related to our own DMS.
3    Q. Right. Software solutions that you -- that
4 dealers use, separate from the DMS; correct?
5       MS. GULLEY: Objection; form.
6    A. It's a very, very small, you know, part of our
7 business.
8    Q. (By Mr. Nemelka) And at this time, Reynolds
9 was using Authenticom for the data needs for those
10 applications; correct?
11       MS. GULLEY: Objection; form.
12    A. Yes. Again, the particular data that we're
13 talking about has to do with service reminder cards,
14 principally, and it's a very small thing. And we use
15 Authenticom from an expediency standpoint to, you know,
16 get us the data.
17    Q. (By Mr. Nemelka) And this was data from CDK
18 DMS; correct?
19    A. Yes.
20    Q. And if you go to the next page, you have a --
21 you have a -- a bullet point here where it starts with
22 "batch type data." Do you see that?
23    A. Yes.
24    Q. It says, "Batch type data that Authenticom (or
25 some other Reynolds agent)" -- so let me stop there. So

13 (Pages 46 - 49)

FTC-0000982

HIGHLY CONFIDENTIAL

Page 50

1  you considered Authenticom a Reynolds agent in
2  collecting the data; is that right?
3      A.  I don't --
4          MS. GULLEY:  Objection; form.
5      A.  I don't know if we would consider Authenticom
6  an agent.  They -- they provided a service.
7      Q.  (By Mr. Nemelka)  You say, "Batch type data
8  that Authenticom (or some other Reynolds agent) collects
9  from ADP sites for Reynolds to use in marketing programs
10 that it sells to the dealer would require that this data
11 is used for no other purpose."  Do you see that?
12         MS. GULLEY:  Objection; form.
13     A.  Yes.
14     Q.  (By Mr. Nemelka)  So you envisioned that
15 Reynolds would continue to use Authenticom even after
16 this proposed data agreement with CDK; is that right?
17         MS. GULLEY:  Objection; form.
18     A.  I don't think that, you know, I would
19 characterize this paragraph in that way.  There's no
20 suggestion here it's long term.  Anytime that you have a
21 process set up for a collection of data, to tear it up,
22 you know, involves some effort.  And what we're talking
23 about that's described in this document here, there's
24 things to be done short term.  There is no implication
25 here that long term -- you know, longer than what the

Page 51

1  immediate, you know, time frame would be -- that we
2  would continue to use Authenticom.
3      Q.  (By Mr. Nemelka)  This is 2012, right?
4          MS. GULLEY:  Objection; form.
5      A.  Yeah.
6      Q.  (By Mr. Nemelka)  Reynolds continued to use
7  Authenticom clear to -- through 2017, right?
8          MS. GULLEY:  Objection; form.
9      A.  I'm not aware of -- of how long that -- that
10 occurred.
11     Q.  (By Mr. Nemelka)  Certainly, you know, for
12 years after this, Reynolds continued to use Authenticom,
13 right?
14         MS. GULLEY:  Objection; form.
15     A.  Again, I'm not aware of what's going on.
16     Q.  (By Mr. Nemelka)  All right, well --
17     A.  In -- in the -- in that particular regard.
18     Q.  We have some documents on that.
19         MS. GULLEY:  Objection; to the sidebar.
20     Q.  (By Mr. Nemelka)  You said "agents."  You say
21 here, "The use of a 3rd-party acting under contract as
22 an agent of ADP or Reynolds is not an issue as long as
23 the specific RCI agreement is directly between us."  Do
24 you see that?
25         MS. GULLEY:  Objection; form.

Page 52

1      A.  Yes.
2      Q.  (By Mr. Nemelka)  What did you mean by that?
3          MS. GULLEY:  Objection; form.
4      A.  What the focus in this particular passage is --
5  and that's that we'd want to have a contract directly
6  with the -- the owner of the data.
7      Q.  (By Mr. Nemelka)  Well, the contract with the
8  owner of data?  That would be the dealer, right?
9          MS. GULLEY:  Objection; form.
10     A.  Correct.
11     Q.  (By Mr. Nemelka)  And so you would consider
12 those who go and collect the data on your behalf as your
13 agents; correct?
14         MS. GULLEY:  Objection; form.
15     A.  I think what -- what we're talking about here
16 is -- and that's that, you know, we don't use agents.
17 What we want to do is we want to have direct contracts
18 with the collector of the data and also the owner of
19 data.
20     Q.  (By Mr. Nemelka)  Well, what you write here is
21 that "The use of a 3rd party acting under contract as an
22 agent of ADP or Reynolds is not an issue as long as the
23 specific RCI agreement is directly between us."  Do you
24 see that?
25         MS. GULLEY:  Objection; form.

Page 53

1      A.  Well, I -- I think that's -- that states
2  clearly that we -- the agreement we want is -- we want
3  one directly between us and -- and not, you know,
4  with any use of an agent.
5      Q.  (By Mr. Nemelka)  And "an agent" being those
6  that go and collect data on your behalf; correct?
7          MS. GULLEY:  No.
8          Objection; form.  I'm sorry.  It was -- I'm
9  sorry.
10         MR. NEMELKA:  That's improper to answer the
11 question.  I asked the witness.
12         MS. GULLEY:  I'm so sorry, Mike.
13         MR. NEMELKA:  It's okay.
14         MS. GULLEY:  It was not -- not intentional.
15         UNIDENTIFIED:  Same objection.
16         MR. NEMELKA:  We'll just leave the record
17 like that.
18         MS. GULLEY:  Well, he can answer the
19 question.
20         MR. NEMELKA:  Sure.
21     Q.  (By Mr. Nemelka)  Do you need me to repeat the
22 question, Mr. Brockman?
23     A.  I need to reread this.
24     Q.  My simple question was -- is that you have here
25 a section called "Use of Agents."  You say, "The use of

14 (Pages 50 - 53)

FTC-0000983

HIGHLY CONFIDENTIAL

Page 54

1 a 3rd party acting under contract as an agent of ADP or
2 Reynolds is not an issue as long as the specific RCI
3 agreement is directly between us -- either of us would
4 take responsibility for their agents." Do you see that?
5        MS. GULLEY: Form.
6    A. Yes.
7    Q. (By Mr. Nemelka) And my question is that the
8 agents that you're referring to are those that would go
9 and collect the data on your behalf; correct?
10    A. I think I'm referring to DMI, Integra.
11    Q. Okay. Did you know how Authenticom accessed
12 data on a CDK system?
13        MS. GULLEY: Objection; form.
14    A. No.
15    Q. (By Mr. Nemelka) Did you know that they were
16 issued log-in credentials, just like DMI and Integra
17 Link! were for Reynolds?
18        MS. GULLEY: Objection; form.
19    A. I'm not aware of that.
20        MS. GULLEY: Are you at a stopping point,
21 Mike?
22        MR. NEMELKA: Sure.
23        MS. GULLEY: Let's take a break.
24        THE VIDEOGRAPHER: The time is 10:25 a.m.,
25 and we're off the record.

Page 55

1        (Short recess 10:25 to 10:50 a.m.)
2        THE VIDEOGRAPHER: The time is 10:50 a.m.
3 We're back on the record.
4        EXAMINATION (Continuing)
5 BY MR. NEMELKA:
6    Q. Mr. Brockman, have you heard of the phrase
7 "whitelisting"?
8        MS. GULLEY: Objection; form.
9    A. In -- recent years, yes.
10    Q. (By Mr. Nemelka) The -- where -- as I think of
11 the term "whitelisting," that's where Reynolds issues a
12 protected user ID that will be exempt from Reynolds'
13 security processes.
14        MS. GULLEY: Object- -- hold on. Let him
15 finish.
16    Q. (By Mr. Nemelka) Is that -- is that how you
17 associate the term?
18        MS. GULLEY: Objection; form.
19    A. No.
20    Q. (By Mr. Nemelka) Reynolds did allow the
21 feeding of data through protected user IDs that were
22 exempt from the secur- -- Reynolds' security processes,
23 right?
24        MS. GULLEY: Objection; form.
25    A. I would say the answer to that is -- is

Page 56

1 qualified as -- as temporary access. I think it's
2 important that, from a transitional standpoint, that's
3 where that's been used.
4    Q. (By Mr. Nemelka) And it was used with CDK's
5 access to the Reynolds system; correct?
6        MS. GULLEY: Objection; form.
7    A. The answer to that is no. The -- the only time
8 that that was used is -- or that process was used was in
9 the situation where everybody's agreed that they're
10 going to stop hacking. They're going to stop being
11 bandits. They're going to get straight. And, you know,
12 we've seen fit to facilitate an orderly stand-down, in
13 which case, you know, we issued user IDs that were
14 temporary in nature.
15    Q. (By Mr. Nemelka) That was in 2000 --
16        MS. GULLEY: Are you finished Mr. Brockman?
17        THE WITNESS: No.
18    A. That's completely different than, you know,
19 what my connotation of whitelist is. Whitelist, in my
20 terminology, has to do with email.
21        I have a lot of problems with spam email.
22 And one of the ways that you deal with spam email is --
23 is you decide what select group of people you'll accept
24 email addresses from, and you -- you create a list. And
25 that's what's called a "whitelist." You know, that's --

Page 57

1 that's my knowledge of the use of the term.
2    Q. (By Mr. Nemelka) So where Reynolds issued
3 these protected user IDs for CDK, that was -- that you
4 were referring to, was that in connection with the 2015
5 wind-down agreement?
6        MS. GULLEY: Form.
7    A. That was one of the factors in that wind-down
8 agreement. It was -- again, first and foremost, that
9 they're -- they're going to stop hacking. They're going
10 to stop being bandits. And this is a temporary
11 situation, you know, where it's a wind-down.
12    Q. (By Mr. Nemelka) Reynolds did it for CDK long
13 before 2015, didn't it?
14        MS. GULLEY: Objection; form.
15    A. Not to my knowledge.
16    Q. (By Mr. Nemelka) Okay. I've handed you
17 Exhibit -- Plaintiff's Exhibit 640.
18        (Exhibit 640 was marked for
19            identification.)
20    Q. (By Mr. Nemelka) And I'll describe it and then
21 you can read it. It's an email from you, Mr. Brockman,
22 dated Friday, February 20, 2013, to Ron Lamb. I'll give
23 you a minute to read it.
24    A. I'm familiar with this issue here.
25    Q. Are you finished reading --

15 (Pages 54 - 57)

FTC-0000984

HIGHLY CONFIDENTIAL

Page 58

1    A.  Let -- let me finish.
2        We have been -- you know, the war with the
3    bandits and the hackers, it's been going on for a long
4    time.  And what we've done over the years is -- and
5    that's that we've created barriers.  And what happens
6    is, in this, is sometimes the barrier blocks somebody
7    that is -- is causing them a great deal of problem.  And
8    what we'll do is -- and that's on a temporary basis
9    while we get the -- you know, the issue -- specific
10   issue sorted out, we will issue a user ID temporarily.
11       And I think that that's reflected in -- it
12   reads, "Obviously it is not getting communicated
13   correctly -- or the dealership person is not listening
14   to the description of the circumstances around the
15   situation -- which is that a formal agreement has been
16   reached whereby entrance into the RCI world by the OEM
17   [involved] will begin.
18       "Part of this [that] agreement is to allow
19   the feeding of data by 'bandit procedures' to continue
20   to exist in [during] the transition period."  And that's
21   what it's all about.
22   Q.  Will you continue to read that last sentence of
23   your email?
24       MS. GULLEY:  Objection; form.
25   A.  "The new USER-ID is a special one that we know

Page 59

1    about -- and there will be exempt from the security
2    processes."
3        What's not, clearly, part of that sentence
4    is "This is a temporary transition."
5    Q.  (By Mr. Nemelka)  Mr. Brockman, this was user
6    IDs that were for both Integra Link! and DMI; correct?
7        MS. GULLEY:  Objection; form.
8    A.  Yes.  I believe -- I believe, in this
9    particular situation, they were the folks that were
10   described -- which they're our -- our worst hackers.
11   Q.  (By Mr. Nemelka)  And this is in 2013; correct?
12       MS. GULLEY:  Objection; form.
13   A.  Yes.  That's -- that's the date.
14   Q.  (By Mr. Nemelka)  And the bottom email is an
15   email from a dealership to Reynolds, right?
16       MS. GULLEY:  Objection; form.
17   A.  Yes.
18   Q.  (By Mr. Nemelka)  Sunset -- excuse me.  Sorry.
19   A.  That's correct.  The email is to Reynolds, from
20   a customer of Reynolds.
21   Q.  And the customer says, "I have now received
22   three calls from the TAC" -- what is the TAC?
23   A.  That stands for Technical Assistance Center.
24   Q.  Of Reynolds?
25   A.  Yes.

Page 60

1    Q.  -- "about setting up user IDs for both
2    Integralink and DMI to allow non-regulated access to our
3    Reynolds system."
4        Then he goes on, "I find it extremely
5    hypocritical that for the better part of 3-4 years
6    Reynolds has pretty much pissed off a large majority of
7    your customer with 'security' enhancements that locked
8    out these companies in one way or another.  Now all of a
9    sudden, Reynolds is calling me to set up exactly what we
10   were told was a security problem.  So my questions is
11   how is this still not a security problem."
12       Do you see that?
13       MS. GULLEY:  Form.
14   Q.  My question is:  Do you see that?
15       MS. GULLEY:  Form.
16   A.  I see, you know, what you have read.
17   Q.  (By Mr. Nemelka)  Did you -- do you agree with
18   the dealer that it's hypocritical for Reynolds to be
19   creating these protected user IDs that are exempt from
20   its security processes?
21       MS. GULLEY:  Form.
22   A.  No.  I -- I disagree with that statement.
23       MS. GULLEY:  Are you --
24   A.  And the characterization that this particular
25   writer, this Christopher K. Upright, that we have,

Page 61

1    quote, angered a number of our customers over the last
2    three or four years, you know, that's way too strong of
3    a characterization.  There's no question there's been
4    inconveniences as we have, you know, ratcheted down, you
5    know, hackers' access.  And that's exactly what happened
6    here, and we -- we obviously dealt with it.
7    Q.  Dealers left Reynolds over this issue of data
8    access, didn't they?
9    A.  There has been some, but a very small minority.
10   Q.  And they transitioned, during this time period,
11   to CDK over those issues; correct?
12       MS. GULLEY:  Objection; form.
13   A.  I don't have any, you know -- you know,
14   knowledge of -- of the -- you know, that correlates
15   security issues to, you know, number of dealerships that
16   departed.  I just don't have that information, if it
17   exists.
18   Q.  (By Mr. Nemelka)  Reynolds keeps track of
19   reasons that dealers leave it, don't -- doesn't it?
20   A.  To the extent that we can ascertain, you know,
21   why, we do.  You know, in many, many cases, we can't.
22   Q.  And you're aware that, in tracking, that there
23   were many instances -- there were instances where
24   dealers said they were leaving Reynolds for CDK because
25   of the data access policies, right?

16 (Pages 58 - 61)

FTC-0000985

HIGHLY CONFIDENTIAL

Page 62

1          MS. GULLEY:  Objection; form.
2     A.  I would say that there -- there are some
3 dealers that have left us over data access, but -- but,
4 this is, you know, a very tiny minority.
5     Q.  (By Mr. Nemelka)  In your email about the user
6 IDs being exempt from security processes, what does
7 "exempt" mean?
8          MS. GULLEY:  Objection; form.
9     A.  I'm sorry.  I'm not understanding.
10    Q.  (By Mr. Nemelka)  You wrote, "The new USER-ID
11 is a special one that we know about -- and they" -- "and
12 there will exempt from the security processes."  What
13 does that "exempt" mean?
14         MS. GULLEY:  Objection; form.
15    A.  I think it means what it says.
16    Q.  (By Mr. Nemelka)  Security processes will not
17 apply to those protected user IDs, right?
18         MS. GULLEY:  Objection; form.
19    A.  The -- the specific security issue that is
20 causing this particular customer unhappiness, that's
21 what the new user ID will -- will exempt them from.
22 Until such time as -- as we have our -- our piece of
23 code -- which is actually, you know, performing the
24 security check a little too aggressively -- until that's
25 corrected.

Page 63

1     Q.  (By Mr. Nemelka)  You can set that aside.  Oh,
2 one -- real quick.  The access that DMI and Integra
3 Link! had to the Reynolds system was automated access,
4 correct?
5          MS. GULLEY:  Objection; form.
6     Q.  (By Mr. Nemelka)  That was protected?
7          MS. GULLEY:  Objection; form.
8     A.  Again, the -- the user ID, you know, gave the
9 ability to -- for, you know, a person to log on to the
10 system.  Exactly, you know, what they did with that, I
11 can't tell from this.
12    Q.  (By Mr. Nemelka)  You weren't -- you're not
13 aware that -- that -- that protected user IDs for CDK
14 were for data access in an automated way?
15         MS. GULLEY:  Objection; form.
16    A.  I'm not aware of that.
17    Q.  (By Mr. Nemelka)  Okay.  You can set that
18 aside.
19         (Exhibit 641 was marked for
20          identification.)
21    Q.  (By Mr. Nemelka)  I've handed you Plaintiff's
22 Exhibit 641, which is an email -- the top email is an
23 email from Bob Schaefer to Howard Gardner at CDK
24 forwarding an email from you, Mr. Brockman, to Robert
25 Schaefer on November 25th, 2013.  Do you see your email

Page 64

1 to Mr. Schaefer where you write on November 25th, 2013?
2          MS. GULLEY:  Objection; form.
3     A.  Sorry.  If you will give me a moment to --
4     Q.  (By Mr. Nemelka)  Let me -- I'll let you review
5 the document.  I just want -- I just want to point out
6 your email to Mr. Schaefer, if I could.
7     A.  Please, let me read the document.
8     Q.  Okay.
9     A.  Again, I --
10    Q.  Have you finished reading them?
11    A.  Yes.
12    Q.  Okay, thank you.
13    A.  Please repeat the question.
14    Q.  Yes.  So you sent an email -- it's the second
15 from the top -- you sent an email dated November 25,
16 2013 to Robert Schaefer where you write, "Bob, you have
17 authority to pursue discussions with ADP on these
18 subjects as per our conversation."  Do you see that?
19    A.  Yes.
20    Q.  So this is you giving Mr. Schaefer -- who is a
21 Reynolds executive; correct?
22         MS. GULLEY:  Objection; form.
23    A.  That is correct.
24    Q.  (By Mr. Nemelka)  -- authority to talk to CDK
25 on the topics outlined in the email below.  Right?

Page 65

1          MS. GULLEY:  Objection; form.
2     A.  Yes.  That -- that is correct.
3     Q.  (By Mr. Nemelka)  And in the email that -- it's
4 an email that Howard Gardner sent to Mr. Schaefer.  Now,
5 Howard Gardner is the CDK executive, right?
6     A.  I'm aware of the fact that he works for CDK.
7 Whether or not he's considered an executive, I'm not --
8 I'm not familiar.
9     Q.  And here -- the first bullet point he says,
10 "Bob Brockman would like to work toward an agreement
11 with ADP, and he has granted you the authority to pursue
12 discussions on a general framework with ADP."  Do you
13 see that?
14         MS. GULLEY:  Objection; form.
15    A.  Yes, I do.
16    Q.  (By Mr. Nemelka)  And that's the authority that
17 you have been granting Mr. -- that you granted
18 Mr. Schaefer, right?
19         MS. GULLEY:  Objection; form.
20    A.  Yes.  I gave him authority to discuss with ADP.
21 He does not have -- this does not give him permission to
22 actually do anything.  It's permission to talk about
23 things.
24    Q.  (By Mr. Nemelka)  Right.  And one of the -- if
25 you turn to the next page -- one of the things that --

17 (Pages 62 - 65)

FTC-0000986

HIGHLY CONFIDENTIAL

Page 66

1 permission to talk about is for OEMs -- if you will
2 look, "Reynolds & Reynolds and DMI will formalize and
3 extend our collaborative approach to helping OEMs
4 transition to a 'protected program' to prevent future
5 disruption of data access."  Do you see that?
6         MS. GULLEY:  Form.
7     A.  Yes.  And I think it's important to point out
8 that what's happening here is -- and that's that ADP's
9 two subsidiaries are the worst of the hackers and
10 bandits --
11    Q.  Right.
12    A.  -- that we face.  And the efforts that we're --
13 we're pursuing here is -- and that's a continued
14 improvement of security by -- by, you know -- you know,
15 planned stand-downs.
16    Q.  The next one, you say -- or here is "Non-OEM
17 Third Parties."  So that would be, not car
18 manufacturers, but the other applications you referred
19 to, like, customer relationship management and so forth,
20 right?
21        MS. GULLEY:  Form.
22    Q.  (By Mr. Nemelka)  For the non- -- No. 2,
23 "Non-OEM Third Parties"?
24        MS. GULLEY:  Form.
25    A.  Okay.  We're now down to No. 2?

Page 67

1     Q.  (By Mr. Nemelka)  "Non-OEM Third Parties."  Do
2 you see that?
3         Mr. Brockman, do you see No. 2, "Non-OEM
4 Third Parties"?
5     A.  Yes.  I'm -- I'm trying to reabsorb that
6 paragraph.  That's a very -- that's kind of a long
7 run-on paragraph.
8     Q.  Well -- if I could just -- that's one reason
9 why you're -- you know -- I'd give you the opportunity
10 to read the whole document, but I ask you about specific
11 sections.  It's more efficient if I could point you to
12 the sections, then I give you a chance to read the
13 whole -- whole thing.  Now -- you know, reading the
14 whole thing really does eat up time -- of our limited
15 time here.
16        MS. GULLEY:  I object to the form and
17 to the sidebar --
18        MR. NEMELKA:  That's fine.
19        MS. GULLEY:  -- and to the instruction as
20 improper.
21        MR. NEMELKA:  Okay.
22    Q.  (By Mr. Nemelka)  So No. 2.  "Non-OEM Third
23 Parties."  Non-OEM third parties would be non-car
24 manufacturers.  They're parties, right?
25        MS. GULLEY:  Objection; form.

Page 68

1     A.  Yes.  That would be a proper characterization.
2     Q.  (By Mr. Nemelka)  And it says here, R&I --
3 "R&R" -- Reynolds -- "and DMI will jointly create and
4 launch a 'protected program' that DMI will offer to its
5 existing and prospective non-OEM clients."  Do you see
6 that?
7         MS. GULLEY:  Objection; form.
8     A.  Yes.  I see that.
9     Q.  (By Mr. Nemelka)  So that -- DMI would have
10 protected access to data that Reynolds' dealers have,
11 not just for OEMs, but for non-OEM third parties, too;
12 correct?
13        MS. GULLEY:  Objection; form.
14    A.  This is -- this is what ADP was asking for, and
15 I -- I think that, probably after this first
16 conversation, that they were brought to understand that
17 we were -- that -- that we were only going to allow
18 access for collection of data to go to specific
19 customers, not for Reynolds and DMI to, basically,
20 continue business as usual.
21    Q.  (By Mr. Nemelka)  And then Point 4,
22 "Exclusivity."  Here there's a sentence that says,
23 Reynolds is -- "R&R is open to the R&R 'protected
24 programs' becoming an exclusive offering by DMI."  Do
25 you see that?

Page 69

1         MS. GULLEY:  Objection; form.
2     A.  Again, the -- this is Howard Gardner's wish
3 list.
4     Q.  (By Mr. Nemelka)  You gave Mr. Schaefer
5 authority to pursue these discussions, right, on these
6 topics?
7         MS. GULLEY:  Objection; form.
8     A.  Yeah.  And "discussions" does not mean yes to
9 everything that -- that is being requested by Howard
10 Gardner.  From a background standpoint, you need to
11 understand who Howard Gardner is.
12        Howard Gardner's baby is Digital Motor
13 Works, DMI.  Again, one of the worst hackers and bandits
14 out there.  There's no question what -- you know,
15 there's items in this list of things that he would like
16 to have continue.  But we have no intention of -- of
17 allowing that to continue to happen.
18    Q.  (By Mr. Nemelka)  One of the topics that you
19 gave Mr. Schaefer authority to pursue discussions with
20 ADP on had to do with market message about -- market
21 messaging about data security, right?
22        MS. GULLEY:  Objection; form.
23    A.  I disagree.  I -- I don't -- I don't think
24 that -- that that's the case.
25    Q.  (By Mr. Nemelka)  If you look at the last

18 (Pages 66 - 69)

FTC-0000987

HIGHLY CONFIDENTIAL

Page 70

1 section here, "Market Messaging -- Data Security."  Do
2 you see that?
3         MS. GULLEY:  Objection; form.
4     A.  Again, this is -- this is Howard Gardner's wish
5 list.
6     Q.  (By Mr. Nemelka)  I'm simply reading your
7 email, Mr. Brockman.  You just wrote to Mr. Schaefer,
8 "You have authority to pursue discussions with ADP on
9 these subjects."
10         MS. GULLEY:  Objection.
11     Q.  (By Mr. Nemelka)  You wrote that to
12 Mr. Schaefer, right?  You saw that?
13         MS. GULLEY:  Objection to the question and
14 the instruction.
15     A.  The instructions that I gave to Mr. Schaefer is
16 on a general basis.  He could -- he could discuss these
17 general areas.  It did not have anything to do with what
18 we were going to agree to.
19     Q.  (By Mr. Nemelka)  And one of those topics was
20 market messaging on data security; correct?
21         MS. GULLEY:  Objection; form.
22     A.  That -- that was one of the items on Howard
23 Gardner's wish list.
24     Q.  (By Mr. Nemelka)  And you authorized
25 Mr. Schaefer to talk to CDK about that, right?

Page 71

1         MS. GULLEY:  Objection; form.
2     A.  What I authorized Mr. Schaefer to do was --
3 that he could discuss in general terms, generally, this
4 list.  Not every specific item.
5     Q.  (By Mr. Nemelka)  Now, as you're having -- as
6 Reynolds is having these -- you can set that aside.  As
7 Reynolds is having these discussions with CDK, you were
8 holding off on security enhancements that would -- that
9 you wanted to release, right?
10         MS. GULLEY:  Objection; form.
11     A.  There were a series of security enhancements
12 which were much improved in their capabilities, and we
13 wanted to deploy these -- these security enhancements.
14 But we did not want to do it that it would cause, kind
15 of, Armageddon kind of situation, where all of a sudden
16 ADP's customers would not get what their contracts
17 called for.
18     Q.  (By Mr. Nemelka)  You said that these security
19 enhancements were much improved in their capabilities.
20 Is that in their capabilities in blocking this access by
21 independent integrators?
22         MS. GULLEY:  Objection; form.
23     A.  Again, I -- I, first of all, take issue with,
24 you know, the characterization of independent
25 integrators.  You know, if you mean hackers and bandits,

Page 72

1 yes, that's what they're intended to do.
2     Q.  (By Mr. Nemelka)  Mr. Brockman, you used
3 Authenticom for your own products, didn't you?
4         MS. GULLEY:  Objection; form.
5         (By Mr. Nemelka)  We already established
6 that, right?
7         MS. GULLEY:  Form.
8     A.  Yes.  But on a temporary basis and very, very
9 minor.
10     Q.  (By Mr. Nemelka)  So you used a hacker and a
11 bandit for your own products?
12         MS. GULLEY:  Objection; form.
13     A.  I used Authenticom to do a specific process,
14 with the knowledge of the dealer and with our knowledge.
15     Q.  (By Mr. Nemelka)  All right.  So these security
16 enhancements that were much improved, much improved in
17 what?
18         MS. GULLEY:  Objection; form.
19     A.  In their ability to detect unauthorized use --
20 use of our software.
21     Q.  (By Mr. Nemelka)  Unauthorized use of the --
22 meaning by integrators to access dealer data?
23         MS. GULLEY:  Objection; form.
24     A.  What we're talking about is -- and that's we're
25 talking about, you know, very, very high-level, you

Page 73

1 know, software enhancements to detect, you know, people
2 coming into the -- the system that -- who we know
3 nothing about.  They're, you know, completely
4 unauthorized.  That's what we're talking about.
5     Q.  (By Mr. Nemelka)  And you held off on releasing
6 those until you concluded your negotiations with CDK,
7 right?
8         MS. GULLEY:  Objection; form.
9     A.  The exact timing of -- of that, you know, when
10 we released the -- those enhancements -- I might add
11 that it's -- it's clear that the enhancements are not
12 necessarily released all at once.  They're -- they're
13 not a single thing.
14         You know, there -- there's a series of what
15 we call "fixes" or "enhancements," and probably some of
16 them we turned loose earlier than others.  They
17 weren't -- it's not a simultaneous, you know,
18 distribution of software enhancements.
19     Q.  (By Mr. Nemelka)  Reynolds held up on a large
20 release of security enhancements during the negotiations
21 with CDK; correct?
22         MS. GULLEY:  Objection; form.
23     A.  Again, I don't know that it was all the
24 security enhancements that we had prepared.  Certainly,
25 there were a number of them.

19 (Pages 70 - 73)

FTC-0000988

HIGHLY CONFIDENTIAL

Page 74

1    Q. (By Mr. Nemelka)  I'm going to hand you
2  Plaintiff's Exhibit 642.
3         (Exhibit 642 was marked for
4         identification.)
5    Q. (By Mr. Nemelka)  And, Mr. Brockman, I'll
6  represent to you that your counsel produced this.  And
7  the metadata as produced says this came from your file.
8  And it's dated June 23rd, 2014.  I'll give you a chance
9  to review it.  There's a back page as well.
10    A. Oh, okay.
11    Q. Mr. Brockman, these are your notes; correct?
12    A. Yes.
13    Q. And you prepared these notes -- sorry.
14    A. This is a -- what I would refer to as a
15  "talking paper."  It is a -- a series of points that I
16  want to make in a conversation with Steve Anenen.
17    Q. And one thing that you told him is over the
18  back, if you turn over to the second page, is that "We
19  have held up on a large release of security enhancements
20  for over 2 months to see if there was a deal to be
21  worked out."  Do you see that?
22    A. Yes.  I -- I see that.  And that was a very
23  important point of -- of a call, that we had a number of
24  security enhancements that would -- would basically
25  block the kind of access that -- that they -- they had

Page 75

1  been using to get into our systems.
2    Q. And you had been holding that up?
3    A. Yes.
4         MS. GULLEY:  Objection; form.
5    Q. (By Mr. Nemelka)  And -- and that would -- the
6  security enhancement would block, not just DMI and
7  Integra Link!, but other integrators; correct?
8         MS. GULLEY:  Objection; form.
9    A. That's an interesting issue.  When we see
10  things happening where people are breaking into our
11  system, we have no idea who they are in most cases.
12  There's no -- they don't have a signature on everything
13  that says who they are when they come in.  We just know
14  that, you know, they're hacking their way in, and we're
15  going to block it.  In some cases, that would cover
16  things that the ADP subsidiaries were doing.  And in
17  some cases, it might uncover people that we had no idea
18  were -- were hacking into our systems.
19    Q. (By Mr. Nemelka)  You understand for DMI and
20  Integra Link! and Authenticom, it was the Reynolds
21  dealers that were providing them that access; correct?
22         MS. GULLEY:  Objection; form.
23    A. From -- when you say "providing that access,"
24  you know, what -- what the Reynolds dealer would do is
25  -- and that's that they would give them a user ID to get

Page 76

1  in, which is completely contrary to the terms of their
2  contracts.  Our contracts with our dealers specifically
3  say, you know, no authorized -- or, no use or access to
4  our software other than employees, you know, is -- is
5  permitted.  Unfortunately, dealers are, you know,
6  somewhat cavalier about following that particular term
7  of their contract.
8    Q. (By Mr. Nemelka)  And -- and they granted that
9  access so that they could -- they granted that --
10  that -- those user IDs to be used to access the dealer
11  data; correct?
12         MS. GULLEY:  Objection; form.
13    A. That's effectively what -- what would happen.
14  You know, the dealer has, you know, very powerful
15  reporting tools where they could do that themselves.
16  But this is for remote unattended access.
17    Q. (By Mr. Nemelka)  All right.  Let's go to the
18  first page.  You have -- let's go to where you say, "The
19  second point is very much a personal one."  Do you see
20  that, about midway through the -- down -- down through
21  the page?  Midway, halfway, it says, "The second point
22  is very much a personal one."  Do you see that?
23    A. Yes.
24    Q. Okay.  Right under there, you say, "ADP has
25  been extracting data out of Reynolds systems for over a

Page 77

1  decade."  Do you see that?
2    A. Yes.  I do.
3    Q. And you knew that ADP was in the business of
4  providing that data to a host of other third parties,
5  right?
6         MS. GULLEY:  Objection; form.
7    A. That -- that's my assumption.  I -- I don't
8  have direct knowledge of that.
9    Q. (By Mr. Nemelka)  And then you say, "ADP has
10  wrongly taken advantage of Reynolds in the marketplace
11  over the issue of data security -- that has cost us in
12  the millions."  Do you see that?
13    A. Yes, I do.
14    Q. How was CDK taking advantage of Reynolds in the
15  marketplace on the issue of data security?
16         MS. GULLEY:  Objection; form.
17    A. ADP's posture in the marketplace was that our
18  approach and our -- our -- you know, our belief that
19  data security is necessary because of the fact that we
20  have nonpublic personal information that -- that exists
21  inside of the Reynolds system, that that manner of
22  access, we think, is the right way to do things.  We
23  think that's what's required by law.
24         ADP, from a sales standpoint, their
25  salespeople, would say that we're taking the wrong

20 (Pages 74 - 77)

FTC-0000989

HIGHLY CONFIDENTIAL

Page 78

1 position on the data security standpoint. And we
2 believed that that was harmful to us in the marketplace.
3    Q. (By Mr. Nemelka) And it cost you in the
4 millions because you lost DMS customers as a result?
5      MS. GULLEY: Objection; form.
6    A. That -- that is correct. And to -- to lose a
7 customer over data security when we're doing things the
8 right way, the way that's required by law, you know, for
9 them to decide to switch their business to ADP, that's
10 obviously hurt.
11    Q. (By Mr. Nemelka) You know that other DMSs,
12 besides Reynolds and CDK, do not take the same view that
13 you do; correct?
14      MS. GULLEY: Objection; form.
15      UNIDENTIFIED SPEAKER: Objection; form.
16    A. I believe that they take views that are -- that
17 are different than ours.
18    Q. (By Mr. Nemelka) Are you saying that they are
19 in violation of the law?
20    A. I believe that the -- what's required by
21 Gramm-Leach-Bliley Act and also the Safeguards Rules --
22 I believe that they're not following those, you know,
23 laws correctly.
24    Q. So you say it cost you -- the CDK wrongly
25 taking advantage of Reynolds in the marketplace over the

Page 79

1 issue of data security cost you millions because you
2 lost DMS customers. Any other way that it cost Reynolds
3 millions, besides losing DMS customers?
4      MS. GULLEY: Objection; form.
5    A. I would say that the -- that it wouldn't
6 necessarily be just the loss of customers, it would also
7 have to do with our ability to acquire new customers.
8 And it is -- you have to understand, we've been -- I
9 personally have been, you know, bitter competitors, you
10 know, with ADP for a very, very, very long time, in
11 excess of 40 years. And this was one of the things that
12 irritated me specifically.
13      The software that I helped create, the
14 Power system in Houston, is extremely, you know, strong
15 in its data security. And from the time that I, you
16 know, came aboard at Reynolds and Reynolds, we've been
17 working to improve our data security. And it is vastly
18 improved from when I first -- you know, first arrived 12
19 years ago.
20      It's still not perfect, because people
21 think that -- you know, more, you know, inventive ways
22 of doing it. And it's very much a cat-and-mouse
23 situation in that the hackers figure out a new way and
24 then we figure out a way to block it. And then they
25 figure out another new way and we figure out a way to

Page 80

1 block it.
2    Q. (By Mr. Nemelka) Now, you say at the -- here,
3 "Therefore, I want" -- "I want a no-charge access to ADP
4 systems for the next 20 years." So you wanted free
5 access for the Reynolds applications for the next 20
6 years, but not to extract data for other third parties,
7 like DMI and Integra Link!, right? You made that clear.
8 And that was a difference?
9      MS. GULLEY: Objection; form.
10      UNIDENTIFIED SPEAKER: Objection; form.
11    A. There -- I think this particular passage
12 indicates the level of differences between -- when I say
13 "differences" -- you know, points of contention between
14 us and ADP. And it is specific in that -- we have
15 applications, for instance, like reminder cards for
16 service, that an ADP dealership, they would like to buy
17 that product from us, and we would have specific
18 certified access into the ADP system to get just the
19 data that it takes to do reminder cards.
20    Q. (By Mr. Nemelka) So you wanted 20 free years
21 of that type of access to this CDK dealer data; correct?
22      MS. GULLEY: Objection; form.
23    A. Well, it says "no-charge access." That means
24 no charge by ADP. That we would basically -- as long as
25 we used it strictly for a product that we offered, like

Page 81

1 service reminders, that we would have free access for 20
2 years.
3    Q. (By Mr. Nemelka) And what did you mean when
4 you told him here that "not to be used to extract data
5 for other 3rd parties"?
6      MS. GULLEY: Objection; form.
7    A. We are not -- never have been -- and have no
8 intention of being in the process of extracting data
9 from other dealership systems for the purposes of
10 reselling. We don't do that.
11    Q. (By Mr. Nemelka) Like DMI and Integra
12 Link! did?
13    A. We don't do that.
14    Q. You were considering entering into a joint
15 venture with CDK on that, though, as we saw earlier.
16 Correct?
17      MS. GULLEY: Objection; form.
18    A. No. That's not true. That -- that's not true.
19 Our -- our whole discussion with ADP was about an
20 orderly stand-down transition, to avoid creating
21 hardships for what is our mutual customers.
22    Q. (By Mr. Nemelka) And here -- did you tell
23 Mr. Anenen that you had no intention of ever entering
24 into the business like DMI and Integra Link!?
25      MS. GULLEY: Objection; form.

