HIGHLY CONFIDENTIAL

Page 167

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION
3                             )
   IN RE: DEALER MANAGEMENT    ) MDL NO. 2817
4   SYSTEMS ANTITRUST          )
   LITIGATION,                ) CASE NO. 18 C 864
5                             )
6

7

8   ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN, VOL 2
9         Highly Confidential - Attorneys' Eyes Only
10                     January 17, 2019
11
12       ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN,
13   VOLUME 2, produced as a witness at the instance of the
14   PLAINTIFF(S), and duly sworn, was taken in the
15   above-styled and numbered cause on the 17th day of
16   January, 2019, from 9:07 a.m. to 4:43 p.m., via
17   telephone, before Shauna L. Beach, RDR, CRR, CSR in and
18   for the State of Texas, reported by machine shorthand,
19   at the law offices of Gibbs & Bruns, LLP, 1100
20   Louisiana, Suite 5300, Houston Texas  77002, pursuant to
21   the Federal Rules of Civil Procedure and the provisions
22   stated on the record or attached hereto.
23

24

25

FTC-0001253

HIGHLY CONFIDENTIAL

**Page 168**

```
 1        A P P E A R A N C E S
 2  FOR THE WITNESS:
 3    AUNDREA K. GULLEY
      BRICE WILKINSON
 4    Gibbs & Bruns, LLP
      1100 Louisiana
 5    Suite 5300
      Houston, Texas  77002
 6    agulley@gibbsbruns.com
      bwilkinson@gibbsbruns.com
 7
   FOR AUTHENTICOM, COX AUTOMOTIVE AND IT'S NAMED PLAINTIFF
 8  SUBSIDIARIES, MDSC, AUTOLOOP AS A REPRESENTATIVE OF THE
   VENDOR CLASS:
 9
      MICHAEL N. NEMELKA
10    JOSEPH LONG
      Kellogg Hansen Todd Figel & Frederick
11    Sumner Square
      1615 M Street, N.W., Suite 400
12    Washington, D.C. 20036
      mnemelka@kellogghansen.com
13    jlong@kellogghansen.com
14  FOR THE DEALERSHIP CLASS PLAINTIFFS:
15    PEGGY J. WEDGWORTH
      ROBERT WALLNER (appearing telephonically)
16    JOHN HUGHES
      Milberg Tadler Phillips Grossman, LLP
17    One Pennsylvania Plaza
      19th Floor
18    New York, New York  10119
      pwedgworth@milberg.com
19    rwallner@milberg.com
20  FOR CDK GLOBAL:
21    MARK RYAN
      Mayer Brown
22    1999 K Street, N.W.
      Washington, DC 20006-1101
23    mryan@mayerbrown.com
24
25
```

**Page 169**

```
 1        A P P E A R A N C E S
 2  FOR THE WITNESS:
 3    MICHAEL P.A. COHEN
      Sheppard Mullin
 4    2099 Pennsylvania Avenue
      Suite 100
 5    Washington, D.C. 20006-6801
      mcohen@sheppardmullin.com
 6
   ALSO PRESENT:
 7
      SCOTT CHERRY
 8    Vice President - General Counsel at The Reynolds
      and Reynolds Company
 9
      Ben Harwood, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 170**

```
 1              INDEX
 2                              PAGE
      Appearances            176
 3
 4  ROBERT BROCKMAN
 5  Examination by Ms. Wedgworth    176
      Examination by Mr. Nemelka    289
 6  Examination by Ms. Gulley    300
      Further Examination by Mr. Nemelka    354
 7  Further Examination by Ms. Wedgworth    357
 8
      Signature and Changes    369
 9
      Reporter's Certificate    370
10
11
12
13
14
15
16 It came to our attention earlier today that there was an
      inadvertent mis-numbering of exhibits at the deposition of Ronald
17 Lamb, causing a duplication of exhibits
18 "Plaintiffs'-670" through "Plaintiffs'-679." Accordingly,
19 Veritext will be adjusting the numbering of the duplicate
20  exhibits to reflect the deponent
21
22
23
24
25
```

**Page 171**

```
 1        EXHIBITS
   NO.    DESCRIPTION            PAGE
 2
   Exhibit 274 Email chain ending with email to  318
 3    Robert Theron Brockman, II from Bob
      Brockman dated November 9, 2016
 4    REYMDL00263304
      Highly Confidential - Attorneys'
 5    Eyes Only
 6  Exhibit 275 Email chain ending with email to  321
      Christopher Rulon from Bob Brockman
 7    dated September 17, 2013
      REYMDL00611282 - REYMDL00611284
 8    Highly Confidential - Attorneys'
      Eyes Only
 9
   Exhibit 657 Email chain ending with email to  184
10    Bob Brockman from Ronald Lamb dated
      September 2, 2015
11    REYMDL00244021 - REYMDL00244025
      Highly Confidential - Attorneys'
12    Eyes Only
13  Exhibit 658 Email chain ending with email to  201
      Robert Schaefer from Bob Brockman
14    dated April 30, 2015
      REYMDL00045348
15    Highly Confidential - Attorneys'
      Eyes Only
16
   Exhibit 659 Email chain ending with email to  213
17    Bob Brockman from Ron Workman dated
      December 24, 2015
18    CDK-CID-00963942
      Confidential
19    Highly Confidential
20  Exhibit 660 Reynolds and Reynolds January 2016  221
      Financial Package
21    REYMDL00719700 - REYMDL00719787
      Highly Confidential - Attorneys'
22    Eyes Only
23  Exhibit 661 Email chain ending with email to  229
      Bob Brockman from Robert Schaefer
24    dated January 5, 2016
      REYMDL00045556
25    Highly Confidential - Attorneys'Eyes Only
```

2 (Pages 168 - 171)

HIGHLY CONFIDENTIAL

Page 172

```
            EXHIBITS
NO.      DESCRIPTION              PAGE

Exhibit 662 Email chain ending with email to   234
     Robert Schaefer from Craig Moss
     dated October 7, 2016
     REYMDL00590725 - REYMDL00590727
     Highly Confidential - Attorneys'
     Eyes Only
Exhibit 663 Email chain ending with email to   237
     Keith Hill from Bob Brockman dated
     November 28, 2017
     REYMDL00661495 - REYMDL00661497
     Highly Confidential - Attorneys'
     Eyes Only

Exhibit 664 Email chain ending with email to   240
     Dan Agan from Jonathan Strawsburg
     dated April 21, 2016
     REYMDL00333091 - REYMDL00333092
     Highly Confidential - Attorneys'
     Eyes Only
Exhibit 665 Email chain ending with email to   244
     Bob Brockman from Robert Schaefer
     dated May 8, 2016
     REYMDL00050127
     Highly Confidential - Attorneys'
     Eyes Only

Exhibit 666 Email chain ending with email to   247
     Robert Schaefer from Bob Brockman
     dated May 31, 2016
     REYMDL00045445
     Highly Confidential - Attorneys'
     Eyes Only
Exhibit 667 Email chain ending with email to   252
     Chris H. Hellyer from Robert
     Schaefer dated June 1, 2016
     REYMDL00068321 - REYMDL00068325
     Highly Confidential - Attorneys'
     Eyes Only
```

Page 174

```
            EXHIBITS
NO.      DESCRIPTION              PAGE

Exhibit 674 Email chain ending with email to   276
     Brockman   Tommy Barras from Jonathan
     Strawsburg dated July 19, 2017
     REYMDL00503332 - REYMDL00503335
     Highly Confidential - Attorneys'
     Eyes Only
Exhibit 675 Reynolds and Reynolds July 2018   284
     Financial Analysis Package
     Brockman REYMDL00723521 - REYMDL00723612
     Highly Confidential - Attorneys'
     Eyes Only
Exhibit 676 Reynolds and Reynolds December YTD   288
     Brockman   2017 Financial Analysis Package
     REYMDL00722459 - REYMDL00722550
     Highly Confidential - Attorneys'
     Eyes Only
Exhibit 677 Email chain ending with email to   289
     Brockman   Robert Schafer from Bob Brockman
     dated February 7, 2015
     REYMDL00061987 - REYMDL00061988
     Highly Confidential - Attorneys'
     Eyes Only

Exhibit 678 Email chain ending with email to   292
     Brockman   Ron Lamb from Bob Brockman dated
     June 30, 2015
     REYMDL00583889 - REYMDL00583890
     Highly Confidential - Attorneys'
     Eyes Only
Exhibit 679 Email chain ending with email to   296
     Brockman   Robert Schaefer from Bob Brockman
     dated July 1, 2017
     REYMDL00045179
     Highly Confidential - Attorneys'
     Eyes Only
```

Page 173

```
            EXHIBITS
NO.      DESCRIPTION              PAGE

Exhibit 668 Email chain ending with email to   256
     Robert Schaefer from Bob Brockman
     dated June 2, 2016
     REYMDL00071272 - REYMDL00071273
     Highly Confidential - Attorneys'
     Eyes Only
Exhibit 669 Email chain ending with email to   256
     Robert Schaefer from Bob Brockman
     dated August 12, 2016
     REYMDL00238490 - REYMDL00238491
     Highly Confidential - Attorneys'
     Eyes Only

Exhibit 670 Email chain ending with email to   259
     Brockman   Robert Schaefer from Bob Brockman
     dated August 12, 201
     REYMDL00238492 - REYMDL00238493
     Highly Confidential - Attorneys'
     Eyes Only
Exhibit 671 Email chain ending with email to   262
     Brockman   Bob Brockman from Jonathan
     Strawsburg dated June 20, 2017
     REYMDL00263065 - REYMDL00263066
     Highly Confidential - Attorneys'
     Eyes Only

Exhibit 672 Email chain ending with email to   268
     Brockman   Robert Schaefer from Bob Brockman
     dated July 4, 2016
     REYCID00074420 - REYCID00074422
     Highly Confidential - Attorneys'
     Eyes Only
Exhibit 673 Email chain ending with email to   271
     Brockman   Jon Martin from Robert Schaefer
     dated May 9, 2017
     REYMDL00470609
     Highly Confidential - Attorneys'
     Eyes Only
```

Page 175

```
 1         P R O C E E D I N G S
 2         THE VIDEOGRAPHER:  Good morning.  Today is
 3   January 17th, 2019.  We're on the record at 9:07 a.m.
 4   This is the continued recorded deposition of Mr. Robert
 5   Brockman in the matter of In Re: Dealer Management
 6   Systems Antitrust Litigation in the United States
 7   District Court for the Northern District of Illinois in
 8   the Eastern Division.
 9         My name is Ben Harwood, and I'm the
10   videographer present on behalf of Veritext.  The court
11   reporter is Shauna Beach, also present on behalf of
12   Veritext.  This deposition is being held at Gibbs &
13   Bruns, LLP, located at 1100 Louisiana Street, Suite
14   5300, in Houston, Texas, ZIP Code 77002.
15         Will counsel please state their appearance
16   and firm affiliation for the record.
17         MS. WEDGWORTH:  Peggy Wedgworth, from
18   Milberg Tadler Phillips Grossman, on behalf of
19   Dealership Class Plaintiffs.
20         MR. HUGHES:  John Hughes, Milberg Tadler
21   Phillips Grossman, representing Dealership Class
22   Plaintiffs.
23         MR. NEMELKA:  Mike Nemelka from Kellogg
24   Hansen, representing the Individual and Dealership Class
25   Plaintiffs, and with my colleague, Joe Long.
```

3 (Pages 172 - 175)

FTC-0001255

HIGHLY CONFIDENTIAL

Page 176

1      MS. GULLEY:  Andi Gulley, from Gibbs &
2  Bruns, representing Mr. Brockman and the Reynolds and
3  Reynolds Company.
4      MR. WILKINSON:  Brice Wilkinson, also with
5  Gibbs & Bruns.
6      MR. COHEN:  Michael Cohen, with Sheppard
7  Mullin, representing the defendant, the Reynolds and
8  Reynolds Company and the witness, Mr. Brockman.
9      MR. RYAN:  Mark Ryan, from Mayer Brown, on
10  behalf of CDK Global.
11      THE VIDEOGRAPHER:  Will the court reporter
12  please swear in the witness and we may proceed.
13      ROBERT THERON BROCKMAN,
14  having been first duly sworn, testified as follows:
15      EXAMINATION
16  BY MS. WEDGWORTH:
17      Q.  Good morning, Mr. Brockman.  As we started
18  yesterday, I'll just ask you -- all of the rules we put
19  in place yesterday, are you okay with continuing those
20  same rules today?
21      A.  Yes, ma'am.
22      Q.  So if you answer a question, I'll assume you
23  understand the question.  Is that fair?
24      A.  Yes, ma'am.
25      Q.  And if you don't understand, please, let me

Page 177

1  know and I'll restate the question.  And if you need to
2  take a break at any time, please, let me know.  I'm
3  happy to take a break as long as there's a question not
4  pending.  I'll ask that you answer the question before
5  we take a break, if that -- can you agree to that?
6      A.  Yes, ma'am.
7      Q.  Okay.  I wanted to start today on a different
8  topic of converting dealerships.  When they convert
9  DMSs, does Reynolds track all dealerships who convert
10  DMSs -- or switch DMSs?
11      MS. GULLEY:  Form.
12      A.  I'm sorry.  I don't understand.
13      Q.  (By Ms. Wedgworth)  Well, when a dealership
14  switches, say, from a Reynolds DMS to a CDK DMS, does
15  Reynolds track that conversion?
16      MS. GULLEY:  Form.
17      A.  That's not -- we consider that a -- a lost
18  customer.  The concept of conversion is not part of
19  anything that we keep track of.
20      Q.  (By Ms. Wedgworth)  So Reynolds --
21      A.  When you lose a customer, I mean, it's implied
22  that there's a -- obviously, there has to be a
23  conversion involved, I suppose, so we don't think about
24  it -- it in those terms.  And therefore, I can't say
25  that -- that we track conversions.  We track lost

Page 178

1  customers.
2      Q.  When a dealership -- do you call it "converts"
3  or "switches"?
4      A.  We use either term.
5      Q.  So when a dealership converts DMS, there are
6  risks, correct, to the dealership?
7      MS. GULLEY:  Objection; form.
8      A.  A risk?
9      Q.  (By Ms. Wedgworth)  Risk, yes.  Risk in loss of
10  sales, loss of customers, loss of employees, are there
11  risks when a DMS switches -- when a dealership switches
12  DMS?
13      MS. GULLEY:  Objection; form.
14      A.  I don't know that I would characterize it as
15  risk.  There's certain overhead that is involved,
16  because the dealership's employees have to learn new
17  software.  And I'm sure you've been through situations
18  where you had to change from one software package to
19  another software package.
20      You know, you've got to learn how -- it's
21  kind of like I have a new iPhone, and I -- I've never
22  had iPhones before.  I've always had Androids.  And
23  it's, you know, quite different.  And so therefore,
24  there's overhead.  I wouldn't call that "risk."
25      Q.  (By Ms. Wedgworth)  Is it fair to say that in

Page 179

1  the first year or two after a DMS conversion by a
2  dealership, there is employee turnover at the dealership
3  in nearly all cases?
4      MS. GULLEY:  Objection; form.
5      A.  I would not agree that that has anything to do
6  with conversions.  Turnover in dealerships is
7  astronomical.  For instance, in the sales department in
8  the dealership, 100 percent turnover a year is quite
9  common.  It's not that high a percentage in other parts
10  of the dealership, but as an industry, the turnover by
11  -- by my standards is horrible.
12      Q.  (By Ms. Wedgworth)  And is some of that
13  turnover for some dealerships a factor of a DMS
14  conversion?
15      MS. GULLEY:  Objection; form.
16      A.  Ma'am, I -- I don't know that I can say that.
17  You know, certainly a conversion that -- that goes
18  poorly -- frankly, the principal reason for a conversion
19  going poorly is the people refuse to learn the new
20  software.
21      Q.  (By Ms. Wedgworth)  And that's a cost for the
22  dealership; correct?
23      MS. GULLEY:  Form.
24      A.  Certainly if the dealership personnel will not
25  learn the new software, which causes the conversion to

4 (Pages 176 - 179)

FTC-0001256

HIGHLY CONFIDENTIAL

Page 180

1 not go as smoothly as it should, certainly that's a cost
2 to the dealership.
3    Q.  (By Ms. Wedgworth)  Is it fair to say that for
4 some dealerships, switching DMS can take years to
5 recover from?
6        MS. GULLEY:  Objection; form.
7    A.  I think that that would be not a fair
8 statement.  There's certainly -- that has happened, you
9 know -- you know, several times in my experience in the
10 business, but it's not -- it does not generally happen.
11    Q.  (By Ms. Wedgworth)  Is it fair to say that
12 there is employee turnover after a dealership switches
13 DMS?
14        MS. GULLEY:  Objection; form.
15    A.  I personally don't believe that, any more than
16 usual, which is horrible.  The turnover by itself,
17 absent anything, is -- is unsatisfactory, in my opinion.
18    Q.  (By Ms. Wedgworth)  Is it fair to say there's
19 customer disruption after a dealership switches DMS?
20        MS. GULLEY:  Objection; form.
21    A.  Again, I think the source of disruption
22 would -- would occur not because the conversion itself,
23 but because of the -- the poor attention that dealership
24 employees pay to learning the new system.  It is -- it's
25 one of our -- our chief problems in the business.

Page 181

1    Q.  (By Ms. Wedgworth)  So when a dealership is
2 considering switching DMS, they have to consider whether
3 or not their employees can efficiently integrate into
4 the new system; is that correct?
5        MS. GULLEY:  Objection; form.
6    A.  That is a correct statement.
7    Q.  (By Ms. Wedgworth)  Is it fair to say that if a
8 dealership does choose to convert, that that conversion
9 cannot be done quickly?
10        MS. GULLEY:  Objection; form.
11    A.  No, I don't agree with that.  The -- the
12 conversion process, you know, properly done, where the
13 dealership personnel do what they're supposed to do as
14 far as learning the new system, that -- that conversion
15 can go very quickly.  And again, I'll repeat again, if
16 they're not diligent in learning the new software,
17 conversion process can drag on until they finally, you
18 know, give up and decide to accept the new system and to
19 learn it.
20    Q.  (By Ms. Wedgworth)  And when you say "drag on,"
21 sometimes that can be up to two years; correct?
22        MS. GULLEY:  Objection; form.
23    A.  No, I think that would be more -- more -- more
24 on the line of two to three months.
25    Q.  (By Ms. Wedgworth)  So when you say "drag on,"

Page 182

1 you don't mean longer than two or three months?
2        MS. GULLEY:  Objection; form.
3    A.  That's correct, ma'am.
4    Q.  (By Ms. Wedgworth)  If a dealership changes
5 DMS, they may have to acquire new servers; correct?
6    A.  That's correct.
7    Q.  And they may have to acquire new printers;
8 correct?
9    A.  Typically not new printers.  Printers are
10 pretty much universal pieces of equipment and,
11 especially since everything is laser printers now, laser
12 printers are very standard.
13    Q.  So it's not typical when you change DMS that
14 you would have to, as a dealer, acquire new printers?
15    A.  That's correct.
16    Q.  And are -- is there other equipment that
17 dealers would have to acquire when they change DMSs?
18        MR. RYAN:  Object to the form.
19    A.  No.  PCs are, again, you know, very much
20 standardized, and whatever PCs they've got, work.  I
21 personally think that it's very advantageous to acquire
22 a second monitor for users -- second monitors are $200.
23 We don't even sell them.  Efficiency goes way up when
24 you go from, you know, one monitor to two monitors.  And
25 that happens a lot in our installations, but it's just

Page 183

1 because we -- we -- you know, tell the dealer, look, if
2 you want to have 20 percent more productivity, give
3 people a second monitor.  But that's not a requirement.
4    Q.  (By Ms. Wedgworth)  If a dealership changes
5 DMS, they also have to get their data transferred from
6 the old DMS to the new DMS; correct?
7    A.  That's correct.
8    Q.  And it can take months for the staff at a
9 dealership to get comfortable with that new DMS once the
10 data is transferred over; correct?
11        MS. GULLEY:  Form.
12    A.  Again, I -- I think that varies greatly by
13 individual.  But in -- from a general statement,
14 dealership personnel don't stand up and cheer -- jump up
15 and down about having to learn a new system any more
16 than you would.  It -- it's something that you -- you
17 got to concentrate on, you got to pay attention and you
18 got to do it.
19    Q.  (By Ms. Wedgworth)  It's a complicated process;
20 is that fair?
21        MS. GULLEY:  Form.
22    A.  It's not a complicated process.  The complexity
23 isn't -- people just are sitting in a chair and doing
24 it.
25    Q.  (By Ms. Wedgworth)  Mr. Brockman, I'll show you

5 (Pages 180 - 183)

HIGHLY CONFIDENTIAL

Page 184

1  what's been marked as Plaintiff's Exhibit 657.
2          (Exhibit 657 was marked for
3          identification.)
4          MR. WEDGWORTH:  And for the record, it's a
5  document Bates-stamped REYMDL00244021 through 025.  Have
6  you had a chance to review the document?
7      A.  Yes, ma'am.
8      Q.  (By Ms. Wedgworth)  Is -- is this an email you
9  wrote to Mr. Lamb around September 1st, 2015?
10     A.  Yes, ma'am.
11     Q.  And in this email, did you try to be truthful
12  and accurate?
13     A.  Yes, ma'am.
14     Q.  So the attachment to the email is a letter
15  dated November 24, 2014, addressed to Mr. Rick Hendrick
16  and is signed by Ron Lamb.  Do you remember reviewing
17  this letter?
18     A.  Yes, ma'am.
19     Q.  And is Mr. Hendrick an owner of the largest
20  automotive group -- I'm sorry -- the largest client of
21  Reynolds?
22     A.  I'm not sure it's the largest client.  It, for
23  sure, is the largest privately owned group in the
24  country.
25     Q.  Are you aware of any client for Reynolds that's

Page 185

1  larger than Hendrick?
2      A.  I believe at that point in time, the Penske
3  organization is -- and still is, because they're the
4  second largest publicly owned group in the country.
5      Q.  And if we look at your email at the 1st to
6  Mr. Lamb, you write, "Ron, the first half of this letter
7  is brilliant.  I made just a slight addition."  Do you
8  see that, at the email you wrote to Mr. Lamb?  First
9  sentence?
10         "The first half of this letter is
11  brilliant.  I made just a slight addition."  Do you see
12  that?
13     A.  I saw it.  But now I'm trying to --
14     Q.  On the first page, right under the --
15     A.  Okay.  Yes, I found -- I found it.
16     Q.  And -- and you say, "The first half of the
17  letter is brilliant.  I made just a slight addition."
18  And then you say, "However starting with 'Upgrade and
19  Grow', it loses fire."  Do you see that?
20     A.  Yes, ma'am.
21     Q.  So if we go to the letter, the first page of
22  the letter, under the heading -- this is a letter that
23  Mr. Lamb wrote to Mr. Hendrick at a time when Hendrick
24  was considering moving from Reynolds to CDK; is that
25  correct?

Page 186

1          MS. GULLEY:  Objection; form.
2      A.  Yes, ma'am.
3      Q.  (By Ms. Wedgworth)  And, in trying to keep the
4  business, Mr. Lamb sends this letter to Mr. Hendrick; is
5  that correct?
6      A.  Yes, ma'am.  I think it was primarily intended
7  for Mr. Brown.  Mr. Hendrick, at that point in time, was
8  not actively involved in -- in this process.  He was
9  the -- the titular head.
10         But as you may or may not be aware, he's
11  very involved in stock car racing and, at this point in
12  time, he was fully consumed in running the stock car
13  racing operation, not the dealership management
14  operation.  Mr. Brown was in -- in charge of that.
15     Q.  And Mr. Brown's title at Hendrick is -- do you
16  know?
17     A.  He was president of the automotive group.
18     Q.  And in trying to keep the business of the
19  Hendrick automotive group, Mr. Lamb writes this letter
20  to Mr. -- I'm sorry -- Mr. Lamb writes the letter to
21  Mr. Hendrick and Mr. Brown; correct?
22     A.  Yes.
23     Q.  And in this letter, on the first page, halfway
24  down the page, there are "Convert with Risks" where
25  Mr. Lamb writes, "Converting 95 dealerships and 29

Page 187

1  collision centers is a major project with serious
2  risks."  Do you agree with that statement?
3          MS. GULLEY:  Objection; form.
4      A.  Yes, ma'am.  The sheer size of it is -- is what
5  makes it, you know, challenging.  It's one thing to
6  convert one dealer or two dealers or four dealers or a
7  dozen dealers, whatever, but to convert 95 and 29
8  collision centers, the sheer scale, you know, causes it
9  to be a -- a very serious project and with risks.
10     Q.  (By Ms. Wedgworth)  One of those risks is it
11  would take -- likely take years to recover?
12         MS. GULLEY:  Form.
13     A.  Well, again, the issue is -- as I've -- as I've
14  previously stated, is that the training and education of
15  personnel is -- is the biggest problem, by far, in
16  conversions.  And if you have, you know, 95 sets of
17  personnel, with each dealership has its own personnel
18  structure that has to be, you know, taught, they have
19  to, you know, accept the fact that change is going to
20  happen.  Get serious about learning the new software.
21  Again, if you take that project for one dealer or two
22  dealers or five dealers -- it's just way greater if it's
23  95.  And that -- that causes, you know, the risk
24  quotient to go up.
25     Q.  (By Ms. Wedgworth)  Even at one dealer, though,

6 (Pages 184 - 187)

FTC-0001258

HIGHLY CONFIDENTIAL

Page 188

1 you have the same issue of training the personnel;
2 correct?
3     A. Yes. But it's much smaller. It could be, for
4 instance, the number of people around this table.
5     Q. Well, it also depends on the size of that
6 dealership originally as well; correct?
7     A. That's correct.
8     Q. But here, Mr. Lamb says, "It will likely take
9 years to recover." You agree with that, right?
10         MS. GULLEY: Form.
11     A. In this particular situation, the level of risk
12 was such that, because of the number of people that have
13 to be trained, it could take -- assuming it went wrong,
14 it could take quite a while.
15     Q. (By Ms. Wedgworth) The last sentence on this
16 page says -- Mr. Lamb writes, "Reynolds tracks all
17 dealerships who convert using publicly available data."
18 Do you see that?
19     A. Yes, I do.
20     Q. Do you agree with that statement?
21     A. I think that -- that the statement is -- is
22 somewhat less than complete, because publicly available
23 data -- I think that the -- the number of dealerships
24 that are public is less than ten. I think the number is
25 actually, like, seven. And so while "Reynolds tracks

Page 189

1 all dealerships who convert using publicly available
2 data" -- it sounds like a lot of dealers, but it's not.
3 It's -- it's really only seven or eight.
4     Q. So in this letter that Mr. Lamb writes to the
5 Hendrick Automotive, he's less than complete on this
6 statement?
7         MS. GULLEY: Objection; form.
8     A. No. I think the -- the state- -- the statement
9 as written is true, okay?
10     Q. (By Ms. Wedgworth) And complete?
11         MS. GULLEY: Objection; form.
12     A. Well, when you say "complete," as a sentence,
13 it certainly is complete. Is it -- is it a paragraph,
14 or is it a page that describes everything that go --
15 goes into this statement? No, it's not.
16     Q. (By Ms. Wedgworth) Well, you commented that
17 the first half of this letter was brilliant. Do you
18 still stand by that?
19         MS. GULLEY: Objection; form.
20     A. Well, first of all, I didn't detect any
21 spelling errors and, you know, that pleased me a lot.
22 Salespeople are not necessarily the greatest as far as
23 grammar and, you know, punctuation and spelling and that
24 sort of thing.
25         I thought it was brilliant in that it

Page 190

1 identified the key issues, specifically, the fact that
2 we had a windows-based DMS. And even more specifically,
3 that it talks about the products that we have that are
4 extremely profitable for the dealer, which are --
5 docuPAD is, perhaps, the leading one.
6     Q. (By Ms. Wedgworth) If we go to the next page
7 of the letter, at the top, it says, "Here are examples
8 of when a group converts from Reynolds." Do you see the
9 chart at the top of the page?
10         And then underneath -- and it lists
11 Herb's -- Herb Chambers, Prestige Management Services
12 and Ed Morse and other auto dealerships. Do you see
13 that?
14     A. Yes, I do.
15     Q. And then Mr. Lamb writes, "In nearly all cases,
16 there is a significant drop in sales, which is expected
17 the first year or two of a conversion given all the
18 employee turnover and customer disruption." Do you see
19 that?
20     A. Yes, I do.
21     Q. Do you agree with that statement?
22     A. I think, certainly, you can pick out cases
23 where, you know, that -- that has been a -- a true
24 statement. And certainly in these cases here -- I know
25 some of these customers. Their problem was -- and

Page 191

1 that's they had, you know, turnover at the top, change
2 in -- in dealership, you know, leaders. I don't know
3 that that's the case in all of them, but I believe from
4 a statistical standpoint, you know, the stats that are
5 shown here are true. But to say that they're -- they're
6 completely the result of -- of a conversion, it could be
7 true; it could not be true.
8     Q. Well, you stand by the statement Mr. Lamb wrote
9 in this letter, don't you?
10         MS. GULLEY: Objection; form.
11     A. Yes, I do. These -- these statistics -- or
12 these particular dealerships are a matter of public
13 record.
14     Q. (By Ms. Wedgworth) So is it fair to say, in
15 nearly all cases, there is a significant drop in sales,
16 which is expected the first year or two of a conversion,
17 given all the employee turnover and customer disruption?
18         MS. GULLEY: Objection; form.
19     A. I -- I think that -- that there's no question
20 that the statistics that are shown for these dealerships
21 are true. I don't agree that one can necessarily infer
22 that all situations, that, you know, that's what's
23 happening.
24     Q. (By Ms. Wedgworth) Well, you approved this
25 letter in this statement going to Hendrick Automotive

7 (Pages 188 - 191)

FTC-0001259

HIGHLY CONFIDENTIAL

Page 192

1 Group; correct?
2        MS. GULLEY:  Objection; form.
3    A.  Yes, I did.
4    Q.  (By Ms. Wedgworth)  The next sentence says,
5 "What is really surprising is these groups have not
6 recovered."  Do you see that?
7    A.  Yes.
8    Q.  And do you recall that these groups listed
9 above, where they drop in sales from one year over the
10 next, have yet to recover?
11   A.  That, I -- I don't have knowledge of.
12   Q.  So the last one on the chart, Gordon Auto
13 Group, it had a conversion year in 2009.  Do you see
14 that?
15   A.  Yes, I do.
16   Q.  And then last year Aut- -- Automotive News
17 ranked them as 110.  And in 2014, which is -- appears to
18 be the most recent data for this letter -- they're at
19 142 with a change, according to this chart, of going
20 down 32 places.  Do you see that?
21   A.  Yes, I do.
22   Q.  Okay.  And in this chart, Mr. Lamb is
23 representing to Hendrick Automotive Group that the
24 conversion had something to do with their lowering in
25 rank of sales; correct?

Page 193

1    A.  That's what it's saying.  I have a little bit
2 different belief as far as changes in Automotive News
3 ranking.  Dealerships are inherently very competitive
4 people.  And the -- the standard of measurement between
5 dealerships is typically number of cars sold, number of
6 vehicles sold.
7        It happens continuously in this industry
8 where a dealer will want to have his name in lights as
9 far as his ranking is concerned, and so he'll do
10 whatever it takes to sell more cars, which means he cuts
11 price.  And he gets his name in lights, and he gets his
12 Automotive News ranking up, and then he decides he's not
13 making enough money.  And then he decides to tighten up
14 on discounting and not to try to sell everybody every
15 car.
16        But his -- so the sales numbers go down,
17 but his profit -- his internal profit numbers -- go way
18 up.  And then they kind of -- like this (indicating).
19   Q.  And in spite of all that, Mr. Lamb -- with your
20 approval, saying it was "brilliant" -- quotes Automotive
21 News ranking with regard to sales in order to convince
22 Hendrick to not convert; is that correct?
23        MS. GULLEY:  Form.
24   A.  What I'm saying is -- and that's that,
25 certainly, conversion issues, particularly with -- with

Page 194

1 big conversions, are a problem.  But what I'm saying is
2 there's -- there's other factors that have to do with
3 Automotive News ranking, and other motivations, other
4 reasons.
5    Q.  (By Ms. Wedgworth)  Is it fair to say that, for
6 some dealerships who convert, it takes at least one to
7 two years to recover?
8    A.  Certainly if they don't educate their people
9 properly.  If they don't force their people to learn the
10 new software promptly, you know, that can occur.
11   Q.  You mentioned docuPAD in your previous answer
12 and some yesterday.  If a dealership buys a docuPAD, is
13 it -- is the price for that purchase and installation
14 somewhere around $10,000 per unit?
15       MS. GULLEY:  Form.
16   A.  Yes, it is.
17   Q.  (By Ms. Wedgworth)  And is there a monthly
18 maintenance fee per docuPAD of $1,000 a month?
19   A.  Yes, ma'am.
20   Q.  And as to any change on any form used on the
21 docuPAD, is there a cost of -- of around $300 for any
22 change?
23   A.  I disagree that that's for any change.  A whole
24 brand-new document, like, for instance, a new finance
25 contract, the charge would be in that area.  But to say

Page 195

1 that any change is in that area, that would not be
2 correct.
3    Q.  Can any change with regard to any docuPAD
4 document be made for free at Reynolds?
5    A.  To the best of my knowledge, unless we have
6 done something in error, in which case we would adjust,
7 or if -- if the entity that produced the contract in the
8 first place, if it was not working, you know, correctly
9 after installation, we would fix that at no charge.  But
10 other than those kind of situations, it would be a
11 charge.
12   Q.  Is the average charge for any change on any
13 document or form with regard to docuPAD roughly $300?
14   A.  I -- I don't know that there is an average.  We
15 don't keep that.  You know, there's not a stat that --
16 you know, that I know of or ever seen.
17   Q.  Well, would it surprise you to say that -- I've
18 heard dealers say that, for any change, when you use the
19 docuPAD, everything is $300?
20   A.  Ma'am, dealers will say most anything on any
21 given day.
22   Q.  Well, does it surprise you they say any change
23 is $300 on a docuPAD form or document?
24       MS. GULLEY:  Objection.  I'm sorry.
25       Objection; form.

8 (Pages 192 - 195)

FTC-0001260

HIGHLY CONFIDENTIAL

Page 196

1    DEFENSE COUNSEL: Objection. (Inaudible.)
2    A. Again, ma'am, you know, dealers are prone day
3 to day to say almost anything. And I -- I have been in
4 this business now -- the 10th of January this year, I've
5 been at it 53 years. And I -- I haven't seen it all,
6 but I've seen a lot. And one of the things is -- is
7 dealers will say most anything.
8    Q. (By Ms. Wedgworth) If a dealership has
9 Reynolds DMS and switches out of Reynolds, can they
10 return the docuPAD and get a credit on an account?
11    A. No, ma'am.
12    Q. Can they sell the docuPAD?
13    A. Yes, ma'am.
14    Q. To -- can they sell it to another dealership
15 who could then use it?
16    A. Yes, ma'am.
17    Q. And are you aware of any -- any incidences like
18 that?
19    A. I think I've been exposed to just one. You
20 know, docuPAD is a -- an amazing profit producer. I
21 don't know whether you've ever bought a car, you know,
22 and been through the docuPAD experience and contrast
23 that with a typical, you know, finance and information
24 manager's, you know, closing techniques.
25    You know, docuPAD takes that all away. It

Page 197

1 is completely user driven in that you interact with --
2 you know, the screen, with the stylus. And you make
3 your choices with no pressure, you know, from the
4 finance manager. And customers love it. The reason why
5 dealerships love it is -- and that's because customers
6 have a chance to choose. And a miracle occurs; they buy
7 more.
8    And that's the reason why docuPAD produces,
9 you know, profits on the average of $200 per trans- --
10 per vehicle sales transaction. And if you have a -- a
11 typical finance manager will handle on the order of 70
12 transactions a month. At $200 additional profit, that's
13 $14,000 a month, which means that you recover the
14 initial cost of docuPAD very, very quickly. And then
15 from that point on, it is a massive generator of
16 profits.
17    We have dealers that are willing to, you
18 know, have their picture in Automotive News and
19 advertisements and say, "docuPAD paid for my entire
20 Reynolds bill," which is --
21    You know, I didn't invent docuPAD, but I
22 saw it and bought it. And the results of -- are nigh on
23 miraculous.
24    MS. WEDGWORTH: Move to strike.
25    Q. (By Ms. Wedgworth) Mr. Brockman, my question

Page 198

1 was simply: Are you aware of any incidents like that,
2 where a dealership can sell their docuPAD? That was my
3 question. It was -- it was straightforward. "Yes" or
4 "no"?
5    MS. GULLEY: Form.
6    A. Yes.
7    Q. (By Ms. Wedgworth) And you said there was one
8 occasion; is that right?
9    MS. GULLEY: Form.
10    A. Well, there's one that I know of.
11    Q. (By Ms. Wedgworth) Now, you've had a chance to
12 review this letter that was sent by Mr. Lamb to Hendrick
13 Automotive Group. Is there anything in the letter that
14 you're aware of that's inaccurate?
15    MS. GULLEY: Objection; form.
16    A. I would want to read it again.
17    Q. (By Ms. Wedgworth) Well, I'm not asking you to
18 read it again. As you reviewed it, did -- did anything
19 stick out as being inaccurate to you?
20    MS. GULLEY: Objection to the form and
21 instruction.
22    A. Ma'am, I would really like to read it one more
23 time.
24    Q. (By Ms. Wedgworth) Well, then let's put it
25 aside and we can go on to the next document.

Page 199

1    With regard to the Reynolds DMS contract,
2 do you know the average length of the -- the DMS
3 contract that a dealer signs today?
4    A. We don't keep an average number. That's not a
5 stat that I keep or have kept. What we see is -- and
6 this is just a general, you know, observation, it's not
7 at all a scientific average. Typically, you know, five
8 years to seven years. It is rarely less than that.
9    Q. Does Reynolds offer a contract -- DMS contract
10 to dealers less than five years?
11    A. We don't offer one. In some cases, you know,
12 we end up negotiating the one that -- where the length
13 of contract relates to the whole process of -- of buying
14 a DMS system is -- and that's the -- the level of
15 discount that the dealership will achieve, it will be
16 based upon the length of the contract. And that
17 short-term contracts -- we'll say a 36-month contract --
18 of the discount is appreciably less. And the dealer has
19 a choice. They can go for a short-term contract, or
20 they can go for a long-term contract; they get a better
21 discount.
22    Q. Are there any DMS contracts at Reynolds longer
23 than seven years?
24    A. Yes, ma'am.
25    Q. What's the longest contract that Reynolds has

9 (Pages 196 - 199)

HIGHLY CONFIDENTIAL

Page 200

1  with the dealership concerning DMS?
2       MS. GULLEY:  Objection; form.
3       A.  I -- I can't speak to what's the longest.  I
4  have seen them ten years and, in some cases, a little
5  over ten years.  But that's not a -- that's not a
6  complete statement, because I don't see every contract.
7  I just see some.
8       Q.  (By Ms. Wedgworth)  Does Reynolds track the
9  tenure that a dealership stays with Reynolds?
10      A.  No.  We have no process for doing that.  The
11 only way to know is -- and that's to go to the contract
12 file and see what prior contracts are in the contract
13 file.  We don't -- we don't produce any reports in -- in
14 that regard.
15      Q.  And have you ever tried to determine
16 the average tenure of a Reynolds dealership?
17      A.  No, ma'am, I have not.
18      Q.  Anyone at Reynolds tried that?
19      MS. GULLEY:  Objection; form.
20      A.  Again, no way of knowing.
21      Q.  (By Ms. Wedgworth)  Well, you said you could
22 look at the contracts and make that determination?
23      MS. GULLEY:  Objection; form.
24      A.  Yes, ma'am.
25      Q.  (By Ms. Wedgworth)  And no one at Reynolds has

Page 201

1  done that?
2       A.  There's not been any --
3       MS. GULLEY:  Objection; form.
4       A.  -- any, you know, orchestrated plan or project
5  to go determine, you know, what the tenure is.  On an
6  individual basis, at contract renewal time, it may come
7  up that this customer has been a customer for 22 years.
8       Q.  (By Ms. Wedgworth)  Mr. Brockman, I'll show you
9  what's been marked as Plaintiffs' Exhibit 658.
10      (Exhibit 658 was marked for
11      identification.)
12      MS. WEDGWORTH:  Which is Bates-stamped
13 REYMDL00045348.
14      Q.  (By Ms. Wedgworth)  Have you had a chance to
15 review the document?
16      A.  Yes, ma'am.
17      Q.  Is GuesTraq a third party here?
18      A.  Yes, I believe they are a third party.
19      Q.  And does this email reflect -- is this an email
20 you wrote to Mr. Schaefer in response to an email he
21 sent you on or about April 23rd, 2015 and April 30th,
22 2015?
23      A.  It appears to -- that to be correct.  Frankly,
24 I don't remember this particular situation.
25      Q.  So GuesTraq doesn't ring a bell to you as you

Page 202

1  sit here?
2       A.  No, ma'am.
3       Q.  Do you have any reason to believe this -- that
4  you didn't receive and write this email?
5       MS. GULLEY:  Objection; form.
6       A.  No, ma'am.  I -- I presume it is.  It's not a
7  forgery.  I -- I have no reason to -- to believe that
8  it's not accurate.  But I -- I don't remember anything
9  about -- GuesTraq is -- must be some very minor entity,
10 because I sure don't remember anything about it.  I
11 don't know what it does.
12      Q.  (By Ms. Wedgworth)  Is this an example of you
13 granting exemption -- an exemption to a third party?
14      MS. GULLEY:  Objection; form.
15      A.  I'd say, based on -- on what's in bold -- what
16 I'm saying here -- and that's that I don't want to
17 invest the time and trouble right now which, I would
18 presume, that applies to an RCI interface.
19      Q.  (By Ms. Wedgworth)  So it's fair to say that
20 you are granting an exemption to GuesTraq here?
21      MS. GULLEY:  Objection; form.
22      A.  Well, there's -- there's -- to discuss that,
23 you've got to look at this next-to-the-last sentence,
24 where it talks about Query Builder.  Query Builder is
25 a -- a piece of software.  It is -- it's a reporting

Page 203

1  software.  It's not really very good.  It's been around
2  for quite a while.  And we're -- we've created a much
3  better set of reporting software, and we're endeavoring
4  to, you know, get Query Builder phased out.
5       And in that kind of situation, there's --
6  there's always times when it arises when somebody is
7  using Query Builder and we'd rather they not use Query
8  Builder because we want to get rid of all Query Builder
9  usage.  We want to delete that software, because we have
10 better software.  We don't want to continue to maintain,
11 you know, very, very old and obsolete-type -- type
12 software.
13      And so the question is, typically:  Do
14 these people convert to an RCI?  And that's what it
15 looks like is the case here.  And what I'm saying is --
16 in this -- I don't want to put them through RCI, you
17 know, because that's -- that's a development effort.
18 Instead, for the time being, let them continue operating
19 the way they're operating.
20      Q.  (By Ms. Wedgworth)  So you approve the ongoing
21 exemption for GuesTraq; correct?
22      A.  Yeah.  Temporarily.
23      Q.  And do you limit the time of the exemption in
24 this email?
25      A.  Not in this email.  I worked very closely with

10 (Pages 200 - 203)

FTC-0001262

HIGHLY CONFIDENTIAL

Page 204

1 Mr. Schaefer, and he understands what I'm doing is --
2 and that's that I -- I'm being forced into a situation
3 of expediency due to development processes.
4     Q. You can set that aside. I want to talk a
5 little bit about ODE, Open Dealer Exchange. Are you
6 familiar with that organization?
7     A. Yes, ma'am.
8     Q. And it's a joint venture between Reynolds and
9 CDK; is that correct?
10     A. That's correct.
11     Q. Do Reynolds and CDK each own 50 percent of ODE?
12     A. That's correct.
13     Q. How did that come about, ODE?
14         MS. GULLEY: Objection; form.
15     Q. (By Ms. Wedgworth) How did ODE come about?
16         MS. GULLEY: Objection; form.
17     A. I think it came about by the fact that there's
18 a -- a process in the -- in the dealership world. It's
19 like this: You have a prospect that comes into the
20 dealership. They're looking for a certain kind of
21 vehicle. You have some of those type that they're
22 looking for: different colors, different trim levels,
23 different options. You go out and you -- you walk the
24 inventory. And they get to visit the green one and the
25 red one and the blue one and the silver one. And

Page 205

1 they -- they have different types of interiors, you
2 know, more leather and less leather.
3     But any rate, the prospect finally decides,
4 "I like this one here." And the car salesman's heart
5 kind of takes a leap for the good. They go back inside
6 to see if they can work out a deal. Well, an inherent
7 part of -- you know, a giant percentage of car sales
8 involves financing. I don't know what the number is,
9 but I wouldn't be surprised by an 80 or 90 percent car
10 sales transactions that involve financing where the
11 dealership has -- has to help get done.
12     So what happens is -- and that's the car
13 salesperson gets an authorization form signed by the
14 prospect to pull their credit. They pull their credit
15 and get their FICO score. And then they go shopping for
16 financing. And Dealertrack has built up a -- a nifty
17 application, and it's enjoyed very considerable success
18 with it. And what it does is -- and that's that you
19 enter the -- you know, the information about this
20 potential transaction, what kind of vehicle it is --
21     Q. (By Ms. Wedgworth) I'm focusing on ODE, not
22 Dealertrack.
23         MS. GULLEY: Just let him finish his
24 answer.
25     A. But you're asking me why ODE got started.

Page 206

1     Q. (By Ms. Wedgworth) How ODE got started.
2         MS. GULLEY: Just let him finish his
3 previous answer.
4         Just go ahead and finish the answer.
5     A. The how, the first part about it is -- implies
6 the why. Okay?
7     Q. (By Ms. Wedgworth) Actually, it doesn't. It's
8 a how.
9         MS. GULLEY: Just let him finish.
10         MR. RYAN: Let me -- let me just -- I know
11 my object-- her objections are good for me, but I
12 believe the question was: How did it come about? And I
13 think he's answering that question.
14         MS. GULLEY: Correct.
15     A. That's certainly what I'm trying to do.
16         MS. GULLEY: Go ahead and continue your
17 response.
18     A. In any rate, at this point, the salesperson
19 inputs the -- you know, the facts of the -- of the
20 transaction, which is the -- you know, the type of car,
21 what the sales price is, you know, what the down payment
22 is, what -- what the consumer's FICO score is. And they
23 can, with a -- not much more than a press of a button,
24 send that package of information to a potential lender.
25 And the lender can look at it and say "Yes" or "No" or

Page 207

1 "Maybe," or "Maybe with a little more down payment, it
2 will work." Or "We need to have some more proof of
3 employment."
4     And it facilitates, you know, the whole
5 financing process. And Dealertrack has done a very good
6 job of -- of building that -- that product and has,
7 basically, a near monopoly on that process. And so
8 ODE's goal was, was to be able to replicate that process
9 and become successful in that marketplace.
10     Q. (By Ms. Wedgworth) Were you the decision maker
11 to enter ODE as a joint venture with CDK?
12     A. I was responsible for the Reynolds side.
13     Q. Did you contact CDK or did CDK contact you,
14 initially?
15     A. I don't specifically recall that, but I --
16 my -- my belief is -- and that's they contacted us.
17     Q. Who contacted you at CDK?
18     A. I don't think that the contact was directly
19 with me. It was -- it -- it was somebody else in our
20 organization.
21     Q. Who did you speak with about the joint venture
22 from CDK, initially?
23         MS. GULLEY: Objection; form.
24     A. I -- I would say that the -- the first
25 conversation, again, was not between me and CDK. It

11 (Pages 204 - 207)

FTC-0001263

HIGHLY CONFIDENTIAL

Page 208

1 was with other people in our organization, principally
2 over in the product planning area. And it was only
3 after that, that I had conversation. And the name that
4 I recall I had a conversation with was Ron Workman. He
5 was a senior vice-president.
6     Q. (By Ms. Wedgworth) Who at Reynolds, in product
7 planning, spoke to CDK concerning forming ODE?
8     A. Certainly one of the people that would have
9 been involved was Jon Strawsburg.
10     Q. Anyone other than Mr. Strawsburg?
11     A. I'm sure there was, but I can't remember
12 specifically.
13     Q. You -- you said yesterday that CDK is your
14 largest competitor; is that a fair statement?
15     A. That's correct.
16     Q. Why did Reynolds en-- -- enter into a joint
17 venture with its largest competitor?
18     A. Well, it wasn't because they were our largest
19 competitor, I can assure you that. But in the situation
20 like this, one has to decide, is the opportunity, you
21 know, worth it? In this particular case, it appeared to
22 be worth it.
23          The other principal factor is -- and that's
24 that if you don't do it, what else might, you know, CDK
25 do. Who might they partner up with? Might they partner

Page 209

1 up with somebody else, which would mean that we would be
2 forever locked out of this very attractive business that
3 Dealertrack has. And so the decision was -- and that's
4 we ought to proceed, but proceed carefully,
5 investigating, you know, the potential with ADP.
6     Q. Was ODE founded around 2009?
7     A. I don't remember the exact date, but it's been
8 a while.
9     Q. And the decision to proceed with CDK was made
10 by you?
11     A. Yes.
12     Q. And in making that decision, you said you spoke
13 to Mr. Workman at CDK?
14          MS. GULLEY: Objection; form.
15     A. That was one of the people that -- that I
16 talked to.
17     Q. (By Ms. Wedgworth) Who else at CDK did you
18 speak to?
19          MS. GULLEY: Objection; form.
20     A. I'm sorry. I -- I don't remember the names.
21 You know, I think that there's -- you know, there's
22 been -- I know there's been turnover in that
23 organization, but Ron Workman was the consistent person
24 throughout.
25          MS. GULLEY: Is this a good time for a

Page 210

1 break?
2          MS. WEDGWORTH: Yes. Let's take a break.
3          THE VIDEOGRAPHER: The time is 9:57 a.m.,
4 and we're off the record.
5          (Short recess 9:57 to 10:17 a.m.)
6          THE VIDEOGRAPHER: The time is 10:17 a.m.,
7 and we're back on the record.
8          EXAMINATION (Continuing)
9 BY MS. WEDGWORTH:
10     Q. Mr. Brockman, focusing you back on ODE, have
11 CDK and Reynolds had meetings in person regarding ODE?
12     A. Yes, ma'am.
13     Q. How many?
14     A. Well, I -- I think in order to give the correct
15 answer on that -- are -- are we talking about meetings
16 where everybody that's involved are all together? Or
17 where some of the folks that are involved are all
18 together and some are on the phone? You know, which
19 definition of -- of "meeting," you know, would you like
20 me to answer?
21     Q. Well, ODE has board of directors' meetings;
22 correct?
23     A. That's correct.
24     Q. And are those board of directors' meetings in
25 person or by phone?

Page 211

1     A. Typically, by phone.
2     Q. And are those -- how often do those board of
3 directors' meetings occur?
4     A. There -- there's not a -- a fixed schedule, but
5 my -- my guess is -- and that would be probably on -- on
6 a quarterly basis, you know, three or four times a year.
7     Q. So on a quarterly basis, ODE holds telephonic
8 board of directors' meetings; is this correct?
9     A. Not -- generally on a quarterly basis. It's
10 not a fixed, you know, first quarter, second quarter,
11 third quarter, you know.
12     Q. And have you participated in meetings with CDK
13 concerning ODE in person?
14     A. I have, but rarely.
15     Q. Approximately how many times?
16          MS. GULLEY: Form.
17     A. No more than once a year, if that. It -- it
18 typically revolves around NADA, because we are -- we
19 tend to all parties be present at NADA, and so we'll sit
20 down and talk for half an hour.
21     Q. (By Ms. Wedgworth) So at the NADA meetings,
22 which are -- that's an annual conference?
23     A. Yes, ma'am.
24     Q. Held in, usually, late January, coming up?
25     A. Coming up. I understand it's going to be Super

12 (Pages 208 - 211)

HIGHLY CONFIDENTIAL

Page 212

1  Bowl Weekend. It's going to be in San Francisco.
2      Q. So normally, at the NADA meetings, you meet
3  with CDK people con-- -- to discuss ODE?
4          MS. GULLEY: Form.
5      A. Yes. And that meeting tends to be a very
6  informal meeting, because we're -- there's not --
7  there's no fixed agenda, there's no, you know, special
8  place or whatever. We just find time to, you know, get
9  together, you know, for a half hour or so.
10     Q. (By Ms. Wedgworth) And when you -- the last
11 time you met with CDK, who did you meet with?
12         MS. GULLEY: Objection; form.
13     A. The only person whose name I -- there's two
14 people: It was Steve Anenen and Ron Workman.
15     Q. (By Ms. Wedgworth) And other than you meeting
16 in person with CDK, do Reynolds people meet with CDK
17 people regarding ODE in person?
18     A. Yes. Yes.
19     Q. How often?
20     A. Again, there's no fixed schedule. It depends
21 on, you know, what projects are at hand. You know, so
22 it could be once or twice a year. It could be five,
23 six, seven times a year.
24     Q. Have you met with anyone from ODE at places
25 other than the NADA convention?

Page 213

1      A. I think that I have, but I can't recall a
2  specific, you know, time or place. Steve Lloyds is
3  the -- is the, you know, the CEO of ODE. I talk to him
4  mostly on the phone or, you know, over Skype. But as
5  far as other people, I think I've -- I've been on
6  telephone calls with their head of software development,
7  Tom -- and I can't remember his last name right now.
8  That -- you know, maybe once a year.
9          (Exhibit 659 was marked for
10             identification.)
11     Q. (By Ms. Wedgworth) I'd like to show you what's
12 been marked as Plaintiff's Exhibit 659. My initial
13 question is: Have you seen this document before?
14     A. No, ma'am.
15     Q. You have not?
16     A. Not this specific document, I don't believe.
17     Q. The cover email says that Mr. Workman sent it
18 to you on December 24th, 2015. The cover email. Is
19 this an email you received from Mr. Workman on or about
20 December 24th, 2015?
21         MS. GULLEY: Objection; form.
22     A. Again, you know, this -- this cover email
23 with -- would tend to indicate that, but I honestly
24 don't recall, yeah, this specific email.
25     Q. (By Ms. Wedgworth) Do you have any reason to

Page 214

1  believe that this is not the board meeting minutes
2  of ODE for December 2015?
3          MS. GULLEY: Form.
4      A. Ma'am, I don't have, you know -- you know,
5  clear enough memory of -- of that particular time, you
6  know, several years back. That's three years back.
7  This -- these are exactly what went on at -- it looks
8  like it, but... (Pause.)
9      Q. (By Ms. Wedgworth) There's someone here you
10 haven't mentioned for CDK: Bihner -- Bihner,
11 B-i-h-n-e-r. Do you know Mr. Bihner?
12     A. I have been on telephone conversations with
13 him, but I don't know. I think his first name is Joe.
14 But I've -- I've -- and I may have met him at NADA and
15 shaken hands with him, but I -- I couldn't pick him out
16 of a crowed.
17     Q. And Mr. Bihner is a CDK person?
18     A. Yes.
19     Q. Manager?
20     A. I would think, maybe, perhaps he might even be
21 an officer.
22     Q. And for R&R, on these board meeting minutes has
23 Mr. Pontis listed. Is he also someone from Reynolds who
24 interacts with CDK concerning ODE?
25     A. Yes. He works for Jon Strawsburg.

Page 215

1      Q. You can put that aside.
2          Is there any reason to believe that these
3  minutes are inaccurate?
4          MS. GULLEY: Objection; form.
5      A. No, ma'am.
6      Q. (By Ms. Wedgworth) Now, Reynolds also has a
7  relationship with CDK concerning CDR; correct?
8          MS. GULLEY: Form.
9      A. Yes, ma'am.
10     Q. (By Ms. Wedgworth) And that relationship is,
11 again, a joint venture between Reynolds and CDK?
12     A. That's my understanding. I -- I'm not --
13 generally much less familiar with CVR, because that
14 is something that was entered into considerably before
15 my time at Reynolds. And it is, you know, completely
16 controlled by CDK, because they have the -- dominant
17 ownership interest.
18     Q. And CVR is 80 percent owned by CDK and 20
19 percent owned by Reynolds; is that correct?
20     A. That's my understanding. Although I'm not in a
21 position where I can say for sure that's exactly how it
22 is, because I was not there when it was -- when it was
23 founded.
24     Q. So other than ODE and CVR, does Reynolds have
25 any other formal relationships with CDK?

13 (Pages 212 - 215)

FTC-0001265

HIGHLY CONFIDENTIAL

Page 216

1          MR. RYAN:  Objection.
2     A.  I don't think so.
3     Q.  (By Ms. Wedgworth)  Does Reynolds have any
4  informal relationships with CDK currently?
5          MS. GULLEY:  Objection; form.
6     A.  Yes.  Probably one.
7     Q.  (By Ms. Wedgworth)  What is that?
8     A.  It is a -- again, this is something that, you
9  know, began considerably before my time.  But I came --
10  became aware of its existence, you know, after we
11  acquired Reynolds.  It has to do with -- when a customer
12  decides to leave, you know, one of us, as long as that
13  customer pays all their bills, honors all of their
14  contractual obligations, we will turn over to the
15  assuming company copies of data files for that
16  dealership.
17     Q.  And that relationship, you have with CDK?
18     A.  Yes, ma'am.
19     Q.  And --
20     A.  And I might add that it is unwritten, informal.
21  And I wouldn't go so far as to characterize it as a
22  relationship.  What it is -- it is a practice.  And
23  it -- it has no specified duration.  It's something
24  that, you know, either one of us could, you know, quit
25  tomorrow.

Page 217

1     Q.  So you would not call it an informal
2  relationship?
3     A.  No, ma'am.  I would call it a practice.
4     Q.  Is the inform- -- the practice reciprocal?
5          MS. GULLEY:  Objection; form.
6     A.  Yes, ma'am.
7     Q.  (By Ms. Wedgworth)  Who for CDK -- who for
8  Reynolds implements this reciprocal practice?
9          MS. GULLEY:  Form.
10     Q.  (By Ms. Wedgworth)  Between CDK and Reynolds?
11          MS. GULLEY:  Form.
12     A.  I honestly don't know which department actually
13  handles it.  It's my belief that it gets done but, you
14  know, exactly where in the organization it occurs, I --
15  I can't tell you.
16     Q.  (By Ms. Wedgworth)  Would it be under
17  Mr. Schaefer's role?  His team?
18     A.  It could be.  But for some reason, I think
19  that -- that that's not where it happens.  I think it --
20  it's more likely to happen over in part of the
21  operations department of the organization.
22     Q.  Do you have a similar reciprocal relationship
23  with any other DMS providers?
24     A.  Do not.
25     Q.  So the only reciprocal relationship you have

Page 218

1  regarding this DMS agreement is with CDK?
2          MS. GULLEY:  Objection; form.
3     A.  That -- that's correct.
4     Q.  (By Ms. Wedgworth)  I'd like to show you what's
5  been previously marked as Exhibit 504.  I don't think we
6  have to mark it again.
7          MS. GULLEY:  You don't.
8     Q.  (By Ms. Wedgworth)  Previously marked Exhibit
9  504, Mr. Brockman.  Document Bates-stamped
10  REYMDL00263055.  Have you had time to review the
11  document, Mr. Brockman?
12     A.  I've never seen this before.  Could you give me
13  just a moment more?
14     Q.  Yes.
15     A.  Yes.
16     Q.  Is this an email you received and responded to
17  on or around May 30, 2017?
18     A.  Yes, ma'am, it appears to be that.
19     Q.  And was it your intent to be truthful and
20  accurate in writing the email?
21          MR. RYAN:  Objection.
22     A.  Yes, ma'am.
23     Q.  (By Ms. Wedgworth)  And here you're responding
24  to a question from Mr. Strawsburg; correct?
25     A.  That's correct.

Page 219

1     Q.  And in the email you write, "Other than our
2  informal relationship with CDK, we provide no assistance
3  to any third party."  Do you see that?
4     A.  Yes.
5     Q.  Is this the informal relationship with CDK you
6  just testified about?
7     A.  Yes, ma'am.
8     Q.  So in -- in the response to Mr. Strawsburg, you
9  referred to it as an informal relationship?
10     A.  Yes, ma'am, in that case, I did.
11     Q.  And did this informal relationship with CDK
12  allow CDK to access Reynolds software in May 2017?
13          MS. GULLEY:  Objection; form.
14     A.  The answer to that is "not correct."
15     Q.  (By Ms. Wedgworth)  Did this informal
16  relationship with CDK allow CDK to -- to work with
17  Reynolds regarding the -- both DMS systems?
18          MS. GULLEY:  Objection; form.
19     A.  There -- we need to talk some more about, you
20  know, what, you know, the informal relationship -- or
21  this involves.  We receive notification, typically
22  from the customer, that they're -- that they're
23  converting to CDK.  And our first question is -- is:
24  "Well, have you decided when?"  And with that
25  information, we also ask them to -- to notify CDK --

14 (Pages 216 - 219)

FTC-0001266

HIGHLY CONFIDENTIAL

Page 220

1 actually, CDK is notifying them as to when their
2 conversion is going to take place.
3         And there's a scheduling process that takes
4 place where -- when the conversion data is going to be
5 outputted on to a tape, and that tape is -- can then --
6 then be given, you know, to CDK. They don't actually
7 access our systems at all.
8         There -- there's an inter- -- intermediate
9 step in there where the accounts receivable position
10 of -- of the customer is verified by our accounting
11 department. And it's not just, you know, what
12 they might be currently due, but also what's going to be
13 due by the time the conversion occurs. And so
14 there's -- there then -- there's then a dollar amount
15 which represents the total remaining obligation of the
16 customer, and that's from a financial standpoint. And
17 before the tape is actually cut, we get a check for
18 their remaining financial obligation.
19     Q. (By Ms. Wedgworth) And then CDK and Reynolds
20 have a conversation; is that correct?
21     A. No. There -- there's been a conversation prior
22 to that, but it will be a -- a subsequent conversation.
23 It -- it's a multistep, and I -- I'm not in a position,
24 from a knowledge standpoint, to describe that with
25 perfect accuracy. But generally, that's what happens.

Page 221

1     Q. And Reynolds does not have that relationship
2 with any other DMS provider; is that correct?
3         MS. GULLEY: Objection; form.
4     A. That's correct. What the other -- other
5 providers have to do is -- and that's they have to ask
6 the customer to, you know, run reports of things like
7 parts inventory and vehicle inventory and general ledger
8 balances, for the -- for the customer to copy those
9 reports out to a -- a thumb drive or a small hard disk
10 and -- and give that to the vendor that they're going
11 to, that they're converting to. And then those reports
12 are run through data conversion programs to accomplish
13 the same thing.
14         MS. WEDGWORTH: Move to strike everything
15 after "That's correct."
16     Q. (By Ms. Wedgworth) You can set that document
17 aside, Mr. Brockman. Mr. Brockman, I'll show you what's
18 been marked as Plaintiff's Exhibit 660.
19         (Exhibit 660 was marked for
20         identification.)
21     Q. (By Ms. Wedgworth) I believe yesterday you
22 testified this type of document is a management report
23 concerning finances at Reynolds; is that correct?
24     A. That -- that's correct.
25     Q. And do you receive these reports on a monthly

Page 222

1 basis?
2     A. Yes, ma'am.
3     Q. And the purpose of this report is for Reynolds
4 to understand the financial analysis going on, overall,
5 at the company; is that correct?
6     A. That's correct. It's prepared for senior level
7 vice-presidents. And it -- it's not financial
8 statements, but it's financial information. And to say
9 that it's used to run the company is probably a
10 mischaracterization.
11         I get this report once a month. I probably
12 spend 30 minutes on it. And the reason why I only spend
13 30 minutes on it is because it's historical information.
14 It is -- has been -- very little bearing as what I
15 should be doing on a day-to-day. Reynolds is the type
16 of company where what happened five years ago has way
17 more impact on what we see in here than what happened --
18 than what's happened in the last month.
19     Q. And these reports show that -- whether or not
20 Reynolds is -- what their sales are; is that correct?
21         MS. GULLEY: Form.
22     A. Yes. That -- that is one of the sta- --
23 statistics that it provides. But, again, from an
24 important standpoint, as far as running the company,
25 this report is very little used by me. I'm much more

Page 223

1 interested in who we've hired, the customers we've sold,
2 what projects we're accomplishing as far as new product
3 development. Those are all way more -- way more
4 important for the success of the organization.
5     Q. (By Ms. Wedgworth) Well, these are prepared by
6 Reynolds at least on a monthly basis; correct?
7     A. That's correct.
8     Q. And they are sent to you at least on a monthly
9 basis?
10     A. That's correct.
11     Q. And it's -- there is a team at Reynolds who
12 prepares these financials; is that correct?
13     A. That's correct.
14     Q. If we go to Page 12 of this document, which has
15 a Bates ending 712. And this document, at the top, is
16 "NA DMS Product Solution Data Services P&L." Do you see
17 that at the top?
18     A. Yes, ma'am.
19     Q. Under the "One Time Revenue" for RCI, you'll
20 see that there's a variance of 354 percent here. Do you
21 see that?
22     A. I'm sorry that I'm not quite -- could you --
23     Q. So it would be the third line of numbers down.
24     A. Okay. Yes. Okay. I see the third line of
25 numbers down.

15 (Pages 220 - 223)

FTC-0001267

HIGHLY CONFIDENTIAL

Page 224

1    Q.  Where it looks like in January of 2015 there
2  were 150 RCI customers.  And then for 2016, there's 681
3  customers.  Do you see that?  Or sales?
4         MS. GULLEY:  Objection; form.
5    A.  I'm seeing that.  I'm not sure that it says
6  that's customers.
7    Q.  (By Ms. Wedgworth)  Or sales -- of 150 sales
8  versus 681 in 2016?
9         MS. GULLEY:  Objection; form.
10    A.  What my issue is -- and that's -- it's just I'm
11  not really familiar with this report.  I don't know
12  whether that means -- whether that's a sales number or
13  whether that's a customer number.
14    Q.  (By Ms. Wedgworth)  In either event, it's
15  increased 354 percent; you would agree?
16         MS. GULLEY:  Objection; form.
17    A.  Whatever it is, it's got "354%" beside it.
18    Q.  So the heading on the left-hand side says, "One
19  Time Revenue."  Do you see the heading?
20         MS. GULLEY:  Objection; form.
21    A.  Yes, I see that.
22    Q.  (By Ms. Wedgworth)  And so for RCI, for January
23  2016, it's 681 versus 150 in the month a year earlier.
24         MS. GULLEY:  Form.
25    A.  Yes, that's what it looks like.  You're

Page 225

1  obviously more familiar with this report than I am.
2    Q.  (By Ms. Wedgworth)  Well --
3         MS. GULLEY:  Move to strike.  It's a joke.
4  I'm sorry.
5    Q.  (By Ms. Wedgworth)  Going -- going down to the
6  recurring revenue, for the RCI number, it's -- appears
7  to be $5,910,000 for 2016, whereas the previous year,
8  for 2015, was $3,104,000.  Do you see that?
9         MS. GULLEY:  Form.
10    A.  I wonder if somebody has a straightedge.  I'm
11  77 years old, and my vision is not as good as it used to
12  be.
13         MS. WEDGWORTH:  Well, even at my age, which
14  I won't put it on the record -- I highlighted.  To keep
15  my -- I'm mean, that's how I read it.  But -- but you
16  didn't have the highlight.  So I -- what I'm saying is,
17  I need aid, too.
18         MS. GULLEY:  Which line are we, I'm sorry.
19         MS. WEDGWORTH:  So RCI, "Recurring
20  Revenue."
21         MS. GULLEY:  Got it.
22    Q.  (By Ms. Wedgworth)  Of $5,910,000 versus
23  $3,104,000 the previous year.  Do you see that?
24    A.  Thanks to the straightedge, yes, I do.
25    Q.  And that's an increase of 90 percent?  Do you

Page 226

1  see that?
2    A.  Yes, I see that.
3    Q.  Okay.  So is it fair to say that, after the
4  February 2015 agreements, that revenue for RCI jumped
5  dramatically?
6         MS. GULLEY:  Objection; form.
7    A.  Well, when you referred to agreements, I'm --
8  I'm -- can you describe which agreement that you're
9  talking about?
10    Q.  (By Ms. Wedgworth)  Well, the data exchange
11  agreements and the other two agreements in February of
12  2015.  We looked at the exhibit yesterday that you
13  signed.
14    A.  Okay.  The --
15         MS. GULLEY:  Objection; form.
16    A.  -- this -- this is the stand-down agreement,
17  you know, with CDK.
18    Q.  (By Ms. Wedgworth)  Okay.  So after the
19  stand-down agreement, is it fair to say that RCI
20  revenues jumped?
21         MS. GULLEY:  Objection; form.
22         MR. RYAN:  Objection.
23    A.  Again, I -- I would not think that a percentage
24  basis -- that they jumped that much.  So I would be
25  surprised if there's not some other, you know,

Page 227

1  customers, you know, third parties that -- that have
2  come under RCI contracts.  I don't think it's just those
3  ones that came to us as a result of the stand-down
4  agreement.  Again, looking at this, I can't tell.
5    Q.  (By Ms. Wedgworth)  Has RCI been profitable in
6  2016?
7         MS. GULLEY:  Objection; form.
8    A.  We -- we don't have profit numbers on RCI.  And
9  I need to explain some about -- we don't have any
10  internal cost accounting.
11    Q.  (By Ms. Wedgworth)  So you don't know if RCI is
12  profitable?
13         MS. GULLEY:  Wait a minute.  He's going to
14  finish his answer.
15    A.  What I'm saying is -- and that's that if RCI is
16  profitable, I have no way of knowing, you know, if it is
17  or how much.  The reason why is because we don't have
18  internal cost accounting.  And organizationally -- and I
19  realize for somebody that's used to dealing with larger
20  corporations, you know, that sounds kind of crazy.
21         But you have to remember that I came from a
22  very small organization, and I'm very sensitive to, you
23  know, the use -- efficient use of personnel, of
24  overhead.  And the cost accounting imposes an
25  overhead -- much like in a law firm, you know, you have

16 (Pages 224 - 227)

FTC-0001268

HIGHLY CONFIDENTIAL

Page 228

1  to keep time accounting records, you know, billing
2  records and that sort of thing.  That takes probably 5
3  or 6 percent.  Well, if we were to have cost accounting,
4  it would do the same thing to us.  And I, frankly, would
5  rather have the productivity, you know, than the
6  information.
7        And that's the reason why that -- I -- I
8  don't have a number as far as profitability for RCI.
9  It's part of the overall, you know, organizational
10  numbers, because you don't have, you know, one
11  piece that operates as a whole entity.  We keep track of
12  sales numbers but not profit numbers, because we don't
13  have any profit numbers.
14    Q.  (By Ms. Wedgworth)  I'd like to show you what
15  was marked yesterday as Plaintiff's Exhibit 651, on Page
16  17.  And yesterday, I think we looked at the footnote on
17  Page 17 that says, "We are expecting an annual revenue
18  of approximately $30 million from" -- "generated from
19  the CDK Deal."  Do you see that?
20    A.  Yes, ma'am.
21    Q.  Is that a number that you asked to be tracked?
22    A.  I did not.
23    Q.  Were you interested in the annual revenue
24  concerning the CDK deal?
25    A.  Revenue-wise, yes.

Page 229

1    Q.  And when you say "CDK Deal," what do you refer
2  to?
3    A.  That is the -- the stand-down agreement where
4  they agreed to cease and desist hacking our systems.
5    Q.  So due to the CDK deal, Reynolds expects annual
6  revenue of approximately $30 million; is that correct?
7        MS. GULLEY:  Objection; form.
8    A.  That's what this says --
9    Q.  Is there any reason to --
10        MS. GULLEY:  Let him finish his answer.
11    A.  That -- that is not -- not my expectation,
12  though, this is something our chief financial officer,
13  you know, decided he would throw in.  But it's -- again,
14  it's not a number that I would routinely track.
15    Q.  (By Ms. Wedgworth)  Was that a number you were
16  interested in?
17    A.  Yes, ma'am.
18    Q.  Is that a number that you -- you asked your CFO
19  and/or Mr. Schaefer to analyze and come up with?
20    A.  No --
21        MS. GULLEY:  Objection; form.
22    A.  -- I did not.  I thought -- I just said that
23  I -- I didn't ask, for instance, for this footnote to be
24  inserted.
25        (Exhibit 661 was marked for

Page 230

1        identification.)
2    Q.  (By Ms. Wedgworth)  I'd like to show you what's
3  been marked as Plaintiff's Exhibit 661, a one-paged
4  document, Bates-stamped REYMDL00045556.
5        Mr. Brockman, have you had time to review
6  the document?
7    A.  Yes, ma'am.
8    Q.  Have you seen it before?
9    A.  Yes, ma'am.
10    Q.  Did you write this email to Mr. Schaefer on or
11  about January 5th, 2016?
12    A.  Yes, I did.
13    Q.  The subject line, when you write the email, is
14  blank.  And then you write, "Bob, From a policy
15  standpoint, the term 'profitability' (and any of its
16  variants) in relation to RCI are never to be uttered in
17  front of anyone inside or outside the company.  Your
18  people need to understand this as well.  Bob."
19        Is that an accurate statement of what you
20  wrote to Mr. Schaefer and Mr. Lamb?
21    A.  Yes, ma'am.  And the reason why that I -- I
22  wrote it is because we don't track profitability,
23  because we don't have cost accounting.  Without cost
24  accounting, it's impossible to accurately track
25  profitability.

Page 231

1        Secondly, you know, from a policy
2  standpoint, Reynolds is run very, very much like a small
3  company where, you know, the CEO, which is me, and a
4  handful of other people actually understand how
5  profitable the company is.  We keep that information
6  very closely held.  It's nobody's business.
7        It -- which is completely different than
8  the way Reynolds used to be operated.  Of course, as a
9  public company, everybody had access to the -- to the
10  financials, because they were -- they were publicly --
11  published.
12        I believe that, from an operating
13  standpoint, that that is very deleterious to the
14  successful operation of the business.  And the reason
15  why I feel that way is because everything we do, you
16  know, is involved in long-term success.  For example,
17  a -- a software package, you know, may take five years
18  to develop, get into the marketplace and have -- become
19  accepted in the marketplace.  You know, that -- that's a
20  direct expense to profit.  You know, if you don't
21  understand, you know, how the company operates, you're
22  liable to think that things aren't doing well.  Well,
23  the reality is, we're developing a lot of software,
24  which costs a lot.
25        So I think that, you know, having profit

17 (Pages 228 - 231)

HIGHLY CONFIDENTIAL

Page 232

1 numbers being thrown around the company -- and
2 particularly in this case, where we don't have any cost
3 accounting to support what profit might be, is -- is
4 dangerous for morale, for the whole organization. I
5 have followed that policy religiously. And as a result,
6 you know, Reynolds is a -- a -- a very profitable
7 company.
8    Q. Is there any reason you limited this email
9 concerning your prohibition on discussing profitability
10 to RCI?
11    A. That -- that's where I saw the most recent
12 violation.
13    Q. What violation did you see?
14    A. I saw someone in Bob Schaefer's organization
15 mumbling about profitability when they're in no position
16 to do so because -- since we have no cost accounting,
17 they don't know how profitable it is -- or unprofitable,
18 for that matter.
19    Q. Who was the person commenting on profitability
20 concerning RCI in Mr. Schaefer's organization?
21    A. I'm sorry. I don't remember the name of the
22 person.
23    Q. And what was the comment?
24    A. The comment was something in regard to RCI
25 being, you know, very, very profitable. Well, there's

Page 233

1 no way to know, in the first place. And secondly, the
2 discussion of profits openly at that level is -- you
3 know, we don't do that.
4    Q. But you're certainly interested in RCI revenue;
5 correct?
6       MS. GULLEY: Objection; form.
7    A. Yes, ma'am. And the reason why I'm interested
8 in RCI revenue, particularly in regards to the CDK
9 stand-down agreement, is because CDK's attitude and, you
10 know, talk and discussion in the marketplace regarding
11 data security, and specifically our data security
12 procedures, has been very hurtful over the years. And
13 I'm looking forward to, you know, recovering from some
14 of the hurt that we endured over a number of years.
15    Q. (By Ms. Wedgworth) So you specifically do want
16 to track revenue at RCI as it relates to the stand-down
17 agreement with CDK?
18       MS. GULLEY: Objection; form.
19    A. Yes, ma'am. I made inquiries about that.
20 Since that's over with now, it's of less importance, you
21 know, currently. I -- I really don't follow it that
22 much anymore. But during this time period, I was.
23    Q. (By Ms. Wedgworth) Well, Reynolds currently
24 follows that; correct?
25       MS. GULLEY: Objection; form.

Page 234

1    Q. (By Ms. Wedgworth) In the financial
2 statements?
3       MS. GULLEY: Form.
4    A. They do not follow any financial statements,
5 you know, incomes, to that level of detail. You know,
6 there is a -- a gross, you know, revenue number that
7 goes in the audits -- goes in -- which is where the
8 financial statements are.
9    Q. (By Ms. Wedgworth) You said the comment that
10 someone made in Mr. Schaefer's organization was that RCI
11 is very, very profitable; is that correct?
12       MS. GULLEY: Objection; form.
13    A. That -- that's what gave rise to this
14 particular email.
15    Q. (By Ms. Wedgworth) And you don't recall who
16 that person is?
17       MS. GULLEY: Objection; form.
18    A. No, ma'am.
19    Q. (By Ms. Wedgworth) I'd like to show you what's
20 been marked as Plaintiff's Exhibit 662.
21       (Exhibit 662 was marked for
22        identification.)
23       MS. WEDGWORTH: Can I have one back?
24    Q. (By Ms. Wedgworth) Mr. Brockman, as you read,
25 I'm going to let you know that I'm going to reference

Page 235

1 questions to the second page of the document where --
2 where you write in it.
3       Mr. Brockman, have you had a chance to
4 review the document?
5    A. I'm almost there. Yes, ma'am.
6    Q. And on the second page, where you wrote an
7 email in response to Mr. Schaefer and Mr. Schaefer wrote
8 you back, did you write this email in ordinary course of
9 your business around August 9th, 2016?
10    A. Okay. Is this -- can you point out
11 specifically --
12    Q. Your email, kind of in the middle of the page.
13    A. Okay. It's the one in bold print?
14    Q. Yes.
15    A. Okay.
16    Q. And you wrote it to Mr. Schaefer on about
17 August 9, 2016?
18    A. Yes, ma'am. That's -- that's what the email
19 says. I don't remember specifically but, you know,
20 that's what it says.
21    Q. And the email says, "I am still needing an
22 answer as to where we stand on the amount of revenue
23 that we were supposed to realize out of the CDK deal."
24 Do you see that?
25    A. Yes.

18 (Pages 232 - 235)

FTC-0001270

HIGHLY CONFIDENTIAL

Page 236

1    Q. And the CDK deal you're referring to there is
2  what you call the "stand-down agreement"?
3    A. That's correct.
4    Q. And you're asking Mr. Schaefer, here, to answer
5  a question you -- you're waiting on concerning the
6  revenue realized from that stand-down deal; is that
7  correct?
8        MS. GULLEY: Objection; form.
9    A. That's correct. And as I pointed out
10  previously, the reason why I'm interested in that is
11  because I believe that we suffered greatly from ADP's
12  actions over the years. And one of -- one of the
13  reasons why I'm concerned about this revenue is because
14  this is a recompense for the things that they did to us.
15  And I'm -- I'm curious as to this coming out at -- as
16  the way that it was planned to come out.
17    Q. (By Ms. Wedgworth) Meaning it was planned to
18  come out to -- to generate revenue?
19        MS. GULLEY: Objection; form.
20    A. That's -- that's correct. That was one of
21  our -- our motivations for, you know, the whole
22  stand-down agreement in the first place. It was to
23  stop, you know, ADP from hacking in, banditing our
24  systems and to, you know, recompense us for the damage
25  they've done to us over the years on the subject of data

Page 237

1  security.
2        MS. GULLEY: Thank you. Robert emailed me
3  and said he was disconnected. Just letting you know.
4        MS. WEDGWORTH: Can we go off the record?
5        THE VIDEOGRAPHER: This is the end of Media
6  1. The time is 11:02 a.m., and we are off the record.
7        (Short recess 11:02 to 11:09 a.m.)
8        THE VIDEOGRAPHER: This is the beginning of
9  Media 2. The time is 11:09 a.m. We're back on the
10  record.
11        EXAMINATION (Continuing)
12        (Exhibit 663 was marked for
13          identification.)
14  BY MS. WEDGWORTH:
15    Q. Mr. Brockman, I'll show you what's been marked
16  as Plaintiff's Exhibit 663. Have you had an opportunity
17  to review it?
18    A. I'm almost done. Yes.
19    Q. Are there any awards at Reynolds that are given
20  to reward high-performing teams?
21    A. Yes, there are.
22    Q. What are those awards?
23    A. The rewards are numerically, you know,
24  principally, individual awards.
25    Q. I asked just for teams, team awards.

Page 238

1    A. Teams? There's really only one team award
2  that's been in place for quite a while, which is a
3  department of the year. And we give that out twice. We
4  give it once in Dayton and we give it once in Houston.
5    Q. Dayton is toward the end of the year?
6    A. No, they're both -- one of them is on a
7  Wednesday in November and on a Friday, the following
8  Friday.
9    Q. And is there any monetary compensation for the
10  team with -- that goes with that award?
11    A. No.
12    Q. Is there any trip or -- or benefit to that
13  award for the team?
14    A. There -- there's no direct prize or -- you
15  know, as there are with some of our awards, individual
16  awards. This particular award, there's no prize.
17  There's a plaque. You know, there's no trip. However,
18  people that are in that department, especially our key
19  people in that department are -- in due course, and --
20  and because it's the right thing to do, they will
21  inevitably, you know, receive better salary increases
22  than -- than they otherwise might. It's a very
23  prestigious award to get, the department of the year.
24    Q. In Plaintiff's Exhibit 663, is this an email
25  you received from Mr. Schaefer around November 10, 2016

Page 239

1  where he writes to you to make a pitch that his team win
2  that 2016 team -- team award.
3    A. Yes. That's what it is.
4    Q. And did you receive this email?
5    A. Yes, ma'am.
6    Q. The second paragraph of this email that
7  Mr. Schaefer writes to you says, "This organiza-" --
8  well, the first paragraph says, "Several years ago
9  (about 9) you met with the Data Services team" -- which
10  is also known as DSV; correct?
11    A. That's correct.
12    Q. -- "you met with the Data Services team and we
13  discussed our role with[in] the company. At this [the]
14  time, we were just starting the security enhancements,
15  RCI was just in it's infancy in the new company. We
16  discussed our role and at the time you quoted the
17  following to the team:
18        "This organization is like the CIA, I
19  (meaning you) understand what this organization is and
20  will be doing but we cannot communicate to the rest of
21  organization what specifically is being done, how it is
22  being done and any the successes that are accomplished.
23  You will receive[d] medals behind the scenes. Someday,
24  we will be able to communicate and celebrate your
25  successes. I can assure you of that!'"

19 (Pages 236 - 239)

FTC-0001271

HIGHLY CONFIDENTIAL

Page 240

1        Did you say that?
2    A.  Yes, I did.
3    Q.  You can put that document aside.  Did
4  Mr. Schaefer's team win the 2016 team award?
5    A.  I honestly can't remember.  I don't -- I don't
6  think they did.
7    Q.  Has Mr. Schaefer's DSV team ever won the award?
8    A.  I don't remember clearly yes or no, but -- I --
9  my belief would be, no.
10    Q.  Mr. Schaefer would know for sure, I presume?
11    A.  I know for sure he would.  And I might add, I
12  get a number of letters like this from all corners of
13  the company.
14        MS. WEDGWORTH:  Why don't we take a break
15  now.  Can we take a 10-minute break?
16        MS. GULLEY:  That's fine.
17        THE VIDEOGRAPHER:  The time is 11:15 a.m.,
18  and we're off the record.
19        (Short recess 11:15 to 11:31 a.m.)
20        THE VIDEOGRAPHER:  Back on the record at
21  11:31 a.m.
22        EXAMINATION (Continuing)
23        (Exhibit 664 was marked for
24             identification.)
25  BY MS. WEDGWORTH:

Page 241

1    Q.  Mr. Brockman, I'll show you what's been marked
2  as Plaintiff's Exhibit 664.
3    A.  May I tell you the news first?
4    Q.  Yes.  Well, off the record, then.
5        MS. GULLEY:  Let's just stay on the record.
6  We'll do this in a little bit.  Let's proceed with --
7        MS. WEDGWORTH:  Sadly, we're on the record.
8  So if you will take a look at the exhibit.
9        (Brief discussion.)
10    664 is the one we're supposed to be looking at
11  it?
12    Q.  (By Ms. Wedgworth)  Yes.
13        MS. GULLEY:  Thank you.
14    Q.  (By Ms. Wedgworth)  A document Bates-stamped
15  REYMDL00333091 through 092.  And Mr. Brockman, as you
16  review the document, I'll let you know my questions
17  relate to the second page of the document.
18        Mr. Brockman, have you had a chance to
19  review --
20    A.  Yes, ma'am.
21    Q.  -- Exhibit 664?  Did you receive and write this
22  email on or about April 19, 2016?
23    A.  Yes, that -- I believe that's what it says.
24    Q.  And if we start on the second page of the email
25  where Mr. Bauer writes to you and some others.  The

Page 242

1  subject is:  "Draft ASB: New Features for MMS Data
2  Synchronization (Sync) - Review Due by April 26."  Do
3  you recognize this email?
4    A.  Yes, ma'am.  But I -- I'm sitting here
5  searching my mind, and I -- I don't recall, frankly,
6  what I was talking about.  It was talking about
7  something having to do with Data Sync, but what it's
8  talking about, I don't remember.
9    Q.  Well, Mr. Bauer writes to you and others,
10  "Please review the attached draft ASB announcing New
11  Features for MMS Data Synchronization (Sync).  Forward
12  any edits/comments to my attention."
13        And then you respond, "Tom, This is
14  absolutely not to be released.  I have no idea why it
15  was ever built.  The policy all along has been to not
16  make further enhancements to MMS that make the dealer's
17  DMS data more valuable - so it is easier to leave us and
18  not feel the pain.  Notify all of those concerned.
19  Bob."
20        Did you write that?
21    A.  Yes, ma'am, I did.  But the point I'm trying to
22  make is -- is whatever the feature was, I can't tell
23  you.  I don't remember.
24    Q.  Is it fair to say that you did not approve of
25  further MMS enhancements to the dealer's DMS data?

Page 243

1        MS. GULLEY:  Objection; form.
2    A.  What -- that's correct.  What -- what's
3  happening here is --
4    Q.  (By Ms. Wedgworth)  Actually, there's no
5  question pending.
6        Is it fair to say that the policy at
7  Reynolds was to not make further enhancements to the MMS
8  to make the dealer's data more valuable?
9        MS. GULLEY:  Objection; form.
10    A.  That's what I'm -- I'm endeavoring to explain.
11    Q.  (By Ms. Wedgworth)  And I just asked a
12  yes-or-no question.
13        MS. GULLEY:  You can answer the question.
14        MR. RYAN:  I object to cutting the witness
15  off.
16        MS. GULLEY:  Go ahead and answer.
17    A.  Well, okay.  There -- there's two databases.
18  There's -- there's the DMS database, which every
19  dealership has.  MMS is -- is a marketing database,
20  which we sell under the Naked Lime Marketing MS tag, and
21  these databases are -- are different in -- in the amount
22  of data that they contain.
23        As we, you know, make investments
24  to improve the product offering for Naked Lime
25  Marketing, which is the MMS database, we want to do that

20 (Pages 240 - 243)

FTC-0001272

HIGHLY CONFIDENTIAL

Page 244

1  so that product will sell more.  That's -- that's what
2  our investment is -- is, you know, based upon.
3            What's happened here appears -- and that's
4  we have done something that's an enhancement to MMS.
5  And for some reason, you know, we have, in the
6  synchronization process, you know, made that -- made
7  that information, which we're buying and building on our
8  own, we're moving that over to the dealership's DMS.
9  And we don't intend to do that.  So what's happened
10  is -- is the development is going to stray from what is
11  logical from a business standpoint.
12      Q.  (By Ms. Wedgworth)  You -- so the developer --
13  did you say "developer" or "development"?
14      A.  Somebody in the development area.
15      Q.  And this is your email reining that
16  development -- or developer back in?
17          MS. GULLEY:  Form.
18      A.  That's correct.  It says, "This is absolutely
19  not to be released."
20      Q.  (By Ms. Wedgworth)  Mr. Brockman, I'd like to
21  show you what's been marked as Plaintiff's Exhibit 665.
22          (Exhibit 665 was marked for
23           identification.)
24      Q.  (By Ms. Wedgworth)  Have you had a chance to
25  review Plaintiff's Exhibit 665?

Page 245

1      A.  I'm just about there.  Yes, ma'am.
2      Q.  Did you write this email on or -- and its
3  attachment on or about May 8, 2016?
4      A.  I -- I'm sorry.  I'm not seeing where -- where
5  I -- I wrote it.  Unless it's this little short email
6  down at the bottom of Page 1 that you're talking about.
7      Q.  Yes.  Yes.
8      A.  Yes, I understand and I -- I did write that.
9      Q.  Page 2 of the document, did you write this as
10  well, dated May 9, 2019, entitled "Security
11  Improvements"?
12      A.  I don't think I actually wrote that.  I think
13  that it was written by somebody else, and I attached it
14  on to my email.
15      Q.  And in your email that has no subject, you
16  write, "This is what needs to be done"; is that correct?
17      A.  That's correct.
18      Q.  And in the attachment, which is entitled
19  "Security Improvements," are these security improvements
20  that you wanted Reynolds to implement in the May 2016
21  time frame?
22      A.  Yes, ma'am.  Specifically, what -- what's
23  involved here is -- and that's that we're endeavoring,
24  as part of our research, to figure out what third-party
25  hackers, bandits, look like.  And one of the things they

Page 246

1  look like is -- and that's they come in in the middle of
2  the night.  And we're -- we're very suspicious about
3  people coming in in the middle of the night.  That's
4  just doesn't look like ordinary business use of the
5  software.  It looks like something foreign.
6            And what they're saying is -- and that's
7  that we want them to enter CAPTCHA individually, which
8  has been a -- a pretty successful way to turn back, you
9  know, interlopers.  They even have gone so far -- and
10  this is hard to believe -- they'll have the software --
11  their software, when they come across CAPTCHA, which
12  they can't fix with their software -- they can't detect.
13            You know, when you look at a CAPTCHA, a
14  series of pictures.  You know, humans can pick them out
15  pretty well, so what they'll do is -- and that they'll
16  send a quickie message to some place in India.  And some
17  place in India, somebody is staying up all night or all
18  day and, you know, they'll look at the CAPTCHA on their
19  screen and they can answer it.  And then they -- they
20  send that back to -- where all of this is occurring in
21  the U.S.  And they get in.  I mean, it's -- it's --
22  they've gone to that extreme to try and dig their way
23  in.
24      Q.  So in these security improvements that
25  you've -- want Reynolds to implement, one of those

Page 247

1  security improvements is CAPTCHA would have to be
2  entered individually for each report to be exported;
3  correct?
4      A.  That's correct.
5      Q.  And the other security improvement would be
6  that no exports could be done from 7 p.m. Saturday until
7  8 a.m. Monday; correct?
8      A.  Correct.  And it says, you know, "Bulk export
9  functionality has been removed for data security
10  reasons."  That's the error message.
11      Q.  And the additional time limit, also, was that
12  no exports could be done, of any kind, from 7 p.m. to 8
13  a.m.; correct?
14      A.  That's correct.
15      Q.  And Reynolds implemented these security
16  improvements at the end of May; correct?
17      A.  I'm not sure, you know, what got done when.
18  I'm not -- I'm not in the loop at that part.
19      Q.  Is it fair to say, when these security
20  improvements were implemented, your main concern was
21  security?
22      A.  Absolutely.
23          (Exhibit 666 was marked for
24           identification.)
25      Q.  (By Ms. Wedgworth)  I'd like to show you what's

21 (Pages 244 - 247)

FTC-0001273

HIGHLY CONFIDENTIAL

Page 248

1  been marked as Plaintiff's Exhibit 666.
2       Mr. Brockman, have you had a chance to
3  review Plaintiff's Exhibit 666?
4       A.  Yes.
5       Q.  And is this an email you received and wrote in
6  May 31, 2016?
7       A.  Yes.
8       Q.  And this email concerns security enhancements;
9  correct?
10      A.  What it concerns is -- and that's that, as I've
11  testified, you know, previously -- yesterday, that the
12  detection of the techniques that, you know, bandits use
13  to get in our system is not a perfect process.  In other
14  words, we can't look at what they're doing and say,
15  "Okay, that's a bad guy and, you know, what's happening
16  is wrong."
17          We -- in the course of continuing to
18  improve our -- our security controls, we make them a
19  little too tight, and it's because there's things
20  happening that we don't -- we had not anticipated.  For
21  instance, here it talks about the fact that, you know,
22  people come in early to run reports.  And I never
23  perceived that that would actually be happening.
24      Q.  You never understood that?
25      A.  No.  I did not understand in the -- in the

Page 249

1  dealership world, that people would come in at 5 a.m. in
2  the morning and run reports.  I just didn't perceive
3  that.  And sure enough, that was a little too tight.
4  And so what we're doing here is -- and that's where
5  we're -- we're issuing, you know, temporary rollbacks
6  for specific dealers of -- of that particular security
7  change until such time as we can, you know, make it an
8  overall change to -- to the -- to the security process.
9       Q.  And you gave temporary exemptions to all of
10  those major accounts listed in Exhibit 666 with regard
11  to your security improvements; correct?
12          MS. GULLEY:  Objection; form.
13      A.  These are -- these are the people that -- you
14  know, that call our support center and -- and register,
15  you know, what we consider to be a valid complaint.  And
16  therefore, these people, we issued a -- a temporary
17  bypass to this particular security change.
18      Q.  (By Ms. Wedgworth)  And the groups listed here
19  are major accounts; is that a fair statement?
20      A.  I've not looked at each specific one.
21      Q.  Well, you don't have any reason to believe that
22  Mr. Bates is inaccurate when he says, "Terry and Willie,
23  Below is a list of Major Accounts who have expressed
24  frustration and disappointment with the changes that
25  have occurred."  Do you see that?

Page 250

1       A.  Yeah.  Mr. Bates is a -- a -- a credible
2  person.
3       Q.  So it's fair to say this list below is of major
4  accounts at Reynolds?
5       A.  Yeah, based on Dave Bates' opinion, yeah, I
6  would agree.  His opinion would be a good opinion.
7       Q.  And so the major accounts at Reynolds were
8  given exemptions for the new security enhancements; is
9  that correct?
10          MR. RYAN:  Object to form.
11      A.  No.  Just these specific ones.
12      Q.  (By Ms. Wedgworth)  The major accounts listed
13  in Exhibit 666 --
14      A.  Yes.
15          MS. GULLEY:  Objection.
16      Q.  (By Ms. Wedgworth) -- are the ones who received
17  exemptions to the security enhancements?
18          MS. GULLEY:  Objection; form.
19      A.  Just the people on this list.
20      Q.  (By Ms. Wedgworth)  Do you recall, when the
21  security enhancement was put into place, it was done
22  over the weekend?
23          MS. GULLEY:  Objection; form.
24      A.  I'm sorry.  I -- I don't recall and I -- I
25  would not know.

Page 251

1       Q.  (By Ms. Wedgworth)  Do -- do you recall that
2  dealers were not informed of these security enhancements
3  in advance?
4          MS. GULLEY:  Objection; form.
5       A.  I would say it's our general policy not to
6  announce security enhancements in advance.
7       Q.  (By Ms. Wedgworth)  With regard to these
8  security enhancements that were put in place at the end
9  of May 2016, they were ultimately withdrawn, weren't
10  they?
11          MS. GULLEY:  Form.
12      A.  I'm not in a position to be able to say.  I --
13  I don't know.
14      Q.  (By Ms. Wedgworth)  Do you recall during this
15  time period Reynolds received a lot of complaints
16  from dealerships concerning the -- the security
17  enhancements that Reynolds released at this time?
18      A.  Ma'am, I'm not aware of -- you know, of what
19  went on in that period of time, other than if I would be
20  notified, such as this email right here.
21      Q.  You would be notified?
22      A.  I would only be notified of situations like
23  this one here.
24      Q.  Would Mr. Schaefer be notified on a -- on a
25  normal basis concerning this?

22 (Pages 248 - 251)

FTC-0001274

HIGHLY CONFIDENTIAL

Page 252

1    A. Yeah, he would be more likely to than I.
2        (Exhibit 667 was marked for
3        identification.)
4    Q. (By Ms. Wedgworth) Mr. Schaefer, I'll show you
5 what's been marked as Plaintiff's Exhibit 667.
6    A. You mean me?
7    Q. Mr. Brockman.
8    A. Okay.
9    Q. I'm trying to see if I can outdo Mr. Nemelka.
10       Mr. Brockman, have you reviewed Plaintiff's
11 Exhibit 667?
12   A. Not quite. It's five pages.
13   Q. The good news is the last two are screenshots,
14 I think.
15   A. You're right.
16   Q. Have you had a chance to review Exhibit 667?
17   A. Yes, ma'am.
18   Q. And did you receive and write this email on or
19 about May 31st, 2016?
20       MS. GULLEY: Form.
21   A. Yes, ma'am.
22   Q. (By Ms. Wedgworth) And in all your emails that
23 you wrote, do you try to be truthful and accurate?
24   A. Yes, ma'am.
25   Q. On the first page, where the subject is "Data

Page 253

1 Security impact," and the earlier emails are May 31st,
2 with your email being May 31st. And then Mr. Schaefer
3 ultimately responding on June 1st, where you -- where
4 the email from Mr. Agan, before yours, says, "Bob, I'm
5 hearing from several AVPs that whatever action we took
6 recently has got a number of customers quite upset.
7 There is an email from the IT Support Director for John
8 Eagle dealerships below. Dan." Are you familiar with
9 John Eagle dealerships?
10   A. Not very much beforehand but, certainly, this
11 one here -- this dear lady -- and I'll refer to her as a
12 "dear lady" -- "I leave my house before 5am to get to
13 the store before 6am." And -- and she's coming in to be
14 there at 6 a.m., and the list of reports that she's
15 running manually is remarkable. She's clearly a very
16 dedicated person.
17   Q. Referring to your email, on the front page,
18 about her remarkable abilities, you write, "Bob, This
19 is one -- "This one is worthy of an exception even
20 considering the CarFax 3rd party usage." Do you see
21 that?
22   A. Yes.
23   Q. Do you know what the CarFax third-party usage
24 reference is?
25       MS. GULLEY: Objection; form.

Page 254

1    A. I don't know specifically what's going on
2 there, but my decision was based on what takes up most
3 of the second page. It's -- this one was clearly worthy
4 of an exception, period.
5    Q. (By Ms. Wedgworth) So you granted this
6 exception; is that correct?
7        MS. GULLEY: Form.
8    A. Yes, ma'am. And I -- the -- I don't know --
9 this happened back in 2016, two -- two and a half years
10 ago. I don't know exactly what the state of affairs is
11 regarding data security in this particular area, but I
12 do know that, you know, this has quieted down and is no
13 longer an issue. And Ms. Lisa Wood continues to be our
14 friend and good customer.
15   Q. (By Ms. Wedgworth) Well, on the "quieted down
16 and no longer an issue," let me show you what we're
17 marking as Plaintiff's Exhibit 668.
18       (Exhibit 668 was marked for
19       identification.)
20   Q. (By Ms. Wedgworth) Have you reviewed
21 Plaintiff's Exhibit 668?
22   A. Not quite through, but so far I'm really
23 enjoying it. I'm serious. Yes, ma'am.
24   Q. Did you receive and write this email on or
25 about June 2nd, 2016?

Page 255

1    A. Yes, I did.
2    Q. And you write to Mr. Schaefer, "Please see
3 changes that I have made." And this attachment is
4 "DRAFT - CAPTCHA Suspension Talk Track."
5        If we go to the second page of the
6 document, "Sales Breaking News," it says, "We have
7 suspended the CAPTCHA and time restriction updates
8 released earlier this week. Read below for the
9 authorized talk track to discuss with customers."
10       Does this refresh your recollection that in
11 early June 2016, Reynolds suspended the security
12 enhancements they had put in place late May?
13       MS. GULLEY: Objection; form.
14   A. Yes. That -- that is correct. And certainly,
15 you know, the whole rest of what I wrote here is -- is
16 worth going through.
17   Q. (By Ms. Wedgworth) I just want to focus on the
18 last bullet point to get to the end of the story.
19 "Effective immediately the two enhancements regarding
20 restricted hours and CAPTCHA have been suspended." Were
21 both suspended on or around June 1, 2016?
22       MS. GULLEY: Object to the form and the
23 instruction.
24   A. I'm not aware of the exact date that that was
25 done, but I would presume sometime in that time frame.

23 (Pages 252 - 255)

FTC-0001275

HIGHLY CONFIDENTIAL

Page 256

1    Q.  (By Ms. Wedgworth)  And in that bullet
2  referencing two enhancements, that references the
3  security enhancements; correct?
4    A.  I think it represents two of the security --
5  security enhancements and, probably, it's not likely all
6  of them because, you know, we do them in batches.  We
7  don't do them individually.  So there -- there's more
8  than likely others which, you know, stayed in place.
9    Q.  This does not reference any, does it?
10       MS. GULLEY:  Form.
11    A.  No, it does not.
12    Q.  (By Ms. Wedgworth)  So this "Sales Breaking
13  News" talking points references two data security
14  enhancements that were being suspended; correct?
15       MS. GULLEY:  Objection; form.
16    A.  Yeah, but it primarily references the reasons
17  why that we do what we do and the reasons why we operate
18  the way we do.
19       (Exhibit 669 was marked for
20        identification.)
21    Q.  (By Ms. Wedgworth)  I'd like to show you what
22  we've marked as Plaintiff's Exhibit 669.  Mr. Brockman,
23  have you had a chance to review Plaintiff's Exhibit 669?
24    A.  I'm just about there.  Yes.
25    Q.  Did you receive and write this email on or

Page 257

1  about August 12th, 2016 that is Plaintiff's Exhibit 669?
2    A.  Yes, ma'am.
3    Q.  I take it you are familiar with AutoAlert as a
4  third-party vendor?
5    A.  In name only.  I've never been to their place.
6  Never talked to them.
7    Q.  Does the Reynolds contract with vendors prevent
8  the vendor from disclosing data integration fees to the
9  dealerships?
10       MS. GULLEY:  Objection; form.
11    A.  That -- that contract specifies that they --
12  they cannot specifically, you know, cite what our
13  monthly fee is to them, which is what appears to have
14  occurred in this particular case.
15    Q.  (By Ms. Wedgworth)  And you have --
16  Mr. Strawsburg writes to you about this particular case
17  of AutoAlert?
18    A.  Yes.
19       MS. GULLEY:  Objection; form.
20    A.  And I'd like to point out as well, this is not
21  an ordinary RCI, you know, application.  It was a very
22  special one where it actually, you know, requires us to,
23  you know, insert into our mainline software the
24  functionality that they're asking here.
25       Because they -- they cite "Repair orders

Page 258

1  will now be in real-time, which will enable the system
2  to identify upgrade opportunities in the timeliest
3  fashion," which makes the AutoAlert product a whale of a
4  lot better.  And so we're doing a lot more than just
5  providing data to them.  We're actually inserting
6  functionality into our operating software that makes
7  their product better.
8    Q.  (By Ms. Wedgworth)  In the top email, you
9  write, "They are clearly over the line.  Exercise our
10  termination for convenience."  Is this you request --
11  ordering that AutoAlert's contract be terminated?
12    A.  That's correct.
13    Q.  And are you ordering that their contract be
14  terminated due to the fact that they're informing
15  dealerships of their monthly data integration fee that
16  they are passing along to the dealers?
17       MS. GULLEY:  Objection; form.
18    A.  That's correct.  That is clearly prohibited in
19  our contract.  Now, they are perfectly within their
20  rights to disclose the cost of their -- of their
21  product, you know, the price that they charge the
22  dealer.  You know, they are not permitted, underneath
23  our contract, to -- you know, publish the price that we
24  charge them.
25    Q.  (By Ms. Wedgworth)  You would agree with me

Page 259

1  that the vendor market is compet- -- is a competitive
2  market; correct?
3    A.  When it comes to car sales, yes, that's
4  necessarily true.
5    Q.  I'd like to show you what's been marked as
6  Plaintiff's Exhibit 670.
7       (Exhibit 670 Brockman was marked for
8        identification.)
9    Q.  (By Ms. Wedgworth)  Mr. Brockman, have you
10  reviewed Exhibit 670 Brockman?
11    A.  Yes, ma'am.
12    Q.  And did you receive and write this email around
13  August 12th, 2016?
14    A.  Yes, ma'am.
15    Q.  And -- and if you will note the previous
16  Exhibit, 669, was on the same day as well.
17    A.  That -- that's correct.  And since there's
18  reference to that -- that's important -- is the reason I
19  just pulled it back out of the pile, so I can open it up
20  and look at it again.
21    Q.  So at this time, meaning August 12th, 2016, did
22  AutoAlert have a "real-time service drive lead feature"?
23    A.  No, they did not.  They were not even
24  certified.  They were not even part of RCI at that
25  point.

24 (Pages 256 - 259)

FTC-0001276

HIGHLY CONFIDENTIAL

Page 260

1    Q.  Your email at the top says, "Take away the
2    RO's" -- RO's means repair orders?
3    A.  Yes.  That's what it means, but what -- what's
4    important is -- is the paragraph just below that, in
5    bold, where it says, "They're not even certified???"
6    Good God.  And now yet in -- in their June 27th, you
7    know, notification, you know, they're -- they're
8    bragging about the fact they're now associated with --
9    we've "completed the process to become RCI certified
10   with your DMS provider, Reynolds & Reynolds.  As you
11   know, the RCI certification program was designed to
12   ensure the highest level of data security for you and
13   your customers, and our certification has a request
14   by many of our dealers."
15        But they haven't got it.
16   Q.  Well, they do have -- real time has been opened
17   for them, right?
18        MS. GULLEY:  Objection; form.
19   A.  No.
20   Q.  (By Ms. Wedgworth)  Well, you -- you say, "Take
21   away the RO's opened real time," so something must be in
22   place for AutoAlert; correct?
23        MS. GULLEY:  Objection; form.
24   A.  What's happening is -- certainly appears, you
25   know, from -- from the documents in front of me --

Page 261

1    that they are using it from a sales standpoint the fact
2    that they are certified -- RCI certified.  And they're
3    not RCI certified.  They haven't achieved certification
4    yet.
5        And so therefore, I'm saying that, going
6    forward, for a third-party to do this means that -- that
7    they're not really quite straightforward-kind-of folks.
8    And therefore, what we're going to do is -- and that's
9    we're not going to give them their real-time repair
10   order opening, because that is a special thing that's
11   over and above what a normal RCI -- normal RCI would be
12   just for data movement.
13        The real-time opening of repair orders
14   means that they're now into our mainline software, and
15   they're writing on our software to -- to feed to them
16   the repair order has just been opened, real time.  And
17   what's happening is -- and that's that I'm -- I'm
18   directing Bob Schaefer:  When somebody is -- is
19   basically being dishonest with us, there's no way we're
20   going to let them into our main software.
21   Q.  (By Ms. Wedgworth)  When you write, "Take away
22   the ROs opened real time from them," you've already
23   given them something; is that correct?
24        MS. GULLEY:  Objection; form.
25   A.  The contract which has obviously not been done

Page 262

1    yet -- it it's not finished, they're not RCI certified.
2    We have decided rather than to go forward as we had
3    planned, based upon their actions, we're not.
4    Q.  (By Ms. Wedgworth)  Did AutoAlert become RCI
5    certified?
6    A.  I'm not aware of whether they have or not.
7    I -- I would presume they did, but I don't know.
8    Q.  Mr. Brockman, have any data breaches of dealer
9    DMS occurred in the past three years?
10        MS. GULLEY:  Objection; form.
11   A.  I believe so.  There's -- there's one that I
12   recall involving DealerBuilt that was pretty
13   substantial.
14   Q.  (By Ms. Wedgworth)  Is that the only one you
15   recall?
16        MS. GULLEY:  Objection; form.
17   A.  Of size, you know, that's the only one that,
18   you know, that was a very, very good-sized one.  It was
19   huge.
20        (Exhibit 671 Brockman was marked for
21         identification.)
22   Q.  (By Ms. Wedgworth)  Mr. Brockman, I'll show you
23   what's been marked as Plaintiff's Exhibit 671.
24   Mr. Brockman, have you had time to review Plaintiff's
25   Exhibit 671?

Page 263

1    A.  Not quite yet, ma'am, but very close.  Yes,
2    ma'am.
3    Q.  Did you receive this email on or about June
4    20th, 2017?
5    A.  Yes.
6    Q.  Do you recall if you approved this deal?
7    A.  I don't have any direct recollection of that.
8    As I read it, it's probably likely that I did, because
9    the ShowroomMagnet actually is -- is a -- is part of the
10   company that we acquired.  It's a product.  And so
11   therefore, doing something for that particular product
12   area would be something that I would likely approve.
13   Q.  Naked Lime -- ShowroomMagnet is part of the
14   Naked Lime entity?
15        MS. GULLEY:  Objection; form.
16   A.  Yes.  What ShowroomMagnet is, as I recall,
17   it -- it is a marketing system which is employed to
18   motivate people that come in and get a test drive.  And
19   to basically show up in the showroom and talk to a
20   salesperson and take a test drive for which they get
21   a -- a small, you know, cash payment.  And it's -- it
22   has been found to be fairly decently and effective way
23   to get people to come into the dealership and take a
24   test drive.
25   Q.  (By Ms. Wedgworth)  And the situation described

25 (Pages 260 - 263)

FTC-0001277

HIGHLY CONFIDENTIAL

Page 264

1 at the top, "ShowroomMagnet has been utilizing a data
2 broker for the extraction of DMS transactional data for
3 clients.  The purpose of this data is for market area
4 evaluations."
5        Did Reynolds, with regard to
6 ShowroomMagnet, agree to eliminate the use of a data
7 broker to access CDK DMS?
8        MS. GULLEY:  Objection; form.
9    A.  I -- I don't recall, you know, that specific
10 action.  But I know it was our intention to, where
11 possible, use -- get -- get data feeds directly from
12 CDK.  And my reason for doing that is -- and that's
13 that, as I think is -- is readily apparent, there's some
14 substantial potential liabilities involved.  Anytime
15 that you start, you know, moving data around, that
16 potentially has personal- -- personally identifiable
17 information.  I want to be doing business with people
18 that, if there is some kind of lawsuit, they can -- if
19 they're found liable, you know, that they can pay the
20 judgment.
21    Q.  Do you know that the data broker mentioned here
22 was Authenticom?
23        MS. GULLEY:  Objection; form.
24    A.  I'm not aware of that.  This is a general
25 policy decision.

Page 265

1    Q.  (By Ms. Wedgworth)  Where does it say that?
2        MS. GULLEY:  Objection; form.
3    A.  That's my belief.
4        MS. GULLEY:  Peggy, if you're between
5 documents, lunch has been here about 30 minutes.
6        MS. WEDGWORTH:  It's here?
7        MS. GULLEY:  Yeah, it is.
8        MS. WEDGWORTH:  Yeah, let's break for
9 lunch.  Thank you.
10        THE VIDEOGRAPHER:  This is the end of Media
11 2.  The time is 12:17 p.m.  We're off the record.
12        (Lunch recess 12:17 to 1:36 p.m.)
13        THE VIDEOGRAPHER:  We're back from lunch.
14 This is the beginning of Media 3.  The time is 1:36 p.m.
15 We're back on the record.
16        EXAMINATION (Continuing)
17 BY MS. WEDGWORTH:
18    Q.  Good afternoon, Mr. Brockman.  Does Reynolds'
19 service product have real-time repair order
20 functionality?
21        MS. GULLEY:  Objection; form.
22    A.  Does Reynolds' service product have
23 real-time --
24    Q.  (By Ms. Wedgworth)  Repair order functionality?
25    A.  Yes.  And that's an integral part of it.

Page 266

1        MS. GULLEY:  Objection.
2    Q.  (By Ms. Wedgworth)  I'm sorry?
3    A.  That's an integral part of it.
4    Q.  Does Reynolds currently allow third part- --
5 any third party to have real-time repair order
6 functionality?
7        MS. GULLEY:  Objection; form.
8    A.  When you talk about functionality, I know we
9 have some interfaces that allow look-only repair work.
10 But there is -- you know, there's no, outside of our
11 application software, actually creating repair orders or
12 updating repair orders.
13    Q.  (By Ms. Wedgworth)  So is that a "no" to the
14 question?
15        MS. GULLEY:  Objection; form.
16    A.  No.  I think my answer is my answer.  And I
17 understand that's a little bit long but, I mean, I can't
18 say it yes or no.
19    Q.  (By Ms. Wedgworth)  So does -- does any third
20 party have the same ability with regard to real-time
21 repair order in the Reynolds system as Reynolds does?
22        MS. GULLEY:  Objection; form.
23    A.  That's a much better restatement.
24    Q.  (By Ms. Wedgworth)  Thank you.
25    A.  And -- yeah.  And the answer is, no.  There's

Page 267

1 no outside third party that has identical access or has
2 identical functionality.  We do -- because remember, you
3 know, repair order -- you know, functionality, that's an
4 integral part.  That's what the service system does, is
5 it creates repair orders.  And, you know, uses them to,
6 you know, process the information and help run the shop.
7 It's not an interface at all.  That's -- that's it.
8    Q.  Has any third party other than AutoAlert had
9 real-time repair order functionality?
10        MS. GULLEY:  Objection; form.
11    A.  Again, you know, repair order functionality, as
12 you're using it, is a very broad statement, okay?  There
13 is certainly some functionality that, you know, other
14 third parties have in terms of, you know, looked-at kind
15 of access.  But to actually start a repair order -- you
16 know, make a repair order -- what you call "repair order
17 functionality," that's the integral part of -- of the
18 service system.  And no other third party has that.
19    Q.  (By Ms. Wedgworth)  The functionality you're
20 speaking about is to create and edit a repair order?
21        MS. GULLEY:  Objection; form.
22    A.  There is the -- the way that I describe it
23 is -- and that's there's -- there's repair order
24 functionality, using a broad word like -- like you --
25 like you stated.  Only, you know, Reynolds software has

26 (Pages 264 - 267)

HIGHLY CONFIDENTIAL

Page 268

1 that, because that is the integral part, you know.
2 That's the center functions of Reynolds service
3 software, okay?  Any other access to repair order
4 functions is -- is much more limited.  It's limited to
5 look only, that type of access.  That's the kind of
6 access the third party had -- have.  None of them have,
7 you know, the first type of access, which is the guts of
8 Reynolds service system.
9    Q.  (By Ms. Wedgworth)  With regard to pricing in
10 June of 2016, did Reynolds implement a transaction fee
11 with regard to RCI to their vendors?
12       MS. GULLEY:  Objection; form.
13    A.  The time frame was when?
14    Q.  (By Ms. Wedgworth)  Mid-2016.
15       MS. GULLEY:  Form.
16    A.  Is that around the date of -- of the Xtime
17 issue?
18    Q.  (By Ms. Wedgworth)  You'd know that better than
19 me, so I don't know the answer to the question.  But I
20 will show you a document that will be Plaintiff's
21 Exhibit 672.
22       (Exhibit 672 Brockman was marked for
23       identification.)
24    Q.  (By Ms. Wedgworth)  I'll show you what's been
25 marked as Plaintiff's Exhibit 672.

Page 269

1       Mr. Brockman, have you reviewed Plaintiff's
2 Exhibit 672?
3    A.  Yes.  And which is very helpful, as a matter of
4 fact, because it does, you know, allow correct focus
5 on -- on the timelines in that, you know -- this
6 particular document is partially in reference to exactly
7 what I thought, which is around the Xtime incident --
8 subsequent to the Xtime incident.
9    Q.  So is it fair to say that in mid-2016, Reynolds
10 raised RCI pricing?
11       MS. GULLEY:  Objection; form.
12    A.  No.  That's not correct.
13    Q.  (By Ms. Wedgworth)  Is it fair to say that they
14 implemented a transaction fee?
15       MS. GULLEY:  Objection; form.
16    A.  No.  That's not correct.  You know, what
17 happened was -- and that's that -- and this affects only
18 a very small number of RCI, you know, customers.  Again,
19 it also -- it only affects those that actually try to
20 have update capability that could cause the kind of
21 problem that occurred with Xtime.
22    Q.  (By Ms. Wedgworth)  So with regard to those
23 vendors who were subject to the transaction fee, is that
24 something sometimes called a "ping fee"?
25       MS. GULLEY:  Objection; form.

Page 270

1    A.  No.  It -- it is called -- and I don't even
2 know that we call it a "transaction fee."  It is -- it
3 is a fee for each time a record is -- is added, changed
4 or deleted.  And it's only where they have write-back
5 access.  You know, in order to talk about this, it's
6 important to talk about what happened to Xtime and --
7    Q.  (By Ms. Wedgworth)  Actually, I didn't ask that
8 question.  I'm just simply asking if there was a
9 transaction fee implemented in mid-2016.
10    A.  The answer to that is -- and that's no.  That's
11 not the case.
12    Q.  A transaction fee was not implemented to
13 vendors with write-back interface?
14       MS. GULLEY:  Objection; form.
15    A.  It's a transaction fee only if they did an add,
16 change or delete.
17    Q.  (By Ms. Wedgworth)  And was that fee five cents
18 per transaction?
19    A.  That's correct.
20    Q.  And a year later, was that
21 five-cent-per-transaction fee increased?
22    A.  Yes, it was increased as part of our -- our
23 normal, you know, annual price increase.
24    Q.  Are you the ultimate decision maker on that
25 price increase?

Page 271

1       MR. RYAN:  Object to the form.
2    A.  Yes and no.  The answer is general -- in
3 general terms, yes.  I do not actually, you know -- I'm
4 not involved in the actual price increase of each
5 individual, you know, item number that we sell.  My
6 involvement has only to do with, you know, what the
7 general percentage is going to be, which is CPI plus 2.
8 And, you know, this year it's -- CPI plus 2 is 4.1
9 percent.
10    Q.  (By Ms. Wedgworth)  Did you receive and write
11 this email, 672, on or about July 4, 2016?
12    A.  Yes, I did.
13       (Exhibit 673 Brockman was marked for
14       identification.)
15    Q.  (By Ms. Wedgworth)  Mr. Brockman, I'll show you
16 what's been marked as Plaintiff's Exhibit 673.
17    A.  Yes.
18    Q.  Did you receive and write this email in 673 on
19 or about May 9, 2017?
20    A.  Yes, that's correct.
21    Q.  And does this document reflect your approval of
22 a price increase with regard to the transaction fee?
23       MS. GULLEY:  Objection; form.
24    A.  I don't see that it -- okay.  It does address
25 the per transaction price increase.

27 (Pages 268 - 271)

HIGHLY CONFIDENTIAL

Page 272

1    Q.  (By Ms. Wedgworth)  And you approved that price
2  increase?
3    A.  Yes, I did.
4    Q.  Do you know how the price increase of a quarter
5  of a cent was determined?
6        MS. GULLEY:  Objection; form.
7    A.  It looks to me like -- it says here, it
8  was a -- a 5 percent -- which was CPI plus 2 -- for that
9  year.
10    Q.  (By Ms. Wedgworth)  Does Reynolds track RCI
11  cost in any way?
12        MS. GULLEY:  Objection; form.
13    A.  We do not.
14    Q.  (By Ms. Wedgworth)  I'm sorry?
15    A.  We do not.
16    Q.  With regard to RCI cost, do those -- do the
17  costs include the developing of interfaces?
18    A.  Yes, that would be one of the costs.
19    Q.  Is another cost server maintenance?
20    A.  Server maintenance, server heat, light, power,
21  server amortization, server repair, replacement, you
22  know, the -- the manpower it takes to supervise all
23  that.  I'm sure that there's more factors than that, but
24  those are the ones that come right off the top of my
25  head.

Page 273

1    Q.  Is one of the costs of RCI the DSV personnel
2  compensation?
3    A.  Yes.
4    Q.  Is Bob Schaefer's salary part of RCI costs?
5    A.  I would imagine so.  But, again, I repeat which
6  I talked about several times, we do not have cost
7  accounting.
8    Q.  I understand.
9    A.  But -- but from a theoretical standpoint, yes,
10  you know, his compensation would -- would be something
11  that would -- it would be -- would be included, you
12  know, if we had cost accounting, which we don't.
13    Q.  Are there any other RCI costs you're aware of,
14  other than the developing of interfaces, the service --
15  server maintenance costs, the DSV personnel comp, such
16  as Mr. Schaefer's salary?  Anything else for RCI costs?
17        MS. GULLEY:  Form.
18    A.  I think it's a considerable more number of
19  things.  Because, you know, for instance, Internet
20  bandwidth is -- would be an important, you know,
21  component, because all these transactions flow through
22  what we refer to as "the hub."  And it -- in itself is a
23  completely separate system.  It's designed for -- for
24  moving packets of data between servers.
25        We have the issue of -- of fire

Page 274

1  insurance -- there's probably -- if I had an opportunity
2  to sit down and think about it for a while, I -- I could
3  build a much longer list.  But it's -- it's much more in
4  terms of numbers of the things to be considered than
5  what you have there.
6    Q.  (By Ms. Wedgworth)  And no one at Reynolds has
7  done this list of costs with regard to RCI?
8        MS. GULLEY:  Objection; form.
9    A.  That's correct.  We do not have cost
10  accounting.
11    Q.  (By Ms. Wedgworth)  Do dealers, as part of
12  their Reynolds contracts, pay Reynolds for storage of
13  their data?
14    A.  Only in -- in certain situations.  We have a --
15  a product offering, which is called -- the acronym for
16  it is RBDR.  And what it does is -- and that's that it
17  provides for backup of -- of dealership's data on a
18  remote automatic basis.  This -- if -- if the customer
19  has their own server, they have to have an employee
20  which is charged with running the backups every night
21  and filing the tape away in a fireproof vault.
22        The RBDR product, you know, takes the
23  responsibility of remotely accessing the dealership's
24  server and backing up its data files into our Dayton,
25  Ohio research park office.  And that -- that service

Page 275

1  also provides for -- in the event of disaster recovery,
2  will air freight them a -- a new server and load it with
3  their most recent backup data so they can get back in
4  business.
5    Q.  So if the dealership has their own server for
6  storage of their data, is there any cost to the
7  dealership from Reyn-- that they must pay to Reynolds?
8        MS. GULLEY:  Objection; form.
9    A.  I'm not -- not quite understanding.  Could
10  you --
11    Q.  (By Ms. Wedgworth)  So -- so if the dealership
12  stores their own data and doesn't use RBDR, is there a
13  cost to the dealership that Reynolds charges?
14        MS. GULLEY:  Object to form.
15    A.  There -- there's a maintenance charge for --
16  for that server.  And what that covers is -- that covers
17  onsite maintenance repair and replacement.
18    Q.  (By Ms. Wedgworth)  So that's a monthly charge?
19        MS. GULLEY:  Form.
20    A.  Yes.
21    Q.  (By Ms. Wedgworth)  To the dealership?
22    A.  Yes, that's correct.
23    Q.  And that monthly charge to the dealership is
24  for dealer storage of their own data on their own
25  server; is that correct?

28 (Pages 272 - 275)

FTC-0001280

HIGHLY CONFIDENTIAL

Page 276

1           MS. GULLEY:  Objection; form.
2       A.  No.  It's not a charge for dealership -- it's
3   charged for hardware maintenance for -- for that server.
4       Q.  (By Ms. Wedgworth)  If a dealership doesn't use
5   the RBDR program you described, is there any cost to the
6   dealership to -- to store the data?
7           MS. GULLEY:  Objection; form.
8       A.  Again, the -- the charge for the server is for
9   hardware maintenance.  There are software monthly fees,
10  which are under contract.  Each element of software
11  generally has some requirement to store data, but
12  there's no, you know, fee that is identified as -- as
13  data storage.
14          (Exhibit 674 Brockman was marked for
15          identification.)
16      Q.  (By Ms. Wedgworth)  Mr. Brockman, I'll show you
17  what's been marked as Plaintiff's Exhibit 674.  It's
18  Bates number:  REYMDL00503332 through 35.
19          Mr. Brockman have you had a chance to
20  review Plaintiff's Exhibit 674?
21      A.  Yes, ma'am.  My comment to this one is really
22  getting down to the weeds.  It's going to take a while
23  to talk about this one.
24      Q.  I'm going to try to stay high-level on this
25  one.

Page 277

1       A.  I don't know that's going to be possible.
2       Q.  Well, we'll give it a whirl.
3           So did you write and receive this email on
4   or about July 19th, 2017?
5           MS. GULLEY:  Objection; form.
6       Q.  (By Ms. Wedgworth)  Let me try it again.
7           Did you write and receive this email on
8   about the time period of July 16 through July 19, 2017?
9           MS. GULLEY:  Form.
10      A.  Well, there's -- I've got to go back.  There --
11  there's lots of emails on this string.  And if you give
12  me a moment, I'll try and count the ones that -- that --
13  I actually sent.
14      Q.  (By Ms. Wedgworth)  I think the one you sent
15  was on the first page.
16          MS. GULLEY:  Form.
17      Q.  (By Ms. Wedgworth)  And my question -- we'll
18  just limit it to that -- the email on the first page,
19  July 18, 2017.  Did you write this?
20      A.  Is this July 18th?
21      Q.  Yes.
22      A.  Yes.  That -- That's correct.  What's saying
23  here is -- and that's that we're concerned about -- you
24  know, caps.  Daily caps, monthly caps.  What -- what
25  this relates to is -- and that's that we have a -- a

Page 278

1   product called "Consumer Reach."  That's what you see
2   abbreviated as CR.
3       Q.  Mr. Brockman, there's no question pending right
4   now.
5       A.  Well, I -- I guess if you're interested in
6   knowing what's going on --
7       Q.  I --  I'm definitely interested in some things,
8   but -- but the way it works is I ask the question and
9   you answer.  It's just the way the process works.
10          So my question is:  Is this part of
11  Reynolds' suite of products to allow email blasts on the
12  part of dealers to customers?
13          MS. GULLEY:  Objection; form.  And to the
14  prior thing.
15      A.  It relates to a -- a Reynolds product, which is
16  being misused by the customer, which is resulting in
17  great dislocation, both to Reynolds and to the customer.
18  Their email traffic is blacklisted, which means it falls
19  in a black hole.  They don't know if it's transmitted or
20  not.  It's a very serious issue.
21      Q.  (By Ms. Wedgworth)  Has Reynolds ever attempted
22  to limit or reduce the number of recipients of a
23  dealer's email blast?
24          MS. GULLEY:  Objection; form.
25      A.  Yeah, prior to this, we had not.  Okay?  But

Page 279

1   what's happened is -- and that's they're buying outside
2   direct mail lists that have bad email addresses in them.
3   And then they send out an email blast.  And the email,
4   you know, provider gets upset about that, and they
5   blacklist the address.  They blacklist the -- you know,
6   the -- the dealership's address.  And in this case, what
7   they're doing is they're getting ours blacklisted, which
8   means that we have a whole bunch of customers that get
9   disabled, you know, because one dealer has done
10  something stupid.
11      Q.  (By Ms. Wedgworth)  And is it fair to say
12  somebody at Reynolds says the problem can be solved by
13  contacting a Reynolds product called Naked Lime?
14          MS. GULLEY:  Objection; form.
15      A.  If you will point that out to me.
16      Q.  (By Ms. Wedgworth)  The first paragraph at the
17  bottom, Mr. Barras writes to you.
18          MS. GULLEY:  Objection; form.
19      A.  That's correct.  That's what it says.  The
20  Naked Lime product has a more sophisticated way of
21  handling emails than the consumer reach product.  The
22  consumer reach product is a very old product.  And
23  the -- the Naked Lime product, it has license built into
24  it that since -- when email service provider is throwing
25  away emails and -- to stop the whole process before

29 (Pages 276 - 279)

FTC-0001281

HIGHLY CONFIDENTIAL

Page 280

1 blacklisting occurs.

2     Q. (By Ms. Wedgworth) So you respond to

3 Mr. Barras by saying, "I think there should be daily

4 caps as well as monthly caps"; is that correct?

5       MS. GULLEY: Objection; form.

6     A. Yes. And that -- that's a -- again, this is --

7 in an effort to stop sending junk to the email service

8 provider, to avoid getting blacklisted.

9     Q. (By Ms. Wedgworth) So Reynolds did limit the

10 number of recipients of a dealer's email blast; correct?

11       MS. GULLEY: Objection; form.

12     A. I'm not sure, you know, what the final

13 disposition was of this problem. I know that -- I do

14 know that now it's no longer the issue it was when this

15 happened. When this happened it was a disaster.

16     Q. (By Ms. Wedgworth) Was the quota done to both

17 legacy and new customers?

18       MS. GULLEY: Objection; form.

19     A. I -- I don't know exactly, you know, what

20 the -- what the final resolution was. You know, these

21 emails relate to a moment in time when the product was,

22 you know -- or when the problem was at its worse.

23     Q. (By Ms. Wedgworth) Well, there was no

24 recommendation to put a quota on Naked Lime; correct?

25       MS. GULLEY: Objection; form.

Page 281

1     A. It's my understanding that Naked Lime did not

2 suffer from the problem.

3     Q. (By Ms. Wedgworth) So there was no quota put

4 on Naked Lime?

5       MS. GULLEY: Objection; form.

6     A. Again, I don't know, you know, what was done,

7 you know, subsequent to this email. I'm -- it is a --

8 it is -- it's one of, you know, of the issues that goes

9 on in the company with 5,000 employees and tens of

10 thousands of customers. And I -- I see moments in time,

11 but I -- I don't know everything that's going on.

12     Q. (By Ms. Wedgworth) Mr. Brockman, I'll show you

13 what has been previously marked as Plaintiff's Exhibit

14 226. I'm going to focus you on the last page to ask you

15 if it's your handwriting.

16     A. You said the last -- the last, last page?

17     Q. Yes.

18       MS. GULLEY: Objection; form.

19     Q. (By Ms. Wedgworth) Is this your handwriting,

20 Mr. Brockman?

21     A. Yes, it is.

22     Q. And at the top of the page, it says, "AutoAlert

23 Irvine California." And then the handwriting you have

24 in the middle of the page, "per dealer installation

25 fee," the typewritten is "150." It -- it's scratched

Page 282

1 out to "300." Is that you scratching out "150" and

2 inserting "300"?

3       MS. GULLEY: Objection; form.

4     A. Yes, ma'am.

5     Q. (By Ms. Wedgworth) Is that true for all the

6 other numbers that are handwritten?

7     A. Yes, ma'am.

8       MS. GULLEY: Form.

9     Q. (By Ms. Wedgworth) And then handwritten, "For

10 installation of monthly support fees for Canadian

11 dealers," it's -- "20%" is crossed out. "30%" -- is

12 that your handwriting?

13     A. Yes, it is.

14     Q. And then "Per dealer install fee is per the

15 table," your handwriting again?

16     A. Yes, that's correct.

17     Q. How did you determine to raise the per dealer

18 installation fee for package going from $150 to $300?

19       MS. GULLEY: Objection; form.

20     A. This particular customer has a number of -- of

21 real-time interfaces, which means they're very heavily

22 dependent upon, you know, our software functionality to,

23 you know, get done what they want to have done. Every

24 time that we do one of these, we run into the issue of

25 increasing the complexity in our application software.

Page 283

1 And part of -- part of my decision-making responsibility

2 is -- and that's that there is all kinds of requests

3 for, you know, this and that to be done to our

4 application software.

5       Now, if I say yes to them all, in the last

6 act, everybody goes crazy, because it's become too big

7 and too complex. It's my job to actually think about

8 all the time, you know, what is it that we're doing

9 that's going to increase complexity in our application

10 software? In this particular case, I believe that

11 the -- the complexity load that this particular customer

12 was going to put on us, you know, really required a

13 little bit higher price.

14       And -- you know, that's just, you know, the

15 sum and substance of it. You know, we cannot do, you

16 know, everything that everybody likes -- would like to

17 have without cost, which means we've got to increase the

18 prices a little bit.

19     Q. (By Ms. Wedgworth) Was one of the real-time

20 interfaces for AutoAlert the repair order?

21       MS. GULLEY: Objection; form.

22     A. It is the -- it is the publish repair order,

23 which is taking the -- it's notifying the third

24 party that there's been activity on a repair order.

25 It's either been opened or closed. And they want to --

30 (Pages 280 - 283)

FTC-0001282

HIGHLY CONFIDENTIAL

1  they want to know that, really, right at the instant
2  that it occurs, it's real time.
3      Q.  (By Ms. Wedgworth)  Did you consult any
4  particular documents, or specific information, when you
5  made these changes?
6      A.  No.
7      Q.  Did you speak to anyone, specifically, about
8  making these changes?
9      A.  Not that I recall.
10     Q.  Mr. Brockman, I'll show you what's been marked
11  as Plaintiff's Exhibit 675.
12         (Exhibit 675 Brockman was marked for
13          identification.)
14     Q.  (By Ms. Wedgworth)  Which is the July 2018
15  financial page -- package.  And I'm going to ask you to
16  turn to Page 16 of the document which is, again, going
17  down under the RCI numbers for July through 2000 --
18  2018, there's a "14%" on "Recurring Revenue" for RCI?
19         MS. GULLEY:  Objection.
20     Q.  (By Ms. Wedgworth)  From the previous year?
21         MS. GULLEY:  Objection; form.
22     A.  Thank you very much.
23     Q.  (By Ms. Wedgworth)  It's about six lines down
24  from the top.  RCI "Recurring" -- "Recurring Revenue" --
25  further up.

1          MS. GULLEY:  Is there a question?
2      Q.  (By Ms. Wedgworth)  Do you see the "14%"?
3          MS. GULLEY:  Objection; form.
4      A.  I'm not seeing a -- a percentage on the line
5  that I'm looking at anywhere.
6      Q.  (By Ms. Wedgworth)  If you start at the top of
7  the page and go six lines down.
8      A.  Oh, the top of the page?
9      Q.  Yes.
10     A.  I'm sorry, I was distracted by the highlighting
11  that you have.  It's further down towards the bottom of
12  the page.
13     Q.  So there's "One Time Revenue," and beneath it
14  is "Recurring Revenue."  Keep going down to RCI, under
15  "Recurring Revenue."  Not "One Time," but "Recurring."
16     A.  Okay.  I -- I found --
17     Q.  Do you see the "14%"?
18         MS. GULLEY:  Objection; form.
19     A.  Yes.
20     Q.  (By Ms. Wedgworth)  And does that -- is this a
21  number that you would look at on a monthly basis?
22     A.  Not really.  As I've stated before, I spend, on
23  this particular package that comes out once a month,
24  half-hour or less.  Because this is not where the action
25  is as far as I'm concerned.  I'm much more interested in

1  new projects, new software, new hires, new customer
2  relationships.  Those are much more important to me than
3  these detailed numbers.
4      Q.  At the bottom of this page where there are
5  three asterisks, at the very bottom, beneath the
6  highlighted numbers that you looked at earlier, there's
7  a note with three asterisks.  "Legal Fees for Data
8  Services are $1,034k in July, $10,690k YTD or $18.3M
9  annualized.  Case to date (Aug 2017-current) costs total
10  $16.3M."  Do you see that?
11         MS. GULLEY:  Objection; form.
12     A.  Yes, I do.
13     Q.  (By Ms. Wedgworth)  Have you looked at that
14  before?
15     A.  I think I've actually -- probably as a thumbed
16  through, I probably noticed that one.
17     Q.  Are those -- are those costs with regard to
18  current litigation we're in now?
19         MS. GULLEY:  Objection; form.
20     A.  I believe that to be the case.  Though it
21  doesn't specifically say that, but that -- I would think
22  that would probably be true.
23     Q.  (By Ms. Wedgworth)  Is this a -- a figure
24  you've requested to be put in the data?
25         MS. GULLEY:  Objection; form.

1      A.  No, it is not.
2          MS. WEDGWORTH:  If we just a very short
3  break, I want to confer with co-counsel for just a
4  minute.  Off the record.
5          MS. GULLEY:  Off the record.
6          THE VIDEOGRAPHER:  Off the record at 2:15
7  p.m.
8          (Short recess 2:15 to 2:21 p.m.)
9          THE VIDEOGRAPHER:  Time is 2:21 p.m.  We're
10  back on the record.
11         EXAMINATION (Continuing)
12  BY MS. WEDGWORTH:
13     Q.  Mr. Brockman, other than the ODE relationship,
14  the CBR relationship and the informal relationship you
15  spoke about earlier today, does Reynolds have any other
16  relationships with CDK?
17         MS. GULLEY:  Objection; form.
18     A.  If you could repeat that list?  It's OD
19  relationship...
20     Q.  (By Ms. Wedgworth)  CBR.
21     A.  CBR.
22     Q.  And the informal relationship you discussed
23  today.
24         MS. GULLEY:  Objection; form.
25     A.  That's all that I'm aware of.

31 (Pages 284 - 287)

FTC-0001283

HIGHLY CONFIDENTIAL

Page 288

1    Q.  (By Ms. Wedgworth)  Are you aware of any other
2  relationships before -- that existed with CDK that no
3  longer exist?
4        MS. GULLEY:  Objection; form.
5     A.  Not that I'm aware of.
6     Q.  (By Ms. Wedgworth)  I want to show you
7  Plaintiff's Exhibit 676, which is the last financial
8  statement we'll look at.  And it's "December YTD 2017."
9  And I just have a simple question:  Is -- this -- did
10 you receive this document in the ordinary course of your
11 job after December 2017?
12       MS. GULLEY:  Objection; form.
13       (Exhibit 676 Brockman was marked for
14         identification.)
15    A.  I -- I don't know what the legal definition is
16 of "in the ordinary course of my job."
17    Q.  (By Ms. Wedgworth)  Well, as part of your job,
18 did you -- it -- was this the document you would receive
19 on a regular basis?
20    A.  Yeah.  Stated that way --
21       MS. GULLEY:  Form.
22    A.  -- yes, I agree.
23       MS. WEDGWORTH:  At this point, I'm going to
24 reserve my remaining time.  And I think Mr. Nemelka has
25 a couple of questions.

Page 289

1        MS. GULLEY:  Could I just ask you a
2  question?  When you say you reserve you're remaining
3  time, do you -- you mean reserve whatever remaining time
4  there is after Mr. Nemelka, right?
5        MR. NEMELKA:  Right.
6        MS. WEDGWORTH:  Yes.
7        MS. GULLEY:  Just to clarify.
8            EXAMINATION
9  BY MR. NEMELKA:
10    Q.  Good afternoon, Mr. Brockman.  Mike Nemelka.
11    A.  Good morning.  (Inaudible.)
12    Q.  I just have a few questions for you about just
13 a few documents here at the end of the day.  I'd hand
14 you Plaintiff's Exhibit 677, which is an email from you
15 to Mr. Schaefer, forwarding a correspondence that you
16 had with Mr. Anenen in February of 2013.  I'll give you
17 a moment to read it.
18       (Exhibit 677 Brockman was marked for
19         identification.)
20    A.  Yes.
21    Q.  (By Mr. Nemelka)  Thank you.  So the bottom
22 email is an email from you to Mr. Steve Anenen dated
23 February 5th [sic], 2015; correct?
24    A.  Yes.
25    Q.  And this was around the time when CDK and

Page 290

1  Reynolds were negotiating the wind-down agreement; is
2  that right?
3        MS. GULLEY:  Objection; form.
4     A.  I believe that's correct.
5     Q.  (By Mr. Nemelka)  And here, the second sentence
6  that you write is, "We need to conclude our deal -- or
7  not -- as I have issues that can no longer wait to be
8  dealt with."  Are those issues the security enhancements
9  that you've been holding off on?
10    A.  That's correct.
11    Q.  And then you relate to him that some "bright,
12 mostly young Harvard MBA-types" have been wanting to
13 talk to you about CDK, right?
14    A.  They really -- they start out, they want to be
15 taught about the industry.
16    Q.  But then they turned and wanted to talk to you
17 about CDK?
18       MS. GULLEY:  Objection; form.
19    A.  Yes.  That -- That's what it says and that's --
20 that's exactly what was happening.
21    Q.  (By Mr. Nemelka)  And what they wanted to know
22 is -- and as you write, "What they really want to know
23 about is CDK -- how you operate -- and not very
24 subtly -- what could be done to improve things."  That's
25 what they wanted to talk to you about, right?

Page 291

1        MS. GULLEY:  Form.
2     A.  These are unsolicited calls.  You know, the
3  phone rang, as I pick it up and, you know, there's
4  somebody that wants to talk to me.  And this is what was
5  happening.
6     Q.  (By Mr. Nemelka)  And you told them, as you
7  write here, "I am exactly the right person that you want
8  to talk to -- but I am very busy -- and am not talking."
9  Is that what you told them?
10       MS. GULLEY:  Form.
11    A.  That's correct.
12    Q.  (By Mr. Nemelka)  When you say you were exactly
13 the right person that they wanted to talk to about CDK
14 and how they could improve things, what did you mean?
15       MS. GULLEY:  Form.
16    A.  No question, I -- I've not been in this
17 business for the number of years I have and not learned
18 things about how to run this type of business.  I don't
19 know about other business, but I know about this kind of
20 business.
21    Q.  (By Mr. Nemelka)  And then you conclude in your
22 email to Mr. Anenen, "Just so you know when someone is
23 throwing darts at you -- it isn't me providing them the
24 ammunition."
25    A.  Yes.

32 (Pages 288 - 291)

FTC-0001284

HIGHLY CONFIDENTIAL

Page 292

1     Q.  So what did you mean by that?
2          MS. GULLEY:  Form.
3     A.  Well, I think exactly that.  I mean, you know,
4  I think Steve Anenen was under a lot of pressure from,
5  you know -- you know, dissident stockholders who were
6  mostly hedge fund-type kind of folks.  And Steve is a
7  very nice person.  I personally like the guy.  He always
8  has been polite, gentlemanly with me, and I've tried to
9  be so with him.  And I wouldn't be in a hurry to see him
10  be ambushed.  And so I couldn't help him other than say,
11  "Look, it ain't me, but somebody is gunning at you."
12     Q.  (By Mr. Nemelka)  Okay.  You can put that
13  aside.
14          (Exhibit 678 Brockman was marked for
15          identification.)
16     Q.  (By Mr. Nemelka)  I've handed you a document --
17  first of all, before I do -- yesterday we talked about
18  how certain applications would need RCI and 3PA
19  interfaces forever from you and CDK.  Do you recall when
20  we talked about -- talked about that?
21          MS. GULLEY:  Objection; form.
22     A.  I think I -- I referred to the fact that, as
23  certain applications -- like, for instance, ReverseRisk,
24  which has a -- a substantial number of, you know, ADP or
25  CDK DMS systems.  In order to provide that particular

Page 293

1  product to them, it would require, on a long -- because
2  as long as they use that product, you know, in order for
3  it to work, it has to have accounting data.
4     Q.  (By Mr. Nemelka)  And there is some Cox
5  Automotive applications that you believe would need RCI
6  and 3PA interfaces forever from Reynolds and CDK, right?
7          MS. GULLEY:  Objection; form.
8     A.  There -- there are -- again, using the
9  ReverseRisk example, a dealership that uses the
10  Dealertrack accounting system in order to be able to,
11  you know, have and utilize a ReverseRisk business
12  intelligence system would need to have some manner of --
13  of data access or accounting data.
14     Q.  (By Mr. Nemelka)  I've handed you Plaintiff's
15  Exhibit 678.  Which is an email from you to Ron Lamb,
16  dated June 30, 2015, the subject being "Cox/DT Merger."
17  And I will give you a moment to review it.
18     A.  Yes.
19     Q.  So this email chain between you and Mr. Lamb
20  relates to Cox Automotive's acquisition of Dealertrack;
21  correct?
22     A.  That's correct.
23     Q.  And the combining of certain applications
24  already owned by Cox Automotive and those who are owned
25  by Dealertrack; correct?

Page 294

1          MS. GULLEY:  Form.
2     A.  I don't know --
3     Q.  (By Mr. Nemelka)  Strike that.  I think that
4  was a bad question.
5     A.  Would you like to s-- -- have another question?
6     Q.  Yes, I do have another question.
7     A.  Okay.
8     Q.  And you recognized that there were some
9  benefits to Cox Automotive and its ac- -- acquisition of
10  Dealertrack in -- in combining those assets; correct?
11          MS. GULLEY:  Objection; form.
12     A.  I think as a -- as just a matter of normal
13  course, when there's a major transaction happen amongst
14  other companies that are in the same industry that we're
15  in, I kind of -- I read those articles.  And certainly,
16  you know, any good size acquisition, such as this one
17  was -- at the heart of it -- it had to be some manner of
18  synergies.  And that's what I said.
19     Q.  (By Mr. Nemelka)  And what you write here is
20  that -- to Mr. Lamb -- "I think [that] there is no
21  question that they will achieve some more market power
22  by combining VAuto and AAX.  However to make these apps
23  really work right, they will require RCI interfaces
24  forever from us and CDK."  You wrote that, right?
25          MS. GULLEY:  Form.

Page 295

1     A.  Yes, that's correct.
2     Q.  (By Mr. Nemelka)  And when you say "RCI
3  interfaces," what you mean is RCI interface from
4  Reynolds and a 3PA interface from CDK, right?
5          MS. GULLEY:  Form.
6     A.  That's correct.  And -- and this -- and there
7  is an opinion statement here when I say, "However to
8  make these apps really work right."  That's my opinion.
9     Q.  (By Mr. Nemelka)  Right.
10     A.  That's not necessarily a decided fact.  And --
11  and the fact these products continue to work as they are
12  today -- but they could also work a little better.
13     Q.  And it's because they have -- but in your
14  opinion, is that they would need interfaces with RCI and
15  3PA forever in order to work properly; correct?
16          MS. GULLEY:  Objection; form.
17     A.  That's my opinion.  It would be very much like
18  the ReverseRisk product that we have today, which
19  is an -- an accounting business intelligence software.
20  In order to work, it relies on a continuing source of,
21  you know, accounting data.
22     Q.  (By Mr. Nemelka)  Does VAuto need -- need
23  accounting data in order --
24          MS. GULLEY:  Form.
25     A.  No.  It doesn't, but -- well, I say it doesn't

33 (Pages 292 - 295)

FTC-0001285

HIGHLY CONFIDENTIAL

Page 296

1  need it, but it's nice.
2      Q.  (By Mr. Nemelka)  All right.
3      A.  It -- it would be -- you know, you can keep
4  track of what your accounting basis is from a tax
5  standpoint, from a -- a gap accounting standpoint.  You
6  can do that by hand in the VAuto system.  But it'd be a
7  little nicer if it automatically went over and sniffed
8  the accounting system and came back with a number and
9  put it in VAuto system.
10     Q.  All right.  You can set that aside.
11         I've handed you what I've marked as Exhibit
12  679, which is an email from you to Bob -- to Bob
13  Schaefer, dated July 1, 2017, with the subject being
14  "Data Access Direction."  I'll give you a moment to
15  review.
16         (Exhibit 679 Brockman was marked for
17             identification.)
18     Q.  (By Mr. Nemelka)  Finished, Mr. Brockman?
19     A.  Yes.
20     Q.  So Mr. Schaef-- this -- July 1st, 2017, this
21  was after Authenticom had filed the lawsuit against
22  Reynolds and CDK; correct?
23     A.  Yes, that's correct.
24     Q.  This is after, also, the preliminary injunction
25  hearing involving that lawsuit; correct?

Page 297

1      A.  Yes, that's correct.
2      Q.  And Mr. Schaefer is writing you to say that
3  Reynolds should terminate any of its relationships with
4  Authenticom services; correct?
5      A.  That -- that's what he's recommending.
6      Q.  And what he says here in the first sentence is
7  that Reynolds is still using Authenticom for MMS.  And
8  that's a Reynolds application; correct?
9          MS. GULLEY:  Objection; form.
10     A.  It is a Reynolds application.  It's sold to a
11  fairly small number of -- of dealers that use CDK
12  systems.
13     Q.  (By Mr. Nemelka)  All right.  And IDS
14  ReminderTrax, that's a Reynolds application; correct?
15         MS. GULLEY:  Objection; form.
16     A.  That's -- that's a service reminder card.  It's
17  an application that we sell to service departments.  And
18  in some cases, those service departments are -- use CDK
19  software.
20     Q.  (By Mr. Nemelka)  RepMan, that's also a
21  Reynolds application; correct?
22         MS. GULLEY:  Objection; form.
23     A.  RepMan is really a General Motors application.
24  It's not -- not really ours.  It's reputation
25  management.

Page 298

1      Q.  (By Mr. Nemelka)  And ShowroomMagnet -- and
2  that's a Reynolds application; correct?
3          MS. GULLEY:  Objection; form.
4      A.  And that's a Reynolds application.  It is a --
5  it's a very small one.  It's the one that provides a
6  cash voucher, a motivation, to get prospective car
7  buyers to come in and take a -- a test drive.
8      Q.  (By Mr. Nemelka)  And he says for that one,
9  Authenticom was currently pulling data from Reynolds
10  DMSs, right?
11         MS. GULLEY:  Objection; form.
12     Q.  (By Mr. Nemelka)  Do you see that?  After -- at
13  Showroom Management -- or ShowroomMagnet?
14         MS. GULLEY:  Form.
15     Q.  (By Mr. Nemelka)  He writes, "Currently pulling
16  from Reynolds DMS."  Do you see that?
17         MS. GULLEY:  Objection; form.
18     A.  I see that.
19     Q.  (By Mr. Nemelka)  So Reynolds was using
20  Authenticom to pull data from Reynolds dealers; correct?
21         MS. GULLEY:  Objection; form.
22     A.  I think what's happening there is -- and that's
23  this was a -- a result of an acquisition of a --
24  evidently, fairly recent acquisition.  And it, you
25  know -- it had, prior to us acquiring this little

Page 299

1  product, this little company, that they had been -- they
2  were doing business, obviously, independently with us.
3  And so therefore, they -- since they weren't RCI
4  certified, they were going to a third party to -- to
5  acquire data for them.  Which -- this is something I'm
6  not ever happy to see happening.  But whenever you have
7  an acquisition, things are not operated in the most
8  efficient manner, and there are stupid things going on.
9  And that would be classified as a stupid thing going on.
10     Q.  (By Mr. Nemelka)  And you -- and in -- in
11  response to Mr. Schaefer's recommendation to terminate
12  all relationships with Authenticom after they had
13  initiated this litigation, you wrote, "I agree -- do
14  what needs to be done."  That's what you wrote; correct?
15         MS. GULLEY:  Objection; form.
16     A.  Yes.  And I might add on that, I obviously
17  wasn't happy about the fact that we've been -- we were
18  sued, in my opinion, without good reason.  But it --
19  it's also important, I think, to do business with
20  people, or with entities, that have substance.  I don't
21  think Authenticom has much in the way of substance.  And
22  I prefer to do business with some folks, particularly
23  when it comes to data.  If there's a lawsuit that goes
24  on and there's a big judgement, I'm not the only one
25  standing there.

34 (Pages 296 - 299)

FTC-0001286

HIGHLY CONFIDENTIAL

Page 300

1  MR. NEMELKA: I have no further questions.
2  I'll reserve the remainder of our time.
3  MS. GULLEY: Thanks. I have some questions
4  before I get started. By my count, you have six
5  minutes.
6  All right. Thank you, Mr. Brockman.
7  Peggy, can you tell me where the exhibits
8  are from yesterday? Are they sort of that sea of
9  information?
10  MS. WEDGWORTH: I think in this area.
11  (Brief discussion.)
12  EXAMINATION
13  BY MS. GULLEY:
14  Q. Let's stick with the document Mr. Nemelka was
15  asking you about. That would be Plaintiff's Exhibit
16  679. All right. Do you have Plaintiff's Exhibit 679 in
17  front of you, sir?
18  A. Yes.
19  Q. One of Mr. Schaefer's statements to you related
20  to having relationships directly with the DMS
21  provider -- do you see it in parentheses? He's list DMS
22  providers CDK, Dealertrack, Automate and Autosoft?
23  A. Uh-huh. (Witness answers affirmatively.)
24  That's correct.
25  Q. And you -- you agreed that he should do what

Page 301

1  needs -- you agreed that he should do what needs to be
2  done in terms of entering into relationships with those
3  DMS providers; correct?
4  MS. WEDGWORTH: Objection.
5  MR. NEMELKA: Objection.
6  A. That's correct.
7  Q. (By Ms. Gulley) And you did, in fact, ent- --
8  you did, in fact, direct others to enter into
9  relationships with the other DMS providers; correct?
10  MS. WEDGWORTH: Objection.
11  A. That's correct.
12  Q. (By Ms. Gulley) Now, did the other -- did
13  Dealertrack sue Reynolds? Did -- has anybody sued
14  Reynolds over their relationship with Dealertrack?
15  MS. WEDGWORTH: Objection.
16  MR. NEMELKA: Objection.
17  A. Not that I'm aware of.
18  Q. (By Ms. Gulley) Do you know who Dealertrack's
19  lawyer is?
20  MR. NEMELKA: Objection.
21  A. No. Am I supposed to?
22  Q. (By Ms. Gulley) Not necessarily. All right.
23  You were asked some questions about the financial
24  information that you received. Do you recall those
25  questions, in general terms?

Page 302

1  A. In general terms, they seem to be clustered
2  around RCI.
3  Q. Okay. And one of the things that you have
4  testified about in the last couple of days is that
5  Reynolds does not have cost accounting; correct?
6  MS. WEDGWORTH: Objection.
7  A. That's correct.
8  Q. (By Ms. Gulley) And Ms. Wedgworth was asking
9  you questions about some of the costs of RCI. There are
10  costs associated with RCI; correct?
11  MS. WEDGWORTH: Objection.
12  A. Absolutely.
13  Q. (By Ms. Gulley) What -- what about Reynolds'
14  efforts to secure its enterprise system? What are the
15  costs associated with Reynolds' efforts to secure its
16  enterprise system, in general terms?
17  MS. WEDGWORTH: Objection.
18  MR. NEMELKA: Objection.
19  A. Well, probably the first category has to do
20  with it takes a whole bunch of executive attention, mine
21  included, to focus on the issue of data security. And
22  deciding, you know, what needs to be done, how -- how to
23  get it done, how to react in the marketplace to data
24  security issues, certainly requires us to spend some
25  more money on advertising, you know, to -- to counteract

Page 303

1  some of the effects of what we've been -- what's been
2  necessary to do from a data security standpoint.
3  You know, that's kind of, you know, the top
4  level. And -- and to go down and enumerate a list of
5  things, it would take -- take a little while. But
6  that's one of the categories that we didn't talk very
7  much about in -- in the previous, you know, questions
8  this afternoon.
9  Q. (By Ms. Gulley) Have you made a conscious
10  choice to invest in system security since the merger by
11  acquisition with the Reynolds and Reynolds company?
12  MS. WEDGWORTH: Objection.
13  A. Yes. I come, originally, from IBM. And the
14  IBM philosophy was very, very much oriented towards
15  security. And in all the software design and
16  development, you know, that I was a part of in the UCS
17  company, data security was extremely important. And I'm
18  very, very pleased to state that, so far as I know --
19  because we never know what we don't know -- that system
20  is totally tight and enjoys that reputation in the
21  marketplace, that it's, from a security standpoint, way
22  ahead of everybody else.
23  When I got to Reynolds, it's kind of like I
24  had been spending my life, you know, mopping and
25  polishing the floor. And I inherited this house, and it

35 (Pages 300 - 303)

FTC-0001287

HIGHLY CONFIDENTIAL

Page 304

1  has two inches of water on the floor.  And we don't need
2  to think about mops and brushes, we need pumps, because
3  that was the situation from a data security standpoint.
4  It was just terrible.
5          And it's been my goal, you know, since that
6  day that -- to get it into the right kind of shape.  And
7  it's -- it's vastly improved.  Still not there, you
8  know, there's still more work to do.  And that's caused
9  by the fact that there are people on the outside, and
10 more of them every day, you know, that want to invade
11 your systems.  Starting from PCs up.
12   Q.  (By Ms. Gulley)  Did you keep that goal a
13 secret in 2006 when UCS acquired the Reynolds and
14 Reynolds company?
15       MS. WEDGWORTH:  Objection.
16       MR. NEMELKA:  Objection.
17   A.  Absolutely not.  It's been -- it's known, you
18 know, that that was going to be one of the goals.
19   Q.  (By Ms. Gulley)  Reporters ever ask you about
20 it?
21       MS. WEDGWORTH:  Objection.
22   A.  Yes.
23   Q.  (By Ms. Gulley)  What did you tell them?
24       MS. WEDGWORTH:  Objection.
25   A.  I told them we were going to improve security.

Page 305

1    Q.  (By Ms. Gulley)  Since that time, late Oct- --
2  late 2006, when the acquisition occurred, how much would
3  you estimate you have invested in data security at the
4  Reynolds and Reynolds company?
5        MS. WEDGWORTH:  Objection.
6    A.  Probably, counting everything, which would
7  include, you know, my time, other executives' time, you
8  know, load on the technical support center answering
9  questions and issues, sales -- salemen's time dealing
10 with customers over the issue of data security,
11 additional advertising, you know, that we felt compelled
12 to -- to do simply from a -- to keep our image up in the
13 public, you know, marketplace, I wouldn't be surprised
14 if the total number, if we ever sat down to figure it
15 out, would be half a million dollars.
16   Q.  (By Ms. Gulley)  In response to some of the
17 questions you had begun explaining about the cost of
18 some issues related to Xtime, and you were unable to
19 finish your answer and were told that you'd be able to
20 finish it later -- so here is your chance -- what were
21 you -- what were you talking about with respect to
22 Xtime?
23       MS. WEDGWORTH:  Objection.
24       MR. NEMELKA:  Objection.
25   A.  Well, the issue started on -- came up on a

Page 306

1  Monday afternoon.  And we started receiving complaints
2  from some customers saying, "What have you done?" and
3  "Why is our system running so slowly?" and "We're" --
4  "We've checked around and we're not running any specific
5  batch jobs," you know, "What is" -- "What on earth is
6  going on?"
7          And, you know, we started, you know,
8  accessing some of those systems, and we discovered there
9  was something going on, that there was a piece of
10 software in -- in the Reynolds server.  It wasn't -- it
11 was running, actually, in -- in the -- in the -- in
12 the -- the outside part of the server.  But what it was
13 doing, it was -- it was adding records at a high rate to
14 the Reynolds server in the customer's location.  And we
15 discovered what was happening was -- and that's that
16 Xtime was -- "abusing" would be the right word -- they
17 were just trampling their -- their permission to have
18 access to add, change and delete records.  And they were
19 adding, you know, dummy, bo- -- bogus customer records
20 at a high rate.  And they added some 700,000.  You know,
21 just trashed customer records.
22          And that was what was slowing down the
23 servers who had called and complained.  Fortunately, we
24 were able to get it shut off before it went any further.
25          Then came the cleanup problem, or the

Page 307

1  cleanup issue.  We found that -- that some of the --
2  that there were some pieces of -- of junk in -- in
3  the -- these customer records that was consistent across
4  all of them.  And, you know, we found that it took us
5  several days to figure this out, that we could write
6  software and we could go read the entire customer file
7  on those servers and find bad records and throw them
8  out.
9          The problem was -- and that's that, in the
10 meantime, the customers continued to operate.  And as
11 the customers continued to operate, they would actually
12 transact business on some of these, you know, bogus, you
13 know, customer records.  And so we were faced with the
14 issue of it wasn't just a matter of -- of going back
15 and -- and deleting customer records that we could
16 identify, we also had to identify whether or not they
17 had had any business transacted on them.  Because if we
18 did, then we would lose that -- lose that data
19 completely.
20          So we ended up having a situation where
21 once we got done doing everything we could from the
22 programming standpoint, the customers had to go back and
23 find the duplicates.  Because there would be a
24 duplicate, you know, customer record that was bad, but
25 yet it was still good, because it had some -- some --

36 (Pages 304 - 307)

FTC-0001288

HIGHLY CONFIDENTIAL

Page 308

1 tracking some business transactions involved.
2        And then in the last act, the customers
3 were actually responsible for cleaning all of that up by
4 hand. Now, what that's like -- it's like, you know,
5 somebody that lives next door who's about half crazy and
6 likes to shoot, and all they did is kill your dog, but
7 they didn't hit you. I mean, so you could be happy
8 about that. Well, but as somebody that's, you know, in
9 charge of -- I'm kind of the executive in charge of loss
10 prevention -- I'm saying, "Well, good God, what could
11 have happened?"
12        Because that same kind of logic could have
13 occurred where they deleted all of our stuff instead of
14 adding. They could have just as well been deleting,
15 because they had write-back access, and if they had sat
16 and deleted, you know, they could have destroyed God
17 knows how much, you know, information. Why did they
18 only get at 400 or so dealerships? I don't know. You
19 know -- you know, the grace of God. You know, it could
20 have been thousands.
21        And so that's the reason why -- that I sat
22 and thought, "How the hell can we put -- you know, we
23 can't prevent this, because we can't stop them. But how
24 can we fix it?" What we did was -- is we went into the
25 software that we allowed them, you know,

Page 309

1 delete/add/change access to, and we created journalling.
2 And what "journalling" means is -- is we take -- let's
3 say you've got a change, you know, function going to
4 happen. What we do is we take a snapshot of the record
5 before they change it, log it off, and then we take a
6 snapshot of it after -- after -- after change and log it
7 off. And that means that we can go back and we can tell
8 what happened. And in many cases, probably able to
9 restore.
10        Unfortunately, we run into the situation
11 where what happens in the time interval from when the
12 incident occurs versus when we discovered they want to
13 fix it -- which is business transactions happen on
14 records in between.
15        Now, the -- the logging -- you know, we can
16 tell you which ones they stepped on, but we can't fix
17 it. We can't do an automatic fix, because there's been
18 business transactions that happened that, you know, we
19 don't know about.
20        So that's all part and parcel of -- of the
21 Xtime story. It was a -- a rude awakening to us that --
22 that third-party programmers could be so -- so lax and
23 so stupid as to let something like that happen.
24    Q. (By Ms. Gulley) How much did it cost you to
25 build out this new protection?

Page 310

1        MS. WEDGWORTH: Objection.
2        MR. NEMELKA: Objection.
3    A. I don't know, because we had to go back in to
4 every application program that we allowed read/write
5 access to and build it in. And then we also had to
6 build the -- the database for these log transactions.
7 And then, of course, the -- the interesting part of
8 these log transactions -- how long do you have to keep
9 them?
10    Q. (By Ms. Gulley) So it's an ongoing expense?
11        MS. WEDGWORTH: Objection.
12    A. It's an ongoing expense, and we don't know how
13 long we have to keep them because, in some cases that --
14 they could have a bust where, you know, the -- the loss
15 was minor. But yet you could have a situation, you
16 know, where they decided -- or not decided, but where
17 they -- through lack of programming skill, they could --
18 they could walk on email addresses.
19        Well, you know, you might not notice that
20 for a couple of months. And then you'd have to go and
21 try and fix it, which means that -- we keep a lot -- lot
22 of file stuff, I think, for retention, seven years. I
23 hope to God we never have to go that far back to fix
24 anything, but somebody had to make a decision as to how
25 long we were going to keep it, so I said seven years.

Page 311

1    Q. (By Ms. Gulley) In terms of what you've had to
2 spend already in building the log-in functionality and
3 the service base so far, are we talking thousands,
4 millions?
5        MS. WEDGWORTH: Objection.
6        MR. NEMELKA: Objection.
7    A. I would say not -- not as much as a million,
8 but probably -- probably made a pretty good hole in
9 700,000 or 800,000.
10    Q. (By Ms. Gulley) Earlier, I had asked you --
11    A. And then there's the ongoing cost. I mean,
12 there's -- you know, the stuff that you vaulted, you've
13 got to keep it. You've got to sell on it, you've got --
14 you've got to spin it.
15    Q. Earlier, I had asked you what you -- you
16 estimated the investment in system security, and
17 the rec-- the -- and we just saw the transcript looked
18 like you had said half a million. I wanted to make sure
19 I got that right.
20    A. No. It's half a billion.
21        MS. WEDGWORTH: Objection.
22    Q. (By Ms. Gulley) Say it again.
23        MS. WEDGWORTH: Objection.
24    A. Our total investment for data security forever
25 and a day probably is in the order of half a billion.

37 (Pages 308 - 311)

FTC-0001289

HIGHLY CONFIDENTIAL

Page 312

1    Q.  (By Ms. Gulley)  How do you feel about data
2  brokers?
3          MS. WEDGWORTH:  Objection.
4          MR. NEMELKA:  Objection.
5    A.  The same way I feel about the unprintable --
6  but, you know, certainly, in polite company --
7    Q.  (By Ms. Gulley)  "The elevator speech"?
8          MS. WEDGWORTH:  Objection.
9    A.  You know, the problem with data brokers is --
10  is -- you know, it starts off from a legal standpoint.
11  You know, according to Gramm-Leach-Bliley, you know,
12  dealerships are considered financial institutions.  And
13  as such, they have certain responsibilities.
14          There's also another act that -- that
15  applies directly.  And what it says in -- in short order
16  is -- and that's that a dealership is considered a
17  financial institution.  And they're responsible for the
18  security of the data that they accumulate in their
19  process of arranging financing.  If they are to use a
20  third-party service provider, they must have a contract
21  with that service provider, you know, that specifies
22  who's responsible for what, who indemnifies who and what
23  the liabilities are and so forth.
24          A data broker, in the -- in the simplest
25  sense, what they're doing is they're extracting data out

Page 313

1  of a dealership system.  It's got to be a contract
2  there.  And then, you know, whoever that they send the
3  data to, there's got to be another contract there.  So
4  there -- there's this, you know, myriad of -- of
5  contracts that are required in order to be legal.
6          Data brokers is -- you know, they're --
7  they're little, small companies for the most part,
8  and they don't have the resources to do that.  They, in
9  many cases, are kind of oblivious to -- to the fact
10  that, you know, they are required to do all of these --
11  these things according to the law.
12          And so therefore, in my opinion, they're
13  absolute outliers.  Secondly, there's called a -- it's
14  called a Computer Fraud and Abuse Act.  Computer Fraud
15  and Abuse Act is very, very clear that if you enter into
16  a computer system, and the software on a computer
17  system, if you're not you authorized to do so, you're in
18  violation of that law.
19          Well, people don't pay a lot of attention
20  to the fact that -- that Reynolds owns the software
21  that's on every dealership system.  If they license that
22  software to the dealer and the license is not an
23  unlimited license, it's very much a limited license that
24  says that you cannot, you know, allow a third party to
25  access or to use that software because you have no

Page 314

1  license to do that, your license covers only your
2  employees and direct agents.
3    Q.  (By Ms. Gulley)  How long have you had those
4  restrictions against the use of third-party data
5  brokers?
6          MS. WEDGWORTH:  Objection.
7    A.  I think in the case of UCS software, it's been
8  at least 25 or 30 years.  As far as Reynolds is
9  concerned, when I got there 12 years ago, they were
10  already there, and had been around for a while.  But I
11  don't know how long.
12    Q.  (By Ms. Gulley)  If -- during this deposition,
13  we've heard you, on numerous occasion, call data
14  brokers, like, Authenticom "hackers and bandits"; is
15  that correct?
16          MS. WEDGWORTH:  Objection.
17          MR. NEMELKA:  Objection.
18    A.  That's correct.
19    Q.  (By Ms. Gulley)  Why do you feel -- what --
20  what are the risks to Reynolds system such that you
21  would give them those names, "hackers and bandits"?
22          MS. WEDGWORTH:  Objection.
23          MR. NEMELKA:  Objection.
24    A.  Well, first of all, what they're doing is --
25  and that's that they have used -- and Steve Cottrell has

Page 315

1  admitted in open court how often that he had worked, you
2  know, gaining entrance, you know, getting passed the
3  security barriers, to access Reynolds software.  And I
4  think that qualifies him for the name "hacker."
5          You know, what the big worry is -- and
6  that's that to the extent that a third-party hacker is
7  involved, there's a security breach and that there's
8  going to be all hell to pay.  And, you know, we've been
9  through this.  You know -- this is -- was my first --
10  matter of fact, that's how I met Michael.  It was a
11  Chevrolet dealership by the name of Franklin, and I
12  don't know where they were in the company -- in the
13  country, but the general manager of that dealership had
14  access to a master password.  And he could run any kind
15  of reports or any kind of listings that -- that he
16  wanted.  Which, that's not unusual for, you know -- he
17  was the onsite person in charge.  He was the general
18  manager.
19          Well, he used that -- that password
20  authority to download the entire customer files of that
21  customer -- of that dealership onto his laptop.  And
22  when he left -- and I don't know under what
23  circumstances he left, but it kind of sounds like maybe
24  not nice circumstances -- he saw fit to post the
25  customer database in its entirety on the Internet.

38 (Pages 312 - 315)

FTC-0001290

HIGHLY CONFIDENTIAL

Page 316

1      And there were, you know, people whose
2  names and information was posted that were not happy,
3  and they called the FDC.  And the FDC came down on that
4  dealer and said, you know -- I don't know whether they
5  had their guns drawn or not, but I mean, they -- they
6  were -- it was -- it was very shocking -- and asked the
7  dealer what on earth he had done.  The dealer was, like,
8  completely unknowledgeable of what all happened.  And as
9  they talked to him some more, he said, "Look, I
10 understand what you're talking about.  You need to talk
11 to Reynolds.  They're our computer guys, they'll know
12 everything."
13     So the next thing we know, we have FTC on
14 our door, and we don't know much about dealing with the
15 FTC.  Matter of fact, never been around them at all.
16 And -- but fortunately -- fortunately, we got a good
17 piece of advice from one of -- one of our outside
18 attorneys --
19     MS. GULLEY:  Okay.  So you can't talk about
20 privileged information.  I'm sorry, sir.
21     THE WITNESS:  Oh, okay.
22     Q.  (By Ms. Gulley)  But -- but you're talking
23 about the FTC.  You're not talking about antitrust,
24 you're talking about the privacy people; is that right?
25     A.  I'm talking about the privacy people.  Can I

Page 317

1  talk about that?
2     Q.  No.
3     A.  No?
4     Q.  You cannot reveal privileged information.
5     MS. WEDGWORTH:  Objection.
6     Q.  (By Ms. Gulley)  But --
7     A.  I can say, you know, what -- what the effect
8  was on us.
9     Q.  What was the effect on you of the FTC's
10 investigation into --
11     A.  Well, we obviously --
12     Q.  -- Franklin?
13     MS. WEDGWORTH:  Objection.
14     MR. NEMELKA:  Objection.
15     A.  We obviously started spending a bunch of money,
16 a whole pile, simply to convince the FTC that we did
17 nothing wrong.  The computer system was not in any way
18 at fault or involved.
19     But it doesn't take much of a leap in my
20 mind to think about, "Well, what if the computer system
21 was involved?  What -- what if something happened that
22 caused a breach?  We better be prepared for all hell to
23 break loose and then it would be really expensive."  And
24 so the idea of having any kind of data broker involved
25 in any of that kind of process to me is not smart --

Page 318

1      (Brief discussion.)
2      (Exhibit 274 was marked for
3      identification.)
4     Q.  (By Ms. Gulley)  I'm marking and handing to you
5  Defendant's Exhibit 274.  Less you think the plaintiff's
6  and defendants' numbers are widely disparate, the
7  plaintiff's skipped numbers.  Ours -- we did not.
8  Here's Defendant's 274.
9      (Brief discussion.)
10     Q.  (By Ms. Gulley)  Take a minute to review
11 Defendant's 274.
12     A.  I'm -- I'm familiar with this.
13     Q.  Who's Robert T. Brockman, II?
14     A.  He's my son.
15     Q.  We were discussing a moment ago the Franklin
16 incident.  What is -- what is this about, the --
17 Defendant's Exhibit 274?
18     MS. WEDGWORTH:  Objection.
19     A.  This one here is -- is -- I believe is
20 DealerBuilt.  DealerBuilt, if I can recall what happened
21 on that one, they had a lot of very sizeable customers.
22 And they were sending backups of the local server in the
23 dealership back to a central point.  And when they
24 transmitted the data, it wasn't encrypted.  And it
25 caused the exposure of -- I want to say, like, 400,000

Page 319

1  or so, that they know of, you know, individual customer
2  records were exposed.
3      And that meant that -- in any kind of data
4  exposure, you know, the first -- the first cost is $2
5  apiece it costs you per name to send a registered letter
6  to the person whose data was exposed and to tell them
7  that their data has been exposed and they should be
8  cautious about, you know, what's happening.  Because
9  their -- you know, their personal information may have
10 gotten into the wrong hands of some bad people.
11     And then, after that, you start dealing
12 with the FTC, which I -- I don't have any knowledge to
13 what that cost in this particular situation, but I bet
14 it was a bunch.  And I think this was one of the first
15 wake-up calls of a really large data breach in the
16 automotive business that we know about.
17     Because we always have to remember -- it's
18 kind of like in -- in the banks where they have worries
19 about bad people stealing money from the banks
20 internally.  You never hear about those.  Now, maybe
21 that's because none of them ever happen.  I don't think
22 that's the case.  I think they're concerned about the
23 publicity.  I think they're concerned about bad guys
24 getting ideas.  And, you know, that's certainly what
25 could be happening here.

39 (Pages 316 - 319)

FTC-0001291

HIGHLY CONFIDENTIAL

Page 320

1    Q.  (By Ms. Gulley)  Would you read what you sent
2  to your son, for the record?
3    A.  Yeah.  It's short.  Three words.  "It finally
4  happened.  Love, Dad."
5    Q.  What did you mean when you said that?
6        MS. WEDGWORTH:  Objection.
7    A.  Well, he and I have had conversations about
8  this a lot.  You know, my son has a degree in computer
9  science from Rice University, along with a master's in
10  electrical engineering and an MBA.  And he's -- he's
11  interested in these kind of things, so we talk about
12  them.  He's 44 years old.  I don't know if he's quite
13  grown yet, but he's getting there.
14    Q.  (By Ms. Gulley)  What do you mean by "finally"?
15    A.  Well, I -- I've been predicting it for a long
16  time, and so it -- it was -- while it was an unhappy
17  situation, at least it serves the fact that I've not
18  been worrying in vain.  We have -- we have -- in terms
19  of numbers of dealerships, you know, numbers of customer
20  records and whatever, we obviously has vastly more than
21  DealerBuilt did.
22    Q.  Have you been criticized for that?
23    A.  I've been criticized a lot for -- for data
24  security, which is incredible.  But I think what really
25  happens in -- in the dealership world is -- and that's

Page 321

1  that it's not the dealer.  It is the -- it is the
2  department head who, short term, you know, wants to get
3  his -- what he wants to get done, what he wants to get
4  done.  He doesn't care about security.  He may not even
5  be around that dealership next year.  He has a very
6  short-term outlook.
7        He is completely -- from a liability
8  standpoint, it's not going to be his personal liability.
9  He's worried about getting done whatever he can get done
10  so his bonuses at the end of the month is -- is good
11  at -- as good as it could be.  He's a very short-term
12  thinker.  And those are the people that make the most
13  noise, you know, when -- when security enhancements take
14  place.
15        Inevitably, when you -- when you get to the
16  dealer and explain to him the liabilities that are
17  floating around and -- and what -- what -- what's going
18  on, what we're trying to prevent, you know, the dealer
19  says, "Okay, we understand."
20    Q.  I'm going to hand you Defendant's 275.  Take a
21  moment to look at that.
22        (Exhibit 275 was marked for
23          identification.)
24    Q.  (By Ms. Gulley)  Have you had a chance to look
25  at that?

Page 322

1    A.  Yes.
2    Q.  All right.  This is a series of emails and a
3  report relating to the Randall Reed dealership.  Do you
4  recall this exchange?
5        MS. WEDGWORTH:  Objection.
6    A.  Yes, I do.
7    Q.  (By Ms. Gulley)  In the very top email, sent
8  September 17, 2013, from you, you say, "Chris, the
9  attached report shows the scheduled unattached
10  automatically run reports being run on Randolph Reed's
11  345 server."  Do you see that?
12        MR. NEMELKA:  Objection.
13    A.  Yes, I do.
14    Q.  (By Ms. Gulley)  And then what did you say?
15        MS. WEDGWORTH:  Objection.
16    A.  It says, "It's a wonder that this box runs at
17  all, much less running docuPAD with acceptable response
18  times."
19    Q.  (By Ms. Gulley)  What does that mean?
20        MS. WEDGWORTH:  Objection.
21    A.  Well, what's happened here in this -- the
22  customer, this Randall Reed company has called up, you
23  know, very, very, very unhappy that their 345 server --
24  and this is an older server.  This is a server that
25  probably -- the last one was manufactured 15 years ago.

Page 323

1  It's that old.  And it is overrun with batch jobs such
2  that docuPAD response time is not as good as it ought to
3  be.  Of course, when you run this report --
4    Q.  (By Ms. Gulley)  And just for the record,
5  you're looking at the attachment?
6        MR. NEMELKA:  Objection.
7    A.  These are a list of -- of -- of what we call
8  "scheduled batch jobs."  And it -- it shows the user ID
9  that set it up in the first place, and then a
10  description of what it is, and then how many stores it's
11  located -- not how many -- which store numbers -- which
12  store number -- this first one is in Store No. 9.
13        And then it shows whether it's a report
14  generator or query builder or a download.  And then how
15  many hours a day did that -- did it run?  It runs every
16  1 and 1/2 minutes, 13 and 1/2 hours a day.
17        So what's happened is -- and that's -- and
18  this reports an available report on -- on every system.
19  The customer has completely dumb-assed themselves.
20  And -- and what they've done is they've completely
21  ignored the fact that all computers have finite
22  resources, and you cannot load on them, you know,
23  immense amounts of work.  And this is probably the worst
24  example I've ever seen about this.
25        And it's -- typically, a lot of these --

40 (Pages 320 - 323)

FTC-0001292

HIGHLY CONFIDENTIAL

Page 324

1 these automatically scheduled reports, that is a sure
2 sign of a hacker. Because what they're doing is -- and
3 that's they want the report run at a specific time where
4 they can go back and get it and -- and pull it off to,
5 you know, their computer in the sky.
6         So I found this one interesting. I mean,
7 it, you know -- this one's so bad, you got to laugh.
8 Just -- it's -- it's, you know, just beyond the pale. I
9 mean, this one here, when we have a -- a place on the
10 wall of our computer history where we have an example of
11 the worst use ever of remotely unattended batch jobs,
12 this is it right here.
13      Q. (By Ms. Gulley) Look at the -- the -- you see
14 that the rows are numbered -- Row 9? Maybe yours aren't
15 numbered. So going down nine spots -- guys, I've just
16 put an arrow -- so one, two, three, four, five -- and
17 for the record, I've put an arrow at "Superior." That's
18 where I want you to look.
19      A. Okay.
20      Q. Who is that? What is that? What do you think
21 that is?
22      A. I think that's Phil Bautista.
23      Q. So is Superior Solutions a hostile data broker?
24         MS. WEDGWORTH: Objection.
25         MR. NEMELKA: Objection.

Page 325

1      A. They are. Of the worst kind.
2      Q. (By Ms. Gulley) Are they -- are they in the
3 same place as Authenticom?
4         MR. NEMELKA: Objection.
5      A. Yes.
6      Q. (By Ms. Gulley) All right. And so how
7 frequently was SIS accessing this Reynolds system at
8 this time?
9         MS. WEDGWORTH: Objection.
10      A. Every two and a half minutes. And accumulating
11 four and a half hours a day worth of compute time.
12      Q. (By Ms. Gulley) What impact can that have on
13 Reynolds technology?
14         MS. WEDGWORTH: Objection.
15         MR. NEMELKA: Objection.
16      A. It -- it overloads it. Even a really good
17 server, you know, shouldn't have anything like that
18 running. And you're pretty good. I didn't catch that.
19         MS. GULLEY: Let's go off the record and
20 take a break. We've been going a while without a good
21 break. I'm going to still be on when I -- when we come
22 back.
23         THE VIDEOGRAPHER: This is the end of Media
24 3. The time is 3:16 p.m. We're off the record.
25         (Short recess 3:16 to 3:31 p.m.)

Page 326

1         THE VIDEOGRAPHER: This is the beginning of
2 Media 4. We're back on the record at 3:31 p.m.
3         EXAMINATION (Continuing)
4 BY MS. GULLEY:
5      Q. When we were talking about Xtime earlier, I
6 don't think I circled around to this question. The
7 Xtime situation that you described, how does that relate
8 to the transaction fee issue that Ms. Wedgworth was
9 asking you about?
10      A. The -- the process of -- of somebody -- some
11 entity like Xtime doing add/change/delete write-back
12 information, what that does is that generates a bunch of
13 extra work we've got to do. Plus, we've got to save the
14 before-and-after images. And we did it on a
15 per-transaction basis simply because we believed that it
16 would always be a number of RCI customers that don't
17 need that, because they're not doing add/change/delete
18 write-back.
19         And therefore, it would be unfair just to
20 have a cover-blanket increase to cover the cost of doing
21 that. We put it on -- on the third parties that are
22 actually using that -- that facility.
23      Q. Do you know what the impact of that transaction
24 fee has been on the number of write-back transactions?
25         MS. WEDGWORTH: Objection.

Page 327

1      A. I -- I'm sure that it has been reduced, because
2 I think before that, there were -- there was no -- no
3 charge for write-back transactions. And so once there
4 became a charge, they came back and changed how they --
5 how they did things. Some cases, you know, for
6 instance, they would want to update a repair order or
7 update a service reservation, you know, frequently. You
8 didn't really need to do that.
9      Q. (By Ms. Gulley) So what's the impact on the
10 system load now?
11         MS. WEDGWORTH: Objection.
12         MR. NEMELKA: Objection.
13      A. It -- it improved the situation from the system
14 load but, you know, the -- there's still the logging.
15 You know, it is a fair amount of overhead.
16      Q. (By Ms. Gulley) Another topic you talked about
17 over the last couple of days is the automated access to
18 the Reynolds system. Does Reynolds allow its customers
19 to provide automated access to third parties?
20         MS. WEDGWORTH: Objection.
21      Q. (By Ms. Gulley) Themselves?
22         MS. WEDGWORTH: Objection.
23      A. No. They're -- they're not allowed to do that
24 and the security changes won't -- won't let that happen.
25      Q. (By Ms. Gulley) But what if an automated third

41 (Pages 324 - 327)

FTC-0001293

HIGHLY CONFIDENTIAL

Page 328

1  party says, "Oh, no, we're the agent of the dealer."
2  Does Reynolds allow that?
3          MS. WEDGWORTH: Objection.
4      A. No.
5      Q. (By Ms. Gulley) You also mentioned, several
6  times, Reynolds reporting functionality. Can dealers
7  give their operational data out to third parties?
8          MS. WEDGWORTH: Objection.
9      A. Yes.
10     Q. (By Ms. Gulley) And so on the one hand, we
11  talked about system access, no automated access, but
12  they can provide their data. How can they do that?
13         MS. WEDGWORTH: Objection.
14     A. We have a -- a data reporting facility. And
15  what they can do is -- and that's they can -- say, for
16  instance, run a print job that's not ever printed.
17  Instead, it's sent to disk and then they -- they
18  transmit that data in that dataset outside in -- as far
19  as we're concerned, you know, once they do it
20  themselves, we're out of the track.
21     Q. (By Ms. Gulley) So if Authenticom was the
22  recipient of that data from the dealer, is that
23  permitted?
24         MS. WEDGWORTH: Objection.
25         MR. NEMELKA: Objection.

Page 329

1      A. Yes.
2      Q. (By Ms. Gulley) I'm sorry?
3      A. Yes. I think there was one -- one of the, you
4  know, big users of -- I can't remember. It's -- it's
5  not a good example.
6      Q. What -- what about CarFax? If the dealer
7  wanted to download its information and send it to
8  CarFax --
9      A. That's what I was thinking about.
10         MS. WEDGWORTH: Objection.
11         MR. NEMELKA: Objections.
12     A. And they do.
13     Q. (By Ms. Gulley) I did not know you were
14  thinking that, by the way.
15     A. Yeah. They do. They use -- they use a
16  reporting mechanism and download their data to CarFax
17  and, as a result, CarFax is -- never became an RCI
18  customer. And that's fine.
19     Q. (By Ms. Gulley) As well?
20         MS. WEDGWORTH: Objection.
21     A. Yes. (Inaudible.)
22     Q. (By Ms. Gulley) Is the wind-down agreement
23  between Reynolds and CDK from 2015 still in effect?
24         MS. WEDGWORTH: Objection.
25     A. No.

Page 330

1      Q. (By Ms. Gulley) Ms. Wedgworth had said -- or,
2  no, I'm sorry, it was Mr. Nemelka had called it a
3  "five-year agreement." The agreement was 2015, five
4  years is 2020. Was it a five-year agreement?
5          MR. NEMELKA: Objection.
6          MS. WEDGWORTH: Objection.
7      A. No. It was an agreement until the -- the
8  stand-down process had been -- had been completed, which
9  it was completed, satisfactorily.
10     Q. (By Ms. Gulley) Ms. Wedgworth asked you about
11  exempted user IDs in various contexts. Are exempted IDs
12  exempted from all Reynolds security policies?
13         MS. WEDGWORTH: Objection.
14     A. No. Only for specific security policy issues.
15     Q. (By Ms. Gulley) Who's knowledgeable on that --
16  those issues?
17         MS. WEDGWORTH: Objection.
18     A. Maybe Kelly Hall.
19     Q. (By Ms. Gulley) All right. We've also talked
20  about DMS competition. Do dealers change DMS providers?
21     A. Yes, they do.
22     Q. Do dealers switch away from Reynolds?
23     A. Yes, they do.
24     Q. Do dealers switch away from CDK?
25         MR. NEMELKA: Objection.

Page 331

1      A. Yes, they do.
2      Q. (By Ms. Gulley) Do they switch away from Cox
3  Automotive Dealertrak?
4          MS. WEDGWORTH: Objection.
5          MR. NEMELKA: Objection.
6      A. Yes, they do.
7      Q. (By Ms. Gulley) Now, you had mentioned there,
8  you do not have an agreement between Reynolds and Cox
9  Automotive Dealertrack with respect to conversions; is
10  that right?
11         MS. WEDGWORTH: Objection.
12     A. Correct.
13     Q. (By Ms. Gulley) But dealers, nevertheless,
14  leave Cox Aut-- are able to switch between Reynolds
15  and Cox; correct?
16         MS. WEDGWORTH: Objection.
17     A. That's correct. That process is -- is really,
18  you know, relatively simple. What you do is -- and
19  that's that you -- you print off a bunch of reports --
20  and I say "print off" -- you run a bunch of print jobs,
21  but don't print them off. Instead, you send them to
22  disk. And then that disk or thumb drive goes to the
23  assuming, you know, competitive system, and then they
24  run a series of software programs that parse the printed
25  information and put it into data records. And that

42 (Pages 328 - 331)

HIGHLY CONFIDENTIAL

Page 332

1  is -- that's how we convert any non-CDK, you know,
2  customer.  For instance, if we convert a Dealertrack
3  customer, we do it all with print jobs, and are very
4  familiar with it doing it.  It's really very simple
5  programming.  It's Tab A, Slot B.  You know, it's very,
6  very simple programming.
7      Q.  (By Ms. Gulley)  Let me hand you what
8  Ms. Wedgworth marked Plaintiff's 657.  This is the draft
9  letter to Hendrick discussed between you and Mr. Lamb.
10  Do you recall that area of questioning?
11     A.  Yes.
12     Q.  So just now, you gave an example of a dealer --
13  how -- how you would convert a dealer other than a CDK
14  dealer; is that accurate?
15         MS. WEDGWORTH:  Objection.
16     A.  That's right.  (Inaudible.)
17     Q.  (By Ms. Gulley)  Now, in this draft letter that
18  Mr. Lamb wrote, he discusses a -- a drop in sales and
19  other costs of a conversion away from Reynolds.  Do you
20  remember that?  And I'm looking at this -- this page
21  with the chart ending in 023.
22         MS. WEDGWORTH:  Objection.
23     A.  Yes.
24     Q.  (By Ms. Gulley)  Now, would you expect a dealer
25  that was switching away from a different DMS provider

Page 333

1  into Reynolds to have the same sort of costs?
2         MS. WEDGWORTH:  Objection.
3      A.  Yes.  You know, if we were converting them off
4  of Dealertrack, you know, we would go through the same
5  process.  And I -- I've tried to make the point that the
6  greatest variable in any kind of conversion is whether
7  or not, you know, the dealership personnel are motivated
8  and actually take their courses, pass their tests and
9  learn how to new -- use the new software.  And that's
10  key.  And it's more important than anything else.
11     Q.  (By Ms. Gulley)  Does Reynolds help customers
12  do that?
13         MS. WEDGWORTH:  Objection.
14     A.  Yes.  We have an education department and we
15  have onsite installers, and we have remote install
16  support people as well.
17     Q.  (By Ms. Gulley)  Would you consider yours
18  superior or inferior to CDK's?
19         MS. WEDGWORTH:  Objection.
20     A.  Well, I think that without question.  We're
21  superior.  But that's -- you know, that -- that's the
22  nature of -- of our business model.  What we try to do
23  is -- is -- we're not the cheapest.  Don't want to be
24  the cheapest.  We want to be the best.
25     Q.  (By Ms. Gulley)  Turn back to that first page.

Page 334

1  So the date of this email exchange is in early September
2  2015.  What does Hendrick do after September 2015, after
3  this pitch was made?
4         MS. WEDGWORTH:  Objection.
5         MR. NEMELKA:  Objection.
6      A.  Really, really, you know, unhappy thing.
7  They -- they issued termination notices to us and
8  announced that they're going to CDK.  And I was very
9  disappointed.
10     Q.  (By Ms. Gulley)  Did they sign a contract with
11  CDK?
12         MS. WEDGWORTH:  Objection.
13     A.  Yes, they did.
14     Q.  (By Ms. Gulley)  So they switched to CDK?
15         MS. GULLEY:  Objection.
16     A.  They didn't.  They didn't switch yet.
17     Q.  (By Ms. Gulley)  They decided to switch?
18         MS. WEDGWORTH:  Objection.
19     A.  They decided to switch.  They contracted to
20  switch.  And then -- which is a further, you know,
21  longer story -- they decided to switch.  And then, as
22  the switch began, it began first with a very small
23  dealership that was, basically, a new start.  And they
24  had all new people and it was -- you know, therefore
25  pretty easy, pretty simple conversion job, which went

Page 335

1  okay.
2         The second dealership that they converted
3  was a monster Toyota dealer, which is within eyesight of
4  Hendrick's headquarters.  And it was a -- an absolute
5  disaster from the conversion standpoint.  But not
6  because of the software, not because of the systems, not
7  because of the data conversion, not because of anything
8  like that.
9         There is a process that is very, very
10  important in the service department, which it's called
11  "opcodes."  And opcodes are -- they're unique to each
12  dealership.  Each dealership has kind of built their own
13  opcode structure.  And typically, it's a two-digit or a
14  three-digit number.  And its whole purpose is -- is to
15  save time in typing.  When you're opening up a repair
16  order, there's a tremendous amount of keystroke-kind of
17  work that has to be done.  And the opcodes shorten that
18  dramatically.
19         Well, there had been an initiative inside
20  Hendrick, which had not been accomplished or even
21  attempted, which was to standardize opcodes amongst all
22  105 dealerships.  And the goal -- or the reason to do
23  that was, that way you could move a service advisor from
24  one dealership to another dealership, and he would not
25  have to relearn the opcodes.  Because if you put a

43 (Pages 332 - 335)

FTC-0001295

HIGHLY CONFIDENTIAL

Page 336

1 service adviser into an environment where there's all
2 new opcodes, he's crippled, because he has to look up
3 whatever opcode it is.  And -- and he has to keep doing
4 that until he's finally memorized, you know, whatever
5 the new set of opcodes are from the place he's been
6 transferred to.
7         They wanted to avoid that forever and all
8 time.  Unfortunately -- and I don't know the exact --
9 who talked to who about what, but the upshot was -- and
10 that's that Hendrick decided -- and -- and CDK let them
11 change the opcodes on the day of conversion to the new
12 system.
13        And the result was -- and that that, you
14 know -- it's always been on Monday mornings, people
15 always bring their cars in, and they've kind of made
16 their to-do list over the weekend and -- you know, day
17 one is, you know, you bring your car into do this or do
18 that.  So there's a lot of -- right -- typical Monday
19 morning.
20        The process of opening a repair order was
21 absolutely crippled, because it was all new opcodes and,
22 you know, the service advisors had to look up every
23 opcode, which just, you know, really made it proceed at
24 a snail's pace.  Which meant that the -- the technicians
25 who were paid on incentive programs, they did not get

Page 337

1 work to do until almost noon.  And they were not happy
2 about that.  They lost half a day's pay.
3         But everybody, I think, had a little bit
4 of, you know, forgiveness built in, because, after all,
5 they were converted to the new system and it was --
6 they -- they expected some things not to go right.
7         The second day, it didn't get any better.
8 And by noontime, you know, the techs were absolutely up
9 in arms.  It was an absolute up rising.  And they were
10 saying -- which is absolutely true -- they were top
11 technicians, some of them had been with Hendrick 25
12 years or more, and they were just wailing.  And so the
13 call for help went out to -- Mr. Hendrick needed to come
14 and address the group, which he did.  And he did a smart
15 thing.  He said, "Guys, I promise you, you're going to
16 make 10 percent more this month than you've ever this
17 year.  Be patient with us."
18        The techs said, "Okay, we understand."
19        And then another interesting thing
20 happened.  Success of data conversions has a lot to do
21 with the quality of personnel, experienced personnel,
22 really.  Obviously, there was -- there was some real
23 lack of experience, because the CDK conversion group
24 should have resisted this idea -- this crazy idea of
25 changing opcodes on the first day of installation.  So

Page 338

1 "Mr. H.," as he's called -- he's very low-key kind of
2 guy.  And he -- he went around and just kind of talked
3 to folks, you know, after, you know, the initial fire
4 had been quenched.  And he walked up to a -- a CDK
5 installer and, you know, talked to him, you know, "Well,
6 how are you?  My name is Rick Hendrick."  Shook his
7 hand.  Rick's -- you know, Rick's a hero figure in -- in
8 car racing.  He's one of "the" guys.  And he was talking
9 to this one young person and, you know, in the course of
10 the conversation, he's -- he asked, well, "How long have
11 you been with CDK?"
12        And the person answers, "Well, I'm not with
13 CDK.  I'm -- I'm a contractor."
14        "Oh, really?  Okay.  How long have you been
15 a contractor?" and so forth.  And he talked to several
16 others, you know, kind of got the same answer.  And he
17 realized that he had been promised the best install team
18 and he had not gotten it.  And Rick Hendrick's the kind
19 of person -- he's a very simple person.  You only get to
20 lie to him once.
21        And the next day he called us up and said,
22 "Bob," you know, "we've got problems.  If you won't
23 punish us, we'd like to come back."
24        And the answer is, obviously, "Whatever our
25 last proposal is, that's it."

Page 339

1        And so they came back.  And, you know,
2 that's probably one of the most amazing, you know,
3 conversion stories that I've ever heard and -- and the
4 software, our software, had nothing to do with it.  You
5 know, CDK's software had nothing to do with it.  There
6 was nothing wrong with the hardware.  Probably not that
7 much wrong with the people.  If they had just not
8 changed opcodes.
9   Q.  (By Ms. Gulley)  Why did you lose Hendrick in
10 the first place?
11        MS. WEDGWORTH:  Objection.
12  A.  Well, that's a very pertinent question.  Mr. Ed
13 Brown is, nominally, the president, is a required
14 banker.  He was with Bank of America there in Charlotte
15 for 30 some-odd years.  He retired.  And he had banked
16 Rick over the years and knew him well.
17        And Rick decided that he wanted to spend
18 more time racing, and he hired Ed Brown.  And Ed Brown
19 knows nothing about computers.  He probably -- by now,
20 he knows a little bit about dealerships but, you know,
21 that's not been -- he's definitely not what you would
22 call a -- an experienced automotive executive.  And I
23 think what he wanted to do is he wanted to go do
24 business with CDK because they were a big public company
25 and we're not.

44 (Pages 336 - 339)

FTC-0001296

HIGHLY CONFIDENTIAL

Page 340

1    Q.  (By Ms. Gulley)  So he just decided to switch?
2         MS. WEDGWORTH:  Objection.
3    A.  So he decided to switch.  And, you know, Mr. H.
4    had promised me -- he said, "Bob, I promise you that I
5    will never, ever let the decision of this magnitude go
6    by without me personally being involved."
7         And I said, "Rick, you really need to do
8    that."
9    Q.  (By Ms. Gulley)  Did he promise he'll stay with
10   you?
11        MS. WEDGWORTH:  Objection.
12   A.  Well, he signed a five-year contract, and he
13   has almost doubled their billing with additional stuff
14   that they bought.  They bought over 400 docuPADs.
15   Q.  (By Ms. Gulley)  Let's talk about docuPAD for a
16   minute.  Does every Reynolds dealer have a docuPAD?
17        MS. WEDGWORTH:  Objection.
18        MR. NEMELKA:  Objection.
19   A.  No.  That -- That's our goal, but I mean --
20   we've not yet achieved that.
21   Q.  (By Ms. Gulley)  Now, if dealer -- if a dealer
22   wanted to use docuPAD with another DMS, would you
23   consider that?
24        MS. WEDGWORTH:  Objection.
25   A.  There -- there's technical issues that just

Page 341

1    prohibit that.  You know, there's -- one of the -- one
2    of the magic screens in -- in docuPAD is a screen
3    where -- will be displayed of some add-on.
4         You know, for instance, like an extended
5    warning for, you know, repair.  There will be a
6    good/better/best -- that kind of choice and -- and the
7    consumer, with their -- with their stylus on their side
8    of the table actually checks which one they want, and
9    they will instantly display what their payment is in the
10   corner.
11        And then they can -- they can tap on the
12   "Better Policy," and it will change the payment for
13   them.  And then it will check -- they'll tap on the
14   "Best Policy" and it will give them what the payment is.
15   And they can choose which one they want or none.
16        They can -- they -- go back and click on
17   the "None" button, and it will (verbally indicating) --
18   it will keep on changing, you know, the payment.
19        Well, how does he get that done?  What it
20   does is -- is it -- it is built right into the Reynolds
21   F&I system.  And, you know, therefore, we can't -- we'd
22   like to consider selling it to, you know, non-Reynolds
23   customers, but we can't from a technical standpoint.  It
24   would just -- the rework would be just huge.
25   Q.  (By Ms. Gulley)  Also in talking about docuPAD

Page 342

1    with Ms. Wedgworth, you used a number of terms like
2    "profit producer" or "revenue generator."  Do you
3    remember that discussion?
4    A.  Yes.
5         MS. WEDGWORTH:  Objection.
6    Q.  (By Ms. Gulley)  You called it "sticky," right?
7         MS. WEDGWORTH:  Objection.
8    A.  Yeah, it is -- it is so compelling from a money
9    standpoint that we think that dealers will stick with it
10   simply because it would make economic -- you know, they
11   wouldn't be sensible to change.
12   Q.  (By Ms. Gulley)  So I think the -- so the
13   record is clear -- it's not entirely clear in the
14   record, who you're talking about.  Who is making all of
15   this revenue?  Who is generating all of this -- who's
16   producing all of this profit?
17        MS. WEDGWORTH:  Objection.
18   A.  The dealer is.  And -- and it's occurring
19   because of what, you know, what I think is nigh onto a
20   miracle.  Because I -- I -- in the original conception,
21   I never dreamed it would do it.
22        What happens is -- and that's that the
23   finance and insurance part of the business is typically
24   called a "business office."  And, you know, the part of
25   the sales process of buying a car -- where it occurs is

Page 343

1    after you've decided what car that you want.  It's after
2    you've decided what kind of financing, it's after you've
3    decided on what trade-in value you're going to have.
4    All that's done and everybody kind of shakes hands on
5    the deal.
6         And then, after a little bit, you're sent
7    to the business office to finalize the paperwork.  Okay?
8    That's where there's this final attempt to sell you
9    things.  And it's all kinds of things.  It's extended
10   warranties.  It is tire and wheel protection.  It's, you
11   know, electronic key, locks.  It's -- it's windshield
12   cracks.  It is what they call "rust and dust," which is,
13   you know -- it's fabric protectant inside.  It used to
14   be undercoating, but nobody undercoats anymore.
15        But it -- it's a very, very essential
16   profit center for the dealership.  Unfortunately, it is
17   ranked very, very high in customer dissatisfaction.  And
18   people who have been through the process are warned that
19   what you do is you cross your arms like this
20   (indicating) when you go in there, and the answer to
21   everything they say is, "No."  "No."  "No."  "No."  And
22   you do that long enough, they'll finally let you loose
23   and you can go away with your new car.
24        What happens in the docuPAD situation is we
25   completely changed that whole process.  Instead, you

45 (Pages 340 - 343)

FTC-0001297

HIGHLY CONFIDENTIAL

Page 344

1 know, the consumer comes in, they sit on their side of
2 the table, and there's this big flat screen that's about
3 so high (indicating) and the whole transaction is --
4 takes place there.  And the customer is given a stylus,
5 and they basically -- it's a menu system.  They get to
6 pick the stuff off the menu that they want.
7          And the miracle is that they buy more
8 because they don't hate the process.  They're -- they're
9 so completely disarmed, you know, they -- they go from
10 this posture here, saying -- telling them, "No."  "No."
11 "No."  Instead, they get handed a stylus, and say --
12 "You" -- "You run the system.  You make your choices."
13          And that amounts to, typically, 200 bucks
14 per transaction more gross profit to the dealer.  So if
15 you have a -- a typical finance manager who will handle
16 70 transactions a month at 200 bucks apiece, that's
17 $14,000 a month in additional gross profit -- per F&I
18 managers.  If you've got five, then it's five times that
19 a month.
20     Q.  (By Ms. Gulley)  Is that more than the -- what
21 they're paying to license the DMS, the whole DMS?
22     A.  Correct.
23          MR. NEMELKA:  Objection.
24     A.  We have customers that will stand up and swear,
25 and take calls, you know, and go visit -- that that's

Page 345

1 what it does.  It's that good.  It's one of those
2 situations where -- I've been in this business a long
3 time, and my daily prayer is, "Oh, Lord, please give me
4 one more killer ap."  And he gave it to me.  I -- I
5 didn't -- I didn't invent it.  I can't take credit for
6 that.  But I saw it, and I said, "God, we've got to have
7 this."
8     Q.  (By Ms. Gulley)  All right.  Let's switch gears
9 a little bit.  Mr. Nemelka just shortly -- this
10 afternoon, put in front of you an email between you and
11 Mr. Anenen.  Do you remember that?
12     A.  Uh-huh.  (Witness answers affirmatively.)
13     Q.  How do you feel about CDK/ADP?
14          MS. WEDGWORTH:  Objection.
15          MR. NEMELKA:  Objection.
16     A.  Well, that is -- that is a -- a complex
17 question.  There's individual people inside CDK that are
18 decent people.  Ron Workman was a decent person.  I
19 mean, Steve Anenen is a decent person.  Corporately,
20 they're -- I don't have good feelings about them at all,
21 and it goes back to many, many, many years ago.  I've
22 been competing against them directly in the marketplace
23 for well in excess of 40 years.  And, you know, they did
24 some things, you know, back early on that I'm still mad
25 about.

Page 346

1     Q.  (By Ms. Gulley)  Are we talking '70s, the
2 1970s?
3          MS. WEDGWORTH:  Objection.
4     A.  1970s.  1970s.  I have very, very bad
5 experience with them, and I'm, you know, still bent out
6 of shape about that.
7          And then about -- about 20 years ago, there
8 was a small company in Houston that, you know, copied
9 our system and built a new one based upon -- they --
10 they stole our -- our screen layouts, our report
11 layouts, our -- our field -- our field layouts, our data
12 fields inside the field -- inside the -- inside the
13 records, and sold it to, you know, ADP for $67 million.
14 And for some reason -- or a reason we don't know, ADP
15 decided to hold back $27 million out of that
16 transaction.  For some reason.
17          We sued ADP as a result, and I wasted a
18 year in depositions, arbitration and whatnot.  You know,
19 finally lost.  I'm still amazed that I did.  But in
20 my -- I was dispirited about that.  But the Lord decided
21 that he will help me.
22          And it went like this:  After ADP won, they
23 put in -- they ran a whole floor in a big office
24 building out of Westmark in Houston.  And they hired
25 about 150 programmers.  This was going to be the next

Page 347

1 generation system.  They told their sales force all
2 about the next generation system.  And they worked at it
3 and they worked at it and they worked at it, and it all
4 looked great, and it would run four terminals well.
5 Four.  You put 20 on it, it wouldn't work at all.  And
6 they could not scale it up.
7          But they worked -- they didn't stop
8 working.  They said, "Well, we can fix this.  We can do
9 this."  And they worked and they worked and they worked
10 and they worked, and finally, five years after their --
11 their, quote, "victory" over Bob Brockman, they scrapped
12 the whole thing.
13          And as close as I can estimate that cost
14 them, including the original purchase price, plus the
15 legal fees for fighting me off, it cost them $250
16 million and cost them five years in market, because all
17 of a sudden, they had to start over on what their next
18 generation piece of software was going to be.
19          So obviously, I have a lot of very, very
20 strong feelings about it -- about ADP or CDK.  I don't
21 like them, and I don't like them a lot.
22     Q.  (By Ms. Gulley)  Do you want help them make
23 more profits?
24          MS. WEDGWORTH:  Objection.
25          MR. NEMELKA:  Objection.

46 (Pages 344 - 347)

FTC-0001298

HIGHLY CONFIDENTIAL

Page 348

1    A.  Only if -- if I make more profit, you know,
2  right alongside them.
3    Q.  (By Ms. Gulley)  Well, in this case, the
4  plaintiffs have alleged that you and CDK have gotten
5  together in some sort of a conspiracy.  I want to kind of
6  talk through some of that.  Are you the leader of
7  Reynolds and Reynolds?
8         MS. WEDGWORTH:  Objection.
9    A.  Unequivocally.
10    Q.  (By Ms. Gulley)  When did you learn that CDK
11  was going to require vendors to access its system
12  through the 3PA program rather than any other method?
13         MS. WEDGWORTH:  Objection.
14    A.  I don't know the exact day, but it was
15  substantially after the stand-down agreement.
16    Q.  (By Ms. Gulley)  So it was after February 2015?
17    A.  Yes.
18         MS. WEDGWORTH:  Objection.
19    Q.  (By Ms. Gulley)  Did you personally agree with
20  anyone at CDK that you would get together to block
21  Authenticom?
22         MS. WEDGWORTH:  Objection.
23         MR. NEMELKA:  Objection.
24    A.  Did not.
25    Q.  (By Ms. Gulley)  That you would get together to

Page 349

1  block anyone in Authenticom's business line?
2         MS. WEDGWORTH:  Objection.
3    A.  No.  Did not.
4    Q.  (By Ms. Gulley)  Did you personally agree with
5  anyone at CDK that you would destroy Authenticom
6  together?
7         MS. WEDGWORTH:  Objection.
8    A.  Absolutely not.
9    Q.  (By Ms. Gulley)  Have you ever discussed CDK's
10  policies about system access to their DMS with CDK?
11         MS. WEDGWORTH:  Objection.
12    A.  I have not.
13    Q.  (By Ms. Gulley)  Are you aware of any agreement
14  between anyone at Reynolds and CDK to eliminate
15  third-party data brokers, like Authenticom?
16         MS. WEDGWORTH:  Objection.
17    A.  I have not.
18    Q.  (By Ms. Gulley)  Did you and CDK ever meet to
19  even discuss the two firm's data access policies?
20         MS. WEDGWORTH:  Objection.
21    A.  We have not.
22    Q.  (By Ms. Gulley)  Are you aware of anyone having
23  those kind of conversations with CDK?
24    A.  No.
25         MS. WEDGWORTH:  Objection.

Page 350

1    A.  I -- I didn't come to understand their data
2  access policy, really, until we bought ReverseRisk,
3  which is -- which was a customer.  They -- they acquired
4  data downloads for accounting data from CDK, and it
5  wasn't until that time that I understood, even, how it
6  all worked.
7    Q.  (By Ms. Gulley)  These -- in terms of an
8  agreement between Reynolds and CDK related to companies
9  like Authenticom, if there was any such agreement about
10  how the two firms were going to jointly treat somebody
11  like Authenticom, would you know about it?
12         MS. WEDGWORTH:  Objection.
13    A.  Absolutely.  As you probably can tell, I'm --
14  I'm into the details, big time.  And there's no way in
15  the world anything like that would happen without my --
16  without my knowledge.
17    Q.  (By Ms. Gulley)  What about any agreement
18  between Reynolds and CDK related to the two firms' data
19  access policies?  If there were any agreement like that,
20  would you know about it?
21    A.  Absolutely.
22         MS. WEDGWORTH:  Objection.
23    A.  Absolutely.
24    Q.  (By Ms. Gulley)  Did you enter into an
25  agreement with CDK to create a market where Reynolds

Page 351

1  controlled all of the access to data stored on a
2  Reynolds DMS and CDK would control all of the access to
3  data stored on CDK's DMS?
4         MS. WEDGWORTH:  Objection.
5    A.  I did not.
6    Q.  (By Ms. Gulley)  Are you aware of any such
7  agreement?
8         MS. WEDGWORTH:  Objection.
9    A.  There is no -- there is no such agreement.
10    Q.  (By Ms. Gulley)  As soon as we find it, I'll
11  hand you Exhibit 644, from plaintiffs, earlier marked.
12  It's notes from a sales meeting in Aspen.  Ms. Wedgworth
13  had asked you some questions about this.  I'd like to
14  direct you to the page ending 632.  I -- I don't
15  actually know if it was Ms. Wedgworth or Mr. Nemelka as
16  I sit here, but do you recall looking at this document
17  before?
18    A.  Yes, I do.
19    Q.  And again, these are -- I believe you
20  testified, in sum and substance, that these are your
21  notes in preparation of speaking to the top salespersons
22  at Reynolds in --
23         MS. WEDGWORTH:  Objection.
24    Q.  (By Ms. Gulley) -- July 2014.
25         MS. WEDGWORTH:  Objection.

47 (Pages 348 - 351)

FTC-0001299

HIGHLY CONFIDENTIAL

Page 352

1    A. Yes, it would be the sales VPs.
2    Q. (By Ms. Gulley) And how many sales VPs are
3 there?
4        MS. WEDGWORTH: Objection.
5    A. All total, like, 12.
6    Q. (By Ms. Gulley) All right. There's a line
7 here -- Bullet 1, 2, 3, 4 -- Bullet 4, "This could put
8 the security wars very much behind us." Do you see
9 that?
10        MS. WEDGWORTH: Objection.
11    A. Is this 632?
12    Q. (By Ms. Gulley) 632. Do you see where it says
13 "Security" at the bottom?
14    A. Okay.
15    Q. And then there's a number of bullet points.
16 I'm looking at the penultimate -- the second from the
17 bottom. "This could put the security wars very much
18 behind us." Do you see where I am?
19        MS. WEDGWORTH: Objection.
20    A. Yes.
21    Q. (By Ms. Gulley) You were asked a lot about
22 this section in earlier questioning. I'd like you to
23 explain what you meant by "security wars" in this
24 document.
25        MS. WEDGWORTH: Objection.

Page 353

1        MR. NEMELKA: Objection.
2    A. The subject of data security, when it comes to
3 third-party data brokers, hackers, whatever you want to
4 call them, has been, over the years, very much a
5 cat-and-mouse kind of situation where we will detect a
6 method by which somebody is getting into the system.
7 And we will devise a countermeasure. And that will
8 cause them to be unable to get into the system for a
9 while.
10    And then they -- they're -- they're not --
11 you know, dummies. What they'll do is they'll figure
12 out a different way. And that will work for a while,
13 and we will, ultimately, observe that one, and we'll
14 then go about employing countermeasures.
15    Now, what that is -- is that -- that's --
16 that's kind of a seesaw, you know, kind of back and
17 forth like a war. And that's where the inference comes
18 from. There's not a -- a -- we don't have a declaration
19 of war per se. You know, we don't have a -- a, quote,
20 "War room" with a capital W, that sort of thing. It --
21 it's a figure of speech. And it applies to this, you
22 know, back and forth nature of -- of data security
23 and -- and its countermeasures.
24    Q. (By Ms. Gulley) So -- so the security war was
25 with DMI and Integra Link!! and Authenticom and SIS,

Page 354

1 those folks? Or something else?
2        MS. WEDGWORTH: Objection.
3        MR. NEMELKA: Objection.
4    A. Probably, you know, Phil Bautista was -- was
5 one of the early and one of the worst ones. And is
6 still -- he's still regrowing his fangs.
7        MS. GULLEY: I thank you for your time. I
8 have nothing further. I believe the plaintiffs have a
9 few minutes left.
10        FURTHER EXAMINATION
11 BY MR. NEMELKA:
12    Q. Mr. Brockman, you testified about an -- an
13 Xtime incident, and I have a question about that. The
14 Xtime incident happened through the RCI interface, not
15 because of any data integrator; correct?
16        MS. GULLEY: Form.
17    A. That's correct.
18    Q. (By Mr. Nemelka) So your answers with respect
19 to the Xtime incident have nothing to do with use of
20 data innovators, right?
21        MS. GULLEY: Form.
22    A. That particular situation, yeah, did not
23 involve data integrator. Come, however, any data
24 integrator that employed any kind of write-back
25 strategy, you know, could, potentially, the same thing

Page 355

1 happen.
2    Q. (By Mr. Nemelka) All right. And then
3 Ms. Gulley put a document in front of you with your son
4 about the DealerBuilt situation. The DealerBuilt
5 situation also had nothing to do with dealers using data
6 integrators, right?
7    A. That's correct.
8    Q. And so you wrote your son, "It finally
9 happened." It had nothing -- but that had nothing to do
10 with Data Integrators, right?
11        MS. GULLEY: Objection; form.
12    A. It has to do with a data breach situation,
13 which is a very distinct possibility with a data
14 integrator.
15    Q. (By Mr. Nemelka) But that incident with
16 DealerBuilt had nothing to do with a data integrator,
17 right?
18        MS. GULLEY: Objection; form.
19    A. That particular incident did not have anything
20 to do with a data integrator.
21    Q. (By Mr. Nemelka) And still today, you haven't
22 -- you're not aware of any data breach caused by
23 Authenticom; correct?
24        MS. GULLEY: Objection; form.
25    A. That's come to my attention.

48 (Pages 352 - 355)

FTC-0001300

HIGHLY CONFIDENTIAL

Page 356

1    Q.  (By Mr. Nemelka)  You also testified about --
2  you estimated that you wouldn't be surprised -- I wrote
3  it down -- you wouldn't be surprised, you said, if the
4  number was 500 million with respect to what Reynolds had
5  spent with respect to security.  Do you recall that
6  testimony?
7          MS. GULLEY:  Billion.  Not millions.  He
8  said billion, not million.
9          MR. NEMELKA:  500 billion?
10         MS. GULLEY:  Oh, I'm sorry.  Half a
11 billion.  I'm sorry, Counselor, it's late.  I'm sorry,
12 Mike.
13    Q.  (By Mr. Nemelka)  You never actually calculated
14 that number, did you?
15    A.  That's correct.
16    Q.  Nobody in Reynolds actually calculated that
17 number, have they?
18         MS. GULLEY:  Objection; form.
19    A.  That's correct.
20    Q.  (By Mr. Nemelka)  There are no documents
21 reflecting that calculation, are there?
22    A.  No.
23         MS. GULLEY:  Form.
24    A.  That's -- that's correct.  I -- I'm making
25 that, you know, guesstimate based on my knowledge and

Page 357

1  experience in the business.
2    Q.  (By Mr. Nemelka)  All right.  That number is
3  just a guesstimate, right?
4          MS. GULLEY:  Objection; form.
5    A.  That's correct.  But I think it's a pretty good
6  one.
7    Q.  (By Mr. Nemelka)  But it's still speculative,
8  right?
9          MS. GULLEY:  Objection; form.
10    A.  It's still speculative.  But I would -- I would
11 add that I'm, you know, probably uniquely qualified to
12 be able to make that kind of guesstimate.
13         MR. NEMELKA:  All right.
14              FURTHER EXAMINATION
15 BY MS. WEDGWORTH:
16    Q.  Mr. Brockman, you stated earlier that the
17 exemptions are only for specific security policy.  Do
18 you remember saying that when Ms. Gulley was asking you
19 questions?
20    A.  Yes, I did.
21    Q.  If you could look at -- at Exhibit 665 of
22 Plaintiff's.  Here's 665.  Mr. Brockman, this document,
23 halfway down the page, the top email, if you'll note, is
24 from Mr. Schaefer to you.  Do you see that?
25    A.  Yes.

Page 358

1    Q.  And the email which is dated May 8, 2016, you
2  might recall that dealt with security enhancements that
3  you wanted to implement and did implement that month.
4  Do you recall that?
5          MS. GULLEY:  Form.
6    A.  Excuse me.  Let me read this again.  Yes, I --
7  I've read this.  I'm not sure that I understand it
8  completely, but --
9    Q.  (By Ms. Wedgworth)  So here, Mr. Schaefer asked
10 you, toward the bottom of the email, talking about the
11 new security enhancements to be implemented by Reynolds.
12 It states, "I am trying to understand if there will be
13 any exceptions?  Which we have always had?  For example,
14 PAG, Hendrick, AMSI, Rahal, Wyler, etc."
15          PAG and Hendrick, AMSI, Rahal and Wyler,
16 those are all dealerships; correct?
17          MS. GULLEY:  Objection; form.
18    A.  That's correct.
19    Q.  (By Ms. Wedgworth)  And they are large
20 dealerships, right?
21    A.  Yes.  They are some of the largest.
22    Q.  And here, Mr. Schaefer says that those
23 dealerships have always had exemptions; is that correct?
24          MS. GULLEY:  Form.
25    A.  For certain, you know, PAG, Hendrick, AMSI, I'm

Page 359

1  personally aware of always had some exceptions.  These
2  are very large organizations, amongst the largest, and
3  have very extensive IT staffs of their own.  And they're
4  what I would call quite sophisticated.
5          Rahal and Wyler are a little smaller, but
6  they still have -- not a large number of individuals,
7  but they have a small number of individuals that are
8  really, really savvy and know what they're doing.
9          And in those particular cases, we've always
10 allowed them, you know, some specific exceptions as far
11 as, you know, downloading of data and that sort of
12 thing.
13          MS. GULLEY:  That's -- that's the end of
14 your time.
15    A.  And what -- what --
16    Q.  (By Ms. Wedgworth)  Well --
17    A.  What Bob Schaefer is doing and that's he wants
18 to know, you know, what kind of exception is -- is going
19 to be.  And he's asking, he's saying, "Please advise."
20    Q.  And he's saying, We have always had these
21 exceptions for these dealerships, correct?
22    A.  The -- the --
23          MS. GULLEY:  Objection; form.
24    A.  -- for these, five dealerships, there's always
25 been some kind of exception.  Without going back in to

49 (Pages 356 - 359)

FTC-0001301

HIGHLY CONFIDENTIAL

Page 360

1 the details, I can't tell you exactly what.
2    Q. (By Ms. Wedgworth) And in addition to --
3       MS. GULLEY: Peggy, that's the end of your
4 time.
5       MS. WEDGWORTH: I'm going to continue. You
6 took a long time, you went over a lot of topics. You
7 covered lots of -- a lot of topics.
8       MS. GULLEY: You had to reserve your time
9 for that. I'm sorry, Peggy. We're not going to
10 continue. I told you that there was a limit to how long
11 you could go. I just didn't cut him off when he was
12 answering.
13      MS. WEDGWORTH: Nor did I when I was
14 questioning him. So I -- I'm going to continue my
15 questioning.
16      MR. NEMELKA: We have two more minutes.
17 You're wrong about your calculation anyway, Andi.
18   Q. (By Ms. Wedgworth) So -- so other than the
19 five dealerships, there's also an "etc." at the end,
20 Mr. Brockman. Do you see that?
21      MS. GULLEY: Objection; form.
22   A. Yes, ma'am, I do.
23   Q. (By Ms. Wedgworth) And so that doesn't limit
24 it to just the five dealerships who always have
25 exemptions; is that correct?

Page 361

1       MS. GULLEY: Objection; form.
2    A. Ma'am, I -- I don't know, you know, if there's
3 one more, or no more, or multiple that more. I can't
4 tell from looking at this. And, again, we -- I think
5 we've talked about in the last two days about the
6 total number of exceptions that are out there and how
7 that number keeps coming down, down, down, down, down.
8 And we're not all the way there yet.
9    Q. (By Ms. Wedgworth) And the biggest drop of
10 those exemptions coming down --
11      MS. GULLEY: Objection.
12   Q. (By Ms. Wedgworth) -- came after the
13 stand-down agreement; correct?
14   A. That's correct.
15   Q. So if we now go to the first exhibit that you
16 -- that I used with you today -- and let's see if I can
17 find it.
18      MR. NEMELKA: I can try to find it for you.
19      MS. WEDGWORTH: Okay. It's the Ron Lamb
20 exhibit. But I -- I'll try to do it without looking for
21 the exhibit. It was the very first one today, which
22 would be 657.
23   Q. (By Ms. Wedgworth) But it's -- it's the letter
24 that Ms. Gulley referred you to that you reviewed, where
25 you said Mr. Lamb has written the letter and the first

Page 362

1 half of it was brilliant?
2       MS. GULLEY: Object to everything you just
3 said.
4       MS. WEDGWORTH: Here's a copy of it for
5 you. 677.
6       MR. NEMELKA: I found it.
7       MS. WEDGWORTH: 657. There we go.
8    Q. (By Ms. Wedgworth) Mr. Brockman, do you recall
9 this document?
10   A. Yes, ma'am.
11   Q. So on the second page, those dealerships that
12 are listed there, those are all privately held
13 dealerships, correct --
14      MS. GULLEY: Objection; form.
15   Q. (By Ms. Wedgworth) -- in that box, in the
16 chart?
17      MS. GULLEY: Form.
18   Q. (By Ms. Wedgworth) Second page.
19      MS. GULLEY: Form.
20   A. And what -- what is your question again,
21 please, ma'am?
22   Q. (By Ms. Wedgworth) The dealerships listed in
23 the chart are all privately held dealerships; is that
24 right?
25      MS. GULLEY: Form.

Page 363

1    A. Ma'am, I -- I don't know that. I -- I --
2 there's some of them -- Herb Chambers, I'm -- I'm
3 familiar with. And I'm pretty sure that one is
4 privately owned. The status of the rest of them, I --
5 I'm unaware.
6    Q. (By Ms. Wedgworth) Well, do you have -- do you
7 have any knowledge that any of those others are publicly
8 held companies?
9    A. Ma'am, I'm -- I'm sorry. I -- I just don't
10 know.
11   Q. Okay. With regard to this letter, I think you
12 answered some questions from Ms. Gulley. You -- do you
13 stand by this letter as Mr. Ron Lamb wrote it and you
14 edited it?
15      MS. GULLEY: Objection; form.
16   A. Yeah, I acknowledge the fact that he wrote it.
17 This is a sales letter. And I looked at it from a
18 topical standpoint. As I think I remember stating, I
19 was very pleased that there were no misspellings, and
20 punctuation also looked pretty good. But as far as
21 the -- the exact, you know, last, you know, comment in
22 the paragraph, I did not read it for that -- that level
23 of content.
24   Q. (By Ms. Wedgworth) Well, when you say it's a
25 sales letter --

50 (Pages 360 - 363)

FTC-0001302

HIGHLY CONFIDENTIAL

Page 364

1      MS. GULLEY:  Ms. Wedgworth, we're way
2  beyond your time.  You can finish the -- you are way
3  beyond your time.  For the record, we have asked
4  questions of all of our witnesses.  You just did not
5  reserve enough.
6      MS. WEDGWORTH:  Well, I'm going to -- I'm
7  going to keep this deposition open for many reasons.
8  The least of which is that we -- we let him answer every
9  single question.  We let him take as long as we want.
10  You've asked a lot of questions.  He's given very long
11  answers and we're entitled to respond to all of that.
12  In addition, you produced over 2,000 -- 200,000
13  documents --
14      MR. NEMELKA:  Pages of documents.
15      MS. WEDGWORTH:  -- pages of documents over
16  the weekend.  And for all those reasons, we are going
17  to --
18      MS. GULLEY:  You knew that those documents
19  were coming in advance, because we --
20      MS. WEDGWORTH:  Actually, we did not.  And
21  we certainly didn't see them coming in on Friday night.
22      MS. GULLEY:  You compelled them and the
23  court ruled that they would be produced after the motion
24  to compel.  As you know, we're all still producing
25  documents in response to the Court's ruling on the

Page 365

1  motion to compel.  You put these depositions on the
2  docket in -- in any event.  That's our entire point, is
3  why plaintiffs are so far ahead of us on the number of
4  depositions, because plaintiffs do not produce
5  documents.  And we understand that we can only take
6  depositions once.
7      We are not holding the deposition open
8  longer.  You have used the entire seven hours.  We split
9  this over two days, not to give you a one-and-a-half day
10  deposition, but rather because of health -- of attorney
11  eyes only -- as we said before -- health considerations
12  that mean Mr. Brockman really cannot be here any longer.
13      And therefore, this deposition is not going
14  to stay here open.  I was actually going to tell you we
15  were out of time; if you would like to finish this
16  series of questions for the next two or three minutes,
17  that's fine, until you jumped down my throat and said
18  you're not going to close it at all.  That's nonsense.
19  That's -- we have an agreed protocol order.
20      MS. WEDGWORTH:  Well, I am not agreeing to
21  it, and I will be making a motion to the court to finish
22  this deposition.
23      MS. GULLEY:  How much longer do you need,
24  Ms. Wedgworth?
25      MS. WEDGWORTH:  I'm not sure.  It's

Page 366

1  depending on his answers.
2      MS. GULLEY:  What are you going to ask the
3  court for, an unlimited deposition?
4      MS. WEDGWORTH:  Nope.  Not unlimited at
5  all.  I would think at least an hour could cover all of
6  this.
7      MS. GULLEY:  Well, I believe that we need
8  to go off the record.  You're asking me before we go off
9  the record for an extension of one hour.  Otherwise,
10  you're filing a motion to just to be clear on the
11  record, for the future.
12      MS. WEDGWORTH:  Correct.  Correct.
13      MS. GULLEY:  And you'll be asking the Court
14  for one hour, additional?
15      MS. WEDGWORTH:  Certainly one hour, yes.
16      MS. GULLEY:  Okay.  Off the record.
17      THE VIDEOGRAPHER:  Off the record at 4:20
18  p.m.
19      (Short recess 4:20 to 4:42 p.m.)
20      THE VIDEOGRAPHER:  Back on the record at
21  4:42 p.m.
22      MS. GULLEY:  While we were off the record,
23  there was discussion back and forth among counsel about
24  next steps.  Counsel for plaintiffs approached me and
25  said, you know, if we could go ten more minutes, they

Page 367

1  would, you know, withdraw their objection to keep the
2  deposition open.  We were agreeable to that extra ten
3  minutes, and we're willing to put Mr. Brockman on the
4  stand for an extra ten minutes.
5      However, during that time period, he
6  suffered an incident with his health, verified by a
7  test.  And unfortunately, he's unable to come back into
8  the room to proceed for those ten minutes.  My
9  understanding is that plaintiffs are okay closing the
10  deposition for today, subject to your statements.
11      MS. WEDGWORTH:  We just reserve our rights
12  to pursue whatever we may need in the future.  And we
13  certainly appreciate that his health is paramount and
14  don't feel it appropriate.  If the -- if he can't
15  testify today, it wouldn't be appropriate to do it
16  today, due to his health.
17      MR. NEMELKA:  And I have no further
18  questions.
19      MS. GULLEY:  No, just in response to
20  Ms. Wedgworth, obviously, Mr. Brockman is the chairman
21  of the company, and he made himself available for the
22  entire seven hours.  We would object to keeping the
23  deposition open in any way.  I understand we've agreed
24  to disagree on that point.
25      MS. WEDGWORTH:  Off the record.

51 (Pages 364 - 367)

FTC-0001303

HIGHLY CONFIDENTIAL

Page 368

1        THE VIDEOGRAPHER:  This will conclude
2  today's deposition for Mr. Robert Brockman.  We are off
3  the record at 4:43 p.m.
4        (Deposition concluded at 4:43 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 369

1        CHANGES AND SIGNATURE
2  WITNESS NAME: ROBERT BROCKMAN   DATE: January 17, 2019
3  PAGE   LINE   CHANGE        REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12
       I, ROBERT BROCKMAN, have read the foregoing
13 deposition and hereby affix my signature that same is
   true and correct, except as noted above.
14
       ROBERT BROCKMAN
15
   THE STATE OF _____  )
16 COUNTY OF _____  )
17      BEFORE ME, _____ , on this
   day personally appeared ROBERT BROCKMAN, known to me (or
18 proved to me under oath or through
   _____) (description of identity
19 card or other document) to be the person whose name is
   subscribed to the foregoing instrument and acknowledged
20 to me that they executed the same for the purposes and
   consideration therein expressed.
21      Given under my hand and seal of office this
   _____ day of _____, _____.
22
23      NOTARY PUBLIC IN AND FOR
        THE STATE OF _____
24      COMMISSION EXPIRES: _____
25

Page 370

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3        )
   IN RE: DEALER MANAGEMENT   ) MDL NO. 2817
4  SYSTEMS ANTITRUST         )
   LITIGATION,               ) CASE NO. 18 C 864
5        )
6        )
7
8        REPORTER'S CERTIFICATION
9  ORAL AND VIDEOTAPED DEPOSITION OF ROBERT BROCKMAN
10       January 17, 2019
11         Volume 2
12
13      I, SHAUNA L. BEACH, Certified Shorthand
14 Reporter in and for the State of Texas, do hereby
15 certify to the following:
16      That the witness, ROBERT BROCKMAN, was duly
17 sworn by the officer and that the transcript of the oral
18 deposition is a true record of the testimony given by
19 the witness;
20      I further certify that pursuant to FRCP Rule
21 30(e)(1) that the signature of the deponent:
22      _X_ was requested by the deponent or a party
23 before the completion of the deposition and is to be
24 returned within 30 days from the date of receipt of the
25 transcript.  If returned, the attached Changes and

Page 371

1  Signature Page contains any changes and the reasons
2  therefor;
3          _____ was not requested by the deponent or a
4  party before the completion of the deposition.
5        I further certify that I am neither counsel
6  for, related to, nor employed by any of the parties or
7  attorneys to the action in which this proceeding was
8  taken.  Further, I am not a relative or employee of any
9  attorney of record in this cause, nor am I financially
10 or otherwise interested in the outcome of the action.
11      Subscribed and sworn to on this
12 30th Day of January , 2019.
13
14
15
16 _____
17      SHAUNA L. BEACH, RDR, CRR, CSR #8408
        Expiration Date:  12/31/2019
18
19
20
21
22
23
24
25

52 (Pages 368 - 371)

FTC-0001304

HIGHLY CONFIDENTIAL

[& - 24]                                                                                    Page 1

| & | 12/31/2019 371:17 | 2 | 235:9,17 238:25 |
|---|---|---|---|

**&**   167:19 168:4,10
175:12 176:1,5
260:10

**0**

**00963942**   171:18
**023**   332:21
**025**   184:5
**092**   241:15

**1**

**1**   170:1 172:21
174:1,20 237:6
245:6 255:21
296:13 323:16
352:7 370:21
**1,000**   194:18
**1,034k**   286:8
**1/2**   323:16,16
**10**   170:10 174:10
238:25 240:15
337:16
**10,000**   194:14
**10,690k**   286:8
**100**   169:4 179:8
**10119**   168:18
**105**   335:22
**10:17**   210:5,6
**10th**   196:4
**11**   170:11 174:11
**110**   192:17
**1100**   167:19 168:4
175:13
**11:02**   237:6,7
**11:09**   237:7,9
**11:15**   240:17,19
**11:31**   240:19,21
**12**   170:12 173:7,10
174:12 223:14
314:9 352:5

**12/31/2019**   371:17
**12:17**   265:11,12
**12th**   257:1 259:13
259:21
**13**   170:13 174:13
323:16
**14**   170:14 174:14
284:18 285:2,17
**14,000**   197:13
344:17
**142**   192:19
**15**   170:15 174:15
322:25
**150**   224:2,7,23
281:25 282:1,18
346:25
**16**   170:16 174:16
277:8 284:16
**16.3m.**   286:10
**1615**   168:11
**16953**   371:15
**17**   167:10 170:17
171:7 174:17
228:16,17 322:8
369:2 370:10
**176**   170:2,5
**17th**   167:15 175:3
**18**   167:4 170:18
174:18 277:19
370:4
**18.3m**   286:8
**184**   171:9
**18th**   277:20
**19**   170:19 174:3,19
241:22 277:8
**1970s**   346:2,4,4
**1999**   168:22
**19th**   168:17 277:4
**1:36**   265:12,14
**1st**   184:9 185:5
253:3 296:20

**2**   167:8,13 170:2
171:10 173:3
174:2 237:9 245:9
265:11 271:7,8
272:8 319:4 352:7
370:11
**2,000**   364:12
**20**   170:20 173:14
174:20 183:2
215:18 282:11
346:7 347:5
**200**   182:22 197:9
197:12 344:13,16
**200,000**   364:12
**2000**   284:17
**20006-1101**
168:22
**20006-6801**   169:5
**20036**   168:12
**2006**   304:13 305:2
**2009**   192:13 209:6
**201**   171:13 173:10
**2013**   171:7 289:16
322:8
**2014**   184:15
192:17 351:24
**2015**   171:10,14,17
174:13,16 184:9
201:21,22 213:18
213:20 214:2
224:1 225:8 226:4
226:12 289:23
293:16 329:23
330:3 334:2,2
348:16
**2016**   171:3,20,24
172:3,10,14,17,21
173:3,7,17 224:2,8
224:23 225:7
227:6 230:11

239:2 240:4
241:22 245:3,20
248:6 251:9
252:19 254:9,25
255:11,21 257:1
259:13,21 268:10
268:14 269:9
270:9 271:11
358:1
**2017**   172:7 173:14
173:21 174:3,9,20
218:17 219:12
263:4 271:19
277:4,8,19 286:9
288:8,11 296:13
296:20
**2018**   174:6 284:14
284:18
**2019**   167:10,16
175:3 245:10
369:2 370:10
371:12
**2020**   330:4
**2099**   169:4
**20th**   263:4
**21**   170:21 172:10
174:21
**213**   171:16
**22**   170:22 174:22
201:7
**221**   171:20
**226**   281:14
**229**   171:23
**23**   170:23 174:23
**234**   172:2
**237**   172:6
**23rd**   201:21
**24**   170:24 171:17
174:24 184:15

HIGHLY CONFIDENTIAL

**[240 - 700,000]**                                                Page 2

| | | | |
|---|---|---|---|
| **240**  172:9 | 339:15 370:21,24 | **5** | 357:22 |
| **244**  172:13 | **300**  170:6 194:21 | **5**  170:5 171:24 | **666**  172:16 247:23 |
| **247**  172:16 | 195:13,19,23 | 174:5 228:2 249:1 | 248:1,3 249:10 |
| **24th**  213:18,20 | 282:1,2,18 | 272:8 | 250:13 |
| **25**  170:25 174:25 | **30th**  201:21 | **5,000**  281:9 | **667**  172:20 252:2,5 |
| 314:8 337:11 | 371:12 | **5,910,000**  225:7,22 | 252:11,16 |
| **250**  347:15 | **31**  172:17 248:6 | **50**  204:11 | **668**  173:2 254:17 |
| **252**  172:20 | **318**  171:2 | **500**  356:4,9 | 254:18,21 |
| **256**  173:2,6 | **31st**  252:19 253:1 | **504**  218:5,9 | **669**  173:6 256:19 |
| **259**  173:9 | 253:2 | **53**  196:5 | 256:22,23 257:1 |
| **26**  242:2 | **32**  192:20 | **5300**  167:20 168:5 | 259:16 |
| **262**  173:13 | **321**  171:6 | 175:14 | **67**  346:13 |
| **268**  173:16 | **345**  322:11,23 | **5am**  253:12 | **670**  170:18 173:9 |
| **27**  346:15 | **35**  276:18 | **5th**  230:11 289:23 | 259:6,7,10 |
| **271**  173:20 | **354**  170:6 223:20 | **6** | **671**  173:13 262:20 |
| **274**  171:2 318:2,5 | 224:15,17 | **6**  170:6 174:6 | 262:23,25 |
| 318:8,11,17 | **357**  170:7 | 228:3 253:14 | **672**  173:16 268:21 |
| **275**  171:6 321:20 | **36**  199:17 | **632**  351:14 352:11 | 268:22,25 269:2 |
| 321:22 | **369**  170:8 | 352:12 | 271:11 |
| **276**  174:2 | **370**  170:9 | **644**  351:11 | **673**  173:20 271:13 |
| **27th**  260:6 | **3:16**  325:24,25 | **651**  228:15 | 271:16,18 |
| **28**  172:7 | **3:31**  325:25 326:2 | **657**  171:9 184:1,2 | **674**  174:2 276:14 |
| **2817**  167:3 370:3 | **3pa**  292:18 293:6 | 332:8 361:22 | 276:17,20 |
| **284**  174:6 | 295:4,15 348:12 | 362:7 | **675**  174:6 284:11 |
| **288**  174:9 | **3rd**  253:20 | **658**  171:13 201:9 | 284:12 |
| **289**  170:5 174:12 | **4** | 201:10 | **676**  174:9 288:7,13 |
| **29**  186:25 187:7 | **4**  170:4 173:17 | **659**  171:16 213:9 | **677**  174:12 289:14 |
| **292**  174:15 | 174:4 271:11 | 213:12 | 289:18 362:5 |
| **296**  174:19 | 326:2 352:7,7 | **660**  171:20 221:18 | **678**  174:15 292:14 |
| **2:21**  287:8,9 | **4.1**  271:8 | 221:19 | 293:15 |
| **2nd**  254:25 | **40**  345:23 | **661**  171:23 229:25 | **679**  170:18 174:19 |
| **3** | **400**  168:11 308:18 | 230:3 | 296:12,16 300:16 |
| **3**  170:3 174:3 | 340:14 | **662**  172:2 234:20 | 300:16 |
| 265:14 325:24 | **400,000**  318:25 | 234:21 | **681**  224:2,8,23 |
| 352:7 | **44**  320:12 | **663**  172:6 237:12 | **6am**  253:13 |
| **3,104,000**  225:8,23 | **4:42**  366:19,21 | 237:16 238:24 | **7** |
| **30**  171:14 174:16 | **4:43**  167:16 368:3 | **664**  172:9 240:23 | **7**  170:7 172:3 |
| 218:17 222:12,13 | 368:4 | 241:2,10,21 | 174:13 247:6,12 |
| 228:18 229:6 | | **665**  172:13 244:21 | **70**  197:11 344:16 |
| 265:5 282:11 | | 244:22,25 357:21 | **700,000**  306:20 |
| 293:16 314:8 | | | 311:9 |

FTC-0001306

HIGHLY CONFIDENTIAL

**70s** 346:1
**712** 223:15
**77** 225:11
**77002** 167:20
 168:5 175:14

**8**

**8** 170:8 172:14
 174:8 245:3 247:7
 247:12 358:1
**80** 205:9 215:18
**800,000** 311:9
**8408** 371:17
**864** 167:4 370:4

**9**

**9** 170:9 171:3
 173:21 174:9
 235:17 239:9
 245:10 271:19
 323:12 324:14
**90** 205:9 225:25
**95** 186:25 187:7,16
 187:23
**9:07** 167:16 175:3
**9:57** 210:3,5
**9th** 235:9

**a**

**a.m.** 167:16 175:3
 210:3,5,6 237:6,7
 237:9 240:17,19
 240:21 247:7,13
 249:1 253:14
**aax** 294:22
**abbreviated** 278:2
**abilities** 253:18
**ability** 266:20
**able** 207:8 239:24
 251:12 293:10
 305:19 306:24
 309:8 331:14
 357:12

**absent** 180:17
**absolute** 313:13
 335:4 337:9
**absolutely** 242:14
 244:18 247:22
 302:12 304:17
 336:21 337:8,10
 349:8 350:13,21
 350:23
**abuse** 313:14,15
**abusing** 306:16
**ac** 294:9
**accept** 181:18
 187:19
**acceptable** 322:17
**accepted** 231:19
**access** 219:12
 220:7 231:9 264:7
 267:1,15 268:3,5,6
 268:7 270:5
 293:13 296:14
 306:18 308:15
 309:1 310:5
 313:25 315:3,14
 327:17,19 328:11
 328:11 348:11
 349:10,19 350:2
 350:19 351:1,2
**accessing** 274:23
 306:8 325:7
**accomplish** 221:12
**accomplished**
 239:22 335:20
**accomplishing**
 223:2
**account** 196:10
**accounting** 220:10
 227:10,18,24
 228:1,3 230:23,24
 232:3,16 273:7,12
 274:10 293:3,10

293:13 295:19,21
 295:23 296:4,5,8
 302:5 350:4
**accounts** 220:9
 249:10,19,23
 250:4,7,12
**accumulate**
 312:18
**accumulating**
 325:10
**accuracy** 220:25
**accurate** 184:12
 202:8 218:20
 230:19 252:23
 332:14
**accurately** 230:24
**achieve** 199:15
 294:21
**achieved** 261:3
 340:20
**acknowledge**
 363:16
**acknowledged**
 369:19
**acquire** 182:5,7,14
 182:17,21 299:5
**acquired** 216:11
 263:10 304:13
 350:3
**acquiring** 298:25
**acquisition** 293:20
 294:9,16 298:23
 298:24 299:7
 303:11 305:2
**acronym** 274:15
**act** 283:6 308:2
 312:14 313:14,15
**action** 253:5
 264:10 285:24
 371:7,10

**actions** 236:12
 262:3
**actively** 186:8
**activity** 283:24
**actual** 271:4
**add** 216:20 240:11
 270:15 299:16
 306:18 309:1
 326:11,17 341:3
 357:11
**added** 270:3
 306:20
**adding** 306:13,19
 308:14
**addition** 185:7,11
 185:17 360:2
 364:12
**additional** 197:12
 247:11 305:11
 340:13 344:17
 366:14
**address** 271:24
 279:5,6 337:14
**addressed** 184:15
**addresses** 279:2
 310:18
**adjust** 195:6
**adjusting** 170:19
**admitted** 315:1
**adp** 209:5 236:23
 292:24 345:13
 346:13,14,17,22
 347:20
**adp's** 236:11
**advance** 251:3,6
 364:19
**advantageous**
 182:21
**advertisements**
 197:19

HIGHLY CONFIDENTIAL

[advertising - approved]                                                    Page 4

| | | | |
|---|---|---|---|
| advertising 302:25 305:11 | 329:22 330:3,3,4,7 331:8 348:15 349:13 350:8,9,17 350:19,25 351:7,9 361:13 | analyze 229:19 | anytime 264:14 |
| advice 316:17 | | andi 176:1 360:17 | anyway 360:17 |
| advise 359:19 | | androids 178:22 | ap 345:4 |
| adviser 336:1 | | anenen 212:14 289:16,22 291:22 292:4 345:11,19 | apiece 319:5 344:16 |
| advisor 335:23 | agreements 226:4 226:7,11,11 | | apparent 264:13 |
| advisors 336:22 | | announce 251:6 | appearance 175:15 |
| affairs 254:10 | agulley 168:6 | announced 334:8 | appearances 170:2 |
| affiliation 175:16 | ahead 206:4,16 243:16 303:22 365:3 | announcing 242:10 | appeared 208:21 369:17 |
| affirmatively 300:23 345:12 | | annual 211:22 228:17,23 229:5 270:23 | appearing 168:15 |
| affix 369:13 | aid 225:17 | | appears 192:17 201:23 218:18 225:6 244:3 257:13 260:24 |
| afternoon 265:18 289:10 303:8 306:1 345:10 | ain't 292:11 | annualized 286:9 | |
| | air 275:2 | answer 176:22 177:4 194:11 205:24 206:3,4 210:15,20 219:14 227:14 229:10 235:22 236:4 243:13,16 246:19 266:16,16,25 268:19 270:10 271:2 278:9 305:19 338:16,24 343:20 364:8 | |
| | alleged 348:4 | | application 205:17 257:21 266:11 282:25 283:4,9 297:8,10,14,17,21 297:23 298:2,4 310:4 |
| agan 172:10 253:4 | allow 219:12,16 266:4,9 269:4 278:11 313:24 327:18 328:2 | | |
| age 225:13 | | | |
| agenda 212:7 | | | |
| agent 328:1 | allowed 308:25 310:4 327:23 359:10 | | |
| agents 314:2 | | | applications 292:18,23 293:5 293:23 |
| ago 222:16 239:8 254:10 314:9 318:15 322:25 345:21 346:7 | | | |
| | alongside 348:2 | answered 363:12 | applies 202:18 312:15 353:21 |
| agree 177:5 179:5 181:11 187:2 188:9,20 190:21 191:21 224:15 250:6 258:25 264:6 288:22 299:13 348:19 349:4 | amazed 346:19 | answering 206:13 305:8 360:12 | appreciably 199:18 |
| | amazing 196:20 339:2 | answers 300:23 338:12 345:12 354:18 364:11 366:1 | appreciate 367:13 |
| | ambushed 292:10 | | approached 366:24 |
| | america 339:14 | | appropriate 367:14,15 |
| | ammunition 291:24 | anticipated 248:20 | |
| agreeable 367:2 | amortization 272:21 | antitrust 167:4 175:6 316:23 370:4 | approval 193:20 271:21 |
| agreed 229:4 300:25 301:1 365:19 367:23 | amount 220:14 235:22 243:21 327:15 335:16 | | approve 203:20 242:24 263:12 |
| agreeing 365:20 | amounts 323:23 344:13 | anybody 301:13 | approved 191:24 263:6 272:1 |
| agreement 218:1 226:8,16,19 227:4 229:3 233:9,17 236:2,22 290:1 | amsi 358:14,15,25 analysis 174:6,9 222:4 | anymore 233:22 343:14 | |

FTC-0001308

HIGHLY CONFIDENTIAL

**approximately**
211:15 228:18
229:6
**apps** 294:22 295:8
**april** 171:14
172:10 201:21,21
241:22 242:2
**arbitration** 346:18
**area** 194:25 195:1
208:2 244:14
254:11 263:12
264:3 300:10
332:10
**arises** 203:6
**arms** 337:9 343:19
**arranging** 312:19
**arrow** 324:16,17
**articles** 294:15
**asb** 242:1,10
**aside** 198:25 204:4
215:1 221:17
240:3 292:13
296:10
**asked** 228:21
229:18 237:25
243:11 301:23
311:10,15 316:6
330:10 338:10
351:13 352:21
358:9 364:3,10
**asking** 198:17
205:25 236:4
257:24 270:8
300:15 302:8
326:9 357:18
359:19 366:8,13
**aspen** 351:12
**assed** 323:19
**assets** 294:10
**assistance** 219:2

**associated** 260:8
302:10,15
**assume** 176:22
**assuming** 188:13
216:15 331:23
**assure** 208:19
239:25
**asterisks** 286:5,7
**astronomical**
179:7
**attached** 167:22
242:10 245:13
322:9 370:25
**attachment**
184:14 245:3,18
255:3 323:5
**attempt** 343:8
**attempted** 278:21
335:21
**attention** 170:16
180:23 183:17
242:12 302:20
313:19 355:25
**attitude** 233:9
**attorney** 365:10
371:9
**attorneys** 167:9
171:4,8,11,15,21
172:4,8,11,15,18
172:22 173:4,8,11
173:15,18,22
174:4,7,10,14,17
174:21 316:18
371:7
**attorneys'eyes**
171:25
**attractive** 209:2
**audits** 234:7
**aug** 286:9
**august** 173:7,10
235:9,17 257:1

259:13,21
**aundrea** 168:3
**aut** 192:16 331:14
**authenticom**
168:7 264:22
296:21 297:4,7
298:9,20 299:12
299:21 314:14
325:3 328:21
348:21 349:5,15
350:9,11 353:25
355:23
**authenticom's**
349:1
**authority** 315:20
**authorization**
205:13
**authorized** 255:9
313:17
**auto** 190:12
192:12
**autoalert** 257:3,17
258:3 259:22
260:22 262:4
267:8 281:22
283:20
**autoalert's** 258:11
**autoloop** 168:8
**automate** 300:22
**automated** 327:17
327:19,25 328:11
**automatic** 274:18
309:17
**automatically**
296:7 322:10
324:1
**automotive** 168:7
184:20 186:17,19
189:5 191:25
192:16,23 193:2
193:12,20 194:3

197:18 198:13
293:5,24 294:9
319:16 331:3,9
339:22
**automotive's**
293:20
**autosoft** 300:22
**available** 188:17
188:22 189:1
323:18 367:21
**avenue** 169:4
**average** 195:12,14
197:9 199:2,4,7
200:16
**avoid** 280:8 336:7
**avps** 253:5
**awakening** 309:21
**award** 238:1,10,13
238:16,23 239:2
240:4,7
**awards** 237:19,22
237:24,25 238:15
238:16
**aware** 184:25
186:10 196:17
198:1,14 216:10
251:18 255:24
262:6 264:24
273:13 287:25
288:1,5 301:17
349:13,22 351:6
355:22 359:1

**b**

**b** 214:11 332:5
**back** 205:5 210:7
210:10 214:6,6
234:23 235:8
237:9 240:20
244:16 246:8,20
254:9 259:19
265:13,15 270:4

HIGHLY CONFIDENTIAL

[back - bottom]                                                            Page 6

270:13 275:3
277:10 287:10
296:8 307:14,22
308:15 309:7
310:3,23 318:23
324:4 325:22
326:2,11,18,24
327:3,4 333:25
338:23 339:1
341:16 345:21,24
346:15 353:16,22
354:24 359:25
366:20,23 367:7
**backing** 274:24
**backup** 274:17
275:3
**backups** 274:20
318:22
**bad** 248:15 279:2
294:4 307:7,24
319:10,19,23
324:7 346:4
**balances** 221:8
**banditing** 236:23
**bandits** 245:25
248:12 314:14,21
**bandwidth** 273:20
**bank** 339:14
**banked** 339:15
**banker** 339:14
**banks** 319:18,19
**barras** 174:3
279:17 280:3
**barriers** 315:3
**base** 311:3
**based** 190:2
199:16 202:15
244:2 250:5 254:2
262:3 346:9
356:25

**basically** 207:7
261:19 263:19
334:23 344:5
**basis** 201:6 211:6
211:7,9 222:1
223:6,9 226:24
251:25 274:18
285:21 288:19
296:4 326:15
**batch** 306:5 323:1
323:8 324:11
**batches** 256:6
**bates** 184:5 201:12
218:9 223:15
230:4 241:14
249:22 250:1,5
276:18
**bauer** 241:25
242:9
**bautista** 324:22
354:4
**beach** 167:17
175:11 370:13
371:17
**bearing** 222:14
**began** 216:9
334:22,22
**beginning** 237:8
265:14 326:1
**begun** 305:17
**behalf** 175:10,11
175:18 176:10
361:10
**belief** 193:2
207:16 217:13
240:9 265:3
**believe** 180:15
185:2 191:3
201:18 202:3,7
206:12 213:16
214:1 215:2
221:21 231:12

236:11 241:23
246:10 249:21
262:11 283:10
286:20 290:4
293:5 318:19
351:19 354:8
366:7
**believed** 326:15
**bell** 201:25
**ben** 169:9 175:9
**beneath** 285:13
286:5
**benefit** 238:12
**benefits** 294:9
**bent** 346:5
**best** 195:5 333:24
338:17 341:6,14
**bet** 319:13
**better** 199:20
203:3,10 238:21
258:4,7 266:23
268:18 295:12
317:22 337:7
341:6,12
**beyond** 324:8
364:2,3
**big** 194:1 283:6
299:24 315:5
329:4 339:24
344:2 346:23
350:14
**biggest** 187:15
361:9
**bihner** 214:10,10
214:11,17
**bill** 197:20
**billing** 228:1
340:13
**billion** 311:20,25
356:7,8,9,11

**bills** 216:13
**bit** 193:1 204:5
241:6 266:17
283:13,18 337:3
339:20 343:6
345:9
**black** 278:19
**blacklist** 279:5,5
**blacklisted** 278:18
279:7 280:8
**blacklisting** 280:1
**blank** 230:14
**blanket** 326:20
**blast** 278:23 279:3
280:10
**blasts** 278:11
**bliley** 312:11
**block** 348:20
349:1
**blue** 204:25
**bo** 306:19
**board** 210:21,24
211:2,8 214:1,22
**bob** 171:3,6,10,13
171:17,23 172:6
172:13,17 173:3,6
173:10,13,17
174:12,16,19
230:14,18 232:14
242:19 253:4,18
261:18 273:4
296:12,12 338:22
340:4 347:11
359:17
**bogus** 306:19
307:12
**bold** 202:15
235:13 260:5
**bonuses** 321:10
**bottom** 245:6
279:17 285:11

HIGHLY CONFIDENTIAL

[bottom – card]                                                    Page 7

286:4,5 289:21
352:13,17 358:10
**bought** 196:21
197:22 340:14,14
350:2
**bowl** 212:1
**box** 322:16 362:15
**bragging** 260:8
**brand** 194:24
**breach** 315:7
317:22 319:15
355:12,22
**breaches** 262:8
**break** 177:2,3,5
210:1,2 240:14,15
265:8 287:3
317:23 325:20,21
**breaking** 255:6
256:12
**brice** 168:3 176:4
**brief** 241:9 300:11
318:1,9
**bright** 290:11
**brilliant** 185:7,11
185:17 189:17,25
193:20 362:1
**bring** 336:15,17
**broad** 267:12,24
**brockman** 167:8
167:12 170:4
171:3,3,6,10,13,17
171:23 172:6,13
172:17 173:3,6,10
173:10,13,13,17
173:17,20 174:3,7
174:9,12,12,16,16
174:19,19 175:5
176:2,8,13,17
183:25 197:25
201:8 210:10
218:9,11 221:17

221:17 230:5
234:24 235:3
237:15 241:1,15
241:18 244:20
248:2 252:7,10
256:22 259:7,9,10
262:8,20,22,24
265:18 268:22
269:1 271:13,15
276:14,16,19
278:3 281:12,20
284:10,12 287:13
288:13 289:10,18
292:14 296:16,18
300:6 318:13
347:11 354:12
357:16,22 360:20
362:8 365:12
367:3,20 368:2
369:2,12,14,17
370:9,16
**broker** 264:2,7,21
312:24 317:24
324:23
**brokers** 312:2,9
313:6 314:5,14
349:15 353:3
**brown** 168:21
176:9 186:7,14,21
339:13,18,18
**brown's** 186:15
**bruns** 167:19
168:4 175:13
176:2,5
**brushes** 304:2
**bucks** 344:13,16
**build** 274:3 309:25
310:5,6
**builder** 202:24,24
203:4,7,8,8 323:14

**building** 207:6
244:7 311:2
346:24
**built** 205:16
242:15 279:23
335:12 337:4
341:20 346:9
**bulk** 247:8
**bullet** 255:18
256:1 352:7,7,15
**bunch** 279:8
302:20 317:15
319:14 326:12
331:19,20
**business** 180:10
180:25 186:4,18
196:4 209:2 231:6
231:14 235:9
244:11 246:4
264:17 275:4
291:17,18,19,20
293:11 295:19
299:2,19,22
307:12,17 308:1
309:13,18 319:16
333:22 339:24
342:23,24 343:7
345:2 349:1 357:1
**bust** 310:14
**busy** 291:8
**button** 206:23
341:17
**buy** 197:6 344:7
**buyers** 298:7
**buying** 199:13
244:7 279:1
342:25
**buys** 194:12
**bwilkinson** 168:6
**bypass** 249:17

**c**

**c** 167:4 168:1
169:1 175:1 370:4
**calculated** 356:13
356:16
**calculation** 356:21
360:17
**california** 281:23
**call** 178:2,24 217:1
217:3 236:2
249:14 267:16
270:2 314:13
323:7 337:13
339:22 343:12
353:4 359:4
**called** 269:24
270:1 274:15
278:1 279:13
306:23 313:13,14
316:3 322:22
330:2 335:10
338:1,21 342:6,24
**calls** 213:6 291:2
319:15 344:25
**canadian** 282:10
**capability** 269:20
**capital** 353:20
**caps** 277:24,24,24
280:4,4
**captcha** 246:7,11
246:13,18 247:1
255:4,7,20
**car** 186:11,12
193:15 196:21
205:4,7,9,12
206:20 259:3
298:6 336:17
338:8 342:25
343:1,23
**card** 297:16
369:19

HIGHLY CONFIDENTIAL

care 321:4
carefully 209:4
carfax 253:20,23
  329:6,8,16,17
cars 193:5,10
  336:15
case 167:4 191:3
  195:6 203:15
  208:21 219:10
  232:2 257:14,16
  270:11 279:6
  283:10 286:9,20
  314:7 319:22
  348:3 370:4
cases 179:3 190:15
  190:22,24 191:15
  199:11 200:4
  297:18 309:8
  310:13 313:9
  327:5 359:9
cash 263:21 298:6
cat 353:5
catch 325:18
categories 303:6
category 302:19
cause 167:15
  269:20 353:8
  371:9
caused 304:8
  317:22 318:25
  355:22
causes 179:25
  187:8,23
causing 170:17
cautious 319:8
cbr 287:14,20,21
cdk 168:20 171:18
  176:10 177:14
  185:24 204:9,11
  207:11,13,13,17
  207:22,25 208:7

208:13,24 209:9
209:13,17 210:11
211:12 212:3,11
212:16,16 214:10
214:17,24 215:7
215:11,16,18,25
216:4,17 217:7,10
218:1 219:2,5,11
219:12,16,16,23
219:25 220:1,6,19
226:17 228:19,24
229:1,5 233:8,17
235:23 236:1
264:7,12 287:16
288:2 289:25
290:13,17,23
291:13 292:19,25
293:6 294:24
295:4 296:22
297:11,18 300:22
329:23 330:24
332:1,13 334:8,11
334:14 336:10
337:23 338:4,11
338:13 339:24
345:13,17 347:20
348:4,10,20 349:5
349:10,14,18,23
350:4,8,18,25
351:2
cdk's 233:9 333:18
  339:5 349:9 351:3
cdr 215:7
cease 229:4
celebrate 239:24
cent 270:21 272:5
center 249:14
  268:2 305:8
  343:16
centers 187:1,8

central 318:23
cents 270:17
ceo 213:3 231:3
certain 178:15
  204:20 274:14
  292:18,23 293:23
  312:13 358:25
certainly 179:17
  179:24 180:1,8
  189:13 190:22,24
  193:25 194:8
  206:15 208:8
  233:4 253:10
  255:14 260:24
  267:13 294:15
  302:24 312:6
  319:24 364:21
  366:15 367:13
certificate 170:9
certification
  260:11,13 261:3
  370:8
certified 259:24
  260:5,9 261:2,2,3
  262:1,5 299:4
  370:13
certify 370:15,20
  371:5
cfo 229:18
chain 171:2,6,9,13
  171:16,23 172:2,6
  172:9,13,16,20
  173:2,6,9,13,16,20
  174:2,12,15,19
  293:19
chair 183:23
chairman 367:20
challenging 187:5
chambers 190:11
  363:2

chance 184:6
  197:6 198:11
  201:14 235:3
  241:18 244:24
  248:2 252:16
  256:23 276:19
  305:20 321:24
change 178:18
  182:13,17 187:19
  191:1 192:19
  194:20,22,23
  195:1,3,12,18,22
  249:7,8,17 270:16
  306:18 309:1,3,5,6
  326:11,17 330:20
  336:11 341:12
  342:11 369:3
changed 270:3
  327:4 339:8
  343:25
changes 170:8
  182:4 183:4 193:2
  249:24 255:3
  284:5,8 327:24
  369:1 370:25
  371:1
changing 337:25
  341:18
characterize
  178:14 216:21
charge 186:14
  194:25 195:9,11
  195:12 258:21,24
  275:15,18,23
  276:2,8 308:9,9
  315:17 327:3,4
charged 274:20
  276:3
charges 275:13
charlotte 339:14

HIGHLY CONFIDENTIAL

[chart - conception]                                                                Page 9

chart 190:9
  192:12,19,22
  332:21 362:16,23
cheapest 333:23
  333:24
check 220:17
  341:13
checked 306:4
checks 341:8
cheer 183:14
cherry 169:7
chevrolet 315:11
chief 180:25
  229:12
choice 199:19
  303:10 341:6
choices 197:3
  344:12
choose 181:8
  197:6 341:15
chris 172:20 322:8
christopher 171:6
cia 239:18
cid 171:18
circled 326:6
circumstances
  315:23,24
cite 257:12,25
civil 167:21
clarify 289:7
class 168:8,14
  175:19,21,24
classified 299:9
cleaning 308:3
cleanup 306:25
  307:1
clear 214:5 313:15
  342:13,13 366:10
clearly 240:8
  253:15 254:3
  258:9,18

click 341:16
client 184:20,22
  184:25
clients 264:3
close 263:1 347:13
  365:18
closed 283:25
closely 203:25
  231:6
closing 196:24
  367:9
clustered 302:1
code 175:14
cohen 169:3 176:6
  176:6
colleague 175:25
collision 187:1,8
colors 204:22
combining 293:23
  294:10,22
come 201:6 204:13
  204:15 206:12
  227:2 229:19
  236:16,18 246:1
  246:11 248:22
  249:1 263:18,23
  272:24 298:7
  303:13 325:21
  337:13 338:23
  350:1 354:23
  355:25 367:7
comes 204:19
  259:3 285:23
  299:23 344:1
  353:2,17
comfortable 183:9
coming 211:24,25
  236:15 246:3
  253:13 361:7,10
  364:19,21

comment 232:23
  232:24 234:9
  276:21 363:21
commented
  189:16
commenting
  232:19
comments 242:12
commission
  369:24
common 179:9
communicate
  239:20,24
comp 273:15
companies 294:14
  313:7 350:8 363:8
company 169:8
  176:3,8 216:15
  222:5,9,16,24
  230:17 231:3,5,9
  231:21 232:1,7
  239:13,15 240:13
  263:10 281:9
  299:1 303:11,17
  304:14 305:4
  312:6 315:12
  322:22 339:24
  346:8 367:21
compel 364:24
  365:1
compelled 305:11
  364:22
compelling 342:8
compensation
  238:9 273:2,10
compet 259:1
competing 345:22
competition
  330:20
competitive 193:3
  259:1 331:23

competitor 208:14
  208:17,19
complained
  306:23
complaint 249:15
complaints 251:15
  306:1
complete 188:22
  189:5,10,12,13
  200:6
completed 260:9
  330:8,9
completely 191:6
  197:1 215:15
  231:7 273:23
  307:19 316:8
  321:7 323:19,20
  343:25 344:9
  358:8
completion 370:23
  371:4
complex 283:7
  345:16
complexity 183:22
  282:25 283:9,11
complicated
  183:19,22
component 273:21
compute 325:11
computer 313:14
  313:14,16,16
  316:11 317:17,20
  320:8 324:5,10
computers 323:21
  339:19
con 212:3
concentrate
  183:17
concept 177:18
conception 342:20

FTC-0001313

HIGHLY CONFIDENTIAL

[concern - correct]                                      Page 10

concern  247:20
concerned  193:9
  236:13 242:18
  277:23 285:25
  314:9 319:22,23
  328:19
concerning  200:1
  208:7 211:13
  214:24 215:7
  221:23 228:24
  232:9,20 236:5
  251:16,25
concerns  248:8,10
conclude  290:6
  291:21 368:1
concluded  368:4
confer  287:3
conference  211:22
confidential  167:9
  171:4,8,11,15,18
  171:19,21,25
  172:4,8,11,15,18
  172:22 173:4,8,11
  173:15,18,22
  174:4,7,10,14,17
  174:21
conscious  303:9
consider  177:17
  181:2 249:15
  333:17 340:23
  341:22
considerable
  205:17 273:18
considerably
  215:14 216:9
consideration
  369:20
considerations
  365:11
considered  274:4
  312:12,16

considering  181:2
  185:24 253:20
consistent  209:23
  307:3
conspiracy  348:5
consult  284:3
consumed  186:12
consumer  278:1
  279:21,22 341:7
  344:1
consumer's
  206:22
contact  207:13,13
  207:18
contacted  207:16
  207:17
contacting  279:13
contain  243:22
contains  371:1
content  363:23
contexts  330:11
continue  203:10
  203:18 206:16
  295:11 360:5,10
  360:14
continued  175:4
  307:10,11
continues  254:13
continuing  176:19
  210:8 237:11
  240:22 248:17
  265:16 287:11
  295:20 326:3
continuously
  193:7
contract  194:25
  195:7 199:1,3,9,9
  199:13,16,17,19
  199:20,25 200:6
  200:11,12 201:6
  257:7,11 258:11

258:13,19,23
  261:25 276:10
  312:20 313:1,3
  334:10 340:12
contracted  334:19
contractor  338:13
  338:15
contracts  199:17
  199:22 200:12,22
  227:2 274:12
  313:5
contractual
  216:14
contrast  196:22
control  351:2
controlled  215:16
  351:1
controls  248:18
convenience
  258:10
convention  212:25
conversation
  207:25 208:3,4
  220:20,21,22
  338:10
conversations
  214:12 320:7
  349:23
conversion  177:15
  177:18,23 179:1
  179:14,17,18,25
  180:22 181:8,12
  181:14,17 190:17
  191:6,16 192:13
  192:24 193:25
  220:2,4,13 221:12
  332:19 333:6
  334:25 335:5,7
  336:11 337:23
  339:3

conversions
  177:25 179:6
  187:16 194:1
  331:9 337:20
convert  177:8,9
  181:8 186:24
  187:6,7 188:17
  189:1 193:22
  194:6 203:14
  332:1,2,13
converted  335:2
  337:5
converting  177:8
  186:25 219:23
  221:11 333:3
converts  178:2,5
  190:8
convince  193:21
  317:16
copied  346:8
copies  216:15
copy  221:8 362:4
corner  341:10
corners  240:12
corporately
  345:19
corporations
  227:20
correct  178:6
  179:22 181:4,6,21
  182:3,5,6,8,15
  183:6,7,10 185:25
  186:5,21 188:2,6,7
  192:1,25 193:22
  195:2 201:23
  203:21 204:9,10
  204:12 206:14
  208:15 210:14,22
  210:23 211:8
  215:7,19 218:3,24
  218:25 219:14

HIGHLY CONFIDENTIAL

[correct – customers]                                                                      Page 11

| | | | |
|---|---|---|---|
| 220:20 221:2,4,15 | **cost**   179:21 180:1 | 248:17 288:10,16 | **crowed**   214:16 |
| 221:23,24 222:5,6 | 194:21 197:14 | 294:13 310:7 | **crr**   167:17 371:17 |
| 222:20 223:6,7,10 | 227:10,18,24 | 323:3 338:9 | **csr**   167:17 371:17 |
| 223:12,13 229:6 | 228:3 230:23,23 | **courses**   333:8 | **curious**   236:15 |
| 233:5,24 234:11 | 232:2,16 258:20 | **court**   167:1 175:7 | **current**   286:9,18 |
| 236:3,7,9,20 | 272:11,16,19 | 175:10 176:11 | **currently**   216:4 |
| 239:10,11 243:2 | 273:6,12 274:9 | 315:1 364:23 | 220:12 233:21,23 |
| 244:18 245:16,17 | 275:6,13 276:5 | 365:21 366:3,13 | 266:4 298:9,15 |
| 247:3,4,7,8,13,14 | 283:17 302:5 | 370:1 | **customer**   177:18 |
| 247:16 248:9 | 305:17 309:24 | **court's**   364:25 | 177:21 180:19 |
| 249:11 250:9 | 311:11 319:4,13 | **cover**   213:17,18 | 190:18 191:17 |
| 254:6 255:14 | 326:20 347:13,15 | 213:22 326:20,20 | 201:7,7 216:11,13 |
| 256:3,14 258:12 | 347:16 | 366:5 | 219:22 220:10,16 |
| 258:18 259:2,17 | **costs**   231:24 | **covered**   360:7 | 221:6,8 224:13 |
| 260:22 261:23 | 272:17,18 273:1,4 | **covers**   275:16,16 | 254:14 274:18 |
| 269:4,12,16 | 273:13,15,16 | 314:1 | 278:16,17 282:20 |
| 270:19 271:20 | 274:7 286:9,17 | **cox**   168:7 293:4,16 | 283:11 286:1 |
| 274:9 275:22,25 | 302:9,10,15 319:5 | 293:20,24 294:9 | 306:19,21 307:3,6 |
| 277:22 279:19 | 332:19 333:1 | 331:2,8,14,15 | 307:13,15,24 |
| 280:4,10,24 | **cottrell**   314:25 | **cpi**   271:7,8 272:8 | 315:20,21,25 |
| 282:16 289:23 | **counsel**   169:8 | **cr**   278:2 | 319:1 320:19 |
| 290:4,10 291:11 | 175:15 196:1 | **cracks**   343:12 | 322:22 323:19 |
| 293:21,22,25 | 287:3 366:23,24 | **craig**   172:3 | 329:18 332:2,3 |
| 294:10 295:1,6,15 | 371:5 | **crazy**   227:20 | 343:17 344:4 |
| 296:22,23,25 | **counselor**   356:11 | 283:6 308:5 | 350:3 |
| 297:1,4,8,14,21 | **count**   277:12 | 337:24 | **customer's**   306:14 |
| 298:2,20 299:14 | 300:4 | **create**   267:20 | **customers**   178:1 |
| 300:24 301:3,6,9 | **counteract**   302:25 | 350:25 | 178:10 190:25 |
| 301:11 302:5,7,10 | **countermeasure** | **created**   203:2 | 197:4,5 223:1 |
| 314:15,18 331:12 | 353:7 | 309:1 | 224:2,3,6 227:1 |
| 331:15,17 344:22 | **countermeasures** | **creates**   267:5 | 253:6 255:9 |
| 354:15,17 355:7 | 353:14,23 | **creating**   266:11 | 260:13 269:18 |
| 355:23 356:15,19 | **counting**   305:6 | **credible**   250:1 | 278:12 279:8 |
| 356:24 357:5 | **country**   184:24 | **credit**   196:10 | 280:17 281:10 |
| 358:16,18,23 | 185:4 315:13 | 205:14,14 345:5 | 305:10 306:2 |
| 359:21 360:25 | **county**   369:16 | **crippled**   336:2,21 | 307:10,11,22 |
| 361:13,14 362:13 | **couple**   288:25 | **criticized**   320:22 | 308:2 318:21 |
| 366:12,12 369:13 | 302:4 310:20 | 320:23 | 326:16 327:18 |
| **correctly**   195:8 | 327:17 | **cross**   343:19 | 333:11 341:23 |
| **correspondence** | **course**   231:8 | **crossed**   282:11 | 344:24 |
| 289:15 | 235:8 238:19 | | |

FTC-0001315

HIGHLY CONFIDENTIAL

[cut - dealerships]                                                                Page 12

| | | | |
|---|---|---|---|
| **cut** 220:17 360:11 | 317:24 318:24 | **day's** 337:2 | 328:6 330:20,22 |
| **cuts** 193:10 | 319:3,6,7,15 | **days** 302:4 307:5 | 330:24 331:13 |
| **cutting** 243:14 | 320:23 324:23 | 327:17 361:5 | 342:9 355:5 |
| **cvr** 215:13,18,24 | 328:7,12,14,18,22 | 365:9 370:24 | **dealership** 168:14 |
| **d** | 329:16 331:25 | **dayton** 238:4,5 | 175:19,21,24 |
| | 335:7 337:20 | 274:24 | 177:13 178:2,5,6 |
| **d** 175:1 239:23 | 346:11 349:15,19 | **dc** 168:22 | 178:11 179:2,2,8 |
| **d.c.** 168:12 169:5 | 350:1,4,4,18 351:1 | **deal** 205:6 228:19 | 179:10,22,24 |
| **dad** 320:4 | 351:3 353:2,3,22 | 228:24 229:1,5 | 180:2,12,19,23 |
| **daily** 277:24 280:3 | 354:15,20,23,23 | 235:23 236:1,6 | 181:1,8,13 182:4 |
| 345:3 | 355:5,10,12,13,16 | 263:6 290:6 343:5 | 183:4,9,14 186:13 |
| **damage** 236:24 | 355:20,22 359:11 | **dealer** 167:3 175:5 | 187:17 188:6 |
| **dan** 172:10 253:8 | **database** 243:18 | 182:14 183:1 | 191:2 194:12 |
| **dangerous** 232:4 | 243:19,25 310:6 | 187:6,21,25 190:4 | 196:8,14 198:2 |
| **darts** 291:23 | 315:25 | 193:8 199:3,18 | 199:15 200:1,9,16 |
| **data** 183:5,10 | **databases** 243:17 | 204:5 258:22 | 204:18,20 205:11 |
| 188:17,23 189:2 | 243:21 | 262:8 275:24 | 216:16 243:19 |
| 192:18 216:15 | **dataset** 328:18 | 279:9 281:24 | 249:1 263:23 |
| 220:4 221:12 | **date** 209:7 255:24 | 282:14,17 313:22 | 275:5,7,11,13,21 |
| 223:16 226:10 | 268:16 286:9 | 316:4,7,7 321:1,16 | 275:23 276:2,4,6 |
| 233:11,11 236:25 | 334:1 369:2 | 321:18 328:1,22 | 293:9 312:16 |
| 239:9,12 242:1,7 | 370:24 371:17 | 329:6 332:12,13 | 313:1,21 315:11 |
| 242:11,17,25 | **dated** 171:3,7,10 | 332:14,24 335:3 | 315:13,21 318:23 |
| 243:8,22 247:9 | 171:14,17,24 | 340:16,21,21 | 320:25 321:5 |
| 252:25 254:11 | 172:3,6,10,14,17 | 342:18 344:14 | 322:3 333:7 |
| 256:13 257:8 | 172:21 173:3,7,10 | 370:3 | 334:23 335:2,12 |
| 258:5,15 260:12 | 173:14,17,21 | **dealer's** 242:16,25 | 335:12,24,24 |
| 261:12 262:8 | 174:3,13,16,20 | 243:8 278:23 | 343:16 |
| 264:1,2,3,6,11,15 | 184:15 245:10 | 280:10 | **dealership's** |
| 264:21 273:24 | 289:22 293:16 | **dealerbuilt** 262:12 | 178:16 244:8 |
| 274:13,17,24 | 296:13 358:1 | 318:20,20 320:21 | 274:17,23 279:6 |
| 275:3,6,12,24 | **dave** 250:5 | 355:4,4,16 | **dealerships** 177:8 |
| 276:6,11,13 286:7 | **day** 167:15 195:21 | **dealers** 182:17 | 177:9 179:6,13 |
| 286:24 293:3,13 | 196:2,3 222:15,15 | 187:6,6,7,22,22 | 180:4 186:25 |
| 293:13 295:21,23 | 246:18 259:16 | 189:2 195:18,20 | 188:17,23 189:1 |
| 296:14 298:9,20 | 289:13 304:6,10 | 196:2,7 197:17 | 190:12 191:12,20 |
| 299:5,23 302:21 | 311:25 323:15,16 | 199:10 249:6 | 193:3,5 194:6 |
| 302:23 303:2,17 | 325:11 336:11,16 | 251:2 258:16 | 197:5 251:16 |
| 304:3 305:3,10 | 337:7,25 338:21 | 260:14 274:11 | 253:8,9 257:9 |
| 307:18 311:24 | 348:14 365:9 | 278:12 282:11 | 258:15 308:18 |
| 312:1,9,18,24,25 | 369:17,21 371:12 | 297:11 298:20 | 312:12 320:19 |
| 313:3,6 314:4,13 | | | |

FTC-0001316

HIGHLY CONFIDENTIAL

335:22 339:20
358:16,20,23
359:21,24 360:19
360:24 362:11,13
362:22,23
**dealertrack**
205:16,22 207:5
209:3 293:10,20
293:25 294:10
300:22 301:13,14
331:9 332:2 333:4
**dealertrack's**
301:18
**dealertrak** 331:3
**dealing** 227:19
305:9 316:14
319:11
**dealt** 290:8 358:2
**dear** 253:11,12
**december** 171:17
174:9 213:18,20
214:2 288:8,11
**decent** 345:18,18
345:19
**decently** 263:22
**decide** 181:18
208:20
**decided** 219:24
229:13 262:2
295:10 310:16,16
334:17,19,21
336:10 339:17
340:1,3 343:1,2,3
346:15,20
**decides** 193:12,13
205:3 216:12
**deciding** 302:22
**decision** 207:10
209:3,9,12 254:2
264:25 270:24
283:1 310:24

340:5
**declaration**
353:18
**dedicated** 253:16
**defendant** 176:7
**defendant's** 318:5
318:8,11,17
321:20
**defendants** 318:6
**defense** 196:1
**definitely** 278:7
339:21
**definition** 210:19
288:15
**degree** 320:8
**delete** 203:9
270:16 306:18
309:1 326:11,17
**deleted** 270:4
308:13,16
**deleterious** 231:13
**deleting** 307:15
308:14
**department** 179:7
217:12,21 220:11
238:3,18,19,23
321:2 333:14
335:10
**departments**
297:17,18
**dependent** 282:22
**depending** 366:1
**depends** 188:5
212:20
**deponent** 170:20
370:21,22 371:3
**deposition** 167:8
167:12 170:16
175:4,12 314:12
364:7 365:7,10,13
365:22 366:3

367:2,10,23 368:2
368:4 369:13
370:9,18,23 371:4
**depositions** 346:18
365:1,4,6
**describe** 220:24
226:8 267:22
**described** 263:25
276:5 326:7
**describes** 189:14
**description** 171:1
172:1 173:1 174:1
323:10 369:18
**design** 303:15
**designed** 260:11
273:23
**desist** 229:4
**destroy** 349:5
**destroyed** 308:16
**detail** 234:5
**detailed** 286:3
**details** 350:14
360:1
**detect** 189:20
246:12 353:5
**detection** 248:12
**determination**
200:22
**determine** 200:15
201:5 282:17
**determined** 272:5
**develop** 231:18
**developer** 244:12
244:13,16
**developing** 231:23
272:17 273:14
**development**
203:17 204:3
213:6 223:3
244:10,13,14,16
303:16

**devise** 353:7
**different** 177:7
178:23 193:2
204:22,22,23
205:1 231:7
243:21 332:25
353:12
**dig** 246:22
**digit** 335:13,14
**diligent** 181:16
**direct** 231:20
238:14 263:7
279:2 301:8 314:2
351:14
**directing** 261:18
**direction** 296:14
**directly** 207:18
264:11 300:20
312:15 345:22
**director** 253:7
**directors** 210:21
210:24 211:3,8
**disabled** 279:9
**disagree** 194:23
367:24
**disappointed**
334:9
**disappointment**
249:24
**disarmed** 344:9
**disaster** 275:1
280:15 335:5
**disclose** 258:20
**disclosing** 257:8
**disconnected**
237:3
**discount** 199:15
199:18,21
**discounting**
193:14

FTC-0001317

HIGHLY CONFIDENTIAL

**discovered** 306:8
306:15 309:12
**discuss** 202:22
212:3 255:9
349:19
**discussed** 239:13
239:16 287:22
332:9 349:9
**discusses** 332:18
**discussing** 232:9
318:15
**discussion** 233:2
233:10 241:9
300:11 318:1,9
342:3 366:23
**dishonest** 261:19
**disk** 221:9 328:17
331:22,22
**dislocation** 278:17
**disparate** 318:6
**dispirited** 346:20
**display** 341:9
**displayed** 341:3
**disposition** 280:13
**disruption** 180:19
180:21 190:18
191:17
**dissatisfaction**
343:17
**dissident** 292:5
**distinct** 355:13
**distracted** 285:10
**district** 167:1,1
175:7,7 370:1,1
**division** 167:2
175:8 370:2
**dmi** 353:25
**dms** 177:14,14
178:5,11,12 179:1
179:13 180:4,13
180:19 181:2

182:5,13 183:5,6,6
183:9 190:2 196:9
199:1,2,9,14,22
200:1 217:23
218:1 219:17
221:2 223:16
242:17,25 243:18
244:8 260:10
262:9 264:2,7
292:25 298:16
300:20,21 301:3,9
330:20,20 332:25
340:22 344:21,21
349:10 351:2,3
**dmss** 177:9,10,10
182:17 298:10
**docket** 365:2
**document** 184:5,6
194:24 195:4,13
195:23 198:25
201:15 213:13,16
218:9,11 221:16
221:22 223:14,15
230:4,6 235:1,4
240:3 241:14,16
241:17 245:9
255:6 268:20
269:6 271:21
284:16 288:10,18
292:16 300:14
351:16 352:24
355:3 357:22
362:9 369:19
**documents** 260:25
265:5 284:4
289:13 356:20
364:13,14,15,18
364:25 365:5
**docupad** 190:5
194:11,12,18,21
195:3,13,19,23

196:10,12,20,22
196:25 197:8,14
197:19,21 198:2
322:17 323:2
340:15,16,22
341:2,25 343:24
**docupads** 340:14
**dog** 308:6
**doing** 183:23
200:10 204:1
222:15 231:22
239:20 248:14
249:4 258:4
263:11 264:12,17
279:7 283:8 299:2
306:13 307:21
312:25 314:24
324:2 326:11,17
326:20 332:4
336:3 359:8,17
**dollar** 220:14
**dollars** 305:15
**dominant** 215:16
**door** 308:5 316:14
**doubled** 340:13
**download** 315:20
323:14 329:7,16
**downloading**
359:11
**downloads** 350:4
**dozen** 187:7
**draft** 242:1,10
255:4 332:8,17
**drag** 181:17,20,25
**dramatically**
226:5 335:18
**drawn** 316:5
**dreamed** 342:21
**drive** 221:9 259:22
263:18,20,24
298:7 331:22

**driven** 197:1
**drop** 190:16
191:15 192:9
332:18 361:9
**dsv** 239:10 240:7
273:1,15
**dt** 293:16
**due** 204:3 220:12
220:13 229:5
238:19 242:2
258:14 367:16
**duly** 167:14
176:14 370:16
**dumb** 323:19
**dummies** 353:11
**dummy** 306:19
**duplicate** 170:19
307:24
**duplicates** 307:23
**duplication**
170:17
**duration** 216:23
**dust** 343:12

---

**e**

**e** 168:1,1 169:1,1
175:1,1 214:11
370:21
**eagle** 253:8,9
**earlier** 170:16
224:23 253:1
255:8 286:6
287:15 311:10,15
326:5 351:11
352:22 357:16
**early** 248:22
255:11 334:1
345:24 354:5
**earth** 306:5 316:7
**easier** 242:17
**eastern** 167:2
175:8 370:2

HIGHLY CONFIDENTIAL

easy 334:25
economic 342:10
ed 190:12 339:12
 339:18,18
edit 267:20
edited 363:14
edits 242:12
educate 194:8
education 187:14
 333:14
effect 317:7,9
 329:23
effective 255:19
 263:22
effects 303:1
efficiency 182:23
efficient 227:23
 299:8
efficiently 181:3
effort 203:17
 280:7
efforts 302:14,15
eight 189:3
either 178:4
 216:24 224:14
 283:25
electrical 320:10
electronic 343:11
element 276:10
elevator 312:7
eliminate 264:6
 349:14
email 171:2,2,6,6
 171:9,9,13,13,16
 171:16,23,23
 172:2,2,6,6,9,9,13
 172:13,16,16,20
 172:20 173:2,2,6,6
 173:9,9,13,13,16
 173:16,20,20
 174:2,2,12,12,15

174:15,19,19
184:8,11,14 185:5
185:8 201:19,19
201:20 202:4
203:24,25 213:17
213:18,19,22,24
218:16,20 219:1
230:10,13 232:8
234:14 235:7,8,12
235:18,21 238:24
239:4,6 241:22,24
242:3 244:15
245:2,5,14,15
248:5,8 251:20
252:18 253:2,4,7
253:17 254:24
256:25 258:8
259:12 260:1
263:3 271:11,18
277:3,7,18 278:11
278:18,23 279:2,3
279:3,24 280:7,10
281:7 289:14,22
289:22 291:22
293:15,19 296:12
310:18 322:7
334:1 345:10
357:23 358:1,10
emailed 237:2
emails 252:22
253:1 277:11
279:21,25 280:21
322:2
employed 263:17
354:24 371:6
employee 179:2
180:12 190:18
191:17 274:19
371:8
employees 178:10
178:16 180:24

181:3 281:9 314:2
employing 353:14
employment 207:3
en 208:16
enable 258:1
encrypted 318:24
endeavoring 203:3
243:10 245:23
ended 307:20
endured 233:14
engineering
320:10
enhancement
244:4 250:21
enhancements
239:14 242:16,25
243:7 248:8 250:8
250:17 251:2,6,8
251:17 255:12,19
256:2,3,5,14 290:8
321:13 358:2,11
enjoyed 205:17
enjoying 254:23
enjoys 303:20
ensure 260:12
ent 301:7
enter 205:19
207:11 208:16
246:7 301:8
313:15 350:24
entered 215:14
247:2
entering 301:2
enterprise 302:14
302:16
entire 197:19
307:6 315:20
365:2,8 367:22
entirely 342:13
entirety 315:25

entities 299:20
entitled 245:10,18
364:11
entity 195:7 202:9
228:11 263:14
326:11
entrance 315:2
enumerate 303:4
environment
336:1
equipment 182:10
182:16
error 195:6
247:10
errors 189:21
especially 182:11
238:18
essential 343:15
estimate 305:3
347:13
estimated 311:16
356:2
evaluations 264:4
event 224:14
275:1 365:2
everybody 193:14
210:16 231:9
283:6,16 303:22
337:3 343:4
evidently 298:24
exact 209:7 255:24
336:8 348:14
363:21
exactly 214:7
215:21 217:14
254:10 269:6
280:19 290:20
291:7,12 292:3
360:1
examination 170:5
170:5,6,6,7 176:15

HIGHLY CONFIDENTIAL

[examination - familiar]                                                                 Page 16

210:8 237:11
240:22 265:16
287:11 289:8
300:12 326:3
354:10 357:14
**example** 202:12
231:16 293:9
323:24 324:10
329:5 332:12
358:13
**examples** 190:7
**exception** 253:19
254:4,6 359:18,25
**exceptions** 358:13
359:1,10,21 361:6
**excess** 345:23
**exchange** 204:5
226:10 322:4
334:1
**excuse** 358:6
**executed** 369:20
**executive** 302:20
308:9 339:22
**executives** 305:7
**exempted** 330:11
330:11,12
**exemption** 202:13
202:13,20 203:21
203:23
**exemptions** 249:9
250:8,17 357:17
358:23 360:25
361:10
**exercise** 258:9
**exhibit** 171:2,6,9
171:13,16,20,23
172:2,6,9,13,16,20
173:2,6,9,13,16,20
174:2,6,9,12,15,19
184:1,2 201:9,10
213:9,12 218:5,8

221:18,19 226:12
228:15 229:25
230:3 234:20,21
237:12,16 238:24
240:23 241:2,8,21
244:21,22,25
247:23 248:1,3
249:10 250:13
252:2,5,11,16
254:17,18,21
256:19,22,23
257:1 259:6,7,10
259:16 262:20,23
262:25 268:21,22
268:25 269:2
271:13,16 276:14
276:17,20 281:13
284:11,12 288:7
288:13 289:14,18
292:14 293:15
296:11,16 300:15
300:16 318:2,5,17
321:22 351:11
357:21 361:15,20
361:21
**exhibits** 170:16,17
170:20 171:1
172:1 173:1 174:1
300:7
**exist** 288:3
**existed** 288:2
**existence** 216:10
**expect** 332:24
**expectation**
229:11
**expected** 190:16
191:16 337:6
**expecting** 228:17
**expects** 229:5
**expediency** 204:3

**expense** 231:20
310:10,12
**expensive** 317:23
**experience** 180:9
196:22 337:23
346:5 357:1
**experienced**
337:21 339:22
**expiration** 371:17
**expires** 369:24
**explain** 227:9
243:10 321:16
352:23
**explaining** 305:17
**export** 247:8
**exported** 247:2
**exports** 247:6,12
**exposed** 196:19
319:2,6,7
**exposure** 318:25
319:4
**expressed** 249:23
369:20
**extended** 341:4
343:9
**extension** 366:9
**extensive** 359:3
**extent** 315:6
**extra** 326:13 367:2
367:4
**extracting** 312:25
**extraction** 264:2
**extreme** 246:22
**extremely** 190:4
303:17
**eyes** 167:9 171:5,8
171:12,15,22
172:5,8,12,15,19
172:22 173:5,8,12
173:15,19,22
174:5,8,11,14,18

174:21 365:11
**eyesight** 335:3

**f**

**f&i** 341:21 344:17
**fabric** 343:13
**faced** 307:13
**facilitates** 207:4
**facility** 326:22
328:14
**fact** 187:19 190:1
204:17 248:21
258:14 260:8
261:1 269:4
292:22 295:10,11
299:17 301:7,8
304:9 313:9,20
315:10 316:15
320:17 323:21
363:16
**factor** 179:13
208:23
**factors** 194:2
272:23
**facts** 206:19
**fair** 176:23 178:25
180:3,7,11,18
181:7 183:20
191:14 194:5
202:19 208:14
226:3,19 242:24
243:6 247:19
249:19 250:3
269:9,13 279:11
327:15
**fairly** 263:22
297:11 298:24
**falls** 278:18
**familiar** 204:6
215:13 224:11
225:1 253:8 257:3
318:12 332:4

HIGHLY CONFIDENTIAL

363:3

**fangs** 354:6

**far** 181:14 187:15
189:22 193:2,9
213:5 216:21
222:24 223:2
228:8 246:9
254:22 285:25
303:18 310:23
311:3 314:8
328:18 359:10
363:20 365:3

**fashion** 258:3

**fault** 317:18

**fdc** 316:3,3

**feature** 242:22
259:22

**features** 242:1,11

**february** 174:13
226:4,11 289:16
289:23 348:16

**federal** 167:21

**fee** 194:18 257:13
258:15 268:10
269:14,23,24
270:2,3,9,12,15,17
270:21 271:22
276:12 281:25
282:14,18 326:8
326:24

**feed** 261:15

**feeds** 264:11

**feel** 231:15 242:18
312:1,5 314:19
345:13 367:14

**feelings** 345:20
347:20

**fees** 257:8 276:9
282:10 286:7
347:15

**felt** 305:11

**fico** 205:15 206:22

**field** 346:11,11,12

**fields** 346:12

**figel** 168:10

**fighting** 347:15

**figure** 245:24
286:23 305:14
307:5 338:7
353:11,21

**file** 200:12,13
307:6 310:22

**filed** 296:21

**files** 216:15 274:24
315:20

**filing** 274:21
366:10

**final** 280:12,20
343:8

**finalize** 343:7

**finally** 181:17
205:3 320:3,14
336:4 343:22
346:19 347:10
355:8

**finance** 194:24
196:23 197:4,11
342:23 344:15

**finances** 221:23

**financial** 171:20
174:6,9 220:16,18
222:4,7,8 229:12
234:1,4,8 284:15
288:7 301:23
312:12,17

**financially** 371:9

**financials** 223:12
231:10

**financing** 205:8,10
205:16 207:5
312:19 343:2

**find** 212:8 307:7
307:23 351:10
361:17,18

**fine** 240:16 329:18
365:17

**finish** 205:23
206:2,4,9 227:14
229:10 305:19,20
364:2 365:15,21

**finished** 262:1
296:18

**finite** 323:21

**fire** 185:19 273:25
338:3

**fireproof** 274:21

**firm** 175:16
227:25

**firm's** 349:19

**firms** 350:10,18

**first** 176:14 179:1
185:6,8,10,14,16
185:21 186:23
189:17,20 190:17
191:16 195:8
206:5 207:24
211:10 214:13
219:23 233:1
236:22 239:8
241:3 252:25
268:7 277:15,18
279:16 292:17
297:6 302:19
314:24 315:9
319:4,4,14 323:9
323:12 333:25
334:22 337:25
339:10 361:15,21
361:25

**fit** 315:24

**five** 187:22 199:7
199:10 212:22

222:16 231:17
252:12 270:17,21
324:16 330:3,3,4
340:12 344:18,18
347:10,16 359:24
360:19,24

**fix** 195:9 246:12
308:24 309:13,16
309:17 310:21,23
347:8

**fixed** 211:4,10
212:7,20

**flat** 344:2

**floating** 321:17

**floor** 168:17
303:25 304:1
346:23

**flow** 273:21

**focus** 255:17 269:4
281:14 302:21

**focusing** 205:21
210:10

**folks** 210:17 261:7
292:6 299:22
338:3 354:1

**follow** 233:21
234:4

**followed** 232:5

**following** 238:7
239:17 370:15

**follows** 176:14
233:24

**footnote** 228:16
229:23

**force** 194:9 347:1

**forced** 204:2

**foregoing** 369:12
369:19

**foreign** 246:5

**forever** 209:2
292:19 293:6

HIGHLY CONFIDENTIAL

294:24 295:15
311:24 336:7
**forgery** 202:7
**forgiveness** 337:4
**form** 177:11,16
178:7,13 179:4,15
179:23 180:6,14
180:20 181:5,10
181:22 182:2,18
183:11,21 186:1
187:3,12 188:10
189:7,11,19
191:10,18 192:2
193:23 194:15,20
195:13,23,25
198:5,9,15,20
200:2,19,23 201:3
202:5,14,21
204:14,16 205:13
207:23 209:14,19
211:16 212:4,12
213:21 214:3
215:4,8 216:5
217:5,9,11 218:2
219:13,18 221:3
222:21 224:4,9,16
224:20,24 225:9
226:6,15,21 227:7
229:7,21 233:6,18
233:25 234:3,12
234:17 236:8,19
243:1,9 244:17
249:12 250:10,18
250:23 251:4,11
252:20 253:25
254:7 255:13,22
256:10,15 257:10
257:19 258:17
260:18,23 261:24
262:10,16 263:15
264:8,23 265:2,21

266:7,15,22
267:10,21 268:12
268:15 269:11,15
269:25 270:14
271:1,23 272:6,12
273:17 274:8
275:8,14,19 276:1
276:7 277:5,9,16
278:13,24 279:14
279:18 280:5,11
280:18,25 281:5
281:18 282:3,8,19
283:21 284:21
285:3,18 286:11
286:19,25 287:17
287:24 288:4,12
288:21 290:3,18
291:1,10,15 292:2
292:21 293:7
294:1,11,25 295:5
295:16,24 297:9
297:15,22 298:3
298:11,14,17,21
299:15 354:16,21
355:11,18,24
356:18,23 357:4,9
358:5,17,24
359:23 360:21
361:1 362:14,17
362:19,25 363:15
**formal** 215:25
**forming** 208:7
**forth** 312:23
338:15 353:17,22
366:23
**fortunately**
306:23 316:16,16
**forward** 233:13
242:11 261:6
262:2

**forwarding**
289:15
**found** 185:15,15
263:22 264:19
285:16 307:1,4
324:6 362:6
**founded** 209:6
215:23
**four** 187:6 211:6
324:16 325:11
347:4,5
**frame** 245:21
255:25 268:13
**francisco** 212:1
**franklin** 315:11
317:12 318:15
**frankly** 179:18
201:23 228:4
242:5
**fraud** 313:14,14
**frcp** 370:20
**frederick** 168:10
**free** 195:4
**freight** 275:2
**frequently** 325:7
327:7
**friday** 238:7,8
364:21
**friend** 254:14
**front** 230:17
253:17 260:25
300:17 345:10
355:3
**frustration** 249:24
**ftc** 316:13,15,23
317:16 319:12
**ftc's** 317:9
**fully** 186:12
**function** 309:3
**functionality**
247:9 257:24

258:6 265:20,24
266:6,8 267:2,3,9
267:11,13,17,19
267:24 282:22
311:2 328:6
**functions** 268:2,4
**fund** 292:6
**further** 170:6,7
242:16,25 243:7
284:25 285:11
300:1 306:24
334:20 354:8,10
357:14 367:17
370:20 371:5,8
**future** 366:11
367:12

**g**

**g** 175:1
**gaining** 315:2
**gap** 296:5
**gears** 345:8
**general** 169:8
183:13 199:6
221:7 251:5
264:24 271:2,3,7
297:23 301:25
302:1,16 315:13
315:17
**generally** 180:10
211:9 215:13
220:25 276:11
**generate** 236:18
**generated** 228:18
**generates** 326:12
**generating** 342:15
**generation** 347:1
347:2,18
**generator** 197:15
323:14 342:2
**gentlemanly** 292:8

FTC-0001322

HIGHLY CONFIDENTIAL

233:25 234:3,12
234:17 236:8,19
237:2 240:16
241:5,13 243:1,9
243:13,16 244:17
249:12 250:15,18
250:23 251:4,11
252:20 253:25
254:7 255:13,22
256:10,15 257:10
257:19 258:17
260:18,23 261:24
262:10,16 263:15
264:8,23 265:2,4,7
265:21 266:1,7,15
266:22 267:10,21
268:12,15 269:11
269:15,25 270:14
271:23 272:6,12
273:17 274:8
275:8,14,19 276:1
276:7 277:5,9,16
278:13,24 279:14
279:18 280:5,11
280:18,25 281:5
281:18 282:3,8,19
283:21 284:19,21
285:1,3,18 286:11
286:19,25 287:5
287:17,24 288:4
288:12,21 289:1,7
290:3,18 291:1,10
291:15 292:2,21
293:7 294:1,11,25
295:5,16,24 297:9
297:15,22 298:3
298:11,14,17,21
299:15 300:3,13
301:7,12,18,22
302:8,13 303:9
304:12,19,23

305:1,16 309:24
310:10 311:1,10
311:22 312:1,7
314:3,12,19
316:19,22 317:6
318:4,10 320:1,14
321:24 322:7,14
322:19 323:4
324:13 325:2,6,12
325:19 326:4
327:9,16,21,25
328:5,10,21 329:2
329:13,19,22
330:1,10,15,19
331:2,7,13 332:7
332:17,24 333:11
333:17,25 334:10
334:14,15,17
339:9 340:1,9,15
340:21 341:25
342:6,12 344:20
345:8 346:1
347:22 348:3,10
348:16,19,25
349:4,9,13,18,22
350:7,17,24 351:6
351:10,24 352:2,6
352:12,21 353:24
354:7,16,21 355:3
355:11,18,24
356:7,10,18,23
357:4,9,18 358:5
358:17,24 359:13
359:23 360:3,8,21
361:1,11,24 362:2
362:14,17,19,25
363:12,15 364:1
364:18,22 365:23
366:2,7,13,16,22
367:19

**gunning** 292:11
**guns** 316:5
**guts** 268:7
**guy** 248:15 292:7
  338:2
**guys** 316:11
  319:23 324:15
  337:15 338:8

**h**

**h** 172:20 214:11
  338:1 340:3
**hacker** 315:4,6
  324:2
**hackers** 245:25
  314:14,21 353:3
**hacking** 229:4
  236:23
**half** 185:6,10,16
  189:17 211:20
  212:9 254:9
  285:24 305:15
  308:5 311:18,20
  311:25 325:10,11
  337:2 356:10
  362:1 365:9
**halfway** 186:23
  357:23
**hall** 330:18
**hand** 212:21
  224:18 289:13
  296:6 308:4
  321:20 328:10
  332:7 338:7
  351:11 369:21
**handed** 292:16
  293:14 296:11
  344:11
**handful** 231:4
**handing** 318:4
**handle** 197:11
  344:15

**handles** 217:13
**handling** 279:21
**hands** 214:15
  319:10 343:4
**handwriting**
  281:15,19,23
  282:12,15
**handwritten**
  282:6,9
**hansen** 168:10
  175:24
**happen** 180:10
  187:20 217:20
  294:13 309:4,13
  309:23 319:21
  327:24 350:15
  355:1
**happened** 180:8
  222:16,17,18
  244:3,9 254:9
  269:17 270:6
  279:1 280:15,15
  308:11 309:8,18
  316:8 317:21
  318:20 320:4
  322:21 323:17
  337:20 354:14
  355:9
**happening** 191:23
  243:3 248:15,20
  248:23 260:24
  261:17 290:20
  291:5 298:22
  299:6 306:15
  319:8,25
**happens** 182:25
  193:7 205:12
  217:19 220:25
  309:11 320:25
  342:22 343:24

HIGHLY CONFIDENTIAL

**happy** 177:3 299:6
  299:17 308:7
  316:2 337:1
**hard** 221:9 246:10
**hardware** 276:3,9
  339:6
**harvard** 290:12
**harwood** 169:9
  175:9
**hate** 344:8
**he'll** 193:9 340:9
**head** 186:9 213:6
  272:25 321:2
**heading** 185:22
  224:18,19
**headquarters**
  335:4
**health** 365:10,11
  367:6,13,16
**hear** 319:20
**heard** 195:18
  314:13 339:3
**hearing** 253:5
  296:25
**heart** 205:4
  294:17
**heat** 272:20
**heavily** 282:21
**hedge** 292:6
**held** 175:12
  211:24 231:6
  362:12,23 363:8
**hell** 308:22 315:8
  317:22
**hellyer** 172:20
**help** 205:11 267:6
  292:10 333:11
  337:13 346:21
  347:22
**helpful** 269:3

**hendrick** 184:15
  184:19 185:1,23
  185:23 186:4,7,15
  186:19,21 189:5
  191:25 192:23
  193:22 198:12
  332:9 334:2
  335:20 336:10
  337:11,13 338:6
  339:9 358:14,15
  358:25
**hendrick's** 335:4
  338:18
**herb** 190:11 363:2
**herb's** 190:11
**hereto** 167:22
**hero** 338:7
**high** 179:9 237:20
  276:24 306:13,20
  343:17 344:3
**higher** 283:13
**highest** 260:12
**highlight** 225:16
**highlighted**
  225:14 286:6
**highlighting**
  285:10
**highly** 167:9 171:4
  171:8,11,15,19,21
  171:25 172:4,8,11
  172:15,18,22
  173:4,8,11,15,18
  173:22 174:4,7,10
  174:14,17,21
**hill** 172:6
**hired** 223:1
  339:18 346:24
**hires** 286:1
**historical** 222:13
**history** 324:10

**hit** 308:7
**hold** 346:15
**holding** 290:9
  365:7
**holds** 211:7
**hole** 278:19 311:8
**honestly** 213:23
  217:12 240:5
**honors** 216:13
**hope** 310:23
**horrible** 179:11
  180:16
**hostile** 324:23
**hour** 211:20 212:9
  285:24 366:5,9,14
  366:15
**hours** 255:20
  323:15,16 325:11
  365:8 367:22
**house** 253:12
  303:25
**houston** 167:20
  168:5 175:14
  238:4 346:8,24
**hub** 273:22
**huge** 262:19
  341:24
**hughes** 168:16
  175:20,20
**huh** 300:23 345:12
**humans** 246:14
**hurry** 292:9
**hurt** 233:14
**hurtful** 233:12

**i**

**ibm** 303:13,14
**idea** 242:14
  317:24 337:24,24
**ideas** 319:24
**identical** 267:1,2

**identifiable**
  264:16
**identification**
  184:3 201:11
  213:10 221:20
  230:1 234:22
  237:13 240:24
  244:23 247:24
  252:3 254:19
  256:20 259:8
  262:21 268:23
  271:14 276:15
  284:13 288:14
  289:19 292:15
  296:17 318:3
  321:23
**identified** 190:1
  276:12
**identify** 258:2
  307:16,16
**identity** 369:18
**ids** 297:13 330:11
  330:11
**ignored** 323:21
**ii** 171:3 318:13
**illinois** 167:1
  175:7 370:1
**image** 305:12
**images** 326:14
**imagine** 273:5
**immediately**
  255:19
**immense** 323:23
**impact** 222:17
  253:1 325:12
  326:23 327:9
**implement** 245:20
  246:25 268:10
  358:3,3
**implemented**
  247:15,20 269:14

HIGHLY CONFIDENTIAL

270:9,12 358:11
implements 217:8
implied 177:21
implies 206:5
importance
233:20
important 222:24
223:4 259:18
260:4 270:6
273:20 286:2
299:19 303:17
333:10 335:10
imposes 227:24
impossible 230:24
improve 243:24
248:18 290:24
291:14 304:25
improved 304:7
327:13
improvement
247:5
improvements
245:11,19,19
246:24 247:1,16
247:20 249:11
inaccurate 198:14
198:19 215:3
249:22
inadvertent
170:16
inaudible 196:1
289:11 329:21
332:16
incentive 336:25
inches 304:1
incidences 196:17
incident 269:7,8
309:12 318:16
354:13,14,19
355:15,19 367:6

incidents 198:1
include 272:17
305:7
included 273:11
302:21
including 347:14
incomes 234:5
increase 225:25
270:23,25 271:4
271:22,25 272:2,4
283:9,17 326:20
increased 224:15
270:21,22
increases 238:21
increasing 282:25
incredible 320:24
indemnifies
312:22
independently
299:2
index 170:1
india 246:16,17
indicate 213:23
indicating 193:18
341:17 343:20
344:3
individual 175:24
183:13 201:6
237:24 238:15
271:5 319:1
345:17
individually 246:7
247:2 256:7
individuals 359:6
359:7
industry 179:10
193:7 290:15
294:14
inevitably 238:21
321:15

infancy 239:15
infer 191:21
inference 353:17
inferior 333:18
inform 217:4
informal 212:6
216:4,20 217:1
219:2,5,9,11,15,20
287:14,22
information
196:23 205:19
206:24 219:25
222:8,13 228:6
231:5 244:7
264:17 267:6
284:4 300:9
301:24 308:17
316:2,20 317:4
319:9 326:12
329:7 331:25
informed 251:2
informing 258:14
inherent 205:6
inherently 193:3
inherited 303:25
initial 197:14
213:12 338:3
initially 207:14,22
initiated 299:13
initiative 335:19
injunction 296:24
innovators 354:20
inputs 206:19
inquiries 233:19
insert 257:23
inserted 229:24
inserting 258:5
282:2
inside 205:5
230:17 335:19
343:13 345:17

346:12,12,12
install 282:14
333:15 338:17
installation 194:13
195:9 281:24
282:10,18 337:25
installations
182:25
installer 338:5
installers 333:15
instance 167:13
179:7 188:4
194:24 229:23
248:21 273:19
292:23 327:6
328:16 332:2
341:4
instant 284:1
instantly 341:9
institution 312:17
institutions 312:12
instruction 198:21
255:23
instrument 369:19
insurance 274:1
342:23
integra 353:25
integral 265:25
266:3 267:4,17
268:1
integrate 181:3
integration 257:8
258:15
integrator 354:15
354:23,24 355:14
355:16,20
integrators 355:6
355:10
intelligence
293:12 295:19

HIGHLY CONFIDENTIAL

**intend** 244:9
**intended** 186:6
**intent** 218:19
**intention** 264:10
**inter** 220:8
**interact** 197:1
**interacts** 214:24
**interest** 215:17
**interested** 223:1
  228:23 229:16
  233:4,7 236:10
  278:5,7 285:25
  320:11 371:10
**interesting** 310:7
  324:6 337:19
**interface** 202:18
  267:7 270:13
  295:3,4 354:14
**interfaces** 266:9
  272:17 273:14
  282:21 283:20
  292:19 293:6
  294:23 295:3,14
**interiors** 205:1
**interlopers** 246:9
**intermediate**
  220:8
**internal** 193:17
  227:10,18
**internally** 319:20
**internet** 273:19
  315:25
**interval** 309:11
**invade** 304:10
**invent** 197:21
  345:5
**inventory** 204:24
  221:7,7
**invest** 202:17
  303:10

**invested** 305:3
**investigating**
  209:5
**investigation**
  317:10
**investment** 244:2
  311:16,24
**investments**
  243:23
**involve** 205:10
  354:23
**involved** 177:23
  178:15 186:8,11
  208:9 210:16,17
  231:16 245:23
  264:14 271:4
  308:1 315:7
  317:18,21,24
  340:6
**involvement** 271:6
**involves** 205:8
  219:21
**involving** 262:12
  296:25
**iphone** 178:21
**iphones** 178:22
**irvine** 281:23
**issue** 187:13 188:1
  224:10 254:13,16
  268:17 273:25
  278:20 280:14
  282:24 302:21
  305:10,25 307:1
  307:14 326:8
**issued** 249:16
  334:7
**issues** 190:1
  193:25 281:8
  290:7,8 302:24
  305:9,18 330:14
  330:16 340:25

**issuing** 249:5
**it'd** 296:6
**item** 271:5

**j**

**j** 168:15
**january** 167:10,16
  171:20,24 175:3
  196:4 211:24
  224:1,22 230:11
  369:2 370:10
  371:12
**jlong** 168:13
**job** 207:6 283:7
  288:11,16,17
  328:16 334:25
**jobs** 306:5 323:1,8
  324:11 331:20
  332:3
**joe** 175:25 214:13
**john** 168:16
  175:20 253:7,9
**joint** 204:8 207:11
  207:21 208:16
  215:11
**jointly** 350:10
**joke** 225:3
**jon** 173:20 208:9
  214:25
**jonathan** 172:10
  173:13 174:3
**joseph** 168:10
**journalling** 309:1
  309:2
**judgement** 299:24
**judgment** 264:20
**july** 173:17 174:3
  174:6,20 271:11
  277:4,8,8,19,20
  284:14,17 286:8
  296:13,20 351:24

**jump** 183:14
**jumped** 226:4,20
  226:24 365:17
**june** 172:21 173:3
  173:14 174:16
  253:3 254:25
  255:11,21 260:6
  263:3 268:10
  293:16
**junk** 280:7 307:2

**k**

**k** 168:3,22
**keep** 177:19 186:3
  186:18 195:15
  199:4,5 225:14
  228:1,11 231:5
  285:14 296:3
  304:12 305:12
  310:8,13,21,25
  311:13 336:3
  341:18 364:7
  367:1
**keeping** 367:22
**keeps** 361:7
**keith** 172:6
**kellogg** 168:10
  175:23
**kellogghansen.c...**
  168:12,13
**kelly** 330:18
**kept** 199:5
**key** 190:1 238:18
  333:10 338:1
  343:11
**keystroke** 335:16
**kill** 308:6
**killer** 345:4
**kind** 178:21
  193:18 195:10
  203:5 204:20
  205:5,20 227:20

HIGHLY CONFIDENTIAL

**[kind - knows]**                                                    Page 24

| | | | |
|---|---|---|---|
| 235:12 247:12 | 207:4 208:21,24 | 267:25 268:1,7,18 | 321:13,18 322:23 |
| 261:7 264:18 | 209:5,21,21,22 | 268:19 269:4,5,16 | 323:22 324:5,7,8 |
| 267:14 268:5 | 210:18,19 211:6 | 269:18 270:2,5,23 | 325:17 326:23 |
| 269:20 291:19 | 211:10,11 212:7,8 | 271:3,5,6,8 272:4 | 327:5,7,14,15 |
| 292:6 294:15 | 212:9,21,21 213:2 | 272:22 273:10,12 | 328:19 329:4,13 |
| 303:3,23 304:6 | 213:3,4,8,22 214:4 | 273:19,20 274:22 | 331:18,23 332:1,5 |
| 308:9,12 313:9 | 214:4,6,11,13 | 276:12 277:1,24 | 333:3,4,7,21 334:6 |
| 315:14,15,23 | 215:15 216:9,10 | 278:19 279:4,5,9 | 334:20,24 336:4,8 |
| 317:24,25 319:3 | 216:12,24,24 | 280:12,13,14,19 | 336:14,16,17,22 |
| 319:18 320:11 | 217:12,14 219:20 | 280:19,20,22 | 336:23 337:4,8 |
| 325:1 333:6 | 219:20 220:6,11 | 281:6,6,7,8,11 | 338:3,3,5,5,7,9,16 |
| 335:12,16 336:15 | 221:6 224:11 | 282:22,23 283:3,8 | 338:22 339:1,2,5 |
| 338:1,2,16,18 | 226:17,25 227:1 | 283:12,14,14,15 | 339:20 340:3 |
| 341:6 343:2,4 | 227:11,16,20,23 | 283:16 284:1 | 341:1,4,5,18,21,22 |
| 348:5 349:23 | 227:25 228:1,5,9 | 288:15 290:21,22 | 342:10,19,24 |
| 353:5,16,16 | 228:10 229:13 | 291:2,3,19,19,22 | 343:11,13 344:1,9 |
| 354:24 357:12 | 231:1,3,16,17,19 | 292:3,5,5,24 293:2 | 344:25 345:23,24 |
| 359:18,25 | 231:20,21,25 | 293:11 294:2,16 | 346:5,8,13,14,18 |
| **kinds**   283:2 343:9 | 232:6,17,25 233:1 | 295:21 296:3 | 348:1,14 350:11 |
| **knew**   339:16 | 233:3,10,13,21 | 298:25 301:18 | 350:20 351:15 |
| 364:18 | 234:5,5,6,25 | 302:22,25 303:3,3 | 353:11,16,19,22 |
| **know**   177:1,2 | 235:19 236:21,23 | 303:7,16,18,19,19 | 354:4,25 356:25 |
| 178:14,20,23 | 236:24 237:3,23 | 303:24 304:5,8,10 | 357:11 358:25 |
| 179:16,17 180:9,9 | 238:15,17,21 | 304:18 305:7,8,11 | 359:8,10,11,18,18 |
| 181:12,18 182:19 | 240:10,11 241:16 | 305:13 306:5,7,7 | 361:2,2 363:1,10 |
| 182:24 183:1 | 243:23 244:2,5,6 | 306:19,20 307:4 | 363:21,21 364:24 |
| 186:16 187:5,8,16 | 246:9,13,14,18 | 307:12,13,24 | 366:25 367:1 |
| 187:18,19,23 | 247:8,17 248:11 | 308:4,8,16,17,18 | **knowing**   200:20 |
| 189:21,23 190:23 | 248:12,15,21 | 308:19,19,19,22 | 227:16 278:6 |
| 190:24 191:1,2,2,4 | 249:5,7,14,15 | 308:25 309:3,15 | **knowledge**   192:11 |
| 191:22 194:10 | 250:25 251:13,18 | 309:18,19 310:3 | 195:5 220:24 |
| 195:8,14,15,16,16 | 253:23 254:1,8,10 | 310:12,14,16,19 | 319:12 350:16 |
| 196:2,20,21,21,23 | 254:12,12 255:15 | 311:12 312:6,9,10 | 356:25 363:7 |
| 196:24,25 197:2,3 | 256:6,8 257:12,21 | 312:11,11,21 | **knowledgeable** |
| 197:9,18,21 | 257:22,23 258:21 | 313:2,4,6,10,24 | 330:15 |
| 198:10 199:2,6,7 | 258:22,23 260:7,7 | 314:11 315:2,2,5,8 | **known**   239:10 |
| 199:11 200:11 | 260:11,25 262:7 | 315:9,12,16,22 | 304:17 369:17 |
| 201:4,5 202:11 | 262:17,18 263:21 | 316:1,4,4,11,13,14 | **knows**   308:17 |
| 203:4,11,17 205:2 | 264:9,10,15,19,21 | 317:7 319:1,1,4,8 | 339:19,20 |
| 205:7,8,19 206:10 | 266:8,10 267:3,3,5 | 319:9,16,24 320:8 | |
| 206:19,20,21 | 267:6,11,13,14,16 | 320:12,19 321:2 | |

**FTC-0001328**

HIGHLY CONFIDENTIAL

| l | | | |
|---|---|---|---|

**l**  167:17 370:13
    371:17
**lack**  310:17
    337:23
**lady**  253:11,12
**lamb**  170:17
    171:10 174:16
    184:9,16 185:6,8
    185:23 186:4,19
    186:20,25 188:8
    188:16 189:4
    190:15 191:8
    192:22 193:19
    198:12 230:20
    293:15,19 294:20
    332:9,18 361:19
    361:25 363:13
**laptop**  315:21
**large**  319:15
    358:19 359:2,6
**larger**  185:1
    227:19
**largest**  184:19,20
    184:22,23 185:4
    208:14,17,18
    358:21 359:2
**laser**  182:11,11
**late**  211:24 255:12
    305:1,2 356:11
**laugh**  324:7
**law**  167:19 227:25
    313:11,18
**lawsuit**  264:18
    296:21,25 299:23
**lawyer**  301:19
**lax**  309:22
**layouts**  346:10,11
    346:11
**leach**  312:11

**lead**  259:22
**leader**  348:6
**leaders**  191:2
**leading**  190:5
**leap**  205:5 317:19
**learn**  178:16,20
    179:19,25 181:19
    183:15 194:9
    333:9 348:10
**learned**  291:17
**learning**  180:24
    181:14,16 187:20
**leather**  205:2,2
**leave**  216:12
    242:17 253:12
    331:14
**ledger**  221:7
**left**  224:18 315:22
    315:23 354:9
**legacy**  280:17
**legal**  286:7 288:15
    312:10 313:5
    347:15
**lender**  206:24,25
**length**  199:2,12,16
**letter**  184:14,17
    185:6,10,17,21,22
    185:22 186:4,19
    186:20,23 189:4
    189:17 190:7
    191:9,25 192:18
    198:12,13 319:15
    332:9,17 361:23
    361:25 363:11,13
    363:17,25
**letters**  240:12
**letting**  237:3
**level**  188:11
    199:14 222:6
    233:2 234:5
    260:12 276:24

303:4 363:22
**levels**  204:22
**liabilities**  264:14
    312:23 321:16
**liability**  321:7,8
**liable**  231:22
    264:19
**license**  279:23
    313:21,22,23,23
    314:1,1 344:21
**lie**  338:20
**life**  303:24
**light**  272:20
**lights**  193:8,11
**likes**  283:16 308:6
**lime**  243:20,24
    263:13,14 279:13
    279:20,23 280:24
    281:1,4
**limit**  203:23
    247:11 277:18
    278:22 280:9
    360:10,23
**limited**  232:8
    268:4,4 313:23
**line**  181:24 223:23
    223:24 225:18
    230:13 258:9
    285:4 349:1 352:6
    369:3
**lines**  284:23 285:7
**link**  353:25
**lisa**  254:13
**list**  249:23 250:3
    250:19 253:14
    274:3,7 287:18
    300:21 303:4
    323:7 336:16
**listed**  192:8
    214:23 249:10,18
    250:12 362:12,22

**listings**  315:15
**lists**  190:10 279:2
**litigation**  167:4
    175:6 286:18
    299:13 370:4
**little**  193:1 200:4
    204:5 207:1
    222:14,25 241:6
    245:5 248:19
    249:3 266:17
    283:13,18 295:12
    296:7 298:25
    299:1 303:5 313:7
    337:3 339:20
    343:6 345:9 359:5
**lives**  308:5
**lloyds**  213:2
**llp**  167:19 168:4
    168:16 175:13
**load**  275:2 283:11
    305:8 323:22
    327:10,14
**local**  318:22
**located**  175:13
    323:11
**location**  306:14
**locked**  209:2
**locks**  343:11
**log**  309:5,6 310:6
    310:8 311:2
**logging**  309:15
    327:14
**logic**  308:12
**logical**  244:11
**long**  168:10
    175:25 177:3
    199:20 216:12
    231:16 266:17
    293:1,2 310:8,13
    310:25 314:3,11
    320:15 338:10,14

HIGHLY CONFIDENTIAL

[long - marking]                                                          Page 26

343:22 345:2
360:6,10 364:9,10
**longer**   182:1
199:22 254:13,16
274:3 280:14
288:3 290:7
334:21 365:8,12
365:23
**longest**   199:25
200:3
**look**   183:1 185:5
200:22 202:23
206:25 241:8
245:25 246:1,4,13
246:18 248:14
259:20 266:9
268:5 285:21
288:8 292:11
316:9 321:21,24
324:13,18 336:2
336:22 357:21
**looked**   226:12
228:16 249:20
267:14 286:6,13
311:17 347:4
363:17,20
**looking**   204:20,22
227:4 233:13
241:10 285:15
323:5 332:20
351:16 352:16
361:4,20
**looks**   203:15 214:7
224:1,25 246:5
272:7
**loop**   247:18
**loose**   317:23
343:22
**lord**   345:3 346:20
**lose**   177:21 307:18
307:18 339:9

**loses**   185:19
**loss**   178:9,10,10
308:9 310:14
**lost**   177:17,25
337:2 346:19
**lot**   182:25 189:2
189:21 196:6
231:23,24 251:15
258:4,4 292:4
310:21,21 313:19
318:21 320:8,23
323:25 336:18
337:20 347:19,21
352:21 360:6,7
364:10
**lots**   277:11 360:7
**louisiana**   167:20
168:4 175:13
**love**   197:4,5 320:4
**low**   338:1
**lowering**   192:24
**lunch**   265:5,9,12
265:13

**m**

**m**   168:11
**ma'am**   176:21,24
177:6 179:16
182:3 184:7,10,13
184:18 185:20
186:2,6 187:4
194:19 195:20
196:2,11,13,16
198:22 199:24
200:17,24 201:16
202:2,6 204:7
210:12 211:23
213:14 214:4
215:5,9 216:18
217:3,6 218:18,22
219:7,10 222:2
223:18 228:20

229:17 230:7,9,21
233:7,19 234:18
235:5,18 239:5
241:20 242:4,21
245:1,22 251:18
252:17,21,24
254:8,23 257:2
259:11,14 263:1,2
276:21 282:4,7
360:22 361:2
362:10,21 363:1,9
**machine**   167:18
**mad**   345:24
**magic**   341:2
**magnitude**   340:5
**mail**   279:2
**main**   247:20
261:20
**mainline**   257:23
261:14
**maintain**   203:10
**maintenance**
194:18 272:19,20
273:15 275:15,17
276:3,9
**major**   187:1
249:10,19,23
250:3,7,12 294:13
**maker**   207:10
270:24
**making**   193:13
209:12 283:1
284:8 342:14
356:24 365:21
**management**
167:3 175:5
186:13 190:11
221:22 297:25
298:13 370:3
**manager**   197:4,11
214:19 315:13,18

344:15
**manager's**   196:24
**managers**   344:18
**manner**   293:12
294:17 299:8
**manpower**   272:22
**manually**   253:15
**manufactured**
322:25
**mark**   168:21
176:9 218:6
**marked**   184:1,2
201:9,10 213:9,12
218:5,8 221:18,19
228:15 229:25
230:3 234:20,21
237:12,15 240:23
241:1 244:21,22
247:23 248:1
252:2,5 254:18
256:19,22 259:5,7
262:20,23 268:22
268:25 271:13,16
276:14,17 281:13
284:10,12 288:13
289:18 292:14
296:11,16 318:2
321:22 332:8
351:11
**market**   259:1,2
264:3 294:21
347:16 350:25
**marketing**   243:19
243:20,25 263:17
**marketplace**
207:9 231:18,19
233:10 302:23
303:21 305:13
345:22
**marking**   254:17
318:4

HIGHLY CONFIDENTIAL

martin 173:20
massive 197:15
master 315:14
master's 320:9
matter 175:5
  191:12 232:18
  269:3 294:12
  307:14 315:10
  316:15
mayer 168:21
  176:9
mayerbrown.com
  168:23
mba 290:12
  320:10
mcohen 169:5
mdl 167:3 370:3
mdsc 168:8
mean 177:21
  182:1 209:1
  225:15 246:21
  252:6 266:17
  289:3 291:14
  292:1,3 295:3
  308:7 311:11
  316:5 320:5,14
  322:19 324:6,9
  340:19 345:19
  365:12
meaning 236:17
  239:19 259:21
means 193:10
  197:13 224:12
  260:2,3 261:6,14
  278:18 279:8
  282:21 283:17
  309:2,7 310:21
meant 319:3
  336:24 352:23
measurement
  193:4

mechanism
  329:16
medals 239:23
media 237:5,9
  265:10,14 325:23
  326:2
meet 212:2,11,16
  349:18
meeting 210:19
  212:5,6,15 214:1
  214:22 351:12
meetings 210:11
  210:15,21,24
  211:3,8,12,21
  212:2
memorized 336:4
memory 214:5
mentioned 194:11
  214:10 264:21
  328:5 331:7
menu 344:5,6
merger 293:16
  303:10
message 246:16
  247:10
met 212:11,24
  214:14 239:9,12
  315:10
method 348:12
  353:6
michael 168:9
  169:3 176:6
  315:10
mid 268:14 269:9
  270:9
middle 235:12
  246:1,3 281:24
mike 175:23
  289:10 356:12
milberg 168:16
  175:18,20

milberg.com
  168:18,19
million 228:18
  229:6 305:15
  311:7,18 346:13
  346:15 347:16
  356:4,8
millions 311:4
  356:7
mind 242:5 317:20
mine 302:20
minor 202:9
  310:15
minute 227:13
  240:15 287:4
  318:10 340:16
minutes 214:1,22
  215:3 222:12,13
  265:5 300:5
  323:16 325:10
  354:9 360:16
  365:16 366:25
  367:3,4,8
miracle 197:6
  342:20 344:7
miraculous 197:23
mis 170:16
mischaracterizat...
  222:10
misspellings
  363:19
misused 278:16
mms 242:1,11,16
  242:25 243:7,19
  243:25 244:4
  297:7
mnemelka 168:12
model 333:22
moment 218:13
  277:12 280:21
  289:17 293:17

296:14 318:15
  321:21
moments 281:10
monday 247:7
  306:1 336:14,18
monetary 238:9
money 193:13
  302:25 317:15
  319:19 342:8
monitor 182:22,24
  183:3
monitors 182:22
  182:24
monopoly 207:7
monster 335:3
month 194:18
  197:12,13 199:17
  222:11,18 224:23
  285:23 321:10
  337:16 344:16,17
  344:19 358:3
monthly 194:17
  221:25 223:6,8
  257:13 258:15
  275:18,23 276:9
  277:24 280:4
  282:10 285:21
months 181:24
  182:1 183:8
  310:20
mopping 303:24
mops 304:2
morale 232:4
morning 175:2
  176:17 249:2
  289:11 336:19
mornings 336:14
morse 190:12
moss 172:3
motion 364:23
  365:1,21 366:10

Case 4:21-cr-00009  Document 236-5  Filed on 12/07/21 in TXSD  Page 81 of 103

HIGHLY CONFIDENTIAL

[motivate - notified]                                                Page 28

motivate 263:18
motivated 333:7
motivation 298:6
motivations 194:3
236:21
motors 297:23
mouse 353:5
move 197:24
221:14 225:3
335:23
movement 261:12
moving 185:24
244:8 264:15
273:24
mryan 168:23
mullin 169:3
176:7
multiple 361:3
multistep 220:23
mumbling 232:15
myriad 313:4

**n**

n 168:1,9 169:1
175:1 214:11
n.w. 168:11,22
nada 211:18,19,21
212:2,25 214:14
naked 243:20,24
263:13,14 279:13
279:20,23 280:24
281:1,4
name 175:9 193:8
193:11 208:3
212:13 213:7
214:13 232:21
257:5 315:4,11
319:5 338:6 369:2
369:19
named 168:7
names 209:20
314:21 316:2

nature 333:22
353:22
near 207:7
nearly 179:3
190:15 191:15
necessarily 189:22
191:21 259:4
295:10 301:22
necessary 303:2
need 177:1 207:2
219:19 225:17
227:9 230:18
290:6 292:18
293:5,12 295:14
295:22,22 296:1
304:1,2 316:10
326:17 327:8
340:7 365:23
366:7 367:12
needed 337:13
needing 235:21
needs 245:16
299:14 301:1,1
302:22
negotiating 199:12
290:1
neither 371:5
nemelka 168:9
170:5,6 175:23,23
252:9 288:24
289:4,5,9,10,21
290:5,21 291:6,12
291:21 292:12,16
293:4,14 294:3,19
295:2,9,22 296:2
296:18 297:13,20
298:1,8,12,15,19
299:10 300:1,14
301:5,16,20
302:18 304:16
305:24 310:2

311:6 312:4
314:17,23 317:14
322:12 323:6
324:25 325:4,15
327:12 328:25
329:11 330:2,5,25
331:5 334:5
340:18 344:23
345:9,15 347:25
348:23 351:15
353:1 354:3,11,18
355:2,15,21 356:1
356:9,13,20 357:2
357:7,13 360:16
361:18 362:6
364:14 367:17
never 178:21
218:12 230:16
248:22,24 257:5,6
303:19 310:23
316:15 319:20
329:17 340:5
342:21 356:13
nevertheless
331:13
new 168:18,18
178:16,21 179:19
179:25 180:24
181:4,14,16,18
182:5,7,9,14 183:6
183:9,15 187:20
194:10,24,24
223:2 239:15
242:1,10 250:8
275:2 280:17
286:1,1,1,1 309:25
333:9,9 334:23,24
336:2,5,11,21
337:5 343:23
346:9 358:11

news 192:16 193:2
193:12,21 194:3
197:18 241:3
252:13 255:6
256:13
nice 292:7 296:1
315:24
nicer 296:7
nifty 205:16
nigh 197:22
342:19
night 246:2,3,17
274:20 364:21
nine 324:15
nobody's 231:6
noise 321:13
nominally 339:13
non 332:1 341:22
nonsense 365:18
noon 337:1
noontime 337:8
nope 366:4
normal 251:25
261:11,11 270:23
294:12
normally 212:2
northern 167:1
175:7 370:1
notary 369:23
note 259:15 286:7
357:23
noted 369:13
notes 351:12,21
notice 310:19
noticed 286:16
notices 334:7
notification
219:21 260:7
notified 251:20,21
251:22,24

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

FTC-0001332

HIGHLY CONFIDENTIAL

**notify** 219:25
242:18
**notifying** 220:1
283:23
**november** 171:3
172:7 184:15
238:7,25
**number** 188:4,12
188:23,24 193:5,5
199:4 205:8
224:12,13 225:6
228:8,21 229:14
229:15,18 233:14
234:6 240:12
253:6 269:18
271:5 273:18
276:18 278:22
280:10 282:20
285:21 291:17
292:24 296:8
297:11 305:14
323:12 326:16,24
335:14 342:1
352:15 356:4,14
356:17 357:2
359:6,7 361:6,7
365:3
**numbered** 167:15
324:14,15
**numbering** 170:16
170:19
**numbers** 193:16
193:17 223:23,25
227:8 228:10,12
228:12,13 232:1
274:4 282:6
284:17 286:3,6
318:6,7 320:19,19
323:11
**numerically**
237:23

**numerous** 314:13

**o**

**o** 175:1
**oath** 369:18
**object** 182:18
206:11 243:14
250:10 255:22
271:1 275:14
362:2 367:22
**objection** 178:7,13
179:4,15 180:6,14
180:20 181:5,10
181:22 182:2
186:1 187:3 189:7
189:11,19 191:10
191:18 192:2
195:24,25 196:1
198:15,20 200:2
200:19,23 201:3
202:5,14,21
204:14,16 207:23
209:14,19 212:12
213:21 215:4
216:1,5 217:5
218:2,21 219:13
219:18 221:3
224:4,9,16,20
226:6,15,21,22
227:7 229:7,21
233:6,18,25
234:12,17 236:8
236:19 243:1,9
249:12 250:15,18
250:23 251:4
253:25 255:13
256:15 257:10,19
258:17 260:18,23
261:24 262:10,16
263:15 264:8,23
265:2,21 266:1,7
266:15,22 267:10

267:21 268:12
269:11,15,25
270:14 271:23
272:6,12 274:8
275:8 276:1,7
277:5 278:13,24
279:14,18 280:5
280:11,18,25
281:5,18 282:3,19
283:21 284:19,21
285:3,18 286:11
286:19,25 287:17
287:24 288:4,12
290:3,18 292:21
293:7 294:11
295:16 297:9,15
297:22 298:3,11
298:17,21 299:15
301:4,5,10,15,16
301:20 302:6,11
302:17,18 303:12
304:15,16,21,24
305:5,23,24 310:1
310:2,11 311:5,6
311:21,23 312:3,4
312:8 314:6,16,17
314:22,23 317:5
317:13,14 318:18
320:6 322:5,12,15
322:20 323:6
324:24,25 325:4,9
325:14,15 326:25
327:11,12,20,22
328:3,8,13,24,25
329:10,20,24
330:5,6,13,17,25
331:4,5,11,16
332:15,22 333:2
333:13,19 334:4,5
334:12,15,18
339:11 340:2,11

340:17,18,24
342:5,7,17 344:23
345:14,15 346:3
347:24,25 348:8
348:13,18,22,23
349:2,7,11,16,20
349:25 350:12,22
351:4,8,23,25
352:4,10,19,25
353:1 354:2,3
355:11,18,24
356:18 357:4,9
358:17 359:23
360:21 361:1,11
362:14 363:15
367:1
**objections** 206:11
329:11
**obligation** 220:15
220:18
**obligations** 216:14
**oblivious** 313:9
**observation** 199:6
**observe** 353:13
**obsolete** 203:11
**obviously** 177:22
225:1 261:25
299:2,16 317:11
317:15 320:20
337:22 338:24
347:19 367:20
**occasion** 198:8
314:13
**occur** 180:22
194:10 211:3
**occurred** 249:25
257:14 262:9
269:21 305:2
308:13
**occurring** 246:20
342:18

HIGHLY CONFIDENTIAL

**occurs** 197:6
  217:14 220:13
  280:1 284:2
  309:12 342:25
**oct** 305:1
**october** 172:3
**od** 287:18
**odd** 339:15
**ode** 204:5,11,13,15
  205:21,25 206:1
  207:11 208:7
  209:6 210:10,11
  210:21 211:7,13
  212:3,17,24 213:3
  214:2,24 215:24
  287:13
**ode's** 207:8
**offer** 199:9,11
**offering** 243:24
  274:15
**office** 274:25
  342:24 343:7
  346:23 369:21
**officer** 214:21
  229:12 370:17
**offices** 167:19
**oh** 285:8 316:21
  328:1 338:14
  345:3 356:10
**ohio** 274:25
**okay** 176:19 177:7
  185:15 189:9
  192:22 206:6
  223:24,24 226:3
  226:14,18 235:10
  235:13,15 243:17
  248:15 252:8
  267:12 268:3
  271:24 278:25
  285:16 292:12
  294:7 302:3

316:19,21 321:19
  324:19 335:1
  337:18 338:14
  343:7 352:14
  361:19 363:11
  366:16 367:9
**old** 183:6 203:11
  225:11 279:22
  320:12 323:1
**older** 322:24
**once** 183:9 211:17
  212:22 213:8
  222:11 238:4,4
  285:23 307:21
  327:3 328:19
  338:20 365:6
**one's** 324:7
**ones** 227:3 250:11
  250:16 272:24
  277:12 309:16
  354:5
**ongoing** 203:20
  310:10,12 311:11
**onsite** 275:17
  315:17 333:15
**opcode** 335:13
  336:3,23
**opcodes** 335:11,11
  335:17,21,25
  336:2,5,11,21
  337:25 339:8
**open** 204:5 259:19
  315:1 364:7 365:7
  365:14 367:2,23
**opened** 260:16,21
  261:16,22 283:25
**opening** 261:10,13
  335:15 336:20
**openly** 233:2
**operate** 256:17
  290:23 307:10,11

**operated** 231:8
  299:7
**operates** 228:11
  231:21
**operating** 203:18
  203:19 231:12
  258:6
**operation** 186:13
  186:14 231:14
**operational** 328:7
**operations** 217:21
**opinion** 180:17
  250:5,6,6 295:7,8
  295:14,17 299:18
  313:12
**opportunities**
  258:2
**opportunity**
  208:20 237:16
  274:1
**options** 204:23
**oral** 167:8,12
  370:9,17
**orchestrated**
  201:4
**order** 193:21
  197:11 210:14
  261:10,16 265:19
  265:24 266:5,21
  267:3,9,11,15,16
  267:16,20,23
  268:3 270:5
  283:20,22,24
  292:25 293:2,10
  295:15,20,23
  311:25 312:15
  313:5 327:6
  335:16 336:20
  365:19
**ordering** 258:11
  258:13

**orders** 257:25
  260:2 261:13
  266:11,12 267:5
**ordinary** 235:8
  246:4 257:21
  288:10,16
**organiza** 239:7
**organization**
  185:3 204:6
  207:20 208:1
  209:23 217:14,21
  223:4 227:22
  232:4,14,20
  234:10 239:18,19
  239:21
**organizational**
  228:9
**organizationally**
  227:18
**organizations**
  359:2
**oriented** 303:14
**original** 342:20
  347:14
**originally** 188:6
  303:13
**ought** 209:4 323:2
**outcome** 371:10
**outdo** 252:9
**outliers** 313:13
**outlook** 321:6
**outputted** 220:5
**outside** 230:17
  266:10 267:1
  279:1 304:9
  306:12 316:17
  328:18
**overall** 222:4
  228:9 249:8
**overhead** 178:15
  178:24 227:24,25

FTC-0001334

HIGHLY CONFIDENTIAL

[overhead - percent]                                                Page 31

327:15
**overloads** 325:16
**overrun** 323:1
**owned** 184:23
185:4 215:18,19
293:24,24 363:4
**owner** 184:19
**ownership** 215:17
**owns** 313:20

**p**

**p** 168:1,1 169:1,1
175:1
**p&l** 223:16
**p.a.** 169:3
**p.m.** 167:16 247:6
247:12 265:11,12
265:14 287:7,8,9
325:24,25 326:2
366:18,19,21
368:3,4
**pace** 336:24
**package** 171:20
174:6,9 178:18,19
206:24 231:17
282:18 284:15
285:23
**packets** 273:24
**pag** 358:14,15,25
**page** 170:1 171:1
172:1 173:1 174:1
185:14,21 186:23
186:24 188:16
189:14 190:6,9
223:14 228:15,17
235:1,6,12 241:17
241:24 245:6,9
252:25 253:17
254:3 255:5
277:15,18 281:14
281:16,22,24
284:15,16 285:7,8

285:12 286:4
332:20 333:25
351:14 357:23
362:11,18 369:3
371:1
**paged** 230:3
**pages** 252:12
364:14,15
**paid** 197:19
336:25
**pain** 242:18
**pale** 324:8
**paperwork** 343:7
**paragraph** 189:13
239:6,8 260:4
279:16 363:22
**paramount** 367:13
**parcel** 309:20
**parentheses**
300:21
**park** 274:25
**parse** 331:24
**part** 177:18 205:7
206:5 217:20
228:9 245:24
247:18 259:24
263:9,13 265:25
266:3,4 267:4,17
268:1 270:22
273:4 274:11
278:10,12 283:1,1
288:17 303:16
306:12 309:20
310:7 313:7
342:23,24
**partially** 269:6
**participated**
211:12
**particular** 188:11
191:12 201:24
208:21 214:5

234:14 238:16
249:6,17 254:21
257:14,16 263:11
269:6 282:20
283:10,11 284:4
285:23 292:25
319:13 354:22
355:19 359:9
**particularly**
193:25 232:2
233:8 299:22
**parties** 211:19
227:1 267:14
326:21 327:19
328:7 371:6
**partner** 208:25,25
**parts** 179:9 221:7
**party** 201:17,18
202:13 219:3
245:24 253:20,23
257:4 261:6 266:5
266:20 267:1,8,18
268:6 283:24
299:4 309:22
312:20 313:24
314:4 315:6 328:1
349:15 353:3
370:22 371:4
**pass** 333:8
**passed** 315:2
**passing** 258:16
**password** 315:14
315:19
**patient** 337:17
**pause** 214:8
**pay** 180:24 183:17
264:19 274:12
275:7 313:19
315:8 337:2
**paying** 344:21

**payment** 206:21
207:1 263:21
341:9,12,14,18
**pays** 216:13
**pcs** 182:19,20
304:11
**peggy** 168:15
175:17 265:4
300:7 360:3,9
**pending** 177:4
243:5 278:3
**pennsylvania**
168:17 169:4
**penske** 185:2
**penultimate**
352:16
**people** 179:19
183:3,23 188:4,12
193:4 194:8,9
203:14 208:1,8
209:15 212:3,14
212:16,17 213:5
230:18 231:4
238:18,19 246:3
248:22 249:1,13
249:16 250:19
263:18,23 264:17
299:20 304:9
313:19 316:1,24
316:25 319:10,19
321:12 333:16
334:24 336:14
339:7 343:18
345:17,18
**perceive** 249:2
**perceived** 248:23
**percent** 179:8
183:2 204:11
205:9 215:18,19
223:20 224:15
225:25 228:3

HIGHLY CONFIDENTIAL

271:9 272:8
337:16
**percentage** 179:9
205:7 226:23
271:7 285:4
**perfect** 220:25
248:13
**perfectly** 258:19
**performing**
237:20
**period** 233:22
251:15,19 254:4
277:8 367:5
**permission** 306:17
**permitted** 258:22
328:23
**person** 209:23
210:11,25 211:13
212:13,16,17
214:17 232:19,22
234:16 250:2
253:16 291:7,13
292:7 315:17
319:6 338:9,12,19
338:19 345:18,19
369:19
**personal** 264:16
319:9 321:8
**personally** 180:15
182:21 264:16
292:7 340:6
348:19 349:4
359:1 369:17
**personnel** 179:24
181:13 183:14
187:15,17,17
188:1 227:23
273:1,15 333:7
337:21,21
**pertinent** 339:12

**phased** 203:4
**phil** 324:22 354:4
**phillips** 168:16
175:18,21
**philosophy** 303:14
**phone** 210:18,25
211:1 213:4 291:3
**pick** 190:22
214:15 246:14
291:3 344:6
**picture** 197:18
**pictures** 246:14
**piece** 202:25
228:11 306:9
316:17 347:18
**pieces** 182:10
307:2
**pile** 259:19 317:16
**ping** 269:24
**pitch** 239:1 334:3
**place** 176:19 195:8
212:8 213:2 220:2
220:4 233:1
236:22 238:2
246:16,17 250:21
251:8 255:12
256:8 257:5
260:22 321:14
323:9 324:9 336:5
339:10 344:4
**places** 192:20
212:24
**plaintiff** 167:14
168:7
**plaintiff's** 184:1
201:9 213:12
221:18 228:15
230:3 234:20
237:16 238:24
241:2 244:21,25
248:1,3 252:5,10

254:17,21 256:22
256:23 257:1
259:6 262:23,24
268:20,25 269:1
271:16 276:17,20
281:13 284:11
288:7 289:14
293:14 300:15,16
318:5,7 332:8
357:22
**plaintiffs** 168:14
170:18,18 175:19
175:22,25 348:4
351:11 354:8
365:3,4 366:24
367:9
**plan** 201:4
**planned** 236:16,17
262:3
**planning** 208:2,7
**plaque** 238:17
**plaza** 168:17
**please** 175:15
176:12,25 177:2
242:10 255:2
345:3 359:19
362:21
**pleased** 189:21
303:18 363:19
**plus** 271:7,8 272:8
326:13 347:14
**point** 185:2 186:7
186:11 197:15
206:18 235:10
242:21 255:18
257:20 259:25
279:15 288:23
318:23 333:5
365:2 367:24
**pointed** 236:9

**points** 256:13
352:15
**policies** 330:12
349:10,19 350:19
**policy** 230:14
231:1 232:5
242:15 243:6
251:5 264:25
330:14 341:12,14
350:2 357:17
**polishing** 303:25
**polite** 292:8 312:6
**pontis** 214:23
**poor** 180:23
**poorly** 179:18,19
**position** 215:21
220:9,23 232:15
251:12
**possibility** 355:13
**possible** 264:11
277:1
**post** 315:24
**posted** 316:2
**posture** 344:10
**potential** 205:20
206:24 209:5
264:14
**potentially** 264:16
354:25
**power** 272:20
294:21
**practice** 216:22
217:3,4,8
**prayer** 345:3
**predicting** 320:15
**prefer** 299:22
**preliminary**
296:24
**preparation**
351:21

HIGHLY CONFIDENTIAL

[prepared - prone]                                                                 Page 33

prepared 222:6
223:5 317:22
prepares 223:12
present 169:6
175:10,11 211:19
president 169:8
186:17 208:5
339:13
presidents 222:7
press 206:23
pressure 197:3
292:4
prestige 190:11
prestigious 238:23
presume 202:6,18
240:10 255:25
262:7
pretty 182:10
246:8,15 262:12
311:8 325:18
334:25,25 357:5
363:3,20
prevent 257:7
308:23 321:18
prevention 308:10
previous 194:11
206:3 225:7,23
259:15 284:20
303:7
previously 187:14
218:5,8 236:10
248:11 281:13
price 193:11
194:13 206:21
258:21,23 270:23
270:25 271:4,22
271:25 272:1,4
283:13 347:14
prices 283:18
pricing 268:9
269:10

primarily 186:6
256:16
principal 179:18
208:23
principally 208:1
237:24
print 235:13
328:16 331:19,20
331:20,21 332:3
printed 328:16
331:24
printers 182:7,9,9
182:11,12,14
prior 200:12
220:21 278:14,25
298:25
privacy 316:24,25
privately 184:23
362:12,23 363:4
privileged 316:20
317:4
prize 238:14,16
probably 211:5
216:6 222:9,11
228:2 256:5 263:8
274:1 286:15,16
286:22 302:19
305:6 309:8 311:8
311:8,25 322:25
323:23 339:2,6,19
350:13 354:4
357:11
problem 187:15
190:25 194:1
269:21 279:12
280:13,22 281:2
306:25 307:9
312:9
problems 180:25
338:22

procedure 167:21
procedures 233:12
proceed 176:12
209:4,4,9 241:6
336:23 367:8
proceeding 371:7
process 181:12,17
183:19,22 186:8
199:13 200:10
204:18 207:5,7,8
220:3 244:6
248:13 249:8
260:9 267:6 278:9
279:25 312:19
317:25 326:10
330:8 331:17
333:5 335:9
336:20 342:25
343:18,25 344:8
processes 204:3
produce 200:13
365:4
produced 167:13
195:7 364:12,23
producer 196:20
342:2
produces 197:8
producing 342:16
364:24
product 207:6
208:2,6 223:2,16
243:24 244:1
258:3,7,21 263:10
263:11 265:19,22
274:15,22 278:1
278:15 279:13,20
279:21,22,22,23
280:21 293:1,2
295:18 299:1
productivity
183:2 228:5

products 190:3
278:11 295:11
profit 193:17,17
196:20 197:12
227:8 228:12,13
231:20,25 232:3
342:2,16 343:16
344:14,17 348:1
profitability 228:8
230:15,22,25
232:9,15,19
profitable 190:4
227:5,12,16 231:5
232:6,17,25
234:11
profits 197:9,16
233:2 347:23
program 260:11
276:5 310:4
348:12
programmers
309:22 346:25
programming
307:22 310:17
332:5,6
programs 221:12
331:24 336:25
prohibit 341:1
prohibited 258:18
prohibition 232:9
project 187:1,9,21
201:4
projects 212:21
223:2 286:1
promise 337:15
340:4,9
promised 338:17
340:4
promptly 194:10
prone 196:2

FTC-0001337

HIGHLY CONFIDENTIAL

[proof - rci]                                                                    Page 34

proof 207:2
properly 181:12
  194:9 295:15
proposal 338:25
prospect 204:19
  205:3,14
prospective 298:6
protectant 343:13
protection 309:25
  343:10
protocol 365:19
proved 369:18
provide 219:2
  292:25 327:19
  328:12
provider 221:2
  260:10 279:4,24
  280:8 300:21
  312:20,21 332:25
providers 217:23
  221:5 300:22
  301:3,9 330:20
provides 222:23
  274:17 275:1
  298:5
providing 258:5
  291:23
provisions 167:21
public 188:24
  191:12 231:9
  305:13 339:24
  369:23
publicity 319:23
publicly 185:4
  188:17,22 189:1
  231:10 363:7
publish 258:23
  283:22
published 231:11
pull 205:14,14
  298:20 324:4

pulled 259:19
pulling 298:9,15
pumps 304:2
punctuation
  189:23 363:20
punish 338:23
purchase 194:13
  347:14
purpose 222:3
  264:3 335:14
purposes 369:20
pursuant 167:20
  370:20
pursue 367:12
put 176:18 198:24
  203:16 215:1
  225:14 240:3
  250:21 251:8
  255:12 280:24
  281:3 283:12
  286:24 292:12
  296:9 308:22
  324:16,17 326:21
  331:25 335:25
  345:10 346:23
  347:5 352:7,17
  355:3 365:1 367:3
pwedgworth
  168:18

q

qualified 357:11
qualifies 315:4
quality 337:21
quarter 211:10,10
  211:11 272:4
quarterly 211:6,7
  211:9
quenched 338:4
query 202:24,24
  203:4,7,7,8 323:14

question 176:22
  176:23 177:1,3,4
  191:19 197:25
  198:3 203:13
  206:12,13 213:13
  218:24 219:23
  236:5 243:5,12,13
  266:14 268:19
  270:8 277:17
  278:3,8,10 285:1
  288:9 289:2
  291:16 294:4,5,6
  294:21 326:6
  333:20 339:12
  345:17 354:13
  362:20 364:9
questioning
  332:10 352:22
  360:14,15
questions 235:1
  241:16 288:25
  289:12 300:1,3
  301:23,25 302:9
  303:7 305:9,17
  351:13 357:19
  363:12 364:4,10
  365:16 367:18
quickie 246:16
quickly 181:9,15
  197:14
quieted 254:12,15
quit 216:24
quite 178:23 179:8
  188:14 203:2
  223:22 238:2
  252:12 253:6
  254:22 261:7
  263:1 275:9
  320:12 359:4
quota 280:16,24
  281:3

quote 347:11
  353:19
quoted 239:16
quotes 193:20
quotient 187:24

r

r 168:1 169:1
  175:1 214:11
r&r 214:22
racing 186:11,13
  338:8 339:18
rahal 358:14,15
  359:5
raise 282:17
raised 269:10
ran 346:23
randall 322:3,22
randolph 322:10
rang 291:3
rank 192:25
ranked 192:17
  343:17
ranking 193:3,9
  193:12,21 194:3
rarely 199:8
  211:14
rate 205:3 206:18
  306:13,20
rbdr 274:16,22
  275:12 276:5
rci 202:18 203:14
  203:16 223:19
  224:2,22 225:6,19
  226:4,19 227:2,5,8
  227:11,15 228:8
  230:16 232:10,20
  232:24 233:4,8,16
  234:10 239:15
  257:21 259:24
  260:9,11 261:2,3
  261:11,11 262:1,4

HIGHLY CONFIDENTIAL

[rci - referred]                                                          Page 35

268:11 269:10,18
272:10,16 273:1,4
273:13,16 274:7
284:17,18,24
285:14 292:18
293:5 294:23
295:2,3,14 299:3
302:2,9,10 326:16
329:17 354:14
**rdr**   167:17 371:17
**reach**   278:1
279:21,22
**react**   302:23
**read**   198:16,18,22
225:15 234:24
255:8 263:8
289:17 294:15
307:6 310:4 320:1
358:6,7 363:22
369:12
**readily**   264:13
**real**   258:1 259:22
260:16,21 261:9
261:13,16,22
265:19,23 266:5
266:20 267:9
282:21 283:19
284:2 337:22
**reality**   231:23
**realize**   227:19
235:23
**realized**   236:6
338:17
**really**   189:3 192:5
198:22 203:1
224:11 233:21
238:1 254:22
261:7 276:21
283:12 284:1
285:22 290:14,22
294:23 295:8

297:23,24 317:23
319:15 320:24
325:16 327:8
331:17 332:4
334:6,6 336:23
337:22 338:14
340:7 350:2 359:8
359:8 365:12
**reason**   179:18
197:4,8 202:3,7
213:25 215:2
217:18 222:12
227:17 228:7
229:9 230:21
231:14 232:8
233:7 236:10
244:5 249:21
259:18 264:12
299:18 308:21
335:22 346:14,14
346:16 369:3
**reasons**   194:4
236:13 247:10
256:16,17 364:7
364:16 371:1
**rec**   311:17
**recall**   192:8
207:15 208:4
213:1,24 234:15
242:5 250:20,24
251:1,14 262:12
262:15 263:6,16
264:9 284:9
292:19 301:24
318:20 322:4
332:10 351:16
356:5 358:2,4
362:8
**receipt**   370:24
**receivable**   220:9

**receive**   202:4
219:21 221:25
238:21 239:4,23
241:21 252:18
254:24 256:25
259:12 263:3
271:10,18 277:3,7
288:10,18
**received**   213:19
218:16 238:25
248:5 250:16
251:15 301:24
**receiving**   306:1
**recess**   210:5 237:7
240:19 265:12
287:8 325:25
366:19
**recipient**   328:22
**recipients**   278:22
280:10
**reciprocal**   217:4,8
217:22,25
**recognize**   242:3
**recognized**   294:8
**recollection**
255:10 263:7
**recommendation**
280:24 299:11
**recommending**
297:5
**recompense**
236:14,24
**record**   167:22
175:3,16 184:4
191:13 210:4,7
225:14 237:4,6,10
240:18,20 241:4,5
241:7 265:11,15
270:3 287:4,5,6,10
307:24 309:4
320:2 323:4

324:17 325:19,24
326:2 342:13,14
364:3 366:8,9,11
366:16,17,20,22
367:25 368:3
370:18 371:9
**recorded**   175:4
**records**   228:1,2
306:13,18,19,21
307:3,7,13,15
309:14 319:2
320:20 331:25
346:13
**recover**   180:5
187:11 188:9
192:10 194:7
197:13
**recovered**   192:6
**recovering**   233:13
**recovery**   275:1
**recurring**   225:6
225:19 284:18,24
284:24 285:14,15
285:15
**red**   204:25
**reduce**   278:22
**reduced**   327:1
**reed**   322:3,22
**reed's**   322:10
**refer**   229:1 253:11
273:22
**reference**   234:25
253:24 256:9
259:18 269:6
**references**   256:2
256:13,16
**referencing**   256:2
**referred**   219:9
226:7 292:22
361:24

FTC-0001339

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| **referring** 236:1 253:17 | 221:1 287:13,14 287:14,19,22 301:14 | **removed** 247:9 | **representative** 168:8 |
| **reflect** 170:20 201:19 271:21 | **relationships** 215:25 216:4 286:2 287:16 288:2 297:3 299:12 300:20 301:2,9 | **renewal** 201:6 | **representing** 175:21,24 176:2,7 192:23 |
| **reflecting** 356:21 | | **repair** 257:25 260:2 261:9,13,16 265:19,24 266:5,9 266:11,12,21 267:3,5,9,11,15,16 267:16,20,23 268:3 272:21 275:17 283:20,22 283:24 327:6 335:15 336:20 341:5 | **represents** 220:15 256:4 |
| **refresh** 255:10 | | | **reputation** 297:24 303:20 |
| **refuse** 179:19 | | | **request** 258:10 260:13 |
| **regard** 193:21 195:3,13 199:1 200:14 232:24 249:10 251:7 264:5 266:20 268:9,11 269:22 271:22 272:16 274:7 286:17 363:11 | **relative** 371:8 | | **requested** 286:24 370:22 371:3 |
| | **relatively** 331:18 | | **requests** 283:2 |
| | **relearn** 335:25 | | **require** 293:1 294:23 348:11 |
| | **released** 242:14 244:19 251:17 255:8 | | **required** 283:12 313:5,10 339:13 |
| | **relies** 295:20 | **repeat** 181:15 273:5 287:18 | **requirement** 183:3 276:11 |
| **regarding** 210:11 212:17 218:1 219:17 233:10 254:11 255:19 | **religiously** 232:5 | **replacement** 272:21 275:17 | **requires** 257:22 302:24 |
| | **remainder** 300:2 | **replicate** 207:8 | **research** 245:24 274:25 |
| | **remaining** 220:15 220:18 288:24 289:2,3 | **repman** 297:20,23 | |
| **regards** 233:8 | | **report** 221:22 222:3,11,25 224:11 225:1 247:2 322:3,9 323:3,13,18 324:3 346:10 | **reservation** 327:7 |
| **register** 249:14 | **remarkable** 253:15,18 | | **reserve** 288:24 289:2,3 300:2 360:8 364:5 367:11 |
| **registered** 319:5 | **remember** 184:16 201:24 202:8,10 208:11 209:7,20 213:7 227:21 232:21 235:19 240:5,8 242:8,23 267:2 319:17 329:4 332:20 342:3 345:11 357:18 363:18 | | |
| **regrowing** 354:6 | | | **resisted** 337:24 |
| **regular** 288:19 | | **reported** 167:18 | **resolution** 280:20 |
| **reining** 244:15 | | **reporter** 175:11 176:11 370:14 | **resources** 313:8 323:22 |
| **relate** 241:17 280:21 290:11 326:7 | | **reporter's** 170:9 370:8 | **respect** 305:21 331:9 354:18 356:4,5 |
| **related** 300:19 305:18 350:8,18 371:6 | **reminder** 297:16 | **reporters** 304:19 | **respond** 242:13 280:2 364:11 |
| | **remindertrax** 297:14 | **reporting** 202:25 203:3 328:6,14 329:16 | **responded** 218:16 |
| **relates** 199:13 233:16 277:25 278:15 293:20 | **remote** 274:18 333:15 | **reports** 200:13 221:6,9,11,25 222:19 248:22 249:2 253:14 315:15 322:10 323:18 324:1 331:19 | **responding** 218:23 253:3 |
| **relating** 322:3 | **remotely** 274:23 324:11 | | |
| **relation** 230:16 | | | |
| **relationship** 215:7 215:10 216:17,22 217:2,22,25 219:2 219:5,9,11,16,20 | | | |

HIGHLY CONFIDENTIAL

[response – reynolds]                                                 Page 37

| | | | |
|---|---|---|---|
| **response** 201:20 206:17 219:8 235:7 299:11 305:16 322:17 323:2 364:25 367:19 | 285:13,14,15 342:2,15 **revenues** 226:20 **reverserisk** 292:23 293:9,11 295:18 350:2 | **reymdl00061988** 174:13 **reymdl00068321** 172:21 **reymdl00068325** 172:21 | **reymdl00583889** 174:17 **reymdl00583890** 174:17 **reymdl00590725** 172:4 |
| **responsibilities** 312:13 | **review** 184:6 198:12 201:15 | **reymdl00071272** 173:4 | **reymdl00590727** 172:4 |
| **responsibility** 274:23 283:1 | 218:10 230:5 235:4 237:17 | **reymdl00071273** 173:4 | **reymdl00611282** 171:7 |
| **responsible** 207:12 308:3 312:17,22 | 241:16,19 242:2 242:10 244:25 248:3 252:16 | **reymdl00238490** 173:7 **reymdl00238491** | **reymdl00611284** 171:7 **reymdl00661495** 172:7 |
| **rest** 239:20 255:15 363:4 | 256:23 262:24 276:20 293:17 | 173:7 **reymdl00238492** | **reymdl00661497** 172:7 |
| **restate** 177:1 **restatement** 266:23 | 296:15 318:10 **reviewed** 198:18 252:10 254:20 | 173:11 **reymdl00238493** 173:11 | **reymdl00719700** 171:21 **reymdl00719787** |
| **restore** 309:9 **restricted** 255:20 | 259:10 269:1 361:24 | **reymdl00244021** 171:11 184:5 | 171:21 **reymdl00722459** |
| **restriction** 255:7 **restrictions** 314:4 | **reviewing** 184:16 **revolves** 211:18 | **reymdl00244025** 171:11 | 174:10 **reymdl00722550** |
| **result** 191:6 227:3 232:5 298:23 | **reward** 237:20 **rewards** 237:23 | **reymdl00263055** 218:10 | 174:10 **reymdl00723521** |
| 329:17 336:13 346:17 | **rework** 341:24 **reycid0074420** | **reymdl00263065** 173:14 | 174:7 **reymdl00723612** |
| **resulting** 278:16 **results** 197:22 | 173:18 **reycid0074422** | **reymdl00263066** 173:14 | 174:7 **reyn** 275:7 |
| **retention** 310:22 **retired** 339:15 | 173:18 **reymdl00045179** | **reymdl00263304** 171:4 | **reynolds** 169:8,8 171:20,20 174:6,6 |
| **return** 196:10 **returned** 370:24 | 174:20 **reymdl00045348** | **reymdl00333091** 172:11 241:15 | 174:9,9 176:2,3,7 176:8 177:9,14,15 |
| 370:25 **reveal** 317:4 | 171:14 201:13 **reymdl00045445** | **reymdl00333092** 172:11 | 177:20 184:21,25 185:24 188:16,25 |
| **revenue** 223:19 224:19 225:6,20 | 172:18 **reymdl00045556** | **reymdl00470609** 173:21 | 190:8 195:4 196:9 196:9 197:20 |
| 226:4 228:17,23 228:25 229:6 | 171:24 230:4 **reymdl00050127** | **reymdl00503332** 174:4 276:18 | 199:1,9,22,25 200:8,9,16,18,25 |
| 233:4,8,16 234:6 235:22 236:6,13 | 172:14 **reymdl00061987** | **reymdl00503335** 174:4 | 204:8,11 207:12 208:6,16 210:11 |
| 236:18 284:18,24 | 174:13 | | |

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| 212:16 214:23 | **rice** 320:9 | **ro's** 260:2,2,21 | 315:14 322:10,10 |
| 215:6,11,15,19,24 | **rick** 184:15 338:6 | **robert** 167:8,12 | 323:3,15 324:3 |
| 216:3,11 217:8,10 | 338:18 339:16,17 | 168:15 170:4 | 328:16 331:20,24 |
| 219:12,17 220:19 | 340:7 | 171:3,13,23 172:3 | 344:12 347:4 |
| 221:1,23 222:3,15 | **rick's** 338:7,7 | 172:13,17,20 | **running** 186:12 |
| 222:20 223:6,11 | **rid** 203:8 | 173:3,6,10,17,20 | 222:24 253:15 |
| 229:5 231:2,8 | **right** 185:14 188:9 | 174:12,19 175:4 | 274:20 306:3,4,11 |
| 232:6 233:23 | 198:8 202:17 | 176:13 237:2 | 322:17 325:18 |
| 237:19 243:7 | 213:7 238:20 | 318:13 368:2 | **runs** 322:16 |
| 245:20 246:25 | 251:20 252:15 | 369:2,12,14,17 | 323:15 |
| 247:15 250:4,7 | 260:17 272:24 | 370:9,16 | **rust** 343:12 |
| 251:15,17 255:11 | 278:3 284:1 289:4 | **role** 217:17 239:13 | **rwallner** 168:19 |
| 257:7 260:10,10 | 289:5 290:2,13,25 | 239:16 | **ryan** 168:21 176:9 |
| 264:5 265:18,22 | 291:7,13 293:6 | **rollbacks** 249:5 | 176:9 182:18 |
| 266:4,21,21 | 294:23,24 295:4,8 | **ron** 171:17 174:16 | 206:10 216:1 |
| 267:25 268:2,8,10 | 295:9 296:2,10 | 184:16 185:6 | 218:21 226:22 |
| 269:9 272:10 | 297:13 298:10 | 208:4 209:23 | 243:14 250:10 |
| 274:6,12,12 275:7 | 300:6,16 301:22 | 212:14 293:15 | 271:1 |
| 275:13 278:11,15 | 304:6 306:16 | 345:18 361:19 | |
| 278:17,21 279:12 | 311:19 316:24 | 363:13 | **s** |
| 279:13 280:9 | 322:2 324:12 | **ronald** 170:16 | |
| 287:15 290:1 | 325:6 330:19 | 171:10 | **s** 167:14 168:1 |
| 293:6 295:4 | 331:10 332:16 | **room** 353:20 | 169:1 175:1 294:5 |
| 296:22 297:3,7,8 | 336:18 337:6 | 367:8 | **sadly** 241:7 |
| 297:10,14,21 | 341:20 342:6 | **ros** 261:22 | **salary** 238:21 |
| 298:2,4,9,16,19,20 | 345:8 348:2 352:6 | **roughly** 195:13 | 273:4,16 |
| 301:13,14 302:5 | 354:20 355:2,6,10 | **routinely** 229:14 | **salemen's** 305:9 |
| 302:13,15 303:11 | 355:17 357:2,3,8 | **row** 324:14 | **sales** 178:10 179:7 |
| 303:11,23 304:13 | 357:13 358:20 | **rows** 324:14 | 190:16 191:15 |
| 304:14 305:4,4 | 362:24 | **rude** 309:21 | 192:9,25 193:16 |
| 306:10,14 313:20 | **rights** 258:20 | **rule** 370:20 | 193:21 197:10 |
| 314:8,20 315:3 | 367:11 | **ruled** 364:23 | 205:7,10 206:21 |
| 316:11 325:7,13 | **ring** 201:25 | **rules** 167:21 | 222:20 224:3,7,7 |
| 327:18,18 328:2,6 | **rise** 234:13 | 176:18,20 | 224:12 228:12 |
| 329:23 330:12,22 | **rising** 337:9 | **ruling** 364:25 | 255:6 256:12 |
| 331:8,14 332:19 | **risk** 178:8,9,9,15 | **rulon** 171:6 | 259:3 261:1 305:9 |
| 333:1,11 340:16 | 178:24 187:23 | **run** 221:6,12 | 332:18 342:25 |
| 341:20,22 348:7,7 | 188:11 | 222:9 231:2 | 347:1 351:12 |
| 349:14 350:8,18 | **risks** 178:6,11 | 248:22 249:2 | 352:1,2 363:17,25 |
| 350:25 351:2,22 | 186:24 187:2,9,10 | 267:6 282:24 | **salesman's** 205:4 |
| 356:4,16 358:11 | 314:20 | 291:18 309:10 | **salespeople** 189:22 |
| | | | **salesperson** |
| | | | 205:13 206:18 |

HIGHLY CONFIDENTIAL

[salesperson - send]                                              Page 39

263:20
**salespersons**
  351:21
**san**  212:1
**sat**  305:14 308:15
  308:21
**satisfactorily**
  330:9
**saturday**  247:6
**save**  326:13
  335:15
**savvy**  359:8
**saw**  185:13 197:22
  232:11,14 311:17
  315:24 345:6
**saying**  193:1,20,24
  194:1 202:16
  203:15 225:16
  227:15 246:6
  261:5 277:22
  280:3 306:2
  308:10 337:10
  344:10 357:18
  359:19,20
**says**  188:8,16
  190:7 192:4
  213:17 224:5,18
  228:17 229:8
  235:19,20,21
  239:7,8 241:23
  244:18 247:8
  249:22 253:4
  255:6 260:1,5
  272:7 279:12,19
  281:22 290:19
  297:6 298:8
  312:15 313:24
  321:19 322:16
  328:1 352:12
  358:22

**scale**  187:8 347:6
**scenes**  239:23
**schaef**  296:20
**schaefer**  171:13
  171:23 172:3,13
  172:17,21 173:3,6
  173:17,20 174:19
  201:20 204:1
  229:19 230:10,20
  235:7,7,16 236:4
  238:25 239:7
  240:10 251:24
  252:4 253:2 255:2
  261:18 289:15
  296:13 297:2
  357:24 358:9,22
  359:17
**schaefer's**  217:17
  232:14,20 234:10
  240:4,7 273:4,16
  299:11 300:19
**schafer**  173:10
  174:12
**schedule**  211:4
  212:20
**scheduled**  322:9
  323:8 324:1
**scheduling**  220:3
**science**  320:9
**scientific**  199:7
**score**  205:15
  206:22
**scott**  169:7
**scrapped**  347:11
**scratched**  281:25
**scratching**  282:1
**screen**  197:2
  246:19 341:2
  344:2 346:10
**screens**  341:2

**screenshots**
  252:13
**se**  353:19
**sea**  300:8
**seal**  369:21
**searching**  242:5
**second**  182:22,22
  183:3 185:4
  211:10 235:1,6
  239:6 241:17,24
  254:3 255:5 290:5
  335:2 337:7
  352:16 362:11,18
**secondly**  231:1
  233:1 313:13
**secret**  304:13
**section**  352:22
**secure**  302:14,15
**security**  233:11,11
  237:1 239:14
  245:10,19,19
  246:24 247:1,5,9
  247:15,19,21
  248:8,18 249:6,8
  249:11,17 250:8
  250:17,21 251:2,6
  251:8,16 253:1
  254:11 255:11
  256:3,4,5,13
  260:12 290:8
  302:21,24 303:2
  303:10,15,17,21
  304:3,25 305:3,10
  311:16,24 312:18
  315:3,7 320:24
  321:4,13 327:24
  330:12,14 352:8
  352:13,17,23
  353:2,22,24 356:5
  357:17 358:2,11

**see**  185:8,11,19
  188:18 190:8,12
  190:18 192:6,13
  192:20 199:5
  200:6,7,12 205:6
  219:3 222:17
  223:16,20,21,24
  224:3,19,21 225:8
  225:23 226:1,2
  228:19 232:13
  235:24 249:25
  252:9 253:20
  255:2 271:24
  278:1 281:10
  285:2,17 286:10
  292:9 298:12,16
  298:18 299:6
  300:21 322:11
  324:13 352:8,12
  352:18 357:24
  360:20 361:16
  364:21
**seeing**  224:5 245:4
  285:4
**seen**  195:16 196:5
  196:6 200:4
  213:13 218:12
  230:8 323:24
**seesaw**  353:16
**sell**  182:23 193:10
  193:14 196:12,14
  198:2 243:20
  244:1 271:5
  297:17 311:13
  343:8
**selling**  341:22
**send**  206:24
  246:16,20 279:3
  313:2 319:5 329:7
  331:21

HIGHLY CONFIDENTIAL

[sending - slowing]                                                    Page 40

sending   280:7
  318:22
sends   186:4
senior   208:5 222:6
sense   312:25
sensible   342:11
sensitive   227:22
sent   198:12 201:21
  213:17 223:8
  277:13,14 320:1
  322:7 328:17
  343:6
sentence   185:9
  188:15 189:12
  192:4 202:23
  290:5 297:6
separate   273:23
september   171:7
  171:10 184:9
  322:8 334:1,2
series   246:14
  322:2 331:24
  365:16
serious   187:1,9,20
  254:23 278:20
server   272:19,20
  272:20,21,21
  273:15 274:19,24
  275:2,5,16,25
  276:3,8 306:10,12
  306:14 318:22
  322:11,23,24,24
  325:17
servers   182:5
  273:24 306:23
  307:7
serves   320:17
service   259:22
  265:19,22 267:4
  267:18 268:2,8
  273:14 274:25

279:24 280:7
  297:16,17,18
  311:3 312:20,21
  327:7 335:10,23
  336:1,22
services   190:11
  223:16 239:9,12
  286:8 297:4
set   203:3 204:4
  221:16 296:10
  323:9 336:5
sets   187:16
seven   188:25
  189:3 199:8,23
  212:23 310:22,25
  365:8 367:22
shaken   214:15
shakes   343:4
shape   304:6 346:6
shauna   167:17
  175:11 370:13
  371:17
sheer   187:4,8
sheppard   169:3
  176:6
sheppardmullin....
  169:5
shocking   316:6
shook   338:6
shoot   308:6
shop   267:6
shopping   205:15
short   199:17,19
  210:5 237:7
  240:19 245:5
  287:2,8 312:15
  320:3 321:2,6,11
  325:25 366:19
shorten   335:17
shorthand   167:18
  370:13

shortly   345:9
show   183:25 201:8
  213:11 218:4
  221:17 222:19
  228:14 230:2
  234:19 237:15
  241:1 244:21
  247:25 252:4
  254:16 256:21
  259:5 262:22
  263:19 268:20,24
  271:15 276:16
  281:12 284:10
  288:6
shown   191:5,20
showroom   263:19
  298:13
showroommagnet
  263:9,13,16 264:1
  264:6 298:1,13
shows   322:9 323:8
  323:13
shut   306:24
sic   289:23
side   207:12 224:18
  341:7 344:1
sign   324:2 334:10
signature   170:8
  369:1,13 370:21
  371:1,15
signed   184:16
  205:13 226:13
  340:12
significant   190:16
  191:15
signs   199:3
silver   204:25
similar   217:22
simple   288:9
  331:18 332:4,6
  334:25 338:19

simplest   312:24
simply   198:1
  270:8 305:12
  317:16 326:15
  342:10
single   364:9
sir   300:17 316:20
sis   325:7 353:25
sit   202:1 211:19
  274:2 344:1
  351:16
sitting   183:23
  242:4
situation   188:11
  201:24 203:5
  204:2 208:19
  263:25 304:3
  307:20 309:10
  310:15 319:13
  320:17 326:7
  327:13 343:24
  353:5 354:22
  355:4,5,12
situations   178:17
  191:22 195:10
  251:22 274:14
  345:2
six   212:23 284:23
  285:7 300:4
size   187:4 188:5
  262:17 294:16
sizeable   318:21
sized   262:18
skill   310:17
skipped   318:7
sky   324:5
skype   213:4
slight   185:7,11,17
slot   332:5
slowing   306:22

HIGHLY CONFIDENTIAL

**[slowly - starting]**                                                    Page 41

slowly  306:3
small  221:9
    227:22 231:2
    263:21 269:18
    297:11 298:5
    313:7 334:22
    346:8 359:7
smaller  188:3
    359:5
smart  317:25
    337:14
smoothly  180:1
snail's  336:24
snapshot  309:4,6
sniffed  296:7
software  178:17
    178:18,19 179:20
    179:25 181:16
    187:20 194:10
    202:25 203:1,3,9
    203:10,12 213:6
    219:12 231:17,23
    246:5,10,11,12
    257:23 258:6
    261:14,15,20
    266:11 267:25
    268:3 276:9,10
    282:22,25 283:4
    283:10 286:1
    295:19 297:19
    303:15 306:10
    307:6 308:25
    313:16,20,22,25
    314:7 315:3
    331:24 333:9
    335:6 339:4,4,5
    347:18
sold  193:5,6 223:1
    297:10 346:13
solution  223:16

solutions  324:23
solved  279:12
somebody  203:6
    207:19 209:1
    225:10 227:19
    244:14 245:13
    246:17 261:18
    279:12 291:4
    292:11 308:5,8
    310:24 326:10
    350:10 353:6
someday  239:23
somewhat  188:22
son  318:14 320:2,8
    355:3,8
soon  351:10
sophisticated
    279:20 359:4
sorry  177:12
    184:20 186:20
    195:24 209:20
    223:22 225:4,18
    232:21 245:4
    250:24 266:2
    272:14 285:10
    316:20 329:2
    330:2 356:10,11
    356:11 360:9
    363:9
sort  189:24 228:2
    300:8 333:1 348:5
    353:20 359:11
sounds  189:2
    227:20 315:23
source  180:21
    295:20
space  325:3
speak  200:3
    207:21 209:18
    284:7

speaking  267:20
    351:21
special  212:7
    257:22 261:10
specific  213:2,16
    213:24 249:6,20
    250:11 264:9
    284:4 306:4 324:3
    330:14 357:17
    359:10
specifically  190:1
    190:2 207:15
    208:12 233:11,15
    235:11,19 239:21
    245:22 254:1
    257:12 284:7
    286:21
specified  216:23
specifies  257:11
    312:21
speculative  357:7
    357:10
speech  312:7
    353:21
spelling  189:21,23
spend  222:12,12
    285:22 302:24
    311:2 339:17
spending  303:24
    317:15
spent  356:5
spin  311:14
spite  193:19
split  365:8
spoke  208:7
    209:12 287:15
spots  324:15
square  168:11
sta  222:22
staff  183:8

staffs  359:3
stamped  184:5
    201:12 218:9
    230:4 241:14
stand  183:14
    189:18 191:8
    226:16,19 227:3
    229:3 233:9,16
    235:22 236:2,6,22
    330:8 344:24
    348:15 361:13
    363:13 367:4
standard  182:12
    193:4
standardize
    335:21
standardized
    182:20
standards  179:11
standing  299:25
standpoint  191:4
    220:16,24 222:24
    230:15 231:2,13
    244:11 261:1
    273:9 296:5,5
    303:2,21 304:3
    307:22 312:10
    321:8 335:5
    341:23 342:9
    363:18
start  177:7 241:24
    264:15 267:15
    285:6 290:14
    319:11 334:23
    347:17
started  176:17
    205:25 206:1
    300:4 305:25
    306:1,7 317:15
starting  185:18
    239:14 304:11

FTC-0001345

HIGHLY CONFIDENTIAL

starts 312:10
stat 195:15 199:5
state 167:18
  175:15 189:8
  254:10 303:18
  369:15,23 370:14
stated 167:22
  187:14 267:25
  285:22 288:20
  357:16
statement 180:8
  181:6 183:13
  187:2 188:20,21
  189:6,8,15 190:21
  190:24 191:8,25
  200:6 208:14
  230:19 249:19
  267:12 288:8
  295:7
statements 222:8
  234:2,4,8 300:19
  367:10
states 167:1 175:6
  358:12 370:1
stating 363:18
statistical 191:4
statistics 191:11
  191:20 222:23
stats 191:4
status 363:4
stay 241:5 276:24
  340:9 365:14
stayed 256:8
staying 246:17
stays 200:9
stealing 319:19
step 220:9
stepped 309:16
steps 366:24
steve 212:14 213:2
  289:22 292:4,6

314:25 345:19
stick 198:19
  300:14 342:9
sticky 342:6
stock 186:11,12
stockholders
  292:5
stole 346:10
stop 236:23
  279:25 280:7
  308:23 347:7
storage 274:12
  275:6,24 276:13
store 253:13 276:6
  276:11 323:11,12
  323:12
stored 351:1,3
stores 275:12
  323:10
stories 339:3
story 255:18
  309:21 334:21
straightedge
  225:10,24
straightforward
  198:3 261:7
strategy 354:25
strawsburg
  172:10 173:14
  174:3 208:9,10
  214:25 218:24
  219:8 257:16
stray 244:10
street 168:11,22
  175:13
strike 197:24
  221:14 225:3
  294:3
string 277:11
strong 347:20

structure 187:18
  335:13
stuff 308:13
  310:22 311:12
  340:13 344:6
stupid 279:10
  299:8,9 309:23
styled 167:15
stylus 197:2 341:7
  344:4,11
subject 230:13
  236:25 242:1
  245:15 252:25
  269:23 293:16
  296:13 353:2
  367:10
subscribed 369:19
  371:11
subsequent 220:22
  269:8 281:7
subsidiaries 168:8
substance 283:15
  299:20,21 351:20
substantial 262:13
  264:14 292:24
substantially
  348:15
subtly 290:24
success 205:17
  223:4 231:16
  337:20
successes 239:22
  239:25
successful 207:9
  231:14 246:8
sudden 347:17
sue 301:13
sued 299:18
  301:13 346:17
suffer 281:2

suffered 236:11
  367:6
suite 167:20 168:5
  168:11 169:4
  175:13 278:11
sum 283:15
  351:20
sumner 168:11
super 211:25
superior 324:17
  324:23 333:18,21
supervise 272:22
support 232:3
  249:14 253:7
  282:10 305:8
  333:16
suppose 177:23
supposed 181:13
  235:23 241:10
  301:21
sure 178:17
  184:22,23 202:10
  208:11 215:21
  224:5 240:10,11
  247:17 249:3
  272:23 280:12
  311:18 324:1
  327:1 358:7 363:3
  365:25
surprise 195:17,22
surprised 205:9
  226:25 305:13
  356:2,3
surprising 192:5
suspended 255:7
  255:11,20,21
  256:14
suspension 255:4
suspicious 246:2
swear 176:12
  344:24

HIGHLY CONFIDENTIAL

**switch**  177:10
330:22,24 331:2
331:14 334:16,17
334:19,20,21,22
340:1,3 345:8
**switched**  334:14
**switches**  177:14
178:3,11,11
180:12,19 196:9
**switching**  180:4
181:2 332:25
**sworn**  167:14
176:14 370:17
371:11
**sync**  242:2,7,11
**synchronization**
242:2,11 244:6
**synergies**  294:18
**system**  180:24
181:4,14,18
183:15 199:14
248:13 258:1
263:17 266:21
267:4,18 268:8
273:23 293:10,12
296:6,8,9 302:14
302:16 303:10,19
306:3 311:16
313:1,16,17,21
314:20 317:17,20
323:18 325:7
327:10,13,18
328:11 331:23
336:12 337:5
341:21 344:5,12
346:9 347:1,2
348:11 349:10
353:6,8
**systems**  167:4
175:6 219:17
220:7 229:4

236:24 292:25
297:12 304:11
306:8 335:6 370:4

**t**

**t**  318:13
**tab**  332:5
**table**  188:4 282:15
341:8 344:2
**tadler**  168:16
175:18,20
**tag**  243:20
**take**  177:2,3,5
180:4 183:8
187:11,11,21
188:8,13,14 210:2
220:2 231:17
240:14,15 241:8
257:3 260:1,20
261:21 263:20,23
276:22 298:7
303:5,5 309:2,4,5
317:19 318:10
321:13,20 325:20
333:8 344:25
345:5 364:9 365:5
**taken**  167:14
371:8
**takes**  193:10 194:6
196:25 205:5
220:3 228:2 254:2
272:22 274:22
302:20 344:4
**talk**  204:4 211:20
213:3 219:19
233:10 255:4,9
263:19 266:8
270:5,6 276:23
290:13,16,25
291:4,8,13 303:6
316:10,19 317:1
320:11 340:15

348:6
**talked**  209:16
257:6 273:6
292:17,20,20
316:9 327:16
328:11 330:19
336:9 338:2,5,15
361:5
**talking**  210:15
226:9 242:6,6,8
245:6 256:13
291:8 305:21
311:3 316:10,22
316:23,24,25
326:5 338:8
341:25 342:14
346:1 358:10
**talks**  190:3 202:24
248:21
**tap**  341:11,13
**tape**  220:5,5,17
274:21
**taught**  187:18
290:15
**tax**  296:4
**team**  217:17
223:11 237:25
238:1,10,13 239:1
239:2,2,9,12,17
240:4,4,7 338:17
**teams**  237:20,25
238:1
**technical**  305:8
340:25 341:23
**technicians**  336:24
337:11
**techniques**  196:24
248:12
**technology**  325:13
**techs**  337:8,18

**telephone**  167:17
213:6 214:12
**telephonic**  211:7
**telephonically**
168:15
**tell**  183:1 217:15
227:4 241:3
242:22 300:7
304:23 309:7,16
319:6 350:13
360:1 361:4
365:14
**telling**  344:10
**temporarily**
203:22
**temporary**  249:5
249:9,16
**ten**  188:24 200:4,5
366:25 367:2,4,8
**tend**  211:19
213:23
**tends**  212:5
**tens**  281:9
**tenure**  200:9,16
201:5
**term**  178:4 199:17
199:19,20 230:15
231:16 321:2,6,11
**terminals**  347:4
**terminate**  297:3
299:11
**terminated**  258:11
258:14
**termination**
258:10 334:7
**terms**  177:24
267:14 271:3
274:4 301:2,25
302:1,16 311:1
320:18 342:1
350:7

HIGHLY CONFIDENTIAL

[terrible - titular]                                                    Page 44

| | | | |
|---|---|---|---|
| **terrible** 304:4 | 302:3 303:5 | **third** 201:17,18 | 212:8,11 213:2 |
| **terry** 249:22 | 313:11 320:11 | 202:13 211:11 | 214:5 215:15 |
| **test** 263:18,20,24 | 327:5 337:6 343:9 | 219:3 223:23,24 | 216:9 218:10 |
| 298:7 367:7 | 343:9 345:24 | 227:1 245:24 | 220:13 223:19 |
| **testified** 176:14 | **think** 177:23 | 253:23 257:4 | 224:19 228:1 |
| 219:6 221:22 | 180:7,21 181:23 | 261:6 266:4,5,19 | 230:5 233:22 |
| 248:11 302:4 | 182:21 183:12 | 267:1,8,14,18 | 237:6,9 239:14,16 |
| 351:20 354:12 | 186:6 188:21,23 | 268:6 283:23 | 240:17 245:21 |
| 356:1 | 188:24 189:8 | 299:4 309:22 | 247:11 249:7 |
| **testify** 367:15 | 190:22 191:19 | 312:20 313:24 | 251:15,17,19 |
| **testimony** 356:6 | 196:19 204:17 | 314:4 315:6 | 255:7,25 258:1 |
| 370:18 | 206:13 207:18 | 326:21 327:19,25 | 259:21,22 260:16 |
| **tests** 333:8 | 209:21 210:14 | 328:7 349:15 | 260:21 261:9,13 |
| **texas** 167:18,20 | 213:1,5 214:13,20 | 353:3 | 261:16,22 262:24 |
| 168:5 175:14 | 216:2 217:18,19 | **thought** 189:25 | 265:11,14,19,23 |
| 370:14 | 218:5 226:23 | 229:22 269:7 | 266:5,20 267:9 |
| **thank** 237:2 | 227:2 228:16 | 308:22 | 268:13 270:3 |
| 241:13 265:9 | 231:22,25 240:6 | **thousands** 281:10 | 277:8 280:21 |
| 266:24 284:22 | 245:12,12 252:14 | 308:20 311:3 | 281:10 282:21,24 |
| 289:21 300:6 | 256:4 264:13 | **three** 181:24 182:1 | 283:8,19 284:2 |
| 354:7 | 266:16 273:18 | 211:6 214:6 262:9 | 285:13,15 287:9 |
| **thanks** 225:24 | 274:2 277:14 | 286:5,7 320:3 | 288:24 289:3,3,25 |
| 300:3 | 280:3 283:7 | 324:16 335:14 | 300:2 305:1,7,7,9 |
| **theoretical** 273:9 | 286:15,21 288:24 | 365:16 | 309:11 320:16 |
| **therefor** 371:2 | 292:3,4,22 294:3 | **throat** 365:17 | 323:2 324:3 325:8 |
| **theron** 171:3 | 294:12,20 298:22 | **throw** 229:13 | 325:11,24 335:15 |
| 176:13 | 299:19,21 300:10 | 307:7 | 336:8 339:18 |
| **thing** 187:5 189:24 | 304:2 310:22 | **throwing** 279:24 | 345:3 350:5,14 |
| 221:13 228:2,4 | 314:7 315:4 | 291:23 | 354:7 359:14 |
| 238:20 261:10 | 317:20 318:5 | **thrown** 232:1 | 360:4,6,8 364:2,3 |
| 278:14 299:9 | 319:14,21,22,23 | **thumb** 221:9 | 365:15 367:5 |
| 316:13 334:6 | 320:24 324:20,22 | 331:22 | **timeliest** 258:2 |
| 337:15,19 347:12 | 326:6 327:2 329:3 | **thumbed** 286:15 | **timelines** 269:5 |
| 353:20 354:25 | 333:20 337:3 | **tight** 248:19 249:3 | **times** 180:9 203:6 |
| 359:12 | 339:23 342:9,12 | 303:20 | 211:6,15 212:23 |
| **things** 196:6 221:6 | 342:19 357:5 | **tighten** 193:13 | 273:6 322:18 |
| 231:22 236:14 | 361:4 363:11,18 | **time** 177:2 185:2 | 328:6 344:18 |
| 245:25 248:19 | 366:5 | 185:23 186:7,12 | **tire** 343:10 |
| 273:19 274:4 | **thinker** 321:12 | 198:23 201:6 | **title** 186:15 |
| 278:7 290:24 | **thinking** 329:9,14 | 202:17 203:18,23 | **titular** 186:9 |
| 291:14,18 299:7,8 | | 209:25 210:3,6 | |

FTC-0001348

HIGHLY CONFIDENTIAL

**today** 170:16
175:2 176:20
177:7 199:3
287:15,23 295:12
295:18 355:21
361:16,21 367:10
367:15,16
**today's** 368:2
**todd** 168:10
**told** 291:6,9
304:25 305:19
347:1 360:10
**tom** 213:7 242:13
**tommy** 174:3
**tomorrow** 216:25
**top** 190:7,9 191:1
223:15,17 258:8
260:1 264:1
272:24 281:22
284:24 285:6,8
303:3 322:7
337:10 351:21
357:23
**topic** 177:8 327:16
**topical** 363:18
**topics** 360:6,7
**total** 220:15 286:9
305:14 311:24
352:5 361:6
**totally** 303:20
**toyota** 335:3
**track** 177:9,15,19
177:25,25 200:8
228:11 229:14
230:22,24 233:16
255:4,9 272:10
296:4 328:20
**tracked** 228:21
**tracking** 308:1
**tracks** 188:16,25

**trade** 343:3
**traffic** 278:18
**trained** 188:13
**training** 187:14
188:1
**trampling** 306:17
**trans** 197:9
**transact** 307:12
**transacted** 307:17
**transaction**
197:10 205:20
206:20 268:10
269:14,23 270:2,9
270:12,15,18,21
271:22,25 294:13
326:8,15,23 344:3
344:14 346:16
**transactional**
264:2
**transactions**
197:12 205:10
273:21 308:1
309:13,18 310:6,8
326:24 327:3
344:16
**transcript** 311:17
370:17,25
**transferred** 183:5
183:10 336:6
**transmit** 328:18
**transmitted**
278:19 318:24
**trashed** 306:21
**treat** 350:10
**tremendous**
335:16
**tried** 200:15,18
292:8 333:5
**trim** 204:22
**trip** 238:12,17

**trouble** 202:17
**true** 189:9 190:23
191:5,7,7,21 259:4
282:5 286:22
337:10 369:13
370:18
**truthful** 184:11
218:19 252:23
**try** 184:11 193:14
246:22 252:23
269:19 276:24
277:6,12 310:21
333:22 361:18,20
**trying** 185:13
186:3,18 206:15
242:21 252:9
321:18 358:12
**turn** 216:14 246:8
284:16 333:25
**turned** 290:16
**turnover** 179:2,6,8
179:10,13 180:12
180:16 190:18
191:1,17 209:22
**twice** 212:22 238:3
**two** 179:1 181:21
181:24 182:1,24
187:6,21 190:17
191:16 194:7
212:13 226:11
243:17 252:13
254:9,9 255:19
256:2,4,13 304:1
324:16 325:10
335:13 349:19
350:10,18 360:16
361:5 365:9,16
**type** 203:11,11
204:21 206:20
221:22 222:15
268:5,7 291:18

292:6
**types** 205:1 290:12
**typewritten**
281:25
**typical** 182:13
196:23 197:11
336:18 344:15
**typically** 182:9
193:5 199:7
203:13 211:1,18
219:21 323:25
335:13 342:23
344:13
**typing** 335:15

**u**

**u.s.** 246:21
**ucs** 303:16 304:13
314:7
**uh** 300:23 345:12
**ultimate** 270:24
**ultimately** 251:9
253:3 353:13
**unable** 305:18
353:8 367:7
**unattached** 322:9
**unattended**
324:11
**unaware** 363:5
**undercoating**
343:14
**undercoats** 343:14
**underneath**
190:10 258:22
**understand**
176:23,25 177:12
211:25 222:4
230:18 231:4,21
239:19 245:8
248:25 266:17
273:8 316:10
321:19 337:18

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| 350:1 358:7,12 365:5 367:23 | upset 253:6 279:4 | vehicle 197:10 | voucher 298:6 |
| **understanding** 215:12,20 275:9 281:1 367:9 | upshot 336:9 | 204:21 205:20 221:7 | vps 352:1,2 |
| | usage 203:9 253:20,23 | vehicles 193:6 | **w** |
| | use 178:4 195:18 196:15 203:7 227:23,23 246:4 248:12 264:6,11 275:12 276:4 293:2 297:11,18 312:19 313:25 314:4 324:11 329:15,15 333:9 340:22 354:19 | vendor 168:8 221:10 257:4,8 259:1 | w 353:20 |
| **understands** 204:1 | | vendors 257:7 268:11 269:23 270:13 348:11 | wailing 337:12 |
| **understood** 248:24 350:5 | | | wait 227:13 290:7 |
| **unequivocally** 348:9 | | venture 204:8 207:11,21 208:17 215:11 | waiting 236:5 |
| **unfair** 326:19 | | | wake 319:15 |
| **unfortunately** 309:10 336:8 343:16 367:7 | | verbally 341:17 | walk 204:23 310:18 |
| | | verified 220:10 367:6 | walked 338:4 |
| **unhappy** 320:16 322:23 334:6 | user 197:1 323:8 330:11 | veritext 170:19 175:10,12 | wall 324:10 |
| **unique** 335:11 | users 182:22 329:4 | versus 224:8,23 225:22 309:12 | wallner 168:15 |
| **uniquely** 357:11 | uses 267:5 293:9 | | want 183:2 193:8 198:16 202:16 203:8,9,10,16 204:4 233:15 243:25 246:7,25 255:17 264:17 282:23 283:25 284:1 287:3 288:6 290:14,22 291:7 304:10 309:12 318:25 324:3,18 327:6 333:23,24 341:8,15 343:1 344:6 347:22 348:5 353:3 364:9 |
| **unit** 194:14 | usual 180:16 | vice 169:8 208:5 222:7 | |
| **united** 167:1 175:6 370:1 | usually 211:24 | victory 347:11 | |
| **universal** 182:10 | utilize 293:11 | videographer 169:9 175:2,10 176:11 210:3,6 237:5,8 240:17,20 265:10,13 287:6,9 325:23 326:1 366:17,20 368:1 | |
| **university** 320:9 | utilizing 264:1 | | |
| **unknowledgeable** 316:8 | uttered 230:16 | | |
| **unlimited** 313:23 366:3,4 | **v** | | |
| **unprintable** 312:5 | vain 320:18 | videotaped 167:8 167:12 370:9 | wanted 177:7 245:20 290:16,21 290:25 291:13 311:18 315:16 329:7 336:7 339:17,23,23 340:22 358:3 |
| **unprofitable** 232:17 | valid 249:15 | violation 232:12 232:13 313:18 | |
| **unsatisfactory** 180:17 | valuable 242:17 243:8 | | |
| **unsolicited** 291:2 | value 343:3 | vision 225:11 | |
| **unusual** 315:16 | variable 333:6 | visit 204:24 344:25 | |
| **unwritten** 216:20 | variance 223:20 | | |
| **update** 269:20 327:6,7 | variants 230:16 | vol 167:8 | wanting 290:12 |
| **updates** 255:7 | varies 183:12 | volume 167:13 370:11 | wants 291:4 321:2 321:3,3 359:17 |
| **updating** 266:12 | various 330:11 | | war 353:17,19,20 353:24 |
| **upgrade** 185:18 258:2 | vastly 304:7 320:20 | | |
| | vault 274:21 | | |
| | vaulted 311:12 | | |
| | vauto 294:22 295:22 296:6,9 | | |

| | | | |
|---|---|---|---|
| **warned** 343:18 | 183:4,19,25 184:4 | 261:21 262:4,14 | 342:1,5,7,17 |
| **warning** 341:5 | 184:8 186:3 | 262:22 263:25 | 345:14 346:3 |
| **warranties** 343:10 | 187:10,25 188:15 | 265:1,6,8,17,24 | 347:24 348:8,13 |
| **wars** 352:8,17,23 | 189:10,16 190:6 | 266:2,13,19,24 | 348:18,22 349:2,7 |
| **washington** | 191:14,24 192:4 | 267:19 268:9,14 | 349:11,16,20,25 |
| 168:12,22 169:5 | 194:5,17 196:8 | 268:18,24 269:13 | 350:12,22 351:4,8 |
| **wasted** 346:17 | 197:24,25 198:7 | 269:22 270:7,17 | 351:12,15,23,25 |
| **water** 304:1 | 198:11,17,24 | 271:10,15 272:1 | 352:4,10,19,25 |
| **way** 182:23 187:22 | 200:8,21,25 201:8 | 272:10,14 274:6 | 354:2 357:15 |
| 193:17 200:11,20 | 201:12,14 202:12 | 274:11 275:11,18 | 358:9,19 359:16 |
| 203:19 222:16 | 202:19 203:20 | 275:21 276:4,16 | 360:2,5,13,18,23 |
| 223:3,3 227:16 | 204:15 205:21 | 277:6,14,17 | 361:9,12,19,23 |
| 231:8,15 233:1 | 206:1,7 207:10 | 278:21 279:11,16 | 362:4,7,8,15,18,22 |
| 236:16 246:8,22 | 208:6 209:17 | 280:2,9,16,23 | 363:6,24 364:1,6 |
| 256:18 261:19 | 210:2,9 211:21 | 281:3,12,19 282:5 | 364:15,20 365:20 |
| 263:22 267:22 | 212:10,15 213:11 | 282:9 283:19 | 365:24,25 366:4 |
| 272:11 278:8,9 | 213:25 214:9 | 284:3,14,20,23 | 366:12,15 367:11 |
| 279:20 288:20 | 215:6,10 216:3,7 | 285:2,6,20 286:13 | 367:20,25 |
| 299:21 303:21 | 217:7,10,16 218:4 | 286:23 287:2,12 | **wednesday** 238:7 |
| 312:5 317:17 | 218:8,23 219:15 | 287:20 288:1,6,17 | **weeds** 276:22 |
| 329:14 335:23 | 220:19 221:14,16 | 288:23 289:6 | **week** 255:8 |
| 350:14 353:12 | 221:21 223:5 | 300:10 301:4,10 | **weekend** 212:1 |
| 361:8 364:1,2 | 224:7,14,22 225:2 | 301:15 302:6,8,11 | 250:22 336:16 |
| 367:23 | 225:5,13,19,22 | 302:17 303:12 | 364:16 |
| **we've** 203:2 223:1 | 226:10,18 227:5 | 304:15,21,24 | **went** 188:13 214:7 |
| 223:1 256:22 | 227:11 228:14 | 305:5,23 310:1,11 | 251:19 296:7 |
| 260:9 283:17 | 229:15 230:2 | 311:5,21,23 312:3 | 306:24 308:24 |
| 299:17 303:1 | 233:15,23 234:1,9 | 312:8 314:6,16,22 | 334:25 337:13 |
| 306:4 314:13 | 234:15,19,23,24 | 317:5,13 318:18 | 338:2 346:22 |
| 315:8 325:20 | 236:17 237:4,14 | 320:6 322:5,15,20 | 360:6 |
| 326:13,13 330:19 | 240:14,25 241:7 | 324:24 325:9,14 | **westmark** 346:24 |
| 338:22 340:20 | 241:12,14 243:4 | 326:8,25 327:11 | **whale** 258:3 |
| 345:6 359:9 361:5 | 243:11 244:12,20 | 327:20,22 328:3,8 | **whatnot** 346:18 |
| 367:23 | 244:24 247:25 | 328:13,24 329:10 | **wheel** 343:10 |
| **wedgworth** | 249:18 250:12,16 | 329:20,24 330:1,6 | **whirl** 277:2 |
| 168:15 170:5,7 | 250:20 251:1,7,14 | 330:10,13,17 | **widely** 318:6 |
| 175:17,17 176:16 | 252:4,22 254:5,15 | 331:4,11,16 332:8 | **wilkinson** 168:3 |
| 177:13,20 178:9 | 254:20 255:17 | 332:15,22 333:2 | 176:4,4 |
| 178:25 179:12,21 | 256:1,12,21 | 333:13,19 334:4 | **willie** 249:22 |
| 180:3,11,18 181:1 | 257:15 258:8,25 | 334:12,18 339:11 | **willing** 197:17 |
| 181:7,20,25 182:4 | 259:9 260:20 | 340:2,11,17,24 | 367:3 |

HIGHLY CONFIDENTIAL

**win** 239:1 240:4
**wind** 290:1 329:22
**windows** 190:2
**windshield** 343:11
**wise** 228:25
**withdraw** 367:1
**withdrawn** 251:9
**witness** 167:13
    168:2 169:2 176:8
    176:12 243:14
    300:23 316:21
    345:12 369:2
    370:16,19
**witnesses** 364:4
**won** 240:7 346:22
**wonder** 225:10
    322:16
**wood** 254:13
**word** 267:24
    306:16
**words** 248:14
    320:3
**work** 182:20 205:6
    207:2 219:16
    266:9 293:3
    294:23 295:8,11
    295:12,15,20
    304:8 323:23
    326:13 335:17
    337:1 347:5
    353:12
**worked** 203:25
    315:1 347:2,3,3,7
    347:9,9,9,10 350:6
**working** 195:8
    347:8
**workman** 171:17
    208:4 209:13,23
    212:14 213:17,19
    345:18

**works** 214:25
    278:8,9
**world** 204:18
    249:1 320:25
    350:15
**worried** 321:9
**worries** 319:18
**worry** 315:5
**worrying** 320:18
**worse** 280:22
**worst** 323:23
    324:11 325:1
    354:5
**worth** 208:21,22
    255:16 325:11
**worthy** 253:19
    254:3
**write** 185:6 202:4
    219:1 230:10,13
    230:14 235:2,8
    241:21 242:20
    245:2,8,9,16
    252:18 253:18
    254:24 255:2
    256:25 258:9
    259:12 261:21
    270:4,13 271:10
    271:18 277:3,7,19
    290:6,22 291:7
    294:19 307:5
    308:15 310:4
    326:11,18,24
    327:3 354:24
**writes** 186:19,20
    186:25 188:16
    189:4 190:15
    239:1,7 241:25
    242:9 257:16
    279:17 298:15
**writing** 218:20
    261:15 297:2

**written** 189:9
    245:13 361:25
**wrong** 188:13
    248:16 317:17
    319:10 339:6,7
    360:17
**wrote** 184:9 185:8
    185:23 191:8
    201:20 230:20,22
    235:6,7,16 245:5
    245:12 248:5
    252:23 255:15
    294:24 299:13,14
    332:18 355:8
    356:2 363:13,16
**wyler** 358:14,15
    359:5

| x |
|---|

**x** 370:22
**xtime** 268:16
    269:7,8,21 270:6
    305:18,22 306:16
    309:21 326:5,7,11
    354:13,14,19

| y |
|---|

**yeah** 203:22
    213:24 250:1,5,5
    252:1 256:16
    265:7,8 266:25
    278:25 288:20
    320:3 329:15
    342:8 354:22
    363:16
**year** 179:1,8
    190:17 191:16
    192:9,13,16 196:4
    211:6,17 212:22
    212:23 213:8
    224:23 225:7,23
    238:3,5,23 270:20

271:8 272:9
    284:20 321:5
    330:3,4 337:17
    340:12 346:18
**years** 180:4
    181:21 187:11
    188:9 194:7 196:5
    199:8,8,10,23
    200:4,5 201:7
    214:6,6 222:16
    225:11 231:17
    233:12,14 236:12
    236:25 239:8
    254:9 262:9
    291:17 310:22,25
    314:8,9 320:12
    322:25 330:4
    337:12 339:15,16
    345:21,23 346:7
    347:10,16 353:4
**yesterday** 176:18
    176:19 194:12
    208:13 221:21
    226:12 228:15,16
    248:11 292:17
    300:8
**york** 168:18,18
**young** 290:12
    338:9
**ytd** 174:9 286:8
    288:8

| z |
|---|

**zip** 175:14

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foreground transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

FTC-0001354