Friday, June 18, 2021

Corey J. Smith
Senior Litigation Counsel
U.S. Department of Justice, Tax Division
150 M Street NE, Rm 2.208
Washington, DC 20002

Re:     USA vs. Robert Brockman

Dear Mr. Smith,

At your request I reviewed the medical records, diagnostic testing, and legal records related to the case of USA vs. Robert Brockman.  I also performed an independent medical examination of Mr. Brockman in his lawyer's offices in Houston, TX on May 5th, 2021, and separately interviewed his wife, Dorothy Brockman, at the same date and location.  Below is a summary of my findings and conclusions as a behavioral neurologist with expertise in evaluating patients with neurological disorders, cognitive disorders, and dementia.

**Sources of Information**
1. Brockman's motion for competency hearing
2. USA response to Competency Motion
3. Brockman's reply to USA response
4. FDG-PET scan brain 3/12/2021
5. Polysomnogram 4/29/2021
6. UT physicians medical records
7. Baylor College of Medicine medical records
8. Dr. Komal Stoerr Medical Records
9. Neuropsychological reports, Dr. Michele York, 3/1/2019, 12/3/2019, and 10/7/2020
10. Deposition of Robert Brockman 1/16/2019 and 1/17/2019
11. Reynolds and Reynolds videos 2017, 2018, and 2019
12. Kelly Hall Deposition 3/10/2021
13. Robert Shaefer Deposition 3/18/2021
14. Tommy Barras Deposition 4/15/2021
15. Interview and examination of Robert Brockman, 5/5/2021
16. Interview with Dorothy Brockman, 5/5/2021
17. Video of Robert Brockman interview with Dr. Park Dietz and Dr. Robert Denney, 5/18/2021 and 5/20/2021
18. Dr. Eugene Lai Medical Records
19. Personal Medical Records kept by Mr. Robert Brockman
20. Dr. Robert Denney's notes from interviewing Kathy Keneally and Peter Romatowski, attorneys representing Robert Brockman in the current case
21. Houston Methodist Hospital records



GOVERNMENT
EXHIBIT

4:21-CR-009-GCH

No. 38

1

## Neurological and Medical Evaluation

*General Medical History*

Mr. Brockman has a prior history of bladder cancer that was successfully resected in 2006. He has a history of recurrent urinary tract infections and prostate infections (prostatitis). He also has a history of atrial fibrillation (an abnormal heart arrhythmia), low thyroid function, elevated cholesterol, glaucoma, basal cell skin cancer, melanoma, and a single ocular migraine in 2012.

*Medications*

The following medications were provided by Mr. Brockman's attorneys for my evaluation on 5/5/2021:

bupropion SR (WELLBUTRIN SR) 12 hr tablet 100 mg (100 mg, oral, 2 tablets in the morning, 1 tablet at night)
carbidopa-levodopa (SINEMET) 25-100 mg per tablet 2 tablet (2 tablets 3 times daily, oral)
ciprofloxacin (CIPRO) tablet 500 mg (500 mg, oral, BID)
enoxaparin (LOVENOX) syringe 40 mg (40 mg, subQ, Daily at 1700)
folic acid (FOLVITE) tablet 400 mcg (400 mcg, oral, Daily)
lactulose 20 gram/30 mL solution 20 g (20 g, oral, TID)
levothyroxine (SYNTHROID) tablet 75 mcg (75 mcg, oral, Daily at 0600)
potassium chloride (K-DUR) CR tablet 60 mEq (60 mEq, oral, Once)
ramelteon (ROZEREM) tablet 8 mg (8 mg, oral, Nightly)
rivastigmine (EXELON) 9.5 mg/24 hr 1 patch (1 patch, TD, Daily)
tamsulosin (FLOMAX) 24 hr capsule 0.4 mg (0.4 mg, oral, Daily with dinner)
acetaminophen (TYLENOL) tablet 650 mg (650 mg, oral, Q6H PRN)
ondansetron (ZOFRAN) injection 4 mg (4 mg, IV, Q6H PRN)
temazepam (RESTORIL) capsule 15 mg (15 mg, oral, Nightly PRN) *** Mr. Brockman denies taking this medication***
tramadol (ULTRAM) tablet 50 mg (50 mg, oral, Q6H PRN)
Eliquis (2.5 mg bid)
Trazodone (50 mg at night)
Myrbetriq (50 mg in morning)
Rosuvastatin (5 mg at night)
Livalo (1 mg at night)
Testim (50 mg/day)
AndroGel
Aspirin
MiraLAX
Vit. D-3 (4000 IU)

*Social and developmental history*

Mr. Brockman was born on ███ 1941 in St. Petersburg, Florida. He had a normal birth and reportedly met all developmental milestones. He attended Center College before transferring to the University of Florida where he graduated with a major in business.  He enrolled in a

Master of Business Administration program but did not finish. He also served in the Marine Corps but did not see active duty.

He worked at the Ford Motor Company for 1 year and at IBM for 5 years before leaving to start his own company, Universal Computer Services, Inc. (UCS), in 1970. The company created software for car dealerships.  In 2006, UCS merged with Reynolds and Reynolds, with Mr. Brockman functioning as the CEO. He continued to serve as CEO of Reynolds and Reynolds until his retirement in November 2020.

Mr. Brockman is married to his wife, Dorothy, and has one son and one grandson.

Mr. Brockman never smoked.  He previously drank alcohol socially, more heavily when on fishing trips, but stopped drinking due to his atrial fibrillation and other health issues. He denies use of illicit drugs.

*Family history*
Mr. Brockman denies a history of dementia, Parkinson disease, psychosis, or other significant neurological diseases in his parents, brother, or grandparents. His son had severe neuropsychiatric problems related to Asperger's / Autistic Spectrum disorder that have improved during adulthood.

*Neurological history*
Mr. Brockman provided typed health update letters dated yearly from 2004 until approximately 2018. These were presumably for annual follow-up visits with his primary care doctor, Bill Obenour.  These notes all included cognitive complaints attributable to aging, including slower mental processes, concentration, ability to complete tasks, and poor memory for names that should be more familiar. These notes denied significant progression of symptoms through his note dated 12/2016. Beginning with notes in 2018, he described a decrease in efficiency at work, stating he felt he was nearing the end of his career as a full time CEO. All notes were well organized and discussed his ongoing health, family and work issues in a clear, organized, and detailed manner. Cognitive and neurological exams from Dr. Obenour through 2014 were noted to be normal. He had a cognitive and neurological exam with Dr. Julia Jones, a neurologist, on 3/30/2012 that was normal. He had an MRI brain on 5/28/1994 for tingling in his toes and on 1/24/2012 for ocular migraine that were both normal.

Mr. Brockman emailed Dr. Stuart Yudofsky, a friend and neuropsychiatrist, on 5/2/2017, indicating that he was having loss of smell and memory difficulties. Mr. Brockman mentioned memory problems to Dr. Kozak at Fondren Orthopedics on 11/27/2017 but these records did not provide further details on his symptoms. On 9/11/2018, Mr. Brockman was seen by his Urologist Dr. Seth Lerner. Dr. Lerner's note did not mention memory problems but stated that Mr. Brockman was not feeling well and had increased stress at work. Dr. Lerner recommended evaluation with Dr. Pool, an internist.

There are vital signs from Dr. Pool's office on 10/15/2018, but no clinical note. Mr. Brockman provided a typed note dated 10/2018 describing lack of stamina, strength, clumsiness, slowness, depression, reduced confidence driving in rush hour, reduced memory, and reduced organizational skills.  An MRI was performed on 11/2/2018, reportedly showing age-appropriate changes to brain size without other abnormalities.

Mr. Brockman gave a recorded deposition as part of a legal matter relating to Reynolds and Reynolds on January 16-17th, 2019. Review of these recordings did not show evidence of fluctuations in attention or arousal. He did not appear to have any problems cognitively understanding or responding to questions, and his details regarding business transactions and facts related to his business were readily remembered.

On 1/30/2019, he was evaluated in a movement disorders clinic by Dr. Daniel Savitt, a fellow, and Dr. Joseph Jankovic, an attending neurologist. At that time, Mr. Brockman reported 1.5 years of memory problems, dating onset of symptoms to approximately June 2017.  He scored a 19/30 on the Montreal Cognitive Assessment (MoCA), a short cognitive screening tool used by neurologists and neuropsychologists to track cognitive performance over time.  Mr. Brockman noted about 1.5 years of slowness and stiffness with movements. Motor examination was notable for rigidity (stiffness) in the legs but not arms, bradykinesia (slower movements) on the right greater than left sides, a slight tremor with movement but none at rest, slower gait, and mild imbalance.  Nonmotor symptoms included a report of acting out dreams 2-3 years prior. The diagnosis of possible Parkinson disease with postural instability gait disorder subtype was made. He was started on Sinemet, a medication to increase dopamine levels and treat Parkinson disease motor symptoms. He had a dopamine transport scan (DATscan) 2/14/2019 showing damage to dopamine neurons, a finding that occurs in Parkinson disease.

Mr. Brockman had neuropsychological testing with Dr. Michele York 3/1/2019. Dr. York noted impaired performance across several domains, including short-term memory, visuospatial, attention / working memory, and executive function.  She also performed a MoCA that was 19/30. He reported seeing movement on the floor or table during their examination, although he denied prior visual hallucinations. Mrs. Brockman noted no significant changes to Mr. Brockman's functional status at that time. Dr. York suspected dementia with Lewy Bodies, and estimated that Mr. Brockman was in the mild to moderate stage of severity.

On 3/13/2019, Mr. Brockman was seen by Dr. Jankovic at follow-up.  At that time, he was started on rivastigmine for treatment of cognitive issues. Dr. Jankovic noted no hallucinations or cognitive fluctuations at that time.

On 3/20/2019, Mr. Brockman was seen by Dr. Melissa Yu, a neurologist specializing in dementia and cognitive disorders. Dr. Yu noted worsening cognitive symptoms beginning 9 months prior to her evaluation due to stress related to Mr. Brockman's legal issues. Dr. Yu suspected mild dementia with Lewy Body. She did not suggest that he lacked the capacity to work or manage his finances, although she noted potential effects of cognitive deficits on these functions.

Around 7/19/2019, Mr. Brockman reportedly asked to meet with his attorneys, where he provided them with a binder organized with medical records detailing the evaluations performed by Drs. Jankovich, Yu, York, and Pool. He stated that he was having cognitive issues and would need information repeated and provided more slowly. His attorneys, Peter Romatowski and Kathy Keneally, stated in interviews to Dr. Denney that they noted impairments prior to this meeting involving Mr. Brockman's limitations in guiding them to relevant information, providing useful interpretation or context to pieces of evidence, ability to help reconstruct events from the past, and presenting information to his attorneys as if it were new when in fact his attorneys had provided this information to him.

On 10/1/2019, he had a cognitive screening test called CogniSense, a digitalized version of Memory Orientation Assessment Test (MOST), which he scored a 12/29.  Mr. Brockman wrote notes regarding his health symptoms for Dr. Pool dated 10/2019, describing more defined memory problems with dates and recall. He also noted that his desk was cluttered and that he had a task initiation problem.

On 12/3/2019, Mr. Brockman had a forensic neuropsychological exam with Dr. York. MoCA was again 19/30.  He scored in the average range on the WAIS test of general intelligence. Variability on task performance was interpreted as showing evidence of fluctuations.  Clinical history indicated progression of symptoms including more repetitive questioning, more fluctuations, slower to complete tasks, difficulty with passwords, a remote, and tying a tie.

On 1/14/2020, Dr. Jankovic provided a letter to Mr. Brockman's attorneys stating his opinion that Mr. Brockman would not be able to assist his attorneys in his defense. He had concerns for possible confabulation, or filling memory gaps with false information in a non-voluntary manner. Dr. Pool provided a letter 1/14/2020 stating that Mr. Brockman's long-term memories would be inaccessible due to dementia, and that any response to questions asked of Mr. Brockman are likely to be confabulations and inaccurate.  Dr. Yu provided a letter on 1/21/2020 stating that Mr. Brockman had cognitive impairment affecting domains beyond just memory. She did not comment on his ability to assist his attorneys and did not mention confabulation.

On 1/18/2020, Mr. Brockman was evaluated by Dr. Eugene Lai,  a neurologist specializing in movement and neurodegenerative disorders. At that time, Mr. and Mrs. Brockman noted cognitive symptoms including repeating himself, misplacing items, losing his train of thought, difficulty multi-tasking, word-finding problems, and poor initiation of activities. He mentioned having a bookkeeper to help with personal finances that preceded his cognitive problems and denied other limitations in his functional independence. Mr. Brockman reported that he continued to drive short distances at that time despite recommendations from Dr. York. He reported some improvement in cognitive symptoms with bupropion and rivastigmine. Motor symptoms included slowed walking, imbalance, smaller handwriting, difficulty signing documents, and softer voice. He reported onset of snoring accompanied by kicking, punching, and possibly acting out dreams 2-3 years prior. MoCA at that time was 20/30. Dr. Lai concluded that Mr. Brockman had a diagnosis of Parkinson disease, mild to moderate cognitive impairment, REM sleep disorder, and depression/anxiety. He recommended avoiding stress and

anxiety by reducing his business responsibilities, physical and occupational therapy, and continuation of Mr. Brockman's medications.

On 2/12/2020, Mr. Brockman had a follow-up appointment with Dr. Lai. He was reported to be functionally independent in his basic activities of daily living, still working full time as CEO of Reynolds and Reynolds but needing occasional assistance from his wife in his office. Dr. Lai's visit diagnosis was Parkinson disease with mild cognitive impairment.  Mr. Brockman was determined to have decision-making capacity and signed an informed consent document for a research study.

Emails written by Mr. Brockman on 2/13/2020 and 2/29/2020 demonstrated that he maintained an active role in his business, with evidence of long-term planning, long-term memory, and communicating reasons for making specific decisions.

On 6/4/2020, Mr. Brockman gave informed consent for anesthesia and a surgical procedure and was deemed to have full medical decision-making capacity.

On 10/6/2020 there was a CogniSense test performed showing a score of 13.

On 10/7/2020, Mr. Brockman had a repeat forensic neuropsychological evaluation with Dr. York. MoCA was 19/30. His scored in the low average range on the WAIS score for general intelligence. He reportedly had a decline in decision-making, working memory, and processing speed. He was searching more for words and forgetting names. He occasionally noted bugs or the sensation of something crawling on a t-shirt.

On the night of 10/17/2020, Mr. Brockman's son reported an episode where Mr. Brockman believed that his son had been at the house looking at unusual material on his computer.

On 11/6/2020, Mr. Brockman retired from CEO at Reynolds and Reynolds, enacting a disability clause of his contract. Up until that time, he had been meeting with Tommy Barras, president of Reynolds and Reynolds and his successor as CEO, several times per week. During his deposition testimony, Mr. Barras denied any significant cognitive issues or any concerns with Mr. Brockman's abilities to successfully run the company.

On 11/25/2020, Dr. Pool provided an additional letter to Mr. Brockman's attorney stating the opinion that Mr. Brockman had progressive cognitive changes, Parkinsonism, and dementia that prevented him from assisting in his own defense.

On 2/2/2021, Mr. Brockman had a follow-up with Dr. Lai.  He was noted to have retired from Reynolds and Reynolds but was still under a great deal of stress. He was independent in basic activities of living, but slower. His wife was assisting him in organizing his responsibilities and legal issues. He described worse mood, stress, low energy, and fatigue.  His cognitive and motor symptoms were felt to be stable and unchanged from his evaluation the year prior. He was

given a diagnosis of Parkinson disease, mild cognitive impairment, and REM sleep disorder. No changes were made to his medications.

On 3/12/2021, Mr. Brockman had an FDG-PET scan of the brain. This scan showed very mildly reduced uptake focally in the right parietal lobe. There was mention of possible, but not definitive, reduced glucose metabolism in the right posterolateral temporal lobe. These findings did not fit the typical pattern seen in Dementia with Lewy Body, Parkinson disease dementia, or Alzheimer's disease, although the radiologists commented that it remains possible these could be early findings for one of these disorders developing in the future.

He was admitted to the hospital from 3/15-19/2021 with confusion and delirium caused by a urinary tract infection that spread to his blood (sepsis). I do not have the actual medical records from this hospitalization to review.

On 4/29/2021, Mr. Brockman had a polysomnography ("sleep study"). This showed that Mr. Brockman had severe obstructive sleep apnea. There was no evidence of REM sleep behavior disorder. The report recommended that Mr. Brockman have a repeat sleep study while using a continuous positive air pressure (CPAP) machine, in order to titrate the CPAP to the appropriate settings, and that additional monitoring for REM sleep behavior disorder could occur during this CPAP titration. This test was scheduled but cancelled due to a hospitalization.

On 5/5/2021, I interviewed and examined Mr. Brockman for approximately 3 hours.  In regard to cognitive issues, he noted problems for about 5-7 years. It began with difficulty remembering names and telephone numbers. He had difficulties with task initiation and being able to finish tasks quickly and efficiently.  He noted slowness with tasks, but not errors per se. This affected more complex tasks but not less demanding tasks.  He noted losing or misplacing items like his reading glasses more frequently. He did not think it interfered with his work initially but started to need help in organizing his office 1-2 years ago.  He denied fully formed visual hallucinations. He recalled the visual illusions of bugs moving in the shadows of a table during his neuropsychological testing but denies similar symptoms outside of medical settings.  He also denied auditory hallucinations, presence hallucinations, misidentifications, or delusions.  He described his Parkinson motor symptoms as well managed until he was no longer able to exercise due to his health club closing at the beginning of the COVID-19 pandemic in 3/2020. He described slowness, difficulty with walking without falls, mild right-hand tremor, reduced voice volume, poor handwriting, and difficulty buttoning his shirt or tying a tie. He denied and changes to his ability to fish or hunt, although he had not done so since the pandemic started. He noted a couple of months where he spoke or made movements in his sleep a few years ago and had to place a pillow between he and his wife but denied sleep problems since that time. He had depression related to the current legal case that has improved somewhat with bupropion.  Functionally, he stated that he has had a personal bookkeeper that came to his home weekly for over 10 years, but that his wife had largely taken over dealing with financial matters following his retirement and legal issues. His wife began managing his medications during this time as well. He did not have difficulty with bathing, grooming, dressing, feeding, or

other basic ADLs until his recent hospitalization in 3/2021 with sepsis and delirium. Since that time, he has needed additional physical assistance due to weakness from his hospitalization.

On 5/5/2021, I interviewed Mr. Brockman's wife, Dorothy, for approximately 1 hour with her lawyer present. In general, Mrs. Brockman provided observations but was unable to give estimations of when these observations occurred or any specific details regarding progression. She noted increasing problems with organizing his desk and workspace. She noted concerns regarding some of his financial decisions, including paying too much for landscaping at their Aspen property, paying too much for partial ownership of a yacht, and losing money investing in a start-up. She noted problems with forgetting he had seen movies, remembering passwords, and initiating tasks.  She is managing medications and finances but cannot tell me when this started. She stated that Beth Yudofsky, Mrs. Brockman's psychiatrist, and Stuart Yudofsky, mentioned concern that Mr. Brockman had physical signs of Parkinson disease, but she was unable to give an estimated date when this observation occurred. She recalled a brief period of time when Mr. Brockman had movements in his sleep, similar to Mr. Brockman's account.  She noted a significant decline in cognitive functioning following the government's announcement to investigate and bring charges against Mr. Brockman.  She also noted a significant recent decline following his March 2021 hospitalization for sepsis, with only partial recovery since that time.

