# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | § |
| | § |
| **Plaintiff,** | § |
| | § |
| **v.** | §   **Cr. No. 4:21cr 009 GCH** |
| | § |
| **ROBERT T. BROCKMAN,** | § |
| | § |
| **Defendant.** | § |
| | § |
| | § |

## UNITED STATES' POST-HEARING BRIEF ON COMPETENCY

# **TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................................ 1

II.  LEGAL STANDARD ................................................................................................ 2

III. ARGUMENT ............................................................................................................ 5

  A.   Defendant has been malingering dementia since the search warrant ..................... 5

    1.   Defendant had a strong motive to malinger ...................................................... 5

    2.   Defendant malingered symptoms to obtain a favorable diagnosis from his
    Baylor doctors. ........................................................................................................ 8

  B.   The 2021 Psychological Testing Demonstrates that the Defendant is Competent 15

    1.   The Competency assessment instruments conducted by Dr. Denney show
    Defendant is competent. ......................................................................................... 16

    2.   Defendant's Implausible Test Results and Failure of Validity Tests. ............. 17

    3.   Defendant's Presentation and Behavior During the Interviews ...................... 26

    4.   Defendant's Neuroimaging is Not Consistent with His Claimed Disease
    Progression. ............................................................................................................ 28

  C.   The Court should give little weight to the testimony of the Defense witnesses .. 32

    1.   Defendant fact witnesses were either biased or, at a minimum, relying on
    incomplete or misleading information .................................................................... 32

    2.   Defendant's experts, due to inexperience or other reasons, either missed or
    ignored contradictory information and should not be relied on ............................. 38

IV. Conclusion .............................................................................................................. 49

## I.    __INTRODUCTION__

Defendant is competent to stand trial.  The evidence shows that from the time Defendant learned about the search warrants executed at the homes of Carlos Kepke and Evatt Tamine, on August 15th, and September 5th, 2018 respectively, he began a campaign of feigning mental incompetency to avoid prosecution.  These 2018 search warrants put in the government's hands direct evidence that Defendant controlled billions of dollars of unreported income in an offshore trust designed to conceal Defendant's identity and control over this income.  The evidence is largely unrebutted, from October 2018 through November 2020, Defendant functioned as the highly competent Chief Executive Officer of the multi-billion-dollar software company, Reynolds & Reynolds ("Reynolds"), while simultaneously convincing selected physicians that he was suffering from severe cognitive deficits.  The Defendant attempted to continue this ruse after he was indicted on October 9, 2020, and after his attorneys filed their motion for a competency hearing pursuant to Title 18 U.S.C § 4241.

The testimony is consistent. Defendant is an 80-year-old man suffering from the early on-set of Parkinson Disease, and perhaps Alzheimer Disease, however, as the Court observed, Defendant's motion for a Competency Hearing ignored a large body of evidence that contradicted his assertion that he is suffering from severe cognitive impairment. Moreover, testing of the Defendant's cognitive ability in 2021 by numerous experts revealed that Defendant is competent to stand trial, and continues to malinger to avoid prosecution.

## II.   **LEGAL STANDARD**

It is a violation of a defendant's right to Constitutional Due Process to be tried on pending charges if said defendant is not "competent." *See United States v. Pervis*, 937 F.3d 546, 553 (5th Cir. 2019). The question before the Court is whether the Defendant is mentally competent to assist his counsel in his own defense. *See* 18 U.S.C. § 4241. Inherent in this question, however, is the ancillary issue of whether Defendant is malingering, fabricating his condition, and/or exaggerating his symptoms of mental and cognitive decline in an attempt to avoid prosecution.

In the Fifth Circuit, the government carries the burden of proving by a preponderance of the evidence that a defendant is competent to assist his counsel in his defense of the charges contained in an indictment. *United States v. Hutson*, 821 F.2d 1015, 1018 (5th Cir. 1987); *see also United States v. Dockins*, 986 F.2d 888, 892 (5th Cir. 1993). A defendant is incompetent if "he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." § 4241(d).

In making its determination, the Court may consider not only expert medical testimony, but also the Court's own observations of the defendant, and "the observations of other individuals that have interacted with the defendant." *United States v. Pervis*, 937 F.3d at 553, *quoting United States v. Simpson*, 645 F.3d 300, 306 (5th Cir. 2011); *see also United States v. Gigante*, 166 F.3d 75, 94 (2d Cir. 1998)(despite conclusions of expert witnesses that defendant was incompetent to stand trial, based on testimony of lay witnesses, Court found defendant was malingering and competent to stand trial).

2

Although from a circuit where the defendant has the burden of persuasion, *United States v. Loman* is informative in light of its similar facts. 597 F. App'x at 520.  Loman, a 71-year-old defendant convicted of bribery, was found competent after district court determined that he was exaggerating dementia despite partially conflicting expert testimony. In finding Loman competent, the court noted that he scored lower in malingering test than individuals who are instructed to malinger, his dementia symptoms were not present in the prior two years, and he made comments suggesting that he was impaired despite patients with dementia generally being unaware of their condition. *Id.*

A defendant is legally incompetent if he is unable to "assist properly in his defense," 18 U.S.C. § 4241(d). The declarations and testimony of Defendant's attorneys make this standard to be much higher than it really is. Courts have acknowledged that "[e]ven perfectly competent defendants often do not fully comprehend the intricacies of some of the defensive theories offered by their lawyers. That level of comprehension is not a requirement of competency." *United States v. Hogan*, 986 F.2d 1364, 1368 (11th Cir. 1993). The standard to assist counsel is not as rigorous as the standard for self-representation. *See Indiana v. Edwards*, 554 U.S. 164, 175–76 (2008) ("In certain instances an individual may well be able to satisfy *Dusky*'s mental competence standard, for he will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel."). To merely assist counsel, a defendant's ability to formulate even a simple exculpatory narrative carries weight. *See, e.g.*, *Dockins*, 986 F.2d at 892 (district court identified defendant's explanation for why he lied on a form as evidence of competence).  Even a *complete loss* of memory

3

does not necessarily constitute incompetency to stand trial. *United States v. Swanson*, 572 F.2d 523, 527 (5th Cir. 1978). In such an instance, the court must weigh "the circumstances surrounding the claimed loss of memory." *Id.*

Defendants with "dementing disorder[s] compatible with Alzheimer's Disease" or "senile dementia" are not *per se* incompetent. *United States v. Couch*, 12 F.3d 207, 1993 WL 529723 at *1–2 (5th Cir. 1993) (unpublished). In *Couch*, the government expert testified that although the defendant "appear[ed] to have suffered some decrement in his cognitive function . . . [which was] primarily a function of aging . . . [he had] considerable mental ability." *Id.* at *3. The court further found that "Couch is a difficult client" but still competent despite testimony from three of his attorneys claiming he could not assist them. *Id.*

District courts recognize that defendants who claim a sudden onset of memory loss or cognitive dysfunction are often malingering, and such malingering findings support the conclusion that the defendants are competent. *See, e.g.*, *Simpson*, 645 F.3d at 306–07; *Dockins*, 986 F.2d at 892. And when a district court finds that a defendant is feigning memory loss, the appellate courts are more deferential to the district court's findings. *See United States v. Swanson*, 572 F.2d 523, 526 (5th Cir. 1978) (noting that because memory loss "may be difficult to ascertain, the district judge is in the best position to make a determination between allowing amnesia to become an unjustified haven for a defendant and, on the other hand, requiring an incompetent person to stand trial").

## III.   ARGUMENT

### A.   Defendant has been malingering dementia since the search warrant

One of the central—and revealing—disputes between the experts is whether Defendant feigned dementia during the period between the search warrant in September 2018 and when he resigned from Reynolds in November 2020, and the probative value of this evidence on Defendant's current cognitive ability.  The evidence introduced during the competency hearing is compelling.  Defendant made an appointment with his doctor the day after the search warrant and ran his company until after he was indicted.  This timing cannot be ignored.  From this date, Defendant's motive to malinger and feign cognitive impairment to avoid prosecution increased exponentially.  In 2019 and 2020, Defendant led a double life – presenting to select doctors as severely cognitively impaired, while simultaneously leading a normal, unimpaired life.  Defendant's duplicity in 2019 and 2020 is readily apparent, and instructive of his current mental competency.  It is also instructive when evaluating the experts' conclusions.   The government's experts reviewed and evaluated the evidence of Defendant's conduct in 2019 and 2020, and his obvious motive to malinger, and concluded that Defendant was malingering, and continues to do so.  Defendant's experts' failure to acknowledge this evidence, or recognize that Defendant was malingering prior to his indictment, is fatal to their credibility.

### 1.   Defendant had a strong motive to malinger

The experts who testified in this case all agree on the need to evaluate the potential for "secondary gain" when conducting a forensic psychological exam. Defendant's expert Dr. Guilmette conceded that this is a "clear case" with a potential secondary gain.  11/22/21

5

PM Tr. 71:11-14.  Here, Defendant's motive to malinger is enhanced due to the strength of the evidence against him.  The search warrant at Carlos Kepke's house, the attorney that created Defendant's offshore trust, made Defendant "as rattled as [Evatt Tamine] had ever seen him," 11/17/21 AM Tr. 151:20:152:4. The evidence obtained in the execution of that search warrant pales in comparison to the materials recovered from the search of Tamine's home on September 5, 2018. As part of that search, the government seized more than 90 terabytes of information on twenty digital devices, some of which were concealed in a child's game box.  11/18/21 PM Tr. 20:16-21:6, 23:14-18.

The files seized in Bermuda contained a master documents file maintained by Tamine for Defendant that included "every document that existed anywhere in relation to any of the entities."  11/17/21 AM Tr. 98:7-12. It included records spanning Tamine's 14-year employment with Defendant including encrypted communications between them. 11/17/21 AM Tr. 99:23-100:14.

The government's seizure of these records gave the government an unusually transparent view of Defendant's offshore trust structure.  The records include Defendant's written performance review of Tamine, GX 9, Defendant's instructions to Tamine on how to evade U.S. Customs, GX 10, and Defendant's instruction to Tamine on creating a falsified back-dated document. GX 134 at 3.  They also include multiple instances of Defendant and Tamine creating false paper trails in the event they are needed in the future. *See* GX 19 (potential buyout of Reynolds), GX 21 (requesting open email to Stuart Yudofsky), GX, 23 (fake negotiation concerning Falcata), and GX 24 (fake negotiation with Don Jones).

