**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Criminal No. 4:21-cr-00009** |
| | § | |
| **ROBERT T. BROCKMAN** | § | |

**DEFENDANT ROBERT T. BROCKMAN'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**REGARDING THE COMPETENCY DETERMINATION**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................ - 1 -

PROPOSED FINDINGS OF FACT .......................................................... - 7 -

I.   Mr. Brockman Currently Suffers from Dementia That Renders Him
     Incompetent to Stand Trial .......................................................... - 7 -

     A.   Mr. Gutierrez Detailed How Mr. Brockman is Dependent on
          Others for Assistance with Everyday Activities ................................. - 8 -

     B.   Dr. James Pool Testified That Mr. Brockman Has Moderate
          Dementia .................................................................................. - 10 -

     C.   Defense Counsel Testified That Mr. Brockman's Cognitive
          Deficits Render Him Incompetent to Stand Trial ............................ - 11 -

     D.   None of the Government's Non-Expert Witnesses Addressed
          Mr. Brockman's Current Cognitive Abilities .................................... - 14 -

II.  Medical Evidence Identifies the Causes of Mr. Brockman's Cognitive
     Deficits That Render Him Incompetent ........................................ - 15 -

     A.   Mr. Brockman Has Cognitive Deficits and Dementia Associated
          with His Parkinson's Disease ......................................................... - 15 -

     B.   Mr. Brockman Has Alzheimer's Disease Dementia ......................... - 17 -

     C.   Objective Neuroimaging Scans Confirm Mr. Brockman Has
          Alzheimer's Disease and Dementia ................................................ - 18 -

          (1)   PET Scans Confirm That Mr. Brockman Has
                Alzheimer's Dementia ........................................................ - 18 -

          (2)   MRI Scans Confirm That Mr. Brockman Has A
                Neurodegenerative Disease .................................................. - 23 -

          (3)   Testimony from Experts for Both Parties Supports
                That Even Mild Dementia Renders Mr. Brockman
                Incompetent to Assist in His Defense ............................ - 25 -

III. Neuropsychological Testing Demonstrates That Mr. Brockman Has
     Global Cognitive Impairment ....................................................... - 30 -

IV.  The Testimony of the Government's Expert Dr. Robert Denney Should
     Be Given Little, If Any, Weight .................................................... - 39 -

PROPOSED CONCLUSIONS OF LAW .................................................. - 44 -

I.   Legal Standards ........................................................................... - 44 -

# TABLE OF CONTENTS
(continued)

Page

A.  Competency is a Present Determination .............................................. - 44 -

B.  The Government Must Establish That Mr. Brockman is Capable of Understanding the Nature and Consequences of the Proceedings and Can Meaningfully Assist in His Defense ............. - 44 -

C.  Mr. Brockman's Competence Must be Assessed Based on the Specific Context of this Proceeding ...................................................... - 45 -

D.  The Government Has Not Established That Mr. Brockman is Competent to Stand Trial ................................................................. - 46 -

E.  In the Alternative to Reaching a Competency Determination, the Court Should Appoint Neural Experts ............................................... - 49 -

CONCLUSION  ...................................................................................................... - 50 -

## PRELIMINARY STATEMENT

1.     The government has not met its burden of proving that Mr. Brockman is presently competent to proceed to trial.  Mr. Brockman's competency must be assessed based on his current mental capacity and whether he can presently understand the complex charges in this case, meaningfully confer with counsel, and competently participate in his defense.  *See Drope v. Missouri*, 420 U.S. 162, 171–72, 181 (1975); *United States v. Collins*, 491 F.2d 1050, 1053 (5th Cir. 1974) (discussing competency as a present determination); *United States v. Hutson*, 821 F.2d 1015, 1018 (5th Cir. 1987) (government bears the burden of proof).  The hearing in this matter established the following points, which the government cannot overcome to meet its burden.

2.     Two of the three experts called by the government to testify at the competency hearing acknowledged that the government cannot meet its burden.  Dr. Ryan Darby stated that "[a]t [Mr. Brockman's] level of cognitive impairment expected based on the natural disease course and Mr. Brockman's neuroimaging, Mr. Brockman could be either competent or incompetent to assist in his defense.  I do not think this can be determined currently[.]"  Gov't Ex. 39, Dr. Darby Suppl. Report, Dkt. No. 177 at 9. Dr. Park Dietz stated in his first supplemental expert report that he was "unable to distinguish between these possibilities" of whether Mr. Brockman is competent or incompetent and "[i]f Mr. Brockman's cognitive capacity and memory have genuinely declined to the degree that he suffers moderate or severe dementia, he would be incapable of working with counsel in preparing his defense, incapable of assisting counsel in the cross-examination of witnesses, and incapable of testifying in his own defense."  Gov't Ex.

- 1 -

84, Dr. Dietz Suppl. Report, Dkt. No. 176 at 20. Dr. Dietz acknowledged that for Mr. Brockman to exaggerate the extent of his cognitive impairments "would no doubt be a Herculean task." Gov't Ex. 84, Dr. Dietz Suppl. Report, Dkt. No. 176 at 18–20. Although Dr. Dietz modified this position five days later, after reading the supplemental report filed by government witness Dr. Robert Denney, at the hearing Dr. Dietz again acknowledged during his direct testimony that based on his own observations and area of expertise: "I couldn't tell whether this was genuine cognitive impairment to a degree that could make this man incompetent or whether this was malingering." 11/19/2021 AM Tr. at 92:14–92:24 (Dietz).

3.      Dr. Maria Ponisio, the government's neuroradiologist, who was not called to testify, opined that Mr. Brockman suffered from Alzheimer's dementia, not mild cognitive impairment as asserted by Dr. Robert Denney. *See* Gov't Ex. 86, Dr. Ponisio October 25, 2021 Report at 2 (explaining that neuroimaging findings are "most consistent with early Alzheimer *dementia*") (emphasis added); *see also* 11/15/2021 AM Tr. at 106:14–107:6 (Darby) (testifying "Dr. Ponisio described [the findings] as early Alzheimer's dementia"); 11/15/2021 PM Tr. at 107:9–107:24 (Darby) (same). Experts on both sides agree that even *early or mild dementia* is associated with *moderate memory problems* that would interfere with an individual's ability to remember and recall newly learned information, and *moderate problems with decision-making* (particularly where the facts are complex). 11/15/2021 PM Tr. at 65:4–66:25, 70:2–71:3, 137:3–137:22 (Darby); 11/17/2021 PM Tr. at 67:10–69:20 (Wisniewski).

4.      The opinion of Dr. Denney, the government's neuropsychologist, who has been found not credible by other federal courts, should be given little, if any, weight. Dr. Denney applied an incorrect legal standard, ignored evidence contrary to his conclusions, lacked expertise in the medical conditions at issue, and employed unreliable methods to reach his clinical judgment. *See Infra* Proposed Findings of Fact, Section IV.

5.      The defense experts, including Dr. Marc E. Agronin, a geriatric psychiatrist, were unequivocal. The data, including the objective imaging data of Mr. Brockman's brain scans, indicate that he is suffering from progressive and irreversible dementia, which renders him incompetent to proceed to trial. *See Infra* Proposed Findings of Fact, Section II; *see also* 11/17/2021 PM Tr. at 62:1–62:3, 62:20–63:2, 64:1–67:3, 82:4–82:20 (Wisniewski); 11/22/2021 PM Tr. at 68:4–68:6, 157:13–157:21 (Guilmette); 11/23/2021 AM Tr. at 23:12–23:18, 29:4–29:10, 83:2–83:24 (Whitlow); 11/23/2021 PM Tr. at 75:11–84:17, 96:19–97:9, 207:18–207:21 (Agronin).

6.      Contrary to the advice of their own expert forensic psychiatrist, Dr. Park Dietz, the government failed to retain an expert in geriatric psychiatry qualified to opine on the defendant's serious medical conditions. 11/19/2021 PM Tr. at 35:16–36:5 (Dietz) (testifying he informed the government that he "was not the right person for this, didn't [the government] want a geriatric psychiatrist who would be able to be a specialist in those things . . . [a]nd [that he] even talked to a couple of geriatric psychiatrists about whether they would be willing to take the case," but the government did not engage a geriatric psychiatrist); *see also* 11/23/2021 PM Tr. at 47:25–48:8 (Agronin) ("[T]his case, without question, requires input from geriatric psychiatry. The circumstances of the case speak to

the heart of what a geriatric psychiatrist does.  And, so, from that standpoint, from needing to assess this individual to give an opinion, to me, geriatric psychiatry needs to take a front and center role.  And so, that's my—my entire career, my experience, has been doing that."); 11/22/2021 PM Tr. at 61:25–62:7 (Guilmette) (discussing the importance of geriatric psychiatrist participation in this case).

7.      Experts for both the government and the defense agree that Mr. Brockman has Parkinson's disease—a permanent and progressive neurodegenerative disease frequently accompanied by non-motor symptoms such as deficits in memory, executive function (e.g., planning, decision-making, and working memory), learning, and attention. *See* 11/15/2021 PM Tr. at 36:14–37:20 (Darby); 11/17/2021 PM Tr. at 63:12–63:24 (Wisniewski).  Experts for both sides also agree that Parkinson's disease frequently results in dementia.  *See* 11/15/2021 PM Tr. at 39:13–39:24 (Darby); 11/17/2021 PM Tr. at 64:9– 64:24 (Wisniewski); 11/23/2021 PM Tr. at 76:1–76:7 (Agronin).

8.      There is also no dispute that Mr. Brockman suffered reoccurring episodes of delirium (at least three episodes) since March 2021.  Experts for both sides agree that delirium is a marker for brain vulnerability with decreased cognitive reserve and is associated with permanent cognitive damage, accelerated cognitive decline, and an increased risk for death.  *See* 11/15/2021 PM Tr. at 9:12–10:24, 47:2–48:23, 51:9–52:15, 130:12–130:24 (Darby); 11/16/2021 PM Tr. at 79:6–79:11, 87:3–87:7 (Denney); 11/17/2021 PM Tr. at 85:24–87:23 (Wisniewski); 11/23/2021 PM Tr. at 55:25–56:4, 85:21–86:16, 87:18–88:7 (Agronin).  A single episode of delirium can double the rate of cognitive decline.  11/17/2021 PM Tr. at 86:8–86:18 (Wisniewski).  Multiple episodes of

delirium, over a short period of time, would be expected to accelerate the dementing process. *Id.* Dr. Agronin testified that delirium has taken a devastating toll on Mr. Brockman, accelerating his neurocognitive decline, and is associated with mortality rates up to 40% in the first year after a bout of delirium. 11/23/2021 PM Tr. at 88:1–88:4 (Agronin).

9. The government's focus on Mr. Brockman's cognitive abilities in 2019, and even 2020, is of minimal probative value in determining his current mental status. The government offered little to no affirmative evidence as to Mr. Brockman's current cognitive ability. As Dr. Dietz testified, the government lacks data to evaluate (and by natural implication prove) Mr. Brockman's "real world" impairment after November of 2020. 11/19/2021 AM Tr. at 104:4–105:1 (Dietz).

10. The government experts, however, did not seek to interview Mr. Brockman's caregiver, Frank Gutierrez, who is able to closely observe Mr. Brockman on a daily basis. *See* 11/19/2021 PM Tr. at 120:13–120:24 (Dietz) (seeking to defend his decision not to interview Mr. Gutierrez despite having many opportunities to do so by claiming "[i]t seemed to be too intrusive to have more than casual passing conversation with [Mr. Gutierrez]."). Mr. Gutierrez testified that Mr. Brockman requires assistance with virtually all activities of daily living, which corresponds to a clinical diagnosis of moderate to severe dementia. *See Infra* Proposed Findings of Fact, Section I.A. Furthermore, Mr. Brockman's primary care physician, Dr. James Pool, testified that Mr. Brockman has moderate dementia. *See Infra* Proposed Findings of Fact, Section I.B. Peter J. Romatowski testified

about how Mr. Brockman's cognitive limitations render him unable to assist counsel in this matter. *See Infra* Proposed Findings of Fact, Section I.C.

11.     Accordingly, as set forth herein, the Court should enter the attached order finding that the government has not met its burden of proving Mr. Brockman is competent to proceed to trial, and convene a status conference to address next steps.

