# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION



| | |
|---|---|
| **UNITED STATES OF AMERICA,** | § |
| | § |
| **Plaintiff,** | § |
| | §   **Cr. No. 4:21cr 009 GCH** |
| **v.** | § |
| | § |
| **ROBERT T. BROCKMAN,** | § |
| | § |
| **Defendant.** | § |
| | § |
| | § |

## UNITED STATES' REPLY BRIEF ON COMPETENCY

## **TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................................ 1

II.      DEFENDANT MISREPRESENTS THE POSITIONS OF GOVERNMENT
EXPERTS ............................................................................................................................ 2

III.      DEFENDANT DISINGENUOUSLY ATTACKS THE GOVERNMENT FOR
FAILING TO CALL MEMBERS OF HIS INNER CIRCLE AS WITNESSES .............. 8

   A.   Witnesses loyal to Defendant refused to speak to the government........................ 8

   B.   Defendant has repeatedly obscured key evidence and testimony unfavorable to
him. .................................................................................................................................... 8

   C.   Defendant chose to limit his interactions after his indictment. ............................ 12

IV.      DEFENDANT FAILS TO ACKNOWLEDGE THE OVERWHELMING
EVIDENCE THAT HE HAS BEEN MALINGERING SINCE 2019 .............................. 13

   A.   Defendant successfully exaggerated symptoms in front of Dr. York to obtain a
false diagnosis of Lewy Body Dementia. ...................................................................... 14

   B.   After malingering for years, it is unlikely he spontaneously stopped in 2021....... 15

   C.   Defendant's experts refuse to even acknowledge that Defendant was malingering
in 2019 and 2020; as such, their opinions on Defendant's current condition have no
credibility. ...................................................................................................................... 15

V.      DEFENDANT'S REQUEST TO APPOINT NEW EXPERTS SHOULD BE
REJECTED AS NO MORE THAN HIS LATEST DELAY TACTIC ............................ 23

VI.   CONCLUSION ........................................................................................................ 23

## I.   <u>INTRODUCTION</u>

On September 5, 2018, Defendant was enjoying a remote Alaskan fishing trip with his friend Dr. Stuart Yudofsky when he learned that the Bermuda Police Service ("BPS") searched the home of his key co-conspirator, Evatt Tamine.  That search uncovered detailed and incriminating records of Defendant's decades-long tax fraud sufficient to put him in prison for the rest of his life.  On September 6, 2018, Defendant emailed his doctor.

Less than six months later, Defendant was diagnosed by Dr. Michelle York with mild to moderate dementia and a memory that functioned in the bottom one-percent of his age group.  But whatever steps Defendant took in physicians' examination rooms were not mirrored in the rest of his life.  Defendant continued to shoot guns, give cogent testimony in depositions, and run his software company.  This charade succeeded temporarily.  He convinced his doctors and lawyers of his impairment and convinced them to write a letter to the government urging that he not be indicted.  Ultimately, however, this double life represents some of the strongest evidence that Defendant is not who he says he is, and instead, has been faking his illness to evade responsibility for his crimes.

Now, rather than engage with this evidence, Defendant and his experts ignore it.  They ignore his Reynolds emails, his deposition testimony, and the sworn testimony of those close to him that he was in no way impaired in 2019 and 2020.  Instead, Defendant chose to misrepresent the testimony of the government's experts, attack the government for not doing a better job revealing his deceit, and try to further delay his day of reckoning.

For the reasons stated below, the Court should deny his motion and find him competent to stand trial.

## II.   DEFENDANT MISREPRESENTS THE POSITIONS OF GOVERNMENT EXPERTS

Defendant consistently misstates the position and testimony of the government experts.   Rather than addressing this testimony on its merits, Defendant repeatedly truncates answers, takes quotes out of context, or plays word games to contort testimony into a form at odds with the record.   Defendant is forced to do this because the testimony of the government experts is persuasive.   Defendant has been malingering dementia since at least the Tamine raid on September 5, 2018 and is competent to stand trial today.

For example, in the second paragraph of his brief Defendant flips the opinion of Dr. Dietz, falsely stating, "[t]wo of the three experts[1] called at the competency hearing acknowledged that the government cannot meet its burden."   ECF 239 at ¶ 2.[2] Defendant cites no testimony to support this claim, relying instead on a complete mischaracterization of Dr. Dietz' final report.   Dr. Dietz clearly testified that "Mr. Brockman is competent to stand trial."   11/19/21 PM Tr. 28:3-4.

Notwithstanding Dr. Dietz's unambiguous conclusion, Defendant attempts to support his false assertion that Dr. Dietz believed the government cannot meet its burden by truncating one of his answers.   Defendant cites an answer that *began*, "I couldn't tell whether this was genuine cognitive impairment to a degree that could make this man incompetent or whether he was malingering."   ECF 239 at ¶ 2, *quoting* 11/19/21 AM Tr. 92:14-24.   Defendant's brief omits the final sentence of Dr. Dietz's answer which states

---

[1] Referencing Drs. Dietz and Darby.

