08:36:40

1            UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF TEXAS

3                     _ _ _

    THE HONORABLE GEORGE C. HANKS, JR., JUDGE PRESIDING
4
USA,                          No. 4:21-CR-00009-1
5
                 Plaintiff,
6
vs.
7                                    **ORIGINAL**

ROBERT T. BROCKMAN,
8
                 Defendant.
9
            COMPETENCY HEARING -- DAY 1 AM SESSION
10
       OFFICIAL REPORTER'S TRANSCRIPT OF PROCEEDINGS
11
                 Houston, Texas
12
            MONDAY, NOVEMBER 15, 2021
13

14 APPEARANCES:

15 For the Plaintiff:    COREY J. SMITH, DOJ

16                       CHRISTOPHER MAGNANI, DOJ

17                       LEE F. LANGSTON, DOJ

18                       BORIS BOURGET, DOJ

19 For the Defendant:    JASON S. VARNADO, ESQ., Attorney
                         at Law
20
                         COLLEEN O' CONNOR, ESQ.,
21                       Attorney at Law

22                       JAMES P. LOONAM, ESQ., Attorney
                         at Law
23
                         KATHRYN KENEALLY, ESQ., Attorney
24                       at Law

25 For the              n/a
   Interpreter:

1
Reported by:          Sean Gumm, RPR, CRR
2                              Official Court Reporter
                           United States District Court
3                              Southern District of Texas
                           sean_gumm@txs.uscourts.gov
4
5  Proceedings recorded by mechanical stenography.
   Transcript produced by Reporter on computer.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                    INDEX OF WITNESSES

 2

 3                                                    PAGE

 4   RYAN DARBY, (For the Government)

 5       Direct Examination By Mr. Magnani:          71

 6

 7

 8                    INDEX OF EXHIBITS

 9        EXHIBITS MARKED ON BEHALF OF THE GOVERNMENT

10    NUMBER    DESCRIPTION           MARKED    RECEIVED    WITHDRAWN

11

12

13

14                    INDEX OF EXHIBITS

15        EXHIBITS MARKED ON BEHALF OF THE DEFENSE

16    NUMBER    DESCRIPTION           MARKED    RECEIVED    WITHDRAWN

17

18

19

20                    INDEX OF EXHIBITS

21        EXHIBITS MARKED ON BEHALF OF THE COURT

22    NUMBER    DESCRIPTION           MARKED    RECEIVED    WITHDRAWN

23

24                         --o0o--

25

26

27

28
```

SEAN W. GUMM, CSR #13168, RPR, CRR

1          PROCEEDINGS

2  _____

3     (The following proceedings held in open court.)

4                    *   *   *

5        **MONDAY, NOVEMBER 15, 2021 -- 9:16 A.M.**

6                    --oOo--

7            THE COURT:  Good morning, everyone.

8  The first case, and the only case on the Court's

9  Docket is Cause 4:21-CR-00009-1, the United States

10 of America versus Robert T. Brockman.  Before we get

11 started and the introductions, I just wanted to tell

12 the parties sort of my rules with respect to masks.

13 When you are addressing the Court, please feel free

14 to take your masks off, or when you are

15 cross-examining the witnesses please feel free to

16 take your masks off.

17            Members of the audience, I

18 respectfully request that you keep your masks on at

19 all times if you are not addressing the Court.  I

20 know it's a little crowded.  You can't really social

21 distance in here.  We're going to see if there's a

22 lot of people for tomorrow, possibly if the

23 electronics works out maybe getting a bigger

24 courtroom to use, but if everything's the way it is

25 today then I think we're okay.

09:16:39   1              If the parties can introduce
09:16:41   2   themselves and state the parties they represent,
09:16:43   3   starting with the Government.
09:16:44   4              MR. COREY SMITH:  Good morning, Your
09:16:45   5   Honor.  Corey Smith on behalf of the United States.
09:16:47   6   With me are my colleagues Lee Langston, Boris
09:16:50   7   Bourget, and Chris Magnani.
09:16:53   8              THE COURT:  Good morning.
09:16:56   9              MR. COREY SMITH:  Also have our case
09:16:57  10   agent sitting at counsel table.
09:16:58  11              THE COURT:  Welcome, sir.
09:16:59  12              On behalf of Mr. Brockman?
09:17:01  13              MR. VARNADO:  Yes, good morning, Your
09:17:02  14   Honor.  Jason Varnado on behalf of Mr. Brockman, and
09:17:06  15   with my colleagues James Loonam, Kathy Keneally, and
09:17:09  16   of course Mr. Brockman is here as well.
09:17:10  17              THE COURT:  Welcome, Mr. Brockman.
09:17:13  18              MR. VARNADO:  We have some other
09:17:14  19   colleagues before openings, but I'll do that for
09:17:16  20   now.
09:17:16  21              THE COURT:  Not a problem.  First of
09:17:18  22   all, is good to see you all in person after so long.
09:17:22  23   It's been awhile so...
09:17:23  24              Before we get started, I know the
09:17:25  25   parties have a couple of issues they wanted to raise

09:17:27  1   with the Court, and then I've got a couple of issues

09:17:30  2   I wanted to talk to you about.  But before we get

09:17:33  3   started, first did you get a chance to exchange

09:17:36  4   witness lists and talk about who is going to be

09:17:38  5   called today?

09:17:39  6          MR. COREY SMITH:  Yes, we've done that,

09:17:40  7   Your Honor.

09:17:40  8          THE COURT:  Okay.  Great.  Can you all

09:17:42  9   just begin with whatever issues you have and then

09:17:45  10  we'll talk about my issues?

09:17:47  11         MR. COREY SMITH:  Sure, Your Honor.  We

09:17:49  12  have three items we want to bring up with the Court

09:17:51  13  before we get started.  We have, as the Court

09:17:53  14  instructed, stipulated as to a number of exhibits

09:17:56  15  that are going to be pre-admitted, and we can go

09:17:58  16  through the respective parties' pre-admitted

09:18:01  17  exhibits.

09:18:01  18             The second issue is there's this --

09:18:03  19  we've discussed sequestration of witnesses, and we

09:18:06  20  need to address that.  I believe the Defense wants

09:18:09  21  sequestration rule and details there, and we'd like

09:18:12  22  to address that with the Court.

09:18:13  23             Third issue is a particular witness

09:18:14  24  that was actually a witness for the Government,

09:18:17  25  Dr. Maria Ponisio.  The Defense now has subpoenaed

| | |
|---|---|
| 09:18:20 | 1 |

her, and there's some scheduling issues that are

kind of urgent and we wanted to bring that up with

the Court.

THE COURT:  Okay.

MR. VARNADO:  Your Honor, there may be

one -- additional information concerning information

we received from the Government last night with

respect to a witness they intend to call this

morning.  Mr. Loonam will address that this morning.

THE COURT:  Okay.  Great.  Before we

get started then, let's go ahead and if you could on

the record tell me which exhibits that you would

like to pre-admit, and then we'll get those on the

record from both sides.  Then we'll talk about

sequestration next.

So let's start with the

Government's exhibits, all of the exhibits that the

parties agree to admit, from the Government.

MR. COREY SMITH:  The parties have

agreed that the Government's exhibit list to

pre-admit Exhibits 1 through 5, 28 through 27 [SIC],

and 81 through 96.

THE COURT:  Okay.  Those exhibits are

admitted.

MR. VARNADO:  Your Honor, there may be

```
09:18:20   1   her, and there's some scheduling issues that are
09:18:22   2   kind of urgent and we wanted to bring that up with
09:18:25   3   the Court.
09:18:25   4               THE COURT:  Okay.
09:18:27   5               MR. VARNADO:  Your Honor, there may be
09:18:28   6   one -- additional information concerning information
09:18:31   7   we received from the Government last night with
09:18:33   8   respect to a witness they intend to call this
09:18:35   9   morning.  Mr. Loonam will address that this morning.
09:18:38  10               THE COURT:  Okay.  Great.  Before we
09:18:40  11   get started then, let's go ahead and if you could on
09:18:42  12   the record tell me which exhibits that you would
09:18:45  13   like to pre-admit, and then we'll get those on the
09:18:48  14   record from both sides.  Then we'll talk about
09:18:51  15   sequestration next.
09:18:53  16               So let's start with the
09:18:54  17   Government's exhibits, all of the exhibits that the
09:18:57  18   parties agree to admit, from the Government.
09:19:00  19               MR. COREY SMITH:  The parties have
09:19:01  20   agreed that the Government's exhibit list to
09:19:03  21   pre-admit Exhibits 1 through 5, 28 through 27 [SIC],
09:19:07  22   and 81 through 96.
09:19:11  23               THE COURT:  Okay.  Those exhibits are
09:19:14  24   admitted.
09:19:15  25               MR. VARNADO:  Your Honor, there may be
```

09:19:16   1   a little...

09:19:17   2                     THE COURT:   Okay.

09:19:25   3                     MR. COREY SMITH:   Sorry, Your Honor.

09:19:27   4   That's right we filed this one.   There's a slight

09:19:29   5   change, if I can correct the record?

09:19:31   6                     THE COURT:   Okay.

09:19:31   7                     MR. COREY SMITH:   Government's

09:19:33   8   Exhibits 1 through 8, 29, 32 through 43, 58 through

09:19:41   9   60, 77 through 95 were pre-admitted.   Then there's

09:19:53   10  additional exhibits that the parties have agreed to

09:19:57   11  that -- there's additional exhibits that the parties

09:20:03   12  have agreed to that are -- that the parties agree

09:20:06   13  are authentic.   That's Government's Exhibit 9

09:20:09   14  through 27, 44 through 57, 62 through 75 and 97

09:20:19   15  through 114.

09:20:20   16                    THE COURT:   Okay.

09:20:22   17                    MR. VARNADO:   Your Honor, on that last

09:20:23   18  batch of exhibits, we did come to an agreement with

09:20:25   19  the Government.   We're not contesting authenticity.

09:20:28   20  We're just preserving our right to object to the

09:20:30   21  evidence being not relevant or cumulative, but tried

09:20:32   22  to work out everything we could so people aren't

09:20:34   23  having to lay a foundation and take the Court's

09:20:36   24  time.

09:20:37   25                    THE COURT:   That's perfect.   So those

09:20:38  1  exhibits are not admitted, but basically there's no
09:20:42  2  objection to the authenticity of those?
09:20:45  3          MR. VARNADO:  That's correct, Your
09:20:46  4  Honor.
09:20:46  5          THE COURT:  Those documents.
09:20:47  6          MR. VARNADO:  For the pre-admitted for
09:20:49  7  the Defense, Your Honor, it's just Exhibits 1
09:20:50  8  through 48.
09:20:51  9          THE COURT:  Okay.  Great.  Those
09:20:54  10  exhibits 1 through 48, and then the exhibits
09:20:56  11  identified by the Government as pre-admitted are now
09:21:00  12  pre-admitted.
09:21:03  13          Okay.  Now, let's talk about the
09:21:04  14  sequestration of the witnesses.
09:21:08  15          MR. VARNADO:  Your Honor, I think the
09:21:09  16  Government has asked that we would consent to their
09:21:12  17  three experts remaining in the courtroom for the
09:21:15  18  entirety of the proceedings and observing all of the
09:21:18  19  cross-examinations.
09:21:20  20          In fact, as represented that one of
09:21:21  21  their witnesses they intend to have is a summary
09:21:24  22  expert witness.  We object to the Defense -- I mean
09:21:27  23  the Government's experts remaining in the courtroom
09:21:30  24  for the entirety of the proceeding.
09:21:32  25          First, the Defense experts -- our

experts are treating physicians.  They have
patients.  They have a very narrow window of time
that they're going to be able to attend this time,
as opposed to the Government's experts, which are
expert testifiers and be here this whole time.

Second, there is disagreement among
the Government's experts.  They've got one expert
who says they can't decide if Mr. Brockman is
competent or not.  They have another expert that is
steadfast and says that Mr. Brockman is malingering.

And they have a third expert who
said Mr. Brockman was competent, and then said he
couldn't decide, and then came back with a different
opinion and comes back and says he is competent.

We believe because there's daylight
between these experts, they should not be allowed to
remain in the courtroom and observe the
cross-examinations of the other experts.  We think
that's an unfair process, and we ask that the expert
witnesses be sequestered for this particular
hearing.

THE COURT:  Okay.  That's very unusual.
Experts are always allowed -- I mean, in my
experience -- to hear the testimony of other experts
and testify -- testify based on what they hear.  Is

09:22:37   1   there any reason why -- I guess you are saying in
09:22:41   2   this case because their testimony differs so much
09:22:45   3   that they shouldn't be allowed to hear other experts
09:22:48   4   items?  I'm not quite sure I understand.
09:22:51   5             MR. VARNADO:  I'll be clear.  We don't
09:22:52   6   object to after they testify if they're going to
09:22:54   7   remain in the courtroom, but we don't think they
09:22:58   8   should be able to observe the expert before them who
09:23:00   9   is testifying to be cross-examined, and educate
09:23:02  10   themselves so they can address their testimony in a
09:23:05  11   different way.
09:23:06  12             So I do think that is what we're
09:23:08  13   asking, not to prohibit them from after -- you know,
09:23:11  14   leave the witness stand from remaining in the
09:23:13  15   courtroom if that's their choice and what they want
09:23:15  16   to do, but for an expert to sit here and observe all
09:23:18  17   of the testimony and essentially form new opinions
09:23:20  18   that are not part of their expert reports, that's
09:23:23  19   something we're objecting to.
09:23:24  20             THE COURT:  But that's typical.
09:23:26  21   Experts can listen to other experts' testimony, and
09:23:29  22   then provide supplemental testimony based on what
09:23:33  23   they hear in Court.  So respectfully, the motion is
09:23:36  24   overruled.
09:23:36  25             MR. VARNADO:  Okay.  Thank you, Your

09:23:37    1    Honor.

09:23:37    2                    THE COURT:  But if you guys do want to

09:23:39    3    invoke the rule, I'll invoke the rule as to fact

09:23:42    4    witnesses, but with respect to experts, experts are

09:23:44    5    allowed to stay in the courtroom and hear the

09:23:46    6    testimony.

09:23:48    7                    MR. COREY SMITH:  We do agree to invoke

09:23:50    8    the rule with fact witnesses, with one exception.  I

09:23:54    9    guess that's the attorney for Mr. Brockman, Kathy

09:23:57   10    Keneally.  I guess she's going to testify -- since

09:23:59   11    she's lead counsel, we don't object to her staying

09:24:01   12    in the courtroom.

09:24:02   13                    THE COURT:  Okay.

09:24:03   14                    MR. VARNADO:  Mr. Smith -- we had

09:24:04   15    talked about Mr. Brockman's caretaker,

09:24:07   16    Mr. Gutierrez.  He may very well testify as well and

09:24:10   17    the Government indicated they did not object to him

09:24:12   18    remaining.

09:24:13   19                    MR. COREY SMITH:  That's correct, Your

09:24:14   20    Honor.  We don't object to Mr. Brockman's caretaker

09:24:18   21    staying in the courtroom.

09:24:19   22                    THE COURT:  So the rule has been

09:24:20   23    invoked.  Anyone that's in the courtroom that's

09:24:22   24    going to be providing fact testimony needs to excuse

09:24:26   25    themselves, and then we can call them back.

```
09:24:28    1              Is there anyone you want me to
09:24:30    2  swear in to make sure they appear later on that are
09:24:33    3  appearing by subpoena?
09:24:35    4              MR. VARNADO:  No, Your Honor.
09:24:36    5              MR. COREY SMITH:  No.
09:24:36    6              THE COURT:  Okay.  Then if you are in
09:24:38    7  the courtroom, ladies and gentlemen, and you are a
09:24:39    8  fact witness and not an expert, or Mr. Brockman's
09:24:43    9  caretaker or attorney, you need to leave the
09:24:45   10  courtroom and then come back when you are called.
09:24:49   11              Counsel, I just need to ask for
09:24:51   12  your help, because I don't know who all of the fact
09:24:54   13  witnesses are.  If you see someone in the courtroom
09:24:56   14  who is a fact witness, let me know and I will ask
09:25:00   15  them to leave.
09:25:01   16              MR. COREY SMITH:  Very well, Your
09:25:03   17  Honor.
09:25:04   18              THE COURT:  Then the final issue on
09:25:05   19  your list was subpoenas?
09:25:07   20              MR. COREY SMITH:  Well, there's one
09:25:08   21  particular witness, Dr. Maria Ponisio.  She was a
09:25:11   22  witness -- an expert that we retained.  She's a
09:25:14   23  radiologist, nuclear radiologist.  She's never met
09:25:19   24  Mr. Brockman.  She was just retained by the
09:25:21   25  Government to review some of the imaging and she
```

09:25:23   1   wrote a report, which the Defense has.

09:25:25   2              We were initially going to call

09:25:27   3   her, but in speaking to Dr. Ponisio, she's up in

09:25:30   4   St. Louis and she works at the George Washington

09:25:33   5   Hospital up there, and she has a lot -- her -- there

09:25:36   6   was a scheduling conflict.  So we believe that her

09:25:39   7   testimony is going to be -- very much duplicative of

09:25:42   8   our very first witness, our neurologist, Dr. Darby

09:25:46   9   so we decided not to call her and waste everyone's

09:25:50   10  time to call her to hear the same thing again.

09:25:52   11  Since that time Defense has subpoenaed her to

09:25:54   12  testify.

09:25:54   13             She's concerned that she may not be

09:25:58   14  able to come down in the appropriate time to

09:26:00   15  testify.  She has to be back -- again, not to take

09:26:04   16  up the Court's time with these minutiae, but she has

09:26:07   17  clinic duties at the children's hospital on Saturday

09:26:10   18  morning, so she has to be out of here Friday night.

09:26:12   19  She has agreed to testify via video if the Defense

09:26:15   20  really wants to call her.

09:26:17   21             So we would ask if they do really

09:26:19   22  want to call Dr. Ponisio to let her testify via

09:26:22   23  video conferencing.

09:26:23   24             THE COURT:  Okay.  Was she in the

09:26:26   25  jurisdiction of the Court at the time she was

09:26:28  1   served, or how did this happen?

09:26:30  2              MR. COREY SMITH:  I'll let Mr. Loomas

09:26:31  3   [SIC] address that.

09:26:32  4              MR. LOONAM:  Your Honor, a little

09:26:33  5   background --

09:26:37  6              MR. COREY SMITH:  I'm sorry, I got your

09:26:39  7   name wrong.

09:26:41  8              MR. LOONAM:  Dr. Ponisio is the

09:26:43  9   Government's retained neuroradiologist who has

09:26:47  10  reviewed the imaging in this case.  She's issued

09:26:50  11  four reports, some reviewing one scan, some

09:26:55  12  combining scans.  Um, and each of those reports has

09:26:59  13  -- well, the last report said that -- that the most

09:27:03  14  likely diagnosis to come out of the reports was

09:27:10  15  early Alzheimer's in the correct clinical situation.

09:27:14  16              Um, and that -- that the, um,

09:27:17  17  imaging most strongly supported early Alzheimer's.

09:27:20  18  That's -- that's different than what Dr. Denney will

09:27:26  19  testify to, the Government's main witness in this

09:27:29  20  case.  So it's just an incredibly important witness.

09:27:31  21              Um, Dr. Ponisio was not on the

09:27:34  22  Government's witness list.  Um, we informed the

09:27:37  23  Government on November 8th that we were adding

09:27:41  24  Dr. Ponisio to our witness list, and asked if the

09:27:44  25  Government would make her available.  Um, Mr. Smith

09:27:47   1   responded that Dr. Ponisio had a conflict for the

09:27:53   2   week of November 15th -- the entire week of

09:27:57   3   November 15th.

09:27:57   4                    "She's based in St. Louis, but is

09:28:00   5   able to testify via video conferencing, and would

09:28:02   6   you like us to forward you contact information?"

09:28:06   7                    We said yes, and Mr. Smith

09:28:07   8   forwarded her contact information.  I spoke with

09:28:11   9   Dr. Ponisio on Friday with, um, my colleague, Conor

09:28:17   10  Maloney on the phone with me.  Dr. Ponisio actually

09:28:21   11  had -- she said some things that are a little

09:28:23   12  different than what the Government just said.  She

09:28:25   13  said she was told by the Government she would never

09:28:28   14  have to testify when she was retained, and never

09:28:31   15  have to testify.

09:28:32   16                    I told her, "Well, I'm sorry to be

09:28:34   17  the bearer of bad news, but you might have to

09:28:37   18  testify.  I don't know, and I want to be respectful

09:28:39   19  of your schedule.  I want to be respectful of your

09:28:43   20  conflicts, so what is your conflict for this week,

09:28:45   21  what conflict do you have?"

09:28:46   22                    She's, like, "Well" -- and there's

09:28:48   23  no conflict other than what every doctor in this

09:28:52   24  case is dealing with.  Maybe, "I have this," or "I'm

09:28:55   25  preparing for a presentation on this day."

09:28:57  1          And very quickly when I said,

09:28:59  2   "Well, you know, this is a really important matter,"

09:29:01  3   she said, "It's better to know sooner rather than

09:29:05  4   later if I need to travel."

09:29:06  5          "I don't want to needlessly

09:29:09  6   inconvenience you."

09:29:10  7          So depending on how the

09:29:12  8   Government's witness, Dr. Darby, who they plan on

09:29:14  9   having testify about Dr. Ponisio's expert report,

09:29:18  10  Dr. Darby, who will be the first witness, is a

09:29:20  11  neurologist.  He's not a neuroradiologist.  I don't

09:29:24  12  know if his opinion is going to be consistent or

09:29:26  13  different from what Dr. Ponisio -- Dr. Ponisio's

09:29:30  14  reports say.

09:29:31  15         And so, what I told Dr. Ponisio is

09:29:35  16  let me hear from the witnesses on Monday, um, and

09:29:37  17  then we will talk, and hopefully I'm better informed

09:29:41  18  as to whether we need you to testify or not.  And

09:29:43  19  then we'll let you know as soon as we can.

09:29:45  20         So we're -- and that's the plan for

09:29:48  21  us to call Dr. Ponisio tonight, um, to let her know

09:29:51  22  if we indeed need to call her and she needs to

09:29:55  23  travel, and we'll work with her schedule just like

09:29:56  24  we have for every other witness in this case.

09:29:58  25              THE COURT:  Okay.

09:29:59    1                    Response, Mr. Smith?

09:30:01    2              MR. COREY SMITH:  That sounds

09:30:03    3    reasonable, Judge.  If we can address this after

09:30:05    4    Dr. Darby testifies, and if they don't have an issue

09:30:10    5    with Dr. Darby's testimony we can -- well, we don't

09:30:13    6    know what Dr. Darby is going to say, but after he

09:30:16    7    testifies we can readdress this issue.  Sounds like

09:30:18    8    a reasonable solution.

09:30:19    9              THE COURT:  Okay.

09:30:22   10              MR. LOONAM:  Sorry, Dr. Darby is the

09:30:24   11    main witness.  I think if Dr. Denney's testifying

09:30:28   12    today, too, we'll want to see what Dr. Denney says

09:30:31   13    about the scans if he's going to testify with

09:30:33   14    respect to the scans.  I don't know, but by the end

09:30:36   15    of the day.

09:30:36   16              We plan on calling -- I think we --

09:30:39   17    I said a time around six o'clock to speak with

09:30:43   18    Dr. Ponisio.

09:30:43   19              THE COURT:  Okay.  Great.  Mr. Varnado?

09:30:48   20              MR. VARNADO:  On this topic of experts

09:30:50   21    and timing, I did want to note for the Court, and

09:30:52   22    we'll confer with the Government as well, that we do

09:30:54   23    have one expert, Dr. Wisniewski that absolutely has

09:30:59   24    to have a full clinic day on Thursday.  You know, we

09:31:01   25    had mentioned in a prior hearing we may need to call

09:31:04   1   some doctors out of order.

09:31:05   2           He is one that we would want to put

09:31:07   3   on the Wednesday lunch break.  Maybe the

09:31:09   4   Government's done by that time -- entirely possible,

09:31:12   5   but I want to flag for the Court this is somebody

09:31:14   6   who is coming in very, very late Tuesday.  Has to

09:31:17   7   absolutely leave late -- you know, will get the

09:31:20   8   latest flight out.  But wanted to flag that we may

09:31:23   9   need Dr. Wisniewski out of order after the lunch

09:31:26   10   break on Wednesday.

09:31:27   11           THE COURT:  Definitely, Mr. Varnado.

09:31:31   12   I'm going to accommodate the doctors' schedules to

09:31:35   13   the best of the Court's ability.  They're taking

09:31:37   14   care of people that have lives at stake.  Whatever

09:31:41   15   we need to do to accommodate them we're doing.

09:31:45   16           MR. COREY SMITH:  Absolutely fine for

09:31:47   17   the Government, Your Honor.

09:31:47   18           THE COURT:  Great.

09:31:48   19           MR. VARNADO:  One issue I added, Judge?

09:31:50   20           THE COURT:  Sure.

09:31:51   21           MR. VARNADO:  We got some

09:31:53   22   demonstratives from the Government last night about

09:31:55   23   5:30 --

09:31:56   24           MR. LOONAM:  6:00 --

09:31:58   25           MR. VARNADO:  Yeah, six o'clock

09:32:00  1    pertaining to Dr. Darby and Dr. Denney.  I'll let
09:32:03  2    Mr. Loonam address the specifics, but to tee it up
09:32:06  3    these demonstratives contain information and
09:32:10  4    references to source material, including academic
09:32:12  5    studies that were never referenced in their prior
09:32:17  6    expert reports.  Each of these experts had two
09:32:19  7    reports, Dr. Denney and Dr. Darby, and they did not
09:32:23  8    refer to this material.
09:32:24  9            So I'll let Mr. Loonam expand
09:32:26  10   further, but it's our position that, you know, this
09:32:29  11   is new information and we object to it being
09:32:32  12   included at this very late hour.  We don't have
09:32:34  13   time, you know, to run it past our experts and dig
09:32:36  14   in.  It's highly technical academic studies on these
09:32:40  15   topics.
09:32:41  16            MR. LOONAM:  I don't want to take up
09:32:43  17   the Court's time, Judge.  The only thing I'd add is
09:32:46  18   we received two sets of demonstratives last night.
09:32:49  19   One was for Dr. Denney, which we're not objecting
09:32:51  20   to.  It's the Dr. Darby slides -- the expert reports
09:32:55  21   were due October 29th in this case.  DOJ missed that
09:33:00  22   deadline by a day.
09:33:01  23            Then on November 1st, we appeared
09:33:03  24   before the Court because one of the expert reports
09:33:06  25   seemed to leave wiggle room for changing the

opinion.  We said, "Wait, we need notice to prepare
this case."

It's a highly technical case.  Lot
of experts.  We're talking about the brain and
neurology.  It's tough, technical stuff.  And so,
the Court stated, "Absolutely, you need" -- and gave
the Government the opportunity to supplement -- by
the way the Government said it wasn't going to
supplement, and then did after it represented it
wasn't going to.

But then Your Honor said, you know,
"By Monday, November 8th the Government needs to
provide all supplemental reports or show good cause
why not."

So that's where we are.  And then,
last night -- I don't know 5:00 or 6:00, because my
clock is off because of New York time frankly, and I
don't know if my computer switched back.  So we'll
call it five o'clock on Sunday night we got an
e-mail of what they say are demonstratives, but
really this is a supplement to the expert report.

The first page includes, "Dementia
progression with beta-amyloid tau neuronal imagery
dysfunction brain structure," with a site to
*Alzheimer's Research and Therapy Vol. II* (phonetic).

09:34:23   1   This is a book they're relying on.  We're entitled

09:34:26   2   to the opinion of the expert, and the bases for the

09:34:28   3   opinion.  This raises a new basis of their opinion

09:34:30   4   right here.

09:34:31   5           Then if you go through this, Judge,

09:34:32   6   some of this is, like, summary slides more for

09:34:36   7   closing.  But, you know, that's not what I'm raising

09:34:39   8   the main objection to.  Here's a slide with the

09:34:43   9   brain images, but then two articles cited at the

09:34:45   10  bottom, right?

09:34:47   11          One article here says, "Posterior

09:34:50   12  paroccipital hypometabolism may differentiate" --

09:35:03   13  "posterior paraoccipital hypometabolism may

09:35:09   14  differentiate mild cognitive impairment from

09:35:12   15  dementia in Parkinson's disease."

09:35:14   16          That's just an example, Judge.

09:35:16   17  It's very important issue in this case, and it's --

09:35:19   18  it's a new basis for Dr. Darby's opinion.

09:35:23   19  Dr. Darby's report has been out for quite some time.

09:35:26   20  Our reports cited medical literature so that their

09:35:29   21  experts could review the medical literature, see if

09:35:32   22  there was something for them so they could prepare

09:35:34   23  for cross.

09:35:35   24          I got this five o'clock last night,

09:35:38   25  middle of preparing on a Sunday.  It's -- there's

09:35:41   1   another article here.  These are very technical,

09:35:44   2   dense medical literature and research.  I should

09:35:49   3   have the opportunity to read this, see if there's

09:35:52   4   conflicting medical research out there, consult with

09:35:56   5   my expert in order to properly cross their expert.

09:36:00   6            I can't do that, um, because of --

09:36:03   7   and these slides weren't prepared last night and

09:36:06   8   thrown together.  There's been work put in these,

09:36:09   9   Your Honor.  To receive this five o'clock before

09:36:11  10   appearing before Your Honor tonight is just

09:36:13  11   inappropriate, so we object.  We object to it.

09:36:16  12            We are prepared to go, but they

09:36:19  13   shouldn't be able to use this.

09:36:20  14            THE COURT:  Okay.

09:36:21  15            Response?

09:36:23  16            MR. MAGNANI:  Your Honor, Christopher

09:36:25  17   Magnani for the United States.  I definitely agree

09:36:28  18   with my colleague this is tough, technical stuff.  I

09:36:31  19   understand why they would object, because it

09:36:33  20   clarifies the tough technical stuff and puts it in a

09:36:36  21   way that's easy for lay people to understand.  So

09:36:39  22   kind of like with sequestration, Your Honor, the

09:36:41  23   goal here is to help the Court as fact finder get

09:36:44  24   through this tough technical stuff.

09:36:46  25            THE COURT:  I'm with you, with the

charts, but the references to articles or books or
treatises that weren't disclosed as part of the
expert opinion.

MR. MAGNANI:  Basically, Your Honor,
the way I describe that is they're not necessary for
the demonstratives.  We put them as sort of
footnotes.  If Defense expert is wondering, "Where
did this come from," it gives them the ability to do
that.

That way if their experts want to
dig in to that, testify in their case when they put
in the opposite number -- so in other words our
first witness is a neurologist.  They call their
neurologist, and they'll have the benefit of the
pictures and footnotes that ours used as a
demonstrative and say, "This is why they're unfair,
this is why they're wrong."

This was prepared a long time ago,
I have no idea what Counsel's basis for saying that
was.  If you want to ask Dr. Darby when he's under
oath, we were working on these slides last night and
we sent them the second they were done.

THE COURT:  Before you continue, couple
of questions.  First, the slides with respect to the
charts, are those charts based on information that

09:37:51   1   was disclosed in discovery or treatises or journals
09:37:55   2   that were disclosed in discovery?
09:37:58   3               MR. MAGNANI:  It's a very good
09:37:59   4   question, Your Honor.  All of the information that
09:38:01   5   it's portraying is all in discovery.  The only new
09:38:04   6   thing is pictures -- you know, either a
09:38:06   7   demonstrative chart that shows -- that demonstrates
09:38:09   8   complex concepts, as opposing counsel said summaries
09:38:13   9   of different experts' opinions that just helps put
09:38:16  10   everything in perspective, and some pictures that
09:38:19  11   are published in, um, you know brain science
09:38:23  12   literature that basically says this is a combination
09:38:27  13   -- this is what a typical brain image looks like in
09:38:30  14   these cases.
09:38:31  15               So the last one is the one that
09:38:33  16   comes from the literature.  Basically what we're
09:38:35  17   trying to do is say are these scans that we're
09:38:38  18   looking at in this case -- do we have to look at
09:38:40  19   them in isolation or compare them to the body of
09:38:43  20   science that exists?  So that comparison is very
09:38:45  21   helpful to the fact finder to see.
09:38:49  22               Again, the study is cited, and so
09:38:50  23   if there's a problem their experts can talk about it
09:38:52  24   in their case.  Frankly, if they want to
09:38:55  25   cross-examine Dr. Darby, and they don't feel

09:38:58   1    prepared today, he can be recalled for that purpose.

09:39:00   2           THE COURT:  I guess what my problem and

09:39:02   3    my concern is what Mr. Loonam points out is the

09:39:05   4    articles themselves, or the journals that are being

09:39:08   5    used aren't something that were disclosed to

09:39:12   6    Mr. Loonam or his client timely.

09:39:14   7           I mean, do we need the footnotes?

09:39:19   8    Can you take the footnotes out and the

09:39:20   9    demonstratives remain the same?

09:39:23   10          MR. MAGNANI:  One hundred percent, Your

09:39:24   11   Honor.  The footnotes are there only for the Defense

09:39:27   12   and their experts to evaluate whether we chose

09:39:30   13   unfair examples or things since refuted.  But in

09:39:33   14   terms of what's going to help someone who is not a

09:39:36   15   neurologist understand this stuff, you just need to

09:39:39   16   see the pictures of the footnotes are not important.

09:39:41   17          THE COURT:  Okay.

09:39:42   18          MR. LOONAM:  If I heard Mr. Magnani

09:39:45   19   correctly, the footnotes are there because it's

09:39:47   20   citation to new pictures that could very well be

09:39:51   21   helpful to the Court.  I don't know.  That's not

09:39:53   22   sort of the standard here.  The pictures are new,

09:39:56   23   not disclosed.

09:39:57   24          Pulled them -- I guess last night a

09:39:59   25   treatise they thought would be helpful and put them

09:40:01   1   on a slide and they're -- this is a supplemental
09:40:04   2   expert report.  I haven't heard good cause, which
09:40:06   3   was the standard for -- for any supplemental expert
09:40:09   4   report.  And to -- to go through direct where I
09:40:12   5   can't properly cross and the -- and the -- and the
09:40:14   6   answer is, um, "Well, have your experts review, and
09:40:17   7   they can then testify about it because we're giving
09:40:20   8   you the basis for the opinion now," that -- in and
09:40:23   9   of itself -- makes very clear this is a supplemental
09:40:26   10  expert report produced to us 5:00 p.m. on Sunday
09:40:28   11  night before we appeared here after the Court
09:40:31   12  admonished the Government to -- to supplement any
09:40:35   13  expert reports by the 8th.
09:40:36   14          THE COURT:  Okay.  What I'm trying to
09:40:37   15  figure out is the supplemental report -- is it
09:40:40   16  changing the opinion in any way, or is it -- or is
09:40:42   17  it a different opinion?  It sounds like -- I'm
09:40:45   18  sorry, I didn't mean to interrupt, but it sounds
09:40:47   19  like what you are doing -- I want to be clear on, is
09:40:50   20  that you are providing graphs and charts that
09:40:53   21  further explain the position that you are going to
09:40:55   22  be testifying about?
09:40:56   23          MR. MAGNANI:  Your Honor, that's right.
09:40:57   24  And I think -- you can understand why counsel wants
09:41:00   25  to describe it as a supplemental expert report,

09:41:02  1  because that would require cause.  But as I said

09:41:04  2  from the beginning, and as opposing counsel said

09:41:07  3  from the beginning, it's a demonstrative exhibit.

09:41:09  4  So it does not change the opinions in the expert

09:41:12  5  reports that were filed, it just does what a

09:41:14  6  demonstrative exhibit does.

09:41:15  7            It demonstrates those opinions to a

09:41:17  8  lay person who does not have as much experience

09:41:20  9  understanding the type of technical stuff we're

09:41:22  10  talking about.

09:41:23  11            THE COURT:  Is this in opening or part

09:41:25  12  of the direct?

09:41:26  13            MR. MAGNANI:  Only as part of

09:41:29  14  Dr. Darby's direct.  Frankly, Your Honor, if it

09:41:30  15  would aid the Court in helping to sort this out, I

09:41:33  16  have printed copies of it.

09:41:35  17            THE COURT:  Can I take a look at it?

09:41:37  18  Give me about five minutes, and I'm going to take a

09:41:39  19  look and just take a quick recess.

09:41:42  20            MR. LOONAM:  Judge, to be clear,

09:41:43  21  pictures are new.

09:41:44  22            THE COURT:  Yeah, you are saying you

09:41:45  23  have never seen this before.  I want to take a look

09:41:47  24  and I'll be right back.

09:41:59  25  (Whereupon, off the record.)

09:41:59  1          THE COURT:  Is Dr. Yudofsky's counsel
09:42:01  2  here also?  Okay because I understood -- that was
09:42:06  3  one of the things I wanted to take up with the
09:42:08  4  parties.  He asked -- he filed a motion asking to be
09:42:11  5  able to address the Court.  I didn't have any --
09:42:13  6  nobody objected.  I don't see why there isn't -- a
09:42:16  7  reason to keep him from addressing the Court if he
09:42:18  8  wanted to -- or she.  I'm not sure.
09:42:21  9          MR. VARNADO:  It's Mr. MacDougall, I
09:42:23  10  believe.
09:42:26  11          MR. LANGSTON:  Your Honor, we don't
09:42:26  12  have an objection to the attorney being heard.
09:42:29  13  Mr. MacDougall had requested, sort of, what day we
09:42:30  14  anticipated calling Dr. Yudofsky, and we told him it
09:42:33  15  was going to be Wednesday.  But if the Court would
09:42:36  16  want, I can tell Mr. MacDougall -- if you want to
09:42:39  17  speak to him we can have him here tomorrow.
09:42:41  18          THE COURT:  No, it's not a problem.  I
09:42:43  19  just wanted to grant his motion to appear before the
09:42:46  20  Court if he was waiting.  Let's take five minutes.
09:42:49  21  (Off the record.)
09:51:24  22          Okay.  Counsel, we're back on the
09:51:26  23  record.  I just have a few questions before we get
09:51:28  24  started.
09:51:29  25                      First, I'm looking at what you

09:51:30  1   handed me, which was Dr. Darby's demonstrative

09:51:35  2   exhibits -- or demonstrative slides.  Page 1,

09:51:41  3   "Dementia Progression," is this a chart created by

09:51:43  4   the expert, or something that came out of

09:51:45  5   *Alzheimer's Research & Therapy Volumes II, 23 2010*?

09:51:51  6              MR. MAGNANI:  My understanding is that

09:51:52  7   it came from that, but I would have to double check

09:51:55  8   with Dr. Darby who is in the courtroom, Your Honor.

09:51:57  9              THE COURT:  Please double check.

09:51:58  10  Because if -- if it's not something he created and

09:52:01  11  it came from this book, I'm not going to allow it.

09:52:03  12  I think Mr. Loonam is absolutely correct.  The

09:52:09  13  problem is if these cites weren't necessary to show

09:52:14  14  where these documents came from, then they wouldn't

09:52:18  15  be there.

09:52:21  16              Since they're there, that means

09:52:24  17  they're pulled from some secondary source.

09:52:26  18              Mr. Loonam, if you're telling me

09:52:29  19  you haven't seen the secondary sources and your

09:52:31  20  experts haven't, then it's not coming in.

09:52:33  21              MR. MAGNANI:  Your Honor, the only

09:52:34  22  thing I would point out -- again, you could ask this

09:52:36  23  of Dr. Darby, but I think he would testify these

09:52:41  24  slides are fair and accurate depictions of certain

09:52:44  25  things.

09:52:44   1            On that basis -- in other words, I
09:52:46   2   believe he could lay the foundation to admit these
09:52:48   3   as actual exhibits, which we're not trying to do.
09:52:51   4   We're not trying to say they're evidence, but I'll
09:52:53   5   put that out there.
09:52:54   6            THE COURT:  The problem is they weren't
09:52:55   7   disclosed to the other side.  It doesn't matter.
09:52:58   8   I'm not disputing the fact it could be evidence.  It
09:53:02   9   could be, but what Mr. Loonam's point is that it
09:53:05  10   wasn't disclosed to him timely in preparation for
09:53:09  11   this hearing, which places him at the disadvantage
09:53:11  12   of preparing his case for his client.
09:53:13  13            I think I'm summarizing that.
09:53:16  14            MR. LOONAM:  Absolutely right.  Whether
09:53:17  15   it's accurate or not, I don't know.  Whether there's
09:53:19  16   other evidence out there, I don't know.  So you are
09:53:21  17   right, Your Honor, 100 percent.
09:53:24  18            THE COURT:  So unless Dr. Darby is
09:53:27  19   going to testify this is a chart he created and it's
09:53:29  20   not pulled from the reference materials, then I
09:53:34  21   won't allow it as demonstrative evidence in this
09:53:36  22   case.  Same with -- at least on page numbers, but
09:53:41  23   the -- it looks like scans of a brain that cite to
09:53:47  24   "Garcia", and "Garcia and Edison".
09:53:51  25            If those aren't slides that

09:53:54  1  Dr. Darby created, and these are pulled from those

09:53:58  2  two reference materials, I'm not going to allow

09:54:01  3  those either.

09:54:01  4            So as I said, Mr. Loonam, I think

09:54:05  5  you are absolutely correct -- Loonam, I'm sorry.

09:54:09  6  You are absolutely correct.

09:54:17  7            Then there's another one from

09:54:18  8  "Garcia" and "Garcia and Edison" as well, but it's

09:54:22  9  later on in the slide presentation.  If those aren't

09:54:27  10  slides that were created by Dr. Darby, and they're

09:54:31  11  slides that were pulled from those reference

09:54:33  12  materials, then I'm not going to allow those either.

09:54:40  13            Do you need to ask Dr. Darby those

09:54:42  14  questions?

09:54:42  15            MR. MAGNANI:  I would like to double

09:54:43  16  check, Your Honor, and I would also like to double

09:54:45  17  check -- I know Your Honor didn't mention it, but

09:54:47  18  consistent with that ruling I might also need to

09:54:49  19  check with him about the -- there's a slide after

09:54:53  20  the first brain scans.  There's no footnote, but I'm

09:54:57  21  just not sure.  It's the one with the.

09:55:03  22            MR. LOONAM:  That comes --

09:55:04  23            THE COURT:  Looks like "Brockman MRI"

09:55:06  24  --

09:55:07  25            MR. LOONAM:  That comes from the

09:55:08  1   Neuroreader® (phonetic).  That's been disclosed.

09:55:12  2          THE COURT:  Okay.

09:55:15  3          MR. MAGNANI:  Your Honor, do you mind

09:55:16  4   if I take a minute?  I do -- I would like to double

09:55:19  5   check.

09:55:19  6          THE COURT:  Sure.  Not a problem.

09:55:55  7          MR. MAGNANI:  Apologies, your Honor.  I

09:55:57  8   didn't steer you wrong.  Dr. Darby confirmed

09:56:00  9   everything I said was correct.  The only caveat is

09:56:02  10  that the slides with the brain scans -- and if Your

09:56:09  11  Honor is looking at them, there are the orange ones

09:56:11  12  and the blue ones.  And I think this is clear, but I

09:56:14  13  want to make it abundantly clear, it's the first

09:56:17  14  two.  The orange ones and the other ones from like,

09:56:20  15  you know, Mr. Brockman's brain scans and were of

09:56:23  16  course, you know, disclosed in this case.

09:56:25  17         THE COURT:  Okay.  If you want to

09:56:27  18  redact the information that was taken from the --

09:56:34  19  from the treatises, that's fine, and leave

09:56:38  20  Mr. Brockman's scan that was disclosed, that's

09:56:41  21  great.

09:56:41  22              But the ones that were taken from

09:56:43  23  the treatises I'm not allowing, so they need to be

09:56:47  24  removed.

09:56:47  25         MR. MAGNANI:  One qualifying question,

09:56:50  1   Your Honor, is that also if Dr. Darby were to
09:56:52  2   testify the orange scans, which he did pull from the
09:56:55  3   literature, are approximations of what he would
09:56:57  4   expect to see and what he does see in his clinical
09:57:00  5   practice?
09:57:01  6            THE COURT:  He can just testify to
09:57:02  7   that.
09:57:02  8            MR. MAGNANI:  Okay.
09:57:02  9            THE COURT:  The problem is if these
09:57:04  10  scans are from this -- these reference materials and
09:57:08  11  Mr. Loonam was saying, "I've not seen them," and
09:57:11  12  nobody disputes that, then they're not in.
09:57:15  13            MR. MAGNANI:  Very well, Your Honor.
09:57:16  14            THE COURT:  Okay.  So during opening I
09:57:21  15  guess -- or I guess during opening you will have an
09:57:24  16  opportunity to modify your demonstratives as
09:57:27  17  necessary.  I assume somebody else will be doing
09:57:30  18  opening?
09:57:32  19            MR. MAGNANI:  Fortunately for me that's
09:57:34  20  true, Your Honor.
09:57:34  21            THE COURT:  Okay.  Great.  That was
09:57:49  22  issues you raised and the issues I had.
09:57:52  23            Anything else before we get
09:57:53  24  started?
09:57:55  25            MR. LOONAM:  I think that's it, Your

09:57:56   1   Honor.

09:57:57   2                   MR. COREY SMITH:  I think that's it,

09:57:58   3   Your Honor.

09:57:58   4                   THE COURT:  Okay.  Great.  We'll

09:57:59   5   proceed with opening statements.  As I said, I need

09:58:02   6   a statement, not argument.  Provide me a roadmap.

09:58:08   7   Preliminary briefings are excellent, Counsel.  Great

09:58:11   8   job sending it out for me, connecting all of the

09:58:13   9   dots.  Before now, I've only seen bits and pieces.

09:58:17  10   It was very, very well done.

09:58:18  11                   So if you can follow up with a good

09:58:20  12   opening, give me a roadmap of where you are going,

09:58:22  13   and then we'll get started.

09:58:25  14                   Government, you may proceed when

09:58:27  15   ready.

09:58:29  16                   MR. LANGSTON:  Thank you.  Lee Langston

09:58:38  17   for the Government.  Your Honor, what you are going

09:58:41  18   to see over the next few days is the extraordinary

09:58:43  19   lengths a man is willing to go to evade

09:58:46  20   accountability of the largest tax fraud in US

09:58:49  21   history.  The evidence will clearly show the

09:58:53  22   Defendant has been living a double life for years.

09:58:54  23                   He's been lying to doctors,

09:58:57  24   exaggerating his symptoms in a desperate attempt to

09:59:00  25   evade prosecution in this case.

09:59:02    1          He didn't see a doctor about his

09:59:05    2  mental capacity until after the key search warrant

09:59:07    3  in this case, and he didn't resign from his position

09:59:11    4  as CEO of his company until after his indictment was

09:59:14    5  unsealed.

09:59:16    6          The evidence will show that the

09:59:18    7  Defendant had the motivation to malinger, that he

09:59:21    8  has the capacity to successfully deceive trained

09:59:24    9  doctors, and that he is presently exaggerating and

09:59:29   10  malingering his symptoms.

09:59:31   11          The first part of our case will be

09:59:32   12  discussing the motivation for the Defendant to

09:59:34   13  malinger.  Our doctors will tell you that's

09:59:37   14  important, because understanding the strength of the

09:59:39   15  evidence against him and the seriousness of the

09:59:41   16  charges helps you understand the Defendant's

09:59:43   17  motivation to fabricate a serious illness.

09:59:48   18          For more than 30 years the

09:59:50   19  Defendant was engaged in a complex scheme to hide

09:59:52   20  the vast majority -- billions of dollars of assets

09:59:55   21  in offshore trusts.  You are going to hear that for

09:59:59   22  30 years he successfully deceived the Government,

10:00:02   23  banks, and those close to him about his true

10:00:05   24  financial condition.

10:00:06   25          You'll see that he used his same

formidable powers of organization and intellect that he used to build his business to hide that from the IRS.  The largest and most important part of this is The A. Eugene Brockman Charitable Trust, and I think you will hear people refer to it as The Brockman Trust.  It controlled more than $10 billion in assets, including the Defendant's software company, Reynolds and Reynolds.

He controlled this offshore empire through a series of nominees.  In 2018, the most important of those nominees was a man named Evatt Tamine.  You are going to hear from Mr. Tamine either today or this week.  You'll hear that on paper, his role was to be the independent trustee of The Brockman Trust.

He's going to testify to you that in reality, however, he was paid millions of dollars a year from the Defendant to hide the Defendant's control and absolute direction over these structures.  He's going to tell you that Mr. Tamine and Mr. Brockman communicated using a bespoke, encrypted messaging service.

And that because of their confidence in this encryption, the Defendant and Mr. Tamine conspired openly -- that they talked in

10:01:21   1   very clear language about hiding the Defendant's

10:01:25   2   control over the structure from the world.  They

10:01:28   3   spoke so openly on the server that Mr. Tamine

10:01:32   4   boasted to the Defendant in writing, in a formal

10:01:36   5   performance review, he had done such a good job

10:01:40   6   destroying evidence in this case, an attempt to

10:01:42   7   search a close associate's house would be fruitless.

10:01:44   8              Now, in contrast to the way they

10:01:47   9   spoke in this encrypted messaging system, you will

10:01:49   10  also hear about something the Defendant refers to as

10:01:52   11  something called open correspondence.  This is

10:01:54   12  letters or e-mails designed to be seen.  And rather

10:01:58   13  than send these through the encrypted system, they

10:02:01   14  would send these in the open.  The reason for that

10:02:03   15  is to create a false paper trail that could one day

10:02:06   16  be pointed to support the Defendant's cover story.

10:02:10   17             You'll see that the Defendant was a

10:02:12   18  man careful enough to create a fake document today

10:02:16   19  that could get him out of hot water years into the

10:02:20   20  future.  You are also going to hear about how this

10:02:23   21  didn't quite work.  That beginning in 2016, despite

10:02:27   22  their careful planning, the Defendant and Mr. Tamine

10:02:30   23  began to feel the walls closing in.

10:02:32   24             In 2016, the Defendant learned of a

10:02:35   25  US investigation into Robert Smith, the founder of

1    Vista Equity Partners.

2              The relationship between Vista and

3    the Defendant is important, because they were

4    concerned that an investigation into Vista could

5    turn into investigation into them.  You'll hear that

6    the Defendant played a large role in creating Vista.

7    The Brockman Trust was the sole investor in the

8    first Vista private equity fund.  At the creation of

9    that -- at the creation of the Vista equity fund,

10   the founder, Mr. Smith -- he also created an

11   offshore trust to hide income from the IRS.

12             Mr. Smith used the same lawyer,

13   Carlos Kepke, as had created The Brockman Trust.

14   Mr. Kepke is the architect of the Brockman offshore

15   structure.  And the Defendant again worried an

16   investigation into Mr. Smith or Mr. Kepke could turn

17   into investigation into The Brockman Trust.

18             That turned out to be a prescient

19   worry.  September of 2016, Vista receives a subpoena

20   from the US Government.  As part of that subpoena,

21   it requests records of Vista's investors, including

22   The Brockman Trust.  Defendant had Mr. Tamine meet

23   with Mr. Smith -- meet with Mr. Smith's lawyers, and

24   ordered Mr. Tamine to destroy evidence in the US in

25   an attempt to contain the damage.  You'll hear he

flew sometimes halfway around the world, making
trips over and over again to the US to destroy
documents.

In 2017, they learned that several
bank accounts associated with The Brockman Trust had
been frozen in Bermuda.  You'll see a memo
Mr. Tamine wrote Mr. Brockman about that freezer --
about that freeze, saying they needed to muddy the
waters about Mr. Tamine's physical location.  They
needed an escape jurisdiction.

Mr. Tamine could never again travel
to the US, and he -- even if he could, he could
never do it with a phone or computer.  Mr. Brockman
wrote back to Mr. Tamine saying he agreed with every
concern Mr. Tamine raised in that memo.

Things got more serious in 2018.
In August of 2018, there was a search warrant of
Mr. Kepke's law office.  Mr. Kepke called
Mr. Tamine, and he tells him that Mr. Tamine and the
Defendant's names are both listed in the warrant.
As soon as he hangs up with Mr. Kepke, Mr. Tamine
calls Mr. Brockman and relays that information to
him.  He will testify that after the Kepke warrant,
he was as rattled as he had ever seen Mr. Brockman
in 14 years of working for him.

Then, on September 5th, Bermuda
authorities execute a search at Mr. Tamine's home.
The significance of that is among the items seized
is a hard drive containing comprehensive records of
The Brockman Trust, and their conspiracy to hide
Mr. Brockman's control over it.  They also seized
encrypted e-mail servers, which meant the Government
was in possession of 14 years of encrypted, secret
and highly incriminating conversations between
Mr. Brockman and Mr. Tamine.  To make matters worse,
Mr. Tamine came in and signed an immunity with the
Government and agreed to testify about his
relationship with Mr. Brockman.

During the hearing, you are going
to see a sampling of the documents contained on that
server.  You are going to see they make this case
almost impossible to defend on the merits, and
provide the motive for the Defendant to malinger his
illness.  You are going to see Mr. Tamine's formal
performance reviews where he trumpets his ability to
remain a figurehead of the trust while under the
constant threat of detention.  You will see clear
evidence of the Defendant's control over the
structure.  You'll even see the Defendant telling
Mr. Tamine he keeps old paper in his house to better

10:06:17  1    and more convincingly backdate documents.

10:06:21  2                So as you can see, to understand

10:06:23  3    the Defendant's motivation to malinger, you have to

10:06:26  4    understand the evidence against him.  To understand

10:06:30  5    the capacity for him to malinger, you also need to

10:06:33  6    step back and look more broadly.

10:06:39  7                That part of the case is going to

10:06:42  8    take us from basically the search warrant 2018,

10:06:42  9    through his indictment of 2020.  You will see the

10:06:45  10   Defendant temporarily succeeds in duping a series of

10:06:49  11   doctors about his mental condition, but that he does

10:06:51  12   that while still living a remarkably

10:06:55  13   high-functioning life.

10:06:55  14               So the search warrant happens on

10:06:58  15   September 5, 2018.  The next day while on a remote

10:07:04  16   Alaskan fishing trip, the Defendant sends a detailed

10:07:08  17   e-mail to his urologist seeking an appointment.  You

10:07:11  18   will learn that appointment happens the following

10:07:13  19   week.  At that appointment, the Defendant's

10:07:16  20   urologist is the first doctor to notice anything

10:07:19  21   wrong with the Defendant's mental health.

10:07:22  22               Now, in their reports, the Defense

10:07:25  23   experts try to point to May 3, 2017, e-mail that the

10:07:29  24   Defendant sent to Dr. Stuart Yudofsky.  What they

10:07:32  25   say in their reports is that that's evidence the

```
10:07:34   1   Defendant had symptoms prior to the warrant.
10:07:38   2              And the Defendant has even made
10:07:40   3   that e-mail Defense Exhibit 1.  But you are going to
10:07:43   4   hear that despite being the recipient of more than
10:07:46   5   $25 million from the Defendant, after receiving that
10:07:49   6   e-mail, Dr. Yudofsky did no examination, he ran no
10:07:52   7   tests, he made no referral.  He and the Defendant
10:07:56   8   never even mentioned it to each other again until
10:07:59   9   after the search warrant.
10:08:00  10              You will also hear from the Defense
10:08:02  11   general practitioner, Dr. Scott Lisse.  Dr. Lisse
10:08:07  12   saw the Defendant multiple times between the
10:08:09  13   Yudofsky e-mail and the search warrant.  The
10:08:12  14   Defendant does not raise any memory issues to
10:08:15  15   Dr. Lisse.  You'll hear the Defendant has planted
10:08:19  16   correspondence in the past, including correspondence
10:08:21  17   to Dr. Yudofsky.
10:08:25  18              Now, the urologist's observation of
10:08:28  19   the Defendant sets off of a flurry of tests that
10:08:31  20   bring us on the path we're on today.  After he sees
10:08:33  21   the urologist, he starts to be examined by a series
10:08:36  22   of doctors all associated with Baylor University.
10:08:39  23   Based on what he demonstrates in the exam room to
10:08:42  24   those doctors, their diagnosis is very serious.
10:08:46  25   They say it's either Lewy bodies or Parkinsonism
```

10:08:50  1  dementia.  That's based on what he tells them in the

10:08:53  2  exam room.

10:08:54  3          You will hear that on January 30th,

10:08:55  4  Dr. Joseph Jankovic concluded the Defendant was

10:09:00  5  unable to respond accurately or appropriately to

10:09:02  6  questions.  He was unable to recall information.  A

10:09:04  7  couple months later on March 1, 2019, Defendant is

10:09:08  8  examined by Dr. Michele York.  During that exam he

10:09:12  9  claims to not even be able to recognize the word

10:09:15  10  "T-W-O," two.  He doesn't recognize that as a word.

10:09:19  11  He claims he's having a hallucination in the

10:09:21  12  doctor's office with Dr. York.

10:09:24  13          Based on that, Dr. York diagnoses

10:09:26  14  him in March of 2019 with mild to moderate dementia.

10:09:31  15  She says that the Defendant's processing speed is

10:09:34  16  extremely slow, and she warns him to refrain from

10:09:39  17  cooking or driving, because he could be a danger to

10:09:43  18  himself or others.

10:09:46  19          By December, the Defendant and his

10:09:49  20  wife are back in front of Dr. York.  They tell that

10:09:51  21  it's gotten worse.  In fact, by that point the

10:09:52  22  Defendant can't use a remote control.  He doesn't

10:09:55  23  understand how to tie a tie.  By the end of 2019,

10:09:59  24  all of these doctors associated with Baylor

10:10:01  25  University have concluded that the Defendant has

10:10:04    1    dementia severe enough that he's not competent to
10:10:07    2    stand trial.
10:10:09    3               Why did they deliver such serious
10:10:12    4    diagnoses?  Because they were doing what any
10:10:14    5    reasonable doctor would do, they would trust that
10:10:18    6    their patient was telling them the truth.  But as
10:10:21    7    you are going to see over the next few days, sadly
10:10:24    8    that's not an assumption you can make when it comes
10:10:26    9    to this patient.
10:10:29   10               What you are going to see is that
10:10:30   11    the picture he's painting inside the exam rooms is
10:10:33   12    entirely inconsistent with the life he continues to
10:10:36   13    lead outside the doctor's office.
10:10:38   14               Two weeks before Dr. Jankovic
10:10:41   15    concludes the Defendant is unable to respond
10:10:44   16    appropriately to questions or recall information.
10:10:45   17    You are going to hear that he sat for two days of
10:10:47   18    testimony in a complex anti-trust matter.  We're
10:10:52   19    going to show you video of that deposition, and you
10:10:54   20    will hear from the attorney that took it.
10:10:57   21               That attorney will tell you he
10:10:59   22    never got any sign that the Defendant was unable to
10:11:02   23    speak accurately, and that he -- that -- sorry, that
10:11:07   24    are there was no sign that he -- any inability to
10:11:10   25    speak accurately, and he's going to tell you that he

10:11:12  1  viewed the Defendant as among the strongest people

10:11:15  2  he had ever deposed.

10:11:17  3              Now, March 1st again is when

10:11:22  4  Dr. York first diagnoses the Defendant with

10:11:24  5  dementia.  Six months after that diagnosis -- six

10:11:28  6  months after the Defendant can't recognize the word

10:11:31  7  two, and is having hallucinations in the exam room,

10:11:34  8  he sits for another two-day deposition in an FTC

10:11:38  9  proceeding.  You'll hear that at that proceeding,

10:11:41  10  neither the Defendant nor his lawyers raised any

10:11:44  11  concerns with his ability to proceed.

10:11:45  12              They did not tell the FTC lawyers

10:11:48  13  he had been diagnosed with dementia, and that for

10:11:50  14  two days he answered questions, he reviewed e-mails,

10:11:53  15  he gave substantive answers in that deposition.

10:11:57  16              And while the Defendant is telling

10:11:59  17  Dr. York he can't tie a tie or understand how to use

10:12:02  18  a remote control, you'll see from his own e-mails

10:12:05  19  he's continuing to use guns throughout 2019 and

10:12:09  20  2020, including shotguns and assault rifles.

10:12:13  21              Most significantly, the evidence is

10:12:15  22  going to show that despite these diagnoses, despite

10:12:18  23  what he's telling doctors and lawyers, the Defendant

10:12:21  24  is remaining at the helm of his 5,000-person,

10:12:24  25  multibillion dollar international software company.

1    You will hear from two of his executives.  And

2    they'll tell you, sure, the Defendant was aging.

3    "We noticed signs of that," but he was not showing

4    the serious incapacity that the Defendant was

5    claiming to his doctors.

6              You will also see he doesn't remain

7    at the helm of his company simply out of inertia.

8    In June of 2020, 15 months after Dr. York's

9    diagnosis, two months after the Defendant's

10   attorneys tell the Government he is so incapacitated

11   he shouldn't even be indicted, the Defendant

12   reorganizes the entire executive leadership of the

13   company.  He moves certain executives up to

14   president, and moves others around and creates an

15   executive committee.  But despite this

16   re-organization, despite what he's telling his

17   doctors and lawyers, the Defendant is remaining as

18   chairman and CEO.  He remained in that role until

19   after his indictment was unsealed in this case.

20             It is clear from the Defendant's

21   life outside the exam room that he's deceiving the

22   doctors inside the exam room, and that he has the

23   ability to deceive even trained medical

24   professionals about his true cognitive ability.

25             I think it'll be clear to you by

November of 2020, the Defendant demonstrated both
the motivation and capacity to malinger.  Our
experts are going to tell you that you have to
consider that when evaluating his performance on the
medical exam that the Court ordered in this case,
and that makes sense.  The Defendant wants to show
you just narrowly what's happening in the exam room.
That's the only thing you should consider.

He wants you to narrow your focus,
because if you do that you'll find the same thing
they did.  You'll give the Defendant a diagnosis
based on his deception.  But we're going to show you
imaging of the Defendant's brain.  It's one of the
only pieces that you can't fake; right?  It's like
an objective medical test.  And our experts will say
while they indicate early signs of Alzheimer's
disease, they're inconsistent with the advanced,
severe dementia the Defendant is trying to portray.

Our experts are also going to ask
you to look at the timeline in this case.  You'll
see that the Defendant's cognitive test scores from
2019 through 2021 are remarkably consistent.  Our
experts are going to tell you that doesn't really
make a lot of sense.  Because if the Defendant truly
has progressive dementia, his test scores should be

10:14:54  1  getting worse.

10:14:55  2          He should be scoring worse on

10:14:57  3  cognitive tests in 2021 than he was scoring in 2019

10:15:00  4  when he's sitting for depositions giving speeches

10:15:02  5  and running his company, but that's not what

10:15:04  6  happened.  The test scores remained the same,

10:15:08  7  because the Defendant is faking the results.

10:15:11  8          You'll hear testimony and see video

10:15:13  9  about the Defendant's May, 2021 exam by the

10:15:16  10  Government's experts.  They'll tell you once again

10:15:20  11  the Defendant's performance on psychiatric tests was

10:15:22  12  totally inconsistent with his real-world

10:15:26  13  performance.  Dr. Robert Denney did the psychiatric

10:15:29  14  exams in this case.  He tested the Defendant on

10:15:31  15  May 2021.

10:15:33  16          He's going to tell you the

10:15:34  17  Defendant's performance was implausibly poor.  That

10:15:37  18  on one exam, the Defendant did worse than he would

10:15:40  19  have done 92 times out of a 100 if he had been

10:15:43  20  blindfolded.  On another exam, the Defendant scored

10:15:47  21  worse than -- on a a demographic and age-adjusted

10:15:50  22  basis than 99.9 percent of patients.

10:15:53  23          That on a memory test, the

10:15:56  24  Defendant got the lowest score Dr. Denney has ever

10:15:59  25  seen in 21 years of administering the test.  You'll

1  hear from the Government's experts that these scores

2  are so low that it's almost impossible the Defendant

3  was not exaggerating his symptoms.

4           We're going to show you video of

5  that test.  The interview portion that was conducted

6  the same day.  You will see the Defendant is in

7  control of the facts.  He talked about the case.  He

8  talks about the possible defenses.  He raises the

9  potential defenses to the case on his own.

10           He'll say the cooperators are lying

11  to try to save their necks.  He's going to say that

12  Mr. Tamine manufactured the documents that were

13  given to the Government, or that other documents say

14  that the Defendant's not in control of the trust.

15  These are not the statements of a person who is so

16  incapacitated he needs almost constant care.

17           That's what Dr. Denney and

18  Dr. Dietz are going to tell you are what his scores

19  are purportedly showing.  His competence in May is

20  going to be nearly impossible to dispute, and our

21  experts will tell you that that's important for two

22  reasons.

23           First, if he's competent in May,

24  that means he managed to fool all of the doctors and

25  lawyers that said he was incompetent for years prior

1    to that exam.

2              Second, his condition in May is

3    instructive of his condition today.  These diseases

4    have well-known progressions, and the Defendant --

5    what the Defendant is trying to portray to this

6    Court is simply inconsistent with a known path that

7    these diseases take.

8              Now, following that exam, the

9    Government experts -- they write-up their findings.

10   They say why they believe the Defendant is faking,

11   and how they intend to demonstrate that he's faking.

12   They write it in a report that's given over to the

13   Defendant.  Now, after he gets that report, he's

14   examined again by his doctors in July.

15             You will see the performance on the

16   May exam versus the July exam are 180 degrees

17   different.  And, Judge, to be clear, the Defendant

18   was hospitalized in June.  So what you are going to

19   have to decide by the end of the hearing is whether

20   his more recent performance is a genuine decline

21   because of that hospitalization, or if the Defendant

22   realized he didn't fool the Government's experts, so

23   he's going to have to step his game up.  The

24   Government experts will tell you why they believe

25   it's the second one, why they believe the Defendant

1  continues to malinger.

2          First, the Defendant is going to

3  continue to fail what are called internal-validity

4  tests, or malingering tests, throughout October.

5  These tests are designed to determine the amount --

6  whether a person is giving a genuine effort on the

7  rest of the psychiatric tests.  The Defendant failed

8  the tests given by Dr. Denney in May and October,

9  and even failed the tests given by his own experts

10  in July.  And one of the things you are going to

11  hear is these are designed to have a low, false

12  positive rate.  So the fact that he's failing these

13  tests at all is indicative of the fact that he's not

14  giving his full effort.

15          Second our experts are going to

16  tell you the progression of the Defendant's alleged

17  symptoms are inconsistent with genuine illness.

18          Third, the fact that the Defendant

19  continues to exaggerate his symptoms, even today, is

20  itself evidence of the fact that he is competent to

21  stand trial.  Over the course of this week, the

22  Defendant will ask you to focus only on what happens

23  in the exam.

24          We ask you to take a broader view.

25  Unlike his doctors, do not take the Defendant's

10:19:20  1    words simply at face value.  We're going to ask you

10:19:22  2    to look at the whole picture of his years of

10:19:24  3    deceitful conduct about his medical symptoms.  And

10:19:28  4    the evidence is going to show when you do that, the

10:19:32  5    Defendant had the motivation to malinger, the

10:19:34  6    capacity to malinger, and is malingering.

10:19:37  7                    Thank you, Your Honor.

10:19:38  8                    THE COURT:  Thank you, Counsel.

10:19:50  9                    MS. KENEALLY:  Good morning, Your

10:19:51  10   Honor.

10:19:51  11                   THE COURT:  Good morning.  You may

10:19:52  12   proceed when ready.

10:19:54  13                   MS. KENEALLY:  Thank you.  Before I

10:19:55  14   start, I do want to introduce one more person in the

10:19:57  15   courtroom, Mrs. Dorothy Brockman is in the row

10:20:03  16   behind the well of the Court.  Mrs. Brockman will

10:20:07  17   not be able to stay through the proceedings.  Her

10:20:09  18   doctor has recommended that she not subject her back

10:20:12  19   to the court seats.

10:20:14  20                   Um, but I did want to introduce --

10:20:24  21   sorry, I'm Kathy Keneally, and I have represented

10:20:27  22   Mr. Brockman since 2018, along with my firm.

10:20:30  23                   THE COURT:  Okay.

10:20:31  24                   MS. KENEALLY:  There's only one issue

10:20:33  25   before the Court at this hearing, can Bob Brockman

10:20:37  1   today understand the criminal proceedings brought

10:20:40  2   against him and assist his counsel in his defense.

10:20:46  3              The Supreme Court said in *Dusky v*

10:20:48  4   *United States*, does Bob have the sufficient

10:20:52  5   presentability to consult with his lawyers with a

10:20:54  6   reasonable degree of rational understanding?  Can

10:20:58  7   Bob today going forward participate in a meaningful

10:21:01  8   way in his defense?

10:21:02  9              He cannot.  I agree with the

10:21:05  10  Government.  This is a complicated case.  It's the

10:21:08  11  most complicated tax case I've ever seen.  The

10:21:11  12  charges in the indictment cover nearly 40 years.

10:21:14  13  The allegations, again as the Government says, track

10:21:18  14  back to a trust, The A. Eugene Brockman Charitable

10:21:22  15  Trust -- which I usually hear referred to as the

10:21:25  16  "AEBCT" -- Bob's father settled in 1981.

10:21:29  17              There's nothing wrong with setting

10:21:30  18  up a trust like The A. Eugene Brockman Charitable

10:21:33  19  Trust.  We talk a lot about offshore trusts, but

10:21:36  20  this trust is of a kind that is used by state

10:21:39  21  players.  And they talk about offshore assets, but

10:21:44  22  the main asset of this trust is the Reynolds and

10:21:48  23  Reynolds Company, and this corporate structure above

10:21:50  24  the Reynolds and Reynolds Company which are all US

10:21:54  25  companies.  This is a company -- they talk about the

10:21:56   1   thousands of people that work for the company.

10:21:58   2   Those people work in Houston and Dayton, Ohio.

10:22:07   3                    Tax crimes are different from most

10:22:09   4   other crimes.  The criminal statutes require proof

10:22:12   5   of specific intent, voluntary and intentional

10:22:14   6   violation of a known-legal duty.  There are defenses

10:22:18   7   to the charges in the indictment.  To some degree, I

10:22:21   8   felt like I was hearing the opening statement of the

10:22:23   9   trial itself this morning.  Bob can't help us in

10:22:29   10   making those defenses.  Bob can't defend himself.

10:22:37   11                    Bob Brockman has dementia.  Bob

10:22:41   12   doesn't remember what I tell him from one call to

10:22:43   13   the next.  I've explained legal issues to Bob and

10:22:46   14   he's agreed to a course of action, and then three

10:22:50   15   days later he didn't remember the discussion or the

10:22:53   16   decision.

10:22:56   17                    I've talked with Bob with each

10:22:57   18   conference, before and after the Court while on the

10:22:59   19   screen.  I talked to him before and tell him what's

10:23:01   20   going to happen.  I speak to him after.  He doesn't

10:23:04   21   remember what I told him ahead of the conference.

10:23:07   22   He doesn't understand what happened.

10:23:11   23                    The Government talks about the

10:23:14   24   timeline, talks about the events of 2019, the search

10:23:20   25   warrant, the phone calls, the trip.  We're not in

10:23:25   1   2019.  We're in late 2021.

10:23:28   2              Again, the question is can Bob

10:23:31   3   Brockman assist today going forward through trial in

10:23:34   4   this case?  There are some things the medical

10:23:39   5   witnesses agree on, on both sides.  They agree that

10:23:42   6   Bob Brockman has Parkinson's disease.  Parkinson's

10:23:46   7   is a progressive, neurodegenerative disease.

10:23:52   8   Parkinson's does not equate to dementia, but experts

10:23:54   9   will tell you dementia is a very common symptom of

10:23:57   10  Parkinson's.

10:23:58   11             In addition to Parkinson's

10:23:59   12  dementia, experts will testify this week and tell

10:24:02   13  the Court there's objective neuroimaging that

10:24:05   14  supports that Bob also has Alzheimer's dementia.

10:24:08   15  Alzheimer's dementia, like Parkinson's, is

10:24:11   16  permanent, progressive and incurable.  Experts on

10:24:17   17  both sides agree that Bob has some degree of

10:24:20   18  cognitive impairment.

10:24:21   19             The experts agree it's progressive,

10:24:26   20  and experts on both sides agree it's progressed.  If

10:24:30   21  you look at the expert reports, they agree it's

10:24:32   22  gotten worse from the time he was examined in May,

10:24:35   23  to the time he was examined in October.

10:24:38   24             Now, the -- Mr. Langston spoke

10:24:42   25  about the tests that were done in July.  If the

Court remembers, we were here in July.  We said Bob had recently been hospitalized for sepsis, which resulted in delirium.  We raised the issues, are those tests going to be affected by that hospitalization?  We're not here talking about the July tests.  He's been reexamined by both sides in October.

So there's been progression, and progression from May to October.  Nobody's here saying -- happened immediately after the sepsis and delirium.

Well, it's happening today.  So the issue is Bob's current cognitive limitations.  The Government says he's exaggerating.  Not that he isn't to some degree impaired, but they contend from an already-impaired state he's faking or exaggerating symptoms.  Not that Bob Brockman of five or ten years ago, but Bob Brockman who already has Parkinson's, and some degree of cognitive impairment -- they're saying still he's faking it.

One of the Government's experts acknowledges that for Bob to fool multiple and treating physicians, along with friends, family and lawyers, would be a Herculean task.  The objective evidence refutes this is what's happening.

10:26:05    1              There are neuroimaging reports.
10:26:08    2   We're going to talk a lot I'm sure over the next
10:26:10    3   week about the neuroimaging reports.  The
10:26:13    4   neuroimaging reports show results consistent with
10:26:16    5   Alzheimer's.  In many cases, the cause of dementia
10:26:20    6   is elusive, and can only be determined postmortem.
10:26:24    7              That's not this case.  In Bob's
10:26:26    8   case, we have concrete, objective, cannot-be-faked
10:26:32    9   neuroimaging reports.  In addition to the
10:26:37   10   neuroradiology experts -- both sides have
10:26:42   11   neuroradiologist experts -- the doctors who analyze
10:26:45   12   the PET scans, those doctors -- both sides plan to
10:26:48   13   call neuropsychiatrists and psychiatrists as
10:26:51   14   witnesses.  So I'm going to take a few minutes to
10:26:53   15   talk about other specialists and get back to the
10:26:56   16   neuroradiologists.
10:26:57   17              Medical experts that the Defense
10:27:01   18   will call address the questions each from those
10:27:06   19   specialities:  Neuropsychology, psychiatry,
10:27:11   20   neurology.  They come to the same conclusion.
10:27:17   21              Dr. Wisniewski, a neurologist who
10:27:17   22   is the director of the Alzheimer's Disease Center
10:27:21   23   NYU will testify that Bob has Parkinson's disease
10:27:25   24   dementia and co-occurring Alzheimer's disease.  In
10:27:29   25   other words, dementia resulting from Parkinson's

disease, and at the same time dementia resulting
from Alzheimer's.

Dr. Wisniewski will testify that
Bob's dementia is at a level that it significantly
impairs all activities of daily living, not just
working with us on this case.

Dr. Guilmette, a neuropsychologist
that we will call, agrees that Bob has Parkinson's
dementia.  He bases his conclusion on his
examination and neuropsychological testing of Bob
that's in the exam room.  He also relies on the
concrete evidence of the neuroimaging.

Dr. Guilmette, in his report,
stated that structural and functional neurodata --
neuroimaging data, which cannot be faked, provides
additional confirmation Mr. Brockman suffers from
genuine neurodegenerative disease -- not faking it.

Dr. Agronin, the psychiatrist the
Defense will call, specializes in treating geriatric
patients with neurocognitive disorders.  He
diagnosed Bob with Parkinson's dementia and possible
comorbidity for Alzheimer's dementia.

The medical experts rely on their
examinations of Bob.  They also rely on interviews
of Bob's wife, caregiver, friends, business

10:28:53   1   colleagues and lawyers.  They rely on objective --

10:28:57   2   medical imaging data.

10:29:00   3           So I'll talk for a few minutes

10:29:02   4   about the Government's experts.  The Government

10:29:04   5   retained a neurologist, Dr. Ryan Darby.  You've

10:29:08   6   heard about Dr. Darby, and we expect to hear from

10:29:14   7   him today.  Dr. Darby, in his supplemental report,

10:29:17   8   actually stated -- again, Bob was examined in May,

10:29:20   9   and then again by all of the experts in October.  In

10:29:24  10   May by the Government, and then all of the experts

10:29:26  11   in October.

10:29:27  12           He said that even Bob's recurring

10:29:31  13   history of hospitalization for delirium --

10:29:34  14   hospitalization this year for delirium, the natural

10:29:37  15   course of his disease, and the neuroimaging that

10:29:40  16   it's reasonable to conclude Bob has progressed to

10:29:45  17   the dementia state.  Then in his report we'll see

10:29:50  18   what he sees here, but in his report he says that

10:29:53  19   he's unable to determine whether Bob's cognitive

10:29:55  20   impairment is severe enough to make him incompetent

10:29:59  21   to assist in his defense.  That's the sole issue

10:30:02  22   before the Court.

10:30:06  23           The Government's neurologist in his

10:30:08  24   report has said that it is reasonable to conclude

10:30:11  25   Bob has dementia, and that he does not know whether

Bob's dementia has reached the stage where he cannot assist in his defense.  Dr. Darby also makes it clear we're only going in one direction here.  As I said earlier, Parkinson's disease dementia and Alzheimer's dementia are progressive.

Dr. Darby concludes Bob is at increased risk of progression over time.  It's going to get worse from here, due to his history of delirium.  The Government has the burden of proof on the issue of Bob's competency.  Dr. Darby's basically saying that in his medical opinion, their expert -- that that burden can't be met.

Again, from the beginning -- from the very beginning, the Government's position has been that Bob is malingering, faking his symptoms to avoid prosecution in everything they file.

The key witness for the Government on this issue is Dr. Robert Denney, a neuropsychologist who spent 20 years conducting examinations and testifying on behalf of the Bureau of Prisons.  Dr. Denney's conclusion, and listening -- we'll all listen to Dr. Denney -- is based on his subjective interpretation of certain tests that he performed and his personal observations of Bob.

He makes reference in his reports

10:31:30  1    to other testing and to Bob's medical history, but

10:31:34  2    glosses over or dismisses information in favor of

10:31:38  3    the subjective interpretation of his own testing,

10:31:40  4    and similarly dismisses Bob's life today, including

10:31:45  5    his wife and his attorneys.

10:31:48  6                    Then the Government's next witness,

10:31:50  7    the psychiatrist -- right -- neurologist --

10:31:54  8    neuropsychologist is Dr. Dietz, a forensic

10:32:00  9    psychologist.  Dr. Dietz -- Dr. Dietz has actually

10:32:04  10   had three different expert reports, three different

10:32:07  11   opinions.  The first report -- the one filed in June

10:32:11  12   based on the examinations in May found not com --

10:32:16  13   competent.

10:32:16  14                   In his supplemental report,

10:32:18  15   Dr. Dietz said he could not -- supplemental report

10:32:21  16   Dr. Dietz said that the brain imaging studies, the

10:32:24  17   PET scans are the most objective evidence, and he

10:32:27  18   acknowledged that they are consistent with

10:32:29  19   Alzheimer's.  At that point, he's in agreement with

10:32:33  20   the Defense's experts.  He also acknowledged that

10:32:39  21   Bob's recent infections and episodes of delirium --

10:32:43  22   again events of this year -- this is a quote, "Throw

10:32:46  23   into question Mr. Brockman's current cognitive

10:32:48  24   abilities, and those aspects of competence to stand

10:32:51  25   trial that require short-term memory."

10:32:54  1          That's their expert.  And it's

10:32:56  2  Dr. Dietz -- and we raised this with the Court

10:32:59  3  previously, it's Dr. Dietz who said to be faking it

10:33:03  4  at this level -- for Bob to be faking and his

10:33:06  5  treating doctors, doctors at Baylor, Houston

10:33:11  6  Methodist, family, friends, lawyers, would be a

10:33:15  7  Herculean task.

10:33:18  8          Dr. Darby -- Dr. Dietz's

10:33:21  9  supplemental report also said he couldn't reach

10:33:24  10  vital conclusion.  Five days later, Dr. Dietz

10:33:27  11  changed his mind issuing an opinion that he had

10:33:31  12  recently reviewed Dr. Denney's supplemental report,

10:33:33  13  and essentially adopts its conclusions.  In other

10:33:36  14  words, Dr. Dietz's conclusions result on

10:33:40  15  Dr. Denney's conclusions.

10:33:43  16          Dr. Dietz is a high-profile,

10:33:46  17  somewhat what of a celebrity witness.  He's

10:33:50  18  testified in a number of high-profile insanity

10:33:53  19  cases.  It's our submission that he's not a

10:33:56  20  geriatric psychiatrist.  This is not his field of

10:34:01  21  expertise.  He doesn't reach a conclusion in one

10:34:04  22  report, and the next report he switches to rely on

10:34:07  23  Dr. Denney's conclusion.

10:34:08  24          So as promised, that brings me back

10:34:10  25  to the neuroradiologist.  Again, that's where I

10:34:15   1   think both sides agree can't be faked to the image

10:34:19   2   of the brain.

10:34:20   3            Dr. Christopher Whitlow, our

10:34:23   4   expert, looked at the neuroimaging studies of Bob's

10:34:27   5   Brain.  Both parties ordered -- asked for a number

10:34:30   6   of them.  He focused on three.  Two of them are

10:34:38   7   FDG-PET scans that Government asked for in March.

10:34:43   8   One is an amyloid PET scan done in July.

10:34:46   9            They form the basis of his opinion

10:34:49   10   that Bob has Alzheimer's disease, as well as

10:34:51   11   Parkinson's disease dementia, it's objective

10:34:54   12   neuroimaging.

10:34:55   13            Historically -- I think we know

10:35:01   14   this -- the causes of dementia could not be

10:35:03   15   determined in many cases in a living patient, but

10:35:08   16   there's a body of data now available from postmortem

10:35:11   17   studies where you can compare the tests done now

10:35:14   18   with -- with what you can learn from the postmortem

10:35:18   19   studies.

10:35:19   20            There's a recent significant study

10:35:21   21   Dr. Whitlow will discuss that show when the results

10:35:24   22   of an amyloid PET scan and FDG-PET for the same

10:35:29   23   individual in combination show results consistent

10:35:31   24   with Alzheimer's that there's -- those results

10:35:34   25   correlate nearly 100 percent with the postmortem

studies of patients with Alzheimer's.

Now, I'm going to leave it to Dr. Whitlow to explain what an amyloid PET scan and an FDG-PET scan is, and how if you look at the two of them together the key point is that the results of PET scans done on Bob's brain show objective results that he has Alzheimer's disease.  Again, progressive and incurable.

The Government -- we talked about Dr. Ponisio this morning whether she'll be called as a witness or not.  The reason there's been discussion about Dr. Ponisio, their expert, is that her report says that the neuroimaging data is also consistent with a finding of Alzheimer's dementia. There's a lot of lining up here on what's going on. That's a lot of medical evidence about how Bob is today.  In response, the Government wants us to look backwards.

The Government's witness list includes Evatt Tamine -- I've always known it as Tamine, but Evatt Tamine is individual one in the indictment.  The Government's acknowledged that.  He also has had no communication with Mr. Brockman for over three years.

Another witness is Craig Moss, the

former CFO of Reynolds and Reynolds, company in Houston and Ohio, a company from which Bob fully retired a year ago.  And there's Michael Nemelka and Dana Abrahamsen, two attorneys who deposed Bob in 2019.

The Government recently did add Dr. Scott Lisse, again a doctor who has not seen Bob in three years, and apparently doesn't remember. These witnesses cannot answer the question, how is Bob today, today and going forward?  Can Bob understand the criminal proceedings brought against him and assist us in his defense?

The Government talks about the exam room.  It's not just the exam room.  The Defense will call testimony from people on Bob's side today. There's Dr. Eugene Lai, director of the Neurodegenerative Disease Clinic at Houston Methodist.  There's been some question about Bob's donations to Baylor, and whether that -- whether those donations actually come from Bob or the trust.

Put that aside.  Dr. Lai is at Houston Methodist.  He's Bob's treating physician today for Parkinson's.  He was originally on our list and the Government's list as a witness.  He examined Bob in early October.  He diagnosed

10:38:20  1    dementia.  He came off their witness list.

10:38:24  2                    Then the remaining medical expert

10:38:26  3    that will be called is Dr. James Pool.  He's on both

10:38:32  4    sides' lists.  He's Bob's primary care physician.

10:38:37  5                    Turning to the people who are in

10:38:40  6    Bob's life.  Dementia is insidious.  Steals

10:38:51  7    memories.  Undercuts ability to reason, and it

10:38:55  8    pervades a person's life.  That's what we're talking

10:38:58  9    about here.

10:38:58  10                   Dementia doesn't manifest the same

10:39:01  11   way in every individual.  Bob's case -- he may still

10:39:05  12   appear able to carry on a conversation, talk about

10:39:09  13   long ago events, or the company he built and ran for

10:39:12  14   decades.  Doctors are going to tell you this week

10:39:15  15   that does not mean he can currently understand,

10:39:18  16   reason, or remember.

10:39:20  17                   This is something -- the doctor's

10:39:22  18   are going to explain medical terms, but this is also

10:39:25  19   something that the people close to Bob can describe,

10:39:28  20   people outside the exam room.  Defense plans to call

10:39:34  21   Frank Gutierrez.  The parties have agreed

10:39:37  22   Mr. Gutierrez is here in the courtroom.  He's Bob's

10:39:40  23   caregiver.  He sees him on a daily basis.

10:39:44  24                   He can speak to how Bob forgets

10:39:46  25   where he is, how he thinks the house he lives in is

not his home, but that his real home is some other
place people are keeping secret from him.  How he
gets up and starts to get ready for work at a job he
hasn't held in over a year.  How he packs for
fishing trips that nobody can take him on anymore.
That's what Mr. Gutierrez will tell you about.

Defense also plans to call Reverend
Jackson.  Reverend Jackson has known Bob since 1994.
They first met when Bob was a congregate in his
church.  Mr. Jackson went to work for Reynolds and
Reynolds, the company we talked about, the US
company owned by this trust.  Serving as executive,
he can speak to how he's watched Bob's physical and
mental deterioration and the impact on Bob's life
today.

Defense also plans to call Stephen
Slade.  Not another medical witness, but somebody
who has known Bob for over 30 years.  They were
fishing buddies.  They're friends today.  Dr. Slade
has watched Bob's dementia progress, and can explain
how his friend is becoming lost to him and also to
himself.

So the people in Bob's life today,
not in the exam room -- these are people who see
him.  This is the man who takes care of him.

10:41:15   1          I need to mention one other

10:41:17   2   potential witness.  On Friday, the Government told

10:41:19   3   us for the first time they had a Tommy Barris

10:41:24   4   (phonetic) to their witness list.  One fact witness

10:41:26   5   on their list who has seen Bob this year.  If the

10:41:31   6   Government actually calls Tommy Barris, ask the

10:41:35   7   Court to listen to what he has to say about how Bob

10:41:37   8   is today.

10:41:38   9          I'm going to end where I started.

10:41:43   10  Objective evidence -- neuroimaging report shows that

10:41:46   11  Bob has dementia.  The witnesses who have seen Bob

10:41:50   12  this year in the last few months -- last few days --

10:41:54   13  treating doctors, friends, caregiver and his lawyers

10:41:59   14  corroborate what the Defense medical experts will

10:42:02   15  tell you.  Bob's dementia -- again, progressive,

10:42:07   16  incurable, has gone beyond the point where he can

10:42:09   17  assist in his defense.

10:42:12   18          The right to defend oneself in a

10:42:17   19  criminal case is fundamental to due process and to

10:42:22   20  other constitutional rights.  As attorneys, we need

10:42:27   21  Bob to understand -- to help us understand the

10:42:30   22  complex structures and transactions that spanned

10:42:33   23  nearly 40 years, to assist us in understanding

10:42:37   24  documents and statements of other witnesses, and to

10:42:38   25  put those things in context, to follow the

10:42:41   1   proceedings in the court, to recognize discrepancies

10:42:45   2   in witness testimony, and fundamentally be able to

10:42:48   3   provide testimony or to make the decision not to

10:42:51   4   testify.

10:42:54   5           So we as lawyers need from our

10:42:56   6   client -- and that's what he has a right to offer in

10:42:59   7   his defense.  As I described at the beginning, Bob

10:43:06   8   can't follow these proceedings.  He's past being

10:43:09   9   able to understand what it means to testify, let

10:43:11   10  alone remember that he made the decision whether to

10:43:14   11  testify or not.  Bob Brockman can't defend himself.

10:43:20   12  Dementia has stolen that from him and much more.

10:43:25   13          Thank you.

10:43:25   14          THE COURT:  Thank you, Counsel.

10:43:34   15          Government may call its first

10:43:36   16  witness.

10:43:37   17          MR. MAGNANI:  Thank you, Your Honor.

10:43:38   18  The United States calls Dr. Ryan Darby.

10:43:40   19          THE COURT:  Okay.  Dr. Darby, if you

10:43:43   20  could step forward.  Good morning, if you could

10:43:51   21  raise your right hand, Dr. Darby.

10:43:53   22

           23                  ///

           24                  ///

           25                  ///

|        |    |                                              |
|--------|----|----------------------------------------------|
| 10:43:53 | 1  | <u>RYAN DARBY,</u>                          |
| 10:43:53 | 2  | (For the Government)                        |
| 10:43:53 | 3  | called as a Witness, having been duly       |
| 10:43:53 | 4  | and regularly sworn, testified as follows:  |
| 10:43:59 | 5  | THE WITNESS:  I do.                          |
| 10:44:00 | 6  | THE COURT:  You may take the stand,          |
| 10:44:01 | 7  | sir.                                         |
| 10:44:01 | 8  | <u>DIRECT EXAMINATION</u>                   |
| 10:44:01 | 9  | BY MR. MAGNANI:                             |
| 10:44:21 | 10 | Q.   Thank you, Your Honor.                 |
| 10:44:22 | 11 | Dr. Darby, what do you do for a             |
| 10:44:28 | 12 | living?                                      |
| 10:44:28 | 13 | A.   I'm a behavioral neurologist.          |
| 10:44:31 | 14 | Q.   What is that?                          |
| 10:44:32 | 15 | A.   Well, it's -- it's two things, actually.  So as |
| 10:44:35 | 16 | a neurologist, I see and evaluate patients with |
| 10:44:39 | 17 | diseases of the nervous system.  So that includes |
| 10:44:42 | 18 | everything extending from the peripheral nerves in |
| 10:44:45 | 19 | the body, through the spinal cord and into the |
| 10:44:47 | 20 | brain.                                       |
| 10:44:47 | 21 | And then, as a behavioral          |
| 10:44:49 | 22 | neurologist I specialize in cognitive disorders, so |
| 10:44:52 | 23 | disorders that affect thinking, memory, language, |
| 10:44:56 | 24 | decision-making.                            |
| 10:44:58 | 25 | Q.   What education qualifies you to be a behavioral |

10:45:01  1   neurologist?

10:45:02  2   **A.**   Well, I first received degree in psychology and

10:45:06  3   neuroscience from Princeton, and that's where my

10:45:09  4   interests in the nervous system began.  Then went to

10:45:11  5   medical school at Vanderbilt, where I received my

10:45:14  6   training in medical education and specialized in

10:45:17  7   neurology.

10:45:18  8            So I did a three-year residency

10:45:20  9   program at the Harvard Massachusetts General and

10:45:24  10  Brigham Women's Hospital Program.  This is where I

10:45:26  11  really learned how to diagnose and manage patients

10:45:29  12  with diseases that can affect the nervous system, so

10:45:32  13  that includes everything from strokes, tumors,

10:45:36  14  inflammatory disorders, and the disorders that we'll

10:45:39  15  be talking about today, including Parkinson's and

10:45:41  16  dementias.

10:45:43  17           I then went on to specialize in

10:45:45  18  those disorders specifically.  So I did a two-year

10:45:48  19  fellowship in behavioral neurology at the Harvard

10:45:53  20  Beth Israel Program, and then after that was hired

10:45:54  21  as an assistant professor of neurology at

10:46:00  22  Vanderbilt.  So I've been in that role for about

10:46:02  23  four and a half years now.

10:46:04  24           At Vanderbilt, I am the director of

10:46:06  25  the Frontotemporal Dementia Clinic, also a faculty

10:46:11   1   member in the Memory and Alzheimer's Center in the

10:46:14   2   Bioethics Department and the Vanderbilt Brain

10:46:17   3   Institute.

10:46:17   4   **Q.**   So that's your educational credentials, but

10:46:22   5   what do you actually do at Vanderbilt?

10:46:23   6   **A.**   I do a number of different things.  So I see

10:46:26   7   patients clinically.  So I evaluate patients with

10:46:29   8   clinically presenting memory problems, cognitive

10:46:32   9   disorders.  I also do research.

10:46:35   10              So my research focuses on

10:46:38   11   understanding the relationship between brain damage,

10:46:41   12   so neurological diseases and behavior, so whatever

10:46:45   13   symptoms the patient has.  And I focus on using

10:46:48   14   different types of MRI scans to do that research.  I

10:46:53   15   also do research in dementia patients where I

10:46:56   16   evaluate them longitudinally to see how their

10:46:59   17   diseases progress and change over time.

10:47:02   18              I'm involved in teaching at the

10:47:03   19   medical center, so that involves clinical teaching.

10:47:05   20   I'll have medical students, residents, and fellows

10:47:08   21   who will rotate through -- with me in clinic where

10:47:11   22   we'll see patients together and discuss the

10:47:13   23   different diagnoses and tests.

10:47:15   24              It also includes teaching in the

10:47:18   25   research setting where I'll have undergraduate

10:47:21  1   students, graduate students, post-doctoral students

10:47:24  2   interested in neuroimaging research, and then giving

10:47:27  3   lectures to kind of students, but also to other

10:47:31  4   neurologists who don't have the same training and

10:47:33  5   background in cognitive disorders.

10:47:36  6   Q.   Do you do any -- well, let me ask it this way.

10:47:40  7   Would you describe yourself as a professional

10:47:45  8   testifier?

10:47:46  9   A.   No, I've testified once before, but I do some

10:47:50  10  forensic work.  So about ten percent of my time is

10:47:53  11  spent doing forensic cases.

10:47:55  12  Q.   Now, just generally, what's the focus of your

10:47:58  13  clinical work?  Can you talk about the types of

10:48:00  14  diseases that you see in your clinical practice?

10:48:02  15  A.   Yeah, and so my clinical practice focuses on

10:48:05  16  patients with cognitive disorders.  So by far, the

10:48:08  17  most common reason and the most common thing I'm

10:48:11  18  evaluating for is dementia, mild cognitive

10:48:15  19  impairment, and determining the different types of

10:48:17  20  dementia that may be present.

10:48:18  21  Q.   And have you -- are you active in any

10:48:24  22  professional organizations in your field?

10:48:25  23  A.   I am.  So I'm a member of a number of

10:48:28  24  professional groups, including the American Academy

10:48:32  25  of Neurology, American Neurological Association,

```
10:48:35   1   Alzheimer's Associations, and the American
10:48:38   2   Neuropsychiatric Association.
10:48:40   3   Q.   Have you received honors or awards for your
10:48:43   4   work?
10:48:43   5   A.   I have.  So I have received awards from the
10:48:45   6   American Academy of Neurology, the American
10:48:48   7   Neuropsychiatric Association, and the Alzheimer's
10:48:51   8   Disease for some of my work in behavioral neurology.
10:48:55   9            MR. MAGNANI:  Your Honor, at this time
10:48:56  10   move to qualify Dr. Ryan Darby as an expert in
10:49:01  11   diagnosing and treating cognitive and behavioral
10:49:04  12   dementias.
10:49:04  13            THE COURT:  Any objection?
10:49:06  14            MR. LOONAM:  No.  I don't know if
10:49:07  15   that'll be necessary for the experts going forward,
10:49:08  16   but, yes.
10:49:09  17            THE COURT:  Okay.  Then he is so
10:49:11  18   qualified.
10:49:12  19            MR. MAGNANI:
10:49:12  20   Q.   So Dr. Darby, let me ask you, do you --
10:49:18  21   qualified as an expert in this case -- are you
10:49:20  22   expert on competency-related law?
10:49:22  23   A.   No, so that's not something that I have
10:49:24  24   expertise in.  And so, I will counsel patients about
10:49:28  25   things like driving, financial decision-making, but
```

1   I don't have expertise in competency to stand trial.

2   Q.   What about specific legal burdens of proof?

3   A.   No, that's not something that I have background

4   or expertise in.

5   Q.   Did you write expert reports in this case?

6   A.   I did.

7              MR. MAGNANI:   Your Honor, I do believe

8   these have been pre-admitted, but I'll note for the

9   record -- would you like the witness to identify his

10  reports?

11             THE COURT:   They've already been

12  pre-admitted.  I don't need to have them identified.

13             MR. MAGNANI:   Very well.  I'll note for

14  the record these are Exhibits 38 and 39.

15  Q.   Before we proceed, did you prepare a PowerPoint

16  presentation for your testimony today?

17  A.   I did.  It's something that I typically find to

18  be helpful when I'm discussing these types of

19  issues.

20             MR. MAGNANI:   And, Your Honor --

21  Q.   Before this morning, was the PowerPoint

22  presentation something you created entirely on your

23  own?

24  A.   Yes, it is something that I created using some

25  of the references that were discussed earlier.

10:50:34  1          MR. MAGNANI:  And, Your Honor, I'd like

10:50:36  2   to put on this PowerPoint presentation.  I'm only

10:50:39  3   flagging that I made the redactions that Your Honor

10:50:41  4   requested this morning.

10:50:42  5          THE COURT:  Okay.  I'm going to allow

10:50:43  6   it as demonstrative evidence -- or demonstrative

10:50:47  7   exhibits, rather.

10:50:48  8          MR. MAGNANI:  Very well.  Does Your

10:50:50  9   Honor mind if I give the witness the clicker to

10:50:53  10  advance slides?

10:50:53  11         THE COURT:  Sure.  Not a problem.

10:51:11  12         MR. MAGNANI:

10:51:11  13  Q.   Okay.  Dr. Darby, so as an expert in diagnosing

10:51:14  14  and treating behavioral and cognitive dementias, can

10:51:17  15  you share with the Court your top-line conclusions,

10:51:22  16  expert opinions in this case?

10:51:23  17  A.   So I have three main opinions in this case.  So

10:51:27  18  the first opinion is regarding Mr. Brockman's

10:51:30  19  diagnosis.  So I believe that Mr. Brockman has a

10:51:33  20  diagnosis of Parkinson's disease.

10:51:36  21              I think it is also possible that he

10:51:38  22  has a diagnosis of Alzheimer's disease.  So the

10:51:43  23  second main conclusion I have is regarding the

10:51:45  24  severity of the cognitive problems that Mr. Brockman

10:51:48  25  has.

```
10:51:50    1                         And so, I think he is at the stage
10:51:52    2    of mild cognitive impairment.  I think it is
10:51:56    3    possible he could have progressed to the stage of
10:51:58    4    mild dementia, but he does not have moderate or
10:52:01    5    severe dementia.
10:52:07    6                         MR. LOONAM:  Objection.  This is not in
10:52:09    7    his expert report, Your Honor.  This is different
10:52:10    8    from his expert report.
10:52:12    9                         THE COURT:  Okay.
10:52:16   10                         MR. LOONAM:  His expert report did not
10:52:17   11    exclude moderate dementia, and we can go through the
10:52:20   12    expert report, but I object to his testimony as
10:52:23   13    beyond the scope of his expert testimony disclosed
10:52:25   14    to us.
10:52:25   15                         THE COURT:  Well, I'm going to hear the
10:52:27   16    testimony, and then you can raise it on
10:52:28   17    cross-examination.  If you are correct, then I'll
10:52:31   18    strike the testimony, and since we don't have a
10:52:34   19    jury.
10:52:34   20                         MR. LOONAM:  Thank you, Your Honor.
10:52:35   21                         MR. MAGNANI:  Although we don't have a
10:52:37   22    jury, to the point he's impugning the witness, I do
10:52:40   23    have quotes from the report that support what he's
10:52:43   24    saying, and I am prepared to read them if the Court
10:52:45   25    would like to hear.
```

10:52:46  1                    No need?

10:52:47  2                    THE COURT:  Continue.

10:52:48  3                    MR. MAGNANI:  Okay.

10:52:49  4   Q.   Sorry, Dr. Darby, could you just repeat that

10:52:53  5   second opinion again?

10:52:54  6   A.   Yes.  So my second opinion is regarding the

10:52:57  7   severity of his cognitive problems.  And so, I think

10:53:00  8   that he is likely in the stage of mild cognitive

10:53:02  9   impairment.  I think it is possible that he could

10:53:06  10  have progressed into the mild dementia stage, but I

10:53:09  11  think that he is not in the moderate or severe

10:53:12  12  dementia stage.

10:53:14  13  Q.   What's your third opinion, Dr. Darby?

10:53:17  14  A.   The third opinion is regarding the certainty of

10:53:23  15  that, and that is impaired by the fact that he's

10:53:24  16  been exaggerating.  And I state that because there

10:53:28  17  have been examples where he clearly has been

10:53:30  18  performing at a higher level than his cognitive

10:53:33  19  testing and reports indicate.

10:53:37  20                    I also base that on the objective

10:53:39  21  neuroimaging data that shows that he is at a milder

10:53:42  22  stage than he is presenting with clinically.

10:53:49  23  Q.   I'd like to just take these sort of one at a

10:53:51  24  time, and talk about how you get to those

10:53:54  25  conclusions, but I guess before I do let me ask.  Do

10:53:56    1    you have an opinion on the Defendant's competence?

10:54:00    2    **A.**    And so, regarding my -- his competence, I

10:54:04    3    don't.  So I don't have a clear sense of what his

10:54:07    4    actual level of cognitive impairment is, so I can't

10:54:10    5    make that determination.

10:54:11    6    **Q.**    Do you feel like you have an accurate sense to

10:54:14    7    understand, based on your experience, the type of

10:54:17    8    assistance that an accused defendant has to provide

10:54:20    9    to counsel?

10:54:20   10    **A.**    No, I have a general understanding of that, but

10:54:23   11    not a specific understanding.

10:54:25   12    **Q.**    So who hired you, Dr. Darby?

10:54:27   13    **A.**    So I was hired by the Department of Justice

10:54:30   14    prosecution team.

10:54:31   15    **Q.**    Did you work with the prosecution team in this

10:54:33   16    case?

10:54:33   17    **A.**    I did, yes.

10:54:34   18    **Q.**    How did you work with them?

10:54:36   19    **A.**    So I reviewed documents that were made

10:54:38   20    available to me.  I recommended certain tests that

10:54:42   21    would be helpful, and help in coordinating those

10:54:46   22    tests and interpreting them.  I communicated

10:54:48   23    findings.

10:54:50   24                    I collaborated with other experts

10:54:52   25    involved in the case.  I wrote reports for the case,

10:54:56  1   and I prepared for this testimony.

10:54:58  2   Q.   Did you ever work with Defense counsel in this

10:55:01  3   case?

10:55:02  4   A.   No, not directly.  Um, there may have been some

10:55:05  5   e-mail exchanges involved in coordinating some of

10:55:09  6   the tests with Prosecution and Defense, but I did

10:55:12  7   not work directly with them.

10:55:13  8   Q.   What about the Court?  Did you work with any

10:55:16  9   members of the judicial branch in this case?

10:55:18  10  A.   Not to my knowledge, no.

10:55:19  11  Q.   Are you being paid for your work in this case?

10:55:22  12  A.   I am.  So I'm paid $350 an hour for my work.

10:55:26  13  Q.   And do you know, approximately, how much you've

10:55:29  14  been paid for your work in this case?

10:55:33  15  A.   I think a rough estimate is around $80,000.

10:55:36  16  Q.   So a lot of hours?

10:55:38  17  A.   Yes, a lot of hours.

10:55:39  18  Q.   What did you do during all of those hours?

10:55:41  19  A.   Well, a lot of it was review of documents.  And

10:55:44  20  so, reviewing the evidence that was available in

10:55:48  21  this case.  Um, it also included reviewing and

10:55:52  22  organizing the diagnostic tests, so the tests that

10:55:55  23  we recommended ordering, and interpreting those.

10:55:58  24              It involved an interview, and

10:56:02  25  evaluation, and examination with Mr. Brockman that

10:56:04  1   happened in May of 2021.  I also interviewed his

10:56:07  2   wife, Dorothy, at that time with her attorney

10:56:10  3   present.  Um, it involved discussions with the other

10:56:13  4   experts about the evidence that they had obtained.

10:56:16  5                    It involved the writing of the

10:56:18  6   reports, and then the preparation of this testimony.

10:56:22  7   Q.    Did you do this work in isolation?

10:56:24  8   A.    No, I was part of a team of other expert

10:56:27  9   witnesses that were involved in this case.

10:56:29  10  Q.    How did -- well how did this team, as you

10:56:33  11  described it, work together?

10:56:35  12  A.    And so, you know, my background and experience

10:56:38  13  is in neurology.  So I -- specifically behavioral

10:56:44  14  neurology, so I was focused on the medical

10:56:46  15  diagnosis, the testing that would be appropriate and

10:56:49  16  helpful in this case, and the knowledge of the

10:56:52  17  diseases and their time course and severity.

10:56:54  18                    Dr. Park Dietz was also involved in

10:56:57  19  the case.  So he is a forensic psychiatrist who has

10:57:01  20  experience and expertise in medical legal

10:57:04  21  determinations, like competency to stand trial.

10:57:07  22  Dr. Robert Denney was an expert neuropsychologist in

10:57:11  23  this case.  So Dr. Denney has experience

10:57:14  24  administering and interpreting the

10:57:17  25  neuropsychological tests, both in dementia patients

10:57:20  1  and evaluations of competency.

10:57:22  2          Then I also consulted with

10:57:24  3  Dr. Maria Ponisio.  So Dr. Ponisio is a nuclear

10:57:28  4  radiologist.  She assisted in evaluating the PET

10:57:32  5  scans, as well as doing quantitative analysis on

10:57:35  6  those PET scans.

10:57:36  7  Q.  So is it fair to say that the team worked

10:57:39  8  collaboratively with each person bringing their

10:57:42  9  respective expertise?

10:57:44  10  A.  We did, yes.  We discussed at the beginning the

10:57:47  11  benefits and cons of working together, versus

10:57:49  12  entirely independently.  The thought was that by

10:57:53  13  sharing opinions and information that would lead

10:57:55  14  each of us to arrive at the most accurate

10:57:59  15  determination.

10:57:59  16  Q.  I want to explore the limits of this

10:58:02  17  collaboration.  Did you read each others' reports

10:58:05  18  before they were filed?

10:58:05  19  A.  No, I did not read any of the other reports

10:58:08  20  before they were filed.

10:58:09  21  Q.  Did you share your report or drafts of your

10:58:11  22  report with any member of the prosecution team

10:58:14  23  before it was filed?

10:58:16  24  A.  I did not.

10:58:17  25  Q.  So I want to start with your first conclusion,

1  Doctor.  Well, why don't you just tell us what is

2  Parkinson's disease?

3  **A.**   Yeah, so Parkinson's disease is a motor

4  disorder of the brain.  And so, it is a

5  neurodegenerative disorder, so something that

6  progresses over time that affects movement.

7        So when we see patients with

8  Parkinson's, they have the typical findings of

9  slowness with their movements, slower to initiate

10  those.  They can have a tremor that occurs at rest.

11  They can have stiffness when we try and move them.

12        That can lead to findings that we

13  see when patients are walking where they have a

14  characteristic gait.  It can lead to decreased

15  expression in facial expressions.

16        Parkinson's disease can also be

17  associated with non-motor symptoms.  In some cases,

18  there are sleep problems or cognitive issues, or

19  affection on the autonomic nervous system.

20  **Q.**   Just to -- why do you think that Mr. Brockman

21  has Parkinson's disease?

22  **A.**   Well, I think there's a number of pieces of

23  evidence that really support that.  Looking at

24  videos of him giving speeches, in 2018 it appears

25  he's having early signs of that that are more clear

1    by 2019 in those videos.

2               He also had evaluations by medical

3    neurologists with expertise in Parkinson's disease,

4    beginning with Dr. Jankovic in -- in January of

5    2019, that diagnosed him with Parkinson's.  When I

6    evaluated him in May, my examination was also

7    consistent with that.

8               And he also had a special type of

9    brain imaging scan called a DaTscan.  And so this

10   looks at the dopamine neurons in the brain.  In

11   Parkinson's disease, one of the things that happens

12   is those dopamine neurons are damaged.  His scan

13   showed evidence there was damage to those dopamine

14   neurons.  So all of those things support diagnosis

15   of Parkinson's.

16   Q.   If you know, to what extent did the other

17   experts in this case agree with that opinion?

18   A.   I think essentially everything agrees with the

19   diagnosis of Parkinson's, both his treating

20   physicians and the other experts in this case.

21   Q.   Doctor, what's dementia with Lewy bodies or

22   Lewy bodies dementia?

23   A.   So Lewy bodies dementia is caused by the same

24   biological change as Parkinson's disease.  So it's

25   the same underlying protein that accumulates, but it

affects different areas of the brain, and that leads
to different symptoms.

So in addition to Parkinson's motor
symptoms, the things that we look for in Lewy body
disease are visual hallucinations.  These are
recurrent.  They happen over and over, and they're
well formed, so often fully-formed figures, persons,
faces.

The second thing that we look for
is REM sleep behavior disorder.  And so, this is
when a patient will actually acts out their dreams
while they're asleep.

Q.   Did you consider this as a potential diagnosis?

A.   I did.  Before moving on, I just wanted to say
the last thing associated with dementia with Lewy
bodies is fluctuations, so changes of arousal or
attention such that the patient may not respond.

This was considered as a diagnosis
early on.  It was a diagnosis that his treating
clinicians at Baylor raised as a concern.  It was
also one of the diagnoses that was initially raised
by the Defense in their motion for competency.

Q.   Were you able to determine from your record
review why they suspected this diagnosis?

A.   I think it was largely based on the fact that

11:01:50  1  he had Parkinson's.  So because Parkinson's and Lewy

11:01:54  2  bodies can be caused by the same protein, that was

11:01:56  3  initially a concern.  It was also the fact that

11:01:59  4  Mr. Brockman stated in his neuropsychological

11:02:02  5  testing that he had seen a bug moving on a table

11:02:05  6  that was interpreted as a hallucination.

11:02:08  7              And because Mr. Brockman had

11:02:10  8  reported movements in his sleep that happened

11:02:14  9  previously where it raised a concern that could have

11:02:16  10  been dream reenactment consistent with REM sleep

11:02:21  11  behavior disorder.

11:02:21  12  Q.  You mentioned this was early, clinical

11:02:24  13  diagnosis.  But again, to the extent you know is

11:02:28  14  this a diagnosis any of the experts in this case are

11:02:32  15  advocating for today?

11:02:34  16  A.  No, I don't believe so.  So I don't think any

11:02:37  17  of the other experts have mentioned this as a

11:02:39  18  diagnosis, although they have mentioned a related

11:02:42  19  disease, Parkinson's disease dementia.

11:02:45  20  Q.  What's -- you said they're related.  What's the

11:02:47  21  relation?

11:02:48  22  A.  And so, really the issue is timing.  In Lewy

11:02:52  23  bodies disease, the features that I mentioned and

11:02:55  24  the cognitive happen early.  It happens within the

11:02:59  25  first year of someone having the motor symptoms of

1    Parkinson's disease.

2            But we know that if we follow

3    patients with Parkinson's disease five or ten years

4    into their disease course, they may also develop

5    hallucinations, and some of these other features

6    that really resemble Lewy bodies dementia.  And

7    that's just because the disease is spreading into a

8    different part of the brain and causing those

9    symptoms.

10   Q.   Doctor, you said Mr. Brockman might also have

11   Alzheimer's disease.  Why do you think that?

12   A.   So that was based on a number of things in this

13   case.  The first is the amyloid PET scan that he

14   had.  So just as a bit of background, there are a

15   number of different proteins that are involved in

16   Alzheimer's disease.  The first one is amyloid.

17           So that is the first thing that we

18   think happens in this disease process, but that

19   happens many years before someone develops symptoms.

20   It can happen a decade before someone has developed

21   any of the other changes or the clinical problems

22   associated with that.

23           And so, there's another protein

24   that is deposited later in the brain and becomes

25   abnormal called tau.  It's thought that that tau

11:04:07  1  protein eventually causes brain damage, and so there

11:04:11  2  is neurodegeneration or brain damage.  It's the

11:04:14  3  brain damage that causes the clinical symptoms.

11:04:17  4            And so, in Alzheimer's disease, you

11:04:20  5  know before the advent of these types of specialized

11:04:22  6  tests, we didn't have a way of saying there was

11:04:24  7  amyloid in the brain.  But the PET scan is actually

11:04:27  8  able to bind to that through a tracer, and we can

11:04:31  9  visualize and see whether or not there is amyloid in

11:04:33  10  the brain.

11:04:34  11            Mr. Brockman had a positive amyloid

11:04:36  12  scan, which indicates he has that first step.  The

11:04:40  13  other thing we consider were the locations of brain

11:04:43  14  damage that were evident on his FDG-PET.  And so,

11:04:47  15  the FDG-PET is a different type of PET scan.  It's

11:04:50  16  looking at brain energy or metabolism.  And that

11:04:54  17  tells us how active a certain area of the brain is.

11:04:59  18            And so if there's a reduction

11:05:00  19  there, we think that indicates there's brain damage

11:05:02  20  in that location.  We look for where those locations

11:05:06  21  are to see if it fits the pattern of locations we

11:05:09  22  could see in Alzheimer's disease.

11:05:11  23  Q.   And, Doctor, can you just do your best to

11:05:13  24  describe the rate of amyloid -- excuse me --

11:05:20  25  accumulation and how long it accumulates before it

11:05:22  1  gets to the maximum level?

11:05:25  2  **A.**   Yes, so that accumulation happens over the

11:05:28  3  course of years or even a decade.  Now that amyloid

11:05:32  4  deposition is happening and increasing, and reaches

11:05:35  5  its peak even while a patient is in the normal

11:05:38  6  stage, so without any cognitive impairment.  It's

11:05:40  7  essentially at the highest level.

11:05:42  8            And then as a patient progresses

11:05:44  9  from normal to mild cognitive impairment to

11:05:47  10  dementia, there's really not a corresponding change

11:05:50  11  in the amyloid.  So the amyloid level stays the

11:05:53  12  same.  If you see a positive amyloid scan, it

11:05:57  13  doesn't necessarily tell you the degree of cognitive

11:05:59  14  problems someone would be having.

11:06:01  15            It's an indicator that disease and

11:06:05  16  that marker is there, which is necessary part for

11:06:08  17  Alzheimer's to occur, but isn't sufficient.  The

11:06:10  18  other changes, the tau, the brain damage -- those

11:06:13  19  are necessary to get to the clinical symptoms.

11:06:15  20  **Q.**   So if a person had positive amyloid without any

11:06:20  21  symptoms, what does amyloid tell us?

11:06:23  22  **A.**   Well, it tells you that those symptoms are more

11:06:25  23  likely related to Alzheimer's disease.  So again,

11:06:28  24  it's that first biological change that you see.  Um,

11:06:31  25  and so you try and correspond that to the clinical

11:06:37   1   symptoms and brain damage to see if that's more

11:06:39   2   likely than not.

11:06:39   3   Q.   Are you able to estimate just about how common

11:06:44   4   positive amyloid factor is in people of

11:06:47   5   Mr. Brockman's age?

11:06:49   6   A.   So amyloid and the disease process, as in

11:06:52   7   Alzheimer's disease, increase over time.   And so, in

11:06:55   8   someone who is in their 80's, there may be as many

11:06:58   9   as 25 or even 30 or 40 percent of people who would

11:07:02   10   have a positive amyloid PET scan.   The Alzheimer's

11:07:05   11   disease just becomes much, much more common.

11:07:07   12                   And so, it is certainly possible

11:07:09   13   that someone could have normal cognition and have a

11:07:12   14   positive amyloid scan.

11:07:14   15   Q.   Dr. Darby, can you -- I'm going to ask you to

11:07:20   16   advance two slides, please.   Sorry, I'll let you

11:07:23   17   drive, but I just want to -- okay.   Can you please

11:07:25   18   just summarize the similarities and differences

11:07:27   19   between the diseases that you have just described

11:07:30   20   for us?

11:07:30   21   A.   Yeah, so this is a chart just describing the

11:07:35   22   differences that we see in between these.   And in

11:07:37   23   each one of these neurodegenerative disorders, we

11:07:40   24   see the disease start with the biological changes.

11:07:43   25   So what are the abnormal proteins that we see?

11:07:45  1        And then, those changes eventually

11:07:48  2   result in brain damage to specific locations.  It's

11:07:52  3   that brain damage, as it becomes significant enough,

11:07:55  4   that leads to the clinical symptoms.  So in

11:07:58  5   something like Parkinson's disease and Lewy bodies

11:08:00  6   disease, we actually had that same abnormal protein,

11:08:04  7   that same biological process, but it affects

11:08:07  8   different parts of the brain.  That's what leads to

11:08:09  9   the differences in the symptoms that we see.

11:08:10  10        In the case of Alzheimer's disease,

11:08:13  11   we have the two proteins that we were discussing.

11:08:15  12   So the amyloid protein, which is that first change,

11:08:18  13   and then the tau protein, which is the second

11:08:21  14   change.  And it's really as the tau protein

11:08:24  15   progresses and causes brain damage in memory areas

11:08:27  16   that the typical findings of memory impairment

11:08:30  17   occur.

11:08:32  18   Q.   Dr. -- Dr. Darby, you just sort of explained

11:08:37  19   the basis of your first opinion related to disease.

11:08:40  20   I'd like to ask you now about your second opinion.

11:08:44  21   A.   Yes, so my second opinion was regarding the

11:08:46  22   severity of the cognitive problems.  And so, my

11:08:50  23   opinion was that Mr. Brockman was at the stage of

11:08:54  24   mild cognitive impairment.  It's possible he could

11:08:56  25   have progressed into the mild dementia stage, but

11:08:59  1   that he isn't in the moderate or severe dementia

11:09:03  2   stage.

11:09:03  3   Q.   And can you define these terms?  You are

11:09:07  4   talking mild cognitive impairment, dementia -- can

11:09:08  5   you please define these terms?

11:09:10  6   A.   Sure.  So I have another slide that goes

11:09:13  7   through some of the different stages.  These are

11:09:15  8   really terms that we're using to describe the

11:09:17  9   severity of the cognitive impairment.  So it's the

11:09:21  10  level of cognitive impairment.  And the

11:09:24  11  differentiation point is whether that is severe

11:09:26  12  enough to impact Defendant's ability to function

11:09:32  13  independently.

11:09:32  14              So if we have reports of cognitive

11:09:34  15  dysfunction prior to the loss of independence, we

11:09:36  16  would call that mild cognitive impairment or an MCI.

11:09:39  17  And examples of problems that a patient with MCI

11:09:43  18  might have might be memory lapses, so losing track

11:09:48  19  of names, appointments, or conversations.  Being

11:09:51  20  slower to complete tasks.  It's harder to make

11:09:53  21  decisions, but even with challenges being able to do

11:09:57  22  these things independently.

11:09:58  23              When a patient reaches a stage of

11:10:00  24  mild dementia, there is the loss of some of this

11:10:03  25  functional independence.  So complex activities like

11:10:07  1  being able to work may be challenging.  Financial

11:10:10  2  decision-making may be challenging, and there may be

11:10:13  3  more difficulty in organizing thoughts.

11:10:16  4                By the time someone is in the

11:10:18  5  moderate stage of dementia, they really need more

11:10:20  6  assistance.  And so, this is a case where in the

11:10:22  7  moderate stage, you wouldn't feel comfortable with a

11:10:26  8  patient being left alone for long period of time.

11:10:28  9  They may be disoriented and lose track of where they

11:10:32  10  are, having difficulty recognizing friends, and may

11:10:35  11  lose memory of certain aspects of personal

11:10:37  12  information like their telephone number or address.

11:10:42  13  Q.   You are describing dementia?

11:10:43  14  A.   Yeah.

11:10:44  15  Q.   What causes dementia?

11:10:46  16  A.   Dementia is caused by a number of different

11:10:50  17  diseases.  It's an umbrella term.  And so,

11:10:52  18  Alzheimer's disease, Lewy bodies, Parkinson's --

11:10:54  19  those are all causes of neurodegenerative disorders

11:10:57  20  which progress over time to get to these stages, but

11:11:00  21  one could have a more acute change like a stroke or

11:11:02  22  brain trauma that would cause a similar result.

11:11:05  23  Q.   So if it could be caused -- I mean, do we care

11:11:11  24  -- does it matter what causes the dementia?

11:11:13  25  A.   Well, for determining the level of the

11:11:16  1   severity, no.  So the cause doesn't contribute to

11:11:19  2   that level of severity.  Um, but in thinking about

11:11:22  3   the time course it does.  And so, you know, diseases

11:11:25  4   like Alzheimer's and Parkinson's progress over time.

11:11:28  5   Other things like an acute brain trauma wouldn't be

11:11:30  6   expected to progress over time.

11:11:32  7   Q.   So in coming to a forensic opinion, would it be

11:11:38  8   relevant whether a person got dementia in 2017

11:11:42  9   versus 2021?

11:11:43  10  A.   It would.  And so, again we know that this

11:11:49  11  diseases progress.  As a ballpark figure, someone

11:11:52  12  who is diagnosed at the early mild dementia stage,

11:11:56  13  it may be five or ten years as that progresses

11:12:00  14  towards death.  And so, if someone was diagnosed

11:12:01  15  with dementia in 2017 for instance, we would expect

11:12:04  16  that progression to have occurred, and for them to

11:12:07  17  be at a very advanced stage now.

11:12:09  18            But someone who is diagnosed more

11:12:11  19  recently in that stage, you know, with only a year

11:12:13  20  to progress or smaller amount of time, we wouldn't

11:12:16  21  expect that severe progression to happen.

11:12:19  22  Q.   Dr. Darby, in your clinical practice, how do

11:12:22  23  you diagnose your patients on this dementia severity

11:12:28  24  scale you just described?

11:12:30  25  A.   It starts with an interview with the patient

11:12:32  1   and their family.  This is where I see a patient in

11:12:35  2   clinic and ask them about their concerns about the

11:12:38  3   memory problems.  I would ask for examples of that.

11:12:40  4                    I would interview a family member,

11:12:42  5   someone close to the patient to know about the

11:12:44  6   observations that they're noting as well.  I would

11:12:48  7   do an examination.  So I would do a neurological

11:12:50  8   examination, and do cognitive testing, both myself

11:12:54  9   with a bedside form of cognitive testing, as well as

11:12:58  10  referring to a patient to a neuropsychologist to do

11:13:00  11  more thorough testing.

11:13:02  12                   Then I get brain imaging to see if

11:13:05  13  there's evidence of brain damage that would go along

11:13:08  14  with these diseases that we're concerned about.

11:13:11  15  Q.   And so, is that fair to say in your clinical

11:13:14  16  practice your sources of information are images or

11:13:17  17  just what comes from the patient?

11:13:18  18  A.   Exactly, yes.

11:13:21  19  Q.   If you take Mr. Brockman's presentation at face

11:13:24  20  value, where would you diagnose him on this scale?

11:13:29  21  A.   So based on the reports that he's giving

11:13:32  22  currently, he would be at the stage of moderate to

11:13:34  23  severe dementia.  So he is reporting, and his family

11:13:39  24  is reporting, that he cannot use a knife, that he

11:13:42  25  has difficulty -- at times -- recognizing his

11:13:44   1   grandson, that he gets confused as to where he is,

11:13:48   2   that he has confusion while putting clothes on, and

11:13:51   3   may put his pants on his arms or vice versa.  And

11:13:55   4   so, these are all examples of a patient that would

11:13:57   5   be at an advanced stage of dementia.

11:14:02   6   Q.   If you saw him in your normal, clinical

11:14:05   7   practice, might you have diagnosed him that way?

11:14:07   8   A.   Yes, if -- you know, if these were the symptoms

11:14:11   9   a patient was reporting to me, you know, those would

11:14:13   10  be consistent with moderate or severe dementia

11:14:16   11  stage.

11:14:16   12  Q.   So why do you think that he is in the mild

11:14:21   13  cognitive impairment to potentially mild dementia

11:14:23   14  range?

11:14:23   15  A.   Well, I think in this case in the forensic role

11:14:27   16  I examined the evidence more critically than I would

11:14:30   17  have, so I had a lot more information to base that

11:14:33   18  opinion on.  And so, for instance I had videos of

11:14:38   19  him giving depositions or speeches, and can compare

11:14:42   20  those to the way he was reporting the symptoms and

11:14:45   21  the cognitive testing results and see that there

11:14:47   22  were discrepancies.

11:14:49   23            I had his work performance, so his

11:14:53   24  ability to continue working and even deposition

11:14:55   25  testimony from some of his work associates who were

11:14:59    1   able to comment on his cognitive abilities in the

11:15:02    2   work setting.

11:15:03    3                   And then, I had the interview with

11:15:06    4   him himself.  So when I saw him in May, and the

11:15:10    5   comparison of those interview findings with his

11:15:14    6   cognitive testing and reporting.  And then the

11:15:17    7   imaging itself to compare.

11:15:19    8   Q.    Okay.  So you gave some examples of

11:15:25    9   demonstration of higher-cognitive function.  So I'm

11:15:28   10   just wondering besides those, what else makes you

11:15:31   11   think he has just mild cognitive impairment or mild

11:15:35   12   cognitive impairment dementia?

11:15:36   13   A.    Yeah, well I think the other things -- one is

11:15:39   14   the neuroimaging.  So we have the neuro as objective

11:15:47   15   demonstration of the brain severity we're seeing,

11:15:50   16   and correspondences more closely to the symptoms we

11:15:53   17   expect to see.  We also have the expected disease

11:15:55   18   course, so how should this progress over time?

11:15:58   19                   My evaluation of him in May he was

11:16:01   20   at the mild cognitive impairment stage.  And so we

11:16:03   21   have a sense of how that should progress, absent

11:16:07   22   extenuating circumstances.

11:16:08   23   Q.    So let's start with the imaging.  What -- just

11:16:12   24   generally, what does neuroradiological imaging show?

11:16:18   25   A.    And so, in this case I think the important

11:16:20  1    things that we're looking for in the neuroimaging

11:16:23  2    are evidence for brain damage.  So the evidence for

11:16:26  3    brain damage, how severe it is, and what parts of

11:16:29  4    the brain it's happening in.

11:16:30  5              There are two ways that we can look

11:16:32  6    at that.  One is using the FDG-PET.  And so, this is

11:16:37  7    a PET scan that looks at brain metabolism or brain

11:16:42  8    function.  So it's actually binding to sugar in the

11:16:45  9    blood, which is the body's source of energy.  So it

11:16:49 10    looks at where that sugar is going in the brain.  If

11:16:52 11    there's less sugar going to certain parts of the

11:16:55 12    brain, that indicates that there could be underlying

11:16:58 13    damage to that area.

11:17:00 14              The other tests that we can use is

11:17:02 15    the brain MRI scan.  So the brain MRI looks at the

11:17:07 16    brain's size or the brain volume.  And so, we can

11:17:10 17    get a sense of that brain volume and compare that to

11:17:14 18    what we would expect normal -- cognitively normal

11:17:18 19    80-year-old to have to get a sense of -- again if

11:17:21 20    there's a lower brain volume, that can indicate

11:17:23 21    there's been brain damage.

11:17:24 22    Q.   Of the two tests that you just mentioned, the

11:17:27 23    FDG-PET and the MRI, which one is more, informative

11:17:35 24    of a patient's neurodegeneration?

11:17:37 25    A.   So the FDG-PET tends to be more sensitive.  So

11:17:40  1   we can see changes on the FDG-PET earlier than we

11:17:44  2   can appreciate them on the MRI scan.

11:17:47  3   Q.   And so, if you can measure metabolic uptake or

11:17:55  4   just brain activity in the brain, why can't you

11:17:58  5   entirely base your diagnosis off an FDG-PET?

11:18:02  6   A.   Yeah, so dementia can't be diagnosed just by

11:18:05  7   the imaging.  And the reason for that is although

11:18:08  8   there's a strong correlation between the amount of

11:18:12  9   brain damage in a patient's clinical symptoms, it's

11:18:15  10  not one-to-one.  So the same amount of damage in two

11:18:18  11  different patients could lead to very different

11:18:21  12  levels of cognitive impairment, because they're

11:18:24  13  starting from different points.

11:18:25  14              And so, in a patient who has a high

11:18:28  15  level of intelligence, they're able to compensate

11:18:31  16  for the same amount of brain damage, more than a

11:18:34  17  person that would not have that level of

11:18:36  18  intelligence.  So it's really the rest of the brain

11:18:39  19  being able to compensate for that, that can change

11:18:41  20  that.  So it's a correlation, but not a one-to-one

11:18:44  21  association.

11:18:45  22  Q.   So do you -- is that sometimes referred to as a

11:18:47  23  patient's baseline?

11:18:49  24  A.   Yes.  Sometimes we'll refer that as the

11:18:52  25  patient's baseline, or as their cognitive reserve,

11:18:55  1  so their ability to compensate for these cognitive

11:18:58  2  issues.

11:18:59  3  Q.   And how do you estimate the cognitive reserves

11:19:03  4  of Mr. Brockman?

11:19:04  5  A.   I think by all indications, Mr. Brockman is a

11:19:06  6  person of superior intelligence.  He's been very

11:19:09  7  successful in running his company.

11:19:11  8  Q.   How does that help inform your view of the

11:19:14  9  FDG-PET images?

11:19:16  10  A.   Well, all other things being equal, you would

11:19:19  11  expect again someone who is at a higher level of

11:19:21  12  intelligence to be able to compensate for those

11:19:25  13  problems more than the average person.

11:19:26  14  Q.   Actually, I realized I -- I missed -- I skipped

11:19:29  15  something.  There are more than one types of PET

11:19:32  16  scans in this case; isn't that right?

11:19:34  17  A.   There are, yes.  So we've been referring to the

11:19:37  18  FDG-PET that looks at metabolism or the brain

11:19:40  19  activity, and that looks at brain damage.  The other

11:19:43  20  PET scan that was obtained in this case is the

11:19:46  21  amyloid PET scan.  So rather than binding to glucose

11:19:50  22  in the body, it binds to amyloid, and that test for

11:19:53  23  that first biological protein associated with

11:19:56  24  Alzheimer's disease.

11:20:00  25  Q.   Without saying the word that FDG stands for --

11:20:05   1   we want to be on the court reporter's good side --

11:20:07   2   what does the FDG mean in FDG-PET; what is that

11:20:10   3   referring to?

11:20:11   4   **A.**   So it refers to binding to glucose or sugar.

11:20:14   5   So it is essentially the energy source for the

11:20:19   6   brain, and how much of that glucose is going to

11:20:22   7   certain parts of the brain indicates how active

11:20:24   8   those brain areas are.

11:20:29   9           THE COURT:  Counsel, we're going to

11:20:30   10  take our break at this time.  About every hour and a

11:20:33   11  half we'll be taking a break.  So we'll take a break

11:20:36   12  at this time for ten minutes, and then we'll start

11:20:38   13  at 11:30 and push through to lunchtime.

11:20:53   14  (Whereupon, a recess was held.)

11:41:24   15          Counsel, you may continue when ready.

11:41:28   16          MR. MAGNANI:  Thank you, Your Honor.

11:41:31   17  **Q.**   Dr. Darby, we left off talking about imaging

11:41:33   18  and you were describing the FDG-PET.  Were any

11:41:37   19  FDG-PETs done of Mr. Brockman's brain?

11:41:40   20  **A.**   Yes, Mr. Brockman had two FDG-PETs done.  So,

11:41:44   21  he had the first one done in March of 2021, and then

11:41:47   22  he had a second FDG-PET performed in August of 2021.

11:41:52   23  **Q.**   And who asked for these FDG-PET scans to be

11:41:57   24  done?

11:41:58   25  **A.**   So they were -- it was me that asked for the

11:42:00  1  FDG-PET scans, and I assisted to order the first one

11:42:04  2  in March.  I believe the recommendation for the

11:42:06  3  second one was communicated that it wasn't actually

11:42:10  4  ordered by me in August.

11:42:11  5  Q.   But is it the case that you recommended

11:42:13  6  ordering both of these scans?

11:42:14  7  A.   Yes, I did.  I thought it would be helpful in

11:42:17  8  this case.

11:42:18  9  Q.   Okay.  Were --

11:42:21  10               MR. MAGNANI:  And this is a

11:42:22  11  pre-admitted exhibit, Your Honor.

11:42:25  12  Q.   Dr. Darby, can you please -- there's some

11:42:26  13  binders behind you.  Can you please flip to

11:42:29  14  Exhibit 43, and just tell the Court what those are?

11:42:49  15               You know, Dr. Darby, are they on the

11:42:52  16  screen in front of you?

11:42:54  17  A.   Yes, they are.

11:42:54  18  Q.   Okay.  So what is Exhibit 43?

11:42:57  19  A.   So these are the FDG-PET scan reports from

11:43:01  20  Houston Methodist Hospital.

11:43:04  21  Q.   Is there a part of the report written in

11:43:06  22  English that anyone can understand?

11:43:08  23  A.   Yes, the impression section gives the overall

11:43:16  24  impression of the radiologist.

11:43:17  25  Q.   Let me ask you a different question.  When you

11:43:19   1   say the radiologist, who are you talking about?

11:43:23   2   **A.**   So this is the clinical radiologist working at

11:43:25   3   Houston Methodist Hospital.   So normally a

11:43:28   4   radiologist would be the person reviewing the images

11:43:30   5   and interpreting them.

11:43:32   6   **Q.**   So what are the impressions of that

11:43:36   7   radiologist?

11:43:37   8   **A.**   So the impression of that radiologist from the

11:43:40   9   March 2021 FDG-PET are that, "The findings are very

11:43:45   10   mild, but suggestive of early neurodegenerative

11:43:48   11   disease, either Alzheimer's disease or dementia with

11:43:51   12   Lewy bodies, in parentheses Parkinson's disease with

11:43:53   13   dementia.

11:43:55   14            "Findings unlikely to represent

11:43:57   15   frontotemporal dementia."

11:44:06   16   **Q.**   Can you go to the last page of the exhibit,

11:44:08   17   Mr. Bourget?

11:44:09   18                 What's this one, Dr. Darby?

11:44:10   19   **A.**   So this is the FDG-PET scan report from August

11:44:14   20   of 2021.

11:44:15   21   **Q.**   And so, what -- and who was the interpreting

11:44:18   22   radiologist in this case?

11:44:19   23   **A.**   Again, it was the clinical radiologist at

11:44:22   24   Houston Methodist Hospital.

11:44:23   25   **Q.**   What were the impressions for this second

11:44:26   1    FDG-PET?

11:44:27   2    **A.**   And so, the findings -- the impression were

11:44:30   3    that, "The findings are mild, but very suggestive of

11:44:35   4    neurodegenerative disease, particularly Alzheimer's

11:44:38   5    disease, although statistically less likely dementia

11:44:39   6    with Lewy bodies or Parkinson's disease with

11:44:41   7    dementia can have a similar scan pattern.  The

11:44:44   8    markedly abnormal uptake and prior PET scan also

11:44:48   9    somewhat favors Alzheimer's disease over DLB/PDD."

11:44:52  10    **Q.**   Ask you to break out those initialisms.  So

11:44:56  11    what's PDD?

11:44:57  12    **A.**   So PDD is Parkinson's disease dementia.  DLB is

11:45:02  13    dementia with Lewy bodies.

11:45:04  14    **Q.**   Do you agree with the findings of this

11:45:07  15    radiologist?

11:45:09  16    **A.**   Yes, I largely agree with these findings that

11:45:11  17    they show abnormalities that are mild, but are

11:45:14  18    suggestive of the diseases mentioned.

11:45:16  19    **Q.**   And did you have the opportunity to read

11:45:18  20    Defense expert reports that also interpret these

11:45:21  21    images?

11:45:21  22    **A.**   I did, yes.

11:45:23  23    **Q.**   Did you have the opportunity to read Dr. Maria

11:45:26  24    Ponisio's report that also interprets these images?

11:45:29  25    **A.**   Yes, and I have a graph that represents the

11:45:32    1    different opinions in this case regarding the PET

11:45:34    2    scan.

11:45:42    3                    MR. MAGNANI:  Apologize, Your Honor.

11:45:43    4    Just bringing this up now.

11:45:46    5    Q.   While we're doing that, Dr. Darby, can you just

11:45:48    6    sort of describe what, if any, are the disagreements

11:45:50    7    between the different interpreting doctors?

11:45:52    8    A.   Yes.  And so -- so as it's up here, there are

11:45:56    9    three main things that we're looking for in the PET

11:45:59   10    scan.  So one is the pattern of where we're seeing

11:46:03   11    abnormalities.  So what's the pattern of the damage?

11:46:06   12    Does that match the diseases that we're interested

11:46:10   13    in knowing about?

11:46:11   14                    So in regards to that pattern,

11:46:13   15    there's largely agreement across the different

11:46:15   16    experts.  So this graph shows the clinical

11:46:18   17    radiologist, Dr. Ponisio's opinion, who is the

11:46:22   18    nuclear radiologist hired by the Government;

11:46:25   19    Dr. Whitlow's interpretation as Defense expert; and

11:46:28   20    my own impressions.

11:46:29   21                    We essentially all agree these

11:46:32   22    findings could be in a pattern one could see in

11:46:34   23    Alzheimer's disease or the Parkinson's disease with

11:46:36   24    cognitive impairment.

11:46:41   25    Q.   And what are -- what about the severity of the

1    disease; is there agreement on that?

2    **A.**   There's largely agreement in the severity as

3    well.  And so the clinical radiologist described

4    these changes as mild.  Dr. Ponisio described them

5    as early Alzheimer's dementia.  I agree that they

6    look mild.

7              Dr. Whitlow did not comment on the

8    severity regarding the August PET scan.  He did say

9    that it looked similar to the March 2021 PET scan,

10   at which time he agreed with the clinical

11   radiologist that the findings were mild.

12   **Q.**   And so, what are the disagreements, if any,

13   between the experts?

14   **A.**   And so, the major disagreement is with the

15   clinical correlation.  So this is what I do as a

16   neurologist is I evaluate the patient and relate

17   symptoms and the severity to the information from

18   the PET scan and see do those correspond with each

19   other.  This is where Dr. Whitlow stated he felt

20   these findings were consistent with the demonstrated

21   dementia and the neuropsychological testing, and I

22   disagree with that.

23              So the findings are showing mild

24   changes in terms of the severity that are far

25   different than the severe -- moderate to severe

11:47:52   1   dementia symptoms that Mr. Brockman is presenting

11:47:54   2   with.  So I there's a disconnect there.

11:47:56   3   Q.   And so, is that disconnect -- is it related to

11:48:01   4   the proportionality of these -- of the different

11:48:04   5   signs that you are seeing?  How would you describe

11:48:06   6   that disconnect?

11:48:07   7   A.   It is.  So as these diseases progress over

11:48:10   8   time, the amount of brain damage increases.  So it

11:48:13   9   spreads to new areas of the brain, and that's what

11:48:16   10   leads to the clinical progression.  So as more and

11:48:19   11   more damage occurs, there are more and more

11:48:21   12   symptoms.

11:48:22   13            So we're trying to make that

11:48:23   14   correspondence between the amount of brain damage

11:48:25   15   and the clinical symptoms.  And that is where I

11:48:27   16   think the disconnect is.

11:48:28   17   Q.   And so you said that the images everyone agrees

11:48:30   18   are mild, but how do you estimate the -- what you

11:48:35   19   are describing as clinical symptoms or clinical

11:48:37   20   presentation?

11:48:38   21   A.   So that's based on my review of the records of

11:48:41   22   the reports that Mr. Brockman and his wife and

11:48:43   23   others are giving regarding his functional

11:48:46   24   impairments with the neurocognitive testing results

11:48:48   25   where he's scoring at low levels, really, taking all

11:48:53    1    of those clinical observations regarding the

11:48:54    2    severity of the problems that he's demonstrating and

11:48:57    3    comparing that to the imaging findings.

11:48:59    4    Q.    In your clinical practice -- I guess or your

11:49:04    5    research, do you ever have occasion to compare

11:49:06    6    images to what you see in a clinic?

11:49:09    7                  MR. LOONAM:  Objection.  Compound.

11:49:12    8                  MR. MAGNANI:  We can take it one at a

11:49:13    9    time, Dr. Darby.

11:49:16    10                  THE COURT:  One second.  Okay.  Just

11:49:18    11    break it up.  That'll be fine.

11:49:20    12                  MR. MAGNANI:

11:49:20    13    Q.    In your clinical practice, do you ever have the

11:49:23    14    occasion to see patients in person and compare their

11:49:25    15    presentation with images?

11:49:27    16    A.    Yes, so essentially every patient that I

11:49:30    17    evaluate in clinic, if there's a concern for

11:49:32    18    cognitive progress, I'm going to order neuroimaging.

11:49:35    19    And so I relate the neuroimaging findings to the

11:49:42    20    patient in every case.

11:49:43    21    Q.    Do you ever in your research compare what

11:49:45    22    patients are showing in an exam room with images?

11:49:48    23    A.    Yes, so my research also deals with taking

11:49:51    24    brain imaging findings, and relating that to the

11:49:53    25    patient's symptoms and their severity.

11:49:55  1   Q.   And so, how would you describe the relationship
11:49:58  2   between the symptoms Mr. Brockman shows in the exam
11:50:01  3   room and the imaging in this case?
11:50:04  4   A.   They're clearly out of proportion.  So the
11:50:06  5   imaging findings on the FDG-PET scan are again at a
11:50:10  6   mild stage of severity.  So there is brain damage,
11:50:12  7   but it's at the mild stage.
11:50:14  8              Whereas, he's presenting with very
11:50:17  9   significant and severe problems.  And one might
11:50:20 10   expect that given his level of intelligence, he
11:50:22 11   would be able to compensate more than the average
11:50:25 12   person.  So I think there's a disagreement between
11:50:27 13   the imaging findings, which are mild, and his
11:50:30 14   clinical symptoms, which are now severe.
11:50:33 15   Q.   Dr. Darby, I'd like to point you, under the
11:50:36 16   Dr. Ponisio section of your slide it says, "Early
11:50:41 17   Alzheimer's dementia."
11:50:43 18              Is early -- well, is that oxymoron?
11:50:47 19   A.   I don't know exactly what Dr. Ponisio meant
11:50:51 20   when she was writing this, but there is often
11:50:54 21   confusion in the terminology between Alzheimer's
11:50:56 22   disease and Alzheimer's dementia.
11:51:00 23              Before we didn't have these ways of
11:51:02 24   evaluating for brain damage or amyloid, and
11:51:06 25   Alzheimer's disease was Alzheimer's dementia.  But

1   now we have other ways of evaluating to show those

2   signs earlier and earlier.

3                    I would still interpret as finding

4   of early abnormality.

5   Q.   Is that to say in the past you couldn't detect

6   Alzheimer's disease without seeing the dementia?

7   A.   Correct.

8   Q.   But now that we can measure amyloid, you can

9   see the disease before the dementia?

10  A.   We know the disease process starts earlier and

11  that we can -- the amyloid PET scan and other PET

12  scans can detect signs of brain damage earlier as

13  well.

14  Q.   Now, you know, you mentioned in your practice

15  in your research you often compare clinical

16  presentation with neuroradiological images.  Did you

17  do that in this case?

18  A.   I did, yes.  I compared the severity of the

19  findings in the FDG-PET with the severity of his

20  actual symptoms.

21  Q.   And so, before getting to the next slide let me

22  just ask you.  When you -- do you have a sense from

23  seeing your own patients of what dementia, FDG-PET

24  looks like?

25  A.   Yes, so I have, you know, an image in my mind

11:52:14    1   of what the typical Alzheimer's dementia patient --

11:52:17    2   what their FDG-PET would look like, and similarly

11:52:20    3   for some of the other disorders being described.

11:52:22    4   **Q.**   And has literature and research on this subject

11:52:26    5   provided representative exemplars of what those

11:52:30    6   scans look like?

11:52:31    7   **A.**   Yes, so there are a number of research studies

11:52:34    8   that have looked at groups of patients with

11:52:37    9   Alzheimer's disease or other types of dementias, and

11:52:40   10   shown the areas of abnormality that they have on

11:52:43   11   their PET scans at the group level -- so kind of

11:52:47   12   average Alzheimer's disease patient, and looks

11:52:50   13   similar to my own mental image of what that looks

11:52:53   14   like.

11:52:53   15   **Q.**   Can we go to the next slide, please?

11:52:58   16              Dr. Darby, did you make a PowerPoint

11:52:59   17   presentation for this case?

11:53:00   18   **A.**   I did, yes.

11:53:01   19   **Q.**   Okay.   Now, this looks a little different than

11:53:03   20   the slide you created; right?

11:53:04   21   **A.**   Yes.

11:53:05   22              MR. LOONAM:   Your Honor, I object on

11:53:08   23   the basis that the witness is now testifying as to

11:53:13   24   his opinion and a new basis for the opinion.   He's

11:53:17   25   removed the slides.   He's removed the citation, but

| | |
|---|---|
| 11:53:20 | 1 |
| 11:53:25 | 2 |
| 11:53:28 | 3 |
| 11:53:30 | 4 |
| 11:53:33 | 5 |
| 11:53:37 | 6 |
| 11:53:39 | 7 |
| 11:53:40 | 8 |
| 11:53:44 | 9 |
| 11:53:49 | 10 |
| 11:53:52 | 11 |
| 11:53:53 | 12 |
| 11:53:56 | 13 |
| 11:53:58 | 14 |
| 11:54:00 | 15 |
| 11:54:01 | 16 |
| 11:54:02 | 17 |
| 11:54:03 | 18 |
| 11:54:06 | 19 |
| 11:54:09 | 20 |
| 11:54:14 | 21 |
| 11:54:20 | 22 |
| 11:54:26 | 23 |
| 11:54:27 | 24 |
| 11:54:30 | 25 |

1  the substance is exactly the same that, um, he is

2  sharing a new basis for opinion that was not

3  disclosed for which I now can't cross him because it

4  was disclosed last night, so I object.

5        THE COURT:  Okay.  So this scan --

6  everybody's seen this scan; right?

7        MR. LOONAM:  I don't object to this

8  scan, Your Honor.  What I object to is Dr. Darby is

9  now saying this scan -- "I am comparing this scan to

10  these images that were up there, but now we've taken

11  them down, but I'm still going to testify about the

12  images that were up there that weren't disclosed to

13  the Defense, and tell you how they compare to one

14  another based on my memory of what they looked

15  like."

16        I can't cross on that.

17        THE COURT:  Okay.  But I didn't hear --

18  that was only one of the things he said.  He also

19  said that based on his experience and training

20  looking at these types of -- this type of injury

21  that this is the pattern he would expect to see in

22  -- in a patient that's presenting like Mr. Brockman.

23        MR. LOONAM:  My objection, Your Honor,

24  goes to the comparison of the -- what would be up

25  there and with the citation and -- and -- and what

11:54:34  1   Dr. Darby I believe was just testifying to -- to --

11:54:38  2   to what we don't object to.

11:54:40  3              That comparison is what hasn't been

11:54:42  4   disclosed and the basis of which I -- I don't have.

11:54:45  5   And so -- so that I object to.  If it's -- based on

11:54:49  6   my experience, I'm looking at these brains and I see

11:54:51  7   that it's not what I would expect, that's different.

11:54:54  8   So -- so I agree with Your Honor.

11:54:55  9              THE COURT:  Okay.  So re-ask the

11:54:59  10  question, and then I'll see whether or not to

11:55:01  11  sustain Mr. Loonam's objection.

11:55:06  12             MR. MAGNANI:

11:55:06  13  Q.   You testified that you -- well, first, what are

11:55:10  14  we looking at on this screen, Dr. Darby?

11:55:12  15  A.   In the bottom we're looking at images of

11:55:15  16  Mr. Brockman's brain FDG-PET scan.  So this is an

11:55:20  17  image where his levels of blood sugar in these areas

11:55:24  18  of the brain has been compared to a group of

11:55:27  19  patients of similar age where they're not having any

11:55:31  20  cognitive problems.

11:55:31  21             THE COURT:  That's objectionable.  I

11:55:33  22  get it, Mr. Loonam.

11:55:35  23             MR. LOONAM:  Thank you, Your Honor.

11:55:35  24  Yeah.

11:55:36  25             THE COURT:  That objection will be

11:55:36    1    sustained.

11:55:37    2                    You can testify -- you can ask the

11:55:39    3    witness to testify about what he sees in that image

11:55:41    4    and how it's consistent or not consistent with the

11:55:44    5    types of diseases that he's testifying about, but he

11:55:46    6    can't compare what he's seeing to the slides that

11:55:51    7    aren't there, basically.

11:55:54    8                    THE WITNESS:  Is it okay if I make a

11:55:56    9    comment?

11:55:56   10                    THE COURT:  Oh, yes, sir.

11:55:57   11                    THE WITNESS:  So I wasn't comparing it

11:55:58   12    to slides that aren't there.  This is actually how

11:56:01   13    the image was generated.

11:56:02   14                    THE COURT:  That's what I thought.

11:56:04   15    That's why I was going to allow to you testify to

11:56:05   16    that.

11:56:06   17                    THE WITNESS:  Sorry.

11:56:06   18                    THE COURT:  No, no, no.  No problem.

11:56:08   19    Please, ask questions.

11:56:15   20                    MR. MAGNANI:

11:56:15   21    Q.   I think we can move to the next slide now.

11:56:18   22                    Dr. Darby.  As we're doing that,

11:56:19   23    besides this FDG-PET, you mentioned another type of

11:56:23   24    brain study that was conducted.  Can you tell us

11:56:26   25    about that one?

**A.**   Yes, so Mr. Brockman also had a brain MRI scan. And so again, that's looking at the size of his different brain areas.  So how large they are.  That scan was ordered and was performed in July of 2021, so July of this year.

In addition to having the radiologist look at it, that scan was sent for quantitative analysis.  So what that means is that is Mr. Brockman's brain volumes were compared to a group of subjects who were his same age, but don't have any neurological problems.  They don't have dementia.  They don't have cognitive impairment.  So what we're really trying to determine is does Mr. Brockman have a lower brain volume in those areas that might go along with having brain damage.

And so, in these graphs we see from the output of the Neuroreader® report, that quantitative analysis, how large Mr. Brockman's brain areas are.  And so, it's a number of different areas in the brain.  The black dot is actually Mr. Brockman's brain volume, so where he falls on there.

On the side of the graph, you see the percentile that it falls in, so the percentile of patients or subjects who are same age, 80 years

11:57:42   1   old, but do not have dementia, do not have cognitive

11:57:46   2   impairment.

11:57:46   3                    And we can see that Mr. Brockman's

11:57:49   4   brain volumes fall within the normal range of what

11:57:52   5   we expect to see.  The lowest brain volume that was

11:57:55   6   reported was in the temporal lobe, and that was at a

11:58:00   7   percentile of 23.8 percent, so approximately the

11:58:03   8   25th percentile.  That's typically considered to be

11:58:07   9   in the normal range.

11:58:08   10                    So as an example, the adult male

11:58:11   11  height at the 25th percentile would be

11:58:16   12  five-foot-seven.  That's my height.  For the most

11:58:18   13  part, we wouldn't consider that to be abnormal.

11:58:22   14  Q.   And just to break that down, this is a

11:58:25   15  volumetric analysis of the volume of Mr. Brockman's

11:58:28   16  brain?

11:58:28   17  A.   Correct.  So it is the volumes of different

11:58:30   18  areas of Mr. Brockman's brain.

11:58:32   19  Q.   Is this -- are these percentiles -- does this

11:58:36   20  compare Mr. Brockman to all 80-year-olds, or just

11:58:39   21  healthy 80-year-olds?

11:58:40   22  A.   No, it's specifically to healthy 80-year-olds

11:58:45   23  without neurological or cognitive impairments.

11:58:47   24  Q.   So how does Mr. Brockman's, from a volumetric

11:58:50   25  standpoint stand up with normal, healthy

11:58:54   1   80-year-olds?

11:58:54   2   **A.**   This shows that he's in the normal range on all

11:58:57   3   of the brain volumes depicted here.

11:59:04   4   **Q.**   We can look at the dot, but you mentioned

11:59:07   5   23.8 percent being the lowest area.  Can you just

11:59:11   6   describe what his -- what his percentile is in the

11:59:14   7   other areas of the brain?

11:59:15   8   **A.**   Yes, so the other areas in the occipital lobe

11:59:18   9   is close to the 50th percentile.  The front lobe is

11:59:22   10  about the 30th percentile.  The hippocampus --

11:59:26   11  another area important for memory -- is about in the

11:59:29   12  45th percentile.

11:59:30   13  **Q.**   So what do the other experts say about this

11:59:35   14  Neuroreader® analysis of the MRI study?

11:59:39   15  **A.**   So again, I have a slide comparing the

11:59:42   16  different impressions and interpretations.  And so,

11:59:45   17  we have both the qualitative interpretation from the

11:59:49   18  clinical radiologist showing volume loss.  I think

11:59:53   19  the question is that related to his age, or is that

11:59:56   20  related to an underlying disease?

11:59:59   21                 And that's where the quantitative

12:00:01   22  MRI is helpful in saying that that falls in the

12:00:03   23  23.8 percentile, for instance, in the temporal lobe.

12:00:07   24  I don't think there's any disagreement in that

12:00:09   25  number, but there is disagreement in the

interpretation of that.

So Dr. Whitlow stated this brain volume loss is profound in the temporal lobes, and I would disagree.  So that brain volume falls within the normal range, and is not significantly different than the population of 80-year-olds without cognitive problems.

I think the second area of disagreement is again on that clinical correlation. So how does the brain imaging findings -- how do those relate to his actual symptoms?  Dr. Whitlow mentioned in his reports that it was beyond what would be expected for mild cognitive impairment, and that it explained the significant findings noted in the clinical interviewing and the psychological testing.

And I would disagree with those statements.  So I do not believe that being at the 23.8th percentile would be evidence of significant disease, and it does not explain the severe problems he's now experiencing.

Q.   And I just -- just to not be confusing, when you say to be at the 23.8th percentile, you are talking about cognitively healthy people?

A.   Correct.

12:01:17   1   Q.   So -- okay.   I'd like to move on to the Amyvid

12:01:29   2   or amyloid PET scan.

12:01:30   3              THE COURT:   Counsel, I wanted to make

12:01:31   4   clear with respect to my ruling, with the slide

12:01:33   5   showing the different scans of the brain I'm not

12:01:38   6   preventing the witness from being able to testify

12:01:41   7   about what he sees in Mr. Brockman's scan, and what

12:01:43   8   that tells him about what's going on.   I'm just

12:01:47   9   ruling that he can't compare it to the two slides

12:01:49   10   that were before -- that were previously on the

12:01:52   11   slide.

12:01:53   12              So if he wants to testify about

12:01:55   13   what he is seeing and how it relates to what he

12:01:58   14   expects the symptoms to be or functionality to be,

12:02:03   15   that's fine.   He just can't compare it to what was

12:02:06   16   previously on the slide, just so that you are clear.

12:02:09   17              MR. MAGNANI:   I think I understand the

12:02:11   18   boundaries.   I apologize if I overstepped them.   I

12:02:14   19   think the witness testified, and I want to make sure

12:02:15   20   this is in bounds, is that he has own sort of gut

12:02:19   21   sense looking at patients, but also there's a body

12:02:21   22   of other images out there that other people write

12:02:24   23   academic research papers in.

12:02:26   24              So to sort of confirm that it's not

12:02:28   25   just his bias, he did compare it.   So it's my

12:02:31   1   understanding he can talk about that, but that we

12:02:33   2   can't show images from that literature.

12:02:35   3            THE COURT:  That's perfect.  I wanted

12:02:36   4   to make sure that you understood.  You haven't

12:02:38   5   crossed a line at all.  I just wanted to make sure

12:02:40   6   that you understood that I'm not stopping you from

12:02:42   7   doing that.

12:02:43   8            MR. MAGNANI:  Okay.

12:02:44   9            MR. LOONAM:  I just want to clarify.  I

12:02:45  10   don't object to part one, right, of talking about,

12:02:50  11   "I'm looking at these images, and based on training

12:02:53  12   and experience this is what I would see and what I

12:02:55  13   would expect."

12:02:56  14            I do -- my objection does include

12:02:58  15   talking about part two, which is I looked at

12:03:02  16   research, um, and -- and this is what I would expect

12:03:05  17   from the research and this is what I would see.

12:03:11  18            THE COURT:  Second part only comes into

12:03:13  19   play based on cross-examination if you get into

12:03:15  20   challenging his viewpoint as to what he's seeing and

12:03:19  21   said that it's not supported, then you probably will

12:03:21  22   open the door up to those other two slides.  So I

12:03:24  23   have to wait to see what -- what the

12:03:27  24   cross-examination is.

12:03:29  25            MR. LOONAM:  Okay.

12:03:30   1          THE COURT:  So you may continue.

12:03:31   2          MR. MAGNANI:  Sorry on the second part,

12:03:35   3  I understand Defense Counsel has an objection, but

12:03:37   4  I'm not -- frankly, Your Honor, I think we're beyond

12:03:39   5  that, and I don't think I need to talk about this

12:03:42   6  anymore.  I think the record's been --

12:03:48   7          And so -- okay.

12:03:50   8  Q.   And so, Dr. Darby, I wanted to move on to that

12:03:55   9  other kind of PET scan you were talking about, which

12:03:57  10  is the amyloid PET scan.  Again, can you sort of --

12:04:01  11  I know you talked about positive amyloid before, but

12:04:04  12  can you help us all understand is there any

12:04:06  13  disagreement on what this PET scan reveals?

12:04:09  14  A.   No.  So I think everyone who has looked at it

12:04:12  15  agrees that it's a positive amyloid scan -- positive

12:04:15  16  for amyloid in the brain.  I think that everyone

12:04:18  17  largely agrees with what that means.  It's the first

12:04:21  18  biological process that occurs in Alzheimer's

12:04:23  19  disease.

12:04:23  20          It's necessary, but not sufficient,

12:04:25  21  if are the diagnosis and that it doesn't correspond

12:04:29  22  to the degree of cognitive impairment.

12:04:34  23  Q.   You said it was the first -- I don't know --

12:04:36  24  did the first biological change, the first protein

12:04:40  25  we see accumulated, but what's the second one?

12:04:42  1   **A.**   So the second one is tau.  So the tau and the

12:04:45  2   deposition of tau is what seems to correspond more

12:04:49  3   closely to the brain damage and subsequent clinical

12:04:52  4   symptoms.

12:04:53  5   **Q.**   And were you able to interpret the level of

12:04:56  6   accumulation of tau, if any, in Mr. Brockman's

12:04:58  7   brain?

12:04:59  8   **A.**   No, there's no tau testing done in this case.

12:05:02  9   So it is possible to test for tau in the spinal

12:05:04  10  fluid, and there are tau PET scans similar to the

12:05:08  11  amyloid PET scan that can be obtained.

12:05:11  12  **Q.**   So what -- you know, we're talking about this

12:05:13  13  in the context of Alzheimer's.  You know, why does

12:05:15  14  it matter whether or not Mr. Brockman has

12:05:18  15  Alzheimer's?

12:05:20  16  **A.**   I think for the current purposes it doesn't.

12:05:23  17  So what we really care about is the level of his

12:05:26  18  cognitive impairment.  That's most directly

12:05:29  19  corresponding to the level of brain damage.

12:05:31  20                  So whether that's due to

12:05:33  21  Alzheimer's disease or Parkinson's, it's really that

12:05:37  22  amount of brain damage and the severity of the

12:05:40  23  cognitive symptoms that it's resulting in that's

12:05:43  24  important.

12:05:44  25  **Q.**   Okay.  We've talked about a lot of different

12:05:47   1   types of brain studies that were done in this case.

12:05:49   2   Can you advance the in next slide, please and tell

12:05:55   3   us what do these brain studies reveal?

12:05:57   4   **A.**   So this is just a summary of what we've been

12:06:00   5   talking about.  So first the FDG-PET scan shows mild

12:06:05   6   brain damage, so mild neurodegeneration.

12:06:09   7                    This is really consistent with the

12:06:12   8   mild cognitive impairment stage, or possibly the

12:06:15   9   mild dementia stage.  The brain MRI does not show

12:06:18   10   any clear abnormalities, so the brain volumes from

12:06:20   11   the MRI scan are within the normal range of what we

12:06:25   12   expect from healthy, non-cognitively impaired

12:06:32   13   80-year-olds.

12:06:32   14                    And the third thing is that the

12:06:32   15   amyloid PET scan was positive.  So again it shows

12:06:33   16   that first biological change in Alzheimer's, which

12:06:36   17   is necessary but not sufficient.  So we don't have

12:06:38   18   the information on the second biological change.

12:06:42   19   Um, and the amyloid itself does not correspond with

12:06:45   20   the degree of cognitive impairment.

12:06:48   21                    So someone may be cognitively

12:06:50   22   normal with a positive amyloid scan, versus a severe

12:06:53   23   dementia patient with an amyloid scan and wouldn't

12:06:55   24   be able to likely tell the difference.

12:06:57   25   **Q.**   And so, just on that MRI I understand you are

12:06:59  1   saying it's normal compared to cognitively normal

12:07:04  2   80-year-olds.  In your work -- break it down.  In

12:07:07  3   your work, what do the MRI's look like with patients

12:07:14  4   of mild to moderate or severe dementia?

12:07:17  5   **A.**   When patients progress to mild or moderate

12:07:20  6   severe dementia, there are typically findings on the

12:07:23  7   MRI scan that go along with that.  So the PET scan

12:07:25  8   is more sensitive, so earlier on in the disease

12:07:27  9   course that can be more present.

12:07:28  10                  As patients progress, there is more

12:07:30  11  and more evidence of neurodegeneration or volume

12:07:34  12  loss on the brain MRI's.  Certain areas like the

12:07:37  13  hippocampus where we look for in Alzheimer's

12:07:40  14  disease, typically older patients with Alzheimer's

12:07:43  15  disease as they advance would show changes.

12:07:47  16  **Q.**   Okay.  So you -- you mentioned how the imaging

12:07:53  17  we're all looking at forms your opinion.  Can you

12:07:57  18  talk about how the natural course of these diseases

12:08:00  19  also forms your opinion?  You mentioned that

12:08:02  20  earlier.

12:08:03  21  **A.**   Yes, so I -- when I evaluated Mr. Brockman in

12:08:06  22  May of 2021, I diagnosed him at the level of mild

12:08:11  23  cognitive impairment.  These are diseases that do

12:08:13  24  progress over time.  That change happens over a

12:08:18  25  number of years.  So in general, from the time of

12:08:21  1  diagnosis of dementia to death that would be on the

12:08:24  2  order of five to ten years.

12:08:25  3          In patients with mild cognitive

12:08:28  4  impairment, there is some rate of progression to

12:08:30  5  dementia over a year that might be -- as a ballpark

12:08:35  6  15/20 percent.

12:08:38  7  Q.   And I'm sorry, just to -- so moving from MCI or

12:08:43  8  mild cognitive impairment to dementia, you're saying

12:08:47  9  there's a 15 percent chance per year of that

12:08:49  10  happening?

12:08:50  11  A.   Approximately, yes.

12:08:50  12  Q.   To dementia to death is about five to ten

12:08:53  13  years?

12:08:53  14  A.   Five to ten years is a good, rough estimate.

12:08:56  15  Q.   Okay.  So -- sorry, you were saying you

12:08:59  16  diagnosed him with MCI in May.  So taking that, what

12:09:02  17  does the natural disease course tell us?

12:09:05  18  A.   So from May to now, over the course of six

12:09:07  19  months, I would expect that there could be some mild

12:09:11  20  progression changes.  I would expect him to have a

12:09:14  21  little bit more trouble with the things he was

12:09:16  22  having trouble with before, and to likely still be

12:09:18  23  at the stage of mild cognitive impairment, although

12:09:21  24  there is that risk he could have progressed to the

12:09:23  25  stage of mild dementia, absent other extenuating

circumstances that could have interfered with that.

Q.   So your starting point is May 2021.  I know you wrote two expert reports in this case, so I'm going to take you back to the first one.  What -- what gives you confidence in your May 2021 diagnosis of MCI?

A.   Well, I examined a great deal of evidence from the initial report.  And so, what I looked at were his videos of depositions and speeches in 2019, where he appeared to be performing at the normal range.

I looked at his work history.  And so, he continued to work at his job in a leadership position at Reynolds and Reynolds through the time he retired in November of 2020.

There was deposition testimony available for me to review from Tommy Barris, the successor of Mr. Brockman at the company, somebody who worked very closely with him.  He did not note any significant cognitive problems that he felt would have interfered with Mr. Brockman's ability to continue functioning in that high role.

I also looked at the medical records that were available.  And so, Mr. Brockman saw his treating neurologist, Dr. Lai, in February

12:10:43   1   of 2021, at which point he was diagnosed as being in

12:10:47   2   the MCI stage, mild cognitive impairment stage.

12:10:52   3   There are also medical records from March

12:10:54   4   hospitalization where he was hospitalized for an

12:10:56   5   infection and delirium where they noted

12:11:00   6   Mrs. Brockman stated that he was functionally

12:11:02   7   independent prior to that time.

12:11:04   8                  And then I also based it on my

12:11:06   9   interview with him and my examination.

12:11:10   10                  MR. MAGNANI:  Um, and I want to show a

12:11:12   11   clip from that examination, if I may, Your Honor?

12:11:15   12                  THE COURT:  Sure.

12:11:16   13                  MR. MAGNANI:  This is about two and a

12:11:17   14   half minutes long.

12:11:18   15                  THE COURT:  Not a problem.

12:11:19   16                  MR. MAGNANI:  This is Exhibit 40, which

12:11:21   17   is admitted.  I'd like to start the video at

12:11:25   18   18 minutes and 47 seconds.

12:11:37   19                  THE COURT:  Counsel, stipulate that --

12:11:39   20   sorry.

12:11:56   21   (Whereupon, audio played and not reported.)

12:14:22   22                  MR. LOONAM:  Could we mark for the

12:14:24   23   record where he stopped?

12:14:25   24                  MR. MAGNANI:  I was just going to do

12:14:26   25   that.  It's unclear.  So this is from Exhibit 40,

12:14:30   1   and it's from 18 minutes and 47 seconds to

12:14:33   2   21 minutes and 15 seconds.  Actually, I just want to

12:14:36   3   raise now -- actually, what we played was a clip

12:14:40   4   pulled from that video.  So we don't have to fidget.

12:14:43   5   I hope that's okay.

12:14:45   6                  THE COURT:  Not a problem.  Counsel,

12:14:46   7   it's 12:15.  We have to take our break right now.

12:14:52   8   So I hate to get you in the middle of a thought, but

12:14:54   9   hold on and we'll take a recess until 1:15.  I have

12:14:57   10   another matter to handle at 12:45 to about one

12:15:03   11   o'clock.  Don't worry, being in here won't interfere

12:15:06   12   with that.

12:15:06   13                  So if we'd all be back at 1:15, get

12:15:10   14   started then.

12:15:11   15                  MR. VARNADO:  Your Honor, okay to leave

12:15:13   16   our materials?

12:15:14   17                  THE COURT:  You can leave everything

12:15:15   18   the way it is.

19   **(WHEREUPON, THE PROCEEDINGS WERE RECESSED AT 12:15**

20   **P.M.)**

21                     ---oOo---

22

23

24

25

1
2              C E R T I F I C A T E
3
4
5          I hereby certify that pursuant to Title 28,
6  Section 753 United States Code, the foregoing is a
7  true and correct transcript of the stenographically
8  reported proceedings in the above matter.
9          Certified on 11/16/2021.
10
11
12         _____
           Sean Gumm, RPR, CRR
13
14
15
16
17
18
19
20
21
22
23
24
25

**$**

**$10** [1] - 37:6
**$25** [1] - 43:5
**$350** [1] - 81:12
**$80,000** [1] - 81:15

**1**

**1** [8] - 1:9, 7:21, 8:8, 9:7, 9:10, 30:2, 43:3, 44:7
**100** [3] - 31:17, 49:19, 64:25
**11/16/2021** [1] - 130:9
**114** [1] - 8:15
**11:30** [1] - 102:13
**12:15** [2] - 129:7, 129:19
**12:45** [1] - 129:10
**14** [2] - 40:25, 41:8
**15** [5] - 1:12, 4:5, 47:8, 126:9, 129:2
**15/20** [1] - 126:6
**15th** [2] - 16:2, 16:3
**18** [2] - 128:18, 129:1
**180** [1] - 51:16
**1981** [1] - 54:16
**1994** [1] - 68:8
**1:15** [2] - 129:9, 129:13
**1st** [2] - 20:23, 46:3

**2**

**20** [1] - 61:19
**2010** [1] - 30:5
**2016** [3] - 38:21, 38:24, 39:19
**2017** [4] - 40:4, 42:23, 95:8, 95:15
**2018** [7] - 37:10, 40:16, 40:17, 42:8, 42:15, 53:22, 84:24
**2019** [12] - 44:7, 44:14, 44:23, 46:19, 48:22, 49:3, 55:24, 56:1, 66:5, 85:1, 85:5, 127:9
**2020** [5] - 42:9, 46:20, 47:8, 48:1, 127:15
**2021** [19] - 1:12, 4:5, 48:22, 49:3, 49:9, 49:15, 56:1, 82:1, 95:9, 102:21, 102:22, 104:9, 104:20, 107:9, 116:4, 125:22, 127:2, 127:5, 128:1
**21** [2] - 49:25, 129:2

**23** [1] - 30:5
**23.8** [3] - 117:7, 118:5, 118:23
**23.8th** [2] - 119:19, 119:23
**25** [1] - 91:9
**25th** [2] - 117:8, 117:11
**27** [2] - 7:21, 8:14
**28** [2] - 7:21, 130:5
**29** [1] - 8:8
**29th** [1] - 20:21

**3**

**3** [1] - 42:23
**30** [4] - 36:18, 36:22, 68:18, 91:9
**30th** [2] - 44:3, 118:10
**32** [1] - 8:8
**38** [1] - 76:14
**39** [1] - 76:14

**4**

**40** [5] - 54:12, 69:23, 91:9, 128:16, 128:25
**43** [3] - 8:8, 103:14, 103:18
**44** [1] - 8:14
**45th** [1] - 118:12
**47** [2] - 128:18, 129:1
**48** [2] - 9:8, 9:10
**4:21-CR-00009-1** [2] - 1:4, 4:9

**5**

**5** [2] - 7:21, 42:15
**5,000-person** [1] - 46:24
**50th** [1] - 118:9
**57** [1] - 8:14
**58** [1] - 8:8
**5:00** [2] - 21:16, 27:10
**5:30** [1] - 19:23
**5th** [1] - 41:1

**6**

**60** [1] - 8:9
**62** [1] - 8:14
**6:00** [2] - 19:24, 21:16

**7**

**71** [1] - 3:5
**75** [1] - 8:14
**753** [1] - 130:6
**77** [1] - 8:9

**8**

**8** [1] - 8:8
**80** [1] - 116:25
**80's** [1] - 91:8
**80-year-old** [1] - 99:19
**80-year-olds** [7] - 117:20, 117:21, 117:22, 118:1, 119:6, 124:13, 125:2
**81** [1] - 7:22
**8th** [3] - 15:23, 21:12, 27:13

**9**

**9** [1] - 8:13
**92** [1] - 49:19
**95** [1] - 8:9
**96** [1] - 7:22
**97** [1] - 8:14
**99.9** [1] - 49:22
**9:16** [1] - 4:5

**A**

**A.M** [1] - 4:5
**abilities** [2] - 62:24, 98:1
**ability** [11] - 19:13, 24:8, 41:20, 46:11, 47:23, 47:24, 67:7, 93:12, 97:24, 101:1, 127:21
**able** [24] - 10:3, 11:8, 14:14, 16:5, 23:13, 29:5, 44:9, 53:17, 67:12, 70:2, 70:9, 86:23, 89:8, 91:3, 93:21, 94:1, 98:1, 100:15, 100:19, 101:12, 110:11, 120:6, 123:5, 124:24
**abnormal** [5] - 88:25, 91:25, 92:6, 105:8, 117:13
**abnormalities** [3] - 105:17, 106:11, 124:10
**abnormality** [2] - 111:4, 112:10
**Abrahamsen** [1] - 66:4
**absent** [2] - 98:21, 126:25
**absolute** [1] - 37:19
**absolutely** [8] - 18:23, 19:7, 19:16, 21:6, 30:12, 31:14, 32:5, 32:6

**abundantly** [1] - 33:13
**academic** [3] - 20:4, 20:14, 120:23
**Academy** [2] - 74:24, 75:6
**accommodate** [2] - 19:12, 19:15
**accountability** [1] - 35:20
**accounts** [1] - 40:5
**accumulated** [1] - 122:25
**accumulates** [2] - 85:25, 89:25
**accumulation** [3] - 89:25, 90:2, 123:6
**accurate** [4] - 30:24, 31:15, 80:6, 83:14
**accurately** [3] - 44:5, 45:23, 45:25
**accused** [1] - 80:8
**acknowledged** [3] - 62:18, 62:20, 65:22
**acknowledges** [1] - 57:22
**action** [1] - 55:14
**active** [3] - 74:21, 89:17, 102:7
**activities** [2] - 59:5, 93:25
**activity** [2] - 100:4, 101:19
**acts** [1] - 86:11
**actual** [4] - 31:3, 80:4, 111:20, 119:11
**acute** [2] - 94:21, 95:5
**add** [2] - 20:17, 66:6
**added** [1] - 19:19
**adding** [1] - 15:23
**addition** [4] - 56:11, 58:9, 86:3, 116:6
**additional** [4] - 7:6, 8:10, 8:11, 59:16
**address** [10] - 6:20, 6:22, 7:9, 11:10, 15:3, 18:3, 20:2, 29:5, 58:18, 94:12
**addressing** [3] - 4:13, 4:19, 29:7
**adjusted** [1] - 49:21
**administering** [2] - 49:25, 82:24
**admit** [4] - 7:13, 7:18, 7:21, 31:2
**admitted** [12] - 6:15, 6:16, 7:24, 8:9, 9:1, 9:6, 9:11, 9:12, 76:8, 76:12, 103:11, 128:17
**admonished** [1] -

27:12
**adopts** [1] - 63:13
**adult** [1] - 117:10
**advance** [4] - 77:10, 91:16, 124:2, 125:15
**advanced** [3] - 48:17, 95:17, 97:5
**advent** [1] - 89:5
**advocating** [1] - 87:15
**AEBCT** [1] - 54:16
**affect** [2] - 71:23, 72:12
**affected** [1] - 57:4
**affection** [1] - 84:19
**affects** [3] - 84:6, 86:1, 92:7
**age** [6] - 49:21, 91:5, 114:19, 116:10, 116:25, 118:19
**age-adjusted** [1] - 49:21
**agent** [1] - 5:10
**aging** [1] - 47:2
**ago** [4] - 24:18, 57:18, 66:3, 67:13
**agree** [18] - 7:18, 8:12, 12:7, 23:17, 54:9, 56:5, 56:17, 56:19, 56:20, 56:21, 64:1, 85:17, 105:14, 105:16, 106:21, 107:5, 114:8
**agreed** [2] - 7:20, 8:10, 8:12, 14:19, 40:14, 41:12, 55:14, 67:21, 107:10
**agreement** [5] - 8:18, 62:19, 106:15, 107:1, 107:2
**agrees** [5] - 59:8, 85:18, 108:17, 122:15, 122:17
**Agronin** [1] - 59:18
**ahead** [2] - 7:11, 55:21
**aid** [1] - 28:15
**Alaskan** [1] - 42:16
**allegations** [1] - 54:13
**alleged** [1] - 52:16
**allow** [6] - 30:11, 31:21, 32:2, 32:12, 77:5, 115:15
**allowed** [4] - 10:16, 10:23, 11:3, 12:5
**allowing** [1] - 33:23
**almost** [3] - 41:17, 50:2, 50:16
**alone** [2] - 70:10, 94:8
**already-impaired** [1] - 57:16
**Alzheimer's** [56] -

15:15, 15:17, 21:25, 30:5, 48:16, 56:14, 56:15, 58:5, 58:22, 58:24, 59:2, 59:22, 61:5, 62:19, 64:10, 64:24, 65:1, 65:7, 65:14, 73:1, 75:1, 75:7, 77:22, 88:11, 88:16, 89:4, 89:22, 90:17, 90:23, 91:7, 91:10, 92:10, 94:18, 95:4, 101:24, 104:11, 105:4, 105:9, 106:23, 107:5, 110:17, 110:21, 110:22, 110:25, 111:6, 112:1, 112:9, 112:12, 122:18, 123:13, 123:15, 123:21, 124:16, 125:13, 125:14

**AM** [1] - 1:9

**America** [1] - 4:10

**American** [5] - 74:24, 74:25, 75:1, 75:6

**amount** [8] - 52:5, 95:20, 100:8, 100:10, 100:16, 108:8, 108:14, 123:22

**amyloid** [36] - 21:23, 64:8, 64:22, 65:3, 88:13, 88:16, 89:7, 89:9, 89:11, 89:24, 90:3, 90:11, 90:12, 90:20, 90:21, 91:4, 91:6, 91:10, 91:14, 92:12, 101:21, 101:22, 110:24, 111:8, 111:11, 120:2, 122:10, 122:11, 122:15, 122:16, 123:11, 124:15, 124:19, 124:22, 124:23

**Amyvid** [1] - 120:1

**analysis** [5] - 83:5, 116:8, 116:18, 117:15, 118:14

**analyze** [1] - 58:11

**answer** [2] - 27:6, 66:9

**answered** [1] - 46:14

**answers** [1] - 46:15

**anti** [1] - 45:18

**anti-trust** [1] - 45:18

**anticipated** [1] - 29:14

**apologies** [1] - 33:7

**apologize** [2] - 106:3, 120:18

**appear** [3] - 13:2, 29:19, 67:12

**APPEARANCES** [1] - 1:14

**appeared** [3] - 20:23, 27:11, 127:10

**appearing** [2] - 13:3, 23:10

**appointment** [3] - 42:17, 42:18, 42:19

**appointments** [1] - 93:19

**appreciate** [1] - 100:2

**appropriate** [2] - 14:14, 82:15

**appropriately** [2] - 44:5, 45:16

**approximations** [1] - 34:3

**architect** [1] - 39:14

**area** [5] - 89:17, 99:13, 118:5, 118:11, 119:8

**areas** [14] - 86:1, 92:15, 102:8, 108:9, 112:10, 114:17, 116:3, 116:14, 116:19, 116:20, 117:18, 118:7, 118:8, 125:12

**argument** [1] - 35:6

**arms** [1] - 97:3

**arousal** [1] - 86:16

**arrive** [1] - 83:14

**article** [2] - 22:11, 23:1

**articles** [3] - 22:9, 24:1, 26:4

**aside** [1] - 66:21

**asleep** [1] - 86:12

**aspects** [2] - 62:24, 94:11

**assault** [1] - 46:20

**asset** [1] - 54:22

**assets** [3] - 36:20, 37:7, 54:21

**assist** [7] - 54:2, 56:3, 60:21, 61:2, 66:12, 69:17, 69:23

**assistance** [2] - 80:8, 94:6

**assistant** [1] - 72:21

**assisted** [2] - 83:4, 103:1

**associate's** [1] - 38:7

**associated** [7] - 40:5, 43:22, 44:24, 84:17, 86:15, 88:22, 101:23

**associates** [1] - 97:25

**Association** [3] - 74:25, 75:2, 75:7

**association** [1] - 100:21

**Associations** [1] - 75:1

**assume** [1] - 34:17

**assumption** [1] - 45:8

**AT** [1] - 129:19

**attempt** [3] - 35:24, 38:6, 39:25

**attend** [1] - 10:3

**attention** [1] - 86:17

**Attorney** [4] - 1:19, 1:21, 1:22, 1:23

**attorney** [6] - 12:9, 13:9, 29:12, 45:20, 45:21, 82:2

**attorneys** [4] - 47:10, 62:5, 66:4, 69:20

**audience** [1] - 4:17

**audio** [1] - 128:21

**August** [5] - 40:17, 102:22, 103:4, 104:19, 107:8

**authentic** [1] - 8:13

**authenticity** [2] - 8:19, 9:2

**authorities** [1] - 41:2

**autonomic** [1] - 84:19

**available** [6] - 15:25, 64:16, 80:20, 81:20, 127:17, 127:24

**average** [3] - 101:13, 110:11, 112:12

**avoid** [1] - 61:16

**awards** [2] - 75:3, 75:5

**awhile** [1] - 5:23

**B**

**backdate** [1] - 42:1

**background** [5] - 15:5, 74:5, 76:3, 82:12, 88:14

**backwards** [1] - 65:18

**bad** [1] - 16:17

**ballpark** [2] - 95:11, 126:5

**bank** [1] - 40:5

**banks** [1] - 36:23

**Barris** [3] - 69:3, 69:6, 127:17

**base** [3] - 79:20, 97:17, 100:5

**based** [21] - 10:25, 11:22, 16:4, 24:25, 42:3, 44:1, 44:13, 48:12, 61:22, 62:12, 80:7, 86:25, 88:12, 96:21, 108:21, 113:14, 113:19,

114:5, 121:11, 121:19, 128:8

**baseline** [2] - 100:23, 100:25

**bases** [2] - 22:2, 59:9

**basis** [13] - 22:3, 22:18, 24:19, 27:8, 31:1, 49:22, 64:9, 67:23, 92:19, 112:23, 112:24, 113:2, 114:4

**batch** [1] - 8:18

**Baylor** [5] - 43:22, 44:24, 63:5, 66:19, 86:20

**bearer** [1] - 16:17

**becomes** [3] - 88:24, 91:11, 92:3

**becoming** [1] - 68:21

**bedside** [1] - 96:9

**began** [2] - 38:23, 72:4

**begin** [1] - 6:9

**beginning** [8] - 28:2, 28:3, 38:21, 61:13, 61:14, 70:7, 83:10, 85:4

**BEHALF** [3] - 3:9, 3:15, 3:21

**behalf** [4] - 5:5, 5:12, 5:14, 61:20

**behavior** [3] - 73:12, 86:10, 87:11

**behavioral** [8] - 71:13, 71:21, 71:25, 72:19, 75:8, 75:11, 77:14, 82:13

**behind** [2] - 53:16, 103:13

**benefit** [1] - 24:14

**benefits** [1] - 83:11

**Bermuda** [2] - 40:6, 41:1

**bespoke** [1] - 37:21

**best** [2] - 19:13, 89:23

**beta** [1] - 21:23

**beta-amyloid** [1] - 21:23

**Beth** [1] - 72:20

**better** [3] - 17:3, 17:17, 41:25

**between** [14] - 10:16, 39:2, 41:9, 43:12, 73:11, 91:19, 91:22, 100:8, 106:7, 107:13, 108:14, 110:2, 110:12, 110:21

**beyond** [4] - 69:16, 78:13, 119:12, 122:4

**bias** [1] - 120:25

**bigger** [1] - 4:23

**billion** [1] - 37:6

**billions** [1] - 36:20

**bind** [1] - 89:8

**binders** [1] - 103:13

**binding** [3] - 99:8, 101:21, 102:4

**binds** [1] - 101:22

**Bioethics** [1] - 73:2

**biological** [9] - 85:24, 90:24, 91:24, 92:7, 101:23, 122:18, 122:24, 124:16, 124:18

**bit** [2] - 88:14, 126:21

**bits** [1] - 35:9

**black** [1] - 116:20

**blindfolded** [1] - 49:20

**blood** [2] - 99:9, 114:17

**blue** [1] - 33:12

**boasted** [1] - 38:4

**Bob** [48] - 53:25, 54:4, 54:7, 55:11, 55:13, 55:17, 56:2, 56:6, 56:14, 56:17, 57:1, 57:17, 57:18, 57:22, 58:23, 59:8, 59:10, 59:21, 59:24, 60:8, 60:16, 60:25, 61:6, 61:15, 61:24, 63:4, 64:10, 65:16, 66:2, 66:4, 66:7, 66:10, 66:20, 66:25, 67:19, 67:24, 68:8, 68:9, 68:18, 69:5, 69:7, 69:11, 69:21, 70:7, 70:11

**bob** [2] - 55:9, 55:10

**Bob's** [26] - 54:16, 57:13, 58:7, 59:4, 59:25, 60:12, 60:19, 61:1, 61:10, 62:1, 62:4, 62:21, 64:4, 65:6, 66:15, 66:18, 66:22, 67:4, 67:6, 67:11, 67:22, 68:13, 68:14, 68:20, 68:23, 69:15

**bodies** [13] - 43:25, 85:21, 85:22, 85:23, 86:16, 87:2, 87:23, 88:6, 92:5, 94:18, 104:12, 105:6, 105:13

**body** [6] - 25:19, 64:16, 71:19, 86:4, 101:22, 120:21

**body's** [1] - 99:9

**book** [2] - 22:1, 30:11
**books** [1] - 24:1
**Boris** [1] - 5:6
**BORIS** [1] - 1:18
**bottom** [2] - 22:10, 114:15
**boundaries** [1] - 120:18
**bounds** [1] - 120:20
**BOURGET** [1] - 1:18
**Bourget** [2] - 5:7, 104:17
**Brain** [2] - 64:5, 73:2
**brain** [104] - 21:4, 21:24, 22:9, 25:11, 25:13, 31:23, 32:20, 33:10, 33:15, 48:13, 62:16, 64:2, 65:6, 71:20, 73:11, 84:4, 85:9, 85:10, 86:1, 88:8, 88:24, 89:1, 89:2, 89:3, 89:7, 89:10, 89:13, 89:16, 89:17, 89:19, 90:18, 91:1, 92:2, 92:3, 92:8, 92:15, 94:22, 95:5, 96:12, 96:13, 98:15, 99:2, 99:3, 99:4, 99:7, 99:10, 99:12, 99:15, 99:16, 99:17, 99:20, 99:21, 100:4, 100:9, 100:16, 100:18, 101:18, 101:19, 102:6, 102:7, 102:8, 102:19, 108:8, 108:9, 108:14, 109:24, 110:6, 110:24, 111:12, 114:16, 114:18, 115:24, 116:1, 116:3, 116:9, 116:14, 116:15, 116:19, 116:20, 116:21, 117:4, 117:5, 117:16, 117:18, 118:3, 118:7, 119:2, 119:4, 119:10, 120:5, 122:16, 123:3, 123:7, 123:19, 123:22, 124:1, 124:3, 124:6, 124:9, 124:10, 125:12
**brain's** [1] - 99:16
**brains** [1] - 114:6
**branch** [1] - 81:9
**break** [10] - 19:3, 19:10, 102:10, 102:11, 105:10,
109:11, 117:14, 125:2, 129:7
**briefings** [1] - 35:7
**Brigham** [1] - 72:10
**bring** [3] - 6:12, 7:2, 43:20
**bringing** [2] - 83:8, 106:4
**brings** [1] - 63:24
**broader** [1] - 52:24
**broadly** [1] - 42:6
**Brockman** [66] - 4:10, 5:12, 5:14, 5:16, 5:17, 10:8, 10:10, 10:12, 12:9, 13:24, 32:23, 37:4, 37:5, 37:15, 37:21, 39:7, 39:13, 39:14, 39:17, 39:22, 40:5, 40:7, 40:13, 40:22, 40:24, 41:5, 41:10, 41:13, 53:15, 53:16, 53:22, 53:25, 54:14, 54:18, 55:11, 56:3, 56:6, 57:17, 57:18, 59:16, 65:23, 70:11, 77:19, 77:24, 81:25, 84:20, 87:4, 87:7, 88:10, 89:11, 92:23, 101:4, 101:5, 102:20, 108:1, 108:22, 110:2, 113:22, 116:1, 116:14, 117:20, 123:14, 125:21, 127:18, 127:24, 128:6
**BROCKMAN** [1] - 1:7
**Brockman's** [22] - 12:15, 12:20, 13:8, 33:15, 33:20, 41:6, 62:23, 77:18, 91:5, 96:19, 102:19, 114:16, 116:9, 116:18, 116:21, 117:3, 117:15, 117:18, 117:24, 120:7, 123:6, 127:21
**brought** [2] - 54:1, 66:11
**buddies** [1] - 68:19
**bug** [1] - 87:5
**build** [1] - 37:2
**built** [1] - 67:13
**burden** [2] - 61:9, 61:12
**burdens** [1] - 76:2
**Bureau** [1] - 61:20
**business** [2] - 37:2, 59:25
**BY** [1] - 71:9

**C**

**cannot** [6] - 54:9, 58:8, 59:15, 61:1, 66:9, 96:24
**cannot-be-faked** [1] - 58:8
**capacity** [5] - 36:2, 36:8, 42:5, 48:2, 53:6
**care** [6] - 19:14, 50:16, 67:4, 68:25, 94:23, 123:17
**careful** [2] - 38:18, 38:22
**caregiver** [3] - 59:25, 67:23, 69:13
**caretaker** [3] - 12:15, 12:20, 13:9
**Carlos** [1] - 39:13
**carry** [1] - 67:12
**case** [75] - 4:8, 5:9, 11:2, 15:10, 15:20, 16:24, 17:24, 20:21, 21:2, 21:3, 22:17, 24:11, 25:18, 25:24, 31:12, 31:22, 33:16, 35:25, 36:3, 36:11, 38:6, 41:16, 42:7, 47:19, 48:5, 48:20, 49:14, 50:7, 50:9, 54:10, 54:11, 56:4, 58:7, 58:8, 59:6, 67:11, 69:19, 75:21, 76:5, 77:16, 77:17, 80:16, 80:25, 81:3, 81:9, 81:11, 81:14, 81:21, 82:9, 82:16, 82:19, 82:23, 85:17, 85:20, 87:14, 88:13, 92:10, 94:6, 97:15, 98:25, 101:16, 101:20, 103:5, 103:8, 104:22, 106:1, 109:20, 110:3, 111:17, 112:17, 123:8, 124:1, 127:3
**cases** [6] - 25:14, 58:5, 63:19, 64:15, 74:11, 84:17
**caused** [4] - 85:23, 87:2, 94:16, 94:23
**causes** [7] - 64:14, 89:1, 89:3, 92:15, 94:15, 94:19, 94:24
**causing** [1] - 88:8
**caveat** [1] - 33:9
**celebrity** [1] - 63:17
**Center** [2] - 58:22,
73:1
**center** [1] - 73:19
**CEO** [2] - 36:4, 47:18
**certain** [9] - 30:24, 47:13, 61:23, 80:20, 89:17, 94:11, 99:11, 102:7, 125:12
**certainly** [1] - 91:12
**certainty** [1] - 79:14
**Certified** [1] - 130:9
**certify** [1] - 130:5
**CFO** [1] - 66:1
**chairman** [1] - 47:18
**challenges** [1] - 93:21
**challenging** [3] - 94:1, 94:2, 121:20
**chance** [2] - 6:3, 126:9
**change** [14] - 8:5, 28:4, 73:17, 85:24, 90:10, 90:24, 92:12, 92:14, 94:21, 100:19, 122:24, 124:16, 124:18, 125:24
**changed** [1] - 63:11
**changes** [10] - 86:16, 88:21, 90:18, 91:24, 92:1, 100:1, 100:7, 107:24, 125:15, 126:20
**changing** [2] - 20:25, 27:16
**characteristic** [1] - 84:14
**charges** [3] - 36:16, 54:12, 55:7
**Charitable** [3] - 37:4, 54:14, 54:18
**chart** [4] - 25:7, 30:3, 31:19, 91:21
**charts** [4] - 24:1, 24:25, 27:20
**check** [6] - 30:7, 30:9, 32:16, 32:17, 32:19, 33:5
**children's** [1] - 14:17
**choice** [1] - 11:15
**chose** [1] - 26:12
**Chris** [1] - 5:7
**CHRISTOPHER** [1] - 1:16
**Christopher** [2] - 23:16, 64:3
**church** [1] - 68:10
**circumstances** [2] - 98:22, 127:1
**citation** [3] - 26:20, 112:25, 113:25
**cite** [1] - 31:23
**cited** [3] - 22:9, 22:20,
25:22
**cites** [1] - 30:13
**claiming** [1] - 47:5
**claims** [2] - 44:9, 44:11
**clarifies** [1] - 23:20
**clarify** [1] - 121:9
**clear** [17] - 11:5, 27:9, 27:19, 28:20, 33:12, 33:13, 38:1, 41:22, 47:20, 47:25, 51:17, 61:3, 80:3, 84:25, 120:4, 120:16, 124:10
**clearly** [3] - 35:21, 79:17, 110:4
**clicker** [1] - 77:9
**client** [3] - 26:6, 31:12, 70:6
**Clinic** [2] - 66:17, 72:25
**clinic** [6] - 14:17, 18:24, 73:21, 96:2, 109:6, 109:17
**clinical** [35] - 15:15, 34:4, 73:19, 74:13, 74:14, 74:15, 87:12, 88:21, 89:3, 90:19, 90:25, 92:4, 95:22, 96:15, 97:6, 100:9, 104:2, 104:23, 106:16, 107:3, 107:10, 107:15, 108:10, 108:15, 108:19, 109:1, 109:4, 109:13, 110:14, 111:15, 118:18, 119:9, 119:15, 123:3
**clinically** [3] - 73:7, 73:8, 79:22
**clinicians** [1] - 86:20
**clip** [2] - 128:11, 129:3
**clock** [1] - 21:17
**close** [5] - 36:23, 38:7, 67:19, 96:5, 118:9
**closely** [3] - 98:16, 123:3, 127:19
**closing** [2] - 22:7, 38:23
**clothes** [1] - 97:2
**co** [1] - 58:24
**co-occurring** [1] - 58:24
**Code** [1] - 130:6
**cognition** [1] - 91:13
**cognitive** [67] - 22:14, 47:24, 48:21, 49:3, 56:18, 57:13, 57:19, 60:19, 62:23, 71:22,

73:8, 74:5, 74:16, 74:18, 75:11, 77:14, 77:24, 78:2, 79:7, 79:8, 79:18, 80:4, 84:18, 87:24, 90:6, 90:9, 90:13, 92:22, 92:24, 93:4, 93:9, 93:10, 93:14, 93:16, 96:8, 96:9, 97:13, 97:21, 98:1, 98:6, 98:9, 98:11, 98:12, 98:20, 100:12, 100:25, 101:1, 101:3, 106:24, 109:18, 114:20, 116:12, 117:1, 117:23, 119:7, 119:13, 122:22, 123:18, 123:23, 124:8, 124:20, 125:23, 126:3, 126:8, 126:23, 127:20, 128:2
**cognitively** [5] - 99:18, 119:24, 124:12, 124:21, 125:1
**collaborated** [1] - 80:24
**collaboration** [1] - 83:17
**collaboratively** [1] - 83:8
**colleague** [2] - 16:9, 23:18
**colleagues** [4] - 5:6, 5:15, 5:19, 60:1
**COLLEEN** [1] - 1:20
**com** [1] - 62:12
**combination** [2] - 25:12, 64:23
**combining** [1] - 15:12
**comfortable** [1] - 94:7
**coming** [3] - 19:6, 30:20, 95:7
**comment** [3] - 98:1, 107:7, 115:9
**committee** [1] - 47:15
**common** [5] - 56:9, 74:17, 91:3, 91:11
**communicated** [3] - 37:21, 80:22, 103:3
**communication** [1] - 65:23
**comorbidity** [1] - 59:22
**companies** [1] - 54:25
**company** [15] - 36:4, 37:7, 46:25, 47:7, 47:13, 49:5, 54:25,

55:1, 66:1, 66:2, 67:13, 68:11, 68:12, 101:7, 127:18
**Company** [2] - 54:23, 54:24
**compare** [15] - 25:19, 64:17, 97:19, 98:7, 99:17, 109:5, 109:14, 109:21, 111:15, 113:13, 115:6, 117:20, 120:9, 120:15, 120:25
**compared** [4] - 111:18, 114:18, 116:9, 125:1
**comparing** [4] - 109:3, 113:9, 115:11, 118:15
**comparison** [4] - 25:20, 98:5, 113:24, 114:3
**compensate** [5] - 100:15, 100:19, 101:1, 101:12, 110:11
**competence** [4] - 50:19, 62:24, 80:1, 80:2
**COMPETENCY** [1] - 1:9
**competency** [6] - 61:10, 75:22, 76:1, 82:21, 83:1, 86:22
**competency-related** [1] - 75:22
**competent** [7] - 10:9, 10:12, 10:14, 45:1, 50:23, 52:20, 62:13
**complete** [1] - 93:20
**complex** [5] - 25:8, 36:19, 45:18, 69:22, 93:25
**complicated** [2] - 54:10, 54:11
**compound** [1] - 109:7
**comprehensive** [1] - 41:4
**computer** [3] - 2:5, 21:18, 40:13
**concepts** [1] - 25:8
**concern** [6] - 26:3, 40:15, 86:20, 87:3, 87:9, 109:17
**concerned** [3] - 14:13, 39:4, 96:14
**concerning** [1] - 7:6
**concerns** [2] - 46:11, 96:2
**conclude** [2] - 60:16,

60:24
**concluded** [2] - 44:4, 44:25
**concludes** [2] - 45:15, 61:6
**conclusion** [8] - 58:20, 59:9, 61:21, 63:10, 63:21, 63:23, 77:23, 83:25
**conclusions** [5] - 63:13, 63:14, 63:15, 77:15, 79:25
**concrete** [2] - 58:8, 59:12
**condition** [4] - 36:24, 42:11, 51:2, 51:3
**conduct** [1] - 53:3
**conducted** [2] - 50:5, 115:24
**conducting** [1] - 61:19
**confer** [1] - 18:22
**conference** [2] - 55:18, 55:21
**conferencing** [2] - 14:23, 16:5
**confidence** [2] - 37:24, 127:5
**confirm** [1] - 120:24
**confirmation** [1] - 59:16
**confirmed** [1] - 33:8
**conflict** [5] - 14:6, 16:1, 16:20, 16:21, 16:23
**conflicting** [1] - 23:4
**conflicts** [1] - 16:20
**confused** [1] - 97:1
**confusing** [1] - 119:22
**confusion** [2] - 97:2, 110:21
**congregate** [1] - 68:9
**connecting** [1] - 35:8
**CONNOR** [1] - 1:20
**Conor** [1] - 16:9
**cons** [1] - 83:11
**consent** [1] - 9:16
**consider** [5] - 48:4, 48:8, 86:13, 89:13, 117:13
**considered** [2] - 86:18, 117:8
**consistent** [14] - 17:12, 32:18, 48:22, 58:4, 62:18, 64:23, 65:14, 85:7, 87:10, 97:10, 107:20, 115:4, 124:7
**conspiracy** [1] - 41:5
**conspired** [1] - 37:25
**constant** [2] - 41:22,

50:16
**constitutional** [1] - 69:20
**consult** [2] - 23:4, 54:5
**consulted** [1] - 83:2
**contact** [2] - 16:6, 16:8
**contain** [2] - 20:3, 39:25
**contained** [1] - 41:15
**containing** [1] - 41:4
**contend** [1] - 57:15
**contesting** [1] - 8:19
**context** [2] - 69:25, 123:13
**continue** [7] - 24:23, 52:3, 79:2, 97:24, 102:15, 122:1, 127:22
**continued** [1] - 127:13
**continues** [3] - 45:12, 52:1, 52:19
**continuing** [1] - 46:19
**contrast** [1] - 38:8
**contribute** [1] - 95:1
**control** [8] - 37:19, 38:2, 41:6, 41:23, 44:22, 46:18, 50:7, 50:14
**controlled** [2] - 37:6, 37:9
**conversation** [1] - 67:12
**conversations** [2] - 41:9, 93:19
**convincingly** [1] - 42:1
**cooking** [1] - 44:17
**cooperators** [1] - 50:10
**coordinating** [2] - 80:21, 81:5
**copies** [1] - 28:16
**cord** [1] - 71:19
**Corey** [1] - 5:5
**COREY** [18] - 1:15, 5:4, 5:9, 6:6, 6:11, 7:19, 8:3, 8:7, 12:7, 12:19, 13:5, 13:16, 13:20, 15:2, 15:6, 18:2, 19:16, 35:2
**corporate** [1] - 54:23
**correct** [13] - 8:5, 9:3, 12:19, 15:15, 30:12, 32:5, 32:6, 33:9, 78:17, 111:7, 117:17, 119:25, 130:7
**correctly** [1] - 26:19

**correlate** [1] - 64:25
**correlation** [4] - 100:8, 100:20, 107:15, 119:9
**correspond** [5] - 90:25, 107:18, 122:21, 123:2, 124:19
**correspondence** [4] - 38:11, 43:16, 108:14
**correspondences** [1] - 98:16
**corresponding** [2] - 90:10, 123:19
**corroborate** [1] - 69:14
**counsel** [17] - 5:10, 12:11, 13:11, 25:8, 27:24, 28:2, 29:1, 29:22, 54:2, 75:24, 80:9, 81:2, 102:9, 102:15, 120:3, 128:19, 129:6
**Counsel** [4] - 35:7, 53:8, 70:14, 122:3
**Counsel's** [1] - 24:19
**couple** [4] - 5:25, 6:1, 24:23, 44:7
**course** [14] - 5:16, 33:16, 52:21, 55:14, 60:15, 82:17, 88:4, 90:3, 95:3, 98:18, 125:9, 125:18, 126:17, 126:18
**Court** [38] - 2:2, 2:2, 4:13, 4:19, 6:1, 6:12, 6:13, 6:22, 7:3, 11:23, 14:25, 18:21, 19:5, 20:24, 21:6, 23:23, 26:21, 27:11, 28:15, 29:5, 29:7, 29:15, 29:20, 48:5, 51:6, 53:16, 53:25, 54:3, 55:18, 56:13, 57:1, 60:22, 63:2, 69:7, 77:15, 78:24, 81:8, 103:14
**COURT** [87] - 1:1, 3:21, 4:7, 5:8, 5:11, 5:17, 5:21, 6:8, 7:4, 7:10, 7:23, 8:2, 8:6, 8:16, 8:25, 9:5, 9:9, 10:22, 11:20, 12:2, 12:13, 12:22, 13:6, 13:18, 14:24, 17:25, 18:9, 18:19, 19:11, 19:18, 19:20, 23:14, 23:25, 24:23, 26:2, 26:17, 27:14, 28:11, 28:17, 28:22, 29:1,

29:18, 30:9, 31:6, 31:18, 32:23, 33:2, 33:6, 33:17, 34:6, 34:9, 34:14, 34:21, 35:4, 53:8, 53:11, 53:23, 70:14, 70:19, 71:6, 75:13, 75:17, 76:11, 77:5, 77:11, 78:9, 78:15, 79:2, 102:9, 109:10, 113:5, 113:17, 114:9, 114:21, 114:25, 115:10, 115:14, 115:18, 120:3, 121:3, 121:18, 122:1, 128:12, 128:15, 128:19, 129:6, 129:17

**court** [4] - 4:3, 53:19, 70:1, 102:1

**Court's** [5] - 4:8, 8:23, 14:16, 19:13, 20:17

**courtroom** [16] - 4:24, 9:17, 9:23, 10:17, 11:7, 11:15, 12:5, 12:12, 12:21, 12:23, 13:7, 13:10, 13:13, 30:8, 53:15, 67:22

**cover** [2] - 38:16, 54:12

**Craig** [1] - 65:25

**create** [2] - 38:15, 38:18

**created** [10] - 30:3, 30:10, 31:19, 32:1, 32:10, 39:10, 39:13, 76:22, 76:24, 112:20

**creates** [1] - 47:14

**creating** [1] - 39:6

**creation** [2] - 39:8, 39:9

**credentials** [1] - 73:4

**crimes** [2] - 55:3, 55:4

**criminal** [4] - 54:1, 55:4, 66:11, 69:19

**critically** [1] - 97:16

**cross** [13] - 4:15, 9:19, 10:18, 11:9, 22:23, 23:5, 25:25, 27:5, 78:17, 113:3, 113:16, 121:19, 121:24

**cross-examination** [3] - 78:17, 121:19, 121:24

**cross-examinations** [2] - 9:19, 10:18

**cross-examine** [1] - 25:25

**cross-examined** [1] - 11:9

**cross-examining** [1] - 4:15

**crossed** [1] - 121:5

**crowded** [1] - 4:20

**CRR** [2] - 2:1, 130:12

**cumulative** [1] - 8:21

**current** [3] - 57:13, 62:23, 123:16

---

# D

**daily** [2] - 59:5, 67:23

**damage** [34] - 39:25, 73:11, 85:13, 89:1, 89:2, 89:3, 89:14, 89:19, 90:18, 91:1, 92:2, 92:3, 92:15, 96:13, 99:2, 99:3, 99:13, 99:21, 100:9, 100:10, 100:16, 101:19, 106:11, 108:8, 108:11, 108:14, 110:6, 110:24, 111:12, 116:15, 123:3, 123:19, 123:22, 124:6

**damaged** [1] - 85:12

**Dana** [1] - 66:4

**danger** [1] - 44:17

**Darby** [51] - 14:8, 17:8, 17:10, 18:4, 18:6, 18:10, 20:1, 20:7, 20:20, 24:20, 25:25, 30:8, 30:23, 31:18, 32:1, 32:10, 32:13, 33:8, 34:1, 60:5, 60:6, 60:7, 61:2, 61:6, 63:8, 70:18, 70:19, 70:21, 71:11, 75:10, 75:20, 77:13, 79:4, 79:13, 80:12, 91:15, 92:18, 95:22, 102:17, 103:12, 103:15, 104:18, 106:5, 109:9, 110:15, 112:16, 113:8, 114:1, 114:14, 115:22, 122:8

**DARBY** [2] - 3:4, 71:1

**Darby's** [6] - 18:5, 22:18, 22:19, 28:14, 30:1, 61:10

**data** [5] - 59:15, 60:2, 64:16, 65:13, 79:21

**DaTscan** [1] - 85:9

**DAY** [1] - 1:9

**daylight** [1] - 10:15

**days** [7] - 35:18, 45:7, 45:17, 46:14, 55:15, 63:10, 69:12

**Dayton** [1] - 55:2

**deadline** [1] - 20:22

**deal** [1] - 127:7

**dealing** [1] - 16:24

**deals** [1] - 109:23

**death** [3] - 95:14, 126:1, 126:12

**decade** [2] - 88:20, 90:3

**decades** [1] - 67:14

**deceitful** [1] - 53:3

**deceive** [2] - 36:8, 47:23

**deceived** [1] - 36:22

**deceiving** [1] - 47:21

**December** [1] - 44:19

**deception** [1] - 48:12

**decide** [3] - 10:8, 10:13, 51:19

**decided** [1] - 14:9

**decision** [6] - 55:16, 70:3, 70:10, 71:24, 75:25, 94:2

**decision-making** [3] - 71:24, 75:25, 94:2

**decisions** [1] - 93:21

**decline** [1] - 51:20

**decreased** [1] - 84:14

**defend** [4] - 41:17, 55:10, 69:18, 70:11

**defendant** [1] - 80:8

**Defendant** [71] - 1:8, 1:19, 35:22, 36:7, 36:12, 36:19, 37:18, 37:24, 38:4, 38:10, 38:17, 38:22, 38:24, 39:3, 39:6, 39:15, 39:22, 41:18, 41:24, 42:10, 42:16, 42:24, 43:1, 43:2, 43:5, 43:7, 43:12, 43:14, 43:15, 43:19, 44:4, 44:7, 44:19, 44:22, 44:25, 45:15, 45:22, 46:1, 46:4, 46:6, 46:10, 46:16, 46:23, 47:2, 47:4, 47:11, 47:17, 48:1, 48:6, 48:11, 48:18, 48:24, 49:7, 49:14, 49:18, 49:20, 49:24, 50:2, 50:6, 51:4, 51:5, 51:10, 51:13, 51:17, 51:21, 51:25, 52:2, 52:7, 52:18, 52:22, 53:5

**Defendant's** [23] - 36:16, 37:7, 37:18, 38:1, 38:16, 40:20, 41:23, 42:3, 42:19, 42:21, 44:15, 47:9, 47:20, 48:13, 48:21, 49:9, 49:11, 49:17, 50:14, 52:16, 52:25, 80:1, 93:12

**defense** [7] - 54:2, 54:8, 60:21, 61:2, 66:12, 69:17, 70:7

**Defense** [7] - 6:20, 6:25, 9:7, 9:22, 9:25, 14:1, 14:11, 14:19, 24:7, 26:11, 42:22, 43:3, 43:10, 58:17, 59:19, 66:14, 67:20, 68:7, 68:16, 69:14, 81:2, 81:6, 86:22, 105:20, 106:19, 113:13, 122:3

**DEFENSE** [1] - 3:15

**Defense's** [1] - 62:20

**defenses** [4] - 50:8, 50:9, 55:6, 55:10

**define** [2] - 93:3, 93:5

**definitely** [2] - 19:11, 23:17

**degree** [9] - 54:6, 55:7, 56:17, 57:15, 57:19, 72:2, 90:13, 122:22, 124:20

**degrees** [1] - 51:16

**delirium** [7] - 57:3, 57:11, 60:13, 60:14, 61:9, 62:21, 128:5

**deliver** [1] - 45:3

**Dementia** [3] - 21:22, 30:3, 72:25

**dementia** [100] - 22:15, 44:1, 44:14, 45:1, 46:5, 46:13, 48:18, 48:25, 55:11, 56:8, 56:9, 56:12, 56:14, 56:15, 58:5, 58:24, 58:25, 59:1, 59:4, 59:9, 59:21, 59:22, 60:17, 60:25, 61:1, 61:4, 61:5, 64:11, 64:14, 65:14, 67:1, 67:6, 67:10, 68:20, 69:11, 69:15, 70:12, 73:15, 74:18, 74:20, 78:4, 78:5, 78:11, 79:10, 79:12, 82:25, 85:21, 85:22, 85:23, 86:15, 87:19, 88:6, 90:10, 92:25, 93:1, 93:4, 93:24,

94:5, 94:13, 94:15, 94:16, 94:24, 95:8, 95:12, 95:15, 95:23, 96:23, 97:5, 97:10, 97:13, 98:12, 100:6, 104:11, 104:13, 104:15, 105:5, 105:7, 105:12, 105:13, 107:5, 107:21, 108:1, 110:17, 110:22, 110:25, 111:6, 111:9, 111:23, 112:1, 116:12, 117:1, 124:9, 124:23, 125:4, 125:6, 126:1, 126:5, 126:8, 126:12, 126:25

**dementias** [4] - 72:16, 75:12, 77:14, 112:9

**demographic** [1] - 49:21

**demonstrate** [1] - 51:11

**demonstrated** [2] - 48:1, 107:20

**demonstrates** [3] - 25:7, 28:7, 43:23

**demonstrating** [1] - 109:2

**demonstration** [2] - 98:9, 98:15

**demonstrative** [9] - 24:16, 25:7, 28:3, 28:6, 30:1, 30:2, 31:21, 77:6

**demonstratives** [7] - 19:22, 20:3, 20:18, 21:20, 24:6, 26:9, 34:16

**Denney** [13] - 15:18, 18:12, 20:1, 20:7, 20:19, 49:13, 49:24, 50:17, 52:8, 61:18, 61:22, 82:22, 82:23

**Denney's** [5] - 18:11, 61:21, 63:12, 63:15, 63:23

**dense** [1] - 23:2

**Department** [2] - 73:2, 80:13

**depicted** [1] - 118:3

**depictions** [1] - 30:24

**deposed** [2] - 46:2, 66:4

**deposited** [1] - 88:24

**deposition** [7] - 45:19, 46:8, 46:15, 90:4, 97:24, 123:2, 127:16

**depositions** [3] - 49:4, 97:19, 127:9

**describe** [10] - 24:5, 27:25, 67:19, 74:7, 89:24, 93:8, 106:6, 108:5, 110:1, 118:6

**described** [7] - 70:7, 82:11, 91:19, 95:24, 107:3, 107:4, 112:3

**describing** [4] - 91:21, 94:13, 102:18, 108:19

**DESCRIPTION** [3] - 3:10, 3:16, 3:22

**designed** [3] - 38:12, 52:5, 52:11

**desperate** [1] - 35:24

**despite** [6] - 38:21, 43:4, 46:22, 47:15, 47:16

**destroy** [2] - 39:24, 40:2

**destroying** [1] - 38:6

**detailed** [1] - 42:16

**details** [1] - 6:21

**detect** [2] - 111:5, 111:12

**detention** [1] - 41:22

**deterioration** [1] - 68:14

**determination** [2] - 80:5, 83:15

**determinations** [1] - 82:21

**determine** [4] - 52:5, 60:19, 86:23, 116:13

**determined** [2] - 58:6, 64:15

**determining** [2] - 74:19, 94:25

**develop** [1] - 88:4

**developed** [1] - 88:20

**develops** [1] - 88:19

**diagnose** [3] - 72:11, 95:23, 96:20

**diagnosed** [12] - 46:13, 59:21, 66:25, 85:5, 95:12, 95:14, 95:18, 97:7, 100:6, 125:22, 126:16, 128:1

**diagnoses** [6] - 44:13, 45:4, 46:4, 46:22, 73:23, 86:21

**diagnosing** [2] - 75:11, 77:13

**diagnosis** [22] - 15:14, 43:24, 46:5, 47:9, 48:11, 77:19, 77:20, 77:22, 82:15, 85:14,

85:19, 86:13, 86:18, 86:19, 86:24, 87:13, 87:14, 87:18, 100:5, 122:21, 126:1, 127:5

**diagnostic** [1] - 81:22

**Dietz** [11] - 50:18, 62:8, 62:9, 62:15, 62:16, 63:2, 63:3, 63:10, 63:16, 82:18

**Dietz's** [2] - 63:8, 63:14

**difference** [1] - 124:24

**differences** [3] - 91:18, 91:22, 92:9

**different** [42] - 10:13, 11:11, 15:18, 16:12, 17:13, 25:9, 27:17, 51:17, 55:3, 62:10, 73:6, 73:14, 73:23, 74:19, 78:7, 86:1, 86:2, 88:8, 88:15, 89:15, 92:8, 93:7, 94:16, 100:11, 100:13, 103:25, 106:1, 106:7, 106:15, 107:25, 108:4, 112:19, 114:7, 116:3, 116:19, 117:17, 118:16, 119:5, 120:5, 123:25

**differentiate** [2] - 22:12, 22:14

**differentiation** [1] - 93:11

**differs** [1] - 11:2

**difficulty** [3] - 94:3, 94:10, 96:25

**dig** [2] - 20:13, 24:11

**direct** [3] - 27:4, 28:12, 28:14

**Direct** [1] - 3:5

**DIRECT** [1] - 71:8

**direction** [2] - 37:19, 61:3

**directly** [3] - 81:4, 81:7, 123:18

**director** [2] - 58:22, 66:16, 72:24

**disadvantage** [1] - 31:11

**disagree** [3] - 107:22, 119:4, 119:17

**disagreement** [7] - 10:6, 107:14, 110:12, 118:24, 118:25, 119:9, 122:13

**disagreements** [2] - 106:6, 107:12

**disclosed** [15] - 24:2, 25:1, 25:2, 26:5, 26:23, 31:7, 31:10, 33:1, 33:16, 33:20, 78:13, 113:3, 113:4, 113:12, 114:4

**disconnect** [4] - 108:2, 108:3, 108:6, 108:16

**discovery** [3] - 25:1, 25:2, 25:5

**discrepancies** [2] - 70:1, 97:22

**discuss** [2] - 64:21, 73:22

**discussed** [3] - 6:19, 76:25, 83:10

**discussing** [3] - 36:12, 76:18, 92:11

**discussion** [2] - 55:15, 65:12

**discussions** [1] - 82:3

**disease** [74] - 22:15, 48:17, 56:6, 56:7, 58:23, 58:24, 59:1, 59:17, 60:15, 61:4, 64:10, 64:11, 65:7, 77:20, 77:22, 84:2, 84:3, 84:16, 84:21, 85:3, 85:11, 85:24, 86:5, 87:19, 87:23, 88:1, 88:3, 88:4, 88:7, 88:11, 88:16, 88:18, 89:4, 89:22, 90:15, 90:23, 91:6, 91:7, 91:11, 91:24, 92:5, 92:6, 92:10, 92:19, 94:18, 98:17, 101:24, 104:11, 104:12, 105:4, 105:5, 105:6, 105:9, 105:12, 106:23, 107:1, 110:22, 110:25, 111:6, 111:9, 111:10, 112:9, 112:12, 118:20, 119:20, 122:19, 123:21, 125:8, 125:14, 125:15, 126:17

**Disease** [3] - 58:22, 66:17, 75:8

**diseases** [19] - 51:3, 51:7, 71:17, 72:12, 73:12, 73:17, 74:14, 82:17, 91:19, 94:17, 95:3, 95:11, 96:14, 105:18, 106:12, 108:7, 115:5, 125:18, 125:23

**dismisses** [2] - 62:2, 62:4

**disorder** [4] - 84:4, 84:5, 86:10, 87:11

**disorders** [12] - 59:20, 71:22, 71:23, 72:14, 72:18, 73:9, 74:5, 74:16, 91:23, 94:19, 112:3

**disoriented** [1] - 94:9

**dispute** [1] - 50:20

**disputes** [1] - 34:12

**disputing** [1] - 31:8

**distance** [1] - 4:21

**District** [2] - 2:2, 2:3

**DISTRICT** [2] - 1:1, 1:2

**DLB** [1] - 105:12

**DLB/PDD** [1] - 105:9

**Docket** [1] - 4:9

**Doctor** [2] - 84:1, 89:23

**doctor** [8] - 16:23, 36:1, 42:20, 45:5, 53:18, 66:7, 85:21, 88:10

**doctor's** [3] - 44:12, 45:13, 67:17

**doctoral** [1] - 74:1

**doctors** [22] - 19:1, 35:23, 36:9, 36:13, 42:11, 43:22, 43:24, 44:24, 46:23, 47:5, 47:17, 47:22, 50:24, 51:14, 52:25, 58:11, 58:12, 63:5, 67:14, 69:13, 106:7

**doctors'** [1] - 19:12

**document** [1] - 38:18

**documents** [10] - 9:5, 30:14, 40:3, 41:15, 42:1, 50:12, 50:13, 69:24, 80:19, 81:19

**DOJ** [5] - 1:15, 1:16, 1:17, 1:18, 20:21

**dollar** [1] - 46:25

**dollars** [2] - 36:20, 37:17

**donations** [2] - 66:19, 66:20

**done** [16] - 6:6, 19:4, 24:22, 35:10, 38:5, 49:19, 56:25, 64:8, 64:17, 65:6, 102:19, 102:20, 102:21, 102:24, 123:8, 124:1

**door** [1] - 121:12

**dopamine** [3] - 85:10, 85:12, 85:13

**Dorothy** [2] - 53:15, 82:2

**dot** [2] - 116:20, 118:4

**dots** [1] - 35:9

**double** [6] - 30:7, 30:9, 32:15, 32:16, 33:4, 35:22

**down** [4] - 14:14, 113:11, 117:14, 125:2

**Dr** [153] - 6:25, 13:21, 14:3, 14:8, 14:22, 15:8, 15:18, 15:21, 15:24, 16:1, 16:9, 16:10, 17:8, 17:9, 17:10, 17:13, 17:15, 17:21, 18:4, 18:5, 18:6, 18:10, 18:11, 18:12, 18:18, 18:23, 19:9, 20:1, 20:7, 20:19, 20:20, 22:18, 22:19, 24:20, 25:25, 28:14, 29:1, 29:14, 30:1, 30:8, 30:23, 31:18, 32:1, 32:10, 32:13, 33:8, 34:1, 42:24, 43:6, 43:11, 43:15, 43:17, 44:4, 44:8, 44:12, 44:13, 44:20, 45:14, 46:4, 46:17, 47:8, 49:13, 49:24, 50:17, 50:18, 52:8, 58:21, 59:3, 59:7, 59:13, 59:18, 60:5, 60:6, 60:7, 61:2, 61:6, 61:10, 61:18, 61:21, 61:22, 62:8, 62:9, 62:15, 62:16, 63:2, 63:3, 63:8, 63:10, 63:12, 63:14, 63:15, 63:16, 63:23, 64:3, 64:21, 65:3, 65:10, 65:12, 66:7, 66:16, 66:21, 67:3, 68:19, 70:18, 70:19, 70:21, 71:11, 75:10, 75:20, 77:13, 79:4, 79:13, 80:12, 82:18, 82:22, 82:23, 83:3, 85:4, 91:15, 92:18, 95:22, 102:17, 103:12, 103:15, 104:18, 105:23, 106:5, 106:17, 106:19, 107:4, 107:7, 107:19, 109:9, 110:15, 110:16, 110:19, 112:16, 113:8, 114:1, 114:14, 115:22, 119:2, 119:11,

122:8, 127:25
**drafts** [1] - 83:21
**dream** [1] - 87:10
**dreams** [1] - 86:11
**drive** [2] - 41:4, 91:17
**driving** [2] - 44:17, 75:25
**due** [4] - 20:21, 61:8, 69:19, 123:20
**duly** [1] - 71:3
**duping** [1] - 42:10
**duplicative** [1] - 14:7
**during** [5] - 34:14, 34:15, 41:14, 44:8, 81:18
**Dusky** [1] - 54:3
**duties** [1] - 14:17
**duty** [1] - 55:6
**dysfunction** [2] - 21:24, 93:15

### E

**e-mail** [8] - 21:20, 41:7, 42:17, 42:23, 43:3, 43:6, 43:13, 81:5
**e-mails** [3] - 38:12, 46:14, 46:18
**early** [14] - 15:15, 15:17, 48:16, 66:25, 84:25, 86:19, 87:12, 87:24, 95:12, 104:10, 107:5, 110:16, 110:18, 111:4
**easy** [1] - 23:21
**Edison** [1] - 32:8
**Edison"** [1] - 31:24
**educate** [1] - 11:9
**education** [2] - 71:25, 72:6
**educational** [1] - 73:4
**effort** [2] - 52:6, 52:14
**either** [6] - 25:6, 32:3, 32:12, 37:13, 43:25, 104:11
**electronics** [1] - 4:23
**elusive** [1] - 58:6
**empire** [1] - 37:9
**encrypted** [5] - 37:22, 38:9, 38:13, 41:7, 41:8
**encryption** [1] - 37:24
**end** [4] - 18:14, 44:23, 51:19, 69:9
**energy** [3] - 89:16, 99:9, 102:5
**engaged** [1] - 36:19
**English** [1] - 103:22

**entire** [2] - 16:2, 47:12
**entirely** [5] - 19:4, 45:12, 76:22, 83:12, 100:5
**entirety** [2] - 9:18, 9:24
**entitled** [1] - 22:1
**episodes** [1] - 62:21
**equal** [1] - 101:10
**equate** [1] - 56:8
**Equity** [1] - 39:1
**equity** [2] - 39:8, 39:9
**escape** [1] - 40:10
**ESQ** [4] - 1:19, 1:20, 1:22, 1:23
**essentially** [7] - 11:17, 63:13, 85:18, 90:7, 102:5, 106:21, 109:16
**estimate** [5] - 81:15, 91:3, 101:3, 108:18, 126:14
**Eugene** [1] - 37:4, 54:14, 54:18, 66:16
**evade** [2] - 35:19, 35:25
**evaluate** [6] - 26:12, 71:16, 73:7, 73:16, 107:16, 109:17
**evaluated** [2] - 85:6, 125:21
**evaluating** [5] - 48:4, 74:18, 83:4, 110:24, 111:1
**evaluation** [2] - 81:25, 98:19
**evaluations** [2] - 83:1, 85:2
**Evatt** [3] - 37:11, 65:20, 65:21
**events** [3] - 55:24, 62:22, 67:13
**eventually** [2] - 89:1, 92:1
**evidence** [33] - 8:21, 31:4, 31:8, 31:16, 31:21, 35:21, 36:6, 36:15, 38:6, 39:24, 41:23, 42:4, 42:25, 46:21, 52:20, 53:4, 57:25, 59:12, 62:17, 65:16, 69:10, 77:6, 81:20, 82:4, 84:23, 85:13, 96:13, 97:16, 99:2, 119:19, 125:11, 127:7
**evident** [1] - 89:14
**exactly** [3] - 96:18, 110:19, 113:1
**exaggerate** [1] - 52:19

**exaggerating** [6] - 35:24, 36:9, 50:3, 57:14, 57:17, 79:16
**exam** [24] - 43:23, 44:2, 44:8, 45:11, 46:7, 47:21, 47:22, 48:5, 48:7, 49:9, 49:18, 49:20, 51:1, 51:8, 51:16, 52:23, 59:11, 66:13, 66:14, 67:20, 68:24, 109:22, 110:2
**Examination** [1] - 3:5
**EXAMINATION** [1] - 71:8
**examination** [11] - 43:6, 59:10, 78:17, 81:25, 85:6, 96:7, 96:8, 121:19, 121:24, 128:9, 128:11
**examinations** [5] - 9:19, 10:18, 59:24, 61:20, 62:12
**examine** [1] - 25:25
**examined** [10] - 11:9, 43:21, 44:8, 51:14, 56:22, 56:23, 60:8, 66:25, 97:16, 127:7
**examining** [1] - 4:15
**example** [2] - 22:16, 117:10
**examples** [6] - 26:13, 79:17, 93:17, 96:3, 97:4, 98:8
**exams** [1] - 49:14
**excellent** [1] - 35:7
**exception** [1] - 12:8
**exchange** [1] - 6:3
**exchanges** [1] - 81:5
**exclude** [1] - 78:11
**excuse** [2] - 12:24, 89:24
**execute** [1] - 41:2
**executive** [3] - 47:12, 47:15, 68:12
**executives** [2] - 47:1, 47:13
**exemplars** [1] - 112:5
**exhibit** [5] - 7:20, 28:3, 28:6, 103:11, 104:16
**Exhibit** [6] - 8:13, 43:3, 103:14, 103:18, 128:16, 128:25
**EXHIBITS** [6] - 3:8, 3:9, 3:14, 3:15, 3:20, 3:21
**exhibits** [15] - 6:14,

6:17, 7:12, 7:17, 7:23, 8:10, 8:11, 8:18, 9:1, 9:10, 30:2, 31:3, 77:7
**Exhibits** [4] - 7:21, 8:8, 9:7, 76:14
**exists** [1] - 25:20
**expand** [1] - 20:9
**expect** [16] - 34:4, 60:6, 95:15, 95:21, 98:17, 99:18, 101:11, 110:10, 113:21, 114:7, 117:5, 121:13, 121:16, 124:12, 126:19, 126:20
**expected** [3] - 95:6, 98:17, 119:13
**expects** [1] - 120:14
**experience** [9] - 10:24, 28:8, 80:7, 82:12, 82:20, 82:23, 113:19, 114:6, 121:12
**experiencing** [1] - 119:21
**expert** [52] - 9:22, 10:5, 10:7, 10:9, 10:11, 10:19, 11:8, 11:16, 11:18, 13:8, 13:22, 17:9, 18:23, 20:6, 20:20, 20:24, 21:21, 22:2, 23:5, 24:3, 24:7, 27:2, 27:3, 27:10, 27:13, 27:25, 28:4, 30:4, 56:21, 61:12, 62:10, 63:1, 64:4, 65:12, 67:2, 75:10, 75:21, 75:22, 76:5, 77:13, 77:16, 78:7, 78:8, 78:10, 78:12, 78:13, 82:8, 82:22, 105:20, 106:19, 127:3
**expertise** [7] - 63:21, 75:24, 76:1, 76:4, 82:20, 83:9, 85:3
**experts** [62] - 9:17, 9:23, 9:25, 10:1, 10:4, 10:7, 10:16, 10:18, 10:23, 10:24, 11:3, 11:21, 12:4, 18:20, 20:6, 20:13, 21:4, 22:21, 24:10, 25:23, 26:12, 27:6, 30:20, 42:23, 48:3, 48:15, 48:19, 48:23, 49:10, 50:1, 50:21, 51:9, 51:22, 51:24, 52:9, 52:15, 56:8,

56:12, 56:16, 56:19, 56:20, 57:21, 58:10, 58:11, 58:17, 59:23, 60:4, 60:9, 60:10, 62:20, 69:14, 75:15, 80:24, 82:4, 85:17, 85:20, 87:14, 87:17, 106:16, 107:13, 118:13
**experts'** [2] - 11:21, 25:9
**explain** [5] - 27:21, 65:3, 67:18, 68:20, 119:20
**explained** [3] - 55:13, 92:18, 119:14
**explore** [1] - 83:16
**expression** [1] - 84:15
**expressions** [1] - 84:15
**extending** [1] - 71:18
**extent** [2] - 85:16, 87:13
**extenuating** [2] - 98:22, 126:25
**extraordinary** [1] - 35:18
**extremely** [1] - 44:16

### F

**fabricate** [1] - 36:17
**face** [2] - 53:1, 96:19
**faces** [1] - 86:8
**facial** [1] - 84:15
**fact** [19] - 9:20, 12:3, 12:8, 12:24, 13:8, 13:12, 13:14, 23:23, 25:21, 31:8, 44:21, 52:12, 52:13, 52:18, 52:20, 69:4, 79:15, 86:25, 87:3
**factor** [1] - 91:4
**facts** [1] - 50:7
**faculty** [1] - 72:25
**fail** [1] - 52:3
**failed** [2] - 52:7, 52:9
**failing** [1] - 52:12
**fair** [3] - 30:24, 83:7, 96:15
**fake** [2] - 38:18, 48:14
**faked** [3] - 58:8, 59:15, 64:1
**faking** [9] - 49:7, 51:10, 51:11, 57:16, 57:20, 59:17, 61:15, 63:3, 63:4
**fall** [1] - 117:4
**falls** [4] - 116:21, 116:24, 118:22,

119:4
**false** [2] - 38:15, 52:11
**family** [5] - 57:23, 63:6, 96:1, 96:4, 96:23
**far** [2] - 74:16, 107:24
**father** [1] - 54:16
**favor** [1] - 62:2
**favors** [1] - 105:9
**FDG** [32] - 64:7, 64:22, 65:4, 89:14, 89:15, 99:6, 99:23, 99:25, 100:1, 100:5, 101:9, 101:18, 101:25, 102:2, 102:18, 102:19, 102:20, 102:22, 102:23, 103:1, 103:19, 104:9, 104:19, 105:1, 110:5, 111:19, 111:23, 112:2, 114:16, 115:23, 124:5
**FDG-PET** [28] - 64:7, 64:22, 65:4, 89:14, 89:15, 99:6, 99:23, 99:25, 100:1, 100:5, 101:9, 101:18, 102:2, 102:18, 102:22, 102:23, 103:1, 103:19, 104:9, 104:19, 105:1, 110:5, 111:19, 111:23, 112:2, 114:16, 115:23, 124:5
**FDG-PETs** [2] - 102:19, 102:20
**features** [2] - 87:23, 88:5
**February** [1] - 127:25
**fellows** [1] - 73:20
**fellowship** [1] - 72:19
**felt** [3] - 55:8, 107:19, 127:20
**few** [7] - 29:23, 35:18, 45:7, 58:14, 60:3, 69:12
**fidget** [1] - 129:4
**field** [2] - 63:20, 74:22
**figure** [2] - 27:15, 95:11
**figurehead** [1] - 41:21
**figures** [1] - 86:7
**file** [1] - 61:16
**filed** [7] - 8:4, 28:5, 29:4, 62:11, 83:18, 83:20, 83:23
**final** [1] - 13:18
**financial** [3] - 36:24,

75:25, 94:1
**finder** [2] - 23:23, 25:21
**findings** [25] - 51:9, 80:23, 84:8, 84:12, 92:16, 98:5, 104:9, 104:14, 105:2, 105:3, 105:14, 105:16, 106:22, 107:11, 107:20, 107:23, 109:3, 109:19, 109:24, 110:5, 110:13, 111:19, 119:10, 119:14, 125:6
**fine** [4] - 19:16, 33:19, 109:11, 120:15
**firm** [1] - 53:22
**first** [44] - 4:8, 5:21, 6:3, 9:25, 14:8, 17:10, 21:22, 24:13, 24:24, 29:25, 32:20, 33:13, 36:11, 39:8, 42:20, 46:4, 50:23, 52:2, 62:11, 68:9, 69:3, 70:15, 72:2, 77:18, 83:25, 87:25, 88:13, 88:16, 88:17, 89:12, 90:24, 92:12, 92:19, 101:23, 102:21, 103:1, 114:13, 122:17, 122:23, 122:24, 124:5, 124:16, 127:4
**fishing** [3] - 42:16, 68:5, 68:19
**fits** [1] - 89:21
**five** [13] - 21:19, 22:24, 23:9, 28:18, 29:20, 57:18, 63:10, 88:3, 95:13, 117:12, 126:2, 126:12, 126:14
**five-foot-seven** [1] - 117:12
**flag** [2] - 19:5, 19:8
**flagging** [1] - 77:3
**flew** [1] - 40:1
**flight** [1] - 19:8
**flip** [1] - 103:13
**fluctuations** [1] - 86:16
**fluid** [1] - 123:10
**flurry** [1] - 43:19
**focus** [4] - 48:9, 52:22, 73:13, 74:12
**focused** [2] - 64:6, 82:14
**focuses** [2] - 73:10, 74:15

**follow** [4] - 35:11, 69:25, 70:8, 88:2
**following** [3] - 4:3, 42:18, 51:8
**follows** [1] - 71:4
**fool** [3] - 50:24, 51:22, 57:22
**foot** [1] - 117:12
**footnote** [1] - 32:20
**footnotes** [7] - 24:7, 24:15, 26:7, 26:8, 26:11, 26:16, 26:19
**foregoing** [1] - 130:6
**forensic** [6] - 62:8, 74:10, 74:11, 82:19, 95:7, 97:15
**forgets** [1] - 67:24
**form** [3] - 11:17, 64:9, 96:9
**formal** [2] - 38:4, 41:19
**formed** [2] - 86:7
**former** [1] - 66:1
**formidable** [1] - 37:1
**forms** [2] - 125:17, 125:19
**fortunately** [1] - 34:19
**forward** [6] - 16:6, 54:7, 56:3, 66:10, 70:20, 75:15
**forwarded** [1] - 16:8
**foundation** [2] - 8:23, 31:2
**founder** [2] - 38:25, 39:10
**four** [2] - 15:11, 72:23
**Frank** [1] - 67:21
**frankly** [4] - 21:17, 25:24, 28:14, 122:4
**fraud** [1] - 35:20
**free** [2] - 4:13, 4:15
**freeze** [1] - 40:8
**freezer** [1] - 40:7
**Friday** [3] - 14:18, 16:9, 69:2
**friend** [1] - 68:21
**friends** [6] - 57:23, 59:25, 63:6, 68:19, 69:13, 94:10
**front** [3] - 44:20, 103:16, 118:9
**frontotemporal** [1] - 104:15
**Frontotemporal** [1] - 72:25
**frozen** [1] - 40:6
**fruitless** [1] - 38:7
**FTC** [2] - 46:8, 46:12
**full** [2] - 18:24, 52:14
**fully** [2] - 66:2, 86:7

**fully-formed** [1] - 86:7
**function** [3] - 93:12, 98:9, 99:8
**functional** [3] - 59:14, 93:25, 108:23
**functionality** [1] - 120:14
**functionally** [1] - 128:6
**functioning** [2] - 42:13, 127:22
**fund** [2] - 39:8, 39:9
**fundamental** [1] - 69:19
**fundamentally** [1] - 70:2
**future** [1] - 38:20

## G

**gait** [1] - 84:14
**game** [1] - 51:23
**Garcia** [4] - 31:24, 32:8
**General** [1] - 72:9
**general** [3] - 43:11, 80:10, 125:25
**generally** [2] - 74:12, 98:24
**generated** [1] - 115:13
**gentlemen** [1] - 13:7
**genuine** [4] - 51:20, 52:6, 52:17, 59:17
**GEORGE** [1] - 1:3
**George** [1] - 14:4
**geriatric** [2] - 59:19, 63:20
**given** [5] - 50:13, 51:12, 52:8, 52:9, 110:10
**glosses** [1] - 62:2
**glucose** [3] - 101:21, 102:4, 102:6
**goal** [1] - 23:23
**Government** [49] - 3:4, 5:3, 6:24, 7:7, 7:18, 8:19, 9:11, 9:16, 12:17, 13:25, 15:23, 15:25, 16:12, 16:13, 18:22, 19:17, 19:22, 21:7, 21:8, 21:12, 27:12, 35:14, 35:17, 36:22, 39:20, 41:7, 41:12, 47:10, 50:13, 51:9, 51:24, 54:10, 54:13, 55:23, 57:14, 60:4, 60:10, 61:9, 61:17, 64:7, 65:9, 65:17, 66:6, 66:13, 69:2, 69:6,

70:15, 71:2, 106:18
**GOVERNMENT** [1] - 3:9
**Government's** [23] - 7:17, 7:20, 8:7, 8:13, 9:23, 10:4, 10:7, 15:9, 15:19, 15:22, 17:8, 19:4, 49:10, 50:1, 51:22, 57:21, 60:4, 60:23, 61:14, 62:6, 65:19, 65:22, 66:24
**graduate** [1] - 74:1
**grandson** [1] - 97:1
**grant** [1] - 29:19
**graph** [3] - 105:25, 106:16, 116:23
**graphs** [2] - 27:20, 116:16
**great** [10] - 6:8, 7:10, 9:9, 18:19, 19:18, 33:21, 34:21, 35:4, 35:7, 127:7
**group** [3] - 112:11, 114:18, 116:10
**groups** [2] - 74:24, 112:8
**guess** [9] - 11:1, 12:9, 12:10, 26:2, 26:24, 34:15, 79:25, 109:4
**Guilmette** [2] - 59:7, 59:13
**Gumm** [2] - 2:1, 130:12
**guns** [1] - 46:19
**gut** [1] - 120:20
**Gutierrez** [4] - 12:16, 67:21, 67:22, 68:6
**guys** [1] - 12:2

## H

**half** [3] - 72:23, 102:11, 128:14
**halfway** [1] - 40:1
**hallucination** [2] - 44:11, 87:6
**hallucinations** [3] - 46:7, 86:5, 88:5
**hand** [1] - 70:21
**handed** [1] - 30:1
**handle** [1] - 129:10
**hangs** [1] - 40:21
**HANKS** [1] - 1:3
**hard** [4] - 41:4, 41:4
**harder** [1] - 93:20
**Harvard** [2] - 72:9, 72:19
**hate** [1] - 129:8
**health** [1] - 42:21

**healthy** [5] - 117:21, 117:22, 117:25, 119:24, 124:12
**hear** [31] - 10:24, 10:25, 11:3, 11:23, 12:5, 14:10, 17:16, 36:21, 37:5, 37:12, 37:13, 38:10, 38:20, 39:5, 39:25, 43:4, 43:10, 43:15, 44:3, 45:17, 45:20, 46:9, 47:1, 49:8, 50:1, 52:11, 54:15, 60:6, 78:15, 78:25, 113:17
**heard** [4] - 26:18, 27:2, 29:12, 60:6
**HEARING** [1] - 1:9
**hearing** [7] - 10:21, 18:25, 31:11, 41:14, 51:19, 53:25, 55:8
**height** [2] - 117:11, 117:12
**held** [3] - 4:3, 68:4, 102:14
**helm** [2] - 46:24, 47:7
**help** [8] - 13:12, 23:23, 26:14, 55:9, 69:21, 80:21, 101:8, 122:12
**helpful** [8] - 25:21, 26:21, 26:25, 76:18, 80:21, 82:16, 103:7, 118:22
**helping** [1] - 28:15
**helps** [2] - 25:9, 36:16
**Herculean** [2] - 57:24, 63:7
**hereby** [1] - 130:5
**hide** [5] - 36:19, 37:2, 37:18, 39:11, 41:5
**hiding** [1] - 38:1
**high** [5] - 42:13, 63:16, 63:18, 100:14, 127:22
**high-functioning** [1] - 42:13
**high-profile** [2] - 63:16, 63:18
**higher** [3] - 79:18, 98:9, 101:11
**higher-cognitive** [1] - 98:9
**highest** [1] - 90:7
**highly** [3] - 20:14, 21:3, 41:9
**himself** [5] - 44:18, 55:10, 68:22, 70:11, 98:4
**hippocampus** [2] - 118:10, 125:13
**hired** [4] - 72:20,

80:12, 80:13, 106:18
**historically** [1] - 64:13
**history** [5] - 35:21, 60:13, 61:8, 62:1, 127:12
**hold** [1] - 129:9
**home** [3] - 41:2, 68:1
**Honor** [65] - 5:5, 5:14, 6:7, 6:11, 7:5, 7:25, 8:3, 8:17, 9:4, 9:7, 9:15, 12:1, 12:20, 13:4, 13:17, 15:4, 19:17, 21:11, 23:9, 23:10, 23:16, 23:22, 24:4, 25:4, 26:11, 27:23, 28:14, 29:11, 30:8, 30:21, 31:17, 32:16, 32:17, 33:3, 33:7, 33:11, 34:1, 34:13, 34:20, 35:1, 35:3, 35:17, 53:7, 53:10, 70:17, 71:10, 75:9, 76:7, 76:20, 77:1, 77:3, 77:9, 78:7, 78:20, 102:16, 103:11, 106:3, 112:22, 113:8, 113:23, 114:8, 114:23, 122:4, 128:11, 129:15
**HONORABLE** [1] - 1:3
**honors** [1] - 75:3
**hope** [1] - 129:5
**hopefully** [1] - 17:17
**Hospital** [5] - 14:5, 72:10, 103:20, 104:3, 104:24
**hospital** [1] - 14:17
**hospitalization** [5] - 51:21, 57:5, 60:13, 60:14, 128:4
**hospitalized** [3] - 51:18, 57:2, 128:4
**hot** [1] - 38:19
**hour** [3] - 20:12, 81:12, 102:10
**hours** [3] - 81:16, 81:17, 81:18
**house** [3] - 38:7, 41:25, 67:25
**Houston** [9] - 1:11, 55:2, 63:5, 66:2, 66:17, 66:22, 103:20, 104:3, 104:24
**hundred** [1] - 26:10
**hypometabolism** [2] - 22:12, 22:13

**I**

**idea** [1] - 24:19
**identified** [2] - 9:11, 76:12
**identify** [1] - 76:9
**II** [2] - 21:25, 30:5
**illness** [3] - 36:17, 41:19, 52:17
**image** [7] - 25:13, 64:1, 111:25, 112:13, 114:17, 115:3, 115:13
**imagery** [1] - 21:23
**images** [17] - 22:9, 96:16, 101:9, 104:4, 105:21, 105:24, 108:17, 109:6, 109:15, 109:22, 111:16, 113:10, 113:12, 114:15, 120:22, 121:2, 121:11
**imaging** [20] - 13:25, 15:10, 15:17, 48:13, 60:2, 62:16, 85:9, 96:12, 98:7, 98:23, 98:24, 100:7, 102:17, 109:3, 109:24, 110:3, 110:5, 110:13, 119:10, 125:16
**immediately** [1] - 57:10
**immunity** [1] - 41:11
**impact** [1] - 44:14, 93:12
**impaired** [4] - 57:15, 57:16, 79:15, 124:12
**impairment** [34] - 22:14, 56:18, 57:20, 60:20, 74:19, 78:2, 79:9, 80:4, 90:6, 90:9, 92:16, 92:24, 93:4, 93:9, 93:10, 93:16, 97:13, 98:11, 98:12, 98:20, 100:12, 106:24, 116:12, 117:2, 119:13, 122:22, 123:18, 124:8, 124:20, 125:23, 126:4, 126:8, 126:23, 128:2
**impairments** [2] - 108:24, 117:23
**impairs** [1] - 59:5
**implausibly** [1] - 49:17
**important** [12] - 15:20,

17:2, 22:17, 26:16, 36:14, 37:3, 37:11, 39:3, 50:21, 98:25, 118:11, 123:24
**impossible** [3] - 41:17, 50:2, 50:20
**impression** [4] - 103:23, 103:24, 104:8, 105:2
**impressions** [4] - 104:6, 104:25, 106:20, 118:16
**impugning** [1] - 78:22
**inability** [1] - 45:24
**inappropriate** [1] - 23:11
**incapacitated** [2] - 47:10, 50:16
**incapacity** [1] - 47:4
**include** [1] - 121:14
**included** [2] - 20:12, 81:21
**includes** [5] - 21:22, 65:20, 71:17, 72:13, 73:24
**including** [8] - 20:4, 37:7, 39:21, 43:16, 46:20, 62:4, 72:15, 74:24
**income** [1] - 39:11
**incompetent** [2] - 50:25, 60:20
**inconsistent** [5] - 45:12, 48:17, 49:12, 51:6, 52:17
**inconvenience** [1] - 17:6
**increase** [1] - 91:7
**increased** [1] - 61:7
**increases** [1] - 108:8
**increasing** [1] - 90:4
**incredibly** [1] - 15:20
**incriminating** [1] - 41:9
**incurable** [3] - 56:16, 65:8, 69:16
**indeed** [1] - 17:22
**independence** [2] - 93:15, 93:25
**independent** [2] - 37:14, 128:7
**independently** [3] - 83:12, 93:13, 93:22
**INDEX** [4] - 3:1, 3:8, 3:14, 3:20
**indicate** [3] - 48:16, 79:19, 99:20
**indicated** [1] - 12:17
**indicates** [4] - 89:12, 89:19, 99:12, 102:7

**indications** [1] - 101:5
**indicative** [1] - 52:13
**indicator** [1] - 90:15
**indicted** [1] - 47:11
**indictment** [6] - 36:4, 42:9, 47:19, 54:12, 55:7, 65:22
**individual** [2] - 64:23, 65:21, 67:11
**inertia** [1] - 47:7
**infection** [1] - 128:5
**infections** [1] - 62:21
**inflammatory** [1] - 72:14
**inform** [1] - 101:8
**information** [19] - 7:6, 16:6, 16:8, 20:3, 20:11, 24:25, 25:4, 33:18, 40:22, 44:6, 45:16, 62:2, 83:13, 94:12, 96:16, 97:17, 107:17, 124:18
**informative** [1] - 99:23
**informed** [2] - 15:22, 17:17
**initial** [1] - 127:8
**initialisms** [1] - 105:10
**initiate** [1] - 84:9
**injury** [1] - 113:20
**insanity** [1] - 63:18
**inside** [2] - 45:11, 47:22
**insidious** [1] - 67:6
**instance** [3] - 95:15, 97:18, 118:23
**Institute** [1] - 73:3
**instructed** [1] - 6:14
**instructive** [1] - 51:3
**intellect** [1] - 37:1
**intelligence** [5] - 100:15, 100:18, 101:6, 101:12, 110:10
**intend** [3] - 7:8, 9:21, 51:11
**intent** [1] - 55:5
**intentional** [1] - 55:5
**interested** [2] - 74:2, 106:12
**interests** [1] - 72:4
**interfere** [1] - 129:11
**interfered** [2] - 127:1, 127:21
**internal** [1] - 52:3
**internal-validity** [1] - 52:3
**international** [1] - 46:25
**interpret** [3] - 105:20,

111:3, 123:5
**interpretation** [5] -
61:23, 62:3, 106:19,
118:17, 119:1
**interpretations** [1] -
118:16
**interpreted** [1] - 87:6
**Interpreter** [1] - 1:25
**interpreting** [6] -
80:22, 81:23, 82:24,
104:5, 104:21, 106:7
**interprets** [1] - 105:24
**interrupt** [1] - 27:18
**interview** [7] - 50:5,
81:24, 95:25, 96:4,
98:3, 98:5, 128:9
**interviewed** [1] - 82:1
**interviewing** [1] -
119:15
**interviews** [1] - 59:24
**introduce** [3] - 5:1,
53:14, 53:20
**introductions** [1] -
4:11
**investigation** [5] -
38:25, 39:4, 39:5,
39:16, 39:17
**investor** [1] - 39:7
**investors** [1] - 39:21
**invoke** [3] - 12:3, 12:7
**invoked** [1] - 12:23
**involved** [9] - 73:18,
80:25, 81:5, 81:24,
82:3, 82:5, 82:9,
82:18, 88:15
**involves** [1] - 73:19
**IRS** [2] - 37:3, 39:11
**isolation** [2] - 25:19,
82:7
**Israel** [1] - 72:20
**issue** [13] - 6:18, 6:23,
13:18, 18:4, 18:7,
19:19, 22:17, 53:24,
57:13, 60:21, 61:10,
61:18, 87:22
**issued** [1] - 15:10
**issues** [13] - 5:25, 6:1,
6:9, 6:10, 7:1, 34:22,
43:14, 55:13, 57:3,
76:19, 84:18, 101:2
**issuing** [1] - 63:11
**it'll** [1] - 47:25
**items** [3] - 6:12, 11:4,
41:3
**itself** [5] - 27:9, 52:20,
55:9, 98:7, 124:19

**J**

**Jackson** [3] - 68:8,

68:10
**James** [2] - 5:15, 67:3
**JAMES** [1] - 1:22
**Jankovic** [3] - 44:4,
45:14, 85:4
**January** [2] - 44:3,
85:4
**JASON** [1] - 1:19
**Jason** [1] - 5:14
**job** [4] - 35:8, 38:5,
68:3, 127:13
**Joseph** [1] - 44:4
**journals** [2] - 25:1,
26:4
**JR** [1] - 1:3
**judge** [1] - 28:20
**JUDGE** [1] - 1:3
**Judge** [6] - 18:3,
19:19, 20:17, 22:5,
22:16, 51:17
**judicial** [1] - 81:9
**July** [9] - 51:14, 51:16,
52:10, 56:25, 57:1,
57:6, 64:8, 116:4,
116:5
**June** [3] - 47:8, 51:18,
62:11
**jurisdiction** [2] -
14:25, 40:10
**jury** [2] - 78:19, 78:22
**Justice** [1] - 80:13

**K**

**KATHRYN** [1] - 1:23
**Kathy** [3] - 5:15, 12:9,
53:21
**keep** [2] - 4:18, 29:7
**keeping** [1] - 68:2
**keeps** [1] - 41:25
**KENEALLY** [4] - 1:23,
53:9, 53:13, 53:24
**Keneally** [3] - 5:15,
12:10, 53:21
**Kepke** [6] - 39:13,
39:14, 39:16, 40:18,
40:21, 40:23
**Kepke's** [1] - 40:18
**key** [3] - 36:2, 61:17,
65:5
**kind** [6] - 7:2, 23:22,
54:20, 74:3, 112:11,
122:9
**knife** [1] - 96:24
**knowing** [1] - 106:13
**knowledge** [2] -
81:10, 82:16
**known** [6] - 51:4, 51:6,
55:6, 65:20, 68:8,
68:18

**known-legal** [1] - 55:6

**L**

**ladies** [1] - 13:7
**Lai** [3] - 66:16, 66:21,
127:25
**LANGSTON** [3] - 1:17,
29:11, 35:16
**Langston** [3] - 5:6,
35:16, 56:24
**language** [2] - 38:1,
71:23
**lapses** [1] - 93:18
**large** [3] - 39:6, 116:3,
116:18
**largely** [5] - 86:25,
105:16, 106:15,
107:2, 122:17
**largest** [2] - 35:20,
37:3
**last** [16] - 7:7, 8:17,
15:13, 19:22, 20:18,
21:16, 22:24, 23:7,
24:21, 25:15, 26:24,
69:12, 86:15,
104:16, 113:4
**late** [4] - 19:6, 19:7,
20:12, 56:1
**latest** [1] - 19:8
**law** [2] - 40:18, 75:22
**Law** [4] - 1:19, 1:21,
1:22, 1:24
**lawyer** [1] - 39:12
**lawyers** [12] - 39:23,
46:10, 46:12, 46:23,
47:17, 50:25, 54:5,
57:24, 60:1, 63:6,
69:13, 70:5
**lay** [4] - 8:23, 23:21,
28:8, 31:2
**lead** [6] - 12:11, 45:13,
83:13, 84:12, 84:14,
100:11
**leadership** [2] - 47:12,
127:13
**leads** [4] - 86:1, 92:4,
92:8, 108:10
**learn** [2] - 42:18,
64:18
**learned** [3] - 38:24,
40:4, 72:11
**least** [1] - 31:22
**leave** [9] - 11:14, 13:9,
13:15, 19:7, 20:25,
33:19, 65:2, 129:15,
129:17
**lectures** [1] - 74:3
**LEE** [1] - 1:17
**Lee** [2] - 5:6, 35:16

**left** [2] - 94:8, 102:17
**legal** [4] - 55:6, 55:13,
76:2, 82:20
**lengths** [1] - 35:19
**less** [2] - 99:11, 105:5
**letters** [1] - 38:12
**level** [19] - 59:4, 63:4,
79:18, 80:4, 90:1,
90:7, 90:11, 93:10,
94:25, 95:2, 100:15,
100:17, 101:11,
110:10, 112:11,
123:5, 123:17,
123:19, 125:22
**levels** [3] - 100:12,
108:25, 114:17
**Lewy** [14] - 43:25,
85:21, 85:22, 85:23,
86:4, 86:15, 87:1,
87:22, 88:6, 92:5,
94:18, 104:12,
105:6, 105:13
**life** [9] - 35:22, 42:13,
45:12, 47:21, 62:4,
67:6, 67:8, 68:14,
68:23
**likely** [7] - 15:14, 79:8,
90:23, 91:2, 105:5,
124:24, 126:22
**limitations** [1] - 57:13
**limits** [1] - 83:16
**line** [2] - 77:15, 121:5
**lining** [1] - 45:16
**Lisse** [4] - 43:11,
43:15, 66:7
**list** [10] - 7:20, 13:19,
15:22, 15:24, 65:19,
66:24, 67:1, 69:4,
69:5
**listed** [1] - 40:20
**listen** [3] - 11:21,
61:22, 69:7
**listening** [1] - 61:21
**lists** [2] - 6:4, 67:4
**literature** [8] - 22:20,
22:21, 23:2, 25:12,
25:16, 34:3, 112:4,
121:2
**little..** [1] - 8:1
**lives** [2] - 19:14, 67:25
**living** [5] - 35:22,
42:12, 59:5, 64:15,
71:12
**lobe** [4] - 117:6, 118:8,
118:9, 118:23
**lobes** [1] - 119:3
**location** [2] - 40:9,
89:20
**locations** [4] - 89:13,
89:20, 89:21, 92:2

**longitudinally** [1] -
73:16
**look** [21] - 25:18,
28:17, 28:19, 28:23,
42:6, 48:20, 53:2,
56:21, 65:4, 65:17,
86:4, 86:9, 89:20,
99:5, 107:6, 112:2,
112:6, 116:7, 118:4,
125:3, 125:13
**looked** [6] - 64:4,
107:9, 112:8,
113:14, 121:15,
122:14, 127:8,
127:12, 127:23
**looking** [15] - 25:18,
29:25, 33:11, 84:23,
89:16, 99:1, 106:9,
113:20, 114:6,
114:14, 114:15,
116:2, 120:21,
121:11, 125:17
**looks** [13] - 25:13,
31:23, 32:23, 85:10,
99:7, 99:10, 99:15,
101:18, 101:19,
111:24, 112:12,
112:13, 112:19
**Loomas** [1] - 15:2
**LOONAM** [24] - 1:22,
15:4, 15:8, 18:10,
19:24, 20:16, 26:18,
28:20, 31:14, 32:22,
32:25, 34:25, 75:14,
78:6, 78:10, 78:20,
109:7, 112:22,
113:7, 113:23,
114:23, 121:9,
121:25, 128:22
**Loonam** [12] - 5:15,
7:9, 20:2, 20:9, 26:3,
26:6, 30:12, 30:18,
32:4, 32:5, 34:11,
114:22
**Loonam's** [2] - 31:9,
114:11
**lose** [2] - 94:9, 94:11
**losing** [1] - 93:18
**loss** [5] - 93:15, 93:24,
118:18, 119:3,
125:12
**lost** [1] - 68:21
**Louis** [2] - 14:4, 16:4
**low** [3] - 50:2, 52:11,
108:25
**lower** [2] - 99:20,
116:14
**lowest** [3] - 49:24,
117:5, 118:5
**lunch** [2] - 19:3, 19:9

**lunchtime** [1] - 102:13
**lying** [2] - 35:23, 50:10

## M

**MacDougall** [3] - 29:9, 29:13, 29:16
**Magnani** [4] - 3:5, 5:7, 23:17, 26:18
**MAGNANI** [42] - 1:16, 23:16, 24:4, 25:3, 26:10, 27:23, 28:13, 30:6, 30:21, 32:15, 33:3, 33:7, 33:25, 34:8, 34:13, 34:19, 70:17, 71:9, 75:9, 75:19, 76:7, 76:13, 76:20, 77:1, 77:8, 77:12, 78:21, 79:3, 102:16, 103:10, 106:3, 109:8, 109:12, 114:12, 115:20, 120:17, 121:8, 122:2, 128:10, 128:13, 128:16, 128:24
**mail** [8] - 21:20, 41:7, 42:17, 42:23, 43:3, 43:6, 43:13, 81:5
**mails** [3] - 38:12, 46:14, 46:18
**main** [7] - 15:19, 18:11, 22:8, 54:22, 77:17, 77:23, 106:9
**major** [1] - 107:14
**majority** [1] - 36:20
**male** [1] - 117:10
**malinger** [9] - 36:7, 36:13, 41:18, 42:3, 42:5, 48:2, 52:1, 53:5, 53:6
**malingering** [5] - 10:10, 36:10, 52:4, 53:6, 61:15
**Maloney** [1] - 16:10
**man** [4] - 35:19, 37:11, 38:18, 68:25
**manage** [1] - 72:11
**managed** [1] - 50:24
**manifest** [1] - 67:10
**manufactured** [1] - 50:12
**March** [9] - 44:7, 44:14, 46:3, 64:7, 102:21, 103:2, 104:9, 107:9, 128:3
**Maria** [4] - 6:25, 13:21, 83:3, 105:23
**mark** [1] - 128:22
**MARKED** [6] - 3:9,

3:10, 3:15, 3:16, 3:21, 3:22
**markedly** [1] - 105:8
**marker** [1] - 90:16
**masks** [4] - 4:12, 4:14, 4:16, 4:18
**Massachusetts** [1] - 72:9
**match** [1] - 106:12
**material** [2] - 20:4, 20:8
**materials** [5] - 31:20, 32:2, 32:12, 34:10, 129:16
**matter** [7] - 17:2, 31:7, 45:18, 94:24, 123:14, 129:10, 130:8
**matters** [1] - 41:10
**maximum** [1] - 90:1
**MCI** [6] - 93:16, 93:17, 126:7, 126:16, 127:6, 128:2
**mean** [9] - 9:22, 10:23, 26:7, 27:18, 67:15, 94:23, 102:2
**meaningful** [1] - 54:7
**means** [5] - 30:16, 50:24, 70:9, 116:8, 122:17
**meant** [2] - 41:7, 110:19
**measure** [2] - 100:3, 111:8
**mechanical** [1] - 2:5
**medical** [28] - 22:20, 22:21, 23:2, 23:4, 47:23, 48:5, 48:15, 53:3, 56:4, 58:17, 59:23, 60:2, 61:11, 62:1, 65:16, 67:2, 67:18, 68:17, 69:14, 72:5, 72:6, 73:19, 73:20, 82:14, 82:20, 85:2, 127:23, 128:3
**meet** [2] - 39:22, 39:23
**member** [4] - 73:1, 74:23, 83:22, 96:4
**members** [2] - 4:17, 81:9
**memo** [2] - 40:6, 40:15
**memories** [1] - 67:7
**Memory** [1] - 73:1
**memory** [12] - 43:14, 49:23, 62:25, 71:23, 73:8, 92:15, 92:16, 93:18, 94:11, 96:3, 113:14, 118:11
**mental** [5] - 36:2,

42:11, 42:21, 68:14, 112:13
**mention** [2] - 32:17, 69:1
**mentioned** [14] - 18:25, 43:8, 87:12, 87:17, 87:18, 87:23, 99:22, 105:18, 111:14, 115:23, 118:4, 119:12, 125:16, 125:19
**merits** [1] - 41:17
**messaging** [2] - 37:22, 38:9
**met** [3] - 13:23, 61:12, 68:9
**metabolic** [1] - 100:3
**metabolism** [3] - 89:16, 99:7, 101:18
**Methodist** [6] - 63:6, 66:18, 66:22, 103:20, 104:3, 104:24
**Michael** [1] - 66:3
**Michele** [1] - 44:8
**middle** [2] - 22:25, 129:8
**might** [9] - 16:17, 32:18, 88:10, 93:18, 97:7, 110:9, 116:15, 126:5
**mild** [44] - 22:14, 44:14, 74:18, 78:2, 78:4, 79:8, 79:10, 90:9, 92:24, 92:25, 93:4, 93:16, 93:24, 95:12, 97:12, 97:13, 98:11, 98:20, 104:10, 105:3, 105:17, 107:4, 107:6, 107:11, 107:23, 108:18, 110:6, 110:7, 110:13, 119:13, 124:5, 124:6, 124:8, 124:9, 125:4, 125:5, 125:22, 126:3, 126:8, 126:19, 126:23, 126:25, 128:2
**milder** [1] - 79:21
**million** [1] - 43:5
**millions** [1] - 37:17
**mind** [4] - 33:3, 63:11, 77:9, 111:25
**minute** [1] - 33:4
**minutes** [9] - 28:18, 29:20, 58:14, 60:3, 102:12, 128:14, 128:18, 129:1, 129:2

**minutiae** [1] - 14:16
**missed** [2] - 20:21, 101:14
**moderate** [12] - 44:14, 78:4, 78:11, 79:11, 93:1, 94:5, 94:7, 96:22, 97:10, 107:25, 125:4, 125:5
**modify** [1] - 34:16
**MONDAY** [2] - 1:12, 4:5
**Monday** [2] - 17:16, 21:12
**months** [7] - 44:7, 46:5, 46:6, 47:8, 47:9, 69:12, 126:19
**morning** [14] - 4:7, 5:4, 5:8, 5:13, 7:9, 14:18, 53:9, 53:11, 55:9, 65:10, 70:20, 76:21, 77:4
**Moss** [1] - 65:25
**most** [13] - 15:13, 15:17, 37:3, 37:10, 46:21, 54:11, 55:3, 62:17, 74:17, 83:14, 117:12, 123:18
**motion** [4] - 11:23, 29:4, 29:19, 86:22
**motivation** [6] - 36:7, 36:12, 36:17, 42:3, 48:2, 53:5
**motive** [1] - 41:18
**motor** [4] - 84:3, 84:17, 86:3, 87:25
**move** [5] - 75:10, 84:11, 115:21, 120:1, 122:8
**movement** [1] - 84:6
**movements** [2] - 84:9, 87:8
**moves** [2] - 47:13, 47:14
**moving** [3] - 86:14, 87:5, 126:7
**MR** [101] - 5:4, 5:9, 5:13, 5:18, 6:6, 6:11, 7:5, 7:19, 7:25, 8:3, 8:7, 8:17, 9:3, 9:6, 9:15, 11:5, 11:25, 12:7, 12:14, 12:19, 13:4, 13:5, 13:16, 13:20, 15:2, 15:4, 15:6, 15:8, 18:2, 18:10, 18:20, 19:16, 19:19, 19:21, 19:24, 19:25, 20:16, 23:16, 24:4, 25:3, 26:10, 26:18, 27:23, 28:13, 28:20, 29:9, 29:11,

30:6, 30:21, 31:14, 32:15, 32:22, 32:25, 33:3, 33:7, 33:25, 34:8, 34:13, 34:19, 34:25, 35:2, 35:16, 70:17, 71:9, 75:9, 75:14, 75:19, 76:7, 76:13, 76:20, 77:1, 77:8, 77:12, 78:6, 78:10, 78:20, 78:21, 79:3, 102:16, 103:10, 106:3, 109:7, 109:8, 109:12, 112:22, 113:7, 113:23, 114:12, 114:23, 115:20, 120:17, 121:8, 121:9, 121:25, 122:2, 128:10, 128:13, 128:16, 128:22, 128:24, 129:15
**MRI** [13] - 32:23, 73:14, 99:15, 99:23, 100:2, 116:1, 118:14, 118:22, 124:9, 124:11, 124:25, 125:7
**MRI's** [2] - 125:3, 125:12
**MS** [3] - 53:9, 53:13, 53:24
**muddy** [1] - 40:8
**multibillion** [1] - 46:25
**multiple** [2] - 43:12, 57:22

## N

**n/a** [1] - 1:25
**name** [1] - 15:7
**named** [1] - 37:11
**names** [2] - 40:20, 93:19
**narrow** [2] - 10:2, 48:9
**narrowly** [1] - 48:7
**natural** [3] - 60:14, 125:18, 126:17
**nearly** [4] - 50:20, 54:12, 64:25, 69:23
**necessarily** [1] - 90:13
**necessary** [8] - 24:5, 30:13, 34:17, 75:15, 90:16, 90:19, 122:20, 124:17
**necks** [1] - 50:11
**need** [25] - 6:20, 13:9, 13:11, 17:4, 17:18, 17:22, 18:25, 19:9, 19:15, 21:1, 21:6,

26:7, 26:15, 32:13, 32:18, 33:23, 35:5, 42:5, 69:1, 69:20, 70:5, 76:12, 79:1, 94:5, 122:5
**needed** [2] - 40:8, 40:10
**needlessly** [1] - 17:5
**needs** [4] - 12:24, 17:22, 21:12, 50:16
**Nemelka** [1] - 66:3
**nerves** [1] - 71:18
**nervous** [4] - 71:17, 72:4, 72:12, 84:19
**neuro** [1] - 98:14
**neurocognitive** [2] - 59:20, 108:24
**neurodata** [1] - 59:14
**neurodegeneration** [4] - 89:2, 99:24, 124:6, 125:11
**neurodegenerative** [7] - 56:7, 59:17, 84:5, 91:23, 94:19, 104:10, 105:4
**Neurodegenerative** [1] - 66:17
**neuroimaging** [10] - 56:13, 58:1, 58:3, 58:4, 58:9, 59:12, 59:15, 60:15, 64:4, 64:12, 65:13, 69:10, 74:2, 79:21, 98:14, 99:1, 109:18, 109:19
**neurological** [4] - 73:12, 96:7, 116:11, 117:23
**Neurological** [1] - 74:25
**neurologist** [15] - 14:8, 17:11, 24:13, 24:14, 26:15, 58:21, 60:5, 60:23, 62:7, 71:13, 71:16, 71:22, 72:1, 107:16, 127:25
**neurologists** [2] - 74:4, 85:3
**neurology** [8] - 21:5, 58:20, 72:7, 72:19, 72:21, 75:8, 82:13, 82:14
**Neurology** [2] - 74:25, 75:6
**neuronal** [1] - 21:23
**neurons** [3] - 85:10, 85:12, 85:14
**Neuropsychiatric** [2] - 75:2, 75:7
**neuropsychiatrists** [1] - 58:13

**neuropsychological** [4] - 59:10, 82:25, 87:4, 107:21
**neuropsychologist** [5] - 59:7, 61:19, 62:8, 82:22, 96:10
**neuropsychology** [1] - 58:19
**neuroradiological** [2] - 98:24, 111:16
**neuroradiologist** [4] - 15:9, 17:11, 58:11, 63:25
**neuroradiologists** [1] - 58:16
**neuroradiology** [1] - 58:10
**Neuroreader®** [3] - 33:1, 116:17, 118:14
**neuroscience** [1] - 72:3
**never** [9] - 13:23, 16:13, 16:14, 20:5, 28:23, 40:11, 40:13, 43:8, 45:22
**new** [11] - 11:17, 20:11, 22:3, 22:18, 25:5, 26:20, 26:22, 28:21, 108:9, 112:24, 113:2
**news** [1] - 16:17
**next** [12] - 7:15, 35:18, 42:15, 45:7, 55:13, 58:2, 62:6, 63:22, 111:21, 112:15, 115:21, 124:2
**night** [12] - 7:7, 14:18, 19:22, 20:18, 21:16, 21:19, 22:24, 23:7, 24:21, 26:24, 27:11, 113:4
**nobody** [3] - 29:6, 34:12, 68:5
**nobody's** [1] - 57:9
**nominees** [2] - 37:10, 37:11
**non** [2] - 84:17, 124:12
**non-cognitively** [1] - 124:12
**non-motor** [1] - 84:17
**normal** [16] - 90:5, 90:9, 91:13, 97:6, 99:18, 117:4, 117:9, 117:25, 118:2, 119:5, 124:11, 124:22, 125:1, 127:10
**normally** [1] - 104:3

**note** [4] - 18:21, 76:8, 76:13, 127:19
**noted** [2] - 119:14, 128:5
**nothing** [1] - 54:17
**notice** [2] - 21:1, 42:20
**noticed** [1] - 47:3
**noting** [1] - 96:6
**November** [7] - 15:23, 16:2, 16:3, 20:23, 21:12, 48:1, 127:15
**NOVEMBER** [2] - 1:12, 4:5
**nuclear** [3] - 13:23, 83:3, 106:18
**NUMBER** [3] - 3:10, 3:16, 3:22
**number** [15] - 6:14, 24:12, 63:18, 64:5, 73:6, 74:23, 84:22, 88:12, 88:15, 94:12, 94:16, 112:7, 116:19, 118:25, 125:25
**numbers** [1] - 31:22
**NYU** [1] - 58:23

## O

**O'** [1] - 1:20
**o'clock** [6] - 18:17, 19:25, 21:19, 22:24, 23:9, 129:11
**oath** [1] - 24:21
**object** [18] - 8:20, 9:22, 11:6, 12:11, 12:17, 12:20, 20:11, 23:11, 23:19, 78:12, 112:22, 113:4, 113:7, 113:8, 114:2, 114:5, 121:10
**objected** [1] - 29:6
**objecting** [2] - 11:19, 20:19
**objection** [11] - 9:2, 22:8, 29:12, 75:13, 78:6, 109:7, 113:23, 114:11, 114:25, 121:14, 122:3
**objectionable** [1] - 114:21
**objective** [11] - 48:15, 56:13, 57:24, 58:8, 60:1, 62:17, 64:11, 65:6, 69:10, 79:20, 98:14
**observation** [1] - 43:18
**observations** [3] -

61:24, 96:6, 109:1
**observe** [3] - 10:17, 11:8, 11:16
**observing** [1] - 9:18
**obtained** [3] - 82:4, 101:20, 123:11
**occasion** [2] - 109:5, 109:14
**occipital** [1] - 118:8
**occur** [2] - 90:17, 92:17
**occurred** [1] - 95:16
**occurring** [1] - 58:24
**occurs** [3] - 84:10, 108:11, 122:18
**October** [9] - 20:21, 52:4, 52:8, 56:23, 57:7, 57:9, 60:9, 60:11, 66:25
**OF** [9] - 1:2, 1:10, 3:1, 3:8, 3:9, 3:14, 3:15, 3:20, 3:21
**offer** [1] - 70:6
**office** [3] - 40:18, 44:12, 45:13
**OFFICIAL** [1] - 1:10
**Official** [1] - 2:2
**offshore** [6] - 36:21, 37:9, 39:11, 39:14, 54:19, 54:21
**often** [3] - 86:7, 110:20, 111:15
**Ohio** [2] - 55:2, 66:2
**old** [2] - 41:25, 117:1
**older** [1] - 125:14
**ON** [5] - 3:9, 3:15, 3:21
**once** [2] - 49:10, 74:9
**one** [67] - 7:6, 8:4, 9:20, 10:7, 12:8, 13:20, 15:11, 18:23, 19:2, 19:19, 20:19, 20:24, 22:11, 25:15, 26:10, 29:3, 32:7, 32:21, 33:25, 38:15, 48:13, 49:18, 51:25, 52:10, 53:14, 53:24, 55:12, 57:21, 61:3, 62:11, 63:21, 64:8, 65:21, 69:1, 69:4, 79:23, 85:11, 86:21, 88:16, 91:23, 94:21, 98:13, 99:6, 99:23, 100:10, 100:20, 101:15, 102:21, 103:1, 103:3, 104:18, 106:10, 106:22, 109:8, 109:10, 110:9, 113:13, 113:18, 115:25, 121:10,

122:25, 123:1, 127:4, 129:10
**one-to-one** [2] - 100:10, 100:20
**ones** [5] - 33:11, 33:12, 33:14, 33:22
**oneself** [1] - 69:18
**oOo** [1] - 129:21
**open** [4] - 4:3, 38:11, 38:14, 121:22
**opening** [7] - 28:11, 34:14, 34:15, 34:18, 35:5, 35:12, 55:8
**openings** [1] - 5:19
**openly** [2] - 37:25, 38:3
**opinion** [33] - 10:14, 17:12, 21:1, 22:2, 22:3, 22:18, 24:3, 27:8, 27:16, 27:17, 61:11, 63:11, 64:9, 77:18, 79:5, 79:6, 79:13, 79:14, 80:1, 85:17, 92:19, 92:20, 92:21, 92:23, 95:7, 97:18, 106:17, 112:24, 113:2, 125:17, 125:19
**opinions** [9] - 11:17, 25:9, 28:4, 28:7, 62:11, 77:16, 77:17, 83:13, 106:1
**opportunity** [5] - 21:7, 23:3, 34:16, 105:19, 105:23
**opposed** [1] - 10:4
**opposing** [2] - 25:8, 28:2
**opposite** [1] - 24:12
**orange** [3] - 33:11, 33:14, 34:2
**order** [6] - 19:1, 19:9, 23:5, 103:1, 109:18, 126:2
**ordered** [5] - 39:24, 48:5, 64:5, 103:4, 116:4
**ordering** [2] - 81:23, 103:6
**organization** [2] - 37:1, 47:16
**organizations** [1] - 74:22
**organizing** [2] - 81:22, 94:3
**originally** [1] - 66:23
**others'** [1] - 83:17
**output** [1] - 116:17
**outside** [3] - 45:13, 47:21, 67:20

**overall** [1] - 103:23
**overruled** [1] - 11:24
**overstepped** [1] - 120:18
**own** [9] - 46:18, 50:9, 52:9, 62:3, 76:23, 106:20, 111:23, 112:13, 120:20
**owned** [1] - 68:12
**oxymoron** [1] - 110:18

## P

**P.M** [1] - 129:20
**p.m** [1] - 27:10
**packs** [1] - 68:4
**PAGE** [1] - 3:3
**Page** [1] - 30:2
**page** [3] - 21:22, 31:22, 104:16
**paid** [4] - 37:17, 81:11, 81:12, 81:14
**painting** [1] - 45:11
**pants** [1] - 97:3
**paper** [3] - 37:14, 38:15, 41:25
**papers** [1] - 120:23
**paraoccipital** [1] - 22:13
**parentheses** [1] - 104:12
**Park** [1] - 82:18
**Parkinson's** [42] - 22:15, 56:6, 56:8, 56:10, 56:11, 56:15, 57:19, 58:23, 58:25, 59:8, 59:21, 61:4, 64:11, 66:23, 72:15, 77:20, 84:2, 84:3, 84:8, 84:16, 84:21, 85:3, 85:5, 85:11, 85:15, 85:19, 85:24, 86:3, 87:1, 87:19, 88:1, 88:3, 92:5, 94:18, 95:4, 104:12, 105:6, 105:12, 106:23, 123:21
**Parkinsonism** [1] - 43:25
**paroccipital** [1] - 22:12
**part** [17] - 11:18, 24:2, 28:11, 28:13, 36:11, 37:3, 39:20, 42:7, 82:8, 88:8, 90:16, 103:21, 117:13, 121:10, 121:15, 121:18, 122:2
**participate** [1] - 54:7
**particular** [3] - 6:23,

10:20, 13:21
**particularly** [1] - 105:4
**parties** [12] - 4:12, 5:1, 5:2, 5:25, 7:18, 7:19, 8:10, 8:11, 8:12, 29:4, 64:5, 67:21
**parties'** [1] - 6:16
**Partners** [1] - 39:1
**parts** [4] - 92:8, 99:3, 99:11, 102:7
**past** [4] - 20:13, 43:16, 70:8, 111:5
**path** [2] - 43:20, 51:6
**patient** [26] - 45:6, 45:9, 64:15, 73:13, 86:11, 86:17, 90:5, 90:8, 93:17, 93:23, 94:8, 95:25, 96:1, 96:5, 96:10, 96:17, 97:4, 97:9, 100:14, 107:16, 109:16, 109:20, 112:1, 112:12, 113:22, 124:23
**patient's** [5] - 99:24, 100:9, 100:23, 100:25, 109:25
**patients** [30] - 10:2, 49:22, 59:20, 65:1, 71:16, 72:11, 73:7, 73:15, 73:22, 74:16, 75:24, 82:25, 84:7, 84:13, 88:3, 95:23, 100:11, 109:14, 109:22, 111:23, 112:8, 114:19, 116:25, 120:21, 125:3, 125:5, 125:10, 125:14, 126:3
**pattern** [7] - 89:21, 105:7, 106:10, 106:11, 106:14, 106:22, 113:21
**PDD** [2] - 105:11, 105:12
**peak** [1] - 90:5
**people** [19] - 4:22, 8:22, 19:14, 23:21, 37:5, 46:1, 55:1, 55:2, 66:15, 67:5, 67:19, 67:20, 68:2, 68:23, 68:24, 91:4, 91:9, 119:24, 120:22
**per** [1] - 126:9
**percent** [10] - 26:10, 31:17, 49:22, 64:25, 74:10, 91:9, 117:7, 118:5, 126:6, 126:9
**percentile** [12] -

116:24, 117:7, 117:8, 117:11, 118:6, 118:9, 118:10, 118:12, 118:23, 119:19, 119:23
**percentiles** [1] - 117:19
**perfect** [2] - 8:25, 121:3
**performance** [9] - 38:5, 41:20, 48:4, 49:11, 49:13, 49:17, 51:15, 51:20, 97:23
**performed** [3] - 61:24, 102:22, 116:4
**performing** [2] - 79:18, 127:10
**period** [1] - 94:8
**peripheral** [1] - 71:18
**permanent** [1] - 56:16
**person** [14] - 5:22, 28:8, 50:15, 52:6, 53:14, 83:8, 90:20, 95:8, 100:17, 101:6, 101:13, 104:4, 109:14, 110:12
**person's** [1] - 60:8
**personal** [2] - 61:24, 94:11
**persons** [1] - 86:7
**perspective** [1] - 25:10
**pertaining** [1] - 20:1
**pervades** [1] - 67:8
**PET** [61] - 58:12, 62:17, 64:7, 64:8, 64:22, 65:3, 65:4, 65:6, 83:4, 83:6, 88:13, 89:7, 89:14, 89:15, 91:10, 99:6, 99:7, 99:23, 99:25, 100:1, 100:5, 101:9, 101:15, 101:18, 101:20, 101:21, 102:2, 102:18, 102:22, 102:23, 103:1, 103:19, 104:9, 104:19, 105:1, 105:8, 106:1, 106:9, 107:8, 107:9, 107:18, 110:5, 111:1, 111:19, 111:23, 112:2, 112:11, 114:16, 115:23, 120:2, 122:9, 122:10, 122:13, 123:10, 123:11, 124:5, 124:15, 125:7

**PETs** [2] - 102:19, 102:20
**phone** [3] - 16:10, 40:13, 55:25
**phonetic** [1] - 69:4
**phonetic)** [2] - 21:25, 33:1
**physical** [2] - 40:9, 68:13
**physician** [2] - 66:22, 67:4
**physicians** [3] - 10:1, 57:23, 85:20
**picture** [2] - 45:11, 53:2
**pictures** [7] - 24:15, 25:6, 25:10, 26:16, 26:20, 26:22, 28:21
**pieces** [3] - 35:9, 48:14, 84:22
**place** [1] - 68:2
**places** [1] - 31:11
**Plaintiff** [2] - 1:5, 1:15
**plan** [4] - 17:8, 17:20, 18:16, 58:12
**planning** [1] - 38:22
**plans** [3] - 67:20, 68:7, 68:16
**planted** [1] - 43:15
**play** [1] - 121:19
**played** [3] - 39:6, 128:21, 129:3
**players** [1] - 114:19
**point** [12] - 30:22, 31:9, 42:23, 44:21, 62:19, 65:5, 69:16, 78:22, 93:11, 110:15, 127:2, 128:1
**pointed** [1] - 38:16
**points** [2] - 26:3, 100:13
**Ponisio** [1] - 6:25, 13:21, 14:3, 14:22, 15:8, 15:21, 15:24, 16:1, 16:9, 16:10, 17:13, 17:15, 17:21, 18:18, 65:10, 65:12, 83:3, 107:4, 110:16, 110:19
**Ponisio's** [4] - 17:9, 17:13, 105:24, 106:17
**Pool** [1] - 67:3
**poor** [1] - 49:17
**population** [1] - 119:6
**portion** [1] - 50:5
**portray** [2] - 48:18, 51:5
**portraying** [1] - 25:5
**position** [5] - 20:10,

27:21, 36:3, 61:14, 127:14
**positive** [6] - 52:12, 89:11, 90:12, 90:20, 91:4, 91:10, 91:14, 122:11, 122:15, 124:15, 124:22
**possession** [1] - 41:8
**possible** [9] - 19:4, 50:8, 59:21, 77:21, 78:3, 79:9, 91:12, 92:24, 123:9
**possibly** [2] - 4:22, 124:8
**post** [1] - 74:1
**post-doctoral** [1] - 74:1
**posterior** [2] - 22:11, 22:13
**postmortem** [4] - 58:6, 64:16, 64:18, 64:25
**potential** [3] - 50:9, 69:2, 86:13
**potentially** [1] - 97:13
**PowerPoint** [4] - 76:15, 76:21, 77:2, 112:16
**powers** [1] - 37:1
**practice** [9] - 34:5, 74:14, 74:15, 95:22, 96:16, 97:7, 109:4, 109:13, 111:14
**practitioner** [1] - 43:11
**pre** [11] - 6:15, 6:16, 7:13, 7:21, 8:9, 9:6, 9:11, 9:12, 76:8, 76:12, 103:11
**pre-admit** [2] - 7:13, 7:21
**pre-admitted** [9] - 6:15, 6:16, 8:9, 9:6, 9:11, 9:12, 76:8, 76:12, 103:11
**preliminary** [1] - 35:7
**preparation** [2] - 31:10, 82:6
**prepare** [3] - 21:1, 22:22, 76:15
**prepared** [6] - 23:7, 23:12, 24:18, 26:1, 78:24, 81:1
**preparing** [3] - 16:25, 22:25, 31:12
**prescient** [1] - 39:18
**present** [3] - 74:20, 82:3, 125:9
**presentability** [1] - 54:5

**presentation** [10] - 16:25, 32:9, 76:16, 76:22, 77:2, 96:19, 108:20, 109:15, 111:16, 112:17
**presenting** [5] - 73:8, 79:22, 108:1, 110:8, 113:22
**presently** [1] - 36:9
**preserving** [1] - 8:20
**president** [1] - 47:14
**PRESIDING** [1] - 1:3
**preventing** [1] - 120:6
**previously** [4] - 63:3, 87:9, 120:10, 120:16
**primary** [1] - 67:4
**Princeton** [1] - 72:3
**printed** [1] - 28:16
**Prisons** [1] - 61:21
**private** [1] - 39:8
**problem** [12] - 5:21, 25:23, 26:2, 29:18, 30:13, 31:6, 33:6, 34:9, 77:11, 115:18, 128:15, 129:6
**problems** [17] - 73:8, 77:24, 79:7, 84:18, 88:21, 90:14, 92:22, 93:17, 96:3, 101:13, 109:2, 110:9, 114:20, 116:11, 119:7, 119:20, 127:20
**proceed** [5] - 35:5, 35:14, 46:11, 53:12, 76:15
**proceeding** [3] - 9:24, 46:9
**Proceedings** [1] - 2:5
**PROCEEDINGS** [3] - 1:10, 4:1, 129:19
**proceedings** [8] - 4:3, 9:18, 53:17, 54:1, 66:11, 70:1, 70:8, 130:8
**process** [7] - 10:19, 69:19, 88:18, 91:6, 92:7, 111:10, 122:18
**processing** [1] - 44:15
**produced** [2] - 2:5, 27:10
**professional** [3] - 74:7, 74:22, 74:24
**professionals** [1] - 47:24
**professor** [1] - 72:21
**profile** [2] - 63:16, 63:18
**profound** [1] - 119:3
**program** [1] - 72:9

**Program** [2] - 72:10, 72:20
**progress** [14] - 68:20, 73:17, 94:20, 95:4, 95:6, 95:11, 95:20, 98:18, 98:21, 108:7, 109:18, 125:5, 125:10, 125:24
**progressed** [6] - 56:20, 60:16, 78:3, 79:10, 92:25, 126:24
**progresses** [4] - 84:6, 90:8, 92:15, 95:13
**Progression** [1] - 30:3
**progression** [10] - 21:23, 52:16, 57:8, 57:9, 61:7, 95:16, 95:21, 108:10, 126:4, 126:20
**progressions** [1] - 51:4
**progressive** [7] - 48:25, 56:7, 56:16, 56:19, 61:5, 65:8, 69:15
**prohibit** [1] - 11:13
**promised** [1] - 63:24
**proof** [3] - 55:4, 61:9, 76:2
**properly** [2] - 23:5, 27:5
**proportion** [1] - 110:4
**proportionality** [1] - 108:4
**Prosecution** [1] - 81:6
**prosecution** [5] - 35:25, 61:16, 80:14, 80:15, 83:22
**protein** [10] - 85:25, 87:2, 88:23, 89:1, 92:6, 92:12, 92:13, 92:14, 101:23, 122:24
**proteins** [3] - 88:15, 91:25, 92:11
**provide** [6] - 11:22, 21:13, 35:6, 41:18, 70:3, 80:8
**provided** [1] - 112:5
**provides** [1] - 59:15
**providing** [2] - 12:24, 27:20
**psychiatric** [3] - 49:11, 49:13, 52:7
**psychiatrist** [4] - 59:18, 62:7, 63:20, 82:19
**psychiatrists** [1] - 58:13
**psychiatry** [1] - 58:19

**psychological** [1] - 119:15
**psychologist** [1] - 62:9
**psychology** [1] - 72:2
**published** [1] - 25:11
**pull** [1] - 34:2
**pulled** [6] - 26:24, 30:17, 31:20, 32:1, 32:11, 129:4
**purportedly** [1] - 50:19
**purpose** [1] - 26:1
**purposes** [1] - 123:16
**pursuant** [1] - 130:5
**push** [1] - 102:13
**put** [19] - 19:2, 23:8, 24:6, 24:11, 25:9, 26:25, 31:5, 66:21, 69:25, 77:2, 97:3
**puts** [1] - 23:20
**putting** [1] - 97:2

**Q**

**qualified** [2] - 75:18, 75:21
**qualifies** [1] - 71:25
**qualify** [1] - 75:10
**qualifying** [1] - 33:25
**qualitative** [1] - 118:17
**quantitative** [4] - 83:5, 116:8, 116:18, 118:21
**questions** [8] - 24:24, 29:23, 32:14, 44:6, 45:16, 46:14, 58:18, 115:19
**quick** [1] - 28:19
**quickly** [1] - 17:1
**quite** [3] - 11:4, 22:19, 38:21
**quote** [1] - 62:22
**quotes** [1] - 78:23

**R**

**radiologist** [18] - 13:23, 83:4, 103:24, 104:1, 104:2, 104:4, 104:7, 104:8, 104:22, 104:23, 105:15, 106:17, 106:18, 107:3, 107:11, 116:7, 118:18
**raise** [5] - 5:25, 43:14, 70:21, 78:16, 129:3
**raised** [8] - 34:22,

40:15, 46:10, 57:3, 63:2, 86:20, 86:21, 87:9
**raises** [2] - 22:3, 50:8
**raising** [1] - 22:7
**ran** [2] - 43:6, 67:13
**range** [7] - 97:14, 117:4, 117:9, 118:2, 119:5, 124:11, 127:11
**rate** [3] - 52:12, 89:24, 126:4
**rather** [4] - 17:3, 38:12, 77:7, 101:21
**rational** [1] - 54:6
**rattled** [1] - 40:24
**re** [2] - 47:16, 114:9
**re-ask** [1] - 114:9
**re-organization** [1] - 47:16
**reach** [2] - 63:9, 63:21
**reached** [1] - 61:1
**reaches** [2] - 90:4, 93:23
**read** [6] - 23:3, 78:24, 83:17, 83:19, 105:19, 105:23
**readdress** [1] - 18:7
**ready** [4] - 35:15, 53:12, 68:3, 102:15
**real** [2] - 49:12, 68:1
**real-world** [1] - 49:12
**reality** [1] - 37:17
**realized** [2] - 51:22, 101:14
**really** [20] - 4:20, 14:20, 14:21, 17:2, 21:21, 48:23, 72:11, 84:23, 87:22, 88:6, 90:10, 92:14, 93:8, 94:5, 100:18, 108:25, 116:13, 123:17, 123:21, 124:7
**reason** [8] - 11:1, 29:7, 38:14, 65:11, 67:7, 67:16, 74:17, 100:7
**reasonable** [6] - 18:3, 18:8, 45:5, 54:6, 60:16, 60:24
**reasons** [1] - 50:22
**recalled** [1] - 26:13
**receive** [1] - 23:9
**RECEIVED** [3] - 3:10, 3:16, 3:22
**received** [6] - 7:7, 20:18, 72:2, 72:5, 75:3, 75:5
**receives** [1] - 39:19

**receiving** [1] - 43:5
**recent** [3] - 51:20, 62:21, 64:20
**recently** [4] - 57:2, 63:12, 66:6, 95:19
**recess** [3] - 28:19, 102:14, 129:9
**RECESSED** [1] - 129:19
**recipient** [1] - 43:4
**recognize** [4] - 44:9, 44:10, 46:6, 70:1
**recognizing** [2] - 94:10, 96:25
**recommendation** [1] - 103:2
**recommended** [4] - 53:18, 80:20, 81:23, 103:5
**record** [10] - 7:12, 7:14, 8:5, 28:25, 29:21, 29:23, 76:9, 76:14, 86:23, 128:23
**record's** [1] - 122:6
**recorded** [1] - 2:5
**records** [5] - 39:21, 41:4, 108:21, 127:24, 128:3
**recurrent** [1] - 86:6
**recurring** [1] - 60:12
**redact** [1] - 33:18
**redactions** [1] - 77:3
**reduction** [1] - 89:18
**reenactment** [1] - 87:10
**reexamined** [1] - 57:6
**refer** [3] - 20:8, 37:5, 100:24
**reference** [5] - 31:20, 32:2, 32:11, 34:10, 61:25
**referenced** [1] - 20:5
**references** [3] - 20:4, 24:1, 76:25
**referral** [1] - 43:7
**referred** [2] - 54:15, 100:22
**referring** [3] - 96:10, 101:17, 102:3
**refers** [2] - 38:10, 102:4
**refrain** [1] - 44:16
**refuted** [1] - 26:13
**refutes** [1] - 57:25
**regarding** [10] - 77:18, 77:23, 79:6, 79:14, 80:2, 92:21, 106:1, 107:8, 108:23, 109:1
**regards** [1] - 106:14
**regularly** [1] - 71:4

**relate** [3] - 107:16, 109:19, 119:11
**related** [8] - 75:22, 87:18, 87:20, 90:23, 92:19, 108:3, 118:19, 118:20
**relates** [1] - 120:13
**relating** [1] - 109:24
**relation** [1] - 87:21
**relationship** [4] - 39:2, 41:13, 73:11, 110:1
**relays** [1] - 40:22
**relevant** [2] - 8:21, 95:8
**relies** [1] - 59:11
**rely** [4] - 59:23, 59:24, 60:1, 63:22
**relying** [1] - 22:1
**REM** [2] - 86:10, 87:10
**remain** [5] - 10:17, 11:7, 26:9, 41:21, 47:6
**remained** [2] - 47:18, 49:6
**remaining** [7] - 9:17, 9:23, 11:14, 12:18, 46:24, 47:17, 67:2
**remarkably** [2] - 42:12, 48:22
**remember** [6] - 55:12, 55:15, 55:21, 66:8, 67:16, 70:10
**remembers** [1] - 57:1
**remote** [3] - 42:15, 44:22, 46:18
**removed** [3] - 33:24, 112:25
**reorganizes** [1] - 47:12
**repeat** [1] - 79:4
**report** [38] - 14:1, 15:13, 17:9, 21:21, 22:19, 27:2, 27:4, 27:10, 27:15, 27:25, 51:12, 51:13, 59:13, 60:7, 60:17, 60:18, 60:24, 62:11, 62:14, 62:15, 63:9, 63:12, 63:22, 65:13, 69:10, 78:7, 78:8, 78:10, 78:12, 78:23, 83:21, 83:22, 103:21, 104:19, 105:24, 116:17, 127:8
**reported** [4] - 87:8, 117:6, 128:21, 130:8
**Reported** [1] - 2:1
**Reporter** [2] - 2:2, 2:5
**REPORTER'S** [1] - 1:10

**reporter's** [1] - 102:1
**reporting** [5] - 96:23, 96:24, 97:9, 97:20, 98:6
**reports** [36] - 11:18, 15:11, 15:12, 15:14, 17:14, 20:6, 20:7, 20:20, 20:24, 21:13, 22:20, 27:13, 28:5, 42:22, 42:25, 56:21, 58:4, 58:3, 58:4, 58:9, 61:25, 62:10, 76:5, 76:10, 79:19, 80:25, 82:6, 83:17, 83:19, 93:14, 96:21, 103:19, 105:20, 108:22, 119:12, 127:3
**represent** [2] - 5:2, 104:14
**representative** [1] - 112:5
**represented** [3] - 9:20, 21:9, 53:21
**represents** [1] - 105:25
**request** [1] - 4:18
**requested** [2] - 29:13, 77:4
**requests** [1] - 39:21
**require** [2] - 28:1, 55:4, 62:25
**Research** [2] - 21:25, 30:5
**research** [17] - 23:2, 23:4, 73:9, 73:10, 73:14, 73:15, 73:25, 74:2, 109:5, 109:21, 109:23, 111:15, 112:4, 112:7, 120:23, 121:16, 121:17
**resemble** [1] - 88:6
**reserve** [1] - 100:25
**reserves** [1] - 101:3
**residency** [1] - 72:8
**residents** [1] - 73:20
**resign** [1] - 36:3
**respect** [6] - 4:12, 7:8, 12:4, 18:14, 24:24, 120:4
**respectful** [2] - 16:18, 16:19
**respectfully** [2] - 4:18, 11:23
**respective** [2] - 6:16, 83:9
**respond** [3] - 44:5, 45:15, 86:17
**responded** [1] - 16:1

**response** [3] - 18:1, 23:15, 65:17
**rest** [3] - 52:7, 84:10, 100:18
**result** [3] - 63:14, 92:2, 94:22
**resulted** [1] - 57:3
**resulting** [3] - 58:25, 59:1, 123:23
**results** [9] - 49:7, 58:4, 64:21, 64:23, 64:24, 65:5, 65:7, 97:21, 108:24
**retained** [5] - 13:22, 13:24, 15:9, 16:14, 60:5
**retired** [2] - 66:3, 127:15
**reveal** [1] - 124:3
**reveals** [1] - 122:13
**Reverend** [2] - 68:7, 68:8
**review** [8] - 13:25, 22:21, 27:6, 38:5, 81:19, 86:24, 108:21, 127:17
**reviewed** [4] - 15:10, 46:14, 63:12, 80:19
**reviewing** [4] - 15:11, 81:20, 81:21, 104:4
**reviews** [1] - 41:20
**Reynolds** [12] - 37:8, 54:22, 54:23, 54:24, 66:1, 68:10, 68:11, 127:14
**rifles** [1] - 46:20
**rights** [1] - 69:20
**risk** [2] - 61:7, 126:24
**roadmap** [2] - 35:6, 35:12
**Robert** [5] - 4:10, 38:25, 49:13, 61:18, 82:22
**ROBERT** [1] - 1:7
**role** [6] - 37:14, 39:6, 47:18, 72:22, 97:15, 127:22
**room** [14] - 20:25, 43:23, 44:2, 46:7, 47:21, 47:22, 48:7, 59:11, 66:14, 67:20, 68:24, 109:22, 110:3
**rooms** [1] - 45:11
**rotate** [1] - 73:21
**rough** [2] - 81:15, 126:14
**row** [1] - 53:15
**RPR** [2] - 2:1, 130:12
**rule** [5] - 6:21, 12:3, 12:8, 12:22

**rules** [1] - 4:12
**ruling** [3] - 32:18, 120:4, 120:9
**run** [1] - 20:13
**running** [2] - 49:5, 101:7
**Ryan** [2] - 60:5, 70:18, 75:10
**RYAN** [2] - 3:4, 71:1

**S**

**sadly** [1] - 45:7
**sampling** [1] - 41:15
**sat** [1] - 45:17
**Saturday** [1] - 14:17
**save** [1] - 50:11
**saw** [4] - 43:12, 97:6, 98:4, 127:25
**scale** [2] - 95:24, 96:20
**scan** [54] - 15:11, 33:20, 64:8, 64:22, 65:3, 65:4, 85:9, 85:12, 88:13, 89:7, 89:12, 89:15, 90:12, 91:10, 91:14, 99:7, 99:15, 100:2, 101:20, 101:21, 103:19, 104:19, 105:7, 105:8, 106:2, 106:10, 107:8, 107:9, 107:18, 110:5, 111:11, 113:5, 113:6, 113:8, 113:9, 114:16, 116:1, 116:4, 116:7, 120:2, 120:7, 122:9, 122:10, 122:13, 122:15, 123:11, 124:5, 124:11, 124:15, 124:22, 124:23, 125:7
**scans** [26] - 15:12, 18:13, 18:14, 25:17, 31:23, 32:20, 33:10, 33:15, 34:2, 34:10, 58:12, 62:17, 64:7, 65:6, 73:14, 83:5, 83:6, 101:16, 102:23, 103:1, 103:6, 111:12, 112:6, 112:11, 120:5, 123:10
**schedule** [2] - 16:19, 17:23
**schedules** [1] - 19:12
**scheduling** [2] - 7:1, 14:6
**scheme** [1] - 36:19

**school** [1] - 72:5
**science** [2] - 25:11, 25:20
**scope** [1] - 78:13
**score** [1] - 49:24
**scored** [1] - 49:20
**scores** [5] - 48:21, 48:25, 49:6, 50:1, 50:18
**scoring** [2] - 49:2, 49:3, 108:25
**Scott** [2] - 43:11, 66:7
**screen** [2] - 55:19, 103:16, 114:14
**Sean** [2] - 2:1, 130:12
**sean_gumm@txs.uscourts.gov** [1] - 2:3
**search** [9] - 36:2, 38:7, 40:17, 41:2, 42:8, 42:14, 43:9, 43:13, 55:24
**seats** [1] - 53:19
**second** [23] - 6:18, 10:6, 24:22, 51:2, 51:25, 52:15, 77:23, 79:5, 79:6, 86:9, 92:13, 92:20, 92:21, 102:22, 103:3, 104:25, 109:10, 119:8, 121:18, 122:2, 122:25, 123:1, 124:18
**secondary** [2] - 30:17, 30:19
**seconds** [3] - 128:18, 129:1, 129:2
**secret** [2] - 41:8, 68:2
**section** [2] - 103:23, 110:16
**Section** [1] - 130:6
**see** [71] - 4:21, 5:22, 13:13, 18:12, 22:21, 23:3, 25:21, 26:16, 29:6, 34:4, 35:18, 36:1, 36:25, 38:17, 40:6, 41:15, 41:16, 41:19, 41:22, 41:24, 42:2, 42:9, 45:7, 45:10, 46:18, 47:6, 48:21, 49:8, 50:6, 51:15, 60:17, 68:24, 71:16, 73:6, 73:16, 73:22, 74:14, 84:7, 84:13, 89:9, 89:21, 89:22, 90:12, 90:24, 91:1, 91:22, 91:24, 91:25, 92:9, 96:1, 96:12, 97:21, 98:17, 100:1, 106:22,

107:18, 109:6, 109:14, 111:9, 113:21, 114:6, 114:10, 116:16, 116:23, 117:3, 117:5, 121:12, 121:17, 121:23, 122:25

**seeing** [8] - 98:15, 106:10, 108:5, 111:6, 111:23, 115:6, 120:13, 121:20

**seeking** [1] - 42:17

**sees** [5] - 43:20, 60:18, 67:23, 115:3, 120:7

**seized** [2] - 41:3, 41:6

**send** [2] - 38:13, 38:14

**sending** [1] - 35:8

**sends** [1] - 42:16

**sense** [9] - 48:6, 48:24, 80:3, 80:6, 98:21, 99:17, 99:19, 111:22, 120:21

**sensitive** [2] - 99:25, 125:8

**sent** [3] - 24:22, 42:24, 116:7

**sepsis** [2] - 57:2, 57:10

**September** [3] - 39:19, 41:1, 42:15

**sequestered** [1] - 10:20

**sequestration** [5] - 6:19, 6:21, 7:15, 9:14, 23:22

**series** [3] - 37:10, 42:10, 43:21

**serious** [5] - 36:17, 40:16, 43:24, 45:3, 47:4

**seriousness** [1] - 36:15

**served** [1] - 15:1

**server** [2] - 38:3, 41:16

**servers** [1] - 41:7

**service** [1] - 37:22

**serving** [1] - 68:12

**SESSION** [1] - 1:9

**sets** [2] - 20:18, 43:19

**setting** [3] - 54:17, 73:25, 98:2

**settled** [1] - 54:16

**seven** [1] - 117:12

**several** [1] - 40:4

**severe** [19] - 45:1, 48:18, 60:20, 78:5,

79:11, 93:1, 93:11, 95:21, 96:23, 97:10, 99:3, 107:25, 110:9, 110:14, 119:20, 124:22, 125:4, 125:6

**severity** [20] - 77:24, 79:7, 82:17, 92:22, 93:9, 95:1, 95:2, 95:23, 98:15, 106:25, 107:2, 107:8, 107:17, 107:24, 109:2, 109:25, 110:6, 111:18, 111:19, 123:22

**share** [2] - 77:15, 83:21

**sharing** [2] - 83:13, 113:2

**short** [1] - 62:25

**short-term** [1] - 62:25

**shotguns** [1] - 46:20

**show** [21] - 21:13, 30:13, 35:21, 36:6, 45:19, 46:22, 48:6, 48:12, 50:4, 53:4, 58:4, 64:21, 64:23, 65:6, 98:24, 105:17, 111:1, 121:2, 124:9, 125:15, 128:10

**showed** [1] - 85:13

**showing** [6] - 47:3, 50:19, 107:23, 109:22, 118:18, 120:5

**shown** [1] - 112:10

**shows** [8] - 25:7, 69:10, 79:21, 106:16, 110:2, 118:2, 124:5, 124:15

**SIC** [2] - 7:21, 15:3

**side** [4] - 31:7, 66:15, 102:1, 116:23

**sides** [8] - 7:14, 56:5, 56:17, 56:20, 57:6, 58:10, 58:12, 64:1

**sides'** [1] - 67:4

**sign** [2] - 45:22, 45:24

**signed** [1] - 41:11

**significance** [1] - 41:3

**significant** [6] - 64:20, 92:3, 110:9, 119:14, 119:19, 127:20

**significantly** [3] - 46:21, 59:4, 119:5

**signs** [6] - 47:3, 48:16, 84:25, 108:5, 111:2, 111:12

**similar** [6] - 94:22, 105:7, 107:9,

112:13, 114:19, 123:10

**similarities** [1] - 91:18

**similarly** [2] - 62:4, 112:2

**simply** [3] - 47:7, 51:6, 53:1

**sit** [1] - 11:16

**site** [1] - 21:24

**sits** [1] - 46:8

**sitting** [2] - 5:10, 49:4

**situation** [1] - 15:15

**six** [5] - 18:17, 19:25, 46:5, 126:18

**size** [2] - 99:16, 116:2

**skipped** [1] - 101:14

**Slade** [2] - 68:17, 68:19

**sleep** [4] - 84:18, 86:10, 87:8, 87:10

**slide** [15] - 22:8, 27:1, 32:9, 32:19, 93:6, 110:16, 111:21, 112:15, 112:20, 115:21, 118:15, 120:4, 120:11, 120:16, 124:2

**slides** [18] - 20:20, 22:6, 23:7, 24:21, 24:24, 30:2, 30:24, 31:25, 32:10, 32:11, 33:10, 77:10, 91:16, 112:25, 115:6, 115:12, 120:9, 121:22

**slight** [1] - 8:4

**slow** [1] - 44:16

**slower** [2] - 84:9, 93:20

**slowness** [1] - 84:9

**smaller** [1] - 95:20

**Smith** [10] - 5:5, 12:14, 15:25, 16:7, 18:1, 38:25, 39:10, 39:12, 39:16, 39:23

**SMITH** [18] - 1:15, 5:4, 5:9, 6:6, 6:11, 7:19, 8:3, 8:7, 12:17, 12:19, 13:5, 13:16, 13:20, 15:2, 15:6, 18:2, 19:16, 35:2

**Smith's** [1] - 39:23

**so..** [1] - 5:23

**social** [1] - 4:20

**software** [2] - 37:7, 46:25

**sole** [2] - 39:7, 60:21

**solution** [1] - 18:8

**someone** [15] - 13:13, 26:14, 87:25, 88:19,

88:20, 90:14, 91:8, 91:13, 94:4, 95:11, 95:14, 95:18, 96:5, 101:11, 124:21

**sometimes** [3] - 40:1, 100:22, 100:24

**somewhat** [2] - 63:17, 105:9

**soon** [2] - 17:19, 40:21

**sooner** [1] - 17:3

**sorry** [15] - 8:3, 15:6, 16:16, 18:10, 27:18, 32:5, 45:23, 53:21, 79:4, 91:16, 115:17, 122:2, 126:7, 126:15, 128:20

**sort** [11] - 4:12, 24:6, 26:22, 28:15, 29:13, 79:23, 92:18, 106:6, 120:20, 120:24, 122:10

**sounds** [4] - 18:2, 18:7, 27:17, 27:18

**source** [4] - 20:4, 30:17, 99:9, 102:5

**sources** [2] - 30:19, 96:16

**Southern** [1] - 2:3

**SOUTHERN** [1] - 1:2

**spanned** [1] - 69:22

**speaking** [1] - 14:3

**special** [1] - 85:8

**specialists** [1] - 58:15

**specialities** [1] - 58:19

**specialize** [2] - 71:22, 72:17

**specialized** [2] - 72:6, 89:5

**specializes** [1] - 59:19

**specific** [4] - 55:5, 76:2, 80:11, 92:2

**specifically** [3] - 72:18, 82:13, 117:22

**specifics** [1] - 20:2

**speeches** [4] - 49:4, 84:24, 97:19, 127:9

**speed** [1] - 44:15

**spent** [2] - 61:19, 74:11

**spinal** [2] - 71:19, 123:9

**spreading** [1] - 88:7

**spreads** [1] - 108:9

**St** [2] - 14:4, 16:4

**stage** [29] - 61:1, 78:1, 78:3, 79:8, 79:10, 79:12, 79:22, 90:6, 92:23, 92:25, 93:2, 93:23, 94:5, 94:7,

95:12, 95:17, 95:19, 96:22, 97:5, 97:11, 98:20, 110:6, 110:7, 124:8, 124:9, 126:23, 126:25, 128:2

**stages** [2] - 93:7, 94:20

**stake** [1] - 19:14

**stand** [8] - 11:14, 45:2, 52:21, 62:24, 71:6, 76:1, 82:21, 117:25

**standard** [2] - 26:22, 27:3

**standpoint** [1] - 117:25

**stands** [1] - 101:25

**start** [7] - 7:16, 53:14, 83:25, 91:24, 98:23, 102:12, 128:17

**started** [10] - 4:11, 5:24, 6:3, 6:13, 7:11, 29:24, 34:24, 35:13, 69:9, 129:14

**starting** [3] - 5:3, 100:13, 127:2

**starts** [4] - 43:21, 68:3, 95:25, 111:10

**state** [5] - 5:2, 54:20, 57:16, 60:17, 79:16

**statement** [2] - 35:6, 55:8

**statements** [4] - 35:5, 50:15, 69:24, 119:18

**States** [7] - 2:2, 4:9, 5:5, 23:17, 54:4, 70:18, 130:6

**STATES** [1] - 1:1

**statistically** [1] - 105:5

**statutes** [1] - 55:4

**stay** [2] - 12:5, 53:17

**staying** [2] - 12:11, 12:21

**stays** [1] - 90:11

**steadfast** [1] - 10:10

**steals** [1] - 67:6

**steer** [1] - 33:8

**stenographically** [1] - 130:7

**stenography** [1] - 2:5

**step** [4] - 42:6, 51:23, 70:20, 89:12

**Stephen** [1] - 68:16

**stiffness** [1] - 84:11

**still** [6] - 42:12, 57:20, 67:11, 111:3, 113:11, 126:22

**stipulate** [1] - 128:19

**stipulated** [1] - 6:14

**stolen** [1] - 70:12
**stopped** [1] - 128:23
**stopping** [1] - 121:6
**story** [1] - 38:16
**strength** [1] - 36:14
**strike** [1] - 78:18
**stroke** [1] - 94:21
**strokes** [1] - 72:13
**strong** [1] - 100:8
**strongest** [1] - 46:1
**strongly** [1] - 15:17
**structural** [1] - 59:14
**structure** [5] - 21:24, 38:2, 39:15, 41:24, 54:23
**structures** [2] - 37:20, 69:22
**Stuart** [1] - 42:24
**students** [5] - 73:20, 74:1, 74:3
**studies** [10] - 20:5, 20:14, 62:16, 64:4, 64:17, 64:19, 65:1, 112:7, 124:1, 124:3
**study** [4] - 25:22, 64:20, 115:24, 118:14
**stuff** [6] - 21:5, 23:18, 23:20, 23:24, 26:15, 28:9
**subject** [2] - 53:18, 112:4
**subjective** [2] - 61:23, 62:3
**subjects** [2] - 116:10, 116:25
**submission** [1] - 63:19
**subpoena** [3] - 13:3, 39:19, 39:20
**subpoenaed** [2] - 6:25, 14:11
**subpoenas** [1] - 13:19
**subsequent** [1] - 123:3
**substance** [1] - 113:1
**substantive** [1] - 46:15
**succeeds** [1] - 42:10
**successful** [1] - 101:7
**successfully** [2] - 36:8, 36:22
**successor** [1] - 127:18
**suffers** [1] - 59:16
**sufficient** [4] - 54:4, 90:17, 122:20, 124:17
**sugar** [5] - 99:8, 99:10, 99:11, 102:4, 114:17

**suggestive** [3] - 104:10, 105:3, 105:18
**summaries** [1] - 25:8
**summarize** [1] - 91:18
**summarizing** [1] - 31:13
**summary** [3] - 9:21, 22:6, 124:4
**Sunday** [2] - 21:19, 22:25, 27:10
**superior** [1] - 101:6
**supplement** [4] - 21:7, 21:9, 21:21, 27:12
**supplemental** [12] - 11:22, 21:13, 27:1, 27:3, 27:9, 27:15, 27:25, 60:7, 62:14, 62:15, 63:9, 63:12
**support** [4] - 38:16, 78:23, 84:23, 85:14
**supported** [2] - 15:17, 121:21
**supports** [1] - 56:14
**Supreme** [1] - 54:3
**suspected** [1] - 86:24
**sustain** [1] - 114:11
**sustained** [1] - 115:1
**swear** [1] - 13:2
**switched** [1] - 21:18
**switches** [1] - 63:22
**sworn** [1] - 71:4
**symptom** [1] - 56:9
**symptoms** [40] - 35:24, 36:10, 43:1, 50:3, 52:17, 52:19, 53:3, 57:17, 61:15, 73:13, 84:17, 86:2, 86:4, 87:25, 88:9, 88:19, 89:3, 90:19, 90:21, 90:22, 91:1, 92:4, 92:9, 97:8, 97:20, 98:16, 100:9, 107:17, 108:1, 108:12, 108:15, 108:19, 109:25, 110:2, 110:14, 111:20, 119:11, 120:14, 123:4, 123:23
**system** [6] - 38:9, 38:13, 71:17, 72:4, 72:12, 84:19

---

## T

**table** [2] - 5:10, 87:5
**talks** [4] - 50:8, 55:23, 55:24, 66:13

**Tamine** [22] - 37:12, 37:20, 37:25, 38:3, 38:22, 39:22, 39:24, 40:7, 40:11, 40:14, 40:15, 40:19, 40:21, 41:10, 41:11, 41:25, 50:12, 65:20, 65:21
**Tamine's** [3] - 40:9, 41:2, 41:19
**task** [2] - 57:24, 63:7
**tasks** [1] - 93:20
**tau** [13] - 21:23, 88:25, 90:18, 92:13, 92:14, 123:1, 123:2, 123:6, 123:8, 123:9, 123:10
**tax** [3] - 35:20, 54:11, 55:3
**teaching** [3] - 73:18, 73:19, 73:24
**team** [4] - 80:14, 80:15, 82:8, 82:10, 83:7, 83:22
**technical** [8] - 20:14, 21:3, 21:5, 23:1, 23:18, 23:20, 23:24, 28:9
**tee** [1] - 20:2
**telephone** [1] - 94:12
**temporal** [3] - 117:6, 118:23, 119:3
**temporarily** [1] - 42:10
**ten** [8] - 57:18, 74:10, 88:3, 95:13, 102:12, 126:2, 126:12, 126:14
**tends** [1] - 99:25
**term** [2] - 62:25, 94:17
**terminology** [1] - 110:21
**terms** [6] - 26:14, 67:18, 93:3, 93:5, 93:8, 107:24
**test** [9] - 48:15, 48:21, 48:25, 49:6, 49:23, 49:25, 50:5, 101:22, 123:9
**tested** [1] - 49:14
**testified** [5] - 63:18, 71:4, 74:9, 114:13, 120:19
**testifier** [1] - 74:8
**testifiers** [1] - 10:5
**testifies** [2] - 18:4, 18:7
**testify** [38] - 10:25, 11:6, 12:10, 12:16, 14:12, 14:15, 14:19, 14:22, 15:19, 16:5, 16:14, 16:15, 16:18, 17:9, 17:18, 18:13,

24:11, 27:7, 30:23, 31:19, 34:2, 34:6, 37:16, 40:23, 41:12, 56:12, 58:23, 59:3, 70:4, 70:9, 70:11, 113:11, 115:2, 115:3, 115:15, 120:6, 120:12
**testifying** [7] - 11:9, 18:11, 27:22, 61:20, 112:23, 114:1, 115:5
**testimony** [24] - 10:24, 11:2, 11:10, 11:17, 11:21, 11:22, 12:6, 12:24, 14:7, 18:5, 45:18, 49:8, 66:15, 70:2, 70:3, 76:16, 78:12, 78:13, 78:16, 78:18, 81:1, 82:6, 97:25, 127:16
**testing** [15] - 59:10, 62:1, 62:3, 79:19, 82:15, 87:5, 96:8, 96:9, 96:11, 97:21, 98:6, 107:21, 108:24, 119:16, 123:8
**tests** [26] - 43:7, 43:19, 49:3, 49:11, 52:4, 52:5, 52:7, 52:8, 52:9, 52:13, 56:25, 57:4, 57:6, 61:23, 64:17, 73:23, 80:20, 80:22, 81:6, 81:22, 82:25, 89:6, 99:14, 99:22
**TEXAS** [1] - 1:2
**Texas** [2] - 1:11, 2:3
**that'll** [2] - 75:15, 109:11
**THE** [94] - 1:3, 3:9, 3:15, 3:21, 4:7, 5:8, 5:11, 5:17, 5:21, 6:8, 7:4, 7:10, 7:23, 8:2, 8:6, 8:16, 8:25, 9:5, 9:9, 10:22, 11:20, 12:2, 12:13, 12:22, 13:6, 13:18, 14:24, 17:25, 18:9, 18:19, 19:11, 19:18, 19:20, 23:14, 23:25, 24:23, 26:2, 26:17, 27:14, 28:11, 28:17, 28:22, 29:1, 29:18, 30:9, 31:6, 31:18, 32:23, 33:2, 33:6, 33:17, 34:6, 34:9, 34:14, 34:21, 35:4, 53:8, 53:11, 53:23, 70:14, 70:19, 71:5, 71:6,

75:13, 75:17, 76:11, 77:5, 77:11, 78:9, 78:15, 79:2, 102:9, 109:10, 113:5, 113:17, 114:9, 114:21, 114:25, 115:8, 115:10, 115:11, 115:14, 115:17, 115:18, 120:3, 121:3, 121:8, 122:1, 128:12, 128:15, 128:19, 129:6, 129:17, 129:19
**themselves** [4] - 5:2, 11:10, 12:25, 26:4
**Therapy** [2] - 21:25, 30:5
**they've** [2] - 10:7, 76:11
**thinking** [2] - 71:23, 95:2
**thinks** [1] - 67:25
**third** [6] - 6:23, 10:11, 52:18, 79:13, 79:14, 124:14
**thorough** [1] - 96:11
**thoughts** [1] - 94:3
**thousands** [1] - 55:1
**threat** [1] - 41:22
**three** [11] - 6:12, 9:17, 55:14, 62:10, 64:6, 65:24, 66:8, 72:8, 77:17, 106:9
**three-year** [1] - 72:8
**throughout** [2] - 46:19, 52:4
**throw** [1] - 62:22
**thrown** [1] - 23:8
**Thursday** [1] - 18:24
**tie** [4] - 44:23, 46:17
**timeline** [2] - 48:20, 55:24
**timely** [2] - 26:6, 31:10
**timing** [2] - 18:21, 87:22
**Title** [1] - 130:5
**today** [27] - 4:25, 6:5, 18:12, 26:1, 37:13, 38:18, 43:20, 51:3, 52:19, 54:1, 54:7, 56:3, 57:12, 60:7, 62:4, 65:17, 66:10, 66:15, 66:23, 68:15, 68:19, 68:23, 69:8, 72:15, 76:16, 87:15
**together** [5] - 23:8, 65:5, 73:22, 82:11, 83:11
**Tommy** [3] - 69:3,

69:6, 127:17
**tomorrow** [2] - 4:22, 29:17
**tonight** [2] - 17:21, 23:10
**took** [1] - 45:20
**top** [1] - 77:15
**top-line** [1] - 77:15
**topic** [1] - 18:20
**topics** [1] - 20:15
**totally** [1] - 49:12
**tough** [4] - 21:5, 23:18, 23:20, 23:24
**towards** [1] - 95:14
**tracer** [1] - 89:8
**track** [3] - 54:13, 93:18, 94:9
**trail** [1] - 38:15
**trained** [2] - 36:8, 47:23
**training** [4] - 72:6, 74:4, 113:19, 121:11
**transactions** [1] - 69:22
**transcript** [2] - 2:5, 130:7
**TRANSCRIPT** [1] - 1:10
**trauma** [2] - 94:22, 95:5
**travel** [3] - 17:4, 17:23, 40:11
**treating** [11] - 10:1, 57:23, 59:19, 63:5, 66:22, 69:13, 75:11, 77:14, 85:19, 86:19, 127:25
**treatise** [1] - 26:25
**treatises** [4] - 24:2, 25:1, 33:19, 33:23
**tremor** [1] - 84:10
**trial** [7] - 45:2, 52:21, 55:9, 56:3, 62:25, 76:1, 82:21
**tried** [1] - 8:21
**trip** [2] - 42:16, 55:25
**trips** [2] - 40:2, 68:5
**trouble** [1] - 126:21, 126:22
**true** [4] - 34:20, 36:23, 47:24, 130:7
**truly** [1] - 48:24
**trumpets** [1] - 41:20
**trust** [11] - 39:11, 41:21, 45:5, 45:18, 50:14, 54:14, 54:18, 54:20, 54:22, 66:20, 68:12
**Trust** [11] - 37:4, 37:6, 37:15, 39:7, 39:13,

39:17, 39:22, 40:5, 41:5, 54:15, 54:19
**trustee** [1] - 37:14
**trusts** [2] - 36:21, 54:19
**truth** [1] - 45:6
**try** [4] - 42:23, 50:11, 84:11, 90:25
**trying** [8] - 25:17, 27:14, 31:3, 31:4, 48:18, 51:5, 108:13, 116:13
**Tuesday** [1] - 19:6
**tumors** [1] - 72:13
**turn** [2] - 39:5, 39:16
**turned** [1] - 39:18
**turning** [1] - 67:5
**TWO** [1] - 44:10
**two** [30] - 20:6, 20:18, 22:9, 32:2, 33:14, 44:10, 45:14, 45:17, 46:7, 46:8, 46:14, 47:1, 47:9, 50:21, 64:6, 65:4, 66:4, 71:15, 72:18, 91:16, 92:11, 99:5, 99:22, 100:10, 102:20, 120:9, 121:15, 121:22, 127:3, 128:13
**two-day** [1] - 46:8
**two-year** [1] - 72:18
**type** [6] - 28:9, 80:7, 85:8, 89:15, 113:20, 115:23
**types** [10] - 73:14, 74:13, 74:19, 76:18, 89:5, 101:15, 112:9, 113:20, 115:5, 124:1
**typical** [5] - 11:20, 25:13, 84:8, 92:16, 112:1
**typically** [4] - 76:17, 117:8, 125:6, 125:14

### U

**umbrella** [1] - 94:17
**unable** [5] - 44:5, 44:6, 45:15, 45:22, 60:19
**unclear** [1] - 128:25
**under** [3] - 24:20, 41:21, 110:15
**undercuts** [1] - 67:7
**undergraduate** [1] - 73:25
**underlying** [3] - 85:25, 99:12, 118:20
**understood** [3] - 29:2,

121:4, 121:6
**unfair** [3] - 10:19, 24:16, 26:13
**United** [7] - 2:2, 4:9, 5:5, 23:17, 54:4, 70:18, 130:6
**UNITED** [1] - 1:1
**University** [1] - 43:22, 44:25
**unless** [1] - 31:18
**unlike** [1] - 52:25
**unlikely** [1] - 104:14
**unsealed** [2] - 36:5, 47:19
**unusual** [1] - 10:22
**up** [42] - 6:12, 7:2, 14:3, 14:5, 14:16, 20:2, 20:16, 29:3, 35:11, 40:21, 47:13, 51:9, 51:23, 54:18, 65:15, 68:3, 106:4, 106:8, 109:11, 113:10, 113:12, 113:24, 117:25, 121:22
**uptake** [2] - 100:3, 105:8
**urgent** [1] - 7:2
**urologist** [3] - 42:17, 42:20, 43:21
**urologist's** [1] - 43:18
**US** [8] - 35:20, 38:25, 39:20, 39:24, 40:2, 40:12, 54:24, 68:11
**USA** [1] - 1:4

### V

**validity** [1] - 52:3
**value** [2] - 53:1, 96:20
**Vanderbilt** [5] - 72:5, 72:22, 72:24, 73:2, 73:5
**VARNADO** [19] - 1:19, 5:13, 5:18, 7:5, 7:25, 8:17, 9:3, 9:6, 9:15, 11:5, 11:25, 12:14, 13:4, 18:20, 19:19, 19:21, 19:25, 29:9, 129:15
**Varnado** [3] - 5:14, 18:19, 19:11
**vast** [1] - 36:20
**versa** [1] - 97:3
**versus** [5] - 4:10, 51:16, 83:11, 95:9, 124:22
**via** [3] - 14:19, 14:22, 16:5
**vice** [1] - 97:3

**video** [8] - 14:19, 14:23, 16:5, 45:19, 49:8, 50:4, 128:17, 129:4
**videos** [4] - 84:24, 85:1, 97:18, 127:9
**view** [2] - 52:24, 101:8
**viewed** [1] - 46:1
**viewpoint** [1] - 121:20
**violation** [1] - 55:6
**Vista** [7] - 39:1, 39:2, 39:4, 39:6, 39:8, 39:9, 39:19
**Vista's** [1] - 39:21
**visual** [1] - 86:5
**visualize** [1] - 89:9
**vital** [1] - 63:10
**Vol** [1] - 21:25
**volume** [11] - 99:16, 99:17, 99:20, 116:14, 116:21, 117:5, 117:15, 118:18, 119:3, 119:4, 125:11
**volumes** [5] - 116:9, 117:4, 117:17, 118:3, 124:10
**Volumes** [1] - 30:5
**volumetric** [2] - 117:15, 117:24
**voluntary** [1] - 55:5
**vs** [1] - 1:6

### W

**wait** [2] - 21:1, 121:23
**waiting** [1] - 29:20
**walking** [1] - 84:13
**walls** [1] - 38:23
**wants** [7] - 6:20, 14:20, 27:24, 48:6, 48:9, 65:17, 120:12
**warns** [1] - 44:16
**warrant** [10] - 36:2, 40:17, 40:20, 40:23, 42:8, 42:14, 43:1, 43:9, 43:13, 55:25
**Washington** [1] - 14:4
**waste** [1] - 14:9
**watched** [2] - 68:13, 68:20
**water** [1] - 38:19
**waters** [1] - 40:9
**ways** [3] - 99:5, 110:23, 111:1
**Wednesday** [3] - 19:3, 19:10, 29:15
**week** [9] - 16:2, 16:20, 37:13, 42:19, 52:21, 56:12, 58:3, 67:14

**weeks** [1] - 45:14
**welcome** [2] - 5:11, 5:17
**well-known** [1] - 51:4
**WERE** [1] - 129:19
**whereas** [1] - 110:8
**WHEREUPON** [1] - 129:19
**Whitlow** [7] - 64:3, 64:21, 65:3, 107:7, 107:19, 119:2, 119:11
**Whitlow's** [1] - 106:19
**whole** [2] - 10:5, 53:2
**wife** [5] - 44:20, 59:25, 62:5, 82:2, 108:22
**wiggle** [1] - 20:25
**willing** [1] - 35:19
**window** [1] - 10:2
**Wisniewski** [4] - 18:23, 19:9, 58:21, 59:3
**WITHDRAWN** [3] - 3:10, 3:16, 3:22
**witness** [41] - 6:4, 6:23, 6:24, 7:8, 9:22, 11:14, 13:8, 13:14, 13:21, 13:22, 14:8, 15:19, 15:20, 15:22, 15:24, 17:8, 17:10, 17:24, 18:11, 24:13, 61:17, 62:6, 63:17, 65:11, 65:19, 65:25, 66:24, 67:1, 68:17, 69:2, 69:4, 70:2, 70:16, 76:9, 77:9, 78:22, 112:23, 115:3, 120:6, 120:19
**Witness** [1] - 71:3
**WITNESS** [4] - 71:5, 115:8, 115:11, 115:17
**WITNESSES** [1] - 3:1
**witnesses** [15] - 4:15, 6:19, 9:14, 9:21, 10:20, 12:4, 12:8, 13:13, 17:16, 56:5, 58:14, 66:9, 69:11, 69:24, 82:9
**Women's** [1] - 72:10
**wondering** [2] - 24:7, 98:10
**word** [4] - 44:9, 44:10, 46:6, 101:25
**words** [5] - 24:12, 31:1, 53:1, 58:25, 63:14
**works** [2] - 4:23, 14:4
**world** [3] - 38:2, 40:1, 49:12

**worried** [1] - 39:15
**worry** [2] - 39:19, 129:11
**worse** [8] - 41:10, 44:21, 49:1, 49:2, 49:18, 49:21, 56:22, 61:8
**write** [4] - 51:9, 51:12, 76:5, 120:22
**write-up** [1] - 51:9
**writing** [3] - 38:4, 82:5, 110:20
**written** [1] - 103:21
**wrote** [5] - 14:1, 40:7, 40:14, 80:25, 127:3

## Y

**year** [14] - 37:18, 60:14, 62:22, 66:3, 68:4, 69:5, 69:12, 72:8, 72:18, 87:25, 95:19, 116:5, 126:5, 126:9
**years** [26] - 35:22, 36:18, 36:22, 38:19, 40:25, 41:8, 49:25, 50:25, 53:2, 54:12, 57:18, 61:19, 65:24, 66:8, 68:18, 69:23, 72:23, 88:3, 88:19, 90:3, 95:13, 116:25, 125:25, 126:2, 126:13, 126:14
**York** [7] - 21:17, 44:8, 44:12, 44:13, 44:20, 46:4, 46:17
**York's** [1] - 47:8
**yourself** [1] - 74:7
**Yudofsky** [5] - 29:14, 42:24, 43:6, 43:13, 43:17
**Yudofsky's** [1] - 29:1