07:57:22

 1            UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF TEXAS

 3                    —  —  —

     THE HONORABLE GEORGE C. HANKS, JR., JUDGE PRESIDING
 4
     ─────────────────────────────────────────────────
     USA,                        No. 4:21-CR-00009-1
 5
                    Plaintiff,
 6
     vs.
 7
     ROBERT T. BROCKMAN,
 8
                    Defendant.
 9
     ─────────────────────────────────────────────────
          COMPETENCY HEARING -- DAY 3 AM SESSION
10
       OFFICIAL REPORTER'S TRANSCRIPT OF PROCEEDINGS
11
                    Houston, Texas
12
            WEDNESDAY, NOVEMBER 17, 2021
13
     ─────────────────────────────────────────────────
14   APPEARANCES:
     For the Plaintiff:    COREY J. SMITH, DOJ
15
                           CHRISTOPHER MAGNANI, DOJ
16
                           LEE F. LANGSTON, DOJ
17
                           BORIS BOURGET, DOJ
18
     For the Defendant:    JASON S. VARNADO, ESQ., Attorney
19                         at Law

20                         COLLEEN O'CONNOR, ESQ., Attorney
                           at Law
21
                           JAMES P. LOONAM, ESQ., Attorney
22                         at Law

23                         KATHRYN KENEALLY, ESQ., Attorney
                           at Law
24
25   For the               n/a
     Interpreter:

1
2   Reported by:        Sean Gumm, RPR, CRR
                        Official Court Reporter
                        United States District Court
3                       Southern District of Texas
                        sean_gumm@txs.uscourts.gov
4
5   Proceedings recorded by mechanical stenography.
    Transcript produced by Reporter on computer.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    <u>**INDEX OF WITNESSES**</u>

2

3                                                    **PAGE**

4  **ROBERT DENNEY, (For the Government)**

5        Cross-Examination Resumed By Mr. Loonam:        12

6  **CRAIG MOSS, (For the Government)**

7        Direct Examination By Mr. Langston:            60

8        Cross-Examination By Ms. Keneally:             84

9  **EVATT TAMINE, (For the Government)**

10       Direct Examination By Mr. Langston:            92

11       Cross-Examination By Mr. Varnado:             153

12

13

14

15                          --o0o--

16

17

18

19

20

21

22

23

24

25

26

27

28

PEOPLE vs ROBERT T. BROCKMAN, CASE NO. 4:21-CR-00009-1
*** Reproduction only per Govt. Code §69954(d) ***

PROCEEDINGS

_____

(The following proceedings held in open court.)

* * *

**WEDNESDAY, NOVEMBER 17, 2021 -- 8:32 A.M.**

**--oOo--**

THE COURT:  Good morning and welcome back.  Before we get started, I did receive the motion from -- I mean Dr. Yudofsky's counsel.  Is he present?

MR. MACDOUGALL:  Yes, Your Honor.

THE COURT:  If you'd like to approach, sir.  Good morning.

MR. MACDOUGALL:  Good morning, Your Honor.  Mark MacDougall for Dr. Yudofsky.

THE COURT:  Good morning.  I received your motion.  I just wanted to make sure I understand what you are asking.  You are asking the Government to call your client tomorrow?

MR. MACDOUGALL:  Your Honor, actually asking he be called today, which was the promised date, the date we were given notice of last week, and that we had inquired of the Government, and the Defense the week before in a letter, which is

08:33:38  1  attached to the motion.  May I remove my mask?

08:33:41  2          THE COURT:  Oh, yes.  I'm sorry.  You

08:33:42  3  weren't here for the rules.  When addressing the

08:33:45  4  Court or at podium you don't have to wear your mask.

08:33:48  5          Um, have you talked to counsel on

08:33:51  6  both sides about this, and talked about where they

08:33:53  7  are and what's going on?

08:33:55  8          MR. MACDOUGALL:  My colleague,

08:33:56  9  Mr. Petree, spoke to Government counsel last night,

08:34:00  10  and nothing definitive came of that discussion.

08:34:03  11  They are uncertain that apparently cross-examination

08:34:06  12  -- haven't been in court, so I'm speaking from

08:34:09  13  hearsay, but the cross-examinations have gone much

08:34:12  14  longer than thought.  I understand that and that's

08:34:14  15  how it goes, but Dr. Yudofsky realigned patient

08:34:18  16  schedules, travel and so forth to be here today as

08:34:20  17  required.  And to be told yesterday afternoon that

08:34:23  18  maybe Thursday -- and we're not even sure about

08:34:25  19  that -- is difficult, given the fact we brought this

08:34:29  20  up as early as September.

08:34:30  21          THE COURT:  Okay.  Counsel from both

08:34:32  22  sides, you have any -- weigh in on this?

08:34:36  23          MR. LANGSTON:  We do.

08:34:37  24          THE COURT:  First of all, you guys have

08:34:38  25  been working extremely hard.  You haven't been here,

08:34:41    1   Mr. MacDougall, but they've been here every morning
08:34:45    2   at nine o'clock and staying until six o'clock the
08:34:48    3   last two nights.  Nobody's wasting time.
08:34:51    4   Everybody's moving as quickly and thorough as they
08:34:54    5   can.  Nobody has been wasting time with witnesses,
08:34:57    6   and the witnesses have been very forthcoming with
08:35:04    7   answers.  It's not their fault, just the schedule.
08:35:06    8              I'm wondering --
08:35:09    9              MR. LANGSTON:  We have discussed it,
08:35:10   10   Your Honor, and we don't think -- just based on the
08:35:12   11   other witnesses that also have conflicts, we just
08:35:17   12   don't think it's likely to happen today, given --
08:35:19   13   you know, we did tell them Wednesday.  That was our,
08:35:22   14   you know, best estimate.  As with all of the other
08:35:25   15   witnesses we've been giving up dates as we learn
08:35:28   16   them, and as we sort of saw how long Dr. Denney was
08:35:31   17   taking yesterday we gave the update.
08:35:33   18              I don't think it can happen
08:35:35   19   Wednesday.  That was the first we learned that there
08:35:37   20   was a conflict on Thursday.  You know, we're not --
08:35:40   21   just to be clear from what the motion said, there is
08:35:42   22   no pattern of harassment here.  We're not trying to,
08:35:45   23   you know, drag Dr. Yudofsky --
08:35:47   24              THE COURT:  Everybody's in the same
08:35:48   25   boat.  We've got lots of doctors that are

08:35:50  1   testifying.

08:35:51  2              MR. LANGSTON:  Quite frankly, I just

08:35:53  3   don't -- given the schedule that we have today and

08:35:55  4   the witnesses that are already lined up, I just

08:35:57  5   don't think it can happen today.

08:35:59  6              THE COURT:  Can it happen tomorrow?

08:36:00  7              MR. LANGSTON:  Yes.

08:36:01  8              THE COURT:  Because after we get this

08:36:02  9   witness off, we can call him out of order.  I don't

08:36:05  10  know how long this witness is going to be on the

08:36:07  11  stand.

08:36:07  12             MR. LANGSTON:  So I think we can call

08:36:12  13  him tomorrow.

08:36:12  14             THE COURT:  Best we can do tomorrow.  I

08:36:14  15  know Dr. Yudofsky has travel plans, but the quickest

08:36:17  16  we can get to him is tomorrow.  We've already

08:36:19  17  interrupted this witness's testimony to call in

08:36:21  18  another witness to accommodate schedules.  There's

08:36:25  19  no way to get Dr. Yudofsky on the stand until

08:36:28  20  tomorrow.

08:36:30  21             MR. MACDOUGALL:  I appreciate that,

08:36:31  22  Your Honor.  If I may respond to the Government

08:36:33  23  briefly?

08:36:33  24             THE COURT:  Sure.

08:36:34  25             MR. MACDOUGALL:  Dr. Yudofsky is a

08:36:35   1   stranger to this case.  He's a third-party under a

08:36:40   2   Rule 17 subpoena.  As I understand it, the majority

08:36:42   3   of the other witnesses are paid experts that

08:36:44   4   Government, and later the Defense control.

08:36:46   5              So, you know, taking Defense

08:36:48   6   witnesses out of order because they have travel

08:36:50   7   plans or anything is -- I would suggest it's not

08:36:53   8   entirely fair to Dr. Yudofsky given his position,

08:37:00   9   vis-à-vis the parties.  If tomorrow is tomorrow, I

08:37:01   10  appreciate the Court's time.

08:37:02   11             THE COURT:  Not a problem.  As you

08:37:04   12  pointed out in your brief, I did say that we would

08:37:06   13  do our best to accommodate everyone's schedule,

08:37:10   14  which we're doing, but it sounds like the quickest

08:37:12   15  we can call him is tomorrow.

08:37:14   16             I mean, can we get -- assuming that

08:37:16   17  this witness is done -- I think we're pretty nearing

08:37:21   18  the end -- should be.  I mean, maybe not exactly,

08:37:24   19  but it's not going to take all day.

08:37:26   20             MR. LANGSTON:  I don't anticipate

08:37:28   21  Dr. Denney will take all day, or at least I'm surely

08:37:32   22  hoping.  But we do have -- the Defense has said they

08:37:34   23  have another witness we do have to take out of

08:37:36   24  order, which is another doctor only available today.

08:37:40   25             We have witnesses with

08:37:41  1   international flights who have been sitting around,

08:37:44  2   you know, for a week that are also lined up.  I

08:37:46  3   mean, we have tried to look at the schedule and, you

08:37:49  4   know, we are trying to accommodate everyone.  But I

08:37:52  5   just don't think it can happen today.

08:37:54  6                   THE COURT:  Okay.  Can it happen

08:37:55  7   tomorrow?

08:37:56  8                   MR. LANGSTON:  Yes.  We are willing to

08:37:58  9   -- are willing to readjust the schedule tomorrow,

08:38:02  10  and I think there's flexibility.  But in terms of --

08:38:04  11  you know, as I said last night, there was an e-mail

08:38:06  12  inbox full of people that had conflicts and we're

08:38:09  13  trying to arrange them as best we can.

08:38:10  14                  THE COURT:  Can you explain,

08:38:12  15  Mr. MacDougall -- I mean to Dr. Yudofsky that the

08:38:15  16  best we can do is tomorrow?  I will get him on the

08:38:18  17  stand tomorrow.  How long it will take just depends

08:38:20  18  on the questioning, but we'll get him on the stand

08:38:25  19  tomorrow.

08:38:25  20                  MR. MACDOUGALL:  I appreciate that,

08:38:26  21  Your Honor.  If I could just briefly ask the Court

08:38:27  22  to inquire of the Government do they have a time

08:38:30  23  estimate morning/afternoon -- something we can work

08:38:33  24  with for tomorrow?

08:38:35  25                  THE COURT:  Sure.

08:38:36  1            MR. LANGSTON:  We can work with

08:38:37  2  Dr. Yudofsky's schedule when he would prefer to do

08:38:40  3  it.  I can give an update, you know, as we see how

08:38:43  4  the testimony goes.  Obviously if there's a witness

08:38:46  5  still on the stand at five o'clock, probably want to

08:38:48  6  finish them, but happy to make him the first witness

08:38:50  7  called tomorrow if that's what they want.

08:38:52  8            If they rather him testify in the

08:38:53  9  afternoon, we can arrange that, too.

08:38:55  10           MR. MACDOUGALL:  As soon as possible,

08:38:57  11 Your Honor.  Thanks very much.

08:38:58  12           THE COURT:  Not a problem.  Thank you,

08:38:59  13 sir.

08:39:01  14           MR. VARNADO:  Your Honor, I was going

08:39:03  15 to mention that as Mr. Langston said, we do have a

08:39:05  16 doctor here today that the Government agreed to call

08:39:08  17 out of order.  We'll address that, and see whenever

08:39:11  18 Dr. Denney finishes his testimony.

08:39:13  19           I know Mr. Langston raised issue at

08:39:16  20 the close of court yesterday.  I know counsel for

08:39:18  21 the UCSH just asked me to mention they were here in

08:39:21  22 the courtroom and ready to address that if the Court

08:39:23  23 wanted to take it up.

08:39:24  24           THE COURT:  Okay.  Great.

08:39:25  25           MR. LANGSTON:  We're ready to address

08:39:27  1  it now if they prefer.  We sort of asked them for

08:39:29  2  more information by the lunch hour today.

08:39:31  3                THE COURT:  Do we need it for this

08:39:33  4  cross?

08:39:33  5                MR. LANGSTON:  We don't need it for

08:39:34  6  this cross.

08:39:35  7                THE COURT:  Then let's get going.  I

08:39:36  8  wanted to start earlier to get a little more

08:39:39  9  testimony in.  During the break we'll just not -- I

08:39:43  10  guess the witnesses and I will take a break.  During

08:39:46  11  this morning's break, we won't take as long a break,

08:39:49  12  and we'll talk about it then.

08:39:51  13                I just want to get the witnesses

08:39:53  14  off and on as quickly as we can.  As I said, I'm not

08:39:56  15  criticizing anyone's examination or

08:39:58  16  cross-examination.  You guys are doing a great job.

08:40:00  17  It's just just I want to make sure that parties

08:40:02  18  aren't inconvenienced unnecessarily.

08:40:05  19                So your witness.

08:40:07  20                MR. LOONAM:  Thank you, Your Honor.

21                **ROBERT DENNEY**,

22                **(For the Government)**

23                having previously been called as a

24  Witness, and having already been duly and regularly

25  sworn, continued to testify as follows:

<u>CROSS-EXAMINATION RESUMED</u>

BY MR. LOONAM:

Q.   Good morning, Dr. Denney.

A.   Good morning.

          THE COURT:  Good morning, Dr. Denney.
Sorry kind of talking around you.  Welcome back,
sir.

          THE WITNESS:  Thank you.

          MR. LOONAM:

Q.   You heard Dr. Darby testify on direct about the
collaboration amongst the Government's experts in
this case; correct?

A.   Yes.

Q.   And did you collaborate with doctors Darby and
Dietz in this matter?

A.   We collaborated in the process of the
evaluation early on, how it went.  I did not share
reports with them or collaborate in any kind of way
on reports.

Q.   Did you share information amongst the group?

A.   Yes.  As that information came in, yes.

Q.   And are you aware that Dr. Darby interviewed
Dorothy Brockman in this matter?

A.   Yes.

08:41:24    1  Q.   And did you obtain that information to include

08:41:29    2  in your first report?

08:41:32    3  A.   I did.

08:41:34    4  Q.   Now, yesterday on direct you provided the

08:41:38    5  following testimony.  And this is from a rough

08:41:43    6  transcript.  So if it differs, let me know from your

08:41:46    7  memory, but.

08:41:47    8           "Question:  Let me ask you about your

08:41:51    9  evaluations of Mr. Brockman, Dr. Denney.  Normally,

08:41:55   10  when you perform an evaluation like this of a

08:41:57   11  defendant in a criminal case, or any subject, do you

08:42:01   12  normally seek to interview people close to the

08:42:04   13  subject to get a recording of their observations of

08:42:08   14  the subject?

08:42:09   15           "Answer:  Yes, I do.

08:42:12   16           "Question:  Did that happen in this

08:42:14   17  case?

08:42:15   18           "Answer:  No.

08:42:17   19           "Question:  You didn't talk to

08:42:19   20  anybody close to Mr. Brockman?

08:42:21   21           "Answer:  No, I did not.

08:42:25   22           "Question:  Why not?

08:42:27   23           "Answer:  Well, I wanted to.  We had

08:42:31   24  talked about the possibility of us being able to do

08:42:33   25  that, and I was told that they -- those -- for

08:42:38  1   example, Mrs. Brockman chose not to be interviewed

08:42:47  2   by me.

08:42:48  3              "Question:  So that was not your

08:42:49  4   choice not to interview anybody?

08:42:50  5              "Answer:  No."

08:42:52  6              Do you recall this testimony?

08:42:53  7   **A.**   Yes.

08:42:53  8   **Q.**   And the substance of what I reported to you

08:42:57  9   forms with your recollection of your testimony from

08:42:59  10  yesterday?

08:42:59  11  **A.**   Yes, it does.

08:43:04  12  **Q.**   We just discussed Dorothy Brockman, who was

08:43:06  13  interviewed by Dr. Darby.  Who -- who were you

08:43:09  14  prevented from interviewing?

08:43:17  15  **A.**   Well, Mrs. Brockman specifically.  I know that

08:43:21  16  early on there were discussions of -- of trying to

08:43:24  17  interview other people that were close to

08:43:29  18  Mr. Brockman in his life.  I don't remember the

08:43:33  19  exact specifics, but none of that panned out, in

08:43:37  20  that we were not able to do that.  So I was not able

08:43:43  21  to interview any other people that would be close to

08:43:45  22  him.

08:43:46  23  **Q.**   I don't understand.  So in your testimony

08:43:48  24  yesterday you said Dorothy Brockman was a -- an

08:43:52  25  example of somebody who you were prevented

08:43:57  1  interviewing.  Dr. Darby, who you collaborated with,

08:43:58  2  interviewed Mrs. Brockman and shared that

08:43:59  3  information with you.  Can you name a specific

08:44:01  4  person that you tried to interview, and that you

08:44:03  5  were prevented from interviewing?

08:44:07  6  **A.**  Mrs. Brockman.

08:44:09  7  **Q.**  In your testimony, you describe Mrs. Brockman

08:44:12  8  as an example, and the testimony was about anybody

08:44:18  9  close to Mr. Brockman.  And then it concluded with,

08:44:22  10  "So that was not your choice not to interview

08:44:25  11  anyone?"

08:44:26  12  And you said, "No."

08:44:29  13  So your testimony was you were

08:44:31  14  prevented from interviewing anyone close to

08:44:33  15  Mr. Brockman.  I'm just asking you, name one person

08:44:37  16  that you were prevented from interviewing, other

08:44:40  17  than Dorothy who you are -- you are -- your

08:44:42  18  collaborator, Dr. Darby, shared the substance of the

08:44:46  19  interview with you.  So who were you prevented from

08:44:48  20  interviewing?

08:44:49  21  **A.**  Well, we had talked about -- now I have to dig

08:44:53  22  deep into my recollection, because it's been awhile

08:44:56  23  on this issue.  We had talked about -- my

08:45:03  24  understanding, my recollection, is that we talked

08:45:04  25  about --

08:45:07  1   Q.   Who is "we?"  I'm sorry, just for foundation.

08:45:10  2   A.   Oh, myself, Dr. Dietz, the attorneys involved

08:45:17  3   -- they were asking us -- the attorneys were asking

08:45:20  4   us what sort of things we wanted to review, people

08:45:23  5   we wanted to talk to.  And we were brainstorming --

08:45:27  6   Q.   Let me stop you, because the Government has

08:45:29  7   asserted work product protection.  So I want to make

08:45:35  8   sure I'm not intruding on work product here?

08:45:38  9              MR. COREY SMITH:  That's fine.  He can

08:45:40  10  answer this question.

08:45:42  11             MR. LOONAM:

08:45:42  12  Q.   Okay.

08:45:43  13  A.   We talked about several people trying to be

08:45:46  14  available, and who would be able to describe what

08:45:49  15  Mr. Brockman was like in his daily life.  My

08:46:02  16  recollection was we weren't able to interview any of

08:46:04  17  those people.

08:46:05  18  Q.   So did you, yourself, try to reach out to

08:46:12  19  anyone to try to conduct a collateral interview in

08:46:14  20  this matter?

08:46:15  21  A.   No, I was -- it was communicated to me to the

08:46:17  22  attorneys that -- that the Defense said no.

08:46:22  23  Q.   Who communicated that to you?

08:46:24  24  A.   I don't recall specifically who it was.

08:46:26  25  Q.   Are they sitting --

08:46:28    1    A.   It was a telephone call.  It was one of the

08:46:30    2    team.  I don't remember who it was.

08:46:31    3    Q.   And somebody communicated to you from this

08:46:34    4    table -- one of these gentlemen, one of these

08:46:37    5    lawyers from the Department of Justice communicated

08:46:40    6    that you couldn't conduct any collateral interviews

08:46:43    7    because the Defense said no?

08:46:46    8    A.   That's the essence of it, yes.

08:46:56    9    Q.   You were asked yesterday about whether you

08:46:58   10    interview anybody close to the subject.  You didn't

08:47:00   11    seek to establish interviews yourself directly.  You

08:47:03   12    went through the prosecutors, and the prosecutors

08:47:05   13    said, "No, you can't conduct those collateral

08:47:08   14    interviews"?

08:47:09   15               MR. COREY SMITH:  Objection.  That's

08:47:10   16    not what he said.

08:47:11   17               THE COURT:  Objection's sustained.

08:47:12   18               MR. LOONAM:

08:47:13   19    Q.   The prosecutors said the Defense said you can't

08:47:15   20    conduct those collateral interviews?

08:47:17   21    A.   It was communicated to me that -- and my

08:47:21   22    recollection is it was communicated to me through

08:47:26   23    the Government witnesses from the Defense -- to the

08:47:30   24    Government attorneys from the Defense attorneys who

08:47:34   25    I -- the impression was contacted individuals and

08:47:38  1  told us that, no, that was not going to happen.

08:47:43  2  Q.   So -- so if -- well -- and you don't recall any

08:47:48  3  of the people that you are talking about?

08:47:51  4             MR. COREY SMITH:   I'm going to object

08:47:52  5  at this point, Your Honor.   If counsel wants an

08:47:54  6  offer of proof of the conversations prosecutors had

08:47:57  7  with Defense counsel, we can do that at sidebar.

08:48:00  8  We're happy to represent to the Court the

08:48:02  9  conversations we had with Defense counsel, but this

08:48:04  10 witness is not competent to testify to these

08:48:05  11 questions.   He was not party to those conversations.

08:48:08  12 Those were conversations between Prosecutor and

08:48:09  13 Defense, and we're happy to tell the Court what

08:48:12  14 those were at sidebar.

08:48:13  15            THE COURT:   Okay.

08:48:14  16            MR. LOONAM:   Your Honor, Ms. Keneally,

08:48:16  17 you can talk about that.   But my -- look, this

08:48:18  18 witness -- first of all, I'm just asking for his

08:48:23  19 efforts to conduct collateral interview.   I'm not

08:48:25  20 asking about conversations between Prosecution and

08:48:28  21 anyone on the Defense team.   So I'm not certainly

08:48:31  22 asking about those communications, and will not ask

08:48:33  23 about those communications.

08:48:34  24            But this witness testified that he

08:48:36  25 normally conducts interviews of people close to the

08:48:41  1   Defendant.  I'm asking who he attempted to
08:48:46  2   interview.  I haven't gotten an answer as to who
08:48:48  3   that was.
08:48:50  4               This case has been going on for a
08:48:52  5   long time.  There were two evaluations, two reports.
08:48:56  6   And I have to breakdown by time period who -- when
08:48:59  7   he attempted to do this.  So there's more to talk
08:49:02  8   about on this subject.
08:49:03  9               MR. COREY SMITH:  I think he's answered
08:49:04  10  the question, Your Honor.  He's been told by
08:49:07  11  Prosecution -- we inquired if he could interview
08:49:12  12  some of the people close to Mr. Brockman.  We were
08:49:13  13  told no.  He conveyed that.  He's testified to that
08:49:16  14  already.  The question's been asked and answered.
08:49:18  15              Any more detail involves
08:49:20  16  communications between Prosecution and Defense.  As
08:49:22  17  I said, we're happy to offer an offer of proof of
08:49:24  18  what we were told by counsel, but I don't think it's
08:49:27  19  appropriate -- he already answered the question
08:49:29  20  twice.
08:49:29  21              THE COURT:  Yeah.  I mean, he says that
08:49:31  22  he asked to interview people close, and the
08:49:35  23  prosecutors told him that they asked the defense
08:49:37  24  team, and the defense team told him no.
08:49:39  25              So what more can he say?

08:49:41    1              MR. LOONAM:  No, that's fine.  I guess
08:49:43    2    I was curious as to whether -- you know, is it your
08:49:45    3    normal practice to go through the -- the -- the
08:49:49    4    prosecution when you are conducting these interviews
08:49:51    5    or reach out on your own to try --
08:49:53    6              THE COURT:  But how could he -- I mean,
08:49:55    7    your whole argument in this case is that he's the --
08:50:00    8    he's the Prosecution expert, so if he's
08:50:05    9    Prosecution's expert how could he go directly to the
08:50:07   10    witnesses and ask them for an interview?
08:50:10   11              MR. LOONAM:  That's fine, Your Honor.
08:50:11   12              THE COURT:  I'm not --
08:50:12   13              MR. LOONAM:  No, look -- that's -- I
08:50:14   14    guess the -- that's fine, Your Honor.
08:50:16   15              THE COURT:  Okay.  Well, I don't mean
08:50:18   16    to interrupt your cross-examination.  I'm just
08:50:20   17    trying to figure this out.  Because you are saying
08:50:22   18    that he's their expert, so you know if he's their
08:50:28   19    expert, he's gotta go through Prosecution to
08:50:32   20    interview anyone, otherwise he'd -- I don't know how
08:50:35   21    you'd do it if --
08:50:38   22              MR. LOONAM:  Fair enough.  I just --
08:50:39   23    fair enough.  I -- I assumed you could reach out to,
08:50:42   24    you know, other doctors or collateral witnesses who
08:50:46   25    aren't part of the immediate family.

08:50:48   1          But that's -- you know, maybe there

08:50:50   2   were instructions that -- and so if -- if you were

08:50:55   3   given an instruction, you couldn't talk to people

08:50:57   4   and conduct collateral interview I understand.

08:51:03   5   Q.   Okay.  In your supplemental -- well, in your

08:51:14   6   supplemental report, you indicate that

08:51:21   7   Mr. Brockman's caretaker, Mr. Gutierrez, may not be

08:51:26   8   -- I think it's unsullied?

08:51:31   9   A.   I did use that term in regards to Mr. Gutierrez

08:51:34   10  and Mrs. Brockman.

08:51:39   11  Q.   So what's your basis to believe that

08:51:43   12  Mr. Brockman's caretaker, Mr. Gutierrez, is not

08:51:48   13  unsullied?

08:51:53   14  A.   Well, they're very close to Mr. Brockman.  And

08:51:55   15  for him specifically, he works for Mr. Brockman.

08:51:58   16  And asked -- or asking information from him

08:52:06   17  regarding the objective characteristics of

08:52:09   18  Mr. Brockman may -- in no disrespect to him, but he

08:52:16   19  probably -- I would expect him to have a bias

08:52:22   20  regarding Mr. Brockman, given the fact that he works

08:52:25   21  for him.  It's his employer, and he is intimately

08:52:30   22  involved with him every day.

08:52:33   23  Q.   Well, I mean --

08:52:37   24  A.   So that's not to rule out talking with him.  I

08:52:40   25  mean, that the information could be helpful.  But

08:52:44  1    I'm just saying because he's, in essence, a part of
08:52:48  2    the family, and that's a part of the whole -- the
08:52:53  3    outcome would make a difference to him and the
08:52:56  4    family in this overall case.  So that does not make
08:53:01  5    him a completely objective and independent
08:53:04  6    individual.  That's all I'm saying.
08:53:05  7    Q.   Well, when you are conducting these -- the
08:53:09  8    collateral interviews, do you -- do you ever find a
08:53:12  9    completely objective individual with somebody who
08:53:14  10   has detailed knowledge of a defendant?
08:53:18  11   A.   There are -- it's on a spectrum.  There are
08:53:21  12   those who are less objective, because they're
08:53:23  13   tighter and closer into the situation.  There are
08:53:26  14   those less affected by the outcome of the case that
08:53:30  15   would be potentially less biased.
08:53:33  16              Maybe those would be other people
08:53:35  17   who worked with Mr. Brockman, or who spent time with
08:53:43  18   him in different settings but were not in some way
08:53:45  19   or another involved as -- not necessarily as a party
08:53:50  20   in the case, but ancillary to a party in the case.
08:53:56  21   Q.   Okay.  Sounds like a bit of a Catch-22, because
08:54:00  22   anyone with detailed knowledge of the Defendant is
08:54:03  23   potentially biased?
08:54:04  24   A.   Well, I mean to some degree that's somewhat
08:54:07  25   true, but as a forensic evaluator I have to judge

08:54:11   1   that when I'm interviewing the person and gauge that

08:54:15   2   issue as best I'm able to do.

08:54:21   3   Q.   Do you agree saying somebody, you know, may not

08:54:24   4   be unsullied is -- but assuming a willingness to

08:54:38   5   misrepresent that may not exist?

08:54:42   6   A.   If I recall, I said may.

08:54:44   7   Q.   Yeah, I think that's question, may be

08:54:46   8   unsullied.

08:54:47   9   A.   I mean no disrespect from that.  And maybe

08:54:49   10   that's not a -- maybe that was somewhat of a

08:54:52   11   derogatory term.  I did not intend it to be.

08:54:54   12   Q.   Yesterday we were discussing the stand-alone

08:54:59   13   validity tests developed by Dr. Paul Green; correct?

08:55:03   14   A.   Yes.

08:55:04   15   Q.   Those are the Word Memory Tests, or WMT; the

08:55:08   16   Non-Verbal Medical Symptom Validity Test, or

08:55:15   17   NV-MSVT; and the Medical Symptom Validity Test, or

08:55:17   18   MSVT; correct?

08:55:18   19   A.   Yes.

08:55:24   20   Q.   These tests were developed to distinguish

08:55:27   21   between individuals exaggerating their symptoms,

08:55:31   22   versus individuals that are truly impaired; correct?

08:55:38   23   A.   Not exactly.  I mean, they're to identify

08:55:43   24   exaggeration, and that's what -- that's what they

08:55:48   25   do.  Again, with any free-standing validity test,

08:55:53   1   it's designed to be -- have a low false positive

08:56:02   2   rate.  So positive scores are very meaningful, and

08:56:05   3   negative scores are not very meaningful.  The thing

08:56:08   4   that's unique about these tests is that they have

08:56:10   5   patterns that help you better determine -- to rule

08:56:14   6   out a possible cognitive problem contributing to

08:56:19   7   that positive finding.

08:56:20   8   Q.   I'll get there with my questions.  Let's go

08:56:23   9   step-by-step, because I want to make sure everyone's

08:56:26   10   following what these are.  I'm going to ask that

08:56:28   11   question again, because I think -- I think you

08:56:30   12   agreed with the question in your answer, but these

08:56:33   13   tests were developed to distinguish between

08:56:36   14   individuals exaggerating their symptoms, versus

08:56:39   15   individuals who were truly impaired; correct?

08:56:45   16   A.   Mostly correct.  It's more complicated than

08:56:50   17   that.  I'm sorry, but it's more complicated than

08:56:53   18   that.

08:56:53   19   Q.   And research has demonstrated that individuals

08:56:58   20   suffering from dementia are at increased risk of

08:57:01   21   receiving a false positive indication of

08:57:04   22   exaggerating on performance validity tests; correct?

08:57:08   23   A.   Yes, if those cutoffs are not adjusted to deal

08:57:13   24   with this -- the pathology that's suspected.

08:57:17   25   Q.   The Green tests -- the tests developed by

08:57:21  1  Dr. Paul Green have various decision rules that have

08:57:29  2  been built in to a mathematical algorithm that is

08:57:33  3  designed to discriminate between individuals with

08:57:36  4  genuine memory impairment, and individuals showing

08:57:40  5  poor effort and exaggerating their symptoms;

08:57:44  6  correct?

08:57:44  7  A.   Yes, and those rules are a part of an

08:57:47  8  interpretive step-by-step process.

08:57:50  9  Q.   We're going to walk through -- and, yes.   And

08:57:52  10  -- and we're going to get there.   And individuals

08:58:04  11  pursuant to that mathematical algorithm that have

08:58:12  12  genuine memory impairment are designated possible

08:58:16  13  genuine memory impairment profile; correct?

08:58:19  14  A.   Yes, possible genuine memory impaired profile.

08:58:22  15  Q.   And the test's sensitivity is the ability to

08:58:25  16  accurately discriminate between those individuals

08:58:29  17  with genuine impairment, versus those individuals

08:58:33  18  purposefully giving less than their best effort;

08:58:36  19  correct?

08:58:36  20  A.   No.

08:58:37  21  Q.   Okay.   What is sensitivity?

08:58:39  22  A.   Sensitivity is the measure's ability to detect

08:58:43  23  exaggeration when exaggeration is truly there.

08:58:53  24  Q.   When you do that, detect exaggeration and when

08:58:56  25  exaggeration is truly there, you are able to

08:58:58    1   discriminate the exaggerators from those who have a
08:59:03    2   genuine impairment; correct?
08:59:10    3   A.   Yes, that deals with specificity more than
08:59:13    4   sensitivity.  The two go hand in hand, but they're
08:59:16    5   different.
08:59:16    6   Q.   But if you're able to distinguish -- fairly
08:59:23    7   discriminate between those -- well, sensitivity --
08:59:29    8   sensitivity is to make sure that you are identifying
08:59:36    9   the figures; right?
08:59:42   10   A.   Yes.
08:59:42   11   Q.   And the WMT, the NV-MSVT, and the MSVT
08:59:52   12   individually have high sensitivity values; correct?
09:00:04   13   A.   Not -- no, not necessarily.  It depends on the
09:00:08   14   -- the manner in which somebody looks at the test.
09:00:11   15   If you only look at a part of the algorithm, they
09:00:15   16   have very high -- they have higher sensitivity.  If
09:00:19   17   you look at the whole algorithm that protects
09:00:24   18   specificity, then the sensitivity drops.
09:00:26   19   Q.   Okay.  What's specificity?
09:00:29   20   A.   Specificity is a measure's -- it's the amount
09:00:38   21   that the measure calls people -- correctly calls
09:00:48   22   non-impaired people -- or correctly calls
09:00:52   23   non-exaggerating people non-exaggerating.  In other
09:00:55   24   words, it's -- it's the opposite of false positive
09:00:59   25   rate.

09:00:59  1                    So a test with high specificity has

09:01:03  2  small false positive rates.  That means it would not

09:01:06  3  call somebody exaggerating when they're not.

09:01:11  4  **Q.**   It wouldn't call somebody exaggerating when

09:01:14  5  they're not is specificity?

09:01:17  6  **A.**   Yes.

09:01:17  7  **Q.**   And sensitivity?

09:01:21  8  **A.**   Is identifying exaggeration when it exists.

09:01:23  9  **Q.**   Identifying exaggeration when it exists.

09:01:26  10  But -- so there's research that you've cited -- and

09:01:32  11  the numbers vary from the studies, but there's

09:01:35  12  research on WMT, NV-MSVT, MSVT that individually --

09:01:43  13  individually administered -- some of those tests and

09:01:48  14  papers have found that they had sensitivity of, you

09:01:53  15  know, 90 percent, 80 percent.  Are you familiar with

09:02:02  16  those studies?

09:02:02  17  **A.**   Yes, and as you said there's a lot of

09:02:05  18  variability, because many of the studies don't look

09:02:07  19  at the entire algorithm.  They only look at a

09:02:09  20  portion of it.  Those tend to have the higher

09:02:12  21  sensitivity numbers.

09:02:12  22  **Q.**   And when you are talking about the -- the

09:02:16  23  algorithm, are you including clinical judgment

09:02:19  24  afterwards in -- as part of the algorithm or no?

09:02:23  25  **A.**   No.

09:02:23  1   Q.   Okay.  Do sensitivity values increase if two
09:02:32  2   tests are given?
09:02:33  3   A.   Generally speaking, yes, to some small amount.
09:02:37  4   Q.   Well, did you -- sensitivity was around
09:02:43  5   80 percent if two of those tests were given; is that
09:02:48  6   accurate?
09:02:51  7   A.   Yes, with simulators that's true.  Sensitivity
09:02:56  8   is higher with simulators than it is with known
09:03:00  9   groups.
09:03:00 10   Q.   When you talk about simulators, you are talking
09:03:06 11   about a group that is instructed to try and
09:03:09 12   purposefully act like they're impaired to generate a
09:03:17 13   genuine memory impairment profile; correct?
09:03:21 14   A.   That would be one example of a simulation
09:03:23 15   situation, yes.
09:03:24 16   Q.   And the study we talked about yesterday, you
09:03:26 17   had a group of psychology graduate students that you
09:03:29 18   had instructed to try and obtain a genuine memory
09:03:36 19   impairment profile; correct?
09:03:37 20   A.   Yeah, they were not instructed to create a
09:03:40 21   genuine memory impaired profile.  They were
09:03:43 22   instructed to act -- to simulate having dementia.
09:03:51 23   Q.   Which would -- which should generate a genuine
09:03:57 24   memory impaired profile; correct?
09:04:04 25   A.   I'm not sure if "should" is correct.

09:04:06  1   Theoretically it very well could, yes.

09:04:09  2   Q.   But the -- the genuine memory impairment

09:04:13  3   profile itself is meant to identify people with

09:04:20  4   cognitive problems like dementia so that they're not

09:04:24  5   captured as a false positive; is that right?

09:04:26  6   A.   No, that's not right.

09:04:27  7   Q.   Okay, explain?

09:04:28  8   A.   Yeah, that's where you are mixing up the

09:04:32  9   specificity side of it, and treating it as if it's

09:04:35  10  sensitivity.  The tests were never designed as a

09:04:38  11  measure to detect severe cognitive problems.  They

09:04:42  12  were designed to detective exaggeration, but the

09:04:49  13  genuine memory impaired profile, as well as the rest

09:04:50  14  of the instructions related to interpreting it, is

09:04:54  15  meant to decrease false positive rates among people

09:04:59  16  who have genuine, serious cognitive problems.

09:05:02  17  Q.   So in other words, if you have dementia these

09:05:13  18  tests, historically, were generating false

09:05:16  19  positives, and designating those people as

09:05:19  20  exaggerators when they weren't; correct?

09:05:20  21  A.   Only if someone looked at the first criterion

09:05:24  22  rule.

09:05:24  23  Q.   And then they added another criterion rule, the

09:05:27  24  B criterion; correct?

09:05:29  25  A.   Yes, that was added, as well as the the latter

```
09:05:34   1   stages of the interpretation process.
09:05:36   2   Q.   And with the genuine memory impaired profile,
09:05:41   3   rather than be identified as exaggerators, the
09:05:45   4   dementia pool was then identified, and would go
09:05:49   5   through the algorithm.  And at least the rules were
09:05:53   6   designed to have those people fall into the genuine
09:05:58   7   memory impairment -- the possible genuine memory
09:06:02   8   impairment profile; correct?
09:06:03   9   A.   Yes, but it's more than just simply A and B.
09:06:06   10  There's other rules, too, that affect it.
09:06:08   11  Q.   We're going to go through the whole --
09:06:10   12  A.   Okay.
09:06:10   13  Q.   So -- -- the study we discussed yesterday with
09:06:19   14  the graduate students where they were told to feign
09:06:23   15  dementia, those were psychology students, graduate
09:06:26   16  students?
09:06:27   17  A.   Yes.
09:06:27   18  Q.   And in that study, you were researching whether
09:06:34   19  if you -- rather than conducting two tests, if you
09:06:39   20  conducted three tests, whether you could increase
09:06:42   21  sensitivity; correct?
09:06:49   22  A.   Yes.  Yes, correct.
09:06:54   23  Q.   And with respect to the cohort that you had,
09:06:58   24  and when you combined all three tests you achieved
09:07:03   25  100 percent sensitivity; correct?
```

09:07:07   1   **A.**   Yes.   As I tried to explain yesterday, yes,

09:07:16   2   with a caveat.   There's one person that did not

09:07:18   3   actually produce the type of pattern that you would

09:07:20   4   expect in severe compromise.

09:07:22   5   **Q.**   But -- but no -- not one single person was able

09:07:29   6   to generate a genuine memory impairment profile -- a

09:07:35   7   possible genuine memory impairment profile across

09:07:38   8   all three tests; correct?

09:07:39   9   **A.**   I'm sorry, could you ask that again?

09:07:40   10   **Q.**   Yes.   There wasn't a single simulator, not one

09:07:44   11   person who was able to generate a possible genuine

09:07:51   12   memory impairment profile across all three tests?

09:07:54   13   **A.**   That is correct.   One of them wasn't actually a

09:07:57   14   fail, so it didn't fit that category.

09:08:00   15   **Q.**   And yet you testified that you believed

09:08:03   16   Mr. Brockman had taken five, not six, of the Green

09:08:08   17   stand-alone validity tests; do you remember that?

09:08:11   18   **A.**   Spread out over time, yes.

09:08:13   19   **Q.**   Is that still your understanding?

09:08:19   20   **A.**   I believe so.   I was trying to count them up on

09:08:22   21   the fly.   That was my recollection.   It may be off,

09:08:24   22   I don't recall -- several.

09:08:27   23   **Q.**   And I had asked you whether -- for all of the

09:08:35   24   Green, stand-alone validity tests whether the

09:08:39   25   computer algorithm spit out for every single one a

09:08:46  1   possible genuine memory impairment profile.  And you

09:08:52  2   answered that, no, for one of the tests the computer

09:08:56  3   did not spit out a possible genuine memory

09:09:03  4   impairment profile; is that correct?

09:09:04  5   A.   Yes, because of decision rules that were

09:09:06  6   broken.

09:09:08  7   Q.   Okay.  So I think -- oh, and we'll go through

09:09:16  8   all of the tests, but just to go back to the --

09:09:20  9   cover one -- one sort of formality.  After you left

09:09:24  10  the stand yesterday, did you talk to Dr. Dietz,

09:09:28  11  Dr. Darby, or anyone of the prosecution team about

09:09:31  12  the subject matter of your case?

09:09:32  13  A.   No.

09:09:36  14  Q.   All right.  On May 19, 2021, -- what number are

09:10:05  15  we up to?  Defense Exhibit 59.  Okay.  Are you able

09:10:45  16  to see this?

09:10:46  17  A.   It's a little bit cut off on the right side, so

09:10:50  18  if you can shrink it just a tiny bit and slide it to

09:10:56  19  the left.  Little more.

09:11:03  20  Q.   It's on the screen behind you.

09:11:05  21  A.   Yeah, but not on this.  There you go.  I think

09:11:08  22  that's good enough.  Thank you.

09:11:10  23  Q.   And so, do you recognize what this document is?

09:11:15  24  A.   Yes, this is interpretive flow sheet that

09:11:20  25  guides the examiner through the mathematical rules,

09:11:25   1   as well as the interpretive process.

09:11:27   2   Q.   Okay.   You look down at the identifying test

09:11:36   3   date.   This is the -- the sheet for the Word Memory

09:11:42   4   Test that you administered on May 19, 2021?

09:11:45   5   A.   Yes, it is.

09:11:47   6            MR. LOONAM:   Your Honor, we admit

09:11:48   7   Defendant's Exhibit 59.

09:11:51   8            THE COURT:   Without objection, Defense

09:11:53   9   Exhibit 59 is admitted.

09:11:54  10            MR. LOONAM:   Okay.

09:11:55  11   Q.   Does this sheet reflect that the computer

09:12:04  12   algorithm designated Mr. Brockman's test as a

09:12:14  13   possible genuine memory impairment profile?

09:12:14  14   A.   Yes, may I explain how this works so the Court

09:12:17  15   can understand the process?

09:12:19  16   Q.   Well, I'll ask you -- I'll ask you questions

09:12:22  17   that go off of this.   So -- so when you get -- when

09:12:26  18   you get to this stage -- so Mr. Brockman has taken

09:12:30  19   the test.   It analyzes the different results through

09:12:36  20   the mathematical formula.   It could come out several

09:12:45  21   ways, including poor or little effort profile, which

09:12:47  22   is right above it; correct?

09:12:47  23   A.   Yes.

09:12:48  24   Q.   But it designated his as possible genuine

09:12:52  25   memory impairment.   It's at that stage that the test

09:12:58    1   then is subject to your own subjective, clinical

09:13:03    2   judgment; correct?

09:13:06    3   A.   Well, I guess if you want to differentiate the

09:13:14    4   mathematical rules from the clinical interpretation

09:13:17    5   processes objective and subjective, so be it.  Then

09:13:22    6   that's fine, because you have to then -- because

09:13:27    7   it's only a possible genuine memory impairment.  And

09:13:30    8   then the arrow goes to the right where it says,

09:13:34    9   "Could be valid.  Apply the Slick criteria," and

09:13:37   10   then it goes to the right again.

09:13:39   11              Lastly, you interpret relative to

09:13:42   12   appropriate comparison groups.

09:13:43   13   Q.   Okay.  Where does the math algorithm stop?

09:13:47   14   A.   It stops at that possible genuine memory

09:13:53   15   impairment stage.

09:13:54   16   Q.   The math algorithm stops there at possible

09:13:56   17   genuine memory impairment; correct?

09:13:59   18   A.   Yes.

09:13:59   19   Q.   So this isn't -- there's no algorithm here;

09:14:01   20   right?  There's no algorithm -- this is applying

09:14:07   21   your subjective, clinical judgment in the context of

09:14:14   22   certain criteria to determine whether you believe

09:14:19   23   it's an actual memory impairment or not; correct?

09:14:25   24   A.   Yes, but the interpreting relative to

09:14:27   25   appropriate comparison groups -- you look at numbers

09:14:30    1    and scores and the differences and how that pattern

09:14:32    2    plays out.

09:14:33    3    Q.   And that's -- those are the graphs that you had

09:14:37    4    up on direct.  We're going to go through those.

09:14:39    5    A.   Sure.

09:14:39    6    Q.   So there are different groups on a graph that

09:14:42    7    show -- pursuant to different subparts of the test,

09:14:47    8    how the examiner -- examinee performed, versus

09:14:53    9    certain groups that are on the chart; correct?

09:14:55   10    A.   Exactly.

09:15:00   11    Q.   And do you select the groups that are on that

09:15:03   12    chart, or is that part of the package -- like that

09:15:08   13    -- that -- like Dr. Green, like, automatically spits

09:15:14   14    out of a software?

09:15:15   15    A.   These are selected as the most relevant

09:15:18   16    comparison groups, the groups that would be most

09:15:20   17    relevant to the question at hand.

09:15:22   18    Q.   By whom is my question.

09:15:23   19    A.   The ones I included here in this process --

09:15:30   20    some of them were automatically generated, but on

09:15:33   21    those I believe I lined them up and put them on

09:15:35   22    there, the groups I selected.

09:15:36   23    Q.   So you selected comparison groups that are on

09:15:39   24    the -- the charts that -- that were up on direct;

09:15:42   25    correct?

09:15:43   1    **A.**   Correct.

09:15:43   2    **Q.**   Yeah.  And -- and we will walk through those.

09:15:49   3    Because you gave examples of those in your

09:15:51   4    supplemental report; correct?

09:15:52   5    **A.**   Correct.

09:15:53   6    **Q.**   Yeah.  All right.  So that's why on direct you

09:15:57   7    were testifying, -- and you were careful in your

09:16:02   8    testimony to say, "It is my opinion that it was a

09:16:05   9    fail."

09:16:12   10                  It's because of the subjective,

09:16:14   11   clinical judgment that's involved once you have a

09:16:16   12   possible genuine memory impairment profile; correct?

09:16:21   13   **A.**   It was due to my judgment based upon these

09:16:24   14   comparison groups, yes.

09:16:25   15   **Q.**   Yeah, and that's -- in your clinical judgment,

09:16:28   16   that comes into play specifically here because had

09:16:33   17   -- had -- well -- and on the test, if you -- well,

09:16:44   18   anyway.  Once you get past the genuine memory

09:16:50   19   impairment stage -- asked and answered, I'm sorry.

09:16:56   20   Okay.  So that's the -- that's the WMT for May 19,

09:17:09   21   2021.

09:17:09   22                  I'm going to show you what is marked

09:17:11   23   as Defendant's Exhibit 60.  Is that okay on your

09:17:40   24   screen?

09:17:41   25   **A.**   Yes, thank you.

09:17:44    1    Q.   Okay.  Do you recognize Defense Exhibit 60?

09:17:48    2    A.   Yes, it's a flow sheet for interpretive

09:17:51    3    analysis of -- of the Non-Verbal Medical Symptom

09:17:56    4    Validity Test.

09:17:56    5    Q.   And is this the flow sheet for the Non-Verbal

09:18:01    6    MSVT that you administered to Mr. Brockman on --

09:18:07    7    A.   May 19th, yes.

09:18:08    8    Q.   May 19, 2021?

09:18:10    9    A.   Yes, it is.

09:18:15   10    Q.   And the flow sheet for this is -- is just a bit

09:18:18   11    different than the Word Memory Test; correct?

09:18:20   12    A.   Yeah, there are variations in the math.

09:18:27   13    Q.   Yeah, but if you follow the -- the process

09:18:29   14    through, you -- you go through here, which states,

09:18:35   15    "Data could be valid, but applies Slick, et al,

09:18:40   16    Criterion D."

09:18:40   17              So this -- basically that box sort of

09:18:45   18    condenses the other boxes that appeared in the word

09:18:52   19    memory flow sheet; correct?

09:18:53   20    A.   Yeah, in essence that's true.  Yeah, you look

09:18:57   21    -- apply the Slick analysis to identify whether

09:18:59   22    there are implausible characteristics and look at

09:19:03   23    the appropriate comparison groups.  All of that

09:19:06   24    would be included this.

09:19:07   25    Q.   But this reflects that it qualified for a

09:19:13   1   possible genuine memory impairment profile; correct?

09:19:18   2   A.   Possible, yes.

09:19:19   3   Q.   And that's when you exercise your subjective

09:19:23   4   clinical judgment.  You do the comparisons on the

09:19:28   5   chart we discussed and then exercise your judgment;

09:19:31   6   correct?

09:19:32   7   A.   Yes, in comparison to appropriate comparison

09:19:36   8   groups.  Exactly.

09:19:37   9   Q.   And we're going to walk through that once we

09:19:39   10   get through these -- the flow charts.  That's

09:19:42   11   Government's Exhibit 60 [SIC].

09:19:44   12             MR. LOONAM:  Your Honor, we move 60 in.

09:19:45   13             THE COURT:  Without objection -- I

09:19:48   14   mean, Defendant's exhibit --

09:19:50   15             MR. LOONAM:  Defendant's Exhibit 60.

09:19:52   16   Did I do that again?  Defendant's Exhibit 60 we move

09:19:54   17   into evidence, Your Honor.

09:19:55   18             THE COURT:  Defendant's Exhibit 60 is

09:19:57   19   admitted.

09:20:04   20             MR. LOONAM:  I'll get it by the end of

09:20:06   21   this hearing, Your Honor.

09:20:07   22             THE COURT:  Not a problem.  Just wanted

09:20:08   23   to make sure I heard it correctly.

09:20:26   24             MR. LOONAM:  Defendant's Exhibit 61.

09:20:44   25   Q.   Are you able to see that sir?

09:20:45    1    **A.**    Yes.

09:20:45    2    **Q.**    Do you recognize Defendant's Exhibit 61?

09:20:48    3    **A.**    Yes.

09:20:49    4    **Q.**    Is this the flow sheet for the MSVT

09:20:56    5    administered by Dr. Guilmette on July 13, 2021?

09:21:01    6    **A.**    Yes.

09:21:02    7    **Q.**    Okay.

09:21:03    8                    MR. LOONAM:    Your Honor, we move

09:21:05    9    Defendant's Exhibit 61 into evidence.

09:21:08    10                    THE COURT:    Defendant's Exhibit 61 is

09:21:10    11    admitted.

09:21:12    12                    MR. LOONAM:

09:21:12    13    **Q.**    Again, does Defendant's Exhibit 61 reflect that

09:21:17    14    the algorithm designated Mr. Brockman's test as

09:21:22    15    qualifying for a possible genuine memory impairment

09:21:28    16    profile?

09:21:39    17    **A.**    Yes, it does, possible genuine memory

09:21:42    18    impairment.

09:21:50    19                    MR. LOONAM:    Marking Defendant's

09:22:26    20    Exhibit 62.

09:22:26    21    **Q.**    Do you recognize what I've marked as

09:22:31    22    Defendant's Exhibit 62?

09:22:33    23    **A.**    Yes, I do.

09:22:34    24    **Q.**    Okay.  And is this the flow sheet for the MSVT

09:22:39    25    test administered by Dr. Guilmette on October 2,

09:22:46   1   2021?

09:22:46   2   A.   Yes, it does.

09:22:46   3   Q.   All right.  And does this flow sheet reflect

09:22:51   4   that the computer algorithm identified

09:22:56   5   Mr. Brockman's test results as qualifying for a

09:22:59   6   possible genuine memory impairment profile?

09:23:01   7   A.   Yes.  However, with this test there are other

09:23:06   8   -- or with this particular example there are other

09:23:09   9   characteristics here that make that possible,

09:23:13   10   genuine memory impairment go away.

09:23:16   11   Q.   Well, but here in the flow sheet --

09:23:17   12   A.   That's reflected in the report.

09:23:19   13   Q.   But -- but on the flow sheet it reflects that

09:23:23   14   it qualifies for possible genuine memory impairment

09:23:26   15   profile?

09:23:26   16   A.   On the flow sheet, yes.

09:23:27   17   Q.   And then you have to move on to your subjective

09:23:31   18   judgment to assess that possible genuine memory

09:23:35   19   impairment profile?

09:23:35   20   A.   In this case, not subjective, no.  There are

09:23:38   21   other mathematical findings on this particular test

09:23:43   22   that the report actually designates as indicative of

09:23:51   23   not a genuine memory impairment profile.

09:23:56   24   Q.   Indicative.  So you are maintaining that even

09:23:59   25   though the results that are indicated from the --

09:24:02  1   the computer printout state that it qualifies for

09:24:08  2   possible genuine memory impairment profile, it

09:24:10  3   doesn't really mean that?

09:24:12  4   **A.**   Well, this is not the entire printout.   This is

09:24:14  5   only one page.   There's other places in the printout

09:24:17  6   that elucidate this finding.

09:24:22  7   **Q.**   All right.   So that's the MSVT of Defendant's

09:24:29  8   Exhibit 62.   Defendant's Exhibit 63.   Do you

09:24:47  9   recognize Defendant's Exhibit 63?

09:24:53  10  **A.**   Yes, I do.

09:24:55  11  **Q.**   And is this the NV-MSVT that you administered

09:25:05  12  to Mr. Brockman on October 20, 2021?

09:25:09  13  **A.**   Yes, it is.

09:25:11  14  **Q.**   And does this flow chart reflect that the

09:25:16  15  computer identified Mr. Brockman's test results as

09:25:19  16  qualifying as a possible genuine memory impairment

09:25:23  17  profile?

09:25:23  18  **A.**   Yeah, it doesn't specifically say that.   It

09:25:25  19  says, "Data could be valid, but apply Slick et al

09:25:29  20  criterion."

09:25:30  21             But for the sake of what we're

09:25:31  22  talking about, that would be reasonably interpreted

09:25:34  23  as possible genuine memory impairment profile.

09:25:35  24  **Q.**   Yeah, that's what we're talking about before.

09:25:37  25  On this particular test, it sort of shrinks those

09:25:42   1   boxes down to one.

09:25:43   2   **A.**   Yeah, it's a little different in that regard,

09:25:45   3   but the point --

09:25:45   4   **Q.**   The substance is the same?

09:25:47   5   **A.**   Yeah.

09:25:49   6              MR. LOONAM:   Your Honor, we move 63

09:25:51   7   into evidence.

09:25:52   8              THE COURT:   Without objection,

09:25:54   9   Defendant's Exhibit 63 is admitted.

09:25:58   10             MR. LOONAM:

09:25:58   11  **Q.**   Defendant's Exhibit 64.   Do you recognize what

09:26:25   12  I've marked as Defendant's Exhibit 64?

09:26:26   13  **A.**   Yes.

09:26:27   14  **Q.**   Is this the -- is this the MSVT test that you

09:26:40   15  administered to Mr. Brockman on October 26, 2021?

09:26:44   16  **A.**   Yes, it is.

09:26:46   17  **Q.**   And again, does this flow sheet reflect that

09:26:52   18  Mr. Brockman obtained a possible genuine memory

09:26:59   19  impairment profile on this test?

09:27:00   20  **A.**   Yes.

09:27:02   21  **Q.**   I think if we -- if we counted them up, I think

09:27:07   22  there are six administrations of the Green

09:27:12   23  stand-alone tests in total.   And you agree that

09:27:21   24  Mr. Brockman obtained a possible genuine memory

09:27:27   25  impairment profile on at least five of them;

09:27:30    1    correct?

09:27:31    2    **A.**    That is correct.

09:27:33    3    **Q.**    And with respect to the other -- the flow sheet

09:27:38    4    at least reflects that Mr. Brockman obtained a

09:27:45    5    genuine memory impairment profile, but you believe

09:27:46    6    that profile is not valid, pursuant to other

09:27:51    7    information in the report; correct?

09:27:52    8    **A.**    Exactly right.

09:28:01    9    **Q.**    And in the study of simulators that we

09:28:07   10    described before that you conducted, you -- you

09:28:12   11    found that none of the simulators could generate a

09:28:21   12    genuine memory impairment profile across three

09:28:28   13    tests; correct?

09:28:31   14    **A.**    None of them could --

09:28:33   15    **Q.**    Generate a genuine memory impairment --

09:28:37   16    **A.**    None of them did.  One was equivocal.  But,

09:28:43   17    yeah, that's true all three tests taken at one time.

09:28:45   18    **Q.**    Different -- this is spread out?

09:28:47   19    **A.**    Sure.

09:28:48   20    **Q.**    So -- but you -- you get to choose the tests

09:28:51   21    that you administer; correct?

09:28:55   22    **A.**    Yes.

09:28:55   23    **Q.**    So if you wanted to administer the three Green

09:28:59   24    tests in one sitting, you could have done that;

09:29:02   25    correct?

09:29:04   1   **A.**   Yes, I could have.

09:29:07   2   **Q.**   And --

09:29:10   3   **A.**   Given time limitations, I could have, yeah.

09:29:12   4   **Q.**   Yeah, but you -- given the time -- given the

09:29:17   5   time you spent with Mr. Brockman in this case, you

09:29:19   6   certainly could have administered the three Green

09:29:24   7   tests if you wanted to; correct?

09:29:26   8   **A.**   Yes.

09:29:35   9   **Q.**   You administered the Victoria Symptom Validity

09:29:46   10   Test with Mr. Brockman; correct?

09:29:52   11   **A.**   And that -- that test has a -- there's -- well,

09:30:12   12   let me -- there's -- there's a high -- higher risk

09:30:17   13   for dementia patients obtaining a false positive on

09:30:22   14   that test; correct?

09:30:24   15   **A.**   Yes, if you use the original cutoffs on it;

09:30:30   16   correct.

09:30:45   17             MR. LOONAM:   What am I up to?

09:30:54   18             THE WITNESS:   If I may finish my

09:30:56   19   answer?   But not if you adjust the cutoffs for

09:31:02   20   severe, cognitive impaired populations.

09:31:10   21             MR. LOONAM:

09:31:11   22   **Q.**   And that makes -- that makes the test easier to

09:31:16   23   pass, not harder; correct?

09:31:18   24   **A.**   Yes.

09:31:19   25   **Q.**   Okay.   And on your direct testimony, you

09:31:35  1    testified that Mr. Brockman failed the Victoria

09:31:41  2    Symptom Validity Test; correct?

09:31:43  3    A.   Yes.

09:31:44  4    Q.   And on the Victoria Symptom Validity Test, you

09:31:51  5    can obtain a valid or a pass score; correct?

09:31:54  6    A.   Yes.

09:31:55  7    Q.   You can obtain an invalid or a fail score;

09:32:00  8    correct?

09:32:03  9    A.   Possibly.  It depends on where you are going

09:32:05  10   with the question.

09:32:06  11   Q.   And then you could obtain a questionable --

09:32:08  12   well, I mean I want to understand what the different

09:32:11  13   sort of outputs are; right.  So are the outputs you

09:32:15  14   can obtain a -- a pass, which is also -- some types

09:32:22  15   of pass is called a valid score; is that correct?

09:32:25  16   A.   Yes.

09:32:26  17   Q.   Okay.  And then you could obtain a fail, and

09:32:30  18   that's sometimes an invalid score; correct?

09:32:37  19   A.   Not -- yes and no.  It depends on what context

09:32:41  20   you are talking about.  I can probably clear this up

09:32:43  21   if I may re-phrase what you are asking.

09:32:47  22   Q.   Let me ask.  And then you could also obtain a

09:32:51  23   chance score or a questionable score; correct?

09:32:53  24   A.   Okay.  Based upon the binomial theorem those

09:32:59  25   are true, yes.

09:32:59    1    **Q.**    Yes.

09:33:00    2    **A.**    And those are presented in the original manual

09:33:02    3    from the mid-1990's.

09:33:08    4    **Q.**    And there's -- similar to the Green tests, do

09:33:11    5    you submit the Victoria Symptom Validity Test, and

09:33:13    6    it -- it has a mathematical scoring sheet that spits

09:33:19    7    out and tells you what the results are?

09:33:22    8    **A.**    Yeah, based solely on the binomial theorem.

09:33:29    9    **Q.**    So I'm going to show you Government Exhibit 65

09:33:33   10    [SIC] -- Defendant's Exhibit 65.  Do you recognize

09:33:39   11    this document?

09:33:40   12    **A.**    Yes, I do.

09:33:41   13    **Q.**    What do you recognize it to be?

09:33:43   14    **A.**    It is the Victoria Symptom Validity Test

09:33:46   15    printout report for my examination of Mr. Brockman

09:33:51   16    on May 19, 2021.

09:33:54   17    **Q.**    Okay.  Turning to Page 2 of the document.  At

09:34:05   18    the top it says, "Suggested interpretation."

09:34:10   19                   And for all three items -- easy

09:34:14   20    items, difficult items, and total items correct,

09:34:19   21    those fell as scored by the program as chance or

09:34:26   22    questionable results, not as fails or invalid

09:34:30   23    results; correct?

09:34:31   24    **A.**    That is correct, based upon that algorithm of

09:34:35   25    the binomial theorem.

```
09:35:17    1            MR. LOONAM:  I'm just marking this for
09:35:19    2    identification 66.  Defendant's Exhibit 66.
09:35:41    3                     Oh, Your Honor, Defense moves
09:35:44    4    Defendant's Exhibit 65 into evidence.
09:35:45    5            THE COURT:  Okay.  Any objection?
09:35:47    6            MR. COREY SMITH:  No objection, Your
09:35:49    7    Honor.
09:35:49    8            THE COURT:  Without objection,
09:35:50    9    Defendant's Exhibit 65 is admitted.
09:35:56   10            MR. LOONAM:
09:35:57   11    Q.  Showing you what's marked for identification as
09:36:01   12    Defense Exhibit 66.  Are you familiar with this
09:36:06   13    study, which is the Victoria Symptom Validity Test
09:36:10   14    Performance in Heterogeneous Clinical Sample?
09:36:13   15    A.  Yes, it is -- yes, I am.
09:36:23   16    Q.  In this study it says that, "Chance responding
09:36:27   17    on the hard VSVT items" -- and defines that as 8 out
09:36:33   18    of 24, through 15 out of 24 -- "with slightly
09:36:37   19    greater with ten percent in the clinically referred
09:36:42   20    group, and did not appear to differ as a function of
09:36:45   21    diagnosis."
09:36:46   22                     Mr. Brockman, on the hard items on
09:36:50   23    the VSVT test scored an 8; correct?
09:36:54   24    A.  That is correct.
09:37:07   25    Q.  This paper also states that their data
```

09:37:09   1   suggests, "An increase likelihood of poor SVT

09:37:13   2   performance in dementia patients compared to other

09:37:16   3   clinical diagnoses" -- and it gives a p-value of

09:37:21   4   .06 -- "using either chance responding, or

09:37:24   5   empirically derived cutoffs for classification.  We

09:37:27   6   believe that this reflects disease characteristics,

09:37:30   7   and consequently should be considered false positive

09:37:33   8   errors."

09:37:34   9                  Do you agree with that analysis?

09:37:37   10   A.   Yes.

09:37:47   11   Q.   And the reason you decided that Mr. Brockman's

09:37:54   12   tests called as a fail is you moved the goalpost on

09:38:01   13   the mathematical equation; correct?

09:38:04   14   A.   No.

09:38:05   15   Q.   Well, did you move -- did you alter the

09:38:08   16   mathematical equation used to score the test?

09:38:16   17   A.   No.

09:38:16   18   Q.   Did you change the p-value?

09:38:20   19   A.   There were two aspects to that test that made

09:38:22   20   it a fail in terms of its relevance for dementia

09:38:28   21   patients.  One was the hard items score of 8, which

09:38:33   22   was below 11.  That was the recommended cutoff from

09:38:37   23   that paper for use with potential dementia-type

09:38:40   24   situations.  That was one thing, so it's a fail

09:38:45   25   there.

09:38:45    1            Then it's also the low enough in
09:38:47    2   the probability scale, based upon the binomial, that
09:38:51    3   it would still be considered indicative of intent.
09:38:55    4   Q.   But doesn't -- doesn't the manual state -- so
09:38:59    5   first of all, the manual sets -- the manual for the
09:39:12    6   hard items --
09:39:13    7   A.   The manual only looked at the binomial theorem
09:39:15    8   as it was understood in the mid-1990's.  In the
09:39:19    9   subsequent 20-some years, the research has evolved,
09:39:23   10   and we've gotten a lot more sophisticated
09:39:26   11   understanding the binomial theorem, as well as how
09:39:30   12   clinical groups perform outside the binomial
09:39:33   13   theorem.
09:39:33   14   Q.   And what -- what -- what changes here -- well,
09:39:37   15   what is -- what is "P" representing?
09:39:41   16   A.   "P" represents the probability of a score
09:39:44   17   falling out into a tail of a normal distribution.
09:39:49   18   In this instance, a tail on the lower side -- well,
09:39:55   19   it could be either actually, but usually what we're
09:39:59   20   talking about is the lower end.  It's the -- it's
09:40:01   21   the demarcation between -- it tells you how far out
09:40:06   22   in the tail of the curve that score fell.
09:40:08   23   Q.   And the p-value used for the binomial scoring
09:40:17   24   was what?
09:40:18   25   A.   On that printout?

09:40:19    1    Q.    Yeah.

09:40:19    2    A.    From the mid-1990's, p-value .05.

09:40:23    3    Q.    And what p-value did you use to get the cutoff

09:40:28    4    to 11 -- do you know?

09:40:32    5    A.    That's totally different issues.  You are

09:40:35    6    combining two things that are not combinable.

09:40:37    7    Q.    So the -- the p-value didn't play a role in --

09:40:42    8    in altering what the cutoff was?

09:40:44    9    A.    Not -- not on the 11, no.  That's totally

09:40:50   10    unrelated.

09:40:50   11    Q.    Okay.  And according to the manual of this

09:41:05   12    test, "The total items correct score provides the

09:41:09   13    most objective and quantifiable evidence regarding

09:41:12   14    whether respondents are exhibiting biased

09:41:16   15    responding"; is that correct?

09:41:18   16    A.    From what are you reading?  I don't know.

09:41:20   17    Q.    Are you familiar with the *Victoria Test Manual*?

09:41:24   18    A.    Yes.

09:41:25   19    Q.    And are you familiar with the manual's

09:41:27   20    instruction that, "The total items score provides

09:41:33   21    the most objective and quantifiable evidence

09:41:37   22    regarding whether respondents are exhibiting biased

09:41:40   23    responding"?

09:41:43   24              MR. COREY SMITH:  Just as a matter of

09:41:43   25    procedure, Your Honor?  If the witness could just

09:41:44  1  have a copy so we can see what he's being asked
09:41:47  2  about?
09:41:47  3              MR. LOONAM:  I would love to have a
09:41:48  4  copy of the manual, but these are all proprietary
09:41:52  5  and impossible to obtain.
09:41:54  6              MR. COREY SMITH:  Aren't you reading
09:41:55  7  from this, 65?  Can he have a copy if he's asked
09:42:01  8  questions about it?
09:42:02  9              MR. LOONAM:  This is a scoring sheet.
09:42:03  10             MR. COREY SMITH:  What are you are
09:42:04  11 reading from?  It's a manual.  I think the witness
09:42:06  12 should at least be able to see what he's being asked
09:42:09  13 about.
09:42:09  14             MR. LOONAM:
09:42:10  15 Q.   Are you familiar with whether the manual
09:42:12  16 instructs people to consider the total score as the
09:42:18  17 most objective measure?
09:42:20  18 A.   The manual published in the mid-1990's?
09:42:23  19 Q.   The manual for the test, yeah.
09:42:25  20 A.   Yeah, it does discuss that issue.
09:42:31  21 Q.   And what the manual -- are you familiar with
09:42:34  22 the concept of what I just -- what I read to you?
09:42:39  23 And are you familiar -- like, are these manuals
09:42:43  24 difficult for people who aren't forensic examiners
09:42:45  25 to obtain?

09:42:46  1            THE COURT:  Okay.  That was a compound
09:42:47  2    question.
09:42:48  3            MR. LOONAM:  Yeah, it was.
09:42:49  4            THE COURT:  "Are you familiar," and
09:42:49  5    then "Does it state?"
09:42:50  6            So can you break it down so I can
09:42:52  7    understand it?
09:42:58  8            MR. LOONAM:  Withdrawn.
09:43:05  9    Q.   Just to be clear, you understand that the
09:43:07  10   manual for the test from the 1990's instructs that,
09:43:11  11   "The total items correct score provides the most
09:43:13  12   objective and quantifiable evidence regarding
09:43:16  13   whether respondents are exhibiting biased
09:43:21  14   reporting"?
09:43:21  15   A.   Yeah, that's what it said, and that's what was
09:43:23  16   believed in the mid-1990's regarding the Victoria.
09:43:27  17   Q.   It's your position now that the total score
09:43:33  18   does not provide the most objective and quantifiable
09:43:41  19   evidence regarding whether respondents are
09:43:43  20   exhibiting biased reporting?
09:43:44  21   A.   No, I would not agree with that today.  I don't
09:43:47  22   believe that's what the current, recent literature
09:43:51  23   supports, including the paper you showed me a minute
09:43:53  24   ago.
09:44:29  25            MR. LOONAM:  One moment, Your Honor?

| | | |
|---|---|---|
| 09:44:30 | 1 | THE COURT:  Sure.  Take your time. |
| 09:45:28 | 2 | MR. LOONAM: |
| 09:45:29 | 3 | Q.  *Dusky* establishes one standard for competence; |
| 09:45:33 | 4 | correct? |
| 09:45:35 | 5 | A.  Yes, that is my understanding. |
| 09:45:37 | 6 | Q.  But two defendants with the exact same |
| 09:45:43 | 7 | neurocognitive deficits could vary in whether |
| 09:45:49 | 8 | they're competent, based on the complexity of the |
| 09:45:51 | 9 | case; correct? |
| 09:45:54 | 10 | A.  Yes, and other factors related to that, sure. |
| 09:45:57 | 11 | Q.  And that's because more is required from a |
| 09:46:01 | 12 | defendant in a long, multiple-count -- for example, |
| 09:46:06 | 13 | bank fraud trial than for a single charge of illegal |
| 09:46:10 | 14 | reentry case; correct? |
| 09:46:13 | 15 | A.  Yes. |
| 09:46:14 | 16 | Q.  And you discussed other factors on your direct |
| 09:46:22 | 17 | testimony and in your report.  I'm not sure about |
| 09:46:25 | 18 | it, but it seemed to me that you may be stating that |
| 09:46:30 | 19 | the quality of the defendant's counsel plays a role |
| 09:46:42 | 20 | whether the Defendant is competent to proceed.  I |
| 09:46:44 | 21 | just want to clarify that point. |
| 09:46:48 | 22 | Does your perception of the |
| 09:46:51 | 23 | competence of counsel play any role in that |
| 09:46:54 | 24 | determination? |
| 09:46:55 | 25 | A.  It provides context, and to the extent that the |

09:47:02   1   Defendant is willing to rely on counsel, and counsel

09:47:05   2   is able to reproduce details from the record and put

09:47:11   3   that together, that is helpful in accommodating

09:47:15   4   difficulties a defendant may have.

09:47:17   5   Q.   No, but so -- so is the answer -- I'm not sure

09:47:23   6   -- I want to make sure I'm very clear on what you

09:47:25   7   mean by it provides context.   In -- in offering your

09:47:30   8   opinion on whether the Defendant is competent to

09:47:37   9   proceed to trial, do you assess the -- the quality

09:47:45  10   of his defense lawyers?

09:47:50  11   A.   Well, I don't specifically assess the quality

09:47:52  12   of defense lawyers.   I take -- I take that into some

09:47:56  13   degree of consideration, because there is some

09:47:59  14   indication that a -- for example, a defendant could

09:48:03  15   potentially be competent with assistance of counsel,

09:48:07  16   but not necessarily competent to do certain things

09:48:11  17   when representing himself.   So there is a little bit

09:48:14  18   of an adjustment there that would -- would

09:48:18  19   correspond with the capability of counsel to assist

09:48:23  20   the Defendant, yes.

09:48:24  21   Q.   So your view of the -- of applying the

09:48:28  22   competence standard is that the -- the analysis

09:48:33  23   would be different for a pro se defendant, versus a

09:48:36  24   represented defendant?

09:48:42  25   A.   To some degree.   There is a little bit of

09:48:43  1   adjustment to that.  It provides a different

09:48:45  2   context.

09:48:46  3   Q.   And so how -- in conducting your analysis to

09:48:48  4   make these adjustments, how do you go about

09:48:51  5   evaluating the quality of counsel to enter into your

09:48:56  6   opinion of whether the Defendant is competent to

09:48:59  7   proceed to trial?

09:49:02  8   A.   Well, that's where I said I don't evaluate the

09:49:06  9   quality of counsel.  I don't provide questionnaires

09:49:09  10  and try to identify how good counsel they are.  I

09:49:13  11  don't evaluate them.  I consider the context of

09:49:15  12  whether or not there is a tremendous amount of

09:49:19  13  assistance available for a defendant or not.

09:49:22  14  Q.   And so -- tremendous amount.  So -- so -- so

09:49:27  15  the ability of someone to have more lawyers factors

09:49:36  16  into your determination of whether or not they're

09:49:39  17  competent to proceed to trial?

09:49:41  18  A.   No.

09:49:41  19  Q.   Okay.  Well, I'm just wondering -- when you

09:49:43  20  said the -- what -- I want to make sure I get your

09:49:46  21  testimony correct.  The tremendous amount of

09:49:50  22  assistance -- what was the tremendous amount of

09:49:52  23  assistance you were referring to?

09:49:53  24  A.   The capability of counsel to identify records,

09:50:01  25  reconstruct the alleged criminal offenses, and

09:50:04   1   provide that assistance for a defendant can help

09:50:07   2   overcome some cognitive deficiency of a defendant.

09:50:14   3   That's more easily done when there is a strong,

09:50:19   4   supportive defense team for somebody, than if there

09:50:22   5   is somebody obviously acting pro se where they're

09:50:24   6   trying to pull it together themselves.

09:50:26   7   Q.   And my question is how -- how do you assess the

09:50:30   8   capability of counsel and whether there's a strong

09:50:36   9   supportive defense team?  Like how do you -- how do

09:50:38  10   you determine that?

09:50:40  11   A.   I don't assess it.  It is either there or it

09:50:43  12   isn't.

09:50:44  13   Q.   But then, that's a standard for something else

09:50:46  14   under the law.  You know it when you see it, but I

09:50:51  15   don't understand.  It's either there or it's not.

09:50:53  16   So any lawyer -- is that what you are saying, any

09:50:55  17   lawyer?

09:50:58  18   A.   Any lawyer is better than no lawyer, yes.

09:51:01  19   Q.   Okay.  So then -- and any lawyer is better than

09:51:04  20   no lawyer, but then there's, like, a sliding scale

09:51:08  21   in your mind with respect to a bigger team or a more

09:51:11  22   capable team, and it goes from -- I don't know what

09:51:15  23   one end is versus a pro se?  It sort of moves on a

09:51:18  24   sliding scale -- I don't know.

09:51:20  25              You tell me.  You tell me how you do

09:51:21   1    this.  I'm trying to understand what's factoring

09:51:24   2    into your decision?

09:51:24   3    **A.**   Yeah, I said I do not rate quality of counsel

09:51:27   4    or in any regard like that.  I don't do that.

09:51:31   5    **Q.**   But how do you determine whether it's a strong

09:51:35   6    team that could offer tremendous support?

09:51:38   7                    MR. COREY SMITH:  I --

09:51:38   8                    THE COURT:  Okay.  Objection's

09:51:39   9    sustained.  Answer this question now counted five

09:51:42   10   times.

09:51:42   11                   MR. LOONAM:  Okay.

09:51:43   12                   THE COURT:  So the answer is he doesn't

09:51:45   13   evaluate the quality of counsel.  I mean, he said it

09:51:49   14   five times.  We just keep going around and around.

09:51:53   15   So respectfully, objection's sustained.

09:51:56   16                   MR. LOONAM:  All right.

09:51:56   17   **Q.**   How many counts are involved in this case?

09:51:59   18   **A.**   Numerous.

09:52:00   19   **Q.**   Do you know how many?

09:52:01   20   **A.**   Not off the top of my head, no.

09:52:04   21   **Q.**   More than a dozen?

09:52:07   22   **A.**   I said I don't know.

09:52:08   23   **Q.**   Okay.  And -- and what are -- what are the

09:52:12   24   charges alleged in this case?

09:52:15   25   **A.**   There's tax evasion.  There is -- oh, let's

09:52:23   1   see.  I know there's tax evasion.  There's several

09:52:31   2   others.  I can't recall off the top of my head at

09:52:33   3   this moment.

09:52:39   4   Q.  Are you familiar with the wire fraud counts in

09:52:41   5   this case?

09:52:44   6   A.  I recall that there are wire fraud counts

09:52:47   7   involved, but I don't know the details enough to

09:52:51   8   tell you about them.

09:52:52   9   Q.  Well, isn't it important for you to understand

09:52:54   10   the details of the indictment to assess whether or

09:52:58   11   not the Defendant understands the indictment?

09:53:07   12   A.  Well, in a general way, yes.  But in specific

09:53:11   13   details, not necessarily, no.

09:53:15   14                MR. LOONAM:  I have no further

09:53:16   15   questions, Your Honor.

09:53:16   16                THE COURT:  Okay.  Redirect?

09:53:20   17                MR. COREY SMITH:  No questions, Your

09:53:21   18   Honor.

09:53:21   19                THE COURT:  Okay.  May this witness be

09:53:22   20   excused?

09:53:23   21                MR. COREY SMITH:  From the Government,

09:53:24   22   yes.

09:53:24   23                THE COURT:  Okay.  Great.  Thank you,

09:53:26   24   Dr. Denney.

09:53:27   25                THE WITNESS:  Thank you.  Appreciate

```
09:53:29   1   it.
09:53:29   2            THE COURT:  Thank you.  Counsel, we're
09:53:30   3   just going to take a seven-minute break.  We're
09:53:33   4   going to start up at ten o'clock.  I need to take
09:53:35   5   care of something, and we'll get started right away.
09:53:37   6   Have your next witness ready to go?
09:53:39   7            MR. LANGSTON:  Yeah.
09:53:39   8            THE COURT:  Okay.  Great.  Get started
09:53:40   9   at ten o'clock.
10:02:49  10   (Whereupon, a recess was held.)
10:06:50  11            MR. LOONAM:  Your Honor, housekeeping.
10:06:52  12   I think I failed to admit 62 and 64, which were flow
10:06:57  13   sheets into evidence.
10:06:59  14            THE COURT:  Without objection?
10:07:00  15            MR. COREY SMITH:  No objection, Your
10:07:01  16   Honor.
10:07:01  17            THE COURT:  Defendant's Exhibit 62 and
10:07:03  18   64 are admitted.
10:07:04  19            MR. LOONAM:  Thank you, Your Honor.
10:07:11  20            MR. LANGSTON:  Government calls Craig
10:07:14  21   Moss.
10:07:14  22            THE COURT:  Mr. Moss, good morning.
10:07:21  23
          24              ///
          25              ///
```

| | | |
|---|---|---|
| 10:07:21 | 1 | <div align="center">**CRAIG MOSS,**</div> |
| 10:07:21 | 2 | <div align="center">**(For the Government)**</div> |
| 10:07:21 | 3 | called as a Witness, having been duly |
| 10:07:21 | 4 | and regularly sworn, testified as follows: |
| 10:07:28 | 5 | THE WITNESS:  I do. |
| 10:07:29 | 6 | THE COURT:  Please take the stand, sir. |
| 10:07:29 | 7 | <div align="center">**DIRECT EXAMINATION**</div> |
| 10:07:29 | 8 | BY MR. LANGSTON: |
| 10:07:44 | 9 | Q.   Good morning, sir.  Could you tell the Court |
| 10:07:46 | 10 | briefly how you know the Defendant, Robert Brockman? |
| 10:07:49 | 11 | THE COURT:  Can you just have him -- |
| 10:07:51 | 12 | MR. LANGSTON:  Sorry. |
| 10:07:51 | 13 | Q.   Could you state your name, spelling the last |
| 10:07:53 | 14 | for the record? |
| 10:07:54 | 15 | A.   Sure, Michael Craig Moss, M-O-S-S. |
| 10:07:57 | 16 | Q.   How do you know Mr. Brockman? |
| 10:07:59 | 17 | A.   I've worked with Brockman for 29 years. |
| 10:08:02 | 18 | Q.   Were you an employee at Reynolds and Reynolds? |
| 10:08:06 | 19 | A.   Yes, sir. |
| 10:08:06 | 20 | Q.   Can you give a very brief description of your |
| 10:08:09 | 21 | career? |
| 10:08:09 | 22 | A.   Um, I was hired on originally as a part-time |
| 10:08:12 | 23 | recruiting assistant, and then I moved up through |
| 10:08:15 | 24 | the -- as I graduated and got my master's degree, I |
| 10:08:20 | 25 | moved into what was the international department, |

```
10:08:22   1   and then moved into various pieces of the accounting
10:08:26   2   world, including the treasurer in 2009, and then
10:08:29   3   being promoted to CFO in 2013.
10:08:32   4   Q.   But the latter part of your career when you
10:08:33   5   were treasurer and CFO, who did you report to?
10:08:36   6   A.   As treasurer, I reported to Robert Burnett.
10:08:43   7   Once I became CFO, I reported directly to Bob.
10:08:46   8   Q.   What year did you become CFO?
10:08:48   9   A.   2013.
10:08:49  10   Q.   I'm going to direct your attention to
10:08:52  11   September 5, 2018.  Did anything unusual happen to
10:08:59  12   you that day?
10:09:00  13   A.   Yes, that was the day I was served a subpoena.
10:09:02  14   Q.   Okay.  Was that a subpoena in connection to
10:09:04  15   this case?
10:09:04  16   A.   Yes, sir.
10:09:04  17   Q.   Did you learn whether anyone else at Reynolds
10:09:08  18   and Reynolds received a subpoena that day?
10:09:09  19   A.   Yes, I was -- before I received my subpoena, I
10:09:14  20   received a call from Charlie Zeto (phonetic), which
10:09:18  21   was a corporate pilot, and he received -- or someone
10:09:20  22   had come to his house looking for him to serve the
10:09:24  23   subpoena.  And I didn't know what that was about,
10:09:26  24   but I was on my way to the office and just got
10:09:30  25   Cherry (phonetic) -- or in-house counsel.
```

10:09:31  1   Q.   Okay.  Without -- without having -- without

10:09:34  2   discussing your discussions with Mr. Cherry

10:09:36  3   (phonetic), did you make him aware of the fact that

10:09:38  4   you received a subpoena?

10:09:40  5   A.   He -- he called me to tell me federal agents

10:09:43  6   were there to serve me a subpoena.

10:09:45  7   Q.   All right.  I'll direct your attention to one

10:09:47  8   month after you received the subpoena, and I'm going

10:09:49  9   to show you Government Exhibit 67, which is marked

10:09:53  10  for identification.  Are you able to see -- are you

10:10:23  11  able to see that Mr. Moss?

10:10:25  12  A.   It's a little blurry.

10:10:26  13  Q.   How is that?  Is that better?

10:10:29  14  A.   Yes.

10:10:29  15  Q.   Okay.  And if you prefer, there's a binder

10:10:31  16  sitting next to you if you'd rather use the paper --

10:10:35  17  whatever is easier for you?

10:10:36  18  A.   No, this should be fine.

10:10:37  19  Q.   Okay.  And then, is this an October 14, 2018,

10:10:42  20  e-mail between you and Mr. Brockman?

10:10:46  21  A.   Yes.

10:10:46  22  Q.   Okay.  Could you briefly describe the substance

10:10:51  23  of the e-mail?

10:10:53  24  A.   The contents -- this would have been about a

10:10:57  25  week after Bob had been indicted -- I'm sorry,

10:11:02  1    that's two years.

10:11:02  2    Q.   2018?

10:11:03  3    A.   2018.  This was a month and a half after I

10:11:06  4    received the subpoena.  And Bob was calling into

10:11:12  5    question whether or not Charlie was capable of

10:11:14  6    making -- having an understanding of what the

10:11:17  7    flights should be designated, whether they were

10:11:19  8    personal, or corporate, or charter flights.  And

10:11:23  9    that was -- couldn't be further from the truth.

10:11:27  10                   Charlie had been in the airline

10:11:28  11   industry for years and years, and a head pilot for a

10:11:31  12   number of years and knew exactly what he was doing.

10:11:33  13   Q.   So Charlie is Charlie Zeto, who you described

10:11:36  14   as the pilot of the Reynolds and Reynolds's jet?

10:11:38  15   A.   Correct.  He was the head pilot.

10:11:41  16   Q.   What you are speaking about in terms of the

10:11:43  17   business or personal purposes, Mr. Zeto had gotten a

10:11:48  18   request to designate the business or personal reason

10:11:50  19   for each flight?

10:11:51  20   A.   Standard process, yes.

10:11:52  21   Q.   Mr. Brockman is requesting you review that list

10:11:55  22   prior to being produced?

10:11:57  23   A.   That's what he's asking for.

10:11:58  24   Q.   Okay.  Was this a usual request for

10:12:01  25   Mr. Brockman to be making of you?

10:12:03    1    A.    Yes, this was unusual.

10:12:08    2    Q.    Why do you say it was unusual?

10:12:09    3    A.    It's unusual that he would ask -- from a timing

10:12:13    4    standpoint.  It was not unusual, because we were all

10:12:16    5    aware of the tax implications of privately

10:12:19    6    designated flights from a tax standpoint.  So we'd

10:12:22    7    always been aware of that and concerned about that.

10:12:25    8    Q.    All right.  I'm going to show you Exhibit 63 --

10:12:34    9            MR. LANGSTON:  Sorry, Your Honor.  Move

10:12:36   10    62 evidence.

10:12:38   11            THE COURT:  Any objection?

10:12:39   12            MS. KENEALLY:  No objection.

10:12:40   13            THE COURT:  Without objection,

10:12:42   14    Government Exhibit 62 is admitted.

10:12:43   15            THE COURT:  Can you make that bigger?

10:12:47   16            MR. LANGSTON:  I'm sorry, 67.  The

10:12:52   17    previous Exhibit 67 is what we're moving into

10:12:54   18    evidence.

10:12:57   19            MS. KENEALLY:  Still no objection.

10:12:58   20            THE COURT:  Without objection, it's

10:13:01   21    admitted.

10:13:01   22            MR. LANGSTON:

10:13:01   23    Q.    Are you able to see that, Mr. Moss?

10:13:03   24    A.    Yes.

10:13:04   25    Q.    Could you tell us what's happening in this

10:13:06  1    e-mail in December of 2018?

10:13:09  2    **A.**   It's a standard e-mail from Bob asking to make

10:13:13  3    a charitable contributions to the Baylor College of

10:13:17  4    Medicine.

10:13:17  5    **Q.**   Do you see the, "Attention:  Seth P. Lerner"?

10:13:21  6    **A.**   Yes.

10:13:22  7    **Q.**   Are you aware Dr. Lerner is the Defendant's

10:13:25  8    urologist?

10:13:25  9    **A.**   I am not, no.

10:13:27  10   **Q.**   Okay.

10:13:28  11              MR. LANGSTON:  I'll offer 63, Your

10:13:31  12   Honor.

10:13:31  13              THE COURT:  Okay.  Any objection?

10:13:32  14              MS. KENEALLY:  No, objection.

10:13:33  15              THE COURT:  Without objections,

10:13:34  16   Defendant -- I mean Government Exhibit's 63 is

10:13:39  17   admitted.

10:13:40  18              MR. LANGSTON:

10:13:40  19   **Q.**   I'm going to now show you Government Exhibit

10:13:42  20   71.  Do you see the date of this e-mail?

10:13:52  21   **A.**   Yes.

10:13:53  22   **Q.**   What's the date?

10:13:55  23   **A.**   October 21, 2019.

10:13:56  24   **Q.**   Okay.  So this is a year later?

10:13:59  25   **A.**   Mm-hmm.

10:13:59  1   Q.   Sorry.   What concern is Mr. Brockman expressing
10:14:03  2   to you in October of 2019?
10:14:05  3   A.   He wanted to make sure that we had our
10:14:08  4   paperwork and could substantiate any -- the excess
10:14:13  5   cash we were building in order to be able to defend
10:14:17  6   any questions regarding accumulated earnings.
10:14:20  7   Q.   Okay.   And so, we've been learning a lot about
10:14:27  8   neurology.   Could you give us a very brief education
10:14:29  9   on accumulated earnings tax?
10:14:29  10  A.   If you can adjust accumulated earnings, which
10:14:33  11  you would be justifying for you, like, to make
10:14:36  12  acquisitions, you are building cash for -- to build
10:14:39  13  a building, you are building cash for certain
10:14:42  14  things, then you are able to justify a reason to
10:14:45  15  build that cash.   Otherwise, the Government would
10:14:48  16  want you to create a dividend for the share holders
10:14:55  17  spare.
10:14:55  18  Q.   If you don't create the dividend what happens?
10:14:58  19  A.   You are taxed.
10:14:59  20  Q.   Mr. Brockman is expressing concern about this
10:15:04  21  accumulated earnings tax?
10:15:06  22  A.   Correct.
10:15:06  23  Q.   Is he also making a prediction to you about
10:15:09  24  what he sees as the future of the auto industry?
10:15:12  25  A.   Let me look back.   That is correct.

10:15:18   1   Q.   What was his prediction in October of 2019?

10:15:21   2   A.   That the vehicle sales were slowing as part of

10:15:24   3   a typical, historical sale cycle.

10:15:26   4   Q.   What was he asking you to do based on his

10:15:30   5   concern about this accumulated earnings tax?

10:15:34   6   A.   He was asking me to draft a document to support

10:15:37   7   that.

10:15:39   8   Q.   In October of 2019, did you go on a hunting

10:15:43   9   trip to Argentina?

10:15:45   10   A.   I believe so.

10:15:46   11   Q.   Okay.   And where exactly in Argentina is this

10:15:50   12   hunting trip?

10:15:51   13   A.   Córdoba.

10:15:52   14   Q.   And what were you hunting?

10:15:55   15   A.   Dove.

10:15:56   16   Q.   Was Mr. Brockman with you on this dove-hunting

10:15:59   17   trip?

10:16:00   18   A.   Yes.

10:16:01   19   Q.   Was he also hunting?

10:16:02   20   A.   Yes.

10:16:03   21   Q.   Did you observe him shooting at all on this

10:16:06   22   trip?

10:16:08   23   A.   No, I don't believe I hunted with him.

10:16:10   24   Q.   Do you know what he was -- what type of gun he

10:16:13   25   was using?

10:16:14  1   **A.**   Um, he used a -- either a .410 or 28-gauge.

10:16:18  2   **Q.**   Those are shotguns?

10:16:19  3   **A.**   Shotguns, excuse me.

10:16:21  4   **Q.**   I understand we are in Texas, so that may be

10:16:24  5   more obvious to everyone else.

10:16:26  6   **A.**   Yes, sir.

10:16:26  7   **Q.**   Did you have any concerns on that trip about

10:16:28  8   his ability to safely handle a gun?

10:16:30  9   **A.**   Zero.

10:16:31  10  **Q.**   Did anyone express to you their concerns about

10:16:36  11  Mr. Brockman's ability to handle a gun safely?

10:16:39  12  **A.**   No.

10:16:39  13  **Q.**   Was that an annual trip?

10:16:41  14  **A.**   It was a regularly annual trip for officers --

10:16:45  15  senior officers.

10:16:46  16  **Q.**   Did you also attend that trip in 2016?

10:16:50  17  **A.**   I believe that's true.

10:16:52  18  **Q.**   Okay.  Was Evatt Tamine on that trip?

10:16:55  19  **A.**   I believe that's correct, yes.

10:16:57  20  **Q.**   And he was actually a roommate?

10:16:59  21  **A.**   Yes.

10:16:59  22  **Q.**   Did Mr. Tamine stay the entire time on that

10:17:02  23  trip?

10:17:02  24  **A.**   No, he left a day or two early.

10:17:04  25  **Q.**   Okay.  Do you remember the reason he gave you

10:17:06  1  for why he left?

10:17:07  2  **A.**   It was related to hurricane coming towards

10:17:11  3  Bermuda.

10:17:13  4  **Q.**   All right.  Now I'll take you to January of

10:17:16  5  2020.  I'm going to show you what's been marked as

10:17:23  6  Government Exhibit 68.

10:17:24  7                MR. LANGSTON:  Before I do that, I

10:17:25  8  offer 71, Your Honor.

10:17:26  9                THE COURT:  Okay.  Any objection?

10:17:28  10                MS. KENEALLY:  No objection, Your

10:17:29  11  Honor.

10:17:29  12                THE COURT:  Okay.  That Government

10:17:31  13  Exhibit 71 is admitted.

10:17:34  14                MR. LANGSTON:

10:17:35  15  **Q.**   This is -- we can zoom in on the top half of

10:17:38  16  the memo.  Okay.  This is an e-mail from

10:17:43  17  Mr. Brockman to you in -- or your copied on this

10:17:45  18  e-mail in January of 2020?

10:17:47  19  **A.**   Okay.

10:17:48  20  **Q.**   Is that true?

10:17:49  21  **A.**   Let me look at it for a second.  He sent this

10:17:56  22  to me.

10:17:56  23  **Q.**   Okay.  And can you give a brief description

10:17:59  24  here of what the issue is that Mr. Brockman is

10:18:01  25  weighing in on?

10:18:04   1   A.   Yes, let me -- this relates to the paragraph

10:18:15   2   that starts, "I just don't want you to think we

10:18:18   3   don't fight for everyone like this.  Your repeated

10:18:20   4   sermonizing on the subject makes it sound like we're

10:18:24   5   not doing our job."

10:18:25   6                    That's what this is in reference

10:18:27   7   to.

10:18:27   8   Q.   Okay.  What's the broader dispute you were --

10:18:30   9   to use his words -- sermonizing about?

10:18:34   10   A.   Yes, when the financial statements would be

10:18:36   11   prepared, I'd often create a cover e-mail.  In the

10:18:40   12   cover e-mail, I would highlight things that needed

10:18:42   13   to be done or needed to be changed from a financial

10:18:46   14   standpoint.

10:18:46   15                    We were losing customers at a rate

10:18:48   16   that was going to negatively impact the financials.

10:18:52   17   So I regularly pointed out we're losing too many

10:18:55   18   customers.

10:18:55   19   Q.   What was Mr. Brockman's response to you?

10:18:57   20   A.   This was the response to that.

10:18:58   21   Q.   Okay.  At this point in January of 2020, did

10:19:06   22   you have any reason to doubt -- to doubt

10:19:10   23   Mr. Brockman's mental competence?

10:19:12   24   A.   None.

10:19:12   25   Q.   And -- well, I understand you may disagree from

10:19:16  1  a business-judgment standpoint about what he's
10:19:19  2  telling you in this e-mail, was he getting any of
10:19:22  3  the facts wrong in this e-mail?
10:19:33  4  **A.**   I didn't know the facts of this particular
10:19:40  5  deal, so I don't know if those -- but he was
10:19:44  6  justifying they were looking at every deal.  So it
10:19:46  7  was an example of him controlling the sales force at
10:19:49  8  that point.
10:19:50  9              MR. LANGSTON:  I'll offer 68, Your
10:19:54  10 Honor.
10:19:54  11             MS. KENEALLY:  No objection.
10:19:54  12             THE COURT:  Without objection,
10:19:57  13 Government Exhibit 68 is admitted.
10:19:58  14             MR. LANGSTON:
10:19:58  15 **Q.**   I'm going to direct your attention to April 9th
10:20:01  16 of 2020.  Are you aware that Mr. Brockman's counsel
10:20:05  17 sent a letter to the Government on that date?
10:20:09  18 **A.**   April 9th?
10:20:09  19 **Q.**   Yes.
10:20:10  20 **A.**   Of --
10:20:11  21 **Q.**   Of 2020.
10:20:12  22 **A.**   No, I'm not aware of that.
10:20:13  23 **Q.**   Okay.  Let me ask you this.  On April 9, 2020,
10:20:17  24 did Mr. Brockman tell you that he had concerns about
10:20:20  25 his mental -- mental abilities?

10:20:22  1   **A.**   No.

10:20:23  2   **Q.**   Are you aware of whether Mr. Brockman had a

10:20:26  3   disability retirement clause in his contract?

10:20:28  4   **A.**   Yes.

10:20:29  5   **Q.**   And did Mr. Brockman have any discussions with

10:20:33  6   you on or around April 9th about exercising that

10:20:35  7   retirement clause?

10:20:36  8   **A.**   Not with Bob, no.

10:20:39  9   **Q.**   Let's fast forward a month later then.

10:20:44  10              MR. LANGSTON:   I'm sorry, Your Honor --

10:20:46  11  **Q.**   Let's fast forward a month.   I'd like to show

10:20:49  12  you Government Exhibit 69.   Can you tell us what's

10:21:06  13  happening here in Government Exhibit 69?

10:21:08  14  **A.**   Can you zoom in, please?

10:21:10  15  **Q.**   Sure.

10:21:26  16  **A.**   Yes, this is -- I'm copied on this e-mail,

10:21:30  17  along with Keith Hill (phonetic), which was the

10:21:33  18  executive vice president of sales, and Tommy Barris.

10:21:36  19  **Q.**   This is an e-mail by Mr. Brockman on May 11,

10:21:40  20  2020?

10:21:40  21  **A.**   Yes.

10:21:41  22  **Q.**   Okay.   Can you give us a brief description of

10:21:44  23  what the discussion that is happening here?

10:21:47  24  **A.**   Yes, this is related to -- we had a product

10:21:50  25  that was related to an acquisition -- created -- it

10:21:54  1   was the IMN that was the newsletter business.  Chris

10:21:58  2   Walsh was trying to salvage this business, and

10:22:01  3   asking to decrease prices to be able to sell it,

10:22:06  4   because sales force was responsible for selling

10:22:10  5   that.

10:22:10  6            And this -- so Chris had -- I had

10:22:13  7   worked with Chris to help him with some of the

10:22:15  8   margin information, and this is Bob's response.  And

10:22:18  9   he was putting us all on notice we were going to run

10:22:21  10  this business into the ground.

10:22:25  11  Q.   So Chris, Mr. Walsh, wanted to invest a little

10:22:29  12  bit more into this business and makes a proposal to

10:22:32  13  Mr. Brockman?

10:22:32  14  A.   Precisely.

10:22:33  15  Q.   This is Mr. Brockman's response?

10:22:36  16  A.   Yes.

10:22:36  17  Q.   This is the first -- the first three

10:22:39  18  paragraphs, if we can zoom in on that.  Are you able

10:22:41  19  to see that right now?

10:22:42  20  A.   Yes.

10:22:42  21  Q.   Okay.  What's Mr. Brockman's discussion about

10:22:45  22  margin here?

10:22:52  23  A.   Well, he's saying in the first -- second

10:22:55  24  paragraph, second sentence that this makes profit

10:22:59  25  ten percent.  It's probably right at zero.  That's

10:23:01  1   -- he would say that there's that much information

10:23:04  2   that we don't have to say that if it's the ten

10:23:06  3   percent margin, it's really probably zero, and why

10:23:12  4   would we do anything that's at zero profit.

10:23:15  5                    And then the second -- the third

10:23:17  6   line is -- 23 percent margin is also not acceptable,

10:23:21  7   and that was typical for our business.  We had -- we

10:23:26  8   had, you know, margins in the hundreds of

10:23:28  9   percentiles.  So, for a software company that's --

10:23:31  10  that's what he required.

10:23:32  11  Q.   Okay.  So those two paragraphs are his analysis

10:23:34  12  of the profitability of this newsletter?

10:23:38  13  A.   That.

10:23:39  14  Q.   Okay.  Ask then, does he set forth kind of a

10:23:42  15  path forward?

10:23:43  16  A.   Yes.  Then he's -- the in the fourth paragraph

10:23:47  17  he says, "We need to exit in business gracefully,"

10:23:51  18  and that's what we were in the process of doing.

10:23:53  19  Q.   Okay.  Was there any action taken as a result

10:23:56  20  of Mr. Brockman's e-mail?

10:23:57  21  A.   Not that I'm aware of.  Would have been for

10:24:00  22  Chris Walsh to --

10:24:01  23  Q.   Okay.  Was -- was this Mr. Brockman's call to

10:24:05  24  make in May of 2020?

10:24:07  25  A.   Absolutely.

10:24:09   1          MR. LANGSTON:  I'll offer 69, Your

10:24:11   2    Honor.

10:24:11   3          THE COURT:  Okay.

10:24:12   4          MS. KENEALLY:  Your Honor, we're not

10:24:13   5    going to object to the fact these are e-mails

10:24:16   6    between Mr. Brockman and Mr. Moss.  We do, at this

10:24:20   7    point, question the relevance of this as to

10:24:26   8    Mr. Brockman's competency today, and to what's

10:24:30   9    becoming rather cumulative nature of going through

10:24:33   10   these e-mails.

10:24:34   11         THE COURT:  Okay.  Objection overruled.

10:24:39   12         THE COURT:  Which exhibit?

10:24:40   13         MR. LANGSTON:  69, Your Honor.

10:24:42   14         THE COURT:  Government Exhibit 69 is

10:24:43   15   admitted.

10:24:44   16         MR. LANGSTON:

10:24:44   17   Q.   Mr. Moss, are you familiar with something at

10:24:47   18   Reynolds and Reynolds called the executive

10:24:50   19   committee?

10:24:50   20   A.   Yes, sir.

10:24:51   21   Q.   What is the executive committee?

10:24:55   22   A.   The executive committee was formed preceding

10:24:58   23   Tommy Barris's promotion, and it was a subject

10:25:00   24   matter of experts from each of the major areas.  And

10:25:04   25   they created -- well, a pseudo board of directors to

```
10:25:10   1   be able to make decisions, and talk through
10:25:12   2   strategies and all of that.
10:25:14   3   Q.   Okay.  Who decided who the members of the
10:25:18   4   executive committee were?
10:25:19   5   A.   Bob and Tommy.
10:25:21   6   Q.   I'm going to direct your attention to June of
10:25:24   7   2020.  Was there a -- was there announced June of
10:25:30   8   2020 a restructuring of the senior leadership of
10:25:33   9   Reynolds and Reynolds?
10:25:33  10   A.   Yes.
10:25:33  11   Q.   And did you get a different job as a result of
10:25:37  12   that?
10:25:38  13   A.   I got the same job, different title.
10:25:41  14   Q.   Okay.
10:25:43  15   Q.   Was Mr. Barris promoted during that time
10:25:47  16   period?
10:25:47  17   A.   Yes.
10:25:47  18   Q.   Okay.  Following this restructuring -- I'll
10:25:52  19   show you Government 51.  Is this an e-mail between
10:26:04  20   you and Mr. Brockman in July of 2020?
10:26:06  21   A.   That's correct.
10:26:07  22   Q.   Okay.  So this is after that restructuring we
10:26:09  23   discussed?
10:26:10  24   A.   Yes.
10:26:10  25   Q.   And you are discussing what his salary is going
```

10:26:13   1    to be that year?

10:26:14   2    **A.**   His bonus.

10:26:15   3    **Q.**   His bonus.  Was there any change in his

10:26:18   4    compensation package from before this restructuring

10:26:21   5    to after the restructuring?

10:26:23   6    **A.**   Not at that point, no.

10:26:25   7    **Q.**   Who was the CEO of Reynolds and Reynolds before

10:26:27   8    the restructuring?

10:26:28   9    **A.**   Bob Brockman.

10:26:29   10   **Q.**   Who was the CEO of Reynolds and Reynolds after

10:26:33   11   the restructuring?

10:26:33   12   **A.**   Bob Brockman.

10:26:34   13   **Q.**   Who was the chairman before?

10:26:36   14   **A.**   Bob Brockman.

10:26:37   15   **Q.**   Who was the chairman after?

10:26:38   16   **A.**   Bob Brockman.

10:26:40   17   **Q.**   Okay.  In August of 2020, did --

10:26:44   18                 MR. LANGSTON:  We'll offer 51, Your

10:26:46   19   Honor.

10:26:46   20                 THE COURT:  Same objection?

10:26:47   21                 MS. KENEALLY:  Same objection.

10:26:48   22                 THE COURT:  Objection overruled.

10:26:51   23   Government Exhibit 51 is admitted.

10:26:54   24                 MR. LANGSTON:

10:26:55   25   **Q.**   Directing your attention to August of 2020, did

```
10:26:58  1  the company issue a dividend in August of 2020?
10:27:02  2  A.   That's correct.
10:27:04  3  Q.   And can you give us sort of a -- can you give
10:27:07  4  us a brief description of the circumstances leading
10:27:10  5  up to that dividend?
10:27:12  6  A.   The dividend was -- the trust had run out of --
10:27:19  7  run out of money, or their funds were frozen so they
10:27:22  8  couldn't make payments to the recipients of the
10:27:25  9  dividend.   And we were asked --
10:27:30 10  Q.   I'm sorry, Mr. Moss.   Having trouble hearing.
10:27:32 11  Sorry, go ahead.   Trust was running --
10:27:35 12  A.   The trust was either out of money or wasn't
10:27:38 13  able to access their money, and we were asked to
10:27:40 14  step into their shoes and make payments to the
10:27:42 15  beneficiaries.
10:27:44 16  Q.   And did you believe that was a good idea?
10:27:46 17  A.   Believed that was a bad idea.
10:27:48 18  Q.   Okay.   So what did you want to do instead?
10:27:50 19  A.   Instead -- I didn't have an instead.   I just --
10:27:54 20  they were trying to do that -- they were treating it
10:27:56 21  as extremely urgent.   And Bob had taught us over the
10:27:59 22  years that if something is urgent, you need to pause
10:28:03 23  and not act on it.
10:28:05 24            And so I did exactly that, and I
10:28:07 25  objected to that because they were trying to do that
```

10:28:09   1   at the point with -- without any board resolutions.

10:28:14   2   Q.   So you wanted -- rather than making the

10:28:16   3   payments directly, a dividend to be declared and go

10:28:18   4   through the proper channels?

10:28:20   5   A.   Yes, makings the payments was not the issue.

10:28:23   6   Making sure the paperwork was in place.

10:28:25   7   Q.   Okay.   What was the total amount of the

10:28:27   8   dividend?   Why don't I put 52 up on the screen.   If

10:28:40   9   we can zoom in on that first paragraph, I believe --

10:28:48   10   sorry, the next one.   First big one.   Was it about

10:28:56   11   eleven and a half million dollars?

10:29:01   12   A.   Yes.

10:29:02   13   Q.   And so this is the declaration that you wanted

10:29:06   14   to have happen, Exhibit 52?

10:29:08   15   A.   Yes.

10:29:08   16   Q.   Declaring an $11 million dividend?

10:29:11   17   A.   Yes.

10:29:12   18   Q.   Who signed this paperwork?

10:29:17   19   A.   We can --

10:29:20   20   Q.   Why don't I show you Page 2.

10:29:26   21   A.   Yes.   Bob Brockman.

10:29:30   22   Q.   Why was he one of the people that had to sign

10:29:33   23   this?

10:29:33   24   A.   He was a board -- member of the board of

10:29:37   25   directors.

10:29:37    1    Q.    Okay.  So in August in -- August 13th of 2020,
10:29:43    2    did Mr. Brockman express concern to you about his
10:29:46    3    qualification to authorize this eleven and a half
10:29:48    4    million dollar dividend?
10:29:49    5    A.    No.
10:29:50    6    Q.    Did anyone at the company express concerns
10:29:52    7    about Mr. Brockman's qualification or ability to
10:29:54    8    sign this document?
10:29:55    9    A.    No.
10:29:56   10    Q.    At some point, did you learn --
10:29:58   11                MR. LANGSTON:  We'll offer 52, Your
10:30:00   12    Honor.  I'm sorry.
10:30:00   13                THE COURT:  Okay.  Objection?
10:30:02   14                MS. KENEALLY:  No objection.
10:30:05   15                THE COURT:  Same objection?
10:30:06   16                MS. KENEALLY:  No objection.
10:30:07   17                THE COURT:  Okay.  No objection.
10:30:09   18    Government Exhibit 52 is admitted.
10:30:13   19                MR. LANGSTON:
10:30:13   20    Q.    And at some point, did you learn the board of
10:30:16   21    directors had changed?
10:30:18   22    A.    It was after this, yes.
10:30:19   23    Q.    Was that in November of 2020?
10:30:21   24    A.    That sounds about right.
10:30:22   25    Q.    Okay.  Who were the new director?

10:30:26   1   **A.**   The new director Tommy Barris and Jim Jackson.

10:30:35   2   **Q.**   Are you familiar with who Tommy Barris is?

10:30:38   3   **A.**   Painfully.

10:30:40   4   **Q.**   What is Mr. Barris's relationship to

10:30:42   5   Mr. Brockman?

10:30:43   6   **A.**   Um, he was executive vice president of software

10:30:46   7   development, and had worked with Bob for 30-plus

10:30:50   8   years.

10:30:50   9   **Q.**   Who is Jim Jackson?

10:30:52   10   **A.**   Jim Jackson was the preacher at Chapelwood

10:31:00   11   United Methodist Church and came on board with us to

10:31:02   12   be our corporate spiritual guidance person or

10:31:06   13   something to that effect.

10:31:06   14   **Q.**   Was Mr. Brockman and Mr. Barris -- were they

10:31:11   15   congregates at Chapelwood Church?

10:31:12   16   **A.**   That's my understanding.

10:31:13   17   **Q.**   And other than his relationship with

10:31:15   18   Mr. Brockman and Mr. Barris, did Mr. Jackson have

10:31:16   19   any qualifications to be on the board of directors

10:31:17   20   of a software company?

10:31:18   21   **A.**   Zero.

10:31:20   22   **Q.**   And was the executive committee consulted about

10:31:24   23   placing Mr. Jackson on the board?

10:31:25   24   **A.**   Not at all.

10:31:26   25   **Q.**   I'll direct your attention now to November 13th

10:31:30  1   of 2020, and we'll put Exhibit 70 up on the screen.

10:31:46  2   So this is an e-mail from Mr. Brockman to you on

10:31:49  3   November 13th of 2020?

10:31:50  4   A.   Yes.

10:31:51  5   Q.   Was this e-mail sent to you before or after you

10:31:55  6   learned of Mr. Brockman's indictment?

10:31:59  7   A.   That would be after.

10:32:00  8   Q.   And can you give a brief sort of description of

10:32:06  9   the background behind Mr. Brockman's son being on

10:32:10  10  the Reynolds's healthcare plan?

10:32:15  11  A.   Yes, his son had been on the medical plan for

10:32:17  12  years and years.  At the time, I was CFO, he --

10:32:21  13  became CFO he was already on that plan.  Then

10:32:25  14  shortly -- he got married.  His wife had a baby.

10:32:29  15           This all kind of came to a head at

10:32:31  16  that point.  I had on my -- on my review -- or

10:32:35  17  regular review was to prepare the company for sale.

10:32:39  18  He had both his son, daughter-in-law, and baby, as

10:32:44  19  well as household staff on the medical plan.  We

10:32:47  20  were trying to clear that up, because that wasn't

10:32:50  21  the way that was supposed to happen.

10:32:51  22  Q.   Okay.  At the time in 2020 when they were on

10:32:55  23  the medical plan, were any of them employees of

10:32:57  24  Reynolds's?

10:32:59  25  A.   No.

10:33:00    1    Q.    As a general rule, do you have to be an

10:33:02    2    employee of the company to be on their healthcare

10:33:04    3    plan?

10:33:04    4    A.    Yes.

10:33:05    5    Q.    Okay.  So in November of 2020, what was

10:33:09    6    Mr. Brockman asking you to do?

10:33:10    7    A.    In this e-mail?

10:33:11    8    Q.    Yes.

10:33:12    9    A.    He's not -- I don't believe he's -- oh, he's

10:33:15    10    asking me to submit a report of how much money he

10:33:18    11    owed us for the back -- back previous years that

10:33:22    12    these people were on the plan and hadn't been paying

10:33:25    13    for it.

10:33:26    14    Q.    So this is sort of -- this is helping to

10:33:31    15    resolve the issue?

10:33:32    16    A.    Yes.

10:33:32    17    Q.    Related to the healthcare plan?

10:33:34    18    A.    It was a cleanup process.

10:33:36    19    Q.    Okay.

10:33:42    20                MR. LANGSTON:  I'll offer Exhibit 70,

10:33:43    21    Your Honor.

10:33:43    22                THE COURT:  Okay.  Objection?

10:33:45    23                MS. KENEALLY:  No objection.

10:33:46    24                MR. LANGSTON:  No further questions.

10:33:47    25                THE COURT:  Government Exhibit 70 is

10:33:48  1  admitted.

10:33:49  2          MR. LANGSTON:   Sorry.  No further

10:33:51  3  questions, Your Honor.   Thank you.

10:33:57  4          THE COURT:   You may proceed whenever

10:33:58  5  you are ready.

10:33:58  6                **CROSS-EXAMINATION**

10:33:58  7  **BY MS. KENEALLY:**

10:34:03  8  **Q.**   Good morning, Mr. Moss.

10:34:04  9  **A.**   Morning.

10:34:04  10  **Q.**   We've never spoken before; correct?

10:34:06  11  **A.**   I don't believe so.

10:34:07  12  **Q.**   I'm sorry, I'm having trouble hearing you?

10:34:10  13  **A.**   I don't believe so.  I don't know what your

10:34:11  14  name is.

10:34:12  15  **Q.**   My name is Kathy Keneally.  Good morning,

10:34:15  16  Mr. Moss.  Do you remember speaking with me before?

10:34:17  17  **A.**   I do not believe so.

10:34:18  18  **Q.**   Have you ever spoken with any member of the

10:34:21  19  defense legal team?

10:34:23  20  **A.**   Not that I'm aware of.

10:34:25  21  **Q.**   You did speak with the Government, though;

10:34:26  22  correct?

10:34:27  23  **A.**   Yes.

10:34:27  24  **Q.**   Um, how many occasions have you spoken with the

10:34:30  25  Government?

10:34:31  1    A.   Two.

10:34:32  2    Q.   And when was the first time?

10:34:34  3    A.   June of 2019, I believe.

10:34:38  4    Q.   Second time?

10:34:40  5    A.   Week ago.

10:34:48  6    Q.   Fair to say Mr. Brockman had reduced his

10:34:50  7    involvement in Reynolds and Reynolds in the last few

10:34:52  8    years?  Stepping back?  Slowing down?

10:34:56  9    A.   Certainly did after the indictments -- or

10:34:58  10   subpoenas had been issued, yes.

10:35:00  11   Q.   Well, prior to the indictment?

10:35:03  12   A.   Shortly before the indictment, his -- his -- he

10:35:07  13   did not come to the office as often and he was, you

10:35:11  14   know -- his access was limited.

10:35:13  15   Q.   When -- when you met with the Government in

10:35:16  16   June of 2020, do you recall telling the Government

10:35:19  17   that Mr. Brockman had been slowing down for about

10:35:22  18   two years prior to that?

10:35:24  19   A.   No, I don't recall that.

10:35:25  20   Q.   You don't remember saying that to the

10:35:26  21   Government?

10:35:27  22   A.   No.

10:35:29  23   Q.   Have you been told Bob has Parkinson's disease?

10:35:31  24   A.   Yes.

10:35:32  25   Q.   When did you learn that?

| | | |
|---|---|---|
| 10:35:32 | 1 | **A.**   Jim Jackson told me that on a return trip from |
| 10:35:40 | 2 | Dayton.  I don't recall the date. |
| 10:35:44 | 3 | **Q.**   Approximate date?  Year? |
| 10:35:48 | 4 | **A.**   2019, 2020 -- one of those. |
| 10:35:55 | 5 | **Q.**   So Reynolds and Reynolds -- who owns Reynolds |
| 10:36:00 | 6 | and Reynolds? |
| 10:36:00 | 7 | **A.**   The trust. |
| 10:36:01 | 8 | **Q.**   So immediately above Reynolds and Reynolds, |
| 10:36:04 | 9 | that would be -- |
| 10:36:05 | 10 | **A.**   UCSH. |
| 10:36:06 | 11 | **Q.**   Universal Computers Services Holding? |
| 10:36:08 | 12 | **A.**   Yes. |
| 10:36:08 | 13 | **Q.**   Above that UCSH? |
| 10:36:10 | 14 | **A.**   Yes. |
| 10:36:11 | 15 | **Q.**   UCSH is?  I get this wrong every time. |
| 10:36:14 | 16 | **A.**   The name? |
| 10:36:15 | 17 | **Q.**   Yeah. |
| 10:36:15 | 18 | **A.**   Universal Computer Systems Holding. |
| 10:36:22 | 19 | **Q.**   And where are those companies located? |
| 10:36:26 | 20 | **A.**   The US, Delaware. |
| 10:36:29 | 21 | **Q.**   Where are the business operations? |
| 10:36:30 | 22 | **A.**   Houston and Dayton, Ohio. |
| 10:36:36 | 23 | **Q.**   Approximately how many people do they employ at |
| 10:36:38 | 24 | those locations? |
| 10:36:39 | 25 | **A.**   About 4,500 employees. |

10:36:44  1   Q.   And --
10:36:45  2   A.   I'm sorry, go ahead.
10:36:46  3   Q.   And they're all -- all three of those, they're
10:36:48  4   US tax-paying entities; correct?
10:36:51  5   A.   Yes, always.
10:36:51  6   Q.   And who owns UCSH?
10:36:55  7   A.   Spanish Steps.  Spanish Steps and Pilot.
10:37:04  8   Q.   And ultimately, Spanish Steps is owned by the
10:37:10  9   A. Eugene Brockman Charitable Trust; is that
10:37:11  10  correct?
10:37:11  11  A.   That's my understanding.
10:37:12  12  Q.   You've known that for a long time; correct?
10:37:15  13  A.   Yes.
10:37:15  14  Q.   Not a secret from you?
10:37:16  15  A.   No.
10:37:17  16  Q.   And, in fact, it's something you've disclosed;
10:37:21  17  correct -- openly disclosed the offshore structure
10:37:25  18  of the ownership of these US companies; correct?
10:37:27  19  A.   To that level, yes.
10:37:47  20  Q.   Now, you -- you mentioned the dividend payments
10:37:58  21  that were made in -- some time in 2020; is that
10:38:04  22  correct?
10:38:04  23  A.   Yes.
10:38:04  24  Q.   And it's my understanding those dividend
10:38:08  25  payments -- those dividends had been made by the

10:38:10  1  company?

10:38:11  2  A.   That's correct.

10:38:11  3  Q.   Which company?

10:38:12  4  A.   I believe that was DCS.

10:38:15  5  Q.   And were those dividend payments made to the

10:38:19  6  shareholder, or were they made to pay obligations of

10:38:26  7  the shareholder?

10:38:27  8  A.   That's correct.

10:38:27  9  Q.   Choice --

10:38:28  10  A.   The second one.

10:38:29  11  Q.   The second one.  So the dividend payments made

10:38:31  12  in 2020 were made -- obligations ultimately of the

10:38:35  13  A. Eugene Brockman Charitable Trust?

10:38:38  14  A.   That's my understanding, yes.

10:38:40  15  Q.   Am I right those dividend payments went to

10:38:44  16  charities?

10:38:45  17  A.   Charities and schools.

10:38:46  18  Q.   Charities and schools?

10:38:47  19  A.   Yes.

10:38:47  20  Q.   Based primarily in Houston; correct?

10:38:51  21  A.   Primarily, yes.

10:38:53  22  Q.   So basically what had happened was the trust

10:38:56  23  had made commitments to make charitable

10:38:59  24  contributions, and those charitable contributions --

10:39:01  25  the trust ran into a financial liquidity issue so

10:39:05  1    the company made those charitable contributions;

10:39:08  2    correct?

10:39:08  3    **A.**   That's correct.

10:39:09  4                 THE COURT:   Before we go any further, I

10:39:10  5    want everyone to understand, I'm not stopping your

10:39:13  6    examination, but if the Government starts getting

10:39:15  7    into the merits, I don't want to hear Defense

10:39:17  8    counsel arguing that we're -- that this is a

10:39:20  9    competency hearing and we're not getting into the

10:39:21  10   merits.  So you are free to examine the witness as

10:39:26  11   you wish, but I want to let everyone know if the

10:39:28  12   Government starts getting into the merits of this

10:39:30  13   case, I'm not going to shut them down because we're

10:39:34  14   getting there now.

10:39:37  15                MS. KENEALLY:   Your Honor, I do not

10:39:38  16   believe any of these issues have to do with the

10:39:42  17   merits of the case at all.  These are activities

10:39:45  18   that happened after the events in the indictment.

10:39:48  19   Um, the Government asked questions about decisions

10:39:51  20   made about the operations of the company, and I

10:39:53  21   wanted to put those in context.

10:39:55  22                    Because certain issues were left

10:39:57  23   hanging, in terms of how things were operating.

10:40:02  24                THE COURT:   Sure.  Not a problem.  I --

10:40:04  25                MS. KENEALLY:   More than ready to move

on.

THE COURT:  I'm letting everyone go on, but I'm saying we're pushing very close.  Based on my understanding of the indictment and what's been argued so far, we're going toward talking about the merits of the case, and about certain transactions that were part -- that the Government was alleging was or was not appropriate.

So I'm letting you guys know that if it comes up, then what's good for the goose is good for the gander.

MS. KENEALLY:  Your Honor, if it comes up, we can have that conversation then.  I do represent these are activities taking place after the indictment.  They're not part of the indictment, and they are part of what he was asked on direct.

THE COURT:  Definitely.  I'm saying we're pushing toward that arena.  So continue on.

MS. KENEALLY:

Q.   And just -- the -- the questions that you were asked about the insurance -- the insurance payments, medical insurance payments --

A.   I'm sorry?

Q.   Remember you were being asked questions about healthcare insurance; correct?

```
10:41:16   1    A.   Related to his household staff.
10:41:17   2    Q.   And to the family?
10:41:18   3    A.   Yes.
10:41:18   4    Q.   And so the company was made whole?  Those
10:41:21   5    payments were re-made?
10:41:22   6    A.   I believe so.
10:41:26   7    Q.   You no longer work for Reynolds; do you?
10:41:36   8    A.   That's correct.
10:41:39   9    Q.   Did Mr. Barris ask you to leave Reynolds?
10:41:43   10   A.   It was a result of a discussion that we had in
10:41:49   11   Dayton on the last trip to Dayton.  And I -- he said
10:41:52   12   that I had to make a decision, and I made that
10:41:54   13   decision.
10:42:02   14   Q.   When was the last time you saw Bob Brockman,
10:42:05   15   prior to today?
10:42:06   16   A.   Probably August of last year.
10:42:10   17   Q.   So over a year ago?
10:42:11   18   A.   Yes.
10:42:13   19              MS. KENEALLY:  No further questions.
10:42:15   20              MR. LANGSTON:  No redirect, Your Honor.
10:42:16   21   The witness can be excused.
10:42:17   22              THE COURT:  Thank you, Mr. Moss.
10:42:19   23   Appreciate it, sir.  Thank you for your patience.
10:42:24   24              THE WITNESS:  Absolutely.  Thank you.
10:42:35   25              MR. LANGSTON:  The Government calls
```

| | | |
|---|---|---|
| 10:42:37 | 1 | Evatt Tamine. |
| 10:43:10 | 2 | THE COURT:  Mr. Tamine, if you could |
| 10:43:15 | 3 | step forward, sir.  If you could, just raise your |
| 10:43:17 | 4 | right hand. |

<div align="center">

**EVATT TAMINE,**

**(For the Government)**

</div>

| | | |
|---|---|---|
| 10:43:17 | 7 | called as a Witness, having been duly |
| 10:43:17 | 8 | and regularly sworn, testified as follows: |
| 10:43:26 | 9 | THE WITNESS:  I do. |
| 10:43:27 | 10 | THE COURT:  Please take the stand, sir. |
| 10:43:29 | 11 | When you are on the stand, can you take your mask |
| 10:43:31 | 12 | off.  It's not a problem. |
| 10:43:33 | 13 | THE WITNESS:  Thank you, Your Honor. |

<div align="center">

**DIRECT EXAMINATION**

</div>

BY MR. LANGSTON:

Q.    Good morning, sir.  Could you state your name,
spelling your last name for the record.

A.    Evatt Tamine, T-A-M-I-N-E.

Q.    And, Mr. Tamine, were you offered a job that
involved you have moving to Bermuda in 2003?

A.    I was.

Q.    Who offered you that job?

A.    Mr. Bob Brockman.

Q.    Was Mr. Bob Brockman your official employer?

A.    No, he wasn't.

10:44:09  1   Q.   Who was your employer on paper?

10:44:11  2   A.   A company called Tangarra Consultants Limited.

10:44:15  3   Q.   In reality, who did you view your employer to

10:44:18  4   be?

10:44:18  5   A.   I considered Mr. Brockman as my employer.

10:44:20  6   Q.   How long did you work for Mr. Brockman?

10:44:22  7   A.   About 14 years, from -- from that period for

10:44:26  8   about 14 years.

10:44:27  9   Q.   So from 2003 to about 2018?

10:44:31  10  A.   January 2004.

10:44:33  11  Q.   During the 14 years you worked for

10:44:36  12  Mr. Brockman, did you submit formal performance

10:44:39  13  reviews to him?

10:44:39  14  A.   I did.

10:44:40  15  Q.   Did Mr. Brockman formally evaluate your

10:44:45  16  performance on an annual basis?

10:44:48  17  A.   Roughly on an annual basis.

10:44:50  18  Q.   Were these reviews that Mr. Brockman gave

10:44:51  19  you -- were they written or oral?

10:44:52  20  A.   Written and oral.

10:44:53  21  Q.   Who set your salary?

10:44:55  22  A.   Mr. Brockman.

10:44:56  23  Q.   What was your starting compensation when you

10:45:00  24  moved to Bermuda in 2004?

10:45:02  25  A.   I think it was about $150,000 with benefits.

10:45:07  1   Q.   What was your total compensation the last full

10:45:10  2   year you worked for him?

10:45:11  3   A.   $2.6 million.

10:45:12  4   Q.   As part of your duties and respondents while

10:45:14  5   working for Mr. Brockman, did you help administer

10:45:17  6   the A. Eugene Brockman Charitable Trust?

10:45:22  7   A.   I did.

10:45:22  8   Q.   Can we call that The Brockman Trust to save the

10:45:26  9   court reporter?

10:45:26  10   A.   Yes.

10:45:27  11   Q.   What was the name of the trustee of The

10:45:30  12   Brockman Trust?

10:45:30  13   A.   St. John's Trust Company, PVT, Limited.

10:45:37  14   Q.   And -- so this was a corporate trust company?

10:45:41  15   A.   A corporate trustee.

10:45:44  16   Q.   Prior to 2010, who was the director of

10:45:48  17   St. John's?

10:45:48  18   A.   There were several directors, but the main

10:45:51  19   director was a man by the name of Gordon Howard.

10:45:55  20   Q.   As part of your duties, were you responsible

10:45:57  21   for passing on direction to Mr. Howard?

10:46:00  22   A.   Yes, from time to time.

10:46:01  23   Q.   Beginning in 2010, who was the director of the

10:46:06  24   St. John's Trust Company?

10:46:08  25   A.   At some point in 2010 -- I think in August -- I

10:46:10  1  became director as as well.

10:46:13  2  Q.   Who directed you to become the director?

10:46:15  3  A.   Mr. Brockman.

10:46:16  4  Q.   And as the director of the St. John's Trust

10:46:20  5  Company, were you, on paper, the person who

10:46:23  6  controlled The Brockman Trust?

10:46:24  7  A.   I was the director of the trustee, yes.

10:46:27  8  Q.   In reality, who controlled and gave direction

10:46:31  9  to the trust?

10:46:32  10  A.   Directions were given from time to time by

10:46:35  11  Mr. Brockman.

10:46:35  12  Q.   And who made all of these substantive and

10:46:40  13  strategic decisions?

10:46:41  14  A.   For the most part it was Mr. Brockman.

10:46:42  15  Q.   And did anything material ever happen in

10:46:45  16  relation to The Brockman Trust that was not ordered

10:46:47  17  or approved by Mr. Brockman?

10:46:49  18  A.   For the most of the time, no.

10:46:52  19  Q.   Are you familiar with an entity known as Point

10:46:55  20  Investments?

10:46:55  21  A.   I am.

10:46:56  22  Q.   What is Point Investments?

10:46:58  23  A.   It is a private mutual fund.

10:47:01  24  Q.   What is the relationship between Point

10:47:03  25  Investments and The Brockman Trust?

10:47:05  1   A.    An entity that is owned -- ultimately owned by

10:47:09  2   The Brockman Trust is an investor into Point

10:47:11  3   Investments.

10:47:12  4   Q.    Okay.  So Point Investments is the bottom, and

10:47:15  5   The Brockman Trust is at the top?

10:47:16  6   A.    Yes, effectively.

10:47:19  7   Q.    Simplifying a little bit.  During the 14 years

10:47:22  8   you worked for Mr. Brockman, did Point Investments

10:47:26  9   have investments in Vista Equity Partners?

10:47:32  10  A.    Yes.

10:47:32  11  Q.    And were those investments profitable?

10:47:35  12  A.    Yes.

10:47:35  13  Q.    Were the profits greater or less than

10:47:39  14  $1 billion?

10:47:39  15  A.    They were greater.

10:47:41  16  Q.    As far as you were aware, were any of these

10:47:43  17  profits ever reported on a US tax return?

10:47:46  18  A.    I'm not aware.

10:47:48  19  Q.    Are you familiar with a company known as

10:47:50  20  Universal Computer Systems, and then later becoming

10:47:54  21  Reynolds and Reynolds?

10:47:55  22  A.    Yes.

10:47:55  23  Q.    Who was the CEO of Reynolds and Reynolds?

10:47:57  24  A.    Mr. Brockman.

10:47:58  25  Q.    Was Reynolds and Reynolds an asset of the

10:48:00   1    trust?

10:48:01   2    **A.**    Yes.

10:48:02   3    **Q.**    And was -- at the time you concluded in 2018,

10:48:10   4    was Reynolds and Reynolds worth more or less than

10:48:13   5    $5 billion?

10:48:13   6    **A.**    Hard to say.  I don't know.

10:48:16   7    **Q.**    Okay.  In addition to The Brockman Trust, were

10:48:19   8    you also directed by Mr. Brockman to oversee other

10:48:22   9    offshore structures?

10:48:23  10    **A.**    Yes.

10:48:24  11    **Q.**    And did one of those structures purchase a

10:48:28  12    yacht called the Turmoil, and I think later renamed

10:48:31  13    the Albula?

10:48:33  14    **A.**    Yes.

10:48:33  15    **Q.**    Who made the decision to purchase the yacht?

10:48:35  16    **A.**    The decision came from Mr. Brockman.

10:48:38  17    **Q.**    Did one of those structures own property in

10:48:40  18    Aspen, and a fishing ranch in Colorado?

10:48:43  19    **A.**    Yes.

10:48:43  20    **Q.**    Who was the primary user of those properties?

10:48:46  21    **A.**    The person who rented the properties was

10:48:48  22    Mr. Brockman.

10:48:49  23    **Q.**    Okay.  Who gave the direction concerning those

10:48:51  24    properties?

10:48:51  25    **A.**    I don't know about the first property, because

10:48:53  1    I wasn't working at the time, but in relation to the

10:48:56  2    second property, the fishing property, it was

10:48:58  3    Mr. Brockman.

10:48:59  4    Q.   And the first property, the Aspen property, was

10:49:03  5    Mr. Brockman the only lessee?

10:49:08  6    A.   Yes, he paid full rent for the property.

10:49:11  7    Q.   Did you do a large scanning project on behalf

10:49:14  8    of Mr. Brockman?

10:49:15  9    A.   Yes.

10:49:18  10   Q.   What documents did you scan?

10:49:20  11   A.   Every document that existed anywhere in

10:49:22  12   relation to any of the entities.

10:49:24  13   Q.   Okay.  Was this a one-time project or was it an

10:49:28  14   ongoing task?

10:49:29  15   A.   It was an ongoing task.

10:49:30  16   Q.   And as part of the scanning project -- or part

10:49:33  17   of this ongoing task, did you save all of the

10:49:36  18   correspondence between you and Mr. Brockman?

10:49:38  19   A.   It was my practice to save everything, yes.

10:49:40  20   Q.   Okay.  Did you generally either scan or add

10:49:44  21   electronic copies of new documents that were being

10:49:48  22   created?

10:49:48  23   A.   Yeah.  As best I could, yes.

10:49:50  24   Q.   And did you do this at or near the time they

10:49:53  25   were created?

10:49:54  1   **A.**   I tried to.

10:49:55  2   **Q.**   Did you save your performance reviews?

10:49:57  3   **A.**   Yes.

10:49:58  4   **Q.**   Did you save your to-do lists from

10:50:01  5   Mr. Brockman?

10:50:02  6   **A.**   Yes.

10:50:05  7   **Q.**   Did you save memos you and Mr. Brockman wrote

10:50:07  8   back and forth to each other?

10:50:08  9   **A.**   Yes.

10:50:09  10  **Q.**   Was Mr. Brockman aware that you were saving all

10:50:12  11  of this?

10:50:12  12  **A.**   Yes.

10:50:14  13  **Q.**   I'd like to direct your attention to

10:50:16  14  September 5, 2018.  What happened that day?

10:50:20  15  **A.**   I was in the United Kingdom when I received a

10:50:24  16  phone call that a search warrant had been executed

10:50:26  17  at my home office in Bermuda.

10:50:29  18  **Q.**   Was there a copy of that master document file

10:50:32  19  we just discussed inside your house that day?

10:50:35  20  **A.**   Yes.

10:50:35  21  **Q.**   Did you also have a copy of that with you?

10:50:38  22  **A.**   Yes.

10:50:39  23  **Q.**   So that master documents file included all of

10:50:44  24  the documents you had scanned from Mr. Brockman; is

10:50:46  25  that fair?

10:50:46   1   **A.**   Yes.

10:50:46   2   **Q.**   As well as all of the correspondence?

10:50:48   3   **A.**   Yes.

10:50:49   4   **Q.**   And subsequent to the search warrant, do you

10:50:53   5   provide a copy of that file to the Government

10:50:55   6   through your lawyers?

10:50:56   7   **A.**   Yes.

10:50:57   8   **Q.**   And do they provide a record spanning 14-year

10:51:02   9   employment with Mr. Brockman?

10:51:02   10   **A.**   Yes.

10:51:03   11   **Q.**   And do those records reflect the direction he

10:51:05   12   exercised over the trust?

10:51:06   13   **A.**   It -- it reflects directions given by

10:51:10   14   Mr. Brockman from time to time, yes.

10:51:11   15   **Q.**   Okay.  Mr. Tamine, did you sign an immunity

10:51:16   16   agreement with the Government?

10:51:17   17   **A.**   I did.

10:51:17   18   **Q.**   And what are the terms, as you understand, to

10:51:20   19   that agreement?

10:51:21   20   **A.**   I am to give full and frank answers and assist

10:51:24   21   the Department of Justice and appear as needed.  But

10:51:29   22   I have no immunity from perjury.

10:51:33   23   **Q.**   Let's look at the some of the documents that

10:51:35   24   were on that hard drive.  I'm going to show you

10:51:38   25   Exhibit 10.  Do you recognize Exhibit 10?

10:52:03  1   A.   Yes, it is an e-mail -- e-mail exchanges

10:52:06  2   between me and Mr. Brockman.

10:52:08  3   Q.   We're zooming in on the top portion, which is

10:52:11  4   sort of the "To or From" section.

10:52:14  5                   Who is Permit?

10:52:16  6   A.   Mr. Brockman.

10:52:16  7   Q.   And who is Red Rish?

10:52:18  8   A.   Me.

10:52:19  9   Q.   Over the 14 years you worked for Mr. Brockman

10:52:25  10  did anyone -- was there another Permit, other than

10:52:27  11  Mr. Brockman?

10:52:27  12  A.   No.

10:52:28  13  Q.   Was there another Red Rish, other than you?

10:52:30  14  A.   No.

10:52:31  15  Q.   What is lambdaprime.org?

10:52:34  16  A.   An e-mail server we were using for a period.

10:52:36  17  Q.   Was that e-mail server encrypted?

10:52:41  18  A.   Yes.

10:52:41  19  Q.   Was that a series of e-mail systems you used to

10:52:44  20  communicate with Mr. Brockman?

10:52:45  21  A.   Yes.

10:52:45  22  Q.   Whose decision was it for you and Mr. Brockman

10:52:49  23  to communicate using these encrypted servers?

10:52:52  24  A.   Mr. Brockman's.

10:52:53  25  Q.   And do you know why he wanted the security --

10:52:56  1  these security systems in place for your

10:52:59  2  communications between him and you?

10:53:01  3  **A.**   To the best of my knowledge, Mr. Brockman was

10:53:03  4  very keen on security.  Um, for a number of reasons

10:53:07  5  he was very keen on privacy.

10:53:10  6  **Q.**   Was one of those reasons that he wanted to

10:53:12  7  prevent government agencies from knowing he was

10:53:14  8  communicating and giving you direction?

10:53:16  9  **A.**   Well, he wanted our communications, yes, not to

10:53:19  10  be seen by government bodies.

10:53:23  11  **Q.**   Were your e-mails, including this e-mail from

10:53:26  12  these part of the documents, seized at your Bermuda

10:53:30  13  home and that you gave to the US Government in

10:53:33  14  September of 2018?

10:53:33  15  **A.**   I can't say which one this came from.  But,

10:53:36  16  yes, it is from one of those.

10:53:37  17  **Q.**   Okay.  Let's go to the last page of the

10:53:39  18  document.  If we can zoom in on the first-in-time

10:53:50  19  e-mail.  This is an e-mail from Mr. Brockman to you?

10:53:55  20  **A.**   Yes.

10:53:55  21  **Q.**   Okay.  And he says to you, "Have you considered

10:53:59  22  the security issues with moving the laptops to

10:54:02  23  Bermuda, especially the big-image documents file"?

10:54:06  24  **A.**   Yes.

10:54:07  25  **Q.**   And that big-image documents file is the backup

10:54:10   1   that we've been discussing?

10:54:11   2   A.   Yes.

10:54:12   3   Q.   Why did Mr. Brockman say that he would expect

10:54:16   4   that you would not be connecting through the United

10:54:19   5   States?

10:54:19   6   A.   I can't say for sure.  Um, I was coming from

10:54:23   7   Europe, and I -- I can't say.  I imagine because I

10:54:32   8   was flying through Britain.

10:54:35   9   Q.   Was this a concern that Mr. Brockman had that

10:54:37   10   the document file not be seized by US Customs?

10:54:41   11   A.   Yes, possibly.

10:54:42   12   Q.   Let's go to -- actually look at the bottom.

10:54:50   13   A.   Yes.

10:54:50   14   Q.   Okay.  There's a "P.S."

10:54:53   15                 What is "PGP"?

10:54:55   16   A.   I believe stands -- it's an encryption

10:54:57   17   software.  I think it stands for Pretty Good

10:54:59   18   Privacy.

10:55:00   19   Q.   What is Radmin?

10:55:02   20   A.   Another software package.  It's a remote access

10:55:05   21   software package.

10:55:06   22   Q.   That's a software package that allows a person

10:55:08   23   to access a computer in another location over the

10:55:11   24   internet?

10:55:11   25   A.   Yes.

10:55:11  1    Q.    And at this point in 2010, where were you

10:55:15  2    living?

10:55:16  3    A.    In Geneva.   Can I double check?   No, I might

10:55:23  4    have been living back in Bermuda at this point.

10:55:26  5    Q.    Well, this is an e-mail discussing you moving

10:55:28  6    from Switzerland to Bermuda?

10:55:31  7    A.    I was looking at the date.   I thought I

10:55:34  8    returned by the first September.   So, yeah, about

10:55:35  9    that time between Bermuda and Geneva.

10:55:38  10   Q.    During your 14 years that you worked for

10:55:40  11   Mr. Brockman, did he keep a laptop at whatever

10:55:45  12   location you were to be able to access remotely?

10:55:48  13   A.    Not always, but at times, yes.

10:55:51  14   Q.    What is "EE"?

10:55:52  15   A.    It's off the shelf software called Evidence

10:55:58  16   Eliminator.

10:55:58  17   Q.    Okay.

10:56:01  18              MR. LANGSTON:   Offer Exhibit 10, Your

10:56:02  19   Honor.

10:56:02  20              THE COURT:   Any objection?

10:56:04  21              MR. VARNADO:   No objection.

10:56:05  22              THE COURT:   Without objection,

10:56:07  23   Exhibit 10 is admitted -- I'm sorry.

10:56:09  24              MR. LANGSTON:   Yes, Government

10:56:10  25   Exhibit 10.

10:56:10  1              THE COURT:  Government Exhibit 10 is

10:56:12  2  admitted.

10:56:13  3              MR. LANGSTON:

10:56:14  4  **Q.**   Let's look at Government Exhibit 26.  We can

10:56:28  5  actually do the whole e-mail first.

10:56:31  6                   What is Government Exhibit 26?

10:56:33  7  **A.**   It's an e-mail from Mr. Brockman to Don Jones

10:56:39  8  and me.

10:56:39  9  **Q.**   Can you tell us why it doesn't look like a

10:56:42 10  traditional e-mail?

10:56:43 11  **A.**   At this time, we were using fully encrypted

10:56:48 12  e-mails is the way I think it worked.  And the

10:56:51 13  e-mail is received as just a series of characters --

10:56:54 14  unreadable.  And one has to decrypt the e-mail.

10:56:59 15                   And what my practice was, was to

10:57:00 16  decrypt the e-mail, copy it, and paste it into a

10:57:04 17  Word document and save it.

10:57:07 18  **Q.**   Did you ever alter the e-mail from the -- after

10:57:11 19  you decrypted it to the Word document you saved it

10:57:13 20  in?

10:57:14 21  **A.**   No.

10:57:14 22  **Q.**   Did you ever go back after the fact and alter

10:57:16 23  an e-mail after you had saved it?

10:57:18 24  **A.**   No.

10:57:19 25  **Q.**   Did you have a certain naming convention for

10:57:21  1   these e-mails?

10:57:22  2   **A.**   I would have a letter to indicate who the

10:57:24  3   e-mail came from, because there were a number of

10:57:27  4   people on this server.  It wasn't just Mr. Brockman

10:57:29  5   and myself.  Then I'd have the date in the form of

10:57:34  6   year, month, day and then a brief description of

10:57:37  7   what the e-mail was about.

10:57:40  8   **Q.**   What was Mr. Brockman's number -- or letter?

10:57:43  9   **A.**   "P".

10:57:50  10  **Q.**   So this e-mail says -- this e-mail is attaching

10:57:54  11  an article about forensic printer technology?

10:57:58  12  **A.**   Yes.

10:57:58  13  **Q.**   And it says, "Therefore, any document that is

10:58:01  14  created for signature, we must ensure we never use

10:58:04  15  the original that comes out of the laser printer.

10:58:07  16  It needs to be run through a standard copy machine

10:58:09  17  first, and the copy used as an original, as the copy

10:58:12  18  machine does not have sufficient resolution to copy

10:58:15  19  the encoded dots."

10:58:17  20            Was that a -- was that a direction

10:58:22  21  given from Mr. Brockman to you?

10:58:23  22  **A.**   Well, it's written more as a recommendation.  I

10:58:27  23  can tell you I've never done this, so, yeah.  It's

10:58:32  24  just Bob reporting -- Mr. Brockman telling Don and

10:58:36  25  myself.  I don't know it was coming as a direction,

10:58:38   1   but certainly his recommendation on how to do

10:58:43   2   certain things.

10:58:43   3   Q.   Okay.  And then the last paragraph, "As a

10:58:46   4   reminder, we also need to remember that all copy

10:58:48   5   machines/laser printer paper has encoded into it the

10:58:52   6   manufacturer of the paper, as well as the year and

10:58:54   7   month of manufacturer.  For that reason, I always

10:58:58   8   set aside some packets of copy paper with dates on

10:59:01   9   them for potential future use."

10:59:06   10              Is that -- was that a statement that

10:59:09   11   Mr. Brockman made to you on this e-mail?

10:59:10   12   A.   It's -- it's in the e-mail.

10:59:12   13   Q.   And was this e-mail included in the documents

10:59:15   14   obtained by the Government in September of 2018?

10:59:18   15   A.   Yes.

10:59:19   16   Q.   I'm going to show you what I'm going to mark as

10:59:24   17   Government Exhibit 130 -- excuse me, 131.  Sorry,

10:59:42   18   I'll -- may I approach the witness?

10:59:43   19              THE COURT:  You may.

10:59:57   20              MR. LANGSTON:  I'll get better at this,

10:59:58   21   Your Honor, but for housekeeping I'll offer 26.

11:00:01   22              THE COURT:  Okay.  Any objections?

11:00:02   23              MR. VARNADO:  For purposes of this

11:00:04   24   hearing, no objection.

11:00:05   25              THE COURT:  Okay.  Exhibit 26 is

11:00:07  1    admitted solely for purposes of this hearing.

11:00:10  2              MR. LANGSTON:  To save Mr. Varnado,

11:00:13  3    that will be the case for all of the documents for

11:00:15  4    this witness.

11:00:15  5              MR. VARNADO:  That's correct, Your

11:00:16  6    Honor.

11:00:19  7              MR. LANGSTON:

11:00:19  8    Q.   What is Government Exhibit 131?  Do you

11:00:23  9    recognize this?

11:00:24  10   A.   It's an e-mail from Mr. Brockman to Don Jones

11:00:26  11   and myself.

11:00:27  12   Q.   Okay.  Is this the same -- the same type of

11:00:31  13   thing where you copied it into a Word document and

11:00:33  14   then saved it?

11:00:34  15   A.   I -- I believe so.  I can't tell from this

11:00:37  16   document, but I believe so.

11:00:38  17   Q.   Okay.  Mr. Brockman uses the phrase, "The

11:00:46  18   house" in this e-mail.  What does that mean to you?

11:00:48  19   A.   I understand that to mean the IRS.

11:00:50  20   Q.   And does he -- what are the circumstances about

11:00:57  21   this?  What is he reporting to you here?

11:01:02  22   A.   He's reporting on a visit to the offices of

11:01:08  23   Miller & Chevalier, a Washington law firm.

11:01:12  24   Q.   The second name is C-H-E-V-A-L-I-E-R.  He went

11:01:20  25   to that law firm to look through their files?

11:01:23   1   **A.**   I -- yeah, that's what I -- I can only repeat

11:01:26   2   in the e-mail he sent.  But, yes, I assume so.

11:01:28   3   **Q.**   He wrote to you, "I'm going to go through these

11:01:31   4   a page at a time, because I wanted to shred

11:01:34   5   personally anything that was super sensitive before

11:01:36   6   turning them over to the outside document shredding

11:01:42   7   and destruction service."

11:01:43   8   **A.**   That's what he says.

11:01:44   9   **Q.**   And does he also express concerns to you about

11:01:46   10   the amount of information that is being saved in

11:01:48   11   these attorney files?

11:01:54   12   **A.**   Not sure where that is, but I'll assume it's

11:01:56   13   there.

11:01:56   14   **Q.**   "What I want to report to you both is that the

11:01:58   15   volume detail and organization of these files was

11:02:02   16   dumbfounding."

11:02:05   17   **A.**   Just going to read that part.

11:02:18   18   **A.**   Yes.

11:02:18   19   **Q.**   Direct your attention to the bottom.  Is he

11:02:20   20   also telling you to be circumspect about the

11:02:23   21   information you give to attorneys?

11:02:25   22   **A.**   Yes.

11:02:25   23   **Q.**   And he's writing to you, "Be very circumspect

11:02:29   24   as to what we tell them verbally, as it will all be

11:02:33   25   reduced to writing and kept in the file"?

11:02:36  1    **A.**   Yes.

11:02:36  2    **Q.**   Was this one of the documents included on the

11:02:39  3    server that was obtained by the government in

11:02:41  4    September of 2018?

11:02:42  5    **A.**   Yes.

11:02:43  6              MR. LANGSTON:   Offer 131.

11:02:45  7              THE COURT:   Same objection?  -- same.

11:02:47  8              MR. VARNADO:   Same response, Your

11:02:49  9    Honor.

11:02:49  10             THE COURT:   Just for the record, all of

11:02:51  11   the exhibits that are being offered with this

11:02:53  12   witness are admitted for purposes of this hearing

11:02:56  13   only, except where you step in and say that you have

11:02:59  14   another objection.

11:03:00  15             MR. VARNADO:   Correct, Your Honor.  And

11:03:02  16   -- and that really is what the stipulation said at

11:03:04  17   the outset.  Frankly, all of the documents are only

11:03:07  18   being entered into evidence for purposes of this

11:03:09  19   hearing, but I wanted to make that clear,

11:03:13  20   particularly with the ones undated with no

11:03:15  21   identifying characteristics.

11:03:17  22             THE COURT:   Definitely.

11:03:20  23             MR. LANGSTON:

11:03:20  24   **Q.**   Let's look at Government Exhibit 9.   Is

11:03:40  25   Government Exhibit 91 of the performance reviews

11:03:42  1   prepared by Mr. Brockman?

11:03:43  2   **A.**   Yes.

11:03:44  3   **Q.**   Okay.  And he would prepare these for you

11:03:46  4   approximately once per year?

11:03:48  5   **A.**   Approximately, yes.

11:03:48  6   **Q.**   Okay.  And he gives you sort of general goals.

11:03:54  7   Is there a section on general goals?

11:03:57  8   **A.**   Yes.

11:03:57  9   **Q.**   And these are sort of standing instructions to

11:04:01  10  you?

11:04:02  11  **A.**   They are.

11:04:02  12  **Q.**   Okay.  Let's look at those goals.  We'll start

11:04:06  13  at Paragraph 2, second page.  Okay.  "Continue to

11:04:20  14  keep the document image database up to date

11:04:23  15  constantly."

11:04:24  16            Was that again the large file we had

11:04:28  17  been talking about?

11:04:28  18  **A.**   Yes.

11:04:28  19  **Q.**   He was aware you were keeping that file?

11:04:33  20  **A.**   Yes.

11:04:33  21  **Q.**   Let's look at paragraphs 13 and 15.

11:04:38  22  **A.**   Yes.

11:04:38  23  **Q.**   Okay.  And did Mr. Brockman tell you to,

11:04:42  24  "Convert keeping all e-mail and financial reports on

11:04:45  25  an encrypted USB dongle.  Carry it in a different

11:04:49  1   location in luggage when traveling abroad"?

11:04:54  2   **A.**   Yes.

11:04:54  3   **Q.**   Did that reflect a concern of Mr. Brockman's of

11:04:56  4   those files being seized by Customs?

11:04:59  5   **A.**   It's one of his concerns, yes.

11:05:00  6   **Q.**   Number 15 says, "Operate as much as possible in

11:05:04  7   a paperless manner, such that if someone were to

11:05:08  8   come to your door unannounced, everything would be

11:05:10  9   encrypted in digital form"?

11:05:12  10  **A.**   Yes.

11:05:12  11  **Q.**   Did that reflect a concern he had about a

11:05:15  12  potential search of your house?

11:05:16  13  **A.**   I believe so.

11:05:18  14  **Q.**   Let's look at paragraphs 17 and 19.   Number 17,

11:05:26  15  "Run Evidence Eliminator at least weekly on your

11:05:30  16  computer."

11:05:32  17             Is that -- what was the purpose of

11:05:34  18  running Evidence Eliminator weekly?

11:05:36  19  **A.**   Just -- I understood it to be just computer

11:05:39  20  practice.   Evidence Eliminator is a standard form of

11:05:45  21  software, but to make sure there are was nothing

11:05:47  22  lingering on the computers that shouldn't be there.

11:05:49  23  **Q.**   When you say good computer practice, do you

11:05:51  24  mean good security practice, or is this like a --

11:05:54  25  making the computer run more efficiently?

11:05:56   1   A.   Good security practice, and I guess more
11:05:58   2   efficiently.   Bit of both.
11:05:59   3   Q.   Okay.   And number 19, "Get Don's computer
11:06:03   4   environment operating on Radmin."
11:06:06   5               Who is Don?
11:06:07   6   A.   Don is Don Jones.
11:06:08   7   Q.   What was Mr. Jones's role, prior to you coming
11:06:12   8   on board?
11:06:13   9   A.   He was my predecessor, and he looked after
11:06:16   10  communications with various service providers, and
11:06:19   11  directors, and so on.
11:06:22   12  Q.   Okay.   And he helped administer the trust,
11:06:24   13  prior to you -- or gave direction to the trust prior
11:06:26   14  to you coming on board?
11:06:27   15  A.   He helped administer the trust, prior to me
11:06:31   16  coming on board.
11:06:31   17  Q.   This is a 2010 performance review.   Did
11:06:35   18  Mr. Jones have a home in Mississippi in 2010?
11:06:41   19  A.   I don't know.
11:06:42   20  Q.   Okay.   Again, this is -- "Get Don's computer
11:06:48   21  environment operating Radmin."
11:06:51   22               That's that remote access software?
11:06:53   23  A.   It is, yes.
11:06:54   24  Q.   Did Mr. Jones -- at some point did Mr. Jones
11:06:57   25  move to the United States?

11:06:57    1   **A.**   He did.

11:06:58    2   **Q.**   And did he have a computer that he would --

11:07:00    3   that was located in Bermuda that he would access

11:07:02    4   remotely?

11:07:03    5   **A.**   Yes.

11:07:09    6   **Q.**   Are you familiar with the term "open

11:07:10    7   correspondence"?

11:07:10    8   **A.**   Yes.

11:07:11    9   **Q.**   And --

11:07:14   10           MR. LANGSTON:   We'll offer Exhibit 9,

11:07:15   11   Your Honor.

11:07:16   12           MR. VARNADO:   Same response, Your

11:07:17   13   Honor.

11:07:17   14           THE COURT:   Government Exhibit 9 is

11:07:20   15   admitted.

11:07:20   16           MR. LANGSTON:

11:07:20   17   **Q.**   What does the phrase "open correspondence" mean

11:07:24   18   to you?

11:07:24   19   **A.**   Open communications weren't subject to

11:07:26   20   encryption -- in my context, not subject to

11:07:29   21   encryption.

11:07:29   22   **Q.**   Okay.   And so, you and Mr. Brockman had an

11:07:32   23   encrypted e-mail server and encrypted e-mail

11:07:36   24   addresses you would communicate with?

11:07:37   25   **A.**   Yes.

11:07:37 1    Q.    And then, you also had a non-encrypted e-mail
11:07:40 2    address, and Mr. Brockman had his Reynolds and
11:07:44 3    Reynolds e-mail?
11:07:45 4    A.    Yes, but we rarely used that.  Even for
11:07:48 5    innocuous things, we tended to use the e-mail server
11:07:52 6    as a main form of communication.
11:07:53 7    Q.    Okay.  You would also send each other letters?
11:07:55 8    A.    Yes, occasionally.
11:07:56 9    Q.    And part of the reason you would do this would
11:07:59 10   be to create a record of that conversation?
11:08:02 11   A.    From time to time, yes.
11:08:04 12   Q.    Okay.  Let's look at Exhibit 19.  What is
11:08:13 13   Exhibit 19?
11:08:14 14   A.    It's an e-mail from Mr. Brockman to me, sent on
11:08:19 15   the 12th of June, 2011.
11:08:20 16   Q.    And actually, if we could focus on the top half
11:08:24 17   of the e-mail.  What is Mr. Brockman asking you to
11:08:29 18   do?
11:08:34 19   A.    He's asking me to send him a letter as the --
11:08:37 20   as the trustee to asking to investigate the
11:08:42 21   potential for a -- for selling -- management buyout
11:08:47 22   of Reynolds and Reynolds.
11:08:48 23   Q.    Okay.  So he was interested in potential
11:08:54 24   management buyout of Reynolds and Reynolds?
11:08:55 25   A.    Well, he is the CEO.  It was clearly something

| | | |
|---|---|---|
| 11:08:59 | 1 | he thought might work. |
| 11:09:00 | 2 | Q.   Okay.  And he's asking you to send him a letter |
| 11:09:02 | 3 | as trustee, asking him to investigate this |
| 11:09:05 | 4 | possibility? |
| 11:09:06 | 5 | A.   Yes. |
| 11:09:07 | 6 | Q.   And he actually even sort of dictates the text? |
| 11:09:12 | 7 | A.   He gave me some wording, yes. |
| 11:09:14 | 8 | Q.   Okay.  And the first line is, "Dear Bob, |
| 11:09:18 | 9 | congrats on passing your 70th birthday.  I trust |
| 11:09:23 | 10 | that proper celebrations occurred"? |
| 11:09:25 | 11 | A.   Yes. |
| 11:09:26 | 12 | Q.   If we can go to Exhibit 20.  Exhibit 20 is the |
| 11:09:39 | 13 | actual letter that you produced? |
| 11:09:43 | 14 | A.   Yes, I produced my own version of it, yes. |
| 11:09:46 | 15 | Q.   Okay.  If we can look at the first paragraph. |
| 11:09:50 | 16 | "Dear Bob, I would like to extend my personal |
| 11:09:54 | 17 | congratulations on passing your 70th birthday.  I |
| 11:09:57 | 18 | trust that proper celebrations occurred.  I'm sorry |
| 11:10:01 | 19 | I was not there to toast you." |
| 11:10:03 | 20 | A.   Yes. |
| 11:10:03 | 21 | Q.   You sort of took the first line he suggested? |
| 11:10:05 | 22 | A.   I followed the letter to a large extent, yes. |
| 11:10:08 | 23 | Q.   Actually throughout you follow his draft? |
| 11:10:10 | 24 | A.   Yes. |
| 11:10:11 | 25 | Q.   And you don't send this to him on the encrypted |

11:10:14   1   e-mail server?

11:10:15   2   **A.**   No, I don't.

11:10:16   3   **Q.**   That's again because you want a record that

11:10:18   4   this letter was sent?

11:10:19   5   **A.**   Yes.

11:10:21   6   **Q.**   At this point in 2011, was Mr. Brockman giving

11:10:27   7   you direction as to how to run the trust?

11:10:29   8   **A.**   He was giving directions in relation to the

11:10:31   9   trust, yes.

11:10:31   10   **Q.**   Okay.  And this letter appears to be you making

11:10:36   11   a request to him?

11:10:37   12   **A.**   Yes.

11:10:38   13   **Q.**   Okay.

11:10:40   14                    MR. LANGSTON:  Offer 19 and 20.

11:10:42   15                    THE COURT:  Okay.

11:10:42   16                    MR. VARNADO:  No objection, Your Honor.

11:10:44   17                    THE COURT:  Okay.  Subject to the same

11:10:46   18   stipulations, 19 and 20 are admitted.

11:10:48   19                    MR. LANGSTON:

11:10:48   20   **Q.**   I'll show you Exhibit 24.  We'll start at the

11:11:00   21   bottom.  Okay.  "Tangarra Consultants Limited,

11:11:09   22   etamine@tangarra.com."

11:11:09   23                    Is that the public e-mail address for

11:11:14   24   you that we discussed?

11:11:14   25   **A.**   That's one of my public addresses, yes.

1   Q.   Okay.  And you sent it to Pilot Management.
2   Who is that?
3   A.   That's the company that employed Don Jones.
4   Q.   What are you purportedly telling Mr. Jones
5   here?
6   A.   I'm telling Mr. Jones of the potential for a
7   sale of the Reynolds and Reynolds company, and in
8   the e-mail I send him, I'm inviting him to undertake
9   some evaluation, industry analysis work.
10   Q.   Okay.  And was that the true reason you were
11   sending him this e-mail?
12   A.   In part.  In fact, he was retained to do that,
13   but the real reason to send the e-mail was Don Jones
14   had a connection with some of his own unrelated
15   entities.  It was just finding a way of winding up
16   his offshore connections, and getting some funds
17   over to him in the US.
18   Q.   Okay.  If I understand what you are saying,
19   Mr. Jones has money or assets in offshore entities?
20   A.   Entities that he had an association with, yes.
21   Q.   Okay.  And the goal is to get that money to him
22   in the United States?
23   A.   Yes.
24   Q.   And so, you are purporting to hire him to do
25   consulting for Reynolds and Reynolds, and you can

```
11:12:27   1   pay him then money in the United States?
11:12:29   2              MR. VARNADO:  Objection.  Leading.
11:12:31   3              THE COURT:  Okay.  Objection's
11:12:33   4   sustained.
11:12:33   5              MR. LANGSTON:  Okay.
11:12:37   6   Q.   What's the -- okay.  What's the -- what was the
11:12:40   7   purpose of this?
11:12:40   8   A.   Well, the -- Mr. Jones was retained to do this
11:12:43   9   work, but the -- but a big part of this was to limit
11:12:48  10   open correspondence -- that was to also get him some
11:12:52  11   of his -- his money back offshore -- offshore to him
11:12:57  12   in the US.
11:12:58  13   Q.   Okay.  If we can go up to the next e-mail.
11:13:01  14   A.   Sorry.  I should also add there was no other
11:13:04  15   way to communicate with Mr. Jones at this time,
11:13:07  16   because he wasn't on the encrypted e-mail server at
11:13:10  17   this time.
11:13:10  18   Q.   Okay.  You forward the e-mail you sent to
11:13:12  19   Mr. Jones to Bob Brockman?
11:13:14  20   A.   Yes.
11:13:14  21   Q.   And you forward that to him on the encrypted
11:13:17  22   e-mail server?
11:13:18  23   A.   Yes.
11:13:18  24   Q.   And you say, "Bob, please see the e-mail I sent
11:13:21  25   to Don.  This was an open e-mail.  I will speak to
```

11:13:26   1   Don on silent phone and ask him to send a response

11:13:29   2   asking for a little more money."

11:13:32   3   **A.**   Yes.

11:13:32   4   **Q.**   So you did have another way of communicating

11:13:34   5   with Mr. Jones?

11:13:35   6   **A.**   Telephone device.

11:13:36   7   **Q.**   Okay.  What is silent phone?

11:13:38   8   **A.**   Oh, it's sort of like a signal-type WhatsApp

11:13:43   9   encrypted -- I don't know how you describe it.

11:13:47   10   **Q.**   Sort of an encrypted, voice messaging service?

11:13:51   11   **A.**   Encrypted telephone service.

11:13:53   12   **Q.**   Okay.  Why are you going to tell him on the

11:13:57   13   phone that you want him to send a request asking for

11:13:59   14   more money?

11:14:00   15   **A.**   Probably to give some substance of the

11:14:02   16   negotiations.

11:14:02   17   **Q.**   Is there actually a negotiation taking place?

11:14:05   18   **A.**   Um, not in terms of the money.  But in terms of

11:14:12   19   retaining Don, he was actually retained.

11:14:14   20   **Q.**   But so, you telling him to ask for more money,

11:14:16   21   is that actually a real negotiation?

11:14:18   22   **A.**   Not that part, no.

11:14:19   23   **Q.**   And you are asking him to create an e-mail

11:14:22   24   asking for more money?

11:14:23   25   **A.**   Yes.

11:14:24  1   Q.   What is Mr. Brockman responding with?

11:14:29  2   A.   He says, "I recommend that you proceed on this

11:14:32  3   basis."

11:14:35  4   Q.   And was this one of the documents contained in

11:14:37  5   the encrypted -- or in the hard drive handed over to

11:14:41  6   the Government?

11:14:42  7   A.   Yes, it was.

11:14:44  8              MR. LANGSTON:  We'll offer 24.

11:14:45  9              MR. VARNADO:  No objection, Your Honor.

11:14:46  10             THE COURT:  Subject to the

11:14:48  11  stipulations, the exhibit is admitted.

11:14:51  12             MR. LANGSTON:

11:14:51  13  Q.   I'll show you Exhibit 23.  What is Falcata?

11:15:02  14  A.   Falcata was a private equity fund that was

11:15:05  15  established in 2015/'16 -- sorry '16/'17 -- actually

11:15:13  16  later to invest in enterprise software companies.

11:15:17  17  Q.   Okay.  Was Mr. Brockman one of the general

11:15:21  18  partners or an entity that he controlled one of the

11:15:23  19  general partners?

11:15:24  20  A.   Yes.

11:15:24  21  Q.   Who was the limited partner?

11:15:26  22  A.   Point Investments.

11:15:28  23  Q.   What was the size of the investment that Point

11:15:31  24  ended up making?

11:15:32  25  A.   Oh, I can't recall right now.

11:15:34  1   Q.   Was it a billion dollars?

11:15:35  2   A.   I can't recall, but could well be.

11:15:39  3   Q.   And so, at this point who is the director of

11:15:42  4   Point?

11:15:43  5   A.   At this point, it was me and I think perhaps

11:15:48  6   James Gilbert.

11:15:49  7   Q.   Okay.  And so, you were representing the

11:15:51  8   limited partner and Mr. Brockman was representing

11:15:54  9   the general partner?

11:15:55  10  A.   Yes.

11:15:55  11  Q.   Okay.

11:15:58  12  A.   One of the general partners.  There were other

11:16:01  13  general partners.

11:16:02  14  Q.   Okay.  And you say -- you say -- this is --

11:16:05  15  another encrypted e-mail?

11:16:06  16  A.   Yes.

11:16:07  17  Q.   And as of this hannah.com server, who were the

11:16:12  18  -- who were the people that had access to this

11:16:15  19  server?

11:16:16  20  A.   Myself and Mr. Brockman.

11:16:19  21  Q.   And you say to him, "Bob, could you please let

11:16:23  22  me know which of the points in the executive summary

11:16:26  23  I can contest with you?

11:16:32  24              "I will be pushing for a straight

11:16:34  25  1.5 percent on management fees, reducing if

11:16:37  1   committed funds remain uncalled after a certain
11:16:40  2   time.  I will make noise about co-invests and be
11:16:44  3   opposed, but then fall back to LP consent is
11:16:48  4   required.  Is there anything else I can contest?"
11:16:57  5              What are you asking Mr. Brockman?
11:16:59  6   A.   His views on what's going on, and also in terms
11:17:03  7   of the negotiation where we're going to end up.  I'm
11:17:05  8   basically wanting to agree with him on the back
11:17:08  9   channels what's going on while on the other side I'm
11:17:13  10  negotiating with -- through the lawyers with, I
11:17:15  11  think, some of the other representatives of the
11:17:17  12  other GP's.
11:17:18  13  Q.   Okay.  Prior to the negotiation that's going to
11:17:20  14  take place, sort of in public, you are planning the
11:17:23  15  negotiation in the back channels with Mr. Brockman?
11:17:25  16  A.   Yes.
11:17:25  17  Q.   And if we can go to the top of this e-mail.  Is
11:17:41  18  this Mr. Brockman's response to you?
11:17:42  19  A.   Yes.
11:17:43  20  Q.   And when he says, "I would continue to gripe
11:17:46  21  about co-invests, but then give in," is that an
11:17:50  22  instruction he's given to you about how to handle
11:17:52  23  the public negotiation?
11:17:53  24  A.   Yes.
11:17:58  25              MR. LANGSTON:  I'll offer 23.

| | |
|---|---|
| 11:18:00 | 1 |
| 11:18:01 | 2 |
| 11:18:04 | 3 |
| 11:18:05 | 4 |
| 11:18:05 | 5 |
| 11:18:16 | 6 |
| 11:18:19 | 7 |
| 11:18:21 | 8 |
| 11:18:23 | 9 |
| 11:18:25 | 10 |
| 11:18:29 | 11 |
| 11:18:32 | 12 |
| 11:18:35 | 13 |
| 11:18:37 | 14 |
| 11:18:39 | 15 |
| 11:18:42 | 16 |
| 11:18:43 | 17 |
| 11:18:44 | 18 |
| 11:18:51 | 19 |
| 11:18:51 | 20 |
| 11:18:55 | 21 |
| 11:18:56 | 22 |
| 11:18:59 | 23 |
| 11:19:02 | 24 |
| 11:19:02 | 25 |

1            MR. VARNADO:  No objection.

2            THE COURT:  Subject to stipulations,

3    Government Exhibit 23 is admitted.

4            MR. LANGSTON:

5    Q.    I'm going to show you Exhibit 21.  Is this

6    another e-mail from Mr. Brockman to you on the

7    encrypted messaging service?

8    A.    It is.

9    Q.    And it says, "Evatt, I think it would be a good

10   idea for you to send an open e-mail to Stuart that

11   you've been considering the formation of a medical

12   research foundation, somewhat along these lines."

13            Who is Stuart?

14   A.    It's Stuart Yudofsky.

15   Q.    Okay.  Mr. Brockman is telling you to send an

16   open e-mail to him?

17   A.    Yes.

18   Q.    And I'll show you Exhibit 27.

19   A.    Yes.

20   Q.    And is this the e-mail that you sent to

21   Dr. Yudofsky?

22   A.    I believe it is.  There is a lag of 12 days

23   between the two, which I don't understand, but I

24   believe it is.

25   Q.    Okay.  And this is from your, again, public

11:19:05    1    e-mail address?

11:19:06    2    A.   Yes.

11:19:07    3    Q.   Okay.

11:19:08    4               MR. LANGSTON:  I'll offer 21 and 27.

11:19:10    5               MR. VARNADO:  No objection.

11:19:11    6               THE COURT:   21 and 27 are admitted,

11:19:14    7    subject to the stipulation.

11:19:16    8               MR. LANGSTON:

11:19:17    9    Q.   Let's talk a little bit more about

11:19:19   10    Dr. Yudofsky.  During your time working for

11:19:21   11    Mr. Brockman, did he direct you to donate money from

11:19:25   12    the trust to Baylor University?

11:19:27   13    A.   Yes.

11:19:28   14    Q.   And what was the amount of that?

11:19:29   15    A.   Been a little confused about the amount, but I

11:19:34   16    think I've confirmed recently it's $25 million.

11:19:37   17    Q.   Okay.  I'll show you -- would it refresh your

11:19:40   18    recollection to look at Exhibit 14?

11:19:41   19    A.   Can I have a quick look, yes?  Yes.

11:19:47   20    Q.   Is your recollection refreshed?

11:19:50   21    A.   Yes.

11:19:51   22    Q.   Was it $25 million?

11:19:53   23    A.   Yes.

11:19:55   24    Q.   Okay.  Let's actually put 14 up on the screen.

11:20:06   25    Is this a conversation between you and Mr. Brockman

11:20:10   1   on the encrypted e-mail server about this gift?

11:20:13   2   **A.**   Yes.

11:20:13   3   **Q.**   Okay.  Did Mr. Brockman direct you to make any

11:20:18   4   conditions on this gift?

11:20:19   5   **A.**   Yes.

11:20:20   6   **Q.**   What were the conditions?

11:20:21   7   **A.**   The donor is to remain anonymous.  Secondly, if

11:20:26   8   Stuart died or became incapable of performance, his

11:20:29   9   place and direct use of the donations is to be taken

11:20:33   10  by Beth Yudofsky.

11:20:34   11  **Q.**   Are you familiar with the position, principal

11:20:38   12  investigator?

11:20:38   13  **A.**   Very rough idea of it.

11:20:41   14  **Q.**   Was one of Mr. Brockman's conditions that

11:20:43   15  Dr. Yudofsky be the principle investigator for this

11:20:45   16  $25 million --

11:20:46   17  **A.**   I'm not sure.  I don't think so.  It's not my

11:20:48   18  understanding of principal investigator.  I thought

11:20:51   19  principal investigator was someone -- I could be

11:20:53   20  wrong -- in relation to a specific research project,

11:20:59   21  but I could be wrong about that.

11:21:00   22  **Q.**   Setting aside the name, was it one of

11:21:02   23  Mr. Brockman's conditions that Dr. Yudofsky be in

11:21:05   24  charge of the spending of this gift at Baylor?

11:21:09   25  **A.**   Be -- yes, I guess so.  Directing the use of

11:21:13   1   the donation, yes.

11:21:14   2   Q.   Okay.  Let's look down at your e-mail.  "Bob, I

11:21:19   3   have received the proposal from Stuart Yudofsky.  I

11:21:22   4   will draft a response along the lines of your

11:21:25   5   previous letters; however, with greatly varied

11:21:29   6   wording so it cannot be suggested that I have taken

11:21:32   7   any lead or direction from you."

11:21:34   8            At this point -- with respect to this

11:21:41   9   gift, were you taking lead or direction from

11:21:43   10  Mr. Brockman?

11:21:43   11  A.   Mr. Brockman was giving me direction in

11:21:46   12  relation to this donation to Baylor.

11:21:50   13  Q.   Okay.  Do you actually send a draft of your

11:21:52   14  letter to Baylor to Mr. Brockman for his review?

11:21:55   15  A.   Um, I believe I did.

11:21:57   16  Q.   I'll show you Exhibit 15.  And is Exhibit 15

11:22:05   17  you sending a draft of your letter to Baylor to

11:22:08   18  Mr. Brockman for review?

11:22:09   19  A.   Yes.

11:22:09   20  Q.   And he makes some grammatical changes and then

11:22:14   21  sends it to you?

11:22:14   22  A.   Yes.

11:22:17   23  Q.   And then, what is -- then if you'll turn your

11:22:20   24  attention to Exhibit 16 -- actually, I'm sorry.

11:22:25   25  Pull up the bottom again on 15.  And you say,

11:22:32   1    "Attached is a draft letter to Stuart Yudofsky and

11:22:35   2    Baylor.  I have followed the outline of your letter;

11:22:38   3    however, have made some changes so it cannot be said

11:22:41   4    that I just copied your letter."

11:22:45   5                    And then you sent it to him for

11:22:46   6    review?

11:22:47   7    **A.**   Yes.

11:22:47   8    **Q.**   Okay.  And Exhibit 16, is that sort of the

11:22:52   9    final executed document that you sent to Baylor?

11:22:55   10   **A.**   It is.

11:23:00   11                   MR. LANGSTON:  Offer 14, 15 and 16.

11:23:03   12                   MR. VARNADO:  No objection.

11:23:04   13                   THE COURT:  Subject to the

11:23:05   14   stipulations, 14, 15 and 16 are admitted.

11:23:08   15                   MR. LANGSTON:

11:23:08   16   **Q.**   Did Mr. Brockman ever use the term with you

11:23:12   17   "Open the robe"?

11:23:13   18   **A.**   He did.

11:23:14   19   **Q.**   What was your understanding of what that term

11:23:16   20   meant?

11:23:16   21   **A.**   It was -- it was my understanding -- and

11:23:19   22   depending on the context was that Mr. Brockman would

11:23:23   23   explain to somebody the full background formally on

11:23:26   24   how the trust works.

11:23:27   25   **Q.**   And when you say formally about how the trust

11:23:30   1  works, that he was the one giving direction to you?

11:23:33   2  **A.**   That he would give directions in relation to

11:23:35   3  what the trust was doing from time to time, yes.

11:23:38   4  **Q.**   Okay.  Did Mr. Brockman ever tell you he opened

11:23:41   5  the robe to Dr. Stuart Yudofsky?

11:23:44   6  **A.**   Yes.

11:23:44   7  **Q.**   I'd like to shift gears and talk about when

11:23:48   8  Mr. Brockman learned of a potential investigation.

11:23:52   9  Are you familiar with Vista Equity Holdings -- or --

11:23:58  10  excuse me, Vista Equity Partners?

11:24:00  11  **A.**   Yes.

11:24:02  12  **Q.**   As part -- what was Mr. Brockman's relationship

11:24:05  13  to Vista Equity Partners?

11:24:09  14  **A.**   I think there's a long history of a

11:24:11  15  relationship --

11:24:13  16  **Q.**   Maybe I'll shorten it a little bit.  Was Point

11:24:16  17  Investments the sole investor in the first Vista

11:24:21  18  fund?

11:24:22  19  **A.**   It wasn't the sole investor.  There was another

11:24:28  20  investor, but Point investors was the biggest

11:24:32  21  investor, I believe.

11:24:33  22  **Q.**   As part of the formation of Vista, was there an

11:24:36  23  offshore general partner -- strike that.  As part of

11:24:41  24  the creation of the first Vista fund, was there an

11:24:44  25  offshore, general partner interest associated with

11:24:48   1   Robert Smith?

11:24:49   2   **A.**   I believe so.

11:24:51   3   **Q.**   And are you aware of what lawyer Mr. Smith used

11:24:54   4   to establish his related offshore trust?

11:24:59   5   **A.**   I believe it was Carlos Kepke.

11:25:03   6   **Q.**   What is Mr. Kepke's relationship to The

11:25:07   7   Brockman Trust?

11:25:07   8   **A.**   I can't be sure, but I believe Mr. Kepke is the

11:25:11   9   one who drafted the original Brockman Trust deed.

11:25:14   10   **Q.**   At some point, did you and Mr. Brockman learn

11:25:17   11   that Mr. Smith was separated and getting a divorce

11:25:21   12   from his first wife?

11:25:22   13   **A.**   Yes.

11:25:23   14   **Q.**   Did Mr. Brockman have any professional concerns

11:25:26   15   related to Mr. Smith's divorce?

11:25:30   16   **A.**   Mr. Brockman had concerns about any time a

11:25:34   17   person got divorced, and it would impact business

11:25:36   18   operations.  Vista was a part owner of Reynolds and

11:25:40   19   Reynolds.

11:25:40   20   **Q.**   Specifically, did he have a concern -- not

11:25:43   21   about the matrimonial proceedings, but that

11:25:46   22   Mr. Smith's divorce could affect the regulatory tax

11:25:50   23   position of -- the regulatory tax --

11:25:56   24           MR. VARNADO:  Objection to leading.

11:25:58   25           THE COURT:  Objection sustained.  Break

11:26:00  1  it down and ask the question.

11:26:01  2              MR. LANGSTON:  Okay.

11:26:02  3  Q.  Was there a concern about the tax position of

11:26:07  4  The Brockman Trust being affected by the divorce?

11:26:08  5  A.  I -- I don't recall.  I could be wrong, but I

11:26:13  6  don't recall that being a concern.

11:26:14  7  Q.  Okay.  If you saw your grand jury testimony,

11:26:16  8  would that refresh your recollection?

11:26:19  9  A.  Yes.

11:26:20  10  Q.  Okay.  I'd like to show you what I'll mark for

11:26:23  11  identification as 132, which is the February 7,

11:26:31  12  2019, grand jury.

11:27:00  13              May I approach?

11:27:01  14              THE COURT:  You may approach.

11:27:08  15              MR. LANGSTON:

11:27:08  16  Q.  Like you to turn to Page 52 -- sorry.  Excuse

11:27:11  17  me.  62.

11:27:14  18  A.  Yes.

11:27:15  19  Q.  Does that refresh your recollection -- why

11:27:18  20  don't you read that page to yourself.

11:27:20  21  A.  Yes, thank you.  Okay.

11:27:40  22  Q.  Does that refresh your recollection as to

11:27:43  23  whether there was a concern that the Smith divorce

11:27:46  24  could affect The Brockman Trust from a tax

11:27:49  25  perspective?

11:27:50  1    **A.**   Yes.

11:27:51  2    **Q.**   And -- and did it?  Sorry, the question was did

11:27:55  3    that refresh your recollection?

11:27:56  4    **A.**   Yes, it did.

11:27:56  5    **Q.**   And was there a concern about the tax

11:27:59  6    perspective?

11:28:00  7    **A.**   It was one of the concerns, yes.

11:28:10  8              MR. LANGSTON:  For the record, I've

11:28:12  9    taken the document back from the witness.

11:28:14  10             THE COURT:  Okay.

11:28:19  11             MR. LANGSTON:

11:28:19  12   **Q.**   As part of this concern, did Mr. Brockman ever

11:28:21  13   direct you to view Mr. Kepke's files regarding his

11:28:25  14   relationship with Mr. Smith?

11:28:27  15   **A.**   Yes.

11:28:28  16   **Q.**   And so, just to be clear, you are viewing

11:28:31  17   Mr. Smith's files with Mr. Kepke?

11:28:33  18   **A.**   Yes.

11:28:34  19   **Q.**   You are doing that on behalf of Mr. Brockman?

11:28:36  20   **A.**   I'm -- yes, at his direction.

11:28:38  21   **Q.**   Okay.  And I'll show you Exhibit 11.  And this

11:28:57  22   is an e-mail in 2000 -- November of 2013, from

11:29:02  23   Mr. Brockman to you?

11:29:03  24   **A.**   Yes.

11:29:03  25   **Q.**   Okay.  It says, "Robert just sent me what was

11:29:08  1   supposed to be the deposition transcript."

11:29:11  2              Are you aware of which -- was that --

11:29:14  3   what was -- what proceeding was that deposition

11:29:18  4   taken in?

11:29:18  5   **A.**   I believe it was in the matrimonial proceedings

11:29:24  6   -- Robert's matrimonial proceedings.

11:29:26  7   **Q.**   Was it fair to say that in 2013, those divorce

11:29:29  8   proceedings were taking place?

11:29:31  9   **A.**   To the best of my recollection.

11:29:33  10  **Q.**   And that you and Mr. Brockman were reviewing

11:29:36  11  documents related to that proceeding?

11:29:38  12  **A.**   Well, the deposition.

11:29:41  13  **Q.**   Okay.  And was this connected to a concern over

11:29:47  14  this potential spillover into the tax position?

11:29:51  15  **A.**   Well, into the regulatory world.  The -- the

11:29:54  16  attention -- yeah, from regulators, yes.

11:29:57  17  **Q.**   Okay.  When you say "regulators," you mean

11:29:59  18  governments?

11:29:59  19  **A.**   Governments, yes.

11:30:01  20  **Q.**   Did you meet with Mr. Smith's attorneys in

11:30:05  21  connection to this?

11:30:06  22  **A.**   I did.

11:30:08  23  **Q.**   And in the fall of 2014, were you -- were you

11:30:12  24  communicating with attorneys from Skadden Arps on

11:30:16  25  behalf of Mr. Smith?

11:30:17   1   **A.**   I'm not great on the dates, but, yes, at some

11:30:19   2   point I did meet with lawyers from from Skadden

11:30:23   3   Arps.

11:30:23   4   **Q.**   Did Mr. Brockman tell you he was meeting with

11:30:25   5   those attorneys?

11:30:26   6   **A.**   He -- I believe he did.

11:30:28   7   **Q.**   At some point in 2016, did you believe the

11:30:32   8   inquiry into Mr. Smith had become a criminal

11:30:35   9   investigation?

11:30:36   10   **A.**   At some point, I believe it was -- yes, from

11:30:40   11   IRS investigation to the Department of Justice

11:30:42   12   investigation.

11:30:43   13   **Q.**   Were you concerned that could expose the trust

11:30:46   14   to further investigation?

11:30:48   15   **A.**   It didn't particularly concern me, but it -- it

11:30:51   16   -- the potential was there for it to -- yeah, leech

11:30:57   17   over into the trust.

11:30:58   18   **Q.**   Did it concern Mr. Brockman?

11:31:00   19   **A.**   I believe it was a concern he had as well, in

11:31:03   20   that sense of leeching over into the trust.

11:31:05   21   **Q.**   Okay.  I think we said that your predecessor

11:31:10   22   for Mr. Brockman was Don Jones?

11:31:12   23   **A.**   Yes.

11:31:12   24   **Q.**   And after he retired, where did Mr. Jones live?

11:31:17   25   **A.**   His retirement kind of came gradually.  He was

11:31:21   1   in North Port in Florida for awhile, and then

11:31:26   2   Oxford, Mississippi.

11:31:27   3   Q.   And --

11:31:29   4                 MR. LANGSTON:  Your Honor, if I can

11:31:31   5   offer 11.

11:31:32   6                 THE COURT:  Okay.

11:31:33   7                 MR. VARNADO:  No objection.

11:31:33   8                 THE COURT:  Subject to the stipulation,

11:31:35   9   Government's Exhibit 11 is admitted.

11:31:43   10                 MR. LANGSTON:

11:31:44   11   Q.   Did Mr. Brockman ever express concern to you

11:31:46   12   about Mr. Jones keeping documents related to the

11:31:48   13   trust in the United States?

11:31:49   14   A.   Over a number of years, both Mr. Brockman and I

11:31:52   15   were concerned about whether or not Don had taken

11:31:55   16   anything to the US from Bermuda.

11:31:58   17   Q.   Okay.  Did Mr. Jones pass away in June of 2016?

11:32:01   18   A.   Yes.

11:32:01   19   Q.   Did you and Mr. Brockman attend his funeral?

11:32:04   20   A.   Yes.

11:32:05   21   Q.   Did you learn anything from Mr. Jones's widow

11:32:09   22   at the funeral?

11:32:10   23   A.   Yes, she told me there were a large number of

11:32:13   24   documents and drives that were still -- appeared to

11:32:15   25   be work related.

| | | |
|---|---|---|
| 11:32:16 | 1 | Q.   Did you relay that information to Mr. Brockman? |
| 11:32:19 | 2 | A.   I did. |
| 11:32:20 | 3 | Q.   And what did he tell you to do? |
| 11:32:24 | 4 | A.   He told me I needed to come and collect all of |
| 11:32:26 | 5 | that material. |
| 11:32:26 | 6 | Q.   When you say collect -- |
| 11:32:29 | 7 | A.   Shred -- take.  Take all of that material. |
| 11:32:34 | 8 | Q.   All right.  I'll show you Exhibit 12. |
| 11:32:39 | 9 | A.   Yes. |
| 11:32:41 | 10 | Q.   What is Exhibit 12? |
| 11:32:42 | 11 | A.   It's my 2016 performance evaluation from me to |
| 11:32:47 | 12 | Mr. Brockman. |
| 11:32:48 | 13 | Q.   Okay.  So you are writing this in 2017, but |
| 11:32:52 | 14 | referring to your 2016 performance? |
| 11:32:54 | 15 | A.   Yes. |
| 11:32:55 | 16 | Q.   Okay.  Let's look -- and you write to him, "I |
| 11:33:01 | 17 | would, say without hesitation, 2016 has been my best |
| 11:33:05 | 18 | year.  I established, beyond any doubt, that I can |
| 11:33:09 | 19 | work under pressure with the added threat of |
| 11:33:12 | 20 | detention hanging over me, all for the sake of |
| 11:33:16 | 21 | protecting the AEBCT"? |
| 11:33:18 | 22 | A.   Yes. |
| 11:33:19 | 23 | Q.   That's The Brockman Trust? |
| 11:33:20 | 24 | A.   Yes. |
| 11:33:21 | 25 | Q.   If we can look at paragraphs four and five. |

11:33:31  1   **A.**   Yes.

11:33:31  2   **Q.**   "In addition to the surprise lunch with the

11:33:36  3   gift to Ole Miss, I made further six trips to

11:33:40  4   Oxford.  Most were at short notice, and all was

11:33:43  5   involved at least three flights there and three

11:33:46  6   flights back, and included always driving from

11:33:50  7   Memphis to Oxford and back.

11:33:52  8           "Now, the trips were made when needed

11:33:55  9   and without hesitation, generally following a call

11:33:57  10   from Melissa telling me she had found more drives,

11:34:00  11   discs, or documents that Don had kept.  As you know,

11:34:04  12   I even cut short the trip to Argentina to get back

11:34:08  13   to Oxford to destroy more drives that had been

11:34:11  14   discovered."

11:34:13  15           Then, "By my extraordinary efforts,

11:34:17  16   hugely impacting my family life, I did all that was

11:34:20  17   humanly possible to clean up what Don had left

11:34:23  18   behind.  Those efforts meant that we could rest

11:34:26  19   easily any attempt to search Don's home would be

11:34:30  20   fruitless."

11:34:34  21   **A.**   Yes.

11:34:35  22   **Q.**   Was that reporting back to Mr. Brockman that

11:34:37  23   you had -- concerning the documents that we just

11:34:40  24   discussed?

11:34:41  25   **A.**   Not quite.  This wasn't me reporting back to

| | |
|---|---|
| 11:34:43 | 1 |
| 11:34:45 | 2 |
| 11:34:49 | 3 |
| 11:34:51 | 4 |

1  Mr. Brockman.  This was a performance review for me
2  pitching for a salary increase.  My reporting back
3  to Mr. Brockman would have come through other means,
4  through e-mail and so on.
5  Q.   Okay.  So you are pitching to Mr. Brockman that
6  you deserve a salary increase?
7  A.   Yes.
8  Q.   And one of the reasons you deserve a salary
9  increase is because you ensured that any attempt to
10  search Don's home would be fruitless?
11  A.   Yes.
12  Q.   And did that reflect Mr. Brockman's mindset
13  concerning the potential for an investigation in
14  2016?
15           MR. VARNADO:  Objection.  Calls for
16  speculation.
17           THE COURT:  Okay.  Foundation, Counsel?
18  How does he know?
19           MR. LANGSTON:  I'll rephrase, Your
20  Honor.
21           THE COURT:  Okay.
22           MR. LANGSTON:
23  Q.   Did Mr. Brockman express to you a concern about
24  a potential investigation in 2016?
25  A.   Yes, probably.  I don't have a specific

11:35:39  1   instance in mind, but I can't imagine he didn't.
11:35:42  2   But probably is the best I can do, I think.
11:35:45  3   Q.   Okay.  Did you, in fact, make these trips to
11:35:47  4   Mississippi?
11:35:48  5   A.   Yes.
11:35:48  6   Q.   And did you, in fact, destroy the documents
11:35:53  7   there?
11:35:54  8   A.   Yes, and sometimes I took them away and
11:35:56  9   sometimes I -- Melissa Jones dealt with some as
11:36:01  10  well.
11:36:01  11  Q.   How did you destroy them?
11:36:03  12  A.   Oh, different things.  There was -- there were
11:36:06  13  -- sometimes I had to use a hammer to break some of
11:36:10  14  the media, because it wasn't something I had ever
11:36:13  15  seen before and didn't have a device would go into.
11:36:15  16  So the only way to destroy it was to actually smash
11:36:18  17  it.  That sort of thing.
11:36:23  18  Q.   Let's go down to Paragraph 7, "I also engaged
11:36:34  19  in doing all I could do to protect the AEBCT over
11:36:38  20  the Robert Smith situation.  Further, I was doing
11:36:43  21  all I could do to protect Robert at the same time.
11:36:48  22  I have spent a great deal of time on the road
11:36:51  23  meeting with Robert (so we could talk freely)
11:36:57  24  meeting Carlos Kepke and Sherri Caplan."
11:37:01  25            Did you, in fact, meet with Mr. Smith

11:37:04  1  in 2016?

11:37:06  2  A.   I believe I did.

11:37:10  3  Q.   Let's go to Paragraph 18.  Could you just

11:37:23  4  briefly describe what you are reporting in

11:37:25  5  Paragraph 18?

11:37:27  6  A.   At the time this was -- at the time 2016/'17,

11:37:31  7  there was a great deal of time being spent on

11:37:34  8  establishing the -- the funding for the building of

11:37:37  9  an opera theater at Rice University.  Bob Yekovich

11:37:43  10  was the dean at The Shepherd School of Music.  He

11:37:47  11  was the principal person I had contact with in

11:37:49  12  relation to that.

11:37:49  13  Q.   You write, "I managed to convey to Bob

11:37:52  14  Yekovich" -- Y-E-K-O-V-I-C-H -- "your wishes without

11:37:57  15  saying anything other than I am the decision maker.

11:38:02  16  Obviously, Bob knows the truth."

11:38:04  17          That's referring to Bob Yekovich?

11:38:06  18  A.   Yes.

11:38:07  19  Q.   "But I made it easy for him and David Lebron to

11:38:12  20  maintain the position."

11:38:14  21  A.   Yes.

11:38:14  22  Q.   Was, Mr. Brockman, in fact, the decision maker

11:38:17  23  in relation to this?

11:38:18  24  A.   In relation to building the opera theater, it

11:38:20  25  was Mr. Brockman who gave the direction.

11:38:22  1   Q.   Okay.  So part of your -- did you view it as
11:38:28  2   part of your job to make it appear that you were the
11:38:33  3   decision maker?
11:38:35  4   A.   Well, not in this context, not this instance.
11:38:38  5   Because these conversations with these two people
11:38:41  6   never worked on the basis that I was the decision
11:38:43  7   maker, but that Mr. Brockman was the decision maker.
11:38:45  8   That was many, many hours of Bob Yekovich where Bob
11:38:50  9   would talk to me about how he could best present
11:38:53 10   things to Bob to receive more funding.
11:38:56 11                   So in this context, no.
11:38:57 12   Q.   In other contexts?
11:38:59 13   A.   Well, depends what the context is.
11:39:01 14   Q.   Okay.  When you say, "I have made it easy for
11:39:03 15   them to maintain the position" --
11:39:06 16   A.   Yes.
11:39:06 17   Q.   What position are you referring to?
11:39:07 18   A.   That the trust has decided to do the funding on
11:39:10 19   this.
11:39:10 20   Q.   Okay.  Who, in fact, decided to do the funding
11:39:13 21   on it?
11:39:13 22   A.   The decision was Mr. Brockman.
11:39:15 23   Q.   Let's look at paragraph 26, "This year has seen
11:39:27 24   me further establish my position as the figurehead
11:39:30 25   of the AEBCT and other trusts."

11:39:33  1  **A.**   Yes.

11:39:34  2  **Q.**   Is that part of what you viewed as your job for

11:39:37  3  Mr. Brockman?

11:39:38  4  **A.**   It was -- it was one part of -- well, I was the

11:39:41  5  -- head of the AEBCT.  Yes, it was part of it.

11:39:47  6                    MR. LANGSTON:  I'll offer Exhibit 12.

11:39:49  7                    MR. VARNADO:  No objection.

11:39:50  8                    THE COURT:  Subject to stipulation,

11:39:52  9  Government Exhibit 12 is admitted.

11:39:54  10                    MR. LANGSTON:

11:39:55  11  **Q.**   And I'm going to direct your attention to the

11:39:58  12  summer of 2017.  I'm going to mark for

11:40:03  13  identification as Government Exhibit 133.

11:40:27  14                    MR. LANGSTON:  May I approach, Your

11:40:28  15  Honor?

11:40:28  16                    THE COURT:  You may approach.

11:40:38  17                    MR. LANGSTON:

11:40:39  18  **Q.**   Is Government Exhibit 133 one of these

11:40:42  19  encrypted e-mail exchanges between you and

11:40:44  20  Mr. Brockman?

11:40:44  21  **A.**   Yes.

11:40:45  22  **Q.**   And what's the general topic of this?

11:40:53  23  **A.**   It's in relation to the boat, the Albula, and

11:40:59  24  problems I was having with the captain that didn't

11:41:02  25  seem to recognize Mr. Brockman was only a minority

11:41:05  1   owner.

11:41:05  2   Q.   So this is -- this is concerning suspicions

11:41:09  3   that the owner has about the ownership?

11:41:11  4   A.   Mistaken suspicions.

11:41:16  5   Q.   Okay.  Let's go to the second page, third

11:41:21  6   paragraph.  "I try to use the boat in ways which

11:41:29  7   would suggest that you are not the sole owner, but

11:41:32  8   this is disruptive to my work and family time.

11:41:35  9   Frankly, my efforts are lame since you are, as far

11:41:39  10  as Tom is concerned" -- Tom is the captain?

11:41:43  11  A.   Yes.

11:41:44  12  Q.   "... the chief decision maker, while I'm an

11:41:47  13  infrequent user who has never slept on the boat, and

11:41:50  14  avoids going out on it.  Sophie has been carrying a

11:41:54  15  lot of this for me."

11:41:55  16  A.   Yes.

11:41:56  17  Q.   That's something you wrote to Mr. Brockman?

11:41:58  18  A.   Yes.

11:41:59  19  Q.   Okay.  We'll go to the final paragraph on that

11:42:02  20  page which continues on, "I would very much like to

11:42:06  21  find a way for you to have full use of the boat

11:42:10  22  year-round, with all costs covered by the

11:42:13  23  foundation.  As matters stand today, the risk to you

11:42:16  24  and me is high because of Robert Smith.  I do

11:42:21  25  believe we are being monitored.  I certainly am.

11:42:25  1  The boat has placed an even bigger target on us."

11:42:29  2  **A.**   Yes.

11:42:30  3  **Q.**   Is that an accurate statement of your state of

11:42:35  4  mind in June of 2017?

11:42:42  5  **A.**   I have to give context to that.  Do you want

11:42:45  6  context?

11:42:46  7  **Q.**   Sure.

11:42:48  8  **A.**   I had spent the 2016 being stopped a number of

11:42:51  9  times coming into the United States.  I had some

11:42:54  10  legal advice, and that is what led to my state of

11:42:57  11  mind.  In terms of the target, that's what I was

11:43:02  12  referring to.

11:43:04  13  **Q.**   You are referring to --

11:43:06  14  **A.**   The monitor bit.

11:43:14  15  **Q.**   Also --

11:43:16  16              MR. LANGSTON:  Well, I'll offer 133,

11:43:17  17  Your Honor.

11:43:18  18              THE COURT:  Okay.  Any objection?

11:43:19  19              MR. VARNADO:  No objection.

11:43:20  20              THE COURT:  No objection.  Subject to

11:43:21  21  the stipulations, 133 is admitted.

11:43:25  22              THE WITNESS:  Do you want this back, or

11:43:26  23  do I leave it here?

11:43:28  24              MR. LANGSTON:  I'll take it.

11:43:39  25  **Q.**   Also in the summer of 2017, did you learn

11:43:46    1    Bermuda Commercial Bank had frozen a number of

11:43:48    2    accounts associated with the Brockman structures?

11:43:51    3    **A.**    I did.

11:43:51    4    **Q.**    Did you write a memo to Mr. Brockman expressing

11:43:56    5    concerns you had related to this freeze?

11:43:57    6    **A.**    Yes.

11:43:58    7    **Q.**    I'll show you Exhibit 18.

11:44:09    8    **A.**    Yes.

11:44:09    9    **Q.**    Okay.  And this is -- this memorandum was one

11:44:13    10    of the documents obtained by the Government in

11:44:15    11    September of 2018?

11:44:21    12    **A.**    Yes, I believe so.

11:44:22    13    **Q.**    Okay.  And you outline sort of a series of

11:44:25    14    problems, and then offer solutions to them?

11:44:27    15    **A.**    Yes.

11:44:28    16    **Q.**    Let's look at Page 2, problem four.

11:44:37    17    **A.**    Yes.

11:44:38    18    **Q.**    And you are expressing a concern with the

11:44:43    19    accounts being frozen you won't be able to access

11:44:46    20    legal fees?

11:44:47    21    **A.**    Yes.

11:44:47    22    **Q.**    Okay.  If we can look at the solution.

11:44:54    23    **A.**    Yes.

11:44:54    24    **Q.**    "We need a hidden fund, which has nothing to do

11:44:58    25    with either me or RTB" -- that's Mr. Brockman?

11:45:01  1   **A.**   Yes.

11:45:02  2   **Q.**   "... which we could control.  Glenn Ferguson, a

11:45:06  3   lawyer in Australia who I know and can trust, would

11:45:08  4   be a prospect to hold funds in a trust and make a

11:45:13  5   'loan' for legal fees and living expenses."

11:45:17  6   **A.**   Yes.

11:45:17  7   **Q.**   Is the fact that the word loan is in quotes

11:45:19  8   there an indication that would not be a real loan?

11:45:22  9   **A.**   It wouldn't have been authentic loan, no.

11:45:29  10  **Q.**   Page 3, and we'll go to Paragraph 3.  It says,

11:45:40  11  "Even if Robert Smith clears up his problems, the

11:45:42  12  target is well fixed on me, and we need to

11:45:45  13  anticipate that we'll be audited at some point."

11:45:49  14              Is that a reflection of your concern

11:45:52  15  about the Robert Smith investigation potentially

11:45:56  16  bleeding over?

11:45:59  17  **A.**   Yes, potentially a concern, yes.

11:46:01  18  **Q.**   Okay.  Let's look at problem seven.  You write,

11:46:18  19  "The target on me is a lot larger than it was some

11:46:22  20  time ago, both because of Robert Smith and the

11:46:26  21  Albula, which also draws a lot of attention."

11:46:30  22              Then you go to the solution, "I need

11:46:32  23  to muddy the waters about where I am located."

11:46:37  24              Then your final line is, "Regulators

11:46:41  25  will come to Bermuda looking for me while we build

11:46:44  1    and maintain connections elsewhere."

11:46:46  2              Does this reflect your concern about

11:46:50  3    the Robert Smith investigation?

11:46:54  4    A.   I can't say that that's strictly about the

11:46:56  5    Robert Smith investigation.  It's just the general

11:46:59  6    concern about -- about, you know, regulators.  But I

11:47:04  7    can't say on that particular bit just if it's

11:47:07  8    specifically Robert Smith.

11:47:08  9    Q.   Okay.  When you say, "The target on me is

11:47:10  10   larger because of Robert Smith" --

11:47:12  11   A.   I see, yeah.  Leading back to that, yes.

11:47:14  12   Q.   Okay.  When you say "Muddy the waters about

11:47:17  13   where I am located," that's as to your physical

11:47:20  14   location?

11:47:20  15   A.   Yes.  Old residence -- I suppose more likely

11:47:25  16   old residence, rather than physical location.

11:47:28  17   Q.   Okay.  And then if we can go down to the

11:47:37  18   bullets at the bottom.  You write to Mr. Brockman,

11:47:41  19   "We need to be somewhere where I don't have to

11:47:45  20   travel through the US.  Even if the fear of

11:47:47  21   detention is lifted, we should be careful about my

11:47:50  22   traveling into the US."

11:47:52  23              Go to the next page.  "Certainly I

11:47:59  24   would never do it again with a computer or

11:48:02  25   telephone.  If the latter is possible, I could keep

1  all I need at Stuart Yudofsky's office, including a

2  phone."

3        Then your next bullet is, "We need a

4  good cover story as to why I would like to establish

5  new relationships."

6        Is that -- you are trying to come up

7  with something you can tell banks that is different

8  from the reality here?

9  A.  Well, wouldn't have been different from the

10 reality, because the reality is I'd be there.  But,

11 yes, it's just trying to establish why it is that I

12 am moving from Bermuda or spending time somewhere

13 else.

14 Q.  Then when you write, "This is not our plan, but

15 it would be something readily understood and

16 accepted by all people who work at those places."

17       Does that reflect that what you were

18 going to tell banks wasn't necessarily the reality?

19 A.  Well, I'm not sure about that.  Because in

20 December -- July of 2017, it's the line that you

21 left out about my daughters will have to go to

22 school outside of Bermuda, and I wished to be nearer

23 to them.  That was something true.  That was

24 something we were already planning.

25 Q.  So why do you tell Mr. Brockman, "That is not

11:49:07  1    our plan"?

11:49:08  2    **A.**   I'm saying that part of it is actually

11:49:12  3    accurate, but that's something we started already,

11:49:14  4    talked about already.

11:49:15  5    **Q.**   Okay.

11:49:15  6    **A.**   It wasn't our plan.  It hadn't been decided,

11:49:18  7    but it was one of the discussions we were already

11:49:20  8    having.

11:49:20  9    **Q.**   Fair to say "That is not our plan" is one of

11:49:23  10   the things you wrote it him?

11:49:24  11   **A.**   Yes.

11:49:24  12   **Q.**   Okay.  I'll offer 18.

11:49:34  13               MR. VARNADO:  No objection.

11:49:34  14               THE COURT:  Subject to stipulations,

11:49:36  15   Government Exhibit 18 is admitted.

11:49:38  16               MR. LANGSTON:  Could I have just a

11:49:40  17   moment, Your Honor?

11:49:40  18               THE COURT:  Sure.

11:49:56  19               MR. LANGSTON:

11:49:56  20   **Q.**   At some point, were you able to get the money

11:49:58  21   -- sorry.  Did you send this memo to Mr. Brockman?

11:50:03  22   **A.**   I did.

11:50:03  23   **Q.**   And can we show Exhibit 17.  Is this an

11:50:14  24   encrypted e-mail you wrote to Mr. Brockman,

11:50:18  25   attaching the memo?

11:50:19   1   **A.**   Yes.

11:50:19   2   **Q.**   What did he respond?

11:50:21   3   **A.**   "I concur with all of these."

11:50:26   4                 MR. LANGSTON:  Offer 17.

11:50:28   5                 MR. VARNADO:  No objection.

11:50:29   6                 THE COURT:  Subject to stipulation, 17

11:50:30   7   is admitted.

11:50:31   8                 MR. LANGSTON:

11:50:31   9   **Q.**   Were you ever able to get the money unfrozen?

11:50:34   10   **A.**   It took quite a long time, but, yes.

11:50:37   11   **Q.**   What did you do with the money after it was

11:50:39   12   unfrozen?

11:50:39   13   **A.**   Some went back to the entities, some went to a

11:50:43   14   charitable gift, and some went to secure my

11:50:46   15   three-year termination fund that had been

11:50:49   16   accomplished by Mr. Brockman.

11:50:50   17   **Q.**   Did you tell Mr. Brockman you would use some of

11:50:52   18   the money to secure your three-year termination

11:50:54   19   fund?

11:50:54   20   **A.**   No.

11:50:54   21   **Q.**   I'm going to turn your attention to August of

11:50:56   22   2018.  Did you receive a call from Mr. Kepke in

11:51:01   23   August of 2018?

11:51:03   24   **A.**   Yes.

11:51:03   25   **Q.**   What did he tell you?

A.   He told me that some -- my recollection is FBI
agents had just executed a search warrant on his
home -- where his office is.  They had just left.

Q.   And did he tell you -- did he mention whose
names were mentioned in the warrant?

A.   He mentioned Mr. Brockman's name was in the
warrant, my name, and some other names I had never
heard of before.

Q.   After learning your name and Mr. Brockman's
name had been written in the warrant, what did you
do?

A.   I contacted Mr. Brockman and told him.

Q.   And what was Mr. Brockman's reaction to being
told that his name was in the warrant in Mr. Kepke's
house?

A.   I'm sure it was over the phone, but as best I
can tell he was surprised.  I mean, it's -- it's
hard to read exactly the reaction, but certainly
concerned.

Q.   Did you continue to talk to Mr. Brockman in the
days after the Kepke warrant?

A.   I did.

Q.   And describe his level of concern in those
phone calls.

A.   He was concerned about it.  You know, concerned

11:52:04   1    to know what was happening, whether there were any

11:52:07   2    developments.

11:52:07   3    Q.   Was that as rattled as you had ever seen him?

11:52:12   4    A.   Yes.

11:52:12   5    Q.   Had Mr. Brockman given you a standing

11:52:14   6    instruction on what to do in a circumstance like the

11:52:17   7    Kepke warrant?

11:52:18   8    A.   Yes.

11:52:18   9    Q.   What was that instruction?

11:52:19   10   A.   To go to George Hani of Miller & Chevalier.

11:52:26   11   He's a partner at that firm.

11:52:27   12   Q.   You said -- after your house was searched

11:52:33   13   September 2018, what did you do?

11:52:35   14   A.   I waited until fairly early in the morning, and

11:52:38   15   waited for a reasonable hour and contacted Mr. Hani.

11:52:42   16   Q.   Shortly after you spoke to -- or the weeks

11:52:45   17   after you spoke to Mr. Hani, is that when you handed

11:52:49   18   over the hard drive to the US Government?

11:52:52   19   A.   It is.

11:52:53   20            MR. LANGSTON:  Nothing further, Your

11:52:55   21   Honor.

11:52:55   22            THE COURT:  Okay.  Cross-examination?

11:52:59   23   We'll get started for about 15 minutes or so.  One

11:53:03   24   second.  Before you get started with the

11:53:07   25   cross-examination.  We'll get started for about

11:53:21  1   15 minutes or so, and then break around 12:15 and

11:53:26  2   take an hour for lunch.

11:53:28  3                  THE WITNESS:  Your Honor --

11:53:28  4                  THE COURT:  You need a break?

11:53:30  5                  THE WITNESS:  I'm in your hands

11:53:31  6   completely, but don't know if anybody has informed

11:53:33  7   you.  We thought we'd be in evidence on Monday.  I

11:53:36  8   have a flight to England this afternoon, but I can

11:53:40  9   -- I'm in your hands and I can change that flight if

11:53:43  10  need be.

11:53:44  11                 THE COURT:  Well, we probably need to

11:53:45  12  take a lunch break at some point in time.  Let's

11:53:48  13  continue on to about 12:15.  We can break for

11:53:51  14  about -- let's say 45 minutes, instead of our usual

11:53:55  15  hour, and be back at one o'clock.

11:53:56  16                    That work for everyone?

11:53:58  17                 MR. VARNADO:  That'll be fine with us,

11:54:00  18  Your Honor.

11:54:00  19                 THE COURT:  Works for the Prosecution?

11:54:01  20                 MR. LANGSTON:  Yes, Your Honor.

11:54:02  21                 THE COURT:  Okay.  Great.

11:54:04  22                 THE WITNESS:  Thank you, Your Honor.

11:54:04  23                 <u>CROSS-EXAMINATION</u>

11:54:04  24  BY MR. VARNADO:

11:54:09  25  Q.   Good afternoon.  My name is Jason Varnado, and

11:54:12   1   I represent Bob Brockman.  As you indicated, you are

11:54:14   2   a cooperating witness for the Government in this

11:54:17   3   case; correct?

11:54:17   4   **A.**   Yes.

11:54:17   5   **Q.**   And you are individual one listed in the

11:54:19   6   indictment?

11:54:19   7   **A.**   Yes.

11:54:19   8   **Q.**   And on September 5th, as we talked about, your

11:54:21   9   home was searched by the Bermuda Police Services in

11:54:26   10  2018?

11:54:27   11  **A.**   Yes.

11:54:27   12  **Q.**   Okay.  In that same month, your attorneys made

11:54:31   13  a proffer to the Government?

11:54:33   14  **A.**   Yes.

11:54:34   15  **Q.**   And you agreed to provide documents that you

11:54:37   16  had stored in an undisclosed location, but only if

11:54:40   17  the Government provided you with immunity; is that

11:54:43   18  right?

11:54:43   19  **A.**   That's not the quote -- that's not the way I --

11:54:46   20  I handed everything over to my lawyers to give -- to

11:54:49   21  hand over.

11:54:50   22  **Q.**   Okay.  But as part of an immunity arrangement,

11:54:53   23  you agreed to provide information?

11:54:54   24  **A.**   No, that -- the immunity arrangement came

11:54:57   25  later.  I had already given the instruction to my

11:54:59   1   lawyers before that.

11:55:00   2   Q.   Is that including to access information and

11:55:03   3   documents in storage lockers and other locations?

11:55:06   4   A.   We hadn't gotten to that stage at that point.

11:55:08   5   Q.   That came later.   Okay.   You did, in fact,

11:55:11   6   receive immunity from the Government on October 2,

11:55:14   7   2018?

11:55:14   8   A.   Yes.

11:55:15   9   Q.   Okay.   That's less than one month after your

11:55:17   10   home was raided in Bermuda?

11:55:18   11   A.   Yes.

11:55:18   12   Q.   All right.   And I know Mr. Langston referenced

11:55:24   13   your grand jury testimony.   You testified before the

11:55:27   14   grand jury, which was sitting in San Francisco three

11:55:29   15   times in this matter; correct?

11:55:31   16   A.   Yes.

11:55:31   17   Q.   That's where the case was originally filed

11:55:33   18   before it was moved to Houston?

11:55:34   19   A.   Yes.

11:55:35   20   Q.   And each time you were sworn in to the grand

11:55:38   21   jury, you promised to tell the truth; correct?

11:55:40   22   A.   Yes.

11:55:40   23   Q.   And at the outset of each time you testified,

11:55:45   24   the prosecutors reminded you that your immunity

11:55:47   25   agreement did not include covering you for perjury,

11:55:52   1   as you mentioned at the beginning of your testimony?

11:55:54   2   **A.**   That's correct.

11:55:54   3   **Q.**   The Government told you that your answers need

11:55:57   4   to be truthful and complete?

11:55:59   5   **A.**   Yes.

11:55:59   6   **Q.**   That if you provided false testimony in any

11:56:02   7   capacity, you could be prosecuted?

11:56:03   8   **A.**   Yes.

11:56:04   9   **Q.**   And you understand that you have to tell the

11:56:07   10   truth, whether it helps the Department of Justice or

11:56:10   11   whether it may help Mr. Brockman?

11:56:11   12   **A.**   Absolutely.

11:56:12   13   **Q.**   Okay.   In other words, you can't take sides,

11:56:15   14   it's just the truth?

11:56:16   15   **A.**   Yes.

11:56:17   16   **Q.**   All right.   And were you truthful in every

11:56:19   17   statement that you made before the grand jury?

11:56:21   18   **A.**   I was truthful, based on what I was asked, yes.

11:56:25   19   **Q.**   Okay.   You understand that the requirement to

11:56:29   20   be truthful is not just in the grand jury testimony,

11:56:32   21   but also in your various meetings that you have had

11:56:35   22   with the United States Government over the last

11:56:37   23   three years?

11:56:38   24   **A.**   Yes.

11:56:38   25   **Q.**   And, in fact, Mr. Smith -- lead prosecutor --

11:56:43   1   warned you of this when you first met with the
11:56:44   2   Government October 4th of 2018?
11:56:46   3   **A.**   I believe it was Mr. Pittman.
11:56:49   4   **Q.**   Fair.  Mr. Pittman admonished when you sat down
11:56:56   5   to be interviewed that same obligation in your
11:56:58   6   immunity agreement to tell the truth applied there?
11:57:00   7   **A.**   Yes.
11:57:01   8   **Q.**   And not just in the grand jury?
11:57:03   9   **A.**   Yes.
11:57:03   10   **Q.**   By the information we've received -- I think we
11:57:06   11   have a record of you sitting down with the
11:57:08   12   Government at least 17 times prior to most recently
11:57:12   13   this weekend; does that sound about right to you?
11:57:14   14   **A.**   I believe.
11:57:17   15   **Q.**   And I think we tallied the start and stop times
11:57:20   16   of those various interviews from the memos returned
11:57:24   17   to us, and came up with 60 hours of meeting with the
11:57:26   18   Government attorneys or agents.  Is there any reason
11:57:30   19   to quibble with that?
11:57:31   20   **A.**   No.
11:57:34   21   **Q.**   When did you land in the United States for
11:57:36   22   purposes of your testimony today?
11:57:37   23   **A.**   Last Friday.
11:57:38   24   **Q.**   Okay.  Been here a little while?
11:57:41   25   **A.**   Yes.

11:57:41    1    Q.   And how many meetings have you had with the

11:57:45    2    prosecutors or the agents since you've landed in

11:57:47    3    Houston last Friday?

11:57:48    4    A.   I met with them on Saturday, and I met with

11:57:53    5    them on Sunday morning.

11:57:54    6    Q.   How long was your meeting on Saturday?

11:57:56    7    A.   I think we finally kicked off around the 11:30

11:57:59    8    mark and finished, I think, 5:30 or 6:00.

11:58:03    9              On Sunday -- I don't have a clear

11:58:06   10    recollection on these times, but on Sunday I think

11:58:08   11    it was about 9:00 a.m.  We might have finished

11:58:11   12    around 11:00 or 11:30.

11:58:13   13    Q.   Okay.  No other discussions with the

11:58:15   14    prosecution team since Sunday?

11:58:17   15    A.   Not that I can recall, no.

11:58:20   16    Q.   Okay.  We'll come back to one of those meetings

11:58:23   17    later in your testimony.  And so, is it your

11:58:26   18    testimony that you have been truthful in every

11:58:28   19    statement that you have made in the -- in the

11:58:31   20    meetings that you have had with the United States

11:58:33   21    Government?

11:58:33   22    A.   I've tried to give truthful answers to

11:58:35   23    everything I've been asked.

11:58:36   24    Q.   Including in your meeting this weekend?

11:58:38   25    A.   Yes.

11:58:39  1   Q.   All right.  So I would like to talk a little

11:58:42  2   bit right now about what you may or may not know

11:58:45  3   about Mr. Brockman's current health condition.

11:58:48  4   Before today, I'm correct that the last time you saw

11:58:52  5   Mr. Brockman in person was June of 2018?

11:58:54  6   A.   That's my recollection.

11:58:56  7   Q.   Okay.  And I guess just sitting here today,

11:59:01  8   does he look different to you today than he did in

11:59:04  9   June of 2018?

11:59:05  10  A.   Very different.

11:59:06  11  Q.   How so?

11:59:08  12  A.   A lot thinner.  Nowhere near as upright.

11:59:15  13  Q.   And so, that's 2018.  Based on our reading of

11:59:20  14  the memorandums that the Government shared with us,

11:59:22  15  your last meeting in person with Mr. Brockman prior

11:59:25  16  to June of '18 was two times in 2017.  I believe it

11:59:31  17  was October of '17 in Argentina?

11:59:33  18  A.   That sounds correct.

11:59:33  19  Q.   And prior to that, in Bermuda in June of 2017,

11:59:37  20  around the time of the America's Cup (phonetic)?

11:59:40  21  A.   Yes, that's correct.

11:59:41  22  Q.   So before today, over the last five years of

11:59:44  23  2017, 2018, 2019, 2020, and now almost all the way

11:59:49  24  through 2021, you've actually laid eyes --

11:59:52  25  personally in his presence -- three times on

11:59:55   1   Mr. Brockman?

12:00:01   2   **A.**   Three times, and one very brief appearance of

12:00:04   3   Mr. Brockman on screen after he was indicted, but

12:00:06   4   that was of course impossible to pick anything up.

12:00:08   5   **Q.**   Okay.  Are you referring to you actually tuned

12:00:12   6   into and observed Mr. Brockman --

12:00:14   7   **A.**   I did for that one.

12:00:15   8   **Q.**   One moment.  Can't talk over each other so the

12:00:18   9   court reporter gets it.  You are just saying that

12:00:20   10  you tuned into Mr. Brockman's initial appearance out

12:00:23   11  in San Francisco, and were able to observe by video;

12:00:27   12  that's the only other time?

12:00:28   13  **A.**   That's the only other time.

12:00:29   14  **Q.**   And as I understood it, you have not spoken on

12:00:32   15  the phone with Mr. Brockman since the search of your

12:00:35   16  home on September 5th of 2018?

12:00:38   17  **A.**   I'd say even slightly earlier than that,

12:00:41   18  probably towards the end of August of 2018.

12:00:43   19  **Q.**   So sometime between the search of Mr. Kepke's

12:00:46   20  home and office in August of 2018, and the search of

12:00:49   21  your home would be the last time that you spoke with

12:00:52   22  Mr. Brockman?

12:00:53   23  **A.**   That's correct.

12:00:53   24  **Q.**   Okay.  And so, other than what you might have

12:00:56   25  learned through public records in these proceedings,

12:00:58  1   you have no personal knowledge of Mr. Brockman's

12:01:00  2   current physical health condition?

12:01:02  3   **A.**   None.

12:01:03  4   **Q.**   And other than again what you might have

12:01:05  5   learned by reading material in this proceeding, you

12:01:08  6   have no knowledge -- personal knowledge of

12:01:10  7   Mr. Brockman's current cognitive functioning?

12:01:12  8   **A.**   None at all.

12:01:13  9   **Q.**   All right.  I want to go back in time to -- you

12:01:17  10  obviously spent time working with Mr. Brockman from

12:01:19  11  2004 through 2018.  When you first met Mr. Brockman,

12:01:23  12  would you describe him as somebody who was hard

12:01:25  13  working?

12:01:25  14  **A.**   Extremely hard working.

12:01:27  15  **Q.**   He worked long hours?

12:01:28  16  **A.**   Yes, seven days a week.

12:01:30  17  **Q.**   Was he physically fit?

12:01:31  18  **A.**   Very strong.

12:01:32  19  **Q.**   Did you agree he was very careful with his

12:01:35  20  health?

12:01:35  21  **A.**   Yes, absolutely.

12:01:36  22  **Q.**   I think in some of your performance reviews, he

12:01:39  23  mentions it's important to maintain diet and

12:01:42  24  exercise, sort of as a recommendation to follow that

12:01:44  25  he did?

12:01:45   1   **A.**   I think he took -- he took pity on me as I

12:01:48   2   wasn't anywhere as fit as him, and he was so much

12:01:51   3   older, yes.

12:01:52   4   **Q.**   And at some point in time when you were still

12:01:54   5   seeing Mr. Brockman in person, did you start to

12:01:56   6   notice physical changes in how he appeared to you?

12:02:00   7   **A.**   Yes, in the last -- going up towards the end of

12:02:05   8   2018.   So the last time I saw him in June of 2018 --

12:02:09   9   probably in the two or three years up to that time.

12:02:11   10   **Q.**   So in the 2015 to 2018 time period, just

12:02:16   11   generally describe what it is you start to observe

12:02:18   12   in Mr. Brockman's physical appearance?

12:02:20   13   **A.**   Um, in terms of his physical appearance, um, he

12:02:23   14   was slightly bent.   I noticed that he was bent a

12:02:25   15   little more at the waist than he used to be.   Bob

12:02:29   16   always walked in a very upright, very fit way.

12:02:32   17                    I noticed that he was slightly more

12:02:34   18   bent.   I noticed something that struck me quite --

12:02:37   19   quite strongly, and I think it might have been -- my

12:02:42   20   memory was it was in Argentina and walking through

12:02:45   21   the hallway in the hotel in Argentina.   So it would

12:02:48   22   have been October of 2017, being struck by

12:02:51   23   Mr. Brockman stepping over a threshold -- he was

12:02:55   24   very, very careful in stepping over a threshold.

12:02:57   25   That actually was quite striking as he took that

12:03:00    1    step.

12:03:01    2    Q.    Why was that so striking?  Did you know him to

12:03:03    3    be somebody who exercised and ran long distances?

12:03:06    4    A.    You know, the idea of stepping over a threshold

12:03:09    5    in a doorway causing problems I had never seen

12:03:11    6    before.

12:03:11    7    Q.    That was back in October --

12:03:13    8    A.    In my recollection it was in the hotel in

12:03:15    9    Argentina that it struck me.

12:03:16   10    Q.    So even when you weren't seeing Mr. Brockman in

12:03:19   11    person, would you have occasion to speak with him by

12:03:21   12    phone or maybe even Skype or video call or anything

12:03:26   13    like that?

12:03:26   14    A.    Yes, regularly.

12:03:27   15    Q.    Did you notice anything in that time period --

12:03:29   16    in those 2015 to 2018 time period about

12:03:32   17    Mr. Brockman's ability to maintain his focus on

12:03:35   18    phone calls and video calls?

12:03:37   19    A.    Yes.  To put it in context, yes, I did notice

12:03:39   20    it.  Do you want me to elaborate?

12:03:42   21    Q.    Please.

12:03:42   22    A.    To put in context, as I said earlier,

12:03:45   23    Mr. Brockman was a very hard-working person, and

12:03:47   24    would do seven-day weeks, long hours every day.

12:03:50   25    Both Mr. Jones and myself had to fit in around his

12:03:55  1  availability, because he's running a large company

12:03:58  2  of thousands of employees.

12:04:01  3          Particularly for me, given where I

12:04:03  4  was the time differences, you -- I would have

12:04:06  5  conversations with Mr. Brockman.  He'd be focused.

12:04:08  6  He'd be -- he'd be -- he'd never repeat himself.

12:04:12  7  His memory was -- his memory was perfect.  His

12:04:16  8  recall was excellent, and he could work long, long

12:04:21  9  hours.  10:00 or 11:00 at night his time was never a

12:04:24  10  problem.

12:04:24  11  Q.   That started to change over time?

12:04:25  12  A.   Then I noticed in the '15/'16/'17 period things

12:04:35  13  started to change.  His focus wasn't what it used to

12:04:38  14  be.  He would drift and talk about other matters.

12:04:41  15  He would latch to more enjoyable topics, fishing

12:04:45  16  instead of work.  I noticed that he would tell me

12:04:50  17  the same story again and again.  This wasn't

12:04:52  18  something Bob used to do in the past --

12:04:54  19  Q.   So that was unusual --

12:04:56  20  A.   That was unusual, and it -- if you know Don

12:04:58  21  Jones, Don would repeat the same story many times.

12:05:02  22  That was something Bob and I had spoken about in

12:05:05  23  relation to Don, and here I was seeing it a little

12:05:07  24  bit with Bob.

12:05:09  25          He didn't work as near the long

12:05:11   1   hours he used to.  I noticed that from time to time

12:05:16   2   -- at times it would be -- he would say, "I've got

12:05:19   3   to go.  Dorothy wants to watch a TV show."

12:05:22   4                    At times it was clear -- we Skyped

12:05:25   5   and other things -- it would be clear Dorothy would

12:05:28   6   come to the door and is calling Bob away.  Things

12:05:30   7   like that.

12:05:31   8   Q.   That were unusual prior to that time period?

12:05:33   9   A.   I noticed it.  I certainly noticed the

12:05:35  10   differences.

12:05:36  11   Q.   Did you ever -- did you ever have an occasion

12:05:39  12   where Mr. Brockman began to fall asleep during

12:05:41  13   meetings?

12:05:42  14   A.   Yes, a couple of times he fell asleep.

12:05:44  15   Q.   Was that unusual?

12:05:45  16   A.   When I was embarrassed of my client sometimes

12:05:49  17   do that, but, no.  It was unusual.  It was very

12:05:52  18   unusual.

12:05:52  19   Q.   At the time, did you attribute these changes to

12:05:56  20   old age, or what was your assessment at the time?

12:05:58  21   A.   At the time it was old age.  Put it down to old

12:06:01  22   age.

12:06:01  23   Q.   Did you think Mr. Brockman was fabricating

12:06:04  24   these physical changes and -- and diminished

12:06:07  25   capacity at the time you were observing him?

12:06:10  1   **A.**   Not at all.

12:06:11  2   **Q.**   Any doubt what you were observing was real?

12:06:14  3   **A.**   None whatsoever.

12:06:15  4   **Q.**   You spoke with people at Reynolds and Reynolds

12:06:16  5   about some of the physical and mental changes you

12:06:19  6   were observing in Mr. Brockman; correct?

12:06:21  7   **A.**   I did.

12:06:21  8   **Q.**   Who were some of those people?

12:06:23  9   **A.**   Definitely Robert Burnett.  I might have

12:06:27  10  mentioned -- I know I spoke to Robin Gilliand, who

12:06:31  11  is in the legal department.  These were people I was

12:06:33  12  closest to inside the company.

12:06:34  13  **Q.**   With Mr. Burnett and your conversations with

12:06:36  14  him, did he share your concerns about Mr. Brockman's

12:06:39  15  physical and mental decline?

12:06:41  16           MR. LANGSTON:  Objection.  Hearsay.

12:06:42  17           THE COURT:  Hearsay.  Response?

12:06:47  18           MR. VARNADO:  Just asking what he

12:06:48  19  experienced from Mr. Burnett in terms of his

12:06:52  20  impression of whether he shared the same view of

12:06:54  21  Mr. Brockman.

12:06:54  22           THE COURT:  I thought asked whether he

12:06:57  23  shared -- one second.  Yeah, with Mr. Burnett in

12:07:07  24  your conversations, did he share your concerns about

12:07:11  25  Mr. Brockman's physical and mental health.  The

| | |
|---|---|
| 12:07:13 | 1 |
| 12:07:16 | 2 |

answer is yes or no, but what he shared would be

hearsay.  So respectfully, objection overruled.

                    MR. VARNADO:

Q.   Did he share your concern?

A.   Yes.

Q.   And same with Mrs. Gilliand?

A.   Yes.

Q.   Any indication -- as to Ms. Gilliand, did her

husband suffer from Parkinson's disease?

A.   Yes --

                    MR. LANGSTON:  Objection, Your Honor.

Counsel is trying to introduce the views of

Ms. Gilliand and Mr. Burnett without calling them as

witnesses here, subject to cross-examination.

That's hearsay.

                    THE COURT:  Yeah.  At this point -- you

can ask him what their general impressions were,

based on his observations and their reactions.

That's not hearsay.  That's great.

                         If you are getting into what they

thought about a medical condition, the only way he

could know that is if they told him that, and that

would be hearsay.  So respectfully, objection

sustained.

                    MR. VARNADO:  Okay.

12:08:07    1    Q.    Note Mr. Burnett was actually on the

12:08:10    2    Government's witness list, but --

12:08:12    3                    MR. LANGSTON:  Move to strike.

12:08:13    4                    THE COURT:  Well, when he comes, we can

12:08:15    5    talk to him.

12:08:17    6                    MR. VARNADO:

12:08:17    7    Q.    At the time, did you have any belief or

12:08:19    8    understanding or awareness that Mr. Brockman was

12:08:23    9    suffering from Parkinson's?

12:08:24   10    A.    No.

12:08:24   11    Q.    Did you understand that to be different today?

12:08:27   12    A.    I understand it to be different from what I've

12:08:30   13    read, but that's all.

12:08:32   14    Q.    Okay.  So let's shift gears and talk a little

12:08:36   15    bit about the AEBCT, which unfortunately I will

12:08:39   16    probably use that term a few times.  You were the

12:08:42   17    trustee of the A. Eugene Brockman Charitable Trust;

12:08:46   18    correct?

12:08:46   19    A.    I was a director of the trust -- of the

12:08:49   20    trustee.

12:08:49   21    Q.    Fair.  The trust company was St. John's?

12:08:53   22    A.    Yes.

12:08:54   23    Q.    You were director at St. John's?

12:08:56   24    A.    Yes.

12:08:56   25    Q.    Which acted as trustee for the AEBCT?

12:08:59  1    **A.**   Right.

12:09:00  2    **Q.**   Okay.  Just to be clear, the AEBCT is a

12:09:06  3    discretionary, charitable trust?

12:09:08  4    **A.**   Yes.

12:09:08  5    **Q.**   And there's nothing improper about a

12:09:13  6    discretionary, charitable trust as an entity under

12:09:16  7    Bermuda law?

12:09:17  8                   MR. LANGSTON:  Objection.  Asking for

12:09:19  9    the witness's legal opinion as to Bermuda law.

12:09:23  10                  THE COURT:  Well --

12:09:25  11                  MR. VARNADO:  I think they spent an

12:09:26  12   hour and a half asking about activities as trustee,

12:09:30  13   and he is a lawyer.

12:09:31  14                  MR. LANGSTON:  Your Honor, about his

12:09:32  15   observations, tasks that he did.  He is asking

12:09:35  16   whether it is legal in Bermuda to have a certain

12:09:39  17   type of trust.

12:09:40  18                  THE COURT:  I think this witness can

12:09:42  19   answer, since he was the trustee.  I mean, he can

12:09:44  20   answer as to his understanding of whether or not it

12:09:46  21   was legal or not legal.  So objection's overruled.

12:09:50  22                  MR. VARNADO:

12:09:50  23   **Q.**   So again, I'll rephrase it so the record's

12:09:52  24   clear.  Under Bermuda law, there's nothing

12:09:56  25   inherently improper or illegal about a

12:09:59  1   discretionary, charitable trust like the AEBCT?

12:10:02  2   **A.**   That's correct.

12:10:03  3   **Q.**   The same is true under US law?

12:10:05  4   **A.**   I don't know about US law.

12:10:07  5   **Q.**   Well, either way -- this was -- you believed

12:10:09  6   the AEBCT to be a lawful structure, just in and of

12:10:13  7   itself how it was established?

12:10:14  8   **A.**   I still do, yes.

12:10:15  9   **Q.**   And still do?

12:10:16  10  **A.**   Yes.

12:10:16  11  **Q.**   All right.  Now, distributions from trusts like

12:10:19  12  the AEBCT to individual beneficiaries, to persons

12:10:24  13  would not be consistent with charitable purposes of

12:10:27  14  such a trust; correct?

12:10:30  15  **A.**   Under this particular trust deed, it wouldn't

12:10:33  16  -- wouldn't have been consistent with a charitable

12:10:35  17  gift.  That's right.

12:10:36  18  **Q.**   Okay.  And I just want to be clear that the

12:10:38  19  AEBCT never made a distribution to an individual

12:10:43  20  beneficiary, correct?

12:10:45  21  **A.**   In all of my time, I never saw such a

12:10:47  22  distribution.  And in my review of the trust

12:10:50  23  records, I never saw such a distribution.

12:10:52  24  **Q.**   And that includes Mr. Brockman?

12:10:54  25  **A.**   That's correct.

```
12:10:55   1   Q.   In fact, you told the Government this weekend
12:10:57   2   that Mr. Brockman, and I quote, "Never took a cent
12:11:01   3   out of the trust," the AEBCT?
12:11:03   4   A.   That's correct.
12:11:04   5   Q.   Now, the most significant asset of the AEBCT is
12:11:07   6   Reynolds and Reynolds; correct?
12:11:08   7   A.   Yes.
12:11:09   8   Q.   That's a US-based company?
12:11:10   9   A.   Yes.
12:11:11  10   Q.   And it's owned by Universal Computer Systems
12:11:15  11   Holdings; right?
12:11:16  12   A.   Yes.
12:11:16  13   Q.   You are aware that entity files US taxes?
12:11:18  14   A.   Yes.
12:11:19  15   Q.   And the same for Reynolds and Reynolds; it
12:11:22  16   files US taxes also?
12:11:23  17   A.   Yes.
12:11:24  18   Q.   And then, again, Dealer Computer Services,
12:11:27  19   which is in the hierarchy, that is also a US entity?
12:11:30  20   A.   Yes.
12:11:31  21   Q.   That files US taxes?
12:11:32  22   A.   Yes.
12:11:32  23   Q.   All right.  So while you were a director at
12:11:35  24   St. John's Trust Company, during the last eight
12:11:38  25   years or so is when you had the director position --
```

12:11:40    1    last eight years of your tenure?

12:11:42    2    A.   That's correct.

12:11:43    3    Q.   From 2010 to 2018.   Again, at the time you were

12:11:48    4    the director, you believed that trust structure to

12:11:49    5    be lawful; correct?

12:11:50    6    A.   Yes.

12:11:51    7    Q.   And you also believed that the activities that

12:11:54    8    you conducted on behalf of the trust were also

12:11:59    9    lawful?

12:11:59   10    A.   Yes.

12:12:00   11    Q.   All right.   And again, as your role as the

12:12:04   12    director of St. John's trustee of the AEBCT; is that

12:12:08   13    fair?

12:12:08   14    A.   Yes.

12:12:08   15    Q.   Okay.   And as a trustee to the -- to the AEBCT,

12:12:13   16    you had fiduciary obligations to the trust and to

12:12:18   17    the related entities that you managed?

12:12:19   18    A.   Yes.

12:12:20   19    Q.   All right.   And I -- I believe it's your

12:12:22   20    testimony and your view, even sitting here right

12:12:25   21    today, that you met your fiduciary obligations with

12:12:28   22    respect to the AEBCT?

12:12:28   23    A.   I believe I did.

12:12:29   24    Q.   All right.   And, in particular, you satisfied

12:12:33   25    your obligations -- fiduciary obligations in

12:12:35   1   connection with charitable giving; correct?

12:12:37   2   A.   Yes.

12:12:37   3   Q.   All right.  And in some instances, did other

12:12:41   4   individuals make recommendations to the

12:12:43   5   organizations that should receive charitable giving

12:12:46   6   from the trust?

12:12:46   7   A.   Yes.

12:12:48   8   Q.   Would one of those examples be Robert Burnett,

12:12:50   9   Reynolds's CFO that suggested a scholarship program

12:12:56   10  be set up at Texas A&M?

12:12:59   11  A.   Yes.

12:12:59   12  Q.   And that particular scholarship was designed to

12:12:59   13  promote students going into the science, technology,

12:13:21   14  engineering and math; correct?

12:13:21   15  A.   Yes.

12:13:22   16  Q.   And that scholarship program was funded by the

12:13:24   17  trust?

12:13:24   18  A.   That's correct.

12:13:25   19  Q.   And is it fair to say that the AEBCT

12:13:28   20  participated in substantial charitable giving?

12:13:31   21  A.   Yes.

12:13:31   22  Q.   And I'm going to run through a few and see if

12:13:34   23  you agree with me.  Around 20 million from the AEBCT

12:13:39   24  to Rice University in 2008 for the Brockman Hall of

12:13:45   25  Physics?

A.   My recollection around -- I thought 22, but,
yeah.  Twenty or twenty-two, yeah.

Q.   Ballpark estimates are fine for this.  A pledge
of $85 million to Rice University in 2014 for an
opera theater called the Brockman Theater?

A.   Yes.  Again, I think it might have been more,
but, yes.

Q.   At least $4 million to the Centre College in
Kentucky for an athletic field?

A.   Yes.

Q.   An additional $22.5 million to the Centre
College in 2010 for the Brockman Residence Commons?

A.   Yes, that was $22,000,000.

Q.   And $25 million to the Baylor College of
Medicine in 2010?

A.   Yes.

Q.   We're going to come back to that date, because
few questions about that that were confusing.  And
again, to the Texas A&M scholarship program, around
$12- to $15 million, beginning around 2018 for
what's called the Brockman Scholars?

A.   Yes.

Q.   And I'll run through a couple more.  There were
$6 million to form the Jefferson Scholars associated
with the University of Virginia?

12:14:45   1   **A.**   Yes.

12:14:45   2   **Q.**   Again --

12:14:46   3   **A.**   Not to form, sorry.   It was $6 million gift to

12:14:50   4   establish a share of colonial history and fellowship

12:14:53   5   to go with the chair.

12:14:55   6   **Q.**   Okay.

12:14:55   7   **A.**   It was money to the Jefferson Scholars.

12:14:58   8   **Q.**   Not to form it, but as a donation?

12:15:01   9   **A.**   That's correct.

12:15:02   10   **Q.**   Thank you.   $6 million to the UT Health Science

12:15:06   11   Center?

12:15:06   12   **A.**   Yes.

12:15:06   13   **Q.**   All right.   And then I think $5 million to

12:15:09   14   various doctors in Bermuda?

12:15:11   15   **A.**   Yes.

12:15:11   16   **Q.**   Would those be some of the donations that --

12:15:14   17   **A.**   Um, there was -- I think -- my recollection was

12:15:16   18   two -- two and a half million dollars, and it was

12:15:19   19   John Hopkins for the doctor who was a Bermudian

12:15:21   20   doctor.   But then over the years, many smaller

12:15:25   21   donations -- many, many years to Bermuda charities.

12:15:27   22   **Q.**   You went through some of what I asked you in

12:15:30   23   your grand jury testimony; correct?

12:15:31   24   **A.**   Yes.

12:15:31   25   **Q.**   And I think that the testimony there was that

12:15:33  1   the trust has given or committed around $200 million

12:15:37  2   in charitable donations during the time period you

12:15:40  3   were involved as the trustee?

12:15:42  4   A.   Yes.

12:15:42  5   Q.   All right.   And the trust made these donations

12:15:47  6   because they're consistent with the charitable

12:15:49  7   purposes of the trust?

12:15:49  8   A.   That's correct.

12:15:50  9   Q.   And as we mentioned, several of these

12:15:53  10  donations, they absolutely reference the Brockman

12:15:55  11  name?

12:15:55  12  A.   Yes.

12:15:56  13  Q.   There's the Brockman Hall of Physics and the

12:15:59  14  Brockman Theater at Rice University?

12:16:00  15  A.   Yes.

12:16:01  16  Q.   The Brockman Commons at Centre College?

12:16:04  17  A.   Yes.

12:16:05  18  Q.   And the Brockman Scholars at Texas A&M?

12:16:08  19  A.   Yes.

12:16:08  20  Q.   So it was publicly available Mr. Brockman was

12:16:11  21  connected, in some way, to this charitable giving?

12:16:14  22  A.   Yes.

12:16:19  23           MR. VARNADO:   Your Honor, it's 12:15 if

12:16:20  24  you would like me to take a break.

12:16:20  25           THE COURT:   That would be great.   Let's

12:16:22  1  be back at one o'clock.  If there's issues, let me

12:16:25  2  know.  We're trying to move along as quickly as we

12:16:27  3  can.

4  **(WHEREUPON, THE PROCEEDINGS WERE RECESSED AT 12:16**

5  **P.M.)**

6  ---oOo---

1                    C E R T I F I C A T E

2

3

4          I hereby certify that pursuant to Title 28,

5 Section 753 United States Code, the foregoing is a

6 true and correct transcript of the stenographically

7 reported proceedings in the above matter.

8          Certified on 11/17/2021.

9

10

11     Sean Gumm, RPR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$11** [1] - 79:16
**$12** [1] - 174:20
**$15** [1] - 174:20
**$150,000** [1] - 93:25
**$200** [1] - 176:1
**$22,000,000** [1] - 174:13
**$25** [4] - 125:16, 125:22, 126:16, 174:14
**$85** [1] - 174:4

## '

**'15/'16/'17** [1] - 164:12
**'16/'17** [1] - 121:15
**'17** [1] - 159:17
**'18** [1] - 159:16
**'loan'** [1] - 146:5

## 0

**05** [1] - 50:2
**06** [1] - 48:4

## 1

**1** [1] - 96:14
**1.5** [1] - 122:25
**10** [6] - 100:25, 104:18, 104:23, 104:25, 105:1
**100** [1] - 30:25
**10:00** [1] - 164:9
**11** [7] - 48:22, 50:4, 50:9, 72:19, 132:21, 135:5, 135:9
**11/17/2021** [1] - 178:8
**11:00** [2] - 158:12, 164:9
**11:30** [2] - 158:7, 158:12
**12** [6] - 3:5, 124:22, 136:8, 136:10, 142:6, 142:9
**12:15** [3] - 153:1, 153:13, 176:23
**12:16** [1] - 177:4
**12th** [1] - 115:15
**13** [2] - 39:5, 111:21
**130** [1] - 107:17
**131** [3] - 107:17, 108:8, 110:6
**132** [1] - 131:11
**133** [4] - 142:13, 142:18, 144:16, 144:21
**13th** [3] - 80:1, 81:25,

82:3
**14** [11] - 62:19, 93:7, 93:8, 93:11, 96:7, 101:9, 104:10, 125:18, 125:24, 128:11, 128:14
**14-year** [1] - 100:8
**15** [10] - 47:18, 111:21, 112:6, 127:16, 127:25, 128:11, 128:14, 152:23, 153:1
**153** [1] - 3:11
**16** [4] - 127:24, 128:8, 128:11, 128:14
**17** [9] - 1:12, 4:6, 8:2, 112:14, 149:23, 150:4, 150:6, 157:12
**18** [5] - 140:3, 140:5, 145:7, 149:12, 149:15
**19** [11] - 32:14, 33:4, 36:20, 37:8, 46:16, 112:14, 113:3, 115:12, 115:13, 117:14, 117:18
**1990's** [1] - 52:10
**19th** [1] - 37:7

## 2

**2** [6] - 39:25, 46:17, 79:20, 111:13, 145:16, 155:6
**2.6** [1] - 94:3
**20** [6] - 41:12, 116:12, 117:14, 117:18, 173:23
**20-some** [1] - 49:9
**2000** [1] - 132:22
**2003** [2] - 92:20, 93:9
**2004** [3] - 93:10, 93:24, 161:11
**2008** [1] - 173:24
**2009** [1] - 61:2
**2010** [9] - 94:16, 94:23, 94:25, 104:1, 113:17, 113:18, 172:3, 174:12, 174:15
**2011** [2] - 115:15, 117:6
**2013** [4] - 61:3, 61:9, 132:22, 133:7
**2014** [2] - 133:23, 174:4
**2015** [2] - 162:10, 163:16
**2015/'16** [1] - 121:15
**2016** [10] - 68:16,

134:7, 135:17, 136:11, 136:14, 136:17, 138:14, 138:24, 140:1, 144:8
**2016/'17** [1] - 140:6
**2017** [9] - 136:13, 142:12, 144:4, 144:25, 148:20, 159:16, 159:19, 159:23, 162:22
**2018** [32] - 61:11, 62:19, 63:2, 63:3, 65:1, 93:9, 97:3, 99:14, 102:14, 107:14, 110:4, 145:11, 150:22, 150:23, 152:13, 154:10, 155:7, 157:2, 159:5, 159:9, 159:13, 159:23, 160:16, 160:18, 160:20, 161:11, 162:8, 162:10, 163:16, 172:3, 174:20
**2019** [8] - 65:23, 66:2, 67:1, 67:8, 85:3, 86:4, 131:12, 159:23
**2020** [25] - 69:5, 69:18, 70:21, 71:16, 71:21, 71:23, 72:20, 74:24, 76:7, 76:8, 76:20, 77:17, 77:25, 78:1, 80:1, 80:23, 82:1, 82:3, 82:22, 83:5, 85:16, 86:4, 87:21, 88:12, 159:23
**2021** [12] - 1:12, 4:6, 32:14, 33:4, 36:21, 37:8, 39:5, 40:1, 41:12, 42:15, 46:16, 159:24
**21** [4] - 65:23, 124:5, 125:4, 125:6
**22** [1] - 174:1
**22.5** [1] - 174:11
**23** [4] - 74:6, 121:13, 123:25, 124:3
**24** [4] - 47:18, 117:20, 121:8
**26** [6] - 42:15, 105:4, 105:6, 107:21, 107:25, 141:23
**27** [3] - 124:18, 125:4, 125:6
**28** [1] - 178:4
**28-gauge** [1] - 68:1
**29** [1] - 60:17

## 3

**3** [3] - 1:9, 146:10
**30-plus** [1] - 81:7

## 4

**4** [1] - 174:8
**4,500** [1] - 86:25
**410** [1] - 68:1
**45** [1] - 153:14
**4:21-CR-00009-1** [1] - 1:4
**4th** [1] - 157:2

## 5

**5** [4] - 61:11, 97:5, 99:14, 175:13
**51** [3] - 76:19, 77:18, 77:23
**52** [5] - 79:8, 79:14, 80:11, 80:18, 131:16
**59** [3] - 32:15, 33:7, 33:9
**5:30** [1] - 158:8
**5th** [2] - 154:8, 160:16

## 6

**6** [3] - 174:24, 175:3, 175:10
**60** [9] - 3:7, 36:23, 37:1, 38:11, 38:12, 38:15, 38:16, 38:18, 157:17
**61** [5] - 38:24, 39:2, 39:9, 39:10, 39:13
**62** [8] - 39:20, 39:22, 41:8, 59:12, 59:17, 64:10, 64:14, 131:17
**63** [7] - 41:8, 41:9, 42:6, 42:9, 64:8, 65:11, 65:16
**64** [4] - 42:11, 42:12, 59:12, 59:18
**65** [5] - 46:9, 46:10, 47:4, 47:9, 51:7
**66** [3] - 47:2, 47:12
**67** [3] - 62:9, 64:16, 64:17
**68** [3] - 69:6, 71:9, 71:13
**69** [5] - 72:12, 72:13, 75:1, 75:13, 75:14
**6:00** [1] - 158:8

## 7

**7** [2] - 131:11, 139:18

**70** [3] - 82:1, 83:20, 83:25
**70th** [2] - 116:9, 116:17
**71** [3] - 65:20, 69:8, 69:13
**753** [1] - 178:5

## 8

**8** [3] - 47:17, 47:23, 48:21
**80** [2] - 27:15, 28:5
**84** [1] - 3:8
**8:32** [1] - 4:6

## 9

**9** [4] - 71:23, 110:24, 114:10, 114:14
**90** [1] - 27:15
**91** [1] - 110:25
**92** [1] - 3:10
**9:00** [1] - 158:11
**9th** [3] - 71:15, 71:18, 72:6

## A

**A&M** [3] - 173:10, 174:19, 176:18
**a.m** [1] - 158:11
**A.M** [1] - 4:6
**abilities** [1] - 71:25
**ability** [7] - 25:15, 25:22, 55:15, 68:8, 68:11, 80:7, 163:17
**able** [28] - 13:24, 14:20, 16:14, 16:16, 23:2, 25:25, 26:6, 31:5, 31:11, 32:15, 38:25, 51:12, 54:2, 62:10, 62:11, 64:23, 66:5, 66:14, 73:3, 73:18, 76:1, 78:13, 104:12, 145:19, 149:20, 150:9, 160:11
**abroad** [1] - 112:1
**absolutely** [5] - 74:25, 91:24, 156:12, 161:21, 176:10
**acceptable** [1] - 74:6
**accepted** [1] - 148:16
**access** [10] - 78:13, 85:14, 103:20, 103:23, 104:12, 113:22, 114:3, 122:18, 145:19, 155:2

accommodate [3] -
7:18, 8:13, 9:4
accommodating [1] -
54:3
accomplished [1] -
150:16
according [1] - 50:11
accounting [1] - 61:1
accounts [2] - 145:2,
145:19
accumulated [5] -
66:6, 66:9, 66:10,
66:21, 67:5
accurate [3] - 28:6,
144:3, 149:3
accurately [1] - 25:16
achieved [1] - 30:24
acquisition [1] - 72:25
acquisitions [1] -
66:12
act [3] - 28:12, 28:22,
78:23
acted [1] - 168:25
acting [1] - 56:5
action [1] - 74:19
activities [4] - 89:17,
90:14, 169:12, 172:7
actual [2] - 34:23,
116:13
add [2] - 98:20, 119:14
added [3] - 29:23,
29:25, 136:19
addition [2] - 97:7,
137:2
additional [1] - 174:11
address [6] - 10:17,
10:22, 10:25, 115:2,
117:23, 125:1
addresses [2] -
114:24, 117:25
addressing [1] - 5:3
adjust [2] - 44:19,
66:10
adjusted [1] - 24:23
adjustment [2] -
54:18, 55:1
adjustments [1] - 55:4
administer [5] - 43:21,
43:23, 94:5, 113:12,
113:15
administered [9] -
27:13, 33:4, 37:6,
39:5, 39:25, 41:11,
42:15, 44:6, 44:9
administrations [1] -
42:22
admit [2] - 33:6, 59:12
admitted [30] - 33:9,
38:19, 39:11, 42:9,
47:9, 59:18, 64:14,

64:21, 65:17, 69:13,
71:13, 75:15, 77:23,
80:18, 84:1, 104:23,
105:2, 108:1,
110:12, 114:15,
117:18, 121:11,
124:3, 125:6,
128:14, 135:9,
142:9, 144:21,
149:15, 150:7
admonished [1] -
157:4
advice [1] - 144:10
AEBCT [18] - 136:21,
139:19, 141:25,
142:5, 168:15,
168:25, 169:2,
170:1, 170:6,
170:12, 170:19,
171:3, 171:5,
172:12, 172:15,
172:22, 173:19,
173:23
affect [3] - 30:10,
130:22, 131:24
affected [2] - 22:14,
131:4
afternoon [4] - 5:17,
10:9, 153:8, 153:25
afterwards [1] - 27:24
age [3] - 165:20,
165:21, 165:22
agencies [1] - 102:7
agents [4] - 62:5,
151:2, 157:18, 158:2
ago [4] - 52:24, 85:5,
91:17, 146:20
agree [7] - 23:3,
42:23, 48:9, 52:21,
123:8, 161:19,
173:23
agreed [4] - 10:16,
24:12, 154:15,
154:23
agreement [4] -
100:16, 100:19,
155:25, 157:6
ahead [2] - 78:11, 87:2
airline [1] - 63:10
al [2] - 37:15, 41:19
Albula [3] - 97:13,
142:23, 146:21
algorithm [17] - 25:2,
25:11, 26:15, 26:17,
27:19, 27:23, 27:24,
30:5, 31:25, 33:12,
34:13, 34:16, 34:19,
34:20, 39:14, 40:4,
46:24
alleged [2] - 55:25,

57:24
alleging [1] - 90:7
allows [1] - 103:22
almost [1] - 159:23
alone [4] - 23:12,
31:17, 31:24, 42:23
alter [3] - 48:15,
105:18, 105:22
altering [1] - 50:8
AM [1] - 1:9
America's [1] - 159:20
amount [10] - 26:20,
28:3, 55:12, 55:14,
55:21, 55:22, 79:7,
109:10, 125:14,
125:15
analysis [7] - 37:3,
37:21, 48:9, 54:22,
55:3, 74:11, 118:9
analyzes [1] - 33:19
ancillary [1] - 22:20
announced [1] - 76:7
annual [4] - 68:13,
68:14, 93:16, 93:17
anonymous [1] -
126:7
Answer [5] - 13:15,
13:18, 13:21, 13:23,
14:5
answer [10] - 16:10,
19:2, 24:12, 44:19,
54:5, 57:9, 57:12,
167:1, 169:19,
169:20
answered [5] - 19:9,
19:14, 19:19, 32:2,
36:19
answers [4] - 6:7,
100:20, 156:3,
158:22
anticipate [2] - 8:20,
146:13
anyway [1] - 36:18
appear [3] - 47:20,
100:21, 141:2
appearance [4] -
160:2, 160:10,
162:12, 162:13
APPEARANCES [1] -
1:14
appeared [3] - 37:18,
135:24, 162:6
applied [1] - 157:6
applies [1] - 37:15
apply [3] - 34:9, 37:21,
41:19
applying [2] - 34:20,
54:21
appreciate [5] - 7:21,
8:10, 9:20, 58:25,

91:23
approach [6] - 4:13,
107:18, 131:13,
131:14, 142:14,
142:16
appropriate [6] -
19:19, 34:12, 34:25,
37:23, 38:7, 90:8
approved [1] - 95:17
approximate [1] - 86:3
April [4] - 71:15,
71:18, 71:23, 72:6
areas [1] - 75:24
arena [1] - 90:18
Argentina [7] - 67:9,
67:11, 137:12,
159:17, 162:20,
162:21, 163:9
argued [1] - 90:5
arguing [1] - 89:8
argument [1] - 20:7
Arps [2] - 133:24,
134:3
arrange [2] - 9:13,
10:9
arrangement [2] -
154:22, 154:24
arrow [1] - 34:8
article [1] - 106:11
aside [2] - 107:8,
126:22
asleep [2] - 165:12,
165:14
aspects [1] - 48:19
Aspen [2] - 97:18,
98:4
asserted [1] - 16:7
assess [6] - 40:18,
54:9, 54:11, 56:7,
56:11, 58:10
assessment [1] -
165:20
asset [2] - 96:25,
171:5
assets [1] - 118:19
assist [2] - 54:19,
100:20
assistance [5] - 54:15,
55:13, 55:22, 55:23,
56:1
assistant [1] - 60:23
associated [3] -
129:25, 145:2,
174:24
association [1] -
118:20
assume [2] - 109:2,
109:12
assumed [1] - 20:23
assuming [2] - 8:16,

23:4
AT [1] - 177:4
athletic [1] - 174:9
attached [2] - 5:1,
128:1
attaching [2] - 106:10,
149:25
attempt [2] - 137:19,
138:9
attempted [2] - 19:1,
19:7
attend [2] - 68:16,
135:19
attention [13] - 61:10,
62:7, 71:15, 76:6,
77:25, 81:25, 99:13,
109:19, 127:24,
133:16, 142:11,
146:21, 150:21
Attention [1] - 65:5
Attorney [4] - 1:18,
1:20, 1:21, 1:23
attorney [1] - 109:11
attorneys [11] - 16:2,
16:3, 16:22, 17:24,
109:21, 133:20,
133:24, 134:5,
154:12, 157:18
attribute [1] - 165:19
audited [1] - 146:13
August [11] - 77:17,
77:25, 78:1, 80:1,
91:16, 94:25,
150:21, 150:23,
160:18, 160:20
Australia [1] - 146:3
authentic [1] - 146:9
authorize [1] - 80:3
auto [1] - 66:24
automatically [2] -
35:13, 35:20
availability [1] - 164:1
available [4] - 8:24,
16:14, 55:13, 176:20
avoids [1] - 143:14
aware [17] - 12:23,
62:3, 64:5, 64:7,
65:7, 71:16, 71:22,
72:2, 74:21, 84:20,
96:16, 96:18, 99:10,
111:19, 130:3,
133:2, 171:13
awareness [1] - 168:8
awhile [2] - 15:22,
135:1

### B

baby [2] - 82:14, 82:18
background [2] -

82:9, 128:23
**backup** [1] - 102:25
**bad** [1] - 78:17
**ballpark** [1] - 174:3
**bank** [1] - 53:13
**Bank** [1] - 145:1
**banks** [2] - 148:7,
148:18
**Barris** [7] - 72:18,
76:15, 81:1, 81:2,
81:14, 81:18, 91:9
**Barris's** [2] - 75:23,
81:4
**based** [14] - 6:10,
36:13, 45:24, 46:8,
46:24, 49:2, 53:8,
67:4, 88:20, 90:3,
156:18, 159:13,
167:18, 171:8
**basis** [5] - 21:11,
93:16, 93:17, 121:3,
141:6
**Baylor** [9] - 65:3,
125:12, 126:24,
127:12, 127:14,
127:17, 128:2,
128:9, 174:14
**became** [4] - 61:7,
82:13, 95:1, 126:8
**become** [3] - 61:8,
95:2, 134:8
**becoming** [2] - 75:9,
96:20
**began** [1] - 165:12
**beginning** [3] - 94:23,
156:1, 174:20
**behalf** [4] - 98:7,
132:19, 133:25,
172:8
**behind** [3] - 32:20,
82:9, 137:18
**belief** [1] - 168:7
**below** [1] - 48:22
**beneficiaries** [2] -
78:15, 170:12
**beneficiary** [1] -
170:20
**benefits** [1] - 93:25
**bent** [3] - 162:14,
162:18
**Bermuda** [24] - 69:3,
92:20, 93:24, 99:17,
102:12, 102:23,
104:4, 104:6, 104:9,
114:3, 135:16,
145:1, 146:25,
148:12, 148:22,
154:9, 155:10,
159:19, 169:7,
169:9, 169:16,

169:24, 175:14,
175:21
**Bermudian** [1] -
175:19
**best** [14] - 6:14, 7:14,
8:13, 9:13, 9:16,
23:2, 25:18, 98:23,
102:3, 133:9,
136:17, 139:2,
141:9, 151:16
**Beth** [1] - 126:10
**better** [5] - 24:5,
56:18, 56:19, 62:13,
107:20
**between** [21] - 18:12,
18:20, 19:16, 23:21,
24:13, 25:3, 25:16,
26:7, 49:21, 62:20,
75:6, 76:19, 95:24,
98:18, 101:2, 102:2,
104:9, 124:23,
125:25, 142:19,
160:19
**beyond** [1] - 136:18
**bias** [1] - 21:19
**biased** [6] - 22:15,
22:23, 50:14, 50:22,
52:13, 52:20
**big** [4] - 79:10, 102:23,
102:25, 119:9
**big-image** [2] -
102:23, 102:25
**bigger** [3] - 56:21,
64:15, 144:1
**biggest** [1] - 129:20
**billion** [3] - 96:14,
97:5, 122:1
**binder** [1] - 62:15
**binomial** [8] - 45:24,
46:8, 46:25, 49:2,
49:7, 49:11, 49:12,
49:23
**birthday** [2] - 116:9,
116:17
**bit** [16] - 22:21, 32:17,
32:18, 37:10, 54:17,
54:25, 73:12, 96:7,
113:2, 125:9,
129:16, 144:14,
147:7, 159:2,
164:24, 168:15
**bleeding** [1] - 146:16
**blurry** [1] - 62:12
**board** [11] - 75:25,
79:1, 79:24, 80:20,
81:11, 81:19, 81:23,
113:8, 113:14,
113:16
**boat** [6] - 6:25,
142:23, 143:6,

143:13, 143:21,
144:1
**Bob** [37] - 61:7, 62:25,
63:4, 65:2, 72:8,
76:5, 77:9, 77:12,
77:14, 77:16, 78:21,
79:21, 81:7, 85:23,
91:14, 92:23, 92:24,
106:24, 116:8,
116:16, 119:19,
119:24, 122:21,
127:2, 140:9,
140:13, 140:16,
140:17, 141:8,
141:10, 154:1,
162:15, 164:18,
164:22, 164:24,
165:6
**Bob's** [1] - 73:8
**bodies** [1] - 102:10
**bonus** [2] - 77:2, 77:3
**BORIS** [1] - 1:17
**bottom** [6] - 96:4,
103:12, 109:19,
117:21, 127:25,
147:18
**BOURGET** [1] - 1:17
**box** [1] - 37:17
**boxes** [2] - 37:18, 42:1
**brainstorming** [1] -
16:5
**break** [13] - 11:9,
11:10, 11:11, 52:6,
59:3, 130:25,
139:13, 153:1,
153:4, 153:12,
153:13, 176:24
**breakdown** [1] - 19:6
**brief** [9] - 8:12, 60:20,
66:8, 69:23, 72:22,
78:4, 82:8, 106:6,
160:2
**briefly** [5] - 7:23, 9:21,
60:10, 62:22, 140:4
**Britain** [1] - 103:8
**broader** [1] - 70:8
**Brockman** [229] -
12:24, 13:9, 13:20,
14:1, 14:12, 14:15,
14:18, 14:24, 15:2,
15:6, 15:7, 15:9,
15:15, 16:15, 19:12,
21:10, 21:14, 21:15,
21:18, 21:20, 22:17,
31:16, 33:18, 37:6,
41:12, 42:15, 42:18,
42:24, 43:4, 44:5,
44:10, 45:1, 46:15,
47:22, 60:10, 60:16,
60:17, 62:20, 63:21,

63:25, 66:1, 66:20,
67:16, 69:17, 69:24,
71:24, 72:2, 72:5,
72:19, 73:13, 75:6,
76:20, 77:9, 77:12,
77:14, 77:16, 79:21,
80:2, 81:5, 81:14,
81:18, 82:2, 83:6,
85:6, 85:17, 87:9,
88:13, 91:14, 92:23,
92:24, 93:5, 93:6,
93:12, 93:15, 93:18,
93:22, 94:5, 94:6,
94:8, 94:12, 95:3,
95:6, 95:11, 95:14,
95:16, 95:17, 95:25,
96:2, 96:5, 96:8,
96:24, 97:7, 97:8,
97:16, 97:22, 98:3,
98:5, 98:8, 98:18,
99:5, 99:7, 99:10,
99:24, 100:9,
100:14, 101:2,
101:6, 101:9,
101:11, 101:20,
101:22, 102:3,
102:19, 103:3,
103:9, 104:11,
105:7, 106:4,
106:21, 106:24,
107:11, 108:10,
108:17, 111:1,
111:23, 114:22,
115:2, 115:14,
115:17, 117:6,
119:19, 121:1,
121:17, 122:8,
122:20, 123:5,
123:15, 124:6,
124:15, 125:11,
125:25, 126:3,
127:10, 127:11,
127:14, 127:18,
128:16, 128:22,
129:4, 129:8, 130:7,
130:9, 130:10,
130:14, 130:16,
131:4, 131:24,
132:12, 132:19,
132:23, 133:10,
134:4, 134:18,
134:22, 135:11,
135:14, 135:19,
136:1, 136:12,
136:23, 137:22,
138:1, 138:3, 138:5,
138:23, 140:22,
140:25, 141:7,
141:22, 142:3,
142:20, 142:25,
143:17, 145:2,

145:4, 145:25,
147:18, 148:25,
149:21, 149:24,
150:16, 150:17,
151:12, 151:20,
152:5, 154:1,
156:11, 159:5,
159:15, 160:1,
160:3, 160:6,
160:15, 160:22,
161:10, 161:11,
162:5, 162:23,
163:10, 163:23,
164:5, 165:12,
165:23, 166:6,
166:21, 168:8,
168:17, 170:24,
171:2, 173:24,
174:5, 174:12,
174:21, 176:10,
176:13, 176:14,
176:16, 176:18,
176:20
**BROCKMAN** [1] - 1:7
**Brockman's** [38] -
21:7, 21:12, 33:12,
39:14, 40:5, 41:15,
48:11, 68:11, 70:19,
70:23, 71:16, 73:15,
73:21, 74:20, 74:23,
75:8, 80:7, 82:6,
82:9, 101:24, 106:8,
112:3, 123:18,
126:14, 126:23,
129:12, 138:12,
151:6, 151:9,
151:13, 159:3,
160:10, 161:1,
161:7, 162:12,
163:17, 166:14,
166:25
**broken** [1] - 32:6
**brought** [1] - 5:19
**build** [3] - 66:12,
66:15, 146:25
**building** [6] - 66:5,
66:12, 66:13, 140:8,
140:24
**built** [1] - 25:2
**bullet** [1] - 148:3
**bullets** [1] - 147:18
**Burnett** [8] - 61:6,
166:9, 166:13,
166:19, 166:23,
167:13, 168:1, 173:8
**business** [11] - 63:17,
63:18, 71:1, 73:1,
73:2, 73:10, 73:12,
74:7, 74:17, 86:21,
130:17

**business-judgment** [1] - 71:1
**buyout** [2] - 115:21, 115:24
**BY** [5] - 12:3, 60:8, 84:7, 92:15, 153:24

## C

**C-H-E-V-A-L-I-E-R** [1] - 108:24
**cannot** [2] - 127:6, 128:3
**capability** [3] - 54:19, 55:24, 56:8
**capable** [2] - 56:22, 63:5
**capacity** [2] - 156:7, 165:25
**Caplan** [1] - 139:24
**captain** [2] - 142:24, 143:10
**captured** [1] - 29:5
**care** [1] - 59:5
**career** [2] - 60:21, 61:4
**careful** [4] - 36:7, 147:21, 161:19, 162:24
**caretaker** [2] - 21:7, 21:12
**Carlos** [2] - 130:5, 139:24
**carry** [1] - 111:25
**carrying** [1] - 143:14
**case** [25] - 8:1, 12:13, 13:11, 13:17, 19:4, 20:7, 22:4, 22:14, 22:20, 32:12, 40:20, 44:5, 53:9, 53:14, 57:17, 57:24, 58:5, 61:15, 89:13, 89:17, 90:6, 108:3, 154:3, 155:17
**cash** [4] - 66:5, 66:12, 66:13, 66:15
**Catch-22** [1] - 22:21
**category** [1] - 31:14
**causing** [1] - 163:5
**caveat** [1] - 31:2
**celebrations** [2] - 116:10, 116:18
**cent** [1] - 171:2
**Center** [1] - 175:11
**Centre** [3] - 174:8, 174:11, 176:16
**CEO** [4] - 77:7, 77:10, 96:23, 115:25
**certain** [10] - 34:22, 35:9, 54:16, 66:13,

89:22, 90:6, 105:25, 107:2, 123:1, 169:16
**certainly** [8] - 18:21, 44:6, 85:9, 107:1, 143:25, 147:23, 151:18, 165:9
**Certified** [1] - 178:8
**certify** [1] - 178:4
**CFO** [7] - 61:3, 61:5, 61:7, 61:8, 82:12, 82:13, 173:9
**chair** [1] - 175:5
**chairman** [2] - 77:13, 77:15
**chance** [4] - 45:23, 46:21, 47:16, 48:4
**change** [5] - 48:18, 77:3, 153:9, 164:11, 164:13
**changed** [2] - 70:13, 80:21
**changes** [7] - 49:14, 127:20, 128:3, 162:6, 165:19, 165:24, 166:5
**channels** [3] - 79:4, 123:9, 123:15
**Chapelwood** [2] - 81:10, 81:15
**characteristics** [5] - 21:17, 37:22, 40:9, 48:6, 110:21
**characters** [1] - 105:13
**charge** [2] - 53:13, 126:24
**charges** [1] - 57:24
**charitable** [16] - 65:3, 88:23, 88:24, 89:1, 150:14, 169:3, 169:6, 170:1, 170:13, 170:16, 173:1, 173:5, 173:20, 176:2, 176:6, 176:21
**Charitable** [4] - 87:9, 88:13, 94:6, 168:17
**charities** [4] - 88:16, 88:17, 88:18, 175:21
**Charlie** [5] - 61:20, 63:5, 63:10, 63:13
**chart** [4] - 35:9, 35:12, 38:5, 41:14
**charter** [1] - 63:8
**charts** [2] - 35:24, 38:10
**check** [1] - 104:3
**Cherry** [1] - 61:25
**cherry** [1] - 62:2
**Chevalier** [2] - 108:23,

152:10
**chief** [1] - 143:12
**choice** [3] - 14:4, 15:10, 88:9
**choose** [1] - 43:20
**chose** [1] - 14:1
**Chris** [5] - 73:1, 73:6, 73:7, 73:11, 74:22
**CHRISTOPHER** [1] - 1:15
**Church** [2] - 81:11, 81:15
**circumspect** [2] - 109:20, 109:23
**circumstance** [1] - 152:6
**circumstances** [2] - 78:4, 108:20
**cited** [1] - 27:10
**clarify** [1] - 53:21
**classification** [1] - 48:5
**clause** [2] - 72:3, 72:7
**clean** [1] - 137:17
**cleanup** [1] - 83:18
**clear** [13] - 6:21, 45:20, 52:9, 54:6, 82:20, 110:19, 132:16, 158:9, 165:4, 165:5, 169:2, 169:24, 170:18
**clearly** [1] - 115:25
**clears** [1] - 146:11
**client** [2] - 4:20, 165:16
**clinical** [9] - 27:23, 34:1, 34:4, 34:21, 36:11, 36:15, 38:4, 48:3, 49:12
**Clinical** [1] - 47:14
**clinically** [1] - 47:19
**close** [13] - 10:20, 13:12, 13:20, 14:17, 14:21, 15:9, 15:14, 17:10, 18:25, 19:12, 19:22, 21:14, 90:3
**closer** [1] - 22:13
**closest** [1] - 166:12
**co** [1] - 123:2, 123:21
**co-invests** [2] - 123:2, 123:21
**Code** [1] - 178:5
**cognitive** [7] - 24:6, 29:4, 29:11, 29:16, 44:20, 56:2, 161:7
**cohort** [1] - 30:23
**collaborate** [2] - 12:15, 12:19
**collaborated** [2] - 12:17, 15:1

**collaboration** [1] - 12:12
**collaborator** [1] - 15:18
**collateral** [8] - 16:19, 17:6, 17:13, 17:20, 18:19, 20:24, 21:4, 22:8
**colleague** [1] - 5:8
**collect** [2] - 136:4, 136:6
**COLLEEN** [1] - 1:20
**College** [5] - 65:3, 174:8, 174:12, 174:14, 176:16
**colonial** [1] - 175:4
**Colorado** [1] - 97:18
**combinable** [1] - 50:6
**combined** [1] - 30:24
**combining** [1] - 50:6
**coming** [7] - 69:2, 103:6, 106:25, 113:7, 113:14, 113:16, 144:9
**Commercial** [1] - 145:1
**commitments** [1] - 88:23
**committed** [2] - 123:1, 176:1
**committee** [5] - 75:19, 75:21, 75:22, 76:4, 81:22
**Commons** [2] - 174:12, 176:16
**communicate** [4] - 101:20, 101:23, 114:24, 119:15
**communicated** [6] - 16:21, 16:23, 17:3, 17:5, 17:21, 17:22
**communicating** [3] - 102:8, 120:4, 133:24
**communication** [1] - 115:6
**communications** [7] - 18:22, 18:23, 19:16, 102:2, 102:9, 113:10, 114:19
**companies** [3] - 86:19, 87:18, 121:16
**Company** [4] - 94:13, 94:24, 95:5, 171:24
**company** [20] - 74:9, 78:1, 80:6, 81:20, 82:17, 83:2, 88:1, 88:3, 89:1, 89:20, 91:4, 93:2, 94:14, 96:19, 118:3, 118:7, 164:1, 166:12,

168:21, 171:8
**compared** [1] - 48:2
**comparison** [8] - 34:12, 34:25, 35:16, 35:23, 36:14, 37:23, 38:7
**comparisons** [1] - 38:4
**compensation** [3] - 77:4, 93:23, 94:1
**competence** [4] - 53:3, 53:23, 54:22, 70:23
**competency** [2] - 75:8, 89:9
**COMPETENCY** [1] - 1:9
**competent** [8] - 18:10, 53:8, 53:20, 54:8, 54:15, 54:16, 55:6, 55:17
**complete** [1] - 156:4
**completely** [3] - 22:5, 22:9, 153:6
**complexity** [1] - 53:8
**complicated** [2] - 24:16, 24:17
**compound** [1] - 52:1
**compromise** [1] - 31:4
**Computer** [4] - 86:18, 96:20, 171:10, 171:18
**computer** [16] - 2:5, 31:25, 32:2, 33:11, 40:4, 41:1, 41:15, 103:23, 112:16, 112:19, 112:23, 112:25, 113:3, 113:20, 114:2, 147:24
**computers** [1] - 112:22
**Computers** [1] - 86:11
**concept** [1] - 51:22
**concern** [26] - 66:1, 66:20, 67:5, 80:2, 103:9, 112:3, 112:11, 130:20, 131:3, 131:6, 131:23, 132:5, 132:12, 133:13, 134:15, 134:18, 134:19, 135:11, 138:23, 145:18, 146:14, 146:17, 147:2, 147:6, 151:23, 167:4
**concerned** [7] - 64:7, 134:13, 135:15, 143:10, 151:19,

151:25
**concerning** [4] -
97:23, 137:23,
138:13, 143:2
**concerns** [12] - 68:7,
68:10, 71:24, 80:6,
109:9, 112:5,
130:14, 130:16,
132:7, 145:5,
166:14, 166:24
**concluded** [2] - 15:9,
97:3
**concur** [1] - 150:3
**condenses** [1] - 37:18
**condition** [3] - 159:3,
161:2, 167:21
**conditions** [4] - 126:4,
126:6, 126:14,
126:23
**conduct** [6] - 16:19,
17:6, 17:13, 17:20,
18:19, 21:4
**conducted** [3] - 30:20,
43:10, 172:8
**conducting** [4] - 20:4,
22:7, 30:19, 55:3
**conducts** [1] - 18:25
**confirmed** [1] - 125:16
**conflict** [1] - 6:20
**conflicts** [2] - 6:11,
9:12
**confused** [1] - 125:15
**confusing** [1] - 174:18
**congrats** [1] - 116:9
**congratulations** [1] -
116:17
**congregates** [1] -
81:15
**connected** [2] -
133:13, 176:21
**connecting** [1] - 103:4
**connection** [4] -
61:14, 118:14,
133:21, 173:1
**connections** [2] -
118:16, 147:1
**consent** [1] - 123:3
**consequently** [1] -
48:7
**consider** [2] - 51:16,
55:11
**consideration** [1] -
54:13
**considered** [4] - 48:7,
49:3, 93:5, 102:21
**considering** [1] -
124:11
**consistent** [3] -
170:13, 170:16,
176:6

**constantly** [1] -
111:15
**Consultants** [2] -
93:2, 117:21
**consulted** [1] - 81:22
**consulting** [1] -
118:25
**contact** [1] - 140:11
**contacted** [3] - 17:25,
151:12, 152:15
**contained** [1] - 121:4
**contents** [1] - 62:24
**contest** [2] - 122:23,
123:4
**context** [16] - 34:21,
45:19, 53:25, 54:7,
55:2, 55:11, 89:21,
114:20, 128:22,
141:4, 141:11,
141:13, 144:5,
144:6, 163:19,
163:22
**contexts** [1] - 141:12
**continue** [5] - 90:18,
111:13, 123:20,
151:20, 153:13
**continued** [1] - 11:25
**continues** [1] - 143:20
**contract** [1] - 72:3
**contributing** [1] - 24:6
**contributions** [4] -
65:3, 88:24, 89:1
**control** [2] - 8:4, 146:2
**controlled** [1] - 95:6,
95:8, 121:18
**controlling** [1] - 71:7
**convention** [1] -
105:25
**conversation** [3] -
90:13, 115:10,
125:25
**conversations** [9] -
18:6, 18:9, 18:11,
18:12, 18:20, 141:5,
164:5, 166:13,
166:24
**Convert** [1] - 111:24
**convey** [1] - 140:13
**conveyed** [1] - 19:13
**cooperating** [1] -
154:2
**copied** [4] - 69:17,
72:16, 108:13, 128:4
**copies** [1] - 98:21
**copy** [13] - 51:1, 51:4,
51:7, 99:18, 99:21,
100:5, 105:16,
106:16, 106:17,
106:18, 107:4, 107:8
**COREY** [13] - 1:14,

16:9, 17:15, 18:4,
19:9, 47:6, 50:24,
51:6, 51:10, 57:7,
58:17, 58:21, 59:15
**corporate** [5] - 61:21,
63:8, 81:12, 94:14,
94:15
**correct** [117] - 12:13,
23:13, 23:18, 23:22,
24:15, 24:16, 24:22,
25:6, 25:13, 25:19,
26:2, 26:12, 28:13,
28:19, 28:24, 28:25,
29:20, 29:24, 30:8,
30:21, 30:22, 30:25,
31:8, 31:13, 32:4,
33:22, 34:2, 34:17,
34:23, 35:9, 35:25,
36:1, 36:4, 36:5,
36:12, 37:11, 37:19,
38:1, 38:6, 43:1,
43:2, 43:7, 43:13,
43:21, 43:25, 44:7,
44:10, 44:14, 44:16,
44:23, 45:2, 45:5,
45:8, 45:15, 45:18,
45:23, 46:20, 46:23,
46:24, 47:23, 47:24,
48:13, 50:12, 50:15,
52:11, 53:4, 53:9,
53:14, 55:21, 63:15,
66:22, 66:25, 68:19,
76:21, 78:2, 84:10,
84:22, 87:4, 87:10,
87:12, 87:17, 87:18,
87:22, 88:2, 88:8,
88:20, 89:2, 89:3,
90:25, 91:8, 108:5,
110:15, 154:3,
155:15, 155:21,
156:2, 159:4,
159:18, 159:21,
160:23, 166:6,
168:18, 170:2,
170:14, 170:20,
170:25, 171:4,
171:6, 172:2, 172:5,
173:1, 173:14,
173:18, 175:9,
175:23, 176:8, 178:6
**correctly** [3] - 26:21,
26:22, 38:23
**correspond** [1] -
54:19
**correspondence** [5] -
98:18, 100:2, 114:7,
114:17, 119:10
**costs** [1] - 143:22
**Counsel** [1] - 138:17
**counsel** [27] - 4:10,

5:5, 5:9, 5:21, 10:20,
18:5, 18:7, 18:9,
19:18, 53:19, 53:23,
54:1, 54:15, 54:19,
55:5, 55:9, 55:10,
55:24, 56:8, 57:3,
57:13, 59:2, 61:25,
71:16, 89:8, 167:12
**count** [2] - 31:20,
53:12
**counted** [2] - 42:21,
57:9
**counts** [3] - 57:17,
58:4, 58:6
**couple** [2] - 165:14,
174:23
**course** [1] - 160:4
**Court** [9] - 2:2, 2:2,
5:4, 9:21, 10:22,
18:8, 18:13, 33:14,
60:9
**COURT** [121] - 1:1,
4:8, 4:13, 4:17, 5:2,
5:21, 5:24, 6:24, 7:6,
7:8, 7:14, 7:24, 8:11,
9:6, 9:14, 9:25,
10:12, 10:24, 11:3,
11:7, 12:6, 17:17,
18:15, 19:21, 20:6,
20:12, 20:15, 33:8,
38:13, 38:18, 38:22,
39:10, 42:8, 47:5,
47:8, 52:1, 52:4,
53:1, 57:8, 57:12,
58:16, 58:19, 58:23,
59:2, 59:8, 59:14,
59:17, 59:22, 60:6,
60:11, 64:11, 64:13,
64:15, 64:20, 65:13,
65:15, 69:9, 69:12,
71:12, 75:3, 75:11,
75:12, 75:14, 77:20,
77:22, 80:13, 80:15,
80:17, 83:22, 83:25,
84:4, 89:4, 89:24,
90:2, 90:17, 91:22,
92:2, 92:10, 104:20,
104:22, 105:1,
107:19, 107:22,
107:25, 110:7,
110:10, 110:22,
114:14, 117:15,
117:17, 119:3,
121:10, 124:2,
125:6, 128:13,
130:25, 131:14,
132:10, 135:6,
135:8, 138:17,
138:21, 142:8,
142:16, 144:18,

144:20, 149:14,
149:18, 150:6,
152:22, 153:4,
153:11, 153:19,
153:21, 166:17,
166:22, 167:16,
168:4, 169:10,
169:18, 176:25
**court** [5] - 4:4, 5:12,
10:20, 94:9, 160:9
**Court's** [1] - 8:10
**courtroom** [1] - 10:22
**cover** [4] - 32:9, 70:11,
70:12, 148:4
**covered** [1] - 143:22
**covering** [1] - 155:25
**CRAIG** [2] - 3:6, 60:1
**Craig** [2] - 59:20,
60:15
**create** [6] - 28:20,
66:16, 66:18, 70:11,
115:10, 120:23
**created** [5] - 72:25,
75:25, 98:22, 98:25,
106:14
**creation** [1] - 129:24
**criminal** [3] - 13:11,
55:25, 134:8
**criteria** [2] - 34:9,
34:22
**criterion** [4] - 29:21,
29:23, 29:24, 41:20
**Criterion** [1] - 37:16
**criticizing** [1] - 11:15
**cross** [9] - 5:11, 5:13,
11:4, 11:6, 11:16,
20:16, 152:22,
152:25, 167:14
**CROSS** [3] - 12:2,
84:6, 153:23
**Cross** [3] - 3:5, 3:8,
3:11
**cross-examination** [6]
- 5:11, 11:16, 20:16,
152:22, 152:25,
167:14
**Cross-Examination**
[3] - 3:5, 3:8, 3:11
**CROSS-
EXAMINATION** [3] -
12:2, 84:6, 153:23
**cross-examinations**
[1] - 5:13
**CRR** [2] - 2:1, 178:11
**cumulative** [1] - 75:9
**Cup** [1] - 159:20
**curious** [1] - 20:2
**current** [4] - 52:22,
159:3, 161:2, 161:7
**curve** [1] - 49:22

**customers** [2] - 70:15, 70:18
**Customs** [2] - 103:10, 112:4
**cut** [2] - 32:17, 137:12
**cutoff** [3] - 48:22, 50:3, 50:8
**cutoffs** [4] - 24:23, 44:15, 44:19, 48:5
**cycle** [1] - 67:3
**Córdoba** [1] - 67:13

# D

**daily** [1] - 16:15
**Darby** [7] - 12:11, 12:15, 12:23, 14:13, 15:1, 15:18, 32:11
**data** [2] - 37:15, 47:25
**Data** [1] - 41:19
**database** [1] - 111:14
**date** [12] - 4:23, 33:3, 65:20, 65:22, 71:17, 86:2, 86:3, 104:7, 106:5, 111:14, 174:17
**dates** [3] - 6:15, 107:8, 134:1
**daughter** [1] - 82:18
**daughter-in-law** [1] - 82:18
**daughters** [1] - 148:21
**David** [1] - 140:19
**DAY** [1] - 1:9
**days** [3] - 124:22, 151:21, 161:16
**Dayton** [4] - 86:2, 86:22, 91:11
**DCS** [1] - 88:4
**deal** [5] - 24:23, 71:5, 71:6, 139:22, 140:7
**Dealer** [1] - 171:18
**deals** [1] - 26:3
**dealt** [1] - 139:9
**dean** [1] - 140:10
**dear** [2] - 116:8, 116:16
**December** [2] - 65:1, 148:20
**decided** [5] - 48:11, 76:3, 141:18, 141:20, 149:6
**decision** [15] - 25:1, 32:5, 57:2, 91:12, 91:13, 97:15, 97:16, 101:22, 140:15, 140:22, 141:3, 141:6, 141:7, 141:22, 143:12
**decisions** [3] - 76:1,

89:19, 95:13
**declaration** [1] - 79:13
**declared** [1] - 79:3
**declaring** [1] - 79:16
**decline** [1] - 166:15
**decrease** [2] - 29:15, 73:3
**decrypt** [2] - 105:14, 105:16
**decrypted** [1] - 105:19
**deed** [2] - 130:9, 170:15
**deep** [1] - 15:22
**defend** [1] - 66:5
**Defendant** [12] - 1:8, 1:18, 19:1, 22:22, 53:20, 54:1, 54:8, 54:20, 55:6, 58:11, 60:10, 65:16
**defendant** [10] - 13:11, 22:10, 53:12, 54:4, 54:14, 54:23, 54:24, 55:13, 56:1, 56:2
**Defendant's** [25] - 33:7, 36:23, 38:14, 38:15, 38:16, 38:18, 38:24, 39:2, 39:9, 39:10, 39:13, 39:19, 39:22, 41:7, 41:8, 41:9, 42:9, 42:11, 42:12, 46:10, 47:2, 47:4, 47:9, 59:17, 65:7
**defendant's** [1] - 53:19
**defendants** [1] - 53:6
**Defense** [20] - 4:25, 8:4, 8:5, 8:22, 16:22, 17:7, 17:19, 17:23, 17:24, 18:7, 18:9, 18:13, 18:21, 19:16, 32:15, 33:8, 37:1, 47:3, 47:12, 89:7
**defense** [7] - 19:23, 19:24, 54:10, 54:12, 56:4, 56:9, 84:19
**deficiency** [1] - 56:2
**deficits** [1] - 53:7
**defines** [1] - 47:17
**definitely** [3] - 90:17, 110:22, 166:9
**definitive** [1] - 5:10
**degree** [4] - 22:24, 54:13, 54:25, 60:24
**Delaware** [1] - 86:20
**demarcation** [1] - 49:21
**dementia** [10] - 24:20, 28:22, 29:4, 29:17,

30:4, 30:15, 44:13, 48:2, 48:20, 48:23
**dementia-type** [1] - 48:23
**demonstrated** [1] - 24:19
**Denney** [7] - 6:16, 8:21, 10:18, 12:4, 12:6, 13:9, 58:24
**DENNEY** [3] - 3:4, 11:21
**department** [2] - 60:25, 166:11
**Department** [4] - 17:5, 100:21, 134:11, 156:10
**deposition** [3] - 133:1, 133:3, 133:12
**derived** [1] - 48:5
**derogatory** [1] - 23:11
**describe** [8] - 15:7, 16:14, 62:22, 120:9, 140:4, 151:23, 161:12, 162:11
**described** [2] - 43:10, 63:13
**description** [6] - 60:20, 69:23, 72:22, 78:4, 82:8, 106:6
**deserve** [2] - 138:6, 138:8
**designate** [1] - 63:18
**designated** [6] - 25:12, 33:12, 33:24, 39:14, 63:7, 64:6
**designates** [1] - 40:22
**designating** [1] - 29:19
**designed** [6] - 24:1, 25:3, 29:10, 29:12, 30:6, 173:12
**destroy** [1] - 137:13, 139:6, 139:11, 139:16
**destruction** [1] - 109:7
**detail** [2] - 19:15, 109:15
**detailed** [2] - 22:10, 22:22
**details** [4] - 54:2, 58:7, 58:10, 58:13
**detect** [3] - 25:22, 25:24, 29:11
**detective** [1] - 29:12
**detention** [2] - 136:20, 147:21
**determination** [2] - 53:24, 55:16
**determine** [4] - 24:5,

34:22, 56:10, 57:5
**developed** [4] - 23:13, 23:20, 24:13, 24:25
**development** [1] - 81:7
**developments** [1] - 152:2
**device** [2] - 120:6, 139:15
**diagnoses** [1] - 48:3
**diagnosis** [1] - 47:21
**dictates** [1] - 116:6
**died** [1] - 126:8
**diet** [1] - 161:23
**Dietz** [3] - 12:16, 16:2, 32:10
**differ** [1] - 47:20
**difference** [1] - 22:3
**differences** [3] - 35:1, 164:4, 165:10
**different** [22] - 18:21, 26:5, 33:19, 35:6, 35:7, 37:11, 42:2, 43:18, 45:12, 50:5, 54:23, 55:1, 76:11, 76:13, 111:25, 139:12, 148:7, 148:9, 159:8, 159:10, 168:11, 168:12
**differentiate** [1] - 34:3
**differs** [1] - 13:6
**difficult** [3] - 5:19, 46:20, 51:24
**difficulties** [1] - 54:4
**dig** [1] - 15:21
**digital** [1] - 112:9
**diminished** [1] - 165:24
**direct** [20] - 12:11, 13:4, 35:4, 35:24, 36:6, 44:25, 53:16, 61:10, 62:7, 71:15, 76:6, 81:25, 90:16, 99:13, 109:19, 125:11, 126:3, 126:9, 132:13, 142:11
**Direct** [2] - 3:7, 3:10
**DIRECT** [2] - 60:7, 92:14
**directed** [2] - 95:2, 97:8
**directing** [1] - 77:25, 126:25
**direction** [15] - 94:21, 95:8, 97:23, 100:11, 102:8, 106:20, 106:25, 113:13, 117:7, 127:7, 127:9,

127:11, 129:1, 132:20, 140:25
**directions** [4] - 95:10, 100:13, 117:8, 129:2
**directly** [4] - 17:11, 20:9, 61:7, 79:3
**director** [16] - 80:25, 81:1, 94:16, 94:19, 94:23, 95:1, 95:2, 95:4, 95:7, 122:3, 168:19, 168:23, 171:23, 171:25, 172:4, 172:12
**directors** [6] - 75:25, 79:25, 80:21, 81:19, 94:18, 113:11
**disability** [1] - 72:3
**disagree** [1] - 70:25
**disclosed** [2] - 87:16, 87:17
**discovered** [1] - 137:14
**discretionary** [3] - 169:3, 169:6, 170:1
**discriminate** [4] - 25:3, 25:16, 26:1, 26:7
**discs** [1] - 137:11
**discuss** [1] - 51:20
**discussed** [9] - 6:9, 14:12, 30:13, 38:5, 53:16, 76:23, 99:19, 117:24, 137:24
**discussing** [5] - 23:12, 62:2, 76:25, 103:1, 104:5
**discussion** [4] - 5:10, 72:23, 73:21, 91:10
**discussions** [5] - 14:16, 62:2, 72:5, 149:7, 158:13
**disease** [3] - 48:6, 85:23, 167:9
**dispute** [1] - 70:8
**disrespect** [2] - 21:18, 23:9
**disruptive** [1] - 143:8
**distances** [1] - 163:3
**distinguish** [3] - 23:20, 24:13, 26:6
**distribution** [4] - 49:17, 170:19, 170:22, 170:23
**distributions** [1] - 170:11
**DISTRICT** [2] - 1:1, 1:2
**District** [2] - 2:2, 2:3
**dividend** [15] - 66:16, 66:18, 78:1, 78:5, 78:6, 78:9, 79:3,

79:8, 79:16, 80:4, 87:20, 87:24, 88:5, 88:11, 88:15
**dividends** [1] - 87:25
**divorce** [6] - 130:11, 130:15, 130:22, 131:4, 131:23, 133:7
**divorced** [1] - 130:17
**doctor** [4] - 8:24, 10:16, 175:19, 175:20
**doctors** [4] - 6:25, 12:15, 20:24, 175:14
**document** [18] - 32:23, 46:11, 46:17, 67:6, 80:8, 98:11, 99:18, 102:18, 103:10, 105:17, 105:19, 106:13, 108:13, 108:16, 109:6, 111:14, 128:9, 132:9
**documents** [22] - 98:10, 98:21, 99:23, 99:24, 100:23, 102:12, 102:23, 102:25, 107:13, 108:3, 110:2, 110:17, 121:4, 133:11, 135:12, 135:24, 137:11, 137:23, 139:6, 145:10, 154:15, 155:3
**DOJ** [4] - 1:14, 1:15, 1:16, 1:17
**dollar** [1] - 80:4
**dollars** [3] - 79:11, 122:1, 175:18
**Don** [18] - 105:7, 106:24, 108:10, 113:5, 113:6, 118:3, 118:13, 119:25, 120:1, 120:19, 134:22, 135:15, 137:11, 137:17, 164:20, 164:21, 164:23
**Don's** [4] - 113:3, 113:20, 137:19, 138:10
**donate** [1] - 125:11
**donation** [3] - 127:1, 127:12, 175:8
**donations** [6] - 126:9, 175:16, 175:21, 176:2, 176:5, 176:10
**done** [5] - 8:17, 43:24, 56:3, 70:13, 106:23
**dongle** [1] - 111:25

**donor** [1] - 126:7
**door** [2] - 112:8, 165:6
**doorway** [1] - 163:5
**Dorothy** [6] - 12:24, 14:12, 14:24, 15:17, 165:3, 165:5
**dots** [1] - 106:19
**double** [1] - 104:3
**doubt** [4] - 70:22, 136:18, 166:2
**dove** [2] - 67:15, 67:16
**dove-hunting** [1] - 67:16
**down** [13] - 33:2, 42:1, 52:6, 85:8, 85:17, 89:13, 127:2, 131:1, 139:18, 147:17, 157:4, 157:11, 165:21
**dozen** [1] - 57:21
**Dr** [36] - 4:10, 4:16, 5:15, 6:16, 6:23, 7:15, 7:19, 7:25, 8:8, 8:21, 9:15, 10:2, 10:18, 12:4, 12:6, 12:11, 12:23, 13:9, 14:13, 15:1, 15:18, 16:2, 23:13, 25:1, 32:10, 32:11, 35:13, 39:5, 39:25, 58:24, 65:7, 124:21, 125:10, 126:15, 126:23, 129:5
**draft** [6] - 67:6, 116:23, 127:4, 127:13, 127:17, 128:1
**drafted** [1] - 130:9
**drag** [1] - 6:23
**draws** [1] - 146:21
**drift** [1] - 164:14
**drive** [3] - 100:24, 121:5, 152:18
**drives** [3] - 135:24, 137:10, 137:13
**driving** [1] - 137:6
**drops** [1] - 26:18
**due** [1] - 36:13
**duly** [3] - 11:24, 60:3, 92:7
**dumbfounding** [1] - 109:16
**during** [10] - 11:9, 11:10, 76:15, 93:11, 96:7, 104:10, 125:10, 165:12, 171:24, 176:2
**Dusky** [1] - 53:3
**duties** [2] - 94:4, 94:20

143:9
**e-mail** [79] - 9:11, 62:20, 62:23, 65:1, 65:2, 65:20, 69:16, 69:18, 70:11, 70:12, 71:2, 71:3, 72:16, 72:19, 74:20, 76:19, 82:2, 82:5, 83:7, 101:1, 101:16, 101:17, 101:19, 102:11, 102:19, 104:5, 105:5, 105:7, 105:10, 105:13, 105:14, 105:16, 105:18, 105:23, 106:3, 106:7, 106:10, 107:11, 107:12, 107:13, 108:10, 108:18, 109:2, 111:24, 114:23, 115:1, 115:3, 115:5, 115:14, 115:17, 117:1, 117:23, 118:8, 118:11, 118:13, 119:13, 119:16, 119:18, 119:22, 119:24, 119:25, 120:23, 122:15, 123:17, 124:6, 124:10, 124:16, 124:20, 125:1, 126:1, 127:2, 132:22, 138:4, 142:19, 149:24
**e-mails** [5] - 75:5, 75:10, 102:11, 105:12, 106:1
**early** [5] - 5:20, 12:18, 14:16, 68:24, 152:14
**earnings** [5] - 66:6, 66:9, 66:10, 66:21, 67:5
**easier** [2] - 44:22, 62:17
**easily** [2] - 56:3, 137:19
**easy** [3] - 46:19, 140:19, 141:14
**education** [1] - 66:8
**EE** [1] - 104:14
**effect** [1] - 81:13
**effectively** [1] - 96:6
**efficiently** [2] - 112:25, 113:2
**effort** [3] - 25:5, 25:18, 33:21
**efforts** [4] - 18:19, 137:15, 137:18,

**E**

**eight** [2] - 171:24, 172:1
**either** [9] - 48:4, 49:19, 56:11, 56:15, 68:1, 78:12, 98:20, 145:25, 170:5
**elaborate** [1] - 163:20
**electronic** [1] - 98:21
**eleven** [2] - 79:11, 80:3
**Eliminator** [4] - 104:16, 112:15, 112:18, 112:20
**elsewhere** [1] - 147:1
**elucidate** [1] - 41:6
**embarrassed** [1] - 165:16
**empirically** [1] - 48:5
**employ** [1] - 86:23
**employed** [1] - 118:3
**employee** [2] - 60:18, 83:2
**employees** [3] - 82:23, 86:25, 164:2
**employer** [5] - 21:21, 92:24, 93:1, 93:3, 93:5
**employment** [1] - 100:9
**encoded** [2] - 106:19, 107:5
**encrypted** [20] - 101:17, 101:23, 105:11, 111:25, 112:9, 114:23, 115:1, 116:25, 119:16, 119:21, 120:9, 120:10, 120:11, 121:5, 122:15, 124:7, 126:1, 142:19, 149:24
**encryption** [3] - 103:16, 114:20, 114:21
**end** [7] - 8:18, 38:20, 49:20, 56:23, 123:7, 160:18, 162:7
**ended** [1] - 121:24
**engaged** [1] - 139:18
**engineering** [1] - 173:14
**England** [1] - 153:8
**enjoyable** [1] - 164:15
**ensure** [1] - 106:14
**ensured** [1] - 138:9
**enter** [1] - 55:5
**entered** [1] - 110:18
**enterprise** [1] - 121:16

**entire** [3] - 27:19, 41:4, 68:22
**entirely** [1] - 8:8
**entities** [7] - 87:4, 98:12, 118:15, 118:19, 118:20, 150:13, 172:17
**entity** [6] - 95:19, 96:1, 121:18, 169:6, 171:13, 171:19
**environment** [2] - 113:4, 113:21
**equation** [2] - 48:13, 48:16
**equity** [1] - 121:14
**Equity** [4] - 96:9, 129:9, 129:10, 129:13
**equivocal** [1] - 43:16
**errors** [1] - 48:8
**especially** [1] - 102:23
**ESQ** [4] - 1:18, 1:20, 1:21, 1:23
**essence** [3] - 17:8, 22:1, 37:20
**establish** [6] - 17:11, 130:4, 141:24, 148:4, 148:11, 175:4
**established** [3] - 121:15, 136:18, 170:7
**establishes** [1] - 53:3
**establishing** [1] - 140:8
**estimate** [2] - 6:14, 9:23
**estimates** [1] - 174:3
**et** [2] - 37:15, 41:19
**etamine@tangarra. com** [1] - 117:22
**Eugene** [4] - 87:9, 88:13, 94:6, 168:17
**Europe** [1] - 103:7
**evaluate** [4] - 55:8, 55:11, 57:13, 93:15
**evaluating** [1] - 55:5
**evaluation** [4] - 12:18, 13:10, 118:9, 136:11
**evaluations** [2] - 13:9, 19:5
**evaluator** [1] - 22:25
**evasion** [2] - 57:25, 58:1
**EVATT** [2] - 3:9, 92:5
**Evatt** [4] - 68:18, 92:1, 92:18, 124:9
**events** [1] - 89:18
**Evidence** [4] - 104:15, 112:15, 112:18, 112:20

**evidence** [13] - 38:17, 39:9, 42:7, 47:4, 50:13, 50:21, 52:12, 52:19, 59:13, 64:10, 64:18, 110:18, 153:7
**evolved** [1] - 49:9
**exact** [2] - 14:19, 53:6
**exactly** [9] - 8:18, 23:23, 35:10, 38:8, 43:8, 63:12, 67:11, 78:24, 151:18
**exaggerating** [8] - 23:21, 24:14, 24:22, 25:5, 26:23, 27:3, 27:4
**exaggeration** [8] - 23:24, 25:23, 25:24, 25:25, 27:8, 27:9, 29:12
**exaggerators** [3] - 26:1, 29:20, 30:3
**examination** [9] - 5:11, 11:15, 11:16, 20:16, 46:15, 89:6, 152:22, 152:25, 167:14
**EXAMINATION** [5] - 12:2, 60:7, 84:6, 92:14, 153:23
**Examination** [5] - 3:5, 3:7, 3:8, 3:10, 3:11
**examinations** [1] - 5:13
**examine** [1] - 89:10
**examinee** [1] - 35:8
**examiner** [2] - 32:25, 35:8
**examiners** [1] - 51:24
**example** [8] - 14:1, 14:25, 15:8, 28:14, 40:8, 53:12, 54:14, 71:7
**examples** [2] - 36:3, 173:8
**excellent** [1] - 164:8
**except** [1] - 110:13
**excess** [1] - 66:4
**exchanges** [2] - 101:1, 142:19
**excuse** [4] - 68:3, 107:17, 129:10, 131:16
**excused** [2] - 58:20, 91:21
**executed** [3] - 99:16, 128:9, 151:2
**executive** [8] - 72:18, 75:18, 75:21, 75:22, 76:4, 81:6, 81:22, 122:22

**exercise** [3] - 38:3, 38:5, 161:24
**exercised** [2] - 100:12, 163:3
**exercising** [1] - 72:6
**exhibit** [3] - 38:14, 75:12, 121:11
**Exhibit** [86] - 32:15, 33:7, 33:9, 36:23, 37:1, 38:11, 38:15, 38:16, 38:18, 38:24, 39:2, 39:9, 39:10, 39:13, 39:20, 39:22, 41:8, 41:9, 42:9, 42:11, 42:12, 46:9, 46:10, 47:2, 47:4, 47:9, 47:12, 59:17, 62:9, 64:8, 64:14, 64:17, 65:19, 69:6, 69:13, 71:13, 72:12, 72:13, 75:14, 77:23, 79:14, 80:18, 82:1, 83:20, 83:25, 100:25, 104:18, 104:23, 104:25, 105:1, 105:4, 105:6, 107:17, 107:25, 108:8, 110:24, 110:25, 114:10, 114:14, 115:12, 115:13, 116:12, 117:20, 121:13, 124:3, 124:5, 124:18, 125:18, 127:16, 127:24, 128:8, 132:21, 135:9, 136:8, 136:10, 142:6, 142:9, 142:13, 142:18, 145:7, 149:15, 149:23
**Exhibit's** [1] - 65:16
**exhibiting** [4] - 50:14, 50:22, 52:13, 52:20
**exhibits** [1] - 110:11
**exist** [1] - 23:5
**existed** [1] - 98:11
**exists** [2] - 27:8, 27:9
**exit** [1] - 74:17
**expect** [3] - 21:19, 31:4, 103:3
**expenses** [1] - 146:5
**experienced** [1] - 166:19
**expert** [4] - 20:8, 20:9, 20:18, 20:19
**experts** [3] - 8:3, 12:12, 75:24
**explain** [5] - 9:14, 29:7, 31:1, 33:14,

128:23
**expose** [1] - 134:13
**express** [6] - 68:10, 80:2, 80:6, 109:9, 135:11, 138:23
**expressing** [4] - 66:1, 66:20, 145:4, 145:18
**extend** [1] - 116:16
**extent** [2] - 53:25, 116:22
**extraordinary** [1] - 137:15
**extremely** [5] - 5:25, 78:21, 161:14
**eyes** [1] - 159:24

## F

**fabricating** [1] - 165:23
**fact** [16] - 5:19, 21:20, 62:3, 75:5, 87:16, 105:22, 118:12, 139:3, 139:6, 139:25, 140:22, 141:20, 146:7, 155:5, 156:25, 171:1
**factoring** [1] - 57:1
**factors** [3] - 53:10, 53:16, 55:15
**facts** [2] - 71:3, 71:4
**fail** [7] - 31:14, 36:9, 45:7, 45:17, 48:12, 48:20, 48:24
**failed** [2] - 45:1, 59:12
**fails** [1] - 46:22
**fair** [11] - 8:8, 20:22, 20:23, 85:6, 99:25, 133:7, 149:9, 157:4, 168:21, 172:13, 173:19
**fairly** [2] - 26:6, 152:14
**Falcata** [2] - 121:13, 121:14
**fall** [4] - 30:6, 123:3, 133:23, 165:12
**falling** [1] - 49:17
**false** [10] - 24:1, 24:21, 26:24, 27:2, 29:5, 29:15, 29:18, 44:13, 48:7, 156:6
**familiar** [16] - 27:15, 47:12, 50:17, 50:19, 51:15, 51:21, 51:23, 52:4, 58:4, 75:17, 81:2, 95:19, 96:19, 114:6, 126:11, 129:9
**family** [6] - 20:25, 22:2, 22:4, 91:2, 137:16, 143:8

**far** [4] - 49:21, 90:5, 96:16, 143:9
**fast** [2] - 72:9, 72:11
**fault** [1] - 6:7
**FBI** [1] - 151:1
**fear** [1] - 147:20
**February** [1] - 131:11
**federal** [1] - 62:5
**fees** [3] - 122:25, 145:20, 146:5
**feign** [1] - 30:14
**fell** [3] - 46:21, 49:22, 165:14
**fellowship** [1] - 175:4
**Ferguson** [1] - 146:2
**few** [4] - 85:7, 168:16, 173:22, 174:18
**fiduciary** [3] - 172:16, 172:21, 172:25
**field** [1] - 174:9
**fight** [1] - 70:3
**figure** [1] - 20:17
**figurehead** [1] - 141:24
**figures** [1] - 26:9
**file** [9] - 99:18, 99:23, 100:5, 102:23, 102:25, 103:10, 109:25, 111:16, 111:19
**filed** [1] - 155:17
**files** [9] - 108:25, 109:11, 109:15, 112:4, 132:13, 132:17, 171:13, 171:16, 171:21
**final** [3] - 128:9, 143:19, 146:24
**finally** [1] - 158:7
**financial** [4] - 70:10, 70:13, 88:25, 111:24
**financials** [1] - 70:16
**findings** [1] - 40:21
**fine** [8] - 16:9, 20:1, 20:11, 20:14, 34:6, 62:18, 153:17, 174:3
**finish** [2] - 10:6, 44:18
**finished** [2] - 158:8, 158:11
**finishes** [1] - 10:18
**firm** [3] - 108:23, 108:25, 152:11
**first** [27] - 5:24, 6:19, 10:6, 13:2, 18:18, 29:21, 49:5, 73:17, 73:23, 79:9, 79:10, 85:2, 97:25, 98:4, 102:18, 104:8, 105:5, 106:17, 116:8, 116:15,

116:21, 129:17, 129:24, 130:12, 157:1, 161:11
**first-in-time** [1] - 102:18
**fishing** [3] - 97:18, 98:2, 164:15
**fit** [5] - 31:14, 161:17, 162:2, 162:16, 163:25
**five** [7] - 10:5, 31:16, 42:25, 57:9, 57:14, 136:25, 159:22
**fixed** [1] - 146:12
**flexibility** [1] - 9:10
**flight** [3] - 63:19, 153:8, 153:9
**flights** [6] - 9:1, 63:7, 63:8, 64:6, 137:5, 137:6
**Florida** [1] - 135:1
**flow** [16] - 32:24, 37:2, 37:5, 37:10, 37:19, 38:10, 39:4, 39:24, 40:3, 40:11, 40:13, 40:16, 41:14, 42:17, 43:3, 59:12
**fly** [1] - 31:21
**flying** [1] - 103:8
**focus** [3] - 115:16, 163:17, 164:13
**focused** [1] - 164:5
**follow** [3] - 37:13, 116:23, 161:24
**followed** [2] - 116:22, 128:2
**following** [5] - 4:4, 13:5, 24:10, 76:18, 137:9
**follows** [3] - 11:25, 60:4, 92:8
**force** [2] - 71:7, 73:4
**foregoing** [1] - 178:5
**forensic** [3] - 22:25, 51:24, 106:11
**form** [7] - 106:5, 112:9, 112:20, 115:6, 174:24, 175:3, 175:8
**formal** [1] - 93:12
**formality** [1] - 32:9
**formally** [3] - 93:15, 128:23, 128:25
**formation** [1] - 124:11, 129:22
**formed** [1] - 75:22
**forms** [1] - 14:9
**formula** [1] - 33:20
**forth** [3] - 5:16, 74:14, 99:8

forthcoming [1] - 6:6
forward [6] - 72:9,
72:11, 74:15, 92:3,
119:18, 119:21
foundation [4] - 16:1,
124:12, 138:17,
143:23
four [2] - 136:25,
145:16
fourth [1] - 74:16
Francisco [2] -
155:14, 160:11
frank [1] - 100:20
frankly [3] - 7:2,
110:17, 143:9
fraud [3] - 53:13, 58:4,
58:6
free [2] - 23:25, 89:10
free-standing [1] -
23:25
freely [1] - 139:23
freeze [1] - 145:5
Friday [2] - 157:23,
158:3
frozen [3] - 78:7,
145:1, 145:19
fruitless [2] - 137:20,
138:10
full [6] - 9:12, 94:1,
98:6, 100:20,
128:23, 143:21
fully [1] - 105:11
function [1] - 47:20
functioning [1] -
161:7
fund [7] - 95:23,
121:14, 129:18,
129:24, 145:24,
150:15, 150:19
funded [1] - 173:16
funding [4] - 140:8,
141:10, 141:18,
141:20
funds [4] - 78:7,
118:16, 123:1, 146:4
funeral [2] - 135:19,
135:22
future [2] - 66:24,
107:9

## G

gander [1] - 90:11
gauge [1] - 23:1
gears [2] - 129:7,
168:14
general [14] - 58:12,
83:1, 111:6, 111:7,
121:17, 121:19,
122:9, 122:12,

122:13, 129:23,
129:25, 142:22,
147:5, 167:17
generally [4] - 28:3,
98:20, 137:9, 162:11
generate [6] - 28:12,
28:23, 31:6, 31:11,
43:11, 43:15
generated [1] - 35:20
generating [1] - 29:18
Geneva [2] - 104:3,
104:9
gentlemen [1] - 17:4
genuine [44] - 25:4,
25:12, 25:13, 25:14,
25:17, 26:2, 28:13,
28:18, 28:21, 28:23,
29:2, 29:13, 29:16,
30:2, 30:6, 30:7,
31:6, 31:7, 31:11,
32:1, 32:3, 33:13,
33:24, 34:7, 34:14,
34:17, 36:12, 36:18,
38:1, 39:15, 39:17,
40:6, 40:10, 40:14,
40:18, 40:23, 41:2,
41:16, 41:23, 42:18,
42:24, 43:5, 43:12,
43:15
GEORGE [1] - 1:3
George [1] - 152:10
gift [8] - 126:1, 126:4,
126:24, 127:9,
137:3, 150:14,
170:17, 175:3
Gilbert [1] - 122:6
Gilliand [4] - 166:10,
167:6, 167:8, 167:13
given [20] - 4:23, 5:19,
6:12, 7:3, 8:8, 21:3,
21:20, 28:2, 28:5,
44:3, 44:4, 95:10,
100:13, 106:21,
123:22, 152:5,
154:25, 164:3, 176:1
Glenn [1] - 146:2
goal [1] - 118:21
goalpost [1] - 48:12
goals [3] - 111:6,
111:7, 111:12
goose [1] - 90:10
Gordon [1] - 94:19
gotta [1] - 20:19
government [4] -
59:20, 102:7,
102:10, 110:3
Government [77] -
3:4, 3:6, 3:9, 4:20,
4:24, 5:9, 7:22, 8:4,
9:22, 10:16, 11:22,

16:6, 17:23, 17:24,
46:9, 58:21, 60:2,
62:9, 64:14, 65:16,
65:19, 66:15, 69:6,
69:12, 71:13, 71:17,
72:12, 72:13, 75:14,
76:19, 77:23, 80:18,
83:25, 84:21, 84:25,
85:15, 85:16, 85:21,
89:6, 89:12, 89:19,
90:7, 91:25, 92:6,
100:5, 100:16,
102:13, 104:24,
105:1, 105:4, 105:6,
107:14, 107:17,
108:8, 110:24,
110:25, 114:14,
121:6, 124:3, 142:9,
142:13, 142:18,
145:10, 149:15,
152:18, 154:2,
154:13, 154:17,
155:6, 156:3,
156:22, 157:2,
157:12, 157:18,
158:21, 159:14,
171:1
Government's [4] -
12:12, 38:11, 135:9,
168:2
governments [2] -
133:18, 133:19
GP's [1] - 123:12
gracefully [1] - 74:17
gradually [1] - 134:25
graduate [3] - 28:17,
30:14, 30:15
graduated [1] - 60:24
grammatical [1] -
127:20
grand [9] - 131:7,
131:12, 155:13,
155:14, 155:20,
156:17, 156:20,
157:8, 175:23
graph [1] - 35:6
graphs [1] - 35:3
great [10] - 10:24,
11:16, 58:23, 59:8,
134:1, 139:22,
140:7, 153:21,
167:19, 176:25
greater [3] - 47:19,
96:13, 96:15
greatly [1] - 127:5
Green [9] - 23:13,
24:25, 25:1, 31:16,
31:24, 42:22, 43:23,
44:6, 46:4
green [1] - 35:13

gripe [1] - 123:20
ground [1] - 73:10
group [4] - 12:21,
28:11, 28:17, 47:20
groups [14] - 28:9,
34:12, 34:25, 35:6,
35:9, 35:11, 35:16,
35:22, 35:23, 36:14,
37:23, 38:8, 49:12
guess [7] - 11:10,
20:1, 20:14, 34:3,
113:1, 126:25, 159:7
guidance [1] - 81:12
guides [1] - 32:25
Guilmette [2] - 39:5,
39:25
Gumm [2] - 2:1,
178:11
gun [3] - 67:24, 68:8,
68:11
Gutierrez [3] - 21:7,
21:9, 21:12
guys [3] - 5:24, 11:16,
90:9

## H

half [7] - 63:3, 69:15,
79:11, 80:3, 115:16,
169:12, 175:18
Hall [2] - 173:24,
176:13
hallway [1] - 162:21
hammer [1] - 139:13
hand [5] - 26:4, 35:17,
92:4, 154:21
handed [3] - 121:5,
152:17, 154:20
handle [3] - 68:8,
68:11, 123:22
hands [2] - 153:5,
153:9
hanging [2] - 89:23,
136:20
Hani [3] - 152:10,
152:15, 152:17
HANKS [1] - 1:3
hannah.com [1] -
122:17
happy [4] - 10:6, 18:8,
18:13, 19:17
harassment [1] - 6:22
hard [13] - 5:25, 47:17,
47:22, 48:21, 49:6,
97:6, 100:24, 121:5,
151:18, 152:18,
161:12, 161:14,
163:23
hard-working [1] -
163:23

harder [1] - 44:23
head [6] - 57:20, 58:2,
63:11, 63:15, 82:15,
142:5
health [4] - 159:3,
161:2, 161:20,
166:25
Health [1] - 175:10
healthcare [4] - 82:10,
83:2, 83:17, 90:25
hear [1] - 89:7
heard [3] - 12:11,
38:23, 151:8
HEARING [1] - 1:9
hearing [8] - 38:21,
78:10, 84:12, 89:9,
107:24, 108:1,
110:12, 110:19
hearsay [5] - 5:13,
166:16, 166:17,
167:2, 167:15,
167:19, 167:23
held [2] - 4:4, 59:10
help [5] - 24:5, 56:1,
73:7, 94:5, 156:11
helped [2] - 113:12,
113:15
helpful [2] - 21:25,
54:3
helping [1] - 83:14
helps [1] - 156:10
hereby [1] - 178:4
hesitation [2] -
136:17, 137:9
Heterogeneous [1] -
47:14
hidden [1] - 145:24
hierarchy [1] - 171:19
high [5] - 26:12,
26:16, 27:1, 44:12,
143:24
higher [4] - 26:16,
27:20, 28:8, 44:12
highlight [1] - 70:12
Hill [1] - 72:17
himself [2] - 54:17,
164:6
hire [1] - 118:24
hired [1] - 60:22
historical [1] - 67:3
historically [1] - 29:18
history [2] - 129:14,
175:4
hmm [1] - 65:25
hold [1] - 146:4
holders [1] - 66:16
Holding [2] - 86:11,
86:18
Holdings [2] - 129:9,
171:11

**home** [11] - 99:17, 102:13, 113:18, 137:19, 138:10, 151:3, 154:9, 155:10, 160:16, 160:20, 160:21
**Honor** [68] - 4:12, 4:16, 4:21, 6:10, 7:22, 9:21, 10:11, 10:14, 11:20, 18:5, 18:16, 19:10, 20:11, 20:14, 33:6, 38:12, 38:17, 38:21, 39:8, 42:6, 47:3, 47:7, 50:25, 52:25, 58:15, 58:18, 59:11, 59:16, 59:19, 64:9, 65:12, 69:8, 69:11, 71:10, 72:10, 75:2, 75:4, 75:13, 77:19, 80:12, 83:21, 84:3, 89:15, 90:12, 91:20, 92:13, 104:19, 107:21, 108:6, 110:9, 110:15, 114:11, 114:13, 117:16, 121:9, 135:4, 138:20, 142:15, 144:17, 149:17, 152:21, 153:3, 153:18, 153:20, 153:22, 167:11, 169:14, 176:23
**HONORABLE** [1] - 1:3
**hoping** [1] - 8:22
**Hopkins** [1] - 175:19
**hotel** [2] - 162:21, 163:8
**hour** [5] - 11:2, 152:15, 153:2, 153:15, 169:12
**hours** [6] - 141:8, 157:17, 161:15, 163:24, 164:9, 165:1
**house** [7] - 61:22, 61:25, 99:19, 108:18, 112:12, 151:15, 152:12
**household** [2] - 82:19, 91:1
**housekeeping** [2] - 59:11, 107:21
**Houston** [5] - 1:11, 86:22, 88:20, 155:18, 158:3
**Howard** [2] - 94:19, 94:21
**hugely** [1] - 137:16
**humanly** [1] - 137:17
**hundreds** [1] - 74:8

**hunted** [1] - 67:23
**hunting** [5] - 67:8, 67:12, 67:14, 67:16, 67:19
**hurricane** [1] - 69:2
**husband** [1] - 167:9

**I**

**idea** [5] - 78:16, 78:17, 124:10, 126:13, 163:4
**identification** [5] - 47:2, 47:11, 62:10, 131:11, 142:13
**identified** [4] - 30:3, 30:4, 40:4, 41:15
**identify** [5] - 23:23, 29:3, 37:21, 55:10, 55:24
**identifying** [5] - 26:8, 27:8, 27:9, 33:2, 110:21
**illegal** [2] - 53:13, 169:25
**image** [3] - 102:23, 102:25, 111:14
**imagine** [1] - 103:7, 139:1
**immediate** [1] - 20:25
**immediately** [1] - 86:8
**immunity** [8] - 100:15, 100:22, 154:17, 154:22, 154:24, 155:6, 155:24, 157:6
**IMN** [1] - 73:1
**impact** [2] - 70:16, 130:17
**impacting** [1] - 137:16
**impaired** [10] - 23:22, 24:15, 25:14, 26:22, 28:12, 28:21, 28:24, 29:13, 30:2, 44:20
**impairment** [39] - 25:4, 25:12, 25:13, 25:17, 26:2, 28:13, 28:19, 29:2, 30:7, 30:8, 31:6, 31:7, 31:12, 32:1, 32:4, 33:13, 33:25, 34:7, 34:15, 34:17, 34:23, 36:12, 36:19, 38:1, 39:15, 39:18, 40:6, 40:10, 40:14, 40:19, 40:23, 41:2, 41:16, 41:23, 42:19, 42:25, 43:5, 43:12, 43:15
**implausible** [1] - 37:22
**implications** [1] - 64:5

**important** [2] - 58:9, 161:23
**impossible** [2] - 51:5, 160:4
**impression** [2] - 17:25, 166:20
**impressions** [1] - 167:17
**improper** [2] - 169:5, 169:25
**in-house** [1] - 61:25
**inbox** [1] - 9:12
**incapable** [1] - 126:8
**include** [2] - 13:1, 155:25
**included** [6] - 35:19, 37:24, 99:23, 107:13, 110:2, 137:6
**includes** [1] - 170:24
**including** [8] - 27:23, 33:21, 52:23, 61:2, 102:11, 148:1, 155:2, 158:24
**inconvenienced** [1] - 11:18
**increase** [6] - 28:1, 30:20, 48:1, 138:2, 138:6, 138:9
**increased** [1] - 24:20
**independent** [1] - 22:5
**INDEX** [1] - 3:1
**indicate** [2] - 21:6, 106:2
**indicated** [2] - 40:25, 154:1
**indication** [4] - 24:21, 54:14, 146:8, 167:8
**indicative** [3] - 40:22, 40:24, 49:3
**indicted** [2] - 62:25, 160:3
**indictment** [10] - 58:10, 58:11, 82:6, 85:11, 85:12, 89:18, 90:4, 90:15, 154:6
**indictments** [1] - 85:9
**individual** [5] - 22:6, 22:9, 154:5, 170:12, 170:19
**individually** [3] - 26:12, 27:12, 27:13
**individuals** [12] - 17:25, 23:21, 23:22, 24:14, 24:15, 24:19, 25:3, 25:4, 25:10, 25:16, 25:17, 173:4
**industry** [3] - 63:11, 66:24, 118:9
**information** [16] - 11:2, 12:21, 12:22,

13:1, 15:3, 21:16, 21:25, 43:7, 73:8, 74:1, 109:10, 109:21, 136:1, 154:23, 155:2, 157:10
**informed** [1] - 153:6
**infrequent** [1] - 143:13
**inherently** [1] - 169:25
**initial** [1] - 160:10
**innocuous** [1] - 115:5
**inquire** [1] - 9:22
**inquired** [2] - 4:24, 19:11
**inquiry** [1] - 134:8
**inside** [2] - 99:19, 166:12
**instance** [3] - 49:18, 139:1, 141:4
**instances** [1] - 173:3
**instead** [5] - 78:18, 78:19, 153:14, 164:16
**instructed** [4] - 28:11, 28:18, 28:20, 28:22
**instruction** [6] - 21:3, 50:20, 123:22, 152:6, 152:9, 154:25
**instructions** [3] - 21:2, 29:14, 111:9
**instructs** [2] - 51:16, 52:10
**insurance** [4] - 90:21, 90:22, 90:25
**intend** [1] - 23:11
**intent** [1] - 49:3
**interest** [1] - 129:25
**interested** [1] - 115:23
**international** [2] - 9:1, 60:25
**internet** [1] - 103:24
**interpret** [1] - 34:11
**interpretation** [3] - 30:1, 34:4, 46:18
**interpreted** [1] - 41:22
**Interpreter** [1] - 1:25
**interpreting** [2] - 29:14, 34:24
**interpretive** [4] - 25:8, 32:24, 33:1, 37:2
**interrupt** [1] - 20:16
**interrupted** [1] - 7:17
**interview** [17] - 13:12, 14:4, 14:17, 14:21, 15:4, 15:10, 15:19, 16:16, 16:19, 17:10, 18:19, 19:2, 19:11, 19:22, 20:10, 20:20, 21:4

**interviewed** [5] - 12:23, 14:1, 14:13, 15:2, 157:5
**interviewing** [7] - 14:14, 15:1, 15:5, 15:14, 15:16, 15:20, 23:1
**interviews** [8] - 17:6, 17:11, 17:14, 17:20, 18:25, 20:4, 22:8, 157:16
**intimately** [1] - 21:21
**introduce** [1] - 167:12
**intruding** [1] - 16:8
**invalid** [3] - 45:7, 45:18, 46:22
**invest** [2] - 73:11, 121:16
**investigate** [2] - 115:20, 116:3
**investigation** [10] - 129:8, 134:9, 134:11, 134:12, 134:14, 138:13, 138:24, 146:15, 147:3, 147:5
**investigator** [4] - 126:12, 126:15, 126:18, 126:19
**investment** [1] - 121:23
**Investments** [8] - 95:20, 95:22, 95:25, 96:3, 96:4, 96:8, 121:22, 129:17
**investments** [2] - 96:9, 96:11
**investor** [5] - 96:2, 129:17, 129:19, 129:20, 129:21
**investors** [1] - 129:20
**invests** [2] - 123:2, 123:21
**inviting** [1] - 118:8
**involved** [9] - 16:2, 21:22, 22:19, 36:11, 57:17, 58:7, 92:20, 137:5, 176:3
**involvement** [1] - 85:7
**involves** [1] - 19:15
**IRS** [2] - 108:19, 134:11
**issue** [9] - 10:19, 15:23, 23:2, 51:20, 69:24, 78:1, 79:5, 83:15, 88:25
**issued** [1] - 85:10
**issues** [5] - 50:5, 89:16, 89:22, 102:22, 177:1

3-189

**items** [11] - 46:19, 46:20, 47:17, 47:22, 48:21, 49:6, 50:12, 50:20, 52:11
**itself** [2] - 29:3, 170:7

## J

**Jackson** [6] - 81:1, 81:9, 81:10, 81:18, 81:23, 86:1
**James** [1] - 122:6
**JAMES** [1] - 1:21
**January** [4] - 69:4, 69:18, 70:21, 93:10
**Jason** [1] - 153:25
**JASON** [1] - 1:18
**Jefferson** [2] - 174:24, 175:7
**jet** [1] - 63:14
**Jim** [4] - 81:1, 81:9, 81:10, 86:1
**job** [8] - 11:16, 70:5, 76:11, 76:13, 92:19, 92:22, 141:2, 142:2
**John** [1] - 175:19
**John's** [1] - 94:13
**john's** [7] - 94:17, 94:24, 95:4, 168:21, 168:23, 171:24, 172:12
**Jones** [22] - 105:7, 108:10, 113:6, 113:18, 113:24, 118:3, 118:4, 118:6, 118:13, 118:19, 119:8, 119:15, 119:19, 120:5, 134:22, 134:24, 135:12, 135:17, 139:9, 163:25, 164:21
**Jones's** [2] - 113:7, 135:21
**JR** [1] - 1:3
**judge** [1] - 22:25
**JUDGE** [1] - 1:3
**judgment** [10] - 27:23, 34:2, 34:21, 36:11, 36:13, 36:15, 38:4, 38:5, 40:18, 71:1
**July** [3] - 39:5, 76:20, 148:20
**June** [12] - 76:6, 76:7, 85:3, 85:16, 115:15, 135:17, 144:4, 159:5, 159:9, 159:16, 159:19, 162:8
**jury** [9] - 131:7,
131:12, 155:13, 155:14, 155:21, 156:17, 156:20, 157:8, 175:23
**Justice** [4] - 17:5, 100:21, 134:11, 156:10
**justify** [1] - 66:14
**justifying** [2] - 66:11, 71:6

## K

**KATHRYN** [1] - 1:23
**Kathy** [1] - 84:15
**keen** [2] - 102:4, 102:5
**keep** [4] - 57:14, 104:11, 111:14, 147:25
**keeping** [3] - 111:19, 111:24, 135:12
**Keith** [1] - 72:17
**Keneally** [3] - 3:8, 18:16, 84:15
**KENEALLY** [17] - 1:23, 64:12, 64:19, 65:14, 69:10, 71:11, 75:4, 77:21, 80:14, 80:16, 83:23, 84:7, 89:15, 89:25, 90:12, 90:19, 91:19
**Kentucky** [1] - 174:9
**Kepke** [7] - 130:5, 130:8, 132:17, 139:24, 150:22, 151:21, 152:7
**Kepke's** [4] - 130:6, 132:13, 151:14, 160:19
**kept** [2] - 109:25, 137:11
**kicked** [1] - 158:7
**kind** [5] - 12:7, 12:19, 74:14, 82:15, 134:25
**Kingdom** [1] - 99:15
**knowing** [1] - 102:7
**knowledge** [6] - 22:10, 22:22, 102:3, 161:1, 161:6
**known** [4] - 28:8, 87:12, 95:19, 96:19
**knows** [1] - 140:16

## L

**lag** [1] - 124:22
**laid** [1] - 159:24
**lambdaprime.org** [1] - 101:15
**lame** [1] - 143:9
**land** [1] - 157:21
**landed** [1] - 158:2
**LANGSTON** [84] - 1:16, 5:23, 6:9, 7:2, 7:7, 7:12, 8:20, 9:8, 10:1, 10:25, 11:5, 59:7, 59:20, 60:8, 60:12, 64:9, 64:16, 64:22, 65:11, 65:18, 69:7, 69:14, 71:9, 71:14, 72:10, 75:1, 75:13, 75:16, 77:18, 77:24, 80:11, 80:19, 83:20, 83:24, 84:2, 91:20, 91:25, 92:15, 104:18, 104:24, 105:3, 107:20, 108:2, 108:7, 110:6, 110:23, 114:10, 114:16, 117:14, 117:19, 119:5, 121:8, 121:12, 123:25, 124:4, 125:4, 125:8, 128:11, 128:15, 131:2, 131:15, 132:8, 132:11, 135:4, 135:10, 138:19, 138:22, 142:6, 142:10, 142:14, 142:17, 144:16, 144:24, 149:16, 149:19, 150:4, 150:8, 152:20, 153:20, 166:16, 167:11, 168:3, 169:8, 169:14
**Langston** [5] - 3:7, 3:10, 10:15, 10:19, 155:12
**laptop** [1] - 104:11
**laptops** [1] - 102:22
**large** [5] - 98:7, 111:16, 116:22, 135:23, 164:1
**larger** [2] - 146:19, 147:10
**laser** [1] - 106:15
**last** [24] - 4:23, 5:9, 6:3, 9:11, 60:13, 85:7, 91:11, 91:14, 91:16, 92:17, 94:1, 102:17, 107:3, 156:22, 157:23, 158:3, 159:4, 159:15, 159:22, 160:21, 162:7, 162:8, 171:24, 172:1
**lastly** [1] - 34:11
**latch** [1] - 164:15
**latter** [3] - 29:25, 61:4, 147:25
**Law** [4] - 1:19, 1:20, 1:22, 1:23
**law** [9] - 56:14, 82:18, 108:23, 108:25, 169:7, 169:9, 169:24, 170:3, 170:4
**lawful** [3] - 170:6, 172:5, 172:9
**lawyer** [9] - 56:16, 56:17, 56:18, 56:19, 56:20, 130:3, 146:3, 169:13
**lawyers** [9] - 17:5, 54:10, 54:12, 55:15, 100:6, 123:10, 134:2, 154:20, 155:1
**lead** [3] - 127:7, 127:9, 156:25
**leadership** [1] - 76:8
**leading** [4] - 78:4, 119:2, 130:24, 147:11
**learn** [8] - 6:15, 61:17, 80:10, 80:20, 85:25, 130:10, 135:21, 144:25
**learned** [5] - 6:19, 82:6, 129:8, 160:25, 161:5
**learning** [2] - 66:7, 151:9
**least** [9] - 8:21, 30:5, 42:25, 43:4, 51:12, 112:15, 137:5, 157:12, 174:8
**leave** [2] - 91:9, 144:23
**Lebron** [1] - 140:19
**led** [1] - 144:10
**LEE** [1] - 1:16
**leech** [1] - 134:16
**leeching** [1] - 134:20
**left** [8] - 32:9, 32:19, 68:24, 69:1, 89:22, 137:17, 148:21, 151:3
**legal** [9] - 84:19, 144:10, 145:20, 146:5, 166:11, 169:9, 169:16, 169:21
**Lerner** [2] - 65:5, 65:7
**less** [7] - 22:12, 22:14, 22:15, 25:18, 96:13, 97:4, 155:9
**lessee** [1] - 98:5
**lessor** [1] - 98:5
**letter** [15] - 4:25, 71:17, 106:2, 106:8,
115:19, 116:2, 116:13, 116:22, 117:4, 117:10, 127:14, 127:17, 128:1, 128:2, 128:4
**letters** [2] - 115:7, 127:5
**letting** [2] - 90:2, 90:9
**level** [2] - 87:19, 151:23
**life** [3] - 14:18, 16:15, 137:16
**lifted** [1] - 147:21
**likelihood** [1] - 48:1
**likely** [2] - 6:12, 147:15
**limit** [1] - 119:9
**limitations** [1] - 44:3
**Limited** [3] - 93:2, 94:13, 117:21
**limited** [3] - 85:14, 121:21, 122:8
**line** [5] - 74:6, 116:8, 116:21, 146:24, 148:20
**lined** [3] - 7:4, 9:2, 35:21
**lines** [2] - 124:12, 127:4
**lingering** [1] - 112:22
**liquidity** [1] - 88:25
**list** [2] - 63:21, 168:2
**listed** [1] - 154:5
**lists** [1] - 99:4
**literature** [1] - 52:22
**live** [1] - 134:24
**living** [3] - 104:2, 104:4, 146:5
**loan** [3] - 146:7, 146:8, 146:9
**located** [4] - 86:19, 114:3, 146:23, 147:13
**location** [6] - 103:23, 104:12, 112:1, 147:14, 147:16, 154:16
**locations** [2] - 86:24, 155:3
**lockers** [1] - 155:3
**look** [34] - 9:3, 18:17, 20:13, 26:15, 26:17, 27:18, 27:19, 33:2, 34:25, 37:20, 37:22, 66:25, 69:21, 100:23, 103:12, 105:4, 105:9, 108:25, 110:24, 111:12, 111:21, 112:14, 115:12,

116:15, 125:18, 125:19, 127:2, 136:16, 136:25, 141:23, 145:16, 145:22, 146:18, 159:8

**looked** [3] - 29:21, 49:7, 113:9

**looking** [4] - 61:22, 71:6, 104:7, 146:25

**looks** [1] - 26:14

**Loonam** [1] - 3:5

**LOONAM** [38] - 1:21, 11:20, 12:3, 12:10, 16:11, 17:18, 18:16, 20:1, 20:11, 20:13, 20:22, 33:6, 33:10, 38:12, 38:15, 38:20, 38:24, 39:8, 39:12, 39:19, 42:6, 42:10, 44:17, 44:21, 47:1, 47:10, 51:3, 51:9, 51:14, 52:3, 52:8, 52:25, 53:2, 57:11, 57:16, 58:14, 59:11, 59:19

**losing** [2] - 70:15, 70:17

**love** [1] - 51:3

**low** [2] - 24:1, 49:1

**lower** [2] - 49:18, 49:20

**LP** [1] - 123:3

**luggage** [1] - 112:1

**lunch** [4] - 11:2, 137:2, 153:2, 153:12

**M**

**M-O-S-S** [1] - 60:15

**MACDOUGALL** [8] - 4:12, 4:15, 4:21, 5:8, 7:21, 7:25, 9:20, 10:10

**MacDougall** [3] - 4:16, 6:1, 9:15

**machine** [2] - 106:16, 106:18

**machines/laser** [1] - 107:5

**MAGNANI** [1] - 1:15

**mail** [79] - 9:11, 62:20, 62:23, 65:1, 65:2, 65:20, 69:16, 69:18, 70:11, 70:12, 71:2, 71:3, 72:16, 72:19, 74:20, 76:19, 82:2, 82:5, 83:7, 101:1, 101:16, 101:17, 101:19, 102:11,

102:19, 104:5, 105:5, 105:7, 105:10, 105:13, 105:14, 105:16, 105:18, 105:23, 106:3, 106:7, 106:10, 107:11, 107:12, 107:13, 108:10, 108:18, 109:2, 111:24, 114:23, 115:1, 115:3, 115:5, 115:14, 115:17, 117:1, 117:23, 118:8, 118:11, 118:13, 119:13, 119:16, 119:18, 119:22, 119:24, 119:25, 120:23, 122:15, 123:17, 124:6, 124:10, 124:16, 124:20, 125:1, 126:1, 127:2, 132:22, 138:4, 142:19, 149:24

**mails** [5] - 75:5, 75:10, 102:11, 105:12, 106:1

**main** [2] - 94:18, 115:6

**maintain** [5] - 140:20, 141:15, 147:1, 161:23, 163:17

**maintaining** [1] - 40:24

**major** [1] - 75:24

**majority** [1] - 8:2

**maker** [6] - 140:15, 140:22, 141:3, 141:7, 143:12

**makings** [1] - 79:5

**man** [1] - 94:19

**managed** [2] - 140:13, 172:17

**management** [3] - 115:21, 115:24, 122:25

**Management** [1] - 118:1

**manner** [2] - 26:14, 112:7

**manual** [13] - 46:2, 49:4, 49:5, 49:7, 50:11, 51:4, 51:11, 51:15, 51:18, 51:19, 51:21, 52:10

**Manual** [1] - 50:17

**manual's** [1] - 50:19

**manuals** [1] - 51:23

**manufacturer** [2] - 107:6, 107:7

**margin** [4] - 73:8, 73:22, 74:3, 74:6

**margins** [1] - 74:8

**mark** [5] - 4:16, 107:16, 131:10, 142:12, 158:8

**marked** [6] - 36:22, 39:21, 42:12, 47:11, 62:9, 69:5

**marking** [2] - 39:19, 47:1

**married** [1] - 82:14

**mask** [3] - 5:1, 5:4, 92:11

**master** [2] - 99:18, 99:23

**master's** [1] - 60:24

**material** [4] - 95:15, 136:5, 136:7, 161:5

**math** [5] - 34:13, 34:16, 37:12, 173:14

**mathematical** [9] - 25:2, 25:11, 32:25, 33:20, 34:4, 40:21, 46:6, 48:13, 48:16

**matrimonial** [3] - 130:21, 133:5, 133:6

**matter** [8] - 12:16, 12:24, 16:20, 32:12, 50:24, 75:24, 155:15, 178:7

**matters** [2] - 143:23, 164:14

**mean** [26] - 4:10, 8:16, 8:18, 9:3, 9:15, 19:21, 20:6, 20:15, 21:23, 21:25, 22:24, 23:9, 23:23, 38:14, 41:3, 45:12, 54:7, 57:13, 65:16, 108:18, 108:19, 112:24, 114:17, 133:17, 151:17, 169:19

**meaningful** [2] - 24:2, 24:3

**means** [2] - 27:2, 138:3

**meant** [4] - 29:3, 29:15, 128:20, 137:18

**measure** [3] - 26:21, 29:11, 51:17

**measure's** [2] - 25:22, 26:20

**mechanical** [1] - 2:5

**media** [1] - 139:14

**medical** [6] - 82:11, 82:19, 82:23, 90:22, 124:11, 167:21

**Medical** [3] - 23:16, 23:17, 37:3

**Medicine** [2] - 65:4, 174:15

**meet** [3] - 133:20, 134:2, 139:25

**meeting** [7] - 134:4, 139:23, 139:24, 157:17, 158:6, 158:24, 159:15

**meetings** [5] - 156:21, 158:1, 158:16, 158:20, 165:13

**Melissa** [2] - 137:10, 139:9

**member** [2] - 79:24, 84:18

**members** [1] - 76:3

**memo** [4] - 69:16, 145:4, 149:21, 149:25

**memorandum** [1] - 145:9

**memorandums** [1] - 159:14

**Memory** [3] - 23:15, 33:3, 37:11

**memory** [47] - 13:7, 25:4, 25:12, 25:13, 25:14, 28:13, 28:18, 28:21, 28:24, 29:2, 29:13, 30:2, 30:7, 31:6, 31:7, 31:12, 32:1, 32:3, 33:13, 33:25, 34:7, 34:14, 34:17, 34:23, 36:12, 36:18, 37:19, 38:1, 39:15, 39:17, 40:6, 40:10, 40:14, 40:18, 40:23, 41:2, 41:16, 41:23, 42:18, 42:24, 43:5, 43:12, 43:15, 162:20, 164:7

**memos** [2] - 99:7, 157:16

**Memphis** [1] - 137:7

**mental** [6] - 70:23, 71:25, 166:5, 166:15, 166:25

**mention** [3] - 10:15, 10:21, 151:4

**mentioned** [6] - 87:20, 151:5, 151:6, 156:1, 166:10, 176:9

**mentions** [1] - 161:23

**merits** [5] - 89:7, 89:10, 89:12, 89:17, 90:6

**messaging** [2] - 120:10, 124:7

**Medical** [3] - 23:16, 23:17, 37:3

**met** [6] - 85:15, 157:1, 158:4, 161:11, 172:21

**Methodist** [1] - 81:11

**Michael** [1] - 60:15

**mid-1990's** [5] - 46:3, 49:8, 50:2, 51:18, 52:16

**might** [8] - 104:3, 116:1, 158:11, 160:24, 161:4, 162:19, 166:9, 174:6

**Miller** [2] - 108:23, 152:10

**million** [19] - 79:11, 79:16, 80:4, 94:3, 125:16, 125:22, 126:16, 173:23, 174:4, 174:8, 174:11, 174:14, 174:20, 174:24, 175:3, 175:10, 175:13, 175:18, 176:1

**mind** [4] - 56:21, 139:1, 144:4, 144:11

**mindset** [1] - 138:12

**minority** [1] - 142:25

**minute** [2] - 52:23, 59:3

**minutes** [3] - 152:23, 153:1, 153:14

**misrepresent** [1] - 23:5

**Miss** [1] - 137:3

**Mississippi** [3] - 113:18, 135:2, 139:4

**mistaken** [1] - 143:4

**mixing** [1] - 29:8

**moment** [4] - 52:25, 58:3, 149:17, 160:8

**Monday** [1] - 153:7

**money** [19] - 78:7, 78:12, 78:13, 83:10, 118:19, 118:21, 119:1, 119:11, 120:2, 120:14, 120:18, 120:20, 120:24, 125:11, 149:20, 150:9, 150:11, 150:18, 175:7

**monitor** [1] - 144:14

**monitored** [1] - 143:25

**month** [8] - 62:8, 63:3, 72:9, 72:11, 106:6, 107:7, 154:12, 155:9

**morning** [16] - 4:8, 4:14, 4:15, 4:17, 6:1,

12:4, 12:5, 12:6,
59:22, 60:9, 84:8,
84:9, 84:15, 92:16,
152:14, 158:5
**morning's** [1] - 11:11
**morning/afternoon**
[1] - 9:23
**Moss** [4] - 59:21,
60:15, 84:16, 91:22
**MOSS** [2] - 3:6, 60:1
**moss** [7] - 59:22,
62:11, 64:23, 75:6,
75:17, 78:10, 84:8
**most** [12] - 35:15,
35:16, 50:13, 50:21,
51:17, 52:11, 52:18,
95:14, 95:18, 137:4,
157:12, 171:5
**mostly** [1] - 24:16
**motion** [4] - 4:10,
4:18, 5:1, 6:21
**move** [11] - 38:12,
38:16, 39:8, 40:17,
42:6, 48:15, 64:9,
89:25, 113:25,
168:3, 177:2
**moved** [6] - 48:12,
60:23, 60:25, 61:1,
93:24, 155:18
**moves** [2] - 47:3,
56:23
**moving** [6] - 6:4,
64:17, 92:20,
102:22, 104:5,
148:12
**MR** [169] - 4:12, 4:15,
4:21, 5:8, 5:23, 6:9,
7:2, 7:7, 7:12, 7:21,
7:25, 8:20, 9:8, 9:20,
10:1, 10:10, 10:14,
10:25, 11:5, 11:20,
12:3, 12:10, 16:9,
16:11, 17:15, 17:18,
18:4, 18:16, 19:9,
20:1, 20:11, 20:13,
20:22, 33:6, 33:10,
38:12, 38:15, 38:20,
38:24, 39:8, 39:12,
39:19, 42:6, 42:10,
44:17, 44:21, 47:1,
47:6, 47:10, 50:24,
51:3, 51:6, 51:9,
51:10, 51:14, 52:3,
52:8, 52:25, 53:2,
57:7, 57:11, 57:16,
58:14, 58:17, 58:21,
59:7, 59:11, 59:15,
59:19, 59:20, 60:8,
60:12, 64:9, 64:16,
64:22, 65:11, 65:18,

69:7, 69:14, 71:9,
71:14, 72:10, 75:1,
75:13, 75:16, 77:18,
77:24, 80:11, 80:19,
83:20, 83:24, 84:2,
91:20, 91:25, 92:15,
104:18, 104:21,
104:24, 105:3,
107:20, 107:23,
108:2, 108:5, 108:7,
110:6, 110:8,
110:15, 110:23,
114:10, 114:12,
114:16, 117:14,
117:16, 117:19,
119:2, 119:5, 121:8,
121:9, 121:12,
123:25, 124:1,
124:4, 125:4, 125:5,
125:8, 128:11,
128:12, 128:15,
130:24, 131:2,
131:15, 132:8,
132:11, 135:4,
135:7, 135:10,
138:15, 138:19,
138:22, 142:6,
142:7, 142:10,
142:14, 142:17,
144:16, 144:19,
144:24, 149:13,
149:16, 149:19,
150:4, 150:5, 150:8,
152:20, 153:17,
153:20, 153:24,
166:16, 166:18,
167:3, 167:11,
167:25, 168:3,
168:6, 169:8,
169:11, 169:14,
169:22, 176:23
**MS** [16] - 64:12, 64:19,
65:14, 69:10, 71:11,
75:4, 77:21, 80:14,
80:16, 83:23, 84:7,
89:15, 89:25, 90:12,
90:19, 91:19
**MSVT** [12] - 23:17,
23:18, 26:11, 27:12,
37:6, 39:4, 39:24,
41:7, 41:11, 42:14
**muddy** [2] - 146:23,
147:12
**multiple** [1] - 53:12
**multiple-count** [1] -
53:12
**Music** [1] - 140:10
**must** [1] - 106:14
**mutual** [1] - 95:23

**N**

**n/a** [1] - 1:25
**name** [19] - 15:3,
15:15, 60:13, 84:14,
84:15, 86:16, 92:16,
92:17, 94:11, 94:19,
108:24, 126:22,
151:6, 151:7, 151:9,
151:10, 151:14,
153:25, 176:11
**names** [2] - 151:5,
151:7
**naming** [1] - 105:25
**nature** [1] - 75:9
**near** [3] - 98:24,
159:12, 164:25
**nearer** [1] - 148:22
**nearing** [1] - 8:17
**necessarily** [5] -
22:19, 26:13, 54:16,
58:13, 148:18
**need** [16] - 11:3, 11:5,
59:4, 74:17, 78:22,
107:4, 145:24,
146:12, 146:22,
147:19, 148:1,
148:3, 153:4,
153:10, 153:11,
156:3
**needed** [5] - 70:12,
70:13, 100:21,
136:4, 137:8
**needs** [1] - 106:16
**negative** [1] - 24:3
**negatively** [1] - 70:16
**negotiating** [1] -
123:10
**negotiation** [6] -
120:17, 120:21,
123:7, 123:13,
123:15, 123:23
**negotiations** [1] -
120:16
**neurocognitive** [1] -
53:7
**neurology** [1] - 66:8
**never** [15] - 29:10,
84:10, 106:14,
106:23, 141:6,
143:13, 147:24,
151:7, 163:5, 164:6,
164:9, 170:19,
170:21, 170:23,
171:2
**new** [4] - 80:25, 81:1,
98:21, 148:5
**newsletter** [2] - 73:1,
74:12
**next** [6] - 59:6, 62:16,

79:10, 119:13,
147:23, 148:3
**night** [3] - 5:9, 9:11,
164:9
**nights** [1] - 6:3
**nine** [1] - 6:2
**nobody** [1] - 6:5
**nobody's** [1] - 6:3
**noise** [1] - 123:2
**non** [4] - 26:22, 26:23,
115:1
**Non** [3] - 23:16, 37:3,
37:5
**non-encrypted** [1] -
115:1
**non-exaggerating** [1]
- 26:23
**non-impaired** [1] -
26:22
**Non-Verbal** [3] -
23:16, 37:3, 37:5
**none** [8] - 14:19,
43:11, 43:14, 43:16,
70:24, 161:3, 161:8,
166:3
**normal** [2] - 20:3,
49:17
**normally** [3] - 13:9,
13:12, 18:25
**North** [1] - 135:1
**note** [1] - 168:1
**nothing** [6] - 5:10,
112:21, 145:24,
152:20, 169:5,
169:24
**notice** [6] - 4:23, 73:9,
137:4, 162:6,
163:15, 163:19
**noticed** [8] - 162:14,
162:17, 162:18,
164:12, 164:16,
165:1, 165:9
**NOVEMBER** [2] -
1:12, 4:6
**November** [5] - 80:23,
81:25, 82:3, 83:5,
132:22
**nowhere** [1] - 159:12
**number** [12] - 32:14,
63:12, 102:4, 106:3,
106:8, 112:6,
112:14, 113:3,
135:14, 135:23,
144:8, 145:1
**numbers** [3] - 27:11,
27:21, 34:25
**numerous** [1] - 57:18
**NV** [4] - 23:17, 26:11,
27:12, 41:11
**NV-MSVT** [4] - 23:17,

26:11, 27:12, 41:11

**O**

**o'clock** [7] - 6:2, 10:5,
59:4, 59:9, 153:15,
177:1
**O'CONNOR** [1] - 1:20
**object** [2] - 18:4, 75:5
**objected** [1] - 78:25
**objection** [58] - 17:15,
33:8, 38:13, 42:8,
47:5, 47:6, 47:8,
59:14, 59:15, 64:11,
64:12, 64:13, 64:19,
64:20, 65:13, 65:14,
69:9, 69:10, 71:11,
71:12, 75:11, 77:20,
77:21, 77:22, 80:13,
80:14, 80:15, 80:16,
80:17, 83:22, 83:23,
104:20, 104:21,
104:22, 107:24,
110:7, 110:14,
117:16, 119:2,
121:9, 124:1, 125:5,
128:12, 130:24,
130:25, 135:7,
138:15, 142:7,
144:18, 144:19,
144:20, 149:13,
150:5, 166:16,
167:2, 167:11,
167:23, 169:8
**objection's** [5] -
17:17, 57:8, 57:15,
119:3, 169:21
**objections** [2] - 65:15,
107:22
**objective** [10] - 21:17,
22:5, 22:9, 22:12,
34:5, 50:13, 50:21,
51:17, 52:12, 52:18
**obligation** [1] - 157:5
**obligations** [6] - 88:6,
88:12, 172:16,
172:21, 172:25
**observations** [3] -
13:13, 167:18,
169:15
**observe** [3] - 67:21,
160:11, 162:11
**observed** [1] - 160:6
**observing** [3] -
165:25, 166:2, 166:6
**obtain** [10] - 13:1,
28:18, 45:5, 45:7,
45:11, 45:14, 45:17,
45:22, 51:5, 51:25
**obtained** [6] - 42:18,

42:24, 43:4, 107:14, 110:3, 145:10
**obtaining** [1] - 44:13
**obvious** [1] - 68:5
**obviously** [4] - 10:4, 56:5, 140:16, 161:10
**occasion** [2] - 163:11, 165:11
**occasionally** [1] - 115:8
**occasions** [1] - 84:24
**occurred** [2] - 116:10, 116:18
**October** [13] - 39:25, 41:12, 42:15, 62:19, 65:23, 66:2, 67:1, 67:8, 155:6, 157:2, 159:17, 162:22, 163:7
**OF** [3] - 1:2, 1:10, 3:1
**offenses** [1] - 55:25
**offer** [26] - 18:6, 19:17, 57:6, 65:11, 69:8, 71:9, 75:1, 77:18, 80:11, 83:20, 104:18, 107:21, 110:6, 114:10, 117:14, 121:8, 123:25, 125:4, 128:11, 135:5, 142:6, 144:16, 145:14, 149:12, 150:4
**offered** [3] - 92:19, 92:22, 110:11
**offering** [1] - 54:7
**office** [6] - 61:24, 85:13, 99:17, 148:1, 151:3, 160:20
**officers** [2] - 68:14, 68:15
**offices** [1] - 108:22
**OFFICIAL** [1] - 1:10
**official** [1] - 92:24
**Official** [1] - 2:2
**offshore** [9] - 87:17, 97:9, 118:16, 118:19, 119:11, 129:23, 129:25, 130:4
**often** [2] - 70:11, 85:13
**Ohio** [1] - 86:22
**old** [5] - 147:15, 147:16, 165:20, 165:21
**older** [1] - 162:3
**Ole** [1] - 137:3
**once** [5] - 36:11, 36:18, 38:9, 61:7,

111:4
**one** [66] - 15:15, 17:1, 17:4, 28:14, 31:2, 31:5, 31:10, 31:13, 31:25, 32:2, 32:9, 41:5, 42:1, 43:16, 43:17, 43:24, 48:21, 48:24, 52:25, 53:3, 56:23, 62:7, 79:10, 79:22, 86:4, 88:10, 88:11, 97:11, 97:17, 98:13, 102:6, 102:15, 102:16, 105:14, 110:2, 112:5, 117:25, 121:4, 121:17, 121:18, 122:12, 126:14, 126:22, 129:1, 130:9, 132:7, 138:8, 142:4, 142:18, 145:9, 149:7, 149:9, 152:23, 153:15, 154:5, 155:9, 158:16, 160:2, 160:7, 160:8, 166:23, 173:8, 177:1
**one-time** [1] - 98:13
**ones** [2] - 35:19, 110:20
**ongoing** [3] - 98:14, 98:15, 98:17
**oOo** [1] - 177:6
**open** [9] - 4:4, 114:6, 114:17, 114:19, 119:10, 119:25, 124:10, 124:16, 128:17
**opened** [1] - 129:4
**openly** [1] - 87:17
**opera** [3] - 140:9, 140:24, 174:5
**operate** [1] - 112:6
**operating** [3] - 89:23, 113:4, 113:21
**operations** [3] - 86:21, 89:20, 130:18
**opinion** [4] - 36:8, 54:8, 55:6, 169:9
**opposed** [1] - 123:3
**opposite** [1] - 26:24
**oral** [2] - 93:19, 93:20
**order** [5] - 7:9, 8:6, 8:24, 10:17, 66:5
**ordered** [1] - 95:16
**organization** [1] - 109:15
**organizations** [1] - 173:5
**original** [5] - 44:15,

46:2, 106:15, 106:17, 130:9
**originally** [2] - 60:22, 155:17
**otherwise** [2] - 20:20, 66:15
**outcome** [2] - 22:3, 22:14
**outline** [2] - 128:2, 145:13
**outputs** [1] - 45:13
**outset** [2] - 110:17, 155:23
**outside** [3] - 49:12, 109:6, 148:22
**overall** [1] - 22:4
**overcome** [1] - 56:2
**overruled** [4] - 75:11, 77:22, 167:2, 169:21
**oversee** [1] - 97:8
**owed** [1] - 83:11
**own** [5] - 20:5, 34:1, 97:17, 116:14, 118:14
**owned** [4] - 87:8, 96:1, 171:10
**owner** [4] - 130:18, 143:1, 143:3, 143:7
**ownership** [2] - 87:18, 143:3
**owns** [2] - 86:5, 87:6
**Oxford** [4] - 135:2, 137:4, 137:7, 137:13

## P

**P"** [1] - 106:9
**p-value** [6] - 48:3, 48:18, 49:23, 50:2, 50:3, 50:7
**P.M** [1] - 177:5
**P.S** [1] - 103:14
**package** [5] - 35:12, 77:4, 103:20, 103:21, 103:22
**packets** [1] - 107:8
**page** [8] - 41:5, 102:17, 109:4, 111:13, 131:20, 143:5, 143:20, 147:23
**Page** [5] - 46:17, 79:20, 131:16, 145:16, 146:10
**PAGE** [1] - 3:3
**paid** [2] - 8:3, 98:6
**painfully** [1] - 81:3
**panned** [1] - 14:19
**paper** [9] - 47:25, 48:23, 52:23, 62:16,

93:1, 95:5, 107:5, 107:6, 107:8
**paperless** [1] - 112:7
**papers** [1] - 27:14
**paperwork** [3] - 66:4, 79:6, 79:18
**Paragraph** [5] - 111:13, 139:18, 140:3, 140:5, 146:10
**paragraph** [9] - 70:1, 73:24, 74:16, 79:9, 107:3, 116:15, 141:23, 143:6, 143:19
**paragraphs** [5] - 73:18, 74:11, 111:21, 112:14, 136:25
**Parkinson's** [3] - 85:23, 167:9, 168:9
**part** [36] - 20:25, 22:1, 22:2, 25:7, 26:15, 27:24, 35:12, 60:22, 61:4, 67:2, 90:7, 90:15, 90:16, 94:4, 94:20, 95:14, 98:16, 102:12, 109:17, 115:9, 118:12, 119:9, 120:22, 129:12, 129:22, 129:23, 130:18, 132:12, 141:1, 141:2, 142:2, 142:4, 142:5, 149:2, 154:22
**part-time** [1] - 60:22
**participated** [1] - 173:20
**particular** [8] - 40:8, 40:21, 41:25, 71:4, 147:7, 170:15, 172:24, 173:12
**particularly** [3] - 110:20, 134:15, 164:3
**parties** [2] - 8:9, 11:17
**partner** [6] - 121:21, 122:8, 122:9, 129:23, 129:25, 152:11
**Partners** [3] - 96:9, 129:10, 129:13
**partners** [4] - 121:18, 121:19, 122:12, 122:13
**party** [4] - 8:1, 18:11, 22:19, 22:20
**pass** [5] - 44:23, 45:5, 45:14, 45:15, 135:17
**passing** [3] - 94:21, 116:9, 116:17

**past** [2] - 36:18, 164:18
**paste** [1] - 105:16
**path** [1] - 74:15
**pathology** [1] - 24:24
**patience** [1] - 91:23
**patient** [1] - 5:15
**patients** [3] - 44:13, 48:2, 48:21
**pattern** [3] - 6:22, 31:3, 35:1
**patterns** [1] - 24:5
**Paul** [2] - 23:13, 25:1
**pause** [1] - 78:22
**pay** [2] - 88:6, 119:1
**paying** [2] - 83:12, 87:4
**payments** [12] - 78:8, 78:14, 79:3, 79:5, 87:20, 87:25, 88:5, 88:11, 88:15, 90:21, 90:22, 91:5
**people** [32] - 9:12, 13:12, 14:17, 14:21, 16:4, 16:13, 16:17, 18:3, 18:25, 19:12, 19:22, 21:3, 22:16, 26:21, 26:22, 26:23, 29:3, 29:15, 29:19, 30:6, 51:16, 51:24, 79:22, 83:12, 86:23, 106:4, 122:18, 141:5, 148:16, 166:4, 166:8, 166:11
**per** [1] - 111:4
**percent** [9] - 27:15, 28:5, 30:25, 47:19, 73:25, 74:3, 74:6, 122:25
**percentiles** [1] - 74:9
**perception** [1] - 53:22
**perfect** [1] - 164:7
**perform** [2] - 13:10, 49:12
**performance** [12] - 24:22, 48:2, 93:12, 93:16, 99:2, 110:25, 113:17, 126:8, 136:11, 136:14, 138:1, 161:22
**Performance** [1] - 47:14
**performed** [1] - 35:8
**perhaps** [1] - 122:5
**period** [10] - 19:6, 76:16, 93:7, 101:16, 162:10, 163:15, 163:16, 164:12, 165:8, 176:2
**perjury** [2] - 100:22,

155:25
**Permit** [2] - 101:5, 101:10
**person** [17] - 15:4, 15:15, 23:1, 31:2, 31:5, 31:11, 81:12, 95:5, 97:21, 103:22, 130:17, 140:11, 159:5, 159:15, 162:5, 163:11, 163:23
**personal** [6] - 63:8, 63:17, 63:18, 116:16, 161:1, 161:6
**personally** [2] - 109:5, 159:25
**persons** [1] - 170:12
**perspective** [2] - 131:25, 132:6
**Petree** [1] - 5:9
**PGP** [1] - 103:15
**phone** [10] - 99:16, 120:1, 120:7, 120:13, 148:2, 151:16, 151:24, 160:15, 163:12, 163:18
**phonetic** [5] - 61:20, 61:25, 62:3, 72:17, 159:20
**phrase** [3] - 45:21, 108:17, 114:17
**physical** [10] - 147:13, 147:16, 161:2, 162:6, 162:12, 162:13, 165:24, 166:5, 166:15, 166:25
**physically** [1] - 161:17
**Physics** [2] - 173:25, 176:13
**pick** [1] - 160:4
**pieces** [1] - 61:1
**Pilot** [2] - 87:7, 118:1
**pilot** [4] - 61:21, 63:11, 63:14, 63:15
**pitching** [2] - 138:2, 138:5
**Pittman** [2] - 157:3, 157:4
**pity** [1] - 162:1
**place** [7] - 79:6, 90:14, 102:1, 120:17, 123:14, 126:9, 133:8
**placed** [1] - 144:1
**places** [2] - 41:5, 148:16
**placing** [1] - 81:23
**Plaintiff** [2] - 1:5, 1:14
**plan** [12] - 82:10,

82:11, 82:13, 82:19, 82:23, 83:3, 83:12, 83:17, 148:14, 149:1, 149:6, 149:9
**planning** [2] - 123:14, 148:24
**plans** [2] - 7:15, 8:7
**play** [3] - 36:16, 50:7, 53:23
**plays** [2] - 35:2, 53:19
**pledge** [1] - 174:3
**podium** [1] - 5:4
**point** [29] - 18:5, 42:3, 53:21, 70:21, 71:8, 75:7, 77:6, 79:1, 80:10, 80:20, 82:16, 94:25, 104:1, 104:4, 113:24, 117:6, 122:3, 122:5, 127:8, 130:10, 134:2, 134:7, 134:10, 146:13, 149:20, 153:12, 155:4, 162:4, 167:16
**Point** [11] - 95:19, 95:22, 95:24, 96:2, 96:4, 96:8, 121:22, 121:23, 122:4, 129:16, 129:20
**pointed** [2] - 8:12, 70:17
**points** [1] - 122:22
**Police** [1] - 154:9
**pool** [1] - 30:4
**poor** [3] - 25:5, 33:21, 48:1
**populations** [1] - 44:20
**Port** [1] - 135:1
**portion** [2] - 27:20, 101:3
**position** [11] - 8:8, 52:17, 126:11, 130:23, 131:3, 133:14, 140:20, 141:15, 141:17, 141:24, 171:25
**positive** [10] - 24:1, 24:2, 24:7, 24:21, 26:24, 27:2, 29:5, 29:15, 44:13, 48:7
**positives** [1] - 29:19
**possibility** [2] - 13:24, 116:4
**possible** [31] - 10:10, 24:6, 25:12, 25:14, 30:7, 31:7, 31:11, 32:1, 32:3, 33:13, 33:24, 34:7, 34:14, 34:16, 36:12, 38:1,

38:2, 39:15, 39:17, 40:6, 40:9, 40:14, 40:18, 41:2, 41:16, 41:23, 42:18, 42:24, 112:6, 137:17, 147:25
**possibly** [2] - 45:9, 103:11
**potential** [11] - 48:23, 107:9, 112:12, 115:21, 115:23, 118:6, 129:8, 133:14, 134:16, 138:13, 138:24
**potentially** [5] - 22:15, 22:23, 54:15, 146:15, 146:17
**practice** [7] - 20:3, 98:19, 105:15, 112:20, 112:23, 112:24, 113:1
**preacher** [1] - 81:10
**preceding** [1] - 75:22
**precisely** [1] - 73:14
**predecessor** [2] - 113:9, 134:21
**prediction** [2] - 66:23, 67:1
**prefer** [3] - 10:2, 11:1, 62:15
**prepare** [2] - 82:17, 111:3
**prepared** [2] - 70:11, 111:1
**presence** [1] - 159:25
**present** [2] - 4:11, 141:9
**presented** [1] - 46:2
**president** [2] - 72:18, 81:6
**PRESIDING** [1] - 1:3
**pressure** [1] - 136:19
**Pretty** [1] - 103:17
**pretty** [1] - 8:17
**prevent** [1] - 102:7
**prevented** [6] - 14:14, 14:25, 15:5, 15:14, 15:16, 15:19
**previous** [3] - 64:17, 83:11, 127:5
**previously** [1] - 11:23
**prices** [1] - 73:3
**primarily** [2] - 88:20, 88:21
**primary** [1] - 97:20
**principal** [4] - 126:11, 126:18, 126:19, 140:11
**principle** [1] - 126:15
**printer** [3] - 106:11,

106:15, 107:5
**printout** [5] - 41:1, 41:4, 41:5, 46:15, 49:25
**privacy** [1] - 102:5
**Privacy** [1] - 103:18
**private** [2] - 95:23, 121:14
**privately** [1] - 64:5
**pro** [3] - 54:23, 56:5, 56:23
**probability** [2] - 49:2, 49:16
**problem** [9] - 8:11, 10:12, 24:6, 38:22, 89:24, 92:12, 145:16, 146:18, 164:10
**problems** [7] - 29:4, 29:11, 29:16, 142:24, 145:14, 146:11, 163:5
**procedure** [1] - 50:25
**proceed** [6] - 53:20, 54:9, 55:7, 55:17, 84:4, 121:2
**proceeding** [3] - 133:3, 133:11, 161:5
**PROCEEDINGS** [3] - 1:10, 4:1, 177:4
**Proceedings** [1] - 2:5
**proceedings** [7] - 4:4, 130:21, 133:5, 133:6, 133:8, 160:25, 178:7
**process** [10] - 12:17, 25:8, 30:1, 33:1, 33:15, 35:19, 37:13, 63:20, 74:18, 83:18
**processes** [1] - 34:5
**produce** [1] - 31:3
**produced** [4] - 2:5, 63:22, 116:13, 116:14
**product** [3] - 16:7, 16:8, 72:24
**professional** [1] - 130:14
**proffer** [1] - 154:13
**profile** [32] - 25:13, 25:14, 28:13, 28:19, 28:21, 28:24, 29:3, 29:13, 30:2, 30:8, 31:6, 31:7, 31:12, 32:1, 32:4, 33:13, 33:21, 36:12, 38:1, 39:16, 40:6, 40:15, 40:19, 40:23, 41:2, 41:17, 41:23, 42:19, 42:25, 43:5, 43:6,

43:12
**profit** [2] - 73:24, 74:4
**profitability** [1] - 74:12
**profitable** [1] - 96:11
**profits** [2] - 96:13, 96:17
**program** [4] - 46:21, 173:9, 173:16, 174:19
**project** [4] - 98:7, 98:13, 98:16, 126:20
**promised** [2] - 4:22, 155:21
**promote** [1] - 173:13
**promoted** [2] - 61:3, 76:15
**promotion** [1] - 75:23
**proof** [2] - 18:6, 19:17
**proper** [3] - 79:4, 116:10, 116:18
**properties** [3] - 97:20, 97:21, 97:24
**property** [5] - 97:17, 97:25, 98:2, 98:4, 98:6
**proposal** [2] - 73:12, 127:3
**proprietary** [1] - 51:4
**prosecuted** [1] - 156:7
**Prosecution** [6] - 18:20, 19:11, 19:16, 20:8, 20:19, 153:19
**prosecution** [3] - 20:4, 32:11, 158:14
**Prosecution's** [1] - 20:9
**prosecutor** [1] - 156:25
**Prosecutor** [1] - 18:12
**prosecutors** [7] - 17:12, 17:19, 18:6, 19:23, 155:24, 158:2
**prospect** [1] - 146:4
**protect** [2] - 139:19, 139:21
**protecting** [1] - 136:21
**protection** [1] - 16:7
**protects** [1] - 26:17
**provide** [7] - 52:18, 55:9, 56:1, 100:5, 100:8, 154:15, 154:23
**provided** [3] - 13:4, 154:17, 156:6
**providers** [1] - 113:10
**provides** [6] - 50:12, 50:20, 52:11, 53:25, 54:7, 55:1

**pseudo** [1] - 75:25
**psychology** [2] - 28:17, 30:15
**public** [6] - 117:23, 117:25, 123:14, 123:23, 124:25, 160:25
**publicly** [1] - 176:20
**published** [1] - 51:18
**pull** [2] - 56:6, 127:25
**purchase** [2] - 97:11, 97:15
**purportedly** [1] - 118:4
**purporting** [1] - 118:24
**purpose** [2] - 112:17, 119:7
**purposefully** [2] - 25:18, 28:12
**purposes** [8] - 63:17, 107:23, 108:1, 110:12, 110:18, 157:22, 170:13, 176:7
**pursuant** [4] - 25:11, 35:7, 43:6, 178:4
**pushing** [3] - 90:3, 90:18, 122:24
**put** [9] - 35:21, 54:2, 79:8, 82:1, 89:21, 125:24, 163:19, 163:22, 165:21
**putting** [1] - 73:9
**PVT** [1] - 94:13

**Q**

**qualification** [2] - 80:3, 80:7
**qualifications** [1] - 81:19
**qualified** [1] - 37:25
**qualifies** [2] - 40:14, 41:1
**qualifying** [3] - 39:15, 40:5, 41:16
**quality** [7] - 53:19, 54:9, 54:11, 55:5, 55:9, 57:3, 57:13
**quantifiable** [4] - 50:13, 50:21, 52:12, 52:18
**question's** [1] - 19:14
**questionable** [3] - 45:11, 45:23, 46:22
**questioning** [2] - 9:18
**questionnaires** [1] - 55:9
**questions** [14] - 18:11,

24:8, 33:16, 51:8, 58:15, 58:17, 66:6, 83:24, 84:3, 89:19, 90:20, 90:24, 91:19, 174:18
**quibble** [1] - 157:19
**quick** [1] - 125:19
**quickest** [2] - 7:15, 8:14
**quickly** [3] - 6:4, 11:14, 177:2
**quite** [6] - 7:2, 137:25, 150:10, 162:18, 162:19, 162:25
**quote** [2] - 154:19, 171:2
**quotes** [1] - 146:7

**R**

**Radmin** [3] - 103:19, 113:4, 113:21
**raided** [1] - 155:10
**raise** [1] - 92:3
**raised** [1] - 10:19
**ran** [2] - 88:25, 163:3
**ranch** [1] - 97:18
**rarely** [1] - 115:4
**rate** [4] - 24:2, 26:25, 57:3, 70:15
**rates** [2] - 27:2, 29:15
**rather** [7] - 10:8, 30:3, 30:19, 62:16, 75:9, 79:2, 147:16
**rattled** [1] - 152:3
**re** [2] - 45:21, 91:5
**re-made** [1] - 91:5
**re-phrase** [1] - 45:21
**reach** [3] - 16:18, 20:5, 20:23
**reaction** [2] - 151:13, 151:18
**reactions** [1] - 167:18
**read** [5] - 51:22, 109:17, 131:20, 151:18, 168:13
**readily** [1] - 148:15
**reading** [5] - 50:16, 51:6, 51:11, 159:13, 161:5
**readjust** [1] - 9:9
**ready** [5] - 10:22, 10:25, 59:6, 84:5, 89:25
**real** [4] - 118:13, 120:21, 146:8, 166:2
**realigned** [1] - 5:15
**reality** [6] - 93:3, 95:8, 148:8, 148:10, 148:18

**really** [3] - 41:3, 74:3, 110:16
**reason** [10] - 48:11, 63:18, 66:14, 68:25, 70:22, 107:7, 115:9, 118:10, 118:13, 157:18
**reasonable** [1] - 152:15
**reasonably** [1] - 41:22
**reasons** [10] - 102:4, 102:6, 138:8
**receive** [4] - 4:9, 141:10, 150:22, 155:6, 173:5
**received** [12] - 4:17, 61:18, 61:19, 61:20, 61:21, 62:4, 62:8, 63:4, 99:15, 105:13, 127:3, 157:10
**receiving** [1] - 24:21
**recent** [1] - 52:22
**recently** [2] - 125:16, 157:12
**recess** [1] - 59:10
**RECESSED** [1] - 177:4
**recipients** [1] - 78:8
**recognize** [11] - 32:23, 37:1, 39:2, 39:21, 41:9, 42:11, 46:10, 46:13, 100:25, 108:9, 142:25
**recollection** [19] - 14:9, 15:22, 15:24, 16:16, 17:2, 31:21, 125:18, 125:20, 131:8, 131:19, 131:22, 132:3, 133:9, 151:1, 158:10, 159:6, 163:8, 174:1, 175:17
**recommend** [1] - 121:2
**recommendation** [3] - 106:22, 107:1, 161:24
**recommendations** [1] - 173:4
**recommended** [1] - 48:22
**reconstruct** [1] - 55:25
**record** [9] - 54:2, 60:14, 92:17, 100:8, 110:10, 115:10, 117:3, 132:8, 157:11
**record's** [1] - 169:23
**recorded** [1] - 2:5
**recording** [1] - 13:13

**records** [4] - 55:24, 100:11, 160:25, 170:23
**recruiting** [1] - 60:23
**Red** [2] - 101:7, 101:13
**redirect** [2] - 58:16, 91:20
**reduced** [2] - 85:6, 109:25
**reducing** [1] - 122:25
**reentry** [1] - 53:14
**reference** [2] - 70:6, 176:10
**referenced** [1] - 155:12
**referred** [1] - 47:19
**referring** [7] - 55:23, 136:14, 140:17, 141:17, 144:12, 144:13, 160:5
**reflect** [11] - 33:11, 39:13, 40:3, 41:14, 42:17, 100:11, 112:3, 112:11, 138:12, 147:2, 148:17
**reflected** [1] - 40:12
**reflection** [1] - 146:14
**reflects** [5] - 37:25, 40:13, 43:4, 48:6, 100:13
**refresh** [5] - 125:17, 131:8, 131:19, 131:22, 132:3
**refreshed** [1] - 125:20
**regard** [2] - 42:2, 57:4
**regarding** [9] - 21:17, 21:20, 50:13, 50:22, 52:12, 52:16, 52:19, 66:6, 132:13
**regards** [1] - 21:9
**regular** [1] - 82:17
**regularly** [6] - 11:24, 60:4, 68:14, 70:17, 92:8, 163:14
**regulators** [4] - 133:16, 133:17, 146:24, 147:6
**regulatory** [3] - 130:22, 130:23, 133:15
**related** [14] - 29:14, 53:10, 69:2, 72:24, 72:25, 83:17, 91:1, 130:4, 130:15, 133:11, 135:12, 135:25, 145:5, 172:17
**relates** [1] - 70:1

**relation** [12] - 95:16, 98:1, 98:12, 117:8, 126:20, 127:12, 129:2, 140:12, 140:23, 140:24, 142:23, 164:23
**relationship** [7] - 81:4, 81:17, 95:24, 129:12, 129:15, 130:6, 132:14
**relationships** [1] - 148:5
**relative** [2] - 34:11, 34:24
**relay** [1] - 136:1
**relevance** [2] - 48:20, 75:7
**relevant** [2] - 35:15, 35:17
**rely** [1] - 54:1
**remain** [2] - 123:1, 126:7
**remember** [18] - 14:18, 17:2, 31:17, 68:25, 84:16, 85:20, 90:24, 107:4
**reminded** [1] - 155:24
**reminder** [1] - 107:4
**remote** [2] - 103:20, 113:22
**remotely** [2] - 104:12, 114:4
**remove** [1] - 5:1
**renamed** [1] - 97:12
**rent** [1] - 98:6
**rented** [1] - 97:21
**repeat** [3] - 109:1, 164:6, 164:21
**repeated** [1] - 70:3
**rephrase** [2] - 138:19, 169:23
**report** [11] - 13:2, 21:6, 36:4, 40:12, 40:22, 43:7, 46:15, 53:17, 61:5, 83:10, 109:14
**reported** [5] - 14:8, 61:6, 61:7, 96:17, 178:7
**Reported** [1] - 2:1
**reporter** [2] - 94:9, 160:9
**Reporter** [2] - 2:2, 2:5
**REPORTER'S** [1] - 1:10
**reporting** [9] - 52:14, 52:20, 106:24, 108:21, 108:22, 137:22, 137:25, 138:2, 140:4

**reports** [4] - 12:19, 12:20, 19:5, 111:24
**represent** [3] - 18:8, 90:14, 154:1
**representatives** [1] - 123:11
**represented** [1] - 54:24
**representing** [4] - 49:15, 54:17, 122:7, 122:8
**represents** [1] - 49:16
**reproduce** [1] - 54:2
**request** [4] - 63:18, 63:24, 117:11, 120:13
**requesting** [1] - 63:21
**required** [4] - 5:17, 53:11, 74:10, 123:4
**requirement** [1] - 156:19
**research** [6] - 24:19, 27:10, 27:12, 49:9, 124:12, 126:20
**researching** [1] - 30:18
**Residence** [1] - 174:12
**residence** [2] - 147:15, 147:16
**resolution** [1] - 106:18
**resolutions** [1] - 79:1
**resolve** [1] - 83:15
**respect** [5] - 30:23, 43:3, 56:21, 127:8, 172:22
**respectfully** [3] - 57:15, 167:2, 167:23
**respond** [2] - 7:22, 150:2
**respondents** [5] - 50:14, 50:22, 52:13, 52:19, 94:4
**responding** [5] - 47:16, 48:4, 50:15, 50:23, 121:1
**response** [10] - 70:19, 70:20, 73:8, 73:15, 110:8, 114:12, 120:1, 123:18, 127:4, 166:17
**responsible** [2] - 73:4, 94:20
**rest** [2] - 29:13, 137:18
**restructuring** [7] - 76:8, 76:18, 76:22, 77:4, 77:5, 77:8, 77:11
**result** [3] - 74:19, 76:11, 91:10

**results** [7] - 33:19, 40:5, 40:25, 41:15, 46:7, 46:22, 46:23
**RESUMED** [1] - 12:2
**Resumed** [1] - 3:5
**retained** [3] - 118:12, 119:8, 120:19
**retaining** [1] - 120:19
**retired** [1] - 134:24
**retirement** [3] - 72:3, 72:7, 134:25
**return** [2] - 86:1, 96:17
**returned** [2] - 104:8, 157:16
**review** [10] - 16:4, 63:21, 82:16, 82:17, 113:17, 127:14, 127:18, 128:6, 138:1, 170:22
**reviewing** [1] - 133:10
**reviews** [5] - 93:13, 93:18, 99:2, 110:25, 161:22
**Reynolds** [49] - 60:18, 61:17, 61:18, 63:14, 75:18, 76:9, 77:7, 77:10, 85:7, 86:5, 86:6, 86:8, 91:7, 91:9, 96:21, 96:23, 96:25, 97:4, 115:2, 115:3, 115:22, 115:24, 118:7, 118:25, 130:18, 130:19, 166:4, 171:6, 171:15
**Reynolds's** [4] - 63:14, 82:10, 82:24, 173:9
**Rice** [4] - 140:9, 173:24, 174:4, 176:14
**Rish** [2] - 101:7, 101:13
**risk** [3] - 24:20, 44:12, 143:23
**road** [1] - 139:22
**robe** [2] - 128:17, 129:5
**Robert** [17] - 60:10, 61:6, 130:1, 132:25, 139:20, 139:21, 139:23, 143:24, 146:11, 146:15, 146:20, 147:3, 147:5, 147:8, 147:10, 166:9, 173:8
**ROBERT** [3] - 1:7, 3:4, 11:21
**Robert's** [1] - 133:6
**Robin** [1] - 166:10

**role** [5] - 50:7, 53:19, 53:23, 113:7, 172:11
**roommate** [1] - 68:20
**rough** [2] - 13:5, 126:13
**roughly** [1] - 93:17
**round** [1] - 143:22
**RPR** [2] - 2:1, 178:11
**RTB** [1] - 145:25
**Rule** [1] - 8:2
**rule** [5] - 21:24, 24:5, 29:22, 29:23, 83:1
**rules** [8] - 5:3, 25:1, 25:7, 30:5, 30:10, 32:5, 32:25, 34:4
**run** [9] - 73:9, 78:6, 78:7, 106:16, 112:15, 112:25, 117:7, 173:22, 174:23
**running** [1] - 78:11, 112:18, 164:1

## S

**safely** [2] - 68:8, 68:11
**sake** [2] - 41:21, 136:20
**salary** [5] - 76:25, 93:21, 138:2, 138:6, 138:8
**sale** [3] - 67:3, 82:17, 118:7
**sales** [4] - 67:2, 71:7, 72:18, 73:4
**salvage** [1] - 73:2
**Sample** [1] - 47:14
**San** [2] - 155:14, 160:11
**sat** [1] - 157:4
**satisfied** [1] - 172:24
**Saturday** [2] - 158:4, 158:6
**save** [8] - 94:8, 98:17, 98:19, 99:2, 99:4, 99:7, 105:17, 108:2
**saved** [4] - 105:19, 105:23, 108:14, 109:10
**saving** [1] - 99:10
**saw** [7] - 6:16, 91:14, 131:7, 159:4, 162:8, 170:21, 170:23
**scale** [3] - 49:2, 56:20, 56:24
**scan** [2] - 98:10, 98:20
**scanned** [1] - 99:24
**scanning** [2] - 98:7, 98:16
**schedule** [6] - 6:7,

7:3, 8:13, 9:3, 9:9, 10:2
**schedules** [2] - 5:16, 7:18
**Scholars** [4] - 174:21, 174:24, 175:7, 176:18
**scholarship** [4] - 173:9, 173:12, 173:16, 174:19
**school** [1] - 148:22
**School** [1] - 140:10
**schools** [2] - 88:17, 88:18
**Science** [1] - 175:10
**science** [1] - 173:13
**score** [15] - 45:5, 45:7, 45:15, 45:18, 45:23, 48:16, 48:21, 49:16, 49:22, 50:12, 50:20, 51:16, 52:11, 52:17
**scored** [2] - 46:21, 47:23
**scores** [3] - 24:2, 24:3, 35:1
**scoring** [3] - 46:6, 49:23, 51:9
**screen** [6] - 32:20, 36:24, 79:8, 82:1, 125:24, 160:3
**se** [3] - 54:23, 56:5, 56:23
**Sean** [2] - 2:1, 178:11
**sean_gumm@txs. uscourts.gov** [1] - 2:3
**search** [9] - 99:16, 100:4, 112:12, 137:19, 138:10, 151:2, 160:15, 160:19, 160:20
**searched** [2] - 152:12, 154:9
**second** [13] - 69:21, 73:23, 73:24, 74:5, 85:4, 88:10, 88:11, 98:2, 108:24, 111:13, 143:5, 152:24, 166:23
**secondly** [1] - 126:7
**secret** [1] - 87:14
**Section** [1] - 178:5
**section** [2] - 101:4, 111:7
**secure** [2] - 150:14, 150:18
**security** [6] - 101:25, 102:1, 102:4, 102:22, 112:24, 113:1

**see** [17] - 10:3, 10:17, 32:16, 38:25, 51:1, 51:12, 56:14, 58:1, 62:10, 62:11, 64:23, 65:5, 65:20, 73:19, 119:24, 147:11, 173:22
**seeing** [3] - 162:5, 163:10, 164:23
**seek** [2] - 13:12, 17:11
**seem** [1] - 142:25
**sees** [1] - 66:24
**seized** [3] - 102:12, 103:10, 112:4
**select** [1] - 35:11
**selected** [3] - 35:15, 35:22, 35:23
**sell** [1] - 73:3
**selling** [2] - 73:4, 115:21
**send** [12] - 115:7, 115:19, 116:2, 116:25, 118:8, 118:13, 120:1, 120:13, 124:10, 124:15, 127:13, 149:21
**sending** [2] - 118:11, 127:17
**sends** [1] - 127:21
**senior** [2] - 68:15, 76:8
**sense** [1] - 134:20
**sensitive** [1] - 109:5
**sensitivity** [18] - 25:15, 25:21, 25:22, 26:4, 26:7, 26:8, 26:12, 26:16, 26:18, 27:7, 27:14, 27:21, 28:1, 28:4, 28:7, 29:10, 30:21, 30:25
**sent** [13] - 69:21, 71:17, 82:5, 109:2, 115:14, 117:4, 118:1, 119:18, 119:24, 124:20, 128:5, 128:9, 132:25
**sentence** [1] - 73:24
**separated** [1] - 130:11
**September** [11] - 5:20, 61:11, 99:14, 102:14, 104:8, 107:14, 110:4, 145:11, 152:13, 154:8, 160:16
**series** [3] - 101:19, 105:13, 145:13
**serious** [1] - 29:16
**sermonizing** [2] - 70:4, 70:9

**serve** [2] - 61:22, 62:6
**served** [1] - 61:13
**server** [12] - 101:16, 101:17, 106:4, 110:3, 114:23, 115:5, 117:1, 119:16, 119:22, 122:17, 122:19, 126:1
**servers** [1] - 101:23
**service** [5] - 109:7, 113:10, 120:10, 120:11, 124:7
**Services** [3] - 86:11, 154:9, 171:18
**SESSION** [1] - 1:9
**set** [4] - 74:14, 93:21, 107:8, 173:10
**Seth** [1] - 65:5
**sets** [1] - 49:5
**setting** [1] - 126:22
**settings** [1] - 22:18
**seven** [4] - 59:3, 146:18, 161:16, 163:24
**seven-day** [1] - 163:24
**seven-minute** [1] - 59:3
**several** [6] - 16:13, 31:22, 33:20, 58:1, 94:18, 176:9
**severe** [3] - 29:11, 31:4, 44:20
**share** [7] - 12:18, 12:21, 66:16, 166:14, 166:24, 167:4, 175:4
**shared** [6] - 15:2, 15:18, 159:14, 166:20, 166:23, 167:1
**shareholder** [2] - 88:6, 88:7
**sheet** [17] - 32:24, 33:3, 33:11, 37:2, 37:5, 37:10, 37:19, 39:4, 39:24, 40:3, 40:11, 40:13, 40:16, 42:17, 43:3, 46:6, 51:9
**sheets** [1] - 59:13
**shelf** [1] - 104:15
**Shepherd** [1] - 140:10
**Sherri** [1] - 139:24
**shift** [2] - 129:7, 168:14
**shoes** [1] - 78:14
**shooting** [1] - 67:21
**short** [2] - 137:4, 137:12

**shorten** [1] - 129:16
**shortly** [3] - 82:14, 85:12, 152:16
**shotguns** [2] - 68:2, 68:3
**show** [24] - 35:7, 36:22, 46:9, 62:9, 64:8, 65:19, 69:5, 72:11, 76:19, 79:20, 100:24, 107:16, 117:20, 121:13, 124:5, 124:18, 125:17, 127:16, 131:10, 132:21, 136:8, 145:7, 149:23, 165:3
**showed** [1] - 52:23
**showing** [2] - 25:4, 47:11
**shred** [2] - 109:4, 136:7
**shredding** [1] - 109:6
**shrink** [1] - 32:18
**shrinks** [1] - 41:25
**shut** [1] - 89:13
**SIC** [1] - 46:10
**SIC]** [1] - 38:11
**side** [4] - 29:9, 32:17, 49:18, 123:9
**sidebar** [2] - 18:7, 18:14
**sides** [3] - 5:6, 5:22, 156:13
**sign** [3] - 79:22, 80:8, 100:15
**signal** [1] - 120:8
**signal-type** [1] - 120:8
**signature** [1] - 106:14
**signed** [1] - 79:18
**significant** [1] - 171:5
**silent** [2] - 120:1, 120:7
**similar** [1] - 46:4
**simplifying** [1] - 96:7
**simply** [1] - 30:9
**simulate** [1] - 28:22
**simulation** [1] - 28:14
**simulator** [1] - 31:10
**simulators** [5] - 28:7, 28:8, 28:10, 43:9, 43:11
**single** [4] - 31:5, 31:10, 31:25, 53:13
**sitting** [8] - 9:1, 16:25, 43:24, 62:16, 155:14, 157:11, 159:7, 172:20
**situation** [3] - 22:13, 28:15, 139:20
**situations** [1] - 48:24

**six** [4] - 6:2, 31:16, 42:22, 137:3
**size** [1] - 121:23
**Skadden** [2] - 133:24, 134:2
**Skype** [1] - 163:12
**Skyped** [1] - 165:4
**slept** [1] - 143:13
**Slick** [4] - 34:9, 37:15, 37:21, 41:19
**slide** [1] - 32:18
**sliding** [2] - 56:20, 56:24
**slightly** [4] - 47:18, 160:17, 162:14, 162:17
**slowing** [3] - 67:2, 85:8, 85:17
**small** [2] - 27:2, 28:3
**smaller** [1] - 175:20
**smash** [1] - 139:16
**Smith** [18] - 130:1, 130:3, 130:11, 131:23, 132:14, 133:25, 134:8, 139:20, 139:25, 143:24, 146:11, 146:15, 146:20, 147:3, 147:5, 147:8, 147:10, 156:25
**SMITH** [13] - 1:14, 16:9, 17:15, 18:4, 19:9, 47:6, 50:24, 51:6, 51:10, 57:7, 58:17, 58:21, 59:15
**Smith's** [4] - 130:15, 130:22, 132:17, 133:20
**software** [12] - 35:14, 74:9, 81:6, 81:20, 103:17, 103:20, 103:21, 103:22, 104:15, 112:21, 113:22, 121:16
**sole** [3] - 129:17, 129:19, 143:7
**solely** [2] - 46:8, 108:1
**solution** [2] - 145:22, 146:22
**solutions** [1] - 145:14
**someone** [5] - 29:21, 55:15, 61:21, 112:7, 126:19
**sometime** [1] - 160:19
**sometimes** [5] - 45:18, 139:8, 139:9, 139:13, 165:16
**somewhat** [3] - 22:24, 23:10, 124:12
**somewhere** [2] -

147:19, 148:12
**son** [3] - 82:9, 82:11, 82:18
**soon** [1] - 10:10
**Sophie** [1] - 143:14
**sophisticated** [1] - 49:10
**sorry** [30] - 5:2, 12:7, 16:1, 24:17, 31:9, 36:19, 60:12, 62:25, 64:9, 64:16, 66:1, 72:10, 78:10, 78:11, 79:10, 80:12, 84:2, 84:12, 87:2, 90:23, 104:23, 107:17, 116:18, 119:14, 121:15, 127:24, 131:16, 132:2, 149:21, 175:3
**sort** [23] - 6:16, 11:1, 16:4, 32:9, 37:17, 41:25, 45:13, 56:23, 78:3, 82:8, 83:14, 101:4, 111:6, 111:9, 116:6, 116:21, 120:8, 120:10, 123:14, 128:8, 139:17, 145:13, 161:24
**sound** [2] - 70:4, 157:13
**sounds** [4] - 8:14, 22:21, 80:24, 159:18
**SOUTHERN** [1] - 1:2
**Southern** [1] - 2:3
**Spanish** [3] - 87:7, 87:8
**spanning** [1] - 100:8
**spare** [1] - 66:17
**speaking** [4] - 5:12, 28:3, 63:16, 84:16
**specific** [4] - 15:3, 58:12, 126:20, 138:25
**specifically** [8] - 14:15, 16:24, 21:15, 36:16, 41:18, 54:11, 130:20, 147:8
**specificity** [7] - 26:3, 26:18, 26:19, 26:20, 27:1, 27:5, 29:9
**specifics** [1] - 14:19
**spectrum** [1] - 22:11
**speculation** [1] - 138:16
**spelling** [2] - 60:13, 92:17
**spending** [2] - 126:24, 148:12
**spent** [7] - 22:17,

44:5, 139:22, 140:7, 144:8, 161:10, 169:11
**spillover** [1] - 133:14
**spiritual** [1] - 81:12
**spit** [2] - 31:25, 32:3
**spits** [2] - 35:13, 46:6
**spoken** [5] - 84:10, 84:18, 84:24, 160:14, 164:22
**spread** [2] - 31:18, 43:18
**St** [8] - 94:13, 94:17, 94:24, 95:4, 168:21, 168:23, 171:24, 172:12
**staff** [2] - 82:19, 91:1
**stage** [5] - 33:18, 33:25, 34:15, 36:19, 155:4
**stages** [1] - 30:1
**stand** [14] - 7:11, 7:19, 9:17, 9:18, 10:5, 23:12, 31:17, 31:24, 32:10, 42:23, 60:6, 92:10, 92:11, 143:23
**stand-alone** [4] - 23:12, 31:17, 31:24, 42:23
**standard** [7] - 53:3, 54:22, 56:13, 63:20, 65:2, 106:16, 112:20
**standing** [3] - 23:25, 111:9, 152:5
**standpoint** [4] - 64:4, 64:6, 70:14, 71:1
**stands** [2] - 103:16, 103:17
**start** [7] - 11:8, 59:4, 111:12, 117:20, 157:15, 162:5, 162:11
**started** [9] - 4:9, 59:5, 59:8, 149:3, 152:23, 152:24, 152:25, 164:11, 164:13
**starting** [1] - 93:23
**starts** [3] - 70:2, 89:6, 89:12
**state** [7] - 41:1, 49:4, 52:5, 60:13, 92:16, 144:3, 144:10
**statement** [4] - 107:10, 144:3, 156:17, 158:19
**statements** [1] - 70:10
**States** [11] - 2:2, 103:5, 113:25, 118:22, 119:1, 135:13, 144:9,

156:22, 157:21, 158:20, 178:5
**STATES** [1] - 1:1
**states** [2] - 37:14, 47:25
**stating** [1] - 53:18
**stay** [1] - 68:22
**staying** [1] - 6:2
**stenographically** [1] - 178:6
**stenography** [1] - 2:5
**step** [8] - 24:9, 25:8, 78:14, 92:3, 110:13, 163:1
**step-by-step** [2] - 24:9, 25:8
**stepping** [4] - 85:8, 162:23, 162:24, 163:4
**Steps** [3] - 87:7, 87:8
**still** [8] - 10:5, 31:19, 49:3, 64:19, 135:24, 162:4, 170:8, 170:9
**stipulation** [5] - 110:16, 125:7, 135:8, 142:8, 150:6
**stipulations** [6] - 117:18, 121:11, 124:2, 128:14, 144:21, 149:14
**stop** [3] - 16:6, 34:13, 157:15
**stopped** [1] - 144:8
**stopping** [1] - 89:5
**stops** [2] - 34:14, 34:16
**storage** [1] - 155:3
**stored** [1] - 154:16
**story** [3] - 148:4, 164:17, 164:21
**straight** [1] - 122:24
**stranger** [1] - 8:1
**strategic** [1] - 95:13
**strategies** [1] - 76:2
**strictly** [1] - 147:4
**strike** [2] - 129:23, 168:3
**striking** [2] - 162:25, 163:2
**strong** [4] - 56:3, 56:8, 57:5, 161:18
**strongly** [1] - 162:19
**struck** [3] - 162:18, 162:22, 163:9
**structure** [3] - 87:17, 170:6, 172:4
**structures** [4] - 97:9, 97:11, 97:17, 145:2
**Stuart** [8] - 124:10, 124:13, 124:14,

126:8, 127:3, 128:1, 129:5, 148:1
**students** [5] - 28:17, 30:14, 30:15, 30:16, 173:13
**studies** [3] - 27:11, 27:16, 27:18
**study** [6] - 28:16, 30:13, 30:18, 43:9, 47:13, 47:16
**subject** [22] - 13:11, 13:13, 13:14, 17:10, 19:8, 32:12, 34:1, 70:4, 75:23, 114:19, 114:20, 117:17, 121:10, 124:2, 125:7, 128:13, 135:8, 142:8, 144:20, 149:14, 150:6, 167:14
**subjective** [7] - 34:1, 34:5, 34:21, 36:10, 38:3, 40:17, 40:20
**submit** [3] - 46:5, 83:10, 93:12
**subparts** [1] - 35:7
**subpoena** [10] - 8:2, 61:13, 61:14, 61:18, 61:19, 61:23, 62:4, 62:6, 62:8, 63:4
**subpoenas** [1] - 85:10
**subsequent** [2] - 49:9, 100:4
**substance** [5] - 14:8, 15:18, 42:4, 62:22, 120:15
**substantial** [1] - 173:20
**substantiate** [1] - 66:4
**substantive** [1] - 95:12
**suffer** [1] - 167:9
**suffering** [2] - 24:20, 168:9
**sufficient** [1] - 106:18
**suggest** [2] - 8:7, 143:7
**suggested** [4] - 46:18, 116:21, 127:6, 173:9
**suggests** [1] - 48:1
**summary** [1] - 122:22
**summer** [2] - 142:12, 144:25
**Sunday** [4] - 158:5, 158:9, 158:10, 158:14
**super** [1] - 109:5
**supplemental** [3] - 21:5, 21:6, 36:4
**support** [2] - 57:6,

67:6
**supportive** [2] - 56:4, 56:9
**supports** [1] - 52:23
**suppose** [1] - 147:15
**supposed** [2] - 82:21, 133:1
**surely** [1] - 8:21
**surprise** [1] - 137:2
**surprised** [1] - 151:17
**suspected** [1] - 24:24
**suspicions** [2] - 143:2, 143:4
**sustained** [6] - 17:17, 57:9, 57:15, 119:4, 130:25, 167:24
**SVT** [1] - 48:1
**Switzerland** [1] - 104:6
**sworn** [4] - 11:25, 60:4, 92:8, 155:20
**Symptom** [9] - 23:16, 23:17, 37:3, 44:9, 45:2, 45:4, 46:5, 46:14, 47:13
**symptoms** [3] - 23:21, 24:14, 25:5
**systems** [2] - 101:19, 102:1
**Systems** [3] - 86:18, 96:20, 171:10

---

**T**

**T-A-M-I-N-E** [1] - 92:18
**table** [1] - 17:4
**tail** [3] - 49:17, 49:18, 49:22
**tallied** [1] - 157:15
**TAMINE** [2] - 3:9, 92:5
**Tamine** [7] - 68:18, 68:22, 92:1, 92:2, 92:18, 92:19, 100:15
**Tangarra** [1] - 93:2
**tangarra** [1] - 117:21
**target** [5] - 144:1, 144:11, 146:12, 146:19, 147:9
**task** [3] - 98:14, 98:15, 98:17
**tasks** [1] - 169:15
**taught** [1] - 78:21
**tax** [15] - 57:25, 58:1, 64:5, 64:6, 66:9, 66:21, 67:5, 87:4, 96:17, 130:22, 130:23, 131:3, 131:24, 132:5, 133:14

tax-paying [1] - 87:4
**taxed** [1] - 66:19
**taxes** [3] - 171:13, 171:16, 171:21
**team** [12] - 17:2, 18:21, 19:24, 32:11, 56:4, 56:9, 56:21, 56:22, 57:6, 84:19, 158:14
**technology** [2] - 106:11, 173:13
**telephone** [4] - 17:1, 120:6, 120:11, 147:25
**ten** [5] - 47:19, 59:4, 59:9, 73:25, 74:2
**tend** [1] - 27:20
**tended** [1] - 115:5
**tenure** [1] - 172:1
**term** [6] - 21:9, 23:11, 114:6, 128:16, 128:19, 168:16
**termination** [2] - 150:15, 150:18
**terms** [11] - 9:10, 48:20, 63:16, 89:23, 100:18, 120:18, 123:6, 144:11, 162:13, 166:19
**Test** [12] - 23:16, 23:17, 33:4, 37:4, 37:11, 44:10, 45:2, 45:4, 46:5, 46:14, 47:13, 50:17
**test** [27] - 23:25, 26:14, 27:1, 33:2, 33:12, 33:19, 33:25, 35:7, 36:17, 39:14, 39:25, 40:5, 40:7, 40:21, 41:15, 41:25, 42:14, 42:19, 44:11, 44:14, 44:22, 47:23, 48:16, 48:19, 50:12, 51:19, 52:10
**test's** [1] - 25:15
**testified** [8] - 18:24, 19:13, 31:15, 45:1, 60:4, 92:8, 155:13, 155:23
**testify** [4] - 10:8, 11:25, 12:11, 18:10
**testifying** [2] - 7:1, 36:7
**testimony** [26] - 7:17, 10:4, 10:18, 11:9, 13:5, 14:6, 14:9, 14:23, 15:7, 15:8, 15:13, 36:8, 44:25, 53:17, 55:21, 131:7, 155:13, 156:1,

156:6, 156:20, 157:22, 158:17, 158:18, 172:20, 175:23, 175:25
**tests** [29] - 23:13, 23:20, 24:4, 24:13, 24:22, 24:25, 27:13, 28:2, 28:5, 29:10, 29:18, 30:19, 30:20, 30:24, 31:8, 31:12, 31:17, 31:24, 32:2, 32:8, 42:23, 43:13, 43:17, 43:20, 43:24, 44:7, 46:4, 48:12
**Tests** [1] - 23:15
**TEXAS** [1] - 1:2
**Texas** [6] - 1:11, 2:3, 68:4, 173:10, 174:19, 176:18
**text** [1] - 116:6
**that'll** [1] - 153:17
**THE** [133] - 1:3, 4:8, 4:13, 4:17, 5:2, 5:21, 5:24, 6:24, 7:6, 7:8, 7:14, 7:24, 8:11, 9:6, 9:14, 9:25, 10:12, 10:24, 11:3, 11:7, 12:6, 12:9, 17:17, 18:15, 19:21, 20:6, 20:12, 20:15, 33:8, 38:13, 38:18, 38:22, 39:10, 42:8, 44:18, 47:5, 47:8, 52:1, 52:4, 53:1, 57:8, 57:12, 58:16, 58:19, 58:23, 58:25, 59:2, 59:8, 59:14, 59:17, 59:22, 60:5, 60:6, 60:11, 64:11, 64:13, 64:15, 64:20, 65:13, 65:15, 69:9, 69:12, 71:12, 75:3, 75:11, 75:12, 75:14, 77:20, 77:22, 80:13, 80:15, 80:17, 83:22, 83:25, 84:4, 89:4, 89:24, 90:2, 90:17, 91:22, 91:24, 92:2, 92:9, 92:10, 92:13, 104:20, 104:22, 105:1, 107:19, 107:22, 107:25, 110:7, 110:10, 110:22, 114:14, 117:15, 117:17, 119:3, 121:10, 124:2, 125:6, 128:13, 130:25, 131:14, 132:10, 135:6, 135:8,

138:17, 138:21,
142:8, 142:16,
144:18, 144:20,
144:22, 149:14,
149:18, 150:6,
152:22, 153:3,
153:4, 153:5,
153:11, 153:19,
153:21, 153:22,
166:17, 166:22,
167:16, 168:4,
169:10, 169:18,
176:25, 177:4
**Theater** [2] - 174:5,
176:14
**theater** [3] - 140:9,
140:24, 174:5
**themselves** [1] - 56:6
**theorem** [6] - 45:24,
46:8, 46:25, 49:7,
49:11, 49:13
**theoretically** [1] - 29:1
**therefore** [1] - 106:13
**they've** [1] - 6:1
**thinner** [1] - 159:12
**third** [3] - 8:1, 74:5,
143:5
**third-party** [1] - 8:1
**thorough** [1] - 6:4
**thousands** [1] - 164:2
**threat** [1] - 136:19
**three** [20] - 30:20,
30:24, 31:8, 31:12,
43:12, 43:17, 43:23,
44:6, 46:19, 73:17,
87:3, 137:5, 150:15,
150:18, 155:14,
156:23, 159:25,
160:2, 162:9
**three-year** [2] -
150:15, 150:18
**threshold** [3] - 162:23,
162:24, 163:4
**throughout** [1] -
116:23
**Thursday** [2] - 5:18,
6:20
**tighter** [1] - 22:13
**timing** [1] - 64:3
**tiny** [1] - 32:18
**title** [1] - 76:13
**Title** [1] - 178:4
**to-do** [1] - 99:4
**toast** [1] - 116:19
**today** [20] - 4:22, 5:16,
6:12, 7:3, 7:5, 8:24,
9:5, 10:16, 11:2,
52:21, 75:8, 91:15,
143:23, 157:22,
159:4, 159:7, 159:8,

159:22, 168:11,
172:21
**together** [2] - 54:3,
56:6
**Tom** [2] - 143:10
**Tommy** [5] - 72:18,
75:23, 76:5, 81:1,
81:2
**tomorrow** [16] - 4:20,
7:6, 7:13, 7:14, 7:16,
7:20, 8:9, 8:15, 9:7,
9:9, 9:16, 9:17, 9:19,
9:24, 10:7
**took** [7] - 116:21,
139:8, 150:10,
162:1, 162:25, 171:2
**top** [8] - 46:18, 57:20,
58:2, 69:15, 96:5,
101:3, 115:16,
123:17
**topic** [1] - 142:22
**topics** [1] - 164:15
**total** [9] - 42:23,
46:20, 50:12, 50:20,
51:16, 52:11, 52:17,
79:7, 94:1
**totally** [2] - 50:5, 50:9
**toward** [2] - 90:5,
90:18
**towards** [3] - 69:2,
160:18, 162:7
**traditional** [1] - 105:10
**transactions** [1] - 90:6
**transcript** [4] - 2:5,
13:6, 133:1, 178:6
**TRANSCRIPT** [1] -
1:10
**travel** [3] - 5:16, 7:15,
8:6, 147:20
**traveling** [2] - 112:1,
147:22
**treasurer** [3] - 61:2,
61:5, 61:6
**treating** [1] - 29:9,
78:20
**tremendous** [5] -
55:12, 55:14, 55:21,
55:22, 57:6
**trial** [4] - 53:13, 54:9,
55:7, 55:17
**tried** [5] - 9:3, 15:4,
31:1, 99:1, 158:22
**trip** [12] - 67:9, 67:12,
67:17, 67:22, 68:7,
68:13, 68:14, 68:16,
68:18, 68:23, 86:1,
91:11, 137:12
**trips** [3] - 137:3,
137:8, 139:3
**trouble** [2] - 78:10,

84:12
**true** [11] - 22:25, 28:7,
37:20, 43:17, 45:25,
68:17, 69:20,
118:10, 148:23,
170:3, 178:6
**truly** [4] - 23:22,
24:15, 25:23, 25:25
**Trust** [21] - 87:9,
88:13, 94:6, 94:8,
94:12, 94:13, 94:24,
95:4, 95:6, 95:16,
95:25, 96:2, 96:5,
97:7, 130:7, 130:9,
131:4, 131:24,
136:23, 168:17,
171:24
**trust** [47] - 78:6, 78:11,
78:12, 86:7, 88:22,
88:25, 94:14, 95:9,
97:1, 100:12,
113:12, 113:13,
113:15, 116:9,
116:18, 117:7,
117:9, 125:12,
128:24, 128:25,
129:3, 130:4,
134:13, 134:17,
134:20, 135:13,
141:18, 146:3,
146:4, 168:19,
168:21, 169:3,
169:6, 169:17,
170:1, 170:14,
170:15, 170:22,
171:3, 172:4, 172:8,
172:16, 173:6,
173:17, 176:1,
176:5, 176:7
**trustee** [13] - 94:11,
94:15, 95:7, 115:20,
116:3, 168:17,
168:20, 168:25,
169:12, 169:19,
172:12, 172:15,
176:3
**trusts** [2] - 141:25,
170:11
**truth** [6] - 63:9,
140:16, 155:21,
156:10, 156:14,
157:6
**truthful** [6] - 156:4,
156:16, 156:18,
156:20, 158:18,
158:22
**try** [7] - 16:18, 16:19,
20:5, 28:11, 28:18,
55:10, 143:6
**trying** [17] - 6:22, 9:4,

9:13, 14:16, 16:13,
20:17, 31:20, 56:6,
57:1, 73:2, 78:20,
78:25, 82:20, 148:6,
148:11, 167:12,
177:2
**tuned** [2] - 160:5,
160:10
**Turmoil** [1] - 97:12
**turn** [3] - 127:23,
131:16, 150:21
**turning** [2] - 46:17,
109:6
**TV** [1] - 165:3
**twenty** [2] - 174:2
**twenty-two** [1] - 174:2
**twice** [1] - 19:20
**two** [22] - 6:3, 19:5,
26:4, 28:1, 28:5,
30:19, 48:19, 50:6,
53:6, 63:1, 68:24,
74:11, 85:1, 85:18,
124:23, 141:5,
159:16, 162:9,
174:2, 175:18
**type** [6] - 31:3, 48:23,
67:24, 108:12,
120:8, 169:17
**types** [1] - 45:14
**typical** [2] - 67:3, 74:7

**U**

**UCSH** [5] - 10:21,
86:10, 86:13, 86:15,
87:6
**ultimately** [3] - 87:8,
88:12, 96:1
**unannounced** [1] -
112:8
**uncalled** [1] - 123:1
**uncertain** [1] - 5:11
**undated** [1] - 110:20
**under** [7] - 8:1, 56:14,
136:19, 169:6,
169:24, 170:3,
170:15
**understood** [4] - 49:8,
112:19, 148:15,
160:14
**undertake** [1] - 118:8
**undisclosed** [1] -
154:16
**unfortunately** [1] -
168:15
**unfrozen** [2] - 150:9,
150:12
**unique** [1] - 24:4
**United** [13] - 2:2,
81:11, 99:15, 103:4,

113:25, 118:22,
119:1, 135:13,
144:9, 156:22,
157:21, 158:20,
178:5
**UNITED** [1] - 1:1
**Universal** [3] - 86:11,
96:20, 171:10
**universal** [1] - 86:18
**University** [6] -
125:12, 140:9,
173:24, 174:4,
174:25, 176:14
**unnecessarily** [1] -
11:18
**unreadable** [1] -
105:14
**unrelated** [2] - 50:10,
118:14
**unsullied** [4] - 21:8,
21:13, 23:4, 23:8
**unusual** [11] - 61:11,
64:1, 64:2, 64:3,
64:4, 164:19,
164:20, 165:8,
165:15, 165:17,
165:18
**up** [37] - 5:20, 6:15,
7:4, 9:2, 10:23, 29:8,
31:20, 32:15, 35:4,
35:21, 35:24, 42:21,
44:17, 45:20, 59:4,
60:23, 78:5, 79:8,
82:1, 82:20, 90:10,
90:13, 111:14,
118:15, 119:13,
121:24, 123:7,
125:24, 127:25,
137:17, 146:11,
148:6, 157:17,
160:4, 162:7, 162:9,
173:10
**update** [2] - 6:17, 10:3
**upright** [2] - 159:12,
162:16
**urgent** [2] - 78:21,
78:22
**urologist** [1] - 65:8
**US** [19] - 86:20, 87:4,
87:18, 96:17,
102:13, 103:10,
118:17, 119:12,
135:16, 147:20,
147:22, 152:18,
170:3, 170:4, 171:8,
171:13, 171:16,
171:19, 171:21
**US-based** [2] - 171:8
**USA** [1] - 1:4
**USB** [1] - 111:25

**user** [2] - 97:20, 143:13
**uses** [1] - 108:17
**usual** [2] - 63:24, 153:14
**UT** [1] - 175:10

**V**

**valid** [6] - 34:9, 37:15, 41:19, 43:6, 45:5, 45:15
**validity** [5] - 23:13, 23:25, 24:22, 31:17, 31:24
**Validity** [9] - 23:16, 23:17, 37:4, 44:9, 45:2, 45:4, 46:5, 46:14, 47:13
**value** [6] - 48:3, 48:18, 49:23, 50:2, 50:3, 50:7
**values** [2] - 26:12, 28:1
**variability** [1] - 27:18
**variations** [1] - 37:12
**varied** [1] - 127:5
**various** [6] - 25:1, 61:1, 113:10, 156:21, 157:16, 175:14
**VARNADO** [30] - 1:18, 10:14, 104:21, 107:23, 108:5, 110:8, 110:15, 114:12, 117:16, 119:2, 121:9, 124:1, 125:5, 128:12, 130:24, 135:7, 138:15, 142:7, 144:19, 149:13, 150:5, 153:17, 153:24, 166:18, 167:3, 167:25, 168:6, 169:11, 169:22, 176:23
**Varnado** [3] - 3:11, 108:2, 153:25
**vary** [2] - 27:11, 53:7
**vehicle** [1] - 67:2
**Verbal** [3] - 23:16, 37:3, 37:5
**verbally** [1] - 109:24
**version** [1] - 116:14
**versus** [6] - 23:22, 24:14, 25:17, 35:8, 54:23, 56:23
**vice** [2] - 72:18, 81:6
**Victoria** [8] - 44:9, 45:1, 45:4, 46:5,

46:14, 47:13, 50:17, 52:16
**video** [3] - 160:11, 163:12, 163:18
**view** [6] - 54:21, 93:3, 132:13, 141:1, 166:20, 172:20
**viewed** [1] - 142:2
**viewing** [1] - 132:16
**views** [2] - 123:6, 167:12
**Virginia** [1] - 174:25
**vis-à-vis** [1] - 8:9
**visit** [1] - 108:22
**Vista** [8] - 96:9, 129:9, 129:10, 129:13, 129:17, 129:22, 129:24, 130:18
**voice** [1] - 120:10
**volume** [1] - 109:15
**vs** [1] - 1:6
**VSVT** [2] - 47:17, 47:23

**W**

**waist** [1] - 162:15
**waited** [2] - 152:14, 152:15
**walk** [3] - 25:9, 36:2, 38:9
**walked** [1] - 162:16
**walking** [1] - 162:20
**Walsh** [3] - 73:2, 73:11, 74:22
**wants** [2] - 18:5, 165:3
**warned** [1] - 157:1
**warrant** [9] - 99:16, 100:4, 151:2, 151:5, 151:7, 151:10, 151:14, 151:21, 152:7
**Washington** [1] - 108:23
**wasting** [2] - 6:3, 6:5
**watch** [1] - 165:3
**waters** [2] - 146:23, 147:12
**ways** [2] - 33:21, 143:6
**wear** [1] - 5:4
**Wednesday** [2] - 6:13, 6:19
**WEDNESDAY** [2] - 1:12, 4:6
**week** [6] - 4:23, 4:25, 9:2, 62:25, 85:5, 161:16
**weekend** [3] - 157:13, 158:24, 171:1

**weekly** [2] - 112:15, 112:18
**weeks** [3] - 152:16, 163:24
**weigh** [1] - 5:22
**weighing** [1] - 69:25
**welcome** [2] - 4:8, 12:7
**WERE** [1] - 177:4
**WhatsApp** [1] - 120:8
**whatsoever** [1] - 166:3
**whole** [6] - 20:7, 22:2, 26:17, 30:11, 91:4, 105:5
**widow** [1] - 135:21
**wife** [2] - 82:14, 130:12
**willing** [3] - 9:8, 9:9, 54:1
**willingness** [1] - 23:4
**winding** [1] - 118:15
**wire** [2] - 58:4, 58:6
**wish** [1] - 89:11
**wished** [1] - 148:22
**wishes** [1] - 140:14
**withdrawn** [1] - 52:8
**witness** [24] - 7:9, 7:10, 7:18, 8:17, 8:23, 10:4, 10:6, 11:19, 18:10, 18:18, 18:24, 50:25, 51:11, 58:19, 59:6, 89:10, 91:21, 107:18, 108:4, 110:12, 132:9, 154:2, 168:2, 169:18
**Witness** [3] - 11:24, 60:3, 92:7
**WITNESS** [11] - 12:9, 44:18, 58:25, 60:5, 91:24, 92:9, 92:13, 144:22, 153:3, 153:5, 153:22
**witness's** [2] - 7:17, 169:9
**WITNESSES** [1] - 3:1
**witnesses** [14] - 6:5, 6:6, 6:11, 6:15, 7:4, 8:3, 8:6, 8:25, 11:10, 11:13, 17:23, 20:10, 20:24, 167:14
**WMT** [4] - 23:15, 26:11, 27:12, 36:20
**wondering** [2] - 6:8, 55:19
**word** [2] - 37:18, 146:7
**Word** [6] - 23:15, 33:3, 37:11, 105:17,

105:19, 108:13
**wording** [2] - 116:7, 127:6
**words** [4] - 26:24, 29:17, 70:9, 156:13
**works** [6] - 21:15, 21:20, 33:14, 128:24, 129:1, 153:19
**world** [2] - 61:2, 133:15
**worth** [1] - 97:4
**write** [6] - 136:16, 140:13, 145:4, 146:18, 147:18, 148:14
**writing** [3] - 109:23, 109:25, 136:13
**written** [4] - 93:19, 93:20, 106:22, 151:10
**wrote** [5] - 99:7, 109:3, 143:17, 149:10, 149:24

**Y**

**yacht** [2] - 97:12, 97:15
**year** [15] - 61:8, 65:24, 77:1, 86:3, 91:16, 91:17, 94:2, 106:6, 107:6, 111:4, 136:18, 141:23, 143:22, 150:15, 150:18
**year-round** [1] - 143:22
**years** [27] - 49:9, 60:17, 63:1, 63:11, 63:12, 78:22, 81:8, 82:12, 83:11, 85:8, 85:18, 93:7, 93:8, 93:11, 96:7, 101:9, 104:10, 135:14, 156:23, 159:22, 162:9, 171:25, 172:1, 175:20, 175:21
**Yekovich** [4] - 140:9, 140:14, 140:17, 141:8
**YEKOVICH** [1] - 140:14
**yesterday** [12] - 5:17, 6:17, 10:20, 13:4, 14:10, 14:24, 17:9, 23:12, 28:16, 30:13, 31:1, 32:10
**yourself** [3] - 16:18,

17:11, 131:20
**Yudofsky** [17] - 4:16, 5:15, 6:23, 7:15, 7:19, 7:25, 8:8, 9:15, 124:14, 124:21, 125:10, 126:10, 126:15, 126:23, 127:3, 128:1, 129:5
**Yudofsky's** [3] - 4:10, 10:2, 148:1

**Z**

**zero** [5] - 68:9, 73:25, 74:3, 74:4, 81:21
**Zeto** [3] - 61:20, 63:13, 63:17
**zoom** [5] - 69:15, 72:14, 73:18, 79:9, 102:18
**zooming** [1] - 101:3