08:04:17

```
 1                UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF TEXAS

 3                         —  —  —

 4    THE HONORABLE GEORGE C. HANKS, JR., JUDGE PRESIDING
```

| | |
|---|---|
| USA, | No. 4:21-CR-00009-1 |

```
 5                      Plaintiff,

 6    vs.

 7    ROBERT T. BROCKMAN,

 8                      Defendant.
```

```
 9         COMPETENCY HEARING -- DAY 4 AM SESSION

10        OFFICIAL REPORTER'S TRANSCRIPT OF PROCEEDINGS

11                     Houston, Texas

12              THURSDAY, NOVEMBER 18, 2021
```

```
14   APPEARANCES:

15   For the Plaintiff:   COREY J. SMITH, DOJ

16                        CHRISTOPHER MAGNANI, DOJ

17                        LEE F. LANGSTON, DOJ

18                        BORIS BOURGET, DOJ

19
     For the Defendant:   JASON S. VARNADO, ESQ., Attorney
20                        at Law

21                        COLLEEN O'CONNOR, ESQ., Attorney
                          at Law
22
                          JAMES P. LOONAM, ESQ., Attorney
23                        at Law

24                        KATHRYN KENEALLY, ESQ., Attorney
                          at Law
25
                          IRINA K. BLEUSTEIN, ESQ.,
```

```
 1                          Attorney at Law

 2  For the Movant       MARK J. MACDOUGALL, ESQ.,
 3  YUDOFSKY:            Attorney at Law

 4                       NICHOLAS E. PETREE, ESQ.,
                         Attorney at Law
 5
                         SAMANTHA J. BLOCK, ESQ.,
 6                       Attorney at Law

 7

 8  Other Counsel        TIM JOHNSON, ESQ., Attorney at
 9  Appearing:           Law

10                       NICK DICKERSON, ESQ., Attorney
                         at Law
11

12

13  Reported by:        Sean Gumm, RPR, CRR
                         Official Court Reporter
14                       United States District Court
                         Southern District of Texas
15                       sean_gumm@txs.uscourts.gov

16
    Proceedings recorded by mechanical stenography.
17  Transcript produced by Reporter on computer.

18

19

20

21

22

23

24

25
```

SEAN W. GUMM, CSR #13168, RPR, CRR

1   ## INDEX OF WITNESSES

2

3                                                      **PAGE**

4   **DANA ABRAHAMSEN, (For the Government)**

5   Direct Examination By Mr. Corey              49

6   Smith:

7   Cross-Examination By Ms. Bleustein:          93

8

9

10

11                    --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       PROCEEDINGS

2    _____

3       (The following proceedings held in open court.)

4                         *   *   *

5           THURSDAY, NOVEMBER 18, 2021 -- 8:49 A.M.

6                        --oOo--

7                THE COURT:  Morning, everyone and

8    welcome back.  We can stay late tonight.  Like

9    previously, I don't have anything going on this

10   evening, so just budget on staying until about six

11   o'clock tonight for your witness purposes.

12   Yesterday before we got started we talked about

13   Dr. Yudofsky and his juggling.  Were you able to

14   juggle things around?  I'm not putting pressure on

15   you, but I know there --

16                MR. LANGSTON:  We're happy to call him

17   first.

18                THE COURT:  Okay.  Great.

19                MR. LANGSTON:  Judge, before we get to

20   Dr. Yudofsky, I think there's an issue involving

21   counsel from Locke Lord that we may want to resolve.

22                THE COURT:  Okay.

23                MR. LOONAM:  We have a small issue,

24   too, Your Honor.

25                THE COURT:  Let's go ahead and take

08:50:04  1    those up then.

08:50:05  2              MR. LOONAM:  Sure, Your Honor.  My

08:50:07  3    colleague, Irina Bleustein, has an issue to raise

08:50:10  4    with the Court.

08:50:11  5              THE COURT:  Okay.  Sure.

08:50:13  6              MS. BLEUSTEIN:  Good morning, Your

08:50:13  7    Honor.  Irina Bleustein on behalf of Mr. Brockman.

08:50:16  8    Just a minor housekeeping note.  Two different

08:50:19  9    Defense Exhibits were marked for identification

08:50:21  10   only, but they were referred to as DX-52.  And to

08:50:24  11   clear up the record, the article entitled

08:50:27  12   "Neuroimaging in Parkinson's Disease Dementia

08:50:30  13   Connecting the Dots" is marked for identification as

08:50:32  14   DX-52.  And the volumetric analysis demonstrative is

08:50:37  15   marked as DX-58, and both of these documents have

08:50:40  16   been shared with the Government with corrected

08:50:42  17   stickers.

08:50:43  18              THE COURT:  Okay.  Great.  Thank you.

08:50:44  19   The record will stand clarified.

08:50:58  20              Good morning.

08:50:59  21              MR. JOHNSON:  Tim Johnson for UCSH and

08:51:03  22   for Reynolds and Reynolds.

08:51:04  23              THE COURT:  Welcome.

08:51:05  24              MR. JOHNSON:  It's not so much our

08:51:06  25   issue.  I believe it's the Government's issue.

08:51:08   1   They've taken the first shot, so we'll stand back

08:51:10   2   and let them address the issues they have with the

08:51:13   3   Court we think are very minimal.  To the extent

08:51:15   4   they're not, we apologize for taking your time this

08:51:18   5   morning.  I know from all accounts you are pretty

08:51:21   6   busy here.

08:51:21   7           THE COURT:  It's been a busy week.

08:51:24   8           MR. LANGSTON:  So, Your Honor, I think

08:51:25   9   we started previewing this for the Court earlier,

08:51:29  10   but the issue is we sent a subpoena to Reynolds and

08:51:32  11   Reynolds for e-mails between Tommy Barris, who is

08:51:37  12   one of the Government's witnesses here and Reverend

08:51:42  13   Jackson, who is going to be one of the Defense

08:51:44  14   witnesses.  They're two of the board members of

08:51:45  15   Reynolds and Reynolds.

08:51:46  16           On Friday, we received a production

08:51:49  17   that included 304 e-mails, I think.  Not included in

08:51:56  18   that was an e-mail that we received on Monday, and

08:52:00  19   I'll hand it up to the Court because I think it will

08:52:03  20   sort of express why we are concerned about this.

08:52:07  21           THE COURT:  Okay.

08:52:17  22           MR. LANGSTON:  And so, this is

08:52:19  23   Mr. Jackson writing to Mr. Barris about an interview

08:52:22  24   by IRS agents associated with this case.  And in

08:52:25  25   that he says that he was purposefully evasive and

SEAN W. GUMM, CSR #13168, RPR, CRR

08:52:30   1   uncertain with the agents, and that he wanted to

08:52:34   2   make sure -- or he said that nothing he said could

08:52:38   3   have deepened Bob's problems and added problems.

08:52:42   4              The e-mail itself is what it is.

08:52:45   5   Our concern is that it was not included in the

08:52:49   6   original production.

08:52:52   7              THE COURT:  It's -- on the Reynolds and

08:52:56   8   Reynolds server.  That's clear.

08:53:01   9              MR. LANGSTON:  Your Honor, that's one

08:53:02  10   of the tricky things here.  So Reynolds and Reynolds

08:53:04  11   has kind of an unusual e-mail system.  For every

08:53:06  12   rank and file employee, it is stored on a central

08:53:10  13   server, you know, sort of as you would expect.  For

08:53:13  14   the top however many executives, including

08:53:16  15   Mr. Barris and Mr. Jackson, what happens is when

08:53:19  16   they -- when their computer downloads from the

08:53:23  17   server, it's then deleted from the server.  So the

08:53:25  18   only place the e-mail resides is on that person's

08:53:27  19   computer.

08:53:28  20              THE COURT:  Okay.

08:53:30  21              MR. LANGSTON:  If that executive

08:53:31  22   deletes the e-mail, it's gone.  Our understanding of

08:53:36  23   how this was produced is they did a scan of

08:53:38  24   Mr. Barris's computer, and this e-mail was no longer

08:53:42  25   on the computer.  So obviously we have some concerns

4-8

08:53:45    1   about why it's not.

08:53:46    2           Mr. Barris has been under a

08:53:48    3   litigation hold for years, so it should be there.

08:53:55    4   And the second e-mail -- I will say, Your Honor, the

08:53:57    5   -- you know, the second production of this e-mail

08:54:00    6   was just this e-mail.  And we know that Reynolds got

08:54:05    7   a specific inquiry about this e-mail over the

08:54:08    8   weekend that was basically, like, "If you don't turn

08:54:11    9   this over to the Government, Government's gonna get

08:54:14   10   it another way."

08:54:14   11           So our concern is this:  --

08:54:16   12           THE COURT:  Well, where did this come

08:54:18   13   from?

08:54:18   14           MR. LANGSTON:  So, it was eventually

08:54:21   15   produced by UCSH, and I think there are -- look,

08:54:26   16   this is what we're trying to figure out.  What we've

08:54:28   17   heard from counsel is they were always intending to

08:54:31   18   produce it.  It was floating around somewhere, but

08:54:33   19   it didn't come from Mr. Barris's computer.  Again,

08:54:37   20   we have reason to believe that may not be the case

08:54:39   21   intent to produce it, certainly.

08:54:41   22           And so -- look, we want to make

08:54:44   23   sure there were not other e-mails deleted similar to

08:54:47   24   this.  Obviously it bears on the bias and veracity

08:54:51   25   of Mr. Jackson and Mr. Barris.  So we've asked them

08:54:55   1   for three things to help resolve this.  We've asked

08:54:58   2   for a witness who can explain the circumstances

08:54:59   3   behind this production and why this was not included

08:55:03   4   on Friday.

08:55:04   5              We've asked for assurance that a

08:55:09   6   search would be done to ensure that there are not

08:55:13   7   other e-mails floating around that may have been

08:55:17   8   removed from one of their two computers, and we've

08:55:20   9   asked for a privilege log of every document that was

08:55:22  10   withheld for whatever reason.

08:55:25  11              We've asked for that on Monday, and

08:55:28  12   so far we've been told that we're not going to get

08:55:30  13   it, or maybe that we will get it but we haven't

08:55:33  14   gotten it yet.  So zero for three right now.  We're

08:55:36  15   going to ask the Court compel Reynolds to do those

08:55:39  16   three things.

08:55:40  17              THE COURT:  Okay.  Was there anything

08:55:41  18   else?  I saw your -- is there anything else you

08:55:44  19   wanted to add?

08:55:46  20              MR. LANGSTON:  Just so you don't -- my

08:55:48  21   colleague -- the reason we're raising this now is

08:55:50  22   obviously we got the production Friday.  We got the

08:55:53  23   new production Monday, so we're not -- I don't want

08:55:55  24   the Court to think that we, you know, are taking up

08:55:57  25   your time now rather than later.

08:56:00  1            THE COURT:  No problem.

08:56:02  2            Counsel for Reynolds and Reynolds.

08:56:04  3            MR. JOHNSON:  May I respond?

08:56:05  4            THE COURT:  Oh, yes, sir.

08:56:06  5            MR. JOHNSON:  Thank you, Your Honor.

08:56:07  6  The reality of this situation is not exactly how it

08:56:10  7  was described by the Government.  We received a

08:56:14  8  subpoena that called for compliance on Monday.  As

08:56:18  9  we have done in the past in dealing with the

08:56:20  10 Government, we have worked with them.  We have tried

08:56:23  11 to provide them documents in advance of when they

08:56:26  12 were entitled to receive them, given the dates of

08:56:29  13 the hearings.

08:56:30  14            We have dealt with 14 subpoenas

08:56:33  15 from the Government.  We have tendered 231,000-plus

08:56:38  16 pages of documents to them over the last several

08:56:40  17 years.  What the Government is complaining of is a

08:56:44  18 complete production that was made to them on the

08:56:47  19 date that they were entitled to get it.

08:56:50  20            We gave them the bulk of the

08:56:52  21 documents, as they said, on Friday as an

08:56:53  22 accommodation.  This document says what it says.

08:56:58  23 What kind of damn fool -- if you pardon my

08:57:02  24 language -- would stand in front of you or anyone

08:57:03  25 else and say, "Well, we were trying to hide this

08:57:06    1    document?"

08:57:09    2                So we gave it to them on a silver

08:57:11    3    platter on Monday when they were entitled to it to

08:57:14    4    draw attention to this one document.  We didn't have

08:57:16    5    any questions they were going to find it as they

08:57:19    6    perused these documents.  So the complaint is that

08:57:22    7    they've served with us a subpoena we fully complied

08:57:25    8    with in a timely manner, and I've never seen such a

08:57:29    9    suggestion that someone would come before you and

08:57:31   10    ask you to compel production of something that they

08:57:34   11    have in their possession.

08:57:36   12                Now, they want a backstory on this.

08:57:39   13    I don't think the Court would have a hard time

08:57:41   14    understanding why I can't, in particular, provide

08:57:44   15    them with a backstory.  What he did touch on was,

08:57:49   16    "We have been aware of this document."

08:57:51   17                In that production, when our vendor

08:57:53   18    goes out there and collects the documents, what they

08:57:55   19    had asked for, Your Honor, were e-mails between

08:57:58   20    Tommy Barris and Jim Jackson, the two directors of

08:58:02   21    Reynolds and Reynolds.  That e-mail was seized in

08:58:09   22    collection from Mr. Barris's computer three times.

08:58:14   23    Mr. Barris -- and I'm going to waive for a very

08:58:16   24    limited purpose the attorney-client privilege --

08:58:19   25    upon his receipt December 3rd last year he sent it

SEAN W. GUMM, CSR #13168, RPR, CRR

08:58:22   1   to me.  Upon my receipt December 3rd, I said, "Thank

08:58:26   2   you."

08:58:27   3            On December 4th, he sent it to the

08:58:29   4   general counsel of Reynolds and Reynolds, because

08:58:35   5   his concerns -- he wanted him to be aware of it.  So

08:58:37   6   we were aware of it.  When it came time after we had

08:58:42   7   given the production on Friday, we then realized

08:58:45   8   that for whatever reason this document wasn't in

08:58:47   9   there.  And the reason why it wasn't is because the

08:58:49   10  subpoena asked for documents, as I said, between

08:58:51   11  Mr. Barris and Mr. Jackson.  That caused it to be

08:58:58   12  collected by our vendor.

08:58:59   13           When the search terms were done, it

08:59:01   14  didn't indicate that it was an e-mail between those

08:59:04   15  two gentlemen.  In the first instance, it indicated

08:59:06   16  it was an e-mail from Mr. Barris to me, Tim Johnson.

08:59:12   17  The next one where it was indicated where I, Tim

08:59:15   18  Johnson, sent an e-mail back to Mr. Barris.

08:59:17   19           The third one indicated that it was

08:59:20   20  from Mr. Barris to Mr. Scott Cherry, the general

08:59:25   21  counsel I mentioned earlier.  We have since gone

08:59:28   22  back and we have tried to make sure if there were

08:59:30   23  any similar e-mails between Mr. Jackson and

08:59:33   24  Mr. Barris embedded in e-mails that were between

08:59:36   25  different people that weren't caught in our

SEAN W. GUMM, CSR #13168, RPR, CRR

08:59:38    1    production that we didn't have any -- that weren't
08:59:41    2    in the same situation.
08:59:43    3                We had found six more.  We offered
08:59:46    4    to give it to the Government today.  They didn't ask
08:59:48    5    us for three things -- and I can pass this up if you
08:59:51    6    like, Judge.  They sent me demand on Tuesday for
08:59:55    7    eight things for a document that we fully complied
08:59:57    8    with in terms of production related to this
08:59:59    9    subpoena.
08:59:59   10                So I don't know what else -- I
09:00:01   11    don't really know why we're here.
09:00:03   12            THE COURT:  Okay.  So the eight things
09:00:08   13    the Government has requested you've given to them?
09:00:11   14            MR. JOHNSON:  No, we have not because I
09:00:13   15    think it's an unreasonable request, and I don't take
09:00:13   16    work assignments from government lawyers.  We have
09:00:16   17    tried to work with them.  We've tried to meet with
09:00:18   18    them this morning.  We did briefly.
09:00:20   19                We're kind of at an impasse, as you
09:00:22   20    might imagine.  And I'm hoping it is not showing
09:00:25   21    that much, but I'm a little frustrated.  Here it is
09:00:28   22    like a little girl asking Santa Claus for a pink
09:00:31   23    bicycle, and the audacity of youth complaining on
09:00:37   24    Christmas day that she got a turquoise one instead.
09:00:42   25            THE COURT:  What I'm still not clear on

SEAN W. GUMM, CSR #13168, RPR, CRR

09:00:44  1  is in the production -- in the production produced
09:00:48  2  on Friday -- I mean, yes, it was early and you guys
09:00:50  3  complied with your obligations before you had to,
09:00:58  4  but is there an explanation as to why it wasn't
09:01:00  5  included as part of the production on Friday?
09:01:07  6          MR. JOHNSON:  Your Honor, the original
09:01:08  7  e-mail was not collected.  That's the part I
09:01:10  8  referenced to you I can't explain for a couple of
09:01:14  9  reasons.  But the gentleman whose e-mail server that
09:01:18  10  it was -- should have been on, he's going to
09:01:23  11  testify.  They can ask him.
09:01:24  12          They want all sorts of declarations
09:01:26  13  from people.  I mean, if you want to ask somebody,
09:01:30  14  he'll be here.  That's Mr. Barris.
09:01:33  15          THE COURT:  But I guess the
09:01:34  16  Government's concern is, "Well, why was it picked up
09:01:37  17  on Friday?"
09:01:38  18          It's great everybody's got it on
09:01:40  19  Monday, and it's great that the documents were
09:01:43  20  produced early because they weren't due until Monday
09:01:47  21  and produced on Friday, but the question is why
09:01:49  22  weren't they picked up on Friday?  I mean, who would
09:01:52  23  have the answer to that?  Does the Government know?
09:01:55  24          MR. LANGSTON:  So just to address that,
09:01:56  25  Your Honor, obviously Mr. Barris -- were he to

09:02:01     1   testify truthfully --

09:02:03     2                   MR. JOHNSON:   Judge --

09:02:04     3                   MR. LANGSTON:   That --

09:02:05     4                   MR. JOHNSON:   -- I'm going to object.

09:02:06     5                   MR. LANGSTON:   -- there's no --

09:02:07     6                   MR. JOHNSON:   -- there's no reason to

09:02:08     7   be bringing into --

09:02:10     8                   THE COURT:   Yeah, I'm not -- I'm not --

09:02:13     9   I'm not impugning anybody's credibility.   That's not

09:02:16    10   an issue here.   The issue -- I'm trying to figure

09:02:20    11   out to solve the problem to make sure we have all of

09:02:22    12   the documents that are responsive to the subpoena

09:02:26    13   requests.

09:02:26    14                   MR. LANGSTON:   I'm hearing there are

09:02:28    15   six documents I still don't have that they've

09:02:31    16   identified, and I guess have identified but still

09:02:33    17   not brought over to us or to court for whatever

09:02:35    18   reason.

09:02:36    19                   MR. JOHNSON:   Judge, we've advised them

09:02:38    20   we have them and would be happy to give them to

09:02:40    21   them.   We've told the Government that they're not

09:02:42    22   yet Bates labeled.   We've tried to do what we can to

09:02:45    23   accommodate the Government's concerns about this

09:02:48    24   issue.

09:02:48    25                         What I've told you is that if this

*SEAN W. GUMM, CSR #13168, RPR, CRR*

09:02:51  1  document was given to them on Monday, which you have

09:02:54  2  before you, had them provided on Friday, we wouldn't

09:02:57  3  be here having this discussion.  Now they're

09:02:59  4  complaining about receiving what they should have

09:03:01  5  received Friday, which they ultimately received in a

09:03:04  6  timely fashion on Monday.

09:03:06  7              MR. LANGSTON:  And, Your Honor --

09:03:07  8              THE COURT:  I hear that.

09:03:08  9              MR. LANGSTON:  -- exactly our concern.

09:03:09  10            THE COURT:  I get it.  I hear all of

09:03:11  11  that, but the problem is what the Government is

09:03:13  12  concerned about is that they got it, but they want

09:03:16  13  to know why they didn't get it sooner if there's

09:03:19  14  something behind that -- if there's some problem in

09:03:21  15  the collection process, if there's some issue

09:03:26  16  documents aren't being picked up.  I don't know.

09:03:29  17            I think what the Government's

09:03:31  18  trying to figure -- I think this could be cleared up

09:03:34  19  by finding out who is responsible for collecting the

09:03:36  20  documents and talking to them and finding out,

09:03:38  21  "Okay, what did you do to collect the documents, and

09:03:41  22  why wasn't this document picked up earlier?"

09:03:43  23            I think that once you get that

09:03:45  24  answer, then the Government should be satisfied.  I

09:03:47  25  mean, once you know why it wasn't picked up earlier

09:03:49   1   that's the end.

09:03:50   2              MR. JOHNSON:  Judge, not to cut you

09:03:53   3   off.  We can get a declaration from our vendor that

09:03:55   4   will tell you -- or the Government that tells what

09:03:58   5   steps they went through in doing this production.  I

09:04:00   6   just don't know that's going to, you know, be

09:04:02   7   sufficient for the Government.  I mean, I think what

09:04:05   8   the Government wants to do -- you know, let's face

09:04:07   9   it.  I mean, this has something to do with the

09:04:10  10   credibility of -- potentially of witnesses who are

09:04:13  11   going to appear today, tomorrow -- whenever they

09:04:15  12   appear.

09:04:16  13              Then have the full range of

09:04:19  14   opportunities to examine them on those issues.  The

09:04:22  15   vendor is not going to know why something wasn't

09:04:24  16   picked up, tell you the processes they went through

09:04:27  17   in doing their collection.

09:04:28  18              THE COURT:  But if it's not reasonable

09:04:30  19   -- if -- -- if they didn't take reasonable steps to

09:04:35  20   make sure a document like this, or take sufficient

09:04:37  21   steps to make sure a document like this was picked

09:04:39  22   up, then that would be an issue.

09:04:41  23              MR. JOHNSON:  What I'm saying, Judge, I

09:04:42  24   want to make very clear.  The document was picked up

09:04:45  25   three times.  They picked it up.  It was the process

SEAN W. GUMM, CSR #13168, RPR, CRR

| | |
|---|---|
| 09:04:47 | 1 |
| 09:04:52 | 2 |
| 09:04:55 | 3 |
| 09:04:59 | 4 |
| 09:05:01 | 5 |
| 09:05:03 | 6 |
| 09:05:06 | 7 |
| 09:05:09 | 8 |
| 09:05:11 | 9 |
| 09:05:14 | 10 |
| 09:05:16 | 11 |
| 09:05:16 | 12 |
| 09:05:19 | 13 |
| 09:05:21 | 14 |
| 09:05:24 | 15 |
| 09:05:26 | 16 |
| 09:05:28 | 17 |
| 09:05:30 | 18 |
| 09:05:32 | 19 |
| 09:05:36 | 20 |
| 09:05:39 | 21 |
| 09:05:41 | 22 |
| 09:05:44 | 23 |
| 09:05:46 | 24 |
| 09:05:49 | 25 |

1  after that.  So if someone -- if Mr. Barris, for

2  example, was intending to that hide that document

3  from the collection and from the Government...

4            THE COURT:  Oh, I'm not impugning --

5  I'm not saying anybody's trying to hide anything.

6  The question I have -- I know that's what you are

7  claiming.  That's not my point.  My point is to see

8  whether or not we've got a process in place that's

9  going to confine documents like this, and make sure

10  if there are other documents like this that they're

11  collected.

12            I'm not -- I mean, you guys want to

13  get into a fight about whether or not it's

14  intentional or not.  That's not my concern.  I'm not

15  worried about that.  I mean, you can make your

16  argument.  You can make your argument.  Great.

17            What I'm trying to find out is --

18  to make sure the process is in place that everybody

19  from the Court's standpoint, and everybody else can

20  be satisfied that if there's any documents that

21  satisfy the subpoena that haven't been produced

22  they're going to be captured.  Then you guys can

23  argue about why they weren't, and the -- and the

24  implication behind that later with the witnesses.

25            So let me take a brief recess.  I

09:05:52    1    want to think about something and take a look at

09:05:55    2    something really quickly, and I'll be right back.

09:05:57    3    (Whereupon, a recess was held.)

09:21:26    4                 THE COURT:  Okay.  Back on the record

09:21:27    5    in this case, everyone.  I wanted to take a look at

09:21:31    6    the other documents to see if there was some -- oh,

09:21:33    7    is counsel -- I'm sorry.  Please approach.

09:21:42    8                 What I wanted to do, and thank you

09:21:43    9    for giving me the other documents.  I know they're

09:21:45   10    not all of them, but I was trying to figure out if

09:21:48   11    by looking at those documents there would be some

09:21:51   12    way to understand why those documents were not

09:21:53   13    produced earlier -- I mean some connection, and they

09:21:58   14    don't seem to be related in any way.  I don't see

09:22:01   15    any obvious connection between the one document

09:22:04   16    produced on Monday and any of these other documents.

09:22:06   17                 So I don't really understand why --

09:22:09   18    you know, I don't know why the search didn't pick up

09:22:13   19    these documents.  So I think what we need to do --

09:22:17   20    and as I said, I don't really, respectfully, care

09:22:20   21    about the motivations.

09:22:21   22                 You say it was bad faith.  You say

09:22:24   23    no one in their right mind would do this and set

09:22:28   24    documents separate and apart.

09:22:30   25                 Your argument is they did it

| | |
|---|---|
| 09:22:32 | 1 |
| 09:22:34 | 2 |
| 09:22:38 | 3 |
| 09:22:41 | 4 |
| 09:22:43 | 5 |
| 09:22:45 | 6 |
| 09:22:51 | 7 |
| 09:22:54 | 8 |
| 09:22:58 | 9 |
| 09:23:00 | 10 |
| 09:23:02 | 11 |
| 09:23:05 | 12 |
| 09:23:09 | 13 |
| 09:23:12 | 14 |
| 09:23:15 | 15 |
| 09:23:18 | 16 |
| 09:23:20 | 17 |
| 09:23:23 | 18 |
| 09:23:27 | 19 |
| 09:23:30 | 20 |
| 09:23:32 | 21 |
| 09:23:36 | 22 |
| 09:23:38 | 23 |
| 09:23:41 | 24 |
| 09:23:41 | 25 |

1  because they knew they were going to get caught.

2            I don't know, and the issue for me

3  is to make sure all of the documents responsive to

4  the subpoena is produced so everybody has them and

5  everybody can review them.  The only way to do that

6  is to -- Mr. Barris and the other board member are

7  going to be appearing live, so you can get them.

8  And the person who conducted the document search --

9  I understand that they're willing to provide an

10  affidavit, but they need to sit for a deposition.

11  They need to talk under oath as to what they did,

12  why they did it, what directions they were given and

13  you get to cross-examine them on it.

14            So I'm ordering that person be

15  available for deposition as soon as possible.

16            Counsel, Mr. Smith and your team,

17  you can take a deposition and find out.  I mean,

18  we're going to be doing this until next week, so

19  you've got time to take a deposition and find out.

20            You can figure out, you know, why

21  this didn't happen -- why it wasn't produced until

22  later, and if there is anything that needs to be

23  done to make sure that there are not other documents

24  out there.

25            MR. LANGSTON:  We appreciate that.

09:23:43   1          THE COURT:  I mean, that's the easy

09:23:44   2   answer.  And I'm not commenting on anybody's

09:23:47   3   motives, because honestly at this point in time I

09:23:50   4   don't care why it was done.  My only concern is to

09:23:53   5   make sure all of the document have been produced.

09:23:55   6   So respectfully, I need you to produce this

09:23:58   7   gentleman for a deposition, whoever it is.  The

09:24:01   8   document -- the document -- whoever is representing

09:24:04   9   the person who ran the search terms and collected

09:24:07  10   the documents.

09:24:08  11          And that way also, Mr. Smith and

09:24:10  12   your team, you can figure out whether or not there's

09:24:12  13   any other documents out there that possibly this

09:24:16  14   search didn't pick up that are responsive to the

09:24:18  15   subpoena and everybody's happy.

09:24:21  16          MR. COREY SMITH:  So is there a time

09:24:23  17   frame?  We can do it this weekend.

09:24:25  18          THE COURT:  You can do it this weekend.

09:24:27  19   I mean, whenever he's available.  This is not going

09:24:28  20   to be -- it shouldn't be a long deposition.  I mean,

09:24:31  21   it shouldn't be, unless there's something else going

09:24:33  22   on, which I'm --

09:24:34  23          MR. LANGSTON:  Sure.

09:24:35  24          THE COURT:  -- assuming there is, but

09:24:36  25   should be a short deposition.  Sit for it and you

09:24:39  1   are done.  That way everybody's happy.

09:24:41  2              MR. LANGSTON:  Your Honor, sort of

09:24:43  3   along those lines, you know, we were handed a

09:24:45  4   privilege log as you went into the back.  So we just

09:24:48  5   ask them to take another look.  We're seeing things

09:24:51  6   here that are like work product privilege for

09:24:55  7   e-mails between Mr. Barris and Mr. Jackson, neither

09:24:57  8   of whom are lawyers, regarding personnel

09:25:00  9   transitions.  And we understand you've already had

09:25:01  10  to review a number of documents associated with this

09:25:04  11  case, so we're trying to not involve the Court, but

09:25:08  12  if you don't mind taking another look.

09:25:11  13             MR. JOHNSON:  Your Honor, I would point

09:25:12  14  out to the Court the subpoenas specifically did not

09:25:14  15  provide for the privilege log, which we have

09:25:17  16  produced them as a result of, you know, what this

09:25:21  17  kerfuffle is about here is.

09:25:24  18             MR. LANGSTON:  We think we're in a

09:25:26  19  different position Monday than we were prior.

