08:31:58

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF TEXAS

3                      —  —  —

   THE HONORABLE GEORGE C. HANKS, JR., JUDGE PRESIDING
4
   _____
   USA,                         No. 4:21-CR-00009-1
5
                   Plaintiff,
6
   vs.
7                                   **ORIGINAL**
   ROBERT T. BROCKMAN,
8
                   Defendant.
9
   _____
            COMPETENCY HEARING -- DAY 5 AM SESSION
10
        OFFICIAL REPORTER'S TRANSCRIPT OF PROCEEDINGS
11
                   Houston, Texas
12
            FRIDAY, NOVEMBER 19, 2021
13 _____

14 APPEARANCES:

15 For the Plaintiff:   COREY J. SMITH, DOJ

16                      CHRISTOPHER MAGNANI, DOJ

17                      LEE F. LANGSTON, DOJ

18                      BORIS BOURGET, DOJ

19
   For the Defendant:   JASON S. VARNADO, ESQ., Attorney
20                       at Law

21                       COLLEEN O'CONNOR, ESQ., ATTORNEY
                         AT LAW
22
                         JAMES P. LOONAM, ESQ., Attorney
23                       at Law

24                       KATHRYN KENEALLY, ESQ., Attorney
                         at Law
25
                         IRINA K. BLEUSTEIN, ESQ.,

1                           Attorney at Law

2
     For the                  n/a
3    Interpreter:

4
     Reported by:        Sean Gumm, RPR, CRR
5                         Official Court Reporter
                          United States District Court
6                         Southern District of Texas
                          sean_gumm@txs.uscourts.gov
7

8    Proceedings recorded by mechanical stenography.
     Transcript produced by Reporter on computer.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     INDEX OF WITNESSES
 2
 3      PARK DIETZ, (For the Government)
 4      Direct Examination By Mr. MAGNANI:              6
 5
 6
 7
 8                        --o0o--
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## PROCEEDINGS

_____

(The following proceedings held in open court.)

* * *

FRIDAY, NOVEMBER 19, 2021 -- 8:38 A.M.

--oOo--

08:56:28  MR. LOONAM:  Your Honor, for the record
08:56:29  I note that Mr. Brockman is with us at counsel table
08:56:33  this morning.

08:56:38  THE COURT:  Okay.  Welcome back,
08:56:40  everyone.  The Government may call the next witness.

08:56:45  MR. LANGSTON:  Actually, Your Honor,
08:56:46  before we call our first witness we just want to let
08:56:49  you know we have worked things out with attorneys
08:56:51  for UCSH.  We agreed to do these depositions by zoom
08:56:57  this weekend, and they agreed if we need those
08:57:00  witnesses to testify they would be available to
08:57:02  testify live next week.

08:57:03  THE COURT:  Okay.

08:57:04  MR. LANGSTON:  So you can take that off
08:57:05  your mind.

08:57:05  THE COURT:  Great.  That makes things a
08:57:07  little bit easier.

08:57:08  Mr. Loonam, anything to add?

08:57:10  MR. LOONAM:  I don't have a dog in that

08:57:12   1    fight.

08:57:12   2                THE COURT:  Okay.  Great.  Then the

08:57:13   3    Government may call the next witness.

08:57:16   4                MR. MAGNANI:  Thank you, Your Honor.

08:57:17   5    Good morning.

08:57:17   6                THE COURT:  Good morning.

08:57:18   7                MR. MAGNANI:  The United States calls

08:57:19   8    Dr. Park Dietz.

08:57:21   9                THE COURT:  Dr. Dietz, if you would

08:57:22   10   please step forward, sir.

08:57:22   11                        PARK DIETZ,

08:57:22   12                    (For the Government)

08:57:22   13                called as a Witness, having been duly

08:57:22   14   and regularly sworn, testified as follows:

08:57:37   15                THE WITNESS:  I do.

08:57:38   16                THE COURT:  Okay.  Please take the

08:57:39   17   stand.  I believe you've been here, so you know

08:57:41   18   about the mask rule.  You can take off your mask if

08:57:44   19   you are comfortable with that.

08:57:49   20                THE WITNESS:  This will be the most

08:57:50   21   comfortable day in court.

08:57:50   22                     DIRECT EXAMINATION

08:57:50   23   BY MR. MAGNANI:

08:57:56   24   Q.   Good morning, Dr. Dietz.

08:57:58   25   A.   Good morning.

08:57:59  1  **Q.**   Can you please state your name, and spell your

08:58:03  2  last name for the record?

08:58:03  3  **A.**   My name is Park Dietz, D-I-E-T-Z.

08:58:09  4  **Q.**   What do you do for a living, sir?

08:58:11  5  **A.**   I am a psychiatrist, limiting my practice to

08:58:16  6  forensic psychiatry.  And I do two things:  One is

08:58:26  7  running a company devoted to forensic services to

08:58:33  8  attorneys.  The other is running a company devoted

08:58:37  9  to the prevention of violence and other misconduct

08:58:42 10  in the workplace.

08:58:43 11  **Q.**   What is forensic psychiatry?

08:58:45 12  **A.**   Forensic psychiatry is the application or

08:58:49 13  principles and practice of psychiatry for the

08:58:52 14  purposes of law.

08:58:55 15  **Q.**   And what education qualifies you to be a

08:58:58 16  forensic psychiatrist?

08:59:00 17  **A.**   Well, to be a forensic psychiatrist, one must

08:59:06 18  first be a psychiatrist, and then the roots toward

08:59:09 19  psychiatry specialization vary.  In my case, I did a

08:59:13 20  fellowship in forensic psychiatry at the Hospital of

08:59:17 21  the University of Pennsylvania.

08:59:20 22  **Q.**   And can you just briefly summarize your

08:59:23 23  educational experience?

08:59:24 24  **A.**   Yes.  I graduated from Cornell with a

08:59:29 25  bachelor's degree in 1970 in Biology and Psychology.

08:59:37   1   I graduated from John Hopkins in 1975 with a Doctor
08:59:42   2   of Medicine degree and also a master's degree in
08:59:46   3   Public Health, and by then had all but completed a
08:59:50   4   dissertation for a Ph.D. in what was called Social
08:59:54   5   Relations, roughly translated to Sociology, and
09:00:00   6   later submitted the dissertation.
09:00:04   7   Q.   And just what was your first job after your
09:00:06   8   residency?
09:00:08   9   A.   So in order to become a psychiatrist, of course
09:00:13   10   I had to do a residency or I wouldn't have been
09:00:16   11   hirable.  So I did two years of residency at Johns
09:00:20   12   Hopkins Hospital, and a year at the University of
09:00:23   13   Pennsylvania, and was then recruited to a position
09:00:27   14   as Assistant Professor of Psychiatry at Harvard
09:00:33   15   Medical School, where I was asked to be in charge of
09:00:38   16   a maximum security hospital for the criminally
09:00:42   17   insane, Forensic Section.
09:00:47   18   Q.   What work did you do in that job?
09:00:49   19   A.   For the two years that I was working at that
09:00:55   20   maximum security hospital, we had a very large
09:00:58   21   volume of pretrial defendants to evaluate.  It was
09:01:03   22   about a thousand evaluations a year of competence to
09:01:07   23   stand trial and sanity with highly inadequate
09:01:11   24   resources.
09:01:12   25              I recruited some additional people

09:01:14  1   and we were able to do a somewhat better job.  But

09:01:18  2   it was, um, very thin on resources, but lots of

09:01:23  3   experiences.

09:01:24  4   Q.   But let me ask you, was there a time during

09:01:26  5   your Harvard tenure that you worked on a matter

09:01:29  6   where you had significantly more resources than you

09:01:32  7   just described?

09:01:35  8   A.   An extraordinary change occurred two years into

09:01:38  9   that when in 19 -- I guess it was 1981 I was asked

09:01:50  10  to work on a particular case of the attempted

09:01:53  11  assassination of President Regan.  And that took me

09:02:00  12  out of the realm of no sources, to being able to

09:02:01  13  spend nearly an entire year conducting a single

09:02:03  14  evaluation.  I did research during that time and

09:02:06  15  wrote a book, too, but really it was the Hinckley

09:02:13  16  case I spent most of the year on.

09:02:14  17  Q.   Can you give very brief overview where you went

09:02:17  18  after Harvard?

09:02:19  19  A.   I was recruited to the University of Virginia,

09:02:24  20  half-time in the law school and half time in the med

09:02:28  21  school, and became a professor of law and a

09:02:30  22  professor of behavioral medicine and psychiatry, but

09:02:33  23  I'm not an attorney.

09:02:35  24  Q.   Do you belong to any professional

09:02:38  25  organizations?

09:02:39    1    **A.**    Yes.

09:02:40    2    **Q.**    What -- can you just very briefly describe the

09:02:43    3    roles that you have in professional organizations?

09:02:46    4    **A.**    Well, I belong to lots of them over the years,

09:02:49    5    but there are only three that I really participated

09:02:54    6    actively in.  One was the American Academy of

09:02:56    7    Forensic Sciences, where I became the Chair of the

09:02:58    8    Forensic Psychiatry section, and opened it up to

09:03:03    9    psychologists as well so that it became the

09:03:05    10   Behavioral Science Section, or Psychiatry and

09:03:09    11   Psychology section.  And I was somewhat involved in

09:03:13    12   the American Psychiatric Association.  Chaired one

09:03:17    13   of the committees on misuse and abuse of psychiatry

09:03:21    14   in the US, and participated in the development of

09:03:24    15   two of the additions of the *Diagnostic and*

09:03:33    16   *Statistical Manual*.

09:03:33    17            And most important for me was the

09:03:35    18   American Academy of Psychiatry and the Law.  And I

09:03:37    19   served many roles there, including president and

09:03:40    20   past president.

09:03:46    21   **Q.**    Have you published on competence?

09:03:49    22   **A.**    Yes.

09:03:49    23   **Q.**    Have you lectured on it?

09:03:51    24   **A.**    Yes.

09:03:54    25   **Q.**    You said your group at Harvard did thousands of

09:03:57 1  evaluations, but do you have a ballpark of how many
09:03:59 2  competency evaluations you personally participated
09:04:01 3  in?
09:04:03 4  **A.**   My estimate is that I participated in a
09:04:06 5  thousand of them, both at Harvard and Virginia.
09:04:12 6  **Q.**   Now, in your work as a forensic psychiatrist,
09:04:18 7  has -- has malingering come up before?
09:04:21 8  **A.**   Yes, often.
09:04:22 9  **Q.**   Can you please describe the typical context
09:04:25 10  where it arises?
09:04:26 11  **A.**   Well, most often in my practice it has arisen
09:04:32 12  in disability claims, which I used to do often.  In
09:04:40 13  personal injury claims, in which the effort is to
09:04:44 14  exaggerate the degree of harm suffered in some
09:04:50 15  event, and in criminal cases where it's used to
09:04:53 16  evade responsibility or escape punishment.
09:04:58 17  **Q.**   And focusing on, I guess, criminal cases more
09:05:04 18  broadly.  Have you worked on significant criminal
09:05:06 19  cases over the course of your career?
09:05:10 20  **A.**   Yes, I've been fortunate to do so.
09:05:12 21  **Q.**   Did you work on the Jeffrey Dahmer case?
09:05:16 22  **A.**   I did.
09:05:16 23  **Q.**   Briefly, who is Jeffrey Dahmer?
09:05:20 24  **A.**   He was a young man who was charged with 17, I
09:05:24 25  believe, homicides in Wisconsin.  I might be

09:05:30  1    including one or two from Ohio as well.  His was an
09:05:36  2    insanity defense case.
09:05:37  3    **Q.**   Did you work on the Walter Moody case?
09:05:41  4    **A.**   Yes.
09:05:41  5    **Q.**   Very briefly, who is Walter Moody?
09:05:46  6    **A.**   It was known as the VanPac case, and was a
09:05:52  7    lengthy investigation because he had set a series of
09:05:55  8    mail bombs it was eventually proved that killed
09:06:00  9    Judge Robert Vance of the Second Circuit Court of
09:06:03  10   Appeals and a civil rights lawyer or two.
09:06:08  11                    And I worked with Louis Freeh in
09:06:15  12   that case.
09:06:15  13   **Q.**   Ted Kaczynski case?
09:06:17  14   **A.**   Yes, he was the Unabomber, and I was asked by
09:06:21  15   Justice to evaluate him.  Never did get to meet him,
09:06:24  16   because he decided to change his plea to guilty the
09:06:27  17   day he was being ordered to meet with me.
09:06:30  18   **Q.**   Andrea Yates?
09:06:32  19   **A.**   That's the woman in Houston who had drowned her
09:06:36  20   five children in the bathtub.
09:06:38  21   **Q.**   Was there a problem with that case?
09:06:39  22   **A.**   There was.
09:06:40  23   **Q.**   Can you please describe it for the Court?
09:06:47  24   **A.**   During my cross-examination and testimony on
09:06:49  25   that case, I was asked a question about a television

09:06:52  1    show to which I consult.  And I gave an answer from

09:06:57  2    memory, not having looked it up, and my answer was

09:07:01  3    factually wrong, incorrect.

09:07:03  4                   I didn't discover that until

09:07:05  5    returning to California, and immediately offered to

09:07:10  6    return to correct the error.  And there was a

09:07:13  7    sequence of fumbles thereafter, but it became a

09:07:18  8    centerpiece of her appeal.  And the Texas Court of

09:07:26  9    Criminal Appeals overturned her conviction based on

09:07:29  10   the possibility that the jury had been misled by my

09:07:31  11   factual error and the Government's -- rather the

09:07:35  12   State's reliance on it in its closing argument.

09:07:38  13   **Q.**   And just moving us a little more to recent

09:07:42  14   cases, who is Joe Caracanio (phonetic)?

09:07:49  15   **A.**   This is the young man in Arizona who had killed

09:07:51  16   a federal judge and wounded Gabrielle Giffords and

09:07:59  17   others.  I evaluated him also on behalf of the

09:08:03  18   Department of Justice, which decided to not pursue

09:08:07  19   death.

09:08:07  20   **Q.**   Dr. Dietz, when you were describing that, were

09:08:10  21   you referring to Jared Loughner?

09:08:15  22   **A.**   I thought that's what you said.

09:08:16  23   **Q.**   I apologize.  I don't remember what I said.

09:08:19  24   What you described was Jared Loughner?

09:08:22  25   **A.**   Yes.

09:08:22    1  Q.   What about the Boston marathon bombing case?

09:08:26    2  A.   That's Dzhokhar Tsarnaev, one of the two

09:08:33    3  brothers -- the surviving brother who was brought to

09:08:34    4  trial.  I was asked to evaluate him in connection

09:08:37    5  with capital sentencing.  He refused to be examined.

09:08:42    6                    I attended the entire sentencing

09:08:45    7  phase, and there was nothing to rebut because the

09:08:50    8  defense witnesses were dropped from the list.  So I

09:08:53    9  flew home.

09:08:56   10  Q.   Did you work on the Dylann Roof case?

09:08:58   11  A.   I did.

09:08:59   12  Q.   Quickly, who is that?

09:09:00   13  A.   This is the young man in Charleston, South

09:09:06   14  Carolina who entered a historic and important church

09:09:12   15  and killed partitioners during a Bible studies

09:09:17   16  class.  I was asked to evaluate him with respect to

09:09:25   17  sanity and did so, submitted a report which was

09:09:29   18  under seal.  And subsequently, Mr. Roof fired his

09:09:35   19  counsel, represented himself, and my report was

09:09:39   20  never unsealed.

09:09:41   21  Q.   Have you also worked on complex competency

09:09:44   22  cases before?

09:09:44   23  A.   I have.

09:09:46   24  Q.   Have courts qualified you as an expert in

09:09:49   25  forensic psychiatry before?

09:09:51  1    **A.**   Yes.

09:09:51  2    **Q.**   Fair to say all over the country?

09:09:53  3    **A.**   Yes.

09:09:53  4    **Q.**   Do you know about how many times you've

09:09:55  5    testified in criminal proceedings?

09:09:57  6    **A.**   I've never added them up.  If one counted the

09:10:02  7    early ones, it would be a very large number --

09:10:05  8    certainly hundreds.

09:10:06  9    **Q.**   Okay.

09:10:07  10            MR. MAGNANI:  The United States moves

09:10:08  11   to qualify Dr. Park Dietz as an expert in forensic

09:10:13  12   psychiatry.

09:10:13  13            MR. VARNADO:  No objection, Your Honor.

09:10:14  14            THE COURT:  He is so qualified.

09:10:20  15            MR. MAGNANI:

09:10:20  16   **Q.**   Dr. Dietz did you write expert reports in this

09:10:22  17   case?

09:10:23  18   **A.**   I did.

09:10:23  19   **Q.**   How many expert reports did you write?

09:10:25  20   **A.**   Three.

09:10:27  21            MR. MAGNANI:  Court's indulgence?

09:10:29  22            THE COURT:  Okay.

09:10:45  23            MR. MAGNANI:  May I approach the

09:10:46  24   witness?

09:10:46  25            THE COURT:  You may.

09:10:48   1          MR. MAGNANI:   I'm just handing the

09:10:51   2    witness the report.

09:10:53   3    Q.   Do you have your expert reports up there with

09:10:55   4    you?

09:10:56   5    A.   I do.

09:10:56   6    Q.   Okay.   And just for the record again, I handed

09:10:59   7    the witness what's been admitted as Exhibits 83, 84

09:11:04   8    and 88?

09:11:06   9          THE COURT:   Okay.

09:11:09  10          MR. MAGNANI:

09:11:09  11    Q.   Dr. Dietz -- well, can you just -- I mean,

09:11:13  12    those are your reports?

09:11:15  13    A.   Yes, they are.

09:11:15  14    Q.   Hopefully we're not going to need them, but I

09:11:18  15    wanted to make sure that you had them.   Of course,

09:11:20  16    let me know if you do.   So I want to back up.   Who

09:11:23  17    hired you in this case?

09:11:24  18    A.   The Department of Justice, Tax Division.

09:11:31  19    Q.   What were you hired to do?

09:11:34  20    A.   To evaluate Mr. Brockman's competence to stand

09:11:37  21    trial.

09:11:37  22    Q.   And can you describe your sort of -- well, did

09:11:41  23    you do that by yourself or with other doctors?

09:11:43  24    A.   With other doctors.

09:11:44  25    Q.   Can you just describe your role on the team of

09:11:47  1   doctors?

09:11:49  2   A.   My role was as a forensic psychiatrist, and one

09:11:54  3   who was not an expert on dementia, or neuroimaging,

09:11:59  4   or even the elderly.   Now, I've seen my share of the

09:12:04  5   elderly, but really to pay attention to the nature

09:12:08  6   of the evidence and to critically evaluate evidence

09:12:13  7   as it became available.

09:12:18  8   Q.   How much were you paid for your work in this

09:12:20  9   case?

09:12:22  10   A.   I had my office calculate the total before I

09:12:25  11   left for this travel, and at that point it had been

09:12:32  12   nearly $200,000.

09:12:34  13   Q.   Is that -- and was it ever unclear to you that

09:12:40  14   you were a government expert in this case?

09:12:43  15   A.   No, not at all.   I wasn't sure whether it was

09:12:47  16   the IRS or the Justice Department that had retained

09:12:51  17   me, but it was always clear it was the Government.

09:12:56  18   Q.   Now, you wrote a declaration about that at one

09:12:58  19   point; right?

09:12:59  20   A.   Yes.

09:12:59  21   Q.   Now, you mentioned a lot of cases.   I'm just

09:13:05  22   wondering, do you also sometimes work for accused

09:13:08  23   defendants?

09:13:08  24   A.   Yes, of course.

09:13:09  25   Q.   In criminal cases?

09:13:10    1    **A.**    Yes.

09:13:11    2    **Q.**    And could you describe -- what's the split?

09:13:19    3    How much work do you do for defense work versus

09:13:22    4    Government?

09:13:22    5    **A.**    This is my career stage.  Early on it was

09:13:26    6    mostly court-appointed work as a state employee.

09:13:31    7    Then -- that's in Boston -- or Massachusetts,

09:13:35    8    generally.  Then it was mostly defense work at the

09:13:39    9    University of Virginia, because that's who referred

09:13:43   10    cases.  And I had to struggle to get prosecution

09:13:48   11    cases to our clinic, but did.

09:13:51   12                        Then in private practice it became

09:13:53   13    primarily government work for a time.  And in recent

09:13:56   14    years, it's been 50/50.

09:13:58   15    **Q.**    Working on both sides, have you ever rendered

09:14:02   16    opinions that were contrary to the theory of your

09:14:05   17    client's case?

09:14:06   18    **A.**    Yes -- well, when working for the Government

09:14:11   19    I've rendered them even in court.

09:14:16   20    **Q.**    Is there a difference between rendering a

09:14:22   21    contrary opinion when working for the Government

09:14:24   22    versus a criminal defendant?

09:14:25   23    **A.**    Yes.  In criminal matters, if the expert finds

09:14:29   24    contrary to the Government, the Government has a

09:14:35   25    duty under *Brady* to turn that over to the Defense.

In the context of working for the Defense, if the Defense doesn't like my opinion at any point along the way, um, they may not disclose me as testifying expert.  And they certainly have no duty to turn over my opinions.

Q.   Now, just -- you know, you billed a lot of time -- do you bill by the hour?

A.   Yes.

Q.   And so, what did you do with all of those hours in this case?

A.   Initially, my task was advising Government attorneys what records they should seek.  Because the records we want when there's a mental health issue are very different from what a prosecutor would normally want.  Chief among those, of course, is the medical records.  But also in some cases there are correctional records, and arrest records, and probation records, and military records, and much, much more education and business records and so on.

Here, I wanted particularly to find the medical records, and I advised the Government on the importance of that.

Q.   Do you remember about when you were retained by the Government?

A.   Um, the first phone call was in December of 2020.  It took a little while for the paperwork to get through.  And before that had occurred, I was asked to write a declaration supporting the need for prior medical records.

Q.   Is that declaration -- was that attached to the Government's motion in this case?

A.   It was.

Q.   Do you know -- well, I'd like to pull up Exhibit 81.  Excuse me.  I think we might need to switch the laptop, please.  I think we'll mostly be working with the laptop.

Dr. Dietz, whenever it comes up, my question is going to be -- well, let's wait until it comes up on the screen, but my question will be, you know, what is Government's 81?  If there's a way to sort of just zoom in -- I guess there's probably not.

Can you recognize it from that distance on your screen?

A.   To some extent.  It's very blurry.

Q.   Maybe we can get through this a little faster. Do you know if the Government had requested medical records from the Defense in this case, prior to your engagement?

09:17:08   1   **A.**   Yes.

09:17:08   2   **Q.**   Okay.  Was that in November 2020?

09:17:13   3   **A.**   Yes.

09:17:13   4   **Q.**   That was before the Defense filed their motion

09:17:17   5   asking for those competency hearings?

09:17:19   6   **A.**   Yes.

09:17:19   7   **Q.**   Okay.  So when you were first -- actually, can

09:17:23   8   we scroll?  Is it possible to scroll in this?  I'm

09:17:33   9   sorry.  Now that I can see on the zoom, can you

09:17:36   10   please go to the first page again?

09:17:38   11           So is Exhibit 81 -- is this a letter

09:17:41   12   from the defense team to the prosecution team of

09:17:45   13   April 2020?

09:17:46   14   **A.**   Yes, it is.

09:17:47   15   **Q.**   Now, this exhibit -- and I'll just represent,

09:17:50   16   if it's not a problem -- does not have any

09:17:52   17   attachments to it.  But, Dr. Dietz, do you recall if

09:17:55   18   there were attachments submitted with this letter of

09:17:59   19   medical records?

09:17:59   20   **A.**   Yes, there were.

09:18:00   21   **Q.**   And were the medical records attached to this

09:18:04   22   letter the same medical records that were filed with

09:18:06   23   the Defense's first motion asking for this hearing?

09:18:15   24   **A.**   That I don't know.

09:18:16   25           MR. MAGNANI:  Okay.  I'll move to admit

09:18:18    1   81 in evidence if it's not.

09:18:21    2                  MR. VARNADO:  No objection.

09:18:21    3                  THE COURT:  Without objection,

09:18:25    4   Exhibit 81 is admitted.

09:18:28    5                  MR. MAGNANI:  Excuse me.

09:18:29    6   Q.   Now I want to go to 80.  Now I apologize for

09:18:32    7   the confusion.  This is maybe what I was asking you

09:18:34    8   about before.  Is Exhibit 80 the Government's

09:18:38    9   November 2020 request for records?

09:18:40   10   A.   It is.

09:18:41   11                  MR. MAGNANI:  I'll move to admit this,

09:18:43   12   too, please.

09:18:43   13                  MR. VARNADO:  No objection.

09:18:44   14                  THE COURT:  Without objection, 80 is

09:18:45   15   admitted.

09:18:46   16                  MR. MAGNANI:

09:18:46   17   Q.   Do you recognize -- can we zoom in on the

09:18:49   18   bullet-pointed section here, and to the bottom?  Do

09:18:52   19   you recognize the names of these doctors that are

09:18:55   20   listed in the Government's request for records?

09:18:58   21   A.   I do.

09:18:59   22   Q.   Well, what -- who are those doctors?

09:19:04   23   A.   Well --

09:19:06   24   Q.   Well, you know, I can probably move this along.

09:19:11   25   Are those -- are those the Baylor doctors that --

09:19:16  1   whose records were attached to the letter that the

09:19:19  2   Defense sent to the Government?

09:19:21  3   A.   That would be one way to put it, yes.  Some

09:19:26  4   were treating doctors at various stages.  One was a

09:19:34  5   very long-term friend and more.

09:19:38  6   Q.   And do you know -- do you know if the

09:19:42  7   Government got medical -- the medical records

09:19:44  8   requested?

09:19:46  9   A.   Not at that time.

09:19:47  10  Q.   Okay.  Did you do an exam -- or let's start --

09:19:52  11  when was the first exam done by any member of the

09:19:55  12  prosecution team in this case?

09:19:56  13  A.   May 2021.

09:19:59  14  Q.   And -- well, let me ask you this.  Do you know

09:20:03  15  about when Dr. Darby did an exam of the Defendant?

09:20:08  16  A.   Dr. Darby did an exam in early May, 2021.

09:20:12  17  Q.   Before Dr. Darby did the exam in early

09:20:15  18  May 2021 -- excuse me -- can you describe what the

09:20:18  19  state of medical records was that the team had

09:20:20  20  access to at that time?

09:20:21  21  A.   Yes.  Despite having requested all of the

09:20:26  22  medical records and litigated the issue, we had

09:20:31  23  records from Fondren Orthopedics that consisted of

09:20:40  24  X-rays of a fracture.  We had records from a

09:20:44  25  dermatologist that were not contributory, other than

09:20:48  1  to show Mr. Brockman had earlier been signing

09:20:52  2  consent forms.

09:20:53  3  Q.   Well, and -- sorry.

09:20:54  4  A.   And we had some other not very useful

09:21:09  5  information.

09:21:10  6  Q.   And let me just ask you this.  After

09:21:14  7  Dr. Darby's exam, did you get some additional

09:21:16  8  records?

09:21:16  9  A.   Yes.

09:21:16  10  Q.   What were those records?

09:21:17  11  A.   Those were the records that Mr. Brockman had

09:21:20  12  stored at his home, including --

09:21:25  13  Q.   Oh.

09:21:26  14          THE WITNESS:  Thank you.

09:21:27  15          MR. MAGNANI:  I don't pick up on cues

09:21:29  16  so well.  Sorry about that.

09:21:31  17          THE WITNESS:  Including Dr. Obenour's

09:21:35  18  case records.

09:21:35  19          MR. MAGNANI:

09:21:35  20  Q.   Whenever you are ready, sorry.  How did you

09:21:40  21  find out about those records?

09:21:43  22  A.   We only learned of Dr. Obenour by virtue of

09:21:49  23  Mr. Brockman's having mentioned that when his GP

09:21:52  24  retired, he negotiated receipt of the records from

09:21:57  25  his file.

09:21:59  1   Q.   And not to sort of rehash everything -- I know
09:22:01  2   you wrote a declaration on this -- but just briefly
09:22:04  3   -- I mean, why is it important to have historical
09:22:11  4   medical records before you examine a subject?
09:22:15  5   A.   Well, in forensic work it's important because
09:22:18  6   we don't know what to ask, or the -- what the basic
09:22:22  7   problems are if we don't have the records in
09:22:25  8   advance.   And one can't gauge, necessarily, the
09:22:28  9   accuracy of what a defendant is saying without being
09:22:32  10  armed with objective data from other sources prior
09:22:38  11  to the interview.
09:22:39  12  Q.   Actually, Doctor, can you also just -- I mean,
09:22:42  13  briefly describe the difference between -- like,
09:22:45  14  your forensic practice and common clinical practice?
09:22:47  15  A.   Sorry.   In clinical practice, one is pushed for
09:23:04  16  time, needs to be efficient, tries to focus on the
09:23:07  17  most important things.   In general, one believes
09:23:10  18  what one's patient and their family members are
09:23:13  19  saying.   If any prior records are received, it's
09:23:17  20  common just to read the discharge summaries from
09:23:21  21  hospitalization or the highlighted parts of an
09:23:27  22  electronic record.   Because no one would have time
09:23:31  23  to review all of the detailed records over the
09:23:34  24  course of a long life.
09:23:36  25                  In forensic work, one has to look

09:23:39  1  at everything -- the nursing notes, the drugs

09:23:41  2  administered -- every little detail, getting help in

09:23:45  3  translating them in need be.  That's a very

09:23:48  4  laborious task.

09:23:49  5           And while we didn't have the

09:23:52  6  significant medical records prior to the May

09:23:56  7  examinations, we would later receive thousands and

09:23:59  8  thousands of pages of medical records of many kinds.

09:24:04  9  They continued to dribble in until perhaps two weeks

09:24:09  10  ago.

09:24:09  11  Q.   And -- and fair to say you were not rushed for

09:24:12  12  time in reviewing those?

09:24:15  13  A.   For the lengthy ones, we were not rushed for

09:24:18  14  time.  We had some months.  For the most recent ones

09:24:25  15  there was some rush.

09:24:26  16  Q.   But overall, you figure you had the resources

09:24:30  17  to take the time to do the appropriate job from a

09:24:33  18  forensic standpoint?

09:24:35  19  A.   Yes.

09:24:35  20  Q.   The bills prove it?

09:24:36  21  A.   Yes.

09:24:37  22  Q.   I'll just note, Defense counsel very generously

09:24:40  23  offered a cough drop if you would like it.  Are you

09:24:44  24  interested?

09:24:45  25  A.   Happy to try it.  Thank you.

09:24:56   1   Q.   Okay.  So besides access to records, is it also

09:25:00   2   important to have access to people?

09:25:04   3   A.   Yes, it is.

09:25:06   4   Q.   Oh, actually before I move on.  Did you prepare

09:25:09   5   a -- a slide deck to assist in your presentation

09:25:14   6   today?

09:25:14   7   A.   I did, since grudgingly converting to the

09:25:17   8   digital world I've used PowerPoint every time I

09:25:21   9   testify.

09:25:22   10   Q.   And actually, can we pull up that deck?  Now,

09:25:31   11   were you talking about your access to -- collateral

09:25:34   12   people I think you said.  What's a collateral

09:25:37   13   source?

09:25:37   14   A.   Collateral sources are anything other than the

09:25:40   15   person being evaluated, and that includes collateral

09:25:45   16   documents, collateral witnesses and more.

09:25:49   17   Q.   Did you have adequate access to collateral

09:25:51   18   sources in this case?

09:25:59   19   A.   For a period of time there was substantial

09:26:01   20   collateral evidence by way of documents, videotapes

09:26:05   21   and -- at least medical records.

09:26:13   22   Q.   I asked too broad of a question.  I asked

09:26:16   23   collateral sources.  Can I ask about collateral

09:26:20   24   interviews?

09:26:20   25   A.   With respect to collateral interviews, there

09:26:23   1    were significant limitations.

09:26:27   2    Q.   Do you have the clicker to drive?

09:26:29   3    A.   I do.

09:26:30   4    Q.   Okay.  If you could just tell us, you know

09:26:35   5    about -- who did you have access to and who did you

09:26:38   6    not have access to?

09:26:40   7    A.   Sure.

09:26:42   8               MR. VARNADO:  Your Honor, can I ask

09:26:43   9    Counsel for a copy of the slide deck?  We don't have

09:26:46   10   it, so...

09:26:47   11              MR. MAGNANI:  Sorry, I didn't have it

09:26:49   12   -- the list.

09:26:49   13              THE COURT:  Can I get a copy as well,

09:26:51   14   Counsel?

09:26:52   15              MR. MAGNANI:  Of course.

09:27:07   16              MR. VARNADO:  I'll note for the record,

09:27:08   17   this looks to be about a 20- to 30-page slide deck

09:27:12   18   I've never seen before.  Just receiving it right

09:27:14   19   now.

09:27:14   20              THE COURT:  Okay.

09:27:16   21              MR. MAGNANI:  I think it's longer than

09:27:17   22   that, Your Honor, I hate to say.

09:27:19   23              THE COURT:  Not a problem.

09:27:20   24              MR. MAGNANI:

09:27:20   25   Q.   And so -- sorry, Dr. Dietz.  Can you just

09:27:29    1   describe your efforts to collect witness interviews

09:27:33    2   in this case?

09:27:34    3   **A.**    Yes, well Mrs. Brockman was interviewed by

09:27:39    4   Dr. Darby.  Ms. Keneally was interviewed by

09:27:42    5   Dr. Denney, and so was Mr. Romatowski.  However, we

09:27:47    6   had problems with obtaining interviews with other

09:27:52    7   people we had asked to interview who were reluctant

09:27:57    8   or refused.  Dr. Yudofsky refused through counsel.

09:28:02    9            I was told to call his attorney,

09:28:04   10   rather than to call him directly.  I did so and was

09:28:08   11   told that I should not call Dr. Yudofsky, that there

09:28:17   12   were discussions about offering him immunity and I

09:28:19   13   was not to approach him directly, and of course I

09:28:22   14   didn't.  Dr. Denney and I asked to interview Dorothy

09:28:35   15   Brockman when we were examining Mr. Brockman in May.

09:28:37   16   I forget exactly the sequence of communications

09:28:40   17   there, but we were told that she had already given

09:28:43   18   an interview and would not consent to meet with us.

