07:51:14

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF TEXAS

3                  — — —

   THE HONORABLE GEORGE C. HANKS, JR., JUDGE PRESIDING
4
   ───────────────────────────────────────────────────
   USA,                          No. 4:21-CR-00009-1
5
                    Plaintiff,
6
   vs.
7
   ROBERT T. BROCKMAN,              **ORIGINAL**
8
                    Defendant.
9  ───────────────────────────────────────────────────
        COMPETENCY HEARING -- DAY 8 AM SESSION
10
      OFFICIAL REPORTER'S TRANSCRIPT OF PROCEEDINGS
11
                  Houston, Texas
12
           WEDNESDAY, NOVEMBER 24, 2021
13 ───────────────────────────────────────────────────

14 APPEARANCES:

15 For the Plaintiff:   COREY J. SMITH, DOJ

16                      CHRISTOPHER MAGNANI, DOJ

17                      LEE F. LANGSTON, DOJ

18                      BORIS BOURGET, DOJ

19 For the Defendant:   JASON S. VARNADO, ESQ., Attorney
                        at Law
20
                        COLLEEN O'CONNOR, ESQ., ATTORNEY
21                      AT LAW

22                      JAMES P. LOONAM, ESQ., Attorney
                        at Law
23
                        KATHRYN KENEALLY, ESQ., Attorney
24                      at Law

25                      IRINA K. BLEUSTEIN, ESQ.,
                        Attorney at Law

1
For the                    n/a
2  Interpreter:

3  Reported by:          Sean Gumm, RPR, CRR
                          Official Court Reporter
4                         United States District Court
                          Southern District of Texas
5                         sean_gumm@txs.uscourts.gov

6
   Proceedings recorded by mechanical stenography.
7  Transcript produced by Reporter on computer.

10:00:05

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2          **<u>INDEX OF WITNESSES</u>**
3
4                                                    **PAGE**
5     **PETER ROMATOWSKI, (For the Defense)**
6     Cross-Examination Resumed By Mr.            9
7     Langston:
8     Redirect Examination By Mr. Loonam:         88
9
10
11
12                      --oOo--
13
14
15
16
17
18
19
20
21
22
23
24
25

|      |    |                                                        |
|------|----|--------------------------------------------------------|
|          | 1  | **WEDNESDAY, NOVEMBER 24, 2021 -- 10:19 A.M.**         |
| 10:06:55 | 2  | --oOo--                                                |
| 10:19:50 | 3  | THE COURT:  Good morning, everyone.                    |
| 10:19:59 | 4  | MR. LOONAM:  Morning, Your Honor.                      |
| 10:20:00 | 5  | THE COURT:  Mr. Langston, were you                     |
| 10:20:01 | 6  | examining the witness and you may continue.  Is        |
| 10:20:05 | 7  | there something...                                     |
| 10:20:05 | 8  | MR. LOONAM:  Very briefly.  Just to set                |
| 10:20:09 | 9  | expectations, -- you know, in light of my misguided    |
| 10:20:12 | 10 | optimism that we had the chance to finish yesterday,   |
| 10:20:17 | 11 | I indicated to the Court that, you know, this would    |
| 10:20:19 | 12 | be our last witness.  But since we're now convened     |
| 10:20:23 | 13 | and for -- you know, with the day available, we        |
| 10:20:25 | 14 | think, you know, we're going to call two additional    |
| 10:20:28 | 15 | short witnesses.                                       |
| 10:20:29 | 16 | THE COURT:  Okay.                                      |
| 10:20:30 | 17 | MR. LOONAM:  Just wanted to advise the                 |
| 10:20:32 | 18 | Court of that after Mr. Romatowski.                    |
| 10:20:34 | 19 | THE COURT:  Sure.  Have they disclosed                 |
| 10:20:36 | 20 | the witnesses to you so you guys know?                 |
| 10:20:38 | 21 | MR. COREY SMITH:  Well, we got an                      |
| 10:20:39 | 22 | e-mail after ten o'clock last night they were          |
| 10:20:43 | 23 | calling two additional witnesses, Your Honor.  So we   |
| 10:20:44 | 24 | were relying on the fact they represented to the       |
| 10:20:47 | 25 | Court this would be the last witness.                  |

| | |
|---|---|
| 10:20:48 | 1 |

THE COURT:  Yeah, the problem -- okay.

MR. VARNADO:  Can I just maybe -- point of clarification?  These are just the two witnesses we had told them on Monday night would be -- you know would be yesterday.  Same people.

THE COURT:  Right.  But then the problem is you've told them -- you didn't tell them -- the rule was by five o'clock to let them know, so they can be be prepared to go and depose these folks -- not depose, but ready to go.

MR. LOONAM:  Okay.

THE COURT:  No, I'm not -- let me think this through.  Because I want to make sure that all of the witnesses -- the Court gets all of the information that it needs to make a determination.  The problem I have is that if they weren't prepared, now instead of having a crisp, clean examination it's going to drag out because they weren't -- they've got to re-tool and get ready to take these witnesses on cross.

MR. LOONAM:  Absolutely understood.  That's a good reason for the rule.  I just want to make clear to the Court these two witnesses were on our list to testify for yesterday.  So those crisp, clean crosses should have been prepared to do these

10:21:54  1  witnesses yesterday.  The cross of the expert, to,

10:22:00  2  you know -- understandably, you know, it -- the --

10:22:03  3  the -- the examination took a longer time than I

10:22:05  4  think we anticipated, so those two witnesses didn't

10:22:08  5  get on the stand.

10:22:11  6              But, look, the rule is there for a

10:22:13  7  good reason.  If the -- the Government believes it's

10:22:16  8  not prepared to cross the two witnesses because of

10:22:19  9  the late e-mail and Your Honor's rule, we

10:22:22  10  understand.  If we have to rest, we'll rest.

10:22:24  11              THE COURT.  Who are the witnesses?

10:22:26  12              MR. LOONAM:  Ms. Keneally and

10:22:28  13  Dr. Slade.

10:22:29  14              THE COURT:  Okay.  Two fact witnesses

10:22:35  15  that arguably aren't repetitive.  I mean, Mr.

10:22:39  16  Romatowski works for the firm, but Dr. Slade -- is

10:22:42  17  it Mister -- Dr. Slade?

10:22:44  18              MR. COREY SMITH:  Dr. Slade.

10:22:45  19              MR. LANGSTON:  Dr. Slade.

10:22:48  20              THE COURT:  Let me think it through.

10:22:50  21  Because the rule is in place to make sure that we

10:22:55  22  get this done quickly and efficiently.  At the same

10:22:58  23  time, the Court wants to make sure that everyone

10:23:02  24  that needs to be heard is heard.  This is a criminal

10:23:04  25  matter.  Mr. Brockman's life and liberty is at issue

```
10:23:08   1   here.  I don't want to prevent the parties from
10:23:12   2   putting on all of the evidence they think that the
10:23:13   3   Court should consider.
10:23:15   4           MR. LOONAM:  And, Your Honor, just --
10:23:17   5   you know --
10:23:17   6           THE COURT:  -- it wasn't intentional.
10:23:19   7           MR. LOONAM:  Yeah.  So we had gotten
10:23:21   8   out and said, "Oh, goodness.  We have to send in the
10:23:24   9   list," and we did as soon as it triggered.
10:23:27  10           But I understand the -- the rule.
10:23:29  11   If the Government believes it's prejudiced we'll --
10:23:31  12   we'll -- we'll rest.
10:23:33  13           THE COURT:  Okay.  Let me hear from the
10:23:34  14   Government.
10:23:35  15           MR. COREY SMITH:  I understand of
10:23:36  16   course -- excuse me -- due process to be adhered to,
10:23:39  17   but they were prepared to rest yesterday without
10:23:41  18   calling these witnesses.  They said, "This is going
10:23:44  19   to be our last witness."
10:23:46  20           Have we prepared some?  Yes, of
10:23:48  21   course.  We were told they would be called
10:23:52  22   yesterday, but then we relied on their
10:23:54  23   representation they're not calling them, until 10:10
10:23:57  24   last night we suddenly got an e-mail, "By the way,
10:24:00  25   we're putting those two back on."
```

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
| 10:24:02 | 1  | They were prepared to rest |
| 10:24:04 | 2  | yesterday.  I think we have the right to rely on |
| 10:24:07 | 3  | that. |
| 10:24:07 | 4  | THE COURT:  Let me take it under |
| 10:24:08 | 5  | advisement.  As I said -- this is a criminal matter. |
| 10:24:13 | 6  | My primary concern -- the rules are in place for a |
| 10:24:17 | 7  | reason, but my primary concern is due process.  Let |
| 10:24:20 | 8  | me think it through, and then I'll get back to the |
| 10:24:22 | 9  | parties after this witness. |
| 10:24:24 | 10 | MR. LOONAM:  Thank you, Your Honor. |
| 10:24:25 | 11 | THE COURT:  Dr. Slade and Ms. Keneally? |
| 10:24:27 | 12 | MR. LOONAM:  Correct, Your Honor. |
| 10:24:29 | 13 | THE COURT:  Okay. |
| 10:24:30 | 14 | MR. LOONAM:  In reverse order.  We |
| 10:24:31 | 15 | would call Ms. Keneally and then Dr. Slade. |
| 10:24:34 | 16 | THE COURT:  Okay. |
| 10:24:35 | 17 | MR. COREY SMITH:  Thank you, Your |
| 10:24:36 | 18 | Honor. |
| 10:24:36 | 19 | THE COURT:  You may proceed. |
|          | 20 | **PETER ROMATOWSKI,** |
|          | 21 | **(For the Defense)** |
|          | 22 | having previously been called as a |
|          | 23 | Witness, and having already been duly and regularly |
|          | 24 | sworn, continued to testify as follows: |
|          | 25 | MR. LANGSTON:  Now I feel pressured to |

10:24:47   1   do a crisp, clean cross.

10:24:47   2           THE COURT:  We're here.  If we can't

10:24:50   3   get it done, Friday is available.  This is very

10:24:53   4   important.  As all of you know, it's as much time as

10:24:58   5   it takes.

10:24:58   6           **CROSS-EXAMINATION RESUMED**

10:25:01   7   **BY MR. LANGSTON:**

10:25:01   8   **Q.**   Good morning again, Mr. Romatowski.

10:25:03   9   **A.**   Good morning.

10:25:03   10  **Q.**   So I think when we spoke yesterday we were

10:25:07   11  speaking about how you've been off the case for a

10:25:09   12  little while?

10:25:10   13  **A.**   Well, I haven't been off the case.

10:25:13   14  **Q.**   Okay.  But you haven't met with Mr. Brockman

10:25:16   15  since February of 2020?

10:25:18   16  **A.**   Correct.

10:25:19   17  **Q.**   When was the last time you spoke to

10:25:21   18  Mr. Brockman on the phone?

10:25:22   19  **A.**   I believe that -- he and I were last together

10:25:27   20  on the phone in a group when we were conferring

10:25:31   21  about one of the pretrial conferences in this case

10:25:37   22  sometime in recent months, perhaps going back to the

10:25:39   23  summer.

10:25:40   24  **Q.**   Okay.  How about before then?

10:25:42   25  **A.**   There were several such occasions across 2021,

10:25:53  1  but a small handful -- two, three, or four times.

10:25:55  2  Q.   So two or three times since February of 2020;

10:25:58  3  is that fair?

10:26:00  4  A.   Well, going back.  I was speaking -- working

10:26:03  5  backwards across 2021.  Several more occasions --

10:26:07  6  well, actually 2020 there was activity of course

10:26:12  7  prior to the indictment.  My goodness, from memory

10:26:20  8  you know perhaps half a dozen to a dozen times, um,

10:26:23  9  after the meeting in February and all by telephone.

10:26:28  10  Q.   And that compares to earlier when I think you

10:26:31  11  said you had countless phone calls with him?

10:26:34  12  A.   Well, more than I can count sitting here today.

10:26:37  13  That's true.

10:26:38  14  Q.   And one of the reasons you stopped meeting with

10:26:41  15  him in person was the COVID pandemic?

10:26:45  16  A.   Well, that was the reason, yes.

10:26:47  17  Q.   Okay.  And since then, at least some of the

10:26:50  18  people you work with have been meeting with

10:26:52  19  Mr. Brockman in person again?

10:26:54  20  A.   Yes.

10:26:54  21  Q.   And you have not?

10:26:55  22          THE COURT:  Mr. Langston, before we go

10:26:58  23  on --

10:26:58  24              Can we just clarify,

10:27:03  25  Mr. Romatowski, when was the date that Jones Day was

10:27:05   1   engaged to represent Mr. Brockman?

10:27:07   2            THE WITNESS:  We -- Bob first called me

10:27:11   3   in late August.  I don't have the date, but there's

10:27:15   4   a record of the date.

10:27:18   5            THE COURT:  The year, I'm sorry?

10:27:20   6            THE WITNESS:  Of 2018.  And then, of

10:27:25   7   course, it was necessary before we got much detail

10:27:27   8   from him to run a conflicts check.  So first

10:27:30   9   conversations were very much -- a priority was to

10:27:33  10   get lists of entities, persons involved, and so on

10:27:37  11   so we could run a conflicts checks of that sort.  So

10:27:39  12   there is a process that has to run its course before

10:27:45  13   we're formally engaged.

10:27:48  14            So we were formally engaged

10:27:50  15   sometime in the month of September is the best I can

10:27:53  16   do.

10:27:53  17            THE COURT:  Oh, no problem.  Really

10:27:55  18   quickly, as part of that conflicts check you want to

10:27:57  19   find out if there was anyone or any companies that

10:28:01  20   Mr. Brockman was involved in litigation with; right?

10:28:05  21            THE WITNESS:  Well, it's broader than

10:28:06  22   that, Your Honor.  It's -- you know, Jones Day is a

10:28:09  23   large firm.  The question was do -- have we ever had

10:28:14  24   any relationship with any person or entity that

10:28:19  25   might come up in this case, whether the prior

10:28:22  1  relationship was with somebody as a client or

10:28:26  2  adverse to somebody in litigation, or opposite them

10:28:30  3  in a corporate transaction -- all of those are

10:28:34  4  considered.

10:28:34  5           Like every law firm, we have an

10:28:36  6  elaborate database that records that sort of

10:28:41  7  information historically.  The checks are run

10:28:45  8  against that.

10:28:46  9           THE COURT:  Okay.  I'm sorry.

10:28:48  10          MR. LANGSTON:  No problem.

10:28:49  11  Q.   Where did you get the information to run those

10:28:51  12  checks?

10:28:54  13  A.   From Mr. Brockman and from -- and based on

10:28:59  14  information from him, we did inquiries of our own to

10:29:03  15  try to gather all of the names we thought might be

10:29:06  16  -- might be useful to check.

10:29:08  17  Q.   So it's fair to say that at least in September

10:29:10  18  of 2018, you were able to get information from

10:29:13  19  Mr. Brockman?

10:29:14  20  A.   Oh, yes.  We -- we got some of the threshold.

10:29:19  21  We gathered more on our own.  There came a time that

10:29:24  22  we got -- we -- we learned of the search of Carlos

10:29:28  23  Kepke's premises.  We heard a list of names that

10:29:35  24  were the subject of that search warrant.  I don't

10:29:40  25  know that we ever -- that we saw -- I don't remember

| | | |
|---|---|---|
| 10:29:42 | 1 | when it was we finally saw the documents themselves, |
| 10:29:44 | 2 | but we learned of names that had been included -- |
| 10:29:49 | 3 | cited in the Kepke search warrant.  We ran all of |
| 10:29:52 | 4 | those, of course. |
| 10:29:53 | 5 | So it was a process.  And even |
| 10:29:55 | 6 | after we had been formally engaged, as new names |
| 10:30:00 | 7 | came up -- um, for a period of time we would run |
| 10:30:03 | 8 | those as well just to make sure we hadn't missed |
| 10:30:06 | 9 | something because we hadn't been aware. |
| 10:30:08 | 10 | THE COURT:  Can I?  I'm sorry. |
| 10:30:09 | 11 | MR. LANGSTON:  No, of course, Your |
| 10:30:10 | 12 | Honor. |
| 10:30:10 | 13 | THE COURT:  And as part of the process, |
| 10:30:12 | 14 | did you run any names connected with the antitrust |
| 10:30:16 | 15 | litigation that Mr. Brockman's company was involved |
| 10:30:17 | 16 | in or that Mr. Brockman was going to testify in? |
| 10:30:20 | 17 | THE WITNESS:  I don't think so.  I |
| 10:30:21 | 18 | don't remember that we did, and I doubt that we did. |
| 10:30:23 | 19 | I don't remember when I first learned of the |
| 10:30:28 | 20 | antitrust litigation, but I believe it was some |
| 10:30:30 | 21 | months into the representation. |
| 10:30:37 | 22 | MR. LANGSTON: |
| 10:30:37 | 23 | Q.   And I think you said you at some point learned |
| 10:30:39 | 24 | of the Kepke search warrant, but the Kepke search |
| 10:30:43 | 25 | warrant was prior to when you began working with |

10:30:45   1   Mr. Brockman?

10:30:46   2   A.   That's what I learned, yes.

10:30:46   3   Q.   I think you talked a little bit about the

10:30:49   4   5.5 million documents involved in this case?

10:30:52   5   A.   Well, what I understand is the electronic

10:30:54   6   production is the equivalent of an estimated

10:30:58   7   5.5 million pages.  I think the document estimate I

10:31:03   8   got was something -- was, I believe, 1.3 million

10:31:07   9   documents.

10:31:07   10   Q.   Okay.  And have you been reviewing those

10:31:09   11   documents?

10:31:11   12   A.   Well, I've seen some of them.  The process of

10:31:18   13   systematic review of all that material blessedly

10:31:21   14   falls to a very capable army of other lawyers.

10:31:23   15   Q.   Sure.  Have you reviewed any of those documents

10:31:26   16   with Mr. Brockman?

10:31:27   17   A.   Yes.

10:31:33   18   Q.   What is Don Jone's name on the encrypted e-mail

10:31:36   19   system?

10:31:36   20   A.   I don't remember.

10:31:37   21   Q.   What is the name of the encrypted e-mail system

10:31:41   22   from 2015 to 2018?

10:31:43   23   A.   I don't remember.

10:31:44   24   Q.   Have you reviewed any of the documents

10:31:46   25   associated with that encrypted e-mail system?

10:31:49  1   A.   I -- I've seen -- well, you called it the

10:31:53  2   encrypted e-mail system.  I've seen documents that

10:31:57  3   on their face come from an e-mail system that have

10:32:00  4   been produced in this case, yes.

10:32:01  5   Q.   And that's the hannah.com e-mail system?

10:32:06  6   A.   Well, that domain name -- if that's the right

10:32:10  7   expression for hannah.com -- is familiar to me.  I'm

10:32:14  8   aware of it, so I likely have seen documents that

10:32:16  9   reflect that domain.

10:32:19  10  Q.   Okay.  I think you testified yesterday that one

10:32:22  11  of the reasons you didn't attend the hearing was

10:32:24  12  because you were going to be listed as a witness --

10:32:26  13  you had been listed as a witness in this case?

10:32:29  14  A.   Right.

10:32:29  15  Q.   And it's fair to say that there'd been sort of

10:32:32  16  a large witness list for the September hearing, is

10:32:35  17  that fair?

10:32:36  18  A.   Well, I believe -- there was a large witness

10:32:39  19  list so as to provide notice of anyone that might be

10:32:42  20  called, so as not to catch anyone by surprise.  And

10:32:47  21  that as preparation proceeded, that list shrank down

10:32:53  22  to a smaller number.

10:32:55  23  Q.   It's fair to say at least as of November 8,

10:32:59  24  2021, you had dropped off the list is that fair?

10:33:02  25  A.   I don't know.

10:33:10   1   Q.   Show the witness marked as 174 for

10:33:13   2   identification.

10:33:13   3            THE COURT:  Okay.

10:33:15   4            MR. LANGSTON:

10:33:15   5   Q.   Actually, before I show it to the witness, were

10:33:18   6   you involved in the -- sort of decisions as to who

10:33:21   7   would be called as a witness in this case?

10:33:24   8   A.   I was -- well, want to be careful here because

10:33:28   9   there's work product protection in our

10:33:33  10   deliberations.  But suffice it to say, yes, I've

10:33:36  11   been involved in strategy discussions about the case

10:33:40  12   at large, and about the conduct of this hearing as

10:33:44  13   well, throughout.

10:33:47  14   Q.   Okay.  So you are aware of who -- where the

10:33:49  15   discussion was going, in terms of who was called as

10:33:52  16   a witness?

10:33:54  17   A.   Well, where the discussion was going -- that

10:33:57  18   implies a trend, I suppose.  I was aware of the

10:33:59  19   discussions.  I was aware that, as is commonplace in

10:34:04  20   litigation, we started with a larger list and

10:34:07  21   gradually -- especially in view of the time set

10:34:10  22   aside for the hearing and limits of time, that got

10:34:14  23   narrowed down.

10:34:18  24            Some people dropped off.  I think

10:34:20  25   perhaps some others were added on to get to the

| | |
|---|---|
| 10:34:22 | 1 |
| 10:34:24 | 2 |

smaller lists that appeared here this -- these past
two weeks.

Q.   Okay.  Were you involved in -- well, I'll put
174 on the screen.

MR. LOONAM:  Your Honor, this is not an
objection.  It's just, um, I asked -- we're not
waiving work product protection in any broad way.
So I ask us to be mindful to see if we can do this
in a way that doesn't waive work product or specific
attorney-client privilege communications.

MR. LANGSTON:  Okay.

THE COURT:  The witness shouldn't
answer if it's privileged.

MR. LANGSTON:

Q.   Okay.  I'll hand the witness a copy of 174.
May I approach?

THE COURT:  Sure.  If it's
attorney-client privilege, then you shouldn't have
it.  So obviously not privileged, so...

MR. LOONAM:  That's right.  But -- but
-- but -- so absolutely if he has it, it's not
privileged, and it's not work product if he has it.
But this sort of -- discussions leading up to --

THE COURT:  Right.

MR. LOONAM:  -- what went out, that's a

| | | |
|---|---|---|
| 10:35:22 | 1 | different story. |
| 10:35:22 | 2 | THE COURT:  Definitely. |
| 10:35:24 | 3 | MR. LANGSTON: |
| 10:35:24 | 4 | Q.   Have you seen this before? |
| 10:35:28 | 5 | A.   I don't know if I have before or not. |
| 10:35:30 | 6 | Q.   And this is an e-mail -- |
| 10:35:31 | 7 | A.   I can't remember. |
| 10:35:32 | 8 | Q.   -- this is an e-mail from Ms. Keneally to the |
| 10:35:37 | 9 | Government on November 8, 2021? |
| 10:35:39 | 10 | A.   Yes, I see that. |
| 10:35:40 | 11 | Q.   You are not on the list of many, many people |
| 10:35:42 | 12 | copied on this, are you? |
| 10:35:43 | 13 | A.   Correct. |
| 10:35:44 | 14 | Q.   You see the fact witnesses? |
| 10:35:47 | 15 | A.   Yes. |
| 10:35:47 | 16 | Q.   And you are not one of the fact witnesses |
| 10:35:50 | 17 | listed; is that fair? |
| 10:35:52 | 18 | A.   Correct. |
| 10:35:53 | 19 | Q.   At least as of November 8th, you were not going |
| 10:35:55 | 20 | to be a witness in this case? |
| 10:35:56 | 21 | A.   That's what's reflected here. |
| 10:36:00 | 22 | Q.   I'm asking, at least as of November 8th, were |
| 10:36:02 | 23 | you told you might have to be a witness in this |
| 10:36:04 | 24 | case? |
| 10:36:04 | 25 | A.   I can't remember.  There were discussions about |

10:36:08   1   whether or not I should testify, whether --

10:36:10   2                MR. LOONAM:  Objection.

10:36:12   3                MR. LANGSTON:  I think the witness said

10:36:13   4   he can't remember, and I'm happy to take that

10:36:15   5   answer.

10:36:16   6                THE COURT:  Yeah, we don't want to talk

10:36:17   7   about discussions.  I know that you want to, but I

10:36:19   8   think that might push us a little too close.

10:36:22   9                THE WITNESS:  That's right, Your Honor.

10:36:23   10  Thank you.

10:36:25   11               MR. LANGSTON:

10:36:25   12  Q.   All right.  So I think you discussed sort of at

10:36:32   13  length yesterday that you don't believe Mr. Brockman

10:36:34   14  is competent to assist in this case?

10:36:37   15  A.   Correct.

10:36:38   16  Q.   So one of the things I want to explore is, you

10:36:41   17  know, sort of when did you come to that decision?

10:36:45   18  A.   It was a gradual process.  The difficulties --

10:36:54   19  my experience of the difficulties of his assisting

10:36:59   20  in the manner typical of clients and witnesses in a

10:37:05   21  document case.  We began to -- I began to notice

10:37:12   22  that in probably fourth quarter of 2018.

10:37:16   23               That problem increased across the

10:37:22   24  first half of 2019.  And we were not getting the

10:37:31   25  assistance from the client, as I say, that's

10:37:33    1    typical.   Then there was the July meeting that I

10:37:36    2    described yesterday.   And that input from the

10:37:44    3    doctors and the information about his medical

10:37:47    4    condition added to those concerns.

10:37:54    5              We researched the question of legal

10:37:57    6    competency, considered how the experience that we

10:38:03    7    had, the medical information we had bore on the

10:38:10    8    question of his competence or not.   There came a

10:38:17    9    point we described yesterday where we engaged the

10:38:19   10    family to help us in support of Bob and to help him,

10:38:23   11    and we came to a decision that we needed to gather

10:38:25   12    more information on that question.

10:38:29   13              And it was not until we had

10:38:32   14    gathered that additional information I believe -- I

10:38:39   15    would say that I came to a formal, legal conclusion

10:38:45   16    that in -- late -- late 2019 or in the first quarter

10:38:52   17    of 2020 -- I'm trying to make sure I keep my years

10:38:57   18    straight here, but I believe that's the sequence.

10:39:00   19    Then I came to the conclusion that, no, he simply

10:39:02   20    couldn't understand the charges and he couldn't

10:39:04   21    assist counsel in a manner that is required.

10:39:07   22    Q.   So you are saying late 2019, early 2020?

10:39:11   23    A.   Yes.

10:39:11   24    Q.   Okay.   And obviously you may be more learned on

10:39:17   25    this than anyone else as to the legal conclusion,

10:39:19  1  and that you wouldn't want to reach the legal

10:39:21  2  conclusion prior to doing research, but prior to

10:39:24  3  doing all of that research had you sort of made a

10:39:26  4  factual sense, "I'm not sure this guy is going to be

10:39:29  5  able to help me the way I need"?

10:39:30  6  **A.**   Yes, that had been the experience for sure.

10:39:33  7  **Q.**   Is it fair to say you had that experience by

10:39:35  8  that sort of July 2019 meeting?

10:39:38  9  **A.**   Yes.

10:39:38  10  **Q.**   Okay.  And so, by July -- at least of 2019 --

10:39:44  11  you had concerns that he might not be able; is that

10:39:49  12  fair?

10:39:49  13  **A.**   Yes.

10:39:49  14  **Q.**   You said when he presented you with that

10:39:53  15  finding, told you that he had dementia; is that

10:39:56  16  right?

10:39:56  17  **A.**   That's the way I remember.  I have to be

10:39:58  18  careful, um, because I'm not 100 percent positive.

10:40:02  19  But I -- what I recall is that he mentioned the two

10:40:06  20  diagnoses, that he had Parkinson's and that he had

10:40:09  21  dementia.

10:40:09  22  **Q.**   And you said -- I think you said a light bulb

10:40:14  23  went off?

10:40:14  24  **A.**   Well, it was a surprise.  And immediately what

10:40:17  25  had triggered for me was a recognition and partial

10:40:21   1   explanation, perhaps, of the difficulties that we've

10:40:23   2   had.  That's what I characterized as a light bulb

10:40:26   3   going on.

10:40:27   4   Q.   So that meeting happened on July 18, 2019; is

10:40:30   5   that fair?

10:40:31   6   A.   That sounds like the right date.

10:40:32   7   Q.   Okay.  So fair to say that sort of on or about

10:40:35   8   that date you had the sense that you didn't think he

10:40:37   9   was going to be able to help you the way you needed?

10:40:40   10   A.   He had not -- by that -- to the point he had

10:40:43   11   not been able to help in the way that we needed.

10:40:45   12   Q.   Okay.  You have a lot of previous experience;

10:40:49   13   is that fair?

10:40:50   14   A.   Yes.

10:40:51   15   Q.   I think you said you have engaged with hundreds

10:40:53   16   of witnesses?

10:40:54   17   A.   Oh, yes.

10:40:54   18   Q.   Probably dozens of clients?

10:40:56   19   A.   Oh, goodness.  Yes.

10:40:58   20   Q.   And some clients are better than others; is

10:41:01   21   that fair?

10:41:01   22   A.   Well, better.  Better of what --

10:41:05   23   Q.   As with everything else in human performance,

10:41:08   24   there's sort of a bell curve; right?  Some clients

10:41:11   25   are better assisting than others --

10:41:13   1   **A.**   Yes.

10:41:13   2   **Q.**   -- is that fair?   Okay.   And because someone

10:41:15   3   isn't on the better side, that doesn't mean they're

10:41:17   4   not competent to assist, that just means they can't

10:41:20   5   provide quite as much assistance; is that fair?

10:41:23   6   **A.**   Yes.

10:41:24   7   **Q.**   Do you ever have a witness lie to you?

10:41:26   8   **A.**   Yes.

10:41:28   9   **Q.**   Do you ever have a client lie to you?

10:41:29   10   **A.**   Yes.

10:41:30   11   **Q.**   Do you ever have a witness lie to you while

10:41:33   12   sitting next to their attorney?

10:41:34   13   **A.**   Did I -- certainly as a prosecutor I did, yes.

10:41:41   14   **Q.**   So it's fair to say you can't always take a

10:41:44   15   person at their word?

10:41:46   16   **A.**   Well, you have to suspend belief, is my

10:41:50   17   expression for that.   Lots of information that you

10:41:56   18   gather you simply can't accept uncritically.

10:41:58   19   **Q.**   Okay.   And I think you said you've worked as a

10:42:01   20   prosecutor and you've worked as a defense attorney?

10:42:03   21   **A.**   Yes.

10:42:03   22   **Q.**   It's fair to say there's a different role when

10:42:05   23   you are working as a prosecutor than when you are as

10:42:07   24   a defense attorney?

10:42:08   25   **A.**   By all means, yes.

Q.   You may have to look at things with a more
critical eye as a prosecutor than if you are an
advocate for a client; is that fair?

A.   You say -- I think -- I don't -- you need to be
equally critical in considering the corroboration
and reliability of the information that you are
getting, whether you are a prosecutor or defense
lawyer.

Q.   Have you -- sorry?

A.   That's -- I hope that's responsive to your
question.

Q.   Sure.  Have you ever had a client feign an
illness?

A.   Not that I recall.

Q.   Okay.  And so, it's fair to say that you don't
have any experience in sort of trying to detect
whether someone's feigning an illness with you; is
that fair?

A.   I think that's right.

Q.   Okay.  I want to talk a little more about that
July 18th meeting.  Mr. Brockman is the person that
presented the binder; is that fair?

A.   Yes.

Q.   He's the one that kind of initiated the
discussion of his health; is that fair?

10:43:18   1   **A.**   Yes.

10:43:18   2   **Q.**   It wasn't based on what you had noticed?   You

10:43:21   3   didn't ask him to go get tested; did you?

10:43:23   4   **A.**   No.

10:43:23   5   **Q.**   And you didn't ask him to reach out to a

10:43:27   6   doctor; did you?

10:43:28   7   **A.**   No.

10:43:28   8   **Q.**   It wasn't his wife that kind of took you aside

10:43:30   9   and said, you know, "There might be a concern here"?

10:43:34   10   **A.**   No.

10:43:34   11   **Q.**   There wasn't a doctor that called you and said,

10:43:37   12   "There is a concern here"?

