1              **IN THE UNITED STATES DISTRICT COURT**

               **FOR THE SOUTHERN DISTRICT OF TEXAS**

2                    **HOUSTON DIVISION**

3  UNITED STATES OF AMERICA     )     NO. 4:21-CR-09

                          )

4                          )

  VS.                     )      Houston, Texas

5                          )    1:13 p.m. to 6:00 p.m.

                          )

6  ROBERT T. BROCKMAN         )     NOVEMBER 16, 2021

7

8     \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

9

                 **COMPETENCY HEARING**

10

                 **AFTERNOON SESSION**

11

        **BEFORE THE HONORABLE GEORGE C. HANKS, JR.**

12

           **UNITED STATES DISTRICT JUDGE**

13

                    **DAY 2**

14

15   \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

16  APPEARANCES:

17  FOR THE GOVERNMENT:

18      Mr. Corey J. Smith

       Mr. Lee F. Langston

19      Mr. Boris Bourget

       Mr. Christopher Magnani

20      U.S. Department of Justice

       Tax Division

21      150 M Street NE

       Room 2208

22      Washington, DC 20002

       Tel:  202-514-9623

23      Email: Corey.smith@usdoj.gov

       Email: Lee.f.langston@usdoj.gov

24          Boris.bourget@usdoj.gov

          Christopher.magnani@usdoj.gov

25

```
 1  FOR THE DEFENDANT:

 2       Mr. Jason Scott Varnado
         Jones Day
 3       717 Texas
         Suite 3300
 4       Houston, TX 77002
         Tel:  832-239-3694
 5       Email:  Jvarnado@jonesday.com

 6       Mr. James P. Loonam
         Ms. Kathryn Keneally
 7       Jones Day
         250 Vesey Street
 8       New York, NY 10281
         Tel:  212-326-3939
 9       Email: Jloonam@jonesday.com
                Kkeneally@jonesday.com
10

11  COURT REPORTER:

12       Ms. Kathleen K. Miller, CSR, RMR, CRR
         515 Rusk, Room 8004
13       Houston, Texas  77002
         Tel:  713-250-5087
14

15  Proceedings recorded by mechanical stenography.

16  Transcript produced by computer-assisted transcription.

17

18

19

20

21

22

23

24

25
```

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1                                    INDEX

2 **MIKE NEMELKA**

3        Direct by Mr. Bourget                        5
         Cross by Mr. Varnado                        31

4

5 **ROBERT DENNEY, Ph.D.**

6        Direct by Mr. Loonam                        44

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PM 2-4

```
               1              P R O C E E D I N G S
               2              NOVEMBER 16, 2021
               3              (1:13 p.m. to 6:00 p.m.)
               4  ************************************************************
01:25:10       5  (Defendant present.)
               6              THE CASE MANAGER:  All rise.
               7              THE COURT:  Please be seated, everyone.
               8                  Had you rested with the witness, sir?
               9              MR. SMITH:  Yes, Your Honor.
01:59:39      10              THE COURT:  Then cross-examination.
              11              MR. LOONAM:  Your Honor, by agreement we are
              12  going to take a witness out of order.
              13              THE COURT:  Oh, that's right.
              14              MR. LOONAM:  Yeah.  The government has to get
01:59:45      15  somebody on a plane.
              16              THE COURT:  Okay.  No problem.
              17                  Ready to call your next witness?
              18              MR. BOURGET:  Yes, Your Honor.  The government
              19  calls Michael Nemelka.
02:00:16      20                  And, Your Honor, before we begin, I just
              21  wanted to flag Mr. Nemelka is represented by Derek Ho from
              22  the firm of Kellogg Hansen.  Mr. Ho wanted me to just
              23  highlight him, and he represented to me that on
              24  cross-examination there may be questions that implicate the
02:00:30      25  attorney-client privilege; and, so, I told him I would
```

*MIKE NEMELKA - DIRECT BY MR. BOURGET*

1 leave it up to him to raise that as appropriate.

2          THE COURT:  Okay.  Well, first, let me just

3 swear you in, sir.  If you would raise your right hand.

4               (Witness sworn.)

02:00:47  5          THE WITNESS:  I do.

6          THE COURT:  You may take the stand.

7               And, Mr. Ho, if you would like to come

8 within the bar, that would be fine, in order to hear the

9 testimony because the acoustics in this room are such that

02:00:56 10 you might not be able to hear clearly back there.

11          MR. HO:  Thank you, Your Honor.

12          THE COURT:  And you may proceed when ready.

13          MR. BOURGET:  Thank you, Your Honor.

14               **MIKE NEMELKA,**

02:01:06 15 duly sworn, testified as follows:

16               **DIRECT EXAMINATION**

17 BY MR. BOURGET:

18 **Q.**    Good afternoon, Mr. Nemelka.  Could you state your

19 full name and spell your last name for the record, please?

02:01:11 20 **A.**    Yes.  My name is Mike Nemelka.  The last name is

21 spelled "N" as in "Nancy," E-M as in "Mary," E-L-K-A.

22 **Q.**    And, Mr. Nemelka, where do you work?

23 **A.**    I am a partner at the law firm Kellogg Hansen in

24 Washington, DC.

02:01:28 25 **Q.**    Could you provide the Court with just a brief

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PM 2-6

MIKE NEMELKA - DIRECT BY MR. BOURGET

1   professional background?

2   **A.**   I graduated from the University of Virginia School of

3   Law in 2006, after which I clerked for Judge Paul Niemeyer

4   on the Fourth Circuit.  And from there I joined Kellogg

02:01:42   5   Hansen as an associate and then became a partner.  I was

6   then nominated and confirmed as the Deputy United States

7   Trade Representative, and then in December 2020 I returned

8   to Kellogg Hansen.

9   **Q.**   And in your position as the Deputy U.S. Trade

02:02:03   10   Representative, does that come with a rank?

11   **A.**   It does come with the rank of Ambassador, which only

12   my kids know to call me.  Others do not.  And my job at

13   USTR was -- my portfolio -- it's a deputy cabinet-level

14   position, and my portfolio was U.S. trading relationships

02:02:21   15   with Africa, the Western Hemisphere, and China.  And then

16   I was also over environment, labor, services and

17   investment, and intellectual property, and textiles.

18   **Q.**   Thank you.  And do you know the defendant, Robert

19   Brockman?

02:02:36   20   **A.**   I do.

21   **Q.**   And how do you know him?

22   **A.**   He was chairman and CEO of the Reynolds and Reynolds

23   company, which is a defendant in cases that I represent

24   clients against.

02:02:48   25   **Q.**   Can you describe what that litigation is about?

PM 2-7

*MIKE NEMELKA - DIRECT BY MR. BOURGET*

1    **A.**    So, I represent clients in a multidistrict litigation

2    that is currently pending before Judge Robert Dow in the

3    Northern District of Illinois, and the Reynolds and

4    Reynolds company and their chief competitor, CDK, are

02:03:05   5    defendants in that case.  And the gist of the claim is a

6    Section 1 conspiracy, that they coordinated their data

7    access policies and were able to charge super-competitive

8    prices for that data access as a result.

9    **Q.**    Okay.  And you said Section 1.  Is that under the

02:03:26   10   Sherman Act?

11   **A.**    It is under the Sherman Act, yeah.

12   **Q.**    And what's the premise of your clients' claims

13   against Reynolds and Reynolds and CDK?

14   **A.**    So, in 30 seconds, the primary product of the

02:03:40   15   Reynolds and Reynolds company and CDK is a dealer

16   management system software, which is the Enterprise

17   software that car dealerships use to run their business.

18   And that software has a database component where dealers

19   store their data, and my clients are the companies that

02:03:53   20   needed access to that data in order to perform their own

21   services for dealers, such as -- such as customer

22   relationship management, inventory management, service

23   reminders, you know, managing parts inventory.  And my

24   clients were charged super-competitive prices for that

02:04:13   25   data access as a result of the alleged conspiracy between

MIKE NEMELKA - DIRECT BY MR. BOURGET

1   CDK and Reynolds.

2   **Q.**   Approximately, what's the amount at issue in the

3   case?

4   **A.**   It's a significant case.  Collectively, Reynolds is

02:04:23   5   facing a liability of over a billion dollars.

6   **Q.**   And is this the first case you have litigated?

7   **A.**   No, it's not.

8   **Q.**   In comparison to other cases you have litigated, how

9   voluminous is the discovery in this case?

02:04:35   10   **A.**   Being an MDL, it was -- I represent the direct

11   purchasers of the services, but the car dealerships also

12   were involved.  We had competitors involved.  It was --

13   and, so, there were millions and millions of pages

14   produced, over 90 depositions, dozens of experts.  I was

02:04:52   15   on the road for basically five months straight taking and

16   defending depositions at one point.

17   **Q.**   And was Mr. Brockman deposed as part of that

18   discovery?

19   **A.**   Yes.  I deposed him.

02:05:02   20   **Q.**   And when did those depositions take place?

21   **A.**   Mr. Brockman's deposition took place in January of

22   2019 over the course of two days.

23   **Q.**   And was Mr. Brockman represented in those

24   depositions?

02:05:16   25   **A.**   He was.  He was represented by Andi Gulley of the law

*MIKE NEMELKA – DIRECT BY MR. BOURGET*

1  firm called Gibbs & Bruns based here in Houston, a very
2  good firm; and also by Michael Cohen of Sheppard Mullin.
3  Scott Cherry, the general counsel of Reynolds was also
4  there.  And CDK had a lawyer there but obviously did not
02:05:37  5  represent Mr. Brockman.
6  Q.   And from your -- from your perspective and your view,
7  how important was Mr. Brockman's deposition to the case?
8  A.   Mr. Brockman and RV was one of the primary
9  co-conspirators of working with CDK to coordinate their
02:05:53  10  data access policies.  He was the chairman, CO and owner
11  of Reynolds.  He was one of the most important depositions
12  in the case.
13  Q.   And how many depositions have you taken or defended
14  in your career?
02:06:05  15  A.   My career?  It's approaching triple digits.
16  Q.   Have you deposed sophisticated individuals or
17  businessmen, executives such as Mr. Brockman before?
18  A.   I have.
19  Q.   And in terms of preparation and skill and -- yeah, in
02:06:21  20  terms of preparation and skill as a deponent, how would
21  you rate Mr. Brockman?
22  A.   I found Mr. Brockman to be very well prepared and a
23  very skilled deponent.
24  Q.   And are you able to rank him in a certain percentage?
02:06:35  25  A.   I would say top five percent of the people I have

*MIKE NEMELKA - DIRECT BY MR. BOURGET*

1   deposed in terms of preparation and skill as a witness.

2   You know, I came away with a grudging respect for him, for

3   sure.

4   **Q.**   And what made him, you know, such a skillful

02:06:51   5   deponent?

6   **A.**   I would say something that makes anybody a skillful

7   deponent.  He was well prepared.  He had met with his

8   attorneys for two days.  He was very careful to make sure

9   he understood my questions.  He answered carefully and

02:07:05   10   thoughtfully.  He took time to make sure to formulate his

11   answers.  He re -- you know, things that you tell your

12   clients to do.

13                He reviewed the documents in whole and

14   made sure he understood the context of e-mails or

02:07:19   15   presentations I put before him.  And, you know,

16   substantively, he was careful to protect the case as well

17   as he could for -- for his company.

18                MR. BOURGET:  And, Your Honor, just for the

19   record, the transcripts from those depositions have been

02:07:34   20   preadmitted as Exhibits 36 and 37.  I also will be walking

21   Mr. Nemelka through some excerpts from the videos of those

22   depositions.  The full videos are Exhibits 58 and 59, and

23   we will mark the clips separately.

24   BY MR. BOURGET:

02:07:49   25   **Q.**   So, Mr. Nemelka, have you reviewed the transcripts of

*MIKE NEMELKA - DIRECT BY MR. BOURGET*

1  the deposition since it took place?

2  **A.**   I have.

3  **Q.**   Have you reviewed the videos of the deposition since

4  it took place?

02:07:57  5  **A.**   I have.

6  **Q.**   And when did you last review the transcripts of the

7  video?

8  **A.**   The video I reviewed again about a month ago, and

9  then the transcripts I've reviewed a few times.  I

02:08:08  10  reviewed it again last night.

11  **Q.**   And why did you review those materials?

12  **A.**   Just to make sure that my memory was refreshed about

13  what was in the deposition.

14  **Q.**   And was that for the purpose of this hearing?

02:08:18  15  **A.**   It was.

16  **Q.**   And who did you prepare with for this hearing?

17  **A.**   I had a series of calls with Chris Magnani and Evan

18  Garrett, and Boris was on some of those calls.  And then

19  my partner and -- and representation here, Derek Ho, was

02:08:38  20  also on some of those calls.

21  **Q.**   And in preparing for the prosecution team, is it fair

22  to say that we discussed many portions of the deposition?

23  **A.**   Yes.  And just to be clear, I also met last night

24  with Boris and Evan Garrett.

02:08:50  25  **Q.**   Thanks for that clarification.

PM 2-12

*MIKE NEMELKA – DIRECT BY MR. BOURGET*

1        Is it also fair to say that you brought

2   sections of the -- of the videos to our attention?

3   **A.**   Right.  We discussed Mr. Brockman's deposition, and I

4   highlighted certain portions for -- for you.

02:09:05   5   **Q.**   So, we will get to those clips in a minute, but

6   before that I want to talk a little bit about bias.

7        Do you have any animosity towards

8   Mr. Brockman?

9   **A.**   I do not.

02:09:14   10   **Q.**   And have you considered the ways that this Court's

11   competency determination might affect the multidistrict

12   litigation and your clients' claims against Reynolds?

13   **A.**   Of course.  I would make that -- consider that.  I

14   would say the main thing is that Mr. Brockman's deposition

02:09:32   15   that I took -- nobody's arguing that he was not competent

16   when I took it.  So, Reynolds is relying on that

17   deposition, we're relying on it in the MDL, and there has

18   never been an argument by anybody in the MDL that that

19   deposition isn't admissible for any reason.

02:09:48   20        But it's true we're still litigating

21   against Reynolds in a high-stakes case.  I haven't thought

22   of all the permutations of how a competency determination

23   could affect that.  It doesn't affect the substantive

24   Section 1 claims, but it is true that we're still

02:10:03   25   litigating against Reynolds.

PM 2-13

*MIKE NEMELKA - DIRECT BY MR. BOURGET*

1  Q.   And how many days did Mr. Brockman's deposition last?

2  A.   It lasted over two days.  It was originally scheduled

3  for one day at the end of 2018, but then counsel for

4  Reynolds called me and said that Mr. Brockman had a heart

02:10:24  5  condition, and they asked if we would accommodate him and

6  have it taken over two days.  And, so, it was taken over

7  two days in January; one day three-and-a-half hours on the

8  record, and then the other day three-and-a-half hours on

9  the record.

02:10:38  10            And then his counsel did redirect on the

11  second day.

12  Q.   And I think you mentioned a heart issue.

13  A.   That was the reason that counsel gave us that it

14  needed to be split over two days, to make sure that he had

02:10:53  15  a break.

16  Q.   Okay.  And, so, other than this potential heart

17  issue, were any other health issues raised by Mr. Brockman

18  or his attorneys?

19  A.   There were no other health issues that -- that

02:11:05  20  counsel raised that I can recall.

21  Q.   Were there any mental or cognitive health issues

22  raised?

23  A.   None that I can recall.  I mean, actually, for mental

24  and cognitive, I know none were raised.

02:11:18  25  Q.   Other than Mr. Brockman's attorneys, did anyone raise

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

MIKE NEMELKA - DIRECT BY MR. BOURGET

1   to you any concerns about Mr. Brockman's cognitive health?

2   **A.**   No.

3   **Q.**   During the deposition did you feel like Mr. Brockman

4   understood your questions?

02:11:32   5   **A.**   I -- I asked him that.  I mean, as the standard

6   questions that you ask before a deposition, one of them I

7   asked was, "If you don't understand a question, please ask

8   for clarification.  And if you answer we will have the

9   ground rule that the record will be that you did

02:11:46   10   understand it."  And he -- he acknowledged that, and he at

11   times asked for clarification, but, otherwise, he -- he

12   answered my questions.

13   **Q.**   Did you -- during the deposition did you ask

14   Mr. Brockman whether he prepared for the deposition?

02:12:03   15   **A.**   Along with that list of questions that I typically

16   ask, one was if he had prepared for the deposition, and he

17   said that he had met with his lawyers over the course of

18   two days for most of the day both days.  I think he said

19   three-quarters of the day each day.

02:12:23   20   **Q.**   Okay.  So, I would like to now play the first clip.

21   This clip is about seven minutes long.  It's the longest

22   one that we have out of the list.

23                     (Video played.)

24                THE COURT:  I don't see anything.

02:13:02   25                THE WITNESS:  One clarification for the Court.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*MIKE NEMELKA - DIRECT BY MR. BOURGET*

1          I took the deposition on the first day,

2   and then my colleague, Peggy Wedgworth, who represents the

3   dealers in the MDL, took the deposition on the second day.

4          THE COURT:  Okay.

02:13:13   5          THE WITNESS:  So, you may hear her asking

6   questions, too.

7          THE COURT:  Not a problem.  Thank you.

8          ***********************

9          **(Video played as follows.)**

02:13:25  10  **Q.**   ...September 2015 after this pitch was made?

11          UNIDENTIFIED SPEAKER:  Objection.

12  **A.**   A really, really unhappy thing.  They issued

13  termination notices to us and announced that they are

14  going to CDK, and I was, you know, very disappointed.

02:13:43  15  **Q.**   They signed a contract with CDK?

16          UNIDENTIFIED SPEAKER:  Objection.

17  **A.**   Yes, they did.

18  **Q.**   So, they switched to CDK?

19          UNIDENTIFIED SPEAKER:  Objection.

02:13:50  20  **A.**   They didn't switch yet.

21  **Q.**   They decided to switch?

22          UNIDENTIFIED SPEAKER:  Objection.

23  **A.**   They decided to switch.  They contracted to switch.

24          **(Video stopped.)**

02:13:54  25          **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

MIKE NEMELKA - DIRECT BY MR. BOURGET

1        MR. BOURGET:   Just pause it.

2   BY MR. BOURGET:

3   Q.   Mr. Brockman is talking about a switch there.  Can

4   you describe what that switch was about?

5   A.   Yes.  And one other clarification.  This was actually

6   on redirect the second day.  That was his own lawyer

7   asking him the question.

8        THE COURT:  Okay.

9   A.   And what this is talking about is Hendrick Automotive

10  Group, which is one of the largest automotive groups in

11  the nation, is a Reynolds client, and had announced that

12  they were going to switch to CDK, the competitor, and it

13  was -- it was a switch that failed.  They were not able to

14  successfully switch dealer management systems from

15  Reynolds to CDK, which in our case one of our arguments is

16  that it is very hard for dealers to switch.  They're

17  locked in.  It's a sticky product.  And, so, it -- it's a

18  good fact for my clients that the largest dealership tried

19  to switch but failed.

20       MR. BOURGET:  Go ahead and continue the video.

21            ************************

22            **(Video played as follows:)**

23  A.   And then -- which is a further -- you know, a longer

24  story, that they decided to switch.  And then, as the

25  switch began, it began first with a very small dealership

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

MIKE NEMELKA – DIRECT BY MR. BOURGET

1   that was basically a new start, and they had all new

2   people, and it was, you know, therefore, a pretty easy,

3   pretty simple conversion job.  This went okay.

4                   The second dealership that they converted

02:15:20   5   was a monster Toyota dealer which is within eyesight of

6   Hendrick's headquarters.  And it was an -- an absolute

7   disaster from a conversion standpoint, but not because of

8   the software, not because of the systems, not because of

9   the data conversion, not because of anything like that.

02:15:46   10                  There is a process that is very, very

11   important in the service department, which is called

12   "op codes," and op codes are -- they're unique to each

13   dealership.  Each dealership has kind of built their own

14   op code structure.  And, typically, it's a two-digit or

02:16:06   15   three-digit number and its whole purpose is to save time

16   in typing.  When you're opening up a repair order there is

17   a tremendous amount of keystroke work that has to be done,

18   and the op code shortened that dramatically.

19                  Well, there had been an initiative inside

02:16:25   20   Hendrick, which had not been accomplished or even

21   attempted, which was to standardized op codes amongst all

22   105 dealerships.  And the goal or the reason to do that

23   was, that way, you can move a service adviser from one

24   dealership to another dealership and he would not have to

02:16:45   25   relearn the op codes.  Because if you put a service

*MIKE NEMELKA – DIRECT BY MR. BOURGET*

1   adviser into an environment where there is all new op

2   codes, he is crippled, because he has to look up what

3   every op code is and he has to keep doing that until he

4   has finally memorized, you know, whatever the new set of

02:17:03  5   op codes are from the place he has been transferred to.

6   They wanted to avoid that forever and all time.

7          Unfortunately -- and I don't know the

8   exact -- who talked to who about what, but the upshot was

9   in this that Hendrick decided and CDK let them change the

02:17:26  10   op codes on the day of conversion to the new system.  The

11   result was -- It's always been on Monday mornings people

12   always bring their cars in.  They kind of have made their

13   to-do list over the weekend, and Day 1 is, you know, you

14   bring your car in to do this or do that.  So, there is a

02:17:45  15   lot -- typical Monday morning.

16          The process of opening repair orders was

17   absolutely crippled because there was all new op codes

18   and, you know, the service advisors had to look up every

19   op code, which just, you know, really made it proceed at a

02:18:03  20   snail's pace, which meant that the technicians, who are

21   paid on incentive programs, they did not get work to do

22   until almost noon.  And they were not happy about that.

23   They lost half a day's pay.  But everybody, I think, had a

24   little bit of, you know, forgiveness built in because,

02:18:21  25   after all, they were converting to a new system and it

MIKE NEMELKA - DIRECT BY MR. BOURGET

1    was -- they expected some things not to go right.

2                    The second day it didn't get any better.

3    By noontime, you know, the techs were absolutely up in

4    arms.  There was an absolute uprising.  And they were

5    saying -- which is absolutely true -- they were top

6    technicians.  Some of them had been with Hendrick 25 years

7    or more, and they were just wailing.

8                    And, so, the call for help went out to --

9    Mr. Hendrick needed to come and address the group, which

10   he did.  And he did a smart thing.  He said, 'Guys, I

11   promise you, you are going to make ten percent more this

12   month than you have ever made this year.  Be patient with

13   us.'  And the techs said, 'Okay.  You know, we

14   understand,' you know.

15                   And then another interesting thing

16   happened.  Success in data conversions has a lot to do

17   with the quality of personnel, the experience with

18   personnel, really.  Obviously, there was some real lack of

19   experience because the CDK conversion group should have

20   resisted this idea -- this crazy idea of changing the op

21   codes on the first day of installation.

22                   So, Mr. H, as he is called -- he's a very

23   low-key kind of guy and he -- he went around and just kind

24   of went around and talked to folks, you know, after the

25   initial fire had been quenched.  And he walked up to a CDK

02:18:41

02:18:58

02:19:17

02:19:36

02:19:55

*MIKE NEMELKA - DIRECT BY MR. BOURGET*

1  installer and, you know, he talked to him.  You know,

2  'Well, how are you?  My name is Rick Hendrick.'  He shook

3  his hand and -- Rick -- you know, Rick is a hero figure in

4  car racing.  He is one of "the" guys.

02:20:14  5              He was talking to this one young person,

6  and, you know, in the course of the conversation he asked

7  him, 'How long have you been with CDK?'

8              And the person answered, 'Well, I am not

9  with CDK.  I am a contractor.'

02:20:28  10              'Oh.  Really?  Okay.  How long have you

11  been a contractor?' and so forth.

12              Then he talked with several others, you

13  know, kind of got the same answer.  And he realized that

14  he had been promised the best install team and he had not

02:20:41  15  gotten it.  And Rick Hendrick is the kind of person -- he

16  is a very simple person.  You only would lie to him once.

17              And the next day he called us up and said,

18  'Bob, you know, we've got problems.  If you won't punish

19  us, we would like to come back.'

02:21:00  20              And the answer is, obviously, 'Whatever

21  our last proposal is, that's it.'

22              And so they came back.

23              And, you know, that's probably one of the

24  most amazing conversion stories that I have ever heard.

02:21:15  25  And the software -- our software had nothing to do with

1  it.  You know, the CDK software had nothing to do with it.

2  There was nothing wrong with the hardware, probably not

3  that much wrong with the people, if they had just not

4  changed op codes.

02:21:34  5              **(Video concluded.)**

6              *******************

7  By MR. BOURGET:

8   **Q.**   All right.  Mr. Nemelka, well, first, what is an op

9  code?

02:21:40  10  **A.**   I think Mr. Brockman explained it well.  It's a

11  shorthand that service technicians use in the service lane

12  for when people come in and need an oil change or tires

13  changed or some work done on their car.  It's a shorthand

14  like a court reporter shorthand so that they don't have to

02:21:56  15  enter all the data.  And, as Mr. Brockman said, each

16  dealership, you know, has unique op codes, and Hendrick

17  was trying to make -- have all their dealerships have the

18  same.

19              MR. BOURGET:  And just for the record, Your

02:22:10  20  Honor, this -- this clip came from Exhibit 59.  Exhibit 59

21  consists of four videos, and this is the fourth video

22  beginning at the nine minute and fifty second mark through

23  the 17 minute second mark.

24              **(Video played.)**

02:22:24  25  BY MR. BOURGET:

MIKE NEMELKA - DIRECT BY MR. BOURGET

1   **Q.**   So, Mr. Nemelka, what was the relevance of what

2   Mr. Brockman was discussing here?

3   **A.**   First, I want to, again, emphasize this was in

4   response to his own lawyer's question.  He didn't give

02:22:45   5   those types of long answers to us.

6                    And, as I mentioned, it was significant

7   that the largest dealership group tried to change dealer

8   management systems and failed.  It shows how hard it is to

9   switch.  Mr. Brockman had a clever answer, to say it

02:22:57   10  wasn't because it was so hard to switch, but it was

11  because they did these op codes at the same time.  And,

12  so, that was a -- it's a narrative that helps -- I think

13  that he thought helped their story of the case.

14  **Q.**   And so -- you mentioned that the discovery in this

02:23:13   15  case was voluminous.  Was document production or retention

16  ever at issue?

17  **A.**   Document production for sure.  You always have

18  document production fights in litigation, especially in

19  the MDL.

02:23:25   20                    But in terms of retention, one big issue

21  that we had was, frankly, about Reynolds and

22  Mr. Brockman's e-mails.  ESI discovery started January

23  1st, 2013, for the case, and Reynolds did not produce any

24  of Mr. Brockman's e-mails before August 26, 2016.  So,

02:23:45   25  there were over three-and-a-half years of e-mails missing

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*MIKE NEMELKA - DIRECT BY MR. BOURGET*

1    from Mr. Brockman.  And we asked Reynolds in discovery,

2    'Where are they?'  And Reynolds came back, and said,

3    'Well, we have done a diligent investigation and we have

4    no information to provide.'  So, we were kind of at a

02:24:02    5    loss.

6              And, so, you know, at the deposition -- I

7    did only have three-and-a-half hours.  So, at the end I

8    was -- I wanted to ask him a few questions about his

9    e-mail use and -- and document retention.

02:24:18    10             MR. BOURGET:  I would like to play a second

11   clip.  The first one we marked as 59-A.  This one will be

12   58-A.  It comes from Exhibit 58.  It's the third video

13   contained within Exhibit 58, and it starts at the 1 minute

14   58 mark and goes through the 5 minute 45, the second mark.

02:24:29    15                       **(Video played.)**

16   BY MR. BOURGET:

17   **Q.**   So, Mr. Nemelka, what was the significance of that

18   back-and-forth about e-mail in relation to your case?

19   **A.**   You know, again, the -- we didn't have any e-mails

02:28:36    20   from Mr. Brockman from before August 2016, and we wanted

21   to know what his e-mail use was and what his e-mail

22   preservation practices were.  And -- and, so, I only had a

23   few minutes left.  That's what I did.

24             MR. BOURGET:  All right.  I would like to play

02:28:53    25   a third clip.  This is from Exhibit 58.  We will mark it as

MIKE NEMELKA - DIRECT BY MR. BOURGET

1  58-B.  It's the third video in Exhibit 58, and it begins at

2  the 17 second mark and goes to the 1 minute and 57 second

3  mark.

4                    **(Video played.)**

02:30:56  5  BY MR. BOURGET:

6  **Q.**    Mr. Nemelka, so what's the significance here of

7  Mr. Brockman talking about finance managers and the money

8  they bring in every month?

9  **A.**    So, as I said, it's very hard for dealers to switch

02:31:07  10  DMS products.  And, here, Mr. Brockman is talking about a

11  product that's -- there's a constellation of products

12  around the DMS that Reynolds offers, and one of them is

13  this docuPAD that dealerships use.  And Mr. Brockman is

14  describing how it brings in enough money to a Ford

02:31:26  15  dealership, an added revenue to pay for the DMS and makes

16  the DMS even more sticky for -- for dealerships.  And,

17  yeah, that's one reason that Reynolds is such a successful

18  business.

19  **Q.**    "DMS."  Does that stand for "dealer management

02:31:44  20  systems"?

21  **A.**    Excuse me.  Sorry for using that acronym.  Yeah,

22  "DMS" stands for "dealer management system."

23  **Q.**    And what's a dealer management system, very briefly?

24  **A.**    As I said, it's the Enterprise software that a car

02:31:56  25  dealership uses and it's Reynolds's main product.  It's

1    CDK's main product.  And it is the -- it's, really, the

2    guts of the dealership.  It manages accounting, HR,

3    transactional information, inventory information, service

4    information.  And it's -- it's kind of the nerve center of

02:32:15    5    the car dealership.

6                    And it has that data post -- database

7    component that I referenced.  And then my clients are the

8    other third-party applications that need access to that

9    data in order to be able to provide additional services to

02:32:27   10    dealers.

11    Q.    Did you ever ask Mr. Brockman a question that he

12    seemed unprepared for?

13    A.    Not many.  I mean, he really was very well prepared.

14                    There was one where I asked him if he had

02:32:42   15    ever used the phrase "data wars."  The conspiracy that we

16    have alleged is that CDK and Reynolds were competing on

17    the basis of their data access policies.  And Mr. Brockman

18    had used that phrase "data wars" in a document, and I

19    asked him early on in the deposition if he had ever used

02:32:59   20    that phrase and he said he never had.  So, that made me

21    think maybe he had not reviewed that one document where he

22    had used that phrase.  But, otherwise, he was -- he was

23    pretty well prepared for the documents and questions I

24    asked.

02:33:15   25    Q.    And, so, overall, how was his memory of past events?

*MIKE NEMELKA - DIRECT BY MR. BOURGET*

1   **A.**   It was good.

2                   Just one thing on that "data wars."  He --

3   when I did finally show him the document -- it was in a

4   series of talking points -- he very quickly pivoted to

02:33:30   5   say, 'Oh.  I do see I used it once, but it's in lower

6   case.  I did it for shorthand.  I was speaking to top-

7   level Reynolds executives,' you know, trying to quickly

8   pivot and minimize his description of the competition

9   between CDK and Reynolds as being in a data war, which the

02:33:49   10   reference in the document was that those data wars are now

11   ending as a result of CDK and Reynolds getting together.

12                   So, what was your question?  I'm sorry.

13   **Q.**   How was his overall -- how was his memory of past

14   events?

02:34:04   15   **A.**   It was -- it was good.  I mean, he had -- he had good

16   recall.  I mean, he --

17                   I remember asking him about talking points

18   that he had prepared in 2012 for a conversation that he

19   was going to have with Steve Anenen, who is the CEO of

02:34:23   20   CDK; so, the CEO of Reynolds talking to the CEO of CDK.

21   And he prepared these talking points for the phone

22   conversation, and he was able to recall exactly, you know,

23   what those talking points were.

24                   I think he even said that, you know, there

02:34:35   25   were certain talking points he didn't get to in the

*MIKE NEMELKA – DIRECT BY MR. BOURGET*

1  conversation.  You know, that was impressive to me.

2  That's a conversation seven years before the deposition

3  that he could recall what he covered and didn't cover.

4  **Q.**   And during his testimony did Mr. Brockman ever

02:34:51  5  correct you or another examiner?

6  **A.**   There were a few times when I got my facts wrong and

7  he made sure to correct me.

8          One was -- Mr. Brockman acquired Reynolds

9  in 2006, and I thought the month was August, and he

02:35:05  10  corrected me and said it was in October.

11          And then I asked some questions at the

12  start of the deposition about the ownership structure of

13  Reynolds and the Eugene Brockman Trust and how that

14  worked, and I -- I didn't know anything about it.  It's

02:35:19  15  not that relevant to our case, but I -- we were curious

16  about the ownership structure of Reynolds, and I asked a

17  few questions, and he was able to correct me on a few

18  points.

19          MR. BOURGET:  At that point I would like to

02:35:31  20  play -- this is another -- this is a seven-minute clip,

21  what I will mark as 58-C.  It's Exhibit 58, the first

22  video, and it starts at the 8 minute 40 second mark through

23  15 minutes and 45 seconds.

24          **(Video played.)**

02:35:47  25  BY MR. BOURGET:

*MIKE NEMELKA - DIRECT BY MR. BOURGET*

1    Q.   All right.  Mr. Nemelka, you mentioned that the trust

2    wasn't, you know, a central part of the case.  So, can you

3    explain what was the significance of asking Mr. Brockman

4    about the trust and the income it distributed?

02:43:07   5    A.   I wanted to know the ownership structure of the

6    defendant in our case.

7    Q.   Did you -- did you ask Mr. Brockman about the

8    properties that he owned?

9    A.   I did.

02:43:22  10    Q.   And what was the purpose of asking him those

11   questions?

12   A.   In depositions I generally ask witnesses where they

13   own properties in case we ever need personal jurisdiction

14   over them for some reason.

02:43:35  15             MR. BOURGET:  All right.  Now I would like to

16   play -- this is the fifth clip.  It's three minutes long.

17   This will be marked as 58-D.  It's Exhibit 58, the first

18   video, and it's at 2 minutes 5 seconds to 5 minutes and

19   1 second.

02:43:47  20             **(Video played.)**

21   BY MR. BOURGET:

22   Q.   All right, Mr. Nemelka.  So, you mentioned that you

23   asked him some of the properties for jurisdictional

24   purposes.  Why did you ask him about his preparation and

02:47:01  25   the lawyers that were -- that were present?

*MIKE NEMELKA - DIRECT BY MR. BOURGET*

1   **A.**   Again, it's just a list of standard questions that I
2   typically ask at each deposition, if they prepared for
3   their deposition and what they did.  There is a litany of
4   topics at the start of the deposition like that that I --
02:47:16   5   that I cover.
6   **Q.**   And did you ask Mr. Brockman about the inner workings
7   of Reynolds?
8   **A.**   I remember asking him if, as chairman and CEO, he had
9   ultimate decisionmaking authority over the policies and
02:47:33   10   practices of the company, and he said yes.
11   **Q.**   Did you ask -- I'm sorry.  Go ahead.
12   **A.**   I mean, in a way, all my questions were about the
13   inner workings of Reynolds, but, yeah, that was --
14   **Q.**   Did you ask Mr. Brockman about the financials of
02:47:47   15   Reynolds?
16   **A.**   I don't know if I -- My colleague and I -- Peggy
17   Wedgworth -- divided topics, and I think Peggy Wedgworth
18   on the second day is the one who asked more about the
19   financial aspects of the business.
02:48:02   20         MR. BOURGET:  Your Honor, I have one last clip.
21   This comes from Exhibit 59.  We will mark it as 59-B.  It's
22   the first video of Exhibit 59.  It starts at the 1 hour and
23   15 minute and 15 second mark and goes to the 1 hour, 18
24   minute and 55 second mark.
02:48:17   25         THE COURT:  Okay.

PM 2-30

1          **(Video played.)**

2    BY MR. BOURGET:

3    **Q.**   Mr. Nemelka, just a few more questions.

4              During Mr. Brockman's deposition, did he

02:51:31   5    ever appear to experience a hallucination?

6    **A.**   No.  And I -- just for the Court, these acronyms --

7    "RCI" stands for the "Reynolds's Certified Interface."

8    That's the data access program that Reynolds has.

9    **Q.**   Thank you.

02:51:45   10             And, so, during his deposition did

11   Mr. Brockman ever seem unusually confused?

12   **A.**   No.

13   **Q.**   Did he ever appear to have erroneous or false

14   memories?

02:51:55   15   **A.**   No.

16   **Q.**   And other than today, have you seen Mr. Brockman in

17   person since his deposition?

18   **A.**   Not in person.

19   **Q.**   So, after the deposition concluded, was there

02:52:09   20   anything about Mr. Brockman's behavior that stood out to

21   you?

22   **A.**   Honestly, I just remember him leaving by himself,

23   wearing his suit jacket, carrying a briefcase and car

24   keys, and smiling a little bit and whistling.  And he just

02:52:24   25   left on his own, which, for some reason, stuck out in my

PM 2-31

*MIKE NEMELKA - CROSS BY MR. VARNADO*

1   memory.

2          MR. BOURGET:  I have nothing further.

3          THE COURT:  Cross-examination?

4          MR. VARNADO:  Yes, Your Honor.

02:52:35   5          Mr. Thomas, can I get the ELMO, please?

6          THE CASE MANAGER:  Sure.

7          MR. VARNADO:  Thank you.

8                    **CROSS-EXAMINATION**

9   BY MR. VARNADO:

02:52:44   10   **Q.**   Good afternoon, Mr. Nemelka.

11   **A.**   Good afternoon.

12   **Q.**   My name is Jason Varnado.  I represent Mr. Brockman.

13   **A.**   Nice to meet you.

14   **Q.**   Nice to meet you.  We have never met each other

02:52:53   15   before other than at lunch I told you you could probably

16   find the government up on the 7th floor.

17   **A.**   Thank you for the help.  Yes.

18   **Q.**   Good.  So, you have been a long-time partner at

19   Kellogg Hansen.  Correct?

02:53:04   20   **A.**   For several years, since -- yes.

21   **Q.**   Okay.  And prior to rejoining the firm in 2020, you

22   had a role in the Trump administration as the Deputy U.S.

23   Trade Representative; is that right?

24   **A.**   Correct.

02:53:15   25   **Q.**   I think Mr. Bourget asked you about that.

*MIKE NEMELKA – CROSS BY MR. VARNADO*

1  **A.**   Yes.

2  **Q.**   And how long did you have that position?

3  **A.**   I joined USTR in January.  I was nominated for the

4  position and confirmed unanimously by the senate in

02:53:28  5  August.  And then I left -- I left in the middle of

6  December, given the change in administrations.

7  **Q.**   So, about five months?

8  **A.**   Well, I was at USTR for a year but in the senate-

9  confirmed position, yeah.

02:53:41  10  **Q.**   Okay.  And you got a title, I think Mr. Bourget said,

11  of ambassador?

12  **A.**   It does come with the rank of ambassador, yes.

13  That's --

14  **Q.**   I think you said your kids are the only ones who

02:53:51  15  really call you that.

16  **A.**   That's a stale joke that I use, yes.  Only my kids

17  need to call me that, yes.

18  **Q.**   So, not something you use professionally today.  I

19  don't have to call you "Ambassador Nemelka"?

02:54:02  20  **A.**   No.  But the government did tell me to make sure I

21  put it on my professional -- not any reason but just

22  respect for the office.

23  **Q.**   So, in your bio it does say "Ambassador Nemelka," on

24  your web page?

02:54:14  25  **A.**   Correct.  And that's -- as I mentioned, that's what

*MIKE NEMELKA - CROSS BY MR. VARNADO*

1    they recommend we do.

2    **Q.**   Okay.  All right.  And, so, I think on here also,

3    since we've talked about this litigation, you know, it

4    says that you spearheaded the investigation into the core

02:54:28    5    claims and the antitrust litigation against the two

6    leading providers of dealer management systems, CDK and

7    Reynolds.  That's the case that Mr. Bourget has been

8    talking about and the depo that took place almost three

9    years ago.  Correct?

02:54:40    10    **A.**   That is the same case, yes.

11    **Q.**   Okay.  And you mentioned just a moment ago that you

12    had not seen Mr. Brockman in person since the deposition.

13    Have you seen him in some other capacity?

14    **A.**   I don't think so.  I just don't know if I saw him,

02:54:55    15    you know, in a video or something, but I don't think so.

16    **Q.**   Okay.  I saw you looking at him a little bit while

17    they were playing the deposition transcripts.  Does he

18    look different today than when you saw him three years

19    ago?

02:55:05    20    **A.**   I mean, under the mask?  I mean, the eyes and the

21    forehead look similar.

22    **Q.**   Okay.  And, now, you have not spoken with

23    Mr. Brockman since you took his deposition.  That's fair;

24    correct?

02:55:19    25    **A.**   No, I have not.

PM 2-34

*MIKE NEMELKA - CROSS BY MR. VARNADO*

1   **Q.**   Okay.  And, as you sit here today, you have no

2   personal knowledge of Mr. Brockman's current health

3   condition?

4   **A.**   I have no personal knowledge of his current, today,

02:55:33   5   health condition.  I did take a deposition of other people

6   who did.

7   **Q.**   Okay.  But, sitting right now, were you aware that

8   Mr. Brockman was hospitalized in March of this year with

9   urosepsis and also had delirium?

02:55:46   10   **A.**   You know, we -- I knew that he had health challenges

11   this spring because we saw his deposition in -- There is a

12   private arbitration going on between one of my clients and

13   Reynolds, and we did seek Mr. Brockman's deposition, and

14   the panel comprised of three former federal judges did

02:56:01   15   order his deposition.  And I think Reynolds told us at a

16   certain point that he had some health challenges.

17   **Q.**   Okay.  And we will talk about that --

18   **A.**   Yeah.

19   **Q.**   -- because you are seeking Mr. Brockman's deposition

02:56:11   20   in your litigation?

21   **A.**   Well, we sought it.  The panel ordered it, and

22   Mr. Brockman refused to appear.

23   **Q.**   Yeah.  And there's legal arguments as to whether the

24   panel has authority to order him to appear.  But, in any

02:56:23   25   event, it's your aim, even as we sit here today, to have

PM 2-35

1    Mr. Brockman sit for a deposition.  Is that correct?

2    **A.**   Well, that ship has sailed.  He refused.  And, so,

3    if -- you know, discovery -- We're now -- we're now

4    preparing for the hearing.

02:56:36    5    **Q.**   Is it your testimony you are not still seeking

6    Mr. Brockman's deposition in that litigation?

7    **A.**   Not actively, but Reynolds told us that he is not

8    appearing.  And, so, we are -- we have moved on.

9    **Q.**   Okay.

02:56:49    10    **A.**   I mean, if you mean actively seeking, we have no

11    pending motion.  We have -- you know, the panel ordered

12    him to appear -- ordered Reynolds to present him for

13    deposition.  As -- as a continuing managing agent, the

14    panel held that Mr. Brockman was a -- continues to be a

02:57:05    15    managing agent under the controlling authorities, and,

16    again, that is comprised of three former federal judges,

17    that panel.  So, Reynolds had a duty to present him as a

18    managing agent.  And, also, the panel held that Reynolds

19    had unclean hands because --

02:57:19    20    **Q.**   Look.  I understand --

21    **A.**   Well, you're asking me about the deposition and --

22    **Q.**   I am asking if you are seeking the deposition of

23    Mr. Brockman.  I don't want you to get into what the panel

24    found about Reynolds.  I am asking if you are asking for

02:57:31    25    him to sit in a deposition in your case that is currently

MIKE NEMELKA - CROSS BY MR. VARNADO

 1  pending.

 2  **A.**    That motion has been decided and we have now -- we

 3  have now moved on.  If Mr. Brockman voluntarily would sit

 4  for a deposition, we would take it.

02:57:42   5  **Q.**    Okay.  So, before you deposed Mr. Brockman, did you

 6  have any personal interaction with him before that

 7  deposition?

 8  **A.**    No.

 9  **Q.**    Okay.  So, you don't have another interaction to

02:57:51  10  compare how he was three years ago with some other point

11  in time?

12  **A.**    That was my only personal interaction with him, was

13  the deposition.

14  **Q.**    So, you don't have a baseline to know what

02:58:02  15  Mr. Brockman was like prior to your January 2019

16  deposition?

17  **A.**    I saw videos, and I watched all I could about him.  I

18  watched interviews and things.  So, I did have -- I saw

19  him on camera in interviews.

02:58:16  20  **Q.**    But you never personally interacted with him.

21  Correct?

22  **A.**    Right.  I have never personally interacted.

23  **Q.**    And you don't have any training or qualifications to

24  diagnose whether somebody has cognitive deficiencies, I

02:58:28  25  take it?

MIKE NEMELKA - CROSS BY MR. VARNADO

1    **A.**   I do not.

2    **Q.**   You are not a doctor?

3    **A.**   Correct.

4    **Q.**   All right.  You don't have any specialized training

02:58:32   5    in identifying symptoms of Parkinson's?

6    **A.**   No, I don't.

7    **Q.**   Okay.  Or Alzheimer's?

8    **A.**   Correct.

9    **Q.**   Or dementia?

02:58:41   10   **A.**   That's correct.

11   **Q.**   So, Mr. Brockman could have exhibited textbook signs

12   of those diseases and you may not have known it, given

13   your lack of training or experience in this area?

14   **A.**   I mean, as a layperson, I -- I know.  I could, you

02:58:55   15   know, perceive things.  But, as an expert, I wouldn't know

16   what the, you know, expert signs are.

17   **Q.**   Did you perceive any signs of Parkinson's in

18   Mr. Brockman when you were deposing him in January of

19   2019?

02:59:09   20   **A.**   As a layperson, not that I was aware of.  No.

21   **Q.**   Okay.  So, are you aware that the government's expert

22   had said that they observed signs of Parkinson's in the

23   deposition from January of 2019?

24   **A.**   No, I am not.

02:59:23   25   **Q.**   Now, you talked with the government on a few

*MIKE NEMELKA – CROSS BY MR. VARNADO*

1  occasions.  You've sat -- at least prior to even last

2  night.  I think you said you had a meeting with

3  Mr. Bourget and one of the agents last night?

4  **A.**   What I said was I had a series of phone calls, and

02:59:40   5  then last night I met with Evan and Boris.

6  **Q.**   And I believe in your discussion with the IRS and the

7  agents and the prosecutor you explained that the

8  deposition, as we saw in the video, covered documents and

9  events from ten years or more ago.  Correct?

02:59:56  10  **A.**   I think one of the earliest documents I showed

11  Mr. Brockman was from 2007.  So, yeah, you know, went back

12  12 years.

13  **Q.**   Are you aware that dementia patients can retain

14  long-term memory as opposed to even short-term memory?

03:00:11  15           MR. BOURGET:  Objection, Your Honor.  There is

16  nothing here to report --

17           THE COURT REPORTER:  I can barely hear you.

18           THE COURT:  I mean, I guess my question -- and

19  I sustain the objection.  This witness has not been

03:00:23  20  qualified as a medical expert.  I think he will admit he

21  has got no expertise in diagnosing anybody with Parkinson's

22  or Alzheimer's.  I mean, do you have any sort of medical

23  training?

24           THE WITNESS:  No.

03:00:35  25           THE COURT:  Can you identify the symptoms of

*MIKE NEMELKA - CROSS BY MR. VARNADO*

1 Parkinson's or Alzheimer's?

2            THE WITNESS:  Other than -- no, I can't.

3            THE COURT:  Then, I'm just trying to figure out

4 why we are asking these questions.

03:00:46  5            MR. VARNADO:  Well, he was -- made statements

6 in response to the government's question that they were

7 covering events back from 2012 and the testimony that will

8 be relevant in this case that long-term memory for dementia

9 patients might not be impacted at all.  That was the

03:00:59  10 question.

11            THE COURT:  You can ask him that.  But whether

12 or not that's consistent or not consistent with Alzheimer's

13 he doesn't know.  I mean -- so, I -- so, the objection is

14 sustained.

03:01:07  15            You can ask him the basic question about

16 what he knows and what he doesn't know.  But with respect

17 to medical diagnosis, I sustain the objection.

18 BY MR. VARNADO:

19 **Q.**    Okay.  Fair to say that Mr. Brockman was conversant

03:01:17  20 with Reynolds' business when you deposed him?

21 **A.**    He was very conversant, yes.

22 **Q.**    Right.  And even for events that had taken place long

23 ago with respect to Reynolds, he knows his stuff cold,

24 backwards and forwards?

03:01:29  25 **A.**    Again, he was very well prepared and very conversant

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*MIKE NEMELKA - CROSS BY MR. VARNADO*

1   about the issues in the case and the documents.

2   **Q.**   And I think you said he was deposed for two half

3   days.  Correct?

4   **A.**   On the record, they were three and a half hours, but,

03:01:42   5   you know, we took lunch, and I think each day ended, you

6   know, mid-afternoon.  And then on the second day his

7   counsel did quite a bit of redirect.  So, that one went

8   most of the day.

9   **Q.**   Okay.  And I think you said your colleague Peggy was

03:01:54   10   doing the examination the second day.  But were you

11   present for both days?

12   **A.**   I was.

13   **Q.**   And I believe you said that the deposition was broken

14   up that way because of Mr. Brockman's health condition?

03:02:06   15   **A.**   That was an accommodation they requested because of a

16   heart condition that they said he had, and we -- we, of

17   course, agreed to that.

18   **Q.**   And you don't dispute that he had atrial fibrillation

19   and that was a necessary accommodation?

03:02:18   20           MR. BOURGET:  Objection, Your Honor.  The same

21   objection.

22           THE COURT:  Yeah.  Do you have any knowledge of

23   Mr. Brockman's medical diagnoses or conditions during that

24   time?

03:02:28   25           THE WITNESS:  No.  We just accepted what his

PM 2-41

*MIKE NEMELKA – CROSS BY MR. VARNADO*

1  lawyers told us.

2           THE COURT:  So, you can ask him what he knows,

3  but he says he has no personal knowledge of it.

4           MR. VARNADO:  And that's all I was asking,

03:02:39  5  Judge, to confirm that he is not disputing that and there

6  was a reason for the deposition being broken up into two

7  days.  That was it.

8  BY MR. VARNADO:

9  **Q.**    So, in the litigation against Reynolds and CDK, is

03:02:51  10  your firm working on an hourly or contingency basis?

11  **A.**    Both.

12  **Q.**    Okay.  And how long has that litigation been ongoing?

13  **A.**    The first lawsuit was filed in January of 2017.

14  **Q.**    And have you or your firm tried to get -- tried to

03:03:08  15  get any state attorneys general active to either

16  participate in that litigation or start an investigation?

17  **A.**    We were asked by states attorney generals for a

18  meeting.  I personally -- I don't think my firm had a

19  role.  We went to the meeting.  I don't -- my -- not that

03:03:29  20  I recall that my firm spearheaded those conversations,

21  or -- or, you know, lobbied.

22  **Q.**    Okay.  The same question with the Federal Trade

23  Commission.  Did you or your firm try to lobby or initiate

24  an investigation with the FTC?

03:03:44  25  **A.**    The FTC is investigating this antitrust case, and we

PM 2-42

MIKE NEMELKA - CROSS BY MR. VARNADO

           1  have gone in for series of meetings that -- you know,
           2  where -- where I have represented clients who have gone in
           3  and given factual information pursuant to the FTC's
           4  request.  And, so, I have been in with the FTC before as
03:04:12   5  part of their investigation.
           6  Q.    Okay.  And I think you mentioned something about
           7  sanctions that would be potentially sought.  That's in
           8  connection with an arbitration, not in the MDL.  Correct?
           9  A.    I don't know if I mentioned sanctions.  We -- So,
03:04:25  10  what's your question?
          11  Q.    Yeah.  That, you know, there is an arbitration that
          12  is separate and apart from the case that is pending inside
          13  the federal court in the MDL.
          14  A.    In the arbitration we represent a company called Cox
03:04:37  15  Automotive --
          16  Q.    Right.
          17  A.    -- against Reynolds, and then in the MDL we represent
          18  other clients against Reynolds and CDK.
          19  Q.    And then I think you mentioned the sort of bad faith
03:04:44  20  finding, but that's in connection with the arbitration,
          21  not in the MDL case.  So, that's in relation to the Cox
          22  Automotive case?
          23  A.    Well, we have filed a sanctions motion in the MDL.
          24  Q.    But nothing has been ruled on yet?
03:04:57  25  A.    That has not been ruled on.

1  **Q.**   And --

2  **A.**   That had nothing to do with Mr. Brockman's

3  deposition.

4  **Q.**   Right.  It didn't.

03:05:04  5              And, so, if -- I think it's fair to say,

6  if Mr. Brockman is found not competent, you definitely

7  will not be able to take his deposition in your

8  litigation.  Correct?

9  **A.**   I don't -- I don't know.  Probably, yeah.  But,

03:05:20  10  again, that -- that ship has sailed.  The panel ordered

11  it.  He didn't appear.  And now we -- discovery is over.

12  **Q.**   Yeah.  So, the answer is you won't get a deposition

13  in that case?

14  **A.**   We are not counting on a deposition from him in that

03:05:32  15  case.

16              MR. VARNADO:  Okay.  No further questions.

17              THE COURT:  Redirect?

18              MR. BOURGET:  Nothing further.

19              THE COURT:  Okay.  Mr. Nemelka, you are

03:05:39  20  released.

21              MR. BOURGET:  Yes, Your Honor.

22              THE COURT:  Sir, thank you.  I appreciate it,

23  sir.

24              THE WITNESS:  Thank you, Your Honor.  It was a

03:05:46  25  privilege to be here.

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1      THE COURT:  And safe travels.

2      THE WITNESS:  Thank you very much.  I

3 appreciate it.

4      THE COURT:  Thank you.

5      Are we ready to recall the previous

6 witness?

7      MR. LOONAM:  Yeah.

8      THE COURT:  Okay.  Doctor, you are still under

9 oath and we are just continuing your examination.

10      THE WITNESS:  Yes, sir.  Thank you.

11      THE COURT:  And you may proceed whenever you

12 are ready.

13      MR. LOONAM:  Whenever he is settled in, Your

14 Honor.

15                **ROBERT DENNEY, Ph.D.,**

16 previously sworn, resumed the stand and testified as

17 follows:

18                **CROSS-EXAMINATION**

19 BY MR. LOONAM:

20 **Q.**   Good afternoon.

21 **A.**   Good afternoon.

22 **Q.**   Dr. Denney, you have testified in a lot of cases.

23 Correct?

24 **A.**   Yes.

25 **Q.**   And fair to say sometimes the courts rule for the

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  party you're testifying for and sometimes the courts rule

2  against you?

3  **A.**   Yeah.  The courts will decide what the court is

4  obligated to decide.

03:07:21  5  **Q.**   Yeah.  And -- but other times courts have gone

6  further and specifically found your testimony in federal

7  court not credible.  Correct?

8  **A.**   Well, sure.  Each judge decides how credible each

9  witness is, and they weigh that credibility against

03:07:47  10  others.  Sure.

11  **Q.**   Sure.  So -- but to be clear, there are times where

12  you will testify on behalf of a party and the court will

13  rule for the adversary.  That is not what I am referring

14  to.  So, that happens.  But what I'm referring to -- and

03:08:09  15  let us know if you recall this -- there are other times

16  where courts have gone further than simply ruling for the

17  adversary, but have specifically found your testimony in

18  federal court not credible.  They have made an adverse

19  credibility finding with respect to you.  Do you recall

03:08:28  20  that?

21  **A.**   Certainly.  And I recall courts finding my testimony

22  more credible than other experts.  It depends on the

23  situation.

24  **Q.**   Okay.  Well, perhaps you could cover that on

03:08:40  25  redirect.  Please listen to my question, sir.

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1          So -- well, do you keep a -- a list of

2   times where courts specifically have made an adverse

3   credibility finding against you?

4   **A.**    Not specifically, no.

03:09:00   5   **Q.**    So, you keep a list of the times where you find a

6   defendant competent or not competent.  Correct?

7   **A.**    Well, I did when I was in the Bureau of Prisons.  Now

8   I just keep a list of my testimony, each case that I

9   testify in, in case I am called to present a list of

03:09:23   10   cases.

11   **Q.**    Okay.  So how long have you been out of the Bureau of

12   Prisons?

13   **A.**    Since 2011.

14   **Q.**    Okay.  So, the percentages that you testified to on

03:09:30   15   direct, with respect to the percentage of people that you

16   find competent, is from 2011?

17   **A.**    Yes.  And I -- looking back on cases since then, I

18   don't see any significant difference, but I haven't kept

19   track of it.  No.

03:09:48   20   **Q.**    Okay.  And you don't keep track of instances where

21   federal judges make a specific adverse credibility finding

22   against you?

23   **A.**    Sometimes I hear about it, but, no, I don't look

24   up -- I don't look them up to try to figure out whether I

03:10:03   25   was liked more or less than a different expert.

PM 2-47

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1    **Q.**   How many times -- I want to be clear, sir.  I want

2    to -- I want to be clear.  I am not talking about sort of

3    a battle of the experts, where the judge says, you know,

4    Considering the totality of the evidence, you know, I am

03:10:19    5    going to rule for the other side.  That's not what I am

6    talking about.  Okay?  Do you understand that?

7    **A.**   Yes.  No.  They have to rule on the credibility of

8    the witness.

9    **Q.**   What I am talking about is where the court

03:10:33    10    specifically says, 'I find Dr. Denney not credible.'  Do

11    you recall instances where that's occurred?

12    **A.**   I can recall one case where a judge used a phrase

13    like that.

14    **Q.**   Okay.  What case is that?

03:10:48    15    **A.**   It was out of Brooklyn.

16    **Q.**   Is that the *Ronell Wilson* case?

17    **A.**   It was *Ronell Wilson* 2.  The prior decision from the

18    court was that my testimony was very credible.

19    **Q.**   Judge Garaufis?

03:11:05    20    **A.**   Yes.

21    **Q.**   Well -- and that's the one instance you remember

22    where a judge specifically found you not credible?

23    **A.**   Yes.

24    **Q.**   You don't recall any others?

03:11:18    25    **A.**   No.  Not off the top of my head.

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  **Q.**   You testified in a case of *Webster v. Lockett* in

2  2019.  Correct?

3  **A.**   *Webster v. Lockett*.  That's familiar, but I can't

4  specifically place it.

03:11:37  5  **Q.**   Did you ever testify in Terre Haute?

6  **A.**   Yeah.  In -- on the Indiana case, sure.  Yeah.  Okay.

7  **Q.**   Do you recall the case now?

8  **A.**   I remember *Webster*, yes.

9  **Q.**   You do?  It's -- it's 2019, two years ago.  It was a

03:11:50  10  death penalty case.  Right?

11  **A.**   Yes, it is.  Right.

12  **Q.**   And do you recall that case now?

13  **A.**   Yes, I do.

14  **Q.**   And you testified in that case that the petitioner

03:12:03  15  was malingering in intellectual disability.  Correct?

16  **A.**   Yes.

17  **Q.**   And you testified that you found malingering in part

18  because the petitioner's test scores differed from your

19  observations of the defendant's real-world functioning.

03:12:20  20  Correct?

21  **A.**   In part, yes.

22  **Q.**   And that was an exercise of your clinical judgment in

23  that case.  Correct?

24  **A.**   Yes.

03:12:30  25  **Q.**   And in that case you focused on evidence that

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1    supported your conclusions while ignoring, disregarding or

2    minimizing evidence that called your conclusions into

3    question.  Correct?

4    **A.**    That was the judge's opinion.  That was not my

03:12:43    5    opinion.

6    **Q.**    But that's -- but that's what happened.  Correct?

7    **A.**    That's what the judge wrote in the decision, yes.

8              MR. LOONAM:  Mark this as 53.

9    BY MR. LOONAM:

03:13:10    10   **Q.**    This is the -- the case *Webster v. Lockett*.  Can you

11   see it on the screen?

12   **A.**    Yes, I can.

13   **Q.**    Turn to Page 11.  So, I'll start at -- Can you see

14   it?

03:13:34    15             MR. LOONAM:  Your Honor, can you read that or

16   not?

17             THE COURT:  I can read it.

18             MR. LOONAM:  Okay.

19   BY MR. LOONAM:

03:13:39    20   **Q.**    On Footnote 13 it says:  "The Court finds the

21   testimony of Dr. Denney, a licensed clinical psychologist

22   who is board certified in clinical neuropsychology and

23   forensic psychology, overall to be not credible and, thus,

24   gives little or no weight" -- "give it little or no

03:14:01    25   weight.  As a whole, Dr. Denney focused on evidence that

 1   supported his conclusions while ignoring, disregarding or

 2   minimizing evidence that called his conclusions into

 3   question."

 4                   So, this opinion came down in 2019.  When

03:14:20   5   did you learn about it?

 6   **A.**   When did I learn about the opinion?

 7   **Q.**   Yes.

 8   **A.**   Oh.  Sometime shortly thereafter.  I don't know when.

 9   **Q.**   And to be clear, we have -- we have met before,

03:14:37  10   haven't we?

11   **A.**   Well, we met at Jones Day, but I also feel like I had

12   some interaction with you previously when you were an

13   assistant U.S. attorney, but I can't place it.

14   **Q.**   Where was I an assistant U.S. attorney?

03:14:53  15   **A.**   Well, I was thinking New York.

16   **Q.**   In the Eastern District of New York.  Correct?

17   **A.**   I think so, but I don't know for sure.

18   **Q.**   When we met at Jones Day, we discussed the *Ronell*

19   *Wilson* case, didn't we?  We discussed the fact that you

03:15:06  20   worked with Jim McGovern?

21   **A.**   Yeah, I don't remember that.  I -- I don't remember

22   you saying that.

23   **Q.**   You don't remember us, when we were connected and we

24   talked about --

03:15:13  25   **A.**   Oh, I remember that conversation, but I don't

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  remember the content about *Ronell Wilson* coming up.

2  **Q.**  Do you remember us talking about Jim McGovern?

3  **A.**  I think so.

4  **Q.**  And you don't remember the context of us talking

03:15:25  5  about Jim McGovern was in the context of the fact that you

6  had worked on the *Ronell Wilson* case?

7  **A.**  Well, I know -- I know that I worked with Jim

8  McGovern in the *Ronell Wilson* case, but I don't remember

9  us talking about the *Ronell Wilson* case.  Because I was

03:15:39  10  thinking about that you were involved in a *Pena* case with

11  me in New York.  That's what I remember asking you about.

12  **Q.**  All right.  Well -- well, I am not going to testify

13  here, although I may have to, Your Honor, apparently.

14              So --

03:16:01  15              MR. SMITH:  I've got to object to that comment

16  and move to strike it.

17              MR. LOONAM:  Well, we can have a sidebar and I

18  can tell you.

19              THE COURT:  Here is the deal.  If you decide to

03:16:10  20  testify, then somebody else is going to have to take the

21  witness because you will become a fact witness in the case.

22              MR. LOONAM:  Then, we'll let that go.

23              THE COURT:  That is just the way it is.  So,

24  either you are going to testify and then have Mr. Varnado

03:16:24  25  or someone else take the witness or you're not.

*ROBERT DENNEY, Ph.D. – CROSS BY MR. LOONAM*

1          MR. LOONAM:  Okay, Your Honor.

2    BY MR LOONAM:

3    **Q.**    So, you remembered I was an AUSA in New York.  You

4    remember we talked about Jim McGovern, who was the

03:16:38    5    prosecutor on the *Ronell Wilson* case.  Correct?

6    **A.**    Yes, he was.

7    **Q.**    And, so, when I asked you about any adverse

8    credibility findings that had been made against you, you

9    had suggested -- you remembered -- the one case you

03:16:50    10    remembered was the *Ronell Wilson* case.  Correct?

11    **A.**    Yes.  I remember Judge Garaufis deciding the way he

12    did.  Sure.

13          THE COURT:  Before we go on, can I just have a

14    copy of the opinion?

03:17:02    15          MR. LOONAM:  Sure.  Of course, Your Honor.

16          THE COURT:  I'm sorry.  I am not -- I can't

17    find it.  Just hand it to my law clerk.

18          MR. LOONAM:  Yes, sir.

19          THE COURT:  I'm sorry.  I didn't mean to

03:17:17    20    interrupt.

21          MR. LOONAM:  Not at all, Your Honor.

22    BY MR. LOONAM:

23    **Q.**    And above, at Paragraph 11 -- at Footnote 11, the

24    Court wrote that "the government argues that the validity

03:17:29    25    tests indicated that Webster was malingering.

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1    Specifically, the government points to the testimony of

2    Dr. Denney that Webster failed the Word Memory Test (WMT)

3    and that Webster's results on the Medical Symptom Validity

4    Test (MSVT) also showed that Webster was malingering.  For

03:17:51   5    the reasons explained below the Court gives Dr. Denney's

6    testimony little weight."

7                Those are two of the freestanding validity

8    tests that you testified about earlier today.  Correct?

9    **A.**   Yes.

03:18:06   10   **Q.**   And you -- Okay.  So -- and, as you sit here, the

11   only two cases you recall where there has been an adverse

12   credibility finding made against you is the *Ronell Wilson*

13   case in the EDNY where Judge Garaufis wrote an opinion,

14   and the -- the *Lockett* case.  Do you recall any other

03:18:44   15   cases?

16   **A.**   Not off the top of my head, no.

17                MR. LOONAM:  I have to reserve on that, Your

18   Honor.

19   BY MR. LOONAM:

03:18:53   20   **Q.**   And to be clear, sometimes in competency proceedings

21   the record is sealed.  Correct?

22   **A.**   Yes.  I believe so.

23   **Q.**   Yeah.  And sometimes the testimony and transcripts

24   are sealed.  Correct?

03:19:13   25   **A.**   Yes.

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1   Q.   And even sometimes judges' orders are sealed in

2   competency proceedings.   Correct?

3   A.   I believe so.

4   Q.   And, so, without telling me the specific case, then,

03:19:26   5   are you aware of any sealed proceedings that -- where the

6   judge has made an adverse credibility finding against you?

7   A.   Not that I can think of.  Not that I can recall.

8   Q.   You discussed your educational background on direct

9   yesterday.  Do you recall that?

03:19:57   10   A.   Yes.

11   Q.   And you described how you received your undergraduate

12   degree in youth ministry.  Correct?

13   A.   Yes.

14   Q.   And that was from the Lutheran Bible Institute?

03:20:12   15   A.   Correct.

16   Q.   Does -- and does the school -- does that school still

17   exist?

18   A.   They changed their name to "Trinity College," and I

19   am unsure if they still exist.  They moved to a different

03:20:24   20   location in Washington state, and I haven't followed it.

21   Q.   Yeah.  So, you are not sure if they exist anymore?

22   A.   Correct.

23   Q.   Okay.  And in -- Yeah.  And then you testified about

24   how you obtained your master's and doctor of psychology

03:20:46   25   degrees.  And I know you discussed that you worked at the

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PM 2-55

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  Forest Institute, but where did you obtain your master's

2  and your doctor of psychology degrees?

3  **A.**   At the Forest Institute of Professional Psychology.

4  **Q.**   And did the Forest Institute have any other programs

03:21:04  5  of study other than the master's of psychology and doctor

6  of psychology degrees that you obtained?

7  **A.**   Well, at one period of time, they had -- more

8  recently, they had a -- I think they had other master's

9  degrees for a while.  I think they may have had a -- an

03:21:31  10  applied behavior analysis program.

11  **Q.**   While you were there?

12  **A.**   When I was teaching later on, not when I was a

13  student.

14  **Q.**   When you attended the Forest Institute as a student,

03:21:43  15  did they have any other programs of study other than the

16  master's of psychology degree that you obtained, and the

17  doctor of psychology degree that you obtained?

18  **A.**   No.  It was a school focused strictly on professional

19  psychology.

03:21:55  20  **Q.**   And just those two degrees.  So, they didn't have a

21  biology department?  They didn't have an English

22  department.  Correct?

23  **A.**   Correct.  It wasn't a university.  It was an

24  institute.

03:22:04  25  **Q.**   And you received your master's in psychology from the

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PM 2-56

*ROBERT DENNEY, Ph.D. – CROSS BY MR. LOONAM*

1    Forest Institute in 1989.  Correct?

2    **A.**   Yes.

3    **Q.**   You came from the -- the -- the ministry background.

4    Did you have to take any courses or -- or -- before

03:22:27   5    applying to the Forest Institute?  Did they have, like,

6    requirements?  Like, did you need a psychology degree in

7    order to apply?

8    **A.**   No.  But I had to have a certain number of psychology

9    undergraduate courses, and I had to take some extra ones

03:22:41  10    on the side when I first started the program, to catch

11    that up.

12    **Q.**   And did you need to take, like, a standardized test,

13    the GRE, or anything, to get into the Forest Institute?

14    **A.**   At that time they did not require a GRE, no.

03:22:55  15    **Q.**   Okay.  Or any other standardized test?  Right?  Like

16    the GMAT or something?

17    **A.**   Well, no.  That would be the -- for a graduate

18    program in clinical psychology, it would be the GRE.

19    That's the only test that they would use.

03:23:07  20    **Q.**   And they didn't require it?

21    **A.**   Correct.

22    **Q.**   Okay.  And then two years after you obtained your

23    masters in 1991, you received a doctor of psychology

24    degree.  Correct?

03:23:23  25    **A.**   Yes.

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1  Q.   And people refer to that as a "PsyD"?

2  A.   PsyD.  That's correct.

3  Q.   PsyD.  And at the time you graduated from the Forest

4  Institute, it was not accredited by the American

03:23:43  5  Psychological Association, or APA, at that time.  Correct?

6  A.   That is correct.  They became accredited three years

7  later.

8  Q.   Okay.  They became accredited three years later.  So,

9  they weren't accredited when you graduated, but they

03:23:59  10  became accredited three years later.

11              And an APA accreditation for a PsyD

12  program is important.  Correct?

13  A.   Yes, it is.  It is very helpful.

14  Q.   In fact, I think on your CV, for your time at the

03:24:23  15  Forest Institute, when you were a director of one of the

16  programs, you note that it was an APA-certified program.

17  Correct?

18  A.   Yes.

19  Q.   And what -- what -- you were the director of the

03:24:42  20  Forest Institute's neuropsychology group; is that right?

21  A.   Well, initially, I was made -- First of all, I taught

22  there as a professor from about 1996 or '7 through 2016

23  and reaching the rank of full professor.  And, initially,

24  I was teaching neuroanatomy, which I taught all the way

03:25:11  25  through, but then I -- I was teaching forensic psychology

PM 2-58

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  courses for the first three or four -- well, first five

2  years maybe, and then it switched over to neuropsychology

3  once I had my board certification in clinical

4  neuropsychology.  They have a specialization track that

03:26:23  5  was in clinical neuropsychology.

6  **Q.**   And I didn't mean any disrespect by going to the

7  binder.  I was listening the whole time.  I just didn't

8  want to waste time looking for documents.

9         THE COURT:  That's okay.

03:26:24  10        MR. LOONAM:  Thank you, sir.

11 BY MR. LOONAM:

12  **Q.**   And, so, you started teaching there in -- in 1996.

13  Right?

14  **A.**   Or '97.  I don't recall exactly.

03:26:24  15  **Q.**   I just checked it.  Perhaps.

16             And, so, then you became the director of

17  neuropsychology when?

18         THE COURT:  Counsel, I'm sorry.  We're going to

19 have to take a break right now.

03:26:24  20         MR. LOONAM:  Sure.

21         THE COURT:  Let's go ahead and take -- Has 15

22 minutes been working for all of you?  Is that pretty --

23 because -- the only reason why I am kind of keeping to a

24 close time schedule is because I understand you guys have

03:26:24  25 doctors involved, and I'm trying to get everyone through so

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  we can get doctors on their way.  But if that works for

2  everyone, let's do 15 minutes.

3              MR. LOONAM:  Judge, we're very grateful.

4              THE COURT:  Okay.  Not a problem.  Let's go

03:26:33  5  ahead.  We will be back at 20 till.

6              THE CASE MANAGER:  All rise.

7  (Break taken from 3:26 to 3:59.)

8              THE CASE MANAGER:  All rise.

9              THE COURT:  Please be seated, everyone.

03:59:30  10              Sorry to keep you waiting, counsel.  We

11  just had a couple things we needed to take care of.

12              MR. LOONAM:  Your Honor, please.  Thank you.

13              THE COURT:  You may continue when ready.

14              MR. LOONAM:  Thank you, sir.

03:59:39  15              Oh, this just restarted.

16  BY MR. LOONAM:

17  Q.   Dr. Denney, a few moments ago, in discussing your

18  educational background, I asked you if your -- the school

19  where you obtained your youth ministry degree still

04:00:05  20  existed.  And -- Do you recall that?

21  A.   Yes.

22  Q.   And you testified that it changed its name to

23  "Trinity College."  It moved, but you weren't sure if it

24  still existed.  You didn't remember.  Do you recall that?

04:00:24  25  A.   Correct.

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1  **Q.**   All right.  Do you recall testifying in a case called

2  *United States v. Seth*?

3  **A.**   Seth?  Seth?

4  **Q.**   Markell Seth.

04:00:37   5  **A.**   Yes.

6          MR. LOONAM:  What number am I up to?  54?  I

7  will mark this Defendant's 55 just for identification.

8  BY MR. LOONAM:

9  **Q.**   Are you able to see that?

04:01:06   10  **A.**   Yes, I can.

11  **Q.**   I am going to turn to what is Page 360 of the

12  testimony.

13          And the question to you was:  "I see that

14  you did your B.A. at the Lutheran Bible Institute of

04:01:34   15  Seattle.

16          "Answer:  Yes.

17          "Question:  Is that right?  Is that

18  accredited?

19          "Answer:  Oh, it was.  They just

04:01:44   20  actually -- they changed their name to 'Trinity Lutheran

21  College' and then just as of two weeks ago closed their

22  doors, sadly.

23          "Question:  The Lutheran Bible Institute

24  closed their doors or Trinity?

04:02:03   25          "Well, the Lutheran Bible Institute of

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PM 2-61

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1    Seattle changed its name to 'Trinity Lutheran College,'

2    moved to Everett, and then maintained a college there for

3    a number of years and have just recently shut their

4    doors."

04:02:22    5                 So, as of May 17th, 2016, you recalled

6    that your alma mater no longer existed.  Correct?

7    **A.**   Yes.  That's what I testified to in 2016.

8    **Q.**   And then you -- between 2016 and today you had

9    forgotten that your alma mater no longer existed?

04:02:51    10   **A.**   No.  Not exactly.  I think I was wrong then when I

11   believed they had shut their doors.  I continued to get

12   mailings talking about the foundation that they're

13   running, and it appears to me they're still running

14   students through the program.  So, that's why I say I am

04:03:10    15   not really sure if it is or not.  I -- back then, I

16   believed they had closed their doors.  Since that time

17   additional information came out to me in mailings, as an

18   alumni, that suggests they're still running some students

19   in there in a different capacity.

04:03:31    20   **Q.**   Okay.  So -- so, you -- so, then, you believe that it

21   is up and running and they are running students through

22   there in some capacity?

23   **A.**   I'm not sure.  Yeah, exactly.  I'm not sure.  I

24   believe that it looks like they are.  I'm just not sure.

04:03:50    25   I haven't followed up with that.  That's what the

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1  paperwork I have received suggested to me, yes.

2  Q.    Going back to the Forest Institute where you obtained

3  your masters in PsyD, APA accreditation for a PsyD program

4  is important, correct?

04:04:10  5  A.    Yes.

6  Q.    Completion of an APA-accredited PsyD program is one

7  of the necessary conditions to receive an APA-accredited

8  internship; is that right?

9  A.    No, actually not.  My internship at the U.S. Medical

04:04:29  10  Center was an APA-accredited internship.

11  Q.    And -- well, did you need to take -- obtain some

12  exemption or have some delay while you waited for your

13  licensing to come through as a result of being an

14  unaccredited school?

04:04:53  15  A.    First of all, no.  Second of all, it wasn't

16  unaccredited.

17  Q.    You went on to become director of the Forest

18  Institute's neuropsychology PsyD program.  Correct?

19  A.    Well, I wasn't a director of the PsyD program.

04:05:15  20  Within the PsyD program they had specialty concentrations,

21  which would be a series of courses as well as practicum

22  experiences in that specialty area, and it was called a

23  "concentration," and I directed the neuropsychology

24  concentration.

04:05:31  25  Q.    Okay.  So, you directed -- in the PsyD program, what

PM 2-63

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  other concentrations were there?

2  **A.**   Well, they had a marriage and family therapy

3  concentration.  They had a forensic psychology

4  concentration.  They had -- during the latter years they

04:05:58  5  had a -- as I mentioned -- what do you call -- behavior --

6  associative -- some sort of behavioral analysis

7  concentration.  I think for a period of time there might

8  have been a police-oriented, sort of an aspect of a -- of

9  the forensic concentration that was geared towards police-

04:06:22  10  related psychology work.  That's all I can remember at

11  this point.

12  **Q.**   Yeah.

13  **A.**   And there were some.

14  **Q.**   Fair enough.  And what years were you the director of

04:06:34  15  the neuropsychology concentration?

16  **A.**   Well, as I said, I started as the director of the

17  forensic psychology concentration, but then it switched

18  over to -- I was asked by the president to switch over to

19  neuropsychology, and I -- I don't remember if that was in

04:06:53  20  2000 or 2003.  It corresponded with my obtaining a board

21  certification in neuropsychology.  And I have had two

22  different board certifications in neuropsychology, one I

23  had in 2000 that I have given up and let go.  The other I

24  obtained in 2003.  So, I am not sure when it started.

04:07:15  25  **Q.**   And then how long were you a director of a

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1    concentration at the Forest Institute?

2    **A.**   Until the school closed its doors in, I believe it

3    was, 2016.  I -- that's my recollection.

4    **Q.**   Okay.

04:07:29  5    **A.**   It's on my CV.

6    **Q.**   Well, during that -- that time while you were at the

7    Forest Institute and the director of concentrations, were

8    you aware that the -- the APA either suspended or put

9    Forest's accreditation on probation from approximately

04:07:52  10   2010 to 2013?

11   **A.**   Yes.  It was on probation for a while.  I don't

12   remember how long it was.  And I remember that it obtained

13   its full accreditation back before they closed the doors.

14   **Q.**   So -- well, do you think it was -- it was on

04:08:09  15   probation -- and it was on probation because it wasn't in

16   compliance with the standards of the APA?

17   **A.**   Well, they -- that -- they were -- there were

18   recommendations that the school needed to change some

19   things and that's why.

04:08:20  20   **Q.**   And that's while you were a director there?

21   **A.**   While I was the director of neuropsychology

22   concentration, yes.

23   **Q.**   And you just testified that the Forest Institute no

24   longer exists -- exists.  Correct?

04:08:36  25   **A.**   That's correct.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  **Q.**   And if I -- it closed its doors in approximately

2  2015.  Does that sound right?

3  **A.**   It might have been 2015.  As I said, I can't

4  remember.  I said 2016.  But it's in my CV.  I don't

04:08:52  5  remember.

6  **Q.**   Yeah.  No.  No.  That's -- I'm just clarifying the

7  record.  That's all.

8  **A.**   That's okay.

9  **Q.**   And, so, was obtaining your board certification --

04:09:03  10  did you have to take any additional steps because, when

11  you graduated Forest Institute, was it APA-accredited?

12  **A.**   Additional steps that are out of the ordinary for

13  anybody going through the board-certification process?  Is

14  that what you're asking?

04:09:19  15  **Q.**   Yes.

16  **A.**   No.

17  **Q.**   Did you have to obtain a certificate of professional

18  qualification?

19  **A.**   No.  I don't even know what that is.

04:09:33  20  **Q.**   Is it correct that the field of psychology has lagged

21  behind other fields in adopting board certification

22  standards?

23  **A.**   Professional psychology in general?

24  **Q.**   Yes.

04:09:51  25  **A.**   Is that what you asked?  As far as -- in terms of its

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PM 2-66

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  comparison to medicine, yes.  Medicine is further advanced

2  in the process of developing board certifications.  They

3  have been doing it longer.  But I believe the American

4  Board of Professional Psychology was started in the '50s

04:10:11  5  or -- I can't remember what date it started, but it was a

6  long, long time ago.

7  Q.   Yeah.  And, so, in -- in the field -- the field of

8  psychology, generally, there may be, very likely, many

9  people who are qualified for board certification who don't

04:10:30  10  seek it out.  Is that fair?

11  A.   Oh, that is fair.  Yeah.  And that is an interesting

12  difference between medicine and psychology, professional

13  psychology, is that in medicine it's pretty much required

14  that you have to go through a board certification process.

04:10:46  15  And that has not been the case in psychology.  And, so,

16  there are a lot of professional psychologists that do not

17  pursue board certification.  However, in recent years, in

18  certain specialties more than others -- and

19  neuropsychology being one of them -- hospitals are

04:11:02  20  starting to demand that that be done.  So, it is lagging

21  behind, certainly.  Hopefully, it will catch up.

22  Q.   And you worked with Dr. Dietz in this case?

23  A.   Yes.  Yes.

24  Q.   And is he board-certified?

04:11:18  25  A.   I -- I believe so.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1   Q.   And --

2   A.   I know he's -- well, I presumed he was.  I thought he

3   was.

4   Q.   Yeah.  My next question is:  What is the basis of

04:11:37   5   your understanding?  Is it just an assumption or do you

6   have a reason that you believe that?

7   A.   I believe -- I guess I can't tell you where I got

8   this from.  I don't know.  I believe that he's board-

9   certified in psychiatry with special -- specialty

04:11:55   10   qualifications in forensic psychiatry.

11   Q.   Now, you agree that Mr. Brockman suffers from

12   Parkinson's disease.  Correct?

13   A.   Yes.

14   Q.   And are -- do you consider yourself an expert in

04:12:14   15   Parkinson's disease?

16   A.   Not -- not uniquely specifically so.  I am an expert

17   in neuroanatomy and neuropathology due to my teaching and

18   my publications and clinical work, but I have not

19   specifically published anything in Parkinson's per se.

04:12:41   20   Q.   I --

21   A.   But I taught on Parkinson's.  I taught graduate

22   students about Parkinson's disease and its characteristics

23   and how it progresses, yes.

24   Q.   Have you ever clinically treated someone for

04:12:52   25   Parkinson's disease?

PM 2-68

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1    **A.**   I have evaluated and been part of the care of people

2    with Parkinson's disease, yes.

3    **Q.**   So, do you consider yourself an expert in Parkinson's

4    disease?

04:12:59    5    **A.**   Well, I guess it depends on how you define

6    yourself -- how you are defining an expert.

7              I believe that in the Federal Rules of

8    Evidence characteristics I probably meet that definition

9    for an expert, yes; but I wouldn't say that I have got

04:13:15   10    some special super duper qualifications in Parkinson's.

11    **Q.**   Okay.  You testified on direct about memory and

12    Parkinson's.  Do you recall that?

13    **A.**   Yes.

14    **Q.**   And do you agree that memory problems are frequently

04:13:51   15    the first subjective cognitive complaint in Parkinson's

16    disease?

17    **A.**   It's frequently -- it is not the most common.  It is

18    not unusual for people to complain of having difficult

19    memory, but it's actually not a memory problem.  It's more

04:14:10   20    of an attention concentration problem.

21    **Q.**   And it's definitely a prominent component of

22    Parkinson's disease dementia.  Correct?

23    **A.**   Yes.  At the later stages of Parkinson's disease,

24    that is correct.

04:14:26   25    **Q.**   Well, so, the later stages of Parkinson's disease --

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  What's -- what's the difference between Parkinson's

2  disease dementia and dementia with Lewy bodies?

3  **A.**   Well, it has a different clinical presentation.  It

4  has a different natural course.

04:14:46  5  **Q.**   Describe it for me.

6  **A.**   Sure.  The presentation of classic Parkinson's

7  disease -- And there's Parkinson's disease and then there

8  is Parkinson's disease plus or Parkinson's disease

9  dementia, PDD, where you have the usual physical types of

04:15:07  10  signs that you would classically have with Parkinson's

11  disease:  Motor slowness, rigidity, lack of arm swing,

12  masked facies, things like that.

13  **Q.**   I apologize.  Maybe my question wasn't clear.  I am

14  not asking you to describe the symptoms of Parkinson's

04:15:27  15  disease.  I am asking you to distinguish between

16  Parkinson's disease dementia and dementia with Lewy

17  bodies.

18  **A.**   Okay.

19  **Q.**   Can you do that?

04:15:37  20  **A.**   Yes, I can.  I was trying to describe Parkinson's and

21  how Lewy body dementia or Parkinson's with Lewy body

22  disease is different.

23              The differing characteristics are the REM

24  sleep behavior disorder, variability of arousal,

04:15:55  25  oftentimes and in my experience -- I have seen this quite

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PM 2-70

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1    often -- is visual hallucinations that are fully formed as

2    far as the clinical characteristics.  And the natural

3    course of it is a faster evolving course than Parkinson's

4    disease.

04:16:10   5    **Q.**    What's the -- what's the timing difference?

6    **A.**    My understanding is that Lewy body dementia will

7    progress much more faster over just three or four years;

8    whereas, Parkinson's disease is a longer course in

9    general.

04:16:33   10   **Q.**    One moment.  I want to make sure I did something

11   right.

12              And what about Alzheimer's disease?  Do

13   you consider yourself an expert in Alzheimer's disease?

14   **A.**    I believe I probably meet that definition, given my

04:17:04   15   current work setting and my history of teaching.

16   **Q.**    Well, actually, let's -- since you're an expert in

17   Parkinson's, we should -- we should -- or consider

18   yourself an expert in Parkinson's, we should make sure we

19   cover it thoroughly.

04:17:19   20             Do you agree that Parkinson's has both

21   motor and non-motor symptoms that we discussed yesterday

22   with Dr. Darby that you heard about when you were sitting

23   in the gallery?

24   **A.**    Yes.

04:17:38   25   **Q.**    And, so, you agree that Parkinson's itself has

PM 2-71

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1    learning and memory issues associated with it?

2    **A.**   It can.  However, you -- or it does, but you have to

3    define it where it is in the course.  You're mushing it

4    all together as one entity saying that Parkinson's has

04:18:00    5    these concentration, memory and -- difficulties.  Yes, it

6    does, when you look at the entire course of the disease,

7    but that's not the early manifestation of the condition.

8    It usually starts out with subtle difficulties that are

9    motor-oriented, not cognitive.

04:18:19    10    **Q.**   And Parkinson's disease, again, often leads to

11    dementia?

12    **A.**   It inevitably will if the patient survives long

13    enough, because it's a progressive neurodegenerative

14    disease.  And it's at that later stage where you see all

04:18:37    15    of that dementia-related symptoms and signs.

16    **Q.**   And dementia is a common symptom of Parkinson's.

17    Correct?

18    **A.**   Yes, in the latter stages.

19    **Q.**   So, your understanding is that is a common symptom in

04:18:55    20    the latter stages.  Okay.

21              Let's talk about Alzheimer's.

22              You do some clinical work at the Missouri

23    Memory Center in "Boulevar" [phonetic], Missouri.  Is that

24    accurate?

04:19:15    25    **A.**   Yes.  "Bolivar."

PM 2-72

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1   Q.   I apologize.

2   A.   That's all right.

3   Q.   And how often do you work there?

4   A.   I work there from one to four days a week.  It

04:19:26   5   varies.  We have -- on Mondays is the Missouri Memory

6   Center Aging Clinic day, and other neurology patients are

7   slotted in throughout the rest of the week.  And we also

8   are involved in Alzheimer's research that gets spread out

9   throughout the week.  And there are occasional inpatient

04:19:50   10   evaluations I run into, too.  So, it really varies.  I am

11   always there on Mondays for sure, and then I am usually

12   there for at least one other day, sometimes three or four

13   other days.

14   Q.   Okay.  And, so, in a month, you know, at least -- at

04:20:11   15   least four, eight, maybe 12 days a month?  Is that fair?

16   A.   Oh, three -- yeah, somewhere between 12 and 15.

17   Q.   Twelve and 15?

18   A.   Sure.  Although, when I am home, I am often writing

19   reports from the work that I was there.  See, I'll

04:20:33   20   evaluate somebody and then I'll return home to my home

21   office where I'll write the report.

22   Q.   Let me just -- Let me -- so, my question was:  How

23   often do you work there?  How often are you in the --

24   A.   In the doors?

04:20:45   25   Q.   Yeah, in the Missouri Memory Clinic.

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1    **A.**    Yeah.  And it would be about that amount.  And I'm

2    just adding to that saying the days I am not there, I am

3    oftentimes writing reports at home for the work that I do

4    there.

04:20:59   5    **Q.**    And memory impairment is the most pervasive feature

6    of Alzheimer's disease.  Correct?

7    **A.**    It's usually the first manifestation and it is

8    generally the most overwhelming difficulty, but there are

9    other difficulties, too, that come onboard.

04:21:15  10    **Q.**    Well, in addition, there are -- non-memory cognitive

11    deficits can manifest early in the disease.  Correct?

12    **A.**    It depends on the -- on the specific type of

13    Alzheimer's disease.  The majority of Alzheimer's --

14    because there is different types.  There -- the majority

04:21:29  15    of the classic Alzheimer's disease, memory is the first

16    budding problem.

17    **Q.**    So, your position is that, for classic Alzheimer's,

18    memory is the -- always the first presentation?

19    **A.**    Pretty much always.  There are behavioral variants of

04:21:50  20    Alzheimer's disease.  There are also language-specific

21    types of Alzheimer's pathology that manifests a little bit

22    differently.  But the majority of Alzheimer's disease,

23    yes, memory is the primary --

24    **Q.**    How is the pathology different for -- I'm sorry.

04:22:05  25    What -- how is the pathology different for the language?

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1    What was it?  Language what?

2    **A.**    There's language concerns as well.  Sometimes there's

3    different variants of Alzheimer's disease and it overlaps

4    with other conditions.  Sometimes it can be starting out

04:22:24   5    with aphasia as the early signs of it.  And it can become

6    more of a language-specific problem and memory then comes

7    in later.  Or sometimes it starts out with behavioral

8    problems and problems in judgment but then evolves into

9    the more -- more full-blown Alzheimer's.

04:22:46   10                    So, there's some minor variants that are

11    less common, but they do occur.

12    **Q.**    And the variants have a different pathology?

13    **A.**    Well, yeah.  What I mean by different pathology is

14    that different parts of the brain are affected sooner than

04:22:59   15    what is typical in the -- I'll use the term "classic" or

16    the majority type of Alzheimer's cases.

17    **Q.**    So, when you are saying different pathology, you are

18    saying different parts of the brain are affected and --

19    and that's a different variant of Alzheimer's?  Is that

04:23:18   20    your --

21    **A.**    There is different timing in the places of the brain

22    where the areas are involved, yes.

23    **Q.**    And that's a variant of Alzheimer's.  Does it have a

24    name?

04:23:24   25    **A.**    Well, there is a behavioral variant.  There are

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1   different language variants.

2   **Q.**   Is that what they are called?

3   **A.**   Yes.

4   **Q.**   And, so, if -- if somebody presents with non-memory

04:23:42   5   cognitive deficits of executive function early in the

6   disease, is that classic Alzheimer's or is that some

7   executive function variant?

8   **A.**   No.  Well, generally speaking, that would make me

9   suspicious of a -- of a behavioral variant.  I would also

04:24:05   10   consider the possibility of a frontotemporal dementia,

11   which is a total different pathology but overlaps and

12   looks the same in some instances.

13               But if there are behavioral executive

14   frontal-type problems and memory problems that are coming

04:24:21   15   onboard, then it can be the behavioral variant of

16   Alzheimer's disease; whereas, the regular Alzheimer's

17   disease does not have that behavioral executive

18   dysfunction up front.  It will eventually, yes, but not up

19   front.

04:24:39   20   **Q.**   I don't know if this is marked.

21               Are you familiar with the American Academy

22   of Neurology?

23   **A.**   Yes.

24               MR. LOONAM:  What number am I on?  56?

04:25:02   25   Government 56.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1              SUPPORT STAFF:  Defense.

2              MR. LOONAM:  Oh.  Sorry.  And I actually wrote

3 it "Defense."  I apologize.

4 BY MR. LOONAM:

04:25:14  5  Q.   I am showing you --

6              THE COURT:  Excuse me, counsel.  Do you have a

7 copy?  Okay.  Thank you.  Are you going to admit this so I

8 can do it now?

9              MR. LOONAM:  I am not going to admit it.  I'm

04:25:26 10 just showing it to confront the witness.  I am happy --

11 when it comes to these, Your Honor -- and the Court's

12 preference.  We may refer to these as -- because they're

13 resource sources like I would refer to a case.

14              THE COURT:  Okay.

04:25:37 15              MR. LOONAM:  And we are happy to attach these

16 to make them available, if the other side --

17                   I mean, if you guys want to admit them,

18 too, we are happy to admit them.

19              THE COURT:  I just wanted to know whether you

04:25:47 20 needed a ruling from me.  That's all.

21 BY MR. LOONAM:

22  Q.   So, I am showing you what -- an article that's titled

23 "Alzheimer's Disease" by Liana Apostolova.  It's titled

24 "Alzheimer's Disease," and on Page 2 of the article, on

04:26:08 25  the section "Cognitive Decline," it reads:  "Memory

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PM 2-77

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1   impairment is the most pervasive feature of AD" --

2   Alzheimer's disease -- "although non-memory cognitive

3   deficits, e.g., aphasia, executive dysfunction, apathy, or

4   personal change can manifest early and even be the

04:26:28   5   presenting feature.  In general, memory decline is

6   considered the leading symptom."

7               And, so, do you agree with this statement?

8   **A.**   Yes.  I would say that's the same thing that I said.

9   And those others would be typically viewed as variants of

04:26:45   10   it.  They're not as common.

11   **Q.**   So, they would -- and there -- and they each have

12   their own variant name and wouldn't be called Alzheimer's.

13   It would be Alzheimer's, you know --

14   **A.**   A behavioral variant, Alzheimer's.  If I recall

04:27:02   15   correctly, there is even a posterior type of a finding.

16   So, yeah, there is different unique variations.

17   **Q.**   Is Alzheimer's disease reversible?

18   **A.**   No.

19   **Q.**   So, it's -- it's progressive.  Correct?

04:27:18   20   **A.**   Yes.  It's considered a progressive neurodegenerative

21   disease.

22   **Q.**   It's an irreversible downward trajectory.  Correct?

23   **A.**   Correct.

24   **Q.**   Let's talk about delirium.  We talked -- you

04:27:33   25   talked -- you testified about delirium in -- on direct.

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1   Do you recall?

2   **A.**   Yes.

3   **Q.**   And you discuss Mr. Brockman's delirium episodes in

4   your supplemental report.  Do you recall that?

04:27:48   5   **A.**   Yes, I do.

6   **Q.**   And in your supplemental report you state that, "To

7   be sure, Mr. Brockman experienced episodes of delirium

8   while hospitalized for infection."

9               Do you recall that is what your report

04:28:06   10   states?

11   **A.**   Yes.

12   **Q.**   And you were referring to Mr. Brockman's three

13   hospitalizations at -- at the Houston Methodist in -- over

14   this past year.  Correct?

04:28:17   15   **A.**   Yes.

16   **Q.**   And those hospitalizations were in March 15th to

17   19th, 2021; May 31st to June 11th, 2021; and September

18   15th to 18th, 2021.  Correct?

19   **A.**   Yes.

04:28:36   20   **Q.**   And it's -- it's important that you have an

21   understanding of delirium so that, in exercising your

22   clinical judgment, you can account for how those episodes

23   of delirium may have affected Mr. Brockman's cognitive

24   ability.  Correct?

04:29:00   25   **A.**   Sure.

PM 2-79

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  **Q.**   So, do you agree that preexisting dementia is the

2  leading risk factor for delirium?

3  **A.**   In what populations?

4  **Q.**   As far as risk factors for delirium, universally.

04:29:22  5  **A.**   Okay.

6  **Q.**   Are you aware that preexisting dementia is the

7  leading risk factor for delirium?

8  **A.**   Yes.  That has -- that has been written, and I agree

9  it is a leading risk factor.  Infection, I think, would be

04:29:36  10  a pretty significant risk factor among the elderly for

11  delirium as well.

12  **Q.**   And what is "cognitive reserve"?

13  **A.**   "Cognitive reserve" is a term referring to people who

14  are very high functioning.  They tend to not show as much

04:29:58  15  day-to-day difficulties in their functioning, particularly

16  like in learning, memory, that sort of thing.  They don't

17  start to show those sort of difficulties until later in

18  the course of a disease because they have got extra

19  reserve.  It's like, if you're going to lose brain cells

04:30:22  20  along the way, there is just more to lose, so to speak;

21  and, so, the person has a better time of it in context

22  of -- of progressing neurodegenerative disease, but it

23  could also be relevant to other things such as traumatic

24  brain injury as well.

04:30:41  25  **Q.**   Okay.  So -- so, we -- Does cognitive reserve apply

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1    to a subset of the population of high-functioning

2    individuals, or does everyone have cognitive reserve?

3    **A.**    Everybody has cognitive reserve to some degree.  When

4    you start talking about high-functioning people who are

04:31:05    5    bright and very accomplished and capable, they have more

6    cognitive reserve than people who are less bright and less

7    capable.

8    **Q.**    And, so, cognitive reserve is -- directly correlates

9    with intelligence?

04:31:28    10    **A.**    I -- I don't know if I would use the word "directly,"

11    but it does correlate with intelligence, yes.  "Directly"

12    is an add-on.  I'm not sure what that means.

13    **Q.**    Well, I asked you to define "cognitive reserve," and

14    you defined it through people who are bright, who are

04:31:42    15    high-functioning, and, so, I'm just exploring what the

16    definition of "cognitive reserve" is.

17                        And, so, everyone has cognitive reserve.

18    Correct?

19    **A.**    Well, you know, it depends on how you define it.

04:32:00    20    Everybody has some level of cognitive reserve.  Maybe some

21    people don't have any cognitive reserve.  So, it -- I

22    mean, you know, how much cognitive reserve?  I mean, if

23    you have got this much, do you have it?  Maybe.  If you

24    have this much, yes.

04:32:15    25    **Q.**    Do all healthy people have cognitive reserve?

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  **A.**   Probably to some degree or other.

2  **Q.**   And you said it depended on your definition.  Are you

3  aware of competing definitions for "cognitive reserve"?

4  **A.**   No.  It was not so much your definition of "cognitive

04:32:43  5  reserve," but it was your definition of how much does

6  somebody have to have to be called having cognitive

7  reserve.

8                    Brighter people have more brain capacity

9  to handle insults to the brain, whether they be

04:32:58  10  progressive, traumatic, what have you.  Less bright and

11  capable people have less capability to bounce back to

12  that.  That's the bottom-line issue.

13  **Q.**   Let's try it this way.  What happens for those people

14  who have no cognitive reserve?  How would they go about

04:33:17  15  their day?  What would that look like?

16  **A.**   I don't understand your question.

17  **Q.**   What happens if you have no cognitive reserve?

18  **A.**   You live your life.  I don't understand the question.

19  **Q.**   Okay.  So, if you have zero cognitive reserve, you

04:33:35  20  think that everything would be normal day-to-day?

21  **A.**   I don't know that we're communicating as to what

22  "cognitive reserve" is --

23  **Q.**   Okay.

24  **A.**   -- because your questions make no sense to me.

04:33:51  25  **Q.**   If you have no cognitive reserve, what happens upon

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1    any insult to the brain?

2    **A.**   That person with -- and it's hard to say, does this

3    person have no cognitive reserve?

4                Somebody with less cognitive reserve is

04:34:05    5    going to have more of a tough time of it recuperating from

6    some insult to the brain.  Somebody with more cognitive

7    reserve deals with that issue better, which makes the

8    course longer, slower, maybe.  They just have a less

9    difficult time with it in terms of daily functioning.

04:34:26    10   **Q.**   And, so, the -- I am just exploring because you said

11   some people may have no cognitive reserve; and, so, I was

12   exploring what that would be like.

13                So, are you aware of people who, you know,

14   take a sleeping pill and that may trigger delirium because

04:34:41    15   the sleeping pill is seen as an insult to the brain?  Have

16   you ever heard of that?

17   **A.**   People can have reactions to medications like that,

18   sure.  I don't know how that necessarily equates to

19   cognitive reserve.

04:34:57    20   **Q.**   Okay.  Do you think that somebody with little or no

21   cognitive reserve is more vulnerable to episodes of

22   delirium?

23   **A.**   That, I do not know.  I am not familiar with any

24   science on that subject.

04:35:23    25   **Q.**   You don't deny that there is science on that subject?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PM 2-83

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1   **A.**   I didn't say that.

2   **Q.**   I am saying you don't deny that there is science on

3   that subject?

4   **A.**   Correct.

04:35:31    5   **Q.**   Yeah.  I mean --

6   **A.**   There might be.  I just don't know of it.

7   **Q.**   Would you expect there to be?

8   **A.**   Not necessarily.

9   **Q.**   So, for example, in this case where the defendant has

04:35:47   10   suffered three bouts of delirium in the last year, it

11   wouldn't occur to you to go research delirium and its

12   effects before you reach your conclusion?

13   **A.**   Oh, no.  I have read up on delirium and its effects.

14   I don't remember any -- any research specifically on

04:36:10   15   delirium and cognitive reserve and sleeping pills.

16   **Q.**   Well, let's not add the -- sleeping pills were --

17   were -- Nobody is talking about people taking sleeping

18   pills as an example.  What about research on delirium and

19   cognitive reserve and the relationship between delirium

04:36:29   20   and cognitive reserve and vulnerability?  Are you aware of

21   that?

22   **A.**   Not specifically using those terms.

23   **Q.**   What are you aware of?

24   **A.**   It would be logical that people who have a higher

04:36:45   25   cognitive reserve would be less prone to delirium.  But

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1  the bigger issue in the presence of delirium is a

2  precipitating problem, such as urinary tract infection,

3  and that's a great risk for delirium in the elderly.  If

4  they have a urinary tract infection, they commonly become

04:37:07  5  delirious.  It is not unusual.

6  Q.   No.  My question was:  Does having a low cognitive

7  reserve make the brain more vulnerable to episodes of

8  delirium?

9  A.   And I said I don't know specific science on that

04:37:36  10  point, that very specific point.  I don't remember seeing

11  any research on cognitive reserve's effects on delirium.

12  Q.   And are you --

13          MR. LOONAM:  One moment, Your Honor.

14          THE COURT:  Sure.

04:38:04  15          MR. LOONAM:  The Court's indulgence.

16          THE COURT:  Not a problem.

17 BY MR. LOONAM:

18  Q.   I'll just use this one.  And this is one I was

19  planning -- Are you familiar with *The Lancet*?

04:39:00  20  A.   *Lancet*, yes.

21  Q.   Yeah.  That's a well-known journal?

22  A.   Yes, it is.

23          MR. LOONAM:  I'll make sure you get a copy.

24 I'll make sure you get it.

04:39:12  25          MR. SMITH:  All right.

PM 2-85
Case 4:21-cr-00009   Document 251   Filed on 03/16/22 in TXSD   Page 85 of 160

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1          MR. LOONAM:  What am I up to?

2          SUPPORT STAFF:  Is the same -- that was DX-58

3 before?

4          MR. LOONAM:  Yeah.  It could be.

04:39:23  5          SUPPORT STAFF:  "Interface with Delirium"?

6          MR. LOONAM:  No.  "Delirium in Elderly People."

7 So, what's the new number?

8          SUPPORT STAFF:  56.

9          MR. LOONAM:  I'll do 54.  Thank you.

04:39:36 10 BY MR. LOONAM:

11  Q.   I'm just going to show you the abstracts for purposes

12  here -- I mean, for time purposes.

13          Do you see the article "Delirium in

14  Elderly People"?

04:39:47 15  A.   Yes, I do.

16  Q.   And here's some research exploring whether delirium

17  is serving both as a marker of brain vulnerability with

18  decreased reserve and a potential mechanism for permanent

19  cognitive damage.  Does this seem to be research that's

04:40:10 20  exploring the very topic we were just discussing?

21  A.   Well, let me... (reading)

22          Yes, I don't know what research it's

23  digging into, but it is talking about that topic.

24  Q.   I'll turn to Page 4, and it just -- "Etiology," the

04:40:47 25  highlighted section there that reads:  "Thus, in patients

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PM 2-86

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1    who are highly vulnerable to delirium, such as those with

2    underlying dementia and multimorbidity, a relatively

3    benign insult, such as a single dose of sleeping

4    medication, may be enough to precipitate delirium."

04:41:02    5                    So, that's exactly what we were talking

6    about before.  Correct?

7    **A.**    Sure.

8    **Q.**    *Lancet* is not an obscure journal, is it?

9    **A.**    No.

04:41:14   10    **Q.**    One of the most respected journals in the United

11    States, probably the world, for medical research

12    publication?

13    **A.**    Is *The Lancet* from the United States?

14    **Q.**    No.  I am saying in the United States.

04:41:28   15    **A.**    Oh, okay.

16    **Q.**    I don't want to speak for the world because I don't

17    know what's popular in China.  But in the United States

18    *Lancet* is among the most respected --

19    **A.**    Sure.

04:41:36   20    **Q.**    -- medical journals.  Is that fair?

21    **A.**    Yeah.  No.  I thought you were saying it was

22    published in the United States.

23    **Q.**    I don't know where it is published.

24                    (Counsel confer off the record.)

04:42:00   25   BY MR. LOONAM:

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1   Q.   Anyway, it doesn't matter.  There is definitely more

2   research.

3                   Okay.  But it -- it would be fair to say

4   that Mr. Brockman's episodes of delirium are important to

04:42:19   5   consider in assessing his permanent cognitive decline and

6   his current mental state?

7   A.   Yes.  They need to be taken into consideration.

8   Q.   And yesterday you heard Dr. Darby's testimony about

9   how a single episode of delirium can accelerate the rate

04:42:37   10   of cognitive decline for persons with Alzheimer's disease.

11   You agree you were in the courthouse -- in the courtroom

12   for that?

13   A.   I did.  Yeah.  I was curious as to whether that's

14   talking about people who develop delirium spontaneously in

04:42:54   15   their dementia or whether that's referring to people who

16   develop delirium as a result of secondary infection, and

17   I'm not sure if that's the same.  But I am not -- I

18   haven't read that specific paper.

19   Q.   Is there a paper that you're referring to?

04:43:10   20   A.   No.

21   Q.   Okay.

22   A.   I'm just curious.

23   Q.   And how -- so, delirium develops spontaneously?

24   A.   There are -- yes.  There are physiological changes in

04:43:22   25   the body that somebody who is ill can become delirious.

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

```
         1   Usually, there's a systemic problem somehow.
         2   Q.   And so -- and then the -- the -- is the effect on the
         3   brain if it's spontaneous delirium versus delirium that is
         4   triggered by an infection different?
04:43:51 5   A.   Well, that's what I was curious about.
         6   Q.   You don't know?
         7   A.   No.  I was just saying that I would be curious to
         8   know if that's what they're differentiating there.
         9   Q.   Okay.
04:44:00 10  A.   I don't know.
         11  Q.   Okay.  Turning to your expert report dated June 21st,
         12  2021 -- which -- what number is that?  Is it -- Oh.
         13  It's Government's 1.  And I'd ask you to turn to Page 18
         14  of that document.  Let me get a clean copy for the ELMO.
04:45:08 15                    You're at Page 18, sir?
         16  A.   Yes.
         17  Q.   And do you see the -- the heading "Recent
         18  Hospitalizations"?
         19  A.   Yes, sir.
04:45:16 20  Q.   All right.  I am going to put this up on the ELMO.
         21  It is Page 18 of Government's 1.
         22                    For Bob's hospitalization of March 15th to
         23  19th, 2021, please direct us to the place where you
         24  disclosed the fact that Bob had delirium during his
04:45:51 25  hospitalization.  And if you want me to turn -- You have a
```

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1    copy there, right?  Okay.

2    **A.**    Yeah, I didn't mention it in that paragraph.

3    **Q.**    Okay.  So, concerning Bob's hospitalization in March

4    and the report you filed with the Court, you didn't

04:46:20    5    mention the fact that Mr. Brockman had delirium.  Correct?

6    **A.**    That's correct, not in that paragraph.  I think I

7    mentioned he had multiple bouts of delirium elsewhere in

8    my reports.  I know I have done that, but I don't remember

9    where.

04:46:36    10    **Q.**    Okay.  Well, let's focus on this report.

11              MR. SMITH:  I am going to object to that.  That

12    misstates the testimony.  He said he did report delirium in

13    this report.

14              MR. LOONAM:  No, he didn't say the reports.

04:46:48    15              MR. SMITH:  Yes, he did.  Not in that

16    paragraph, but in other paragraphs.

17              MR. LOONAM:  Okay.  You show me where he said

18    reports.

19              THE COURT:  One second.

04:46:59    20              MR. SMITH:  He said he didn't refer to delirium

21    in that paragraph, but he did in other paragraphs in the

22    report.

23              MR. LOONAM:  Okay.  We will go through it.

24              THE COURT:  Hang on one second before you go

04:47:11    25    on.  I just want to make sure.

PM 2-90

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1    MR. LOONAM:  He said:  "I think I have

2  mentioned multiple bouts of delirium elsewhere in my

3  reports," plural.

4    THE COURT:  "Reports," plural.  He didn't say

04:47:28   5  this one.

6    MR. LOONAM:  Yeah.  And I am focused on this.

7  That's all.

8    THE COURT:  Oh, Okay.  I just wanted to be sure

9  I understood the answer.

04:47:35  10    MR. LOONAM:  The June report for now.  So,

11  Government's 1.  Yeah.  We will go through it, all the

12  recent hospitalizations here.

13  BY MR. LOONAM:

14  **Q.**    Okay.  And, so, even though you testified that

04:47:53  15  delirium -- an episode of delirium would be important to

16  consider in assessing Bob's current mental state, you

17  failed to disclose an episode of delirium in the March

18  hospitalization.  Correct?

19  **A.**    I didn't include it in that paragraph.  In the

04:48:15  20  following paragraph talking about the next hospitalization

21  I discuss delirium.

22  **Q.**    Okay.  So, let's go through that.

23    In the next hospitalization you say:

24  "Medical records from Houston Methodist Hospital indicated

04:48:28  25  Mr. Brockman presented there on May 31st, 2021, with signs

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PM 2-91

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  of confusion and potential urinary tract infection.

2  Admitting notes indicated" -- and I have moved to Page

3  19 -- "Admitting notes indicated he was unable to provide

4  history due to altered mental status, and family were

04:48:53   5  available to assist."

6          "On the previous morning" -- "on the

7  previous morning, they noticed he was more tired and had

8  to take a nap.  Later, he began saying things" -- "he did

9  not make sense.  Additionally, he was not eating and

04:49:17  10  tended to stare off blankly."

11          And, so, you believe that that paragraph

12  discloses an episode of delirium?

13  **A.**   Signs of confusion.  Yeah, that is delirium.

14  **Q.**   Okay.  So --

04:49:34  15  **A.**   Those are the characteristics that make delirium.

16  **Q.**   Sure.  No.  It -- so, yeah, delirium involves

17  confusion.  Confusion could also come from other instances

18  other than delirium, though.  Correct?

19  **A.**   Well, they can.  But in this context with confusion,

04:49:53  20  signs of confusion, potentially urinary tract infection,

21  admitting note saying he had altered mental status and the

22  tiredness the morning before, all of that suggests that

23  he's got a delirium going on.

24  **Q.**   It's suggests delirium, but you are leaving it for

04:50:12  25  the reader to connect the dots and figure out that it's an

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1   episode of delirium.  Is that -- that was purposeful?

2   A.   No.  That's not my intent.

3   Q.   But you believe that this discloses delirium?  Did

4   you -- Scratch that.

04:50:26   5              Did you review multiple records from this

6   hospitalization, pages and pages, where scan after scan on

7   repeated days for this defendant were -- were scans

8   that -- that showed the defendant was experiencing

9   delirium?

04:50:47  10   A.   I reviewed the records, and there's a lot of

11   information, and I didn't include every word in all of it.

12   So, I mean, I reviewed it.

13   Q.   And I am saying do you recall there were multiple

14   records that used the word "delirium" to describe this

04:51:04  15   defendant, and they did a screening -- screening, if it's

16   delirium?  Do you recall that?

17   A.   I don't recall specifically which hospitalization

18   that was in, but I do know that they exist.

19   Q.   So, if hospital records for -- and many, many records

04:51:24  20   for this hospitalization specifically refer to delirium

21   and screenings for delirium, you would think you

22   accurately described those records by saying he presented

23   confused and in an altered state and didn't use the word

24   "delirium"?  You think that would be accurate?

04:51:47  25   A.   It's reasonably accurate, in my view, yes.

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1  Q.   Reasonably accurate?

2  A.   Yes, sir.

3  Q.   So, you don't think it's important to use the actual

4  term for the medical condition that the defendant has been

04:52:06  5  diagnosed with -- has been diagnosed with?

6  A.   Not necessarily, no.  I am describing the

7  characteristics of it.

8  Q.   You described in your direct testimony that the --

9  the neuro -- the neuroimaging was important to your

04:52:56  10  conclusions in this case.  Do you recall that testimony?

11  A.   Yes.

12  Q.   And you specifically noted the -- the volumetric

13  analysis for -- that was conducted on the -- the MRI

14  scans.  Correct?

04:53:20  15  A.   Yes.

16  Q.   And the volumetric analysis that's reflected in what

17  I refer to as "Neuroreader reports"?

18  A.   Correct.

19  Q.   All right.  And in your report of materials, you

04:53:34  20  disclose reviewing the -- the MRIs, but I guess, part and

21  parcel to that, the Neuroreader reports were part of the

22  MRI scan?

23  A.   Right.  I did not review the actual MRI scan --

24  Q.   Yeah.

04:53:53  25  A.   -- just the reports related to the MRI scan.

*ROBERT DENNEY, Ph.D. – CROSS BY MR. LOONAM*

1    **Q.**    Okay.  And so -- All right.  You reviewed the -- the

2    Neuroreader reports for the 2018 and the 2021 MRIs.

3    Correct?

4    **A.**    Yes.

04:54:20  5    **Q.**    And what you said was you -- it was important to you

6    that the defendant's brain, when compared against a

7    population of brains, fell within sort of normal

8    boundaries.  Correct?

9    **A.**    Yes.

04:54:37  10   **Q.**    And you understand that normal boundaries, as

11   Dr. Darby described it with two standard deviations, would

12   include 95 percent of the population, approximately.

13   Correct?

14   **A.**    Well, that's not the way I would have defined it, no.

04:55:00  15   **Q.**    Okay.

16   **A.**    I would have said -- Well, that's a broad spectrum,

17   that far out.  I don't think that you could say that that

18   broad of -- you know, 95 sent of the population is where

19   you would define not normal.  That's too broad of a range.

04:55:19  20   I don't think it goes that far to two standard deviations.

21   **Q.**    Okay.

22   **A.**    But beyond one standard deviation could be mild.  Two

23   could be more moderate.

24   **Q.**    So, you don't think the standard is two standard

04:55:33  25   deviations?  You think, if it was one standard deviation,

PM 2-95

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1    if you're outside that, then that would be abnormal?

2    **A.**    No.  It depends on what you are talking about.

3    **Q.**    I am talking about the Neuroreader report --

4    **A.**    Okay.

04:55:44  5    **Q.**    -- that you were talking about.

6    **A.**    No.  In a Neuroreader report they're using

7    statistical probability, and that's two standard

8    deviations.

9    **Q.**    Okay.  So, we're talking about two standard

04:55:54  10   deviations.  We're talking about excluding 95 percent of

11   the population is normal, and you have the two-and-a-half

12   percent on either side once you get out of the two

13   standard deviations.  Correct?

14   **A.**    You are not using it the proper way.  No.  It's not

04:56:08  15   correct.

16   **Q.**    Okay.  And would you agree that what you're looking

17   for in an MRI are signs of atrophy?  Correct?

18   **A.**    Yes.

19   **Q.**    And, you know, as you heard yesterday with Dr. Darby

04:56:24  20   on the stand, with a neurodegenerative disease, you don't

21   necessarily have atrophy?

22   **A.**    I am not sure that that's my recollection of what he

23   said.  I believe that there will be atrophy as the disease

24   progresses.

04:56:43  25   **Q.**    And so --

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1   A.   It's just late in its development.  Later.

2   Q.   Okay.  So, you think the process that's underway of

3   how the -- the -- whatever the degeneration process is,

4   it -- for a neurodegenerative disease necessarily results

04:57:07   5   in atrophy?

6   A.   It will, yes.  It does.

7   Q.   And -- and are there other processes taking place in

8   a neurodegenerative disease, such as neuronal disruption,

9   that do not result in atrophy?

04:57:25   10   A.   Yes.  In the very earliest stages there's neuronal

11   disruption, and as that disruption continues neurons die.

12   And as neurons -- as more and more neurons die, that area

13   of the brain shrinks, and that's called "atrophy."

14   Q.   Okay.  So, your understanding is that neuronal

04:57:46   15   disruption is just an early stage that is sort of a step

16   in the process to atrophy?  That's your understanding?

17   A.   It could be.  Neuronal disruption doesn't necessarily

18   imply that it is going to be.

19   Q.   And, so, if you are looking for atrophy, it's

04:58:03   20   interesting to compare a brain against sort of a general

21   population.  Do you believe it would be more informative

22   to compare the brain against the same brain at different

23   points in time?

24   A.   Not necessarily.  It can show change, but that

04:58:26   25   doesn't necessarily mean that it's now become abnormal.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PM 2-97

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1   Q.   Okay.  So -- so, if you're interested in atrophy and

2   brain shrinkage, you don't think it's necessarily

3   interesting to compare a brain as it's progressing over

4   the course of years.  You're more interested in taking a

04:58:53   5   brain and comparing it against a general population to see

6   if it becomes an outlier against the statistical

7   population.

8            Did I understand you correctly or do I

9   have that wrong?

04:59:02   10   A.   Well, both are interesting.

11   Q.   Okay.

12   A.   So, I find both interesting.

13   Q.   Okay.  But if you are looking for actual atrophy --

14   right?  So, let's put it this way:

04:59:12   15            If you're comparing a brain against a

16   control set, are you making assumptions that that one

17   snapshot of the brain fits within -- where it fits within

18   the general population as a comparator?

19   A.   I don't understand your question.

04:59:34   20   Q.   Okay.  If you have a brain picture -- it's the same

21   brain, you can see actual signs of atrophy as opposed to

22   making assumptions when you are comparing it against sort

23   of a control set.  Is that correct?

24   A.   You can see changes in that brain longitudinally over

04:59:53   25   time, yes.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PM 2-98

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1   **Q.**   All right.

2   **A.**   But that doesn't necessarily mean that the brain has

3   atrophied to the point that it is considered abnormal.

4   **Q.**   Yeah.  But you're --

05:00:04    5   **A.**   Because there is atrophy in everybody's brain.  I'm

6   sorry to say it, but everybody's brain is atrophying after

7   about 40 years of age to some degree.  So, we can monitor

8   that.  And if somebody has something happening that's

9   causing it to go a lot faster -- because they drink too

05:00:21   10   much -- then, it would probably start to show up as

11   abnormal compared to the normal population.

12   **Q.**   Okay.  I am going to show you --

13        MR. LOONAM:  You guys have this 52 from

14   yesterday?

05:00:31   15   BY MR. LOONAM:

16   **Q.**   So, this is Defendant's Exhibit 52 I've previously

17   provided to the government.  What this document does is it

18   takes pictures from the 2018 Neuroreader report that you

19   reviewed in the top row and has the corresponding area of

05:01:03   20   the brain for the 2021 area below it.  All right.  Do you

21   see that?

22   **A.**   Yes, I do.

23   **Q.**   Okay.  And, so, for the -- And did you -- did you

24   conduct a comparison of the 2018 and 2021 MRIs on your own

05:01:29   25   in the data you had to form your report?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1    **A.**    Did I compare the MRIs?

2    **Q.**    Yeah.

3    **A.**    Not specifically.  I looked at the reports.

4    **Q.**    You looked at the reports as snapshots in time, but

05:01:49    5    you didn't say, 'I want to get a longitudinal view of

6    Mr. Brockman's brain and look at it in 2018 and look at it

7    in 2021 and see what it tells me'?

8    **A.**    I don't remember specifically doing that, and I don't

9    necessarily recall seeing this pretty colored picture.

05:02:11    10    So, I guess I don't -- I don't recall.

11    **Q.**    Okay.  So, if you -- if you look at the hippocampus

12    in 2018, do you see where that -- the point is on the

13    graph?

14    **A.**    Yes.

05:02:28    15    **Q.**    And then if you go down to 2021, does it appear that

16    the hippocampus is larger or smaller in 2021?

17    **A.**    Well, the dot is lower.  There appears to be change

18    on this graph, but I don't know that that's a

19    statistically significant change.

05:02:49    20    **Q.**    Yeah.  No.  I mean, the MRI is an imprecise tool.

21    Right?

22    **A.**    Well, it can be pretty precise.  It depends on what

23    we're talking about.

24    **Q.**    Well, in the volumetric analysis of the brain --

05:03:02    25    **A.**    Volumetric analysis is not necessarily precise.  You

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1 didn't spell that out for me.  Sorry.

2 **Q.**   Let's go over to the temporal lobe, 2018.  Do you see

3 the 2018 dot, where that is?

4 **A.**   Yes.

05:03:19 5 **Q.**   All right.  And then you go down to 2021.  What do

6 you observe there?

7 **A.**   It looks like it's -- was at about the 50th

8 percentile and now it's about the -- I can't quite read

9 that -- low 20th -- 23rd, 25th percentile, something like

05:03:38 10 that.

11 **Q.**   Does that seem statistically significant to you or

12 you just don't know?

13 **A.**   It might be.  I mean, there is change there,

14 probably.  I can't say for sure.  And that may correspond

05:03:48 15 with the onset of mild cognitive impairment.

16 **Q.**   It might?

17 **A.**   Yeah, it might.

18 **Q.**   It might correspond to the onset of dementia as well.

19 Correct?

05:04:02 20 **A.**   Well, and I was talking about MRI findings in context

21 of moderate to severe dementia, and I would say no.

22 Potentially early/mild, maybe.

23 **Q.**   Early -- "early/mild" is a -- that's a repetitive

24 term.  Right?  No?

05:04:24 25 **A.**   No.

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1    **Q.**   Okay.  Frontal lobe, 2018.  Do you see what that

2    shows?  And then if you go down to the 2021, what do you

3    observe?

4    **A.**   Again, there is a slight change.  Again, I don't know

05:04:41  5    if it's a statistically significant change.

6    **Q.**   Okay.  So, you know, a volume change of, you know,

7    approximately 405 milliliters to 384, 385 milliliters.

8    You don't know if that's statistically significant or not?

9    **A.**   No.  Because there's considerable error in these

05:05:10  10   voxel -- volumetric studies, and I don't know if that

11   change overcomes the amount of error for both points.

12   **Q.**   Yeah.  So, there is a lot of error in these

13   volumetric analyses.  Correct?

14   **A.**   Sure.  Yes.  A score could be above what it is or

05:05:25  15   could be below.  We don't know.

16   **Q.**   Go to your -- Government's Exhibit 2.

17            THE COURT:  Counsel, we will just keep going to

18   roughly 5:30.  So, if we need to go past that, that's fine.

19   So, if you need more time -- You are not being rushed.

05:05:57  20            MR. LOONAM:  Thank you, sir.

21   BY MR. LOONAM:

22   **Q.**   So, Government's Exhibit 2.  In your opinion to the

23   Court -- zoom in there -- I am on the last page, Page 21

24   of 21 -- you wrote:  "But for the question of severe

05:07:10  25   memory disorder, there is no indication that Mr. Brockman

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1   would not be able to provide assistance to counsel."

2                Do you see -- did I accurately read what

3   you wrote?

4   **A.**   Yes.

05:07:54   5                MR. LOONAM:  Government's Exhibit 1, Page 21.

6   BY MR. LOONAM:

7   **Q.**   So, here, you detailed an interview you conducted

8   with Peter Romatowski of Jones Day on June 15th of 2021.

9   Correct?

05:08:22   10   **A.**   Yes.

11   **Q.**   And in the middle of the paragraph -- I'll point it

12   out here -- you wrote, as Mr. Romatowski recounted to you,

13   "He" -- being the defendant -- "did not appear able to

14   remember facts to the extent one would expect, but memory

05:08:50   15   was less than half of it.  More importantly, he was not

16   able to help us with information such as documents and

17   other information regarding potential witnesses.  He said

18   he was not able to do what other defendants could do,

19   namely, helping reconstruct what happened.  Mr. Romatowski

05:09:13   20   said a defendant can tell you how to make the inferences,

21   which are stronger and why, in looking at documents to

22   highlight important things attorneys may not see.  From

23   early on, he said it was apparent that Mr. Brockman

24   struggled to do those things, and it became progressively

05:09:31   25   worse.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1          "He noted Mr. Brockman badly wanted to

2    help but was very suggestible.  Mr. Romatowski noted that

3    Mr. Brockman would repeat back and distort information he

4    had heard previously.  He noted these examples occurred

05:09:48    5    regarding facts that were neutral, so it did not appear

6    like he was trying to make his case more favorable.

7          "Mr. Romatowski said, 'He cannot weigh the

8    evidence or weigh the strength of the evidence.  He just

9    cannot do it.'  He noted that the more they would dig into

05:10:08   10    the details, the more Mr. Brockman would retreat to high-

11    level anecdotes and reports of Reynolds operations or

12    something else not related to the details which they were

13    dealing with."

14          Is Mr. -- the information Mr. Romatowski

05:10:35   15    provided to you consistent with your statement to the

16    Court that, but for the question of severe memory

17    disorder, there is no indication that Mr. Brockman would

18    not be able to provide assistance to counsel?

19    **A.**    Your question again?

05:11:01   20    **Q.**    Is -- is your statement to the Court consistent with

21    the information Mr. Romatowski provided to you?

22    **A.**    Well, most of what Mr. Romatowski described I would

23    say falls under the issue of memory-related; and, so,

24    that's reasonable.

05:11:26   25          The -- the other issue is I have to take

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1    what Mr. Romatowski tells me with some grain of salt

2    regarding how accurately it reflects the situation.

3    **Q.**    Why is that?

4    **A.**    He's involved in defending Mr. Brockman in this case.

05:11:58    5    **Q.**    So?  What -- why -- why does that matter with respect

6    to the information Mr. Romatowski provides to you?

7    **A.**    Well, it is not uncommon, in my experience, for

8    attorneys who hire -- or attorneys who interact with

9    mental health experts in a case to present ardently a very

05:12:27    10   particular viewpoint, and I have found that that viewpoint

11   is not always as it seems.  And it happens on all types of

12   cases, all situations.

13                    As soon as I get a call from a personal

14   injury lawyer asking me to hear this really terrible case,

05:12:49    15   immediately they're starting to try to create a picture

16   for me.  So, as a forensic examiner, I have to listen to

17   that and evaluate its relevance and its importance in the

18   overall picture.  And, so, I -- no disrespect to

19   Mr. Romatowski or any of the defense team.  I just say,

05:13:16    20   okay, let's see how that stacks up with the rest of the

21   test data.

22                    And in a -- in a situation where the

23   person is clearly grossly exaggerating and from early on

24   in the course of this litigation, it's very possible that

05:13:35    25   counsel is also falling victim to that exaggeration, I

PM 2-105

1   just have to be somewhat critical in -- in assessing it.

2   That's all.

3   **Q.**   So, being a -- looking at things with a critical eye

4   is the job of a forensic examiner.  That's a given and

05:13:59   5   that's completely appropriate.  But are you saying that

6   you have to take what Mr. Romatowski said with a -- with a

7   grain of salt, I think was your term, because he is a

8   defense lawyer?

9   **A.**   No.  Because he has been involved with Mr. Brockman

05:14:22   10   in the defense of this case.  And that may -- Mr. Brockman

11   may have succeeded in also -- As I mentioned in one of

12   these reports, that the exaggeration aspect of this I view

13   as a ruse, and that may very well have encompassed counsel

14   as well.

05:14:44   15   **Q.**   Didn't the Supreme Court -- you talked about how you

16   reviewed cases from the Supreme Court and some smaller

17   courts, I think is the term you used, or appellate courts

18   and smaller courts.

19                Are you familiar with any case law that

05:14:58   20   says that the defense lawyer is going to be uniquely

21   positioned to provide insight with respect to a

22   defendant's ability to provide assistance of counsel?

23   **A.**   Oh, yeah, that's absolutely true.  And in the context

24   of a defendant who's not necessarily grossly exaggerating

05:15:18   25   that is all the more true.

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1          But in a context where there is ample

2    indication, in my opinion, that Mr. Brockman is

3    significantly exaggerating and maybe even orchestrating

4    some of the presentation related to his severe memory

05:15:35   5    problem and presence of dementia, particularly early on in

6    the case, I have to view that information a little bit

7    differently.

8    Q.   And, so, you -- if I read this paragraph where it

9    says, "But for the question of severe memory disorder,

05:15:55   10   there is no indication" -- "no indication that

11   Mr. Brockman would not be able to provide assistance of

12   counsel."

13          So, given that sentence, is it fair to say

14   you completely discounted the information that

05:16:13   15   Mr. Romatowski provided to you?

16          MR. SMITH:  I'm sorry.  I've got to object.  He

17   has already answered this question twice.

18          THE COURT:  I am -- I am going to respectfully

19   overrule the objection.  The witness can answer the

05:16:23   20   question.

21   A.   This sentence in the context with where it is in my

22   report, where I am pulling things together and describing

23   the information from the paragraph above it and putting it

24   in context, I would -- if I could go back and change it, I

05:16:44   25   would say "no valid and reliable indication."  That would

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1   probably clarify it better.  But in the context with where

2   this is in the report, I believe it's accurate.

3   **Q.**   Okay.  So -- and that would go for the information

4   provided to you by Ms. Keneally as well, who in the

05:17:07   5   interest of time I don't need to go through it, but who

6   also provided information about problems with Mr. Brockman

7   that went beyond memory problems.  Correct?

8   **A.**   Yes.  And they were -- particularly, her information

9   was presented very ardently, and I have to weigh that as

05:17:30  10   part of my assessment process.

11   **Q.**   But -- and you -- you talked about, you know, you get

12   calls from personal injury lawyers.  Do you know who Pete

13   Romatowski is?

14   **A.**   I know he's a well respected lawyer.

05:17:46  15   **Q.**   Yeah, he is.  He's Chief of the Securities and

16   Commodities Fraud Task Force in the Southern District of

17   New York.

18   **A.**   I did not know that.

19   **Q.**   And one of the pioneers of insider trading law, *U.S.*

05:18:00  20   *v. Carpenter.*  Are you aware of that?

21   **A.**   Not my area of expertise.

22          MR. SMITH:  I don't understand what the

23   relevance of this line of inquiry is, Your Honor.  Sorry.

24          THE COURT:  Okay.  I am -- I am going to allow

05:18:10  25   the question; so, respectfully, overruled.

*ROBERT DENNEY, Ph.D. – CROSS BY MR. LOONAM*

1  BY MR. LOONAM:

2  **Q.**   Yeah.  And Ms. Keneally -- are you aware that

3  Ms. Keneally was the Assistant Attorney General of the

4  United States, Tax Division?

05:18:29  5  **A.**   I am aware of that, yes.

6  **Q.**   But because she gave you the information -- I'm

7  sorry.  How did you describe the manner in which she

8  provided the information?

9  **A.**   Well, that's making it simplistic.  In the context of

05:18:42  10  representing this criminal defendant is a totally

11  different role than what she was when she was working in

12  the other agency.

13  **Q.**   So, just to be clear, do you think defense counsel

14  would lie to you or provide you with false information in

05:19:00  15  order to assist the defendant in his defense?  Is that --

16  is that your position?

17  **A.**   Well, that is a possibility.  I am not suggesting

18  that.  I am saying it is also a possibility that the

19  defendant has successfully exaggerated with counsel in

05:19:19  20  such a degree that counsel honestly believes it.  That

21  does not necessarily make it accurate in terms of the

22  context of my clinical formulation.

23  **Q.**   And, as a result of that risk, you -- you discounted

24  the information to the point where it provided no

05:19:43  25  indication to you of any issue beyond memory issues.

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1    Correct?

2    **A.**    To be fair, no valid and reliable, in context with

3    the gross exaggeration that has been started since

4    certainly 2019 and in the context of the descriptions of

05:20:02    5    how he presented his memory problems to them initially,

6    yes.

7                    MR. LOONAM:  I am going to, Your Honor, play

8    videos from the -- the May interview and, also, the October

9    interview at this time.

05:20:35    10                    THE COURT:  Okay.

11                    MR. LOONAM:  And, so, can we switch from the

12    ELMO to the video capability?

13                        And, Dr. Denney, I am going to play a

14    video -- a snippet of a video from your interview with

05:20:55    15    Mr. Brockman on May 20th, which I believe is Government's

16    Exhibit 4, and this snippet -- we have got to keep this

17    snippet and we are going to make it into a separate

18    exhibit, and we will make it GX-4A.

19                    THE COURT:  Do you have the reference for it,

05:21:13    20    just to -- because the court reporter is not going to be

21    taking this down word for word, so I just want to make sure

22    that we --

23                    MR. LOONAM:  Yes.  Okay.  So, it's -- 4A will

24    be -- Can you read this writing, just read it into the

05:21:26    25    record for me.

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1           MR. VARNADO:  Transcript Page 51, Line 1,

2  through Transcript Page 53, Line 21 --

3           THE COURT:  Great.

4           MR. VARNADO:  -- from Government's Exhibit 4.

05:21:36    5           THE COURT:  Thank you.

6           MR. LOONAM:  Thanks.

7           ***************************

8  **(Video played as follows:)**

9           DR. DENNEY:  Would you be expected to tell your

05:21:49   10  attorney everything that you know and remember about your

11  case?  I mean, the situations, the details?

12           MR. BROCKMAN:  Yes.

13           DR. DENNEY:  Do you expect any problems in

14  being able to tell her and the team those sorts of details?

05:22:08   15           MR. BROCKMAN:  I don't think so.

16           MR. LOONAM:  Can we stop there?

17           THE COURT:  Can we turn it up just a little

18  bit?

19                **(Video playing.)**

05:22:14   20           "DR. DENNEY:  You can answer if you wish."

21                **(Video paused.)**

22           MR. LOONAM:  And, Your Honor, you asked for the

23  audio to go up a bit?

24           THE COURT:  Yes.

05:22:21   25           MR. LOONAM:  Are we able to send the audio up a

KATHY MILLER, RMR, CRR - kathy@miller-reporting.com

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  bit?

2         THE COURT:  Or maybe we can do it from our end.

3  I'm not sure.

4              (Counsel confer off the record.)

05:22:48  5         MR. VARNADO:  Start it over.

6              **(Video played as follows:)**

7         DR. DENNEY:  Would you be expected to tell your

8  attorney everything that you know and remember about your

9  case?  I mean, the situations, the details?

05:23:07  10         MR. BROCKMAN:  Yes.

11         DR. DENNEY:  Do you expect any problems in

12  being able to tell her and the team those sort of details?

13         MR. BROCKMAN:  I don't think so.

14              **(Video paused.)**

05:23:20  15              **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

16         MR. LOONAM:  Can we stop there?  Pause it.

17  BY MR. LOONAM:

18  **Q.**   And, so, Dr. Denney, in drawing your conclusions, I

19  believe, you -- you were of the opinion that the

05:23:41  20  defendant, during the interview portion, presented to you

21  better than he was testing.  Is that a -- a fair way to

22  put it?

23  **A.**   Correct.

24  **Q.**   And -- but do you have any doubt that the defendant

05:24:00  25  was aware that the interview part of the process was --

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1  was part of the examination?

2  **A.**   No.  I am sure he understood that was part of the

3  examination.  I don't know that he appreciated the

4  possible impact that would have when it's so disparate

05:24:22  5  from the test data.

6  **Q.**   So, you think in Mr. Brockman's mind, when he was

7  speaking with you and Dr. Dietz, he thought that how he

8  was perceived in this interview wouldn't impact his -- the

9  determination you would make in your competency

05:24:53  10  assessment?

11  **A.**   No, I didn't say that.

12  **Q.**   You do think that he was aware that you would play --

13  you believe he -- he thought that you would place more

14  weight on the testing data versus the interview portion?

05:25:05  15  **A.**   Not necessarily, no.

16  **Q.**   Okay.

17  **A.**   Maybe.  Possibly.

18  **Q.**   Possibly?  So, do you know if Mr. Brockman even knew

19  that -- that there was some distinction between forensic

05:25:18  20  testing and the interview process?

21  **A.**   Well, I'm sure he was aware of the difference between

22  interviewing and testing.

23  **Q.**   Well, when he goes through it.  At this stage, do you

24  know whether he was aware of any distinction in the

05:25:35  25  examination between interviewing and testing?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1   **A.**   I -- I don't know how to answer that question.  Of

2   course, he knew the distinction between interviewing and

3   testing.  I presume that's the case.

4   **Q.**   As he is sitting there, do you know if he knew he was

05:25:51   5   going to be subjected to testing?

6   **A.**   Oh, yes.  Yeah.  Sure.

7   **Q.**   And what's the basis of that?

8   **A.**   We explained that that's -- that's a part of it.

9   I --

05:26:05   10   **Q.**   You explained that --

11   **A.**   Well, isn't that -- I guess I am assuming he would

12   know that.  He has been tested before.  I asked him if

13   he -- I -- if I recall correctly, I thought I had asked

14   him if he had been through this before, had other testing

05:26:24   15   done.

16   **Q.**   And, so, you think, here, he's just letting his guard

17   down; whereas, when he's testing, that's when he's -- he

18   decides, 'Oh, now, I need to exaggerate my symptoms'?

19   That's --

05:26:41   20   **A.**   I mean, that's a very simplistic way to put it, but,

21   basically, it's true, that there -- You have to understand

22   that a person who is exaggerating for secondary gain is

23   trying to create a picture, and it's a picture that they

24   don't fully understand how to create and, so, they think,

05:27:05   25   'Okay.  I need to perform more poorly on testing than I

1  really do.  I've got to look like I'm impaired, but I

2  don't want to overdo it.'

3              It's -- literally, a person is somewhat

4  shooting in the dark when they're trying to exaggerate

05:27:18  5  because they're not being genuine in their behaviors.

6  And, so, it's a -- it's a hit and miss for them.  They

7  really don't know.  And, so, it's very possible and very

8  common, actually, when they will misjudge that.

9  **Q.**   And this is the same person who you believe has the

05:27:37  10  capability to vitiate a lot of the tests that -- that you

11  administer?

12  **A.**   Yes.

13  **Q.**   So, he's smart enough to be able to vitiate the tests

14  but doesn't realize that this interview is part of the --

05:27:58  15  an important part of the evaluation process?

16  **A.**   No.  He understands that the interview is a part of

17  the evaluation process.  It's just -- it's the judgment of

18  'How impaired do I need to look in comparison to how

19  impaired do I look on the test data?'  Because people have

05:28:14  20  very little understanding of how much impairment looks

21  like on test data.  That is a harder thing to judge

22  because it is so foreign to a person.

23              Interacting with you face-to-face is much

24  more within a person's control.  And I don't believe he

05:28:30  25  appreciated the fact that the test data would look so much

1   more severe than his presentation.  And vitiating the

2   test, validity test, is not a hard task if one knows the

3   way to do it, and it can be very simple.

4   **Q.**   Vitiating the test is very simple?

5   **A.**   Yeah.  There are some rules that, if somebody knows

6   those rules or somebody looks them up or learns them on

7   the internet or is told them or is taught them, yes, they

8   can be beaten pretty easily.

9   **Q.**   So, if you have, say, a pool of graduate students

10   that you want to have, and you specifically instruct those

11   graduate students that they're going to take these tests

12   and simulate malingering, those graduate students in

13   psychology would know the rules.  You would think they

14   would be able to obtain -- across the board they would be

15   able to obtain a genuine memory impairment, because

16   they could -- it's so easy to beat the rules.  Correct?

17   **A.**   Well, it is easy to beat the rules if somebody

18   instructs you exactly how to do it.  Those students were

19   not instructed to do anything other than simulate

20   dementia.  They were not told specifically how to beat the

21   test.

22   **Q.**   Because not a single one, not a single graduate

23   student of these -- these psychology graduate students

24   were able to -- who were told to simulate and try and get

25   a genuine memory impairment, could not do it across the

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  three green tests -- the Word Memory Test, the nonverbal,

2  and the MSDT?  Sorry.  I am sure I got that wrong, but --

3  **A.**   That's right.

4  **Q.**   Correct?

05:30:17   5  **A.**   Well, there was one that actually was able to do it

6  somewhat enough to win the prize.  But most of them, no,

7  they were not able to do it.

8  **Q.**   In your study you said no one was able to do it,

9  didn't you?

05:30:30   10  **A.**   Well, there is one case that is -- that is equivocal.

11           MR. LOONAM:  Is this marked?  What am I up to?

12           SUPPORT STAFF:  Defendant's 57.

13           MR. LOONAM:  Defendant's 57, yes.  I'm sorry.

14  Is there a highlighter there?  Make it easier.

05:31:32   15  BY MR. LOONAM:

16  **Q.**   Okay.  So, I am showing you Defense Exhibit Fifty --

17  Oh.  Could we go back to the ELMO?  I'm sorry.

18           I am showing you Defense Exhibit 57, which

19  is an article titled "The Detection of Feigned Impairment

05:31:50   20  using the WMT, MSVT and NV-MSVT," and the authors are

21  Armistead-Jehle and Denney.  I apologize for

22  mispronouncing your coauthor's name.

23  **A.**   That's all right.

24  **Q.**   I am going to turn to Page 152 of the article.  I am

05:32:11   25  going to read the highlighted portion.

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1          "Across the three tests, no participant

2     was able to produce genuine memory-impaired profiles

3      (GMIPs) across all measures."

4               Stop there.

05:32:31    5               What were the measures?

6     **A.**    The Word Memory Test, the MSVT and the nonverbal

7     MSVT.

8     **Q.**    "However, one participant was able to produce a GMIP

9     on the Word Memory Test and the MSVT and create a passing

05:32:47   10     NV-MSVT that evidenced deficient memory."

11               But the statement that none of the

12     participants were able to produce GMIPs across all three

13     measures is correct.  Right?

14     **A.**    Yes.  And I was equivocating on that "however" person

05:33:12   15     because he created a -- a memory-impaired profile.  It

16     just wasn't the GMIP specifically.

17     **Q.**    Yeah.  It was a passing score.  It was not the -- the

18     genuine memory-impaired profile.  Correct?

19     **A.**    Right.  50 percent of them created GMIPs on the MSVT.

05:33:31   20     **Q.**    Yes.

21     **A.**    So, they were able to do that.  And about 30 percent

22     did the same on the WMT.  But it's hard to do it on all

23     three at one time.

24     **Q.**    The point of the study was to combine those tests to

05:33:43   25     increase the sensitivity to be able to filter out the

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PM 2-118

*ROBERT DENNEY, Ph.D. – CROSS BY MR. LOONAM*

1  fakers from those with a true, genuine memory impairment

2  profile.  Correct?

3  **A.**   Yes, to see how -- how the sensitivity was with all

4  three put together in the same battery.

05:33:56  5  **Q.**   And there was previous work that, if you combined

6  two, you got to 80 percent sensitivity?

7  **A.**   Yeah.  That's probably about right.

8  **Q.**   And you wrote that, when you combined three -- you

9  combined the Word Memory Test, you combined the MSVT and

05:34:15  10  you combined the Nonverbal MSVT -- you got to 100 percent

11  sensitivity.  Right?

12  **A.**   Well, again, it's equivocal because of that one

13  person, but it's very high.  Yes, all three together is

14  very high.

05:34:32  15  **Q.**   I will just go to the line before here.  "As such,

16  the sensitivity of the NV-MSVT in combination with the WMT

17  or the MSVT was 100 percent"?

18  **A.**   Yes.

19  **Q.**   So, what does that mean when the sensitivity is 100

05:34:50  20  percent?

21  **A.**   It was able to identify all of these simulators.

22  **Q.**   And what -- I mean, what is "sensitivity"?

23  **A.**   The ability to detect exaggeration when it's there.

24  **Q.**   And, so, what this was was you combined these --

05:35:07  25  **A.**   Yes.

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  **Q.**    -- and it has 100 percent sensitivity, meaning it can

2  detect the fakers?

3  **A.**    In this sample of graduate students, yes.

4            MR. LOONAM:  All right.  Can we -- I'll go back

05:35:22  5  to the -- I just want to finish this clip.

6            THE COURT:  Sure.

7            MR. LOONAM:  All right.  Maybe we will play the

8  next clip, too, just so we can make the comparison.

9            Can we play it?

05:35:32  10            ****************

11            **(Resuming Video.)**

12            DR. DENNEY:  And, sir, if you wish, you can not

13  answer if you -- if you believe you shouldn't, but I'm

14  going to ask the question anyway.

05:35:44  15            What -- what lead agents to arrest you?

16  Do you have any idea what sort of things lead the agents to

17  arrest you in the first place?

18            MR. BROCKMAN:  I'm sure there was a reason, but

19  I don't know what it was.

05:35:55  20            ****************

21            **(Video paused.)**

22            MR. LOONAM:  Can we pause that?

23  BY MR. LOONAM:

24  **Q.**    Was Mr. Brockman arrested by agents?

05:36:09  25  **A.**    Well, he -- you know, he may not have been.  I mean,

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  I meant --

2  **Q.**   You don't know?

3  **A.**   I meant as -- yeah, as a loose term, arrested.  I

4  should have said "indicted," is what I was meaning, but I

05:36:23   5  said "arrested."

6  **Q.**   But he provided information back to you, and you

7  didn't know one way or another whether or not he was

8  arrested in evaluating the information he provided to you?

9  **A.**   No.  I wanted to know what his -- I was asking him if

05:36:36   10  he knew the basis on which he was getting in trouble with

11  the law.  I used the word "arrest," and that was

12  inappropriate.  I should have said "indicted."  But it's

13  the same point.  It's going to the same issue.

14  **Q.**   And, by the way, just to go back, you -- on the

05:36:54   15  study, I didn't close the loop, and I should have because

16  I assume too much in my head, Judge.

17              But on the -- the three tests that you had

18  100 percent sensitivity for in detecting the fakers, if

19  they were combined -- was Mr. Brockman administered those

05:37:14   20  same tests?

21  **A.**   Over the course of separated months, yes.

22  **Q.**   Did he take it six times?

23  **A.**   Six times?

24  **Q.**   Yeah.  If you combined all those tests, he took six

05:37:27   25  Green tests?

PM 2-121

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1   **A.**   Maybe five.

2   **Q.**   Okay.  About five?

3   **A.**   Yeah.  Sure.

4   **Q.**   Okay.  And you don't -- you don't think it was six

05:37:42   5   but five.

6                    Okay.  And did he generate a genuine

7   memory-impaired profile in every single one of those

8   tests?

9   **A.**   No.

05:37:53  10   **Q.**   Which one didn't he generate a genuine memory-

11   impairment profile?

12   **A.**   He did not produce a GMIP because of an implausible

13   problem in Dr. Guilmette's assessment on the MSVT.

14   **Q.**   Well, what was it --

05:38:09  15   **A.**   I believe the second one.

16   **Q.**   And it was in how it was administered is your issue

17   with it or --

18   **A.**   No.

19   **Q.**   Oh, assessment.  So -- so, to be clear, what

05:38:20  20   happens -- let me -- let's be clear here.  And we will

21   have -- there's going to be a whole line of questioning,

22   but is it -- is it true that the -- that the subject, the

23   defendant, takes the test, potentially on the computer, or

24   not.  The test data is entered into the computer.  It's

05:38:39  25   sent out to Dr. Green's computer algorithm, whatever it

*ROBERT DENNEY, Ph.D. – CROSS BY MR. LOONAM*

1    is.  It spits out the test results.  If you have the AI

2    program with it, it then gives you the results and it will

3    indicate -- going through the algorithm that is designed

4    to screen out the fakers, it will indicate possible

05:39:00    5    genuine memory impairment profile.  It's then that you

6    exercise your clinical judgment on whether or not there's

7    a genuine memory impairment, but -- but you get the

8    profile from the program it comes out.

9                My question is:  In every single one of

05:39:17    10    the Green tests administered to Mr. Brockman, did the

11    program -- the algorithm spit out that he had obtained a

12    profile for a genuine memory impairment?

13    **A.**    No.

14    **Q.**    Okay.  And -- and you're taking issue with --

05:39:34    15    **A.**    The printout in Dr. Guilmette's evaluation, and I

16    suspect it will show up here.

17    **Q.**    Okay.  Well, we will take a look at that.

18                MR. LOONAM:  Should we press "play"?

19                **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

05:39:48    20                **(Video resumed as follows.)**

21                DR. DENNEY:  Have you confessed to anything --

22                MR. BROCKMAN:  No.

23                DR. DENNEY:  -- in this case?  No?

24                Are you -- I'm trying to dance around it a

05:40:05    25    little bit.  Are you able to describe what -- what it is

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 that the government claims you did wrong?  I mean, not to

2 us necessarily, but can you describe it?

3            MR. BROCKMAN:  Somewhat but, you know,

4 basically not completely.

05:40:29   5            DR. DENNEY:  Okay.

6            MR. BROCKMAN:  Not even very much.  I mean,

7 it's -- the -- the area of the law -- and, of course, since

8 I know nothing about law, generally.  But it looks to me

9 like it is -- the statutes involved in it are complex

05:40:46  10 themselves.  And, so, that's what -- I rely on my

11 attorneys, you know.  They now understand enough of my

12 business where that's -- I'm no longer, you know, crucial

13 to what's going on.

14            DR. DENNEY:  Okay.  So, you've sort of -- it

05:41:11  15 sounds like you've played your part.  I mean, you've

16 fulfilled your role in the sense of trying to help your

17 attorneys understand the nature of your business, and they

18 understand that pretty well now at this point?

19            MR. BROCKMAN:  To listen to them, I would say

05:41:27  20 no.

21            DR. DENNEY:  Okay.  Not as much as you would

22 like them to?

23            MR. BROCKMAN:  Yeah.  Well, they understand as

24 much as it's reasonable for them to understand.  But,

05:41:42  25 again, the business itself is very complex.  And the -- the

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1 policies and practices and procedures are very, very, very

2 complex.  And I'm confident that my attorneys will

3 ultimately get a level of knowledge and understanding that

4 I think is appropriate, but I don't know how long that's

05:42:10  5 going to take.

6            DR. DENNEY:  Okay.  But they're working on it?

7            MR. BROCKMAN:  Yes.

8            DR. DENNEY:  And you're proud of what they have

9 done so far --

05:42:17  10            MR. BROCKMAN:  Yeah.  I think --

11            DR. DENNEY:  -- but there is a lot more that

12 needs to be done?

13            MR. BROCKMAN:  Exactly.

14                    **(Video concluded.)**

05:42:23  15                    ******************

16 BY MR. LOONAM:

17 **Q.**   So, when Mr. Brockman, in trying to talk about the

18 charges in this case, talks about the business practices,

19 policies and procedures, do you have an understanding of

05:42:31  20 what he was referring to?

21 **A.**   Yes.  He was talking about Reynolds and Reynolds.

22            And, if I may, Your Honor, I understand

23 where this is now in the interview process.  This was in

24 the midst of the competency assessment instrument, which

05:42:45  25 is why I used the word "arrest."  It's off the outline.

KATHY MILLER, RMR, CRR - kathy@miller-reporting.com

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1   **Q.**   Yeah.   No.   This is the sort of interview process

2   that you had described this morning.   Correct?

3   **A.**   Yeah.   Part of the competency assessment instrument,

4   sure.

05:42:58   5   **Q.**   And it was off of that that you, you know, I think --

6   I think you opined that, you know, there was a factual,

7   rational understanding of the case based on -- it was this

8   interview.   Right?

9   **A.**   Well, in -- in part, in part the extra as well.   But,

05:43:18   10   also, you have to keep in mind that Mr. Brockman was

11   unwilling to talk specifics about those instances.   He

12   refused to do that.   He said he would not do that.

13                  So, I was, at this point, trying to talk

14   around it to see if I could get him to open up and talk a

05:43:34   15   little bit more about the things that would be important.

16   **Q.**   All right.   And what -- what role does Reynolds and

17   Reynolds have in the indictment?

18   **A.**   Very little.

19   **Q.**   So, the -- when asked about the charges and

05:43:54   20   Mr. Brockman is talking about the business policies and

21   procedures of Reynolds and Reynolds, is he demonstrating

22   an understanding of the charges against him?

23   **A.**   Not that specific question, no.   But he is able to

24   describe a bit -- complicated processes and things like

05:44:15   25   that a little bit.

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1    Q.    But -- but when he is -- in understanding that the --

2    the facts that lead to his arrest or the charges against

3    him, he's describing Reynolds, we just saw the answer is,

4    no, he's not expressing an understanding of the charges

05:44:41    5    against him.  Correct?

6    A.    On this particular moment.  But on the ECST-R in

7    October, he did.

8    Q.    Oh.  You did this again in October, right?

9    A.    No.

05:44:52   10    Q.    Oh, you didn't do this in October?

11    A.    No.  I used a different competency assessment tool.

12    Q.    A different competency assessment tool.

13         MR. LOONAM:  Could we play the next clip?

14    BY MR. LOONAM:

05:45:03   15    Q.    Did you videotape that competency assessment that you

16    are referring to?

17    A.    No.  This is more of a test.  I have got it written

18    down.  What he did.

19    Q.    Okay.  So, in --

05:45:11   20    A.    The test data.

21    Q.    -- in October, after Mr. Brockman had several bouts

22    of delirium and reportedly experienced, you know,

23    significant cognitive decline, in -- to obtain the

24    information regarding his rational and factual

05:45:30   25    understanding of the case against him, you conducted a

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1  test that was not videotaped.  Correct?

2  **A.**   Right.  It was security concerns regarding the test.

3  The publisher said, Don't do that.

4  **Q.**   But you didn't do this same exercise here where you

05:45:45  5  asked sometimes open-ended questions to try and understand

6  what Mr. Brockman knew?  You didn't do that same sort of

7  interview in October.  Correct?

8  **A.**   Well, no.  It is very similar in that regard.  It's

9  not the exact same instrument, but it is also a semi-

05:46:02  10  structured interview that allows you to ask questions to

11  help flesh out what their response is regarding the topic.

12  **Q.**   Okay.  So -- so, it was proprietary concern -- you

13  didn't have the proprietary concerns when you first

14  conducted the -- the structure or semi-structured

05:46:28  15  interview, but you had proprietary concerns about doing it

16  in October?

17  **A.**   Because it's a different instrument.  The CAI, there

18  is no -- that is not a concern.  But for the ECST-R, the

19  publisher says it is.

05:46:41  20  **Q.**   And you chose -- you get to choose the manner in

21  which you are going to ask the questions to the defendant.

22  Correct?

23  **A.**   I -- not completely, no.

24  **Q.**   You don't -- you -- could you have decided to ask the

05:46:59  25  same questions you asked that were videotaped in May when

PM 2-128

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  you assessed the defendant in October?

2  **A.**   Oh.  That's what you're asking?  Yes.  I choose the

3  method that the -- the evaluation is going to undergo,

4  yes.

05:47:15  5  **Q.**   And you chose a method that had proprietary concerns

6  that couldn't be videotaped.  Correct?

7  **A.**   Well, that was not why I chose it.

8          MR. LOONAM:  Could we play the -- I am going to

9  play a clip of part of the interview in October.  This is

05:47:38  10  going to be -- Here.  Sorry.  This is going to be from the

11  October 20th interview.  It's from Government's Exhibit 93.

12  We will label this clip 93-A.  And Mr. Varnado will be kind

13  enough to read in the actual section of it.

14          MR. VARNADO:  It's going to be from Page 27,

05:48:00  15  Line 18, to Page 31, Line 9, the first one, 93-A.

16          MR. LOONAM:  Is the ELMO on?  Do we go to the

17  video?  Please go to the video.  I apologize.  I should

18  have signaled that.  I apologize.  I thought we had these

19  clips cued up.

05:48:54  20              **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

21                  **(Video played as follows.)**

22          DR. DENNEY:  Okay.  Very good.  Okay.

23  Mr. Brockman, we're back onto the video, and we just have

24  one procedure to go through.  It should go pretty quickly.

05:49:17  25  Okay?

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1          MR. BROCKMAN:  Well, depending upon how you

2     define "pretty quickly," yeah, it's okay.

3          DR. DENNEY:  All right.  Yeah.  Yeah.

4               Well, it's a multiple-choice

05:49:29   5     questionnaire.  Okay?  So, I'll just read the instructions

6     and then we'll charge ahead.  All right.

7               I would like to ask you some questions

8     regarding your indictment, because your memory of the

9     details of what is alleged in the indictment pertaining to

05:49:47  10     the charges against you are important.

11               I realize things have changed for you in

12     such a way as to make your memory a significant concern.  I

13     do not want you to tell me any private information

14     discussed between you and your lawyers.  I am not asking

05:50:03  15     about that.  All I am asking is questions about your

16     indictment -- okay? -- the document itself.  I'm not asking

17     you to tell me anything that's not already in the public

18     domain.

19               Because your memory for these events is a

05:50:23  20     concern, I wanted to document just how much memory loss

21     you -- you have in regards to your indictment.  Okay?

22               So, in -- in what district court -- and

23     every question I've got has got a multiple choice.  I'm

24     going to ask -- I'm going to read the question, and I'm

05:50:47  25     going to give you the options.  Okay?  And I'd like for you

ROBERT DENNEY, Ph.D. – CROSS BY MR. LOONAM

1   to choose an option to the best of your memory.

2                    And if you don't remember something, I

3   appreciate that.  Just make your best guess.  Okay?

4                    In what district court were you first

05:51:01   5   indicted?  Eastern District of Texas or the Northern

6   District of California?

7                    MR. BROCKMAN:  I have no idea.

8                    DR. DENNEY:  Okay.  Best guess.  Eastern

9   District of Texas or Northern California?

05:51:24   10                    MR. BROCKMAN:  I can only guess.  I don't --

11                    DR. DENNEY:  Sure.

12                    MR. BROCKMAN:  I don't think I should be

13   guessing.

14                    DR. DENNEY:  Well, that's okay.  Guessing is

05:51:35   15   fine.

16                    Eastern District of Texas or you think the

17   Northern District of California?

18                    MR. BROCKMAN:  Eastern District of Texas.

19                    DR. DENNEY:  Okay.  In what division was --

05:51:51   20   actually -- it was the Northern District of California,

21   actually.

22                    In what division was the indictment first

23   filed in the Northern District of California?  San

24   Francisco Division or Oakland Division?

05:52:04   25                    MR. BROCKMAN:  I have no idea.

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1          DR. DENNEY:  Best guess.

2          MR. BROCKMAN:  I'd say San Francisco.

3          DR. DENNEY:  Okay.  That's right.

4          **(Video concluded.)**

05:52:18   5          **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

6   BY MR. LOONAM:

7   **Q.**   And, so, this is a -- a different test you're

8   administering here that resembles a forced-choice test.

9   Is that fair?

05:52:34  10  **A.**   It is.  It is a forced-choice questionnaire related

11  to details in the indictment.

12  **Q.**   And it's -- it's -- it's almost -- almost a catch-22

13  in some ways.  Correct?

14  **A.**   No.

05:52:51  15  **Q.**   Well, if Mr. Brockman receives a passing score on the

16  test as it's designed, he would demonstrate -- or you

17  would argue he would demonstrate a factual understanding

18  of the case against him.  Correct?

19  **A.**   No.  I would say he would have memory for the

05:53:14  20  indictment.

21  **Q.**   And that would be part of establishing that he had

22  factual understanding of the indictment.  Correct?

23  **A.**   Yeah.  It would go -- it would go into it, sure.

24  Sure.

05:53:25  25  **Q.**   And then if he --

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM

1    **A.**    But it's more focused on memory.

2    **Q.**    -- if he can't remember and doesn't know --

3    **A.**    Right.

4    **Q.**    -- and fails, then he's -- he would be malingering.

05:53:34    5    Correct?

6    **A.**    No.

7    **Q.**    If he fails, he is not -- Oh.  If he fails, he is

8    exaggerating his symptoms.  Correct?

9    **A.**    I'm sorry.  You've got to define exactly what you

05:53:44    10    said --

11    **Q.**    Okay.

12    **A.**    -- what you're asking.

13    **Q.**    There are three possibilities with respect to this

14    test.

05:53:49    15    **A.**    Okay.

16    **Q.**    There is a pass that shows that he understands the

17    indictment.  Right?  There is chance?

18    **A.**    Okay.  I see what you're doing.

19    **Q.**    Okay?  And then there is a fail.

05:53:59    20                    Fail evidences or would go towards

21    malingering.  Pass --

22    **A.**    Sure.

23    **Q.**    -- goes towards competence and a factual

24    understanding of his case?

05:54:13    25    **A.**    Well, knowledge.  A memory for the indictment is what

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1    it would go to.

2    **Q.**   And it just so happened -- what did -- what happened

3    with Mr. -- Mr. Brockman?  He scored within the chance

4    range.  Correct?

05:54:24  5    **A.**   Yeah.  He put it right about 50 percent.  Actually,

6    below 50 percent, if I recall.

7    **Q.**   46 percent?

8    **A.**   46 percent.

9    **Q.**   Yeah.  He got about 46 percent.

05:54:32  10            And during the -- the test, you -- you

11    provide feedback to him on whether he's getting the

12    answers correct or not?

13    **A.**   Yes.  Generally speaking, that's true.

14    **Q.**   And at times during this -- administering this test

05:54:59  15    to Mr. Brockman, at any point of the test did you grow

16    frustrated with Mr. Brockman?

17    **A.**   I don't remember.

18    **Q.**   Do you recall whether or not you expressed any

19    frustration with Mr. Brockman during the course of

05:55:12  20    administering this test?

21    **A.**   I do not.

22            MR. LOONAM:  Okay.  Your Honor, I think we are

23    at a good place to stop for now.

24            THE COURT:  Okay.  Then, we will take -- or

05:55:21  25    recess now.  We will start again tomorrow morning at 9:00.

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1      As far as the schedule for tomorrow, I do

2 have a hearing at 5:00 tomorrow afternoon; so, we are going

3 to have to end by 5:00 tomorrow.

4      What do we have on tap for witnesses?  We

05:55:38   5 are going to finish this witness, obviously.

6      MR. LOONAM:  Yes, Your Honor.  And then I -- I

7 don't know.  Tomorrow we had agreed to take a witness out

8 of order, one of the government's doctors, but after lunch.

9      MR. SMITH:  Your doctor.

05:55:54   10      MR. LOONAM:  One of the defense doctors after

11 lunch.

12      MR. LANGSTON:  Which one?  Your Honor, I have

13 an e-mail box full of witnesses giving their stories for

14 why they absolutely have to testify in the morning

05:56:07   15 tomorrow.  So, we are going to sort of sort those out when

16 I get downstairs, but we will send the list as soon as we

17 have it available.

18      THE COURT:  Do we need to start earlier

19 tomorrow?

05:56:16   20      MR. LANGSTON:  I do think that would be helpful

21 if the Court is available.

22      THE COURT:  Let me just -- I need to check with

23 my staff.  I know I'll be available.  I just need to check

24 and make sure that everybody can make it.

05:56:33   25      **(Court confers with staff)**

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1    THE COURT:  So, I think everybody is good with

2  8:30 tomorrow.  That gives us an additional 30 minutes.

3    MR. SMITH:  That's fine with the government,

4  Your Honor, yes.

05:56:40   5    THE COURT:  And that will give us a little

6  bit -- I mean, it's probably not going to help you all the

7  way out with your witnesses, but it's 30 minutes.

8    MR. LANGSTON:  Hey, that's better than nothing.

9  That helps.

05:56:49   10    THE COURT:  Okay.  Because we are not going to

11  be able to go this late tomorrow because I have got a

12  hearing tomorrow.  So, tomorrow is going to be a pretty

13  hard cutoff at 5:00.

14    MR. LOONAM:  Understood, Your Honor.

05:56:59   15    MR. VARNADO:  And, Your Honor, we have had some

16  conversations also with the government.  I think there is

17  six witnesses on their list after this particular witness.

18  There is ten on the defense witness list.  It seems --

19    THE COURT:  We will keep going.  We will keep

05:57:12   20  going.  I have a trial scheduled for Monday, but this has

21  already started.  This is a criminal hearing.  It's got

22  precedent.  So, they are going to have to wait.  So, if we

23  can't get it done by Friday, we just keep going.

24    MR. LANGSTON:  And, Your Honor, you don't

05:57:30   25  necessarily need to give us this information now, but I

*ROBERT DENNEY, Ph.D. – CROSS BY MR. LOONAM*

1 think in one of our status conferences you indicated

2 potential interest in maybe working over the weekend.

3          THE COURT:  That's an alternative as well, I

4 mean, to try to get people accommodated.  I would have to

05:57:45   5 check with my staff about that.  I am okay, but it's not --

6 I can't speak for my staff because it's their weekend as

7 well.

8          MR. LANGSTON:  Okay.

9          THE COURT:  So, let me talk to them.  If

05:57:54  10 everybody is okay, then, Saturday is fine.  I don't have a

11 problem with that.  But we will definitely start tomorrow

12 morning at 8:30.  That will give you at least another 30

13 minutes -- additional 30 minutes to work with.

14          MR. LOONAM:  Thank you, Your Honor, and your

05:58:11  15 staff.  Thank you.

16          THE COURT:  Not a problem.  You guys have a

17 good night.

18          MR. LANGSTON:  Actually, Your Honor, if you

19 have a moment, there is just one issue we want to flag for

05:58:18  20 the Court.

21          THE COURT:  Sure.

22          MR. LANGSTON:  So, on Friday we received a

23 subpoena return from UCSH, and among those -- you know, it

24 is a subpoena for between Jim Jackson, who I believe is

05:58:27  25 going to be one of the defense witnesses, and Tommy Barras,

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1  who was one of the government witnesses.  And, you know,

2  late in the day yesterday we received an additional

3  production.  It was a single document.  That document was

4  an e-mail between -- written by Mr. Jackson to Mr. Barras

05:58:46  5  reporting on Mr. Jackson's meeting with IRS agents, where

6  Mr. Jackson --

7           MR. VARNADO:  Before we just read this into the

8  record, what's the issue we're addressing?

9           THE COURT:  Yeah.

05:58:55  10          MR. LANGSTON:  So, we tried to have some

11  conversations with UCSH.  Obviously, we're concerned, and I

12  think if you hear what the document says that will express

13  sort of the nature of our concern, that maybe we still do

14  not have a whole production.  And, so, we may need to take

05:59:11  15  either Mr. Barras or Mr. Jackson out of turn, and we may be

16  coming to you for a ruling concerning -- you know, we want

17  to make sure we get a full production here.

18          MR. VARNADO:  This is the first we are hearing

19  about it.  We are happy to talk with the government.

05:59:26  20          THE COURT:  Well, why don't you guys talk about

21  it and then --

22          MR. VARNADO:  We don't have a document.

23          MR. LANGSTON:  It's not the defendant.  It's

24  Reynolds and Reynolds, which is the defendant's former

05:59:33  25  company.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1              THE COURT:  Okay.

2              MR. LANGSTON:  So, as I said, you know, we --

3   it's an issue we did want to flag for the Court.  And to

4   the extent that the defense has an issue here, it's because

05:59:41  5   we may need to be moving witnesses around.

6              THE COURT:  Okay.  Well, bring -- why don't you

7   guys bring me the issue tomorrow morning after thinking it

8   through.  If you just got it, I want you guys to think it

9   through, and I want a presentation of issues and then a

05:59:57  10   proposed solution.

11              MR. LANGSTON:  Okay.

12              THE COURT:  So, instead of me guessing what's

13   going on and how to accommodate everyone, tell me, 'Here is

14   the issue.  Here's how I'd like to solve it.  Anybody

06:00:06  15   object?'  I'll look at my schedule, look and see what needs

16   to be ruled on, and we will go from there.

17              MR. LANGSTON:  Great.

18              THE COURT:  Have a good night, everyone.  We

19   will see you all at 8:30 tomorrow.

06:00:18  20              THE CASE MANAGER:  All rise.

21   (Recessed at 6:00 p.m.)

22

23

24

25

*ROBERT DENNEY, Ph.D. - CROSS BY MR. LOONAM*

1                    COURT REPORTER'S CERTIFICATE

2        I, Kathleen K. Miller, certify that the foregoing is a

3   correct transcript from the record of proceedings in the

4   above-entitled matter.

5

6   DATE: 11/19/21              /s/     _Kathleen K. Miller

7                               Kathleen K. Miller, RPR, RMR, CRR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## '

**'50s** [1] - 66:4
**'97** [1] - 58:14
**'Bob** [1] - 20:18
**'guys** [1] - 19:10
**'he** [1] - 103:7
**'here** [1] - 138:13
**'how** [2] - 20:7, 114:18
**'oh** [3] - 20:10, 26:5, 113:18
**'okay** [2] - 19:13, 113:25
**'Trinity** [2] - 60:20, 61:1
**'well** [3] - 20:2, 20:8, 23:3
**'whatever** [1] - 20:20
**'where** [1] - 23:2

## /

**/s** [1] - 139:6

## 1

**1** [14] - 7:6, 7:9, 12:24, 18:13, 23:13, 24:2, 28:19, 29:22, 29:23, 88:13, 88:21, 90:11, 102:5, 110:1
**100** [5] - 118:10, 118:17, 118:19, 119:1, 120:18
**10281** [1] - 2:8
**105** [1] - 17:22
**11** [3] - 49:13, 52:23
**11/19/21** [1] - 139:6
**11th** [1] - 78:17
**12** [3] - 38:12, 72:15, 72:16
**13** [1] - 49:20
**15** [7] - 27:23, 29:23, 58:21, 59:2, 72:16, 72:17
**150** [1] - 1:21
**152** [1] - 116:24
**15th** [4] - 78:16, 78:18, 88:22, 102:8
**16** [2] - 1:6, 4:2
**17** [2] - 21:23, 24:2
**17th** [1] - 61:5
**18** [5] - 29:23, 88:13, 88:15, 88:21, 128:15
**18th** [1] - 78:18
**19** [1] - 91:3
**1989** [1] - 56:1
**1991** [1] - 56:23
**1996** [2] - 57:22, 58:12
**19th** [2] - 78:17, 88:23
**1:13** [2] - 1:5, 4:3
**1st** [1] - 22:23

## 2

**2** [6] - 1:13, 28:18, 47:17, 76:24, 101:16, 101:22
**20** [1] - 59:5
**2000** [2] - 63:20, 63:23
**20002** [1] - 1:22

**2003** [2] - 63:20, 63:24
**2006** [2] - 6:3, 27:9
**2007** [1] - 38:11
**2010** [1] - 64:10
**2011** [2] - 46:13, 46:16
**2012** [2] - 26:18, 39:7
**2013** [2] - 22:23, 64:10
**2015** [3] - 15:10, 65:2, 65:3
**2016** [8] - 22:24, 23:20, 57:22, 61:5, 61:7, 61:8, 64:3, 65:4
**2017** [1] - 41:13
**2018** [9] - 13:3, 94:2, 98:18, 98:24, 99:6, 99:12, 100:2, 100:3, 101:1
**2019** [8] - 8:22, 36:15, 37:19, 37:23, 48:2, 48:9, 50:4, 109:4
**202-514-9623** [1] - 1:22
**2020** [2] - 6:7, 31:21
**2021** [17] - 1:6, 4:2, 78:17, 78:18, 88:12, 88:23, 90:25, 94:2, 98:20, 98:24, 99:7, 99:15, 99:16, 100:5, 101:2, 102:8
**20th** [3] - 100:9, 109:15, 128:11
**21** [4] - 101:23, 101:24, 102:5, 110:2
**212-326-3939** [1] - 2:8
**21st** [1] - 88:11
**2208** [1] - 1:21
**23rd** [1] - 100:9
**25** [1] - 19:6
**250** [1] - 2:7
**25th** [1] - 100:9
**26** [1] - 22:24
**27** [1] - 128:14

## 3

**30** [6] - 7:14, 117:21, 135:2, 135:7, 136:12, 136:13
**31** [2] - 3:3, 128:15
**31st** [2] - 78:17, 90:25
**3300** [1] - 2:3
**36** [1] - 10:20
**360** [1] - 60:11
**37** [1] - 10:20
**384** [1] - 101:7
**385** [1] - 101:7
**3:26** [1] - 59:7
**3:59** [1] - 59:7

## 4

**4** [3] - 85:24, 109:16, 110:4
**40** [2] - 27:22, 98:7
**405** [1] - 101:7
**44** [1] - 3:6
**45** [2] - 23:14, 27:23
**46** [3] - 133:7, 133:8, 133:9
**4:21-CR-09** [1] - 1:3
**4A** [1] - 109:23

## 5

**5** [4] - 3:3, 23:14, 28:18
**50** [3] - 117:19, 133:5, 133:6
**50th** [1] - 100:7
**51** [1] - 10:1
**515** [1] - 2:12
**52** [2] - 98:13, 98:16
**53** [2] - 49:8, 110:2
**54** [2] - 60:6, 85:9
**55** [2] - 29:24, 60:7
**56** [3] - 75:24, 75:25, 85:8
**57** [4] - 24:2, 116:12, 116:13, 116:18
**58** [8] - 10:22, 23:12, 23:13, 23:14, 23:25, 24:1, 27:21, 28:17
**58-A** [1] - 23:12
**58-B** [1] - 24:1
**58-C** [1] - 27:21
**58-D** [1] - 28:17
**59** [5] - 10:22, 21:20, 29:21, 29:22
**59-A** [1] - 23:11
**59-B** [1] - 29:21
**5:00** [3] - 134:2, 134:3, 135:13
**5:30** [1] - 101:18

## 6

**6:00** [3] - 1:5, 4:3, 138:21

## 7

**7** [1] - 57:22
**713-250-5087** [1] - 2:13
**717** [1] - 2:3
**77002** [2] - 2:4, 2:13
**7th** [1] - 31:16

## 8

**8** [1] - 27:22
**80** [1] - 118:6
**8004** [1] - 2:12
**832-239-3694** [1] - 2:4
**8:30** [3] - 135:2, 136:12, 138:19

## 9

**9** [1] - 128:15
**90** [1] - 8:14
**93** [1] - 128:11
**93-A** [2] - 128:12, 128:15
**95** [3] - 94:12, 94:18, 95:10
**9:00** [1] - 133:25

## A

**ability** [3] - 78:24, 105:22, 118:23
**able** [34] - 5:10, 7:7, 9:24, 16:13, 25:9, 26:22, 27:17, 43:7, 60:9, 102:1, 102:13, 102:16, 102:18, 103:18,

106:11, 110:14, 110:25, 111:12,
114:13, 115:14, 115:15, 115:24,
116:5, 116:7, 116:8, 117:2, 117:8,
117:12, 117:21, 117:25, 118:21,
122:25, 125:23, 135:11
**abnormal** [4] - 95:1, 96:25, 98:3, 98:11
**above-entitled** [1] - 139:4
**absolute** [2] - 17:6, 19:4
**absolutely** [5] - 18:17, 19:3, 19:5,
105:23, 134:14
**abstracts** [1] - 85:11
**Academy** [1] - 75:21
**accelerate** [1] - 87:9
**accepted** [1] - 40:25
**access** [8] - 7:7, 7:8, 7:20, 7:25, 9:10,
25:8, 25:17, 30:8
**accommodate** [2] - 13:5, 138:13
**accommodated** [1] - 136:4
**accommodation** [2] - 40:15, 40:19
**accomplished** [2] - 17:20, 80:5
**account** [1] - 78:22
**accounting** [1] - 25:2
**accreditation** [4] - 57:11, 62:3, 64:9,
64:13
**accredited** [10] - 57:4, 57:6, 57:8, 57:9,
57:10, 60:18, 62:6, 62:7, 62:10, 65:11
**accurate** [6] - 71:24, 92:24, 92:25, 93:1,
107:2, 108:21
**accurately** [3] - 92:22, 102:2, 104:2
**acknowledged** [1] - 14:10
**acoustics** [1] - 5:9
**acquired** [1] - 27:8
**acronym** [1] - 24:21
**acronyms** [1] - 30:6
**Act** [2] - 7:10, 7:11
**active** [1] - 41:15
**actively** [2] - 35:7, 35:10
**actual** [5] - 93:3, 93:23, 97:13, 97:21,
128:13
**AD** [1] - 77:1
**add** [2] - 80:12, 83:16
**add-on** [1] - 80:12
**added** [1] - 24:15
**adding** [1] - 73:2
**addition** [1] - 73:10
**additional** [7] - 25:9, 61:17, 65:10,
65:12, 135:2, 136:13, 137:2
**additionally** [1] - 91:9
**address** [1] - 19:9
**addressing** [1] - 137:8
**administer** [1] - 114:11
**administered** [3] - 120:19, 121:16,
122:10
**administering** [3] - 131:8, 133:14,
133:20
**administration** [1] - 31:22
**administrations** [1] - 32:6
**admissible** [1] - 12:19
**admit** [5] - 38:20, 76:7, 76:9, 76:17,

76:18
**admitting** [3] - 91:2, 91:3, 91:21
**adopting** [1] - 65:21
**advanced** [1] - 66:1
**adversary** [2] - 45:13, 45:17
**adverse** [6] - 45:18, 46:2, 46:21, 52:7,
53:11, 54:6
**adviser** [2] - 17:23, 18:1
**advisors** [1] - 18:18
**affect** [3] - 12:11, 12:23
**affected** [3] - 74:14, 74:18, 78:23
**Africa** [1] - 6:15
**AFTERNOON** [1] - 1:10
**afternoon** [7] - 5:18, 31:10, 31:11, 40:6,
44:20, 44:21, 134:2
**age** [1] - 98:7
**agency** [1] - 108:12
**agent** [3] - 35:13, 35:15, 35:18
**agents** [6] - 38:3, 38:7, 119:15, 119:16,
119:24, 137:5
**Aging** [1] - 76:23
**ago** [11] - 11:8, 33:9, 33:11, 33:19,
36:10, 38:9, 39:23, 48:9, 59:17, 60:21,
66:6
**agree** [9] - 67:11, 68:14, 70:20, 70:25,
77:7, 79:1, 79:8, 87:11, 95:16
**agreed** [2] - 40:17, 134:7
**agreement** [1] - 4:11
**ahead** [5] - 16:20, 29:11, 58:21, 59:5,
129:6
**AI** [1] - 122:1
**aim** [1] - 34:25
**algorithm** [3] - 121:25, 122:3, 122:11
**alleged** [3] - 7:25, 25:16, 129:9
**allow** [1] - 107:24
**allows** [1] - 127:10
**alma** [1] - 61:6, 61:9
**almost** [4] - 18:22, 33:8, 131:12
**altered** [3] - 91:4, 91:21, 92:23
**alternative** [1] - 136:3
**alumni** [1] - 61:18
**Alzheimer's** [32] - 37:7, 38:22, 39:1,
39:12, 70:12, 70:13, 71:21, 72:8, 73:6,
73:13, 73:15, 73:17, 73:20, 73:21,
73:22, 74:3, 74:9, 74:16, 74:19, 74:23,
75:6, 75:16, 76:23, 76:24, 77:2, 77:12,
77:13, 77:14, 77:17, 87:10
**amazing** [1] - 20:24
**ambassador** [3] - 32:11, 32:12, 32:23
**Ambassador** [2] - 6:11, 32:19
**AMERICA** [1] - 1:3
**American** [3] - 57:4, 66:3, 75:21
**amount** [4] - 8:2, 17:17, 73:1, 101:11
**ample** [1] - 106:1
**analyses** [1] - 101:13
**analysis** [6] - 55:10, 63:6, 93:13, 93:16,
99:24, 99:25
**Andi** [1] - 8:25
**anecdotes** [1] - 103:11

**Anenen** [1] - 26:19
**animosity** [1] - 12:7
**announced** [2] - 15:13, 16:11
**answer** [13] - 14:8, 20:13, 20:20, 22:9,
43:12, 60:16, 60:19, 90:9, 106:19,
110:20, 113:1, 119:13, 126:3
**answered** [4] - 10:9, 14:12, 20:8, 106:17
**answers** [3] - 10:11, 22:5, 133:12
**antitrust** [2] - 33:5, 41:25
**anyway** [2] - 87:1, 119:14
**APA** [10] - 57:5, 57:11, 57:16, 62:3,
62:6, 62:7, 62:10, 64:8, 64:16, 65:11
**APA-accredited** [4] - 62:6, 62:7, 62:10,
65:11
**APA-certified** [1] - 57:16
**apart** [1] - 42:12
**apathy** [1] - 77:3
**aphasia** [2] - 74:5, 77:3
**apologize** [6] - 69:13, 72:1, 76:3,
116:21, 128:17, 128:18
**Apostolova** [1] - 76:23
**apparent** [1] - 102:23
**appear** [9] - 30:5, 30:13, 34:22, 34:24,
35:12, 43:11, 99:15, 102:13, 103:5
**APPEARANCES** [1] - 1:16
**appearing** [1] - 35:8
**appellate** [1] - 105:17
**applications** [1] - 25:8
**applied** [1] - 55:10
**apply** [2] - 56:7, 79:25
**applying** [1] - 56:5
**appreciate** [3] - 43:22, 44:3, 130:3
**appreciated** [2] - 112:3, 114:25
**approaching** [1] - 9:15
**appropriate** [3] - 5:1, 105:5, 124:4
**arbitration** [5] - 34:12, 42:8, 42:11,
42:14, 42:20
**ardently** [2] - 104:9, 107:9
**area** [7] - 37:13, 62:22, 96:12, 98:19,
98:20, 107:21, 123:7
**areas** [1] - 74:22
**argue** [1] - 131:17
**argues** [1] - 52:24
**arguing** [1] - 12:15
**argument** [1] - 12:18
**arguments** [2] - 16:15, 34:23
**arm** [1] - 69:11
**Armistead** [1] - 116:21
**Armistead-Jehle** [1] - 116:21
**arms** [1] - 19:4
**arousal** [1] - 69:24
**arrest** [5] - 119:15, 119:17, 120:11,
124:25, 126:2
**arrested** [4] - 119:24, 120:3, 120:5,
120:8
**article** [5] - 76:22, 76:24, 85:13, 116:19,
116:24
**aspect** [2] - 63:8, 105:12
**aspects** [1] - 29:19

**assessed** [1] - 128:1
**assessing** [3] - 87:5, 90:16, 105:1
**assessment** [9] - 107:10, 112:10, 121:13, 121:19, 124:24, 125:3, 126:11, 126:12, 126:15
**assist** [2] - 91:5, 108:15
**assistance** [4] - 102:1, 103:18, 105:22, 106:11
**assistant** [3] - 50:13, 50:14, 108:3
**assisted** [1] - 2:16
**associate** [1] - 6:5
**associated** [1] - 71:1
**association** [1] - 57:5
**associative** [1] - 63:6
**assume** [1] - 120:16
**assuming** [1] - 113:11
**assumption** [1] - 67:5
**assumptions** [2] - 97:16, 97:22
**atrial** [1] - 40:18
**atrophied** [1] - 98:3
**atrophy** [12] - 95:17, 95:21, 95:23, 96:5, 96:9, 96:13, 96:16, 96:19, 97:1, 97:13, 97:21, 98:5
**atrophying** [1] - 98:6
**attach** [1] - 76:15
**attempted** [1] - 17:21
**attended** [1] - 55:14
**attention** [2] - 12:2, 68:20
**Attorney** [1] - 108:3
**attorney** [6] - 4:25, 41:17, 50:13, 50:14, 110:10, 111:8
**attorney-client** [1] - 4:25
**attorneys** [10] - 10:8, 13:18, 13:25, 41:15, 102:22, 104:8, 123:11, 123:17, 124:2
**audio** [2] - 110:23, 110:25
**August** [4] - 22:24, 23:20, 27:9, 32:5
**AUSA** [1] - 52:3
**authorities** [1] - 35:15
**authority** [2] - 29:9, 34:24
**authors** [1] - 116:20
**automotive** [2] - 16:9, 16:10
**Automotive** [2] - 42:15, 42:22
**available** [5] - 76:16, 91:5, 134:17, 134:21, 134:23
**avoid** [1] - 18:6
**aware** [18] - 34:7, 37:20, 37:21, 38:13, 54:5, 64:8, 79:6, 81:3, 82:13, 83:20, 83:23, 107:20, 108:2, 108:5, 111:25, 112:12, 112:21, 112:24

**B**

**B.A** [1] - 60:14
**back-and-forth** [1] - 23:18
**background** [4] - 6:1, 54:8, 56:3, 59:18
**backwards** [1] - 39:24
**bad** [1] - 42:19
**badly** [1] - 103:1

**bar** [1] - 5:8
**barely** [1] - 38:17
**Barras** [3] - 136:25, 137:4, 137:15
**based** [2] - 9:1, 125:7
**baseline** [1] - 36:14
**basic** [1] - 39:15
**basis** [5] - 25:17, 41:10, 67:4, 113:7, 120:10
**battery** [1] - 118:4
**battle** [1] - 47:3
**beat** [3] - 115:16, 115:17, 115:20
**beaten** [1] - 115:8
**became** [6] - 6:5, 57:6, 57:8, 57:10, 58:16, 102:24
**become** [6] - 51:21, 62:17, 74:5, 84:4, 87:25, 96:25
**becomes** [1] - 97:6
**BEFORE** [1] - 1:11
**began** [3] - 16:25, 91:8
**begin** [1] - 4:20
**beginning** [1] - 21:22
**begins** [1] - 24:1
**behalf** [1] - 45:12
**behavior** [4] - 30:20, 55:10, 63:5, 69:24
**behavioral** [9] - 63:6, 73:19, 74:7, 74:25, 75:9, 75:13, 75:15, 75:17, 77:14
**behaviors** [1] - 114:5
**behind** [2] - 65:21, 66:21
**believes** [1] - 108:20
**below** [4] - 53:5, 98:20, 101:15, 133:6
**benign** [1] - 86:3
**best** [5] - 20:14, 130:1, 130:3, 130:8, 131:1
**better** [6] - 19:2, 79:21, 82:7, 107:1, 111:21, 135:8
**between** [16] - 7:25, 26:9, 34:12, 61:8, 66:12, 69:1, 69:15, 72:16, 83:19, 112:19, 112:21, 112:25, 113:2, 129:14, 136:24, 137:4
**beyond** [3] - 94:22, 107:7, 108:25
**bias** [1] - 12:6
**Bible** [4] - 54:14, 60:14, 60:23, 60:25
**big** [1] - 22:20
**bigger** [1] - 84:1
**billion** [1] - 8:5
**binder** [1] - 58:7
**bio** [1] - 32:23
**biology** [1] - 55:21
**bit** [15] - 12:6, 18:24, 30:24, 33:16, 40:7, 73:21, 106:6, 110:18, 110:23, 111:1, 122:25, 125:15, 125:24, 125:25, 135:6
**blankly** [1] - 91:10
**blown** [1] - 74:9
**board** [15] - 49:22, 58:3, 63:20, 63:22, 65:9, 65:13, 65:21, 66:2, 66:4, 66:9, 66:14, 66:17, 66:24, 67:8, 115:14
**board-certification** [1] - 65:13
**board-certified** [1] - 66:24

**Bob** [1] - 88:24
**Bob's** [3] - 88:22, 89:3, 90:16
**bodies** [2] - 69:2, 69:17
**body** [4] - 69:21, 70:6, 87:25
**Bolivar** [1] - 71:25
**Boris** [4] - 1:19, 11:18, 11:24, 38:5
**boris.bourget@usdoj.gov** [1] - 1:24
**bottom** [1] - 81:12
**bottom-line** [1] - 81:12
**Boulevar** [1] - 71:23
**bounce** [1] - 81:11
**boundaries** [2] - 94:8, 94:10
**Bourget** [6] - 1:19, 3:3, 31:25, 32:10, 33:7, 38:3
**BOURGET** [26] - 4:18, 5:13, 5:17, 10:18, 10:24, 16:1, 16:2, 16:20, 21:7, 21:19, 21:25, 23:10, 23:16, 23:24, 24:5, 27:19, 27:25, 28:15, 28:21, 29:20, 30:2, 31:2, 38:15, 40:20, 43:18, 43:21
**bouts** [4] - 83:10, 89:7, 90:2, 126:21
**box** [1] - 134:13
**brain** [32] - 74:14, 74:18, 74:21, 79:19, 79:24, 81:8, 81:9, 82:1, 82:6, 82:15, 84:7, 85:17, 88:3, 94:6, 96:13, 96:20, 96:22, 97:2, 97:3, 97:5, 97:15, 97:17, 97:20, 97:21, 97:24, 98:2, 98:5, 98:6, 98:20, 99:6, 99:24
**brains** [1] - 94:7
**break** [2] - 13:15, 58:19
**Break** [1] - 59:7
**brief** [1] - 5:25
**briefcase** [1] - 30:23
**briefly** [1] - 24:23
**bright** [4] - 80:5, 80:6, 80:14, 81:10
**brighter** [1] - 81:8
**bring** [5] - 18:12, 18:14, 24:8, 138:6, 138:7
**brings** [1] - 24:14
**broad** [3] - 94:16, 94:18, 94:19
**Brockman** [82] - 6:19, 8:17, 8:23, 9:5, 9:8, 9:17, 9:21, 9:22, 12:8, 13:4, 13:17, 14:3, 14:14, 16:3, 21:10, 21:15, 22:2, 22:9, 23:1, 23:20, 24:7, 24:10, 24:13, 25:11, 25:17, 27:4, 27:8, 27:13, 28:3, 28:7, 29:6, 29:14, 30:11, 30:16, 31:12, 33:12, 33:23, 34:8, 34:22, 35:1, 35:14, 35:23, 36:3, 36:5, 36:15, 37:11, 37:18, 38:11, 39:19, 43:6, 67:11, 78:7, 89:5, 90:25, 101:25, 102:23, 103:1, 103:3, 103:10, 103:17, 104:4, 105:9, 105:10, 106:2, 106:11, 107:6, 109:15, 112:18, 119:24, 120:19, 122:10, 124:17, 125:10, 125:20, 126:21, 127:6, 128:23, 131:15, 133:3, 133:15, 133:16, 133:19
**BROCKMAN** [21] - 1:6, 110:12, 110:15, 111:10, 111:13, 119:18, 122:22, 123:3, 123:6, 123:19, 123:23, 124:7, 124:10, 124:13, 129:1, 130:7, 130:10, 130:12, 130:18, 130:25, 131:2

**Brockman's** [24] - 8:21, 9:7, 12:3, 12:14, 13:1, 13:25, 14:1, 22:22, 22:24, 30:4, 30:20, 34:2, 34:13, 34:19, 35:6, 40:14, 40:23, 43:2, 78:3, 78:12, 78:23, 87:4, 99:6, 112:6
**broken** [2] - 40:13, 41:6
**Brooklyn** [1] - 47:15
**brought** [1] - 12:1
**Bruns** [1] - 9:1
**budding** [1] - 73:16
**built** [2] - 17:13, 18:24
**Bureau** [2] - 46:7, 46:11
**business** [9] - 7:17, 24:18, 29:19, 39:20, 123:12, 123:17, 123:25, 124:18, 125:20
**businessmen** [1] - 9:17
**BY** [37] - 5:17, 10:24, 16:2, 21:25, 23:16, 24:5, 27:25, 28:21, 30:2, 31:9, 39:18, 41:8, 44:19, 49:9, 49:19, 52:2, 52:22, 53:19, 58:11, 59:16, 60:8, 76:4, 76:21, 84:17, 85:10, 86:25, 90:13, 98:15, 101:21, 102:6, 108:1, 111:17, 116:15, 119:23, 124:16, 126:14, 131:6

## C

**cabinet** [1] - 6:13
**cabinet-level** [1] - 6:13
**CAI** [1] - 127:17
**California** [5] - 130:6, 130:9, 130:17, 130:20, 130:23
**camera** [1] - 36:19
**cannot** [2] - 103:7, 103:9
**capability** [3] - 81:11, 109:12, 114:10
**capable** [3] - 80:5, 80:7, 81:11
**capacity** [4] - 33:13, 61:19, 61:22, 81:8
**car** [8] - 7:17, 8:11, 18:14, 20:4, 21:13, 24:24, 25:5, 30:23
**care** [2] - 59:11, 68:1
**career** [2] - 9:14, 9:15
**careful** [2] - 10:8, 10:16
**carefully** [1] - 10:9
**carpenter** [1] - 107:20
**carrying** [1] - 30:23
**cars** [1] - 18:12
**CASE** [5] - 4:6, 31:6, 59:6, 59:8, 138:20
**case** [79] - 7:5, 8:3, 8:4, 8:6, 8:9, 9:7, 9:12, 10:16, 12:21, 16:15, 22:13, 22:15, 22:23, 23:18, 26:6, 27:15, 28:2, 28:6, 28:13, 33:7, 33:10, 35:25, 39:8, 40:1, 41:25, 42:12, 42:21, 42:22, 43:13, 43:15, 46:8, 46:9, 47:12, 47:14, 47:16, 48:1, 48:6, 48:7, 48:10, 48:12, 48:14, 48:23, 48:25, 49:10, 50:19, 51:6, 51:8, 51:9, 51:10, 51:21, 52:5, 52:9, 52:10, 53:13, 53:14, 54:4, 60:1, 66:15, 66:22, 76:13, 83:9, 93:10, 103:6, 104:4, 104:9, 104:14, 105:10, 105:19, 106:6, 110:11, 111:9, 113:3, 116:10, 122:23, 124:18, 125:7,
126:25, 131:18, 132:24
**cases** [10] - 6:23, 8:8, 44:22, 46:10, 46:17, 53:11, 53:15, 74:16, 104:12, 105:16
**catch** [2] - 56:10, 66:21
**catch-22** [1] - 131:12
**causing** [1] - 98:9
**CDK** [25] - 7:4, 7:13, 7:15, 8:1, 9:4, 9:9, 15:14, 15:15, 15:18, 16:12, 16:15, 18:9, 19:19, 19:25, 20:7, 20:9, 21:1, 25:16, 26:9, 26:11, 26:20, 33:6, 41:9, 42:18
**CDK's** [1] - 25:1
**cells** [1] - 79:19
**Center** [3] - 62:10, 71:23, 72:6
**center** [1] - 25:4
**central** [1] - 28:2
**CEO** [5] - 6:22, 26:19, 26:20, 29:8
**certain** [6] - 9:24, 12:4, 26:25, 34:16, 56:8, 66:18
**certainly** [3] - 45:21, 66:21, 109:4
**CERTIFICATE** [1] - 139:1
**certificate** [1] - 65:17
**certification** [8] - 58:3, 63:21, 65:9, 65:13, 65:21, 66:9, 66:14, 66:17
**certifications** [2] - 63:22, 66:2
**certified** [5] - 30:7, 49:22, 57:16, 66:24, 67:9
**certify** [1] - 139:2
**chairman** [3] - 6:22, 9:10, 29:8
**challenges** [2] - 34:10, 34:16
**chance** [2] - 132:17, 133:3
**change** [15] - 18:9, 21:12, 22:7, 32:6, 64:18, 77:4, 96:24, 99:17, 99:19, 100:13, 101:4, 101:5, 101:6, 101:11, 106:24
**changed** [7] - 21:4, 21:13, 54:18, 59:22, 60:20, 61:1, 129:11
**changes** [2] - 87:24, 97:24
**changing** [1] - 19:20
**characteristics** [6] - 67:22, 68:8, 69:23, 70:2, 91:15, 93:7
**charge** [2] - 7:7, 129:6
**charged** [1] - 7:24
**charges** [6] - 124:18, 125:19, 125:22, 126:2, 126:4, 129:10
**check** [3] - 134:22, 134:23, 136:5
**checked** [1] - 58:15
**Cherry** [1] - 9:3
**chief** [2] - 7:4, 107:15
**China** [2] - 6:15, 86:17
**choice** [4] - 129:4, 129:23, 131:8, 131:10
**choose** [3] - 127:20, 128:2, 130:1
**chose** [3] - 127:20, 128:5, 128:7
**Chris** [1] - 11:17
**Christopher** [1] - 1:19
**christopher.magnani@usdoj.gov** [1] - 1:24

**Circuit** [1] - 6:4
**claim** [1] - 7:5
**claims** [5] - 7:12, 12:12, 12:24, 33:5, 123:1
**clarification** [5] - 11:25, 14:8, 14:11, 14:25, 16:5
**clarify** [1] - 107:1
**clarifying** [1] - 65:6
**classic** [5] - 69:6, 73:15, 73:17, 74:15, 75:6
**classically** [1] - 69:10
**clean** [1] - 88:14
**clear** [10] - 11:23, 45:11, 47:1, 47:2, 50:9, 53:20, 69:13, 108:13, 121:19, 121:20
**clearly** [2] - 5:10, 104:23
**clerk** [1] - 52:17
**clerked** [1] - 6:3
**clever** [1] - 22:9
**client** [2] - 4:25, 16:11
**clients** [10] - 6:24, 7:1, 7:19, 7:24, 10:12, 16:18, 25:7, 34:12, 42:2, 42:18
**clients'** [2] - 7:12, 12:12
**Clinic** [2] - 72:6, 72:25
**clinical** [13] - 48:22, 49:21, 49:22, 56:18, 58:3, 58:5, 67:18, 69:3, 70:2, 71:22, 78:22, 108:22, 122:6
**clinically** [1] - 67:24
**clip** [13] - 14:20, 14:21, 21:20, 23:11, 23:25, 27:20, 28:16, 29:20, 119:5, 119:8, 126:13, 128:9, 128:12
**clips** [2] - 10:23, 12:5, 128:19
**close** [2] - 58:24, 120:15
**closed** [6] - 60:21, 60:24, 61:16, 64:2, 64:13, 65:1
**co** [1] - 9:9
**CO** [1] - 9:10
**co-conspirators** [1] - 9:9
**coauthor's** [1] - 116:22
**code** [5] - 17:14, 17:18, 18:3, 18:19, 21:9
**codes** [12] - 17:12, 17:21, 17:25, 18:2, 18:5, 18:10, 18:17, 19:21, 21:4, 21:16, 22:11
**cognitive** [50] - 13:21, 13:24, 14:1, 36:24, 68:15, 71:9, 73:10, 75:5, 76:25, 77:2, 78:23, 79:12, 79:13, 79:25, 80:2, 80:3, 80:6, 80:8, 80:13, 80:16, 80:17, 80:20, 80:21, 80:22, 80:25, 81:3, 81:4, 81:6, 81:14, 81:17, 81:19, 81:22, 81:25, 82:3, 82:4, 82:6, 82:11, 82:19, 82:21, 83:15, 83:19, 83:20, 83:25, 84:6, 84:11, 85:19, 87:5, 87:10, 100:15, 126:23
**Cohen** [1] - 9:2
**cold** [1] - 39:23
**colleague** [3] - 15:2, 29:16, 40:9
**collectively** [1] - 8:4
**College** [2] - 54:18, 59:23
**college** [2] - 61:1, 61:2

PM 2-144

**college'** [1] - 60:21
**colored** [1] - 99:9
**combination** [1] - 118:16
**combine** [1] - 117:24
**combined** [8] - 118:5, 118:8, 118:9, 118:10, 118:24, 120:19, 120:24
**coming** [3] - 51:1, 75:14, 137:16
**comment** [1] - 51:15
**commission** [1] - 41:23
**commodities** [1] - 107:16
**common** [6] - 68:17, 71:16, 71:19, 74:11, 77:10, 114:8
**commonly** [1] - 84:4
**communicating** [1] - 81:21
**companies** [1] - 7:19
**company** [7] - 6:23, 7:4, 7:15, 10:17, 29:10, 42:14, 137:25
**comparator** [1] - 97:18
**compare** [5] - 36:10, 96:20, 96:22, 97:3, 99:1
**compared** [2] - 94:6, 98:11
**comparing** [3] - 97:5, 97:15, 97:22
**comparison** [5] - 8:8, 66:1, 98:24, 114:18, 119:8
**competence** [1] - 132:23
**competency** [10] - 12:11, 12:22, 53:20, 54:2, 112:9, 124:24, 125:3, 126:11, 126:12, 126:15
**COMPETENCY** [1] - 1:9
**competent** [5] - 12:15, 43:6, 46:6, 46:16
**competing** [2] - 25:16, 81:3
**competition** [1] - 26:8
**competitive** [2] - 7:7, 7:24
**competitor** [2] - 7:4, 16:12
**competitors** [1] - 8:12
**complain** [1] - 68:18
**complaint** [1] - 68:15
**completely** [4] - 105:5, 106:14, 123:4, 127:23
**completion** [1] - 62:6
**complex** [3] - 123:9, 123:25, 124:2
**compliance** [1] - 64:16
**complicated** [1] - 125:24
**component** [2] - 7:18, 25:7, 68:21
**comprised** [2] - 34:14, 35:16
**computer** [4] - 2:16, 121:23, 121:24, 121:25
**computer-assisted** [1] - 2:16
**concentration** [12] - 62:23, 62:24, 63:3, 63:4, 63:7, 63:9, 63:15, 63:17, 64:1, 64:22, 68:20, 71:5
**concentrations** [3] - 62:20, 63:1, 64:7
**concern** [5] - 127:12, 127:18, 129:12, 129:20, 137:13
**concerned** [1] - 137:11
**concerning** [2] - 89:3, 137:16
**concerns** [6] - 14:1, 74:2, 127:2, 127:13, 127:15, 128:5
**concluded** [4] - 21:5, 30:19, 124:14,

131:4
**conclusion** [1] - 83:12
**conclusions** [6] - 49:1, 49:2, 50:1, 50:2, 93:10, 111:18
**condition** [7] - 13:5, 34:3, 34:5, 40:14, 40:16, 71:7, 93:4
**conditions** [3] - 40:23, 62:7, 74:4
**conduct** [1] - 98:24
**conducted** [4] - 93:13, 102:7, 126:25, 127:14
**confer** [2] - 86:24, 111:4
**conferences** [1] - 136:1
**confers** [1] - 134:25
**confessed** [1] - 122:21
**confident** [1] - 124:2
**confirm** [1] - 41:5
**confirmed** [3] - 6:6, 32:4, 32:9
**confront** [1] - 76:10
**confused** [2] - 30:11, 92:23
**confusion** [6] - 91:1, 91:13, 91:17, 91:19, 91:20
**connect** [1] - 91:25
**connected** [1] - 50:23
**connection** [2] - 42:8, 42:20
**consider** [8] - 12:13, 67:14, 68:3, 70:13, 70:17, 75:10, 87:5, 90:16
**considerable** [1] - 101:9
**consideration** [1] - 87:7
**considered** [4] - 12:10, 77:6, 77:20, 98:3
**considering** [1] - 47:4
**consistent** [4] - 39:12, 103:15, 103:20
**consists** [1] - 21:21
**conspiracy** [3] - 7:6, 7:25, 25:15
**conspirators** [1] - 9:9
**constellation** [1] - 24:11
**contained** [1] - 23:13
**content** [1] - 51:1
**context** [15] - 10:14, 51:4, 51:5, 79:21, 91:19, 100:20, 105:23, 106:1, 106:21, 106:24, 107:1, 108:9, 108:22, 109:2, 109:4
**contingency** [1] - 41:10
**continue** [2] - 16:20, 59:13
**continued** [1] - 61:11
**continues** [2] - 35:14, 96:11
**continuing** [2] - 35:13, 44:9
**contract** [1] - 15:15
**contracted** [1] - 15:23
**contractor** [2] - 20:9, 20:11
**control** [3] - 97:16, 97:23, 114:24
**controlling** [1] - 35:15
**conversant** [3] - 39:19, 39:21, 39:25
**conversation** [6] - 20:6, 26:18, 26:22, 27:1, 27:2, 50:25
**conversations** [3] - 41:20, 135:16, 137:11
**conversion** [6] - 17:3, 17:7, 17:9, 18:10, 19:19, 20:24

**conversions** [1] - 19:16
**converted** [1] - 17:4
**converting** [1] - 18:25
**coordinate** [1] - 9:9
**coordinated** [1] - 7:6
**copy** [5] - 52:14, 76:7, 84:23, 88:14, 89:1
**core** [1] - 33:4
**Corey** [1] - 1:18
**corey.smith@usdoj.gov** [1] - 1:23
**correct** [106] - 27:5, 27:7, 27:17, 31:19, 31:24, 32:25, 33:9, 33:24, 35:1, 36:21, 37:3, 37:8, 37:10, 38:9, 40:3, 42:8, 43:8, 44:23, 45:7, 46:6, 48:2, 48:15, 48:20, 48:23, 49:3, 49:6, 50:16, 52:5, 52:10, 53:8, 53:21, 53:24, 54:2, 54:12, 54:15, 54:22, 55:22, 55:23, 56:1, 56:21, 56:24, 57:2, 57:5, 57:6, 57:12, 57:17, 59:25, 61:6, 62:4, 62:18, 64:24, 64:25, 65:20, 67:12, 68:22, 68:24, 71:17, 73:6, 73:11, 77:19, 77:22, 77:23, 78:14, 78:18, 78:24, 80:18, 83:4, 86:6, 89:5, 89:6, 90:18, 91:18, 93:14, 93:18, 94:3, 94:8, 94:13, 95:13, 95:15, 95:17, 97:23, 100:19, 101:13, 102:9, 107:7, 109:1, 111:23, 115:16, 116:4, 117:13, 117:18, 118:2, 125:2, 126:5, 127:1, 127:7, 127:22, 128:6, 131:13, 131:18, 131:22, 132:5, 132:8, 133:4, 133:12, 139:3
**corrected** [1] - 27:10
**correctly** [3] - 77:15, 97:8, 113:13
**correlate** [1] - 80:11
**correlates** [1] - 80:8
**correspond** [2] - 100:14, 100:18
**corresponded** [1] - 63:20
**corresponding** [1] - 98:19
**counsel** [21] - 9:3, 13:3, 13:10, 13:13, 13:20, 40:7, 58:18, 59:10, 76:6, 86:24, 101:17, 102:1, 103:18, 104:25, 105:13, 105:22, 106:12, 108:13, 108:19, 108:20, 111:4
**counting** [1] - 43:14
**couple** [1] - 59:11
**course** [20] - 8:22, 12:13, 14:17, 20:6, 40:17, 52:15, 69:4, 70:3, 70:8, 71:3, 71:6, 79:18, 82:8, 97:4, 104:24, 113:2, 120:21, 123:7, 133:19
**courses** [4] - 56:4, 56:9, 58:1, 62:21
**Court** [14] - 14:25, 30:6, 49:20, 52:24, 53:5, 89:4, 101:23, 103:16, 103:20, 105:15, 105:16, 134:21, 136:20, 138:3
**court** [13] - 5:25, 21:14, 42:13, 45:3, 45:7, 45:12, 45:18, 47:9, 47:18, 109:20, 129:22, 130:4, 134:25
**COURT** [79] - 1:1, 2:11, 4:7, 4:10, 4:13, 4:16, 5:2, 5:6, 5:12, 14:24, 15:4, 15:7, 16:8, 29:25, 31:3, 38:17, 38:18, 38:25, 39:3, 39:11, 40:22, 41:2, 43:17, 43:19, 43:22, 44:1, 44:4, 44:8, 44:11, 49:17,

PM 2-145

51:19, 51:23, 52:13, 52:16, 52:19,
58:9, 58:18, 58:21, 59:4, 59:9, 59:13,
76:6, 76:14, 76:19, 84:14, 84:16,
89:19, 89:24, 90:4, 90:8, 101:17,
106:18, 107:24, 109:10, 109:19,
110:3, 110:5, 110:17, 110:24, 111:2,
119:6, 133:24, 134:18, 134:22, 135:1,
135:5, 135:10, 135:19, 136:3, 136:9,
136:16, 136:21, 137:9, 137:20, 138:1,
138:6, 138:12, 138:18, 139:1
**Court's** [3] - 12:10, 76:11, 84:15
**courthouse** [1] - 87:11
**courtroom** [1] - 87:11
**courts** [10] - 44:25, 45:1, 45:3, 45:5,
45:16, 45:21, 46:2, 105:17, 105:18
**cover** [4] - 27:3, 29:5, 45:24, 70:19
**covered** [2] - 27:3, 38:8
**covering** [1] - 39:7
**Cox** [2] - 42:14, 42:21
**crazy** [1] - 19:20
**create** [4] - 104:15, 113:23, 113:24,
117:9
**created** [2] - 117:15, 117:19
**credibility** [8] - 45:9, 45:19, 46:3, 46:21,
47:7, 52:8, 53:12, 54:6
**credible** [8] - 45:7, 45:8, 45:18, 45:22,
47:10, 47:18, 47:22, 49:23
**criminal** [2] - 108:10, 135:21
**crippled** [2] - 18:2, 18:17
**critical** [2] - 105:1, 105:3
**cross** [4] - 3:3, 4:10, 4:24, 31:3
**CROSS** [2] - 31:8, 44:18
**cross-examination** [3] - 4:10, 4:24,
31:3
**CROSS-EXAMINATION** [2] - 31:8,
44:18
**CRR** [2] - 2:12, 139:7
**crucial** [1] - 123:12
**CSR** [1] - 2:12
**cued** [1] - 128:19
**curious** [5] - 27:15, 87:13, 87:22, 88:5,
88:7
**current** [5] - 34:2, 34:4, 70:15, 87:6,
90:16
**customer** [1] - 7:21
**cutoff** [1] - 135:13
**CV** [3] - 57:14, 64:5, 65:4

# D

**daily** [1] - 82:9
**damage** [1] - 85:19
**dance** [1] - 122:24
**Darby** [3] - 70:22, 94:11, 95:19
**Darby's** [1] - 87:8
**dark** [1] - 114:4
**data** [27] - 7:6, 7:8, 7:19, 7:20, 7:25,
9:10, 17:9, 19:16, 21:15, 25:6, 25:9,
25:15, 25:17, 25:18, 26:2, 26:9, 26:10,
30:8, 98:25, 104:21, 112:5, 112:14,

114:19, 114:21, 114:25, 121:24,
126:20
**database** [2] - 7:18, 25:6
**date** [1] - 66:5
**DATE** [1] - 139:6
**dated** [1] - 88:11
**DAY** [1] - 1:13
**day's** [1] - 18:23
**day-to-day** [2] - 79:15, 81:20
**days** [17] - 8:22, 10:8, 13:1, 13:2, 13:6,
13:7, 13:14, 14:18, 40:3, 40:11, 41:7,
72:4, 72:13, 72:15, 73:2, 92:7
**DC** [2] - 1:22, 5:24
**deal** [1] - 51:19
**dealer** [8] - 7:15, 16:14, 17:5, 22:7,
24:19, 24:22, 24:23, 33:6
**dealers** [6] - 7:18, 7:21, 15:3, 16:16,
24:9, 25:10
**dealership** [13] - 16:18, 16:25, 17:4,
17:13, 17:24, 21:16, 22:7, 24:15,
24:25, 25:2, 25:5
**dealerships** [6] - 7:17, 8:11, 17:22,
21:17, 24:13, 24:16
**dealing** [1] - 103:13
**deals** [1] - 82:7
**death** [1] - 48:10
**December** [2] - 6:7, 32:6
**decide** [3] - 45:3, 45:4, 51:19
**decided** [6] - 15:21, 15:23, 16:24, 18:9,
36:2, 127:24
**decides** [2] - 45:8, 113:18
**deciding** [1] - 52:11
**decision** [2] - 47:17, 49:7
**decisionmaking** [1] - 29:9
**decline** [5] - 76:25, 77:5, 87:5, 87:10,
126:23
**decreased** [1] - 85:18
**defendant** [21] - 6:18, 6:23, 28:6, 46:6,
83:9, 92:7, 92:8, 92:15, 93:4, 102:13,
102:20, 105:24, 108:10, 108:15,
108:19, 111:20, 111:24, 121:23,
127:21, 128:1, 137:23
**DEFENDANT** [2] - 2:1
**Defendant** [1] - 4:5
**defendant's** [8] - 48:19, 60:7, 94:6,
98:16, 105:22, 116:12, 116:13, 137:24
**defendants** [2] - 7:5, 102:18
**defended** [1] - 9:13
**defending** [2] - 8:16, 104:4
**defense** [12] - 76:1, 76:3, 104:19, 105:8,
105:10, 105:20, 108:13, 108:15,
134:10, 135:18, 136:25, 138:4
**Defense** [2] - 116:16, 116:18
**deficiencies** [1] - 36:24
**deficient** [1] - 117:10
**deficits** [3] - 73:11, 75:5, 77:3
**define** [7] - 68:5, 71:3, 80:13, 80:19,
94:19, 129:2, 132:9
**defined** [2] - 80:14, 94:14

**defining** [1] - 68:6
**definitely** [4] - 43:6, 68:21, 87:1, 136:11
**definition** [6] - 68:8, 70:14, 80:16, 81:2,
81:4, 81:5
**definitions** [1] - 81:3
**degeneration** [1] - 96:3
**degree** [10] - 54:12, 55:16, 55:17, 56:6,
56:24, 59:19, 80:3, 81:1, 98:7, 108:20
**degrees** [5] - 54:25, 55:2, 55:6, 55:9,
55:20
**delay** [1] - 62:12
**delirious** [2] - 84:5, 87:25
**delirium** [63] - 34:9, 77:24, 77:25, 78:3,
78:7, 78:21, 78:23, 79:2, 79:4, 79:7,
79:11, 82:14, 82:22, 83:10, 83:11,
83:13, 83:15, 83:18, 83:19, 83:25,
84:1, 84:3, 84:8, 84:11, 85:5, 85:6,
85:13, 85:16, 86:1, 86:4, 87:4, 87:9,
87:14, 87:16, 87:23, 88:3, 88:24, 89:5,
89:7, 89:12, 89:20, 90:2, 90:15, 90:17,
90:21, 91:12, 91:13, 91:15, 91:16,
91:18, 91:23, 91:24, 92:1, 92:3, 92:9,
92:14, 92:16, 92:20, 92:21, 92:24,
126:22
**demand** [1] - 66:20
**dementia** [23] - 37:9, 38:13, 39:8, 68:22,
69:2, 69:9, 69:16, 69:21, 70:6, 71:11,
71:15, 71:16, 75:10, 79:1, 79:6, 86:2,
87:15, 100:18, 100:21, 106:5, 115:20
**dementia-related** [1] - 71:15
**demonstrate** [2] - 131:16, 131:17
**demonstrating** [1] - 125:21
**DENNEY** [24] - 3:5, 44:15, 110:9,
110:13, 110:20, 111:7, 111:11,
119:12, 122:21, 122:23, 123:5,
123:14, 123:21, 124:6, 124:8, 124:11,
128:22, 129:3, 130:8, 130:11, 130:14,
130:19, 131:1, 131:3
**Denney** [9] - 44:22, 47:10, 49:21, 49:25,
53:2, 59:17, 109:13, 111:18, 116:21
**Denney's** [1] - 53:5
**deny** [2] - 82:25, 83:2
**department** [3] - 17:11, 55:21, 55:22
**Department** [1] - 1:20
**depended** [1] - 81:2
**depo** [1] - 33:8
**deponent** [4] - 9:20, 9:23, 10:5, 10:7
**deposed** [7] - 8:17, 8:19, 9:16, 10:1,
36:5, 39:20, 40:2
**deposing** [1] - 37:18
**deposition** [55] - 8:21, 9:7, 11:1, 11:3,
11:13, 11:22, 12:3, 12:14, 12:17,
12:19, 13:1, 14:3, 14:6, 14:13, 14:14,
14:16, 15:1, 15:3, 23:6, 25:19, 27:2,
27:12, 29:2, 29:3, 29:4, 30:4, 30:10,
30:17, 30:19, 33:12, 33:17, 33:23,
34:5, 34:11, 34:13, 34:15, 34:19, 35:1,
35:6, 35:13, 35:21, 35:22, 35:25, 36:4,
36:7, 36:13, 36:16, 37:23, 38:8, 40:13,
41:6, 43:3, 43:7, 43:12, 43:14

**depositions** [9] - 8:14, 8:16, 8:20, 8:24, 9:11, 9:13, 10:19, 10:22, 28:12
**deputy** [3] - 6:6, 6:9, 6:13
**Deputy** [1] - 31:22
**derek** [1] - 4:21
**Derek** [1] - 11:19
**describe** [10] - 6:25, 16:4, 69:5, 69:14, 69:20, 92:14, 108:7, 122:25, 123:2, 125:24
**described** [6] - 54:11, 92:22, 93:8, 94:11, 103:22, 125:2
**describing** [4] - 24:14, 93:6, 106:22, 126:3
**description** [1] - 26:8
**descriptions** [1] - 109:4
**designed** [2] - 122:3, 131:16
**detailed** [1] - 102:7
**details** [8] - 103:10, 103:12, 110:11, 110:14, 111:9, 111:12, 129:9, 131:11
**detect** [2] - 118:23, 119:2
**detecting** [1] - 120:18
**detection** [1] - 116:19
**determination** [3] - 12:11, 12:22, 112:9
**develop** [2] - 87:14, 87:16
**developing** [1] - 66:2
**development** [1] - 96:1
**develops** [1] - 87:23
**deviation** [2] - 94:22, 94:25
**deviations** [6] - 94:11, 94:20, 94:25, 95:8, 95:10, 95:13
**diagnose** [1] - 36:24
**diagnosed** [2] - 93:5
**diagnoses** [1] - 40:23
**diagnosing** [1] - 38:21
**diagnosis** [1] - 39:17
**die** [2] - 96:11, 96:12
**Dietz** [2] - 66:22, 112:7
**differed** [1] - 48:18
**difference** [5] - 46:18, 66:12, 69:1, 70:5, 112:21
**different** [29] - 33:18, 46:25, 54:19, 61:19, 63:22, 69:3, 69:4, 69:22, 73:14, 73:24, 73:25, 74:3, 74:12, 74:13, 74:14, 74:17, 74:18, 74:19, 74:21, 75:1, 75:11, 77:16, 88:4, 96:22, 108:11, 126:11, 126:12, 127:17, 131:7
**differentiating** [1] - 88:8
**differently** [2] - 73:22, 106:7
**differing** [1] - 69:23
**difficult** [2] - 68:18, 82:9
**difficulties** [5] - 71:5, 71:8, 73:9, 79:15, 79:17
**difficulty** [1] - 73:8
**dig** [1] - 103:9
**digging** [1] - 85:23
**digit** [2] - 17:14, 17:15
**digits** [1] - 9:15
**diligent** [1] - 23:3
**Direct** [2] - 3:3, 3:6

**direct** [7] - 8:10, 46:15, 54:8, 68:11, 77:25, 88:23, 93:8
**DIRECT** [1] - 5:16
**directed** [2] - 62:23, 62:25
**directly** [3] - 80:8, 80:10, 80:11
**director** [11] - 57:15, 57:19, 58:16, 62:17, 62:19, 63:14, 63:16, 63:25, 64:7, 64:20, 64:21
**disability** [1] - 48:15
**disappointed** [1] - 15:14
**disaster** [1] - 17:7
**disclose** [2] - 90:17, 93:20
**disclosed** [1] - 88:24
**discloses** [2] - 91:12, 92:3
**discounted** [2] - 106:14, 108:23
**discovery** [7] - 8:9, 8:18, 22:14, 22:22, 23:1, 35:3, 43:11
**discuss** [2] - 78:3, 90:21
**discussed** [8] - 11:22, 12:3, 50:18, 50:19, 54:8, 54:25, 70:21, 129:14
**discussing** [3] - 22:2, 59:17, 85:20
**discussion** [1] - 38:6
**disease** [48] - 67:12, 67:15, 67:22, 67:25, 68:2, 68:4, 68:16, 68:22, 68:23, 68:25, 69:2, 69:7, 69:8, 69:11, 69:15, 69:16, 69:22, 70:4, 70:8, 70:12, 70:13, 71:6, 71:10, 71:14, 73:6, 73:11, 73:13, 73:15, 73:20, 73:22, 74:3, 75:6, 75:16, 75:17, 76:23, 76:24, 77:2, 77:17, 77:21, 79:18, 79:22, 87:10, 95:20, 95:23, 96:4, 96:8
**diseases** [1] - 37:12
**disorder** [4] - 69:24, 101:25, 103:17, 106:9
**disparate** [1] - 112:4
**dispute** [1] - 40:18
**disputing** [1] - 41:5
**disregarding** [2] - 49:1, 50:1
**disrespect** [2] - 58:6, 104:18
**disruption** [5] - 96:8, 96:11, 96:15, 96:17
**distinction** [3] - 112:19, 112:24, 113:2
**distinguish** [1] - 69:15
**distort** [1] - 103:3
**distributed** [1] - 28:4
**district** [3] - 7:3, 129:22, 130:4
**DISTRICT** [3] - 1:1, 1:1, 1:12
**District** [10] - 50:16, 107:16, 130:5, 130:6, 130:9, 130:16, 130:17, 130:18, 130:20, 130:23
**divided** [1] - 29:17
**division** [5] - 108:4, 130:19, 130:22, 130:24
**DIVISION** [1] - 1:2
**Division** [1] - 1:20
**DMS** [6] - 24:10, 24:12, 24:15, 24:16, 24:19, 24:22
**doctor** [8] - 37:2, 44:8, 54:24, 55:2, 55:5, 55:17, 56:23, 134:9
**doctors** [4] - 58:25, 59:1, 134:8, 134:10

**document** [16] - 22:15, 22:17, 22:18, 23:9, 25:18, 25:21, 26:3, 26:10, 88:14, 98:17, 129:16, 129:20, 137:3, 137:12, 137:22
**documents** [8] - 10:13, 25:23, 38:8, 38:10, 40:1, 58:8, 102:16, 102:21
**docuPAD** [1] - 24:13
**dollars** [1] - 8:5
**domain** [1] - 129:18
**done** [9] - 17:17, 21:13, 23:3, 66:20, 89:8, 113:15, 114:9, 124:12, 135:23
**doors** [9] - 60:22, 60:24, 61:4, 61:11, 61:16, 64:2, 64:13, 65:1, 72:24
**dose** [1] - 86:3
**dot** [2] - 99:17, 100:3
**dots** [1] - 91:25
**doubt** [1] - 111:24
**Dow** [1] - 7:2
**down** [7] - 50:4, 99:15, 100:5, 101:2, 109:21, 113:17, 126:18
**downstairs** [1] - 134:16
**downward** [1] - 77:22
**dozens** [1] - 8:14
**DR** [22] - 110:9, 110:13, 110:20, 111:7, 111:11, 119:12, 122:21, 122:23, 123:5, 123:14, 123:21, 124:6, 124:8, 124:11, 128:22, 129:3, 130:8, 130:11, 130:14, 130:19, 131:1, 131:3
**Dr** [18] - 44:22, 47:10, 49:21, 49:25, 53:2, 53:5, 59:17, 66:22, 70:22, 87:8, 94:11, 95:19, 109:13, 111:18, 112:7, 121:13, 121:25, 122:15
**dramatically** [1] - 17:18
**drawing** [1] - 111:18
**drink** [1] - 98:9
**due** [2] - 67:17, 91:4
**duly** [1] - 5:15
**duper** [1] - 68:10
**during** [13] - 14:3, 14:13, 27:4, 30:4, 30:10, 40:23, 63:4, 64:6, 88:24, 111:20, 133:10, 133:14, 133:19
**duty** [1] - 35:17
**DX-58** [1] - 85:2
**dysfunction** [2] - 75:18, 77:3

# E

**E-L-K-A** [1] - 5:21
**e-mail** [6] - 23:9, 23:18, 23:21, 134:13, 137:4
**e-mails** [5] - 10:14, 22:22, 22:24, 22:25, 23:19
**e.g** [1] - 77:3
**earliest** [2] - 38:10, 96:10
**early** [11] - 25:19, 71:7, 73:11, 74:5, 75:5, 77:4, 96:15, 100:23, 102:23, 104:23, 106:5
**early/mild** [2] - 100:22, 100:23
**easier** [1] - 116:14
**easily** [1] - 115:8

PM 2-147

**Eastern** [5] - 50:16, 130:5, 130:8, 130:16, 130:18
**easy** [3] - 17:2, 115:16, 115:17
**eating** [1] - 91:9
**ECST** [2] - 126:6, 127:18
**ECST-R** [2] - 126:6, 127:18
**EDNY** [1] - 53:13
**educational** [2] - 54:8, 59:18
**effect** [1] - 88:2
**effects** [3] - 83:12, 83:13, 84:11
**eight** [1] - 72:15
**either** [5] - 41:15, 51:24, 64:8, 95:12, 137:15
**elderly** [4] - 79:10, 84:3, 85:6, 85:14
**ELMO** [6] - 31:5, 88:14, 88:20, 109:12, 116:17, 128:16
**elsewhere** [2] - 89:7, 90:2
**EM** [1] - 5:21
**Email** [4] - 1:23, 1:23, 2:5, 2:9
**emphasize** [1] - 22:3
**encompassed** [1] - 105:13
**end** [4] - 13:3, 23:7, 111:2, 134:3
**ended** [2] - 40:5, 127:5
**ending** [1] - 26:11
**English** [1] - 55:21
**enter** [1] - 21:15
**entered** [1] - 121:24
**enterprise** [1] - 7:16
**Enterprise** [1] - 24:24
**entire** [1] - 71:6
**entitled** [1] - 139:4
**entity** [1] - 71:4
**environment** [2] - 6:16, 18:1
**episode** [5] - 87:9, 90:15, 90:17, 91:12, 92:1
**episodes** [6] - 78:3, 78:7, 78:22, 82:21, 84:7, 87:4
**equates** [1] - 82:18
**equivocal** [2] - 116:10, 118:12
**equivocating** [1] - 117:14
**erroneous** [1] - 30:13
**error** [3] - 101:9, 101:11, 101:12
**ESI** [1] - 22:22
**especially** [1] - 22:18
**establishing** [1] - 131:21
**etiology** [1] - 85:24
**Eugene** [1] - 27:13
**evaluate** [2] - 72:20, 104:17
**evaluated** [1] - 68:1
**evaluating** [1] - 120:8
**evaluation** [4] - 114:15, 114:17, 122:15, 128:3
**evaluations** [1] - 72:10
**Evan** [3] - 11:17, 11:24, 38:5
**event** [1] - 34:25
**events** [6] - 25:25, 26:14, 38:9, 39:7, 39:22, 129:19
**eventually** [1] - 75:18
**Everett** [1] - 61:2

**Evidence** [1] - 68:8
**evidence** [7] - 47:4, 48:25, 49:2, 49:25, 50:2, 103:8
**evidenced** [1] - 117:10
**evidences** [1] - 132:20
**evolves** [1] - 74:8
**evolving** [1] - 70:3
**exact** [2] - 18:8, 127:9
**exactly** [8] - 26:22, 58:14, 61:10, 61:23, 86:5, 115:18, 124:13, 132:9
**exaggerate** [2] - 113:18, 114:4
**exaggerated** [1] - 108:19
**exaggerating** [5] - 104:23, 105:24, 106:3, 113:22, 132:8
**exaggeration** [4] - 104:25, 105:12, 109:3, 118:23
**examination** [4] - 4:10, 4:24, 31:3, 40:10, 44:9, 112:1, 112:3, 112:25
**EXAMINATION** [3] - 5:16, 31:8, 44:18
**examiner** [3] - 27:5, 104:16, 105:4
**example** [2] - 83:9, 83:18
**examples** [1] - 103:4
**excerpts** [1] - 10:21
**excluding** [1] - 95:10
**excuse** [2] - 24:21, 76:6
**executive** [5] - 75:5, 75:7, 75:13, 75:17, 77:3
**executives** [2] - 9:17, 26:7
**exemption** [1] - 62:12
**exercise** [3] - 48:22, 122:6, 127:4
**exercising** [1] - 78:21
**exhibit** [12] - 21:20, 23:12, 23:13, 23:25, 24:1, 27:21, 28:17, 29:21, 29:22, 98:16, 109:18
**Exhibit** [8] - 101:16, 101:22, 102:5, 109:16, 110:4, 116:16, 116:18, 128:11
**exhibited** [1] - 37:11
**exhibits** [2] - 10:20, 10:22
**exist** [4] - 54:17, 54:19, 54:21, 92:18
**existed** [4] - 59:20, 59:24, 61:6, 61:9
**exists** [2] - 64:24
**expect** [4] - 83:7, 102:14, 110:13, 111:11
**expected** [3] - 19:1, 110:9, 111:7
**experience** [6] - 19:17, 19:19, 30:5, 37:13, 69:25, 104:7
**experienced** [2] - 78:7, 126:22
**experiences** [1] - 62:22
**experiencing** [1] - 92:8
**expert** [14] - 37:15, 37:16, 37:21, 38:20, 46:25, 67:14, 67:16, 68:3, 68:6, 68:9, 70:13, 70:16, 70:18, 88:11
**expertise** [2] - 38:21, 107:21
**experts** [4] - 8:14, 45:22, 47:3, 104:9
**explain** [1] - 28:3
**explained** [5] - 21:10, 38:7, 53:5, 113:8, 113:10
**exploring** [5] - 80:15, 82:10, 82:12, 85:16, 85:20

**express** [1] - 137:12
**expressed** [1] - 133:18
**expressing** [1] - 126:4
**extent** [2] - 102:14, 138:4
**extra** [3] - 56:9, 79:18, 125:9
**eye** [1] - 105:3
**eyes** [1] - 33:20
**eyesight** [1] - 17:5

## F

**face** [2] - 114:23
**face-to-face** [1] - 114:23
**facies** [1] - 69:12
**facing** [1] - 8:5
**fact** [8] - 16:18, 50:19, 51:5, 51:21, 57:14, 88:24, 89:5, 114:25
**factor** [4] - 79:2, 79:7, 79:9, 79:10
**factors** [1] - 79:4
**facts** [4] - 27:6, 102:14, 103:5, 126:2
**factual** [6] - 42:3, 125:6, 126:24, 131:17, 131:22, 132:23
**fail** [2] - 132:19, 132:20
**failed** [5] - 16:13, 16:19, 22:8, 53:2, 90:17
**fails** [3] - 132:4, 132:7
**fair** [16] - 11:21, 12:1, 33:23, 39:19, 43:5, 44:25, 63:14, 66:10, 66:11, 72:15, 86:20, 87:3, 106:13, 109:2, 111:21, 131:9
**faith** [1] - 42:19
**fakers** [4] - 118:1, 119:2, 120:18, 122:4
**falling** [1] - 104:25
**falls** [1] - 103:23
**false** [2] - 30:13, 108:14
**familiar** [5] - 48:3, 75:21, 82:23, 84:19, 105:19
**family** [2] - 63:2, 91:4
**far** [7] - 65:25, 70:2, 79:4, 94:17, 94:20, 124:9, 134:1
**faster** [3] - 70:3, 70:7, 98:9
**favorable** [1] - 103:6
**feature** [3] - 73:5, 77:1, 77:5
**Federal** [1] - 68:7
**federal** [7] - 34:14, 35:16, 41:22, 42:13, 45:6, 45:18, 46:21
**feedback** [1] - 133:11
**feigned** [1] - 116:19
**fell** [1] - 94:7
**few** [9] - 11:9, 23:8, 23:23, 27:6, 27:17, 30:3, 37:25, 59:17
**fibrillation** [1] - 40:18
**field** [3] - 65:20, 66:7
**fields** [1] - 65:21
**fifth** [1] - 28:16
**fifty** [1] - 21:22
**Fifty** [1] - 116:16
**fights** [1] - 22:18
**figure** [4] - 20:3, 39:3, 46:24, 91:25

**filed** [4] - 41:13, 42:23, 89:4, 130:23
**filter** [1] - 117:25
**finally** [2] - 18:4, 26:3
**finance** [1] - 24:7
**financial** [1] - 29:19
**financials** [1] - 29:14
**findings** [2] - 52:8, 100:20
**fine** [5] - 5:8, 101:18, 130:15, 135:3, 136:10
**finish** [2] - 119:5, 134:5
**fire** [1] - 19:25
**firm** [10] - 4:22, 5:23, 9:1, 9:2, 31:21, 41:10, 41:14, 41:18, 41:20, 41:23
**first** [28] - 5:2, 8:6, 14:20, 15:1, 16:25, 19:21, 21:8, 22:3, 23:11, 27:21, 28:17, 29:22, 41:13, 56:10, 57:21, 58:1, 62:15, 68:15, 73:7, 73:15, 73:18, 119:17, 127:13, 128:15, 130:4, 130:22, 137:18
**fits** [2] - 97:17
**five** [7] - 8:15, 9:25, 32:7, 58:1, 121:1, 121:2, 121:5
**flag** [3] - 4:21, 136:19, 138:3
**flesh** [1] - 127:11
**floor** [1] - 31:16
**focus** [1] - 89:10
**focused** [5] - 48:25, 49:25, 55:18, 90:6, 132:1
**folks** [1] - 19:24
**followed** [2] - 54:20, 61:25
**following** [1] - 90:20
**follows** [8] - 5:15, 15:9, 16:22, 44:17, 110:8, 111:6, 122:20, 128:21
**Footnote** [1] - 49:20
**footnote** [1] - 52:23
**FOR** [3] - 1:1, 1:17, 2:1
**force** [1] - 107:16
**forced** [2] - 131:8, 131:10
**forced-choice** [2] - 131:8, 131:10
**Ford** [1] - 24:14
**foregoing** [1] - 139:2
**forehead** [1] - 33:21
**foreign** [1] - 114:22
**forensic** [9] - 49:23, 57:25, 63:3, 63:9, 63:17, 67:10, 104:16, 105:4, 112:19
**Forest** [15] - 55:1, 55:3, 55:4, 55:14, 56:1, 56:5, 56:13, 57:3, 57:15, 57:20, 62:2, 64:1, 64:7, 64:23, 65:11
**forest** [1] - 62:17
**forest's** [1] - 64:9
**forever** [1] - 18:6
**forgiveness** [1] - 18:24
**forgotten** [1] - 61:9
**form** [1] - 98:25
**formed** [1] - 70:1
**former** [3] - 34:14, 35:16, 137:24
**formulate** [1] - 10:10
**formulation** [1] - 108:22
**forth** [2] - 20:11, 23:18

**forwards** [1] - 39:24
**foundation** [1] - 61:12
**four** [6] - 21:21, 58:1, 70:7, 72:4, 72:12, 72:15
**Fourth** [1] - 6:4
**fourth** [1] - 21:21
**Francisco** [1] - 130:24, 131:2
**frankly** [1] - 22:21
**fraud** [1] - 107:16
**freestanding** [1] - 53:7
**frequently** [2] - 68:14, 68:17
**Friday** [2] - 135:23, 136:22
**front** [2] - 75:18, 75:19
**frontal** [2] - 75:14, 101:1
**frontal-type** [1] - 75:14
**frontotemporal** [1] - 75:10
**frustrated** [1] - 133:16
**frustration** [1] - 133:19
**FTC** [3] - 41:24, 41:25, 42:4
**FTC's** [1] - 42:3
**fulfilled** [1] - 123:16
**full** [7] - 5:19, 10:22, 57:23, 64:13, 74:9, 134:13, 137:17
**full-blown** [1] - 74:9
**fully** [2] - 70:1, 113:24
**function** [2] - 75:5, 75:7
**functioning** [7] - 48:19, 79:14, 79:15, 80:1, 80:4, 80:15, 82:9

## G

**gain** [1] - 113:22
**gallery** [1] - 70:23
**Garaufis** [3] - 47:19, 52:11, 53:13
**Garrett** [2] - 11:18, 11:24
**geared** [1] - 63:9
**general** [8] - 9:3, 41:15, 65:23, 70:9, 77:5, 96:20, 97:5, 97:18
**General** [1] - 108:3
**generally** [6] - 28:12, 66:8, 73:8, 75:8, 123:8, 133:13
**generals** [1] - 41:17
**generate** [2] - 121:6, 121:10
**genuine** [11] - 114:5, 115:15, 115:25, 117:2, 117:18, 118:1, 121:6, 121:10, 122:5, 122:7, 122:12
**GEORGE** [1] - 1:11
**Gibbs** [1] - 9:1
**gist** [1] - 7:5
**given** [7] - 32:6, 37:12, 42:3, 63:23, 70:14, 105:4, 106:13
**GMAT** [1] - 56:16
**GMIP** [3] - 117:8, 117:16, 121:12
**GMIPs** [3] - 117:3, 117:12, 117:19
**goal** [1] - 17:22
**government** [14] - 4:14, 4:18, 31:16, 32:20, 37:25, 52:24, 53:1, 75:25, 98:17, 123:1, 135:3, 135:16, 137:1, 137:19

**GOVERNMENT** [1] - 1:17
**Government's** [7] - 90:11, 101:16, 101:22, 102:5, 109:15, 110:4, 128:11
**government's** [5] - 37:21, 39:6, 88:13, 88:21, 134:8
**graduate** [8] - 56:17, 67:21, 115:9, 115:11, 115:12, 115:22, 115:23, 119:3
**graduated** [4] - 6:2, 57:3, 57:9, 65:11
**grain** [2] - 104:1, 105:7
**graph** [2] - 99:13, 99:18
**grateful** [1] - 59:3
**GRE** [3] - 56:13, 56:14, 56:18
**great** [3] - 84:3, 110:3, 138:17
**green** [2] - 116:1, 122:10
**Green** [1] - 120:25
**green's** [1] - 121:25
**gross** [1] - 109:3
**grossly** [2] - 104:23, 105:24
**ground** [1] - 14:9
**group** [5] - 16:10, 19:9, 19:19, 22:7, 57:20
**groups** [1] - 16:10
**grow** [1] - 133:15
**grudging** [1] - 10:2
**guard** [1] - 113:16
**guess** [9] - 38:18, 67:7, 68:5, 93:20, 99:10, 113:11, 130:3, 130:8, 130:10, 131:1
**guessing** [3] - 130:13, 130:14, 138:12
**Guilmette's** [2] - 121:13, 122:15
**gulley** [1] - 8:25
**guts** [1] - 25:2
**guy** [1] - 19:23
**guys** [8] - 20:4, 58:24, 76:17, 98:13, 136:16, 137:20, 138:7, 138:8
**GX-4A** [1] - 109:18

## H

**half** [9] - 13:7, 13:8, 18:23, 22:25, 23:7, 40:2, 40:4, 95:11, 102:15
**hallucination** [1] - 30:5
**hallucinations** [1] - 70:1
**hand** [3] - 5:3, 20:3, 52:17
**handle** [1] - 81:9
**hands** [1] - 35:19
**hang** [1] - 89:24
**HANKS** [1] - 1:11
**Hansen** [4] - 4:22, 5:23, 6:5, 6:8, 31:19
**happy** [5] - 18:22, 76:10, 76:15, 76:18, 137:19
**hard** [8] - 16:16, 22:8, 22:10, 24:9, 82:2, 115:2, 117:22, 135:13
**harder** [1] - 114:21
**hardware** [1] - 21:2
**Haute** [1] - 48:5
**head** [3] - 47:25, 53:16, 120:16
**heading** [1] - 88:17
**headquarters** [1] - 17:6

**health** [10] - 13:17, 13:19, 13:21, 14:1, 34:2, 34:5, 34:10, 34:16, 40:14, 104:9
**healthy** [1] - 80:25
**hear** [7] - 5:8, 5:10, 15:5, 38:17, 46:23, 104:14, 137:12
**heard** [6] - 20:24, 70:22, 82:16, 87:8, 95:19, 103:4
**HEARING** [1] - 1:9
**hearing** [7] - 11:14, 11:16, 35:4, 134:2, 135:12, 135:21, 137:18
**heart** [4] - 13:4, 13:12, 13:16, 40:16
**held** [2] - 35:14, 35:18
**help** [7] - 19:8, 31:17, 102:16, 103:2, 123:16, 127:11, 135:6
**helped** [1] - 22:13
**helpful** [2] - 57:13, 134:20
**helping** [1] - 102:19
**helps** [2] - 22:12, 135:9
**hemisphere** [1] - 6:15
**Hendrick** [8] - 16:9, 17:20, 18:9, 19:6, 19:9, 20:2, 20:15, 21:16
**Hendrick's** [1] - 17:6
**hero** [1] - 20:3
**high** [8] - 12:21, 79:14, 80:1, 80:4, 80:15, 103:10, 118:13, 118:14
**high-functioning** [3] - 80:1, 80:4, 80:15
**high-stakes** [1] - 12:21
**higher** [1] - 83:24
**highlight** [2] - 4:23, 102:22
**highlighted** [3] - 12:4, 85:25, 116:25
**highlighter** [1] - 116:14
**highly** [1] - 86:1
**himself** [1] - 30:22
**hippocampus** [2] - 99:11, 99:16
**hire** [1] - 104:8
**history** [2] - 70:15, 91:4
**hit** [1] - 114:6
**Ho** [2] - 4:21, 11:19
**ho** [2] - 4:22, 5:7
**HO** [1] - 5:11
**home** [4] - 72:18, 72:20, 73:3
**honestly** [2] - 30:22, 108:20
**Honor** [37] - 4:9, 4:11, 4:18, 4:20, 5:11, 5:13, 10:18, 21:20, 29:20, 31:4, 38:15, 40:20, 43:21, 43:24, 44:14, 49:15, 51:13, 52:1, 52:15, 52:21, 53:18, 59:12, 76:11, 84:13, 107:23, 109:7, 110:22, 124:22, 133:22, 134:6, 134:12, 135:4, 135:14, 135:15, 135:24, 136:14, 136:18
**HONORABLE** [1] - 1:11
**hopefully** [1] - 66:21
**Hospital** [1] - 90:24
**hospital** [1] - 92:19
**hospitalization** [9] - 88:22, 88:25, 89:3, 90:18, 90:20, 90:23, 92:6, 92:17, 92:20
**hospitalizations** [4] - 78:13, 78:16, 88:18, 90:12

**hospitalized** [2] - 34:8, 78:8
**hospitals** [1] - 66:19
**hour** [2] - 29:22, 29:23
**hourly** [1] - 41:10
**hours** [4] - 13:7, 13:8, 23:7, 40:4
**HOUSTON** [1] - 1:2
**Houston** [5] - 2:4, 2:13, 9:1, 78:13, 90:24
**houston** [1] - 1:4
**HR** [1] - 25:2

# I

**idea** [5] - 19:20, 119:16, 130:7, 130:25
**identification** [1] - 60:7
**identify** [2] - 38:25, 118:21
**identifying** [1] - 37:5
**ignoring** [2] - 49:1, 50:1
**ill** [1] - 87:25
**Illinois** [1] - 7:3
**immediately** [1] - 104:15
**impact** [2] - 112:4, 112:8
**impacted** [1] - 39:9
**impaired** [7] - 114:1, 114:18, 114:19, 117:2, 117:15, 117:18, 121:7
**impairment** [12] - 73:5, 77:1, 100:15, 114:20, 115:15, 115:25, 116:19, 118:1, 121:11, 122:5, 122:7, 122:12
**implausible** [1] - 121:12
**implicate** [1] - 4:24
**imply** [1] - 96:18
**importance** [1] - 104:17
**important** [15] - 9:7, 9:11, 17:11, 57:12, 62:4, 78:20, 87:4, 90:15, 93:3, 93:9, 94:5, 102:22, 114:15, 125:15, 129:10
**importantly** [1] - 102:15
**imprecise** [1] - 99:20
**impressive** [1] - 27:1
**IN** [1] - 1:1
**inappropriate** [1] - 120:12
**incentive** [1] - 18:21
**include** [3] - 90:19, 92:11, 94:12
**income** [1] - 28:4
**increase** [1] - 117:25
**INDEX** [1] - 3:1
**Indiana** [1] - 48:6
**indicate** [2] - 122:3, 122:4
**indicated** [5] - 52:25, 90:24, 91:2, 91:3, 136:1
**indication** [7] - 101:25, 103:17, 106:2, 106:10, 106:25, 108:25
**indicted** [3] - 120:4, 120:12, 130:5
**indictment** [11] - 125:17, 129:8, 129:9, 129:16, 129:21, 130:22, 131:11, 131:20, 131:22, 132:17, 132:25
**individuals** [2] - 9:16, 80:2
**indulgence** [1] - 84:15
**inevitably** [1] - 71:12
**infection** [8] - 78:8, 79:9, 84:2, 84:4,

87:16, 88:4, 91:1, 91:20
**inferences** [1] - 102:20
**information** [28] - 23:4, 25:3, 25:4, 42:3, 61:17, 92:11, 102:16, 102:17, 103:3, 103:14, 103:21, 104:6, 106:6, 106:14, 106:23, 107:3, 107:6, 107:8, 108:6, 108:8, 108:14, 108:24, 120:6, 120:8, 126:24, 129:13, 135:25
**informative** [1] - 96:21
**initial** [1] - 19:25
**initiate** [1] - 41:23
**initiative** [1] - 17:19
**injury** [3] - 79:24, 104:14, 107:12
**inner** [2] - 29:6, 29:13
**inpatient** [1] - 72:9
**inquiry** [1] - 107:23
**inside** [2] - 17:19, 42:12
**insider** [1] - 107:19
**insight** [1] - 105:21
**install** [1] - 20:14
**installation** [1] - 19:21
**installer** [1] - 20:1
**instance** [1] - 47:21
**instances** [5] - 46:20, 47:11, 75:12, 91:17, 125:11
**instead** [1] - 138:12
**Institute** [18] - 54:14, 55:1, 55:3, 55:4, 55:14, 56:1, 56:5, 56:13, 57:4, 57:15, 60:14, 60:23, 60:25, 62:2, 64:1, 64:7, 64:23, 65:11
**institute** [1] - 55:24
**institute's** [1] - 62:18
**Institute's** [1] - 57:20
**instruct** [1] - 115:10
**instructed** [1] - 115:19
**instructions** [1] - 129:5
**instructs** [1] - 115:18
**instrument** [4] - 124:24, 125:3, 127:9, 127:17
**insult** [4] - 82:1, 82:6, 82:15, 86:3
**insults** [1] - 81:9
**intellectual** [2] - 6:17, 48:15
**intelligence** [2] - 80:9, 80:11
**intent** [1] - 92:2
**interact** [1] - 104:8
**interacted** [2] - 36:20, 36:22
**interacting** [1] - 114:23
**interaction** [4] - 36:6, 36:9, 36:12, 50:12
**interest** [2] - 107:5, 136:2
**interested** [2] - 97:1, 97:4
**interesting** [6] - 19:15, 66:11, 96:20, 97:3, 97:10, 97:12
**interface** [2] - 30:7, 85:5
**internet** [1] - 115:7
**internship** [3] - 62:8, 62:9, 62:10
**interrupt** [1] - 52:20
**interview** [19] - 102:7, 109:8, 109:9, 109:14, 111:20, 111:25, 112:8, 112:14, 112:20, 114:14, 114:16,

PM 2-150

124:23, 125:1, 125:8, 127:7, 127:10, 127:15, 128:9, 128:11
**interviewing** [3] - 112:22, 112:25, 113:2
**interviews** [2] - 36:18, 36:19
**inventory** [3] - 7:22, 7:23, 25:3
**investigating** [1] - 41:25
**investigation** [5] - 23:3, 33:4, 41:16, 41:24, 42:5
**investment** [1] - 6:17
**involved** [9] - 8:12, 51:10, 58:25, 72:8, 74:22, 104:4, 105:9, 123:9
**involves** [1] - 91:16
**irreversible** [1] - 77:22
**IRS** [2] - 38:6, 137:5
**issue** [20] - 8:2, 13:12, 13:17, 22:16, 22:20, 81:12, 82:7, 84:1, 103:23, 103:25, 108:25, 120:13, 121:16, 122:14, 136:19, 137:8, 138:3, 138:4, 138:7, 138:14
**issued** [1] - 15:12
**issues** [7] - 13:17, 13:19, 13:21, 40:1, 71:1, 108:25, 138:9
**itself** [3] - 70:25, 123:25, 129:16

## J

**jacket** [1] - 30:23
**Jackson** [4] - 136:24, 137:4, 137:6, 137:15
**Jackson's** [1] - 137:5
**James** [1] - 2:6
**January** [8] - 8:21, 13:7, 22:22, 32:3, 36:15, 37:18, 37:23, 41:13
**Jason** [2] - 2:2, 31:12
**Jehle** [1] - 116:21
**Jim** [6] - 50:20, 51:2, 51:5, 51:7, 52:4, 136:24
**jloonam@jonesday.com** [1] - 2:9
**job** [6] - 6:12, 17:3, 105:4
**joined** [2] - 6:4, 32:3
**joke** [1] - 32:16
**Jones** [5] - 2:2, 2:7, 50:11, 50:18, 102:8
**journal** [2] - 84:21, 86:8
**journals** [2] - 86:10, 86:20
**JR** [1] - 1:11
**judge** [7] - 45:8, 47:3, 47:12, 47:22, 49:7, 54:6, 114:21
**JUDGE** [1] - 1:12
**Judge** [8] - 6:3, 7:2, 41:5, 47:19, 52:11, 53:13, 59:3, 120:16
**judge's** [1] - 49:4
**judges** [3] - 34:14, 35:16, 46:21
**judges'** [1] - 54:1
**judgment** [5] - 48:22, 74:8, 78:22, 114:17, 122:6
**June** [4] - 78:17, 88:11, 90:10, 102:8
**jurisdiction** [1] - 28:13
**jurisdictional** [1] - 28:23
**Justice** [1] - 1:20
**jvarnado@jonesday.com** [1] - 2:5

## K

**Kathleen** [4] - 2:12, 139:2, 139:6, 139:7
**Kathryn** [1] - 2:6
**keep** [12] - 18:3, 46:1, 46:5, 46:8, 46:20, 59:10, 101:17, 109:16, 125:10, 135:19, 135:23
**keeping** [1] - 58:23
**Kellogg** [5] - 4:22, 5:23, 6:4, 6:8, 31:19
**Keneally** [4] - 2:6, 107:4, 108:2, 108:3
**kept** [1] - 46:18
**key** [1] - 19:23
**keys** [1] - 30:24
**keystroke** [1] - 17:17
**kids** [3] - 6:12, 32:14, 32:16
**kind** [10] - 17:13, 18:12, 19:23, 20:13, 20:15, 23:4, 25:4, 58:23, 128:12
**kkeneally@jonesday.com** [1] - 2:9
**knowledge** [6] - 34:2, 34:4, 40:22, 41:3, 124:3, 132:25
**known** [2] - 37:12, 84:21
**knows** [5] - 39:16, 39:23, 41:2, 115:2, 115:5

## L

**label** [1] - 128:12
**labor** [1] - 6:16
**lack** [3] - 19:18, 37:13, 69:11
**lagged** [1] - 65:20
**lagging** [1] - 66:20
**Lancet** [4] - 84:19, 86:8, 86:13, 86:18
**lancet** [1] - 84:20
**lane** [1] - 21:11
**Langston** [1] - 1:18
**LANGSTON** [12] - 134:12, 134:20, 135:8, 135:24, 136:8, 136:18, 136:22, 137:10, 137:23, 138:2, 138:11, 138:17
**language** [6] - 73:20, 73:25, 74:1, 74:2, 74:6, 75:1
**language-specific** [2] - 73:20, 74:6
**larger** [1] - 99:16
**largest** [3] - 16:10, 16:18, 22:7
**last** [13] - 5:19, 5:20, 11:6, 11:10, 11:23, 13:1, 20:21, 29:20, 38:1, 38:3, 38:5, 83:10, 101:23
**lasted** [1] - 13:2
**late** [2] - 96:1, 135:11, 137:2
**latter** [2] - 63:4, 71:18, 71:20
**law** [9] - 5:23, 6:3, 8:25, 52:17, 105:19, 107:19, 120:11, 123:7, 123:8
**lawsuit** [1] - 41:13
**lawyer** [6] - 9:4, 16:6, 104:14, 105:8, 105:20, 107:14
**lawyer's** [1] - 22:4
**lawyers** [5] - 14:17, 28:25, 41:1, 107:12, 129:14
**layperson** [2] - 37:14, 37:20
**lead** [3] - 119:15, 119:16, 126:2

**leading** [5] - 33:6, 77:6, 79:2, 79:7, 79:9
**leads** [1] - 71:10
**learn** [2] - 50:5, 50:6
**learning** [2] - 71:1, 79:16
**learns** [1] - 115:6
**least** [5] - 38:1, 72:12, 72:14, 72:15, 136:12
**leave** [1] - 5:1
**leaving** [2] - 30:22, 91:24
**Lee** [1] - 1:18
**lee.f.langston@usdoj.gov** [1] - 1:23
**left** [4] - 23:23, 30:25, 32:5
**legal** [1] - 34:23
**less** [10] - 46:25, 74:11, 80:6, 81:10, 81:11, 82:4, 82:8, 83:25, 102:15
**letting** [1] - 113:16
**level** [5] - 6:13, 26:7, 80:20, 103:11, 124:3
**Lewy** [5] - 69:2, 69:16, 69:21, 70:6
**liability** [1] - 8:5
**Liana** [1] - 76:23
**licensed** [1] - 49:21
**licensing** [1] - 62:13
**lie** [2] - 20:16, 108:14
**life** [1] - 81:18
**likely** [1] - 66:8
**line** [8] - 81:12, 107:23, 110:1, 110:2, 118:15, 121:21, 128:15
**list** [11] - 14:15, 14:22, 18:13, 29:1, 46:1, 46:5, 46:8, 46:9, 134:16, 135:17, 135:18
**listen** [3] - 45:25, 104:16, 123:19
**listening** [1] - 58:7
**litany** [1] - 29:3
**literally** [1] - 114:3
**litigated** [2] - 8:6, 8:8
**litigating** [2] - 12:20, 12:25
**litigation** [13] - 6:25, 7:1, 12:12, 22:18, 33:3, 33:5, 34:20, 35:6, 41:9, 41:12, 41:16, 43:8, 104:24
**live** [1] - 81:18
**lobbied** [1] - 41:21
**lobby** [1] - 41:23
**lobe** [2] - 100:2, 101:1
**location** [1] - 54:20
**locked** [1] - 16:17
**lockett** [1] - 48:1
**Lockett** [3] - 48:3, 49:10, 53:14
**logical** [1] - 83:24
**long-term** [2] - 38:14, 39:8
**long-time** [1] - 31:18
**longest** [1] - 14:21
**longitudinal** [1] - 99:5
**longitudinally** [1] - 97:24
**look** [19] - 18:2, 18:18, 33:18, 33:21, 35:20, 46:23, 46:24, 71:6, 81:15, 99:6, 99:11, 114:1, 114:18, 114:19, 114:25, 122:17, 138:15
**looked** [2] - 99:3, 99:4

**looking** [8] - 33:16, 46:17, 58:8, 95:16, 96:19, 97:13, 102:21, 105:3
**looks** [6] - 61:24, 75:12, 100:7, 114:20, 115:6, 123:8
**LOONAM** [87] - 4:11, 4:14, 44:7, 44:13, 44:19, 49:8, 49:9, 49:15, 49:18, 49:19, 51:17, 51:22, 52:1, 52:2, 52:15, 52:18, 52:21, 52:22, 53:17, 53:19, 58:10, 58:11, 58:20, 59:3, 59:12, 59:14, 59:16, 60:6, 60:8, 75:24, 76:2, 76:4, 76:9, 76:15, 76:21, 84:13, 84:15, 84:17, 84:23, 85:1, 85:4, 85:6, 85:9, 85:10, 86:25, 89:14, 89:17, 89:23, 90:1, 90:6, 90:10, 90:13, 98:13, 98:15, 101:20, 101:21, 102:5, 102:6, 108:1, 109:7, 109:11, 109:23, 110:6, 110:16, 110:22, 110:25, 111:16, 111:17, 116:11, 116:13, 116:15, 119:4, 119:7, 119:22, 119:23, 122:18, 124:16, 126:13, 126:14, 128:8, 128:16, 131:6, 133:22, 134:6, 134:10, 135:14, 136:14
**Loonam** [2] - 2:6, 3:6
**loop** [1] - 120:15
**loose** [1] - 120:3
**lose** [2] - 79:19, 79:20
**loss** [2] - 23:5, 129:20
**lost** [1] - 18:23
**low** [3] - 19:23, 84:6, 100:9
**low-key** [1] - 19:23
**lower** [2] - 26:5, 99:17
**lunch** [4] - 31:15, 40:5, 134:8, 134:11
**Lutheran** [6] - 54:14, 60:14, 60:20, 60:23, 60:25, 61:1

# M

**Magnani** [2] - 1:19, 11:17
**mail** [6] - 23:9, 23:18, 23:21, 134:13, 137:4
**mailings** [2] - 61:12, 61:17
**mails** [5] - 10:14, 22:22, 22:24, 22:25, 23:19
**main** [3] - 12:14, 24:25, 25:1
**maintained** [1] - 61:2
**majority** [4] - 73:13, 73:14, 73:22, 74:16
**malingering** [7] - 48:15, 48:17, 52:25, 53:4, 115:12, 132:4, 132:21
**management** [9] - 7:16, 7:22, 16:14, 22:8, 24:19, 24:22, 24:23, 33:6
**MANAGER** [5] - 4:6, 31:6, 59:6, 59:8, 138:20
**managers** [1] - 24:7
**manages** [1] - 25:2
**managing** [4] - 7:23, 35:13, 35:15, 35:18
**manifest** [2] - 73:11, 77:4
**manifestation** [2] - 71:7, 73:7
**manifests** [1] - 73:21
**manner** [2] - 108:7, 127:20
**March** [5] - 34:8, 78:16, 88:22, 89:3,

90:17
**mark** [15] - 10:23, 21:22, 21:23, 23:14, 23:25, 24:2, 24:3, 27:21, 27:22, 29:21, 29:23, 29:24, 49:8, 60:7
**marked** [4] - 23:11, 28:17, 75:20, 116:11
**Markell** [1] - 60:4
**marker** [1] - 85:17
**marriage** [1] - 63:2
**Mary** [1] - 5:21
**mask** [1] - 33:20
**masked** [1] - 69:12
**master's** [6] - 54:24, 55:1, 55:5, 55:8, 55:16, 55:25
**masters** [2] - 56:23, 62:3
**mater** [2] - 61:6, 61:9
**materials** [2] - 11:11, 93:19
**matter** [3] - 87:1, 104:5, 139:4
**McGovern** [5] - 50:20, 51:2, 51:5, 51:8, 52:4
**MDL** [10] - 8:10, 12:17, 12:18, 15:3, 22:19, 42:8, 42:13, 42:17, 42:21, 42:23
**me'** [1] - 99:7
**me..** [1] - 85:21
**mean** [38] - 13:23, 14:5, 25:13, 26:15, 26:16, 29:12, 33:20, 35:10, 37:14, 38:18, 38:22, 39:13, 52:19, 58:6, 74:13, 76:17, 80:22, 83:5, 85:12, 92:12, 96:25, 98:2, 99:20, 100:13, 110:11, 111:9, 113:20, 118:19, 118:22, 119:25, 123:1, 123:6, 123:15, 135:6, 136:4
**meaning** [2] - 119:1, 120:4
**means** [1] - 80:12
**meant** [3] - 18:20, 120:1, 120:3
**measures** [3] - 117:3, 117:5, 117:13
**mechanical** [1] - 2:15
**mechanism** [1] - 85:18
**medical** [8] - 38:20, 38:22, 39:17, 40:23, 86:11, 86:20, 90:24, 93:4
**Medical** [2] - 53:3, 62:9
**medication** [1] - 86:4
**medications** [1] - 82:17
**medicine** [4] - 66:1, 66:12, 66:13
**meet** [4] - 31:13, 31:14, 68:8, 70:14
**meeting** [4] - 38:2, 41:18, 41:19, 137:5
**meetings** [1] - 42:1
**memories** [1] - 30:14
**memorized** [1] - 18:4
**Memory** [8] - 53:2, 71:23, 72:5, 72:25, 116:1, 117:6, 117:9, 118:9
**memory** [54] - 11:12, 25:25, 26:13, 31:1, 38:14, 39:8, 68:11, 68:14, 68:19, 71:1, 71:5, 73:5, 73:10, 73:15, 73:18, 73:23, 74:6, 75:4, 75:14, 76:25, 77:2, 77:5, 79:16, 101:25, 102:14, 103:16, 103:23, 106:4, 106:9, 107:7, 108:25, 109:5, 115:15, 115:25, 117:2, 117:10, 117:15, 117:18, 118:1, 121:7, 121:10, 122:5, 122:7, 122:12, 129:8, 129:12,

129:19, 129:20, 130:1, 131:19, 132:1, 132:25
**memory-impaired** [4] - 117:2, 117:15, 117:18, 121:7
**memory-related** [1] - 103:23
**mental** [7] - 13:21, 13:23, 87:6, 90:16, 91:4, 91:21, 104:9
**mention** [2] - 89:2, 89:5
**mentioned** [14] - 13:12, 22:6, 22:14, 28:1, 28:22, 32:25, 33:11, 42:6, 42:9, 42:19, 63:5, 89:7, 90:2, 105:11
**met** [8] - 10:7, 11:23, 14:17, 31:14, 38:5, 50:9, 50:11, 50:18
**method** [2] - 128:3, 128:5
**Methodist** [2] - 78:13, 90:24
**Michael** [2] - 4:19, 9:2
**mid** [1] - 40:6
**mid-afternoon** [1] - 40:6
**middle** [2] - 32:5, 102:11
**midst** [1] - 124:24
**might** [10] - 5:10, 12:11, 39:9, 63:7, 65:3, 83:6, 100:13, 100:16, 100:17, 100:18
**MIKE** [2] - 3:2, 5:14
**Mike** [1] - 5:20
**mild** [2] - 94:22, 100:15
**Miller** [4] - 2:12, 139:2, 139:6, 139:7
**milliliters** [1] - 101:7
**millions** [2] - 8:13
**mind** [2] - 112:6, 125:10
**minimize** [1] - 26:8
**minimizing** [2] - 49:2, 50:2
**ministry** [3] - 54:12, 56:3, 59:19
**minor** [1] - 74:10
**minute** [10] - 12:5, 21:22, 21:23, 23:13, 23:14, 24:2, 27:20, 27:22, 29:23, 29:24
**minutes** [12] - 14:21, 23:23, 27:23, 28:16, 28:18, 58:22, 59:2, 135:2, 135:7, 136:13
**misjudge** [1] - 114:8
**mispronouncing** [1] - 116:22
**miss** [1] - 114:6
**missing** [1] - 22:25
**Missouri** [4] - 71:22, 71:23, 72:5, 72:25
**misstates** [1] - 89:12
**moderate** [2] - 94:23, 100:21
**moment** [5] - 33:11, 70:10, 84:13, 126:6, 136:19
**moments** [1] - 59:17
**Monday** [3] - 18:11, 18:15, 135:20
**Mondays** [2] - 72:5, 72:11
**money** [2] - 24:7, 24:14
**monitor** [1] - 98:7
**monster** [1] - 17:5
**month** [6] - 11:8, 19:12, 24:8, 27:9, 72:14, 72:15
**months** [3] - 8:15, 32:7, 120:21
**morning** [9] - 18:15, 91:6, 91:7, 91:22,

125:2, 133:25, 134:14, 136:12, 138:7
**mornings** [1] - 18:11
**most** [12] - 9:11, 14:18, 20:24, 40:8, 68:17, 73:5, 73:8, 77:1, 86:10, 86:18, 103:22, 116:6
**motion** [3] - 35:11, 36:2, 42:23
**motor** [4] - 69:11, 70:21, 71:9
**motor-oriented** [1] - 71:9
**move** [2] - 17:23, 51:16
**moved** [6] - 35:8, 36:3, 54:19, 59:23, 61:2, 91:2
**moving** [1] - 138:5
**MR** [169] - 4:9, 4:11, 4:14, 4:18, 5:11, 5:13, 5:17, 10:18, 10:24, 16:1, 16:2, 16:20, 21:7, 21:19, 21:25, 23:10, 23:16, 23:24, 24:5, 27:19, 27:25, 28:15, 28:21, 29:20, 30:2, 31:2, 31:4, 31:7, 31:9, 38:15, 39:5, 39:18, 40:20, 41:4, 41:8, 43:16, 43:18, 43:21, 44:7, 44:13, 44:19, 49:8, 49:9, 49:15, 49:18, 49:19, 51:15, 51:17, 51:22, 52:1, 52:2, 52:15, 52:18, 52:21, 52:22, 53:17, 53:19, 58:10, 58:11, 58:20, 59:3, 59:12, 59:14, 59:16, 60:6, 60:8, 75:24, 76:2, 76:4, 76:9, 76:15, 76:21, 84:13, 84:15, 84:17, 84:23, 84:25, 85:1, 85:4, 85:6, 85:9, 85:10, 86:25, 89:11, 89:14, 89:15, 89:17, 89:20, 89:23, 90:1, 90:6, 90:10, 90:13, 98:13, 98:15, 101:20, 101:21, 102:5, 102:6, 106:16, 107:22, 108:1, 109:7, 109:11, 109:23, 110:1, 110:4, 110:6, 110:12, 110:15, 110:16, 110:22, 110:25, 111:5, 111:10, 111:13, 111:16, 111:17, 116:11, 116:13, 116:15, 119:4, 119:7, 119:18, 119:22, 119:23, 122:18, 122:22, 123:3, 123:6, 123:19, 123:23, 124:7, 124:13, 124:16, 126:13, 126:14, 128:8, 128:14, 128:16, 129:1, 130:7, 130:10, 130:12, 131:2, 131:6, 133:22, 134:6, 134:9, 134:10, 134:12, 134:20, 135:3, 135:8, 135:14, 135:15, 135:24, 136:8, 136:14, 136:18, 136:22, 137:7, 137:10, 137:18, 137:22, 137:23, 138:2, 138:11, 138:17
**MRI** [7] - 93:13, 93:22, 93:23, 93:25, 95:17, 99:20, 100:20
**MRIs** [4] - 93:20, 94:2, 98:24, 99:1
**MSDT** [1] - 116:2
**MSVT** [13] - 53:4, 116:20, 117:6, 117:7, 117:9, 117:10, 117:19, 118:9, 118:10, 118:16, 118:17, 121:13
**Mullin** [1] - 9:2
**multidistrict** [2] - 7:1, 12:11
**multimorbidity** [1] - 86:2
**multiple** [6] - 89:7, 90:2, 92:5, 92:13, 129:4, 129:23
**multiple-choice** [1] - 129:4
**mushing** [1] - 71:3

# N

**name** [13] - 5:19, 5:20, 20:2, 31:12, 54:18, 59:22, 60:20, 61:1, 74:24, 77:12, 116:22
**namely** [1] - 102:19
**Nancy** [1] - 5:21
**nap** [1] - 91:8
**narrative** [1] - 22:12
**nation** [1] - 16:11
**natural** [2] - 69:4, 70:2
**nature** [2] - 123:17, 137:13
**NE** [1] - 1:21
**necessarily** [17] - 82:18, 83:8, 93:6, 95:21, 96:4, 96:17, 96:24, 96:25, 97:2, 98:2, 99:9, 99:25, 105:24, 108:21, 112:15, 123:2, 135:25
**necessary** [2] - 40:19, 62:7
**need** [20] - 21:12, 25:8, 28:13, 32:17, 56:6, 56:12, 62:11, 87:7, 101:18, 101:19, 107:5, 113:18, 113:25, 114:18, 134:18, 134:22, 134:23, 135:25, 137:14, 138:5
**needed** [6] - 7:20, 13:14, 19:9, 59:11, 64:18, 76:20
**needs** [2] - 124:12, 138:15
**NEMELKA** [2] - 3:2, 5:14
**Nemelka** [18] - 4:19, 4:21, 5:18, 5:20, 5:22, 10:21, 10:25, 21:8, 22:1, 23:17, 24:6, 28:1, 28:22, 30:3, 31:10, 32:19, 32:23, 43:19
**nerve** [1] - 25:4
**neuro** [1] - 93:9
**neuroanatomy** [2] - 57:24, 67:17
**neurodegenerative** [6] - 71:13, 77:20, 79:22, 95:20, 96:4, 96:8
**neuroimaging** [1] - 93:9
**neurology** [1] - 72:6
**Neurology** [1] - 75:22
**neuronal** [4] - 96:8, 96:10, 96:14, 96:17
**neurons** [3] - 96:11, 96:12
**neuropathology** [1] - 67:17
**neuropsychology** [14] - 49:22, 57:20, 58:2, 58:4, 58:5, 58:17, 62:18, 62:23, 63:15, 63:19, 63:21, 63:22, 64:21, 66:19
**Neuroreader** [6] - 93:17, 93:21, 94:2, 95:3, 95:6, 98:18
**neutral** [1] - 103:5
**never** [5] - 12:18, 25:20, 31:14, 36:20, 36:22
**new** [8] - 17:1, 18:1, 18:4, 18:10, 18:17, 18:25, 85:7
**New** [6] - 2:8, 50:15, 50:16, 51:11, 52:3, 107:17
**next** [7] - 4:17, 20:17, 67:4, 90:20, 90:23, 119:8, 126:13
**nice** [2] - 31:13, 31:14
**Niemeyer** [1] - 6:3
**night** [7] - 11:10, 11:23, 38:2, 38:3,

38:5, 136:17, 138:18
**nine** [1] - 21:22
**NO** [1] - 1:3
**nobody** [1] - 83:17
**nobody's** [1] - 12:15
**nominated** [2] - 6:6, 32:3
**non** [4] - 70:21, 73:10, 75:4, 77:2
**non-memory** [3] - 73:10, 75:4, 77:2
**non-motor** [1] - 70:21
**none** [3] - 13:23, 13:24, 117:11
**nonverbal** [2] - 116:1, 117:6
**Nonverbal** [1] - 118:10
**noon** [1] - 18:22
**noontime** [1] - 19:3
**normal** [6] - 81:20, 94:7, 94:10, 94:19, 95:11, 98:11
**northern** [2] - 7:3, 130:9
**Northern** [4] - 130:5, 130:17, 130:20, 130:23
**note** [2] - 57:16, 91:21
**noted** [5] - 93:12, 103:1, 103:2, 103:4, 103:9
**notes** [2] - 91:2, 91:3
**nothing** [10] - 20:25, 21:1, 21:2, 31:2, 38:16, 42:24, 43:2, 43:18, 123:8, 135:8
**noticed** [1] - 91:7
**notices** [1] - 15:13
**NOVEMBER** [2] - 1:6, 4:2
**number** [7] - 17:15, 56:8, 60:6, 61:3, 75:24, 85:7, 88:12
**NV** [3] - 116:20, 117:10, 118:16
**NV-MSVT** [3] - 116:20, 117:10, 118:16
**NY** [1] - 2:8

# O

**Oakland** [1] - 130:24
**oath** [1] - 44:9
**object** [4] - 51:15, 89:11, 106:16, 138:15
**objection** [11] - 15:11, 15:16, 15:19, 15:22, 38:15, 38:19, 39:13, 39:17, 40:20, 40:21, 106:19
**obligated** [1] - 45:4
**obscure** [1] - 86:8
**observations** [1] - 48:19
**observe** [2] - 100:6, 101:3
**observed** [1] - 37:22
**obtain** [6] - 55:1, 62:11, 65:17, 115:14, 115:15, 126:23
**obtained** [10] - 54:24, 55:6, 55:16, 55:17, 56:22, 59:19, 62:2, 63:24, 64:12, 122:11
**obtaining** [2] - 63:20, 65:9
**obviously** [5] - 9:4, 19:18, 20:20, 134:5, 137:11
**occasional** [1] - 72:9
**occasions** [1] - 38:1
**occur** [2] - 74:11, 83:11

**occurred** [2] - 47:11, 103:4
**October** [11] - 27:10, 109:8, 126:7, 126:8, 126:10, 126:21, 127:7, 127:16, 128:1, 128:9, 128:11
**OF** [2] - 1:1, 1:3
**offers** [1] - 24:12
**office** [2] - 32:22, 72:21
**often** [6] - 70:1, 71:10, 72:3, 72:18, 72:23
**oftentimes** [2] - 69:25, 73:3
**oil** [1] - 21:12
**onboard** [2] - 73:9, 75:15
**once** [4] - 20:16, 26:5, 58:3, 95:12
**one** [78] - 8:16, 9:8, 9:11, 13:3, 13:7, 14:6, 14:16, 14:22, 14:25, 16:5, 16:10, 16:15, 17:23, 20:4, 20:5, 20:23, 22:20, 23:11, 24:12, 24:17, 25:14, 25:21, 26:2, 27:8, 29:18, 29:20, 34:12, 38:3, 38:10, 40:7, 47:12, 47:21, 52:9, 55:7, 57:15, 62:6, 63:22, 66:19, 70:10, 71:4, 72:4, 72:12, 84:13, 84:18, 86:10, 89:19, 89:24, 90:5, 94:22, 94:25, 97:16, 102:14, 105:11, 107:19, 115:2, 115:22, 116:5, 116:8, 116:10, 117:8, 117:23, 118:12, 120:7, 121:7, 121:10, 121:15, 122:9, 128:15, 128:24, 134:8, 134:10, 134:12, 136:1, 136:19, 136:25, 137:1
**ones** [2] - 32:14, 56:9
**ongoing** [1] - 41:12
**onset** [2] - 100:15, 100:18
**op** [17] - 17:12, 17:14, 17:18, 17:21, 17:25, 18:1, 18:3, 18:5, 18:10, 18:17, 18:19, 19:20, 21:4, 21:8, 21:16, 22:11
**open** [2] - 125:14, 127:5
**open-ended** [1] - 127:5
**opening** [2] - 17:16, 18:16
**operations** [1] - 103:11
**opined** [1] - 125:6
**opinion** [9] - 49:4, 49:5, 50:4, 50:6, 52:14, 53:13, 101:22, 106:2, 111:19
**opposed** [2] - 38:14, 97:21
**option** [1] - 130:1
**options** [1] - 129:25
**orchestrating** [1] - 106:3
**order** [10] - 4:12, 5:8, 7:20, 17:16, 25:9, 34:15, 34:24, 56:7, 108:15, 134:8
**ordered** [4] - 34:21, 35:11, 35:12, 43:10
**orders** [2] - 18:16, 54:1
**ordinary** [1] - 65:12
**oriented** [2] - 63:8, 71:9
**originally** [1] - 13:2
**otherwise** [2] - 14:11, 25:22
**outlier** [1] - 97:6
**outline** [1] - 124:25
**outside** [1] - 95:1
**overall** [4] - 25:25, 26:13, 49:23, 104:18
**overcomes** [1] - 101:11
**overdo** [1] - 114:2
**overlaps** [2] - 74:3, 75:11

**overrule** [1] - 106:19
**overruled** [1] - 107:25
**overwhelming** [1] - 73:8
**own** [8] - 7:20, 16:6, 17:13, 22:4, 28:13, 30:25, 77:12, 98:24
**owned** [1] - 28:8
**owner** [1] - 9:10
**ownership** [3] - 27:12, 27:16, 28:5

## P

**p.m** [5] - 1:5, 4:3, 138:21
**pace** [1] - 18:20
**page** [17] - 32:24, 49:13, 60:11, 76:24, 85:24, 88:13, 88:15, 88:21, 91:2, 101:23, 102:5, 110:1, 110:2, 116:24, 128:14, 128:15
**pages** [3] - 8:13, 92:6
**paid** [1] - 18:21
**panel** [9] - 34:14, 34:21, 34:24, 35:11, 35:14, 35:17, 35:18, 35:23, 43:10
**paper** [2] - 87:18, 87:19
**paperwork** [1] - 62:1
**paragraph** [11] - 52:23, 89:2, 89:6, 89:16, 89:21, 90:19, 90:20, 91:11, 102:11, 106:8, 106:23
**paragraphs** [2] - 89:16, 89:21
**parcel** [1] - 93:21
**Parkinson's** [38] - 37:5, 37:17, 37:22, 38:21, 39:1, 67:12, 67:15, 67:19, 67:21, 67:22, 67:25, 68:2, 68:3, 68:10, 68:12, 68:15, 68:22, 68:23, 68:25, 69:1, 69:6, 69:7, 69:8, 69:10, 69:14, 69:16, 69:20, 69:21, 70:3, 70:8, 70:17, 70:18, 70:20, 70:25, 71:4, 71:10, 71:16
**part** [22] - 8:17, 28:2, 42:5, 48:17, 48:21, 68:1, 93:20, 93:21, 107:10, 111:25, 112:1, 112:2, 113:8, 114:14, 114:15, 114:16, 123:15, 125:3, 125:9, 128:9, 131:21
**participant** [2] - 117:1, 117:8
**participants** [1] - 117:12
**participate** [1] - 41:16
**particular** [3] - 104:10, 126:6, 135:17
**particularly** [3] - 79:15, 106:5, 107:8
**partner** [4] - 5:23, 6:5, 11:19, 31:18
**parts** [3] - 7:23, 74:14, 74:18
**party** [3] - 25:8, 45:1, 45:12
**pass** [2] - 132:16, 132:21
**passing** [3] - 117:9, 117:17, 131:15
**past** [4] - 25:25, 26:13, 78:14, 101:18
**pathology** [7] - 73:21, 73:24, 73:25, 74:12, 74:13, 74:17, 75:11
**patient** [2] - 19:12, 71:12
**patients** [4] - 38:13, 39:9, 72:6, 85:25
**Paul** [1] - 6:3
**pause** [3] - 16:1, 111:16, 119:22
**paused** [3] - 110:21, 111:14, 119:21
**pay** [2] - 18:23, 24:15

**PDD** [1] - 69:9
**Peggy** [4] - 15:2, 29:16, 29:17, 40:9
**Pena** [1] - 51:10
**penalty** [1] - 48:10
**pending** [4] - 7:2, 35:11, 36:1, 42:12
**people** [31] - 9:25, 17:2, 18:11, 21:3, 21:12, 34:5, 46:15, 57:1, 66:9, 68:1, 68:18, 79:13, 80:4, 80:6, 80:14, 80:21, 80:25, 81:8, 81:11, 81:13, 82:11, 82:13, 82:17, 83:17, 83:24, 85:6, 85:14, 87:14, 87:15, 114:19, 136:4
**per** [1] - 67:19
**perceive** [2] - 37:15, 37:17
**perceived** [1] - 112:8
**percent** [18] - 9:25, 19:11, 94:12, 95:10, 95:12, 117:19, 117:21, 118:6, 118:10, 118:17, 118:20, 119:1, 120:18, 133:5, 133:6, 133:7, 133:8, 133:9
**percentage** [2] - 9:24, 46:15
**percentages** [1] - 46:14
**percentile** [2] - 100:8, 100:9
**perform** [2] - 7:20, 113:25
**perhaps** [2] - 45:24, 58:15
**period** [2] - 55:7, 63:7
**permanent** [2] - 85:18, 87:5
**permutations** [1] - 12:22
**person** [17] - 20:5, 20:8, 20:15, 20:16, 30:17, 30:18, 33:12, 79:21, 82:2, 82:3, 104:23, 113:22, 114:3, 114:9, 114:22, 117:14, 118:13
**person's** [1] - 114:24
**personal** [9] - 28:13, 34:2, 34:4, 36:6, 36:12, 41:3, 77:4, 104:13, 107:12
**personally** [3] - 36:20, 36:22, 41:18
**personnel** [2] - 19:17, 19:18
**persons** [1] - 87:10
**perspective** [1] - 9:6
**pertaining** [1] - 129:9
**pervasive** [2] - 73:5, 77:1
**Pete** [1] - 107:12
**Peter** [1] - 102:8
**petitioner** [1] - 48:14
**petitioner's** [1] - 48:18
**Ph.D** [2] - 3:5, 44:15
**phone** [2] - 26:21, 38:4
**phonetic** [1] - 71:23
**phrase** [5] - 25:15, 25:18, 25:20, 25:22, 47:12
**physical** [1] - 69:9
**physiological** [1] - 87:24
**picture** [6] - 97:20, 99:9, 104:15, 104:18, 113:23
**pictures** [1] - 98:18
**pill** [2] - 82:14, 82:15
**pills** [3] - 83:15, 83:16, 83:18
**pioneers** [1] - 107:19
**pitch** [1] - 15:10
**pivot** [1] - 26:8
**pivoted** [1] - 26:4

**place** [14] - 8:20, 8:21, 11:1, 11:4, 18:5, 33:8, 39:22, 48:4, 50:13, 88:23, 96:7, 112:13, 119:17, 133:23
**places** [1] - 74:21
**plane** [1] - 4:15
**planning** [1] - 84:19
**play** [14] - 14:20, 23:10, 23:24, 27:20, 28:16, 109:7, 109:13, 112:12, 119:7, 119:9, 122:18, 126:13, 128:8, 128:9
**played** [13] - 14:23, 15:9, 16:22, 21:24, 23:15, 24:4, 27:24, 28:20, 30:1, 110:8, 111:6, 123:15, 128:21
**playing** [2] - 33:17, 110:19
**plural** [2] - 90:3, 90:4
**plus** [1] - 69:8
**point** [16] - 8:16, 27:19, 34:16, 36:10, 63:11, 84:10, 98:3, 99:12, 102:11, 108:24, 117:24, 120:13, 123:18, 125:13, 133:15
**points** [9] - 26:4, 26:17, 26:21, 26:23, 26:25, 27:18, 53:1, 96:23, 101:11
**police** [2] - 63:8, 63:9
**police-oriented** [1] - 63:8
**policies** [7] - 7:7, 9:10, 25:17, 29:9, 124:1, 124:19, 125:20
**pool** [1] - 115:9
**poorly** [1] - 113:25
**popular** [1] - 86:17
**population** [10] - 80:1, 94:7, 94:12, 94:18, 95:11, 96:21, 97:5, 97:7, 97:18, 98:11
**populations** [1] - 79:3
**portfolio** [2] - 6:13, 6:14
**portion** [3] - 111:20, 112:14, 116:25
**portions** [2] - 11:22, 12:4
**position** [7] - 6:9, 6:14, 32:2, 32:4, 32:9, 73:17, 108:16
**positioned** [1] - 105:21
**possibilities** [1] - 132:13
**possibility** [3] - 75:10, 108:17, 108:18
**possible** [4] - 104:24, 112:4, 114:7, 122:4
**possibly** [2] - 112:17, 112:18
**post** [1] - 25:6
**posterior** [1] - 77:15
**potential** [5] - 13:16, 85:18, 91:1, 102:17, 136:2
**potentially** [4] - 42:7, 91:20, 100:22, 121:23
**practices** [4] - 23:22, 29:10, 124:1, 124:18
**practicum** [1] - 62:21
**preadmitted** [1] - 10:20
**precedent** [1] - 135:22
**precipitate** [1] - 86:4
**precipitating** [1] - 84:2
**precise** [2] - 99:22, 99:25
**preexisting** [2] - 79:1, 79:6
**preference** [1] - 76:12

**premise** [1] - 7:12
**preparation** [4] - 9:19, 9:20, 10:1, 28:24
**prepare** [1] - 11:16
**prepared** [10] - 9:22, 10:7, 14:14, 14:16, 25:13, 25:23, 26:18, 26:21, 29:2, 39:25
**preparing** [2] - 11:21, 35:4
**presence** [2] - 84:1, 106:5
**present** [7] - 4:5, 28:25, 35:12, 35:17, 40:11, 46:9, 104:9
**presentation** [6] - 69:3, 69:6, 73:18, 106:4, 115:1, 138:9
**presentations** [1] - 10:15
**presented** [5] - 90:25, 92:22, 107:9, 109:5, 111:20
**presenting** [1] - 77:5
**presents** [1] - 75:4
**preservation** [1] - 23:22
**president** [1] - 63:18
**press** [1] - 122:18
**presume** [1] - 113:3
**presumed** [1] - 67:2
**pretty** [14] - 17:2, 17:3, 25:23, 58:22, 66:13, 73:19, 79:10, 99:9, 99:22, 115:8, 123:18, 128:24, 129:2, 135:12
**previous** [4] - 44:5, 91:6, 91:7, 118:5
**previously** [4] - 44:16, 50:12, 98:16, 103:4
**prices** [2] - 7:8, 7:24
**primary** [3] - 7:14, 9:8, 73:23
**printout** [1] - 122:15
**Prisons** [2] - 46:7, 46:12
**private** [2] - 34:12, 129:13
**privilege** [2] - 4:25, 43:25
**prize** [1] - 116:6
**probability** [1] - 95:7
**probation** [4] - 64:9, 64:11, 64:15
**problem** [14] - 4:16, 15:7, 59:4, 68:19, 68:20, 73:16, 74:6, 84:2, 84:16, 88:1, 106:5, 121:13, 136:11, 136:16
**problems** [11] - 20:18, 68:14, 74:8, 75:14, 107:6, 107:7, 109:5, 110:13, 111:11
**procedure** [1] - 128:24
**procedures** [3] - 124:1, 124:19, 125:21
**proceed** [3] - 5:12, 18:19, 44:11
**proceedings** [5] - 2:15, 53:20, 54:2, 54:5, 139:3
**process** [15] - 17:10, 18:16, 65:13, 66:2, 66:14, 96:2, 96:3, 96:16, 107:10, 111:25, 112:20, 114:15, 114:17, 124:23, 125:1
**processes** [2] - 96:7, 125:24
**produce** [5] - 22:23, 117:2, 117:8, 117:12, 121:12
**produced** [2] - 2:16, 8:14
**product** [5] - 7:14, 16:17, 24:11, 24:25, 25:1
**production** [6] - 22:15, 22:17, 22:18,

137:3, 137:14, 137:17
**products** [2] - 24:10, 24:11
**professional** [9] - 6:1, 32:21, 55:3, 55:18, 65:17, 65:23, 66:4, 66:12, 66:16
**professionally** [1] - 32:18
**professor** [2] - 57:22, 57:23
**profile** [8] - 117:15, 117:18, 118:2, 121:7, 121:11, 122:5, 122:8, 122:12
**profiles** [1] - 117:2
**program** [16] - 30:8, 55:10, 56:10, 56:18, 57:12, 57:16, 61:14, 62:3, 62:6, 62:18, 62:19, 62:20, 62:25, 122:2, 122:8, 122:11
**programs** [4] - 18:21, 55:4, 55:15, 57:16
**progress** [1] - 70:7
**progresses** [2] - 67:23, 95:24
**progressing** [2] - 79:22, 97:3
**progressive** [4] - 71:13, 77:19, 77:20, 81:10
**progressively** [1] - 102:24
**prominent** [1] - 68:21
**promise** [1] - 19:11
**promised** [1] - 20:14
**prone** [1] - 83:25
**proper** [1] - 95:14
**properties** [3] - 28:8, 28:13, 28:23
**property** [1] - 6:17
**proposal** [1] - 20:21
**proposed** [1] - 138:10
**proprietary** [4] - 127:12, 127:13, 127:15, 128:5
**prosecution** [1] - 11:21
**prosecutor** [2] - 38:7, 52:5
**protect** [1] - 10:16
**proud** [1] - 124:8
**provide** [11] - 5:25, 23:4, 25:9, 91:3, 102:1, 103:18, 105:21, 105:22, 106:11, 108:14, 133:11
**provided** [10] - 98:17, 103:15, 103:21, 106:15, 107:4, 107:6, 108:8, 108:24, 120:6, 120:8
**providers** [1] - 33:6
**provides** [1] - 104:6
**psychiatry** [2] - 67:9, 67:10
**psychological** [1] - 57:5
**psychologist** [1] - 49:21
**psychologists** [1] - 66:16
**psychology** [27] - 49:23, 54:24, 55:2, 55:3, 55:5, 55:6, 55:16, 55:17, 55:19, 55:25, 56:6, 56:8, 56:18, 56:23, 57:25, 63:3, 63:10, 63:17, 65:20, 65:23, 66:4, 66:8, 66:12, 66:13, 66:15, 115:13, 115:23
**PsyD** [11] - 57:1, 57:2, 57:3, 57:11, 62:3, 62:6, 62:18, 62:19, 62:20, 62:25
**public** [1] - 129:17
**publication** [1] - 86:12
**publications** [1] - 67:18

**published** [3] - 67:19, 86:22, 86:23
**publisher** [2] - 127:3, 127:19
**pulling** [1] - 106:22
**punish** [1] - 20:18
**purchasers** [1] - 8:11
**purpose** [3] - 11:14, 17:15, 28:10
**purposeful** [1] - 92:1
**purposes** [3] - 28:24, 85:11, 85:12
**pursuant** [1] - 42:3
**pursue** [1] - 66:17
**put** [10] - 10:15, 17:25, 32:21, 64:8, 88:20, 97:14, 111:22, 113:20, 118:4, 133:5
**putting** [1] - 106:23

## Q

**qualification** [1] - 65:18
**qualifications** [3] - 36:23, 67:10, 68:10
**qualified** [2] - 38:20, 66:9
**quality** [1] - 19:17
**quarters** [1] - 14:19
**quenched** [1] - 19:25
**questioning** [1] - 121:21
**questionnaire** [2] - 129:5, 131:10
**questions** [24] - 4:24, 10:9, 14:4, 14:6, 14:12, 14:15, 15:6, 23:8, 25:23, 27:11, 27:17, 28:11, 29:1, 29:12, 30:3, 39:4, 43:16, 81:24, 127:5, 127:10, 127:21, 127:25, 129:7, 129:15
**quickly** [4] - 26:4, 26:7, 128:24, 129:2
**quite** [3] - 40:7, 69:25, 100:8

## R

**racing** [1] - 20:4
**raise** [3] - 5:1, 5:3, 13:25
**raised** [4] - 13:17, 13:20, 13:22, 13:24
**range** [2] - 94:19, 133:4
**rank** [5] - 6:10, 6:11, 9:24, 32:12, 57:23
**rate** [2] - 9:21, 87:9
**rational** [2] - 125:7, 126:24
**RCI** [1] - 30:7
**re** [1] - 10:11
**reach** [1] - 83:12
**reaching** [1] - 57:23
**reactions** [1] - 82:17
**read** [14] - 49:15, 49:17, 83:13, 87:18, 100:8, 102:2, 106:8, 109:24, 116:25, 128:13, 129:5, 129:24, 137:7
**reader** [1] - 91:25
**reading** [1] - 85:21
**reads** [2] - 76:25, 85:25
**ready** [5] - 4:17, 5:12, 44:5, 44:12, 59:13
**real** [2] - 19:18, 48:19
**real-world** [1] - 48:19
**realize** [2] - 114:14, 129:11
**realized** [1] - 20:13
**really** [13] - 15:12, 18:19, 19:18, 20:10, 25:1, 25:13, 32:15, 61:15, 72:10,

104:14, 114:1, 114:7
**reason** [11] - 12:19, 13:13, 17:22, 24:17, 28:14, 30:25, 32:21, 41:6, 58:23, 67:6, 119:18
**reasonable** [2] - 103:24, 123:24
**reasonably** [2] - 92:25, 93:1
**reasons** [1] - 53:5
**recalled** [1] - 61:5
**receive** [1] - 62:7
**received** [6] - 54:11, 55:25, 56:23, 62:1, 136:22, 137:2
**receives** [1] - 131:15
**recent** [3] - 66:17, 88:17, 90:12
**recently** [2] - 55:8, 61:3
**recess** [1] - 133:25
**recessed** [1] - 138:21
**recollection** [2] - 64:3, 95:22
**recommend** [1] - 33:1
**recommendations** [1] - 64:18
**reconstruct** [1] - 102:19
**record** [14] - 5:19, 10:19, 13:8, 13:9, 14:9, 21:19, 40:4, 53:21, 65:7, 86:24, 109:25, 111:4, 137:8, 139:3
**recorded** [1] - 2:15
**records** [7] - 90:24, 92:5, 92:10, 92:14, 92:19, 92:22
**recounted** [1] - 102:12
**recuperating** [1] - 82:5
**redirect** [5] - 13:10, 16:6, 40:7, 43:17, 45:25
**refer** [6] - 57:1, 76:12, 76:13, 89:20, 92:20, 93:17
**reference** [2] - 26:10, 109:19
**referenced** [1] - 25:7
**referring** [8] - 45:13, 45:14, 78:12, 79:13, 87:15, 87:19, 124:20, 126:16
**reflected** [1] - 93:16
**reflects** [1] - 104:2
**refreshed** [1] - 11:12
**refused** [3] - 34:22, 35:2, 125:12
**regard** [1] - 127:8
**regarding** [7] - 102:17, 103:5, 104:2, 126:24, 127:2, 127:11, 129:8
**regards** [1] - 129:21
**regular** [1] - 75:16
**rejoining** [1] - 31:21
**related** [7] - 63:10, 71:15, 93:25, 103:12, 103:23, 106:4, 131:10
**relation** [2] - 23:18, 42:21
**relationship** [2] - 7:22, 83:19
**relationships** [1] - 6:14
**relatively** [1] - 86:2
**relearn** [1] - 17:25
**released** [1] - 43:20
**relevance** [3] - 22:1, 104:17, 107:23
**relevant** [3] - 27:15, 39:8, 79:23
**reliable** [2] - 106:25, 109:2
**rely** [1] - 123:10
**relying** [2] - 12:16, 12:17

**REM** [1] - 69:23
**remember** [34] - 26:17, 29:8, 30:22, 47:21, 48:8, 50:21, 50:23, 50:25, 51:1, 51:2, 51:4, 51:8, 51:11, 52:4, 52:11, 59:24, 63:10, 63:19, 64:12, 65:4, 65:5, 66:5, 83:14, 84:10, 89:8, 99:8, 102:14, 110:10, 111:8, 130:2, 132:2, 133:17
**remembered** [3] - 52:3, 52:9, 52:10
**reminders** [1] - 7:23
**repair** [2] - 17:16, 18:16
**repeat** [1] - 103:3
**repeated** [1] - 92:7
**repetitive** [1] - 100:23
**report** [19] - 38:16, 72:21, 78:4, 78:6, 78:9, 88:11, 89:4, 89:10, 89:12, 89:13, 89:22, 90:10, 93:19, 95:3, 95:6, 98:18, 98:25, 106:22, 107:2
**reportedly** [1] - 126:22
**REPORTER** [2] - 2:11, 38:17
**reporter** [2] - 21:14, 109:20
**REPORTER'S** [1] - 139:1
**reporting** [1] - 137:5
**reports** [15] - 72:19, 73:3, 89:8, 89:14, 89:18, 90:3, 90:4, 93:17, 93:21, 93:25, 94:2, 99:3, 99:4, 103:11, 105:12
**represent** [7] - 6:23, 7:1, 8:10, 9:5, 31:12, 42:14, 42:17
**representation** [1] - 11:19
**representative** [2] - 6:7, 6:10
**Representative** [1] - 31:23
**represented** [5] - 4:21, 4:23, 8:23, 8:25, 42:2
**representing** [1] - 108:10
**represents** [1] - 15:2
**request** [1] - 42:4
**requested** [1] - 40:15
**require** [2] - 56:14, 56:20
**required** [1] - 66:13
**requirements** [1] - 56:6
**research** [10] - 72:8, 83:11, 83:14, 83:18, 84:11, 85:16, 85:19, 85:22, 86:11, 87:2
**resembles** [1] - 131:8
**reserve** [36] - 53:17, 79:12, 79:13, 79:19, 79:25, 80:2, 80:3, 80:6, 80:8, 80:13, 80:16, 80:17, 80:20, 80:21, 80:22, 80:25, 81:3, 81:5, 81:7, 81:14, 81:17, 81:19, 81:22, 81:25, 82:3, 82:4, 82:7, 82:11, 82:19, 82:21, 83:15, 83:19, 83:20, 83:25, 84:7, 85:18
**reserve's** [1] - 84:11
**resisted** [1] - 19:20
**resource** [1] - 76:13
**respect** [9] - 10:2, 32:22, 39:16, 39:23, 45:19, 46:15, 104:5, 105:21, 132:13
**respected** [3] - 86:10, 86:18, 107:14
**respectfully** [2] - 106:18, 107:25
**response** [3] - 22:4, 39:6, 127:11
**rest** [2] - 72:7, 104:20
**restarted** [1] - 59:15

PM 2-156

**rested** [1] - 4:8
**result** [8] - 7:8, 7:25, 18:11, 26:11, 62:13, 87:16, 96:9, 108:23
**results** [4] - 53:3, 96:4, 122:1, 122:2
**resumed** [2] - 44:16, 122:20
**resuming** [1] - 119:11
**retain** [1] - 38:13
**retention** [3] - 22:15, 22:20, 23:9
**retreat** [1] - 103:10
**return** [2] - 72:20, 136:23
**returned** [1] - 6:7
**revenue** [1] - 24:15
**reversible** [1] - 77:17
**review** [4] - 11:6, 11:11, 92:5, 93:23
**reviewed** [12] - 10:13, 10:25, 11:3, 11:8, 11:9, 11:10, 25:21, 92:10, 92:12, 94:1, 98:19, 105:16
**reviewing** [1] - 93:20
**Reynolds** [59] - 6:22, 7:3, 7:4, 7:13, 7:15, 8:1, 8:4, 9:3, 9:11, 12:12, 12:16, 12:21, 12:25, 13:4, 16:11, 16:15, 22:21, 22:23, 23:1, 23:2, 24:12, 24:17, 25:16, 26:7, 26:9, 26:11, 26:20, 27:8, 27:13, 27:16, 29:7, 29:13, 29:15, 30:8, 33:7, 34:13, 34:15, 35:7, 35:12, 35:17, 35:18, 35:24, 39:23, 41:9, 42:17, 42:18, 103:11, 124:21, 125:16, 125:17, 125:21, 126:3, 137:24
**Reynolds'** [1] - 39:20
**Reynolds's** [2] - 24:25, 30:7
**Rick** [4] - 20:2, 20:3, 20:15
**rigidity** [1] - 69:11
**rise** [4] - 4:6, 59:6, 59:8, 138:20
**risk** [7] - 79:2, 79:4, 79:7, 79:9, 79:10, 84:3, 108:23
**RMR** [2] - 2:12, 139:7
**road** [1] - 8:15
**ROBERT** [3] - 1:6, 3:5, 44:15
**Robert** [2] - 6:18, 7:2
**role** [5] - 31:22, 41:19, 108:11, 123:16, 125:16
**Romatowski** [14] - 102:8, 102:12, 102:19, 103:2, 103:7, 103:14, 103:21, 103:22, 104:1, 104:6, 104:19, 105:6, 106:15, 107:13
**Ronell** [10] - 47:16, 47:17, 50:18, 51:1, 51:6, 51:8, 51:9, 52:5, 52:10, 53:12
**room** [1] - 5:9
**Room** [2] - 1:21, 2:12
**roughly** [1] - 101:18
**row** [1] - 98:19
**RPR** [1] - 139:7
**rule** [6] - 14:9, 44:25, 45:1, 45:13, 47:5, 47:7
**ruled** [3] - 42:24, 42:25, 138:16
**Rules** [1] - 68:7
**rules** [5] - 115:5, 115:6, 115:13, 115:16, 115:17
**ruling** [3] - 45:16, 76:20, 137:16
**run** [2] - 7:17, 72:10

**running** [5] - 61:13, 61:18, 61:21
**ruse** [1] - 105:13
**rushed** [1] - 101:19
**Rusk** [1] - 2:12
**RV** [1] - 9:8

## S

**sadly** [1] - 60:22
**safe** [1] - 44:1
**sailed** [2] - 35:2, 43:10
**salt** [2] - 104:1, 105:7
**sample** [1] - 119:3
**San** [2] - 130:23, 131:2
**sanctions** [3] - 42:7, 42:9, 42:23
**sat** [1] - 38:1
**Saturday** [1] - 136:10
**save** [1] - 17:15
**saw** [8] - 33:14, 33:16, 33:18, 34:11, 36:17, 36:18, 38:8, 126:3
**scan** [5] - 92:6, 93:22, 93:23, 93:25
**scans** [2] - 92:7, 93:14
**schedule** [3] - 58:24, 134:1, 138:15
**scheduled** [2] - 13:2, 135:20
**school** [8] - 6:2, 54:16, 55:18, 59:18, 62:14, 64:2, 64:18
**science** [4] - 82:24, 82:25, 83:2, 84:9
**score** [3] - 101:14, 117:17, 131:15
**scored** [1] - 133:3
**scores** [1] - 48:18
**Scott** [2] - 2:2, 9:3
**scratch** [1] - 92:4
**screen** [2] - 49:11, 122:4
**screening** [2] - 92:15
**screenings** [1] - 92:21
**se** [1] - 67:19
**sealed** [4] - 53:21, 53:24, 54:1, 54:5
**seated** [2] - 4:7, 59:9
**Seattle** [2] - 60:15, 61:1
**second** [22] - 13:11, 15:3, 16:6, 17:4, 19:2, 21:22, 21:23, 23:10, 23:14, 24:2, 27:22, 28:19, 29:18, 29:23, 29:24, 40:6, 40:10, 62:15, 89:19, 89:24, 121:15
**secondary** [2] - 87:16, 113:22
**seconds** [3] - 7:14, 27:23, 28:18
**section** [6] - 7:6, 7:9, 12:24, 76:25, 85:25, 128:13
**sections** [1] - 12:2
**securities** [1] - 107:15
**security** [1] - 127:2
**see** [27] - 14:24, 26:5, 46:18, 49:11, 49:13, 60:9, 60:13, 71:14, 72:19, 85:13, 88:17, 97:5, 97:21, 97:24, 98:21, 99:7, 99:12, 100:2, 101:1, 102:2, 102:22, 104:20, 118:3, 125:14, 132:18, 138:15, 138:19
**seeing** [2] - 84:10, 99:9
**seek** [2] - 34:13, 66:10

**seeking** [4] - 34:19, 35:5, 35:10, 35:22
**seem** [3] - 30:11, 85:19, 100:11
**semi** [1] - 127:9, 127:14
**semi-structured** [1] - 127:14
**senate** [2] - 32:4, 32:8
**send** [2] - 110:25, 134:16
**sense** [3] - 81:24, 91:9, 123:16
**sensitivity** [9] - 117:25, 118:3, 118:6, 118:11, 118:16, 118:19, 118:22, 119:1, 120:18
**sent** [2] - 94:18, 121:25
**sentence** [2] - 106:13, 106:21
**separate** [2] - 42:12, 109:17
**separated** [1] - 120:21
**separately** [1] - 10:23
**September** [2] - 15:10, 78:17
**series** [5] - 11:17, 26:4, 38:4, 42:1, 62:21
**service** [8] - 7:22, 17:11, 17:23, 17:25, 18:18, 21:11, 25:3
**services** [4] - 6:16, 7:21, 8:11, 25:9
**serving** [1] - 85:17
**SESSION** [1] - 1:10
**set** [3] - 18:4, 97:16, 97:23
**Seth** [4] - 60:2, 60:3, 60:4
**setting** [1] - 70:15
**settled** [1] - 44:13
**seven** [3] - 14:21, 27:2, 27:20
**seven-minute** [1] - 27:20
**several** [3] - 20:12, 31:20, 126:21
**severe** [6] - 100:21, 101:24, 103:16, 106:4, 106:9, 115:1
**Sheppard** [1] - 9:2
**Sherman** [2] - 7:10, 7:11
**ship** [2] - 35:2, 43:10
**shook** [1] - 20:2
**shooting** [1] - 114:4
**short** [1] - 38:14
**short-term** [1] - 38:14
**shortened** [1] - 17:18
**shorthand** [4] - 21:11, 21:13, 21:14, 26:6
**shortly** [1] - 50:8
**show** [9] - 26:3, 79:14, 79:17, 85:11, 89:17, 96:24, 98:10, 98:12, 122:16
**showed** [3] - 38:10, 53:4, 92:8
**showing** [5] - 76:5, 76:10, 76:22, 116:16, 116:18
**shows** [3] - 22:8, 101:2, 132:16
**shrinkage** [1] - 97:2
**shrinks** [1] - 96:13
**shut** [2] - 61:3, 61:11
**side** [4] - 47:5, 56:10, 76:16, 95:12
**sidebar** [1] - 51:17
**signaled** [1] - 128:18
**signed** [1] - 15:15
**significance** [3] - 23:17, 24:6, 28:3
**significant** [10] - 8:4, 22:6, 46:18, 79:10, 99:19, 100:11, 101:5, 101:8, 126:23,

PM 2-157

129:12
**significantly** [1] - 106:3
**signs** [12] - 37:11, 37:16, 37:17, 37:22, 69:10, 71:15, 74:5, 90:25, 91:13, 91:20, 95:17, 97:21
**similar** [2] - 33:21, 127:8
**simple** [4] - 17:3, 20:16, 115:3, 115:4
**simplistic** [2] - 108:9, 113:20
**simply** [1] - 45:16
**simulate** [3] - 115:12, 115:19, 115:24
**simulators** [1] - 118:21
**single** [7] - 86:3, 87:9, 115:22, 121:7, 122:9, 137:3
**sit** [6] - 34:1, 34:25, 35:1, 35:25, 36:3, 53:10
**sitting** [3] - 34:7, 70:22, 113:4
**situation** [3] - 45:23, 104:2, 104:22
**situations** [3] - 104:12, 110:11, 111:9
**six** [5] - 120:22, 120:23, 120:24, 121:4, 135:17
**skill** [3] - 9:19, 9:20, 10:1
**skilled** [1] - 9:23
**skillful** [2] - 10:4, 10:6
**sleep** [1] - 69:24
**sleeping** [6] - 82:14, 82:15, 83:15, 83:16, 83:17, 86:3
**slight** [1] - 101:4
**slotted** [1] - 72:7
**slower** [1] - 82:8
**slowness** [1] - 69:11
**small** [1] - 16:25
**smaller** [3] - 99:16, 105:16, 105:18
**smart** [2] - 19:10, 114:13
**smiling** [1] - 30:24
**SMITH** [10] - 4:9, 51:15, 84:25, 89:11, 89:15, 89:20, 106:16, 107:22, 134:9, 135:3
**Smith** [1] - 1:18
**snail's** [1] - 18:20
**snapshot** [1] - 97:17
**snapshots** [1] - 99:4
**snippet** [3] - 109:14, 109:16, 109:17
**software** [8] - 7:16, 7:17, 7:18, 17:8, 20:25, 21:1, 24:24
**solution** [1] - 138:10
**solve** [1] - 138:14
**someone** [2] - 51:25, 67:24
**sometime** [1] - 50:8
**sometimes** [11] - 44:25, 45:1, 46:23, 53:20, 53:23, 54:1, 72:12, 74:2, 74:4, 74:7, 127:5
**somewhat** [4] - 105:1, 114:3, 116:6, 123:3
**somewhere** [1] - 72:16
**soon** [2] - 104:13, 134:16
**sooner** [1] - 74:14
**sophisticated** [1] - 9:16
**sorry** [19] - 24:21, 26:12, 29:11, 52:16, 52:19, 58:18, 59:10, 73:24, 76:2, 98:6,

100:1, 106:16, 107:23, 108:7, 116:2, 116:13, 116:17, 128:10, 132:9
**sort** [19] - 38:22, 42:19, 47:2, 63:6, 63:8, 79:16, 79:17, 94:7, 96:15, 96:20, 97:22, 111:12, 119:16, 123:14, 125:1, 127:6, 134:15, 137:13
**sorts** [1] - 110:14
**sought** [2] - 34:21, 42:7
**sound** [1] - 65:2
**sounds** [1] - 123:15
**sources** [1] - 76:13
**SOUTHERN** [1] - 1:1
**Southern** [1] - 107:16
**SPEAKER** [4] - 15:11, 15:16, 15:19, 15:22
**speaking** [4] - 26:6, 75:8, 112:7, 133:13
**spearheaded** [2] - 33:4, 41:20
**special** [2] - 67:9, 68:10
**specialization** [1] - 58:4
**specialized** [1] - 37:4
**specialties** [1] - 66:18
**specialty** [3] - 62:20, 62:22, 67:9
**specific** [9] - 46:21, 54:4, 73:12, 73:20, 74:6, 84:9, 84:10, 87:18, 125:23
**specifically** [20] - 45:6, 45:17, 46:2, 46:4, 47:10, 47:22, 48:4, 53:1, 67:16, 67:19, 83:14, 83:22, 92:17, 92:20, 93:12, 99:3, 99:8, 115:10, 115:20, 117:16
**specifics** [1] - 125:11
**spectrum** [1] - 94:16
**spell** [2] - 5:19, 100:1
**spelled** [1] - 5:21
**spit** [1] - 122:11
**spits** [1] - 122:1
**split** [1] - 13:14
**spoken** [1] - 33:22
**spontaneous** [1] - 88:3
**spontaneously** [2] - 87:14, 87:23
**spread** [1] - 72:8
**spring** [1] - 34:11
**stacks** [1] - 104:20
**staff** [5] - 134:23, 134:25, 136:5, 136:6, 136:15
**STAFF** [5] - 76:1, 85:2, 85:5, 85:8, 116:12
**stage** [3] - 71:14, 96:15, 112:23
**stages** [5] - 68:23, 68:25, 71:18, 71:20, 96:10
**stakes** [1] - 12:21
**stale** [1] - 32:16
**stand** [4] - 5:6, 24:19, 44:16, 95:20
**standard** [11] - 14:5, 29:1, 94:11, 94:20, 94:22, 94:24, 94:25, 95:7, 95:9, 95:13
**standardized** [3] - 17:21, 56:12, 56:15
**standards** [2] - 64:16, 65:22
**standpoint** [1] - 17:7
**stands** [2] - 24:22, 30:7
**stare** [1] - 91:10

**start** [12] - 17:1, 27:12, 29:4, 41:16, 49:13, 79:17, 80:4, 98:10, 111:5, 133:25, 134:18, 136:11
**started** [9] - 22:22, 56:10, 58:12, 63:16, 63:24, 66:4, 66:5, 109:3, 135:21
**starting** [3] - 66:20, 74:4, 104:15
**starts** [5] - 23:13, 27:22, 29:22, 71:8, 74:7
**state** [7] - 5:18, 41:15, 54:20, 78:6, 87:6, 90:16, 92:23
**statement** [4] - 77:7, 103:15, 103:20, 117:11
**statements** [1] - 39:5
**states** [2] - 41:17, 78:10
**STATES** [3] - 1:1, 1:3, 1:12
**States** [8] - 6:6, 60:2, 86:11, 86:13, 86:14, 86:17, 86:22, 108:4
**statistical** [2] - 95:7, 97:6
**statistically** [4] - 99:19, 100:11, 101:5, 101:8
**status** [3] - 91:4, 91:21, 136:1
**statutes** [1] - 123:9
**stenography** [1] - 2:15
**step** [1] - 96:15
**steps** [2] - 65:10, 65:12
**Steve** [1] - 26:19
**sticky** [2] - 16:17, 24:16
**still** [11] - 12:20, 12:24, 35:5, 44:8, 54:16, 54:19, 59:19, 59:24, 61:13, 61:18, 137:13
**stood** [1] - 30:20
**stop** [4] - 110:16, 111:16, 117:4, 133:23
**stopped** [1] - 15:24
**store** [1] - 7:19
**stories** [2] - 20:24, 134:13
**story** [2] - 16:24, 22:13
**straight** [1] - 8:15
**Street** [2] - 1:21, 2:7
**strength** [1] - 103:8
**strictly** [1] - 55:18
**strike** [1] - 51:16
**stronger** [1] - 102:21
**structure** [5] - 17:14, 27:12, 27:16, 28:5, 127:14
**structured** [2] - 127:10, 127:14
**struggled** [1] - 102:24
**stuck** [1] - 30:25
**student** [3] - 55:13, 55:14, 115:23
**students** [10] - 61:14, 61:18, 61:21, 67:22, 115:9, 115:11, 115:12, 115:18, 115:23, 119:3
**studies** [1] - 101:10
**study** [5] - 55:5, 55:15, 116:8, 117:24, 120:15
**stuff** [1] - 39:23
**subject** [4] - 82:24, 82:25, 83:3, 121:22
**subjected** [1] - 113:5
**subjective** [1] - 68:15
**subpoena** [2] - 136:23, 136:24

**subset** [1] - 80:1
**substantive** [1] - 12:23
**substantively** [1] - 10:16
**subtle** [1] - 71:8
**succeeded** [1] - 105:11
**success** [1] - 19:16
**successful** [1] - 24:17
**successfully** [2] - 16:14, 108:19
**suffered** [1] - 83:10
**suffers** [1] - 67:11
**suggested** [2] - 52:9, 62:1
**suggestible** [1] - 103:2
**suggesting** [1] - 108:17
**suggests** [3] - 61:18, 91:22, 91:24
**suit** [1] - 30:23
**Suite** [1] - 2:3
**super** [3] - 7:7, 7:24, 68:10
**super-competitive** [2] - 7:7, 7:24
**supplemental** [2] - 78:4, 78:6
**SUPPORT** [5] - 76:1, 85:2, 85:5, 85:8, 116:12
**supported** [2] - 49:1, 50:1
**Supreme** [2] - 105:15, 105:16
**survives** [1] - 71:12
**suspect** [1] - 122:16
**suspended** [1] - 64:8
**suspicious** [1] - 75:9
**sustain** [2] - 38:19, 39:17
**sustained** [1] - 39:14
**swear** [1] - 5:3
**swing** [1] - 69:11
**switch** [18] - 15:20, 15:21, 15:23, 16:3, 16:4, 16:12, 16:13, 16:14, 16:16, 16:19, 16:24, 16:25, 22:9, 22:10, 24:9, 63:18, 109:11
**switched** [3] - 15:18, 58:2, 63:17
**sworn** [3] - 5:4, 5:15, 44:16
**symptom** [3] - 71:16, 71:19, 77:6
**Symptom** [1] - 53:3
**symptoms** [6] - 37:5, 38:25, 69:14, 70:21, 71:15, 132:8
**symptoms'** [1] - 113:18
**system** [5] - 7:16, 18:10, 18:25, 24:22, 24:23
**systemic** [1] - 88:1
**systems** [5] - 16:14, 17:8, 22:8, 24:20, 33:6

## T

**talks** [1] - 124:18
**tap** [1] - 134:4
**task** [2] - 107:16, 115:2
**taught** [5] - 57:21, 57:24, 67:21, 115:7
**Tax** [1] - 1:20
**tax** [1] - 108:4
**teaching** [6] - 55:12, 57:24, 57:25, 58:12, 67:17, 70:15
**team** [5] - 11:21, 20:14, 104:19, 110:14, 111:12
**technicians** [3] - 18:20, 19:6, 21:11
**techs** [2] - 19:3, 19:13
**Tel** [4] - 1:22, 2:4, 2:8, 2:13
**temporal** [1] - 100:2
**ten** [3] - 19:11, 38:9, 135:18
**tend** [1] - 79:14
**tended** [1] - 91:10
**term** [10] - 38:14, 39:8, 74:15, 79:13, 93:4, 100:24, 105:7, 105:17, 120:3
**termination** [1] - 15:13
**terms** [8] - 9:19, 9:20, 10:1, 22:20, 65:25, 82:9, 83:22, 108:21
**Terre** [1] - 48:5
**terrible** [1] - 104:14
**test** [28] - 48:18, 56:12, 56:15, 56:19, 104:21, 112:5, 114:19, 114:21, 114:25, 115:2, 115:4, 115:21, 121:23, 121:24, 122:1, 126:17, 126:20, 127:1, 127:2, 131:7, 131:8, 131:16, 132:14, 133:10, 133:14, 133:15, 133:20
**Test** [6] - 53:2, 53:4, 116:1, 117:6, 117:9, 118:9
**tested** [1] - 113:12
**testified** [15] - 5:15, 44:16, 44:22, 46:14, 48:1, 48:14, 48:17, 53:8, 54:23, 59:22, 61:7, 64:23, 68:11, 77:25, 90:14
**testify** [7] - 45:12, 46:9, 48:5, 51:12, 51:20, 51:24, 134:14
**testifying** [2] - 45:1, 60:1
**testimony** [18] - 5:9, 27:4, 35:5, 39:7, 45:6, 45:17, 45:21, 46:8, 47:18, 49:21, 53:1, 53:6, 53:23, 60:12, 87:8, 89:12, 93:8, 93:10
**testing** [10] - 111:21, 112:14, 112:20, 112:22, 112:25, 113:3, 113:5, 113:14, 113:17, 113:25
**tests** [14] - 52:25, 53:8, 114:10, 114:13, 115:11, 116:1, 117:1, 117:24, 120:17, 120:20, 120:24, 120:25, 121:8, 122:10
**TEXAS** [1] - 1:1
**Texas** [7] - 1:4, 2:3, 2:13, 130:5, 130:9, 130:16, 130:18
**textbook** [1] - 37:11
**textiles** [1] - 6:17
**THE** [95] - 1:1, 1:1, 1:11, 1:17, 2:1, 4:6, 4:7, 4:10, 4:13, 4:16, 5:2, 5:5, 5:6, 5:12, 14:24, 14:25, 15:4, 15:5, 15:7, 16:8, 29:25, 31:3, 31:6, 38:17, 38:18, 38:24, 38:25, 39:2, 39:3, 39:11, 40:22, 40:25, 41:2, 43:17, 43:19, 43:22, 43:24, 44:1, 44:2, 44:4, 44:8, 44:10, 44:11, 49:17, 51:19, 51:23, 52:13, 52:16, 52:19, 58:9, 58:18, 58:21, 59:4, 59:6, 59:8, 59:9, 59:13, 76:6, 76:14, 76:19, 84:14, 84:16, 89:19, 89:24, 90:4, 90:8, 101:17, 106:18, 107:24, 109:10, 109:19, 110:3, 110:5, 110:17, 110:24, 111:2, 119:6, 133:24, 134:18, 134:22, 135:1, 135:5, 135:10, 135:19, 136:3, 136:9, 136:16, 136:21, 137:9, 137:20, 138:1, 138:6, 138:12, 138:18, 138:20
**themselves** [1] - 123:10
**therapy** [1] - 63:2
**thereafter** [1] - 50:8
**therefore** [1] - 17:2
**thinking** [3] - 50:15, 51:10, 138:7
**third** [4] - 23:12, 23:25, 24:1, 25:8
**third-party** [1] - 25:8
**Thomas** [1] - 31:5
**thoroughly** [1] - 70:19
**thoughtfully** [1] - 10:10
**three** [31] - 13:7, 13:8, 14:19, 17:15, 22:25, 23:7, 28:16, 33:8, 33:18, 34:14, 35:16, 36:10, 40:4, 57:6, 57:8, 57:10, 58:1, 70:7, 72:12, 72:16, 78:12, 83:10, 116:1, 117:1, 117:12, 117:23, 118:4, 118:8, 118:13, 120:17, 132:13
**three-and-a-half** [4] - 13:7, 13:8, 22:25, 23:7
**three-digit** [1] - 17:15
**three-quarters** [1] - 14:19
**throughout** [2] - 72:7, 72:9
**timing** [2] - 70:5, 74:21
**tired** [1] - 91:7
**tiredness** [1] - 91:22
**tires** [1] - 21:12
**title** [1] - 32:10
**titled** [3] - 76:22, 76:23, 116:19
**to-do** [1] - 18:13
**today** [8] - 30:16, 32:18, 33:18, 34:1, 34:4, 34:25, 53:8, 61:8
**together** [5] - 26:11, 71:4, 106:22, 118:4, 118:13
**Tommy** [1] - 136:25
**tomorrow** [14] - 133:25, 134:1, 134:2, 134:3, 134:7, 134:15, 134:19, 135:2, 135:11, 135:12, 136:11, 138:7, 138:19
**took** [12] - 8:21, 10:10, 11:1, 11:4, 12:15, 12:16, 15:1, 15:3, 33:8, 33:23, 40:5, 120:24
**tool** [3] - 99:20, 126:11, 126:12
**top** [6] - 9:25, 19:5, 26:6, 47:25, 53:16, 98:19
**topic** [3] - 85:20, 85:23, 127:11
**topics** [2] - 29:4, 29:17
**total** [1] - 75:11
**totality** [1] - 47:4
**totally** [1] - 108:10
**tough** [1] - 82:5
**towards** [4] - 12:7, 63:9, 132:20, 132:23
**Toyota** [1] - 17:5
**track** [3] - 46:19, 46:20, 58:4
**tract** [4] - 84:2, 84:4, 91:1, 91:20
**Trade** [1] - 31:23
**trade** [3] - 6:7, 6:9, 41:22
**trading** [2] - 6:14, 107:19
**training** [4] - 36:23, 37:4, 37:13, 38:23

**trajectory** [1] - 77:22
**transactional** [1] - 25:3
**Transcript** [1] - 2:16
**transcript** [3] - 110:1, 110:2, 139:3
**transcription** [1] - 2:16
**transcripts** [6] - 10:19, 10:25, 11:6, 11:9, 33:17, 53:23
**transferred** [1] - 18:5
**traumatic** [2] - 79:23, 81:10
**travels** [1] - 44:1
**treated** [1] - 67:24
**tremendous** [1] - 17:17
**trial** [1] - 135:20
**tried** [5] - 16:18, 22:7, 41:14, 137:10
**trigger** [1] - 82:14
**triggered** [1] - 88:4
**Trinity** [3] - 54:18, 59:23, 60:24
**triple** [1] - 9:15
**trouble** [1] - 120:10
**true** [9] - 12:20, 12:24, 19:5, 105:23, 105:25, 113:21, 118:1, 121:22, 133:13
**trump** [1] - 31:22
**trust** [3] - 27:13, 28:1, 28:4
**try** [7] - 41:23, 46:24, 81:13, 104:15, 115:24, 127:5, 136:4
**trying** [12] - 21:17, 26:7, 39:3, 58:25, 69:20, 103:6, 113:23, 114:4, 122:24, 123:16, 124:17, 125:13
**turn** [8] - 49:13, 60:11, 85:24, 88:13, 88:25, 110:17, 116:24, 137:15
**turning** [1] - 88:11
**Twelve** [1] - 72:17
**twice** [1] - 106:17
**two** [27] - 8:22, 10:8, 13:2, 13:6, 13:7, 13:14, 14:18, 17:14, 33:5, 40:2, 41:6, 48:9, 53:7, 53:11, 55:20, 56:22, 60:21, 63:21, 94:11, 94:20, 94:22, 94:24, 95:7, 95:9, 95:11, 95:12, 118:6
**two-and-a-half** [1] - 95:11
**two-digit** [1] - 17:14
**TX** [1] - 2:4
**type** [4] - 73:12, 74:16, 75:14, 77:15
**types** [5] - 22:5, 69:9, 73:14, 73:21, 104:11
**typical** [2] - 18:15, 74:15
**typically** [4] - 14:15, 17:14, 29:2, 77:9
**typing** [1] - 17:16

# U

**U.S** [8] - 1:20, 6:9, 6:14, 31:22, 50:13, 50:14, 62:9, 107:19
**UCSH** [2] - 136:23, 137:11
**ultimate** [1] - 29:9
**ultimately** [1] - 124:3
**unable** [1] - 91:3
**unaccredited** [2] - 62:14, 62:16
**unanimously** [1] - 32:4
**unclean** [1] - 35:19

**uncommon** [1] - 104:7
**under** [6] - 7:9, 7:11, 33:20, 35:15, 44:8, 103:23
**undergo** [1] - 128:3
**undergraduate** [2] - 54:11, 56:9
**underlying** [1] - 86:2
**understood** [6] - 10:9, 10:14, 14:4, 90:9, 112:2, 135:14
**underway** [1] - 96:2
**unfortunately** [1] - 18:7
**unhappy** [1] - 15:12
**UNIDENTIFIED** [4] - 15:11, 15:16, 15:19, 15:22
**unique** [3] - 17:12, 21:16, 77:16
**uniquely** [2] - 67:16, 105:20
**United** [8] - 6:6, 60:2, 86:10, 86:13, 86:14, 86:17, 86:22, 108:4
**UNITED** [3] - 1:1, 1:3, 1:12
**universally** [1] - 79:4
**university** [1] - 55:23
**University** [1] - 6:2
**unprepared** [1] - 25:12
**unsure** [1] - 54:19
**unusual** [2] - 68:18, 84:5
**unusually** [1] - 30:11
**unwilling** [1] - 125:11
**up** [34] - 5:1, 17:16, 18:2, 18:18, 19:3, 19:25, 20:17, 31:16, 40:14, 41:6, 46:24, 51:1, 56:11, 60:6, 61:21, 61:25, 63:23, 66:21, 75:18, 83:13, 85:1, 88:20, 98:10, 104:20, 110:17, 110:23, 110:25, 115:6, 116:11, 122:16, 125:14, 128:19
**uprising** [1] - 19:4
**upshot** [1] - 18:8
**urinary** [4] - 84:2, 84:4, 91:1, 91:20
**urosepsis** [1] - 34:9
**uses** [1] - 24:25
**USTR** [3] - 6:13, 32:3, 32:8
**usual** [1] - 69:9

# V

**valid** [2] - 106:25, 109:2
**Validity** [1] - 53:3
**validity** [3] - 52:24, 53:7, 115:2
**variability** [1] - 69:24
**variant** [8] - 74:19, 74:23, 74:25, 75:7, 75:9, 75:15, 77:12, 77:14
**variants** [6] - 73:19, 74:3, 74:10, 74:12, 75:1, 77:9
**variations** [1] - 77:16
**varies** [2] - 72:5, 72:10
**Varnado** [5] - 2:2, 3:3, 31:12, 51:24, 128:12
**VARNADO** [16] - 31:4, 31:7, 31:9, 39:5, 39:18, 41:4, 41:8, 43:16, 110:1, 110:4, 111:5, 128:14, 135:15, 137:7, 137:18, 137:22
**versus** [2] - 88:3, 112:14

**Vesey** [1] - 2:7
**victim** [1] - 104:25
**Video** [17] - 15:9, 15:24, 16:22, 21:24, 23:15, 24:4, 27:24, 28:20, 30:1, 110:8, 110:19, 110:21, 111:6, 111:14, 119:11, 119:21, 131:4
**video** [22] - 11:7, 11:8, 14:23, 16:20, 21:5, 21:21, 23:12, 24:1, 27:22, 28:18, 29:22, 33:15, 38:8, 109:12, 109:14, 122:20, 124:14, 128:17, 128:21, 128:23
**videos** [7] - 10:21, 10:22, 11:3, 12:2, 21:21, 36:17, 109:8
**videotape** [1] - 126:15
**videotaped** [3] - 127:1, 127:25, 128:6
**view** [5] - 9:6, 92:25, 99:5, 105:12, 106:6
**viewed** [1] - 77:9
**viewpoint** [1] - 104:10
**Virginia** [1] - 6:2
**visual** [1] - 70:1
**vitiate** [2] - 114:10, 114:13
**vitiating** [2] - 115:1, 115:4
**volume** [1] - 101:6
**volumetric** [6] - 93:12, 93:16, 99:24, 99:25, 101:10, 101:13
**voluminous** [2] - 8:9, 22:15
**voluntarily** [1] - 36:3
**voxel** [1] - 101:10
**VS** [1] - 1:4
**vulnerability** [2] - 83:20, 85:17
**vulnerable** [3] - 82:21, 84:7, 86:1

# W

**wailing** [1] - 19:7
**wait** [1] - 135:22
**waited** [1] - 62:12
**waiting** [1] - 59:10
**walked** [1] - 19:25
**walking** [1] - 10:20
**war** [1] - 26:9
**wars** [4] - 25:15, 25:18, 26:2, 26:10
**Washington** [3] - 1:22, 5:24, 54:20
**waste** [1] - 58:8
**watched** [2] - 36:17, 36:18
**ways** [2] - 12:10, 131:13
**wearing** [1] - 30:23
**web** [1] - 32:24
**Webster** [7] - 48:1, 48:3, 48:8, 49:10, 52:25, 53:2, 53:4
**Webster's** [1] - 53:3
**Wedgworth** [3] - 15:2, 29:17
**week** [3] - 72:4, 72:7, 72:9
**weekend** [3] - 18:13, 136:2, 136:6
**weeks** [1] - 60:21
**weigh** [4] - 45:9, 103:7, 103:8, 107:9
**weight** [4] - 49:24, 49:25, 53:6, 112:14
**well-known** [1] - 84:21

**western** [1] - 6:15
**whereas** [3] - 70:8, 75:16, 113:17
**whistling** [1] - 30:24
**whole** [6] - 10:13, 17:15, 49:25, 58:7, 121:21, 137:14
**Wilson** [10] - 47:16, 47:17, 50:19, 51:1, 51:6, 51:8, 51:9, 52:5, 52:10, 53:12
**win** [1] - 116:6
**wish** [2] - 110:20, 119:12
**witness** [18] - 4:8, 4:12, 4:17, 5:4, 10:1, 38:19, 44:6, 45:9, 47:8, 51:21, 51:25, 76:10, 106:19, 134:5, 134:7, 135:17, 135:18
**WITNESS** [9] - 5:5, 14:25, 15:5, 38:24, 39:2, 40:25, 43:24, 44:2, 44:10
**witnesses** [9] - 28:12, 102:17, 134:4, 134:13, 135:7, 135:17, 136:25, 137:1, 138:5
**WMT** [4] - 53:2, 116:20, 117:22, 118:16
**word** [8] - 80:10, 92:11, 92:14, 92:23, 109:21, 120:11, 124:25
**Word** [5] - 53:2, 116:1, 117:6, 117:9, 118:9
**workings** [2] - 29:6, 29:13
**works** [1] - 59:1
**world** [3] - 48:19, 86:11, 86:16
**worse** [1] - 102:25
**write** [1] - 72:21
**writing** [3] - 72:18, 73:3, 109:24
**written** [3] - 79:8, 126:17, 137:4
**wrote** [8] - 49:7, 52:24, 53:13, 76:2, 101:24, 102:3, 102:12, 118:8

## Y

**year** [5] - 19:12, 32:8, 34:8, 78:14, 83:10
**years** [22] - 19:6, 22:25, 27:2, 31:20, 33:9, 33:18, 36:10, 38:9, 38:12, 48:9, 56:22, 57:6, 57:8, 57:10, 58:2, 61:3, 63:4, 63:14, 66:17, 70:7, 97:4, 98:7
**yesterday** [6] - 54:9, 70:21, 87:8, 95:19, 98:14, 137:2
**York** [6] - 2:8, 50:15, 50:16, 51:11, 52:3, 107:17
**young** [1] - 20:5
**yourself** [5] - 67:14, 68:3, 68:6, 70:13, 70:18
**youth** [2] - 54:12, 59:19

## Z

**zero** [1] - 81:19
**zoom** [1] - 101:23