1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
2                     HOUSTON DIVISION

3    UNITED STATES OF AMERICA        )        NO. 4:21-CR-09
                                     )
4                                    )
     VS.                             )        Houston, Texas
5                                    )     1:19 p.m. to 6:58 p.m.
                                     )
6    ROBERT T. BROCKMAN              )        NOVEMBER 18, 2021

7


8
      ********************************************************
9

                     COMPETENCY HEARING
10
                     AFTERNOON SESSION
11
           BEFORE THE HONORABLE GEORGE C. HANKS, JR.
12
                UNITED STATES DISTRICT JUDGE
13
                          DAY 4
14

15   ********************************************************

16   APPEARANCES:

17   FOR THE GOVERNMENT:

18        Mr. Corey J. Smith
          Mr. Lee F. Langston
19        Mr. Boris Bourget
          Mr. Christopher Magnani
20        U.S. Department of Justice
          Tax Division
21        150 M Street NE
          Room 2208
22        Washington, DC 20002
          Tel:  202-514-9623
23        Email: Corey.smith@usdoj.gov
          Email: Lee.f.langston@usdoj.gov
24             Boris.bourget@usdoj.gov
               Christopher.magnani@usdoj.gov
25

```
 1  FOR THE DEFENDANT:

 2       Mr. Jason Scott Varnado
         Jones Day
 3       717 Texas
         Suite 3300
 4       Houston, TX 77002
         Tel:  832-239-3694
 5       Email:  Jvarnado@jonesday.com

 6       Mr. James P. Loonam
         Ms. Kathryn Keneally
 7       Ms. Sarah Efronson
         Jones Day
 8       250 Vesey Street
         New York, NY 10281
 9       Tel:  212-326-3939
         Email: Jloonam@jonesday.com
10            Kkeneally@jonesday.com

11
    COURT REPORTER:
12
         Ms. Kathleen K. Miller, CSR, RMR, CRR
13       515 Rusk, Room 8004
         Houston, Texas  77002
14       Tel:  713-250-5087

15
    Proceedings recorded by mechanical stenography.
16
    Transcript produced by computer-assisted transcription.
17

18

19

20

21

22

23

24

25
```

```
 1                           INDEX

 2  PETER DICKERMAN

 3       Direct by Mr. Smith                        4
         Cross by Ms. Efronson                     26
 4

 5  NORMAN THOMAS BARRAS, JR.

 6       Direct by Mr. Langston                    34
         Cross by Ms. Keneally                     98
 7

 8  SCOTT ANTHONY LISSE, M.D.

 9       Direct by Mr. Bourget                    126
         Cross by Mr. Loonam                      141
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

01:58:03

1              P R O C E E D I N G S

2                NOVEMBER 18, 2021

3              (1:19 p.m. to 6:58 p.m.)

4 ************************************************************

01:19:13   5         THE CASE MANAGER:  All rise.

6         THE COURT:  Please be seated, everyone.

7              Okay.  You may call your next witness,

8 Mr. Smith.

9         MR. SMITH:  Thank you, Your Honor.  The United

01:19:19  10 States calls Peter Dickerman.

11         THE COURT:  Okay.  Hello, sir.  If you will

12 just be sworn in.

13              (Witness sworn.)

14         THE WITNESS:  I do.

01:19:51  15         THE COURT:  You may take the stand, sir.  And

16 when you are on the stand, sir, you don't have to wear your

17 mask.  You can take them off if you feel comfortable.

18         THE WITNESS:  Okay.

19                   **PETER DICKERMAN,**

01:20:05  20 duly sworn, testified as follows:

21                   **DIRECT EXAMINATION**

22 BY MR. SMITH:

23 **Q.**  For the record, could you just please state your name

24  and spell your last name.

01:20:09  25 **A.**  Yes.  My name is Peter Dickerman.  "D" as in "Delta"

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*PETER DICKERMAN - DIRECT BY MR. SMITH*

1   I-C-K-E-R-M-A-N.

2   **Q.**   And, Mr. Dickerman, how are you employed?

3   **A.**   I am a special agent with the Internal Revenue

4   Service, Criminal Investigation, currently assigned as a

01:20:26   5   senior analyst to our digital forensics program.

6   **Q.**   How long have you been with the IRS?

7   **A.**   For a little bit over 18 years.

8   **Q.**   And that last part -- In what city are you assigned

9   to?

01:20:37   10   **A.**   Denver, Colorado.

11   **Q.**   And that last part of your title, the computer

12   forensics -- what is that called?  The --

13   **A.**   So, currently I am a senior analyst for our digital

14   forensics program.  Prior to being switched over into the

01:20:56   15   senior analyst role, my title was as a computer

16   investigative specialist.  So, that would be, basically,

17   any digital evidence that is received or seized in the

18   course of an investigation that IRS is executing is

19   something that would come through somebody like myself,

01:21:18   20   whether it be something that was received from a provider

21   like Google or through a search warrant where computers,

22   phones or any other device capable of storing digital

23   evidence -- that would be something that I would process,

24   and then later do an analysis of the data that was seized.

01:21:42   25   **Q.**   So, how long have you had that position as a digital

*PETER DICKERMAN - DIRECT BY MR. SMITH*

1    forensic specialist?

2    **A.**    I have been doing that full-time since 2013.

3    **Q.**    And have you had any specialized training with the

4    IRS regarding digital forensic analyst?

01:22:00    5    **A.**    I have.  My training in that area began in either

6    2010 or 2011, and it has continued on an annual or more

7    frequent basis since then, beginning with the basic

8    computer evidence recovery training, which is part of a

9    three-agency program with IRS, HSI, and Secret Service.

01:22:31    10    Over the course of that, I have also obtained a number of

11    certifications relating to the field of digital forensics

12    as well.

13    **Q.**    And you mentioned you sometimes are called in to

14    search warrants.  Could you briefly describe for the

01:22:45    15    Court, when there is a search warrant and you are assigned

16    to go to the search warrant, what is your obli -- what is

17    your duty at the search warrant site?  What are you

18    supposed to do?

19    **A.**    So, my role as a digital forensics specialist is to

01:22:57    20    identify items that are likely to contain evidence that is

21    called for in the search warrant and to process that in a

22    forensically sound manner to preserve that data, whether

23    it be from a typical computer, a cellular phone or

24    whatever digital media that we are talking about.

01:23:23    25    **Q.**    So, physically, what do you do at the search warrant

*PETER DICKERMAN - DIRECT BY MR. SMITH*

1    site to preserve that evidence, as you say?  What is it

2    you actually do?

3    **A.**    So, I -- for instance, with a desktop computer, I

4    would actually physically remove that from the location

01:23:43   5    where it's installed and, depending on the actual

6    components, may end up removing the hard drive and then

7    using various equipment to make an exact copy of -- of

8    that device.  So, that would be an actual bit-for-bit copy

9    of that device so, that way, that can be preserved and can

01:24:10   10   be looked at ongoing while no longer needing access to the

11   original physical device.

12   **Q.**    So, when you make an image of what's on an electronic

13   device, do you use any measures to ensure that that copy

14   is accurate?

01:24:24   15   **A.**    We do.  We go through a process of what's referred to

16   as "hash verification."  So, basically, it's a -- there

17   are a number of different algorithms that are used.

18   Typically, MD5 and SHA-1 are the typical algorithms that

19   are applied to that.  And what that does is observes what

01:24:47   20   the data -- what the original state of the data is on the

21   device that's being acquired.  So, it looks at it on that

22   original device, and then after the image has been

23   completed, it verifies that the MD5 or SHA-1 value of that

24   matches that original device so that it verifies that it

01:25:13   25   is, in fact, a bit-for-bit copy.

*PETER DICKERMAN - DIRECT BY MR. SMITH*

1    Q.    So, when you leave a search warrant site after doing

2    one of these imaging jobs, are you confident that what you

3    are leaving that site with is a true and accurate copy of

4    what was on the computers or electronic devices seized?

01:25:30    5    A.    Yes.  And -- and, predominantly, the practice is to

6    do that on-site.  There are times when we will have to

7    remove the device for various reasons.  And there are also

8    times when we will retain the physical device in addition

9    to the forensic copy.

01:25:52    10    Q.    So -- Thank you, Mr. Dickerman.  At some point in

11    time in your duties as an IRS special agent, were you

12    assigned to the Robert Smith investigation?

13    A.    Yes, I was.

14    Q.    And when was that?

01:26:06    15    A.    My official assignment to that would have been -- I

16    believe it was August of 2016.

17                    In my role as a digital forensics

18    specialist, I often am sought and consulted upon by the

19    case agents even before I am officially assigned to a

01:26:30    20    case, just to kind of have them pass things by me, to give

21    them advice and whatnot.  But, officially, I began working

22    on that in September of 2016 -- or August of 2016, rather.

23    Q.    August of 2016?

24    A.    Correct.

01:26:47    25    Q.    So, let me ask you to briefly, very briefly, please,

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PM 4-9

*PETER DICKERMAN - DIRECT BY MR. SMITH*

1   describe -- I know the Robert Smith case is a big case --

2   but can you briefly describe for the Court just what that

3   case involved.

4   **A.**   So, the Robert Smith investigation, essentially, was

01:27:03   5   a tax investigation in which it was alleged that Robert

6   Smith had underreported his income, and that that income

7   had been primarily held in offshore entities.

8   **Q.**   And that investigation in that case is pretty much

9   terminated at this point; is that correct?

01:27:24   10   **A.**   Yes.

11   **Q.**   So, do you know what the IRS voluntary disclosure

12   program is?

13   **A.**   I do.

14   **Q.**   Can you describe for the Court what that is?

01:27:33   15   **A.**   So, the offshore voluntary disclosure program was a

16   program that was instituted by the IRS in an effort to

17   provide individuals with an opportunity to avoid criminal

18   prosecution by reporting holdings and income from offshore

19   entities and/or banks that they had not previously

01:27:58   20   disclosed and to -- if that was done in a forthright and

21   in an honest manner, for them to avoid prosecution.

22   **Q.**   And do you know whether or not Mr. Robert Smith

23   attempted to avail himself of this voluntary disclosure

24   program?

01:28:15   25   **A.**   He did.

*PETER DICKERMAN - DIRECT BY MR. SMITH*

1    **Q.**   Let me show you -- and we can put it on the screen --

2    what's marked for identification as Government's 118.

3            MR. SMITH:  It's -- yeah, the letter, 117,

4    then.  Yes.

01:28:37  5            This is Government's Exhibit 117?

6            MR. LANGSTON:  118.

7            MR. SMITH:  118.

8    BY MR. SMITH:

9    **Q.**   So, 118 is on the screen marked for identification.

01:28:47  10   Do you recognize this letter?

11   **A.**   I do.

12   **Q.**   And does it pertain to Mr. Smith?

13   **A.**   It does.

14   **Q.**   And what's the date of the letter?

01:28:54  15   **A.**   The date of the letter is May 13th of 2015.

16   **Q.**   And does this pertain to Mr. Smith's attempt to get

17   into the voluntary disclosure program?

18   **A.**   Yes.  It's a cover letter relating to that.

19   **Q.**   Do you know whether or not Mr. Smith qualified or was

01:29:11  20   accepted into the voluntary disclosure program?

21   **A.**   He was not accepted into it.

22   **Q.**   Do you know why?

23   **A.**   An investigation related to Mr. Smith had already

24   commenced prior to that being received.

01:29:21  25   **Q.**   So, what does that have to do with accepting

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*PETER DICKERMAN - DIRECT BY MR. SMITH*

1    Mr. Smith into the voluntary disclosure program?

2    **A.**    The voluntary disclosure program would only apply to

3    people who had not been looked at previously but, rather,

4    were coming forward prior to -- prior to them being

01:29:40    5    investigated.

6    **Q.**    And if I can show you 117.  Can we just go to the

7    first page for a second.

8                    Do you recognize this document that is on

9    the screen, which is marked for identification as

01:29:57    10    Government's Exhibit 117?

11    **A.**    I do.

12    **Q.**    What is it?

13    **A.**    It's a Form 8275 relating to the -- the offshore

14    holdings that -- that Mr. Smith was claiming to have, and

01:30:16    15    this was attached to his -- his amended return that was

16    submitted.

17    **Q.**    So, what is the purpose -- why would a taxpayer use a

18    Form 8275?

19    **A.**    That would be used to disclose offshore holdings.

01:30:35    20    **Q.**    And if we can go -- and this is the form pertaining

21    to -- a form per -- pertaining to Mr. Smith?

22    **A.**    Yes.

23                    MR. SMITH:  Can we go to the second page?

24    BY MR. SMITH:

01:30:45    25    **Q.**    I want to draw your attention to the second page.

*PETER DICKERMAN - DIRECT BY MR. SMITH*

1    And what is the relationship between this narrative here

2    and the Form 8275?

3    **A.**   So, this is the attachment that is referenced on the

4    previous page citing that -- that this narrative was

01:31:04  5    essentially explaining the circumstances relating to his

6    offshore holdings.

7    **Q.**   And do you know whether -- was this Form 8275 filed

8    with the IRS contemporaneous with the letter that we just

9    saw, which was Government's Exhibit 118?

01:31:21  10   **A.**   It was.

11   **Q.**   And I want to draw your attention to the second

12   paragraph and ask you some questions about it.

13              Where it starts "Fund II..."  During the

14   course of your assignment to the Robert Smith

01:31:41  15   investigation, do you know what Fund II is?

16   **A.**   Yes.  Fund II is an investment fund under Vista

17   Equity Partners.

18   **Q.**   And, as far as you know from the course of your

19   investigation or the investigation you were assigned to,

01:31:54  20   what was the relationship to Fund II and the -- what

21   Mr. Smith was being investigated for?

22   **A.**   There was a direct relationship, in that the income

23   that he was holding offshore was derived from -- from

24   Fund II and Vista Equity.

01:32:16  25   **Q.**   And later in that paragraph, one, two -- Let me just

*PETER DICKERMAN - DIRECT BY MR. SMITH*

1  direct your attention to a particular line.  It's one,

2  two, three, four, five -- six lines down.  Do you see

3  that?  It starts "Partnership agreement..."

4  **A.**   I see a sentence ending in "partnership agreement,"

01:32:47  5  yes.

6  **Q.**   Yeah.  So -- well, actually, the sentence above it

7  where the --

8  **A.**   Okay.

9  **Q.**   -- the word "Hurdle" with parenthesis around it -- Do

01:32:55  10  you see that?

11  **A.**   Yes.

12  **Q.**   And after that it says, "Hurdle to Point."  Do you

13  see where it says point?

14  **A.**   Yeah.

01:33:04  15  **Q.**   Do you know what "Point" is?

16  **A.**   Point Investments is an entity -- is an offshore

17  entity.

18  **Q.**   Now, at the time this was received, this -- 117 and

19  118 were received by the IRS, were they sent directly to

01:33:20  20  your division of the IRS criminal investigations?

21  **A.**   No.  They were sent to a service center.

22  **Q.**   And at some point in time, are you aware of them

23  being sent to criminal investigations?

24  **A.**   Yes.

01:33:32  25  **Q.**   And at that time this entity, Point -- is there some

1  connection between that reference and Mr. Brockman?

2  **A.**   So, when this -- when these documents were received

3  by the investigative team, there were various efforts made

4  to determine who or what Point Investment was.  Through

01:34:05  5  the course of the investigation it was determined that

6  Point Investment was held by another entity called Spanish

7  Steps.  Spanish Steps was held by an entity called the A.

8  Eugene Brockman Trust, and Mr. Robert Brockman is a

9  beneficiary of the A. Eugene Brockman Trust.

01:34:26  10            MR. SMITH:  At this time, Your Honor, I would

11  offer 117 and 118 into evidence.

12            THE COURT:  Any objection?

13            MS. EFRONSON:  No objection, Your Honor.

14            THE COURT:  With no objection, 117 and 118 are

01:34:34  15  admitted.

16  BY MR. SMITH:

17  **Q.**   So, what I want to ask you, Mr. Dickerman, is after

18  this document was received in 2015 and sent to criminal

19  investigations, and the idea of Points and whether or not

01:34:49  20  it there was a connection to Mr. Brockman -- once that was

21  all digested by CI, did there come a point in time where

22  IRS criminal investigations opened a criminal

23  investigation into Mr. Brockman?

24  **A.**   Yes.

01:34:59  25  **Q.**   Do you know when or about that was?

*PETER DICKERMAN - DIRECT BY MR. SMITH*

1    **A.**    I believe that was in 2017.

2    **Q.**    Were you assigned to that investigation?

3    **A.**    I was.

4    **Q.**    So, I now want to show you what's marked for

01:35:13  5    identification as Government's Exhibit 28.  We will put it

6    on the screen.  Or you have got a binder right there.  You

7    can look at it, too.  The very first -- Yeah, that one.

8    But we are going to put it on the screen as well.

9                     Scroll down to the date it was issued.

01:35:55  10                     So, Mr. Dickerman, what is Government's

11    Exhibit twenty -- what's marked for identification as

12    Government's Exhibit 28?

13    **A.**    This is a grand jury subpoena that was issued to

14    Vista Funds, LLC, on or around September 15th of 2016.

01:36:12  15    **Q.**    And was this part of the Robert Smith criminal

16    investigation?

17    **A.**    It was.

18    **Q.**    And I want to ask you to turn the page to the second

19    page.  And on Part A of that second page, there's a list

01:36:30  20    of Vista Equity entities.

21                     No. 9, Vista Equity Fund II.  Do you

22    recognize that?

23    **A.**    I do.

24    **Q.**    And is that the same entity that was referenced in

01:36:44  25    Mr. Smith's 82 -- the exhibit we just looked at?

PM 4-16

*PETER DICKERMAN - DIRECT BY MR. SMITH*

1    **A.**   In the narrative of that, yes.

2    **Q.**   And during the course of your investigation, did you

3    determine whether there was a relationship between Point

4    and Vista Equity Fund II GP, LLC?

01:36:58   5    **A.**   Yes.  Point had -- was the -- was the entity that had

6    funded the -- that investment and was also the limited

7    partner of that.

8    **Q.**   And later down in that subpoena, the documents

9    requested, No. 4 and No. 5 -- what type of -- I don't want

01:37:22   10   you to read the whole thing, but just what type of

11   documents were being requested by the subpoena?

12   **A.**   Articles of incorporation, partnership agreement,

13   correspondence, basically, anything relating to the

14   entities under these -- these various Vista Funds and/or

01:37:45   15   entities.

16   **Q.**   To the best of your knowledge, would that include

17   Point?

18   **A.**   It would have.

19   **Q.**   And why is that?

01:37:54   20   **A.**   As the limited partner of Vista Equity Fund II Point

21   would fall under that.

22   **Q.**   Do you know if this subpoena was complied with back

23   in 2016?

24   **A.**   I'm sorry?

01:38:04   25   **Q.**   Did you receive records?

*PETER DICKERMAN - DIRECT BY MR. SMITH*

1   **A.**   Yes.

2          MR. SMITH:  Offer 28 at this time, Your Honor.

3          THE COURT:  Any objection?

4          MS. EFRONSON:  No objection.

01:38:11   5          THE COURT:  Without objection, 28 is admitted.

6   BY MR. SMITH:

7   **Q.**   So, I just want to ask you about a few more key

8   milestones in the course of your investigation of Robert

9   Smith -- or not yours but IRS's investigation of Robert

01:38:23   10   Smith and then, later, Robert Brockman.

11              I am going to draw your attention to the

12   date August 15th, 2018.  What, if anything, happened on

13   that date with regard to these investigations?

14   **A.**   On that date a -- a federal search warrant was

01:38:37   15   executed in -- here in Houston, Texas, at the residence of

16   a Carlos Kepke, a Houston-based attorney.

17   **Q.**   And were records taken in that search warrant?

18   **A.**   They were.

19   **Q.**   And, to the best of your knowledge, your duties and

01:38:55   20   assignments of these two investigations, do you know what

21   the relationship was or what you determined to be the

22   relationship between Mr. Kepke and Mr. Brockman?

23   **A.**   Mr. Brockman was a client of Mr. Kepke.

24   **Q.**   And Mr. Kepke and Mr. Smith?

01:39:11   25   **A.**   Correct.

*PETER DICKERMAN - DIRECT BY MR. SMITH*

1   **Q.**   The same thing?

2   **A.**   Yes.

3   **Q.**   Okay.  Then I want to ask you about a date September

4   5th, 2018.  What, if anything, happened on that date?

01:39:26   5   **A.**   So, on September 5th of 2018 a Bermudian search

6   warrant in the country and island of Bermuda was executed

7   at the residence of Evatt Tamine.

8   **Q.**   I'm sorry.  I neglected to ask you.  Before we get to

9   the September 5th search warrant:  In the August 15th

01:39:46   10   search warrant of Carlos Kepke, were records taken?

11   **A.**   There were.

12   **Q.**   Was digital evidence taken?

13   **A.**   Yes.

14   **Q.**   And is that evidence still in the custody of the IRS

01:39:56   15   and the Department of Justice?

16   **A.**   It is.

17   **Q.**   So, there was a search warrant executed in Bermuda on

18   September 5th?

19   **A.**   Yes.

01:40:02   20   **Q.**   And whose home was it executed at?

21   **A.**   At Evatt Tamine's.

22   **Q.**   Were you there?

23   **A.**   I was.

24   **Q.**   Can you describe for the Court what happened on that

01:40:10   25   date at Mr. Tamine's home?

*PETER DICKERMAN - DIRECT BY MR. SMITH*

1    **A.**   So, the warrant happened at a residence at 2 Hidden

2    Lane in Bermuda.  This was a fairly large multi -- or a

3    fairly large single-family home.  I believe there were two

4    or three floors to it.

01:40:37   5              And during the course of that search

6    warrant, there were a number of paper documents and quite

7    a few number of computers and/or computer-related devices

8    taken.

9              Later on, that warrant ended up turning

01:40:53   10   into a series of -- of warrants that were -- that occurred

11   on some additional dates.

12   **Q.**   So, let me ask you about -- Before we get to the

13   second -- the follow-up warrant, let me ask you about the

14   first one.

01:41:10   15              Was your job at the initial search

16   warrant?

17   **A.**   To locate and secure any computer-related or digital

18   evidence.

19   **Q.**   And before I ask you about your -- what you did, was

01:41:24   20   this a search warrant that was requested by the IRS?

21   **A.**   It was not.

22   **Q.**   So, you're at the location.  How many IRS agents were

23   at the location?

24   **A.**   I believe in addition to myself there were four or

01:41:44   25   five, I believe, other IRS agents.

*PETER DICKERMAN - DIRECT BY MR. SMITH*

1  **Q.**   Was there any other law enforcement presence at the

2  search warrant?

3  **A.**   So, predominantly, the presence was with the Bermuda

4  Police Services.

01:41:58  5  **Q.**   So, what was -- your job was to -- as you already

6  described for the Court, to take images of digital

7  evidence?  Is that --

8  **A.**   Yes, to -- to -- in a forensically sound manner, to

9  secure those devices and to later make forensic copies of

01:42:15  10  those devices.

11  **Q.**   And did you do that?

12  **A.**   I did.  With -- with -- along with the assistance of

13  an individual from the Bermuda Police Services.

14  **Q.**   Can you quantify for the court how much digital

01:42:26  15  evidence you imaged on that day?

16  **A.**   So, in that first search there was -- between the

17  various devices there was a total of -- in excess of 90

18  terabytes of data storage capability.

19  **Q.**   And, so, just to give a sense of how much that is,

01:42:47  20  compared to other search warrants that you had to image

21  digital evidence, how does that compare?

22  **A.**   In the time that I have been acting in this role,

23  that was by far the largest amount of data that I had been

24  involved in seizing, whether it be on my own cases or ones

01:43:04  25  that I had assisted in.

PETER DICKERMAN - DIRECT BY MR. SMITH

1   Q.   Now, you mentioned that there were some follow-up

2   warrants.  Can you just briefly describe the circumstances

3   of those -- I'm sorry.  Before we get there:

4                    Digital devices.  How many digital devices

5   were there that you had to work with?

6   A.   It was somewhere in the neighborhood of 20 devices.

7   Q.   And can you describe for the Court what kind of

8   devices we're talking about?

9   A.   There were laptops, desktop computers.  There were

10  external hard drives.  There was network storage devices.

11  I believe some mobile phones as well.

12  Q.   Now, you mentioned there were follow-up warrants.

13  Now can you please describe the circumstances of those

14  follow-up warrants.

15  A.   So, during the course of the investigation it became

16  known to us that during the initial search that there were

17  items that were -- that were missed because they had been

18  obscured and/or -- or relocated prior to that -- the

19  execution -- the execution of that search warrant.

20  Q.   And did you later go back to the same location

21  several days later to find those items?

22  A.   So, the subsequent search warrants were not ones that

23  I personally participated in but law enforcement

24  individuals again from the Bermuda Police Services.

25  And -- and, at least for the third search warrant, there

*PETER DICKERMAN - DIRECT BY MR. SMITH*

1    was a member of the Internal Revenue Service at that one

2    as well.

3    **Q.**    Did you -- did you later have a hand in imaging some

4    of the digital evidence from those devices?

01:44:41   5    **A.**    I did.

6    **Q.**    And what type of devices are we talking about?

7    **A.**    So, in the -- in the third search warrant there were

8    a few different -- there were two different locations that

9    were -- that were searched and a few different types of

01:45:00   10   devices.  There was a storage locker at -- at a location

11   other than Mr. Tamine's residence which contained some

12   tubs that had several laptop computers.  And then at

13   Mr. Tamine's residence, there was -- inside a child's game

14   box, there were found several laptop hard drives and --

01:45:31   15   that had been removed from laptops, and there were

16   additional -- additionally, an SD memory card.

17   **Q.**    And were there any e-mail servers seized?

18   **A.**    So, one of the laptops that was seized at the storage

19   location contained a private e-mail server.

01:45:51   20   **Q.**    Can you describe for the Court, what is a private

21   e-mail server?

22   **A.**    So, an e-mail server is, essentially, a computer that

23   operates and handles the task of receiving and

24   distributing e-mails from sender and recipients that have

01:46:16   25   access to that.

KATHY MILLER, RMR, CRR - kathy@miller-reporting.com

PETER DICKERMAN - DIRECT BY MR. SMITH

1           These -- this e-mail server, along with

2  several of the other devices, additionally, resided on

3  drives that employed what's referred to as "full disk

4  encryption," meaning that the data that was on those

01:46:35   5  without appropriate passwords and/or decryption keys would

6  be unaccessible or unreadable to individuals.

7  **Q.**   And you worked with these laptop/e-mail servers?

8  **A.**   I did.

9  **Q.**   Do you know where they were found?

01:46:54  10  **A.**   So, the e-mail server and -- and the -- which was --

11  which resided on a laptop, and the other laptops were

12  found at a storage location, not -- at a storage locker

13  initially.

14  **Q.**   And were there other parts of this e-mail system that

01:47:15  15  were in different locations?

16  **A.**   Yes.  The hard drives of -- of some of those laptops

17  had been removed and they had been kept at Mr. Tamine's

18  residence and obscured inside a child's game box.

19  **Q.**   And so -- in a child's game box.  Was it out in the

01:47:43  20  open or was it concealed somewhere?

21  **A.**   I believe it was on a bookcase or something of that

22  nature.

23  **Q.**   So, just so we understand:  So, you have the laptop

24  and the hard drives removed but in a different location,

01:47:52  25  in a different building?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PM 4-24

*PETER DICKERMAN - DIRECT BY MR. SMITH*

 1  **A.**   Yes.

 2  **Q.**   In a child's game box?

 3  **A.**   Correct.

 4  **Q.**   Did you manage to assemble this system?

01:48:00  5  **A.**   I did.

 6  **Q.**   And did you -- were you able to see what the data was

 7  on the system, and did you image it?

 8  **A.**   Yes.  So, it was a multi-step process to do it in a

 9  forensically sound manner, first taking a -- just a normal

01:48:17  10  forensic image of those storage devices, whether it be the

 11  laptop, hard drive, the SD card or -- or the external hard

 12  drive -- or external USB hard drive and then later, with

 13  the assistance of Mr. Tamine, using the passwords that he

 14  had provided to create a decrypted copy of that same data.

01:48:46  15  **Q.**   So, the data was encrypted?

 16  **A.**   It was.

 17  **Q.**   You needed assistance to decrypt it?

 18  **A.**   Correct.

 19  **Q.**   Once it was decrypted were you able to determine who

01:48:54  20  the users of this e-mail server system were?

 21  **A.**   So, the e-mail accounts that were managed by the

 22  e-mail server were in the name of Permit, p-e-r-m-i-t, at

 23  hannah.com, and there was a -- an additional e-mail

 24  account in the name of redfish@permit.com -- or at

01:49:23  25  hannah.com.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*PETER DICKERMAN - DIRECT BY MR. SMITH*

1  Q.   At some point in time did you mange to obtain this

2  data from this system?

3  A.   I'm sorry.  Say that again.

4  Q.   At some point in time were you able to obtain the

01:49:33    5  data from the system?

6  A.   So, after I assisted in the decryption of the data, I

7  was able to extract from that the e-mails that were

8  contained on the various devices so that they could go

9  through a privileged review process ordered by the

01:49:56   10  Bermudian court.

11  Q.   Is that process now complete?

12  A.   It's complete relating to some of the e-mails, but it

13  is ongoing relating to additional digital evidence.

14  Q.   Okay.  Let me ask you to turn your attention to

01:50:11   15  Exhibit 29, which I believe this exhibit is preadmitted.

16            MS. EFRONSON:  It is.

17            MR. SMITH:  Yeah.

18  BY MR. SMITH:

19  Q.   So, this appears to be a trip itinerary.  I just -- a

01:50:29   20  couple of questions about this, Mr. Dickerman.

21            Is this a document that you're familiar

22  with due to your assignment to this investigation?

23  A.   Yes.

24  Q.   What is the date frame of this trip itinerary?

01:50:40   25  A.   So, the trip dates range from September 3rd of 2018

PETER DICKERMAN – CROSS BY MS. EFRONSON

1   to September 10th of 2018.

2   **Q.**   Does that encompass the time frame in which you were

3   in Bermuda during the search warrant that you were just

4   telling the Court about?

01:50:52   5   **A.**   It does.

6   **Q.**   And who is on this trip?

7   **A.**   So, the passengers are Robert Brockman, Robert

8   Nalley, Norman Barras, Edward Cappel, Carlan Cooper,

9   Alfred Deaton, Joe Doggett, Tommy Harper, Jerry Kirwan,

01:51:13   10   Fred Massey, Charles McCord, and Stuart Yudnofsky.

11   **Q.**   And where is the trip from and to?

12   **A.**   The trip is from Houston, Texas, to Anchorage,

13   Alaska.

14           MR. SMITH:  Okay.  Can I have a moment, Your

01:51:26   15   Honor?

16           THE COURT:  Sure.

17           MR. SMITH:  Yeah.  No further questions.  Thank

18   you.

19           THE COURT:  Okay.  Cross-examination.

01:51:49   20           MS. EFRONSON:  Good afternoon, Your Honor.

21   Sarah Efronson on behalf of Mr. Brockman.

22           THE COURT:  You may proceed when ready.

23                    **CROSS-EXAMINATION**

24   BY MS. EFRONSON:

01:51:57   25   **Q.**   Good afternoon, Mr. Dickerman.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1   **A.**   Good afternoon.

2   **Q.**   You are not a doctor, are you?

3   **A.**   I am not.

4   **Q.**   And you are not qualified to opine as to whether

01:52:06   5   Mr. Brockman is or is not competent to stand trial?

6   **A.**   Correct.

7   **Q.**   And you have never met Mr. Brockman?

8   **A.**   I have not.

9   **Q.**   Okay.  So, you have no personal knowledge as to

01:52:15   10   Mr. Brockman's cognitive functioning?

11   **A.**   Correct.

12   **Q.**   But at least one witness on the government's witness

13   list, Robert Burnett, told the government this past

14   Friday --

01:52:25   15             MR. SMITH:  Objection, Your Honor.

16             THE COURT:  Okay.

17             MR. SMITH:  I don't know what Robert Burnett

18   has to do with this witness on direct, and she's about to

19   bring up a question of what Mr. Burnett said.  It would be

01:52:38   20   asking for hearsay.

21             THE COURT:  Okay.  Question -- I mean,

22   response?

23             MS. EFRONSON:  Yeah.  He is a member of the

24   prosecution team and is a government's witness.  I am

01:52:47   25   trying to see what he has knowledge as to.

*PETER DICKERMAN - CROSS BY MS. EFRONSON*

1          THE COURT:  Are you going to ask him -- Well,

2     the way you started the question was 'Mr. Burnett testified

3     and he said X.'  So, rephrase the question, and I'll let

4     you ask him about that issue, but you can't start that way.

01:53:01    5          MS. EFRONSON:  Okay.

6     BY MS. EFRONSON:

7     **Q.**   Were you aware that Mr. Burnett is one of the

8     government -- is one of the government's witnesses on

9     their witness list?

01:53:12   10    **A.**   I am not familiar with Mr. Burnett.

11    **Q.**   Okay.  The prosecution didn't tell you that

12    Mr. Burnett is on their witness list?

13    **A.**   That's not an event I am familiar with, no.

14    **Q.**   Okay.  So, they didn't tell you that?

01:53:24   15    **A.**   No.

16    **Q.**   Okay.  On your direct examination, when Mr. Smith was

17    asking you questions, you said that the investigation

18    against Robert Smith had terminated.  Do you recall that

19    testimony?

01:53:38   20    **A.**   Yes.

21    **Q.**   Okay.  And was that due to the nonprosecution

22    agreement that Mr. Smith received from the government?

23    **A.**   Yes.

24          MS. EFRONSON:  No further questions, Your

01:53:50   25    Honor.

PM 4-29

```
              1              THE COURT:  Anything further, Mr. Smith?
              2              MR. SMITH:  No, Your Honor.  No further
              3 questions.
              4              THE COURT:  May this witness be excused?
  01:53:56    5              MR. SMITH:  Yes.  Yes, Your Honor.  Yes.
              6              THE COURT:  Thank you, sir.  You may be
              7 excused.
              8              MR. SMITH:  Your Honor, the government calls
              9 Norman Tommy Barras.
  01:54:21   10              THE COURT:  Okay.
             11              MR. JOHNSON:  Your Honor, he is right outside.
             12 I will go grab him.
             13              THE COURT:  Okay.  Sure.
             14              MR. JOHNSON:  Your Honor, Mr. Barras just
  01:55:29   15 stepped up to the 7th floor.
             16              THE COURT:  I assume that you are going to be
             17 representing Mr. Barras.
             18              MR. JOHNSON:  Yes, Your Honor.
             19              THE COURT:  If you would like to come up and
  01:55:36   20 sit closer to you can hear, that would be fine.
             21              MR. JOHNSON:  Thank you very much.
             22              THE COURT:  Or you can stay where you are.  I
             23 am not pressuring you.  But if you might be representing
             24 him, you have a right to be up front.
  01:59:42   25              MR. LANGSTON:  Your Honor, I'm sorry for the
```

```
 1  wait.  Do you want to take our break now and then we will
 2  just go with that or --
 3              THE COURT:  Sure.  I mean, we can go ahead and
 4  break for 15 minutes and then we will start.  It might make
 5  it a little easier.
 6              MR. LANGSTON:  That way, we will save a little
 7  time.
 8              MR. SMITH:  There is a small matter with regard
 9  to some of the exhibits we just put in --
10              THE COURT:  Okay.
11              MR. SMITH:  -- the Robert Smith material.  I
12  think Robert Smith's attorney is here.  I think she wants
13  to be heard.
14              THE COURT:  Okay.
15              MR. SMITH:  Whether we should put those under
16  seal.  We want the Court to have them, but since they are
17  tax filings Robert Smith's attorney would like them to be
18  sealed.  I don't think either side has -- I can't speak for
19  counsel.  The government doesn't have a real strong
20  position on it either way.
21              THE COURT:  Okay.
22              MR. SMITH:  But they have -- Emily is in the
23  courtroom.  I think she wants to be heard.  Since we got
24  some time here, I thought maybe --
25              THE COURT:  Sure.
```

01:59:50
01:59:57
02:00:04
02:00:16
02:00:25

1            MR. SMITH:  -- we could just dispense with

2   that.  I don't know what their position is.

3            THE COURT:  Let me be heard on this.  I mean,

4   you want -- counsel, please speak.

02:00:34  5            MS. HUGHES:  Thank you, Your Honor.  Emily

6   Hughes with Kirkland and Ellis on behalf of Robert Smith.

7                 So, the exhibits that the government just

8   had admitted -- Exhibits 117 and 118, I believe -- contain

9   confidential taxpayer information of my client, Robert

02:00:51  10  Smith.  That confidential taxpayer information is, of

11  course, heavily protected and guaranteed protections by

12  Congress under 6103.  It's not relevant or directly related

13  to the proceedings here as to whether or not Mr. Brockman

14  is competent.

02:01:06  15                We don't have any objection, of course, to

16  the information being before the Court, including the date

17  of the filing and the fact that Point Investments is

18  identified in that document, but there are lots of other

19  details in that document that are protected taxpayer

02:01:22  20  information.  So, we would ask that it be sealed or

21  redacted.

22            THE COURT:  And the government doesn't have a

23  position on this?

24            MR. SMITH:  Well, we have a position in that we

02:01:28  25  think it's relevant because it sets the timeline of the

1  investigation, but as far as --

2          THE COURT:  But as far as sealing it.

3          MR. SMITH:  But as far as sealing it -- as long

4  as the Court has it, that's what our concern is.  The

02:01:38  5  public doesn't need to see it.  We just want the Court to

6  have it.

7          THE COURT:  Defendant?

8          MR. VARNADO:  And, Your Honor, I would just

9  say, I mean, we don't think it's relevant.  It might be

02:01:44  10  relevant for Mr. Smith, not Mr. Brockman.  But, look, I

11  think it's already public knowledge that the letter sent in

12  for the Swiss program contained false information for

13  Mr. -- on behalf of Mr. Smith.  So, if the Court wants to

14  seal it, that's fine.

02:01:57  15          THE COURT:  I am granting your request to seal

16  the record.  So, those exhibits will be sealed.

17          Madame court reporter, as part of the

18  record, those records -- the exhibits that were used during

19  the examination of the last witness will be sealed.

02:02:11  20          MR. SMITH:  Well, it's just one or two.  Not

21  all of them, just the two, Your Honor.

22          THE COURT:  Two.  Which --

23          MR. SMITH:  117 and 118.

24          THE COURT:  117 and 118 are sealed.

02:02:21  25          MS. HUGHES:  Thank you, Your Honor.

1          THE COURT:  My case manager is here and we will

2   make sure that that happens.

3               MS. HUGHES:  Thank you very much.

4               MR. SMITH:  Thank you, Your Honor.

02:02:27   5          THE COURT:  Not a problem.

6               MR. LANGSTON:  Mr. Barras is now, apparently,

7   right outside.  So, whatever the Court would like to do.

8   We can get going and then take our break a little later.

9               THE COURT:  I would like to keep going --

02:02:36   10         MR. LANGSTON:  Then, let's do.

11              THE COURT:  -- because we have a lot going on

12  this morning.  We have lost time.  So, let's just keep

13  pushing on.

14              MR. LANGSTON:  Okay.

02:03:14   15         THE COURT:  Good afternoon, sir.  If you could

16  just raise your right hand.  Sorry.

17              THE WITNESS:  Sorry.

18                   (Witness sworn.)

19              THE WITNESS:  I do.

02:03:30   20         THE COURT:  You may take the stand.  And when

21  you are on the stand, you don't have to wear your mask if

22  you don't want to.

23              THE WITNESS:  Thank you.

24              THE COURT:  And you may proceed when ready.

02:03:51   25         MR. LANGSTON:  For the record, the witness just

1  winked at the defendant.

2          THE COURT:  Okay.  I didn't see it, but if you

3  say it happened, then the record --

4          MS. KENEALLY:  I didn't see it either.  I was

02:04:02  5  watching the stand.  I didn't see it.

6                    **NORMAN THOMAS BARRAS, JR.,**

7  duly sworn, testified as follows:

8                    **DIRECT EXAMINATION**

9  BY MR. LANGSTON:

02:04:04  10  **Q.**   Can you state your name for the record.

11  **A.**   Norman Thomas Barras, Jr.

12  **Q.**   Did you just wink at the defendant?

13  **A.**   I did.

14  **Q.**   What's your current position at Reynolds and

02:04:15  15  Reynolds?

16  **A.**   I am the CEO and chairman.

17  **Q.**   How long have you worked there?

18  **A.**   45 years.

19  **Q.**   Who hired you?

02:04:21  20  **A.**   Bob Brockman.

21  **Q.**   And did Mr. Brockman personally hire you right out of

22  high school?

23  **A.**   Yes.

24  **Q.**   How old -- who did you report to throughout your

02:04:33  25  career?

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1   **A.**   Can you restate the question?

2   **Q.**   Who did you -- to whom did you report during your

3   career?

4   **A.**   Oh, I had many, many managers and supervisors

02:04:44   5   throughout my career -- 45-year career.  Ultimately, I

6   reported to Bob.

7   **Q.**   And were you a direct report to him for at least 20

8   years?

9   **A.**   That would be fair to say.

02:05:00   10   **Q.**   Could you tell the Court a little bit about your

11   relationship to Mr. Brockman?

12   **A.**   Well, we have worked together 45 years in the

13   technology parts of the business.  We've constructed

14   applications for the automobile industry from the ground

02:05:21   15   up to build, you know, complete systems that allow

16   automobile dealerships to run their business.

17   **Q.**   Do you view Mr. Brockman as, essentially, family?

18   **A.**   Yes.

19   **Q.**   You, in fact -- you view him as your father,

02:05:38   20   essentially?

21   **A.**   Yes.

22   **Q.**   Who made the decision to make you president and then

23   CEO and chairman?

24   **A.**   Bob Brockman.

02:05:51   25   **Q.**   What was your compensation prior to becoming CEO?

PM 4-36

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1  **A.**   I don't know the exact number, but in the 600k range.

2  **Q.**   Okay.  And what's your current compensation?

3  **A.**   About $11 million.

4  **Q.**   Mr. Brockman also gave you a 1 percent interest in

02:06:24  5  UCS at some point?

6  **A.**   That's long ago.  Yes.

7  **Q.**   And that interest is worth in excess of $40 million?

8  **A.**   I couldn't say exactly what it's worth.

9  **Q.**   Approximately $40 million?

02:06:41  10  **A.**   That sounds like a good number.

11  **Q.**   Other executives who receive 1 percent have been paid

12  out for that amount?

13  **A.**   I don't know what their payouts were.

14  **Q.**   You were upset when you learned of the indictment of

02:06:55  15  Mr. Brockman?

16  **A.**   Can you re -- can you restate the question?

17  **Q.**   Were you upset when you learned of the indictment of

18  Mr. Brockman?

19  **A.**   Yes.

02:07:09  20  **Q.**   Mr. Barras, how did you prepare for your testimony

21  today?

22  **A.**   I'm not sure I understand your question.

23  **Q.**   Well, you knew that you were going to be called as a

24  witness in this case.  Right?

02:07:25  25  **A.**   Up until just recently I didn't know, yeah, but,

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

1  yeah, recently.

2  **Q.**   When did you learn that you were going to be called

3  as a witness?

4  **A.**   This week.

02:07:33  5  **Q.**   Okay.  And after you learned this week that you were

6  going to be called as a witness, what did you do to

7  prepare?

8  **A.**   I talked with my attorneys.

9  **Q.**   Okay.  Who else did you talk to?

02:07:42  10  **A.**   No one.

11  **Q.**   Mr. Barras, did you meet with Jones Day last night?

12  **A.**   Yes.

13  **Q.**   So, when you said you met with no one else, that was

14  in error?

02:08:00  15  **A.**   Excuse me?

16  **Q.**   When you just said that you met with no one else,

17  that was in error?

18  **A.**   Jones Day is an attorney.

19  **Q.**   Okay.  Well, let me back up and make sure I

02:08:12  20  understand your testimony.

21          I think you testified that to prepare for

22  this you met with your attorneys.

23  **A.**   Yes.

24  **Q.**   Are Jones Day your attorneys?

02:08:21  25  **A.**   You'd have to -- I don't really understand that

1    question.  I have a relationship, a legal relationship,

2    with Jones Day.  Does that make them my attorney?  I think

3    it does.

4    **Q.**   Okay.  What is that legal relationship?

5    **A.**   They are the attorney for Bob Brockman.

6    **Q.**   Okay.  And, so, they're the attorneys for

7    Mr. Brockman.  Are they your attorneys?

8    **A.**   Again, I don't understand your question.

9    **Q.**   Are you paying Jones Day to be your attorneys?

10   **A.**   My company pays Jones Day to be Bob Brockman's

11   attorney.

12   **Q.**   Okay.  All right.  Are they paying them to be your

13   attorney?

14   **A.**   I don't believe so.

15   **Q.**   Okay.

16   **A.**   But I'm not sure of that.  How about that?

17   **Q.**   Do you have a retainer agreement with them?

18   **A.**   With?

19   **Q.**   Jones Day.

20   **A.**   No.

21   **Q.**   Had you ever asked them to represent you?

22   **A.**   No.

23   **Q.**   Okay.  So, they're not your attorneys.  Is that fair?

24   **A.**   If that's what you say.  I don't -- I still don't

25   understand the question.

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1  **Q.**  Okay.

2  **A.**  But go ahead.

3  **Q.**  I'm trying to understand whether attorneys for --

4  actually, let's do it this way.

5             MR. LANGSTON:  Can we get a stipulation you are

6  not Mr. Barras's attorney?

7             MR. VARNADO:  Yes.  Absolutely.

8             MS. KENEALLY:  Yes.  We represent Defendant

9  Robert Brockman.  We do not represent Mr. Barras, nor do we

10 represent his company.

11            THE COURT:  Okay.

12 BY MR. LANGSTON:

13 **Q.**  So, you met with Jones Day last night?

14 **A.**  Yes.

15 **Q.**  And that was to help prepare for your testimony?

16 **A.**  Yes.

17 **Q.**  Okay.  How long did you meet with them?

18 **A.**  Several hours.

19 **Q.**  Was that the only time you have met with them?

20 **A.**  No.

21 **Q.**  And I want to separate, you know, you having met with

22 them, you know, to provide information to them versus you

23 having met with them to prepare your testimony.

24            Was that the only time you met with them

25 to prepare your testimony?

1   **A.**   I don't recall.

2   **Q.**   Okay.  Have you ever met with attorneys for the

3   government?

4   **A.**   No.

02:10:42   5          MR. LANGSTON:  Permission to lead this witness,

6   Your Honor.

7          THE COURT:  Sure.

8   BY MR. LANGSTON:

9   **Q.**   Mr. Barras, do you view it as your role to protect

02:10:50   10   Mr. Brockman from harm?

11   **A.**   Yes.

12   **Q.**   And, in fact, you believe that you must protect

13   Mr. Brockman and his wife, no matter the cost?

14   **A.**   Yes.

02:11:05   15   **Q.**   You would do horrible things to protect Mr. Brockman?

16   **A.**   Define "horrible."

17          MR. LANGSTON:  Well, let's -- let's show a

18   document.  I am going to mark a document as No. 144.

19              Permission to approach.

02:11:42   20          THE COURT:  Permission to approach.

21          MR. LANGSTON:  I am handing the witness a copy

22   of what I have marked for identification as Exhibit 144.

23   BY MR. LANGSTON:

24   **Q.**   And, Mr. Barras, this is a series of e-mails between

02:11:54   25   you and Jim Jackson.  Is that fair?

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1  **A.**   Yes.

2  **Q.**   And we will turn to the second page.  And I'll put it

3  up on my screen.

4                I want to direct your attention to the

02:12:34  5  e-mail that you sent to Mr. -- to Dr. Jackson on March

6  31st, 2020.  Do you see that e-mail?

7  **A.**   Yes.

8  **Q.**   And you write to -- to Dr. Jackson -- and,

9  incidentally, Dr. Jackson is your fellow board member at

02:13:00  10  Reynolds and Reynolds?

11  **A.**   Yes.

12  **Q.**   At this point he is a corporate coach, but subsequent

13  to that he became a board member?

14  **A.**   I think he resigned as the coach and he is the board

02:13:11  15  member.

16  **Q.**   And Dr. Jackson was actually your pastor at

17  Chapelwood Methodist Church; is that fair?

18  **A.**   Yes.

19  **Q.**   And Mr. Brockman also attended that church?

02:13:17  20  **A.**   (No response.)

21  **Q.**   Mr. Brockman also attended that church?

22  **A.**   Yes.

23  **Q.**   Okay.  And, so, you write to Dr. Jackson:  "I have

24  done many horrible things in my work life with the goal of

02:13:33  25  always protecting Bob and the company."

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

1                    Did you write that to Dr. Jackson?

2    **A.**   That's what it says.

3    **Q.**   Did you write that to Dr. Jackson?

4    **A.**   Yes.

5    **Q.**   And was that a true statement?

6    **A.**   Define the word "horrible."

7    **Q.**   Well, I am asking you.  When you wrote to

8    Dr. Jackson, "I have done many horrible things in my work

9    life with the goal of always protecting Bob and the

10   company," did you mean that?

11   **A.**   The horrible -- the horrible things I am talking

12   about here are terminating a friend, a fellow associate.

13   Those -- that process or that -- that situation is

14   horrible for me.

15   **Q.**   Okay.  So, that's one of the horrible things you have

16   done.  This says, you have done many horrible things.

17   Would you agree that you have done them?

18   **A.**   I have terminated other associates, friends.  That's

19   horrible.  That's a horrible thing for me.

20   **Q.**   What other horrible things have you done on behalf

21   of -- in protecting Bob?

22   **A.**   That's what I have done.

23   **Q.**   Okay.

24            MR. LANGSTON:  I'll offer 144.

25            MS. KENEALLY:  No objection.

KATHY MILLER, RMR, CRR - kathy@miller-reporting.com

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1              THE COURT:  Any objection?  I'm sorry.  Any

2    objection?

3              MS. KENEALLY:  No objection, Your Honor.

4              THE COURT:  Without objection, Exhibit 144 is

02:15:06    5    admitted.

6    BY MR. LANGSTON:

7    **Q.**    Mr. Barras, when did you become chairman and CEO of

8    Reynolds and Reynolds?

9    **A.**    November 2020.

02:15:24   10    **Q.**    Okay.  And was it actually November 5th, 2020?

11    **A.**    Correct.

12    **Q.**    And I think you said that it was Mr. Brockman's

13    decision for you to become chairman and CEO?

14    **A.**    Yes.

02:15:34   15    **Q.**    All right.  When did you learn Mr. Brockman had

16    Parkinson's disease?

17    **A.**    When it became public.

18    **Q.**    Okay.  So, when was that?

19    **A.**    I don't recall the date.

02:15:52   20    **Q.**    So, did you speak to the defense expert in this case,

21    Dr. Agronin?

22    **A.**    I spoke to a doctor.  I don't recall the name.

23    **Q.**    And you were aware that that doctor worked for

24    Mr. Brockman?

02:16:12   25    **A.**    I didn't recall that until you just said that, but

1   yes.

2   **Q.**   Okay.  But, at the time, you didn't think it was your

3   health?

4   **A.**   No.

02:16:24   5   **Q.**   And you were aware that you were speaking to this

6   doctor about Mr. Brockman's health?

7   **A.**   Yes.

8   **Q.**   And that the purpose of that interview was to allow

9   that doctor to evaluate Mr. Brockman's cog -- mental

02:16:38   10   condition for the purposes of this trial?

11   **A.**   The question?  What's the --

12   **Q.**   The purpose of your meeting with this doctor was to

13   evaluate Mr. Brockman's mental competency for the purpose

14   of this case?

02:16:54   15   **A.**   I met with the doctor.  I don't recall all the

16   reasons that we met.

17   **Q.**   Okay.  Did you think this was one of -- one of

18   Mr. Brockman's treating physicians?

19   **A.**   I don't -- I don't have -- The family doesn't share

02:17:12   20   with me their -- their -- their medical issues and their

21   medical doctors; so, no, I didn't know.

22   **Q.**   Okay.  And you said the family doesn't share with

23   you.  Who set up the interview?

24   **A.**   I don't recall.

02:17:27   25   **Q.**   Was it Jones Day?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

1   **A.**   I don't recall.

2   **Q.**   You don't recall who asked you to meet with this

3   doctor?

4   **A.**   I don't recall.

02:17:39   5   **Q.**   And I understand you may not understand the name of

6   the attorney that set it up, but do you remember that it

7   was an attorney?

8   **A.**   I don't recall.

9   **Q.**   Did -- were you contacted directly to set this up, or

02:17:55   10   was it Mr. Johnson or Mr. Dickerman -- Dickerson?

11   **A.**   I don't recall.

12   **Q.**   Okay.  And let's just -- so I remember your

13   testimony -- you said that you first learned of

14   Mr. Brockman's Parkinson's disease in -- when it became

02:18:20   15   public in this case?

16   **A.**   Correct.

17   **Q.**   And, so, that would have been December of 2020,

18   thereabouts?

19   **A.**   I don't recall.

02:18:32   20   **Q.**   It was after his indictment?

21   **A.**   Again, I don't recall.

22   **Q.**   Okay.  But you're confident that it was when it

23   became public?  That you do recall?

24   **A.**   Yes.

02:18:47   25   **Q.**   Okay.  I am going to show you what I'll mark for

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

1  identification as 145, which is the interview notes by

2  Dr. Agronin from July 7th, 2021.

3                   And I'll hand a copy of that to the

4  witness.

02:19:12  5                   MR. LOONAM:  What is the number on it?

6                   MR. LANGSTON:  145.

7                   MR. LOONAM:  Thank you.

8  BY MR. LANGSTON:

9  Q.   Does that refresh your recollection as to the name of

02:19:20  10  the doctor that you spoke to?

11  A.   (No response.)

12  Q.   Mr. Barras, does that refresh your recollection as to

13  the name of the doctor you spoke to?

14  A.   I thought you wanted me to read this.

02:20:15  15  Q.   Well, the question before you is:  Does that refresh

16  your recollection as to the name of the doctor you spoke

17  to?

18  A.   No.

19  Q.   Okay.  Here it says -- or here it says:  "In July of

02:20:26  20  2020 he" -- that's referring to you -- "learned that

21  Mr. Brockman had Parkinson's disease."

22                   Did you tell that to Dr. Agronin?

23  A.   I don't recall that.

24  Q.   Okay.  But -- so, you don't recall what you told

02:20:44  25  Dr. Agronin, but that's not true.  Right?

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1  **A.**   I don't recall.

2  **Q.**   Well -- No.  No.  No.  I am not asking what you told

3  him back then.  Now I am asking you:  Is it true that you

4  learned of Mr. Brockman's Parkinson's diagnosis in July of

02:21:05  5  2020?

6  **A.**   No.

7  **Q.**   Okay.  So, if that's in there, that's wrong; is that

8  fair?

9  **A.**   Can I read it?

02:21:20  10  **Q.**   Okay.  And, if you are looking, it's the seventh

11  paragraph on the first page.

12  **A.**   I don't recall why that's in here.

13  **Q.**   So -- that wasn't my question.  My question was:  Was

14  it true?  Actually, I -- Strike that.  I think that may

02:22:41  15  have been my question.

16          You don't remember if you told Dr. Agronin

17  that?

18  **A.**   Correct.

19  **Q.**   But, if you did tell Dr. Agronin that, that would be

02:22:52  20  false?

21  **A.**   I don't recall.

22  **Q.**   No.  No.  So, that's not a "I don't recall" question.

23  That's a, if you had told him that, that would be a false

24  statement?

02:23:06  25  **A.**   I don't recall saying that to him.

PM 4-48

1  **Q.**   Okay.  And, so, I understand that you don't recall

2  what you said to him.  I am asking:  Had you said that to

3  him, that wouldn't have been true?

4  **A.**   I don't recall saying that to the doctor.

02:23:37    5  **Q.**   Okay.  And, so, if the doctor wrote that down --

6               THE COURT:  I'm sorry.  I don't mean to

7  interrupt.

8                    Respectfully, that wasn't the question.

9  You can ask it again.  You ask it as many times as you want

02:23:44   10  until you get an answer.

11               MR. LANGSTON:  Okay.

12               THE COURT:  So, please continue.

13  BY MR. LANGSTON:

14  **Q.**   So, had you said that to the doctor, that would have

02:23:52   15  been a false statement?

16  **A.**   I don't recall saying that to the doctor.

17  **Q.**   And I think we all understand that you don't recall

18  saying that to the doctor.

19                    Let's imagine a world in which you had

02:24:12   20  said that to the doctor, where Dr. Agronin is accurately

21  recording what you said.  Would that have been true?

22  **A.**   I don't recall saying that to the doctor.

23               MR. LANGSTON:  Judge, ordinarily, I wouldn't do

24  this, but I am going to ask that you order the witness to

02:24:36   25  answer the question.

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1          THE COURT:  Try it one more time in this way.

2  Just ask the question, is it true.  Ask him when did he

3  learn -- just ask him when he learned, and then you can

4  move on.  Then you have made your point.

02:24:49   5  BY MR. LANGSTON:

6     **Q.**   When did you learn that Mr. Brockman had Parkinson's

7  disease?

8     **A.**   When it was made public after November of 2020.

9     **Q.**   Okay.

02:24:58  10          THE COURT:  Now you have made your point and

11  you can move on now.

12  BY MR. LANGSTON:

13     **Q.**   While we're on the subject of the Agronin interview,

14  is there anything else in here that's inaccurate?

02:25:12  15     **A.**   I don't see any other problems here.

16     **Q.**   Okay.  Let's talk about that.

17               I want to direct your attention to Page 2

18  of Exhibit 145.  Do you see the line where it says, "No

19  litigations or projects recently.  Nothing since years

02:29:02  20  ago, 2008, 2009."  Do you see that line?

21     **A.**   I see the line.

22     **Q.**   Okay.  Did you tell Dr. Agronin that?

23     **A.**   I'm not sure what this is referring to.

24     **Q.**   Well, let's break it down.

02:29:39  25               It's either talking about you or

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

1    Mr. Brockman.  Right?

2    **A.**    I'm not sure what this refers to.

3    **Q.**    Okay.  Let me ask you this.  Have you been involved

4    in litigation since 2008 and 2009?

02:29:59  5    **A.**    No.

6    **Q.**    Were you deposed in the Cox Automotive lawsuit in

7    April 15th, 2021?

8    **A.**    I'm sorry.  The previous question, I thought you said

9    prior to.  You said "since."  Yes, I am involved in

02:30:14  10    litigation currently.  Yes.

11    **Q.**    Okay.  And from the time period from 2008, 2009, to

12    the present Mr. Brockman has also been involved in

13    litigation; is that fair?

14    **A.**    I don't know that for a fact.

02:30:27  15    **Q.**    Are you aware that he was deposed in an antitrust

16    matter in January 2019?

17    **A.**    I wasn't involved in the litigation with the company.

18    **Q.**    Okay.  You now head the legal department, right?

19    **A.**    Yes.

02:30:42  20    **Q.**    And are you aware that Mr. Brockman gave testimony in

21    an FTC proceeding in September of 2019?

22    **A.**    I am aware he gave testimony.  I don't recall the

23    times.

24    **Q.**    Okay.  So, that would be being involved in

02:30:57  25    litigation; is that fair?

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1   **A.**   I don't understand your question.

2   **Q.**   Okay.  I'll move on to Page 3.

3                Did you tell Dr. Agronin that after

4   Mr. Brockman resigned you had no discussion with him about

02:31:19   5   business?

6   **A.**   (No response.)

7   **Q.**   And I'll direct your attention to the second from the

8   last paragraph beginning with "He was my leader."

9   **A.**   I have read it.

02:31:47   10   **Q.**   And did you tell that to Dr. Agronin?

11   **A.**   Yes.

12   **Q.**   Okay.  So that you do recall, that you told him that?

13   **A.**   Yes.

14   **Q.**   Okay.  And is that a true statement?

02:31:59   15   **A.**   Yes.

16   **Q.**   Mr. Brockman resigned on November 5th, 2021?

17   **A.**   He resigned in November of 2020.

18   **Q.**   Oh.  Excuse me.  You're right.  November 5th, 2020.

19   **A.**   Yes.

02:32:28   20   **Q.**   And there is, essentially, a meeting where he signs

21   some documents resigning, and then you sign some documents

22   becoming the CEO; is that fair?

23   **A.**   Yes.

24   **Q.**   And at that meeting -- And that was shortly before --

02:32:44   25   or, actually, on November 5th, 2020; is that right?

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

1   **A.**   Yes.

2   **Q.**   And on November 5th, 2020, you had no concerns about

3   his ability to sign those documents; is that fair?

4   **A.**   Yes.

02:32:57   5   **Q.**   And there was no power of attorney or anything like

6   that involved in him signing those documents?

7   **A.**   I don't recall that, no.

8   **Q.**   Okay.  But then -- so after that date, on November

9   5th, 2020, you had no further discussions with him about

02:33:13   10   business?

11   **A.**   Correct.

12   **Q.**   Okay.  Did you discuss any of the sales numbers?

13   **A.**   No.

14   **Q.**   Did you discuss any personnel decisions?

02:33:23   15   **A.**   No.

16   **Q.**   Did you discuss reorganization of any executive

17   officers?

18   **A.**   No.

19   **Q.**   Okay.  I would like to show you what I am going to

02:33:34   20   mark as Government's Exhibit 146.

21                      I am handing the witness a copy of 146.

22                      Mr. Barras, this is a series of e-mails

23   between you and Dr. Jackson on November 24th, 2020.  Is

24   that right?  I am going to put it up on the ELMO.

02:34:42   25   **A.**   Yes.

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1  **Q.**   And, Mr. Barras, I think we may be able to move

2  things on a little faster here.  Rather than reading the

3  entire document each time I show you one, if you can read

4  the portion you need to answer my questions, that might

02:34:59  5  help us move things along.  Does that sound okay?

6  **A.**   I'm not comfortable with that.

7  **Q.**   Okay.  Well, we want you to be comfortable.

8              So, this is from November 24th, 2020?

9  **A.**   Which date are you looking at?

02:35:16  10  **Q.**   This is a series of e-mails.  In fact, all the dates

11  are November 4th, 2020.

12  **A.**   November 4th?

13  **Q.**   Sorry.  November 24th, 2020.

14  **A.**   That's the date I am looking at.

02:35:30  15  **Q.**   Okay.  And are these actually your e-mails and

16  Dr. Jackson's e-mails?

17  **A.**   I don't recall these -- this conversation.

18  **Q.**   Okay.  Do you have any -- Strike that.

19              This is discussing the severance agreement

02:36:02  20  given to Craig Moss; is that fair?

21  **A.**   Yes.

22  **Q.**   Okay.  And I am going to direct your attention to the

23  second page, the e-mail that you sent on November 24th,

24  2020, at 9:06 a.m.  Do you see that e-mail?

02:36:21  25  **A.**   I see the words.

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1  **Q.**   Okay.  And you write:  "Cherry" -- that's Scott

2  Cherry, the -- Scott Cherry, the general counsel?

3  **A.**   Yes.

4  **Q.**   Okay.  "Cherry working on separation.  Severance

02:36:41  5  monies will be high.  Bob will not be happy."  Did I read

6  that correctly?

7  **A.**   Yes.

8  **Q.**   And "Bob" is referring to Bob Brockman?

9  **A.**   It could have been referring to Robert.  Bob, Robert,

02:37:08  10  the same name to me.

11  **Q.**   You refer to Robert Burnett as "Bob"?  Is that your

12  testimony?

13  **A.**   I have called him many things.  "Bob" would be one of

14  them.

02:37:20  15  **Q.**   Okay.  So, your sworn testimony today is "Bob will

16  not be happy" is referring to Robert Burnett?

17  **A.**   This is probably not Robert Burnett, but --

18  **Q.**   Okay.  So, "Bob" is Bob Brockman?

19  **A.**   Yes.

02:37:40  20      MR. LANGSTON:  I'll offer 146.

21      THE COURT:  Any objection?

22      MS. KENEALLY:  No objections.

23      THE COURT:  Without objection, 146 is admitted.

24  BY MR. LANGSTON:

02:37:49  25  **Q.**   Okay.  So, did you discuss -- we're talking about

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1    whether you discussed business or financial matters with

2    Mr. Brockman after he left Reynolds and Reynolds.  Right?

3    Is that what we're discussing right now?

4    **A.**    Yes.

02:38:06  5    **Q.**    Okay.  And your testimony is that you didn't?

6    **A.**    I didn't.

7    **Q.**    And that's what you told to the defense expert?

8    **A.**    (No response.)

9    **Q.**    Right?

02:38:15 10    **A.**    I'm sorry?

11    **Q.**    You told the defense expert?  That's one of the

12    things you're able to recall from that interview, is that

13    you never spoke to Mr. Brockman about business after

14    November 5th, 2020?

02:38:25 15    **A.**    That's correct.

16    **Q.**    Okay.  And the reason you didn't speak to him about

17    that is because he wasn't capable of that.  Right?  That's

18    what you told the expert?

19    **A.**    On advice from counsel, I am not talking to Bob about

02:38:41 20    the business.

21    **Q.**    Okay.  I am going to show you what I'll mark as 147.

22    And, Mr. Barras, the e-mail I am interested in is the

23    second one from you to Mark Bales.  And that is an e-mail

24    you sent to Mr. Bales on February 12th, 2021?

02:40:15 25    **A.**    The date on the e-mail is February 16.

1    **Q.**    Okay.  Well -- Sorry.  No.  I am talking about the

2    e-mail that you sent to Mr. Bales.

3    **A.**    The second one down?

4    **Q.**    Yes.  And that's February 12th, 2021?

02:40:28    5    **A.**    Correct.

6    **Q.**    Okay.  And, so, that's three months after

7    Mr. Brockman resigned?

8    **A.**    Correct.

9    **Q.**    And you write to him:  "Are you working up an invoice

02:40:37    10   to Bob from Hardwicke for his portion of the costs in

11   supporting Global?"

12                   Hardwicke is the ownership structure for

13   the corporate jet?

14   **A.**    Correct.

02:40:50    15   **Q.**    Okay.  And "Bob," again, is Bob Brockman?  Is that

16   who we are referring to here?

17   **A.**    Yes.

18   **Q.**    Okay.  "Goal is not to collect, is to show him the

19   expenses of his 1 percent ownership."  Is that what you

02:41:03    20   wrote to Mr. Bales?

21   **A.**    That's what I wrote.

22   **Q.**    Okay.  And that's in February of 2021?

23   **A.**    Yes.

24                   MR. LANGSTON:  I offer 147.

02:41:13    25                   THE COURT:  Any objection?

1              MS. KENEALLY:  No objection.

2              THE COURT:  Without objection, Exhibit 147 is

3 admitted.

4 BY MR. LANGSTON:

02:41:21  5   **Q.**   Mr. Barras, I am going to go back to 145, the

6   interview with Dr. Agronin.

7                   Did you purposely omit anything from that

8   interview?

9   **A.**   No.

02:41:43  10   **Q.**   So, you don't believe you had any relevant

11   information about Mr. Brockman's health that you chose not

12   to share with Dr. Agronin; is that fair?

13   **A.**   Restate the question.

14   **Q.**   Okay.  You don't believe there's any information you

02:41:57  15   had about Mr. Brockman's health that you chose to not tell

16   Dr. Agronin?

17   **A.**   I'm not sure I understand the question.  You're

18   talking about this document?

19   **Q.**   Yeah.  And so -- I am talking more broadly about your

02:42:23  20   interview with Dr. Agronin.  I am sure there are some

21   things that you know that you didn't tell Dr. Agronin

22   because it just didn't come up; is that fair?

23   **A.**   I have known Mr. Brockman for 45 years.  You can't

24   put 45 years in three pages of stuff.

02:42:43  25   **Q.**   Right.  So, that's understood.  But is there anything

1    you specifically chose not to tell Dr. Agronin?

2    **A.**    No.

3    **Q.**    Was there any information about Mr. Brockman's health

4    that you hid from Dr. Agronin?

02:43:01    5    **A.**    Ask the question again.

6    **Q.**    Was there any information that you had about

7    Mr. Brockman's health that you hid from Dr. Agronin?

8    **A.**    I am not a medical professional.  I didn't -- I don't

9    know about his medical problems.

02:43:22    10    **Q.**    I totally understand that.  But you have, you said,

11    45 years of observations of Mr. Brockman.

12    **A.**    Correct.

13    **Q.**    Okay.  And, so, based on that 45 years, was there any

14    information that you hid on purpose from Dr. Agronin?

02:43:36    15    **A.**    No.

16    **Q.**    Okay.  Now, prior to his resignation did you have any

17    reason to believe that Mr. Brockman was unable to run

18    Reynolds and Reynolds?

19    **A.**    Say the time again.

02:43:54    20    **Q.**    Prior to his resignation on November 5th, 2020, did

21    you any reason to believe Mr. Brockman was unable to run

22    Reynolds?

23    **A.**    No.

24    **Q.**    Did you believe that he was still sharp enough to run

02:44:08    25    Reynolds and Reynolds?

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

1   **A.**   Yes.

2   **Q.**   Did you believe he had the cognitive abilities

3   sufficient to lead Reynolds and Reynolds?

4   **A.**   Yes.

02:44:16  5   **Q.**   In November of 2020, did you have any reason to doubt

6   his mental capabilities?

7   **A.**   On November 5th, 2020, he resigned, exercising his

8   disability rights in his employment agreement.

9   **Q.**   So, setting aside his resignation -- so, let's talk

02:44:35  10  about on November 4th did you have any reasons to doubt

11  his mental capabilities?

12  **A.**   No.

13  **Q.**   On November 4th you thought he was sharp?

14  **A.**   Yes.

02:44:44  15  **Q.**   You thought he had strong cognitive abilities on

16  November 4th?

17  **A.**   Yes.

18  **Q.**   Okay.  And we will go back to 145.

19          Can you show us where in this document you

02:44:57  20  told Dr. Agronin that you believed that, on November 4th,

21  Mr. Brockman was sharp and had the cognitive abilities to

22  lead?

23  **A.**   We're not talking about dates in this document.  We

24  are just talking.

02:45:37  25  **Q.**   Okay.  Did you tell Dr. Agronin that, on November

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1    4th, 2020, you thought Mr. Brockman was sharp?

2    **A.**   Did he ask me that question?

3    **Q.**   Well, did you tell Dr. Agronin?

4    **A.**   I answered the questions he asked me.

02:45:56    5    **Q.**   Okay.  So, it just didn't come up during this

6    interview, whether you thought Mr. Brockman was sharp in

7    November of 2020?

8    **A.**   I answered the questions the doctor answered -- asked

9    me.

02:46:09    10    **Q.**   Okay.  So, that's my question for you, is was that

11    one of the questions he asked you?

12    **A.**   It's -- is it in the document?

13    **Q.**   Well, I am asking based on your memory.  This

14    happened, you know, four or five months ago.

02:46:22    15                    Did Dr. Agronin ask you whether

16    Mr. Brockman was sharp in November 2020?

17    **A.**   I don't recall.

18    **Q.**   Did he ask you whether you had any reason to doubt

19    Mr. Brockman's mental capabilities in November of 2020?

02:46:37    20    **A.**   I don't recall.

21    **Q.**   Did Dr. Agronin ask you about Mr. Brockman's mental

22    capabilities during this interview?

23    **A.**   I don't recall.

24    **Q.**   Did you tell Dr. Agronin that you viewed your job as

02:47:04    25    protecting Mr. Brockman and Dorothy, his wife, no matter

1    what the cost?

2    **A.**    Yes.

3    **Q.**    You told Dr. Agronin that you viewed your job as

4    protecting him, no matter the cost?

02:47:20   5    **A.**    Yes.

6    **Q.**    Okay.  I want to shift gears from 145 now.

7                        According to you, Mr. Barras, did

8    Mr. Brockman get lost driving home in 2018?

9    **A.**    Restate the question, please.

02:47:54   10   **Q.**    Do you remember a time that Mr. Brockman got lost

11   driving home in 2018?

12   **A.**    I had concerns that it took him a long time to get

13   from our office to home.

14   **Q.**    Okay.  So, there was a time he was driving home and

02:48:21   15   he was lost for over an hour.  Do you remember that?

16   **A.**    I remember being concerned that it took him a long

17   time to get home.

18   **Q.**    Let me ask a more specific question.

19                        Did you tell Dr. Jackson that you were

02:48:39   20   concerned because Mr. Brockman had become lost for over an

21   hour?

22   **A.**    I don't recall that conversation.

23   **Q.**    Okay.  And, so, if Dr. Jackson told that to a defense

24   expert, you don't know whether that actually -- whether

02:48:53   25   you actually told him?

1    **A.**   I don't recall that conversation.

2    **Q.**   Okay.  Would someone getting lost and being

3    unreachable give you a reason to doubt their mental

4    capability?

02:49:08  5    **A.**   Restate the question, please.

6    **Q.**   Okay.  Based on -- You said you were concerned that

7    Mr. Brockman became lost in 2018?

8    **A.**   That's not what I said.

9    **Q.**   Okay.  Were you concerned that Mr. Brockman became

02:49:25  10   lost in 2018?

11   **A.**   I was concerned that it took him a while to get home.

12   **Q.**   Okay.  So, you don't know whether he was lost.  You

13   just knew that he was out of pocket for a while.  Is that

14   fair?

02:49:36  15   **A.**   Correct.

16   **Q.**   And did that concern you?

17   **A.**   Yes.

18   **Q.**   Okay.  And did that give you a reason to doubt his

19   mental capabilities?

02:49:44  20   **A.**   No.

21   **Q.**   So, you may have told Dr. Jackson this, you may not

22   have, but that wasn't actually something that caused you

23   to be concerned about Mr. Brockman's mental capabilities.

24   Is that fair?

02:49:57  25   **A.**   Yes.

1   **Q.**   Okay.  Do you know if Mr. Brockman was driving in

2   2020?

3   **A.**   I do not know.

4   **Q.**   Okay.  Maybe I can help you.  I'm just --

02:50:23   5   **A.**   Excuse me.  Could I get another bottle of water?

6   **Q.**   Oh, of course.

7           THE WITNESS:  Thank you.

8           MR. LANGSTON:  And I am going to put

9   Exhibit 73, which I believe is in evidence, on the screen.

02:50:53   10   BY MR. LANGSTON:

11   **Q.**   Are you able to see that, Mr. Barras?

12   **A.**   I read it.

13   **Q.**   Okay.  And that's an e-mail from you to Craig Moss in

14   August 14th, 2020?

02:51:32   15   **A.**   Yes.

16   **Q.**   And you write to Mr. Moss:  "Rob signed" -- that's

17   Rob Nalley?

18   **A.**   (No response.)

19   **Q.**   Is that right?

02:51:49   20   **A.**   Yes.

21   **Q.**   -- "Bob was not able to get to Al's last night,"

22   parenthesis, "no driving at night," close parenthesis.

23           That's referring to Mr. Brockman; is that

24   fair?

02:52:03   25   **A.**   Yes.

1   **Q.**   Okay.  And this is in -- you sent this e-mail in

2   August of 2020?

3   **A.**   Yes.

4              MR. LANGSTON:  Okay.  I'll offer 73, if it is

02:52:14   5   not in evidence.

6              MR. MAGNANI:  It is not admitted.

7              MR. LANGSTON:  I'll offer 73, Your Honor.

8              MS. KENEALLY:  No objection.

9              THE COURT:  Without objection, Exhibit 73 is

02:52:27   10   admitted.

11   BY MR. LANGSTON:

12   **Q.**   Let's talk about the reasons that Mr. Brockman gave

13   you for the company reorganization in 2020.

14              In early 2020, Mr. Brockman told you he

02:52:39   15   was planning on reorganizing the company; is that fair?

16   **A.**   Yes.

17   **Q.**   He told you you were being promoted to president?

18   **A.**   Yes.

19   **Q.**   And the reason he gave for that was it was time for

02:53:01   20   him to start turning over the reins of the company; is

21   that fair?

22   **A.**   Yes.

23   **Q.**   He didn't tell you that he had been diagnosed with

24   dementia a year earlier; is that fair?

02:53:12   25   **A.**   He did not tell me that.

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

1    Q.   He didn't tell you that, by that point, four

2    different doctors had diagnosed him with dementia?

3    A.   I was not included in his medical processes with his

4    family.  I wasn't included.

02:53:31  5    Q.   He didn't tell you his lawyers were meeting with the

6    government concerning the potential indictment?

7    A.   No.

8    Q.   He didn't tell you that his lawyers had concluded he

9    wasn't competent to assist in his defense, if it ever got

02:53:47  10   that far?

11   A.   No.

12   Q.   In fact, apart from his age, when he told you about

13   the reorganization, he gave no other reason for why he was

14   reorganizing the company; is that fair?

02:54:00  15   A.   He was stepping down and turning over the company to

16   the next -- the next executive to run.

17   Q.   Okay.  And he didn't tell you that it was because of

18   his health; is that fair?

19   A.   It wasn't because of his health.

02:54:15  20   Q.   Okay.  In fact, the reorganization was not because of

21   his health.  That's fair to say?

22   A.   That's fair.

23   Q.   All right.  And at the time of that, again, you had

24   no doubts about his ability to lead Reynolds?

02:54:26  25   A.   What time are you talking about?

1    Q.   At the time he told you of the reorganization.

2    A.   In January 2020 we had those conversations.  He was

3    able to run the company.

4    Q.   And, in fact, through November 4th, 2020, you had no

5    doubts about his ability to run the company?

6    A.   Through November 5th, 2020, I had no doubts.

7    Q.   November 5th.  After the reorganization, was he still

8    CEO?

9    A.   What time are you talking about?

10   Q.   The reorganization, I think it was official -- made

11   official on June 5th, 2020.

12   A.   He was still CEO on June -- in June of 2020.

13   Correct.

14   Q.   Okay.  And after June of 2020 did you and

15   Mr. Brockman still discuss important decisions together?

16   A.   Yes.

17   Q.   In fact, you talked about every important decision

18   with him; is that fair?

19   A.   Yes.

20   Q.   And you thought Mr. Brockman gave you pretty good

21   advice; is that fair?

22   A.   Yes.

23   Q.   You relied on his counsel after June of 2020.  That's

24   fair?

25   A.   Yes.

1          MR. LANGSTON:  All right.  I am going to mark

2   this as 148.  148.  And I am showing the witness a copy of

3   148.

4   BY MR. LANGSTON:

02:56:14   5   **Q.**   And I am interested in that top e-mail, Mr. Barras,

6   which I am putting on the ELMO right now.  And that's an

7   e-mail from you to Dr. Jackson on June 19th, 2020; is that

8   fair?

9   **A.**   (No response.)

02:56:58   10  **Q.**   Mr. Barras, that e-mail is from June 19th, 2020?

11  **A.**   The top e-mail is from June 19th, 2020.

12  **Q.**   Great.  That's the one we're talking about.

13          And it's discussing a dispute between you

14  and Robert Burnett?

02:57:15   15  **A.**   (No response.)

16  **Q.**   Why don't we strike that just in the interest of

17  moving things along.

18          Look at the second line in that e-mail.

19  You write to Dr. Jackson:  "Bob advised me every step of

02:58:02   20  the way.  He predicted every step that Robert would take

21  and how I should react.  Bob called it perfectly."

22          Is that what you wrote to Dr. Jackson?

23  **A.**   That's what's written here.

24  **Q.**   Okay.  And was that a true statement?

02:58:17   25  **A.**   I am going -- I am going to read the part you're

1    questioning me about.  Okay?

2    **Q.**   So, that -- I am asking you just about that one line,

3    Mr. Barras.

4    **A.**   I can't answer until I understand what -- what the

02:58:47    5    words are below.

6             MR. LANGSTON:  Your Honor, we have received a

7    request that now might be a good time to take a break.

8             MR. LOONAM:  Whenever is convenient for

9    counsel.  Whenever.

03:00:07   10             THE COURT:  Why don't we finish this one

11    question and then we will take a break.

12             MR. LANGSTON:  Sure.

13             MR. MAGNANI:  And, Your Honor, I just want to

14    raise maybe one or two things before we take that break,

03:00:15   15    but I understand there is a question pending.

16    **A.**   Your question is?

17   BY MR. LANGSTON:

18    **Q.**   Is it a true statement that Bob advised you every

19    step of the way, "He predicted every step that Robert

03:00:32   20    would take and how I should react.  Bob called it

21    perfectly"?  Was that a true statement?

22    **A.**   True.

23    **Q.**   Okay.

24             THE COURT:  Let's go ahead and take our break.

03:00:45   25             MR. LANGSTON:  I'll offer 148, actually.

1            THE COURT:  Any objection to 148?

2            MS. KENEALLY:  No objection.

3            THE COURT:  Without objection, 148 is admitted.

4                 And then before we take our break,

03:00:53  5  Counsel, your colleague wanted to say something.

6            MR. MAGNANI:  Yes.  Sorry, Your Honor.  I just

7  would like the Court to consider perhaps instructing this

8  witness not talk to anyone about his testimony during our

9  break.

03:01:03  10           MS. KENEALLY:  Your Honor, unnecessary.

11           MR. LOONAM:  No problem.

12           THE COURT:  Well, I mean --

13           MS. KENEALLY:  Unless he is talking to his own

14 counsel.

03:01:08  15           THE COURT:  Okay.  I mean, I think it's --

16 every witness during a break should not be speaking with

17 anyone other than the counsel that represents them.

18                 You guys aren't counsel.

19           MR. VARNADO:  We are not.

03:01:22  20           THE COURT:  And are you -- Mr. Johnson, I guess

21 you're representing this witness, Mr. Barras.

22           MR. JOHNSON:  I am, Your Honor.  I do expect to

23 be talking to him during the break.

24           THE COURT:  I'm sorry?

03:01:34  25           MR. JOHNSON:  I do expect to be talking to him

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

1 during the break.

2           THE COURT:  Oh.  Yes.  That's what I said.  I

3 assumed that you would.  I mean, he is your client.

4                So, other than you guys' witness, any

03:01:43  5 witness should not be speaking with anyone else.

6           MR. JOHNSON:  Thank you, Judge.

7           MR. MAGNANI:  And the other question I would

8 prefer -- well, I can bring it up now.  I just wanted to

9 give notice that during this break I will probably be

03:01:55 10 talking to my colleagues about not calling Dr. Mark Dietz,

11 who I told defense counsel I was going to call today.  So,

12 I just want to make sure everybody is clear that we might

13 rest after this witness.  I just want to have the

14 opportunity to discuss with my colleagues.  So, the defense

03:02:08 15 should be ready to call a witness after that.

16           MR. VARNADO:  We certainly won't be ready to

17 call a witness with, you know, this announcement at this

18 hour, with the expectation he was told that he would be the

19 summary -- sorry, Your Honor -- the summary expert and that

03:02:21 20 they were going to call him today.  So, just for scheduling

21 purposes, we will do what we can to --

22           MR. MAGNANI:  We need to discuss -- There are

23 two fact witnesses in the room that have been sitting

24 through the whole thing, both Ms. Keneally and

03:02:32 25 Mr. Gutierrez.  And so --

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

 1            THE COURT:  You might call them?

 2            MR. MAGNANI:  Those are defense witnesses that

 3 are in the room.  My apologies.

 4            THE COURT:  Well, are there any adverse

 03:02:41  5 witnesses that you plan on calling?

 6            MR. LANGSTON:  Well, why don't we take our

 7 break and we can discuss it?

 8            THE COURT:  All right.  The deal is I don't

 9 want to waste -- not waste -- but not utilize the

03:02:49 10 afternoon.  If we have witnesses, we need to get started.

11 But, if you're not prepared, then that's an issue.

12            So, why don't you guys talk, think about

13 it, figure out what you want to do.  I just want to let you

14 know my preference is I would rather not finish early.  I

03:03:04 15 want to use every available hour to get as much testimony

16 in as possible.

17            MR. LOONAM:  Your Honor --

18            We also understood you guys were calling

19 Dr. Lisse.  Is Dr. Lisse off the --

03:03:15 20            MR. MAGNANI:  I did misspeak about that.  There

21 is one very short witness -- fact witness from the

22 government.  We are still calling him.  We will discuss it,

23 Your Honor.  We understand.

24            THE COURT:  You guys talk about it.  Let's be

03:03:26 25 back, at this time, 3:20, if that's okay.  So, we stand in

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

1  recess until 3:20.

2  (Proceedings recessed from 3:03 p.m. to 3:46 p.m.)

3            THE CASE MANAGER:  All rise.

4            THE COURT:  Please be seated, everyone.

03:46:08  5            Counsel, with this witness are you ready?

6            MR. LANGSTON:  Yes, sir.  Thank you.

7            THE COURT:  Sorry, Counsel.  I'm trying to

8  juggle a couple things this afternoon.  I got it done.  We

9  took a little bit longer than I anticipated.

03:46:24  10            MR. LANGSTON:  Judge, you have accommodated us

11  on other days.

12  BY MR. LANGSTON:

13  **Q.**  All right, Mr. Barras.  I think we were talking about

14  Mr. Brockman's involvement in the important decisions of

03:46:38  15  Reynolds in the latter half of 2020; is that right?

16  **A.**  Yes.

17  **Q.**  Okay.  And I think you said that he was involved in

18  all the important decisions.  Right?

19  **A.**  He was involved.

03:46:52  20  **Q.**  And he -- well in all the important decisions.

21  Right?

22  **A.**  We were speaking about all the -- yes.

23  **Q.**  Okay.  And, in fact, I think you said that

24  Mr. Brockman was giving you good advice.  Right?

03:47:08  25  **A.**  Yes.

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1   **Q.**   And he was -- he perfectly advised you when it came

2   to a Robert Burnett situation?

3   **A.**   Yes.

4   **Q.**   Okay.  And I am going to put on the screen for you

03:47:23   5   what I have marked for identification as 149.  And

6   Government's Exhibit 149 is an e-mail between you -- from

7   you to Dr. Jackson on August 6th, 2020; is that right?

8   **A.**   (No response.)

9   **Q.**   Mr. Barras, that is an e-mail from you to Dr. Jackson

03:48:26   10   on August 6, 2020?

11   **A.**   Yes.

12   **Q.**   And our screen is slightly different from your

13   screen, so if you have trouble seeing it, please let me

14   know.

03:48:37   15              I am going to direct your attention to the

16   third paragraph, and you wrote to Dr. Jackson in August of

17   2020.  "I can assure you Bob is involved in EVERY" --

18   "every" is in all caps -- "important decision being made.

19   We talk about excom" -- that's the executive committee --

03:48:59   20   "opinions and whether to allow feedback or not.  These are

21   frequent conversations."

22              Is that what you wrote to Dr. Jackson?

23   **A.**   Yes.

24   **Q.**   And was that a true statement as of August 6, 2020?

03:49:14   25   **A.**   Yes.

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

1   Q.   Okay.  And, so, that means that, in August of 2020,

2   Mr. Brockman was involved in every important decision at

3   Reynolds and Reynolds?

4   A.   Yes.

03:49:48   5   Q.   Okay.  Did you tell Dr. Agronin that, in August of

6   2020, Mr. Brockman was involved in every important

7   decision at Reynolds and Reynolds?

8   A.   I don't recall the question.

9   Q.   So, I -- I understand you probably don't recall every

03:49:53   10   question that Dr. Agronin asked, but during the course of

11   your interview with him, did you convey to him that, as of

12   August 2020, Mr. Brockman was involved in every important

13   decision?

14   A.   You want me to review the letter?

03:50:09   15   Q.   No.  I'm just asking you based on your memory.

16   A.   I don't remember.  I would have to review again.

17   Q.   Okay.

18          MR. LANGSTON:  I'll offer 149.

19          THE COURT:  Any objection?

03:50:19   20          MS. KENEALLY:  No objection.

21          THE COURT:  149 is admitted.

22          THE WITNESS:  Excuse me.

23          THE COURT:  Do you have enough water, sir?  Do

24   you need some water?

03:50:33   25          THE WITNESS:  No, I have some.  Thank you.

1  Thank you.

2  BY MR. LANGSTON:

3  Q.   Mr. Brockman -- I think you testified Mr. Brockman

4  executed the disability portion of his contract in

03:50:43  5  November of 2020.

6  A.   November 5th.

7  Q.   Okay.  And I think you said, when he did that, that

8  was actually the first you even knew he was ill; is that

9  right?

03:50:56  10  A.   That's the first time I had to admit to myself he was

11  ill.

12  Q.   Well, in fact, actually, that's the first time you

13  knew he was ill; isn't that right?

14  A.   That's true.  Yes.

03:51:19  15  Q.   Okay.  And, so, an outside auditor put a valuation on

16  Mr. Brockman's disability package of $150 million; is that

17  right?

18  A.   I have no knowledge of that.

19  Q.   Okay.  Well, then, let's look at a document.  I'll

03:51:39  20  mark this as Government's Exhibit 150.  And I am turning

21  to the second page of Government's Exhibit 150, and this

22  is an e-mail from Mr. Burnett to you on February 1st of

23  2021.  Is that right?

24  A.   February 1st, 2021.  Correct.

03:52:37  25  Q.   And on that date Mr. Burnett told you:  "We're going

PM 4-76

1    to take a 150 million dollar" -- he writes "bit," but I

2    think he means "hit to the 2020 financials for accruing

3    the liability for Bob's requirement."

4                    Did Mr. Burnett write that to you in

03:52:56    5    February of 2021?

6    **A.**    I don't recall it, but the e-mail says that.

7    **Q.**    Okay.  And I think you write back -- we're looking at

8    the bottom of Page 1, and you write back to him on

9    February 1st, 2021; is that right?

03:53:23    10    **A.**    At the very bottom you're talking about, correct?

11    **Q.**    Yes.

12    **A.**    February 1st, 2021.

13    **Q.**    Okay.  And you write you have no idea where this

14    number comes from, but you would love to give Bob and

03:53:43    15    Dorothy this number.  Is that what you say?

16    **A.**    Well, I can't read it all, but --

17    **Q.**    Oh.  Okay.  I can move it up here.

18    **A.**    Can you move it to the left?

19    **Q.**    Oh, sure.  How is that?

03:54:04    20    **A.**    That's what's written.

21                    MR. LANGSTON:  Okay.  I'll offer 150.

22                    THE COURT:  Okay.

23                    MS. KENEALLY:  No objection.

24                    THE COURT:  Without objection, 150 is admitted.

03:54:14    25    BY MR. LANGSTON:

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1  Q.   It's fair to say that the way Mr. Brockman's contract

2  was structured, if he retires just on his own, so not

3  exercising the disability portion, his retirement is less

4  generous; is that fair?

03:54:28  5  A.   I don't know the specifics of his agreement.

6  Q.   Okay.  And I understand you don't know the specifics,

7  but do you understand that it would be less generous if he

8  just chooses to retire?

9  A.   I don't know that for a fact.

03:54:42  10  Q.   Okay.  Did you do anything to verify that

11  Mr. Brockman was, in fact, disabled?

12  A.   I don't understand the question.

13  Q.   Okay.  So, you become CEO on November 5th.  Right?

14  A.   Correct.

03:55:05  15  Q.   And by Mr. Brockman exercising the disability portion

16  of his contract, the company accrues a financial hit of

17  $150 million; is that right?

18  A.   That's what Mr. Burnett said.

19  Q.   Okay.  And on -- as of November 6th, you're

03:55:24  20  responsible for the company money.  Right?

21  A.   Correct.

22  Q.   Is there a threshold by which you have to approve

23  certain expenses at Reynolds?

24  A.   Yes.

03:55:35  25  Q.   Okay.  And I don't know exactly what the number is,

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

1  but 150 million would be over that threshold.  Right?

2  **A.**    Sure.  Yes.

3  **Q.**    And did you have a doctor examine Mr. Brockman to

4  determine that he was, in fact, disabled?

03:55:52  5  **A.**    No.

6  **Q.**    Because you're saying that, on November 4th, 2020,

7  you had no reason to doubt his mental capabilities.

8  Right?

9  **A.**    Correct.

03:56:03  10  **Q.**    And -- but you didn't do anything to verify it; is

11  that fair?

12  **A.**    Yes.

13  **Q.**    Okay.  Let's talk about the e-mail system of Reynolds

14  and Reynolds.

03:56:18  15                Reynolds has two different e-mail systems

16  for executives versus the rank and file; is that fair?

17  **A.**    Yes.

18  **Q.**    And I don't want to say the regular employee, but I

19  mean a, you know, lower-tier employee.  Their e-mail is

03:56:36  20  kept on a central server.  Right?

21  **A.**    Yes.

22  **Q.**    And their e-mail is backed up.  Right?

23  **A.**    For 30 days, yes.

24  **Q.**    So, how long has it been the case that their e-mail

03:56:54  25  is only backed up for 30 days?

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

1   **A.**   I believe that's policy.

2   **Q.**   Okay.  And when did that policy go into place?

3   **A.**   I don't recall.

4   **Q.**   You were -- one of the many hats you have worn at

03:57:10   5   Reynolds was sort of being in charge of internal IT at

6   some point?

7   **A.**   Yes.

8   **Q.**   And, so, you would have been the person to put that

9   policy in place.  Right?

03:57:18   10   **A.**   Yes.

11   **Q.**   Okay.  And can you ballpark for us how long that

12   policy has been in place?

13   **A.**   I am guessing a long time.

14   **Q.**   Okay.  And, so, comfortably, for five years or so?

03:57:30   15   **A.**   A long time.

16   **Q.**   Okay.  When you say "a long time," do you mean more

17   than a year?

18   **A.**   More than a year.

19   **Q.**   More than three years?

03:57:41   20   **A.**   I said, "A long time."  I don't know the exact date

21   the policy went into place.

22   **Q.**   Okay.  And the rank and file, if they delete an

23   e-mail off their computer, there will still be another

24   copy of it somewhere else; is that fair?

03:57:59   25   **A.**   No.

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

1  Q.   So, your testimony is that, if a rank-and-file
2  employee deletes an e-mail off their computer, there will
3  be no other copy on the server?  I just want to make sure
4  that's your testimony.
03:58:23  5  A.   The backups are done once a day.  They -- an e-mail
6  that an employee received today wouldn't be backed up
7  until that night's backup.
8  Q.   Okay.  So, after a day.  If an e-mail -- if an
9  employee deleted an e-mail after a day, then it would be
03:58:42  10  backed up?
11  A.   Yes.
12  Q.   And I just want to make sure your testimony is clear.
13  If I delete an e-mail as soon as I receive it and I am a
14  regular rank-and-file Reynolds employee, there is no
03:58:55  15  backup.  That is your testimony?
16  A.   I believe that's how it works, but now I'm not sure.
17  Q.   Okay.  And your lawyer -- well, without getting into
18  what your lawyers have told you, you understand that this
19  is a more important issue than it might normally be.  Is
03:59:19  20  that fair?
21  A.   Pardon me?
22  Q.   The e-mail system of Reynolds and Reynolds is --
23  you're aware that you were going to be asked about that
24  today; is that fair?
03:59:29  25  A.   No.

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1  **Q.**   You were not aware you were going to be asked about

2  the e-mail system of Reynolds and Reynolds today?

3  **A.**   No.

4  **Q.**   That's your testimony?

03:59:41  5         THE COURT:  Counsel, it's -- you need to move

6  on.

7         MR. LANGSTON:  Okay.

8  BY MR. LANGSTON:

9  **Q.**   Well, let's talk about how the executives' e-mails

03:59:48  10  are kept.

11         The top 30 or so executives at Reynolds

12  and Reynolds -- their e-mails are downloaded from the

13  server onto their computers; is that fair?

14  **A.**   Yes.

04:00:02  15  **Q.**   And once it's downloaded it's immediately removed

16  from that server.  Right?

17  **A.**   Correct.

18  **Q.**   And there is no backup for those e-mails?

19  **A.**   Correct.

04:00:14  20  **Q.**   Which means, if an executive deletes an e-mail, it's

21  lost forever?

22  **A.**   Yes.

23  **Q.**   And your computer is set up that way.  Right?

24  **A.**   Yes.

04:00:29  25  **Q.**   And Dr. Jackson's e-mail is set up that way?

1   **A.**   I don't know that for a fact today.

2   **Q.**   Okay.  Dr. Jackson is one of the two board members at

3   Reynolds and Reynolds?

4   **A.**   Yes.

04:00:44   5   **Q.**   Would you consider him a senior officer?

6   **A.**   He's a board member.

7   **Q.**   Okay.  Would you consider him a senior officer?

8   **A.**   He's not an officer of the company.

9   **Q.**   Okay.

04:00:54   10   **A.**   He's a board member.

11   **Q.**   Okay.  So, if you deleted -- if Dr. -- So, you are

12   not sure if Dr. Jackson does --

13            It was your decision to set up this

14   system; is that right?

04:01:08   15   **A.**   Set up the e-mail system?

16   **Q.**   To set up the system such that, if an executive

17   deletes an e-mail, it's gone forever.  That was your

18   decision?

19   **A.**   That was a decision that our executives made.

04:01:24   20   **Q.**   Okay.  But, in fact, you were the person who set up

21   the system?

22   **A.**   I was one of the executives, yes.

23   **Q.**   Well -- and setting aside the other executives, it

24   was your decision to set up the system this way; is that

04:01:38   25   right?

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1  **A.**   It was the decision of our executives that that's the

2  policy that we would have.

3  **Q.**   Who had final say?

4  **A.**   Your question?

04:01:56   5  **Q.**   Who had final say over this decision?

6  **A.**   Bob Brockman.

7  **Q.**   Okay.  And your testimony is that you are not the

8  person that set the policy that, if an e-mail is

9  downloaded to the laptop, they're removed from the server?

04:02:22  10  Your testimony is that it is not you that set that policy;

11  is that fair?

12  **A.**   I said it was an executive decision.

13  **Q.**   Okay.  And I guess what I am asking is:  Setting

14  aside that, it was your decision to set up the system that

04:02:37  15  way?

16          THE COURT:  I thought he keeps saying -- I

17  mean, I --

18          You don't have to answer the question

19  again.

04:02:48  20          Mr. Barras said that it was an executive

21  decision.  I mean, it wasn't his decision.  He said it's a

22  decision --

23          Am I not misstating that you said it was a

24  decision of the executives?

04:02:58  25          THE WITNESS:  We made an executive decision to

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1   set the system up that way.

2   BY MR. LANGSTON:

3   **Q.**   Okay.  And that's -- I think that's what I'm trying

4   to clarify.

04:03:06   5              Mr. Barras, you gave -- this is not the

6   first time you have been questioned under oath about this

7   e-mail system; is that fair?

8   **A.**   Yes.

9   **Q.**   You gave a deposition on April 15th, 2021, in the Cox

04:03:18   10   Automotive matter?

11   **A.**   Yes.

12   **Q.**   And you were under oath at that time?

13   **A.**   Yes.

14   **Q.**   The same oath that you took today?

04:03:26   15   **A.**   Yes.

16   **Q.**   And you had your lawyer sitting next to you.  Right?

17   **A.**   I believe so.

18   **Q.**   And there was no reason why you couldn't testify

19   truthfully that day.  Right?

04:03:37   20   **A.**   Correct.

21   **Q.**   Okay.  I am going to refer to Exhibit 60, Page 102 --

22   No.  I am going to put one up -- Page 102 from Exhibit 60

23   up on the screen.  And I am --

24              Are you able to see that, Mr. Barras?

04:04:20   25   **A.**   I can see -- It needs to be more to the left.

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1  **Q.**   Okay.  How's that?

2  **A.**   Yep.  I see it.

3  **Q.**   And I am reading from Line 2:

4              "Question:  Are they stored on a server

04:04:33  5  and then deleted?

6              "Answer:  The way the system works, when I

7  fire up my laptop, my e-mail are downloaded to my laptop

8  and they're removed from the server.

9              "Question:  How long has that been

04:04:48  10  Reynolds's policy with respect to your e-mails?

11             "Answer:  Over 25 years.

12             "Question:  Who set that policy?

13             "Answer:  I did."

14             Did I read that correctly?

04:05:00  15  **A.**   Yes.

16  **Q.**   Did you ever consider changing it such that the

17  executive's e-mails would be backed up?

18  **A.**   No.

19  **Q.**   You have never considered changing the system over

04:05:22  20  the years?

21  **A.**   No.

22             MR. LANGSTON:  Court's indulgence, Your Honor.

23             THE COURT:  Sure.

24  BY MR. LANGSTON:

04:06:02  25  **Q.**   Mr. Barras, I am going to refer to Page 106, and I am

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1  referring to Line 11.  Are you able to see that,

2  Mr. Barras?

3  **A.**   Yes.

4  **Q.**   And you were asked this question:

04:06:20  5              "Question:  Have you thought of changing

6  Reynolds's policy so that the e-mails aren't stored only

7  on the laptop but that there's at least a backup copy on

8  Reynolds's company servers?

9              "Answer, yes."

04:06:37  10              Did I read that correctly?

11  **A.**   Yes.

12  **Q.**   And the fact that the e-mails are not backed up on

13  the server has caused potential problems over the years;

14  is that fair?

04:06:51  15  **A.**   No.

16  **Q.**   Did Mr. Schaefer lose a laptop at some point?

17  **A.**   Yes.

18  **Q.**   And when Mr. Schaefer lost his laptop, all the

19  e-mails on that were just gone.  Right?

04:07:08  20  **A.**   I guess so.

21  **Q.**   Well, there is no backup.  Right?

22  **A.**   I wasn't involved in Mr. Schaefer's laptop.

23  **Q.**   Okay.  And in 2016, in August, Mr. Brockman deleted

24  all of his work e-mails; isn't that true?

04:07:32  25  **A.**   I have no knowledge of Mr. Brockman's laptop.

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1    **Q.**   I understand you don't have knowledge of his laptop,

2    but are you aware that in August of 2016 he deleted all of

3    his work e-mails?

4    **A.**   I don't recall that incident.

04:07:58   5    **Q.**   Okay.  And you were asked about this during your

6    deposition; is that fair?

7    **A.**   I don't recall.

8    **Q.**   I am going to refer to Page 170 of your deposition.

9    Are you able to see that?

04:08:23   10   **A.**   Yes.

11   **Q.**   Okay.  I am going to read from -- I'll move it over

12   so you can see the line numbers.  I am going to read from

13   Line 13.

14                 "Question:  In all your -- any

04:08:36   15   conversations and decades of experience with Mr. Brockman,

16   he never mentioned Evidence Eliminator to you once?

17                 "Answer:  No.

18                 Question:  Did he ever tell you that in

19   August 2016 that he was going to destroy or delete all his

04:08:51   20   work e-mails?

21                 "Answer:  No.

22                 "Question" -- and I'll slide it down for

23   you -- "Did he ever tell you that after August 16 he

24   destroyed all his work e-mails?

04:09:04   25                 "Answer" -- it was on the next page,

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

1    171 -- "No.

2                   "Question:  Did he tell you that he

3    deleted all his work e-mails in August 2016?

4                   "No" -- "Answer:  No."

04:09:19    5                   Did I read that correctly?

6    **A.**   Yes.

7    **Q.**   And you don't ask the questioner, 'I have no idea

8    what you're talking about.  Mr. Brockman never deleted his

9    e-mails'?  You don't say that, do you?

04:09:32   10   **A.**   Restate your question, please.

11   **Q.**   You don't tell Mr. Nemelka, who took your deposition,

12   that you have no idea what he is talking about with

13   respect to Mr. Brockman deleting his e-mails in August of

14   2016?

04:09:45   15   **A.**   I answered the question.

16   **Q.**   Okay.  So, you don't tell Mr. Nemelka that you have

17   no idea what he is talking about concerning Mr. Brockman

18   deleting his e-mails?

19   **A.**   I answered the question.

04:10:01   20   **Q.**   And, so, again, my question to you is:  You didn't

21   tell Mr. Nemelka that you had no idea what he was talking

22   about; is that fair?

23   **A.**   I answered the question.

24   **Q.**   So, "yes" or "no"?  Did you tell Mr. Nemelka that you

04:10:17   25   had no idea what he was talking about?

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1  **A.**   I answered the question.

2              MR. LANGSTON:  Judge.

3              THE COURT:  I am going to try to figure out if

4  there is a better way.  I think he is -- I think Mr. Barras

04:10:34  5  has answered your question.

6                    Can you ask your question again?

7              MR. LANGSTON:  Sure.

8              THE COURT:  Make sure I understand it.

9  BY MR. LANGSTON:

04:11:56  10  **Q.**   Mr. Barras, "yes" or "no"?  Did you tell Mr. Nemelka

11  during your deposition that you had no idea what he was

12  talking about when he asked you about Mr. Brockman

13  destroying his e-mails in August of 2016?

14  **A.**   And I answered Mr. Nemelka's question, is my point.

04:12:22  15              MR. LANGSTON:  I am happy to move on, Your

16  Honor.

17  BY MR. LANGSTON:

18  **Q.**   All right.  Now, you're not allowed to delete your

19  e-mails; is that fair?

04:12:37  20  **A.**   Yes.

21  **Q.**   Because you're under a legal hold?

22  **A.**   Correct.

23  **Q.**   And, so, -- well, let me ask you this.  Do you delete

24  e-mails?

04:12:49  25  **A.**   No.

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1   **Q.**   And, in fact, you have testified under oath that the

2   only e-mails that you delete are spam e-mails; is that

3   right?

4   **A.**   Yes.

04:12:58   5   **Q.**   What is your definition of a spam e-mail?

6   **A.**   Hard question to answer.

7   **Q.**   Would you consider an e-mail from a Reynolds and

8   Reynolds employee to be a spam e-mail?

9   **A.**   No.

04:13:26   10   **Q.**   How about an e-mail from a Reynolds and Reynolds

11   board member?  Would that be a spam e-mail?

12   **A.**   No.

13              MR. LANGSTON:  Okay.  I am going to mark this

14   as 151.

04:14:10   15              (Counsel confer off the record.)

16   BY MR. LANGSTON:

17   **Q.**   Okay.  Mr. Barras, these are a series of e-mails that

18   your attorneys have given us today.  Have you seen these

19   before?  Let's start with this, the one up on the screen,

04:14:31   20   which is the first page of 151.

21              Have you seen this before?

22   **A.**   Can you move it over some, please, to the left.  I

23   still can't see it all.

24   **Q.**   How is that?  I am looking at the bottom e-mail, not

04:15:01   25   the top one.

A. But I still can't see the words to the -- all the way to the right.

MR. LANGSTON: Okay. Why don't we do this. I am handing the witness the first page of 151.

04:15:13 BY MR. LANGSTON:

Q. So, do you see the e-mail from Mr. Jackson to you on November 5th, 2020, at 8:13 a.m.?

A. Yes.

Q. That's not a spam e-mail; is that right?

04:15:38 A. No.

Q. And, so, since you don't delete your e-mails that are not spam e-mails, that e-mail should be on your laptop right now; is that fair?

A. Yes.

04:15:54 Q. Do you know if that e-mail is on your laptop right now?

A. No.

Q. You don't know or it is not on your laptop?

A. I don't know.

04:16:01 Q. Okay. Do you have any recollection of deleting this e-mail?

A. No.

Q. Okay. Let's look at the third page of 151. Are you able to see that?

04:16:29 A. I can see the e-mail. I can't read the text all the

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1    way to the right.

2    **Q.**   All right.

3            MR. LANGSTON:  I'll hand the witness the third

4    page of 151.

04:16:37  5    BY MR. LANGSTON:

6    **Q.**   Now, do you see the e-mail from Mr. Jackson to you on

7    December 24th, 2020, at 3:06 p.m.?

8    **A.**   Yes.

9    **Q.**   Do you view that as a spam e-mail?

04:17:08  10   **A.**   It might be.

11   **Q.**   Okay.  So, you may have deleted this one?

12   **A.**   It may not have been delivered to me.  The attachment

13   is something that our system might have thrown out.  I

14   don't know.

04:17:27  15   **Q.**   Okay.  So, you don't know on that one.

16           MR. LANGSTON:  And I'll offer 1151, Your Honor.

17           THE COURT:  Any objection?

18           MS. KENEALLY:  I have no objection, Your Honor.

19   I just want the record be clear that this is a collection

04:17:59  20   of e-mails --

21           MR. LANGSTON:  Yes.

22           MS. KENEALLY:  -- on different dates, that it

23   is not a single document, which I believe counsel has

24   represented it is the documents that they received.

04:18:10  25           THE COURT:  Okay.  Subject to that stipulation,

KATHY MILLER, RMR, CRR - kathy@miller-reporting.com

1   it's admitted.

2           MR. LANGSTON:  All right.  Let's talk about --

3   I'll mark this as 152.  And I'll hand a copy to the witness

4   of what I have marked as 152.

04:18:55   5   BY MR. LANGSTON:

6   **Q.**   Do you recognize Exhibit 152?

7   **A.**   I don't recall this document.

8   **Q.**   Okay.  And this is an e-mail from Mr. Jackson to you

9   on December 3rd, 2020, at 1:37 p.m.  Is that fair?

04:19:40   10   **A.**   It's on this piece of paper.  It's an e-mail from

11   December 3rd, 2020.

12   **Q.**   Okay.  And the subject of this e-mail is "Two IRS

13   agents"?

14   **A.**   Yes.

04:19:51   15   **Q.**   And do you remember Dr. Jackson telling you that he

16   had been visited by two IRS agents?

17   **A.**   No.

18   **Q.**   After you received this e-mail did you do anything

19   with it?

04:20:16   20   **A.**   I don't recall receiving this e-mail.

21   **Q.**   Okay.  Well, you forwarded this e-mail on three

22   separate occasions.  Is that fair?

23   **A.**   I don't recall that either.

24   **Q.**   On December 3rd, 2020, were you in control of your

04:20:35   25   e-mail account?

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1  **A.**   Yes.

2  **Q.**   You hadn't lost your laptop; is that fair?

3  **A.**   No.

4  **Q.**   And does your laptop have a password?

04:20:48  5  **A.**   Yes.

6  **Q.**   So, if this e-mail was forwarded three times, that

7  was probably by you.  Is that fair to say?

8  **A.**   I don't recall forwarding the e-mail.  I don't recall

9  getting the e-mail.

04:21:00  10  **Q.**   You don't have any reason to believe that someone

11  else forwarded this e-mail on your behalf?

12  **A.**   No.

13  **Q.**   And is this -- would you consider this to be a spam

14  e-mail?

04:21:24  15  **A.**   No.

16  **Q.**   So, this e-mail should still be on your computer.  Is

17  that fair?

18  **A.**   I don't recall getting this e-mail.

19  **Q.**   But you receive a lot of e-mails that you don't

04:22:06  20  recall getting.  Right?

21  **A.**   Yes.

22  **Q.**   Do you have any reason to believe that you did not

23  receive this e-mail?

24  **A.**   I don't recall getting this e-mail.

04:22:21  25  **Q.**   And I understand that you said that, but do you have

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

1   any reason to believe you did not receive this e-mail?

2   **A.**   No.

3   **Q.**   And, so, if you received it, it should still be on

4   your computer.  Is that fair?

04:22:39  5   **A.**   I don't recall getting this e-mail.

6   **Q.**   Okay.  I think you testified to that.  But if you

7   received it, it should still be there.  Right?

8   **A.**   I don't recall getting this e-mail.

9   **Q.**   And I think you testified to that, Mr. Barras, but my

04:22:56  10  question to you is:  If you had received this e-mail, it

11  should still be on your computer?

12  **A.**   I don't remember getting this e-mail.

13  **Q.**   Do you have any reason to believe -- Again, you

14  testified you have no reason to believe you didn't get

04:23:13  15  this; is that right?

16  **A.**   Excuse me.  Say again.

17  **Q.**   You have no reason to believe this is not a genuine

18  e-mail sent to your computer from Dr. Jackson?

19  **A.**   I don't remember getting this e-mail.

04:23:31  20  **Q.**   I understand that, Mr. Barras.  My question for you

21  is:  Do you have any reason to believe you didn't receive

22  it?

23  **A.**   I didn't get --  I don't remember getting this

24  e-mail.

04:23:44  25  **Q.**   And my question to you is:  Do you have any reason to

*NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON*

1  believe you didn't receive this?

2  **A.**   I don't remember getting this e-mail.

3          THE COURT:  Okay.  Counsel, I think you made

4  your point.

04:24:02  5          MR. LANGSTON:  Okay.

6  BY MR. LANGSTON:

7  **Q.**   Were you aware that on Friday your attorneys -- are

8  you aware that the government subpoenaed all

9  communications between you and Mr. Jackson?

04:24:20  10  **A.**   I am aware that my -- my e-mail was -- was pulled.

11  **Q.**   Okay.  Did you have any discussions with Dr. Jackson

12  that the government had subpoenaed all communications

13  between you and him?

14  **A.**   I don't recall that conversation.

04:24:42  15  **Q.**   Okay.  Are you aware that on Friday your attorneys

16  made a production of 300 or so e-mails?

17  **A.**   I believe that's the case.

18  **Q.**   Did you review the production before it went out?

19  **A.**   No.

04:25:02  20  **Q.**   Do you know why this e-mail was not included in the

21  production?

22  **A.**   No, I do not.

23  **Q.**   When did you delete this e-mail, Mr. Barras?

24  **A.**   I don't recall getting this e-mail.

04:25:21  25  **Q.**   Did you direct anyone not to produce this e-mail?

NORMAN THOMAS BARRAS, JR. - DIRECT BY MR. LANGSTON

1  **A.**   No.

2  **Q.**   Did you delete this e-mail to hide it from the

3  government?

4  **A.**   No.

04:25:35  5  **Q.**   Did you delete this e-mail to protect Dr. Jackson?

6  **A.**   No.

7  **Q.**   This e-mail says that Dr. Jackson was purposefully

8  evasive and uncertain with the IRS agents.  Do you see

9  where it says that?

04:25:53  10  **A.**   Yes.

11  **Q.**   Have you ever known Dr. Jackson to be purposefully

12  evasive and uncertain?

13  **A.**   I can't answer that question.

14  **Q.**   Okay.  And with respect to this case, have you ever

04:26:14  15  been purposefully evasive and uncertain?

16  **A.**   No.

17        MR. LANGSTON:  No further questions, Your

18  Honor.

19             Well, I'll offer 152.

04:26:27  20        MS. KENEALLY:  No objection.

21        THE COURT:  Without objection, 152 is admitted.

22        MS. KENEALLY:  I am going to hand the

23  government what's marked for identification as Defense

24  Exhibit 67.  Make sure I am correct, Your Honor.  It was

04:27:14  25  just handed to me.

NORMAN THOMAS BARRAS, JR. - CROSS BY MS. KENEALLY

1                          **CROSS-EXAMINATION**

2    BY MS. KENEALLY:

3    **Q.**    Mr. Barras, do you see Exhibit 67 in front of you?

4    **A.**    I see the e-mail.

04:27:46    5    **Q.**    You see the e-mail?  Okay.  You see that it's marked

6    Defense Exhibit 67.  Correct?

7    **A.**    Yes.

8                    MS. KENEALLY:  Always adjusting for height.

9    BY MS. KENEALLY:

04:28:15    10    **Q.**    Mr. Barras, do see the -- I'm sorry.  You can see it

11    on the screen.  Right?

12    **A.**    Yes.

13    **Q.**    And this is an e-mail addressed to you.  Right?

14    That's your e-mail address, Tommy_Barras@reyrey.com?

04:28:32    15    **A.**    Yes.

16    **Q.**    And from Jim_Jackson@reyrey.com?

17    **A.**    Yes.

18    **Q.**    Okay.  And if you go down -- I mean, just going down

19    the e-mail, right -- this is an e-mail string, and,

04:28:53    20    ultimately, Jim Jackson is sending you or forwarding you

21    e-mails.  Correct?

22    **A.**    I'm sorry.  I didn't hear.

23    **Q.**    Let me ask you -- let me go -- let me actually go to

24    the second page.  Let me know if you want to see the whole

04:29:12    25    document.

*NORMAN THOMAS BARRAS, JR. - CROSS BY MS. KENEALLY*

1  **A.**   Oh, that would be nice.

2           MS. KENEALLY:  Your Honor, may I approach?

3           THE COURT:  You may approach.

4  BY MS. KENEALLY:

04:29:37   5  **Q.**   Mr. Barras, I am going to ask you questions about the

6  last e-mail that appears in the document for the first

7  e-mail in the chain.

8  **A.**   The last e-mail.  Right?

9  **Q.**   Yes.

04:29:55   10  **A.**   Okay.

11  **Q.**   Are you there?

12  **A.**   Yes.

13  **Q.**   Turn to the second page of the document, and you

14  see -- do you see where it says, "On June 26, 2020,

04:30:10   15  Dorothy Brockman wrote"?  Correct?

16  **A.**   Yes.

17  **Q.**   And that's Mr. Brockman's wife, right, Dorothy?

18  **A.**   Yes.

19  **Q.**   And that is her e-mail address.  She also had an

04:30:20   20  e-mail address on the reyrey system?

21  **A.**   Yes.

22  **Q.**   Okay.  And she says, "Hi, Dear Tommy and Jim" --

23           MR. LANGSTON:  Objection, Your Honor.

24           THE COURT:  Yes.

04:30:29   25           MR. LANGSTON:  So we don't -- I'd like to

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  clarify something.

2         THE COURT:  Yes.

3         MR. LANGSTON:  If this is being offered for the

4  fact that it was said to this witness and with respect to

04:30:37  5  his opinion, we don't have an issue.  If this is being

6  offered for the truth of the matter asserted we would

7  object to hearsay.

8         MS. KENEALLY:  I am -- I am not -- I am

9  offering it -- my intention is to inquire as to the --

04:30:51  10        MR. VARNADO:  To refresh his recollection.

11        MS. KENEALLY:  -- to refresh his recollection

12  on the e-mail.

13        MR. LANGSTON:  And if that's --

14        MS. KENEALLY:  Yes, as Mr. Varnado says.  But,

04:30:58  15  no, I'm not offering it for the truth of the content.

16        THE COURT:  So, what is it being offered for?

17        MS. KENEALLY:  Well, Mr. Varnado said I'm

18  offering to refresh his recollection, but I am also

19  offering it for the fact that he received the e-mail.

04:31:11  20        MR. LANGSTON:  So, Your Honor --

21        THE COURT:  So, he remembers getting this

22  e-mail.

23        MS. KENEALLY:  I'm sorry?

24        THE COURT:  Are you going to establish that he

04:31:17  25  remembers getting this e-mail?

1            MS. KENEALLY:  I am going to ask him if he

2  remembers getting this e-mail.

3            THE COURT:  Okay.

4            MR. LANGSTON:  And for refreshing his

04:31:24  5  recollection we do not have an objection.  If this is an

6  attempt to introduce Dorothy Brockman's statement, where we

7  don't get the opportunity to cross-examine her, we do have

8  objection.

9            MS. KENEALLY:  No, I'm not intending to offer

04:31:33  10  it for Mrs. Brockman's statement.

11            THE COURT:  So, again --

12            MS. KENEALLY:  I'm actually not intending to

13  offer it for Mrs. Brockman's statement.

14            THE COURT:  Again, let me make sure I get it on

04:31:39  15  the record.  Why are offering this document?

16            MS. KENEALLY:  I am offering it for -- to

17  refresh Mr. Barras's recollection and, also, Mr. Barras's

18  state of mind.

19            THE COURT:  Okay.  Then, why are we admitting

04:31:53  20  it if it's refreshing his recollection?

21            MR. LANGSTON:  She hasn't offered it.

22            MS. KENEALLY:  I have marked it for

23  identification.

24            THE COURT:  Oh.  Okay.  So, if she is just

04:32:01  25  showing it for identification, counsel, that's perfectly

NORMAN THOMAS BARRAS, JR. - CROSS BY MS. KENEALLY

1  okay.

2              MR. LANGSTON:  Okay.

3  BY MS. KENEALLY:

4      **Q.**   Mr. Barras, you see the e-mail from Mrs. Brockman.

04:32:13   5  Correct?

6      **A.**   Yes.

7      **Q.**   And it says, "Hi, Dear Tommy and Jim."  Correct?

8      **A.**   Yes.

9      **Q.**   Are you "Tommy"?

04:32:20  10  **A.**   I am Tommy.

11     **Q.**   And is Jim Jackson -- is "Jim" Jim Jackson, Reverend

12  Jim Jackson?

13     **A.**   It appears so, yes.

14     **Q.**   And do you see the last sentence on that page?

04:32:41  15  **A.**   Yes.

16     **Q.**   And in that sentence, do you see that Mrs. Brockman

17  makes reference to Mr. Brockman having huge Parkinson's

18  problems?

19              THE COURT:  Now there is problem.  Why are you

04:32:56  20  admitting this document if it is not for purposes of

21  Mrs. Brockman's stating that this is a problem?  I mean --

22              MS. KENEALLY:  I'm not.  I am not --

23              THE COURT:  Okay.  Then, what are you -- then,

24  what are you using it for?  I don't want to waste time

04:33:07  25  here.

KATHY MILLER, RMR, CRR - kathy@miller-reporting.com

NORMAN THOMAS BARRAS, JR. - CROSS BY MS. KENEALLY

1                    If you are trying to get it in to refresh

2 his recollection, ask him to look at it, then ask a

3 question.  That's how you refresh somebody's recollection.

4 You don't have him read the document and then read it into

04:33:18  5 the record as to what somebody said in the document.

6                    If it's truly being used to refresh

7 recollection, you show it to the witness, you take it back,

8 then you ask the witness a question.

9                    It's very disingenuous.  I'm sorry.  But

04:33:31  10 do it the right way.

11                    He saw the document.  Take the document

12 back.  Now ask him the question.  We're not going to play

13 games here, respectfully.  It's late in the day.  We have

14 got witnesses waiting.  Let's get this done.

04:33:47  15             MS. KENEALLY:  Your Honor, I apologize.  I did

16 not -- genuinely did not mean to put the statement into the

17 record.

18             THE COURT:  But you were about to read it.

19             MS. KENEALLY:  I meant to call --

04:33:54  20             THE COURT:  And you said the whole purpose was

21 to refresh his recollection.

22             MS. KENEALLY:  Right.

23             THE COURT:  So, you are all good lawyers here.

24 You all know how to refresh someone's recollection.  You

04:34:03  25 show it to the witness, then you ask the witness a

1  question, and then the witness says, Now, I recall this or

2  not.  We all know how to do this.  I am not upset, but I'm

3  just telling you we need to move on.  So, you have shown it

4  to the witness.  The witness has looked at it.  Now, ask

04:34:17  5  the question.

6  BY MS. KENEALLY:

7  **Q.**   Mr. Barras, does this document refresh your

8  recollection as to when you knew about Mr. Brock- --

9  Mr. Brockman's health issues?  Does this document refresh

04:34:33  10  your recollection concerning when you learned that

11  Mr. Brockman had Parkinson's?

12  **A.**   It's not a simple "yes" or "no" answer.  But, yes.

13  **Q.**   So --

14           THE COURT:  So the follow-up question is:  When

04:35:06  15  did he know?  Otherwise --

16           MS. KENEALLY:  Right.

17           THE COURT:  -- there is no reason to continue

18  on.

19  BY MS. KENEALLY:

04:35:10  20  **Q.**   Mr. Barras, when did you learn that Mr. Brockman had

21  Parkinson's disease?

22  **A.**   The date of that e-mail.  I don't have it anymore, so

23  I can't tell you.

24           MR. LANGSTON:  Judge, just to move things

04:35:39  25  along.  We will stipulate that the date is June 26, 2020.

NORMAN THOMAS BARRAS, JR. - CROSS BY MS. KENEALLY

1                    THE COURT:  Okay.  So stipulated.

2  BY MS. KENEALLY:

3  Q.   Mr. Barras, so when you told Dr. Agronin that -- I'm

4  sorry, I need to take a look at the -- give me a moment.

04:36:01  5  Apologies, Your Honor.

6                    Mr. Barras, do you recall that you

7  testified concerning statements you made to Dr. Agronin,

8  correct?

9  A.   Yes.

04:36:19  10  Q.   And you were asked if the statement that you made to

11  Dr. Agronin concerning your knowledge about Mr. Brockman's

12  Parkinson's disease was true or not, correct?

13  A.   Yes.

14  Q.   And you stated that with Dr. -- what Dr. Agronin

04:36:39  15  stated was not correct; is that right?

16  A.   Yes.

17  Q.   And having looked at Defendant's Exhibit 67, does

18  that refresh your recollection now that the statement you

19  made to Dr. Agronin was, in fact, correct?

04:37:09  20  A.   It's not a "yes" or "no" answer.  I'm sorry.

21  Q.   Well, you told Dr. Agronin -- let's take a look at

22  what you told Dr. Agronin.

23                    (Counsel confer off the record.)

24                    MS. KENEALLY:  Your Honor, I seem to have

04:37:45  25  misplaced a document.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1    THE COURT:  No problem.

2    MR. LANGSTON:  You looking for 145?

3    MS. KENEALLY:  Yeah, 145.

4    MR. LANGSTON:  I can get it out.

04:38:32    5    MS. KENEALLY:  Your Honor, rather than hold the

6  witness while I look for the sentence...

7  BY MS. KENEALLY:

8  **Q.**   Just to confirm.  When you told Dr. Agronin that you

9  knew -- earlier than November 5th, or November 6th, that

04:38:45  10  Mr. Brockman had Parkinson's disease, that was a correct

11  statement, right?

12  **A.**   Say again, please.

13  **Q.**   When you told Dr. Agronin that you knew earlier than

14  November 5th or November 6th that Mr. Brockman had

04:39:01  15  Parkinson's disease, that was a correct statement to

16  Dr. Agronin, correct?

17  **A.**   No.

18  **Q.**   Well, Mr. Barras, the -- you just testified that this

19  e-mail told you that -- this e-mail refreshes your

04:39:16  20  recollection that you knew as of the date of this e-mail

21  that Mr. Brockman had Parkinson's disease, correct?

22  **A.**   The e-mail from Mrs. Brockman mentioned a problem,

23  but I did not accept that.

24  **Q.**   You didn't believe her?

04:39:43  25  **A.**   The e-mail that we're talking about was not about

1   his -- his -- his disease.  It was about the transition to

2   me in the leadership role of Reynolds.

3   **Q.**   The topic of the transition, leadership transition to

4   you, was Mr. Brockman, who made the decision to appoint

04:40:17   5   you president of Reynolds, correct?

6   **A.**   Yes.

7   **Q.**   And it was also Mr. Brockman who made the decision

8   for you to become the CEO of Reynolds, correct?

9   **A.**   Yes.

04:40:28   10   **Q.**   If Bob Brockman had dementia in 2020, could that be

11   used as a challenge to your authority as the president and

12   CEO of Reynolds?

13   **A.**   I did not know he had dementia.

14   **Q.**   That is not my question.  If Bob Brockman had

04:40:51   15   dementia in 2020, when he appointed you to president of

16   Reynolds, when he appointed you CEO of Reynolds, could

17   that be used as a challenge to your authority as the

18   president and CEO of Reynolds?

19   **A.**   I don't know that he had that disease.

04:41:17   20         MS. KENEALLY:  No further questions.

21         THE COURT:  Anything further, Counsel?

22         MR. LANGSTON:  No, Your Honor.

23         THE COURT:  Great.  Can this witness be

24   excused?

04:41:22   25         MR. LANGSTON:  Yes, sir.

PM 4-108

1          MS. KENEALLY:  Your Honor, I -- Your Honor, I

2   would like to offer Defendant's Exhibit 67.

3          THE COURT:  Is that the e-mail that you used

4   for refreshing the recollection?

04:41:36   5          MS. KENEALLY:  Yes, Your Honor.

6          THE COURT:  Objection?

7          MR. LANGSTON:  We have an objection.

8          THE COURT:  Objection sustained.  That one, I

9   am not going to allow.

04:41:44   10          MR. LANGSTON:  And, Your Honor, we are -- we

11  are done with Mr. Barras today subject to a potential

12  recall next week after the deposition that we will,

13  obviously, give the Court.

14          THE COURT:  Mr. Johnson, your witness -- your

04:41:59   15  client is subject to being recalled, subject to the

16  deposition of the person who conducted the search.

17          MR. JOHNSON:  Judge, I appreciate that.  Can we

18  take up that matter for just two minutes, the subject of

19  that order earlier today regarding the deposition?

04:42:17   20          THE COURT:  Okay.  I can, but I need about a

21  five-minute break, if you don't mind.  So can you hold on

22  for five minutes?  Unfortunately, it looks like I might

23  have to handle a TRO at 5:15.  So we might not be able to

24  go until 6:00, as anticipated, or if I can get it done

04:42:36   25  quickly, then, maybe, I can get that done, and then we can

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  just push on late.

2          MR. BOURGET:  Your Honor, just one issue.  The

3  government does have one fact witness, Dr. Scott Lisse,

4  that is waiting outside.  He has been outside for a couple

04:42:49   5  hours.  We think that he will be in and out, including with

6  cross, you know, in about 30 minutes.

7          THE COURT:  Okay.  We will get to him.  I just

8  need to see what I am going to do about this temporary

9  restraining order.

04:42:59  10          Okay.  So, Mr. Johnson, can you hold on

11  just a second for me?

12          MR. JOHNSON:  Judge, you're captain of the

13  ship.

14          THE COURT:  We just need a little time.  Stand

04:43:12  15  in recess for a few minutes.

16  (Proceedings recessed from 4:43 to 4:55.)

17          THE CASE MANAGER:  All rise.

18          THE COURT:  Please be seated everyone.  I know

19  Mr. Johnson wants to be heard -- can you find him?  That

04:55:35  20  would be great.

21          MR. DICKERSON:  I'll go grab him, Your Honor.

22          THE COURT:  Before that, I do have a TRO set

23  for 5:15.  It shouldn't take that long.  I am going to

24  restrict the parties to about 15 minutes, and then we will

04:55:47  25  finish up as late as it takes this evening.  Everybody can

1  stay from my side.  If you guys can just hang in there, we

2  will get through the next witness.  If you are telling me

3  the next witness will be on direct for about 30 minutes,

4  then the cross, can it be more than an hour?  I mean, if

04:56:04   5  that much?  Twice as long as the direct?

6            MR. LOONAM:  It won't be -- I don't expect it

7  to be that long, Your Honor, but who knows.

8            THE COURT:  Okay.  Just as a rule of thumb, it

9  is usually twice.  If that is the case, we will just keep

04:56:19  10  pushing through for this evening.  So just be prepared to

11  stick it out probably until about 7:00.

12            MR. LOONAM:  Will do.

13            MR. VARNADO:  Your Honor, if I could just say

14  one thing, and I may have spoken to all my colleagues while

04:56:29  15  Ms. Keneally was conducting that examination.  I want it to

16  be perfectly clear.  We were not playing any games.  In

17  fact, that e-mail was offered to impeach that witness and

18  not to slide something into the record.  I just want to be

19  very, very clear.  We did not sponsor Mr. Barras's

04:56:42  20  testimony.  We were not trying do anything untoward.

21  Hopefully, the government understands that as well.  And,

22  in fact, because of the comments and statements about

23  Dr. Agronin, we will send this testimony to Dr. Agronin to

24  see if it in any way impacts his opinion.  But we will make

04:57:01  25  sure he has read Mr. Barras's testimony.  If he has some

1  supplement, we will give it to the government.  I really

2  did not want the Court to think -- and I think it was my

3  error to throw off Ms. Keneally in how she was conducting

4  that exam.  I just want to make that clear.

04:57:14  5         THE COURT:  No problem.  Ms. Keneally, I didn't

6  mean to be short with you in any way.  It's just that we

7  have got a limited amount of time, and you said it was for

8  refreshing.

9         MS. KENEALLY:  Well --

04:57:24  10         THE COURT:  You know, and then it sounds like

11  it was really for impeachment.  Then, if it was for

12  impeachment, then there was -- there is a different

13  process, but if it is for refreshing, then there is --

14  there is one -- one process.  And if it is -- if you are

04:57:38  15  trying to get it in as evidence, then there is another

16  process.

17         MR. VARNADO:  Right.

18         THE COURT:  And it wasn't clear to me which

19  one.  From my standpoint, it seemed like you were using it

04:57:47  20  to refresh your recollection, which means that we wouldn't

21  put it on the ELMO.  We wouldn't leave it with the witness,

22  as you all know as good lawyers, you show it to the

23  witness, come back, ask them whether or not it refreshes

24  their recollection.  If it does, ask them the question; if

04:57:59  25  it doesn't --

1          MR. VARNADO:  Sure.

2          THE COURT:  -- the answer is no, they move on

3 and we go.

4          But, Ms. Keneally, I apologize, I didn't

04:58:06  5 realize what you were trying to do.

6          MS. KENEALLY:  No, Your Honor.  I want to

7 apologize.  I think Mr. Varnado was trying to come to my

8 rescue, and between the Judge -- Your Honor suggesting that

9 we were offering it for the truth of that statement, which

04:58:20 10 we certainly were not, because I think there has been ample

11 evidence on that.  I would not rely on that e-mail for the

12 question of when and how on Parkinson's.  So it was not

13 that.  I think it was just an internal confusion with us,

14 but, yes, we --

04:58:40 15          THE COURT:  It's not a problem.  It is not a

16 problem.  No one is getting in trouble.  I'm not upset with

17 anybody.  I'm just trying to keep everything moving.  So

18 apologies are not needed --

19          MS. KENEALLY:  No, Your Honor.

04:58:53 20          THE COURT:  -- but they are accepted, and we

21 can move on.

22          MR. VARNADO:  Very good.  Thank you.

23          THE COURT:  And, Mr. Johnson?

24          MR. JOHNSON:  Judge, you ordered this morning

04:59:01 25 we get the vendor who did the collection on these two

PM 4-113

1  e-mails or two laptops.

2              The two people who worked on that, one

3  resides in Dallas, one resides in Austin.  We have asked

4  the government to agree to do it by Zoom, or video

04:59:14  5  conferencing.  They have refused that.  We would ask the

6  Court to order that we be able to do it by Zoom.  I mean,

7  they're being asked to do something of which, you know,

8  they're tangentially parties to, of course, and we are

9  happy to, you know, try to schedule them as best we can,

04:59:29  10  but on a Saturday in particular, they are available

11  Saturday.  They are available by Zoom.

12              THE COURT:  Okay.  I mean, can you -- yeah.

13              MR. LANGSTON:  So, Judge.

14              THE COURT:  I'm sorry.  I will let you speak.

04:59:41  15  I get the importance of the issue.  I mean, I just sat

16  through an hour of testimony.  I get it.  The question is,

17  the convenience of the parties.  So I just wanted to hear

18  how you can accommodate.  I know you have got your trial

19  team here.

04:59:55  20              MR. LANGSTON:  So we have offered to make

21  ourselves available the entire weekend if the travel time

22  is the issue.  We do think we want to do it live, in part

23  because -- and we are certainly cognizant of our schedule

24  next week.  You know, to the extent that they -- that we

05:00:09  25  would decide to want live testimony, we would need them

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

 1  here anyway.

 2               So we think that -- you know, also the

 3  logistics on our end are a little bit more complex on a

 4  Zoom line.  You know, we prefer to take live testimony.

05:00:23   5       THE COURT:  Is there any way you guys can get

 6  up to Dallas?  Is he in Dallas?

 7       MR. JOHNSON:  One is in Austin and one is in

 8  Dallas.

 9       THE COURT:  Can you guys arrange to put them in

05:00:31  10  one place and the government can travel?  I mean, that's a

11  compromise.  I mean, you know, neither side gets them

12  exactly the way they want them.  You want Zoom; they want

13  it in person.  You get it in person, but you have to bring

14  them to a central location so it can be done in person.

05:00:46  15  And you guys have a government -- you know, U.S. Attorney's

16  offices are all over.  There is lots between here, Austin,

17  and Dallas.  Pick one.

18       MR. LANGSTON:  If we can do it in one location,

19  we can make that happen.

05:00:59  20       THE COURT:  Then you guys, the compromise is

21  you bring them to a central location, both of them.

22  Neither of you get what you want, completely, because you

23  don't want to travel at all.  You want them here.  You want

24  them by Zoom.

05:01:13  25       MR. DICKERSON:  Your Honor, sorry to interrupt.

 1  But it's -- the issue is not only the travel, the issue
 2  availability for travel time.  The two witnesses who are
 3  most directly involved in this -- one, who primarily did
 4  the actual collection, and the one who did the searching of
 5  the data, those are the -- one in Dallas, one in Austin.
 6              The gentleman in Dallas is a primary
 7  caregiver for his elderly father.  We have been told that
 8  he's the only one that can watch him this weekend.  The
 9  father can't drive, can't get around, can't take care of
10  himself, so he needs to be in Dallas.
11              The witness in Austin just closed on a new
12  house yesterday, and has had plans to move into a new
13  house.  They have said, both of them have said, if they
14  need to be available for Zoom, that -- really, I can't
15  imagine this deposition taking very long at all.  They
16  can -- they can do that.  But to -- for either of them to
17  have to travel significantly this weekend is going to be
18  very, very difficult.
19              THE COURT:  And I get that.  But this issue is
20  very important, in light of Mr. Barras's testimony.  I
21  mean, I understand that there is explanations both ways,
22  but he is saying he doesn't even remember getting the
23  e-mail.  I mean, it would -- I am not commenting on the
24  merits, but if he had at least said that he remembers
25  getting the e-mail, then that's one thing.  But he said he

1  doesn't even remember receiving the e-mail, and in which

2  case, that -- and he doesn't remember whether or not it is

3  on his laptop or not on his laptop, so you -- somebody

4  needs to figure out, was it on his laptop or wasn't,

05:02:49  5  because he also testified he didn't delete anything from

6  his laptop.

7         So, I mean, it shouldn't take very long,

8  but it's an issue that's pretty important based on his

9  testimony.  Let me think about how we can make this

05:03:04  10  convenient.  I get it.

11         MR. DICKERSON:  If I could offer a possible

12  third option.  There is -- another representative of the

13  vendor, in town, who is sort of the -- I guess, the boss of

14  these two.  He wasn't the person most directly involved in

05:03:22  15  either of these, but he has offered, since he is local, to

16  appear locally, and speak with his guys, and figure out,

17  you know, the background industry and the --

18         THE COURT:  We need the person with knowledge

19  of relevant facts.  The person with personal knowledge.

05:03:37  20  If -- if the witness had said that he had at least received

21  it, then, I -- I wouldn't have a problem with getting

22  somebody to speak on behalf of the company as to the

23  process, but this witness said he never saw it, didn't

24  receive it, doesn't know whether it's on his computer or

05:03:54  25  not.

1            I mean, that's -- there's a lot of

2  questions to be answered, and you need the person with the

3  knowledge -- who has personal knowledge of what was on that

4  computer, what they did, what they found, and where it went

05:04:06  5  from there.

6            I mean, so, let me -- I need to think

7  about it.  I understand the concerns about Zoom.  And

8  ordinarily, Zoom would be fine, except for the fact of this

9  witness's answers, because the witness's answers --

05:04:24  10  before the examination, I probably would have been leaning

11  toward a Zoom, because it's just basic information to

12  figure out what happened, because we'd know it was on the

13  computer.  He can say, 'I did it.  I looked for it.  It was

14  on the computer.  I turned it over.'

05:04:38  15            And then it is just a matter of where it

16  went from there.

17            Now, there is a question of whether or not

18  it was on the computer, whether or not it -- well, first of

19  all whether it was on the computer at all.

05:04:47  20            Second of all, whether it was deleted from

21  the computer.  And then also, it appears to me that there

22  might be some issues as to the retention.  How it was

23  retained, who got it, because I heard testimony that this

24  document was sent to at least three different people.  So

05:05:03  25  what was that about and where did it come from?

1            MR. JOHNSON:  Judge, I'm sorry to cut you off

2   on that.  We have provided to the government the three

3   instances where it was sent to our people, and we discussed

4   that with you this morning.  That is not going to change.

05:05:18   5            I think that what you're going to find

6   and, of course, I am not an expert on IT matters, but the

7   vendor is going to say that they captured all the

8   documents.  They did a collection from Mr. Barras's laptop.

9   And they're going to further say that the original document

05:05:38   10   was not on his laptop.  They're going to say the other

11   three were on his laptop.  So, I mean, to --

12            THE COURT:  And then where did the document

13   come from?

14            MR. JOHNSON:  We know where the document came

05:05:49   15   from.  The document came from Mr. Jackson.  I mean, it's --

16   I don't think that's in dispute.  So I don't -- I don't

17   know how much light the people who did our collection for

18   us are going to be able to shed on where did it go.

19   They're only going to be able to say what we were able to

05:06:08   20   collect.

21            THE COURT:  Are they going to -- I mean, so the

22   question is, are they going to say that when they searched

23   this witness -- Mr. Barras's laptop, the document was not

24   there?

05:06:19   25            MR. JOHNSON:  The particular original document

1 was not there.  There were three other iterations of it

2 that were there.

3               THE COURT:  So, there were -- okay.

4               MR. DICKERSON:  Your Honor, if you'd like, I

05:06:33  5 have copies of the three I can tender to you right now.

6 And --

7               MR. LANGSTON:  I just learned that I haven't

8 received them yet.  So -- maybe they want to, or, maybe, my

9 e-mails --

05:06:42  10              THE COURT:  Okay.  Let me think about this.

11 I -- Counsel, now we only have about ten minutes.

12              MR. LANGSTON:  If we could offer a compromise.

13 We are willing to meet with them after court on Monday.  If

14 they only want to come here -- you know, they could talk to

05:06:48  15 us Monday night, and if they had to testify, they could do

16 it Tuesday.  If that makes it easier, we are willing to

17 make ourselves available in the night.  But, you consider

18 it, and --

19              THE COURT:  Okay.  Let me think about this a

05:07:07  20 little bit.  And I understand the arguments.  I want to

21 think about how to -- how to resolve it.

22              MR. JOHNSON:  Okay.  We appreciate that, and

23 anything we can do to help you resolve it, we want to do.

24 But at the same time, you know, being sensitive to, you

05:07:21  25 know, things happening on a Sunday or a Saturday, which we

1 would try to schedule around, and it is not a question of

2 Mr. Dickerson, or myself --

3          THE COURT:  Right.

4          MR. JOHNSON:  -- I promise you, we will both be

05:07:35  5 there if that is what the Court orders, and I know that is

6 the standing order at the moment.  But the real issue we

7 have is, still, if we were to bring one of those people, I

8 don't believe that the testimony they're going to give will

9 shed any light on where it went to.

05:07:50  10          THE COURT:  And that's what I want to figure

11 out, because I don't want to waste anyone's time.  If they

12 really can't tell me, or tell us, you know, what happened,

13 and why it wasn't picked up, or if it was picked up, then,

14 I don't want to waste their time, and I don't want to waste

05:08:06  15 your time.

16          MR. DICKERSON:  We represent to the Court, and

17 I understand they want to speak to the witness, and, you

18 know, cross-examine the person who actually did it, but I

19 can represent to the Court that I have had conversations

05:08:17  20 with the vendor, that they collected all of the e-mail data

21 that was available on the laptop in the first instance, and

22 that when they searched that data, as part of our review,

23 that the original e-mail in that chain, the first e-mail

24 from Mr. Jackson to Mr. Barras was not there.

05:08:36  25          THE COURT:  Okay.  Then -- okay.  So, if that

1 wasn't there, then what was there?

2          MR. DICKERSON:  There were three other e-mail

3 chains that had that original e-mail at the bottom of the

4 chain.  The first was Mr. Barras forwarding it to

05:08:53  5 Mr. Johnson.  The second was Mr. Johnson responding to

6 Mr. Barras, "Thank you."  And the third was Mr. Barras

7 forwarding the e-mail to the in-house counsel at Reynolds.

8          THE COURT:  Okay.  And then -- okay.  So -- and

9 so what happened to those copies?

05:09:14 10          MR. DICKERSON:  Those, we have.

11          THE COURT:  But why weren't they produced as

12 part of the original production, or today?

13          MR. DICKERSON:  They -- that was the -- the

14 e-mail that was produced on Monday.  It was one of those,

05:09:25 15 with the correspondence between Mr. Barras and counsel

16 redacted.

17          THE COURT:  Okay.  So it was redacted.  Because

18 I didn't see the top part.  I didn't know where -- it

19 looked like --

05:09:34 20          MR. DICKERSON:  Correct.  The version we

21 produced with the redacted top part, all that is, is

22 Mr. Barras forwarding to Mr. Johnson.

23          THE COURT:  Okay.

24          MR. DICKERSON:  There are two other similar

05:09:45 25 ones, again, just forwards responses between counsel.  And,

1  again, the reason that was not part of the original search

2  is because of the way the search was done.  The search

3  parameters didn't capture that, because we were only

4  searching for e-mails -- for Mr. Barras's e-mails to or

05:10:04  5  from, or CC'ing Mr. Jackson.  And the way that the program

6  worked, it didn't pick up any of those three, because they

7  were -- Mr. Jackson was not a recipient of any of those

8  three in the e-mail chain.

9          THE COURT:  But it seems like, I guess, it

05:10:21  10  would be important to find out from the person who did the

11  search, what his instructions were, or her instructions

12  were, to do the search, and then what it turned out -- what

13  that search turned out, and then where the information went

14  from there.  But -- but, I guess, the reason -- well, let

05:10:38  15  me -- I just need to think it through.

16          Let me hear from the government, quickly,

17  and then --

18          MR. SMITH:  Well, another option, Your Honor,

19  is, obviously, there is a mystery where the original

05:10:46  20  e-mail, not the e-mails that forwarded the e-mail, the

21  original e-mail, we all heard the testimony, produce a

22  forensic image of Mr. Barras's laptop.  We can analyze it.

23  If Mr. Barras deleted it, contrary to his testimony today,

24  it should leave a trail in the metadata of the laptop.  So

05:11:05  25  I was just checking with our forensic expert.

1          We might be able to find it.  Was it, in

2 fact, deleted?  Did it exist there?  Some of these

3 questions could be answered by forensic analysis of Mr.

4 Barras's hard drive of his laptop.

05:11:17   5          THE COURT:  Okay.  Well, I don't want to --

6 really don't see where we need to go there yet, because

7 that's not really what I am focused on.

8          MR. SMITH:  Uh-huh.

9          THE COURT:  What I'm trying to make sure is

05:11:29  10 that there is no other documents out there that we should

11 -- that should have been captured as part of the search

12 that haven't been produced.  And that's my main focus.

13          You guys can blame each other -- I mean, I

14 don't mean to be terrible, but you can attribute motives

05:11:43  15 for every -- you know, whenever you want.  But my concern

16 is, is that all of the documents responsive to the

17 subpoenas have, in fact, been produced, and there is

18 nothing else out there, and that this person who did it was

19 given the proper instructions, and gathered those documents

05:12:03  20 appropriately, and turned them over.  And then once that's

21 done, then, you guys can attribute why it was produced

22 late, and argue that later.

23          But what I am concerned about,

24 Mr. Johnson, you may be right, I don't want to drag

05:12:17  25 everybody out here for -- on literally a collateral issue

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  that has very little bearing on the ultimate decisions I

2  need to make.  So I just need to digest that a little bit,

3  and I can get back to you in the morning.

4          MR. JOHNSON:  Okay.  That's great, Your Honor.

05:12:35  5  We appreciate your consideration.

6          THE COURT:  I understand your concern as well.

7  Nobody wants to have to be deposed for five minutes, you

8  know, bringing someone to Austin, for five minutes, or 15

9  minutes, when it is not necessary.  So, I just need to

05:12:48  10  think it through.

11          MR. JOHNSON:  Thank you, Judge.

12          THE COURT:  Thanks, and y'all can be excused if

13  you would like.  We will --

14          MR. JOHNSON:  We will take you up on that

05:12:56  15  offer.  Thank you.

16          MR. DICKERSON:  Thank you, Judge.

17          THE COURT:  Counsel, it's now 5:15.  I have got

18  to take this other matter up.  You are free to stay in the

19  courtroom.  I am going to do it by Zoom.  But as soon as I

05:13:09  20  am done, we will start up, and we will just continue until

21  this witness is done.

22          MR. SMITH:  Appreciate it, Your Honor.  Thank

23  you.

24          MR. LOONAM:  About 5:30 should we come back?

05:13:22  25          THE COURT:  I am guessing more like 5:40 to be

```
 1  on the safe side.
 2            MR. LOONHAM:  Thank you, sir.
 3            THE COURT:  Okay.  So if you want to grab some
 4  food, that's fine.  We will be back.
 5            (Proceedings recessed from 5:13 to 6:05.)
 6            THE CASE MANAGER:  All rise.
 7            THE COURT:  Please be seated, everyone.
 8            Okay.  Mr. Loonam.
 9            MR. LOONAM:  Your Honor, before we begin with
10  the next witness we would like to waive Mr. Brockman's
11  appearance just for the balance of the day.  We appreciate
12  the courtesy of both the Court and the government.
13            THE COURT:  Okay.  Not a problem.
14            Okay.  And you may call your next witness.
15            MR. BOURGET:  The government calls Dr. Scott
16  Lisse.
17            THE COURT:  Hello, sir.  How are you?  Just
18  step on up and I am going to swear you in.  And thank you
19  for your patience.
20            THE WITNESS:  Yeah.  Now I know how my patients
21  feel.
22            THE COURT:  I'm sorry.
23            THE WITNESS:  That's quite all right.
24            THE COURT:  If you could please just raise your
25  right hand, sir.
```

06:05:54 (line 5)
06:06:04 (line 10)
06:06:19 (line 15)
06:06:46 (line 20)
06:06:55 (line 25)

*SCOTT ANTHONY LISSE, M.D. - DIRECT BY MR. BOURGET*

```
 1                    (Witness sworn.)

 2              THE WITNESS:  Yes.

 3              THE COURT:  Please take the stand.  And if you

 4    feel comfortable, it is not a problem when you are on the

 5    stand to take your mask off.

 6              THE WITNESS:  I would be honored.

 7              THE COURT:  Okay.  Counsel, whenever you are

 8    all set and the witness is ready, you may proceed.

 9              MR. BOURGET:  Thank you, Your Honor.

10                    SCOTT ANTHONY LISSE, M.D.,

11    duly sworn, testified as follows:

12                        DIRECT EXAMINATION

13    BY MR. BOURGET:

14    Q.   Good evening, Dr. Lisse.  Could you start by stating

15    your full name for the record and spelling your last name.

16    A.   Scott Anthony Lisse, L-I-S-S-E.

17    Q.   And are you a medical doctor?

18    A.   Yes, sir.

19    Q.   Was the defendant, Robert Brockman, a patient of

20    yours?

21    A.   Yes.

22    Q.   And was he a patient of yours from approximately 2015

23    through 2018?

24    A.   Yes.

25    Q.   And as a general practitioner -- I got ahead of
```

06:07:05
06:07:19
06:07:25
06:07:35
06:07:40

*SCOTT ANTHONY LISSE, M.D. – DIRECT BY MR. BOURGET*

1    myself.  What sort of practice do you have?

2    **A.**    Internal medicine.

3    **Q.**    Okay.  And, as -- you know, would you say that you

4    practice a wide range of medicine?

5    **A.**    No.  I'm a primary care doctor; so, I know a little

6    bit about a lot of things.

7    **Q.**    Sure.  And, as a primary care doctor, do you have

8    some familiarity with the symptoms of Alzheimer's disease?

9    **A.**    Yes.

10   **Q.**    And do you have some familiarity with symptoms of

11   other forms of dementia?

12   **A.**    Yes.

13   **Q.**    Okay.  Do you specialize in Alzheimer's or dementia?

14   **A.**    No.

15   **Q.**    Are you a neurologist?

16   **A.**    I -- once I have concern about a patient and I think

17   they have dementia, I can test for it, and then I would

18   say that -- do a basic workup and then send them to a

19   neurologist, if they don't have any metabolic issues or

20   any type of brain tumor.

21   **Q.**    Okay.  And we will touch on that in a minute.

22              You have some binders next to you.  Could

23   you find the one that has a tab for the number 95?

24   **A.**    They told me I needed to bring my reading glasses.

25              MR. BOURGET:  And, Your Honor, we have spoken

*SCOTT ANTHONY LISSE, M.D. - DIRECT BY MR. BOURGET*

1 with the defense, and the documents and exhibits that I

2 will be going through with the witness contains sensitive

3 medical information that are -- that isn't relevant to the

4 Court's competency determination.  So, we have agreed that

06:09:10    5 these documents will be -- if admitted, they will be

6 admitted under seal.  And when I show them I won't put them

7 on the ELMO, but I will give you a copy, the witness and

8 the defense.

9            MR. LOONAM:  And, Your Honor, just to move

06:09:21   10 things along, we are not going to have any objection to the

11 admission of these documents.

12            THE COURT:  Okay.  But you need to tell me

13 which documents they are that are sealed so I can make sure

14 that the court reporter knows.

06:09:34   15            MR. BOURGET:  Absolutely.  I will mark them.

16 We'll do it the usual way.  I just won't put them on the

17 ELMO or display them.

18 BY MR. BOURGET:

19 **Q.**   So, Dr. Lisse, have you found Tab 95?

06:09:42   20 **A.**   Does it say "Government's Exhibit 95"?  Is that it?

21 **Q.**   Yes.

22 **A.**   Okay.

23 **Q.**   Can you just flip through those pages quickly and let

24 me know if you recognize what's contained under Exhibit

06:09:53   25 95?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*SCOTT ANTHONY LISSE, M.D. - DIRECT BY MR. BOURGET*

1  **A.**   Okay.  Okay.  I'm ready.

2           MR. BOURGET:  Mr. Loonam just raised a good

3  point, that one thing that we could do to display the

4  documents to everybody is, if we could turn off just that

06:10:27  5  screen, that might be the easiest way to do it.

6           THE COURT:  That sounds great.

7           THE CASE MANAGER:  So, turn it off?

8           MR. BOURGET:  Yes, please.

9              Now, Mr. Loonam has forced me to use an

06:10:43  10  ELMO for the first time in a couple years.

11           MR. VARNADO:  Welcome to the stone ages.

12  BY MR. BOURGET:

13  **Q.**   Dr. Lisse, have you had a chance to review

14  Exhibit 95?

06:10:49  15  **A.**   I have looked over it.

16  **Q.**   And do you recognize what's contained there?

17  **A.**   I do.

18  **Q.**   And what is it?

19  **A.**   Well, the first page is a copy of the middle -- mini-

06:11:00  20  mental status examination questionnaire that I carry in my

21  pocket.  And the others are a -- it looks like

22  Mr. Brockman's medical record condensed from our old

23  electronic medical record into our current one.

24  **Q.**   Okay.  And are these medical records that you

06:11:21  25  produced to the government in response to a subpoena?

*SCOTT ANTHONY LISSE, M.D. – DIRECT BY MR. BOURGET*

1  **A.**   Yes, sir.

2  **Q.**   Okay.  And are they fair and accurate depictions of

3  your medical records?

4  **A.**   Yes, sir.

06:11:30  5  **Q.**   Okay.

6          MR. BOURGET:  At this point, Your Honor, I

7  would offer 95 into evidence.

8              MR. LOONAM:  No objection.

9              THE COURT:  No objections.  Is it under seal?

06:11:37  10             MR. BOURGET:  Yes.

11             MR. LOONAM:  Under seal, Your Honor.

12             THE COURT:  95 is admitted under seal.

13             MR. BOURGET:  Yes.  We can do it this way:

14  Unless I say otherwise, everything is under seal.

06:11:47  15             THE COURT:  Okay.

16  BY MR. BOURGET:

17  **Q.**   All right.  Dr. Lisse, you mentioned that

18  Mr. Brockman was a patient of yours.  Do you have any

19  specific memories of Mr. Brockman beyond what is contained

06:12:01  20  in your records?

21  **A.**   Not specifically.

22  **Q.**   As a patient, was there anything that you recall that

23  was remarkable or unusual about him?

24  **A.**   I don't even know how to answer that.

06:12:15  25  **Q.**   Did Mr. Brockman stand out to you in any way?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*SCOTT ANTHONY LISSE, M.D. - DIRECT BY MR. BOURGET*

1  **A.**   Well, he was a nice gentleman.  I mean, I have a lot

2  of nice patients.  No specific thing except that I knew

3  that he, you know, was of well-to-do means.

4  **Q.**   Okay.  And how do you know that?

06:12:33  5  **A.**   Well, because his wife and I -- his wife is a patient

6  of mine -- if that's not a HIPAA violation -- and that,

7  you know, they would travel and go different places

8  and -- That's about it.

9  **Q.**   So, is it fair to say that your recollection of

06:12:52  10  Mr. Brockman's visits to your office are limited to what's

11  contained in your records?

12  **A.**   Yes.

13       MR. BOURGET:  Your Honor, I am marking a

14  document that is 95-A.  This comes from Exhibit 95.  It's

06:13:17  15  just an excerpt for the ease.

16            May I approach?

17            THE COURT:  You may approach.

18            MR. BOURGET:  I have handed the witness what I

19  have marked as Exhibit 95-A.

06:13:50  20  BY MR. BOURGET:

21  **Q.**   All right, Dr. Lisse.  Do you recognize this

22  document?

23  **A.**   Yes.

24  **Q.**   And are these records from a -- Mr. Brockman's visit

06:13:58  25  to your office in August of 2018?

SCOTT ANTHONY LISSE, M.D. – DIRECT BY MR. BOURGET

1  **A.**  Yes.

2  **Q.**  I'm sorry.  I misspoke.  January of 2018?

3  **A.**  Yes, sir.

4  **Q.**  And turning to -- well, actually, just flipping right

06:14:08  5  down the page -- I don't know if you can see me

6  pointing --

7  **A.**  Yeah.

8  **Q.**  -- on the screen.  What is a "well man exam"?

9  **A.**  Basically, we -- when people come in for a physical,

06:14:18  10  we either put a "well man/well woman" because it

11  prepopulates with male or female parts of the physical

12  examination.  And then it is also broken down by, for

13  commercial insurance purposes, their age group.

14  **Q.**  And you said that -- you mentioned prepopulated.  So,

06:14:37  15  what gets prepopulated on this -- on this sheet?

16  **A.**  Basically, the things that get prepopulated are your

17  reviews -- for me, because we can set this up in the very

18  beginning -- are the review systems, your physical exam.

19  Everything else is all imported so, if there is some

06:14:52  20  medical diagnosis that comes in from one visit, it will

21  get transferred and carried over from visit to visit.

22  **Q.**  Okay.  I would like to turn your attention to Page 3

23  of 95 -- Page 4 of 95-A.  Looking at the bottom of the

24  page here under the headers that say "Neurologic" and

06:15:17  25  "Psychiatric" -- do you see that there?

SCOTT ANTHONY LISSE, M.D. - DIRECT BY MR. BOURGET

1   **A.**   Uh-huh.

2   **Q.**   Can you explain what's noted here?

3   **A.**   Well, basically, this is my physical examination.

4   So, if you look at an entire physical examination of

06:15:30   5   everything single thing that you can look at and document

6   on an individual during a visit, it would take an hour,

7   hour-and-a-half easily just for that, and you just can't

8   do that in a regular medical practice and see people and

9   document and such.  So, you narrow it down to things that

06:15:46   10   you think are important that are -- are something that you

11   think are a normal either physical exam or review -- a

12   negative review of system, and then, when there is some

13   type of abnormality, that tricks me to -- or tells me I

14   need to change that.

06:16:04   15   **Q.**   Okay.  So, if I understand correctly, you know, for

16   example, under "Neurologic" where it says "mental status,"

17   it says, "overall alert, oriented."  That prepopulates?

18   **A.**   That prepopulates, yes.

19   **Q.**   Right.  And if I understand you correctly, it stays

06:16:21   20   that way unless you notice something abnormal and put it

21   in the record?

22   **A.**   Correct.

23   **Q.**   And, so, is it fair to say that during this January

24   of 2018 visit -- did you notice anything abnormal about

06:16:33   25   Mr. Brockman from a neurologic or psychiatric standpoint?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*SCOTT ANTHONY LISSE, M.D. – DIRECT BY MR. BOURGET*

1            MR. LOONAM:  Objection, unless he is calling

2  for memory or what the record reflects.  Just to

3  distinguish that for the record.

4            MR. BOURGET:  Okay.  Let me rephrase that.

06:16:47  5  BY MR. BOURGET:

6  **Q.**   Dr. Lisse, do your records from this visit reflect

7   you seeing anything abnormal about Mr. Brockman from a

8   neurological or psychiatric standpoint?

9  **A.**   From the record, no.

06:17:12  10            MR. BOURGET:  I am marking Government's Exhibit

11  95-B.  Again, this is an excerpt from Exhibit 95.  I'm just

12  making it easier for us to get through.

13            I am handing the witness a copy of 95-B.

14  BY MR. BOURGET:

06:17:41  15  **Q.**   Similar questions, Dr. Lisse.

16            Is Exhibit 95-B a copy of Mr. Brockman's

17  medical records from, it looks like, an August 31st, 2018,

18  visit?

19  **A.**   Yes, sir.

06:17:52  20  **Q.**   And is this a fair and accurate depiction of the

21  records of that visit?

22  **A.**   Yes, sir.

23  **Q.**   Was this visit a -- a -- an annual exam?

24  **A.**   No.

06:18:06  25  **Q.**   I'm sorry.  You -- I interrupted you.  Was this an

SCOTT ANTHONY LISSE, M.D. – DIRECT BY MR. BOURGET

 1   annual exam?

 2   **A.**   No.  He came in with a specific complaint.

 3   **Q.**   And what was that specific complaint?

 4   **A.**   "Dysuria," which is a typical term for burning when

 5   he urinates, a symptom of a urinary tract infection, and

 6   back pain.

 7   **Q.**   And when a patient comes in for a specific complaint

 8   like this, do you look for symptoms of any other

 9   conditions?

10   **A.**   Unless it's extremely obvious or takes me -- whatever

11   they're complaining of takes me into a different route

12   that makes me discover that, the answer is "No."

13   **Q.**   And during this visit in August of 2018, from your

14   records, is there anything that suggests that Mr. Brockman

15   reported any sort of symptom or abnormality from a

16   neurologic or psychiatric standpoint?

17   **A.**   Not that I see.  No.

18            MR. BOURGET:  I'm putting up what I have marked

19   as Government's Exhibit 95-C.  Again, it's an excerpt of

20   Exhibit 95.  And I am handing a copy to the witness.

21   BY MR. BOURGET:

22   **Q.**   All right.  Similar -- similar question, Dr. Lisse,

23   going a little further back in time.  Does this appear to

24   be a fair and accurate copy of your record of

25   Mr. Brockman's visit from September 29th, 2015?

06:18:17 (line 5)
06:18:31 (line 10)
06:18:51 (line 15)
06:19:53 (line 20)
06:20:13 (line 25)

SCOTT ANTHONY LISSE, M.D. – DIRECT BY MR. BOURGET

1   **A.**   Yes.

2   **Q.**   And reviewing this specific record, if we can turn

3   down to the physical exam portion that we looked at

4   earlier -- or later, I guess -- Again, I want to turn your

06:20:39   5   attention to the neurologic and psychiatric portions.  Do

6   you see anything there that reflects that you noticed or

7   Mr. Brockman reported any abnormal symptoms from a

8   neurologic or psychiatric standpoint?

9   **A.**   No.

06:21:00   10           MR. BOURGET:  At this point, Your Honor, I

11   would like to offer Exhibits 95-A and 95-B and 95-C into

12   evidence under seal.

13           MR. LOONAM:  No objection.

14           THE COURT:  Without objection, they are

06:21:11   15   admitted.

16           MR. BOURGET:  I am marking Government's Exhibit

17   153.  And I am handing a copy of Exhibit 153 to the

18   witness.

19   BY MR. BOURGET:

06:21:57   20   **Q.**   Dr. Lisse, do you recognize Exhibit 153?

21   **A.**   Initially, no, but when it was shown to me prior to

22   this visit, when I met with the U.S. Government, it looked

23   familiar.  Then I was able to have our head of medical

24   records be able to get this out of our old electronic

06:22:20   25   medical records we no longer use, in this format.

*SCOTT ANTHONY LISSE, M.D. - DIRECT BY MR. BOURGET*

1   **Q.**   And is it possible -- so, when you say that when you

2   saw one earlier, is that the one that you were shown when

3   you spoke with the government last week?

4   **A.**   That is correct.

06:22:35   5   **Q.**   And is it possible that the one that you were shown

6   was slightly different from this one?

7   **A.**   I have no clue.

8   **Q.**   Okay.  But turning to this one specifically from --

9   it looks like it's a document -- it's captioned "September

06:22:52   10   2015 health issues."

11                You said you didn't recall this document

12   prior.  Do you know why that is?

13   **A.**   Well, he talked a lot about his wife, and I admire

14   that, and also I think I remember the -- his little -- or

06:23:07   15   the entrance about the dog, Sweet Pea.

16   **Q.**   Right.  And have you -- have you reviewed this

17   document before coming to court today?

18   **A.**   Yes.

19   **Q.**   Okay.  And, you know, turning -- turning through

06:23:22   20   these, it appears that there's several different symptoms

21   or potential illnesses reported.  Is that --

22   **A.**   That is correct.

23   **Q.**   And turning -- turning to the -- turning to the

24   fourth page, at the bottom, just turning your attention to

06:23:46   25   the header, it says "Mental Processes, Including Memory."

*SCOTT ANTHONY LISSE, M.D. – DIRECT BY MR. BOURGET*

1          Do you recall ever discussing this

2    document with Mr. Brockman?

3    **A.**   Specifically, I can say that I think this was a

4    synopsis that he gave me when he came in to my practice

06:24:04  5    after his former doctor retired.  We were next door to him

6    in our old building.  And, so, I may have gone through

7    this with him, but, again, as -- as being a -- even with a

8    brand-new patient with 30 minutes, you can't delve into

9    every single specific thing that's on here in a very

06:24:28  10   detailed manner.  So, basically, I took, "What's the thing

11   that bothers you the most?  "What can I fix that concerns

12   you?"

13   **Q.**   And do you have any record of, when you asked

14   Mr. Brockman what concerned him or what bothers him the

06:24:42  15   most, that he said his memory?

16   **A.**   No, I don't recall that.

17   **Q.**   Is that reflected in your records?

18   **A.**   Well --

19   **Q.**   And let me rephrase that.  Is it reflected, in your

06:24:52  20   records from 2015 or anywhere in the records that you have

21   produced, that Mr. Brockman ever complained to you of

22   memory issues?

23   **A.**   The answer in my -- my records, the answer is "No."

24          MR. BOURGET:  At this point, Your Honor, we

06:25:26  25   will offer 153 into evidence.

*SCOTT ANTHONY LISSE, M.D. – DIRECT BY MR. BOURGET*

1                    THE COURT:  Any objection?

2                    MR. LOONAM:  No objection.

3                    THE COURT:  153 --

4                    MR. LOONAM:  Under seal.

06:25:33   5         MR. BOURGET:  Under seal.

6                    THE COURT:  It's admitted.

7    BY MR. BOURGET:

8    Q.   I want to show you this document.  I believe that you

9    pointed this out.  This is the first page of Exhibit 95.

06:25:49  10    I haven't marked it separately, but it's the first page of

11   that exhibit.

12                   Do you recognize what is on the screen?

13   A.   Yes, sir.

14   Q.   What is it?

06:25:56  15    A.   It's my own personal Mini-Mental Status Exam

16   questionnaire that I carry in my coat pocket.

17   Q.   Do you carry that with you whenever you see a

18   patient?

19   A.   Yes.

06:26:07  20    Q.   And can you explain for the Court what the

21   Mini-Mental State Examination is?

22   A.   Basically, this is a construct that was created that

23   is -- it measures multiple different areas of an

24   individual's cognition, from memory to being able to -- to

06:26:27  25    repeat things, to be able to do specific tasks where they

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*SCOTT ANTHONY LISSE, M.D. - DIRECT BY MR. BOURGET*

1  have to think; so, it works multiple different parts of

2  the brain.

3           And there is a composite score of 30.  And

4  normal is considered, depending on who you look at, 27 to

06:26:45  5  30, or -- 24 to 30 is one I just saw before.  Every time

6  you miss something, that's subtracted from your total

7  score, and then depending on how low the score is will

8  depend on how much -- how severe the dementia is.

9  Q.  And have you given this to your patients before?

06:27:04  10  A.  The ones that need it.

11  Q.  And what usually causes you to believe that somebody

12  needs it?

13  A.  Well, the main thing that the -- that gets me to do

14  this is when a family member brings in the patient,

06:27:18  15  because the patient has no idea how their cognitive

16  process has declined.  They're getting lost.  They are

17  forgetting to pay bills.  They are leaving the door

18  unlocked.  They are leaving the stove on.  They don't

19  remember how to make coffee.  Those type of things.

06:27:34  20           If I am talking to somebody and they keep

21  perseverating on a specific item or they can't seem to

22  progress or can't tell me something more about an issue or

23  some questions that they are just not processing properly,

24  I will then switch to this.

06:27:54  25  Q.  And you mentioned earlier in your testimony that

*SCOTT ANTHONY LISSE, M.D. - CROSS BY MR. LOONAM*

1   Dorothy Brockman is also a patient of yours?

2   **A.**   That's correct.

3   **Q.**   And do you have any recollection of Dorothy Brockman

4   ever, you know, saying or -- saying anything to you about

06:28:07   5   her husband having memory issues or potential symptoms of

6   a neurological or psychiatric issue?

7   **A.**   I cannot recall.

8               MR. BOURGET:  Okay.  Nothing further, Your

9   Honor.

06:28:18   10              THE COURT:  Cross.

11              MR. LOONAM:  Thank you, Your Honor.

12                     **CROSS-EXAMINATION**

13   BY MR. LOONAM:

14   **Q.**   Hi, Doctor.

06:28:31   15   **A.**   Hello, sir.

16   **Q.**   I'll try and be as efficient as I can.  We covered

17   some of this.  We'll go through it quickly.

18   **A.**   Okay.

19   **Q.**   You are not a dementia specialist.  Right?

06:28:58   20   **A.**   Correct.

21   **Q.**   And you are not an Alzheimer's specialist?

22   **A.**   Correct.

23   **Q.**   And you are a busy doctor?

24   **A.**   I'd like to think so.

06:29:05   25   **Q.**   And you -- you said you take about 30 minutes with a

SCOTT ANTHONY LISSE, M.D. - CROSS BY MR. LOONAM

1   patient in a -- the full exam?  Is that right?

2   **A.**   It all depends.  I -- for a regular physical, yes,

3   but, if they come in with one of their complaints, the

4   visit goes longer.

06:29:25   5   **Q.**   And do you take insurance?

6   **A.**   Yes.

7   **Q.**   And, so, when -- when you saw Bob Brockman did he --

8   you know, was he like every other patient who has

9   insurance and pays the copay?

06:29:39   10   **A.**   As far as I know.

11   **Q.**   Yeah.  So, it wasn't like sort of an all-cash,

12   special -- There are doctors in New York who have these

13   practices for wealthy people where they just take cash.

14   **A.**   I am not a concierge doctor.

06:29:51   15   **Q.**   Yeah.  Not one of those?

16   **A.**   No.

17   **Q.**   Yeah.  So -- and -- and you don't remember Bob?

18   **A.**   I don't know how to answer that.

19   **Q.**   Well, other than --

06:30:05   20   **A.**   What -- I mean, I am -- I remember him.  I remember

21   the name.  And that's pretty much it.

22   **Q.**   Yeah.  Okay.  Because you treat his wife, but you

23   don't have a specific memory of Mr. Brockman?

24   **A.**   I can't -- I have been in practice for 29 years; so,

06:30:25   25   I have a lot of patients.

*SCOTT ANTHONY LISSE, M.D. - CROSS BY MR. LOONAM*

1  **Q.**    Yeah.

2  **A.**    So, if anyone comes out with something being special,

3  different, a disease process that's unusual, somebody that

4  has a bot fly infection from being in a jungle in Belize,

06:30:37  5  I remember that.

6  **Q.**    Okay.  Understandable.  And Mr. Brockman didn't fall

7  into that category?

8  **A.**    No.

9  **Q.**    And you discussed how the medical records that were

06:30:49  10  admitted into evidence are prepopulated with default

11  answers.  Right?

12  **A.**    Correct.

13  **Q.**    And the no's, with respect to sort of the psychiatric

14  history and neurological history, those were the

06:31:04  15  prepopulated defaults that were in the system?

16  **A.**    Actually, I chose them.  So, there's a lot more.  But

17  because I can't justify them I don't -- I don't put them

18  in there.

19  **Q.**    You -- you chose them as you are -- as your default

06:31:19  20  in the system as the prepopulation?

21  **A.**    When we first created the electronic medical record

22  you do that.

23  **Q.**    Yeah.  Yeah.  That's what I was clarifying --

24  **A.**    Yes, sir.

06:31:27  25  **Q.**    -- was that it was chosen to populate as the default

*SCOTT ANTHONY LISSE, M.D. - CROSS BY MR. LOONAM*

 1   for his records --

 2   **A.**   By -- by me, though.

 3   **Q.**   Yes.

 4   **A.**   But you can pick and choose which physical

 5   examination items you want in your physical.

 6   **Q.**   Yeah.  No.  That makes a lot of sense.

 7   **A.**   Okay.

 8   **Q.**   So, it was by use of that -- you know, for every

 9   visit you don't have to go through and do the whole thing

10   again, essentially?

11   **A.**   Correct.

12   **Q.**   Yeah.  And are you aware of research that primary

13   care physicians often fail to diagnose early signs of

14   dementia?

15   **A.**   I am not aware of that.

16   **Q.**   All right.  And would you -- would you disagree with

17   the statement that primary care physicians often fail to

18   diagnose the early signs of dementia?

19   **A.**   What does "early signs" mean?

20   **Q.**   Well, so -- so, I guess -- You mentioned you usually

21   diagnose dementia when it's brought to your attention from

22   a family member because people are forgetting to pay bills

23   or leaving the stove on, at that stage.

24   **A.**   Uh-huh.

25   **Q.**   Do you think that level -- how would you define that

*SCOTT ANTHONY LISSE, M.D. - CROSS BY MR. LOONAM*

1    stage of dementia?

2    **A.**   Well, if you look at that Mini-Mental Status Exam --

3    **Q.**   Uh-huh.

4    **A.**   -- there's a lot of different things on there.  Now,

06:33:03    5    of course, those are all specific focus that I am giving

6    to the patient and recording their results.  So, I can't

7    honestly look you in the eye, or anybody in this room, and

8    say they don't have early dementia.  I don't know if I

9    have it.  So, it's basically more of a gestalt of they're

06:33:23   10    not thinking clearly, they're not taking their medicines,

11    they're forgetting something that you can pick up.

12    **Q.**   Understood.  And so if we go to -- and I have -- let

13    me get the Government's exhibit version of this.  This is

14    a -- from the August 31st, 2018 records, what's in

06:33:53   15    evidence as GX 95-B.  This is your record from August

16    31st, 2018, Doctor, correct?

17    **A.**   Correct.

18    **Q.**   And this is when Mr. Brockman was coming in with a

19    particular concern.  This wasn't for a general physical,

06:34:11   20    right?

21    **A.**   This is correct.

22    **Q.**   Yeah.  And -- in this record, is there -- if you

23    had -- if you had seen or observed signs of Parkinsonism,

24    would you have noted it in this record?

06:34:29   25    **A.**   Specifically, if he had a shuffling gait, if he had a

1  pill-rolling tremor.  If he had cogwheel rigidity.

2  Normally, they would walk in very slowly.  They can have

3  -- Parkinson's can be by itself as a movement disorder.

4  They can have dementia associated with it.  So it's

06:34:50  5  something that he has no -- had no previous diagnosis

6  prior to this.

7  **Q.**   Uh-huh.

8  **A.**   I did not make any notation that there was anything I

9  was concerned about as far as a tremor.  He wasn't

06:35:01  10  complaining of a tremor.  Wasn't complaining of anything

11  that would make me feel like he had Parkinson's at that

12  time, if that's what he has been diagnosed with

13  subsequently.

14  **Q.**   Yeah.  I guess -- so, my question to you is, because

06:35:15  15  there had been no previous diagnosis of Parkinson's, had

16  you noticed or observed symptoms of Parkinson's disease

17  during this visit, would you have noted it in this record?

18  **A.**   I would have made some kind of more delving into

19  questions about:  Do you have problems with handwriting?

06:35:37  20  Do you have problems feeding yourself?  Do you have

21  problems with your balance?  Are you falling?  Then, I

22  would say, We need you to see a neurologist.

23  **Q.**   Uh-huh.  And there would have been a referral note,

24  then, in here, with respect to sending him to a

06:35:54  25  neurologist for workup for Parkinsonism?

*SCOTT ANTHONY LISSE, M.D. - CROSS BY MR. LOONAM*

1   **A.**   Sure.  I would have had some type of notation on

2   that.  If you just come in with one thing and I notice

3   there's something else, we focus on that, too.

4   **Q.**   Yeah.  And I don't know if you -- you can -- I am

5   happy to flip through this, but I -- do you believe there

6   is any reference to any Parkinson's symptoms in this

7   record?

8   **A.**   Let me go look again.

9   **Q.**   Yes, please.  Do you have -- do you have the 95-B?

10   **A.**   Well, if it's the August 31st, 2018, visit for

11   dysuria, that's the one.

12   **Q.**   Right.

13   **A.**   Yeah.  It's just not marked there.  I don't remember

14   that.  The fact that there is no neurologic exam or

15   psychiatric exam that is documented on here means this was

16   focused just for this issue or these issues.

17   **Q.**   Yes.  But -- so is there any reference to any -- I

18   think you previously testified that had you noticed any

19   signs of Parkinson's, it would have resulted in, you know,

20   a notation of a referral to a neurologist, or, you know,

21   some other notation.

22   **A.**   Uh-huh.

23   **Q.**   The absence of that, does that suggest to you that

24   you did not -- you did not observe?

25   **A.**   I did not observe.

SCOTT ANTHONY LISSE, M.D. – CROSS BY MR. LOONAM

1    Q.   Based on this record, you don't think you --

2    A.   That's correct.

3    Q.   -- observed any -- you do not believe you observed

4    any symptoms of Parkinson's during this visit in August of

06:37:41    5    2018?

6    A.   If there is nothing documented in the chart about it,

7    no, I do not.

8    Q.   And do you see -- if you go to page -- and they're

9    helpfully numbered at the bottom, four of five.

06:38:03    10    A.   Okay.

11    Q.   In referrals, if you go down, you see there's a

12    referral, "See Dr. Lerner, urologist," if your symptoms

13    persist.

14    A.   I see that.

06:38:14    15    Q.   Okay.  Do you know if Mr. Brockman followed with

16    Dr. Seth Lerner?

17    A.   Well, basically, he came to me for a urinary tract

18    infection, and he has a history of bladder cancer, and a

19    history of, I think, recurrent urinary tract infections.

06:38:29    20           So as a primary care doctor, if I have a

21    patient who sees a specialist, I will say, Hey, look, I'll

22    take care of this because you're here; but if this

23    persists, there may be something else going on and you

24    need to go back and see your specialist.  I don't know if

06:38:44    25    he ever did because this is the last time I saw him.

SCOTT ANTHONY LISSE, M.D. - CROSS BY MR. LOONAM

1    Q.    Okay.  So you don't know if he went to Dr. Seth

2    Lerner after you -- and you instructed him, according to

3    these notes, that if his issue persisted, to go and see

4    Dr. Seth Lerner?

06:38:56   5    A.    That's correct.

6    Q.    Okay.  And so, do you know if Bob was subsequently

7    diagnosed in January 2019 with Parkinson's disease?

8    A.    No.  I have no other record of him except from this

9    is his last time I saw him, was August 31st of 2018.

06:39:16   10   Q.    And that in -- in February of 2019, that there was a

11   DaTscan that confirmed the diagnosis of Parkinson's

12   disease?

13   A.    I have no record of that.

14   Q.    You -- you testified -- I am putting up GX 153 here.

06:39:42   15   You testified about how you found these records.  If I

16   understand you correctly, the agents showed you similar

17   records to this, and that triggered a memory that caused

18   you to go back and look in an old system for records?  Is

19   that -- is that fair?

06:40:03   20   A.    Yeah.  I don't know what you're showing me, if it is

21   the exact same thing as theirs, if it's different.  I have

22   no idea.

23   Q.    Okay.  Let me -- so -- we will take it step-by-step.

24   The -- when the government came to visit you and interview

06:40:18   25   you, they asked for records, and you were able to print

1   records off the system, like records we were just looking

2   at --

3   **A.**   Correct.

4   **Q.**   -- off your system, your current system.

5   **A.**   Right.

6   **Q.**   During that interview, on the -- the agents showed

7   you other records that aren't on your -- they are not your

8   normal sort of records that you keep on your current

9   system, but if I heard your testimony correctly, it

10  triggered some memory that you may have seen something --

11  those records or something very similar to them, and that

12  caused you to look on a different system that you have for

13  older medical records; is that accurate?

14  **A.**   Sort of.  Basically, what happens is, we had our old

15  system called Aprima.  And Aprima is no longer serviced,

16  so we switched over to a new one called Athena, and that

17  was in September of 2019, then we switched over when we

18  folded into Village Medical, which is my current employer

19  now, in June of 2020.  We switched over into a different

20  electronic medical record, actually 2021.  We switched

21  into a different level Athena.  So we have three different

22  electronic medical records.

23  **Q.**   Uh-huh.

24  **A.**   So in order to get the information from our Aprima

25  charts to come over into our charts for Athena and then

Timestamps:
06:40:27 (line 5)
06:40:43 (line 10)
06:41:00 (line 15)
06:41:21 (line 20)
06:41:34 (line 25)

*SCOTT ANTHONY LISSE, M.D. - CROSS BY MR. LOONAM*

1    the subsequent now one that we have there, there is a

2    third-party vendor called ChartScout or Chart -- yeah,

3    ChartScout -- which takes the information from the

4    physicals, the histories, basically the visits,

06:41:54    5    consolidates them and sticks them into a version that

6    we're able to visualize, get the information out of.

7    **Q.**    Uh-huh.

8    **A.**    It does not bring over colonoscopy reports or

9    something specific that's not a usual document.  So I

06:42:12    10    actually found out from a doctor's meeting that one of my

11    other partners said that you had -- that one of -- our

12    medical records director is able to get into Aprima

13    directly and take out specific documents.  So, that's when

14    they said, Do you have this?  The government said, Please,

06:42:36    15    look, and he looked, and he found this.

16    **Q.**    Okay.  And so this record is from -- September --

17    it's a September 2015 health update.  Do you see that?

18    **A.**    I see that.

19    **Q.**    And this was stored in -- in your archived files.  Is

06:42:58    20    it stored in a particular place?  Is there --

21    **A.**    It's scanned into the patient's chart --

22    **Q.**    Okay.

23    **A.**    -- which is then bind -- in that specific electronic

24    medical record platform.

06:43:10    25    **Q.**    I see.  Okay.  So when you went back and you looked,

1    you looked, you had -- there's -- there's some scanned

2    chart for Mr. Brockman, and this record was found in that

3    electronic scanned chart, correct?

4    **A.**    That is correct.

06:43:23    5    **Q.**    And your colleague looked through that chart and has

6    now produced all of the documents that were in that chart?

7    **A.**    All the documents that were not like this.

8    **Q.**    Okay.

9    **A.**    They're in a different format, but they are the exact

06:43:40    10    same information.

11    **Q.**    Under -- understood.  Because it's -- you described

12    that process where it's taken out.

13    **A.**    Right.

14    **Q.**    But all the documents like this?

06:43:50    15    **A.**    That's the only one there was.

16    **Q.**    Okay.  So this document -- September 2015 was in your

17    files, and I think you testified you're unsure, but you

18    think that Mr. Brockman may have, sort of, gone through

19    this with you at the beginning of the --

06:44:09    20    **A.**    He may have given it to me and -- and said this is

21    the -- the stuff that -- this is my history, and then we

22    go and do the regular stuff, and I can read this

23    afterwards.

24    **Q.**    Okay.

06:44:20    25    **A.**    That's a very common thing.  You know, sometimes

1    people will say, Hey, this is what I want you to

2    specifically focus on, this is what I am concerned about.

3    So, that basically -- I have a fair number of patients who

4    will bring in large synopses, or their entire medical

5    history.  It is just not feasible to go through every

6    single minutia.

7                     I know that is the exact opposite of what

8    lawyers do, but you have to take care of your patients,

9    and you have to pick out, Okay, what's the important

10   things?  What are we looking for?  What concerns you?  And

11   then, go from there.

12   **Q.**   Yeah.  No.  Understood.  And you would be surprised

13   how often lawyers need to triage.  So -- so -- but fair to

14   say, you -- what you just described is, like, what you --

15   from common practice, you don't -- or, what I am hearing

16   is, you don't recall whether he went through it with you

17   or whether he just gave it to you to go and read

18   afterwards?

19   **A.**   That is correct.

20   **Q.**   Okay.  So looking at Government's Exhibit 153, it

21   begins with, "My job as chairman/CEO of Reynolds and

22   Reynolds, 5,000 employees, continues to be demanding but

23   highly successful and rewarding."

24                     Do you recall that at all?

25   **A.**   Now that you're pointing it out to me, it could be

 1  vaguely familiar.  But I can't --

 2  **Q.**   That's fine.  It's just -- is it -- does it stand out

 3  to you at all that, you know, in a -- in a sort of medical

 4  paper, that Mr. Brockman starts with his position as, you

 5  know, chairman and CEO of a company and tells you how many

 6  employees there are?  He seems quite proud, and it's what

 7  he leads with.  So, does that stand out to you at all as

 8  perhaps, you know, a bit different?

 9  **A.**   He includes a lot of personal items in a history of

10  his medical background.  So that is unusual, and the more

11  I look at it, the more I would say, okay, that is

12  something I may have remembered.

13  **Q.**   Got it.  I am going to go to page 4 of 9.

14          THE CASE MANAGER:  Do you want that on the

15  ELMO?

16          MR. LOONAM:  Is the ELMO not on?  I just don't

17  want it on the big screen.

18          THE CASE MANAGER:  You don't.

19          MR. LOONAM:  I want it on everyone else's

20  screen, not the big screen.

21          THE CASE MANAGER:  That's fine.

22          MR. LOONAM:  Thank you.

23  BY MR. LOONAM:

24  **Q.**   I am showing you page 4 of that document, sir.  Do

25  you see the marked energy levels there?

*SCOTT ANTHONY LISSE, M.D. - CROSS BY MR. LOONAM*

1  **A.**   Uh-huh.

2  **Q.**   All right.  And what's -- and this is from 2015,

3  Mr. Brockman communicated:  Unfortunately, I am not doing

4  enough -- sufficient cardio exercise on the StairMaster.

06:47:28  5  Over the summer, I got down to a weight of 188, and a

6  little below.  Colorado is great for that.  Unfortunately,

7  for most of the year, I felt like sometimes 40 percent of

8  my energy was gone, something is really wrong with me.  I

9  need to get back to my cardio early this fall.

06:47:48  10  If we go back to the -- sorry.  Just want

11  to make sure I get the right exhibit.

12  If we go back to -- well, anyway, does

13  this sound like Mr. Brockman may have been suffering from

14  something that may have been described as fatigue, or how

06:48:44  15  would you categorize this description of, "Unfortunately,

16  for most of the year, I felt like sometimes 40 percent of

17  my energy was gone"?  Would that be -- would you reflect

18  that or not, if you think that is something that you

19  wouldn't reflect in your medical records?

06:48:56  20  **A.**   Well, I mean, I complain -- I have patients, plenty

21  of patients, we all get fatigued.  That is just a normal

22  part of being a human.  So I worry about people that are

23  chronically fatigued.  I wake up fatigued.  On weekends

24  I -- when I am not working, I am fatigued.  So there is

06:49:11  25  mental fatigue.  There is physical fatigue.  So is there a

1    medical issue going on?  That's what concerns me when

2    people say that.

3    **Q.**   And here, Mr. Brockman communicated in 2015:

4    "Something is really wrong with me."  So -- so we will go

06:49:28   5    down the page.  It says, mental processes including

6    memory.

7                 Back in 2015, Mr. Brockman communicated:

8    "Mental processes not as good, but no further serious

9    decline.  Memory continues to get poorer, especially with

06:49:45  10    names of people that I know well, and should remember

11    easily.  In a new, weird phenomena, names that I ought to

12    remember, like one of our maids and a restaurant close to

13    the house that I have been to 20 times or more, yet I have

14    had real problems remembering these two names.  And then,

06:50:06  15    ability to work long hours effectively is now pretty much

16    as good as ever now."

17                 So, in this document, Mr. Brockman is

18    complaining about some memory issues, correct?

19    **A.**   That's what he has written down, yes, sir.

06:50:21  20    **Q.**   And he's complaining about some energy issues,

21    correct?

22    **A.**   Yes, but he also, if I may --

23    **Q.**   Yeah.  I think I am going to get to where you're

24    going, because it sounds like it's -- there is a conflict

06:50:37  25    there, because he -- he says there is something really

SCOTT ANTHONY LISSE, M.D. - CROSS BY MR. LOONAM

1    wrong with him here, right?

2    **A.**    Well, he says, "Something is really wrong with me."

3    But he also thinks that part of it is that he's not doing

4    his cardio.  He wants to get back to that.  He's a CEO of

06:50:50   5    5,000 people, so a lot of times he won't have a lot of

6    free time to do stuff.  So if -- I don't know -- if you

7    can say that his energy level is low because he's so busy

8    and he doesn't have time to exercise, and he thinks the

9    exercise would help him, so I would encourage him to get

06:51:07  10    back on your exercise, see how you do.

11    **Q.**    And then, but -- down here it says, "Ability to work

12    long hours effectively is now pretty much as good as ever

13    now," that would seem to conflict with the other

14    information he's reporting to you, which is that he's

06:51:24  15    having memory issues, and energy issues --

16            MR. BOURGET:  Objection, Your Honor.  This

17    question is compound, number one, and at this point,

18    counsel is testifying.

19            THE COURT:  Yeah, it is testimony.  So

06:51:35  20    objection sustained.

21    BY MR. LOONAM:

22    **Q.**    Well, do you believe that Mr. Brockman's statement

23    that "ability to work long hours effectively is now pretty

24    much as good as ever now," is intentioned with -- to a

06:51:49  25    certain extent, the statements that he provided to you

1  about his energy level and his -- his mental processes?

2  **A.**   I'm not sure I understand the question.

3  **Q.**   Okay.  Do you have -- in your experience, dealing

4  with patients who are experiencing early signs of dementia

5  or mild cognitive impairment -- we haven't used that term

6  yet, but I assume you're familiar with mild cognitive

7  impairment?

8  **A.**   Yes, sir.

9  **Q.**   Are the patients sometimes in denial, even if they do

10  recognize some of the symptoms, about this -- the severity

11  of the symptoms?

12  **A.**   If they have enough mental process to be able to see

13  that there's a problem, then they will try and compensate.

14  They write themselves notes.  They have other people help

15  them do specific things, so I don't have a lot of people

16  that -- that say, Hey, I am really bad, but I am really

17  good at the same time.

18              So, some people will play up their

19  symptoms, and it's very concerning, and that's on the

20  forefront of their mind.  Others will downplay their

21  symptoms, and say, I'm just going to power through it.  It

22  is all individual on how they are.

23  **Q.**   Yeah.  And so some people downplay their symptoms and

24  power through, correct?

25  **A.**   That's correct.

*SCOTT ANTHONY LISSE, M.D. - CROSS BY MR. LOONAM*

1  **Q.**   But in 2015, Mr. Brockman communicated to you that he

2  had memory issues, correct?

3  **A.**   That's what he wrote down here.

4  **Q.**   And he communicated to you that he -- he believed

06:53:29  5  something is really wrong with me, correct?

6  **A.**   In his note he did.

7  **Q.**   And you don't have an independent recollection of him

8  saying anything contrary to that at all, correct?

9  **A.**   Recollection, no.  But if it was something that was

06:53:55  10  important enough, it goes down into the medical record

11  because we discuss it.

12  **Q.**   And important enough, you decide it's important

13  enough, the short amount of time that you have to see the

14  patient, treat what's really bothering them, and then

06:54:13  15  document it, correct?

16  **A.**   Right.  We have something called the chief complaint.

17           MR. LOONAM:  Yeah.  No further questions, Your

18  Honor.

19           THE COURT:  Redirect.

06:54:22  20           MR. BOURGET:  No, Your Honor.

21           THE COURT:  May this witness be excused?

22           MR. BOURGET:  Yes, Your Honor.

23           THE COURT:  Doctor, thank you so much for being

24  here this long.

06:54:29  25           THE WITNESS:  Thank you, sir.  I understand.

1 Thank you fitting me in.

2                THE COURT:  Not a problem.

3                THE WITNESS:  And my patients thank you.

4                THE COURT:  Yes.  So, Counsel, this is the end

06:54:42  5 of the day.  We will start tomorrow at 8:30.  What do we

6 have on tap for tomorrow in terms of witnesses?

7                MR. SMITH:  Our last witness, Dr. Park Dietz.

8                THE COURT:  Okay.  So you will call Dr. Dietz.

9 Is that going to take all day, pretty much?

06:54:58  10                MR. SMITH:  I don't know what the cross is

11 going to be.  The direct is, what, two hours?

12                MR. MAGNANI:  I am trying to cut it down.

13                THE COURT:  Two hours on direct.  So, basically

14 let's start at 8:30 again, and we will push through to the

06:55:14  15 evening.  And then you guys will probably start on Monday?

16                MR. VARNADO:  Yes, Your Honor.

17                THE COURT:  I don't know.  I mean, if we get

18 done earlier, then maybe you can.

19                MR. VARNADO:  We will -- we can try to have --

06:55:25  20 I think our first witness is, probably, going to be

21 Dr. James Pool.  I just wanted some leeway of having him --

22 you know, again, he is another doctor with patients, if we

23 have him sitting around in the afternoon, do you want us to

24 start our case Monday?  What would you prefer, Judge?

06:55:39  25                THE COURT:  Well, the minute they are done with

*SCOTT ANTHONY LISSE, M.D. - CROSS BY MR. LOONAM*

1    Dr. Dietz, you are going to rest?

2              MR. SMITH:  Yes, Your Honor.

3              THE COURT:  When they finish with Dr. Dietz,

4    let's have Dr. Pool ready to go.

06:55:47  5              MR. VARNADO:  We will be ready to go, Your

6    Honor.  Very well.

7              THE COURT:  And then after Dr. Pool, what other

8    witnesses do you have lined up for next week?

9              MR. VARNADO:  We have a series of experts for

06:55:55  10   next week that will be -- I do think -- anyway, we're

11   hoping, hopefully, we can finish this Tuesday --

12             THE COURT:  Okay.

13             MR. VARNADO:  -- and not go into Wednesday.

14             THE COURT:  I was just trying to figure out

06:56:05  15   whether or not -- because I would like to schedule some

16   things on Wednesday, and I was just going to get a feel for

17   whether or not I need to leave Wednesday open to schedule

18   things or give it to you guys.  Well, maybe by Monday, can

19   you give me an idea of whether or not we will --

06:56:18  20             MR. VARNADO:  Yes.  Yes.  Yes, Your Honor.

21             MR. SMITH:  I hope we don't get there, Your

22   Honor, but Wednesday, we are going to have a problem going

23   on Wednesday.

24             THE COURT:  Okay.

06:56:28  25             MR. SMITH:  That is why we wanted to go on

1 Saturday.  That is, obviously, not an option.  We

2 understand why.  But I don't think we can address that now.

3 Hopefully, we finish on Tuesday.

4          MR. VARNADO:  And we will -- we are working to

06:56:38  5 try to streamline some things as well.  So we will give the

6 government the schedule, and so we will be ready to go

7 tomorrow with the first witnesses and try to get some

8 headway on our case.

9          THE COURT:  Okay.  And then on the other issue

06:56:49  10 with respect to the depositions, we will talk tomorrow

11 morning at 8:30, and I have thought about it, and I have

12 made a decision, but I don't think's fair until we get

13 counsel --

14          MR. SMITH:  Well, we --

06:57:01  15          MR. BOURGET:  Yeah.

16          MR. SMITH:  You want to go ahead?

17          MR. BOURGET:  Sure.  Your Honor, my colleague

18 Lee Langston reached out to the attorneys for UCHS, and

19 after talking, we decided that we could probably do a Zoom

06:57:12  20 deposition over the weekend.  We have asked that they

21 arrange the logistics.

22              The government will pay for the court

23 reporter, but we want them to just handle the scheduling.

24 We are waiting to hear back from them.  So hopefully, we

06:57:26  25 haven't -- if Mr. Langston hasn't already heard, we should

PM 4-163

1  have an update for you in the morning.

2            MR. SMITH:  He is talking -- well, he was

3  talking, that is why he is not here, to try to work it out.

4            THE COURT:  Okay.  Fantastic.  That way you get

06:57:35  5  it taken care of.  Because one of the things that I was

6  concerned about, and I wanted to talk to the parties about

7  now -- well, tomorrow -- is the fact that I -- I looked

8  back at the transcript about what was said about these

9  documents, and if -- if the documents -- if the original

06:57:54  10  was not present, that means it was deleted, so where did

11  these other copies come from?

12                    They must have come from another file.

13  Either a sent file, or a draft file, or a trash file, and

14  if they did come to that file, what other documents that

06:58:09  15  may be responsive to your request that may be in those

16  particular files that have not been searched.

17                    So I think that -- that's what I want to

18  talk to you about tomorrow.  I really believe that you

19  should be given the opportunity to get into all of that.

06:58:21  20  So the depositions are clearly necessary.

21            MR. SMITH:  We share that concern, Your Honor.

22  Thank you.

23            THE COURT:  But we -- hopefully, you get it all

24  arranged, but I want you to be able to take those

06:58:32  25  depositions.

*SCOTT ANTHONY LISSE, M.D. – CROSS BY MR. LOONAM*

1          MR. SMITH:  We appreciate that.  Thank you,

2   Your Honor.

3          THE COURT:  Okay.  7:00.  Another good day,

4   everyone.  Thank you for your patience.

06:58:39   5          MR. LOONAM:  Thank you, Judge.

6          MR. VARNADO:  Thank you, Judge.  Thanks so

7   much.

8   (Recessed at 6:58 p.m.)

9              COURT REPORTER'S CERTIFICATE

10

11      I, Kathleen K. Miller, certify that the foregoing is a

12   correct transcript from the record of proceedings in the

13   above-entitled matter.

14

15   DATE: 11/21/21          /s/    _Kathleen K. Miller

16                           Kathleen K. Miller, RPR, RMR, CRR

17

18

19

20

21

22

23

24

25

## $

**$11** [1] - 36:3
**$150** [2] - 75:16, 77:17
**$40** [2] - 36:7, 36:9

## '

**'Mr** [1] - 28:2

## /

**/s** [1] - 164:15

## 1

**1** [4] - 36:4, 36:11, 56:19, 76:8
**102** [2] - 84:21, 84:22
**10281** [1] - 2:8
**106** [1] - 85:25
**10th** [1] - 26:1
**11** [1] - 86:1
**11/21/21** [1] - 164:15
**1151** [1] - 92:16
**117** [10] - 10:3, 10:5, 11:6, 11:10, 13:18, 14:11, 14:14, 31:8, 32:23, 32:24
**118** [11] - 10:2, 10:6, 10:7, 10:9, 12:9, 13:19, 14:11, 14:14, 31:8, 32:23, 32:24
**126** [1] - 3:9
**12th** [2] - 55:24, 56:4
**13** [1] - 87:13
**13th** [1] - 10:15
**141** [1] - 3:9
**144** [4] - 40:18, 40:22, 42:24, 43:4
**145** [8] - 46:1, 46:6, 49:18, 57:5, 59:18, 61:6, 106:2, 106:3
**146** [4] - 52:20, 52:21, 54:20, 54:23
**147** [3] - 55:21, 56:24, 57:2
**148** [6] - 67:2, 67:3, 68:25, 69:1, 69:3
**149** [4] - 73:5, 73:6, 74:18, 74:21
**14th** [1] - 63:14
**15** [3] - 30:4, 109:24, 124:8
**150** [7] - 1:21, 75:20, 75:21, 76:1, 76:21, 76:24, 78:1
**151** [5] - 90:14, 90:20, 91:4, 91:23, 92:4
**152** [5] - 93:3, 93:4, 93:6, 97:19, 97:21
**153** [7] - 136:17, 136:20, 138:25, 139:3, 149:14, 153:20
**15th** [5] - 15:14, 17:12, 18:9, 50:7, 84:9
**16** [2] - 55:25, 87:23
**170** [1] - 87:8
**171** [1] - 88:1
**18** [3] - 1:6, 4:2, 5:7
**188** [1] - 155:5
**19th** [3] - 67:7, 67:10, 67:11
**1:19** [2] - 1:5, 4:3
**1:37** [1] - 93:9
**1st** [4] - 75:22, 75:24, 76:9, 76:12

## 2

**2** [3] - 19:1, 49:17, 85:3
**20** [3] - 21:6, 35:7, 156:13
**20002** [1] - 1:22
**2008** [3] - 49:20, 50:4, 50:11
**2009** [3] - 49:20, 50:4, 50:11
**2010** [1] - 6:6
**2011** [1] - 6:6
**2013** [1] - 6:2
**2015** [12] - 10:15, 14:18, 126:22, 135:25, 137:10, 138:20, 151:17, 152:16, 155:2, 156:3, 156:7, 159:1
**2016** [12] - 8:16, 8:22, 8:23, 15:14, 16:23, 86:23, 87:2, 87:19, 88:3, 88:14, 89:13
**2017** [1] - 15:1
**2018** [20] - 17:12, 18:4, 18:5, 25:25, 26:1, 61:8, 61:11, 62:7, 62:10, 126:23, 131:25, 132:2, 133:24, 134:17, 135:13, 145:14, 145:16, 147:10, 148:5, 149:9
**2019** [5] - 50:16, 50:21, 149:7, 149:10, 150:17
**202-514-9623** [1] - 1:22
**2020** [61] - 41:6, 43:9, 43:10, 45:17, 46:20, 47:5, 49:8, 51:17, 51:18, 51:25, 52:2, 52:9, 52:23, 53:8, 53:11, 53:13, 53:24, 55:14, 58:20, 59:5, 59:7, 60:1, 60:7, 60:16, 60:19, 63:2, 63:14, 64:2, 64:13, 64:14, 66:2, 66:4, 66:6, 66:11, 66:12, 66:14, 66:23, 67:7, 67:10, 67:11, 72:15, 73:7, 73:10, 73:17, 73:24, 74:1, 74:6, 74:12, 75:5, 76:2, 78:6, 91:7, 92:7, 93:9, 93:11, 93:24, 99:14, 104:25, 107:10, 107:15, 150:19
**2021** [19] - 1:6, 4:2, 46:2, 50:7, 51:16, 55:24, 56:4, 56:22, 75:23, 75:24, 76:5, 76:9, 76:12, 84:9, 150:20
**212-326-3939** [1] - 2:9
**2208** [1] - 1:21
**24** [1] - 140:5
**24th** [5] - 52:23, 53:8, 53:13, 53:23, 92:7
**25** [1] - 85:11
**250** [1] - 2:8
**26** [3] - 3:3, 99:14, 104:25
**27** [1] - 140:4
**28** [4] - 15:5, 15:12, 17:2, 17:5
**29** [2] - 25:15, 142:24
**29th** [1] - 135:25

## 3

**3** [2] - 51:2, 132:22
**30** [10] - 78:23, 78:25, 81:11, 109:6, 110:3, 138:8, 140:3, 140:5, 141:25
**300** [1] - 96:16
**31st** [6] - 41:6, 134:17, 145:14, 145:16, 147:10, 149:9
**3300** [1] - 2:3

## 34

**34** [1] - 3:6
**3:03** [1] - 72:2
**3:06** [1] - 92:7
**3:20** [2] - 71:25, 72:1
**3:46** [1] - 72:2
**3rd** [4] - 25:25, 93:9, 93:11, 93:24

## 4

**4** [6] - 1:13, 3:3, 16:9, 132:23, 154:13, 154:24
**40** [2] - 155:7, 155:16
**45** [6] - 34:18, 35:12, 57:23, 57:24, 58:11, 58:13
**45-year** [1] - 35:5
**4:21-CR-09** [1] - 1:3
**4:43** [1] - 109:16
**4:55** [1] - 109:16
**4th** [9] - 53:11, 53:12, 59:10, 59:13, 59:16, 59:20, 60:1, 66:4, 78:6

## 5

**5** [1] - 16:9
**5,000** [2] - 153:22, 157:5
**515** [1] - 2:13
**5:13** [1] - 125:5
**5:15** [3] - 108:23, 109:23, 124:17
**5:30** [1] - 124:24
**5:40** [1] - 124:25
**5th** [21] - 18:4, 18:5, 18:9, 18:18, 43:10, 51:16, 51:18, 51:25, 52:2, 52:9, 55:14, 58:20, 59:7, 66:6, 66:7, 66:11, 75:6, 77:13, 91:7, 106:9, 106:14

## 6

**6** [2] - 73:10, 73:24
**60** [2] - 84:21, 84:22
**600k** [1] - 36:1
**6103** [1] - 31:12
**67** [5] - 97:24, 98:3, 98:6, 105:17, 108:2
**6:00** [1] - 108:24
**6:05** [1] - 125:5
**6:58** [3] - 1:5, 4:3, 164:8
**6th** [4] - 73:7, 77:19, 106:9, 106:14

## 7

**713-250-5087** [1] - 2:14
**717** [1] - 2:3
**73** [4] - 63:9, 64:4, 64:7, 64:9
**77002** [2] - 2:4, 2:13
**7:00** [2] - 110:11, 164:3
**7th** [2] - 29:15, 46:2

## 8

**8004** [1] - 2:13
**82** [1] - 15:25

**8275** [4] - 11:13, 11:18, 12:2, 12:7
**832-239-3694** [1] - 2:4
**8:13** [1] - 91:7
**8:30** [3] - 160:5, 160:14, 162:11

# 9

**9** [2] - 15:21, 154:13
**90** [1] - 20:17
**95** [12] - 127:23, 128:19, 128:20, 128:25, 129:14, 130:7, 130:12, 131:14, 132:23, 134:11, 135:20, 139:9
**95-A** [4] - 131:14, 131:19, 132:23, 136:11
**95-B** [6] - 134:11, 134:13, 134:16, 136:11, 145:15, 147:9
**95-C** [2] - 135:19, 136:11
**98** [1] - 3:6
**9:06** [1] - 53:24

# A

**a.m** [2] - 53:24, 91:7
**abilities** [3] - 59:2, 59:15, 59:21
**Ability** [1] - 157:11
**ability** [5] - 52:3, 65:24, 66:5, 156:15, 157:23
**able** [28] - 24:6, 24:19, 25:4, 25:7, 53:1, 55:12, 63:11, 63:21, 66:3, 84:24, 86:1, 87:9, 91:24, 108:23, 113:6, 118:18, 118:19, 123:1, 136:23, 136:24, 139:24, 139:25, 149:25, 151:6, 151:12, 158:12, 163:24
**abnormal** [4] - 133:20, 133:24, 134:7, 136:7
**abnormality** [2] - 133:13, 135:15
**above-entitled** [1] - 164:13
**absence** [1] - 147:23
**absolutely** [2] - 39:7, 128:15
**accept** [1] - 106:23
**accepted** [3] - 10:20, 10:21, 112:20
**accepting** [1] - 10:25
**access** [2] - 7:10, 22:25
**accommodate** [1] - 113:18
**accommodated** [1] - 72:10
**according** [2] - 61:7, 149:2
**account** [2] - 24:24, 93:25
**accounts** [1] - 24:21
**accrues** [1] - 77:16
**accruing** [1] - 76:2
**accurate** [6] - 7:14, 8:3, 130:2, 134:20, 135:24, 150:13
**accurately** [1] - 48:20
**acquired** [1] - 7:21
**acting** [1] - 20:22
**actual** [3] - 7:5, 7:8, 115:4
**addition** [2] - 8:8, 19:24
**additional** [4] - 19:11, 22:16, 24:23, 25:13
**additionally** [2] - 22:16, 23:2

**address** [4] - 98:14, 99:19, 99:20, 162:2
**addressed** [1] - 98:13
**adjusting** [1] - 98:8
**admire** [1] - 137:13
**admission** [1] - 128:11
**admit** [1] - 75:10
**admitted** [19] - 14:15, 17:5, 31:8, 43:5, 54:23, 57:3, 64:6, 64:10, 69:3, 74:21, 76:24, 93:1, 97:21, 128:5, 128:6, 130:12, 136:15, 139:6, 143:10
**admitting** [2] - 101:19, 102:20
**adverse** [1] - 71:4
**advice** [4] - 8:21, 55:19, 66:21, 72:24
**advised** [3] - 67:19, 68:18, 73:1
**AFTERNOON** [1] - 1:10
**afternoon** [7] - 26:20, 26:25, 27:1, 33:15, 71:10, 72:8, 160:23
**afterwards** [2] - 152:23, 153:18
**age** [2] - 65:12, 132:13
**agency** [1] - 6:9
**agent** [2] - 5:3, 8:11
**agents** [8] - 8:19, 19:22, 19:25, 93:13, 93:16, 97:8, 149:16, 150:6
**ages** [1] - 129:11
**ago** [3] - 36:6, 49:20, 60:14
**agree** [2] - 42:17, 113:4
**agreed** [1] - 128:4
**agreement** [7] - 13:4, 16:12, 28:22, 38:17, 53:19, 59:8, 77:5
**agreement..** [1] - 13:3
**Agronin** [41] - 43:21, 46:2, 46:22, 46:25, 47:16, 47:19, 48:20, 49:13, 49:22, 51:3, 51:10, 57:6, 57:12, 57:16, 57:20, 57:21, 58:1, 58:4, 58:7, 58:14, 59:20, 59:25, 60:3, 60:15, 60:21, 60:24, 61:3, 74:5, 74:10, 105:3, 105:7, 105:11, 105:14, 105:19, 105:21, 105:22, 106:8, 106:13, 106:16, 110:23
**ahead** [5] - 30:3, 39:2, 68:24, 126:25, 162:16
**Al's** [1] - 63:21
**Alaska** [1] - 26:13
**alert** [1] - 133:17
**Alfred** [1] - 26:9
**algorithms** [2] - 7:17, 7:18
**all-cash** [1] - 142:11
**alleged** [1] - 9:5
**allow** [4] - 35:15, 44:8, 73:20, 108:9
**allowed** [1] - 89:18
**Alzheimer's** [3] - 127:8, 127:13, 141:21
**amended** [1] - 11:15
**AMERICA** [1] - 1:3
**amount** [4] - 20:23, 36:12, 111:7, 159:13
**ample** [1] - 112:10
**analysis** [2] - 5:24, 123:3
**analyst** [4] - 5:5, 5:13, 5:15, 6:4
**analyze** [1] - 122:22
**Anchorage** [1] - 26:12

**announcement** [1] - 70:17
**annual** [3] - 6:6, 134:23, 135:1
**answer** [23] - 48:10, 48:25, 53:4, 68:4, 83:18, 85:6, 85:11, 85:13, 86:9, 87:17, 87:21, 87:25, 88:4, 90:6, 97:13, 104:12, 105:20, 112:2, 130:24, 135:12, 138:23, 142:18
**answered** [11] - 60:4, 60:8, 88:15, 88:19, 88:23, 89:1, 89:5, 89:14, 117:2, 123:3
**answers** [3] - 117:9, 143:11
**Anthony** [1] - 126:16
**ANTHONY** [2] - 3:8, 126:10
**anticipated** [2] - 72:9, 108:24
**antitrust** [1] - 50:15
**anyway** [3] - 114:1, 155:12, 161:10
**apart** [1] - 65:12
**apologies** [3] - 71:3, 105:5, 112:18
**apologize** [3] - 103:15, 112:4, 112:7
**appear** [2] - 116:16, 135:23
**appearance** [1] - 125:11
**APPEARANCES** [1] - 1:16
**applications** [1] - 35:14
**applied** [1] - 7:19
**apply** [1] - 11:2
**appoint** [1] - 107:4
**appointed** [2] - 107:15, 107:16
**appreciate** [6] - 108:17, 119:22, 124:5, 124:22, 125:11, 164:1
**approach** [6] - 40:19, 40:20, 99:2, 99:3, 131:16, 131:17
**appropriate** [1] - 23:5
**appropriately** [1] - 123:20
**approve** [1] - 77:22
**April** [2] - 50:7, 84:9
**Aprima** [4] - 150:15, 150:24, 151:12
**archived** [1] - 151:19
**area** [1] - 6:5
**areas** [1] - 139:23
**argue** [1] - 123:22
**arguments** [1] - 119:20
**arrange** [2] - 114:9, 162:21
**arranged** [1] - 163:24
**articles** [1] - 16:12
**aside** [3] - 59:9, 82:23, 83:14
**assemble** [1] - 24:4
**asserted** [1] - 100:6
**assigned** [7] - 5:4, 5:8, 6:15, 8:12, 8:19, 12:19, 15:2
**assignment** [3] - 8:15, 12:14, 25:22
**assignments** [1] - 17:20
**assist** [1] - 65:9
**assistance** [3] - 20:12, 24:13, 24:17
**assisted** [3] - 2:16, 20:25, 25:6
**associate** [1] - 42:12
**associated** [1] - 146:4
**associates** [1] - 42:18
**assume** [2] - 29:16, 158:6
**assumed** [1] - 70:3

**assure** [1] - 73:17
**Athena** [3] - 150:16, 150:21, 150:25
**attached** [1] - 11:15
**attachment** [2] - 12:3, 92:12
**attempt** [2] - 10:16, 101:6
**attempted** [1] - 9:23
**attended** [2] - 41:19, 41:21
**attention** [14] - 11:25, 12:11, 13:1, 17:11, 25:14, 41:4, 49:17, 51:7, 53:22, 73:15, 132:22, 136:5, 137:24, 144:21
**attorney** [12] - 17:16, 30:12, 30:17, 37:18, 38:2, 38:5, 38:11, 38:13, 39:6, 45:6, 45:7, 52:5
**attorney's** [1] - 114:15
**attorneys** [13] - 37:8, 37:22, 37:24, 38:6, 38:7, 38:9, 38:23, 39:3, 40:2, 90:18, 96:7, 96:15, 162:18
**attribute** [2] - 123:14, 123:21
**auditor** [1] - 75:15
**August** [29] - 8:16, 8:22, 8:23, 17:12, 18:9, 63:14, 64:2, 73:7, 73:10, 73:16, 73:24, 74:1, 74:5, 74:12, 86:23, 87:2, 87:19, 87:23, 88:3, 88:13, 89:13, 131:25, 134:17, 135:13, 145:14, 145:15, 147:10, 148:4, 149:9
**Austin** [6] - 113:3, 114:7, 114:16, 115:5, 115:11, 124:8
**authority** [2] - 107:11, 107:17
**automobile** [2] - 35:14, 35:16
**Automotive** [2] - 50:6, 84:10
**avail** [1] - 9:23
**availability** [1] - 115:2
**available** [7] - 71:15, 113:10, 113:11, 113:21, 115:14, 119:17, 120:21
**avoid** [2] - 9:17, 9:21
**aware** [16] - 13:22, 28:7, 43:23, 44:5, 50:15, 50:20, 50:22, 80:23, 81:1, 87:2, 96:7, 96:8, 96:10, 96:15, 144:12, 144:15

## B

**backed** [6] - 78:22, 78:25, 80:6, 80:10, 85:17, 86:12
**background** [2] - 116:17, 154:10
**backup** [5] - 80:7, 80:15, 81:18, 86:7, 86:21
**backups** [1] - 80:5
**bad** [1] - 158:16
**balance** [2] - 125:11, 146:21
**bales** [1] - 56:2
**Bales** [3] - 55:23, 55:24, 56:20
**ballpark** [1] - 79:11
**banks** [1] - 9:19
**Barras** [53] - 26:8, 29:9, 29:14, 29:17, 33:6, 34:11, 36:20, 37:11, 39:9, 40:9, 40:24, 43:7, 46:12, 52:22, 53:1, 55:22, 57:5, 61:7, 63:11, 67:5, 67:10, 68:3, 69:21, 72:13, 73:9, 83:20, 84:5, 84:24, 85:25, 86:2, 89:4, 89:10, 90:17, 95:9,

95:20, 96:23, 98:3, 98:10, 99:5, 102:4, 104:7, 104:20, 105:3, 105:6, 106:18, 108:11, 120:24, 121:4, 121:6, 121:15, 121:22, 122:23
**BARRAS** [2] - 3:5, 34:6
**Barras's** [11] - 39:6, 101:17, 110:19, 110:25, 115:20, 118:8, 118:23, 122:4, 122:22, 123:4
**based** [7] - 17:16, 58:13, 60:13, 62:6, 74:15, 116:8, 148:1
**basic** [3] - 6:7, 117:11, 127:18
**basis** [1] - 6:7
**bearing** [1] - 124:1
**became** [7] - 21:15, 41:13, 43:17, 45:14, 45:23, 62:7, 62:9
**become** [5] - 43:7, 43:13, 61:20, 77:13, 107:8
**becoming** [2] - 35:25, 51:22
**BEFORE** [1] - 1:11
**began** [2] - 6:5, 8:21
**begin** [1] - 125:9
**beginning** [4] - 6:7, 51:8, 132:18, 152:19
**begins** [1] - 153:21
**behalf** [6] - 26:21, 31:6, 32:13, 42:20, 94:11, 116:22
**Belize** [1] - 143:4
**below** [2] - 68:5, 155:6
**beneficiary** [1] - 14:9
**Bermuda** [7] - 18:6, 18:17, 19:2, 20:3, 20:13, 21:24, 26:3
**Bermudian** [2] - 18:5, 25:10
**best** [3] - 16:16, 17:19, 113:9
**better** [1] - 89:4
**between** [15] - 12:1, 14:1, 16:3, 17:22, 20:16, 40:24, 52:23, 67:13, 73:6, 96:9, 96:13, 112:8, 114:16, 121:15, 121:25
**beyond** [1] - 130:19
**big** [3] - 9:1, 154:17, 154:20
**bills** [2] - 140:17, 144:22
**bind** [1] - 151:23
**binder** [1] - 15:6
**binders** [1] - 127:22
**bit** [13] - 5:7, 7:8, 7:25, 35:10, 72:9, 76:1, 114:3, 119:20, 124:2, 127:6, 154:8
**bit-for-bit** [2] - 7:8, 7:25
**bladder** [1] - 148:18
**blame** [1] - 123:13
**board** [7] - 41:9, 41:13, 41:14, 82:2, 82:6, 82:10, 90:11
**Bob** [34] - 34:20, 35:6, 35:24, 38:5, 38:10, 41:25, 42:9, 42:21, 54:5, 54:8, 54:9, 54:11, 54:13, 54:15, 54:18, 55:19, 56:10, 56:15, 63:21, 67:19, 67:21, 68:18, 68:20, 73:17, 76:14, 83:6, 107:10, 107:14, 142:7, 142:17, 149:6
**Bob's** [1] - 76:3
**bookcase** [1] - 23:21

**Boris** [1] - 1:19
**boris.bourget@usdoj.gov** [1] - 1:24
**boss** [1] - 116:13
**bot** [1] - 143:4
**bothering** [1] - 159:14
**bothers** [2] - 138:11, 138:14
**bottle** [1] - 63:5
**bottom** [7] - 76:8, 76:10, 90:24, 121:3, 132:23, 137:24, 148:9
**Bourget** [2] - 1:19, 3:9
**BOURGET** [35] - 109:2, 125:15, 126:9, 126:13, 127:25, 128:15, 128:18, 129:2, 129:8, 129:12, 130:6, 130:10, 130:13, 130:16, 131:13, 131:18, 131:20, 134:4, 134:5, 134:10, 134:14, 135:18, 135:21, 136:10, 136:16, 136:19, 138:24, 139:5, 139:7, 141:8, 157:16, 159:20, 159:22, 162:15, 162:17
**box** [4] - 22:14, 23:18, 23:19, 24:2
**brain** [2] - 127:20, 140:2
**brand** [1] - 138:8
**brand-new** [1] - 138:8
**break** [16] - 30:1, 30:4, 33:8, 49:24, 68:7, 68:11, 68:14, 68:24, 69:4, 69:9, 69:16, 69:23, 70:1, 70:9, 71:7, 108:21
**briefly** [5] - 6:14, 8:25, 9:2, 21:2
**bring** [8] - 27:19, 70:8, 114:13, 114:21, 120:7, 127:24, 151:8, 153:4
**bringing** [1] - 124:8
**brings** [1] - 140:14
**broadly** [1] - 57:19
**Brock** [1] - 104:8
**Brockman** [123] - 14:1, 14:8, 14:9, 14:20, 14:23, 17:10, 17:22, 17:23, 26:7, 26:21, 27:5, 27:7, 31:13, 32:10, 34:20, 34:21, 35:11, 35:17, 35:24, 36:4, 36:15, 36:18, 38:5, 38:7, 39:9, 40:10, 40:13, 40:15, 41:19, 41:21, 43:15, 43:24, 46:21, 49:6, 50:1, 50:12, 50:20, 51:4, 51:16, 54:8, 54:18, 55:2, 55:13, 56:7, 56:15, 57:23, 58:11, 58:17, 58:21, 59:21, 60:1, 60:6, 60:16, 60:25, 61:8, 61:10, 61:20, 62:7, 62:9, 63:1, 63:23, 64:12, 64:14, 66:15, 66:20, 72:24, 74:2, 74:6, 74:12, 75:3, 77:11, 77:15, 78:3, 83:6, 86:23, 87:15, 88:8, 88:13, 88:17, 89:12, 99:15, 102:4, 102:16, 102:17, 104:11, 104:20, 106:10, 106:14, 106:21, 106:22, 107:4, 107:7, 107:10, 107:14, 126:19, 130:18, 130:19, 130:25, 133:25, 134:7, 135:14, 136:7, 138:2, 138:14, 138:21, 141:1, 141:3, 142:7, 142:23, 143:6, 145:18, 148:15, 152:2, 152:18, 154:4, 155:3, 155:13, 156:3, 156:7, 156:17, 159:1
**BROCKMAN** [1] - 1:6
**Brockman's** [34] - 27:10, 38:10, 43:12, 44:6, 44:9, 44:13, 44:18, 45:14, 47:4,

57:11, 57:15, 58:3, 58:7, 60:19, 60:21, 62:23, 72:14, 75:16, 77:1, 86:25, 99:17, 101:6, 101:10, 101:13, 102:21, 104:9, 105:11, 125:10, 129:22, 131:10, 131:24, 134:16, 135:25, 157:22
**broken** [1] - 132:12
**brought** [1] - 144:21
**build** [1] - 35:15
**building** [2] - 23:25, 138:6
**Burnett** [16] - 27:13, 27:17, 27:19, 28:2, 28:7, 28:10, 28:12, 54:11, 54:16, 54:17, 67:14, 73:2, 75:22, 75:25, 76:4, 77:18
**burning** [1] - 135:4
**business** [7] - 35:13, 35:16, 51:5, 52:10, 55:1, 55:13, 55:20
**busy** [2] - 141:23, 157:7
**BY** [57] - 4:22, 10:8, 11:24, 14:16, 17:6, 25:18, 26:24, 28:6, 34:9, 39:12, 40:8, 40:23, 43:6, 46:8, 48:13, 49:5, 49:12, 54:24, 57:4, 63:10, 64:11, 67:4, 68:17, 72:12, 75:2, 76:25, 81:8, 84:2, 85:24, 89:9, 89:17, 90:16, 91:5, 92:5, 93:5, 96:6, 98:2, 98:9, 99:4, 102:3, 104:6, 104:19, 105:2, 106:7, 126:13, 128:18, 129:12, 130:16, 131:20, 134:5, 134:14, 135:21, 136:19, 139:7, 141:13, 154:23, 157:21

## C

**cancer** [1] - 148:18
**cannot** [1] - 141:7
**capabilities** [7] - 59:6, 59:11, 60:19, 60:22, 62:19, 62:23, 78:7
**capability** [2] - 20:18, 62:4
**capable** [2] - 5:22, 55:17
**Cappel** [1] - 26:8
**caps** [1] - 73:18
**captain** [1] - 109:12
**captioned** [1] - 137:9
**capture** [1] - 122:3
**captured** [2] - 118:7, 123:11
**card** [2] - 22:16, 24:11
**cardio** [3] - 155:4, 155:9, 157:4
**care** [9] - 115:9, 127:5, 127:7, 144:13, 144:17, 148:20, 148:22, 153:8, 163:5
**career** [4] - 34:25, 35:3, 35:5
**caregiver** [1] - 115:7
**Carlan** [1] - 26:8
**Carlos** [2] - 17:16, 18:10
**carried** [1] - 132:21
**carry** [3] - 129:20, 139:16, 139:17
**CASE** [8] - 4:5, 72:3, 109:17, 125:6, 129:7, 154:14, 154:18, 154:21
**case** [18] - 8:19, 8:20, 9:1, 9:3, 9:8, 33:1, 36:24, 43:20, 44:14, 45:15, 78:24, 96:17, 97:14, 110:9, 116:2, 160:24, 162:8

**cases** [1] - 20:24
**cash** [2] - 142:11, 142:13
**categorize** [1] - 155:15
**category** [1] - 143:7
**caused** [4] - 62:22, 86:13, 149:17, 150:12
**causes** [1] - 140:11
**CC'ing** [1] - 122:5
**cellular** [1] - 6:23
**center** [1] - 13:21
**central** [3] - 78:20, 114:14, 114:21
**CEO** [15] - 34:16, 35:23, 35:25, 43:7, 43:13, 51:22, 66:8, 66:12, 77:13, 107:8, 107:12, 107:16, 107:18, 154:5, 157:4
**certain** [2] - 77:23, 157:25
**certainly** [3] - 70:16, 112:10, 113:23
**CERTIFICATE** [1] - 164:9
**certifications** [1] - 6:11
**certify** [1] - 164:11
**chain** [4] - 99:7, 120:23, 121:4, 122:8
**chains** [1] - 121:3
**chairman** [3] - 34:16, 35:23, 43:7, 43:13, 154:5
**chairman/CEO** [1] - 153:21
**challenge** [2] - 107:11, 107:17
**chance** [1] - 129:13
**change** [2] - 118:4, 133:14
**changing** [3] - 85:16, 85:19, 86:5
**Chapelwood** [1] - 41:17
**charge** [1] - 79:5
**Charles** [1] - 26:10
**Chart** [1] - 151:2
**chart** [6] - 148:6, 151:21, 152:2, 152:3, 152:5, 152:6
**charts** [2] - 150:25
**ChartScout** [1] - 151:2
**chartscout** [1] - 151:3
**checking** [1] - 122:25
**cherry** [4] - 54:1, 54:2, 54:4
**chief** [1] - 159:16
**child's** [4] - 22:13, 23:18, 23:19, 24:2
**choose** [1] - 144:4
**chooses** [1] - 77:8
**chose** [5] - 57:11, 57:15, 58:1, 143:16, 143:19
**chosen** [1] - 143:25
**Christopher** [1] - 1:19
**christopher.magnani@usdoj.gov** [1] - 1:24
**chronically** [1] - 155:23
**church** [3] - 41:17, 41:19, 41:21
**CI** [1] - 14:21
**circumstances** [3] - 12:5, 21:2, 21:13
**citing** [1] - 12:4
**city** [1] - 5:8
**claiming** [1] - 11:14
**clarify** [2] - 84:4, 100:1
**clarifying** [1] - 143:23

**clear** [7] - 70:12, 80:12, 92:19, 110:16, 110:19, 111:4, 111:18
**clearly** [2] - 145:10, 163:20
**client** [4] - 17:23, 31:9, 70:3, 108:15
**close** [2] - 63:22, 156:12
**closed** [1] - 115:11
**closer** [1] - 29:20
**clue** [1] - 137:7
**coach** [2] - 41:12, 41:14
**coat** [1] - 139:16
**coffee** [1] - 140:19
**cog** [1] - 44:9
**cognition** [1] - 139:24
**cognitive** [7] - 27:10, 59:2, 59:15, 59:21, 140:15, 158:5, 158:6
**cognizant** [1] - 113:23
**cogwheel** [1] - 146:1
**collateral** [1] - 123:25
**colleague** [3] - 69:5, 152:5, 162:17
**colleagues** [3] - 70:10, 70:14, 110:14
**collect** [2] - 56:18, 118:20
**collected** [1] - 120:20
**collection** [5] - 92:19, 112:25, 115:4, 118:8, 118:17
**colonoscopy** [1] - 151:8
**Colorado** [2] - 5:10, 155:6
**comfortable** [4] - 4:17, 53:6, 53:7, 126:4
**comfortably** [1] - 79:14
**coming** [3] - 11:4, 137:17, 145:18
**commenced** [1] - 10:24
**commenting** [1] - 115:23
**comments** [1] - 110:22
**commercial** [1] - 132:13
**committee** [1] - 73:19
**common** [2] - 152:25, 153:15
**communicated** [5] - 155:3, 156:3, 156:7, 159:1, 159:4
**communications** [2] - 96:9, 96:12
**company** [18] - 38:10, 39:10, 41:25, 42:10, 50:17, 64:13, 64:15, 64:20, 65:14, 65:15, 66:3, 66:5, 77:16, 77:20, 82:8, 86:8, 116:22, 154:5
**compare** [1] - 20:21
**compared** [1] - 20:20
**compensate** [1] - 158:13
**compensation** [2] - 35:25, 36:2
**COMPETENCY** [1] - 1:9
**competency** [2] - 44:13, 128:4
**competent** [3] - 27:5, 31:14, 65:9
**complain** [1] - 155:20
**complained** [1] - 138:21
**complaining** [5] - 135:11, 146:10, 156:18, 156:20
**complaint** [4] - 135:2, 135:3, 135:7, 159:16
**complaints** [1] - 142:3
**complete** [3] - 25:11, 25:12, 35:15
**completed** [1] - 7:23
**completely** [1] - 114:22

**complex** [1] - 114:3
**complied** [1] - 16:22
**components** [1] - 7:6
**composite** [1] - 140:3
**compound** [1] - 157:17
**compromise** [3] - 114:11, 114:20, 119:12
**computer** [23] - 2:16, 5:11, 5:15, 6:8, 6:23, 7:3, 19:7, 19:17, 22:22, 79:23, 80:2, 81:23, 94:16, 95:4, 95:11, 95:18, 116:24, 117:4, 117:13, 117:14, 117:18, 117:19, 117:21
**computer-assisted** [1] - 2:16
**computer-related** [2] - 19:7, 19:17
**computers** [6] - 5:21, 8:4, 19:7, 21:9, 22:12, 81:13
**concealed** [1] - 23:20
**concern** [7] - 32:4, 62:16, 123:15, 124:6, 127:16, 145:19, 163:21
**concerned** [11] - 61:16, 61:20, 62:6, 62:9, 62:11, 62:23, 123:23, 138:14, 146:9, 153:2, 163:6
**concerning** [6] - 65:6, 88:17, 104:10, 105:7, 105:11, 158:19
**concerns** [6] - 52:2, 61:12, 117:7, 138:11, 153:10, 156:1
**concierge** [1] - 142:14
**concluded** [1] - 65:8
**condensed** [1] - 129:22
**condition** [1] - 44:10
**conditions** [1] - 135:9
**conducted** [1] - 108:16
**conducting** [2] - 110:15, 111:3
**confer** [2] - 90:15, 105:23
**conferencing** [1] - 113:5
**confident** [2] - 8:2, 45:22
**confidential** [2] - 31:9, 31:10
**confirm** [1] - 106:8
**confirmed** [1] - 149:11
**conflict** [2] - 156:24, 157:13
**confusion** [1] - 112:13
**Congress** [1] - 31:12
**connection** [2] - 14:1, 14:20
**consider** [7] - 69:7, 82:5, 82:7, 85:16, 90:7, 94:13, 119:17
**consideration** [1] - 124:5
**considered** [2] - 85:19, 140:4
**consolidates** [1] - 151:5
**construct** [1] - 139:22
**constructed** [1] - 35:13
**consulted** [1] - 8:18
**contacted** [1] - 45:9
**contain** [2] - 6:20, 31:8
**contained** [8] - 22:11, 22:19, 25:8, 32:12, 128:24, 129:16, 130:19, 131:11
**contains** [1] - 128:2
**contemporaneous** [1] - 12:8
**content** [1] - 100:15
**continue** [3] - 48:12, 104:17, 124:20

**continued** [1] - 6:6
**continues** [2] - 153:22, 156:9
**contract** [3] - 75:4, 77:1, 77:16
**contrary** [2] - 122:23, 159:8
**control** [1] - 93:24
**convenience** [1] - 113:17
**convenient** [2] - 68:8, 116:10
**conversation** [4] - 53:17, 61:22, 62:1, 96:14
**conversations** [4] - 66:2, 73:21, 87:15, 120:19
**convey** [1] - 74:11
**Cooper** [1] - 26:8
**copay** [1] - 142:9
**copies** [4] - 20:9, 119:5, 121:9, 163:11
**copy** [22] - 7:7, 7:8, 7:13, 7:25, 8:3, 8:9, 24:14, 40:21, 46:3, 52:21, 67:2, 79:24, 80:3, 86:7, 93:3, 128:7, 129:19, 134:13, 134:16, 135:20, 135:24, 136:17
**Corey** [1] - 1:18
**corey.smith@usdoj.gov** [1] - 1:23
**corporate** [2] - 41:12, 56:13
**correct** [70] - 8:24, 9:9, 17:25, 24:3, 24:18, 27:6, 27:11, 43:11, 45:16, 47:18, 52:11, 55:15, 56:5, 56:8, 56:14, 58:12, 62:15, 66:13, 75:24, 76:10, 77:14, 77:21, 78:9, 81:17, 81:19, 84:20, 89:22, 97:24, 98:6, 98:21, 99:15, 102:5, 102:7, 105:8, 105:12, 105:15, 105:19, 106:10, 106:15, 106:16, 106:21, 107:5, 107:8, 121:20, 133:22, 137:4, 137:22, 141:2, 141:20, 141:22, 143:12, 144:11, 145:16, 145:17, 145:21, 148:2, 149:5, 150:3, 152:3, 152:4, 153:19, 156:18, 156:21, 158:24, 158:25, 159:2, 159:5, 159:8, 159:15, 164:12
**correctly** [8] - 54:6, 85:14, 86:10, 88:5, 133:15, 133:19, 149:16, 150:9
**correspondence** [2] - 16:13, 121:15
**cost** [3] - 40:13, 61:1, 61:4
**costs** [1] - 56:10
**Counsel** [2] - 69:5, 72:7
**counsel** [27] - 30:19, 31:4, 54:2, 55:19, 66:23, 68:9, 69:14, 69:17, 69:18, 70:11, 72:5, 81:5, 90:15, 92:23, 96:3, 101:25, 105:23, 107:21, 119:11, 121:7, 121:15, 121:25, 124:17, 126:7, 157:18, 160:4, 162:13
**country** [1] - 18:6
**couple** [4] - 25:20, 72:8, 109:4, 129:10
**course** [16] - 5:18, 6:10, 12:14, 12:18, 14:5, 16:2, 17:8, 19:5, 21:15, 31:11, 31:15, 63:6, 74:10, 113:8, 118:6, 145:5
**court** [9] - 20:14, 25:10, 32:5, 32:17, 119:13, 120:5, 128:14, 137:17, 162:22
**Court** [22] - 6:15, 9:2, 9:14, 18:24, 20:6, 21:7, 22:20, 26:4, 30:16, 31:16, 32:4,

32:13, 33:7, 35:10, 69:7, 108:13, 111:2, 113:6, 120:16, 120:19, 125:12, 139:20
**COURT** [190] - 1:1, 2:11, 4:6, 4:11, 4:15, 14:12, 14:14, 17:3, 17:5, 26:16, 26:19, 26:22, 27:16, 27:21, 28:1, 29:1, 29:4, 29:6, 29:10, 29:13, 29:16, 29:19, 29:22, 30:3, 30:10, 30:14, 30:21, 30:25, 31:3, 31:22, 32:2, 32:7, 32:15, 32:22, 32:24, 33:1, 33:5, 33:9, 33:11, 33:15, 33:20, 33:24, 34:2, 39:11, 40:7, 40:20, 43:1, 43:4, 48:6, 48:12, 49:1, 49:10, 54:21, 54:23, 56:25, 57:2, 64:9, 68:10, 68:24, 69:1, 69:3, 69:12, 69:15, 69:20, 69:24, 70:2, 71:1, 71:4, 71:8, 71:24, 72:4, 72:7, 74:19, 74:21, 74:23, 76:22, 76:24, 81:5, 83:16, 85:23, 89:3, 89:8, 92:17, 92:25, 96:3, 97:21, 99:3, 99:24, 100:2, 100:16, 100:21, 100:24, 101:3, 101:11, 101:14, 101:19, 101:24, 102:19, 102:23, 103:18, 103:20, 103:23, 104:14, 104:17, 105:1, 106:1, 107:21, 107:23, 108:3, 108:6, 108:8, 108:14, 108:20, 109:7, 109:14, 109:18, 109:22, 110:8, 111:5, 111:10, 111:18, 112:2, 112:15, 112:20, 112:23, 113:12, 113:14, 114:5, 114:9, 114:20, 115:19, 116:18, 118:12, 118:21, 119:3, 119:10, 119:19, 120:3, 120:10, 120:25, 121:8, 121:11, 121:17, 121:23, 122:9, 123:5, 123:9, 124:6, 124:12, 124:17, 124:25, 125:3, 125:7, 125:13, 125:17, 125:22, 125:24, 126:3, 126:7, 128:12, 129:6, 130:9, 130:12, 130:15, 131:17, 136:14, 139:1, 139:3, 139:6, 141:10, 157:19, 159:19, 159:21, 159:23, 160:2, 160:4, 160:8, 160:13, 160:17, 160:25, 161:3, 161:7, 161:12, 161:14, 161:24, 162:9, 163:4, 163:23, 164:3, 164:9
**court's** [1] - 85:22
**Court's** [1] - 128:4
**courtesy** [1] - 125:12
**courtroom** [2] - 30:23, 124:19
**cover** [1] - 10:18
**covered** [1] - 141:16
**Cox** [2] - 50:6, 84:9
**Craig** [2] - 53:20, 63:13
**create** [1] - 24:14
**created** [2] - 139:22, 143:21
**criminal** [7] - 9:17, 13:20, 13:23, 14:18, 14:22, 15:15
**Criminal** [1] - 5:4
**cross** [7] - 26:19, 101:7, 109:6, 110:4, 120:18, 141:10, 160:10
**Cross** [3] - 3:3, 3:6, 3:9
**CROSS** [2] - 26:23, 98:1, 141:12
**cross-examination** [1] - 26:19
**CROSS-EXAMINATION** [3] - 26:23,

98:1, 141:12
**cross-examine** [2] - 101:7, 120:18
**CRR** [2] - 2:12, 164:16
**CSR** [1] - 2:12
**current** [6] - 34:14, 36:2, 129:23, 150:4, 150:8, 150:18
**custody** [1] - 18:14
**cut** [2] - 118:1, 160:12

# D

**Dallas** [8] - 113:3, 114:6, 114:8, 114:17, 115:5, 115:6, 115:10
**data** [16] - 5:24, 6:22, 7:20, 20:18, 20:23, 23:4, 24:6, 24:14, 24:15, 25:2, 25:5, 25:6, 115:5, 120:20, 120:22
**date** [21] - 10:14, 10:15, 15:9, 17:12, 17:13, 17:14, 18:3, 18:4, 18:25, 25:24, 31:16, 43:19, 52:8, 53:9, 53:14, 55:25, 75:25, 79:20, 104:22, 104:25, 106:20
**DATE** [1] - 164:15
**dates** [5] - 19:11, 25:25, 53:10, 59:23, 92:22
**DaTscan** [1] - 149:11
**DAY** [1] - 1:13
**days** [4] - 21:21, 72:11, 78:23, 78:25
**DC** [1] - 1:22
**deal** [1] - 71:8
**dealerships** [1] - 35:16
**dealing** [1] - 158:3
**Dear** [1] - 99:22
**dear** [1] - 102:7
**Deaton** [1] - 26:9
**decades** [1] - 87:15
**December** [5] - 45:17, 92:7, 93:9, 93:11, 93:24
**decide** [2] - 113:25, 159:12
**decided** [1] - 162:19
**decision** [23] - 35:22, 43:13, 66:17, 73:18, 74:2, 74:7, 74:13, 82:13, 82:18, 82:19, 82:24, 83:1, 83:5, 83:12, 83:14, 83:21, 83:22, 83:24, 83:25, 107:4, 107:7, 162:12
**decisions** [6] - 52:14, 66:15, 72:14, 72:18, 72:20, 124:1
**decline** [1] - 156:9
**declined** [1] - 140:16
**decrypt** [1] - 24:17
**decrypted** [2] - 24:14, 24:19
**decryption** [2] - 23:5, 25:6
**default** [3] - 143:10, 143:19, 143:25
**defaults** [1] - 143:15
**DEFENDANT** [1] - 2:1
**defendant** [5] - 32:7, 34:1, 34:12, 39:8, 126:19
**Defendant's** [2] - 105:17, 108:2
**defense** [10] - 43:20, 55:7, 55:11, 61:23, 65:9, 70:11, 70:14, 71:2, 128:1, 128:8
**Defense** [2] - 97:23, 98:6
**define** [3] - 40:16, 42:6, 144:25

**definition** [1] - 90:5
**delete** [11] - 79:22, 80:13, 87:19, 89:18, 89:23, 90:2, 91:11, 96:23, 97:2, 97:5, 116:5
**deleted** [12] - 80:9, 82:11, 85:5, 86:23, 87:2, 88:3, 88:8, 92:11, 117:20, 122:23, 123:2, 163:10
**deletes** [3] - 80:2, 81:20, 82:17
**deleting** [3] - 88:13, 88:18, 91:20
**delivered** [1] - 92:12
**Delta** [1] - 4:25
**delve** [1] - 138:8
**delving** [1] - 146:18
**demanding** [1] - 153:22
**dementia** [17] - 64:24, 65:2, 107:10, 107:13, 107:15, 127:11, 127:13, 127:17, 140:8, 141:19, 144:14, 144:18, 144:21, 145:1, 145:8, 146:4, 158:4
**denial** [1] - 158:9
**Denver** [1] - 5:10
**department** [1] - 50:18
**Department** [2] - 1:20, 18:15
**depiction** [1] - 134:20
**depictions** [1] - 130:2
**deposed** [2] - 50:6, 50:15, 124:7
**deposition** [10] - 84:9, 87:6, 87:8, 88:11, 89:11, 108:12, 108:16, 108:19, 115:15, 162:20
**depositions** [3] - 162:10, 163:20, 163:25
**derived** [1] - 12:23
**describe** [9] - 6:14, 9:1, 9:2, 9:14, 18:24, 21:2, 21:7, 21:13, 22:20
**described** [4] - 20:6, 152:11, 153:14, 155:14
**description** [1] - 155:15
**desktop** [2] - 7:3, 21:9
**destroy** [1] - 87:19
**destroyed** [1] - 87:24
**destroying** [1] - 89:13
**detailed** [1] - 138:10
**details** [1] - 31:19
**determination** [1] - 128:4
**determine** [4] - 14:4, 16:3, 24:19, 78:4
**determined** [2] - 14:5, 17:21
**device** [10] - 5:22, 7:8, 7:9, 7:11, 7:13, 7:21, 7:22, 7:24, 8:7, 8:8
**devices** [16] - 8:4, 19:7, 20:9, 20:10, 20:17, 21:4, 21:6, 21:8, 21:10, 22:4, 22:6, 22:10, 23:2, 24:10, 25:8
**diagnose** [3] - 144:13, 144:18, 144:21
**diagnosed** [4] - 64:23, 65:2, 146:12, 149:7
**diagnosis** [5] - 47:4, 132:20, 146:5, 146:15, 149:11
**DICKERMAN** [2] - 3:2, 4:19
**Dickerman** [8] - 4:10, 4:25, 8:10, 14:17, 15:10, 25:20, 26:25, 45:10

**dickerman** [1] - 5:2
**DICKERSON** [11] - 109:21, 114:25, 116:11, 119:4, 120:16, 121:2, 121:10, 121:13, 121:20, 121:24, 124:16
**Dickerson** [2] - 45:10, 120:2
**Dietz** [5] - 70:10, 160:7, 160:8, 161:1, 161:3
**different** [28] - 7:17, 22:8, 22:9, 23:15, 23:24, 23:25, 65:2, 73:12, 78:15, 92:22, 111:12, 117:24, 131:7, 135:11, 137:6, 137:20, 139:23, 140:1, 143:3, 145:4, 149:21, 150:12, 150:19, 150:21, 152:9, 154:8
**difficult** [1] - 115:18
**digest** [1] - 124:2
**digested** [1] - 14:21
**digital** [19] - 5:5, 5:13, 5:17, 5:22, 5:25, 6:4, 6:11, 6:19, 6:24, 8:17, 18:12, 19:17, 20:6, 20:14, 20:21, 21:4, 22:4, 25:13
**direct** [15] - 12:22, 13:1, 27:18, 28:16, 35:7, 41:4, 49:17, 51:7, 53:22, 73:15, 96:25, 110:3, 110:5, 160:11, 160:13
**DIRECT** [3] - 4:21, 34:8, 126:12
**Direct** [3] - 3:3, 3:6, 3:9
**directly** [3] - 13:19, 31:12, 45:9, 115:3, 116:14, 151:13
**director** [1] - 151:12
**disability** [5] - 59:8, 75:4, 75:16, 77:3, 77:15
**disabled** [2] - 77:11, 78:4
**disagree** [1] - 144:16
**disclose** [1] - 11:19
**disclosed** [1] - 9:20
**disclosure** [7] - 9:11, 9:15, 9:23, 10:17, 10:20, 11:1, 11:2
**discover** [1] - 135:12
**discuss** [10] - 52:12, 52:14, 52:16, 54:25, 66:15, 70:14, 70:22, 71:7, 71:22, 159:11
**discussed** [3] - 55:1, 118:3, 143:9
**discussing** [4] - 53:19, 55:3, 67:13, 138:1
**discussion** [1] - 51:4
**discussions** [2] - 52:9, 96:11
**disease** [16] - 43:16, 45:14, 46:21, 49:7, 104:21, 105:12, 106:10, 106:15, 106:21, 107:1, 107:19, 127:8, 143:3, 146:16, 149:7, 149:12
**disingenuous** [1] - 103:9
**disk** [1] - 23:3
**disorder** [1] - 146:3
**dispense** [1] - 31:1
**display** [2] - 128:17, 129:3
**dispute** [2] - 67:13, 118:16
**distinguish** [1] - 134:3
**distributing** [1] - 22:24
**DISTRICT** [3] - 1:1, 1:1, 1:12
**division** [1] - 13:20
**DIVISION** [1] - 1:2

**Division** [1] - 1:20
**doctor** [31] - 27:2, 43:22, 43:23, 44:6, 44:9, 44:12, 44:15, 45:3, 46:10, 46:13, 46:16, 48:4, 48:5, 48:14, 48:16, 48:18, 48:20, 48:22, 60:8, 78:3, 126:17, 127:5, 127:7, 138:5, 141:14, 141:23, 142:14, 145:16, 148:20, 159:23, 160:22
**doctor's** [1] - 151:10
**doctors** [3] - 44:21, 65:2, 142:12
**document** [48] - 11:8, 14:18, 25:21, 31:18, 31:19, 40:18, 53:3, 57:18, 59:19, 59:23, 60:12, 75:19, 92:23, 93:7, 98:25, 99:6, 99:13, 101:15, 102:20, 103:4, 103:5, 103:11, 104:7, 104:9, 105:25, 117:24, 118:9, 118:12, 118:14, 118:15, 118:23, 118:25, 131:14, 131:22, 133:5, 133:9, 137:9, 137:11, 137:17, 138:2, 139:8, 151:9, 152:16, 154:24, 156:17, 159:15
**documented** [2] - 147:15, 148:6
**documents** [25] - 14:2, 16:8, 16:11, 19:6, 51:21, 52:3, 52:6, 92:24, 118:8, 123:10, 123:16, 123:19, 128:1, 128:5, 128:11, 128:13, 129:4, 151:13, 152:6, 152:7, 152:14, 163:9, 163:14
**dog** [1] - 137:15
**Doggett** [1] - 26:9
**dollar** [1] - 76:1
**done** [21] - 9:20, 41:24, 42:8, 42:16, 42:17, 42:20, 42:22, 72:8, 80:5, 103:14, 108:11, 108:24, 108:25, 114:14, 122:2, 123:21, 124:20, 124:21, 160:18, 160:25
**door** [2] - 138:5, 140:17
**Dorothy** [7] - 60:25, 76:15, 99:15, 99:17, 101:6, 141:1, 141:3
**doubt** [6] - 59:5, 59:10, 60:18, 62:3, 62:18, 78:7
**doubts** [3] - 65:24, 66:5, 66:6
**down** [22] - 13:2, 15:9, 16:8, 48:5, 49:24, 56:3, 65:15, 87:22, 98:18, 132:5, 132:12, 133:9, 136:3, 148:11, 155:5, 156:5, 156:19, 157:11, 159:3, 159:10, 160:12
**downloaded** [4] - 81:12, 81:15, 83:9, 85:7
**downplay** [2] - 158:20, 158:23
**Dr** [96] - 41:5, 41:8, 41:9, 41:16, 41:23, 42:1, 42:3, 42:8, 43:21, 46:2, 46:22, 46:25, 47:16, 47:19, 48:20, 49:22, 51:3, 51:10, 52:23, 53:16, 57:6, 57:12, 57:16, 57:20, 57:21, 58:1, 58:4, 58:7, 58:14, 59:20, 59:25, 60:3, 60:15, 60:21, 60:24, 61:3, 61:19, 61:23, 62:21, 67:7, 67:19, 67:22, 70:10, 71:19, 73:7, 73:9, 73:16, 73:22, 74:5, 74:10, 81:25, 82:2, 82:11, 82:12, 93:15, 95:18, 96:11, 97:5, 97:7, 97:11, 105:3, 105:7, 105:11, 105:14, 105:19,

105:21, 105:22, 106:8, 106:13, 106:16, 109:3, 110:23, 125:15, 126:14, 128:19, 129:13, 130:17, 131:21, 134:6, 134:15, 135:22, 136:20, 148:12, 148:16, 149:1, 149:4, 160:7, 160:8, 160:21, 161:1, 161:3, 161:4, 161:7
**draft** [1] - 163:13
**drag** [1] - 123:24
**draw** [3] - 11:25, 12:11, 17:11
**drive** [6] - 7:6, 24:11, 24:12, 115:9, 123:4
**drives** [5] - 21:10, 22:14, 23:3, 23:16, 23:24
**driving** [5] - 61:8, 61:11, 61:14, 63:1, 63:22
**due** [2] - 25:22, 28:21
**duly** [3] - 4:20, 34:7, 126:11
**during** [24] - 12:13, 16:2, 19:5, 21:15, 21:16, 26:3, 32:18, 35:2, 60:5, 60:22, 69:8, 69:16, 69:23, 70:1, 70:9, 74:10, 87:5, 89:11, 133:6, 133:23, 135:13, 146:17, 148:4, 150:6
**duties** [2] - 8:11, 17:19
**duty** [1] - 6:17
**dysuria** [2] - 135:4, 147:11

# E

**e-mail** [137] - 22:17, 22:19, 22:21, 22:22, 23:1, 23:10, 23:14, 24:20, 24:21, 24:22, 24:23, 41:5, 41:6, 53:23, 53:24, 55:22, 55:23, 55:25, 56:2, 63:13, 64:1, 67:5, 67:7, 67:10, 67:11, 67:18, 73:6, 73:9, 75:22, 76:6, 78:13, 78:15, 78:19, 78:22, 78:24, 79:23, 80:2, 80:5, 80:8, 80:9, 80:13, 80:22, 81:2, 81:20, 81:25, 82:15, 82:17, 83:8, 84:7, 85:7, 90:5, 90:7, 90:8, 90:10, 90:11, 90:24, 91:6, 91:9, 91:12, 91:15, 91:21, 91:25, 92:6, 92:9, 93:8, 93:10, 93:12, 93:18, 93:20, 93:21, 93:25, 94:6, 94:8, 94:9, 94:11, 94:14, 94:16, 94:18, 94:23, 94:24, 95:1, 95:5, 95:8, 95:10, 95:12, 95:18, 95:19, 95:24, 96:2, 96:10, 96:20, 96:23, 96:24, 96:25, 97:2, 97:5, 97:7, 98:4, 98:5, 98:13, 98:14, 98:19, 99:6, 99:7, 99:8, 99:19, 99:20, 100:12, 100:19, 100:22, 100:25, 101:2, 102:4, 104:22, 106:19, 106:20, 106:22, 106:25, 108:3, 110:17, 112:11, 115:23, 115:25, 116:1, 120:20, 120:23, 121:2, 121:3, 121:7, 121:14, 122:8, 122:20, 122:21
**e-mails** [40] - 22:24, 25:7, 25:12, 40:24, 52:22, 53:10, 53:15, 53:16, 81:9, 81:12, 81:18, 85:10, 85:17, 86:6, 86:12, 86:19, 86:24, 87:3, 87:20, 87:24, 88:3, 88:13, 88:18, 89:13, 89:19, 89:24, 90:2, 90:17, 91:11,

91:12, 92:20, 94:19, 96:16, 98:21, 113:1, 119:9, 122:4, 122:20
**e-mails'** [1] - 88:9
**early** [6] - 64:14, 71:14, 144:13, 144:18, 144:19, 145:8, 155:9, 158:4
**ease** [1] - 131:15
**easier** [3] - 30:5, 119:16, 134:12
**easiest** [1] - 129:5
**easily** [2] - 133:7, 156:11
**Edward** [1] - 26:8
**effectively** [4] - 156:15, 157:12, 157:23
**efficient** [1] - 141:16
**effort** [1] - 9:16
**efforts** [1] - 14:3
**Efronson** [3] - 2:7, 3:3, 26:21
**EFRONSON** [9] - 14:13, 17:4, 25:16, 26:20, 26:24, 27:23, 28:5, 28:6, 28:24
**either** [11] - 6:5, 30:18, 30:20, 34:4, 49:25, 93:23, 115:16, 116:15, 132:10, 133:11, 163:13
**elderly** [1] - 115:7
**electronic** [9] - 7:12, 8:4, 129:23, 136:24, 143:21, 150:20, 150:22, 151:23, 152:3
**Eliminator** [1] - 87:16
**Ellis** [1] - 31:6
**ELMO** [8] - 52:24, 67:6, 111:21, 128:7, 128:17, 129:10, 154:15, 154:16
**Email** [4] - 1:23, 1:23, 2:5, 2:9
**Emily** [2] - 30:22, 31:5
**employed** [2] - 5:2, 23:3
**employee** [7] - 78:18, 78:19, 80:2, 80:6, 80:9, 80:14, 90:8
**employees** [2] - 153:22, 154:6
**employer** [1] - 150:18
**employment** [1] - 59:8
**encompass** [1] - 26:2
**encourage** [1] - 157:9
**encrypted** [1] - 24:15
**encryption** [1] - 23:4
**end** [3] - 7:6, 114:3, 160:4
**ended** [1] - 19:9
**ending** [1] - 13:4
**energy** [7] - 154:25, 155:8, 155:17, 156:20, 157:7, 157:15, 158:1
**enforcement** [2] - 20:1, 21:23
**ensure** [1] - 7:13
**entire** [4] - 53:3, 113:21, 133:4, 153:4
**entities** [5] - 9:7, 9:19, 15:20, 16:14, 16:15
**entitled** [1] - 164:13
**entity** [7] - 13:16, 13:17, 13:25, 14:6, 14:7, 15:24, 16:5
**entrance** [1] - 137:15
**equipment** [1] - 7:7
**Equity** [5] - 12:17, 12:24, 15:20, 15:21, 16:4
**equity** [1] - 16:20
**error** [3] - 37:14, 37:17, 111:3

**especially** [1] - 156:9
**essentially** [7] - 9:4, 12:5, 22:22, 35:17, 35:20, 51:20, 144:10
**establish** [1] - 100:24
**Eugene** [2] - 14:8, 14:9
**evaluate** [2] - 44:9, 44:13
**evasive** [3] - 97:8, 97:12, 97:15
**Evatt** [2] - 18:7, 18:21
**evening** [4] - 109:25, 110:10, 126:14, 160:15
**event** [1] - 28:13
**EVERY** [1] - 73:17
**Evidence** [1] - 87:16
**evidence** [23] - 5:17, 5:23, 6:8, 6:20, 7:1, 14:11, 18:12, 18:14, 19:18, 20:7, 20:15, 20:21, 22:4, 25:13, 63:9, 64:5, 111:15, 112:11, 130:7, 136:12, 138:25, 143:10, 145:15
**exact** [6] - 7:7, 36:1, 79:20, 149:21, 152:9, 153:7
**exactly** [3] - 36:8, 77:25, 114:12
**exam** [10] - 111:4, 132:8, 132:18, 133:11, 134:23, 135:1, 136:3, 142:1, 147:14, 147:15
**Exam** [2] - 139:15, 145:2
**EXAMINATION** [6] - 4:21, 26:23, 34:8, 98:1, 126:12, 141:12
**examination** [10] - 26:19, 28:16, 32:19, 110:15, 117:10, 129:20, 132:12, 133:3, 133:4, 144:5
**Examination** [1] - 139:21
**examine** [3] - 78:3, 101:7, 120:18
**example** [1] - 133:16
**except** [3] - 117:8, 131:2, 149:8
**excerpt** [3] - 131:15, 134:11, 135:19
**excess** [2] - 20:17, 36:7
**excom** [1] - 73:19
**excuse** [5] - 37:15, 51:18, 63:5, 74:22, 95:16
**excused** [5] - 29:4, 29:7, 107:24, 124:12, 159:21
**executed** [5] - 17:15, 18:6, 18:17, 18:20, 75:4
**executing** [1] - 5:18
**execution** [2] - 21:19
**executive** [8] - 52:16, 65:16, 73:19, 81:20, 82:16, 83:12, 83:20, 83:25
**executive's** [1] - 85:17
**executives** [8] - 36:11, 78:16, 81:11, 82:19, 82:22, 82:23, 83:1, 83:24
**executives'** [1] - 82:16
**exercise** [4] - 155:4, 157:8, 157:9, 157:10
**exercising** [3] - 59:7, 77:3, 77:15
**Exhibit** [34] - 10:5, 11:10, 12:9, 15:5, 15:11, 15:12, 25:15, 52:20, 57:2, 63:9, 64:9, 73:6, 75:20, 75:21, 84:21, 84:22, 97:24, 98:3, 98:6, 105:17, 108:2, 128:20, 129:14, 131:14, 134:10, 134:11, 134:16, 135:19, 135:20,

136:16, 136:17, 136:20, 139:9, 153:20
**exhibit** [11] - 15:25, 25:15, 40:22, 43:4, 49:18, 93:6, 128:24, 131:19, 139:11, 145:13, 155:11
**exhibits** [7] - 30:9, 31:7, 31:8, 32:16, 32:18, 128:1, 136:11
**exist** [1] - 123:2
**expect** [3] - 69:22, 69:25, 110:6
**expectation** [1] - 70:18
**expenses** [2] - 56:19, 77:23
**experience** [2] - 87:15, 158:3
**experiencing** [1] - 158:4
**expert** [8] - 43:20, 55:7, 55:11, 55:18, 61:24, 70:19, 118:6, 122:25
**experts** [1] - 161:9
**explain** [2] - 133:2, 139:20
**explaining** [1] - 12:5
**explanations** [1] - 115:21
**extent** [2] - 113:24, 157:25
**external** [3] - 21:10, 24:11, 24:12
**extract** [1] - 25:7
**extremely** [1] - 135:10
**eye** [1] - 145:7

# F

**fact** [32] - 7:25, 31:17, 35:19, 40:12, 50:14, 53:10, 65:12, 65:20, 66:4, 66:17, 70:23, 71:21, 72:23, 75:12, 77:9, 77:11, 78:4, 82:1, 82:20, 86:12, 90:1, 100:4, 100:19, 105:19, 109:3, 110:17, 110:22, 117:8, 123:2, 123:17, 147:14, 163:7
**facts** [1] - 116:19
**fail** [2] - 144:13, 144:17
**fair** [56] - 35:9, 38:23, 40:25, 41:17, 47:8, 50:13, 50:25, 51:22, 52:3, 53:20, 57:12, 57:22, 62:14, 62:24, 63:24, 64:15, 64:21, 64:24, 65:14, 65:18, 65:21, 65:22, 66:18, 66:21, 66:24, 67:8, 77:1, 77:4, 78:11, 78:16, 79:24, 80:20, 80:24, 81:13, 83:11, 84:7, 86:14, 87:6, 88:22, 89:19, 91:13, 93:9, 93:22, 94:2, 94:7, 94:17, 95:4, 130:2, 131:9, 133:23, 134:20, 135:24, 149:19, 153:3, 153:13, 162:12
**fairly** [2] - 19:2, 19:3
**fall** [3] - 16:21, 143:6, 155:9
**falling** [1] - 146:21
**false** [4] - 32:12, 47:20, 47:23, 48:15
**familiar** [6] - 25:21, 28:10, 28:13, 136:23, 154:1, 158:6
**familiarity** [2] - 127:8, 127:10
**family** [7] - 19:3, 35:17, 44:19, 44:22, 65:4, 140:14, 144:22
**fantastic** [1] - 163:4
**far** [8] - 12:18, 20:23, 32:1, 32:2, 32:3, 65:10, 142:10, 146:9
**faster** [1] - 53:2
**father** [3] - 35:19, 115:7, 115:9

**fatigue** [3] - 155:14, 155:25
**fatigued** [4] - 155:21, 155:23, 155:24
**feasible** [1] - 153:5
**February** [10] - 55:24, 55:25, 56:4, 56:22, 75:22, 75:24, 76:5, 76:9, 76:12, 149:10
**federal** [1] - 17:14
**feedback** [1] - 73:20
**feeding** [1] - 146:20
**fellow** [2] - 41:9, 42:12
**felt** [2] - 155:7, 155:16
**female** [1] - 132:11
**few** [5] - 17:7, 19:7, 22:8, 22:9, 109:15
**field** [1] - 6:11
**figure** [7] - 71:13, 89:3, 116:4, 116:16, 117:12, 120:10, 161:14
**file** [9] - 78:16, 79:22, 80:1, 80:14, 163:12, 163:13, 163:14
**filed** [1] - 12:7
**files** [3] - 151:19, 152:17, 163:16
**filing** [1] - 31:17
**filings** [1] - 30:17
**final** [2] - 83:3, 83:5
**financial** [2] - 55:1, 77:16
**financials** [1] - 76:2
**fine** [6] - 29:20, 32:14, 117:8, 125:4, 154:2, 154:21
**finish** [6] - 68:10, 71:14, 109:25, 161:3, 161:11, 162:3
**fire** [1] - 85:7
**first** [25] - 11:7, 15:7, 19:14, 20:16, 24:9, 45:13, 47:11, 75:8, 75:10, 75:12, 84:6, 90:20, 91:4, 99:6, 117:18, 120:21, 120:23, 121:4, 129:10, 129:19, 139:9, 139:10, 143:21, 160:20, 162:7
**fitting** [1] - 160:1
**five** [9] - 13:2, 19:25, 60:14, 79:14, 108:21, 108:22, 124:7, 124:8, 148:9
**five-minute** [1] - 108:21
**fix** [1] - 138:11
**flip** [2] - 128:23, 147:5
**flipping** [1] - 132:4
**floor** [1] - 29:15
**floors** [1] - 19:4
**fly** [1] - 143:4
**focus** [4] - 123:12, 145:5, 147:3, 153:2
**focused** [2] - 123:7, 147:16
**folded** [1] - 150:18
**follow** [5] - 19:13, 21:1, 21:12, 21:14, 104:14
**follow-up** [5] - 19:13, 21:1, 21:12, 21:14, 104:14
**followed** [1] - 148:15
**follows** [3] - 4:20, 34:7, 126:11
**food** [1] - 125:4
**FOR** [3] - 1:1, 1:17, 2:1
**forced** [1] - 129:9
**forefront** [1] - 158:20
**foregoing** [1] - 164:11

**forensic** [8] - 6:1, 6:4, 8:9, 20:9, 24:10, 122:22, 122:25, 123:3
**forensically** [3] - 6:22, 20:8, 24:9
**forensics** [6] - 5:5, 5:12, 5:14, 6:11, 6:19, 8:17
**forever** [2] - 81:21, 82:17
**forgetting** [3] - 140:17, 144:22, 145:11
**Form** [4] - 11:13, 11:18, 12:2, 12:7
**form** [2] - 11:20, 11:21
**format** [2] - 136:25, 152:9
**former** [1] - 138:5
**forms** [1] - 127:11
**forthright** [1] - 9:20
**forward** [1] - 11:4
**forwarded** [4] - 93:21, 94:6, 94:11, 122:20
**forwarding** [5] - 94:8, 98:20, 121:4, 121:7, 121:22
**forwards** [1] - 121:25
**four** [5] - 13:2, 19:24, 60:14, 65:1, 148:9
**fourth** [1] - 137:24
**frame** [2] - 25:24, 26:2
**Fred** [1] - 26:10
**free** [2] - 124:18, 157:6
**frequent** [2] - 6:7, 73:21
**Friday** [3] - 27:14, 96:7, 96:15
**friend** [1] - 42:12
**friends** [1] - 42:18
**front** [2] - 29:24, 98:3
**FTC** [1] - 50:21
**full** [4] - 6:2, 23:3, 126:15, 142:1
**full-time** [1] - 6:2
**functioning** [1] - 27:10
**Fund** [8] - 12:13, 12:15, 12:16, 12:20, 12:24, 15:21, 16:4, 16:20
**fund** [1] - 12:16
**funded** [1] - 16:6
**Funds** [2] - 15:14, 16:14

## G

**gait** [1] - 145:25
**game** [4] - 22:13, 23:18, 23:19, 24:2
**games** [2] - 103:13, 110:16
**gathered** [1] - 123:19
**gears** [1] - 61:6
**general** [3] - 54:2, 126:25, 145:19
**generous** [2] - 77:4, 77:7
**gentleman** [2] - 115:6, 131:1
**genuine** [1] - 95:17
**genuinely** [1] - 103:16
**GEORGE** [1] - 1:11
**gestalt** [1] - 145:9
**given** [6] - 53:20, 90:18, 123:19, 140:9, 152:20, 163:19
**glasses** [1] - 127:24
**global** [1] - 56:11
**goal** [3] - 41:24, 42:9, 56:18
**Google** [1] - 5:21

**GOVERNMENT** [1] - 1:17
**Government** [1] - 136:22
**government** [30] - 27:13, 28:8, 28:22, 29:8, 30:19, 31:7, 31:22, 40:3, 65:6, 71:22, 96:8, 96:12, 97:3, 97:23, 109:3, 110:21, 111:1, 113:4, 114:10, 114:15, 118:2, 122:16, 125:12, 125:15, 129:25, 137:3, 149:24, 151:14, 162:6, 162:22
**government's** [4] - 10:2, 27:12, 27:24, 28:8
**Government's** [16] - 10:5, 11:10, 12:9, 15:5, 15:10, 15:12, 52:20, 73:6, 75:20, 75:21, 128:20, 134:10, 135:19, 136:16, 145:13, 153:20
**GP** [1] - 16:4
**grab** [3] - 29:12, 109:21, 125:3
**grand** [1] - 15:13
**granting** [1] - 32:15
**great** [6] - 67:12, 107:23, 109:20, 124:4, 129:6, 155:6
**ground** [1] - 35:14
**group** [1] - 132:13
**guaranteed** [1] - 31:11
**guess** [9] - 69:20, 83:13, 86:20, 116:13, 122:9, 122:14, 136:4, 144:20, 146:14
**guessing** [2] - 79:13, 124:25
**Gutierrez** [1] - 70:25
**guys** [14] - 69:18, 71:12, 71:18, 71:24, 110:1, 114:5, 114:9, 114:15, 114:20, 116:16, 123:13, 123:21, 160:15, 161:18
**guys'** [1] - 70:4
**GX** [2] - 145:15, 149:14

## H

**half** [2] - 72:15, 133:7
**hand** [7] - 22:3, 33:16, 46:3, 92:3, 93:3, 97:22, 125:25
**handed** [2] - 97:25, 131:18
**handing** [6] - 40:21, 52:21, 91:4, 134:13, 135:20, 136:17
**handle** [2] - 108:23, 162:23
**handles** [1] - 22:23
**handwriting** [1] - 146:19
**hang** [1] - 110:1
**HANKS** [1] - 1:11
**hannah.com** [2] - 24:23, 24:25
**happy** [5] - 54:5, 54:16, 89:15, 113:9, 147:5
**hard** [10] - 7:6, 21:10, 22:14, 23:16, 23:24, 24:11, 24:12, 90:6, 123:4
**Hardwicke** [2] - 56:10, 56:12
**harm** [1] - 40:10
**Harper** [1] - 26:9
**hash** [1] - 7:16
**hats** [1] - 79:4
**head** [2] - 50:18, 136:23
**header** [1] - 137:25

**headers** [1] - 132:24
**headway** [1] - 162:8
**health** [12] - 44:3, 44:6, 57:11, 57:15, 58:3, 58:7, 65:18, 65:19, 65:21, 104:9, 137:10, 151:17
**hear** [5] - 29:20, 98:22, 113:17, 122:16, 162:24
**heard** [8] - 30:13, 30:23, 31:3, 109:19, 117:23, 122:21, 150:9, 162:25
**HEARING** [1] - 1:9
**hearing** [1] - 153:15
**hearsay** [2] - 27:20, 100:7
**heavily** [1] - 31:11
**height** [1] - 98:8
**held** [3] - 9:7, 14:6, 14:7
**hello** [3] - 4:11, 125:17, 141:15
**help** [6] - 39:15, 53:5, 63:4, 119:23, 157:9, 158:14
**helpfully** [1] - 148:9
**hi** [1] - 141:14
**Hi** [2] - 99:22, 102:7
**hid** [3] - 58:4, 58:7, 58:14
**hidden** [1] - 19:1
**hide** [1] - 97:2
**high** [2] - 34:22, 54:5
**highly** [1] - 153:23
**himself** [2] - 9:23, 115:10
**HIPAA** [1] - 131:6
**hire** [1] - 34:21
**hired** [1] - 34:19
**histories** [1] - 151:4
**history** [7] - 143:14, 148:18, 148:19, 152:21, 153:5, 154:9
**hit** [2] - 76:2, 77:16
**hold** [4] - 89:21, 106:5, 108:21, 109:10
**holding** [1] - 12:23
**holdings** [4] - 9:18, 11:14, 11:19, 12:6
**home** [9] - 18:20, 18:25, 19:3, 61:8, 61:11, 61:13, 61:14, 61:17, 62:11
**honest** [1] - 9:21
**honestly** [1] - 145:7
**Honor** [84] - 4:9, 14:10, 14:13, 17:2, 26:15, 26:20, 27:15, 28:25, 29:2, 29:5, 29:8, 29:11, 29:14, 29:18, 29:25, 31:5, 32:8, 32:21, 32:25, 33:4, 40:6, 43:3, 64:7, 68:6, 68:13, 69:6, 69:10, 69:22, 70:19, 71:17, 71:23, 85:22, 89:16, 92:16, 92:18, 97:18, 97:24, 99:2, 99:23, 100:20, 103:15, 105:5, 105:24, 106:5, 107:22, 108:1, 108:5, 108:10, 109:2, 109:21, 110:7, 110:13, 112:6, 112:8, 112:19, 114:25, 119:4, 122:18, 124:4, 124:22, 125:9, 126:9, 127:25, 128:9, 130:6, 130:11, 131:13, 136:10, 138:24, 141:9, 141:11, 157:16, 159:18, 159:20, 159:22, 160:16, 161:2, 161:6, 161:20, 161:22, 162:17, 163:21, 164:2
**HONORABLE** [1] - 1:11
**honored** [1] - 126:6

**hope** [1] - 161:21
**hopefully** [5] - 110:21, 161:11, 162:3, 162:24, 163:23
**hoping** [1] - 161:11
**horrible** [13] - 40:15, 40:16, 41:24, 42:6, 42:8, 42:11, 42:14, 42:15, 42:16, 42:19, 42:20
**hour** [8] - 61:15, 61:21, 70:18, 71:15, 110:4, 113:16, 133:6, 133:7
**hour-and-a-half** [1] - 133:7
**hours** [7] - 39:18, 109:5, 156:15, 157:12, 157:23, 160:11, 160:13
**house** [4] - 115:12, 115:13, 121:7, 156:13
**HOUSTON** [1] - 1:2
**Houston** [5] - 2:4, 2:13, 17:15, 17:16, 26:12
**houston** [1] - 1:4
**Houston-based** [1] - 17:16
**HSI** [1] - 6:9
**huge** [1] - 102:17
**HUGHES** [3] - 31:5, 32:25, 33:3
**Hughes** [1] - 31:6
**human** [1] - 155:22
**hurdle** [2] - 13:9, 13:12
**husband** [1] - 141:5

## I

**I-C-K-E-R-M-A-N** [1] - 5:1
**idea** [11] - 14:19, 76:13, 88:7, 88:12, 88:17, 88:21, 88:25, 89:11, 140:15, 149:22, 161:19
**identification** [11] - 10:2, 10:9, 11:9, 15:5, 15:11, 40:22, 46:1, 73:5, 97:23, 101:23, 101:25
**identified** [1] - 31:18
**identify** [1] - 6:20
**II** [7] - 12:15, 12:16, 12:20, 12:24, 15:21, 16:4, 16:20
**II..** [1] - 12:13
**ill** [3] - 75:8, 75:11, 75:13
**illnesses** [1] - 137:21
**image** [6] - 7:12, 7:22, 20:20, 24:7, 24:10, 122:22
**imaged** [1] - 20:15
**images** [1] - 20:6
**imagine** [2] - 48:19, 115:15
**imaging** [2] - 8:2, 22:3
**immediately** [1] - 81:15
**impacts** [1] - 110:24
**impairment** [2] - 158:5, 158:7
**impeach** [1] - 110:17
**impeachment** [2] - 111:11, 111:12
**importance** [1] - 113:15
**important** [12] - 66:15, 66:17, 72:14, 72:18, 72:20, 73:18, 74:2, 74:6, 74:12, 80:19, 115:20, 116:8, 122:10, 133:10, 153:9, 159:10, 159:12
**imported** [1] - 132:19

**IN** [1] - 1:1
**in-house** [1] - 121:7
**inaccurate** [1] - 49:14
**incident** [1] - 87:4
**incidentally** [1] - 41:9
**include** [1] - 16:16
**included** [3] - 65:3, 65:4, 96:20
**includes** [1] - 154:9
**including** [4] - 31:16, 109:5, 137:25, 156:5
**income** [1] - 9:6, 9:18, 12:22
**incorporation** [1] - 16:12
**independent** [1] - 159:7
**INDEX** [1] - 3:1
**indictment** [4] - 36:14, 36:17, 45:20, 65:6
**individual** [3] - 20:13, 133:6, 158:22
**individual's** [1] - 139:24
**individuals** [3] - 9:17, 21:24, 23:6
**indulgence** [1] - 85:22
**industry** [2] - 35:14, 116:17
**infection** [3] - 135:5, 143:4, 148:18
**infections** [1] - 148:19
**information** [19] - 31:9, 31:10, 31:16, 31:20, 32:12, 39:22, 57:11, 57:14, 58:3, 58:6, 58:14, 117:11, 122:13, 128:3, 150:24, 151:3, 151:6, 152:10, 157:14
**initial** [2] - 19:15, 21:16
**inquire** [1] - 100:9
**inside** [2] - 22:13, 23:18
**installed** [1] - 7:5
**instance** [2] - 7:3, 120:21
**instances** [1] - 118:3
**instituted** [1] - 9:16
**instructed** [1] - 149:2
**instructing** [1] - 69:7
**instructions** [3] - 122:11, 123:19
**insurance** [2] - 132:13, 142:5, 142:9
**intending** [2] - 101:9, 101:12
**intention** [1] - 100:9
**intentioned** [1] - 157:24
**interest** [3] - 36:4, 36:7, 67:16
**interested** [2] - 55:22, 67:5
**internal** [3] - 79:5, 112:13, 127:2
**Internal** [2] - 5:3, 22:1
**interrupt** [2] - 48:7, 114:25
**interrupted** [1] - 134:25
**interview** [13] - 44:8, 44:23, 46:1, 49:13, 55:12, 57:6, 57:8, 57:20, 60:6, 60:22, 74:11, 149:24, 150:6
**introduce** [1] - 101:6
**investigated** [2] - 11:5, 12:21
**Investigation** [1] - 5:4
**investigation** [20] - 5:18, 8:12, 9:4, 9:5, 9:8, 10:23, 12:15, 12:19, 14:5, 14:23, 15:2, 15:16, 16:2, 17:8, 17:9, 21:15, 25:22, 28:17, 32:1
**investigations** [6] - 13:20, 13:23, 14:19,

14:22, 17:13, 17:20
**investigative** [2] - 5:16, 14:3
**investment** [2] - 12:16, 16:6
**Investment** [2] - 14:4, 14:6
**Investments** [2] - 13:16, 31:17
**invoice** [1] - 56:9
**involved** [17] - 9:3, 20:24, 50:3, 50:9, 50:12, 50:17, 50:24, 52:6, 72:17, 72:19, 73:17, 74:2, 74:6, 74:12, 86:22, 115:3, 116:14
**involvement** [1] - 72:14
**IRS** [18] - 5:6, 5:18, 6:4, 6:9, 8:11, 9:11, 9:16, 12:8, 13:19, 13:20, 14:22, 18:14, 19:20, 19:22, 19:25, 93:12, 93:16, 97:8
**IRS's** [1] - 17:9
**island** [1] - 18:6
**issue** [18] - 28:4, 71:11, 80:19, 100:5, 109:2, 113:15, 113:22, 115:1, 115:19, 116:8, 120:6, 123:25, 140:22, 141:6, 147:16, 149:3, 156:1, 162:9
**issued** [2] - 15:9, 15:13
**issues** [13] - 44:20, 104:9, 117:22, 127:19, 137:10, 138:22, 141:5, 147:16, 156:18, 156:20, 157:15, 159:2
**IT** [2] - 79:5, 118:6
**item** [1] - 140:21
**items** [5] - 6:20, 21:17, 21:21, 144:5, 154:9
**iterations** [1] - 119:1
**itinerary** [2] - 25:19, 25:24
**itself** [1] - 146:3

## J

**Jackson** [40] - 40:25, 41:5, 41:8, 41:9, 41:16, 41:23, 42:1, 42:3, 42:8, 52:23, 61:19, 61:23, 62:21, 67:7, 67:19, 67:22, 73:7, 73:9, 73:16, 73:22, 82:2, 82:12, 91:6, 92:6, 93:8, 93:15, 95:18, 96:9, 96:11, 97:5, 97:7, 97:11, 98:20, 102:11, 102:12, 118:15, 120:24, 122:5, 122:7
**Jackson's** [2] - 53:16, 81:25
**James** [2] - 2:6, 160:21
**January** [5] - 50:16, 66:2, 132:2, 133:23, 149:7
**Jason** [1] - 2:2
**Jerry** [1] - 26:9
**jet** [1] - 56:13
**Jim** [8] - 40:25, 98:20, 99:22, 102:7, 102:11, 102:12
**Jim_Jackson@reyrey.com** [1] - 98:16
**jloonam@jonesday.com** [1] - 2:9
**job** [5] - 19:15, 20:5, 60:24, 61:3, 153:21
**jobs** [1] - 8:2
**Joe** [1] - 26:9
**JOHNSON** [19] - 29:11, 29:14, 29:18, 29:21, 69:22, 69:25, 70:6, 108:17, 109:12, 112:24, 114:7, 118:1, 118:14,

118:25, 119:22, 120:4, 124:4, 124:11, 124:14
**Johnson** [10] - 45:10, 69:20, 108:14, 109:10, 109:19, 112:23, 121:5, 121:22, 123:24
**Jones** [11] - 2:2, 2:7, 37:11, 37:18, 37:24, 38:2, 38:9, 38:10, 38:19, 39:13, 44:25
**JR** [3] - 1:11, 3:5, 34:6
**Jr** [1] - 34:11
**Judge** [15] - 48:23, 70:6, 72:10, 89:2, 104:24, 108:17, 109:12, 112:8, 112:24, 118:1, 124:11, 124:16, 160:24, 164:5, 164:6
**judge** [1] - 113:13
**JUDGE** [1] - 1:12
**juggle** [1] - 72:8
**July** [3] - 46:2, 46:19, 47:4
**June** [11] - 66:11, 66:12, 66:14, 66:23, 67:7, 67:10, 67:11, 99:14, 104:25, 150:19
**jungle** [1] - 143:4
**jury** [1] - 15:13
**Justice** [2] - 1:20, 18:15
**justify** [1] - 143:17
**jvarnado@jonesday.com** [1] - 2:5

## K

**Kathleen** [4] - 2:12, 164:11, 164:15, 164:16
**Kathryn** [1] - 2:6
**keep** [6] - 33:9, 33:12, 110:9, 112:17, 140:20, 150:8
**keeps** [1] - 83:16
**Keneally** [7] - 2:6, 3:6, 70:24, 110:15, 111:3, 111:5, 112:4
**KENEALLY** [50] - 34:4, 39:8, 42:25, 43:3, 54:22, 57:1, 64:8, 69:2, 69:10, 69:13, 74:20, 76:23, 92:18, 92:22, 97:20, 97:22, 98:2, 98:8, 98:9, 99:2, 99:4, 100:8, 100:11, 100:14, 100:17, 100:23, 101:1, 101:9, 101:12, 101:16, 101:22, 102:3, 102:22, 103:15, 103:19, 103:22, 104:6, 104:16, 104:19, 105:2, 105:24, 106:3, 106:5, 106:7, 107:20, 108:1, 108:5, 111:9, 112:6, 112:19
**Kepke** [5] - 17:16, 17:22, 17:23, 17:24, 18:10
**kept** [3] - 23:17, 78:20, 81:10
**key** [1] - 17:7
**keys** [1] - 23:5
**kind** [3] - 8:20, 21:7, 146:18
**Kirkland** [1] - 31:6
**Kirwan** [1] - 26:9
**kkeneally@jonesday.com** [1] - 2:10
**knowledge** [13] - 16:16, 17:19, 27:9, 27:25, 32:11, 75:18, 86:25, 87:1, 105:11, 116:18, 116:19, 117:3

**known** [3] - 21:16, 57:23, 97:11
**knows** [2] - 110:7, 128:14

## L

**L-I-S-S-E** [1] - 126:16
**lane** [1] - 19:2
**Langston** [4] - 1:18, 3:6, 162:18, 162:25
**LANGSTON** [90] - 10:6, 29:25, 30:6, 33:6, 33:10, 33:14, 33:25, 34:9, 39:5, 39:12, 40:5, 40:8, 40:17, 40:21, 40:23, 42:24, 43:6, 46:6, 46:8, 48:11, 48:13, 48:23, 49:5, 49:12, 54:20, 54:24, 56:24, 57:4, 63:8, 63:10, 64:4, 64:7, 64:11, 67:1, 67:4, 68:6, 68:12, 68:17, 68:25, 71:6, 72:6, 72:10, 72:12, 74:18, 75:2, 76:21, 76:25, 81:7, 81:8, 84:2, 85:22, 85:24, 89:2, 89:7, 89:9, 89:15, 89:17, 90:13, 90:16, 91:3, 91:5, 92:3, 92:5, 92:16, 92:21, 93:2, 93:5, 96:5, 96:6, 97:17, 99:23, 99:25, 100:3, 100:13, 100:20, 101:4, 101:21, 102:2, 104:24, 106:2, 106:4, 107:22, 107:25, 108:7, 108:10, 113:13, 113:20, 114:18, 119:7, 119:12
**laptop** [31] - 22:12, 22:14, 23:11, 23:23, 24:11, 83:9, 85:7, 86:7, 86:16, 86:18, 86:22, 86:25, 87:1, 91:12, 91:15, 91:18, 94:2, 94:4, 116:3, 116:4, 116:6, 118:8, 118:10, 118:11, 118:23, 120:21, 122:22, 122:24, 123:4
**laptop/e** [1] - 23:7
**laptop/e-mail** [1] - 23:7
**laptops** [6] - 21:9, 22:15, 22:18, 23:11, 23:16, 113:1
**large** [3] - 19:2, 19:3, 153:4
**largest** [1] - 20:23
**last** [16] - 4:24, 5:8, 5:11, 32:19, 37:11, 39:13, 51:8, 63:21, 99:6, 99:8, 102:14, 126:15, 137:3, 148:25, 149:9, 160:7
**late** [4] - 103:13, 109:1, 109:25, 123:22
**latter** [1] - 72:15
**law** [2] - 20:1, 21:23
**lawsuit** [1] - 50:6
**lawyer** [2] - 80:17, 84:16
**lawyers** [7] - 65:5, 65:8, 80:18, 103:23, 111:22, 153:8, 153:13
**lead** [4] - 40:5, 59:3, 59:22, 65:24
**leader** [1] - 51:8
**leadership** [2] - 107:2, 107:3
**leads** [1] - 154:7
**leaning** [1] - 117:10
**learn** [5] - 37:2, 43:15, 49:3, 49:6, 104:20
**learned** [9] - 36:14, 36:17, 37:5, 45:13, 46:20, 47:4, 49:3, 104:10, 119:7
**least** [7] - 21:25, 27:12, 35:7, 86:7, 115:24, 116:20, 117:24
**leave** [4] - 8:1, 111:21, 122:24, 161:17
**leaving** [4] - 8:3, 140:17, 140:18, 144:23

**Lee** [2] - 1:18, 162:18
**lee.f.langston@usdoj.gov** [1] - 1:23
**leeway** [1] - 160:21
**left** [4] - 55:2, 76:18, 84:25, 90:22
**legal** [4] - 38:1, 38:4, 50:18, 89:21
**lerner** [1] - 148:12
**Lerner** [3] - 148:16, 149:2, 149:4
**less** [2] - 77:3, 77:7
**letter** [8] - 10:3, 10:10, 10:14, 10:15, 10:18, 12:8, 32:11, 74:14
**level** [4] - 144:25, 150:21, 157:7, 158:1
**levels** [1] - 154:25
**liability** [1] - 76:3
**life** [2] - 41:24, 42:9
**light** [3] - 115:20, 118:17, 120:9
**likely** [1] - 6:20
**limited** [4] - 16:6, 16:20, 111:7, 131:10
**line** [11] - 13:1, 49:18, 49:20, 49:21, 67:18, 68:2, 85:3, 86:1, 87:12, 87:13, 114:4
**lined** [1] - 161:8
**lines** [1] - 13:2
**Lisse** [13] - 71:19, 109:3, 125:16, 126:16, 128:19, 129:13, 130:17, 131:21, 134:6, 134:15, 135:22, 136:20
**lisse** [1] - 126:14
**LISSE** [2] - 3:8, 126:10
**list** [4] - 15:19, 27:13, 28:9, 28:12
**literally** [1] - 123:25
**litigation** [5] - 50:4, 50:10, 50:13, 50:17, 50:25
**litigations** [1] - 49:19
**live** [3] - 113:22, 113:25, 114:4
**LLC** [2] - 15:14, 16:4
**local** [1] - 116:15
**locally** [1] - 116:16
**locate** [1] - 19:17
**location** [11] - 7:4, 19:22, 19:23, 21:20, 22:10, 22:19, 23:12, 23:24, 114:14, 114:18, 114:21
**locations** [2] - 22:8, 23:15
**locker** [2] - 22:10, 23:12
**logistics** [2] - 114:3, 162:21
**look** [21] - 15:7, 32:10, 67:18, 75:19, 91:23, 103:2, 105:4, 105:21, 106:6, 133:4, 133:5, 135:8, 140:4, 145:2, 145:7, 147:8, 148:21, 149:18, 150:12, 151:15, 154:11
**looked** [15] - 7:10, 11:3, 15:25, 104:4, 105:17, 117:13, 121:19, 129:15, 136:3, 136:22, 151:15, 151:25, 152:1, 152:5, 163:7
**looking** [10] - 47:10, 53:9, 53:14, 76:7, 90:24, 106:2, 132:23, 150:1, 153:10, 153:20
**looks** [5] - 7:21, 108:22, 129:21, 134:17, 137:9
**LOONAM** [25] - 46:5, 46:7, 68:8, 69:11, 71:17, 110:6, 110:12, 124:24, 125:9, 128:9, 130:8, 130:11, 134:1, 136:13,

139:2, 139:4, 141:11, 141:13, 154:16, 154:19, 154:22, 154:23, 157:21, 159:17, 164:5
**Loonam** [4] - 2:6, 3:9, 125:8, 129:2
**loonam** [1] - 129:9
**LOONHAM** [1] - 125:2
**lose** [1] - 86:16
**lost** [13] - 33:12, 61:8, 61:10, 61:15, 61:20, 62:2, 62:7, 62:10, 62:12, 81:21, 86:18, 94:2, 140:16
**love** [1] - 76:14
**low** [2] - 140:7, 157:7
**lower** [1] - 78:19
**lower-tier** [1] - 78:19

# M

**M.D** [2] - 3:8, 126:10
**madame** [1] - 32:17
**Magnani** [1] - 1:19
**MAGNANI** [8] - 64:6, 68:13, 69:6, 70:7, 70:22, 71:2, 71:20, 160:12
**maids** [1] - 156:12
**mail** [138] - 22:17, 22:19, 22:21, 22:22, 23:1, 23:7, 23:10, 23:14, 24:20, 24:21, 24:22, 24:23, 41:5, 41:6, 53:23, 53:24, 55:22, 55:23, 55:25, 56:2, 63:13, 64:1, 67:5, 67:7, 67:10, 67:11, 67:18, 73:6, 73:9, 75:22, 76:6, 78:13, 78:15, 78:19, 78:22, 78:24, 79:23, 80:2, 80:5, 80:8, 80:9, 80:13, 80:22, 81:2, 81:20, 81:25, 82:15, 82:17, 83:8, 84:7, 85:7, 90:5, 90:7, 90:8, 90:10, 90:11, 90:24, 91:6, 91:9, 91:12, 91:15, 91:21, 91:25, 92:6, 92:9, 93:8, 93:10, 93:12, 93:18, 93:20, 93:21, 93:25, 94:6, 94:8, 94:9, 94:11, 94:14, 94:16, 94:18, 94:23, 94:24, 95:1, 95:5, 95:8, 95:10, 95:12, 95:18, 95:19, 95:24, 96:2, 96:10, 96:20, 96:23, 96:24, 96:25, 97:2, 97:5, 97:7, 98:4, 98:5, 98:13, 98:14, 98:19, 99:6, 99:7, 99:8, 99:19, 99:20, 100:12, 100:19, 100:22, 100:25, 101:2, 102:4, 104:22, 106:19, 106:20, 106:22, 106:25, 108:3, 110:17, 112:11, 115:23, 115:25, 116:1, 120:20, 120:23, 121:2, 121:3, 121:7, 121:14, 122:8, 122:20, 122:21
**mails** [40] - 22:24, 25:7, 25:12, 40:24, 52:22, 53:10, 53:15, 53:16, 81:9, 81:12, 81:18, 85:10, 85:17, 86:6, 86:12, 86:19, 86:24, 87:3, 87:20, 87:24, 88:3, 88:13, 88:18, 89:13, 89:19, 89:24, 90:2, 90:17, 91:11, 91:12, 92:20, 94:19, 96:16, 98:21, 113:1, 119:9, 122:4, 122:20
**mails'** [1] - 88:9
**main** [2] - 123:12, 140:13
**male** [1] - 132:11
**man** [1] - 132:8

**man/well** [1] - 132:10
**manage** [1] - 24:4
**managed** [1] - 24:21
**manager** [1] - 33:1
**MANAGER** [8] - 4:5, 72:3, 109:17, 125:6, 129:7, 154:14, 154:18, 154:21
**managers** [1] - 35:4
**mange** [1] - 25:1
**manner** [5] - 6:22, 9:21, 20:8, 24:9, 138:10
**March** [1] - 41:5
**Mark** [2] - 55:23, 70:10
**mark** [9] - 40:18, 45:25, 52:20, 55:21, 67:1, 75:20, 90:13, 93:3, 128:15
**marked** [16] - 10:2, 10:9, 11:9, 15:4, 15:11, 40:22, 73:5, 93:4, 97:23, 98:5, 101:22, 131:19, 135:18, 139:10, 147:13, 154:25
**marking** [3] - 131:13, 134:10, 136:16
**mask** [3] - 4:17, 33:21, 126:5
**Massey** [1] - 26:10
**matches** [1] - 7:24
**material** [1] - 30:11
**matter** [11] - 30:8, 40:13, 50:16, 60:25, 61:4, 84:10, 100:6, 108:18, 117:15, 124:18, 164:13
**matters** [2] - 55:1, 118:6
**McCord** [1] - 26:10
**MD5** [2] - 7:18, 7:23
**mean** [38] - 27:21, 30:3, 31:3, 32:9, 42:10, 48:6, 69:12, 69:15, 70:3, 78:19, 79:16, 83:17, 83:21, 98:18, 102:21, 103:16, 110:4, 111:6, 113:6, 113:12, 113:15, 114:10, 114:11, 115:21, 115:23, 116:7, 117:1, 117:6, 118:11, 118:15, 118:21, 123:13, 123:14, 131:1, 142:20, 144:19, 155:20, 160:17
**meaning** [1] - 23:4
**means** [7] - 74:1, 76:2, 81:20, 111:20, 131:3, 147:15, 163:10
**meant** [1] - 103:19
**measures** [2] - 7:13, 139:23
**mechanical** [1] - 2:15
**media** [1] - 6:24
**medical** [30] - 44:20, 44:21, 58:8, 58:9, 65:3, 126:17, 128:3, 129:22, 129:23, 129:24, 130:3, 132:20, 133:8, 134:17, 136:23, 136:25, 143:9, 143:21, 150:13, 150:18, 150:20, 150:22, 151:12, 151:24, 153:4, 154:3, 154:10, 155:19, 156:1, 159:10
**medicine** [2] - 127:2, 127:4
**medicines** [1] - 145:10
**meet** [4] - 37:11, 39:17, 45:2, 119:13
**meeting** [5] - 44:12, 51:20, 51:24, 65:5, 151:10
**member** [10] - 22:1, 27:23, 41:9, 41:13, 41:15, 82:6, 82:10, 90:11, 140:14, 144:22
**members** [1] - 82:2

**memories** [1] - 130:19
**memory** [17] - 22:16, 60:13, 74:15, 134:2, 137:25, 138:15, 138:22, 139:24, 141:5, 142:23, 149:17, 150:10, 156:6, 156:9, 156:18, 157:15, 159:2
**mental** [18] - 44:9, 44:13, 59:6, 59:11, 60:19, 60:21, 62:3, 62:19, 62:23, 78:7, 129:20, 133:16, 137:25, 155:25, 156:5, 156:8, 158:1, 158:12
**Mental** [3] - 139:15, 139:21, 145:2
**mentioned** [9] - 6:13, 21:1, 21:12, 87:16, 106:22, 130:17, 132:14, 140:25, 144:20
**merits** [1] - 115:24
**met** [13] - 27:7, 37:13, 37:16, 37:22, 39:13, 39:19, 39:21, 39:23, 39:24, 40:2, 44:15, 44:16, 136:22
**metabolic** [1] - 127:19
**metadata** [1] - 122:24
**Methodist** [1] - 41:17
**middle** [1] - 129:19
**might** [15] - 29:23, 30:4, 32:9, 53:4, 68:7, 70:12, 71:1, 80:19, 92:10, 92:13, 108:22, 108:23, 117:22, 123:1, 129:5
**mild** [2] - 158:5, 158:6
**milestones** [1] - 17:8
**Miller** [4] - 2:12, 164:11, 164:15, 164:16
**million** [5] - 36:3, 36:7, 36:9, 75:16, 76:1, 77:17, 78:1
**mind** [3] - 101:18, 108:21, 158:20
**mine** [1] - 131:6
**Mini** [3] - 139:15, 139:21, 145:2
**mini** [1] - 129:19
**Mini-Mental** [3] - 139:15, 139:21, 145:2
**minute** [3] - 108:21, 127:21, 160:25
**minutes** [13] - 30:4, 108:18, 108:22, 109:6, 109:15, 109:24, 110:3, 119:11, 124:7, 124:8, 124:9, 138:8, 141:25
**minutia** [1] - 153:6
**misplaced** [1] - 105:25
**miss** [1] - 140:6
**missed** [1] - 21:17
**misspeak** [1] - 71:20
**misspoke** [1] - 132:2
**misstating** [1] - 83:23
**mobile** [1] - 21:11
**moment** [3] - 26:14, 105:4, 120:6
**Monday** [6] - 119:13, 119:15, 121:14, 160:15, 160:24, 161:18
**money** [1] - 77:20
**monies** [1] - 54:5
**months** [2] - 56:6, 60:14
**morning** [6] - 33:12, 112:24, 118:4, 124:3, 162:11, 163:1
**Moss** [3] - 53:20, 63:13, 63:16
**most** [6] - 115:3, 116:14, 138:11, 138:15, 155:7, 155:16
**motives** [1] - 123:14

**move** [17] - 49:4, 49:11, 51:2, 53:1, 53:5, 76:17, 76:18, 81:5, 87:11, 89:15, 90:22, 104:3, 104:24, 112:2, 112:21, 115:12, 128:9
**movement** [1] - 146:3
**moving** [2] - 67:17, 112:17
**MR** [247] - 4:9, 4:22, 10:3, 10:6, 10:7, 10:8, 11:23, 11:24, 14:10, 14:16, 17:2, 17:6, 25:17, 25:18, 26:14, 26:17, 27:15, 27:17, 29:2, 29:5, 29:8, 29:11, 29:14, 29:21, 29:25, 30:6, 30:8, 30:11, 30:15, 30:22, 31:1, 31:24, 32:3, 32:8, 32:20, 32:23, 33:4, 33:6, 33:10, 33:25, 34:9, 39:5, 39:7, 39:12, 40:5, 40:8, 40:17, 40:21, 40:23, 42:24, 43:6, 46:5, 46:6, 46:7, 46:8, 48:11, 48:13, 48:23, 49:5, 49:12, 54:20, 54:24, 56:24, 57:4, 63:8, 63:10, 64:4, 64:6, 64:7, 64:11, 67:1, 67:4, 68:6, 68:8, 68:12, 68:13, 68:17, 68:25, 69:6, 69:11, 69:19, 69:22, 69:25, 70:6, 70:7, 70:16, 70:22, 71:2, 71:6, 71:17, 71:20, 72:6, 72:10, 72:12, 74:18, 75:2, 76:21, 76:25, 81:7, 81:8, 84:2, 85:22, 85:24, 89:2, 89:7, 89:9, 89:15, 89:17, 90:13, 90:16, 91:3, 91:5, 92:3, 92:5, 92:16, 92:21, 93:2, 93:5, 96:5, 96:6, 97:17, 99:23, 99:25, 100:3, 100:10, 100:13, 100:20, 101:4, 101:21, 102:2, 104:24, 106:2, 106:4, 107:22, 107:25, 108:7, 108:10, 108:17, 109:2, 109:12, 109:21, 110:6, 110:12, 110:13, 111:17, 112:1, 112:22, 112:24, 113:13, 113:20, 114:7, 114:18, 114:25, 116:11, 118:1, 118:14, 118:25, 119:4, 119:7, 119:12, 119:22, 120:4, 120:16, 121:2, 121:10, 121:13, 121:20, 121:24, 122:18, 123:8, 124:4, 124:11, 124:14, 124:16, 124:22, 124:24, 125:2, 125:9, 125:15, 126:9, 126:13, 127:25, 128:9, 128:15, 128:18, 129:2, 129:8, 129:11, 129:12, 130:6, 130:8, 130:10, 130:11, 130:13, 130:16, 131:13, 131:18, 131:20, 134:1, 134:4, 134:5, 134:10, 134:14, 135:18, 135:21, 136:10, 136:13, 136:16, 136:19, 138:24, 139:2, 139:5, 139:7, 141:8, 141:11, 141:13, 154:16, 154:19, 154:22, 154:23, 157:16, 157:21, 159:17, 159:20, 159:22, 160:7, 160:10, 160:12, 160:16, 160:19, 161:2, 161:5, 161:9, 161:13, 161:20, 161:21, 161:25, 162:4, 162:14, 162:15, 162:16, 162:17, 163:2, 163:21, 164:1, 164:5, 164:6
**MS** [62] - 14:13, 17:4, 25:16, 26:20, 26:24, 27:23, 28:5, 28:6, 28:24, 31:5, 32:25, 33:3, 34:4, 39:8, 42:25, 43:3, 54:22, 57:1, 64:8, 69:2, 69:10, 69:13, 74:20, 76:23, 92:18, 92:22, 97:20, 97:22, 98:2, 98:8, 98:9, 99:2, 99:4,

100:8, 100:11, 100:14, 100:17, 100:23, 101:1, 101:9, 101:12, 101:16, 101:22, 102:3, 102:22, 103:15, 103:19, 103:22, 104:6, 104:16, 104:19, 105:2, 105:24, 106:3, 106:5, 106:7, 107:20, 108:1, 108:5, 111:9, 112:6, 112:19
**multi** [2] - 19:2, 24:8
**multi-step** [1] - 24:8
**multiple** [2] - 139:23, 140:1
**must** [2] - 40:12, 163:12
**mystery** [1] - 122:19

## N

**Nalley** [2] - 26:8, 63:17
**name** [15] - 4:23, 4:24, 4:25, 24:22, 24:24, 34:10, 43:22, 45:5, 46:9, 46:13, 46:16, 54:10, 126:15, 142:21
**names** [3] - 156:10, 156:11, 156:14
**narrative** [2] - 12:1, 12:4, 16:1
**narrow** [1] - 133:9
**nature** [1] - 23:22
**NE** [1] - 1:21
**necessary** [2] - 124:9, 163:20
**need** [29] - 32:5, 53:4, 70:22, 71:10, 74:24, 81:5, 104:3, 105:4, 108:20, 109:8, 109:14, 113:25, 115:14, 116:18, 117:2, 117:6, 122:15, 123:6, 124:2, 124:9, 128:12, 133:14, 140:10, 146:22, 148:24, 153:13, 155:9, 161:17
**needed** [3] - 24:17, 112:18, 127:24
**needing** [1] - 7:10
**needs** [4] - 84:25, 115:10, 116:4, 140:12
**negative** [1] - 133:12
**neglected** [1] - 18:8
**neighborhood** [1] - 21:6
**Nemelka** [5] - 88:11, 88:16, 88:21, 88:24, 89:10
**Nemelka's** [1] - 89:14
**network** [1] - 21:10
**neurologic** [7] - 132:24, 133:16, 133:25, 135:16, 136:5, 136:8, 147:14
**neurological** [3] - 134:8, 141:6, 143:14
**neurologist** [5] - 127:15, 127:19, 146:22, 146:25, 147:20
**never** [6] - 27:7, 55:13, 85:19, 87:16, 88:8, 116:23
**New** [2] - 2:8, 142:12
**new** [5] - 115:11, 115:12, 138:8, 150:16, 156:11
**next** [15] - 4:7, 65:16, 84:16, 87:25, 108:12, 110:2, 110:3, 113:24, 125:10, 125:14, 127:22, 138:5, 161:8, 161:10
**nice** [3] - 99:1, 131:1, 131:2
**night** [6] - 37:11, 39:13, 63:21, 63:22, 119:15, 119:17
**night's** [1] - 80:7
**NO** [1] - 1:3
**no's** [1] - 143:13

**nobody** [1] - 124:7
**nonprosecution** [1] - 28:21
**normal** [5] - 24:9, 133:11, 140:4, 150:8, 155:21
**normally** [2] - 80:19, 146:2
**Norman** [3] - 26:8, 29:9, 34:11
**NORMAN** [2] - 3:5, 34:6
**notation** [4] - 146:8, 147:1, 147:20, 147:21
**note** [2] - 146:23, 159:6
**noted** [3] - 133:2, 145:24, 146:17
**notes** [3] - 46:1, 149:3, 158:14
**nothing** [4] - 49:19, 123:18, 141:8, 148:6
**notice** [4] - 70:9, 133:20, 133:24, 147:2
**noticed** [2] - 136:6, 146:16, 147:18
**NOVEMBER** [1] - 1:6, 4:2
**November** [40] - 43:9, 43:10, 49:8, 51:16, 51:17, 51:18, 51:25, 52:2, 52:8, 52:23, 53:8, 53:11, 53:12, 53:13, 53:23, 55:14, 58:20, 59:5, 59:7, 59:10, 59:13, 59:16, 59:20, 59:25, 60:7, 60:16, 60:19, 66:4, 66:6, 66:7, 75:5, 75:6, 77:13, 77:19, 78:6, 91:7, 106:9, 106:14
**number** [13] - 6:10, 7:17, 19:6, 19:7, 36:1, 36:10, 46:5, 76:14, 76:15, 77:25, 127:23, 153:3, 157:17
**numbered** [1] - 148:9
**numbers** [2] - 52:12, 87:12
**NY** [1] - 2:8

## O

**oath** [4] - 84:6, 84:12, 84:14, 90:1
**object** [1] - 100:7
**objection** [46] - 14:12, 14:13, 14:14, 17:3, 17:4, 17:5, 27:15, 31:15, 42:25, 43:1, 43:2, 43:3, 43:4, 54:21, 54:23, 56:25, 57:1, 57:2, 64:8, 64:9, 69:1, 69:2, 69:3, 74:19, 74:20, 76:23, 76:24, 92:17, 92:18, 97:20, 97:21, 99:23, 101:5, 101:8, 108:6, 108:7, 108:8, 128:10, 130:8, 134:1, 136:13, 136:14, 139:1, 139:2, 157:16, 157:20
**objections** [2] - 54:22, 130:9
**obli** [1] - 6:16
**obscured** [2] - 21:18, 23:18
**observations** [1] - 58:11
**observe** [2] - 147:24, 147:25
**observed** [4] - 145:23, 146:16, 148:3
**observes** [1] - 7:19
**obtain** [2] - 25:1, 25:4
**obtained** [1] - 6:10
**obvious** [1] - 135:10
**obviously** [3] - 108:13, 122:19, 162:1
**occasions** [1] - 93:22
**occurred** [1] - 19:10
**OF** [2] - 1:1, 1:3
**offer** [21] - 14:11, 17:2, 42:24, 54:20,

56:24, 64:4, 64:7, 68:25, 74:18, 76:21, 92:16, 97:19, 101:9, 101:13, 108:2, 116:11, 119:12, 124:15, 130:7, 136:11, 138:25
**offered** [7] - 100:3, 100:6, 100:16, 101:21, 110:17, 113:20, 116:15
**offering** [7] - 100:9, 100:15, 100:18, 100:19, 101:15, 101:16, 112:9
**office** [3] - 61:13, 131:10, 131:25
**officer** [3] - 82:5, 82:7, 82:8
**officers** [1] - 52:17
**offices** [1] - 114:16
**official** [3] - 8:15, 66:10, 66:11
**officially** [2] - 8:19, 8:21
**offshore** [8] - 9:7, 9:15, 9:18, 11:13, 11:19, 12:6, 12:23, 13:16
**often** [4] - 8:18, 144:13, 144:17, 153:13
**old** [6] - 34:24, 129:22, 136:24, 138:6, 149:18, 150:14
**older** [1] - 150:13
**omit** [1] - 57:7
**on-site** [1] - 8:6
**once** [7] - 14:20, 24:19, 80:5, 81:15, 87:16, 123:20, 127:16
**one** [82] - 8:2, 12:25, 13:1, 15:7, 19:14, 22:1, 22:18, 27:12, 28:7, 28:8, 32:20, 37:10, 37:13, 37:16, 42:15, 44:17, 49:1, 53:3, 54:13, 55:11, 55:23, 56:3, 60:11, 67:12, 68:2, 68:10, 68:14, 71:21, 79:4, 82:2, 82:22, 84:22, 90:19, 90:25, 92:11, 92:15, 108:8, 109:2, 109:3, 110:14, 111:14, 111:19, 112:16, 113:2, 113:3, 114:7, 114:10, 114:17, 114:18, 115:3, 115:4, 115:5, 115:8, 115:25, 120:7, 121:14, 127:23, 129:3, 129:23, 132:20, 137:2, 137:5, 137:6, 137:8, 140:5, 142:3, 142:15, 147:2, 147:11, 150:16, 151:1, 151:10, 151:11, 152:15, 156:12, 157:17, 163:5
**ones** [4] - 20:24, 21:22, 121:25, 140:10
**ongoing** [2] - 7:10, 25:13
**open** [2] - 23:20, 161:17
**opened** [1] - 14:22
**operates** [1] - 22:23
**opine** [1] - 27:4
**opinion** [2] - 100:5, 110:24
**opinions** [1] - 73:20
**opportunity** [4] - 9:17, 70:14, 101:7, 163:19
**opposite** [1] - 153:7
**option** [3] - 116:12, 122:18, 162:1
**order** [6] - 48:24, 108:19, 109:9, 113:6, 120:6, 150:24
**ordered** [2] - 25:9, 112:24
**orders** [1] - 120:5
**ordinarily** [2] - 48:23, 117:8
**oriented** [1] - 133:17
**original** [13] - 7:11, 7:20, 7:22, 7:24, 118:9, 118:25, 120:23, 121:3, 121:12, 122:1, 122:19, 122:21, 163:9

**otherwise** [2] - 104:15, 130:14
**ought** [1] - 156:11
**ourselves** [2] - 113:21, 119:17
**outside** [5] - 29:11, 33:7, 75:15, 109:4
**overall** [1] - 133:17
**own** [4] - 20:24, 69:13, 77:2, 139:15
**ownership** [2] - 56:12, 56:19

## P

**p.m** [9] - 1:5, 4:3, 72:2, 92:7, 93:9, 164:8
**package** [1] - 75:16
**page** [38] - 11:7, 11:23, 11:25, 12:4, 15:18, 15:19, 41:2, 47:11, 49:17, 51:2, 53:23, 75:21, 76:8, 84:21, 84:22, 85:25, 87:8, 87:25, 90:20, 91:4, 91:23, 92:4, 98:24, 99:13, 102:14, 129:19, 132:5, 132:22, 132:23, 132:24, 137:24, 139:9, 139:10, 148:8, 154:13, 154:24, 156:5
**pages** [2] - 57:24, 128:23
**paid** [1] - 36:11
**pain** [1] - 135:6
**paper** [3] - 19:6, 93:10, 154:4
**paragraph** [5] - 12:12, 12:25, 47:11, 51:8, 73:16
**parameters** [1] - 122:3
**pardon** [1] - 80:21
**parenthesis** [3] - 13:9, 63:22
**park** [1] - 160:7
**Parkinson's** [22] - 43:16, 45:14, 46:21, 47:4, 49:6, 102:17, 104:11, 104:21, 105:12, 106:10, 106:15, 106:21, 112:12, 146:3, 146:11, 146:15, 146:16, 147:6, 147:19, 148:4, 149:7, 149:11
**Parkinsonism** [2] - 145:23, 146:25
**part** [15] - 5:8, 5:11, 6:8, 15:15, 32:17, 67:25, 113:22, 120:22, 121:12, 121:18, 121:21, 122:1, 123:11, 155:22, 157:3
**Part** [1] - 15:19
**participated** [1] - 21:23
**particular** [6] - 13:1, 113:10, 118:25, 145:19, 151:20, 163:16
**parties** [4] - 109:24, 113:8, 113:17, 163:6
**partner** [2] - 16:7, 16:20
**partners** [1] - 151:11
**Partners** [1] - 12:17
**partnership** [3] - 13:3, 13:4, 16:12
**parts** [4] - 23:14, 35:13, 132:11, 140:1
**party** [1] - 151:2
**pass** [1] - 8:20
**passengers** [1] - 26:7
**password** [1] - 94:4
**passwords** [2] - 23:5, 24:13
**past** [1] - 27:13
**pastor** [1] - 41:16
**patience** [2] - 125:19, 164:4

**patient** [17] - 126:19, 126:22, 127:16, 130:18, 130:22, 131:5, 135:7, 138:8, 139:18, 140:14, 140:15, 141:1, 142:1, 142:8, 145:6, 148:21, 159:14
**patient's** [1] - 151:21
**patients** [12] - 125:20, 131:2, 140:9, 142:25, 153:3, 153:8, 155:20, 155:21, 158:4, 158:9, 160:3, 160:22
**pay** [3] - 140:17, 144:22, 162:22
**paying** [2] - 38:9, 38:12
**payouts** [1] - 36:13
**pays** [2] - 38:10, 142:9
**pea** [1] - 137:15
**pending** [1] - 68:15
**people** [19] - 11:3, 113:2, 117:24, 118:3, 118:17, 120:7, 132:9, 133:8, 142:13, 144:22, 153:1, 155:22, 156:2, 156:10, 157:5, 158:14, 158:15, 158:18, 158:23
**per** [1] - 11:21
**percent** [5] - 36:4, 36:11, 56:19, 155:7, 155:16
**perfectly** [5] - 67:21, 68:21, 73:1, 101:25, 110:16
**perhaps** [2] - 69:7, 154:8
**period** [1] - 50:11
**permission** [3] - 40:5, 40:19, 40:20
**Permit** [1] - 24:22
**PERMIT** [1] - 24:22
**perseverating** [1] - 140:21
**persist** [1] - 148:13
**persisted** [1] - 149:3
**persists** [1] - 148:23
**person** [14] - 79:8, 82:20, 83:8, 108:16, 114:13, 114:14, 116:14, 116:18, 116:19, 117:2, 120:18, 122:10, 123:18
**personal** [5] - 27:9, 116:19, 117:3, 139:15, 154:9
**personally** [2] - 21:23, 34:21
**personnel** [1] - 52:14
**pertain** [2] - 10:12, 10:16
**pertaining** [2] - 11:20, 11:21
**PETER** [2] - 3:2, 4:19
**Peter** [2] - 4:10, 4:25
**phenomena** [1] - 156:11
**phone** [1] - 6:23
**phones** [2] - 5:22, 21:11
**physical** [14] - 7:11, 8:8, 132:9, 132:11, 132:18, 133:3, 133:4, 133:11, 136:3, 142:2, 144:4, 144:5, 145:19, 155:25
**physically** [2] - 6:25, 7:4
**physicals** [1] - 151:4
**physicians** [3] - 44:18, 144:13, 144:17
**pick** [5] - 114:17, 122:6, 144:4, 145:11, 153:9
**picked** [2] - 120:13
**piece** [1] - 93:10
**pill** [1] - 146:1
**pill-rolling** [1] - 146:1
**place** [6] - 79:2, 79:9, 79:12, 79:21,

114:10, 151:20
**places** [1] - 131:7
**plan** [1] - 71:5
**planning** [1] - 64:15
**plans** [1] - 115:12
**platform** [1] - 151:24
**play** [2] - 103:12, 158:18
**playing** [1] - 110:16
**plenty** [1] - 155:20
**pocket** [3] - 62:13, 129:21, 139:16
**Point** [6] - 13:16, 14:4, 14:6, 16:17, 16:20, 31:17
**point** [26] - 8:10, 9:9, 13:12, 13:13, 13:15, 13:22, 13:25, 14:21, 16:3, 16:5, 25:1, 25:4, 36:5, 41:12, 49:4, 49:10, 65:1, 79:6, 86:16, 89:14, 96:4, 129:3, 130:6, 136:10, 138:24, 157:17
**pointed** [1] - 139:9
**pointing** [2] - 132:6, 153:25
**Points** [1] - 14:19
**Police** [3] - 20:4, 20:13, 21:24
**policy** [11] - 79:1, 79:2, 79:9, 79:12, 79:21, 83:2, 83:8, 83:10, 85:10, 85:12, 86:6
**pool** [3] - 160:21, 161:4, 161:7
**poorer** [1] - 156:9
**populate** [1] - 143:25
**portion** [6] - 53:4, 56:10, 75:4, 77:3, 77:15, 136:3
**portions** [1] - 136:5
**position** [7] - 5:25, 30:20, 31:2, 31:23, 31:24, 34:14, 154:4
**possible** [4] - 71:16, 116:11, 137:1, 137:5
**potential** [5] - 65:6, 86:13, 108:11, 137:21, 141:5
**power** [3] - 52:5, 158:21, 158:24
**practice** [7] - 8:5, 127:1, 127:4, 133:8, 138:4, 142:24, 153:15
**practices** [1] - 142:13
**practitioner** [1] - 126:25
**preadmitted** [1] - 25:15
**predicted** [2] - 67:20, 68:19
**predominantly** [2] - 8:5, 20:3
**prefer** [3] - 70:8, 114:4, 160:24
**preference** [1] - 71:14
**prepare** [6] - 36:20, 37:7, 37:21, 39:15, 39:23, 39:25
**prepared** [2] - 71:11, 110:10
**prepopulated** [5] - 132:14, 132:15, 132:16, 143:10, 143:15
**prepopulates** [3] - 132:11, 133:17, 133:18
**prepopulation** [1] - 143:20
**presence** [2] - 20:1, 20:3
**present** [2] - 50:12, 163:10
**preserve** [2] - 6:22, 7:1
**preserved** [1] - 7:9
**president** [6] - 35:22, 64:17, 107:5,

107:11, 107:15, 107:18
**pressuring** [1] - 29:23
**pretty** [8] - 9:8, 66:20, 116:8, 142:21, 156:15, 157:12, 157:23, 160:9
**previous** [4] - 12:4, 50:8, 146:5, 146:15
**previously** [3] - 9:19, 11:3, 147:18
**primarily** [2] - 9:7, 115:3
**primary** [6] - 115:6, 127:5, 127:7, 144:12, 144:17, 148:20
**print** [1] - 149:25
**private** [2] - 22:19, 22:20
**privileged** [1] - 25:9
**problem** [15] - 33:5, 69:11, 102:19, 102:21, 106:1, 106:22, 111:5, 112:15, 112:16, 116:21, 125:13, 126:4, 158:13, 160:2, 161:22
**problems** [8] - 49:15, 58:9, 86:13, 102:18, 146:19, 146:20, 146:21, 156:14
**proceed** [3] - 26:22, 33:24, 126:8
**proceeding** [1] - 50:21
**proceedings** [2] - 2:15, 31:13, 164:12
**Proceedings** [3] - 72:2, 109:16, 125:5
**process** [15] - 5:23, 6:21, 7:15, 24:8, 25:9, 25:11, 42:13, 111:13, 111:14, 111:16, 116:23, 140:16, 143:3, 152:12, 158:12
**processes** [2] - 65:3, 137:25, 156:5, 156:8, 158:1
**processing** [1] - 140:23
**produce** [2] - 96:25, 122:21
**produced** [10] - 2:16, 121:11, 121:14, 121:21, 123:12, 123:17, 123:21, 129:25, 138:21, 152:6
**production** [4] - 96:16, 96:18, 96:21, 121:12
**professional** [1] - 58:8
**program** [13] - 5:5, 5:14, 6:9, 9:12, 9:15, 9:16, 9:24, 10:17, 10:20, 11:1, 11:2, 32:12, 122:5
**progress** [1] - 140:22
**projects** [1] - 49:19
**promise** [1] - 120:4
**promoted** [1] - 64:17
**proper** [1] - 123:19
**properly** [1] - 140:23
**prosecution** [4] - 9:18, 9:21, 27:24, 28:11
**protect** [4] - 40:9, 40:12, 40:15, 97:5
**protected** [2] - 31:11, 31:19
**protecting** [5] - 41:25, 42:9, 42:21, 60:25, 61:4
**protections** [1] - 31:11
**proud** [1] - 154:6
**provide** [2] - 9:17, 39:22
**provided** [3] - 24:14, 118:2, 157:25
**provider** [1] - 5:20
**psychiatric** [9] - 132:25, 133:25, 134:8, 135:16, 136:5, 136:8, 141:6, 143:13, 147:15

**public** [6] - 32:5, 32:11, 43:17, 45:15, 45:23, 49:8
**pulled** [1] - 96:10
**purpose** [6] - 11:17, 44:8, 44:12, 44:13, 58:14, 103:20
**purposefully** [3] - 97:7, 97:11, 97:15
**purposely** [1] - 57:7
**purposes** [4] - 44:10, 70:21, 102:20, 132:13
**push** [2] - 109:1, 160:14
**pushing** [2] - 33:13, 110:10
**put** [21] - 10:1, 15:5, 15:8, 30:9, 30:15, 41:2, 52:24, 57:24, 63:8, 73:4, 75:15, 79:8, 84:22, 103:16, 111:21, 114:9, 128:6, 128:16, 132:10, 133:20, 143:17
**putting** [3] - 67:6, 135:18, 149:14

**Q**

**qualified** [2] - 10:19, 27:4
**quantify** [1] - 20:14
**questioned** [1] - 84:6
**questioner** [1] - 88:7
**questioning** [1] - 68:1
**questionnaire** [2] - 129:20, 139:16
**questions** [19] - 12:12, 25:20, 26:17, 28:17, 28:24, 29:3, 53:4, 60:4, 60:8, 60:11, 97:17, 99:5, 107:20, 117:2, 123:3, 134:15, 140:23, 146:19, 159:17
**quickly** [4] - 108:25, 122:16, 128:23, 141:17
**quite** [3] - 19:6, 125:23, 154:6

**R**

**raise** [3] - 33:16, 68:14, 125:24
**raised** [1] - 129:2
**range** [3] - 25:25, 36:1, 127:4
**rank** [4] - 78:16, 79:22, 80:1, 80:14
**rank-and-file** [2] - 80:1, 80:14
**rather** [5] - 8:22, 11:3, 53:2, 71:14, 106:5
**re** [1] - 36:16
**reached** [1] - 162:18
**react** [2] - 67:21, 68:20
**read** [21] - 16:10, 46:14, 47:9, 51:9, 53:3, 54:5, 63:12, 67:25, 76:16, 85:14, 86:10, 87:11, 87:12, 88:5, 91:25, 103:4, 103:18, 110:25, 152:22, 153:17
**reading** [3] - 53:2, 85:3, 127:24
**ready** [10] - 26:22, 33:24, 70:15, 70:16, 72:5, 126:8, 129:1, 161:4, 161:5, 162:6
**real** [3] - 30:19, 120:6, 156:14
**realize** [1] - 112:5
**really** [16] - 37:25, 111:1, 111:11, 115:14, 120:12, 123:6, 123:7, 155:8, 156:4, 156:25, 157:2, 158:16, 159:5, 159:14, 163:18
**reason** [22] - 55:16, 58:17, 58:21, 59:5,

60:18, 62:3, 62:18, 64:19, 65:13, 78:7, 84:18, 94:10, 94:22, 95:1, 95:13, 95:14, 95:17, 95:21, 95:25, 104:17, 122:1, 122:14
**reasons** [4] - 8:7, 44:16, 59:10, 64:12
**recalled** [1] - 108:15
**receive** [9] - 16:25, 36:11, 80:13, 94:19, 94:23, 95:1, 95:21, 96:1, 116:24
**received** [18] - 5:17, 5:20, 10:24, 13:18, 13:19, 14:2, 14:18, 28:22, 68:6, 80:6, 92:24, 93:18, 95:3, 95:7, 95:10, 100:19, 116:20, 119:8
**receiving** [3] - 22:23, 93:20, 116:1
**recently** [3] - 36:25, 37:1, 49:19
**recess** [2] - 72:1, 109:15
**Recessed** [1] - 164:8
**recessed** [3] - 72:2, 109:16, 125:5
**recipient** [1] - 122:7
**recipients** [1] - 22:24
**recognize** [10] - 10:10, 11:8, 15:22, 93:6, 128:24, 129:16, 131:21, 136:20, 139:12, 158:10
**recollection** [26] - 46:9, 46:12, 46:16, 91:20, 100:10, 100:11, 100:18, 101:5, 101:17, 101:20, 103:2, 103:3, 103:7, 103:21, 103:24, 104:8, 104:10, 105:18, 106:20, 108:4, 111:20, 111:24, 131:9, 141:3, 159:7, 159:9
**record** [38] - 4:23, 32:16, 32:18, 33:25, 34:3, 34:10, 90:15, 92:19, 101:15, 103:5, 103:17, 105:23, 110:18, 126:15, 129:22, 129:23, 133:21, 134:2, 134:3, 134:9, 135:24, 136:2, 138:13, 143:21, 145:15, 145:22, 145:24, 146:17, 147:7, 148:1, 149:8, 149:13, 150:20, 151:16, 151:24, 152:2, 159:10, 164:12
**recorded** [1] - 2:15
**recording** [2] - 48:21, 145:6
**records** [35] - 16:25, 17:17, 18:10, 32:18, 129:24, 130:3, 130:20, 131:11, 131:24, 134:6, 134:17, 134:21, 135:14, 136:24, 136:25, 138:17, 138:20, 138:23, 143:9, 144:1, 145:14, 149:15, 149:17, 149:18, 149:25, 150:1, 150:7, 150:8, 150:11, 150:13, 150:22, 151:12, 155:19
**recovery** [1] - 6:8
**recurrent** [1] - 148:19
**redacted** [4] - 31:21, 121:16, 121:17, 121:21
**redfish@permit.com** [1] - 24:24
**redirect** [1] - 159:19
**refer** [4] - 54:11, 84:21, 85:25, 87:8
**reference** [4] - 14:1, 102:17, 147:6, 147:17
**referenced** [2] - 12:3, 15:24
**referral** [3] - 146:23, 147:20, 148:12
**referrals** [1] - 148:11
**referred** [2] - 7:15, 23:3

**referring** [8] - 46:20, 49:23, 54:8, 54:9, 54:16, 56:16, 63:23, 86:1
**refers** [1] - 50:2
**reflect** [3] - 134:6, 155:17, 155:19
**reflected** [2] - 138:17, 138:19
**reflects** [2] - 134:2, 136:6
**refresh** [16] - 46:9, 46:12, 46:15, 100:10, 100:11, 100:18, 101:17, 103:1, 103:3, 103:6, 103:21, 103:24, 104:7, 104:9, 105:18, 111:20
**refreshes** [2] - 106:19, 111:23
**refreshing** [5] - 101:4, 101:20, 108:4, 111:8, 111:13
**refused** [1] - 113:5
**regard** [2] - 17:13, 30:8
**regarding** [2] - 6:4, 108:19
**regular** [5] - 78:18, 80:14, 133:8, 142:2, 152:22
**reins** [1] - 64:20
**related** [4] - 10:23, 19:7, 19:17, 31:12
**relating** [7] - 6:11, 10:18, 11:13, 12:5, 16:13, 25:12, 25:13
**relationship** [10] - 12:1, 12:20, 12:22, 16:3, 17:21, 17:22, 35:11, 38:1, 38:4
**relevant** [7] - 31:12, 31:25, 32:9, 32:10, 57:10, 116:19, 128:3
**relied** [1] - 66:23
**relocated** [1] - 21:18
**rely** [1] - 112:11
**remarkable** [1] - 130:23
**remember** [24] - 45:6, 45:12, 47:16, 61:10, 61:15, 61:16, 74:16, 93:15, 95:12, 95:19, 95:23, 96:2, 115:22, 116:1, 116:2, 137:14, 140:19, 142:17, 142:20, 143:5, 147:13, 156:10, 156:12
**remembered** [1] - 154:12
**remembering** [1] - 156:14
**remembers** [4] - 100:21, 100:25, 101:2, 115:24
**remove** [2] - 7:4, 8:7
**removed** [6] - 22:15, 23:17, 23:24, 81:15, 83:9, 85:8
**removing** [1] - 7:6
**reorganization** [7] - 52:16, 64:13, 65:13, 65:20, 66:1, 66:7, 66:10
**reorganizing** [2] - 64:15, 65:14
**repeat** [1] - 139:25
**rephrase** [3] - 28:3, 134:4, 138:19
**report** [3] - 34:24, 35:2, 35:7
**reported** [4] - 35:6, 135:15, 136:7, 137:21
**reporter** [3] - 32:17, 128:14, 162:23
**REPORTER** [1] - 2:11
**REPORTER'S** [1] - 164:9
**reporting** [2] - 9:18, 157:14
**reports** [1] - 151:8
**represent** [6] - 38:21, 39:8, 39:9, 39:10, 120:16, 120:19
**representative** [1] - 116:12

**represented** [1] - 92:24
**representing** [3] - 29:17, 29:23, 69:21
**represents** [1] - 69:17
**request** [3] - 32:15, 68:7, 163:15
**requested** [3] - 16:9, 16:11, 19:20
**requirement** [1] - 76:3
**rescue** [1] - 112:8
**research** [1] - 144:12
**resided** [2] - 23:2, 23:11
**residence** [6] - 17:15, 18:7, 19:1, 22:11, 22:13, 23:18
**resides** [1] - 113:3
**resignation** [3] - 58:16, 58:20, 59:9
**resigned** [6] - 41:14, 51:4, 51:16, 51:17, 56:7, 59:7
**resigning** [1] - 51:21
**resolve** [2] - 119:21, 119:23
**respect** [7] - 85:10, 88:13, 97:14, 100:4, 143:13, 146:24, 162:10
**respectfully** [2] - 48:8, 103:13
**responding** [1] - 121:5
**response** [10] - 27:22, 41:20, 46:11, 51:6, 55:8, 63:18, 67:9, 67:15, 73:8, 129:25
**responses** [1] - 121:25
**responsible** [1] - 77:20
**responsive** [2] - 123:16, 163:15
**rest** [2] - 70:13, 161:1
**restate** [6] - 35:1, 36:16, 57:13, 61:9, 62:5, 88:10
**restaurant** [1] - 156:12
**restraining** [1] - 109:9
**restrict** [1] - 109:24
**resulted** [1] - 147:19
**results** [1] - 145:6
**retain** [1] - 8:8
**retained** [1] - 117:23
**retainer** [1] - 38:17
**retention** [1] - 117:22
**retire** [1] - 77:8
**retired** [1] - 138:5
**retirement** [1] - 77:3
**retires** [1] - 77:2
**return** [1] - 11:15
**Revenue** [2] - 5:3, 22:1
**Reverend** [1] - 102:11
**review** [9] - 25:9, 74:14, 74:16, 96:18, 120:22, 129:13, 132:18, 133:11, 133:12
**reviewed** [1] - 137:16
**reviewing** [1] - 136:2
**reviews** [1] - 132:17
**rewarding** [1] - 153:23
**Reynolds** [49] - 34:14, 34:15, 41:10, 43:8, 55:2, 58:18, 58:22, 58:25, 59:3, 65:24, 72:15, 74:3, 74:7, 77:23, 78:13, 78:14, 78:15, 79:5, 80:14, 80:22, 81:2, 81:11, 81:12, 82:3, 90:7, 90:8, 90:10, 107:2, 107:5, 107:8, 107:12, 107:16,

107:18, 121:7, 153:21, 153:22
**Reynolds's** [3] - 85:10, 86:6, 86:8
**reyrey** [1] - 99:20
**rights** [1] - 59:8
**rigidity** [1] - 146:1
**rise** [4] - 4:5, 72:3, 109:17, 125:6
**RMR** [2] - 2:12, 164:16
**rob** [2] - 63:16, 63:17
**Robert** [32] - 8:12, 9:1, 9:4, 9:5, 9:22,
   12:14, 14:8, 15:15, 17:8, 17:9, 17:10,
   26:7, 27:13, 27:17, 28:18, 30:11,
   30:12, 30:17, 31:6, 31:9, 39:9, 54:9,
   54:11, 54:16, 54:17, 67:14, 67:20,
   68:19, 73:2, 126:19
**ROBERT** [1] - 1:6
**role** [6] - 5:15, 6:19, 8:17, 20:22, 40:9,
   107:2
**rolling** [1] - 146:1
**room** [3] - 70:23, 71:3, 145:7
**Room** [2] - 1:21, 2:13
**route** [1] - 135:11
**RPR** [1] - 164:16
**rule** [1] - 110:8
**run** [7] - 35:16, 58:17, 58:21, 58:24,
   65:16, 66:3, 66:5
**Rusk** [1] - 2:13

# S

**safe** [1] - 125:1
**sales** [1] - 52:12
**Sarah** [2] - 2:7, 26:21
**sat** [1] - 113:15
**Saturday** [4] - 113:10, 113:11, 119:25,
   162:1
**save** [1] - 30:6
**saw** [8] - 12:9, 103:11, 116:23, 137:2,
   140:5, 142:7, 148:25, 149:9
**scanned** [3] - 151:21, 152:1, 152:3
**Schaefer** [2] - 86:16, 86:18
**Schaefer's** [1] - 86:22
**schedule** [6] - 113:9, 113:23, 120:1,
   161:15, 161:17, 162:6
**scheduling** [2] - 70:20, 162:23
**school** [1] - 34:22
**score** [3] - 140:3, 140:7
**Scott** [6] - 2:2, 54:1, 54:2, 109:3,
   125:15, 126:16
**SCOTT** [2] - 3:8, 126:10
**screen** [19] - 10:1, 10:9, 11:9, 15:6,
   15:8, 41:3, 63:9, 73:4, 73:12, 73:13,
   84:23, 90:19, 98:11, 129:5, 132:8,
   139:12, 154:17, 154:20
**scroll** [1] - 15:9
**SD** [2] - 22:16, 24:11
**seal** [11] - 30:16, 32:14, 32:15, 128:6,
   130:9, 130:11, 130:12, 130:14,
   136:12, 139:4, 139:5
**sealed** [6] - 30:18, 31:20, 32:16, 32:19,
   32:24, 128:13

**sealing** [2] - 32:2, 32:3
**search** [34] - 5:21, 6:14, 6:15, 6:16,
   6:17, 6:21, 6:25, 8:1, 17:14, 17:17,
   18:5, 18:9, 18:10, 18:17, 19:5, 19:15,
   19:20, 20:2, 20:16, 20:20, 21:16,
   21:19, 21:22, 21:25, 22:7, 26:3,
   108:16, 122:1, 122:2, 122:11, 122:12,
   122:13, 123:11
**searched** [4] - 22:9, 118:22, 120:22,
   163:16
**searching** [2] - 115:4, 122:4
**seated** [4] - 4:6, 72:4, 109:18, 125:7
**second** [19] - 11:7, 11:23, 11:25, 12:11,
   15:18, 15:19, 19:13, 41:2, 51:7, 53:23,
   55:23, 56:3, 67:18, 75:21, 98:24,
   99:13, 109:11, 117:20, 121:5
**Secret** [1] - 6:9
**secure** [2] - 19:17, 20:9
**see** [67] - 13:2, 13:4, 13:10, 13:13, 24:6,
   27:25, 32:5, 34:2, 34:4, 34:5, 41:6,
   49:15, 49:18, 49:20, 49:21, 53:24,
   53:25, 63:11, 84:24, 84:25, 85:2, 86:1,
   87:9, 87:12, 90:23, 91:1, 91:6, 91:24,
   91:25, 92:6, 97:8, 98:3, 98:4, 98:5,
   98:10, 98:24, 99:14, 102:4, 102:14,
   102:16, 109:8, 110:24, 121:18, 123:6,
   132:5, 132:25, 133:8, 135:17, 136:6,
   139:17, 146:22, 148:8, 148:11,
   148:12, 148:14, 148:24, 149:3,
   151:17, 151:18, 151:25, 154:25,
   157:10, 158:12, 159:13
**seeing** [2] - 73:13, 134:7
**seem** [3] - 105:24, 140:21, 157:13
**sees** [1] - 148:21
**seized** [5] - 5:17, 5:24, 8:4, 22:17, 22:18
**seizing** [1] - 20:24
**send** [2] - 110:23, 127:18
**sender** [1] - 22:24
**sending** [2] - 98:20, 146:24
**senior** [5] - 5:5, 5:13, 5:15, 82:5, 82:7
**sense** [2] - 20:19, 144:6
**sensitive** [2] - 119:24, 128:2
**sent** [14] - 13:19, 13:21, 13:23, 14:18,
   32:11, 41:5, 53:23, 55:24, 56:2, 64:1,
   95:18, 117:24, 118:3, 163:13
**sentence** [4] - 13:4, 13:6, 102:14,
   102:16
**sentence..** [1] - 106:6
**separate** [2] - 39:21, 93:22
**separately** [1] - 139:10
**separation** [1] - 54:4
**September** [15] - 8:22, 15:14, 18:3,
   18:5, 18:9, 18:18, 25:25, 26:1, 50:21,
   135:25, 137:9, 150:17, 151:16,
   151:17, 152:16
**series** [6] - 19:10, 40:24, 52:22, 53:10,
   90:17, 161:9
**serious** [1] - 156:8
**server** [15] - 22:19, 22:21, 22:22, 23:1,
   23:10, 24:20, 24:22, 78:20, 80:3,

81:13, 81:16, 83:9, 85:4, 85:8, 86:13
**servers** [3] - 22:17, 23:7, 86:8
**service** [1] - 13:21
**Service** [3] - 5:4, 6:9, 22:1
**serviced** [1] - 150:15
**Services** [3] - 20:4, 20:13, 21:24
**SESSION** [1] - 1:10
**set** [18] - 44:23, 45:6, 45:9, 81:23, 81:25,
   82:13, 82:15, 82:16, 82:20, 82:24,
   83:8, 83:10, 83:14, 84:1, 85:12,
   109:22, 126:8, 132:17
**Seth** [3] - 148:16, 149:1, 149:4
**sets** [1] - 31:25
**setting** [3] - 59:9, 82:23, 83:13
**seventh** [1] - 47:10
**several** [6] - 21:21, 22:12, 22:14, 23:2,
   39:18, 137:20
**severance** [2] - 53:19, 54:4
**severe** [1] - 140:8
**severity** [1] - 158:10
**SHA-1** [2] - 7:18, 7:23
**share** [4] - 44:19, 44:22, 57:12, 163:21
**sharp** [6] - 58:24, 59:13, 59:21, 60:1,
   60:6, 60:16
**shed** [2] - 118:18, 120:9
**sheet** [1] - 132:15
**shift** [1] - 61:6
**ship** [1] - 109:13
**short** [3] - 71:21, 111:6, 159:13
**shortly** [1] - 51:24
**show** [15] - 10:1, 11:6, 15:4, 40:17,
   45:25, 52:19, 53:3, 55:21, 56:18,
   59:19, 103:7, 103:25, 111:22, 128:6,
   139:8
**showed** [2] - 149:16, 150:6
**showing** [4] - 67:2, 101:25, 149:20,
   154:24
**shown** [4] - 104:3, 136:21, 137:2, 137:5
**shuffling** [1] - 145:25
**side** [4] - 30:18, 110:1, 114:11, 125:1
**sign** [2] - 51:21, 52:3
**signed** [1] - 63:16
**significantly** [1] - 115:17
**signing** [1] - 52:6
**signs** [7] - 51:20, 144:13, 144:18,
   144:19, 145:23, 147:19, 158:4
**similar** [6] - 121:24, 134:15, 135:22,
   149:16, 150:11
**simple** [1] - 104:12
**single** [5] - 19:3, 92:23, 133:5, 138:9,
   153:6
**single-family** [1] - 19:3
**sit** [1] - 29:20
**site** [5] - 6:17, 7:1, 8:1, 8:3, 8:6
**sitting** [3] - 70:23, 84:16, 160:23
**situation** [2] - 42:13, 73:2
**six** [1] - 13:2
**slide** [2] - 87:22, 110:18
**slightly** [2] - 73:12, 137:6

**slowly** [1] - 146:2
**small** [1] - 30:8
**Smith** [29] - 1:18, 3:3, 4:8, 8:12, 9:1, 9:4, 9:6, 9:22, 10:12, 10:19, 10:23, 11:1, 11:14, 11:21, 12:14, 12:21, 15:15, 17:9, 17:10, 17:24, 28:16, 28:18, 28:22, 29:1, 30:11, 31:6, 31:10, 32:10, 32:13
**SMITH** [43] - 4:9, 4:22, 10:3, 10:7, 10:8, 11:23, 11:24, 14:10, 14:16, 17:2, 17:6, 25:17, 25:18, 26:14, 26:17, 27:15, 27:17, 29:2, 29:5, 29:8, 30:8, 30:11, 30:15, 30:22, 31:1, 31:24, 32:3, 32:20, 32:23, 33:4, 122:18, 123:8, 124:22, 160:7, 160:10, 161:2, 161:21, 161:25, 162:14, 162:16, 163:2, 163:21, 164:1
**Smith's** [4] - 10:16, 15:25, 30:12, 30:17
**someone** [3] - 62:2, 94:10, 124:8
**sometimes** [5] - 6:13, 152:25, 155:7, 155:16, 158:9
**somewhere** [3] - 21:6, 23:20, 79:24
**soon** [2] - 80:13, 124:19
**sorry** [30] - 16:24, 18:8, 21:3, 25:3, 29:25, 33:16, 33:17, 43:1, 48:6, 50:8, 53:13, 55:10, 56:1, 69:6, 69:24, 70:19, 72:7, 98:10, 98:22, 100:23, 103:9, 105:4, 105:20, 113:14, 114:25, 118:1, 125:22, 132:2, 134:25, 155:10
**sort** [10] - 79:5, 116:13, 127:1, 135:15, 142:11, 143:13, 150:8, 150:14, 152:18, 154:3
**sought** [1] - 8:18
**sound** [5] - 6:22, 20:8, 24:9, 53:5, 155:13
**sounds** [4] - 36:10, 111:10, 129:6, 156:24
**SOUTHERN** [1] - 1:1
**spam** [8] - 90:2, 90:5, 90:8, 90:11, 91:9, 91:12, 92:9, 94:13
**Spanish** [2] - 14:6, 14:7
**speaking** [4] - 44:5, 69:16, 70:5, 72:22
**special** [4] - 5:3, 8:11, 142:12, 143:2
**specialist** [8] - 5:16, 6:1, 6:19, 8:18, 141:19, 141:21, 148:21, 148:24
**specialize** [1] - 127:13
**specialized** [1] - 6:3
**specific** [16] - 61:18, 130:19, 131:2, 135:2, 135:3, 135:7, 136:2, 138:9, 139:25, 140:21, 142:23, 145:5, 151:9, 151:13, 151:23, 158:15
**specifically** [6] - 58:1, 130:21, 137:8, 138:3, 145:25, 153:2
**specifics** [2] - 77:5, 77:6
**spell** [1] - 4:24
**spelling** [1] - 126:15
**spoken** [2] - 110:14, 127:25
**sponsor** [1] - 110:19
**stage** [2] - 144:23, 145:1
**stairMaster** [1] - 155:4
**stand** [13] - 4:15, 4:16, 27:5, 33:20,

33:21, 34:5, 71:25, 109:14, 126:3, 126:5, 130:25, 154:2, 154:7
**standing** [1] - 120:6
**standpoint** [5] - 111:19, 133:25, 134:8, 135:16, 136:8
**start** [10] - 28:4, 30:4, 64:20, 90:19, 124:20, 126:14, 160:5, 160:14, 160:15, 160:24
**started** [2] - 28:2, 71:10
**starts** [3] - 12:13, 13:3, 154:4
**state** [4] - 4:23, 7:20, 34:10, 101:18
**State** [1] - 139:21
**statement** [19] - 42:5, 47:24, 48:15, 51:14, 67:24, 68:18, 68:21, 73:24, 101:6, 101:10, 101:13, 103:16, 105:10, 105:18, 106:11, 106:15, 112:9, 144:17, 157:22
**statements** [3] - 105:7, 110:22, 157:25
**STATES** [3] - 1:1, 1:3, 1:12
**States** [1] - 4:10
**stating** [2] - 102:21, 126:14
**status** [2] - 129:20, 133:16
**Status** [2] - 139:15, 145:2
**stay** [3] - 29:22, 110:1, 124:18
**stays** [1] - 133:19
**stenography** [1] - 2:15
**step** [8] - 24:8, 67:19, 67:20, 68:19, 125:18, 149:23
**step-by-step** [1] - 149:23
**stepped** [1] - 29:15
**stepping** [1] - 65:15
**Steps** [2] - 14:7
**stick** [1] - 110:11
**sticks** [1] - 151:5
**still** [15] - 18:14, 38:24, 58:24, 66:7, 66:12, 66:15, 71:22, 79:23, 90:23, 91:1, 94:16, 95:3, 95:7, 95:11, 120:7
**stipulate** [1] - 104:25
**stipulated** [1] - 105:1
**stipulation** [2] - 39:5, 92:25
**stone** [1] - 129:11
**storage** [7] - 20:18, 21:10, 22:10, 22:18, 23:12, 24:10
**stored** [4] - 85:4, 86:6, 151:19, 151:20
**storing** [1] - 5:22
**stove** [2] - 140:18, 144:23
**streamline** [1] - 162:5
**Street** [2] - 1:21, 2:8
**strike** [3] - 47:14, 53:18, 67:16
**string** [1] - 98:19
**strong** [2] - 30:19, 59:15
**structure** [1] - 56:12
**structured** [1] - 77:2
**Stuart** [1] - 26:10
**stuff** [4] - 57:24, 152:21, 152:22, 157:6
**subject** [7] - 49:13, 92:25, 93:12, 108:11, 108:15, 108:18
**submitted** [1] - 11:16
**subpoena** [5] - 15:13, 16:8, 16:11,

16:22, 129:25
**subpoenaed** [2] - 96:8, 96:12
**subpoenas** [1] - 123:17
**subsequent** [3] - 21:22, 41:12, 151:1
**subsequently** [2] - 146:13, 149:6
**subtracted** [1] - 140:6
**successful** [1] - 153:23
**suffering** [1] - 155:13
**sufficient** [2] - 59:3, 155:4
**suggest** [1] - 147:23
**suggesting** [1] - 112:8
**suggests** [1] - 135:14
**Suite** [1] - 2:3
**summary** [2] - 70:19
**summer** [1] - 155:5
**Sunday** [1] - 119:25
**supervisors** [1] - 35:4
**supplement** [1] - 111:1
**supporting** [1] - 56:11
**supposed** [1] - 6:18
**surprised** [1] - 153:12
**sustained** [2] - 108:8, 157:20
**swear** [1] - 125:18
**sweet** [1] - 137:15
**Swiss** [1] - 32:12
**switch** [1] - 140:24
**switched** [5] - 5:14, 150:16, 150:17, 150:19, 150:20
**sworn** [8] - 4:12, 4:13, 4:20, 33:18, 34:7, 54:15, 126:1, 126:11
**symptom** [2] - 135:5, 135:15
**symptoms** [15] - 127:8, 127:10, 135:8, 136:7, 137:20, 141:5, 146:16, 147:6, 148:4, 148:12, 158:10, 158:11, 158:19, 158:21, 158:23
**synopses** [1] - 153:4
**synopsis** [1] - 138:4
**system** [31] - 23:14, 24:4, 24:7, 24:20, 25:2, 25:5, 78:13, 80:22, 81:2, 82:14, 82:15, 82:16, 82:21, 82:24, 83:14, 84:1, 84:7, 85:6, 85:19, 92:13, 99:20, 133:12, 143:15, 143:20, 149:18, 150:1, 150:4, 150:9, 150:12, 150:15
**systems** [3] - 35:15, 78:15, 132:18

# T

**tab** [2] - 127:23, 128:19
**Tamine** [2] - 18:7, 24:13
**Tamine's** [5] - 18:21, 18:25, 22:11, 22:13, 23:17
**tangentially** [1] - 113:8
**tap** [1] - 160:6
**task** [1] - 22:23
**tasks** [1] - 139:25
**tax** [2] - 9:5, 30:17
**Tax** [1] - 1:20
**taxpayer** [4] - 11:17, 31:9, 31:10, 31:19
**team** [3] - 14:3, 27:24, 113:19

**technology** [1] - 35:13
**Tel** [4] - 1:22, 2:4, 2:9, 2:14
**temporary** [1] - 109:8
**ten** [1] - 119:11
**tender** [1] - 119:5
**terabytes** [1] - 20:18
**term** [2] - 135:4, 158:5
**terminated** [3] - 9:9, 28:18, 42:18
**terminating** [1] - 42:12
**terms** [1] - 160:6
**terrible** [1] - 123:14
**test** [1] - 127:17
**testified** [17] - 4:20, 28:2, 34:7, 37:21, 75:3, 90:1, 95:6, 95:9, 95:14, 105:7, 106:18, 116:5, 126:11, 147:18, 149:14, 149:15, 152:17
**testify** [2] - 84:18, 119:15
**testifying** [1] - 157:18
**testimony** [36] - 28:19, 36:20, 37:20, 39:15, 39:23, 39:25, 45:13, 50:20, 50:22, 54:12, 54:15, 55:5, 69:8, 71:15, 80:1, 80:4, 80:12, 80:15, 81:4, 83:7, 83:10, 110:20, 110:23, 110:25, 113:16, 113:25, 114:4, 115:20, 116:9, 117:23, 120:8, 122:21, 122:23, 140:25, 150:9, 157:19
**TEXAS** [1] - 1:1
**Texas** [5] - 1:4, 2:3, 2:13, 17:15, 26:12
**text** [1] - 91:25
**THE** [215] - 1:1, 1:1, 1:11, 1:17, 2:1, 4:5, 4:6, 4:11, 4:14, 4:15, 4:18, 14:12, 14:14, 17:3, 17:5, 26:16, 26:19, 26:22, 27:16, 27:21, 28:1, 29:1, 29:4, 29:6, 29:10, 29:13, 29:16, 29:19, 29:22, 30:3, 30:10, 30:14, 30:21, 30:25, 31:3, 31:22, 32:2, 32:7, 32:15, 32:22, 32:24, 33:1, 33:5, 33:9, 33:11, 33:15, 33:17, 33:19, 33:20, 33:23, 33:24, 34:2, 39:11, 40:7, 40:20, 43:1, 43:4, 48:6, 48:12, 49:1, 49:10, 54:21, 54:23, 56:25, 57:2, 63:7, 64:9, 68:10, 68:24, 69:1, 69:3, 69:12, 69:15, 69:20, 69:24, 70:2, 71:1, 71:4, 71:8, 71:24, 72:3, 72:4, 72:7, 74:19, 74:21, 74:22, 74:23, 74:25, 76:22, 76:24, 81:5, 83:16, 83:25, 85:23, 89:3, 89:8, 92:17, 92:25, 96:3, 97:21, 99:3, 99:24, 100:2, 100:16, 100:21, 100:24, 101:3, 101:11, 101:14, 101:19, 101:24, 102:19, 102:23, 103:18, 103:20, 103:23, 104:14, 104:17, 105:1, 106:1, 107:21, 107:23, 108:3, 108:6, 108:8, 108:14, 108:20, 109:7, 109:14, 109:17, 109:18, 109:22, 110:8, 111:5, 111:10, 111:18, 112:2, 112:15, 112:20, 112:23, 113:12, 113:14, 114:5, 114:9, 114:20, 115:19, 116:18, 118:12, 118:21, 119:3, 119:10, 119:19, 120:3, 120:10, 120:25, 121:8, 121:11, 121:17, 121:23, 122:9, 123:5,

123:9, 124:6, 124:12, 124:17, 124:25, 125:3, 125:6, 125:7, 125:13, 125:17, 125:20, 125:22, 125:23, 125:24, 126:2, 126:3, 126:6, 126:7, 128:12, 129:6, 129:7, 130:9, 130:12, 130:15, 131:17, 136:14, 139:1, 139:3, 139:6, 141:10, 154:14, 154:18, 154:21, 157:19, 159:19, 159:21, 159:23, 159:25, 160:2, 160:3, 160:4, 160:8, 160:13, 160:17, 160:25, 161:3, 161:7, 161:12, 161:14, 161:24, 162:9, 163:4, 163:23, 164:3
**theirs** [1] - 149:21
**themselves** [1] - 158:14
**thereabouts** [1] - 45:18
**think's** [1] - 162:12
**thinking** [1] - 145:10
**thinks** [2] - 157:3, 157:8
**third** [8] - 21:25, 22:7, 73:16, 91:23, 92:3, 116:12, 121:6, 151:2
**third-party** [1] - 151:2
**THOMAS** [2] - 3:5, 34:6
**Thomas** [1] - 34:11
**three** [17] - 6:9, 13:2, 19:4, 56:6, 57:24, 79:19, 93:21, 94:6, 117:24, 118:2, 118:11, 119:1, 119:5, 121:2, 122:6, 122:8, 150:21
**three-agency** [1] - 6:9
**threshold** [1] - 77:22, 78:1
**throughout** [2] - 34:24, 35:5
**throw** [1] - 111:3
**thrown** [1] - 92:13
**thumb** [1] - 110:8
**tier** [1] - 78:19
**timeline** [1] - 31:25
**title** [2] - 5:11, 5:15
**today** [15] - 36:21, 54:15, 70:11, 70:20, 80:6, 80:24, 81:2, 82:1, 84:14, 90:18, 108:11, 108:19, 121:12, 122:23, 137:17
**together** [2] - 35:12, 66:15
**Tommy** [6] - 26:9, 29:9, 99:22, 102:7, 102:9, 102:10
**tommy_Barras@reyrey.com** [1] - 98:14
**tomorrow** [6] - 160:5, 160:6, 162:7, 162:10, 163:7, 163:18
**took** [7] - 61:12, 61:16, 62:11, 72:9, 84:14, 88:11, 138:10
**top** [6] - 67:5, 67:11, 81:11, 90:25, 121:18, 121:21
**topic** [1] - 107:3
**total** [2] - 20:17, 140:6
**totally** [1] - 58:10
**touch** [1] - 127:21
**toward** [1] - 117:11
**town** [1] - 116:13
**tract** [3] - 135:5, 148:17, 148:19
**trail** [1] - 122:24
**training** [3] - 6:3, 6:5, 6:8
**transcript** [2] - 163:8, 164:12

**Transcript** [1] - 2:16
**transcription** [1] - 2:16
**transferred** [1] - 132:21
**transition** [3] - 107:1, 107:3
**trash** [1] - 163:13
**travel** [7] - 113:21, 114:10, 114:23, 115:1, 115:2, 115:17, 131:7
**treat** [2] - 142:22, 159:14
**treating** [1] - 44:18
**tremor** [3] - 146:1, 146:9, 146:10
**triage** [1] - 153:13
**trial** [3] - 27:5, 44:10, 113:18
**tricks** [1] - 133:13
**triggered** [2] - 149:17, 150:10
**trip** [6] - 25:19, 25:24, 25:25, 26:6, 26:11, 26:12
**TRO** [2] - 108:23, 109:22
**trouble** [2] - 73:13, 112:16
**true** [17] - 8:3, 42:5, 46:25, 47:3, 47:14, 48:3, 48:21, 49:2, 51:14, 67:24, 68:18, 68:21, 68:22, 73:24, 75:14, 86:24, 105:12
**truly** [1] - 103:6
**trust** [1] - 14:8
**Trust** [1] - 14:9
**truth** [3] - 100:6, 100:15, 112:9
**truthfully** [1] - 84:19
**try** [10] - 49:1, 89:3, 113:9, 120:1, 141:16, 158:13, 160:19, 162:5, 162:7, 163:3
**trying** [13] - 27:25, 39:3, 72:7, 84:3, 103:1, 110:20, 111:15, 112:5, 112:7, 112:17, 123:9, 160:12, 161:14
**tubs** [1] - 22:12
**Tuesday** [3] - 119:16, 161:11, 162:3
**tumor** [1] - 127:20
**turn** [9] - 15:18, 25:14, 41:2, 99:13, 129:4, 129:7, 132:22, 136:2, 136:4
**turned** [4] - 117:14, 122:12, 122:13, 123:20
**turning** [12] - 19:9, 64:20, 65:15, 75:20, 132:4, 137:8, 137:19, 137:23, 137:24
**twenty** [1] - 15:11
**twice** [2] - 110:5, 110:9
**two** [24] - 12:25, 13:2, 17:20, 19:3, 22:8, 32:20, 32:21, 32:22, 68:14, 70:23, 78:15, 82:2, 93:12, 93:16, 108:18, 112:25, 113:1, 113:2, 115:2, 116:14, 121:24, 156:14, 160:11, 160:13
**TX** [1] - 2:4
**type** [7] - 16:9, 16:10, 22:6, 127:20, 133:13, 140:19, 147:1
**types** [1] - 22:9
**typical** [3] - 6:23, 7:18, 135:4
**typically** [1] - 7:18

## U

**U.S** [3] - 1:20, 114:15, 136:22
**UCHS** [1] - 162:18

**UCS** [1] - 36:5
**ultimate** [1] - 124:1
**ultimately** [2] - 35:5, 98:20
**unable** [2] - 58:17, 58:21
**unaccessible** [1] - 23:6
**uncertain** [3] - 97:8, 97:12, 97:15
**under** [21] - 12:16, 16:14, 16:21, 30:15, 31:12, 84:6, 84:12, 89:21, 90:1, 128:6, 128:24, 130:9, 130:11, 130:12, 130:14, 132:24, 133:16, 136:12, 139:4, 139:5, 152:11
**underreported** [1] - 9:6
**understandable** [1] - 143:6
**understood** [5] - 57:25, 71:18, 145:12, 152:11, 153:12
**unfortunately** [3] - 108:22, 155:3, 155:6
**Unfortunately** [1] - 155:15
**United** [1] - 4:9
**UNITED** [3] - 1:1, 1:3, 1:12
**unless** [5] - 69:13, 130:14, 133:20, 134:1, 135:10
**unlocked** [1] - 140:18
**unnecessary** [1] - 69:10
**unreachable** [1] - 62:3
**unreadable** [1] - 23:6
**unsure** [1] - 152:17
**untoward** [1] - 110:20
**unusual** [3] - 130:23, 143:3, 154:10
**up** [60] - 7:6, 19:9, 19:13, 21:1, 21:12, 21:14, 27:19, 29:15, 29:19, 29:24, 35:15, 36:25, 37:19, 41:3, 44:23, 45:6, 45:9, 52:24, 56:9, 57:22, 60:5, 70:8, 76:17, 78:22, 78:25, 80:6, 80:10, 81:23, 81:25, 82:13, 82:15, 82:16, 82:20, 82:24, 83:14, 84:1, 84:22, 84:23, 85:7, 85:17, 86:12, 90:19, 104:14, 108:18, 109:25, 114:6, 120:13, 122:6, 124:14, 124:18, 124:20, 125:18, 132:17, 135:18, 145:11, 149:14, 155:23, 158:18, 161:8
**update** [2] - 151:17, 163:1
**upset** [4] - 36:14, 36:17, 104:2, 112:16
**urinary** [3] - 135:5, 148:17, 148:19
**urinates** [1] - 135:5
**urologist** [1] - 148:12
**USB** [1] - 24:12
**users** [1] - 24:20
**usual** [2] - 128:16, 151:9
**utilize** [1] - 71:9

---

## V

**vaguely** [1] - 154:1
**valuation** [1] - 75:15
**value** [1] - 7:23
**various** [6] - 7:7, 8:7, 14:3, 16:14, 20:17, 25:8
**Varnado** [4] - 2:2, 100:14, 100:17, 112:7
**VARNADO** [18] - 32:8, 39:7, 69:19, 70:16, 100:10, 110:13, 111:17, 112:1,

112:22, 129:11, 160:16, 160:19, 161:5, 161:9, 161:13, 161:20, 162:4, 164:6
**vendor** [5] - 112:25, 116:13, 118:7, 120:20, 151:2
**verification** [1] - 7:16
**verifies** [2] - 7:23, 7:24
**verify** [2] - 77:10, 78:10
**version** [3] - 121:20, 145:13, 151:5
**versus** [2] - 39:22, 78:16
**Vesey** [1] - 2:8
**video** [1] - 113:4
**view** [4] - 35:17, 35:19, 40:9, 92:9
**viewed** [2] - 60:24, 61:3
**village** [1] - 150:18
**violation** [1] - 131:6
**visit** [19] - 131:24, 132:20, 132:21, 133:6, 133:24, 134:6, 134:18, 134:21, 134:23, 135:13, 135:25, 136:22, 142:4, 144:9, 146:17, 147:10, 148:4, 149:24
**visited** [1] - 93:16
**visits** [2] - 131:10, 151:4
**vista** [1] - 16:20
**Vista** [7] - 12:16, 12:24, 15:14, 15:20, 15:21, 16:4, 16:14
**visualize** [1] - 151:6
**voluntary** [7] - 9:11, 9:15, 9:23, 10:17, 10:20, 11:1, 11:2
**VS** [1] - 1:4

---

## W

**wait** [1] - 30:1
**waiting** [3] - 103:14, 109:4, 162:24
**waive** [1] - 125:10
**wake** [1] - 155:23
**walk** [1] - 146:2
**wants** [6] - 30:12, 30:23, 32:13, 109:19, 124:7, 157:4
**warrant** [24] - 5:21, 6:15, 6:16, 6:17, 6:21, 6:25, 8:1, 17:14, 17:17, 18:6, 18:9, 18:10, 18:17, 19:1, 19:6, 19:9, 19:13, 19:16, 19:20, 20:2, 21:19, 21:25, 22:7, 26:3
**warrants** [7] - 6:14, 19:10, 20:20, 21:2, 21:12, 21:14, 21:22
**Washington** [1] - 1:22
**waste** [6] - 71:9, 102:24, 120:11, 120:14
**watch** [1] - 115:8
**watching** [1] - 34:5
**water** [3] - 63:5, 74:23, 74:24
**ways** [1] - 115:21
**wealthy** [1] - 142:13
**wear** [2] - 4:16, 33:21
**Wednesday** [5] - 161:13, 161:16, 161:17, 161:22, 161:23
**week** [7] - 37:4, 37:5, 108:12, 113:24, 137:3, 161:8, 161:10
**weekend** [4] - 113:21, 115:8, 115:17,

162:20
**weekends** [1] - 155:23
**weight** [1] - 155:5
**weird** [1] - 156:11
**welcome** [1] - 129:11
**well-to-do** [1] - 131:3
**whatnot** [1] - 8:21
**whole** [5] - 16:10, 70:24, 98:24, 103:20, 144:9
**wide** [1] - 127:4
**wife** [7] - 40:13, 60:25, 99:17, 131:5, 137:13, 142:22
**willing** [2] - 119:13, 119:16
**wink** [1] - 34:12
**winked** [1] - 34:1
**witness** [71] - 4:7, 4:13, 27:12, 27:18, 27:24, 28:9, 28:12, 29:4, 32:19, 33:18, 33:25, 36:24, 37:3, 37:6, 40:5, 40:21, 46:4, 48:24, 52:21, 67:2, 69:8, 69:16, 69:21, 70:4, 70:5, 70:13, 70:15, 70:17, 71:21, 72:5, 91:4, 92:3, 93:3, 100:4, 103:7, 103:8, 103:25, 104:1, 104:4, 106:6, 107:23, 108:14, 109:3, 110:2, 110:3, 110:17, 111:21, 111:23, 115:11, 116:20, 116:23, 118:23, 120:17, 124:21, 125:10, 125:14, 126:1, 126:8, 128:2, 128:7, 131:18, 134:13, 135:20, 136:18, 159:21, 160:7, 160:20
**WITNESS** [15] - 4:14, 4:18, 33:17, 33:19, 33:23, 63:7, 74:22, 74:25, 83:25, 125:20, 125:23, 126:2, 126:6, 159:25, 160:3
**witness's** [2] - 117:9
**witnesses** [10] - 28:8, 70:23, 71:2, 71:5, 71:10, 103:14, 115:2, 160:6, 161:8, 162:7
**woman** [1] - 132:10
**word** [2] - 13:9, 42:6
**words** [3] - 53:25, 68:5, 91:1
**works** [3] - 80:16, 85:6, 140:1
**workup** [2] - 127:18, 146:25
**world** [1] - 48:19
**worn** [1] - 79:4
**worry** [1] - 155:22
**worse** [2] - 36:7, 36:8
**write** [13] - 41:8, 41:23, 42:1, 42:3, 54:1, 56:9, 63:16, 67:19, 76:4, 76:7, 76:8, 76:13, 158:14
**writes** [1] - 76:1
**written** [3] - 67:23, 76:20, 156:19
**wrote** [9] - 42:7, 48:5, 56:20, 56:21, 67:22, 73:16, 73:22, 99:15, 159:3

---

## Y

**y'all** [1] - 124:12
**year** [5] - 64:24, 79:17, 79:18, 155:7, 155:16
**years** [16] - 5:7, 34:18, 35:8, 35:12,

49:19, 57:23, 57:24, 58:11, 58:13,
79:14, 79:19, 85:11, 85:20, 86:13,
129:10, 142:24
**yesterday** [1] - 115:12
**York** [2] - 2:8, 142:12
**yourself** [1] - 146:20
**Yudnofsky** [1] - 26:10

## Z

**Zoom** [10] - 113:4, 113:6, 113:11,
114:24, 115:14, 117:7, 117:8, 117:11,
124:19, 162:19
**zoom** [2] - 114:4, 114:12