21 (Pages 78 - 81)

FTC-0000990

HIGHLY CONFIDENTIAL

Page 82

1    A. I don't think I made a -- a general statement
2 of that. I think it's pretty clear, it says, "like
3 service reminders -- not to be used to extract data for
4 other 3rd parties." So that comment was directly in
5 relationship to the access that we would be granted by
6 ADP.
7    Q. (By Mr. Nemelka) I've handed you Plaintiff's
8 Exhibit 643.
9         (Exhibit 643 was marked for
10        identification.)
11   Q. (By Mr. Nemelka) The top email is an email
12 from Steve Anenen to you, dated July 2nd, 2015. I'll
13 give you a chance to read it. But again, Steve Anenen
14 is CDK's CEO, right?
15   A. That's correct.
16   Q. And this is an email to you, July 2nd, 2014.
17 I'll give you a chance to -- to review it.
18        MS. GULLEY: It starts on the back.
19   Q. (By Mr. Nemelka) Right. It starts off with an
20 email from you on June 30th, to Mr. Anenen; correct?
21 Mr. Brockman?
22   A. Just -- just a moment. Let me -- let me read
23 it. Yes, I've read it. Can you repeat your question?
24   Q. All right. So this starts off with an email
25 from you to Mr. Anenen, dated June 30, 2014, right?

Page 83

1    A. That's correct.
2    Q. And this follows up a conversation that you had
3 with him; correct?
4         MS. GULLEY: Form.
5    A. Yes. That is correct.
6    Q. (By Mr. Nemelka) And those were the -- the
7 talking points for that conversation is the document
8 that we just -- just looked at; correct?
9         MS. GULLEY: Objection; form.
10   A. Yes. That -- that's correct. And as you can
11 tell by the tone of this email, I'm getting a little
12 impatient.
13   Q. Right.
14   A. More than a little impatient.
15   Q. Right. You write here at the end, "My data
16 security projects have been delayed another week."
17 Right?
18   A. Yes. That's what it says.
19   Q. You're still delaying the -- the data security
20 projects since June 30th, 2014, right?
21        MS. GULLEY: Objection; form.
22   A. That's the date of this email. What's
23 happening is -- and that's that Steve Anenen is
24 employing delay tactics. And I'm impatient to get this
25 situation of, you know, data hacking, bandits, going on

Page 84

1 as far as our system is concerned. It's time for it to
2 be over.
3    Q. (By Mr. Nemelka) And you write to him, also --
4 still your email, Mr. Brockman. "However given that ADP
5 has accessed our systems for a couple of decades, my
6 request is for more than just data access than for
7 maintenance reminders -- both in content and duration."
8        So you -- here, you're saying, because CDK
9 accessed your systems for a long time, your request here
10 for free access is more than just for maintenance
11 reminders, right?
12        MS. GULLEY: Objection; form.
13   A. It is for other software products that -- that
14 we might offer to the marketplace. But still under the
15 certified interface process --
16   Q. (By Mr. Nemelka) Right.
17   A. -- where it's clearly spelled out by contract,
18 you know, what data that we -- we get and nothing else.
19   Q. And then I want to ask you about what
20 Mr. Anenen says to that statement in particular, if you
21 go to his email.
22        MS. GULLEY: I don't -- I don't think he
23 read this first page.
24        MR. NEMELKA: I'm not going to ask about
25 anything but this one email -- but this one paragraph.

Page 85

1    Q. (By Mr. Nemelka) He says --
2        MS. GULLEY: I object to that.
3        MR. NEMELKA: Okay. I just want to point
4 you to this one -- one paragraph that Mr. Anenen writes
5 in response to that statement.
6        MS. GULLEY: I object to that.
7        THE WITNESS: I would like to read the
8 email, please.
9        MR. NEMELKA: Okay.
10       MR. RYAN: So my -- my complaint is that
11 the procedure is that if the witness wants to read the
12 document, the witness can, right? That's certainly been
13 the case in depositions of the witnesses that you
14 represented. I just want to know what the ground rules
15 are.
16       MR. NEMELKA: If it's going to be
17 obstructionist, then we'll do it document by document.
18 I will let him read this email.
19       MS. GULLEY: I object to that comment as
20 well.
21       MR. NEMELKA: While he's reading, I'll just
22 state for the record, we've been given limited time,
23 here. I think it's fair to direct him to particular
24 points in a -- in a document. I'm giving him a chance
25 to read them. If they are longer documents, I think

22 (Pages 82 - 85)

FTC-0000991

HIGHLY CONFIDENTIAL

Page 86

1 it's fair for us to direct him, for efficiency purposes.
2 If you want to take your time and ask him about other
3 parts of the document, you're free to.
4        MS. GULLEY:  Mr. Nemelka, you have called
5 opposing counsel inappropriate for making statements on
6 the record like the one that you just made.  I
7 completely object to your statement.
8        I also ask -- direct you to look into the
9 depositions that you have defended and that your
10 partner, Mr. Ho, has defended, in which he hasn't even
11 allowed counsel to use the time that they have on the
12 record.  Everyone has the same amount of time, and
13 this -- this -- the desire to read documents is one that
14 you instructed your clients, repeatedly, on the record.
15        And if Mr. Brockman suggests that he would
16 like to read the document -- you're asking him to opine
17 on statements by Mr. Anenen -- he should at least be
18 allowed to read those statements, given that they were
19 more than four years ago.
20        MR. NEMELKA:  You've gone beyond what's
21 appropriate, Andi, and I'll get back to questioning.
22    Q.  (By Mr. Nemelka)  All right, Mr. Brockman, I'd
23 like to ask you about --
24        THE WITNESS:  Excuse me.  I didn't finish
25 reading.  The amount of conversation that's been going

Page 87

1 on across the table, I haven't had a chance to read.
2        MR. NEMELKA:  Okay.
3        MS. WEDGWORTH:  Can we go off the record a
4 minute?  Mr. Wallner has informed us the phone is not --
5 has been disconnected.  Can we go off the record?
6        THE VIDEOGRAPHER:  The time is 11:37 a.m.
7 We are off the record.
8        (Short recess 11:37 to 11:50 a.m.)
9        THE VIDEOGRAPHER:  This is the beginning of
10 Media 2.  The time is 11:50 a.m.  We are back on the
11 record.
12        EXAMINATION (Continuing)
13 BY MR. NEMELKA:
14    Q.  Mr. Brockman, I'd like to point you to the
15 email that you received from Mr. Anenen on July 2nd,
16 2014.  Do you have that in front of you?
17    A.  I do.
18    Q.  And he wrote to you -- in the paragraph after
19 his bullet points, he said, "I should point out that we
20 have not been 'accessing R&R systems for decades' as you
21 said.  Our businesses that access R&R systems came to us
22 through an acquisition."  Do you see that?
23        MS. GULLEY:  Form.
24    A.  Yes, I do.
25    Q.  (By Mr. Nemelka)  And then he says, "In any

Page 88

1 case, controlling data access has become a priority for
2 R&R only within the last several years.  I would be
3 remiss not pointing out that R&R is accessing the ADP
4 system through a contract with Authenticom, and has been
5 doing so for quite some time without an agreement from
6 ADP."
7        Is Mr. Anenen correct in that, that -- that
8 Reynolds was accessing the ADP system through a contract
9 with Authenticom?
10        MS. GULLEY:  Objection; form.
11    A.  Well, there are some things that I -- I
12 disagree with in -- in this paragraph, starting with the
13 first sentence.  I believe that when you acquire a
14 company and you make it part of your organization, that,
15 you know, the history of that company kind of goes with
16 it and becomes part of your history.  And for him to,
17 you know, basically say that because DMI and Integra
18 Link! are organizations they acquired, you know, that
19 doesn't count.  I believe it does count.
20    Q.  (By Mr. Nemelka)  That wasn't my question,
21 Mr. Brockman.  My question was:  Is he correct in
22 pointing out that R&R is accessing that CDK system
23 through a contract with Authenticom?
24        MS. GULLEY:  Objection; form.
25    A.  Yes.  I'm -- I concur with that -- comma --

Page 89

1 however, there is an issue of degree here.  What's been
2 going on -- what ADP has been doing as far as, you know,
3 hacking our systems has been on -- on a giant scale,
4 whereas the -- the agreement with Authenticom for
5 information from CDK's systems, specifically around
6 reminder cards, is -- is min-- minuscule.  And what
7 he's doing is -- and that's, you know, this -- this is a
8 negotiation -- a pretty heated negotiation, frankly --
9 or at least kind of heated on my part -- and that he's
10 endeavoring to dodge around.
11    Q.  (By Mr. Nemelka)  You wouldn't have used
12 Authenticom if they were insecure, would you have?
13        MS. GULLEY:  Objection; form.
14    A.  For reminder cards, you know, there's no
15 nonpublic personal information.  There's no accounting
16 information.  It -- again, it is -- it's not an
17 application that's sensitive.
18    Q.  (By Mr. Nemelka)  Reynolds used Authenticom for
19 more than just those reminders, right?
20        MS. GULLEY:  Objection; form.
21    A.  I think that they started to do some work for
22 the -- the ad agency.
23    Q.  (By Mr. Nemelka)  Right.  Naked Line Marketing,
24 right?
25        MS. GULLEY:  Objection; form.

23 (Pages 86 - 89)

FTC-0000992

HIGHLY CONFIDENTIAL

Page 90

1    A. Yes. That's the name of our ad agency.
2    Q. And Naked Line does have information -- does
3  get information on customers; correct?
4        MS. GULLEY: Objection; form.
5    A. Again, the usage of -- that usage is -- has
6  been extremely minor.
7    Q. (By Mr. Nemelka) Again, you would not have
8  used Authenticom if they were insecure, right?
9        MS. GULLEY: Objection; form.
10   A. As far as I know, there's been -- there was no
11 inquiry made with regards to their internal security
12 procedures.
13   Q. (By Mr. Nemelka) You're not aware of any data
14 breaches that they've had, right?
15       MS. GULLEY: Objection; form.
16   A. Not that I'm aware of.
17   Q. (By Mr. Nemelka) They provided a reliable
18 service; correct?
19       MS. GULLEY: Objection; form.
20   A. And I'm not involved in -- in that part of our
21 business. It's -- I'm not in -- in a position to say
22 whether it's reliable or not.
23   Q. (By Mr. Nemelka) It's cost-effective for
24 Reynolds to use Authenticom, right?
25       MS. GULLEY: Objection; form.

Page 91

1    A. Again, I'm -- I'm not sufficiently involved in
2  that part of the business to be able to comment on that.
3    Q. (By Mr. Nemelka) And then he writes at the end
4  of that paragraph, "We need to clean this up as well."
5  And you understood that to mean that Reynolds needed to
6  stop using Authenticom, right?
7        MS. GULLEY: Objection; form.
8    A. Frankly, I don't recall that I've ever focused
9  on that -- on that sentence. It's a little short one,
10 kind of down at the end of the whole thing. And so --
11   Q. (By Mr. Nemelka) What do you understand him to
12 mean by saying, "We need to clean this up as well"?
13       MS. GULLEY: Objection; form. Please let
14 him finish his answers.
15   A. It is -- it is not clear to me what that means
16 and, frankly, when I received this, I didn't pay much
17 attention to that, you know, little short sentence in
18 the next-to-the-last paragraph.
19   Q. (By Mr. Nemelka) Reynolds ultimately did agree
20 to stop using Authenticom as part of its agreements with
21 CDK, right?
22       MS. GULLEY: Objection; form.
23   A. I -- I know that -- that we stopped using
24 Authenticom. Whether it was part of the -- of the
25 stand-down agreement, I'm not sure.

Page 92

1        (By Mr. Nemelka) I've handed you an
2  exhibit marked Plaintiff's Exhibit 644.
3        (Exhibit 644 was marked for
4        identification.)
5    Q. (By Mr. Nemelka) And I will represent to you
6  that this was produced to us by your counsel from your
7  custodial files, with a date of July 14th, 2014. And
8  the file name was "Aspen Meeting 2014 State of the
9  Union." And I'm only going to ask you about two
10 sections.
11       So it's a multipage state of the union
12 notes. So do you -- do you recognize these as your --
13 your notes for a state of the union meeting?
14       MS. GULLEY: Form.
15   A. The context of this is -- and that's we have an
16 annual meeting of sales -- you know -- vice-presidents,
17 and we discuss a number of issues of general interest.
18   Q. (By Mr. Nemelka) Okay. If I could just point
19 you to the section on "Security," on the next page.
20       MS. GULLEY: Objection; form.
21   A. Well, I think that this -- this is a big
22 document. I think I would prefer to, you know, spend a
23 little more time on it than that. I -- I hesitate to,
24 essentially, take things out of context.
25   Q. (By Mr. Nemelka) All right. I don't intend on

Page 93

1  taking anything out of context. I'm just going to ask
2  you about the sections on security. But -- you know, it
3  is a long document. And I don't intend on asking you
4  about most of it.
5        I guess, can I just ask you, first of
6  all -- maybe I'll just do it this way. Do you recognize
7  these as your -- your speaking notes for that -- for
8  that address?
9        MS. GULLEY: Form.
10   A. These were, you know, talking points. They
11 covered a number of issues of interest, a lot of which
12 are related.
13   Q. (By Mr. Nemelka) I'll -- maybe if I could just
14 ask you the questions on security, and if you feel like
15 you need to review the rest of it to answer them,
16 then -- then I'll give you the chance. But if I could
17 just try to -- you know, make this more efficient by
18 pointing you to the security section?
19       MS. GULLEY: Objection; form.
20   A. I think to make -- to make an intelligent
21 decision as of what to do, I need to read it first.
22       MR. NEMELKA: All right. Well, while you
23 do that, let's go off the record.
24       MS. GULLEY: Objection. We are staying on
25 the record. That's just the procedure that's been

24 (Pages 90 - 93)

FTC-0000993

HIGHLY CONFIDENTIAL

Page 94

1 followed by Kellogg, so I'm just trying to make it, you
2 know, sort of goose/gander.
3          MR. NEMELKA:  All right.  We have a jury
4 that's going to be watching this.  And I would just like
5 to state for the record, I've asked him to -- only asked
6 him for a few questions to make this efficient.  But he
7 wants to review the whole -- whole documents.  He's
8 recognized that -- he's acknowledged that these are
9 speaking notes for -- for that meeting.  And with that
10 statement, Mr. Brockman, you can review the document.
11          MS. GULLEY:  I object.
12          MR. RYAN:  I object as well.
13          THE WITNESS:  I'd like to speak to my
14 attorney about this document.
15          MR. NEMELKA:  Okay.
16          MS. GULLEY:  Does it relate to a matter of
17 privilege -- potential privilege?
18          THE WITNESS:  This is very, very sensitive
19 information.  You know --
20          MS. GULLEY:  Is there a question pending
21 right now?  So we can go off the record?  There is not.
22 There is not a question pending.
23          MR. RYAN:  There is no question.
24          MS. GULLEY:  Okay.  Thanks.  Let's go off
25 the record.

Page 95

1          THE VIDEOGRAPHER:  The time is 12:01 p.m.
2 We're off the record.
3          (Short recess 12:01 to 12:02 p.m.)
4          THE VIDEOGRAPHER:  Back on the record at
5 12:02 p.m.
6          MS. GULLEY:  Thank you for that short
7 break.  Mr. Brockman had a question about the protective
8 order.  And in light of the sensitive nature of this
9 document, we ask that I remind everyone that this has
10 been marked "Attorneys' Eyes Only," that this entire
11 deposition is "Attorneys' Eyes Only."  In particular, to
12 remind Mr. Ryan that executives within his company and
13 all the parties are not to know about or be told about
14 any of this document or the subject of this testimony.
15 Thank you.
16          EXAMINATION (Continuing)
17 BY MR. NEMELKA:
18     Q.  Can I ask you some questions now, Mr. Brockman?
19     A.  I'm almost done reading it.
20     Q.  Okay.
21     A.  Yes.
22     Q.  If you can go to the section on "Security,"
23 which is on the -- after the first page, on the back of
24 the first page.  Do you see that bottom-of-the-page
25 section on Security?

Page 96

1     A.  Yes.
2     Q.  I want to ask you about a few bullet points
3 that start with "ADP" -- and CDK -- "has approached us
4 about doing the same -- we are in the early stages of
5 negotiating a similar agreement."  Do you see that?
6     A.  Yes.  I see that.
7     Q.  So is it CDK that approached Reynolds about
8 entering into an agreement with respect to its -- its
9 data access on Reynolds system?
10          MS. GULLEY:  Form.
11     A.  It's hard for me to -- to recall exactly how
12 that, you know, came about, because I was not the first
13 person to actually talk, you know, to CDK.  And whether
14 or not one of their people talked to one of our people,
15 or one of our people talked to one of their people, I --
16 I don't know the answer to that.
17     Q.  (By Mr. Nemelka)  At least -- these notes,
18 though, you -- you seem to indicate that ADP has
19 approached "us," meaning CDK approached Reynolds, right?
20          MS. GULLEY:  Form.
21     A.  Yes.  The -- that's what it says, but -- you
22 know, as far as my, you know, hard knowledge, you know,
23 behind that -- that statement, I don't have hard
24 knowledge as to what actually -- and frankly, I don't
25 think that's important.

Page 97

1     Q.  (By Mr. Nemelka)  And then you write here,
2 fourth bullet point, "This could put the security wars
3 very much behind us."  Do you see that?
4          MS. GULLEY:  Form.
5     A.  Certainly, those two entities that belong to
6 ADP are by far the worst and, matter of fact,
7 probably -- in total, probably the amount of data
8 hacking that goes on, they equal everybody else combined
9 and more.
10     Q.  (By Mr. Nemelka)  That wasn't my question.  The
11 question here is:  Do you see that you wrote that "This
12 could put the security wars very much behind us"?  Do
13 you see that?
14          MS. GULLEY:  Objection; form.
15     A.  Yeah.  What I'm talking about there is -- and
16 that's that, you know, the volume of hacking would be
17 substantially reduced.
18     Q.  (By Mr. Nemelka)  So you -- earlier this
19 morning, you said that you never used the phrase
20 "security wars."  Does this refresh your recollection
21 that you actually do -- did?
22          MS. GULLEY:  Objection; form.
23     A.  Well, it -- it looks like that -- that I
24 actually have used it once.  I will admit, it's in lower
25 case.  And when I write documents like this, it's just

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL

Page 98

1  very much kind of stream of consciousness, because I'm
2  trying to give the best picture to the people that are
3  listening to it.  Because they're my top people, and
4  also the most expensive people.
5      Q.  (By Mr. Nemelka)  And you felt that you had
6  been in a security war with CDK, right?
7          MS. GULLEY:  Objection; form.
8      A.  I definitely had been in -- I had long-term
9  issues with CDK over -- over, you know, just ban- --
10  plain old banditry as far as our system is concerned.
11     Q.  (By Mr. Nemelka)  This wasn't just about the
12  access of your system, though, this was also about CDK's
13  own policies, right?
14         MS. GULLEY:  Objection; form.
15     A.  It also included, you know, the fact that they
16  had outright lied to manufacturers about what data they
17  were extracting from our systems.  And particularly,
18  General Motors.  We discovered that they were fulfilling
19  a request by General Motors for data, and they were
20  talking to dealers saying, "This needs to be done
21  because it's General Motors."  Well, the fact of the
22  matter is, they were collecting way more than what
23  General Motors ever asked for.
24         MS. GULLEY:  Wait.  Let him finish.
25     A.  And so that is kind of -- the whole general

Page 99

1  area is what I'm referring to.
2      Q.  (By Mr. Nemelka)  That's not what I asked.
3  What I'm saying is, this was not just about CDK's access
4  on the Reynolds system.  It was also about CDK's own
5  policies with respect to access on the CDK system,
6  right?
7          MS. GULLEY:  Objection to the form.
8      A.  No.  It was -- it was -- it refers to
9  situations where they were accessing dealership systems
10  on behalf of OEMs.
11     Q.  (By Mr. Nemelka)  The next bullet point, you
12  write, "Since we have no idea of how ADP is going to
13  charge 3rd parties for their version of RCI -- we will
14  likely continue to have the issue of customers
15  complaining that their costs from 3rd party vendors are
16  more expensive with a DMS from Reynolds than ADP."
17         I wanted to ask you:  How did you know that
18  CDK would have a version of RCI, like you did?
19         MS. GULLEY:  Objection; form.
20     A.  I think at that point in time, it -- it
21  looked -- it had become apparent -- it wasn't done, but
22  it had become apparent that there was going to be a --
23  an entirely stand-down agreement with ADP.  That's --
24  that's what I'm saying here.
25     Q.  (By Mr. Nemelka)  All right.  I'm not talking

Page 100

1  about the wind-down agreement.  What you write is,
2  "Since we have no idea of how ADP is going to charge 3rd
3  parties for their version of RCI."
4          And my question is:  How did you know that
5  CDK was going to have their version of an RCI?
6          MS. GULLEY:  Objection; form.
7      A.  I think at that point, we were also
8  understanding that we were going to be able to have RCI
9  access into ADP dealership customers, not for the
10  purposes of being a redistributor, but for the purposes
11  of using it within one of our product offerings.  And
12  there was going to be a charge associated with that.
13     Q.  (By Mr. Nemelka)  Reynolds was going to be
14  getting five free years of access, no -- no charge to --
15  to Reynolds, right?
16         MS. GULLEY:  Objection; form.
17         MR. RYAN:  Objection; form.
18     A.  That -- that was -- that was what ended up
19  being -- being part of the agreement.  However, we had
20  no, you know, specific idea that our usage would be
21  limited to 600 dealerships.  It -- it would be -- it
22  would be other products.  You know, their -- this
23  marketplace is -- is constantly, you know, building more
24  products.
25         And actually, in, you know, looking back,

Page 101

1  it's fortunate that we were able to achieve this kind of
2  access as part of the agreement, because we bought an
3  organization called Reverse Risk, which is a business
4  intelligence system that has over 1,000 dealerships that
5  are CDK dealerships, that through an RCI type agreement,
6  you know, with CDK, you know, we -- you know -- we
7  downloaded accounting information for the purposes of
8  making comparisons.
9      Q.  (By Mr. Nemelka)  That wasn't my question,
10  Mr. Brockman.
11         I'm asking you why, after you say it's
12  going to be an end to the security wars, you list that
13  ADP is going to have their own version of RCI?  What is
14  the connection?
15         MS. GULLEY:  Objection; form.
16     A.  Again, I -- their -- their own version of RCI
17  is -- is part of what the stand-down agreement is all
18  about.
19     Q.  (By Mr. Nemelka)  You don't talk about -- in
20  that bullet point, you don't talk about the stand-down
21  agreement.  You talk about third parties for their
22  version of RCI, right?
23         MS. GULLEY:  Objection; form.
24     A.  Well, again, I'm trying to tell you what I was
25  thinking about when I wrote this thing and what I was

26 (Pages 98 - 101)

FTC-0000995

HIGHLY CONFIDENTIAL

Page 102

1 trying to communicate.
2      Q. (By Mr. Nemelka) And I'm just saying I'm just
3 reading your words, "charge 3rd parties" -- not "charge
4 Reynolds" -- "charge 3rd parties for their version of
5 RCI."
6          MS. GULLEY: Objection; form.
7      Q. (By Mr. Nemelka) And so my question is --
8          MS. GULLEY: Let him finish his question.
9          THE WITNESS: Yeah.
10     Q. (By Mr. Nemelka) Go ahead and answer.
11         MS. GULLEY: Answer what?
12     Q. (By Mr. Nemelka) Mr. Brockman wants to talk.
13         MS. GULLEY: Just wait for a question.
14         MR. RYAN: Wait for a question.
15     Q. (By Mr. Nemelka) My question is -- is: You're
16 not talking about what -- what CDK is going to charge
17 Reynolds. You're talking about what CDK is going to
18 charge third parties for their version of RCI; correct?
19         MS. GULLEY: Objection; form.
20     A. In -- in that context, I believe that I'm, you
21 know, characterizing Reynolds as a third party.
22     Q. (By Mr. Nemelka) You're not talking about all
23 of the other vendors?
24     A. I -- I don't think that I'm -- I know,
25 specifically, that I'm talking about, at least,

Page 103

1 Reynolds.
2      Q. Well, you go on, Mr. Brockman, "We will likely
3 continue to have the issue of customers complaining that
4 their costs from 3rd party vendors are more expensive
5 with a DMS from Reynolds than ADP." Are you referring
6 only to the Reynolds applications?
7          MS. GULLEY: Objection; form.
8      A. What I'm referring to is, in this, that, you
9 know, we get beat up in the marketplace over, you know,
10 third parties having to pay for a Reynolds-certified
11 interface, and it looks like -- it looks like the way
12 it's going is -- and that's that CDK is going to do it
13 the same way.
14     Q. (By Mr. Nemelka) All right. Let's go to the
15 first page. I want to ask you about a bullet point
16 here.
17         MS. GULLEY: I'm sorry. So we're on 644.
18 You're talking about something other than the "Security"
19 section?
20         MR. NEMELKA: Andi, make your objections.
21 I'm on the first --
22         MS. GULLEY: I'm trying to figure out --
23         MR. NEMELKA: I'm on the first page. I'm
24 on the first page. That's not what you're doing.
25         MS. GULLEY: Mr. Nemelka, I'm asking:

Page 104

1 Are -- we're on the first page of what document?
2          MR. NEMELKA: The document that's right in
3 front of him, Andi.
4          MS. GULLEY: Could you identify the exhibit
5 for the record, please.
6          MR. NEMELKA: This is Exhibit 644.
7          MS. GULLEY: Thank you.
8      Q. (By Mr. Nemelka) Under the section on
9 "Acquisitions" -- since you read the whole document -- I
10 wanted to ask you about a sentence here where you write,
11 "We need to quit talking about DMS systems and focus on
12 RMS and the massive financial advantages of our
13 offering."
14         And my first question is: "RMS" stands for
15 Retail Management Ser- -- is that Retail Management
16 Services or Retail Management System?
17         MS. GULLEY: Objection; form.
18     A. Retail Management System.
19     Q. (By Mr. Nemelka) Okay. And you said you need
20 to -- and this is a speech to your salespeople; is that
21 right?
22         MS. GULLEY: Objection; form.
23     A. That's correct.
24     Q. (By Mr. Nemelka) And you say they -- they need
25 to quit talking about DMS systems and focus instead on

Page 105

1 RMS. What did you mean by that?
2          MS. GULLEY: Form.
3      A. What I mean by that is -- and that's the DMS
4 systems are the -- the traditional, you know,
5 applications of -- of accounting, payroll, parts, you
6 know, service, finance, vehicle inventory, factory
7 communications. That is a suite of applications which
8 has been under long development and, frankly, it's
9 gotten to the point where it's so good that there's
10 nothing much more we can do to it. I know that sounds a
11 little strange but, I mean, that's the truth. The level
12 of requests we have for software enhancement in those
13 application areas is, you know, been kind of like this
14 (indicating) for a long time.
15         The retail management system takes into
16 consideration all of the other applications that
17 surround the DMS, which is under active development.
18 For instance, our docuPAD application and our imaging
19 systems, our advanced service products have been under,
20 you know, steady improvement. And we have considerable
21 competitive advantage in those areas. And so what I'm
22 encouraging them to do is -- and that's to not focus on,
23 you know, the older applications where we -- where
24 everybody is kind of caught up. To be focused -- to
25 focus, instead, on the retail management system, which

27 (Pages 102 - 105)

FTC-0000996

HIGHLY CONFIDENTIAL

Page 106

1 includes all of the other applications that integrate to
2 the central core applications.
3     Q. Thank you for that explanation.
4       (Exhibit 645 was marked for
5       identification.)
6     Q. (By Mr. Nemelka) I've handed you Plaintiff's
7 Exhibit 645. And if you recognize -- the top email is
8 an email from Mr. Schaefer to Ron Workman, dated January
9 6, 2015. But the chain starts with an email from you to
10 Mr. Brockman, also dated January 6, 2015. So do you
11 recognize this document?
12     A. I've got to -- I've got to read it. Okay.
13     Q. So I need to ask you about your email where you
14 write to Mr. Anenen -- this is now January 2015 -- "We
15 have held off on a series of major security enhancements
16 to our DMS systems at your request." So are these the
17 same security enhancements that we saw from 2014 that
18 Reynolds had been holding off on?
19       MS. GULLEY: Objection; form.
20     A. I'm sorry. I don't know what specific ones are
21 involved. I don't -- I'm not a programmer.
22     Q. (By Mr. Nemelka) But still -- Reynolds is
23 still holding off on security enhancements, though,
24 right?
25       MS. GULLEY: Objection; form.

Page 107

1     A. They're -- that's what I was saying to Steve
2 Anenen in this -- in this email. There's no question --
3 you can tell my -- my frustration is increasing and, you
4 know, this is -- this is an or-else kind of email.
5     Q. (By Mr. Nemelka) Right. And you say, "We must
6 proceed with the release of our security enhancements."
7 You say that at the end, right?
8     A. That's correct.
9     Q. And these have been pending for a long time,
10 given the documents we've been looking at, right?
11       MS. GULLEY: Form.
12     A. That's correct. It's been a very frustrating,
13 you know, process.
14     Q. (By Mr. Nemelka) And the security enhancements
15 that you are going to release -- strike that.
16       MS. GULLEY: For the room, the lunch is
17 here.
18       MR. NEMELKA: I want to ask him about one
19 more document. It might be more than one.
20       (Exhibit 646 was marked for
21       identification.)
22     Q. (By Mr. Nemelka) I've handed you Plaintiff's
23 Exhibit 646, which is an email from Bob Schaefer to you,
24 Mr. Brockman, dated January 11, 2015. Do you recognize
25 receiving this email from Mr. Schaefer?