On 5/18/2021 through 5/20/2021, Mr. Brockman was interviewed by Dr. Robert Denney, a neuropsychologist, and Dr. Park Dietz, a forensic psychiatrist.

Mr. Brockman was hospitalized again from  5/31/2021 until 6/11/2021 with a urinary tract infection and blood infection causing confusion and delirium. I have partial records from this hospitalization to review. His wife Dorothy told doctors that Mr. Brockman had been fully independent in all activities until his 3/2021 hospitalization. After that time, he required assistance from his caregiver and wife due to physical limitations. On admission, he was not fully oriented, confused, and easily distracted, with periods of agitation and possible psychosis. He was treated for the infection and started on Seroquel, an anti-psychotic medication used to control his agitated delirium. This medication is expected to be used temporarily until the infection clears and the delirium resolves. His MoCA was 10/30 on 6/7/2021 while acutely delirious. I do not have any records regarding his mental status at discharge 6/11/2021.

_Neurological Examination_
**General Observations:** Mr. Brockman was well groomed and clean.  He walked into the interview unassisted but was accompanied by his caregiver Frank.  He was friendly and cooperative during interactions with me and the videographer. The examination occurred at the end of an approximately 2-hour clinical interview and history.  He took his Sinemet (2 pills) at approximately 11:45 AM.  The examination started with the cognitive exam and the motor exam began at approximately 12:10 PM.  He had breaks to empty an indwelling urinary catheter with his caregiver Frank approximately every hour during the interview, with his last break immediately before cognitive testing. In general, during the cognitive testing, Mr.

8

Brockman performed all tasks extremely slowly.  He had some additional limitations in hearing that resulted in his hearing the wrong word or phrase at times.

**Cognitive Exam:**
There was a disconnect between the speed of verbal responses during our interview and during the cognitive examination, with much slower response times during the examination.  He scored a 13/30 on the Montreal Cognitive Assessment (MoCA).

*Executive Functions*: He was unable to perform the short trails part B, initially connecting numbers in order and then switching to letters, rather than alternating between the two.

*Visuospatial*: He took a long time attempting to draw the cube (> 60 seconds) and ended up missing the line for the back bottom edge, as well as drawing an incomplete top front edge.

His clock-drawing was also prolonged in duration. He drew lines out from the center towards the 12 positions of the numbers in a radial pattern, similar to documented practice clocks from his visit with Dr. Yu in 3/2019.  He noted his errors in the numbering but declined the opportunity to redraw the clock on the back.  He had crowding of his numbers on the right side of the clock and did not place the hands on the clock.

*Language:* He correctly named 3/3 animals. Sentence repetition and abstraction were normal. For phonetic fluency, he had difficulty hearing that I wanted him to name words beginning with the letter "F", and instead gave me 6 words starting with the letter "S". He was able to generate a list of 15 animals in 1 minute.  Except for the difficulties with hearing, he did not have difficulties understanding any of my instructions or questions during the interview.

*Memory*: He encoded 3/5 words and 5/5 words on two trials of a 5-item word list. Delayed recall was 0/5 at 5 minutes. He was able to remember 2 words with category cue (red, velvet) and two with multiple choice (face, daisy). He did not give any spontaneous false responses.

Long term episodic memory for events in his past remained intact. Short term episodic memory during the interview appeared relatively preserved. He was also able to give me details of recent events, such as the specifics details regarding his sleep behaviors, specific events related to the COVID epidemic, and details regarding taking expired antibiotics prior to his recent hospitalization for a UTI and sepsis, all of which were independently verified by his wife.  He was also able to provide a coherent account of his history medical appointments and tests related to his neurological issues that were largely consistent with those documented in the medical record. I did not identify any specific example of reported memories or details that were incorrect or false. When asked questions he did not know, he appropriately told me that he could not remember.

*Attention / working memory*: He had normal digit span forwards and backwards.  He performed the sustained attention task in the normal range, with 1 erroneous extra tap.  On a serial subtraction of 7 from 100, he correctly answered 93 but then began listing single digit numbers.

9

I did not note any specific fluctuations in alertness, arousal, or attention during our approximately 2-hour clinical interview.  He occasionally briefly paused to consider a question or was slow to initiate a verbal response, but never with a clear lapse in attention.  He did struggle more to respond and engage in the cognitive testing with pencil and paper, although responses became quicker again when we switched to the motor examination.

_Orientation:_ Orientation to date was impaired. He was one off on the date (6th instead of 5th) and stated that it was Friday (instead of Wednesday), November (instead of May), and 2012 (instead of 2021). He was oriented to the location and that we were in his lawyer's office.

_Praxis_: Normal. He was able to pantomime saluting, brushing, and putting a letter in an envelope. Interhemispheric sensorimotor function was normal, being able to transport hand position information from one hand to the other without visual input.

**Cranial nerves:** Pupils were equal and symmetric upon eye opening. He had normal extra-ocular movements without delays.  Face sensation was normal. He had reduced facial expression (2+) with masked facies, although he was able to generate facial movements. Speech was low volume but without dysarthria. No oral-buccal apraxia. Swallow and guttural sounds were normal.

**Motor:** Strength was 5/5 and symmetric.  He had bradykinesia in the right greater than left upper and lower extremities (3+) to finger tapping, hand opening, pronation- supination, toe tapping, and foot raises. He had rigidity in the right greater than left (2+) upper extremities although with some volitional component especially in the left arm, as the rigidity here actually reduced in intensity with performance of an activation task that was distracting. There was occasional resting tremor in the right hand.

**Sensory:** Intact to light touch diffusely. Romberg weakly positive

**Reflexes:** 2+ in the upper extremities, 2+ although difficult to elicit in the lower extremities

**Cerebellar:** Normal finger nose finger and heel to shin. Some difficulty with random alternating movements bilaterally.

**Gait:** He could stand from a chair with his arms crossed unassisted. He had a slow gait with a stooped posture, some festination, and reduced arm-swing on the right greater than left. He took 3-4 steps for turning and took 2-3 steps backwards on examination of postural reflexes.

**Medical Diagnoses and Opinion**
_Parkinson disease_
**_Mr. Brockman meets criteria for a diagnosis of clinically probable Parkinson disease (PD)_**
using criteria from the Movement Disorder Society.  Cardinal features of PD include bradykinesia with either resting tremor, rigidity, or both. At the time of my examination on

10

5/5/2021, Mr. Brockman had evidence of asymmetric bradykinesia, rigidity, and resting tremor affecting the right greater than left side of his body.  While not formally part of the MDS diagnostic criteria for PD, the presence of reduced striatal dopamine transport uptake on his DAT scan dated 2/14/2019 also supports a diagnosis of PD.  The diagnosis of PD was also made by Drs. Savitt and Jankovic on 1/30/2019, and by Dr. Lai on 1/18/2020. These records reported PD symptoms beginning in approximately 2017, which is supported by Reynolds and Reynolds videos of Mr. Brockman showing subtle signs of Parkinsonism in 2018 and 2019, including reduced arm-swing and movement of the left arm, slower movements, and possible right-hand tremor.

*Extent, severity, and time-course of cognitive impairment*
Cognitive impairment can be characterized as a spectrum from normal age-related changes to mild cognitive impairment (MCI) to dementia.  MCI is differentiated from age-related changes by the presence of cognitive deficits on neuropsychological or neurological testing, and dementia is differentiated from MCI when the cognitive deficits are severe enough to impair functional independence in daily social, occupational, and/or personal care activities.  Reports of functional status and neuropsychological testing can be limited, inaccurate, and/or invalid. Because of this, clinical observations of cognitive capacities and evidence of functional status from additional sources are also used to determine whether cognitive deficits are present and severe enough to limit functional independence.

In patients with Parkinson symptoms, cognitive changes can be classified as either PD-MCI, PD dementia (PDD), or Dementia with Lewy Bodies (DLB).  As mentioned previously, PD-MCI is differentiated from PDD and DLB by whether a patient is capable of maintaining functional independence in daily social, occupational, and personal care activities. Patients with PD-MCI have a variable course, with some patients having worsening cognitive symptoms over time and progressing to dementia, some patients improving into the normal range of cognitive functioning, and some patients having stable cognitive problems over time.  DLB is differentiated from PDD by whether dementia occurs within the first year of Parkinson symptoms, and also requires having two of four core DLB clinical features: well-formed visual hallucinations, REM sleep disorder, significant fluctuations in attention and arousal, and clinical signs of Parkinson disease.

**Characterization of Mr. Brockman's cognitive deficits**
Mr. Brockman provided typed health symptoms reports from 2004 through 2016 noting  non-progressive cognitive changes, including difficulty remembering names, slower thinking, feeling not as sharp mentally, and decreased efficiency at work. Clinical assessments with Dr. Obenour through 2014 reported normal cognition. These symptoms are commonly associated with normal aging and are not indicative or early signs of a dementia or neurological disease.  Mr. Brockman began noting more cognitive changes beginning in 2017-2018. Despite reported progression, the characterization of the symptoms has remained the same, including difficulty remembering names, problems with task initiation, task efficiency, slowed thinking, and losing or misplacing items. Many of these symptoms can be attributable to age-related changes, as well as cognitive symptoms that are common in PD patients without dementia.

Mr. Brockman has had significant deficits on neuropsychological testing.  However, there is reason to believe that the neuropsychological testing results are an underestimation of his true capacities and are therefore invalid. First, Dr. Denney found inconsistent results on tests of validity that suggested invalid test results, although I will defer to Dr. Denney's report for a full discussion of this testing. Second, there was a marked difference between Mr. Brockman's cognitive capacities on formal testing and his demonstrated cognitive capacities during clinical interviews. During interviews, Mr. Brockman was able to retain, comprehend, manipulate, and communicate information with a level of complexity sufficient for most daily functions. In specific cognitive domains, he performed much better during the clinical interview than during situations where cognition was being explicitly tested.  For instance, Mr. Brockman correctly stated that he would turn 80 in ten days during his interview with Dr. Denney and Dr. Dietz on ███2021 (his birthday is ████1941), yet repeatedly stated the wrong date when asked directly during cognitive assessments.  He was able to provide details of recent events, such as his hospitalization for sepsis, moving to a new home, his new caregiver, his 1-year-old grandson, recalling the details of a fall he had during a break in an interview, and remembering information from earlier in the interview. Yet on direct questioning he denied knowing the name of the current president, denied knowing the name of his medical condition (Parkinson disease), and performed poorly on memory tasks in the context of the cognitive exam. The speed at which he responded to questions during the clinical interview vs. during cognitive assessments was also strikingly different. These discrepancies indicate that these cognitive assessments are likely underestimating Mr. Brockman's true cognitive abilities.

***Characterization of Mr. Brockman's functional independence***

Mrs. Brockman reported to doctors at Houston Methodist Hospital that up until his 3/2021 hospitalization, Mr. Brockman maintained his functional independence in occupational, social, and personal care activities. Co-workers such as Mr. Barras did not observe any cognitive issues that interfered with Mr. Brockman's ability to perform his job as a CEO of a large company through his retirement in 11/6/2020.  He continued to socialize at the Houstonian fitness club until it was closed in March 2020 due to the Covid-19 pandemic. He maintained decision-making capacity to vote, sign informed consent for medical procedures and research studies, have access to financial accounts, and maintained access to firearms without restriction.

Dr. York recommended that Mr. Brockman stop driving after his 3/2019 evaluation, but this recommendation may relate to physical impairments from PD in addition to noted cognitive impairments. The fact that Dr. York did not recommend restricting his financial or occupational decision-making capacity is incongruent with cognitive deficits being the sole reason for her recommendation that he stop driving. Dr. Lai's notes indicate that Mr. Brockman continued to drive despite Dr. York's recommendation without issue.

Mrs. Brockman stated that she and her son have taken over control of the finances after Mr. Brockman's retirement. It is unclear whether this is entirely due to Mr. Brockman's inability to functionally manage financial decisions, or if this is partially related to his ongoing legal issues. His wife stated that Mr. Brockman was making poor financial decisions.  However, her examples

are focused on spending decisions she disagreed with, but not necessarily errors or mistakes in managing finances due to cognitive deficits.  For instance, Mrs. Brockman stated that Mr. Brockman was spending too much on a yacht he partially owned and spending too much in landscaping expenses at a property in Aspen. Another example she gave was losing money he had invested in a start-up company that was unsuccessful. When Dr. Dietz questioned Mr. Brockman about this start-up, Mr. Brockman was able recall this business venture, give a rational explanation for investing in this company, and provide insight into the aspects of that business venture that caused it to fail. There were no examples of missing bills or being unable to understand financial issues due to memory or cognitive problems.  It also appears the Mr. Brockman has not lost all financial decision-making capacity, as he continues to maintain a separate bank account that he personally writes checks from.

Mr. and Mrs. Brockman stated that he is no longer managing his medications because he was missing doses, although neither was able to give an approximate date for when this started. Mr. Brockman currently has a health aide assisting with several aspects of self-care, including walking and toileting. However, this decline in functional independence is unrelated to his cognitive deficits, and instead relates the weakness from his recent hospitalization for sepsis.

Mr. Brockman's attorneys, Mr. Romatowski and Ms. Keneally, have raised concerns regarding Mr. Brockman's cognitive ability to assist them in his defense.  Specifically, they have noted an inability for Mr. Brockman to assist in reconstructing a narrative timeline for events in his case, to provide specific contextual details, or to provide additional information, documents, or sources to assist in his case. They have also expressed concern that they cannot trust what he does or does not understand, and that they do not feel the information he does provide is factually accurate or reliable. These observations are incongruent with Mr. Brockman's demonstrated capacities to perform similar tasks in other situations. First, Mr. Brockman gave depositions during 2019 which involved highly complex, detailed questions regarding specific events and decisions relating to his business. He was able to understand these questions, maintain information over an extended period of time, recall details, and appropriately respond to these questions. There were no indications during these recordings of any cognitive deficits interfering with his ability to provide information asked of him.  Second, observations of his work-performance through 11/2020 show that Mr. Brockman was able to comprehend complex information and make appropriate decisions in a manner that was unchanged from his previous performance. Third, Mr. Brockman was able to accurately recount many details regarding his remote and more recent medical care and history to myself and Drs. Denney and Dietz during our clinical interviews. Mr. Brockman spontaneously suggested that I review personal medical records he had that might be useful in my evaluation of his cognitive issues because he remembered that these records included details of cognitive symptoms reported in the past. This required Mr. Brockman to have an awareness of the purpose of my evaluation, to remember details of evidence that he had that might be useful for his position, and to communicate with me regarding this evidence so that I had access to it for my evaluation. He was able to report details regarding his medical history that when possible were verified as accurate from collateral sources including his wife and available medical records.  He was able to evaluate questions from Drs. Dietz and Denney and determine whether these questions

13

were related to his medical and cognitive issues or delved too deeply into questions regarding his legal case that he did not want to discuss. These examples illustrate Mr. Brockman's ability to understand, remember, express, and evaluate complex information to a degree that would be adequate to assist his defense.

### Summary and diagnosis

The extent and severity of Mr. Brockman's cognitive deficits is challenging to estimate because his reported functional deficits and cognitive deficits on neuropsychological testing are in excess of his demonstrated cognitive capacities during the clinical interview. He reported age related cognitive changes prior to 2017 that are common and did not impair his level of functional independence. He reported deterioration in cognitive function beginning in 2017-2018 with associated cognitive deficits on bedside testing, but performance on cognitive testing was discrepant with observed cognitive capacities in other contexts. Evidence suggests that Mr. Brockman maintained functional independence at least until his hospitalization for sepsis in 3/2021. While there are reports of loss of functional independence since that time, he demonstrated cognitive capacities during the clinical interview that would be sufficient for him to continue independence in most activities of daily living.

**Thus, while it remains possible that Mr. Brockman has some degree of mild cognitive impairment, these cognitive deficits would not be expected to significantly limit his functional independence or reach the threshold for a diagnosis of dementia.**

### Forensic Opinions

Patients with MCI maintain decision-making capacity for financial, medical, occupational, and legal decisions, even if cognitive deficits make the process leading to these decisions harder. Based on Mr. Brockman's clinical diagnosis of PD-MCI, it is expected that he would have the cognitive capacity necessary to assist his defense and to understand aspects of his legal trial.

Mr. Brockman's long-term memory was normal on clinical interview and testing. He was able to discuss in great detail events throughout his life, up to and including recent medical issues, moving homes, vacations and trips, details related to his business, and details of events earlier in the interviews.  He was also able to relate important details regarding aspects of his legal case, witnesses against him, and the relationship between the Eugene Brockman Trust, Reynolds and Reynolds, and his personal finances.

There was no evidence of confabulation, which refers to filling memory gaps with false, misinterpreted, or distorted information.  Memories recalled by Mr. Brockman, when they could be verified against collateral sources, were typically accurate. Mr. Brockman appropriately responded when he did not remember something.  Confabulation is typically found in patients with alcohol-related memory disorder called Wernicke-Korsakoff's dementia, or rarely in Alzheimer's disease where dense memory impairment occurs. Confabulation would be extremely unlikely in PD, PD-MCI, PDD, or DLB; in fact, I could not identify any research papers or even single case reports in the scientific literature describing confabulation in

14

patients PD or DLB. Thus, it is unlikely that Mr. Brockman's cognitive deficits would prevent him from providing accurate information regarding past events.

Mr. Brockman was interviewed for several hours as part of this evaluation. During these hours of interviewing, he consistently demonstrated the ability to understand and appropriately respond to questions.  He was able to maintain vigilance regarding questions or topics that he determined to fall outside of the scope of the evaluation, or that might provide non-disclosed details in his legal case. He was able to understand the role of our evaluation and to offer evidence to us that might be beneficial. On specific questioning with Dr. Denney and Dr. Dietz, he was able to demonstrate knowledge of the financial dealings implicated in the charges against him, other involved parties, and that he was actively working with his attorneys and educating them about aspects of his business and personal finances. He was also able to clearly articulate an appropriate understanding of legal proceedings, the charges against him, the consequences of such charges, and his legal options for defending himself against these charges. There was no indication that cognitive deficits would prevent him from answering similar questions with his attorneys in order to assist in his defense.

**<u>Conclusions:</u>**
***In summary, Mr. Brockman has evidence of Parkinson disease and mild cognitive impairment. His level of cognitive impairment does not clearly reach the threshold of dementia. Extensive clinical interviewing demonstrates that Mr. Brockman has the cognitive capacities to access and accurately report past memories, to comprehend, manipulate, and make appropriate judgments regarding questions asked of him, and to understand the charges against him and the role of his attorneys in defending him against these charges.  To a reasonable degree of medical certainty, there are no cognitive deficits that would prevent Mr. Brockman from assisting in his defense.***

Thank you for referring this very interesting matter for my evaluation and report.

Sincerely,

R. Ryan Darby, MD
Assistant Professor of Neurology
Vanderbilt University Medical Center

15

Friday, October 29, 2021

Corey J. Smith
Senior Litigation Counsel
U.S. Department of Justice, Tax Division
150 M Street NE, Rm 2.208
Washington, DC 20002

Re:     USA vs. Robert Brockman

Dear Mr. Smith,

At your request I am providing an addendum to my initial report dated 6/18/2021. I have
reviewed additional materials as outlined below. Unless otherwise stated, the opinions
expressed in my initial report have not changed.