In addition to demonstrating Defendant's unilateral control over the offshore structure, and billions of dollars in unreported income, the records seized by the government provide clear evidence of the element that is usually hardest to prove in tax cases—that Defendant acted with criminal intent.  Here, using the evidence seized in Bermuda, the government will be able to show that Defendant and Tamine acted like criminals.  Tamine would delete his phone's contents before passing through customs.  GX 135.  They spoke of the need for "a good cover story" and "escape jurisdictions" where Tamine could "muddy the waters" about his physical location.  GX 18; *see also* GX 17 (wherein Brockman agrees to "get away" from a bank that might "report[] us to a regulator"). Tamine boasted to Defendant, in writing, that "I can work under pressure with the added threat of detention hanging over me."  GX 12, p. 1.  Later in the same document, Tamine took credit for doing such a good job destroying evidence at Don Jones' house that "we could rest easily that any attempt to search Don's home would be fruitless."  *Id.* at p. 2.

The evidence establishes that Defendant's malingering was driven, in large part, by the September 5, 2018 search warrant in Bermuda.  On the day of the search warrant Defendant was on an Alaskan fishing trip with Stuart Yudofsky, a family friend, neuropsychiatrist, and recipient of a $25 million donation from Defendant.  GX 29.  The very next day, Defendant made an appointment with Dr. Seth Lerner, a urologist, and the first doctor to record any complaints by Defendant of cognitive impairment.  Dr. Lerner

referred Defendant to a new general practitioner (Dr. James Pool)[1] and three other doctors at the Baylor College of Medicine ("BCM"), where Defendant is a major donor and trustee.

### 2. Defendant malingered symptoms to obtain a favorable diagnosis from his Baylor doctors.

Defendant presented as severely impaired to his new clinicians at BCM, Drs. York, Yu, Jankovic, and Pool, ("Baylor Doctors"). These performances resulted in a March 1, 2019 diagnosis of mild-to-moderate dementia, and several thereafter. The Baylor Doctors' diagnoses converged on the diagnosis of Lewy Body Dementia ("LBD"),[2] a disease which was particularly attractive for Defendant's case because it is marked by variability in presentation (to explain his high functioning outside of the exam room) and two symptoms that were diagnosed entirely based on Defendant's self-reporting - REM sleep disorder and visual hallucinations.

Then, in June 2019, Defendant appeared for a meeting with his newly retained attorneys at Jones Day. To this meeting Defendant brought a binder of materials and walked his attorneys through what is now the basis for his competency defense. According to his attorneys, the diagnosis made sense to them in light of the hard time they were having with Defendant. But these presentations were inconsistent with Defendant's proven ability to continue to function at a high level, as evidenced by his depositions and speeches in 2019, and his continued control of Reynolds through 2020.

---

[1] Defendant's last appointment with Dr. Scott Lisse was on August 31, 2018. GX 95A. His first appointment with Dr. Pool was on October 15, 2018.  GX 85 at 1. The Alaska fishing trip was between September 3, 2018 and September 10, 2018.  GX 29.

[2] None of Defendant's current doctors have diagnosed him with LBD.

The March 2019 diagnosis and July 2019 meeting with his attorneys were sandwiched by two depositions, in January 2019 and September 2019, in which Defendant demonstrated a mastery of technical software knowledge, his company's document retention procedures, and other minutiae. During these depositions Defendant also demonstrated command over his short-term and long-term memory.



In January 2019, Defendant sat for a video-taped deposition in a billion-dollar antitrust suit filed against Reynolds and its main competitor, CDK Global. 11/16/21 PM Tr. 8:2-5. Michael Nemelka, a seasoned litigator, took Defendant's deposition. He estimated that Defendant was in the top 5% of deponents he had encountered in terms of preparation and ability to give strategic answers. *Id.* at 9:13-10:3. During this deposition there was no mention of any cognitive health concerns. *Id.* at 13:1-14:2. Defendant prepared for the deposition with his attorneys over two, three-quarter-day sessions. Jan. 18 Depo. Tr. 11:10-25, GX 36.  According to Nemelka, no one involved in the suit, including

Reynolds, is claiming that Defendant was not competent to testify in this deposition or that his testimony was flawed in any manner. *Id.* at 12:10-19.

Then, in September 2019, Defendant was examined by Dana Abrahamsen as part of an FTC antitrust investigation. *See generally* GX 32, 33. By this time, Defendant had been evaluated by additional Baylor Doctors and received a diagnosis of Lewy Body Dementia. *See* GX 82 at 47-55, 65-71.   Nevertheless, there was no mention of any cognitive impairment or diagnoses of dementia before or during the FTC hearing. 11/18/21 AM Tr. 58:4-16. Again, Defendant performed at a level inconsistent with how he presented himself to his Baylor Doctors and Jones Day attorneys. He recalled and discussed highly technical matters regarding Reynolds software with apparent ease. *Id.* at 61:6-63:5; GX 32 at 32:3-20.

A couple months later, in November 2019, Defendant gave the annual Reynolds "Birthday" speech.   GX 77; GX 77A.   While the Government's experts agree that, in retrospect, there are signs of Parkinson's disease in Defendant's demeanor, he gave the speech with minimal notes. The speech "revealed no evidence of cognitive impairment or dementia." GX 83 at 23.

On April 9, 2020, defense counsel sent a letter to the government making the case that Defendant was too impaired to even be indicted, claiming that Defendant "can no longer effectively serve as the chief executive officer" and that he "will shortly step down as CEO and Chair."   GX 81.   This letter was wholly inconsistent with Defendant's observable "real-world" conduct and behavior, including his continued leadership of Reynolds.

Rather than "shortly" stepping down as CEO, Defendant continued to serve as CEO of Reynolds until November 5, 2020.[3]  Defendant's own lawyer conceded that Defendant's "continuation in the role is a puzzle in view of [our] observation that he wasn't competent in other respects."  11/24/21 AM Tr. 61:3-7.  Defendant's continued work as CEO of Reynolds is only a "puzzle" if you ignore evidence that he is malingering.  Tommy Barras, who went on to succeed Defendant, and currently serves as CEO, testified that he never had any reason to doubt Defendant's mental capabilities or his ability to run the company until the day Defendant resigned.[4]  11/18/21 PM Tr. 59:2-17.[5]

Barras further testified that he talked to Defendant about every company decision between June 2020 and November 2020, that Defendant gave good advice, and that Barras relied on Defendant's counsel until he resigned.  11/18/21 AM Tr. 66:14-25; *see also* GX 149 ("I can assure you Bob is involved in EVERY important decision being made . . . These are frequent conversations.") (emphasis in original).

---

[3] Following the unsealing of his indictment.

[4] Although the government called Barras as a witness, it is clear that his loyalties are to Defendant.  He testified that he viewed Defendant as essentially his "father", 11/18/21 PM Tr. 35:19-21.  Defendant made the decision that increased Barras's pay to $11 million annually and ensured Barras received a one-time payment valued at $40 million. *Id.* at 35:22-36:10. Barras testified that he believes that he "must protect Mr. Brockman and his wife, no matter the cost." *Id.* at 40:12-14. Although he initially tried to conceal it on the stand, Barras prepared for several hours with Defendant's counsel the night before his testimony. *Id.* at 37:2-12.  Barras even winked at Defendant from the stand. *Id.* at 33:25-34:13.

[5] As discussed further below, Barras has twice testified, under oath, that he had no reason to doubt Defendant's competence. *See, e.g.*, GX 60 at 51:7-52:15.  When he spoke to defendant's experts while not under the penalty of perjury, he told them a considerably different story.

11

Barras's testimony is corroborated by Defendant's email record at Reynolds throughout 2019 and 2020. This email record is irreconcilably inconsistent with the picture Defendant painted for the Baylor Doctors in the exam room. On March 1, 2019, Defendant scored below the first percentile on a memory test and was diagnosed with mild to moderate dementia. *See* GX 82, Attachment O. In contrast, on October 21, 2019, Defendant was asked by Craig Moss, the CFO of Reynolds, to create board minutes to ward off any attempt by the IRS to assess the accumulated earnings tax on Reynolds retained profits.[6] GX 71. Two months later, in December 2019, Defendant told Dr. York he cannot recognize the word "T-W-O",[7] 11/16/21 AM Tr. 73:20, and can no longer use a remote control or put on a tie. GX 82 at 3.

Defendant's emails at Reynolds in 2020 are replete with examples that contradict his performance for the Baylor Doctors. Defendant weighed in on several business disputes including a lengthy email concerning a Reynolds newsletter business. GX 69; *see also* GX 55 (2/13/2020), GX 56 (3/1/2020) and GX 68 (1/2/2020). Defendant sent detailed information to his accountant regarding his tax returns in July 2020 (GX 45) and October 2020 (GX 47). He continued using firearms. *See* GX 44 (June 2020) and GX 48 (August 2020). He signed off on an $11.4 million dividend on August 13, 2020. GX 52. Both Mr.

---

[6] Brockman also went shooting in Argentina that month with a number of Reynolds executives. GX 115.

[7] Dr. Denney was particularly skeptical of that assertion calling the result "ridiculous." 11/16/21 PM Tr. 74.5. As Dr. Denney described in his testimony, even the most severely impaired individual can recall learned behavior from their childhood – like the word "T-W-O." In Dr. Denney's opinion, this is nothing more than a transparent attempt by the Defendant to present a false, severely impaired presentation. *Id.*

Moss and Mr. Barras testified that they did not doubt his ability or competence to authorize the payment. 11/17/21 AM Tr. 79:2-80:9.