12.     In the alternative, at a minimum, the Court should appoint neutral experts to conduct a competency examination pursuant to Title 18, United States Code, Sections 4241(b) and 4247(b). *See* Def. Robert T. Brockman's Mot. for the Appointment of Neutral Ct.-Designated Experts and to Exclude Test. from Dr. Park Dietz, Dr. Robert Denney, and Dr. Ryan Darby, and Reply, Dkt. Nos. 105 and 122 (incorporated herein by reference).

13.     The three government experts appointed by this Court have failed to provide any reliable opinion on the single issue before this Court—Mr. Brockman's present ability to understand the charges against him and to assist in his defense.   Dr. Darby, the government's neurologist, testified that he could not opine on Mr. Brockman's competency to assist counsel. *See* 11/15/2021 AM Tr. at 80:2–80:11 (Darby); Gov't Ex. 39, Dr. Darby Suppl. Report, Dkt. No. 177 at 11 ("[I] am therefore unable to determine whether his cognitive impairment is severe enough to make him incompetent to assist his defense."). Dr. Dietz effectively disqualified himself as an appropriate expert by testifying that he "was not the right person for this" case, that a geriatric psychiatrist would be more qualified to opine, and that he was unable to reach an independent conclusion regarding Mr. Brockman's competency after his October examination until conferring with Dr. Denney. 11/19/2021 PM Tr. at 35:16–36:2, 151:18–151:25 (Dietz).  And Dr. Denney's

- 6 -

results-oriented approach and lack of credibility renders his testimony wholly unreliable. *See Infra* Proposed Findings of Fact, Section IV.

14.     Lastly, the government itself previously endorsed the appointment of neutral experts if the Court is unable to determine whether Mr. Brockman is competent.  *See, e.g.*, United States' Opp'n to Def.'s Mot. to Exclude Test. and Appoint More Experts, Dkt. No. 113 at 13–14; 9/13/2021 Tr. at 25:24–26:9 (Corey Smith).

## PROPOSED FINDINGS OF FACT

**I.    MR. BROCKMAN CURRENTLY SUFFERS FROM DEMENTIA THAT RENDERS HIM INCOMPETENT TO STAND TRIAL**

15.     ***Dementia*** is a clinical diagnosis that involves marked progressive impairment of cognitive abilities that may include memory, executive functioning, attention, language, and visual-spatial abilities.  *See* 11/15/2021 PM Tr. at 65:4–67:18, 70:2–74:3 (Darby); 11/17/2021 PM Tr. at 67:4–69:17 (Wisniewski); 11/23/2021 PM Tr. at 80:6–80:13 (Agronin).  ***Dementia*** is distinguished from ***mild cognitive impairment*** in that the cognitive impairment affects a person's ability to perform everyday activities. 11/15/2021 AM Tr. at 93:23–94:12 (Darby); 11/17/2021 PM Tr. at 67:10–68:2, 93:23– 94:1 (Wisniewski); 11/23/2021 PM Tr. at 78:11–80:3 (Agronin).

16.     Dementia exists on a spectrum of cognitive and functional impairment. ***Early or mild dementia*** is associated with *moderate* memory loss and *moderate* impairments with judgment and problem-solving; ***moderate dementia*** is associated with *severe* memory loss and *severe* impairments exercising judgment or handling problems; ***end-stage or severe dementia*** is associated with *severe* memory loss such that only

memory fragments remain and the individual is unable to make judgments or solve problems, does not have any significant function at home, and requires assistance with personal care. *See* 11/15/2021 AM Tr. at 93:3–94:12 (Darby); 11/15/2021 PM Tr. at 65:4–67:18, 70:2–74:3 (Darby); 11/17/2021 PM Tr. at 67:4–69:17 (Wisniewski).  For example, Dr. Wisniewski testified that when judges, lawyers, and physicians are diagnosed with mild dementia, he instructs them to stop working immediately because of the risks associated with impaired judgment and memory.  11/17/2021 PM Tr. at 67:10–68:2, 68:15–69:17 (Wisniewski).

### A.   Mr. Gutierrez Detailed How Mr. Brockman is Dependent on Others for Assistance with Everyday Activities

17.    Mr. Gutierrez is an experienced caregiver for individuals with Parkinson's disease who has provided home healthcare services to Mr. Brockman since April 2021 and testified about Mr. Brockman's significant impairments and the level of assistance he requires.   11/22/2021 PM Tr. at 6:19–7:7 (Gutierrez).    Mr. Gutierrez works with Mr. Brockman for twelve hours a day, with two days off every two weeks.  11/22/2021 PM Tr. at 7:10–7:13 (Gutierrez).  He is paid hourly and his services are in high demand. 11/22/2021 PM Tr. at 10:23–11:7, 11:20–11:21 (Gutierrez).    Mr. Gutierrez seeks opportunities where people need his help.  11/22/2021 PM Tr. at 41:5–41:11 (Gutierrez).

18.    Mr. Gutierrez testified to Mr. Brockman's functional impairment that is consistent with dementia.  11/23/2021 PM Tr. at 65:18–66:22, 78:12–79:8 (Agronin). Mr. Gutierrez testified that he assists Mr. Brockman with virtually all activities of daily living, including bathing, dressing, toileting, grooming, eating, and mobility.  11/22/2021

PM Tr. at 15:23–16:21, 18:8–21:19, 24:14–25:3, 25:22–26:9, 46:15–47:11 (Gutierrez); *see also* 11/23/2021 PM Tr. at 78:25–79:4 (Agronin); 11/15/2021 PM Tr. at 140:15-140:22 (Darby) (testifying that "assistance with his grooming, his self-care, with using the restroom, having difficulty remembering where he is and recognizing his home" would be "at the moderate to severe stage" of dementia).

19.     Mr. Gutierrez also assists Mr. Brockman with instrumental activities of daily living, including preparing meals, managing medications, and handling transportation. 11/22/2021 PM Tr. at 17:8–17:25, 23:4–23:8, 24:10–24:13, 39:15–40:4 (Gutierrez); *see also* 11/23/2021 PM Tr. at 79:5–79:8 (Agronin).  Dr. Darby, the government's neurology expert, testified that "if these were the symptoms a patient was reporting to me, you know, those would be consistent with moderate or severe dementia stage."  11/15/2021 AM Tr. at 97:6–97:11 (Darby).

20.     Mr. Gutierrez's testimony demonstrates that Mr. Brockman has no independent real-world functioning.  Dr. Denney, the government's neuropsychologist, conceded that "real-world functioning always trumps psychological test result[s]." 11/16/2021 AM Tr. at 76:20–77:1 (Denney).

21.     In the past seven months, Mr. Gutierrez observed Mr. Brockman's mental and physical conditions deteriorate.   For example, Mr. Gutierrez has observed Mr. Brockman's difficulty remembering where he is and recognizing his own home. 11/22/2021 PM Tr. at 34:18–40:4, 47:6–47:11 (Gutierrez).

22.     In his fifteen-year career, Mr. Gutierrez has experience working with patients with Parkinson's disease dementia, and he does not believe it is possible that

Mr. Brockman is faking or exaggerating his mental impairments.  11/22/2021 PM Tr. at 5:11–5:12,  9:21–10:1,  40:5–40:8,  40:12–42:11  (Gutierrez).    Mr. Gutierrez  closely observed Mr. Brockman to determine if he was faking his symptoms, and has no doubt that Mr. Brockman's deficits are genuine. 11/22/2021 PM Tr. at 40:12–42:11 (Gutierrez).

### B.  Dr. James Pool Testified That Mr. Brockman Has Moderate Dementia

23.    Dr. Pool holds the James L. Pool Presidential Endowed Chair in Clinical Pharmacology at Baylor College of Medicine and previously in his career served as Dr. Michael E. DeBakey's personal physician.  He is Mr. Brockman's current primary care physician.  11/22/2021 AM Tr. at 5:16–5:23 (Pool).

24.    Dr. Pool described how the neuroimaging studies, neuropsychological testing, and clinical observations objectively confirm that Mr. Brockman currently suffers from neurodegenerative damage to his brain.  11/22/2021 AM Tr. at 65:3–65:21 (Pool). Dr. Pool testified that Mr. Brockman currently has dementia, and that he confabulates— meaning that his brain fills in inaccurate information for gaps in cognition or memory. 11/22/2021 AM Tr. at 72:18–72:24, 98:24–99:15 (Pool).  Dr. Pool believes Mr. Brockman is not malingering.  11/22/2021 AM Tr. at 77:4–77:6 (Pool).

25.    Dr. Pool testified about Mr. Brockman's four hospitalizations this year— three hospitalizations for urinary tract infections ("UTIs"), accompanied by sepsis and delirium, and a fourth hospitalization for a medical procedure intended to alleviate the conditions that triggered the UTIs.  11/22/2021 AM Tr. at 56:4–61:3, 63:24–64:4 (Pool).

26.     Delirium can cause permanent cognitive damage, and demented individuals with sepsis are at a significantly increased risk for developing delirium.  11/22/2021 AM Tr. at 56:12–58:9 (Pool).

27.     Mr. Brockman's surgical procedure was performed under general anesthesia. Dr. Pool testified that Mr. Brockman's wife, Dorothy, had to provide consent as durable medical power of attorney because "he's not able to consent to procedures."  11/22/2021 AM Tr. at 61:7–61:16 (Pool).  In order to obtain informed consent from Mrs. Brockman, Dr. Pool explained that general anesthesia carried the risk of death and permanent cognitive damage.  11/22/2021 AM Tr. at 61:17–63:17 (Pool).  Despite the risks associated with this procedure, Dr. Pool advised that minimizing Mr. Brockman's risk of recurring UTIs in the future was "[p]aramount."  11/22/2021 AM Tr. at 63:20–63:23 (Pool).

28.     Mr. Brockman was hospitalized most recently in September for UTI and delirium.   11/22/2021 AM Tr. at 63:24–64:4 (Pool).   Dr. Pool testified that if Mr. Brockman were to develop another UTI and urosepsis, there is a risk for permanent cognitive damage and even mortality.  See 11/22/2021 AM Tr. at 71:18–72:2 (Pool).

29.     Dr. Pool testified that Mr. Brockman's cognitive conditions are permanent and progressive.  11/22/2021 AM Tr. at 66:25–68:5 (Pool).

**C.     Defense Counsel Testified That Mr. Brockman's Cognitive Deficits Render Him Incompetent to Stand Trial**

30.     Defense counsel, Mr. Romatowski, testified to his experiences with Mr. Brockman and how he does not have sufficient present ability to assist counsel with a reasonable degree of rational or factual understanding.

- 11 -

31.   Mr. Romatowski began noticing Mr. Brockman's memory and cognitive deficits during their third or fourth meeting, and observed Mr. Brockman's limitations "progress[] in the wrong direction."  11/23/2021 PM Tr. at 215:21–216:5 (Romatowski); Decl. of Peter J. Romatowski, Dkt. No. 1-3 at 170, ¶ 14 (hereinafter Romatowski Decl.).

32.   Mr. Romatowski described Mr. Brockman's memory problems, including his inability to learn and later recall information.  For example, Mr. Brockman cannot "even read and absorb and recall" one critical document, let alone the volume of critical documents relevant to the case.[1]  11/23/2021 PM Tr. at 226:25–227:5 (Romatowski); Romatowski Decl., Dkt. No. 1-3 at 169–70, ¶ 11.

33.   Mr. Romatowski testified that he was not "daunted simply by memory issues."  11/23/2021 PM Tr. at 220:15–220:21 (Romatowski).   He described Mr. Brockman's inability to draw inferences, recognize facts that counsel cannot perceive, provide strategy or judgment, drill down on specific raw material, or analyze documents. 11/23/2021 PM Tr. at 220:15–220:21, 242:1–243:1 (Romatowski); 11/24/2021 AM Tr. at 46:17–46:24 (Romatowski).

34.   Mr. Romatowski testified that Mr. Brockman appeared eager to assist defense counsel, but "increasingly over time . . . he simply would draw a blank," even when it would better serve Mr. Brockman's interests to provide an answer.  11/23/2021 PM Tr. at 220:22–221:7 (Romatowski); Romatowski Decl., Dkt. No. 1-3 at 170, ¶ 12.