[2] All reference to Defendant's post-hearing brief will cite to his numbered paragraphs.

"Then, subsequently I received additional information that I thought did clarify." 11/19/21

AM Tr. 92:25-93:1. Dr. Dietz then went on to discuss in great detail the factors he

considered in his analysis including the suspicious timeline, the collateral evidence, and

Defendant's performance on validity testing before stating, "I can only conclude that the

only explanation that fits all the facts is that he's exaggerating his impairment, and that he

was exaggerating that in March 2019, and continues to." 11/19/21 AM Tr. 108:4-8. Dr.

Dietz even used a graphic to specifically explain why he thinks Defendant's severely

impaired presentation does not "fit[] all the facts,"—facts like Defendant's performance in

the 2019 depositions, ability to write cogent emails, and mild neuroimaging findings:



Defendant selectively quotes Dr. Darby as well, trimming one of his sentences to

provide a misleading restatement of his opinion. *Compare* ECF 239 at ¶ 2 ("I do not think

this can be determined currently[.]") *with* GX-39 at 9 ("I do not think this can be determined currently because I do not think his recent assessments accurately reflect his true level of cognitive impairment").   In both his reports and testimony, Dr. Darby explained his conclusion that Defendant had mild cognitive impairment ("MCI") in May and is in the MCI or early dementia stage now, as his change in presentation after his June hospitalizations, in Dr. Darby's opinion, was most likely due to enhanced malingering.   On the stand, Dr. Darby walked through his reasoning, explaining that the "markedly different" presentations in the May and July recorded examinations could be due to either: 1) a "rapid progression of dementia," 2) "acute[] deliri[um]" in July, or 3) "exaggerating his symptoms more than he had been previously."   11/15/21 PM at 14:16-15:18.

To investigate the first possibility, Dr. Darby ordered another FDG PET to compare with the prior scan taken in March and determine whether the changes in objectively measured brain function (between March and August) were consistent with Defendant's presentations during his recorded interviews in May and July.   *Id.* at 15:19-16:7.   The August scan revealed changes that Dr. Darby subjectively believed were consistent with what he sees in his MCI patients, and testified that the progression between March and August was mild.   *Id.* at 20:6-21:4.   This led Dr. Darby to eliminate the possibility of rapid dementia progression because "this amount of change on the PET scan would not explain the amount of change we saw in his performance in the July interviews compared to May. . . . [The] FDG PET changes [] can't fully explain the change that we see in his examination."   *Id.* at 22:13-25.

To investigate the second possible cause of the change in Defendant's presentation between May and July (the presence of lingering delirium), Dr. Darby explained that there was no way to retrospectively test if Defendant had residual delirium in July, but he ordered an EEG that indicated Defendant was not delirious in September. *Id.* at 23:15-24:11. Unable to objectively measure whether Defendant was delirious during his July exams, Dr. Darby could only conclude that Defendant either was delirious or malingering. *Id.* at 24:16-25:6. During the October exams, the second possibility (delirium) was ruled out in light of the September EEG, leaving only the possibilities of significant, genuine cognitive decline or enhanced malingering. *Id.* at 29:11-30:3.

Ultimately, because the dramatic change in Defendant's presentation was inconsistent with both the natural course of the disease and the mild neuroimaging changes, Dr. Darby concluded Defendant was malingering. *Id.* at 30:4-31:13. It is true that Dr. Darby was more certain of his opinion in May 2021, but that was because Defendant's presentation in May demonstrated higher cognitive function than suggested by his psychological testing—i.e., the "gap" was plainly visible. *See id.* at 31:14-32:4. Since then, however, Dr. Darby has no recent examples of Defendant's genuine cognitive ability (such as emails or testimony), leaving him to rely only on the natural disease course and the neuroimaging which, as discussed below, has its limitations. *Id.* at 32:5-33:7.

In his attempt to criticize Dr. Denney for misapplying legal standards, Defendant simply invents an assertion that Dr. Denney claimed Defendant's access to "excellent" counsel means a different standard of competence should apply to him. ECF 239 at ¶ 122.

While counsel repeatedly[3] asked Dr. Denney whether he considered the quality of counsel in formulating his opinion, Dr. Denney was unequivocal: "I do not rate quality of counsel or in any regard like that.  I don't do that." 11/17/21 AM Tr. 57:3-4; *see also id.* at 55:3-13 (Dr. Denney stating, "I don't evaluate the quality of counsel. I don't provide questionnaires and try to identify how good counsel they are. I don't evaluate them.")