09:25:27  20             THE COURT:  I mean, if there are

09:25:29  21  documents that are being held that are responsive to

09:25:31  22  subpoena, then the -- I mean, the answer is -- first

09:25:36  23  of all, the parties try to work it out amongst

09:25:39  24  themselves, which it sounds like you did and weren't

09:25:42  25  able to get that done.  Second thing is I'll order a

09:25:45   1   privilege log to be done.  I mean, if there are
09:25:48   2   documents that are not responsive and are being
09:25:51   3   withheld, then I need -- based on privilege, I need
09:25:53   4   to see a privilege log in order to evaluate the
09:25:57   5   privilege.
09:25:58   6          MR. LANGSTON:  To be clear the subpoena
09:26:00   7   does request non-privileged communications.  It's
09:26:03   8   just as -- you know, there may be a kerfuffle over
09:26:06   9   whether some of these are non-privileged.
09:26:09  10          THE COURT:  Why don't you talk to them
09:26:10  11   about it, find out whether they're claiming a
09:26:12  12   privilege, what privilege they're claiming, and if
09:26:15  13   you want to ask for a privilege log or move to
09:26:18  14   compel the documents you know what to do.
09:26:20  15          MR. LANGSTON:  Thank you, Your Honor.
09:26:21  16          THE COURT:  Move to compel.  Ask for a
09:26:22  17   privilege log.  I mean, it sounds like they provided
09:26:26  18   one preemptively to you.
09:26:28  19          MR. LANGSTON:  Well, we got one today.
09:26:29  20          THE COURT:  Well, that shows
09:26:33  21   cooperation.  That's what everybody is supposed to
09:26:35  22   do.
09:26:35  23          MR. LANGSTON:  Sure.
09:26:37  24          THE COURT:  But other than that, they
09:26:38  25   didn't have to do that for you -- I mean,

09:26:40  1  technically.  They've done it.  They've taken the

09:26:43  2  step moving in the right direction.  You follow up

09:26:45  3  with them and talk to them about whether or not that

09:26:48  4  that's sufficient, or whether or not there's

09:26:51  5  additional documents.  If you can't work it out,

09:26:53  6  file a motion to compel.  I'll hear that on

09:26:55  7  expedited basis, and then -- you know, I can tell

09:26:59  8  you guys right now if you file a motion to compel

09:27:02  9  the first thing I'm going to need is a privilege

09:27:04  10  log.

09:27:05  11          So, you know, if you are claiming

09:27:06  12  privilege I'll need a privilege log, so you'll have

09:27:09  13  to produce it now or either later.

09:27:14  14          MR. DICKERSON:  Judge, Nate Dickerson

09:27:16  15  for Reynolds and Reynolds.  First, we have a

09:27:18  16  privilege log, and we provided it to them.  We're

09:27:20  17  happy to give the Court a copy now if you like or

09:27:22  18  wait and see --

09:27:22  19          THE COURT:  Why don't you talk it over

09:27:24  20  first, and that way see if you can come to some

09:27:27  21  agreement as to why it's privileged or if they need

09:27:30  22  additional information.  And if you really can't

09:27:32  23  work it out, then bring it to me.

09:27:38  24          If we had more time, what I would

09:27:40  25  do instead of having a motion to compel is basically

09:27:43  1  both parties would write me a letter setting out
09:27:46  2  exactly what -- like you did earlier in the other
09:27:49  3  privilege log.  I mean, you weren't here for that,
09:27:52  4  but send the letter pointing out exactly -- you
09:27:54  5  know, identifying the people in the privileged
09:27:56  6  documents, what their roles are so that when I look
09:28:00  7  at this I can get an idea of exactly why it should
09:28:03  8  be or shouldn't be privileged.
09:28:05  9          But we don't have that luxury at
09:28:07  10  this point, so just file a motion to compel.  If you
09:28:11  11  can't work it out, file a motion.  Respond.  I'll
09:28:15  12  rule on it.  We have to continue the hearing for me
09:28:17  13  to get that done.  At the end, we can do that.
09:28:19  14  That's not a problem.
09:28:20  15          MR. LANGSTON:  Thank you, Judge.
09:28:22  16          MR. DICKERSON:  Thank you, Your Honor.
09:28:23  17  If my may?  With regard to the deposition, of course
09:28:26  18  we're happy to produce a representative from the
09:28:29  19  third-party vendor who did the data collection.
09:28:31  20  We're happy to do that if that's what's necessary.
09:28:35  21  In the interest of not wasting anybody's time, I
09:28:37  22  think I can shed maybe a little bit of light on the
09:28:41  23  collection process.
09:28:42  24          Because I don't think at the end of
09:28:44  25  the day the -- what the vendor did, the way they

09:28:46  1  collected the data, the way they searched the data

09:28:51  2  is going to help resolve this issue at all.

09:28:53  3          THE COURT:  Well, it's not just that.

09:28:54  4  So how they did it, coupled with the deposition --

09:28:57  5  or the testimony under oath of the individuals that

09:29:00  6  you are going to call -- with that -- those three

09:29:04  7  individuals -- I mean, the testimony from those

09:29:06  8  three people under oath should clarify it.  I mean,

09:29:10  9  because -- you know, first of all the people under

09:29:14  10 oath can say what documents were or were not

09:29:18  11 created.  I mean, because it's their documents.

09:29:20  12 They send them back and forth.

09:29:21  13          And then the person who -- the

09:29:23  14 vendor who collects the documents can tell me what

09:29:26  15 they did and whether or not what they did would have

09:29:30  16 picked up those documents.  And if it wouldn't have,

09:29:37  17 then there's a problem with the collection process I

09:29:39  18 think, or maybe with the way the subpoena's worded.

09:29:41  19 I don't know, but a deposition is necessary.

09:29:44  20          I mean, he's gotta be deposed and

09:29:46  21 under oath.  It's not going to be a statement that's

09:29:48  22 not subject to cross-examination.  That's not going

09:29:51  23 to solve anything.

09:29:53  24          MR. DICKERSON:  Judge, I appreciate

09:29:54  25 that.  Just one point of clarification, just to make

SEAN W. GUMM, CSR #13168, RPR, CRR

09:29:59  1   sure we understand.  The documents that were

09:30:02  2   collected by the vendor were all of the documents,

09:30:04  3   all e-mail files from -- as Mr. Langston explained

09:30:11  4   the way Mr. Barris's e-mailed were stored, once

09:30:14  5   they're downloaded from the company server, they're

09:30:16  6   only on his laptop.  So the vendor went in and

09:30:18  7   collected PST files of all of the e-mails that were

09:30:21  8   on his laptop.

09:30:23  9              Where I think the issue arises is

09:30:26  10  not in the collection -- because everything was

09:30:27  11  collected -- but in the way the searches were run.

09:30:32  12  Um, because of the way the subpoena was worded, what

09:30:34  13  they asked for -- for example, for Mr. Barris's

09:30:37  14  e-mail were all e-mails between Mr. Barris and

09:30:40  15  Mr. Jackson.  So we took the collection set of all

09:30:43  16  of Mr. Barris's e-mails and had the vendor filter

09:30:47  17  those with the metadata fields, "To, From, CC, BCC"

09:30:56  18  fields of those e-mails, and ran Mr. Jackson's

09:30:58  19  e-mail address through all of those fields.

09:31:01  20             That's what pulled out the set we

09:31:02  21  used to make our production last Friday.

09:31:04  22             THE COURT:  Okay.  Well, but -- but

09:31:06  23  it's really easy, though.  So the first question to

09:31:09  24  the vendor is, "See Exhibit A.  Was Exhibit A part

09:31:13  25  of your initial search?  When you did your cull --

09:31:17  1   your initial search, was this document a part of the

09:31:19  2   exhibit; yes or no?  If it was, then the next step

09:31:24  3   is -- and where did it go?  What did you do with

09:31:27  4   that document once you got it?"

09:31:29  5                 Okay?  And then, "Once you figure

09:31:30  6   out what you did with it, did you give it to the

09:31:32  7   lawyers?  Did you give it to someone?  Where did it

09:31:35  8   go?"

09:31:36  9                 Then we can figure out whether it

09:31:39  10  was an issue of the document never being pulled in

09:31:41  11  the first place or whether it's an issue -- and I'm

09:31:43  12  not impugning anybody's credibility or motives, or

09:31:46  13  whether it was -- whether it was pulled initially,

09:31:50  14  but there was some judgment decision made that it

09:31:52  15  wasn't going to be produced, or whether it wasn't

09:31:55  16  produced by accident.

09:31:56  17                But the issue is whether or not the

09:32:00  18  process in place pulled that document.  If the

09:32:01  19  vendor says, you know, this document -- and I'll

09:32:05  20  give everything back to you -- "Yes, when I went

09:32:08  21  through the search I found this document and I gave

09:32:10  22  it to somebody."

09:32:12  23                "Who did you give it to?"

09:32:14  24                Okay.  Then we find our where it

09:32:14  25  went.  And then we need to figure out if the vendor

SEAN W. GUMM, CSR #13168, RPR, CRR

09:32:17  1  got it -- if it existed, the vendor got it and sent

09:32:20  2  it to someone, then the next question is why wasn't

09:32:23  3  it produced to the Government sooner?

09:32:26  4          MR. DICKERSON:  Judge, respectfully we

09:32:27  5  have the answers to all of those, and we've shared

09:32:29  6  the answers to all of those with the Government.

09:32:31  7  The issue is they don't like the answer.

09:32:33  8          THE COURT:  But what's the answer?  So

09:32:34  9  was -- was this document that was produced on Monday

09:32:38 10  -- was it pulled by the vendor?

09:32:40 11          MR. DICKERSON:  The document that was

09:32:43 12  produced on Monday, yes, it was pulled by the

09:32:46 13  vendor.  However, the original document, the

09:32:48 14  original e-mail in the chain from Mr. Jackson to

09:32:52 15  Mr. Barris was not part of the collection.  That

09:32:54 16  does not exist in the collection, which indicates

09:32:57 17  that it was not on the laptop.

09:32:59 18          However, as Mr. Johnson explained,

09:33:02 19  there were three additional e-mails, one of which is

09:33:05 20  the version that was produced on Monday --

09:33:07 21          MR. LANGSTON:  Can I just stop you

09:33:08 22  right there?

09:33:09 23          THE COURT:  Okay.

09:33:11 24          MR. LANGSTON:  Limited waiver privilege

09:33:13 25  here, Your Honor.  But if they want to waive

09:33:15   1   privilege to say why this is not, we're going to

09:33:17   2   want to explore why it perhaps was intentionally

09:33:20   3   withheld.

09:33:21   4             THE COURT:  Yeah, I don't want to get

09:33:22   5   any further than this, because the first step -- the

09:33:24   6   very, very first step is to take the deposition of

09:33:28   7   the vendor and find out whether this document was

09:33:30   8   pulled as part of the initial cull.  If it was, then

09:33:35   9   the issue's going to be what happened between that

09:33:38   10  initial cull and what was produced on Friday.  Who

09:33:42   11  made -- you know -- I mean, I don't know.

09:33:45   12            I have no idea, but the first

09:33:46   13  question before we go any further is was the

09:33:48   14  document pulled?  If it wasn't pulled, then why not?

09:33:53   15  If it wasn't pulled and -- and it wasn't pulled, are

09:33:57   16  there other documents that might not have been

09:33:59   17  pulled for the same reason?

09:34:01   18            Once we figure that out, you'll

09:34:03   19  have an idea of the universe of documents that are

09:34:05   20  out there, and then you guys can figure out why it

09:34:08   21  wasn't produced sooner.

09:34:10   22            I mean, we can sort that out later,

09:34:12   23  but my initial -- my main concern at this point is

09:34:19   24  was -- or were the documents pulled as part of the

09:34:21   25  initial cull by the vendor?  Respectfully, you can't

09:34:25  1  say that -- I mean, you can say that, Counsel, but

09:34:29  2  you are not the -- you don't have personal

09:34:32  3  knowledge, because you are not the person who did

09:34:34  4  it.  I mean, I want the person who did it to tell

09:34:36  5  me, "Yes, this document I pulled and gave it to

09:34:38  6  somebody."

09:34:39  7           "Who did you give it to?"

09:34:41  8           Then you guys can follow up with

09:34:42  9  the questions as to whether the document went

09:34:47  10 between being pulled and, you know, showing up on

09:34:49  11 your doorstep on Monday and you can figure out

09:34:52  12 whether it was pulled and it didn't show up, whether

09:34:55  13 or not there were other documents pulled that

09:34:56  14 haven't shown up on your doorstep yet.

09:35:00  15           What I was trying to do, as an

09:35:01  16 aside by looking at the document that was produced

09:35:04  17 on Monday versus the other documents that haven't

09:35:07  18 been produced yet, is there some common thread to

09:35:11  19 indicate why those documents might not have been,

09:35:13  20 you know, part -- why they might not have been

09:35:17  21 pulled or custody -- they don't seem to be related.

09:35:21  22           MR. DICKERSON:  Judge, there is a

09:35:22  23 common thread, if I may again?  I'm sorry, to keep

09:35:26  24 jumping in.

09:35:26  25           THE COURT:  Sure.

09:35:27    1          MR. DICKERSON:  But the common thread

09:35:29    2  with all seven of these documents is that the latest

09:35:32    3  e-mail in the chain, the most recent e-mail -- you

09:35:35    4  know, how the system pulls it -- is not between

09:35:38    5  Mr. Barris and Mr. Jackson.  That was what the

09:35:41    6  subpoena called for.  That was the way we ran the

09:35:44    7  searches, e-mails between Mr. Barris on one hand and

09:35:49    8  Mr. Jackson on the other hand.

09:35:50    9          THE COURT:  But the first document is

09:35:51   10  between Mr. Barris and Mr. Jackson.

09:35:53   11          MR. DICKERSON:  Correct.  Somewhere

09:35:54   12  down in the e-mail chain there is an e-mail between

09:36:00   13  Mr. Barris and Mr. Jackson.  And those were the ones

09:36:03   14  that were not pulled, because the latest-in-time

09:36:06   15  e-mail was not between the two of them.

09:36:09   16          THE COURT:  That brings a problem the

09:36:11   17  Government need to explore.  There may be documents

09:36:14   18  directly responsive, but are not being pulled

09:36:18   19  because they're not the latest document in the

09:36:21   20  e-mail chain between Barris and Jackson.  So what

09:36:24   21  you are telling me is the only documents that were

09:36:27   22  produced were documents directly between Barris and

09:36:30   23  Jackson that are the most recent recipients of the

09:36:33   24  e-mail.

09:36:34   25          Because -- so what you are telling

09:36:36   1    me is -- let's say Jackson and Barris e-mail, and

09:36:42   2    there were, like, other multiple e-mails that

09:36:45   3    respond to that e-mail.  So you would never get the

09:36:48   4    original Jackson and Barris e-mail, because the way

09:36:50   5    you are telling me the search went, it was only

09:36:53   6    looking for the final e-mail -- the final e-mail --

09:36:57   7    and the final e-mail isn't between Barris and

09:37:00   8    Jackson, then it's not pulled up.

09:37:02   9             MR. DICKERSON:  Correct.  But

09:37:03   10   theoretically, in the e-mail when you collect all of

09:37:06   11   the e-mails in the PST file, it would have not only

09:37:10   12   latest e-mail, it would have every single one as a

09:37:13   13   separate file, so it should pull all of them out.

09:37:15   14   That's why we ran the additional search once we

09:37:19   15   realized this issue with the one produced on Monday.

09:37:21   16             So instead of just running

09:37:23   17   Mr. Jackson's name through the To, From, CC fields,

09:37:27   18   we went through manually and looked, "Is there

09:37:30   19   anything in this chain that is not part of what we

09:37:32   20   already produced?"

09:37:33   21             THE COURT:  That's great, and I think

09:37:35   22   that's what -- that's what you need to get somebody

09:37:36   23   under oath to tell you.

09:37:39   24             MR. DICKERSON:  And that's already

09:37:40   25   done.

09:37:40   1            THE COURT:  Well, no.  They need to be

09:37:41   2   subject to cross-examination.  I mean --

09:37:44   3            MR. COREY SMITH:  We understand the

09:37:44   4   Court's ruling.  We want someone under oath, subject

09:37:47   5   to cross-examination, to give us some facts.  With

09:37:49   6   all due respect to Counsel, yes, they're making

09:37:52   7   representations to the Court.  I'm sure they're

09:37:54   8   telling you exactly what they believe happened, but

09:37:56   9   they're not fact witnesses under oath.  We

09:37:58   10   understand the Court's ruling.

09:37:59   11            THE COURT:  Okay.  And I think it's

09:38:00   12   pretty clear.  I mean, you can depose them, find out

09:38:02   13   what's going on, and then from there you can figure

09:38:05   14   out whether or not there are other documents.

09:38:07   15   Because, you know, the other thing I heard that was

09:38:09   16   kind of surprising was -- I heard this for the first

09:38:13   17   time this morning, you know, was that executive

09:38:15   18   e-mails, you know, only reside on the laptops

09:38:18   19   themselves, or the -- of the desktops themselves.

09:38:22   20   They don't reside in some sort of mainframe or

09:38:28   21   backup file, which causes more concern because you

09:38:31   22   don't know whether or not -- you know, whether or

09:38:33   23   not you're getting all of the documents that ever

09:38:35   24   existed.  You have no idea.

09:38:37   25                 So you need to explore that with

| | | |
|---|---|---|
| 09:38:39 | 1 | them and find out what the person who was collecting |
| 09:38:41 | 2 | the documents did with respect to that knowledge. |
| 09:38:44 | 3 | So anyway, I think the issue is -- |
| 09:38:47 | 4 | MR. COREY SMITH:  Thank you. |
| 09:38:47 | 5 | THE COURT:  Take the deposition, |
| 09:38:48 | 6 | respectfully, over the weekend.  Then you guys will |
| 09:38:51 | 7 | have Barris and the other gentleman on the stand. |
| 09:38:54 | 8 | You can ask them on the stand and then we can move |
| 09:39:03 | 9 | on.  And then, if there's any implication of |
| 09:39:06 | 10 | wrongdoing, we can take it up once you have the |
| 09:39:08 | 11 | facts.  But we've got doctors standing by, so I |
| 09:39:10 | 12 | can't spend more time on this. |
| 09:39:12 | 13 | MR. JOHNSON:  Judge, one other matter. |
| 09:39:14 | 14 | They indicated Mr. Barris is going to be called to |
| 09:39:17 | 15 | the witness stand today.  I only inquire of the |
| 09:39:19 | 16 | Government if that's changed now given the ruling of |
| 09:39:22 | 17 | the Court? |
| 09:39:22 | 18 | THE COURT:  He can be called.  If |
| 09:39:23 | 19 | there's something that comes up, you can recall him. |
| 09:39:26 | 20 | MR. LANGSTON:  That makes sense. |
| 09:39:27 | 21 | THE COURT:  I mean, he gets to be -- |
| 09:39:29 | 22 | you know, we've gotta get the witnesses moving.  We |
| 09:39:32 | 23 | can't put everything on hold just for one witness. |
| 09:39:35 | 24 | I've got -- I know you haven't been |
| 09:39:37 | 25 | here, Counsel, but we've been juggling everybody's |

09:39:40   1   schedule.  It's -- to try to accommodate all of the

09:39:43   2   doctors, all of the folks that have flights to move

09:39:45   3   around.

09:39:49   4              My understanding is Mr. Barris's

09:39:51   5   testimony is part of a mosaic, cobbled together with

09:39:55   6   Defense Counsel and the prosecutors to get

09:39:58   7   everything done timely.  So I'm not going to

09:40:01   8   interfere with that.  If you want to call them, call

09:40:03   9   them, and can be called again.

09:40:05  10              MR. DICKERSON:  Thank you, Your Honor.

09:40:06  11              MR. JOHNSON:  Thank you.

09:40:07  12              THE COURT:  Thank you, all, and it's

09:40:09  13   good to see you all.

09:40:10  14              MR. DICKERSON:  You as well, Judge.

09:40:13  15   Thanks.

09:40:16  16              THE COURT:  Okay.  Ready for your first

09:40:17  17   witness this morning?

09:40:18  18              MR. LANGSTON:  Yes.

09:40:19  19              THE COURT:  I'm sorry.  We will push

09:40:22  20   through lunch probably a little late.  We'll go

09:40:26  21   about 12:15.

09:40:28  22              MR. LANGSTON:  Your Honor, the

09:40:29  23   Government calls Dr. Stuart Yudofsky.

09:40:32  24              THE COURT:  If someone would like to

09:40:33  25   call Dr. Yudofsky?

09:40:36  1          MR. MACDOUGALL:  Your Honor, if I may

09:40:37  2   be heard?

09:40:37  3          THE COURT:  Oh, you are his counsel?

09:40:39  4          MR. MACDOUGALL:  Yes, Your Honor.  Mark

09:40:40  5   MacDougall for Dr. Yudofsky.  As the Court is aware,

09:40:47  6   Dr. -- first, thank you.  Like to thank the Court

09:40:51  7   for arranging his testimony this morning.

09:40:55  8   Dr. Yudofsky is being called pursuant to a

09:40:59  9   Rule 17(c) subpoena.  His intent on the advice of

09:41:01  10  counsel beyond basic identifying information or

09:41:07  11  questions that could be asked having nothing to do

09:41:09  12  with the case is to assert his right under the Fifth

09:41:14  13  Amendment to decline to answer.

09:41:14  14          You know, one of the -- one of the

09:41:17  15  few nice things about being a lawyer is every now

09:41:19  16  and then, no matter how long you've been doing it,

09:41:23  17  something kind of comes to the surface that you kind

09:41:24  18  of don't expect.  That's happened here.  I'll be

09:41:26  19  very brief, Your Honor.

09:41:29  20          There is no case that we've been

09:41:31  21  able to find where the Government has proffered

09:41:34  22  enough, you know, motion practice up until now in

09:41:37  23  which the Government in a criminal case is trying to

09:41:40  24  do what the Government's doing today, which is call

09:41:42  25  a witness to the stand without immunity and seek to

09:41:45  1   persuade the Court to compel him to testify.

09:41:48  2              And the reason there is no such

09:41:50  3   case is that Congress gave the Department of

09:41:55  4   Justice, under Title 18, a unique tool.  It's not

09:41:57  5   available to civil litigants.  It's not available to

09:42:00  6   defendants.  And it's not even really available to

09:42:02  7   the Court, because it can only happen, as the Court

09:42:03  8   knows, on Government motion.  We've asked from the

09:42:06  9   beginning for Dr. Yudofsky to be immunized, and he

09:42:09  10  will answer every question the Government has.  He

09:42:12  11  will do so again if the Government makes that

09:42:14  12  motion.

09:42:15  13             But if they decline to do that and

09:42:17  14  they seek to persuade the Court to compel him,

09:42:19  15  notwithstanding his assertion of the Fifth

09:42:21  16  Amendment, they're essentially backing into immunity

09:42:25  17  because the case law is very clear that compelled

09:42:27  18  testimony is immunized testimony.  So we have a very

09:42:30  19  short bench brief that with the Court's permission

09:42:33  20  I'd like to hand up.

09:42:34  21             THE COURT:  Sure.

09:42:40  22             MR. MACDOUGALL:  I believe the Court

09:42:41  23  had --

09:42:44  24             THE COURT:  This is -- has it been

09:42:46  25  filed yet or...

09:42:47  1          MR. MACDOUGALL:  It'll be filed today.

09:42:49  2          MR. COREY SMITH:  Seeing this for the

09:42:51  3   first time, Your Honor.

09:42:52  4          MR. LOONAM:  Us, too.

09:42:53  5          MR. LANGSTON:  We're happy to respond,

09:42:55  6   but I think we've already had this argument.

09:42:58  7          THE COURT:  One second.  Well, the

09:43:14  8   first question that I've got -- I mean, I'm familiar

09:43:16  9   with this case law that you cited, because I did

09:43:19 10   some research on this.  The question I have is how

09:43:23 11   is the -- I mean, how am I going to -- you know, the

09:43:27 12   Fifth Circuit's pretty clear you just don't blanket

09:43:31 13   give someone -- allow somebody to plead Fifth

09:43:35 14   Amendment blanket without allowing -- without first

09:43:39 15   figuring out whether the testimony they're going to

09:43:41 16   give truly implicates, um, criminal prosecution.

09:43:45 17          The Fifth Circuit has said that

09:43:46 18   it's not just -- it's not just some, "Trifling or

09:43:53 19   imaginary possibility of prosecution.  It must be

09:43:57 20   substantial, real, and not merely trifling or

09:44:01 21   imaginary."

09:44:02 22          So basically I need to make the

09:44:05 23   connects between the testimony and the possible

09:44:09 24   criminal prosecution.  This is a competency hearing.

09:44:12 25   We're not going to be talking about -- and I mean --

09:44:14  1  well, it seems like the parties want to get into the

09:44:18  2  merits of the case, and they're doing that.  But on

09:44:21  3  the issue of competency, what is -- what can -- what

09:44:26  4  specifically -- my concern is on the issue of

09:44:29  5  competency, what is it that Dr. Yudofsky's going to

09:44:33  6  be asked about that would implicate the Fifth

09:44:38  7  Amendment?

09:44:38  8              I mean, if they ask him about

09:44:40  9  Mr. Brockman's appearance, or they ask him about was

09:44:43 10  he able to do something, or what -- or what did he

09:44:46 11  say, how he said it -- how is that implicating a

09:44:51 12  possible criminal prosecution of Dr. Yudofsky?  Some

09:44:55 13  of the other issues, I get it.  Because there's been

09:44:57 14  testimony that -- from Mr. Tamine that Dr. Yudofsky

09:45:02 15  allegedly held phones for Mr. Tamine when he was

09:45:08 16  coming into the country or going to hold phones for

09:45:11 17  him.  I get that.  But if they ask pure questions

09:45:13 18  about competency, how is that implicating the Fifth

09:45:17 19  Amendment?

09:45:18 20              MR. MACDOUGALL:  Your Honor, the

09:45:19 21  Court's quite right.  The standard is not fanciful.

09:45:21 22  If we get to that point and Dr. Yudofsky's here, he

09:45:24 23  will take the stand and he will go under oath and

09:45:28 24  respond to any questions that are asked.  But we'd

09:45:31 25  be prepared to make an in camera ex parte proffer of

09:45:34  1   what our concerns are.

09:45:35  2              He's acting on the advice of

09:45:38  3   counsel, some of which I would tell the Court would

09:45:40  4   be privileged.

09:45:41  5              THE COURT:  Okay.

09:45:42  6              MR. MACDOUGALL:  We believe much more

09:45:43  7   to meet that bar of fanciful, but we cannot do it in

09:45:49  8   court.  So if we get to that point, like to renew my

09:45:53  9   request.

09:45:54  10             MR. LANGSTON:  Judge, we're happy to

09:45:56  11  hand up a list of topics that we want to explore

09:45:59  12  with Dr. Yudofsky if that'll help the Court to make

09:46:06  13  a more educated determination if you do want to do

09:46:07  14  an in camera review.

09:46:07  15             MR. LOONAM:  Your Honor, I don't have

09:46:09  16  any dog in this fight at all, except insofar as the

09:46:13  17  Government cannot use immunity as a sword and a

09:46:16  18  shield.  They've put on an immunized witness already

09:46:24  19  in this case.  So to the extent the Government is

09:46:26  20  going to call Dr. Yudofsky and ask Dr. Yudofsky

09:46:29  21  questions that implicate his Fifth Amendment

09:46:34  22  privilege, and there's some inference to the

09:46:37  23  questions that the Government's asking -- it isn't a

09:46:41  24  jury trial.  I get that.

09:46:43  25             But to the extent the Government is

09:46:44  1    making insinuations through mere questions, which

09:46:47  2    obviously aren't evidence, we would ask that gets

09:46:50  3    cut off, or that they immunize the witness so we can

09:46:55  4    hear his answers.  You know, we have no dog in this

09:47:00  5    fight.  That's between them.  So that's our only

09:47:02  6    position.

09:47:03  7            MR. LANGSTON:  Judge, my first question

09:47:04  8    is, "Are you Mr. Brockman's's doctor?"

09:47:08  9            If you want to make an in camera

09:47:10  10   review as to why that would incriminate Dr.

09:47:11  11   Yudofsky --

09:47:12  12           THE COURT:  I understand

09:47:13  13   Mr. MacDougall, because he doesn't want to waive his

09:47:15  14   client's rights.  I get that.  You want to make sure

09:47:20  15   that there's nothing that's said that would possibly

09:47:29  16   cause your client problems later on, and I believe

09:47:32  17   saw you in this courtroom all three days.  You know

09:47:34  18   that the parties are getting into -- even though

09:47:39  19   it's a competency hearing, the parties are somewhat

09:47:42  20   getting into the merits of the criminal prosecution.

09:47:45  21   And you're concerned about that, because it could

09:47:48  22   affect your client.

09:47:48  23           I'm there.  I understand.  I'm just

09:47:53  24   trying to figure out the best way to do this.  Is it

09:47:56  25   a combination of looking at the topics and then

09:47:58   1   talking about the -- about this issue in camera?

09:48:04   2   That might be the way to go, because as I said, this

09:48:06   3   is a competency hearing.  We shouldn't really be

09:48:09   4   getting into the merits.  Although, the parties are

09:48:11   5   doing that for different reasons, and the fact that

09:48:16   6   they're doing that causes heartburn and concern for

09:48:18   7   your client.

09:48:19   8                I understand, because testifying

09:48:21   9   could implicate -- on the issues of talking about so

09:48:26   10  far, could possibly implicate his Fifth Amendment

09:48:29   11  rights.  I'm there.  I'm trying to figure out the

09:48:33   12  best procedure to handle this.

09:48:34   13               MR. LANGSTON:  I can tell you, we're

09:48:34   14  not going to be asking about phones or any of that.

09:48:37   15  I do think that it -- it probably is most efficient

09:48:40   16  if we give you the topics, and we do the in camera

09:48:43   17  representation.  Because it may be -- again, we --

09:48:46   18  we had a discussion with counsel and offered, you

09:48:50   19  know, if they were willing to give us an attorney

09:48:52   20  proffer, we were willing to have a discussion about

09:48:54   21  immunity.

09:48:55   22               Dr. Yudofsky wanted immunity for

09:48:57   23  all crimes ever committed without any representation

09:48:59   24  --

09:48:59   25               THE COURT:  I guess I don't need to

09:49:02  1    know anything about all of that.

09:49:03  2                   MR. LANGSTON:  Sure.  Happy to hand up

09:49:04  3    the topics, and I think it makes more sense to do an

09:49:06  4    in camera review prior to him taking the stand, and

09:49:11  5    then that way we may focus the direction we're going

09:49:13  6    in.

09:49:13  7                   THE COURT:  Let me see the topics

09:49:15  8    first.

09:49:15  9                   MR. LANGSTON:  Sure.

09:49:16  10                  THE COURT:  And then, Mr. MacDougall,

09:49:18  11   let's talk about in camera.  Sorry we're holding

09:49:20  12   this up a little bit, but this is important.  We're

09:49:23  13   going to take a brief recess, everyone.

09:49:26  14   (Whereupon, a recess was held.)

10:00:44  15                  THE COURT:  Please be seated, everyone.