09:28:51   19            I was told that Don Passmore,

09:28:55   20   Mr. Brockman's CPA had refused to speak to

09:28:58   21   government agents or experts through counsel.  I was

09:29:02   22   told the same thing about Craig Moss.  I was told

09:29:08   23   the same thing about Robert Burnett.  I was told the

09:29:11   24   same thing about Rob Nalley.  I was told that Laura

09:29:19   25   Douglas's attorney had said he'd considered it, but

09:29:22   1   never followed up.

09:29:24   2                   I personally tried several times

09:29:27   3   calling Paul and Isabelita Sheehan, who were

09:29:37   4   caretakers of the Brockman home and the larger home

09:29:40   5   they moved out of in February of this year, and

09:29:42   6   never received an answer.  There was a message

09:29:46   7   saying the voicemail box had not been set up.

09:29:49   8                   I called Larry Perry, who is

09:29:52   9   Mr. Brockman's barber.  And he's a very nice

09:29:55   10  gentleman.  Had a conversation that he said he

09:29:58   11  doesn't speak about his clients and wasn't going to

09:30:00   12  talk to me about Mr. Brockman.

09:30:07   13                  I called Donna Ball, Mr. Brockman's

09:30:11   14  longtime secretary who was also very nice and said

09:30:14   15  that she'd consider it and call back later.  I

09:30:20   16  called her back, and she said that she had spoken to

09:30:23   17  her attorney and wasn't going to be comfortable

09:30:27   18  speaking.  And I said that I hadn't known she was

09:30:31   19  represented or I wouldn't have called her directly.

09:30:34   20  That was the end of that contact.

09:30:36   21  Q.   Just generally, you talked about who some of

09:30:38   22  the people were, but can you just describe why you

09:30:41   23  were trying to contact these people?

09:30:43   24  A.   To see if they had observations bearing on

09:30:46   25  Mr. Brockman's mental state, particularly his

09:30:50  1  cognitive abilities longitudinally over the years.

09:30:54  2  These were people who I thought were well placed to

09:30:57  3  see his cognitive functioning and to observe what

09:31:03  4  decline may or may not have occurred.

09:31:05  5              Usually collateral witnesses of

09:31:08  6  this sort would be able to give examples that would

09:31:12  7  inform my decision making.

09:31:15  8  Q.   Is that just because it's important to have

09:31:18  9  access to the people that see an accused person in

09:31:22  10  their daily life?

09:31:24  11  A.   I would put it more broadly.  It's important to

09:31:27  12  have multiple sources of data so that they can be

09:31:30  13  compared with one another.  And one important source

09:31:33  14  of data is the people who have daily and ongoing

09:31:38  15  contact with a defendant.

09:31:42  16  Q.   Dr. Dietz, at the this time I want to move -- I

09:31:44  17  want to try to narrow the issues here.  Can you

09:31:48  18  just, you know, frame the dispute for the Court?

09:31:50  19  Like, can you tell us what -- what's in agreement in

09:31:53  20  this case?

09:31:53  21  A.   My perception -- and of course others may see

09:31:57  22  it differently -- is that there are several areas of

09:32:02  23  agreement.  First, Mr. Brockman spent his adult life

09:32:05  24  as a hard working businessman and executive who

09:32:09  25  built a successful business.

09:32:11   1              Second, that he has got Parkinson's
09:32:14   2   disease.  No one disputes Parkinson's disease.  And
09:32:20   3   there are demonstrable brain changes, not just the
09:32:23   4   ones that prove Parkinson's disease.  And are --
09:32:29   5   there's some degree of cognitive decline.  I believe
09:32:32   6   all of the experts agree to those points.  I think
09:32:38   7   also everyone agrees -- well, the experts do -- that
09:32:44   8   Mr. Brockman's cognitive decline is progressive and
09:32:51   9   is irreversible.  He's not going to get better from
09:32:57  10   whatever degree of cognitive decline he currently
09:33:00  11   has.
09:33:01  12              Lastly, I think the experts all
09:33:03  13   agree that Mr. Brockman physically frail, and some
09:33:08  14   of that is from his Parkinson's disease.  And so,
09:33:16  15   one can observe physical frailty and manifestations
09:33:20  16   thereof.  He is a fall risk because of his posture,
09:33:25  17   his balance, and a history of falls -- and his age
09:33:29  18   in general.  And everyone agrees that he needs
09:33:32  19   assistance with mobility and daily activities.
09:33:36  20              And that can all be accounted for
09:33:40  21   by Parkinson's motor symptoms.  So that physical
09:33:46  22   frailty does not inform us about his cognition, and
09:33:56  23   that can be misleading to us.  Because the fact that
09:34:02  24   he looks physically frail implies there might be
09:34:06  25   mental frailty as well, but the truth on that is

09:34:08   1   that there may or may not be mental frailty in a

09:34:13   2   physically frail person.

09:34:15   3                    He is at least physically frail.

09:34:18   4   Q.   And how would you describe the points of

09:34:20   5   contention or disagreement between the experts in

09:34:23   6   this case?

09:34:24   7   A.   I think they are few in number, but very

09:34:28   8   important.  First, whether he is competent to stand

09:34:31   9   trial.  And two subcomponents of that that are

09:34:37   10   really underlying the disagreement about competence,

09:34:41   11   the first of those is the extent of his cognitive

09:34:45   12   impairment.  There's not agreement on how impaired

09:34:50   13   Mr. Brockman is cognitively.

09:34:53   14                    Second, whether he is malingering,

09:34:56   15   that is exaggerating the degree of cognitive

09:35:00   16   impairment, this is the basis of the differing

09:35:04   17   opinions on competence.

09:35:14   18   Q.   And in terms of how we talk about cognitive

09:35:19   19   impairment.  Is it fair to say the defense experts

09:35:22   20   are using different -- well, substantively different

09:35:26   21   terminology --

09:35:27   22                    MR. VARNADO:  Object to leading.

09:35:29   23                    THE COURT:  Objection overruled.

09:35:33   24                    THE WITNESS:  I think -- I think

09:35:39   25   there's room for vagueness, uncertainty, and

1    different uses of terminology within the field as a
2    whole.  And that some of the terminology used in the
3    case can be misleading or confusing.
4    **Q.**   I mean, what is your opinion about these areas
5    of disagreement?  As a forensic psychiatrist, what's
6    your take on the disagreements here?
7    **A.**   Well, I can give my opinions about these
8    contested issues.  The first of those is that I
9    believe that Mr. Brockman does meet the *Dusky*
10   standard for competence to stand trial, has each of
11   the ingredients necessary to be found competent.
12   That is that he has a reasonable degree of rational
13   understanding and rational and factual understanding
14   of the proceedings against him, and that he is able
15   to consult with his attorney.
16   **Q.**   And how is your -- how does malingering factor
17   into that opinion?
18   **A.**   It's my belief Mr. Brockman's ability to do
19   this is masked by the exaggeration of his symptom
20   severity, and that he is capable fooling others or
21   duping others into believing his impairment is more
22   severe than it is.
23   **Q.**   When do you think that started?
24   **A.**   It started quite early.  And as we go through
25   the different sources of information, I think it

09:37:36  1    will become clearer, at which points which kinds of
09:37:41  2    exaggeration were occurring.  One point at which
09:37:45  3    we've got very clear evidence of it is in Dr. York's
09:37:51  4    first examination in March of 2019.
09:37:55  5    Q.    Now, can you just describe, generally, how
09:37:59  6    exaggeration or malingering impacts the ability to
09:38:03  7    accurately measure the degree of cognitive
09:38:06  8    impairment?
09:38:12  9    A.    With respect to the kind of malingering
09:38:17  10   observed here, testing batteries that would normally
09:38:24  11   measure cognitive impairment are invalidated, and
09:38:30  12   therefore can't be relied on at all for anything.
09:38:40  13   An invalid battery of neuropsychological testing
09:38:43  14   tells us we can't rely on any of the results of that
09:38:46  15   testing.
09:38:49  16   Q.    And do you know if Mr. Brockman's diagnoses by
09:38:52  17   other doctors have relied on that type of testing?
09:38:56  18   A.    Yes, I know that at least Dr. Agronin,
09:39:01  19   Dr. Guilmette, and Dr. Wisniewski relied on testing
09:39:07  20   that in my view was not valid.
09:39:10  21   Q.    And just back to -- zooming out to cognitive
09:39:13  22   function.  I mean, what is your opinion on where
09:39:17  23   Mr. Brockman falls on the normal cognitive function
09:39:20  24   to severe dementia scale?
09:39:22  25   A.    Where he actually falls, in my opinion, is at

09:39:27   1   the mild cognitive impairment stage, or perhaps at
09:39:37   2   the stage of mild dementia.
09:39:41   3   Q.   I wanted -- I think you already talked about
09:39:44   4   having had the opportunity to examine Mr. Brockman.
09:39:48   5   I just want to ask you -- directing your attention
09:39:52   6   to the May 18th exam, did you have the chance to
09:39:55   7   just learn about this man?
09:39:56   8   A.   Yes.
09:39:57   9   Q.   And so -- I mean, what can you -- you know,
09:40:00  10   we've had a lot of witnesses here.  But what can you
09:40:02  11   tell us about this man that you interviewed?
09:40:05  12   A.   Well, first of all this is a man that it's hard
09:40:10  13   not to admire.  He really had spectacular
09:40:16  14   achievement.  He came from a life he regarded as
09:40:22  15   working poor, and had enormous contact with a
09:40:26  16   grandmother who taught him all sorts of values.  She
09:40:31  17   taught him hard work.  She taught him to save for
09:40:40  18   the future.
09:40:41  19                  She instilled in him, through lots
09:40:43  20   of contact, a set of values that I happen to admire
09:40:48  21   greatly.  And he credits her with much of the
09:40:57  22   success, because of the values she instilled in him.
09:41:06  23   He was able to receive an education because his
09:41:08  24   grandmother had paid his complete tuition, and room
09:41:11  25   and board with money she had accumulated by buying

properties around her home and saving well.

And Mr. Brockman had all manner of jobs from the time his grandma made him be a paperboy through college, and later when he was picking up and delivering laundry.  He gave a colorful description of all of these jobs and how they taught him all various things.

Q.   You talked about jobs he had when he was a -- you know, a younger boy or man.  Can you talk a little bit about his professional career?

A.   Well, he worked for two other employers when he joined the real working world full-time.  The first was Ford Motor Company.  He described his experience there as less than illuminating.  And then he worked for IBM, where he learned a very great deal.  But he saw how some things could be done better than IBM was doing them, and decided that he wanted to start his own company.

He gave me a vivid description of how Dorothy, his wife, had supported his idea of taking this risky step of starting his own company. And it was started in the living room of their home. And from nothing, he built what would later become the set of companies that included Reynolds and Reynolds.  And that's kind of an American dream

story to go from -- not exactly rags, but working
poor to riches with a successful business employing
lots of people.

He even taught himself to program.
It's not that he went to school to learn to program.
He taught himself to do it.  And for the head of a
software company to have done that is another -- in
my view -- admirable achievement.  So it ensured he
had an enormously successful business career, and
also engaged in significant philanthropy through the
A. Eugene Brockman Charitable Trust.

On the first day of the May
interview, he was able to give, from memory, a list
of the various charities to which the trust had
contributed, and he gave detail about what some of
those charities had accomplished by way of
scholarships, the opera hall and so on.

He happened not to mention Baylor
Medical College in that list on the first day.  And
on the second day he was asked to talk about any
additional charities he thought of, and again to
mention Baylor.

And on the third day in May when I
asked him about Baylor by bringing up the name he
said, "Yes, there'd been something there.  It's hard

1    to remember them all."

2                    But he said he thought it was

3    around a million dollars that he donated to Baylor,

4    when I knew that it was $25 million.  And I asked

5    him if it could have been closer to 30, and he said

6    that that number was too high.

7    Q.   And just -- I mean, any -- did he discuss any

8    sort of personal interests --

9    A.   Oh, yes.

10   Q.   -- besides his business career?  Can you talk

11   about those?

12   A.   So he talked about his fisher -- his fishing

13   expeditions.  He's an avid fisherman, even had a

14   collection of fishing reels.  And this had been a

15   longstanding interest.  He also was a shooter and a

16   bird hunter.  We talked about some of the weapons

17   that he owned and his enjoyment of them, which

18   was -- he gave a story about how he was able to have

19   a New England manufacturer make a customized 1911

20   pistol with the serial number being his name.

21                    So he -- he knew his stuff about

22   his hobbies, and was enthusiastic about speaking

23   about them.  I learned that he was widely traveled,

24   including many trips for fishing and shooting

25   purposes.  I learned, of course, and had already

09:46:20   1    known that he had retired a year previously as CEO

09:46:27   2    and chair of Reynolds and Reynolds.  But when I

09:46:35   3    asked him if he had exercised a disability clause,

09:46:38   4    he said that he hadn't, and of course I knew that he

09:46:46   5    was an 80-year-old man.

09:46:49   6                    He had been married for 53 years,

09:46:51   7    and that his family, to whom he was particularly

09:46:57   8    close, included not only his wife Dorothy, but also

09:47:00   9    his son Robert and his daughter-in-law, and their --

09:47:10   10   at the time -- infant child.

09:47:11   11   Q.   Did you also learn about Mr. Brockman's medical

09:47:14   12   history throughout your work in this case?

09:47:18   13   A.   Yes.

09:47:18   14   Q.   Can you please just summarize the relevant

09:47:21   15   medical history?

09:47:21   16   A.   So it's a very long medical history with many,

09:47:25   17   many detailed records, but the relevant portion is

09:47:32   18   that he first developed depression in recent years,

09:47:39   19   and that depression was attributed by -- was

09:47:43   20   attributed to different causes by various people.

09:47:51   21   Q.   I mean, do you -- can you talk -- can you

09:47:56   22   describe that a little more, please?

09:47:57   23   A.   I don't think the cause of it is all that

09:48:01   24   important here, because there are multiple possible

09:48:03   25   causes.  It could have been related to the early

09:48:06  1   onset of Parkinson's.  It could have been related to

09:48:12  2   his recognition of the jeopardy he was in from

09:48:15  3   ongoing investigations.

09:48:17  4              It could have been related to loss

09:48:23  5   of some functions that are difficult for men of his

09:48:28  6   age.  So there are multiple, possible cause of it.

09:48:33  7   But it's clear that there was some depression, and

09:48:37  8   that he was treated quite promptly with Wellbutrin,

09:48:43  9   an anti-depressant.  And that most of the time that

09:48:46  10  has worked adequately, he calls them happy pills.

09:48:52  11  Q.   And if you are not that's okay, but are you

09:48:55  12  able to estimate about when he started being treated

09:48:57  13  for depression?

09:49:01  14  A.   I think it was -- I'm sorry?

09:49:03  15  Q.   I mean, if you are.

09:49:06  16  A.   I didn't make note of it, but I think it is

09:49:09  17  around October of 2018 that he is speaking --

09:49:23  18  Q.   If you are not sure.

09:49:24  19  A.   Yeah, I'm not sure.

09:49:25  20  Q.   Okay.  Well, we already talked about

09:49:33  21  Parkinson's, but what other relevant history did you

09:49:36  22  consider?

09:49:36  23  A.   Parkinson's disease, of course, was an

09:49:39  24  important part.  That's managed with medication.

09:49:46  25  The dose has been tweaked at various points along

09:49:50   1   the way to make sure it was not producing side

09:49:53   2   effects, but he's been on a stable dose for some

09:49:58   3   time.

09:49:58   4              There was the discovery through a

09:50:02   5   request from defense experts for the beta-amyloid

09:50:09   6   study.  And the beta-amyloid study doesn't actually

09:50:14   7   tell us much since an 80-year-old is likely to be

09:50:20   8   positive for beta-amyloid.

09:50:23   9              And it's consistent with perfectly

09:50:26   10  normal cognition, or also consistent with problems

09:50:31   11  with cognition.  So it's not informative about his

09:50:37   12  cognitive function at any point in time.

09:50:40   13  Q.   Is there another protein that gets deposited in

09:50:43   14  the brain that can be more informative about

09:50:49   15  Alzheimer's disease?

09:50:50   16  A.   Yes, tau.  T-A-U -- MR. VARNADO:  Your Honor,

09:50:54   17  I'd object.  This is not in his report and not his

09:50:57   18  area of expertise.  He's just regurgitating what

09:51:01   19  other people have testified in this court.

09:51:02   20              THE COURT:  But he has worked on a team

09:51:04   21  and looked at other experts' opinions; right,

09:51:07   22  Counsel?

09:51:09   23              MR. MAGNANI:  Yes, Your Honor.  But

09:51:10   24  also to be clear, I'm hoping to work with this

09:51:12   25  witness to clarify some things that -- maybe

09:51:15   1   testimony that didn't come out in the course of this

09:51:17   2   hearing.  And so if -- if that's helpful for the

09:51:19   3   Court, I think it's appropriate for this witness to

09:51:23   4   do that.  But happy to hear it if it's not.

09:51:26   5                  MR. VARNADO:  He testified at the

09:51:27   6   beginning, Your Honor, he's not an expert in

09:51:30   7   dementia, neuroimaging, or even in the elderly.  So

09:51:33   8   having sat through regurgitate the opening is not

09:51:39   9   appropriate.

09:51:39   10                  THE COURT:  Objection's overruled.  You

09:51:40   11   can deal with it on cross-examination.

09:51:43   12   Respectfully, I'll let you continue.

09:51:44   13                  MR. MAGNANI:

09:51:45   14   Q.   I apologize.  If you remember where you were,

09:51:47   15   you can pick it up from there.  But if you don't,

09:51:49   16   um, really the question is I wanted to know about if

09:51:51   17   there was another protein that deposits in the brain

09:51:56   18   after beta-amyloid that's informative about

09:52:02   19   Alzheimer's disease.

09:52:03   20   A.   Yes, and I answered tau, T-A-U.

09:52:06   21   Q.   Do you know if tau -- the levels of tau can be

09:52:09   22   tested in a person?

09:52:10   23   A.   Yes, there are two ways to test it.  One is

09:52:14   24   with another radioactive tracer test, that is an FMG

09:52:22   25   -- I'm sorry, a PET looking specifically for this

09:52:26   1   protein.

09:52:26   2                    The other is from the cerebrospinal

09:52:31   3   fluid, which requires a spinal tap.  So most people

09:52:34   4   would rather have the scan.

09:52:37   5   Q.   Do you know if there was any test of the levels

09:52:40   6   of tau in Mr. Brockman in this case?

09:52:42   7   A.   This was not done.

09:52:49   8   Q.   Can you think of any reason -- I mean, you

09:52:49   9   worked at a forensic psychiatrist on both sides.

09:52:53   10  Can you think about a reason why the Defense's

09:52:55   11  experts may have ordered an amyloid and not tau PET?

09:52:59   12  A.   Well, there's no downside risk to the Defense

09:53:02   13  ordering an amyloid, because if it's negative that

09:53:08   14  just means that the cause of any alleged dementia is

09:53:14   15  probably not Alzheimer's disease.  But if it's

09:53:20   16  present, then it's possible there's Alzheimer's

09:53:26   17  disease.  It's not going to say how far that disease

09:53:30   18  has progressed.  The amyloid doesn't really inform

09:53:35   19  as to that.

09:53:38   20                    On the other hand, the measurement

09:53:40   21  of tau has the risk that it won't be there, which

09:53:52   22  would limit the ability to use Alzheimer's disease

09:53:59   23  as the explanation for cognitive decline.  So the

09:54:03   24  safer one was done as a tactical matter, or for

09:54:11   25  trial strategy.

Q.   And what -- just get back to the medical
history.  What, from your review of records, have
you been able to see about the Defendant's level of
cognitive impairment?

A.   Well, that's pretty interesting.  That's
disputed.  And it depends on who is looking when
what's seen as to the level of cognitive impairment.
As a topic we'll have to come back to, because
that's the central dispute.

Q.   Um, can you describe -- well, was a sleep study
ordered by the Government team in this case?

A.   Yes.

Q.   Can you describe why the Government asked for a
sleep study?

A.   The reason for the sleep study originally was
that there'd been a suggestion in clinical records
that there might be Lewy bodies dementia.  That was
raised as an issue because of some instances in
which Mr. Brockman had been told by his wife that he
was moving during sleep.

          That creates the possibility that
he's acting out his dreams, which can happen with
Lewy bodies dementia.  It's known as an REM sleep
movement disorder.  The way one verifies whether
it's actually present is by using some of the leads

09:55:54   1   of an EEG -- brainwaves -- while the person is

09:56:00   2   sleeping in the lab and while they're being

09:56:02   3   videotaped.  So one can verify are they in REM sleep

09:56:07   4   from the EEG, at the same time that one can see

09:56:11   5   their movements through the video.  So that's the

09:56:16   6   gold standard for seeing if there's an REM movement

09:56:21   7   sleep disorder.

09:56:22   8             The first test done of that didn't

09:56:27   9   result in a sufficient duration of REM sleep to be

09:56:31  10   able to say whether he had that disorder.  So it

09:56:37  11   doesn't rule it out that it was not observed in an

09:56:42  12   inadequately small sample.  But what was observed,

09:56:46  13   despite the short length of REM sleep, was that he

09:56:52  14   had obstructive sleep apnea.  Now, this is a chronic

09:56:59  15   condition that causes the person to become alert to

09:57:03  16   varying degrees, or for the brain to begin to show

09:57:07  17   signs of arousal and a decrease in the amount of

09:57:12  18   restorative sleep.

09:57:17  19             And there are cutoff points used by

09:57:22  20   sleep specialists for how many of these arousal

09:57:25  21   episodes per hour constitute severe-enough

09:57:32  22   obstructive sleep apnea to impair a person's

09:57:39  23   functions in various ways, or incase risk of cardiac

09:57:45  24   events resulting in death.  So it's a significant

09:57:48  25   concern if someone is having 70 arousals an hour and

09:57:53  1    not getting sufficient rest.

09:57:55  2                    And among the problems that can

09:57:57  3    occur are those affecting cognitive function.  So

09:58:05  4    that was picked up on the very first sleep study.

09:58:12  5    And the second sleep study titrated --

09:58:16  6    Q.    Actually, Dr. Dietz, before you move on to the

09:58:18  7    second study.  You mentioned that the study was

09:58:22  8    ordered to try to measure whether the Defendant was

09:58:24  9    having a telltale symptom of dementia with Lewy

09:58:28  10   bodies.  I want to just ask, do you know if any of

09:58:31  11   the doctors at Baylor who diagnosed dementia with

09:58:34  12   Lewy bodies -- if they had ordered a sleep study?

09:58:36  13   A.    No, it was ordered by Dr. Darby.

09:58:39  14   Q.    Okay.  You said that it revealed sleep apnea

09:58:44  15   and it produced an insufficient sample.  I think you

09:58:46  16   were going to describe what did the -- Dr. Darby and

09:58:50  17   the team do after they got the first sleep study

09:58:53  18   results?

09:58:53  19   A.    Because that one didn't tell us what we were

09:58:57  20   looking for -- it was just not an adequate sample --

09:59:01  21   we asked for a repeat sleep study.  That was done,

09:59:06  22   and that was able to rule out the REM movement

09:59:14  23   disorder.  And so, from that point on there was not

09:59:20  24   much discussion from anyone of dementia with Lewy

09:59:25  25   bodies.

09:59:25   1   **Q.**   What -- besides having a larger sample in that

09:59:27   2   second sleep study, was there a difference with it

09:59:30   3   relating to the sleep apnea?

09:59:33   4   **A.**   Well, here too he had sleep apnea, but the

09:59:39   5   treatment for it is continuous airway pressure.

09:59:46   6   It's a machine called a CPAP machine, and the

09:59:50   7   patient has to wear a mask or nasal pillows.  The

09:59:55   8   airway is kept open through the application of

10:00:01   9   pressurized air.  That was effective with

10:00:06   10   Mr. Brockman, and they calibrated what the machine's

10:00:10   11   settings should be and recommended he used that

10:00:12   12   nightly.

10:00:13   13   **Q.**   And so, after the second -- well, what does it

10:00:18   14   mean when the term -- can you just explain the term

10:00:20   15   CPAP titration?

10:00:25   16   **A.**   That's figuring out what the right machine

10:00:28   17   setting for that patient that -- it's the pounds of

10:00:33   18   pressure per square inch.  And there's a dial on the

10:00:35   19   machine, and if one knows the code then one can

10:00:39   20   change what that setting is.

10:00:41   21           Used to have to go back to the

10:00:43   22   doctor for another visit to have a change.  Now

10:00:45   23   people look it up on YouTube and change their own

10:00:49   24   settings.  But the upshot of it is one will sleep

10:00:55   25   better, be better rested, have less daytime

10:01:02    1    sleepiness, and improvement of cognitive functioning

10:01:05    2    if one uses as described.

10:01:06    3    Q.   In addition to the forensic benefit of getting

10:01:09    4    more REM sleep data, was there also a clinical

10:01:13    5    benefit, perhaps, to Mr. Brockman?

10:01:15    6    A.   Yes.

10:01:15    7    Q.   And could improved sleep -- or could improved

10:01:22    8    sleep have an impact on cognitive function?

10:01:25    9    A.   Yes, but I don't want to overstate the extent

10:01:29   10    of it.

10:01:29   11    Q.   Okay.

10:01:29   12    A.   So the literature on CPAP and improved

10:01:33   13    cognition does show significant benefit, but it

10:01:36   14    doesn't take someone from moderately demented to

10:01:40   15    normal.  It's not going to cure real dementia.

10:01:46   16    Q.   Fair to say CPAP -- or a good night's rest

10:01:50   17    doesn't cure neurodegeneration?

10:01:52   18    A.   Correct.

10:01:54   19    Q.   What about other -- I want to talk about

10:01:56   20    relevant medical history, focusing on other systems

10:02:00   21    of the body.  Was there anything -- other

10:02:03   22    significant medical history that you considered?

10:02:05   23    A.   If you are talking about other systems of the

10:02:08   24    body, the bladder cancer would be a big one.  But

10:02:10   25    there's a host of other medical problems that I

10:02:14  1    don't think are relevant.

10:02:15  2    Q.   Well, just focusing on what's relevant then.

10:02:23  3    A.   I would say the most relevant and recent set of

10:02:25  4    issues has to deal with these urinary tract

10:02:31  5    infections that turned into sepsis in at least two

10:02:34  6    of the three instances for which he was hospitalized

10:02:38  7    with both a urinary tract infection and also

10:02:47  8    delirium.   Those were significant hospitalizations.

10:02:49  9    And delirium is a serious medical problem with a

10:03:01  10   high mortality rate.   So those are recent enough to

10:03:05  11   be striking and important in this case.

10:03:09  12   Q.   Well, has Mr. Brockman had urinary tract

10:03:13  13   problems since before recent times?

10:03:16  14   A.   Yes, for years he's had urinary tract problems,

10:03:20  15   but none that led to sepsis until these, and none

10:03:25  16   that led to delirium until these.

10:03:27  17   Q.   And is it the -- is it the urinary infection or

10:03:33  18   the sepsis that leads to delirium?

10:03:37  19   A.   It's -- well, either one can.   It's a lot

10:03:45  20   easier to understand how it happens when he's

10:03:48  21   septic, because if the urinary tract infection

10:03:51  22   spreads into the blood then of course it can more

10:03:57  23   readily affect the brain.   But even without it being

10:04:02  24   detected in the blood by looking at whether bacteria

10:04:07  25   grow from a -- from an arterial blood sample, even

10:04:13   1   if one hasn't proved that, the infection itself can

10:04:19   2   create such a response in the body that ability to

10:04:25   3   think clearly is overwhelmed.

10:04:29   4                    That's really what delirium is.

10:04:31   5   It's an acute state that can have many, many

10:04:34   6   different cause.  But the brain is not functioning

10:04:38   7   properly for delirious patient.

10:04:42   8   Q.   And would you agree sepsis is a pretty serious

10:04:47   9   condition?

10:04:47   10   A.   Very.

10:04:47   11   Q.   So if a healthy, young, cognitively normal

10:04:51   12   person were hospitalize would sepsis, could that

10:04:54   13   result in delirium?

10:04:55   14   A.   Certainly.

10:05:01   15   Q.   If you don't know, that's okay, but is the

10:05:04   16   sepsis that's happening -- is that related to

10:05:06   17   cognition?

10:05:08   18   A.   I don't understand the question.

10:05:15   19   Q.   I guess my question is you mentioned how

10:05:20   20   bacteria from a UTI can lead to sepsis.  I'm

10:05:23   21   wondering if the bacteria leading to sepsis has

10:05:26   22   anything to do with the brain or its other areas of

10:05:30   23   the body?  If you don't know, that's okay.

10:05:38   24   A.   I think I can provide an answer that will

10:05:41   25   address that, but I believe the concept one needs to

10:05:47  1  have is that there are many, many causes of

10:06:00  2  delirium.  Among the causes seen in delirium in

10:06:05  3  medical practice, generally alcohol would probably

10:06:08  4  be the most common, barbiturates and other

10:06:14  5  sedatives.  Person can be perfectly healthy, take

10:06:17  6  too much at home and be brought to the hospital

10:06:21  7  delirious.

10:06:22  8            I don't know the frequency, but

10:06:26  9  other common ones would be liver failure, kidney

10:06:29  10  failure, complications of diabetes, fever of any

10:06:35  11  cause -- infection causing a fever.

10:06:45  12            So depending on the setting one is

10:06:48  13  looking at, the causes of delirium are variable.

10:06:52  14  It's one thing in the emergency room.  It's another

10:06:53  15  in the ICU, and another in the geriatric ward.

10:07:00  16  There are many causes that lead to this final common

10:07:02  17  pathway of the brain not being able to function

10:07:07  18  adequately and presenting this delirious, confused

10:07:10  19  and inattentive state which the person's level of

10:07:13  20  arousal is quite variable.

10:07:16  21  Q.   Is there any other --

10:07:18  22  A.   That's always the brain.

10:07:19  23  Q.   Okay.

10:07:20  24  A.   But how it gets from the insole to the brain

10:07:24  25  problem is highly variable.

10:07:26    1   Q.   Okay.   Any other relevant medical history in
10:07:33    2   this case?
10:07:37    3   A.   There was a UroLift procedure in June that was
10:07:41    4   done under general anesthesia.   He was not under
10:07:44    5   anesthesia excessively long that one had to consider
10:07:50    6   whether that could have changed his mental state and
10:07:53    7   the aftermath, but there were no complications to
10:07:57    8   it.   It was surgically successful.
10:07:59    9   Q.   But is it possible that general anesthesia
10:08:02   10   could contribute to delirium?
10:08:04   11   A.   Yes, particularly with some of the older ones,
10:08:12   12   but he wasn't delirious after this.
10:08:14   13   Q.   And I know we talked about lot of different
10:08:17   14   materials you reviewed in this case.   Like to sort
10:08:19   15   of get to your assessment of these materials.   So
10:08:23   16   just starting off what, Doctor, can you tell us
10:08:25   17   about your assessment of the brain studies that have
10:08:28   18   been done in this case?
10:08:34   19   A.   Well, I think the most basic point is that the
10:08:45   20   brain studies done in this case show that there has
10:08:48   21   been amyloid accumulating.   No one can be sure for
10:08:55   22   how long, but it could have been accumulating for
10:08:58   23   years.
10:08:58   24                   They tell us that there are
10:09:00   25   neurodegenerative changes in the brain, which are

visible through the hypometabolism through the
FTG-PET scans, through the less than maximal volume
on the MRI, but still in the normal range, and that
-- and none of these studies of the brain tell us
his cognitive function.

There is not a one-to-one
relationship between what's seen in any brain
imaging and cognitive function.

Q.   So what -- moving to the collateral interviews,
what did they inform about Mr. Brockman's cognitive
function -- well, actually let me ask you.  Is
cognitive function the thing we're all trying to
measure here?

A.   Cognitive function is one of the big disputed
issues, how severely is a big question.

Q.   What do the collateral interviews review about
his cognitive function?

A.   The collateral witnesses describe him as acting
with varying degrees of impairment.  Some describe
quite severe issues.  For example, putting his pants
on his arms or shirt on his legs.  That would
suggest quite severe cognitive impairment.  Not
knowing how to move about his house or where he is
in his home.

Believing he's in Aspen when he's

really in Houston.  Examples of this sort reported
by collateral witnesses are at the higher range of
severity of impairment.  But collateral witnesses at
the same time period -- until at least recently --
also describe lesser degrees of impairment.

From the second and third hand
reports of collateral witnesses available to me, by
hearing what Mr. Brockman's wife or son told the
doctor and what that doctor decided to write that I
could later read, it's attenuated.  I'm not able to
question the person.

The same thing is true when
Dr. Agronin interviews a collateral witness, I can
read what Dr. Agronin write -- writes about that,
but I'm not able to question that witness.  And, of
course, I saw some of the testimony of collateral
witnesses here.  And that's better than reading what
an interviewer wrote, because it's subject to
cross-examination and it's in more depth and it's
not selective.

So my view, just to cut to the
chase on it, is that I don't regard the collateral
witnesses in this case as necessarily valid
informants providing information on which I can
rely.  I have no doubt that if we lined them all up,

10:12:58  1   we would find varying degrees of liability.  I'll
10:13:03  2   leave it at that.
10:13:04  3   Q.   Okay.  Fair to say Mr. Brockman has been
10:13:07  4   subject to a very large number of very long forensic
10:13:13  5   interviews?
10:13:14  6   A.   Yes, indeed.
10:13:15  7   Q.   Okay.  What did those inform about cognitive
10:13:17  8   function?
10:13:26  9   A.   Well, here too we have considerable
10:13:32  10  variability.  I think we'll get to look at the
10:13:34  11  details of it, but in May his functioning was
10:13:41  12  clearly far better than it appeared to be in July.
10:13:53  13  And in October, in my view, his functioning was
10:13:56  14  better than it appeared to be in July.  But what's
10:14:00  15  happening in these forensic interviews is that, um,
10:14:04  16  experienced examiners get to question him and see
10:14:08  17  how he responds to that, and he gets to act as he
10:14:14  18  wishes to act.
10:14:16  19              And so, what we always have is a
10:14:21  20  performance.  When he's subjected to testing, he's
10:14:27  21  performing on those tests.  And we have to consider,
10:14:31  22  are we getting a reliable indicator of his actual
10:14:37  23  cognitive function at these times?  And this is no
10:14:47  24  guarantee that we're getting valid result when we
10:14:52  25  talk to him.