10:43:39   13   **A.**   No.

10:43:39   14   **Q.**   And I think you said you've never seen anyone

10:43:43   15   do this before in your career; is that right?

10:43:46   16   **A.**   Right.

10:43:47   17   **Q.**   That thing that you've never seen them do is

10:43:49   18   come to a meeting with a binder of materials about

10:43:52   19   their health; is that fair?

10:43:53   20   **A.**   That's one of the unique things about this

10:43:56   21   case, yeah.   That was a unique experience.

10:43:57   22   **Q.**   All right.   You said you get this binder and so

10:44:01   23   -- you know, you said you have to look critically at

10:44:04   24   it, so you wanted to check it out; is that fair?

10:44:07   25   **A.**   Yes.

10:44:07   1   Q.   And it took a little while, but eventually you

10:44:12   2   obtained the reports from his treating physicians?

10:44:14   3   A.   Ms. Keneally did, yes.

10:44:16   4   Q.   Okay.  And I think you testified yesterday that

10:44:19   5   those were clinical evaluations, and so you wanted

10:44:22   6   to make sure that -- well, what you obtained were

10:44:25   7   clinical evaluations; that's fair?

10:44:27   8   A.   Well, I guess so.  I'm a layperson, not a

10:44:32   9   medical person, so I'm not quite sure -- to me they

10:44:35   10  were reports of his treating physicians.

10:44:36   11  Q.   Okay.  And so, you thought it was important to

10:44:39   12  go out and get another exam done?

10:44:43   13  A.   Well, we -- we examined the legal standards for

10:44:47   14  competency and compared what we had with what we

10:44:54   15  learned would be required in order to inform a

10:44:58   16  decision legally as to competency, and we concluded

10:45:02   17  that we needed to supplement what we had in hand.

10:45:05   18  Q.   Okay.  Did you seek an independent forensic

10:45:10   19  expert?

10:45:10   20  A.   I did not, no.

10:45:11   21  Q.   Did anyone on your team, prior to the end of

10:45:15   22  2019, seek out an independent forensic expert?

10:45:19   23  A.   Prior to the end of 2019?  Not that I know of

10:45:23   24  or remember.  I don't think that happened.

10:45:25   25  Q.   In fact, you asked one of Mr. Brockman's

10:45:27  1   treating physicians to do a forensic exam; is that

10:45:31  2   fair?

10:45:31  3   **A.**   Yes.

10:45:32  4   **Q.**   That was Dr. York?

10:45:35  5   **A.**   Once again, I defer to Ms. Keneally about that,

10:45:38  6   because she handled the details of the doctors.

10:45:40  7   But, yes, I believe that's what happened.

10:45:41  8   **Q.**   So you weren't involved in the selection of

10:45:43  9   Dr. York to do a forensic exam?

10:45:46  10  **A.**   Well, I -- I know I was aware at the time of

10:45:50  11  our progress and what we planned to do, because

10:45:54  12  Kathy Keneally and I were in daily communication.

10:45:58  13  **Q.**   So you were aware Dr. York was one of

10:46:01  14  Mr. Brockman's treating physicians?

10:46:03  15  **A.**   Yes.

10:46:04  16  **Q.**   You talked a little bit yesterday about

10:46:10  17  Mrs. Brockman and the son; is that right?

10:46:13  18  **A.**   Right.

10:46:14  19  **Q.**   You said -- you actually had them get

10:46:16  20  additional counseling?

10:46:17  21  **A.**   Yes, because I recognized as things were

10:46:22  22  progressing in this investigation that it likely

10:46:29  23  could raise questions that affected their legal

10:46:31  24  interests -- their personal legal interests,

10:46:33  25  separate from Mr. Brockman.

10:46:33  1    Q.    And so, separate from Mr. Brockman they had a

10:46:39  2    stake in the outcome of this case; is that fair?

10:46:42  3    A.    Well, I'm not sure it extends that far.    They

10:46:45  4    had legal interests that were potentially affected,

10:46:50  5    depending on what course the investigation took.

10:46:52  6    Q.    And -- and one of those legal interests was

10:46:56  7    their inheritance in this trust?

10:46:59  8    A.    Well, I don't know that.    Um, but I do know --

10:47:03  9    Mrs. Brockman is a discretionary beneficiary of the

10:47:07  10   trust, I believe.    I can't remember what the son's

10:47:09  11   interest is or not in those respects.    But

10:47:15  12   nevertheless, in as complex a situation like this we

10:47:18  13   did recognize that -- in various ways they did have

10:47:22  14   legal interests that could be affected.

10:47:23  15   Q.    Okay.    Some of those interests were financial

10:47:28  16   interests?

10:47:28  17   A.    Yes.

10:47:29  18   Q.    All right.    So by July, 2019, you had -- at

10:47:32  19   least in your mind -- this belief that he couldn't

10:47:34  20   help you; that's fair?

10:47:35  21   A.    That he -- that he couldn't -- well, that he

10:47:41  22   had been unable to assist in a manner I found

10:47:44  23   dispensable and commonplace with every other client

10:47:51  24   represented.

10:47:52  25   Q.    He was different from any other client you

10:47:54   1   represented?

10:47:54   2   A.   Yes.

10:47:54   3   Q.   And I'm sure all of your clients are unique

10:47:57   4   flowers; right?  But he was different in that he was

10:48:00   5   unable to assist unlike every other client that

10:48:03   6   you've had; that's fair?

10:48:04   7   A.   Yeah.

10:48:06   8   Q.   And you were aware, at that point in July of

10:48:07   9   2019, that he had dementia or had been diagnosed

10:48:10   10  with dementia?

10:48:11   11  A.   Yes.

10:48:11   12  Q.   Okay.  Were you aware he was scheduled to give

10:48:13   13  a deposition in September of 2019?

10:48:17   14  A.   I was aware at about the time of those

10:48:24   15  depositions -- I couldn't tell you what dates they

10:48:26   16  were.

10:48:27   17  Q.   Sure.

10:48:27   18  A.   But we -- we were generally aware that counsel

10:48:34   19  was engaging -- that he was a witness in such case,

10:48:38   20  and Reynolds's counsel was preparing him to testify.

10:48:41   21  Q.   Okay.  And it's fair to say that one of the

10:48:43   22  reasons you were kept in the loop is that any time

10:48:45   23  the subject of a criminal investigation is about to

10:48:47   24  give sworn testimony, that's a cause for concern for

10:48:51   25  his criminal attorneys; is that fair?

10:48:53   1   **A.**   Yes.

10:48:53   2   **Q.**   Because even though it's a civil case, it could

10:48:56   3   -- there could be admissions that could impact the

10:48:59   4   criminal case?

10:49:00   5   **A.**   Well, it's a concern.  Whether -- whether we

10:49:06   6   thought there was a risk of admissions, I don't

10:49:09   7   remember considering there would be a risk of

10:49:11   8   admissions, but we wanted to keep -- certainly we

10:49:16   9   wanted to keep abreast of any other legal matters

10:49:19   10   that he was involved in.  We didn't participate in

10:49:22   11   his preparation or in Reynolds's counsels'

10:49:30   12   litigation of that case.  We were just informed and

10:49:32   13   kept aware, and we didn't object.

10:49:35   14   **Q.**   Okay.  All other things being equal, you

10:49:38   15   probably prefer that he not sit for the deposition

10:49:40   16   while the criminal case -- while the criminal

10:49:41   17   investigation was ongoing?

10:49:45   18   **A.**   Well, I understood enough to know that it -- it

10:49:50   19   related to Reynolds's competitor disputes.  I didn't

10:49:57   20   accept that Mr. Brockman would repeatedly describe

10:50:01   21   that to us.

10:50:01   22            We didn't see any relationship

10:50:04   23   between those activities and the matters we

10:50:07   24   understood to be under investigation.  So, frankly,

10:50:11   25   I had -- I had less concern than one might in other

10:50:15  1  circumstances about testifying in civil cases.

10:50:18  2  Q.    You are aware that one of the issues that's

10:50:23  3  come up repeatedly in the civil case is the

10:50:25  4  ownership of Reynolds and Reynolds?

10:50:27  5  A.    No, as a matter of fact I'm not aware of that.

10:50:29  6  Q.    Okay.  So did you read his deposition testimony

10:50:32  7  from January of 2019?

10:50:34  8  A.    Did I read the -- I don't believe so.

10:50:36  9  Q.    Okay.  So you are not aware that he described

10:50:42  10 the ownership kind of going all the way up to the A.

10:50:48  11 Eugene Brockman Charitable Trust?

10:50:48  12 A.    I don't know whether he did or not.  I wouldn't

10:50:50  13 dispute that he did.

10:50:51  14 Q.    It's fair to say the control and ownership of

10:50:55  15 the A. Eugene Brockman Charitable Trust is one of

10:51:00  16 the central -- one of the central disputed items in

10:51:03  17 this case?

10:51:06  18 A.    Yes.

10:51:09  19 Q.    And so, after the January deposition your

10:51:12  20 testimony is that you never sought to obtain a

10:51:14  21 transcript of that?

10:51:14  22 A.    Oh, goodness, no.  I know we got a transcript

10:51:27  23 of that deposition eventually.

10:51:28  24 Q.    So Jones Day obtained it, but you haven't read

10:51:31  25 it?

10:51:31  1   **A.**   Well, I -- there's also a videotape, and I -- I

10:51:36  2   looked months later at a part of the videotape.   I

10:51:46  3   don't remember looking at the transcript, but I

10:51:47  4   can't rule out I did.   I'm quite certain I didn't

10:51:50  5   read it through.

10:51:51  6   **Q.**   Okay.   And you would have remembered had he

10:51:53  7   talked -- had you read the section where he talks

10:51:56  8   about the A. Eugene Brockman charitable trust?

10:51:57  9   **A.**   Well, I'm not sure I would have.

10:51:59  10  **Q.**   Okay.

10:52:06  11  **Q.**   I think you said you were not involved with the

10:52:08  12  civil attorneys in preparing for the deposition?

10:52:11  13  **A.**   Right.

10:52:11  14  **Q.**   Were you involved in preparing for the January

10:52:14  15  deposition?

10:52:14  16  **A.**   No.

10:52:15  17  **Q.**   Separate and apart from your -- you know,

10:52:18  18  sitting in with Sheppard Mullin for those civil

10:52:23  19  depositions, did you prepare --

10:52:25  20            MR. LOONAM:   Objection to foundation.

10:52:26  21  I'm not sure that's the testimony.

10:52:29  22            MR. LANGSTON:   Just said --

10:52:30  23            THE COURT:   Yeah.

10:52:31  24            THE WITNESS:   We did not sit in with

10:52:33  25  Sheppard Mullin for those depositions or attend,

```
10:52:38    1   just so we're clear on the premise.  I think I
10:52:41    2   understand you, but I could have interpreted what
10:52:43    3   you said either way.
10:52:44    4              MR. LANGSTON:
10:52:44    5   Q.   I'm sorry.  We're on day eight.  I'm not sure
10:52:47    6   that I'm --
10:52:47    7              MR. LOONAM:   That's fair.
10:52:52    8              MR. LANGSTON:
10:52:52    9   Q.   You did not sit in with Sheppard Mullin for the
10:52:56   10   preparation?
10:52:56   11   A.   No.
10:52:56   12   Q.   Separate from the preparation done by Sheppard
10:52:59   13   Mullin, did you do anything to prepare Mr. Brockman
10:53:02   14   for those depositions?
10:53:03   15   A.   No.
10:53:04   16   Q.   And that's the September deposition?
10:53:06   17   A.   Right.
10:53:07   18   Q.   And the January deposition?
10:53:08   19   A.   Right.  As best I remember, we didn't do
10:53:11   20   anything to prepare him for those depositions.
10:53:12   21   Q.   Okay.  And did you have discussions with the
10:53:17   22   civil -- with the civil attorneys that these
10:53:20   23   depositions were coming up?
10:53:21   24   A.   Oh, yes, in the sense that they alerted us that
10:53:25   25   they were pending -- generally kept us abreast.
```

10:53:36   1    Q.   Did you tell the civil attorneys Mr. Brockman

10:53:38   2    had been diagnosed with dementia?

10:53:39   3    A.   No.

10:53:40   4    Q.   Why not?

10:53:41   5    A.   Because it was a confidential communication of

10:53:44   6    our client to us.  Part of of that discussion was he

10:53:50   7    wanted this closely held, did not authorize us to

10:53:54   8    disclose it elsewhere.  We respected that.

10:54:00   9    Q.   So if I understand that, Mr. Brockman told you

10:54:05   10   that he had dementia in July of 2019?

10:54:07   11   A.   As -- as -- as best I remember, he mentioned it

10:54:11   12   at the meeting and we read about that in the

10:54:12   13   reports.

10:54:12   14   Q.   Okay.  But at least between July and September

10:54:16   15   when this deposition had -- he wanted that

10:54:18   16   information closely held?

10:54:19   17   A.   Yes.

10:54:19   18   Q.   He wanted it held just within the criminal

10:54:21   19   team?

10:54:22   20   A.   Well, he told -- he told us, and asked us not

10:54:25   21   to share with others.

10:54:27   22   Q.   Okay.  And did you and the attorneys from

10:54:30   23   Sheppard Mullin have any discussion of his cognitive

10:54:33   24   abilities?

10:54:34   25   A.   I don't recall that we did.

10:54:38   1    Q.   Did they raise any concerns with you?

10:54:40   2    A.   I don't recall that they did.

10:54:42   3    Q.   Okay.  Are you aware that the Defendant was

10:54:50   4    scheduled to testify in an arbitration in 2021?

10:54:55   5    A.   That Mr. Brockman was?

10:54:57   6    Q.   Yeah.

10:54:59   7    A.   Scheduled to testify -- I can't say that I

10:55:01   8    remember that.  I remember there was an arbitration

10:55:04   9    where his testimony was sought --

10:55:05   10   Q.   And, in fact --

10:55:06   11   A.   -- but I don't know it ever actually got

10:55:09   12   scheduled.

10:55:09   13   Q.   In fact, it was ordered by the arbitrator that

10:55:12   14   he sit for a deposition --

10:55:14   15   A.   Well, I -- I don't remember that, but I'll

10:55:16   16   accept it if that's --

10:55:17   17   Q.   -- okay.  And Jones Day actually blocked him

10:55:20   18   from testifying?

10:55:21   19   A.   Well, we objected to that -- to that

10:55:24   20   deposition.  We didn't think it was authorized by

10:55:26   21   law, and that they weren't entitled to get it.

10:55:30   22   Q.   And despite the arbitrator ordering him -- the

10:55:33   23   arbitrator overruled your objection?

10:55:35   24   A.   I don't remember the disposition of that, nor

10:55:39   25   whether the arbitrator had jurisdiction over us to

1  order one way or another.

2  Q.   Well, setting aside your belief as to the

3  arbitrator's jurisdiction, do you remember whether

4  the arbitrator ordered him to sit for the

5  deposition?

6  A.   I don't remember.

7  Q.   Okay.  And you don't remember whether Jones Day

8  blocked it in part because of his health?

9  A.   I know we -- we objected to that -- to such a

10  deposition.  What the steps were and how those

11  objections were expressed -- I just don't remember.

12  Q.   I think one of the concerns you had was that

13  Mr. Brockman was consistently unable to review and

14  evaluate documents; is that fair?

15  A.   Right.  Right.  Especially -- and this -- this

16  was a problem that progressed and got worse, so

17  especially by -- you know, as -- as time advanced

18  that was -- that was the case.

19  Q.   Okay.  But -- but by July of 2019, that was

20  already an issue; is that fair?

21  A.   Yes.  Yes.

22  Q.   And I'm going to show you what I'll mark -- or

23  what is already marked as 115.  I'll hand the

24  witness a copy of 115.  This is an e-mail from

25  Mr. Brockman to his accountant, Don Passmore in

10:57:20  1    October of 2018; is that fair?

10:57:22  2    **A.**    The top page of this string of this, yes.

10:57:25  3    **Q.**    And Mr. Brockman is discussing the history of

10:57:29  4    his investment in something called, "the GOOSE

10:57:32  5    group"?

10:57:33  6    **A.**    Well, would you like me to pause to read it?

10:57:35  7    **Q.**    Sure.  Go ahead.

10:58:02  8    **A.**    Okay.  I've read it, yes.

10:58:06  9    **Q.**    Okay.  To be fair, you haven't seen this e-mail

10:58:09  10   before today?

10:58:09  11   **A.**    I don't believe I've ever seen this.

10:58:11  12   **Q.**    Okay.  Was this -- is this e-mail consistent

10:58:13  13   with your experience of Mr. Brockman in October of

10:58:16  14   2019?

10:58:19  15   **A.**    I -- I'm struggling with consistent.  I don't

10:58:24  16   think I have an opinion as to whether it was

10:58:27  17   consistent or inconsistent.

10:58:27  18   **Q.**    All right.  I think you were saying

10:58:31  19   Mr. Brockman was struggling to recall information;

10:58:33  20   is that fair?

10:58:34  21   **A.**    Yes, that was a part of it.

10:58:36  22   **Q.**    And he had difficulty with sort of task

10:58:39  23   initiation?  He was a little apathetic in the -- in

10:58:43  24   your representation of him?

10:58:45  25   **A.**    Apathetic?  Task initiation?  Over time, he

| | | |
|---|---|---|
| 10:58:51 | 1 | became more and more week physically and would tire |
| 10:58:59 | 2 | over the course of the day. |
| 10:59:01 | 3 | Q.   And he sort of would fall back on generalities |
| 10:59:05 | 4 | I think you said? |
| 10:59:05 | 5 | A.   Yes. |
| 10:59:06 | 6 | Q.   And had difficulty offering specifics? |
| 10:59:08 | 7 | A.   Yes. |
| 10:59:10 | 8 | Q.   Guess what I'm asking is this e-mail consistent |
| 10:59:13 | 9 | with -- with those things -- things that you |
| 10:59:15 | 10 | testified to? |
| 10:59:16 | 11 | A.   Well, I have a hard time saying consistent or |
| 10:59:24 | 12 | inconsistent.  There are details in here, to be |
| 10:59:26 | 13 | sure.  We did -- I had not heard the Jones School |
| 10:59:30 | 14 | Business Plan Competition, or GOOSE, or this |
| 10:59:34 | 15 | activity, so this is unfamiliar to me. |
| 10:59:36 | 16 | Q.   Okay. |
| 10:59:37 | 17 |         MR. LANGSTON:  I'll offer 115. |
| 10:59:39 | 18 |         MR. LOONAM:  No objection. |
| 10:59:40 | 19 |         THE COURT:  Okay.  Without objection, |
| 10:59:41 | 20 | 115 is admitted. |
| 10:59:43 | 21 |         MR. LANGSTON: |
| 10:59:43 | 22 | Q.   I'm going to show the witness what's in |
| 10:59:54 | 23 | evidence as Government's Exhibit 69.  This is an |
| 11:00:17 | 24 | e-mail from Mr. Brockman to a number of executives |
| 11:00:19 | 25 | at Reynolds and Reynolds in May of 2020? |

11:00:23    1    **A.**   On its face that's what it is, yes.

11:00:26    2    **Q.**   Okay.   And you can go ahead and read this.

11:00:31    3    Then my question for you is going to be the same.

11:00:34    4    Was that consistent with your experience of

11:00:36    5    Mr. Brockman in May of 2020?

11:00:44    6    **A.**   This -- this is consistent in one important

11:01:09    7    sense.   Mr. Brockman had at his fingerprints, and

11:01:15    8    would often divert conversations of ours into

11:01:18    9    Reynolds and Reynolds's operations to describe the

11:01:23   10    products, to describe marketing and customer

11:01:27   11    relations, sales.

11:01:30   12                Um, he -- he was very adept and

11:01:35   13    knowledgeable about Reynolds and Reynolds's

11:01:38   14    operations, and that's what I -- how I would

11:01:40   15    characterize what we have here.   He's talking about

11:01:43   16    the profitability or unprofitability of a particular

11:01:50   17    product it seems.

11:01:50   18    **Q.**   Okay.   And -- and let's clarify for a second.

11:01:53   19    I think you said he's very adept at discussing

11:01:56   20    Reynolds and Reynolds's business?

11:01:57   21    **A.**   Yes.

11:01:58   22    **Q.**   And his ownership of the company has gone back

11:02:02   23    40 years?

11:02:02   24    **A.**   Well, the -- the trust through a chain of

11:02:05   25    entities --

11:02:05  1   Q.   Ownership is a tricky word.  His involvement in

11:02:09  2   the company has gone back 40 years?

11:02:11  3   A.   Yes.

11:02:11  4   Q.   And --

11:02:12  5   A.   And Reynolds and predecessor companies, yes.

11:02:15  6   Q.   Okay.  And he could give you a history going

11:02:18  7   back to the day he founded it in his garage; right?

11:02:21  8   A.   I think it was on the living room sofa.

11:02:23  9   Q.   Okay.  So going back to the living room sofa,

11:02:25  10  he can give you the history of going all the way

11:02:28  11  back to that day?

11:02:29  12           MR. LOONAM:  Objection, insofar as

11:02:31  13  requesting a time frame.

11:02:32  14           MR. LANGSTON:  I think that's what

11:02:33  15  we're doing right now.

11:02:34  16           THE COURT:  I think he wants a

11:02:35  17  timeframe as when does he think that he could do

11:02:37  18  that.

11:02:37  19           MR. LANGSTON:  Oh, I got you.

11:02:39  20           THE COURT:  I mean, you are saying he

11:02:40  21  could do that.  Can he do it now?  Can he -- at what

11:02:43  22  point in time I think is what Mr. Loonam is saying.

11:02:47  23           MR. LANGSTON:

11:02:48  24  Q.   Okay.  Let's go to February of 2020, which is

11:02:49  25  the last time that you met with him?

11:02:51   1    **A.**   Yes.

11:02:51   2    **Q.**   In February of 2020, was he able to give you

11:02:53   3    the history of Reynolds and Reynolds?

11:02:55   4    **A.**   Well, as I said, the history -- he would give

11:02:57   5    us and repeat colorful anecdotes that described

11:03:03   6    milestones in the history of the company, you know.

11:03:06   7    And he would do that and often would repeat those

11:03:09   8    anecdotes.

11:03:10   9                I can't remember that we heard it

11:03:12   10   again in February of 2020, but, yes.  Throughout we

11:03:17   11   -- he could, um, explain that colorful history in

11:03:23   12   anecdotal terms.

11:03:24   13   **Q.**   Okay.  I think that there's been a lot of -- a

11:03:28   14   lot of medical discussion you've been lucky enough

11:03:30   15   not to have to sit through about the difference sort

11:03:35   16   of between short-term memory and sort of long-term

11:03:39   17   memory.

11:03:39   18   **A.**   I'll accept that.  I didn't hear it.

11:03:41   19   **Q.**   Okay.  So the question I want to ask you is

11:03:43   20   these discussions that you would have with him about

11:03:46   21   Reynolds and Reynolds -- and again, we'll take this

11:03:48   22   up until February of 2020 -- was he able to discuss

11:03:52   23   recent events that had occurred at Reynolds and

11:03:58   24   Reynolds?

11:03:58   25   **A.**   Well, we certainly heard a lot about the CDK

1   competitive dispute.   I don't know how recent or
2   remote in time that was.
3   Q.   Well the antitrust matter was ongoing at late
4   as of the deposition of September of 2019; right?
5   A.   So I see, yes.
6   Q.   Okay.
7   A.   But the underlying dispute, I don't know quite
8   when that happened, but we heard a lot about that.
9   Q.   But he was still the CEO in February of 2020;
10  is that fair?
11  A.   I believe that's right.
12  Q.   Okay.   Was he able to discuss with you things
13  that were happening that month at Reynolds and
14  Reynolds?
15  A.   I can't recall the February meetings in
16  sufficient detail to remember whether or not we
17  heard about Reynolds's business in February of 2020.
18  Q.   Okay.   So in February of 2020, you can't
19  remember whether he was able to discuss recent
20  events; is that fair?
21  A.   Whether he was able -- I don't remember whether
22  we did or did not.   I don't remember the specific
23  discussions in February.
24  Q.   How about in any of your meetings prior to
25  February of 2020?

11:04:55  1   A.   Okay.  Prior meetings and -- the question is

11:04:58  2   what?

11:04:58  3   Q.   The question is could he discuss events that

11:05:00  4   happened that month or were -- the discussions about

11:05:03  5   Reynolds's things that happened far in the past?

11:05:09  6   A.   I have to think about that.  Sometimes we heard

11:05:17  7   -- it was difficult to understand whether or not you

11:05:19  8   were hearing about something that was current,

11:05:23  9   because it wasn't tied to a timeframe.  We'd hear

11:05:29  10  about sales, and sales technique, and auto dealers

11:05:35  11  as customers -- what tough negotiators car dealers

11:05:41  12  are.  Looking back, I can't remember whether that

11:05:43  13  was prompted, or in the context of some recent event

11:05:46  14  at Reynolds, or this was just something on his mind

11:05:48  15  from, you know, more distant events.

11:05:52  16  Q.   Okay.  So I'll turn your attention back to

11:05:54  17  Exhibit 69.  This is discussing an ongoing decision

11:05:59  18  -- a decision being made in May of 2020; do you

11:06:03  19  understand that?

11:06:03  20  A.   My copy's not marked.  Is this the one

11:06:07  21  Bates Number 8695?

11:06:09  22  Q.   Yes.

11:06:10  23  A.   Okay.  I'm with you.

11:06:11  24  Q.   It's discussing something that's happening in

11:06:13  25  May of 2020 -- in fact, in the present.

| | | |
|---|---|---|
| 11:06:22 | 1 | **A.**  It appears to be something contemporaneous. |
| 11:06:26 | 2 | **Q.**  Okay.  So based on your experiences with |
| 11:06:29 | 3 | Mr. Brockman, by May of 2020 did you believe he was |
| 11:06:34 | 4 | able to discuss contemporaneous events? |
| 11:06:38 | 5 | **A.**  I'm sorry, could you repeat the question? |
| 11:06:39 | 6 | **Q.**  Sure.  I'm now taking you forward from |
| 11:06:44 | 7 | February 2020, to May 2020 when this was written. |
| 11:06:48 | 8 | **A.**  Okay. |
| 11:06:48 | 9 | **Q.**  Based on your discussions and experiences with |
| 11:06:50 | 10 | Mr. Brockman in May of 2020, did you believe he |
| 11:06:54 | 11 | could discuss contemporaneous events? |
| 11:06:58 | 12 | **A.**  I -- I'm quite sure that in May of 2020, I |
| 11:07:02 | 13 | never asked myself that question. |
| 11:07:03 | 14 | **Q.**  Okay. |
| 11:07:14 | 15 | **A.**  And I might add -- I mean, I was not aware |
| 11:07:16 | 16 | until you showed me of this e-mail of this activity |
| 11:07:18 | 17 | that it describes.  I had no awareness of any of |
| 11:07:22 | 18 | this. |
| 11:07:22 | 19 | **Q.**  Okay.  Fair to say you didn't have any |
| 11:07:24 | 20 | awareness of how he was running the company at all? |
| 11:07:28 | 21 | **A.**  Well, that may overstate it. |
| 11:07:30 | 22 | **Q.**  Might overstate it? |
| 11:07:31 | 23 | **A.**  But I certainly didn't know of activities at |
| 11:07:35 | 24 | this level of detail, no. |
| 11:07:37 | 25 | **Q.**  So you were unaware that he was engaged in |

11:07:39   1   activities in this level of detail in May of 2020;
11:07:43   2   is that your testimony?
11:07:43   3   A.   I don't say that I -- that I was not aware that
11:07:47   4   he was engaged.  I was saying I was not aware of
11:07:51   5   such details.
11:07:52   6   Q.   Okay.  You weren't aware of any of the e-mails
11:07:55   7   he was sending from his Reynolds and Reynolds's
11:07:59   8   e-mail account throughout 2020?
11:08:01   9   A.   Well, throughout 2020, I can't say I never saw
11:08:04   10  one.  He may have sent some to me for that matter.
11:08:06   11  Q.   But not e-mails sent to you, e-mails he was
11:08:09   12  sending to other people.  He wasn't sharing those
11:08:11   13  with you?
11:08:12   14  A.   Unless you see me copied on an e-mail, he
11:08:15   15  wasn't sharing those e-mails with me.
11:08:16   16  Q.   Okay.  So fair to say you were not aware of the
11:08:20   17  quality, or lack of quality, of the e-mails he was
11:08:23   18  sending from Reynolds in 2020?
11:08:27   19  A.   Right.
11:08:28   20  Q.   And so, that did not play a role in your belief
11:08:33   21  that he was not capable of assisting you in trying
11:08:37   22  this case; is that fair?
11:08:39   23  A.   No, his -- my opinion was based on my
11:08:43   24  experience of him, and doing what we needed to do to
11:08:46   25  engage his assistance and prepare a defense.

11:08:49  1    Q.   Okay.  And I think you talked about, you know,
11:08:53  2  he's able to recall sort of different milestones in
11:08:59  3  Reynolds and Reynolds and before that UCSH?
11:09:01  4    A.   Yes.
11:09:02  5    Q.   And going back to -- I think you said on the
11:09:06  6  living room couch, you know, 40 or 50 years
11:09:08  7  previously; is that fair?
11:09:09  8    A.   Yes.
11:09:09  9    Q.   And was he able to similarly recall the
11:09:13 10  milestones with respect to the offshore structures?
11:09:19 11    A.   That's a very broad question, and it starts to
11:09:28 12  poach on privileged communications.  But if one were
11:09:31 13  to answer, the answer would be no.
11:09:33 14    Q.   Okay.  So he can recall Reynolds and Reynolds's
11:09:36 15  business going back 50 years, but not trust business
11:09:38 16  going back 40 years; is that fair?
11:09:42 17    A.   What we got, all the way back to the founding
11:09:46 18  of the related company, were anecdotes in the
11:09:49 19  history of the company, not -- we got detail as to
11:09:56 20  Reynolds's operations, you know, over the last -- I
11:10:01 21  don't know -- seemed to be 10 to 20 years.  Um, what
11:10:08 22  we were trying to accomplish in our inquiry was to
11:10:14 23  drill down in very specific raw material, and he was
11:10:23 24  not able to assist in that process I described.
11:10:26 25    Q.   Okay.  We've all seen deposition testimony

where he is drilling down in pretty substantial
detail with respect to Reynolds and Reynolds's
business.  Was he able to do that with respect to
trust business?

**A.**   With respect to trust business?  Um, I don't --
I don't think -- I'm struggling with what -- what
one would regard as trust business, and also
questions of -- of privilege.

He was not -- he was -- he was far
more facile and adept at describing matters related
to Reynolds's operations, if you want a comparison.

**Q.**   So far more adept at discussing the Reynolds
and Reynolds's business than he was at discussing
the matter at interest in the criminal case; is that
fair?

**A.**   Yes.

**Q.**   All right.  In April of 2020, you -- you were
involved in writing a letter to the Department of
Justice in anticipation of what's called a taxpayer
conference?

**A.**   Yes.

**Q.**   And this is in evidence as Government's
Exhibit 81 --

MR. LOONAM:  The letter?

MR. LANGSTON:  Judge, would you like a

11:12:14   1   copy of it --

11:12:14   2                  THE COURT:  Sure.  Sure.

11:12:21   3                  MR. LANGSTON:  Handing a copy of 81 to

11:12:23   4   the witness.

11:12:30   5                  MR. LOONAM:  This is without exhibits?

11:12:32   6                  MR. LANGSTON:  I think the exhibits are

11:12:33   7   82.

11:12:34   8                  MR. LOONAM:  Okay.

11:12:36   9                  MR. LANGSTON:

11:12:37   10  Q.   Okay.  And this is the letter that you were

11:12:39   11  involved in writing to the Government on April 9,

11:12:42   12  2020?

11:12:43   13  A.   Correct.

11:12:44   14  Q.   Okay.  If we turn to the last page, you are on

11:12:48   15  the signature block?