Page 108

1       MS. GULLEY: Form.
2     A. Give me a chance to -- to read it. I'll be
3 with you shortly.
4     Q. (By Mr. Nemelka) Okay.
5     A. Okay.
6     Q. Okay, I want to ask you just about one issue
7 here that he references. First of all, do you recall
8 getting this email from Mr. Schaefer, Mr. Brockman?
9     A. Yes.
10     Q. And the -- an issue -- and it's about the
11 continuing negotiations between CDK and Reynolds;
12 correct?
13       MS. GULLEY: Form.
14     A. Yes.
15     Q. (By Mr. Nemelka) And an issue that -- I mean,
16 I've identified is -- I'm quoting -- "CDK committing to
17 NEVER accessing the Reynolds DMS again." Do you see
18 that at the bottom of the first page?
19       MS. GULLEY: Form.
20     Q. (By Mr. Nemelka) At bottom of the first page,
21 the very last line.
22       MS. GULLEY: Objection; form.
23     Q. (By Mr. Nemelka) Are you there with me,
24 Mr. Brockman?
25     A. I see that, and I'm -- and I'm looking at --

Page 109

1 what the reply was.
2     Q. And --
3       MS. GULLEY: Objection; form.
4     Q. (By Mr. Nemelka) What Mr. Schaefer explains to
5 you is, is that -- and I want to ask you, Mr. Brockman,
6 about the next page, Mr. -- what Mr. Schaefer writes to
7 you about that issue. Second-to-last sentence of
8 that first paragraph up top, he says, "We have added" --
9 meaning Reynolds -- "have added after the 5 years they
10 cannot access the system on behalf of any 3rd party
11 forever." Do you see that?
12       MS. GULLEY: Form.
13     A. Yes.
14     Q. (By Mr. Nemelka) And that's what Reynolds
15 wanted, is for CDK to agree to never access the Reynolds
16 system again on behalf of any third party, right?
17       MS. GULLEY: Form.
18     A. That's certainly what we wanted to happen.
19     Q. (By Mr. Nemelka) And CDK said, at least --
20 current state of the negotiation was for five years.
21 We'll have this wind-down period, but after that, we
22 don't want to agree to the forever, right?
23       MS. GULLEY: Objection; form.
24     A. That -- that was my understanding. And this
25 whole -- I've not been involved at this level of detail

28 (Pages 106 - 109)

FTC-0000997

HIGHLY CONFIDENTIAL

Page 110

1  in this negotiation, which is basically formalizing what
2  the stand-down agreement consists of.  And I know what
3  we asked for and -- and they're -- they're not agreeing.
4      Q.  (By Mr. Nemelka)  Okay.  Reynolds was insisting
5  on forever never accessing.  And CDK, at least, wanted
6  to keep that to five years, right?
7          MS. GULLEY:  Objection; form.
8      Q.  (By Mr. Nemelka)  Right?  What was that -- what
9  was the answer?
10         MS. GULLEY:  Objection; form.
11     A.  That's my understanding.  That's what this is
12  all about.
13     Q.  (By Mr. Nemelka)  And in fact, in the wind-down
14  agreement, it is forever, right?
15         MS. GULLEY:  Objection --
16         MR. NEMELKA:  Let me finish answering my
17  question -- asking my question.
18     Q.  (By Mr. Nemelka)  In fact, it is forever,
19  correct, that CDK agreed to never access the Reynolds
20  system, right?
21         MS. GULLEY:  Objection; form.  This is
22  improper.
23     A.  I would want to go look at that document, but I
24  don't believe it says that.
25         MR. NEMELKA:  All right.  Let's pull it

Page 111

1  out.
2         (Exhibit 647 marked for identification.)
3      Q.  (By Mr. Nemelka)  Mr. Brockman, I've handed you
4  Plaintiff's Exhibit 647, which is the data exchange
5  agreement between CDK and Reynolds.  And the first thing
6  I'm going to do is point you to where you -- you --
7  first of all, you signed this agreement, right, on
8  behalf of Reynolds?
9          MS. GULLEY:  Objection; form.
10     A.  Yes, I did.
11     Q.  (By Mr. Nemelka)  So let's go there.  This is
12  on Page -- on Page 11 of 13.  11 of 13, do you see that,
13  Mr. Brockman, your signature there?
14     A.  Yes.
15     Q.  Dated February 18, 2015?
16     A.  That's correct.
17     Q.  And do you typically read contracts before you
18  sign them?
19         MS. GULLEY:  Objection; form.
20     A.  Umm, it depends.  In this particular case, I
21  did not read this one extensively.  I felt that the --
22  you know, this particular issue had -- or, you know, a
23  stand-down had -- had been, you know, worked on,
24  negotiated at length.  And this one, I was ready to get
25  done.  And so I was -- I had already made up my mind not

Page 112

1  to go ask for any further changes and to agree to, you
2  know, what CDK wanted, just to get it off the table so I
3  could get on with the next project.
4      Q.  (By Mr. Nemelka)  Did you read this before you
5  signed it?
6          MS. GULLEY:  Form.
7      A.  I did not read it.  I -- I -- I skimmed it.
8      Q.  (By Mr. Nemelka)  Okay.  So let's go to Section
9  4.5.  And the Section 4.5 is "Prohibition on Knowledge
10  Transfer and DMS Access."  Do you see that?
11         MS. GULLEY:  Form.
12     A.  Yes, I see that paragraph.
13     Q.  (By Mr. Nemelka)  All right.  And in this
14  paragraph, CDK and Reynolds agreed to two things.
15         MS. GULLEY:  Form.
16     Q.  (By Mr. Nemelka)  Let's look at the first.
17  "Each of Reynolds and CDK further covenants and agrees
18  not to sell, transfer, or assign to any affiliate or
19  third party any technology, business process, or other
20  such knowledge regarding integration with the other
21  party's DMS or take any other steps to assist any person
22  that it reasonably believes to have plans to access or
23  integrate with the other party's DMS without other
24  party's written consent."  Do you see that?
25         MS. GULLEY:  Form.

Page 113

1      A.  Yes, I see that.  And that -- that's a very
2  important provision.
3      Q.  (By Mr. Nemelka)  And -- and what --
4          MS. GULLEY:  Objection.
5      Q.  (By Mr. Nemelka)  What did you agree to there?
6          MS. GULLEY:  I'm sorry.  Were you finished
7  answering the last question?
8          THE WITNESS:  Would you please repeat the
9  last question?
10     Q.  (By Mr. Nemelka)  My question is -- is --
11  was -- was:  Did you see that?  You said, "Yes."  So my
12  que-- -- my pending question is:  What did you agree to
13  there with CDK?
14         MS. GULLEY:  Objection; form.  He was not
15  done answering the last question before that.
16     A.  Okay.  What -- what's at work here is -- and
17  that's that as a result of the, you know, the
18  stand-down, you know, that -- to accomplish that, would
19  require, you know, knowledge of how access is gained
20  to a dealership system.  And so what we're doing is --
21  and that's we're -- we're jointly agreeing with each
22  other that we will not turn loose any kind of knowledge
23  or technology that enables somebody to do that.
24     Q.  All right.  And then the next sentence is, "For
25  the avoidance of doubt, this Section 4.5 is not intended

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL

Page 114

1  as a 'covenant not to compete,' but rather as a
2  contractual restriction of access and attempted access
3  intended to protect the operational and data security
4  integrity of the Reynolds DMS and the CDK DMS and
5  protection of intellectual property."
6         And so my question is:  It was a
7  contractual restriction of access that CDK and Reynolds
8  agreed to, right?
9         MS. GULLEY:  Objection; form.
10     A.  Well, okay.  I'm not -- I'm not -- I'm not
11  seeing that here.  What -- what's intended here is --
12  and that's that -- you know, what's happening is -- and
13  that's that, you know, we're going to gain knowledge
14  about how to get -- how to get into our systems, and
15  they're going to get some knowledge about how to get
16  into ours, okay?  We're agreeing not to disseminate that
17  knowledge, okay?
18         And what we're further saying is -- is
19  look, you know, this is an IP protection provision.  It
20  is not intended as a covenant not to compete, you know.
21  We're going to compete.  But we're not going to -- we're
22  not going to share, you know, the IP to other third
23  parties or fourth parties, you know, as a result of --
24  of this agreement.
25     Q.  (By Mr. Nemelka)  Now, you just saw a document

Page 115

1  where Mr. Schaefer said to you that -- and you testified
2  that Reynolds wanted CDK to agree to never access the
3  Reynolds DMS again, right?
4         MS. GULLEY:  Objection; form.
5         MR. RYAN:  Do you have an exhibit number?
6     A.  There -- there -- that provision did not make
7  it into the final agreement, I don't believe.
8     Q.  (By Mr. Nemelka)  So what is this contractual
9  restriction of access that we're looking at here in 4.5?
10        MS. GULLEY:  Objection; form.
11     A.  It is not restriction of access.  It's
12  restriction of the -- not to disseminate knowledge about
13  how to access.
14     Q.  (By Mr. Nemelka)  Mr. Brockman, it says --
15     A.  It was --
16     Q.  -- "contractual restriction of access and
17  attempted access."  Correct?
18        MS. GULLEY:  Objection; form.
19     A.  But -- but if you look at the heading for 4.5,
20  it's "Provision on Knowledge Transfer" --
21     Q.  Finish reading the -- the --
22        MS. GULLEY:  Objection; form.
23     A.  -- "and DMS Access."
24        MR. NEMELKA:  Let -- let me finish my
25  question.

Page 116

1     Q.  (By Mr. Nemelka)  Please finish reading the
2  entire title of 4.5, Mr. Brockman.
3        MS. GULLEY:  Objection; form.  Just give me
4  a chance to object, Mr. Brockman.
5     A.  It says "Prohibition on Knowledge Transfer and
6  DMS Access."
7     Q.  (By Mr. Nemelka)  All right.
8     A.  And -- and you know, what -- what it's intended
9  to mean is -- and that's that each party is going to
10  have access to intellectual property of the other and
11  that we're both jointly, you know, agreeing not to
12  disclose that.  But, you know, it's not intended to be a
13  covenant not to compete.  It's -- it's simply an issue
14  of intellectual property.
15     Q.  After covenant not to pete -- compete, it
16  doesn't say it's simply an issue of intellectual
17  property, does it?
18        MS. GULLEY:  Objection; form.
19     A.  Yeah, I -- I think the 4.5 heading, you know,
20  goes a long ways towards accomplishing that.
21     Q.  (By Mr. Nemelka)  4.5 heading says "Prohibition
22  of Knowledge Transfer and DMS Access"; correct?
23        MS. GULLEY:  Objection; form.
24     A.  I believe that -- I believe that that's all one
25  issue.  It's not two separate issues.

Page 117

1     Q.  (By Mr. Nemelka)  Prohibition on DMS access?
2        MS. GULLEY:  Objection; form.
3     A.  I believe it's prohibition on knowledge
4  transfer.  Yeah, that's what it's all about.
5     Q.  (By Mr. Nemelka)  But there's an "and" there,
6  isn't there?
7        MS. GULLEY:  Objection; form.
8     A.  I'm sorry.  I have to plead a little bit that
9  I'm not a lawyer like you are, and -- and, you know,
10  this document has got lots of words in it.  And I do not
11  believe that that was the intent of the drafter.
12     Q.  (By Mr. Nemelka)  Even though -- well, if we go
13  back to the document where -- well, this is -- what you
14  testified is that CDK agreed not to access for five
15  years.  It was just the "forever" part that they didn't
16  agree to, right?
17        MS. GULLEY:  Objection; form.  What's the
18  exhibit, as Mr. Ryan asked a while back.
19        MR. NEMELKA:  646.
20     Q.  (By Mr. Nemelka)  I'm reminding Mr. Brockman of
21  his testimony.
22        MS. GULLEY:  Objection.  That is not
23  correct.  Objection to that statement.
24     Q.  (By Mr. Nemelka)  It says here, that we just
25  saw, "We have added" -- as we've -- as we've already

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL

Page 118

1 done, "We have added after the 5 years they cannot
2 access the system on behalf of any 3rd party forever."
3 Do you recall that?
4        MS. GULLEY:  Objection; form.
5    A.  That -- that's what it says.  That's what we're
6 asking for.  We did not get that provision.
7    Q.  (By Mr. Nemelka)  Are you aware of how long
8 Section 4.5 lasts?
9        MS. GULLEY:  Objection; form.
10   A.  Again, I'll confess that I'm not an attorney
11 and I -- you know, as far as the duration of provisions,
12 I don't know what it says.
13   Q.  (By Mr. Nemelka)  All right.  Let's go to
14 Section 6.1 of the agreement.  Are you there with me?
15 6.1?
16   A.  I'm sorry.  I thought I was.
17   Q.  Are you there with me?
18   A.  Yes.
19   Q.  "With the exception of the obligations set
20 forth in Sections 4.5" -- that was the section we were
21 just looking at, right, Mr. Brockman?
22        MS. GULLEY:  Objection; form.
23   Q.  (By Mr. Nemelka)  4.5 is the section we were
24 just looking at; correct?
25        MS. GULLEY:  Form.

Page 119

1    A.  Yes.  "Prohibition of Knowledge Transfer."
2    Q.  (By Mr. Nemelka)  "And DMS Access."  I know you
3 want to leave off the last part.  But it says "and DMS
4 access"; correct?
5        MS. GULLEY:  Objection; form.
6        MR. RYAN:  Object to form.
7        MS. GULLEY:  And move to strike the
8 instruction.
9    Q.  (By Mr. Nemelka)  "With the exception of the
10 obligations set forth in Sections 4.5" -- and it even
11 identifies it as "[Prohibition on Knowledge Transfer and
12 DMS Access]...this Agreement shall terminate at the end
13 of the Wind Down Period."
14        MS. GULLEY:  Objection.
15   Q.  (By Mr. Nemelka)  So --
16   A.  I see what you're saying, but I've got to
17 reiterate again, okay?  It's been a long war with ADP.
18 The long war is -- has finally settled, okay?  I heave a
19 sigh of relief.  My guys, their guys, our attorneys,
20 their attorneys, they build this document.  It comes to
21 me for signature.  And I said, "My God, I'm -- I'm
22 happy -- I'm happy to sign this damn thing and have it
23 off the list."  You know, I did not read it, certainly
24 not at the level of detail that you're talking about.
25        You know, I would further support that the

Page 120

1 stand-down worked.  You know, they, in fact, you know,
2 got out of our systems.  They quit -- they quit hacking
3 them, you know.  They quit -- quit being bandits.  They
4 got out.
5        And we accomplished the transition such
6 that none of -- none of our mutual customers -- the
7 dealerships that are our mutual customers, where we got
8 the DMS but, you know, they've got a third party that's
9 been doing something else -- nobody got mad.  Nobody
10 got -- I didn't get any letters.  I didn't get any angry
11 phone calls.  So, you know, whatever this document is
12 and whatever shortcomings it might have, it worked.
13        MR. NEMELKA:  We can take lunch.
14        MS. GULLEY:  Let's go off the record.
15        THE VIDEOGRAPHER:  The time is 12:38 p.m.
16 We're off the record.
17        (Short recess 12:38 to 1:42 p.m.)
18        THE VIDEOGRAPHER:  The time is 1:42 p.m.
19 We're back from lunch and we're back on the record.
20        EXAMINATION (Continuing)
21 BY MR. NEMELKA:
22   Q.  Good afternoon, Mr. Brockman.
23   A.  I'm sorry we don't have a prettier day for
24 you-all.
25   Q.  It's still beautiful views.

Page 121

1    A.  It has been really pretty.
2    Q.  So after Reynolds and CDK concluded the -- the
3 wind-down agreement, Reynolds then did release those
4 security enhancements that it had been holding off on;
5 correct?
6        MS. GULLEY:  Form.
7    A.  I'm not personally aware, but that's my --
8 that's my belief.
9    Q.  (By Mr. Nemelka)  And after the agreement,
10 Reynolds protected the user IDs that CDK was using to
11 access the Reynolds system; is that right?
12        MS. GULLEY:  Objection; form.
13   A.  That was part of the stand-down agreement, and
14 it's my understanding that's now all over.
15   Q.  (By Mr. Nemelka)  So the security enhancements
16 did not affect CDK's access to the sys- -- to the
17 Reynolds system, right?
18        MS. GULLEY:  Form.
19   A.  That's correct.  The whole goal of -- of the
20 stand-down agreement was to provide for an orderly
21 stand-down, and that -- and that meant enabling their
22 customers to operate without issue during the stand-down
23 period.
24   Q.  (By Mr. Nemelka)  But those security
25 enhancements did affect Authenticom, right?

31 (Pages 118 - 121)

FTC-0001000

HIGHLY CONFIDENTIAL

Page 122

1        MS. GULLEY:  Objection; form.
2    A.  I -- I'm not aware.
3    Q.  (By Mr. Nemelka)  They were intended to, right?
4        MS. GULLEY:  Objection; form.
5    A.  No.  Again, our security enhancements are --
6    are not specifically aimed at any individual entity.
7    The problem is, we can't, because when we see things
8    happening, people coming into our system, we don't know
9    who they are and -- and we can't track who they are.
10   And therefore, unless they have put in their user ID,
11   something that identifies them, we don't know who they
12   are.
13   Q.  (By Mr. Nemelka)  After you entered into this
14   agreement with CDK, you started to approve some --
15   strike that.
16       After you entered into the agreement with
17   CDK, you believed that the logic had shifted somewhat
18   with respect to pricing that you offered dealers who
19   were coming on board, right?
20       MS. GULLEY:  Objection; form.
21   A.  I -- I disagree with that.  I think that our --
22   our position, as far as negotiating the discounts and
23   whatever raised all the time.  And it depends a lot on
24   the overall macroeconomic situation that we're facing
25   nationwide or, specifically, what the -- the certain

Page 123

1    states, certain market areas go through periods of
2    tougher times, discounting various -- all over the
3    point.
4    Q.  (By Mr. Nemelka)  The logic had shifted
5    somewhat due to you getting the CDK RCI business, right?
6        MS. GULLEY:  Form.
7    A.  I don't believe that's the case at all.  I
8    think that -- since I'm the one that's personally in
9    charge of -- of approving this percentage discounts,
10   they're part of the market conditions.  The -- our
11   competitors go through cycles.  If you can watch, for
12   instance, CDK -- CDK in the month or two before their
13   year-end -- their fiscal year-end, they'll be much more
14   aggressive in discounting.
15       Other competitors have other, you know,
16   closing of sales quota deadlines.  And they get really
17   aggressive just before the deadline, because they're
18   trying to, you know, meet their quotas so they get their
19   bonuses.  And that's the drivers behind percentage
20   discounts.
21       (Exhibit 648 marked for identification?)
22   Q.  Mr. Schaefer, I've handed you Plaintiff's
23   Exhibit 648 --
24       MS. GULLEY:  Brockman.
25       MR. NEMELKA:  Sorry.  Mr. Brockman.  What

Page 124

1    did I say?  Schaefer?
2    Q.  (By Mr. Nemelka)  Mr. Brockman, I've handed you
3    Plaintiff's Exhibit 648.  And the email I'm focusing on
4    is your email dated Thursday, May 7th, 2015 to Agan,
5    where you write, "The logic has shifted somewhat due to
6    us getting the CDK RCI business (and soon to get
7    Authenticomas [sic] well)."  Do you see where you wrote
8    that?
9        MS. GULLEY:  Form.
10   A.  Yes, I do.
11   Q.  (By Mr. Nemelka)  And then you wrote, "A deal
12   with numbers of dealerships will have a number of
13   additional RCI 3rd parties where we get that revenue if
14   we have those dealership's DMS systems."  Do you see
15   that?
16       MS. GULLEY:  Form.
17   A.  Yes, I do.
18   Q.  (By Mr. Nemelka)  So the logic had shifted a
19   little bit, because now you're going to be getting the
20   additional RCI revenue if the dealers are using your
21   DMS, right?
22       MS. GULLEY:  Objection; form.
23   A.  I don't think this has anything to do with the
24   percentage discounts on deals.  This is obviously
25   talking about customers.

Page 125

1    Q.  (By Mr. Nemelka)  Right.  DMS customers;
2    correct?
3    A.  Yes.
4    Q.  If you turn to the next page, I believe that
5    Mr. Agan is asking you for your approval at the bottom.
6    "Are you okay with a 55.38% discount?"
7        MS. GULLEY:  Form.
8    Q.  (By Mr. Nemelka)  Do you see where he says
9    that?
10   A.  I see that --
11       MS. GULLEY:  Objection; form.
12   A.  -- but I'm -- I'm reading the rest of it to see
13   what, in context, that's all about.  Could you repeat
14   your question, please?
15   Q.  (By Mr. Nemelka)  Sure.  Mr. Agan asked you if
16   you would approve of 55.38 percent discount for this
17   dealer that you were trying to sign; correct?
18       MS. GULLEY:  Form.
19   A.  That's correct.
20   Q.  (By Mr. Nemelka)  You approved it, because the
21   logic had shifted somewhat, due to you getting the CDK
22   RCI business and Authenticom's as well, right?
23       MS. GULLEY:  Objection; form.
24   A.  I think I've already, you know, said that those
25   two sentences you said, that I see them.

32 (Pages 122 - 125)

FTC-0001001

HIGHLY CONFIDENTIAL

Page 126

1    Q.  (By Mr. Nemelka)  Okay.  Your contract with
2   CDK -- you can set that aside Mr. Brockman -- your
3   contract with CDK required Reynolds to take over all of
4   CDK's existing third-party relationships, regardless of
5   size; isn't that right?
6         MS. GULLEY:  Form.
7    A.  Third-party relationships where they were, you
8   know, hacking our systems, that's when I was talking
9   about.
10    Q.  (By Mr. Nemelka)  "Third parties," meaning the
11   vendors to whom CDK was providing Reynolds dealer data,
12   right?
13         MS. GULLEY:  Form.
14    A.  Yes, that's correct.
15    Q.  (By Mr. Nemelka)  You also wanted to take every
16   Authenticom customer that came to you, regardless of
17   size; correct?
18         MS. GULLEY:  Objection; form.
19    A.  I -- I don't think that's correct.
20         (Exhibit 649 was marked for
21          identification.)
22    Q.  (By Mr. Nemelka)  I've handed you what I've
23   marked as Plaintiff's Exhibit 649, which is an email
24   chain between you and Tommy Barras and Bob Schaefer.
25   And the email I want to focus on, Mr. Brockman, is the

Page 127

1   one that you sent on Friday, August 21st, 2015, at the
2   bottom, to Tommy Barras, where you write, "We also want
3   to take every Authenticom customer that comes to us,
4   regardless of size."  It's at the bottom of that page.
5   Do you see that?
6         MS. GULLEY:  Objection; form.
7    A.  I think what's going on here is in -- as the --
8   our agreement with CDK requires us to take over all
9   their existing third-party relationships.  That's an
10   integral part of this stand-down.
11         Generally speaking, you know, we're not
12   interested in just anything, as far as size is
13   concerned.  You know, small dealers are not, you know,
14   what our target market is.  You know, we're -- we live
15   more in the larger dealer -- or larger group
16   marketplace.  And so therefore, you know, the comments
17   as far as Authenticom is concerned, you know, they all
18   relate to size more than anything else.
19    Q.  (By Mr. Nemelka)  You wrote here, "We also want
20   to take every Authenticom customer that comes to us,
21   regardless of size"; correct?
22         MS. GULLEY:  Objection; form.
23    Q.  (By Mr. Nemelka)  Very bottom, last -- the last
24   thing on the page.
25         MS. GULLEY:  Objection; form.

Page 128

1    Q.  (By Mr. Nemelka)  You wrote that; correct?
2         MS. GULLEY:  Form.
3    A.  Yes, I did.  But I think that that was at -- at
4   a point in time that that's not been our policy ongoing,
5   regardless of size -- to take people -- take customers
6   that are -- regardless of size.  You can look at our --
7   our customer base, you know, we're predominantly larger
8   dealerships.
9    Q.  (By Mr. Nemelka)  Authenticom customers are
10   the -- are not dealerships.  They're -- they're ven- --
11   they're vendors, right?
12         MS. GULLEY:  Form.
13    Q.  (By Mr. Nemelka)  Well, they're both, but the
14   customers you're talking about here are the vendors that
15   need access to dealer data, right?
16         MS. GULLEY:  Form.
17    A.  Yeah, but I think the -- certainly, you know,
18   those types of customers vary greatly in size as well.
19    Q.  (By Mr. Nemelka)  And so if -- if a vendor is
20   small and doesn't serve that many dealers, you're not
21   interested in -- in serving them, then?
22         MS. GULLEY:  Form.
23    A.  It's a matter of priority.  We have, you know,
24   great development resources, but all development
25   resources are not without limit.  And therefore, from

Page 129

1   time to time, we get really busy and we get really
2   behind.  And therefore, our -- our appetite for, you
3   know, small situations, you know, varies.
4    Q.  (By Mr. Nemelka)  In fact, after this agreement
5   with CDK, you had a lot of -- a lot of work to bring on
6   all of the former CDK customers into the RCI program,
7   right?
8         MS. GULLEY:  Objection; form.
9    A.  That's correct.
10    Q.  (By Mr. Nemelka)  You wrote that you had a
11   mountain of work ahead of you, with over 100 RCI
12   customers to convert, right?
13         MS. GULLEY:  Form.
14    A.  I believe at one point in time, that I -- I
15   made that statement because that was the case.
16    Q.  (By Mr. Nemelka)  And by mid-2017, two years
17   later, Reynolds had successfully converted many of those
18   former CDK vendors into the RCI program, right?
19         MS. GULLEY:  Form.
20    A.  I'm not sure about that specific date.  But I
21   do know we made steady progress and... (Pause.)
22         (Exhibit 650 was marked for
23          identification.)
24    Q.  (By Mr. Nemelka)  I've handed you Plaintiff's
25   Exhibit 650, which is an email from Tommy Barras to you,

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

Page 130

1 dated Friday, July 7th, 2017. Who is Tommy Barras?
2       MS. GULLEY: Form.
3    A. Tommy Barras is head of our -- our software
4 group.
5    Q. (By Mr. Nemelka) And he wrote to you about CDK
6 vendors that moved into the RCI program, right?
7    A. That's correct.
8    Q. And he writes, "Bob, In 2015 you challenged
9 DEV" -- what is DEV, a development?
10   A. Development.
11   Q. Software development?
12   A. Yes.
13   Q. -- "and DSV" -- is that data services?
14   A. That's correct.
15   Q. -- "(Schaefer) with absorbing 157 CDK vendors
16 into the RCI program." Do you see that?
17   A. That's correct.
18   Q. Now, these are not vendors that CDK owned.
19 These are former CDK customers, right?
20      MS. GULLEY: Form.
21   A. That's correct. These -- these are companies
22 that had been employing CDK to enter our system as, you
23 know, hackers.
24   Q. (By Mr. Nemelka) And as part of the wind-down,
25 CDK worked with you to transition those customers to

Page 131

1 Reynolds so that they could join the RCI program;
2 correct?
3       MS. GULLEY: Objection; form.
4    A. That's correct.
5    Q. (By Mr. Nemelka) And it was CDK's access to
6 the Reynolds system on behalf of those customers that
7 you protected during that five-year wind-down period,
8 correct?
9       MS. GULLEY: Objection; form.
10   A. That's correct.
11   Q. (By Mr. Nemelka) You asked Mr. Schaefer to
12 calculate the amount of revenue that Reynolds was
13 supposed to realize out of this agreement with CDK,
14 right?
15      MS. GULLEY: Objection; form.
16   A. I don't know that I asked that specifically of
17 Bob Schaefer.
18   Q. (By Mr. Nemelka) You asked -- you asked
19 somebody on -- on your team to calculate the amount of
20 revenue that Reynolds was supposed to realize out of the
21 CDK deal, right?
22      MS. GULLEY: Objection; form.
23   A. I don't recall what that was, but it may well
24 have -- it may well have occurred.
25   Q. (By Mr. Nemelka) Regardless of who it was, you

Page 132

1 made that request. You wanted to know how much
2 Reynolds -- how much -- the amount of revenue that
3 Reynolds was supposed to realize out of the deal, right?
4       MS. GULLEY: Objection; form.
5    A. That's correct. We -- we had -- as I think
6 we've -- before lunch, I talked about the fact that we
7 had -- CDK had cost us a lot of -- a lot. And, you
8 know, we were hoping to make back these, you know,
9 third-party vendors coming directly to us through the
10 RCI program as opposed to going through CDK. That was
11 our way to ultimately dig out of the hole, you know,
12 from a a -- a money standpoint that we had been put
13 through by CDK.
14   Q. (By Mr. Nemelka) You testified earlier they
15 cost you millions in this form of -- market -- market
16 messaging about data security and losing dealer
17 customers, right?
18   A. It's cust- --
19      MS. GULLEY: Objection; form.
20      You just have to let him finish his
21 question and then you can answer.
22   A. That consists of the revenue we lost by
23 customers that we should have been able to sell but
24 couldn't sell, or customers -- which was the -- the more
25 minor group, customers that actually left us because

Page 133

1 of -- because of security.
2    Q. (By Mr. Nemelka) And those customers you're
3 referring to are the dealers, not --
4    A. That's right.
5       MS. GULLEY: Objection; form.
6       Just -- just -- for the court reporter and
7 for the record, he'll ask his question and then you
8 answer.
9       MR. NEMELKA: We're doing okay, but --
10   Q. (By Mr. Nemelka) And -- excuse me -- your team
11 did calculate the val- -- the amount of revenue that
12 Reynolds was supposed to realize out of the CDK deal,
13 right?
14      MS. GULLEY: Form.
15   A. I see that you're referring to documents that
16 I'm not -- I'm not having the opportunity to look at.
17   Q. (By Mr. Nemelka) Well, I'm just wondering --
18 you remember if you made this request, and your team did
19 actually make that calculation; correct?
20      MS. GULLEY: Objection; form.
21   A. Yes, I believe they did. It looks like -- if
22 that's what you're looking at. It's not being shared
23 with me, which -- which I find, you know, a little
24 unusual.
25   Q. (By Mr. Nemelka) All right. I'm just trying

34 (Pages 130 - 133)

FTC-0001003

HIGHLY CONFIDENTIAL

Page 134

1 to get -- get through this efficiently. I'm not trying
2 to do anything else.
3         MS. GULLEY: Objection to the statement.
4     Q. (By Mr. Nemelka) Okay. Well, then, let's do
5 --
6     MR. NEMELKA: 69.
7     (Exhibit 651 was marked for
8     identification.)
9     Q. (By Mr. Nemelka) I truly am only going to show
10 you that one part about the -- this is a big, long
11 document -- I'm only going to show you -- or ask you
12 about the part that we just talked about, which is the
13 team calculating the value of the CDK deal with you. If
14 you intend on reading this whole thing, then I'll just
15 skip. So I'm --
16     THE WITNESS: What's that about?
17     MS. GULLEY: I object to everything you
18 just said: Statements, instructions, et cetera. But
19 first of all, can you at least hand it to him?
20     Q. (By Mr. Nemelka) I'd like to mark Exhibit
21 Plaintiff's Exhibit 651, which is an email from Craig
22 Moss to you, Mr. Brockman, dated Friday, August 25th,
23 2017, the subject being "July 2017 Financials." Do you
24 see that that's the subject, at least, of this?
25     MS. GULLEY: Form.

Page 135

1     Q. (By Mr. Nemelka) Mr. Brockman?
2     MS. GULLEY: Form.
3     A. If I can just kind of leaf through what -- what
4 this... (Pause.)
5         This appears to be part of our confidential
6 internal financial information. And so, therefore, it's
7 okay that I don't have to read every page of it.
8     Q. (By Mr. Nemelka) Thank you. So you received
9 monthly financials like this from Mr. Moss?
10     MS. GULLEY: Form.
11     A. They're not financial statements. They're
12 management reports concerning the finances. That's the
13 technically accurate description.
14     Q. (By Mr. Nemelka) And this is one from July
15 2017, that you received?
16     MS. GULLEY: Form.
17     A. Yes.
18     Q. (By Mr. Nemelka) And if you could turn with me
19 to Page 17. There you are. On the bottom-highlighted
20 part, which is how it was produced to us -- you see the
21 bottom-highlighted part that says, "We are expecting an
22 annual revenue of approximately $30 million (original
23 $21M, plus additional dealers, added interfaces and
24 price increases, etc) generated from the CDK Deal."
25     A. Yeah, that means that --

Page 136

1     MS. GULLEY: Objection; form.
2     A. -- in 10 to 12 years, we might break out.
3     Q. (By Mr. Nemelka) What do you mean by that?
4     MS. GULLEY: Form.
5     A. Well, as -- as I've stated before, CDK's
6 position, as far as hacking our customers, has cost us
7 millions. And, you know, based upon this amount of
8 money, we got a ways to go.
9     Q. (By Mr. Nemelka) The annual revenue, though,
10 is 30 million, that they calculated, correct?
11     MS. GULLEY: Objection; form.
12     A. That's what it says.
13     Q. (By Mr. Nemelka) And that includes added
14 interfaces, which means additional RCI customers, right?
15     MS. GULLEY: Form.
16     A. No. I don't think that -- "additional
17 interfaces" means additional datasets that third parties
18 would want out of Reynolds systems.
19     Q. (By Mr. Nemelka) That they were getting from
20 CDK before?
21     MS. GULLEY: Form.
22     A. No. It's kind of like pitter-patter, like the
23 rain. Either OEMs or various third parties want more
24 data or different types of data, and it's not related to
25 the -- the stand-down agreement at all. It's just part

Page 137

1 of their, you know, their desire for more data.
2     Q. (By Mr. Nemelka) And now that they're
3 customers of Reynolds, you get the financial benefit of
4 that; correct?
5     MS. GULLEY: Form.
6     A. That's correct.
7     Q. (By Mr. Nemelka) I skipped one. "Plus
8 additional dealers," meaning -- what -- what does that
9 mean?
10     MS. GULLEY: Objection; form.
11     A. Well, what I believe that means is -- and
12 that's that there's constant movement as far as
13 ownership of dealerships. And if we have a group that
14 has dealerships in it and they're all on Reynolds, if
15 that dealer buys another dealer, so they -- he now has
16 11, what's going to happen is -- and that's if that
17 dealer is not already on Reynolds -- he's going to
18 convert to Reynolds, likely, and vice versa.
19         If there's a group of -- of ten
20 dealerships, all of which are on CDK, and they buy
21 another dealership that's on Reynolds, you know, the
22 odds are very, very, very high that that dealership will
23 be converted to CDK. And all that has some impact on
24 what's going on in the world.
25     Q. (By Mr. Nemelka) And then you list price,

35 (Pages 134 - 137)

FTC-0001004

HIGHLY CONFIDENTIAL

Page 138

1 here -- what is listed here is price increases. So
2 price increases for -- for DMS and RCI?
3        MS. GULLEY: Objection; form.
4     A. It's just -- it's part of our standard
5 pricing-based process.
6     Q. (By Mr. Nemelka) But the price increases here
7 would have referred to price increases for DMS, right?
8        MS. GULLEY: Objection; form.
9     A. Our price increase policy covers all -- all
10 products, you know, all services.
11    Q. (By Mr. Nemelka) What is your price increase
12 policy?
13       MS. GULLEY: Objection; form.
14    A. It is -- you know, typically CPI plus 2, which
15 represents the normal rate of CPI plus those things that
16 cost us extra, because we're in the high tech business.
17 Principally, salaries.
18    Q. (By Mr. Nemelka) So you -- so for your DMS
19 business, your standard price increases every year is
20 CPI plus 2 percent?
21    A. That's correct.
22       MS. GULLEY: Form.
23    Q. (By Mr. Nemelka) And for -- okay.
24       And this 30 million is an annual number,
25 it's not -- you said over 10 to 12 years. That -- that

Page 139

1 30 million is not over 10 to 12 years. That 30 million
2 is an annual number, right?
3     A. That's not what I meant at all. When I say
4 that CDK has cost us in the millions, I'm not talking
5 about the 30 or 40 or 50 million, I'm talking in the
6 hundreds of millions, over time. And, you know, so it
7 takes a while before $30 million worth of revenue out of
8 this particular situation even begins to make up for
9 what they've done.
10    Q. You said 10 to 12 years, so 30 times 10, about
11 300 to $360 million?
12    A. Absolutely.
13       MS. GULLEY: Objection; form.
14    A. Absolutely.
15    Q. (By Mr. Nemelka) Is what CDK cost you as a
16 result of them -- their data access on the Reynolds
17 system?
18    A. Yeah, and the fact that they badmouthed you,
19 know, our process, I think, unjustifiably. And they --
20 and they did that, you know, high and wide, you know, in
21 the -- in the market.
22    Q. Badmouthing your data access policies in the
23 market; is that right?
24       MS. GULLEY: Objection; form.
25    A. That's correct.