**Additional Sources of Information**
1. FDG-PET scan brain, 8/24/21
2. Amyloid-PET scan brain, 7/28/21
3. MRI brain, 7/30/21
4. Sleep study, 8/12/21
5. EEG brain, 9/2/21
6. Neuroreader quantitative MRI analysis of MRI scans from 7/30/21 and 11/2/18
7. Additional medical records from Mr. Brockman's hospitalizations with urosepsis at
   Houston Methodist Hospital, 5/31/21-6/11/21 and 3/15-19/21
8. St. Luke's hospital records for Uro-Lift procedure, 6/23-25/21
9. Additional hand-written records from Dr. James Pool
10. Additional hand-written records from Dr. Stuart Yudofsky
11. Additional records from Dr. Seth Lerner
12. Reports of qualitative and semi-quantitative PET scan analyses from Dr. Maria Ponisio,
    9/5/21
13. Dr. Park Dietz report, 6/21/21
14. Dr. Robert Denney's report, 6/21/21
15. Dr. Thomas Wisniewski report, 8/6/21
16. Dr. Christopher Whitlow's report, 8/6/21
17. Dr. Marc Agronin report, 8/6/21
18. Dr. Thomas Guilmette report, 8/6/21
19. Video and transcript from Dr. Guilmette's interview of Mr. Brockman, 7/16/21
20. Video and transcript from Dr. Agronin's interview of Mr. Brockman, 7/13/21
21. Note from Dr. Eugene Lai, MD/PhD, 10/7/2021
22. Court transcript 10/15/2021
23. Video and transcript from Dr. Dietz and Dr. Denney interview of Mr. Brockman,
    10/20/21
24. Lab results, Quest Diagnostics, 10/20/21

**GOVERNMENT EXHIBIT**

**4:21-CR-009-GCH**

**No. 39**

**Background on neurodegenerative disorders or dementias**

The diseases being evaluated in this case (Parkinson disease, Lewy Body disease, Alzheimer's disease) are called neurodegenerative disorders or dementias.  These diseases start with **biological abnormalities (abnormal protein depositions)** that lead to **neurodegeneration (brain damage)** and resulting **cognitive impairment (mild cognitive impairment or dementia)**.

*Abnormal protein depositions*

In Alzheimer's disease, the first biological change that occurs is deposition of an abnormal protein called amyloid beta.  Amyloid deposition can occur 15-20 years prior to the onset of dementia.  Amyloid is deposited broadly throughout the brain but does not directly cause brain damage or significant cognitive impairment. Tau is the other main protein involved in Alzheimer's disease pathology. In contrast to amyloid, tau deposition correlates closely with brain damage and the onset of clinical symptoms.  Both amyloid and tau can now be measured clinically by analyzing the cerebrospinal fluid after a spinal tap or using special PET scans to show where these proteins are deposited in the brain.

In Parkinson disease and Lewy Body disease, alpha-synuclein is the abnormal protein. There are no clinical tests available to test for alpha-synuclein.

*Neurodegeneration, or brain damage*

These biological changes ultimately result in brain damage, or neurodegeneration. This damage can be measured using FDG-PET and brain MRI.

FDG-PET scans use a radiotracer to bind to sugar in the blood. Because sugar is used as energy by the brain, the amount of the tracer going to certain brain regions is a sign of how active that brain region is. Reduced activity indicates brain damage.

MRI scans can be used to measure the size of different brain regions. Brain regions that are smaller than expected have atrophy, or brain damage. FDG-PET is more sensitive and may show changes prior to the MRI. As the disease progresses, MRI changes become clearer.

Different types of dementia cause damage to different parts of the brain. In Parkinson disease, damage occurs to dopamine neurons causing decreased dopamine transporter levels in the basal ganglia on DAT scans. In Lewy Body disease, damage occurs in the occipital lobes causing reduced activity on FDG-PET. In Alzheimer's disease, brain damage occurs in memory areas causing brain atrophy in the hippocampus on MRI, and reduced activity in the precuneus, posterior cingulate, and lateral temporal-parietal lobes on FDG-PET.  The patterns of which brain regions are damaged can help to determine what specific disease is causing problems.

*Clinical symptoms are linked to brain damage*

Clinical symptoms result from where brain damage occurs and the amount of brain damage. In Parkinson disease, damage to dopamine neurons and basal ganglia circuits results in the typical motor symptoms of slowness, rigidity, tremor, and difficulty walking. Damage to these circuits can also cause cognitive impairment that is common in Parkinson disease, including slowness in thought, speech, decision-making, and attention. In Lewy Body disease, brain damage causes more extensive cognitive impairment, visual hallucinations, and fluctuations in attention and arousal. In Alzheimer's disease, brain damage causes memory problems.

Clinical symptoms progress as brain damage becomes more severe and spreads to new brain regions. Brain damage occurs in a small number of brain regions in patients with mild cognitive impairment and spreads to involve more brain regions in patients with early dementia. By the severe or end-stage of dementia, brain damage is wide-spread throughout the brain.

**Review of additional records**

*Medical Records*

Mr. Brockman was hospitalized with a pseudomonas urinary tract infection spreading to the blood (urosepsis) and delirium from 5/31/21-6/11/21. On exam, he was noted to have fluctuating attention and arousal, visual hallucinations, and cognitive impairment with a score of 10/30 on the MOCA test. On 6/7/21 Mr. Brockman reportedly had a fall while in the hospital when he was confused and tried to get out of bed. A CT scan of the brain did not show any damage or bleeding. He had an MRI on 6/6/21 that reported age-appropriate volume loss and mild white matter hyperintensities. His delirium improved throughout his hospital stay with treatment for his infection, although he still had a positive delirium screen on his day of discharge (6/11/21).

Mr. Brockman had a urological surgery called a Uro-Lift on 6/24/2021. There were no reported complications. There are not details regarding Mr. Brockman's mental status in these records.

On 9/13/2021 Mr. Brockman presented to the Houston Methodist emergency room with right elbow swelling after a fall several weeks beforehand.

Mr. Brockman was hospitalized with delirium and a Klebsiella urinary tract infection from 9/15-18/2021. On admission he was disoriented, weak, and with decreased level of awareness. His mental status improved with antibiotics. A CT head on 9/16/21 showed diffuse volume loss and microvascular ischemic white matter changes. An EEG performed 9/17/21 showed that his posterior dominant rhythm was low voltage and poorly sustained. He had beta activity in the 18-22 Hz range in all areas, often a sign of benzodiazepine medication use. Findings were felt to be consistent with diffuse brain dysfunction without seizures.

Mr. Brockman had a follow-up appointment with his neurologist, Dr. Lai, on 10/7/2021. Dr. Lai noted significant functional decline reported by Mrs. Brockman and Mr. Brockman's caregiver Frank. Mr. Brockman was reportedly able to feed and groom himself slowly but needed

assistance with the remainder of his basic activities of daily living. On exam, Mr. Brockman scored a 13/30 on the MoCA.  Dr. Lai did not note any abnormalities in arousal or attention to suggest ongoing delirium. Mood was stressed and depressed.  Mr. Brockman did not have a tremor but did have slowed movements, mild rigidity, and a narrow, shuffling, stooped posture while walking. Dr. Lai diagnosed Mr. Brockman with Parkinson's disease with associated dementia, with decline in cognitive and neurological exam since his last visit. He increased Mr. Brockman's Sinemet to treat his motor symptoms. He did not make changes to his medications for his cognitive impairment or sleep.

_Evaluations by Drs. Agronin and Guilmette in July 2021_

Mr. Brockman had evaluations performed by Dr. Thomas Guilmette, a neuropsychologist, on July 16,2021, and Dr. Marc Agronin, a geriatric psychiatrist, on July 13th, 2021.  Review of the videos available from these interviews show a marked decline in Mr. Brockman's demonstrated cognitive capacities. He appeared confused as to the purpose of the evaluation and often became tangential or nonsensical in his answers to questions. Given his profound level of impairment and fluctuations during interview and cognitive testing, both Dr. Agronin and Dr. Guilmette raised concerns that he might have had ongoing delirium during their evaluations.

Dr. Agronin performed a MOCA where Mr. Brockman scored a 9/28, 4 points lower than when I administered this test in May 2021 and 1 point lower than when Mr. Brockman was severely sick and delirious in the hospital in June 2021.  Dr. Guilmette's neuropsychological testing showed profound decline across all comparable tasks between May 2021 and July 2021. Mr. Brockman recalled 0 items from a word list, 1 item from a story, and 0 items from a figure after a delay, near the lowest possible performance.  On the Connors Continuous Performance Test 3, a test of sustained attention and vigilance, Mr. Brockman had extremely abnormal scores for omissions, indicating that he often did not respond to the stimuli at all. He was unable to complete the Trails Part A task that requires a patient to connect numbers in order, a task he completed two months prior with Dr. Denney.  He was unable to complete several executive function tasks including the Stroop Color-Word task and 20 questions task from the D-KEFS.  Dr. Guilmette administered several performance validity tests.  Mr. Brockman scored in the invalid range on some but not all tests, which Dr. Guilmette interpreted as being more consistent with a genuine cognitive impairment than malingering.

Dr. Guilmette had Mrs. Dorothy Brockman complete assessments regarding Mr. Brockman's current level of functional impairment using the AD8 dementia screening interview and the standardized functional assessment questionnaire (FAQ). Mr. Brockman was reported to have the highest impairment rating possible on the AD8 (8/8). Dr. Guilmette cites that a cutoff of 2 is typically considered to support a diagnosis of dementia, with 8 therefore being at the level of severe or end-stage dementia. Mr. Brockman was reported to have a score of 26/30 on the FAQ. This is above dementia cutoffs scores cited by Dr. Guilmette ranging from 2-6 and again suggests severe or end-stage dementia. It is unclear if these reported functional impairments were related to Mr. Brockman's physical impairments (i.e., weakness from hospitalizations,

Parkinson's disease, urinary issues) or cognitive impairment from ongoing delirium in addition to cognitive impairment from dementia.

*Evaluations by Drs. Dietz and Denney in October 2021*

Drs. Dietz and Denney conducted an evaluation of Mr. Brockman on 10/20/2021. Mr. Brockman was more impaired than in his May 2021 assessments.  He was slow to respond and often stated that he did not know the answers to questions he was asked. This was especially apparent when asked about details of his indictment, where he answered that he didn't recall or know most of the details related to this.  His responses were shorter and less detailed than in May 2021.  He had a general sense of many current events although lacking the specific details. He was disoriented to the date although could accurately estimate the age of his grandson and knew the current president. He provided much less details and understanding of his medical care compared with the May 2021 evaluations.  Compared with his evaluations from July 2021, Mr. Brockman's answers were more appropriate and he was not as tangential or nonsensical.

Lab testing indicated positive metabolites for trazodone, bupropion, and Seroquel, all prescribed medications. Urinalysis showed negative leukocyte esterase and nitrate, 6-10 white blood cells, and many bacteria. Urine culture was significant for >100,000 colonies of pseudomonas aeruginosa and 50,000-100,000 colonies of coagulase-negative staphylococcus (a common contaminant from the external skin).

*Sleep study*

Mr. Brockman had a sleep study on 8/12/2021. He again had evidence of obstructive sleep apnea and had a CPAP mask placed and titrated to the appropriate settings. He had no evidence of REM sleep disorder. The EEG during wakefulness did not have any reported abnormalities.

*MRI scans*

Mr. Brockman had an MRI scan of the brain 7/30/2021. The reviewing neuro-radiologist's interpretation was "Moderate diffuse cerebral volume loss with proportional ventricular predominance. Mild chronic microvascular ischemic change."

MRI scans from 11/2/2018 and 7/30/21 were also analyzed quantitatively using a software called Neuroreader. Neuroreader uses a computer algorithm to identify different brain regions on the MRI scan. It then compares the size of these regions in a single patient to a database of MRI scans from healthy persons without any neurological or cognitive disorders. Finally, Neuroreader provides a percentile for the brain size for the patient compared to healthy subjects of the same age and gender.

The MRI scan from 7/30/21 used a sequence specifically designed for Neuroreader, with a short distance (1.2 mm) between brain slices that allows for more precise measurement. The

software outputs a summary sheet. The summary sheet highlights brain regions with a volume below the 25th percentile for age and gender.  This cutoff percentile is arbitrary and does not indicate that identified brain regions are necessarily abnormal. In general, values within one standard deviation of the population average are considered normal, corresponding to the 16th percentile. Scores greater than two standard deviations from the population average are typically considered abnormal, corresponding to the 2.5th percentile. Mr. Brockman's brain volume in the temporal lobe was at the 23.8th percentile (specifically 21.94th percentile on the right) and was at the 24.8th percentile in the right diencephalon on the July 2021 MRI scan. These values fall within the normal range.

Neuroreader was also performed on the MRI scan from 11/2/2018. This scan had 1.5mm between slices, and so was not optimized for Neuroreader's algorithm. Results should therefore be taken with more caution, especially when comparing results between the two scans. Mr. Brockman's brain volume was reported to be in the 23.4th percentile overall, at the 19.33rd percentile in the amygdala (14.94th percentile in the right amygdala), 20.02nd percentile in the putamen (23.98th percentile in the right putamen, 17.16th percentile in the left putamen, and 18.11th percentile in the caudate (19.41st percentile right caudate, 17.46th percentile left caudate). Only the right amygdala volume was greater than one standard deviation from average and none were greater than two standard deviations from average.

### FDG-PET scans

Mr. Brockman's FDG-PET scan from 3/12/21 was interpreted by the clinical neuroradiologist as *"mildly reduced uptake in the right parietal lobe… findings are very mild, but suggestive of early neurodegenerative disease, either Alzheimer's disease or Lewy Body Disease."*

Mr. Brockman's FDG-PET scan from 8/24/21 was interpreted by the clinical neuroradiologist as *"mildly reduced uptake in the posterior temporal and parietal lobes bilaterally…Findings are mild, but very suggestive of neurodegenerative disease, particularly Alzheimer's disease. Although statistically less likely, dementia with Lewy Bodies or Parkinson's disease with dementia can have a similar scan pattern."*

Dr. Maria Ponisio, a neuroradiologist and nuclear medicine radiologist, analyzed the FDG-PET scans from 3/12/2021 and 8/24/2021 both qualitatively and using semi-quantitative analysis. Like the Neuro-reader, semiquantitative analysis of FDG-PET scans using MIMneuro compares levels of brain activity in a patient against brain activity levels in health control subjects. Reported abnormal regions were two standard deviations below the population average, corresponding to a percentile of 2.5%.

For the 3/12/2021 scan, Dr. Ponisio's visual inspection noted reduced metabolism in the cingulate cortex, precuneus, and the caudate bilaterally, as well as the right frontoparietal lobe. Semiquantitative analysis noted abnormalities in the caudate, anterior cingulate, posterior cingulate, and precuneus cortex bilaterally. Dr. Ponisio's opinion is that these PET findings were

most suggestive of early Alzheimer's disease. She did not note significant extension of abnormalities into the temporal-parietal lobes as would be seen in more advanced dementia.

For the 8/24/21 FDG-PET scan, Dr. Ponisio's visual inspection again noted reduced metabolism in the cingulate, precuneus cortex, and caudate nucleus bilaterally, as well as in the right frontoparietal lobe. Semi-quantitative analysis noted abnormalities in the caudate, anterior cingulate, posterior cingulate, and precuneus cortex bilaterally, as well as the left amygdala and superior frontal gyrus. Dr. Ponisio again felt this was consistent with early but not severe Alzheimer's disease, with mild progression since the prior PET scan.

### Amyloid PET scan 7/28/21

Amyloid deposits in the brain up to 15-20 years before patients develop clinical symptoms and many older adults (80+) who are cognitively normal can have positive amyloid PET scans. Thus, the presence and severity of amyloid detected on PET scan does not correlate with the degree of cognitive impairment.  Rather, a positive amyloid scan increases the likelihood that detected cognitive changes are related to Alzheimer's disease.  A positive scan also increases the likelihood for developing cognitive changes due to Alzheimer's disease in the future, although the timing of this change is difficult to predict.  Mr. Brockman's amyloid PET scan was positive, indicating that he does have amyloid depositions in his brain.

### Electroencephalogram (EEG) 9/2/2021

The normal background frequency of brain activity on EEG is 8-13 Hz, which is called the alpha range. The theta range, from 4-7 Hz, is slower and may indicate nonspecific brain dysfunction. Mr. Brockman's background was mostly in the alpha range, but occasionally went to 7Hz, which is at the higher end of the theta range. This was interpreted by the clinical neurologist reading the study as "mildly abnormal video-EEG study characterized by diffuse slowing of the background, a non-specific indicator of global cerebral dysfunction." This pattern is unlikely to be due to delirium because the reported slowing was mild and not always present. This EEG pattern could be compatible with mild cognitive impairment or early dementia.  This pattern is not consistent with severe or end-stage dementia where more significant and consistent abnormalities would be expected.

**Medical Diagnoses and Opinion**

### Medical opinion regarding Mr. Brockman's cognitive status prior to 6/18/21

At the time of my report dated 6/18/2021, I concluded that Mr. Brockman had a diagnosis of Parkinson's disease with mild cognitive impairment (MCI). My opinion regarding his diagnosis at that time remains unchanged. This opinion was based on review of available records, including that Mr. Brockman was diagnosed with Parkinson's disease with MCI by his treating neurologist Dr. Lai at his evaluation on 2/2/21, medical records indicating he had been fully independent with functional activities at least until his hospitalization in March 2021, videos and transcripts

of deposition testimony in 2019 where Mr. Brockman had no demonstrable cognitive impairment, and from deposition testimony under oath from Tommy Barras, Mr. Brockman's closest work associate, indicating that he did not have concerns regarding Mr. Brockman's cognitive capacity to serve as CEO of Reynolds and Reynolds through his retirement in November 2020.  It is also based on my evaluation and review of the evaluations performed by Drs. Dietz and Denney in May 2021.

Several possible areas of loss of functional independence were raised in May 2021, including driving restrictions, changes to financial decision-making, and ability to assist counsel in his defense.  As I discussed in further detail in my report from 6/18/2021, I did not feel that there was clear evidence for loss of functional independence because 1.) there were often conflicting accounts of whether Mr. Brockman was able to function independently, 2.) it was unclear if more recent functional limitations were related to physical impairments from medical issues and not to from dementia; and 3.) Mr. Brockman often demonstrated the cognitive capacities necessary to perform these functions independently in other contexts.

***In summary, I continue to conclude that through my initial evaluations in May 2021, Mr. Brockman had a diagnosis of Parkinson's disease with mild cognitive impairment.***

<u>*Medical opinion regarding Mr. Brockman's cognitive status after 6/18/21*</u>

Mr. Brockman's interview, cognitive testing, and reported functional declines in July 2021 indicated severe or end-stage dementia.  This is markedly worse than his assessment in May 2021. There are three potential reasons for this change. First, Mr. Brockman may have had a progression of his dementia, with hospitalizations for delirium causing more rapid progression. Second, he might have still been delirious at the time of his evaluation in July 2021.  Third, he might have been exaggerating the severity of his cognitive impairment in July 2021.

It is unlikely that the rapid deterioration of Mr. Brockman's cognitive impairment can be entirely attributable to disease progression.  The amount of deterioration is beyond what is typically seen in the natural course of dementia. A history of delirium can increase the rate of progression in patients with dementia but would still not account for the dramatic decline Mr. Brockman had over only 2 months.

The amount of brain damage on Mr. Brockman's MRI and PET scans is also much less than would be expected in a patient with severe or end-stage dementia. Mr. Brockman's FDG-PET scan from 8/24/2021 shows findings expected at the earlier stages of dementia, and far less than would be expected at the severe or end-stages of dementia. Further, there was only mild progression of the FDG-PET changes from March 2021 to August 2021, far less than what would be expected based on the dramatic change in his cognitive abilities. Finally, there was not significant brain atrophy on his MRI scans, a later sign of more significant brain damage.