The email record also reveals that Defendant brought to his doctors' offices the practice of backdating documents. On October 1, 2019, Defendant had a medical checkup with Dr. Pool. GX 85 at 9. He brought with him a typed list of symptoms. *Id.* Attached to that list was a list of symptoms that were purportedly from October 1, 2018. *Id.* at 10. Defendant even wrote the date "as of 10/1/18" on the document. *Id.* Although this list was within Dr. Pool's medical records, Dr. Pool admitted that he was not Defendant's doctor on October 1, 2018 and thus could not have received the list then. 11/22/21 AM Tr. 124:14-19. More damningly, Defendant's own email reveals that the list purportedly from October 1, 2018 was actually a list of symptoms he googled and then discussed with Dr. Yudofsky on January 20, 2019.[8] GX 159.

In addition, the Baylor Doctors' diagnoses, and defense counsel's reliance on them, is contrary to the diagnosis of Defendant's treating neurologist - Dr. Eugene Lai. On January 8, 2020, Dr. Lai diagnosed Defendant with mild cognitive impairment ("MCI"). GX 156. Dr. Lai again diagnosed Defendant with MCI in February 2020 and February 2021. *See* GX 157 (2/12/2020) and GX 158 (2/22/21). Dr. Lai never diagnosed Defendant with LBD, and only changed his diagnosis from Parkinson's disease with MCI ("PD-

---

[8] Defendant's googling appears to have coincided with some sort of legal meeting. He told Dr. Yudofsky "The meeting today went excellently—in spite of some unfortunate news. My belief is that when the whole truth comes out, that issue may look somewhat differently." GX 159. This email was sent two days after the January antitrust deposition.

MCI") to Parkinson's disease with dementia ("PDD") in October 2021.[9]  It is notable that although Defendant visited Dr. Lai eleven times in 2020 and 2021, Dr. Lai's medical records and diagnoses were not referenced in defense counsel's letter to the government on April 9, 2020.  *Compare* GX 81 and 82 (Defendant's Letter to the Tax Division with exhibits), *with* DX 38 (Dr. Lai's complete medical records of Defendant).

Understanding Defendant's history of malingering in 2018-2020 provides an important context to the forensic psychological and medical examinations in 2021.  As noted above, it was clear that Defendant had a strong motivation to malinger and had been *successfully* malingering in front of the Baylor Doctors and his own attorneys for the two years prior to the forensic examinations in this case.  Defendant would like the Court to either ignore the evidence that he was malingering in 2019 and 2020,[10] or believe that he somehow suddenly decided to stop malingering and genuinely developed dementia in 2021.  As discussed below, the government's experts, considering all of the collateral evidence–which Defendant's experts have ignored—have concluded that Defendant continues to malinger.

---

[9] As noted, Dr. Lai did finally diagnose Defendant with dementia approximately one month prior to the hearing on October 7, 2021. DX 48.  Dr. Lai did so after a 42-minute examination.  The 42 minutes included a review of previous medical records, MoCA testing, care coordination, adjustments to medication, counseling and education, and documentation of the visit.  11/22/21 AM Tr. 116:2-25.

[10] *See, e.g.*, 11/15/21 AM Tr. 55:23-56:1; 11/17/21 AM Tr. 75:4-10;

B.    The 2021 Psychological Testing Demonstrates that the Defendant is Competent

Dr. Robert Denney conducted the psychological testing on behalf of the government in this case.  Dr. Denney is one of the nation's leading forensic neuropsychologists who has evaluated as many as 1,000 criminal defendants for competency and associated malingering.    11/15/21  PM  Tr.  151:8-23.[11]  His  expert  opinion,  and  forensic neuropsychological analyses of criminal defendants has been found reliable by numerous courts in both *Atkins* and competency cases.[12]

Following  his  five  days  of  examinations  and  extensive  review  of  the  available collateral evidence, Dr. Denney concluded that Defendant is competent to stand trial, is malingering, and exaggerating the extent of his cognitive impairment  to avoid prosecution. 11/16/21 AM Tr. 130:2-22. Dr. Denney based these conclusions primarily on four factors: (1) Defendant's performance on Competency Assessment Instruments; (2) Defendant's

---

[11] Dr. Denney's experience stands in stark contrast to the Defendant's expert witness, Dr. Guilmette, who has extremely limited experience with criminal cases, and is primarily a *clinical* neuropsychologist specializing in personal injury cases.  *See* 11/22/21 AM Tr. 160:6 – 161:13 (conceding that he has testified in exactly one criminal case).

[12] *See e.g. United States v. Jones*, 6:10 cr 03090 (DGK)(WDMO) Dkt. No 396, p. 9 (Order Denying *Atkins* Motion: "[Dr. Denney] has excellent credentials and extensive relevant experience.  His demeanor was candid and straightforward.  The Court finds his testimony very credible and gives it significant weight'); *United States v. Williams*, 06 cr 79 (JMS-KSC) *Dkt. No 2414, p77* (Order Denying *Atkins* Motion: "[T]he court finds credible Dr. Denney's testimony and opinion that if Defendant has a mathematics disorder, but is not intellectually disabled, such a disorder could also contribute to his relatively low IQ scores"); *United States v. Knox*, 1:05 cr 270 (WS-C) *Dkt. No. 452 pp12-15, 18* (Order finding defendant competent to stand trial: "[Dr. Denney] has conducted one of the most thorough forensic psychological evaluations this Court has ever seen. . . . Dr. Denney's testimony withstood vigorous cross examination by defense counsel, leaving the Court with the firm impression that his expert opinion is reliable.").

15

implausible test results, including his failure of several validity tests; (3) Defendant's presentation and behavior during interviews and other collateral evidence; and (4) Defendant's neuroimaging which is not consistent with the severity of the disease he is trying to portray.  11/15/21 PM Tr. 159:10.

> 1. *The Competency assessment instruments conducted by Dr. Denney show Defendant is competent.*

In both the May and October test batteries, Dr. Denney administered Competency Assessment Instruments to evaluate the Defendant's ability to understand the nature of the criminal case.  He administered two specialized exams designed to evaluate a defendant's factual understanding of his case and his ability to consult with his counsel. Defendant passed both tests.  11/16/21 AM Tr. 8:13; *see also* GX 119 (ECST-R Test Summary Page). Dr. Denney testified that: "[Defendant] demonstrated a factual and rational understanding of the nature and consequences of the proceedings against him." 11/16/21 AM Tr. 10:25.

In his conversations with Drs. Dietz and Denney, Defendant accurately described a jury as a group of 12 people selected out of a pool that determine the guilt or innocence of the accused based on the evidence presented. GX 5 at 127:23-128:28. Defendant recognized that he is the accused in this case and demonstrated a fluency of the charges contained in the Indictment. *Id.* at 128:30-32.  Defendant also discussed possible defenses with Drs. Denney and Dietz. *See, e.g.*, *id.* at 114:19-21 (suggesting that Tamine emails were fabricated).

After his summer 2021 hospitalizations, Defendant continued to demonstrate an understanding of these proceedings. During the October 2021 interview with Drs. Dietz

and Denney, Defendant "again demonstrated adequate knowledge of courtroom participants and processes." GX 84 at 20. Dr. Denney noted that Defendant was initially unwilling to discuss the charges against him, but he then "hesitantly" stated that "they revolved around tax evasion and were very serious." GX 2 at 21. Defendant also discussed the pending charges in this case with Dr. Agronin. In his interview with Dr. Agronin, Defendant not only knew that he has "been charged by the IRS with massive amounts of tax fraud," DX 14 at 25, but also expressed anger at the Department of Justice for keeping him from "reap[ing] any kind of reward," *id.* at 26:9-20, from the trust his father created. *See generally id.* at 25:9-29:2.

### 2. *Defendant's Implausible Test Results and Failure of Validity Tests.*

In addition to Defendant's passing performance on Dr. Denney's competency tests, his performance on cognitive and validity tests demonstrates that he was malingering and exaggerating his cognitive symptoms. Specifically, Dr. Denney found that Defendant (a) failed numerous validity tests in both May and October; (b) gave performances on the psychological testing that were internally inconsistent; and (c) performed in a manner that was inconsistent with the natural course of the disease.

### a) **Failure of Validity Tests**

Neuropsychologists use validity tests to determine if a Defendant is feigning symptomology to achieve a secondary gain like avoiding prosecution. 11/15/21 PM Tr. 155:7–159:9. If a defendant fails two or more validity tests in a battery of testing, it indicates that the examinee is not putting forth a genuine effort during testing, or intentionally trying to "fail the tests," and that test results do not represent the examinee's

17

actual cognitive ability.   11/15/21 PM Tr. 159:20-160:24; *see also* GX 162, American Academy of Clinical Neuropsychology 2021 Consensus Statement on Validity Assessment) (hereinafter, the "AACN 2021 Consensus Statement").

Validity tests are designed to have low false positive rates.  11/16/21 AM Tr. 14:16-24. However, forensic psychologists generally do not rely on just one validity test to determine if a subject is malingering. 11/16/21 AM Tr. 15:8-15. Over the course of Dr. Denney's May and October examinations, Defendant failed at least six validity tests. Defendant also failed four validity tests administered by Dr. Guilmette.  Defendant's consistent failure of so many validity tests persuasively supports a finding that Defendant was trying to "game" the cognitive testing, and his cognitive test results to not represent his true cognitive ability.[13]  *See* GX 2 at 7, n.5 (the presence of multiple failed validity tests "eliminates the possibility for any conclusion except that Mr. Brockman is exaggerating his cognitive disfunction.").