---

[1] The government has estimated that it will produce 1.1 terabytes (the equivalent of approximately 22 million pages) of discovery.  *See* Decl. of Neal J. Stephens, Dkt. 1-2 at 130 ¶¶ 3–4.

35.     Mr. Brockman repeatedly discussed historical information that was not responsive to the criminal charges, such as the business operations of Reynolds and Reynolds or a competitor dispute.   *See* 11/23/2021 PM Tr. at 222:10–223:11 (Romatowski); 11/24/2021 AM Tr. at 46:17–46:24 (Romatowski); *see also* Romatowski Decl., Dkt. No. 1-3 at 169–70, ¶ 11.

36.     On other occasions, when reviewing documents with counsel, Mr. Brockman would repeat recently absorbed information in a distorted fashion (in essence, demonstrating confabulation).   *See* 11/23/2021 PM Tr. at 225:9–226:10 (Romatowski); Romatowski Decl., Dkt. No. 1-3 at 169–70, ¶ 11.   Repeating information in a distorted manner is self-defeating and does not contribute to his defense.   11/23/2021 PM Tr. at 225:20–226:1 (Romatowski).

37.     Mr. Romatowski explained that, due to his cognitive limitations, Mr. Brockman cannot perform the functions required of a criminal defendant to stand trial. 11/24/2021 AM Tr. at 28:21–28:24 (Romatowski); *see also* Romatowski Decl., Dkt. No. 1-3 at 168, ¶¶ 3–4.   Specifically, Mr. Brockman cannot assist in assembling a defense, either by providing his own account of past events or by providing leads to other evidence. 11/23/2021 PM Tr. at 242:1–243:24 (Romatowski); Romatowski Decl., Dkt. No. 1-3 at 169–70, ¶ 11.

38.     Mr. Brockman's cognitive deficits impede the abilities required of a criminal defendant to stand trial.   Mr. Romatowski observed that Mr. Brockman cannot assist in crucial decisions necessary for his defense, such as whether to seek a compromise in the case; whether to proceed with a bench or jury trial; which witnesses should be called at

trial; and whether to testify in his own defense.  11/23/2021 PM Tr. at 242:1–243:24 (Romatowski); *see also* Romatowski Decl., Dkt. No. 1-3 at 168, ¶¶ 3–4.

### D.   None of the Government's Non-Expert Witnesses Addressed Mr. Brockman's Current Cognitive Abilities

39.    The government introduced video and transcripts and called Michael Nemelka and Dana Abrahamsen to show that Mr. Brockman testified at depositions in 2019, *see, e.g.*,  Gov't Ex. 36 (deposition transcript from 1/16/2019); Gov't Ex. 58 (deposition video from 1/16/2019); 11/16/2021 PM Tr. at 5:17–44:4 (Nemelka); 11/18/2021 AM Tr. at 48:5–97:8 (Abrahamsen);[2] introduced video recordings and emails and called Craig Moss and N. Thomas Barras to show that Mr. Brockman gave speeches and engaged in business activities in 2018 through 2020, *see, e.g.*, Gov't Ex. 51; Gov't Ex. 77 (video from 2019); 11/17/2021 AM Tr. at 60:1–91:24 (Moss); 11/18/2021 PM Tr. at 34:6–107:25 (Barras); and called IRS Special Agent Peter Dickerman and Evatt Tamine in an attempt to push its purported timeline as to when Mr. Brockman knew of the investigation to an earlier date than when he first raised medical concerns regarding cognitive issues.  11/17/2021 AM Tr. at 92:5–177:3 (Tamine); 11/17/2021 PM Tr. at 4:9–54:25 (Tamine); 11/18/2021 PM Tr. at 14:17–15:1 (Dickerman).[3]  None of these witnesses testified as to Mr. Brockman's current cognitive abilities at any time during 2021.

---

[2] Mr. Brockman's depositions from 2019 are not indicative of his current cognitive abilities, and the government failed to address the possibility that his performance was the result of access to overlearned information. 11/17/2021 PM Tr. at 83:5–84:20 (Wisniewski); 11/23/2021 PM Tr. at 57:8–58:15, 110:4–112:21 (Agronin).

[3] The government's timeline argument has been a moving target.  In the Indictment and other pleadings, the government has consistently alleged that Mr. Brockman first learned of this investigation in June 2016 and began complaining about memory problems to doctors in 2018.  *See, e.g.*, Indictment, Dkt. No. 2 at ¶ 194; United States' Hr'g Mem., Dkt. No. 194 at 8, 10; *see also* 11/15/2021 AM Tr. at 36:1–36:3.  Evidence presented by the government, however, establishes that there is no dispute that Mr. Brockman began raising concerns about his cognition at least as of 2015.  Dr. Scott Lisse, Mr. Brockman's former general practitioner and the government's witness, confirmed that

## II. MEDICAL EVIDENCE IDENTIFIES THE CAUSES OF MR. BROCKMAN'S COGNITIVE DEFICITS THAT RENDER HIM INCOMPETENT

### A. Mr. Brockman Has Cognitive Deficits and Dementia Associated with His Parkinson's Disease

40.     Experts for both sides agree that Mr. Brockman has Parkinson's disease. *See, e.g.*, 11/15/2021 AM Tr. at 85:16–85:20 (Darby); 11/17/2021 PM Tr. at 63:8–63:11 (Wisniewski); 11/19/2021 AM Tr. at 31:1–31:4 (Dietz); 11/23/2021 PM Tr. at 75:11–75:15 (Agronin).   Parkinson's disease is a progressive neurodegenerative disease that is incurable. *See, e.g.*, 11/15/2021 AM Tr. at 83:25–84:19 (Darby); 11/17/2021 PM Tr. at 63:12–64:11 (Wisniewski).

41.     Mr. Brockman underwent a DaTscan in February 2019.  The independent radiologist interpreted the DaTscan as showing "[s]evere loss of dopaminergic neuronal function in the bilateral dorsal striata with loss greater on the right compared to the left." Def. Ex. 37, BCM-0000743 at BCM-0000744.  The findings from this DaTscan showed evidence of severe damage to Mr. Brockman's dopamine neurons, a finding consistent with Parkinson's disease.  11/15/2021 AM Tr. at 85:8–85:15 (Darby); 11/17/2021 PM Tr. at 64:1–64:8 (Wisniewski); 11/23/2021 AM Tr. at 15:11–18:12 (Whitlow).

42.     Parkinson's disease is often associated with both motor and non-motor symptoms.  *See* 11/17/2021 PM Tr. at 63:12–63:19 (Wisniewski).  Experts for both sides testified that non-motor symptoms of Parkinson's disease can include problems with

---

Mr. Brockman raised concerns in 2015 that his "mental processes [were] not as good" and that his memory was getting poorer.  Gov't Ex. 153 at 4 (Mr. Brockman's September 2015 health notes in Dr. Lisse's records); 11/18/2021 PM Tr. at 136:16–138:12, 156:3–159:16 (Lisse).  The government's belated attempt to push the timeline back to salvage its position when faced with the evidence found in Dr. Lisse's files is unavailing.

memory, executive function, learning and attention.  *See* 11/15/2021 PM Tr. at 36:14–37:20 (Darby); 11/17/2021 PM Tr. at 63:12–63:24 (Wisniewski).

43.     These non-motor symptoms can occur early in the course of Parkinson's disease, and may begin at the same time as the motor symptoms associated with the disease. 11/17/2021 PM Tr. at 63:20–63:25 (Wisniewski).  There is also no dispute that Parkinson's disease is associated with dementia in the majority of cases.  *See* 11/15/2021 PM Tr. at 39:13–39:24 (Darby); 11/23/2021 PM Tr. at 75:22–76:7 (Agronin).  The risk of developing dementia for individuals with Parkinson's disease is high, and approximately 70% of Parkinson's disease patients develop progressive dementia.  Def. Ex. 30, Dr. Whitlow Suppl. Report, Dkt. No. 174 at 2; 11/17/2021 PM Tr. at 63:12–63:19 (Wisniewski).

44.     There are two forms of progressive dementia commonly associated with Parkinson's disease: Parkinson's disease dementia and Dementia with Lewy bodies. Parkinson's disease dementia is a term used for progressive dementia that develops after exhibiting motor symptoms associated with Parkinson's disease, whereas Dementia with Lewy bodies involves dementia that usually appears prior to or within one year of the onset of motor symptoms.  *See* 11/15/2021 AM Tr. at 87:12–88:9 (Darby); 11/17/2021 PM Tr. at 62:8–62:19 (Wisniewski).  The distinction between Parkinson's disease dementia and Dementia with Lewy bodies is not important in this case because both are progressive dementias with the same underlying pathology—abnormal protein deposits in the brain called Lewy bodies.  *See* 11/17/2021 PM Tr. at 62:12–62:19 (Wisniewski); *see also* 11/15/2021 AM Tr. at 85:21–88:9 (Darby); 11/23/2021 PM Tr. at 143:9–143:13 (Agronin) (discussing the challenges of diagnosing Dementia with Lewy bodies).  Drs. Wisniewski,

Whitlow, Agronin, and Guilmette all diagnosed Mr. Brockman with Parkinson's disease dementia based on the clear presence of Parkinson's disease and the clear presence of dementia.  11/17/2021 PM Tr. at 62:1–62:3; 64:20–64:24 (Wisniewski); 11/22/2021 PM Tr. at 68:4–68:6 (Guilmette); 11/23/2021 PM Tr. at 75:4–80:13 (Agronin); Def. Ex. 30, Dr. Whitlow Suppl. Report, Dkt. No. 174 at 4–5.

45.     Mr. Brockman has Parkinson's disease dementia.  11/17/2021 PM Tr. at 62:1–62:3 (Wisniewski); 11/23/2021 PM Tr. at 75:4–80:13 (Agronin); 11/22/2021 PM Tr. at 68:4–68:6 (Guilmette); Def. Ex. 30, Dr. Whitlow Suppl. Report, Dkt. No. 174 at 4–5.

### B.     Mr. Brockman Has Alzheimer's Disease Dementia

46.     In addition to Parkinson's disease dementia, Mr. Brockman also has Alzheimer's disease dementia.  Gov't Ex. 86, Dr. Ponisio October 25, 2021 Report at 2; Def. Ex. 24, Dr. Wisniewski Report, Dkt. No. 99 at 5; Def. Ex. 29, Dr. Whitlow Report, Dkt. No. 100 at 3-5; Def. Ex. 12, Dr. Agronin Report, Dkt. No. 102 at 34–35.

47.     Alzheimer's disease is a progressive neurodegenerative disease that is incurable.  11/15/2021 AM Tr. at 95:1–95:4 (Darby); 11/15/2021 PM Tr. at 45:17–45:25 (Darby); Def. Ex. 15, Dr. Agronin Suppl. Report, Dkt. No. 172 at 15–16; Def. Ex. 27, Dr. Wisniewski Suppl. Report, Dkt. No. 175 at 12.  Alzheimer's disease frequently coexists with dementias associated with Parkinson's disease.  Def. Ex. 24, Dr. Wisniewski Report, Dkt. No. 99 at 5.

48.     The symptoms associated with Alzheimer's disease are global.  Alzheimer's disease involves impairment of short-term memory in its earliest stages, but inevitably affects judgment, attention, planning, organizing, language, insight, and perception.  *See,*

*e.g.*, 11/15/2021 PM Tr. at 43:23–45:25 (Darby); 11/17/2021 PM Tr. at 65:7–65:16 (Wisniewski).

49.     There are several changes to the brain that are hallmark pathologies of Alzheimer's disease, including the accumulation of an abnormal toxic protein called beta-amyloid; the accumulation of a toxic protein in the brain called phosphorylated tau within neurons; and inflammation and atrophy of the brain (i.e., decreased brain volume).  *See, e.g.*, Gov't Ex. 39, Dr. Darby Suppl. Report, Dkt. No. 177 at 2; 11/17/2021 PM Tr. at 64:25–65:6, 79:2–81:22 (Wisniewski).