Defendant's penchant for misleading word games hit its apogee with Dr. Ponisio, as he repeatedly imported significance to her use of the phrase "Alzheimer dementia" rather than "Alzheimer's disease."   Specifically, Defendant implies that Dr. Ponisio's word choice reflects an opinion that the imaging is consistent with a person whose cognitive impairment has impacted his functional independence (as the term "dementia" has been defined by all testifying experts), and that the government sought to hide this "opinion" from the Court.  This campaign began in Defendant's pre-hearing brief where, like in his instant filing, he quoted Dr. Ponisio's language with emphasis on the word "dementia." *Compare* ECF 196 at p. 2, *with* ECF 239 at ¶ 3.  Defendant's opening statement also quoted Dr. Ponisio's "Alzheimer's dementia" language, 11/15/21 AM at 65:9-14, and her phrasing was used during cross examination of other government witnesses.  *See, e.g.*, 11/19/21 PM at 48:14-19.  Defendant indicated he would call Dr. Ponisio as a witness both in his filed witness list, ECF #197 ("Dr. Ponisio is expected to testify . . . that three neuroimaging studies are indicative that Mr. Brockman has Alzheimer's dementia"), and on the first day of the competency hearing.  11/15/21 AM at 13:20-18:18 (discussions on the availability

---

[3] The Court noted that Dr. Denney answered the question "five times."  11/17/21 AM Tr. 57:12-15.

of Dr. Ponisio, Defendant's desire to call her as a witness, and government's suggestion to allow her to testify by video).

But Defendant did not call Dr. Ponisio,[4] and the reason is now clear: it is easier to twist her use of the term "Alzheimer dementia" than to ask her to explain it for herself. As Dr. Darby explained, "there is often confusion in the terminology between Alzheimer's disease and Alzheimer's dementia." 11/15/21 AM at 110:19-22. That confusion is the result of the rapid advancement of nuclear neuroradiology. Historically, Alzheimer's disease could only be diagnosed clinically—i.e., the evidence of Alzheimer's *disease* was the presence of *dementia*, as observed in a clinical setting. Dr. Ponisio has never met, let alone examined, Defendant. Now, the advanced scans that have been discussed in this case, like the FDG and Amyloid PET scans, can show the physiological changes from diseases like Alzheimer's even before the disease rises to the level of dementia. *See id.* at 110:23-111:13. This issue is a red herring because all of the testifying experts agree that the degree of cognitive dysfunction (e.g., dementia) cannot be diagnosed with imaging alone. Nevertheless, if the Court is interested in Dr. Ponisio's take on the matter (and why Defendant did not call her), it might wish to review the testimony of Dr. Dietz, who explained that Dr. Ponisio told him that the areas of Defendant's brain suffering hypometabolism are "where it is most often seen in early or mild Alzheimer's, and that there is relatively less hypometabolism in the areas that she would expect to see it as the disease progresses beyond that point." 11/19/21 PM at 21:5-22.

---

[4] If the Court finds it necessary, the government would consent to reopening the evidence to take Dr. Ponisio's testimony either by video, in person, or by declaration.

### III.    DEFENDANT DISINGENUOUSLY ATTACKS THE GOVERNMENT FOR FAILING TO CALL MEMBERS OF HIS INNER CIRCLE AS WITNESSES

Defendant argues that the government's case is lacking because the government did not call any lay witnesses to testify about Defendant's condition in 2021.  ECF 239 at ¶9. This argument is flawed for several reasons.  First, many of the witnesses loyal to Defendant refused to speak to the government experts and/or investigators.  Second, this hearing was far more notable for who Defendant refrained from calling to testify rather than the witnesses called by the government.  Finally, it should be no surprise that the extrinsic evidence available to the government was limited after Defendant advanced his mental competency defense, resigned from his company, and only interacted with family, confidants, and selected doctors.

A.    Witnesses loyal to Defendant refused to speak to the government.

Defendant's argument that the government failed to contact important collateral witnesses is belied by the number of witnesses loyal to Defendant who declined to speak to the government's experts.  They included Defendant's doctors (Pool and Yudofsky), Defendant's accountants (Don Passmore and Laura Douglas), Defendant's fellow board member (Robert Nalley), Defendant's assistant (Donna Ball), the caretakers of his home (Paul and Isabelita Sheehan), and his barber (Larry Perry).  *See* 11/19/21 AM Tr. 27:25-30:15.

B.    Defendant has repeatedly obscured key evidence and testimony unfavorable to him.

If anything, the testimony was far more notable for who Defendant failed to call to give sworn testimony.  This hearing has the possibility of being dispositive of this case.

Defendant had every motive to try and muster the best evidence available to him. Indeed, Defendant had several close associates speak to his experts in an effort to provide support for his supposed cognitive impairment. Other than Frank Gutierrez, Defendant, for whatever reason, declined to question these same witnesses under oath and subject to cross-examination.[5]

The most notable absence is Defendant's wife. She gave unsworn statements to experts on both sides. She has been married to Defendant for fifty years and knowns him better than any other individual.[6] She attended his doctor appointments and has allegedly had a medical power of attorney for Defendant for more than two years.[7] 11/22/21 AM Tr. 34:3-10, 61:7-16. Mrs. Brockman attended opening statements and was pointed out by defense counsel but never took the stand. 11/15/21 AM Tr. 53:13-19.