10:00:50  16   Mr. MacDougall, based on the summary of topics that

10:01:01  17   the Government was going to get into, coupled with

10:01:04  18   what I have heard so far in this case, I do believe

10:01:07  19   that there's potential that the questions could

10:01:10  20   implicate Dr. Yudofsky's Fifth Amendment.  So what I

10:01:14  21   believe we need to do is have an in camera hearing

10:01:17  22   with just you, the Court, and the record sealed with

10:01:23  23   the courtroom cleared.

10:01:26  24                       There's an office next to -- that

10:01:30  25   is being used by counsel that's next to this one.

10:01:33   1   That's gotta be cleared, because there's audio

10:01:35   2   that's potentially in there, because that's my old

10:01:38   3   case manager's office.

10:01:39   4                 So whatever in that office next

10:01:42   5   door cannot be there.  I've got two CSOs coming to

10:01:48   6   guard the doors while we speak, but this portion of

10:01:53   7   the record will be sealed.

10:01:54   8                 Is there anything else we need to

10:01:56   9   do?

10:01:57  10                 MR. MACDOUGALL:  Two of my

10:01:58  11   colleagues -- if they can be present?

10:01:59  12                 THE COURT:  Oh, they can be as well.

10:02:01  13   Sir, if you could just clear the courtroom at this

10:02:05  14   time.

10:02:12  15                 MR. LOONAM:  We'll make sure that's

10:02:14  16   cleared out.

10:02:33  17                 THE COURT:  Also, we're shutting down

10:02:34  18   real time, because all of you would have access.

10:02:34  19        (Whereupon, the courtroom was vacated.)

10:02:34  20        **THURSDAY, NOVEMBER 18, 2021 -- 10:42 A.M.**

10:52:48  21                       **--oOo--**

10:52:48  22                 THE COURT:  We're back on the record in

10:52:49  23   this case.  The Court just held an in camera hearing

10:52:53  24   with respect to Dr. Yudofsky's testimony in this

10:52:56  25   case.  And the Court was clear, and the record has

| | |
|---|---|
| 10:53:03 | 1 been sealed.  And the Court makes the following |
| 10:53:05 | 2 rulings with respect to Dr. Yudofsky's testimony: |
| 10:53:07 | 3 After reviewing the summary of |
| 10:53:09 | 4 questions and topics for Dr. Yudofsky, and |
| 10:53:11 | 5 considering the evidence that was presented in the |
| 10:53:16 | 6 -- in camera hearing, the Court finds that the |
| 10:53:18 | 7 possibility of criminal prosecution, based on |
| 10:53:21 | 8 Dr. Yudofsky's testimony, is substantial and real, |
| 10:53:24 | 9 and not merely trifling or imaginary. |
| 10:53:28 | 10 The Court, looking at the topics |
| 10:53:33 | 11 that the Government presented, each of those topics, |
| 10:53:37 | 12 given the information the Court heard both in this |
| 10:53:41 | 13 case and during the in camera hearing, creates -- |
| 10:53:45 | 14 implicates Dr. Yudofsky's Fifth Amendment rights. |
| 10:53:49 | 15 So the Court will not order |
| 10:53:51 | 16 Dr. Yudofsky to testify regarding those six topics. |
| 10:53:56 | 17 There are facts that Dr. Yudofsky could testify to |
| 10:54:01 | 18 in this matter, but all of those facts are |
| 10:54:04 | 19 undisputed, and the Court doesn't find any reason |
| 10:54:08 | 20 for asking Dr. Yudofsky to come in and testify about |
| 10:54:10 | 21 those.  For example:  What is his name?  Whether or |
| 10:54:13 | 22 not he's a doctor of the Brockmans.  The time he's |
| 10:54:18 | 23 known the Brockmans.  Whether or not he's treated |
| 10:54:21 | 24 Elizabeth Bellows (phonetic) and Robert Brockman II. |
| 10:54:30 | 25 All of those issues are, in this case, undisputed. |

10:54:32   1   And if they become disputed, we can talk about it at

10:54:34   2   that time.

10:54:35   3                    But only facts I can find

10:54:37   4   Dr. Yudofsky could testify to are facts that are

10:54:39   5   undisputed in this case.  Therefore, the Court at

10:54:42   6   this time will not require Dr. Yudofsky to take the

10:54:45   7   stand and plead before the Court his Fifth Amendment

10:54:50   8   rights.

10:54:50   9                    Mr. MacDougall has represented, and

10:54:52   10  just get it on the record, that if Dr. Yudofsky was

10:54:56   11  called, he would assert his Fifth Amendment right

10:54:59   12  with respect to all evidence other than facts that

10:55:04   13  are undisputed in this case.

10:55:06   14                    Is that correct, Mr. MacDougall?

10:55:09   15  He would be pleading the Fifth Amendment if he was

10:55:12   16  asked to take the stand.

10:55:13   17                    MR. MACDOUGALL:  Yes, Your Honor.  That

10:55:15   18  is correct.

10:55:15   19                    THE COURT:  So based on that

10:55:17   20  representation, I don't see any reason to have

10:55:18   21  Dr. Yudofsky testify.  So he is excused from any

10:55:24   22  subpoenas that he is under, and we can proceed with

10:55:26   23  the next witness.

10:55:27   24                    Thank you, Mr. MacDougall.  You are

10:55:29   25  free to stay -- your team is free to stay or leave,

| | | |
|---|---|---|
| 10:55:32 | 1 | your pleasure. |
| 10:55:34 | 2 | MR. MACDOUGALL:  Thank you, Your Honor. |
| 10:55:35 | 3 | THE COURT:  You may call your next |
| 10:55:36 | 4 | witness. |
| 10:55:36 | 5 | MR. COREY SMITH:  The Government calls |
| 10:55:37 | 6 | Dana Abrahamsen. |
| 10:55:40 | 7 | THE COURT:  Okay.  Just to clarify |
| 10:56:08 | 8 | again, Counsel, Mr. MacDougall, that's for purposes |
| 10:56:11 | 9 | of this hearing.  The Government's free to try to |
| 10:56:16 | 10 | call Dr. Yudofsky at a later date for any |
| 10:56:19 | 11 | proceedings. |
| 10:56:24 | 12 | Hello, sir, if you can step forward |
| 10:56:26 | 13 | and be sworn.  If you could raise your right hand. |
| 10:56:26 | 14 | DANA ABRAHAMSEN, |
| 10:56:26 | 15 | (For the Government) |
| 10:56:26 | 16 | called as a Witness, having been duly |
| 10:56:26 | 17 | and regularly sworn, testified as follows: |
| 10:56:41 | 18 | THE WITNESS:  I do. |
| 10:56:41 | 19 | THE COURT:  You may take the stand. |
| 10:56:43 | 20 | MR. COREY SMITH:  And with |
| 10:56:44 | 21 | Mr. Abrahamsen, Your Honor, the attorney from the |
| 10:56:47 | 22 | FTC is in the courtroom, Burke Kappler.  I'd ask he |
| 10:56:51 | 23 | be permitted to sit here, just in case something |
| 10:56:53 | 24 | comes up with regard to this investigation -- not |
| 10:56:55 | 25 | this investigation, that investigation. |

SEAN W. GUMM, CSR #13168, RPR, CRR

| | |
|---|---|
| 10:56:57 | 1 |
| 10:56:58 | 2 |
| 10:57:01 | 3 |
| 10:57:04 | 4 |
| 10:57:07 | 5 |

THE COURT:  Not a problem.  You are
welcome to sit at counsel table, sir.  You may
proceed -- oh, yes, sir.  You weren't here for the
mask rules.  When you are on the stand and counsel
is addressing you, you don't have to wear your mask.

THE WITNESS:  Do I take it off all the
way?

THE COURT:  Whatever --

THE WITNESS:  Is that okay?  It's got a
rubber band on the back.

THE COURT:  It's okay.  Take it off.
Whatever you need.

THE WITNESS:  Thank you, Your Honor.

### DIRECT EXAMINATION

BY MR. COREY SMITH:

Q.   For the record, could you please just state
your name, and spell your last name?

A.   Sure.  Dana Abrahamsen.  The last name is
A-B-R-A-H-A-M-S-E-N.

Q.   And, Mr. Abrahamsen, how are you employed?

A.   I work for the Federal Trade Commission in
Washington.

Q.   What do you do for the Federal Trade
Commission?

A.   I'm an attorney.

SEAN W. GUMM, CSR #13168, RPR, CRR

10:57:45  1    Q.   Can you briefly describe for the Court the work

10:57:47  2    you do for the FTC as an attorney?

10:57:50  3    A.   Sure, I work on anti-trust matters.

10:57:52  4    Q.   During the course of your duties, did you --

10:57:56  5    were you assigned, or did you come to know an FTC

10:58:00  6    matter involving Reynolds and Reynolds, which also

10:58:03  7    involved the Defendant in this case, Robert

10:58:06  8    Brockman?

10:58:06  9    A.   Yes, sir.

10:58:07  10   Q.   Could you give the Court a brief description of

10:58:10  11   that matter?

10:58:11  12   A.   Sure.  The two companies you just mentioned,

10:58:16  13   CDK and Reynolds, they both make something called a

10:58:19  14   DMS, which is a computer software product that

10:58:22  15   virtually every car dealership in the world -- in

10:58:25  16   the United States, in our case -- they have to have

10:58:28  17   these.  They're very complicated software products.

10:58:32  18                    And they -- dealers use them for a

10:58:34  19   full range of different things in the dealership,

10:58:37  20   selling the cars, having parts inventoried, having

10:58:41  21   car inventory, having rebates, having warranty work,

10:58:46  22   et cetera.

10:58:46  23                    And they're sophisticated pieces of

10:58:52  24   software.  But there's also in the industry a lot of

10:58:54  25   applications that are made by other third-parties,

10:58:57   1   and they're very high tech and innovative.  Dealers

10:59:01   2   like to get maybe eight or ten of these apps to work

10:59:05   3   on their DMS.

10:59:07   4              And they have to be integrated into

10:59:10   5   the DMS, so there's another layer of companies

10:59:13   6   called integrators that are working in this industry

10:59:17   7   as well.  So the apps go through an integrator onto

10:59:20   8   the dealer's DMS.

10:59:22   9              And there was a point of

10:59:24   10  competition between CDK and Reynolds.  Reynolds --

10:59:30   11  their public position was they would not permit

10:59:33   12  integrators to be on their DMS, whereas CDK took a

10:59:38   13  more laissez-faire attitude toward it, to the point

10:59:41   14  where CDK was trying to get dealers to switch from

10:59:45   15  Reynolds to CDK because they had a more lax approach

10:59:49   16  to letting these integrators work on the dealers.

10:59:54   17             So our investigation -- and then

10:59:55   18  CDK changed its mind.  CDK flipped 180 degrees and

10:59:59   19  said, "No, we're going to close our DMS as well."

11:00:02   20             And that seemed to be an issue --

11:00:07   21  perfectly fine for them to change their mind and do

11:00:10   22  something different.  But the question was had the

11:00:14   23  two firms excluded to the point where they both had

11:00:17   24  a meeting of the minds that they would close their

11:00:22   25  DMS.

11:00:22   1              We didn't expect to find explicit

11:00:25   2    agreement where they shook hands and agreed to that.

11:00:28   3    But in the anti-trust laws, you can infer an

11:00:31   4    agreement by looking at communications between the

11:00:34   5    two and infer whether there was a meeting of the

11:00:36   6    minds.  So that's what we were investigating.

11:00:37   7    Q.    When did this investigation start?

11:00:39   8    A.    Several years ago now.  I can't remember

11:00:42   9    exactly.

11:00:43  10    Q.    Is it still an open investigation by the FTC?

11:00:45  11    A.    Yes, sir.

11:00:46  12    Q.    And if you can just maybe summarize it for the

11:00:49  13    Court, what is the objective of -- what are you

11:00:52  14    trying to find?  What is the objective of the

11:00:54  15    investigation?

11:00:56  16    A.    Really, I'd say the main objective was to find

11:00:59  17    whether the two companies had colluded.  Whether

11:01:05  18    there was evidence of collusion.

11:01:06  19    Q.    Civil or criminal?

11:01:07  20    A.    All of ours are civil.

11:01:09  21    Q.    And who was the interested party, or maybe

11:01:12  22    subject of that investigation?  Was it just Reynolds

11:01:13  23    and Reynolds, or was it Reynolds and Reynolds and

11:01:15  24    CDK?

11:01:16  25    A.    No, it's both companies.  The -- we were

11:01:20  1   investigating whether the two of them colluded.

11:01:23  2   Q.   Mm-hmm.  Now, during the course of this

11:01:26  3   investigation, did you have occasion to depose

11:01:29  4   Mr. Brockman?

11:01:30  5   A.   Yes, we call them investigational hearings when

11:01:34  6   we're at the stage that we're at in this

11:01:42  7   investigation, but it's like a deposition.

11:01:44  8   Q.   When was that deposition or investigative

11:01:46  9   hearing?

11:01:46  10  A.   I believe it was in September of 2019.

11:01:47  11  Q.   Where was this deposition held?

11:01:49  12  A.   In Washington D.C., in law firm conference

11:01:54  13  room.

11:01:54  14  Q.   Which law firm would that be?

11:01:55  15  A.   The law firm that represented Mr. Brockman's

11:01:59  16  firm.

11:02:00  17  Q.   And did you conduct this deposition?

11:02:01  18  A.   Sheppard Mullin is the name.

11:02:05  19  Q.   Sheppard Mullin, just so the record is clear.

11:02:08  20  Okay.  Did you conduct this deposition yourself?

11:02:12  21  A.   Yes.  The way we do it is there would be two

11:02:19  22  lawyers.  One lawyer takes -- asks the bulk of the

11:02:22  23  questions, but the other lawyer might ask a few,

11:02:25  24  too, but I ask the bulk of the questions.

11:02:28  25  Q.   And could you -- to the extent you can

| | |
|---|---|
| 11:02:33 | 1 |
| 11:02:38 | 2 |
| 11:02:41 | 3 |
| 11:02:43 | 4 |
| 11:02:46 | 5 |
| 11:02:50 | 6 |
| 11:02:53 | 7 |
| 11:02:58 | 8 |
| 11:03:01 | 9 |
| 11:03:05 | 10 |
| 11:03:06 | 11 |
| 11:03:09 | 12 |
| 11:03:13 | 13 |
| 11:03:22 | 14 |
| 11:03:23 | 15 |
| 11:03:24 | 16 |
| 11:03:25 | 17 |
| 11:03:26 | 18 |
| 11:03:27 | 19 |
| 11:03:30 | 20 |
| 11:03:33 | 21 |
| 11:03:37 | 22 |
| 11:03:45 | 23 |
| 11:03:51 | 24 |
| 11:03:58 | 25 |

1  remember, who was present at this deposition?

2  **A.** I was present. I had a second -- we did it

3  over the course of two days. So I had a second

4  lawyer with me. It was different on the two days,

5  different colleague of mine on the two days.

6  We had an economist with us. The

7  court reporter was there. Mr. Brockman was there,

8  and Mr. Brockman's lawyers from the law firm

9  Sheppard Mullin -- he had I think two. It's in the

10  transcript, so my memory --

11  **Q.** If I can direct your attention to what's been

12  pre-admitted as Government Exhibit 32 and 33. It's

13  the white binder right to your right in the front.

14  I believe it's the one your hand -- yeah, exhibit

15  numbers are in the front.

16  **A.** Which exhibit number was it again?

17  **Q.** 32.

18  **A.** Oh, yeah.

19  **Q.** If you can turn to that, perhaps that will

20  refresh your recollection as to a couple of things.

21  So the first thing I want to ask you is can we put

22  into the record the exact date of the deposition?

23  **A.** Let's see, this is September 18, 2019.

24  **Q.** And who was present at the deposition?

25  **A.** Myself; my colleague, Alex Ansaldo; our

11:04:02  1   economist, Michael Williams; the court reporter;

11:04:07  2   Michael Cohen, from Sheppard Mullin; and Scott

11:04:13  3   Cherry, who I think is the general counsel of

11:04:17  4   Reynolds; and Jon Emmanuel.

11:04:19  5              THE COURT:  Counsel --

11:04:21  6              MS. BLEUSTEIN:  Your Honor, we would

11:04:22  7   just like to make the record clear the witness is

11:04:24  8   reading from the document.

11:04:24  9              THE COURT:  Okay.  Not a problem.

11:04:32  10             MR. COREY SMITH:

11:04:32  11  Q.   Do you recall, Mr. Abrahamsen, how long it was

11:04:35  12  before the deposition took place that you noticed

11:04:40  13  the deposition and marked it up -- you know weeks,

11:04:42  14  months, just ballpark?

11:04:43  15  A.   No, I don't remember.  Generally, it does take

11:04:48  16  some time to set these things up.

11:04:50  17  Q.   And before this deposition, had there been a

11:04:53  18  documentary discovery going back and forth or --

11:04:57  19  from the FTC to Reynolds and Reynolds?

11:04:58  20  A.   Well, the other way around.  We sought

11:05:01  21  documents from Reynolds and Reynolds, and we had

11:05:03  22  documents in our -- yes, we got documents from

11:05:05  23  Reynolds and Reynolds.

11:05:06  24  Q.   Yeah, that was an unartfully worded question.

11:05:09  25  That's what I meant.  Had there been discovery

| | | |
|---|---|---|
| 11:05:11 | 1 | requests to Reynolds and Reynolds from the FTC? |
| 11:05:15 | 2 | **A.**   Yes. |
| 11:05:15 | 3 | **Q.**   Had those been complied with? |
| 11:05:17 | 4 | **A.**   Yes, to some extent anyway. |
| 11:05:20 | 5 | **Q.**   To the best of your knowledge, do you know |
| 11:05:22 | 6 | whether or not Mr. Brockman prepared for this |
| 11:05:25 | 7 | deposition with his attorneys? |
| 11:05:28 | 8 | **A.**   I don't know for sure. |
| 11:05:29 | 9 | **Q.**   Were attorneys present during the entire |
| 11:05:32 | 10 | deposition? |
| 11:05:32 | 11 | **A.**   Oh, yes. |
| 11:05:33 | 12 | **Q.**   How long did the deposition go each day? |
| 11:05:36 | 13 | **A.**   From 9:00 in the morning to 1:00 in the |
| 11:05:39 | 14 | afternoon. |
| 11:05:39 | 15 | **Q.**   Did you speak -- without getting into the |
| 11:05:41 | 16 | details of the conversations, just the general |
| 11:05:43 | 17 | topics, did you discuss the logistics of the |
| 11:05:49 | 18 | deposition with the Reynolds and Reynolds attorneys? |
| 11:05:51 | 19 | **A.**   Yes. |
| 11:05:51 | 20 | **Q.**   And that you were going to be deposing |
| 11:05:53 | 21 | Mr. Brockman? |
| 11:05:53 | 22 | **A.**   Yes. |
| 11:05:53 | 23 | **Q.**   What was his position with Reynolds and |
| 11:05:55 | 24 | Reynolds at the time? |
| 11:05:56 | 25 | **A.**   He was the head of the company.  He owned it |

11:05:59   1   and he ran it.

11:05:59   2   Q.   Was anybody else from Reynolds and Reynolds at

11:06:02   3   the deposition, other than Mr. Brockman?

11:06:04   4   A.   Well, his attorneys --

11:06:06   5   Q.   Other than the attorneys?

11:06:08   6   A.   No, he was the only businessperson in the room.

11:06:10   7   Q.   That was my question, thank you.  So in working

11:06:13   8   on the logistics of the deposition with the

11:06:18   9   attorneys for Mr. Brockman to appear on

11:06:20   10  September 18th, did any of Mr. Brockman's attorneys

11:06:23   11  raise any medical issues of Mr. Brockman about the

11:06:27   12  deposition?

11:06:28   13  A.   Yes.  That's, in fact, why we took it at the

11:06:31   14  law firm.  They said he had some medical issues, and

11:06:34   15  their law firm was right across the street from a

11:06:36   16  hospital.  And that's why -- we usually do them in

11:06:40   17  our office, but we did it at the firm instead.

11:06:44   18  Q.   So what medical issues did they tell you about?

11:06:46   19  A.   I don't recall any specific issue.

11:06:51   20  Q.   Did anybody tell you that at this date, or

11:06:53   21  prior to this date, September 18, 2019, that

11:06:56   22  Mr. Brockman had been diagnosed with dementia?

11:06:59   23  A.   No.

11:06:59   24          MS. BLEUSTEIN:  Objection as to

11:07:01   25  leading.

*SEAN W. GUMM, CSR #13168, RPR, CRR*

| | |
|---|---|
| 11:07:02 | 1 |
| 11:07:06 | 2 |
| 11:07:07 | 3 |
| 11:07:07 | 4 |
| 11:07:12 | 5 |
| 11:07:15 | 6 |
| 11:07:18 | 7 |
| 11:07:19 | 8 |
| 11:07:20 | 9 |
| 11:07:21 | 10 |
| 11:07:22 | 11 |
| 11:07:24 | 12 |
| 11:07:24 | 13 |
| 11:07:25 | 14 |
| 11:07:28 | 15 |
| 11:07:28 | 16 |
| 11:07:28 | 17 |
| 11:07:31 | 18 |
| 11:07:34 | 19 |
| 11:07:38 | 20 |
| 11:07:42 | 21 |
| 11:07:50 | 22 |
| 11:07:51 | 23 |
| 11:08:06 | 24 |
| 11:08:07 | 25 |

1  THE COURT:  Okay.  Objection overruled.

2  THE WITNESS:  No, absolutely not.

3  MR. COREY SMITH:

4  Q.  At any time during the did Mr. Brockman tell

5  you on September 18, 2019, that he had been

6  diagnosed with dementia?

7  A.  No, absolutely not.

8  Q.  Did he tell you that he had Parkinson's

9  disease?

10 A.  No, I don't believe so.

11 Q.  Did he tell you that he had Lewy bodies

12 disease?

13 A.  I don't believe so.

14 Q.  Did he tell you that he had mild cognitive

15 impairment?

16 A.  No.

17 Q.  Okay.  So I want to ask you a couple of

18 questions about some of the exchanges between you

19 and Mr. Brockman during this deposition.  If I can

20 ask you to turn to Page 45 of that first exhibit

21 from the first day of the deposition -- 45, Line 1.

22 Yeah, can we switch?

23 THE CLERK:  Sure.

24 MR. COREY SMITH:

25 Q.  If you can briefly read that to yourself to

11:08:11   1   refresh your memory of what that exchange was.

11:08:24   2   **A.**   Okay.  I've looked at the one page.

11:08:28   3   **Q.**   Could you summarize for the Court what was the

11:08:30   4   question about -- well, let's start there.  What was

11:08:33   5   the question about that you had asked Mr. Brockman

11:08:35   6   in this deposition?

11:08:37   7   **A.**   We were asking him about a document.  And we

11:08:45   8   were trying to get him to explain a little bit about

11:08:48   9   why -- just to get an understanding of how the

11:08:53   10   company treated the -- data that was in the DMS.

11:09:02   11   **Q.**   And Mr. Brockman's answer -- how did he answer

11:09:07   12   that question?

11:09:07   13   **A.**   Well, he was explaining the fact that they were

11:09:11   14   fearful of the liability that could arise if there

11:09:15   15   was a data breach.  And he started talking about an

11:09:22   16   example involving Franklin Chevrolet, where there'd

11:09:27   17   been apparently a disgruntled employee or something

11:09:30   18   where they'd taken data from a dealership to develop

11:09:33   19   the DMS, and posted it on the internet or something.

11:09:39   20   The dealer, of course, is the person mainly

11:09:41   21   responsible.  But Mr. Brockman's point was that as a

11:09:44   22   deep pocket, somebody who had their data -- data

11:09:51   23   breached would come after Reynolds, because they had

11:09:54   24   the deeper pocket.

11:09:55   25                    He had this experience with

| | |
|---|---|
| 11:09:57 | 1 |
| 11:10:00 | 2 |
| 11:10:05 | 3 |
| 11:10:07 | 4 |
| 11:10:11 | 5 |
| 11:10:15 | 6 |
| 11:10:16 | 7 |
| 11:10:18 | 8 |
| 11:10:21 | 9 |
| 11:10:23 | 10 |
| 11:10:24 | 11 |
| 11:10:26 | 12 |
| 11:10:27 | 13 |
| 11:10:31 | 14 |
| 11:10:33 | 15 |
| 11:10:37 | 16 |
| 11:10:38 | 17 |
| 11:10:39 | 18 |
| 11:10:44 | 19 |
| 11:10:47 | 20 |
| 11:10:48 | 21 |
| 11:10:52 | 22 |
| 11:10:57 | 23 |
| 11:11:01 | 24 |
| 11:11:04 | 25 |

1  Franklin Chevrolet, and that's how he explained he
2  first encountered his now -- the lawyer that was you
3  know, sitting next to him.  That's how he first came
4  in contact, because even the FTC -- apparently the
5  other part of the FTC from where I work also got
6  involved apparently.
7                      He said he was upset because it
8  cost him $400,000 in legal fees.
9  Q.  When you say "He," who are you referring to?
10  A.  Mr. Brockman.
11  Q.  Now, did you know about this incident when you
12  asked this question in the deposition?
13  A.  I don't think I had heard of the incident.  I
14  most certainly didn't know the background that, you
15  know, that's how he became involved with Sheppard
16  Mullin, and I certainly didn't know the amount of
17  his legal fee.
18  Q.  Do you know how long ago from 2018 -- not
19  today, but 2018 back -- how long ago this incident
20  had occurred?
21  A.  No, but it must have been quite -- several
22  years I would think, because I remember Mr. Cohen
23  saying repeatedly that he been representing Reynolds
24  for a long time.  So he characterized his
25  representation of them as a long time.

11:11:06   1   **Q.**   When you say "Them," who do you mean?

11:11:08   2   **A.**   Well, he represented Reynolds.  He represented

11:11:12   3   Reynolds for a long time.  And Mr. Brockman

11:11:16   4   explained this Chevrolet incident is the first time

11:11:19   5   Reynolds had engaged Mr. Cohen as his lawyer.

11:11:23   6   **Q.**   While you were listening to Mr. Brockman relay

11:11:26   7   this story to you, did it appear to you that he had

11:11:29   8   any problem recalling these facts to tell the story?

11:11:31   9   **A.**   Oh, not at all.

11:11:32   10   **Q.**   Did he need to be prompted by his attorneys to

11:11:35   11   remember any of the facts?

11:11:35   12   **A.**   No.

11:11:39   13   **Q.**   Let me ask you another question you asked.  I'm

11:11:41   14   on Page 57.

11:11:52   15   **A.**   Yes, sir.  What line?

11:11:54   16   **Q.**   I think his answer, Mr. Brockman's answer

11:11:56   17   starts on Line 5.  I would ask you if you could just

11:11:59   18   read that answer to yourself, and then I'm going to

11:12:02   19   ask you a question about it.  It's Page 57, Line 5

11:12:05   20   of Exhibit 32.

11:12:15   21   **A.**   Yes, sir.

11:12:15   22   **Q.**   Yeah, do you recall that question and answer

11:12:18   23   exchange now?

11:12:19   24   **A.**   Yes.

11:12:19   25   **Q.**   So could you explain to the jury -- I'm sorry,

SEAN W. GUMM, CSR #13168, RPR, CRR

11:12:22   1   to the Judge -- can you explain to the Court what

11:12:26   2   was that question and answer about, and then I'll

11:12:28   3   ask you about the answer.

11:12:29   4   A.   It was this is -- everything about these DMS's

11:12:33   5   is complicated.  The Reynolds had, as I mentioned

11:12:37   6   earlier, stated a position that they would not allow

11:12:41   7   these integrators to come on to their system, but

11:12:45   8   they did let the OEMs onto their system through

11:12:49   9   agents.  I was trying to --

11:12:51   10   Q.   I'm sorry, if I could interrupt.  What's an

11:12:56   11   OEM?

11:12:56   12   A.   Original equipment manufacture like Toyota,

11:13:00   13   Ford, General Motors, et cetera.

11:13:00   14   Q.   Sorry to interrupt.

11:13:02   15   A.   So we were talking about the distinction.  And

11:13:04   16   then in the answer -- the question and answer you

11:13:07   17   specifically turned my attention to, he was pointing

11:13:11   18   out that under their contractual -- I asked whether

11:13:16   19   the dealer could grant permission to the integrator

11:13:20   20   to come on to its system.  And he explained that

11:13:30   21   under their relationship with the dealer, they had

11:13:34   22   contracts in place that did not permit the dealer to

11:13:37   23   give that permission.  Only Reynolds could grant

11:13:39   24   that permission, and that was laid out in their

11:13:43   25   contracts.

11:13:43   1   Q.   As far as you know in their investigation --

11:13:47   2   the FTC investigation -- did Mr. Brockman, to your

11:13:51   3   satisfaction, accurately relay the issues in their

11:13:55   4   investigation to you?

11:13:56   5   A.   Yes.

11:14:01   6   Q.   How long did he go on in this answer?

11:14:03   7   A.   It looks like it's about six lines.

11:14:11   8   Q.   At any time -- let me start with you.  At any

11:14:13   9   time did you have to prompt Mr. Brockman to recall

11:14:15   10   these facts?

11:14:18   11   A.   No.

11:14:18   12   Q.   At any time did his attorneys -- at least

11:14:21   13   according to the transcript and your recollection --

11:14:23   14   prompt Mr. Brockman and help him recall the facts?

11:14:26   15   A.   No.  I could only remember maybe one incident

11:14:31   16   where we -- that might have been a discussion, but

11:14:34   17   in the whole two days.

11:14:36   18   Q.   And did it appear to you -- well, first of all

11:14:40   19   let me ask you this.  This dispute that was the

11:14:42   20   subject of your investigation, how far back did it

11:14:44   21   go back -- not the length of the investigation, but

11:14:47   22   how far back in history in the business relationship

11:14:50   23   between Reynolds and Reynolds and CDK did your

11:14:54   24   investigation reach back to?

11:14:55   25   A.   I'm not sure I understood the question.  You

11:14:58   1   said the dispute.

11:14:59   2   Q.   Let me rephrase.  Maybe that was unartful.

11:15:02   3   What I'm asking is not the length of your

11:15:04   4   investigation.   I'm asking about how -- what is the

11:15:07   5   subject matter of your investigation -- how far back

11:15:11   6   in time did it reach -- how far back in time were

11:15:14   7   the events you are interested in go back?

11:15:20   8   A.   Do you mean the difference the two companies

11:15:22   9   had between integration -- how far back at odds on

11:15:25   10  that issue?

11:15:26   11  Q.   Correct?