10:14:53  1          What we have to look for, of
10:14:55  2   course, is are there times when preserved cognitive
10:14:59  3   function comes through in an interview in which he
10:15:08  4   otherwise seems quite impaired from time to time?
10:15:17  5   And I think in each of the interviews there are
10:15:19  6   examples of some impairment being shown and some
10:15:22  7   lack of impairment being shown.  But how impaired he
10:15:28  8   looks is quite variable across these interviews.
10:15:31  9   Q.   Let's talk about the test -- excuse me.  Is
10:15:36  10  there one area where -- you describe a lot of things
10:15:39  11  where there's lots of variabilities.  Is there an
10:15:42  12  area where Mr. Brockman's performance has been very
10:15:44  13  consistent?
10:15:44  14  A.   Oh, yes.  And this is one of the most
10:15:48  15  extraordinary and important things that since the
10:15:52  16  very first neuropsychological test battery was
10:15:57  17  administered in March of 2019, Mr. Brockman has been
10:16:05  18  performing at a very low level.  And specifically,
10:16:10  19  if one looks at his memory since the beginning of
10:16:15  20  2019, he's been performing in the lowest first
10:16:20  21  percentile on memory.
10:16:24  22  Q.   And you said from the beginning.  Do you
10:16:26  23  remember the first time he had this type of testing
10:16:30  24  conducted?
10:16:32  25  A.   I think I just mentioned that March 2019 was

```
10:16:38   1   Dr. York's first battery of neuropsychological test.
10:16:43   2   Q.   Okay.  So I'd like to just talk about some of
10:16:49   3   the documents and other materials that you had to
10:16:51   4   review.  And I'd like to just start with, you know,
10:16:59   5   the medical records I guess --
10:17:00   6                MR. MAGNANI:  I apologize, Your
10:17:01   7   Honor.
10:17:07   8   Q.   You talked about how you looked at the
10:17:09   9   materials from his treating doctors, which trickled
10:17:11  10   in over time.  I mean, how did those records -- what
10:17:14  11   did those records say, if you can summarize?
10:17:20  12   A.   Well, different doctors are seeing different
10:17:23  13   things at different times because they arrived out
10:17:25  14   of order.  It was somewhat difficult to keep all of
10:17:32  15   this straight.  But what is observable is a
10:17:47  16   progressive reporting of signs and symptoms of
10:17:52  17   dementia by Mr. Brockman or his family members.
10:17:58  18                It's not always clear who is giving
10:18:00  19   the doctor information.  But the -- the narrative
10:18:05  20   that the doctors are receiving is of progressive
10:18:10  21   decline.  The doctors' opinions are varying over
10:18:23  22   time, and usually in the direction of Mr. Brockman
10:18:25  23   seeming worse and worse.
10:18:29  24                And one particularly notable
10:18:31  25   example where I happened to recall the timing was
```

10:18:37   1   Dr. Lai having evaluated Mr. Brockman over the

10:18:44   2   course of these years.

10:18:48   3   Q.   I'm sorry, just -- Doctor, I want to interrupt

10:18:51   4   you for a second.  Can you remind the Court, who is

10:18:53   5   Dr. Lai?

10:18:54   6   A.   Dr. Eugene Lai, who is a neurologist and --

10:18:59   7   Mr. Brockman's treating neurologist -- and

10:19:03   8   considered Mr. Brockman to have Parkinson's disease

10:19:08   9   with mild cognitive impairment as recently as June

10:19:11   10  of this year.  But in October of this year, for the

10:19:20   11  first time, described him as having Parkinson's

10:19:24   12  dementia.  The record isn't clear as to the basis

10:19:28   13  for the change in diagnosis or phrasing, but the

10:19:34   14  record's clear that there's change from MCI, mild

10:19:40   15  cognitive impairment, to use of the term dementia in

10:19:43   16  Dr. Lai's records.

10:19:51   17              If we look at all of the records

10:19:53   18  and which terms people are using, there's a great

10:19:57   19  deal of discrepancy from early 2019, up to October

10:20:03   20  of 2021, until we get to October of 2021, where the

10:20:14   21  opinions are converging and using the term dementia.

10:20:18   22  Q.   Besides reviewing all of these medical records,

10:20:20   23  did you also review videos of Mr. Brockman giving

10:20:23   24  speeches or deposition testimony?

10:20:24   25  A.   Yes.

10:20:25    1    Q.    What do those videos reveal about
10:20:28    2    Mr. Brockman's cognitive function?
10:20:29    3    A.    In my view, the testimony that Mr. Brockman
10:20:36    4    gave to -- in both of the matters in 2019
10:20:40    5    demonstrates that he is not demented at the time of
10:20:45    6    that testimony.  I observed the entire videotape of
10:20:52    7    the two days of testimony in early 2019, and read
10:20:57    8    the entire transcript for the non-videotaped
10:21:00    9    testimony later in 2019, and could not find evidence
10:21:06   10    of dementia there, and did find evidence of superior
10:21:11   11    mental functioning, superior cognitive skills.
10:21:15   12    Q.    And I'm sorry, did you say speeches, too?  Did
10:21:20   13    you watch any speeches?
10:21:21   14    A.    I did.
10:21:22   15    Q.    And just, I guess -- I know there were -- well,
10:21:24   16    do you watch a lot of speeches?
10:21:27   17    A.    At least three from 2017, 2018 and 2019.  And
10:21:36   18    as with the testimony, my opinion is the speeches
10:21:42   19    show that he was not demented as recently as late, I
10:21:48   20    think, November 2019.  Now, one can see evidence of
10:21:54   21    Parkinson's disease motor symptoms, at least when
10:21:59   22    viewed in retrospect knowing he's been diagnosed
10:22:01   23    with that, but not of dementia.
10:22:07   24    Q.    Do you remember the context -- I think you said
10:22:09   25    the November -- excuse me, the 2019 speech you

10:22:13   1   thought was around November of 2019.  Do you

10:22:15   2   remember the context of these speeches?

10:22:18   3   A.   Yes, these were company birthday parties of

10:22:22   4   Reynolds and Reynolds events.

10:22:26   5   Q.   And how -- just what you describe --

10:22:30   6           MR. MAGNANI:  -- and I'm trying to

10:22:31   7   avoid playing long segments of video, Your Honor,

10:22:34   8   just to amove things along --

10:22:36   9   Q.   -- but how would you describe how Mr. Brockman

10:22:38   10   performed in these speeches?

10:22:39   11           MR. MAGNANI:  These are in evidence,

10:22:40   12   too, Your Honor.

10:22:45   13           THE WITNESS:  He is speaking

10:22:46   14   coherently, and carefully he's making few mistakes.

10:22:54   15   When he makes mistakes, he corrects himself.  And

10:22:57   16   some he is extemporizing a great deal.  In the 2019

10:23:04   17   one he is using notes, but he looks up appropriately

10:23:07   18   at the audience, makes eye contact with the

10:23:11   19   audience, adds comments to what seem to be in the

10:23:14   20   notes, doesn't lose his place in the notes, and is

10:23:21   21   doing a good job.

10:23:24   22   Q.   And did you review a -- some e-mail

10:23:29   23   correspondence of Mr. Brockman's?

10:23:32   24   A.   I did.

10:23:32   25   Q.   Just top level first, what -- well, how does

10:23:36   1   your view of the e-mail correspondence inform your

10:23:40   2   opinion of his cognitive function?

10:23:42   3   A.   I think the e-mails are extremely important in

10:23:46   4   showing Mr. Brockman's cognitive functioning beyond

10:23:51   5   where we have the video evidence.  That's only from

10:23:56   6   2019.  But the e-mails show that at least through

10:23:59   7   November of 2020, Mr. Brockman is writing coherent

10:24:07   8   e-mails, sometimes being clever.  He's understanding

10:24:12   9   what's being said to him.  He's responding

10:24:20   10   intelligently.

10:24:21   11          Some of this is technical matters, such

10:24:24   12   as discussions with his accountant about gift taxes

10:24:27   13   and whether they will be owed and tax planning

10:24:38   14   purposes.

10:24:38   15   Q.   We can get into some examples, but you said

10:24:40   16   through November of 2020.  Have you reviewed any of

10:24:43   17   Mr. Brockman's e-mails from after November of 2020?

10:24:45   18   A.   I've seen no e-mails from after November 2020

10:24:50   19   from after the time he stepped down.

10:24:53   20          So this window into his mind that

10:24:57   21   personal writings like that can provide closes at

10:25:01   22   that point.

10:25:03   23   Q.   Okay.

10:25:03   24          THE COURT:  Can I ask a quick question?

10:25:05   25   I mean, in formulating your opinion, would it be

10:25:10    1   helpful to have those e-mails after November 2020?

10:25:15    2   Do you think that would be helpful to you?

10:25:18    3               THE WITNESS:  If there were any, that

10:25:19    4   would be extremely helpful.  But what Mr. Brockman

10:25:23    5   has said is that he stopped being able to write

10:25:29    6   e-mails.  I don't know if there are any.

10:25:32    7               THE COURT:  Okay.

10:25:34    8               MR. MAGNANI:  Maybe this might help,

10:25:35    9   Your Honor.

10:25:36   10   Q.   Do you know -- well, did you -- was the source

10:25:38   11   of the e-mails UCSH or Reynolds and Reynolds?

10:25:41   12   A.   Yes.

10:25:41   13   Q.   Okay.  Do you know Mr. Brockman stepped down

10:25:45   14   from that company?

10:25:46   15   A.   Yes.

10:25:47   16   Q.   When did he step down?

10:25:49   17   A.   November 2020.

10:25:53   18   Q.   I'm just going to go through a few -- not all

10:25:55   19   of these, but can we please pull up Exhibit 44?

10:25:59   20               MR. MAGNANI:  And, Mr. Bourget, can you

10:26:01   21   let me know if any of these have not been admitted,

10:26:04   22   please?

10:26:05   23               I believe they all have been

10:26:07   24   admitted, but just want to make sure, Your Honor.

10:26:16   25   Q.   Dr. Dietz, what -- tell us about how Exhibit 44

10:26:24  1    informs your opinion?

10:26:25  2    **A.**   Well, this shows that as late of June 2020,

10:26:30  3    Mr. Brockman was talking about getting to arrange

10:26:37  4    and putting rounds through his SCAR, which is a

10:26:43  5    Belgian manufactured, high-end version of the AR-15.

10:27:00  6    **Q.**   Sorry, anything else?

10:27:02  7    **A.**   Well, the fact -- the fact that he's continuing

10:27:06  8    to shoot has some significance to me.

10:27:12  9    **Q.**   And just -- I mean, besides the thing that he's

10:27:15  10   describing doing, does the writing of an e-mail like

10:27:20  11   this also have any significance?

10:27:28  12   **A.**   It's a short e-mail, but it is formatted

10:27:34  13   correctly.  The punctuation is correct.  It's

10:27:41  14   coherent.  It's logical.  You know, it's a window

10:27:44  15   into the fact this is a mind that is functioning

10:27:46  16   adequately.

10:27:53  17              MR. MAGNANI:  And can we pull up

10:27:55  18   Exhibit 45, please?

10:27:56  19              Also, Your Honor, I think that the

10:27:57  20   Defense reserved objection on these exhibits due to

10:28:01  21   -- on relevance grounds.  So -- but I also think

10:28:05  22   they might have been pre-admitted, so just ask for

10:28:07  23   some clarification.

10:28:08  24              MR. LOONAM:  We'll take them as they

10:28:10  25   come along.

10:28:13    1          MR. MAGNANI:  Okay.  Then I'll admit --
10:28:15    2    well, I'll do it at the end.
10:28:16    3    Q.    So Exhibit 45 --
10:28:18    4          MR. MAGNANI:  Can you please pull that
10:28:19    5    one up?  Again, if you can zoom in on the sort of
10:28:27    6    text portion.
10:28:30    7    Q.    Dr. Dietz, the question will be, after you've
10:28:33    8    had time, how does this e-mail inform your opinion?
10:28:39    9    A.    This is a month later, July of 2020, and is a
10:28:46   10    considerably more detailed and significant set of
10:28:50   11    issues in which Mr. Brockman is writing about losses
10:28:53   12    in various entities, and how he can use them against
10:28:57   13    his W2 income.  I think the -- arguably the worst
10:29:08   14    feature of this e-mail is that he seems to imply
10:29:14   15    that he might be able to use losses from these
10:29:21   16    Nehemiah entities against 60 million in W2 income.
10:29:29   17          Maybe I'm naive, but I thought
10:29:30   18    there was a $3,000 a year limit of the use of losses
10:29:36   19    from investment income against earned income.  And I
10:29:40   20    would expect Mr. Brockman to know that, but maybe
10:29:44   21    both of us are wrong on this point.
10:29:47   22    Q.    Well, let's just -- actually, before taking
10:29:52   23    that down, directing your attention to the PPS line,
10:29:57   24    is Donna Ball a person you tried to interview in it
10:30:05   25    this case?

10:30:05  1    **A.**   Yes, and she was in touch with him every day

10:30:08  2    according to this while he was way.

10:30:10  3    **Q.**   Were you able to interview her?

10:30:12  4    **A.**   No, just polite refusal.

10:30:16  5    **Q.**   Like to pull up Exhibit 47, please.  I

10:30:24  6    apologize, Dr. Dietz.  This one looks like it might

10:30:27  7    be a multipage document.  If it's helpful for you,

10:30:30  8    there are hardcopies of these in the binders.  You

10:30:33  9    can also just direct us where to zoom in if you can,

10:30:36  10   because my question is how does this inform your

10:30:38  11   opinion?

10:30:39  12   **A.**   What's the number?

10:30:41  13   **Q.**   It's Exhibit Number 47.

10:31:11  14   **A.**   If we're talking about the Don Passmore

10:31:18  15   correspondence --

10:31:19  16   **Q.**   Yeah, Mr. Bourget if you can start us off by

10:31:22  17   zooming in on the top and take it from there maybe?

10:31:26  18   **A.**   This I alluded to earlier that it is

10:31:28  19   correspondence with his accountant concerning

10:31:32  20   whether gift taxes are going to be due.

10:31:39  21   **Q.**   And does this inform your opinion about

10:31:41  22   Mr. Brockman's cognitive function?

10:31:43  23   **A.**   Yes, this -- this is all coherent, reasonable

10:31:47  24   stuff for him to be inquiring about.  And this is

10:31:54  25   late in 2020, October.  It shows a sophistication

10:32:03   1   about some of these issues.

10:32:05   2   Q.   And, Dr. Dietz, I know you are looking at the

10:32:09   3   document, but can we move along, or is there

10:32:12   4   something else you wanted to say about that?

10:32:15   5   A.   No, that's all.

10:32:16   6   Q.   I want to pull up 70, 7-O.  This one I have

10:32:23   7   ready for you, Dr. Dietz.

10:32:25   8           MR. MAGNANI:  May I approach the

10:32:26   9   witness, Your Honor?

10:32:26   10           THE COURT:  You may approach.

10:32:35   11           MR. MAGNANI:

10:32:35   12   Q.   It's on the screen.  And again, if we can pull

10:32:38   13   up 70, and maybe start by zooming in on the top.

10:32:42   14           Dr. Dietz, when you are ready, could

10:32:46   15   you please just tell us how this e-mail informs your

10:32:49   16   opinion of Mr. Brockman's cognitive function?

10:32:52   17   A.   This is November 13th of 2020 when Mr. Brockman

10:32:59   18   is being declared mild or moderately demented by

10:33:05   19   some of the people who have seen him.  And he's

10:33:10   20   writing an e-mail that is well formed, completely

10:33:17   21   coherent, addressed to the correct person talking

10:33:22   22   about his family being off the Reynolds and Reynolds

10:33:27   23   healthcare plan by end of year at the latest and how

10:33:32   24   he's moving them to a small group plan administered

10:33:36   25   by another company.

| | | |
|---|---|---|
| 10:33:38 | 1 | He's asking to be billed for the |
| 10:33:41 | 2 | cost for those who weren't Reynolds's employees so |
| 10:33:47 | 3 | he can compensate the company for what it had paid, |
| 10:33:51 | 4 | and he wanted lots of detail with monthly amounts. |
| 10:33:58 | 5 | He thanks Craig Moss for helping him correct this. |
| 10:34:02 | 6 | So this is coherent.  Thoughtful. |
| 10:34:07 | 7 | Reflects that he has memory for these events, |
| 10:34:14 | 8 | judgement of the importance of getting this issue |
| 10:34:19 | 9 | properly resolved and papered in the files, and |
| 10:34:24 | 10 | putting money where it belongs.  This is consistent |
| 10:34:30 | 11 | with normal cognitive function. |
| 10:34:32 | 12 | Q.   And what was the date of that e-mail? |
| 10:34:34 | 13 | A.   November 13, 2020. |
| 10:34:40 | 14 | MR. MAGNANI:  Now, at this time, Your |
| 10:34:42 | 15 | Honor, I'd like to move to admit 44, 45, 47 and 70, |
| 10:34:49 | 16 | which are the e-mails that the witness just |
| 10:34:52 | 17 | testified about. |
| 10:34:53 | 18 | MR. VARNADO:  No objection. |
| 10:34:53 | 19 | THE COURT:  Without objection, they are |
| 10:34:55 | 20 | admitted. |
| 10:34:58 | 21 | MR. MAGNANI: |
| 10:34:58 | 22 | Q.   I'd also like to move to admit -- can we go |
| 10:35:01 | 23 | back to the PowerPoint deck, please? |
| 10:35:09 | 24 | While we're doing that, Dr. Dietz, |
| 10:35:11 | 25 | did you prepare to talk about other e-mails as well |

10:35:14   1   today?

10:35:15   2   A.   Yes.

10:35:15   3   Q.   And are those the exhibit numbers listed in

10:35:18   4   your PowerPoint deck?

10:35:19   5   A.   Okay.

10:35:20   6   Q.   Did they also inform your opinion on cognitive

10:35:23   7   function?

10:35:23   8   A.   Yes, only in the same way that as the testimony

10:35:28   9   and speeches from 2019 showed a window into normal

10:35:33   10   performance, so too did these e-mails from 2020.

10:35:40   11   Q.   So is this --

10:35:41   12   A.   Just the e-mail window is more recent than the

10:35:44   13   videotape window.

10:35:46   14   Q.   And so, are these other examples of relatively

10:35:49   15   recent e-mails?

10:35:50   16   A.   Yes.

10:35:51   17        MR. MAGNANI:  Okay.  And without having

10:35:52   18   to show the witness all of these, I would move to

10:35:55   19   admit 55, 56, 69, 54, 57, 46, 48, 52 -- that's all I

10:36:08   20   got.

10:36:08   21        THE COURT:  Okay.

10:36:09   22        MR. VARNADO:  Your Honor, I'd like to

10:36:11   23   have a chance to look at them, and we can tell them

10:36:13   24   over the break if we object.

10:36:14   25        THE COURT:  Okay.  But what would be

10:36:16   1   the objection?  I'm trying to figure out --

10:36:17   2                   MR. VARNADO:  I don't even know what

10:36:18   3   they are.

10:36:19   4                   THE COURT:  Okay.

10:36:20   5                   MR. MAGNANI:  I think these were

10:36:21   6   subject to a stipulation, Your Honor, about

10:36:23   7   authenticity.  And the Defense reserved, I think,

10:36:25   8   objection on relevance.  But this is where --

10:36:27   9                   THE COURT:  Okay.  This is where you

10:36:29   10  are.  Great.

10:36:29   11                  MR. VARNADO:  We'll take a look at

10:36:31   12  break and get back to you.

10:36:32   13                  THE COURT:  Okay.  Great.

10:36:33   14                  MR. MAGNANI:  I'm sorry if I just don't

10:36:34   15  remember.  There was a ruling -- other ones were

10:36:36   16  admitted?

10:36:37   17                  MR. VARNADO:  Yes.

10:36:38   18                  MR. MAGNANI:  Okay.

10:36:41   19                  THE COURT:  Are we moving on to a

10:36:43   20  different topic?

10:36:45   21                  MR. MAGNANI:  Yeah, this might be a

10:36:46   22  good point for a break, Your Honor.

10:36:49   23                  MR. LOONAM:  Your Honor, if I can raise

10:36:50   24  one issue prior to the break?

10:36:51   25                  THE COURT:  Sure.

10:36:52  1          MR. LOONAM:   We understand Your Honor's
10:36:54  2    ruling to allow this expert to testify beyond the
10:36:59  3    findings and bases set forth in his expert report.
10:37:02  4    Not -- not quibbling with that, but we do take issue
10:37:06  5    with respect to, um -- in particular the last two
10:37:10  6    slides of this deck.  This witness is not a
10:37:15  7    neuroradiologist.  This witness is not a
10:37:18  8    neurologist.
10:37:18  9          And With respect to the last slide,
10:37:20  10   in particular, DX-58, it's not even in evidence,
10:37:23  11   Your Honor.  That slide was used during
10:37:26  12   cross-examination of Dr. Denney.  Dr. Wisniewski,
10:37:30  13   who is a neurologist, testified that this slide, in
10:37:34  14   particular, because it's quantitative -- not the
10:37:38  15   qualitative -- the quantitative longitudinal
10:37:41  16   comparison between the 2018, study and the 2021 MRI
10:37:46  17   study -- because of the imprecision of that
10:37:50  18   qualitative analysis, and then also because the
10:37:53  19   slices were different -- like, highly technical
10:37:55  20   slices were different used in comparing 2018 to
10:38:01  21   2021, that this comparison was not reliable and
10:38:04  22   potentially misleading.
10:38:05  23          And so, what it's being used for
10:38:07  24   here is -- is unclear.  This was used during the
10:38:12  25   cross of Dr. Denney who said he relied on the

10:38:14   1  quantitative analysis in reaching his conclusions,

10:38:18   2  and then explained away during the end of the cross

10:38:20   3  that quantitative analysis was not particularly

10:38:23   4  precise or reliable.

10:38:24   5          Is um, and so this is the subject

10:38:26   6  of -- of neurology.  Neuroradiology was not within

10:38:34   7  this witness's expert report.  And so, frankly we

10:38:38   8  strongly object to these last two slides.

10:38:45   9          THE COURT:  Let me take a break.  You

10:38:46  10  consider the objections to the exhibits that you

10:38:48  11  were talking about, Mr. Varnado.

10:38:54  12          MR. VARNADO:  Yes, Your Honor.

10:38:54  13          THE COURT:  Hear from you, counsel for

10:38:58  14  the prosecution, and let's say we're going to take a

10:38:59  15  break until 11 o'clock.  I do understand your

10:39:05  16  objection and want to hear the response.  I just

10:39:06  17  want to take a break now and we can continue.

10:39:09  18          MR. LOONAM:  Understood.

10:39:11  19          THE COURT:  Thank you, Dr. Dietz.

10:39:14  20  We'll be back.

11:08:35  21  (Whereupon, a recess was held.)

11:12:40  22          THE COURT:  You may continue.

11:12:41  23          MR. MAGNANI:  Thank you, Your Honor.  I

11:12:42  24  spoke to Defense Counsel, and I think we have an

11:12:46  25  agreement with respect to those exhibits I moved to

11:12:48   1   admit before.

11:12:49   2                   THE COURT:  Okay.

11:12:49   3                   MR. MAGNANI:  Please correct me if I'm

11:12:51   4   wrong, but at this time I move to admit Exhibits 55,

11:12:54   5   56, 69, 54, 57, 46, 48 and 52.

11:13:05   6                   THE COURT:  Okay.

11:13:06   7                   MR. VARNADO:  No objection, Your Honor.

11:13:07   8                   THE COURT:  Without objection, they are

11:13:08   9   admitted.  Counsel, just for scheduling purposes --

11:13:11   10  I hate to be doing this, but I've got another matter

11:13:14   11  I have to handle at 12:45.  So we're going to

11:13:17   12  continue again until 12:15.  Then we'll break from

11:13:21   13  12:15 to 1:15, and then pick up again at this time.

11:13:25   14                   So we're not going to be able to

11:13:27   15  work -- just going to be like we have been.  We're

11:13:30   16  going to work into lunchtime.

11:13:34   17                   MR. LOONAM:  Yes, Your Honor.  I just

11:13:35   18  wanted to note this was -- there's a pending

11:13:37   19  objection with respect to the last two slides.

11:13:40   20                   THE COURT:  Right.

11:13:41   21                   MR. LOONAM:  Because the last slide is

11:13:43   22  not in evidence.  You know, the testimony is it's,

11:13:45   23  you know, not reliable because of the difference

11:13:48   24  with the quantitative analysis as longitudinal.

11:13:53   25  This expert is not a neurologist or

11:13:55  1   neuroradiologist.  Not in his report.  And so, we

11:13:59  2   object to the inclusion of that and the slide

11:14:01  3   previous, which is the neurology scans comparison.

11:14:06  4              THE COURT:  Okay.  I'm going to take

11:14:08  5   the objection under advisement.  I need you to lay a

11:14:11  6   foundation, and I need to hear the foundation.  Once

11:14:13  7   I hear it, I can make the call on the objection.  So

11:14:17  8   when you get to that point don't say, "Judge, now

11:14:22  9   I'm laying a foundation for the use of these

11:14:24  10  slides."

11:14:25  11             Lay the foundation, and then I'll

11:14:26  12  entertain the objection again.

11:14:27  13             MR. MAGNANI:  I'll try to remember to

11:14:30  14  do that, Your Honor.  For the record, the Government

11:14:32  15  disagrees with some of the characterization of the

11:14:35  16  testimony, but we can pick this up later.

11:14:38  17             THE COURT:  As I said, when you get

11:14:39  18  into it -- and I'll be following along.  The nice

11:14:42  19  thing about the printouts, I can follow along.  When

11:14:45  20  we get near that page, I'll be listening for the

11:14:48  21  foundation.  You can remember.  I can remember.  The

11:14:49  22  objection's already on the table.

11:14:51  23             MR. MAGNANI:  Okay.  Great.

11:14:54  24  Q.   So, Dr. Dietz, I think where we left off was as

11:14:58  25  you described the window of e-mail correspondence

closed.  So now what I want to do is move into where
a different window opened, which was these
videotaped exams we've been talking about.  Can I
ask you first -- well, I think you already testified
about early May Darby exam; is that right?

**A.**   Yes.

**Q.**   That was the exam where the Defendant opened up
box of medical records in his home?

**A.**   Correct.

**Q.**   We don't need to go back into that exam if you
discussed it.  I need to go into the exams you and
Dr. Denney did.  If you could just describe what
happened in those exams -- could you please do that?

**A.**   The first day, which was May 18, 2021, I took
the lead in interviewing Mr. Brockman about his life
history, and he gave a detailed, coherent life
history story.  And at the end, he told me that he
doesn't think anyone's ever asked him in that depth
before about his life story.  And I felt it was an
adequate representation of life story, which is
actually an important part of trying to look where
disease processes where problems arise.  If one
doesn't have the life story, one doesn't know the
context.

**Q.**   And I know you've testified already about

Mr. Brockman's life story.  That was on May 18th that interview; right?

**A.**   Yes.

**Q.**   Okay.  And from May 18th and May 20th together, what was your overall assessment of Mr. Brockman?

**A.**   Well, his memory was good on many topics. Obviously, it was good on these remote topics about his childhood and early life, but it was also good on recent things, too.

For example, he had moved in February. When I asked him about his prior house, he gave a very detailed, coherent description of it, which actually tracks well with what I was able to look up on a realtor's website about that property.

And so, this was a man who could communicate recent knowledge adequately.  I talked to him about a couple business points, and these are things I had learned about from his speeches, but I asked him if he could educate me, for example, on how many direct points an executive should have. And he gave a good description of one.

One should limit the number of direct reports and his idea of the ideal number of direct reports.  This was all reasonable discussion about business.

11:18:20    1    **Q.**   Did you also ask him about any bad financial

11:18:23    2    incidents described by his wife previously to

11:18:25    3    Dr. Darby?

11:18:31    4    **A.**   Yes, there -- Mrs. Brockman had mentioned two

11:18:35    5    bad financial decisions that were the examples she

11:18:36    6    gave of his problems in judgment.  One was the

11:18:39    7    purchase of the yacht, the Albula -- Abdula -- I'm

11:18:47    8    not sure how one pronounces it.  She thought that a

11:18:54    9    mistake, that she thought it overly costly.  I don't

11:18:56   10    disagree with her about that, but he seemed to

11:18:59   11    recognize that there were -- there was a dispute in

11:19:06   12    the marriage about it.  The other was an investment

11:19:15   13    in a software company she thought was quite foolish.

11:19:18   14    And he was able to describe what that investment had

11:19:20   15    been, and why he believed that at the time he made

11:19:24   16    the investment that there was going to be a coming

11:19:28   17    need for cyber security, and whoever could develop

11:19:32   18    very good software in the cyber security space was

11:19:36   19    going to make a killing.

11:19:37   20              He invested large sum of personal

11:19:40   21    money in that.  I think it was sixty million

11:19:46   22    dollars.  And he didn't pay close enough attention

11:19:50   23    to the man he trusted to develop it all, and the

11:19:56   24    investment was a bust.  And he disagreed with his

11:19:58   25    wife as to whether that had been foolhardy.

11:20:01    1                    But my understanding of it was that
11:20:03    2    it was a great idea, and he probably didn't pay
11:20:05    3    close enough attention and he lost that money.  But
11:20:12    4    I think he's right that it was a wonderful time to
11:20:15    5    start looking into that business in a big way.
11:20:19    6    Q.   Was there also -- and I'm just -- the
11:20:24    7    interviews that we're talking about now, these are
11:20:26    8    between May 18th and May 20th; right?
11:20:31    9    A.   Correct.
11:20:32   10    Q.   Was there also an interview on May 19th?
11:20:34   11    A.   On May 19th, Dr. Denney did testing of
11:20:37   12    Mr. Brockman.  I wasn't present for that, nor was it
11:20:39   13    videotaped.
11:20:40   14    Q.   But do you know how he did on that testing?
11:20:43   15    A.   I do.
11:20:44   16    Q.   How did he do?
11:20:47   17    A.   His performance was poor, and his validity
11:20:55   18    testing showed that the testing was invalid.
11:21:00   19    Q.   And how -- how consistent was that with your
11:21:04   20    observations of him on the 18th and the 20th of May?
11:21:08   21    A.   It was not consistent with the observations of
11:21:13   22    him in the interview context on those days.  But, of
11:21:16   23    course, it was consistent with his tanking all of
11:21:19   24    the prior neuropsychological tests, too.
11:21:23   25    Q.   During your interview days that you were

present for, was there any competency testing

administered?

**A.**   Yes.

**Q.**   Can you describe that, please?

**A.**   So there are two different things that were

done.  Only one should be called testing.  There is

a standardized interview protocol for

semi-structured interview that's used to assess

competence to stand trial.  Dr. Denney administered

one that he frequently uses, which of course

provides him a baseline to compare it to others.

        And although Mr. Brockman wouldn't

discuss the charges against him, his performance on

that semistructured interview showed him to be

competent to stand trial the way this is usually

assessed.  In addition to that, I also asked him

questions in the May interviews regarding certain

aspects of the indictment.  And he had a

more-than-adequate grasp of the aspects that I asked

him about.

        In fact, he even described some of

the defenses available to him.  I was simply asking

who's individual number one in the indictment.  And

he told me, and talked about why Mr. Tamine was

doing these things.  He described all of the things

11:23:04   1   one hears defendants say about their coconspirators

11:23:10   2   and the people who have been granted immunity.  He

11:23:18   3   said Mr. Tamine might have been creating a fake

11:23:21   4   e-mail stream in order to further his

11:23:26   5   self-interests, and told me how easy it was to

11:23:31   6   create fake e-mails.

11:23:32   7                   He understood that FBAR was a

11:23:37   8   reporting requirement.  He distinguished between the

11:23:44   9   trust as an entity and his person as an entity, and

11:23:50   10  indicated that the Government was trying to treat

11:23:54   11  him as if he were the same entity as the trust and

11:24:02   12  that was wrong.  He objected to some of the

11:24:05   13  Department of Justice's behavior, and blamed them

11:24:08   14  for leaking personal information about him.  This

11:24:18   15  was all coherent.  He understood the charges he was

11:24:21   16  facing.  He was able to discuss his position on

11:24:24   17  these things.

11:24:27   18                   And based on both the competency

11:24:30   19  testing and that kind of interview reporting, I did

11:24:33   20  not think it was even a close call as to whether he

11:24:36   21  was competent to stand trial at that time.

11:24:39   22  Q.   Was your confidence in the May evaluation an

11:24:43   23  important part of your opinion today still?

11:24:47   24  A.   Yes.

11:24:49   25                   MR. MAGNANI:  Your Honor, at the this

| | | |
|---|---|---|
| 11:24:50 | 1 | time -- so Government's Exhibit 5 is two transcripts |
| 11:24:54 | 2 | stuck on top of each other from the May 18th and |
| 11:24:57 | 3 | May 20th interviews.  So it's a little confusing, |
| 11:25:01 | 4 | but what I've done is marked as 5-A -- Government's |
| 11:25:06 | 5 | 5-A, Pages 99 -- sorry, this is of the May 20th |
| 11:25:11 | 6 | transcript, Pages 99 through the end. |
| 11:25:14 | 7 | And I think -- well, let me hand |
| 11:25:16 | 8 | these around.  May I approach the witness, Your |
| 11:25:30 | 9 | Honor? |
| 11:25:31 | 10 | THE COURT:  You may. |
| 11:25:50 | 11 | MR. MAGNANI: |
| 11:25:52 | 12 | Q.   And, Dr. Dietz, can you just flip that for a |
| 11:25:55 | 13 | second and familiarize yourself with it enough to |
| 11:25:58 | 14 | answer this question.  Are many of the things that |
| 11:26:00 | 15 | you just testified about the Defendant talking about |
| 11:26:05 | 16 | the case, are those encapsulated in this portion of |
| 11:26:08 | 17 | the transcript? |
| 11:26:08 | 18 | A.   Yes, they are. |
| 11:26:11 | 19 | MR. MAGNANI:  I would move to admit |
| 11:26:13 | 20 | this, just to make things easier, as Government's |
| 11:26:16 | 21 | 5-A, which again is just a portion of Government's |
| 11:26:19 | 22 | 5. |
| 11:26:19 | 23 | MR. VARNADO:  No objection. |
| 11:26:20 | 24 | THE COURT:  Without objection, it is |
| 11:26:22 | 25 | admitted. |

```
11:26:32   1              MR. MAGNANI:
11:26:33   2   Q.   How far did you get, Doctor, in your
11:26:35   3   discussions with the Defendant about the case?
11:26:39   4   A.   About the case?
11:26:40   5   Q.   Yeah, about the facts of the case?
11:26:47   6   A.   I would say not too far, but what we did cover
11:26:49   7   was all evidence of competence.  In other words,
11:26:59   8   didn't say anything that made no sense or that was
11:27:03   9   clearly wrong when talking about these case-related
11:27:08  10   facts.  At -- or at least to my knowledge.
11:27:15  11   Q.   And then, Dr. Dietz -- and I'm not -- you
11:27:24  12   testified prior to the break about -- I'm sorry to
11:27:27  13   sort of jump around here -- about evaluation with
11:27:31  14   Dr. Lai when MCI was diagnosed?
11:27:35  15   A.   Yes.
11:27:35  16   Q.   And can you just -- do you remember when the
11:27:39  17   last time Dr. Lai diagnosed MCI, if you can
11:27:43  18   remember?
11:27:43  19   A.   I think it was in June.
11:27:45  20   Q.   Okay.  So you said you were confident at this
11:28:01  21   point, but did something happen after the May exams?
11:28:04  22   A.   Yes, a number of things happened after the May
11:28:09  23   exam, and after the report I submitted in June.
11:28:10  24   Q.   And just -- I know we've covered a lot of it,
11:28:13  25   but can you just briefly talk about what happened
```

11:28:15  1  and why that was concerning to you?