11:12:50   16  A.   Am I?  Let me look.  Um, yes.  Listed names --

11:12:58   17  signed manually by Kathy Keneally, but lists three

11:13:02   18  of us.

11:13:03   19  Q.   Okay.  But you agreed with the information

11:13:05   20  written in this letter; is that fair?

11:13:06   21  A.   Yes.  Not -- haven't read it in quite some

11:13:09   22  time, but I know I reviewed it carefully and agreed

11:13:14   23  with it at the time we sent it forward.

11:13:16   24  Q.   Okay.  So April 9th of 2020, you had read the

11:13:18   25  entire letter?

11:13:19  1  **A.**   Yes.

11:13:19  2  **Q.**   And you had agreed with every word written in

11:13:22  3  it; is that fair?

11:13:23  4  **A.**   I'm confident I did.

11:13:25  5  **Q.**   Okay.  Did you include all of the relevant

11:13:27  6  facts in this letter?

11:13:29  7  **A.**   Oh, goodness.  Um, I can't imagine that we did,

11:13:44  8  but I can't -- I can't cite to you -- I haven't

11:13:47  9  re-read the letter.  I can't -- I haven't then

11:13:49  10  searched my memory to compare detail that was not

11:13:52  11  included here, but, um, I'm sure that there -- there

11:13:56  12  was additional detail, um, beyond what made it into

11:14:04  13  even a 17-page letter.

11:14:05  14  **Q.**   Okay.  And just -- I think one of the things

11:14:08  15  I'm trying to understand is, is this an exercise in

11:14:12  16  advocacy where you're only highlighting the good

11:14:14  17  facts, or are you trying to lay out the true case

11:14:18  18  for the Government?

11:14:19  19  **A.**    I didn't think in either of those terms.  It

11:14:21  20  was -- it was an effort to bring to the Government's

11:14:25  21  attention, um, the medical history that we'd

11:14:32  22  learned, our conclusion about the legal consequence

11:14:34  23  of that, and to try to engage the Government in --

11:14:37  24  in a parallel, if you will, inquiry on their part to

11:14:42  25  vet that information and reach their own

11:14:46  1  conclusions, um, and to weigh it in considering a

11:14:51  2  charging decision or how the matter ought to be

11:14:56  3  disposed of.

11:14:56  4  Q.   It's fair to say one of the things you were

11:14:58  5  trying to do is convince the Government not to

11:15:01  6  indict Mr. Brockman?

11:15:02  7  A.   Yes.

11:15:02  8  Q.   And so this letter was in service of convincing

11:15:07  9  the Government of that?

11:15:08  10  A.   Yes.

11:15:08  11  Q.   And I think you said you were trying to kind of

11:15:11  12  engage the Government in a dialogue?

11:15:13  13  A.   Yes.

11:15:13  14  Q.   And so, you made sure to include all of the

11:15:18  15  good facts and all of the bad facts; is that fair?

11:15:21  16  A.   Well, we -- we certainly intended to present a

11:15:28  17  balanced, candid view of the situation, um, that we

11:15:36  18  hoped would persuade them to join us in the course I

11:15:38  19  just described.

11:15:40  20  Q.   And so, did you deliberately leave out any bad

11:15:44  21  facts?

11:15:45  22  A.   Not that I remember.

11:15:46  23  Q.   Okay.  When did you decide to write this

11:15:48  24  letter?

11:15:50  25  A.   I can't pinpoint a decision date.  I mean, it

11:15:55  1  was under consideration for at least a matter of

11:15:58  2  weeks before the letter went forward.

11:16:01  3  Q.   And I imagine this probably was not the final

11:16:03  4  draft -- or this was not the only draft?

11:16:06  5  A.   Oh, goodness, no.  I know that it went through

11:16:11  6  numerous drafts.

11:16:12  7  Q.   Okay.  And the -- as part of the exhibits for

11:16:19  8  this, there are letters in January of 2020 from

11:16:24  9  Doctors Jankovic and Dr. Pool?

11:16:28  10  A.   I don't remember, but I accept that if that's

11:16:30  11  what the letter shows.

11:16:30  12  Q.   Okay.  Is it fair to say that you contemplated

11:16:33  13  writing this letter prior to soliciting those

11:16:36  14  letters from his doctors?

11:16:38  15  A.   I can't remember.

11:16:40  16  Q.   Okay.

11:16:40  17  A.   First of all, I don't have the additional

11:16:42  18  letters that you are talking about in front of me,

11:16:46  19  and so I can't remember the sequence of

11:16:50  20  decision-making over when to send the letter, and

11:16:52  21  get those letters and so on.

11:16:54  22  Q.   Okay.  And so I will hand you, um, 82, which is

11:17:01  23  in evidence.  I'm going to turn you to Exhibit F.

11:17:14  24  That's one of the letters; isn't it?

11:17:20  25  A.   I don't know.  I have to go through this.  I

11:17:22  1   accept it, if that's what you tell me it is.

11:17:24  2   Q.   Okay.  Well, these are the attachments you sent

11:17:26  3   to the Department of Justice; is that fair?

11:17:30  4   A.   I can't say specifically I recognize it as

11:17:32  5   such, but I accept it if that's what you tell me

11:17:35  6   what the record shows.

11:17:36  7   Q.   Okay.  And the first paragraph of this says, "I

11:17:41  8   have been asked to provide this letter by counsel

11:17:42  9   for Robert T. Brockman.  I understand that this

11:17:46  10  letter will be included by counsel as part of a

11:17:48  11  submission to the US Department of Justice on the

11:17:51  12  issue of Mr. Brockman's cognitive impairment"?

11:17:55  13  A.   Yes, that's what it says.

11:17:57  14  Q.   Okay.  That's in January of 2020?

11:17:59  15  A.   Correct.

11:17:59  16  Q.   So fair to say at least by January of 2020, you

11:18:03  17  are contemplating this?

11:18:04  18  A.   Yes.

11:18:04  19  Q.   And obviously the January 2020 -- when the

11:18:13  20  letter was written would have to be solicited prior

11:18:15  21  to that; is that fair?

11:18:16  22  A.   Correct.

11:18:16  23  Q.   And so, it's prior to the solicitation of these

11:18:19  24  letters that you believed you were going to make a

11:18:22  25  submission to the -- to the US Government; is that

11:18:26  1   fair?

11:18:26  2   A.   Yes.

11:18:26  3   Q.   Was it prior to the December exam by Dr. York?

11:18:30  4   A.   Well, we -- we had in mind that that's where

11:18:33  5   all of this might lead, but I don't believe there

11:18:41  6   was a decision made finally to go forward in this

11:18:44  7   fashion until we had all of the evidence in hand.

11:18:46  8   Q.   Okay.  Let's turn back to 81.

11:18:57  9   A.   I'm sorry, Counsel.  My copies aren't numbered.

11:19:00  10  Do you want me to look at 81?

11:19:02  11  Q.   Yes.

11:19:04  12  A.   Which is that?

11:19:05  13  Q.   We'll go to -- that's the letter.

11:19:08  14  A.   The April 9th letter itself?

11:19:10  15  Q.   Yes.

11:19:10  16  A.   Okay.

11:19:13  17  Q.   And I'll turn your attention to Page 2.  And

11:19:22  18  I'm looking at the third full paragraph/fourth

11:19:27  19  paragraph down starting with, "Mr. Brockman can no

11:19:30  20  longer..."

11:19:32  21  A.   Yes.

11:19:32  22  Q.   So you say that, "Mr. Brockman also can no

11:19:36  23  longer effectively serve as the chief executive

11:19:39  24  officer of Reynolds and Reynolds."

11:19:43  25             Did you believe that to be true in

11:19:45   1   April of 2020?

11:19:46   2   **A.**   Yes, I did.

11:19:48   3   **Q.**   Okay.  And when did you come to the conclusion

11:19:51   4   that he could no longer effectively serve as the CEO

11:19:55   5   of Reynolds and Reynolds?

11:19:58   6   **A.**   Well, I can't remember when I came to that

11:20:00   7   conclusion, but it was related to my own experience

11:20:05   8   about his ability to assist us in the case, and to

11:20:13   9   the decision of gathering such information to come

11:20:15   10   forward to the Department of Justice.

11:20:17   11                     As we gathered all of that

11:20:19   12   information and learned this, um, it occurred to me

11:20:23   13   that his -- his difficulties would likewise impair

11:20:28   14   his ability to serve effectively as CEO of the

11:20:32   15   company.

11:20:32   16   **Q.**   Okay.  How about in February of 2020, the last

11:20:35   17   time you saw him do you think he could have served

11:20:38   18   effectively, based on what you knew in February of

11:20:40   19   2020?

11:20:40   20   **A.**   Well, see, I'm struggling when you try to

11:20:43   21   pinpoint it to a specific time or even month.  I

11:20:48   22   don't remember the February meeting, in particular.

11:20:50   23   As I sit here, I can't recall what -- what we

11:20:53   24   discussed or his appearance, except that -- that it

11:20:57   25   was consistent that over time and over a period his

11:21:02  1   physical condition deteriorated.  I don't remember

11:21:08  2   asking myself that question in February of 2020,

11:21:10  3   so...

11:21:10  4   Q.   Okay.  Let's do it this way.  You said in the

11:21:13  5   fourth quarter of 2019, you were convinced that he

11:21:16  6   could not assist in his defense?

11:21:22  7   A.   I was convinced, and my experience had been he

11:21:25  8   was unable to assist in the way typical of other

11:21:29  9   clients and that the question was -- likely rose to

11:21:38  10  the level of incompetence of the legal standard.

11:21:41  11  Q.   I want to make sure we're using the same

11:21:43  12  definitions here.  Do you believe that a person who

11:21:45  13  is unable to assist in their criminal defense is

11:21:48  14  capable of running a 5,000-employee company?

11:21:53  15  A.   Maybe.  I -- I don't know that the -- the tests

11:21:58  16  are identical.

11:22:01  17  Q.   Okay.

11:22:01  18  A.   Well --

11:22:03  19  Q.   So when you say -- and -- and -- and that may

11:22:06  20  be your testimony.  So when you say that you don't

11:22:08  21  believe that Mr. Brockman can assist in his defense,

11:22:12  22  you think it could be possible, however, for him to

11:22:15  23  continue to run Reynolds and Reynolds?

11:22:18  24  A.   Well, what sticks in my mind, Counsel -- I've

11:22:21  25  heard from doctors in the course of what we've all

11:22:23   1   learned in this process -- an anecdote about a

11:22:27   2   skilled surgeon thoroughly demented who can

11:22:31   3   nevertheless conduct brain surgery.  And that

11:22:33   4   baffles me, but I heard that described that certain

11:22:38   5   -- especially highly-skilled, intelligent people who

11:22:42   6   have done one thing for a long, long time, even as

11:22:46   7   they deteriorate mentally into severe dementia are

11:22:51   8   nevertheless capable -- some of them -- at doing

11:22:54   9   highly-skilled things.

11:22:56   10                  THE COURT:  One second --

11:22:59   11                  MR. LANGSTON:

11:23:00   12   Q.   When did you hear that fact?

11:23:01   13   A.   Somewhere in the course of preparation in our

11:23:05   14   learning and study for this hearing.

11:23:09   15   Q.   Was it in the last two weeks?

11:23:12   16   A.   It was longer ago than that.

11:23:13   17   Q.   Okay.  So you met with the experts in this

11:23:19   18   case?

11:23:19   19   A.   No -- well, I did a couple of times recently.

11:23:22   20                  MR. LOONAM:  I just want to -- so -- I

11:23:24   21   mean, I want to -- I don't want to impede on the

11:23:27   22   cross.  I don't want to use privilege as a sword and

11:23:31   23   shield.

11:23:33   24                  THE COURT:  Right.  It's okay.  You can

11:23:35   25   --

11:23:36  1           MR. LOONAM:  Work product.

11:23:37  2           THE COURT:  Right.  You can't talk

11:23:38  3  about what Mr. Romatowski talked about with the

11:23:42  4  expert.  The problem is that's not what the expert

11:23:47  5  testified to in court.  I wrote it down.  It wasn't

11:23:49  6  just what -- what the witness said isn't exactly the

11:23:54  7  way the expert testified to.

11:23:57  8           So -- I mean, I think the most you

11:24:04  9  can get is that he talked to the expert, and that's

11:24:08  10  pretty much it.  As far as the contents, I'm

11:24:11  11  concerned that it gets into work product, even

11:24:15  12  though the -- even though the expert's testimony is

11:24:20  13  not privileged, the question.

11:24:26  14           MR. LANGSTON:  I did stop on that one,

11:24:28  15  Your Honor.

11:24:28  16           THE COURT:  Okay.

11:24:28  17           MR. LOONAM:  Also a foundational issue.

11:24:30  18  It's possible Mr. Romatowski may have heard that

11:24:34  19  anecdote from me, just to clear this up.

11:24:37  20           MR. LANGSTON:  I just want to be sure

11:24:39  21  hadn't violated --

11:24:40  22           THE COURT:  Okay.  That -- I bet you he

11:24:43  23  hadn't, but you can go down that road.

11:24:45  24           MR. LANGSTON:  Okay.

11:24:46  25  Q.  All right.  So I think we were saying -- so

11:24:49  1  based on this -- maybe based on this anecdote, maybe

11:24:52  2  not, you believe that a person who was not competent

11:24:57  3  to stand trial could continue to run a multibillion

11:25:03  4  dollar software company?

11:25:04  5  **A.**   I'm saying I can't rule that out.  I don't know

11:25:07  6  that incompetence -- in the sense it's important to

11:25:09  7  me in a criminal case -- means incompetence in other

11:25:14  8  realms.

11:25:14  9  **Q.**   Okay.  And so -- so when you say that someone

11:25:17  10  is incompetent in a criminal case, you are not

11:25:19  11  ruling out that they could have this ability to run

11:25:22  12  a 5,000-person software company?

11:25:24  13  **A.**   No, I'm not, but I just don't know.

11:25:26  14  **Q.**   Okay.  And you were aware that he -- well, let

11:25:31  15  me ask you this.  So you -- you are saying that you

11:25:34  16  can't rule that out as of the fourth quarter of

11:25:38  17  2019; is that fair?

11:25:39  18  **A.**   Yes.

11:25:39  19  **Q.**   Okay.  But by April of 2020, you have ruled

11:25:42  20  that out?

11:25:43  21  **A.**   Well, I worried that he was -- that he was not

11:25:46  22  capable.  I -- I -- what I had seen of what he was

11:25:51  23  able to do mentally did make me concerned that he

11:25:57  24  was unable to perform fully and adequately as CEO of

11:26:06  25  Reynolds.

11:26:06  1    Q.   That's based on when you were observing him in

11:26:10  2    your meetings with him?

11:26:11  3    A.   Yes.

11:26:12  4    Q.   And based on your phone calls with him?

11:26:14  5    A.   Right.  My layman's observations, yes.

11:26:17  6    Q.   So based on your layman's observations of

11:26:21  7    Mr. Brockman, you didn't believe that he could

11:26:23  8    continue to effectively serve as CEO of Reynolds and

11:26:26  9    Reynolds?

11:26:26  10   A.   Right, I was concerned that he wasn't capable.

11:26:29  11   Q.   Okay.  Are you aware he did continue to serve

11:26:34  12   as CEO of Reynolds and Reynolds?

11:26:35  13   A.   Yes, for a time.

11:26:36  14   Q.   In fact, until after his indictment in this

11:26:39  15   case?

11:26:39  16   A.   I think it was not until after, yes.

11:26:42  17   Q.   So six months after you wrote this letter?

11:26:45  18   A.   That's -- yes, what the calendar shows, yes.

11:26:47  19   Q.   Okay.  Are you aware that Mr. Brockman chose a

11:26:52  20   successor?

11:26:53  21   A.   Yes.

11:26:53  22   Q.   Are you aware he continued signing board

11:26:56  23   resolutions?

11:26:58  24   A.   Was I -- I probably was aware of that, yes.

11:27:00  25   Q.   Are you aware that he continued to weigh in on

11:27:04  1   executive matters?

11:27:09  2   **A.**   Yes.   Stated broadly, I think that's right,

11:27:13  3   yes.

11:27:13  4   **Q.**   Are you aware that he continued to be involved

11:27:15  5   in every major decision at Reynolds and Reynolds?

11:27:18  6   **A.**   Well, every -- I can't go that far.   I don't

11:27:24  7   know every major decision of Reynolds's in the

11:27:27  8   period, so I just don't know.

11:27:28  9   **Q.**   Did you read Mr. Barris's deposition testimony

11:27:31  10  in this case?

11:27:32  11  **A.**   No.

11:27:32  12  **Q.**   Okay.   Here in the second -- or sorry, the

11:27:40  13  final paragraph, of 81 you indicate --

11:27:45  14  **A.**   Is 81 one the April 9th letter?

11:27:48  15  **Q.**   Yes.   81, Page 2, the final paragraph.   You

11:27:59  16  indicate that Mr. Brockman will shortly step down as

11:28:02  17  CEO and Chair?

11:28:05  18  **A.**   Yes, of -- in the final, partial paragraph,

11:28:09  19  yes.

11:28:11  20  **Q.**   And he didn't actually step down as CEO and

11:28:15  21  Chair?

11:28:16  22  **A.**   Well, eventually he did.   It took longer than

11:28:19  23  we all hoped.

11:28:20  24  **Q.**   And when you say it took longer than you hoped,

11:28:23  25  is that because you understand that Mr. Brockman not

11:28:26   1  stepping down certainly hurts your case that he's

11:28:29   2  incompetent?

11:28:37   3  A.   That was down a list of concerns, yes.  But --

11:28:40   4  but, yes, it -- I acknowledge that his continuation

11:28:45   5  in the role is a puzzle in view of the -- our

11:28:53   6  observation that he wasn't competent in other

11:28:55   7  respects, yes.

11:29:06   8  Q.   In fact, during the tax payer conference, you

11:29:09   9  indicated that Mr. Brockman was going to step down

11:29:11  10  in two weeks -- maybe you didn't, but Jones Day told

11:29:14  11  the Government that?

11:29:15  12  A.   I'm not a tax partitioner, so I'm not as adept.

11:29:19  13  The tax payer conference -- is that -- by that you

11:29:22  14  mean the phone call that resulted after this letter?

11:29:25  15  Q.   Yes.

11:29:26  16  A.   I did participate in that call.

11:29:27  17  Q.   Okay.  And that call was in April of 2020?

11:29:30  18  A.   I think so, yes.

11:29:31  19  Q.   And it may not have been you, but someone from

11:29:35  20  your team indicated that Mr. Brockman was going to

11:29:38  21  step down within two weeks?

11:29:39  22  A.   I don't remember that, but...

11:29:44  23  Q.   Are you aware that Mr. Brockman reorganized the

11:29:46  24  company in June of 2020?

11:29:54  25  A.   I know there was a reorganization of a sort.  I

11:29:56  1  couldn't tell you that it was in June.

11:29:58  2  Q.   Okay.  But after that reorganization, you are

11:30:00  3  aware that he continued to serve as CEO?

11:30:02  4  A.   Well, I'd say -- reorganization -- the board --

11:30:06  5  I remember the board being reconfigured.  When you

11:30:09  6  say reorganization of a company this large, I don't

11:30:11  7  want to be misunderstood for what it is that I can

11:30:14  8  remember.

11:30:14  9              The -- there was -- the board was

11:30:17  10  reconfigured as part of the process by which he

11:30:21  11  would withdraw.

11:30:24  12  Q.   But he, in fact, did not withdraw in June; is

11:30:27  13  that fair?

11:30:27  14  A.   I think that's right.

11:30:28  15  Q.   Okay.  Okay.  You've got 82 there, which is the

11:30:39  16  exhibits to the left.  And there are -- there are a

11:30:47  17  number of exhibits -- 16 if I counted on my fingers

11:30:51  18  correctly; is that fair?

11:30:51  19  A.   I accept that if you have counted them, yes.

11:30:54  20  Q.   And there are medical reports of Dr. York

11:30:56  21  attached?

11:31:00  22  A.   Well, I -- you know, I'm sure that the exhibit

11:31:04  23  speaks for itself.  I can page through and confirm

11:31:06  24  that for you if you like.

11:31:07  25  Q.   Were you involved in exhibits attached to this

11:31:11   1   letter?

11:31:11   2   **A.**   Could you repeat the question?

11:31:13   3   **Q.**   So you wrote the letter April 9, 2020?

11:31:17   4   **A.**   Right, we did.

11:31:17   5   **Q.**   And I think you said you read it?

11:31:20   6   **A.**   Yes.

11:31:20   7   **Q.**   And you agreed with every word?

11:31:22   8   **A.**   Yes.

11:31:23   9   **Q.**   Okay.  And so, I guess I should have extended

11:31:26   10   those questions to the exhibits.  Had you

11:31:28   11   familiarized yourselves with the exhibits prior to

11:31:30   12   attaching to this letter?

11:31:32   13   **A.**   I'm sure I did.

11:31:33   14   **Q.**   So there are medical reports of Dr. York in

11:31:37   15   there?

11:31:38   16   **A.**   Yes, I -- I see that.

11:31:39   17   **Q.**   And of Dr. Jankovic?

11:31:42   18   **A.**   Um, I -- haven't found it yet, but I accept

11:31:46   19   that if you remind me that.

11:31:47   20   **Q.**   Okay.  There are CV's of some of his doctors in

11:31:52   21   there, too?

11:31:53   22   **A.**   Yes.

11:31:53   23   **Q.**   Of Dr. Pool?

11:31:55   24   **A.**   Okay.

11:31:56   25   **Q.**   Of Dr. York?

11:31:58   1   **A.**   All right.  I'm on Dr. Lerner, but -- yeah, I'm

11:32:02   2   -- I'm sure.

11:32:03   3   **Q.**   Okay.

11:32:03   4   **A.**   I'll accept your representation to what's

11:32:05   5   included here.

11:32:06   6   **Q.**   Fair to say, I think you just saw Dr. Lerner's

11:32:10   7   CV is in there?

11:32:11   8   **A.**   Yes.

11:32:12   9   **Q.**   And Dr. Lerner is Mr. Brockman's urologist; is

11:32:16   10  that fair?

11:32:17   11  **A.**   I think that's right.

11:32:19   12  **Q.**   He wasn't involved in treating Mr. Brockman for

11:32:21   13  dementia at all?

11:32:24   14  **A.**   Well, I don't know -- I don't know the scope of

11:32:31   15  his treatment of Mr. Brockman.

11:32:33   16  **Q.**   Okay.  But we can agree that traditionally a

11:32:36   17  urologist would not be your first choice to get

11:32:40   18  treated for dementia?

11:32:40   19  **A.**   I think that's right.

11:32:42   20  **Q.**   Okay.  And Mr. Brockman certainly had the

11:32:43   21  resources to get access to the best doctors?

11:32:48   22  **A.**   Yes.

11:32:48   23  **Q.**   So Dr. Lerner's CV here -- is that being

11:32:53   24  included just to be thorough?

11:32:55   25  **A.**   I can't remember the reason to include him in

11:33:00  1  particular.

11:33:00  2  Q.   Okay.  And I'll turn you back to 81, now to

11:33:05  3  Page 4.  Do you see the final line, all four --

11:33:25  4  Dr. Pool, Dr. Jankovic, Dr. York, and Dr. Yu agreed

11:33:29  5  that Mr. Brockman has mild to moderate dementia?

11:33:33  6  A.   I see that.

11:33:33  7  Q.   Okay.  And was that all of the doctors he had

11:33:40  8  been seen by in April of 2020?

11:33:41  9  A.   I don't know.

11:33:44  10  Q.   Are you aware that he was being seen by

11:33:48  11  Dr. Lai, a neurologist at Houston Methodist?

11:33:53  12  A.   I don't remember that.

11:33:55  13  Q.   Okay.  And is that -- you have forgotten since

11:33:58  14  then, or you were never aware of that?

11:34:00  15  A.   I don't remember hearing Dr. Lai's name until

11:34:03  16  very recent weeks.

11:34:06  17  Q.   And during the tax payer conference, that was

11:34:09  18  one of the doctors that was mentioned; isn't that

11:34:11  19  true?

11:34:11  20  A.   I can't recall that.

11:34:13  21  Q.   Okay.  I guess in preparation for writing this

11:34:19  22  letter did you try to find out who all of

11:34:21  23  Mr. Brockman's doctors were?

11:34:22  24  A.   Kathy Keneally conducted our liaison with his

11:34:27  25  doctors and investigated that.  I didn't do that

11:34:29  1   personally.

11:34:29  2   Q.   Okay.  Were you curious when you read the

11:34:34  3   letter as to whether this was all of Mr. Brockman's

11:34:36  4   doctors?

11:34:37  5   A.   I can't remember -- I can't remember that I

11:34:40  6   was.

11:34:41  7   Q.   Did you try to find out if there were any

11:34:43  8   conflicting diagnoses?

11:34:45  9   A.   I did not investigate with the doctors myself

11:34:49  10  personally.

11:34:49  11  Q.   Okay.  It's fair to say that Dr. Lai's CV is

11:34:55  12  not included in the attachments to this letter; is

11:34:57  13  that fair?

11:34:57  14  A.   Well, I haven't paged through it, but I accept

11:35:00  15  that if that's what the document shows.

11:35:02  16  Q.   Okay.  And fair to say that Dr. Lai's name does

11:35:04  17  not appear anywhere in this letter?

11:35:07  18  A.   Well, I haven't word searched it, but if you

11:35:09  19  tell me that's so I accept that.

11:35:11  20  Q.   Okay.  And so, your testimony is that in April

11:35:14  21  of 2020, you were not aware of who Mr. Brockman's

11:35:18  22  treating neurologist was?

11:35:20  23  A.   Well, I don't know if I was or wasn't, because

11:35:25  24  I don't -- I'm not well familiar -- certainly not

11:35:30  25  any longer, with each of these doctors and their

11:35:33  1  separate roles.

11:35:34  2  Q.   Okay.  But I mean, we can agree that the

11:35:38  3  treating neurologist for a patient with cognitive

11:35:42  4  decline would be an important person to want to

11:35:45  5  speak to; right?

11:35:46  6  A.   Well, I think that's right.

11:35:49  7  Q.   And so --

11:35:49  8  A.   But I'm not -- I'm not the best person to opine

11:35:53  9  on that, but I think that's right.

11:35:55  10  Q.   Okay.  Just one moment here.

11:36:10  11       MR. LANGSTON:   Thank you, Your Honor.

11:36:11  12  Q.   So you were not aware that in January of 2020,

11:36:14  13  Dr. Lai had diagnosed the Defendant with not

11:36:18  14  dementia, but mild cognitive impairment?

11:36:21  15  A.   I don't remember knowing that.

11:36:23  16  Q.   Okay.  And you don't --

11:36:25  17  A.   If that's the case, I don't remember knowing

11:36:27  18  that.

11:36:27  19  Q.   You are not aware in February of 2020, Dr. Lai

11:36:30  20  examined him again and found not dementia but mild

11:36:35  21  cognitive impairment?

11:36:35  22  A.   I don't -- I don't remember knowing that.

11:36:37  23  Q.   Okay.  So in -- in writing this letter, you

11:36:42  24  weren't aware of -- you weren't aware that

11:36:45  25  Mr. Brockman had continued to have medical exams?

11:36:48   1   **A.**   Well, no, I understood that there was a course

11:36:53   2   of examination, and part of it stimulated and

11:36:55   3   requested by us.

11:37:00   4   **Q.**   In your proofing of this letter, when you are

11:37:02   5   agreeing with every word, is one of the things you

11:37:05   6   would want to know is this still accurate?

11:37:07   7   **A.**   I certainly wanted to do what I could to

11:37:09   8   contribute to see to it that it was accurate, yes.

11:37:12   9   **Q.**   And so -- again, without getting into your

11:37:16   10  internal deliberations, did you want to know if he'd

11:37:18   11  seen a doctor since Dr. York saw him in December of

11:37:22   12  2019?

11:37:23   13  **A.**   I don't remember having that question in mind.

11:37:25   14  **Q.**   Okay.  It's fair to say that the exams in

11:37:31   15  January of 2020, and February of 2020, are prior to

11:37:35   16  this letter; is that fair?

11:37:37   17  **A.**   January and February are before April, yes.

11:37:39   18  **Q.**   Okay.  And I think if we go to Page 10 of the

11:37:44   19  letter there's a picture of two clocks?

11:37:59   20  **A.**   Yes.

11:38:00   21  **Q.**   And what did you think when you saw these

11:38:04   22  clocks?

11:38:04   23  **A.**   I was startled.

11:38:06   24  **Q.**   Why were you startled?

11:38:10   25  **A.**   Because they are so far distorted from an

11:38:14  1  accurate picture of an analog clock.

11:38:21  2  Q.   Was that part of what went into your thinking

11:38:24  3  that Mr. Brockman might not be able to help you?

11:38:27  4  A.   Well, my -- my thinking that Mr. Brockman

11:38:30  5  wasn't able to help me was born of my own

11:38:34  6  experience.

11:38:40  7  Q.   Okay.

11:38:40  8  A.   This did alert me in a way as a non-medical

11:38:44  9  person -- I hadn't been before that he had cognitive

11:38:47  10  problems.

11:38:48  11  Q.   Okay.  I think one of the reasons you included

11:38:52  12  these were you thought they would be very persuasive

11:38:57  13  to the Department of Justice that if the clocks are

11:39:00  14  looking like this that Mr. Brockman may have some

11:39:03  15  mental issues; is that fair?

11:39:04  16  A.   Yes.  And Dr. York had set them out in her

11:39:08  17  report.

11:39:09  18  Q.   So you thought that was a clear visual

11:39:14  19  depiction of Mr. Brockman's state of mind?

11:39:17  20  A.   Well, one indication of it, yeah.  Yes.

11:39:19  21  Q.   Okay.  Were you aware that Mr. Brockman had

11:39:24  22  drawn a clock more recently than December 3, 2019?

11:39:29  23  A.   I know that there were a series of these

11:39:32  24  examinations that included this test.  I can't

11:39:37  25  remember when they all were.

11:39:38   1   Q.   Okay.  So when Dr. Lai examined Mr. Brockman in

11:39:44   2   January, were you aware that he drew a clock?

11:39:47   3   A.   No, because I don't remember being aware that

11:39:49   4   Dr. Lai conducted such an examination.

11:39:52   5   Q.   And this is Page 143 of Exhibit 156, which is

11:40:00   6   in evidence.  So were you aware -- and this clock is

11:40:11   7   more recent than the two clocks in the one that you

11:40:16   8   attached -- or the one you included in the letter to

11:40:21   9   the government?

11:40:22   10   A.   Okay.  If you represent that to me, I accept

11:40:23   11   that.

11:40:24   12   Q.   Okay.  January 8, 2020, is more recent than

11:40:27   13   December 3, 2019?

11:40:30   14   A.   For sure, yes.

11:40:31   15   Q.   And he drew this clock four months prior to

11:40:34   16   your letter to the Department of Justice?

11:40:37   17   A.   Well, you are showing me this.  I don't -- I

11:40:39   18   don't believe -- I'm quite sure I've never seen this

11:40:42   19   document, but if -- if that's what this represents,

11:40:47   20   then, yes.

11:40:49   21   Q.   Fair to say this is a far better clock than the

11:40:52   22   two that were included in the letter to the

11:40:54   23   Government?

11:40:54   24   A.   I think that's a better clock.

11:40:55   25   Q.   Okay.

11:40:56  1    **A.**   I think -- I think the -- the document I'm

11:40:58  2    looking at here dated 1/8/20 with that clock picture

11:41:03  3    I think is more coherent -- you know, closer than

11:41:08  4    the ones pictured on April 9th letter, yes.

11:41:10  5    **Q.**   Okay.  I think you testified you didn't know

11:41:13  6    this clock existed, I guess, at the time you wrote

11:41:16  7    the letter?

11:41:18  8    **A.**   I don't believe that I did.

11:41:27  9    **Q.**   You certainly did not personally did not make

11:41:30  10   the decision not to include this clock?

11:41:31  11   **A.**   No.