Page 140

1     Q. (By Mr. Nemelka) CDK doesn't badmouth your
2 data access policies anymore, does it?
3        MS. GULLEY: Objection; form.
4     A. It's not been as prevalent as it was before.
5     Q. (By Mr. Nemelka) That badmouthing large- --
6 largely stopped after you entered into this agreement
7 with them, right?
8        MS. GULLEY: Objection; form.
9     A. Again, I have no way of measuring that.
10    Q. (By Mr. Nemelka) It wasn't just CDK and
11 Authenticom that you wanted to get -- get rid of. You
12 wanted to get rid of all independent data integrators
13 that dealers were using for automated access to the
14 Reynolds -- Reynolds system; correct?
15       MR. RYAN: Object to form.
16    A. I -- I definitely want to eliminate, you know,
17 completely, you know, all automated access to Reynolds
18 systems. It's -- it is a classic security breach.
19    Q. (By Mr. Nemelka) Could Reynolds -- could CDK
20 access your system today with their independent
21 integrators?
22       MS. GULLEY: Objection; form.
23       MR. RYAN: Objection; form.
24    A. When you say "independent integrators," I don't
25 recognize that term.

Page 141

1     Q. (By Mr. Nemelka) Meaning DMI and Integra
2 Link!.
3        MS. GULLEY: Objection; form.
4     A. The people -- the guys that are in the hacking
5 business, the bandits?
6     Q. (By Mr. Nemelka) Yeah.
7     A. Yeah, I don't know. As I've said before, you
8 know, security is a cat-and-mouse game, and it could
9 well be that they, you know, figured out some new way,
10 and it's -- where I -- it's not discernible to us who it
11 actually is. It could be in there today and --
12 because that's the nature of it, of -- of the situation.
13       You know, somebody on the outside figures
14 out a new way to come in. We don't know who it is. You
15 know, we figure out how to block it. You know, the only
16 way we know for sure, you know, was when somebody
17 squawks.
18    Q. One of the independent integrators was
19 StoneEagle; correct?
20       MS. GULLEY: Objection; form.
21    A. Yes.
22    Q. (By Mr. Nemelka) I've handed you Plaintiff's
23 Exhibit 652.
24       (Exhibit 652 was marked for
25          identification.)

36 (Pages 138 - 141)

FTC-0001005

HIGHLY CONFIDENTIAL

Page 142

1    Q.  (By Mr. Nemelka)  This is an email from you to
2  Mr. Schaefer, dated April 14, 2016.  And your question
3  is:  "Bob, When do we get rid of StoneEagle?"  And
4  that's referring to not allowing them to access dealer
5  data on the Reynolds DMS anymore, right?
6         MS. GULLEY:  Objection; form.
7    A.  That -- that's correct.  We are -- we are now,
8  finally -- you know, StoneEagle has joined the RCI
9  program, and they had to make a -- a number of changes
10  in their software, and all that's been accomplished.
11  And they're now a -- in a peaceful situation as far as
12  we're concerned.  They're -- they're in the RCI program.
13  They're getting their data.  They're getting their
14  business done.
15    Q.  (By Mr. Nemelka)  For a while, Reynolds had
16  been protecting their access to the -- to -- to the
17  system; correct?
18         MS. GULLEY:  Objection; form.
19    A.  It -- it is -- it is typical in the situation
20  where we have a -- a -- a party, which is doing like
21  StoneEagle was, which is, basically, hacking in.  And
22  they say, "Oh, well, we're sorry.  We'll do better.
23  We'll sign up for RCI."  And they do, but they don't get
24  it done.  They -- they don't -- they don't make the
25  changes in on their side that's necessary for them to

Page 143

1  access through the RCI program, and so they linger in
2  this, you know, this -- this in-between mode.  That, you
3  know, of all the -- the one's where that issue came up,
4  StoneEagle was the worst.  And it is with a sigh of
5  relief that that's fixed, done, over with.
6         (Exhibit 653 was marked for
7          identification.)
8    Q.  (By Mr. Nemelka)  I've handed you Plaintiff's
9  Exhibit 653, which is an email from you to Mr. Schaefer,
10  dated Wednesday, April 19, 2017, where you write to
11  Mr. Schaefer, "Bob, Give them written notice that we
12  will shut down their current method of access for
13  security reasons on June 1, 2017."  And that referred to
14  StoneEagle; correct?
15    A.  That first email doesn't say that it's
16  StoneEagle, but I believe in context with the second
17  email, it does indicate that it is StoneEagle.
18    Q.  And up to the time, and for -- for several
19  years, their method of access had been protected while
20  they were applying for the RCI program, right?
21         MS. GULLEY:  Objection; form.
22    A.  That's correct.
23    Q.  (By Mr. Nemelka)  And their method of access
24  was -- I'm sorry, Mr. Brockman.
25    A.  I don't understand their method of access.  It

Page 144

1  was their method.  They -- they were doing it all on
2  their own.  You know, this indicates, you know, what
3  I've been saying all along.  We were very, very
4  frustrated by these people.  And I think this one line
5  here, which says, "I think its 2 years now we've been
6  strung out......." -- we were not happy.
7    Q.  Mr. Brockman, in 2015, you asked Mr. Schaefer
8  about -- questions about the state of affairs before
9  Authenticom got cut -- got shut off.  You wanted to know
10  how many DMS providers' data does Authenticom provide
11  Reynolds.  Two, and how many dealerships for each DMS
12  providers was Authenticom serving Reynolds apps with?
13  Do you recall asking Mr. Schaefer to compile that
14  information?
15         MS. GULLEY:  Objection; form.
16    A.  Not specifically, but I would -- not be unusual
17  for me to ask that.
18         (Exhibit 654 was marked for
19          identification.)
20    Q.  (By Mr. Nemelka)  Mr. Brockman, I've handed you
21  Plaintiff's Exhibit 654, which is an email from
22  Mr. Schaefer to you, dated Friday, November 20th, 2015.
23  I will give you a chance to look at it, but your email
24  to him starts the chain on the back page.
25    A.  I'm looking on the back page.  If you recall,

Page 145

1  earlier today, I mentioned the term "ReminderTrax."
2    Q.  Mm-hmm.
3    A.  It's a -- it's a service reminder program for
4  dealerships, to remind their -- their customers to come
5  back in and have oil changed or other routine
6  preventative maintenance.  And I said that, you know,
7  that was a very minor thing that was going on, and it
8  talks -- right here, it says, "16 CDK dealers," which,
9  in the scope of things, is -- is a very, very small
10  situation.
11    Q.  Mr. Sch- -- Brockman, if you look at the first
12  page, though, it's identified "ReminderTrax."  There's
13  199 CDK connections that Authenticom provides.  Do you
14  see that?
15         MS. GULLEY:  Objection; form.
16    A.  Can you point that one out to me?
17    Q.  (By Mr. Nemelka)  Sure.
18    A.  I'm not --
19    Q.  Right there (indicating).
20    A.  Okay.
21         MS. GULLEY:  Objection; form.
22    A.  Okay, I stand corrected.
23    Q.  (By Mr. Nemelka)  And what's listed here
24  are the various Reynolds applications -- are the -- are
25  the columns, MMS, AIMDATA, ReminderTrax, IMN and so

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

1  forth, right?
2        MS. GULLEY:  Form.
3        Q.  (By Mr. Nemelka)  Those are the columns?
4        MS. GULLEY:  Form.
5        Q.  (By Mr. Nemelka)  Is that right?
6        MS. GULLEY:  Form.
7        A.  Okay.  Would you repeat that again?
8        Q.  (By Mr. Nemelka)  Sure.  These datas
9  along these -- companies along the top, MMS, AIMDATA,
10  ReminderTrax, IMN, Xtream, OnlineD and KeyTrack, those
11  are Reynolds applications; correct?
12        A.  Correct.
13        Q.  And on the left are the DMSs that dealers use;
14  correct?
15        A.  Yes.  Okay.  I -- I understand that now.
16        Q.  And what this is showing is the connections
17  that Authenticom provides to the dealers using these
18  DMSs; correct?
19        MS. GULLEY:  Objection; form.
20        Q.  (By Mr. Nemelka)  For -- for these various
21  applications?
22        MS. GULLEY:  Objection; form.
23        Q.  (By Mr. Nemelka)  Is that correct?
24        MS. GULLEY:  Form.
25        A.  For instance, if he looks at the CDK line,

Page 147

1  that's where the 199 number is.  And I -- I'm afraid I'm
2  not getting what you're trying to get at as far as
3  this -- this chart is concerned.
4        Q.  (By Mr. Nemelka)  All right.  Well, just --
5  what Mr. Schaefer is reflecting here are the number
6  of -- he's answering your question, which is: "What DMS
7  provider's data does Authenticom provide to us?  How
8  many dealerships are there from each DMS provider?"
9  Those are the questions that you asked on the email that
10  we looked at, right?
11        MS. GULLEY:  Form.
12        A.  You -- you keep referring to the CDK line.
13  What's that got to do with Authenticom?
14        Q.  (By Mr. Nemelka)  These are the CDK -- numbers
15  of -- that the dealers that use CDK for whom Authenticom
16  is providing access to that data for these Reynolds
17  applications.
18        MS. GULLEY:  Objection; form.  Is that a
19  question?
20        Form.
21        Q.  (By Mr. Nemelka)  If you look back at your
22  que- -- at your email, you say, "Bob, Questions on the
23  state of affairs before Authenticom got shutoff....."
24  Do you see that?  Your email to Mr. Schaefer?
25        A.  Yes.

Page 148

1        Q.  And you say, "What DMS provider's data does
2  Authenticom provide to us?"  Do you see that?
3        A.  Yeah, but, you know, you keep referring to the
4  CDK line, and that's not the Authenticom line.
5        Q.  Right.  But -- but your question was:  How many
6  dealerships are there from each DMS provider that
7  Authenticom provides you with access?
8        A.  Okay.  But --
9        MS. GULLEY:  Objection; form.
10        A.  Okay.  But the point that I'm -- I'm not -- I'm
11  not getting is -- is what does Authenticom have to do
12  with the CDK line on -- on this -- on this chart?  These
13  are -- it appears to me, that these are dealership's
14  data that CDK is providing to ReminderTrax.  For
15  instance, that 199 number.  ReminderTrax is -- is the
16  Reynolds application, and the 199 is -- is the
17  dealerships that -- where CDK has been -- has been
18  serving up -- up to that application.  Authenticom is --
19  is not related to that line.
20        Q.  (By Mr. Nemelka)  Well, we can ask Mr. Schaefer
21  what he did here.  My understanding was that he is
22  providing with you the number -- he's answering your
23  questions, which is:  "The state of affairs before
24  Authenticom got cut off," "What DMS provider's data does
25  Authenticom provide to us?" and "How many dealerships

Page 149

1  are there from each DMS provider" for that?
2        MS. GULLEY:  Objection to that.
3        A.  Okay.
4        MS. GULLEY:  There's no question.
5        A.  I -- I understand the question.  I just don't
6  see where that answer is -- the CDK line on the first
7  page.
8        Q.  (By Mr. Nemelka)  Okay.  We'll ask Mr. Schaefer
9  about that.  You can put that aside.
10        Mr. Schaefer, are you aware --
11        MS. GULLEY:  Mr. Brockman.
12        MR. NEMELKA:  I'm sorry.  Strike that.
13        Q.  (By Mr. Nemelka)  Mr. Brockman, are you aware
14  that -- that Reynolds has an ERA DMS expiration
15  opportunity close date list with respect to dealer
16  customers?
17        MS. GULLEY:  Objection; form.
18        A.  An ERA EXT?
19        Q.  An ERA DMS expirations and opportunity close
20  dates.
21        MS. GULLEY:  Objection; form.
22        A.  I'm -- I'm not familiar with any kind of
23  list with that kind of nomenclature.  We've got lots of
24  lists, but...
25        Q.  (By Mr. Nemelka)  All right.  A list of those

38 (Pages 146 - 149)

FTC-0001007

HIGHLY CONFIDENTIAL

Page 150

1 dealers that have DMS contracts coming up for renewal
2 within the next six months?
3      A. Okay. You're talking about, you know, contract
4 expiration.
5      Q. Yes.
6      A. Okay. Okay, I understand that term.
7      Q. And Reynolds keeps a list of those dealers that
8 are coming up for renewal in six months, right?
9      A. That's right.
10      Q. And Reynolds has protected those dealers who
11 use independent integrators like Authenticom from any
12 type of interference with that during that six-month
13 window; correct?
14          MS. GULLEY: Form.
15      A. I -- I think we have done some of that. I
16 don't know that policy is still in place, but I know as
17 part of the -- the process of unwinding hacker-type kind
18 of relationships, that what we've done is, is we've --
19 we've taken measures to keep the things quiet from a
20 customer's standpoint while we're in -- you know,
21 contract renewal negotiation process.
22      Q. (By Mr. Nemelka) And then once you close on
23 that contract, then you stop that dealer from using the
24 independent integrators, right?
25          MS. GULLEY: Objection; form.

Page 151

1      A. I think at that point in time, we -- we
2 recommend more -- more strongly that they -- that they
3 look at their -- their data security policies.
4      Q. (By Mr. Nemelka) After closing of the
5 contract?
6          MS. GULLEY: Objection; form.
7      A. It's an opportune time for that discussion to
8 occur.
9      Q. (By Mr. Nemelka) And if they want to continue
10 to use independent integrators after the closing of the
11 contract, did you -- did you let them?
12          MS. GULLEY: Objection; form.
13      A. Not over a long period.
14      Q. (By Mr. Nemelka) Mr. Brockman, what is
15 syscheck? S-y-s-c-h-e-c-k?
16          MS. GULLEY: Form.
17      A. I understand about this one. The -- the
18 operating system that we use on the computers that
19 operate the Arrow system -- it's Linux -- and Linux has
20 an interesting attribute in that -- let's say you have a
21 30-user system. Linux will allow you to start running
22 30 -- what we call "batch jobs." This will be, like,
23 end-of-month, general ledger, schedules, parts ordering,
24 that sort of thing.
25          What's happens is -- and that's that the

Page 152

1 customer is -- is allowed to, unknowingly, kind of step
2 off into a hole where response time is going to be
3 terrible throughout the whole system because they let
4 too many things get going.
5          And what -- what this is -- is this
6 typically is a battle between the accounting department
7 and the parts and service departments. Because the
8 accounting department's end-of-month, they have all
9 manner of big, long, huge reports they want to run, and
10 they can basically gobble the capacity of the -- of the
11 server completely so that the people in the parts
12 department, when they're doing -- they're selling parts,
13 printing invoices, whatnot, service advisors are writing
14 repair orders and printing service invoices -- their
15 response time is terrible.
16          So there is a -- a place inside the Linux
17 operating system where you can go and interrogate and
18 see how busy the whole system is. And syscheck, what it
19 does is in essence that it goes and checks that area,
20 you know, meter -- think of it as a meter -- checks that
21 meter to see how busy things are. Things are too busy,
22 it will not let somebody -- a user start a batch job,
23 because if they do, they're going to destroy, you know,
24 response times for the parts department and the service
25 department. That's what syscheck is all about. It

Page 153

1 works really good.
2      Q. (By Mr. Nemelka) And you wrote that syscheck
3 would be a way that we randomly cause Authenticom some
4 grief. How would you cause Authenticom grief through
5 syscheck?
6          MS. GULLEY: Objection; form.
7      A. Because the -- they run batch jobs in order to,
8 you know, get their -- get their business done, and
9 syscheck does not know that it's -- it's -- it's
10 Authenticom doing things. All they know is that
11 somebody is asking for a batch job and the system is
12 already too busy.
13          (Exhibit 655 was marked for
14          identification.)
15      Q. (By Mr. Nemelka) I've handed you Plaintiff's
16 Exhibit 655, which is an email from you to Tommy Barras,
17 dated August 15, 2017. And the subject of the email is
18 "Great day," and he's giving you an update on exemption
19 numbers; correct?
20      A. That's correct.
21      Q. And these exemptions are user IDs that Reynolds
22 had exempted for various data access points; correct?
23          MS. GULLEY: Form.
24      A. That's correct.
25      Q. (By Mr. Nemelka) And what he says is, "Today

39 (Pages 150 - 153)

FTC-0001008

HIGHLY CONFIDENTIAL

Page 154

1  is a good day from the security standpoint.  Number of
2  exemption dropped from 932 to 526 in one week."  So
3  as -- in August 14, 2017, you still had 932 exempt user
4  IDs, but that dropped to 527 in one week?  Is that what
5  he's saying here?
6          MS. GULLEY:  Form.
7      A.  That's correct.
8      Q.  (By Mr. Nemelka)  And then, at the end he
9  writes, "Been a long road but we went from 12,000[+]
10  exemptions at the beginning to just over 500 ten years
11  later."  Do you see that?
12          MS. GULLEY:  Form.
13     A.  Yes, I do.
14     Q.  (By Mr. Nemelka)  And then you respond, "I
15  agree - it has been a long pull - good to get there."
16  Right?
17          MS. GULLEY:  Form.
18     A.  Umm... (Pause.)
19     Q.  (By Mr. Nemelka)  Your email at the very top?
20     A.  Okay.  Yes.  That -- that's what it says.  It
21  has been a very long haul.
22     Q.  All right.
23     A.  A long haul.  And frankly, by now -- it's now
24  down -- I think it's 300 or less.
25     Q.  Today?

Page 155

1      A.  Today, uh-huh.  I will not be completely happy
2  until it's zero.
3      Q.  And these exemptions are the protected user
4  IDs, right?
5          MS. GULLEY:  Objection; form.
6      A.  That's correct.
7      Q.  (By Mr. Nemelka)  Mr. Brockman, you believed
8  that for vendors to truly make their apps work, they're
9  going to require RCI interface forever from Reynolds,
10  and the equivalent from CDK as well, right?
11          MS. GULLEY:  Form.
12     A.  I -- I think that would depend entirely on the
13  type of interface.  And by that, there is -- there are
14  certain interfaces that are what we call "batch jobs."
15  And -- you know, these are situations where our
16  reporting software will, you know, with ease, you know,
17  create the data extracts that the dealer's looking for
18  for these types of -- of batch jobs, where they can --
19  they can run that batch job, you know, themselves and
20  send it off themselves to whoev- -- you know, we --
21  there's no restriction on that.
22          But if they want it to be done conveniently
23  and happen every day with hands off, or whatever, that's
24  where RCI interface takes place.
25          Now, there's -- there's a second type of

Page 156

1  interface which is where the third party is -- is asking
2  something to be done within our software.  And the
3  classic example of that is Xtime.  You know, Xtime, in
4  order for their software to work, they have to be able
5  to create reservation records.  And they have to be able
6  to look at, you know, service history.
7          Those types of applications, since they're
8  actually part of our software, in order -- you know, for
9  their application to -- to work, you know, their RCI to
10  work, they got to keep doing it forever.  As long as
11  Xtime does what Xtime does, you know, they have to do it
12  within our system.
13     Q.  (By Mr. Nemelka)  And what if they were to get
14  cut off by Reynolds?  What -- what -- how would they --
15  how would they operate?
16          MS. GULLEY:  Objection; form.
17     A.  Well, since their -- their -- their stuff
18  actually runs inside our software, you know, they would
19  basically be unable to use our software to accomplish,
20  you know, what they do today.
21     Q.  (By Mr. Nemelka)  You believe that the Reynolds
22  DMS product is -- is a sticky product, right?
23          MS. GULLEY:  Objection; form.
24     A.  I don't think I've ever used that term in
25  relationship to the DMS.  I've used that -- that term in

Page 157

1  relationship to specific products.  By "stickiness,"
2  what I mean is -- is they're so advantageous to the
3  dealership from a financial standpoint that they would
4  be -- they would have to think hard about changing to
5  another DMS provider.
6      Q.  (By Mr. Nemelka)  And what you're referring to
7  is the collection of the DMS, along with docuPAD and the
8  other applications, as you were describing, that form
9  the -- the retail management system; correct?
10          MS. GULLEY:  Objection; form.
11     A.  That's -- that's close.  Okay?  That's not
12  exactly correct, but it's pretty close.
13     Q.  (By Mr. Nemelka)  Okay.  So finish it for me.
14  What did I miss?
15          MS. GULLEY:  Form.
16     A.  Well, we talk about stickiness in regards to
17  specific products, like docuPAD, for instance.  You
18  know, we don't refer to the RMS itself as being -- which
19  is the collection of everything -- as being sticky.  We
20  talk about specific products.
21          MS. GULLEY:  Were you done with your
22  answer?
23          THE WITNESS:  Yeah.
24          MS. GULLEY:  Okay.
25          MR. NEMELKA:  I wasn't starting to ask a

40 (Pages 154 - 157)

FTC-0001009

HIGHLY CONFIDENTIAL

Page 158

1 question.
2    Q. (By Mr. Nemelka) And you believe that the
3 value in your sticky products is so huge as to overcome
4 any economic advantage offered by CDK and Cox in their
5 offerings; correct?
6        MS. GULLEY: Objection to the form.
7    A. I believe that statement to be correct.
8    Q. (By Mr. Nemelka) Let's go off the record.
9        THE VIDEOGRAPHER: This is the end of Media
10 2. The time is 2:34 -- I'm sorry, 2:35 p.m. We're off
11 the record.
12        (Short recess 2:35 to 2:50 p.m.)
13        THE VIDEOGRAPHER: This is the beginning of
14 Media 3. The time is 2:50 p.m. We're back on the
15 record.
16        (Exhibit 656 was marked for
17          identification.)
18    Q. (By Mr. Nemelka) Mr. Brockman, I just wanted
19 to show you the document where you made that statement
20 about stickiness. It's Plaintiff's Exhibit 656.
21        MS. GULLEY: I object to the statement.
22    Q. (By Mr. Nemelka) This is an email that you
23 sent to Keith Hill, Tuesday, November 28, 2017. Do you
24 see that?
25        MS. GULLEY: Objection; form.

Page 159

1    A. Yeah, November 28th, 2017?
2    Q. (By Mr. Nemelka) Yes.
3    A. Yes.
4    Q. And the second sentence says you -- or third
5 sentence -- whatever -- second line of your email is,
6 "The value in our sticky products is so huge as to
7 overcome any economic advantage offered by CDK and Cox."
8 Do you see that?
9        MS. GULLEY: Objection; form.
10    A. And what I'm talking about is -- and that's you
11 take, for instance, docuPAD. Average increase in gross
12 profit per sale -- per new unit sold, docuPAD, is right
13 at $200. If you take a -- a typical finance manager
14 will do 70-plus transactions a month. That's $14,000 a
15 month worth of additional gross. Now, if you got -- if
16 you got five finance managers, that's 14,000 times 5.
17 The numbers are crazy.
18        And that's -- the -- the stickiness issue
19 is -- we're not, you know -- no, we're not putting
20 sticky stuff on people. It's -- it's the additional
21 gross profit to the dealership is -- is compelling.
22        And -- and, you know, you perhaps have
23 seen, you know, in Automotive News, where we run ads.
24 These are direct quotes from people that you can call on
25 the phone where they say, you know, "Reynolds product,

Page 160

1 docuPAD, pays my entire bill."
2    Q. (By Mr. Nemelka) And they have to have the
3 Reynolds DMS in order to use docuPAD; correct?
4    A. That's correct.
5    Q. So that helps with the stickiness of the
6 Reynolds DMS; correct?
7        MS. GULLEY: Objection; form.
8    A. That's correct.
9    Q. (By Mr. Nemelka) Okay. You can set that
10 aside.
11        Mr. Brockman, my last few questions are
12 just about your -- your email accounts. You -- you've
13 seen that we have an email account for -- for your
14 Reynolds business, right?
15    A. I only have one email account, period.
16    Q. You don't have -- do you have any other -- do
17 you have, like, a Gmail account?
18    A. No.
19    Q. The only email account you use is the -- is the
20 single Reynolds?
21    A. That has all of my personal data in it.
22    Q. And -- so all of your personal emails go
23 through your -- your Reynolds email account as well?
24    A. Yeah, I'm -- I've been planning now for several
25 months to change that, but it is -- you know, the

Page 161

1 notification of senders is a big issue. And I haven't
2 been able to find the time to bite down and get that
3 done.
4    Q. And so do you have a doc- -- do your emails get
5 preserved -- that -- for your Reynolds email account?
6        MS. GULLEY: Objection; form.
7    A. They are all being preserved, at this point.
8    Q. (By Mr. Nemelka) And were they preserved back
9 in 2016, 2015?
10        MS. GULLEY: Objection; form.
11    A. My retention was somewhere between six -- six
12 months and a year. Now, based upon how full my
13 Outlook.pst file was getting -- and I get mountains of
14 email. I mean, I spend half my life looking at email.
15 And I don't smile at this, because I'm not intending it
16 to be a joke, it's real.
17        In our organization, there's a lot of
18 hunting, and a lot fishing goes on. And, you know, in
19 my organization, almost all my friends are inside the
20 organization, and we're hunting and fishing buddies, and
21 we swap fish pictures and hunting pictures. And they're
22 10 meg, and they're high res, and a good fish picture
23 deserves a really high res picture, and all that takes
24 up space. And so therefore, I -- I find that I have to
25 go back and delete --

41 (Pages 158 - 161)

FTC-0001010

HIGHLY CONFIDENTIAL

Page 162

1      Q.  (By Mr. Nemelka)  Do you have a laptop that you
2  use for business-related matters?
3          MS. GULLEY:  Form.
4      A.  I just have one computer.
5      Q.  (By Mr. Nemelka)  And is that a -- is that a
6  laptop?
7      A.  Yes.
8      Q.  And do you download your email on to the
9  laptop?
10     A.  Correct.
11     Q.  And did you do that back in 2016, 2015?
12     A.  I've always done it that way.
13     Q.  And do you have your emails backed up -- your
14 historical emails backed up, then, on that laptop?
15     A.  No.  I don't.  When -- when the things get
16 purged, I'm -- I'm a -- still the old school.  I -- I
17 confess, it's perhaps my age; I like paper.  And so
18 anything that's -- that's worth keeping long term is
19 printed and put in a file.
20     Q.  So you print out your emails and documents that
21 are worth preserving and they're put in files?
22     A.  Yes.
23     Q.  Okay.  Has Reynolds ever issued any external
24 backup drive to either back up your -- your laptop?
25     A.  No.  They did not.

Page 163

1      Q.  Apart from printing them out, do you print them
2  out yourself or do you have your assistant print them
3  out?
4      A.  I do it myself.
5      Q.  Are those files kept at your home or in your
6  office at Reynolds?
7      A.  At home.
8      Q.  Do you use any other method, besides that
9  printout, to back up your emails or documents?
10     A.  No.
11     Q.  Do you use any tablets or mobile phones?
12     A.  I have a mobile phone.
13     Q.  Mobile phone.  Any tablets?
14     A.  No.
15     Q.  And did your attorneys provide you with a
16 litigation hold notice?
17         MS. GULLEY:  Objection; form.
18     A.  Yes, they did.
19         MR. NEMELKA:  All right.  I have no further
20 questions today.
21         MS. GULLEY:  Okay.  Let's go off.
22         THE VIDEOGRAPHER:  This concludes today's
23 proceeding for Mr. Robert Brockman.  The time is 2:56
24 p.m., and we're off the record.
25         (Deposition adjourned at 2:56 p.m.)

Page 164

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION
3 )
   IN RE: DEALER MANAGEMENT   )  MDL NO. 2817
4  SYSTEMS ANTITRUST          )
   LITIGATION,                )  CASE NO. 18 C 864
5                             )
6
7
8          REPORTER'S CERTIFICATION
9  ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN
10          January 16, 2019
11             Volume 1
12
13     I, SHAUNA L. BEACH, Certified Shorthand
14 Reporter in and for the State of Texas, do hereby
15 certify to the following:
16     That the witness, ROBERT BROCKMAN, was duly
17 sworn by the officer and that the transcript of the oral
18 deposition is a true record of the testimony given by
19 the witness;
20     I further certify that pursuant to FRCP Rule
21 30(e)(1) that the signature of the deponent:
22     _X_ was requested by the deponent or a party
23 before the completion of the deposition and is to be
24 returned within 30 days from the date of receipt of the
25 transcript.  If returned, the attached Changes and

Page 165

1  Signature Page contains any changes and the reasons
2  therefor;
3     ____ was not requested by the deponent or a
4  party before the completion of the deposition.
5     I further certify that I am neither counsel
6  for, related to, nor employed by any of the parties or
7  attorneys to the action in which this proceeding was
8  taken.  Further, I am not a relative or employee of any
9  attorney of record in this cause, nor am I financially
10 or otherwise interested in the outcome of the action.
11     Subscribed and sworn to on this
12     25th of January, 2019.
13
14
15
16 _____
17 SHAUNA L. BEACH, RDR, CRR, CSR #8408
   Expiration Date:  12/31/2019
18
19
20
21
22
23
24
25

42 (Pages 162 - 165)

FTC-0001011

HIGHLY CONFIDENTIAL

Page 166

1 In Re: Dealer Management Systems Antitrust Litigation v.
2    Robert Brockman
3    INSTRUCTIONS TO THE WITNESS
4    Please read your deposition over
5 carefully and make any necessary corrections.
6 You should state the reason in the
7 appropriate space on the errata sheet for any
8 corrections that are made.
9    After doing so, please sign the errata
10 sheet and date it.
11    You are signing same subject to the
12 changes you have noted on the errata sheet,
13 which will be attached to your deposition.
14    It is imperative that you return the
15 original errata sheet to the deposing
16 attorney within thirty (30) days of receipt
17 of the deposition transcript by you.  If you
18 fail to do so, the deposition transcript may
19 be deemed to be accurate and may be used in
20 court.
21
22
23
24 3185059
25

Page 168

1 In Re: Dealer Management Systems Antitrust Litigation v.
2    Robert Brockman
3    ACKNOWLEDGMENT OF DEPONENT
4    I, _____, do
5 hereby certify that I have read the foregoing
6 pages and that the same is a correct
7 transcription of the answers given by
8 me to the questions therein propounded,
9 except for the corrections or changes in form
10 or substance, if any, noted in the attached
11 Errata Sheet.
12
13 _____    _____
14 DATE          SIGNATURE
15
16
17
18
19
20
21
22
23
24 3185059
25

Page 167

1    In Re: Dealer Management Systems Antitrust Litigation v.
2    Robert Brockman
3    E R R A T A
4    - - - - -
5 PAGE  LINE   CHANGE
6 ___ ___  ___ ___ ___ ___ ___ ___
7 Reason:_____
8 ___ ___  ___ ___ ___ ___ ___ ___
9 Reason:_____
10 ___ ___  ___ ___ ___ ___ ___ ___
11 Reason:_____
12 ___ ___  ___ ___ ___ ___ ___ ___
13 Reason:_____
14 ___ ___  ___ ___ ___ ___ ___ ___
15 Reason:_____
16 ___ ___  ___ ___ ___ ___ ___ ___
17 Reason:_____
18 ___ ___  ___ ___ ___ ___ ___ ___
19 Reason:_____
20 ___ ___  ___ ___ ___ ___ ___ ___
21 Reason:_____
22 ___ ___  ___ ___ ___ ___ ___ ___
23 Reason:_____
24 3185059
25

43 (Pages 166 - 168)