While there is not a perfect correspondence between neuroimaging findings and clinical symptoms, there is nevertheless a strong relationship. Given the inconsistent and conflicting

reports of Mr. Brockman's functional impairments and cognitive testing performance, the extent of brain damage on neuroimaging is useful for estimating the degree of expected cognitive impairment.  Based on this imaging, one would expect Mr. Brockman to be at the MCI or mild dementia stage and not at the severe or end-stage dementia stage.

It is therefore likely that something other than dementia progression contributed to the dramatic change in Mr. Brockman's cognitive impairment between May 2021 and July 2021. It would be atypical, but not impossible, for residual delirium to persist for one month following his hospitalization for sepsis. His hospitalization for the Uro-Lift procedure and the anesthesia he received as part of this procedure could also contribute to delirium, although delirium during this hospitalization is not documented in the available medical records.  His EEG from 9/2/2021 indicates that he was no longer delirious at that date but would not address whether he was delirious at the time of his evaluations in July.

Whether due to continued delirium, exaggeration of symptoms, or some other reason, the July 2021 assessments do not accurately reflect Mr. Brockman's true cognitive and functional capacities related to dementia.

Mr. Brockman was subsequently evaluated by Drs. Dietz and Denney in October 2021. Although not as severe as in July 2021, his cognitive and functional impairment continued to be in the severe or end-stage dementia range. During the October 2021 interview Mr. Brockman did not have fluctuations in arousal, attention, or profound confusion to suggest that he was delirious. Mr. Brockman did have bacteria growing in his urine, but he did not describe any symptoms of a urinary tract infection and there was no evidence of significant inflammation in his urinalysis (his white blood cell count was not elevated, and his leukocyte esterase level was negative). I think this is asymptomatic bacteriuria rather than a urinary tract infection and do not believe it contributed significantly to his cognitive symptoms during that evaluation.

Given his age, recent hospitalizations for delirium, the expected disease progression, and neuroimaging results, it is possible that Mr. Brockman is now in the dementia stage. However, it is unlikely that Mr. Brockman would be at the severe or end-stage dementia as his most recent evaluations would suggest. While it is possible that Mr. Brockman had ongoing delirium during his July assessments, delirium was unlikely during his October assessments.

At the level of cognitive impairment expected based on the natural disease course and Mr. Brockman's neuroimaging, Mr. Brockman could be either competent or incompetent to assist in his defense. I do not think this can be determined currently because I do not think his recent assessments accurately reflect his true level of cognitive impairment.

***In summary, Mr. Brockman's level of cognitive impairment is beyond what would be expected based on the natural disease progression and his neuroimaging findings. It is reasonable given his hospitalizations for delirium, natural disease course, and neuroimaging that Mr. Brockman has progressed to the dementia stage, but it is unlikely that he would be at the severe or end-stages of dementia as indicated by his recent assessments. While ongoing***

*delirium could have contributed to his July 2021 performance, delirium was unlikely to have contributed to his October 2021 evaluations.  I do not think Mr. Brockman's competency can be determined without knowing the true degree of his cognitive impairment.*

<u>Medical opinion regarding Mr. Brockman's underlying diagnosis</u>

Mr. Brockman has a clinical diagnosis of Parkinson's disease supported by his clinical exam findings and dopamine transporter SPECT scan.

Mr. Brockman has Parkinsonism but not the other core clinical criteria for a diagnosis of Lewy Body dementia, including no REM sleep disorder, no well-formed visual hallucinations, and no significant fluctuations in arousal and attention. Additionally, his FDG-PET scan did not show the occipital hypometabolism most characteristic of Lewy Body dementia. Mr. Brockman therefore does not meet criteria for Lewy Body dementia.

Mr. Brockman's positive amyloid PET scan alone is not useful in estimating his expected degree of cognitive impairment but does increase the likelihood that his cognitive symptoms are related to Alzheimer's disease.  Tau imaging was not performed but would further support the conclusion that Mr. Brockman's symptoms are related to Alzheimer's disease. Finally, the abnormalities on Mr. Brockman's FDG-PET scans in the precuneus and cingulate cortices are consistent with the locations of brain damage often seen in early Alzheimer's disease.  Thus, Mr. Brockman has the biological changes and early neurodegenerative changes that can be seen in patients with of Alzheimer's disease.

*In summary, Mr. Brockman has a diagnosis of Parkinson's disease.  It is plausible that Mr. Brockman's also has a co-morbid biological diagnosis of Alzheimer's disease. It is unclear whether Parkinson's disease, Alzheimer's disease, or both diseases are contributing to his current cognitive impairment.  Amyloid PET scans can be positive in many cognitively normal subjects and is therefore not useful in estimating Mr. Brockman's expected degree of cognitive impairment.*

<u>Medical opinion regarding Mr. Brockman's risk for future progression</u>

Mr. Brockman has evidence of mild progression of his FDG-PET scan abnormalities between March 2021 and August 2021.  Mr. Brockman has also had three hospitalizations for delirium in in the last year. Delirium is a risk factor for more rapid progression of cognitive symptoms in patients with neurodegenerative disorders.

**<u>Conclusions:</u>**

1.) *It continues to be my opinion that Mr. Brockman had a diagnosis of Parkinson disease with mild cognitive impairment through his May 2021 evaluations.*

2.) *Based on the expected natural disease course, neuroimaging findings, and hospitalizations for delirium, it is plausible that Mr. Brockman would have progressed from the MCI to dementia stage. However, I do not think it is likely that he would be at the severe or end-stages of dementia.*

3.) *The progression of cognitive impairment between May 2021 and July 2021 is well beyond what would be expected over a two-month period in a patient with dementia even accounting for a history of delirium, and well beyond what would be expected given his neuroimaging. Whether due to continued delirium, exaggeration of symptoms, or some other reason, the results of his July 2021 evaluations are not accurate representations of Mr. Brockman's cognitive and functional status.*

4.) *In his October 2021 evaluation, Mr. Brockman was not delirious, but continued to demonstrate cognitive impairment beyond what would be expected from his dementia based on the natural disease progression and his neuroimaging findings.*

5.) *I do not believe that his current assessments accurately reflect his true level of cognitive impairment and am therefore unable to determine whether his cognitive impairment is severe enough to make him incompetent to assist his defense.*

6.) *It is plausible that Mr. Brockman has co-morbid Alzheimer's disease, but the amyloid PET scan is not useful in estimating his expected degree of cognitive impairment as this test can be positive in cognitively normal subjects.*

7.) *Mr. Brockman is at increased risk for progression over time due to his history of delirium.  He is also at risk for future episodes of urinary infections and delirium.*

All opinions are to a reasonable degree of medical certainty. Thank you for referring this very interesting matter for my evaluation and report.

Sincerely,

R. Ryan Darby, MD

Assistant Professor of Neurology
Vanderbilt University Medical Center

# EXHIBIT 40A

# Darby May Exam (Excerpt)

Ex. 40 Timestamp: 18:47 to 21:15

**GOVERNMENT EXHIBIT**

**4:21-CR-009-GCH**

No. 40A


UTHealth
McGovern
Medical School
The University of Texas
Health Science Center at Houston


MEMORIAL
HERMANN®

**Memorial Hermann Hospital Texas Medical Center**
**Sleep Disorders Center**
6411 Fannin, Houston Texas 77030
Ph: 713.704.2337 Fax: 713.704.5586


AASM
ACCREDITED
Facility Member™

### POLYSOMNOGRAPHY REPORT

| | | |
|---|---|---|
| **Patient name:** BROCKMAN, ROBERT | **MR Number:** 37903111-7500 | **Study Date:** 4/29/2021 |
| **Date of birth:** ▉1941 | **Age (years):** 79 year | **Gender:** Male |
| **Height:** 6' 1" | **Weight:** 175.0 lbs | **BMI:** 23.2 kg/m² |
| **Referring Physician:** Ryan Darby MD | | |

## HISTORY

ROBERT BROCKMAN is a 79 year-old man with medical conditions including atrial fibrillation, arthritis, thyroid disease and dementia (on treatment for a Parkinsonian syndrome) who has been referred for **the evaluation of REM-behavior disorders.** He goes to bed at 10.30 pm and wakes up at 7.30 am. He reports loud snoring, dry mouth, unrefreshing sleep, leg kicking during sleep, difficulty concentrating during the day, lying in bed worrying about sleep, and frequent nighttime awakenings. The sleep is further disturbed by nocturia, and back pain. **Sleep walking, teeth grinding, nightmares, and acting out of dreams have been described. Hypnogogic/hypnopompic hallucinations were also endorsed.** He drinks 2 caffeinated beverages a day, does not smoke and does not drink alcohol. Pertinent medications the patient is currently taking include: Carbidopa/Levodopa, Eliquis, Flomax, trazodone, synthyroid and bupropion. **The Epworth sleepiness score (ESS) is 14** (a score greater than 10 is consistent with abnormal daytime sleepiness). *An RBD montage was used for this sleep study.*

**GOVERNMENT EXHIBIT**
4:CR-21-009-GCH
No. 41

## RESULTS

### Sleep Characteristics

The lights were turned off at 08:46:47 PM. The total recording time (TRT) was 425.2 minutes and the total sleep time (TST) was 206.0 minutes with a low sleep efficiency of 48%. ***The patient complained of back pain, and was not able to sleep through the entire sleep study.*** There was a short sleep latency of 1.9 minutes with a normal REM latency of 21.0 minutes. Sleep architecture was characterized by 7% N1 sleep, 52% N2 sleep, 27% N3 (delta) sleep and **14% REM sleep. The duration of REM sleep (29.5 minutes) may have been insufficient for a valid assessment REM-sleep related disorders.** The patient slept in the supine position during the entire sleep study. The arousal index was 36.4 arousals per hour of sleep.

### Respiratory Analysis

There was mild snoring during the polysomnographic assessment with 28 obstructive apneas, 5 option 1B hypopneas (associated with a ≥4% Desaturation) and 118 option 1A hypopneas scored (associated with a ≥3% Desaturation and/or Arousal). **The Obstructive Apnea Hypopnea Index (AHI) was 9.6 obstructive apneas, and option 1B hypopneas/hour of sleep** *(CMS criteria – abnormal considered >5 events/hour of sleep)* with a **Respiratory Disturbance Index (RDI) of**

MHH-0000001

<u>42.5 obstructive apneas and 1A+1B hypopneas /hour of sleep</u> *(AASM criteria)*, indicating **severe obstructive sleep apnea.**

The baseline awake $SpO_2$ was 95%, with an average $SpO_2$ of 94% during sleep, 94% during REM, and **an oxygen saturation nadir of 89%.** No sleep time was spent below an $SpO_2$ of 88% and the Oxygen Desaturation Index (ODI) was 15.4 desaturations/hour of sleep. The oxygen desaturation events were brief and not sustained. The baseline awake end tidal $CO_2$ was 43 torr *(abnormal >45 torr)*, averaged 41.5 torr during total sleep, 40.6 torr during REM sleep, and was above 50 torr for 0.5 minutes of total sleep time *(abnormal is considered >10 torr above baseline <u>and</u> greater than 50 torr for >10 minutes or >55 torr for >10 minutes regardless of baseline)*. This is not consistent with sleep-related alveolar hypoventilation.

Cardiac Analysis

The EKG demonstrated normal sinus rhythm with an average heart rate during sleep of 71 beats/minute.

EEG Characteristics

The EEG did not demonstrate any significant abnormalities.

Limb Movement/EMG Analysis

There were no significant periodic limb movements during sleep. The periodic limb movement index (PLMI) was <u>11.1 limb movements/hour of sleep</u> *(normal <15 limb movements/hour of sleep)*. **There was no loss of normal muscle atonia during REM sleep. In addition, there was no videographic evidence of dream enactment behavior or other abnormal movements.**

## DIAGNOSIS

**G47.33 Obstructive Sleep Apnea – severe**

**No REM sleep Behavior disorder**

## RECOMMENDATIONS

1. The patient meets the diagnostic criteria for severe obstructive sleep apnea. We recommend a follow up polysomnography for titration of continuous positive airway pressure (CPAP) as first line therapy for obstructive sleep apnea in adults and to assess an optimal pressure to treat his severe OSA.

2. **No REM sleep behavior was seen during this sleep evaluation however the diagnosis may have been missed (only 29.5 minutes of REM sleep recorded).** We recommend that the patient return for an in lab titration of CPAP for the optimal treatment of their severe OSA. **An RBD montage can be ordered during the titration study as more REM sleep may be experienced after the sleep apnea is treated.**

3. Patient demonstrated a low sleep efficiency (total sleep time of 3 hours) due to back pain and was unable to sleep for the entire sleep study. We would recommend optimization of pain and other sleep disruptors to improve the overall duration and quality of sleep.

4. The patient should be cautioned about factors that may potentially exacerbate snoring and sleep related breathing problems, such as CNS depressants (alcohol and sedatives-hypnotics) especially at bedtime.

**MHH-0000002**

5. We strongly recommend optimization of the sleep schedule/duration because sleep deprivation can be a major contributor to daytime sleepiness.

Interpreted by Komal Imtiaz MD, Lilit Sargsyan, M.D.

Attending Physician: _____, M.D., Date: 5/04/2021

Ruckshanda Majid, MD., FCCP, D.ABSM
Co-Medical Director Memorial Hermann Sleep Center
Associate Professor: Department of Pulmonary, Critical Care and Sleep Medicine
McGovern Medical School. University of Texas. Health Sciences Center at Houston

## PROCEDURE

A baseline polysomnogram was performed (CPT 95810). The nocturnal polysomnogram (NPSG) included the recording of electroencephalogram (EEG): F4-M1, F3-M2, C4-M1, C3-M2, O2-M1, O1-M2, electrooculogram (EOG), submental and anterior tibialis electromyogram (EMG), electrocardiogram (EKG), airflow by nasal pressure, and oral thermistor, continuous capnography with end tidal $CO_2$, abdominal and chest wall excursion using impedance plethysmography and oxygen saturation by pulse oximetry with the continued presence of a sleep technologist. Recordings were staged and scored manually according to the American Academy of Sleep Medicine (AASM) most recent published guidelines and interpretations made based on both the ICSD-3 2014 and CMS criteria.

## DEFINITIONS:

The study was scored according to 2018 (Version 2.5) American Academy of Sleep Medicine (AASM) adult criteria and interpreted according to the (2014) Third Edition of the International Classification of Sleep Disorders (ICSD-3).
**Obstructive apnea:** Drop in thermal sensor by greater than 90% for 10 seconds with continued respiratory effort.
**Central apnea:** Drop in thermal sensor by greater than 90% for 10 seconds with absent respiratory effort.
**Option 1B hypopneas** characterized by 30% decrease in airflow accompanied by 4% oxygen desaturation were scored according to current CMS and 2018 AASM (Version 2.5) and expressed in the <u>Apnea Hypopnea Index (AHI).</u>
**Option 1A hypopneas** characterized by 30% decrease in airflow accompanied by 3% oxygen desaturation or arousal were scored according to the 2018 AASM (Version 2.5) and expressed in the <u>Respiratory Disturbance Index (RDI).</u>
**Respiratory effort related arousals (RERAs):** Drop in nasal pressure or flattening of the flow lasting equal or more than 10 seconds and does not meet the criteria for a hypopnea (drop in flow by 30%) leading to an arousal. These events are also included in the **RDI**.

MHH-0000003

# Memorial Hermann Hospital Texas Medical Center
## Sleep Disorders Center
**6411 Fannin, Houston, TX 77030**
Phone: 713.704.2337 Fax: 713.704.5586

### POLYSOMNOGRAPHY REPORT

| | | | |
|---|---|---|---|
| **Patient:** | BROCKMAN, ROBERT | **Study Date:** | 4/29/2021 |
| **DOB:** | ▮1941 | **Height:** | 6' 1" in. |
| **MR#:** | 37903111-7500 | **Weight:** | 175.0 lbs. |
| **Gender:** | Male | **Age:** | 79 year |

**Referring Physician:** Ryan Darby MD
**Interpreting Physician:**  Komal Imtiaz MD, Lilit Sargsyan MD

## Sleep Summary:

| | | |
|---|---|---|
| Bedtime: | 08:46:47 PM | |
| Risetime: | 03:52:01 AM | |
| Total Recording Time: | 425.2 min. | |
| Total Sleep Time: | 206.0 min. | |
| Sleep Efficiency: | 48.4% | |
| **Sleep Onset Latency:** | **1.9 min.** | |
| **REM Onset Latency** | **21.0 min.** | |



**% Sleep Time**

REM 14.3%
NREM 1 6.8%
NREM 2 51.5%
NREM 3 27.4%

## Sleep Stage Summary:

| Stage | Latency (min) | Duration (min) | % TST |
|---|---|---|---|
| WASO | | 217.0 | - |
| Stage N1 | 0.0 | 14.0 | 6.8% |
| Stage N2 | 3.5 | 106.0 | 51.5% |
| Stage N3 | 51.0 | 56.5 | 27.4% |
| Total NREM | - | 176.5 | 85.7% |
| REM | 21.0 | 29.5 | 14.3% |



MHH-0000004

**Patient: BROCKMAN, ROBERT**          **MR#: 37903111-7500**          **Study Date: 4/29/2021**

### Respiratory Events Summary:

| | RERA | Obs. Apnea | Mixed Apnea | Central Apnea | Hypopnea 1A | 1B | AI (C+O+M) | Obs. AHI (O+M+H¹ᴮ) | RDI |
|---|---|---|---|---|---|---|---|---|---|
| **REM Events** | - | **6** | - | - | **15** | - | | | |
| Max (secs) | - | 43.2 | - | - | 202.3 | | | | |
| Mean (secs) | - | 37.7 | - | - | 44.1 | | | | |
| Index ( /hr) | - | 12.2 | - | - | 30.5 | - | 12.2 | 12.2 | 42.7 |
| **NREM Events** | - | **22** | - | - | **103** | **5** | | | |
| Max (secs) | - | 44.0 | - | - | 50.5 | | | | |
| Mean (secs) | - | 27.5 | - | - | 31.1 | | | | |
| Index ( /hr) | - | 7.5 | - | - | 35.0 | 1.7 | 7.5 | 9.2 | 42.5 |
| **Event Totals** | - | **28** | - | - | **118** | **5** | | | |
| **Index Totals** | - | **8.2** | - | - | **34.4** | **1.5** | **8.2** | **9.6** | **42.5** |

### Respiratory Events by Body Position:

| | (min.) | %TST | Apneas Obs. | Mixed | Central | Hypopneas 1A | 1B | Total Events | AI (C+O+M) | Obs. AHI (O+M+H¹ᴮ) | Arousal Index |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Back | 206.0 | 100.0% | 28 | - | - | 118 | 5 | 146 | 8.2 | 9.6 | 36.4 |
| Prone | - | - | - | - | - | - | - | - | - | - | - |
| Left | - | - | - | - | - | - | - | - | - | - | - |
| Right | - | - | - | - | - | - | - | - | - | - | - |
| Up | - | - | - | - | - | - | - | - | - | - | - |
| **Total** | **206.0** | | **28** | **-** | **-** | **118** | **5** | **128** | **8.2** | **9.6** | **36.4** |

### Oximetry Summary:



| SpO2 | Min | Mean | Max | | |
|---|---|---|---|---|---|
| Sleep | 88.9% | 94.2% | 98.0% | **Min. TST SaO2 < 90%:** | **4.6 min.** |
| REM | 91.4% | 94.4% | 97.3% | **%TST SaO₂ < 90%:** | **1.1%** |
| NREM | 88.9% | 94.2% | 98.0% | | |
| Wake | 50.6% | 94.5% | 99.4% | **Min. TST SaO2 < 88%:** | **3.0 min.** |
| All Stages | 50.6% | 94.3% | 99.4% | **%TST SaO₂ < 88%:** | **0.7%** |

| EKG | Min | Mean | Max |
|---|---|---|---|
| Sleep | 49.0 | 72.8 | 83.0 |
| REM | 53.0 | 73.9 | 80.0 |
| NREM | 49.0 | 72.7 | 83.0 |
| Wake | 32.0 | 65.4 | 87.0 |