> May 19, 2021 Validity Tests

In May 2021, the Defendant failed three validity tests administered by Dr. Denney. He failed the Word Memory Test ("WMT"), the Non-Verbal Medical Symptom Validity Test ("NV-MSVT"), and the Victoria Symptom Validity Test ("VSVT").  GX 1 at 24-25; *see also* 11/16/21 AM Tr. 21:6 – 28:18. Defendant's failure of these three validity tests informs the Court that Defendant is purposefully trying to perform badly—itself

---

[13] These validity and cognitive tests are in contrast to the "competency tests" administered by Dr. Denney which measure an examinees' knowledge of the criminal process and the case pending against them.

revealing—and that his cognitive test results are unreliable and should be disregarded.[14]

Dr. Denney's scoring of Defendant's performance on validity tests is consistent with the accepted practice in the field of neuropsychology, as codified in the AACN 2021 Consensus Statement. The AACN 2021 Consensus Statement states: "More specifically, these investigations demonstrate the importance of maintaining a low false positive rate to improve diagnostic accuracy. Current consensus also supports a false positive rate of .10 per PVT (Performance Validity Test) or SVT (Symptom Validity Test)." AACN 2021 Consensus Statement, GX 162 at 38. This means that for a population of patients known to have dementia that take a validity test, the cutoff for a "pass" or "fail" for that particular test is set at the score that no more than 10% of the patients with dementia demonstrate. 11/16/2021 AM Tr. 14:20-16:12. For example, if 50 patients with dementia take a particular validity test, and the test contains 100 possible correct answers, and if 5 patients known to have dementia (10%) obtain a score of 25, then the pass/fail line for that test is set at 25. Then, when a subject being evaluated for *possible* cognitive impairment takes this same test and scores 24 or less, below the cutoff score of 25, that subject is said to have "failed" the validity test or produced an "invalid score." According to the AACN Consensus Statement, such a low score is to be interpreted as the examinee not putting forth a genuine effort in taking the test and may be an indication of malingering. As Dr.

---

[14] Validity testing is designed to determine if a low score on a cognitive test is the result of a genuine impairment or intentional lack of effort. This is necessarily a one-way ratchet. Validity testing cannot invalidate a high score on a cognitive test because the subject has demonstrated their ability irrespective of their amount of effort. Thus, Defendant's passing score on the competency related testing is not invalidated by his scores on the validity testing.

Denney testified, Defendant fell below the accepted 10% cutoff score on numerous validity tests after these cutoffs had been adjusted for examinees with possible dementia. 11/16/2021 PM Tr. 15:11. Remarkably, Defendant's expert witness, Dr. Guilmette, ignores the AACN 2021 Consensus Statement scoring methodology, and instead scores Defendant's performance on validity tests solely on his "judgment." *See* 11/22/2021 PM Tr. 199:3, 214:12, and 222:5 – 223:15.

The Defendant's score on the WMT, as adjusted for patients with dementia, presented what is called a Genuine Memory Impairment Profile, or "GMIP."  As Dr. Denney testified, this means that either Defendant failed the test outright or has *possible* GMIP.  11/16/21 AM Tr. 27:9-28:18. A genuine GMIP would indicate that the Defendant's memory is so impaired that he cannot obtain a valid score on the WMT.  In order to determine whether the Defendant has an actual GMIP, or is not putting forth a genuine effort, Dr. Denney compared Defendant's scores on the six sub-tests of the WMT to the scores obtained by elderly patients known to have dementia.  *See* GX120.  Dr. Denney testified that when this comparison is made, the Defendant's scores are atypical because relative to the most impaired sample group, Defendant scored worse on the easier parts of the test than he did on the harder portions.  11/16/21 AM Tr. 28:8-18; GX 120 at 2-3.

In fact, Defendant scored worse on the easiest portions of the test than the most severely impaired elderly patients with dementia, and even worse than people simulating dementia.  This severe performance was "not consistent with his demonstrated cognitive performance during the two full day interviews, and general behavior throughout the three-day interaction."  *See* GX 1 at 24.

The Defendant performed similarly on the NV-MSVT validity test, *see* GX 121 at 2; 11/16/21 AM Tr. 33:19-35:18, failing the validity portion (and invalidating the possibility of genuine GMIP) because again he did relatively better on the harder portions of the test. *See* GX 121 at 2. Defendant's atypical profile once again demonstrated malingering. 11/16/21 AM Tr. 34:6-35:11.

Defendant also failed the VSVT. *See* GX 1 at 24-25; 11/16/21 AM Tr. 37:22-38:15. The VSVT is a very simple test in which the subject is shown a five-digit number, then after a few seconds is shown two numbers on a screen and asked to choose which number matches the number he just saw previously. 11/16/21 AM Tr. 35:23-36:18. While the entire VSVT is extremely easy, the test is comprised of "easy" items and "hard" items, the latter of which *appear* more difficult to the examinee even though they are not actually harder. The test is a binary, forced-choice test in which the subject only has two possible choices. Defendant received a failing score on this test under the AACN 2021 Consensus Statement criteria. 11/16/21 AM Tr. 37:16-38:10; *see also* GX 1 at 24 n.3.

Defendant's score on the VSVT is invalid not only because of the gap in his performance between "easy" and "hard" questions, but also because his results were worse than chance. 11/16/21 AM Tr. 39:6-43:4. With binary forced-choice tests, one can expect a predictable pattern based on random probability – like flipping a coin, or if the test subject were blindfolded while taking the test. 11/16/21 AM Tr. 39:13-22. Producing a graph of random choices will create a standard bell curve. *Id.* If an examinee produced scores on such a test that were significantly below what one would observe from random chance, one can conclude the examinee knew the correct answer but chose the wrong answer

intentionally.  Here, the Defendant scored at the bottom of the bell curve.  His score on the "hard" portion of the VSVT was 8/24, or below the bottom 8% of the bell curve ($p$ = 0.0758; i.e., more than 92% of *blindfolded* people would score better than the Defendant). *See* GX 1 at 24.  Accordingly, using either the AACN 2021 Consensus Statement criteria, or the random chance methodology, Defendant failed the VSVT and intentionally did so. This test result, together with the atypical profile of his scores in the WMT and NV-MSVT tests is persuasive evidence that the Defendant was consciously trying to present a false impression of someone with severe cognitive impairment, and his cognitive testing should be disregarded.

<u>October 20 and 26, 2021 Validity Tests</u>

Dr. Denney observed a similar pattern in his testing of Defendant on October 20 and 26, 2021.  Once again, the Defendant failed three validity tests using the AACN 2021 Consensus Statement criteria.  The Defendant failed the NV-MSVT, the MSVT, and a test called the Rey-15 Item test ("Rey-15").  On both the NV-MSVT and the MSVT, as the Defendant had done in May, his score presented a *possible* GMIP.  11/16/21 AM Tr. 53:9-54:8.  Once again, however, when Dr. Denney compared Defendant's scores to control groups of elderly patients known to have dementia, Defendant's scores presented an

atypical profile compared to genuine dementia patients. *See* GX 2, at 11-12; 11/16/21 AM Tr. 53:13-54:14.

The Defendant also failed the Rey-15 validity test. This is a very simple test in which the subject is shown a set of 15 items and then asked to perform two tasks: 1) free recall, in which the subject is asked to recreate the 15 items, and 2) recognition, in which the subject is shown a page with 30 objects on it and then asked to circle the objects from the first 15 items. Although the test is presented in a way that makes it sound hard, 11/16/21 AM Tr. 55:21-56:1, the 15 items are very easy to remember, especially because of the layout in which they are presented. GX 124

| A | B | C |
|---|---|---|
| 1 | 2 | 3 |
| a | b | c |
| ○ | □ | △ |
| I | II | III |

In failing this simple test, Defendant presented as having essentially no short-term memory. This result, however, is inconsistent with Defendant's other test results. During Denney's administration of the ECST-R competency exam, Defendant mentioned Kathy Keneally and spelled her name; minutes later, after discussion about other legal topics and after the exam concluded, Denney asked how to "spell her name again" (without referencing whose name he was asking about name). GX 2 at 19-20. Defendant remembered it was Ms. Keneally and spelled her name one more time. *Id*.

Defendant's repeated failures of the validity tests demonstrate that he is still malingering his symptoms. This continued malingering is itself evidence of competence.[15]

---

[15] District courts recognize that defendants who claim a sudden onset of memory loss or cognitive dysfunction are often malingering, and such malingering findings support the conclusion that the defendant is competent. *See, e.g.*, *Simpson*, 645 F.3d at 306–07; *Dockins*, 986 F.2d at 892.

### b)  Internally Inconsistent Results

In addition to Defendant's failure of the free-standing validity tests, Defendant's performance on other cognitive testing did not match that of a genuinely impaired person. In both May and October, Dr. Denney administered the NAB Memory Module ("NAB"), which is a standard neuropsychological test of memory.  11/16/21 AM Tr. 43:5-20.  In May, Defendant scored almost three standard deviations below the mean which would represent someone "severely impaired."  11/16/21 AM Tr. 44:17-19. This test result was entirely inconsistent with how Defendant behaved when being interviewed by Dr. Denney and Dr. Dietz. Video of May Dietz/Denney Interview, GX 3.    Defendant demonstrated the ability to retain information from one day to the next and even volunteered information from the previous day.  *See, e.g.*, 11/16/21 AM Tr. 45:11-46:3.  Dr. Denney testified that if Defendant's score on the NAB was genuine, he simply would not have been able to recall conversations day to day as he did while being interviewed over two days.  *Id.* 45:15-46:3.

In both May and October, Defendant produced dismal scores on the verbal portion of the NAB test but did well on the non-verbal section of the test.[16]  As Dr. Denney testified, "[t]hat's pretty striking.  For somebody to be that globally impaired, and yet produce normal ranges on the nonverbal portions of the tests does not make clinical sense." *Id.* at 46:18-23.  The October NAB scores were also atypical.  *Id.* at 63:17; GX 2 at 15.  In fact, Defendant's NAB memory scores were the lowest Dr. Denney had ever seen, even though Defendant tested normal on two imbedded sub-tests.  This is not consistent with genuine

---

[16] A particularly notable finding in light of Defendant's experts' view that Defendant's verbal abilities are particularly strong and remain largely intact.

illness.  11/16/21 AM Tr. 64:25-65:4. From these atypical scores, Dr. Denney concluded that the Defendant was intentionally exaggerating his memory "problems" in both May and October.  *Id.* at 68:9-12.

Defendant's NAB scores were also inconsistent with his Rey-15 performance. Defendant scored in the normal range for shape learning on the May and October NABs. *Id.* at 64:6-10. Given those scores (on the more difficult test), Defendant should have scored nearly 100% on the Rey-15, which is much simpler.  *Id.* at 64:11-20.  Instead, Defendant only identified 1 out of 15 simple items.  *Id.* at 56:4-8.