### C.     Objective Neuroimaging Scans Confirm Mr. Brockman Has Alzheimer's Disease and Dementia

#### (1)     PET Scans Confirm That Mr. Brockman Has Alzheimer's Dementia

50.     Brain neuroimaging studies—FDG PET scans, the amyloid PET scan, and MRI scans—present compelling and objective evidence that Mr. Brockman has Alzheimer's disease and dementia.  *See* Def. Ex. 29, Dr. Whitlow Report, Dkt. No. 100 at 3–5; 11/17/2021 PM Tr. at 164:20–165:3 (Wisniewski); 11/23/2021 AM Tr. at 82:14–83:25 (Whitlow); 11/23/2021 PM Tr. at 75:6–84:18 (Agronin); Gov't Ex. 86, Dr. Ponisio October 25, 2021 Report at 2.

51.     FDG PET scans involve the injection of a small amount of radioactive tracer that allows for an evaluation of hypometabolism in the brain (i.e., diminished brain energy utilization).  11/15/2021 PM Tr. at 17:2–17:21, 101:12–101:24, 107:1–107:12 (Darby);

11/23/2021 AM Tr. at 19:20–20:13 (Whitlow).  Mr. Brockman underwent two FDG PET

scans this year at the request of the government.[4]

52.    The first FDG PET scan was conducted on March 12, 2021.  Def. Ex. 39,

HMH-0000001.  An independent radiologist at Houston Methodist Hospital interpreted the

FDG PET scan and reported findings of "[m]ildly reduced uptake in the right parietal lobe,"

with an impression that this pattern of hypometabolism is "suggestive of early

neurodegenerative disease, either Alzheimer's disease or dementia with Lewy bodies

(Parkinson's disease with dementia)."  Def. Ex. 39, HMH-0000001 at 1.  Dr. Ponisio, the

government's expert, reviewed the March FDG PET scan and interpreted the scan as

showing additional abnormalities in the brain compared to the interpretation offered by the

radiologist at Houston Methodist Hospital.  *See* Gov't Ex. 86, Dr. Ponisio October 25, 2021

Report at 1 (discussing March FDG PET scan demonstrating "abnormal moderate to

markedly decreased metabolic activity in the cingulate gyrus and bilateral precuneus"); *see*

*also* 11/15/2021 PM Tr. at 100:1–102:11 (Darby) (discussing Dr. Ponisio's interpretation

noting "more areas of abnormalities" compared to interpreting radiologist at Houston

Methodist).

53.    The parietal lobe is one of the four main lobes of the brain, and is important

for processing and interpreting sensory input (sight, taste, touch, and hearing).  11/23/2021

AM Tr. at 22:1–22:11 (Whitlow).

---

[4] The government could have requested a tau scan but never did so.  11/15/2021 PM Tr. at 110:4–110:8 (Darby).  In any event, the FDG PET scans show hypometabolism that would result from tau pathology.  *See* 11/17/2021 PM Tr. at 79:18–80:4 (Wisniewski).

54.     The March 12, 2021 FDG PET scan objectively shows that Mr. Brockman is experiencing a neurodegenerative disease, which may be either or both Alzheimer's disease dementia and Parkinson's disease dementia.  *See* 11/23/2021 AM Tr. at 22:18–23:18 (Whitlow); *see also* 11/17/2021 PM Tr. at 161:23-162:13 (Wisniewski); Gov't Ex. 86, Dr. Ponisio October 25, 2021 Report at 2.

55.     Mr. Brockman underwent a second FDG PET scan on August 24, 2021.  Def. Ex. 45, RTBrockman_Medical_Records_0005257.  An independent radiologist at Houston Methodist Hospital interpreted the FDG PET scan and reported findings of "[m]ildly reduced uptake in the posterior temporal lobes and bilaterally in the parietal lobes.  Slightly reduced uptake in the frontal lobes."  Def. Ex. 45, RTBrockman_Medical_Records_0005257 at 2.  Dr. Ponisio reviewed the August FDG PET scan and again interpreted it as showing additional abnormalities in the brain.  *See* Gov't Ex. 86, Dr. Ponisio October 25, 2021 Report at 1 (discussing August FDG PET scan demonstrating "abnormal markedly decreased metabolic activity").  The interpreting radiologist at Houston Methodist reported that this pattern of hypometabolism is "very suggestive of a neurodegenerative disease, particularly Alzheimer's disease."  Def. Ex. 45, RTBrockman_Medical_Records_0005257 at 2.

56.     The temporal lobe is one of the four main lobes of the brain, and is involved in memory.  11/23/2021 AM Tr. at 24:25–25:9 (Whitlow).  The frontal lobe is another one of the main lobes of the brain, and is involved in executive functioning.  11/23/2021 AM Tr. at 24:25–25:9 (Whitlow).

57.     The August 24, 2021 FDG PET scan is additional objective evidence that Mr. Brockman is experiencing Alzheimer's disease dementia.  Def. Ex. 30, Dr. Whitlow Suppl. Report, Dkt. No. 174 at 2; Def. Ex. 27, Dr. Wisniewski Suppl. Report, Dkt. No. 175 at 4–5; 11/23/2021 AM Tr. at 25:12–26:3 (Whitlow).

58.     FDG PET scans are typically repeated annually or every year-and-a-half because noticeable change is not expected at shorter intervals.  11/17/2021 PM Tr. at 71:15–71:21 (Wisniewski).  Comparing Mr. Brockman's two FDG PET scans—taken just five-and-a-half months apart—showed that there had been noticeable rapid disease progression, with greater hypometabolism and loss of function in more areas of the brain. *See* Gov't Ex. 86, Dr. Ponisio October 25, 2021 Report at 2 (noting decreased metabolic activity that was "more pronounced" in August FDG PET).  11/17/2021 PM Tr. at 70:15–71:21, 122:7–122:13 (Wisniewski); 11/23/2021 AM Tr. at 25:17–28:2, 32:4–33:4 (Whitlow); Def. Ex. 30, Dr. Whitlow Suppl. Report, Dkt. No. 174 at 2.  This level of progression is beyond the disease course seen in typical cases of Alzheimer's disease. 11/23/2021 AM Tr. at 25:17–28:2, 32:4–33:4 (Whitlow).

59.     The government's neuroradiologist reviewed Mr. Brockman's FDG PET scans and found that they "show[ ] metabolic findings most consistent with early Alzheimer *dementia*[.]"  Gov't Ex. 86, Dr. Ponisio October 25, 2021 Report at 2 (emphasis added).

60.     Mr. Brockman also underwent an amyloid PET scan on July 28, 2021.  Def. Ex. 42, RTBrockman_Medical_Records_0001798.  Amyloid PET scans involve the injection of a small amount of radioactive tracer used to estimate the density of beta-amyloid plaques in the brain, an abnormal protein deposit.  *See* Gov't Ex. 39, Dr. Darby

Suppl. Report, Dkt. No. 177 at 2; 11/15/2021 AM Tr. at 122:8–122:19 (Darby); 11/17/2021

PM Tr. at 64:25–65:6, 79:2–81:22 (Wisniewski).

61.     An independent radiologist at Houston Methodist Hospital interpreted

Mr. Brockman's amyloid PET scan and found that it was a "[p]ositive study, indicating

moderate    to    frequent    amyloid    neuritic    plaques."    Def.    Ex.    42,

RTBrockman_Medical_Records_0001798 at 2.  The findings from this study are consistent

with the presence of Alzheimer's disease.  Def. Ex. 24, Dr. Wisniewski Report, Dkt. No.

99 at 5; Def. Ex. 29, Dr. Whitlow Report, Dkt. No. 100 at 3–4; Def. Ex. 12, Dr. Agronin

Report, Dkt. No. 102 at 34–35; Gov't Ex. 86, Dr. Ponisio October 25, 2021 Report at 2–3.

62.     A recently published study combined qualitative results from FDG PET

scans and amyloid PET scans in diagnosing Alzheimer's disease.  In this study, when both

FDG PET scans and amyloid PET scans were positive, the diagnosis of Alzheimer's

disease in live patients approached 100% accuracy as compared to the gold-standard

postmortem autopsy of the brain.  Def. Ex. 27, Dr. Wisniewski Suppl. Report, Dkt. No.

175 at 11; Def. Ex. 30, Dr. Whitlow Suppl. Report, Dkt. No. 174 at 2–3; Def. Ex. 15,

Agronin Suppl. Report, Dkt. No. 172 at 15–16 & n.3.

63.     Mr. Brockman's FDG PET scans and amyloid PET scan were both positive.

These findings indicate that there is near-100% diagnostic certainty that Mr. Brockman has

Alzheimer's disease in addition to his diagnosed Parkinson's disease.  Def. Ex. 15,

Dr. Agronin Suppl. Report, Dkt. No. 172 at 15–16; Def. Ex. 30, Dr. Whitlow Suppl.

Report, Dkt. No. 174 at 3; Def. Ex. 27, Dr. Wisniewski Suppl. Report, Dkt. No. 175 at 11;

11/23/2021 AM Tr. at 33:5–37:8 (Whitlow).

64.    The findings from Mr. Brockman's FDG PET scans and amyloid PET scan correlate with the presence of significant dementia.  11/17/2021 PM Tr. at 79:4–80:25 (Wisniewski); 11/23/2021 PM Tr. at 82:22–84:11 (Agronin).

### (2)    MRI Scans Confirm That Mr. Brockman Has A Neurodegenerative Disease

65.    In addition to the PET scans, Mr. Brockman underwent three brain MRI scans between 2018 and 2021.  MRI scans are a type of neuroimaging technique that offer high resolution images of brain structures, and permit the detection of atrophy or brain tissue loss that is an objective indication of the presence of a neurodegenerative process.  *See* 11/15/2021 AM Tr. at 99:14–99:21 (Darby); 11/23/2021 AM Tr. at 40:1–40:22 (Whitlow).

66.    Mr. Brockman's first brain MRI was conducted on November 2, 2018, as part of his medical diagnosis and treatment.  Def. Ex. 36, BCM-0000791.  An independent radiologist at Baylor College of Medicine analyzed Mr. Brockman's MRI scan and found global atrophy.  Def. Ex. 36, BCM-0000791 at 793.  The November 2, 2018 MRI showed that Mr. Brockman's entire brain was shrinking, which is associated with cognitive decline and dysfunction.  Def. Ex. 29, Dr. Whitlow Report, Dkt. No. 100 at 2; 11/23/2021 AM Tr. at 44:12–46:5, 47:24–48:17 (Whitlow).

67.    Mr. Brockman's most recent brain MRI scan was conducted on July 30, 2021.  Def. Ex. 43, RTBrockman_Medical_Records_0001778.  An independent radiologist at Houston Methodist Hospital analyzed Mr. Brockman's MRI scan and found "[m]oderate diffuse cerebral volume loss with proportionate ventricular prominence.  Mild chronic

microvascular ischemic change." Def. Ex. 43, RTBrockman_Medical_Records_0001778 at 2. The July 30, 2021 MRI indicates that Mr. Brockman has experienced moderate brain volume loss across his entire brain, which has increased since the November 2, 2018 brain scan. Def. Ex. 29, Dr. Whitlow Report, Dkt. No. 100 at 3; 11/17/2021 PM Tr. at 71:22–72:22 (Wisniewski); 11/23/2021 AM Tr. at 49:12–53:2 (Whitlow).

68.     Moderate diffuse brain volume loss is an abnormal finding that is not consistent with normal aging. 11/23/2021 AM Tr. at 50:8–51:18 (Whitlow). Moderate brain atrophy is associated with cognitive deficits. 11/23/2021 AM Tr. at 51:13–52:3 (Whitlow).

69.     An objective and systematic comparison of Mr. Brockman's 2018 and 2021 brain MRIs showed rapid progressive brain volume loss, with profound loss in areas of the brain responsible for critical cognitive functions like learning and memory. Def. Ex. 30, Dr. Whitlow Suppl. Report, Dkt. No. 174 at 4; 11/23/2021 AM Tr. at 53:13–54:18 (Whitlow).