Another notable absence was Defendant's attorney, Kathy Keneally. Unlike Peter Romatowski, Ms. Keneally has seen Defendant in the last two years and has had more contact with him in the last two years than Mr. Romatowski. 11/23/21 PM Tr. 254:7-10. In fact, she was the primary point of contact for Defendant, 11/23/21 PM Tr. 252:3-8, and

---

[5] Of course, Defendant is not required to call any witnesses. The Government has the burden of proof. But the Court should consider the absence of these witnesses when considering the weight of their out-of-court statements offered through the defense experts (particularly Dr. Agronin).

[6] *See* 11/23/2021 PM Tr. 64:21-25 (Agronin "She knows him the best. She spends the most time with him. She's been married with him long enough to see the changes over time. She knows his baseline the best.").

[7] It is notable that while Defendant allegedly has a medical power of attorney dating back to early 2019, Defendant personally signed the papers authorizing the August 2020 $11 million dividend payment as well as the papers resigning from Reynolds and Reynolds and appointing Tommy Barras on November 5, 2020.

obtained the reports from his treating physicians.  11/24/21 AM Tr. 26:1-3; 27:5-7; 65:24-66:1. She also spearheaded the April 9, 2020 letter urging the government not to indict Defendant. 11/23/21 PM Tr. 235:12; *see also* GX-81.  Mr. Romatowski conceded that Ms. Keneally "has more direct experience of [Defendant's] current condition than I do." *Id.* at 254:11-14.  While Ms. Keneally gave the opening statement and even gave a first-person[8] description of Defendant's condition,[9] Defendant declined to question her under oath.[10]

Defendant also did not call Dr. Eugene Lai, Defendant's treating neurologist since January 2020. This fits a pattern by Defendant.  Defendant did not reference Dr. Lai in his letter to the Department of Justice in April 2020.  *See* GX-81.[11]  Similarly, Defendant did not reference Dr. Lai a single time in his brief on the instant motion.  Further, Defendant did not produce Dr. Lai's medical records to the government.  Instead, the government obtained Dr. Lai's complete medical records only through the issuance of a subpoena to Houston Methodist Hospital.  The absence of Dr. Lai's testimony, and his medical records

---

[8] *See* 11/15/2021 AM Tr. 55:11-22. "Bob doesn't remember what I tell him from one call to the next.  I've explained legal issues to Bob and he's agreed to a course of action, and then three days later he didn't remember the discussion or the decision.  I've talked with Bob with each conference, before and after the Court while on the screen.  I talked to him before and tell him what's going to happen.  I speak to him after.  He doesn't remember what I told him ahead of the conference.  He doesn't understand what happened."

[9] As the Court is aware, Ms. Keneally's unsworn opening statement is not evidence.

[10] Defendant's contention that he declined to call Ms. Keneally simply because of the upcoming holiday has the same amount of credibility as Mr. Romatowski's assertion that Defendant declined to contact Dr. Yudofsky because he was represented by an attorney. *See* GX-81, p. 15, n.17; *see also* 11/24/21 AM Tr. 96:23-97:2 (where the Court offers Defendant additional time to call Ms. Keneally and Dr. Slade).

[11] Although Defendant included the CV of Defendant's urologist in the exhibits to his letter, Defendant did not include a single reference or medical record of his treating neurologist.

from Defendant's production, especially since Dr. Lai's diagnosis in 2020 and 2021 is contrary to the diagnoses of the Baylor Doctors, speaks volumes about Defendant's motivations.

Defendant's reluctance to call fact witnesses under oath is perhaps explained by the lack of credibility, or bias, demonstrated by other potential defense witnesses.  Reverend James Jackson fell off Defendant's witness list when Reynolds and Reynolds ("Reynolds") produced an email—after the hearing had already started—from Rev. Jackson telling Tommy Barras that he had been "purposefully evasive and uncertain" with IRS agents and that he "certainly said nothing that could have deepened Bob's problems and added problems for you."  GX-152.  Although Mr. Barras also spoke to defense experts after his direct testimony in the government's case—including about whether he deleted the email from Jackson—all defense experts said they "disregarded" his and Jackson's testimony.

Perhaps due to the lack of credible witnesses, Defendant resorted to try and introduce unsworn testimony throughout the hearing.  *See* 11/23/21 PM Tr. 67:25-68:22 (Stephen Slade); 11/18/21 PM Tr. 27:12 (Robert Burnett); 11/18/21 PM Tr. 102:16-103:10 (Dorothy Brockman); 11/22/21 AM Tr. 55:17-55:23 (Dr. Eugene Lai).  None of the testimony concerning these witnesses was admitted for the truth of the matter asserted.  As a result, rather than a string of lay witnesses testifying about Defendant's current cognitive condition, Defendant called a single lay witness.  This is particularly concerning because Defendant's experts, particularly Dr. Agronin, relied on interviews with these witnesses that were incomplete or contradicted by sworn testimony.  As with his attorneys' April

2020 letter, Defendant holds back unfavorable facts and testimony to increase the chances the Court will rule in Defendant's favor.