11:15:27   12  A.   I don't know precisely.  I know I can remember

11:15:31   13  one document that Mr. Brockman had written where he

11:15:35   14  said, "You've been doing this on my machines for

11:15:39   15  20 years."

11:15:40   16              So it had been a long time.

11:15:42   17  Q.   Now, in that question and answer on Page 57,

11:15:45   18  there's a reference to -- on Page 58 and 59 to an

11:15:55   19  exhibit to the deposition.  Do you see that?

11:16:09   20  A.   No.  Where's the exhibit you mention?

11:16:11   21  Q.   Somewhere on 58 and 59.  It's Exhibit 1143.

11:16:19   22  A.   On 57 we're talking about 4043.

11:16:23   23  Q.   Oh, 58 and 59.

11:16:38   24  A.   I'm sorry, I'm unable to find a reference to an

11:16:42   25  exhibit.

11:16:42  1  Q.   That's all right.  Can we pull up that exhibit?

11:16:44  2  Yeah, we'll pull up the exhibit to your deposition

11:16:47  3  1143 and put it on the screen.

11:16:52  4              MR. COREY SMITH:  This is Exhibit 34

11:16:54  5  for this hearing, Your Honor, the set of exhibits to

11:16:57  6  the deposition.

11:16:58  7  Q.   I just want to ask you what this is.  This was

11:17:01  8  an exhibit to your deposition.

11:17:04  9  A.   It's very blurry on the screen.  I think it's

11:17:09  10  an e-mail from the CEO of CDK to Mr. Brockman.

11:17:17  11  Q.   What is the date of the e-mail?

11:17:18  12  A.   That's better.  July 2, 2014.

11:17:24  13  Q.   Did you ask Mr. Brockman about -- about his

11:17:27  14  relationship or interactions with Mr. Steve Anenen?

11:17:31  15  A.   Oh, yes.  We had several documents.  This is

11:17:34  16  one of them where they communicated with one

11:17:37  17  another, and we knew of phone calls they had -- at

11:17:41  18  least one phone call.  And, yes, we needed to

11:17:47  19  understand the substance of their communications.

11:17:50  20  There were a number of questions about these

11:17:52  21  communications.

11:17:55  22  Q.   Did you show this e-mail to Mr. Brockman during

11:17:57  23  the deposition?

11:17:58  24  A.   Yes.

11:17:58  25  Q.   Did he -- did it appear to you that he recalled

11:18:01   1   the e-mail?

11:18:02   2   **A.**   Yes.

11:18:02   3   **Q.**   Did it appear to you in his answers that he

11:18:07   4   recalled who Steve Anenen is?

11:18:09   5   **A.**   Oh, yeah, he definitely -- yes, he knew

11:18:12   6   Mr. Anenen.

11:18:12   7   **Q.**   Did he answer questions that you put to him

11:18:14   8   about his conversations with Mr. Anenen, the CEO of

11:18:19   9   CDK, from 2014?

11:18:21   10   **A.**   Yes, and there were other conversations in 2012

11:18:27   11   as I recall.

11:18:28   12   **Q.**   Did Mr. Brockman appear to you to recall those

11:18:30   13   historical facts?

11:18:31   14   **A.**   Oh, yeah.

11:18:32   15   **Q.**   So let me ask you about another question you

11:18:34   16   asked.   This one's on Page 99 -- I'm sorry, 94.   My

11:18:48   17   apologies, 94.

11:18:49   18   **A.**   What line?

11:18:50   19   **Q.**   Line 7 -- what are.   I'm sorry.

11:19:03   20   **A.**   It's a lengthy answer, I'm sorry.

11:19:05   21   **Q.**   Yeah, that's all right.

11:19:13   22   **A.**   Goes on for several pages.

11:19:15   23   **Q.**   Just the part on 94.   Read that to yourself to

11:19:20   24   refresh your memory.

11:19:23   25   **A.**   Yes.

SEAN W. GUMM, CSR #13168, RPR, CRR

11:19:23   1   Q.   So what I want to ask you is first,

11:19:26   2   Mr. Abrahamsen, what is it you are asking

11:19:28   3   Mr. Brockman in this question?

11:19:29   4   A.   The -- in addition to understanding the

11:19:35   5   communications between Mr. Brockman and Mr. Anenen,

11:19:39   6   the two CEOs, we were also interested -- there were

11:19:43   7   far more communications between a person who is

11:19:48   8   directly below Mr. Brockman who is a Mr. Schaefer,

11:19:54   9   and he communicated extensively with his colleague

11:19:58   10   at CDK, Mr. Gardener.

11:20:00   11            In addition to trying to understand

11:20:01   12   the direct communication between the two CEOs, we

11:20:04   13   also wanted to ask about the communications between

11:20:07   14   the people just below the CEO level, and that is

11:20:11   15   sort of what we're getting into here.

11:20:16   16            And Mr. Schaefer is a direct report to

11:20:18   17   Mr. Brockman, and I'm asking him what he knew about

11:20:21   18   Mr. Schaefer's communications with CDK.

11:20:22   19   Q.   That was something of interest to you in your

11:20:25   20   investigation?

11:20:25   21   A.   Oh, absolutely.

11:20:27   22   Q.   What did Mr. Brockman tell you about

11:20:29   23   Mr. Schaefer?

11:20:30   24   A.   Quite a bit of his history going back to when

11:20:34   25   Mr. Schaefer played basketball in college.  He said

11:20:38    1    Mr. Schaefer still held records that he set as a
11:20:44    2    basketball player in college.  Mr. Schaefer is
11:20:47    3    probably approximately my age.
11:20:48    4              And he went on and gave a lengthy
11:20:51    5    history about what Mr. Schaefer's role was in the
11:20:55    6    company, and he developed some of the software in
11:20:57    7    the DMS.  Apparently Mr. Schaefer had a patent
11:21:02    8    granted on the -- some of the work he did on the
11:21:06    9    Reynolds DMS.
11:21:08   10              And then he went on to explain that
11:21:12   11    Mr. Schaefer apparently was near -- about to be
11:21:15   12    fired when Mr. Brockman bought Reynolds.  And
11:21:19   13    Mr. Brockman thought highly of Mr. Schaefer and kept
11:21:22   14    him on, and that was the background he was giving
11:21:25   15    me.
11:21:25   16    Q.   So when Mr. Brockman was giving you
11:21:27   17    Mr. Schaefer's history, did it appear to you that he
11:21:29   18    had any problem recalling these facts, all the way
11:21:32   19    back to Mr. Schaefer's high school basketball career
11:21:35   20    -- I'm sorry, college basketball career?
11:21:39   21    A.   No, he was telling me stuff I didn't know.
11:21:41   22    Q.   Did anybody, if you can recall, during this
11:21:44   23    deposition anybody in the room prompt Mr. Brockman
11:21:47   24    to relay these stories to you or this history to
11:21:50   25    you?

11:21:50  1  **A.**   No, not -- as I said, there was one other

11:21:53  2  incident.  But, no, this was all coming straight

11:21:56  3  from him.

11:21:56  4  **Q.**   All right.  Let me ask you one more page on

11:22:00  5  this day on Page 99, Line 18.

11:22:32  6  **A.**   I've read the answer on that page.

11:22:36  7  **Q.**   All right.  So what was the question that you

11:22:37  8  were asking Mr. Brockman in that exchange?

11:22:45  9  **A.**   Excuse me, the question had to do with whether

11:22:48  10  there was any discussion between CDK and Reynolds

11:22:52  11  about making a joint announcement.  They were

11:22:56  12  entering into written contracts that were going on

11:23:00  13  simultaneously with the unwritten agreement we were

11:23:03  14  investigating.

11:23:04  15          And the question had to do with

11:23:06  16  whether the two firms had agreed to come out with

11:23:10  17  public comments when they finished and executed the

11:23:16  18  written agreements that came into existence.

11:23:19  19  **Q.**   Are these written agreements between two and

11:23:21  20  two?

11:23:22  21  **A.**   CDK and Reynolds.

11:23:24  22  **Q.**   Now, in his answer on 19 he references ADP.

11:23:30  23  What's ADP?

11:23:31  24  **A.**   ADP was -- is a very large company, and it had

11:23:36  25  a subsidiary that made DMS's.  Then they spun that

SEAN W. GUMM, CSR #13168, RPR, CRR

11:23:41   1   off, and CDK is the publicly held company that now

11:23:47   2   holds the division that used to be part of ADP.

11:23:51   3   Q.   Do you know when that spinoff occurred?

11:24:00   4   A.   I'm going to say probably sometime in the --

11:24:12   5   sometime probably 2000 to 2010 would be my best

11:24:16   6   recollection.   I mean, I know the answer to that.   I

11:24:18   7   mean, at some point -- I -- I know we had

11:24:20   8   established that precisely, but I just don't recall.

11:24:23   9   Q.   Based on your observations at this deposition,

11:24:26   10   did Mr. Brockman appear to have any trouble

11:24:29   11   recalling who ADP was and its relationship to CDK?

11:24:32   12   A.   Oh, no.   Not at all.

11:24:33   13   Q.   Back you up to Page 98, Line 10.   When you are

11:24:49   14   done, you can let me know.

11:25:02   15   A.   Okay.   I've read the question and answer.

11:25:04   16   Q.   So what did you ask Mr. Brockman in that

11:25:06   17   exchange?

11:25:06   18   A.   I was asking him about whether he and

11:25:09   19   Mr. Schaefer had discussed a possible interaction

11:25:14   20   with CDK about coming up with a common market

11:25:18   21   message.

11:25:19   22   Q.   And how did Mr. Brockman answer that question?

11:25:22   23   A.   He said, "My answer is the same.   We are now

11:25:25   24   down really into the weeds, and my memory just is

11:25:29   25   not that good."

SEAN W. GUMM, CSR #13168, RPR, CRR

| | |
|---|---|
| 11:25:31 | 1 |
| 11:25:33 | 2 |
| 11:25:35 | 3 |
| 11:25:38 | 4 |
| 11:25:42 | 5 |
| 11:25:44 | 6 |
| 11:25:46 | 7 |
| 11:25:47 | 8 |
| 11:25:49 | 9 |
| 11:25:52 | 10 |
| 11:25:55 | 11 |
| 11:25:57 | 12 |
| 11:25:58 | 13 |
| 11:26:06 | 14 |
| 11:26:15 | 15 |
| 11:26:46 | 16 |
| 11:26:47 | 17 |
| 11:26:51 | 18 |
| 11:26:53 | 19 |
| 11:26:54 | 20 |
| 11:26:58 | 21 |
| 11:26:59 | 22 |
| 11:27:03 | 23 |
| 11:27:06 | 24 |
| 11:27:12 | 25 |

Q.   Is this the incident you previously testified
to, the one incident where Mr. Brockman said that
his memory wasn't that good?

A.   No, if I made a reference to any of the
testimony previously it had to do with a date.

Q.   Oh, I see.  I see.

A.   This is not it, no.

Q.   But to the best of your recollection,
Mr. Abrahamsen, is this the only time this exchange
now on Page 98, Line 10, that Mr. Brockman made
reference to his memory?

A.   I don't recall.

Q.   Okay.  Let me ask you to turn to one last page
and this is Page 100, Line 18 -- actually answer
starts at Line 15 and it goes to Line 22.

A.   Yes, I've read it.

Q.   Okay.  So what were you asking the Defendant in
that exchange?

A.   The Defendant?

Q.   I'm sorry, Mr. Brockman, the defendant in this
case?

A.   Oh, okay.  There was a -- I think even
referenced this earlier.  There was a request by
Mr. Brockman to Mr. Anenen that Reynolds be able to
access the CDK DMS for its -- its sole applications

11:27:21  1   as well.

11:27:21  2                      It wanted its application to be

11:27:24  3   able to go on to the CDK DMS for free for 20 years.

11:27:31  4   Because -- his logic was that CDK had been -- they

11:27:37  5   owned an integrator that had been taking data from

11:27:41  6   Reynolds for 20 years.

11:27:43  7   Q.   Who is "They"?  Who is "They"?

11:27:47  8   A.   Oh, CDK owned two subsidiaries that -- they

11:27:52  9   bought them and they were integrators.  Those

11:27:55  10  integrators owned by CDK had been taking -- they'd

11:28:00  11  been using the Reynolds DMS -- they were an

11:28:06  12  integrator, so they were putting third-party apps

11:28:09  13  onto the Reynolds DMS through the integrator

11:28:15  14  subsidiaries that CDK owned.

11:28:18  15  Q.   What was Mr. Brockman's position about this

11:28:20  16  conduct you are just relaying to the Court?

11:28:22  17  A.   Right.  He was very negative about that

11:28:26  18  conduct.  He was very anxious to stop it.  And in

11:28:30  19  return, he wanted them to stop doing that, and then

11:28:33  20  he wanted them to give him 20 years of free access

11:28:35  21  to their DMS -- to the CDK DMS because he felt that

11:28:41  22  was what had been going on.

11:28:44  23  Q.   This whole issue of your FTC investigation

11:28:46  24  about integrators and accessing databases and

11:28:49  25  applications, do you consider this a complex topic?

SEAN W. GUMM, CSR #13168, RPR, CRR

11:28:54    1    **A.**   It certainly was for me.

11:28:57    2    **Q.**   In this deposition for two days when you were

11:29:00    3    observing Mr. Brockman, what were your observations

11:29:05    4    about whether or not he had command of these

11:29:07    5    difficult, technical issues?

11:29:09    6    **A.**   He had tremendous command of these technical

11:29:12    7    issues.  He also had great command of the history

11:29:16    8    of, you know, his company and the other people in

11:29:18    9    the industry.

11:29:22   10    **Q.**   Let's turn to the second day, which is

11:29:25   11    Exhibit 33.  I'm going to ask you a couple more

11:29:27   12    questions about the deposition, but this time on the

11:29:29   13    second day.  I want to start at page 119, and just

11:29:39   14    ask you about a couple of the exchanges you had with

11:29:41   15    Mr. Brockman.

11:29:47   16    **A.**   Yes, which line?

11:29:48   17    **Q.**   Page 19, starting -- 119, starting at line 21?

11:30:15   18    **A.**   Yes, I've read it.

11:30:16   19    **Q.**   Okay.  And so, first of all what is the subject

11:30:20   20    matter of these questions -- well, let me back up a

11:30:23   21    second.  This is the very beginning of the second

11:30:25   22    day?

11:30:31   23    **A.**   Yes, towards the beginning anyway.

11:30:33   24    **Q.**   What is the subject matter of your questions on

11:30:35   25    the beginning of the second day?

11:30:39  1   A.   Well, on this particular page you asked me to

11:30:41  2   turn to, we're asking him about a system that CDK

11:30:51  3   had developed called 3PA, third-party access I

11:30:59  4   believe is what the acronym stands for.

11:31:03  5              He said he had not known about it,

11:31:05  6   but apparently they had developed it.  He was

11:31:08  7   learning from an exhibit I was showing him.  He had

11:31:11  8   learned at the time of the exhibit -- you know,

11:31:13  9   about in that time period -- that CDK had this 3PA,

11:31:20  10  which is essentially a port where if you had an

11:31:23  11  application and you wanted to go -- not from an

11:31:25  12  integrator, but if you wanted to go directly on to

11:31:28  13  the DMS with the permission of the DMS holder -- in

11:31:35  14  other words CDK -- if Mr. Brockman owned an

11:31:38  15  application and he wanted it to integrate on CDK's

11:31:42  16  DMS's without using an integrator, he would go

11:31:46  17  through 3PA, third-party access, which is a computer

11:31:50  18  port.

11:31:51  19  Q.   And this topic, this subject matter, had you

11:31:55  20  started asking Mr. Brockman about it the day before?

11:31:57  21  A.   I don't recall.

11:31:59  22  Q.   And this issue that you are -- well, you want

11:32:03  23  to take a look at the deposition.

11:32:05  24  A.   I'll do whatever you want me to do.

11:32:06  25  Q.   Well, let me ask you this.  This -- what you

11:32:10    1    just described to the Court, these third-party

11:32:12    2    access -- this portal, are these items and facts

11:32:17    3    that you relayed to Mr. Brockman, or did

11:32:21    4    Mr. Brockman relay them to you?

11:32:22    5    **A.**   Well, in this narrow context of asking him

11:32:25    6    about this exhibit, he was relating to me that his

11:32:32    7    knowledge and his thought process in terms of how he

11:32:35    8    first learned about it, and what his reaction was to

11:32:38    9    learning about it -- and he goes on the next page

11:32:41   10    and says, "Well, I was glad to see they had this,

11:32:46   11    because it means it was up and running, and it would

11:32:48   12    be a lot easier for me to use a process that had

11:32:51   13    already been established by them, rather than

11:32:53   14    starting from scratch."

11:32:54   15    **Q.**   Is there a timeframe when these chain of events

11:32:59   16    started that Mr. Brockman relayed to you about what

11:33:01   17    you are talking about now?

11:33:04   18    **A.**   Um --

11:33:05   19    **Q.**   What year?

11:33:06   20    **A.**   Um, most of the questions we were talking to

11:33:12   21    him about -- the bulk of them would been between

11:33:16   22    2012 and 2015.

11:33:18   23    **Q.**   When you were asking Mr. Brockman these

11:33:21   24    questions about these business transactions and his

11:33:25   25    software from 2012 to 2015, did he appear to you to

11:33:29    1   have any problem recalling any of these historical

11:33:32    2   facts?

11:33:33    3   A.   No.

11:33:33    4   Q.   Did -- during his answering of the questions,

11:33:36    5   did any of his attorneys have to prompt him?

11:33:39    6   A.   As I said, there may have been one incident

11:33:41    7   involving a year, but beyond that, no.  His -- no.

11:33:45    8   Q.   All right.  Let me show you one of the exhibits

11:33:47    9   to the second day.  Again, this is Exhibit 34.  It

11:33:53   10   is your deposition exhibit CX-4043 contained within

11:34:00   11   Government Exhibit 34.  It's on the left-hand side

11:34:05   12   of the screen.

11:34:08   13   A.   Can we make it any bigger?

11:34:11   14   Q.   Yeah, if you can enlarge the exhibit that would

11:34:13   15   be great.  Just a couple quick questions on this

11:34:16   16   exhibit.  Do you know what this is?

11:34:17   17   A.   Can we -- is that the very top of the -- --

11:34:31   18   Q.   Let's try -- I'm sorry.  Do you know what this

11:34:33   19   is?

11:34:33   20   A.   I believe these are notes Mr. Brockman had

11:34:36   21   prepared for himself in anticipation of a telephone

11:34:40   22   call with Mr. Anenen at CDK.

11:34:44   23   Q.   Can we show 1143 --

11:34:46   24        MR. LOONAM:  Can we get a timeframe for

11:34:47   25   that document?

11:34:48   1           MR. COREY SMITH:  We're going to do

11:34:50   2   that right now in the next exhibit.

11:34:51   3           MR. LOONAM:  Okay.  Yeah, just enlarge

11:35:01   4   the top.

11:35:02   5   Q.   So again, this appears to be another e-mail

11:35:07   6   between Mr. Brockman and Steve Anenen?

11:35:10   7   A.   Steve Anenen.

11:35:11   8   Q.   So in the deposition, are you asking him about

11:35:13   9   exchanges between himself and the CEO of CDK?

11:35:16  10   A.   Yes.

11:35:17  11   Q.   Does this pertain to the notes we just saw in

11:35:20  12   Exhibit 4043?

11:35:23  13   A.   I believe there were exchanges -- there were

11:35:26  14   two different exchanges.  I think the prior exhibit

11:35:29  15   you showed me with the talking points, I believe we

11:35:34  16   identified that as having been prepared in 2012.

11:35:37  17   Q.   Okay.  And what about this e-mail?

11:35:39  18   A.   Well, it's dated July 2, 2014.

11:35:42  19   Q.   Can you explain to us -- more importantly the

11:35:46  20   Court -- why were these exchanges between

11:35:49  21   Mr. Brockman and the CEO of CDK so important to you?

11:35:52  22   A.   The two companies had lengthy negotiations that

11:35:59  23   resulted in three executed written contracts that

11:36:03  24   were not directly related to our investigation.

11:36:07  25   They were not -- they would not have been directly

11:36:10  1   related -- with the possible exception of one

11:36:14  2   paragraph -- they were not directly related to our

11:36:16  3   investigation.

11:36:17  4                    But it did appear that there were

11:36:20  5   communications between the two companies that we

11:36:22  6   wanted to understand better to see whether there was

11:36:25  7   also an unwritten agreement that was the subject of

11:36:27  8   our investigation.

11:36:29  9   Q.   Were there a number of questions about

11:36:32  10  Mr. Brockman's communications with Mr. Anenen?

11:36:36  11  A.   Oh, yes.

11:36:37  12  Q.   Did it appear to you Mr. Brockman had any

11:36:40  13  problems recalling who Mr. Anenen was?

11:36:42  14  A.   No, he knew who he was.

11:36:44  15  Q.   Did it appear to you he had any problem

11:36:46  16  recalling some of these conversations?

11:36:47  17  A.   No, he -- he recalled them.

11:36:51  18  Q.   So let me ask you to turn now to another page,

11:36:54  19  Page 135 of the second day, which is Exhibit 33 of

11:37:05  20  this hearing.

11:37:05  21  A.   Do you have a line?

11:37:06  22  Q.   Yes.  Um -- well, starting 135 -- well, let's

11:37:20  23  start at Page 135, and then get to a different page

11:37:22  24  and a specific line.  If you can just read that -- I

11:37:25  25  want to ask you the subject matter of what you are

SEAN W. GUMM, CSR #13168, RPR, CRR

11:37:27  1  asking.

11:37:44  2  **A.**   There was an e-mail exchange that -- between

11:37:48  3  the two companies that -- to our reading of the

11:37:52  4  exhibit anyway made it sound like Mr. Schaefer was

11:37:58  5  telling CDK that it was important that CDK give some

11:38:03  6  sort of market message about this very issue we're

11:38:07  7  talking about.  Whether, you know, it was going to

11:38:10  8  be an open or closed system.

11:38:12  9                    And I was asking Mr. Brockman

11:38:14  10  whether he and Mr. Schaefer discussed this.  That

11:38:19  11  was -- that was the inquiry.

11:38:22  12  **Q.**   And again, did Mr. Brockman have any problem

11:38:25  13  relaying those facts to you?

11:38:27  14  **A.**   No, he said he didn't recall any conversation

11:38:31  15  of that type with Mr. Schaefer.

11:38:33  16  **Q.**   During the course of this deposition and your

11:38:36  17  investigation, did you come across an entity by the

11:38:40  18  name of Superior -- not sure of the exact name.

11:38:44  19  **A.**   I think it's Superior Integration Services.  It

11:38:48  20  went by the acronym SIS.

11:38:50  21  **Q.**   So what is that?

11:38:51  22  **A.**   It is an integrator.

11:38:54  23  **Q.**   Why was that something you were asking

11:38:56  24  Mr. Brockman about?

11:38:57  25  **A.**   We asked about asking various integrators we

SEAN W. GUMM, CSR #13168, RPR, CRR

11:39:04  1   knew existed in the industry.

11:39:05  2   Q.   If I can ask you to turn to Page 143 of your

11:39:09  3   deposition, Line 1.

11:39:23  4   A.   I'm sorry, 143.

11:39:26  5   Q.   Yes, sir, 143.

11:39:34  6   A.   Yes, this is line -- Line 1 is in the middle of

11:39:38  7   an answer, or the answer begins on the bottom of the

11:39:41  8   prior page.  Yes, I'm asking him about a paragraph

11:39:48  9   that was in a settlement agreement between Reynolds

11:39:53  10  and SIS.

11:39:55  11  Q.   And why was that important to you?

11:39:57  12  A.   There was similar language in the agreement

11:40:01  13  that -- one of the three agreements eventually

11:40:06  14  entered into between Reynolds and CDK.

11:40:08  15  Q.   Was there something that occurred between SIS

11:40:11  16  and Reynolds and Reynolds that was of interest to

11:40:14  17  you?

11:40:15  18  A.   Well, we wanted to know the background of --

11:40:18  19  you know, we wanted to know the background of

11:40:20  20  everything that was going on in the industry.  But

11:40:22  21  we wanted to know specifically about the origin of

11:40:26  22  this particular paragraph.

11:40:28  23  Q.   Why is that?

11:40:29  24  A.   Because as I said, it showed up in the final

11:40:33  25  agreement -- final written agreement between

11:40:36  1    Reynolds and CDK.

11:40:40  2    Q.    When did this agreement become entered into?

11:40:43  3    A.    Between Reynolds --

11:40:45  4    Q.    Reynolds and SIS.  I think we have the

11:40:48  5    agreement as attached.  It's 4036 I think.

11:40:51  6    A.    I used it as an exhibit, I remember.

11:40:54  7    Q.    Yeah, 4036 to his deposition.

11:41:01  8    A.    That's not the settlement agreement.

11:41:04  9    Q.    4273, the next exhibit.  Is that the settlement

11:41:14  10   agreement?  That's it.  Is that it?

11:41:22  11   A.    Yes, that's it.  And the date is in the

11:41:25  12   agreement somewhere.  It's on -- somewhere in the

11:41:28  13   agreement it's dated.

11:41:30  14   Q.    Do you recall, from your memory, approximately

11:41:33  15   when this settlement agreement was entered into?

11:41:37  16   A.    I mean, the written agreement's between CDK and

11:41:41  17   Reynolds were 2015.  This was probably one to three

11:41:46  18   years earlier.

11:41:53  19   Q.    Summarize, briefly for us, your understanding

11:41:56  20   of what was the issue between Reynolds and Reynolds

11:41:57  21   and SIS.

11:41:58  22   A.    Sure.  SIS was an integrator.  It was doing

11:42:03  23   integration on the Reynolds DMS for various

11:42:06  24   application providers.  There was a lawsuit over

11:42:10  25   that, whether that was permitted or not.  They

11:42:13  1   settled the lawsuit with the understanding that SIS

11:42:18  2   would stop doing integration services on Reynolds

11:42:24  3   going forward.  But that for the clients that SIS

11:42:31  4   had that were integrating through SIS, they'd be

11:42:34  5   given a wind-down period where instead of just

11:42:37  6   having those apps cut off and the dealer not being

11:42:39  7   able to use them, they would let those applications

11:42:45  8   continue to function through the SIS integration

11:42:48  9   system for a period of time until they could be

11:42:51  10  migrated into a direct relationship with Reynolds.

11:42:57  11  **Q.**   So did Reynolds and Reynolds -- at least is it

11:43:00  12  your understanding Reynolds and Reynolds had a

11:43:01  13  problem with what SIS was doing?

11:43:04  14  **A.**   Oh, yes.

11:43:05  15  **Q.**   And the settlement agreement was the result?

11:43:08  16  **A.**   It resolved the problem.

11:43:09  17  **Q.**   After the settlement agreement, what's your

11:43:11  18  understanding of whether or not SIS was still going

11:43:14  19  to have access to the Reynolds and Reynolds DMS?

11:43:17  20  **A.**   Well, it was our understanding going in that

11:43:20  21  this was going to be the end of SIS as a hostile

11:43:27  22  integrator, according to the settlement, or terms of

11:43:27  23  the settlement.

11:43:27  24  **Q.**   Did you ask Mr. Brockman about this dispute --

11:43:30  25  this issue?

SEAN W. GUMM, CSR #13168, RPR, CRR

11:43:31  1   **A.**   Oh, yes.

11:43:31  2   **Q.**   Did it appear to you that he had any problems

11:43:34  3   recalling the issue?

11:43:35  4   **A.**   No.

11:43:35  5   **Q.**   Who is Mr. Bautista?

11:43:38  6   **A.**   Um, I believe Mr. Bautista was the gentleman

11:43:41  7   that ran SIS.

11:43:45  8   **Q.**   I want to direct your attention to Page 144,

11:43:48  9   Line 6.  Your question starts on Line 2, and the

11:43:58  10  answer is on Line 6 by Mr. Brockman.

11:44:06  11  **A.**   Yes, I read it.

11:44:07  12  **Q.**   So what are you asking Mr. Brockman there in

11:44:11  13  that question?

11:44:11  14  **A.**   I don't recall how we got on to this, but it

11:44:18  15  came out that Mr. Brockman, despite the settlement

11:44:21  16  agreement, was still concerned that Mr. Bautista had

11:44:25  17  found another way to get on to the Reynolds DMS.

11:44:32  18          And that he was explaining to me

11:44:34  19  how he thought SIS or Mr. Bautista -- who runs SIS

11:44:39  20  -- how he accomplished that.

11:44:41  21  **Q.**   And did you know about that before Mr. Brockman

11:44:44  22  told you?

11:44:44  23  **A.**   No, I don't believe so.

11:44:46  24  **Q.**   So this was the first time you heard this?

11:44:47  25  **A.**   Well, certainly -- if I had heard about it at

11:44:51  1   all, I hadn't heard about it in this detail.

11:44:53  2   Q.   So when you asked Mr. Brockman that question,

11:44:55  3   how did Mr. Brockman respond about what Mr. Bautista

11:45:00  4   had done?

11:45:03  5   A.   Apparently, Mr. Bautista had access, or had

11:45:09  6   owned an application that went through the official,

11:45:17  7   authorized portal.   RCI is -- yes, RCI was the

11:45:26  8   portal that Reynolds made available to apps that

11:45:31  9   wanted to go through the authorized pipeline to get

11:45:35  10  into the DMS.

11:45:35  11              Apparently Mr. Bautista had done

11:45:39  12  that with one of his applications, and then somehow

11:45:44  13  was able to use that access to then sort of, I

11:45:53  14  guess, continue to do integration for other apps.

11:45:57  15  Q.   And Mr. Bautista's use of RCI to gain backdoor

11:46:02  16  access to the Reynolds and Reynolds DMS -- how did

11:46:05  17  Mr. Brockman describe that?

11:46:07  18  A.   Well, he --

11:46:08  19  Q.   In his answer.   In his answer?

11:46:11  20  A.   Yeah, well he explained that Mr. Bautista had

11:46:13  21  set up a -- like a separate subsidiary, and through

11:46:22  22  that sort of shielded -- apparently shielded the

11:46:27  23  fact that it was really SIS that was coming in

11:46:30  24  through RCI.

11:46:32  25  Q.   But what was the words Mr. Brockman used in his

11:46:34  1  answer?  I'm directing you to Line 6.

11:46:43  2  **A.**   Oh, yes.  He called it a straw entity.

11:46:46  3  **Q.**   And what I want to ask you, Mr. Abrahamsen, did

11:46:48  4  you suggest that term to Mr. Brockman?

11:46:50  5  **A.**   No, I don't use that term.