11:28:18  2  **A.**   Well, one thing that occurred that was not

11:28:19  3  concerning, just belated, was we began to get a lot

11:28:24  4  of the medical records, including the complete

11:28:29  5  records from the sepsis and delirium hospitalization

11:28:33  6  that occurred prior to this exam.  And thousands of

11:28:45  7  pages of medical records began to arrive after that

11:28:50  8  exam was completed.  But then significant events in

11:28:53  9  the world that occurred had to do with

11:28:56  10  Mr. Brockman's subsequent hospitalizations in

11:29:00  11  UroLift procedure.

11:29:02  12  **Q.**   And so, are you talking about June

11:29:06  13  hospitalization?

11:29:08  14  **A.**   May/June, yes.

11:29:09  15  **Q.**   Was there -- well, let me ask you, was

11:29:13  16  Mr. Brockman hospitalized for sepsis prior to your

11:29:17  17  May -- earlier in the year?

11:29:19  18  **A.**   Yes.

11:29:19  19  **Q.**   Do you remember when his first hospitalization

11:29:22  20  for sepsis was in 2021?

11:29:27  21  **A.**   I couldn't give you the date right now.

11:29:30  22  **Q.**   Okay.  So after -- just to try to get through

11:29:35  23  this quickly, you would agree that the delirium in

11:29:38  24  those hospitalizations could cause cognitive decline

11:29:42  25  that's pretty serious?

11:29:43  1   **A.**   Of course.

11:29:44  2   **Q.**   Okay.  I want to turn your attention to July,

11:29:46  3   after your expert reports have been filed, did you

11:29:48  4   review the Defense experts reported videos from July

11:29:53  5   of 2021?

11:29:54  6   **A.**   Yes.

11:29:54  7   **Q.**   Can you just describe them, please?

11:29:58  8   **A.**   This was a very different presentation of

11:30:02  9   Mr. Brockman.  He appeared much more impaired than

11:30:06  10  he had in May.  I didn't think there was any doubt

11:30:15  11  about a dramatic change in his appearance.  And if

11:30:20  12  one goes step-by-step through important facts of

11:30:24  13  cognitive functioning, his memory was variable.

11:30:29  14  Certainly worse than that.  His orientation was

11:30:31  15  variable, just knowing where he was and what he was

11:30:34  16  doing and the date.

11:30:35  17              He had even more trouble than he

11:30:37  18  had in the past in sequencing events, like how long

11:30:41  19  ago hospitalization was or in what order things

11:30:44  20  occurred.  He seemed to have very poor attention

11:30:50  21  during that interview.  There was lots of confusion.

11:30:55  22  He seemed not to know the context.  I think he said

11:31:02  23  -- when asked why we were here today by Dr. Agronin,

11:31:05  24  he said, "To take my deposition."

11:31:09  25              He seemed to have difficulty

11:31:12  1   understanding which side Dr. Agronin had been

11:31:15  2   retained by.  There were times he answered questions

11:31:20  3   as if he were being asked about the civil suit

11:31:24  4   against Reynolds and Reynolds, as opposed to his

11:31:26  5   criminal case.

11:31:28  6   Q.   And, Dr. Dietz, was this the exam we watched a

11:31:32  7   sample of this when Dr. Darby was on the stand?

11:31:34  8   A.   Yes.

11:31:38  9   Q.   Did he discuss the criminal case at all in this

11:31:42  10  exam?

11:31:42  11  A.   No.

11:31:42  12  Q.   I'd like to jump ahead now to the October

11:31:46  13  examination.  Um, can you describe, um -- well, were

11:31:51  14  there two set of examinations in October?

11:31:52  15  A.   There were.

11:31:54  16  Q.   Who did the first set of examinations?

11:31:55  17  A.   The first was done by the Defense experts, and

11:32:03  18  that's Dr. Guilmette and Dr. Agronin.

11:32:07  19  Q.   And just can you describe what you observed

11:32:09  20  from those recorded examinations?

11:32:11  21  A.   Sure.  Here there were good performances and

11:32:17  22  bad performances.  He recognized the faces of both

11:32:21  23  examiners, knew some names of his lawyer and

11:32:25  24  Dr. Pool and Dr. Lerner.

11:32:28  25            He was slow in responding and

11:32:30  1    imprecise in what I think is already shown a video

11:32:34  2    slip when he was asked questions about wearing masks

11:32:38  3    and, "Why are we doing that?"

11:32:42  4              But he was eventually able to say

11:32:45  5    he had two doses of the Moderna vaccine, that it was

11:32:51  6    protecting his family, and that it was for COVID.

11:32:52  7    It was slow to get that out of him.  He was

11:32:56  8    seemingly less confused and more attentive than he

11:32:59  9    had been in July, but still seemed confused between

11:33:05  10   the civil and criminal cases, and said he didn't

11:33:12  11   know his address.  He gave incorrect estimates of

11:33:15  12   the time since previous events, which is that same

11:33:18  13   kind of sequencing difficulty.

11:33:22  14   Q.   Now, doctor, after that you had the chance to

11:33:25  15   interview him again; is that right?

11:33:26  16   A.   Yes.

11:33:27  17   Q.   Can you please describe when that was and what

11:33:30  18   happened?

11:33:30  19   A.   So this is a few weeks later on October 20th,

11:33:35  20   Dr. Denney and I spent a day with the Defendant.

11:33:41  21   And on that occasion, I would say he acted much more

11:33:48  22   impaired than he had in May when we saw him --

11:33:53  23   varying degrees of impairment throughout our time

11:33:57  24   with him.  He recalled my name and displeasure with

11:34:00  25   me for the afternoon of May 20th when I confronted

him with some of the information in the indictment

and a couple of e-mails, and he didn't like being

confronted with that material when asked about

recent events recalled the January 6th riot.  He did

not seem to know others had referred to as an

insurrection.

He did know there was a problem at

the border of US and Mexico, and that resources were

overrun, but didn't seem to have depth of knowledge

and didn't recall the incident in which Haitian

immigrants had gathered under a bridge, which had

recently been in the news.

Q.   Dr. Dietz, if I can stop you there.  You

mentioned the riot versus insurrection.  Do you have

any understanding of the type of news media -- well,

let me ask a different question.  Did you ever talk

about the political persuasions of Mr. Brockman?

A.   We didn't overtly discuss it, but it was made

very plain.

Q.   Okay.  And without getting too much into the

details of that, can you explain if -- well, just --

I mean, which way were they, without getting too

into it?

MR. VARNADO:  Object to the relevance

of that.

11:35:30   1          THE COURT:  Yeah, I'm trying to figure
11:35:32   2   out why that's relevant.
11:35:33   3          MR. MAGNANI:
11:35:34   4   Q.   Doctor, only if you think it's relevant, was
11:35:36   5   there any meaning to him hearing of the January 6th
11:35:39   6   incident as a riot, but not having heard of it as an
11:35:42   7   insurrection?
11:35:42   8   A.   His primary news source was the Wall Street
11:35:49   9   Journal.
11:35:50  10   Q.   During your late August -- I'm sorry, late
11:35:54  11   October interviews, did you conduct competency
11:35:57  12   evaluation?
11:36:01  13   A.   Collectively, Dr. Denney and I did in two
11:36:05  14   different ways.  Prior to this October evaluation,
11:36:16  15   Dr. Denney and I discussed whether to use a
11:36:20  16   different instrument for measurement for competence
11:36:23  17   to stand trial -- having already used one -- should
11:36:28  18   we try another or repeat the same one.
11:36:31  19          And I had just attended a webinar
11:36:35  20   on cases of restoration of competence in which a
11:36:40  21   forensic neuropsychologist had described his
11:36:44  22   experience with the varying standardized instruments
11:36:48  23   used for competence to stand trial, and had come
11:36:52  24   down in favor of one called "The Evaluation of
11:36:58  25   Competence to Stand Trial Revised," the ECST-R.

11:37:06  1                 So I had asked Dr. Denney what he
11:37:08  2   thought of using the ECST-R, and he was familiar
11:37:14  3   with it, had used it before, and agreed that would
11:37:17  4   be a good one to use.  And so that was administered.
11:37:29  5                 During that, the Defendant
11:37:31  6   demonstrated adequate knowledge of the consequences,
11:37:35  7   the seriousness of the matter, knowledge of the
11:37:37  8   courtroom participants.  He was motivated to help
11:37:40  9   himself, and he expressed trust and confidence in
11:37:44  10  his attorneys.  He said he would follow their
11:37:48  11  direction and advice, but he refused to discuss the
11:37:55  12  charges, which later led to Dr. Denney being able to
11:38:00  13  see him again briefly, at which time the instrument
11:38:06  14  was completed, but not in my presence.
11:38:09  15  Q.   So is that part of this -- part of this ECST-R
11:38:16  16  was completed in your presence, and part of it not
11:38:18  17  in your presence?
11:38:19  18  A.   Most of it was completed in my presence, but
11:38:23  19  some by Dr. Denney alone in a repeat visit.
11:38:27  20  Q.   Do you know the results of that exam?
11:38:30  21  A.   Yes.
11:38:31  22  Q.   What were they?
11:38:37  23  A.   That in each of the four categories that are
11:38:42  24  scored and assigned numbers, Mr. Brockman was in the
11:38:46  25  normal range for competence to stand trial.

11:38:51   1   Q.   Now, do you know what competency measures --
11:38:54   2   well, were any competency measures used like this in
11:38:57   3   the defense exams in July and also October?
11:39:00   4   A.   No.   Not only didn't they use these
11:39:04   5   widely-accepted instruments for exploring and
11:39:08   6   measuring competence to stand trial, they did not
11:39:12   7   even interview him about all of the elements of
11:39:14   8   competence to stand trial.
11:39:20   9   Q.   You talked about Mr. Brockman talking to you
11:39:23   10   about having full confidence in his attorneys.   Did
11:39:28   11   he talk about any of those attorneys in particular?
11:39:31   12   A.   Did he speak of them?   Yes, he did.
11:39:33   13   Q.   Okay.   And did he spell one of those attorney's
11:39:36   14   names?
11:39:37   15   A.   Well, interestingly, yes.   That was
11:39:41   16   Ms. Keneally.   In that instance, he was first asked
11:39:44   17   to spell her name and spell correctly.   Later, after
11:39:48   18   a delay in time he was asked, "How do you spell that
11:39:53   19   name again?"
11:39:54   20            And he spelled Keneally without
11:39:58   21   being reminded whose name he was being asked to
11:40:01   22   spell.   That is the kind of short term memory that
11:40:10   23   in his testing he scores in a way where it would not
11:40:14   24   be able to do a thing like that.   So there's this
11:40:19   25   tremendous contradiction between what we sometimes

11:40:25   1   see in his real-world behavior, and what he's

11:40:31   2   showing then being tested and knows that it's his

11:40:37   3   memory and cognitive skills being tested.

11:40:39   4              That's a theme that was true

11:40:45   5   throughout this period in question that he behaved

11:40:47   6   differently when he was doing something anyone would

11:40:56   7   know is a test of how you are thinking, from how he

11:40:59   8   did when he wasn't undergoing a test of how he was

11:41:04   9   thinking.

11:41:04  10   Q.   But even during the parts of the evaluation

11:41:09  11   that are not obviously testing, you would agree that

11:41:12  12   his presentation declined dramatically from May?

11:41:16  13   A.   Yes.  After May, and then reports saying that

11:41:22  14   he was malingering and saying in those reports that

11:41:27  15   there was this tremendous difference between how he

11:41:31  16   acted when he was being interviewed, and how he

11:41:34  17   performed in testing, his behavior changed.  Um, so

11:41:40  18   that by July he was behaving demented in interview

11:41:47  19   and in testing.

11:41:52  20   Q.   And just to -- I know we sort of took those in

11:41:55  21   pieces, each of those different exams.  Can you just

11:41:58  22   sort of briefly discuss, I guess, the change over

11:42:01  23   time in those multiple interviews?

11:42:04  24   A.   I would synopsize it this way that in May he

11:42:13  25   exhibited mild cognitive impairment.  We could see

it.  In July, he presented as significantly more impaired throughout the exams done by the defense experts.

In early October, he presented as significantly impaired.  Perhaps not quite as badly as he had in July.  It's a difference of degree, but still impaired throughout.  And when we saw him in October, he presented as mildly impaired when we were dealing with the competency issues, but more impaired late in the afternoon around four o'clock or so when there was such a sudden change in his cognition that it was confusing.

He suddenly thought we were -- well, we asked who we were and what the purpose was. He said that he thought we were there from a research firm in San Francisco, hired by ADP, which of course is a reference back to the civil dispute with CDK.

And he also gave a mixture of correct and absurd answers to mental status examination questions.  So for example, he was able to correctly spell the word "World" backwards, though he hadn't been able to in May.  And yet, he said that the year was 2051, and failed at subtracting 3 from 20.  And he persisted in that

11:44:21  1   failure even when Dr. Denney asked him, "Are you

11:44:25  2   saying that 20 minus 3 is 27?"

11:44:29  3                And he stuck to it and said, "Yes."

11:44:32  4                These were answers that we found

11:44:34  5   ridiculous to say it was 2051, and to not be able to

11:44:40  6   subtract 3 from 20, when he'd been very coherent on

11:44:44  7   many other things earlier in the day.  That led me

11:44:57  8   to consider whether this was a phenomenon sometimes

11:45:00  9   referred to as sundowning, in which someone with

11:45:02  10  dementia behaves -- has a significant difference in

11:45:05  11  their cognitive function late in the day or after

11:45:11  12  dark or from fatigue.  There's no single explanation

11:45:15  13  for why it occurs.

11:45:20  14                But I saw this as a fairly dramatic

11:45:23  15  change, and left confused about what his true mental

11:45:27  16  state was, because there'd been such variability.

11:45:36  17  And I had a week to turn around a report.  Didn't

11:45:39  18  have the benefit of some of the other data that had

11:45:43  19  by then come into existence and wrote a report in

11:45:46  20  which I concluded that I couldn't tell whether this

11:45:50  21  was genuine cognitive impairment to a degree that

11:45:55  22  could make this man incompetent or whether this was

11:45:58  23  malingering.  I didn't feel I had the tools to make

11:46:03  24  that distinction at that time.

11:46:10  25                Then, subsequently I received

11:46:11  1    additional information that I thought did clarify.

11:46:20  2    Q.    And what was one of the major things that

11:46:22  3    helped you resolve this uncertainty that you left

11:46:24  4    the October 20th exam with?

11:46:28  5    A.    Um, I would say there were two things.  First,

11:46:32  6    I gained a better understanding of the limits of

11:46:37  7    what we could learn from the brain imaging, and how

11:46:42  8    much weight could be put on it with respect to an

11:46:48  9    assessment of cognitive function.

11:46:49  10                   Second, I learned about the lengths

11:47:01  11   to which the profession of neuropsychology has gone

11:47:05  12   to establish the validity of neuropsychological

11:47:12  13   testing in contested settings, and the statistical

11:47:21  14   safeguards in place with respect the sensitivity and

11:47:27  15   specificity of declarations of invalid test

11:47:33  16   performance.  And when I had a better grasp of the

11:47:42  17   current state of that literature, I believe that all

11:47:48  18   of the neuropsychological testing that had been done

11:47:51  19   from early 2019, up to last month, was invalid and

11:47:58  20   can't be relied on for anything.

11:48:03  21   Q.    And, Doctor, you mentioned a few times, but can

11:48:08  22   you sort of very quickly just explain when you wrote

11:48:10  23   each of your reports and basically what the top-line

11:48:13  24   conclusion was -- just the timeline of your thinking

11:48:17  25   on this?

A.    My reports were June 21st of this year, in
which I concluded he was malingering and competent.

October 29th, in which I said I
couldn't tell on competency or extent of cognitive
impairment.

November 4th, when I concluded that
he is presently competent and that what had looked
like cognitive impairment was malingered -- there
was an exaggeration of the extent of it, though the
truth is most likely he suffers from either mild
cognitive impairment or earlier mild dementia.

Q.    And I just want -- in going into your -- well,
can you explain, I guess, the basis for your opinion
that Mr. Brockman is malingering?

A.    Yes, there are a number of bases for this view.
First of all, he has extreme motivation to avoid
prosecution.  One has to look at the context, and
the context is that this could be the magic bullet
for escaping the consequences of any criminal
conduct that may have occurred.

I'm not making a judgment as to
that, Your Honor.

Second, I consider there to be a
suspicious timeline of the initial assessment of his
memory complaints.  There was an e-mail -- that's

11:50:13  1   Government Exhibit 104 -- that Dr. Yudofsky received
11:50:19  2   in which Mr. Brockman's asking for help because of
11:50:23  3   his memory.  And Dr. Yudofsky replies saying, "Well,
11:50:30  4   you know I'm a neuropsychiatrist" -- which of course
11:50:34  5   Mr. Brockman had sponsored in a big way -- and yet,
11:50:41  6   no immediate action is taken.  This is May of 2017.
11:50:47  7                    But in June of the following year,
11:50:53  8   Mr. Brockman takes Dr. Yudofsky along with the group
11:50:56  9   on a fishing trip to Alaska.  And while there,
11:51:02  10  learns of the raid in Bermuda on Tamine's residence.
11:51:09  11  Q.   Just to interrupt you, Doctor, I think you said
11:51:12  12  June.  Was this in June --
11:51:14  13  A.   September.
11:51:15  14  Q.   Okay.
11:51:15  15  A.   Sorry, I misspoke.
11:51:18  16  Q.   Yeah, that's okay.
11:51:22  17  A.   So the September 5th raid in Bermuda is made
11:51:26  18  known to Mr. Brockman, who the next day e-mails
11:51:35  19  Dr. Lerner asking for an appointment.  And
11:51:40  20  Dr. Lerner, in that visit, which occurs on
11:51:44  21  September 11th, refers Mr. Brockman to Dr. Pool,
11:51:51  22  even though Dr. Lerner knows that Dr. Lisse is
11:51:56  23  already the primary care doctor for Mr. Brockman.
11:52:08  24  Q.   Let me stop you there.  You said Lisse is the
11:52:11  25  primary care doctor.  Did Mr. Brockman get a new

11:52:14    1    primary care doctor after this search warrant?

11:52:16    2    **A.**   Yes, he does.   That's Dr. Pool.

11:52:19    3    **Q.**   Okay.

11:52:25    4    **A.**   And on the first visit with Dr. Pool on

11:52:28    5    October 15th, Mr. Brockman tells him that, "My

11:52:32    6    memory is failing more."

11:52:37    7    **Q.**   I'm sorry.   Actually, Doctor, can you go back

11:52:40    8    to the previous slide?   Just to make this easy, I'd

11:52:42    9    like to move to admit -- I'm not going to show all

11:52:45   10    of these exhibits that go into this timeline, but I

11:52:48   11    would like them to be in evidence.   So --

11:52:49   12                 THE COURT:   Okay.

11:52:50   13                 MR. MAGNANI:   -- I move to admit

11:52:52   14    Exhibit 29, 59, 104 -- which actually I think 104

11:53:00   15    might also be Defense Exhibit 1, but move it in

11:53:04   16    anyway.   Oh, did I misspeak?

11:53:09   17                 THE COURT:   You said 59.   I think you

11:53:11   18    meant 49.

11:53:14   19                 MR. MAGNANI:   Well, to be candid,

11:53:16   20    there's a discrepancy in my notes and the

11:53:19   21    PowerPoint.   I'll do this at another time, Your

11:53:21   22    Honor.

11:53:21   23                 THE COURT:   Okay.   Are you sure?   I

11:53:22   24    mean --

11:53:23   25                 MR. MAGNANI:   Okay.   Dr. Dietz is

11:53:24  1  correct, it's 49.

11:53:26  2            THE COURT:  Okay.

11:53:28  3            MR. MAGNANI:  So I'm sorry.  So one at

11:53:31  4  a time.  29.

11:53:32  5            MR. VARNADO:  I'll take a look at break

11:53:34  6  and let you know, Judge.

11:53:35  7            MR. MAGNANI:  For the record, I told

11:53:36  8  Defense Counsel I was going to try to move all of

11:53:40  9  these in before, but we can take it up later.  I'll

11:53:43  10  just say it again now.  I'm going to move all of

11:53:45  11  these in after the break.

11:53:47  12            MR. VARNADO:  Yeah, just bring them up,

11:53:50  13  and we'll give an answer like we said.

11:53:52  14            MR. MAGNANI:  So what I'm hearing right

11:53:54  15  now -- is there an objection or not to 29?

11:53:56  16            THE COURT:  Well, he wants to reserve

11:53:57  17  his objection until after the break.

11:53:59  18            MR. VARNADO:  Just like to take a look,

11:54:01  19  Judge, that's all.

11:54:02  20            THE COURT:  He says that he's reserving

11:54:04  21  his right to object after the break.  Not a problem.

11:54:06  22  We can keep going.  Just have to remember when we

11:54:10  23  come back to move to admit them.

11:54:14  24            MR. MAGNANI:  I will.  Thank you.

11:54:15  25            THE COURT:  Or you can move -- or other

11:54:17  1    alternative, move to admit them now and then I can

11:54:19  2    consider the objection, if any, later.

11:54:21  3             MR. MAGNANI:  Yeah, I think we can move

11:54:23  4    it along right now and we'll handle this after.

11:54:25  5    Q.   So I apologize for interrupting, Dr. Dietz.

11:54:27  6    Can you tell -- you were just telling us about the

11:54:30  7    timeline, and the last thing I believe you testified

11:54:32  8    about was his first visit with Dr. Pool.  Can you

11:54:36  9    keep us going from there?

11:54:38  10   A.   Yes -- well, while this is still on, let me

11:54:40  11   explain that this is not the first complaint of

11:54:43  12   memory.  Mr. Brockman did create annual health

11:54:50  13   summaries for his treating doctors.  And in those

11:54:53  14   summaries, he has memory complaints going back

11:54:57  15   before 2015, all the way to -- I think -- 2008.  And

11:55:03  16   the complaints that he's making are that, "I'm

11:55:07  17   having some trouble with memory, especially the

11:55:09  18   names," and that gradually worsens.

11:55:17  19             This is commented on memory

11:55:19  20   complaints by doctors before this period that we're

11:55:21  21   talking about who attribute it to normal age.  And

11:55:27  22   that's a common phenomenon for people to begin to

11:55:31  23   take longer to remember a name or not be able to

11:55:35  24   recall a name.  That does not necessarily indicate

11:55:40  25   dementia.  The aging brain gets slower at some of

these tasks.

The first person to notice that is usually the patient.  And I've seen instances in which colleagues have began to doubt themselves and gone to get neuropsychological testing for fear of having neurodegenerative disease, and it turns out they're normal for their age.  They keep practicing another 20 years.

So the earlier memory complaints that resulted in no action beyond reassurance I think were appropriately handled at the time. What's different is that here in May of 2017, Mr. Brockman is writing to his friend and buddy about memory problems and asking for help, but nothing occurs by way of a workup then.

Dr. Yudofsky knows exactly how to go work up someone for a memory problem, who they should see, what tests should be done and so on. And later -- a year later he recommends all of that. But it wasn't done until after this raid.  So that's why I regard this as suspicious timing.

Now, to go on from that issue, it's on October 20th of 2018, that Dr. Yudofsky creates a medical record treating Mr. Brockman as a patient. And it's a record in which he diagnoses mild to

11:57:39  1   moderate neurocognitive disorder.  He refers

11:57:44  2   Mr. Brockman for an assessment of Parkinson's

11:57:47  3   disease, which would normally be a neurologist; a

11:57:54  4   comprehensive medical workup, which could be done by

11:57:57  5   a GP and neuropsychological testing.

11:58:09  6                    It's unclear to me who the

11:58:11  7   reporting party was for Dr. Pool, and Dr. York, and

11:58:17  8   Dr. Jankovic.  And Dr. Pool says he's doing those

11:58:26  9   referrals, Dr. Yudofsky is talking about those

11:58:30  10  referrals, and Dr. York says that this is a patient

11:58:36  11  referred by Dr. Pool and I think mentions

11:58:40  12  Dr. Yudofsky in that.  So maybe they're both doing

11:58:46  13  referrals, but this is all things that one would

11:58:51  14  have expected to have occurred a year earlier.

11:58:56  15  Q.   And when you talk about the referral, do you

11:58:58  16  remember specifically how Mr. Brockman was referred

11:59:01  17  on?  Well, do you remember how Mr. Brockman was

11:59:07  18  referred to when these referrals were made?

11:59:12  19  A.   Well, I know that Dr. York's records reflect

11:59:16  20  that this was a VIP patient of Dr. Pool.  Is that

11:59:24  21  what you are asking me about?

11:59:26  22  Q.   Yes.  And so, after -- after these October

11:59:32  23  appointments with Doctors Pool and Yudofsky, what

11:59:37  24  happens next?

11:59:42  25  A.   Mr. Brockman made a million dollar donation to

11:59:46   1   Baylor Medical College, "Attention:  Dr. Seth

11:59:53   2   Lerner."

11:59:53   3   Q.   Who is Dr. Seth Lerner?

11:59:56   4   A.   The urologist that he had seen after the Alaska

12:00:00   5   fishing trip.

12:00:02   6   Q.   Okay.  And then what happened after this

12:00:04   7   donation?

12:00:10   8   A.   In January, he saw Dr. Jankovic -- I

12:00:13   9   mispronounced that, I'm sorry -- Dr. Jankovic on

12:00:18   10   referral from Doctors Pool and Yudofsky.  And at

12:00:21   11   that visit to a neurologist and memory expert, he

12:00:26   12   reports a history of concentration and memory

12:00:29   13   problems, having gone on for one and a half years

12:00:33   14   and having had depression for six months.

12:00:39   15                    And he had called MoCa 19 out of

12:00:43   16   30.

12:00:44   17   Q.   As you describe it, what sort of doctor is

12:00:47   18   Dr. Jankovic?

12:00:50   19   A.   I believe he's a neurologist with special

12:00:55   20   interest in memory.

12:00:56   21   Q.   Who did he see after Dr. Jankovic?

12:01:01   22   A.   Dr. York for the neuropsychological test

12:01:05   23   battery the first of three times.

12:01:12   24   Q.   Did -- as far as you are aware, did any other

12:01:14   25   doctor do a testing battery before Dr. York in

1   March 2019?

2   **A.**   I'm not aware of any testing battery before

3   that.

4   **Q.**   What was -- how -- did Dr. York estimate the

5   Defendant's IQ at that time?

6   **A.**   Yes.   From that testing in March of 2019, she

7   said he had a full-scale IQ of 87.

8   **Q.**   Do you know if Dr. York had reviewed any of the

9   videotaped deposition transcripts -- I'm sorry,

10  deposition videos that Mr. Brockman gave just two

11  months before?

12  **A.**   I'm sure she didn't, but there's no mention of

13  it one way or the other.

14  **Q.**   So -- I mean, what was -- what was Dr. York's

15  -- what were the pillars that were supporting her

16  conclusions?

17  **A.**   Well, I think there were three things.   Her

18  test results, which she learned from collaterals,

19  who would have been Mr. Brockman's wife and son, and

20  what Mr. Brockman told her.

21  **Q.**   And how -- I mean -- and you mention that, you

22  know, she didn't reference any of those videos.   Do

23  you know if she had access to any of Mr. Brockman's

24  e-mails he was composing at that time?

25  **A.**   Um, she is silent about any sources, other than

12:02:45  1    the ones I mentioned in the medical records.  But

12:02:48  2    there's no reason she would be expected to have his

12:02:53  3    e-mails or his -- videotapes of speeches or

12:02:57  4    testimony, or deposition transcripts.  Clinicians

12:03:01  5    aren't going to keep that stuff anyway.

12:03:04  6    Q.   So these bases you say her -- her opinion was

12:03:07  7    dependent upon, are those the same bases that

12:03:14  8    supported the defense letter that we looked at

12:03:16  9    before regarding Mr. Brockman's competency?

12:03:19  10   A.   That's right.

12:03:21  11   Q.   And so, before the involvement of the defense

12:03:24  12   experts in this case from the forensic panel, is it

12:03:27  13   fair to say that these same bases were relied on for

12:03:30  14   other dementia diagnoses?

12:03:32  15   A.   Correct.

12:03:47  16   Q.   How would you describe the consistency in these

12:03:51  17   different sources over time?

12:03:56  18   A.   Those three sources of how he acts and what his

12:04:06  19   family says about his impairment and what happens on

12:04:12  20   neuropsych testing, I would say that the first two

12:04:20  21   look worse and worse.  The third -- the testing --

12:04:24  22   is flat-lined at the bottom from the beginning.

12:04:28  23   Q.   And so, what I want to do now, Doctor, is move

12:04:35  24   ahead in -- well, let me ask you.  Did you prepare a

12:04:39  25   demonstrative exhibit that's in your slide deck?

12:04:42   1  **A.**   Yes.

12:04:42   2  **Q.**   Okay.  Can you please move to that, now?  So,

12:04:48   3  Doctor, can you -- well, can you explain this?

12:04:53   4  **A.**   Yes.  The amount of data here was so confusing

12:05:01   5  that it seemed a good idea to have a graphic

12:05:05   6  representation to clarify what some of these

12:05:07   7  discrepancies are that various experts have pointed

12:05:13   8  to.  So the top line of this graph is Mr. Brockman's

12:05:22   9  functioning as CEO, as businessman -- his

12:05:28   10  functioning in the real, external world.  And for

12:05:32   11  that, we have evidence of what I regard as superior

12:05:39   12  functioning of his cognitive capacities through his

12:05:46   13  speeches, through his testimony, and through his

12:05:48   14  e-mails that extends through 2019, and up to

12:05:58   15  November of 2020 when the window closes and I have

12:06:05   16  no access to data about his acts in the real world.

12:06:16   17           From that point on, he's only in

12:06:18   18  contact with a very small number of people, and

12:06:22   19  there is no e-mail stream.  And that small number of

12:06:26   20  people are those closest to him -- those in his

12:06:31   21  household, those in his family, and long-term

12:06:37   22  trusted friends.

12:06:43   23           So at that point, I can't evaluate

12:06:46   24  with what I regard as the objective means brought to

12:06:48   25  bear on the videotape speeches, the testimony

| | | |
|---|---|---|
| 12:06:53 | 1 | transcripts, and his own e-mails. |
| 12:06:58 | 2 | The second level here is |
| 12:07:01 | 3 | represented by the X's for the MRIs.  The MRI's both |
| 12:07:08 | 4 | in November and July are normal in a way that can't |
| 12:07:17 | 5 | really inform us about his cognitive function. |
| 12:07:24 | 6 | Certainly consistent with the superior performance |
| 12:07:28 | 7 | we see.  No contradiction there. |
| 12:07:33 | 8 | And on imaging, I'll point to the |
| 12:07:36 | 9 | blue line to the right.  When Dr. Darby orders the |
| 12:07:43 | 10 | FDG-PET scans, we get two points at which we can |
| 12:07:49 | 11 | look at how his brain metabolism is.  And that shows |
| 12:08:03 | 12 | some possible decrease between March and August, but |
| 12:08:14 | 13 | is not looking very bad even then. |
| 12:08:19 | 14 | MR. VARNADO:  Your Honor, just state an |
| 12:08:20 | 15 | objection of this witness's basis for this making |
| 12:08:22 | 16 | this testimony about the FDG-PET and it's impact on |
| 12:08:27 | 17 | cognitive functioning representing on a particular |
| 12:08:29 | 18 | graph.  This is just not his area. |
| 12:08:30 | 19 | THE COURT:  Objection overruled.  He |
| 12:08:32 | 20 | looked at it. |
| 12:08:35 | 21 | Doctor, you looked at this |
| 12:08:36 | 22 | information and used it in the preparation of your |
| 12:08:38 | 23 | graph; correct? |
| 12:08:39 | 24 | THE WITNESS:  Yes, Your Honor. |
| 12:08:40 | 25 | THE COURT:  Objection overruled.  You |

| | |
|---|---|
| 12:08:42 | 1 |
| 12:08:45 | 2 |
| 12:08:50 | 3 |
| 12:08:54 | 4 |
| 12:08:58 | 5 |
| 12:09:03 | 6 |
| 12:09:10 | 7 |
| 12:09:17 | 8 |
| 12:09:24 | 9 |
| 12:09:30 | 10 |
| 12:09:34 | 11 |
| 12:09:38 | 12 |
| 12:09:40 | 13 |
| 12:09:45 | 14 |
| 12:09:49 | 15 |
| 12:09:55 | 16 |
| 12:09:58 | 17 |
| 12:10:01 | 18 |
| 12:10:07 | 19 |
| 12:10:12 | 20 |
| 12:10:17 | 21 |
| 12:10:24 | 22 |
| 12:10:29 | 23 |
| 12:10:34 | 24 |
| 12:10:36 | 25 |

1  may continue.