11:41:33  12   **Q.**   And had you known about it, you would have

11:41:36  13   wanted to include it in the letter; is that fair?

11:41:38  14   **A.**   Well, what I understand better what this

11:41:40  15   document is, I see half a page -- half a single page

11:41:44  16   -- I certainly would study it, consider it, see how

11:41:49  17   it related to this other material and confer with

11:41:53  18   others about what ought to be included in such a

11:41:57  19   letter.

11:42:08  20   **Q.**   Okay.  Let me ask you this -- let's shift gears

11:42:11  21   a little from clocks.  When do you believe that

11:42:13  22   Mr. Brockman learned of the criminal investigation?

11:42:17  23   **A.**   Well, I'm quite sure that any answer to that

11:42:22  24   question would be privileged.

11:42:23  25   **Q.**   Well, you included your belief of when he

11:42:26  1  learned of the investigation in the letter; isn't

11:42:27  2  that true?

11:42:28  3  A.   I don't know that.  Is that -- could you direct

11:42:31  4  my attention to it?

11:42:33  5  Q.   Sure.  So you'll look at Footnote 17, which is

11:42:41  6  on Page 15, in May 2017, long before Mr. Brockman

11:42:46  7  was aware he might be involved in an investigation.

11:42:49  8  A.   Hold on.  Page which?

11:42:52  9  Q.   Page 15, Footnote 17.

11:43:06  10  A.   Okay.

11:43:08  11  Q.   So in April of 2021, you disclosed to the

11:43:14  12  Government when you believed -- at least in part --

11:43:18  13  when he learned of the investigation?

11:43:22  14  A.   Well, the letter says what it says.

11:43:25  15  Q.   And you said that it was all a true statement?

11:43:29  16  A.   Yes.

11:43:30  17  Q.   Okay.  So when did he learn -- in your mind,

11:43:33  18  when do you believe he learned of the criminal

11:43:35  19  investigation?

11:43:36  20  A.   Once again, that calls for privileged

11:43:39  21  communication.

11:43:39  22          MR. LOONAM:  Objection.  I think --

11:43:42  23  objection to the extent that the question calls for

11:43:44  24  communication from the client to Jones Day.

11:43:48  25          MR. LANGSTON:  Your Honor, I don't

11:43:49  1   think they can say -- they can write a letter that

11:43:51  2   says they believe that, you know, he had symptoms

11:43:55  3   long before he learned he was aware of the

11:43:57  4   investigation and then claim privilege as to when he

11:44:00  5   learned of the investigation.  That seems like using

11:44:02  6   as the sword and the shield.

11:44:03  7            MR. LOONAM:  Well -- well -- well, it's

11:44:06  8   unclear if the source of the information here is a

11:44:11  9   communication from the client or if it's based on

11:44:14  10  the -- the -- the understanding of Jones Day from

11:44:17  11  objective other evidence when the client may have

11:44:20  12  learned of the investigation.  It could have been

11:44:22  13  from -- in this case alone, Dr. Dietz set the date

11:44:28  14  in his report for when the client learned of the

11:44:32  15  investigation in 2018.

11:44:35  16            I understand this has been a moving

11:44:37  17  target and it's moved, you know, further back, back,

11:44:39  18  back by the Government, but it may not be based on

11:44:42  19  information from the client.

11:44:44  20            Um, I think perhaps there's a way

11:44:46  21  to --

11:44:46  22            MR. LANGSTON:  I can ask --

11:44:47  23            THE COURT:  I think easiest way cutting

11:44:51  24  to the chase is can he answer that question without

11:44:54  25  relating information that was told to him by

11:44:56   1   Mr. Brockman?  If the answer is yes -- I mean, if

11:45:00   2   the answer is yes, then he can relate it.  If it's

11:45:03   3   no, then he can't.

11:45:04   4            MR. LOONAM:  I don't think the way that

11:45:05   5   question was phrased he could.  There may be another

11:45:08   6   way to skin the cat.  I don't know.

11:45:09   7            THE COURT:  But you are absolutely

11:45:11   8   right.  I mean, Mr. Romatowski cannot talk about --

11:45:15   9   if he -- if it was when Mr. Brockman told him that

11:45:19   10   that's covered by privilege and he can't answer it.

11:45:23   11   I mean, he can.

11:45:24   12            MR. LANGSTON:  Okay.

11:45:25   13            THE COURT:  So you can ask him if you

11:45:28   14   -- has that information from another source.  If the

11:45:33   15   answer is yes, then he can answer it.  But if his

11:45:36   16   source of that information is from Mr. Brockman, he

11:45:38   17   cannot.

11:45:39   18            MR. LANGSTON:  Okay.

11:45:39   19            THE COURT:  Breaches the

11:45:41   20   attorney-client privilege.

11:45:42   21            MR. LANGSTON:

11:45:43   22   Q.  Setting aside any information you learned from

11:45:45   23   Mr. Brockman, are you able to say whether the first

11:45:49   24   sentence of Footnote 17 is true?

11:45:52   25   A.  Well, I can't answer -- I can't explain -- I

11:46:03   1   can't answer a question about when Mr. Brockman

11:46:05   2   learned of the criminal investigation without

11:46:08   3   revealing attorney-client communications.

11:46:11   4                    THE COURT:  And that makes sense.  I

11:46:13   5   mean, I don't know how you can.  I mean, I know

11:46:15   6   where you want to go with this, but I don't know how

11:46:17   7   he can answer that.

11:46:18   8                    MR. LANGSTON:  I will say that -- you

11:46:20   9   know, they've said that to their experts.  I think

11:46:22   10  their experts testified to what Ms. Keneally -- you

11:46:25   11  know, they specifically asked Ms. Keneally when did

11:46:27   12  he learn of the investigation, and she answered that

11:46:30   13  question to their experts.

11:46:31   14                   THE COURT:  Okay.

11:46:33   15                   MR. LANGSTON:  Again, they're

11:46:34   16  disclosing it in a communication to the Government.

11:46:37   17  In the extent that was disclosed to Mr. Brockman, I

11:46:39   18  think sort of already waived that privilege.

11:46:41   19                   THE COURT:  Use Ms. Keneally's

11:46:43   20  admission, then.

11:46:44   21                   MR. LANGSTON:  Okay.

11:46:45   22  Q.   Ms. Keneally told Dr. Agronin that he learned

11:46:50   23  about it shortly around the search warrant; is that

11:46:53   24  fair?

11:46:53   25                   THE COURT:  Did she say that?

| | | |
|---|---|---|
| 11:46:54 | 1 | MR. LOONAM:  The foundation here, I |
| 11:46:56 | 2 | believe, are -- and I want to get Counsel -- where |
| 11:47:01 | 3 | -- what he needs on this, right?  But I think the |
| 11:47:04 | 4 | foundation for this is that comes from Dr. Agronin's |
| 11:47:07 | 5 | notes of a conversation with Ms. Keneally, and the |
| 11:47:14 | 6 | context for that was after Dr. Dietz -- Dr. Dietz |
| 11:47:18 | 7 | had issued his report.  And Dr. Dietz's report -- I |
| 11:47:23 | 8 | believe Dr. Dietz pins the date of when the |
| 11:47:27 | 9 | Defendant learned of the investigation. |
| 11:47:29 | 10 | So the Government's expert pins the |
| 11:47:31 | 11 | date of when the Defendant learned of the |
| 11:47:33 | 12 | investigation as of a search warrant in Bermuda, |
| 11:47:36 | 13 | which was in September of 2018.  So I think that was |
| 11:47:39 | 14 | the context for this conversation.  So I don't -- |
| 11:47:43 | 15 | you know -- |
| 11:47:44 | 16 | THE COURT:  Well, if she -- if she said |
| 11:47:46 | 17 | that, then -- well, if she said that, it's not |
| 11:47:51 | 18 | necessarily a waiver of the privilege.  I mean, I |
| 11:47:55 | 19 | don't see it as a waiver of the privilege, but you |
| 11:47:57 | 20 | are sort of stuck with it.  I mean, you are entitled |
| 11:47:59 | 21 | to rely on it, because that's what she said. |
| 11:48:02 | 22 | MR. LOONAM:  I want to be clear.  I |
| 11:48:04 | 23 | don't know if that's what Ms. Keneally -- I think |
| 11:48:06 | 24 | this was -- I don't know that attorney-client |
| 11:48:10 | 25 | privilege was waived.  I think that -- |

```
11:48:11    1              THE COURT:  I'm not saying it was
11:48:13    2   waived.
11:48:14    3              MR. LOONAM:  I think that conversation
11:48:15    4   took place in the context of responding to the
11:48:19    5   Dietz's report, which pegged the date as of Kepke
11:48:24    6   search in -- no, the Tamine search.
11:48:32    7              MR. LANGSTON:  I think it's the Kepke.
11:48:34    8              MR. LOONAM:  The Bermuda search.
11:48:36    9              MR. VARNADO:  I think he says Bermuda.
11:48:38   10              THE COURT:  Let me read this.
11:48:41   11              MR. LOONAM:  It's in Dr. Dietz's
11:48:42   12   report.  It's definitely -- he sets in 2018.
11:48:46   13              MR. LANGSTON:  I'm going to put a paper
11:48:47   14   copy rather than a laptop on the ELMO.
11:48:56   15              MR. MAGNANI:  See if it still works.
11:48:57   16              THE COURT:  Here's the deal.
11:48:59   17   Regardless of whether -- I mean, I'm not finding a
11:49:01   18   waiver of privilege.
11:49:02   19              MR. LANGSTON:  Sure.
11:49:02   20              THE COURT:  But the bottom line is
11:49:04   21   that's what she said, you can use it.
11:49:06   22              MR. LANGSTON:  Okay.
11:49:07   23              THE COURT:  You can cross-examine him
11:49:10   24   on it, but he can't answer -- I mean, you can't ask
11:49:14   25   him -- well -- it says what it says it says.  He --
```

11:49:19  1  if he doesn't have any independent knowledge, other

11:49:22  2  than based on -- on attorney-client privilege

11:49:28  3  information, then he can't answer it.  You have to

11:49:30  4  take it up with Ms. Keneally.

11:49:33  5          MR. LANGSTON:  Okay.

11:49:33  6          THE COURT:  But that's the date now

11:49:35  7  established, because that's what is in the expert

11:49:37  8  report.  So you can ask him, "Is it your position in

11:49:41  9  this lawsuit that this is when it happened, yes or

11:49:44  10  no?"

11:49:45  11         MR. LANGSTON:  Okay.

11:49:45  12  Q.  So is it your position that it was in or around

11:49:50  13  August of 2018, when he learned of this?

11:49:53  14  A.  Once again, for my part I don't know a way to

11:50:00  15  answer that question without revealing

11:50:05  16  attorney-client communication.

11:50:06  17  Q.  Okay.  Setting aside any attorney-client

11:50:09  18  communications, have you learned anything that makes

11:50:12  19  you believe it was earlier than that?

11:50:18  20         THE COURT:  I don't know how he can

11:50:19  21  answer the question based on --

11:50:21  22         MR. LANGSTON:  Okay.  Let's do this --

11:50:23  23         THE COURT:  I don't see it.  I mean, I

11:50:25  24  understand where you want to go, but his

11:50:29  25  understanding is based on conversations with

11:50:33  1   Mr. Brockman.  There's no way to get around that.

11:50:37  2                 MR. LANGSTON:

11:50:38  3   Q.   How about this?  The date the investigation

11:50:40  4   started is an important date -- or the date

11:50:42  5   Mr. Brockman learned of the investigation is an

11:50:43  6   important date of this case; is that fair?

11:50:45  7   A.   Well, I think -- I don't know that that's right

11:50:49  8   or not.  I suppose so.  I'll accept that, if you

11:50:51  9   think that's important.  Yes, I would accept that.

11:50:53  10  Q.   Okay.  One of the reasons it's important for

11:50:55  11  this competency case is if he was showing symptoms

11:50:58  12  prior to learning of the investigation, it makes the

11:51:01  13  Government's theory that he's faking less likely; is

11:51:05  14  that fair?

11:51:05  15  A.   Well, it sounds like that's your argument.  I

11:51:10  16  sort of lost track of the double negatives in the

11:51:13  17  course of that, but I accept that's your argument.

11:51:15  18  Q.   Okay.  And you recognized when you wrote the

11:51:17  19  letter that was important information for the

11:51:19  20  Government; is that fair?

11:51:23  21  A.   Well, that was important information.  I

11:51:25  22  suppose I've lost track of the "That."

11:51:28  23  Q.   Again, look at Footnote 17.

11:51:31  24  A.   Yes.

11:51:31  25  Q.   In May 2017, long before Mr. Brockman was aware

11:51:34  1   that he might be involved in an investigation, he

11:51:37  2   sent an e-mail to his friend Dr. Yudofsky?

11:51:39  3   A.   Right.

11:51:39  4   Q.   And so, you wrote that to the Government as

11:51:43  5   part of your effort to persuade the Government that

11:51:48  6   Mr. Brockman had a genuine illness; is that fair?

11:51:50  7   A.   Yes.   Yes.

11:51:51  8   Q.   And the reason why you are saying it's long

11:51:52  9   before he might be involved in an investigation is

11:51:55 10   because again that makes it less likely he's faking?

11:52:00 11   A.   Yeah, that defuses an allegation of a motive to

11:52:04 12   fabricate.

11:52:06 13   Q.   So had he learned of the investigation prior to

11:52:09 14   this Dr. Yudofsky e-mail, that undermines that

11:52:13 15   argument a little bit; is that fair?

11:52:14 16   A.   Yes.

11:52:15 17   Q.   Okay.   And if the e-mail sent to Dr. Yudofsky

11:52:18 18   is not genuine, that would also undermine that

11:52:22 19   argument a little bit?

11:52:23 20   A.   I suppose that's right.

11:52:31 21   Q.   You didn't speak to Dr. Yudofsky; did you?

11:52:34 22   A.   No.

11:52:35 23   Q.   Why not?

11:52:37 24   A.   Well, there's a lot to do.   There came a point

11:52:42 25   when Dr. Yudofsky had separate counsel of his own.

11:52:47    1   I don't remember when that happened or when we

11:52:49    2   learned, but he wasn't available to us to speak --

11:52:49    3   Q.   So you just didn't get around to it?

11:52:55    4   A.   -- and further, my role did not include liaison

11:53:05    5   with the physicians --

11:53:05    6   Q.   Well, I think you described here Dr. Yudofsky

11:53:07    7   is a friend?

11:53:07    8   A.   Yes, he's a close friend of Mr. Brockman.

11:53:09    9   Q.   So that's outside of your purview?

11:53:13   10   A.   Well, yes.  I regarded Dr. Yudofsky as -- you

11:53:18   11   know, among that -- that group of doctors, including

11:53:23   12   treating physicians, that Ms. Keneally was our

11:53:26   13   liaison to.

11:53:28   14   Q.   So Ms. Keneally is the person that tried to set

11:53:30   15   up this meeting with Dr. Yudofsky?

11:53:32   16   A.   Well, I didn't say anybody tried to set up a

11:53:34   17   meeting with Dr. Yudofsky.  I don't know if that

11:53:36   18   happened or not.

11:53:37   19   Q.   Okay.  The last sentence of this is, "Because

11:53:40   20   we understand Dr. Yudofsky is a potential witness

11:53:45   21   represented by counsel in this matter" --

11:53:47   22   A.   There you go.

11:53:49   23   Q.   -- "we have not contacted him to discuss his

11:53:52   24   confidential examination of Mr. Brockman."

11:53:55   25                Is --

11:53:57   1   **A.**   Okay.  That's what it says, yes.

11:53:58   2   **Q.**   Okay.  And was that your understanding in April

11:54:01   3   of 2020, as to why you hadn't spoken to

11:54:06   4   Dr. Yudofsky?

11:54:10   5   **A.**   I don't want to split hairs, but I can't

11:54:12   6   remember this detail of that letter.  But obviously

11:54:14   7   that was my state of mind at the time.

11:54:16   8   **Q.**   Okay.

11:54:16   9   **A.**   Because I read this at the time, understood it,

11:54:18   10   and didn't have any reason to disagree with any of

11:54:21   11   it.

11:54:21   12   **Q.**   Okay.  And this is not -- this doesn't say, "We

11:54:25   13   contacted his counsel and his counsel said no"?

11:54:27   14           This says, "We have not contacted

11:54:30   15   Dr. Yudofsky"; right?

11:54:32   16   **A.**   It says we have not contacted him to discuss

11:54:34   17   his confidential examination of Mr. Brockman; that's

11:54:36   18   right.

11:54:36   19   **Q.**   And the reason you give for having not

11:54:39   20   contacted him was that he was a potential witness

11:54:43   21   represented by counsel?

11:54:44   22   **A.**   That's what this says.

11:54:45   23   **Q.**   Does Jones Day have a policy not to contact

11:54:49   24   potential witnesses who are represented by counsel?

11:54:51   25   **A.**   No.

| | | |
|---|---|---|
| 11:54:53 | 1 | **Q.**   And, in fact, Jones Day has contacted a lot of |
| 11:54:56 | 2 | witnesses in this case represented by counsel? |
| 11:54:58 | 3 | **A.**   Well, through their counsel, yes. |
| 11:55:00 | 4 | **Q.**   Mr. Tamine or Tamine? |
| 11:55:03 | 5 | **A.**   Yes. |
| 11:55:03 | 6 | **Q.**   Mr. Burnett? |
| 11:55:04 | 7 | **A.**   I think so, yes. |
| 11:55:05 | 8 | **Q.**   Mr. Moss? |
| 11:55:06 | 9 | **A.**   I think so, yes. |
| 11:55:07 | 10 | **Q.**   Dr. Pool? |
| 11:55:09 | 11 | **A.**   Likewise.  I didn't make those contacts, but I |
| 11:55:12 | 12 | believe that Jones Day has, yes. |
| 11:55:13 | 13 | **Q.**   Tommy Barris? |
| 11:55:15 | 14 | **A.**   Same. |
| 11:55:16 | 15 | **Q.**   Robert Smith? |
| 11:55:18 | 16 | **A.**   Robert Smith -- yes, we have been in contact |
| 11:55:23 | 17 | with counsel for Robert Smith. |
| 11:55:24 | 18 | **Q.**   In fact, even Mrs. Brockman is represented by |
| 11:55:27 | 19 | counsel? |
| 11:55:27 | 20 | **A.**   Yes, she is. |
| 11:55:28 | 21 | **Q.**   And you are still willing to contact her, even |
| 11:55:30 | 22 | though she's a potential witness represented by |
| 11:55:32 | 23 | counsel? |
| 11:55:32 | 24 | **A.**   Well, yes.  We've considered carefully with her |
| 11:55:36 | 25 | counsel about the appropriate relationship and |

11:55:41  1   appropriate boundaries for contact with

11:55:44  2   Mrs. Brockman directly, and with her counsel's

11:55:48  3   careful consideration there has been a relationship

11:55:50  4   struck that permits us to speak to Mrs. Brockman.

11:55:53  5   Q.   Why the exception for Dr. Yudofsky?

11:55:55  6   A.   I -- I don't remember the -- this was our

11:55:59  7   position at the time about Dr. Yudofsky, so I can't

11:56:03  8   --

11:56:03  9   Q.   You said every word in this letter is accurate;

11:56:06  10  right?

11:56:06  11  A.   I read it to satisfy myself that as best I

11:56:09  12  could tell it was accurate, yes.

11:56:11  13  Q.   I think you testified earlier that after

11:56:13  14  reading you believed that every word was accurate?

11:56:15  15  A.   Yes.

11:56:15  16  Q.   And so, that would include the footnotes;

11:56:18  17  right?

11:56:18  18  A.   Yes.

11:56:18  19  Q.   We're not just talking about the text?

11:56:20  20  A.   Yes.

11:56:20  21  Q.   And so, you are saying it's an accurate

11:56:22  22  statement?

11:56:23  23  A.   Mm-hmm.

11:56:24  24  Q.   That Jones Day declined to contact Dr. Yudofsky

11:56:28  25  because he was represented by counsel?

11:56:31   1   A.   Well, I don't remember that independently, but
11:56:34   2   I read that here so I'm sure that was our position.
11:56:37   3   Q.   And that that's a policy that has not been
11:56:40   4   extended to the other witnesses in this case?
11:56:43   5   A.   Well, our relationship, one by one to witnesses
11:56:47   6   in any case, is very much a case-by-case question.
11:56:52   7   Q.   Did you know at the time you wrote this letter
11:56:56   8   that Dr. Yudofsky was going to take the Fifth to all
11:57:00   9   questions related to his treatment of Mr. Brockman?
11:57:05   10   A.   No, I'm quite sure I did not know that.
11:57:08   11   Q.   Okay.  So the way this is worded is just
11:57:16   12   because Dr. Yudofsky had an attorney, Jones Day did
11:57:18   13   not bother to reach out to him; that's your
11:57:20   14   testimony?
11:57:21   15   A.   Well, it does not say we did not bother.  It
11:57:23   16   says what it says.
11:57:24   17   Q.   It says, "We have not contacted him"?
11:57:27   18   A.   Correct.
11:57:28   19   Q.   And so that's, "We didn't even make an
11:57:31   20   attempt"?
11:57:31   21   A.   That I think is a fair implication of this.
11:57:34   22   Q.   So you are trying to assemble the best evidence
11:57:39   23   you can to convince the Government not to indict
11:57:42   24   your client?
11:57:43   25   A.   Right.

11:57:44  1   Q.   And this letter is an important stage in the

11:57:48  2   case?

11:57:48  3   A.   An important first step in that process, yes.

11:57:51  4   Q.   And prior to taking that important first step,

11:57:56  5   you didn't bother to contact this witness?

11:57:59  6   A.   I didn't do so, and I read here that we did not

11:58:03  7   -- that Jones Day did not.

11:58:22  8            MR. LANGSTON:   I have nothing further,

11:58:23  9   Your Honor.

11:58:24  10            MR. LOONAM:   Short redirect, Your

11:58:25  11   Honor.

11:58:25  12            THE COURT:   Let me -- before we go on,

11:58:27  13   I want to make sure I get this.   So who is Mr. David

11:58:31  14   Schmeck (phonetic) to your knowledge?

11:58:34  15            MR. VARNADO:   Your Honor, I apologize.

11:58:35  16   I don't know that name.

11:58:39  17            THE COURT:   Um, okay.   I was trying to

11:58:41  18   figure out -- my understanding is that he is counsel

11:58:45  19   for Reynolds and Reynolds; is that right?

11:58:49  20            MR. VARNADO:   David Schmeck --

11:58:53  21            MR. LANGSTON:   Scott Cherry is the

11:58:54  22   general counsel.

11:58:55  23            MR. LOONAM:   Yeah, Cherry.

11:58:58  24            THE COURT:   Okay.   Great.

11:59:00  25            MR. LOONAM:   It's not ringing a bell

11:59:01   1    for me either, Your Honor.  Let me look back and see

11:59:04   2    if there are -- anyone?

11:59:06   3                    THE COURT:  Okay.  This is a collateral

11:59:08   4    issue that I was looking at, so I wanted to make

11:59:10   5    sure.

11:59:11   6                         Then the second question I had,

11:59:13   7    just briefly, I want to make sure I understood the

11:59:16   8    decision not to tell counsel that were involved in

11:59:22   9    the depositions of Mr. Brockman, that decision was

11:59:26   10   made by Mr. Brockman or was it made by you?

11:59:29   11                   THE WITNESS:  That was made by us, but

11:59:31   12   it was pursuant to a general request by Mr. Brockman

11:59:37   13   that we keep closely held and not tell others about

11:59:41   14   his medical problems.

11:59:42   15                   THE COURT:  Okay.  So others included

11:59:44   16   counsel that was representing him in the

11:59:47   17   depositions?

11:59:49   18                   THE WITNESS:  Well, he didn't specify.

11:59:50   19   He just asked us to keep to ourselves and not tell

11:59:53   20   others.  We applied that direction to those counsel

11:59:58   21   as well.  We respected that request.

11:59:59   22                   THE COURT:  Okay.  I just wanted to

12:00:01   23   make sure I understood it.  Thank you.

           24                         ///

           25                         ///

<u>**REDIRECT EXAMINATION**</u>

**BY MR. LOONAM:**

Q.   On that point, pick up where Judge left off.
Were you aware, or did you have knowledge of whether
Mr. Brockman had any concerns of being perceived as
weak because of his diagnosis?

A.   Yes.

Q.   Can you tell us about that?

A.   Well, I -- I do remember that he -- he was
concerned that certain people at the company and
others might have that reaction.

          MR. LANGSTON:  Your Honor, I'm going to
object here.  I don't necessarily have a problem
with the question, but to the extent he's going to
be able to testify about things Mr. Brockman told
him with respect to his motivation, and we are not
allowed to ask other information that he learned
from his client I think is a little unfair.

          THE COURT:  It's getting close to
touching upon attorney-client privilege.  If he's
talking about what motivated him to tell his lawyers
not to disclose that information, then you're
opening up the door.  I don't think you want to, but
you're opening up the door about him cross-examining
about exactly what words he used.

12:01:17  1          MR. LOONAM:  I certainly don't want the

12:01:18  2    direct communication.  I was asking for -- for

12:01:20  3    Mr. Romatowski's understanding and -- and impression

12:01:24  4    that I think laid the foundation, but I can move on.

12:01:28  5          THE COURT:  Okay.  Because I mean, I

12:01:30  6    understand where you are going.

12:01:31  7          MR. LOONAM:  Yep.

12:01:31  8          THE COURT:  My question was focused on

12:01:33  9    -- I wanted to know who made the call, and that was

12:01:36  10   it.  I didn't ask about any conversations about why

12:01:38  11   it was made, who made it -- I mean, why it was made,

12:01:41  12   the discussions.  I just wanted to know who made the

12:01:44  13   call.  You are actually getting into why the call

12:01:49  14   was made, and that's pushing into attorney-client

12:01:52  15   privilege information.

12:01:53  16          MR. LOONAM:  Your Honor, it's --

12:01:54  17          THE COURT:  I mean --

12:01:56  18          MR. LOONAM:  -- thank you.  I don't

12:01:58  19   want to do that, and so we're not going to do and so

12:02:00  20   I'll withdraw.

12:02:01  21          THE COURT:  Okay.

12:02:03  22          MR. LOONAM:

12:02:03  23   Q.   You -- in discussing the letter and what was in

12:02:11  24   the letter, what was not in the letter, you

12:02:13  25   described the April letter -- Government's

Exhibit --

MR. VARNADO:  81.

MR. LOONAM:

Q.   -- 81 -- you don't need to look at it -- as an important first step.  What do you mean you viewed this an important first step?

A.   Well, we expected this to start a process to open up a dialogue between us and prosecutors about these medical issues, interviews by the Government of our doctors, which we offered that they conduct without our participation in any respect, possibly further medical examination requested by the Government -- by physicians of their own choosing. And I expected that this would start an -- a rigorous inquiry into his medical condition and discussion back and forth between us and a responsible decision reached on the question.

So I -- this was not the last word. -- this April letter was the first word, expecting that all of this material -- whatever source had new material generated in the fashion I described would contribute to that conversation.

Q.   And on cross-examination you were asked questions about Dr. York and whether you had retained an independent forensic expert to conduct

12:03:43  1  an examination of Mr. Brockman; do you recall that

12:03:46  2  testimony on direct?

12:03:47  3  **A.**   Right.

12:03:47  4  **Q.**   On cross-examination?

12:03:49  5  **A.**   Yes.

12:03:49  6  **Q.**   Well, did -- did you indeed invite the

12:03:55  7  Government to do exactly that?

12:03:57  8  **A.**   Yes.

12:04:00  9  **Q.**   And did you have any reason to believe that,

12:04:05  10  um, the information obtained from Dr. York at Baylor

12:04:12  11  Medical School -- that she was doing anything less

12:04:15  12  than an honest job?

12:04:16  13  **A.**   None at all.

12:04:18  14  **Q.**   Did you believe that Dr. York at Baylor Medical

12:04:20  15  School was doing -- was not qualified or capable of

12:04:25  16  providing the information you needed to provide to

12:04:30  17  the Department of Justice -- as a first step?

12:04:32  18  **A.**   We thought that she was well qualified and an

12:04:35  19  appropriate person to contribute to this inquiry.

12:04:38  20  **Q.**   Um --

12:04:40  21  **A.**   We didn't think she'd be the last word.

12:04:45  22  **Q.**   And here we are.  She wasn't the last word.

12:04:49  23  **A.**   Turns out.

12:04:52  24  **Q.**   You were asked questions about Dr. Lai -- well,

12:05:00  25  going back to the -- the April 6th letter and -- and

12:05:05  1  Dr. Yudofsky, are you aware that Jones Day provided

12:05:13  2  HIPAA wavers to the Government so that it could

12:05:17  3  obtain records and engage in conversations with, um,

12:05:21  4  Mr. Brockman's treating doctors?

12:05:22  5  A.   Yes.

12:05:22  6  Q.   And are you aware of whether the Government

12:05:25  7  provided a HIPAA waiver for Dr. Yudofsky?

12:05:28  8  A.   Whether the Government provided --

12:05:30  9  Q.   No, I'm sorry.  Whether -- whether -- whether

12:05:32  10  Jones Day provided a HIPAA waiver for Dr. Yudofsky

12:05:35  11  so the Government could talk to --

12:05:36  12  A.   I believe that's correct.

12:05:48  13  Q.   You were asked questions about Dr. Lai and

12:05:52  14  Dr. Lai's diagnosis.  Are you aware that Dr. Lai has

12:05:57  15  now diagnosed Mr. Brockman with dementia?

12:06:00  16  A.   I don't know anything about Dr. Lai's opinions,

12:06:03  17  I'm afraid.

12:06:05  18  Q.   You were asked questions about short-term

12:06:09  19  memory and long-term memory, and Mr. Brockman's

12:06:13  20  ability to -- and I think if we go back -- discuss

12:06:19  21  contemporaneous events; do you recall that

12:06:22  22  testimony?

12:06:22  23  A.   I recall there were questions in that area.

12:06:23  24  Q.   Okay.  And now that we've gone down this

12:06:28  25  hearing, there may be distinctions between

12:06:31  1  discussing contemporaneous events and memory.  Did

12:06:35  2  you -- in connection with Bob's resignation from

12:06:43  3  Reynolds and Reynolds, do you recall anything where

12:06:48  4  you could highlight the distinction between being

12:06:52  5  able to discuss contemporaneous events and having a

12:06:55  6  memory for contemporaneous events?

12:06:59  7  A.   I'm afraid I'm not acquainted with the

12:07:05  8  distinction.  I'm not aware of the testimony that's

12:07:08  9  elaborated this, so I just don't have anything to

12:07:12  10 offer in that respect -- put that way.

12:07:14  11 Q.   No, fair enough.  It's a terrible question.

12:07:21  12 You were asked questions on direct about

12:07:22  13 Mr. Brockman having to continue to sign board

12:07:26  14 resolutions, you know, while he remained in the

12:07:29  15 position at Reynolds and Reynolds; correct?

12:07:30  16 A.   Yes, but I had questions about a

12:07:36  17 reorganization.  What I remember is that the board

12:07:37  18 was reconstituted.

12:07:38  19 Q.   And do you know if Mr. Brockman needed to sign

12:07:43  20 documents in connection with his resignation from

12:07:48  21 Reynolds and Reynolds?

12:07:48  22 A.   I'm quite sure he did, yes.

12:07:55  23 Q.   Do you recall discussions afterwards that are

12:07:57  24 raised concerns about Mr. Brockman's cognitive

12:07:59  25 abilities?

12:07:59  1   **A.**   Well, there were discussions throughout about

12:08:02  2   our concerns about Mr. Brockman's cognitive

12:08:04  3   abilities.

12:08:05  4   **Q.**   Okay.  But as you sit here today you don't

12:08:07  5   recall whether there was a specific instance that

12:08:09  6   you recall in connection with his resignation?

12:08:11  7   **A.**   I -- I can't say that I recall that.

12:08:15  8                   MR. LOONAM:  All right.  No further

12:08:16  9   questions for this witness, Your Honor.