HIGHLY CONFIDENTIAL

[& - 3185059]                                                                    Page 1

| & |
| --- |
| **&**   1:20 2:4,14 3:9 8:8,18 9:4,6 32:16 66:2 |

| 0 |
| --- |
| **0.008**   18:21 |
| **0.08**   18:18 |
| **00242098**   6:4 |
| **00242099**   6:4 |
| **00261635**   5:22 |
| **00569545**   5:13 |
| **00569547**   5:13 |
| **01535307**   5:19 |
| **01535308**   5:19 |

| 1 |
| --- |
| **1**   1:11 143:13 164:11,21 |
| **1,000**   101:4 |
| **1/6/2015**   6:3 |
| **10**   7:9 136:2 138:25 139:1,10 139:10 161:22 |
| **100**   2:10 129:11 |
| **10119**   2:22 |
| **106**   6:2 |
| **107**   6:6 |
| **10:25**   54:24 55:1 |
| **10:50**   55:1,2 |
| **10th**   38:12 |
| **11**   6:7 107:24 111:12,12 137:16 |
| **11/25/2013**   5:12 |
| **1100**   1:20 2:4 8:9 |
| **111**   6:9 |
| **11:37**   87:6,8 |
| **11:50**   87:8,10 |
| **12**   6:12 26:8 79:18 136:2 138:25 139:1,10 |

| 12,000   154:9 |
| --- |
| **12/31/2019**   165:17 |
| **123**   6:11 |
| **1250**   3:21 |
| **126**   6:15 |
| **129**   6:18 |
| **12:01**   95:1,3 |
| **12:02**   95:3,5 |
| **12:38**   120:15,17 |
| **13**   111:12,12 |
| **134**   6:21 |
| **14**   5:21 7:3 142:2 154:3 |
| **14,000**   159:14,16 |
| **141**   7:2 |
| **143**   7:5 |
| **144**   7:9 |
| **14th**   92:7 |
| **15**   7:13 47:13,19 153:17 |
| **153**   7:12 |
| **157**   130:15 |
| **158**   7:15 |
| **16**   1:10 145:8 164:10 |
| **1615**   2:15 |
| **164**   4:6 |
| **165**   4:7 |
| **16953**   165:15 |
| **16th**   1:16 8:3 |
| **17**   135:19 |
| **1731**   10:8 |
| **18**   1:4 111:15 164:4 |
| **19**   5:5 7:6 143:10 |
| **1963**   14:11 |
| **1970**   15:1 |
| **1980s**   15:18 |
| **1981**   19:21 |
| **199**   145:13 147:1 148:15,16 |

| 1990s   15:18 |
| --- |
| **1999**   3:4 |
| **19th**   2:21 32:18 |
| **1:42**   120:17,18 |

| 2 |
| --- |
| **2**   4:2 66:22,25 67:3,22 74:20 87:10 138:14,20 144:5 158:10 |
| **2.8**   16:11 |
| **20**   5:9 57:22 80:4 80:5,20 81:1 |
| **200**   159:13 |
| **2000**   56:15 |
| **20005**   3:22 |
| **20006-1101**   3:4 |
| **20006-6801**   2:10 |
| **2000s**   15:18 |
| **20036**   2:16 |
| **2006**   16:3,6 |
| **2007**   5:5 32:6,18 38:12 |
| **2012**   44:12 45:4 46:3 51:3 |
| **2013**   5:9 57:22 59:11 63:25 64:1 64:16 |
| **2014**   5:22 74:8 82:16,25 83:20 87:16 92:7,8 106:17 |
| **2015**   6:7,12,16 7:9 57:4,13 82:12 106:9,10,14 107:24 111:15 124:4 127:1 130:8 144:7,22 161:9 162:11 |
| **2016**   7:3 142:2 161:9 162:11 |

| 2017   6:19,22 7:6 |
| --- |
| 7:13,16 51:7 129:16 130:1 134:23,23 135:15 143:10,13 153:17 154:3 158:23 159:1 |
| **2019**   1:10,17 8:3 164:10 165:12 |
| **2099**   2:9 |
| **20th**   144:22 |
| **21m**   135:23 |
| **21st**   127:1 |
| **22**   6:16 |
| **23rd**   74:8 |
| **25**   5:2 6:22 64:15 |
| **25th**   63:25 64:1 134:22 165:12 |
| **27**   5:3 |
| **28**   7:16 158:23 |
| **2817**   1:3 164:3 |
| **28th**   159:1 |
| **29th**   44:12 45:4 |
| **2:34**   158:10 |
| **2:35**   158:10,12 |
| **2:50**   158:12,14 |
| **2nd**   82:12,16 87:15 |

| 3 |
| --- |
| **3**   158:14 |
| **3-4**   60:5 |
| **30**   82:25 135:22 136:10 138:24 139:1,1,5,7,10 151:21,22 164:21 164:24 166:16 |
| **300**   139:11 154:24 |
| **30th**   82:20 83:20 |
| **3185059**   166:24 167:24 168:24 |

HIGHLY CONFIDENTIAL

[32 - accounts]                                                                 Page 2

**32**  5:5
**333**  10:4
**350**  3:21
**360**  139:11
**3rd**  51:21 52:21
  54:1 81:5 82:4
  99:13,15 100:2
  102:3,4 103:4
  109:10 118:2
  124:13

**4**

**4**  68:21
**4.5**  112:9 113:25
  115:9,19 116:2,19
  116:21 118:8,20
  118:23 119:10
**4.5.**  112:9
**40**  79:11 139:5
**400**  2:15
**44**  5:6
**442**  38:9
**45**  47:13

**5**

**5**  109:9 118:1
  159:16
**50**  139:5
**500**  154:10
**501c3**  21:23
**526**  154:2
**527**  154:4
**5300**  1:21 2:5 8:9
**55.38**  125:6,16
**57**  5:8

**6**

**6**  106:9,10
**6.1**  118:14,15
**600**  100:21
**63**  5:11
**636**  5:2 25:25 26:3

**637**  5:3 27:8,11
**638**  5:5 32:12,15
  32:15
**639**  5:6 44:5,8
**640**  5:8 57:17,18
**641**  5:11 63:19,22
**642**  5:15 74:2,3
**643**  5:18 82:8,9
**644**  5:21 92:2,3
  103:17 104:6
**645**  6:2 106:4,7
**646**  6:6 107:20,23
  117:19
**647**  6:9 111:2,4
**648**  6:11 123:21,23
  124:3
**649**  6:15 126:20,23
**650**  6:18 129:22,25
**651**  6:21 134:7,21
**652**  7:2 141:23,24
**653**  7:5 143:6,9
**654**  7:9 144:18,21
**655**  7:12 153:13,16
**656**  7:15 158:16,20
**69**  134:6

**7**

**7**  6:19
**7/2/2014**  5:19
**70**  159:14
**74**  5:15
**75**  23:25
**77002**  1:21 2:5
  8:10
**77024**  10:4
**7th**  124:4 130:1

**8**

**8**  18:18
**8/10ths**  18:23,25
  19:5

**82**  5:18
**8408**  165:17
**864**  1:4 164:4

**9**

**9**  4:5
**90s**  18:5
**92**  5:21
**932**  154:2,3
**96**  17:4,25
**98**  19:11,11
**9:30**  1:17 8:3
**9th**  32:18

**a**

**a.m.**  1:17 8:3
  54:24 55:1,2 87:6
  87:8,10
**ability**  63:9 72:19
  79:7
**able**  42:10,17 91:2
  100:8 101:1
  132:23 156:4,5
  161:2
**aboard**  79:16
**abrupt**  46:19
**absolute**  43:22
**absolutely**  139:12
  139:14
**absorbing**  130:15
**accept**  56:23
**access**  25:16,20
  26:13 30:3,8,14,16
  30:17,21 31:7,12
  31:15 35:11 37:9
  37:15 42:2,11
  45:25 46:3,10
  47:23 48:11 56:1
  56:5 60:2 61:5,8
  61:25 62:3 63:2,3
  63:14 66:5 68:10
  68:18 71:20 72:22

74:25 75:21,23
  76:3,9,10,16 77:22
  80:3,5,18,21,23
  81:1 82:5 84:6,10
  87:21 88:1 96:9
  98:12 99:3,5
  100:9,14 101:2
  109:10,15 110:19
  112:10,22 113:19
  114:2,2,7 115:2,9
  115:11,13,16,17
  115:23 116:6,10
  116:22 117:1,14
  118:2 119:2,4,12
  121:11,16 128:15
  131:5 139:16,22
  140:2,13,17,20
  142:4,16 143:1,12
  143:19,23,25
  147:16 148:7
  153:22
**accessed**  54:11
  84:5,9
**accessing**  41:2,12
  43:25 47:5 87:20
  88:3,8,22 99:9
  108:17 110:5
**accomplish**  113:18
  156:19
**accomplished**
  120:5 142:10
**accomplishing**
  116:20
**account**  160:13,15
  160:17,19,23
  161:5
**accounting**  89:15
  101:7 105:5 152:6
  152:8
**accounts**  160:12

FTC-0001014

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| **accurate**  135:13 166:19 | 52:22 54:1 64:17 65:11,12,20 68:14 | 53:4,5 54:1 | **ahead**  102:10 129:11 |
| **accurately**  35:5 | 69:20 70:8 75:16 | **agents**  51:20 52:13 52:16 53:25 54:4 | **aimdata**  145:25 146:9 |
| **achieve**  101:1 | 76:24 77:3,9,24 | 54:8 | **aimed**  122:6 |
| **acknowledged** 94:8 | 78:9 79:10 80:3 80:14,16,18,24 | **aggressive**  123:14 123:17 | **allow**  25:20 26:13 30:8 31:8,13,16 |
| **acknowledges** 28:22 | 81:19 82:6 84:4 88:3,6,8 89:2 96:3 | **aggressively**  62:24 | 55:20 58:18 60:2 68:17 151:21 |
| **acknowledgment** 168:3 | 96:18 97:6 99:12 99:16,23 100:2,9 | **ago**  12:22 26:8 79:19 86:19 | **allowed**  42:2 86:11,18 152:1 |
| **acquire**  79:7 88:13 | 101:13 103:5 119:17 | **agree**  25:6,15 35:14 60:17 70:18 | **allowing**  35:10 69:17 142:4 |
| **acquired**  16:3 88:18 | **adp's**  34:24 35:16 66:8 71:16 77:17 | 91:19 109:15,22 112:1 113:5,12 | **amount**  86:12,25 97:7 131:12,19 |
| **acquisition**  16:17 34:3 43:16 87:22 | **ads**  159:23 | 115:2 117:16 154:15 | 132:2 133:11 136:7 |
| **acquisitions**  104:9 | **advanced**  105:19 | **agreed**  56:9 | **andi**  9:4 12:3 33:8 |
| **act**  78:21 | **advantage**  77:10 77:14 78:25 | 110:19 112:14 114:8 117:14 | 43:1 86:21 103:20 104:3 |
| **acting**  51:21 52:21 54:1 | 105:21 158:4 159:7 | **agreeing**  110:3 113:21 114:16 | **anenen**  5:19 38:12 38:23,25 40:4 |
| **action**  165:7,10 | **advantageous** 157:2 | 116:11 | 44:24 45:15 46:22 47:4,9,17 48:6 |
| **active**  47:13 105:17 | **advantages**  104:12 | **agreement**  5:6 6:9 44:13,19 46:14,15 | 74:16 81:23 82:12 82:13,20,25 83:23 |
| **ad**  89:22 90:1 | **advertisement** 26:6,20 | 46:16,18 50:16 51:23 52:23 53:2 | 84:20 85:4 86:17 87:15 88:7 106:14 |
| **add**  26:21 41:6 73:10 | **advisors**  152:13 | 54:3 57:5,8 58:15 58:18 65:10 88:5 | 107:2 |
| **added**  109:8,9 117:25 118:1 | **affairs**  144:8 147:23 148:23 | 89:4 91:25 96:5,8 99:23 100:1,19 | **angered**  61:1 |
| 135:23 136:13 | **affect**  121:16,25 | 101:2,5,17,21 110:2,14 111:5,7 | **angry**  120:10 |
| **additional**  124:13 124:20 135:23 | **affiliate**  112:18 | 114:24 115:7 118:14 119:12 | **annual**  39:14,20 92:16 135:22 |
| 136:14,16,17 137:8 159:15,20 | **affiliation**  8:16 | 121:3,9,13,20 122:14,16 127:8 | 136:9 138:24 139:2 |
| **address**  10:3 47:17 93:8 | **affirmatively** 47:21 | 129:4 131:13 136:25 140:6 | **answer**  13:3,7,11 13:13,14 17:16,23 |
| **addresses**  56:24 | **afraid**  147:1 | **agreements**  91:20 | 20:14 32:16 33:20 34:23 48:13 53:10 |
| **adjourned**  163:25 | **afternoon**  120:22 | **agrees**  112:17 | 53:18 55:25 56:7 93:15 96:16 |
| **admit**  97:24 | **agan**  6:12 124:4 125:5,15 | **agulley**  2:6 | |
| **adp**  34:6,6,11,12 34:17 36:14 40:22 | **age**  162:17 | | |
| 43:7 44:12,19,22 44:23 50:9 51:22 | **agency**  89:22 90:1 **agent**  49:25 50:1,6 50:8 51:22 52:22 | | |

FTC-0001015

HIGHLY CONFIDENTIAL

102:10,11 110:9
132:21 133:8
149:6 157:22
**answering** 13:22
110:16 113:7,15
147:6 148:22
**answers** 47:21
91:14 168:7
**antitrust** 1:4 8:5
164:4 166:1 167:1
168:1
**anybody** 12:6,15
**anymore** 140:2
142:5
**anytime** 50:20
**apart** 163:1
**apparent** 99:21,22
**appearance** 8:15
**appearances** 4:2
**appearing** 2:19
**appears** 135:5
148:13
**appetite** 129:2
**application** 48:23
89:17 105:13,18
148:16,18 156:9
**applications** 29:2
29:5 30:2 49:10
66:18 80:5,15
103:6 105:5,7,16
105:23 106:1,2
145:24 146:11,21
147:17 156:7
157:8
**apply** 62:17
**applying** 143:20
**appointed** 20:5,11
21:4
**approach** 66:3
77:18

**approached** 96:3
96:7,19,19
**appropriate** 86:21
166:7
**approval** 125:5
**approve** 122:14
125:16
**approved** 125:20
**approving** 123:9
**approximately**
23:25 26:8 34:2
43:16 135:22
**apps** 144:12 155:8
**april** 7:3,6 142:2
143:10
**area** 21:10 24:5
99:1 152:19
**areas** 70:17
105:13,21 123:1
**armageddon**
71:15
**arrived** 79:18
**arrow** 151:19
**article** 5:5 32:16
32:19 33:3
**ascertain** 61:20
**aside** 27:3 28:15
63:1,18 71:6
126:2 149:9
160:10
**asked** 34:6 53:11
94:5,5 98:23 99:2
110:3 117:18
125:15 131:11,16
131:18,18 144:7
147:9
**asking** 68:14
86:16 93:3 101:11
103:25 110:17
118:6 125:5
144:13 153:11

156:1
**aspen** 10:20 92:8
**assign** 112:18
**assist** 112:21
**assistance** 59:23
**assistant** 163:2
**associate** 55:17
**associated** 100:12
**association** 39:12
**assumption** 77:7
**atlantic** 3:21
**attach** 38:16
**attached** 1:23 39:6
40:13 164:25
166:13 168:10
**attachment** 38:16
40:15
**attempted** 114:2
115:17
**attention** 27:17
91:17
**attorney** 11:15
12:7 94:14 118:10
165:9 166:16
**attorneys** 1:9 5:10
5:17,23 6:8,13,17
6:20,23 7:4,7,10
7:14,17 11:12
12:4 95:10,11
119:19,20 163:15
165:7
**attractive** 40:7
41:21
**attribute** 151:20
**august** 6:16,22
7:13 16:3 127:1
134:22 153:17
154:3
**aundrea** 2:3
**authenticom** 2:12
8:19 31:4,8,11

42:17 48:22 49:9
49:15,24 50:1,5,8
50:15 51:2,7,12
54:11 72:3,13
75:20 88:4,9,23
89:4,12,18 90:8,24
91:6,20,24 121:25
126:16 127:3,17
127:20 128:9
140:11 144:9,10
144:12 145:13
146:17 147:7,13
147:15,23 148:2,4
148:7,11,18,24,25
150:11 153:3,4,10
**authenticom's**
125:22
**authenticomas**
124:7
**authority** 20:21
23:4 64:17,24
65:11,16,20 69:5
69:19 70:8
**authorized** 70:24
71:2 76:3
**auto** 39:12
**autoloop** 2:12 8:20
**automated** 31:13
35:11 63:3,14
140:13,17
**automotive** 2:12
5:5 8:19 23:11
32:16,19,25 33:14
33:24 34:5 159:23
**avenue** 2:9
**average** 159:11
**avoid** 81:20
**avoidance** 113:25
**aware** 51:9,15
54:19 61:22 63:13
63:16 65:6 90:13

HIGHLY CONFIDENTIAL

90:16 118:7 121:7
122:2 149:10,13
**awhile** 35:2,19

**b**

**baby** 69:12
**back** 32:6 33:16
55:3 74:9,18
82:18 86:21 87:10
95:4,23 100:25
117:13,18 120:19
120:19 132:8
144:24,25 145:5
147:21 158:14
161:8,25 162:11
162:24 163:9
**backed** 162:13,14
**background** 69:10
**backup** 162:24
**badmouth** 140:1
**badmouthed** 139:18
**badmouthing** 139:22 140:5
**ban** 98:9
**bandit** 58:19 72:11
**banditry** 98:10
**bandits** 56:11
57:10 58:3 66:10
69:13 71:25 83:25
120:3 141:5
**bank** 20:10,11
**barras** 6:15,19
7:12 18:15 126:24
127:2 129:25
130:1,3 153:16
**barrier** 58:6
**barriers** 58:5
**base** 128:7
**based** 19:17 136:7
138:5 161:12

**basically** 68:19
74:24 80:24 88:17
110:1 142:21
152:10 156:19
**basis** 58:8 70:16 72:8
**batch** 49:22,24
50:7 151:22
152:22 153:7,11
155:14,18,19
**battle** 152:6
**beach** 1:18 8:13
164:13 165:17
**beat** 103:9
**beautiful** 120:25
**becoming** 68:24
**beginning** 87:9
154:10 158:13
**begins** 139:8
**behalf** 8:12,13,19
8:24 9:2,14 52:12
53:6 54:9 99:10
109:10,16 111:8
118:2 131:6
**belief** 77:18 121:8
**believe** 17:24 18:7
19:9 33:2 40:7
41:12 59:8,8
78:16,20,22 88:13
88:19 102:20
110:24 115:7
116:24,24 117:3
117:11 123:7
125:4 129:14
133:21 137:11
143:16 156:21
158:2,7
**believed** 78:2
122:17 155:7
**believes** 112:22

**belong** 97:5
**belonging** 37:9
**belongs** 28:8,23
**ben** 3:10 8:11
**beneficiaries**
21:12 22:2
**beneficiary** 21:25
**benefit** 137:3
**bermuda** 19:18
20:10,12 21:16
**best** 13:1 43:21 98:2
**better** 60:5 142:22
**beyond** 86:20
**big** 92:21 134:10
152:9 161:1
**bill** 160:1
**billion** 16:11
**bit** 23:9 33:10
117:8 124:19
**bite** 161:2
**bitter** 79:9
**blanking** 12:10
**bliley** 78:21
**block** 74:25 75:6
75:15 79:24 80:1
141:15
**blocking** 71:20
**blocks** 58:6
**board** 122:19
**bob** 5:8,18 6:6,15
6:18,21 7:2,6,9,12
7:16 38:11 63:23
64:16 65:10
107:23 126:24
130:8 131:17
142:3 143:11
147:22
**bonuses** 123:19
**boss** 26:16

**bottom** 59:14
95:24 108:18,20
125:5 127:2,4,23
135:19,21
**bought** 101:2
**breach** 140:18
**breaches** 90:14
**break** 13:18,21
14:1 54:23 95:7
136:2
**breaking** 75:10
**brice** 2:3 9:6
**bring** 129:5
**brockman** 1:8,13
4:4 5:2,8,18 6:6
6:15,18,21 7:3,6,9
7:12,16 8:4 9:12
9:17,21,25 17:3,19
18:9 23:10 26:3
27:12 30:10 32:17
32:18,25 33:14
36:19 38:8,11,19
40:20 44:8,16
45:24 53:22 55:6
56:16 57:21 59:5
63:24 65:10 67:3
70:7 72:2 74:5,11
82:21 84:4 86:15
86:22 87:14 88:21
94:10 95:7,18
101:10 102:12
103:2 106:10
107:24 108:8,24
109:5 111:3,13
115:14 116:2,4
117:20 118:21
120:22 123:24,25
124:2 126:2,25
134:22 135:1
143:24 144:7,20
145:11 149:11,13

FTC-0001017

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| 151:14 155:7<br>158:18 160:11<br>163:23 164:9,16<br>166:2 167:2 168:2<br>**brother** 21:15<br>**brought** 68:16<br>**brown** 3:3 9:13<br>**bruns** 1:20 2:4 8:8<br>9:4,7<br>**bryce** 12:3<br>**buddies** 161:20<br>**build** 119:20<br>**building** 100:23<br>**bullet** 26:11 45:24<br>49:21 65:9 87:19<br>96:2 97:2 99:11<br>101:20 103:15<br>**business** 14:9<br>24:12 25:7 28:4,8<br>28:23 32:7 34:25<br>35:17 40:23 43:24<br>49:7 68:20 77:3<br>78:9 81:24 90:21<br>91:2 101:3 112:19<br>123:5 124:6<br>125:22 138:16,19<br>141:5 142:14<br>153:8 160:14<br>162:2<br>**businesses** 87:21<br>**businesspeople**<br>12:12<br>**busy** 43:18 129:1<br>152:18,21,21<br>153:12<br>**buy** 80:16 137:20<br>**buys** 137:15<br>**bwilkinson** 2:6 | **c**<br><br>**c** 1:4 2:1 3:1 8:1<br>151:15,15 164:4<br>**calculate** 131:12<br>131:19 133:11<br>**calculated** 136:10<br>**calculating** 134:13<br>**calculation** 133:19<br>**call** 44:25 45:3,7<br>46:21,23,25 47:11<br>47:12,19 48:18<br>73:15 74:23<br>151:22 155:14<br>159:24<br>**called** 11:6 15:25<br>16:2,20 19:25<br>30:24 36:18 46:23<br>46:24 53:25 56:25<br>71:17 86:4 101:3<br>**calling** 60:9<br>**calls** 59:22 120:11<br>**capabilities** 71:12<br>71:19,20<br>**capacity** 152:10<br>**car** 15:10 38:2<br>66:17 67:23<br>**cards** 49:13 80:15<br>80:19 89:6,14<br>**carefully** 166:5<br>**case** 1:4 41:25<br>56:13 69:24 85:13<br>88:1 97:25 111:20<br>123:7 129:15<br>164:4<br>**cases** 61:21 75:11<br>75:15,17<br>**cash** 16:12 22:17<br>**cat** 79:22 141:8<br>**caught** 105:24<br>**cause** 1:16 71:14<br>153:3,4 165:9 | **causing** 58:7 62:20<br>**cavalier** 76:6<br>**cdk** 3:2 5:13,13,19<br>5:19 6:4,4 9:14<br>12:4 23:17,20<br>32:1,5 34:6,13<br>35:21 36:2,11,18<br>36:18 37:2 38:25<br>39:21,25 40:16,22<br>42:3,10,11,15,23<br>43:3,23 46:6,7,7<br>46:16 47:4 48:10<br>49:17 50:16 54:12<br>57:3,12 61:11,24<br>63:13,23 64:24<br>65:5,6 70:25 71:7<br>73:6,21 77:14<br>78:12,24 80:21<br>81:15 84:8 88:22<br>91:21 96:3,7,13,19<br>98:6,9 99:5,18<br>100:5 101:5,6<br>102:16,17 103:12<br>108:11,16 109:15<br>109:19 110:5,19<br>111:5 112:2,14,17<br>113:13 114:4,7<br>115:2 117:14<br>121:2,10 122:14<br>122:17 123:5,12<br>123:12 124:6<br>125:21 126:2,3,11<br>127:8 129:5,6,18<br>130:5,15,18,19,22<br>130:25 131:13,21<br>132:7,10,13<br>133:12 134:13<br>135:24 136:20<br>137:20,23 139:4<br>139:15 140:1,10<br>140:19 145:8,13 | 146:25 147:12,14<br>147:15 148:4,12<br>148:14,17 149:6<br>155:10 158:4<br>159:7<br>**cdk's** 31:18,20,22<br>32:8 35:8 56:4<br>82:14 89:5 98:12<br>99:3,4 121:16<br>126:4 131:5 136:5<br>**cease** 46:1,11<br>47:24<br>**center** 59:23<br>**central** 106:2<br>**ceo** 22:25 23:3<br>26:25 38:25 82:14<br>**certain** 122:25<br>123:1 155:14<br>**certainly** 29:4<br>35:15 40:3 43:7<br>51:11 73:24 85:12<br>97:5 109:18<br>119:23 128:17<br>**certificate** 4:7<br>**certification** 164:8<br>**certified** 30:25<br>80:18 84:15<br>103:10 164:13<br>**certify** 164:15,20<br>165:5 168:5<br>**cetera** 134:18<br>**chain** 5:8,11 6:2,6<br>6:11,15 7:5,12,15<br>106:9 126:24<br>144:24<br>**chairman** 22:25<br>23:3 26:25<br>**challenged** 130:8<br>**chance** 67:12 74:8<br>82:13,17 85:24<br>87:1 93:16 108:2 |

**FTC-0001018**

116:4 144:23
**change** 35:2,20,21
  36:2,11 160:25
  167:5
**changed** 36:18
  145:5
**changes** 4:6 35:25
  35:25 36:16 112:1
  142:9,25 164:25
  165:1 166:12
  168:9
**changing** 157:4
**characterization**
  60:24 61:3 68:1
  71:24
**characterize** 29:3
  40:2 50:19
**characterizing**
  102:21
**charge** 80:3,23,24
  99:13 100:2,12,14
  102:3,3,4,16,18
  123:9
**charitable** 17:3,19
  17:21 18:9 19:2,7
  22:7,9,11,13
**charities** 21:16,19
  21:20,21,22
**chart** 147:3
  148:12
**check** 62:24
**checks** 152:19,20
**cherry** 3:7 9:8,8
  12:3,11
**chevy** 38:2
**chief** 23:20
**choose** 25:16,20
  26:12 30:7,13
**christopher** 60:25
**cid** 5:13,13,19,19
  6:4,4

**circumstances**
  58:14
**civil** 1:22
**class** 2:13,18 8:21
  8:25 9:2 14:11
**classic** 140:18
  156:3
**clean** 91:4,12
**clear** 51:7 73:11
  80:7 82:2 91:15
**clearly** 53:2 59:3
  84:17
**client** 11:15
**clients** 68:5 86:14
**close** 149:15,19
  150:22 157:11,12
**closing** 123:16
  151:4,10
**code** 62:23
**cohen** 2:8 9:10,10
**collaborative** 66:3
**colleague** 8:22
**collect** 52:12 53:6
  54:9
**collecting** 50:2
  98:22
**collection** 50:21
  68:18 157:7,19
**collector** 52:18
**collects** 50:8
**college** 14:9
**colorado** 10:21
**columns** 145:25
  146:3
**combined** 97:8
**come** 75:13 141:14
  145:4
**comes** 119:20
  127:3,20
**coming** 73:2 122:8
  122:19 132:9

150:1,8
**comma** 88:25
**comment** 82:4
  85:19 91:2
**commenting** 41:18
**comments** 127:16
**committing**
  108:16
**communicate**
  102:1
**communicated**
  58:12
**communication**
  11:15
**communications**
  105:7
**companies** 60:8
  130:21 146:9
**company** 2:2,7 3:8
  9:11 14:14 16:4
  16:15,19,22,24
  17:4 19:11,25
  20:1,8,10,16 22:22
  43:17 88:14,15
  95:12
**company's** 23:5
**comparisons**
  101:8
**compelling** 159:21
**compete** 42:17
  114:1,20,21
  116:13,15
**competitive**
  105:21
**competitor** 23:18
**competitors** 42:1
  42:16 79:9 123:11
  123:15
**compile** 144:13
**complaining** 99:15
  103:3

**complaint** 85:10
**completely** 56:18
  73:3 76:1 86:7
  140:17 152:11
  155:1
**completion** 164:23
  165:4
**comply** 33:8
**component** 24:7
**computer** 15:2,6
  16:20,21,25 17:12
  162:4
**computers** 151:18
**conception** 42:23
**concerned** 84:1
  98:10 127:13,17
  142:12 147:3
**concerning** 135:12
**concluded** 73:6
  121:2
**concludes** 163:22
**concur** 88:25
**conditions** 123:10
**confess** 118:10
  162:17
**confidential** 1:9
  5:10,13,14,17,20
  5:20,23 6:4,5,8,10
  6:13,17,20,23 7:4
  7:7,10,14,17 135:5
**connection** 57:4
  101:14
**connections**
  145:13 146:16
**connotation** 56:19
**consciousness**
  98:1
**consent** 112:24
**consider** 13:7 50:5
  52:11

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| **considerable** 45:9 45:10 105:20 | **contrary** 76:1 | 75:21 76:11 78:6 | **counsel** 3:7 8:15 |
| **consideration** 41:5 105:16 | **contribute** 40:22 41:2 43:24 | 78:13 80:21 81:16 | 9:8 13:10,11,12 |
| **considered** 50:1 65:7 | **control** 10:14 23:24 | 82:15,20 83:1,3,5 | 44:10 74:6 86:5 |
| **considering** 43:12 81:14 | **controlling** 88:1 | 83:8,10 88:7,21 | 86:11 92:6 165:5 |
| **consistent** 28:3,6 | **conveniently** 155:22 | 90:3,18 102:18 | **count** 88:19,19 |
| **consists** 110:2 132:22 | **convention** 39:14 39:17 | 104:23 107:8,12 | **couple** 84:5 |
| **constant** 137:12 | **conventions** 39:20 | 108:12 110:19 | **course** 24:12 |
| **constantly** 100:23 | **conversation** 45:14 47:14 64:18 | 111:16 115:17 | **court** 1:1 8:6,12 |
| **contains** 165:1 | 68:16 74:16 83:2 | 116:22 117:23 | 9:15 133:6 164:1 |
| **content** 84:7 | 83:7 86:25 | 118:24 119:4 | 166:20 |
| **contention** 80:13 | **convert** 129:12 | 121:5,19 125:2,17 | **covenant** 114:1,20 |
| **contents** 33:4,24 | 137:18 | 125:19 126:14,17 | 116:13,15 |
| **context** 92:15,24 | **converted** 129:17 | 126:19 127:21 | **covenants** 112:17 |
| 93:1 102:20 | 137:23 | 128:1 129:9 130:7 | **cover** 45:20 75:15 |
| 125:13 143:16 | **core** 106:2 | 130:14,17,21 | **covered** 45:20 |
| **continue** 48:11 | **correct** 12:19 14:9 | 131:2,4,8,10 132:5 | 93:11 |
| 50:15 51:2 58:19 | 14:21 16:18,19 | 133:19 136:10 | **covers** 31:1 138:9 |
| 58:22 68:20 69:16 | 17:7 19:1,4,9,13 | 137:4,6 138:21 | **cox** 2:12 8:19 |
| 69:17 99:14 103:3 | 19:15,16 23:1,2,12 | 139:25 140:14 | 158:4 159:7 |
| 151:9 | 23:15 24:12 25:3 | 141:19 142:7,17 | **cpi** 138:14,15,20 |
| **continued** 15:19 | 26:17 27:2,5 | 143:14,22 146:11 | **craig** 6:12,21 |
| 51:6,12 66:13 | 28:17,20,23 29:2 | 146:12,14,18,23 | 134:21 |
| **continuing** 55:4 | 29:10,20,24 30:5 | 150:13 153:19,20 | **crazy** 159:17 |
| 87:12 95:16 | 31:15,18 33:4,25 | 153:22,24 154:7 | **create** 56:24 68:3 |
| 108:11 120:20 | 34:4,7,14 35:12 | 155:6 157:9,12 | 79:13 155:17 |
| **contract** 28:17,19 | 36:12 37:5,7,10,21 | 158:5,7 160:3,4,6 | 156:5 |
| 51:21 52:5,7,21 | 38:4,16,23 39:1,21 | 160:8 162:10 | **created** 19:19 |
| 54:1 76:7 84:17 | 40:18,23 41:3,6,16 | 168:6 | 44:19 58:5 |
| 88:4,8,23 126:1,3 | 42:12 43:13 46:5 | **corrected** 62:25 | **creating** 37:16 |
| 150:3,21,23 151:5 | 46:6 48:24 49:4 | 145:22 | 45:6 60:19 81:20 |
| 151:11 | 49:10,18 52:10,13 | **corrections** 166:5 | **credentials** 37:16 |
| **contracts** 52:17 | 53:6 54:9 56:5 | 166:8 168:9 | 54:16 |
| 71:16 76:2,2 | 59:6,11,19 61:11 | **correctly** 58:13 | **crr** 1:18 165:17 |
| 111:17 150:1 | 63:4 64:21,23 | 78:23 | **csr** 1:18 165:17 |
| **contractual** 114:2 | 65:2 68:12 70:20 | **correlates** 61:14 | **current** 109:20 |
| 114:7 115:8,16 | 73:21 74:11 75:7 | **cost** 77:11 78:3,24 | 143:12 |
| | | 79:1,2 90:23 | **cust** 132:18 |
| | | 132:7,15 136:6 | **custodial** 44:11 |
| | | 138:16 139:4,15 | 92:7 |
| | | **costs** 99:15 103:4 | **customer** 29:5 |
| | | | 59:20,21 60:7 |

HIGHLY CONFIDENTIAL

[customer - defended]                                                                                  Page 9

62:20 66:19 78:7
126:16 127:3,20
128:7 152:1
**customer's** 150:20
**customers** 24:24
61:1 68:19 71:16
78:4 79:2,3,6,7
81:21 90:3 99:14
100:9 103:3 120:6
120:7 121:22
124:25 125:1
128:5,9,14,18
129:6,12 130:19
130:25 131:6
132:17,23,24,25
133:2 136:6,14
137:3 145:4
149:16
**cut** 144:9 148:24
156:14
**cycles** 123:11

**d**

**d** 8:1
**d.c.** 2:10,16 3:22
**damn** 119:22
**dan** 6:12
**data** 5:6 6:9 14:24
24:7,12 25:2,6,12
25:16,20 26:12,16
27:20,23,24 28:7
28:12,20,23 30:3,7
30:14,16,21 31:1,2
31:8,12 34:20
35:11 36:19,24
37:9,15,20 40:14
40:17 41:13 42:2
42:3,11 43:13
44:12,19 46:14,15
46:15,18 49:9,12
49:16,17,22,24
50:2,7,10,16,21