MHH-0000005

Patient: BROCKMAN, ROBERT          MR#: 37903111-7500          Study Date: 4/29/2021

## Limb Movement Summary:

|  | # Events | Index |
|---|---|---|
| #PLMs – REM | 9 | 18.3 |
| #PLMS -- NREM | 29 | 9.9 |
| #PLMs | 38 | 11.1 |
| #PLMs with Arousal | 0.3 | 0.3 |

## Arousal Summary:

| | NREM | | REM | | Total | |
|---|---|---|---|---|---|---|
| **Source of Arousals** | Count | Index | Count | Index | Count | Index |
| Spontaneous | 7 | 2.4 | 4 | 8.1 | 11 | 3.2 |
| Apnea | 8 | 2.7 | 3 | 6.1 | 11 | 3.2 |
| Hypopneas | 85 | 28.9 | 12 | 24.4 | 97 | 28.3 |
| RERAs | - | - | - | - | - | - |
| Snoring | - | - | - | - | - | - |
| Desaturations | 45 | 15.3 | 8 | 16.3 | 53 | 15.4 |
| Periodic Limb Movement | 1 | 0.3 | - | - | 1 | 0.3 |
| Total Arousals | 101 | 34.3 | 19 | 38.6 | 120 | 35.0 |

## END TIDAL CO$_2$

| | Wake | | NREM | | REM | | TST | | TIB | |
|---|---|---|---|---|---|---|---|---|---|---|
| Max EtCO2 | 53.6 | | 52.6 | | 52.0 | | 52.6 | | 53.6 | |
| Mean EtCO2 | 43.0 | | 41.7 | | 40.6 | | 41.5 | | 42.3 | |
| | min | % | min | % | min | % | min | % | min | % |
| > 60 mmHg: | 0.0 | 0.0% | 0.0 | 0.0% | 0.0 | 0.0% | 0.0 | 0.0% | 0.0 | 0.0% |
| 55 - 60 mmHg: | 0.0 | 0.0% | 0.0 | 0.0% | 0.0 | 0.0% | 0.0 | 0.0% | 0.0 | 0.0% |
| 50 - 55 mmHg: | 2.1 | 0.9% | 0.5 | 0.3% | 0.0 | 0.1% | 0.5 | 0.2% | 2.6 | 0.6% |
| 45 - 50 mmHg: | 38.7 | 17.6% | 39.9 | 22.6% | 1.2 | 4.0% | 41.1 | 19.9% | 79.8 | 18.8% |
| 40 - 45 mmHg: | 137.3 | 62.5% | 81.1 | 45.9% | 17.4 | 58.9% | 98.5 | 47.8% | 235.7 | 55.4% |
| 35 - 40 mmHg: | 24.0 | 10.9% | 33.1 | 18.8% | 7.8 | 26.6% | 41.0 | 19.9% | 65.0 | 15.3% |
| 0 - 35 mmHg: | 7.5 | 3.4% | 15.2 | 8.6% | 2.2 | 7.6% | 17.5 | 8.5% | 24.9 | 5.9% |

MHH-0000006

**Patient: BROCKMAN, ROBERT** **MR#: 37903111-7500** **Study Date: 4/29/2021**

## Hypnograms:

MHH-0000007





# MEMORIAL HERMANN



ACCREDITED
Facility Member™

**Memorial Hermann Hospital Texas Medical Center**
**Sleep Disorders Center**
6411 Fannin, Houston Texas 77030
Ph: 713.704.2337 Fax: 713.704.5586

### TITRATION REPORT

| | | |
|---|---|---|
| **Patient name:** BROCKMAN, ROBERT | **MR Number:** 37903111-7501 | **Study Date:** 8/12-13/2021 |
| **Date of birth:** ▮▮1941 | **Age (years):** 80 | **Gender:** Male |
| **Height:** 6' | **Weight:** 175 lbs | **BMI:** 24 kg/m² |
| **Referring Physician:** Ryan Darby, MD | | |

## HISTORY

ROBERT BROCKMAN is an 80-year-old man with atrial fibrillation, and dementia (on treatment for a Parkinsonian syndrome) who was previously evaluated at the Memorial Hermann Hospital Sleep Disorders Center for obstructive sleep apnea and REM-behavior disorder (RBD). He underwent a nocturnal polysomnography (NPSG) with RBD montage on 4/29/2021 and was diagnosed with **severe obstructive sleep apnea with an Obstructive Apnea Hypopnea Index (AHI) of 9.6 apneas and hypopneas/hour of sleep, a total Respiratory Disturbance Index (tRDI) of 42.5 obstructive respiratory events/hour of sleep, and an oxygen saturation nadir of 89%.** No REM sleep without atonia was seen although he had only 29.5 minutes of REM sleep which may have been insufficient for a valid assessment of RBD. He now returns for titration of continuous positive airway pressure (CPAP) with RBD montage. The Epworth sleepiness score (ESS) at the time of the initial PSG was 14 (a score greater than 10 is consistent with abnormal daytime sleepiness).

## RESULTS

GOVERNMENT
EXHIBIT
4:21-CR-009-GCH
No. 42

### Sleep Characteristics

The lights were turned off at 10:30:08 PM. The total recording time (TRT) was 412.7 minutes and the total sleep time (TST) was 259 minutes with a low sleep efficiency of 62.8%. There was a normal sleep latency of 16.9 minutes with a normal REM latency of 157.9 minutes. Sleep architecture was characterized by 15% N1 sleep, 63% N2 sleep, 4% N3 (delta) sleep and 18% REM sleep. The duration of REM sleep (47 minutes) was adequate for a valid titration of CPAP. The patient slept in the supine position for the entirety of the study. The arousal index was 36.8 arousals per hour of sleep.

### Respiratory Analysis

The patient was placed on CPAP and the pressure was gradually increased to treat the obstructive apneas, hypopneas and snoring. The patient used a **medium ResMed AirTouch F20 full face mask** during the titration. The maximum CPAP pressure used was 15 cm H₂O but the patient did not have any sleep on that pressure. Sleep efficiency was poor overall. The obstructive respiratory events were most controlled at CPAP 12 cmH2O. At this pressure, the residual AHI was 11.7 and supine REM sleep was achieved although this is not a therapeutic pressure. The patient tolerated the titration. The minimal SpO2 demonstrated on the optimal PAP pressure used was 92.8%.

| Patient Name: BROCKMAN, ROBERT | Study Date: 8/12/2021 | Page 1 of 3 |
|---|---|---|

Cardiac Analysis

The EKG demonstrated normal sinus rhythm with an average heart rate during sleep of 65.8 beats/minute. No arrhythmias were noted.

EEG Characteristics

The EEG did not demonstrate any significant abnormalities. The posterior dominant rhythm was 8.7 Hz.

Limb Movement/EMG Analysis

There were no significant periodic limb movements during sleep. The periodic limb movement index (PLMI) was 2.1 limb movements/hour of sleep *(normal <15 limb movements/hour of sleep)*. **There was no loss of normal muscle atonia during REM sleep. In addition, there was no videographic evidence of dream enactment behavior or other abnormal movements.**

## DIAGNOSIS

G47.33 Severe Obstructive Sleep Apnea improved with PAP therapy

## RECOMMENDATIONS

1. Treatment with auto-titrating positive airway pressure (APAP) at 12-20 cm H2O during sleep is recommended. The patient used a medium ResMed AirTouch F20 full face mask while in the laboratory. The patient will benefit from close follow up with evaluation of data download with PAP use. This will help ensure adequate treatment and resolution of underlying OSA. This will also help monitor for central events and a need for a repeat titration study.

2. No REM sleep without atonia was observed during this study.

3. The patient should be cautioned about factors that may potentially exacerbate snoring and sleep related breathing problems, such as CNS depressants (alcohol and sedatives-hypnotics) especially at bedtime.

4. The patient should also be cautioned about driving and operating dangerous machinery until the sleepiness is eliminated if daytime sleepiness is endorsed.

5. We strongly recommend optimization of the sleep schedule/duration because sleep deprivation can be a major contributor to daytime sleepiness.

6. Follow up with referring physician to review study results and treatment options.

7. The patient may be seen for a post-evaluation subspecialty consultation to discuss the above treatment modalities and follow subsequent usage data at the University of Texas – Houston Sleep Clinic (832) 325-7222, University of Texas – Bellaire Sleep Clinic at (713) 572-8122, or the University of Texas – Sienna Village Clinic (713) 486-1200.

MHH-0000009

Interpreted by Sarah Beshay, MD and Reeba Mathew, MD, FCCP

Attending Physician: _____ M.D., Date 08/16/21

Reeba Mathew MD, FCCP
Co-Medical Director, Memorial Hermann TMC Sleep Center
Associate Professor, Division of Pulmonary, Critical Care and Sleep Medicine
McGovern Medical School at University of Texas Health Sciences Center at Houston

## PROCEDURE

A polysomnogram with constant airway pressure (PAP) titration was performed (CPT 95810). The nocturnal polysomnogram (NPSG) included the recording of electroencephalogram (EEG): F4-M1, F3-M2, C4-M1, C3-M2, O2-M1, O1-M2, electrooculogram (EOG), submental and anterior tibialis electromyogram (EMG), electrocardiogram (EKG), airflow by pneumotachometry, abdominal and chest wall excursion using impedance plethysmography and oxygen saturation by pulse oximetry with the continued presence of a sleep technologist. Recordings were staged and scored manually according to the American Academy of Sleep Medicine most recent published guidelines and interpretations made based on both the ICSD-3 2014 and CMS criteria *(refer to definitions at the end of the report).

## *DEFINITIONS:

The study was scored according to 2018 (Version 2.5) American Academy of Sleep Medicine (AASM) adult criteria and interpreted according to the (2014) Third Edition of the International Classification of Sleep Disorders (ICSD-3).

**Obstructive apnea:** Drop in thermal sensor by greater than 90% for 10 seconds with continued respiratory effort.

**Central apnea:** Drop in thermal sensor by greater than 90% for 10 seconds with absent respiratory effort.

**Option 1B hypopnea** characterized by 30% decrease in airflow accompanied by 4% oxygen desaturation were scored according to current CMS and 2018 AASM (Version 2.5) and expressed in the **Apnea Hypopnea Index (AHI).**

**Option 1A hypopnea** characterized by 30% decrease in airflow accompanied by 3% oxygen desaturation or arousal were scored according to the 2018 AASM (Version 2.5) and expressed in the **Respiratory Disturbance Index (RDI).**

**Respiratory effort related arousals (RERAs):** Drop in nasal pressure or flattening of the flow lasting equal or more than 10 seconds and does not meet the criteria for a hypopnea (drop in flow by 30%) leading to an arousal. These events are also included in the **RDI**.

## Memorial Hermann Hospital Texas Medical Center
## Sleep Disorders Center
### 6411 Fannin, Houston, TX 77030
#### Phone: 713.704.2337 Fax: 713.704.5586

### TITRATION REPORT

| | | | | |
|---|---|---|---|---|
| **Patient:** | BROCKMAN, ROBERT | **Study Date:** | 8/12-13/2021 |
| **DOB:** | ▮▮▮941 | **Height:** | 6' in. |
| **MR#:** | 37903111-7501 | **Weight:** | 175.0 lbs. |
| **Gender:** | Male | **Age:** | 80 years |

**Referring Physician:** Ryan Darby MD
**Interpreting Physician:** S Beshay MD, R Mathew MD

### Sleep Summary:

| | |
|---|---|
| Bedtime: | 10:30:08 PM |
| Risetime: | 05:22:52 AM |
| Total Recording Time: | 412.7 min. |
| Total Sleep Time: | 258.5 min. |
| Sleep Efficiency: | 62.6% |
| **Sleep Onset Latency:** | **16.9 min.** |
| **REM Onset Latency** | **141.0 min.** |

**% Sleep Time**



REM 18.2%
NREM 1 14.9%
NREM 3 3.7%
NREM 2 63.2%

MHH-0000011

Patient: BROCKMAN, ROBERT

MRH#: 37903111-7500

Study Date: 8/12/2021

## Sleep Stage Summary:

| Stage | Latency (min) | Duration (min) | % TST |
|-------|---------------|----------------|-------|
| WASO | - | 137.0 | - |
| Stage N1 | 16.9 | 38.5 | 14.9% |
| Stage N2 | 9.0 | 163.5 | 63.2% |
| Stage N3 | 129.5 | 9.5 | 3.7% |
| Total NREM | - | 211.5 | 81.8% |
| REM | 141.0 | 47.0 | 18.2% |



Page 2 of 7

MHH-0000012

MHH-0000013

Patient: BROCKMAN, ROBERT     MR#: 37903111-7500     Study Date: 8/12/2021

## Respiratory Events Summary:

| | RERA | Obs. Apnea | Mixed Apnea | Central Apnea | Hypopnea 1A | Hypopnea 1B | AI (C+O+M) | Obs. AHI ($O+M+H^{1B}$) | RDI |
|---|---|---|---|---|---|---|---|---|---|
| **REM Events** | - | - | - | 6 | 18 | 4 | | | |
| Max (secs) | | - | - | 14.7 | 65.2 | | | | |
| Mean (secs) | | - | - | 13.4 | 26.9 | | | | |
| Index (/hr) | - | - | - | 7.7 | 23.0 | 5.1 | 7.7 | 5.1 | 23.0 |
| **NREM Events** | - | 21 | 1 | 2 | 92 | 10 | | | |
| Max (secs) | | 40.2 | 46.4 | 16.5 | 81.4 | | | | |
| Mean (secs) | | 26.2 | 46.4 | 14.9 | 33.6 | | | | |
| Index (/hr) | - | 6.0 | 0.3 | 0.6 | 26.1 | 2.8 | 6.8 | 9.1 | 32.3 |
| **Event Totals** | - | 22 | 1 | 8 | 111 | 14 | | | |
| **Index Totals** | - | 5.1 | 0.2 | 1.9 | 25.8 | 3.2 | 7.2 | 8.6 | 31.1 |

## Respiratory Events by Body Position:

| | (min.) | %TST | Apneas Obs. | Mixed | Central | Hypopneas 1A | 1B | Total Events | AI (C+O+M) | Obs. AHI ($O+M+H^{1B}$) | Arousal Index |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Back | 258.5 | 100.0% | 22 | 1 | 8 | 111 | 14 | 142 | 7.2 | 8.6 | 36.9 |
| Prone | - | - | - | - | - | - | - | - | - | - | - |
| Left | - | - | - | - | - | - | - | - | - | - | - |
| Right | - | - | - | - | - | - | - | - | - | - | - |
| Up | - | - | - | - | - | - | - | - | - | - | - |
| **Total** | **258.5** | | **22** | **1** | **8** | **111** | **14** | **91** | **7.2** | **8.6** | **36.9** |

## Oximetry Summary:




OSat   %

100 — 90 — 80 — 70 — 60 — 50 —

Time of Day (h:m:s): 22:30:19   23:11:49   23:53:19   00:34:49   01:16:19   01:57:49   02:39:19   03:20:49   04:02:19   04:43:49

Case 4:21-cr-00009   Document 236-6   Filed on 12/07/21 in TXSD   Page 46 of 123

MHH-0000014

**Patient: BROCKMAN, ROBERT**          **MR#: 37903111-7500**          **Study Date: 8/12/2021**

Time of Day (h:m:s)  22:30:19  23:11:49  23:53:19  00:34:49  01:16:19  01:57:49  02:39:19  03:20:49  04:02:19  04:43:49

| SpO2 | Min | Mean | Max |
|------|-----|------|-----|
| Sleep | 90.1% | 95.1% | 98.0% |
| REM | 90.1% | 94.7% | 97.8% |
| NREM | 90.2% | 95.1% | 98.0% |
| Wake | 87.5% | 95.3% | 98.7% |
| All Stages | 87.5% | 95.1% | 98.7% |

| | |
|---|---|
| Min. TST SaO2 < 90%: | 0.3 min. |
| %TST SaO$_2$ < 90%: | 0.1% |
| Min. TST SaO2 < 88%: | 0.1 min. |
| %TST SaO$_2$ < 88%: | 0.0% |

| EKG | Min | Mean | Max |
|-----|-----|------|-----|
| Sleep | 52.0 | 63.0 | 84.0 |
| REM | 52.0 | 61.3 | 79.0 |
| NREM | 52.0 | 63.4 | 84.0 |
| Wake | 49.0 | 65.2 | 84.0 |

MHH-0000015

Patient: BROCKMAN, ROBERT                MR#: 3790311-7500                Study Date: 8/12/2021

## Limb Movement Summary:

| | # Events | Index |
|---|---|---|
| #PLMs – REM | - | - |
| #PLMs – NREM | 9 | 2.6 |
| #PLMs | 9 | 2.1 |
| #PLMs with Arousal | - | - |

## Arousal Summary:

| Source of Arousals | NREM | | REM | | Total | |
|---|---|---|---|---|---|---|
| | Count | Index | Count | Index | Count | Index |
| Spontaneous | 61 | 17.3 | 21 | 26.8 | 82 | 19.0 |
| Apnea | 12 | 3.4 | 1 | 1.3 | 13 | 3.0 |
| Hypopneas | 34 | 9.6 | 12 | 15.3 | 46 | 10.7 |
| RERAs | - | - | - | - | - | - |
| Snoring | - | - | - | - | - | - |
| Desaturations | 96 | 27.2 | 17 | 21.7 | 113 | 26.2 |
| Periodic Limb Movement | - | - | - | - | - | - |
| Total Arousals | 116 | 32.9 | 37 | 47.2 | 153 | 35.5 |

MHH-0000017

Patient: BROCKMAN, ROBERT

MR#: 37903111-7500

Study Date: 8/12/2021

## Titration Summary:

| PAP Device | PAP Level | O2 Level | Time (min) | TST (min) | REM (min) | REM Supine | NREM (min) | Sleep Eff% | OA | CA | MA | Hypop. 1A | AHI | CAHI | RERA | RDI | Ar. Index | Max EtCO2 | Max TcCO2 | Min O2 Sat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CPAP | 5 | - | 45.0 | 18.5 | 0.0 | 0.0 | 18.5 | 41.1% | 3 | - | - | 12 | 48.6 | - | - | 48.6 | 48.6 | - | - | 87.5 |
| CPAP | 6 | - | 12.0 | 11.5 | 0.0 | 0.0 | 11.5 | 95.8% | 7 | - | 1 | 3 | 57.4 | - | - | 57.4 | 52.2 | - | - | 89.9 |
| CPAP | 7 | - | 16.0 | 15.0 | 0.0 | 0.0 | 15.0 | 93.8% | - | - | - | 13 | 52.0 | - | - | 52.0 | 4.0 | - | - | 91.3 |
| CPAP | 8 | - | 31.5 | 20.5 | 0.0 | 0.0 | 20.5 | 65.1% | 2 | 1 | - | 12 | 43.9 | 2.9 | - | 43.9 | 32.2 | - | - | 90.5 |
| CPAP | 9 | - | 10.5 | 8.0 | 0.0 | 0.0 | 8.0 | 76.2% | 3 | - | - | 5 | 60.0 | - | - | 60.0 | 45.0 | - | - | 92.1 |
| CPAP | 10 | - | 20.5 | 15.5 | 0.0 | 0.0 | 15.5 | 75.6% | 4 | - | - | 8 | 46.5 | - | - | 46.5 | 27.1 | - | - | 93.2 |
| CPAP | 11 | - | 98.0 | 76.5 | 3.0 | 3.0 | 73.5 | 78.1% | 1 | - | - | 34 | 27.5 | - | - | 27.5 | 33.7 | - | - | 91.9 |
| CPAP | 12 | - | 21.0 | 20.5 | 16.5 | 16.5 | 4.0 | 97.6% | - | - | - | 4 | 11.7 | - | - | 11.7 | 64.4 | - | - | 92.8 |
| CPAP | 13 | - | 43.5 | 40.0 | 13.5 | 13.5 | 26.5 | 92.0% | - | - | - | 12 | 18.0 | - | - | 18.0 | 30.0 | - | - | 90.5 |
| CPAP | 14 | - | 92.0 | 32.5 | 14.0 | 14.0 | 18.5 | 35.3% | 1 | 7 | - | 7 | 27.7 | 12.9 | - | 27.7 | 33.2 | - | - | 90.1 |
| CPAP | 15 | - | 23.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0% | - | - | - | - | - | - | - | - | - | - | - | 92.9 |

Note: BiLevel=IP/EP/Rate; ASV=EEP/Min-PS/Max-PS; AVAPS=EPAP/IPAPmin/IPAPmax/TidalVolume/Rate/I-Time;

MHH-0000018

**Patient: BROCKMAN, ROBERT**          **MR#: 37903111-7500**          **Study Date: 8/12/2021**



MHH-0000019

# PET BRAIN METABOLIC EVAL

**Brockman, Robert T**
MRN: 003768603, Legal Sex: Male,　1941 (79 yrs), Outpatient
Accession #: IM32223937

## Final Result

PROCEDURE:   PET BRAIN METABOLIC EVAL

CLINICAL HISTORY:  G31.83 Dementia with Lewy
bodies, G30.0 Alzheimer's disease with early
onset, EVAL FOR LEWY BODY DEMENTIA  ALZHEIMER
DISEASE

COMPARISON:
No prior brain PET or SPECT scans are available.