### c)  Inconsistent with the Natural Course of the Disease

The Defendant's exaggeration of his symptoms can be illustrated by observing his memory test scores over time.  *See* GX 130; 11/16/21 AM Tr.127:22-129:11. When Dr. York tested Defendant's cognition on March 1, 2019, she scored Defendant in the bottom tenth of the first percentile, and his scores have remained in that range ever since.  This is not typical for neurodegenerative diseases. 11/16/21 AM Tr. 128:14-129:5. With a genuine neurodegenerative disease, one would expect a subject's scores to get worse over time, with a gradual downward curve.  *Id.*  In this case, the Defendant tested at the lowest possible level from the very beginning, and his test scores stayed at the bottom (≤1st percentile) across three years.  *Id.*  In Dr. Denney's opinion, this scoring pattern over time is a clear indicator of malingering.  *Id.* at 130:9. Essentially, the extent to which Defendant feigned cognitive dysfunction on tests ultimately became a compelling piece of evidence that he was malingering because, as Dr. Dietz stated, he "overshot . . . and bottomed out on

[neuropsychological test] performance too early in March of 2019, and had nowhere down to go."  11/19/21 PM Tr. 135:13-15.

### 3.  *Defendant's Presentation and Behavior During the Interviews*

The recorded examinations support Dr. Denney's conclusion that Defendant is competent.  The May examination videos by Drs. Denney and Dr. Dietz speak for themselves, and reveal a man competent to stand trial.  *See generally* GX 3. In his May 5th examination with Dr. Darby, Defendant gave an accurate accounting of his medical history as reflected in the available records.  11/15/21 PM Tr. 8:22-9:11. When asked how long he had been experiencing cognitive problems, Defendant gave an answer that was favorable to his case and then offered up documentary evidence of his claim, pointing Dr. Darby to medical records Defendant had in his home and that had not been previously produced.  *Id.* at 5:17-7:25. When Dr. Darby began administering tests, however, Defendant "struggled" and responded more slowly.  *Id.* at 8:14-18.

The May interviews with Drs. Denney and Dietz proceeded similarly.  Defendant presented as high functioning during the interview portions but, again, presented as severely impaired during the cognitive testing.  Defendant's interview performance also betrayed an understanding of the live issues in the competency hearing and the case-in-chief.  For example, in listing his charitable contribution on the first day of interviewing, Defendant omitted Baylor; he omitted Baylor again on the second day and, when confronted about it on the third day, he acknowledged that the trust donated to Baylor but downplayed the amount.  11/19/21 AM Tr. 37:12-38:6. He also went out of his way to build up Reverend Jim Jackson, who would later be called on by the defense experts as a

26

collateral source, as "an absolutely, totally honest and straightforward person."  11/19/21
PM Tr. 24:24-26:13; GX 5 at 56:2-3.[17]

Finally, although he was reluctant to discuss his case, Defendant did not shy away
from asserting his defenses to the allegations, covering every potential defense theory: 1)
cooperating witnesses lied to save themselves; 2) the emails were fabricated; and 3)
Defendant and the trust are completely separate.  After correctly identifying Tamine as
"Individual One," Defendant explained that the indictment is Tamine's "work product"
that was produced for the Justice Department in exchange for immunity.  GX 5A at 112:19-
114:1.  He also conveyed his "supposition" that Robert Smith[18] cooperated with the
government to "save his neck."  When asked about emails between Defendant and Tamine,
he noted "I'd be remiss in pointing out that you can create a piece of paper like this without
it being an e-mail."  *Id.* at 114:19-21.  And when asked about FBARs, Defendant said that
his trust had no FBAR reporting requirements and that the fact that Defendant has never
taken a distribution from the trust indicates that the trust documents (suggesting it is
independent from Defendant) are correct.  *Id.* at 120:19-121:15. This conversation was
followed by an accurate description of the debt-buyback transactions at the heart of the
wire fraud counts, and a comment about how expensive the attorneys' fees have been.  *Id.*

---

[17] Of course, that is not the case.  Reynolds omitted a key email from its response to a
hearing subpoena. In that email, Jackson admits to purposefully misleading IRS
investigators to protect Defendant. GX 152. Undoubtedly, that email reals Jackson to be
less than "absolutely totally honest and straightforward."

[18] Robert Smith controlled the private equity fund through which Defendant received a
substantial portion of the unreported income alleged in the indictment. On October 9,
2020, Smith signed a non-prosecution agreement and agreed to cooperate with the
government in its investigation.

at 122:2-129:15. These exchanges between Defendant, Dr. Denney, and Dr. Dietz contradict Defendant's performance during cognitive testing in which he presented as a severely impaired individual. These inconsistencies in behavior, however, are consistent with Dr. Denney's conclusion that Defendant is malingering.

After the government's experts filed reports concluding that Defendant was exaggerating, citing the conspicuous gap between his scores and his performance during the non-testing portions of their evaluations, Defendant changed his performance. In July 2021, during the interview with Drs. Agronin and Guilmette, Defendant presented as severely impaired. Still, during the government's October evaluation, Defendant passed the ECST-R competency exam, and demonstrated sufficient short-term memory to remember a discussion about Ms. Keneally minutes after it had ended. GX 2 at 19-20. He was also able to spell "world" backwards, even though he could not do this in his May. 11/19/21 AM Tr. 91:19-23. He expressed a vague understanding of current political news. *Id.* at 86:3-12. He also remembered Dr. Dietz's name and expressed displeasure about Dietz confronting him with the indictment and some emails during their meeting in May. *Id.* at 85:24-86:3. Again, Defendant's performance in October 2021 was inconsistent with genuine severe cognitive impairment.

### 4. *Defendant's Neuroimaging is Not Consistent with His Claimed Disease Progression.*

Dementia cannot be diagnosed with neuroimaging alone. There is not a one-to-one correlation between neurodegeneration (brain damage) and cognitive dysfunction, as some people can withstand brain damage better than others. Although there are many factors

that explain this, the experts agree that a person with a higher baseline cognitive function ("cognitive reserve") can likely better withstand neurodegeneration than a person with a lower cognitive reserve. By all accounts, Defendant's premorbid intelligence was unusually high. The experts all agree that the imaging evidence in this case reveals that Defendant is suffering from neurodegeneration. However, the objective evidence evaluated by the government's experts Drs. Darby, Dietz, and Denney establishes that Defendant's relatively mild imaging data is not consistent with how he presented himself during cognitive testing – as severely impaired. Further, the imaging can demonstrate that Defendant did not take an unusually sharp downward departure after the May 2021 examination when all of the government experts found Defendant to be competent.

The imaging evidence reveals signs of mild neurodegeneration in Defendant's brain. The FDG-PET is the most informative scan as it shows current brain function by measuring how much sugar is being metabolized throughout different parts of the brain. These metabolic changes, over time, lead to a reduction in brain volume, which is measured by an MRI. The Amyloid PET does not measure neurodegeneration.[19]

In advance of his May 2021 evaluation, Dr. Darby ordered an FDG-PET in March. The interpreting radiologist wrote "[f]indings are very mild, but suggestive of early neurodegenerative disease." GX 43 at 1. Taking seriously the potential that Defendant's June hospitalization could have severely injured his brain, Dr. Darby ordered another FDG-

---

[19] Whether Defendant's brain changes result from Parkinson's or Alzheimer's is not important, as both diseases cause progressive neurodegeneration, which can be observed on the FDG-PET and MRI scans.

PET in August.  The August FDG-PET was "mild, but very suggestive of neurodegenerative disease, particularly Alzheimer's disease."  GX 43 at 4.  In comparing the two FDG-PETs, Defendant's expert neuroradiologist wrote that the "pattern of diminished metabolic activity is similar between the two recent FDG-PET scans, though may have progressed slightly to involve more of the brain."  DX-30 at 2; GX 170.[20]  The mild August FDG-PET does not match Defendant's severe July and October presentation, and the minor *change* between the March and August scans do not match the dramatic *change* between Defendant's May and July (and October) presentations.

The MRI images tell a similar story.  The 2018 MRI testing showed age-appropriate changes to brain size without other abnormalities. GX 39 at 6. The 2021 MRI also revealed no more than age-appropriate volume loss.  *Id.*

Having received Defendant's 2021 Neuroreader report, Dr. Darby ordered Neuroreader reports for the 2018 and 2021 MRI data.  As expected, the 2021 reports ordered by Dr. Darby and Defendant's experts show the same results.[21]  Defendant's 2018 and 2021 brain volumes were in the 23.4th and 23.8th percentiles of cognitively normal people of the same age (77-year-olds and 80-year-olds).  GX 39, at 6.  Despite these quantitative findings, produced by software that Defendant's experts were the first to order,

---

[20] Dr. Whitlow contradicted his report in his testimony, stating that the progression should actually be considered aggressive. 11/23/21 AM Tr. 121:7-122:17.

[21] The quantitative analyses between the two are not subject to fair comparison because, although the 2021 MRI "used a sequence specifically designed for Neuroreader, with a short distance (1.2mm) between brain slices that allows for more precise measurement," the 2018 scan was on a machine with 1.5mm slices. GX 39 at 5-6.  Still, both scans showed normal brain volume.

Defendant's expert neurologist and radiologists ask the Court to give greater weight to their subjective interpretations of the MRIs instead of the objective statistical analysis.  Dr. Whitlow went on to testify that his subjective comparison of Defendant's images to his memory of images of his other patients is more reliable than a computer program's quantitative comparison of Defendant's MRI data to a group of cognitively normal samples.  11/23/21 AM Tr. 172:12-173:16. This defies logic.  Defendant's MRIs reveal that his brain volume is the normal range for a man of his age, and his experts' refusal to acknowledge that is reflective of their prejudgment of the outcome in this case.