70.     Mr. Brockman's MRI scans evidence either or both Alzheimer's disease dementia and Parkinson's disease dementia, and are not consistent with mild cognitive impairment. Def. Ex. 29, Dr. Whitlow Report, Dkt. No. 100 at 3-4; Def. Ex. 30, Dr. Whitlow Suppl. Report, Dkt. No. 174 at 4.[5]

---

[5] The government's heavy reliance on quantitative analysis of the MRI scans is misplaced. *See* Def. Ex. 30, Dr. Whitlow Suppl. Report, Dkt. No. 174 at 4; 11/17/2021 PM Tr. at 74:5–74:23 (Wisniewski); 11/23/2021 AM Tr. at 64:2-66:21 (Whitlow). Moreover, the government introduced testimony from Dr. Dietz, who is admittedly not an expert in neuroimaging, regarding qualitative longitudinal comparisons of the MRI scans. *See* 11/19/2021 PM Tr. at 18:19-19:7 (Dietz) (claiming that "[i]f the slice thickness was different between the 2018 and 2021 scans, then that makes the comparison qualitatively as flawed as the quantitative comparison"). That testimony was directly contradicted by Dr. Whitlow, Chief of Neuroradiology at Wake Forest School of Medicine. 11/23/2021 AM Tr. at

**(3)  Testimony from Experts for Both Parties Supports that Even Mild Dementia Renders Mr. Brockman Incompetent to Assist in His Defense**

71.     The defense presented two expert reports and testimony by Dr. Thomas Wisniewski, who is a neurologist, the Gerald J. and Dorothy R. Friedman Professor of the New York University Alzheimer's Disease Center, and the Director of the Alzheimer's Disease Center, one of thirty-three Alzheimer's Disease Research Centers funded by the U.S. National Institute of Health.  Def. Ex. 23, Dr. Wisniewski CV.

72.     The defense also presented two expert reports and testimony by Dr. Christopher Whitlow, who is a neuroradiologist, the Chief of Neuroradiology at Wake Forest School of Medicine, and the Director of the Neuroimaging Core at the Alzheimer's Disease Research Center.  Def. Ex. 28, Dr. Whitlow CV.  The Neuroimaging Core is dedicated to collecting and analyzing neuroimaging data.  11/23/2021 AM Tr. at 6:18–7:16 (Whitlow).

73.     Dr. Wisniewski and Dr. Whitlow testified that the neuroimaging findings— which cannot be malingered—show that Mr. Brockman's dementia has progressed beyond early or mild dementia, and that he likely suffers from moderate dementia.  11/17/2021 PM Tr. at 79:4–81:4, 164:20–165:3 (Wisniewski); 11/23/2021 AM Tr. at 83:13–83:24 (Whitlow).

74.     Moderate dementia is associated with severe memory loss to the point that only highly learned material is retained (e.g., overlearned material that has been a subject

---

164:1-164:21, 170:12-172:11 (Whitlow) (explaining that the difference in slice thickness between scans is irrelevant for qualitative analysis).

of intense focus for numerous years), while new material is rapidly lost. *See* 11/15/2021 AM Tr. at 94:4–94:12 (Darby); 11/15/2021 PM Tr. at 72:5–74:13 (Darby); 11/17/2021 PM Tr. at 81:23–82:14 (Wisniewski).

75.     Moderate dementia is associated with severe impairments in exercising judgment and problem-solving, severe difficulty with relationships, and disorientation to time and often to place, and requires assistance with personal care, including dressing and hygiene. *See* 11/15/2021 AM Tr. at 94:4–94:12 (Darby); 11/17/2021 PM Tr. at 81:23–82:20, 94:2–94:7 (Wisniewski).

76.     The government's neurologist, Dr. Darby, acknowledged in his supplemental expert report that "[i]t is reasonable given his hospitalizations for delirium, natural disease course, and neuroimaging that Mr. Brockman *has progressed to the dementia stage*," offering only the caveat that "it is unlikely that he would be *at the severe or end-stages of dementia* as indicated by his recent assessments." Gov't Ex. 39, Dr. Darby Suppl. Report, Dkt. No. 177 at 9 (emphasis added).

77.     The government's neuroradiologist, Dr. Ponisio, similarly opined that Mr. Brockman's neuroimaging studies are consistent with dementia. In her September 2, 2021 report, Dr. Ponisio stated that she reviewed Mr. Brockman's March 12, 2021 FDG PET scan and fused it with the July 30, 2021 brain MRI scan. Dr. Ponisio concluded that "the described pattern of hypometabolism can represent *early Alzheimer's dementia* in the correct clinical setting." Gov't Ex. 6, Dr. Ponisio September 2, 2021 Report at 2 (emphasis added). In her October 25, 2021 report, Dr. Ponisio concluded that "given the pattern of metabolic abnormalities seen on FDG/PET-CT and amyloid scans, the findings are most

consistent with *early dementia* in the correct clinical setting." Gov't Ex. 86, Dr. Ponisio October 25, 2021 Report at 3 (emphasis added).

78.    Even a diagnosis of mild dementia is associated with significant cognitive deficits that render Mr. Brockman incompetent. 11/17/2021 PM Tr. at 67:7–69:17 (Wisniewski). Mild dementia is associated with moderate memory loss that is more marked for recent events. *See* 11/15/2021 PM Tr. at 65:23–66:6, 70:2–70:19 (Darby); 11/17/2021 PM Tr. at 67:7–67:14 (Wisniewski) (explaining that mild dementia is "associated with moderate memory dysfunction, often primarily short-memory, but also some degree of long-term memory").

79.    Dr. Darby testified that moderate memory problems would lead to "difficulty with remembering recent events," which could "interfere with helping counsel." 11/15/2021 PM Tr. at 67:11–67:18 (Darby). More specifically, moderate memory problems cause "difficulty remembering something that's happened now and remembering that in the future," 11/15/2021 PM Tr. at 70:6–70:9 (Darby), including the ability to listen to someone speak, retain that information, and later recall it. *See* 11/15/2021 PM Tr. at 70:11–70:19 (Darby).

80.    Mild dementia is also associated with moderate difficulty exercising judgment and problem-solving. 11/15/2021 PM Tr. at 65:4–66:25, 70:2–71:3, 137:3–137:22 (Darby); 11/17/2021 PM Tr. 67:7–68:2 (Wisniewski). Dr. Darby testified that mild dementia can affect the ability to organize one's thoughts and perform complex activities like financial decision-making and work. 11/15/2021 AM Tr. at 93:23–94:3; 11/15/2021 PM Tr. at 68:17–68:25, 70:20–71:3,137:14–137:22 (Darby).

81.     Dr. Agronin, a board-certified geriatric psychiatrist with over twenty-five years of experience treating elderly patients with neurocognitive diseases,[6] diagnosed Mr. Brockman with Parkinson's disease dementia based on the diagnostic criteria set out by the Movement Disorder Society, finding Mr. Brockman (a) has Parkinson's disease; (b) developed Parkinson's disease prior to developing dementia; (c) has decreased global cognitive abilities, as evidenced by two Montreal Cognitive Assessment tests Dr. Agronin administered; (d) has significant functional impairment in daily life, as evidenced by collateral interviews, medical records, and in-court testimony; and (e) has impairment in attention, executive function, visuo-constructive ability, and memory.  11/23/2021 PM Tr. at 75:11–81:9 (Agronin).

82.     Dr. Agronin also diagnosed Mr. Brockman with possible comorbid Alzheimer's disease based on objective PET scans; recurring delirium that presents a very high risk of further recurrence in light of Mr. Brockman's history of UTIs and dementia; and apathy, one of the most common neuropsychiatric syndromes associated with dementia.  11/23/2021 PM Tr. at 81:12–90:14 (Agronin).

83.     Dr. Agronin testified that it was "completely implausible" for Mr. Brockman to malinger a complex disease state that unfolds over several years, particularly considering Mr. Brockman's indisputable baseline cognitive impairment and recurring delirium.  11/23/2021 PM Tr. at 93:22–95:24 (Agronin).

---

[6] Dr. Agronin oversees mental behavior health in older individuals living at a long-term care campus at Miami Jewish Health; founded Miami Jewish Health's memory disorder clinic called the MIND Institute; and conducts clinical trials and teaches and publishes on neurocognitive diseases.  11/23/2021 PM Tr. at 37:25–45:2 (Agronin); Def. Ex. 9, Dr. Agronin CV.

84.     Dr. Agronin concluded that Mr. Brockman does not have the mental stamina to engage in the criminal proceedings and is unable to assist counsel because "across multiple neurocognitive domains he's sufficiently impaired not to be able to engage with his attorneys, recognize the details of his defense, remember things, remember things over time, consistently express his opinions to both take in information, process it, engage in the process of his defense over time."  11/23/2021 PM Tr. at 96:4–97:12, 207:18–207:21 (Agronin).

85.     In contrast to Dr. Agronin, the government's forensic psychiatrist, Dr. Dietz, has not treated patients since the early 1980s and is, by his own admission, "not an expert on dementia, on neuroimaging, or even the elderly."  11/19/2021 PM Tr. at 35:16–36:5, 47:19–48:8 (Dietz).  Dr. Dietz does not have specialized training in geriatric psychiatry, neuropsychology, radiology, or neurodegenerative disorders. 11/19/2021 PM Tr. at 47:3–47:8, 82:11–82:17, 90:20–91:1 (Dietz).

86.     Dr. Dietz demonstrated his lack of expertise by claiming that Mr. Brockman's "physical frailty" from Parkinson's disease "is a big leg up" and "gives him a head start . . . to look impaired," thus failing to appreciate the devastating non-motor symptoms associated with Parkinson's disease.  11/19/2021 PM Tr. at 133:12–133:16 (Dietz).  His testimony is entitled to less weight because he lacks the relevant experience in dementia-related diseases.[7]

---

[7] *See United States v. Rothman*, No. 08-20895, 2010 WL 3259927, at *35 (S.D. Fla. Aug. 18, 2010) (finding the government expert's testimony cannot be credited because he lacks the "relevant experience in dealing with the diagnosis, implications and manifestations of specific dementia-related diseases particularly when compared to the expertise of [the court-appointed expert] in this area").

87.     Dr. Dietz acknowledged that delirium is a serious medical problem with a high mortality rate and could cause serious cognitive decline.  11/19/2021 AM Tr. at 49:3–51:3, 82:22–83:1 (Dietz).

88.     Dr. Dietz acknowledged Mr. Brockman has progressive and irreversible cognitive decline and that he needs assistance with daily activities, such that the opinions in October 2021 are converging to dementia and Mr. Brockman is "perhaps at the stage of mild dementia."   11/19/2021 AM Tr. at 31:1–35:2, 58:17–58:21, 94:6–94:11 (Dietz); 11/19/2021 PM Tr. at 36:11–36:13 (Dietz).

89.     Dr. Dietz's contention that Mr. Brockman is malingering should be given no weight in light of Dr. Dietz's admissions that his conclusions are not based on "expertise [in] dementia or how the testing is done or how the scans are done," and that Mr. Brockman has cognitive impairment and Parkinson's disease.  11/19/2021 PM Tr. at 36:6–36:13, 154:3–154:5 (Dietz).

90.     Dr. Dietz also has testified falsely for the government in two separate cases and has been rejected from serving as an expert as a result.  11/19/2021 PM Tr. at 49:2–70:6 (Dietz).

## III.   NEUROPSYCHOLOGICAL   TESTING   DEMONSTRATES   THAT MR. BROCKMAN HAS GLOBAL COGNITIVE IMPAIRMENT

91.     Serial neuropsychological testing by multiple examiners demonstrates that Mr. Brockman is globally impaired with significant cognitive deficits in numerous domains necessary to understand the charges, assist counsel, and stand trial.

92.     Neuropsychological testing involves the administration of various measures specifically designed to target discrete aspects of cognitive function and measure both the existence and degree of cognitive impairment.  *See* 11/15/2021 PM Tr. at 145:12–145:22 (Denney); 11/22/2021 PM Tr. at 70:1–70:23 (Guilmette).

93.     Cognitive domains assessed using neuropsychological testing include learning and memory (*e.g.*, immediate memory, recent memory, long-term memory), executive function (*e.g.*, planning, judgment, decision-making, problem-solving, working memory or the ability to temporarily hold information and perform mental operations on it), complex attention (*e.g.*, sustained attention, divided attention, mental processing speed), perceptual-motor (*e.g.*, visual-spatial abilities), orientation, and language (*e.g.*, naming, word finding).  *See* Gov't Ex. 1, Dr. Denney Report, Dkt. No. 79 at 25–28 (describing Mr. Brockman's performance in various domains); Def. Ex. 19, Dr. Guilmette Report, Dkt. No. 101 at 29; 11/22/2021 PM Tr. at 66:11–67:8, 150:12–155:12 (Guilmette).