    C.  <u>Defendant chose to limit his interactions after his indictment.</u>

Although Defendant was diagnosed with dementia in March 2019 and claimed to the government in April 2020 that he was not competent to stand trial, he remained CEO of Reynolds until November 2020.  As discussed further below, the evidence shows that Defendant was firmly in charge of Reynolds and Reynolds during that time with no evidence of cognitive decline.  The testimony of these witnesses was corroborated by Defendant's emails with friends and colleagues, which again demonstrated a man firmly in control of a multibillion-dollar enterprise.  In sharp contrast to the then-existing medical diagnoses and statements of Defendant's lawyers, the testimony and email evidence made clear that as of November 4, 2020, there was "no reason to doubt [Defendant's] mental capabilities."  11/11/18 PM Tr. 78:6-9 (Barras).

It is true that the availability of this evidence drops off after Defendant's indictment.[12]  But, it is perfectly logical that extrinsic evidence of his competence would be elusive after his indictment.  At that point—particularly given the pandemic— Defendant limited his interactions to a select inner circle of acquaintances.  Moreover, following his indictment, Defendant was fully committed to his mental competency

---

[12] While Defendant no longer had a Reynolds email account after he resigned, Tommy Barras's email account indicates that Barras continued to discuss personnel and financial matters with Defendant into early 2021.  *See* GX-146 and GX-147.

defense.  Defendant's argument is akin to a bank robber arguing to a jury that there is no evidence of him robbing banks after he was arrested.

## IV.   DEFENDANT FAILS TO ACKNOWLEDGE THE OVERWHELMING EVIDENCE THAT HE HAS BEEN MALINGERING SINCE 2019

Through his briefing and experts, Defendant focused heavily on the supposed implausibility for him to malinger dementia, *see, e.g.*, ECF 239 at ¶ 83 ("Dr. Agronin testified that it was 'completely implausible' for Mr. Brockman to malinger a complex disease state that unfolds over several years."). The Defense experts ignore the fact that Defendant successfully fooled highly qualified doctors and lawyers about his cognitive condition in 2019 and 2020.  The fact that Defendant malingered in 2019 and 220 is not subject to reasonable dispute.

Defendant tries to dismiss or ignore[13] the evidence that Defendant was malingering in 2019 and 2020 by claiming it is irrelevant to his competence today. But it is relevant for at least three reasons.  First, evidence that Defendant was malingering in 2019 and 2020 demonstrates that he can manipulate the cognitive testing to appear more impaired than he actually is.  Second, if he was malingering in 2019 and 2020, it is unlikely that he stopped this charade in 2021.   Third, the fact that he was malingering in 2019 and 2020 is devastating to the credibility of the defense experts who do not, even now, in light of overwhelming evidence, acknowledge that Defendant was previously malingering.

---

[13] Neither Defendant's brief nor any of Defendant's expert reports have a single reference to Defendant's work emails, which give an unvarnished view of his mental acuity and show him firmly in control of Reynolds through the end of 2020.

A. <u>Defendant successfully exaggerated symptoms in front of Dr. York to obtain a false diagnosis of Lewy Body Dementia.</u>

Dr. Michelle York is the head of neuropsychology at the Baylor College of Medicine and has published extensively in the field. Yet despite her esteemed credentials, she incorrectly diagnosed Defendant with mild to moderate dementia in March 2019. She compounded the error during her December 2019 forensic exam where she diagnosed Defendant with Lewy Body Dementia and found he was not competent to stand trial because he could not recall and understand the relevant issues and "manipulate [the] information in a logical manner that will allow him to make comparisons and weigh his options." GX-82, at 9.

It is hard to fault Dr. York because she did not have access to all of the relevant information, and she was not aware that Defendant was affirmatively misrepresenting relevant information. Defendant told Dr. York that his tax issues "are about a small company that he sold to a family trust in 1981," *id.* at 3, and did not mention that they actually involve a multinational trust structure with dozens of subsidiaries he controlled with a team of professional nominees and an encrypted email system in Bermuda. He also did not mention that the "small company" was the multi-billion dollar software company for which he was currently the CEO. Defendant told Dr. York that he could not recognize the common word "two." 11/16/21 AM Tr. 73:20. Dr. York did not have access to evidence of his Reynolds emails, including an email he sent three months later using that same word. GX-56.

The evidence of Defendant's deception of Dr. York shows that he is capable of spoofing psychological testing, and reveals why the truth of this matter cannot be discerned simply by looking at his examination room performances.

B. <u>After malingering for years, it is unlikely he spontaneously stopped in 2021.</u>

It defies belief that a person who malingered in 2019 and 2020 would suddenly stop—on the big stage, during the recorded exams that would be used by the experts for this hearing—after being indicted in 2021. If convicted, Defendant faces the possibility of dying in prison and being liable for billions of dollars in potential back taxes and penalties. If anything, Defendant's motives to malinger only increased in 2021.

C. <u>Defendant's experts refuse to even acknowledge that Defendant was malingering in 2019 and 2020; as such, their opinions on Defendant's current condition have no credibility.</u>

The fact of Defendant's prior malingering is devastating to the credibility of Defendant's experts, who refuse to acknowledge it. Defendant's experts were unanimous that Defendant was not malingering in 2021 and avoided commenting on whether he was previously malingering. Their inability to engage with this "bad fact" for the defense is itself sufficient to cast doubt over their entire testimony.