11:46:52  6  **Q.**   And then, the overall situation of what

11:46:55  7  Mr. Bautista did in gaining backdoor access to the

11:46:59  8  Reynolds and Reynolds DMS, I want to direct your

11:47:03  9  attention to Line 13.  Did Mr. Brockman give you his

11:47:06  10  opinion of what Mr. Bautista had done?

11:47:08  11  **A.**   Yeah, we were talking about that one paragraph

11:47:10  12  in the settlement agreement.  And he said either the

11:47:15  13  lawyers had missed the point when they -- when they

11:47:21  14  wrote the paragraph, or Mr. Bautista was guilty of

11:47:24  15  fraud and deception.

11:47:26  16  **Q.**   And my question to you, Mr. Abrahamsen, is that

11:47:29  17  a term you suggested to Mr. Brockman?

11:47:31  18  **A.**   I would not use that term in a hearing.

11:47:34  19  **Q.**   And again, were you aware that any of this had

11:47:37  20  happened when you were taking this deposition?

11:47:38  21  **A.**   I don't believe so.

11:47:40  22  **Q.**   So you learned about it for the first time from

11:47:43  23  Mr. Brockman?

11:47:43  24  **A.**   Yes.  I -- yes.  This paragraph was all news to

11:47:47  25  me.

SEAN W. GUMM, CSR #13168, RPR, CRR

11:47:47    1  Q.   And about when did this all take place?
11:47:51    2  Keeping in mind, now, in this deposition we're
11:47:53    3  sitting there in September 2018.
11:47:56    4  A.   So I think my impression would have been that
11:48:01    5  -- well, it took place after -- we never did find
11:48:04    6  the settlement -- the date of the settlement
11:48:06    7  agreement with SIS, but it's in the document.  So it
11:48:09    8  would have been between the time Reynolds settled
11:48:13    9  with SIS, and the day of the investigational hearing
11:48:19   10  -- somewhere in between.  So...
11:48:22   11  Q.   Let me ask you to turn to two more exchanges I
11:48:26   12  want to ask you about, Page 185 of the deposition.
11:48:38   13  If you can just read that to yourself to refresh
11:48:47   14  your memory.  Specifically -- your question is
11:48:49   15  really what I'm going to ask you about, Line 14 to
11:48:52   16  16.
11:49:03   17  A.   Yes, I remember.
11:49:04   18  Q.   What is it you are asking Mr. Brockman about in
11:49:06   19  these lines?
11:49:07   20  A.   There was a reference in this document -- 4459
11:49:13   21  our number -- to something called Syscheck,
11:49:22   22  S-Y-S-C-H-E-C-K, all caps.  We were trying to
11:49:25   23  determine whether this was an entity that had been
11:49:28   24  given permission to -- beyond the Reynolds DMS.
11:49:35   25  Q.   Did Mr. Brockman give you a satisfactory answer

11:49:37    1    to your question?

11:49:38    2    **A.**   He gave a very lengthy explanation to my

11:49:41    3    question.  I did not know what Syscheck was.  I kind

11:49:46    4    of misinterpreted the document a little bit, so he

11:49:48    5    gave an answer I wasn't prepared for.  Apparently

11:49:51    6    it's a complicated software product that Reynolds

11:49:58    7    developed.  He was explaining exactly how it worked.

11:50:04    8                I didn't know computers could do

11:50:05    9    this, but he was explaining that somehow they

11:50:09   10    regulated the amount of data by different offices.

11:50:18   11    DMS has extensive -- it's in every part of the

11:50:20   12    dealership.  So his concern was at the end of the

11:50:23   13    month, the finance department would run these great

11:50:25   14    big reports and they would suck a lot of the data

11:50:28   15    capacity out of the computer.  So if a customer came

11:50:30   16    in -- it's the same DMS -- and the customer comes in

11:50:32   17    and says, "I want to buy a wiper blade," or a

11:50:36   18    customer says, "Okay.  Yes, I want to buy a car.

11:50:40   19    Where do I sign?"

11:50:41   20                If those functions really

11:50:43   21    face-to-face with a customer are lagging because the

11:50:45   22    finance department just at that time happens to be

11:50:49   23    printing out 100-page report, that's not a good

11:50:52   24    thing for Reynolds.  So Reynolds developed a

11:50:55   25    software mechanism where they would kind of tell the

11:50:59  1  printer not to print the 100 pages -- to hold off on

11:51:03  2  that until there was enough computer capacity

11:51:07  3  available to that all of the other parts of the

11:51:09  4  computer software program could run smoothly.

11:51:12  5  Q.   That sounds very technical.  You lost me about

11:51:17  6  five minutes ago.

11:51:19  7  A.   It -- yeah.

11:51:20  8  Q.   Did you know this before Mr. Brockman told you?

11:51:23  9  A.   No, I didn't even know computers could do that.

11:51:26  10  Q.   Did Mr. Brockman -- to the best of your

11:51:28  11  recollection, did Mr. Brockman refer to any notes

11:51:30  12  when he was giving you this answer?

11:51:32  13  A.   Oh, no.

11:51:33  14  Q.   Did he have --

11:51:34  15  A.   He had the e-mail that you -- had the term

11:51:37  16  Syscheck in it, but we didn't know -- that's why we

11:51:40  17  asked the question, because we couldn't tell from

11:51:42  18  the document what Syscheck was.

11:51:43  19  Q.   Was there anything in front of Mr. Brockman --

11:51:46  20  notes, manuals that he was referring to when he was

11:51:50  21  giving you this lengthy, detailed, technical answer?

11:51:53  22  A.   No.

11:51:53  23  Q.   Last question or last exchange I want to ask

11:51:55  24  you about, Mr. Abrahamsen, is on Page 189.  And

11:52:03  25  Line 1, you ask Mr. Brockman about something called

SEAN W. GUMM, CSR #13168, RPR, CRR

11:52:05  1   StoneEagle.  If we can put Exhibit 4420 also up on

11:52:11  2   the screen -- actually 4420 up on the screen that

11:52:14  3   would be fine.  That's what Mr. Abrahamsen was

11:52:17  4   asking Mr. Brockman about.  That's Exhibit 4420 to

11:52:40  5   your deposition?

11:52:40  6   A.   Yeah, I don't know where -- it's tiny.  I don't

11:52:46  7   know where StoneEagle is on the exhibit, but

11:52:50  8   anyway...

11:52:50  9   Q.   My question is what is StoneEagle?

11:52:52  10  A.   StoneEagle is an integrator.

11:52:55  11  Q.   Another computer company that accesses the

11:52:58  12  Reynolds and Reynolds DMS?

11:52:58  13  A.   Yes.

11:53:00  14  Q.   Did you know about StoneEagle before you asked

11:53:03  15  Mr. Brockman what it was?

11:53:04  16  A.   Yeah, I knew -- yeah, I knew who they were.

11:53:08  17  Q.   And did -- when was the StoneEagle -- well, let

11:53:12  18  me rephrase that.  The time period you are asking

11:53:16  19  Mr. Brockman about -- I think it's on the exhibit,

11:53:18  20  what is that time period regarding StoneEagle?

11:53:21  21  A.   Yeah, if we can get the date -- yeah, good.

11:53:26  22  Thanks okay.  This is an e-mail from Mr. Schaefer to

11:53:31  23  Mr. Brockman dated November 1, 2016.

11:53:35  24  Q.   And what was your question -- what was the

11:53:39  25  purpose of your inquiry about StoneEagle?

11:53:42   1   A.   The question -- we were trying to get a better

11:53:47   2   understanding of whether a company -- an integrator

11:53:49   3   had received permission from Reynolds to be on the

11:53:52   4   DMS.

11:53:53   5   Q.   And did Mr. Brockman -- at least to your

11:53:57   6   observation -- appear to recall the incident about

11:54:03   7   StoneEagle?

11:54:04   8   A.   Yes, he knew about StoneEagle.

11:54:07   9   Q.   Did he give you a satisfactory answer?

11:54:09   10   A.   Yes.

11:54:12   11   Q.   Overall, Mr. Abrahamsen, in the two days of

11:54:21   12   depositions, were you satisfied with the answers you

11:54:23   13   got from Mr. Brockman?

11:54:25   14   A.   Yes.

11:54:25   15   Q.   Obviously technical software issues.  Did

11:54:28   16   Mr. Brockman appear to you to have any problem

11:54:31   17   handling these difficult, technical question?

11:54:34   18   A.   No.

11:54:34   19   Q.   Did he appear to you -- and some of these

11:54:38   20   questions, and we've seen the e-mails you showed him

11:54:41   21   go back to 2014 or 2012?

11:54:43   22   A.   Yes.

11:54:44   23   Q.   When you were asking him these questions, did

11:54:47   24   it appear to you that Mr. Brockman had any problem

11:54:48   25   recalling these historical facts?

11:54:50   1   **A.**   No, he had good command of the facts.

11:54:52   2   **Q.**   And did -- I mean, I asked you once about the

11:54:57   3   one question if he had notes or manuals in front of

11:54:59   4   him.  During the entire deposition for two days, did

11:55:03   5   Mr. Brockman refer to notes, manuals, books or

11:55:05   6   anything like that to answer your questions?

11:55:07   7   **A.**   No, the only documents that would be in front

11:55:10   8   of the witness would be exhibits that I showed him.

11:55:14   9   **Q.**   And during the course of this deposition, were

11:55:18  10   there things that you asked Mr. Brockman about that

11:55:21  11   you didn't know about?

11:55:22  12   **A.**   Oh, yeah.

11:55:23  13   **Q.**   And did Mr. Brockman relay those historical

11:55:25  14   facts to you to your satisfaction?

11:55:28  15   **A.**   Yes.

11:55:30  16   **Q.**   How long have you been with the FTC?

11:55:33  17   **A.**   I started in 1980.

11:55:35  18   **Q.**   So more than a few years?

11:55:38  19   **A.**   Thank you for your generous characterization.

11:55:40  20   **Q.**   How many times -- how many times have you

11:55:44  21   deposed people in FTC depositions -- how many

11:55:48  22   depositions have you done?

11:55:49  23   **A.**   I have no idea.

11:55:50  24   **Q.**   More than a hundred?

11:55:52  25   **A.**   I'm not sure it's more than 100, but I've been

| | |
|---|---|
| 11:55:56 | 1 |
| 11:55:59 | 2 |
| 11:56:02 | 3 |
| 11:56:03 | 4 |
| 11:56:06 | 5 |
| 11:56:08 | 6 |
| 11:56:11 | 7 |
| 11:56:15 | 8 |
| 11:56:19 | 9 |

1   doing them -- you know, I've been in this position

2   I'm in now for about 35 years.  So it's normal

3   course of our practice.

4   Q.   Well, I want you to sit there right now,

5   Mr. Abrahamsen, and recall the deposition you did on

6   Mr. Brockman and compare it in your mind to all of

7   the other people that you have deposed.  In your

8   opinion, how would you rank Mr. Brockman compared to

9   those other deponents?

10   A.   Yeah, he was a good witness.  He was

11   forthcoming.  Sometimes witnesses just aren't.  I

12   mean, for whatever reason they just -- they're just

13   sort of a dud, but he was informative.

14   Q.   Can I use the word evasive?

15   A.   Well, that's a different issue.  I mean, that's

16   -- now you are going into somebody's intent.  We

17   never know whether they're saying, "I don't

18   remember," because they don't remember or they're

19   being evasive.  So that's --

20   Q.   I'm sorry, I didn't mean to cut you off.

21   A.   I'm done.

22   Q.   My question is was Mr. Brockman evasive?

23   A.   I didn't think he was.

24           MR. COREY SMITH:  Thank you.  No

25   further questions, Your Honor.

| | | |
|---|---|---|
| 11:56:57 | 1 | THE COURT:  Okay.  Cross? |
| 11:56:57 | 2 | <u>CROSS-EXAMINATION</u> |
| 11:56:57 | 3 | BY MS. BLEUSTEIN: |
| 11:57:06 | 4 | Q.   Good morning, Mr. Abrahamsen. |
| 11:57:08 | 5 | A.   Good morning. |
| 11:57:09 | 6 | Q.   Now, you are not a medical doctor? |
| 11:57:11 | 7 | A.   No, that's correct. |
| 11:57:12 | 8 | Q.   In fact, you are a lawyer? |
| 11:57:15 | 9 | A.   That's also correct. |
| 11:57:16 | 10 | Q.   So you don't have any medical training in |
| 11:57:18 | 11 | diagnosing cognitive issues? |
| 11:57:20 | 12 | A.   No. |
| 11:57:20 | 13 | Q.   Or in recognizing the symptoms of Alzheimer's |
| 11:57:23 | 14 | disease? |
| 11:57:24 | 15 | A.   No. |
| 11:57:24 | 16 | Q.   Parkinson's disease? |
| 11:57:25 | 17 | A.   No. |
| 11:57:26 | 18 | Q.   Or dementia? |
| 11:57:27 | 19 | A.   No. |
| 11:57:27 | 20 | Q.   During your deposition of Mr. Brockman, you |
| 11:57:33 | 21 | asked him about topics related to UCS and Reynolds? |
| 11:57:36 | 22 | A.   Yes. |
| 11:57:37 | 23 | Q.   UCS, the company that he founded and built from |
| 11:57:42 | 24 | the ground up; right? |
| 11:57:43 | 25 | A.   Yes. |

SEAN W. GUMM, CSR #13168, RPR, CRR

11:57:44   1    Q.   The company that he ran for decades?

11:57:45   2    A.   Right.

11:57:47   3    Q.   To you, did Mr. Brockman seem passionate about

11:57:50   4    the company?

11:57:50   5    A.   I think that's a fair characterization.

11:57:53   6    Q.   Um, so you deposed Mr. Brockman -- or I believe

11:57:56   7    you referred to it as an investigational hearing?

11:57:58   8    A.   You are correct.

11:57:59   9    Q.   Yeah.  So that was September 18th and 19th of

11:58:03   10   2019?

11:58:05   11   A.   Correct.

11:58:05   12   Q.   But the deposition didn't last the entire day

11:58:09   13   on either of those days; did it?

11:58:11   14   A.   Correct.

11:58:11   15   Q.   It was about four hours the first day?

11:58:13   16   A.   I think my recollection was they went about

11:58:16   17   9:00 to 1:00.

11:58:17   18   Q.   Okay.  Okay.  When you met Mr. Brockman during

11:58:21   19   the deposition in 2019, did he seem physically fit

11:58:24   20   to you?

11:58:25   21   A.   He was -- physically -- I would characterize a

11:58:30   22   little frail.  When he walked, I remember a little

11:58:33   23   stooped over.

11:58:35   24   Q.   Did he need assistance to stand up or sit down?

11:58:38   25   A.   No.

11:58:39    1   Q.    Okay.  And did he need any assistance walking

11:58:42    2   in and out of the room?

11:58:43    3   A.    No, and he didn't have a cane or anything like

11:58:46    4   that.

11:58:46    5   Q.    Okay.  Okay.  Now, throughout your deposition,

11:58:48    6   he was providing you with details of Reynolds's

11:58:52    7   history; is that right?

11:58:53    8   A.    Among other topics we touched on.

11:58:55    9   Q.    Okay.  And you testified that he was

11:58:57   10   forthcoming with his answers?

11:58:59   11   A.    Yeah, I would say so.

11:59:01   12   Q.    He wasn't feigning memory impairment at any

11:59:05   13   point during the deposition?

11:59:05   14   A.    I don't believe so.

11:59:07   15   Q.    And he knew you were a lawyer for the

11:59:09   16   government?

11:59:09   17   A.    Oh, yeah.

11:59:13   18   Q.    You never interacted with Mr. Brockman before

11:59:15   19   the deposition?

11:59:16   20   A.    Correct.

11:59:16   21   Q.    And you said the deposition was September of

11:59:19   22   2019?

11:59:20   23   A.    Correct.

11:59:21   24   Q.    So that's over two years ago now; right?

11:59:23   25   A.    Right.

SEAN W. GUMM, CSR #13168, RPR, CRR

11:59:25  1  Q.   And you haven't seen Mr. Brockman in person
11:59:27  2  since then?
11:59:28  3  A.   Correct.
11:59:29  4  Q.   And also, just to be clear, you haven't
11:59:32  5  communicated with him in any way by phone, e-mail
11:59:34  6  since then?
11:59:36  7  A.   No.   I mean, to the extent any communications
11:59:41  8  would be through lawyers.
11:59:42  9  Q.   Lawyers.   So other than what you can see by
11:59:45  10  looking at Mr. Brockman sitting here today, you have
11:59:48  11  no firsthand knowledge of his current physical
11:59:51  12  condition?
11:59:51  13  A.   Correct.
11:59:51  14  Q.   And you have no firsthand knowledge of his
11:59:54  15  current cognitive condition?
11:59:55  16  A.   Correct.
11:59:55  17  Q.   And you have no firsthand knowledge of how
11:59:58  18  Mr. Brockman has declined cognitively since 2019?
12:00:01  19  A.   I would -- I have no idea.
12:00:04  20  Q.   So you have no idea whether Mr. Brockman is
12:00:06  21  presently competent to stand trial?
12:00:08  22  A.   Oh, I have no idea.
12:00:11  23        MS. BLEUSTEIN:   No further questions.
12:00:12  24  Thank you.
12:00:12  25        THE COURT:   Thank you, ma'am.   Anything

SEAN W. GUMM, CSR #13168, RPR, CRR

12:00:14  1  further?

12:00:14  2                    MR. COREY SMITH:   No questions, Your

12:00:15  3  Honor.

12:00:15  4                    THE COURT:   Okay.   May this witness be

12:00:16  5  excused?

12:00:17  6                    MR. COREY SMITH:   Yes, Your Honor.

12:00:20  7                    THE COURT:   Thank you for your time,

12:00:21  8  sir.   You are excused.

12:00:23  9                    THE WITNESS:   Thank you for that.

12:00:26  10                    THE COURT:   Counsel, we'll take our

12:00:28  11  lunch break at this time.   If we can all be back at

12:00:31  12  one o'clock, we'll continue on into the evening.

        13  (WHEREUPON, THE PROCEEDINGS WERE RECESSED AT 12:00

        14                          P.M.)

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

SEAN W. GUMM, CSR #13168, RPR, CRR

1                   C E R T I F I C A T E

2

3

4          I hereby certify that pursuant to Title 28,

5   Section 753 United States Code, the foregoing is a

6   true and correct transcript of the stenographically

7   reported proceedings in the above matter.

8          Certified on 11/18/2021.

9

10

11          Sean Gumm, RPR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4 - 99

## $

**$400,000** [1] - 60:8

## 1

**1** [5] - 58:21, 80:3, 80:6, 88:25, 89:23
**10** [2] - 70:13, 71:10
**100** [3] - 71:14, 88:1, 91:25
**100-page** [1] - 87:23
**10:42** [1] - 45:20
**11/18/2021** [1] - 98:8
**1143** [3] - 64:21, 65:3, 76:23
**119** [2] - 73:13, 73:17
**12:00** [1] - 97:13
**12:15** [1] - 36:21
**13** [1] - 85:9
**135** [3] - 78:19, 78:22, 78:23
**14** [2] - 10:14, 86:15
**143** [3] - 80:2, 80:4, 80:5
**144** [1] - 83:8
**15** [1] - 71:15
**16** [1] - 86:16
**17(c** [1] - 37:9
**18** [9] - 1:12, 4:5, 38:4, 45:20, 54:23, 57:21, 58:5, 69:5, 71:14
**180** [1] - 51:18
**185** [1] - 86:12
**189** [1] - 88:24
**18th** [2] - 57:10, 94:9
**19** [2] - 69:22, 73:17
**1980** [1] - 91:17
**19th** [1] - 94:9
**1:00** [2] - 56:13, 94:17

## 2

**2** [3] - 65:12, 77:18, 83:9
**20** [4] - 64:15, 72:3, 72:6, 72:20
**2000** [1] - 70:5
**2010** [1] - 70:5
**2012** [5] - 66:10, 75:22, 75:25, 77:16, 90:21
**2014** [4] - 65:12, 66:9, 77:18, 90:21
**2015** [3] - 75:22, 75:25, 81:17
**2016** [1] - 89:23
**2018** [3] - 60:18, 60:19, 86:3
**2019** [8] - 53:10,

54:23, 57:21, 58:5, 94:10, 94:19, 95:22, 96:18
**2021** [3] - 1:12, 4:5, 45:20
**21** [1] - 73:17
**22** [1] - 71:15
**231,000-plus** [1] - 10:15
**28** [1] - 98:4

## 3

**304** [1] - 6:17
**32** [3] - 54:12, 54:17, 61:20
**33** [3] - 54:12, 73:11, 78:19
**34** [3] - 65:4, 76:9, 76:11
**35** [1] - 92:2
**3PA** [2] - 74:3, 74:9, 74:17
**3rd** [2] - 11:25, 12:1

## 4

**4** [1] - 1:9
**4036** [2] - 81:5, 81:7
**4043** [2] - 64:22, 77:12
**4273** [1] - 81:9
**4420** [3] - 89:1, 89:2, 89:4
**4459** [1] - 86:20
**45** [2] - 58:20, 58:21
**49** [1] - 3:5
**4:21-CR-00009-1** [1] - 1:4
**4th** [1] - 12:3

## 5

**5** [2] - 61:17, 61:19
**57** [4] - 61:14, 61:19, 64:17, 64:22
**58** [3] - 64:18, 64:21, 64:23
**59** [3] - 64:18, 64:21, 64:23

## 6

**6** [3] - 83:9, 83:10, 85:1

## 7

**7** [1] - 66:19
**753** [1] - 98:5

## 8

**8:49** [1] - 4:5

## 9

**93** [1] - 3:7
**94** [3] - 66:16, 66:17, 66:23
**98** [2] - 70:13, 71:10
**99** [2] - 66:16, 69:5
**9:00** [2] - 56:13, 94:17

## A

**A-B-R-A-H-A-M-S-E-N** [1] - 49:19
**A.M** [2] - 4:5, 45:20
**able** [8] - 4:13, 22:25, 37:21, 40:10, 71:24, 72:3, 82:7, 84:13
**Abrahamsen** [14] - 48:6, 48:21, 49:18, 49:20, 55:11, 67:2, 71:9, 85:3, 85:16, 88:24, 89:3, 90:11, 92:5, 93:4
**ABRAHAMSEN** [2] - 3:4, 48:14
**absolutely** [3] - 58:2, 58:7, 67:21
**access** [11] - 45:18, 71:25, 72:20, 74:3, 74:17, 75:2, 82:19, 84:5, 84:13, 84:16, 85:7
**accesses** [1] - 89:11
**accessing** [1] - 72:24
**accident** [1] - 28:16
**accommodate** [2] - 15:23, 36:1
**accommodation** [1] - 10:22
**accomplished** [1] - 83:20
**according** [2] - 63:13, 82:22
**accounts** [1] - 6:5
**accurately** [1] - 63:3
**acronym** [2] - 74:4, 79:20
**acting** [1] - 41:2
**add** [1] - 9:19
**added** [1] - 7:3
**addition** [2] - 67:4, 67:11
**additional** [4] - 24:5, 24:22, 29:19, 33:14
**address** [3] - 6:2, 14:24, 27:19

**addressing** [1] - 49:5
**admitted** [1] - 54:12
**ADP** [5] - 69:22, 69:23, 69:24, 70:2, 70:11
**advance** [1] - 10:11
**advice** [2] - 37:9, 41:6
**advised** [1] - 15:19
**affect** [1] - 42:22
**affidavit** [1] - 20:10
**afternoon** [1] - 56:14
**age** [1] - 68:3
**agents** [3] - 6:24, 7:1, 62:9
**ago** [5] - 52:8, 60:18, 60:19, 88:6, 95:24
**agreed** [2] - 52:2, 69:16
**agreement** [21] - 24:21, 52:2, 52:4, 69:13, 78:7, 80:9, 80:12, 80:25, 81:2, 81:5, 81:8, 81:10, 81:12, 81:13, 81:15, 82:15, 82:17, 83:16, 85:12, 86:7
**agreement's** [1] - 81:16
**agreements** [3] - 69:18, 69:19, 80:13
**ahead** [1] - 4:25
**Alex** [1] - 54:25
**allegedly** [1] - 40:15
**allow** [2] - 39:13, 62:6
**allowing** [1] - 39:14
**Alzheimer's** [1] - 93:13
**AM** [1] - 1:9
**Amendment** [12] - 37:13, 38:16, 39:14, 40:7, 40:19, 41:21, 43:10, 44:20, 46:14, 47:7, 47:11, 47:15
**amount** [2] - 60:16, 87:10
**analysis** [1] - 5:14
**Anenen** [1] - 65:14, 66:4, 66:6, 66:8, 67:5, 71:24, 76:22, 77:6, 77:7, 78:10, 78:13
**announcement** [1] - 69:11
**Ansaldo** [1] - 54:25
**answer** [41] - 14:23, 16:24, 21:2, 22:22, 29:7, 29:8, 37:3, 38:10, 59:11, 61:16, 61:18, 61:22, 62:2, 62:3, 62:16, 63:6, 64:17, 66:7, 66:20,

**69:6, 69:22, 70:6, 70:15, 70:22, 70:23, 71:14, 80:7, 83:10, 84:19, 85:1, 86:25, 87:5, 88:12, 88:21, 90:9, 91:6
**answering** [1] - 76:4
**answers** [6] - 29:5, 29:6, 42:4, 66:3, 90:12, 95:10
**anti** [2] - 50:3, 52:3
**anti-trust** [2] - 50:3, 52:3
**anticipation** [1] - 76:21
**anxious** [1] - 72:18
**anyway** [4] - 35:3, 56:4, 73:23, 79:4
**anyway..** [1] - 89:8
**apart** [1] - 19:24
**apologies** [1] - 66:17
**apologize** [1] - 6:4
**appear** [19] - 17:11, 17:12, 57:9, 61:7, 63:18, 65:25, 66:3, 66:12, 68:17, 70:10, 75:25, 78:4, 78:12, 78:15, 83:2, 90:6, 90:16, 90:19, 90:24
**appearance** [1] - 40:9
**APPEARANCES** [1] - 1:14
**appearing** [1] - 20:7
**Appearing** [1] - 2:9
**application** [5] - 72:2, 74:11, 74:15, 81:24, 84:6
**applications** [5] - 50:25, 71:25, 72:25, 82:7, 84:12
**appreciate** [2] - 20:25, 26:24
**approach** [2] - 19:7, 51:15
**apps** [6] - 51:2, 51:7, 72:12, 82:6, 84:8, 84:14
**argue** [1] - 18:23
**argument** [4] - 18:16, 19:25, 39:6
**arise** [1] - 59:14
**arises** [1] - 27:9
**arranging** [1] - 37:7
**article** [1] - 5:11
**aside** [1] - 31:16
**assert** [2] - 37:12, 47:11
**assertion** [1] - 38:15
**assigned** [1] - 50:5
**assignments** [1] -

13:16
**assistance** [2] - 94:24, 95:1
**associated** [2] - 6:24, 22:10
**assuming** [1] - 21:24
**assurance** [1] - 9:5
**AT** [1] - 97:13
**attached** [1] - 81:5
**attention** [5] - 11:4, 54:11, 62:17, 83:8, 85:9
**attitude** [1] - 51:13
**Attorney** [10] - 1:19, 1:21, 1:22, 1:24, 2:1, 2:3, 2:4, 2:6, 2:8, 2:10
**attorney** [5] - 11:24, 43:19, 48:21, 49:25, 50:2
**attorney-client** [1] - 11:24
**attorneys** [10] - 56:7, 56:9, 56:18, 57:4, 57:5, 57:9, 57:10, 61:10, 63:12, 76:5
**audacity** [1] - 13:23
**audio** [1] - 45:1
**authorized** [2] - 84:7, 84:9
**available** [7] - 20:15, 21:19, 38:5, 38:6, 84:8, 88:3
**aware** [5] - 11:16, 12:5, 12:6, 37:5, 85:19

# B

**backdoor** [2] - 84:15, 85:7
**background** [4] - 60:14, 68:14, 80:18, 80:19
**backing** [1] - 38:16
**backstory** [2] - 11:12, 11:15
**backup** [1] - 34:21
**bad** [1] - 19:22
**ballpark** [1] - 55:14
**band** [1] - 49:10
**bar** [1] - 41:7
**Barris** [30] - 6:11, 6:23, 7:15, 8:2, 8:25, 11:20, 11:23, 12:11, 12:16, 12:18, 12:20, 12:24, 14:14, 14:25, 18:1, 20:6, 22:7, 27:14, 29:15, 32:5, 32:7, 32:10, 32:13,

32:20, 32:22, 33:1, 33:4, 33:7, 35:7, 35:14
**Barris's** [7] - 7:24, 8:19, 11:22, 27:4, 27:13, 27:16, 36:4
**based** [5] - 23:3, 44:16, 46:7, 47:19, 70:9
**basic** [1] - 37:10
**basis** [1] - 24:7
**basketball** [4] - 67:25, 68:2, 68:19, 68:20
**Bates** [1] - 15:22
**Bautista** [11] - 83:5, 83:6, 83:16, 83:19, 84:3, 84:5, 84:11, 84:20, 85:7, 85:10, 85:14
**Bautista's** [1] - 84:15
**BCC** [1] - 27:17
**bears** [1] - 8:24
**became** [1] - 60:15
**become** [2] - 47:1, 81:2
**beginning** [4] - 38:9, 73:21, 73:23, 73:25
**begins** [1] - 80:7
**behalf** [1] - 5:7
**behind** [3] - 9:3, 16:14, 18:24
**Bellows** [1] - 46:24
**below** [2] - 67:8, 67:14
**bench** [1] - 38:19
**best** [6] - 42:24, 43:12, 56:5, 70:5, 71:8, 88:10
**better** [3] - 65:12, 78:6, 90:1
**between** [47] - 6:11, 11:19, 12:10, 12:14, 12:23, 12:24, 19:15, 22:7, 27:14, 30:9, 31:10, 32:4, 32:7, 32:10, 32:12, 32:15, 32:20, 32:22, 33:7, 39:23, 42:5, 51:10, 52:4, 58:18, 63:23, 64:9, 67:5, 67:7, 67:12, 67:13, 69:10, 69:19, 75:21, 77:6, 77:9, 77:20, 78:5, 79:2, 80:9, 80:14, 80:15, 80:25, 81:3, 81:16, 81:20, 86:8, 86:10
**beyond** [3] - 37:10, 76:7, 86:24
**bias** [1] - 8:24
**bicycle** [1] - 13:23