2          THE WITNESS:  And I should say, this

3  graph is a collaborative effort.  Dr. Denney,

4  Dr. Darby, and I all spoke on the phone with a

5  graphic artist, at the same time saying which lines

6  to move where and which colors would be better.  The

7  black line on this graph is, I think, an inadequate

8  detailed representation of what Mr. Brockman is

9  telling doctors.  He seems to be telling doctors

10  over time a narrative consistent with decline.

11          And I say this is inadequately

12  represented here, because it's not really tied to

13  specific dates.  It doesn't show the three bouts of

14  delirium this year well enough, but the story is one

15  of decline based on what doctors observed and hear

16  Mr. Brockman say.

17          And down at the bottom, the lowest

18  line from March 2019 on, this is the flat-lined

19  memory functioning shown by neuropsychological tests

20  in which Mr. Brockman, again, and again, and again

21  performs in the lowest first percentile.  And it

22  does not make sense that that could be valid in

23  light of his real-world performance on the top line.

24          It is as dramatic a contradiction

25  as one can find.  I believe Dr. Denney testified

that one of the scores was the lowest he'd seen in
his career.  So my puzzlement after our October
exam, and continuing concerns about this case have
to do with these apparently big contradictions
between how Mr. Brockman appears, depending on how
we're looking.  It's very much like an old parable
about blind men and an elephant, in which what you
look at, what you feel, the data you have determine
what your impression of what this is.  And to put it
in its simplest terms, if you look at his
functioning in the world to the extent you can, he
is clearly competent and highly functional, and has
little or no cognitive impairment as long as we're
able to look at that up until November of 2020.

                   If you look at how he's behaving
around doctors, and the story he's telling doctors
and what his intimates are telling doctors, it looks
like a story of progressive impairment and
deterioration.  If you look at his brain studies,
they don't appear to be in the abnormal range to the
extent that the narrative seems to be.

                   And if you look at when he does
informal neurocognitive test batteries, he's got no
memory at all.  He's got this terrible, terrible
memory problem that's not reflected in any of the

12:12:53   1   other sources.  Couple that with the repeated,

12:13:02   2   invalid test performance, that makes it a

12:13:05   3   statistical improbability of substantial degree that

12:13:12   4   any of the neuropsych testing is valid.  I can only

12:13:18   5   conclude that the only explanation that fits all of

12:13:21   6   the facts is that he's exaggerating the extent of

12:13:25   7   his impairment, and that he was exaggerating that in

12:13:32   8   March 2019, and continues to.

12:13:37   9           MR. MAGNANI:  Your Honor, I know that

12:13:38   10  you wanted to break around 12:15.

12:13:42   11          THE COURT:  Yeah, this is a good time,

12:13:43   12  because I need to get ready for the hearing.  Do you

12:13:45   13  want more time to consider the objections?

12:13:50   14          MR. VARNADO:  Look at the documents

12:13:51   15  right now, and as soon as we come back, Your Honor.

12:13:53   16          THE COURT:  We'll go ahead, everyone,

12:13:55   17  and recess until 1:15.  Again, you don't have to

12:13:59   18  clear out anything.  You can leave everything where

12:14:02   19  it is.

12:14:03   20          MR. VARNADO:  Thank you, Judge.

           21  (WHEREUPON, THE PROCEEDINGS WERE RECESSED AT 12:14

           22                      P.M.)

           23                    ---oOo---

           24

           25

C E R T I F I C A T E

        I hereby certify that pursuant to Title 28,
Section 753 United States Code, the foregoing is a
true and correct transcript of the stenographically
reported proceedings in the above matter.
        Certified on 11/20/2021.


_____
        Sean Gumm, RPR, CRR

## $

**$200,000** [1] - 16:12
**$25** [1] - 38:4
**$3,000** [1] - 64:18

## 1

**1** [1] - 96:15
**104** [3] - 95:1, 96:14
**11** [1] - 71:15
**11/20/2021** [1] - 109:8
**11th** [1] - 95:21
**12:14** [1] - 108:21
**12:15** [3] - 72:12, 72:13, 108:10
**12:45** [1] - 72:11
**13** [1] - 67:13
**13th** [1] - 66:17
**15th** [1] - 96:5
**17** [1] - 10:24
**18** [1] - 74:14
**18th** [6] - 35:6, 75:1, 75:4, 77:8, 77:20, 80:2
**19** [4] - 1:12, 4:5, 8:9, 101:15
**1911** [1] - 38:19
**1970** [1] - 6:25
**1975** [1] - 7:1
**1981** [1] - 8:9
**19th** [2] - 77:10, 77:11
**1:15** [2] - 72:13, 108:17

## 2

**20** [5] - 27:17, 91:25, 92:2, 92:6, 99:8
**2008** [1] - 98:15
**2015** [1] - 98:15
**2017** [3] - 59:17, 95:6, 99:12
**2018** [5] - 40:17, 59:17, 70:16, 70:20, 99:23
**2019** [21] - 34:4, 56:17, 56:20, 56:25, 58:19, 59:4, 59:7, 59:9, 59:17, 59:20, 59:25, 60:1, 60:16, 61:6, 68:9, 93:19, 102:1, 102:6, 104:14, 106:18, 108:8
**2020** [18] - 19:2, 20:2, 20:13, 21:9, 61:7, 61:16, 61:17, 61:18, 62:1, 62:17, 63:2, 64:9, 65:25, 66:17, 67:13, 68:10,

104:15, 107:14
**2021** [12] - 1:12, 4:5, 22:13, 22:16, 22:18, 58:20, 70:16, 70:21, 74:14, 82:20, 83:5
**2051** [2] - 91:24, 92:5
**20th** [9] - 75:4, 77:8, 77:20, 80:3, 80:5, 85:19, 85:25, 93:4, 99:23
**21st** [1] - 94:1
**27** [1] - 92:2
**28** [1] - 109:4
**29** [3] - 96:14, 97:4, 97:15
**29th** [1] - 94:3

## 3

**3** [3] - 91:25, 92:2, 92:6
**30** [2] - 38:5, 101:16
**30-page** [1] - 27:17

## 4

**44** [3] - 62:19, 62:25, 67:15
**45** [3] - 63:18, 64:3, 67:15
**46** [2] - 68:19, 72:5
**47** [3] - 65:5, 65:13, 67:15
**48** [2] - 68:19, 72:5
**49** [2] - 96:18, 97:1
**4:21-CR-00009-1** [1] - 1:4
**4th** [1] - 94:6

## 5

**5** [3] - 1:9, 80:1, 80:22
**5-A** [3] - 80:4, 80:5, 80:21
**50/50** [1] - 17:14
**52** [2] - 68:19, 72:5
**53** [1] - 39:6
**54** [2] - 68:19, 72:5
**55** [2] - 68:19, 72:4
**56** [2] - 68:19, 72:5
**57** [2] - 68:19, 72:5
**59** [2] - 96:14, 96:17
**5th** [1] - 95:17

## 6

**6** [1] - 3:4
**60** [1] - 64:16
**69** [2] - 68:19, 72:5
**6th** [2] - 86:4, 87:5

## 7

**7-0** [1] - 66:6
**70** [4] - 45:25, 66:6, 66:13, 67:15
**753** [1] - 109:5

## 8

**80** [3] - 21:6, 21:8, 21:14
**80-year-old** [2] - 39:5, 41:7
**81** [5] - 19:10, 19:16, 20:11, 21:1, 21:4
**83** [1] - 15:7
**84** [1] - 15:7
**87** [1] - 102:7
**88** [1] - 15:8
**8:38** [1] - 4:5

## 9

**99** [2] - 80:5, 80:6

## A

**A.M** [1] - 4:5
**Abdula** [1] - 76:7
**abilities** [1] - 30:1
**ability** [4] - 33:18, 34:6, 43:22, 50:2
**able** [29] - 8:1, 8:12, 30:6, 33:14, 35:23, 37:13, 38:18, 40:12, 44:3, 45:10, 46:22, 51:17, 54:10, 54:15, 62:5, 64:15, 65:3, 72:14, 75:13, 76:14, 79:16, 85:4, 88:17, 89:24, 91:21, 91:23, 92:5, 98:23, 107:14
**abnormal** [1] - 107:20
**absurd** [1] - 91:20
**abuse** [1] - 9:13
**Academy** [2] - 9:6, 9:18
**accepted** [1] - 89:5
**access** [10] - 22:20, 26:1, 26:2, 26:11, 26:17, 27:5, 27:6, 30:9, 102:23, 104:16
**accomplished** [1] - 37:16
**according** [1] - 65:2
**accountant** [2] - 61:12, 65:19
**accounted** [1] - 31:20
**accumulated** [1] - 35:25

**accumulating** [2] - 52:21, 52:22
**accuracy** [1] - 24:9
**accurately** [1] - 34:7
**accused** [2] - 16:22, 30:9
**achievement** [2] - 35:14, 37:8
**act** [2] - 55:17, 55:18
**acted** [2] - 85:21, 90:16
**acting** [2] - 44:22, 53:18
**action** [2] - 95:6, 99:10
**actively** [1] - 9:6
**activities** [1] - 31:19
**acts** [2] - 103:18, 104:16
**actual** [1] - 55:22
**acute** [1] - 50:5
**add** [1] - 4:24
**added** [1] - 14:6
**addition** [2] - 48:3, 78:16
**additional** [4] - 7:25, 23:7, 37:21, 93:1
**additions** [1] - 9:15
**address** [2] - 50:25, 85:11
**addressed** [1] - 66:21
**adds** [1] - 60:19
**adequate** [5] - 26:17, 46:20, 74:20, 78:19, 88:6
**adequately** [4] - 40:10, 51:18, 63:16, 75:16
**administered** [6] - 25:2, 56:17, 66:24, 78:2, 78:9, 88:4
**admirable** [1] - 37:8
**admire** [2] - 35:13, 35:20
**admit** [13] - 20:25, 21:11, 64:1, 67:15, 67:22, 68:19, 72:1, 72:4, 80:19, 96:9, 96:13, 97:23, 98:1
**admitted** [10] - 15:7, 21:4, 21:15, 62:21, 62:24, 63:22, 67:20, 69:16, 72:9, 80:25
**ADP** [1] - 91:16
**adult** [1] - 30:23
**advance** [1] - 24:8
**advice** [1] - 88:11
**advised** [1] - 18:22
**advisement** [1] - 73:5
**advising** [1] - 18:11

**affect** [1] - 49:23
**affecting** [1] - 46:3
**aftermath** [1] - 52:7
**afternoon** [2] - 85:25, 91:10
**age** [4] - 31:17, 40:6, 98:21, 99:7
**agents** [1] - 28:21
**aging** [1] - 98:25
**ago** [2] - 25:10, 83:19
**agree** [5] - 31:6, 31:13, 50:8, 82:23, 90:11
**agreed** [3] - 4:15, 4:16, 88:3
**agreement** [4] - 30:19, 30:23, 32:12, 71:25
**agrees** [2] - 31:7, 31:18
**Agronin** [6] - 34:18, 54:13, 54:14, 83:23, 84:1, 84:18
**ahead** [3] - 84:12, 103:24, 108:16
**air** [1] - 47:9
**airway** [2] - 47:5, 47:8
**Alaska** [2] - 95:9, 101:4
**Albula** [1] - 76:7
**alcohol** [1] - 51:3
**alert** [1] - 45:15
**alleged** [1] - 43:14
**allow** [1] - 70:2
**alluded** [1] - 65:18
**alone** [1] - 88:19
**alternative** [1] - 98:1
**Alzheimer's** [5] - 41:15, 42:19, 43:15, 43:16, 43:22
**AM** [1] - 1:9
**American** [4] - 9:6, 9:12, 9:18, 36:25
**amount** [2] - 45:17, 104:4
**amounts** [1] - 67:4
**amove** [1] - 60:8
**amyloid** [8] - 41:5, 41:6, 41:8, 42:18, 43:11, 43:13, 43:18, 52:21
**analysis** [4] - 70:18, 71:1, 71:3, 72:24
**Andrea** [1] - 11:18
**anesthesia** [3] - 52:4, 52:5, 52:9
**annual** [1] - 98:12
**answer** [6] - 12:1, 12:2, 29:6, 50:24, 80:14, 97:13
**answered** [2] - 42:20,

84:2
answers [2] - 91:20, 92:4
anti [1] - 40:9
anti-depressant [1] - 40:9
anyway [2] - 96:16, 103:5
apnea [5] - 45:14, 45:22, 46:14, 47:3, 47:4
apologize [6] - 12:23, 21:6, 42:14, 57:6, 65:6, 98:5
appeal [1] - 12:8
Appeals [2] - 11:10, 12:9
appear [1] - 107:20
appearance [1] - 83:11
APPEARANCES [1] - 1:14
appeared [3] - 55:12, 55:14, 83:9
application [2] - 6:12, 47:8
appointed [1] - 17:6
appointment [1] - 95:19
appointments [1] - 100:23
approach [5] - 14:23, 28:13, 66:8, 66:10, 80:8
appropriate [3] - 25:17, 42:3, 42:9
appropriately [2] - 60:17, 99:11
April [1] - 20:13
AR-15 [1] - 63:5
area [4] - 41:18, 56:10, 56:12, 105:18
areas [3] - 30:22, 33:4, 50:22
arguably [1] - 64:13
argument [1] - 12:12
arise [1] - 74:22
arisen [1] - 10:11
arises [1] - 10:10
Arizona [1] - 12:15
armed [1] - 24:10
arms [1] - 53:21
arousal [3] - 45:17, 45:20, 51:20
arousals [1] - 45:25
arrange [1] - 63:3
arrest [1] - 18:17
arrive [1] - 82:7
arrived [1] - 57:13
arterial [1] - 49:25

artist [1] - 106:5
aspects [2] - 78:18, 78:19
Aspen [1] - 53:25
assassination [1] - 8:11
assess [1] - 78:8
assessed [1] - 78:16
assessment [6] - 52:15, 52:17, 75:5, 93:9, 94:24, 100:2
assigned [1] - 88:24
assist [1] - 26:5
assistance [1] - 31:19
Assistant [1] - 7:14
Association [1] - 9:12
AT [2] - 1:21, 108:21
attached [3] - 19:6, 20:21, 22:1
attachments [2] - 20:17, 20:18
attempted [1] - 8:10
attended [2] - 13:6, 87:19
Attention [1] - 101:1
attention [7] - 16:5, 35:5, 64:23, 76:22, 77:3, 83:2, 83:20
attentive [1] - 85:8
attenuated [1] - 54:10
attorney [5] - 8:23, 28:9, 28:25, 29:17, 33:15
Attorney [4] - 1:19, 1:22, 1:24, 2:1
ATTORNEY [1] - 1:21
attorney's [1] - 89:13
attorneys [6] - 4:14, 6:8, 18:12, 88:10, 89:10, 89:11
attribute [1] - 98:21
attributed [2] - 39:19, 39:20
audience [2] - 60:18, 60:19
August [2] - 87:10, 105:12
authenticity [1] - 69:7
available [4] - 4:17, 16:7, 54:7, 78:22
avid [1] - 38:13
avoid [2] - 60:7, 94:16
aware [2] - 101:24, 102:2

## B

bachelor's [1] - 6:25
backwards [1] - 91:22
bacteria [3] - 49:24,

50:20, 50:21
bad [4] - 76:1, 76:5, 84:22, 105:13
badly [1] - 91:5
balance [1] - 31:17
Ball [2] - 29:13, 64:24
ballpark [1] - 10:1
barber [1] - 29:9
barbiturates [1] - 51:4
based [3] - 12:9, 79:18, 106:15
baseline [1] - 78:11
bases [5] - 70:3, 94:15, 103:6, 103:7, 103:13
basic [2] - 24:6, 52:19
basis [4] - 32:16, 58:12, 94:13, 105:15
bathtub [1] - 11:20
batteries [2] - 34:10, 107:23
battery [6] - 34:13, 56:16, 57:1, 101:23, 101:25, 102:2
Baylor [7] - 21:25, 37:18, 37:22, 37:24, 38:3, 46:11, 101:1
bear [1] - 104:25
bearing [1] - 29:24
became [6] - 8:21, 9:7, 9:9, 12:7, 16:7, 17:12
become [4] - 7:9, 34:1, 36:23, 45:15
began [3] - 82:3, 82:7, 99:4
begin [2] - 45:16, 98:22
beginning [4] - 42:6, 56:19, 56:22, 103:22
behalf [1] - 12:17
behaved [1] - 90:5
behaves [1] - 92:10
behaving [2] - 90:18, 107:15
behavior [3] - 79:13, 90:1, 90:17
behavioral [1] - 8:22
Behavioral [1] - 9:10
belated [1] - 82:3
Belgian [1] - 63:5
belief [1] - 33:18
believes [1] - 24:17
belong [2] - 8:24, 9:4
belongs [1] - 67:10
benefit [4] - 48:3, 48:5, 48:13, 92:18
Bermuda [2] - 95:10, 95:17
beta [4] - 41:5, 41:6,

41:8, 42:18
beta-amyloid [4] - 41:5, 41:6, 41:8, 42:18
better [11] - 8:1, 31:9, 36:16, 47:25, 54:17, 55:12, 55:14, 93:6, 93:16, 106:6
between [12] - 17:20, 24:13, 32:5, 53:7, 70:16, 77:8, 79:8, 85:9, 89:25, 90:15, 105:12, 107:5
beyond [3] - 61:4, 70:2, 99:10
Bible [1] - 13:15
big [6] - 48:24, 53:14, 53:15, 77:5, 95:5, 107:4
bill [1] - 18:7
billed [2] - 18:6, 67:1
bills [1] - 25:20
binders [1] - 65:8
Biology [1] - 6:25
bird [1] - 38:16
birthday [1] - 60:3
bit [2] - 4:23, 36:10
black [1] - 106:7
bladder [1] - 48:24
blamed [1] - 79:13
BLEUSTEIN [1] - 1:25
blind [1] - 107:7
blood [3] - 49:22, 49:24, 49:25
blue [1] - 105:9
blurry [1] - 19:21
board [1] - 35:25
bodies [5] - 44:17, 44:23, 46:10, 46:12, 46:25
body [4] - 48:21, 48:24, 50:2, 50:23
bombing [1] - 13:1
bombs [1] - 11:8
book [1] - 8:15
border [1] - 86:8
BORIS [1] - 1:18
Boston [2] - 13:1, 17:7
bottom [3] - 21:18, 103:22, 106:17
Bourget [2] - 62:20, 65:16
BOURGET [1] - 1:18
bouts [1] - 106:13
box [2] - 29:7, 74:8
boy [1] - 36:9
Brady [1] - 17:25
brain [19] - 31:3, 41:14, 42:17, 45:16, 49:23, 50:6, 50:22,

51:17, 51:22, 51:24, 52:17, 52:20, 52:25, 53:4, 53:7, 93:7, 98:25, 105:11, 107:19
brainwaves [1] - 45:1
break [14] - 68:24, 69:12, 69:22, 69:24, 71:9, 71:15, 71:17, 72:12, 81:12, 97:5, 97:11, 97:17, 97:21, 108:10
bridge [1] - 86:11
brief [1] - 8:17
briefly [9] - 6:22, 9:2, 10:23, 11:5, 24:2, 24:13, 81:25, 88:13, 90:22
bring [1] - 97:12
bringing [1] - 37:24
broad [1] - 26:22
broadly [2] - 10:18, 30:11
Brockman [68] - 4:8, 23:1, 23:11, 28:3, 28:15, 29:4, 29:12, 30:23, 31:13, 32:13, 33:9, 34:23, 35:4, 36:2, 37:11, 43:6, 44:19, 47:10, 48:5, 49:12, 55:3, 56:17, 57:17, 57:22, 58:1, 58:8, 58:23, 59:3, 60:9, 61:7, 62:4, 62:13, 63:3, 64:11, 64:20, 66:17, 74:15, 75:5, 76:4, 77:12, 78:12, 82:16, 83:9, 86:17, 88:24, 89:9, 94:14, 95:5, 95:8, 95:18, 95:21, 95:23, 95:25, 96:5, 98:12, 99:13, 99:24, 100:2, 100:16, 100:17, 100:25, 102:10, 102:20, 106:8, 106:16, 106:20, 107:5
BROCKMAN [1] - 1:7
Brockman's [27] - 15:20, 23:23, 28:20, 29:9, 29:13, 29:25, 31:8, 33:18, 34:16, 39:11, 53:10, 54:8, 56:12, 58:7, 59:2, 60:23, 61:4, 61:17, 65:22, 66:16, 75:1, 82:10, 95:2, 102:19, 102:23, 103:9, 104:8
brother [1] - 13:3

**brothers** [1] - 13:3
**brought** [3] - 13:3, 51:6, 104:24
**buddy** [1] - 99:13
**built** [2] - 30:25, 36:23
**bullet** [2] - 21:18, 94:18
**bullet-pointed** [1] - 21:18
**Burnett** [1] - 28:23
**business** [8] - 18:19, 30:25, 37:2, 37:9, 38:10, 75:17, 75:25, 77:5
**businessman** [2] - 30:24, 104:9
**bust** [1] - 76:24
**buying** [1] - 35:25
**BY** [1] - 5:23

## C

**calculate** [1] - 16:10
**calibrated** [1] - 47:10
**California** [1] - 12:5
**cancer** [1] - 48:24
**candid** [1] - 96:19
**capable** [1] - 33:20
**capacities** [1] - 104:12
**capital** [1] - 13:5
**Caracanio** [1] - 12:14
**cardiac** [1] - 45:23
**care** [3] - 95:23, 95:25, 96:1
**career** [6] - 10:19, 17:5, 36:10, 37:9, 38:10, 107:2
**carefully** [1] - 60:14
**caretakers** [1] - 29:4
**Carolina** [1] - 13:14
**case** [47] - 6:19, 8:10, 8:16, 10:21, 11:2, 11:3, 11:6, 11:12, 11:13, 11:21, 11:25, 13:1, 13:10, 14:17, 15:17, 16:9, 16:14, 17:17, 18:10, 19:7, 19:24, 22:12, 23:18, 26:18, 28:2, 30:20, 32:6, 33:3, 39:12, 43:6, 44:11, 49:11, 52:2, 52:14, 52:18, 52:20, 54:23, 64:25, 80:16, 81:3, 81:4, 81:5, 81:9, 84:5, 84:9, 103:12, 107:3
**case-related** [1] - 81:9
**cases** [12] - 10:15, 10:17, 10:19, 12:14, 13:22, 16:21, 16:25,

17:10, 17:11, 18:16, 85:10, 87:20
**categories** [1] - 88:23
**causes** [7] - 39:20, 39:25, 45:15, 51:1, 51:2, 51:13, 51:16
**causing** [1] - 51:11
**CDK** [1] - 91:18
**centerpiece** [1] - 12:8
**central** [1] - 44:9
**CEO** [2] - 39:1, 104:9
**cerebrospinal** [1] - 43:2
**certain** [1] - 78:17
**certainly** [5] - 14:8, 18:4, 50:14, 83:14, 105:6
**Certified** [1] - 109:8
**certify** [1] - 109:4
**Chair** [1] - 9:7
**chair** [1] - 39:2
**chaired** [1] - 9:12
**chance** [3] - 35:6, 68:23, 85:14
**change** [11] - 8:8, 11:16, 47:20, 47:22, 47:23, 58:13, 58:14, 83:11, 90:22, 91:11, 92:15
**changed** [2] - 52:6, 90:17
**changes** [2] - 31:3, 52:25
**characterization** [1] - 73:15
**charge** [1] - 7:15
**charged** [1] - 10:24
**charges** [3] - 78:13, 79:15, 88:12
**Charitable** [1] - 37:11
**charities** [3] - 37:14, 37:16, 37:21
**Charleston** [1] - 13:13
**chase** [1] - 54:22
**chief** [1] - 18:15
**child** [1] - 39:10
**childhood** [1] - 75:8
**children** [1] - 11:20
**CHRISTOPHER** [1] - 1:16
**chronic** [1] - 45:14
**church** [1] - 13:14
**Circuit** [1] - 11:9
**civil** [4] - 11:10, 84:3, 85:10, 91:17
**claims** [2] - 10:12, 10:13
**clarification** [1] - 63:23
**clarify** [3] - 41:25,

93:1, 104:6
**class** [1] - 13:16
**clause** [1] - 39:3
**clear** [8] - 16:17, 34:3, 40:7, 41:24, 57:18, 58:12, 58:14, 108:18
**clearer** [1] - 34:1
**clearly** [4] - 50:3, 55:12, 81:9, 107:12
**clever** [1] - 61:8
**clicker** [1] - 27:2
**client's** [1] - 17:17
**clients** [1] - 29:11
**clinic** [1] - 17:11
**clinical** [4] - 24:14, 24:15, 44:16, 48:4
**clinicians** [1] - 103:4
**close** [4] - 39:8, 76:22, 77:3, 79:20
**closed** [1] - 74:1
**closer** [1] - 38:5
**closes** [2] - 61:21, 104:15
**closest** [1] - 104:20
**closing** [1] - 12:12
**coconspirators** [1] - 79:1
**Code** [1] - 109:5
**code** [1] - 47:19
**cognition** [6] - 31:22, 41:10, 41:11, 48:13, 50:17, 91:12
**cognitive** [54] - 30:1, 30:3, 31:5, 31:8, 31:10, 32:11, 32:15, 32:18, 34:7, 34:11, 34:21, 34:23, 35:1, 41:12, 43:23, 44:4, 44:7, 46:3, 48:1, 48:8, 53:5, 53:8, 53:10, 53:12, 53:14, 53:17, 53:22, 55:7, 55:23, 56:2, 58:9, 58:15, 59:2, 59:11, 61:2, 61:4, 65:22, 66:16, 67:11, 68:6, 82:24, 83:13, 90:3, 90:25, 92:11, 92:21, 93:9, 94:4, 94:8, 94:11, 104:12, 105:5, 105:17, 107:13
**cognitively** [2] - 32:13, 50:11
**coherent** [9] - 61:7, 63:14, 65:23, 66:21, 67:6, 74:16, 75:12, 79:15, 92:6
**coherently** [1] - 60:14
**collaborative** [1] -

106:3
**collateral** [20] - 26:11, 26:12, 26:14, 26:15, 26:16, 26:17, 26:20, 26:23, 26:25, 30:5, 53:9, 53:16, 53:18, 54:2, 54:3, 54:7, 54:13, 54:16, 54:22
**collaterals** [1] - 102:18
**colleagues** [1] - 99:4
**collect** [1] - 28:1
**collection** [1] - 38:14
**collectively** [1] - 87:13
**COLLEEN** [1] - 1:21
**college** [1] - 36:4
**College** [2] - 37:19, 101:1
**colorful** [1] - 36:6
**colors** [1] - 106:6
**comfortable** [3] - 5:19, 5:21, 29:17
**coming** [1] - 76:16
**commented** [1] - 98:19
**comments** [1] - 60:19
**committees** [1] - 9:13
**common** [6] - 24:14, 24:20, 51:4, 51:9, 51:16, 98:22
**communicate** [1] - 75:16
**communications** [1] - 28:16
**companies** [1] - 36:24
**company** [10] - 6:7, 6:8, 36:18, 36:21, 37:7, 60:3, 62:14, 66:25, 67:3, 76:13
**Company** [1] - 36:13
**compare** [1] - 78:11
**compared** [1] - 30:13
**comparing** [1] - 70:20
**comparison** [3] - 70:16, 70:21, 73:3
**compensate** [1] - 67:3
**Competence** [1] - 87:25
**competence** [14] - 7:22, 9:21, 15:20, 32:10, 32:17, 33:10, 78:9, 81:7, 87:16, 87:20, 87:23, 88:25, 89:6, 89:8
**competency** [11] - 10:2, 13:21, 20:5, 78:1, 79:18, 87:11, 89:1, 89:2, 91:9, 94:4, 103:9
**COMPETENCY** [1] -

1:9
**competent** [7] - 32:8, 33:11, 78:15, 79:21, 94:2, 94:7, 107:12
**complaint** [1] - 98:11
**complaints** [5] - 94:25, 98:14, 98:16, 98:20, 99:9
**complete** [2] - 35:24, 82:4
**completed** [5] - 7:3, 82:8, 88:14, 88:16, 88:18
**completely** [1] - 66:20
**complex** [1] - 13:21
**complications** [2] - 51:10, 52:7
**composing** [1] - 102:24
**comprehensive** [1] - 100:4
**computer** [1] - 2:8
**concentration** [1] - 101:12
**concept** [1] - 50:25
**concern** [1] - 45:25
**concerning** [3] - 65:19, 82:1, 82:3
**concerns** [1] - 107:3
**conclude** [1] - 108:5
**concluded** [3] - 92:20, 94:2, 94:6
**conclusion** [2] - 71:1, 102:16
**conclusions** [2] - 93:24
**condition** [2] - 45:15, 50:9
**conduct** [2] - 87:11, 94:20
**conducted** [1] - 56:24
**conducting** [1] - 8:13
**confidence** [3] - 79:22, 88:9, 89:10
**confident** [1] - 81:20
**confronted** [2] - 85:25, 86:3
**confused** [4] - 51:18, 85:8, 85:9, 92:15
**confusing** [4] - 33:3, 80:3, 91:12, 104:4
**confusion** [2] - 21:7, 83:21
**connection** [1] - 13:4
**consent** [2] - 23:2, 28:18
**consequences** [2] - 88:6, 94:19
**consider** [9] - 29:15, 40:22, 52:5, 55:21, 71:10, 92:8, 94:23,

98:2, 108:13
**considerable** [1] - 55:9
**considerably** [1] - 64:10
**considered** [3] - 28:25, 48:22, 58:8
**consisted** [1] - 22:23
**consistency** [1] - 103:16
**consistent** [9] - 41:9, 41:10, 56:13, 67:10, 77:19, 77:21, 77:23, 105:6, 106:10
**constitute** [1] - 45:21
**consult** [2] - 12:1, 33:15
**contact** [7] - 29:20, 29:23, 30:15, 35:15, 35:20, 60:18, 104:18
**contention** [1] - 32:5
**contested** [2] - 33:8, 93:13
**context** [9] - 10:9, 18:1, 59:24, 60:2, 74:24, 77:22, 83:22, 94:17, 94:18
**continue** [5] - 42:15, 71:17, 71:22, 72:12, 106:1
**continued** [1] - 25:9
**continues** [1] - 108:8
**continuing** [2] - 63:7, 107:3
**continuous** [1] - 47:5
**contradiction** [3] - 89:25, 105:7, 106:24
**contradictions** [1] - 107:4
**contrary** [3] - 17:16, 17:21, 17:24
**contribute** [1] - 52:10
**contributed** [1] - 37:15
**contributory** [1] - 22:25
**converging** [1] - 58:21
**conversation** [1] - 29:10
**converting** [1] - 26:7
**conviction** [1] - 12:9
**copy** [2] - 27:9, 27:13
**COREY** [1] - 1:15
**Cornell** [1] - 6:24
**correct** [13] - 12:6, 48:18, 63:13, 66:21, 67:5, 72:3, 74:9, 77:9, 91:20, 97:1, 103:15, 105:23, 109:6

**correctional** [1] - 18:17
**correctly** [3] - 63:13, 89:17, 91:22
**corrects** [1] - 60:15
**correspondence** [5] - 60:23, 61:1, 65:15, 65:19, 73:25
**cost** [1] - 67:2
**costly** [1] - 76:9
**cough** [1] - 25:23
**counsel** [7] - 4:8, 13:19, 25:22, 28:8, 28:21, 71:13, 72:9
**Counsel** [5] - 27:9, 27:14, 41:22, 71:24, 97:8
**counted** [1] - 14:6
**country** [1] - 14:2
**couple** [3] - 75:17, 86:2, 108:1
**course** [22] - 7:9, 10:19, 15:15, 16:24, 18:15, 24:24, 27:15, 28:13, 30:21, 38:25, 39:4, 40:23, 42:1, 49:22, 54:16, 56:2, 58:2, 77:23, 78:10, 83:1, 91:17, 95:4
**COURT** [55] - 1:1, 4:10, 4:19, 4:22, 5:2, 5:6, 5:9, 5:16, 14:14, 14:22, 14:25, 15:9, 21:3, 21:14, 27:13, 27:20, 27:23, 32:23, 41:20, 42:10, 61:24, 62:7, 66:10, 67:19, 68:21, 68:25, 69:4, 69:9, 69:13, 69:19, 69:25, 71:9, 71:13, 71:19, 71:22, 72:2, 72:6, 72:8, 72:20, 73:4, 73:17, 80:10, 80:24, 87:1, 96:12, 96:17, 96:23, 97:2, 97:16, 97:20, 97:25, 105:19, 105:25, 108:11, 108:16
**Court** [8] - 2:5, 2:5, 11:9, 11:23, 12:8, 30:18, 42:3, 58:4
**court** [5] - 4:3, 5:21, 17:6, 17:19, 41:19
**Court's** [1] - 14:21
**court-appointed** [1] - 17:6
**courtroom** [1] - 88:8
**courts** [1] - 13:24
**cover** [1] - 81:6
**covered** [1] - 81:24

**COVID** [1] - 85:6
**CPA** [1] - 28:20
**CPAP** [4] - 47:6, 47:15, 48:12, 48:16
**Craig** [2] - 28:22, 67:5
**create** [3] - 50:2, 79:6, 98:12
**creates** [2] - 44:21, 99:23
**creating** [1] - 79:3
**credits** [1] - 35:21
**Criminal** [1] - 12:9
**criminal** [11] - 10:15, 10:17, 10:18, 14:5, 16:25, 17:22, 17:23, 84:5, 84:9, 85:10, 94:19
**criminally** [1] - 7:16
**critically** [1] - 16:6
**cross** [6] - 11:24, 42:11, 54:19, 70:12, 70:25, 71:2
**cross-examination** [4] - 11:24, 42:11, 54:19, 70:12
**CRR** [2] - 2:4, 109:11
**cues** [1] - 23:15
**cure** [2] - 48:15, 48:17
**current** [1] - 93:17
**customized** [1] - 38:19
**cut** [1] - 54:21
**cutoff** [1] - 45:19
**cyber** [2] - 76:17, 76:18