12:08:18  10                  THE COURT:  Okay.  Anything further

12:08:19  11  from this witness?

12:08:20  12                  MR. LANGSTON:  No, Your Honor.

12:08:21  13                  THE COURT:  May Mr. Romatowski be

12:08:22  14  excused?

12:08:25  15                  MR. LANGSTON:  Yes.

12:08:26  16                  MR. VARNADO:  Yes, Your Honor.

12:08:27  17                  THE WITNESS:  Thank you.

12:08:27  18                  THE COURT:  You are excused, sir.

12:08:30  19                  THE WITNESS:  Thank you, Your Honor.

12:08:31  20  Happy Thanksgiving.

12:08:32  21                  THE COURT:  Happy Thanksgiving.

12:08:34  22                  Counsel, I want to take a quick

12:08:36  23  recess and think about the issue.  One quick

12:08:38  24  question, though.  First, Ms. Keneally, I don't -- I

12:08:43  25  don't mean to talk to you -- talk about you like in

12:08:45  1    the third person here, but Ms. Keneally, what -- her

12:08:50  2    -- how is her testimony going to differ from

12:08:54  3    Mr. Romatowski?  They're both from Jones Day.  They

12:08:56  4    both saw Mr. Brockman.

12:09:01  5              MR. LOONAM:  Your Honor, it's -- it's

12:09:02  6    largely duplicative.  The Government has a point

12:09:06  7    that Ms. Keneally has had some more recent contact

12:09:12  8    with Mr. Brockman, but I think we have a lot of

12:09:18  9    testimony about the downward progression of

12:09:22  10   Mr. Brockman's disease, especially after the

12:09:25  11   delirium episodes.

12:09:28  12             So that -- that's largely in the

12:09:30  13   record.  You know, so -- so I think it does largely

12:09:35  14   duplicate, and certainly the -- the vast majority of

12:09:41  15   my direct would duplicate what -- what

12:09:44  16   Mr. Romatowski has testified to.

12:09:46  17             THE COURT:  Okay.  I mean, and so -- I

12:09:52  18   guess my question to the Government is what's the

12:09:53  19   prejudice -- I know they didn't give you time --

12:09:57  20   they didn't follow my rules to give you adequate

12:09:59  21   time to prepare, but they're just going to

12:10:01  22   cross-examine her on, you know, the more recent

12:10:05  23   issues of incompetence.  Why can't I give you guys,

12:10:12  24   you know, a couple hours or a little time to be

12:10:14  25   prepared for that and then address it?

```
12:10:17   1              MR. LOONAM:  I mean --
12:10:19   2              MR. COREY SMITH:  If I can respond?
12:10:20   3    You know, we don't want to cause all of this
12:10:23   4    consternation.  We do all want to get finished.  The
12:10:26   5    holidays are tomorrow.  If they want to put
12:10:27   6    Ms. Keneally on to say the same thing Peter
12:10:29   7    Romatowski -- let's just move forward.  And so, you
12:10:32   8    know, we just noted our objection we weren't given
12:10:35   9    proper notice.
12:10:36  10              We're ready to go if they want to
12:10:37  11    go, let's just finish this thing and get this last
12:10:40  12    bit of testimony.  We're fine with that, Judge.
12:10:43  13              MR. LOONAM:  Your Honor, I don't want
12:10:44  14    to waste -- going to duplicate.  We'll rest.
12:10:47  15              THE COURT:  I'm not forcing anyone to
12:10:48  16    rest.  I mean, the -- what I'm looking at is my
12:10:51  17    rules are basically for notice so that the
12:10:55  18    proceeding can go forward on an expedited basis and
12:11:03  19    an orderly basis.  You know, basically one of the
12:11:08  20    main reasons for the rule is to make sure that the
12:11:10  21    parties have enough time to prepare and be ready for
12:11:13  22    the witness.
12:11:16  23              So what I was thinking about is
12:11:18  24    just giving you additional time, but I want -- I'm
12:11:20  25    not cutting you off because it's Thanksgiving.  If
```

12:11:23   1   you want additional time, I'm here.  I'll give it to

12:11:25   2   you.

12:11:26   3            MR. LOONAM:  Your Honor, given the

12:11:27   4   timing of where we are and the -- and the

12:11:30   5   duplication of the testimony and what's already in

12:11:33   6   the record about the progressive nature of the

12:11:35   7   disease and the observations I think from all sides

12:11:38   8   -- I mean, we're -- I think at the end of the day,

12:11:40   9   and we have a briefing and discuss the briefing

12:11:43   10  schedule, but -- but -- but we're slicing the

12:11:47   11  difference between, you know, what is reasonable

12:11:51   12  between early dementia, moderate dementia or MCI,

12:11:54   13  and his capabilities.  You know, I -- I think the

12:11:58   14  Court has what it needs, and the parties have what

12:12:03   15  they need to brief this at this point.  I don't want

12:12:06   16  to duplicate and keep everyone here and -- and

12:12:09   17  prejudice anyone.

12:12:10   18            So we rest.

12:12:12   19            THE COURT:  Okay.

12:12:14   20            MR. COREY SMITH:  We just want the

12:12:14   21  record to be clear that we're not -- we want the

12:12:18   22  record to reflect in some way the Government is

12:12:20   23  encouraging them to rest that if they did want to --

12:12:22   24  we're ready to go.

12:12:23   25            THE COURT:  Okay.

| | |
|---|---|
| 12:12:24 | 1 |
| 12:12:26 | 2 |
| 12:12:29 | 3 |
| 12:12:31 | 4 |
| 12:12:34 | 5 |
| 12:12:36 | 6 |
| 12:12:39 | 7 |
| 12:12:45 | 8 |
| 12:12:48 | 9 |
| 12:12:51 | 10 |
| 12:12:55 | 11 |
| 12:12:57 | 12 |
| 12:12:59 | 13 |
| 12:13:02 | 14 |
| 12:13:03 | 15 |
| 12:13:05 | 16 |
| 12:13:07 | 17 |
| 12:13:10 | 18 |
| 12:13:14 | 19 |
| 12:13:16 | 20 |
| 12:13:19 | 21 |
| 12:13:21 | 22 |
| 12:13:24 | 23 |
| 12:13:25 | 24 |
| 12:13:27 | 25 |

MR. COREY SMITH:  If that's -- do what they want.  That's fine.  But for appellate purposes, we're not encouraging that or requesting it.  That's their decision.

MR. LOONAM:  Yeah, no.  We -- we don't think there's any due process violation with respect to this -- at this point.  We understand that, you know, the Court's willing to give them time.  They don't want to -- the appellate issue -- we -- we -- we're not -- we rest, and we rest in light of the Government's comment.

THE COURT:  Okay.

MR. LOONAM:  Comment they don't --

MR. COREY SMITH:  Yeah, there's no objection.  We're satisfied.

THE COURT:  Well, we'll bring this hearing to a close then.  Counsel, thank you for your time and your focus.  We got a lot done in the course of a, you know, week and a half.  I appreciate you guys working with my schedule as well.

What about the briefing?

MR. COREY SMITH:  Before we get to that, Your Honor.  We do have one document we want to put in rebuttal --

12:13:29  1           THE COURT:  Okay.

12:13:29  2           MR. COREY SMITH:  -- which is marked as

12:13:30  3  175, which is the October 15th transcript of the

12:13:34  4  Defendant's arraignment in San Francisco by --

12:13:38  5           THE COURT:  Okay.

12:13:39  6           MR. COREY SMITH:  -- representing the

12:13:40  7  defendant at that time was Neal Stephen's partner at

12:13:43  8  Jones Day, and we can put the transcript in.

12:13:45  9           MR. VARNADO:  Don't object to it.

12:13:47  10           MR. LOONAM:  No objection.

12:13:50  11           MR. COREY SMITH:  Want a copy?

12:13:51  12           MR. VARNADO:  Know what it says.

12:13:52  13           MR. COREY SMITH:  I want to read into

12:13:53  14  the record, because this is relevant to the issues

12:13:55  15  today.  In answer to a question from the Court,

12:13:58  16  Mr. Stephens told the Court in response to -- in

12:14:01  17  regard to Mr. Brockman that, "He is not a flight

12:14:04  18  risk.  He's certainly not a danger to the community.

12:14:06  19  He's dealing with serious medical issues" -- I'm

12:14:10  20  sorry.  Let me start over.  I got the wrong

12:14:12  21  paragraph.

12:14:13  22           "To counsel's point, Your Honor, on

12:14:15  23  risk of flight, Mr. Brockman has known about this

12:14:17  24  investigation for four years.  He's here today, you

12:14:21  25  know, voluntarily after accepting summons from the

12:14:23    1  government" -- and it goes on.

12:14:24    2                    That's Page 18 of the transcript.

12:14:26    3  So we move that into evidence.

12:14:27    4              MR. VARNADO:  We have no objection to

12:14:29    5  that, Your Honor.  I want to try to get the audio of

12:14:32    6  that to see if he's known about it "for years," or

12:14:37    7  "for four years."

12:14:38    8              I -- he -- may only said --

12:14:40    9  Mr. Stephens may have said "for four" --

12:14:43   10              MR. COREY SMITH:  The transcript says

12:14:44   11  "for four."

12:14:45   12              MR. VARNADO:  I agree with you.  The

12:14:46   13  transcripts in this case riddled with errors -- not

12:14:55   14  these ones.  The Zoom hearings are a challenge.

12:14:56   15              MR. LOONAM:  Can we agree to keep the

12:14:58   16  record open for the audio portion of that?  We

12:15:00   17  obviously all want a perfect record.

12:15:03   18              MR. COREY SMITH:  Have to contact the

12:15:04   19  court reporter in San Francisco.

12:15:06   20              THE COURT:  Sure.  Here's what we'll

12:15:08   21  do, and this is part of getting everything together

12:15:10   22  for me.  I need you all to get together and agree on

12:15:13   23  everything that was admitted, and then get that to

12:15:16   24  me and I will give you all an affidavit basically to

12:15:20   25  sign saying this is all of the evidence so that

| | | |
|---|---|---|
| 12:15:22 | 1 | there's no question on appeal if there's an appeal |
| 12:15:26 | 2 | what evidence the Court had to consider. |
| 12:15:28 | 3 | MR. LOONAM:  Yeah. |
| 12:15:28 | 4 | THE COURT:  Because everybody was -- |
| 12:15:30 | 5 | there are bits and pieces of things that had already |
| 12:15:33 | 6 | been introduced.  I need everything in one place, |
| 12:15:37 | 7 | either in a box or one computer file, and then I'll |
| 12:15:39 | 8 | give you my case manager.  Ask him for it -- the |
| 12:15:44 | 9 | form I need you to fill out.  -- just an |
| 12:15:47 | 10 | acknowledgement saying, "These are all of the |
| 12:15:49 | 11 | documents.  This is everything that the Court should |
| 12:15:51 | 12 | consider," so that I'm not inadvertently considering |
| 12:15:54 | 13 | something that wasn't introduced or -- or -- or |
| 12:15:58 | 14 | wasn't given to me in the proper form. |
| 12:16:01 | 15 | MR. VARNADO:  We've been communicating |
| 12:16:03 | 16 | really collaboratively with the Government all week. |
| 12:16:05 | 17 | And I think what I would recommend -- and we haven't |
| 12:16:09 | 18 | talked to Corey about this yet -- prepare a |
| 12:16:11 | 19 | stipulation that says, "We all agree these were the |
| 12:16:13 | 20 | items entered into evidence, and these following |
| 12:16:16 | 21 | exhibits should be sealed because of so much medical |
| 12:16:18 | 22 | evidence." |
| 12:16:20 | 23 | So we're on it, and I think |
| 12:16:22 | 24 | collaborating every night after work to try -- |
| 12:16:25 | 25 | MR. COREY SMITH:  The parties have been |

12:16:26  1  matching exhibit lists and exhibits.  They've been

12:16:28  2  working together.  I'm informed we have a set of

12:16:31  3  exhibits that have all -- that have been shown to

12:16:33  4  counsel.  They've agreed that -- at least the

12:16:36  5  Government exhibits.  I believe the same has gone

12:16:38  6  the other way.

12:16:39  7          So I think we're just about there,

12:16:41  8  Judge.

12:16:41  9          THE COURT:  Okay.

12:16:42  10         MR. LOONAM:  I would only add, I think

12:16:45  11 under your rules there's a 48-hour --

12:16:48  12         THE COURT:  Right, we'll suspend the

12:16:50  13 48 hours, because it's the holidays.

12:16:53  14         MR. LOONAM:  Big sigh of relief here.

12:16:54  15 We very much appreciate that.

12:16:56  16         THE COURT:  It'll be by agreement of

12:16:57  17 the parties.  Typically I want 48 hours, because

12:17:01  18 usually what happens after an evidentiary hearing or

12:17:03  19 a trial is everybody goes their separate ways.  They

12:17:06  20 leave poor hapless legal assistants to try to sort

12:17:10  21 it all out and the lawyers are gone.  So I tell

12:17:12  22 them, "Forty-eight hours.  Get it.  Do it and then

12:17:16  23 it is done."

12:17:17  24         But in this case there's a holiday

12:17:19  25 involved, so it'll be -- you'll get it together by

12:17:21  1  agreement of the parties.

12:17:24  2           MR. VARNADO:  Very good, Judge.

12:17:25  3           MR. LOONAM:  Thank you, sir.

12:17:27  4           MR. COREY SMITH:  Now the briefing

12:17:28  5  schedule.

12:17:28  6           MR. VARNADO:  So right now, Judge, we

12:17:30  7  just have an order that you entered on

12:17:34  8  September 17th that sort of adjusted the

12:17:36  9  post-hearing briefing schedule when this got

12:17:37  10  continued from September to last week.  I think at

12:17:41  11  that point in time the Government estimated their

12:17:43  12  case would take two and a half days, and we thought

12:17:46  13  the balance of our case would take a total of five

12:17:48  14  days.  We're here now on day eight.

12:17:51  15           That's not anything pejorative of

12:17:55  16  either side.  It's been a well-litigated case in all

12:17:57  17  respects, but I think increased volume -- the

12:18:02  18  current briefing deadline is December 6th.  I think

12:18:04  19  that's far too soon, and there's a lot to consider.

12:18:08  20           So what we consider is additional

12:18:11  21  briefing be 30 days from today, which would take us

12:18:14  22  to December 23rd, at least before Christmas.

12:18:17  23           And then, sometime after -- I think

12:18:18  24  the current schedule would contemplate -- I think it

12:18:21  25  was two weeks for just, you know, simultaneous reply

12:18:24  1  briefing.  We would suggest it be pushed out a

12:18:27  2  little bit to January 10th for replies just so

12:18:31  3  people aren't having to work completely between

12:18:34  4  Christmas and New Year's.

12:18:35  5          You'll have everything by the 10th

12:18:37  6  of January with all of the parties's submissions.

12:18:40  7  That's our proposal to the Court.

12:18:41  8          THE COURT:  Okay.

12:18:42  9          MR. COREY SMITH:  We were looking for

12:18:43  10  something a little bit quicker.  We were looking to

12:18:45  11  propose initial briefs by December 10th, which is

12:18:49  12  the Friday after the 6th, and keep the response

12:18:51  13  briefs on the 23rd as initially scheduled.

12:18:55  14          THE COURT:  Okay.  Is there a reason --

12:18:58  15  and my concern -- I want to try to get this done as

12:19:02  16  quickly as possible, but I don't want to

12:19:04  17  inconvenience the parties because we need -- you

12:19:06  18  know, I need to know and Mr. Brockman needs to know

12:19:08  19  what's going to happen as soon as possible.

12:19:14  20          So with respect to your briefing --

12:19:16  21  I mean, how many pages are you looking at?  I mean,

12:19:19  22  there's a lot.  I mean, there's no question.

12:19:22  23          MR. COREY SMITH:  We were going to

12:19:23  24  inquire.  We brought this up before, Your Honor.  If

12:19:27  25  the Court has some ideas of what they'd like --

12:19:29   1   you'd like to hear, narrow the issues to questions

12:19:31   2   that you have, we can then focus the briefs on those

12:19:36   3   issues.  And we'd also ask for a page limit -- I

12:19:41   4   mean, the typical rules are 25 pages.  We don't

12:19:44   5   think we need to go much past that, maybe 40.

12:19:48   6                    But not unlimited, and focused on

12:19:50   7   the issues the Court wants to hear about.  That's

12:19:53   8   what we would like to do.

12:19:54   9                    THE COURT:  Okay.

12:19:54   10                   MR. LOONAM:  Your Honor, I'll just add.

12:19:56   11   With respect to the timing of this and -- and -- and

12:19:58   12   the parties aren't far off.  Um, I think the

12:20:02   13   additional time is useful.  You know, the old adage

12:20:05   14   that, "If I had more time, it could have been a

12:20:08   15   little shorter."

12:20:10   16                   THE COURT:  Right.

12:20:10   17                   MR. LOONAM:  So for Your Honor's

12:20:11   18   benefit, you know, that time is helpful for us

12:20:13   19   instead of trying to scramble to get everything in,

12:20:15   20   and gives us time to work it down and make it more

12:20:18   21   focused.  So I think it would be productive for all

12:20:21   22   sides to have that, and try to and focus it and try

12:20:23   23   to digest the vast volume of information of highly

12:20:27   24   technical and specific critical to this hearing.

12:20:31   25                    On the page limit, you know --

12:20:35  1          MR. VARNADO:  That's going to be more

12:20:37  2  than 25 or 40 pages.  There's a lot here.

12:20:39  3          THE COURT:  Yeah, there's a lot --

12:20:41  4          MR. VARNADO:  We need to put some law

12:20:42  5  in front of you, as well as the facts.  And, you

12:20:44  6  know, obviously we'll adhere to whatever guideline

12:20:47  7  restriction you give us, but I would submit this --

12:20:50  8  these submissions could be fairly lengthy, maybe

12:20:53  9  double the normal page limit.

12:20:54  10          THE COURT:  Why don't you guys try to

12:20:56  11  reach some agreement and I'll think about it.  I

12:20:58  12  will get back to you guys on Friday.  So you think

12:21:03  13  about it, I'll think about it, and then we'll confer

12:21:06  14  after Friday with respect to what you guys are

12:21:10  15  thinking and I'm thinking.

12:21:12  16          Because as I said, the longer it --

12:21:15  17  the longer we put it off, the -- you know, the

12:21:20  18  parties need to get some resolution, one way or the

12:21:22  19  other, as soon as possible.  Mr. Brockman needs to

12:21:25  20  know.  The Government needs to know, so that

12:21:29  21  everybody can do whatever they need to do.

12:21:31  22          And I am reminded of what a wise

12:21:36  23  judge once said, which was a lawyer will agree to

12:21:39  24  his own execution date if you just give him an

12:21:42  25  extension.

| | | |
|---|---|---|
| 12:21:44 | 1 | MR. VARNADO:  Judge, we're not trying |
| 12:21:45 | 2 | to put this off, but just given the amount of volume |
| 12:21:49 | 3 | and respect for the holidays on both sides. |
| 12:21:50 | 4 | THE COURT:  I understand that.  And I |
| 12:21:52 | 5 | don't want to jam you guys up as well.  So why don't |
| 12:21:55 | 6 | you see if you can come to some agreement, and maybe |
| 12:22:00 | 7 | time agreement as to page length and briefing |
| 12:22:03 | 8 | schedule, and then submit something to me and I will |
| 12:22:06 | 9 | think about the same thing. |
| 12:22:07 | 10 | MR. COREY SMITH:  Very good, Your |
| 12:22:08 | 11 | Honor.  We'll do that. |
| 12:22:09 | 12 | THE COURT:  Okay.  With that, the |
| 12:22:12 | 13 | hearing's adjourned.  Thank you all again for your |
| 12:22:14 | 14 | time.  Happy Thanksgiving everyone.  Safe travels |
| 12:22:17 | 15 | back to wherever. |
| 12:22:19 | 16 | MR. VARNADO:  I'll be here, Judge. |
| 12:22:20 | 17 | THE COURT:  Okay.  Everyone else. |
| 12:22:21 | 18 | MR. LOONAM:  I'm outta here. |
| 12:22:27 | 19 | MR. VARNADO:  And thanks to your staff, |
| 12:22:28 | 20 | and really the time and attention.  We really |
| 12:22:29 | 21 | appreciate it. |
| 12:22:29 | 22 | THE COURT:  Not a problem.  You all may |
| 12:22:30 | 23 | be excused, but I need to get things organized so |
| 12:22:33 | 24 | I'm not moving for awhile. |
| 12:22:36 | 25 | **(PROCEEDINGS ADJOURNED AT: 12:22 P.M.)** |

1                          ---oOo---

2

3                    C E R T I F I C A T E

4

5

6          I hereby certify that pursuant to Title 28,

7   Section 753 United States Code, the foregoing is a

8   true and correct transcript of the stenographically

9   reported proceedings in the above matter.

10         Certified on 11/29/2021.

11

12

13   _____
     Sean Gumm, RPR, CRR

14

15

16

17

18

19

20

21

22

23

24

25

## 1

**1.3** [1] - 14:8
**1/8/20** [1] - 71:2
**10** [2] - 46:21, 68:18
**100** [1] - 21:18
**10:10** [1] - 7:23
**10:19** [1] - 4:1
**10th** [3] - 104:2, 104:5, 104:11
**11/29/2021** [1] - 108:10
**115** [4] - 36:23, 36:24, 38:17, 38:20
**12:22** [1] - 107:25
**143** [1] - 70:5
**15** [2] - 72:6, 72:9
**156** [1] - 70:5
**15th** [1] - 99:3
**16** [1] - 62:17
**17** [4] - 72:5, 72:9, 74:24, 79:23
**17-page** [1] - 49:13
**174** [3] - 16:1, 17:4, 17:15
**175** [1] - 99:3
**17th** [1] - 103:8
**18** [1] - 22:4, 100:2
**18th** [1] - 24:21

## 2

**2** [2] - 53:17, 60:15
**20** [1] - 46:21
**2015** [1] - 14:22
**2017** [2] - 72:6, 79:25
**2018** [9] - 11:6, 12:18, 14:22, 19:22, 37:1, 73:15, 76:13, 77:12, 78:13
**2019** [21] - 19:24, 20:16, 20:22, 21:8, 21:10, 22:4, 26:22, 26:23, 28:18, 29:9, 29:13, 31:7, 34:10, 36:19, 37:14, 42:4, 55:5, 58:17, 68:12, 69:22, 70:13
**2020** [49] - 9:15, 10:2, 10:6, 20:17, 20:22, 38:25, 39:5, 40:24, 41:2, 41:10, 41:22, 42:9, 42:17, 42:18, 42:25, 43:18, 43:25, 44:3, 44:7, 44:10, 44:12, 45:1, 45:8, 45:9, 45:18, 47:17, 48:12, 48:24, 51:8, 52:14, 52:16, 52:19, 54:1, 54:16, 54:19,

55:2, 58:19, 61:17, 61:24, 63:3, 65:8, 66:21, 67:12, 67:19, 68:15, 70:12, 82:3
**2021** [8] - 1:12, 4:1, 9:25, 10:5, 15:24, 18:9, 35:4, 72:11
**23rd** [2] - 103:22, 104:13
**24** [2] - 1:12, 4:1
**25** [2] - 105:4, 106:2
**28** [1] - 108:6

## 3

**3** [2] - 69:22, 70:13
**30** [1] - 103:21

## 4

**4** [1] - 65:3
**40** [6] - 39:23, 40:2, 46:6, 46:16, 105:5, 106:2
**48** [2] - 102:13, 102:17
**48-hour** [1] - 102:11
**4:21-CR-00009-1** [1] - 1:4

## 5

**5,000-employee** [1] - 55:14
**5,000-person** [1] - 58:12
**5.5** [2] - 14:4, 14:7
**50** [2] - 46:6, 46:15

## 6

**69** [2] - 38:23, 43:17
**6th** [3] - 91:25, 103:18, 104:12

## 7

**753** [1] - 108:7

## 8

**8** [4] - 1:9, 15:23, 18:9, 70:12
**81** [10] - 47:23, 48:3, 53:8, 53:10, 60:13, 60:14, 60:15, 65:2, 90:2, 90:4
**82** [3] - 48:7, 51:22, 62:15
**8695** [1] - 43:21
**88** [1] - 3:8

## 8th

**8th** [2] - 18:19, 18:22

## 9

**9** [3] - 3:6, 48:11, 63:3
**9th** [4] - 48:24, 53:14, 60:14, 71:4

## A

**A.M** [1] - 4:1
**abilities** [3] - 34:24, 93:25, 94:3
**ability** [4] - 54:8, 54:14, 58:11, 92:20
**able** [21] - 12:18, 21:5, 21:11, 22:9, 22:11, 41:2, 41:22, 42:12, 42:19, 42:21, 44:4, 46:2, 46:9, 46:24, 47:3, 58:23, 69:3, 69:5, 74:23, 88:15, 93:5
**abreast** [2] - 30:9, 33:25
**absolutely** [3] - 5:21, 17:21, 74:7
**accept** [16] - 23:18, 30:20, 35:16, 41:18, 51:10, 52:1, 52:5, 62:19, 63:18, 64:4, 66:14, 66:19, 70:10, 79:8, 79:9, 79:17
**accepting** [1] - 99:25
**access** [1] - 64:21
**accomplish** [1] - 46:22
**account** [1] - 45:8
**accountant** [1] - 36:25
**accurate** [7] - 68:6, 68:8, 69:1, 84:9, 84:12, 84:14, 84:21
**acknowledge** [1] - 61:4
**acknowledgement** [1] - 101:10
**acquainted** [1] - 93:7
**activities** [3] - 30:23, 44:23, 45:1
**activity** [3] - 10:6, 38:15, 44:16
**adage** [1] - 105:13
**add** [3] - 44:15, 102:10, 105:10
**added** [2] - 16:25, 20:4
**additional** [10] - 4:14, 4:23, 20:14, 27:20, 49:12, 51:17, 96:24, 97:1, 103:20, 105:13

**address** [1] - 95:25
**adept** [5] - 39:12, 39:19, 47:10, 47:12, 61:12
**adequate** [1] - 95:20
**adequately** [1] - 58:24
**adhere** [1] - 106:6
**adhered** [1] - 7:16
**adjourned** [1] - 107:13
**ADJOURNED** [1] - 107:25
**adjusted** [1] - 103:8
**admission** [1] - 75:20
**admissions** [3] - 30:3, 30:6, 30:8
**admitted** [2] - 38:20, 100:23
**advanced** [1] - 36:17
**adverse** [1] - 12:2
**advise** [1] - 4:17
**advisement** [1] - 8:5
**advocacy** [1] - 49:16
**advocate** [1] - 24:3
**affected** [3] - 27:23, 28:4, 28:14
**affidavit** [1] - 100:24
**afraid** [2] - 92:17, 93:7
**afterwards** [1] - 93:23
**ago** [1] - 56:16
**agree** [7] - 64:16, 67:2, 100:12, 100:15, 100:22, 101:19, 106:23
**agreed** [6] - 48:19, 48:22, 49:2, 63:7, 65:4, 102:4
**agreeing** [1] - 68:5
**agreement** [5] - 102:16, 103:1, 106:11, 107:6, 107:7
**Agronin** [1] - 75:22
**Agronin's** [1] - 76:4
**ahead** [2] - 37:7, 39:2
**alert** [1] - 69:8
**alerted** [1] - 33:24
**allegation** [1] - 80:11
**allowed** [1] - 88:17
**alone** [1] - 73:13
**AM** [1] - 1:9
**amount** [1] - 107:2
**analog** [1] - 69:1
**anecdotal** [1] - 41:12
**anecdote** [1] - 56:1, 57:19, 58:1
**anecdotes** [3] - 41:5, 41:8, 46:18
**answer** [19] - 17:13, 19:5, 46:13, 71:23, 73:24, 74:1, 74:2,

74:10, 74:15, 74:25, 75:1, 75:7, 77:24, 78:3, 78:15, 78:21, 99:15
**answered** [1] - 75:12
**anticipated** [1] - 6:4
**anticipation** [1] - 47:19
**antitrust** [3] - 13:14, 13:20, 42:3
**apart** [1] - 32:17
**apathetic** [2] - 37:23, 37:25
**apologize** [1] - 86:15
**appeal** [2] - 101:1
**appear** [1] - 66:17
**appearance** [1] - 54:24
**APPEARANCES** [1] - 1:14
**appeared** [1] - 17:1
**appellate** [2] - 98:2, 98:9
**applied** [1] - 87:20
**appreciate** [3] - 98:20, 102:15, 107:21
**approach** [1] - 17:16
**appropriate** [3] - 83:25, 84:1, 91:19
**April** [18] - 47:17, 48:11, 48:24, 53:14, 54:1, 58:19, 60:14, 61:17, 63:3, 65:8, 66:20, 68:17, 71:4, 72:11, 82:2, 89:25, 90:19, 91:25
**arbitration** [2] - 35:4, 35:8
**arbitrator** [5] - 35:13, 35:22, 35:23, 35:25, 36:4
**arbitrator's** [1] - 36:3
**area** [1] - 92:23
**arguably** [1] - 6:15
**argument** [4] - 79:15, 79:17, 80:15, 80:19
**army** [1] - 14:14
**arraignment** [1] - 99:4
**aside** [5] - 16:22, 25:8, 36:2, 74:22, 78:17
**assemble** [1] - 85:22
**assist** [11] - 19:14, 20:21, 23:4, 28:22, 29:5, 46:24, 54:8, 55:6, 55:8, 55:13, 55:21
**assistance** [3] - 19:25, 23:5, 45:25
**assistants** [1] - 102:20
**assisting** [3] - 19:19,

22:25, 45:21
**associated** [1] - 14:25
**AT** [2] - 1:21, 107:25
**attached** [3] - 62:21, 62:25, 70:8
**attaching** [1] - 63:12
**attachments** [2] - 52:2, 66:12
**attempt** [1] - 85:20
**attend** [2] - 15:11, 32:25
**attention** [5] - 43:16, 49:21, 53:17, 72:4, 107:20
**attorney** [14] - 17:10, 17:18, 23:12, 23:20, 23:24, 74:20, 75:3, 76:24, 78:2, 78:16, 78:17, 85:12, 88:20, 89:14
**Attorney** [4] - 1:19, 1:22, 1:23, 1:25
**ATTORNEY** [1] - 1:20
**attorney-client** [10] - 17:10, 17:18, 74:20, 75:3, 76:24, 78:2, 78:16, 78:17, 88:20, 89:14
**attorneys** [5] - 29:25, 32:12, 33:22, 34:1, 34:22
**audio** [2] - 100:5, 100:16
**August** [2] - 11:3, 78:13
**authorize** [1] - 34:7
**authorized** [1] - 35:20
**auto** [1] - 43:10
**available** [3] - 4:13, 9:3, 81:2
**aware** [49] - 13:9, 15:8, 16:14, 16:18, 16:19, 27:10, 27:13, 29:8, 29:12, 29:14, 29:18, 30:13, 31:2, 31:5, 31:9, 35:3, 44:15, 45:3, 45:4, 45:6, 45:16, 58:14, 59:11, 59:19, 59:22, 59:24, 59:25, 60:4, 61:23, 62:3, 65:10, 65:14, 66:21, 67:12, 67:19, 67:24, 69:21, 70:2, 70:3, 70:6, 72:7, 73:3, 79:25, 88:4, 92:1, 92:6, 92:14, 93:8
**awareness** [2] - 44:17, 44:20
**awhile** [1] - 107:24