52:6,8,12,18,19
53:6 54:9,12
55:21 58:19 61:7
61:25 62:3 63:14
66:5 68:10,18
69:21 70:1,20
72:22 76:11,25
77:4,11,15,19 78:1
78:7 79:1,15,17
80:6,19,21 81:4,8
82:3 83:15,19,25
84:6,18 88:1
90:13 96:9 97:7
98:16,19 111:4
114:3 126:11
128:15 130:13
132:16 136:24,24
137:1 139:16,22
140:2,12 142:5,13
144:10 147:7,16
148:1,14,24 151:3
153:22 155:17
160:21
**database** 24:7
**datas** 146:8
**datasets** 136:17
**date** 16:5,6 44:11
45:6 59:13 83:22
92:7 129:20
149:15 164:24
165:17 166:10
168:14
**dated** 5:5,8,12,19
6:3,7,12,16,19,22
7:3,6,9,13,16
32:17 38:12 57:22
64:15 74:8 82:12
82:25 106:8,10
107:24 111:15
124:4 130:1
134:22 142:2

143:10 144:22
153:17
**dates** 149:20
**day** 1:16 11:18,19
11:21,21,23,23
12:25 22:21,21
120:23 153:18
154:1 155:23
**days** 164:24
166:16
**dc** 3:4
**deadline** 123:17
**deadlines** 123:16
**deal** 16:14 32:17
56:22 58:7 74:20
124:11 131:21
132:3 133:12
134:13 135:24
**dealer** 1:3 8:5
16:20,21 23:10
30:3,21 31:7 34:6
34:11,13,18 37:20
50:10 52:8 60:18
72:14,22 75:24
76:10,14 80:21
125:17 126:11
127:15 128:15
132:16 137:15,15
137:17 142:4
149:15 150:23
164:3 166:1 167:1
168:1
**dealer's** 25:8
155:17
**dealers** 15:15
23:11 24:7,11
25:7,12,15,19
26:15 28:8,9,17,20
29:1 30:7,13,16,21
32:1 34:18 35:9
35:10 37:3,10,14

39:12 42:3 49:4
61:7,19,24 62:3
68:10 75:21 76:2
76:5 98:20 122:18
124:20 127:13
128:20 133:3
135:23 137:8
140:13 145:8
146:13,17 147:15
150:1,7,10
**dealership** 2:18
8:24 9:2 15:10,14
27:25 40:17 41:12
58:13 59:15 80:16
81:9 99:9 100:9
113:20 137:21,22
157:3 159:21
**dealership's** 24:24
124:14 148:13
**dealerships** 15:11
15:21 24:1 61:15
100:21 101:4,5
120:7 124:12
128:8,10 137:13
137:14,20 144:11
145:4 147:8 148:6
148:17,25
**deals** 124:24
**dealt** 61:6
**decade** 77:1
**decades** 84:5
87:20
**decide** 56:23 78:9
**decided** 41:9
**decision** 23:4
93:21
**deemed** 166:19
**defendant** 9:11
**defendants** 36:6
**defended** 86:9,10

FTC-0001021

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| **definitely** 98:8 140:16 | **deserves** 161:23 | **discuss** 65:20 70:16 71:3 92:17 | 142:5 144:10,11 147:6,8 148:1,6,24 |
| **degree** 89:1 | **desire** 86:13 137:1 | **discussed** 40:23 | 149:1,14,19 150:1 |
| **delay** 83:24 | **destroy** 152:23 | 47:4 | 156:22,25 157:5,7 |
| **delayed** 83:16 | **detail** 109:25 | **discussion** 47:13 | 160:3,6 |
| **delaying** 83:19 | 119:24 | 81:19 151:7 | **dmss** 23:14 78:11 |
| **delete** 161:25 | **details** 43:18 | **discussions** 48:17 | 146:13,18 |
| **deliver** 45:17 | **detect** 72:19 73:1 | 64:17 65:12 69:5 | **dns** 15:24 |
| **departed** 61:16 | **dev** 130:9,9 | 69:8,19 70:8 71:7 | **doc** 161:4 |
| **department** 152:6 152:12,24,25 | **developed** 15:9 | **disruption** 66:5 | **document** 26:4 27:10 40:13 43:5 |
| **department's** 152:8 | **development** 105:8,17 128:24 128:24 130:9,10 | **disseminate** 114:16 115:12 | 44:9 45:7 46:14 50:23 64:5,7 |
| **departments** 25:3 152:7 | 130:11 | **distribute** 22:1 | 67:10 83:7 85:12 |
| **depend** 155:12 | **difference** 80:8 | **distribution** 73:18 | 85:17,17,24 86:3 |
| **depends** 22:7 111:20 122:23 | **differences** 80:12 80:13 | **distributions** 22:9 22:11,15 | 86:16 92:22 93:3 94:10,14 95:9,14 |
| **deploy** 71:13 | **different** 16:5,6 17:8 23:14 31:17 | **district** 1:1,1 8:6,7 164:1,1 | 104:1,2,9 106:11 107:19 110:23 |
| **deponent** 164:21 164:22 165:3 168:3 | 31:24 56:18 78:17 136:24 | **division** 1:2 8:7 164:2 | 114:25 117:10,13 119:20 120:11 |
| **deposed** 12:19 | **dig** 132:11 | **dmi** 37:5,8,15,19 | 134:11 158:19 |
| **deposing** 166:15 | **digital** 69:12 | 40:22 41:13 43:12 | **documents** 51:18 |
| **deposition** 1:8,13 8:4,8 11:10,17 | **direct** 52:17 77:8 85:23 86:1,8 | 43:24 54:10,16 59:6 60:2 63:2 | 85:25 86:13 94:7 97:25 107:10 |
| 12:13,16 33:9 95:11 163:25 | 159:24 | 66:2 68:3,4,9,19 68:24 69:13 75:6 | 133:15 162:20 163:9 |
| 164:9,18,23 165:4 166:4,13,17,18 | **directly** 51:23 52:5,23 53:3 54:3 | 75:19 80:7 81:11 81:24 88:17 141:1 | **docupad** 105:18 157:7,17 159:11 |
| **depositions** 85:13 86:9 | 82:4 132:9 | **dms** 23:17,21 24:6 28:17,19 29:2 | 159:12 160:1,3 |
| **describe** 38:10 57:20 | **disagree** 30:12 60:22 69:23 88:12 | 41:2 43:13,25 48:24,25 49:2,4,18 | **dodge** 89:10 |
| **described** 41:20 50:23 59:14 | 122:21 | 78:4 79:2,3 99:16 | **doing** 41:14,18 75:16 78:7 79:22 |
| **describing** 157:8 | **discernible** 141:10 | 103:5 104:11,25 | 88:5 89:2,7 96:4 |
| **description** 5:1 6:1 7:1 58:14 | **disclose** 116:12 | 105:3,17 106:16 108:17 112:10,21 | 103:24 113:20 120:9 133:9 |
| 135:13 | **disconnected** 87:5 | 112:23 114:4,4 | 142:20 144:1 |
| | **discount** 125:6,16 | 115:3,23 116:6,22 | 152:12 153:10 |
| | **discounting** 123:2 123:14 | 117:1 119:2,3,12 120:8 124:14,21 | 156:10 166:9 |
| | **discounts** 122:22 123:9,20 124:24 | 125:1 138:2,7,18 | **doubt** 113:25 |
| | **discovered** 98:18 | | |

FTC-0001022

HIGHLY CONFIDENTIAL

[download - exemptions]

**download** 162:8
**downloaded** 101:7
**downs** 66:15
**drafter** 117:11
**drive** 5:4 162:24
**drivers** 123:19
**dropped** 154:2,4
**ds** 23:25
**dsv** 130:13
**due** 123:5 124:5
  125:21
**duly** 1:15 9:18
  164:16
**duration** 84:7
  118:11

**e**

**e** 2:1,1 3:1,1 8:1,1
  151:15 164:21
  167:3
**earlier** 73:16
  81:15 97:18
  132:14 145:1
**early** 42:6 96:4
**ease** 155:16
**eastern** 1:2 8:7
  164:2
**eat** 67:14
**economic** 158:4
  159:7
**effective** 90:23
**effectively** 76:13
**efficiency** 86:1
**efficient** 67:11
  93:17 94:6
**efficiently** 12:25
  134:1
**effort** 50:22
**efforts** 29:23
  66:12
**either** 54:3 136:23
  162:24

**electronic** 31:10
**eliminate** 140:16
**email** 5:8,8,11,11
  5:18 6:2,2,6,6,11
  6:11,15,15,18,21
  7:2,5,5,9,12,12,15
  7:15 38:11,15,21
  38:22 41:22 56:20
  56:21,22,24 57:21
  58:23 59:14,15,19
  62:5 63:22,22,23
  63:24,25 64:6,14
  64:15,25 65:3,4
  70:7 82:11,11,16
  82:20,24 83:11,22
  84:4,21,25 85:8,18
  87:15 106:7,8,9,13
  107:2,4,23,25
  108:8 124:3,4
  126:23,25 129:25
  134:21 142:1
  143:9,15,17
  144:21,23 147:9
  147:22,24 153:16
  153:17 154:19
  158:22 159:5
  160:12,13,15,19
  160:23 161:5,14
  161:14 162:8
**emails** 160:22
  161:4 162:13,14
  162:20 163:9
**employed** 165:6
**employee** 165:8
**employees** 76:4
**employing** 83:24
  130:22
**enables** 113:23
**enabling** 121:21
**encouraging**
  105:22

**endeavoring** 89:10
**ended** 100:18
**endurance** 13:18
**engaged** 36:18
**engaging** 48:17
**enhancement** 75:6
  105:12
**enhancements**
  60:7 71:8,11,13,19
  72:16 73:1,10,11
  73:15,18,20,24
  74:19,24 106:15
  106:17,23 107:6
  107:14 121:4,15
  121:25 122:5
**enter** 130:22
**entered** 30:25
  122:13,16 140:6
**entering** 46:16
  81:14,23 96:8
**entire** 95:10 116:2
  160:1
**entirely** 155:12
**entities** 22:9,11
  41:14 97:5
**entitled** 32:16
**entity** 10:13 43:24
  122:6
**entrance** 58:16
**envisioned** 46:16
  50:14
**equal** 97:8
**equivalent** 155:10
**era** 23:15 149:14
  149:18,19
**errata** 166:7,9,12
  166:15 168:11
**essence** 152:19
**essentially** 92:24
**established** 72:5

**et** 134:18
**eugene** 17:3,19
  18:9
**eventually** 15:9
**everybody** 97:8
  105:24
**everybody's** 56:9
**exact** 73:9
**exactly** 24:4 35:25
  60:9 61:5 63:10
  96:11 157:12
**examination** 4:5
  9:19 41:8,24 55:4
  87:12 95:16
  120:20
**example** 30:22
  156:3
**exception** 118:19
  119:9
**exceptions** 30:20
**excess** 79:11
**exchange** 6:9
  111:4
**exclusive** 68:24
**exclusivity** 68:22
**excuse** 21:18
  22:14 28:4 34:12
  59:18 86:24
  133:10
**executive** 39:25
  64:21 65:5,7
**executives** 39:21
  95:12
**exempt** 55:12,22
  59:1 60:19 62:6,7
  62:12,13,21 154:3
**exempted** 153:22
**exemption** 153:18
  154:2
**exemptions**
  153:21 154:10

FTC-0001023

Case 4:21-cr-00009   Document 236-4   Filed on 12/07/21 in TXSD   Page 56 of 80

HIGHLY CONFIDENTIAL

[exemptions - focus]                                                                                  Page 12

155:3
**exhibit** 5:2,3,5,6,8
5:11,15,18,21 6:2
6:6,9,11,15,18,21
7:2,5,9,12,15
25:25 26:3 27:8
27:11,11 32:12,14
38:9 44:5,8 57:17
57:17,18 63:19,22
74:2,3 82:8,9 92:2
92:2,3 104:4,6
106:4,7 107:20,23
111:2,4 115:5
117:18 123:21,23
124:3 126:20,23
129:22,25 134:7
134:20,21 141:23
141:24 143:6,9
144:18,21 153:13
153:16 158:16,20
**exhibits** 5:1 6:1
7:1 11:13
**exist** 43:7 58:20
**existence** 16:1
**existing** 68:5
126:4 127:9
**exists** 43:6 61:17
77:20
**expecting** 135:21
**expediency** 49:15
**expensive** 98:4
99:16 103:4
**expert** 31:25
**expiration** 149:14
150:4 165:17
**expirations**
149:19
**explains** 109:4
**explanation** 106:3
**ext** 149:18

**extend** 66:3
**extensively** 37:13
111:21
**extent** 61:20
**external** 162:23
**extra** 138:16
**extract** 34:19
41:13 80:6 81:4
82:3
**extracting** 40:17
43:13 76:25 81:8
98:17
**extracts** 155:17
**extremely** 43:17
60:4 79:14 90:6
**eye** 3:21
**eyes** 1:9 5:10,17
5:23 6:8,14,17,20
6:23 7:4,8,11,14
7:18 95:10,11

**f**

**face** 66:12
**facilitate** 56:12
**facilities** 30:18
**facing** 122:24
**fact** 12:17 15:13
32:6 46:12,12
65:6 77:19 97:6
98:15,21 110:13
110:18 120:1
129:4 132:6
139:18
**factors** 57:7
**factory** 105:6
**fail** 166:18
**fair** 23:20 85:23
86:1
**familiar** 20:15
21:11 27:7,13,16
28:16 31:20 36:1
57:24 65:8 149:22

**far** 31:15 42:21
84:1 89:2 90:10
96:22 97:6 98:10
118:11 122:22
127:12,17 136:6
137:12 142:11
147:2
**february** 5:5
32:17 57:22
111:15
**federal** 1:22
**feeding** 55:21
58:19
**feel** 93:14
**felt** 98:5 111:21
**figel** 2:14 3:9 8:18
**figure** 79:23,24,25
79:25 103:22
141:15
**figured** 141:9
**figures** 141:13
**file** 44:11,12 74:7
92:8 161:13
162:19
**files** 92:7 162:21
163:5
**final** 115:7
**finally** 119:18
142:8
**finance** 105:6
159:13,16
**finances** 135:12
**financial** 104:12
135:6,11 137:3
157:3
**financially** 165:9
**financials** 134:23
135:9
**find** 60:4 133:23
161:2,24

**fine** 14:2 67:18
**finish** 13:2,22
33:16 42:25 55:15
58:1 86:24 91:14
98:24 102:8
110:16 115:21,24
116:1 132:20
157:13
**finished** 38:18
56:16 57:25 64:10
113:6
**firm** 8:16,18
**first** 9:18 12:23,24
26:11 27:19 29:16
40:3 45:25 46:9
47:3,7 57:8 65:9
68:15 71:23 76:18
79:18,18 84:23
88:13 93:5,21
95:23,24 96:12
103:15,21,23,24
104:1,14 108:7,18
108:20 109:8
111:5,7 112:16
134:19 143:15
145:11 149:6
**fiscal** 123:13
**fish** 161:21,22
**fishing** 161:18,20
**fit** 56:12
**five** 100:14 109:20
110:6 117:14
131:7 159:16
**fixed** 143:5
**fixes** 73:15
**floor** 2:21
**florida** 14:9,14
**focus** 52:4 104:11
104:25 105:22,25
126:25

215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

FTC-0001024

HIGHLY CONFIDENTIAL

**focused**  91:8
  105:24
**focusing**  124:3
**folks**  59:9
**followed**  42:7 94:1
**following**  76:6
  78:22 164:15
**follows**  9:18 83:2
**ford**  14:14,17 38:2
**foregoing**  168:5
**foremost**  57:8
**forever**  109:11,22
  110:5,14,18
  117:15 118:2
  155:9 156:10
**form**  10:6,11,15
  10:22 11:1,5,24
  17:6,11,22 18:2,6
  18:11,14,20,24
  19:3,8,12,20,24
  20:7,13,18,22 21:5
  21:9,14 22:3,6,18
  22:23 23:7,23
  24:2,9,15,19,21,25
  25:4,9,13,17,22
  27:6,14 28:1,10,24
  29:7,11,14,17,21
  30:1,4,11,15,23
  31:10,14,19 32:3
  32:20 33:1,5,15,21
  34:1,9,10 35:6,13
  35:23 36:4,13,20
  36:25 37:6,11,17
  37:24 38:3,13,17
  39:22 40:10,19,24
  41:4,17,23 42:5,13
  42:19 43:4,14
  44:2,14,20 45:1,5
  45:18 46:17,20
  47:1,6 48:4,12,19
  49:5,11 50:4,12,17

51:4,8,14,25 52:3
52:9,14,25 53:8
54:5,13,18 55:8,18
55:24 56:6 57:6
57:14 58:24 59:7
59:12,16 60:13,15
60:21 61:12 62:1
62:8,14,18 63:5,7
63:15 64:2,22
65:1,14,19 66:6,21
66:24 67:16,25
68:7,13 69:1,7,22
70:3,21 71:1,10,22
72:4,7,12,18,23
73:8,22 75:4,8,22
76:12 77:6,16
78:5,14,15 79:4
80:9,10,22 81:6,17
81:25 83:4,9,21
84:12 87:23 88:10
88:24 89:13,20,25
90:4,9,15,19,25
91:7,13,22 92:14
93:9,19 96:10,20
97:4,14,22 98:7,14
99:7,19 100:6,16
100:17 101:15,23
102:6,19 103:7
104:17,22 105:2
106:19,25 107:11
108:1,13,19,22
109:3,12,17,23
110:7,10,21 111:9
111:19 112:6,11
112:15,25 113:14
114:9 115:4,10,18
115:22 116:3,18
116:23 117:2,7,17
118:4,9,22,25
119:5,6 121:6,12
121:18 122:1,4,20

123:6 124:9,16,22
125:7,11,18,23
126:6,13,18 127:6
127:22,25 128:2
128:12,16,22
129:8,13,19 130:2
130:20 131:3,9,15
131:22 132:4,15
132:19 133:5,14
133:20 134:25
135:2,10,16 136:1
136:4,11,15,21
137:5,10 138:3,8
138:13,22 139:13
139:24 140:3,8,15
140:22,23 141:3
141:20 142:6,18
143:21 144:15
145:15,21 146:2,4
146:6,19,22,24
147:11,18,20
148:9 149:17,21
150:14,25 151:6
151:12,16 153:6
153:23 154:6,12
154:17 155:5,11
156:16,23 157:8
157:10,15 158:6
158:25 159:9
160:7 161:6,10
162:3 163:17
168:9
**formal**  58:15
**formalize**  66:2
**formalizing**  110:1
**formed**  17:15
**former**  129:6,18
  130:19
**forming**  41:16
**forms**  10:18

**forth**  66:19 118:20
  119:10 146:1
**fortunate**  101:1
**forwarding**  63:24
**founded**  15:2
**four**  61:2 86:19
**fourth**  97:2 114:23
**fourths**  11:23
**frame**  51:1
**framework**  65:12
**franchised**  23:25
**frankly**  35:1,19
  89:8 91:8,16
  96:24 105:8
  154:23
**frcp**  164:20
**frederick**  2:14 3:9
  8:18
**free**  31:9 80:4,20
  81:1 84:10 86:3
  100:14
**frequently**  39:20
**friar**  10:4
**friday**  57:22 127:1
  130:1 134:22
  144:22
**friends**  161:19
**front**  87:16 104:3
**frustrated**  144:4
**frustrating**  107:12
**frustration**  107:3
**fuel**  5:3
**fulfilling**  98:18
**full**  9:23 11:21
  161:12
**further**  41:8,8,24
  48:17 112:1,17
  114:18 119:25
  163:19 164:20
  165:5,8

FTC-0001025

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| **future** 66:4 | 143:11 144:23 | 114:13,15,21,21 | 20:7,13,18,22 21:5 |
| **g** | **given** 84:4 85:22 | 114:22 116:9 | 21:9,14 22:3,6,18 |
| **g** 8:1 | 86:18 107:10 | 124:19 127:7 | 22:23 23:7,23 |
| **gain** 114:13 | 164:18 168:7 | 132:10 134:9,11 | 24:2,9,15,19,21,25 |
| **gained** 113:19 | **giving** 64:20 85:24 | 137:16,17,24 | 25:4,9,13,17,22 |
| **game** 141:8 | 153:18 | 145:7 152:2,4,23 | 27:6,14 28:1,10,24 |
| **gander** 94:2 | **global** 3:2 9:14 | 155:9 | 29:7,11,14,17,21 |
| **gardner** 5:12 | **gmail** 160:17 | **good** 8:2 9:21 | 30:1,4,11,15,23 |
| 63:23 65:4,5 | **go** 40:13 43:10 | 26:21 36:6 105:9 | 31:14,19 32:3,20 |
| 69:10,11 | 49:20 52:12 53:6 | 120:22 153:1 | 32:22 33:1,5,15,21 |
| **gardner's** 69:2,12 | 54:8 68:18 76:17 | 154:1,15 161:22 | 34:1,9 35:6,13,23 |
| 70:4,23 | 76:18 84:21 87:3 | **goose** 94:2 | 36:4,13,20,25 37:6 |
| **general** 3:7 9:8 | 87:5 93:23 94:21 | **gotten** 105:9 | 37:11,17,24 38:3 |
| 24:5 48:2 65:12 | 94:24 95:22 | **graduated** 14:8 | 38:13,17 39:22 |
| 70:16,17 71:3 | 102:10 103:2,14 | **graduating** 14:13 | 40:10,19,24 41:4 |
| 82:1 92:17 98:18 | 110:23 111:11 | **gramm** 78:21 | 41:17,23 42:5,13 |
| 98:19,21,23,25 | 112:1,8 117:12 | **grant** 30:21 31:7 | 42:19,24 43:4,14 |
| 151:23 | 118:13 120:14 | 32:24 37:15 | 44:2,14,20 45:1,5 |
| **generally** 71:3 | 123:1,11 136:8 | **granted** 65:11,17 | 45:18 46:17,20 |
| 127:11 | 152:17 158:8 | 76:8,9 82:5 | 47:1,6 48:4,12,19 |
| **generate** 24:11 | 160:22 161:25 | **granting** 65:17 | 49:5,11 50:4,12,17 |
| 25:7 28:8 | 163:21 | **great** 58:7 128:24 | 51:4,8,14,19,25 |
| **generated** 135:24 | **goal** 121:19 | 153:18 | 52:3,9,14,25 53:7 |
| **getting** 58:12 | **gobble** 152:10 | **greatly** 128:18 | 53:12,14,18 54:5 |
| 83:11 100:14 | **god** 119:21 | **grief** 153:4,4 | 54:13,18,20,23 |
| 108:8 123:5 124:6 | **goes** 27:16 60:4 | **gross** 159:11,15,21 | 55:8,14,18,24 56:6 |
| 124:19 125:21 | 88:15 97:8 116:20 | **grossman** 2:20 | 56:16 57:6,14 |
| 136:19 142:13,13 | 152:19 161:18 | 8:24 9:2 | 58:24 59:7,12,16 |
| 147:2 148:11 | **going** 12:25 33:18 | **ground** 12:24 | 60:13,15,21,23 |
| 161:13 | 43:19 45:7 46:1 | 85:14 | 61:12 62:1,8,14,18 |
| **giant** 89:3 | 46:11 47:24 51:15 | **group** 56:23 | 63:5,7,15 64:2,22 |
| **gibbs** 1:20 2:4 8:8 | 56:10,10,11 57:9,9 | 127:15 130:4 | 65:1,14,19 66:6,21 |
| 9:4,6 | 58:3 68:17 70:18 | 132:25 137:13,19 | 66:24 67:16,19,25 |
| **gibbsbruns.com** | 74:1 75:15 83:25 | **guess** 18:3 36:15 | 68:7,13 69:1,7,22 |
| 2:6,6 | 84:24 85:16 86:25 | 93:5 | 70:3,10,13,21 71:1 |
| **give** 13:2 20:14 | 89:2 92:9 93:1 | **gulley** 2:3 9:4,4 | 71:10,22 72:4,7,12 |
| 32:11 48:15 57:22 | 94:4 99:12,22 | 10:6,11,15,22 11:1 | 72:18,23 73:8,22 |
| 64:3 65:21 67:9 | 100:2,5,8,12,13 | 11:5,14,24 12:3 | 75:4,8,22 76:12 |
| 67:12 74:8 75:25 | 101:12,13 102:16 | 17:6,11,22 18:2,6 | 77:6,16 78:5,14 |
| 82:13,17 93:16 | 102:17 103:12,12 | 18:11,14,20,24 | 79:4 80:9,22 81:6 |
| 98:2 108:2 116:3 | 107:15 111:6 | 19:3,8,12,20,24 | 81:17,25 82:18 |

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| 83:4,9,21 84:12,22 | 136:11,15,21 | **hand** 26:3 74:1 | **health** 13:17 |
| 85:2,6,19 86:4 | 137:5,10 138:3,8 | 134:19 | **hear** 44:15 |
| 87:23 88:10,24 | 138:13,22 139:13 | **handed** 27:10 | **heard** 55:6 |
| 89:13,20,25 90:4,9 | 139:24 140:3,8,22 | 32:15 38:8 44:7 | **heated** 89:8,9 |
| 90:15,19,25 91:7 | 141:3,20 142:6,18 | 57:16 63:21 82:7 | **heave** 119:18 |
| 91:13,22 92:14,20 | 143:21 144:15 | 92:1 106:6 107:22 | **held** 8:8 73:5,19 |
| 93:9,19,24 94:11 | 145:15,21 146:2,4 | 111:3 123:22 | 74:19 106:15 |
| 94:16,20,24 95:6 | 146:6,19,22,24 | 124:2 126:22 | **help** 12:24 29:19 |
| 96:10,20 97:4,14 | 147:11,18 148:9 | 129:24 141:22 | **helped** 79:13 |
| 97:22 98:7,14,24 | 149:2,4,11,17,21 | 143:8 144:20 | **helping** 66:3 |
| 99:7,19 100:6,16 | 150:14,25 151:6 | 153:15 | **helps** 160:5 |
| 101:15,23 102:6,8 | 151:12,16 153:6 | **hands** 155:23 | **hereto** 1:23 |
| 102:11,13,19 | 153:23 154:6,12 | **hansen** 2:14 3:9 | **hesitate** 92:23 |
| 103:7,17,22,25 | 154:17 155:5,11 | 8:18 | **high** 72:25 137:22 |
| 104:4,7,17,22 | 156:16,23 157:10 | **happen** 43:10 | 138:16 139:20 |
| 105:2 106:19,25 | 157:15,21,24 | 69:17 76:13 | 161:22,23 |
| 107:11,16 108:1 | 158:6,21,25 159:9 | 109:18 137:16 | **highlighted** |
| 108:13,19,22 | 160:7 161:6,10 | 155:23 | 135:19,21 |
| 109:3,12,17,23 | 162:3 163:17,21 | **happened** 61:5 | **highly** 1:9 5:10,14 |
| 110:7,10,15,21 | **guy** 48:7,14 | **happening** 46:4 | 5:17,20,23 6:5,8 |
| 111:9,19 112:6,11 | **guys** 119:19,19 | 66:8 75:10 83:23 | 6:13,17,20,23 7:4 |
| 112:15,25 113:4,6 | 141:4 | 114:12 122:8 | 7:7,10,14,17 |
| 113:14 114:9 | | **happens** 40:2 58:5 | **hill** 7:16 158:23 |
| 115:4,10,18,22 | **h** | 151:25 | **historical** 31:20 |
| 116:3,18,23 117:2 | **h** 151:15 | **happy** 119:22,22 | 162:14 |
| 117:7,17,22 118:4 | **hacked** 37:12 | 144:6 155:1 | **history** 88:15,16 |
| 118:9,22,25 119:5 | **hacker** 72:10 | **hard** 96:11,22,23 | 156:6 |
| 119:7,14 120:14 | 150:17 | 157:4 | **hmm** 145:2 |
| 121:6,12,18 122:1 | **hackers** 46:9 58:3 | **hardships** 81:21 | **ho** 86:10 |
| 122:4,20 123:6,24 | 59:10 61:5 66:9 | **harmful** 78:2 | **hold** 55:14 163:16 |
| 124:9,16,22 125:7 | 69:13 71:25 79:23 | **harwood** 3:10 | **holding** 16:22,24 |
| 125:11,18,23 | 130:23 | 8:11 | 17:4,12 71:8 75:2 |
| 126:6,13,18 127:6 | **hacking** 56:10 | **haul** 154:21,23 | 106:18,23 121:4 |
| 127:22,25 128:2 | 57:9 75:14,18 | **hazy** 43:21 | **holdings** 16:25 |
| 128:12,16,22 | 83:25 89:3 97:8 | **he'll** 133:7 | **hole** 132:11 152:2 |
| 129:8,13,19 130:2 | 97:16 120:2 126:8 | **head** 130:3 | **home** 163:5,7 |
| 130:20 131:3,9,15 | 136:6 141:4 | **heading** 115:19 | **hoping** 132:8 |
| 131:22 132:4,19 | 142:21 | 116:19,21 | **host** 77:4 |
| 133:5,14,20 134:3 | **half** 11:21 34:2 | **headquarters** | **hour** 14:1 47:12 |
| 134:17,25 135:2 | 161:14 | 10:18 | **houston** 1:21 2:5 |
| 135:10,16 136:1,4 | **halfway** 76:21 | | 8:10 10:2,4 79:14 |

HIGHLY CONFIDENTIAL

**howard** 5:12
  63:23 65:4,5 69:2
  69:9,11,12 70:4,22
**huge** 152:9 158:3
  159:6
**hughes** 2:20 9:1,1
**huh** 12:23 47:21
  155:1
**hundreds** 139:6
**hunting** 161:18,20
  161:21
**hurt** 78:10
**hypocritical** 60:5
  60:18

**i**

**ibm** 14:17 15:1,2
**idea** 42:6 75:11,17
  99:12 100:2,20
**ideas** 5:3
**identification** 26:1
  27:9 32:13 44:6
  57:19 63:20 74:4
  82:10 92:4 106:5
  107:21 111:2
  123:21 126:21
  129:23 134:8
  141:25 143:7
  144:19 153:14
  158:17
**identified** 46:8
  108:16 145:12
**identifies** 119:11
  122:11
**identify** 104:4
**identifying** 26:25
**ids** 55:21 56:13
  57:3 59:6 60:1,19
  62:6,17 63:13
  76:10 121:10
  153:21 154:4
  155:4

**ignite** 23:15
**illinois** 1:1 8:7
  164:1
**imagine** 32:8
  34:25 35:17
**imaging** 105:18
**immediate** 51:1
**imminent** 45:8,8
**imn** 145:25 146:10
**impact** 137:23
**impatient** 83:12
  83:14,24
**imperative** 166:14
**implication** 50:24
**important** 56:2
  66:7 74:23 96:25
  113:2
**impossible** 43:20
**impressively** 15:5
**improper** 53:10
  67:20 110:22
**improve** 79:17
**improved** 71:12
  71:19 72:16,16
  79:18
**improvement**
  66:14 105:20
**inappropriate**
  86:5
**inaudible** 37:1
**included** 98:15
**includes** 106:1
  136:13
**including** 37:23
  46:6
**income** 22:2
**inconveniences**
  61:4
**increase** 138:9,11
  159:11

**increases** 135:24
  138:1,2,6,7,19
**increasing** 107:3
**independent** 30:22
  31:3 32:2 35:11
  37:3,4 71:21,24
  140:12,20,24
  141:18 150:11,24
  151:10
**index** 4:1
**indicate** 96:18
  143:17
**indicates** 80:12
  144:2
**indicating** 105:14
  145:19
**indication** 48:16
**individual** 21:2
  122:6
**information** 24:23
  32:11 33:17 61:16
  77:20 89:5,15,16
  90:2,3 94:19
  101:7 135:6
  144:14
**informed** 87:4
**initial** 39:10 40:6
  43:8
**initiated** 46:22
**inquiry** 90:11
**insecure** 89:12
  90:8
**inside** 77:21
  152:16 156:18
  161:19
**insisting** 110:4
**instance** 1:14
  80:15 105:18
  123:12 146:25
  148:15 157:17
  159:11

**instances** 61:23,23
**instructed** 86:14
**instruction** 67:19
  70:14 119:8
**instructions** 70:15
  134:18 166:3
**instructs** 13:11,13
**integra** 37:5,8,15
  37:19 54:10,16
  59:6 63:2 75:7,20
  80:7 81:11,24
  88:17 141:1
**integral** 127:10
**integralink** 60:2
**integrate** 106:1
  112:23
**integration** 112:20
**integrator's** 35:11
**integrators** 30:22
  31:4 32:2 37:4,5
  71:21,25 72:22
  75:7 140:12,21,24
  141:18 150:11,24
  151:10
**integrity** 114:4
**intellectual** 114:5
  116:10,14,16
**intelligence** 101:4
**intelligent** 93:20
**intend** 92:25 93:3
  134:14
**intended** 72:1
  113:25 114:3,11
  114:20 116:8,12
  122:3
**intending** 161:15
**intent** 117:11
**intention** 69:16
  81:8,23
**intentional** 53:14

FTC-0001028

HIGHLY CONFIDENTIAL

**interest**  11:8 18:18
   92:17 93:11
**interested**  48:17
   127:12 128:21
   165:10
**interesting**  75:9
   151:20
**interface**  30:25
   84:15 103:11
   155:9,13,24 156:1
**interfaces**  135:23
   136:14,17 155:14
**interference**
   150:12
**internal**  90:11
   135:6
**interrogate**  152:17
**intervals**  14:2
**interview**  32:24
   33:4,13,23,24
**inventive**  79:21
**inventory**  24:17
   24:20 29:9,12,13
   29:16 105:6
**invoices**  152:13,14
**involved**  15:13
   46:18 58:17 90:20
   91:1 106:21
   109:25
**involves**  50:22
**ip**  114:19,22
**irritated**  79:12
**issue**  31:21 48:13
   51:22 52:22 54:2
   57:24 58:9,10,10
   61:7 62:19 71:23
   75:9 77:11,15
   79:1 89:1 99:14
   103:3 108:6,10,15
   109:7 111:22
   116:13,16,25

   121:22 143:3
   159:18 161:1
**issued**  26:7,9
   54:16 56:13 57:2
   162:23
**issues**  5:15 13:17
   47:17 55:11 61:11
   61:15 92:17 93:11
   98:9 116:25
**item**  71:4
**items**  69:15 70:22