TECHNIQUE:
The patient was injected with 10 mCi of 18F-FDG
intravenously, followed 1 hour later by PET-CT
scanning of the brain. CT scanning was
nondiagnostic in quality and was used for
attenuation correction and to aid in
localization of any abnormal findings on
PET. Blood glucose = 111.

FINDINGS:
Mildly reduced uptake in the right parietal
lobe. Mildly reduced uptake in the
posterolateral right temporal lobe is fairly
focal; this may correspond to a prominent sulcus
on the MRI of 1/24/2012. Thus, the right
parietal hypometabolism is the only
definite metabolic abnormality. Uptake elsewhere
in the temporal lobes and in the rest of the
cortex bilaterally is normal. Normal metabolism
bilaterally in the basal ganglia, thalami, and
cerebellum.

IMPRESSION:
Findings are very mild, but suggestive of early
neurodegenerative disease, either Alzheimer's
disease or dementia with Lewy bodies
(Parkinson's disease with dementia). Findings
are unlikely to represent frontotemporal
dementia.

HMH-2UA70310KZ

## Appointment Info

**Exam Date**
📅 3/12/2021

**Department**
**HOUSTON METHODIST HOSPITAL OPC
NUC MED**
📞 713-441-2282
📍 6445 Main Street
　HOUSTON TX 77030-1502

## Reason for Exam
**EVAL FOR LEWY BODY DEMENTIA,
ALZHEIMER DISEASE**

## Diagnoses
**Lewy body Parkinson disease (HCC)
Alzheimer disease type 3 (HCC)
Dementia without behavioral
disturbance, unspecified dementia type
(HCC)**

## Providers
PCP
**James L. Pool, MD**
📞 713-798-0180
📍 6620 Main St.
　Houston TX 77030

Ordering Provider
**R. Ryan Darby, MD**
📞 615-875-7160
📍 1509 CLAYTON AVE
　NASHVILLE TN 37212

Attending Provider
**Provider Not In System**
📞 No number on file
📍 No address on file

**GOVERNMENT
EXHIBIT**

**4:21-CR-009-GCH**
**No. 43**

Signed by Fisher, Ronald Evan, MD on 3/12/2021  2:49 PM



# FAX TRANSMITTAL

**** CONFIDENTIALITY NOTICE****
This facsimile transmission, including attachments to this cover page, is the property of Houston Methodist and/or its relevant affiliates and may contain confidential and privileged material for the sole use of the intended recipient (s). Any review, use, distribution, or disclosure by others is strictly prohibited. If you are not the intended recipient (or are not authorized to receive for the recipient), please contact the sender or reply to Houston Methodist at privacy@houstonmethodist.org and return all copies of the facsimile to Houston Methodist.  The sender or privacy@houstonmethodist.org can provide you with mailing instructions.  Otherwise, this facsimile may be destroyed using a cross-shredder.

| **To:** | Michael Welner, MD | **From:** | Hm Interface, Radiology Results Incoming |
|---|---|---|---|
| Fax: | 212-535-3259 | Fax: | |
| | | Phone: | 713-441-2282 |
| | | Dept: | HOUSTON METHODIST HOSPITAL OPC NUC MED |

**NOTES:**

**Date and time of transmission:  8/24/2021 2:46:18 PM**
**Number of pages including this cover sheet:  2**

Ex. 43 Page 3 of 4

## PET BRAIN METABOLIC EVAL

*HOUSTON*
*Methodist*
*LEADING MEDICINE*

### Brockman, Robert T
MRN: 003768603, Legal Sex: Male, █████1941 (80 yrs), Outpatient
Accession #: IM33191029

---

# Final Result

PROCEDURE:  PET BRAIN METABOLIC EVAL

CLINICAL HISTORY:  G30.9 Alzheimer's disease
 unspecified, F02.80 Dementia in other diseases
classified elsewhere without behavioral disturbance,
alzheimers

COMPARISON:
Amyvid brain PET 7/28/2021.

TECHNIQUE:
The patient was injected with 10 mCi of 18F-FDG
intravenously, followed 1 hour later by PET-CT
scanning of the brain. CT scanning was nondiagnostic
in quality and was used for attenuation correction
and to aid in localization of any abnormal findings
on
PET. Blood glucose = 117.

FINDINGS:
Mildly reduced uptake in the posterior temporal lobes
and bilaterally in the parietal lobes. Slightly
reduced uptake in the frontal lobes. Occipital uptake
is reasonably good. There is preserved, prominent
uptake in the primary sensorimotor cortex
bilaterally, frequently a secondary sign of adjacent
neurodegenerative disease. Normal metabolism in the
basal ganglia, thalami, and cerebellum.

IMPRESSION:
Findings are mild, but very suggestive of
neurodegenerative disease, particularly Alzheimer's
disease. Although statistically less likely, dementia
with Lewy bodies or Parkinson's disease with dementia
can have a similar scan pattern. The markedly
abnormal uptake on the prior Amyvid PET scan also
somewhat favors Alzheimer's disease over DLB/PDD.

HMH-2UA70310KZ
       Signed by Fisher, Ronald Evan, MD on 8/24/2021 2:43 PM

---

## Appointment Info

Exam Date
📅 8/24/2021

Department
HOUSTON METHODIST HOSPITAL OPC
NUC MED
📞 713-441-2282
📍 6445 Main Street
   HOUSTON TX 77030-1502

## Reason for Exam

alzheimers

## Diagnosis

Alzheimer's dementia (HCC)

## Providers

PCP
James L. Pool, MD
📞 713-798-0180
📍 6620 Main St.
   Houston TX 77030

Ordering Provider
Michael Welner, MD
📞 212-535-9286
📍 224 WEST 30TH STREET SUITE 806
   NEW YORK NY 10001

Attending Provider
Michael Welner, MD
📞 212-535-9286
📍 224 WEST 30TH STREET SUITE 806
   NEW YORK NY 10001

---

Ex. 43 Page 4 of 4

**Message**

**From**:      Bob Brockman [bob_brockman@reyrey.com]
**Sent**:      6/27/2020 3:42:18 PM
**To**:      'Bart Chandler' [flyrod1llc@hotmail.com]

Bart

I finally made it to Colorado.

I am trying to figure out how to gain access to the Ranch – keys, codes, wall boxes, etc..

I am hoping to put a few rounds thru my SCAR today or tomorrow.

Could you please point me in the right direction.

Bob

GOVERNMENT
EXHIBIT

4:21-CR-009-GCH
No. 44

---

Message
_____

**From**:        Bob Brockman [bob_brockman@reyrey.com]
**Sent**:        7/31/2020 4:07:03 PM
**To**:          Don Passmore (Passmore@covad.net) [Passmore@covad.net]

Don,

I am inquiring about the losses in the various Nehemiah entities being able to be used against my W-2 income (approximately $60 M).  Do you lack any further documentation needed on this issue?

To what extent would this save on my 43% personal income tax?

I suspect that you have been plenty busy – but I would appreciate what your guess is.

I know that you have been working with Laura.  Please let me know what remaining  issues that you lack to complete RTB/DKB and RTB II returns.

Bob

PSS:  I am in Colorado until around Labor Day.  I get a FEDX package every day from Houston.  My assistant (Donna Ball) is responsible.



GOVERNMENT
EXHIBIT

4:21-CR-009-GCH

No. 45

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0229391

---

Message

---

**From:** Bob Brockman [bob_brockman@reyrey.com]
**Sent:** 8/4/2020 12:42:33 AM
**To:** 'Cynthia Slade' [cfslade@mac.com]
**Subject:** RE:

Cyndi

I found it in one of the many pockets in my wallet.

Sorry for raising the alarm.

Bob

---

**From:** Bob Brockman [mailto:bob_brockman@reyrey.com]
**Sent:** Saturday, August 01, 2020 12:03 PM
**To:** 'Cynthia Slade'
**Subject:** RE:

Cyndi

The Concealed Carry license is exactly the same dimensions as a drivers license.

It is also a plastic card with my picture on it.

Bob

---

**From:** Cynthia Slade [mailto:cfslade@mac.com]
**Sent:** Friday, July 31, 2020 6:53 PM
**To:** Bob Brockman
**Subject:** Re:

Hi, Bob:

I remember looking at your license in Taylor River Flyshop and getting the info from it, but I don't remember completely the Concealed Carry permit with it.  I checked my bag from that day and haven't seen it.

I also called Taylor Creek Fly Shop today and spoke with Justin.  I asked him if anyone had turned in a Concealed Carry permit and he said he hasn't seen one.

I'm back in Houston today, I can double check in the car when I return to Aspen on August 12th or Maria is welcome to go by the house and check the car if that helps, but I am sure I haven't seen any paper in the car.

I'm so sorry that I'm not much help.  Please let me know what I can do to help.

Sincerely,

Cyndi



GOVERNMENT EXHIBIT

4:21-CR-009-GCH

No. 46

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0229417

On Jul 31, 2020, at 4:25 PM, Bob Brockman <bob_brockman@reyrey.com> wrote:

Cyndi

I am missing my Concealed Carry permit.

The last that I saw it was when you were needing my documentation and I gave you my Drivers license and Concealed Carry permit .  There was some amount of confusion about then as things were being passed back and forth.

Please check to see if you have it.

Bob

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0229418

Message
_____

**From:**        Bob Brockman [bob_brockman@reyrey.com]
**Sent:**        10/10/2020 10:21:31 AM
**To:**          'Don Passmore' [passmore@houston-cpa.com]; 'Robert Brockman (robert@firehead.org)' [robert@firehead.org]
**Subject:**     RE: 2019 Gift Tax Return due 10/15/20

Don,

It seems to me that the view should be....

Brockman and Son has paid regular income tax on all earnings every year.  Don — you have been filing those returns — as did Al Thorpe before you.

Brockman and Son funds are completely owned by RTB II already — so there should be no gift tax involved with RTB (senior)

Cc RTB II

_____

**From:** Don Passmore [mailto:passmore@houston-cpa.com]
**Sent:** Friday, October 09, 2020 1:57 PM
**To:** 'Bob Brockman'
**Cc:** Dorothy Brockman
**Subject:** 2019 Gift Tax Return due 10/15/20

Bob
Please give me a call so we can finalize the Gift Tax Returns.
Thanks
Don


Don L. Passmore, CPA
Passmore & Associates, LLC
713-935-0300
713-935-0305 Fax

**CONFIDENTIALITY STATEMENT:**
This electronic message transmission contains information from Passmore & Associates, LLC and is confidential or privileged.  The information is intended only for the use of the person(s) named above.  If you are not the intended recipient, any use, disclosure, copying, distribution or any other action based on the contents of this email and any attachments is strictly prohibited.  If you received this electronic transmission in error, this message and any attachments should be deleted immediately and please notify us by telephone at 713-935-0300.

_____

**From:** Don Passmore
**Sent:** Tuesday, September 29, 2020 3:51 PM
**To:** 'Bob Brockman'
**Cc:** 'Dorothy Brockman'
**Subject:** 2019 Gift Tax Return

Bob & Dorothy



GOVERNMENT
EXHIBIT

4:21-CR-009-GCH
No. 47

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0229970

We are completing your 2019 U S Gift (and GST) Tax Return (Form 709) for both of you due 10/15/20 and need your assistance with the following items:

1)      Confirm 2019 cash gifts; Attached is a schedule of gifts based on information provided (see JT Gifts to RTBII.PDF Laura generated report attached and email from Robert II below). Note that Laura's report reflects a 12/24/18 date for the 135,450 that Robert reflects received 1/17/19.  The schedule for now includes it as a 2019 gift.

2)      Determine value of fair rental value for the personal use of █████████ and the amounts of 2019 gift from each of you to Robert II (and possibly Elizabeth); for now it is listed at 24,000.  Note that information provided indicates that  Dorothy bought out Bob's ½ interest on 10/15/19.  This could give rise to an unequal gift unless the year's use was considered gifted prior to the sale.

Please call if you have any questions.

Thanks
Don

Don L. Passmore, CPA
Passmore & Associates, LLC
713-935-0300
713-935-0305 Fax

**CONFIDENTIALITY STATEMENT:**
This electronic message transmission contains information from Passmore & Associates, LLC and is confidential or privileged.  The information is intended only for the use of the person(s) named above.  If you are not the intended recipient, any use, disclosure, copying, distribution or any other action based on the contents of this email and any attachments is strictly prohibited.  If you received this electronic transmission in error, this message and any attachments should be deleted immediately and please notify us by telephone at 713-935-0300.

**From:** Robert Theron Brockman II [mailto:robert@firehead.org]
**Sent:** Thursday, September 10, 2020 12:26 PM
**To:** Don Passmore
**Subject:** Tax Information for my 2019 return

Here are the major deposits into my checking account and where they came from:

01/17/19 $ 135,455.70 - gift from Dad, should probably count against his lifetime gift allowance
04/10/19 $ 11,380.70 - sales of gold ETFs, from Morgan Stanley account, likely Brockman and Sons
05/31/19 $ 909,847.57 - partial unwinding of Brockman and Sons, should be no tax due on this
08/14/19 $ 1,322,740.00 - selling of interest in Falcata management company
10/21/19 $ 200,000.00 - income from contract consulting work for parents

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0229971

---

Message

---

**From:**      Bob Brockman [bob_brockman@reyrey.com]
**Sent:**       8/10/2020 12:20:58 AM
**To:**          'Stephen Slade' [sgs@visiontexas.com]
**Subject:**    RE: Good Day in Houston!

Steve,

I agree – George and I were out today with Bart at the Basalt city range.

Bob

---

**From:** Stephen Slade [mailto:sgs@visiontexas.com]
**Sent:** Saturday, August 08, 2020 8:06 PM
**To:** Bob Brockman
**Subject:** Re: Good Day in Houston!

We had a great time!

Robert is extremely knowledgeable about all the guns, very tuned in to safety as well.

Cyndi is a pretty good shot!

Let's go shoot when we come up to Aspen!

Steve

On Aug 8, 2020, at 7:10 PM, Bob Brockman <bob_brockman@reyrey.com> wrote:

Steve,

Looks like lots of good groups.

This means that the shooting is already running at high quality – it just needs sight adjustments.

Bob

---

**From:** Stephen Slade [mailto:sgs@visiontexas.com]
**Sent:** Friday, August 07, 2020 8:48 PM
**To:** Bob Brockman; Dorothy Brockman
**Subject:** Good Day in Houston!

Dear Bob and Dorothy,

I wanted to share a couple of pictures from our shooting day with Robert, we had a "blast".

Cyndi has a new 57 and now that is her favorite pistol.

That target looks dead to me!



GOVERNMENT
EXHIBIT

4:21-CR-009-GCH
No. 48

Much love,

Stephen<image001.jpg><image002.jpg>

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0229465

**Message**

---

**From:**   Bob Brockman [bob_brockman@reyrey.com]
**Sent:**   8/27/2018 7:44:03 PM
**To:**   'Sheehan, Chris' [Chris_Sheehan@reyrey.com]; 'Robert Theron Brockman II' [robert@firehead.org]; 'Dorothy Brockman' [dorothy_brockman@reyrey.com]; 'Donna Ball' [Donna_Ball@reyrey.com]
**Subject:**   FW: Alaska Itinerary / N529DB / Sept. 3-10, 2018
**Attachments:**   alaska itinerary sept 3-10, 2018.pdf

---

**From:** Jeanne Zeto [mailto:jzeto@solairus.aero]
**Sent:** Monday, August 27, 2018 1:06 PM
**To:** 'Bob_Brockman@reyrey.com'; Rob Nalley (rob_nalley@reyrey.com); 'Ball, Donna'
**Cc:** al_deaton@reyrey.com; Tommy_Barras@reyrey.com; carlan_cooper@reyrey.com; Edward Cappel; gerard_kirwan@reyrey.com; cmccord@mccordprod.com; stuart.yudofsky@gmail.com; doggettj@sbcglobal.net; masseythermolube@aol.com; tharper3@reagan.com
**Subject:** Alaska Itinerary / N529DB / Sept. 3-10, 2018

Good Afternoon Everyone!

It is that time of year again for the Annual Alaskan/ Labor Day Fishing trip

Please find your travel itinerary attached for departure Monday,  September 3rd  at 0930 am local
Returning Monday, September 10th

Please do not hesitate to email me at jzeto@solairus.aero or call me on my cell phone at 281-507-9241 if you have any questions or concerns

Have a Wonderful Trip!

Thank you


Best Regards,

Jeanne Zeto
Director, Business Development

Solairus Aviation
D 707.769.6029
C 281.507.9241
T 800.359.7861 - 24/7
jzeto@solairus.aero
www.solairus.aero

GOVERNMENT
EXHIBIT

4:21-CR-009-GCH
No. 49

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0219578



CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

---

Message

---

**From**:      Bob Brockman [bob_brockman@reyrey.com]
**Sent**:      9/6/2018 7:19:54 PM
**To**:        Dr. Seth Lerner (slerner@bcm.tmc.edu) [slerner@bcm.tmc.edu]; 'Dorothy Brockman'
               [dorothy_brockman@reyrey.com]

Seth,

I have been having trouble with a persistent UTI since at least mid July.

I take Levaquin (one 750mg per day) which seems to work right away and clears things up.

This last time around, I did this for 15 straight days.

Yet after doing this – I stopped for 5 days.  Then the symptoms started coming back.

Last Friday, I went to Dr. Scott Lisse, my GP.

He requested a specimen – which looked absolutely horrible when I gave it.

The abnormal results from the Friday specimen were:

Ketones          trace
Blood            3+
Protein          3+
Nitrite          positive
Leucocyte Esterase     3+
WBC              too numerous to count

All the rest were in the normal range.