Like Dr. Darby, Drs. Denney and Dietz were genuinely concerned about the effect of Defendant's June 2021 hospitalization on his cognition.  Dr. Dietz's concerns were resolved after receiving Drs. Darby and Denney's reports[22] that were filed on the same day (unlike the defense experts, the government's experts did not exchange drafts and propose edits to each other's reports). Dr. Dietz's final three-page report, GX 88, explained why he ultimately concluded that Defendant's post-hospitalization presentation represents enhanced malingering, and not genuine cognitive collapse.  First, he explained, Defendant's continued failure of performance validity tests shows that he continues to exaggerate his cognitive impairment. *Id.* at 3.  Second, Defendant's severe presentation is inconsistent with the imaging findings, as the latest imaging reveals only mild

---

[22] And the concurrently filed defense expert reports.  Dietz's confidence is bolstered by the defense experts' continual failure to address Defendant's "motivation to avoid prosecution, the marked discrepancy between his early cognitive test results and his contemporaneous testimony and speeches, or the serious allegations of a remarkable pattern of deceptive conduct spelled out in the indictment."  GX 88 at 3.

neurodegeneration and the pre-and-post hospitalization imaging reflect only a small change, which is not reflective of the large change in presentation. *Id.* at 2.

   C.   The Court should give little weight to the testimony of the Defense witnesses.

   1. *Defendant fact witnesses were either biased or, at a minimum, relying on incomplete or misleading information*

As discussed further above, the evidence shows that Defendant was malingering in 2019 and 2020.  In an effort to rebut this testimony, Defendant promised to call several fact witnesses who could testify as to Defendant's lack of ability in 2021.  During the presentation of evidence, however, Defendant called only three fact witnesses, Dr. James Pool, Frank Gutierrez, and Peter Romatowski.  None of these witnesses were able to provide compelling evidence about Defendant's inability to assist his attorneys.

   A. Dr. James Pool

Defendant called Dr. James Pool to testify about the medical care provided to Defendant from 2018 through 2021.  Dr. Pool's testimony revealed substantial bias in favor of the pre-determined outcome that Defendant is not competent to proceed in this matter. As an initial matter, Dr. Pool suffered from the same handicap as all of the Baylor Doctors—he only saw Defendant inside the exam room. 11/22/21 AM Tr. 78:6-8. Second, although Dr. Pool was not a neurologist or psychiatrist, he concurred with the mistaken diagnosis of Dr. York that Defendant had dementia in March 2019. 11/22/2021 AM Tr. 105:14-20.  Dr. Pool testified that he was not aware of the criminal investigation and thus could not take that into consideration as a motive to feign impairment.  11/22/21 AM Tr. 88:11-21.  Also, although Dr. Pool was supposed to be the "quarterback" all of Defendant's care, he claimed that he was unaware that Dr. Yudofsky was prescribing medicine to

Defendant or receiving copies of the medical records.  11/22/21 AM Tr. 128:5-129:2. Dr. Pool further claimed that he somehow did not notice that the former Chairman of Psychiatry at the institution he practiced was involved in his patient's cognitive care.  *Id.* at 129:3-21.  When Dr. Pool was confronted with his own handwritten notes that suggested Dr. Pool was "following up" with Dr. Yudofsky, Dr. Pool incredulously claimed that he only made that note because Yudofsky was Defendant's "fishing buddy."  11/22/21 AM Tr. 136:6-139:4; *see also* GX 85 at 11-12.

Dr. Pool's lack of medical objectivity was transparently obvious during his testimony.  Dr. Pool worked closely with Defendant's counsel, meeting with them 22 times, but refused to meet with representatives of the government or its experts. 11/22/21 AM Tr. 100:6-19. Dr. Pool admitted that his declaration filed with this Court was actually drafted by Defendant's counsel. 11/22/21 AM Tr. 91:8-24.  Similarly, his January 2020 letter supporting Defendant's April 9, 2020 request to the government to not indict was drafted in conjunction with defense counsel.

When confronted with Dr. Lai's medical records of his treatment of Defendant, which contradicted Dr. York's March 2019 diagnosis, Dr. Pool attempted to claim that "mild cognitive impairment" (Dr. Lai) and dementia (Dr. York) were the same thing, or that he knew that Dr. Lai was using imprecise language.  11/22/21 AM Tr. 110:20-111:1. Dr. Pool claimed he never attempted to speak to Dr. Lai about this apparent discrepancy despite Dr. Lai being Defendant's treating neurologist.  *Id.* at 114:5-10.

Dr. Pool's testimony is simply not credible. Dr. Pool's explanation about Dr. Yudofsky's name appearing in his notes is not believable. *See* GX 85 at 11.  Nor is his

"interpretation" of Dr. Lai's diagnosis of mild cognitive impairment. Dr. Pool's prevarication should give the Court pause with respect to all of his testimony, particularly given the suspicious relationship between Defendant and Dr. Yudofsky.

B. <u>Frank Gutierrez</u>

Mr. Gutierrez has only known Defendant since April 15, 2021 – after the motion for this hearing was filed.[23]  Although he described numerous ailments suffered by Defendant, most of what he described were physical symptoms.  As Mr. Gutierrez told the Court, physical limitations are not the same thing as mental limitations.  11/22/21 PM Tr. 49:5-8.[24]

While Mr. Gutierrez does spend a significant amount of time with Defendant every day, his ability to perceive is limited in crucial ways.  Mr. Gutierrez does not go into the room when Defendant meets with his attorneys. *Id.* at 49:18-25.  Defendant and his wife have discussions that Mr. Gutierrez is not a party to, and Mr. Gutierrez is not in the room when Defendant meets with Barras. *Id.* at 50:9-51:16. Additionally, there are certain phone calls and discussions where the Brockmans specifically ask Mr. Gutierrez to leave the room or go into another room to talk without him in earshot. *Id.*  Mr. Gutierrez's testimony only presents a carefully chosen snapshot of what Defendant wishes those outside his inner circle to see.

---

[23] Dr. Agronin, however, incorrectly determined that Mr. Gutierrez had been with Defendant for "a year-plus."  GX 160; *see also* 11/22/21 PM Tr. 54:9-55:4.

[24] While Mr. Gutierrez did describe some mental symptoms like disorientation or Defendant's desire to go to the office or fishing, those limited symptoms would be the easiest to fake.

C.  Peter Romatowski

Mr. Romatowski's testimony also has significant limitations. He admitted that he has not met with Defendant since February 2020, and has only spoken to him by telephone between 6-12 times since then.  11/24/21 AM Tr. 10:4-9.  He claims that he is still involved in the case but has never entered an appearance, signed a brief, or spoken to Defendant's doctors. *Id.* 65:24-66:1.

Mr. Romatowski testified that he had concerns about Defendant's competency since a July 18, 2019 meeting when Defendant told counsel he had dementia.  *Id.* at 21:7-22:11. Despite this claim, Mr. Romatowski did not bring this concern to the attention of Defendant's civil attorneys prior to Defendant's September 2019 deposition in the FTC investigation.  *Id.* at 34:3-8.  With the reputation of Reynolds under assault, and potentially large fines at stake, one would expect that the cognitive abilities of the CEO would be paramount.

Further, Mr. Romatowski's observations were not consistent with contemporaneous evidence. Mr. Romatowski claims that Defendant was consistently unable to review and evaluate documents, fell back on generalities during discussions, and had difficulty recalling information or offering specifics. *Id.* at 36:12-21, 37:18-38:7.  Mr. Romatowski's testimony is contradicted by the "real world" evidence in this case.  On October 9, 2019, months after Mr. Romatowski concluded Defendant was not competent, Defendant emailed his tax accountant about his 2018 returns and recalled detailed information

concerning an investment by the GOOSE group.[25] GX 115. Moreover, this is not information Defendant could have simply looked up as he sent the email while dove shooting in Argentina. *Id.* Perhaps aware of this inconsistency, Mr. Romatowski testified that he "can't rule out" that someone incompetent to stand trial would be able simultaneously able to run a multi-billion-dollar software company. 11/24/21 AM Tr. 58:9-13.

Mr. Romatowski's credibility was also hurt by the letter he signed that was sent to the Department of Justice on April 9, 2020.[26] *See* GX 81. In addition to the conclusions in this letter being inconsistent with contemporaneous "real world" evidence, the letter omitted crucial information relevant to the determination of Defendant's mental condition. For example, the letter completely omitted any reference to Defendant's treating neurologist, Dr. Lai. Notably, at the time of this letter – April 9, 2020, Dr. Lai's diagnosis of mild cognitive impairment directly contradicted the diagnosis of the Baylor Doctors cited in the letter. The letter also included two clocks drawn by Defendant for Dr. York as part of her testing that Mr. Romatowski described as "startl[ing]" and "very persuasive to the Department of Justice that if the clocks are looking like this that Mr. Brockman may have some mental issues." 11/24/21 AM Tr. 68:18-69:17. The clocks looked like this:

---

[25] Defendant is even aware he is misspelling the word "Entrepreneurs."

[26] Mr. Romatowski testified he read every word of the letter and believed it to be accurate.



03/01/2019                                          12/03/2019

GX 81, p. 10.

Not included in the letter signed by Dr. Romatowski was Defendant's more recent clock drawn for Dr. Lai on January 8, 2020 – also as part of cognitive testing. This clock was drawn only three months prior to counsel's April 9, 2020 letter and looked like this:



GX 156, p. 143. Mr. Romatowski claimed to have never seen this clock but conceded "I think that's a better clock." 11/24/21 AM Tr. 70:15-24.

Mr. Romatowski also could not answer for a footnote that described the May 3, 2017 email to defendant's "friend" Dr. Yudofsky. GX 81 at 15 n.17. The letter claimed, incredibly, that "[b]ecause we understand that Dr. Yudofsky is a potential witness represented by counsel in his matter, we have not contacted him to discuss his confidential examination of Mr. Brockman." *Id.* Mr. Romatowski conceded that Jones Day has no policy that would prevent Defendant's lawyers from contacting a represented witness and

could provide no explanation for why Jones Day declined to contact Dr. Yudofsky. 11/24/21 AM Tr. 82:23-83:20. In sum, Mr. Romatowski's testimony is so thoroughly inconsistent with relevant facts that the Court should disregard it.

> 2. *Defendant's experts, due to inexperience or other reasons, either missed or ignored contradictory information and should not be relied on*

Defendant also presented the testimony of expert witnesses who were similarly unpersuasive. Defendant's experts made recurring mistakes that undermine their testimony. Defendant's experts (a) were inexperienced in forensic criminal proceedings; (b) failed to meaningfully consider the Defendant's substantial motivation to malinger (c) did not address evidence that contradicted the diagnoses of the Baylor Doctors; (d) used flawed methodology; and (e) ignored contradictory evidence.