94.     Mr. Brockman has undergone serial neuropsychological testing by multiple examiners, including Dr. Michele York, the head of neuropsychology at Baylor College of Medicine, who examined Mr. Brockman three times between March 2019 and October 2020; Dr. Denney, who examined Mr. Brockman on May 18–May 20, 2021, October 20, 2021, and October 26, 2021; and defense witness Dr. Thomas Guilmette, a clinical neuropsychologist and professor of psychology at Providence College, who examined Mr. Brockman on July 13-July 14, 2021 and October 2, 2021.  *See* Gov't Ex. 1, Dr. Denney Report, Dkt. No. 79 at 1; Gov't Ex. 2, Dr. Denney Suppl. Report, Dkt. No. 179 at 2; Def.

Ex. 19, Dr. Guilmette Report, Dkt. No. 101 at 21, 29; Def. Ex. 22, Dr. Guilmette Suppl. Report, Dkt. No. 173 at 2.

95.     Across neuropsychological testing, Mr. Brockman's test scores reflect significant cognitive impairments.  11/22/2021 PM Tr. at 80:13–80:21 (Guilmette).

96.     Mr. Brockman's scores reflect deficits in learning and memory (impeding his ability to learn, retain, and recall information); executive function (impeding his ability to organize his thoughts, plan, problem-solve and exercise judgment); attention and mental processing speed (impeding his ability to attend to relevant information or process information and think through problems); and visual-spatial problems (impeding his ability to navigate in the physical world).  *See* 11/22/2021 PM Tr. at 66:9–67:22, 150:12–155:12 (Guilmette); Gov't Ex. 1, Dr. Denney Report, Dkt. No. 79 at 25–28 (discussing scores showing deficits in memory, attention, concentration, etc.); Gov't Ex. 2, Dr. Denney Suppl. Report, Dkt. No. 179 at 13–15 (same).

97.     Across neuropsychological testing, Mr. Brockman consistently demonstrated poor memory.  11/22/2021 PM Tr. at 81:12–81:13 (Guilmette); *see also* Gov't Ex. 1, Dr. Denney Report, Dkt. No. 79 at 26; Gov't Ex. 2, Dr. Denney Suppl. Report, Dkt. No. 179 at 14.  As a result of gaps in is ability to remember, Mr. Brockman's dementia causes him to confabulate by filling in unreliable information.  Def. Ex. 22, Dr. Guilmette Suppl. Report, Dkt. No. 173 at 4, 35; 11/22/2021 PM Tr. at 151:4–151:10, 156:18–157:7 (Guilmette).[8]

---

[8] Comparing Mr. Brockman's neuropsychological test scores over time also demonstrates a decline in mental processing speed, mental stamina, and sustained attention.  11/22/2021 PM Tr. at 80:22–81:9 (Guilmette).

98.     Mr. Brockman has relatively preserved language functions and social skills, which allow him to speak about certain overlearned topics in detail, such as the business operations of Reynolds and Reynolds. *See* 11/22/2021 PM Tr. at 67:13–67:18 (Guilmette); Def. Ex. 22, Dr. Guilmette Suppl. Report, Dkt. No. 173 at 34; *see also* Gov't Ex. 1, Dr. Denney Report, Dkt. No. 79 at 26 (discussing test scores for language function).  The business operations of Reynolds and Reynolds are not relevant to the allegations in the Indictment, and Mr. Brockman's relatively preserved language and social skills can mask but do not compensate for his impaired cognitive functioning.  Def. Ex. 19, Dr. Guilmette Report, Dkt. No. 101 at 23; Def. Ex. 22, Dr. Guilmette Suppl. Report, Dkt. No. 173 at 34; 11/22/2021 AM Tr. at 52:18–53:10 (Dr. Pool describing observations of Mr. Brockman's preserved language function covering other cognitive deficits).

99.     Mr. Brockman's neuropsychological test scores are consistent with dementia.  *See* Def. Ex. 19, Dr. Guilmette Report, Dkt. No. 101 at 23; Def. Ex. 22, Dr. Guilmette Suppl. Report, Dkt. No. 173 at 34.

100.     Dr. Denney, the government's expert, does not dispute that test scores reflect cognitive impairment; instead, he claims these tests are not an accurate reflection of Mr. Brockman's ability because of purported failed performance validity tests ("PVTs"). *See* Gov't Ex. 1, Dr. Denney Report, Dkt. No. 79 at 25 (noting Mr. Brockman's PVT scores and claiming neuropsychological "test results are not a valid reflection of Mr. Brockman's genuine cognitive abilities"); Gov't Ex. 2, Dr. Denney Suppl. Report, Dkt. No. 179 at 13.

101.     PVTs are measures designed to assess a test subject's effort and possible malingering on cognitive ability tests.  *See* 11/16/2021 AM Tr. at 13:21–14:9 (Denney);

11/22/2021 PM Tr. at 71:15–72:6 (Guilmette).  There are known risks that PVTs will produce false positive errors and incorrectly label an individual as possibly malingering when they are not.  These risks are especially acute for individuals suffering from dementia. *See* 11/17/2021 AM Tr. at 44:9–44:16 (Denney); 11/22/2021 PM Tr. at 74:13–76:6, 77:22–79:4 (Guilmette); Def. Ex. 19, Dr. Guilmette Report, Dkt. No. 101 at 41; Def. Ex. 22, Dr. Guilmette Suppl. Report, Dkt. No. 173 at 17.

102.    As Dr. Denney acknowledged during the hearing, PVT cutoff scores must be adjusted and lowered for older and cognitively impaired individuals to prevent false positive findings.  *See* 11/16/2021 AM Tr. at 14:10–14:15 (Denney); 11/17/2021 AM Tr. at 24:19–24:24 (Denney); *see also* 11/22/2021 PM Tr. at 121:23–122:15 (Dr. Guilmette explaining that there is consensus that scoring must be adjusted to accommodate demented and cognitive impaired individuals).

103.    Dr. Paul Green developed three widely used computer-administered PVTs that adjust for and help distinguish between a genuine memory impairment profile and possible malingering: the Word Memory Test ("WMT"), the Non-Verbal Medical Symptom Validity Test ("NV-MSVT"), and the Medical Symptom Validity Test ("MSVT") (collectively, "Green's PVTs").  11/22/2021 PM Tr. at 72:7–74:1 (Guilmette); *see also* 11/17/2021 AM Tr. at 24:8–24:18 (Denney).

104.    Each of Green's PVTs—considered separately—have high rates of sensitivity; that is, to a high degree they correctly identify persons who are malingering on cognitive ability tests.  *See* 11/17/2021 AM Tr. at 27:9–27:21 (Denney).  Sensitivity

increases when two of Green's PVTs are administered.  11/17/2021 AM Tr. at 28:1–28:9 (Denney).

105.    Dr. Denney acknowledged that, according to his own research, the sensitivity of detecting a fake memory impairment is notably increased when all three of Green's PVTs are administered.[9]   Dr. Denney agreed that his research established that no participant was able to produce genuine memory impairment profiles across all three tests. 11/17/2021 AM Tr. at 30:18–31:14 (Denney).  In other words, when all three of Green's PVTs are administered, they were 100% sensitive in detecting a fake memory impairment in that study.  11/17/2021 AM Tr. at 30:18–31:14 (Denney); *see also* 11/22/2021 PM Tr. at 77:2–77:17, 133:18–134:11 (Guilmette).

106.    Mr. Brockman has been administered each of Green's PVTs at least once. Across each of Green's three PVTs, Mr. Brockman produced a genuine memory impairment profile.  *See* Def. Ex. 59, DBD-0000124 (WMT administered during Dr. Denney's May exam); Def. Ex. 60, DBD-0000075 (NV-MSVT administered during Dr. Denney's May exam); Def. Ex. 61, RTBrockman_Medical_Records_0001891 (MSVT administered during Dr. Guilmette's July exam); Def. Ex. 63 (NV-MSVT administered during Dr. Denney's October exam); Def. Ex. 64 (MSVT administered during Dr. Denney's October exam); *see also* 11/17/2021 AM Tr. at 43:9–44:8 (Denney).

107.    Mr. Brockman's genuine memory impairment profiles across all three of Green's PVTs strongly indicate that he is not malingering his cognitive impairment.

---

[9] Patrick Armistead-Jehle and Robert L. Denney, *The Detection of Feigned Impairment Using the WMT, MSVT, and NV-MSVT*, 22 Applied Neuropsychology 147, 152 (2015).

108.    Dr. Denney disregarded Mr. Brockman's genuine memory impairment profiles (and his own research), contending that his subjective clinical judgment allowed him to find that Mr. Brockman's scores did not correspond with profiles of certain comparison groups, including dementia profiles.  *See* Gov't Ex. 2, Dr. Denney Suppl. Report, Dkt. No. 179 at 10–13.

109.    Dr. Denney compared Mr. Brockman's individual test scores against the mean score (*i.e.*, average) of the comparison groups that he subjectively selected.  *See* Gov't Ex. 2, Dr. Denney Suppl. Report, Dkt. No. 179 at 10–13; 11/22/2021 PM Tr. at 135:1–135:14 (Guilmette) (discussing NV-MSVT administered during Dr. Denney's October exam and comparison profiles).

110.    Comparing an individual's test scores to the mean score of a group is not an accurate or scientifically sound method of analysis.  The mean is merely a single number, and it does not account for the range of scores within a group (*i.e.*, the fluctuation of scores within a sample, such as the highest and lowest scores obtained) or the standard of deviation from the mean for that group (*i.e.*, the dispersion of scores and how much they vary from the mean).[10]  11/22/2021 PM Tr. at 135:16–137:5 (Guilmette).  Dr. Denney did not disclose the range or standard deviations for the comparison groups he utilized to enable a scientifically sound analysis of his comparison groups.  *See* 11/22/2021 PM Tr. at 136:12–137:12, 139:10–139:15 (Guilmette).

---

[10] Moreover, comparing Mr. Brockman's scores to dementia comparison groups demonstrated that his scores were either: (a) within two standard deviations of the group mean (which captures 95% of that group); or (b) equal to or higher than the lowest score obtained by one of the dementia comparison groups.  11/22/2021 PM Tr. at 142:9–142:18, 143:15–143:21 (Guilmette).  In other words, Mr. Brockman's test scores did not fall below dementia comparison groups in any statistically significant way.  11/22/2021 PM Tr. at 143:25–144:3 (Guilmette).

111.  Dr. Denney also administered the Victoria Symptom Validity Test ("VSVT"), which he claimed Mr. Brockman failed.  In doing so, Dr. Denney deviated from the testing manual and made his own adjustments to the scoring criteria by increasing the cutoff scores.  *See* Gov't Ex. 1, Dr. Denney Report, Dkt. No. 79 at 24; DX-65 (VSVT scoring sheet); 11/17/2021 AM Tr. at 46:4–52:24 (Denney); 11/22/2021 PM Tr. at 101:14–107:11 (Guilmette).

112.  By increasing VSVT cutoff scores, Dr. Denney did the opposite of what he testified clinicians should do when testing older and cognitively impaired individuals— adjust PVT cutoff scores by lowering them to decrease the rate of false positive errors.  *See* 11/16/2021 AM Tr. at 14:10–14:15 (Denney); 11/17/2021 AM Tr. at 24:19–24:24, 44:9– 44:24 (Denney).

113.  Dr. Denney also failed to account for the Total Items Correct score on the VSVT, which according to the test's own manual provides the most objective and quantifiable evidence regarding whether respondents are exhibiting biased responding on the VSVT.  Def. Ex. 19, Dr. Guilmette Report, Dkt. No. 101 at 26.

114.  When dementia patients produce chance scores on the VSVT—as Mr. Brockman did—that score should be interpreted as a false-positive rather than evidence of malingering.  *See* 11/17/2021 AM Tr. at 47:12–48:8 (Denney) (discussing David W. Loring et al., *Victoria Symptom Validity Test Performance in Heterogeneous Clinical Sample*, The Clinical Neuropsychologist (2007) at 529); 11/22/2021 PM Tr. at 104:24–105:22 (Guilmette) (discussing article).