Unlike Dr. York and the Baylor Doctors, Defendant's experts had access to the evidence that proves Defendant malingered in 2019 and 2020. Nevertheless, they refused to acknowledge this evidence, and even relied on the 2019 and 2020 testing to inform their opinions. *See, e.g.*, ECF 239 at ¶ 94, DX-19 at 3 (Guilmette), and DX-12 at 3 (Agronin). Defendant's experts are apparently blinded to the reality that Dr. York's March 2019 exam is not supportive of his position, and instead represents some of the most probative

evidence of Defendant's persistent malingering.  In that exam, Defendant tested in the first percentile in memory, allegedly had a hallucination in front of Dr. York,[14] and exhibited extremely slow processing speed.  GX-82 at 67.  These March 2019 test results, and the resulting diagnoses, were entirely inconsistent with other extrinsic evidence, including Defendant's January and August 2019 deposition testimony.

Rather than grappling with this clear contradiction, Defendant's experts dismiss these inconsistencies by saying that Defendant simply relied upon "overlearned material that has been the subject of intense focus for numerous years."  ECF 239 at ¶ 74.  But this explanation makes no sense.  As Defendant's expert Dr. Wisniewski explained, highly learned information involves people "speaking about things which were a core part of their life. . . " 11/17/21 PM Tr. 84:1-8.  During his testimony, Defendant was not speaking in generalities.  He testified in whole paragraphs about notes he took years earlier.  *See* GX-32 at 52:17-56:22. He remembered the high school athletic records of a former employee Mr. Schaefer.  11/18/21 AM Tr. 67:22-68:15; GX-32 at 94:7-95:20. Further, he was not exclusively speaking about events decades in the past. He testified about the minutia of his company's email retention policy. GX-58A.  He proved capable of testifying about an email he sent approximately one year before the deposition.  GX-36 158:22-160:8. And he even had the wherewithal to lie about the existence of his encrypted email system that he used to communicate with Tamine.  *Id*. at 160:15. Far from speaking extemporaneously

---

[14] Something that has been repeated in front of no other doctor or witness in this case.

about "overlearned" material, his testimony was the result of lengthy preparation with his attorneys. *See* GX-58D at 1:38 to 2:55.

Defendant's Reynolds emails from 2020 also demonstrate his ability to discuss, reason, and recall information about current issues that are not a "core part" of his life. One month after defense counsel told the government that Defendant "cannot put his thoughts into written form, and cannot even recall how to spell common words," GX-81 at 2, Defendant sent a lengthy email refereeing an ongoing dispute over a newsletter business at Reynolds.  GX-69.  After deciding that the gross margin was overstated, he made the decision to "exit this business gracefully—saying nothing—just reducing overhead." *Id.* Rather that forming a core part of Defendant's identity or using information he had stored years previously; this email addressed a current dispute where Defendant analyzed new information and made decisions based on his view of the future.

In addition to dismissing contemporaneous evidence that Defendant's exam room performance did not reflect reality, Defendant's experts ignored the suspicious timeline of events related to Defendant's claim of dementia.  That is, they ignored the fact that Defendant contacted his urologist from an Alaskan fishing trip the day after the search warrant in Bermuda to schedule an appointment – September 6, 2018.  That appointment set off the string of examinations that led to his incompetency defense after he told his urologist he was "distressed by change in his health and sense of well-being" and would like to have a consultation with Dr. Pool.  DX-79 at 5.  Despite multiple diagnoses of dementia in 2019, Defendant failed to inform deposing attorneys of these diagnoses and

17

remained as Chairman and CEO of Reynolds until after his indictment while warning them of a heart issue and requesting appropriate accommodations. 11/16/21 PM Tr. 13:1-9.

Defendant's experts did not address this timeline in part because they were provided with bad information.  First, they relied on the email Defendant sent to Dr. Yudofsky in May 2017 as evidence that he sought treatment before the search warrant.  But they refused to reconsider that belief even after learning that Dr. Yudofsky could not answer any questions about his treatment of Defendant without potentially incriminating himself.  *See* 11/23/21 PM Tr. 154:1-6.[15]  Second, Defendant's experts were told that the Yudofsky email predated Defendant's knowledge of the investigation because Defendant only learned of the investigation on the date of the search warrant.  *See* id. at 150:9-25.  That was also false.  Tamine testified that Defendant became concerned about the investigation in 2016.  11/17/21 AM Tr. 134:7-20.  Further, in contrast to what they told the experts, Defendant's own lawyers told the Court at the initial appearance—when Defendant sought to establish that he was not a flight risk—that Defendant has known about the investigation for four years.  GX-175 at 18:5-6.[16]

---

[15] Like his experts, Defendant also refuses to engage with this fact, and does not even mention Dr. Yudofsky (let alone the two men he appointed to the board of his company, Tommy Barras and Rev. Jim Jackson) in his post-hearing brief.