**big** [1] - 87:14
**bigger** [1] - 76:13
**binder** [1] - 54:13
**bit** [5] - 25:22, 44:12, 59:8, 67:24, 87:4
**blade** [1] - 87:17
**blanket** [2] - 39:12, 39:14
**Bleustein** [3] - 3:7, 5:3, 5:7
**BLEUSTEIN** [6] - 1:25, 5:6, 55:6, 57:24, 93:3, 96:23
**BLOCK** [1] - 2:5
**blurry** [1] - 65:9
**board** [2] - 6:14, 20:6
**Bob's** [1] - 7:3
**bodies** [1] - 58:11
**books** [1] - 91:5
**BORIS** [1] - 1:18
**bottom** [1] - 80:7
**bought** [2] - 68:12, 72:9
**BOURGET** [1] - 1:18
**breach** [1] - 59:15
**breached** [1] - 59:23
**break** [1] - 97:11
**brief** [5] - 18:25, 37:19, 38:19, 44:13, 50:10
**briefly** [4] - 13:18, 50:1, 58:25, 81:19
**bring** [1] - 24:23
**bringing** [1] - 15:7
**brings** [1] - 32:16
**BROCKMAN** [1] - 1:7
**Brockman** [100] - 5:7, 46:24, 50:8, 53:4, 54:7, 56:6, 56:21, 57:3, 57:9, 57:11, 57:22, 58:4, 58:19, 59:5, 60:10, 61:3, 61:6, 63:2, 63:9, 63:14, 64:13, 65:10, 65:13, 65:22, 66:12, 67:3, 67:5, 67:8, 67:17, 67:22, 68:12, 68:13, 68:16, 68:23, 69:8, 70:10, 70:16, 70:22, 71:2, 71:10, 71:20, 71:24, 73:3, 73:15, 74:14, 74:20, 75:3, 75:4, 75:16, 75:23, 76:20, 77:6, 77:21, 78:12, 79:9, 79:12, 79:24, 82:24, 83:10, 83:12, 83:15, 83:21, 84:2, 84:3, 84:17, 84:25, 85:4, 85:9, 85:17, 85:23,

86:18, 86:25, 88:8, 88:10, 88:11, 88:19, 88:25, 89:4, 89:15, 89:19, 89:23, 90:5, 90:13, 90:16, 90:24, 91:5, 91:10, 91:13, 92:6, 92:8, 92:22, 93:20, 94:3, 94:6, 94:18, 95:18, 96:1, 96:10, 96:18, 96:20
**Brockman's** [9] - 40:9, 53:15, 54:8, 57:10, 59:11, 59:21, 61:16, 72:15, 78:10
**Brockman's's** [1] - 42:8
**Brockmans** [2] - 46:22, 46:23
**brought** [1] - 15:17
**budget** [1] - 4:10
**built** [1] - 93:23
**bulk** [4] - 10:20, 53:22, 53:24, 75:21
**Burke** [1] - 48:22
**business** [2] - 63:22, 75:24
**businessperson** [1] - 57:6
**busy** [2] - 6:6, 6:7
**buy** [2] - 87:17, 87:18
**BY** [2] - 49:15, 93:3

# C

**camera** [11] - 40:25, 41:14, 42:9, 43:1, 43:16, 44:4, 44:11, 44:21, 45:23, 46:6, 46:13
**cane** [1] - 95:3
**cannot** [3] - 41:7, 41:17, 45:5
**capacity** [2] - 87:15, 88:2
**caps** [1] - 86:22
**captured** [1] - 18:22
**car** [3] - 50:15, 50:21, 87:18
**care** [2] - 19:20, 21:4
**career** [2] - 68:19, 68:20
**cars** [1] - 50:20
**case** [24] - 6:24, 8:20, 19:5, 22:11, 37:12, 37:20, 37:23, 38:3, 38:17, 39:9, 40:2, 41:19, 44:18, 45:3, 45:23, 45:25, 46:13, 46:25, 47:5, 47:13, 48:23, 50:7, 50:16,

71:21
**caught** [2] - 12:25, 20:1
**caused** [1] - 12:11
**causes** [2] - 34:21, 43:6
**CC** [2] - 27:17, 33:17
**CDK** [36] - 50:13, 51:10, 51:12, 51:14, 51:15, 51:18, 52:24, 63:23, 65:10, 66:9, 67:10, 67:18, 69:10, 69:21, 70:1, 70:11, 70:20, 71:25, 72:3, 72:4, 72:8, 72:10, 72:14, 72:21, 74:2, 74:9, 74:14, 76:22, 77:9, 77:21, 79:5, 80:14, 81:1, 81:16
**CDK's** [1] - 74:15
**central** [1] - 7:12
**CEO** [5] - 65:10, 66:8, 67:14, 77:9, 77:21
**CEOs** [2] - 67:6, 67:12
**certainly** [5] - 8:21, 60:14, 60:16, 73:1, 83:25
**Certified** [1] - 98:8
**certify** [1] - 98:4
**cetera** [2] - 50:22, 62:13
**chain** [6] - 29:14, 32:3, 32:12, 32:20, 33:19, 75:15
**change** [1] - 51:21
**changed** [2] - 35:16, 51:18
**characterization** [2] - 91:19, 94:5
**characterize** [1] - 94:21
**characterized** [1] - 60:24
**Cherry** [2] - 12:20, 55:3
**Chevrolet** [3] - 59:16, 60:1, 61:4
**Christmas** [1] - 13:24
**CHRISTOPHER** [1] - 1:16
**Circuit** [1] - 39:17
**Circuit's** [1] - 39:12
**circumstances** [1] - 9:2
**cited** [1] - 39:9
**civil** [3] - 38:5, 52:19, 52:20
**claiming** [4] - 18:7, 23:11, 23:12, 24:11
**clarification** [1] -

26:25
**clarified** [1] - 5:19
**clarify** [2] - 26:8, 48:7
**Claus** [1] - 13:22
**clear** [13] - 5:11, 7:8, 13:25, 17:24, 23:6, 34:12, 38:17, 39:12, 45:13, 45:25, 53:19, 55:7, 96:4
**cleared** [4] - 16:18, 44:23, 45:1, 45:16
**CLERK** [1] - 58:23
**client** [4] - 11:24, 42:16, 42:22, 43:7
**client's** [1] - 42:14
**clients** [1] - 82:3
**close** [2] - 51:19, 51:24
**closed** [1] - 79:8
**cobbled** [1] - 36:5
**Code** [1] - 98:5
**cognitive** [3] - 58:14, 93:11, 96:15
**cognitively** [1] - 96:18
**Cohen** [3] - 55:2, 60:22, 61:5
**colleague** [5] - 5:3, 9:21, 54:5, 54:25, 67:9
**colleagues** [1] - 45:11
**collect** [2] - 16:21, 33:10
**collected** [8] - 12:12, 14:7, 18:11, 21:9, 26:1, 27:2, 27:7, 27:11
**collecting** [2] - 16:19, 35:1
**collection** [11] - 11:22, 16:15, 17:17, 18:3, 25:19, 25:23, 26:17, 27:10, 27:15, 29:15, 29:16
**collects** [2] - 11:18, 26:14
**COLLEEN** [1] - 1:21
**college** [3] - 67:25, 68:2, 68:20
**colluded** [2] - 52:17, 53:1
**collusion** [1] - 52:18
**combination** [1] - 42:25
**coming** [5] - 40:16, 45:5, 69:2, 70:20, 84:23
**command** [4] - 73:4, 73:6, 73:7, 91:1
**commenting** [1] - 21:2
**comments** [1] - 69:17

**Commission** [2] - 49:21, 49:24
**committed** [1] - 43:23
**common** [4] - 31:18, 31:23, 32:1, 70:20
**communicated** [3] - 65:16, 67:9, 96:5
**communication** [1] - 67:12
**communications** [11] - 23:7, 52:4, 65:19, 65:21, 67:5, 67:7, 67:13, 67:18, 78:5, 78:10, 96:7
**companies** [8] - 50:12, 51:5, 52:17, 52:25, 64:8, 77:22, 78:5, 79:3
**company** [12] - 27:5, 56:25, 59:10, 68:6, 69:24, 70:1, 73:8, 89:11, 90:2, 93:23, 94:1, 94:4
**compare** [1] - 92:6
**compared** [1] - 92:8
**compel** [10] - 9:15, 11:10, 23:14, 23:16, 24:6, 24:8, 24:25, 25:10, 38:1, 38:14
**compelled** [1] - 38:17
**COMPETENCY** [1] - 1:9
**competency** [6] - 39:24, 40:3, 40:5, 40:18, 42:19, 43:3
**competent** [1] - 96:21
**competition** [1] - 51:10
**complaining** [3] - 10:17, 13:23, 16:4
**complaint** [1] - 11:6
**complete** [1] - 10:18
**complex** [1] - 72:25
**compliance** [1] - 10:8
**complicated** [3] - 50:17, 62:5, 87:6
**complied** [4] - 11:7, 13:7, 14:3, 56:3
**computer** [3] - 2:17, 7:16, 7:19, 7:24, 7:25, 8:19, 11:22, 50:14, 74:17, 87:15, 88:2, 88:4, 89:11
**computers** [3] - 9:8, 87:8, 88:9
**concern** [11] - 7:5, 8:11, 14:16, 16:9, 18:14, 21:4, 30:23, 34:21, 40:4, 43:6, 87:12

**concerned** [4] - 6:20, 16:12, 42:21, 83:16
**concerns** [4] - 7:25, 12:5, 15:23, 41:1
**condition** [2] - 96:12, 96:15
**conduct** [4] - 53:17, 53:20, 72:16, 72:18
**conducted** [1] - 20:8
**conference** [1] - 53:12
**confine** [1] - 18:9
**Congress** [1] - 38:3
**Connecting** [1] - 5:13
**connection** [2] - 19:13, 19:15
**connects** [1] - 39:23
**consider** [1] - 72:25
**considering** [1] - 46:5
**contact** [1] - 60:4
**contained** [1] - 76:10
**context** [1] - 75:5
**continue** [4] - 25:12, 82:8, 84:14, 97:12
**contracts** [4] - 62:22, 62:25, 69:12, 77:23
**contractual** [1] - 62:18
**conversation** [1] - 79:14
**conversations** [4] - 56:16, 66:8, 66:10, 78:16
**cooperation** [1] - 23:21
**copy** [1] - 24:17
**Corey** [1] - 3:5
**COREY** [16] - 1:15, 21:16, 34:3, 35:4, 39:2, 48:5, 48:20, 49:15, 55:10, 58:3, 58:24, 65:4, 77:1, 92:24, 97:2, 97:6
**correct** [16] - 32:11, 33:9, 47:14, 47:18, 64:11, 93:7, 93:9, 94:8, 94:11, 94:14, 95:20, 95:23, 96:3, 96:13, 96:16, 98:6
**corrected** [1] - 5:16
**cost** [1] - 60:8
**Counsel** [6] - 2:8, 31:1, 34:6, 35:25, 36:6, 48:8
**counsel** [17] - 4:21, 8:17, 10:2, 12:4, 12:21, 19:7, 20:16, 37:3, 37:10, 41:3, 43:18, 44:25, 49:2, 49:4, 55:3, 55:5, 97:10
**country** [1] - 40:16

**couple** [6] - 14:8, 54:20, 58:17, 73:11, 73:14, 76:15
**coupled** [2] - 26:4, 44:17
**course** [8] - 25:17, 50:4, 53:2, 54:3, 59:20, 79:16, 91:9, 92:3
**Court** [42] - 2:13, 2:14, 5:4, 6:3, 6:9, 6:19, 9:15, 9:24, 11:13, 22:11, 22:14, 24:17, 34:7, 35:17, 37:5, 37:6, 38:1, 38:7, 38:14, 38:22, 41:3, 41:12, 44:22, 45:23, 45:25, 46:1, 46:6, 46:10, 46:12, 46:15, 46:19, 47:5, 47:7, 50:1, 50:10, 52:13, 59:3, 62:1, 72:16, 75:1, 77:20
**COURT** [80] - 1:1, 4:7, 4:18, 4:22, 4:25, 5:5, 5:18, 5:23, 6:7, 6:21, 7:7, 7:20, 8:12, 9:17, 10:1, 10:4, 13:12, 13:25, 14:15, 15:8, 16:8, 16:10, 17:18, 18:4, 19:4, 21:1, 21:18, 21:24, 22:20, 23:10, 23:16, 23:20, 23:24, 24:19, 26:3, 27:22, 29:8, 29:23, 30:4, 31:25, 32:9, 32:16, 33:21, 34:1, 34:11, 35:5, 35:18, 35:21, 36:12, 36:16, 36:19, 36:24, 37:3, 38:21, 38:24, 39:7, 41:5, 42:12, 43:25, 44:7, 44:10, 44:15, 45:12, 45:17, 45:22, 47:19, 48:3, 48:7, 48:19, 49:1, 49:8, 49:11, 55:5, 55:9, 58:1, 93:1, 96:25, 97:4, 97:7, 97:10
**court** [5] - 4:3, 15:17, 41:8, 54:7, 55:1
**Court's** [5] - 18:19, 34:4, 34:10, 38:19, 40:21
**courtroom** [5] - 42:17, 44:23, 45:13, 45:19, 48:22
**created** [1] - 26:11
**creates** [1] - 46:13
**credibility** [3] - 15:9,

17:10, 28:12
**crimes** [1] - 43:23
**criminal** [7] - 37:23, 39:16, 39:24, 40:12, 42:20, 46:7, 52:19
**CROSS** [1] - 93:2
**cross** [5] - 20:13, 26:22, 34:2, 34:5, 93:1
**Cross** [1] - 3:7
**cross-examination** [3] - 26:22, 34:2, 34:5
**CROSS-EXAMINATION** [1] - 93:2
**Cross-Examination** [1] - 3:7
**cross-examine** [1] - 20:13
**CRR** [2] - 2:13, 98:11
**CSOs** [1] - 45:5
**cull** [4] - 27:25, 30:8, 30:10, 30:25
**current** [2] - 96:11, 96:15
**custody** [1] - 31:21
**customer** [4] - 87:15, 87:16, 87:18, 87:21
**cut** [4] - 17:2, 42:3, 82:6, 92:20
**CX-4043** [1] - 76:10

# D

**D.C** [1] - 53:12
**damn** [1] - 10:23
**DANA** [2] - 3:4, 48:14
**Dana** [2] - 48:6, 49:18
**data** [11] - 25:19, 26:1, 59:10, 59:15, 59:18, 59:22, 72:5, 87:10, 87:14
**databases** [1] - 72:24
**date** [10] - 10:19, 48:10, 54:22, 57:20, 57:21, 65:11, 71:5, 81:11, 86:6, 89:21
**dated** [3] - 77:18, 81:13, 89:23
**dates** [1] - 10:12
**DAY** [1] - 1:9
**days** [9] - 42:17, 54:3, 54:4, 54:5, 63:17, 73:2, 90:11, 91:4, 94:13
**dealer** [5] - 59:20, 62:19, 62:21, 62:22, 82:6
**dealer's** [1] - 51:8
**dealers** [4] - 50:18,

51:1, 51:14, 51:16
**dealership** [4] - 50:15, 50:19, 59:18, 87:12
**dealing** [1] - 10:9
**dealt** [1] - 10:14
**decades** [1] - 94:1
**December** [3] - 11:25, 12:1, 12:3
**deception** [1] - 85:15
**decision** [1] - 28:14
**declaration** [1] - 17:3
**declarations** [1] - 14:12
**decline** [2] - 37:13, 38:13
**declined** [1] - 96:18
**deep** [1] - 59:22
**deepened** [1] - 7:3
**deeper** [1] - 59:24
**Defendant** [5] - 1:8, 1:19, 50:7, 71:17, 71:19
**defendant** [1] - 71:20
**defendants** [1] - 38:6
**Defense** [3] - 5:9, 6:13, 36:6
**definitely** [1] - 66:5
**degrees** [1] - 51:18
**deleted** [2] - 7:17, 8:23
**deletes** [1] - 7:22
**demand** [1] - 13:6
**dementia** [3] - 57:22, 58:6, 93:18
**Dementia** [1] - 5:12
**demonstrative** [1] - 5:14
**department** [2] - 87:13, 87:22
**Department** [1] - 38:3
**deponents** [1] - 92:9
**depose** [2] - 34:12, 53:3
**deposed** [4] - 26:20, 91:21, 92:7, 94:6
**deposing** [1] - 56:20
**deposition** [63] - 20:10, 20:15, 20:17, 20:19, 21:7, 21:20, 21:25, 25:17, 26:4, 26:19, 30:6, 35:5, 53:7, 53:8, 53:11, 53:17, 53:20, 54:1, 54:22, 54:24, 55:12, 55:13, 55:17, 56:7, 56:10, 56:12, 56:18, 57:3, 57:8, 57:12, 58:19, 58:21, 59:6, 60:12, 64:19, 65:2, 65:6, 65:8, 65:23,

68:23, 70:9, 73:2, 73:12, 74:23, 76:10, 77:8, 79:16, 80:3, 81:7, 85:20, 86:2, 86:12, 89:5, 91:4, 91:9, 92:5, 93:20, 94:12, 94:19, 95:5, 95:13, 95:19, 95:21
**depositions** [3] - 90:12, 91:21, 91:22
**describe** [2] - 50:1, 84:17
**described** [2] - 10:7, 75:1
**description** [1] - 50:10
**desktops** [1] - 34:19
**despite** [1] - 83:15
**detail** [1] - 84:1
**detailed** [1] - 88:21
**details** [2] - 56:16, 95:6
**determination** [1] - 41:13
**determine** [1] - 86:23
**develop** [1] - 59:18
**developed** [6] - 68:6, 74:3, 74:6, 87:7, 87:24
**diagnosed** [2] - 57:22, 58:6
**diagnosing** [1] - 93:11
**DICKERSON** [13] - 2:10, 24:14, 25:16, 26:24, 29:4, 29:11, 31:22, 32:1, 32:11, 33:9, 33:24, 36:10, 36:14
**Dickerson** [1] - 24:14
**difference** [1] - 64:8
**different** [12] - 5:8, 12:25, 22:19, 43:5, 50:19, 51:22, 54:4, 54:5, 77:14, 78:23, 87:10, 92:15
**difficult** [2] - 73:5, 90:17
**DIRECT** [1] - 49:14
**direct** [6] - 54:11, 67:12, 67:16, 82:10, 83:8, 85:8
**Direct** [1] - 3:5
**directing** [1] - 85:1
**direction** [2] - 24:2, 44:5
**directions** [1] - 20:12
**directly** [7] - 32:18, 32:22, 67:8, 74:12, 77:24, 77:25, 78:2
**directors** [1] - 11:20
**discovery** [2] - 55:18,

55:25
**discuss** [1] - 56:17
**discussed** [2] - 70:19, 79:10
**discussion** [5] - 16:3, 43:18, 43:20, 63:16, 69:10
**Disease** [1] - 5:12
**disease** [4] - 58:9, 58:12, 93:14, 93:16
**disgruntled** [1] - 59:17
**dispute** [3] - 63:19, 64:1, 82:24
**disputed** [1] - 47:1
**distinction** [1] - 62:15
**DISTRICT** [2] - 1:1, 1:2
**District** [2] - 2:14, 2:14
**division** [1] - 70:2
**DMS** [30] - 50:14, 51:3, 51:5, 51:8, 51:12, 51:19, 51:25, 59:10, 59:19, 68:7, 68:9, 71:25, 72:3, 72:11, 72:13, 72:21, 74:13, 81:23, 82:19, 83:17, 84:10, 84:16, 85:8, 86:24, 87:11, 87:16, 89:12, 90:4
**DMS's** [3] - 62:4, 69:25, 74:16
**doctor** [3] - 42:8, 46:22, 93:6
**doctors** [2] - 35:11, 36:2
**document** [42] - 9:9, 10:22, 11:1, 11:4, 11:16, 12:8, 13:7, 16:1, 16:22, 17:20, 17:21, 17:24, 18:2, 19:15, 20:8, 21:5, 21:8, 28:1, 28:4, 28:10, 28:18, 28:19, 28:21, 29:9, 29:11, 29:13, 30:7, 30:14, 31:5, 31:9, 31:16, 32:9, 32:19, 55:8, 59:7, 64:13, 76:25, 86:7, 86:20, 87:4, 88:18
**documentary** [1] - 55:18
**documents** [57] - 5:15, 10:11, 10:16, 10:21, 11:6, 11:18, 12:10, 14:19, 15:12, 15:15, 16:16, 16:20, 16:21, 18:9, 18:10, 18:20, 19:6, 19:9, 19:11, 19:12, 19:16,

19:19, 19:24, 20:3, 20:23, 21:10, 21:13, 22:10, 22:21, 23:2, 23:14, 24:5, 25:6, 26:10, 26:11, 26:14, 26:16, 27:1, 27:2, 30:16, 30:19, 30:24, 31:13, 31:17, 31:19, 32:2, 32:17, 32:21, 32:22, 34:14, 34:23, 35:2, 55:21, 55:22, 65:15, 91:7
**dog** [2] - 41:16, 42:4
**DOJ** [4] - 1:15, 1:16, 1:17, 1:18
**done** [18] - 9:6, 10:9, 12:13, 20:23, 21:4, 22:1, 22:25, 23:1, 24:1, 25:13, 33:25, 36:7, 70:14, 84:4, 84:11, 85:10, 91:22, 92:21
**door** [1] - 45:5
**doors** [1] - 45:6
**doorstep** [2] - 31:11, 31:14
**Dots** [1] - 5:13
**down** [5] - 32:12, 45:17, 70:24, 82:5, 94:24
**downloaded** [1] - 27:5
**downloads** [1] - 7:16
**Dr** [31] - 4:13, 4:20, 36:23, 36:25, 37:5, 37:6, 37:8, 38:9, 40:5, 40:12, 40:14, 40:22, 41:12, 41:20, 42:10, 43:22, 44:20, 45:24, 46:2, 46:4, 46:8, 46:14, 46:16, 46:17, 46:20, 47:4, 47:6, 47:10, 47:21, 48:10
**draw** [1] - 11:4
**dud** [1] - 92:13
**due** [1] - 14:20, 34:6
**duly** [1] - 48:16
**during** [15] - 46:13, 50:4, 53:2, 56:9, 58:4, 58:19, 65:22, 68:22, 76:4, 79:16, 91:4, 91:9, 93:20, 94:18, 95:13
**duties** [1] - 50:4
**DX-52** [1] - 5:10, 5:14
**DX-58** [1] - 5:15

**E**

**e-mail** [45] - 6:18, 7:4,

7:11, 7:18, 7:22, 7:24, 8:4, 8:5, 8:6, 8:7, 11:21, 12:14, 12:16, 12:18, 14:7, 14:9, 27:3, 27:14, 27:19, 29:14, 32:3, 32:12, 32:15, 32:20, 32:24, 33:1, 33:3, 33:4, 33:6, 33:7, 33:10, 33:12, 65:10, 65:11, 65:22, 66:1, 77:5, 77:17, 79:2, 88:15, 89:22, 96:5
**e-mailed** [1] - 27:4
**e-mails** [18] - 6:11, 6:17, 8:23, 9:7, 11:19, 12:23, 12:24, 22:7, 27:7, 27:14, 27:16, 27:18, 29:19, 32:7, 33:2, 33:11, 34:18, 90:20
**early** [2] - 14:2, 14:20
**easier** [1] - 75:12
**easy** [2] - 21:1, 27:23
**economist** [2] - 54:6, 55:1
**educated** [1] - 41:13
**efficient** [1] - 43:15
**eight** [3] - 13:7, 13:12, 51:2
**either** [3] - 24:13, 85:12, 94:13
**Elizabeth** [1] - 46:24
**embedded** [1] - 12:24
**Emmanuel** [1] - 55:4
**employed** [1] - 49:20
**employee** [2] - 7:12, 59:17
**encountered** [1] - 60:2
**end** [5] - 17:1, 25:13, 25:24, 82:21, 87:12
**engaged** [1] - 61:5
**enlarge** [2] - 76:14, 77:3
**ensure** [1] - 9:6
**entered** [3] - 80:14, 81:2, 81:15
**entering** [1] - 69:12
**entire** [3] - 56:9, 91:4, 94:12
**entitled** [4] - 5:11, 10:12, 10:19, 11:3
**entity** [3] - 79:17, 85:2, 86:23
**equipment** [1] - 62:12
**ESQ** [10] - 1:19, 1:21, 1:22, 1:24, 1:25, 2:2, 2:4, 2:5, 2:8, 2:10
**essentially** [2] - 38:16,

74:10
**established** [2] - 70:8, 75:13
**et** [2] - 50:22, 62:13
**evaluate** [1] - 23:4
**evasive** [4] - 6:25, 92:14, 92:19, 92:22
**evening** [2] - 4:10, 97:12
**events** [2] - 64:7, 75:15
**eventually** [2] - 8:14, 80:13
**evidence** [4] - 42:2, 46:5, 47:12, 52:18
**ex** [1] - 40:25
**exact** [2] - 54:22, 79:18
**exactly** [8] - 10:6, 16:9, 25:2, 25:4, 25:7, 34:8, 52:9, 87:7
**examination** [3] - 26:22, 34:2, 34:5
**EXAMINATION** [2] - 49:14, 93:2
**Examination** [2] - 3:5, 3:7
**examine** [2] - 17:14, 20:13
**example** [4] - 18:2, 27:13, 46:21, 59:16
**except** [1] - 41:16
**exception** [1] - 78:1
**exchange** [8] - 59:1, 61:23, 69:8, 70:17, 71:9, 71:18, 79:2, 88:23
**exchanges** [7] - 58:18, 73:14, 77:9, 77:13, 77:14, 77:20, 86:11
**excluded** [1] - 51:23
**excuse** [1] - 69:9
**excused** [3] - 47:21, 97:5, 97:8
**executed** [2] - 69:17, 77:23
**executive** [2] - 7:21, 34:17
**executives** [1] - 7:14
**Exhibit** [13] - 27:24, 54:12, 61:20, 64:21, 65:4, 73:11, 76:9, 76:11, 77:12, 78:19, 89:1, 89:4
**exhibit** [23] - 28:2, 54:14, 54:16, 58:20, 64:19, 64:20, 64:25, 65:1, 65:2, 65:8,

74:7, 74:8, 75:6, 76:10, 76:14, 76:16, 77:2, 77:14, 79:4, 81:6, 81:9, 89:7, 89:19
**exhibits** [3] - 65:5, 76:8, 91:8
**Exhibits** [1] - 5:9
**exist** [1] - 29:16
**existed** [3] - 29:1, 34:24, 80:1
**existence** [1] - 69:18
**expect** [3] - 7:13, 37:18, 52:1
**expedited** [1] - 24:7
**experience** [1] - 59:25
**explain** [7] - 9:2, 14:8, 59:8, 61:25, 62:1, 68:10, 77:19
**explained** [6] - 27:3, 29:18, 60:1, 61:4, 62:20, 84:20
**explaining** [4] - 59:13, 83:18, 87:7, 87:9
**explanation** [2] - 14:4, 87:2
**explicit** [1] - 52:1
**explore** [4] - 30:2, 32:17, 34:25, 41:11
**express** [1] - 6:20
**extensive** [1] - 87:11
**extensively** [1] - 67:9
**extent** [6] - 6:3, 41:19, 41:25, 53:25, 56:4, 96:7

**F**

**face** [3] - 17:8, 87:21
**face-to-face** [1] - 87:21
**fact** [6] - 34:9, 43:5, 57:13, 59:13, 84:23, 93:8
**facts** [19] - 34:5, 35:11, 46:17, 46:18, 47:3, 47:4, 47:12, 61:8, 61:11, 63:10, 63:14, 66:13, 68:18, 75:2, 76:2, 79:13, 90:25, 91:1, 91:14
**fair** [1] - 94:5
**faire** [1] - 51:13
**faith** [1] - 19:22
**familiar** [1] - 39:8
**fanciful** [2] - 40:21, 41:7
**far** [10] - 9:12, 43:10, 44:18, 63:1, 63:20, 63:22, 64:5, 64:6,

64:9, 67:7
**fashion** [1] - 16:6
**fearful** [1] - 59:14
**Federal** [2] - 49:21, 49:23
**fee** [1] - 60:17
**fees** [1] - 60:8
**feigning** [1] - 95:12
**felt** [1] - 72:21
**few** [3] - 37:15, 53:23, 91:18
**fields** [4] - 27:17, 27:18, 27:19, 33:17
**Fifth** [4] - 37:12, 38:15, 39:12, 39:13, 39:17, 40:6, 40:18, 41:21, 43:10, 44:20, 46:14, 47:7, 47:11, 47:15
**fight** [3] - 18:13, 41:16, 42:5
**figure** [15] - 8:16, 15:10, 16:18, 19:10, 20:20, 21:12, 28:5, 28:9, 28:25, 30:18, 30:20, 31:11, 34:13, 42:24, 43:11
**figuring** [1] - 39:15
**file** [8] - 7:12, 24:6, 24:8, 25:10, 25:11, 33:11, 33:13, 34:21
**filed** [2] - 38:25, 39:1
**files** [2] - 27:3, 27:7
**filter** [1] - 27:16
**final** [5] - 33:6, 33:7, 80:24, 80:25
**finance** [2] - 87:13, 87:22
**fine** [2] - 51:21, 89:3
**finished** [1] - 69:17
**fired** [1] - 68:12
**firm** [8] - 53:12, 53:14, 53:15, 53:16, 54:8, 57:14, 57:15, 57:17
**firms** [2] - 51:23, 69:16
**first** [35] - 4:17, 6:1, 12:15, 22:22, 24:9, 24:15, 24:20, 26:9, 27:23, 28:11, 30:5, 30:6, 30:12, 32:9, 34:16, 36:16, 37:6, 39:3, 39:8, 39:14, 42:7, 44:8, 54:21, 58:20, 58:21, 60:2, 60:3, 61:4, 63:18, 67:1, 73:19, 75:8, 83:24, 85:22, 94:15
**firsthand** [3] - 96:11, 96:14, 96:17