# D

**D-I-E-T-Z** [1] - 6:3
**Dahmer** [2] - 10:21, 10:23
**daily** [3] - 30:10, 30:14, 31:19
**Darby** [11] - 22:15, 22:16, 22:17, 28:4, 46:13, 46:16, 74:5, 76:3, 84:7, 105:9, 106:4
**Darby's** [1] - 23:7
**dark** [1] - 92:12
**data** [8] - 24:10, 30:12, 30:14, 48:4, 92:18, 104:4, 104:16, 107:8
**date** [3] - 67:12, 82:21, 83:16
**dates** [1] - 106:13
**daughter** [1] - 39:9
**daughter-in-law** [1] - 39:9
**DAY** [1] - 1:9

**days** [3] - 59:7, 77:22, 77:25
**daytime** [1] - 47:25
**deal** [5] - 36:15, 42:11, 49:4, 58:19, 60:16
**dealing** [1] - 91:9
**death** [2] - 12:19, 45:24
**December** [1] - 19:1
**decided** [4] - 11:16, 12:18, 36:17, 54:9
**decision** [1] - 30:7
**decisions** [1] - 76:5
**deck** [8] - 26:5, 26:10, 27:9, 27:17, 67:23, 68:4, 70:6, 103:25
**declaration** [4] - 16:18, 19:4, 19:6, 24:2
**declarations** [1] - 93:15
**declared** [1] - 66:18
**decline** [9] - 30:4, 31:5, 31:8, 31:10, 43:23, 57:21, 82:24, 106:10, 106:15
**declined** [1] - 90:12
**decrease** [2] - 45:17, 105:12
**defendant** [3] - 17:22, 24:9, 30:15
**Defendant** [9] - 1:8, 1:19, 22:15, 46:8, 74:7, 80:15, 81:3, 85:20, 88:5
**Defendant's** [2] - 44:3, 102:5
**defendants** [3] - 7:21, 16:23, 79:1
**defense** [11] - 11:2, 13:8, 17:3, 17:8, 20:12, 32:19, 41:5, 89:3, 91:2, 103:8, 103:11
**Defense** [15] - 17:25, 18:1, 18:2, 19:24, 20:4, 22:2, 25:22, 43:12, 63:20, 69:7, 71:24, 83:4, 84:17, 96:15, 97:8
**Defense's** [2] - 20:23, 43:10
**defenses** [1] - 78:22
**degree** [12] - 6:25, 7:2, 10:14, 31:5, 31:10, 32:15, 33:12, 34:7, 91:6, 92:21, 108:3
**degrees** [5] - 45:16, 53:19, 54:5, 55:1, 85:23

**delay** [1] - 89:18
**delirious** [4] - 50:7, 51:7, 51:18, 52:12
**delirium** [13] - 49:8, 49:9, 49:16, 49:18, 50:4, 50:13, 51:2, 51:13, 52:10, 82:5, 82:23, 106:14
**delivering** [1] - 36:5
**demented** [5] - 48:14, 59:5, 59:19, 66:18, 90:18
**dementia** [21] - 16:3, 34:24, 35:2, 42:7, 43:14, 44:17, 44:23, 46:9, 46:11, 46:24, 48:15, 57:17, 58:12, 58:15, 58:21, 59:10, 59:23, 92:10, 94:11, 98:25, 103:14
**demonstrable** [1] - 31:3
**demonstrated** [1] - 88:6
**demonstrates** [1] - 59:5
**demonstrative** [1] - 103:25
**Denney** [16] - 28:5, 28:14, 70:12, 70:25, 74:12, 77:11, 78:9, 85:20, 87:13, 87:15, 88:1, 88:12, 88:19, 92:1, 106:3, 106:25
**Department** [4] - 12:18, 15:18, 16:16, 79:13
**dependent** [1] - 103:7
**deposited** [1] - 41:13
**deposition** [5] - 58:24, 83:24, 102:9, 102:10, 103:4
**depositions** [1] - 4:15
**deposits** [1] - 42:17
**depressant** [1] - 40:9
**depression** [5] - 39:18, 39:19, 40:7, 40:13, 101:14
**depth** [3] - 54:19, 74:18, 86:9
**dermatologist** [1] - 22:25
**describe** [31] - 9:2, 10:9, 11:23, 15:22, 15:25, 17:2, 22:18, 24:13, 28:1, 29:22, 32:4, 34:5, 39:22, 44:10, 44:13, 46:16, 53:18, 53:19, 54:5, 56:10, 60:5, 60:9,

5-114

74:12, 76:14, 78:4,
83:7, 84:13, 84:19,
85:17, 101:17,
103:16
**described** [10] - 8:7,
12:24, 36:13, 48:2,
58:11, 73:25, 76:2,
78:21, 78:25, 87:21
**describing** [2] - 12:20,
63:10
**description** [4] - 36:6,
36:19, 75:12, 75:21
**despite** [2] - 22:21,
45:13
**detail** [3] - 25:2, 37:15,
67:4
**detailed** [6] - 24:23,
39:17, 64:10, 74:16,
75:12, 106:8
**details** [2] - 55:11,
86:21
**detected** [1] - 49:24
**deterioration** [1] -
107:19
**determine** [1] - 107:8
**develop** [2] - 76:17,
76:23
**developed** [1] - 39:18
**development** [1] -
9:14
**devoted** [2] - 6:7, 6:8
**diabetes** [1] - 51:10
**diagnosed** [4] - 46:11,
59:22, 81:14, 81:17
**diagnoses** [3] - 34:16,
99:25, 103:14
**diagnosis** [1] - 58:13
**Diagnostic** [1] - 9:15
**dial** [1] - 47:18
**Dietz** [28] - 5:8, 5:9,
5:24, 6:3, 12:20,
14:11, 14:16, 15:11,
19:13, 20:17, 27:25,
30:16, 46:6, 62:25,
64:7, 65:6, 66:2,
66:7, 66:14, 67:24,
71:19, 73:24, 80:12,
81:11, 84:6, 86:13,
96:25, 98:5
**DIETZ** [2] - 3:3, 5:11
**difference** [7] - 17:20,
24:13, 47:2, 72:23,
90:15, 91:6, 92:10
**different** [23] - 18:14,
32:20, 33:1, 33:25,
39:20, 50:6, 52:13,
57:12, 57:13, 69:20,
70:19, 70:20, 74:2,
78:5, 83:8, 86:16,
87:14, 87:16, 90:21,

99:12, 103:17
**differently** [2] - 30:22,
90:6
**differing** [1] - 32:16
**difficult** [2] - 40:5,
57:14
**difficulty** [2] - 83:25,
85:13
**digital** [1] - 26:8
**direct** [4] - 65:9,
75:20, 75:23, 75:24
**DIRECT** [1] - 5:22
**Direct** [1] - 3:4
**directing** [2] - 35:5,
64:23
**direction** [2] - 57:22,
88:11
**directly** [3] - 28:10,
28:13, 29:19
**disability** [2] - 10:12,
39:3
**disagree** [1] - 76:10
**disagreed** [1] - 76:24
**disagreement** [2] -
32:5, 32:10, 33:5
**disagreements** [1] -
33:6
**disagrees** [1] - 73:15
**discharge** [1] - 24:20
**disclose** [1] - 18:3
**discover** [1] - 12:4
**discovery** [1] - 41:4
**discrepancies** [1] -
104:7
**discrepancy** [2] -
58:19, 96:20
**discuss** [7] - 38:7,
78:13, 79:16, 84:9,
86:18, 88:11, 90:22
**discussed** [2] - 74:11,
87:15
**discussion** [2] -
46:24, 75:24
**discussions** [3] -
28:12, 61:12, 81:3
**disease** [16] - 31:2,
31:4, 31:14, 40:23,
41:15, 42:19, 43:15,
43:17, 43:22, 58:8,
59:21, 74:22, 99:6,
100:3
**disorder** [5] - 44:24,
45:7, 45:10, 46:23,
100:1
**displeasure** [1] -
85:24
**dispute** [4] - 30:18,
44:9, 76:11, 91:17
**disputed** [2] - 44:6,
53:14

**disputes** [1] - 31:2
**dissertation** [2] - 7:4,
7:6
**distance** [1] - 19:20
**distinction** [1] - 92:24
**distinguished** [1] -
79:8
**DISTRICT** [2] - 1:1, 1:2
**District** [2] - 2:5, 2:6
**Division** [1] - 15:18
**doctor** [11] - 47:22,
54:9, 57:19, 85:14,
87:4, 95:23, 95:25,
96:1, 101:17, 101:25
**Doctor** [11] - 7:1,
24:12, 52:16, 58:3,
81:2, 93:21, 95:11,
96:7, 103:23, 104:3,
105:21
**doctors** [20] - 15:23,
15:24, 16:1, 21:19,
21:22, 21:25, 22:4,
34:17, 46:11, 57:9,
57:12, 57:20, 98:13,
98:20, 106:9,
106:15, 107:16,
107:17
**Doctors** [2] - 100:23,
101:10
**doctors'** [1] - 57:21
**document** [2] - 65:7,
66:3
**documents** [4] -
26:16, 26:20, 57:3,
108:14
**dog** [1] - 4:25
**DOJ** [4] - 1:15, 1:16,
1:17, 1:18
**dollar** [1] - 100:25
**dollars** [2] - 38:3,
76:22
**Don** [2] - 28:19, 65:14
**donated** [1] - 38:3
**donation** [2] - 100:25,
101:7
**done** [18] - 22:11,
36:16, 37:7, 43:7,
43:24, 45:8, 46:21,
52:4, 52:18, 52:20,
78:6, 80:4, 84:17,
91:2, 93:18, 99:18,
99:20, 100:4
**Donna** [2] - 29:13,
64:24
**Dorothy** [3] - 28:14,
36:20, 39:8
**dose** [2] - 40:25, 41:2
**doses** [1] - 85:5
**doubt** [3] - 54:25,
83:10, 99:4

**Douglas's** [1] - 28:25
**down** [6] - 61:19,
62:13, 62:16, 64:23,
87:24, 106:17
**downside** [1] - 43:12
**Dr** [111] - 5:8, 5:9,
5:24, 12:20, 14:11,
14:16, 15:11, 19:13,
20:17, 22:15, 22:16,
22:17, 23:7, 23:17,
23:22, 27:25, 28:4,
28:5, 28:8, 28:11,
30:16, 34:3, 34:18,
34:19, 46:6, 46:13,
46:16, 54:13, 54:14,
57:1, 58:1, 58:5,
58:6, 58:16, 62:25,
64:7, 65:6, 66:2,
66:7, 66:14, 67:24,
70:12, 70:25, 71:19,
73:24, 74:12, 76:3,
77:11, 78:9, 80:12,
81:11, 81:14, 81:17,
83:23, 84:1, 84:6,
84:7, 84:18, 84:24,
85:20, 86:13, 87:13,
87:15, 88:1, 88:12,
88:19, 92:1, 95:1,
95:3, 95:8, 95:19,
95:20, 95:21, 95:22,
96:2, 96:4, 96:25,
98:5, 98:8, 99:16,
99:23, 100:7, 100:8,
100:9, 100:10,
100:11, 100:12,
100:19, 100:20,
101:1, 101:3, 101:8,
101:9, 101:18,
101:21, 101:22,
101:25, 102:4,
102:8, 102:14,
105:9, 106:3, 106:4,
106:25
**dr** [1] - 28:14
**dramatic** [3] - 83:11,
92:14, 106:24
**dramatically** [1] -
90:12
**dream** [1] - 36:25
**dreams** [1] - 44:22
**dribble** [1] - 25:9
**drive** [1] - 27:2
**drop** [1] - 25:23
**dropped** [1] - 13:8
**drowned** [1] - 11:19
**drugs** [1] - 25:1
**due** [2] - 63:20, 65:20
**duly** [1] - 5:13
**duping** [1] - 33:21
**duration** [1] - 45:9

**during** [13] - 8:4, 8:14,
11:24, 13:15, 44:20,
70:11, 70:24, 71:2,
77:25, 83:21, 87:10,
88:5, 90:10
**Dusky** [1] - 33:9
**duty** [2] - 17:25, 18:4
**DX-58** [1] - 70:10
**Dylann** [1] - 13:10
**Dzhokhar** [1] - 13:2

## E

**e-mail** [14] - 60:22,
61:1, 63:10, 63:12,
64:8, 64:14, 66:15,
66:20, 67:12, 68:12,
73:25, 79:4, 94:25,
104:19
**e-mails** [19] - 61:3,
61:6, 61:8, 61:17,
61:18, 62:1, 62:6,
62:11, 67:16, 67:25,
68:10, 68:15, 79:6,
86:2, 95:18, 102:24,
103:3, 104:14, 105:1
**early** [12] - 14:7, 17:5,
22:16, 22:17, 33:24,
39:25, 58:19, 59:7,
74:5, 75:8, 91:4,
93:19
**earned** [1] - 64:19
**easier** [3] - 4:23,
49:20, 80:20
**easy** [2] - 79:5, 96:8
**ECST** [3] - 87:25, 88:2,
88:15
**ECST-R** [3] - 87:25,
88:2, 88:15
**educate** [1] - 75:19
**education** [3] - 6:15,
18:19, 35:23
**educational** [1] - 6:23
**EEG** [2] - 45:1, 45:4
**effective** [1] - 47:9
**effects** [1] - 41:2
**efficient** [1] - 24:16
**effort** [2] - 10:13,
106:3
**efforts** [1] - 28:1
**either** [2] - 49:19,
94:10
**elderly** [3] - 16:4, 16:5,
42:7
**electronic** [1] - 24:22
**elements** [1] - 89:7
**elephant** [1] - 107:7
**emergency** [1] - 51:14
**employee** [1] - 17:6
**employees** [1] - 67:2

**employers** [1] - 36:11
**employing** [1] - 37:2
**encapsulated** [1] - 80:16
**end** [7] - 29:20, 63:5, 64:2, 66:23, 71:2, 74:17, 80:6
**engaged** [1] - 37:10
**engagement** [1] - 19:25
**England** [1] - 38:19
**enjoyment** [1] - 38:17
**enormous** [1] - 35:15
**enormously** [1] - 37:9
**ensured** [1] - 37:8
**entered** [1] - 13:14
**entertain** [1] - 73:12
**enthusiastic** [1] - 38:22
**entire** [4] - 8:13, 13:6, 59:6, 59:8
**entities** [2] - 64:12, 64:16
**entity** [3] - 79:9, 79:11
**episodes** [1] - 45:21
**error** [2] - 12:6, 12:11
**escape** [1] - 10:16
**escaping** [1] - 94:19
**especially** [1] - 98:17
**ESQ** [5] - 1:19, 1:21, 1:22, 1:24, 1:25
**establish** [1] - 93:12
**estimate** [3] - 10:4, 40:12, 102:4
**estimates** [1] - 85:11
**Eugene** [2] - 37:11, 58:6
**evade** [1] - 10:16
**evaluate** [7] - 7:21, 11:15, 13:4, 13:16, 15:20, 16:6, 104:23
**evaluated** [3] - 12:17, 26:15, 58:1
**evaluation** [6] - 8:14, 79:22, 81:13, 87:12, 87:14, 90:10
**Evaluation** [1] - 87:24
**evaluations** [3] - 7:22, 10:1, 10:2
**event** [1] - 10:15
**events** [7] - 45:24, 60:4, 67:7, 82:8, 83:18, 85:12, 86:4
**eventually** [2] - 11:8, 85:4
**evidence** [15] - 16:6, 21:1, 26:20, 34:3, 59:9, 59:10, 59:20, 60:11, 61:5, 70:10, 72:22, 81:7, 96:11,

104:11
**exactly** [3] - 28:16, 37:1, 99:16
**exaggerate** [1] - 10:14
**exaggerating** [3] - 32:15, 108:6, 108:7
**exaggeration** [4] - 33:19, 34:2, 34:6, 94:9
**exam** [18] - 22:10, 22:11, 22:15, 22:16, 22:17, 23:7, 35:6, 74:5, 74:7, 74:10, 81:23, 82:6, 82:8, 84:6, 84:10, 88:20, 93:4, 107:3
**EXAMINATION** [1] - 5:22
**examination** [7] - 11:24, 34:4, 42:11, 54:19, 70:12, 84:13, 91:21
**Examination** [1] - 3:4
**examinations** [4] - 25:7, 84:14, 84:16, 84:20
**examine** [2] - 24:4, 35:4
**examined** [1] - 13:5
**examiners** [2] - 55:16, 84:23
**examining** [1] - 28:15
**example** [5] - 53:20, 57:25, 75:10, 75:19, 91:21
**examples** [6] - 30:6, 54:1, 56:6, 61:15, 68:14, 76:5
**exams** [7] - 74:3, 74:11, 74:13, 81:21, 89:3, 90:21, 91:2
**excessively** [1] - 52:5
**excuse** [5] - 19:10, 21:5, 22:18, 56:9, 59:25
**executive** [2] - 30:24, 75:20
**exercised** [1] - 39:3
**Exhibit** [14] - 19:10, 20:11, 21:4, 21:8, 62:19, 62:25, 63:18, 64:3, 65:5, 65:13, 80:1, 95:1, 96:14, 96:15
**exhibit** [3] - 20:15, 68:3, 103:25
**exhibited** [1] - 90:25
**Exhibits** [2] - 15:7, 72:4
**exhibits** [4] - 63:20,

71:10, 71:25, 96:10
**existence** [1] - 92:19
**expect** [1] - 64:20
**expected** [2] - 100:14, 103:2
**expeditions** [1] - 38:13
**experience** [3] - 6:23, 36:13, 87:22
**experienced** [1] - 55:16
**experiences** [1] - 8:3
**expert** [16] - 13:24, 14:11, 14:16, 14:19, 15:3, 16:3, 16:14, 17:23, 18:4, 42:6, 70:2, 70:3, 71:7, 72:25, 83:3, 101:11
**expertise** [1] - 41:18
**experts** [13] - 28:21, 31:6, 31:7, 31:12, 32:5, 32:19, 41:5, 43:11, 83:4, 84:17, 91:3, 103:12, 104:7
**experts'** [1] - 41:21
**explain** [6] - 47:14, 86:21, 93:22, 94:13, 98:11, 104:3
**explained** [1] - 71:2
**explanation** [3] - 43:23, 92:12, 108:5
**exploring** [1] - 89:5
**expressed** [1] - 88:9
**extemporizing** [1] - 60:16
**extends** [1] - 104:14
**extent** [8] - 19:21, 32:11, 48:9, 94:4, 94:9, 107:11, 107:21, 108:6
**external** [1] - 104:10
**extraordinary** [2] - 8:8, 56:15
**extreme** [1] - 94:16
**extremely** [2] - 61:3, 62:4
**eye** [1] - 60:18

---

## F

**faces** [1] - 84:22
**facing** [1] - 79:16
**fact** [5] - 31:23, 63:7, 63:15, 78:21
**factor** [1] - 33:16
**facts** [4] - 81:5, 81:10, 83:12, 108:6
**factual** [2] - 12:11, 33:13
**factually** [1] - 12:3

**failed** [1] - 91:24
**failing** [1] - 96:6
**failure** [3] - 51:9, 51:10, 92:1
**fair** [6] - 14:2, 25:11, 32:19, 48:16, 55:3, 103:13
**fairly** [1] - 92:14
**fake** [2] - 79:3, 79:6
**fall** [1] - 31:16
**falls** [3] - 31:17, 34:23, 34:25
**familiar** [1] - 88:2
**familiarize** [1] - 80:13
**family** [7] - 24:18, 39:7, 57:17, 66:22, 85:6, 103:19, 104:21
**far** [5] - 43:17, 55:12, 81:2, 81:6, 101:24
**faster** [1] - 19:22
**fatigue** [1] - 92:12
**favor** [1] - 87:24
**FBAR** [1] - 79:7
**FDG** [2] - 105:10, 105:16
**FDG-PET** [2] - 105:10, 105:16
**fear** [1] - 99:5
**feature** [1] - 64:14
**February** [2] - 29:5, 75:10
**federal** [1] - 12:16
**fellowship** [1] - 6:20
**felt** [1] - 74:19
**fever** [2] - 51:10, 51:11
**few** [5] - 32:7, 60:14, 62:18, 85:19, 93:21
**field** [1] - 33:1
**fight** [1] - 5:1
**figure** [3] - 25:16, 69:1, 87:1
**figuring** [1] - 47:16
**file** [1] - 23:25
**filed** [3] - 20:4, 20:22, 83:3
**files** [1] - 67:9
**final** [1] - 51:16
**financial** [2] - 76:1, 76:5
**findings** [1] - 70:3
**fired** [1] - 13:18
**firm** [1] - 91:16
**first** [42] - 4:13, 6:18, 7:7, 19:1, 20:7, 20:10, 20:23, 22:11, 30:23, 32:8, 32:11, 33:8, 34:4, 35:12, 36:12, 37:12, 37:19, 39:18, 45:8, 46:4, 46:17, 56:16, 56:20,

56:23, 57:1, 58:11, 60:25, 74:4, 74:14, 82:19, 84:16, 84:17, 89:16, 93:5, 94:16, 96:4, 98:8, 98:11, 99:2, 101:23, 103:20, 106:21
**fisher** [1] - 38:12
**fisherman** [1] - 38:13
**fishing** [5] - 38:12, 38:14, 38:24, 95:9, 101:5
**fits** [1] - 108:5
**five** [1] - 11:20
**flat** [2] - 103:22, 106:18
**flat-lined** [2] - 103:22, 106:18
**flew** [1] - 13:9
**flip** [1] - 80:12
**fluid** [1] - 43:3
**FMG** [1] - 42:24
**focus** [1] - 24:16
**focusing** [3] - 10:17, 48:20, 49:2
**follow** [2] - 73:19, 88:10
**followed** [1] - 29:1
**following** [3] - 4:3, 73:18, 95:7
**follows** [1] - 5:14
**Fondren** [1] - 22:23
**foolhardy** [1] - 76:25
**fooling** [1] - 33:20
**foolish** [1] - 76:13
**Ford** [1] - 36:13
**foregoing** [1] - 109:5
**forensic** [22] - 6:6, 6:7, 6:11, 6:12, 6:16, 6:17, 6:20, 10:6, 13:25, 14:11, 16:2, 24:5, 24:14, 24:25, 25:18, 33:5, 43:9, 48:3, 55:4, 55:15, 87:21, 103:12
**Forensic** [3] - 7:17, 9:7, 9:8
**forget** [1] - 28:16
**formatted** [1] - 63:12
**formed** [1] - 66:20
**forms** [1] - 23:2
**formulating** [1] - 61:25
**forth** [1] - 70:3
**fortunate** [1] - 10:20
**forward** [1] - 5:10
**foundation** [5] - 73:6, 73:9, 73:11, 73:21
**four** [2] - 88:23, 91:10
**fracture** [1] - 22:24

**frail** [4] - 31:13, 31:24, 32:2, 32:3
**frailty** [4] - 31:15, 31:22, 31:25, 32:1
**frame** [1] - 30:18
**Francisco** [1] - 91:16
**frankly** [1] - 71:7
**Freeh** [1] - 11:11
**frequency** [1] - 51:8
**frequently** [1] - 78:10
**FRIDAY** [2] - 1:12, 4:5
**friend** [2] - 22:5, 99:13
**friends** [1] - 104:22
**FTG** [1] - 53:2
**FTG-PET** [1] - 53:2
**full** [3] - 36:12, 89:10, 102:7
**full-scale** [1] - 102:7
**full-time** [1] - 36:12
**fumbles** [1] - 12:7
**function** [24] - 34:22, 34:23, 41:12, 46:3, 48:8, 51:17, 53:5, 53:8, 53:11, 53:12, 53:14, 53:17, 55:8, 55:23, 56:3, 59:2, 61:2, 65:22, 66:16, 67:11, 68:7, 92:11, 93:9, 105:5
**functional** [1] - 107:12
**functioning** [15] - 30:3, 48:1, 50:6, 55:11, 55:13, 59:11, 61:4, 63:15, 83:13, 104:9, 104:10, 104:12, 105:17, 106:19, 107:11
**functions** [2] - 40:5, 45:23
**future** [1] - 35:18

**G**

**Gabrielle** [1] - 12:16
**gained** [1] - 93:6
**gathered** [1] - 86:11
**gauge** [1] - 24:8
**general** [4] - 24:17, 31:18, 52:4, 52:9
**generally** [4] - 17:8, 29:21, 34:5, 51:3
**generously** [1] - 25:22
**gentleman** [1] - 29:10
**genuine** [1] - 92:21
**GEORGE** [1] - 1:3
**geriatric** [1] - 51:15
**Giffords** [1] - 12:16
**gift** [2] - 61:12, 65:20
**given** [1] - 28:17
**gold** [1] - 45:6

98:4
**handled** [1] - 99:11
**HANKS** [1] - 1:3
**happy** [3] - 25:25, 40:10, 42:4
**hard** [4] - 30:24, 35:12, 35:17, 37:25
**hardcopies** [1] - 65:8
**harm** [1] - 10:14
**Harvard** [5] - 7:14, 8:5, 8:18, 9:25, 10:5
**hate** [2] - 27:22, 72:10
**head** [1] - 37:6
**health** [2] - 18:13, 98:12
**Health** [1] - 7:3
**healthcare** [1] - 66:23
**healthy** [2] - 50:11, 51:5
**hear** [6] - 42:4, 71:13, 71:16, 73:6, 73:7, 106:15
**heard** [1] - 87:6
**HEARING** [1] - 1:9
**hearing** [6] - 20:23, 42:2, 54:8, 87:5, 97:14, 108:12
**hearings** [1] - 20:5
**hears** [1] - 79:1
**held** [2] - 4:3, 71:21
**help** [5] - 25:2, 62:8, 88:8, 95:2, 99:14
**helped** [1] - 93:3
**helpful** [5] - 42:2, 62:1, 62:2, 62:4, 65:7
**helping** [1] - 67:5
**hereby** [1] - 109:4
**high** [3] - 38:6, 49:10, 63:5
**high-end** [1] - 63:5
**higher** [1] - 54:2
**highlighted** [1] - 24:21
**highly** [4] - 7:23, 51:25, 70:19, 107:12
**himself** [5] - 13:19, 37:4, 37:6, 60:15, 88:9
**Hinckley** [1] - 8:15
**hirable** [1] - 7:11
**hired** [3] - 15:17, 15:19, 91:16
**historic** [1] - 13:14
**historical** [1] - 24:3
**history** [12] - 31:17, 39:12, 39:15, 39:16, 40:21, 44:2, 48:20, 48:22, 52:1, 74:16, 74:17, 101:12
**hobbies** [1] - 38:22

**government** [21] - 3:3, 4:11, 5:3, 5:12, 16:17, 17:4, 17:18, 17:21, 17:24, 18:11, 18:22, 18:25, 19:23, 22:2, 22:7, 44:11, 44:13, 73:14, 79:10, 95:1
**government** [3] - 16:14, 17:13, 28:21
**Government's** [9] - 12:11, 19:7, 19:16, 21:8, 21:20, 80:1, 80:4, 80:20, 80:21
**GP** [2] - 23:23, 100:5
**gradually** [1] - 98:18
**graduated** [2] - 6:24, 7:1
**grandma** [1] - 36:3
**grandmother** [2] - 35:16, 35:24
**granted** [1] - 79:2
**graph** [5] - 104:8, 105:18, 105:23, 106:3, 106:7
**graphic** [2] - 104:5, 106:5
**grasp** [2] - 78:19, 93:16
**great** [9] - 4:22, 5:2, 36:15, 58:18, 60:16, 69:10, 69:13, 73:23, 77:2
**greatly** [1] - 35:21
**grounds** [1] - 63:21
**group** [3] - 9:25, 66:24, 95:8
**grow** [1] - 49:25
**grudgingly** [1] - 26:7
**guarantee** [1] - 55:24
**guess** [8] - 8:9, 10:17, 19:17, 50:19, 57:5, 59:15, 90:22, 94:13
**Guilmette** [2] - 34:19, 84:18
**guilty** [1] - 11:16
**Gumm** [2] - 2:4, 109:11

**H**

**Haitian** [1] - 86:10
**half** [3] - 8:20, 101:13
**half-time** [1] - 8:20
**hall** [1] - 37:17
**hand** [3] - 43:20, 54:6, 80:7
**handed** [1] - 15:6
**handing** [1] - 15:1
**handle** [2] - 72:11,

**home** [9] - 13:9, 23:12, 29:4, 36:1, 36:22, 51:6, 53:24, 74:8
**homicides** [1] - 10:25
**Honor** [35] - 4:7, 4:12, 5:4, 14:13, 27:8, 27:22, 41:16, 41:23, 42:6, 57:7, 60:7, 60:12, 62:9, 62:24, 63:19, 66:9, 67:15, 68:22, 69:6, 69:22, 69:23, 70:11, 71:12, 71:23, 72:7, 72:17, 73:14, 79:25, 80:9, 94:22, 96:22, 105:14, 105:24, 108:9, 108:15
**Honor's** [1] - 70:1
**HONORABLE** [1] - 1:3
**hopefully** [1] - 15:14
**hoping** [1] - 41:24
**Hopkins** [2] - 7:1, 7:12
**Hospital** [2] - 6:20, 7:12
**hospital** [3] - 7:16, 7:20, 51:6
**hospitalization** [5] - 24:21, 82:5, 82:13, 82:19, 83:19
**hospitalizations** [3] - 49:8, 82:10, 82:24
**hospitalize** [1] - 50:12
**hospitalized** [2] - 49:6, 82:16
**host** [1] - 48:25
**hour** [3] - 18:7, 45:21, 45:25
**hours** [1] - 18:9
**house** [2] - 53:23, 75:11
**household** [1] - 104:21
**Houston** [3] - 1:11, 11:19, 54:1
**hundreds** [1] - 14:8
**hunter** [1] - 38:16
**hypometabolism** [1] - 53:1

**I**

**IBM** [2] - 36:15, 36:16
**ICU** [1] - 51:15
**idea** [4] - 36:20, 75:23, 77:2, 104:5
**ideal** [1] - 75:23
**illuminating** [1] - 36:14
**imaging** [3] - 53:8,

93:7, 105:8
**immediate** [1] - 95:6
**immediately** [1] - 12:5
**immigrants** [1] - 86:11
**immunity** [2] - 28:12, 79:2
**impact** [2] - 48:8, 105:16
**impacts** [1] - 34:6
**impair** [1] - 45:22
**impaired** [10] - 32:12, 56:4, 56:7, 83:9, 85:22, 91:2, 91:5, 91:7, 91:8, 91:10
**impairment** [27] - 32:12, 32:16, 32:19, 33:21, 34:8, 34:11, 35:1, 44:4, 44:7, 53:19, 53:22, 54:3, 54:5, 56:6, 56:7, 58:9, 58:15, 85:23, 90:25, 92:21, 94:5, 94:8, 94:11, 103:19, 107:13, 107:18, 108:7
**implies** [1] - 31:24
**imply** [1] - 64:14
**importance** [2] - 18:23, 67:8
**important** [18] - 9:17, 13:14, 24:3, 24:5, 24:17, 26:2, 30:8, 30:11, 30:13, 32:8, 39:24, 40:24, 49:11, 56:15, 61:3, 74:21, 79:23, 83:12
**imprecise** [1] - 85:1
**imprecision** [1] - 70:17
**impression** [1] - 107:9
**improbability** [1] - 108:3
**improved** [2] - 48:7, 48:12
**improvement** [1] - 48:1
**inadequate** [2] - 7:23, 106:7
**inadequately** [2] - 45:12, 106:11
**inattentive** [1] - 51:19
**incase** [1] - 45:23
**inch** [1] - 47:18
**incident** [2] - 86:10, 87:6
**incidents** [1] - 76:2
**included** [2] - 36:24, 39:8
**includes** [1] - 26:15
**including** [6] - 9:19,

11:1, 23:12, 23:17, 38:24, 82:4
**inclusion** [1] - 73:2
**income** [4] - 64:13, 64:16, 64:19
**incompetent** [1] - 92:22
**incorrect** [2] - 12:3, 85:11
**indeed** [1] - 55:6
**INDEX** [1] - 3:1
**indicate** [1] - 98:24
**indicated** [1] - 79:10
**indicator** [1] - 55:22
**indictment** [3] - 78:18, 78:23, 86:1
**individual** [1] - 78:23
**indulgence** [1] - 14:21
**infant** [1] - 39:10
**infection** [5] - 49:7, 49:17, 49:21, 50:1, 51:11
**infections** [1] - 49:5
**inform** [11] - 30:7, 31:22, 43:18, 53:10, 55:7, 61:1, 64:8, 65:10, 65:21, 68:6, 105:5
**informal** [1] - 107:23
**informants** [1] - 54:24
**information** [8] - 23:5, 33:25, 54:24, 57:19, 79:14, 86:1, 93:1, 105:22
**informative** [3] - 41:11, 41:14, 42:18
**informs** [2] - 63:1, 66:15
**ingredients** [1] - 33:11
**initial** [1] - 94:24
**injury** [1] - 10:13
**inquiring** [1] - 65:24
**insane** [1] - 7:17
**insanity** [1] - 11:2
**insole** [1] - 51:24
**instance** [1] - 89:16
**instances** [3] - 44:18, 49:6, 99:3
**instilled** [2] - 35:19, 35:22
**instrument** [2] - 87:16, 88:13
**instruments** [2] - 87:22, 89:5
**insufficient** [1] - 46:15
**insurrection** [3] - 86:6, 86:14, 87:7
**intelligently** [1] - 61:10
**interest** [2] - 38:15,

101:20
**interested** [1] - 25:24
**interesting** [1] - 44:5
**interestingly** [1] - 89:15
**interests** [2] - 38:8, 79:5
**Interpreter** [1] - 2:3
**interrupt** [2] - 58:3, 95:11
**interrupting** [1] - 98:5
**interview** [20] - 24:11, 28:7, 28:14, 28:18, 37:13, 56:3, 64:24, 65:3, 75:2, 77:10, 77:22, 77:25, 78:7, 78:8, 78:14, 79:19, 83:21, 85:15, 89:7, 90:18
**interviewed** [4] - 28:3, 28:4, 35:11, 90:16
**interviewer** [1] - 54:18
**interviewing** [1] - 74:15
**interviews** [16] - 26:24, 26:25, 28:1, 28:6, 53:9, 53:16, 54:13, 55:5, 55:15, 56:5, 56:8, 77:7, 78:17, 80:3, 87:11, 90:23
**intimates** [1] - 107:17
**invalid** [5] - 34:13, 77:18, 93:15, 93:19, 108:2
**invalidated** [1] - 34:11
**invested** [1] - 76:20
**investigation** [1] - 11:7
**investigations** [1] - 40:3
**investment** [5] - 64:19, 76:12, 76:14, 76:16, 76:24
**involved** [1] - 9:11
**involvement** [1] - 103:11
**IQ** [2] - 102:5, 102:7
**IRINA** [1] - 1:25
**irreversible** [1] - 31:9
**IRS** [1] - 16:16
**Isabelita** [1] - 29:3
**issue** [7] - 18:14, 22:22, 44:18, 67:8, 69:24, 70:4, 99:22
**issues** [8] - 30:17, 33:8, 49:4, 53:15, 53:20, 64:11, 66:1, 91:9
**itself** [1] - 50:1