## B

**backwards** [1] - 10:5
**bad** [2] - 50:15, 50:20
**baffles** [1] - 56:4
**balance** [1] - 103:13
**balanced** [1] - 50:17
**Barris** [1] - 83:13
**Barris's** [1] - 60:9
**based** [16] - 12:13, 25:2, 44:2, 44:9, 45:23, 54:18, 58:1, 59:1, 59:4, 59:6, 73:9, 73:18, 78:2, 78:21, 78:25
**basis** [2] - 96:18, 96:19
**Bates** [1] - 43:21
**Baylor** [2] - 91:10, 91:14
**became** [1] - 38:1
**began** [3] - 13:25, 19:21
**belief** [5] - 23:16, 28:19, 36:2, 45:20, 71:25
**believes** [2] - 6:7, 7:11
**bell** [2] - 22:24, 86:25
**beneficiary** [1] - 28:9
**benefit** [1] - 105:18
**Bermuda** [3] - 76:12, 77:8, 77:9
**best** [7] - 11:15, 33:19, 34:11, 64:21, 67:8, 84:11, 85:22
**bet** [1] - 57:22
**better** [8] - 22:20, 22:22, 22:25, 23:3, 70:21, 70:24, 71:14
**between** [10] - 30:23, 34:14, 41:16, 90:8, 90:16, 92:25, 93:4, 97:11, 97:12, 104:3
**beyond** [1] - 49:12
**big** [1] - 102:14
**binder** [3] - 24:22, 25:18, 25:22
**bit** [7] - 14:3, 27:16, 80:15, 80:19, 96:12, 104:2, 104:10
**bits** [1] - 101:5
**blessedly** [1] - 14:13
**BLEUSTEIN** [1] - 1:25
**block** [1] - 48:15
**blocked** [2] - 35:17, 36:8
**board** [6] - 59:22, 62:4, 62:5, 62:9, 93:13, 93:17
**Bob** [2] - 11:2, 20:10

**Bob's** [1] - 93:2
**bore** [1] - 20:7
**BORIS** [1] - 1:18
**born** [1] - 69:5
**bother** [3] - 85:13, 85:15, 86:5
**bottom** [1] - 77:20
**boundaries** [1] - 84:1
**BOURGET** [1] - 1:18
**box** [1] - 101:7
**brain** [1] - 56:3
**breaches** [1] - 74:19
**brief** [1] - 97:15
**briefing** [10] - 97:9, 98:22, 103:4, 103:9, 103:18, 103:21, 104:1, 104:20, 107:7
**briefly** [2] - 4:8, 87:7
**briefs** [3] - 104:11, 104:13, 105:2
**bring** [2] - 49:20, 98:16
**broad** [2] - 17:7, 46:11
**broader** [1] - 11:21
**broadly** [1] - 60:2
**Brockman** [90] - 9:14, 9:18, 10:19, 11:1, 11:20, 12:13, 12:19, 13:16, 14:1, 14:16, 19:13, 24:21, 27:17, 27:25, 28:1, 28:9, 30:20, 31:11, 31:15, 32:8, 33:13, 34:1, 34:9, 35:5, 36:13, 36:25, 37:3, 37:13, 37:19, 38:24, 39:5, 39:7, 44:3, 44:10, 50:6, 52:9, 53:19, 53:22, 55:21, 59:7, 59:19, 60:16, 60:25, 61:9, 61:20, 61:23, 64:12, 64:15, 64:20, 65:5, 67:25, 69:3, 69:4, 69:14, 69:21, 70:1, 71:22, 72:6, 74:1, 74:9, 74:16, 74:23, 75:1, 75:17, 79:1, 79:5, 79:25, 80:6, 81:8, 81:24, 82:17, 83:18, 84:2, 84:4, 85:9, 87:9, 87:10, 87:12, 88:5, 88:15, 91:1, 92:15, 93:13, 93:19, 95:4, 95:8, 99:17, 99:23, 104:18, 106:19
**BROCKMAN** [1] - 1:7
**Brockman's** [15] - 6:25, 13:15, 26:25, 27:14, 52:12, 64:9,

65:23, 66:3, 66:21, 69:19, 92:4, 92:19, 93:24, 94:2, 95:10
**brought** [1] - 104:24
**bulb** [2] - 21:22, 22:2
**Burnett** [1] - 83:6
**business** [9] - 39:20, 42:17, 46:15, 47:3, 47:4, 47:5, 47:7, 47:13
**Business** [1] - 38:14
**but..** [1] - 61:22
**BY** [2] - 9:7, 88:2

## C

**calendar** [1] - 59:18
**candid** [1] - 50:17
**cannot** [2] - 74:8, 74:17
**capabilities** [1] - 97:13
**capable** [7] - 14:14, 45:21, 55:14, 56:8, 58:22, 59:10, 91:15
**car** [1] - 43:11
**career** [1] - 25:15
**careful** [3] - 16:8, 21:18, 84:3
**carefully** [2] - 48:22, 83:24
**Carlos** [1] - 12:22
**case** [49] - 9:11, 9:13, 9:21, 11:25, 14:4, 15:4, 15:13, 16:7, 16:11, 18:20, 18:24, 19:14, 19:21, 25:21, 28:2, 29:19, 30:2, 30:4, 30:12, 30:16, 31:3, 31:17, 36:18, 45:22, 47:14, 49:17, 54:8, 56:18, 58:7, 58:10, 59:15, 60:10, 61:1, 67:17, 73:13, 79:6, 79:11, 83:2, 85:4, 85:6, 86:2, 100:13, 101:8, 102:24, 103:12, 103:13, 103:16
**case-by-case** [1] - 85:6
**cases** [1] - 31:1
**cat** [1] - 74:6
**catch** [1] - 15:20
**CDK** [1] - 41:25
**central** [2] - 31:16
**CEO** [9] - 42:9, 54:4, 54:14, 58:24, 59:8, 59:12, 60:17, 60:20, 62:3

**certain** [3] - 32:4, 56:4, 88:10
**certainly** [14] - 23:13, 30:8, 41:25, 44:23, 50:16, 61:1, 64:20, 66:24, 68:7, 71:9, 71:16, 89:1, 95:14, 99:18
**Certified** [1] - 108:10
**certify** [1] - 108:6
**chain** [1] - 39:24
**Chair** [2] - 60:17, 60:21
**challenge** [1] - 100:14
**chance** [1] - 4:10
**characterize** [1] - 39:15
**characterized** [1] - 22:2
**charges** [1] - 20:20
**charging** [1] - 50:2
**Charitable** [2] - 31:11, 31:15
**charitable** [1] - 32:8
**chase** [1] - 73:24
**check** [4] - 11:8, 11:18, 12:16, 25:24
**checks** [3] - 11:11, 12:7, 12:12
**Cherry** [2] - 86:21, 86:23
**chief** [1] - 53:23
**choice** [1] - 64:17
**choosing** [1] - 90:13
**chose** [1] - 59:19
**Christmas** [2] - 103:22, 104:4
**CHRISTOPHER** [1] - 1:16
**circumstances** [1] - 31:1
**cite** [1] - 49:8
**cited** [1] - 13:3
**civil** [8] - 30:2, 31:1, 31:3, 32:12, 32:18, 33:22, 34:1
**claim** [1] - 73:4
**clarification** [1] - 5:3
**clarify** [1] - 10:24, 39:18
**clean** [3] - 5:17, 5:25, 9:1
**clear** [6] - 5:23, 33:1, 57:19, 69:18, 76:22, 97:21
**client** [26] - 12:1, 17:10, 17:18, 19:25, 23:9, 24:3, 24:12, 28:23, 28:25, 29:5, 34:6, 72:24, 73:9,

73:11, 73:14, 73:19, 74:20, 75:3, 76:24, 78:2, 78:16, 78:17, 85:24, 88:18, 88:20, 89:14
**clients** [6] - 19:20, 22:18, 22:20, 22:24, 29:3, 55:9
**clinical** [2] - 26:5, 26:7
**clock** [10] - 69:1, 69:22, 70:2, 70:6, 70:15, 70:21, 70:24, 71:2, 71:6, 71:10
**clocks** [5] - 68:19, 68:22, 69:13, 70:7, 71:21
**close** [4] - 19:8, 81:8, 88:19, 98:17
**closely** [3] - 34:7, 34:16, 87:13
**closer** [1] - 71:3
**Code** [1] - 108:7
**cognitive** [8] - 34:23, 52:12, 67:3, 67:14, 67:21, 69:9, 93:24, 94:2
**coherent** [1] - 71:3
**collaborating** [1] - 101:24
**collaboratively** [1] - 101:16
**collateral** [1] - 87:3
**COLLEEN** [1] - 1:20
**colorful** [2] - 41:5, 41:11
**coming** [1] - 33:23
**comment** [2] - 98:11, 98:13
**commonplace** [2] - 16:19, 28:23
**communicating** [1] - 101:15
**communication** [8] - 27:12, 34:5, 72:21, 72:24, 73:9, 75:16, 78:16, 89:2
**communications** [4] - 17:10, 46:12, 75:3, 78:18
**community** [1] - 99:18
**companies** [2] - 11:19, 40:5
**company** [14] - 13:15, 39:22, 40:2, 41:6, 44:20, 46:18, 46:19, 54:15, 55:14, 58:4, 58:12, 61:24, 62:6, 88:10
**compare** [1] - 49:10
**compared** [1] - 26:14

**compares** [1] - 10:10
**comparison** [1] - 47:11
**competence** [1] - 20:8
**COMPETENCY** [1] - 1:9
**competency** [4] - 20:6, 26:14, 26:16, 79:11
**competent** [4] - 19:14, 23:4, 58:2, 61:6
**Competition** [1] - 38:14
**competitive** [1] - 42:1
**competitor** [1] - 30:19
**completely** [1] - 104:3
**complex** [1] - 28:12
**computer** [2] - 2:7, 101:7
**concern** [8] - 8:6, 8:7, 25:9, 25:12, 29:24, 30:5, 30:25, 104:15
**concerned** [4] - 57:11, 58:23, 59:10, 88:10
**concerns** [8] - 20:4, 21:11, 35:1, 36:12, 61:3, 88:5, 93:24, 94:2
**concluded** [1] - 26:16
**conclusion** [7] - 20:15, 20:19, 20:25, 21:2, 49:22, 54:3, 54:7
**conclusions** [1] - 50:1
**condition** [3] - 20:4, 55:1, 90:15
**conduct** [4] - 16:12, 56:3, 90:10, 90:25
**conducted** [2] - 65:24, 70:4
**confer** [2] - 71:17, 106:13
**conference** [4] - 47:20, 61:8, 61:13, 65:17
**conferences** [1] - 9:21
**conferring** [1] - 9:20
**confident** [1] - 49:4
**confidential** [3] - 34:5, 81:24, 82:17
**confirm** [1] - 62:23
**conflicting** [1] - 66:8
**conflicts** [3] - 11:8, 11:11, 11:18
**connected** [1] - 13:14
**connection** [3] - 93:2, 93:20, 94:6
**consequence** [1] - 49:22
**consider** [6] - 7:3,

71:16, 101:2, 101:12, 103:19, 103:20
**consideration** [2] - 51:1, 84:3
**considered** [3] - 12:4, 20:6, 83:24
**considering** [4] - 24:5, 30:7, 50:1, 101:12
**consistent** [8] - 37:12, 37:15, 37:17, 38:8, 38:11, 39:4, 39:6, 54:25
**consistently** [1] - 36:13
**consternation** [1] - 96:4
**contact** [8] - 82:23, 83:16, 83:21, 84:1, 84:24, 86:5, 95:7, 100:18
**contacted** [7] - 81:23, 82:13, 82:14, 82:16, 82:20, 83:1, 85:17
**contacts** [1] - 83:11
**contemplate** [1] - 103:24
**contemplated** [1] - 51:12
**contemplating** [1] - 52:17
**contemporaneous** [7] - 44:1, 44:4, 44:11, 92:21, 93:1, 93:5, 93:6
**contents** [1] - 57:10
**context** [4] - 43:13, 76:6, 76:14, 77:4
**continuation** [1] - 61:4
**continue** [6] - 4:6, 55:23, 58:3, 59:8, 59:11, 93:13
**continued** [7] - 8:24, 59:22, 59:25, 60:4, 62:3, 67:25, 103:10
**contribute** [3] - 68:8, 90:22, 91:19
**control** [1] - 31:14
**convened** [1] - 4:12
**conversation** [4] - 76:5, 76:14, 77:3, 90:22
**conversations** [5] - 11:9, 39:8, 78:25, 89:10, 92:3
**convince** [2] - 50:5, 85:23
**convinced** [2] - 55:5, 55:7

**convincing** [1] - 50:8
**copied** [2] - 18:12, 45:14
**copies** [1] - 53:9
**copy** [6] - 17:15, 36:24, 48:1, 48:3, 77:14, 99:11
**copy's** [1] - 43:20
**Corey** [1] - 101:18
**COREY** [21] - 1:15, 4:21, 6:18, 7:15, 8:17, 96:2, 97:20, 98:1, 98:14, 98:23, 99:2, 99:6, 99:11, 99:13, 100:10, 100:18, 101:25, 103:4, 104:9, 104:23, 107:10
**corporate** [1] - 12:3
**correct** [12] - 8:12, 9:16, 18:13, 18:18, 19:15, 48:13, 52:15, 52:22, 85:18, 92:12, 93:15, 108:8
**correctly** [1] - 62:18
**corroboration** [1] - 24:5
**couch** [1] - 46:6
**Counsel** [3] - 53:9, 55:24, 76:2
**counsel** [26] - 20:21, 29:18, 29:20, 52:8, 52:10, 80:25, 81:21, 82:13, 82:21, 82:24, 83:2, 83:3, 83:17, 83:19, 83:23, 83:25, 84:25, 86:18, 86:22, 87:8, 87:16, 87:20, 94:22, 98:17, 102:4
**counsel's** [2] - 84:2, 99:22
**counseling** [1] - 27:20
**counsels'** [1] - 30:11
**count** [1] - 10:12
**counted** [2] - 62:17, 62:19
**countless** [1] - 10:11
**couple** [2] - 56:19, 95:24
**course** [15] - 7:16, 7:21, 10:6, 11:7, 11:12, 13:4, 13:11, 28:5, 38:2, 50:18, 55:25, 56:13, 68:1, 79:17, 98:19
**Court** [17] - 2:3, 2:4, 4:11, 4:18, 4:25, 5:14, 5:23, 6:23, 7:3, 97:14, 99:15, 99:16, 101:2, 101:11,

104:7, 104:25, 105:7
**COURT** [96] - 1:1, 4:3, 4:5, 4:16, 4:19, 5:1, 5:6, 5:12, 6:11, 6:14, 6:20, 7:6, 7:13, 8:4, 8:11, 8:13, 8:16, 8:19, 9:2, 10:22, 11:5, 11:17, 12:9, 13:10, 13:13, 16:3, 17:12, 17:17, 17:24, 18:2, 19:6, 32:23, 38:19, 40:16, 40:20, 48:2, 56:10, 56:24, 57:2, 57:16, 57:22, 73:23, 74:7, 74:13, 74:19, 75:4, 75:14, 75:19, 75:25, 76:16, 77:1, 77:10, 77:16, 77:20, 77:23, 78:6, 78:20, 78:23, 86:12, 86:17, 86:24, 87:3, 87:15, 87:22, 88:19, 89:5, 89:8, 89:17, 89:21, 94:10, 94:13, 94:18, 94:21, 95:17, 96:15, 97:19, 97:25, 98:12, 98:16, 99:1, 99:5, 100:20, 101:4, 102:9, 102:12, 102:16, 104:8, 104:14, 105:9, 105:16, 106:3, 106:10, 107:4, 107:12, 107:17, 107:22
**court** [2] - 57:5, 100:19
**Court's** [1] - 98:8
**covered** [1] - 74:10
**COVID** [1] - 10:15
**criminal** [15] - 6:24, 8:5, 29:23, 29:25, 30:4, 30:16, 34:18, 47:14, 55:13, 58:7, 58:10, 71:22, 72:18, 75:2
**crisp** [3] - 5:17, 5:24, 9:1
**critical** [3] - 24:2, 24:5, 105:24
**critically** [1] - 25:23
**cross** [11] - 5:20, 6:1, 6:8, 9:1, 9:6, 56:22, 77:23, 88:24, 90:23, 91:4, 95:22
**Cross** [1] - 3:6
**cross-examination** [3] - 9:6, 90:23, 91:4
**Cross-Examination** [1] - 3:6

cross-examine [2] - 77:23, 95:22
cross-examining [1] - 88:24
crosses [1] - 5:25
CRR [2] - 2:3, 108:13
curious [1] - 66:2
current [3] - 43:8, 103:18, 103:24
curve [1] - 22:24
customer [1] - 39:10
customers [1] - 43:11
cutting [2] - 73:23, 96:25
CV [3] - 64:7, 64:23, 66:11
CV's [1] - 63:20

**D**

daily [1] - 27:12
danger [1] - 99:18
database [1] - 12:6
date [16] - 10:25, 11:3, 11:4, 22:6, 22:8, 50:25, 73:13, 76:8, 76:11, 77:5, 78:6, 79:3, 79:4, 79:6, 106:24
dated [1] - 71:2
dates [1] - 29:15
David [2] - 86:13, 86:20
DAY [1] - 1:9
days [3] - 103:12, 103:14, 103:21
deadline [1] - 103:18
deal [1] - 77:16
dealers [2] - 43:10, 43:11
dealing [1] - 99:19
December [7] - 53:3, 68:11, 69:22, 70:13, 103:18, 103:22, 104:11
decide [1] - 50:23
decision [17] - 19:17, 20:11, 26:16, 43:17, 43:18, 50:2, 50:25, 51:20, 53:6, 54:9, 60:5, 60:7, 71:10, 87:8, 87:9, 90:17, 98:4
decision-making [1] - 51:20
decisions [1] - 16:6
decline [1] - 67:4
declined [1] - 84:24
defendant [1] - 99:7
Defendant [6] - 1:8,

1:19, 35:3, 67:13, 76:9, 76:11
Defendant's [1] - 99:4
defense [7] - 23:20, 23:24, 24:7, 45:25, 55:6, 55:13, 55:21
Defense [2] - 3:5, 8:21
defer [1] - 27:5
definitely [2] - 18:2, 77:12
definitions [1] - 55:12
defuses [1] - 80:11
deliberately [1] - 50:20
deliberations [2] - 16:10, 68:10
delirium [1] - 95:11
demented [1] - 56:2
dementia [15] - 21:15, 21:21, 29:9, 29:10, 34:2, 34:10, 56:7, 64:13, 64:18, 65:5, 67:14, 67:20, 92:15, 97:12
Department [7] - 47:18, 52:3, 52:11, 54:10, 69:13, 70:16, 91:17
depiction [1] - 69:19
depose [2] - 5:9, 5:10
deposition [17] - 29:13, 30:15, 31:6, 31:19, 31:23, 32:12, 32:15, 33:16, 33:18, 34:15, 35:14, 35:20, 36:5, 36:10, 42:4, 46:25, 60:9
depositions [8] - 29:15, 32:19, 32:25, 33:14, 33:20, 33:23, 87:9, 87:17
describe [3] - 30:20, 39:9, 39:10
described [10] - 20:2, 20:9, 31:9, 41:5, 46:24, 50:19, 56:4, 81:6, 89:25, 90:21
describes [1] - 44:17
describing [1] - 47:10
despite [1] - 35:22
detail [9] - 11:7, 42:16, 44:24, 45:1, 46:19, 47:2, 49:10, 49:12, 82:6
details [3] - 27:6, 38:12, 45:5
detect [1] - 24:16
deteriorate [1] - 56:7
deteriorated [1] - 55:1
determination [1] -

5:15
diagnosed [4] - 29:9, 34:2, 67:13, 92:15
diagnoses [1] - 21:20, 66:8
diagnosis [2] - 88:6, 92:14
dialogue [2] - 50:12, 90:8
Dietz [4] - 73:13, 76:6, 76:8
Dietz's [5] - 76:7, 77:5, 77:11
differ [1] - 95:2
difference [2] - 41:15, 97:11
different [5] - 18:1, 23:22, 28:25, 29:4, 46:2
difficult [1] - 43:7
difficulties [4] - 19:18, 19:19, 22:1, 54:13
difficulty [2] - 37:22, 38:6
digest [1] - 105:23
direct [5] - 72:3, 89:2, 91:2, 93:12, 95:15
direction [1] - 87:20
directly [1] - 84:2
disagree [1] - 82:10
disclose [2] - 34:8, 88:22
disclosed [3] - 4:19, 72:11, 75:17
disclosing [1] - 75:16
discretionary [1] - 28:9
discuss [3] - 41:22, 42:12, 42:19, 44:3, 44:4, 44:11, 81:23, 82:16, 92:20, 93:5, 97:9
discussed [2] - 19:12, 54:24
discussing [8] - 37:3, 39:19, 43:17, 43:24, 47:12, 47:13, 89:23, 93:1
discussion [7] - 16:15, 16:17, 24:25, 34:6, 34:23, 41:14, 90:16
discussions [13] - 16:11, 16:19, 17:23, 18:25, 19:7, 33:21, 41:20, 42:23, 43:4, 44:9, 89:12, 93:23, 94:1
disease [2] - 95:10, 97:7

dispensable [1] - 28:23
disposed [1] - 50:3
disposition [1] - 35:24
dispute [3] - 31:13, 42:1, 42:7
disputed [1] - 31:16
disputes [1] - 30:19
distant [1] - 43:15
distinction [2] - 93:4, 93:8
distinctions [1] - 92:25
distorted [1] - 68:25
District [2] - 2:4, 2:4
DISTRICT [2] - 1:1, 1:2
divert [1] - 39:8
doctor [3] - 25:6, 25:11, 68:11
Doctors [1] - 51:9
doctors [16] - 20:3, 27:6, 51:14, 55:25, 63:20, 64:21, 65:7, 65:18, 65:23, 65:25, 66:4, 66:9, 66:25, 81:11, 90:10, 92:4
document [14] - 14:7, 19:21, 66:15, 70:19, 71:1, 71:15, 98:24
documents [11] - 13:1, 14:4, 14:9, 14:11, 14:15, 14:24, 15:2, 15:8, 36:14, 93:20, 101:11
DOJ [4] - 1:15, 1:16, 1:17, 1:18
dollar [1] - 58:4
domain [2] - 15:6, 15:9
Don [2] - 14:18, 36:25
done [8] - 6:22, 9:3, 26:12, 33:12, 56:6, 98:18, 102:23, 104:15
door [2] - 88:23, 88:24
double [2] - 79:16, 106:9
doubt [1] - 13:18
down [15] - 15:21, 16:23, 46:23, 47:1, 53:19, 57:5, 57:23, 60:16, 60:20, 61:1, 61:3, 61:9, 61:21, 92:24, 105:20
downward [1] - 95:9
dozen [2] - 10:8
dozens [1] - 22:18
Dr [72] - 6:13, 6:16, 6:17, 6:18, 6:19, 8:11, 8:15, 27:4,

27:9, 27:13, 51:9, 53:3, 62:20, 63:14, 63:17, 63:23, 63:25, 64:1, 64:6, 64:9, 64:23, 65:4, 65:11, 65:15, 66:11, 66:16, 67:13, 67:19, 68:11, 69:16, 70:1, 70:4, 73:13, 75:22, 76:4, 76:6, 76:7, 76:8, 77:11, 80:2, 80:14, 80:17, 80:21, 80:25, 81:6, 81:10, 81:15, 81:17, 81:20, 82:4, 82:15, 83:10, 84:5, 84:7, 84:24, 85:8, 85:12, 90:24, 91:10, 91:14, 91:24, 92:1, 92:7, 92:10, 92:13, 92:14, 92:16
draft [2] - 51:4
drafts [1] - 51:6
drag [1] - 5:18
drawn [1] - 69:22
drew [2] - 70:2, 70:15
drill [1] - 46:23
drilling [1] - 47:1
dropped [2] - 15:24, 16:24
due [3] - 7:16, 8:7, 98:6
duly [1] - 8:23
duplicate [4] - 95:14, 95:15, 96:14, 97:16
duplication [1] - 97:5
duplicative [1] - 95:6
during [2] - 61:8, 65:17

**E**

e-mail [22] - 4:22, 6:9, 7:24, 14:18, 14:21, 14:25, 15:2, 15:3, 15:5, 18:6, 18:8, 36:24, 37:9, 37:12, 38:8, 38:24, 44:16, 45:8, 45:14, 80:2, 80:14, 80:17
e-mails [5] - 45:6, 45:11, 45:15, 45:17
early [2] - 20:22, 97:12
easiest [1] - 73:23
effectively [5] - 53:23, 54:4, 54:14, 54:18, 59:8
efficiently [1] - 6:22
effort [2] - 49:20, 80:5
eight [3] - 33:5, 102:22, 103:14

**either** [5] - 33:3, 49:19, 87:1, 101:7, 103:16
**elaborate** [1] - 12:6
**elaborated** [1] - 93:9
**electronic** [1] - 14:5
**ELMO** [1] - 77:14
**elsewhere** [1] - 34:8
**encouraging** [2] - 97:23, 98:3
**encrypted** [4] - 14:18, 14:21, 14:25, 15:2
**end** [3] - 26:21, 26:23, 97:8
**engage** [4] - 45:25, 49:23, 50:12, 92:3
**engaged** [8] - 11:1, 11:13, 11:14, 13:6, 20:9, 22:15, 44:25, 45:4
**engaging** [1] - 29:19
**entered** [2] - 101:20, 103:7
**entire** [1] - 48:25
**entities** [2] - 11:10, 39:25
**entitled** [2] - 35:21, 76:20
**entity** [1] - 11:24
**episodes** [1] - 95:11
**equal** [1] - 30:14
**equally** [1] - 24:5
**equivalent** [1] - 14:6
**errors** [1] - 100:13
**especially** [5] - 16:21, 36:15, 36:17, 56:5, 95:10
**ESQ** [5] - 1:19, 1:20, 1:22, 1:23, 1:25
**established** [1] - 78:7
**estimate** [1] - 14:7
**estimated** [2] - 14:6, 103:11
**Eugene** [3] - 31:11, 31:15, 32:8
**evaluate** [1] - 36:14
**evaluations** [2] - 26:5, 26:7
**event** [1] - 43:13
**events** [10] - 41:23, 42:20, 43:3, 43:15, 44:4, 44:11, 92:21, 93:1, 93:5, 93:6
**eventually** [3] - 26:1, 31:23, 60:22
**evidence** [13] - 7:2, 38:23, 47:22, 51:23, 53:7, 70:6, 73:11, 85:22, 100:3, 100:25, 101:2,

**101:20, 101:22**
**evidentiary** [1] - 102:18
**exactly** [3] - 57:6, 88:25, 91:7
**exam** [4] - 26:12, 27:1, 27:9, 53:3
**examination** [10] - 5:17, 6:3, 68:2, 70:4, 81:24, 82:17, 90:12, 90:23, 91:1, 91:4
**Examination** [2] - 3:6, 3:8
**EXAMINATION** [2] - 9:6, 88:1
**examinations** [1] - 69:24
**examine** [2] - 77:23, 95:22
**examined** [3] - 26:13, 67:20, 70:1
**examining** [2] - 4:6, 88:24
**exams** [2] - 67:25, 68:14
**except** [1] - 54:24
**exception** [1] - 84:5
**excuse** [1] - 7:16
**excused** [3] - 94:14, 94:18, 107:23
**execution** [1] - 106:24
**executive** [2] - 53:23, 60:1
**executives** [1] - 38:24
**exercise** [1] - 49:15
**Exhibit** [6] - 38:23, 43:17, 47:23, 51:23, 70:5, 90:1
**exhibit** [2] - 62:22, 102:1
**exhibits** [12] - 48:5, 48:6, 51:7, 62:16, 62:17, 62:25, 63:10, 63:11, 101:21, 102:1, 102:3, 102:5
**existed** [1] - 71:6
**expectations** [1] - 4:9
**expected** [2] - 90:7, 90:14
**expecting** [1] - 90:19
**expedited** [1] - 96:18
**experience** [13] - 19:19, 20:6, 21:6, 21:7, 22:12, 24:16, 25:21, 37:13, 39:4, 45:24, 54:7, 55:7, 69:6
**experiences** [2] - 44:2, 44:9
**expert** [10] - 6:1,

**26:19, 26:22, 57:4, 57:7, 57:9, 76:10, 78:7, 90:25**
**expert's** [1] - 57:12
**experts** [4] - 56:17, 75:9, 75:10, 75:13
**explain** [2] - 41:11, 74:25
**explanation** [1] - 22:1
**explore** [1] - 19:16
**expressed** [1] - 36:11
**expression** [2] - 15:7, 23:17
**extended** [2] - 63:9, 85:4
**extends** [1] - 28:3
**extension** [1] - 106:25
**extent** [3] - 72:23, 75:17, 88:14
**eye** [1] - 24:2

## F

**fabricate** [1] - 80:12
**face** [2] - 15:3, 39:1
**facile** [1] - 47:10
**fact** [15] - 4:24, 6:14, 18:14, 18:16, 26:25, 31:5, 35:10, 35:13, 43:25, 56:12, 59:14, 61:8, 62:12, 83:1, 83:18
**facts** [6] - 49:6, 49:17, 50:15, 50:21, 106:5
**factual** [1] - 21:4
**fair** [76] - 10:3, 12:17, 15:15, 15:17, 15:23, 15:24, 18:17, 21:7, 21:12, 22:5, 22:7, 22:13, 22:21, 23:2, 23:5, 23:14, 23:22, 24:3, 24:15, 24:18, 24:22, 24:25, 25:19, 25:24, 26:7, 27:2, 28:2, 28:20, 29:6, 29:21, 29:25, 31:14, 33:7, 36:14, 36:20, 37:1, 37:9, 37:20, 42:10, 42:20, 44:19, 45:16, 45:22, 46:7, 46:16, 47:15, 48:20, 49:3, 50:4, 50:15, 51:12, 52:3, 52:16, 52:21, 53:1, 58:17, 62:13, 62:18, 64:6, 64:10, 66:11, 66:13, 66:16, 68:14, 68:16, 69:15, 70:21, 71:13, 75:24, 79:6, 79:14, 79:20, 80:6, 80:15,

**85:21, 93:11**
**fairly** [1] - 106:8
**faking** [2] - 79:13, 80:10
**fall** [1] - 38:3
**falls** [1] - 14:14
**familiar** [2] - 15:7, 66:24
**familiarized** [1] - 63:11
**family** [1] - 20:10
**far** [10] - 28:3, 43:5, 47:9, 47:12, 57:10, 60:6, 68:25, 70:21, 103:19, 105:12
**fashion** [2] - 53:7, 90:21
**February** [21] - 9:15, 10:2, 10:9, 40:24, 41:2, 41:10, 41:22, 42:9, 42:15, 42:17, 42:18, 42:23, 42:25, 44:7, 54:16, 54:18, 54:22, 55:2, 67:19, 68:15, 68:17
**feign** [1] - 24:12
**feigning** [1] - 24:17
**Fifth** [1] - 85:8
**figure** [1] - 86:18
**file** [1] - 101:7
**fill** [1] - 101:9
**final** [5] - 51:3, 60:13, 60:15, 60:18, 65:3
**finally** [2] - 13:1, 53:6
**financial** [1] - 28:15
**fine** [2] - 96:12, 98:2
**fingerprints** [1] - 39:7
**fingers** [1] - 62:17
**finish** [2] - 4:10, 96:11
**finished** [1] - 96:4
**firm** [3] - 6:16, 11:23, 12:5
**first** [16] - 11:2, 11:8, 13:19, 19:24, 20:16, 51:17, 52:7, 64:17, 74:23, 86:3, 86:4, 90:5, 90:6, 90:19, 91:17, 94:24
**five** [2] - 5:8, 103:13
**flight** [2] - 99:17, 99:23
**flowers** [1] - 29:4
**focus** [2] - 98:18, 105:2, 105:22
**focused** [3] - 89:8, 105:6, 105:21
**folks** [1] - 5:10
**follow** [1] - 95:20
**following** [1] - 101:20
**follows** [1] - 8:24