**j**

**j**  2:19
**january**  1:10,17
   6:7 8:3 106:8,10
   106:14 107:24
   164:10 165:12
**jlong**  2:17
**job**  152:22 153:11
   155:19
**jobs**  151:22 153:7
   155:14,18
**joe**  8:22
**john**  2:20 9:1
   12:10
**johns**  19:25 20:16
**join**  131:1
**joined**  14:17 142:8
**joint**  40:16 41:16
   42:2,4,10,17 43:12
   81:14
**jointly**  68:3
   113:21 116:11
**joke**  161:16
**jones**  18:15
**joseph**  3:9
**july**  5:21 6:19
   44:12 45:4 82:12
   82:16 87:15 92:7
   130:1 134:23
   135:14

**june**  38:12 74:8
   82:20,25 83:20
   143:13
**jury**  94:3

**k**

**k**  2:3 3:4 60:25
   151:15
**keep**  11:20 24:3
   110:6 147:12
   148:3 150:19
   156:10
**keeping**  162:18
**keeps**  61:18 150:7
**keith**  7:16 158:23
**kellogg**  2:14 3:9
   8:18 94:1
**kellogghansen.c...**
   2:16,17
**kept**  163:5
**keytrack**  146:10
**kind**  48:8 67:6
   71:14,15 74:25
   88:15 89:9 91:10
   98:1,25 101:1
   105:13,24 107:4
   113:22 135:3
   136:22 149:22,23
   150:17 152:1
**kinds**  43:18
**kingdom**  21:17,21
**knew**  32:1 35:8
   77:3
**know**  12:17 13:6
   17:16,23 20:23
   21:2,6 22:8,19
   24:3,3 28:11
   30:17 31:22 36:21
   41:24 43:6,19,21
   43:22 45:6 46:8
   48:6,8 49:6,15
   50:5,18,22,25 51:1

   51:11 52:16 53:3
   54:11,15 56:11,13
   56:18,25 57:11
   58:2,9,25 60:16
   61:2,4,5,13,13,14
   61:15,20,21 62:4
   62:11,23 63:8,9,10
   66:14,14 67:9,13
   69:14 71:24,25
   72:25 73:1,1,2,3,9
   73:14,17,23 75:13
   75:14,24 76:3,4,5
   76:14,14 77:18
   78:8,11,22 79:9,10
   79:14,16,18,21,21
   80:13 83:25 84:18
   85:14 88:15,17,18
   89:2,7,14 90:10
   91:17,23 92:16,22
   93:2,10,17 94:2,19
   95:13 96:12,13,16
   96:22,22,22 97:16
   98:9,15 99:17
   100:4,20,22,23,25
   101:6,6,6 102:21
   102:24 103:9,9
   105:4,6,10,13,20
   105:23 106:20
   107:4,13 110:2
   111:22,22,23
   112:2 113:17,18
   113:19 114:12,13
   114:19,20,22,23
   116:8,11,12,19
   117:9 118:11,12
   119:2,23,25 120:1
   120:1,3,8,11 122:8
   122:11 123:15,18
   125:24 126:8
   127:11,13,13,14
   127:16,17 128:7

FTC-0001029

HIGHLY CONFIDENTIAL

128:17,23 129:3,3
129:21 130:23
131:16 132:1,8,8
132:11 133:23
136:7 137:1,21
138:10,14 139:6
139:19,20,20
140:16,17 141:7,8
141:9,13,14,15,15
141:16,16 142:8
143:2,3 144:2,2,9
145:6 148:3 150:3
150:16,16,20
152:20,23 153:8,9
153:10 155:15,16
155:16,19,20
156:3,6,8,9,11,18
156:20 157:18
159:19,22,23,25
160:25 161:18
**knowledge** 43:21
43:22 57:1,15
61:14 72:14,14
77:8 96:22,24
112:9,20 113:19
113:22 114:13,15
114:17 115:12,20
116:5,22 117:3
119:1,11
**knowledgeable**
32:4

**l**

**l** 1:18 164:13
165:17
**laid** 43:8
**lamb** 5:8 57:22
**lane** 10:4 29:20
**laptop** 162:1,6,9
162:14,24
**large** 15:21 43:17
60:6 73:19 74:19

140:5
**largely** 140:6
**larger** 127:15,15
128:7
**largest** 23:17
**lasted** 47:19
**lasts** 118:8
**launch** 68:4
**law** 1:20 8:18
21:10 77:23 78:8
78:19
**laws** 78:23
**lawyer** 117:9
**leach** 78:21
**leaf** 135:3
**lease** 11:2,3,4
**leave** 53:16 61:19
119:3
**leaving** 61:24
**ledger** 151:23
**left** 15:2 61:7 62:3
132:25 146:13
**legal** 3:21
**length** 45:9,10
111:24
**letters** 120:10
**level** 16:24 72:25
80:12 105:11
109:25 119:24
**licensed** 15:15
**lied** 98:16
**life** 161:14
**light** 95:8
**limit** 128:25
**limited** 67:14
85:22 100:21
**line** 39:5 46:10
89:23 90:2 108:21
144:4 146:25
147:12 148:4,4,12
148:19 149:6

159:5 167:5
**linger** 143:1
**link** 37:5,9,15,20
54:17 59:6 63:3
75:7,20 80:7
81:12,24 88:18
141:2
**linux** 151:19,19,21
152:16
**list** 56:24 69:3,15
70:5,23 71:4
101:12 119:23
137:25 149:15,23
149:25 150:7
**listed** 138:1
145:23
**listening** 58:13
98:3
**lists** 149:24
**litigation** 1:4 8:6
163:16 164:4
166:1 167:1 168:1
**little** 14:16 23:9
33:10 62:24 83:11
83:14 91:9,17
92:23 105:11
117:8 124:19
133:23
**live** 10:1 127:14
**lives** 10:8
**llp** 1:20 2:4,20 8:8
**located** 8:9
**locations** 10:16
**locked** 60:7
**log** 37:16 54:16
63:9
**logic** 122:17 123:4
124:5,18 125:21
**long** 3:9 5:15 8:22
11:19 47:12 50:20
50:25 51:9,22

52:22 54:2 57:12
58:3 67:6 79:10
80:24 84:9 93:3
98:8 105:8,14
107:9 116:20
118:7 119:17,18
134:10 151:13
152:9 154:9,15,21
154:23 156:10
162:18
**longer** 40:8 50:25
85:25
**look** 26:11,16
27:13,18 38:10,21
66:2 69:25 86:8
110:23 112:16
114:19 115:19
128:6 133:16
144:23 145:11
147:21 151:3
156:6
**looked** 28:7 83:8
99:21 147:10
**looking** 100:25
107:10 108:25
115:9 118:21,24
133:22 144:25
155:17 161:14
**looks** 97:23 103:11
103:11 133:21
146:25
**loose** 73:16 113:22
**lose** 78:6
**losing** 79:3 132:16
**loss** 79:6
**lost** 78:4 79:2
132:22
**lot** 24:11 29:1,3
30:20 33:17 40:2
48:5 56:21 93:11
122:23 129:5,5

HIGHLY CONFIDENTIAL

132:7,7 161:17,18
**lots**  31:24 117:10
  149:23
**louisiana**  1:21 2:4
  8:9
**lower**  97:24
**lunch**  107:16
  120:13,19 132:6

**m**

**m**  2:15
**machine**  1:19
**macroeconomic**
  122:24
**mad**  120:9
**main**  10:17
**maintenance**  84:7
  84:10 145:6
**major**  106:15
**majority**  60:6
**making**  23:4 86:5
  101:8
**management**  1:3
  8:5 15:10,14
  23:11 29:6,9
  66:19 104:15,15
  104:16,18 105:15
  105:25 135:12
  157:9 164:3 166:1
  167:1 168:1
**manager**  159:13
**managers**  159:16
**manner**  41:13
  77:21 152:9
**manufacturers**
  38:2 66:18 67:24
  98:16
**manufacturing**
  10:18
**mark**  3:3 9:13
  134:20

**marked**  25:25
  26:2 27:8,11
  32:12,14 38:9
  44:5 57:18 63:19
  74:3 82:9 92:2,3
  95:10 106:4
  107:20 111:2
  123:21 126:20,23
  129:22 134:7
  141:24 143:6
  144:18 153:13
  158:16
**market**  23:17,21
  23:25 69:20,20
  70:1,20 123:1,10
  127:14 132:15,15
  139:21,23
**marketed**  15:24
**marketing**  29:23
  50:9 89:23
**marketplace**
  77:10,15,17 78:2
  78:25 84:14
  100:23 103:9
  127:16
**massive**  104:12
**matter**  8:5 94:16
  97:6 98:22 128:23
**matters**  162:2
**mayer**  3:3 9:13
**mayerbrown.com**
  3:5
**mcohen**  2:11
**mdl**  1:3 164:3
**mdsc**  2:12 8:20
**mean**  21:22 22:14
  38:1,6 39:13 52:2
  62:7,13 69:8
  71:25 81:3 91:5
  91:12 105:1,3,11
  108:15 116:9

136:3 137:9 157:2
  161:14
**meaning**  40:22
  45:11 48:10 72:22
  96:19 109:9
  126:10 137:8
  141:1
**means**  62:15 80:23
  91:15 135:25
  136:14,17 137:11
**meant**  121:21
  139:3
**measures**  150:19
**measuring**  140:9
**media**  87:10 158:9
  158:14
**meet**  11:19 12:1,2
  39:21,21 123:18
**meeting**  5:21
  39:10 40:6 92:8
  92:13,16 94:9
**meg**  161:22
**mentioned**  145:1
**message**  69:20
**messaging**  69:21
  70:1,20 132:16
**met**  39:17,25 40:4
**metadata**  44:9
  74:7
**meter**  152:20,20
  152:21
**method**  143:12,19
  143:23,25 144:1
  163:8
**michael**  2:8,14
  9:10 12:3
**mid**  3:21 129:16
**midway**  76:20,21
**mike**  8:17 9:21
  36:5 53:12 54:21

**milberg**  2:20 8:23
  9:1
**milberg.com**  2:22
  2:23
**million**  135:22
  136:10 138:24
  139:1,1,5,7,11
**millions**  77:12
  78:4 79:1,3
  132:15 136:7
  139:4,6
**min**  89:6
**mind**  111:25
**minor**  72:9 90:6
  132:25 145:7
**minority**  61:9 62:4
**minuscule**  89:6
**minute**  57:23 87:4
**minutes**  47:13,14
  47:20
**mm**  145:2
**mms**  145:25 146:9
**mnemelka**  2:16
**mobile**  163:11,12
  163:13
**mode**  143:2
**modified**  44:11
**moment**  64:3
  82:22
**money**  132:12
  136:8
**month**  16:9 34:2
  123:12 150:12
  151:23 152:8
  159:14,15
**monthly**  135:9
**months**  43:16
  45:11,12,13 74:20
  150:2,8 160:25
  161:12

HIGHLY CONFIDENTIAL

**morning** 8:2 9:21
  97:19
**moss** 6:12,22
  134:22 135:9
**motor** 14:14 69:12
**motors** 98:18,19
  98:21,23
**mountain** 11:6,8
  129:11
**mountains** 161:13
**mouse** 79:22 141:8
**move** 119:7
**moved** 130:6
**movement** 137:12
**mryan** 3:5
**mullin** 2:9 9:10
**multipage** 92:11
**mutual** 39:6 81:21
  120:6,7

**n**

**n** 2:1,14 3:1 8:1
**n.w.** 2:15 3:4
**nada** 39:10,11,13
  39:25 40:6
**naked** 89:23 90:2
**name** 8:11,17 9:21
  9:23 12:10 20:23
  21:3 44:12 90:1
  92:8
**named** 2:12 8:20
**national** 39:12
**nationwide** 122:25
**nature** 56:14 95:8
  141:12
**necessarily** 73:12
  79:6
**necessary** 77:19
  142:25 166:5
**need** 13:18 14:2
  27:24 30:2 53:21
  53:23 69:10 91:4

91:12 93:15,21
  104:11,19,24
  106:13 128:15
**needed** 91:5
**needs** 49:9 98:20
**negotiated** 111:24
**negotiating** 96:5
  122:22
**negotiation** 89:8,8
  109:20 110:1
  150:21
**negotiations** 73:6
  73:20 108:11
**neither** 165:5
**nemelka** 2:14 4:5
  8:17,17 9:20,22
  10:9,13,20,24 11:3
  11:7,16 12:1 17:9
  17:14,25 18:4,8,13
  18:17,21,25 19:5
  19:10,14,22 20:2
  20:11,16,20,25
  21:7,12,18 22:5,10
  22:20,25 23:9,24
  24:6,11,17,20,23
  25:2,6,11,15,19
  26:2 27:10,18
  28:3,14 29:1,9,15
  29:19,23 30:2,6,13
  30:19 31:3,17,22
  32:6,14,24 33:3,8
  33:12,18,23 34:4
  34:11,17 35:8,21
  36:2,7,11,17,23
  37:2,8,14,19 38:1
  38:5,15,18 39:24
  40:12,20 41:1,10
  41:20 42:1,9,16,22
  42:25 43:2,11,23
  44:7,15,23 45:3,10
  45:23 46:21 47:3

47:9 48:10,15,21
  49:8,17 50:7,14
  51:3,6,11,16,20
  52:2,7,11,20 53:5
  53:10,13,16,20,21
  54:7,15,22 55:5,10
  55:16,20 56:4,15
  57:2,12,16,20 59:5
  59:11,14,18 60:17
  61:18 62:5,10,16
  63:1,6,12,17,21
  64:4,24 65:3,16,24
  66:22 67:1,18,21
  67:22 68:2,9,21
  69:4,18,25 70:6,11
  70:19,24 71:5,18
  72:2,5,10,15,21
  73:5,19 74:1,5
  75:5,19 76:8,17
  77:9 78:3,11,18
  80:2,20 81:3,11,22
  82:7,11,19 83:6
  84:3,16,24 85:1,3
  85:9,16,21 86:4,20
  86:22 87:2,13,25
  88:20 89:11,18,23
  90:7,13,17,23 91:3
  91:11,19 92:1,5,18
  92:25 93:13,22
  94:3,15 95:17
  96:17 97:1,10,18
  98:5,11 99:2,11,25
  100:13 101:9,19
  102:2,7,10,12,15
  102:22 103:14,20
  103:23,25 104:2,6
  104:8,19,24 106:6
  106:22 107:5,14
  107:18,22 108:4
  108:15,20,23
  109:4,14,19 110:4

110:8,13,16,18,25
  111:3,11 112:4,8
  112:13,16 113:3,5
  113:10 114:25
  115:8,14,24 116:1
  116:7,21 117:1,5
  117:12,19,20,24
  118:7,13,23 119:2
  119:9,15 120:13
  120:21 121:9,15
  121:24 122:3,13
  123:4,25 124:2,11
  124:18 125:1,8,15
  125:20 126:1,10
  126:15,22 127:19
  127:23 128:1,9,13
  128:19 129:4,10
  129:16,24 130:5
  130:24 131:5,11
  131:18,25 132:14
  133:2,9,10,17,25
  134:4,6,9,20 135:1
  135:8,14,18 136:3
  136:9,13,19 137:2
  137:7,25 138:6,11
  138:18,23 139:15
  140:1,5,10,19
  141:1,6,22 142:1
  142:15 143:8,23
  144:20 145:17,23
  146:3,5,8,20,23
  147:4,14,21
  148:20 149:8,12
  149:13,25 150:22
  151:4,9,14 153:2
  153:15,25 154:8
  154:14,19 155:7
  156:13,21 157:6
  157:13,25 158:2,8
  158:18,22 159:2
  160:2,9 161:8

HIGHLY CONFIDENTIAL

162:1,5 163:19
**never**   36:23 41:7
  42:21 81:7 97:19
  108:17 109:15
  110:5,19 115:2
**new**   2:22,22 43:24
  58:25 62:10,21
  79:7,23,25 141:9
  141:14 159:12
**news**   5:5 32:16,19
  32:25 33:14,25
  159:23
**nice**   26:22 48:6,14
**nomenclature**
  149:23
**non**   60:2 66:16,22
  66:23 67:1,3,22,23
  67:23 68:5,11
**nonpublic**   77:20
  89:15
**normal**   138:15
**norman**   18:15
**northern**   1:1 8:7
  164:1
**noted**   166:12
  168:10
**notes**   5:15,21
  74:11,13 92:12,13
  93:7 94:9 96:17
**notice**   143:11
  163:16
**notification**   161:1
**november**   7:9,16
  63:25 64:1,15
  144:22 158:23
  159:1
**number**   61:1,15
  73:25 74:23 92:17
  93:11 115:5
  124:12 138:24
  139:2 142:9 147:1

147:5 148:15,22
  154:1
**numbered**   1:16
**numbers**   124:12
  147:14 153:19
  159:17
**nw**   3:21

**o**

**o**   8:1
**object**   13:10,12
  34:10 55:14 67:16
  85:2,6,19 86:7
  94:11,12 116:4
  119:6 134:17
  140:15 158:21
**objection**   10:6,11
  10:15,22 11:1,5,24
  17:11 18:2,6,11
  19:20,24 20:7,13
  20:18,22 21:5,9,14
  22:3,6,18,23 23:7
  24:2,9,15,19,21,25
  25:4,9,13,17,22
  27:6,14 28:1,24
  30:11,15,23 31:14
  31:19 32:3,20
  33:1,5,15,21 34:1
  34:9,15 35:6,13,23
  36:4,5,13,20,25
  37:6,11,17 38:13
  39:22 40:10,19
  41:17,23 42:5,13
  42:19,24 43:4,14
  44:2,14,20 45:1
  46:17,20 47:1,6
  48:4,12,19 49:5,11
  50:4,12,17 51:4,8
  51:14,19,25 52:3,9
  52:14,25 53:8,15
  54:13,18 55:8,18
  55:24 56:6 57:14

58:24 59:7,12,16
  61:12 62:1,8,14,18
  63:5,7,15 64:2,22
  65:1,14,19 67:25
  68:7,13 69:1,7,22
  70:3,10,13,21 71:1
  71:10,22 72:4,12
  72:18,23 73:8,22
  75:4,8,22 76:12
  77:6,16 78:5,14,15
  79:4 80:9,10,22
  81:6,17,25 83:9,21
  84:12 88:10,24
  89:13,20,25 90:4,9
  90:15,19,25 91:7
  91:13,22 92:20
  93:19,24 97:14,22
  98:7,14 99:7,19
  100:6,16,17
  101:15,23 102:6
  102:19 103:7
  104:17,22 106:19
  106:25 108:22
  109:3,23 110:7,10
  110:15,21 111:9
  111:19 113:4,14
  114:9 115:4,10,18
  115:22 116:3,18
  116:23 117:2,7,17
  117:22,23 118:4,9
  118:22 119:5,14
  121:12 122:1,4,20
  124:22 125:11,23
  126:18 127:6,22
  127:25 129:8
  131:3,9,15,22
  132:4,19 133:5,20
  134:3 136:1,11
  137:10 138:3,8,13
  139:13,24 140:3,8
  140:22,23 141:3

141:20 142:6,18
  143:21 144:15
  145:15,21 146:19
  146:22 147:18
  148:9 149:2,17,21
  150:25 151:6,12
  153:6 155:5
  156:16,23 157:10
  158:6,25 159:9
  160:7 161:6,10
  163:17
**objections**   103:20
**obligations**   118:19
  119:10
**obstinate**   34:24
  35:16
**obstructionist**
  85:17
**obviously**   58:12
  61:6 78:10 124:24
**occur**   151:8
**occurred**   41:7
  51:10 131:24
**october**   16:10,11
**odds**   137:22
**oem**   58:16 66:16
  66:23 67:1,3,22,23
  68:5,11
**oems**   37:23 38:1
  66:1,3 68:11
  99:10 136:23
**offer**   68:4 84:14
**offered**   33:6 80:25
  122:18 158:4
  159:7
**offering**   68:24
  104:13
**offerings**   100:11
  158:5
**offers**   23:10,14

HIGHLY CONFIDENTIAL

**office** 163:6
**officer** 164:17
**offices** 1:20
**offshore** 19:15
**oh** 16:6 63:1 74:10
  142:22
**ohio** 10:17
**oil** 145:5
**okay** 11:10 12:12
  13:4,8,14,19,23
  14:3,8 16:24 17:9
  17:14 19:14 33:22
  36:8 44:13,18
  53:13 54:11 57:16
  63:17 64:8,12
  66:25 67:21 74:10
  76:24 85:3,9 87:2
  92:18 94:15,24
  95:20 104:19
  106:12 108:4,5,6
  110:4 112:8
  113:16 114:10,16
  114:17 119:17,18
  125:6 126:1 133:9
  134:4 135:7
  138:23 145:20,22
  146:7,15 148:8,10
  149:3,8 150:3,6,6
  154:20 157:11,13
  157:24 160:9
  162:23 163:21
**old** 98:10 162:16
**older** 105:23
**once** 31:18 39:15
  73:12 97:24
  150:22
**one's** 143:3
**ones** 106:20
**ongoing** 128:4
**onlined** 146:10

**open** 37:2 68:23
**operate** 121:22
  151:19 156:15
**operating** 24:12
  28:8 151:18
  152:17
**operational** 43:18
  114:3
**opine** 86:16
**opinion** 35:2,19
**opportune** 151:7
**opportunities** 39:7
  40:7
**opportunity** 9:22
  33:6 41:21 67:9
  133:16 149:15,19
**opposed** 46:19
  132:10
**opposing** 86:5
**opposite** 34:25
  35:17
**oral** 1:8,13 164:9
  164:17
**order** 33:9 95:8
  153:7 156:4,8
  160:3
**ordering** 151:23
**orderly** 56:12
  81:20 99:23
  121:20
**orders** 152:14
**organization**
  21:23 88:14 101:3
  161:17,19,20
**organizations**
  88:18
**original** 20:8,9
  42:14,23 43:3
  135:22 166:15
**originally** 16:1

**outcome** 165:10
**outlined** 64:25
**outlook.pst** 161:13
**outright** 98:16
**outside** 27:24
  43:19 141:13
**overall** 122:24
**overcome** 158:3
  159:7
**oversight** 22:21
**owned** 16:18,22
  17:13 19:7 130:18
**owner** 52:6,8,18
**owners** 18:8 19:1
**ownership** 11:7
  17:7,10 18:18
  137:13
**owns** 10:16 17:4
  17:18

**p**

**p** 2:1,1 3:1,1 8:1
**p.a.** 2:8
**p.m.** 1:17 95:1,3,5
  120:15,17,18
  158:10,12,14
  163:24,25
**page** 4:1 5:1 6:1
  7:1 33:16 34:5
  40:12,14 49:20
  65:25 74:9,18
  76:18,21 84:23
  92:19 95:23,24,24
  103:15,23,24
  104:1 108:18,20
  109:6 111:12,12
  125:4 127:4,24
  135:7,19 144:24
  144:25 145:12
  149:7 165:1 167:5
**pages** 168:6

**paid** 16:11
**paper** 74:15
  162:17
**paragraph** 50:19
  67:6,7 84:25 85:4
  87:18 88:12 91:4
  91:18 109:8
  112:12,14
**part** 14:24 49:6
  58:18 59:3 60:5
  88:14,16 89:9
  90:20 91:2,20,24
  100:19 101:2,17
  117:15 119:3
  121:13 123:10
  127:10 130:24
  134:10,12 135:5
  135:20,21 136:25
  138:4 150:17
  156:8
**particular** 43:15
  49:12 51:17 52:4
  59:9 60:24 62:20
  76:6 80:11 84:20
  85:23 95:11
  111:20,22 139:8
**particularly** 98:17
**parties** 43:20
  66:17,23 67:1,4,23
  67:23,24 68:11
  77:4 80:6 81:5
  82:4 95:13 99:13
  100:3 101:21
  102:3,4,18 103:10
  114:23,23 124:13
  126:10 136:17,23
  165:6
**partner** 86:10
**parts** 24:20 29:12
  86:3 105:5 151:23
  152:7,11,12,24

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| **party** 37:20 51:21 52:21 54:1 99:15 102:21 103:4 109:10,16 112:19 116:9 118:2 120:8 126:4,7 127:9 132:9 142:20 156:1 164:22 165:4 | **percentages** 24:4 **perfect** 79:20 **perfectly** 31:9 **performing** 62:23 **period** 58:20 61:10 109:21 119:13 121:23 131:7 151:13 160:15 | **plain** 98:10 **plaintiff** 1:15 2:12 5:1 6:1 7:1 8:20 **plaintiff's** 26:2 27:11 32:15 38:9 44:7 57:17 63:21 74:2 82:7 92:2 106:6 107:22 111:4 123:22 124:3 126:23 129:24 134:21 141:22 143:8 144:21 153:15 158:20 | 101:20 103:15 105:9 111:6 123:3 128:4 129:14 145:16 148:10 151:1 161:7 **pointing** 88:3,22 93:18 **points** 44:13,18,21 45:13,17,19,20,24 74:15 80:13 83:7 85:24 87:19 93:10 96:2 153:22 **policies** 23:5 61:25 98:13 99:5 139:22 140:2 151:3 |
| **party's** 112:21,23 112:24 **passage** 52:4 80:11 **password** 34:19 **patter** 136:22 **pause** 129:21 135:4 154:18 **pay** 27:17 91:16 103:10 **payroll** 105:5 **pays** 160:1 **peaceful** 142:11 **peggy** 2:19 8:23 **pending** 13:23 94:20,22 107:9 113:12 **pennsylvania** 2:9 2:21 | **periods** 123:1 **permission** 65:21 65:22 66:1 **permitted** 76:5 **person** 20:23 48:7 48:8 58:13 63:9 96:13 112:21 **person's** 21:3 **personal** 76:19,22 77:20 89:15 160:21,22 **personally** 15:13 27:15 79:9 121:7 123:8 **pete** 116:15 **phased** 46:19 **phillips** 2:20 8:24 9:2 | **plaintiffs** 2:18 8:25 9:3 **plan** 13:25 **planned** 66:15 **planning** 160:24 **plans** 112:22 **plant** 10:19 **plaza** 2:21 **plead** 117:8 **pleasant** 46:11 **please** 8:15 9:16 9:23 13:6,13 33:8 39:6 64:7,13 85:8 91:13 104:5 113:8 116:1 125:14 166:4,9 | **policy** 128:4 138:9 138:12 150:16 **porting** 30:18 **position** 30:20 31:18 32:8 34:24 35:1,3,9,16,18,20 35:22 36:3,12 78:1 90:21 122:22 136:6 **positions** 31:21 **positive** 48:9 **posture** 77:17 **potential** 21:24 94:17 **power** 16:2 23:15 79:14 |
| **people** 56:23 73:1 75:10,17 79:20 96:14,14,15,15 98:2,3,4 122:8 128:5 141:4 144:4 152:11 159:20,24 **percent** 17:4,25 18:19,21,23,25 19:5,11 23:25 125:16 138:20 **percentage** 17:20 18:5 123:9,19 124:24 | **phone** 44:25 45:3 45:7,14 48:18 87:4 120:11 159:25 163:12,13 **phones** 163:11 **phrase** 55:6 97:19 **picture** 26:19,21 98:2 161:22,23 **pictures** 161:21,21 **piece** 62:22 **pissed** 60:6 **pitter** 136:22 **place** 44:22 150:16 152:16 155:24 | **plus** 135:23 137:7 138:14,15,20 159:14 **point** 15:2 26:11 43:15,20 48:20 49:21 54:20 64:5 65:9 66:7 67:11 68:21 74:23 76:19 76:21 85:3 87:14 87:19 92:18 97:2 99:11,20 100:7 | **powerdns** 15:25 **powerful** 76:14 **practices** 23:5 31:23,24,25 **predominantly** 128:7 **prefer** 92:22 **prepare** 11:10,16 **prepared** 12:13 45:14 73:24 74:13 |

HIGHLY CONFIDENTIAL

present  3:6 8:12
  8:13 12:4,6,12
preserved  161:5,7
  161:8
preserving  162:21
president  3:7 39:2
presidents  92:16
prettier  120:23
pretty  46:12 60:6
  82:2 89:8 121:1
  157:12
prevalent  140:4
prevent  66:4
preventative
  145:6
previously  38:9
price  135:24
  137:25 138:1,2,6,7
  138:9,11,19
pricing  122:18
  138:5
primarily  15:21
principally  49:14
  138:17
print  162:20 163:1
  163:2
printed  162:19
printing  152:13,14
  163:1
printout  27:12
  163:9
prior  16:14
priority  88:1
  128:23
privilege  94:17,17
probably  11:22
  35:2,20 68:15
  73:15 97:7,7
problem  58:7
  60:10,11 122:7

problems  56:21
procedure  1:22
  85:11 93:25
procedures  58:19
  90:12
proceed  9:16
  107:6
proceeding  163:23
  165:7
process  41:7 50:21
  56:8 72:13 81:8
  84:15 107:13
  112:19 138:5
  139:19 150:17,21
processes  55:13,22
  59:2 60:20 62:6
  62:12,16
processing  14:24
produced  1:14
  44:10 74:6,7 92:6
  135:20
product  80:17,25
  100:11 156:22,22
  159:25
products  72:3,11
  84:13 100:22,24
  105:19 138:10
  157:1,17,20 158:3
  159:6
profit  159:12,21
program  30:24
  31:4 66:4 68:4
  129:6,18 130:6,16
  131:1 132:10
  142:9,12 143:1,20
  145:3
programmer
  106:21
programming
  15:6,14

programs  50:9
  68:24
progress  48:6
  129:21
prohibit  34:18
prohibition  112:9
  116:5,21 117:1,3
  119:1,11
project  22:7 42:20
  43:9 44:4 112:3
projects  83:16,20
proper  41:14 68:1
property  10:5,9
  10:14,20,25 11:2
  114:5 116:10,14
  116:17
proposal  42:14
  43:3 44:3 48:3
proposals  41:19
proposed  41:7,15
  50:16
proposing  40:16
  43:8
propounded  168:8
prospective  68:5
protect  114:3
protected  55:12
  55:21 57:3 60:19
  62:17 63:6,13
  66:4 68:4,10,23
  121:10 131:7
  143:19 150:10
  155:3
protecting  142:16
protection  114:5
  114:19
protections  31:1
protective  95:7
protector  20:24
  21:1,4,7

protocol  33:9
provide  14:5
  37:20 42:11
  121:20 144:10
  147:7 148:2,25
  163:15
provided  15:9
  37:9 50:6 90:17
provider  147:8
  148:6 149:1 157:5
provider's  147:7
  148:1,24
providers  144:10
  144:12
provides  145:13
  146:17 148:7
providing  34:18
  75:21,23 77:4
  126:11 147:16
  148:14,22
provision  113:2
  114:19 115:6,20
  118:6
provisions  1:22
  118:11
public  16:14 26:6
  26:7,9 28:4,6
publication  5:2
publicly  25:11,19
  30:7
pull  110:25 154:15
purged  162:16
purpose  50:11
purposes  81:9
  86:1 100:10,10
  101:7
pursuant  1:21
  164:20
pursue  64:17
  65:11 69:5,19
  70:8

HIGHLY CONFIDENTIAL

**pursuing**  66:13
**put**  27:3 28:14
 97:2,12 122:10
 132:12 149:9
 162:19,21
**puts**  32:17
**putting**  159:19
**pwedgworth**  2:22

**q**

**qualified**  56:1
**que**  113:12 147:22
**queen**  11:6,8
**question**  13:2,7,8
 13:11,23,23 32:16
 33:19,22 34:5,21
 36:10 42:25 53:11
 53:19,22,24 54:7
 60:14 61:3 64:13
 69:14 70:13 82:23
 88:20,21 94:20,22
 94:23 95:7 97:10
 97:11 100:4 101:9
 102:7,8,13,14,15
 104:14 107:2
 110:17,17 113:7,9
 113:10,12,15
 114:6 115:25
 125:14 132:21
 133:7 142:2 147:6
 147:19 148:5
 149:4,5 158:1
**questioning**  86:21
**questions**  9:23
 13:14 60:10 93:14
 94:6 95:18 144:8
 147:9,22 148:23
 160:11 163:20
 168:8
**quick**  63:2
**quiet**  150:19

**quit**  104:11,25
 120:2,2,3,3
**quite**  30:10 40:8
 41:21 45:22 88:5
**quota**  123:16
**quotas**  123:18
**quote**  26:16 28:22
 28:23 61:1
**quotes**  159:24
**quoting**  108:16

**r**

**r**  2:1 3:1 8:1 167:3
 167:3
**r&i**  68:2
**r&r**  68:3,23,23
 87:20,21 88:2,3,22
**rain**  136:23
**raised**  122:23
**randomly**  153:3
**rare**  40:3
**ratcheted**  61:4
**rate**  138:15
**rci**  31:4 51:23
 52:23 54:2 58:16
 99:13,18 100:3,5,8
 101:5,13,16,22
 102:5,18 123:5
 124:6,13,20
 125:22 129:6,11
 129:18 130:6,16
 131:1 132:10
 136:14 138:2
 142:8,12,23 143:1
 143:20 155:9,24
 156:9
**rdr**  1:18 165:17
**reabsorb**  67:5
**reached**  58:16
**read**  33:11 40:15
 57:21,23 58:22
 60:16 64:7 67:10

 67:12 82:13,22,23
 84:23 85:7,11,18
 85:25 86:13,16,18
 87:1 93:21 104:9
 106:12 108:2
 111:17,21 112:4,7
 119:23 135:7
 166:4 168:5
**reading**  33:16
 38:18 57:25 64:10
 67:13 70:6 85:21
 86:25 95:19 102:3
 115:21 116:1
 125:12 134:14
**reads**  58:12
**ready**  111:24
**real**  63:2 161:16
**realize**  131:13,20
 132:3 133:12
**really**  67:14 121:1
 123:16 129:1,1
 153:1 161:23
**reason**  14:5 67:8
 166:6 167:7,9,11
 167:13,15,17,19
 167:21,23
**reasonably**  112:22
**reasons**  61:19
 143:13 165:1
**recall**  12:22 32:11
 46:24 47:7 91:8
 96:11 108:7 118:3
 131:23 144:13,25
**receipt**  164:24
 166:16
**received**  22:13,14
 59:21 87:15 91:16
 135:8,15
**receiving**  107:25
**recess**  55:1 87:8
 95:3 120:17