The culture also discovered that Levaquin is not supposed to work on the bug, but Doxycycline will.

Since the culture was not going to be available, the specimen looked horrible – and -  I was leaving for Alaska on Labor Day for a one week fishing trip, I went back on Levaquin last Friday night – stopping again today.  The Levaquin has temporarily reduced my symptoms apparently completely – even though the culture said it shouldn't have worked.

All of this may have some rational  explanation, but seems to be somewhat bizarre at this point.

Dr. Lisse is concerned that there may be something seriously amiss inside my bladder.

I will be back from Alaska this coming Tuesday.

I am over due for "bladder washings" according to my records.

If at all possible, can you work me in for a cystoscopy on Tuesday or any day later in the week?

I would be much obliged.

Bob Brockman

Cc Dorothy Brockman

GOVERNMENT
EXHIBIT

4:21-CR-009-GCH

No. 50

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0219722

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

**Message**

---

**From:**        Bob Brockman [bob_brockman@reyrey.com]
**Sent:**        7/30/2020 2:55:21 PM
**To:**          'Moss, Craig' [Craig_Moss@reyrey.com]
**Subject**:     RE: Adjusted Bonus

OK

BB

---

**From:** Moss, Craig [mailto:Craig_Moss@reyrey.com]
**Sent:** Wednesday, July 29, 2020 11:00 AM
**To:** 'Bob Brockman'
**Subject:** Adjusted Bonus

Bob:

Due to the decrease in EBITDA we need to adjust you bonus so that we are in line with your employment agreement.  Base on the June Financials the Annualized EBITDA is $537,600,000.00 times 3% is $16,128,000.  We will revisit in September again and hopefully adjust it upwards.

Craig



**GOVERNMENT
EXHIBIT**

4:21-CR-009-GCH

No. 51

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0229389

**UNANIMOUS WRITTEN CONSENT OF THE
BOARD OF DIRECTORS OF
DEALER COMPUTER SERVICES, INC.**

**August 13, 2020**

The members of the Board of Directors (the "**Board**") of Dealer Computer Services, Inc., a Delaware Corporation (the "**Company**"), hereby adopt the following resolutions in accordance with the terms of the Bylaws of the Company:

**WHEREAS**, a director of both Medlands (PTC) Limited, in its capacity as Trustee of the A. Eugene Brockman Charitable Trust (the "**Trust**"), and Spanish Steps Holdings Ltd ("**Spanish Steps**"), the 96.5121% shareholder of Universal Computer Systems Holding, Inc. ("**UCSH**"), has issued a letter to UCSH dated August 12, 2020 (the "**Letter**"), a copy of which is attached hereto as **Exhibit A**, which formally requests that UCSH issue a cash dividend to its shareholders in the amount necessary to permit UCSH, to (i) make cash payments to the U.S. charities, ultimately on behalf of the Trust and to be treated by UCSH as a deemed dividend to Spanish Steps, in accordance with the Letter in the total amount equal to USD $11,409,868; (ii) pay an equivalent amount of dividends, on a per share basis, to UCSH's other shareholders; and (iii) pay the required U.S. tax withholding obligation with respect to the dividend deemed paid to Spanish Steps in accordance with the timing in which payments are actually made to the U.S. charities by UCSH as well as with regard to actual dividends paid to all other foreign (non-U.S.) shareholders of UCSH (collectively, the "**Dividend Payment**"); and

**WHEREAS**, the Board of Directors of UCSH has determined that it does not have sufficient cash resources to fund the Dividend Payment and has requested that the Company issue a dividend in an amount equal to the Dividend Payment; and

**WHEREAS**, the Board has determined that it does not have sufficient cash resources to fund the Dividend Payment and has requested that The Reynolds and Reynolds Company ("**Reynolds**") issue a dividend in an amount equal to the Dividend Payment (the "**Reynolds Dividend**"); and

**WHEREAS**, the Board has determined that it is prudent to issue a dividend to UCSH in an amount equal to the Reynolds Dividend;

**NOW, THEREFORE, IT IS RESOLVED**, that the Board hereby authorizes the Company, upon receipt of the Reynolds Dividend, to pay an equivalent dividend payment to UCSH; and

**FURTHER RESOLVED**, that any proper officer of the Company is hereby authorized and empowered, for and on behalf of the Company, to take any and all such further actions as may be necessary or proper to carry out the intent and accomplish the purposes of the above resolutions, including, without limitation, executing and delivering such documents and instruments as shall be deemed necessary or desirable in connection therewith, the taking of any action or the execution of any document to be conclusive evidence of the necessity therefore; and

**GOVERNMENT
EXHIBIT**

4:21-CR-009-GCH
No. 52

**FURTHER RESOLVED**, that any and all actions taken previously hereto by the officers, employees or representatives of the Company or its subsidiaries in furtherance of the above resolutions are hereby authorized, ratified and confirmed in all respects.

**IN WITNESS WHEREOF**, the undersigned have hereunto subscribed their names as all of the members of the Board of Directors of Dealer Computer Services, Inc., to the same extent and for all purposes as if an actual meeting of the Board had been held in the offices of the Company on this the 13th day of August, 2020.

Signature: _R. T. Brockman_____
Robert T. Brockman

Signature: _____
Alfred L. Deaton III

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0229513

**EXHIBIT A**

**LETTER FROM MEDLANDS (PTC) LIMITED DATED AUGUST 12, 2020**

**(Attached)**

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0229514

**UNANIMOUS WRITTEN CONSENT OF THE
BOARD OF DIRECTORS OF
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.**

**August 13, 2020**

The members of the Board of Directors (the "**Board**") of Universal Computer Systems Holding, Inc., a Delaware Corporation (the "**Company**"), hereby adopt the following resolutions in accordance with the terms of the Bylaws of the Company:

**WHEREAS**, the A. Eugene Brockman Charitable Trust (the "**Trust**") indirectly owns substantially all of the Company's equity; and

**WHEREAS**, the Trust has previously made various charitable commitments for which substantial payment obligations are due on or before September 30, 2020; and

**WHEREAS**, a director of both Medlands (PTC) Limited, in its capacity as Trustee of the Trust, and Spanish Steps Holdings Ltd. ("**Spanish Steps**"), the 96.5121% shareholder of the Company, has issued a letter to the Company dated August 12, 2020 (the "**Letter**"), a copy of which is attached hereto as **Exhibit A**, which formally requests that the Company issue a cash dividend to its shareholders in the amount necessary to permit the Company, to (i) make cash payments to the U.S. charities, ultimately on behalf of the Trust and to be treated by the Company as a deemed dividend to Spanish Steps, in accordance with the Letter in the total amount equal to USD $11,409,868; (ii) pay an equivalent amount of dividends, on a per share basis, to the Company's other shareholders; and (iii) pay the required U.S. tax withholding obligation with respect to the dividend deemed paid to Spanish Steps in accordance with the timing in which payments are actually made to the U.S. charities by the Company as well as with regard to actual dividends paid to all other foreign (non-U.S.) shareholders of the Company (collectively, the "**Dividend Payment**"); and

**WHEREAS**, the Board has determined that the Company can satisfy this request by making the Dividend Payment and, with respect to the portion that would be paid to the Trust, making direct payments to the U.S. charities as requested by the Letter; and

**WHEREAS**, the Board has determined that the Company does not have sufficient cash resources to fund the Dividend Payment and, as a result, an equivalent dividend payment will need to be paid from The Reynolds and Reynolds Company ("**Reynolds**") to Dealer Computer Services, Inc. ("**DCSI**"), with a resulting payment from DCSI to the Company;

**NOW, THEREFORE, IT IS RESOLVED**, that the Board hereby authorizes the Company to pay the Dividend Payment; and

**FURTHER RESOLVED**, that any proper officer of the Company is hereby authorized and directed to make payments to the U.S. charities as requested by the Letter, which amount shall be funded with a portion of the Dividend Payment; and

**FURTHER RESOLVED**, that the Company, in its capacity as the sole shareholder of DCSI, hereby requests the members of the Board of Directors of DCSI to (i) have Reynolds

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

make a dividend payment to DCSI in the amount necessary to fund the Dividend Payment; and (ii) pay such dividend payment to the Company; and

**FURTHER RESOLVED**, that any proper officer of the Company is hereby authorized and empowered, for and on behalf of the Company, to take any and all such further actions as may be necessary or proper to carry out the intent and accomplish the purposes of the above resolutions, including, without limitation, executing and delivering such documents and instruments as shall be deemed necessary or desirable in connection therewith, the taking of any action or the execution of any document to be conclusive evidence of the necessity therefore; and

**FURTHER RESOLVED**, that any and all actions taken previously hereto by the officers, employees or representatives of the Company or its subsidiaries in furtherance of the above resolutions are hereby authorized, ratified and confirmed in all respects.

**IN WITNESS WHEREOF,** the undersigned have hereunto subscribed their names as all of the members of the Board of Directors of Universal Computer Systems Holding, Inc., to the same extent and for all purposes as if an actual meeting of the Board had been held in the offices of the Company on this the 13th day of August, 2020.

Signature:  _R. T. Brockman_____
Robert T. Brockman

Signature:  _____
Alfred L. Deaton III

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

**EXHIBIT A**

**LETTER FROM MEDLANDS (PTC) LIMITED DATED AUGUST 12, 2020**

**(Attached)**

## UNANIMOUS WRITTEN CONSENT OF THE
## BOARD OF DIRECTORS OF
## THE REYNOLDS AND REYNOLDS COMPANY

### August 13, 2020

The members of the Board of Directors (the "**Board**") of The Reynolds and Reynolds Company, an Ohio Corporation (the "**Company**"), hereby adopt the following resolutions in accordance with the terms of the Code of Regulations of the Company:

**WHEREAS**, a director of both Medlands (PTC) Limited, in its capacity as Trustee of the A. Eugene Brockman Charitable Trust (the "**Trust**"), and Spanish Steps Holdings Ltd. ("**Spanish Steps**"), the 96.5121% shareholder of Universal Computer Systems Holding, Inc. ("**UCSH**"), has issued a letter to UCSH dated August 12, 2020 (the "**Letter**"), a copy of which is attached hereto as **Exhibit A**, which formally requests that UCSH issue a cash dividend to its shareholders in the amount necessary to permit UCSH, to (i) make cash payments to the U.S. charities, ultimately on behalf of the Trust and to be treated by UCSH as a deemed dividend to Spanish Steps, in accordance with the Letter in the total amount equal to USD $11,409,868; (ii) pay an equivalent amount of dividends, on a per share basis, to UCSH's other shareholders; and (iii) pay the required U.S. tax withholding obligation with respect to the dividend deemed paid to Spanish Steps in accordance with the timing in which payments are actually made to the U.S. charities by UCSH as well as with regard to actual dividends paid to all other foreign (non-U.S.) shareholders of UCSH (collectively, the "**Dividend Payment**"); and

**WHEREAS**, the Board of Directors of UCSH has determined that it does not have sufficient cash resources to fund the Dividend Payment and has requested that Dealer Computer Services, Inc. ("**DCSI**"), issue a dividend in an amount equal to the Dividend Payment; and

**WHEREAS**, the Board of Directors of DCSI has determined that it does not have sufficient cash resources to fund the Dividend Payment and has requested that the Company issue a dividend in an amount equal to the Dividend Payment; and

**WHEREAS**, the Board has determined that it is prudent to issue a dividend to DCSI in an amount equal to the Dividend Payment;

**NOW, THEREFORE, IT IS RESOLVED**, that the Board hereby authorizes the Company to pay a dividend to DCSI in an amount equal to the Dividend Payment; and

**FURTHER RESOLVED**, that any proper officer of the Company is hereby authorized and empowered, for and on behalf of the Company, to take any and all such further actions as may be necessary or proper to carry out the intent and accomplish the purposes of the above resolutions, including, without limitation, executing and delivering such documents and instruments as shall be deemed necessary or desirable in connection therewith, the taking of any action or the execution of any document to be conclusive evidence of the necessity therefore; and

**FURTHER RESOLVED**, that any and all actions taken previously hereto by the officers, employees or representatives of the Company or its subsidiaries in furtherance of the above resolutions are hereby authorized, ratified and confirmed in all respects.

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0229518

**IN WITNESS WHEREOF,** the undersigned have hereunto subscribed their names as all of the members of the Board of Directors of the The Reynolds and Reynolds Company, to the same extent and for all purposes as if an actual meeting of the Board had been held in the offices of the Company on this the 13th day of August, 2020.

Signature: _____
Robert T. Brockman

Signature: _____
Alfred L. Deaton III

Signature: _____
Robert M. Nalley

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0229519

**EXHIBIT A**

**LETTER FROM MEDLANDS (PTC) LIMITED DATED AUGUST 12, 2020**

**(Attached)**

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

**UNANIMOUS WRITTEN CONSENT OF THE
BOARD OF DIRECTORS OF
THE REYNOLDS AND REYNOLDS COMPANY**

**August 13, 2020**

The members of the Board of Directors (the "**Board**") of The Reynolds and Reynolds Company, an Ohio Corporation (the "**Company**"), hereby adopt the following resolutions in accordance with the terms of the Code of Regulations of the Company:

**WHEREAS**, a director of both Medlands (PTC) Limited, in its capacity as Trustee of the A. Eugene Brockman Charitable Trust (the "**Trust**"), and Spanish Steps Holdings Ltd. ("**Spanish Steps**"), the 96.5121% shareholder of Universal Computer Systems Holding, Inc. ("**UCSH**"), has issued a letter to UCSH dated August 12, 2020 (the "**Letter**"), a copy of which is attached hereto as **Exhibit A**, which formally requests that UCSH issue a cash dividend to its shareholders in the amount necessary to permit UCSH, to (i) make cash payments to the U.S. charities, ultimately on behalf of the Trust and to be treated by UCSH as a deemed dividend to Spanish Steps, in accordance with the Letter in the total amount equal to USD $11,409,868; (ii) pay an equivalent amount of dividends, on a per share basis, to UCSH's other shareholders; and (iii) pay the required U.S. tax withholding obligation with respect to the dividend deemed paid to Spanish Steps in accordance with the timing in which payments are actually made to the U.S. charities by UCSH as well as with regard to actual dividends paid to all other foreign (non-U.S.) shareholders of UCSH (collectively, the "**Dividend Payment**"); and

**WHEREAS**, the Board of Directors of UCSH has determined that it does not have sufficient cash resources to fund the Dividend Payment and has requested that Dealer Computer Services, Inc. ("**DCSI**"), issue a dividend in an amount equal to the Dividend Payment; and

**WHEREAS**, the Board of Directors of DCSI has determined that it does not have sufficient cash resources to fund the Dividend Payment and has requested that the Company issue a dividend in an amount equal to the Dividend Payment; and

**WHEREAS**, the Board has determined that it is prudent to issue a dividend to DCSI in an amount equal to the Dividend Payment;

**NOW, THEREFORE, IT IS RESOLVED**, that the Board hereby authorizes the Company to pay a dividend to DCSI in an amount equal to the Dividend Payment; and

**FURTHER RESOLVED**, that any proper officer of the Company is hereby authorized and empowered, for and on behalf of the Company, to take any and all such further actions as may be necessary or proper to carry out the intent and accomplish the purposes of the above resolutions, including, without limitation, executing and delivering such documents and instruments as shall be deemed necessary or desirable in connection therewith, the taking of any action or the execution of any document to be conclusive evidence of the necessity therefore; and

**FURTHER RESOLVED**, that any and all actions taken previously hereto by the officers, employees or representatives of the Company or its subsidiaries in furtherance of the above resolutions are hereby authorized, ratified and confirmed in all respects.

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0229521

**IN WITNESS WHEREOF,** the undersigned have hereunto subscribed their names as all of the members of the Board of Directors of the The Reynolds and Reynolds Company, to the same extent and for all purposes as if an actual meeting of the Board had been held in the offices of the Company on this the 13th day of August, 2020.

Signature: _R. T. Brockman_____

Robert T. Brockman

Signature: _____

Alfred L. Deaton III

Signature: _____

Robert M. Nalley

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

**EXHIBIT A**

**LETTER FROM MEDLANDS (PTC) LIMITED DATED AUGUST 12, 2020**

**(Attached)**

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

**UNANIMOUS WRITTEN CONSENT OF THE**
**BOARD OF DIRECTORS OF**
**THE REYNOLDS AND REYNOLDS COMPANY**

**August 13, 2020**

The members of the Board of Directors (the "**Board**") of The Reynolds and Reynolds Company, an Ohio Corporation (the "**Company**"), hereby adopt the following resolutions in accordance with the terms of the Code of Regulations of the Company:

**WHEREAS**, a director of both Medlands (PTC) Limited, in its capacity as Trustee of the A. Eugene Brockman Charitable Trust (the "**Trust**"), and Spanish Steps Holdings Ltd. ("**Spanish Steps**"), the 96.5121% shareholder of Universal Computer Systems Holding, Inc. ("**UCSH**"), has issued a letter to UCSH dated August 12, 2020 (the "**Letter**"), a copy of which is attached hereto as **Exhibit A**, which formally requests that UCSH issue a cash dividend to its shareholders in the amount necessary to permit UCSH, to (i) make cash payments to the U.S. charities, ultimately on behalf of the Trust and to be treated by UCSH as a deemed dividend to Spanish Steps, in accordance with the Letter in the total amount equal to USD $11,409,868; (ii) pay an equivalent amount of dividends, on a per share basis, to UCSH's other shareholders; and (iii) pay the required U.S. tax withholding obligation with respect to the dividend deemed paid to Spanish Steps in accordance with the timing in which payments are actually made to the U.S. charities by UCSH as well as with regard to actual dividends paid to all other foreign (non-U.S.) shareholders of UCSH (collectively, the "**Dividend Payment**"); and

**WHEREAS**, the Board of Directors of UCSH has determined that it does not have sufficient cash resources to fund the Dividend Payment and has requested that Dealer Computer Services, Inc. ("**DCSI**"), issue a dividend in an amount equal to the Dividend Payment; and

**WHEREAS**, the Board of Directors of DCSI has determined that it does not have sufficient cash resources to fund the Dividend Payment and has requested that the Company issue a dividend in an amount equal to the Dividend Payment; and

**WHEREAS**, the Board has determined that it is prudent to issue a dividend to DCSI in an amount equal to the Dividend Payment;

**NOW, THEREFORE, IT IS RESOLVED**, that the Board hereby authorizes the Company to pay a dividend to DCSI in an amount equal to the Dividend Payment; and

**FURTHER RESOLVED**, that any proper officer of the Company is hereby authorized and empowered, for and on behalf of the Company, to take any and all such further actions as may be necessary or proper to carry out the intent and accomplish the purposes of the above resolutions, including, without limitation, executing and delivering such documents and instruments as shall be deemed necessary or desirable in connection therewith, the taking of any action or the execution of any document to be conclusive evidence of the necessity therefore; and

**FURTHER RESOLVED**, that any and all actions taken previously hereto by the officers, employees or representatives of the Company or its subsidiaries in furtherance of the above resolutions are hereby authorized, ratified and confirmed in all respects.

**IN WITNESS WHEREOF,** the undersigned have hereunto subscribed their names as all of the members of the Board of Directors of the The Reynolds and Reynolds Company, to the same extent and for all purposes as if an actual meeting of the Board had been held in the offices of the Company on this the 13th day of August, 2020.