### a) Defendant's experts are inexperienced in crucial ways

Defendant's experts have little experience in forensic criminal practice and detecting malingering. Dr. Guilmette, the defendant's neuropsychiatrist, has only testified in a single criminal case. 11/22/21 AM Tr. 161:11. Indeed, Dr. Guilmette is primarily a clinical neuropsychologist who specializes in personal injury cases. 11/22/21 AM Tr. 160:6-161:13. Similarly, Dr. Agronin works in a Florida nursing home, 11/23/21 PM Tr. 41:13-20, and, prior to this case, he evaluated only two criminal defendants. *Id.* at 191:15-192:1. He has no experience with malingering, but testified that he considered it and "did not find and see any evidence" of it. *Id.* at 92:18-93:16. Although he analogized his diagnostic evaluation to "detective work. . . looking at a mosaic to try to put all the pieces

together," *id.* at 54:16-20, he went on to explain that his evaluation was essentially clinical. *Id.* at 54:21-55:12 (he relied on clinical history,[27] examinations, and imaging).

Dr. Thomas Wisniewski told the Court that he "see[s] patients on the prison floor" and suggested he had previously given opinions on criminal competency, 11/17/21 PM Tr. 88:24-89:20, but he later admitted he had done "not many" competency examinations and could not remember the name of any defendant he previously evaluated. *Id.* at 94:19-95:2. He acknowledged that is not an experienced forensic examiner, *id.* at 88:9-11, 136:12-15, explaining that he took this assignment because he "thought it would be fun, a different experience." *Id.* at 61:6.

### b) Defendant's Experts failed to consider the motivation to malinger

Defendant's experts consistently dismissed Defendant's motive to malinger. Dr. Wisniewski, who billed only 40 hours for this case, 11/17/21 PM Tr. 142:16-19, was not even aware that a search warrant was executed at the home of Defendant's associate. *Id.* at 151:11-17. This is a striking blind spot because the investigative timeline provides important context for analyzing the timeline of Defendant's memory complaints. And while Dr. Wisniewski simply lacked that context, Drs. Guilmette and Agronin knew about the criminal investigation but failed to address it. Dr. Guilmette, in his reports, failed to consider the timeline of the criminal case, and the probative value this timeline has on the question of the Defendant's motivation to malinger to avoid prosecution.

---

[27] Dr. Agronin selectively relied on the "clinical history," going on to note Dr. Lai's October 2021 dementia diagnosis, but not the fact that he diagnosed MCI before then. *Id.* at 80:16-81:6.

It is clear from the record that Defendant's first complaints to a medical professional about "cognitive problems" came immediately after the September 5, 2018 search warrant in Bermuda of Evatt Tamine's home in which the Defendant's encrypted email server was seized by the Bermuda Police Service. 11/18/21 PM Tr. 18:17- 24:13. The juxtaposition of Defendant's "cognitive issues" to the timeline of the criminal case is very suspicious and should give one pause. Instead of addressing these facts as a possible motive by the Defendant to exaggerate his symptoms, Dr. Guilmette simply takes the Defendant "at his word," devoid of any skepticism. *See* 11/22/21 Tr. 244:12-245-22. The failure of Dr. Guilmette to reconcile evidence that may contradict a diagnosis of mild to severe dementia reveals a bias that diminishes the weight the Court should give to his conclusions.

### c) Defendant's Experts refuse to acknowledge that Defendant successfully fooled the Baylor Doctors

Defendant returned from his fishing trip on the evening of September 10, 2018, just five days after the Tamine search warrant. The very next day, Defendant saw Dr. Lerner and told him he was "distressed by change in his health and sense of well being" and would like to set up a consultation with Dr. Pool. DX-79 at 5. During Dr. Pool's first appointment with Defendant, Dr. Pool referred Defendant to additional doctors to evaluate what Dr. Pool believed was a major neurocognitive disorder. After Dr. York conducted a series of neuropsychological tests in March 2019, she concluded that Defendant had mild-to-moderate dementia. This diagnosis was adopted by the rest of the Baylor team. Those diagnoses were made by doctors that did not have access to the opinions of Defendant's colleagues, or Defendant's contemporaneous speeches,

depositions, and emails.  Nonetheless, rather than acknowledging that Defendant fooled these doctors into making false diagnoses, Defendant's experts ignore this evidence. Worse still, when pushed to opine on those diagnoses, they contort themselves to claim that the diagnoses were accurate, and cavalierly dismiss the possibility of malingering.

Defendant's performance during the 2019 depositions is particularly instructive.  In Dr. Denney's opinion, a patient diagnosed with mild to moderate dementia, as the Defendant was in 2019, could not possibly have performed as the Defendant did during these depositions.  11/16/21 AM Tr. 77:13, 78:16, 80:22.  The same is true of the Defendant's speeches at the November 2018 and November 2019 Reynolds gatherings. GX77, 77A, 116, 116A; 11/16/21 AM Tr. 88:9-11.  Dr. Guilmette, by contrast, was aware of this "real world" evidence and chose not to comment upon it in his reports.  11/16/21 AM Tr. 92:8-92:19.

The defense experts' collective failure to critically evaluate the 2019 diagnosis, infects their opinions about Defendant's competence today.  Dr. Agronin's belief that Defendant had dementia back in early 2019, 11/23/21 PM Tr. 179:7-13, supports his conclusion that he is not malingering today.  *Id.* at 94:2-16.  On direct, Dr. Agronin testified that "for someone to be able to feign . . . dementia like this over years in nearly every single setting to me is completely implausible.  It is herculean in a sense that it would be a mythic thing for someone to do."  *Id.* at 95:7-11.  While focusing on Dr. Dietz's use of the word "herculean," Dr. Agronin missed the fact that Defendant did *not* feign dementia "in nearly every single setting."  Dr. Agronin ignored Barras's sworn testimony about Defendant's running of Reynolds, (*see infra*), failed to seriously consider that Defendant continued to

41

write cogent emails about complex topics through 2020 (*id.* at 197:20-198:13), and disingenuously compared Defendant's testimony to Tony Bennett's singing, as if testifying over the course of four days is akin to singing a familiar song. *Id.* at 57:21-59:19.[28]

### d) Defendant's Experts used flawed methodology

In his testing of Defendant, Dr. Guilmette made three major errors: 1) he dismissed the Defendant's failure of validity tests by presupposing that Defendant was simply too impaired to take the tests; 2) he re-administered two validity tests after Defendant failed them; and 3) he ignored standardized scoring methodology to re-characterize failed validity tests as "passes."   These errors require substantial skepticism of Dr. Guilmette's conclusions.

Dr. Guilmette administered a very simple validity test called the Coin-in-the-Hand test.  11/16/21 PM Tr. 109:10.  The subject observes the examiner place a coin in one hand, the subject closes his eyes and counts down from ten, and then opens his eyes and is asked to guess which hand contains the coin.  Although Defendant failed this simple validity test, GX 167; 11/22/21 PM Tr. 112:14-113:1, Dr. Guilmette concluded otherwise by presupposing that Defendant was simply too impaired to understand the test.  DX-22 at 18. Dr. Guilmette's methodology applies circular logic, and his conclusions thusly, should be given very little weight.  It also ignores the AACN 2021 Consensus Statement accepted

---

[28] Agronin went conceded that the deposition included some relevantly recent material, but said nothing of Defendant's strategic or misleading answers, let alone why Defendant could convey a firm grasp over the history and management of his business, but not his offshore trust structure.

scoring methodology for validity tests in the field. *See* GX 162, AACN 2021 Consensus Statement, p. 1090.

Dr. Guilmette also re-administered two validity tests after Defendant initially failed them. 11/22/2021 Tr. 192:17 – 198:7. This practice is not condoned by the American Academy of Clinical Neuropsychology. "Practices that depart from standardized instructions can result in more sophisticated feigning, thereby impacting the effectiveness of PVTs [performance validity tests]." GX 162 at 17; *see also* GX 161 at 4 (*"*It is not, of course, appropriate to subtly or directly warn or prompt the patient immediately before the test is administered."); 11/22/21 PM Tr. 188:17-189:16. Dr. Guilmette acknowledged that initially the Defendant failed both tests, but then he immediately re-administered them. *Id.* at 191:6-192:4; DX 19 at 42-43. As Dr. Denney testified, such re-administration amounts to "prompting" or "coaching" the test subject in direct contravention of the AACN 2021 Consensus Statement. 11/16/21 PM Tr. 110:6-16.

Further, on October 2, 2021, Dr. Guilmette mis-scored two validity tests, and re-characterized "fails" as "passes." By ignoring accepted scoring practices, and substituting his own judgment in scoring these tests, Dr. Guilmette permits himself to conclude that the Defendant is not feigning cognitive impairment. 11/22/21 PM Tr. 203:4-206:24. Dr. Guilmette acknowledged on cross-examination that despite his initial assessment of the MSVT for the Defendant as a "pass," the Defendant actually failed this test. 11/22/21 PM Tr. 206:22-24. Dr. Guilmette's demonstratable departure from accepted practices in his own field should give the Court pause in assigning any weight to his testimony. *See* AACN 2021 Consensus Statement, GX 162 at 38.

43

Finally, Dr. Guilmette also tried to hide instances when the tests he administered produced a result contrary to Defendant's position.  For example, in July 2021 Dr. Guilmette administered a sophisticated and lengthy computerized test called the Iowa Gambling Test.  *See* GX 127; 11/16/21 AM Tr. 114:13-115:6. The Iowa Gambling Test measures a subject's executive skills, judgment, decision making, and risk-taking behavior. The Defendant passed this test with a score of 49 which placed him in the "unimpaired range."  11/16/21 AM Tr. 118:7-14. Dr. Guilmette, notes the Defendant's score in his report, but fails to explain that, according to the testing manual, Defendant tested as an "unimpaired" subject. DX 19 at 52-53; *see also* 11/22/21 PM Tr. 184:25-187:22. Dr. Guilmette's report also misleadingly highlights Defendant's score on the last portion of the test, where the Defendant did not perform as well, giving the Court the false impression that the Defendant did not poorly on a test he passed.  Dr. Guilmette's failure to objectively comment on, or consider, medical evidence that contradicts the pre-ordained diagnosis of severe cognitive impairment or dementia invalidates his conclusions, and the Court should wholly disregard them.