115.    Mr. Brockman has also been administered the Rey 15-Item Test Plus Recognition Test ("RFIT") on multiple occasions.  *See* Def. Ex. 19, Dr. Guilmette Report, Dkt. No. 101 at 42; Gov't Ex. 1, Dr. Denney Report, Dkt. No. 79 at 31; Def. Ex. 22, Dr. Guilmette Suppl. Report, Dkt. No. 173 at 17; Gov't Ex. 2, Dr. Denney Suppl. Report, Dkt. No. 179 at 13.  On the RFIT, the subject is asked to memorize different stimuli for a limited period of time and then asked to draw as many of the stimuli from memory as possible.  *See* 11/16/2021 AM Tr. at 54:15–55:20 (Denney).

116.    Dr. Denney purported to rely on Rachel L. Fazio et al., *Use of the Rey 15-Item Test as a Performance Validity Test in an Elderly Population*, Applied Neuropsychology: Adult (2017) (the "Fazio Study").  Gov't Ex. 165; *see* Gov't Ex. 1, Dr. Denney Report, Dkt. No. 79 at 31 n.12; Gov't Ex. 2, Dr. Denney Suppl. Report, Dkt. No. 179 at 13 n.7; 11/16/2021 AM Tr. at 57:13–58:25 (Denney).

117.    For older and cognitively impaired test subjects, the Fazio Study recommends that rather than using traditional cutoff scores, pattern analysis can be used "as a pathognomonic marker of likely disingenuous performance."  Gov't Ex. 165 at 6. That is, pattern analysis can be used as a particular sign of malingering.  11/22/2021 PM Tr. at 124:14–125:25 (Guilmette).

118.    Applying pattern analysis to Mr. Brockman's scores revealed valid range scores that were not consistent with suboptimal effort or malingering.  Def. Ex. 19, Dr. Guilmette Report, Dkt. No. 101 at 42; Def. Ex. 22, Dr. Guilmette Suppl. Report, Dkt. No. 173 at 17; 11/22/2021 PM Tr. at 124:14–125:25 (Guilmette).

119.    Dr. Denney did not acknowledge Mr. Brockman's valid scores using pattern analysis, despite citing the Fazio Study in his reports and discussing it during his testimony. *See* Gov't Ex. 1, Dr. Denney Report, Dkt. No. 79 at 31 n.12;  11/16/21 AM Tr. at 57:13–58:25 (Denney); *see also* 11/22/2021 PM Tr. at 129:4–129:25 (Guilmette).

120.    In sum, PVT scores obtained across numerous neuropsychological testing sessions demonstrate that Mr. Brockman suffers from a genuine cognitive impairment and is not malingering cognitive incapacitation.  Def. Ex. 19, Dr. Guilmette Report, Dkt. No. 101 at 72–77; Def. Ex. 22, Dr. Guilmette Suppl. Report, Dkt. No. 173 at 4, 39–43.

## IV.   THE TESTIMONY OF THE GOVERNMENT'S EXPERT DR. ROBERT DENNEY SHOULD BE GIVEN LITTLE, IF ANY, WEIGHT

121.    Dr. Denney repeatedly distorted the legal standards that apply to a determination as to whether Mr. Brockman is competent to assist in his defense, ignored evidence that contradicted his position concerning Mr. Brockman's competency, misinterpreted the neuropsychological testing, and misstated the neuroimaging findings in this case.

122.    Dr. Denney's contention that Mr. Brockman's access to the "assistance of *excellent* counsel" should bear on the issue of his competency is in fundamental contradiction with the applicable legal standards.  *See* Gov't Ex. 2, Dr. Denney Suppl. Report, Dkt. No. 179 at 21 (emphasis added); *see also* 11/17/2021 AM Tr. at 55:24–56:12 (Denney).  The standard is not, as Dr. Denney contends, whether counsel can compensate for Mr. Brockman's memory impairments by identifying records and reconstructing the offenses alleged in the Indictment.  *See* Gov't Ex. 2, Dr. Denney Suppl. Report, Dkt. No.

179 at 21; 11/17/2021 AM Tr. at 55:19–56:12 (Denney).  Rather, the standard is whether

Mr. Brockman is competent to exercise his Constitutional right to understand the charges

and participate in his defense, as required by the Supreme Court in *Drope v. Missouri*, 420

U.S. 162, 171–72, 181 (1975), and *Dusky v. United States*, 362 U.S. 402, 402 (1960).  *See*

*Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001) (competency to stand trial "requires

the mental acuity to see, hear and digest the evidence, and the ability to communicate with

counsel in helping prepare an effective defense").

123.    Dr. Denney compounded his error by disregarding the perspective of defense

counsel that Mr. Brockman cannot in fact assist in his defense.  *See* 11/16/2021 PM Tr. at

103:25–104:4 (Denney) (describing "tak[ing] what Mr. Romatowski tells me with some

grain of salt" because "[h]e's involved in defending Mr. Brockman in this case").  As the

Supreme Court has recognized, "defense counsel will often have the best-informed view

of the defendant's ability to participate in his defense." *Medina v. California*, 505 U.S.

437, 450 (1992).

124.    Dr. Denney similarly dismissed interview statements by Mr. Brockman's

wife, Dorothy Brockman, and his caregiver, Mr. Gutierrez, contending that "their

motivation may not be unsullied."  Gov't Ex. 2, Dr. Denney Suppl. Report, Dkt. No. 179

at 20.  In other words, contrary to the applicable legal standards, Dr. Denney "ignor[ed],

disregard[ed], or minimiz[ed] evidence that called his conclusions into question." *Webster*

*v. Lockett*, No. 2:12-cv-86, 2019 WL 2514833, at *7 n.13 (S.D. Ind. June 18, 2019), *aff'd*

*sub nom. Webster v. Watson*, 975 F.3d 667, 682 (7th Cir. 2020) (finding Dr. Denney

"overall to be not credible" by reason of his selective treatment of the evidence).

125.   Despite conceding, as the law provides, that two defendants with the exact same neurocognitive deficits (*e.g.*, mild dementia) could vary in their competence based on the complexity of the case, Dr. Denney failed to consider Mr. Brockman's competency in the context of the extraordinarily complicated charges in the Indictment.  Dr. Denney himself acknowledged the complexity of the case should be considered in assessing a defendant's cognitive status.[11]  *See* 11/17/2021 AM Tr. at 53:6–53:15 (Denney); *see also United States v. Dreyer*, 705 F.3d 951, 961 (9th Cir. 2013) ("[T]he defendant's ability to participate or assist his counsel must be evaluated in light of the type of participation required.").

126.   Dr. Denney's opinion that Mr. Brockman is malingering rests on his misinterpretation of performance validity test ("PVT") results.  Dr. Denney (a) disregarded that Mr. Brockman produced genuine impairment profiles on PVTs that Dr. Denney's own published research concluded are 100% accurate at detecting individuals faking dementia; (b) failed to adjust PVT cutoff scores that produce a high number of false positive errors when applied to older populations and those suffering from dementia (despite acknowledging that such adjustments must be made for older and cognitively impaired individuals); (c) substituted his own subjective criteria to justify disregarding test results that did not support his position; and (d) for certain PVTs, abandoned the guidelines in the

---

[11]   Dr. Denney himself does not possess even a cursory understanding of the complex allegations in the Indictment.  *See* 11/16/2021 PM Tr. at 125:5–125:25 (Denney); 11/17/2021 AM Tr. at 57:17–58:13 (Denney).  Dr. Denney did not know the number of counts in the Indictment or any details about the charges against Mr. Brockman except that they involve tax evasion.  *See* 11/17/2021 AM Tr. at 57:17–58:3 (Denney).  The tax evasion charges comprise less than one-fifth of the 39-count Indictment.  Dr. Denney was utterly unable to describe the wire fraud conspiracy charges in this case.  11/17/2021 AM Tr. at 58:4–58:13 (Denney).  Given that Dr. Denney himself does not understand the charges, he is not qualified to assess whether this mentally impaired defendant can do so.

test manual and made the tests *harder* by increasing cutoff scores, doing the exact opposite of what he said clinicians must do when testing older or cognitively impaired individuals.[12] *See* 11/16/2021 AM Tr. at 14:10–14:24 (Denney); *see also* Def. Ex. 19, Dr. Guilmette Report, Dkt. No. 101 at 41; Def. Ex. 22, Dr. Guilmette Suppl. Report, Dkt. No. 173 at 17; 11/22/2021 PM Tr. at 77:22–79:21 (Guilmette).

127.    Dr. Denney inaccurately described the course of Parkinson's disease and its non-motor symptoms.   Dr. Denney claimed that Parkinson's patients may complain of memory deficits, but "it's actually not a memory problem.   It's more of an attention concentration problem,"  11/16/2021 PM Tr. at 68:14–68:20 (Denney), and also asserted that memory deficits occur at "the later stages of Parkinson's disease" with the presentation of Parkinson's disease dementia.  11/16/2021 PM Tr. at 68:21–68:24 (Denney).   In this respect, Dr. Denney contradicts Dr. Darby, another government expert, who testified that Parkinson's disease is often associated with non-motor symptoms such as problems with memory, executive function, learning, and attention, *see* 11/15/2021 PM Tr. at 36:14–37:20 (Darby).   These non-motor symptoms can occur early in the course of Parkinson's disease, contemporaneously with the motor symptoms associated with Parkinson's disease. *See* 11/17/2021 PM Tr. at 63:20–63:25 (Wisniewski).

---

[12] Dr. Denney attempted to structure his testing to support his conclusions that Mr. Brockman is malingering and competent to stand trial regardless of how he performed.  For example, Dr. Denney devised and administered a forced-choice test that purported to examine Mr. Brockman's understanding of the Indictment.  Gov't Ex. 2, Dr. Denney Suppl. Report, Dkt. No. 179 at 20.  Above chance scoring would have been interpreted to demonstrate that Mr. Brockman has a memory for the Indictment and is thus competent to proceed; below chance would have been interpreted to demonstrate malingering.  11/16/2021 PM Tr. at 132:16–133:1 (Denney).  Mr. Brockman scored at chance, 11/16/2021 PM Tr. at 133:2–133:9 (Denney), which did not provide any support for Dr. Denney's conclusion but did demonstrate that Mr. Brockman is incompetent.  In other words, in a test that Dr. Denney constructed as "heads I win, tails you lose," the coin landed on its edge, thus frustrating Dr. Denney's design.

128. Dr. Denney misstated the neuroimaging studies by claiming that the findings suggest Mr. Brockman likely "has an Alzheimer's disease process starting in his brain," with findings that "indicate he would be in the earliest stages of that disease process." 11/16/2021 AM Tr. at 5:16–5:22 (Denney). This testimony is directly contradicted by the reports of Dr. Darby and Dr. Ponisio, government experts who concluded Mr. Brockman's neuroimaging studies indicated disease progression beyond mild cognitive impairment that had reached the dementia stage. *See* Gov't Ex. 39, Dr. Darby Suppl. Report, Dkt. No. 177 at 9, 11; Gov't Ex. 86, Dr. Ponisio October 25, 2021 Report at 2.

129. Dr. Denney incredibly claimed he did not remember an adverse credibility finding by a federal judge in a death penalty case from just two years ago. 11/16/2021 PM Tr. at 47:9–47:25 (Denney). There, the Court found the testimony of Dr. Denney "overall to be not credible," and that "Dr. Denney focused on evidence that supported his conclusions while ignoring, disregarding, or minimizing evidence that called his conclusions into question." *Webster*, 2019 WL 2514833, at *7 n.13.[13]

130. Consistent with the adverse credibility findings made by other federal judges, Dr. Denney's testimony during the hearing demonstrated that he is not a credible witness. His opinions are entitled to little or no weight.

---

[13] Dr. Denney did recall his involvement in yet another case where the Court found his testimony to be "less credible" and "assign[ed] it less weight" in part because he adopted an approach "directly at odds with the clinical standard" and provided explanations that "were at times incoherent." *United States v. Wilson*, 170 F. Supp. 3d 347, 385 (E.D.N.Y. 2016); 11/16/2021 PM Tr. at 47:12–47:23 (Denney).