[16] In their brief, Defendant tries to push Defendant's claim of memory issues further back in time.  Defendant points to a note he wrote to his doctor in 2015 referencing memory issues.  *See* ECF 239 at p. 14, n. 3. This is on page four of a nine-page document complaining of a slew of maladies including hip ache, urinary issues, a healing forearm injury caused by weightlifting. GX-153.  A 75-year-old man telling his doctor that his memory is "not as good" but without "serious decline," *id.*, is a far cry, however, from Defendant performing badly enough to get a referral to a neurologist.  Indeed, at multiple appointments subsequent to Defendant's note, his primary care doctor found Defendant's cognition/memory to be normal.  *See* GX-95 at 19 (11/14/16) and 11 (11/19/18).

Defendant's experts tied themselves in knots rather than admit the simplest explanation: that Defendant was not truthful with his doctors in 2019 and 2020. Defendant's experts did this because to admit that Defendant lied about his health in 2019 and 2020 would undermine their conclusions that he is not lying now. Unfortunately, the refusal of Defendant's experts to acknowledge adverse facts during the competency hearing was a hallmark of their evasive and unpersuasive testimony.

One way this manifested itself was Defendant's experts' unwillingness to admit that someone with even mild dementia could be competent to stand trial. According to Defendant's witnesses, a person with mild dementia can perform surgery (Wisniewski),[17] be a hit singer (Agronin),[18] be a two-term president (Pool),[19] and run a multi-billion dollar software company (Romatowski).[20] Nevertheless, they claim that a person with mild dementia could never be competent to assist attorneys in a criminal trial.

Defendant's experts were also exceedingly reticent to acknowledge the instances when their own testing produced results that did not support their positions. For example, Defendant's experts resisted the fact that the Neuroreader report they ordered revealed that Defendant's brain volume was normal. In Dr. Whitlow's first report, using the Neuroreader report ordered by Defendant's experts, he noted the two areas of Defendant's brain that were lower than the 25th percentile. DX-29 at 3. Dr. Whitlow went on to write

---

[17] 11/17/2021 PM Tr. 146:17-21

[18] 11/23/2021 PM Tr. 57:23-58:8.

[19] 11/22/2021 AM Tr. 52:22-53:10.

[20] 11/24/2021 AM Tr. 58:9-13.

that "[t]he magnitude of visually obvious volume loss on MRI is beyond anything that would be reversible, with temporal lobe (an important structure in cognitive functions like memory being well within the bottom 25% of the population for volume based on the quantitative analysis." *Id.* at 4.  By "well within the bottom 25%," Dr. Whitlow was referring to the 23.8th percentile.  11/15/21 AM Tr. 117:3-13.  Being in the 24th percentile is normal—the equivalent height percentile of an American man who is 5'7." *Id.*

After relying on the Neuroreader report to hyperbolically note that a certain part of Defendant's brain was "well within the bottom 25%," Dr. Whitlow seemingly went on to abandon the quantitative findings (over nonspecific concerns about his ignorance of the Neuroreader sample population) when confronted with the reality that the report reveals a brain of normal size.  This was not Dr. Whitlow's only hypothetical concern about sampling.  He painstakingly contorted himself throughout his cross-examination, in which he would not readily concede even modest points.  For example, when confronted with one of the three papers that he cited in his expert report—GX-172, which showed that 53% of cognitively normal 80-year-olds have positive amyloid—he went on about how the 500 people in the longitudinal study were not a representative sample because they skewed white and male (irrelevant because Defendant is white and male).  *Id.* at 12:4-23:13. He then refused to even estimate what percentage of amyloid-positive people had dementia, probably because he knew the figure was low, *as revealed in a paper he wrote earlier in 2021*. GX-173According to Dr. Whitlow's own study, only 9% of amyloid-positive patients had dementia (41% had MCI and 48% were *cognitively normal*). *Id.* at 24:1-26:19.

Defendant's psychologist, Dr. Guilmette, also misconstrued the results of validity tests he administered in order to produce results favorable to the pre-ordained conclusion that Defendant's cognitive test results were valid.[21]   For instance, Dr. Guilmette administered the Rey-15 Item test, and, using a mischaracterization of the leading research, scored Defendant's failure as a "pass."  11/22/21 PM Tr. 125:4-18; GX-165 at 6, *Use of the Rey-15 Item Test as a Performance Validity Test in an Elderly Population*, <u>Applied Neuropsychology</u>, p6 (2017), (the "Fazio Article").

The Rey-15 Item test is a very simple test in which the subject is shown a set of 15 letters, numbers and symbols, GX-124, and then asked to perform two tasks: 1) free recall, in which the subject is asked to recreate the 15 items; and 2) recognition, in which the subject is shown a page with 30 objects on it and then asked to circle the objects from the first 15 items.  GX-126.  Both Dr. Denney and Dr. Guilmette administered this test to Defendant.   When Dr. Denney administered this test, Defendant could only recall *one* of these items on the free recall portion of the Rey-15 Item test.    GX-125.