**fit** [1] - 94:19
**five** [1] - 88:6
**flights** [1] - 36:2
**flipped** [1] - 51:18
**floating** [2] - 8:18, 9:7
**focus** [1] - 44:5
**folks** [1] - 36:2
**follow** [2] - 24:2, 31:8
**following** [2] - 4:3, 46:1
**follows** [1] - 48:17
**fool** [1] - 10:23
**Ford** [1] - 62:13
**foregoing** [1] - 98:5
**forth** [2] - 26:12, 55:18
**forthcoming** [2] - 92:11, 95:10
**forward** [2] - 48:12, 82:3
**founded** [1] - 93:23
**four** [1] - 94:15
**frail** [1] - 94:22
**frame** [1] - 21:17
**Franklin** [2] - 59:16, 60:1
**fraud** [1] - 85:15
**free** [5] - 47:25, 48:9, 72:3, 72:20
**Friday** [14] - 6:16, 9:4, 9:22, 10:21, 12:7, 14:2, 14:5, 14:17, 14:21, 14:22, 16:2, 16:5, 27:21, 30:10
**front** [6] - 10:24, 54:13, 54:15, 88:19, 91:3, 91:7
**frustrated** [1] - 13:21
**FTC** [12] - 48:22, 50:2, 50:5, 52:10, 55:19, 56:1, 60:4, 60:5, 63:2, 72:23, 91:16, 91:21
**full** [2] - 17:13, 50:19
**fully** [2] - 11:7, 13:7
**function** [1] - 82:8
**functions** [1] - 87:20

**G**

**gain** [1] - 84:15
**gaining** [1] - 85:7
**gardener** [1] - 67:10
**General** [1] - 62:13
**general** [4] - 12:4, 12:20, 55:3, 56:16
**generally** [1] - 55:15
**generous** [1] - 91:19
**gentleman** [4] - 14:9, 21:7, 35:7, 83:6
**gentlemen** [1] - 12:15

**GEORGE** [1] - 1:3
**girl** [1] - 13:22
**given** [9] - 10:12, 12:7, 13:13, 16:1, 20:12, 35:16, 46:12, 82:5, 86:24
**glad** [1] - 75:10
**gonna** [1] - 8:9
**gotta** [3] - 26:20, 35:22, 45:1
**government** [2] - 13:16, 95:16
**Government** [35] - 3:4, 5:16, 8:9, 10:7, 10:10, 10:15, 10:17, 13:4, 13:13, 14:23, 15:21, 16:11, 16:24, 17:4, 17:7, 17:8, 29:3, 29:6, 32:17, 35:16, 36:23, 37:21, 37:23, 38:8, 38:10, 38:11, 41:17, 41:19, 41:25, 44:7, 46:11, 48:5, 48:15, 54:12, 76:11
**Government's** [9] - 5:25, 6:12, 8:9, 14:16, 15:23, 16:17, 37:24, 41:23, 48:9
**Government..** [1] - 18:3
**grant** [2] - 62:19, 62:23
**granted** [1] - 68:8
**great** [9] - 4:18, 5:18, 14:18, 14:19, 18:16, 33:21, 73:7, 76:15, 87:13
**ground** [1] - 93:24
**guard** [1] - 45:6
**guess** [4] - 14:15, 15:16, 43:25, 84:14
**guilty** [1] - 85:14
**Gumm** [2] - 2:13, 98:11
**guys** [7] - 14:2, 18:12, 18:22, 24:8, 30:20, 31:8, 35:6

**H**

**hand** [9] - 6:19, 32:7, 32:8, 38:20, 41:11, 44:2, 48:13, 54:14, 76:11
**handed** [1] - 22:3
**handle** [1] - 43:12
**handling** [1] - 90:17
**hands** [1] - 52:2
**HANKS** [1] - 1:3

**happy** [10] - 4:16, 15:20, 21:15, 22:1, 24:17, 25:18, 25:20, 39:5, 41:10, 44:2
**hard** [1] - 11:13
**head** [1] - 56:25
**hear** [4] - 16:8, 16:10, 24:6, 42:4
**heard** [10] - 8:17, 34:15, 34:16, 37:2, 44:18, 46:12, 60:13, 83:24, 83:25, 84:1
**hearing** [16] - 15:14, 25:12, 39:24, 42:19, 43:3, 44:21, 45:23, 46:6, 46:13, 48:9, 53:9, 65:5, 78:20, 85:18, 86:9, 94:7
**HEARING** [1] - 1:9
**hearings** [2] - 10:13, 53:5
**heartburn** [1] - 43:6
**held** [9] - 4:3, 19:3, 22:21, 40:15, 44:14, 45:23, 53:11, 68:1, 70:1
**hello** [1] - 48:12
**help** [4] - 9:1, 26:2, 41:12, 63:14
**hereby** [1] - 98:4
**hide** [3] - 10:25, 18:2, 18:5
**high** [2] - 51:1, 68:19
**highly** [1] - 68:13
**himself** [2] - 76:21, 77:9
**historical** [4] - 66:13, 76:1, 90:25, 91:13
**history** [7] - 63:22, 67:24, 68:5, 68:17, 68:24, 73:7, 95:7
**hmm** [1] - 53:2
**hold** [4] - 8:3, 35:23, 40:16, 88:1
**holder** [1] - 74:13
**holding** [1] - 44:11
**holds** [1] - 70:2
**honestly** [1] - 21:3
**Honor** [33] - 4:24, 5:2, 5:7, 6:8, 7:9, 8:4, 10:5, 11:19, 14:6, 14:25, 16:7, 22:2, 22:13, 23:15, 25:16, 29:25, 36:10, 36:22, 37:1, 37:4, 37:19, 39:3, 40:20, 41:15, 47:17, 48:2, 48:21, 49:13, 55:6, 65:5, 92:25, 97:3, 97:6
**HONORABLE** [1] - 1:3

**hoping** [1] - 13:20
**hospital** [1] - 57:16
**hostile** [1] - 82:21
**hours** [1] - 94:15
**housekeeping** [1] - 5:8
**Houston** [1] - 1:11
**hundred** [1] - 91:24

**I**

**idea** [8] - 25:7, 30:12, 30:19, 34:24, 91:23, 96:19, 96:20, 96:22
**identification** [2] - 5:9, 5:13
**identified** [3] - 15:16, 15:17, 16:14
**identifying** [2] - 25:5, 37:10
**II** [1] - 46:24
**imaginary** [3] - 39:19, 39:21, 46:9
**imagine** [1] - 13:20
**immunity** [5] - 37:25, 38:16, 41:17, 43:21, 43:22
**immunize** [1] - 42:3
**immunized** [3] - 38:9, 38:18, 41:18
**impairment** [2] - 58:15, 95:12
**impasse** [1] - 13:19
**implicate** [5] - 40:6, 41:21, 43:9, 43:10, 44:20
**implicates** [2] - 39:16, 46:14
**implicating** [2] - 40:11, 40:18
**implication** [2] - 18:24, 35:9
**important** [4] - 44:12, 77:21, 79:5, 80:11
**importantly** [1] - 77:19
**impression** [1] - 86:4
**impugning** [1] - 15:9, 18:4, 28:12
**incident** [10] - 60:11, 60:13, 60:19, 61:4, 63:15, 69:2, 71:1, 71:2, 76:6, 90:6
**included** [5] - 6:17, 7:5, 9:3, 14:5
**including** [1] - 7:14
**incriminate** [1] - 42:10
**INDEX** [1] - 3:1
**indicate** [2] - 12:14, 31:19
**indicated** [4] - 12:15,

12:17, 12:19, 35:14
**indicates** [1] - 29:16
**individuals** [2] - 26:5, 26:7
**industry** [5] - 50:24, 51:6, 73:9, 80:1, 80:20
**infer** [2] - 52:3, 52:5
**inference** [1] - 41:22
**information** [3] - 24:22, 37:10, 46:12
**informative** [1] - 92:13
**initial** [6] - 27:25, 28:1, 30:8, 30:10, 30:23, 30:25
**innovative** [1] - 51:1
**inquire** [1] - 35:15
**inquiry** [3] - 8:7, 79:11, 89:25
**insinuations** [1] - 42:1
**insofar** [1] - 41:16
**instance** [1] - 12:15
**instead** [5] - 13:24, 24:25, 33:16, 57:17, 82:5
**integrate** [1] - 74:15
**integrated** [1] - 51:4
**integrating** [1] - 82:4
**integration** [5] - 64:9, 81:23, 82:2, 82:8, 84:14
**Integration** [1] - 79:19
**integrator** [12] - 51:7, 62:19, 72:5, 72:12, 72:13, 74:12, 74:16, 79:22, 81:22, 82:22, 89:10, 90:2
**integrators** [8] - 51:6, 51:12, 51:16, 62:7, 72:9, 72:10, 72:24, 79:25
**intending** [2] - 8:17, 18:2
**intent** [3] - 8:21, 37:9, 92:16
**intentional** [1] - 18:14
**intentionally** [1] - 30:2
**interacted** [1] - 95:18
**interaction** [1] - 70:19
**interactions** [1] - 65:14
**interest** [3] - 25:21, 67:19, 80:16
**interested** [3] - 52:21, 64:7, 67:6
**interfere** [1] - 36:8
**internet** [1] - 59:19
**interrupt** [2] - 62:10, 62:14
**interview** [1] - 6:23

**inventoried** [1] - 50:20
**inventory** [1] - 50:21
**investigating** [3] - 52:6, 53:1, 69:14
**investigation** [24] - 48:24, 48:25, 51:17, 52:7, 52:10, 52:15, 52:22, 53:3, 53:7, 63:1, 63:2, 63:4, 63:20, 63:21, 63:24, 64:4, 64:5, 67:20, 72:23, 77:24, 78:3, 78:8, 79:17
**investigational** [3] - 53:5, 86:9, 94:7
**investigative** [1] - 53:8
**involve** [1] - 22:11
**involved** [3] - 50:7, 60:6, 60:15
**involving** [4] - 4:20, 50:6, 59:16, 76:7
**IRINA** [1] - 1:25
**Irina** [2] - 5:3, 5:7
**IRS** [1] - 6:24
**issue** [33] - 4:20, 4:23, 5:3, 5:25, 6:10, 15:10, 15:24, 16:15, 17:22, 20:2, 26:2, 27:9, 28:10, 28:11, 28:17, 29:7, 33:15, 35:3, 40:3, 40:4, 43:1, 51:20, 57:19, 64:10, 72:23, 74:22, 79:6, 81:20, 82:25, 83:3, 92:15
**issue's** [1] - 30:9
**issues** [13] - 6:2, 17:14, 40:13, 43:9, 46:25, 57:11, 57:14, 57:18, 63:3, 73:5, 73:7, 90:15, 93:11
**it'll** [1] - 39:1
**items** [1] - 75:2
**itself** [1] - 7:4

**J**

**Jackson** [19] - 6:13, 6:23, 7:15, 8:25, 11:20, 12:11, 12:23, 22:7, 27:15, 29:14, 32:5, 32:8, 32:10, 32:13, 32:20, 32:23, 33:1, 33:4, 33:8
**Jackson's** [2] - 27:18, 33:17
**JAMES** [1] - 1:22
**JASON** [1] - 1:19
**Jim** [1] - 11:20

**John** [1] - 55:4
**JOHNSON** [16] - 2:8, 5:21, 5:24, 10:3, 10:5, 13:14, 14:6, 15:2, 15:4, 15:6, 15:19, 17:2, 17:23, 22:13, 35:13, 36:11
**Johnson** [4] - 5:21, 12:16, 12:18, 29:18
**joint** [1] - 69:11
**JR** [1] - 1:3
**judge** [11] - 4:19, 15:2, 15:19, 17:2, 24:14, 26:24, 29:4, 31:22, 35:13, 41:10, 42:7
**JUDGE** [1] - 1:3
**Judge** [5] - 13:6, 17:23, 25:15, 36:14, 62:1
**judgment** [1] - 28:14
**juggle** [1] - 4:14
**juggling** [2] - 4:13, 35:25
**July** [2] - 65:12, 77:18
**jumping** [1] - 31:24
**jury** [2] - 41:24, 61:25
**Justice** [1] - 38:4

**K**

**Kappler** [1] - 48:22
**KATHRYN** [1] - 1:24
**keep** [1] - 31:23
**keeping** [1] - 86:2
**KENEALLY** [1] - 1:24
**kept** [1] - 68:13
**kerfuffle** [2] - 22:17, 23:8
**kind** [8] - 7:11, 10:23, 13:19, 34:16, 37:17, 87:3, 87:25
**knowledge** [7] - 31:3, 35:2, 56:5, 75:7, 96:11, 96:14, 96:17
**known** [2] - 46:23, 74:5
**knows** [1] - 38:8

**L**

**labeled** [1] - 15:22
**lagging** [1] - 87:21
**laid** [1] - 62:24
**laissez** [1] - 51:13
**laissez-faire** [1] - 51:13
**Langston** [1] - 27:3
**LANGSTON** [35] - 1:17, 4:16, 4:19, 6:8, 6:22, 7:9, 7:21, 8:14,

9:20, 14:24, 15:3, 15:5, 15:14, 16:7, 16:9, 20:25, 21:23, 22:2, 22:18, 23:6, 23:15, 23:19, 23:23, 25:15, 29:21, 29:24, 35:20, 36:18, 36:22, 39:5, 41:10, 42:7, 43:13, 44:2, 44:9
**language** [2] - 10:24, 80:12
**laptop** [3] - 27:6, 27:8, 29:17
**laptops** [1] - 34:18
**large** [1] - 69:24
**last** [9] - 10:16, 11:25, 27:21, 49:17, 49:18, 71:13, 88:23, 94:12
**late** [2] - 4:8, 36:20
**latest** [4] - 32:2, 32:14, 32:19, 33:12
**latest-in-time** [1] - 32:14
**law** [8] - 38:17, 39:9, 53:12, 53:14, 53:15, 54:8, 57:14, 57:15
**Law** [10] - 1:20, 1:21, 1:23, 1:24, 2:1, 2:3, 2:4, 2:6, 2:9, 2:10
**laws** [1] - 52:3
**lawsuit** [2] - 81:24, 82:1
**lawyer** [7] - 37:15, 53:22, 53:23, 54:4, 60:2, 61:5, 93:8, 95:15
**lawyers** [8] - 13:16, 22:8, 28:7, 53:22, 54:8, 85:13, 96:8, 96:9
**lax** [1] - 51:15
**layer** [1] - 51:5
**leading** [1] - 57:25
**learned** [3] - 74:8, 75:8, 85:22
**learning** [2] - 74:7, 75:9
**least** [4] - 63:12, 65:18, 82:11, 90:5
**leave** [1] - 47:25
**LEE** [1] - 1:17
**left** [1] - 76:11
**left-hand** [1] - 76:11
**legal** [2] - 60:8, 60:17
**length** [2] - 63:21, 64:3
**lengthy** [5] - 66:20, 68:4, 77:22, 87:2, 88:21
**letter** [2] - 25:1, 25:4

**letting** [1] - 51:16
**level** [1] - 67:14
**Lewy** [1] - 58:11
**liability** [1] - 59:14
**light** [1] - 25:22
**limited** [2] - 11:24, 29:24
**line** [7] - 61:15, 66:18, 73:16, 73:17, 78:21, 78:24, 80:6
**Line** [19] - 58:21, 61:17, 61:19, 66:19, 69:5, 70:13, 71:10, 71:14, 71:15, 80:3, 80:6, 83:9, 83:10, 85:1, 85:9, 86:15, 88:25
**lines** [3] - 22:3, 63:7, 86:19
**list** [1] - 41:11
**listening** [1] - 61:6
**litigants** [1] - 38:5
**litigation** [1] - 8:3
**live** [1] - 20:7
**Locke** [1] - 4:21
**log** [11] - 9:9, 22:4, 22:15, 23:1, 23:4, 23:13, 23:17, 24:10, 24:12, 24:16, 25:3
**logic** [1] - 72:4
**logistics** [2] - 56:17, 57:8
**look** [8] - 8:15, 8:22, 19:1, 19:5, 22:5, 22:12, 25:6, 74:23
**looked** [2] - 33:18, 59:2
**looking** [7] - 19:11, 31:16, 33:6, 42:25, 46:10, 52:4, 96:10
**looks** [1] - 63:7
**LOONAM** [8] - 1:22, 4:23, 5:2, 39:4, 41:15, 45:15, 76:24, 77:3
**Lord** [1] - 4:21
**lost** [1] - 88:5
**lunch** [2] - 36:20, 97:11
**luxury** [1] - 25:9

## M

**ma'am** [1] - 96:25
**MACDOUGALL** [10] - 2:2, 37:1, 37:4, 38:22, 39:1, 40:20, 41:6, 45:10, 47:17, 48:2
**MacDougall** [8] - 37:5,

42:13, 44:10, 44:16, 47:9, 47:14, 47:24, 48:8
**machines** [1] - 64:14
**MAGNANI** [1] - 1:16
**mail** [45] - 6:18, 7:4, 7:11, 7:18, 7:22, 7:24, 8:4, 8:5, 8:6, 8:7, 11:21, 12:14, 12:16, 12:18, 14:7, 14:9, 27:3, 27:14, 27:19, 29:14, 32:3, 32:12, 32:15, 32:20, 32:24, 33:1, 33:3, 33:4, 33:6, 33:7, 33:10, 33:12, 65:10, 65:11, 65:22, 66:1, 77:5, 77:17, 79:2, 88:15, 89:22, 96:5
**mailed** [1] - 27:4
**mails** [18] - 6:11, 6:17, 8:23, 9:7, 11:19, 12:23, 12:24, 22:7, 27:7, 27:14, 27:16, 27:18, 29:19, 32:7, 33:2, 33:11, 34:18, 90:20
**main** [2] - 30:23, 52:16
**mainframe** [1] - 34:20
**manager's** [1] - 45:3
**manner** [1] - 11:8
**manually** [1] - 33:18
**manuals** [3] - 88:20, 91:3, 91:5
**manufacture** [1] - 62:12
**mark** [1] - 37:4
**MARK** [1] - 2:2
**marked** [4] - 5:9, 5:13, 5:15, 55:13
**market** [2] - 70:20, 79:6
**mask** [2] - 49:4, 49:5
**matter** [11] - 35:13, 37:16, 46:18, 50:6, 50:11, 64:5, 73:20, 73:24, 74:19, 78:25, 98:7
**matters** [1] - 50:3
**mean** [44] - 14:2, 14:13, 14:22, 16:25, 17:7, 17:9, 18:12, 18:15, 19:13, 20:17, 21:1, 21:19, 21:20, 22:20, 22:22, 23:1, 23:17, 23:25, 25:3, 26:7, 26:8, 26:11, 26:20, 30:11, 30:22, 31:1, 31:4, 34:2, 34:12, 35:21, 39:8,

39:11, 39:25, 40:8, 61:1, 64:8, 70:6, 70:7, 81:16, 91:2, 92:12, 92:15, 92:20, 96:7
**means** [1] - 75:11
**meant** [1] - 55:25
**mechanical** [1] - 2:16
**mechanism** [1] - 87:25
**medical** [5] - 57:11, 57:14, 57:18, 93:6, 93:10
**meet** [2] - 13:17, 41:7
**meeting** [2] - 51:24, 52:5
**member** [1] - 20:6
**members** [1] - 54:14
**memory** [5] - 54:10, 59:1, 66:24, 70:24, 71:3, 71:11, 81:14, 86:14, 95:12
**mention** [1] - 64:20
**mentioned** [3] - 12:21, 50:12, 62:5
**mere** [1] - 42:1
**merely** [2] - 39:20, 46:9
**merits** [3] - 40:2, 42:20, 43:4
**message** [2] - 70:21, 79:6
**met** [1] - 94:18
**metadata** [1] - 27:17
**Michael** [2] - 55:1, 55:2
**middle** [1] - 80:6
**might** [7] - 13:20, 30:16, 31:19, 31:20, 43:2, 53:23, 63:16
**migrated** [1] - 82:10
**mild** [1] - 58:14
**mind** [6] - 19:23, 22:12, 51:18, 51:21, 86:2, 92:6
**minds** [2] - 51:24, 52:6
**mine** [1] - 54:5
**minimal** [1] - 6:3
**minor** [1] - 5:8
**minutes** [1] - 88:6
**misinterpreted** [1] - 87:4
**missed** [1] - 85:13
**Monday** [17] - 6:18, 9:11, 9:23, 10:8, 11:3, 14:19, 14:20, 16:1, 16:6, 19:16, 22:19, 29:9, 29:12, 29:20, 31:11, 31:17,

33:15
**month** [1] - 87:13
**months** [1] - 55:14
**morning** [11] - 4:7, 5:6, 5:20, 6:5, 13:18, 34:17, 36:17, 37:7, 56:13, 93:4, 93:5
**mosaic** [1] - 36:5
**most** [5] - 32:3, 32:23, 43:15, 60:14, 75:20
**motion** [8] - 24:6, 24:8, 24:25, 25:10, 25:11, 37:22, 38:8, 38:12
**motivations** [1] - 19:21
**motives** [2] - 21:3, 28:12
**Motors** [1] - 62:13
**Movant** [1] - 2:2
**move** [4] - 23:13, 23:16, 35:8, 36:2
**moving** [2] - 24:2, 35:22
**MR** [92] - 4:16, 4:19, 4:23, 5:2, 5:21, 5:24, 6:8, 6:22, 7:9, 7:21, 8:14, 9:20, 10:3, 10:5, 13:14, 14:6, 14:24, 15:2, 15:3, 15:4, 15:5, 15:6, 15:14, 15:19, 16:7, 16:9, 17:2, 17:23, 20:25, 21:16, 21:23, 22:2, 22:13, 22:18, 23:6, 23:15, 23:19, 23:23, 24:14, 25:15, 25:16, 26:24, 29:4, 29:11, 29:21, 29:24, 31:22, 32:1, 32:11, 33:9, 33:24, 34:3, 35:4, 35:13, 35:20, 36:10, 36:11, 36:14, 36:18, 36:22, 37:1, 37:4, 38:22, 39:1, 39:2, 39:4, 39:5, 40:20, 41:6, 41:10, 41:15, 42:7, 43:13, 44:2, 44:9, 45:10, 45:15, 47:17, 48:2, 48:5, 48:20, 49:15, 55:10, 58:3, 58:24, 65:4, 76:24, 77:1, 77:3, 92:24, 97:2, 97:6
**MS** [5] - 5:6, 55:6, 57:24, 93:3, 96:23
**Mullin** [5] - 53:18, 53:19, 54:9, 55:2, 60:16

**multiple** [1] - 33:2
**must** [2] - 39:19,
60:21

# N

**name** [8] - 33:17,
46:21, 49:17, 49:18,
53:18, 79:18
**narrow** [1] - 75:5
**Nate** [1] - 24:14
**near** [1] - 68:11
**necessary** [2] - 25:20,
26:19
**need** [22] - 19:19,
20:10, 20:11, 21:6,
23:3, 24:9, 24:12,
24:21, 28:25, 32:17,
33:22, 34:1, 34:25,
39:22, 43:25, 44:21,
45:8, 49:12, 61:10,
94:24, 95:1
**needed** [1] - 65:18
**needs** [1] - 20:22
**negative** [1] - 72:17
**negotiations** [1] -
77:22
**Neuroimaging** [1] -
5:12
**never** [6] - 11:8, 28:10,
33:3, 86:5, 92:17,
95:18
**new** [1] - 9:23
**news** [1] - 85:24
**next** [13] - 12:17,
20:18, 28:2, 29:2,
44:24, 44:25, 45:4,
47:23, 48:3, 60:3,
75:9, 77:2, 81:9
**nice** [1] - 37:15
**NICHOLAS** [1] - 2:4
**NICK** [1] - 2:10
**non** [2] - 23:7, 23:9
**non-privileged** [2] -
23:7, 23:9
**normal** [1] - 92:2
**note** [1] - 5:8
**notes** [6] - 76:20,
77:11, 88:11, 88:20,
91:3, 91:5
**nothing** [3] - 7:2,
37:11, 42:15
**noticed** [1] - 55:12
**notwithstanding** [1] -
38:15
**NOVEMBER** [3] -
1:12, 4:5, 45:20
**November** [1] - 89:23
**number** [5] - 22:10,
54:16, 65:20, 78:9,

86:21
**numbers** [1] - 54:15

# O

**o'clock** [2] - 4:11,
97:12
**O'CONNOR** [1] - 1:21
**oath** [9] - 20:11, 26:5,
26:8, 26:10, 26:21,
33:23, 34:4, 34:9,
40:23
**object** [1] - 15:4
**objection** [2] - 57:24,
58:1
**objective** [3] - 52:13,
52:14, 52:16
**obligations** [1] - 14:3
**observation** [1] - 90:6
**observations** [2] -
70:9, 73:3
**observing** [1] - 73:3
**obvious** [1] - 19:15
**obviously** [6] - 7:25,
8:24, 9:22, 14:25,
42:2, 90:15
**occasion** [1] - 53:3
**occurred** [3] - 60:20,
70:3, 80:15
**odds** [1] - 64:9
**OEM** [1] - 62:11
**OEMs** [1] - 62:8
**OF** [3] - 1:2, 1:10, 3:1
**offered** [2] - 13:3,
43:18
**office** [4] - 44:24,
45:3, 45:4, 57:17
**offices** [1] - 87:10
**Official** [1] - 2:13
**official** [1] - 84:6
**OFFICIAL** [1] - 1:10
**old** [1] - 45:2
**Once** [1] - 28:5
**once** [8] - 16:23,
16:25, 27:4, 28:4,
30:18, 33:14, 35:10,
91:2
**one** [44] - 6:12, 6:13,
7:9, 9:8, 11:4, 12:17,
12:19, 13:24, 19:15,
19:23, 23:18, 23:19,
26:25, 29:19, 32:7,
33:12, 33:15, 35:13,
35:23, 37:14, 39:7,
44:25, 53:22, 54:14,
59:2, 63:15, 64:13,
65:16, 65:18, 69:1,
69:4, 71:2, 71:13,
76:6, 76:8, 78:1,
80:13, 81:17, 84:12,

85:11, 91:3, 97:12
**one's** [1] - 66:16
**ones** [1] - 32:13
**open** [3] - 4:3, 52:10,
79:8
**opinion** [2] - 85:10,
92:8
**opportunities** [1] -
17:14
**or..** [1] - 38:25
**order** [3] - 22:25, 23:4,
46:15
**ordering** [1] - 20:14
**origin** [1] - 80:21
**original** [6] - 7:6, 14:6,
29:13, 29:14, 33:4,
62:12
**overall** [2] - 85:6,
90:11
**overruled** [1] - 58:1
**owned** [7] - 56:25,
72:5, 72:8, 72:10,
72:14, 74:14, 84:6

# P

**P.M** [1] - 97:14
**page** [10] - 59:2, 69:4,
69:6, 71:13, 73:13,
74:1, 75:9, 78:18,
78:23, 80:8
**Page** [17] - 58:20,
61:14, 61:19, 64:17,
64:18, 66:16, 69:5,
70:13, 71:10, 71:14,
73:17, 78:19, 78:23,
80:2, 83:8, 86:12,
88:24
**PAGE** [1] - 3:3
**pages** [3] - 10:16,
66:22, 88:1
**paragraph** [6] - 78:2,
80:8, 80:22, 85:11,
85:14, 85:24
**pardon** [1] - 10:23
**Parkinson's** [3] - 5:12,
58:8, 93:16
**part** [14] - 14:5, 14:7,
27:24, 28:1, 29:15,
30:8, 30:24, 31:20,
33:19, 36:5, 60:5,
66:23, 70:2, 87:11
**parte** [1] - 40:25
**particular** [5] - 11:14,
74:1, 80:22
**parties** [7] - 22:23,
25:1, 40:1, 42:18,
42:19, 43:4, 50:25
**parts** [2] - 50:20, 88:3
**party** [2] - 25:19,

52:21, 72:12, 74:3,
74:17, 75:1
**pass** [1] - 13:5
**passionate** [1] - 94:3
**past** [1] - 10:9
**patent** [1] - 68:7
**people** [9] - 12:25,
14:13, 25:5, 26:8,
26:9, 67:14, 73:8,
91:21, 92:7
**perfectly** [1] - 51:21
**perhaps** [2] - 30:2,
54:19
**period** [5] - 74:9, 82:5,
82:9, 89:18, 89:20
**permission** [7] -
38:19, 62:19, 62:23,
62:24, 74:13, 86:24,
90:3
**permit** [2] - 51:11,
62:22
**permitted** [2] - 48:23,
81:25
**person** [10] - 20:8,
20:14, 21:9, 26:13,
31:3, 31:4, 35:1,
59:20, 67:7, 96:1
**person's** [1] - 7:18
**personal** [1] - 31:2
**personnel** [1] - 22:8
**persuade** [2] - 38:1,
38:14
**pertain** [1] - 77:11
**perused** [1] - 11:6
**PETREE** [1] - 2:4
**phone** [3] - 65:17,
65:18, 96:5
**phones** [3] - 40:15,
40:16, 43:14
**phonetic** [1] - 46:24
**physical** [1] - 96:11
**physically** [2] - 94:19,
94:21
**pick** [2] - 19:18, 21:14
**picked** [10] - 14:16,
14:22, 16:16, 16:22,
16:25, 17:16, 17:21,
17:24, 17:25, 26:16
**pieces** [1] - 50:23
**pink** [1] - 13:22
**pipeline** [1] - 84:9
**place** [9] - 7:18, 18:8,
18:18, 28:11, 28:18,
55:12, 62:22, 86:1,
86:5
**Plaintiff** [2] - 1:5, 1:15
**platter** [1] - 11:3
**played** [1] - 67:25
**player** [1] - 68:2
**plead** [2] - 39:13, 47:7

**pleading** [1] - 47:15
**pleasure** [1] - 48:1
**pocket** [2] - 59:22,
59:24
**point** [16] - 18:7, 21:3,
22:13, 25:10, 26:25,
30:23, 40:22, 41:8,
51:9, 51:13, 51:23,
59:21, 70:7, 85:13,
95:13
**pointing** [2] - 25:4,
62:17
**points** [1] - 77:15
**port** [2] - 74:10, 74:18
**portal** [3] - 75:2, 84:7,
84:8
**portion** [1] - 45:6
**position** [7] - 22:19,
42:6, 51:11, 56:23,
62:6, 72:15, 92:1
**possession** [1] -
11:11
**possibility** [2] - 39:19,
46:7
**possible** [5] - 20:15,
39:23, 40:12, 70:19,
78:1
**possibly** [3] - 21:13,
42:15, 43:10
**posted** [1] - 59:19
**potential** [1] - 44:19
**potentially** [2] - 17:10,
45:2
**practice** [2] - 37:22,
92:3
**pre** [1] - 54:12
**pre-admitted** [1] -
54:12
**precisely** [2] - 64:12,
70:8
**preemptively** [1] -
23:18
**prepared** [5] - 40:25,
56:6, 76:21, 77:16,
87:5
**present** [5] - 45:11,
54:1, 54:2, 54:24,
56:9
**presented** [2] - 46:5,
46:11
**presently** [1] - 96:21
**PRESIDING** [1] - 1:3
**pressure** [1] - 4:14
**pretty** [3] - 6:5, 34:12,
39:12
**previewing** [1] - 6:9
**previously** [3] - 4:9,
71:1, 71:5
**print** [1] - 88:1
**printer** [1] - 88:1