**J**

**JAMES** [1] - 1:22
**Jankovic** [5] - 100:8, 101:8, 101:9, 101:18, 101:21
**January** [3] - 86:4, 87:5, 101:8
**Jared** [2] - 12:21, 12:24
**JASON** [1] - 1:19
**Jeffrey** [2] - 10:21, 10:23
**jeopardy** [1] - 40:2
**job** [5] - 7:7, 7:18, 8:1, 25:17, 60:21
**jobs** [3] - 36:3, 36:6, 36:8
**Joe** [1] - 12:14
**John** [1] - 7:1
**Johns** [1] - 7:11
**joined** [1] - 36:12
**Journal** [1] - 87:9
**JR** [1] - 1:3
**Judge** [5] - 11:9, 73:8, 97:6, 97:19, 108:20
**judge** [1] - 12:16
**JUDGE** [1] - 1:3
**judgement** [1] - 67:8
**judgment** [2] - 76:6, 94:21
**July** [11] - 55:12, 55:14, 64:9, 83:2, 83:4, 85:9, 89:3, 90:18, 91:1, 91:6, 95:4
**jump** [2] - 81:13, 84:12
**June** [10] - 52:3, 58:9, 63:2, 81:19, 81:23, 82:12, 94:1, 95:7, 95:12
**jury** [1] - 12:10
**Justice** [4] - 11:15, 12:18, 15:18, 16:16
**Justice's** [1] - 79:13

**K**

**Kaczynski** [1] - 11:13
**KATHRYN** [1] - 1:24
**keep** [5] - 57:14, 97:22, 98:9, 99:7, 103:5
**Keneally** [3] - 28:4, 89:16, 89:20
**KENEALLY** [1] - 1:24
**kept** [1] - 47:8
**kidney** [1] - 51:9
**killed** [3] - 11:8, 12:15,

13:15
**killing** [1] - 76:19
**kind** [5] - 34:9, 36:25, 79:19, 85:13, 89:22
**kinds** [2] - 25:8, 34:1
**knowing** [3] - 53:23, 59:22, 83:15
**knowledge** [5] - 75:16, 81:10, 86:9, 88:6, 88:7
**known** [5] - 11:6, 29:18, 39:1, 44:23, 95:18
**knows** [4] - 47:19, 90:2, 95:22, 99:16

**L**

**lab** [1] - 45:2
**laborious** [1] - 25:4
**lack** [1] - 56:7
**Lai** [5] - 58:1, 58:5, 58:6, 81:14, 81:17
**Lai's** [1] - 58:16
**LANGSTON** [3] - 1:17, 4:12, 4:20
**laptop** [2] - 19:11, 19:12
**large** [4] - 7:20, 14:7, 55:4, 76:20
**larger** [2] - 29:4, 47:1
**Larry** [1] - 29:8
**last** [9] - 6:2, 70:5, 70:9, 71:8, 72:19, 72:21, 81:17, 93:19, 98:7
**lastly** [1] - 31:12
**late** [7] - 59:19, 63:2, 65:25, 87:10, 91:10, 92:11
**latest** [1] - 66:23
**laundry** [1] - 36:5
**Laura** [1] - 28:24
**law** [4] - 6:14, 8:20, 8:21, 39:9
**Law** [5] - 1:20, 1:23, 1:24, 2:1, 9:18
**LAW** [1] - 1:21
**lawyer** [2] - 11:10, 84:23
**lay** [2] - 73:5, 73:11
**laying** [1] - 73:9
**lead** [3] - 50:20, 51:16, 74:15
**leading** [2] - 32:22, 50:21
**leads** [2] - 44:25, 49:18
**leaking** [1] - 79:14
**learn** [4] - 35:7, 37:5,

39:11, 93:7
**learned** [7] - 23:22, 36:15, 38:23, 38:25, 75:18, 93:10, 102:18
**learns** [1] - 95:10
**least** [9] - 26:21, 32:3, 34:18, 49:5, 54:4, 59:17, 59:21, 61:6, 81:10
**leave** [2] - 55:2, 108:18
**lectured** [1] - 9:23
**led** [4] - 49:15, 49:16, 88:12, 92:7
**LEE** [1] - 1:17
**left** [4] - 16:11, 73:24, 92:15, 93:3
**legs** [1] - 53:21
**length** [1] - 45:13
**lengths** [1] - 93:10
**lengthy** [2] - 11:7, 25:13
**Lerner** [6] - 84:24, 95:19, 95:20, 95:22, 101:2, 101:3
**less** [4] - 36:14, 47:25, 53:2, 85:8
**lesser** [1] - 54:5
**letter** [5] - 20:11, 20:18, 20:22, 22:1, 103:8
**level** [6] - 44:3, 44:7, 51:19, 56:18, 60:25, 105:2
**levels** [2] - 42:21, 43:5
**Lewy** [5] - 44:17, 44:23, 46:9, 46:12, 46:24
**liability** [1] - 55:1
**life** [11] - 24:24, 30:10, 30:23, 35:14, 74:15, 74:16, 74:19, 74:20, 74:23, 75:1, 76:8
**light** [1] - 106:23
**likely** [2] - 41:7, 94:10
**limit** [3] - 43:22, 64:18, 75:22
**limitations** [1] - 27:1
**limiting** [1] - 6:5
**limits** [1] - 93:6
**line** [7] - 64:23, 93:23, 104:8, 105:9, 106:7, 106:18, 106:23
**lined** [3] - 54:25, 103:22, 106:18
**lines** [1] - 106:5
**Lisse** [2] - 95:22, 95:24
**list** [4] - 13:8, 27:12, 37:13, 37:19

**listed** [2] - 21:20, 68:3
**listening** [1] - 73:20
**literature** [2] - 48:12, 93:17
**litigated** [1] - 22:22
**live** [1] - 4:18
**liver** [1] - 51:9
**living** [2] - 6:4, 36:22
**logical** [1] - 63:14
**long-term** [2] - 22:5, 104:21
**longitudinal** [2] - 70:15, 72:24
**longitudinally** [1] - 30:1
**longstanding** [1] - 38:15
**longtime** [1] - 29:14
**look** [21] - 24:25, 47:23, 55:10, 56:1, 58:17, 68:23, 69:11, 74:21, 75:13, 94:17, 97:5, 97:18, 103:21, 105:11, 107:8, 107:10, 107:14, 107:15, 107:19, 107:22, 108:14
**looked** [7] - 12:2, 41:21, 57:8, 94:7, 103:8, 105:20, 105:21
**looking** [9] - 42:25, 44:6, 46:20, 49:24, 51:13, 66:2, 77:5, 105:13, 107:6
**looks** [7] - 27:17, 31:24, 56:8, 56:19, 60:17, 65:6, 107:17
**LOONAM** [9] - 1:22, 4:7, 4:25, 63:24, 69:23, 70:1, 71:18, 72:17, 72:21
**Loonam** [1] - 4:24
**lose** [1] - 60:20
**loss** [1] - 40:4
**losses** [3] - 64:11, 64:15, 64:18
**lost** [1] - 77:3
**Loughner** [2] - 12:21, 12:24
**Louis** [1] - 11:11
**low** [1] - 56:18
**lowest** [4] - 56:20, 106:17, 106:21, 107:1
**lunchtime** [1] - 72:16

## M

**machine** [4] - 47:6,

47:16, 47:19
**machine's** [1] - 47:10
**magic** [1] - 94:18
**MAGNANI** [58] - 1:16, 3:4, 5:4, 5:7, 5:23, 14:10, 14:15, 14:21, 14:23, 15:1, 15:10, 20:25, 21:5, 21:11, 21:16, 23:15, 23:19, 27:11, 27:15, 27:21, 27:24, 41:23, 42:13, 57:6, 60:6, 60:11, 62:8, 62:20, 63:17, 64:1, 64:4, 66:8, 66:11, 67:14, 67:21, 68:17, 69:5, 69:14, 69:18, 69:21, 71:23, 72:3, 73:13, 73:23, 79:25, 80:11, 80:19, 81:1, 87:3, 96:13, 96:19, 96:25, 97:3, 97:7, 97:14, 97:24, 98:3, 108:9
**mail** [15] - 11:8, 60:22, 61:1, 63:10, 63:12, 64:8, 64:14, 66:15, 66:20, 67:12, 68:12, 73:25, 79:4, 94:25, 104:19
**mails** [19] - 61:3, 61:6, 61:8, 61:17, 61:18, 62:1, 62:6, 62:11, 67:16, 67:25, 68:10, 68:15, 79:6, 86:2, 95:18, 102:24, 103:3, 104:14, 105:1
**major** [1] - 93:2
**malingered** [1] - 94:8
**malingering** [9] - 10:7, 32:14, 33:16, 34:6, 34:9, 90:14, 92:23, 94:2, 94:14
**man** [11] - 10:24, 12:15, 13:13, 35:7, 35:11, 35:12, 36:9, 39:5, 75:15, 76:23, 92:22
**managed** [1] - 40:24
**manifestations** [1] - 31:15
**manner** [1] - 36:2
**Manual** [1] - 9:16
**manufactured** [1] - 63:5
**manufacturer** [1] - 38:19
**marathon** [1] - 13:1
**March** [8] - 34:4, 56:17, 56:25, 102:1, 102:6, 105:12,

106:18, 108:8
**marked** [1] - 80:4
**marriage** [1] - 76:12
**married** [1] - 39:6
**mask** [3] - 5:18, 47:7
**masked** [1] - 33:19
**masks** [1] - 85:2
**Massachusetts** [1] - 17:7
**master's** [1] - 7:2
**material** [1] - 86:3
**materials** [4] - 52:14, 52:15, 57:3, 57:9
**matter** [5] - 8:5, 43:24, 72:10, 88:7, 109:7
**matters** [3] - 17:23, 59:4, 61:11
**maximal** [1] - 53:2
**maximum** [2] - 7:16, 7:20
**May/June** [1] - 82:14
**MCI** [3] - 58:14, 81:14, 81:17
**mean** [18] - 15:11, 24:3, 24:12, 33:4, 34:22, 35:9, 38:7, 39:21, 40:15, 43:8, 47:14, 57:10, 61:25, 63:9, 86:22, 96:24, 102:14, 102:21
**meaning** [1] - 87:5
**means** [2] - 43:14, 104:24
**meant** [1] - 96:18
**measure** [4] - 34:7, 34:11, 46:8, 53:13
**measurement** [2] - 43:20, 87:16
**measures** [2] - 89:1, 89:2
**measuring** [1] - 89:6
**mechanical** [1] - 2:8
**med** [1] - 8:20
**media** [1] - 86:15
**Medical** [3] - 7:15, 37:19, 101:1
**medical** [33] - 18:16, 18:22, 19:5, 19:23, 20:19, 20:21, 20:22, 22:7, 22:19, 22:22, 24:4, 25:6, 25:8, 26:21, 39:11, 39:15, 39:16, 44:1, 48:20, 48:22, 48:25, 49:9, 51:3, 52:1, 57:5, 58:22, 74:8, 82:4, 82:7, 99:24, 100:4, 103:1
**medication** [1] - 40:24
**medicine** [1] - 8:22

**Medicine** [1] - 7:2
**meet** [4] - 11:15, 11:17, 28:18, 33:9
**member** [1] - 22:11
**members** [2] - 24:18, 57:17
**memory** [25] - 12:2, 37:13, 56:19, 56:21, 67:7, 75:6, 83:13, 89:22, 90:3, 94:25, 95:3, 96:6, 98:12, 98:14, 98:17, 98:19, 99:9, 99:14, 99:17, 101:11, 101:12, 101:20, 106:19, 107:24, 107:25
**men** [2] - 40:5, 107:7
**mental** [8] - 18:13, 29:25, 31:25, 32:1, 52:6, 59:11, 91:20, 92:15
**mention** [4] - 37:18, 37:22, 102:12, 102:21
**mentioned** [9] - 16:21, 23:23, 46:7, 50:19, 56:25, 76:4, 86:14, 93:21, 103:1
**mentions** [1] - 100:11
**message** [1] - 29:6
**metabolism** [1] - 105:11
**Mexico** [1] - 86:8
**might** [11] - 10:25, 19:10, 31:24, 44:17, 62:8, 63:22, 64:15, 65:6, 69:21, 79:3, 96:15
**mild** [9] - 35:1, 35:2, 58:9, 58:14, 66:18, 90:25, 94:10, 94:11, 99:25
**mildly** [1] - 91:8
**military** [1] - 18:18
**million** [5] - 38:3, 38:4, 64:16, 76:21, 100:25
**mind** [4] - 4:21, 61:20, 63:15
**minus** [1] - 92:2
**misconduct** [1] - 6:9
**misleading** [3] - 31:23, 33:3, 70:22
**misled** [1] - 12:10
**mispronounced** [1] - 101:9
**misspeak** [1] - 96:16
**misspoke** [1] - 95:15
**mistake** [1] - 76:9
**mistakes** [2] - 60:14,

60:15
**misuse** [1] - 9:13
**mixture** [1] - 91:19
**mobility** [1] - 31:19
**MoCa** [1] - 101:15
**moderate** [1] - 100:1
**moderately** [2] - 48:14, 66:18
**Moderna** [1] - 85:5
**money** [4] - 35:25, 67:10, 76:21, 77:3
**month** [2] - 64:9, 93:19
**monthly** [1] - 67:4
**months** [3] - 25:14, 101:14, 102:11
**Moody** [2] - 11:3, 11:5
**more-than-adequate** [1] - 78:19
**morning** [5] - 4:9, 5:5, 5:6, 5:24, 5:25
**mortality** [1] - 49:10
**Moss** [2] - 28:22, 67:5
**most** [14] - 5:20, 8:16, 9:17, 10:11, 24:17, 25:14, 40:9, 43:3, 49:3, 51:4, 52:19, 56:14, 88:18, 94:10
**mostly** [3] - 17:6, 17:8, 19:11
**motion** [3] - 19:7, 20:4, 20:23
**motivated** [1] - 88:8
**motivation** [1] - 94:16
**Motor** [1] - 36:13
**motor** [2] - 31:21, 59:21
**move** [26] - 20:25, 21:11, 21:24, 26:4, 30:16, 46:6, 53:23, 66:3, 67:15, 67:22, 68:18, 72:4, 74:1, 80:19, 96:9, 96:13, 96:15, 97:8, 97:10, 97:23, 97:25, 98:1, 98:3, 103:23, 104:2, 106:6
**moved** [3] - 29:5, 71:25, 75:10
**movement** [3] - 44:24, 45:6, 46:22
**movements** [1] - 45:5
**moves** [1] - 14:10
**moving** [5] - 12:13, 44:20, 53:9, 66:24, 69:19
**MR** [89] - 4:7, 4:12, 4:20, 4:25, 5:4, 5:7, 5:23, 14:10, 14:13, 14:15, 14:21, 14:23,

15:1, 15:10, 20:25,
21:2, 21:5, 21:11,
21:13, 21:16, 23:15,
23:19, 27:8, 27:11,
27:15, 27:16, 27:21,
27:24, 32:22, 41:16,
41:23, 42:5, 42:13,
57:6, 60:6, 60:11,
62:8, 62:20, 63:17,
63:24, 64:1, 64:4,
66:8, 66:11, 67:14,
67:18, 67:21, 68:17,
68:22, 69:2, 69:5,
69:11, 69:14, 69:17,
69:18, 69:21, 69:23,
70:1, 71:12, 71:18,
71:23, 72:3, 72:7,
72:17, 72:21, 73:13,
73:23, 79:25, 80:11,
80:19, 80:23, 81:1,
86:24, 87:3, 96:13,
96:19, 96:25, 97:3,
97:5, 97:7, 97:12,
97:14, 97:18, 97:24,
98:3, 105:14, 108:9,
108:14, 108:20
**MRI** [2] - 53:3, 70:16
**MRI's** [1] - 105:3
**MRIs** [1] - 105:3
**multipage** [1] - 65:7
**multiple** [4] - 30:12,
39:24, 40:6, 90:23
**must** [1] - 6:17

# N

**n/a** [1] - 2:2
**naive** [1] - 64:17
**Nalley** [1] - 28:24
**name** [11] - 6:1, 6:2,
6:3, 37:24, 38:20,
85:24, 89:17, 89:19,
89:21, 98:23, 98:24
**names** [4] - 21:19,
84:23, 89:14, 98:18
**narrative** [3] - 57:19,
106:10, 107:21
**narrow** [1] - 30:17
**nasal** [1] - 47:7
**nature** [1] - 16:5
**near** [1] - 73:20
**nearly** [2] - 8:13, 16:12
**necessarily** [3] - 24:8,
54:23, 98:24
**necessary** [1] - 33:11
**need** [11] - 4:16,
15:14, 19:4, 19:10,
25:3, 73:5, 73:6,
74:10, 74:11, 76:17,
108:12

**needs** [3] - 24:16,
31:18, 50:25
**negative** [1] - 43:13
**negotiated** [1] - 23:24
**Nehemiah** [1] - 64:16
**neurocognitive** [2] -
100:1, 107:23
**neurodegeneration**
[1] - 48:17
**neurodegenerative**
[2] - 52:25, 99:6
**neuroimaging** [2] -
16:3, 42:7
**neurologist** [8] - 58:6,
58:7, 70:8, 70:13,
72:25, 100:3,
101:11, 101:19
**neurology** [2] - 71:6,
73:3
**neuropsych** [2] -
103:20, 108:4
**neuropsychiatrist** [1]
- 95:4
**neuropsychological**
[10] - 34:13, 56:16,
57:1, 77:24, 93:12,
93:18, 99:5, 100:5,
101:22, 106:19
**neuropsychologist**
[1] - 87:21
**neuropsychology** [1]
- 93:11
**neuroradiologist** [2] -
70:7, 73:1
**neuroradiology** [1] -
71:6
**never** [6] - 11:15,
13:20, 14:6, 27:18,
29:1, 29:6
**New** [1] - 38:19
**new** [1] - 95:25
**news** [3] - 86:12,
86:15, 87:8
**next** [5] - 4:11, 4:18,
5:3, 95:18, 100:24
**nice** [3] - 29:9, 29:14,
73:18
**night's** [1] - 48:16
**nightly** [1] - 47:12
**non** [1] - 59:8
**non-videotaped** [1] -
59:8
**none** [3] - 49:15, 53:4
**normal** [11] - 34:23,
41:10, 48:15, 50:11,
53:3, 67:11, 68:9,
88:25, 98:21, 99:7,
105:4
**normally** [3] - 18:15,
34:10, 100:3

**notable** [1] - 57:24
**note** [5] - 4:8, 25:22,
27:16, 40:16, 72:18
**notes** [5] - 25:1,
60:17, 60:20, 96:20
**nothing** [1] - 13:7,
36:23, 99:15
**notice** [1] - 99:2
**NOVEMBER** [2] -
1:12, 4:5
**November** [17] - 20:2,
21:9, 59:20, 59:25,
60:1, 61:7, 61:16,
61:17, 61:18, 62:1,
62:17, 66:17, 67:13,
94:6, 104:15, 105:4,
107:14
**Number** [1] - 65:13
**number** [13] - 14:7,
32:7, 38:6, 38:20,
55:4, 65:12, 75:22,
75:23, 78:23, 81:22,
94:15, 104:18,
104:19
**numbers** [2] - 68:3,
88:24
**nursing** [1] - 25:1

# O

**o'clock** [2] - 71:15,
91:10
**O'CONNOR** [1] - 1:21
**Obenour** [1] - 23:22
**Obenour's** [1] - 23:17
**object** [7] - 32:22,
41:17, 68:24, 71:8,
73:2, 86:24, 97:21
**objected** [1] - 79:12
**objection** [26] - 14:13,
21:2, 21:3, 21:13,
21:14, 32:23, 63:20,
67:18, 67:19, 69:1,
69:8, 71:16, 72:7,
72:8, 72:19, 73:5,
73:7, 73:12, 80:23,
80:24, 97:15, 97:17,
98:2, 105:15,
105:19, 105:25
**objection's** [2] -
42:10, 73:22
**objections** [2] - 71:10,
108:13
**objective** [2] - 24:10,
104:24
**observable** [1] - 57:15
**observations** [3] -
29:24, 77:20, 77:21
**observe** [2] - 30:3,
31:15

**observed** [6] - 34:10,
45:11, 45:12, 59:6,
84:19, 106:15
**obstructive** [2] -
45:14, 45:22
**obtaining** [1] - 28:6
**obviously** [2] - 75:7,
90:11
**occasion** [1] - 85:21
**occur** [1] - 46:3
**occurred** [9] - 8:8,
19:3, 30:4, 82:2,
82:6, 82:9, 83:20,
94:20, 100:14
**occurring** [1] - 34:2
**occurs** [3] - 92:13,
95:20, 99:15
**October** [20] - 40:17,
55:13, 58:10, 58:19,
58:20, 65:25, 84:12,
84:14, 85:19, 87:11,
87:14, 89:3, 91:4,
91:8, 93:4, 94:3,
96:5, 99:23, 100:22,
107:2
**OF** [3] - 1:2, 1:10, 3:1
**offered** [2] - 12:5,
25:23
**offering** [1] - 28:12
**office** [1] - 16:10
**OFFICIAL** [1] - 1:10
**Official** [1] - 2:5
**often** [3] - 10:8, 10:11,
10:12
**Ohio** [1] - 11:1
**old** [1] - 107:6
**older** [1] - 52:11
**once** [1] - 73:6
**one** [78] - 6:6, 6:17,
9:6, 9:12, 11:1, 13:2,
14:6, 16:2, 16:18,
22:3, 22:4, 24:8,
24:15, 24:17, 24:22,
24:25, 30:13, 31:2,
31:15, 34:2, 42:23,
43:24, 44:24, 45:3,
45:4, 46:19, 47:19,
47:24, 48:2, 48:24,
49:19, 50:1, 50:25,
51:12, 51:14, 52:5,
52:21, 53:6, 53:14,
56:10, 56:14, 56:19,
57:24, 59:20, 60:17,
64:5, 65:6, 66:6,
69:24, 74:22, 74:23,
75:21, 75:22, 76:6,
76:8, 78:6, 78:10,
78:23, 79:1, 82:2,
83:12, 87:17, 87:18,
87:24, 88:4, 89:13,

93:2, 94:17, 97:3,
100:13, 101:13,
102:13, 106:14,
106:25, 107:1
**one's** [1] - 24:18
**one-to-one** [1] - 53:6
**ones** [8] - 14:7, 25:13,
25:14, 31:4, 51:9,
52:11, 69:15, 103:1
**ongoing** [2] - 30:14,
40:3
**onset** [1] - 40:1
**oOo** [1] - 108:23
**open** [2] - 4:3, 47:8
**opened** [3] - 9:8, 74:2,
74:7
**opening** [1] - 42:8
**opera** [1] - 37:17
**opinion** [18] - 17:21,
18:2, 33:4, 33:17,
34:22, 34:25, 59:18,
61:2, 61:25, 63:1,
64:8, 65:11, 65:21,
66:16, 68:6, 79:23,
94:13, 103:6
**opinions** [7] - 17:16,
18:5, 32:17, 33:7,
41:21, 57:21, 58:21
**opportunity** [1] - 35:4
**opposed** [1] - 84:4
**order** [4] - 7:9, 57:14,
79:4, 83:19
**ordered** [6] - 11:17,
43:11, 44:11, 46:8,
46:12, 46:13
**ordering** [1] - 43:13
**orders** [1] - 105:9
**organizations** [2] -
8:25, 9:3
**orientation** [1] - 83:14
**originally** [1] - 44:15
**Orthopedics** [1] -
22:23
**otherwise** [1] - 56:4
**overall** [2] - 25:16,
75:5
**overly** [1] - 76:9
**overruled** [4] - 32:23,
42:10, 105:19,
105:25
**overrun** [1] - 86:9
**overstate** [1] - 48:9
**overtly** [1] - 86:18
**overturned** [1] - 12:9
**overview** [1] - 8:17
**overwhelmed** [1] -
50:3
**owed** [1] - 61:13
**own** [4] - 36:18, 36:21,
47:23, 105:1

**owned** [1] - 38:17

# P

**P.M** [1] - 108:22
**page** [2] - 20:10, 73:20
**PAGE** [1] - 3:2
**Pages** [2] - 80:5, 80:6
**pages** [2] - 25:8, 82:7
**paid** [3] - 16:8, 35:24, 67:3
**panel** [1] - 103:12
**pants** [1] - 53:20
**paperboy** [1] - 36:4
**papered** [1] - 67:9
**paperwork** [1] - 19:2
**parable** [1] - 107:6
**PARK** [2] - 3:3, 5:11
**Park** [3] - 5:8, 6:3, 14:11
**Parkinson's** [12] - 31:1, 31:2, 31:4, 31:14, 31:21, 40:1, 40:21, 40:23, 58:8, 58:11, 59:21, 100:2
**part** [6] - 40:24, 74:21, 79:23, 88:15, 88:16
**participants** [1] - 88:8
**participated** [4] - 9:5, 9:14, 10:2, 10:4
**particular** [6] - 8:10, 70:5, 70:10, 70:14, 89:11, 105:17
**particularly** [6] - 18:21, 29:25, 39:7, 52:11, 57:24, 71:3
**parties** [1] - 60:3
**partitioners** [1] - 13:15
**parts** [2] - 24:21, 90:10
**party** [1] - 100:7
**Passmore** [2] - 28:19, 65:14
**past** [2] - 9:20, 83:18
**pathway** [1] - 51:12
**patient** [8] - 24:18, 47:7, 47:17, 50:7, 99:3, 99:24, 100:10, 100:20
**Paul** [1] - 29:3
**pay** [3] - 16:5, 76:22, 77:2
**pending** [1] - 72:18
**Pennsylvania** [2] - 6:21, 7:13
**people** [20] - 7:25, 26:2, 26:12, 28:7, 29:22, 29:23, 30:2, 30:9, 30:14, 37:3,

39:20, 41:19, 43:3, 47:23, 58:18, 66:19, 79:2, 98:22, 104:18, 104:20
**per** [2] - 45:21, 47:18
**percentile** [2] - 56:21, 106:21
**perception** [1] - 30:21
**perfectly** [2] - 41:9, 51:5
**performance** [9] - 55:20, 56:12, 68:10, 77:17, 78:13, 93:16, 105:6, 106:23, 108:2
**performances** [2] - 84:21, 84:22
**performed** [2] - 60:10, 90:17
**performing** [3] - 55:21, 56:18, 56:20
**performs** [1] - 106:21
**perhaps** [4] - 25:9, 35:1, 48:5, 91:5
**period** [4] - 26:19, 54:4, 90:5, 98:20
**Perry** [1] - 29:8
**persisted** [1] - 91:25
**person** [13] - 26:15, 30:9, 32:2, 42:22, 45:1, 45:15, 50:12, 51:5, 54:11, 64:24, 66:21, 79:9, 99:2
**person's** [2] - 45:22, 51:19
**personal** [5] - 10:13, 38:8, 61:21, 76:20, 79:14
**personally** [2] - 10:2, 29:2
**persuasions** [1] - 86:17
**PET** [5] - 42:25, 43:11, 53:2, 105:10, 105:16
**Ph.D** [1] - 7:4
**phase** [1] - 13:7
**phenomenon** [2] - 92:8, 98:22
**philanthropy** [1] - 37:10
**phone** [2] - 19:1, 106:4
**phonetic** [1] - 12:14
**phrasing** [1] - 58:13
**physical** [2] - 31:15, 31:21
**physically** [4] - 31:13, 31:24, 32:2, 32:3
**pick** [4] - 23:15, 42:15, 72:13, 73:16
**picked** [1] - 46:4

**picking** [1] - 36:5
**pieces** [1] - 90:21
**pillars** [1] - 102:15
**pillows** [1] - 47:7
**pills** [1] - 40:10
**pistol** [1] - 38:20
**place** [2] - 60:20, 93:14
**placed** [1] - 30:2
**plain** [1] - 86:19
**Plaintiff** [2] - 1:5, 1:15
**plan** [2] - 66:23, 66:24
**planning** [1] - 61:13
**playing** [1] - 60:7
**plea** [1] - 11:16
**point** [15] - 16:11, 16:19, 18:2, 34:2, 41:12, 46:23, 52:19, 61:22, 64:21, 69:22, 73:8, 81:21, 104:17, 104:23, 105:8
**pointed** [2] - 21:18, 104:7
**points** [8] - 31:6, 32:4, 34:1, 40:25, 45:19, 75:17, 75:20, 105:10
**polite** [1] - 65:4
**political** [1] - 86:17
**Pool** [2] - 100:23, 101:10
**pool** [9] - 84:24, 95:21, 96:2, 96:4, 98:8, 100:7, 100:8, 100:11, 100:20
**poor** [4] - 35:15, 37:2, 77:17, 83:20
**portion** [4] - 39:17, 64:6, 80:16, 80:21
**position** [2] - 7:13, 79:16
**positive** [1] - 41:8
**possibility** [2] - 12:10, 44:21
**possible** [6] - 20:8, 39:24, 40:6, 43:16, 52:9, 105:12
**posture** [1] - 31:16
**potentially** [1] - 70:22
**pounds** [1] - 47:17
**PowerPoint** [4] - 26:8, 67:23, 68:4, 96:21
**PPS** [1] - 64:23
**practice** [6] - 6:5, 6:13, 10:11, 17:12, 24:14, 24:15, 51:3
**practicing** [1] - 99:7
**pre** [1] - 63:22
**pre-admitted** [1] - 63:22
**precise** [1] - 71:4

**preparation** [1] - 105:22
**prepare** [3] - 26:4, 67:25, 103:24
**presence** [4] - 88:14, 88:16, 88:17, 88:18
**present** [4] - 43:16, 44:25, 77:12, 78:1
**presentation** [3] - 26:5, 83:8, 90:12
**presented** [3] - 91:1, 91:4, 91:8
**presenting** [1] - 51:18
**presently** [1] - 94:7
**preserved** [1] - 56:2
**president** [2] - 9:19, 9:20
**President** [1] - 8:11
**PRESIDING** [1] - 1:3
**pressure** [2] - 47:5, 47:18
**pressurized** [1] - 47:9
**pretrial** [1] - 7:21
**pretty** [3] - 44:5, 50:8, 82:25
**prevention** [1] - 6:9
**previous** [3] - 73:3, 85:12, 96:8
**previously** [2] - 39:1, 76:2
**primarily** [1] - 17:13
**primary** [4] - 87:8, 95:23, 95:25, 96:1
**principles** [1] - 6:13
**printouts** [1] - 73:19
**private** [1] - 17:12
**probation** [1] - 18:18
**problem** [9] - 11:21, 20:16, 27:23, 49:9, 51:25, 86:7, 97:21, 99:17, 107:25
**problems** [11] - 24:7, 28:6, 41:10, 46:2, 48:25, 49:13, 49:14, 74:22, 76:6, 99:14, 101:13
**procedure** [2] - 52:3, 82:11
**Proceedings** [1] - 2:8
**PROCEEDINGS** [3] - 1:10, 4:1, 108:21
**proceedings** [4] - 4:3, 14:5, 33:14, 109:7
**processes** [1] - 74:22
**produced** [2] - 2:8, 46:15
**producing** [1] - 41:1
**profession** [1] - 93:11
**professional** [3] - 8:24, 9:3, 36:10

**Professor** [1] - 7:14
**professor** [2] - 8:21, 8:22
**program** [2] - 37:4, 37:5
**progressed** [1] - 43:18
**progressive** [4] - 31:8, 57:16, 57:20, 107:18
**promptly** [1] - 40:8
**pronounces** [1] - 76:8
**properly** [2] - 50:7, 67:9
**properties** [1] - 36:1
**property** [1] - 75:14
**prosecution** [5] - 17:10, 20:12, 22:12, 71:14, 94:17
**prosecutor** [1] - 18:14
**protecting** [1] - 85:6
**protein** [3] - 41:13, 42:17, 43:1
**protocol** [1] - 78:7
**prove** [2] - 25:20, 31:4
**proved** [2] - 11:8, 50:1
**provide** [2] - 50:24, 61:21
**provides** [1] - 78:11
**providing** [1] - 54:24
**Psychiatric** [1] - 9:12
**psychiatrist** [9] - 6:5, 6:16, 6:17, 6:18, 7:9, 10:6, 16:2, 33:5, 43:9
**Psychiatry** [4] - 7:14, 9:8, 9:10, 9:18
**psychiatry** [10] - 6:6, 6:11, 6:12, 6:13, 6:19, 6:20, 8:22, 9:13, 13:25, 14:12
**psychologists** [1] - 9:9
**Psychology** [2] - 6:25, 9:11
**Public** [1] - 7:3
**published** [1] - 9:21
**pull** [8] - 19:9, 26:10, 62:19, 63:17, 64:4, 65:5, 66:6, 66:12
**punctuation** [1] - 63:13
**punishment** [1] - 10:16
**purchase** [1] - 76:7
**purpose** [1] - 91:14
**purposes** [4] - 6:14, 38:25, 61:14, 72:9
**pursuant** [1] - 109:4
**pursue** [1] - 12:18
**pushed** [1] - 24:15
**put** [4] - 22:3, 30:11,

93:8, 107:9
**putting** [3] - 53:20, 63:4, 67:10
**puzzlement** [1] - 107:2

## Q

**qualified** [2] - 13:24, 14:14
**qualifies** [1] - 6:15
**qualify** [1] - 14:11
**qualitative** [2] - 70:15, 70:18
**quantitative** [5] - 70:14, 70:15, 71:1, 71:3, 72:24
**questions** [4] - 78:17, 84:2, 85:2, 91:21
**quibbling** [1] - 70:4
**quick** [1] - 61:24
**quickly** [3] - 13:12, 82:23, 93:22
**quite** [9] - 33:24, 40:8, 51:20, 53:20, 53:22, 56:4, 56:8, 76:13, 91:5