**85:21, 93:11**
**Footnote** [4] - 72:5, 72:9, 74:24, 79:23
**footnotes** [1] - 84:16
**forcing** [1] - 96:15
**foregoing** [1] - 108:7
**forensic** [5] - 26:18, 26:22, 27:1, 27:9, 90:25
**forgotten** [1] - 65:13
**form** [2] - 101:9, 101:14
**formal** [1] - 20:15
**formally** [3] - 11:13, 11:14, 13:6
**forth** [1] - 90:16
**forty** [1] - 102:22
**forty-eight** [1] - 102:22
**forward** [7] - 44:6, 48:23, 51:2, 53:6, 54:10, 96:7, 96:18
**foundation** [4] - 32:20, 76:1, 76:4, 89:4
**foundational** [1] - 57:17
**founded** [1] - 40:7
**founding** [1] - 46:17
**four** [7] - 10:1, 65:3, 70:15, 99:24, 100:7, 100:9, 100:11
**fourth** [3] - 19:22, 55:5, 58:16
**frame** [1] - 40:13
**Francisco** [2] - 99:4, 100:19
**frankly** [1] - 30:24
**Friday** [4] - 9:3, 104:12, 106:12, 106:14
**friend** [3] - 80:2, 81:7, 81:8
**front** [2] - 51:18, 106:5
**full** [1] - 53:18
**fully** [1] - 58:24

## G

**garage** [1] - 40:7
**gather** [3] - 12:15, 20:11, 23:18
**gathered** [3] - 12:21, 20:14, 54:11
**gathering** [1] - 54:9
**gears** [1] - 71:20
**general** [2] - 86:22, 87:12
**generalities** [1] - 38:3
**generally** [2] - 29:18, 33:25

generated [1] - 90:21
genuine [2] - 80:6, 80:18
GEORGE [1] - 1:3
given [4] - 96:8, 97:3, 101:14, 107:2
goodness [6] - 7:8, 10:7, 22:19, 31:22, 49:7, 51:5
GOOSE [2] - 37:4, 38:14
Government [34] - 6:7, 7:11, 7:14, 18:9, 48:11, 49:18, 49:23, 50:5, 50:9, 50:12, 52:25, 61:11, 70:23, 72:12, 73:18, 75:16, 79:20, 80:4, 80:5, 85:23, 90:9, 90:13, 91:7, 92:2, 92:6, 92:8, 92:11, 95:6, 95:18, 97:22, 101:16, 102:5, 103:11, 106:20
government [2] - 70:9, 100:1
Government's [7] - 38:23, 47:22, 49:20, 76:10, 79:13, 89:25, 98:11
gradual [1] - 19:18
gradually [1] - 16:21
great [1] - 86:24
group [3] - 9:20, 37:5, 81:11
guess [6] - 26:8, 38:8, 63:9, 65:21, 71:6, 95:18
guideline [1] - 106:6
Gumm [2] - 2:3, 108:13
guy [1] - 21:4
guys [7] - 4:20, 95:23, 98:20, 106:10, 106:12, 106:14, 107:5

**H**

hairs [1] - 82:5
half [6] - 10:8, 19:24, 71:15, 98:19, 103:12
hand [5] - 17:15, 26:17, 36:23, 51:22, 53:7
handful [1] - 10:1
handing [1] - 48:3
handled [1] - 27:6
HANKS [1] - 1:3
hannah.com [2] -

15:5, 15:7
hapless [1] - 102:20
happy [4] - 19:4, 94:20, 94:21, 107:14
hard [1] - 38:11
health [3] - 24:25, 25:19, 36:8
hear [4] - 7:13, 41:18, 43:9, 56:12, 105:1, 105:7
heard [12] - 6:24, 12:23, 38:13, 41:9, 41:25, 42:8, 42:17, 43:6, 55:25, 56:4, 57:18
hearing [12] - 15:11, 15:16, 16:12, 16:22, 43:8, 56:14, 65:15, 92:25, 98:17, 102:18, 103:9, 105:24
HEARING [1] - 1:9
hearing's [1] - 107:13
hearings [1] - 100:14
held [4] - 34:7, 34:16, 34:18, 87:13
help [8] - 20:10, 21:5, 22:9, 22:11, 28:20, 69:3, 69:5
helpful [1] - 105:18
hereby [1] - 108:6
highlight [1] - 93:4
highlighting [1] - 49:16
highly [3] - 56:5, 56:9, 105:23
highly-skilled [2] - 56:5, 56:9
HIPAA [3] - 92:2, 92:7, 92:10
historically [1] - 12:7
history [9] - 37:3, 40:6, 40:10, 41:3, 41:4, 41:6, 41:11, 46:19, 49:21
hmm [1] - 84:23
hold [1] - 72:8
holiday [1] - 102:24
holidays [3] - 96:5, 102:13, 107:3
honest [1] - 91:12
Honor [32] - 4:4, 4:23, 7:4, 8:10, 8:12, 8:18, 11:22, 13:12, 17:5, 19:9, 57:15, 67:11, 72:25, 86:9, 86:11, 86:15, 87:1, 88:12, 89:16, 94:9, 94:12, 94:16, 94:19, 95:5, 96:13, 97:3, 98:24,

99:22, 100:5, 104:24, 105:10, 107:11
Honor's [2] - 6:9, 105:17
HONORABLE [1] - 1:3
hope [1] - 24:10
hoped [3] - 50:18, 60:23, 60:24
hours [4] - 95:24, 102:13, 102:17, 102:22
Houston [2] - 1:11, 65:11
human [1] - 22:23
hundreds [1] - 22:15
hurts [1] - 61:1

**I**

ideas [1] - 104:25
identical [1] - 55:16
identification [1] - 16:2
illness [3] - 24:13, 24:17, 80:6
imagine [2] - 49:7, 51:3
immediately [1] - 21:24
impact [1] - 30:3
impair [1] - 54:13
impairment [3] - 52:12, 67:14, 67:21
impede [1] - 56:21
implication [1] - 85:21
implies [1] - 16:18
important [16] - 9:4, 26:11, 39:6, 58:6, 67:4, 79:4, 79:6, 79:9, 79:10, 79:19, 79:21, 86:1, 86:3, 86:4, 90:5, 90:6
impression [1] - 89:3
inadvertently [1] - 101:12
include [7] - 49:5, 50:14, 64:25, 71:10, 71:13, 81:4, 84:16
included [13] - 13:2, 49:11, 52:10, 64:5, 64:24, 66:12, 69:11, 69:24, 70:8, 70:22, 71:18, 71:25, 87:15
including [1] - 81:11
incompetence [4] - 55:10, 58:6, 58:7, 95:23
incompetent [2] - 58:10, 61:2

inconsistent [2] - 37:17, 38:12
inconvenience [1] - 104:17
increased [2] - 19:23, 103:17
indeed [1] - 91:6
independent [4] - 26:18, 26:22, 78:1, 90:25
independently [1] - 85:1
INDEX [1] - 3:2
indicate [2] - 60:13, 60:16
indicated [3] - 4:11, 61:9, 61:20
indication [1] - 69:20
indict [2] - 50:6, 85:23
indictment [2] - 10:7, 59:14
inform [1] - 26:15
information [32] - 5:15, 12:7, 12:11, 12:14, 12:18, 20:3, 20:7, 20:12, 20:14, 23:17, 24:6, 34:16, 37:19, 48:19, 49:25, 54:9, 54:12, 73:8, 73:19, 73:25, 74:14, 74:16, 74:22, 78:3, 79:19, 79:21, 88:17, 88:22, 89:15, 91:10, 91:16, 105:23
informed [2] - 30:12, 102:2
inheritance [1] - 28:7
initial [1] - 104:11
initiated [1] - 24:24
initiation [2] - 37:23, 37:25
input [1] - 20:2
inquire [1] - 104:24
inquiries [1] - 12:14
inquiry [4] - 46:22, 49:24, 90:15, 91:19
insofar [1] - 40:12
instance [1] - 94:5
instead [2] - 5:17, 105:19
intelligent [1] - 56:5
intended [1] - 50:16
intentional [1] - 7:6
interest [2] - 28:11, 47:14
interests [7] - 27:24, 28:4, 28:6, 28:14, 28:15, 28:16
internal [1] - 68:10
interpreted [1] - 33:2

Interpreter [1] - 2:2
interviews [1] - 90:9
introduced [2] - 101:6, 101:13
investigate [1] - 66:9
investigated [1] - 65:25
investigation [25] - 27:22, 28:5, 29:23, 30:17, 30:24, 71:22, 72:1, 72:7, 72:13, 72:19, 73:4, 73:5, 73:12, 73:15, 75:2, 75:12, 76:9, 76:12, 79:3, 79:5, 79:12, 80:1, 80:9, 80:13, 99:24
investment [1] - 37:4
invite [1] - 91:6
involved [21] - 11:10, 11:20, 13:15, 14:4, 16:6, 16:11, 17:3, 27:8, 30:10, 32:11, 32:14, 47:18, 48:11, 60:4, 62:25, 64:12, 72:7, 80:1, 80:9, 87:8, 102:25
involvement [1] - 40:1
IRINA [1] - 1:25
issue [7] - 6:25, 36:20, 52:12, 57:17, 87:4, 94:23, 98:9
issued [1] - 76:7
issues [9] - 31:2, 69:15, 90:9, 95:23, 99:14, 99:19, 105:1, 105:3, 105:7
it'll [2] - 102:16, 102:25
items [2] - 31:16, 101:20
itself [2] - 53:14, 62:23

**J**

jam [1] - 107:5
JAMES [1] - 1:22
Jankovic [3] - 51:9, 63:17, 65:4
January [15] - 31:7, 31:19, 32:14, 33:18, 51:8, 52:14, 52:16, 52:19, 67:12, 68:15, 68:17, 70:2, 70:12, 104:2, 104:6
JASON [1] - 1:19
job [1] - 91:12
join [1] - 50:18
Jones's [1] - 14:18
Jones [19] - 10:25,

11:22, 31:24, 35:17, 36:7, 38:13, 61:10, 72:24, 73:10, 82:23, 83:1, 83:12, 84:24, 85:12, 86:7, 92:1, 92:10, 95:3, 99:8
**JR** [1] - 1:3
**Judge** [6] - 88:3, 96:12, 102:8, 103:2, 103:6, 107:16
**JUDGE** [1] - 1:3
**judge** [3] - 47:25, 106:23, 107:1
**July** [10] - 20:1, 21:8, 21:10, 22:4, 24:21, 28:18, 29:8, 34:10, 34:14, 36:19
**June** [3] - 61:24, 62:1, 62:12
**jurisdiction** [2] - 35:25, 36:3
**Justice** [7] - 47:19, 52:3, 52:11, 54:10, 69:13, 70:16, 91:17

## K

**KATHRYN** [1] - 1:23
**Kathy** [3] - 27:12, 48:17, 65:24
**keep** [8] - 20:17, 30:8, 30:9, 87:13, 87:19, 97:16, 100:15, 104:12
**Keneally** [21] - 6:12, 8:11, 8:15, 18:8, 26:3, 27:5, 27:12, 48:17, 65:24, 75:10, 75:11, 75:22, 76:5, 76:23, 78:4, 81:12, 81:14, 94:24, 95:1, 95:7, 96:6
**KENEALLY** [1] - 1:23
**Keneally's** [1] - 75:19
**Kepke** [5] - 13:3, 13:24, 77:5, 77:7
**Kepke's** [1] - 12:23
**kept** [3] - 29:22, 30:13, 33:25
**kind** [4] - 24:24, 25:8, 31:10, 50:11
**knowing** [3] - 67:15, 67:17, 67:22
**knowledge** [3] - 78:1, 86:14, 88:4
**knowledgeable** [1] - 39:13
**known** [3] - 71:12, 99:23, 100:6

## L

**lack** [1] - 45:17
**Lai** [8] - 65:11, 67:13, 67:19, 70:1, 70:4, 91:24, 92:13, 92:14
**Lai's** [5] - 65:15, 66:11, 66:16, 92:14, 92:16
**laid** [1] - 89:4
**LANGSTON** [37] - 1:17, 6:19, 8:25, 9:7, 12:10, 13:11, 13:22, 16:4, 17:11, 17:14, 18:3, 19:3, 19:11, 32:22, 33:4, 33:8, 38:17, 38:21, 40:14, 40:19, 40:23, 47:25, 48:3, 48:6, 48:9, 56:11, 57:14, 57:20, 57:24, 67:11, 72:25, 73:22, 74:12, 74:18, 74:21, 75:8, 75:15, 75:21, 77:7, 77:13, 77:19, 77:22, 78:5, 78:11, 78:22, 79:2, 86:8, 86:21, 88:12, 94:12, 94:15
**Langston** [3] - 3:7, 4:5, 10:22
**laptop** [1] - 77:14
**large** [5] - 11:23, 15:16, 15:18, 16:12, 62:6
**largely** [1] - 95:6, 95:12, 95:13
**larger** [1] - 16:20
**last** [18] - 4:12, 4:22, 4:25, 7:19, 7:24, 9:17, 9:19, 40:25, 46:20, 48:14, 54:16, 56:15, 81:19, 90:18, 91:21, 91:22, 96:11, 103:10
**late** [6] - 6:9, 11:3, 20:16, 20:22, 42:3
**law** [3] - 12:5, 35:21, 106:4
**Law** [4] - 1:19, 1:22, 1:24, 1:25
**LAW** [1] - 1:21
**lawsuit** [1] - 78:9
**lawyer** [2] - 24:8, 106:23
**lawyers** [3] - 14:14, 88:21, 102:21
**lay** [1] - 49:17
**layman's** [2] - 59:5, 59:6
**layperson** [1] - 26:8

**lead** [1] - 53:5
**leading** [1] - 17:23
**learn** [2] - 72:17, 75:12
**learned** [29] - 12:22, 13:2, 13:19, 13:23, 14:2, 20:24, 26:15, 49:22, 54:12, 56:1, 71:22, 72:1, 72:13, 72:18, 73:3, 73:5, 73:12, 73:14, 74:22, 75:2, 75:22, 76:9, 76:11, 78:13, 78:18, 79:5, 80:13, 81:2, 88:17
**learning** [2] - 56:14, 79:12
**least** [13] - 10:17, 12:17, 15:23, 18:19, 18:22, 21:10, 28:19, 34:14, 51:1, 52:16, 72:12, 102:4, 103:22
**leave** [2] - 50:20, 102:20
**LEE** [1] - 1:17
**left** [2] - 62:16, 88:3
**legal** [14] - 20:5, 20:15, 20:25, 21:1, 26:13, 27:23, 27:24, 28:4, 28:6, 28:14, 30:9, 49:22, 55:10, 102:20
**legally** [1] - 26:16
**length** [2] - 19:13, 107:7
**lengthy** [1] - 106:8
**Lerner** [2] - 64:1, 64:9
**Lerner's** [2] - 64:6, 64:23
**less** [4] - 30:25, 79:13, 80:10, 91:11
**letter** [54] - 47:18, 47:24, 48:10, 48:20, 48:25, 49:6, 49:9, 49:13, 50:8, 50:24, 51:2, 51:11, 51:13, 51:20, 52:8, 52:10, 52:20, 53:13, 53:14, 59:17, 60:14, 61:14, 63:1, 63:3, 63:12, 65:22, 66:3, 66:12, 66:17, 67:23, 68:4, 68:16, 68:19, 70:8, 70:16, 70:22, 71:4, 71:7, 71:13, 71:19, 72:1, 72:14, 73:1, 79:19, 82:6, 84:9, 85:7, 86:1, 89:23, 89:24, 89:25, 90:19, 91:25

**letters** [6] - 51:8, 51:14, 51:18, 51:21, 51:24, 52:24
**level** [4] - 44:24, 45:1, 55:10
**liaison** [3] - 65:24, 81:4, 81:13
**liberty** [1] - 6:25
**lie** [3] - 23:7, 23:9, 23:11
**life** [1] - 6:25
**light** [4] - 4:9, 21:22, 22:2, 98:10
**likely** [5] - 15:8, 27:22, 55:9, 79:13, 80:10
**likewise** [2] - 54:13, 83:11
**limit** [3] - 105:3, 105:25, 106:9
**limits** [1] - 16:22
**line** [2] - 65:3, 77:20
**list** [9] - 5:24, 7:9, 12:23, 15:16, 15:19, 15:21, 15:24, 16:20, 18:11, 61:3
**listed** [5] - 15:12, 15:13, 18:17, 48:16
**lists** [5] - 11:10, 17:1, 48:17, 102:1
**litigated** [1] - 103:16
**litigation** [6] - 11:20, 12:2, 13:15, 13:20, 16:20, 30:12
**living** [3] - 40:8, 40:9, 46:6
**long-term** [2] - 41:16, 92:19
**longer..** [1] - 53:20
**look** [9] - 6:6, 24:1, 25:23, 48:16, 53:10, 72:5, 79:23, 87:1, 90:4
**looked** [1] - 32:2
**looking** [10] - 32:3, 43:12, 53:18, 69:14, 71:2, 87:4, 96:16, 104:9, 104:10, 104:21
**Loonam** [2] - 3:8, 40:22
**LOONAM** [60] - 1:22, 4:4, 4:8, 4:17, 5:11, 5:21, 6:12, 7:4, 7:7, 8:10, 8:12, 8:14, 17:5, 17:20, 17:25, 19:2, 32:20, 33:7, 38:18, 40:12, 47:24, 48:5, 48:8, 56:20, 57:1, 57:17, 72:22, 73:7, 74:4, 76:1,

76:22, 77:3, 77:8, 77:11, 86:10, 86:23, 86:25, 88:2, 89:1, 89:7, 89:16, 89:18, 89:22, 90:3, 94:8, 95:5, 96:1, 96:13, 97:3, 98:5, 98:13, 99:10, 100:15, 101:3, 102:10, 102:14, 103:3, 105:10, 105:17, 107:18
**loop** [1] - 29:22
**lost** [2] - 79:16, 79:22
**lucky** [1] - 41:14

## M

**MAGNANI** [2] - 1:16, 77:15
**mail** [22] - 4:22, 6:9, 7:24, 14:18, 14:21, 14:25, 15:2, 15:3, 15:5, 18:6, 18:8, 36:24, 37:9, 37:12, 38:8, 38:24, 44:16, 45:8, 45:14, 80:2, 80:14, 80:17
**mails** [5] - 45:6, 45:11, 45:15, 45:17
**main** [1] - 96:20
**major** [2] - 60:5, 60:7
**majority** [1] - 95:14
**manager** [1] - 101:8
**manner** [3] - 19:20, 20:21, 28:22
**manually** [1] - 48:17
**mark** [1] - 36:22
**marked** [4] - 16:1, 36:23, 43:20, 99:2
**marketing** [1] - 39:10
**matching** [1] - 102:1
**material** [5] - 14:13, 46:23, 71:17, 90:20, 90:21
**materials** [1] - 25:18
**matter** [10] - 6:25, 8:5, 31:5, 42:3, 45:10, 47:14, 50:2, 51:1, 81:21, 100:9
**matters** [4] - 30:9, 30:23, 47:10, 60:1
**MCI** [1] - 97:12
**mean** [32] - 6:15, 23:3, 40:20, 44:15, 50:25, 56:21, 57:8, 61:14, 67:2, 74:1, 74:8, 74:11, 75:5, 76:18, 76:20, 77:17, 77:24, 78:23, 89:5, 89:11,

89:17, 90:5, 94:25, 95:17, 96:1, 96:16, 97:8, 104:21, 104:22, 105:4
**means** [3] - 23:4, 23:25, 58:7
**mechanical** [1] - 2:6
**Medical** [2] - 91:11, 91:14
**medical** [15] - 20:3, 20:7, 26:9, 41:14, 49:21, 62:20, 63:14, 67:25, 69:8, 87:14, 90:9, 90:12, 90:15, 99:19, 101:21
**meeting** [12] - 10:9, 10:14, 10:18, 20:1, 21:8, 22:4, 24:21, 25:18, 34:12, 54:22, 81:15, 81:17
**meetings** [4] - 42:15, 42:24, 43:1, 59:2
**memory** [4] - 10:7, 41:16, 41:17, 49:10, 92:19, 93:1, 93:6
**mental** [1] - 69:15
**mentally** [2] - 56:7, 58:23
**mentioned** [3] - 21:19, 34:11, 65:18
**met** [3] - 9:14, 40:25, 56:17
**Methodist** [1] - 65:11
**might** [17] - 11:25, 12:15, 12:16, 15:19, 18:23, 19:8, 21:11, 25:9, 30:25, 44:15, 44:22, 53:5, 69:3, 72:7, 80:1, 80:9, 88:11
**mild** [3] - 65:5, 67:14, 67:20
**milestones** [3] - 41:6, 46:2, 46:10
**million** [3] - 14:4, 14:7, 14:8
**mind** [8] - 28:19, 43:14, 53:4, 55:24, 68:13, 69:19, 72:17, 82:7
**mindful** [1] - 17:8
**misguided** [1] - 4:9
**missed** [1] - 13:8
**Mister** [1] - 6:17
**misunderstood** [1] - 62:7
**moderate** [2] - 65:5, 97:12
**moment** [1] - 67:10
**Monday** [1] - 5:4

**month** [4] - 11:15, 42:13, 43:4, 54:21
**months** [5] - 9:22, 13:21, 32:2, 59:17, 70:15
**morning** [4] - 4:3, 4:4, 9:8, 9:9
**moss** [1] - 83:8
**most** [1] - 57:8
**motivated** [1] - 88:21
**motivation** [1] - 88:16
**motive** [1] - 80:11
**move** [3] - 89:4, 96:7, 100:3
**moved** [1] - 73:17
**moving** [2] - 73:16, 107:24
**MR** [148] - 4:4, 4:8, 4:17, 4:21, 5:2, 5:11, 5:21, 6:12, 6:18, 6:19, 7:4, 7:7, 7:15, 8:10, 8:12, 8:14, 8:17, 8:25, 9:7, 12:10, 13:11, 13:22, 16:4, 17:5, 17:11, 17:14, 17:20, 17:25, 18:3, 19:2, 19:3, 19:11, 32:20, 32:22, 33:4, 33:7, 33:8, 38:17, 38:18, 38:21, 40:12, 40:14, 40:19, 40:23, 47:24, 47:25, 48:3, 48:5, 48:6, 48:8, 48:9, 56:11, 56:20, 57:1, 57:14, 57:17, 57:20, 57:24, 67:11, 72:22, 72:25, 73:7, 73:22, 74:4, 74:12, 74:18, 74:21, 75:8, 75:15, 75:21, 76:1, 76:22, 77:3, 77:7, 77:8, 77:9, 77:11, 77:13, 77:15, 77:19, 77:22, 78:5, 78:11, 78:22, 79:2, 86:8, 86:10, 86:15, 86:20, 86:21, 86:23, 86:25, 88:2, 88:12, 89:1, 89:7, 89:16, 89:18, 89:22, 90:2, 90:3, 94:8, 94:12, 94:15, 94:16, 95:5, 96:1, 96:2, 96:13, 97:3, 97:20, 98:1, 98:5, 98:13, 98:14, 98:23, 99:2, 99:6, 99:9, 99:10, 99:11, 99:12, 99:13, 100:4, 100:10, 100:12, 100:15, 100:18,

101:3, 101:15, 101:25, 102:10, 102:14, 103:2, 103:3, 103:4, 103:6, 104:9, 104:23, 105:10, 105:17, 106:1, 106:4, 107:1, 107:10, 107:16, 107:18, 107:19
**Mullin** [5] - 32:18, 32:25, 33:9, 33:13, 34:23
**multibillion** [1] - 58:3

## N

**n/a** [1] - 2:1
**name** [6] - 14:18, 14:21, 15:6, 65:15, 66:16, 86:16
**names** [6] - 12:15, 12:23, 13:2, 13:6, 13:14, 48:16
**narrow** [1] - 105:1
**narrowed** [1] - 16:23
**nature** [1] - 97:6
**Neal** [1] - 99:7
**necessarily** [2] - 76:18, 88:13
**necessary** [1] - 11:7
**need** [14] - 21:5, 24:4, 90:4, 97:15, 100:22, 101:6, 101:9, 104:17, 104:18, 105:5, 106:4, 106:18, 106:21, 107:23
**needed** [7] - 20:11, 22:9, 22:11, 26:17, 45:24, 91:16, 93:19
**needs** [7] - 5:15, 6:24, 76:3, 97:14, 104:18, 106:19, 106:20
**negatives** [1] - 79:16
**negotiators** [1] - 43:11
**neurologist** [3] - 65:11, 66:22, 67:3
**never** [7] - 25:14, 25:17, 31:20, 44:13, 45:9, 65:14, 70:18
**nevertheless** [3] - 28:12, 56:3, 56:8
**New** [1] - 104:4
**new** [2] - 13:6, 90:20
**next** [1] - 23:12
**night** [4] - 4:22, 5:4, 7:24, 101:24
**non** [1] - 69:8
**non-medical** [1] - 69:8

**none** [1] - 91:13
**normal** [1] - 106:9
**noted** [1] - 96:8
**notes** [1] - 76:5
**nothing** [1] - 86:8
**notice** [4] - 15:19, 19:21, 96:9, 96:17
**noticed** [1] - 25:2
**NOVEMBER** [2] - 1:12, 4:1
**November** [4] - 15:23, 18:9, 18:19, 18:22
**Number** [1] - 43:21
**number** [3] - 15:22, 38:24, 62:17
**numbered** [1] - 53:9
**numerous** [1] - 51:6

## O

**o'clock** [2] - 4:22, 5:8
**O'CONNOR** [1] - 1:20
**object** [3] - 30:13, 88:13, 99:9
**objected** [2] - 35:19, 36:9
**objection** [13] - 17:6, 19:2, 32:20, 35:23, 38:18, 38:19, 40:12, 72:22, 72:23, 96:8, 98:15, 99:10, 100:4
**objections** [1] - 36:11
**objective** [1] - 73:11
**observation** [1] - 61:6
**observations** [1] - 59:5, 59:6, 97:7
**observing** [1] - 59:1
**obtain** [2] - 31:20, 92:3
**obtained** [4] - 26:2, 26:6, 31:24, 91:10
**obviously** [6] - 17:19, 20:24, 52:19, 82:6, 100:17, 106:6
**occasions** [2] - 9:25, 10:5
**occurred** [2] - 41:23, 54:12
**October** [3] - 37:1, 37:13, 99:3
**OF** [3] - 1:2, 1:10, 3:2
**offer** [2] - 38:17, 93:10
**offered** [1] - 90:10
**offering** [1] - 38:6
**officer** [1] - 53:24
**OFFICIAL** [1] - 1:10
**Official** [1] - 2:3
**offshore** [1] - 46:10
**often** [2] - 39:8, 41:7
**old** [1] - 105:13

**once** [4] - 27:5, 72:20, 78:14, 106:23
**one** [45] - 9:21, 10:14, 15:10, 18:16, 19:16, 24:24, 25:20, 26:25, 27:13, 28:6, 29:21, 30:25, 31:2, 31:15, 31:16, 36:1, 36:12, 39:6, 43:20, 45:10, 46:12, 47:7, 49:14, 50:4, 51:24, 56:6, 56:10, 57:14, 60:14, 65:18, 67:10, 68:5, 69:11, 69:20, 70:7, 70:8, 79:10, 85:5, 94:23, 96:19, 98:24, 101:6, 101:7, 106:18
**ones** [2] - 71:4, 100:14
**ongoing** [3] - 30:17, 42:3, 43:17
**oOo** [1] - 108:1
**open** [2] - 90:8, 100:16
**opening** [2] - 88:23, 88:24
**operations** [4] - 39:9, 39:14, 46:20, 47:11
**opine** [1] - 67:8
**opinion** [2] - 37:16, 45:23
**opinions** [1] - 92:16
**opposite** [1] - 12:2
**optimism** [1] - 4:10
**order** [4] - 8:14, 26:15, 36:1, 103:7
**ordered** [2] - 35:13, 36:4
**ordering** [1] - 35:22
**orderly** [1] - 96:19
**organized** [1] - 107:23
**ought** [2] - 50:2, 71:18
**ourselves** [1] - 87:19
**outcome** [1] - 28:2
**outside** [1] - 81:9
**outta** [1] - 107:18
**overruled** [1] - 35:23
**overstate** [2] - 44:21, 44:22
**own** [8] - 12:14, 12:21, 49:25, 54:7, 69:5, 80:25, 90:13, 106:24
**ownership** [5] - 31:4, 31:10, 31:14, 39:22, 40:1

## P

**P.M** [1] - 107:25
**Page** [8] - 53:17, 60:15, 65:3, 68:18,

70:5, 72:6, 72:9, 100:2
**page** [10] - 37:2, 48:14, 62:23, 71:15, 72:8, 105:3, 105:25, 106:9, 107:7
**PAGE** [1] - 3:4
**paged** [1] - 66:14
**pages** [4] - 14:7, 104:21, 105:4, 106:2
**pandemic** [1] - 10:15
**paper** [1] - 77:13
**paragraph** [6] - 52:7, 53:19, 60:13, 60:15, 60:18, 99:21
**paragraph/fourth** [1] - 53:18
**parallel** [1] - 49:24
**Parkinson's** [1] - 21:20
**part** [16] - 11:18, 13:13, 32:2, 34:6, 36:8, 37:21, 49:24, 51:7, 52:10, 62:10, 68:2, 69:2, 72:12, 78:14, 80:5, 100:21
**partial** [2] - 21:25, 60:18
**participate** [2] - 30:10, 61:16
**participation** [1] - 90:11
**particular** [3] - 39:16, 54:22, 65:1
**parties** [10] - 7:1, 8:9, 96:21, 97:14, 101:25, 102:17, 103:1, 104:17, 105:12, 106:18
**parties's** [1] - 104:6
**partitioner** [1] - 61:12
**partner** [1] - 99:7
**Passmore** [1] - 36:25
**past** [3] - 17:1, 43:5, 105:5
**patient** [1] - 67:3
**pause** [1] - 37:6
**payer** [3] - 61:8, 61:13, 65:17
**pegged** [1] - 77:5
**pejorative** [1] - 103:15
**pending** [1] - 33:25
**people** [8] - 5:5, 10:18, 16:24, 18:11, 45:12, 56:5, 88:10, 104:3
**perceived** [1] - 88:5
**percent** [1] - 21:18
**perfect** [1] - 100:17
**perform** [1] - 58:24

**performance** [1] - 22:23
**perhaps** [5] - 9:22, 10:8, 16:25, 22:1, 73:20
**period** [3] - 13:7, 54:25, 60:8
**permits** [1] - 84:4
**person** [14] - 10:15, 10:19, 11:24, 23:15, 24:21, 26:9, 55:12, 58:2, 67:4, 67:8, 69:9, 81:14, 91:19, 95:1
**personal** [1] - 27:24
**personally** [3] - 66:1, 66:10, 71:9
**persons** [1] - 11:10
**persuade** [2] - 50:18, 80:5
**persuasive** [1] - 69:12
**PETER** [2] - 3:5, 8:20
**Peter** [1] - 96:6
**phone** [5] - 9:18, 9:20, 10:11, 59:4, 61:14
**phonetic** [1] - 86:14
**phrased** [1] - 74:5
**physical** [1] - 55:1
**physically** [1] - 38:1
**physicians** [7] - 26:2, 26:10, 27:1, 27:14, 81:5, 81:12, 90:13
**pick** [1] - 88:3
**picture** [3] - 68:19, 69:1, 71:2
**pictured** [1] - 71:4
**pieces** [1] - 101:5
**pinpoint** [2] - 50:25, 54:21
**pins** [2] - 76:8, 76:10
**place** [4] - 6:21, 8:6, 77:4, 101:6
**Plaintiff** [2] - 1:5, 1:15
**Plan** [1] - 38:14
**planned** [1] - 27:11
**play** [1] - 45:20
**poach** [1] - 46:12
**point** [13] - 5:2, 13:23, 20:9, 22:10, 29:8, 40:22, 80:24, 88:3, 95:6, 97:15, 98:7, 99:22, 103:11
**policy** [2] - 82:23, 85:3
**Pool** [1] - 51:9
**pool** [3] - 63:23, 65:4, 83:10
**poor** [1] - 102:20
**portion** [1] - 100:16
**position** [5] - 78:8, 78:12, 84:7, 85:2,