 158:12
**recognize**  26:4
 32:18 33:12 44:18
 92:12 93:6 106:7
 106:11 107:24
 140:25
**recognized**  94:8
**recognizes**  27:24
 28:12,20
**recollection**  97:20
**recommend**  151:2
**record**  1:23 5:2
 8:3,16 9:24 53:16
 54:25 55:3 85:22
 86:6,12,14 87:3,5
 87:7,11 93:23,25
 94:5,21,25 95:2,4
 104:5 120:14,16
 120:19 133:7
 158:8,11,15
 163:24 164:18
 165:9
**recorded**  8:4
**records**  156:5
**redistributor**
 100:10
**reduced**  97:17
**refer**  74:14 157:18
**references**  108:7
**referred**  34:12
 66:18 138:7
 143:13
**referring**  29:12
 54:8,10 57:4 99:1
 103:5,8 133:3,15
 142:4 147:12
 148:3 157:6
**refers**  99:8
**reflected**  58:11
**reflecting**  33:4
 147:5

FTC-0001037

HIGHLY CONFIDENTIAL

[reflects - reymdl00238133]                                                          Page 26

reflects   33:13,23
  35:5
refresh   97:20
regard   32:5 36:15
  42:8 51:17
regarding   39:6
  112:20
regardless   126:4
  126:16 127:4,21
  128:5,6 131:25
regards   90:11
  157:16
region   3:21
regulated   60:2
reiterate   119:17
relate   94:16
  127:18
related   49:2 93:12
  136:24 148:19
  162:2 165:6
relationship   29:5
  66:19 82:5 156:25
  157:1
relationships
  126:4,7 127:9
  150:18
relative   165:8
release   71:9 73:20
  74:19 107:6,15
  121:3
released   73:10,12
releasing   73:5
reliable   90:17,22
relief   119:19 143:5
remember   25:23
  30:8 32:10 45:6
  133:18
remind   95:9,12
  145:4
reminder   49:13
  80:15,19 89:6,14

145:3
reminders   81:1
  82:3 84:7,11
  89:19
remindertrax
  145:1,12,25
  146:10 148:14,15
reminding   117:20
remiss   88:3
remote   45:25 46:3
  46:10 47:23 76:16
remove   20:21
removed   20:17
  21:8
renewal   150:1,8
  150:21
repair   152:14
repeat   36:9 43:9
  44:4 53:21 64:13
  82:23 113:8
  125:13 146:7
repeatedly   86:14
reply   47:25 109:1
reported   1:19
reporter   8:13 9:15
  133:6 164:14
reporter's   4:7
  164:8
reporting   76:15
  155:16
reports   31:9,10
  135:12 152:9
represent   44:8
  74:6 92:5
representations
  27:4
representative
  2:12 8:21
represented   85:14
represents   138:15

request   84:6,9
  98:19 106:16
  132:1 133:18
requested   46:23
  46:25 69:9 164:22
  165:3
requests   105:12
require   50:10
  113:19 155:9
required   77:23
  78:8,20 126:3
requires   127:8
reread   53:23
res   161:22,23
reselling   81:10
reservation   156:5
resources   128:24
  128:25
respect   23:5 26:15
  96:8 99:5 122:18
  149:15
respond   47:22,23
  154:14
response   43:9 44:3
  47:10 48:2,9 85:5
  152:2,15,24
responsibilities
  22:21
responsibility
  54:4
rest   19:6 93:15
  125:12
restriction   114:2,7
  115:9,11,12,16
  155:21
result   78:4 113:17
  114:23 139:16
retail   104:15,15,16
  104:18 105:15,25
  157:9

retention   161:11
return   166:14
returned   164:24
  164:25
reveal   11:14
revenue   124:13,20
  131:12,20 132:2
  132:22 133:11
  135:22 136:9
  139:7
reverse   101:3
review   32:23 33:7
  64:4 74:9 82:17
  93:15 94:7,10
reviewed   11:12
reymdl   5:22
reymdl00014384
  6:10
reymdl00014396
  6:10
reymdl00044042
  6:16
reymdl00044043
  6:16
reymdl00044241
  7:10
reymdl00044242
  7:10
reymdl00138479
  7:7
reymdl00200760
  5:9
reymdl00200761
  5:9
reymdl00226199
  6:19
reymdl0022620...
  6:19
reymdl00238133
  7:3

HIGHLY CONFIDENTIAL

**reymdl00260942**
  5:16
**reymdl00260943**
  5:16
**reymdl00261631**
  5:22
**reymdl00263558**
  7:13
**reymdl00263619**
  7:17
**reymdl00565070**
  6:7
**reymdl00565071**
  6:7
**reymdl00652128**
  6:13
**reymdl00652133**
  6:13
**reymdl00716766**
  5:7
**reymdl00716767**
  5:7
**reymdl00720415**
  6:22
**reymdl00720511**
  6:22
**reynolds**  2:2,2,7,7
  3:7,8 9:9,9,11,11
  10:16,16,17,17
  12:6,8,12,15 16:4
  16:4,14,17,22,25
  22:22,22 23:1,4,10
  23:10,20 24:6
  26:7 27:1,4,12,15
  27:23 28:12,16,19
  28:22 30:19,24
  36:18 37:9,14
  40:16 41:1,2 42:3
  42:10,11 43:13,19
  45:25 46:4,10
  47:5,24 48:11,21

48:23 49:8,25
50:1,8,9,15 51:6
51:12,22 52:22
54:2,17 55:11,12
55:20,22 56:5
57:2,12 59:15,19
59:20,24 60:3,6,9
60:18 61:7,18,24
63:3 64:21 66:2,2
68:3,10,19,23 71:6
71:7 73:19 75:20
75:24 76:25 77:10
77:14,21 78:12,25
79:2,16,16 80:5
88:8 89:18 90:24
91:5,19 96:7,9,19
99:4,16 100:13,15
102:4,17,21 103:1
103:5,6,10 106:18
106:22 108:11,17
109:9,14,15 110:4
110:19 111:5,8
112:14,17 114:4,7
115:2,3 121:2,3,10
121:11,17 126:3
126:11 129:17
131:1,6,12,20
132:2,3 133:12
136:18 137:3,14
137:17,18,21
139:16 140:14,14
140:17,19 142:5
142:15 144:11,12
145:24 146:11
147:16 148:16
149:14 150:7,10
153:21 155:9
156:14,21 159:25
160:3,6,14,20,23
161:5 162:23
163:6

**rid**  140:11,12
  142:3
**right**  14:15,18,24
  15:3,7,11,16,19,22
  16:4,12,15 17:1,5
  18:1,19,22 19:2,7
  19:11 23:6,18,21
  24:1,8,14,24 25:8
  25:12,16,21 26:17
  28:9 29:6 30:3,22
  32:2,9 34:17 36:3
  36:6,19 37:16,23
  38:2,6 42:18 43:3
  44:1 46:4,7 49:3
  50:2,16 51:3,7,13
  51:16 52:8 55:23
  59:15 61:25 62:17
  64:25 65:5,18,24
  66:11,20 67:24
  69:5,21 70:12,25
  71:9 72:6,15 73:7
  76:17,24 77:5,22
  78:8 80:7 82:14
  82:19,24,25 83:13
  83:15,17,20 84:11
  84:16 85:12 86:22
  89:19,23,24 90:8
  90:14,24 91:6,21
  92:25 93:22 94:3
  94:21 96:19 98:6
  98:13 99:6,25
  100:15 101:22
  103:14 104:2,21
  106:24 107:5,7,10
  109:16,22 110:6,8
  110:14,20,25
  111:7 112:13
  113:24 114:8
  115:3 116:7
  117:16 118:13,21
  121:11,17,25

122:3,19 123:5
124:21 125:1,22
126:5,12 128:11
128:15 129:7,12
129:18 130:6,19
131:14,21 132:3
132:17 133:4,13
133:25 136:14
140:7 142:5
143:20 145:8,19
146:1,5 147:4,10
148:5 149:25
150:8,9,24 154:16
154:22 155:4,10
156:22 159:12
160:14 163:19
**risk**  101:3
**rival**  23:21
**rms**  104:12,14
  105:1 157:18
**road**  154:9
**robert**  1:8,13 2:19
  4:4 5:12 6:3,6 7:2
  7:9 8:4 9:17,25
  63:24 64:16
  163:23 164:9,16
  166:2 167:2 168:2
**rodeo**  12:24
**role**  23:3
**ron**  6:3 38:11 39:2
  57:22 106:8
**ronald**  5:8
**room**  107:16
**routine**  145:5
**rule**  164:20
**rules**  1:22 12:24
  78:21 85:14
**run**  15:19 31:9
  67:7 152:9 153:7
  155:19 159:23

HIGHLY CONFIDENTIAL

**running** 22:21
25:7 151:21
**runs** 156:18
**rwallner** 2:23
**ryan** 3:3 9:13,13
34:10,15 85:10
94:12,23 95:12
100:17 102:14
115:7 117:18
119:6 140:15,23

**s**

**s** 1:15 2:1 3:1 8:1
151:15,15
**safeguards** 78:21
**salaries** 138:17
**sale** 159:12
**sales** 5:21 24:14
77:24 92:16
123:16
**salespeople** 77:25
104:20
**salesperson** 14:20
**saw** 30:6 70:12
81:15 106:17
114:25 117:25
**saying** 25:23 78:18
84:8 91:12 98:20
99:3,24 102:2
107:1 114:18
119:16 144:3
154:5
**says** 27:15,20,23
28:11,22 34:17
49:24 59:21 62:15
65:9 68:2,22 74:7
75:13 76:21 80:23
82:2 83:18 84:20
85:1 87:25 96:21
109:8 110:24
115:14 116:5,21
117:24 118:5,12

119:3 125:8
135:21 136:12
144:5 145:8
153:25 154:20
159:4
**scale** 89:3
**sch** 145:11
**schaefer** 5:12 6:3
6:6 7:2,6,9 63:23
63:25 64:1,6,16,20
65:4,18 69:4,19
70:7,12,15,25 71:2
106:8 107:23,25
108:8 109:4,6
115:1 123:22
124:1 126:24
130:15 131:11,17
142:2 143:9,11
144:7,13,22 147:5
147:24 148:20
149:8,10
**schedules** 151:23
**school** 162:16
**scope** 145:9
**scott** 3:7 9:8 12:3
12:11
**screenshot** 5:3
**second** 32:22 34:5
40:14 64:14 74:18
76:19,21 109:7
143:16 155:25
159:4,5
**section** 40:14
53:25 70:1 92:19
93:18 95:22,25
103:19 104:8
112:8,9 113:25
118:8,14,20,23
**sections** 67:11,12
92:10 93:2 118:20
119:10

**secur** 55:22
**security** 5:16 31:2
55:13,22 59:1
60:7,10,11,20
61:15 62:6,12,16
62:19,24 66:14
69:21 70:1,20
71:8,11,13,18
72:15 73:20,24
74:19,24 75:6
77:11,15,19 78:1,7
79:1,15,17 83:16
83:19 90:11 92:19
93:2,14,18 95:22
95:25 97:2,12,20
98:6 101:12
103:18 106:15,17
106:23 107:6,14
114:3 121:4,15,24
122:5 132:16
133:1 140:18
141:8 143:13
151:3 154:1
**see** 22:1 27:21,25
28:2,12 34:21
35:3 38:12 39:6,7
40:9 46:1 49:22
50:11 51:24 52:24
54:4 60:12,14,16
63:25 64:18 65:13
66:5 67:2,3 68:5,8
68:25 70:2 74:20
74:21,22 75:9
76:19,22 77:1,12
87:22 95:24 96:5
96:6 97:3,11,13
108:17,25 109:11
111:12 112:10,12
112:24 113:1,11
119:16 122:7
124:7,14 125:8,10

125:12,25 127:5
130:16 133:15
134:24 135:20
145:14 147:24
148:2 149:6
152:18,21 154:11
158:24 159:8
**seeing** 114:11
**seen** 56:12 159:23
160:13
**select** 56:23
**sell** 112:18 132:23
132:24
**selling** 152:12
**sells** 50:10
**send** 31:10 155:20
**senders** 161:1
**senior** 39:2
**sense** 37:3
**sensitive** 89:17
94:18 95:8
**sent** 38:22 64:14
64:15 65:4 127:1
158:23
**sentence** 58:22
59:3 68:22 88:13
91:9,17 104:10
109:7 113:24
159:4,5
**sentences** 125:25
**separate** 48:24,25
49:4 116:25
**september** 5:9
**ser** 104:15
**series** 36:16 71:11
73:14 74:15
106:15
**serve** 128:20
**served** 15:21
**server** 152:11

FTC-0001040

HIGHLY CONFIDENTIAL

service  25:2 29:20
  40:17 49:13 50:6
  80:16 81:1 82:3
  90:18 105:6,19
  145:3 152:7,13,14
  152:24 156:6
services  14:24
  15:3 16:20,21
  34:6,11,13,18
  40:14 42:2 104:16
  130:13 138:10
serving  128:21
  144:12 148:18
set  20:15 50:21
  60:9 63:1,17 71:6
  118:19 119:10
  126:2 160:9
setting  60:1
settled  119:18
seven  43:16
share  27:24 31:1
  114:22
shared  133:22
shauna  1:18 8:13
  164:13 165:17
sheet  166:7,10,12
  166:15 168:11
sheppard  2:9 9:10
sheppardmullin....
  2:11
shifted  122:17
  123:4 124:5,18
  125:21
short  14:16 50:24
  55:1 87:8 91:9,17
  95:3,6 120:17
  158:12
shortcomings
  120:12
shorter  14:2

shorthand  1:19
  164:13
shortly  108:3
show  39:14 134:9
  134:11 158:19
showing  146:16
shut  143:12 144:9
shutdown  46:19
shutoff  147:23
sic  124:7
side  142:25
sidebar  51:19
  67:17
sigh  119:19 143:4
sign  111:18 119:22
  125:17 142:23
  166:9
signature  4:6
  26:23 75:12
  111:13 119:21
  164:21 165:1,15
  168:14
signed  111:7 112:5
significant  40:8
  41:22
signing  166:11
similar  27:4 96:5
simple  53:24
simply  70:6
  116:13,16
simultaneous
  73:17
single  73:13
  160:20
sir  22:12
sites  50:9
situation  56:9
  57:11 58:15 59:9
  71:15 79:23 83:25
  122:24 139:8
  141:12 142:11,19

145:10
situations  99:9
  129:3 155:15
six  150:2,8,12
  161:11,11
size  126:5,17
  127:4,12,18,21
  128:5,6,18
skimmed  112:7
skip  134:15
skipped  137:7
small  49:6,14 61:9
  127:13 128:20
  129:3 145:9
smile  161:15
software  15:10,15
  23:11 29:1,6,19
  48:23 49:3 72:20
  73:1,18 76:4
  79:13 84:13
  105:12 130:3,11
  142:10 155:16
  156:2,4,8,18,19
sold  14:23 15:15
  159:12
solutions  3:21
  49:3
somebody  58:6
  113:23 131:19
  141:13,16 152:22
  153:11
somewhat  76:6
  122:17 123:5
  124:5 125:21
son  10:7
soon  124:6
sorry  11:20 17:16
  20:14 21:2,6
  22:19 25:23 27:7
  32:10 36:9 53:8,9
  53:12 59:18 62:9

64:3 74:13 103:17
  106:20 113:6
  117:8 118:16
  120:23 123:25
  142:22 143:24
  149:12 158:10
sort  94:2 151:24
sorted  58:10
sound  18:1
sounds  105:10
space  161:24
  166:7
spam  56:21,22
spanish  17:13,14
  17:18,20 18:9
speak  94:13
speaker  36:5,8
  78:15 80:10
speaking  93:7
  94:9 127:11
special  58:25
  62:11
specific  25:24
  47:25 48:13 51:23
  52:23 54:2 58:9
  62:19 67:10 68:18
  71:4 72:13 80:14
  80:17 100:20
  106:20 129:20
  157:1,17,20
specifically  32:21
  42:7 76:2 79:12
  89:5 102:25 122:6
  122:25 131:16
  144:16
speech  104:20
spelled  84:17
spend  92:22
  161:14
spotlight  32:17

HIGHLY CONFIDENTIAL

[spun - system]                                                                          Page 30

spun   34:13
square   2:15
squawks   141:17
st   19:25 20:16
stages   96:4
stand   56:12 66:15
    81:20 91:25 99:23
    101:17,20 110:2
    111:23 113:18
    120:1 121:13,20
    121:21,22 127:10
    136:25 145:22
standard   28:17,19
    138:4,19
standing   5:15
standpoint   31:2
    32:7 34:25 35:18
    42:20 49:15 56:2
    69:10 77:24 78:1
    132:12 150:20
    154:1 157:3
stands   59:23
    104:14
start   96:3 151:21
    152:22
started   89:21
    122:14
starting   88:12
    157:25
starts   49:21 82:18
    82:19,24 106:9
    144:24
state   1:19 8:15
    9:23 85:22 92:8
    92:11,13 94:5
    109:20 144:8
    147:23 148:23
    164:14 166:6
stated   1:23 25:11
    136:5

statement   25:24
    28:4,7,13 46:11,12
    48:1 60:22 82:1
    84:20 85:5 86:7
    94:10 96:23
    117:23 129:15
    134:3 158:7,19,21
statements   86:5
    86:17,18 134:18
    135:11
states   1:1 8:6
    10:10 21:16,20
    44:9 53:1 123:1
    164:1
staying   93:24
steady   105:20
    129:21
step   152:1
steps   17:13,14,18
    17:20 18:9 112:21
steve   5:18 38:11
    38:25 40:4 44:24
    48:6 74:16 82:12
    82:13 83:23 107:1
stickiness   157:1
    157:16 158:20
    159:18 160:5
sticky   156:22
    157:19 158:3
    159:6,20
stoneeagle   141:19
    142:3,8,21 143:4
    143:14,16,17
stop   11:14 35:9,10
    46:19 47:4 49:25
    56:10,10 57:9,10
    91:6,20 150:23
stopped   91:23
    140:6
stopping   54:20

store   24:7
straight   56:11
strange   105:11
stream   98:1
street   2:15 3:4,21
    8:9
strictly   80:25
strike   28:5 48:22
    107:15 119:17
    122:15 149:12
strong   61:2 79:14
strongly   151:2
structure   17:8,10
strung   144:6
stuff   156:17
    159:20
styled   1:16
subject   11:15
    39:10 40:6 95:14
    134:23,24 153:17
    166:11
subjects   64:18
    70:9
subscribed   165:11
subsequent   41:8
subsidiaries   2:12
    8:20 46:7 66:9
    75:16
subsidiary   16:18
substan   17:25
substance   168:10
substantially
    17:24 97:17
successful   14:20
successfully
    129:17
sudden   60:9 71:15
sufficiently   91:1
suggestion   50:20
suggests   86:15

suite   1:21 2:5,10
    2:15 3:21 8:9
    105:7
sumner   2:15
sunday   38:12
sunset   10:8 59:18
support   119:25
supposed   131:13
    131:20 132:3
    133:12
sure   33:12,18
    36:11 45:19 53:20
    54:22 91:25
    125:15 129:20
    141:16 145:17
    146:8
surround   105:17
swap   161:21
swear   9:16
switch   78:9
sworn   1:15 9:18
    164:17 165:11
sys   121:16
syscheck   151:15
    151:15 152:18,25
    153:2,5,9
system   15:10
    23:11 37:3 46:4
    48:11 54:12 56:5
    60:3 63:3,10 73:2
    75:11 77:21 79:14
    80:18 84:1 88:4,8
    88:22 96:9 98:10
    98:12 99:4,5
    101:4 104:16,18
    105:15,25 109:10
    109:16 110:20
    113:20 118:2
    121:11,17 122:8
    130:22 131:6
    139:17 140:14,20

FTC-0001042

HIGHLY CONFIDENTIAL

142:17 151:18,19
151:21 152:3,17
152:18 153:11
156:12 157:9
**systems**   1:4 8:5
16:25 17:12 37:12
40:18 41:3,13
43:19,25 46:1,10
47:5,24 75:1,18
76:25 80:4 81:9
84:5,9 87:20,21
89:3,5 98:17 99:9
104:11,25 105:4
105:19 106:16
114:14 120:2
124:14 126:8
136:18 140:18
164:4 166:1 167:1
168:1

**t**

**t**   167:3
**table**   87:1 112:2
**tablets**   163:11,13
**tac**   59:22,22
**tactics**   83:24
**tadler**   2:20 8:24
9:1
**take**   13:19,25
32:22 44:21 54:4
54:23 71:23 78:12
78:16 86:2 92:24
112:21 120:13
126:3,15 127:3,8
127:20 128:5,5
159:11,13
**taken**   1:15 30:20
77:10 150:19
165:8
**takes**   80:19 105:15
139:7 155:24
161:23

**talk**   12:15 13:1,3
23:9 47:18 64:24
65:22 66:1 70:25
96:13 101:19,20
101:21 102:12
157:16,20
**talked**   11:12 96:14
96:15 132:6
134:12
**talking**   19:10
41:15 44:13,18,21
45:13,17 49:13
50:22 52:15 72:24
72:25 73:4 74:15
83:7 93:10 97:15
98:20 99:25
102:16,17,22,25
103:18 104:11,25
119:24 124:25
126:8 128:14
139:4,5 150:3
159:10
**talks**   145:8
**target**   127:14
**taught**   15:5
**team**   131:19
133:10,18 134:13
**tear**   50:21
**tech**   138:16
**technical**   59:23
**technically**   135:13
**technology**   41:2
43:25 112:19
113:23
**telephone**   1:18
**telephonically**
2:19
**tell**   63:11 81:22
83:11 101:24
107:3

**temporarily**   58:10
**temporary**   56:1
56:14 57:10 58:8
59:4 72:8
**ten**   137:19 154:10
**term**   36:21,23
40:8 50:20,24,25
55:11,17 57:1
76:6 98:8 140:25
145:1 150:6
156:24,25 162:18
**terminate**   119:12
**terminology**   56:20
**terms**   31:12 71:3
76:1
**terrible**   152:3,15
**terry**   18:15
**test**   13:18
**testified**   9:18
115:1 117:14
132:14
**testimony**   14:6
95:14 117:21
164:18
**texas**   1:19,21 2:5
8:10 10:10 164:14
**text**   27:19
**thank**   14:4 16:11
28:14 36:8 38:21
64:12 95:6,15
104:7 106:3 135:8
**thanks**   94:24
**therefor**   165:2
**theron**   9:25
**thing**   41:9,10
49:14 67:13,14
73:13 74:17 91:10
101:25 111:5
119:22 127:24
134:14 145:7
151:24

**things**   47:18 49:1
50:24 65:23,25
69:15 75:10,16
77:22 78:7 79:11
88:11 92:24
112:14 122:7
138:15 145:9
150:19 152:4,21
152:21 153:10
162:15
**think**   14:23 41:6
45:21 50:18 52:15
53:1 54:10 55:10
56:1 58:11 62:15
66:7 68:15 69:23
77:22,23 79:21
80:11 82:1,2
84:22 85:23,25
89:21 92:21,22
93:20 96:25 99:20
100:7 102:24
116:19 122:21
123:8 124:23
125:24 126:19
127:7 128:3,17
132:5 136:16
139:19 144:4,5
150:15 151:1
152:20 154:24
155:12 156:24
157:4
**thinking**   45:7
101:25
**third**   37:20 39:5,5
43:20 66:17,23
67:1,4,22,23 68:11
77:4 80:6 101:21
102:18,21 103:10
109:16 112:19
114:22 120:8
126:4,7,10 127:9

HIGHLY CONFIDENTIAL

132:9 136:17,23
156:1 159:4
**thirty** 166:16
**thomas** 18:15
**thought** 42:9,20
118:16
**thoughts** 34:20
39:6
**three** 11:23 59:22
61:2
**thursday** 124:4
**time** 10:25,25
11:20 12:22,22
13:2 15:6 32:25
33:10 39:24 40:1
40:3 43:11,15,20
45:4,9,11 47:3,8
48:21 49:8 51:1
54:24 55:2 56:7
58:4 61:10 62:22
67:14,15 79:10,15
84:1,9 85:22 86:2
86:11,12 87:6,10
88:5 92:23 95:1
99:20 105:14
107:9 120:15,18
122:23 128:4
129:1,1,14 139:6
143:18 151:1,7
152:2,15 158:10
158:14 161:2
163:23
**times** 12:21 19:6
123:2 139:10
152:24 159:16
**timing** 73:9
**tiny** 62:4
**title** 116:2
**titled** 46:15
**today** 8:21 9:23
11:11,17 14:6

140:20 141:11
145:1 153:25
154:25 155:1
156:20 163:20
**today's** 163:22
**todd** 2:14 3:9 8:18
**told** 25:19 26:15
30:7 47:23 60:10
74:17 81:4 95:13
**tommy** 6:15,18
7:12 126:24 127:2
129:25 130:1,3
153:16
**tone** 83:11
**tools** 76:15
**top** 16:24 27:19
63:22 64:15 82:11
98:3 106:7 109:8
146:9 154:19
**topics** 47:19 64:25
69:6,18 70:19
**total** 97:7
**totally** 49:1
**tougher** 123:2
**townhouse** 10:7
**toyota** 38:2
**track** 11:20 24:3
61:18 122:9
**tracked** 36:14
**tracking** 61:22
**trade** 39:14
**traditional** 105:4
**transactions** 24:14
159:14
**transcript** 164:17
164:25 166:17,18
**transcription**
168:7
**transfer** 112:10,18
115:20 116:5,22
117:4 119:1,11

**transition** 58:20
59:4 66:4 81:20
120:5 130:25
**transitional** 56:2
**transitioned** 61:10
**true** 30:10 81:18
81:18 164:18
**truly** 32:8 35:1,18
134:9 155:8
**trust** 17:3,19,21
18:10 19:2,7,15,19
19:23,25,25 20:3,6
20:8,10,16,24,25
21:4,7,13 22:1,15
22:17,20
**trustee** 20:12,17
20:21
**trustees** 19:22
20:2,5
**trusts** 20:15,15
**truth** 105:11
**truthful** 14:6
**try** 13:3 93:17
**trying** 13:25 67:5
94:1 98:2 101:24
102:1 103:22
123:18 125:17
133:25 134:1
147:2
**tuck** 10:4
**tuesday** 158:23
**turn** 34:4 40:12
65:25 74:18
113:22 125:4
135:18
**turned** 73:16
**two** 10:16 14:15
14:16 19:2,6
23:14 66:9 92:9
97:5 112:14
116:25 123:12

125:25 129:16
144:11
**type** 23:14 49:22
49:24 50:7 80:21
101:5 150:12,17
155:13,25
**types** 128:18
136:24 155:18
156:7
**typical** 142:19
159:13
**typically** 111:17
138:14 152:6

**u**

**ucs** 15:9,19,21,24
16:3,11,18
**ugly** 46:13
**uh** 12:23 47:21
155:1
**ultimate** 23:4
**ultimately** 91:19
132:11
**umm** 29:12 111:20
154:18
**unable** 156:19
**unattended** 31:15
45:25 46:3,10
47:23 76:16
**unauthorized**
72:19,21 73:4
**uncover** 75:17
**understand** 13:6
13:16 14:23 34:23
35:16 38:5 68:16
69:11 75:19 79:8
91:11 143:25
146:15 149:5
150:6 151:17
**understanding**
34:16 35:24 62:9
100:8 109:24

HIGHLY CONFIDENTIAL

110:11 121:14
148:21
**understood** 13:8
91:5
**underway** 22:8
**unfortunately**
76:5
**unhappiness**
62:20
**unidentified** 36:5
36:8 53:15 78:15
80:10
**union** 92:9,11,13
**unit** 159:12
**united** 1:1 8:6
21:16,16,20,21
164:1
**universal** 15:2
16:25 17:12
**university** 14:8,13
**unjustifiably**
139:19
**unknowingly**
152:1
**unproductive**
47:14,16
**unusual** 47:11
133:24 144:16
**unwinding** 150:17
**update** 153:18
**upright** 60:25
**upwards** 19:10
**usage** 90:5,5
100:20
**use** 29:1,4,19 32:1
37:3 49:4,14 50:9
50:15 51:2,6,12,21
52:16,21 53:4,25
53:25 57:1 72:19
72:20,21 76:3
86:11 90:24

146:13 147:15
150:11 151:10,18
156:19 160:3,19
162:2 163:8,11
**user** 34:19 55:12
55:21 56:13 57:3
58:10,25 59:5
60:1,19 62:5,10,17
62:21 63:8,13
75:25 76:10
121:10 122:10
151:21 152:22
153:21 154:3
155:3
**usual** 68:20

**v**

**v** 166:1 167:1
168:1
**val** 133:11
**value** 134:13
158:3 159:6
**varies** 129:3
**various** 123:2
136:23 145:24
146:20 153:22
**vary** 128:18
**vastly** 79:17
**vehic** 29:15
**vehicle** 24:17
29:13,16 105:6
**ven** 128:10
**vendor** 2:13 8:21
128:19
**vendors** 34:19
37:21 43:13 99:15
102:23 103:4
126:11 128:11,14
129:18 130:6,15
130:18 132:9
155:8

**venture** 40:16
41:16 42:2,4,10,18
43:12 81:15
**veritext** 3:21 8:12
8:14
**versa** 137:18
**version** 99:13,18
100:3,5 101:13,16
101:22 102:4,18
**vice** 3:7 39:2 92:16
137:18
**video** 8:4
**videographer** 3:10
8:2,12 9:15 54:24
55:2 87:6,9 95:1,4
120:15,18 158:9
158:13 163:22
**videotaped** 1:8,13
164:9
**view** 78:12
**views** 78:16
120:25
**violation** 78:19
**visit** 10:25
**volume** 1:11 97:16
164:11

**w**

**wait** 98:24 102:13
102:14
**wallner** 2:19 87:4
**want** 31:1 45:23
47:17 52:5,17,17
53:2,2 64:5,5
71:14 74:16 80:3
80:3 84:19 85:3
85:14 86:2 96:2
103:15 107:18
108:6 109:5,22
110:23 119:3
126:25 127:2,19
136:18,23 140:16

151:9 152:9
155:22
**wanted** 31:7 45:20
47:18 71:9,13
80:4,20 99:17
104:10 109:15,18
110:5 112:2 115:2
126:15 132:1
140:11,12 144:9
158:18
**wants** 85:11 94:7
102:12
**war** 58:2 98:6
119:17,18
**wars** 36:19,24
97:2,12,20 101:12
**washington** 2:10
2:16 3:4,22
**watch** 123:11
**watching** 94:4
**way** 27:20 31:13
48:16 50:19 60:8
61:2 63:14 75:14
77:22 78:8,8 79:2
79:23,24,25,25
93:6 98:22 103:11
103:13 132:11
140:9 141:9,14,16
153:3 162:12
**ways** 56:22 79:21
116:20 136:8
**we've** 56:12 58:4,5
79:8,16 85:22
107:10 117:25,25
132:6 144:5
149:23 150:18,18
150:19
**webpage** 27:20
**website** 5:3 27:5
27:13,16

FTC-0001045

HIGHLY CONFIDENTIAL

[wedgworth - zero]                                                    Page 34

| | | |
|---|---|---|
| **wedgworth** 2:19<br>8:23,23 87:3<br>**wednesday** 143:10<br>**week** 83:16 154:2<br>154:4<br>**weeks** 45:11<br>**went** 44:4 154:9<br>**west** 10:4<br>**whatnot** 152:13<br>**whitelist** 56:19,19<br>56:25<br>**whitelisting** 55:7<br>55:11<br>**whoev** 155:20<br>**wholly** 16:18<br>**wide** 139:20<br>**wife** 10:7 21:15,15<br>**wilkinson** 2:3 9:6<br>9:6<br>**wind** 57:5,7,11<br>100:1 109:21<br>110:13 119:13<br>121:3 130:24<br>131:7<br>**window** 150:13<br>**wish** 69:2 70:4,23<br>**witness** 1:14 2:2,7<br>9:5,12,16 36:9<br>47:21 53:11 56:17<br>85:7,11,12 86:24<br>94:13,18 102:9<br>113:8 134:16<br>157:23 164:16,19<br>166:3<br>**witnesses** 85:13<br>**wondering** 133:17<br>**words** 102:3<br>117:10<br>**work** 30:3 65:10<br>89:21 113:16<br>129:5,11 155:8 | 156:4,9,10<br>**worked** 14:14<br>74:21 111:23<br>120:1,12 130:25<br>**working** 79:17<br>**workman** 6:3<br>38:11,22 39:2,18<br>106:8<br>**works** 12:11 65:6<br>69:13 153:1<br>**world** 58:16<br>137:24<br>**worst** 46:9 59:10<br>66:9 69:13 97:6<br>143:4<br>**worth** 47:13 139:7<br>159:15 162:18,21<br>**write** 39:5,9 40:5<br>52:20 64:1,16<br>83:15 84:3 97:1<br>97:25 99:12 100:1<br>104:10 106:14<br>124:5 127:2<br>143:10<br>**writer** 60:25<br>**writes** 85:4 91:3<br>109:6 130:8 154:9<br>**writing** 152:13<br>**written** 112:24<br>143:11<br>**wrong** 41:9,10<br>77:25<br>**wrongly** 77:10<br>78:24<br>**wrote** 43:23 62:10<br>70:7,11 87:18<br>97:11 101:25<br>124:7,11 127:19<br>128:1 129:10<br>130:5 153:2 | **x**<br>**x** 164:22<br>**xtime** 156:3,3,11<br>156:11<br>**xtream** 146:10<br>**y**<br>**y** 151:15<br>**yeah** 18:3 51:5<br>69:8 97:15 102:9<br>116:19 117:4<br>128:17 135:25<br>139:18 141:6,7<br>148:3 157:23<br>159:1 160:24<br>**year** 39:15 123:13<br>123:13 131:7<br>138:19 161:12<br>**years** 14:15,16<br>26:8 36:3,12<br>51:12 55:9 58:4<br>60:5 61:2 79:11<br>79:19 80:4,6,20<br>81:2 86:19 88:2<br>100:14 109:9,20<br>110:6 117:15<br>118:1 129:16<br>136:2 138:25<br>139:1,10 143:19<br>144:5 154:10<br>**yesterday** 11:18<br>**york** 2:22,22<br>**z**<br>**zero** 155:2 |

**FTC-0001046**

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

FTC-0001048