Signature: _R. T. Brockman_____
Robert T. Brockman

Signature: _Alfred L. Deaton_____
Alfred L. Deaton III

Signature: _____
Robert M. Nalley

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0229525

**EXHIBIT A**

**LETTER FROM MEDLANDS (PTC) LIMITED DATED AUGUST 12, 2020**

**(Attached)**

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0229526

Message
_____

**From:** Bob Brockman [bob_brockman@reyrey.com]
**Sent:** 6/3/2020 5:55:40 PM
**To:** 'Arnett, Michael D (Mike)' [Michael_Arnett@reyrey.com]
**Subject:** RE: Thank You.

Mike,

Thanks for the kind words.

Bob

---

**From:** Arnett, Michael D (Mike) [mailto:Michael_Arnett@reyrey.com]
**Sent:** Wednesday, June 03, 2020 8:02 AM
**To:** Brockman, Bob
**Subject:** Thank You.

Bob,
Thank you for the blood, sweat and tears you have shed to build this great company that I have been blessed to call family for 26 years so far.
I pray that God will bless you, Dorothy and especially that new grandchild as you transition to the next season before you.
Thank you again for all you do Bob,
Mike

## Mike Arnett
**Marketing & Document Services Consultant**
**The Reynolds & Reynolds Company**
**Cell: 407-448-3399**
**Fax: 866-778-1151**
**michael_arnett@reyrey.com**



---

**From:** ReynoldsWorld <ReynoldsWorld@reyrey.com>
**Sent:** Wednesday, June 3, 2020 7:54 AM
**To:** All US Associates <AllUSAssociates@reyrey.com>; All Canada Associates <AllCanadaAssociates@reyrey.com>
**Subject:** Memo from CEO Bob Brockman: Management Changes

To all Reynolds Associates:

I want to let you know about some management changes at Reynolds and Reynolds, and its affiliates, that I believe will position us to grow and thrive for many years to come.

**GOVERNMENT EXHIBIT**

**4:21-CR-009-GCH**
**No. 54**

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

On May 28, 2020, I celebrated my 79th birthday, which came just over six weeks after the pleasure of celebrating the 52nd anniversary of my marriage to my wonderful wife, Dorothy.  She and I also welcomed the birth of our first grandchild, James Maxwell Brockman, a few short weeks ago.  The two touchstones of my life have been my cherished family, and my second family at Reynolds and Reynolds.

I have been privileged to serve as steward of our company from its inception when it was Universal Computer Services, Inc.  Together with you, we have built this company into a remarkable industry leader.  One of the truly great strengths of our company over the years has been our ability to attract talented people who stay with us and make valuable contributions over the course of their entire careers.

It is important now that we plan for the future.  I am pleased to announce that Tommy (N. Thomas) Barras has agreed to step into the role of President and Chief Operations Officer.  Tommy is one of that small handful of people who have been with us for virtually our entire journey.

He has worked his way up from Shipping and Receiving to become a senior leader on whom I have relied time and again on matters large and small.  Equally important, Tommy's product achievements over his forty-year career have been key to our success as UCS and now Reynolds.  He understands in amazing detail the core strengths of our software and products, and the talented associates who deliver on both.  Those strengths will remain our defining characteristics as an organization.

I will continue in my current position.  I plan to focus my time and attention on supporting Tommy and our leadership team to position the company for transition and growth beyond my leadership.

I am also letting you know that Rob Nalley stepped down from his position as President.  Rob will continue to serve the company as an Advisor and Vice Chairman until I step down as CEO.

Rob joined us as a salesman almost fifty years ago.  He has served in many leadership roles throughout his career.  I have thought of him as my right hand for more years than I can count.  I thank him for his service as President.  I am also grateful that he will continue as my trusted advisor and good friend as we move forward through this transition period.

The company today vastly exceeds my greatest expectations when we began.  In recognition of our size and the diversity of our operations, I am also announcing the formation of an Executive Committee (ExCom) that will work together as the company moves forward.  This committee, led by Tommy, will include seven members who will also serve as Division Heads who can provide subject matter expertise along with a collaborative future vision.  In addition to Tommy, who will be Chairman of the Executive Committee, the members will be:

- Willie Daughters, Executive Vice President of Customer Support

- Eric Edwards, Executive Vice President of Technology, CTO

- Keith Hill, Executive Vice President of Sales

- Scott Santana, Executive Vice President of Product Management

- Jerry Kirwan, Executive Vice President of Document Services

- Craig Moss, Executive Vice President of Finance, CFO

- Robert Burnett, Executive Vice President of Corporate Development

Each of these individuals has been with the company for more than two decades, and in some cases for over three decades.  They have contributed significantly to what makes us great today, and I am grateful that they have agreed to step up to these new responsibilities.

Leaders who report to me or Rob will begin reporting to Executive Committee leaders as declared by Tommy.

I am honored every day to work with every one of you.  I thank you for your trust and support over the many years.  Together we have built something to last.  I ask that you join me in working together as we move forward in this time of transition, in support of this entire leadership team.

Bob

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0228919

---

Message

---

**From:** Bob Brockman [bob_brockman@reyrey.com]
**Sent:** 2/13/2020 8:46:16 PM
**To:** 'tommybarras@reyrey.com' [tommybarras@reyrey.com]
**Subject:** RE: GoMoto

Tommy

Your comments are valid.

This is a young entity that is barely a company.  That would indicate that they don't have a lot of history to dig thru – so we don't have much risk of buried bombs.

As far as paying too much – probably so.

The trade off is that we got a product that would taken us as much as a couple of years or more to define – and then reproduce.

With the slowing of new car sales, the focus will be even greater on the service department – however check in time on service customers is a barrier to more service business unless new facilities are built.

Therefore GoMoto is much more timely than usual – helping service sales keep up their profits up without having to have more people and resources.

One of your first stops at the display should be listening to the GoMoto story.

Bob

---

**From:** tommybarras@reyrey.com [mailto:tommybarras@reyrey.com]
**Sent:** Thursday, February 13, 2020 12:21 PM
**To:** Bob Brockman
**Subject:** FW: GoMoto

Based on your comments from other acquisition fast is not always the best strategy – did we over pay..?

Do you have an opinion on this deal..?

Tommy

---

**From:** Burnett, Robert <Robert_Burnett@reyrey.com>
**Sent:** Tuesday, February 11, 2020 3:58 PM
**To:** Brockman, Bob <Bob_Brockman@reyrey.com>; Nalley, Rob <Rob_Nalley@reyrey.com>; tommybarras@reyrey.com; Moss, Craig <Craig_Moss@reyrey.com>; 'Daughters, Willie' <Willie_Daughters@reyrey.com>; Edwards, Eric <Eric_Edwards@reyrey.com>; Strawsburg, Jonathan C (Jon) <Jonathan_Strawsburg@reyrey.com>; Fowler, Tony <Tony_Fowler@reyrey.com>; 'Edwards, Kasi' <Kasi_Edwards@reyrey.com>; Hill, Keith <Keith_Hill@reyrey.com>; Nieto, Rudolph L <Rudolph_Nieto@reyrey.com>; Robinson, Sheri <Sheri_Robinson@reyrey.com>; Cherry, Scott <Scott_Cherry@reyrey.com>; Sideris, Jason D <Jason_Sideris@reyrey.com>
**Cc:** Zachary, Matthew <Matthew_Zachary@reyrey.com>; 'Stewart, Jake' <Jake_Stewart@reyrey.com>; 'Emmanual, Jonathan' <Jonathan_Emmanual@reyrey.com>
**Subject:** GoMoto



GOVERNMENT
EXHIBIT

4:21-CR-009-GCH

No. 55

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

All:

I am pleased to tell you that we have just closed the acquisition of GoMoto!

From shaking hands and an LOI to a signed deal took just a little more than 30 days!

Thanks to the M&A team which included many from the Accounting and Legal teams for jumping in and getting it done.

We will now shift into the communication and integration mode.

Please keep this confidential at this point so that we can make a splash on Friday at NADA with an announcement.  We are working with Kasi and Tom right now on communications (both external and internal).

Let's make this another docuPAD!

Thanks,

Robert

**Robert Burnett**
**Sr. Vice President, Corporate Development**
**The Reynolds and Reynolds Company**
**Phone: 713-718-1418**
**Mobile: 713-882-0019**

**Confidentiality Statement:**
This message and any attachments may contain legally privileged and / or confidential information.  It is intended only for use by the addressee(s) named herein.  If you are not the intended recipient of this e-mail, you are notified that any dissemination, distribution or duplication of this e-mail and any attachment thereto is strictly prohibited.  If you received this e-mail in error, please notify the sender by reply e-mail immediately and permanently delete the original and any copy of the e-mail, attachment(s) and any printout thereof.

---

**Message**

---

| | |
|---|---|
| **From:** | Bob Brockman [bob_brockman@reyrey.com] |
| **Sent:** | 3/1/2020 9:57:01 PM |
| **To:** | 'tommy_barras@reyrey.com' [tommy_barras@reyrey.com] |
| **Subject:** | FW: See financials and Fact Sheet to Bob |

Tommy,

One of my concerns is that the key to keep the sales department from running over everyone else – is people like Schaefer and Agan before him.

Management of sales decision making is one of the most complex things that I have to teach you about.

It cannot be done quickly – as the education is focused on many, many situations – what is happening, what should the response be to the situation at hand?

Right now Schaefer is the most knowledgeable about the above rules and policies.

Rudy is the most adept at trying to find a way around the rules – which is a source of friction between the two.

Unless the situation is that Schaefer is clearly not following my rules and policies – the decision must go Schaefer's way.  Otherwise Schaefer will become "broken" and give up trying to keep a lid on sales people – which will cause Sales to run amok.

If sales doesn't like a decision – let them endeavor to make their case – in writing and only with you – Rudy should not be allowed to try to move Schaefer around on his own.  Then it is an educational opportunity for you and me to discuss.

Right now Schaefer undoubtedly feel like a lonely soldier.  He was assigned his task.  He is following my orders and what I taught him.  He is dug into his position quite correctly.  For sure he wonders what is going on and what is happening to him.  When there are different orders and rules, he will follow orders – unless it involves giving salesmen a free pass to do whatever they want – which in his heart he would believe that to be insanity.

Bob

---

**From:** tommybarras@reyrey.com [mailto:tommybarras@reyrey.com]
**Sent:** Saturday, February 29, 2020 8:41 AM
**To:** 'Bob Brockman'
**Subject:** RE: See financials and Fact Sheet to Bob

Bob

I hope the outcome is positive – begin to change your opinion.    Only time will tell.

My comments on ExCom – Willie, Santana, Rudy sat together to build game plan (Willie is really good).   The pro's and con's (the discussion) was as you envision.   The "white boarding" laid out the game plan and our expectation for Rudy to follow.    Very positive event – all are in agreement on the points we must have in order to have a deal.    Without those we walk away

**GOVERNMENT EXHIBIT**

4:21-CR-009-GCH
No. 56

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0227291

Other issue:  Rudy and Schaefer at each other's throats.    The negativity is not productive – both just want to battle to show up the other.    Both want you to see them as the key to the future – the other must fail in order to accomplish.    There is no middle ground.

Be best if you didn't intervene.    I talked for a couple hours with Schaefer, an hour with Rudy.    Their fighting is only hurting Reynolds – the game to prove to you who's best should not be addressed by you.    Do not fan the flame – ignore it and hopefully they will get the point

Tommy

**From:** Bob Brockman <bob_brockman@reyrey.com>
**Sent:** Friday, February 28, 2020 6:52 PM
**To:** tommybarras@reyrey.com
**Subject:** RE: See financials and Fact Sheet to Bob

Tommy

I think that it is too early to declare a "win" on this.

The OEM's are notorious for being flakey.  They are just apt to say "we want to buy" – but at half the price we are proposing.

Then they get bitter that "we would not cooperate".

Another interesting outcome is that with us involved in the project – we are well positioned to get all the blame if the project doesn't work out to their satisfaction.

I have been seeing all of this happening for the last 30 years or so.

Bob

**From:** tommybarras@reyrey.com [mailto:tommybarras@reyrey.com]
**Sent:** Friday, February 28, 2020 10:10 AM
**To:** Bob Brockman
**Subject:** FW: See financials and Fact Sheet to Bob

Bob – I have the ball.    Willie, Santana, Rudy and Schaefer will settle on the parameters.    We need to use this opportunity to improve relationship with OEM and improve utilization of our products with customers.

May also provide us a selling opportunity.

Lots of give & take this morning on this topic.    The ExCom strategy (no one knows this term yet) will be a strong solution for the future.    You need to be pleased

Tommy

**From:** Robert Schaefer <Robert_Schaefer@reyrey.com>
**Sent:** Thursday, February 27, 2020 9:44 PM

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0227292

**To:** Brockman, Bob <Bob_Brockman@reyrey.com>; tommy_barras@reyrey.com
**Subject:** FW: See financials and Fact Sheet to Bob

Bob

I believe Rudy and Willie talked to you about this project last Friday at the Houstonian. We are responding to an RFQ to see if we can make it to the second phase of the process. The request is to train dealers on the Toyota SMARTPATH process for all DMS providers for all of the Toyota dealerships in the US. Our response is to have Toyota train 2 of our training resources on the Toyota SMARTPATH process, train our training resources and then train Reynolds only dealerships leveraging a training cycle if 4 days on site for Pre-Launch, 4 days for Launch and 1 health check remote site training. The pricing I used is based on the pricing model that was created when we were responding to the GM consultant project and is priced for the 4 day training cycle as 5 days. (4 days of day rate and travel and 1 day (the 5th day) of day rate only for a fee of $1,847 per day). I also added in pricing for a Program manager, Toyota training and internal training – the train the trainer concept (se recommendation below).

The response is to move us to the next level in the RFQ process. We have a lot of information to understand, I am recommending we move forward with our response, see if we make it through the next phase and then we can reprice and understand exactly what Toyota is requiring. We can always back out if we find out this is not a project we want to continue to bid on.

Please see below and approve responding to the RFQ to try to get to the next level in the process. I will keep you up to date as we move through the process.

Bob

See Fact Sheet below and attached

<u>Project Description</u>
Toyota provide Reynolds with an RFP for SmartPath Training. Toyota is looking for a company to train Toyota and Lexus dealerships on Toyota's SmartPath initiative.
<u>Facts/Overview</u>
* ### US only project (~500 Toyota and Lexus Reynolds dealers)
  o Toyota forecasts 65% adoption rate for SmartPath or ~325 Reynolds dealers
* Reynolds will only train Toyota / Lexus dealerships with a Reynolds DMS
* Training will focus on Toyota sales process and Toyota Technology (Toyota Sales Tablet)
* If selected - Toyota will train 2 Reynolds resources on the SmartPath process and technology
  o The two trained resources will train Reynolds resources (6 other associates)
* Reynolds will provide program management
  o Will require up to 8 full training resources to support installation efforts (see timing) and 2 remote training resources
* ### Training - 8 days on site and 1 remote site training
* Training days will be:
  o Pre-Launch and Dealer Setup – 4 days
  o Launch Training – 4 days
  o Health Check Remote Training – 4 hours
    * Health Check is to follow up on launch and answer questions
* Anticipated time – 2 hours – Charging Toyota for 8 hours
<u>Delivery Timing</u>
* ### RFP response due on 2/27/20
* Forecasted program launch in April of 2020
  o 5 installations to be completed between April and July of 2020
  o Beginning July 2020 installation will ramp up to 11 installations per month based on demand – anticipated 325 dealers over 14 month period
<u>Recommendation</u>

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0227293

- Reynolds will only install Toyota SmartPath at dealer's using Reynolds DMS
- Make available up to 8 onsite training resources and 2 remote installation resources
- Pricing:
  - Program Manager
    - One Time - $10,000
  - Train the Train - 2 trainers travel to Plano Texas (TMNA Offices) to be trained on SMARTPATH Process
    - One Time - $18,480
  - Train the Reynolds – 6 Reynolds associates trained to train SMARTPATH Dealers
    - One Time - $73,920
  - Onsite Resources - Charge Toyota for 4 day increments
  - Per day rate - $1,847 per day (includes Travel and expenses)
    - Day Rate - $561.94 per day
    - Travel and Expenses per day - $425.00 per day
    - 7,388 = 4 days @ day rate + travel and expense and 1 day @ day rate only
  - Remote Training
    - Hourly Rate - $147 per hour
    - Charge Toyota for 1 day at $1,176 per day
      - $147 * 8 = $1,176

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

UCSH 0227294

---

Message

---

**From:** Bob Brockman [bob_brockman@reyrey.com]
**Sent:** 6/3/2020 7:54:20 PM
**To:** 'tommy_barras@reyrey.com' [tommy_barras@reyrey.com]
**Subject:** RE: Wow...I cannot explain

Tommy

To start with – you and I should be talking every day about any decision of importance that is cooking – before it is leaked or published.   We need to focus on the reasons for making any decision.  The reasons should be stated along with the decision.

The purpose for this is that it raises the odds in favor of making all decisions as thoughtful and correct that they can be.

This makes your record as perfect as it can be – which enhances followership.

Always remember – in virtually every case there is time to think and talk about a decision.  The main thing is to do it "RIGHT" – not to do it quickly.  Just because someone else is wanting a quick decision – do not let your decision be hurried !

Bob

---

**From:** tommy_barras@reyrey.com [mailto:tommy_barras@reyrey.com]
**Sent:** Tuesday, June 02, 2020 7:54 PM
**To:** Bob Brockman; Dorothy Brockman
**Subject:** Wow...I cannot explain

Bob, Dorothy

I cannot describe the feelings I have tonight knowing the new chapter that begins tomorrow.   I still do not understand why you choose me to carry forward your mission – but I will do my best to never disappoint you.

You guys are my family.   Pray for me – give me the strength needed to carry on your legacy.

Love you guys

Tommy



GOVERNMENT
EXHIBIT

4:21-CR-009-GCH

No. 57

CONFIDENTIAL TREATMENT REQUESTED BY
UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.

# EXHIBIT 58

# January 2019 Brockman Depo Video Day 1

**GOVERNMENT EXHIBIT**

**4:21-CR-009-GCH**

**No. 58**

# EXHIBIT 58A

# Brockman Jan. 2019 Depo Excerpt

Ex. 58, Video 3 of 3, timestamp: 1:58 to 5:45

GOVERNMENT
EXHIBIT

4:21-CR-009-GCH
No. 58A

# EXHIBIT 58B

# Brockman Jan. 2019 Depo Excerpt

Ex. 58, Video 3 of 3, timestamp: 0:17 to 1:57

**GOVERNMENT EXHIBIT**

**4:21-CR-009-GCH**

**No. 58B**

# EXHIBIT 58C

# Brockman Jan. 2019 Depo Excerpt

## Ex. 58, Video 1 of 3, timestamp: 8:40 to 15:45

**GOVERNMENT EXHIBIT**

**4:21-CR-009-GCH**

**No. 58C**

# EXHIBIT 58D

# Brockman Jan. 2019 Depo Excerpt

Ex. 58, Video 1 of 3, timestamp: 2:05 to 5:01

**GOVERNMENT EXHIBIT**

**4:21-CR-009-GCH**

**No. 58D**

# EXHIBIT 59

# January 2019
# Brockman Depo Video
# Day 2

**GOVERNMENT EXHIBIT**

4:21-CR-009-GCH

No. 59

# EXHIBIT 59A

# Brockman Jan. 2019 Depo Excerpt

Ex. 59, Video 4 of 4, timestamp: 9:50-17:00

**GOVERNMENT EXHIBIT**

**4:21-CR-009-GCH**

**No. 59A**

# EXHIBIT 59B

# Brockman Jan. 2019 Depo Excerpt

Ex. 59, Video 1 of 4, timestamp: 1:15:50 to 1:18:55

GOVERNMENT
EXHIBIT

4:21-CR-009-GCH

No. 59B