### e)  Defendant's experts ignore contradictory evidence

While they credited the March 2019 Baylor diagnosis of mild-to-moderate dementia, Defendant's experts ignored the fact that Defendant's treating neurologist, Dr. Lai, consistently diagnosed Defendant with mild cognitive impairment and *not* dementia between January 2020 and February 2021. GX 156, 157, 158.  From January 2020 through October 2021, the defendant visited Dr. Lai 11 times.  *See* generally DX 38.  Not until

October 7, 2021, did Dr. Lai change his diagnosis of Defendant to "mild dementia."[29]  The most revealing example of the experts' selective focus on Dr. Lai's medical records was Dr. Wisniewski's ignorance about Dr. Lai's numerous MCI diagnoses and his independent recall of "the October 7th" dementia diagnosis.  11/17/21 PM Tr. 148:2-18.

Defendant's experts also seemed to find no meaning in the fact that Defendant and his family members reported hallucinations and REM sleep disorder to the Baylor doctors. In diagnosing Defendant with potential LBD, the Baylor Doctors relied on Defendant's statements to find that he had a REM Sleep Disorder.  11/22/21 AM Tr. 122:2-123:9. The lack of REM Sleep Disorder does not conclusively rule out a diagnosis of LBD, but it is a strong indicator that LBD is not present.  11/16/21 PM Tr. 84:18. In August 2021, the Defendant underwent a comprehensive sleep study which ruled out REM Sleep Disorder. GX 42.  While Dr. York's LBD diagnosis came prior to the August 2021 sleep study, she could not have possibly known to rule out LBD.  Dr. Guilmette, however, did know about the August 2021 sleep study when he prepared and submitted his October 29, 2021 report. Yet he chose not to question Dr. York's diagnosis of LBD.  *See* DX 19, pp. 12-13, 15 and DX 22 p. 26. On cross-examination Dr. Guilmette acknowledged that like Dr. York, he did not consider contradictory evidence in coming to his conclusions. 11/22/21 PM Tr. 242:14-20.

Dr. Agronin testified that "collateral reports are critical," 11/23/21 PM Tr. 57:1. However, Dr. Agronin only relied on "collateral evidence," that was spoon fed to him by

---

[29] As noted above, Dr. Lai saw Defendant for only 42 minutes at that meeting, administered only one cognitive test, and administered no validity tests.

Defendant, and ignored substantial amounts of collateral evidence that contradicted the pre-conceived conclusions desired.   Primarily, Dr. Agronin relied the most heavily on statements made by Defendant's wife – who did not testify at the hearing and was not subject to cross-examination. *Id.* at 64:3-4.   The only witnesses that Dr. Agronin interviewed that did testify at the hearing were Barras and Gutierrez.   While on the stand, Dr. Agronin tried to distance himself from his previous reliance on Barras, explaining that Barras's testimony was "different from" what Barras told Dr. Agronin.   *Id.* at 70:24-71:19.[30]

Dr. Agronin's self-described detective skills were unable to uncover any evidence contrary to Defendant's narrative.   For example, even though Barras was the first person he interviewed, *id.* at 155:12-13, Dr. Agronin admitted that he did not even know about Barras's prior deposition testimony. *See* GX 60 at 52:1-15.   Instead, Dr. Agronin testified that he simply "disregarded" Barras as a collateral source. *Id.* at 160:3-162:16. What Dr. Agronin actually disregarded appears to be Barras's sworn testimony that contradicts the diagnosis of Defendant having severe cognitive impairment or dementia.   *Id.* at 164:7-165:1. Ultimately, Dr. Agronin just assumed that what Barras told him was more accurate than what he testified to under oath, twice.   *Id.* at 154:10-24 ("I don't understand . . . why he would not be as forthcoming in his testimony as when he spoke to me.").[31]

---

[30] Gutierrez had been working for Defendant for less than six months when Agronin interviewed him on October 3, 2021.  But in his notes, Agronin wrote that Gutierrez "has worked with Mr. Brockman for the past year plus."  GX 160.

[31] Dr. Agronin's blind spots applied to Defendant's associate, James Jackson as well.  Dr. Agronin interviewed Jackson, and relied upon Jackson's "assessment" of Defendant's

(continued...)

Dr. Wisniewski was also unaware of Barras's March 2021 deposition,[32] and said it would surprise him if Barras testified that he had no concerns about Defendant's cognitive abilities. 11/17/21 PM Tr. 156:7-157:4. These examples reveal that Defendant's experts were not provided the context necessary to critically, and objectively, evaluate Defendant's cognitive ability and claims of impairment.

Defendant's experts relied almost universally on what Defendant told them, or showed his doctors, at the expense of more reliable third-party information. This led them to ignore many key facts in this case. For example, the experts did not investigate whether Defendant continued to run his company, assuming instead that dementia would have prevented him from doing so. *See, e.g.*, 11/23/21 PM Tr.at 195:20-198:13.[33] None of Defendant's experts addressed Defendant's 2020 Reynolds emails that evidence a high level of cognitive ability, and when confronted with them, Dr. Agronin reflexively testified "I don't know exactly that he wrote it. I don't know if someone helped him write it." *Id.* at 198:7-10.

None of Defendant's experts considered the relationship between Defendant and Dr. Yudofsky, and when Dr. Agronin asked if he could interview Yudofsky he simply

---

cognitive state. Incredibly, Dr. Agronin also testified that it would not necessarily have altered his opinion if he learned that Jackson had boasted to Barras in an email about being "evasive" with law enforcement, and that Barras deleted that email when it was subpoenaed. 11/17/21 PM Tr. at 174:7-15.

[32] Dr. Wisniewski testified prior to Barras so his opinion of Barras's actual testimony is not known.

[33] This level of forensic work is the equivalent of a government expert pointing to Gutierrez's testimony and concluding that Brockman must still be running the company because he tells his caretaker to pack a suitcase and take him to work.

accepted the response that he was unavailable.  *Id.* at 152:21-153:24. Dr. Agronin further testified that it would have made no difference to him if Yudofsky was just too busy to get involved or if he was worried that the answers to questions about Defendant's competency would implicate Yudofsky in a crime.  *Id.* at 153:21-154:6. Dr. Agronin's inherent bias and lack of objectivity was transparently on display for the Court.  Similarly, although Dr. Wisniewski cited the 2017 Yudofsky email as the likely source of his claim that Defendant first sought medical attention for memory impairment in 2017, he went on to explain that he did not know anything about Yudofsky.  11/17/21 PM Tr. 149:11-151:8.

Lacking that context led Wisniewski to disregard evidence contrary to Defendant's position.  For example, during his direct examination, he testified that he "reviewed" the 2019 deposition videos and "saw" the Reynolds speech videos, saying that they were "entirely consistent" with mild dementia.  *Id.* at 83:5-24.  He expounded, seeming to equate testifying in a deposition (giving sworn testimony in response to questions that cannot be entirely predicted from skilled examiners) with the recitation of "highly learned information."[34]  On cross examination, he admitted that he did not watch the full deposition videos or read the transcripts, saying he did not use "those videos for evidence of dementia. I am using collateral information."  *Id.* at 144:12-146:7. He went on to clarify that, in

---

[34] If credited, this testimony would actually cut against Defendant's position, as it suggests that the material Defendant's lawyers need is redundantly stored in multiple locations in his brain.  If Wisniewski is actually correct that a person with dementia can testify skillfully in a deposition, perform surgery "very well," and serve as CEO of a multibillion-dollar software company, it defies credulity that such a person could not meet the modest standard of assisting counsel.

claiming that the deposition evidence is "consistent" with dementia, he meant only that it was *possible* for a dementia patient to perform well in a deposition. *Id.* at 146:7-13.

IV.     **CONCLUSION**

While the parties agree that Defendant is suffering from the early stages of Parkinson's disease, and perhaps Alzheimer's Disease, when one considers all of the objective evidence of Defendant's relevant conduct, beginning with the underlying criminal investigation becoming overt, it is clear Defendant is competent to proceed, and has instituted a deliberate campaign to create the appearance of severe cognitive impairment when no such pronounced neurodegeneration is currently present.  Defendant was motivated by the obvious "secondary gain," i.e., to avoid prosecution for his crimes. From 2018 through indictment in October 2020, Defendant led a double life, feigning severe impairment to a select group of physicians, while continuing to lead his life unimpaired.

Once indicted, Defendant changed his strategy and curtailed the outside activities that could produce evidence contrary to a diagnosis of dementia.  However, medical and psychological testing and evaluation reveal that Defendant continues to malinger to the present day.  Objective imagining of Defendant's brain is inconsistent with the picture of severe cognitive impairment or dementia Defendant seeks to portray.  Further Defendant's repeated failure of psychological validity tests presents the inescapable conclusion that Defendant continues to try and "beat" cognitive testing in effort to appear more impaired that is truly the case.  The Defendant's own experts' conclusions are simply not credible.

During the hearing they exhibited clear bias toward a preordained result, and utterly failed to consider any evidence contrary to this preconceived conclusion.

Respectfully submitted this 17th day of December 2021,

DAVID A. HUBBERT
Deputy Assistant
Attorney General
Tax Division

*/s/ Corey Smith*
COREY J. SMITH
Senior Litigation Counsel
Department of Justice
Tax Division
Mass Bar No. 553615
corey.smith@usdoj.gov
Tele: (202) 514-5230
LEE LANGSTON
CHRISTOPHER MAGNANI
BORIS BOURGET
Trial Attorneys
Department of Justice
Tax Division

Attorneys for United States of America

## <u>Certificate of Service</u>

I the undersigned do hereby certify that on December 17, 2021, I electronically filed the foregoing with the Clerk of Court using the ECF electronic filing system, which will send notice of electronic filing to Defendant's counsel of record.

<u>/s/ *Corey Smith*</u>
Senior Litigation Counsel
U.S. Department of Justice
Tax Division