## PROPOSED CONCLUSIONS OF LAW

### I.   LEGAL STANDARDS

#### A.   Competency is a Present Determination

131.   "Competency to stand trial at a particular time goes not to the mental condition existing at the time of the alleged offense; it is concerned solely with whether the defendant is then able to confer intelligently with counsel and to competently participate in the trial of his case."  *United States v. Collins*, 491 F.2d 1050, 1053 (5th Cir. 1974).

132.   Even if a defendant was competent at the time of the alleged offense or even at an earlier stage of his criminal proceedings, courts "must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial."  *Drope*, 420 U.S. at 181; *see also* 18 U.S.C. § 4241(a) (instructing the court to consider competency "[a]t any time after the commencement of a prosecution for an offense and prior to the sentencing . . . .").

#### B.   The Government Must Establish That Mr. Brockman is Capable of Understanding the Nature and Consequences of the Proceedings and Can Meaningfully Assist in His Defense

133.   The Government bears the burden of proving a defendant's competence by a "preponderance of the evidence" following a competency hearing.  18 U.S.C. § 4241(a); Dkt. No. 113 at 3 (government acknowledging it bears the burden of proof, citing *United States v. Hutson*, 821 F.2d 1015, 1018 (5th Cir. 1987)).

134.   A defendant is not competent to stand trial if his "mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against

him, to consult with counsel, and to assist in preparing his defense." *Drope*, 420 U.S. at

171; *accord Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam) (competency

turns on "whether [the defendant] has sufficient present ability to consult with his lawyer

with a reasonable degree of rational understanding.").

135.    Mere "functional competence" is not enough to establish "competence to

stand trial." *Riggins v. Nevada*, 504 U.S. 127, 141 (1992) (Kennedy, J., concurring).  A

competent defendant "should be able to relate pertinent facts, names and events to his

attorneys," "review and evaluate documents and other written evidence with bearing on the

case," "appreciate[e] [] the Government's evidence against him," "consider the wisdom of

taking a course other than standing trial on the merits," "decide objectively whether to

exercise his constitutional right to take the stand," "testify in an intelligent, coherent and

relevant manner," "remain sufficiently alert and responsive so as to follow and recognize

any discrepancies in the testimony of witnesses," "discuss the testimony with his

attorneys," and "postulate questions to the witnesses through counsel." *United States v.*

*Rothman*, No. 08-208954-CR, 2010 WL 3259927, at *6 (S.D. Fla. Aug. 18, 2010).

### C.    Mr. Brockman's Competence Must be Assessed Based on the Specific Context of this Proceeding

136.    Because competence to stand trial turns on the defendant's ability to

participate in and assist with his defense, it is necessarily a context-specific determination.

*Dreyer*, 705 F.3d at 961 ("the defendant's ability to participate or assist his counsel must

be evaluated in light of the type of participation required" given the complexity of the

proceedings).

### D.     The Government Has Not Established That Mr. Brockman is Competent to Stand Trial

137.    The government has not satisfied its burden of proving that Mr. Brockman is presently able to understand the charges against him and consult with and assist his counsel with a reasonable degree of rational understanding.

138.    Courts have found that dementia can render a defendant incompetent.  *See, e.g.*, *United States v. Ferro*, 321 F.3d 756, 759 (8th Cir. 2003); *United States v. Brown*, 147 F. Supp. 3d 312, 325–26 (E.D. Pa. 2015); *United States v. Azure*, 488 F. Supp. 2d 885, 885 (D.N.D. 2007); *United States v. Rothman*, No. 08-20895, 2010 WL 3259927, at *34–35 (S.D. Fla. Aug. 18, 2010); *United States v. Kasim*, no. 2:07 CR 56, 2008 U.S. Dist. LEXIS 89137, at *52–53 (N.D. Ind. Nov. 3, 2008).  This remains true even if the defendant "can recall certain facts (particularly older facts) and perform abstract reasoning," because competence requires the present ability "to scrutinize the evidence and testimony presented during trial."  *United States v. Buckingham*, 2020 WL 7238273, at *11 (N.D. Ala. Dec. 9, 2020).

139.    Mr. Brockman is presently suffering from a mental disease or defect— dementia—rendering him mentally incompetent because he is unable to understand the nature and consequences of the proceedings against him or assist properly in his defense. *See* 18 U.S.C. § 4241(d).

140.    Objective neuroimaging studies, neuropsychological test results, psychiatric testimony, and observations by Mr. Brockman's treating physician, caregiver and defense

counsel all confirm that Mr. Brockman has dementia.  The cause of Mr. Brockman's dementia is comorbid Parkinson's disease and Alzheimer's disease.

141.    The Court need not decide whether Mr. Brockman suffers from mild dementia (as reflected in the reports of Drs. Darby and Ponisio) or moderate dementia (as opined by Drs. Wisniewski, Whitlow, Guilmette, Agronin).    In either case, Mr. Brockman's dementia renders him incompetent.

142.    The Court accepted the testimony of Dr. Wisniewski that Mr. Brockman lacks the ability to provide relevant and requested facts, dates, and specifics.  11/17/2021 PM Tr. at 62:20–63:2 (Wisniewski).

143.    The Court accepted the testimony of Dr. Guilmette that Mr. Brockman currently lacks the ability to testify on his own behalf.  11/22/2021 PM Tr. at 157:13–157:15 (Guilmette).

144.    The Court accepted the testimony of Dr. Wisniewski, Dr. Guilmette, and Dr. Agronin that Mr. Brockman currently lacks the mental stamina needed for a courtroom trial.  11/17/2021 PM Tr. at 63:3–63:7 (Wisniewski); 11/22/2021 PM Tr. at 157:16–157:18 (Guilmette); 11/23/2021 PM Tr. at 95:25–96:13 (Agronin).

145.    The Court accepted the testimony of Dr. Guilmette and Dr. Agronin that, to a reasonable degree of medical certainty, Mr. Brockman lacks the ability to consult with his attorneys with a reasonable degree of rational understanding, and, therefore, is not competent to stand trial.  11/22/2021 PM Tr. at 65:9–65:18, 156:15–157:7 (Guilmette); 11/23/2021 PM Tr. at 96:19–97:12, 207:15–207:21 (Agronin).

146.    Because his dementia involves marked progressive impairment in several cognitive domains necessary to stand trial, including: (a) learning and memory; (b) executive function; and (c) attention and mental processing speed, *see* 11/22/2021 PM Tr. at 66:4–67:22 (Guilmette), the government cannot meet the requirement of showing that Mr. Brockman is able to understand the charges against him and consult with his attorneys with a reasonable degree of rational understanding.

147.    Mr. Brockman's learning and memory deficits render him incapable of retaining and recalling newly learned information (e.g., conversations with counsel or the testimony of witnesses), comparing it to his own recollections, and processing that information.  Mr. Brockman lacks the ability to remember past conversations; review and analyze evidence bearing on the case; digest evidence and testimony at trial, retain it, discuss it with defense counsel (including discrepancies in witness testimony), and meaningfully assist in confronting witnesses and evidence.

148.    Mr. Brockman's executive function deficits impede his ability to organize his thoughts, plan, problem-solve, exercise sound judgment, and utilize working memory. Mr. Brockman cannot understand the legal issues involved in the case or available defenses; he cannot comprehend instructions and advice of counsel, or make decisions after receiving advice; he cannot appreciate (or remember) the government's evidence, appraise likely outcomes, consider the wisdom of taking a course other than trial, or consider the risks and benefits of exercising his constitutional right to take the stand at trial; he cannot testify in a relevant and coherent manner; his disorganized thought processes render him incapable of effectively preparing for cross-examination (if necessary); his working

memory deficits render him incapable of understanding a complex sentence, following fast dialogue, or managing multiple ideas simultaneously during trial.

149.    Mr. Brockman's attention and mental processing speed impede his ability to attend to relevant information while ignoring irrelevant information.  He cannot remain alert and responsive, whether in preparing for trial or in following the presentation of evidence and testimony at trial.

150.    In short, Mr. Brockman lacks the cognitive abilities required of a criminal defendant.

151.    The medical evidence is clear that Mr. Brockman's condition is permanent, progressive, and incurable, and that no available treatments can restore Mr. Brockman to competency.   A status conference is required to address the submission of additional evidence and briefing on whether treatment in a suitable facility for any period of time is necessary to determine whether Mr. Brockman can attain capacity to stand trial in the future.  *Jackson v. Indiana*, 406 U.S. 715 (1972); *see also* 18 U.S.C. § 4241(d).

**E.    In the Alternative to Reaching a Competency Determination, the Court Should Appoint Neural Experts**

152.    The government has not proven by a preponderance of the evidence, and Mr. Brockman may not be found on this record, to be competent to stand trial.  But if the Court is not prepared to decide the question on this record, the Court should appoint neutral experts to conduct an independent competency examination pursuant to Title 18, United States Code, Sections 4241(b) and 4247(b).

153.    The government has repeatedly endorsed the appointment of neutral experts if the Court is unable to determine whether Mr. Brockman is competent.  *See, e.g.*, Dkt. No. 113 at 13 ("If the Court is inclined to consider Defendant's request for the appointment of more experts, the United States suggests it defer making that decision until after the [competency] hearing."); *id.* at 14; 9/13/2021 Tr. at 25:24–26:9 (Corey Smith).

## **CONCLUSION**

154.    The government has not satisfied its burden of proving that Mr. Brockman is presently able to understand the charges against him and consult with and assist his counsel with a reasonable degree of rational understanding.  The evidence at the competency hearing showed that Mr. Brockman has dementia, a condition that is permanent, progressive and incurable.  He is legally incompetent to stand trial.  A status conference is required to consider further proceedings in order to determine whether treatment in a suitable facility for any period of time is necessary to determine whether Defendant Robert T. Brockman can attain capacity to stand trial in the future.  *Jackson v. Indiana*, 406 U.S. 715 (1972); *see also* 18 U.S.C. § 4241(d).

155.    If the Court is not prepared to decide the question, neural experts should be appointed to conduct an independent examination.

Dated:  December 17, 2021                    /s/ Jason S. Varnado
                                             Jason S. Varnado
                                             Texas Bar No. 24034722
                                             SDTX Ad. ID No. 32166
                                             Email: jvarnado@jonesday.com
                                             JONES DAY
                                             717 Texas, Suite 3300
                                             Houston, TX  77002
                                             Telephone: 832-239-3939
                                             Facsimile: 832-239-3600

                                             Kathryn Keneally (*Admitted Pro Hac Vice*)
                                             New York Bar No. 1866250
                                             Email: kkeneally@jonesday.com
                                             James P. Loonam (*Admitted Pro Hac Vice*)
                                             New York Bar No. 4035275
                                             Email: jloonam@jonesday.com
                                             Sarah D. Efronson (*Admitted Pro Hac Vice*)
                                             New York Bar No. 5217484
                                             Email:sefronson@jonesday.com
                                             Colleen E. O'Connor (*Admitted Pro Hac Vice*)
                                             New York Bar No. 5764725
                                             Email: colleenoconnor@jonesday.com
                                             JONES DAY
                                             250 Vesey Street
                                             New York, NY 10281-1047
                                             Telephone: 212-326-3939
                                             Facsimile: 212-755-7306

                                             Irina K. Bleustein (*Admitted Pro Hac Vice*)
                                             District of Columbia Bar No. 1044772
                                             Email: ibleustein@jonesday.com
                                             Conor G. Maloney (*Admitted Pro Hac Vice*)
                                             District of Columbia Bar No. 1632584
                                             Email: cmaloney@jonesday.com
                                             Patrick J. Manion (*Admitted Pro Hac Vice*)
                                             District of Columbia Bar No. 1615138
                                             Email: pmanion@jonesday.com
                                             Michael R. Tompkins (*Admitted Pro Hac Vice*)
                                             District of Columbia Bar No. 1720349
                                             Email: mtompkins@jonesday.com
                                             JONES DAY

51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: 202-879-3450
Facsimile: 202-626-1700

*Attorneys for Defendant*
*Robert T. Brockman*

## **CERTIFICATE OF SERVICE**

I certify that on this 17th day of December, 2021, I electronically served this document on all counsel of record.

*/s/ Jason S. Varnado*
Jason S. Varnado