Defendant's combined recall and recognition score on the Rey 15 Item test was an eight.  Normally anything below twenty-two is a fail.  11/16/21 AM Tr. 57:7-58:17. As described in the Fazio Article, the pass/fail cutoff needs to be adjusted when testing elderly

---

[21] As elaborated on in the government's brief, a validity test is merely a method by which psychologists determine if the cognitive test results of an examinee represent the examinee's "genuine effort," and are therefore reliable.  If an examinee "fails" a validity test, then the cognitive test results are NOT reliable.

patients. Dr. Denney made this adjustment, but Defendant failed anyway. *Id*. As Dr. Denney testified, the calculation recommended in the Fazio Article is very straight forward; one takes the true positives (correct recognitions) subtracts the false positives (wrong recognitions) and then subtracts any intrusions (extra drawings on the initial recall portion) *Id*. Then, one compares that score to scores of a criterion group (here, elderly people with cognitive problems) using the AACN 2021 Consensus Statement criteria that a score achieved by less than or equal to ten percent of the appropriate comparison group constitutes a "fail." *See* GX-162.

In this case, when the Fazio Article methodology was applied, Defendant scored a one ("1"). 11/16/21 AM Tr. 58:18-25. According to the Fazio Article, fewer than ten percent of elderly patients with cognitive problems score less than two. Therefore, Defendant's score of 1 falls within this bottom ten percent range, and is a "fail." In his scoring of this test, Dr. Guilmette, contrary to Dr. Fazio's recommendations, substituted his own subjective judgment to turn a fail into a pass. *See* GX-128; 11/22/21 PM Tr. 212:3 -214:12.

During his testimony, Dr. Denney explained Dr. Guilmette's error. 11/16/21 AM Tr. 107:10. As explained by Dr. Denney, Dr. Guilmette chose a selective reading of a single, out of context, passage while ignoring the procedure advanced by Dr. Fazio. *See* GX-165 at 6. In her article, Dr. Fazio clearly stated: "Given the relatively poor performance of the variables presently used to assess validity, *the number of intrusions was also evaluated* . . . A *new* combination score including true positives and false positives from the recognition trial *in conjunction with intrusions* was also evaluated. . . [and]

seemed to have *somewhat better specificity* than recall.  GX 165 at 6 (emphasis added).
Dr. Guilmette simply ignored this portion of Dr. Fazio's article, and instead incorrectly
cited her article in support of his mischaracterization of Defendant's performance on the
Rey-15 Item test as a "pass," when in reality it was an abysmal failure.  Dr. Guilmette's
selective application of the Fazio Article to his scoring of Defendant's Rey-15 Item test
reveals Dr. Guilmette's lack of objectivity and raises serious doubts about the credibility
of his entire testimony.

## V.  <u>DEFENDANT'S REQUEST TO APPOINT NEW EXPERTS SHOULD BE REJECTED AS NO MORE THAN HIS LATEST DELAY TACTIC</u>

Following eight days of testimony by nine doctors, Defendant asks the Court to
delays its ruling and appoint more experts.  ECF 239 at ¶ 152.  The Court should read that
request for what it is—another attempt by Defendant to delay accountability for his crimes.
Defendant was indicted in October 2020.  Following his indictment, Defendant requested
to move the case to this District.  Since arriving in the Southern District of Texas, the
competency matter has been delayed three times, and the Court has denied another request
by Defendant for a continuance.  More than fifteen months have already elapsed since
Defendant's indictment without the setting of a trial date. Defendant will have a chance to
contest the charges against him; the Court should reject this attempt to cause further delay.

## VI.  <u>CONCLUSION</u>

The government and its experts were willing to engage with all of the facts of this
case.  Defendant tried to obfuscate or ignore the uncomfortable facts.  Ultimately, however,
the evidence is clear.  Defendant malingered in 2019.  Defendant malingered in 2020.  And,
he is malingering now.

Contrary to Defendant's assertions, the evidence in 2019 and 2020 is crucial to understanding his condition today.  His performance outside the exam room was in direct contrast to his performance in the exam room.  Through that divergent performance, Defendant showed the motive and capacity to fool his medical professionals and lawyers in 2019 and 2020.  Through his continuing failure of validity testing and inconsistency in his performance, he has shown he continues to try and fool the doctors now.

The Court should find that Defendant is competent to stand trial and set a trial date in this case.

Respectfully submitted this 7th day of January 2022,

DAVID A. HUBBERT
Deputy Assistant
Attorney General
Tax Division

*/s/ Corey Smith*
COREY J. SMITH
Senior Litigation Counsel
Department of Justice
Tax Division
Mass Bar No. 553615
corey.smith@usdoj.gov
Tele: (202) 514-5230
LEE LANGSTON
CHRISTOPHER MAGNANI
BORIS BOURGET
Trial Attorneys
Department of Justice
Tax Division

Attorneys for United States of America

## **Certificate of Service**

I the undersigned do hereby certify that on January 7, 2022, I electronically filed the foregoing with the Clerk of Court using the ECF electronic filing system, which will send notice of electronic filing to Defendant's counsel of record.

/s/ *Corey Smith*
Senior Litigation Counsel
U.S. Department of Justice
Tax Division