**printing** [1] - 87:23
**privilege** [21] - 9:9, 11:24, 22:4, 22:6, 22:15, 23:1, 23:3, 23:4, 23:5, 23:12, 23:13, 23:17, 24:9, 24:12, 24:16, 25:3, 29:24, 30:1, 41:22
**privileged** [6] - 23:7, 23:9, 24:21, 25:5, 25:8, 41:4
**problem** [18] - 10:1, 15:11, 16:11, 16:14, 25:14, 26:17, 32:16, 49:1, 55:9, 61:8, 68:18, 76:1, 78:15, 79:12, 82:13, 82:16, 90:16, 90:24
**problems** [5] - 7:3, 42:16, 78:13, 83:2
**procedure** [1] - 43:12
**proceed** [2] - 47:22, 49:3
**PROCEEDINGS** [3] - 1:10, 4:1, 97:13
**Proceedings** [1] - 2:16
**proceedings** [3] - 4:3, 48:11, 98:7
**process** [9] - 16:15, 17:25, 18:8, 18:18, 25:23, 26:17, 28:18, 75:7, 75:12
**processes** [1] - 17:16
**produce** [5] - 8:18, 8:21, 21:6, 24:13, 25:18
**produced** [26] - 2:17, 7:23, 8:15, 14:1, 14:20, 14:21, 18:21, 19:13, 19:16, 20:4, 20:21, 21:5, 22:16, 28:15, 28:16, 29:3, 29:9, 29:12, 29:20, 30:10, 30:21, 31:16, 31:18, 32:22, 33:15, 33:20
**product** [3] - 22:6, 50:14, 87:6
**production** [17] - 6:16, 7:6, 8:5, 9:3, 9:22, 9:23, 10:18, 11:10, 11:17, 12:7, 13:1, 13:8, 14:1, 14:5, 17:5, 27:21
**products** [1] - 50:17
**proffer** [2] - 40:25, 43:20
**proffered** [1] - 37:21
**program** [1] - 88:4

**prompt** [4] - 63:9, 63:14, 68:23, 76:5
**prompted** [1] - 61:10
**prosecution** [6] - 39:16, 39:19, 39:24, 40:12, 42:20, 46:7
**prosecutors** [1] - 36:6
**provide** [4] - 10:11, 11:14, 20:9, 22:15
**provided** [3] - 16:2, 23:17, 24:16
**providers** [1] - 81:24
**providing** [1] - 95:6
**PST** [2] - 27:7, 33:11
**public** [2] - 51:11, 69:17
**publicly** [1] - 70:1
**pull** [3] - 33:13, 65:1, 65:2
**pulled** [21] - 27:20, 28:10, 28:13, 28:18, 29:10, 29:12, 30:8, 30:14, 30:15, 30:17, 30:24, 31:5, 31:10, 31:12, 31:13, 31:21, 32:14, 32:18, 33:8
**pulls** [1] - 32:4
**pure** [1] - 40:17
**purpose** [2] - 11:24, 89:25
**purposefully** [1] - 6:25
**purposes** [2] - 4:11, 48:8
**pursuant** [2] - 37:8, 98:4
**push** [1] - 36:19
**put** [6] - 35:23, 41:18, 54:21, 65:3, 66:7, 89:1
**putting** [2] - 4:14, 72:12

---

## Q

**questions** [29] - 11:5, 31:9, 37:11, 40:17, 40:24, 41:21, 41:23, 42:1, 44:19, 46:4, 53:23, 53:24, 58:18, 65:20, 66:7, 73:12, 73:20, 73:24, 75:20, 75:24, 76:4, 76:15, 78:9, 90:20, 90:23, 91:6, 92:25, 96:23, 97:2
**quick** [1] - 76:15
**quickly** [1] - 19:2
**quite** [3] - 40:21, 60:21, 67:24

---

## R

**raise** [3] - 5:3, 48:13, 57:11
**raising** [1] - 9:21
**ran** [7] - 21:9, 27:18, 32:6, 33:14, 57:1, 83:7, 94:1
**range** [2] - 17:13, 50:19
**rank** [2] - 7:12, 92:8
**rather** [2] - 9:25, 75:13
**RCI** [4] - 84:7, 84:15, 84:24
**reach** [2] - 63:24, 64:6
**reaction** [1] - 75:8
**read** [10] - 58:25, 61:18, 66:23, 69:6, 70:15, 71:16, 73:18, 78:24, 83:11, 86:13
**reading** [2] - 55:8, 79:3
**ready** [1] - 36:16
**real** [3] - 39:20, 45:18, 46:8
**reality** [1] - 10:6
**realized** [2] - 12:7, 33:15
**really** [13] - 13:11, 19:2, 19:17, 19:20, 24:22, 27:23, 38:6, 43:3, 52:16, 70:24, 84:23, 86:15, 87:20
**reason** [12] - 8:20, 9:10, 9:21, 12:8, 12:9, 15:6, 15:18, 30:17, 38:2, 46:19, 47:20, 92:12
**reasonable** [2] - 17:18, 17:19
**reasons** [2] - 14:9, 43:5
**rebates** [1] - 50:21
**recalled** [3] - 65:25, 66:4, 78:17
**recalling** [8] - 61:8, 68:18, 70:11, 76:1, 78:13, 78:16, 83:3, 90:25
**receipt** [2] - 11:25, 12:1
**receive** [1] - 10:12
**received** [6] - 6:16, 6:18, 10:7, 16:5, 90:3
**receiving** [1] - 16:4
**recent** [2] - 32:3, 32:23
**recess** [4] - 18:25, 19:3, 44:13, 44:14

**RECESSED** [1] - 97:13
**recipients** [1] - 32:23
**recognizing** [1] - 93:13
**recollection** [6] - 54:20, 63:13, 70:6, 71:8, 88:11, 94:16
**record** [12] - 5:11, 5:19, 19:4, 44:22, 45:7, 45:22, 45:25, 47:10, 49:16, 53:19, 54:22, 55:7
**recorded** [1] - 2:16
**records** [1] - 68:1
**refer** [2] - 88:11, 91:5
**reference** [5] - 64:18, 64:24, 71:4, 71:11, 86:20
**referenced** [2] - 14:8, 71:23
**references** [1] - 69:22
**referred** [2] - 5:10, 94:7
**referring** [2] - 60:9, 88:20
**refresh** [4] - 54:20, 59:1, 66:24, 86:13
**regard** [2] - 25:17, 48:24
**regarding** [3] - 22:8, 46:16, 89:20
**regularly** [1] - 48:17
**regulated** [1] - 87:10
**related** [7] - 13:8, 19:14, 31:21, 77:24, 78:1, 78:2, 93:21
**relating** [1] - 75:6
**relationship** [5] - 62:21, 63:22, 65:14, 70:11, 82:10
**relay** [5] - 61:6, 63:3, 68:24, 75:4, 91:13
**relayed** [2] - 75:3, 75:16
**relaying** [2] - 72:16, 79:13
**remember** [12] - 52:8, 54:1, 55:15, 60:22, 61:11, 63:15, 64:12, 81:6, 86:17, 92:18, 94:22
**removed** [1] - 9:8
**renew** [1] - 41:8
**repeatedly** [1] - 60:23
**rephrase** [2] - 64:2, 89:18
**report** [2] - 67:16, 87:23
**Reported** [2] - 2:13

**reported** [1] - 98:7
**Reporter** [2] - 2:13, 2:17
**reporter** [2] - 54:7, 55:1
**REPORTER'S** [1] - 1:10
**reports** [1] - 87:14
**representation** [4] - 43:17, 43:23, 47:20, 60:25
**representations** [1] - 34:7
**representative** [1] - 25:18
**represented** [4] - 47:9, 53:15, 61:2
**representing** [2] - 21:8, 60:23
**request** [4] - 13:15, 23:7, 41:9, 71:23
**requested** [1] - 13:13
**requests** [2] - 15:13, 56:1
**require** [1] - 47:6
**research** [1] - 39:10
**reside** [2] - 34:18, 34:20
**resides** [1] - 7:18
**resolve** [3] - 4:21, 9:1, 26:2
**resolved** [2] - 82:16
**respect** [5] - 34:6, 35:2, 45:24, 46:2, 47:12
**respectfully** [5] - 19:20, 21:6, 29:4, 30:25, 35:6
**respond** [6] - 10:3, 25:11, 33:3, 39:5, 40:24, 84:3
**responsible** [2] - 16:19, 59:21
**responsive** [6] - 15:12, 20:3, 21:14, 22:21, 23:2, 32:18
**result** [2] - 22:16, 82:15
**resulted** [1] - 77:23
**return** [1] - 72:19
**Reverend** [1] - 6:12
**review** [5] - 20:5, 22:10, 41:14, 42:10, 44:4
**reviewing** [1] - 46:3
**Reynolds** [96] - 5:22, 6:10, 6:11, 6:15, 7:7, 7:8, 7:10, 8:6, 9:15, 10:2, 11:21, 12:4, 24:15, 50:6, 50:13,

51:10, 51:15, 52:22, 52:23, 55:4, 55:19, 55:21, 55:23, 56:1, 56:18, 56:23, 56:24, 57:2, 59:23, 60:23, 61:2, 61:3, 61:5, 62:5, 62:23, 63:23, 68:9, 68:12, 69:10, 69:21, 71:24, 72:6, 72:11, 72:13, 80:9, 80:14, 80:16, 81:1, 81:3, 81:4, 81:17, 81:20, 81:23, 82:2, 82:10, 82:11, 82:12, 82:19, 83:17, 84:8, 84:16, 85:8, 86:8, 86:24, 87:6, 87:24, 89:12, 90:3, 93:21
**Reynolds's** [1] - 95:6
**rights** [4] - 42:14, 43:11, 46:14, 47:8
**ROBERT** [1] - 1:7
**Robert** [2] - 46:24, 50:7
**role** [1] - 68:5
**roles** [1] - 25:6
**room** [4] - 53:13, 57:6, 68:23, 95:2
**RPR** [2] - 2:13, 98:11
**rubber** [1] - 49:10
**Rule** [1] - 37:9
**rule** [1] - 25:12
**rules** [1] - 49:4
**ruling** [3] - 34:4, 34:10, 35:16
**rulings** [1] - 46:2
**run** [3] - 27:11, 87:13, 88:4
**running** [2] - 33:16, 75:11
**runs** [1] - 83:19

## S

**SAMANTHA** [1] - 2:5
**Santa** [1] - 13:22
**satisfaction** [2] - 63:3, 91:14
**satisfactory** [2] - 86:25, 90:9
**satisfied** [3] - 16:24, 18:20, 90:12
**satisfy** [1] - 18:21
**saw** [3] - 9:18, 42:17, 77:11
**scan** [1] - 7:23
**Schaefer** [14] - 67:8, 67:16, 67:23, 67:25, 68:1, 68:2, 68:7, 68:11, 68:13, 70:19,

79:4, 79:10, 79:15, 89:22
**Schaefer's** [4] - 67:18, 68:5, 68:17, 68:19
**schedule** [1] - 36:1
**school** [1] - 68:19
**Scott** [2] - 12:20, 55:2
**scratch** [1] - 75:14
**screen** [5] - 65:3, 65:9, 76:12, 89:2
**sealed** [3] - 44:22, 45:7, 46:1
**Sean** [2] - 2:13, 98:11
**sean_gumm@txs. uscourts.gov** [1] - 2:15
**search** [11] - 9:6, 12:13, 19:18, 20:8, 21:9, 21:14, 27:25, 28:1, 28:21, 33:5, 33:14
**searched** [1] - 26:1
**searches** [2] - 27:11, 32:7
**seated** [1] - 44:15
**second** [13] - 8:4, 8:5, 22:25, 39:7, 54:2, 54:3, 73:10, 73:13, 73:21, 73:25, 76:9, 78:19
**Section** [1] - 98:5
**see** [16] - 18:7, 19:6, 19:14, 23:4, 24:18, 24:20, 36:13, 44:7, 47:20, 54:23, 64:19, 71:6, 75:10, 78:6, 96:9
**See** [1] - 27:24
**seeing** [2] - 22:5, 39:2
**seek** [2] - 37:25, 38:14
**seem** [4] - 19:14, 31:21, 94:3, 94:19
**seized** [1] - 11:21
**selling** [1] - 50:20
**send** [2] - 25:4, 26:12
**sense** [2] - 35:20, 44:3
**sent** [6] - 6:10, 11:25, 12:3, 12:18, 13:6, 29:1
**separate** [3] - 19:24, 33:13, 84:21
**September** [8] - 53:10, 54:23, 57:10, 57:21, 58:5, 86:3, 94:9, 95:21
**served** [1] - 11:7
**server** [6] - 7:8, 7:13, 7:17, 14:9, 27:5
**Services** [1] - 79:19
**services** [1] - 82:2

**SESSION** [1] - 1:9
**set** [7] - 19:23, 27:15, 27:20, 55:16, 65:5, 68:1, 84:21
**setting** [1] - 25:1
**settled** [2] - 82:1, 86:8
**settlement** [12] - 80:9, 81:8, 81:9, 81:15, 82:15, 82:17, 82:22, 82:23, 83:15, 85:12, 86:6
**seven** [1] - 32:2
**several** [5] - 10:16, 52:8, 60:21, 65:15, 66:22
**shared** [2] - 5:16, 29:5
**shed** [1] - 25:22
**Sheppard** [5] - 53:18, 53:19, 54:9, 55:2, 60:15
**shield** [1] - 41:18
**shielded** [2] - 84:22
**shook** [1] - 52:2
**short** [2] - 21:25, 38:19
**shot** [1] - 6:1
**show** [4] - 31:12, 65:22, 76:8, 76:23
**showed** [4] - 77:15, 80:24, 90:20, 91:8
**showing** [3] - 13:20, 31:10, 74:7
**shown** [1] - 31:14
**shows** [1] - 23:20
**shutting** [1] - 45:17
**side** [1] - 76:11
**sign** [1] - 87:19
**silver** [1] - 11:2
**similar** [3] - 8:23, 12:23, 80:12
**simultaneously** [1] - 69:13
**single** [1] - 33:12
**SIS** [19] - 79:20, 80:10, 80:15, 81:4, 81:21, 81:22, 82:1, 82:3, 82:4, 82:8, 82:13, 82:18, 82:21, 83:7, 83:19, 84:23, 86:7, 86:9
**sit** [6] - 20:10, 21:25, 48:23, 49:2, 92:4, 94:24
**sitting** [3] - 60:3, 86:3, 96:10
**situation** [3] - 10:6, 13:2, 85:6
**six** [5] - 4:10, 13:3, 15:15, 46:16, 63:7
**small** [1] - 4:23

**Smith** [3] - 3:6, 20:16, 21:11
**SMITH** [16] - 1:15, 21:16, 34:3, 35:4, 39:2, 48:5, 48:20, 49:15, 55:10, 58:3, 58:24, 65:4, 77:1, 92:24, 97:2, 97:6
**smoothly** [1] - 88:4
**so..** [1] - 86:10
**software** [9] - 50:14, 50:17, 50:24, 68:6, 75:25, 87:6, 87:25, 88:4, 90:15
**sole** [1] - 71:25
**solve** [2] - 15:11, 26:23
**someone** [7] - 11:9, 18:1, 28:7, 29:2, 34:4, 36:24, 39:13
**sometime** [2] - 70:4, 70:5
**sometimes** [1] - 92:11
**somewhat** [1] - 42:19
**somewhere** [6] - 8:18, 32:11, 64:21, 81:12, 86:10
**soon** [1] - 20:15
**sooner** [3] - 16:13, 29:3, 30:21
**sophisticated** [1] - 50:23
**sorry** [14] - 19:7, 31:23, 36:19, 44:11, 61:25, 62:10, 62:14, 64:24, 66:16, 66:19, 66:20, 68:20, 71:20, 76:18, 80:4, 92:20
**sort** [10] - 6:20, 7:13, 22:2, 30:22, 34:20, 67:15, 79:6, 84:13, 84:22, 92:13
**sorts** [1] - 14:12
**sought** [1] - 55:20
**sound** [1] - 79:4
**sounds** [2] - 22:24, 23:17, 88:5
**SOUTHERN** [1] - 1:2
**Southern** [1] - 2:14
**specific** [3] - 8:7, 57:19, 78:24
**specifically** [5] - 22:14, 40:4, 62:17, 80:21, 86:14
**spell** [1] - 49:17
**spend** [1] - 35:12
**spinoff** [1] - 70:3
**spun** [1] - 69:25
**stage** [1] - 53:6
**stand** [15] - 5:19, 6:1,

10:24, 35:7, 35:8, 35:15, 37:25, 40:23, 44:4, 47:7, 47:16, 48:19, 49:4, 94:24, 96:21
**standard** [1] - 40:21
**standing** [1] - 35:11
**standpoint** [1] - 18:19
**stands** [1] - 74:4
**start** [5] - 52:7, 59:4, 63:8, 73:13, 78:23
**started** [6] - 4:12, 6:9, 59:15, 74:20, 75:16, 91:17
**starting** [4] - 73:17, 75:14, 78:22
**starts** [3] - 61:17, 71:15, 83:9
**state** [1] - 49:16
**statement** [1] - 26:21
**STATES** [1] - 1:1
**States** [3] - 2:14, 50:16, 98:5
**stay** [3] - 4:8, 47:25
**staying** [1] - 4:10
**stenographically** [1] - 98:6
**stenography** [1] - 2:16
**step** [5] - 24:2, 28:2, 30:5, 30:6, 48:12
**steps** [3] - 17:5, 17:19, 17:21
**Steve** [4] - 65:14, 66:4, 77:6, 77:7
**stickers** [1] - 5:17
**still** [7] - 13:25, 15:15, 15:16, 52:10, 68:1, 82:18, 83:16
**StoneEagle** [10] - 89:1, 89:7, 89:9, 89:10, 89:14, 89:17, 89:20, 89:25, 90:7, 90:8
**stooped** [1] - 94:23
**stop** [4] - 29:21, 72:18, 72:19, 82:2
**stored** [2] - 7:12, 27:4
**stories** [1] - 68:24
**story** [2] - 61:7, 61:8
**straight** [1] - 69:2
**straw** [1] - 85:2
**street** [1] - 57:15
**Stuart** [1] - 36:23
**stuff** [1] - 68:21
**subject** [11] - 26:22, 34:2, 34:4, 52:22, 63:20, 64:5, 73:19, 73:24, 74:19, 78:7, 78:25
**subpoena** [14] - 6:10,

10:8, 11:7, 12:10, 13:9, 15:12, 18:21, 20:4, 21:15, 22:22, 23:6, 27:12, 32:6, 37:9

**subpoena's** [1] - 26:18
**subpoenas** [3] - 10:14, 22:14, 47:22
**subsidiaries** [2] - 72:8, 72:14
**subsidiary** [2] - 69:25, 84:21
**substance** [1] - 65:19
**substantial** [2] - 39:20, 46:8
**suck** [1] - 87:14
**sufficient** [3] - 17:7, 17:20, 24:4
**suggest** [1] - 85:4
**suggested** [1] - 85:17
**suggestion** [1] - 11:9
**summarize** [1] - 52:12, 59:3, 81:19
**summary** [2] - 44:16, 46:3
**Superior** [2] - 79:18, 79:19
**supposed** [1] - 23:21
**surface** [1] - 37:17
**surprising** [1] - 34:16
**switch** [1] - 51:14, 58:22
**sword** [1] - 41:17
**sworn** [2] - 48:13, 48:17
**symptoms** [1] - 93:13
**Syscheck** [4] - 86:21, 87:3, 88:16, 88:18
**SYSCHECK** [1] - 86:22
**system** [8] - 7:11, 32:4, 62:7, 62:8, 62:20, 74:2, 79:8, 82:9

## T

**table** [1] - 49:2
**Tamine** [2] - 40:14, 40:15
**team** [3] - 20:16, 21:12, 47:25
**tech** [1] - 51:1
**technical** [6] - 73:5, 73:6, 88:5, 88:21, 90:15, 90:17
**technically** [1] - 24:1
**telephone** [1] - 76:21
**ten** [1] - 51:2

**tendered** [1] - 10:15
**term** [5] - 85:4, 85:5, 85:17, 85:18, 88:15
**terms** [5] - 12:13, 13:8, 21:9, 75:7, 82:22
**testified** [3] - 48:17, 71:1, 95:9
**testify** [8] - 14:11, 15:1, 38:1, 46:16, 46:17, 46:20, 47:4, 47:21
**testifying** [1] - 43:8
**testimony** [13] - 26:5, 26:7, 36:5, 37:7, 38:18, 39:15, 39:23, 40:14, 45:24, 46:2, 46:8, 71:5
**TEXAS** [1] - 1:2
**Texas** [2] - 1:11, 2:14
**that'll** [1] - 41:12
**THE** [88] - 1:3, 4:7, 4:18, 4:22, 4:25, 5:5, 5:18, 5:23, 6:7, 6:21, 7:7, 7:20, 8:12, 9:17, 10:1, 10:4, 13:12, 13:25, 14:15, 15:8, 16:8, 16:10, 17:18, 18:4, 19:4, 21:1, 21:18, 21:24, 22:20, 23:10, 23:16, 23:20, 23:24, 24:19, 26:3, 27:22, 29:8, 29:23, 30:4, 31:25, 32:9, 32:16, 33:21, 34:1, 34:11, 35:5, 35:18, 35:21, 36:12, 36:16, 36:19, 36:24, 37:3, 38:21, 38:24, 39:7, 41:5, 42:12, 43:25, 44:7, 44:10, 44:15, 45:12, 45:17, 45:22, 47:19, 48:3, 48:7, 48:18, 48:19, 49:1, 49:6, 49:8, 49:9, 49:11, 49:13, 55:5, 55:9, 58:1, 58:2, 58:23, 93:1, 96:25, 97:4, 97:7, 97:9, 97:10, 97:13
**themselves** [3] - 22:24, 34:19
**theoretically** [1] - 33:10
**there'd** [1] - 59:16
**therefore** [1] - 47:5
**they've** [6] - 6:1, 11:7, 15:15, 24:1, 41:18
**third** [7] - 12:19, 25:19, 50:25, 72:12,

74:3, 74:17, 75:1
**third-parties** [1] - 50:25
**third-party** [5] - 25:19, 72:12, 74:3, 74:17, 75:1
**thread** [3] - 31:18, 31:23, 32:1
**three** [13] - 9:1, 9:14, 9:16, 11:22, 13:5, 17:25, 26:6, 26:8, 29:19, 42:17, 77:23, 80:13, 81:17
**throughout** [1] - 95:5
**THURSDAY** [3] - 1:12, 4:5, 45:20
**TIM** [1] - 2:8
**Tim** [3] - 5:21, 12:16, 12:17
**timeframe** [2] - 75:15, 76:24
**timely** [1] - 11:8, 16:6, 36:7
**tiny** [1] - 89:6
**Title** [2] - 38:4, 98:4
**today** [8] - 13:4, 17:11, 23:19, 35:15, 37:24, 39:1, 60:19, 96:10
**together** [1] - 36:5
**Tommy** [2] - 6:11, 11:20
**tomorrow** [1] - 17:11
**tonight** [2] - 4:8, 4:11
**took** [5] - 27:15, 51:12, 55:12, 57:13, 86:5
**tool** [1] - 38:4
**top** [3] - 7:14, 76:17, 77:4
**topic** [2] - 72:25, 74:19
**topics** [13] - 41:11, 42:25, 43:16, 44:3, 44:7, 44:16, 46:4, 46:10, 46:11, 46:16, 56:17, 93:21, 95:8
**touch** [1] - 11:15
**touched** [1] - 95:8
**toward** [1] - 51:13
**towards** [1] - 73:23
**Toyota** [1] - 62:12
**Trade** [2] - 49:21, 49:23
**training** [1] - 93:10
**transactions** [1] - 75:24
**TRANSCRIPT** [1] - 1:10
**transcript** [4] - 2:17, 54:10, 63:13, 98:6

**transitions** [1] - 22:9
**treated** [2] - 46:23, 59:10
**tremendous** [1] - 73:6
**trial** [2] - 41:24, 96:21
**tricky** [1] - 7:10
**tried** [5] - 10:10, 12:22, 13:17, 15:22
**trifling** [3] - 39:18, 39:20, 46:9
**trouble** [1] - 70:10
**true** [1] - 98:6
**truly** [1] - 39:16
**trust** [2] - 50:3, 52:3
**truthfully** [1] - 15:1
**try** [4] - 22:23, 36:1, 48:9, 76:18
**trying** [19] - 8:16, 10:25, 15:10, 16:18, 18:5, 18:17, 19:10, 22:11, 31:15, 37:23, 42:24, 43:11, 51:14, 52:14, 59:8, 62:9, 67:11, 86:22, 90:1
**Tuesday** [1] - 13:6
**turn** [9] - 8:8, 54:19, 58:20, 71:13, 73:10, 74:2, 78:18, 80:2, 86:11
**turned** [1] - 62:17
**turquoise** [1] - 13:24
**two** [35] - 5:8, 6:14, 9:8, 11:20, 12:15, 32:15, 45:5, 45:10, 50:12, 51:23, 52:5, 52:17, 53:1, 53:21, 54:3, 54:4, 54:5, 54:9, 63:17, 64:8, 67:6, 67:12, 69:16, 69:19, 69:20, 72:8, 73:2, 77:14, 77:22, 78:5, 79:3, 86:11, 90:11, 91:4, 95:24
**type** [1] - 79:15

## U

**UCS** [2] - 93:21, 93:23
**UCSH** [2] - 5:21, 8:15
**ultimately** [1] - 16:5
**unable** [1] - 64:24
**unartful** [1] - 64:2
**unartfully** [1] - 55:24
**uncertain** [1] - 7:1
**under** [15] - 8:2, 20:11, 26:5, 26:8, 26:9, 26:21, 33:23, 34:4, 34:9, 37:12, 38:4, 40:23, 47:22, 62:18, 62:21

**understood** [1] - 63:25
**undisputed** [4] - 46:19, 46:25, 47:5, 47:13
**unique** [1] - 38:4
**UNITED** [1] - 1:1
**United** [3] - 2:14, 50:16, 98:5
**universe** [1] - 30:19
**unless** [1] - 21:21
**unreasonable** [1] - 13:15
**unusual** [1] - 7:11
**unwritten** [2] - 69:13, 78:7
**up** [46] - 5:1, 5:11, 6:19, 9:24, 13:5, 14:16, 14:22, 16:16, 16:18, 16:22, 16:25, 17:16, 17:22, 17:24, 17:25, 19:18, 21:14, 24:2, 26:16, 31:8, 31:10, 31:12, 31:14, 33:8, 35:10, 35:19, 37:22, 38:20, 41:11, 44:2, 44:12, 48:24, 55:13, 55:16, 65:1, 65:2, 70:13, 70:20, 73:20, 75:11, 80:24, 84:21, 89:1, 89:2, 93:24, 94:24
**upset** [1] - 60:7
**USA** [1] - 1:4

## V

**vacated** [1] - 45:19
**various** [2] - 79:25, 81:23
**VARNADO** [1] - 1:19
**vendor** [18] - 11:17, 12:12, 17:3, 17:15, 25:19, 25:25, 26:14, 27:2, 27:6, 27:16, 27:24, 28:19, 28:25, 29:1, 29:10, 29:13, 30:7, 30:25
**veracity** [1] - 8:24
**version** [1] - 29:20
**versus** [1] - 31:17
**virtually** [1] - 50:15
**volumetric** [1] - 5:14
**vs** [1] - 1:6

## W

**wait** [1] - 24:18
**waive** [3] - 11:23, 29:25, 42:13

**waiver** [1] - 29:24
**walked** [1] - 94:22
**walking** [1] - 95:1
**wants** [1] - 17:8
**warranty** [1] - 50:21
**Washington** [2] - 49:22, 53:12
**wasting** [1] - 25:21
**wear** [1] - 49:5
**weeds** [1] - 70:24
**week** [2] - 6:7, 20:18
**weekend** [4] - 8:8, 21:17, 21:18, 35:6
**weeks** [1] - 55:13
**welcome** [3] - 4:8, 5:23, 49:2
**WERE** [1] - 97:13
**whereas** [1] - 51:12
**WHEREUPON** [1] - 97:13
**white** [1] - 54:13
**whole** [2] - 63:17, 72:23
**Williams** [1] - 55:1
**willing** [3] - 20:9, 43:19, 43:20
**wind** [1] - 82:5
**wind-down** [1] - 82:5
**wiper** [1] - 87:17
**withheld** [3] - 9:10, 23:3, 30:3
**WITNESS** [6] - 48:18, 49:6, 49:9, 49:13, 58:2, 97:9
**Witness** [1] - 48:16
**witness** [14] - 4:11, 9:2, 35:15, 35:23, 36:17, 37:25, 41:18, 42:3, 47:23, 48:4, 55:7, 91:8, 92:10, 97:4
**witnesses** [7] - 6:12, 6:14, 17:10, 18:24, 34:9, 35:22, 92:11
**WITNESSES** [1] - 3:1
**word** [1] - 92:14
**worded** [3] - 26:18, 27:12, 55:24
**words** [2] - 74:14, 84:25
**world** [1] - 50:15
**worried** [1] - 18:15
**write** [1] - 25:1
**writing** [1] - 6:23
**written** [7] - 64:13, 69:12, 69:18, 69:19, 77:23, 80:25, 81:16
**wrongdoing** [1] - 35:10
**wrote** [1] - 85:14

## Y

**year** [3] - 11:25, 75:19, 76:7
**years** [12] - 8:3, 10:17, 52:8, 60:22, 64:15, 72:3, 72:6, 72:20, 81:18, 91:18, 92:2, 95:24
**yesterday** [1] - 4:12
**yourself** [5] - 53:20, 58:25, 61:18, 66:23, 86:13
**youth** [1] - 13:23
**YUDOFSKY** [1] - 2:3
**Yudofsky** [23] - 4:13, 4:20, 36:23, 36:25, 37:5, 37:8, 38:9, 40:12, 40:14, 41:12, 41:20, 42:11, 43:22, 46:4, 46:16, 46:17, 46:20, 47:4, 47:6, 47:10, 47:21, 48:10
**Yudofsky's** [7] - 40:5, 40:22, 44:20, 45:24, 46:2, 46:8, 46:14

## Z

**zero** [1] - 9:14