## R

**radioactive** [1] - 42:24
**rags** [1] - 37:1
**raid** [3] - 95:10, 95:17, 99:20
**raise** [1] - 69:23
**raised** [1] - 44:18
**range** [4] - 53:3, 54:2, 88:25, 107:20
**rate** [1] - 49:10
**rather** [3] - 12:11, 28:10, 43:4
**rational** [2] - 33:12, 33:13
**rays** [1] - 22:24
**reaching** [1] - 71:1
**read** [4] - 24:20, 54:10, 54:14, 59:7
**readily** [1] - 49:23
**reading** [1] - 54:17
**ready** [4] - 23:20, 66:7, 66:14, 108:12
**real** [6] - 36:12, 48:15, 90:1, 104:10, 104:16, 106:23
**real-world** [1] - 90:1, 106:23
**really** [11] - 8:15, 9:5, 16:5, 32:10, 35:13, 42:16, 43:18, 50:4, 54:1, 105:5, 106:12

**realm** [1] - 8:12
**realtor's** [1] - 75:14
**reason** [4] - 43:8, 43:10, 44:15, 103:2
**reasonable** [3] - 33:12, 65:23, 75:24
**reassurance** [1] - 99:10
**rebut** [1] - 13:7
**recalled** [2] - 85:24, 86:4
**receipt** [1] - 23:24
**receive** [2] - 25:7, 35:23
**received** [4] - 24:19, 29:6, 92:25, 95:1
**receiving** [2] - 27:18, 57:20
**recent** [12] - 12:13, 17:13, 25:14, 39:18, 49:3, 49:10, 49:13, 68:12, 68:15, 75:9, 75:16, 86:4
**recently** [4] - 54:4, 58:9, 59:19, 86:12
**recess** [2] - 71:21, 108:17
**RECESSED** [1] - 108:21
**recognition** [1] - 40:2
**recognize** [4] - 19:19, 21:17, 21:19, 76:11
**recognized** [1] - 84:22
**recommended** [1] - 47:11
**recommends** [1] - 99:19
**record** [10] - 4:7, 6:2, 15:6, 24:22, 27:16, 58:12, 73:14, 97:7, 99:24, 99:25
**record's** [1] - 58:14
**recorded** [2] - 2:8, 84:20
**records** [51] - 18:12, 18:13, 18:16, 18:17, 18:18, 18:19, 18:22, 19:5, 19:24, 20:19, 20:21, 20:22, 21:9, 21:20, 22:1, 22:7, 22:19, 22:22, 22:23, 22:24, 23:8, 23:10, 23:11, 23:18, 23:21, 23:24, 24:4, 24:7, 24:19, 24:23, 25:6, 25:8, 26:1, 26:21, 39:17, 44:2, 44:16, 57:5, 57:10, 57:11, 58:16, 58:17, 58:22, 74:8, 82:4, 82:5,

82:7, 100:19, 103:1
**recruited** [2] - 7:13, 7:25, 8:19
**reels** [1] - 38:14
**reference** [2] - 91:17, 102:22
**referral** [2] - 100:15, 101:10
**referrals** [4] - 100:9, 100:10, 100:13, 100:18
**referred** [6] - 17:9, 86:5, 92:9, 100:11, 100:16, 100:18
**referring** [1] - 12:21
**refers** [2] - 95:21, 100:1
**reflect** [1] - 100:19
**reflected** [1] - 107:25
**reflects** [1] - 67:7
**refusal** [1] - 65:4
**refused** [5] - 13:5, 28:8, 28:20, 88:11
**Regan** [1] - 8:11
**regard** [4] - 54:22, 99:21, 104:11, 104:24
**regarded** [1] - 35:14
**regarding** [2] - 78:17, 103:9
**regularly** [1] - 5:14
**regurgitate** [1] - 42:8
**regurgitating** [1] - 41:18
**rehash** [1] - 24:1
**related** [5] - 39:25, 40:1, 40:4, 50:16, 81:9
**relating** [1] - 47:3
**Relations** [1] - 7:5
**relationship** [1] - 53:7
**relatively** [1] - 68:14
**relevance** [3] - 63:21, 69:8, 86:24
**relevant** [10] - 39:14, 39:17, 40:21, 48:20, 49:1, 49:2, 49:3, 52:1, 87:2, 87:4
**reliable** [4] - 55:22, 70:21, 71:4, 72:23
**reliance** [1] - 12:12
**relied** [6] - 34:12, 34:17, 34:19, 70:25, 93:20, 103:13
**reluctant** [1] - 28:7
**rely** [2] - 34:14, 54:25
**REM** [7] - 44:23, 45:3, 45:6, 45:9, 45:13, 46:22, 48:4
**remember** [18] -

12:23, 18:24, 38:1, 42:14, 56:23, 59:24, 60:2, 69:15, 73:13, 73:21, 81:16, 81:18, 82:19, 97:22, 98:23, 100:16, 100:17
**remind** [1] - 58:4
**reminded** [1] - 89:21
**remote** [1] - 75:7
**rendered** [2] - 17:15, 17:19
**rendering** [1] - 17:20
**repeat** [2] - 46:21, 87:18, 88:19
**repeated** [1] - 108:1
**replies** [1] - 95:3
**report** [10] - 13:17, 13:19, 15:2, 41:17, 70:3, 71:7, 73:1, 81:23, 92:17, 92:19
**reported** [3] - 54:1, 83:4, 109:7
**Reported** [1] - 2:4
**Reporter** [2] - 2:5, 2:8
**REPORTER'S** [1] - 1:10
**reporting** [4] - 57:16, 79:8, 79:19, 100:7
**reports** [13] - 14:16, 14:19, 15:3, 15:12, 54:7, 75:23, 75:24, 83:3, 90:13, 90:14, 93:23, 94:1, 101:12
**represent** [2] - 20:15
**representation** [3] - 74:20, 104:6, 106:8
**represented** [4] - 13:19, 29:19, 105:3, 106:12
**representing** [1] - 105:17
**request** [2] - 21:9, 21:20, 41:5
**requested** [3] - 19:23, 22:8, 22:21
**requirement** [1] - 79:8
**requires** [1] - 43:3
**research** [2] - 8:14, 91:16
**reserve** [1] - 97:16
**reserved** [2] - 63:20, 69:7
**reserving** [1] - 97:20
**residence** [1] - 95:10
**residency** [3] - 7:8, 7:10, 7:11
**resolve** [1] - 93:3
**resolved** [1] - 67:9
**resources** [3] - 7:24, 8:2, 8:6, 25:16, 86:8

**respect** [9] - 13:16, 26:25, 34:9, 70:5, 70:9, 71:25, 72:19, 93:8, 93:14
**respectfully** [1] - 42:12
**responding** [2] - 61:9, 84:25
**responds** [1] - 55:17
**response** [2] - 50:2, 71:16
**responsibility** [1] - 10:16
**rest** [2] - 46:1, 48:16
**rested** [1] - 47:25
**restoration** [1] - 87:20
**restorative** [1] - 45:18
**result** [3] - 45:9, 50:13, 55:24
**resulted** [1] - 99:10
**resulting** [1] - 45:24
**results** [4] - 34:14, 46:18, 88:20, 102:18
**retained** [3] - 16:16, 18:24, 84:2
**retired** [2] - 23:24, 39:1
**retrospect** [1] - 59:22
**return** [1] - 12:6
**returning** [1] - 12:5
**reveal** [1] - 59:1
**revealed** [1] - 46:14
**review** [7] - 24:23, 44:2, 53:16, 57:4, 58:23, 60:22, 83:4
**reviewed** [3] - 52:14, 61:16, 102:8
**reviewing** [2] - 25:12, 58:22
**Revised** [1] - 87:25
**Reynolds** [12] - 36:24, 36:25, 39:2, 60:4, 62:11, 66:22, 84:4
**Reynolds's** [1] - 67:2
**riches** [1] - 37:2
**ridiculous** [1] - 92:5
**rights** [1] - 11:10
**riot** [3] - 86:4, 86:14, 87:6
**risk** [4] - 31:16, 43:12, 43:21, 45:23
**risky** [1] - 36:21
**Rob** [1] - 28:24
**ROBERT** [1] - 1:7
**Robert** [3] - 11:9, 28:23, 39:9
**role** [2] - 15:25, 16:2
**roles** [2] - 9:3, 9:19
**Romatowski** [1] - 28:5
**Roof** [2] - 13:10, 13:18

**room** [4] - 32:25, 35:24, 36:22, 51:14
**roots** [1] - 6:18
**roughly** [1] - 7:5
**rounds** [1] - 63:4
**RPR** [2] - 2:4, 109:11
**rule** [3] - 5:18, 45:11, 46:22
**ruling** [2] - 69:15, 70:2
**running** [2] - 6:7, 6:8
**rush** [1] - 25:15
**rushed** [2] - 25:11, 25:13

## S

**safeguards** [1] - 93:14
**safer** [1] - 43:24
**sample** [6] - 45:12, 46:15, 46:20, 47:1, 49:25, 84:7
**San** [1] - 91:16
**sanity** [2] - 7:23, 13:17
**sat** [1] - 42:8
**save** [1] - 35:17
**saving** [1] - 36:1
**saw** [6] - 36:16, 54:16, 85:22, 91:7, 92:14, 101:8
**scale** [2] - 34:24, 102:7
**scan** [1] - 43:4
**scans** [3] - 53:2, 73:3, 105:10
**SCAR** [1] - 63:4
**scheduling** [1] - 72:9
**scholarships** [1] - 37:17
**school** [3] - 8:20, 8:21, 37:5
**School** [1] - 7:15
**Science** [1] - 9:10
**Sciences** [1] - 9:7
**scored** [1] - 88:24
**scores** [2] - 89:23, 107:1
**screen** [3] - 19:15, 19:20, 66:12
**scroll** [2] - 20:8
**seal** [1] - 13:18
**Sean** [2] - 2:4, 109:11
**sean_gumm@txs.
uscourts.gov** [1] - 2:6
**search** [1] - 96:1
**second** [13] - 31:1, 32:14, 37:20, 46:5, 46:7, 47:2, 47:13, 54:6, 58:4, 80:13, 93:10, 94:23, 105:2

**Second** [1] - 11:9
**secretary** [1] - 29:14
**Section** [3] - 7:17, 9:10, 109:5
**section** [3] - 9:8, 9:11, 21:18
**security** [4] - 7:16, 7:20, 76:17, 76:18
**sedatives** [1] - 51:5
**see** [15] - 20:9, 29:24, 30:3, 30:9, 30:21, 44:3, 45:4, 55:16, 59:20, 88:13, 90:1, 90:25, 99:18, 101:21, 105:7
**seeing** [2] - 45:6, 57:12
**seek** [1] - 18:12
**seem** [3] - 60:19, 86:5, 86:9
**seeming** [1] - 57:23
**seemingly** [1] - 85:8
**segments** [1] - 60:7
**selective** [1] - 54:20
**self** [1] - 79:5
**self-interests** [1] - 79:5
**semi** [1] - 78:8
**semi-structured** [1] - 78:8
**semistructured** [1] - 78:14
**sense** [2] - 81:8, 106:22
**sensitivity** [1] - 93:14
**sent** [1] - 22:2
**sentencing** [2] - 13:5, 13:6
**sepsis** [11] - 49:5, 49:15, 49:18, 50:8, 50:12, 50:16, 50:20, 50:21, 82:5, 82:16, 82:20
**September** [3] - 95:13, 95:17, 95:21
**septic** [1] - 49:21
**sequence** [2] - 12:7, 28:16
**sequencing** [2] - 83:18, 85:13
**serial** [1] - 38:20
**series** [1] - 11:7
**serious** [3] - 49:9, 50:8, 82:25
**seriousness** [1] - 88:7
**served** [1] - 9:19
**services** [1] - 6:7
**SESSION** [1] - 1:9
**set** [9] - 11:7, 29:7, 35:20, 36:24, 49:3,

64:10, 70:3, 84:14, 84:16
**Seth** [2] - 101:1, 101:3
**setting** [3] - 47:17, 47:20, 51:12
**settings** [3] - 47:11, 47:24, 93:13
**several** [2] - 29:2, 30:22
**severe** [5] - 33:22, 34:24, 45:21, 53:20, 53:22
**severe-enough** [1] - 45:21
**severely** [1] - 53:15
**severity** [2] - 33:20, 54:3
**share** [1] - 16:4
**Sheehan** [1] - 29:3
**shirt** [1] - 53:21
**shoot** [1] - 63:8
**shooter** [1] - 38:15
**shooting** [1] - 38:24
**short** [3] - 45:13, 63:12, 89:22
**show** [10] - 12:1, 23:1, 45:16, 48:13, 52:20, 59:19, 61:6, 68:18, 96:9, 106:13
**showed** [3] - 68:9, 77:18, 78:14
**showing** [2] - 61:4, 90:2
**shown** [4] - 56:6, 56:7, 85:1, 106:19
**shows** [3] - 63:2, 65:25, 105:11
**side** [2] - 41:1, 84:1
**sides** [2] - 17:15, 43:9
**significance** [2] - 63:8, 63:11
**significant** [11] - 10:18, 25:6, 27:1, 37:10, 45:24, 48:13, 48:22, 49:8, 64:10, 82:8, 92:10
**significantly** [3] - 8:6, 91:1, 91:5
**signing** [1] - 23:1
**signs** [2] - 45:17, 57:16
**silent** [1] - 102:25
**simplest** [1] - 107:10
**simply** [1] - 78:22
**single** [2] - 8:13, 92:12
**six** [1] - 101:14
**sixty** [1] - 76:21
**skills** [2] - 59:11, 90:3
**sleep** [26] - 44:10, 44:14, 44:15, 44:20,

44:23, 45:3, 45:7, 45:9, 45:13, 45:14, 45:18, 45:20, 45:22, 46:4, 46:5, 46:12, 46:14, 46:17, 46:21, 47:2, 47:3, 47:4, 47:24, 48:4, 48:7, 48:8
**sleepiness** [1] - 48:1
**sleeping** [1] - 45:2
**slices** [2] - 70:19, 70:20
**slide** [10] - 26:5, 27:9, 27:17, 70:9, 70:11, 70:13, 72:21, 73:2, 96:8, 103:25
**slides** [4] - 70:6, 71:8, 72:19, 73:10
**slip** [1] - 85:2
**slow** [2] - 84:25, 85:7
**slower** [1] - 98:25
**small** [4] - 45:12, 66:24, 104:18, 104:19
**SMITH** [1] - 1:15
**so..** [1] - 27:10
**Social** [1] - 7:4
**Sociology** [1] - 7:5
**software** [3] - 37:7, 76:13, 76:18
**someone** [4] - 45:25, 48:14, 92:9, 99:17
**sometimes** [4] - 16:22, 61:8, 89:25, 92:8
**somewhat** [3] - 8:1, 9:11, 57:14
**son** [3] - 39:9, 54:8, 102:19
**soon** [1] - 108:15
**sophistication** [1] - 65:25
**sorry** [21] - 20:9, 23:3, 23:16, 23:20, 24:15, 27:11, 27:25, 40:14, 42:25, 58:3, 59:12, 63:6, 69:14, 80:5, 81:12, 87:10, 95:15, 96:7, 97:3, 101:9, 102:9
**sort** [13] - 15:22, 19:17, 24:1, 30:6, 38:8, 52:14, 54:1, 64:5, 81:13, 90:20, 90:22, 93:22, 101:17
**sorts** [1] - 35:16
**source** [4] - 26:13, 30:13, 62:10, 87:8
**sources** [11] - 8:12, 24:10, 26:14, 26:18,

26:23, 30:12, 33:25, 102:25, 103:17, 103:18, 108:1
**South** [1] - 13:13
**Southern** [1] - 2:6
**SOUTHERN** [1] - 1:2
**space** [1] - 76:18
**speaking** [4] - 29:18, 38:22, 40:17, 60:13
**special** [1] - 101:19
**specialists** [1] - 45:20
**specialization** [1] - 6:19
**specific** [1] - 106:13
**specifically** [3] - 42:25, 56:18, 100:16
**specificity** [1] - 93:15
**spectacular** [1] - 35:13
**speech** [1] - 59:25
**speeches** [12] - 58:24, 59:12, 59:13, 59:16, 59:18, 60:2, 60:10, 68:9, 75:18, 103:3, 104:13, 104:25
**spell** [7] - 6:1, 89:13, 89:17, 89:18, 89:22, 91:22
**spelled** [1] - 89:20
**spend** [1] - 8:13
**spent** [3] - 8:16, 30:23, 85:20
**spinal** [1] - 43:3
**split** [1] - 17:2
**spoken** [1] - 29:16
**sponsored** [1] - 95:5
**spreads** [1] - 49:22
**square** [1] - 47:18
**stable** [1] - 41:2
**stage** [3] - 17:5, 35:1, 35:2
**stages** [1] - 22:4
**stand** [14] - 5:17, 7:23, 15:20, 32:8, 33:10, 78:9, 78:15, 79:21, 84:7, 87:17, 87:23, 88:25, 89:6, 89:8
**Stand** [1] - 87:25
**standard** [2] - 33:10, 45:6
**standardized** [2] - 78:7, 87:22
**standpoint** [1] - 25:18
**start** [6] - 22:10, 36:17, 57:4, 65:16, 66:13, 77:5
**started** [4] - 33:23, 33:24, 36:22, 40:12
**starting** [1] - 36:21, 52:16

**state** [10] - 6:1, 17:6, 22:19, 29:25, 50:5, 51:19, 52:6, 92:16, 93:17, 105:14
**State's** [1] - 12:12
**States** [4] - 2:5, 5:7, 14:10, 109:5
**STATES** [1] - 1:1
**Statistical** [1] - 9:16
**statistical** [2] - 93:13, 108:3
**status** [1] - 91:20
**stenographically** [1] - 109:6
**stenography** [1] - 2:8
**step** [5] - 5:10, 36:21, 62:16, 83:12
**step-by-step** [1] - 83:12
**stepped** [2] - 61:19, 62:13
**still** [5] - 53:3, 79:23, 85:9, 91:7, 98:10
**stipulation** [1] - 69:6
**stop** [2] - 86:13, 95:24
**stopped** [1] - 62:5
**stored** [1] - 23:12
**story** [10] - 37:1, 38:18, 74:17, 74:19, 74:20, 74:23, 75:1, 106:14, 107:16, 107:18
**straight** [1] - 57:15
**strategy** [1] - 43:25
**stream** [2] - 79:4, 104:19
**Street** [1] - 87:8
**striking** [1] - 49:11
**strongly** [1] - 71:8
**structured** [1] - 78:8
**struggle** [1] - 17:10
**stuck** [2] - 80:2, 92:3
**studies** [3] - 13:15, 52:17, 52:20, 53:4, 107:19
**study** [15] - 41:6, 44:10, 44:14, 44:15, 46:4, 46:5, 46:7, 46:12, 46:17, 46:21, 47:2, 70:16, 70:17
**stuff** [3] - 38:21, 65:24, 103:5
**subcomponents** [1] - 32:9
**subject** [5] - 24:4, 54:18, 55:4, 69:6, 71:5
**subjected** [1] - 55:20
**submitted** [4] - 7:6, 13:17, 20:18, 81:23

**subsequent** [1] - 82:10
**subsequently** [2] - 13:18, 92:25
**substantial** [2] - 26:19, 108:3
**substantively** [1] - 32:20
**subtract** [1] - 92:6
**subtracting** [1] - 91:25
**success** [1] - 35:22
**successful** [4] - 30:25, 37:2, 37:9, 52:8
**sudden** [1] - 91:11
**suddenly** [1] - 91:13
**suffered** [1] - 10:14
**suffers** [1] - 94:10
**sufficient** [2] - 45:9, 46:1
**suggest** [1] - 53:22
**suggestion** [1] - 44:16
**suit** [1] - 84:3
**sum** [1] - 76:20
**summaries** [3] - 24:20, 98:13, 98:14
**summarize** [2] - 6:22, 39:14, 57:11
**sundowning** [1] - 92:9
**superior** [4] - 59:10, 59:11, 104:11, 105:6
**supported** [2] - 36:20, 103:8
**supporting** [2] - 19:4, 102:15
**surgically** [1] - 52:8
**surviving** [1] - 13:3
**suspicious** [2] - 94:24, 99:21
**switch** [1] - 19:11
**sworn** [1] - 5:14
**symptom** [2] - 33:19, 46:9
**symptoms** [3] - 31:21, 57:16, 59:21
**synopsize** [1] - 90:24
**systems** [2] - 48:20, 48:23

**T**

**T-A-U** [1] - 42:20
**table** [2] - 4:8, 73:22
**tactical** [1] - 43:24
**Tamine** [2] - 78:24, 79:3
**Tamine's** [1] - 95:10
**tanking** [1] - 77:23
**tap** [1] - 43:3

**task** [2] - 18:11, 25:4
**tasks** [1] - 99:1
**tau** [7] - 41:16, 42:20, 42:21, 43:6, 43:11, 43:21
**TAU** [1] - 41:16
**taught** [6] - 35:16, 35:17, 36:7, 37:4, 37:6
**Tax** [1] - 15:18
**tax** [1] - 61:13
**taxes** [2] - 61:12, 65:20
**team** [8] - 15:25, 20:12, 22:12, 22:19, 41:20, 44:11, 46:17
**technical** [2] - 61:11, 70:19
**Ted** [1] - 11:13
**television** [1] - 11:25
**telltale** [1] - 46:9
**tenure** [1] - 8:5
**term** [7] - 22:5, 47:14, 58:15, 58:21, 89:22, 104:21
**terminology** [3] - 32:21, 33:1, 33:2
**terms** [3] - 32:18, 58:18, 107:10
**terrible** [2] - 107:24
**test** [14] - 42:23, 42:24, 43:5, 45:8, 56:9, 56:16, 57:1, 90:7, 90:8, 93:15, 101:22, 102:18, 107:23, 108:2
**tested** [3] - 42:22, 90:2, 90:3
**testified** [12] - 5:14, 14:5, 41:19, 42:5, 67:17, 70:13, 74:4, 74:25, 80:15, 81:12, 98:7, 106:25
**testify** [4] - 4:17, 4:18, 26:9, 70:2
**testifying** [1] - 18:3
**testimony** [16] - 11:24, 42:1, 54:16, 58:24, 59:3, 59:6, 59:7, 59:9, 59:18, 68:8, 72:22, 73:16, 103:4, 104:13, 104:25, 105:16
**testing** [28] - 34:10, 34:13, 34:15, 34:17, 34:19, 55:20, 56:23, 77:11, 77:14, 77:18, 78:1, 78:6, 79:19, 89:23, 90:11, 90:17, 90:19, 93:13, 93:18,

99:5, 100:5, 101:25, 102:2, 102:6, 103:20, 103:21, 108:4
**tests** [4] - 55:21, 77:24, 99:18, 106:19
**TEXAS** [1] - 1:2
**Texas** [3] - 1:11, 2:6, 12:8
**text** [1] - 64:6
**THE** [65] - 1:3, 4:10, 4:19, 4:22, 5:2, 5:6, 5:9, 5:15, 5:16, 5:20, 14:14, 14:22, 14:25, 15:9, 21:3, 21:14, 23:14, 23:17, 27:13, 27:20, 27:23, 32:23, 32:24, 41:20, 42:10, 60:13, 61:24, 62:3, 62:7, 66:10, 67:19, 68:21, 68:25, 69:4, 69:9, 69:13, 69:19, 69:25, 71:9, 71:13, 71:19, 71:22, 72:2, 72:6, 72:8, 72:20, 73:4, 73:17, 80:10, 80:24, 87:1, 96:12, 96:17, 96:23, 97:2, 97:16, 97:20, 97:25, 105:19, 105:24, 105:25, 106:2, 108:11, 108:16, 108:21
**theme** [1] - 90:4
**themselves** [1] - 99:4
**theory** [1] - 17:16
**there'd** [3] - 37:25, 44:16, 92:16
**thereafter** [1] - 12:7
**therefore** [1] - 34:12
**thereof** [1] - 31:16
**thin** [1] - 8:2
**thinking** [3] - 90:7, 90:9, 93:24
**third** [3] - 37:23, 54:6, 103:21
**thoughtful** [1] - 67:6
**thousand** [2] - 7:22, 10:5
**thousands** [4] - 9:25, 25:7, 25:8, 82:6
**three** [8] - 9:5, 14:20, 49:6, 59:17, 101:23, 102:17, 103:18, 106:13
**throughout** [5] - 39:12, 85:23, 90:5, 91:2, 91:7
**tied** [1] - 106:12
**timeline** [4] - 93:24,

94:24, 96:10, 98:7
**timing** [2] - 57:25, 99:21
**Title** [1] - 109:4
**titrated** [1] - 46:5
**titration** [1] - 47:15
**today** [4] - 26:6, 68:1, 79:23, 83:23
**together** [1] - 75:4
**took** [4] - 8:11, 19:2, 74:14, 90:20
**tools** [1] - 92:23
**top** [7] - 60:25, 65:17, 66:13, 80:2, 93:23, 104:8, 106:23
**top-line** [1] - 93:23
**topic** [2] - 44:8, 69:20
**topics** [2] - 75:6, 75:7
**total** [1] - 16:10
**touch** [1] - 65:1
**toward** [1] - 6:18
**tracer** [1] - 42:24
**tracks** [1] - 75:13
**tract** [5] - 49:4, 49:7, 49:12, 49:14, 49:21
**TRANSCRIPT** [1] - 1:10
**transcript** [5] - 2:8, 59:8, 80:6, 80:17, 109:6
**transcripts** [4] - 80:1, 102:9, 103:4, 105:1
**translated** [1] - 7:5
**translating** [1] - 25:3
**travel** [1] - 16:11
**traveled** [1] - 38:23
**treat** [1] - 79:10
**treated** [2] - 40:8, 40:12
**treating** [5] - 22:4, 57:9, 58:7, 98:13, 99:24
**treatment** [1] - 47:5
**tremendous** [2] - 89:25, 90:15
**trial** [14] - 7:23, 13:4, 15:21, 32:9, 33:10, 43:25, 78:9, 78:15, 79:21, 87:17, 87:23, 88:25, 89:6, 89:8
**Trial** [1] - 87:25
**trickled** [1] - 57:9
**tried** [2] - 29:2, 64:24
**tries** [1] - 24:16
**trip** [2] - 95:9, 101:5
**trips** [1] - 38:24
**trouble** [2] - 83:17, 98:17
**true** [4] - 54:12, 90:4, 92:15, 109:6

Trust [1] - 37:11
trust [4] - 37:14, 79:9, 79:11, 88:9
trusted [2] - 76:23, 104:22
truth [2] - 31:25, 94:10
try [7] - 25:25, 30:17, 46:8, 73:13, 82:22, 87:18, 97:8
trying [7] - 29:23, 53:12, 60:6, 69:1, 74:21, 79:10, 87:1
Tsarnaev [1] - 13:2
tuition [1] - 35:24
turn [4] - 17:25, 18:4, 83:2, 92:17
turned [1] - 49:5
turns [1] - 99:6
tweaked [1] - 40:25
two [27] - 6:6, 7:11, 7:19, 8:8, 9:15, 11:1, 11:10, 13:2, 25:9, 32:9, 36:11, 42:23, 49:5, 59:7, 70:5, 71:8, 72:19, 76:4, 78:5, 80:1, 84:14, 85:5, 87:13, 93:5, 102:10, 103:20, 105:10
type [3] - 34:17, 56:23, 86:15
typical [1] - 10:9

U

UCSH [2] - 4:15, 62:11
Unabomber [1] - 11:14
uncertainty [2] - 32:25, 93:3
unclear [3] - 16:13, 70:24, 100:6
under [6] - 13:18, 17:25, 52:4, 73:5, 86:11
undergoing [1] - 90:8
underlying [1] - 32:10
understood [3] - 71:18, 79:7, 79:15
United [4] - 2:5, 5:7, 14:10, 109:5
UNITED [1] - 1:1
University [4] - 6:21, 7:12, 8:19, 17:9
unsealed [1] - 13:20
up [37] - 9:8, 10:7, 12:2, 14:6, 15:3, 15:16, 19:9, 19:13, 19:15, 23:15, 26:10, 29:1, 29:7, 36:5,

37:24, 42:15, 46:4, 47:23, 54:25, 58:19, 60:17, 62:19, 63:17, 64:5, 65:5, 66:6, 66:13, 72:13, 73:16, 74:7, 75:13, 93:19, 97:9, 97:12, 99:17, 104:14, 107:14
upshot [1] - 47:24
urinary [6] - 49:4, 49:7, 49:12, 49:14, 49:17, 49:21
UroLift [2] - 52:3, 82:11
urologist [1] - 101:4
US [2] - 9:14, 86:8
USA [1] - 1:4
useful [1] - 23:4
uses [3] - 33:1, 48:2, 78:10
UTI [1] - 50:20

V

vaccine [1] - 85:5
vagueness [1] - 32:25
valid [5] - 34:20, 54:23, 55:24, 106:22, 108:4
validity [2] - 77:17, 93:12
values [3] - 35:16, 35:20, 35:22
Vance [1] - 11:9
VanPac [1] - 11:6
variabilities [1] - 56:11
variability [2] - 55:10, 92:16
variable [6] - 51:13, 51:20, 51:25, 56:8, 83:13, 83:15
various [8] - 22:4, 36:7, 37:14, 39:20, 40:25, 45:23, 64:12, 104:7
VARNADO [24] - 1:19, 14:13, 21:2, 21:13, 27:8, 27:16, 32:22, 41:16, 42:5, 67:18, 68:22, 69:2, 69:11, 69:17, 71:12, 72:7, 80:23, 86:24, 97:5, 97:12, 97:18, 105:14, 108:14, 108:20
Varnado [1] - 71:11
vary [1] - 6:19
varying [6] - 45:16, 53:19, 55:1, 57:21,

85:23, 87:22
verifies [1] - 44:24
verify [1] - 45:3
version [1] - 63:5
versus [3] - 17:3, 17:22, 86:14
video [4] - 45:5, 60:7, 61:5, 85:1
videos [5] - 58:23, 59:1, 83:4, 102:10, 102:22
videotape [3] - 59:6, 68:13, 104:25
videotaped [5] - 45:3, 59:8, 74:3, 77:13, 102:9
videotapes [2] - 26:20, 103:3
view [7] - 34:20, 37:8, 54:21, 55:13, 59:3, 61:1, 94:15
viewed [1] - 59:22
violence [1] - 6:9
VIP [1] - 100:20
Virginia [3] - 8:19, 10:5, 17:9
virtue [1] - 23:22
visible [1] - 53:1
visit [6] - 47:22, 88:19, 95:20, 96:4, 98:8, 101:11
vivid [1] - 36:19
voicemail [1] - 29:7
volume [2] - 7:21, 53:2
vs [1] - 1:6

W

W2 [2] - 64:13, 64:16
wait [1] - 19:14
Wall [1] - 87:8
Walter [2] - 11:3, 11:5
wants [1] - 97:16
ward [1] - 51:15
warrant [1] - 96:1
watch [2] - 59:13, 59:16
watched [1] - 84:6
ways [3] - 42:23, 45:23, 87:14
weapons [1] - 38:16
wear [1] - 47:7
wearing [1] - 85:2
webinar [1] - 87:19
website [1] - 75:14
week [2] - 4:18, 92:17
weekend [1] - 4:16
weeks [2] - 25:9, 85:19

weight [1] - 93:8
welcome [1] - 4:10
Wellbutrin [1] - 40:8
WERE [1] - 108:21
whole [1] - 33:2
widely [2] - 38:23, 89:5
widely-accepted [1] - 89:5
wife [7] - 36:20, 39:8, 44:19, 54:8, 76:2, 76:25, 102:19
window [8] - 61:20, 63:14, 68:9, 68:12, 68:13, 73:25, 74:2, 104:15
Wisconsin [1] - 10:25
wishes [1] - 55:18
Wisniewski [2] - 34:19, 70:12
Witness [1] - 5:13
witness [17] - 4:11, 4:13, 5:3, 14:24, 15:2, 15:7, 28:1, 41:25, 42:3, 54:13, 54:15, 66:9, 67:16, 68:18, 70:6, 70:7, 80:8
WITNESS [9] - 5:15, 5:20, 23:14, 23:17, 32:24, 60:13, 62:3, 105:24, 106:2
witness's [2] - 71:7, 105:15
WITNESSES [1] - 3:1
witnesses [11] - 4:17, 13:8, 26:16, 30:5, 35:10, 53:18, 54:2, 54:3, 54:7, 54:17, 54:23
woman [1] - 11:19
wonderful [1] - 77:4
wondering [2] - 16:22, 50:21
word [1] - 91:22
words [1] - 81:7
workplace [1] - 6:10
workup [2] - 99:15, 100:4
world [9] - 26:8, 36:12, 82:9, 90:1, 91:22, 104:10, 104:16, 106:23, 107:11
worse [5] - 57:23, 83:14, 103:21
worsens [1] - 98:18
worst [1] - 64:13
wounded [1] - 12:16
write [6] - 14:16,

14:19, 19:4, 54:9, 54:14, 62:5
writes [1] - 54:14
writing [5] - 61:7, 63:10, 64:11, 66:20, 99:13
writings [1] - 61:21
wrote [6] - 8:15, 16:18, 24:2, 54:18, 92:19, 93:22

X

X's [1] - 105:3
X-rays [1] - 22:24

Y

yacht [1] - 76:7
Yates [1] - 11:18
year [17] - 7:12, 7:22, 8:13, 8:16, 29:5, 39:1, 58:10, 64:18, 66:23, 82:17, 91:24, 94:1, 95:7, 99:19, 100:14, 106:14
years [13] - 7:11, 7:19, 8:8, 9:4, 17:14, 30:1, 39:6, 39:18, 49:14, 52:23, 58:2, 99:8, 101:13
York [6] - 100:7, 100:10, 101:22, 101:25, 102:4, 102:8
York's [4] - 34:3, 57:1, 100:19, 102:14
young [4] - 10:24, 12:15, 13:13, 50:11
younger [1] - 36:9
yourself [2] - 15:23, 80:13
YouTube [1] - 47:23
Yudofsky [11] - 28:8, 28:11, 95:1, 95:3, 95:8, 99:16, 99:23, 100:9, 100:12, 100:23, 101:10

Z

zoom [6] - 4:15, 19:17, 20:9, 21:17, 64:5, 65:9
zooming [3] - 34:21, 65:17, 66:13