93:15
**positive** [1] - 21:18
**possible** [5] - 55:22, 57:18, 104:16, 104:19, 106:19
**possibly** [1] - 90:11
**post** [1] - 103:9
**post-hearing** [1] - 103:9
**potential** [4] - 81:20, 82:20, 82:24, 83:22
**potentially** [1] - 28:4
**predecessor** [1] - 40:5
**prefer** [1] - 30:15
**prejudice** [2] - 95:19, 97:17
**prejudiced** [1] - 7:11
**premise** [1] - 33:1
**premises** [1] - 12:23
**preparation** [6] - 15:21, 30:11, 33:10, 33:12, 56:13, 65:21
**prepare** [7] - 32:19, 33:13, 33:20, 45:25, 95:21, 96:21, 101:18
**prepared** [8] - 5:9, 5:16, 5:25, 6:8, 7:17, 7:20, 8:1, 95:25
**preparing** [3] - 29:20, 32:12, 32:14
**present** [2] - 43:25, 50:16
**presented** [2] - 21:14, 24:22
**PRESIDING** [1] - 1:3
**pressured** [1] - 8:25
**pretrial** [1] - 9:21
**pretty** [2] - 47:1, 57:10
**prevent** [1] - 7:1
**previous** [1] - 22:12
**previously** [2] - 8:22, 46:7
**primary** [2] - 8:6, 8:7
**priority** [1] - 11:9
**privilege** [15] - 17:10, 17:18, 47:8, 56:22, 73:4, 74:10, 74:20, 75:18, 76:18, 76:19, 76:25, 77:18, 78:2, 88:20, 89:15
**privileged** [7] - 17:13, 17:19, 17:22, 46:12, 57:13, 71:24, 72:20
**problem** [10] - 5:1, 5:7, 5:16, 11:17, 12:10, 19:23, 36:16, 57:4, 88:13, 107:22
**problems** [2] - 69:10, 87:14
**proceed** [1] - 8:19

**proceeded** [1] - 15:21
**proceeding** [1] - 96:18
**proceedings** [1] - 108:9
**PROCEEDINGS** [2] - 1:10, 107:25
**Proceedings** [1] - 2:6
**process** [7] - 7:16, 8:7, 11:12, 13:5, 13:13, 14:12, 19:18, 46:24, 56:1, 62:10, 86:3, 90:7, 98:6
**produced** [2] - 2:7, 15:4
**product** [7] - 16:9, 17:7, 17:9, 17:22, 39:17, 57:1, 57:11
**production** [1] - 14:6
**productive** [1] - 105:21
**products** [1] - 39:10
**profitability** [1] - 39:16
**progress** [1] - 27:11
**progressed** [1] - 36:16
**progressing** [1] - 27:22
**progression** [1] - 95:9
**progressive** [1] - 97:6
**prompted** [1] - 43:13
**proofing** [1] - 68:4
**proper** [2] - 96:9, 101:14
**proposal** [1] - 104:7
**propose** [1] - 104:11
**prosecutor** [5] - 23:13, 23:20, 23:23, 24:2, 24:7
**prosecutors** [1] - 90:8
**protection** [2] - 16:9, 17:7
**provide** [4] - 15:19, 23:5, 52:8, 91:16
**provided** [4] - 92:1, 92:7, 92:8, 92:10
**providing** [1] - 91:16
**purposes** [1] - 98:3
**pursuant** [2] - 87:12, 108:6
**purview** [1] - 81:9
**push** [1] - 19:8
**pushed** [1] - 104:1
**pushing** [1] - 89:14
**put** [9] - 17:3, 77:13, 93:10, 96:5, 98:25, 99:8, 106:4, 106:17, 107:2
**putting** [2] - 7:2, 7:25
**puzzle** [1] - 61:5

**Q**

**qualified** [2] - 91:15, 91:18
**quality** [2] - 45:17
**quarter** [4] - 19:22, 20:16, 55:5, 58:16
**questions** [13] - 27:23, 47:8, 63:10, 85:9, 90:24, 91:24, 92:13, 92:18, 92:23, 93:12, 93:16, 94:9, 105:1
**quick** [2] - 94:22, 94:23
**quicker** [1] - 104:10
**quickly** [3] - 6:22, 11:18, 104:16
**quite** [10] - 23:5, 26:9, 32:4, 42:7, 44:12, 48:21, 70:18, 71:23, 85:10, 93:22

**R**

**raise** [2] - 27:23, 35:1
**raised** [1] - 93:24
**ran** [1] - 13:3
**rather** [1] - 77:14
**raw** [1] - 46:23
**re** [2] - 5:19, 49:9
**re-read** [1] - 49:9
**re-tool** [1] - 5:19
**reach** [5] - 21:1, 25:5, 49:25, 85:13, 106:11
**reached** [1] - 90:17
**reaction** [1] - 88:11
**read** [21] - 31:6, 31:8, 31:24, 32:5, 32:7, 34:12, 37:6, 37:8, 39:2, 48:21, 48:24, 49:9, 60:9, 63:5, 66:2, 77:10, 82:9, 84:11, 85:2, 86:6, 99:13
**reading** [1] - 84:14
**ready** [5] - 5:10, 5:19, 96:10, 96:21, 97:24
**really** [4] - 11:17, 101:16, 107:20
**realms** [1] - 58:8
**reason** [10] - 5:22, 6:7, 8:7, 10:16, 64:25, 80:8, 82:10, 82:19, 91:9, 104:14
**reasonable** [1] - 97:11
**reasons** [6] - 10:14, 15:11, 29:22, 69:11, 79:10, 96:20
**rebuttal** [1] - 98:25
**recent** [10] - 9:22,

41:23, 42:1, 42:19, 43:13, 65:16, 70:7, 70:12, 95:7, 95:22
**recently** [2] - 56:19, 69:22
**recess** [1] - 94:23
**recognition** [1] - 21:25
**recognize** [2] - 28:13, 52:4
**recognized** [2] - 27:21, 79:18
**recommend** [1] - 101:17
**reconfigured** [2] - 62:5, 62:10
**reconstituted** [1] - 93:18
**record** [9] - 11:4, 52:6, 95:13, 97:6, 97:21, 97:22, 99:14, 100:16, 100:17
**recorded** [1] - 2:6
**records** [2] - 12:6, 92:3
**redirect** [1] - 86:10
**Redirect** [1] - 3:8
**REDIRECT** [1] - 88:1
**reflect** [2] - 15:9, 97:22
**reflected** [1] - 18:21
**regard** [2] - 47:7, 99:17
**regarded** [1] - 81:10
**regardless** [1] - 77:17
**regularly** [1] - 8:23
**relate** [1] - 74:2
**related** [6] - 30:19, 46:18, 47:10, 54:7, 71:17, 85:9
**relating** [1] - 73:25
**relations** [1] - 39:11
**relationship** [6] - 11:24, 12:1, 30:22, 83:25, 84:3, 85:5
**relevant** [2] - 49:5, 99:14
**reliability** [1] - 24:6
**relied** [1] - 7:22
**relief** [1] - 102:14
**rely** [2] - 8:2, 76:21
**relying** [1] - 4:24
**remained** [1] - 93:14
**remember** [56] - 12:25, 13:18, 13:19, 14:20, 14:23, 18:7, 18:25, 19:4, 21:17, 26:24, 28:10, 30:7, 32:3, 33:19, 34:11, 35:8, 35:15, 35:24,

36:3, 36:6, 36:7, 36:11, 41:9, 42:16, 42:19, 42:21, 42:22, 43:12, 50:22, 51:10, 51:15, 51:19, 54:6, 54:22, 55:1, 61:22, 62:5, 62:8, 64:25, 65:12, 65:15, 66:5, 67:15, 67:17, 67:22, 68:13, 69:25, 70:3, 81:1, 82:6, 84:6, 85:1, 88:9, 93:17
**remembered** [1] - 32:6
**remind** [1] - 63:19
**reminded** [1] - 106:22
**remote** [1] - 42:2
**reorganization** [5] - 61:25, 62:2, 62:4, 62:6, 93:17
**reorganized** [1] - 61:23
**repeat** [4] - 41:5, 41:7, 44:5, 63:2
**repeatedly** [2] - 30:20, 31:3
**repetitive** [1] - 6:15
**replies** [1] - 104:2
**reply** [1] - 103:25
**report** [7] - 69:17, 73:14, 76:7, 77:5, 77:12, 78:8
**reported** [1] - 108:9
**Reported** [1] - 2:3
**reporter** [1] - 100:19
**Reporter** [2] - 2:3, 2:7
**REPORTER'S** [1] - 1:10
**reports** [5] - 26:2, 26:10, 34:13, 62:20, 63:14
**represent** [2] - 11:1, 70:10
**representation** [4] - 7:23, 13:21, 37:24, 64:4
**represented** [10] - 4:24, 28:24, 29:1, 81:21, 82:21, 82:24, 83:2, 83:18, 83:22, 84:25
**representing** [2] - 87:16, 99:6
**represents** [1] - 70:19
**request** [2] - 87:12, 87:21
**requested** [2] - 68:3, 90:12
**requesting** [2] - 40:13, 98:3
**required** [2] - 20:21,

26:15
**research** [2] - 21:2, 21:3
**researched** [1] - 20:5
**resignation** [3] - 93:2, 93:20, 94:6
**resolution** [1] - 106:18
**resolutions** [2] - 59:23, 93:14
**resources** [1] - 64:21
**respect** [12] - 46:10, 47:2, 47:3, 47:5, 88:16, 90:11, 93:10, 98:6, 104:20, 105:11, 106:14, 107:3
**respected** [2] - 34:8, 87:21
**respects** [3] - 28:11, 61:7, 103:17
**respond** [1] - 96:2
**responding** [1] - 77:4
**response** [2] - 99:16, 104:12
**responsible** [1] - 90:17
**responsive** [1] - 24:10
**rest** [11] - 6:10, 7:12, 7:17, 8:1, 96:14, 96:16, 97:18, 97:23, 98:10
**restriction** [1] - 106:7
**resulted** [1] - 61:14
**Resumed** [1] - 3:6
**RESUMED** [1] - 9:6
**retained** [1] - 90:25
**revealing** [2] - 75:3, 78:15
**reverse** [1] - 8:14
**review** [2] - 14:13, 36:13
**reviewed** [3] - 14:15, 14:24, 48:22
**reviewing** [1] - 14:10
**Reynolds** [45] - 31:4, 38:25, 39:9, 39:13, 39:20, 40:5, 41:3, 41:21, 41:23, 41:24, 42:13, 42:14, 43:14, 45:7, 45:18, 46:3, 46:14, 47:2, 47:12, 53:24, 54:5, 55:23, 58:25, 59:8, 59:9, 59:12, 60:5, 86:19, 93:3, 93:15, 93:21
**Reynolds's** [15] - 29:20, 30:11, 30:19, 39:9, 39:13, 39:20, 42:17, 43:5, 45:7, 46:14, 46:20, 47:2,

47:11, 47:13, 60:7
**riddled** [1] - 100:13
**rigorous** [1] - 90:15
**ringing** [1] - 86:25
**risk** [4] - 30:6, 30:7, 99:18, 99:23
**road** [1] - 57:23
**Robert** [4] - 52:9, 83:15, 83:16, 83:17
**ROBERT** [1] - 1:7
**role** [4] - 23:22, 45:20, 61:5, 81:4
**roles** [1] - 67:1
**ROMATOWSKI** [2] - 3:5, 8:20
**Romatowski** [11] - 4:18, 6:16, 9:8, 10:25, 57:3, 57:18, 74:8, 94:13, 95:3, 95:16, 96:7
**Romatowski's** [1] - 89:3
**room** [3] - 40:8, 40:9, 46:6
**rose** [1] - 55:9
**RPR** [2] - 2:3, 108:13
**rule** [10] - 5:8, 5:22, 6:6, 6:9, 6:21, 7:10, 32:4, 58:5, 58:16, 96:20
**ruled** [1] - 58:19
**rules** [5] - 8:6, 95:20, 96:17, 102:11, 105:4
**ruling** [1] - 58:11
**run** [10] - 11:8, 11:11, 11:12, 12:7, 12:11, 13:7, 13:14, 55:23, 58:3, 58:11
**running** [2] - 44:20, 55:14

---

## S

**safe** [1] - 107:14
**sales** [3] - 39:11, 43:10
**San** [2] - 99:4, 100:19
**satisfied** [1] - 98:15
**satisfy** [1] - 84:11
**saw** [8] - 12:25, 13:1, 45:9, 54:17, 64:6, 68:11, 68:21, 95:4
**schedule** [6] - 97:10, 97:20, 98:20, 103:5, 103:9, 103:24, 107:8
**scheduled** [5] - 29:12, 35:4, 35:7, 35:12, 104:13
**Schmeck** [2] - 86:14, 86:20

**School** [3] - 38:13, 91:11, 91:15
**scope** [1] - 64:14
**Scott** [1] - 86:21
**scramble** [1] - 105:19
**screen** [1] - 17:4
**sealed** [1] - 101:21
**Sean** [2] - 2:3, 108:13
**sean_gumm@txs. uscourts.gov** [1] - 2:5
**search** [10] - 12:22, 12:24, 13:3, 13:24, 75:23, 76:12, 77:6, 77:8
**searched** [2] - 49:10, 66:18
**second** [4] - 39:18, 56:10, 60:12, 87:6
**section** [1] - 32:7
**Section** [1] - 108:7
**see** [19] - 17:8, 18:10, 18:14, 30:22, 42:5, 45:14, 54:20, 63:16, 65:3, 65:6, 68:8, 71:15, 71:16, 76:19, 77:15, 78:23, 87:1, 100:6, 107:6
**seek** [2] - 26:18, 26:22
**selection** [1] - 27:8
**send** [2] - 7:8, 51:20
**sending** [3] - 45:7, 45:12, 45:18
**sense** [6] - 21:4, 22:8, 33:24, 39:7, 58:6, 75:4
**sent** [6] - 45:10, 45:11, 48:23, 52:2, 80:2, 80:17
**sentence** [2] - 74:24, 81:19
**separate** [7] - 27:25, 28:1, 32:17, 33:12, 67:1, 80:25, 102:19
**September** [10] - 11:15, 12:17, 15:16, 29:13, 33:16, 34:14, 42:4, 76:13, 103:8, 103:10
**sequence** [2] - 20:18, 51:19
**series** [1] - 69:23
**serious** [1] - 99:19
**serve** [6] - 53:23, 54:4, 54:14, 59:8, 59:11, 62:3
**served** [1] - 54:17
**service** [1] - 50:8
**SESSION** [1] - 1:9
**set** [7] - 4:8, 16:21,

69:16, 73:13, 81:14, 81:16, 102:2
**sets** [1] - 77:12
**setting** [3] - 36:2, 74:22, 78:17
**several** [2] - 9:25, 10:5
**severe** [1] - 56:7
**share** [1] - 34:21
**sharing** [2] - 45:12, 45:15
**Sheppard** [5] - 32:18, 32:25, 33:9, 33:12, 34:23
**shield** [2] - 56:23, 73:6
**shift** [1] - 71:20
**short** [4] - 4:15, 41:16, 86:10, 92:18
**short-term** [2] - 41:16, 92:18
**shorter** [1] - 105:15
**shortly** [2] - 60:16, 75:23
**show** [4] - 16:1, 16:5, 36:22, 38:22
**showed** [1] - 44:16
**showing** [2] - 70:17, 79:11
**shown** [1] - 102:3
**shows** [4] - 51:11, 52:6, 59:18, 66:15
**shrank** [1] - 15:21
**side** [2] - 23:3, 103:16
**sides** [3] - 97:7, 105:22, 107:3
**sigh** [1] - 102:14
**sign** [3] - 93:13, 93:19, 100:25
**signature** [1] - 48:15
**signed** [1] - 48:17
**signing** [1] - 59:22
**similarly** [1] - 46:9
**simply** [2] - 20:19, 23:18
**simultaneous** [1] - 103:25
**single** [1] - 71:15
**sit** [8] - 30:15, 32:24, 33:9, 35:14, 36:4, 41:15, 54:23, 94:4
**sitting** [3] - 10:12, 23:12, 32:18
**situation** [2] - 28:12, 50:17
**six** [1] - 59:17
**skilled** [3] - 56:2, 56:5, 56:9
**skin** [1] - 74:6
**Slade** [7] - 6:13, 6:16, 6:17, 6:18, 6:19, 8:11, 8:15

**slicing** [1] - 97:10
**small** [1] - 10:1
**smaller** [2] - 15:22, 17:1
**Smith** [3] - 83:15, 83:16, 83:17
**SMITH** [21] - 1:15, 4:21, 6:18, 7:15, 8:17, 96:2, 97:20, 98:1, 98:14, 98:23, 99:2, 99:6, 99:11, 99:13, 100:10, 100:18, 101:25, 103:4, 104:9, 104:23, 107:10
**so..** [2] - 17:19, 55:3
**sofa** [2] - 40:8, 40:9
**software** [2] - 58:4, 58:12
**solicitation** [1] - 52:23
**solicited** [1] - 52:20
**soliciting** [1] - 51:13
**someone** [3] - 23:2, 58:9, 61:19
**something..** [1] - 4:7
**sometime** [3] - 9:22, 11:15, 103:23
**sometimes** [1] - 43:6
**somewhere** [1] - 56:13
**son** [1] - 27:17
**son's** [1] - 28:10
**soon** [4] - 7:9, 103:19, 104:19, 106:19
**sorry** [10] - 11:5, 12:9, 13:10, 24:9, 33:5, 44:5, 53:9, 60:12, 92:9, 99:20
**sort** [23] - 11:11, 12:6, 15:15, 16:6, 17:23, 19:12, 19:17, 21:3, 21:8, 22:7, 22:24, 24:16, 37:22, 38:3, 41:15, 41:16, 46:2, 61:25, 75:18, 76:20, 79:16, 102:20, 103:8
**sought** [2] - 31:20, 35:9
**sounds** [2] - 22:6, 79:15
**source** [4] - 73:8, 74:14, 74:16, 90:20
**SOUTHERN** [1] - 1:2
**Southern** [1] - 2:4
**speaking** [2] - 9:11, 10:4
**speaks** [1] - 62:23
**specific** [6] - 17:9, 42:22, 46:23, 54:21, 94:5, 105:24

**specifically** [2] - 52:4, 75:11
**specifics** [1] - 38:6
**specify** [1] - 87:18
**split** [1] - 82:5
**spoken** [1] - 82:3
**staff** [1] - 107:19
**stage** [1] - 86:1
**stake** [1] - 28:2
**stand** [2] - 6:5, 58:3
**standard** [1] - 55:10
**standards** [1] - 26:13
**start** [3] - 90:7, 90:14, 99:20
**started** [2] - 16:20, 79:4
**starting** [1] - 53:19
**startled** [2] - 68:23, 68:24
**starts** [1] - 46:11
**state** [2] - 69:19, 82:7
**statement** [2] - 72:15, 84:22
**STATES** [1] - 1:1
**States** [2] - 2:4, 108:7
**stenographically** [1] - 108:8
**stenography** [1] - 2:6
**step** [9] - 60:16, 60:20, 61:9, 61:21, 86:3, 86:4, 90:5, 90:6, 91:17
**Stephen's** [1] - 99:7
**Stephens** [2] - 99:16, 100:9
**stepping** [1] - 61:1
**steps** [1] - 36:10
**sticks** [1] - 55:24
**still** [4] - 42:9, 68:6, 77:15, 83:21
**stimulated** [1] - 68:2
**stipulation** [1] - 101:19
**stop** [1] - 57:14
**stopped** [1] - 10:14
**story** [1] - 18:1
**straight** [1] - 20:18
**strategy** [1] - 16:11
**string** [1] - 37:2
**struck** [1] - 84:4
**structures** [1] - 46:10
**struggling** [4] - 37:15, 37:19, 47:6, 54:20
**stuck** [1] - 76:20
**study** [2] - 56:14, 71:16
**subject** [2] - 12:24, 29:23
**submission** [2] -

52:11, 52:25
**submissions** [2] - 104:6, 106:8
**submit** [2] - 106:7, 107:8
**substantial** [1] - 47:1
**successor** [1] - 59:20
**suddenly** [1] - 7:24
**suffice** [1] - 16:10
**sufficient** [1] - 42:16
**suggest** [1] - 104:1
**summer** [1] - 9:23
**summons** [1] - 99:25
**supplement** [1] - 26:17
**support** [1] - 20:10
**suppose** [4] - 16:18, 79:8, 79:22, 80:20
**surgeon** [1] - 56:2
**surgery** [1] - 56:3
**surprise** [2] - 15:20, 21:24
**suspend** [2] - 23:16, 102:12
**sword** [2] - 56:22, 73:6
**sworn** [2] - 8:24, 29:24
**symptoms** [2] - 73:2, 79:11
**system** [6] - 14:19, 14:21, 14:25, 15:2, 15:3, 15:5
**systematic** [1] - 14:13

**T**

**talks** [1] - 32:7
**Tamine** [3] - 77:6, 83:4
**target** [1] - 73:17
**task** [2] - 37:22, 37:25
**tax** [4] - 61:8, 61:12, 61:13, 65:17
**taxpayer** [1] - 47:19
**team** [3] - 26:21, 34:19, 61:20
**technical** [1] - 105:24
**technique** [1] - 43:10
**telephone** [1] - 10:9
**ten** [1] - 4:22
**term** [4] - 41:16, 92:18, 92:19
**terms** [3] - 16:15, 41:12, 49:19
**terrible** [1] - 93:11
**test** [1] - 69:24
**tested** [1] - 25:3
**testified** [9] - 15:10, 26:4, 38:10, 57:5, 57:7, 71:5, 75:10,

84:13, 95:16
**testify** [8] - 5:24, 8:24, 13:16, 19:1, 29:20, 35:4, 35:7, 88:15
**testifying** [2] - 31:1, 35:18
**testimony** [19] - 29:24, 31:6, 31:20, 32:21, 35:9, 45:2, 46:25, 55:20, 57:12, 60:9, 66:20, 85:14, 91:2, 92:22, 93:8, 95:2, 95:9, 96:12, 97:5
**tests** [1] - 55:15
**TEXAS** [1] - 1:2
**Texas** [2] - 1:11, 2:4
**text** [1] - 84:19
**Thanksgiving** [4] - 94:20, 94:21, 96:25, 107:14
**THE** [106] - 1:3, 4:3, 4:5, 4:16, 4:19, 5:1, 5:6, 5:12, 6:11, 6:14, 6:20, 7:6, 7:13, 8:4, 8:11, 8:13, 8:16, 8:19, 9:2, 10:22, 11:2, 11:5, 11:6, 11:17, 11:21, 12:9, 13:10, 13:13, 13:17, 16:3, 17:12, 17:17, 17:24, 18:2, 19:6, 19:9, 32:23, 32:24, 38:19, 40:16, 40:20, 48:2, 56:10, 56:24, 57:2, 57:16, 57:22, 73:23, 74:7, 74:13, 74:19, 75:4, 75:14, 75:19, 75:25, 76:16, 77:1, 77:10, 77:16, 77:20, 77:23, 78:6, 78:20, 78:23, 86:12, 86:17, 86:24, 87:3, 87:11, 87:15, 87:18, 87:22, 88:19, 89:5, 89:8, 89:17, 89:21, 94:10, 94:13, 94:17, 94:18, 94:19, 94:21, 95:17, 96:15, 97:19, 97:25, 98:12, 98:16, 99:1, 99:5, 100:20, 101:4, 102:9, 102:12, 102:16, 104:8, 104:14, 105:9, 105:16, 106:3, 106:10, 107:4, 107:12, 107:17, 107:22
**themselves** [1] - 13:1
**theory** [1] - 79:13
**there'd** [1] - 15:15

**they've** [4] - 5:19, 75:9, 102:1, 102:4
**thinking** [5] - 69:2, 69:4, 96:23, 106:15
**third** [2] - 53:18, 95:1
**thorough** [1] - 64:24
**thoroughly** [1] - 56:2
**three** [3] - 10:1, 10:2, 48:17
**threshold** [1] - 12:20
**throughout** [5] - 16:13, 41:10, 45:8, 45:9, 94:1
**tied** [1] - 43:9
**timeframe** [2] - 40:17, 43:9
**timing** [1] - 97:4, 105:11
**tire** [1] - 38:1
**Title** [1] - 108:6
**today** [6] - 10:12, 37:10, 94:4, 99:15, 99:24, 103:21
**together** [5] - 9:19, 100:21, 100:22, 102:2, 102:25
**Tommy** [1] - 83:13
**tomorrow** [1] - 96:5
**took** [7] - 6:3, 25:8, 26:1, 28:5, 60:22, 60:24, 77:4
**tool** [1] - 5:19
**top** [1] - 37:2
**total** [1] - 103:13
**touching** [1] - 88:20
**tough** [1] - 43:11
**track** [2] - 79:16, 79:22
**traditionally** [1] - 64:16
**transaction** [1] - 12:3
**TRANSCRIPT** [1] - 1:10
**transcript** [9] - 2:7, 31:21, 31:22, 32:3, 99:3, 99:8, 100:2, 100:10, 108:8
**transcripts** [1] - 100:13
**travels** [1] - 107:14
**treated** [1] - 64:18
**treating** [9] - 26:2, 26:10, 27:1, 27:14, 64:12, 66:22, 67:3, 81:12, 92:4
**treatment** [2] - 64:15, 85:9
**trend** [1] - 16:18
**trial** [2] - 58:3, 102:19
**tricky** [1] - 40:1
**tried** [2] - 81:14, 81:16

**triggered** [2] - 7:9, 21:25
**true** [8] - 10:13, 49:17, 53:25, 65:19, 72:2, 72:15, 74:24, 108:8
**trust** [8] - 28:7, 28:10, 32:8, 39:24, 46:15, 47:4, 47:5, 47:7
**Trust** [2] - 31:11, 31:15
**try** [12] - 12:15, 49:23, 54:20, 65:22, 66:7, 100:5, 101:24, 102:20, 104:15, 105:22, 106:10
**trying** [12] - 20:17, 24:16, 45:21, 46:22, 49:15, 49:17, 50:5, 50:11, 85:22, 86:17, 105:19, 107:1
**turn** [6] - 43:16, 48:14, 51:23, 53:8, 53:17, 65:2
**turns** [1] - 91:23
**two** [20] - 4:14, 4:23, 5:3, 5:23, 6:4, 6:8, 6:14, 7:25, 10:1, 10:2, 17:2, 21:19, 56:15, 61:10, 61:21, 68:19, 70:7, 70:22, 103:12, 103:25
**typical** [4] - 19:20, 20:1, 55:8, 105:4
**typically** [1] - 102:17

**U**

**UCSH** [1] - 46:3
**unable** [6] - 28:22, 29:5, 36:13, 55:8, 55:13, 58:24
**unaware** [1] - 44:25
**unclear** [1] - 73:8
**uncritically** [1] - 23:18
**under** [4] - 8:4, 30:24, 51:1, 102:11
**underlying** [1] - 42:7
**undermine** [1] - 80:18
**undermines** [1] - 80:14
**understandably** [1] - 6:2
**understood** [7] - 5:21, 30:18, 30:24, 68:1, 82:9, 87:7, 87:23
**unfair** [1] - 88:18
**unfamiliar** [1] - 38:15
**unique** [3] - 25:20, 25:21, 29:3
**UNITED** [1] - 1:1

**United** [2] - 2:4, 108:7
**unless** [1] - 45:14
**unlike** [1] - 29:5
**unlimited** [1] - 105:6
**unprofitability** [1] - 39:16
**up** [17] - 11:25, 13:7, 17:23, 31:3, 31:10, 33:23, 41:22, 57:19, 78:4, 81:15, 81:16, 88:3, 88:23, 88:24, 90:8, 104:24, 107:5
**urologist** [2] - 64:9, 64:17
**US** [2] - 52:11, 52:25
**USA** [1] - 1:4
**useful** [2] - 12:16, 105:13

**V**

**various** [1] - 28:13
**VARNADO** [19] - 1:19, 5:2, 77:9, 86:15, 86:20, 90:2, 94:16, 99:9, 99:12, 100:4, 100:12, 101:15, 103:2, 103:6, 106:1, 106:4, 107:1, 107:16, 107:19
**vast** [2] - 95:14, 105:23
**vet** [1] - 49:25
**videotape** [2] - 32:1, 32:2
**view** [3] - 16:21, 50:17, 61:5
**viewed** [1] - 90:5
**violated** [1] - 57:21
**violation** [1] - 98:6
**visual** [1] - 69:18
**volume** [3] - 103:17, 105:23, 107:2
**voluntarily** [1] - 99:25
**vs** [1] - 1:6

**W**

**waive** [1] - 17:9
**waived** [3] - 75:18, 76:25, 77:2
**waiver** [5] - 76:18, 76:19, 77:18, 92:7, 92:10
**waiving** [1] - 17:7
**wants** [3] - 6:23, 40:16, 105:7
**warrant** [6] - 12:24, 13:3, 13:24, 13:25, 75:23, 76:12

**waste** [1] - 96:14
**wavers** [1] - 92:2
**ways** [2] - 28:13, 102:19
**weak** [1] - 88:6
**WEDNESDAY** [2] - 1:12, 4:1
**week** [4] - 38:1, 98:19, 101:16, 103:10
**weeks** [7] - 17:2, 51:2, 56:15, 61:10, 61:21, 65:16, 103:25
**weigh** [2] - 50:1, 59:25
**well-litigated** [1] - 103:16
**wife** [1] - 25:8
**willing** [2] - 83:21, 98:8
**wise** [1] - 106:22
**withdraw** [3] - 62:11, 62:12, 89:20
**WITNESS** [10] - 11:2, 11:6, 11:21, 13:17, 19:9, 32:24, 87:11, 87:18, 94:17, 94:19
**Witness** [1] - 8:23
**witness** [32] - 4:6, 4:12, 4:25, 7:19, 8:9, 15:12, 15:13, 15:16, 15:18, 16:1, 16:5, 16:7, 16:16, 17:12, 17:15, 18:20, 18:23, 19:3, 23:7, 23:11, 29:19, 36:24, 38:22, 48:4, 57:6, 81:20, 82:20, 83:22, 86:5, 94:9, 94:11, 96:22
**WITNESSES** [1] - 3:2
**witnesses** [21] - 4:15, 4:20, 4:23, 5:3, 5:14, 5:20, 5:23, 6:1, 6:4, 6:8, 6:11, 6:14, 7:18, 18:14, 18:16, 19:20, 22:16, 82:24, 83:2, 85:4, 85:5
**word** [12] - 23:15, 40:1, 49:2, 63:7, 66:18, 68:5, 84:9, 84:14, 90:18, 90:19, 91:21, 91:22
**worded** [1] - 85:11
**words** [1] - 88:25
**works** [2] - 6:16, 77:15
**worried** [1] - 58:21
**worse** [1] - 36:16
**write** [2] - 50:23, 73:1
**writing** [5] - 47:18, 48:11, 51:13, 65:21, 67:23
**written** [4] - 44:7,

48:20, 49:2, 52:20
**wrote** [7] - 57:5, 59:17, 63:3, 71:6, 79:18, 80:4, 85:7

**Y**

**year** [1] - 11:5
**Year's** [1] - 104:4
**years** [10] - 20:17, 39:23, 40:2, 46:6, 46:15, 46:16, 46:21, 99:24, 100:6, 100:7
**yesterday** [14] - 4:10, 5:5, 5:24, 6:1, 7:17, 7:22, 8:2, 9:10, 15:10, 19:13, 20:2, 20:9, 26:4, 27:16
**York** [13] - 27:4, 27:9, 27:13, 53:3, 62:20, 63:14, 63:25, 65:4, 68:11, 69:16, 90:24, 91:10, 91:14
**yourselves** [1] - 63:11
**Yu** [1] - 65:4
**Yudofsky** [20] - 80:2, 80:14, 80:17, 80:21, 80:25, 81:6, 81:10, 81:15, 81:17, 81:20, 82:4, 82:15, 84:5, 84:7, 84:24, 85:8, 85:12, 92:1, 92:7, 92:10

**Z**

**Zoom** [1] - 100:14