**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | NO. 4:21-CR-09 |
| | ) | |
| | ) | |
| VS. | ) | Houston, Texas |
| | ) | 1:30 p.m. to 6:20 p.m. |
| | ) | |
| ROBERT T. BROCKMAN | ) | NOVEMBER 19, 2021 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**COMPETENCY HEARING**

**AFTERNOON SESSION**

**BEFORE THE HONORABLE GEORGE C. HANKS, JR.**

**UNITED STATES DISTRICT JUDGE**

**DAY 5**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEARANCES:

FOR THE GOVERNMENT:

    Mr. Corey J. Smith
    Mr. Lee F. Langston
    Mr. Boris Bourget
    Mr. Christopher Magnani
    U.S. Department of Justice
    Tax Division
    150 M Street NE
    Room 2208
    Washington, DC 20002
    Tel:  202-514-9623
    Email: Corey.smith@usdoj.gov
           Lee.f.langston@usdoj.gov
           Boris.bourget@usdoj.gov
           Christopher.magnani@usdoj.gov

```
 1  FOR THE DEFENDANT:

 2         Mr. Jason Scott Varnado
           Jones Day
 3         717 Texas
           Suite 3300
 4         Houston, TX 77002
           Tel:  832-239-3694
 5         Email:  Jvarnado@jonesday.com

 6         Mr. James P. Loonam
           Ms. Kathryn Keneally
 7         Ms. Sarah Efronson
           Jones Day
 8         250 Vesey Street
           New York, NY 10281
 9         Tel:  212-326-3939
           Email: Jloonam@jonesday.com
10                Kkeneally@jonesday.com

11
    COURT REPORTER:
12
           Ms. Kathleen K. Miller, CSR, RMR, CRR
13         515 Rusk, Room 8004
           Houston, Texas  77002
14         Tel:  713-250-5087

15
    Proceedings recorded by mechanical stenography.
16
    Transcript produced by computer-assisted transcription.
17

18

19

20

21

22

23

24

25
```

1                                    INDEX

2 **PARK E. DIETZ, M.D.**

3        Continued Direct by Mr. Smith                    4
         Cross by Ms. Efronson                           26

4

5 **GOVERNMENT RESTS**                                  155

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*PARK E. DIETZ, M.D. - DIRECT BY MR. MAGNANI*

1                       **P R O C E E D I N G S**

2                          NOVEMBER 19, 2021

3                       (1:32 p.m. to 6:20 p.m.)

4    ************************************************************

01:32:19    5            THE COURT:  Please be seated, everyone.

6                   You may continue when ready.

7            MR. MAGNANI:  Thank you, Your Honor.

8                   The United States moves to admit Exhibits

9    104, 29, 49, 50 and 63.

01:32:31    10            MR. VARNADO:  No objection.

11            THE COURT:  Without objection, those exhibits

12    are admitted.

13                   And you may proceed.

14            MR. MAGNANI:  Thank you, Your Honor.  And could

01:32:36    15    we have the screen turned back on, please?  I assure

16    everyone I am going to try to move this along.

17            THE COURT:  It's okay.  We are going to next

18    week, so...

19            MR. MAGNANI:  All right.

01:32:54    20                   **DIRECT EXAMINATION (CONTINUED)**

21    BY MR. MAGNANI:

22    **Q.**   Dr. Dietz, you mentioned that you have written three

23    different expert reports in this case; is that right?

24    **A.**   Yes.

01:33:00    25    **Q.**   And you mentioned that the third report -- Well, let

me ask a different question.

Do you know if any other experts wrote three reports in this case?

**A.** I don't believe so.

01:33:12 **Q.** Did you have an opportunity to review the defense expert reports?

**A.** Yes.

**Q.** Okay. And I just want to -- again, to sort of narrow the disagreements, I want to talk about why the defense experts disagree with some of your conclusions. So, if I -- Oh. And do you still have the clicker, Dr. Dietz?

01:33:22

**A.** I do.

**Q.** And do you still have your reports?

**A.** Yes.

01:33:34 **Q.** So how -- how do the defense experts reconcile the Baylor diagnosis with Mr. Brockman's performance in recorded depositions and speeches?

**A.** Basically, they don't. They don't address the recorded performances.

01:33:56 **Q.** And how did the defense experts evaluate the defendant's potential motivation to malinger?

**A.** Well, they acknowledge that he faces serious charges, but they don't seem to address that issue or consider the degree to which he would be motivated to malinger.

01:34:19 **Q.** How did the defense experts conduct their competency

*PARK E. DIETZ, M.D. – DIRECT BY MR. MAGNANI*

1  evaluations in this case?

2  **A.**   I -- I believe it's fair to say that they did this in

3  a different sequence, for at least some of them, in which

4  there was reliance on what Mr. Brockman had told prior

01:34:44  5  clinicians.  There was reliance on what family members had

6  told prior clinicians and told these examiners.  There was

7  reliance on the neuropsychological testing.  There was

8  reliance on the collateral witnesses.  There was some

9  interpretation of the brain scans, but -- and maybe

01:35:14  10  reliance on it, but there was not attention to those

11  business activities that show superior function up until

12  the window closed in November of 2020.

13  **Q.**   And, Dr. Dietz, how did the defense experts talk in

14  their recorded interviews to the defendant about the facts

01:35:42  15  and charges in this case?

16  **A.**   There was not much discussion about the facts or

17  charges.  And on one occasion, when the defendant began to

18  discuss the charges knowledgeably, Dr. Agronin then asked

19  him how he was doing, whether he had energy, and switched

01:36:05  20  the topic to beginning to do some testing.

21          So, there was never a full exploration of

22  the elements of competence to stand trial.

23  **Q.**   And how did the defense experts evaluate the

24  collateral interviews that they conducted?

01:36:23  25  **A.**   It appears from the reports and from the testimony of

1   Dr. Wisniewski that they relied on the collateral

2   informants as providing valid and reliable information.

3   **Q.**   Well, is that -- as an expert in forensic -- Well,

4   you are not a geriatric psychiatrist.  Right?

01:36:47   5   **A.**   Correct.

6   **Q.**   So, as an expert in forensic psychiatry, what is

7   your -- I mean, what's your take on their reliance on the

8   collateral interview sources?

9   **A.**   Well, there's an issue where the expert needs to be

01:37:00   10   cautious.  It's never our role to evaluate the credibility

11   of a witness in a case or to express an opinion on it.

12   And yet, at the same time, we need to for our own

13   decisionmaking evaluate the reliability and validity of

14   the evidence put before us so that we can decide how much

01:37:21   15   weight to put on it.

16              And it appears that they placed weight on

17   the collateral informants that was, I would say, having

18   viewed as much of the trial -- of the hearing as I have,

19   was misplaced reliance, in that the collateral informants

01:37:50   20   have displayed behaviors that would cause me to place less

21   weight on their information.

22   **Q.**   How -- how did the defense experts account for what

23   you described as a discrepancy between the documentary

24   e-mail evidence and the defendant's testing results?

01:38:15   25   **A.**   They don't address it at all.  There's no mention of

*PARK E. DIETZ, M.D. - DIRECT BY MR. MAGNANI*

 1    the kinds of e-mails we were talking about earlier.

 2    **Q.**   And how -- you know, did the defense experts -- did

 3    they -- well, how did they address the -- I'll say, the

 4    evidence that the defendant's testing performance was in

01:38:40  5    the bottom first percentile consistently from March 2019

 6    all the way to present?

 7    **A.**   Apart from the repeated comments that he has

 8    dementia, they don't explain it at all.

 9    **Q.**   Would it be -- I want to focus on your uncertainty

01:39:02  10   that you expressed in your second report.

 11                Would it be -- and just I -- I understand

 12   there is probably more to it, which, hopefully, you can

 13   explain.  But would it be fair to characterize the source

 14   of your uncertainty as being related to your lack of

01:39:16  15   access to these collateral interviews compared to the

 16   defense experts?

 17   **A.**   That's -- that's a part of it, because I didn't know

 18   whether I could place weight on the second- and thirdhand

 19   accounts I was getting about what those collateral

01:39:34  20   witnesses were observing.  But that's only one of the

 21   issues.

 22   **Q.**   And you mentioned how, you know, being present in the

 23   hearing -- Well, let me ask a different question.

 24                You said that was only one.  So, what were

01:39:53  25   the other sources that lead to your, you know, since-

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*PARK E. DIETZ, M.D. – DIRECT BY MR. MAGNANI*

1   resolved uncertainty?

2   **A.**   I would say it is gathering a greater understanding

3   of the neuropsychological testing and why it could not be

4   relied on, and gathering a greater understanding of the

01:40:20   5   meaning of the neuroimaging results.

6                    Now, I had it put to me, through reports

7   by Dr. Denney and Dr. Darby that I reviewed after my

8   second report, what their impressions were, but I also

9   confronted that and challenged them and asked them

01:40:41   10   questions about it and was shown additional studies and

11   additional information that lead me to -- to believe they

12   were correct, that that analysis wins, in my opinion.

13   **Q.**   And you mentioned -- well, is it fair to say that

14   you've had the opportunity to observe most of the

01:41:08   15   testimony and evidence in this hearing?

16   **A.**   All but one or two witnesses yesterday, who were not

17   on mental topics.

18   **Q.**   Okay.  Did the testimony of Drs. Darby and Wisniewski

19   help inform your opinion today?

01:41:29   20   **A.**   It did.

21   **Q.**   Can you explain why?

22   **A.**   Well, Dr. Wisniewski is a charming physician with

23   great accomplishments, the sort of man I would want to

24   care for me.  But my impression of how he went about his

01:41:52   25   task was that he did it very much as a clinician would in

1   relying on what Mr. Brockman had said and what family

2   members told him and, having concluded that there was

3   dementia based on those sources and prior medical records,

4   he then explains how the brain imaging fits that

01:42:26   5   conclusion and accepts that the neuropsych testing fits

6   that conclusion.  And I believe that's a more clinical

7   approach that is not looking at all of the evidence and is

8   not considering all of the evidence.

9           He said he watched only a 15-minute

01:42:49   10   segment of one of the videos from testimony, and I don't

11   know if he selected it or it was randomly selected or

12   selected by someone else, but there were hours and hours

13   of video to be watched.  And I can understand why a busy

14   professional wouldn't have time to do it.  But I think

01:43:10   15   it's a different -- different approach to the critical

16   analysis of contradictory evidence.

17           When it came to the specifics of the

18   Neuroreader analysis and the effort for quantitative

19   measurement, he explained the variability in the machines

01:43:35   20   used and the slice thickness and so on as one of the

21   reasons that one couldn't compare from time to time.  But

22   we know that the most recent scan had precise instructions

23   on how to do it so it could be analyzed according to the

24   Neuroreader report, and we know that it showed normal

01:44:04   25   brain volume.  And, so, his discarding of it did not

1    correspond with, at least, my understanding of what the

2    most reliable reading would be.

3              And, here, my concern is the statistical

4    norms available for the Neuroreader analysis on the most

01:44:35   5    recent administration that tell us how Mr. Brockman's

6    brain compares to the brains of 80-year-olds without

7    cognitive impairment.  And he -- his brain volume was in

8    the normal range for eighty-year-olds without cognitive

9    impairment.

01:45:00   10              Now, I don't think that proves no

11    cognitive impairment, but I also think it's inconsistent

12    with a finding that it was shrunken abnormally or grossly

13    or profoundly different.

14    Q.    And, Doctor, actually, at this point -- and I am

01:45:18   15    going to want to bring up Defense Exhibit 58.

16              MR. LOONAM:  We object, Your Honor.

17    This witness is now offering his lay opinion with respect

18    to he's learning -- he has admitted, at the time he issued

19    his second report, he didn't know enough about the

01:45:38   20    neuroimaging and the limits of the neuroimaging.

21              Since then he has spoken with Dr. Darby

22    and learned more in his lay opinion as to the -- the

23    neuroimaging.  He is now comparing the testimony of

24    Dr. Wisniewski, offering credibility determinations with

01:45:55   25    respect to that testimony.

*PARK E. DIETZ, M.D. - DIRECT BY MR. MAGNANI*

1          We haven't objected to this line of

2   questioning without the slides.  But now counsel plans on

3   putting up slides which were admitted by the government

4   through Dr. Wisniewski.  They could have asked

01:46:14   5   Dr. Wisniewski additional questions about this.  This is

6   not in this expert witness's report.  He is not a

7   neurologist.  He is not a neuroradiologist, which is the

8   expertise required to interpret these scans.  Any opinion

9   he would offer with respect to these scans would be as a

01:46:30   10   lay witness outside of his expertise.  So, we object.

11          For the follow-up slide, to save our time,

12   this witness has just said, as Dr. Wisniewski said, you

13   cannot do the quantitative analysis across time.  It's not

14   even in evidence, and it's outside this expert's expertise.

01:46:47   15   He is relying on Dr. Darby informing him with respect to

16   the -- the Neuroreader's importance as opposed to the

17   qualitative comparison longitudinally from 2008 [sic] to

18   2021.

19          So, we do object and we do not think there

01:47:05   20   is foundation because Dr. Dietz has explained that he has

21   relied on information provided by the experts in his field,

22   is fine.  We haven't objected to that.  But to put up the

23   slides to have him describe his interpretation of them is

24   completely out of bounds, and that's why we would object.

01:47:22   25          THE COURT:  But my understanding is he is going

1  to -- and maybe I am wrong.  My understanding is Dr. Dietz

2  is going to look at the slide and interpret them based on

3  what he was told by Dr. Denney and Dr. Darby.

4              MR. LOONAM:  I believe that is inappropriate,

01:47:37  5  Your Honor.  That is -- they're the experts.  Then this

6  becomes not only hearsay, but it's the lay opinion, the

7  interpretation of a lay witness on this subject on a very

8  technical matter and outside the scope of his expert report

9  on top of it.  There are compound problems with respect to

01:47:54  10  this, Your Honor.

11              THE COURT:  Okay.  Respectfully, overruled.

12              MR. LOONAM:  Yes, sir.

13              MR. MAGNANI:  So, can we just jump to what's

14  been marked as Defense Exhibit 58?  I'm sorry.  I might be

01:48:08  15  a minute here, Your Honor.

16              THE COURT:  So, what is Defense -- Oh, I'm

17  sorry.

18              MR. MAGNANI:  Oh, I apologize.  It's in the

19  slides now, the last or second to last slide.  We got

01:48:23  20  through all the other slides.  Okay.

21  BY MR. MAGNANI:

22  **Q.**   So, Dr. Dietz -- well, let's just -- Did you see

23   defense counsel, Mr. Loonam, show this slide to

24   Dr. Denney -- sorry -- this exhibit to Dr. Denney?

01:48:45  25  **A.**   Yes.

1     **Q.**   And asked Dr. Denney a lot of questions about it?

2     **A.**   Yes.

3     **Q.**   Did you see Dr. Wisniewski talk about this slide?

4     **A.**   Yes.

01:48:54   5   **Q.**   And was it Dr. Wisniewski's opinion that this slide

6     was misleading?

7     **A.**   Yes.

8     **Q.**   And do you recall why he said it was misleading?

9     **A.**   The principal reason had -- had to do with the

01:49:07  10   variability in the two different occasions on which the

11    MRIs were done, that they were done on different machines,

12    that they were done on different slice thickness, and that

13    one couldn't compare from time to time with different

14    slice thickness.

01:49:33  15   **Q.**   And --

16    **A.**   So --

17    **Q.**   And do you remember if -- so, did -- when

18    Dr. Wisniewski talked about the MRI showing significant

19    brain shrinkage, he didn't rely on this; so, what did he

01:49:46  20   rely on for that conclusion?

21          MR. LOONAM:   Your Honor, I still don't

22    understand.  This slide -- what Dr. Dietz just said was

23    exactly the basis of my objection to this slide.  This is

24    not -- he didn't rely on this for his opinion.  He's not

01:49:59  25   saying, 'Oh, this is what informed my opinion here.'  He's

*PARK E. DIETZ, M.D. - DIRECT BY MR. MAGNANI*

1  saying, 'No, I couldn't rely on this because of the slice

2  thickness was different between A and B,' which is exactly

3  the basis of my objection.

4           So, again, I object to this slide.

01:50:13    5           THE COURT:  Response?

6           MR. MAGNANI:  Yeah.  Your Honor, I think there

7  is no dispute.  I mean, we can disagree about the -- you

8  know, describing Dr. Denney's testimony with Mr. Loonam,

9  but I think it's beyond dispute that  1) the defense made

01:50:26   10  this slide; 2) they showed it to Dr. Denney, who is a, you

11  know, psychologist, expert in testing, not radiology.  They

12  did not show this misleading slide to Dr. Darby, our expert

13  neurologist.  Instead, they showed it someone who has less

14  of an expertise in MRIs.  And then  3) their own expert

01:50:42   15  said it was misleading; and  4) that expert said that,

16  because this was misleading, he relied on his qualitative

17  subjective analysis of comparisons.  And, so, that's what I

18  am trying to ask Dr. Dietz about.

19           MR. LOONAM:  So, he is using this slide to

01:50:57   20  attack the defense rather than to explore the opinions of

21  the -- of the expert.  So, this is, essentially, a closing

22  argument that's going on right here, Your Honor.  It's

23  inappropriate.

24           This slide was used to explore the

01:51:09   25  knowledge of Dr. Denney, who explained that he relied

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1   heavily on the quantitative analysis.  If we go through --

2   and we can -- we will quibble over the testimony of

3   Dr. Denney when -- when -- and how he handled this.  It's

4   our opinion that Dr. Denney, when confronted with the

5   comparison, he decided to minimize the importance of

6   quantitative analysis that he had previously stated was

7   very important to him, because now it did appear that the

8   evidence cut against him, which revealed Dr. Denney's bias,

9   which was revealed over and over and over again during the

10  course of his cross-examination.

11              We never entered it into evidence.  It was

12  never entered into evidence.

13              And we don't quibble with the fact that

14  there is a difference in the slice thickness.  And, so, you

15  can't draw the comparisons that Dr. Denney was drawing

16  from -- from the slide, the comparisons that are drawn from

17  these two tables that are admitted into evidence, but this

18  slide is not.  We have no problem with the testimony from

19  Dr. Wisniewski.  As we have stated to this Court three

20  times today, this slide is not reliable.  This slide is

21  potentially misleading, which is why we don't think it

22  should be up, and it's not in evidence.

23              THE COURT:  Okay.  Why did you guys use it?

24              MR. LOONAM:  We put -- there's the Neuroreader

25  reports.  There is the 2018 Neuroreader reports, the 2021

*PARK E. DIETZ, M.D. - DIRECT BY MR. MAGNANI*

1    Neuroreader reports.  Dr. Denney testified that he relied

2    on the quantitative analysis.  It was very important to him

3    in making his opinion.

4                    It was clear to us, as other courts have

01:52:38    5    found, that Dr. Denney minimizes evidence and ignores

6    evidence that cuts against his opinion and that -- and he

7    did that when he talked about talking to defense counsel,

8    how he took their testimony with a grain of salt.

9                    You know, we put this up as a comparison

01:52:54    10   of -- of the two slides that are in evidence, and we wanted

11   to see what Dr. Denney would have to say about it.  And

12   what Dr. Denney said about it was, 'Well, I don't know if

13   it's statistically significant,' and, 'These things aren't

14   reliable.'  And we said okay.  Once he said it wasn't

01:53:10    15   reliable, we said, 'Okay.  So, the quantitative analysis is

16   not reliable.'  And we -- and we sat down.

17                    So -- and, frankly, this was a slide put

18   together before Dr. Denney's testimony, not by any of our

19   neuroradiologists or neurologists.  So, it was put together

01:53:30    20   for the purpose of exploring Dr. Denney's knowledge of the

21   quantitative analysis that he said he relied on.  And there

22   was no question that there was an issue regarding the

23   comparison of the 2018 and 2021 Neuroreaders because in

24   Dr. Darby's report --

01:53:52    25                    MR. MAGNANI:  And, sorry, Counsel, if I can

*PARK E. DIETZ, M.D. - DIRECT BY MR. MAGNANI*

1  interrupt.  This is taking too much time.  I can just move

2  on.

3          THE COURT:  No.  Here's the deal.  I am

4  overruling the objection.  Doctor -- respectfully.

01:54:01  5  Dr. Denney is an expert in this case.  Dr. Denney worked

6  with Dr. Dietz on formulating opinions.  Dr. Dietz said

7  that he got additional information from Dr. Denney and

8  Dr. Darby in formulating a supplemental report -- a

9  supplemental opinion.

01:54:19  10          And, respectfully, I am overruling the

11  objection.

12          You can make the argument.

13          MR. MAGNANI:  Yes, Your Honor.

14  BY MR. MAGNANI:

01:54:27  15  **Q.**   Unfortunately, I don't remember exactly where we

16  were, Dr. Dietz, but -- Well, can I just ask you:  You're

17  not an expert in neuroradiology.  Right?

18  **A.**   No.  I am not.

19  **Q.**   So, are you not concerned that Dr. Wisniewski, who

01:54:42  20  does have this kind of expertise, that he might be able to

21  subjectively see things that you can't, doing a

22  qualitative analysis which he relied on to conclude

23  significant brain shrinkage?

24  **A.**   I have no doubt that with his vast experience he can

01:54:59  25  have an impression from looking at a scan that's orders of

PARK E. DIETZ, M.D. - DIRECT BY MR. MAGNANI

1    magnitude more sophisticated than mine.  That's not in

2    dispute.

3              I do think, however, that there was a

4    logical problem.  If the slice thickness was different

01:55:22    5    between the 2018 and the 2021 scans, then that makes the

6    comparison qualitatively as flawed as the quantitative

7    comparison.

8              THE COURT:  It makes sense.  I understand.

9    BY MR. MAGNANI:

01:55:45   10    Q.    And if we could just go to what's been admitted as

11    Exhibit 43 -- 143.  Excuse me.  And I --

12              Have you -- Dr. Dietz, have you seen this

13    slide from Dr. Darby's PowerPoint deck that he prepared

14    for his testimony?

01:56:08   15    A.    I have.

16    Q.    Okay.  And -- and were -- and did you see -- you

17    know, and is it fair to say that Dr. Wisniewski agreed

18    that the top two rows here are sort of accurate depictions

19    of dementia patients with Parkinson's and Alzheimer's

01:56:33   20    disease respectively?

21    A.    Yes.

22    Q.    And that the bottom one is the latter of the

23    Defendant's two FDG PET scans?

24    A.    Yes.

01:56:41   25    Q.    And did Dr. Wisniewski testify along the lines that,

1    you know, even people, lay people, can appreciate the

2    types of differences that we're seeing on the screen here?

3    **A.**    Yes, he did.

4    **Q.**    Do you remember -- and, you know, only if you

5    remember, but -- Well, what's an MMSE?

6    **A.**    Mini-Mental Status Examination.

7    **Q.**    Is that the thing that Dr. Lisse carries around in

8    his pocket?

9    **A.**    It is.

10   **Q.**    Okay.  And do you recall how the defendant's score on

11   the MMSE compared to the samples of dementia patients in

12   the top two lines of the slide?

13   **A.**    Mr. Brockman's score was lower than that of the

14   dementia patients studied for the top two lines.

15   **Q.**    And, so, you know, you talked about how, you know,

16   some of your opinions have further resolved during the

17   course of this hearing.  Can you talk about that with

18   respect to the imaging?

19   **A.**    I'm sorry.  I didn't hear the whole question.

20   **Q.**    So, I guess my question is:  Is it fair to say that,

21   you know, all of the experts on both sides agree that the

22   FDG PET is the most accurate diagnostic imaging tool to

23   determine whether -- you know, a person's level of

24   neurodegeneration?

25   **A.**    Yes.

PARK E. DIETZ, M.D. - DIRECT BY MR. MAGNANI

1    Q.   And you talked about how some of your uncertainties

2    from your second report were clarified over time, and I'm

3    just asking you to explain the course of that

4    clarification with regard to the imaging.

01:58:14    5    A.   With respect to the imaging, it was clear from the

6    August imaging that there was hypometabolism in areas of

7    the brain that are implicated in some of the dementias

8    that are under consideration here or have been diagnosed.

9              What was not clear to me, just from

01:58:45    10    looking at the images, was the time sequence of

11    hypometabolism development in Alzheimer's disease, which

12    is one of the conditions on which there is converging

13    opinion.  Mr. Brockman is at some stage.

14              What I came to learn, in part through

01:59:14    15    Dr. Ponisio providing additional information about this,

16    is that the blue that we're seeing on the side view, the

17    lateral view here, is in two particular areas known as the

18    cingulate gyrus and the precuneus, which is precisely

19    where it is most often seen in early or mild Alzheimer's,

01:59:51    20    and that there is relatively less hypometabolism in the

21    areas that she would expect to see it as the disease

22    progresses beyond that point.

23              Now, minimum formation here is entirely

24    secondary.  Despite being a physician, despite being a

02:00:09    25    psychiatrist who studied some neurology, I don't

1   specialize in anything like this.  And, so, I -- I don't

2   want to in any way overstate my competence to look at

3   this, but I am capable of listening to an expert and

4   hearing their logic and seeing the basis of their opinion

5   and seeking to discern where the truth lies.  And that's

6   all I'm attempting to do here.

7          MR. VARNADO:  Your Honor, if I could just ask

8   for a clarification as to whether the information from

9   Dr. Ponisio, who did not testify in this hearing, it is

10  memorialized in a report that you relied upon?

11          THE COURT:  I thought -- Well, sorry.  Do you

12  want to ask the question?

13          MR. MAGNANI:  Yeah.  I don't know the answer.

14  If this witness does, he can answer if he knows it.

15          THE COURT:  Okay.  You can answer if you know

16  it, sir.

17          THE WITNESS:  Your Honor, I don't believe it

18  would be characterized as a report.  I think there are four

19  formal reports Dr. Ponisio wrote.  But there came a time

20  that a conference call was arranged between the government

21  experts and Dr. Ponisio.  I don't know if government

22  lawyers were on it or not.  But Dr. Ponisio illustrated a

23  number of points of her analysis of the case, and she

24  followed that up with an e-mail that included a link to --

25  to a videotape.  And, so, there was additional information

1  that arose from Dr. Ponisio to clarify her findings with

2  respect to Mr. Brockman's FDG PET.

3          MR. VARNADO:  And just to be clear, we never

4  received this formation that Dr. Dietz is referring to.

02:02:01  5          MR. MAGNANI:  And, Your Honor, here I can make

6  a representation, in that I can understand why Mr. Varnado

7  might think that, but that's not right.

8          So, the defense has put Dr. Ponisio on

9  their exhibit list and they have exhibited her reports.

02:02:12  10 But the defense also received large PowerPoint

11 presentations from Dr. Ponisio, which contained embedded

12 videos that I believe this witness is talking about.

13          So, you know, I think that's why he might

14 have said something about it's not in her formal report,

02:02:27  15 but it's certainly in materials that were disclosed to the

16 defense.

17          I think through the reflection I can see

18 Mr. Loonam nodding.  So, I --

19          MR. LOONAM:  Well, I mean, I'll take -- I'll

02:02:37  20 obviously take the government's representation if he is

21 saying that what was discussed on this conference call --

22 I don't know if the government was part of it.  Perhaps the

23 video was disclosed.  I don't know what -- Anyway, we can

24 sort it out, but -- but --

02:02:52  25          MR. MAGNANI:  And we can move on from here,

*PARK E. DIETZ, M.D. - DIRECT BY MR. MAGNANI*

1  Your Honor, I think, unless Your Honor has any more

2  questions about it.

3          THE COURT:  I don't have any questions.

4  BY MR. MAGNANI:

02:03:00  5  **Q.**   So, you -- Dr. Dietz, you also talked about how --

6  well, I think you testified before about how, when you

7  wrote your second report, you had some concerns about your

8  relative lack of access to some of the collateral

9  witnesses, and I would like to now focus on, you know, the

02:03:15  10  evidence and testimony in this hearing.

11          Well, I mean, are you -- still, today, are

12  you concerned about your lack of access to these

13  collateral witnesses that the defense relied -- that the

14  defense experts relied on?

02:03:28  15  **A.**   Well, I would say less concerned.  I don't have

16  information now about all of the people we might have

17  hoped to interview, but I do have information about enough

18  of them and their -- their position in this case to

19  believe it would not have been fruitful to have spent much

02:03:57  20  time interviewing the others.

21          MR. MAGNANI:  With the Court's indulgence, just

22  a minute.  I want to look for something.

23  BY MR. MAGNANI:

24  **Q.**   Dr. Dietz, during your May 18th interview with the

02:04:43  25  defendant, did you talk to him about a man named Dr.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PARK E. DIETZ, M.D. – DIRECT BY MR. MAGNANI

1   -- Reverend Jim Jackson?

2   **A.**   Yes.

3   **Q.**   Do you remember how the defendant described this

4   person?

5   **A.**   Glowingly and as particularly honest.

6              MR. MAGNANI:  And can I have the document

7   camera, please?  And I am going to put up Exhibit 5.

8                   And just to remind the Court -- I

9   apologize -- this time I didn't make a sub-exhibit, but

10  this is the large exhibit of the two transcripts.  And so

11  this is -- I am starting at Page 55 of the May 18th

12  transcript.

13  BY MR. MAGNANI:

14  **Q.**   Well, while this is up, can you just tell us -- I

15  mean, who is Dr. Jackson?

16  **A.**   He was the pastor of a church attended by both

17  Mr. Brockman and Tommy Barras, and he had replaced a

18  pastor who had also been a chaplain for Reynolds and

19  Reynolds.  And Mr. Brockman told the story of how he came

20  to see it useful to have a clergyman available at the

21  organization following an incident in which an employee

22  had accidentally shot himself while cleaning a .22

23  revolver.

24                   And the -- I forget what the question was.

25  I'm sorry.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*PARK E. DIETZ, M.D. – DIRECT BY MR. MAGNANI*

1  Q.   Sorry.  Well, no.  Just who -- Let me ask you this.

2         Do you -- did you get a sense from the

3  defendant how much time he spent with Dr. Jackson in

4  recent days?  Or in the last year or two?

02:06:57  5  A.   (No response.)

6  Q.   Well, actually, you know, what?  Before I get there,

7  I realize that I want to show the next page, which is

8  Page 56.

9         And you said that the defendant referred

02:07:12  10  to him glowingly, and I would just like you to -- Did the

11  defendant refer to him as an absolutely, totally honest

12  and straightforward person?

13  A.   Yes.

14  Q.   And is this man now on the board of Reynolds and

02:07:33  15  Reynolds?

16  A.   Yes.

17  Q.   And besides him is there anyone else on the board of

18  Reynolds and Reynolds?

19  A.   Tommy Barras.

02:07:42  20  Q.   Now, I want to show what's been admitted in this

21  hearing as Exhibit 152, and I want to ask you, Dr. Dietz,

22  my question.  Can you see 152?  My question is:  Before

23  this hearing began, had you ever seen this e-mail before?

24  A.   No.

02:08:01  25  Q.   And -- well, when did you first see this e-mail?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*PARK E. DIETZ, M.D. — DIRECT BY MR. MAGNANI*

1 **A.**    During this hearing.

2 **Q.**    And who is this e-mail from?

3 **A.**    From Reverend Jackson, and I believe it was on Monday

4 that I first saw this.

02:08:28    5 **Q.**    And in this e-mail between the only two board members

6 of Reynolds and Reynolds, did Dr. Jackson describe when

7 IRS agents came to visit him at his home?

8 **A.**    Yes.  He does describe that.

9 **Q.**    Did he tell Tommy Barras that he was purposefully

02:08:57   10 evasive and uncertain?

11 **A.**    Precisely.

12 **Q.**    Did he tell him, "I did a good job of answering the

13 questions without over-answering?  I certainly said

14 nothing that could have deepened Bob's problems and added

02:09:13   15 problems for you"?

16 **A.**    Yes.

17 **Q.**    Did he tell them that he, "Gave them a good answer"?

18 **A.**    Yes.

19 **Q.**    Did he tell them what he told agents about his

02:09:25   20 knowledge about the trust structure?

21 **A.**    Yes.

22 **Q.**    So, Dr. Dietz, just starting from your point of

23 uncertainty in October of this year until now, have you

24 resolved some of those uncertainties?

02:09:42   25 **A.**    Yes.

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1  **Q.**   So, what is your opinion today about Mr. Brockman's

2  competence?

3  **A.**   It remains my opinion, as expressed in my most recent

4  report, that Mr. Brockman is competent to stand trial.

02:09:58  5         MR. MAGNANI:  No further questions, Your Honor.

6         THE COURT:  All right.  Cross-examination?

7         MR. VARNADO:  Thank you, Your Honor.

8                    **CROSS-EXAMINATION**

9  BY MR. VARNADO:

02:10:16  10  **Q.**   Good afternoon, Dr. Dietz.

11  **A.**   Good afternoon.

12  **Q.**   Would you agree with me this e-mail doesn't speak at

13  all to whether or not Bob Brockman is competent to stand

14  trial?

02:10:26  15  **A.**   I would agree with that.

16         MR. VARNADO:  Thank you, Your Honor.  Bear with

17  me.  A few things here.

18         THE COURT:  Sure.

19         MR. MAGNANI:  And, Mr. Varnado, I think I left

02:10:54  20  one thing at the podium -- two things.  Sticky notes.

21         MR. VARNADO:  Okay.

22  BY MR. VARNADO:

23  **Q.**   Dr. Dietz, do you agree that it's important for a

24  forensic psychiatrist to remain free from bias when

02:11:06  25  assessing a defendant's competence to stand trial?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1  **A.**   To the extent possible, yes.

2  **Q.**   And I believe you -- Is it not possible?

3  **A.**   No one can remain completely free from bias.  The

4  duty is to protect against it to the extent one can.

02:11:24  5  **Q.**   Did you do that in this matter?

6  **A.**   I would hope so.

7  **Q.**   I think you have stated -- and I'll quote -- that the

8  proper role of a forensic psychiatrist is to seek the

9  truth and not to help any party in a case; is that

02:11:34  10  correct?

11  **A.**   Yes, it is.

12  **Q.**   When you're first engaged in a competency matter, do

13  you presume at the outset that a defendant is competent to

14  stand trial?

02:11:47  15  **A.**   The law does, but I don't.

16  **Q.**   Do you presume the defendant to be not competent?

17  **A.**   I don't presume either way.

18  **Q.**   Okay.

19  **A.**   But there's a legal presumption of competence.

02:11:55  20  **Q.**   And you agree that the government has the burden of

21  actually proving Mr. Brockman's competence to stand trial

22  here?

23  **A.**   In this circuit, yes.

24  **Q.**   Yes.  Now, how did you first hear about the case

02:12:08  25  against Mr. Brockman?

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1   **A.**   I received a telephone call from -- I think Chris

2   Magnani was the very first to call me.

3   **Q.**   Okay.  So, the government reached out to you first as

4   opposed to you reaching out to the government?

02:12:22   5   **A.**   Of course.

6   **Q.**   Well, there are some instances where you actually

7   will affirmatively reach out to offer your expert services

8   in cases?

9   **A.**   I don't know that I have ever done that, but I have

02:12:40   10   learned that my office has from time to time reminded a

11   former client of our existence.

12   **Q.**   Okay.

13   **A.**   But we -- we do not solicit work or haven't in the

14   past.  I hear that competitors are, and we may try it one

02:12:58   15   day.

16   **Q.**   So, it's your testimony you did not solicit work in

17   the Nxivm case?

18   **A.**   I received a call from an attorney representing some

19   of the principles, and that's how I became involved.

02:13:20   20   **Q.**   Okay.

21   **A.**   Now, when the Nxivm case became later a criminal

22   case, I did contact one of the defendant's criminal

23   lawyers to say, "I have information that might be useful

24   to your client."

02:13:39   25   **Q.**   So, you did reach out in that capacity?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*PARK E. DIETZ, M.D. – CROSS BY MR. VARNADO*

1  **A.**   Sure.  It was the same person I had been hired by in

2  the civil matter or -- I don't even know how to

3  characterize it -- but before there was -- there were

4  criminal charges.  I didn't think it right for them not to

02:14:02  5  know that I had information.

6  **Q.**   At the time you were contacted by Mr. Magnani in this

7  case, were you aware of the press conference conducted by

8  the Department of Justice in San Francisco alleging that

9  this was, quote, the largest tax case brought against an

02:14:15  10  individual in U.S. history?

11  **A.**   I wasn't aware of it until after I got a call, and

12  then I went online and found such a story.

13  **Q.**   Did that press release or statement of the alleged

14  size and significance of the case make you more interested

02:14:33  15  or less interested?

16  **A.**   Probably more.

17  **Q.**   Okay.  And I think you testified that you were

18  retained in December of 2020, although there may have been

19  some paperwork being worked out.

02:14:47  20       Do you have a formal retainer agreement

21  with the Department of Justice in this case?

22  **A.**   There ought to be a formal contract.  I don't know

23  what it looks like in this case, but usually when DOJ

24  retains us, it's a DOJ contract with a lot of detail about

02:15:07  25  per diem rates and flying coach and such.

PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO

1  Q.   Is that contract specific to this matter or a

2  contract with the government for multiple cases?

3  A.   Every case is a new contract for us.  Occasionally

4  there's more than one expert retained on a given case's

02:15:27  5  contract.

6  Q.   Okay.  And as I understand it, at least from the

7  information we received from the government, that as of,

8  you know, the weekend before we began here today -- this

9  week, you had billed the government $233,000, roughly, for

02:15:42  10  your services on this matter?  Does that sound about

11  right?

12  A.   No.

13  Q.   That information we got from the government is wrong?

14  A.   Well, there could be a total bill of that amount, if

02:15:54  15  it includes expenses, and then it wouldn't be for

16  services.  It would be for services --

17  Q.   Okay.

18  A.   -- and expenses.

19  Q.   Fair.

02:16:02  20  A.   Or if it includes some of Dr. Darby's billings.

21  Q.   No.  It was just specific to you and not Dr. Darby.

22          So, 233 for services and expenses,

23  233,000.  Does that sound accurate?

24  A.   That could well be.

02:16:20  25  Q.   And what's the hourly rate that you are charging on

1  this particular matter?

2  **A.**   I don't know offhand, but my customary hourly rate is

3  $800 per hour, the government hourly.

4  **Q.**   So, the government hourly rate is $800 an hour --

02:16:33   5  **A.**   Yes.

6  **Q.**   -- for your services on this case?

7  **A.**   Well, I think so.  I assume it's true of this case.

8  **Q.**   All right.  We will do the math to figure out how

9  many hours that is.

02:16:42   10  **A.**   250.

11  **Q.**   250 hours that you have put in so far?

12  **A.**   That's my knowledge, yes.

13  **Q.**   Okay.  And that's prior to this week where you were

14  here in court all day for these five days?

02:16:53   15  **A.**   It's what would have been billed as of last Friday.

16  **Q.**   Okay.  All right.

17            Okay.  So, what material did you read

18  before actually accepting the engagement on this case?

19  And, more specifically, let me just ask:  Did you read the

02:17:11   20  government's response to the defendant's motion for a

21  competency hearing when the case was pending out in San

22  Francisco before you took the engagement?

23  **A.**   I think that was quite a long document.  I doubt I

24  would have read it carefully before being retained.

02:17:32   25  **Q.**   Okay.  But you're aware that's one of the first

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1 filings that was in this case when the matter was pending

2 in San Francisco?

3 **A.**   Yes.  And I also remember, before agreeing to take

4 the case, I learned some of what was being alleged and

02:17:48   5 what was going on.

6 **Q.**   Meaning did you learn that it was -- before you

7 agreed to take the case, did you learn that it was the

8 government's position that the defendant was malingering

9 incompetence?

02:18:00  10 **A.**   Yes, I knew that.

11 **Q.**   So, as you initiated engagement on this particular

12 matter, you were aware that the government's position was

13 that Mr. Brockman was malingering incompetence?

14 **A.**   Yes.  I knew they thought that.

02:18:14  15 **Q.**   Okay.  And did that influence your view from the

16 outset here?

17 **A.**   Well, I'd like to think not.  One can never be sure.

18 That's what I meant when I said that nobody is free of

19 bias.

02:18:26  20 **Q.**   Okay.

21 **A.**   Here, they had believed that from the beginning --

22 and, as I'm sure your firm did as well, I argued with them

23 that just because he was obviously faking earlier doesn't

24 mean he was faking now, and we needed to look at it.

02:18:42  25 **Q.**   So, let me ask you this, Dr. Dietz.  You obviously

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1  knew that from the outset -- and Mr. Magnani showed you

2  our letter from April of 2020 -- that the defense's

3  position was that Mr. Brockman, one, suffered from

4  Parkinson's disease.  Correct?

02:18:57  5  **A.**  Yes.

6  **Q.**  Okay.  And that our -- and that the defense's

7  position was that it was Parkinson's disease dementia or

8  Lewy body dementia that was rendering the defendant

9  unable -- Mr. Brockman unable to communicate with us in

02:19:12  10  defending him?

11  **A.**  Yes.

12  **Q.**  Okay.  So, you knew that this was a case -- this was

13  not a case where the defendant was claiming to be insane,

14  or psychotic, or some of your more traditional engagements

02:19:25  15  that you have had in the past?

16  **A.**  That's correct.  And that's why I argued with them

17  that I was not the right person for this, didn't they want

18  a geriatric psychiatrist who would be able to be a

19  specialist in those things.

02:19:40  20  **Q.**  And -- but -- so, you argued for them that they --

21  you told them they should, in fact, have -- a geriatric

22  psychiatrist would be the proper expert to engage on this

23  matter?

24  **A.**  I suggested that as one of the courses of action they

02:19:53  25  could take, and that they could have both if they wanted.

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    And I even talked to a couple of geriatric psychiatrists

2    about whether they would be willing to take the case.

3    **Q.**   And a geriatric -- they did not engage a geriatric

4    psychiatrist on this matter.  Correct?

02:20:08   5    **A.**   Correct.

6    **Q.**   So, again, as we sit here today, having gone through

7    this hearing -- and I know you have put in a lot of work

8    on the case -- you do not contest that Mr. Brockman has

9    Parkinson's disease?

02:20:23   10   **A.**   Correct.

11   **Q.**   And you concede that Mr. Brockman has some form of

12   cognitive impairment?

13   **A.**   I don't concede it.  I acknowledge it as the truth.

14   **Q.**   Okay.  So, in your mind the question is just how

02:20:36   15   impaired Mr. Brockman actually is?

16   **A.**   Yes.

17   **Q.**   I am going to show you what's marked as Defendant's

18   Exhibit 68.

19          MR. VARNADO:  May I approach, Your Honor?

02:20:50   20          THE COURT:  You may.

21   BY MR. VARNADO:

22   **Q.**   I'll just hand this to you, Dr. Dietz.  It's

23   Defendant's Exhibit 68.  Do you recognize that, Dr. Dietz,

24   as a copy of your CV?

02:21:00   25   **A.**   I do.

PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO

1           MR. VARNADO:  I am going to move to admit

2  Government's -- I mean -- sorry -- Defendant's 68 into

3  evidence.

4           MR. MAGNANI:  Without objection.

02:21:08   5           THE COURT:  Without objection, it is admitted.

6  BY MR. VARNADO:

7  Q.   I just want to spend a little bit of time on your CV,

8  Dr. Dietz.

9           Is your --

02:21:16   10  A.   Do you expect me to be able to get it through the

11  Plexiglas?

12  Q.   Let me hand it around.  No.  It's too thick to get

13  there.

14  A.   Thank you.

02:21:26   15  Q.   Hand it this way.

16           Is this the normal CV that you have for

17  all of your engagements, Dr. Dietz?

18  A.   This one is a little old.  I think the one we're

19  currently using is six months more recent.

02:21:36   20  Q.   Okay.

21  A.   But it's the only CV for its age.

22  Q.   Okay.  And this is 104 pages.  Correct?

23  A.   I couldn't tell you without looking, but I'll take

24  your word for it.

02:21:49   25  Q.   I think it's listed in the upper left corner of each

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  page.  And I will just give you a chance to look at that,

2  if you can see 104 pages.

3  **A.**   Yes.  That's right.

4  **Q.**   Okay.  And I -- you know, Mr. Magnani may have been

02:22:03  5  selling you a little bit short when he said you have been

6  on some pretty significant criminal cases.  It's fair to

7  say that you have been retained as an expert in some of

8  the most high-profile, sensationalistic cases in U.S.

9  history?

02:22:15  10  **A.**   That's very nicely said, but -- some of them, yes.

11  **Q.**   Okay.  And we went through a couple of them.  The

12  Jeffrey Dahmer case, the Unibomber case, Dylann Roof,

13  Jared Loughner.  These are some of the matters that you

14  have been engaged on.  Correct?

02:22:31  15  **A.**   Correct.

16  **Q.**   As well as the Susan Smith case.  Do you recall that

17  one?

18  **A.**   Yes.

19  **Q.**   And, again, this is listed in the "Notable Cases"

02:22:39  20  section of your CV.

21             And Susan Smith was the mother in South

22  Carolina who had rolled her -- unfortunately, rolled her

23  children into a lake and drowned them in South Carolina.

24  Correct?

02:22:51  25  **A.**   Correct.

PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO

1   Q.   And Mr. Magnani also mentioned the Yates case, the

2   Andrea Yates case here in Houston, as one of the cases you

3   have been engaged.

4   A.   Yes.

02:22:59   5   Q.   Correct?

6            And, you know, in terms of the notable

7   cases on your CV, you would agree with me that those

8   generally concern defendants that are accused -- in that

9   section of your CV, accused of violent crimes or crimes

02:23:10   10   involving sexual deviancy, that sort of thing?

11   A.   I think those would be the most prominent there.

12   Q.   Okay.  And, again, those are just cases I mentioned

13   that -- where you were an expert for the prosecution.  To

14   be fair, you also represent defendants as well.  Correct?

02:23:26   15   A.   I don't represent them, but I have been engaged by

16   them.

17   Q.   Engaged on their behalf?

18   A.   Yes.

19   Q.   Yes.  Okay.  And, again, that would include Keith

02:23:34   20   Raniere in the Nxivm case?

21   A.   Actually, not him.  It was Clare Bronfman and some of

22   the others.

23   Q.   Okay.  And then what about Ghislaine Maxwell?  Do

24   you -- currently engaged on her behalf in connection with

02:23:48   25   the Epstein case?

PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO

1    **A.**    Yes.

2    **Q.**    All right.  In addition to the notable cases, your CV

3    contains a list of cases upon which you have provided

4    expert testimony since 1990.  I think this is Pages 22

02:24:01    5    through 35.

6    **A.**    Yes.

7    **Q.**    We are not going to go through all those.  It's

8    literally 20 pages, lots of different cases that you have

9    been engaged on.  Correct?

02:24:09    10    **A.**    True.

11    **Q.**    And you are an M.D.  That stands for "medical

12    doctor."  Correct?

13    **A.**    Yes.

14    **Q.**    All right.  But you are not a doctor that sees

02:24:15    15    patients in a clinical setting?

16    **A.**    Not anymore.

17    **Q.**    Okay.  And you haven't done that for a really long

18    time?

19    **A.**    Correct.

02:24:21    20    **Q.**    Close to 40 years?

21    **A.**    Getting there.

22    **Q.**    Okay.  Your CV also contains a list of publications.

23    I think there is about 15 pages of those from Pages 36 to

24    42.  Do you agree with that?

02:24:36    25    **A.**    Yes.

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1   **Q.**   All right.  And that's books and book chapters,

2   essays, and letters to the editor, and a whole host of

3   publications.  Fair?

4   **A.**   Sure.

02:24:45   5   **Q.**   All right.  Literally hundreds, I think, of

6   publications that you have written or co-written?

7   **A.**   Well, one hundred.

8   **Q.**   Yeah.  Okay.  And none of those publications are

9   specific to the competency of individuals with Parkinson's

02:24:58   10   disease dementia.  You would agree with me.  Correct?

11   **A.**   I do agree.

12   **Q.**   And none of those writings specifically address the

13   competency of individuals with Alzheimer's disease

14   dementia?

02:25:07   15   **A.**   Correct.

16   **Q.**   And none of them -- Okay.  Strike that.

17                  There is also a section in your CV that I

18   want to talk about briefly, Dr. Dietz, "Filmography."

19   This is one I haven't seen before for a person in your

02:25:23   20   line of work, but that's -- Is it fair to say you have had

21   at times an active career in Hollywood, Dr. Dietz?

22   **A.**   I don't know that I would call it that.  I've always

23   objected to experts having their media appearances at the

24   time they were on CNN or Fox or CNBC.  I don't think it

02:25:45   25   belongs in the list.  But after others made it an issue

PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO

1  that I have consulted on TV, I figured what the hell.

2  I'll put it in my CV.

3  **Q.**   All right.

4  **A.**   And at that point --

02:25:56  5  **Q.**   I'm sorry.

6  **A.**   -- I hadn't even kept track of them, but there is a

7  source online that keeps track of all this.  And so I was

8  able to cut and paste from that source, IMDb, all the

9  credits I have had for these various things.

02:26:14  10  **Q.**   Okay.  And, so, some of these -- and I'll just put it

11  up there on the screen -- under your filmography is Law &

12  Order.  And I think, if I added them up correctly, there

13  is somewhere in the neighborhood of 300 or so Law &

14  Order -- of that type of series episodes on which you have

02:26:29  15  been a technical adviser, a forensic technical adviser, or

16  something of that nature.  Is that fair?

17  **A.**   I thought it was around 250, but too many.

18  **Q.**   Yeah.  I think there is few more than that.  But

19  okay.

02:26:41  20            And this also includes some documentaries,

21  including some documentaries on the Yates case, correct --

22  **A.**   I assume so.

23  **Q.**   -- in your filmography?  Yes?

24  **A.**   Yes.

02:26:52  25  **Q.**   Do you recall that?  All right.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          And, again, fair to say that that

2   filmography generally relates to the notable cases that we

3   have talked about before in large part?  For the cases

4   where you appeared as yourself and were actually involved

02:27:06   5   in the film?

6   **A.**   Yes.  That would be true.

7   **Q.**   Okay.  So, I do want to turn -- Well, actually, you

8   know, we were talking about sort of your role and I said

9   40 years -- it's been about 40 years since you have seen

02:27:22   10   patients, and you said, "Getting there."

11          What year could we put down as the last

12   time you were actively involved in a clinical setting of

13   treating patients?

14   **A.**   I couldn't give you an exact date now, but from '82

02:27:35   15   to '88 I had hospital privileges at the University of

16   Virginia and some responsibilities for issues arising in

17   those patients -- for example, a consultation on

18   competence to consent to treatment.

19   **Q.**   But in terms of, you know, treating patients being

02:27:58   20   your -- you know, your core work, that dates back to the

21   1980-1981 time period, prior to this time period at

22   University of Virginia?

23   **A.**   I was actively treating patients in the late '70s and

24   maybe the earliest '80s.  But --

02:28:14   25   **Q.**   Not since?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    **A.**   Correct.

2    **Q.**   Okay.  Fair enough.

3              And I believe you made appearance on

4    60 Minutes, if you'll recall, in 2001.  And in response to

02:28:24  5  a question -- or a statement about, you know, there is one

6    thing Dr. Dietz hasn't spent much time on and that's

7    treating patients, I am correct that you responded, "A lot

8    of it is very boring.  Treating private psychiatric

9    patients means listening endlessly to people with fairly

02:28:40  10  normal lives whine about why their lives aren't as great

11   as they wished, and I wasn't going to spend my career

12   doing that."  Is that an accurate statement?

13   **A.**   I can't validate every aspect of the question since I

14   don't really remember this, but yes.

02:28:54  15  **Q.**   Okay.  I mean, I can show it to you if you would like

16   to see it or will you --

17   **A.**   I trust you on that.

18   **Q.**   All right.  Very good.

19              And, so, you were here for Dr. Darby's

02:29:01  20  testimony.  Correct?

21   **A.**   Yes.

22   **Q.**   And, again, as mentioned, you have been in the

23   courtroom, essentially, for every witness.  You may have

24   missed one or two, it sounds like.  But you have been here

02:29:12  25  all week?

1    **A.**    Yes.

2    **Q.**    And you heard Dr. Darby testify that, in his view,

3    having clinical experience is important for somebody who

4    is conducting a forensic evaluation.  Did you hear that

5    testimony?

6    **A.**    I did.

7    **Q.**    And you had recommended to the government that they

8    actually engage a geriatric psychiatrist for this

9    particular matter.  Correct?

10   **A.**    I thought that would be good.

11   **Q.**    And they did not?

12   **A.**    No.

13   **Q.**    Now, you're board-certified in psychiatry.  Correct?

14   **A.**    I am.

15   **Q.**    But you are not board-certified in forensic

16   psychiatry.  Correct?

17   **A.**    That's right.

18   **Q.**    Have you ever been board-certified in forensic

19   psychiatry?

20   **A.**    No.  I refuse to sit for the boards.

21   **Q.**    Okay.  So, you have never -- it's not like you sat

22   for the test and failed.  You just haven't sat for the

23   test?

24   **A.**    More than that.  It was a political issue.  The

25   people who created the board were my friends, and I guess

1   one could say peers, though some of them were older.  It

2   was presidents and past presidents of Apple, the people

3   that I hobnobbed with at the national meetings.  I knew

4   them all.  They wanted to have a board.  I thought a board

02:30:19  5   was a very good idea, but I diverged from them on what it

6   ought to be about.

7              They kept insisting that it be focused on

8   case law and that everyone should have a broad-spectrum

9   experience that included child psychiatry, adolescent

02:30:39  10   psychiatry, adults, criminal, civil, disability, worker's

11   comp.  And I said no one can master all of that -- I wrote

12   an article about this issue -- and that it --

13   **Q.**   And I am --

14   **A.**   -- really ought to be specialized.

02:30:54  15   **Q.**   I don't mean to cut you off, Dr. Dietz.  I accept

16   your representation you had a philosophical disagreement

17   with the board and that's why you're not board-certified

18   in forensic psychiatry.  I'll accept that just in the

19   interest of moving on.  But I did want to clarify that we

02:31:07  20   hadn't missed something and that it is, in fact, the case

21   you are not certified in forensic psychiatry.

22   **A.**   I am not certified.

23   **Q.**   Fair.  I understand there is, obviously, a good and

24   long explanation for that.

02:31:17  25             And so, again, you do not have a specialty

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    in geriatric psychiatry?

2    **A.**    That is right.

3    **Q.**    And you have no specialized training in geriatrics or

4    neurodegenerative disorders?

02:31:29    5    **A.**    No specialized training?

6    **Q.**    Correct.

7    **A.**    That would be correct.  No more than any other

8    physician.

9    **Q.**    And no specialized training in Parkinson's disease?

02:31:35    10   **A.**    Well, a little more than the average physician, but

11   certainly not a fellowship in it or --

12   **Q.**    Okay.

13   **A.**    -- or a neurology fellowship.

14   **Q.**    And you would agree with me that you don't have

02:31:46    15   experience actually treating Parkinson's disease patients.

16   Correct?

17   **A.**    Not significant experience.  I have had patients back

18   when I had patients who had Parkinson's.

19   **Q.**    Okay.  So, for purposes of these questions, not

02:32:00    20   --since the early 1980s, you have not had any experience

21   treating patients with Parkinson's disease.  Correct?

22   **A.**    I think that's right.

23   **Q.**    All right.  And you have no specialized training in

24   treating Parkinson's disease dementia.  Correct?

02:32:15    25   **A.**    Correct.

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    Q.    And, again, the same question.  No experience

2    treating patients since at least the -- 1980-81 for

3    Parkinson's disease dementia?

4    A.    That's right.

02:32:23  5    Q.    And if I asked you those same questions for

6    Alzheimer's disease and Alzheimer's disease dementia,

7    those -- I would have the same answers.  Correct?

8    A.    Yes.

9    Q.    Okay.  Now, this matter, obviously, concerns the

02:32:35  10   competency of a geriatric patient.  Correct?

11   A.    It does.

12   Q.    Mr. Brockman is 80 years old?

13   A.    Yes.

14   Q.    Yes?  And you mentioned Dr. Ponisio, who was engaged

02:32:50  15   by the government.  You are aware that Dr. Ponisio has

16   issued a report that says that the -- Mr. Brockman's March

17   of 2021 FDG PET scan is consistent were Alzheimer's

18   disease dementia.  Have you seen that in her report?

19   A.    I have seen that.

02:33:09  20   Q.    Okay.  And, again, despite your relative lack --

21   well, really, within the last 40 years at least, lack of

22   experience with specialized training or treating

23   Parkinson's disease or Alzheimer's, you were engaged as

24   the forensic expert, psychiatric expert on this case.

02:33:25  25   Correct?

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1  **A.**   That's correct.

2  **Q.**   Okay.  Now, you were asked some questions on direct

3  about the Yates case, and I believe you were asked about,

4  you know, were there some problems with that case.  Do you

02:33:37  5  recall that question?

6  **A.**   I do.

7  **Q.**   And I think you said, 'Well, when I was testifying, I

8  was asked about, you know, a TV show that I consulted on.'

9  That was the Law & Order that we looked at on your CV just

02:33:48  10  a moment ago?

11  **A.**   Yes.

12  **Q.**   Correct?  And you said -- your testimony was that you

13  gave an answer from memory that was factually wrong.  You

14  offered to correct the error, but, in any event, that

02:33:58  15  testimony became a central part of the appeal because it

16  was possible that the jury was misled based on your,

17  quote, factual error and the state's reliance on it in

18  closing argument.  That was your testimony on direct.

19  Correct?

02:34:12  20  **A.**   Correct.

21  **Q.**   I want to talk a little bit about the Yates case, and

22  I think people -- it happened here in Houston.  Some

23  people may be familiar with it.  A tragic case where a

24  mother drowned her five children in the bathtub at their

02:34:25  25  home here in Houston.  Correct?

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1  **A.**   Yes.

2  **Q.**   And the facts came out at trial where, after having

3  her fourth child, Ms. Yates was told -- or actually she

4  became severely depressed and tried to commit suicide, I

02:34:36  5  think, by taking her father's medication.  Does that sound

6  right?

7  **A.**   I don't remember enough of the facts.

8  **Q.**   Okay.  Well, and I'll -- Just see if you agree with

9  me here.  She was told by her psychiatrist that she was at

02:34:47  10  risk of postpartum depression and another psychotic

11  episode if she were to have another baby.  Do you remember

12  that?

13  **A.**   Yes.

14  **Q.**   All right.  And then, nevertheless, she did have

02:34:56  15  another child, a fifth child, and then, unfortunately, did

16  in fact have postpartum depression and this episode and

17  took their lives?

18  **A.**   Yes.

19  **Q.**   Okay.  And you were the sole mental health expert for

02:35:07  20  the state in that case.  Correct?

21  **A.**   That, I don't know.  On the first trial I might have

22  been.

23  **Q.**   Yeah.  And let's stick with the first trial, because

24  I know there was a retrial, but let's stick with that

02:35:20  25  first trial.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1          And you had interviewed Ms. Yates in

2     connection with your work on that first trial?

3     **A.**   Yes.

4     **Q.**   Correct?  All right.  And at the time you accepted

02:35:28   5     that engagement you were not a, quote, specialist in

6     postpartum depression, were you?

7     **A.**   No.

8     **Q.**   All right.  And you did not claim to have any sort

9     of, quote, unusually strong knowledge in that area.

02:35:40  10     Correct?

11     **A.**   That's true.

12     **Q.**   All right.  And, again, out of the numerous

13     psychologists and psychiatrists that testified in the

14     Yates case, in the first trial, you were the only expert

02:35:50  15     to testify that Ms. Yates was sane at the time she killed

16     her children.  Correct?

17     **A.**   Well, of course, I did not testify to the ultimate

18     issue.  I was one of two who testified that she knew that

19     what she was doing was wrong and that she knew the nature

02:36:15  20     and quality.

21     **Q.**   And then, under the Texas standard, that met the

22     definition for knowing what she did was wrong and being

23     sane and able to be tried on that particular case.

24     Correct?

02:36:24  25     **A.**   Yes.  Yes.

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1   **Q.**   Now, again, the facts at trial were revealed that

2   Ms. Yates actually watched Law & Order, that television

3   show that you consulted on.  Correct?

4   **A.**   I did not know that --

02:36:34   5   **Q.**   Okay.

6   **A.**   -- until after the trial.

7   **Q.**   Okay.  And during your cross-examination you were

8   asked about your consulting for Law & Order that we

9   discussed from your CV.  And when you were asked a

02:36:46   10   question on cross-examination, if any of those Law & Order

11   episodes dealt with postpartum depression, you volunteered

12   some testimony.  Correct?

13   **A.**   Yes.  It was a smart-aleck response.

14   **Q.**   Okay.  And let's go through it, because I think it's

02:37:00   15   important for everyone to understand.

16          First, you said:  "Yes, there was an

17   episode concerning a woman with postpartum depression."

18   That was part of your testimony.  Correct?

19   **A.**   Yes.

02:37:09   20   **Q.**   And, second, you said that "One of the episodes

21   involved a woman that had drowned her children in the

22   bathtub and was found insane."  That was part of your

23   testimony also?

24   **A.**   Yes.

02:37:18   25   **Q.**   And then, third, that the episode had aired shortly

1    before the -- this particular crime, Ms. Yates,

2    unfortunately, taking her own kids' life, that it had

3    aired, you know, right soon before the events of that

4    tragic day.  Correct?

02:37:33    5    **A.**    Shortly before, yes.

6    **Q.**    And the prosecution used that testimony, first, to

7    discredit a defense expert.  Do you remember that?

8    **A.**    No, I don't know about that.

9    **Q.**    And, as you already conceded, they also used it in

02:37:43    10    summation to suggest that Ms. Yates had done the same

11    thing, you know, presented in the television episode.  You

12    recall that.  Correct?

13    **A.**    That, I do know about.

14    **Q.**    And, in any event, Ms. Yates was convicted after you

02:37:54    15    had testified.

16                      After the conviction but before

17    sentencing, it's correct that the defense counsel was

18    contacted by the producers of Law & Order about your

19    testimony.  Right?

02:38:06    20    **A.**    Right.

21    **Q.**    And the producers subsequently reached out to you and

22    informed you, 'Look.  There was no such Law & Order

23    episode that you describe in your testimony.'  Right?

24    **A.**    Right.

02:38:18    25    **Q.**    And, as a response to that, being informed of the

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1  falsity of your testimony, you sent a letter to the

2  prosecutors.  Fair?

3  **A.**   Right.  After spending a day or two trying to figure

4  out where this mistake came from, I gave them my best

02:38:32   5  guess, because they asked me to write a letter that they'd

6  put in the record.

7  **Q.**   Okay.

8  **A.**   I had offered to fly back, but they said, 'No, don't

9  bother.  Write a letter.  We'll put it in the record.'

02:38:47   10        MR. VARNADO:  I'm just going to mark for

11  identification Defendant's Exhibit 69.  And I just want to

12  run through it.

13            And I'll just -- let me just show you,

14  Dr. Dietz --

02:39:02   15            May I approach?

16            THE COURT:  You may.

17  BY MR. VARNADO:

18  **Q.**   Again, maybe not the exact format, but if you could

19  look at that and see if it's the substance of the letter

02:39:11   20  that you sent to the DA's office to correct your error.

21            MR. MAGNANI:  And if I could ask, do I have a

22  copy of this, Mr. Varnado?

23            MR. VARNADO:  Yes.

24            MR. MAGNANI:  Thank you.  69, Mr. Varnado?

02:39:23   25            MR. VARNADO:  Yes.

1  BY MR. VARNADO:

2  **Q.**   Do you recognize that --

3  **A.**   I do, yes.

4  **Q.**   -- Dr. Dietz?

02:39:39    5  **A.**   That seems to be the verbal content of the letter.

6  **Q.**   Okay.  And I'll just put this on the screen so we can

7  go through it.  Because you communicated to the two

8  District Attorneys that it had been brought to your

9  attention that you were incorrect in an answer that you

02:39:54   10  gave during cross-examination, and then, you know, it goes

11  through what we just talked about, that this was the

12  substance of your testimony, that there was a show, the

13  woman who was postpartum who drowned her children in the

14  bathtub, and that it aired before the crime occurred,

02:40:08   15  correct?

16  **A.**   Yes.

17  **Q.**   And then that you were contacted by the producers,

18  including Dick Wolfe, who said, listen, that -- you know,

19  there is no episode that matches those facts; and that you

02:40:18   20  said, Look, your memory about the content of the show is

21  incorrect, and you were confounding the facts of three

22  filicide cases.  That's unfortunately when people kill

23  their children.  Correct?

24  **A.**   Yeah.  This turns out not to be right either.

02:40:31   25  **Q.**   We will get to that.

1    **A.**   I thought it was conflating these.

2    **Q.**   Yeah, we will get to that.  And so in this letter

3    that you sent to the DA's office, you said, Look, the

4    first is that I had a certain episode in mind, and I'll

02:40:44   5    just sort of paraphrase here, but, first off, the Susan

6    Smith case, the woman who had drowned her children in

7    South Carolina, that was part of what was in your head, as

8    you explained to the DA's office, correct?

9    **A.**   Yes.

02:40:57   10   **Q.**   And then also that there was, you know, a Law & Order

11   episode in part based on the Smith case called "Insanity"

12   that you had, you know, confounded and were sort of

13   thinking of at the same time also?

14   **A.**   I don't even remember about that.

02:41:16   15   **Q.**   Okay.  We can look here.  In terms of the three --

16   you said my answer thus confounded A -- and I'll just skip

17   to that part, the drowning by Susan Smith, the insanity

18   claim in the episode "Angel," and the acquittal in an air

19   date -- in an episode called "Denial."  Do you see that

02:41:35   20   one where my pen is?

21   **A.**   Yes.

22   **Q.**   That particular paragraph.  And that's what you wrote

23   to the DA's office as an explanation for your testimony,

24   correct?

02:41:41   25   **A.**   That's what I thought at the time.  Yes.

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    **Q.**   Okay.  And I think you had -- you know, you were just

2    -- admitted you were just wrong about the bathtub, that

3    was something that had just, you know -- not connected to

4    an episode, you just made that up?

02:41:54   5    **A.**   No, I hadn't just made it up.  I had a memory, but it

6    was not from the sources I thought at the time.

7    **Q.**   Okay.  And so, you know, kind of blending all of

8    those parts into one thing, you had given your response to

9    the testimony at the Yates trial, correct, that we just

02:42:11   10   went through?

11   **A.**   We just went through the best I could reconstruct it

12   on March 14, 2002.

13   **Q.**   Okay.

14   **A.**   Subsequently, I learned the -- the true explanation.

02:42:24   15   **Q.**   Okay.  And we will -- we will get to that part as

16   well.

17               And so --

18               MR. MAGNANI:  Sorry, just to object, Your

19   Honor, I just want to make sure counsel is not trying to

02:42:32   20   impeach this witness with two versions of different

21   out-of-court statements that are inconsistent.

22               Of course, impeachment is proper if

23   something the witness said in court is inconsistent with a

24   prior statement, but I just want to make sure that

02:42:46   25   Mr. Varnado is not trying to take two out-of-court

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1   statements and use that as a basis for impeachment of this

2   witness's testimony here today.

3              THE COURT:  Response?

4              MR. SMITH:  Look, I believe if he is making

02:42:56   5   representations as to his testimony, it's quite relevant,

6   regardless of whether it's in court or out of court.

7              THE COURT:  I agree.  Respectfully, objection

8   overruled.  You may proceed.

9              MR. VARNADO:  Thank you.

02:43:06  10   BY MR. VARNADO:

11   Q.   And so, Dr. Dietz, you explained all this in writing

12   to the DA's office and took responsibility for the error,

13   correct?

14   A.   Yes.

02:43:13  15   Q.   All right.  And, in fact, that -- there was no

16   episode that ran shortly before Ms. Yates committed these

17   offenses, that was an error also?

18   A.   There was no such episode of Law & Order that ran

19   shortly before these offenses.

02:43:27  20   Q.   Okay.  And that's the show upon which you had been

21   consulting as well as LA Law, correct?

22   A.   I couldn't tell you now what all shows I was

23   consulting on at that time.

24   Q.   Let's move forward.  The defense in that case moved

02:43:43  25   for a mistrial based on your false testimony, correct?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    **A.**    Oh, yes.

2    **Q.**    And that -- that was denied, and Ms. Yates was -- was

3    in fact, sentenced, and her case proceeded, correct?

4    **A.**    I misunderstood your previous point, because I don't

02:44:04    5    know whether she moved for a mistrial.  I do know that she

6    was convicted.

7    **Q.**    Okay.

8    **A.**    I know that they filed a motion for an appeal --

9    **Q.**    Okay.

02:44:16    10    **A.**    -- based on my testimony and what followed.

11    **Q.**    You weren't aware that in the -- before the appeal,

12    before her conviction was final, they had actually moved

13    for a mistrial based on your -- the inaccuracy and falsity

14    of your testimony?

02:44:29    15    **A.**    I may have known it at one time.  I don't recall it

16    now.

17    **Q.**    Okay.  And, in fact, after the revelations about your

18    testimony in the Yates case, there was a Grand Jury that

19    was constituted to examine this situation.  In fact, you

02:44:46    20    were presented for indictment for aggravated perjury,

21    correct?

22    **A.**    Yes.  Both the prosecutors and I were called before a

23    Grand Jury --

24    **Q.**    Okay.

02:45:00    25    **A.**    -- which was a runaway Grand Jury who had kicked out

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    the prosecutors.

2    **Q.**   Okay.   Your testimony that this was -- let me just

3    mark this for identification as Government's Exhibit 70.

4    Sorry.   Defendant's Exhibit 70, apologize.

02:45:14    5             I'll just show this to you, Dr. Dietz.   Do

6    you recognize that as the indictment that was presented

7    against you here in Harris County, Texas, in the State of

8    Texas vs. Park Elliot Dietz?

9    **A.**   I don't know how these are characterized in Texas.

02:45:39    10   But what I was aware of is that a Grand Jury had decided

11   to investigate this and eventually concluded no true bill.

12   **Q.**   Okay.   And you testified on the Grand Jury, correct?

13   **A.**   I did, against legal advice.

14   **Q.**   And were you ever informed how close the vote was in

02:46:01    15   that particular instance?

16   **A.**   No.

17   **Q.**   But there was a no bill.   You were not indicted?

18   **A.**   Correct.

19   **Q.**   All right.   Now, after you avoided indictment in the

02:46:12    20   Yates case, the First District Court of Appeals here in

21   Houston actually reversed Andrea Yates' conviction,

22   correct?

23   **A.**   They did.   Well, the Judge sitting for a three-Judge

24   panel did.

02:46:27    25   **Q.**   And, in fact, issued an opinion, I believe, that

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1  characterized your testimony as false testimony, or false

2  statements at least 12 times, correct?

3  **A.**   I didn't count how many times he used the phrase, but

4  he analogized it to a rape victim recanting her complaint.

02:46:55  5  **Q.**   Okay.

6  **A.**   And cited authorities about rape victim recantation.

7  **Q.**   I'll move on past that and just address, that this --

8  this Judge here, Judge Nuchia, in the First Court of

9  Appeals here in Houston, issued this decision, found that

02:47:15  10  you had, in fact, testified falsely, referenced false

11  testimony 12 times, and reversed Ms. Yates' conviction,

12  correct?

13         MR. MAGNANI:  Objection, asked and answered

14  with respect to how many times the Judge referred to false

02:47:28  15  testimony in the opinion.  The witness answered that.

16         THE COURT:  The witness said he didn't know how

17  many times.  He said he didn't know how many times the word

18  "false" was used.  But -- I mean you can ask the question

19  again.

02:47:38  20  BY MR. VARNADO:

21  **Q.**   Her conviction was overturned as a result of your

22  testimony, correct?

23  **A.**   Her conviction was overturned as a result of the

24  potential that the jury had relied on the defense's -- or

02:47:55  25  rather the government -- correction -- the prosecutors

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    having argued that she got the idea to kill her children

2    from the TV show, which she supported with my mistake

3    about the plot, knowing full --

4    **Q.**   Your testimony?

02:48:21   5   **A.**   Yes, my mistaken testimony about the plot of the TV

6    show --

7    **Q.**   Correct.

8    **A.**   -- was used for other purposes that could have

9    mislead the jury and the conviction was overturned.

02:48:35   10   **Q.**   And I want to be clear.  The First Circuit Court of

11   Appeals here in Houston didn't call it mistaken testimony,

12   they called it false testimony?

13   **A.**   There are two ways for there to be false testimony:

14   Error and lie.  This was error.

02:48:48   15   **Q.**   Okay.

16   **A.**   And no court has ever said otherwise.  No court has

17   ever said I did anything wrong.

18   **Q.**   Well, we'll talk about that in a little bit,

19   Dr. Dietz.

02:49:01   20              After Ms. Yates' conviction was overturned

21   you did an appearance on Good Morning America, correct?

22   **A.**   On some show, maybe one of the ones --

23   **Q.**   You spoke to Charles Gibson?

24   **A.**   Pardon me?

02:49:14   25   **Q.**   Do you recall speaking with Charles Gibson who was

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1   the anchor of Good Morning America at that time?

2   **A.**   Could be.  I don't remember who.

3   **Q.**   Okay.  So just to cut right to it, Charles Gibson

4   asked you -- and, again, you had some attention after this

02:49:27   5   conviction was overturned, and essentially in your

6   statement in 2005 you said that it was actually the

7   prosecutors who had mentioned an episode like this to you

8   and that is what caused you to give the false testimony,

9   as opposed to just confounding something in your memory,

02:49:44   10   correct?

11   **A.**   I don't know what I said on a TV show.  But I can

12   tell you what I now believe to be the case, and learned at

13   some point after all of this, the sentence that -- there

14   was an episode of Law and Order in which a woman killed

02:50:11   15   her children by drowning them in the bathtub and was found

16   insane, and it aired shortly before this crime, came

17   directly from notes I took in a conference call involving

18   Mr. Owmby, one of the prosecutors, a prosecutor in Germany

19   that I was working with preparing for an Army prosecution,

02:50:43   20   and another prosecutor, I think, Kaylynn Williford.

21                   I think we were all in this conference

22   call and this was Mr. Owmby's recollection of what he

23   characterized as a letter from a citizen who had said that

24   there was an episode of Law & Order in which a woman

02:51:13   25   killed her children and so on.

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1           Now, I had notes from that phone call.  I

2  never looked at it again.  I didn't rely on that again.

3  But when I was in Houston to examine Mrs. Yates, Mr. Owmby

4  mentioned during a car ride about this letter from a

02:51:34  5  citizen and asked me if that could be true, that she

6  killed her children because she got the idea from a show?

7           And I told him the idea was preposterous,

8  that that's not why she killed her children.  She was

9  mentally ill.  And he said, well, would you look into it?

02:51:52  10  And I said, sure, but --

11  **Q.**   Okay.  So these are notes that you took in the car?

12  Is that what you're saying?

13  **A.**   No.  No.

14  **Q.**   You had -- I just want to get to what you said in the

02:52:02  15  Good Morning America program, and I understand your

16  explanation.

17           But in response to this discussion, I'll

18  just put this up briefly since you said you didn't

19  remember what you talked about.  Was --

02:52:12  20           MR. MAGNANI:  And objection, Your Honor, we

21  talked about this yesterday.  There is a way to do

22  refreshing recollection, and this witness has testified he

23  doesn't remember what he said on the show.

24           So if he is going to refresh his

02:52:22  25  recollection, let's do it properly, and see if it actually

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

 1  refreshes his recollection.

 2            MR. VARNADO:  Happy to do that, Your Honor.

 3  Happy to do that, Dr. Dietz.

 4  BY MR. VARNADO:

02:52:35   5  **Q.**   I have handed you what's been marked as Government's

 6  Exhibit 71.  I'm sorry.  Defendant's Exhibit 71.

 7            MR. MAGNANI:  Do you have a copy for me,

 8  Mr. Varnado?

 9            MR. VARNADO:  Yeah, I do.

02:52:42  10            MR. MAGNANI:  71?

11            MR. VARNADO:  Yes.

12  BY MR. VARNADO:

13  **Q.**   Dr. Dietz, do you see the page I handed you?

14  **A.**   I do.

02:52:57  15  **Q.**   Does that refresh your memory as to the discussion

16  with Charles Gibson --

17  **A.**   It does.

18  **Q.**   -- with the Good Morning America show?

19  **A.**   Yes.

02:53:04  20  **Q.**   And that, again, Gibson said, "Are you saying that

21  the prosecution had told you about this episode?"  And

22  Dietz, "They had.  They told me there was such a show.  I

23  believe they thought I would check it out and determine if

24  it was true, but I hadn't done that because I didn't think

02:53:17  25  it had anything to do with this case."  That was your

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    response?

2    **A.**    Yes.

3    **Q.**    I can take that back from you unless you're still

4    looking at that.

02:53:25    5                    And the prosecutors denied that, correct?

6    **A.**    Denied what?

7    **Q.**    Your statement that they were the ones who had

8    mentioned this television show to you?

9    **A.**    I wouldn't know that.  I never heard that before.

02:53:37    10    **Q.**    You don't know what the DA's testified in the Grand

11    Jury?

12    **A.**    No.

13    **Q.**    Okay.  All right.  I want to talk about another one

14    of your historical cases, Dr. Dietz.  Do you recall the

02:53:55    15    O.C. Smith case?

16    **A.**    I do.

17    **Q.**    All right.  And O.C. Smith, that case concerned a

18    state medical examiner who was found after midnight on

19    June 2nd of 2002 wrapped in barbed wire with a bomb around

02:54:08    20    his neck.  Do you remember that?

21    **A.**    Yes.

22    **Q.**    And that Smith claimed he was attacked by an

23    assailant who did this to him, correct?

24    **A.**    Yes.

02:54:15    25    **Q.**    And the government alleged that Smith did this to

    1   himself and charged him with possession of a bomb and

    2   lying about an attack.  Do you remember that?

    3   **A.**   More or less.

    4   **Q.**   Okay.  And Smith's defense was not that he was

02:54:26   5   incompetent or insane, but that the attack happened just

    6   as he said it did, that somebody abducted him and did this

    7   to him.  Do you remember that?

    8   **A.**   Yes.

    9   **Q.**   And you were hired by the prosecution to testify as

02:54:36  10   to why someone would fake such an attack, correct?

   11   **A.**   Yes.

   12   **Q.**   And in that particular case, the defense lawyers

   13   challenged your testimony, and actually obtained a Daubert

   14   hearing.  Do you recall that?

02:54:49  15   **A.**   I don't.

   16   **Q.**   Okay.  The Daubert hearing is a hearing to determine

   17   whether or not expert testimony is going to be allowed.

   18   You're familiar with that?

   19   **A.**   Yes.

02:54:57  20   **Q.**   All right.  And, again, in that -- your -- your

   21   opinion and statements were that actually this O.C. Smith

   22   case was a copycat of a different case involving somebody

   23   named Brian Wells in Erie, Pennsylvania, correct?

   24   **A.**   I do remember this issue.

02:55:13  25   **Q.**   And that Wells was a pizza delivery man who had

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1  robbed a bank by threatening to explode a live bomb that

2  was locked around his neck.  Do you remember that?

3  **A.**   Yes.

4  **Q.**   And that Wells had stated he was abducted and chained

02:55:25  5  to the bomb and forced to rob the bank, in the Erie,

6  Pennsylvania case, correct?

7  **A.**   I have only a vague recollection, but I recall what I

8  had wrong was the sequence of these two events.

9  **Q.**   Right.  Your testimony and opinion was that O.C.

02:55:40  10  Smith had patterned his particular conduct on the pizza

11  delivery guy in Erie, Pennsylvania, correct?

12  **A.**   I don't remember if I thought he patterned it on it,

13  or got the idea for --

14  **Q.**   I think you said --

02:55:57  15  **A.**   -- from that, but I know I was wrong about which came

16  first.

17  **Q.**   Right.  Right.  Your testimony was that O.C. Smith

18  was, and I'll quote, Influenced or, quote, Derived the

19  idea from the news reporting from the Erie, Pennsylvania

02:56:09  20  case, correct?

21  **A.**   That sounds right.

22  **Q.**   All right.  But, in fact, the Erie, Pennsylvania and

23  those sequence of events occurred 15 months after the O.C.

24  Smith incident, correct?

02:56:21  25  **A.**   As I say, it was not the sequence I had believed.  I

1    couldn't tell you how many months it was.

2    **Q.**    So, I asked you earlier in my examination, Dr. Dietz

3    if you recall -- actually, let me ask you that now.

4                    Do you know who -- which judge in the

5    Northern District of California had this case before it

6    was transferred to Judge Hanks?

7    **A.**    As a matter of fact, I did notice the name once upon

8    a time.

9    **Q.**    And that's Judge Alsup, correct?

10   **A.**    Yes.

11   **Q.**    And that's because there was a case pending before

12   Judge Alsup where the government, or the state, I believe,

13   in that case, had proposed that you serve as a

14   court-appointed expert to conduct a competency examination

15   of a defendant, right?

16   **A.**    Yes.

17   **Q.**    And in that case Judge Alsup rejected the request

18   that you serve as a court-appointed expert stating,

19   "Dr. Park Dietz should not be on the list of proposed

20   experts.  Dr. Dietz was held by the Texas Court of

21   Criminal Appeals to have testified falsely for the

22   prosecution in a capital case.

23                    In light of this, respondent cannot

24   demonstrate that Dr. Dietz is a suitable expert.

25   Certainly there are other potential experts who have not

70

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    given false testimony in a capital case."

2                    Do you recall that?

3    **A.**    I recall it only because I remember the Capital

4    Defense Bar alerted me that I should correct Judge Alsup

02:57:46  5    about his misunderstanding of the Yates case, which that

6    lawyer had carefully looked at.

7    **Q.**    Are there any other cases we should discuss,

8    Dr. Dietz, where your testimony has been excluded?

9    **A.**    The only times I am aware of it being offered and

02:58:01 10    excluded have been where it was offered for an improper

11    purpose of profiling.

12                    There was one case in which a prosecutor

13    wanted to introduce my testimony to explain the sexual

14    motives behind somebody burying a box of bones of his dead

02:58:24 15    lover.  And I didn't think it was appropriate testimony

16    either.  So I thought the Judge ruled correctly on that.

17    **Q.**    But you didn't think it was appropriate but you

18    offered it?

19    **A.**    No.  The prosecutor offered it.

02:58:38 20    **Q.**    Okay.  All right.

21    **A.**    And --

22    **Q.**    Are there any others that have been --

23    **A.**    There was something else similar to that where it

24    was -- the person who wanted to offer the testimony was

02:58:50 25    suggesting doing something that went too far.

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1   Q.   Okay.  We may come back to that topic.

2            Dr. Dietz, we talked before, you were

3   aware that -- that I think Mr. Magnani showed you the

4   letter from April of 2020 where the defense had raised the

02:59:11   5   issue of Mr. Brockman's competency preindictment in this

6   case, correct?

7   A.   Yes.

8   Q.   All right.  And did you see in defense counsel's

9   letter to the government that, again, Mr. Brockman was

02:59:25   10   suffering from Parkinson's disease and based upon the

11   information he had Parkinson's disease dementia, correct?

12   A.   I'm sorry.  I lost the thread there.

13   Q.   Yeah.  That in the letter, the reason -- what the

14   defense counsel -- what we were saying to the government

02:59:39   15   was, please, you know, hear us out here, Mr. Brockman's

16   not competent to stand trial.  He's got Parkinson's

17   disease dementia or Lewy body dementia, something of

18   those -- along those lines, that's the subject of the

19   April 2020 letter?

02:59:52   20   A.   It was.  I couldn't tell you from memory what

21   diagnoses were suggested at that time.

22   Q.   And were you aware that defense counsel invited the

23   prosecutors to interview Mr. Brockman's treating

24   physicians, in advance of any indictment, and agreed to

03:00:09   25   execute HIPAA waivers and not prepare them in any way?

PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO

1   **A.**   Yes, I do recall that.

2   **Q.**   And that the prosecutors never contacted the doctors

3   in that case?

4   **A.**   Not to my knowledge.

03:00:20   5   **Q.**   And instead the government indicted Mr. Brockman six

6   months later, in October of 2020?

7   **A.**   Yes.

8   **Q.**   Okay.  I am going to hand up what I'll mark for

9   identification and later admission as Defense Exhibit 72.

03:00:48   10              MR. VARNADO:  May I approach, Your Honor?

11              THE COURT:  You may approach.

12              MR. VARNADO:  Thanks.  Here you go, Doctor.

13   BY MR. VARNADO:

14   **Q.**   Dr. Dietz, I have handed you what's been marked as

03:00:56   15   Defendant's Exhibit 72, which is just my representation,

16   we will walk through it, contains a list of all of the

17   competency testing that Mr. Brockman has undergone at the

18   Department of Justice's request in this case.

19              Can you just take a quick look at that and

03:01:10   20   then we will kind of go through some of those entries, but

21   I want to make sure you can read it and that it comports

22   with your memory of some of the testing that's gone on and

23   interviews that have happened in this case?

24   **A.**   Yes, it appears to represent the right sequence of

03:01:33   25   events.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1   **Q.**   Okay.  And I'll just go ahead and move to admit

2   Government's Exhibit -- I'm sorry.  Defendant's Exhibit --

3   is it 71, Dr. Dietz?  I'm sorry.

4               MR. LOONAM:  72.

03:01:43   5   **A.**   72.

6               MR. MAGNANI:  And, Your Honor, I am seeing this

7   for the first time.  I think the witness said it's roughly

8   the right sequence of events, but there is a lot of

9   information on here that -- well, I don't know if the -- I

03:01:54   10   mean, the witness hasn't been asked about it and, frankly,

11   I just haven't had time to look at it, so if we could do

12   the same as before, Mr. Varnado, where I can take a look?

13               MR. VARNADO:  Sure.  No problem.

14   BY MR. VARNADO:

03:02:04   15   **Q.**   And I'll just kind of get to -- I want to focus

16   first, Dr. Dietz, on the interviews that have taken place

17   in this --

18               THE COURT:  Actually, Counsel, before we get

19   into, that since it is a new topic, it is 3:00.  We have

03:02:16   20   been going an hour-and-a-half, everyone, let's take a

21   15-minute break and we will start up again at 3:15.

22               MR. VARNADO:  Very good.  Thank you, Your

23   Honor.

24               THE CASE MANAGER:  All rise.

03:02:28   25   (Proceedings recessed from 3:02 p.m. to 3:25 p.m.)

1        THE CASE MANAGER:  All rise.

2        THE COURT:  Please be seated, everyone.  We're

3   all set.  Oh, except for -- we're all ready.

4        MR. SMITH:  Thank you, Your Honor.

03:25:43   5   BY MR. VARNADO:

6   **Q.**   Hello, Dr. Dietz.  We will resume here with what's

7   been marked for identification as Defendant's Exhibit 72.

8   Do you have that in your hands?

9   **A.**   I do.

03:25:52  10   **Q.**   I also have it up on the screen, and I would like to

11   just kind of march through this to make sure we have the

12   sequence of events correct in terms of the testing and

13   interviews and other things that Mr. Brockman has

14   undertaken in connection with the government's request in

03:26:05  15   this competency proceeding, okay?

16   **A.**   Sure.

17   **Q.**   All right.  So the first entry is for the March 12th

18   FDG PET scan that was ordered by Dr. Darby, correct?

19   **A.**   Correct.

03:26:15  20   **Q.**   All right.  The next entry is that first sleep study

21   that you mentioned where Mr. Brockman underwent a sleep

22   study at Memorial Hermann and insufficient data was

23   gathered, but he underwent the study nonetheless?

24   **A.**   Yes.

03:26:28  25   **Q.**   All right.  Then the next entry is from Dr. Darby's

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1   interview and test of Mr. Brockman that lasted

2   approximately three hours.  Do you agree with that?

3   **A.**   Yes.

4   **Q.**   All right.  And then Dr. Darby also interviewed

5   Mrs. Brockman, Mr. Brockman's wife, for an hour.  Correct?

6   **A.**   That's my understanding of the duration.

7   **Q.**   Okay.  And you were not present for that interview?

8   You did not attend?

9   **A.**   Correct.

10   **Q.**   All right.  Then there is a series of interviews and

11   tests in the mid-May time period.  So, May 18th.  This was

12   yourself and Dr. Denney who interviewed Mr. Brockman for,

13   roughly, eight-and-a-half hours?

14   **A.**   Yes.  And on all of these entries I believe the time

15   to be roughly correct, but I don't know if that includes

16   breaks or other issues.

17   **Q.**   Fair.  And I'll just tell you the way we put this

18   chart together, generally, is sort of when the -- when you

19   all arrived to begin the either interviews or testing and

20   when it concluded.  So, that would include breaks.

21   **A.**   In that case, all of these times are roughly correct.

22   **Q.**   Okay.  Great.

23             I think you mentioned on that May 18th

24   interview that you primarily lead the questioning and that

25   it largely concerned Mr. Brockman's historical background

1   and life story, if you will?

2   **A.**   Yes.

3   **Q.**   And I think you said on direct that, sort of

4   unsurprisingly, you know, his memory was intact on those

03:27:49   5   events.  Is that your testimony?

6   **A.**   On the remote events, it's not at all surprising; but

7   even on the more recent ones, he had good memory.

8   **Q.**   Right.  And my question was:  On the remote events,

9   not surprising that those are intact, even given his

03:28:03   10   cognitive difficulties?

11   **A.**   Correct.

12   **Q.**   All right.  And then on the 19th you were not

13   present, but Dr. Denney conducted testing of Mr. Brockman

14   for roughly eight hours?

03:28:13   15   **A.**   Yes.

16   **Q.**   All right.  And then you all resumed the next day

17   together and conducted another seven-and-a-half to eight

18   hours of additional interviews and testing of

19   Mr. Brockman?

03:28:22   20   **A.**   Yes.

21   **Q.**   All right.  And, then, you're aware that Dr. Denney

22   interviewed Kathy Keneally on June 14th of 2021?

23   **A.**   Yes.

24   **Q.**   And you were not present for that interview?

03:28:34   25   **A.**   Correct.

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1   **Q.**   And then Dr. Denney also interviewed Pete Romatowski,

2   another one of Mr. Brockman's counsel, the following day

3   for 40 minutes on June 15th?

4   **A.**   Yes.

03:28:46   5   **Q.**   And you didn't attend that either?

6   **A.**   Correct.

7   **Q.**   All right.  And then we talked about the second sleep

8   study in mid-August of 2021 that Mr. Brockman underwent at

9   Memorial Hermann.  Is that reflected there accurately?

03:29:00   10   **A.**   Yes.

11   **Q.**   And then on September 2nd, at the government's

12   request, Mr. Brockman underwent an EEG at Houston

13   Methodist again at Dr. Darby's request?

14   **A.**   Yes.  There is a typo in this line.

03:29:14   15   **Q.**   Well, I --

16   **A.**   It says he underwent an electrophysiology --

17   **Q.**   Ah.  Okay.

18   **A.**   -- but he underwent an electroencephalogram.

19   **Q.**   Okay.  The EEG.  We will let the record reflect you

03:29:28   20   corrected our typo.  But EEG on September 2nd.

21          And then you get to the final interviews

22   on -- that you mentioned in October 20th, where you and

23   Dr. Denney again interviewed and tested Mr. Brockman for

24   roughly seven hours in October of -- just last month.

03:29:44   25   Correct?

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1   **A.**   That's right.

2   **Q.**   And there was also a phlebotomist that conducted a

3   toxicology screen that day as well?

4   **A.**   She collected samples at the lunch break.

03:29:52   5   **Q.**   Right.  And then, finally, Dr. Denney returned for a

6   follow-up testing for about one hour on the 26th of

7   October.  Correct?

8   **A.**   Correct.  And I was not present for that.

9   **Q.**   You were not present for that.  Okay.  So, does

03:30:04   10   Defense Exhibit 72 fairly and accurately represent the

11   testing and other interviews and imaging that the

12   defendant has undertaken at the government's request in

13   this competency proceeding?

14   **A.**   Yes.

03:30:17   15            MR. VARNADO:  I move to admit Defense

16   Exhibit 72.

17            MR. MAGNANI:  Without objection.

18            THE COURT:  Without objection, it is admitted.

19   BY MR. VARNADO:

03:30:24   20   **Q.**   And maybe some separate witnesses will address some

21   of the testing and interviews that Mr. Brockman underwent

22   at the defense's request, but you do recall that in August

23   of 2021 the defendant underwent a PET amyloid scan.

24   Correct?

03:30:42   25   **A.**   Yes.

PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO

1    Q.    Okay.  And that was done at the defense's request in

2    August?

3    A.    Yes.

4    Q.    All right.  And I think you got some testimony -- or

03:30:51  5    your direct testimony -- Mr. Magnani had asked you that --

6    that there could have been a Tau PET scan that could have

7    been done in this case.  Correct?

8    A.    Yes.

9    Q.    And I believe he got you to say that it was the safer

03:31:11  10   trial strategy not to do a Tau PET test; is that right?

11   That was your testimony?

12   A.    Yes.

13   Q.    Okay.  Now, certainly, the government, which is --

14   has spared no expense in this case, could have ordered a

03:31:26  15   Tau PET scan if it had wanted to.  Correct?

16   A.    Yes.

17   Q.    And you heard Dr. Wisniewski testify that because

18   there was already a March FDG PET scan, there would have

19   been no reason to do a Tau PET scan?  You heard that

03:31:42  20   testimony.  Correct?

21   A.    Yes, I did.

22   Q.    And the reality is the government could have ordered

23   it if it wanted it and it did?

24   A.    Correct.

03:31:53  25   Q.    And there is no indication Mr. Brockman would have

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1   refused it because he has done everything that has been

2   asked of him in this process?

3   **A.**   That's right.

4   **Q.**   And for each of these items that are listed on

03:32:11   5   Defense Exhibit 72, interviews and the test results --

6   those are things that you looked at, relied on, considered

7   in forming your opinions.  Correct?

8   **A.**   Everything on this chart?

9   **Q.**   Yes.

03:32:25   10   **A.**   I did look at all of this and relied on it to the

11   extent it deserved to be relied upon.

12   **Q.**   Okay.  What didn't deserve to be relied upon that was

13   in this particular -- Are you thinking about the sleep

14   study that didn't have any results or something different?

03:32:43   15   **A.**   Really, what I am thinking about is invalid

16   neuropsychological testing.

17   **Q.**   I mean, you just testified that you took Dr. Denney's

18   analysis of those test results and was the keystone of

19   your opinion by the end of it?

03:33:05   20   **A.**   I am talking about the validity --

21   **Q.**   Right.

22   **A.**   -- that once a neuropsychological test battery is

23   invalidated, one can't rely on any of the results in the

24   battery.  And, here, we're talking about two of the seven

03:33:27   25   or more batteries that have been done, but all seven of

1   them have validity concerns.

2   **Q.**   Okay.  And you were here for Dr. Denney's testimony.

3   Correct?

4   **A.**   Yes.

03:33:44  5   **Q.**   And you heard Mr. Loonam cross-examine Dr. Denney

6   about those validity tests.  Correct?

7   **A.**   Yes.

8   **Q.**   And that he admitted that at least five of the six of

9   those tests, when coming out of the algorithm, actually

03:34:02  10   triggered an impaired memory profile, prior to Dr. Denney

11   exercising his subjective judgment.  You heard that

12   testimony.  Correct?

13   **A.**   That's not exactly correct.  The algorithm, prior to

14   the last two steps, indicated a possible genuine memory

03:34:22  15   impairment profile, which one --

16   **Q.**   Correct.

17   **A.**   -- must then go beyond the algorithm in order to see

18   if "possible" is more than possible.

19   **Q.**   And, so, before Dr. Denney's involvement and

03:34:37  20   subjective effort, there is a "possible memory-impaired"

21   profile that came out of at least five, if not all six, of

22   those validity tests.  Correct?

23   **A.**   For the Green tests --

24   **Q.**   Yes.  That's what I'm asking about.

03:34:52  25   **A.**   -- you are talking about?  Then, the algorithm

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1   suggests "possible."

2   **Q.**   Right.

3   **A.**   If one wants to know whether the "possible" is a true

4   positive, a false positive, a true negative, a false

5   negative, one needs to go beyond that.  "Possible" is one

6   thing, but there are two additional steps --

7   **Q.**   Let me just ask you -- Sorry.  I don't want to

8   interrupt you.  But that's not your area of expertise.

9   Correct?  You are relying on Dr. Denney's work in that

10   respect for this case.  Correct?

11   **A.**   Well, I think both Dr. Guilmette and Dr. Denney are

12   experts in neuropsychology, who know more about

13   neuropsychology than I do, by a long shot.  But I also do

14   think I understand some key issues about this, including

15   the probability of being wrong -- that is, the known error

16   rates when there are sufficient number of invalid test

17   results.

18   **Q.**   And in looking at the validity tests -- and we will

19   talk about this in a little bit more detail -- but it is

20   fair to say you have accepted Dr. Denney's subjective

21   measures and you have rejected Dr. Guilmette's.  Correct?

22   **A.**   I don't actually think the term "subjective measures"

23   correctly captures this issue.

24   **Q.**   Okay.  We can agree to disagree on this.

25   **A.**   In a sense --

PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO

1   Q.   Well, I'll come back to this topic.  I promise to

2   give you a chance to talk about this.

3               Okay.  I want to just continue to cover

4   what it is you relied upon, which we went through the

03:36:34   5   interviews, the testing, images and the like.

6               There was also categories of information

7   such as speeches and depositions that Mr. Brockman gave in

8   2019 and earlier.  Correct?

9   A.   Yes.  And then the e-mails in 2020.

03:36:51   10   Q.   I'll get to all of them.

11               Sticking with the speeches and the

12   depositions, I believe those -- the ones that are in

13   evidence anywhere are from September of 2017, November of

14   '18, and November of '19.  Does that sound right to you?

03:37:05   15   A.   Yes.

16   Q.   All right.  And, so, you looked at those speeches

17   from two, three, and four years ago, respectively, and

18   considered them as part of your opinion?

19   A.   Yes.

03:37:13   20   Q.   All right.  And you have not reviewed any speeches or

21   recorded statements by Mr. Brockman since 2019.  Fair?

22   A.   Fair.

23   Q.   And, again, you did review Mr. Brockman's deposition

24   testimony from January of 2019 in the Cox Automotive

03:37:33   25   litigation.  Fair?

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    **A.**   Yes.

2    **Q.**   And then, again, the September 19th FTC testimony,

3    which was not recorded, but you have seen the transcript?

4    **A.**   Correct.

03:37:41  5    **Q.**   And you haven't seen any recorded testimony similar

6    to a deposition or an investigative interview since 2019?

7    **A.**   Correct.

8    **Q.**   All right.  Now, you have also received and reviewed

9    and relied upon a number of medical records in this case.

03:37:57  10   Correct?

11   **A.**   Yes.

12   **Q.**   All right.  And I won't -- I am not going to belabor

13   the details, but these would include -- and I'll just

14   summarize these and you tell me if you agree, in general,

03:38:07  15   who the doctors are.

16              From his treating -- Mr. Brockman's

17   treating physicians:  Dr. Pool, Dr. York, Dr. Yu,

18   Dr. Yankovich and even Stuart Yudnofsky, you have seen

19   those records in part of this proceeding here?

03:38:23  20   **A.**   Yes.

21   **Q.**   All right.  And is it fair to say that, at least for,

22   you know, all of the first doctors that I mentioned --

23   maybe with the exception of Yudnofsky, all of them have

24   stated that Mr. Brockman is suffering from some sort of

03:38:33  25   cognitive impairment?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1   **A.**   Yes.  I think that's fair.

2   **Q.**   And, in fact, each one of these include dementia.

3   For example, Dr. Pool has found that Mr. Brockman has

4   moderate to severe dementia.  Do you recall that?

03:38:50   5   **A.**   Last month, you're -- No.  Let me --

6   **Q.**   I am talking about Dr. Pool.

7   **A.**   Sorry.  Yes.

8   **Q.**   Okay.  And Dr. Yankovich.  His diagnosis also

9   included dementia.  Correct?

03:39:03   10   **A.**   Yes.

11   **Q.**   And Dr. York found that Mr. Brockman had mild to

12   moderate dementia.  Correct?

13   **A.**   Yes.

14   **Q.**   And Dr. Yu also found that Mr. Brockman had dementia

03:39:13   15   with Lewy bodies or Parkinson's disease dementia?

16   **A.**   Yes.

17   **Q.**   All right.  And then, most recently, I think you were

18   referencing Dr. Lai at Houston Methodist had found on

19   October 7th of this year -- his diagnosis had been

03:39:28   20   modified to Parkinson's disease dementia.  Correct?

21   **A.**   That's right.

22   **Q.**   And I think you testified on direct that -- that as

23   recently -- that Dr. Lai had had a different diagnosis in

24   June of 2021.

03:39:46   25   **A.**   I think it was June that he said mild cognitive

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    impairment.

2    **Q.**   And I just want to refresh your memory with Defense

3    Exhibit 38, Dr. Dietz, because I'll represent to you that

4    the last time prior to October that Mr. Brockman saw

03:40:06   5    Dr. Lai was actually in February.  Would you accept that?

6    **A.**   I do accept that.

7    **Q.**   And the June appointment was actually cancelled

8    because he had been hospitalized?

9    **A.**   Yes.

03:40:21   10   **Q.**   And speaking of hospitalizations -- we have covered

11   this but just so that the record is clear -- Mr. Brockman

12   was hospitalized at Houston Methodist from March 15th to

13   March 19th with urosepsis and delirium.  Correct?

14   **A.**   Yes.

03:40:36   15   **Q.**   And then again from May 31st to June 11th with the

16   same condition, which also included delirium, a very

17   serious hospital episode?

18   **A.**   Yes.

19   **Q.**   He then had surgery under general anesthesia to try

03:40:48   20   to reduce the onset of future urinary tract infections in

21   late June of this year.  Correct?

22   **A.**   Yes.

23   **Q.**   And, again, you're aware, as has been discussed at

24   length in this proceeding, that the medical literature

03:41:05   25   says that "Patients who are already in a compromised state

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*PARK E. DIETZ, M.D. – CROSS BY MR. VARNADO*

1   are at risk of suffering further cognitive impairment when

2   placed under general anesthesia"?

3   **A.**   Yes.

4   **Q.**   All right.  And Bob was most recently hospitalized

03:41:17   5   from September 15th to 18th with yet another UTI and some

6   amount of delirium?

7   **A.**   Correct.

8   **Q.**   Okay.  And, again, something that's been discussed at

9   length as well is delirium in this case.  You would agree

03:41:29   10   that delirium can be deadly, particularly for someone in

11   Mr. Brockman's compromised position?

12   **A.**   Yes.

13   **Q.**   That it can lead to further functional decline?

14   **A.**   It can for many functions.

03:41:40   15   **Q.**   And it can actually lead to permanent cognitive

16   impairment such that there is no return to the prior

17   baseline cognition?

18   **A.**   It can.

19   **Q.**   And I take it you agree with Dr. Darby that

03:41:52   20   Mr. Brockman is susceptible to additional bouts of

21   delirium?

22   **A.**   Yes.

23   **Q.**   In addition to the records we have already discussed,

24   there are also Mr. Brockman's personal medical writings

03:42:07   25   that you reviewed and considered as part of your report

1    and opinion in this case.  Correct?

2    **A.**    Yes.

3    **Q.**    And those writings document memory concerns, I'll

4    describe them, from at least 2004 up through 2018; is that

03:42:25    5    fair?

6    **A.**    I don't remember the earliest date, but 2004 or 2008

7    up to quite recently.

8    **Q.**    Okay.  And we will come back to those records, but I

9    just wanted to mention that as one of the -- it features

03:42:39    10    prominently in your report.  I think you quote them for

11    about ten pages in your initial report --

12    **A.**    Yes.

13    **Q.**    -- those personal writings.

14                     And then you mentioned e-mails that you

03:42:47    15    had also reviewed as part of your work on this case?

16    **A.**    Correct.

17    **Q.**    And are you -- do you have -- do you have any

18    personal knowledge whether Mr. Brockman actually typed the

19    e-mails that you have reviewed in this case?

03:43:02    20    **A.**    I do not.

21    **Q.**    Are you aware of whether or not Mr. Brockman had any

22    assistance in constructing e-mail responses?

23    **A.**    I am aware that there were statements made to various

24    people that he was having difficulty with his e-mail and

03:43:19    25    had help from his wife with e-mails.

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1  **Q.**   And are you aware that one of the government

2  witnesses in this case, Robert Burnett, has identified

3  documents that purport to be from Mr. Brockman but that

4  are not actually from Mr. Brockman?

03:43:33  5  **A.**   I am not aware.

6  **Q.**   Okay.  I would like to talk about some of the

7  opinions in your original report.  Do you still have your

8  reports up there --

9  **A.**   I do.

03:43:41  10  **Q.**   -- with you?

11          Okay.  And so we mentioned the -- the FDG

12  PET scan that Dr. Darby ordered in March of Two

13  Thousand -- March 12th of this year.  And, again, that PET

14  scan was undertaken at Houston Methodist.  Correct?

03:44:02  15  **A.**   Yes.  That's right.

16  **Q.**   Okay.  And a Houston Methodist radiologist named -- I

17  think we have seen this before -- Dr. Ronald Fisher

18  interpreted the result of the PET scan, and I'll put it up

19  here so you can see it.  Do you recall seeing this PET

03:44:18  20  scan from March of this year?

21  **A.**   Yes, I do.

22  **Q.**   Okay.  Just so -- you remember seeing the signature

23  of Dr. Fisher, who interpreted the results of the scan?

24  **A.**   Yes.

03:44:30  25  **Q.**   Okay.  And that test was undertaken in March of this

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    year.  And the impressions, which I'll just read:

2    "Findings are very mild but suggestive of early

3    neurodegenerative disease, either Alzheimer's disease or

4    dementia with Lewy bodies, Parkinson's disease with

03:44:52  5    dementia.  Findings are unlikely to represent

6    frontotemporal dementia."  Did I read that correctly?

7    **A.**    Yes.

8    **Q.**    And in your original report -- which I am looking at

9    the copy, which is paginated, of Defense Exhibit No. 5.

03:45:09  10   If you need it, I can point you to the pages, but I am

11   going to put it up on the screen.

12              In your original report, when you assessed

13   these radiological findings by Dr. Fisher, your comment on

14   this result was that "The interpretation of ambiguous,

03:45:25  15   very mild findings would appear to have been biased by the

16   interpreter's foreknowledge of prior diagnoses of

17   dementia, a phenomenon known as 'confirmation bias.'"  You

18   put that in your original report?

19   **A.**    I did put that comment in.

03:45:38  20   **Q.**    You're not trained in radiology?

21   **A.**    No.  I am trained in forensic sciences and...

22   **Q.**    Well, let me ask you another question, Dr. Dietz.

23   You know, you don't have a practice of being somebody who

24   interprets PET scans as part of your professional work.

03:45:58  25   The radiologist does that work.  Correct?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*PARK E. DIETZ, M.D. – CROSS BY MR. VARNADO*

1  **A.**   Correct.

2  **Q.**   And Dr. Fisher is not one of Mr. Brockman's treating

3  physicians in any way, as far as you know?

4  **A.**   No.  I don't think so.

03:46:07  5  **Q.**   Did you try to contact Dr. Fisher?

6  **A.**   No.

7  **Q.**   Okay.  He was just a radiologist on duty at the time

8  that interpreted this scan?

9  **A.**   Yes.

03:46:15  10  **Q.**   And there is no evidence from interpreting this scan

11  that Dr. Fisher deviated in any way from the standard

12  procedure in reading the scan?

13  **A.**   No, of course not.  That's the problem with this

14  field, that in order to get PET scans done or MRI scans

03:46:34  15  done, it's required to give a diagnosis, and that unblinds

16  the reviewer to what is suspected.

17              Now, that very problem of unblinded

18  reviews is what has lead to some of the critical issues

19  surrounding ballistic evidence, tool mark evidence, bite

03:47:03  20  mark evidence.

21  **Q.**   Dr. Dietz, I don't mean to interrupt you, but we are

22  getting a little far afield with bite mark evidence and --

23  I do want to just stick to the radiology scans.  Okay?

24  **A.**   There is nothing wrong --

03:47:14  25  **Q.**   Now, I understand --

PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO

1   **A.**   -- with the scan or the interpretation.  I am making

2   a general comment about the practice of introducing

3   clinical scans in disputed medical legal matters when the

4   scans are read after the hypothesis has been articulated.

03:47:34   5   **Q.**   But, Dr. Dietz, you didn't say that it might be

6   biased on the interpreter's foreknowledge.  You said it

7   appears to be biased.  It appeared to have been biased by

8   the interpreter's foreknowledge.  You presumed the bias of

9   the scan reader, Dr. Fisher.  Correct?

03:47:52   10   **A.**   No.  It's not that he is biased.  The term "bias" is

11   used differently in science from in law.

12                 In law, one is concerned about an

13   individual's bias.  In science one's concerned that the

14   conditions of an experiment or the conditions of the

03:48:16   15   evaluation inherently bias whoever is going to be

16   responding to it.  And, so, each of the biases that social

17   psychology has studied endlessly and confirmed in many,

18   many experiments are biases not in the control or

19   awareness of a person.  It's that the conditions create

03:48:46   20   bias.

21                 So, this is no criticism of Dr. Fisher.

22   It is a criticism, however, that clinical scans are done

23   in a way that tells the, hopefully, neutral scan reader

24   and interpreter what somebody believes might be true.

03:49:13   25   And, in fact, in this case, it was Dr. Darby who suggested

*PARK E. DIETZ, M.D. – CROSS BY MR. VARNADO*

1    what might be true, because he has to say that in order to

2    get the scan done.

3    **Q.**   But why, Dr. Dietz, in that instance, didn't you

4    write the findings "may have been biased"?  You said they

5    "appear to be biased" as if to explain-away the result.

6    **A.**   Good point.  It could have been phrased better --

7    **Q.**   Exactly.

8    **A.**   -- and certainly shouldn't have appeared in a comment

9    here, if I were going to make the point about the entire

10   field.  I should have made it more broadly.

11   **Q.**   And, in fact, the future PET scans and subsequent

12   imaging corroborated and confirmed what Dr. Fisher had

13   actually read in the first instance in March, that there

14   were these indicia of cognitive findings.  Correct?

15   **A.**   No.

16   **Q.**   The -- the August FDG PET scan doesn't corroborate

17   what Dr. Fisher found here in March?

18   **A.**   I think you --

19   **Q.**   Is that your testimony?

20   **A.**   -- just said that it corroborates what he found about

21   cognitive findings.  Maybe I misheard you.

22   **Q.**   Yeah.  That -- that's what I was asking you, that it

23   did corroborate that.

24   **A.**   No.

25   **Q.**   You say, no, it doesn't corroborate what Dr. Fisher

*PARK E. DIETZ, M.D. – CROSS BY MR. VARNADO*

1  found in the March scan?

2  **A.**   Scans can't reveal cognition.

3  **Q.**   Right.  Agreed.

4         So, let me rephrase it to say the scan

03:50:41  5  revealing that there's indicia suggestive of early

6  neurodegenerative disease.  Set aside cognition.  The

7  actual disease state.

8  **A.**   That's confirmed, yes.

9  **Q.**   And that's what's confirmed.  But your statement

03:50:55  10  here, you would agree with me, goes too far, to say that

11  "it appears that the radiologist was biased" as opposed to

12  "perhaps the radiologist may have been biased"?  Would you

13  agree with that?

14  **A.**   Absolutely.  I'll do you one better.  It would have

03:51:10  15  been better to say -- and not necessarily even say in this

16  report -- that all scans ordered in accordance with the

17  rules that hospitals, insurance companies, and others

18  demand, unintentionally, inadvertently create a situation

19  subject to biasing all readers.

03:51:36  20  **Q.**   Okay.  But, thankfully, that, you know, wasn't the

21  case here because the subsequent scans had similar results

22  as this March scan that was ordered by Dr. Darby.

23  Correct?

24  **A.**   I don't think one can judge that from any of the

03:51:52  25  facts here.

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    **Q.**   You don't view the August FDG PET scan as consistent

2    with the March FDG PET scan?

3    **A.**   I do.  But we're talking about two different issues.

4                     One is:  Can one reliably detect

03:52:08   5    hypometabolism by this technology?  Of course.

6                     The other is:  Is it helpful or harmful,

7    biasing or not, to tell the person who is going to

8    interpret the scan a hypothesis, clinically, of what's

9    going on?

03:52:30   10   **Q.**   Yeah.  And I understand it's a philosophical issue

11   surrounding that you have to have a diagnosis to get the

12   scan, but just to make clear --

13   **A.**   It is not philosophical.  This is about what ought to

14   be accepted as evidence and what's the state of the

03:53:02   15   technology for use in legal proceedings.

16   **Q.**   Okay.  And we can agree that this comment could be

17   better written to address the fact that perhaps the

18   interpreter was biased, but not that they would have

19   appeared to have been definitively biased?

03:53:06   20   **A.**   I did not say and am not saying that the interpreter

21   was biased.  Again, you are using bias the way lawyers do

22   to mean a person's failing.  I am not saying that.  I am

23   talking about a context that creates bias.

24   **Q.**   Okay.

03:53:25   25   **A.**   And against which all of us have to guard because all

1  of us are subject to that.

2  **Q.**   Let's talk about continuing this conversation related

3  to bias somewhat.  I want to talk about some statements in

4  your first report that deal with the doctors at Baylor and

03:53:59  5  we talked about the fact that you had reviewed medical

6  records from Mr. Brockman's treating physicians at Baylor

7  Medical College, correct?

8  **A.**   Yes.

9  **Q.**   I may have some slides that I show here.  I will mark

03:54:02  10  them for identification as government -- or Defense

11  Exhibit 73.

12             MR. VARNADO:  So, Your Honor, I can hand

13  this up to you as well and give a copy to the government.

14  BY MR. VARNADO:

03:54:24  15  **Q.**   And I want to be clear, Dr. Dietz, to make sure I

16  understand what your opinion is with respect to the

17  doctors at Baylor.

18             In your first report, you note that the

19  medical referenced Mr. Brockman as a quote, VIP Dr. Pool

03:54:47  20  patient, and that Mr. Brockman got a VIP capacity

21  evaluation.

22             Do you remember those statements in your

23  report that refer to that?

24  **A.**   I was quoting from the Baylor records.

03:54:56  25  **Q.**   Correct.

1  **A.**   Yes.

2  **Q.**   Right.  Did you speak with anyone at Baylor about the

3  Comprehensive Healthcare Clinic at the Baylor College of

4  Medicine?

03:55:05   5  **A.**   No.

6  **Q.**   Do you know that the designation of a VIP patient is

7  just somebody in the health records coding system for

8  someone who is part of the Comprehensive Healthcare Clinic

9  at Baylor?

03:55:17   10  **A.**   No.

11  **Q.**   And so you're not aware that Baylor offers an

12  executive health program designed for particular

13  individuals to receive comprehensive care?

14  **A.**   I don't know what Baylor does.  I am familiar with

03:55:32   15  such things.

16  **Q.**   That is not unusual?  That takes place at

17  Johns-Hopkins and other preeminent --

18  **A.**   Yes.

19  **Q.**   -- hospitals around the country?

03:55:40   20  **A.**   Yes, it does.

21  **Q.**   Fair?  Okay.  And in -- in your report, in talking

22  about the -- this is on page 42 of your report, you made

23  some statements here that I want to explore.

24                 Because you say that, "One must question,

03:55:58   25  for example, whether Dr. Pool's November 14th, 2018,

1  November 18, 2019 referrals of Mr. Brockman to Dr. York as

2  a, quote, VIP Dr. Pool patient, and for a VIP capacity

3  e-mail" -- those are in quotes, right?  That what's you

4  saw in the records?

03:56:14  5              "-- or other information provided by

6  colleagues or administrators about Mr. Brockman's

7  contributions to the Baylor College of Medicine could have

8  biased her evaluation, or those of others who took his and

9  his family's reports regarding his functioning at face

03:56:33  10  value."  Did I read that accurately?

11  **A.**   You did.

12  **Q.**   You recognize that from your report.  And I

13  understand how you were talking about bias before, and is

14  that the same way you are using it here?

03:56:41  15  **A.**   Exactly.  That it's the situation that can

16  inadvertently, unintentionally create an effect on the

17  person whose neutrality one seeks.

18  **Q.**   But I want to be clear.  Are you suggesting that the

19  professionals at Baylor in any way created some sort of

03:57:06  20  false diagnosis to support Mr. Brockman's, in any way?

21  **A.**   Absolutely not.

22  **Q.**   Okay.

23  **A.**   What I am suggesting is that everyone who evaluates

24  Mr. Brockman, knowing who the man is, is going to be

03:57:19  25  subject to this VIP biasing impact because everyone,

1    including me, including Dr. Denney, Dr. Darby,

2    Dr. Guilmette, Dr. Agronin, the treating doctors, can't

3    help but know that this is an important man with

4    significant accomplishments, and that can tend to affect

03:57:53    5    judgment of the most honest and objective of experts.  And

6    we have to guard against it.

7    **Q.**    Okay.  Fair.

8    **A.**    And we do that imperfectly --

9    **Q.**    Okay.

03:58:04    10    **A.**    -- because we're human and fallible.

11    **Q.**    And in terms -- do you think the government -- you

12    have read some of the pleadings that the government has

13    filed in this case, that discuss Baylor Medical College,

14    have you not?

03:58:15    15    **A.**    Yes.  And I don't share their view of all that.

16    **Q.**    Okay.  So you diverge with their view on the

17    discussion of bias that they have had in their pleadings,

18    and instead adopt the discussion and interpretation that

19    you have provided today on that topic of bias?

03:58:32    20    **A.**    I don't even remember what all they said, but it

21    doesn't speak for me.

22    **Q.**    Fair enough.  I did want to ask because in addition

23    to the VIP patient and the notations in the records, you

24    have a statement in here, "Or other information provided

03:58:52    25    by colleagues or administrators about Mr. Brockman's

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    contributions to the Baylor College of Medicine."

2                    What evidence do you have that Dr. Pool

3    knew anything about any contributions Mr. Brockman made to

4    the Baylor College of Medicine?

03:59:06   5    **A.**   I don't have any of evidence of this, and the

6    sentence begins, "One must question."  That's all.  I am

7    raising a question.

8    **Q.**   There is no suggestion by you -- I want to be clear.

9    You're not -- whether the government has or not, you're

03:59:19   10   not suggesting that any donations or charitable

11   contributions have corrupted or influenced medical

12   professionals at Baylor College of Medicine here in

13   Houston, Texas?

14   **A.**   I am not suggesting there were any fraudulent medical

03:59:33   15   diagnoses, that any doctors were purposely doing something

16   inappropriate, that there was any corruption by these

17   doctors at Baylor.

18                    I do not mean to suggest any of that, or

19   imply it.  I -- I do believe, however, that everyone can

03:59:59   20   be influenced by knowing that someone is a VIP, and some

21   of the work I have done over the course of my career has

22   shown me how powerful a magnet VIPs can be to others and

23   how their behavior changes as they become closer and

24   closer to VIPs.

04:00:22   25   **Q.**   Isn't some of the literature you cite about VIPs in

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1  your first report really about VIPs not getting a

2  straightforward diagnosis, kind of getting a sugar-coated

3  diagnosis, and that they are actually not told how bad the

4  situation really is because of their VIP status?

04:00:38  5  **A.**   A lot of that medical literature is exactly about

6  that, yes.

7  **Q.**   Which would be the opposite of what we were talking

8  about, sort of somebody concocting or cooking up a

9  diagnosis on Mr. Brockman's behalf?  You don't think

04:00:50  10  that's what happened here?

11  **A.**   I don't think that's what happened here, but the

12  influence can go both ways.

13  **Q.**   Let me keep going here.  So, I reference those

14  speeches from Mr. Brockman that you viewed from the 2017

04:01:31  15  to 2019 time period.

16          MR. VARNADO:  Can we switch to the video?

17  BY MR. VARNADO:

18  **Q.**   I want to play just a few of those, and -- I think

19  you have -- you have talked about these videos as

04:01:41  20  representing a "Marked discrepancy between Mr. Brockman's

21  cognitive testing, and I am quoting, objective

22  observations, including his speeches.  Do you recall that

23  in your report?

24  **A.**   Yes.

04:01:55  25          MR. VARNADO:  Let's go ahead and play the clip

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1  from 2017, which I'll represent is Defendant's Exhibit 2-A.

2  Give you guys the time stamp once we do it.

3           MR. MAGNANI:  Mr. Varnado, can I just ask, is

4  the 2017 speech, is that in evidence?

04:02:16  5           MR. VARNADO:  Yes, Defendant's Exhibit 2, I

6  think.

7           MR. MAGNANI:  Well, if it is not, I don't

8  object to it being used.

9           MR. VARNADO:  Okay.  Great.  Thank you.

04:02:32  10              (Exhibit 2-A played as follows.)

11              "MR. BROCKMAN:  Good afternoon, everybody.

12  It's my pleasure to be here.  This is my, oh, Lord, 27th or

13  something like that, birthday party.

14              I'd like to also welcome our colleagues in

04:02:49  15  College Station who are watching this live, also the team

16  at I.D.S.

17              I am going to share the stage today with

18  Rob Nalley who is going to help me out a little bit.

19              Anyway, when I started this business, you

04:03:03  20  know, many, many years ago, I certainly could not imagine

21  anything like the video that we just saw."

22              THE COURT:  The video -- it's off sync.

23              (Video played as follows.)

24              "From an opportunities standpoint --"

04:03:15  25           MR. VARNADO:  Can we pause that?  What is it,

PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO

1   Judge?

2                THE COURT:  It seems to me to be off sync.  Am

3   I the only one that sees that?

4                MR. VARNADO:  Oh, the sound is not linked up?

04:03:26   5                THE COURT:  The sound doesn't correspond to

6   what he is saying on the screen.

7                MR. VARNADO:  I'll try that again, Judge.

8                THE COURT:  Okay.  Sure.

9                (Video played.)

04:03:49   10               "MR. BROCKMAN:  Good afternoon everybody.  It's

11  my pleasure to be here.  This is my, oh, Lord, 27th, or

12  something like that, birthday party.

13                    "I would like to also welcome our

14  colleagues in College Station who are watching this live,

04:04:02   15  also the team at I.D.S.  I am going to share the stage

16  today with Rob Nalley.  He is going to help me out a little

17  bit.

18                    "Anyway, when I started this business, you

19  know, many, many years ago, I certainly could not imagine

04:04:18   20  anything like the video that we just saw.  From an

21  opportunities standpoint, I didn't have a clue as to how

22  exciting this business was going to turn out to be.

23                    "But we got lots of things to talk about

24  today, but before we get to that, I would like, again, to

04:04:37   25  welcome everybody here.  Thank you all for joining us.  You

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1  know, big gatherings like this, this is the only big

2  gathering we have, just once a year here at Reynolds.

3             "That's a tradition that started somewhat

4  over 40 years ago -- we don't know the exact year -- when

04:04:54  5  someone was making a casual suggestion about let's have

6  barbecue for lunch.  Let's have barbecue brought in.

7             "And with even less advance planning

8  somebody said, Bob, why don't you stand up and talk to us a

9  little bit?  And so that's how it was with about 35 people

04:05:09  10  and this is where we're at today."

11             (Video stopped.)

12             MR. VARNADO:  I am going to play a series of

13  these clips, Dr. Dietz, from these birthday parties.  That

14  one was from 2017 and in your report, to avoid having to

04:05:21  15  switch back with the court reporter, or with the case

16  manager, you will agree that your comment was, "This video

17  contains some evidence of Parkinson's disease, at least

18  when viewed in retrospect, but no evidence of cognitive

19  impairment or dementia."

04:05:34  20             That was your comment in your report on

21  that video?

22  **A.**   Yes.

23             MR. VARNADO:  I would like to show a clip

24  from -- again, these are similar time periods, be about a

04:05:41  25  couple minutes -- from the 2018 Texas birthday party speech

1 at Reynolds and Reynolds, which I believe, if it's not in

2 evidence, I want to move the December 18 birthday party in,

3 and we will denote the clip as 73-A.

4                THE COURT:  Any objection?

04:06:01 5                MR. MAGNANI:  If is it not in, there is no

6 objection.

7                THE COURT:  Okay.  73-A is admitted.

8                (Video marked 73-A played.)

9                "MR. BROCKMAN:  Welcome.  Again, thank you for

04:06:15 10 joining us."

11                (Video stopped.)

12                MR. MAGNANI:  Mr. Varnado, do you know if the

13 full videos are all in?

14                MR. VARNADO:  I will make the full video 73 if

04:06:23 15 it's not already in.

16                MR. MAGNANI:  Yeah.  I don't know either.

17                MR. VARNADO:  So 73-A would be the clip.

18                MR. MAGNANI:  And, just curious, for the first

19 one that we watched, I assume that the synced clip is in,

04:06:32 20 is the one that you admitted?

21                MR. VARNADO:  Correct.

22                MS. EFRONSON:  73 was the --

23                MR. VARNADO:  Okay.  So, 74.  Sorry, Your

24 Honor.  Instead of 73-A, it was 74-A.

04:06:49 25                THE COURT:  Okay.

1          MR. VARNADO:  For that last clip.

2          THE COURT:  74-A is admitted.

3          (Video played.)

4          "MR. BROCKMAN:  Welcome.  Again, thank you for

04:07:00   5  joining us.  I don't have a lot of chances to be in front

6  of large gatherings of associates nowadays, and I welcome

7  the opportunity that I can, when I do get the opportunity,

8  and that's especially true of this event.

9          "I am pried away from my four monitors

04:07:17   10 doing e-mails, which that is kind of my daily project that

11 never ends.

12          "Many of y'all have probably heard the

13 story, or pieces of the story about how birthday parties

14 first began.  It was like this:  The company was probably

04:07:34   15 six years old.  We probably had 30 employees.  Everybody

16 was working hard, really hard.

17          "And so I decided that we would cater

18 barbecue in, and sitting in the snack bar and consume

19 barbecue as a special treat, Demeris Barbeque, which I

04:07:55   20 think is the best kind of barbecue, and so we did.

21          "And so somebody piped up in the back and

22 said, Bob, would you stand up and say a few words?  And so

23 I said, Okay, I'll stand up and say a few words.  And, you

24 know, there was a chalkboard behind me on the wall, and

04:08:09   25 I -- I put some names up there and put some projects up

*PARK E. DIETZ, M.D. – CROSS BY MR. VARNADO*

1 there, and that was that.

2                    "And you would not think that having

3 barbecue in the snack bar would stick in peoples' minds,

4 but, you know, in the ensuing summertime, all I ever heard

04:08:28  5 was, are we going to have barbeque again?  So, at any rate,

6 one thing lead to another, and I think this year we have

7 stepped up even more.

8                    "I personally am not responsible for what

9 all has been done from an electronic standpoint.  All I did

04:08:47  10 is I said, Make it better.  And they took me at my word and

11 made it better."

12                    (Video stopped.)

13          MR. VARNADO:  We can pause it there, Matt.

14 BY MR. VARNADO:

04:08:57  15 **Q.**   So, Dr. Dietz, would you agree with me that these

16 birthday party speeches have a repetition to them and

17 there are pretty similar remarks made in these two

18 speeches?

19 **A.**   Those two segments do.  There are other parts that

04:09:08  20 are vastly different.

21 **Q.**   Okay.  Let me show you the segment from November of

22 2019, which we will mark as Defense Exhibit 3-A.

23                    We will play this and then we will be done

24 with the clips for a little bit, Your Honor.

04:09:22  25                    THE COURT:  Okay.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO

1          (Video marked as Defendant's 3-A played.)

2          "Please welcome our chairman and CEO, Bob --"

3                    THE COURT:  And which is the -- I'm sorry.

4     What -- this is -- okay, Defendant's 3-A?

04:09:35  5                    MR. VARNADO:  This is Defendant's 3-A, Your

6     Honor, I move to admit that.

7                    MR. MAGNANI:  Without objection.

8                    THE COURT:  Without objection, it is admitted.

9     BY MR. VARNADO:

04:09:40  10    Q.   So just to orient you, Dr. Dietz, this is the same

11     speech just a year later from November of 2019.

12                    MR. MAGNANI:  And, Your Honor, in case it makes

13     it easier, the government won't object to any clips of

14     videos for which the full video is also available.

04:09:52  15                    THE COURT:  Okay.

16          (Video played.)

17          "-- our chairman and CEO Bob Brockman.

18          (Applause.)

19          "MR. BROCKMAN:  This event has always been a

04:10:13  20     special one for me, and I am really pleased to see all of

21     y'all here.  The first birthday party was in 1976, which by

22     my calculation is 43 years ago.

23               "And just from a perspective standpoint,

24     you know, I am going to give you some information, get a

04:10:36  25     word picture in your mind.  Think of a coffee bar that has

1 room for four tables and four chairs for each table, had a

2 big kind of pipe kind of thing, attached up in the ceiling

3 that came around, and it was something that people could

4 lean on.  I don't believe we ever had anybody jump over it.

04:11:02  5 And we decided to have barbecue, serve barbecue in, and

6 this is Demeris Barbeque, good barbeque.  And then somebody

7 said, Bob, you know, why don't you speak to us?  Of course

8 I am not prepared at all.

9                    "But, fortunately, I had a green board,

04:11:20  10 chalkboard, right behind me.  And somewhere there is

11 pictures of me actually writing on that board, and I have

12 no idea what I wrote, but -- because that's a long time

13 ago, but to think a company with 20 employees has grown

14 into this, which I consider absolutely remarkable."

04:11:46  15            MR. VARNADO:  That's good.  You can pause it

16 there.

17                    Can we switch back to the ELMO again?

18 BY MR. VARNADO:

19 Q.   Again, I just played you those series of clips,

04:11:57  20 Dr. Dietz.  And, again, these are just the excerpts from

21 your comments on those videos from your original report.

22                    And from the September 17 and November 18,

23 really, I think you say exactly the same thing, that there

24 is evidence of Parkinson's, at least when viewed in

04:12:12  25 retrospect, but in your opinion no evidence of cognitive

1    impairment.

2                    By November of '19, you say that the video

3    clearly supports a diagnosis of Parkinson's disease, but

4    not a diagnosis of cognitive impairment or dementia.

04:12:25    5                    I think we can all agree watching the

6    video that Mr. Brockman's in worse shape in 2019 than in

7    the prior years, correct?

8    **A.**   I can't speak for everyone, but I agree.

9    **Q.**   Okay.  And my -- my question, Dr. Dietz, is that

04:12:40   10    you're looking at these videos and looking at the

11    deposition testimony, and the like, and you have heard

12    testimony in this case about how someone with

13    Mr. Brockman's intellect could perform under these

14    circumstances even if he was suffering from cognitive

04:12:59   15    impairment or dementia.  Do you recall that?

16    **A.**   I only recall -- could you direct me to what you're

17    referring to?

18    **Q.**   Well, let me ask you this.  You know, we have talked

19    about the fact -- or let me -- would agree with me that

04:13:21   20    language function can be less affected in patients with

21    cognitive impairment and Parkinson's disease?

22    **A.**   I would agree that different functions can become

23    impaired at different rates.

24    **Q.**   Okay.  And is it your testimony to the Court that you

04:13:42   25    can actually make a medical diagnosis of cognitive

1  impairment or dementia by watching a video?

2  **A.**   No.  I would not say that.  I would say that a video

3  can give indications that a trained observer would be able

4  to point to to say these suggest that hypothesis, but it

04:14:15  5  could always be wrong if the person is acting demented

6  when they are not.

7           In other words, it could be faked.  It

8  could be real.  And I suppose there could be explanations

9  other than dementia for even extreme symptoms portrayed.

04:14:33  10  **Q.**   You state in the first two videos, there is no

11  evidence of cognitive impairment, but by November of 2019,

12  you have dropped down to, well, there's not a diagnosis.

13  This video wouldn't support a diagnosis.  What's your

14  explanation for that?

04:14:49  15  **A.**   I don't know that that was intended to be an

16  important distinction.  But what I had observed on the

17  Parkinson's disease front is that it went from subtle

18  indications of reduced associated movements, and slow and

19  changed gait, and lesser facial expression, to more

04:15:15  20  pronounced examples of those, and considerably greater

21  care taken as he turned from one side to another.

22  **Q.**   Fair.  But you're not suggesting that you can make a

23  definitive determination or diagnosis of somebody's

24  cognitive impairment or dementia based on watching a

04:15:37  25  video, correct?

1   **A.**   No.  Nor would I diagnose Parkinson's disease from

2   it.  But when I have observed those kinds of indicators of

3   Parkinson's in the real world, with somebody I knew, I've

4   taken steps because of it.

04:15:53   5   **Q.**   But, again, that's if you're seeing affirmative

6   steps.  The absence of some evidence in a video doesn't

7   rule out dementia or some kind of cognitive impairment,

8   just because you didn't observe it in a video, correct?

9   **A.**   Well, it can rule out some aspects of it.  Cognitive

04:16:09   10   impairment includes many functions.

11   **Q.**   Sure.

12   **A.**   These three videos, each of them are, in my view,

13   quite inconsistent when viewed from beginning to end with

14   memory being in the first percentile or lower.

04:16:31   15   **Q.**   Okay.  We will talk more about that, Dr. Dietz.  I

16   want to talk about the personal health writings as you

17   describe them in your original report.  I think that is a

18   term you use for those.  Do you recall those?

19   **A.**   Yeah, the personal writings.

04:16:46   20   **Q.**   Yes.  And I think you have said that one aspect of

21   your opinion concerning malingering is that the onset of

22   apparent deficits during tests of cognitive function were

23   reported only by Mr. Brockman and his closest family

24   members after the raid on Evatt Tamine's Bermuda home.

04:17:07   25   That's in your report, correct?

PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO

1    A.   The testing, that's right.

2    Q.   Well, you also say, you know, that other deficits

3    reported by his closest family members and Mr. Brockman

4    about memory decline.

04:17:21    5              Look at your report at page 44.

6              MR. MAGNANI:  Mr. Varnado, could you just let

7    us know which report?

8              MR. VARNADO:  I'm sorry?

9              MR. MAGNANI:  Is this the first report?

04:17:33    10              MR. VARNADO:  Yes.  Yes.

11   BY MR. VARNADO:

12   Q.   Let me direct your attention to the part of the

13   health writings that we are talking about, Dr. Dietz,

14   because I am going to get to this PowerPoint slide here in

04:17:57    15   a little bit that Mr. Magnani covered with you.

16              And so as you began to look at the health

17   reports that Mr. Brockman had written in this case, you,

18   again, whether we talk about bias or what the explanation

19   is, you presume that these -- fair to say you presume

04:18:19    20   these are not authentic documents in your report?

21   A.   No.  I didn't presume that.  I questioned it.

22   Q.   Okay.

23   A.   I questioned it because they were not at that time

24   known to be in any medical records.

04:18:31    25   Q.   Okay.  And have you since modified your view and

1   changed your opinion on that?

2   **A.**   Yes, my questions were all answered.

3   **Q.**   Okay.  And so you now do believe them to be authentic

4   medical records, typed by Mr. Brockman?

04:18:44   5   **A.**   I do.  And I know with confidence that back to 2015

6   he was producing such documents.  And I have no reason to

7   doubt the earlier ones to be contemporaneous to their

8   dating.

9   **Q.**   Okay.  So -- so from the time period of your report,

04:19:05   10   your original report, on page 6, where you said there is

11   no way to determine whether these health writings were

12   created, you know, proximal to the dates listed on these

13   personal writings, that has since been addressed, you have

14   modified that opinion?

04:19:19   15   **A.**   To my satisfaction it was addressed by the finding of

16   one page of them in --

17   **Q.**   Dr. Lisse's records?

18   **A.**   No.  Multiple pages in his records.

19   **Q.**   Okay.

04:19:31   20   **A.**   But somebody else had one page.  I think it was

21   Dr. Pool had one page in his records, too.

22   **Q.**   Okay.  So we can take off the table, as far as you're

23   concerned, whether or not these health writings are

24   authentic?

04:19:42   25   **A.**   Yes.

*PARK E. DIETZ, M.D. – CROSS BY MR. VARNADO*

1    **Q.**   Very good.

2            MR. VARNADO:  One moment, Your Honor.

3  BY MR. VARNADO:

4    **Q.**   And you also, Dr. Dietz, received the expert report

04:20:05   5  from Scott Polus, who looked at the metadata of those

6  reports.  Did that also factor into your decision and your

7  opinion that these are authentic records?

8    **A.**   No, it didn't, because he did not account for the

9  fact that the hard drive that he imaged was of a computer

04:20:25   10  different from the computer in which the -- on which the

11  records were already created.

12            The computer that he imaged didn't exist

13  at the time of many of those records.  And it's my

14  understanding that it's a simple matter, particularly for

04:20:42   15  somebody sophisticated about computers, to go into a

16  computer, change the date, and make a document appear to

17  be older than, in fact, it was.

18    **Q.**   Well, now, you're aware that -- and you are not

19  testifying that you believe that to have occurred in this

04:21:01   20  case, correct?

21    **A.**   I'm not saying that occurred in this case, and I am

22  not an expert on these issues.  I'm just saying that, it

23  was finding it in other medical records, historically,

24  that persuaded me.

04:21:13   25    **Q.**   Okay.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1    **A.**   Not the cyber analysis.

2    **Q.**   All right.  Fair enough.  And we can take that up

3    next week if necessary.  But, you're satisfied from where

4    you sit right now as to those records --

04:21:24   5    **A.**   Yes.

6    **Q.**   -- being authentic?  Very good.  All right.

7                   You were asked some questions about the

8    sequencing of events with the timing of Mr. Brockman

9    seeking medical care from Dr. Lerner.  Do you recall those

04:21:45  10    questions?

11    **A.**   Yes.

12    **Q.**   And I think the suggestion was made to you in

13    Government Exhibit 40 that there was a fishing trip that

14    took place in August of 2018 in Alaska, and that fishing

04:22:14  15    trip occurred during the time period when Mr. Tamine's

16    house was searched in Bermuda, correct?

17    **A.**   The fishing trip was in September.

18    **Q.**   Right.  This is -- I am putting up this August e-mail

19    that shows an itinerary for departing on September 3rd,

04:22:30  20    and returning September 10th, which is one of the records

21    the government put in front of you, or at least referenced

22    in your testimony.

23    **A.**   Yes.

24    **Q.**   Okay.  And I believe the series of questions was to

04:22:39  25    suggest that while on this fishing trip, that was attended

PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO

1   by Mr. Brockman and Mr. Yudnofsky, there was a search of

2   Mr. Tamine's home in Bermuda while that trip occurred,

3   correct?

4   **A.**   With the correction that it's Dr. Yudnofsky, yes.

04:22:58   5   **Q.**   Dr. Yudnofsky.  And that after the trip, or at least

6   while it was ongoing, there was an e-mail from

7   Mr. Brockman on September 6, 2018 -- let me see if we can

8   see that a little better -- to Dr. Lerner -- can you see

9   that, Dr. Dietz?

04:23:21   10   **A.**   I do.

11   **Q.**   Okay.  I'm trying to get it to focus correctly.  With

12   the suggestion this occurred one day after the search of

13   Mr. Tamine's home, and that this was some ruse by

14   Mr. Brockman to seek medical care from Dr. Lerner.  Do you

04:23:38   15   recall those line of questions?

16   **A.**   I don't think that would -- that's not how I would

17   characterize it.

18   **Q.**   Okay.

19   **A.**   I know that the time sequence was, raid on Tamine's

04:23:53   20   home, followed by reaching out to Dr. Lerner, but he

21   doesn't need a ruse to reach out to Dr. Lerner.  He is

22   complaining about urological problems that would be

23   appropriate to see a urologist about.

24   **Q.**   And the sequence of events, Dr. Lerner then refers

04:24:10   25   Mr. Brockman to Dr. Pool.

1  **A.**   Yes.

2  **Q.**   And then you were asked a series of questions about

3  the Baylor doctors.  And I want to make sure we're clear.

4  You are not suggesting that Dr. Lerner colluded with

04:24:19  5  Dr. Pool and created some conspiracy to get Mr. Brockman

6  treatment so it would lead to a claim of incompetence at a

7  future criminal matter?

8  **A.**   I am not suggesting that.

9  **Q.**   Okay.  The sequence of events in reality is, while

04:24:34  10  this message to Dr. Lerner was sent on September 6 of

11  2018, as we saw from Mr. Lisse last night, he had actually

12  seen Mr. Brockman, according to Government's Exhibit 95-B,

13  on August 31st, of 2018.  Do you recall this?

14  **A.**   Yes.

04:24:55  15  **Q.**   Yes?  And that in the notes, where Mr. -- and you

16  recall Mr. Brockman was seeing Mr. Lisse at the time, and

17  complaining of a urinary tract infection, correct?

18  **A.**   Dr. Lisse, correct.

19  **Q.**   Dr. Lisse.  And that what Dr. Lisse's recommendation

04:25:09  20  was, Go see Dr. Lerner, your urologist, if your symptoms

21  persist?

22  **A.**   Yes.

23  **Q.**   And then you simply don't know what lead Dr. Lerner

24  to refer Mr. Brockman to Dr. Pool, correct?

04:25:23  25  **A.**   Correct.  I do not know.

1    **Q.**   Did you try to contact Dr. Pool in this case?

2    **A.**   No.

3    **Q.**   I want to talk about some more collateral interviews

4    since you brought that topic up and were questioned about

04:25:38   5    it on direct examination.  And I am looking at the

6    government's slide deck that I have written all over, so I

7    won't put it up on the ELMO.  And under the slide that

8    says, "Collateral witness interviews," I think you said

9    that your aim was to discuss information with people who

04:25:58   10    had, quote, daily and ongoing contact with Mr. Brockman,

11    that would be your ideal in terms of collateral witness

12    interviews, correct?

13    **A.**   It would be ideal, yes.

14    **Q.**   Now, Mrs. Brockman was interviewed by Dr. Darby, but

04:26:14   15    you chose not to attend that interview, correct?

16    **A.**   It didn't even occur to us that we would have to all

17    fly for that, when there were other flights scheduled,

18    but, no, I was not in Houston then.

19    **Q.**   Okay.  And on this list that I will put up, even if

04:26:34   20    it has a little bit of writing on here, there is Don

21    Passmore, the C.P.A. that says, you know, through counsel,

22    didn't sit for an interview with you.  Do you believe

23    Mr. Brockman's C.P.A. is someone with daily and ongoing

24    contact with him?

04:26:52   25    **A.**   No.  But I think he probably had substantial contact

1  about high-level issues, and that cognition would be

2  recognizable to a C.P.A.

3  **Q.**   Okay.  You have on here Craig Moss, and Robert

4  Burnett, who apparently through counsel didn't talk to

04:27:09  5  you.  You're aware that both of those individuals are

6  government witnesses in this hearing, correct?

7  **A.**   Yes, they became that.

8  **Q.**   And there are some other names on hear, Rob Nalley,

9  Laura Douglas.  You are not suggesting Mr. Brockman

04:27:26  10  prevented these people from talking to you, correct?

11  **A.**   No.  And I think I have a sense of what happened

12  here, but I am not suggesting he prevented it.

13  **Q.**   Since you began interviewing Mr. Brockman in May,

14  over the course of two different days yourself, and

04:27:49  15  another day in October, you never sought to have a

16  collateral interview with Mr. Gutierrez?

17  **A.**   It did occur to us, and Dr. Denney and I have

18  discussed it, but we hadn't scheduled it.  We hadn't asked

19  the government about it.  It seemed to be too intrusive to

04:28:11  20  have more than casual passing conversation with him.  So,

21  that was my reason for not doing it.

22  **Q.**   But you thought that would have been somebody good to

23  talk to?

24  **A.**   Yes, and I look forward to his testimony.

04:28:29  25  **Q.**   Okay.  And then with respect to Ms. Keneally and

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1   Ms. -- Mr. Romatowski, Mr. Brockman's counsel, you didn't

2   attend those collateral interviews either?

3   **A.**   Correct.  I had to rely on Dr. Denney's write-ups.

4   **Q.**   I am going to look at some of the opinions in your

04:29:01   5   supplemental report, okay?

6   **A.**   Okay.

7   **Q.**   This looks to be Government's Exhibit 84.  And I am

8   going to turn to page 18 under "Findings and Opinions."

9   This portion of your report, the first paragraph under

04:29:52   10   "Findings and Opinions," you state that nothing changed

11   your opinion as of May 2021.  Let me know when you get

12   there.

13   **A.**   I am there.

14   **Q.**   Nothing changes your opinion from May, correct?

04:30:02   15   **A.**   Correct.

16   **Q.**   But that the newly received information does throw

17   into question Mr. Brockman's current cognitive abilities

18   and those aspects of competence to stand trial that

19   require adequate short-term memory, particularly in light

04:30:15   20   of this -- his more recent episodes of delirium, the

21   surgery we talked about, and new evidence of brain imaging

22   consistent with early Alzheimer's disease.  That was one

23   of the findings and opinions in your supplemental report,

24   correct?

04:30:30   25   **A.**   Yes.

1  Q.   And as part of this report, you conducted interviews,

2  Dr. Denney did testing, and you were present for part of

3  that testing on October 20th, correct?

4  A.   The competency part that others are allowed to

04:30:48  5  observe.

6  Q.   And let me ask you about that.  You used the term

7  "ECST-R," E-C-S-T-R.  Is that the test that you and

8  Dr. Denney decided on for the second interview with

9  Mr. Brockman on October 20th?

04:31:07  10  A.   Well, only Dr. Denney decides, but I proposed it.

11  Q.   You said you had made that suggestion after attending

12  a conference.  What conference were you attending?

13  A.   This was a webinar sponsored by the National District

14  Attorneys' Association, and I believe the speakers in that

04:31:25  15  session were Dr. Maurine Rearden and Dr. Daniel Martell.

16  But I may be wrong about the exact speakers.  I know the

17  particular point about the ECST-R was made by doctor --

18  Q.   The ECST-R?

19  A.   Yes.   Thank you.

04:31:48  20                 -- was made by Dr. Martell.

21  Q.   So the decision was made -- you said it was

22  ultimately Dr. Denney who made the decision to use the

23  ECST-R instead of the prior scan?

24  A.   Yes.   He's in charge of test choice.

04:31:59  25  Q.   Okay.   And that was the single competency evaluation

1    of that nature conducted on October 20th?

2    **A.**    Yes.

3    **Q.**    And that happens to be the one portion of that day,

4    or a portion of that day, that's simply not recorded at

5    all?

6    **A.**    Because the publisher doesn't permit it.

7    **Q.**    So because of some sort of publishing proprietary

8    concerns, that part of the examination, we do not have

9    preserved in video or otherwise?

10   **A.**    That's correct.  But I was able to attend with him

11   because publisher permits another clinician to be present.

12   **Q.**    Then -- and then who scores that?  Do you score that?

13   **A.**    Dr. Denney scored it.

14   **Q.**    So --

15   **A.**    But I have seen the scoring sheets and how he went

16   about that.

17   **Q.**    And that particular test has a lot of emphasis on

18   whether or not Mr. Brockman understands what a jury is,

19   what a Judge does, that sort of thing?

20   **A.**    All of those things are in there, and they carry

21   weight as to the other things that are in there.

22   **Q.**    And you understand, no one is suggesting Mr. Brockman

23   doesn't understand what a judge is, or what a jury is,

24   it's the question of whether he can actually assist his

25   counsel in understanding the facts and presenting a

*PARK E. DIETZ, M.D. — CROSS BY MR. VARNADO*

1   defense?

2   **A.**   Yes.

3   **Q.**   Okay.  And so in terms of what happened on that test,

4   we just have to take Dr. Denney's word for it?  There is

04:33:23   5   no video whatsoever?

6   **A.**   There's no video, but there are detailed notes of

7   what was said in response to standard questions so the

8   questions are available, and Dr. Denney's notes on what

9   Mr. Brockman responded conform to my memory of it sitting

04:33:48   10   right there.

11   **Q.**   And you were there for, virtually, the entire time?

12   I think there was some testing that he came -- Dr. Denney

13   came back to do, but otherwise, you were present for the

14   entirety of October 20th?

04:33:58   15   **A.**   That's not accurate.  I was present for the entire

16   ECST-R administration on October 20th, and for

17   interviewing on that date, but unrelated tests were done

18   in my absence.  I exited the room, because I'm not allowed

19   to watch that part.  It interferes with the protocol.

04:34:23   20   **Q.**   So when Dr. Denney was conducting the other types of

21   tests that we discussed, you were not present for that?

22   **A.**   That's right.  And when Dr. Denney came back for an

23   hour to finish the ECST-R and whatever else he did that

24   day, I was not present.

04:34:37   25   **Q.**   And I want to try to understand what your opinion is,

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    during the testing -- or, I'm sorry -- during the

2    interview portion.  I think you said that Mr. Brockman

3    performed best in May, worst in July, and better in

4    October in terms of his interviewing with you, and

04:34:58    5    demonstrating, in your mind, memory capabilities and

6    better cognition?

7    **A.**    If we -- we have to be clear about what we're

8    comparing.  I do agree best in May, worst in July.  I

9    think it's debatable whether in early October, with the

04:35:24    10    defense exams, he was the same or worse than he had been

11    in July.  But in our late October exams, I thought he was

12    clearly better than he had been in July.

13    **Q.**    Okay.

14    **A.**    But still impaired.

04:35:44    15    **Q.**    I am going to show you a clip from what is already in

16    evidence as Government's Exhibit 93, and I will call it

17    Defense Exhibit 75-A, and that is a clip from your October

18    20th interview with Dr. Denney.  We are going to play two

19    clips sort of at the beginning and end of the day.

04:36:09    20         MR. VARNADO:  I will start with this one, 75-A,

21    which is RB 102002607, Matt.

22              Can we switch to the video?

23              **************************

24              **(Video plays as follows.)**

04:36:35    25         "DR. DIETZ:  Do you know my name?

1     "MR. BROCKMAN:  I believe it's Dietz.

2     "DR. DIETZ:  Yes, it is.  And who is this?

3     "MR. BROCKMAN:  Sorry, I don't remember.

4     "DR. DIETZ:  This is Dr. Denney, and do you

04:36:48  5 know what we're here to evaluate you about?

6     "MR. BROCKMAN:  You're here to evaluate my

7 competency to stand trial."

8     **(Video concludes.)**

9     **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

04:37:03  10     MR. VARNADO:  Can we play the next clip that is

11 just from later in that same interview?  And I'll mark that

12 as 75-B, Defense exhibit.

13     **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

14     **(Video played as follows:)**

04:37:16  15     "DR. DIETZ:  Why do you think we were here

16 talking to you today?

17     "MR. BROCKMAN:  I think that you're

18 representing your client and asking questions.

19     "DR. DIETZ:  Who is our client?

04:37:30  20     "MR. BROCKMAN:  I believe, ultimately, it's --

21 it is -- its name originally was ADP, Automatic Data

22 Processing.  It now goes by a different name.

23     "MR. DIETZ:  Do you think we work for the

24 competition?

04:37:54  25     "MR. BROCKMAN:  The competition of Reynolds and

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1  Reynolds?  Yes.

2          "DR. DIETZ:  I'm not sure I'm hearing you

3  correctly.

4          "MR. BROCKMAN:  If you say competition, meaning

04:38:08  5  competition to Reynolds and Reynolds, I believe that to be

6  the case."

7              **(Video concluded.)**

8              **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

9  BY MR. VARNADO:

04:38:17  10  **Q.**    Dr. Dietz, you talked about something called

11  sundowning that you thought, maybe, was going on.  There's

12  a dementia difference late in the day.  That's near the

13  end of your interview, correct?

14  **A.**    Yes, around 4:15.

04:38:29  15  **Q.**    And that was, sort of, one the last interactions you

16  had with Mr. Brockman before the interview concluded, and

17  you went off to write your supplemental report, correct?

18  **A.**    Well, there was also some mental status examination

19  questions right after that.

04:38:45  20  **Q.**    That's the forced choice questions?

21  **A.**    No.

22  **Q.**    He has to pick multiple choice.  You got to pick one,

23  even if you're guessing?

24  **A.**    That was earlier --

04:38:54  25  **Q.**    Okay.

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1   **A.**   -- that he did that.

2                But after this clip, at 4:15 or so, there

3   were questions:  How do you spell "world" backwards?  Who

4   is the president?  And so on.

04:39:04  5   **Q.**   Sure.  Right.  And so after -- I am not going to play

6   that just in the interest of time.  I know which clip

7   you're talking about.

8                But as you left and prepared your report,

9   you had that interaction with Mr. Brockman, and I want to

04:39:18  10  get to what your conclusions actually are in your

11   supplemental report, because I don't think we saw them on

12   your direct examination.

13             MR. VARNADO:  If we could go back to the ELMO.

14  BY MR. VARNADO:

04:39:26  15  **Q.**   I have got a couple of portions highlighted, and I

16   think you say the most objective evidence in Mr.

17   Brockman's brain functioning is provided by brain image

18   studies, and you agree these are mostly consistent with

19   early Alzheimer's disease, correct?

04:39:48  20  **A.**   Yes.

21   **Q.**   And I am going to skip some of the part that I

22   haven't highlighted.  It is fine for everybody to read it,

23   obviously, but it says, "If Mr. Brockman's performance

24   were a reliable and valid indicator of his cognitive

04:40:00  25  capacity, I would join the defense experts in considering

1   him too demented to assist in his counsel in the course of

2   trial, and I would agree that the prognosis is poor."

3                   Then, I want to get to this point here

4   because this is sort of leading into your actual opinion

04:40:14   5   here.  And you say, "But, it is also possible that this

6   unusually intelligent and disciplined defendant has

7   intentionally and knowingly mislead his professional and

8   social circle to see him as more impaired than he actually

9   is by exaggerating the extent of his decline.  This would

04:40:31   10   no doubt be a Herculean task, but Mr. Brockman has

11   previously accomplished Herculean tasks."

12                   So -- and I am going to put up a

13   demonstrative here in just a moment, Dr. Dietz.  But what

14   Herculean tasks had Mr. Brockman previously accomplished?

04:40:50   15   **A.**   Building an enormous company, succeeding in

16   developing this elaborate network of offshore companies,

17   that through its investments did spectacularly well.

18   Offshore trusts, I should have said.

19   **Q.**   Meaning, being a savvy investor, and making good

04:41:20   20   business decisions, is that what you're referring to?  And

21   building his business, is the Herculean task you're

22   referring to there?

23   **A.**   Yes, very few accomplish anything at that level.

24   **Q.**   Okay.  And so is it your view --

04:41:35   25   **A.**   Sustaining a marriage for 53 years, that's another

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    one.

2    **Q.**   We can all agree on that.  Is it your view that

3    people who have had successful business careers should

4    have a bigger uphill battle in a competency determination?

04:41:50   5    **A.**   No.

6    **Q.**   It just seems here, Dr. Dietz, that you are -- you

7    know, there is evidence here at the end of your report,

8    and we are going to get to it, at the end -- when you sign

9    this report, you actually say you cannot decide whether or

04:42:07   10   not Mr. Brockman is competent to stand trial, correct?

11   **A.**   At that time I could not tell which of two

12   possibilities was true, and being unable to know, it

13   seemed to me, the only honest thing to do was to say I

14   didn't know.

04:42:23   15   **Q.**   And have you ever issued another opinion where you

16   found a defendant competent to stand trial because he

17   didn't prove himself capable but -- not capable of doing

18   Herculean tasks?

19   **A.**   I don't know that I have ever used the phrase

04:42:43   20   "Herculean task" before.

21   **Q.**   Okay.  And here, your -- your -- you have got

22   evidence of Mr. Brockman's incompetence but you say, Look,

23   it's possible Mr. Brockman could have engaged in a

24   Herculean task, and actually be competent.  That's what

04:43:02   25   that sentence means?

**A.**   No.  I don't say that there is evidence that he's
incompetent.  That's not true.  There was -- there was
certainly evidence of neurodegenerative disease, and there
are various narratives of his performance suggesting
cognitive decline, and then there is the testing
suggesting extreme impairment, so there's contradictory
evidence that I hadn't yet sorted and understood why are
these things not corresponding.

**Q.**   Okay.  I mean, you had some of that same
contradictory evidence in your first report, according to
what you wrote, but you did make an opinion there?

**A.**   Yes, because --

**Q.**   And so things have changed by October, and you
ultimately were not able to offer the Court an opinion one
way or the other when you submitted this report?

**A.**   Yes.  And what had changed and concerned me the most
is I saw the July videos.  I examined him myself in
October.  And the man looked much worse, and had had those
bouts of delirium in the hospital.  I had no doubt that
was true, and bad for him.  And I did not know if it had
diminished his capacities to the point where he had become
so impaired as to be incompetent.

**Q.**   So do you --

**A.**   And I was puzzled by his doing so well on the
competency test, the ECST-R, so I was puzzled and confused

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    and uncertain at that time.

2    **Q.**   So what your ultimate finding here at the conclusion

3    of your supplemental report -- I want to make sure

4    everybody has seen -- is that if Mr. Brockman's cognitive

04:45:07    5    capacity and memory have genuinely declined to the degree

6    that he suffers moderate or severe dementia, he would be

7    incapable of working with counsel in preparing his

8    defense, incapable of assisting counsel in the

9    cross-examination of witnesses, and incapable of

04:45:22   10    testifying in his own defense.  So you agree, Dr. Denney,

11    that if --

12                THE COURT:  Dr. Dietz.

13   BY MR. VARNADO:

14    **Q.**   Dr. Dietz, apologize.  You agree, Dr. Dietz, that if

04:45:30   15    Mr. Brockman suffers from moderate or severe dementia, he

16    is clearly not competent to stand trial?

17    **A.**   Well, not based on the labels, but based on the way

18    he has acted at his worst.  If all of that is genuine

19    impairment that is causing him to be confused of -- about

04:45:49   20    which case this is, whether it's a deposition, or exam,

21    where he is at any time, if -- if those things are true, I

22    would expect he would not be competent to stand trial in

23    the view of the Court.

24    **Q.**   And as of October 29th, the date that you submitted

04:46:09   25    this report, what you wrote down is that you couldn't

1  tell?

2  **A.**   That's right.  I couldn't tell between two

3  possibilities that seemed to me to both be plausible:

4  That he was faking it, and faking it very well, that's the

5  Herculean task; or that he really was that impaired.

6  **Q.**   And on the faking it very well, I want to make sure

7  we understand.  You are saying someone in Mr. Brockman's

8  condition that you admit has mild cognitive impairment,

9  could nevertheless pull off potentially a Herculean task

10  of perpetuating this whole exaggeration and fooling

11  everybody, in essence?

12  **A.**   Yes.  But let me explain what it takes.  His physical

13  frailty is a big leg up.  It gives him a head start in

14  this process because it allows him time to answer slowly,

15  think before he responds, to look impaired, and to create

16  an expectation of being mentally fragile as well.

17  **Q.**   Where did you write that in your report, Dr. Dietz?

18  In your three reports, did you ever write that anywhere?

19  Before coming in here to testify, you never mentioned

20  anything about his physical frailty.

21  **A.**   I thought I did write about his physical frailty, but

22  it is self-evident, and I think everybody agrees he's

23  physically frail.

24  **Q.**   But you are now using it as part of your opinion for

25  why he may be malingering, and that's nowhere in your

1   reports, is it?

2   **A.**   It's in the reports that he has Parkinson's disease.

3   There's a long list of his medical conditions.  I don't

4   think it's a surprise that the man is physically frail.

04:47:55   5   He has had multiple hospitalizations for sepsis.

6   **Q.**   What's a surprise is that nowhere in the three

7   reports you submitted to the Court, because I took note of

8   it when you said it on the stand, that this physical

9   frailty gives him a leg up, or don't be deceived because

04:48:13   10   you see Bob is not doing well.  That is nowhere in your

11   reports after spending hours and hours and hours with

12   Mr. Brockman.

13   **A.**   Okay.

14   **Q.**   So, I mean, are you just -- is this -- you're using

04:48:24   15   this to bolster your testimony, because you can obviously

16   see how bad Mr. Brockman is doing?

17            MR. MAGNANI:  Objection, Your Honor.  At this

18   point, he is just badgering the witness.

19            THE COURT:  Okay.  I am going to -- I mean,

04:48:34   20   what's your objection?

21            MR. MAGNANI:  My objection is that he is

22   badgering the witness.

23            THE COURT:  Okay.  I don't think -- is there a

24   question on the floor?

04:48:42   25            MR. MAGNANI:  I don't believe so, Your Honor.

1 BY MR. VARNADO:

2 **Q.**   Yeah.  The question is:  Where in your report did you

3 note that Mr. Brockman's frailty is something we all need

4 to be on the lookout for as a possible malingerer, and it

04:48:54   5 gives him a leg up, which you just testified to?

6 **A.**   It's not in the report, but I was answering your

7 question about Herculean tasks.  I had not completed that

8 answer.

9 **Q.**   Well, please continue.

04:49:05   10 **A.**   So, the task that he would have to complete in order

11 to develop the supporting evidence he has developed, is

12 that he has to do extremely poorly on neuropsychological

13 tests again and again.  And in my view, he overshot that,

14 and bottomed out on that performance too early in March of

04:49:30   15 2019, and had nowhere down to go.

16                    Second, he would need, when visiting

17 doctors for half an hour, or an hour, to say particular

18 things, and to behave in a particular way.

19                    Third, if he was having contact with

04:49:49   20 people who were not part of the trusted inner circle to

21 whom, to use his words, he had opened the road, he would

22 have to behave in a particular way and look impaired.  And

23 the only place he could safely let down his guard would be

24 with the most trusted inner circle, who would never betray

04:50:16   25 him.  So it's a big job to keep all of that straight, and

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    to keep looking very impaired in --

2    **Q.**   Dr. Dietz, let me just ask you really quick --

3    **A.**   -- the October --

4    **Q.**   -- because it's your -- the government can cover some

5    of this with you on redirect.

6             THE COURT:  The problem is, you asked him:  Why

7    do you think it's a Herculean task?  He's explaining it.

8    If you don't want to hear it, we can move on, but he hasn't

9    finished.

10   BY MR. VARNADO:

11   **Q.**   Go ahead.  Absolutely.  Finish, Dr. Dietz.

12            THE COURT:  I mean, if you don't want him to

13   answer it, it can come out on cross.  I'm just saying you

14   asked him a question, and Dr. Dietz never got a chance to

15   respond.

16            MR. MAGNANI:  And, Your Honor, just so that

17   it's not confusing, I just want to make it clear.  Is

18   Dr. Dietz free to honestly answer the questions as best he

19   can, or would Your Honor prefer only to have him testify

20   about things that are in his report?  Because I think --

21            THE COURT:  Well, the problem is, whether it's

22   in the report or not, the question was asked.  I mean,

23   whether it's in the report or not, he was asked the

24   question and now he has to answer it.

25            MR. VARNADO:  That's fair, Your Honor.  Yeah.

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    THE COURT:  And, so, if -- if you want an

2  answer, I am going to allow Dr. Dietz to give an answer.

3  But if you don't want an answer, we will cut it off.

4    MR. VARNADO:  I will cut it off, Your Honor.

04:51:30   5  BY MR. VARNADO:

6  **Q.**   The government can finish up with you on that

7  because, at the end of the day, you put in there that

8  Mr. Brockman would be potentially capable of a Herculean

9  task, but as of October 29th you could not make up your

04:51:42  10  mind and determine whether or not Mr. Brockman was

11  competent.  Correct?

12  **A.**   That's true.

13  **Q.**   And, so, you issue a third report in this case and

14  that comes on November 4th.  Correct?

04:51:59  15  **A.**   Yes.

16  **Q.**   And this is Government's Exhibit 88.

17    I think you testified on direct as well

18  that there were really two things that occurred; that you

19  said you now -- you were made aware from Dr. Denney of the

04:52:18  20  lengths to which neuropsychological testing could be

21  verified, and that that was -- that was one of the things

22  that influenced you.  Correct?

23  **A.**   I didn't hear how you phrased it.  I'm sorry.

24  **Q.**   I phrased it as:  You had mentioned two different

04:52:36  25  things that formulated your opinion in modifying your

1    ultimate conclusion and going back to deciding that

2    Mr. Brockman is competent.

3                      The first, or at least one of them, was

4    that you said you had come into new information from

04:52:50    5    Dr. Denney about the lengths to which neuropsychological

6    testing could be verified.  Do you recall saying that?

7    **A.**    Yes.

8    **Q.**    So, again, that comes from Dr. Denney.  That's not

9    something that you on your own had; you had to rely on

04:53:05   10    Dr. Denney for that?

11    **A.**    Yes.

12    **Q.**    And then I think you said the other was better

13    understanding the limits of what we can learn through

14    brain imaging -- in essence, information that Dr. Darby

04:53:19   15    shared with you?

16    **A.**    Correct.

17    **Q.**    And did you conduct your own statistical analysis of

18    the test data, or did you just rely on Dr. Denney's

19    information that he provided you on that?

04:53:35   20    **A.**    Well, I didn't conduct my own statistical analysis.

21    What I did is to come to understand how the validity tests

22    are developed, how good they are, and what happens when

23    you combine a set of them together, so that the

24    probability of getting away with faking is high if there

04:54:08   25    is only one validity test in a battery and the person -- I

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1  am phrasing this wrong.  I'm sorry.

2                    The tests are set such that there is a 10

3  percent risk of coming to the wrong conclusion.  If you

4  combine two of them together that -- so that the person

04:54:39  5  fails twice in the same testing session, that more or less

6  reduces the risk of making an error to 1 in a 100.  If the

7  person fails three in the same testing session, it reduces

8  the risk of falsely proclaiming it a fake to 1 in 1,000.

9  If they were to fail four, it could reduce it to, roughly,

04:55:09  10  1 in 10,000.

11                    So, the more times a person fails a

12  validity test within a session the greater the chance that

13  you can -- or the more certain you can be that they are

14  faking.

04:55:25  15  **Q.**   And, Dr. Dietz --

16  **A.**   That's what persuaded me, is coming to understand

17  that.

18  **Q.**   And, again, you heard Dr. Denney's cross-examination

19  where he agreed that in five of the six stand-alone

04:55:38  20  validity tests by Dr. Green, there was a probable genuine

21  memory-impaired profile, correct?

22  **A.**   Possible, not probable.

23  **Q.**   Possible genuine memory-impaired profile out of those

24  six?

04:55:55  25  **A.**   If one didn't complete the scoring of the test by

1    going on to the next two phases, one of which is to

2    compare to age-appropriate controls.

3    **Q.**   Which, again, relies upon Dr. Denney's own analysis,

4    not something you did?

04:56:05    5    **A.**   No, it does not depend on his analysis.  It's a

6    function of the test, that there are three things.  First,

7    there is the algorithm, which can come up with a possible

8    genuine memory-impaired profile.

9    **Q.**   Which it did on the Green tests here.  That's what

04:56:22   10    happened?

11              MR. MAGNANI:  Objection.  If Mr. Varnado could

12    let him finish the answer.  He said there is three

13    possibilities and Mr. Varnado cut him off in the middle of

14    the first one.

04:56:31   15    **Q.**   Go ahead, Dr. Dietz.

16    **A.**   The second is the part that's been referred to as

17    subjective or impressionistic, and it may be as subjective

18    and impressionistic as, say, reading brain imaging after

19    years of experience doing it, that one might think there

04:56:51   20    is shrinkage because you have seen thousands of them

21    before.  The same is true here, that there may be a

22    subjective or impressionistic phase.  That's Part 2.

23              And then the third one is to compare these

24    data with the appropriate age group.

04:57:08   25              And you can't judge it until you have done

1   all three of those things.  So, the fact that there are

2   repetitive possible memory-impaired profiles doesn't tell

3   us very much.  We have to finish the analysis in order to

4   know what to do with the possible profile.

04:57:37   5   **Q.**   Dr. Dietz, I want to show you the graphic that the

6   government went through you -- went through with you on

7   your direct.  Do you recognize that?

8   **A.**   Yes.

9   **Q.**   And you said -- I believe you said you and Dr. Denney

04:57:51   10   and Dr. Darby came up with this chart.  Is that right?

11   **A.**   Yes.  Not all in one session.  There were drafts

12   circulated back and forth and then -- and then discussion

13   with the graphic artist to try to finalize it.

14   **Q.**   And we have talked about a few things on here that I

04:58:05   15   want to make sure it's clear for the record and the Court

16   that are missing from this chart.

17                 The first is sort of -- your timeline

18   started in Two Thousand -- you have the line here on 2018

19   for the search warrant of Mr. Tamine's home as being a

04:58:24   20   demarcation for when health concerns were raised, but we

21   talked earlier today on cross-examination that you go back

22   to at least 2015 with Dr. Lisse and the health -- memory

23   concerns that were raised in those health notes that we

24   looked at yesterday.  Correct?

04:58:37   25   **A.**   Yeah, this isn't about when memory concerns were

1    raised.  This is when memory function began being tested

2    and worked up.

3    **Q.**   Correct.  But, in terms of it being raised, you are

4    not going to dispute that it goes back at least to

04:58:51   5    November of Two Thousand -- I mean, to this date in 2015

6    with Dr. Lisse?

7    **A.**   Correct.

8    **Q.**   I think what Mr. Brockman wrote in that note that he

9    provided to Dr. Lisse that was:  Unfortunately, most of

04:59:07  10    the time of year I felt like sometimes 40 percent of my

11    energy was gone and something is really wrong with me;

12    and, again, memory continues to get poorer, especially

13    with the names of people that I know well and should

14    remember easily; and a new weird phenomenon, names that I

04:59:21  15    ought to remember, like one of our maids and a restaurant

16    close by, by the house, I have been to 20 times or more,

17    that I have had a real problem remembering these two

18    names.

19             And this was pretty specific memory

04:59:31  20    concerns that Mr. Brockman was raising with Dr. Lisse back

21    in '15?

22    **A.**   And that same passage appears in multiple years.

23    **Q.**   And there is a progression.  Sometimes it would be

24    the same and then maybe some additional concerns and

04:59:43  25    comments over the years through those medical records.

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1  **A.**   Yes.   That's right.   At the same time that he says he

2  is capable of working very long hours.

3  **Q.**   Right.   And, again, we have Dr. Pool's diagnosis in

4  October of 2018.   And then you know that he referred

04:59:59  5  Mr. Brockman to Dr. Yankovich, who diagnosed him with

6  Parkinson's disease in January of 2019.   Correct?

7  **A.**   Yes.   That's right.

8  **Q.**   And then, in fact, that was confirmed through a

9  DaTscan in February of 2019?

05:00:13  10  **A.**   Yes.

11  **Q.**   No doubt he's got Parkinson's at that point?

12  **A.**   Correct.

13          MR. MAGNANI:   Mr. Varnado, I don't want to mess

14  up your flow, but is this marked also?

05:00:27  15          MR. VARNADO:   Well, I will mark it --

16          MR. MAGNANI:   Okay.

17          MR. VARNADO:   -- as 77-A.   Actually, I'll just

18  mark it as Defense Exhibit 77.

19          THE COURT:   Counsel, I -- I have got an issue

05:00:39  20  that's come up.   We're going to continue tonight until we

21  get this witness off the stand.   I have got to handle a

22  hearing at 5:15, in 15 minutes.   So, I am going to go ahead

23  and take a recess at this time until 5:35.

24          MR. VARNADO:   Very good, Your Honor.

05:00:58  25          THE COURT:   I have got to handle this.   I

1   appreciate your patience.  I didn't think that we were

2   going to be here more than a week; so, I had things

3   scheduled that way.  And there is just a hearing I am going

4   to have to handle after-hours.

05:01:13   5              So, if we all stand by, if we can break

6   for 35 minutes, we will start up as close to 5:35 as we

7   can, and we will just continue on into the evening.  And we

8   will finish this witness as long as it takes.

9              MR. VARNADO:  Very good.  Thank you.

05:01:27   10             THE COURT:  I appreciate everyone.  Thank you.

11   (Proceedings recessed from 5:01 p.m. to 5:34 p.m.)

12             MR. LOONAM:  With the government's

13   agreement, is it okay if we waive the appearance of the

14   defendant for the remainder of the day?

05:54:30   15             THE COURT:  Not a problem.

16             MR. LOONAM:  Thank you, Judge.

17             THE COURT:  And let's do this.  We're planning

18   on going -- I want to go late tonight, as late as we can.

19   So, let's try to --

05:54:38   20             MR. VARNADO:  Judge, I would say I don't have

21   much more.  I don't know what Mr. Magnani has on redirect,

22   but I am going to try to finish up really quickly.  I

23   streamlined over the break and we should be --

24             THE COURT:  Well, I am not --

05:54:47   25             MR. VARNADO:  No.  That's fine.

1          THE COURT:  This is an important hearing.  So,

2  I am not rushing you guys.  I'm just telling you that we

3  are here for the long haul.  So, my staff is ready.  You

4  know, we're -- we will stay here to get it all done.

05:55:02  5          MR. VARNADO:  Very good.

6          THE COURT:  So as long as you need us, we're

7  here.

8          MR. VARNADO:  Thank you, Judge.

9          THE COURT:  So, let me just take just a quick

05:55:08  10 break and then we will get started again.

11         THE CASE MANAGER:  All rise.

12 (Proceedings recessed from 5:55 p.m. to 6:07 p.m.)

13         THE CASE MANAGER:  All rise.

14         THE COURT:  Please be seated, everyone.

06:07:34  15         Mr. Varnado, you may continue.

16         MR. VARNADO:  Thank you, Your Honor.

17         THE COURT:  Counsel, thank you for your

18 patience this evening.  It took a lot longer than I

19 thought, but that's kind of the way it is.

06:07:43  20         MR. VARNADO:  Well, thank you.  I will try to

21 streamline this, Your Honor.

22         A couple of housekeeping items I was told

23 by our team that I did not move into evidence:  Defense

24 Exhibit 2-A, which is the clip from the 2017 birthday

06:07:56  25 party; and Defense Exhibit 74, which is the 2018 Texas

PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO

1  birthday party video.  So, I just move for those clips --

2            MR. MAGNANI:  Yeah.  As long as the full videos

3  are in, there is no objection.

4            THE COURT:  Okay.  Without objection, they're

06:08:13  5  admitted.

6            MR. VARNADO:  Thank you, Your Honor.

7            MR. MAGNANI:  Oh.  Wait.  I'm sorry.  I just

8  had one other thing, which is just I -- the slides that

9  we're using now, someone just pointed out to me that they

06:08:26  10  indicate a Dr. Pool diagnosis in October 2018.  So, I know

11  he is going to be a witness and so -- We are not aware of a

12  diagnosis.  So, if there are any medical records that

13  relate to that, we would just request them before he

14  testifies.

06:08:39  15            MR. VARNADO:  And I'll verify that, Your Honor.

16  It may just be the initial exam, but we will look at it.

17            THE COURT:  And this that I have been given, is

18  this an exhibit?

19            MR. VARNADO:  No.  It's just a demonstrative,

06:08:52  20  Your Honor.

21            THE COURT:  Okay.

22            MR. VARNADO:  All right.  Thank you.

23  BY MR. VARNADO:

24  Q.  Dr. Dietz, we were looking at this particular slide

06:08:59  25  deck, which is the graphic that you and your team prepared

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    for purposes of your testimony.  Correct?

2    **A.**    With your overlays, yes.

3    **Q.**    Correct.  Yes, this one has our overlays.  And we had

4    gotten through the DaTscan confirming the Parkinson's

06:09:12   5    disease diagnosis, and I just wanted to note a couple of

6    different items on -- that we have overlaid on top of your

7    graphic.  Okay?

8                        First, I just wanted to note the delirium

9    episode in March of 2021 in connection with Mr. Brockman's

06:09:27  10    hospitalization for urosepsis in that March time frame.

11    **A.**    Yes.

12    **Q.**    And then there was a -- again, another delirium

13    episode -- I am going to write it on this one -- in the

14    May-July time frame for the second hospitalization this

06:09:43  15    year for urosepsis with delirium.  Correct?

16    **A.**    Correct.

17    **Q.**    And then there was a procedure under general

18    anesthesia in late June of 2021.  I believe it was June

19    26.  Do you recall that --

06:09:56  20    **A.**    Yes.

21    **Q.**    -- from your testimony?

22                        And then we also had a note there, the

23    amyloid PET scan that was done, this time at the defense

24    expert's recommendation, in July of 2021?

06:10:09  25    **A.**    Yes.

1    Q.   And then, again, the delirium episode from

2    Mr. Brockman's most recent hospitalization in September of

3    2021?

4    A.   That's cut off of the screen.

06:10:18    5    Q.   Okay.  I'll slide it this way.  Can you see it better

6    now?  The box up here.

7    A.   Oh.  Yes.  That's right.

8    Q.   Okay.  Very good.

9                    And, so, when you look at these -- your

06:10:36    10   line from -- going from March to August of 2021 that

11   continues to stay in the mild cognitive impairment

12   range -- You heard Dr. Darby or you read Dr. Darby's

13   conclusion in his report that it's plausible that

14   Mr. Brockman would have progressed from the mild cognitive

06:10:55    15   impairment to the dementia stage.  Correct?

16   A.   Yes.  And I agree.

17   Q.   You agree that's plausible?

18   A.   Yes.

19   Q.   Dr. Dietz, we talked about a number of the things

06:11:02    20   that you relied upon and looked at in connection with this

21   case, including communications like e-mails and other

22   writings or communications from the defendant,

23   Mr. Brockman.  Correct?

24   A.   Yes.

06:11:15    25   Q.   Okay.  And you said that that was important for you

1    to understand those and absorb those in forming your

2    opinions?

3    **A.**    Yes.

4    **Q.**    I am showing you what's been marked as Government's

06:11:28    5    Exhibit 74.  Were you aware -- which is a memo purporting

6    to be to Craig Moss and purporting to be from Robert

7    Brockman.  Were you aware that Mr. Moss informed the

8    government that he did not believe that Mr. Brockman wrote

9    this communication?

06:11:43    10         MR. MAGNANI:  Objection, Your Honor, hearsay.

11    This witness took the stand in this case and could have

12    been asked about this, you know, under oath and subject to

13    cross, but now it seems like counsel might be trying to

14    admit hearsay for the truth of the matter asserted through

06:12:00    15    an inappropriate witness.

16         MR. VARNADO:  Well, Your Honor, Mr. --

17    Dr. Dietz has been provided with a whole host of

18    information, and I want to just ask him the simple

19    question, that 'Would it be important to you?  Is this

06:12:11    20    something you would have wanted to know if Mr. Brockman had

21    not written some of these communications?'

22         THE COURT:  Well, that's a question that he

23    needs to answer.  But did Mr. Moss -- I am looking at my --

24    thinking back through the testimony, did Mr. Moss say that

06:12:25    25    he didn't -- that this -- this e-mail was not written by

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1  him?

2            MR. VARNADO:  He was not questioned on that

3  topic.  We received that notification from the government

4  that Mr. Moss -- they provided that to us as a *Brady*

06:12:37   5  disclosure, that Mr. Moss believed Mr. Brockman did not

6  write this communication.

7            THE COURT:  But why didn't anybody ask him that

8  if it was true?  I mean, wasn't Mr. Moss on the stand?  I

9  don't remember him ever being asked that question.

06:12:47   10            MR. VARNADO:  He was.  We did not examine him

11  on this document, but I am asking this particular

12  witness -- and it doesn't have to be particular to this

13  document -- that if it would be important for him to know

14  if there were documents that Mr. Brockman did not write in

06:13:00   15  the case.

16            THE COURT:  That's a perfectly good question.

17  You can ask that question.

18            THE WITNESS:  So, the exact question is?

19  BY MR. VARNADO:

06:13:07   20  **Q.**   The communications in this matter were something that

21  you relied upon in forming your opinions?

22  **A.**   Yes.

23  **Q.**   And if there were information that some of these

24  communications were not, in fact, written by Mr. Brockman,

06:13:18   25  is that something you would want to know?

1  A.   I would want to know that, yes.

2  Q.   Dr. Dietz, we put up the conclusion from your

3  supplemental report that, to your dismay, you were unable

4  to form an opinion as of October 29th of 2021 concerning

06:13:39  5  Mr. Brockman's competency.  Correct?

6  A.   Correct.  And I expressed hope that subsequent

7  information would lend clarity.

8  Q.   And I believe you testified on direct that you have

9  conducted 1,000 or more competency examinations in your

06:13:52  10  career.  Correct?

11  A.   Yes.

12  Q.   And that, on this day and in this matter, it was such

13  a close call that you could not decide on October 29th.

14  Correct?

06:14:02  15  A.   Well, I don't know that "close call" is the correct

16  way to put it.  It was either all one or all the other,

17  and I couldn't be certain which.

18  Q.   So, you could not make up your mind independently as

19  of October 29th.  Correct?

06:14:15  20  A.   That's correct.

21  Q.   And, so, only after you received subsequent

22  information from Dr. Denney and Dr. Darby did you actually

23  form your opinion -- your final opinion in this case?

24  A.   Well, I think there was other subsequent information,

06:14:27  25  but that was the most important.

*PARK E. DIETZ, M.D. - CROSS BY MR. VARNADO*

1    Q.    Okay.

2              MR. VARNADO:  I'll pass the witness.  No

3    further questions.

4              THE COURT:  Redirect?

06:14:35    5              MR. MAGNANI:  No thanks, Your Honor.  The

6    witness can be excused.

7              THE COURT:  Okay.  Well -- Okay.  Dr. Dietz, I

8    don't mean to hold you, but you were explaining that --

9              THE WITNESS:  You're welcome to.

06:14:49   10              THE COURT:  In response to cross-examination

11    you were explaining about "Herculean task," and it was a

12    question that I had as well, what you meant by that, and

13    you never got a chance to finish explaining.  Can you

14    finish that answer?

06:15:02   15              THE WITNESS:  Certainly, Your Honor.

16              THE COURT:  And I'll let you guys cross-examine

17    or direct on it.  I just want to know what Dr. Dietz was

18    going to say.

19              THE WITNESS:  It's that, if it is the case, as

06:15:13   20    I believe, that Mr. Brockman has been duping people, what

21    he has to do to accomplish that is take the

22    neuropsychological testing, which requires knowing a very

23    few decision rules about how to respond, and perform poorly

24    every time they're given.  He has performed poorly every

06:15:43   25    time they have been given.

1          The second thing he has to do is to act

2    impaired when in the presence of other people who will

3    honestly report what they observed.

4          The third thing he has to do is to either

5    create accomplices who will make false reports on his

6    behalf or fool those people who will make reports they

7    believe to be true consistent with what he hopes to show.

8          These are doable, but he has to remember

9    when to do it.  He can't fool the brain imaging; and, as it

10   turns out, he can't really fool the neuropsychological

11   tests if the tester uses enough validity tests to be able

12   to show if someone is faking impairment.

13          And, so, we have got pretty clear evidence

14   from the test data that this doesn't add up and doesn't fit

15   what he has been showing when he is around other people.

16   There's a mismatch between the really poor testing

17   performance and the decreasingly good performance around

18   other people.

19          I looked to the speeches and testimony as

20   really clear evidence of a higher level of functioning than

21   is being reported elsewhere and much higher than reported

22   through test results.

23          I am now persuaded that the test results

24   are invalid across the board, and I don't see any

25   explanation that fits all of these facts other than that

1 Mr. Brockman continues to malinger.

2                    THE COURT:  Okay.

3                    THE WITNESS:  And some of that is a matter of

4 logic more than expertise about dementia or how the testing

06:18:14 5 is done or how the scans are done.

6                    THE COURT:  Okay.

7                    THE WITNESS:  There is a big discrepancy here

8 that I don't know how else anyone could explain.

9                    THE COURT:  Thank you, Dr. Dietz.

06:18:29 10                    I'm sorry.  I didn't mean to -- I might

11 have opened you up to further examination, but I needed

12 to hear your full answer since you were trying to give

13 it.

14                    THE WITNESS:  Thank you, Your Honor.

06:18:40 15                    THE COURT:  Parties, you can -- further

16 questions for Dr. Dietz?

17                    MR. LOONAM:  No.  I want to make my flight.

18 (Laughter.)

19                    THE COURT:  From the government?

06:18:51 20                    MR. MAGNANI:  No, Your Honor.  Nothing from the

21 government.

22                    THE COURT:  Can Dr. Dietz be excused?

23                    MR. VARNADO:  Your Honor, I'm sorry.  I will

24 just make one question.

06:18:57 25                    THE COURT:  Sure.

1                    **CROSS-EXAMINATION (CONTINUED)**

2   BY MR. VARNADO:

3   **Q.**   It was Dr. Denney who interpreted the

4   neuropsychological testing and shared the results with

06:19:05   5   you.   Correct?

6   **A.**   That's correct.  And also shared studies with me and

7   shared data with me.

8               MR. VARNADO:  Okay.  No further questions.

9               THE COURT:  I think we are done.  Thank you,

06:19:17   10  sir.

11              THE WITNESS:  Thank you, Your Honor.

12              MR. LOONAM:  Thank you, Judge.

13              THE COURT:  Okay.  If there is nothing further,

14  let's -- I know we have been starting a little later than

06:19:27   15  8:30, but I think by targeting 8:30 we get started a little

16  bit sooner and we get a few minutes more.

17              As you heard from the last hearing -- I

18  mean, I know you guys say Monday or Tuesday but I ways

19  figure it could go longer.  So, if you can finish up by

06:19:43   20  Tuesday evening that would be great.  We all get to enjoy

21  Thanksgiving.  But, if you can't, don't worry.  We have got

22  Wednesday.  I'll clear Wednesday for you.

23              MR. VARNADO:  And I believe the government was

24  going to rest and then --

06:19:54   25              MR. SMITH:  Yes.  We rest at this time, Your

 1  Honor.

 2              THE COURT:  Okay.  Great.

 3              MR. LANGSTON:  Subject to Mr. Barras, and this

 4  weekend, but, yes --

 5              MR. SMITH:  Subject to the depositions

 6  tomorrow.

 7              MR. VARNADO:  We'll be ready to begin our case

 8  on Monday, Judge.

 9              THE COURT:  Let's start at 8:30, if we could.

10              Have a good weekend, all.  We had a good

11  week.  We got a lot done and accomplished.  I really

12  appreciate your focus and your time.

13              MR. VARNADO:  Thank you.

14              THE COURT:  We got a lot done.

15              MR. LOONAM:  Thank you.  And thank you to your

16  court staff for the late hours.

17              THE COURT:  They're the ones that really

18  deserve a lot of credit.  So, thank you on their behalf.

19              MR. LOONAM:  Thank you, sir.

20              THE COURT:  Have a good weekend, everyone.

21  (Recessed at 6:20 p.m.)

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2        I, Kathleen K. Miller, certify that the foregoing is a

3   correct transcript from the record of proceedings in the

4   above-entitled matter.

5   DATE: 11/23/21            /s/     _Kathleen K Miller_

6                             Kathleen K. Miller, RPR, RMR, CRR

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$233,000** [1] - 32:9
**$800** [2] - 33:3, 33:4

## '

**'15** [1] - 142:21
**'18** [1] - 83:14
**'19** [2] - 83:14, 110:2
**'70s** [1] - 43:23
**'80s** [1] - 43:24
**'82** [1] - 43:14
**'88** [1] - 43:15
**'confirmation** [1] - 90:17
**'look** [1] - 53:22
**'no** [2] - 15:1, 54:8
**'oh** [1] - 14:25
**'okay** [1] - 17:15
**'these** [1] - 17:13
**'well** [2] - 17:12, 49:7
**'would** [1] - 149:19

## /

**/s** [1] - 157:5

## 1

**1** [4] - 15:9, 139:6, 139:8, 139:10
**1,000** [2] - 139:8, 151:9
**10** [1] - 139:2
**10,000** [1] - 139:10
**100** [1] - 139:6
**102002607** [1] - 125:21
**10281** [1] - 2:8
**104** [3] - 4:9, 37:22, 38:2
**10th** [1] - 116:20
**11/23/21** [1] - 157:5
**11th** [1] - 86:15
**12** [1] - 61:2, 61:11
**12th** [2] - 74:17, 89:13
**14** [1] - 57:12
**143** [1] - 19:11
**14th** [2] - 76:22, 97:25
**15** [3] - 40:23, 68:23, 143:22
**15-minute** [2] - 10:9, 73:21
**150** [1] - 1:21
**152** [2] - 26:21, 26:22
**155** [1] - 3:5
**15th** [3] - 77:3, 86:12, 87:5
**17** [1] - 109:22
**18** [4] - 98:1, 105:2, 109:22, 121:8
**18th** [5] - 24:24, 25:11, 75:11, 75:23, 87:5
**19** [2] - 1:6, 4:2
**1976** [1] - 108:21
**1980-1981** [1] - 43:21
**1980-81** [1] - 48:2
**1980s** [1] - 47:20

**1990** [1] - 40:4
**19th** [3] - 76:12, 84:2, 86:13
**1:30** [1] - 1:5
**1:32** [1] - 4:3

## 2

**2** [3] - 15:10, 102:5, 140:22
**2-A** [3] - 102:1, 102:10, 145:24
**20** [3] - 40:8, 109:13, 142:16
**20002** [1] - 1:22
**2001** [1] - 44:4
**2002** [2] - 57:12, 66:19
**2004** [2] - 88:4, 88:6
**2005** [1] - 63:6
**2008** [2] - 12:17, 88:6
**2015** [3] - 114:5, 141:22, 142:5
**2017** [6] - 83:13, 101:14, 102:1, 102:4, 104:14, 145:24
**2018** [14] - 16:25, 17:23, 19:5, 88:4, 97:25, 104:25, 116:14, 117:7, 118:11, 118:13, 141:18, 143:4, 145:25, 146:10
**2019** [14] - 8:5, 83:8, 83:21, 83:24, 84:6, 98:1, 101:15, 107:22, 108:11, 110:6, 111:11, 135:15, 143:6, 143:9
**202-514-9623** [1] - 1:22
**2020** [7] - 6:12, 31:18, 35:2, 71:4, 71:19, 72:6, 83:9
**2021** [18] - 1:6, 4:2, 12:18, 16:25, 17:23, 19:5, 48:17, 76:22, 77:8, 78:23, 85:24, 121:11, 147:9, 147:18, 147:24, 148:3, 148:10, 151:4
**20th** [7] - 77:22, 122:3, 122:9, 123:1, 124:14, 124:16, 125:18
**212-326-3939** [1] - 2:9
**22** [2] - 25:22, 40:4
**2208** [1] - 1:21
**233** [1] - 32:22
**233,000** [1] - 32:23
**250** [4] - 2:8, 33:10, 33:11, 42:17
**26** [2] - 3:3, 147:19
**26th** [1] - 78:6
**27th** [2] - 102:12, 103:11
**29** [1] - 4:9
**29th** [5] - 132:24, 137:9, 151:4, 151:13, 151:19
**2nd** [3] - 66:19, 77:11, 77:20

## 3

**3** [1] - 15:14
**3-A** [4] - 107:22, 108:1, 108:4, 108:5
**30** [1] - 106:15
**300** [1] - 42:13
**31st** [2] - 86:15, 118:13
**3300** [1] - 2:3
**35** [3] - 40:5, 104:9, 144:6
**36** [1] - 40:23
**38** [1] - 86:3
**3:00** [1] - 73:19

**3:02** [1] - 73:25
**3:15** [1] - 73:21
**3:25** [1] - 73:25
**3rd** [1] - 116:19

## 4

**4** [2] - 3:3, 15:15
**40** [8] - 40:20, 43:9, 48:21, 77:3, 104:4, 116:13, 142:10
**42** [2] - 40:24, 97:22
**43** [2] - 19:11, 108:22
**44** [1] - 113:5
**49** [1] - 4:9
**4:15** [2] - 127:14, 128:2
**4:21-CR-09** [1] - 1:3
**4th** [1] - 137:14

## 5

**5** [3] - 1:13, 25:7, 90:9
**50** [1] - 4:9
**515** [1] - 2:13
**53** [1] - 129:25
**55** [1] - 25:11
**56** [1] - 26:8
**58** [2] - 11:15, 13:14
**5:01** [1] - 144:11
**5:15** [1] - 143:22
**5:34** [1] - 144:11
**5:35** [2] - 143:23, 144:6
**5:55** [1] - 145:12

## 6

**6** [3] - 114:10, 117:7, 118:10
**60** [1] - 44:4
**63** [1] - 4:9
**68** [3] - 36:18, 36:23, 37:2
**69** [2] - 54:11, 54:24
**6:07** [1] - 145:12
**6:20** [3] - 1:5, 4:3, 156:21

## 7

**70** [2] - 60:3, 60:4
**71** [4] - 65:6, 65:10, 73:3
**713-250-5087** [1] - 2:14
**717** [1] - 2:3
**72** [8] - 72:9, 72:15, 73:4, 73:5, 74:7, 78:10, 78:16, 80:5
**73** [3] - 96:11, 105:14, 105:22
**73-A** [6] - 105:3, 105:7, 105:8, 105:17, 105:24
**74** [3] - 105:23, 145:25, 149:5
**74-A** [2] - 105:24, 106:2
**75-A** [2] - 125:17, 125:20
**75-B** [1] - 126:12
**77** [1] - 143:18
**77-A** [1] - 143:17

**77002** [2] - 2:4, 2:13
**7th** [1] - 85:19

## 8

**80** [1] - 48:12
**80-year-olds** [1] - 11:6
**8004** [1] - 2:13
**832-239-3694** [1] - 2:4
**84** [1] - 121:7
**88** [1] - 137:16
**8:30** [3] - 155:15, 156:9

## 9

**93** [1] - 125:16
**95-B** [1] - 118:12

## A

**abducted** [2] - 67:6, 68:4
**abilities** [1] - 121:17
**able** [9] - 18:20, 35:18, 37:10, 42:8, 51:23, 111:3, 123:10, 131:14, 153:11
**abnormally** [1] - 11:12
**above-entitled** [1] - 157:4
**absence** [2] - 112:6, 124:18
**absolutely** [4] - 26:11, 94:14, 98:21, 109:14
**Absolutely** [1] - 136:11
**absorb** [1] - 149:1
**accept** [4] - 46:15, 46:18, 86:5, 86:6
**accepted** [3] - 51:4, 82:20, 95:14
**accepting** [1] - 33:18
**accepts** [1] - 10:5
**access** [3] - 8:15, 24:8, 24:12
**accidentally** [1] - 25:22
**accomplices** [1] - 153:5
**accomplish** [2] - 129:23, 152:21
**accomplished** [3] - 129:11, 129:14, 156:11
**accomplishments** [2] - 9:23, 99:4
**accordance** [1] - 94:16
**according** [3] - 10:23, 118:12, 131:10
**account** [2] - 7:22, 115:8
**accounts** [1] - 8:19
**accurate** [5] - 19:18, 20:22, 32:23, 44:12, 124:15
**accurately** [3] - 77:9, 78:10, 98:10
**accused** [2] - 39:8, 39:9
**acknowledge** [2] - 5:22, 36:13
**acquittal** [1] - 56:18
**act** [1] - 153:1
**acted** [1] - 132:18
**acting** [1] - 111:5
**action** [1] - 35:24
**active** [1] - 41:21
**actively** [2] - 43:12, 43:23
**activities** [1] - 6:11
**actual** [2] - 94:7, 129:4

**add** [1] - 153:14
**added** [2] - 27:14, 42:12
**addition** [3] - 40:2, 87:23, 99:22
**additional** [10] - 9:10, 9:11, 12:5, 18:7, 21:15, 22:25, 76:18, 82:6, 87:20, 142:24
**address** [8] - 5:18, 5:23, 7:25, 8:3, 41:12, 61:7, 78:20, 95:17
**addressed** [2] - 114:13, 114:15
**adequate** [1] - 121:19
**administration** [2] - 11:5, 124:16
**administrators** [2] - 98:6, 99:25
**admission** [1] - 72:9
**admit** [7] - 4:8, 37:1, 73:1, 78:15, 108:6, 133:8, 149:14
**admitted** [15] - 4:12, 11:18, 12:3, 16:17, 19:10, 26:20, 37:5, 57:2, 78:18, 81:8, 105:7, 105:20, 106:2, 108:8, 146:5
**adolescent** [1] - 46:9
**adopt** [1] - 99:18
**ADP** [1] - 126:21
**adults** [1] - 46:10
**advance** [2] - 71:24, 104:7
**advice** [1] - 60:13
**adviser** [2] - 42:15
**affect** [1] - 99:4
**affected** [1] - 110:20
**affirmatively** [1] - 30:7
**afield** [1] - 91:22
**after-hours** [1] - 144:4
**AFTERNOON** [1] - 1:10
**afternoon** [4] - 28:10, 28:11, 102:11, 103:10
**age** [3] - 37:21, 140:2, 140:24
**age-appropriate** [1] - 140:2
**agents** [2] - 27:7, 27:19
**aggravated** [1] - 59:20
**ago** [7] - 49:10, 83:17, 102:20, 103:19, 104:4, 108:22, 109:13
**agree** [34] - 20:21, 28:12, 28:15, 28:23, 29:20, 39:7, 40:24, 41:10, 41:11, 47:14, 50:8, 58:7, 75:2, 82:24, 84:14, 87:9, 87:19, 94:10, 94:13, 95:16, 104:16, 107:15, 110:5, 110:8, 110:19, 110:22, 125:8, 128:18, 129:2, 130:2, 132:10, 132:14, 148:16, 148:17
**agreed** [5] - 19:17, 34:7, 71:24, 94:3, 139:19
**agreeing** [1] - 34:3
**agreement** [2] - 31:20, 144:13
**agrees** [1] - 133:22
**Agronin** [2] - 6:18, 99:2
**ahead** [5] - 73:1, 101:25, 136:11, 140:15, 143:22
**aim** [1] - 119:9
**air** [1] - 56:18
**aired** [4] - 52:25, 53:3, 55:14, 63:16
**Alaska** [1] - 116:14
**aleck** [1] - 52:13

**alerted** [1] - 70:4
**algorithm** [5] - 81:9, 81:13, 81:17, 81:25, 140:7
**alleged** [3] - 31:13, 34:4, 66:25
**alleging** [1] - 31:8
**allow** [1] - 137:2
**allowed** [3] - 67:17, 122:4, 124:18
**allows** [1] - 133:14
**alone** [1] - 139:19
**Alsup** [4] - 69:9, 69:12, 69:17, 70:4
**Alzheimer's** [11] - 19:19, 21:11, 21:19, 41:13, 48:6, 48:17, 48:23, 90:3, 121:22, 128:19
**ambiguous** [1] - 90:14
**AMERICA** [1] - 1:3
**America** [4] - 62:21, 63:1, 64:15, 65:18
**amount** [2] - 32:14, 87:6
**amyloid** [2] - 78:23, 147:23
**analogized** [1] - 61:4
**analysis** [20] - 9:12, 10:16, 10:18, 11:4, 12:13, 15:17, 16:1, 16:6, 17:2, 17:15, 17:21, 18:22, 22:23, 80:18, 116:1, 138:17, 138:20, 140:3, 140:5, 141:3
**analyzed** [1] - 10:23
**anchor** [1] - 63:1
**and..** [1] - 90:21
**Andrea** [2] - 39:2, 60:21
**anesthesia** [3] - 86:19, 87:2, 147:18
**Angel** [1] - 56:18
**answer** [19] - 22:13, 22:14, 22:15, 27:17, 49:13, 55:9, 56:16, 133:14, 135:8, 136:13, 136:18, 136:24, 137:2, 137:3, 140:12, 149:23, 152:14, 154:12
**answered** [3] - 61:13, 61:15, 114:2
**answering** [3] - 27:12, 27:13, 135:6
**answers** [1] - 48:7
**anyway** [3] - 23:23, 102:19, 103:18
**apart** [1] - 8:7
**apologize** [4] - 13:18, 25:9, 60:4, 132:14
**apparent** [1] - 112:22
**appeal** [3] - 49:15, 59:8, 59:11
**Appeals** [4] - 60:20, 61:9, 62:11, 69:21
**appear** [4] - 16:7, 90:15, 93:5, 115:16
**appearance** [2] - 44:3, 62:21, 144:13
**APPEARANCES** [1] - 1:16
**appearances** [1] - 41:23
**appeared** [4] - 43:4, 92:7, 93:8, 95:19
**applause** [1] - 108:18
**Apple** [1] - 46:2
**appointed** [2] - 69:14, 69:18
**appointment** [1] - 86:7
**appreciate** [3] - 20:1, 144:1, 144:10, 156:12
**approach** [6] - 10:7, 10:15, 36:19, 54:15, 72:10, 72:11
**appropriate** [5] - 70:15, 70:17, 117:23, 140:2, 140:24
**April** [3] - 35:2, 71:4, 71:19
**area** [2] - 51:9, 82:8

**areas** [3] - 21:6, 21:17, 21:21
**argued** [4] - 34:22, 35:16, 35:20, 62:1
**argument** [3] - 15:22, 18:12, 49:18
**arising** [1] - 43:16
**Army** [1] - 63:19
**arose** [1] - 23:1
**arranged** [1] - 22:20
**arrived** [1] - 75:19
**article** [1] - 46:12
**articulated** [1] - 92:4
**artist** [1] - 141:13
**aside** [1] - 94:6
**aspect** [2] - 44:13, 112:20
**aspects** [2] - 112:9, 121:18
**assailant** [1] - 66:23
**asserted** [1] - 149:14
**assessed** [1] - 90:12
**assessing** [1] - 28:25
**assist** [2] - 123:24, 129:1
**assistance** [1] - 88:22
**assisted** [1] - 2:16
**assisting** [1] - 132:8
**associated** [1] - 111:18
**associates** [1] - 106:6
**association** [1] - 122:14
**assume** [4] - 33:7, 42:22, 105:19
**assure** [1] - 4:15
**attached** [1] - 109:2
**attack** [4] - 15:20, 67:2, 67:5, 67:10
**attacked** [1] - 66:22
**attempting** [1] - 22:6
**attend** [5] - 75:8, 77:5, 119:15, 121:2, 123:10
**attended** [2] - 25:16, 116:25
**attending** [2] - 122:11, 122:12
**attention** [4] - 6:10, 55:9, 63:4, 113:12
**attorney** [1] - 30:18
**Attorneys** [1] - 55:8
**attorneys'** [1] - 122:14
**August** [10] - 21:6, 77:8, 78:22, 79:2, 93:16, 95:1, 116:14, 116:18, 118:13, 148:10
**authentic** [5] - 113:20, 114:3, 114:24, 115:7, 116:6
**authorities** [1] - 61:6
**automatic** [1] - 126:21
**Automotive** [1] - 83:24
**available** [4] - 11:4, 25:20, 108:14, 124:8
**average** [1] - 47:10
**avoid** [1] - 104:14
**avoided** [1] - 60:19
**aware** [23] - 31:7, 31:11, 33:25, 34:12, 48:15, 59:11, 60:10, 70:9, 71:3, 71:22, 76:21, 86:23, 88:21, 88:23, 89:1, 89:5, 97:11, 115:18, 120:5, 137:19, 146:11, 149:5, 149:7
**awareness** [1] - 92:19

# B

**baby** [1] - 50:11
**background** [1] - 75:25
**backwards** [1] - 128:3
**bad** [3] - 101:3, 131:20, 134:16
**badgering** [2] - 134:18, 134:22
**ballistic** [1] - 91:19
**bank** [2] - 68:1, 68:5
**Bar** [1] - 70:4
**bar** [3] - 106:18, 107:3, 108:25
**barbecue** [8] - 104:6, 106:18, 106:19, 106:20, 107:3, 109:5
**barbed** [1] - 66:19
**Barbeque** [2] - 106:19, 109:6
**barbeque** [2] - 107:5, 109:6
**Barras** [4] - 25:17, 26:19, 27:9, 156:3
**based** [11] - 10:3, 13:2, 49:16, 56:11, 58:25, 59:10, 59:13, 71:10, 111:24, 132:17
**baseline** [1] - 87:17
**basis** [4] - 14:23, 15:3, 22:4, 58:1
**bathtub** [5] - 49:24, 52:22, 55:14, 57:2, 63:15
**batteries** [1] - 80:25
**battery** [3] - 80:22, 80:24, 138:25
**battle** [1] - 130:4
**Baylor** [18] - 5:16, 96:4, 96:6, 96:17, 96:24, 97:2, 97:3, 97:9, 97:11, 97:14, 98:7, 98:19, 99:13, 100:1, 100:4, 100:12, 100:17, 118:3
**bear** [1] - 28:16
**became** [5] - 30:19, 30:21, 49:15, 50:4, 120:7
**become** [3] - 100:23, 110:22, 131:21
**becomes** [1] - 13:6
**BEFORE** [1] - 1:11
**began** [7] - 6:17, 26:23, 32:8, 106:14, 113:16, 120:13, 142:1
**begin** [2] - 75:19, 156:7
**beginning** [4] - 6:20, 34:21, 112:13, 125:19
**begins** [1] - 100:6
**behalf** [5] - 39:17, 39:24, 101:9, 153:6, 156:18
**behave** [2] - 135:18, 135:22
**behavior** [1] - 100:23
**behaviors** [1] - 7:20
**behind** [3] - 70:14, 106:24, 109:10
**belabor** [1] - 84:12
**believes** [1] - 92:24
**belongs** [1] - 41:25
**Bermuda** [3] - 112:24, 116:16, 117:2
**best** [6] - 54:4, 57:11, 106:20, 125:3, 125:8, 136:18
**betray** [1] - 135:24
**better** [12] - 93:6, 94:14, 94:15, 95:17, 107:10, 107:11, 117:8, 125:3, 125:6, 125:12, 138:12, 148:5

**between** [8] - 7:23, 15:2, 19:5, 22:20, 27:5, 101:20, 133:2, 153:16
**beyond** [4] - 15:9, 21:22, 81:17, 82:5
**bias** [17] - 16:8, 28:24, 29:3, 34:19, 90:17, 92:8, 92:10, 92:13, 92:15, 92:20, 95:21, 95:23, 96:3, 98:13, 99:17, 99:19, 113:18
**biased** [13] - 90:15, 92:6, 92:7, 92:10, 93:4, 93:5, 94:11, 94:12, 95:18, 95:19, 95:21, 98:8
**biases** [2] - 92:16, 92:18
**biasing** [3] - 94:19, 95:7, 98:25
**big** [6] - 104:1, 109:2, 133:13, 135:25, 154:7
**bigger** [1] - 130:4
**bill** [3] - 32:14, 60:11, 60:17
**billed** [2] - 32:9, 33:15
**billings** [1] - 32:20
**birthday** [10] - 102:13, 103:12, 104:13, 104:25, 105:2, 106:13, 107:16, 108:21, 145:24, 146:1
**bit** [12] - 37:7, 38:5, 49:21, 62:18, 82:19, 102:18, 103:17, 104:9, 107:24, 113:15, 119:20, 155:16
**bite** [2] - 91:19, 91:22
**blending** [1] - 57:7
**blue** [1] - 21:16
**board** [14] - 26:14, 26:17, 27:5, 45:13, 45:15, 45:18, 45:25, 46:4, 46:17, 109:9, 109:11, 153:24
**board-certified** [4] - 45:13, 45:15, 45:18, 46:17
**boards** [1] - 45:20
**Bob** [8] - 28:13, 87:4, 104:8, 106:22, 108:2, 108:17, 109:7, 134:10
**Bob's** [1] - 27:14
**bodies** [2] - 85:15, 90:4
**body** [2] - 35:8, 71:17
**bolster** [1] - 134:15
**bomb** [4] - 66:19, 67:1, 68:1, 68:5
**bones** [1] - 70:14
**book** [1] - 41:1
**books** [1] - 41:1
**boring** [1] - 44:8
**Boris** [1] - 1:19
**boris.bourget@usdoj.gov** [1] - 1:24
**bother** [1] - 54:9
**bottom** [2] - 8:5, 19:22
**bottomed** [1] - 135:14
**bounds** [1] - 12:24
**Bourget** [1] - 1:19
**bouts** [2] - 87:20, 131:19
**box** [2] - 70:14, 148:6
**Brady** [1] - 150:4
**brain** [14] - 6:9, 10:4, 10:25, 11:6, 11:7, 14:19, 18:23, 21:7, 121:21, 128:17, 138:14, 140:18, 153:9
**brains** [1] - 11:6
**break** [5] - 73:21, 78:4, 144:5, 144:23,

145:10
**breaks** [2] - 75:16, 75:20
**Brian** [1] - 67:23
**briefly** [2] - 41:18, 64:18
**bring** [1] - 11:15
**broad** [1] - 46:8
**broad-spectrum** [1] - 46:8
**broadly** [1] - 93:10
**brockman** [1] - 77:8
**BROCKMAN** [13] - 1:6, 102:11, 103:10, 105:9, 106:4, 108:19, 126:1, 126:3, 126:6, 126:17, 126:20, 126:25, 127:4
**Brockman** [96] - 6:4, 10:1, 21:13, 25:17, 25:19, 28:4, 28:13, 29:25, 34:13, 35:3, 35:9, 36:8, 36:11, 36:15, 48:12, 71:9, 72:5, 72:17, 74:13, 74:21, 75:1, 75:5, 75:12, 76:13, 76:19, 77:12, 77:23, 78:21, 79:25, 83:7, 83:21, 84:24, 85:3, 85:11, 85:14, 86:4, 86:11, 87:20, 88:18, 88:21, 89:3, 89:4, 96:19, 96:20, 98:1, 98:24, 100:3, 101:14, 108:17, 112:23, 113:3, 113:17, 114:4, 116:8, 117:1, 117:7, 117:14, 117:25, 118:5, 118:12, 118:16, 118:24, 119:10, 119:14, 120:9, 120:13, 122:9, 123:18, 123:22, 124:9, 125:2, 127:16, 128:9, 129:10, 129:14, 130:10, 130:23, 132:15, 134:12, 134:16, 137:8, 137:10, 138:2, 142:8, 142:20, 143:5, 148:14, 148:23, 149:7, 149:8, 149:20, 150:5, 150:14, 150:24, 152:20, 154:1
**Brockman's** [38] - 5:16, 11:5, 20:13, 23:2, 28:1, 29:21, 48:16, 71:5, 71:15, 71:23, 75:5, 75:25, 77:2, 83:23, 84:16, 87:11, 87:24, 91:2, 96:6, 98:6, 98:20, 99:25, 101:9, 101:20, 110:6, 110:13, 119:23, 121:1, 121:17, 128:17, 128:23, 130:22, 132:4, 133:7, 135:3, 147:9, 148:2, 151:5
**Bronfman** [1] - 39:21
**brought** [4] - 31:9, 55:8, 104:6, 119:4
**building** [2] - 129:15, 129:21
**burden** [1] - 29:20
**Burnett** [2] - 89:2, 120:4
**burying** [1] - 70:14
**business** [7] - 6:11, 102:19, 103:18, 103:22, 129:20, 129:21, 130:3
**busy** [1] - 10:13
**BY** [37] - 4:21, 13:21, 18:14, 19:9, 24:4, 24:23, 25:13, 28:9, 28:22, 36:21, 37:6, 54:17, 55:1, 58:10, 61:20, 65:4, 65:12, 72:13, 73:14, 74:5, 78:19, 96:14, 101:17, 107:14, 108:9, 109:18, 113:11, 115:3, 127:9, 128:14, 132:13, 135:1, 136:10, 137:5, 146:23, 150:19, 155:2

---

**C**

---

**C.P.A** [3] - 119:21, 119:23, 120:2

**calculation** [1] - 108:22
**California** [1] - 69:5
**camera** [1] - 25:7
**cancelled** [1] - 86:7
**cannot** [3] - 12:13, 69:23, 130:9
**capabilities** [1] - 125:5
**capable** [5] - 22:3, 130:17, 137:8, 143:2
**capacities** [1] - 131:21
**capacity** [5] - 30:25, 96:20, 98:2, 128:25, 132:5
**capital** [2] - 69:22, 70:1
**Capital** [1] - 70:3
**captures** [1] - 82:23
**car** [2] - 64:4, 64:11
**care** [5] - 9:24, 97:13, 111:21, 116:9, 117:14
**career** [4] - 41:21, 44:11, 100:21, 151:10
**careers** [1] - 130:3
**carefully** [2] - 33:24, 70:6
**Carolina** [3] - 38:22, 38:23, 56:7
**carries** [1] - 20:7
**carry** [1] - 123:20
**case** [104] - 4:23, 5:3, 6:1, 6:15, 7:11, 18:5, 22:23, 24:18, 29:9, 29:24, 30:17, 30:21, 30:22, 31:7, 31:9, 31:14, 31:21, 31:23, 32:3, 33:6, 33:7, 33:18, 33:21, 34:1, 34:4, 34:7, 35:12, 35:13, 36:2, 36:8, 38:12, 38:16, 39:1, 39:2, 39:20, 39:25, 42:21, 46:8, 46:20, 48:24, 49:3, 49:4, 49:21, 49:23, 50:20, 51:14, 51:23, 56:6, 56:11, 58:24, 59:3, 59:18, 60:20, 63:12, 65:25, 66:15, 66:17, 67:12, 67:22, 68:6, 68:20, 69:5, 69:11, 69:13, 69:17, 69:22, 70:1, 70:5, 70:12, 71:6, 72:3, 72:18, 72:23, 75:21, 79:7, 79:14, 82:10, 84:9, 87:9, 88:1, 88:15, 88:19, 89:2, 92:25, 94:21, 99:13, 104:15, 108:12, 110:12, 113:17, 115:20, 115:21, 119:1, 127:6, 132:20, 137:13, 148:21, 149:11, 150:15, 151:23, 152:19, 156:7
**CASE** [4] - 73:24, 74:1, 145:11, 145:13
**case's** [1] - 32:4
**cases** [16] - 30:8, 32:2, 38:6, 38:8, 38:19, 39:2, 39:7, 39:12, 40:2, 40:3, 40:8, 43:2, 43:3, 55:22, 66:14, 70:7
**casual** [2] - 104:5, 120:20
**categories** [1] - 83:6
**cater** [1] - 106:17
**caused** [1] - 63:8
**causing** [1] - 132:19
**cautious** [1] - 7:10
**ceiling** [1] - 109:2
**central** [1] - 49:15
**CEO** [2] - 108:2, 108:17
**certain** [3] - 56:4, 139:13, 151:17
**certainly** [10] - 23:15, 27:13, 47:11, 69:25, 79:13, 93:8, 102:20, 103:19, 131:3, 152:15
**CERTIFICATE** [1] - 157:1

**certified** [6] - 45:13, 45:15, 45:18, 46:17, 46:21, 46:22
**certify** [1] - 157:2
**chained** [1] - 68:4
**chairman** [2] - 108:2, 108:17
**chairs** [1] - 109:1
**chalkboard** [2] - 106:24, 109:10
**challenged** [2] - 9:9, 67:13
**chance** [5] - 38:1, 83:2, 136:14, 139:12, 152:13
**chances** [1] - 106:5
**change** [1] - 115:16
**changed** [5] - 111:19, 114:1, 121:10, 131:13, 131:16
**changes** [2] - 100:23, 121:14
**chaplain** [1] - 25:18
**chapters** [1] - 41:1
**characterize** [3] - 8:13, 31:3, 117:17
**characterized** [4] - 22:18, 60:9, 61:1, 63:23
**charge** [1] - 122:24
**charged** [1] - 67:1
**charges** [5] - 5:22, 6:15, 6:17, 6:18, 31:4
**charging** [1] - 32:25
**charitable** [1] - 100:10
**Charles** [4] - 62:23, 62:25, 63:3, 65:16
**charming** [1] - 9:22
**chart** [4] - 75:18, 80:8, 141:10, 141:16
**check** [1] - 65:23
**child** [4] - 46:9, 50:3, 50:15
**children** [12] - 38:23, 49:24, 51:16, 52:21, 55:13, 55:23, 56:6, 62:1, 63:15, 63:25, 64:6, 64:8
**choice** [3] - 122:24, 127:20, 127:22
**chose** [1] - 119:15
**Chris** [1] - 30:1
**Christopher** [1] - 1:19
**christopher.magnani@usdoj.gov** [1] - 1:24
**church** [1] - 25:16
**cingulate** [1] - 21:18
**circle** [3] - 129:8, 135:20, 135:24
**circuit** [1] - 29:23
**Circuit** [1] - 62:10
**circulated** [1] - 141:12
**circumstances** [1] - 110:14
**cite** [1] - 100:25
**cited** [1] - 61:6
**citizen** [2] - 63:23, 64:5
**civil** [2] - 31:2, 46:10
**claim** [3] - 51:8, 56:18, 118:6
**claimed** [1] - 66:22
**claiming** [1] - 35:13
**Clare** [1] - 39:21
**clarification** [2] - 21:4, 22:8
**clarified** [1] - 21:2
**clarify** [2] - 23:1, 46:19
**clarity** [1] - 151:7

**cleaning** [1] - 25:22
**clear** [17] - 17:4, 21:5, 21:9, 23:3, 62:10, 86:11, 95:12, 96:15, 98:18, 100:8, 118:3, 125:7, 136:17, 141:15, 153:13, 153:20, 155:22
**clearly** [3] - 110:3, 125:12, 132:16
**clergyman** [1] - 25:20
**clicker** [1] - 5:11
**client** [4] - 30:11, 30:24, 126:18, 126:19
**Clinic** [2] - 97:3, 97:8
**clinical** [6] - 10:6, 40:15, 43:12, 45:3, 92:3, 92:22
**clinically** [1] - 95:8
**clinician** [2] - 9:25, 123:11
**clinicians** [2] - 6:5, 6:6
**clip** [12] - 101:25, 104:23, 105:3, 105:17, 105:19, 106:1, 125:15, 125:17, 126:10, 128:2, 128:6, 145:24
**clips** [6] - 104:13, 107:24, 108:13, 109:19, 125:19, 146:1
**close** [6] - 40:20, 60:14, 142:16, 144:6, 151:13, 151:15
**closed** [1] - 6:12
**closer** [2] - 100:23, 100:24
**closest** [2] - 112:23, 113:3
**closing** [2] - 15:21, 49:18
**clue** [1] - 103:21
**CNBC** [1] - 41:24
**CNN** [1] - 41:24
**co** [1] - 41:6
**co-written** [1] - 41:6
**coach** [1] - 31:25
**coated** [1] - 101:2
**coding** [1] - 97:7
**coffee** [1] - 108:25
**cognition** [5] - 87:17, 94:2, 94:6, 120:1, 125:6
**cognitive** [30] - 11:7, 11:8, 11:11, 36:12, 76:10, 84:25, 85:25, 87:1, 87:15, 93:14, 93:21, 101:21, 104:18, 109:25, 110:4, 110:14, 110:21, 110:25, 111:11, 111:24, 112:7, 112:9, 112:22, 121:17, 128:24, 131:5, 132:4, 133:8, 148:11, 148:14
**collateral** [15] - 6:8, 6:24, 7:1, 7:8, 7:17, 7:19, 8:15, 8:19, 24:8, 24:13, 119:3, 119:8, 119:11, 120:16, 121:2
**colleagues** [4] - 98:6, 99:25, 102:14, 103:14
**collected** [1] - 78:4
**College** [9] - 96:7, 97:3, 98:7, 99:13, 100:1, 100:4, 100:12, 102:15, 103:14
**colluded** [1] - 118:4
**combine** [2] - 138:23, 139:4
**coming** [4] - 81:9, 133:19, 139:3, 139:16
**comment** [7] - 90:13, 90:19, 92:2, 93:8, 95:16, 104:16, 104:20
**comments** [3] - 8:7, 109:21, 142:25
**commit** [1] - 50:4

**committed** [1] - 58:16
**communicate** [1] - 35:9
**communicated** [1] - 55:7
**communication** [2] - 149:9, 150:6
**communications** [5] - 148:21, 148:22, 149:21, 150:20, 150:24
**comp** [1] - 46:11
**companies** [2] - 94:17, 129:16
**company** [3] - 106:14, 109:13, 129:15
**compare** [4] - 10:21, 14:13, 140:2, 140:23
**compared** [2] - 8:15, 20:11
**compares** [1] - 11:6
**comparing** [2] - 11:23, 125:8
**comparison** [6] - 12:17, 16:5, 17:9, 17:23, 19:6, 19:7
**comparisons** [3] - 15:17, 16:15, 16:16
**competence** [8] - 6:22, 22:2, 28:2, 28:25, 29:19, 29:21, 43:18, 121:18
**COMPETENCY** [1] - 1:9
**competency** [15] - 5:25, 29:12, 33:21, 41:9, 41:13, 48:10, 69:14, 71:5, 72:17, 74:15, 78:13, 122:4, 122:25, 126:7, 130:4, 131:25, 151:5, 151:9
**competent** [12] - 28:4, 28:13, 29:13, 29:16, 71:16, 130:10, 130:16, 130:24, 132:16, 132:22, 137:11, 138:2
**competition** [4] - 126:24, 126:25, 127:4, 127:5
**competitors** [1] - 30:14
**complaining** [2] - 117:22, 118:17
**complaint** [1] - 61:4
**complete** [2] - 135:10, 139:25
**completed** [1] - 135:7
**completely** [2] - 12:24, 29:3
**comports** [1] - 72:21
**compound** [1] - 13:9
**Comprehensive** [2] - 97:3, 97:8
**comprehensive** [1] - 97:13
**compromised** [2] - 86:25, 87:11
**computer** [2] - 2:16, 115:9, 115:10, 115:12, 115:16
**computer-assisted** [1] - 2:16
**computers** [1] - 115:15
**concede** [2] - 36:11, 36:13
**conceded** [1] - 53:9
**concern** [2] - 11:3, 39:8
**concerned** [9] - 18:19, 24:12, 24:15, 66:17, 75:25, 92:12, 92:13, 114:23, 131:16
**concerning** [3] - 52:17, 112:21, 151:4
**concerns** [10] - 24:7, 48:9, 81:1, 88:3, 123:8, 141:20, 141:23, 141:25, 142:20, 142:24
**conclude** [1] - 18:22
**concluded** [5] - 10:2, 60:11, 75:20, 127:7, 127:16
**concludes** [1] - 126:8
**conclusion** [8] - 10:5, 10:6, 14:20,

132:2, 138:1, 139:3, 148:13, 151:2
**conclusions** [2] - 5:10, 128:10
**concocting** [1] - 101:8
**condition** [2] - 86:16, 133:8
**conditions** [5] - 21:12, 92:14, 92:19, 134:3
**conduct** [5] - 5:25, 68:10, 69:14, 138:17, 138:20
**conducted** [8] - 6:24, 31:7, 76:13, 76:17, 78:2, 122:1, 123:1, 151:9
**conducting** [2] - 45:4, 124:20
**conference** [7] - 22:20, 23:21, 31:7, 63:17, 63:21, 122:12
**confidence** [1] - 114:5
**confirmed** [5] - 92:17, 93:12, 94:8, 94:9, 143:8
**confirming** [1] - 147:4
**conflating** [1] - 56:1
**conform** [1] - 124:9
**confounded** [2] - 56:12, 56:16
**confounding** [2] - 55:21, 63:9
**confronted** [2] - 9:9, 16:4
**confused** [2] - 131:25, 132:19
**confusing** [1] - 136:17
**connected** [1] - 57:3
**connection** [5] - 39:24, 51:2, 74:14, 147:9, 148:20
**consent** [1] - 43:18
**consider** [2] - 5:23, 109:14
**considerably** [1] - 111:20
**consideration** [1] - 21:8
**considered** [3] - 80:6, 83:18, 87:25
**considering** [2] - 10:8, 128:25
**consistent** [5] - 48:17, 95:1, 121:22, 128:18, 153:7
**consistently** [1] - 8:5
**conspiracy** [1] - 118:5
**constituted** [1] - 59:19
**constructing** [1] - 88:22
**consultation** [1] - 43:17
**consulted** [3] - 42:1, 49:8, 52:3
**consulting** [3] - 52:8, 58:21, 58:23
**consume** [1] - 106:18
**contact** [7] - 30:22, 91:5, 119:1, 119:10, 119:24, 119:25, 135:19
**contacted** [4] - 31:6, 53:18, 55:17, 72:2
**contained** [1] - 23:11
**contains** [4] - 40:3, 40:22, 72:16, 104:17
**contemporaneous** [1] - 114:7
**content** [2] - 55:5, 55:20
**contest** [1] - 36:8
**context** [1] - 95:23
**continue** [6] - 4:6, 83:3, 135:9, 143:20, 144:7, 145:15
**Continued** [1] - 3:3
**CONTINUED** [2] - 4:20, 155:1
**continues** [3] - 142:12, 148:11, 154:1
**continuing** [1] - 96:2

**contract** [6] - 31:22, 31:24, 32:1, 32:2, 32:3, 32:5
**contradictory** [3] - 10:16, 131:6, 131:10
**contributions** [4] - 98:7, 100:1, 100:3, 100:11
**control** [1] - 92:18
**controls** [1] - 140:2
**converging** [1] - 21:12
**conversation** [2] - 96:2, 120:20
**convicted** [2] - 53:14, 59:6
**conviction** [9] - 53:16, 59:12, 60:21, 61:11, 61:21, 61:23, 62:9, 62:20, 63:5
**cooking** [1] - 101:8
**copy** [5] - 36:24, 54:22, 65:7, 90:9, 96:13
**copycat** [1] - 67:22
**core** [1] - 43:20
**Corey** [1] - 1:18
**corey.smith@usdoj.gov** [1] - 1:23
**corner** [1] - 37:25
**correct** [185] - 7:5, 9:12, 29:10, 35:4, 35:16, 36:4, 36:5, 36:10, 37:22, 38:14, 38:15, 38:24, 38:25, 39:5, 39:14, 40:9, 40:12, 40:19, 41:10, 41:15, 42:21, 44:1, 44:7, 44:20, 45:9, 45:13, 45:16, 47:6, 47:7, 47:16, 47:21, 47:24, 47:25, 48:7, 48:10, 48:25, 49:1, 49:12, 49:14, 49:19, 49:20, 49:25, 50:20, 51:4, 51:10, 51:16, 51:24, 52:3, 52:12, 52:18, 53:4, 53:12, 53:17, 54:20, 55:15, 55:23, 56:8, 56:24, 57:9, 58:13, 58:21, 58:25, 59:3, 59:21, 60:12, 60:18, 60:22, 61:2, 61:12, 61:22, 62:7, 62:21, 63:10, 66:5, 66:23, 67:10, 67:23, 68:6, 68:11, 68:20, 68:24, 69:9, 70:4, 71:6, 71:11, 74:12, 74:18, 74:19, 75:5, 75:9, 75:15, 75:21, 76:11, 76:25, 77:6, 77:25, 78:7, 78:8, 78:24, 79:7, 79:15, 79:20, 79:24, 80:7, 81:3, 81:6, 81:12, 81:13, 81:16, 81:22, 82:9, 82:10, 82:21, 83:8, 84:4, 84:7, 84:10, 85:9, 85:12, 85:20, 86:13, 86:21, 87:7, 88:1, 88:16, 89:14, 90:25, 91:1, 92:9, 93:14, 94:23, 96:7, 96:25, 105:21, 110:7, 111:25, 112:8, 112:25, 115:20, 116:16, 117:3, 118:17, 118:18, 118:24, 118:25, 119:12, 119:15, 120:6, 120:10, 121:3, 121:14, 121:15, 121:24, 122:3, 123:10, 127:13, 127:17, 128:19, 130:10, 137:11, 137:14, 137:22, 138:16, 139:21, 141:24, 142:3, 142:7, 143:6, 143:12, 147:1, 147:3, 147:15, 147:16, 148:15, 148:23, 151:5, 151:6, 151:10, 151:14, 151:15, 151:19, 151:20, 155:5, 155:6, 157:3
**corrected** [1] - 77:20
**correction** [2] - 61:25, 117:4
**correctly** [6] - 42:12, 70:16, 82:23, 90:6, 117:11, 127:3

**correspond** [2] - 11:1, 103:5
**corresponding** [1] - 131:8
**corroborate** [3] - 93:16, 93:23, 93:25
**corroborated** [1] - 93:12
**corroborates** [1] - 93:20
**corrupted** [1] - 100:11
**corruption** [1] - 100:16
**counsel** [19] - 12:2, 13:23, 17:7, 17:25, 53:17, 57:19, 71:14, 71:22, 77:2, 119:21, 120:4, 121:1, 123:25, 129:1, 132:7, 132:8, 143:19, 145:17, 149:13
**Counsel** [1] - 73:18
**counsel's** [1] - 71:8
**count** [1] - 61:3
**country** [1] - 97:19
**County** [1] - 60:7
**couple** [6] - 36:1, 38:11, 104:25, 128:15, 145:22, 147:5
**course** [12] - 16:10, 20:17, 21:3, 30:5, 51:17, 57:22, 91:13, 95:5, 100:21, 109:7, 120:14, 129:1
**courses** [1] - 35:24
**Court** [11] - 16:19, 25:8, 60:20, 61:8, 62:10, 69:20, 110:24, 131:14, 132:23, 134:7, 141:15
**COURT** [82] - 1:1, 2:11, 4:5, 4:11, 4:17, 12:25, 13:11, 13:16, 15:5, 16:23, 18:3, 19:8, 22:11, 22:15, 24:3, 28:6, 28:18, 36:20, 37:5, 54:16, 58:3, 58:7, 61:16, 72:11, 73:18, 74:2, 78:18, 102:22, 103:2, 103:5, 103:8, 105:4, 105:7, 105:25, 106:2, 107:25, 108:3, 108:8, 108:15, 132:12, 134:19, 134:23, 136:6, 136:12, 136:21, 137:1, 143:19, 143:25, 144:10, 144:15, 144:17, 144:24, 145:1, 145:6, 145:9, 145:14, 145:17, 146:4, 146:17, 146:21, 149:22, 150:7, 150:16, 152:4, 152:7, 152:10, 152:16, 154:2, 154:6, 154:9, 154:15, 154:19, 154:22, 154:25, 155:9, 155:13, 156:2, 156:9, 156:14, 156:17, 156:20, 157:1
**court** [12] - 33:14, 57:21, 57:23, 57:25, 58:6, 62:16, 69:14, 69:18, 104:15, 156:16
**Court's** [1] - 24:21
**court-appointed** [2] - 69:14, 69:18
**courtroom** [1] - 44:23
**courts** [1] - 17:4
**cover** [2] - 83:3, 136:4
**covered** [2] - 86:10, 113:15
**Cox** [1] - 83:24
**Craig** [2] - 120:3, 149:6
**create** [5] - 92:19, 94:18, 98:16, 133:15, 153:5
**created** [5] - 45:25, 98:19, 114:12, 115:11, 118:5
**creates** [1] - 95:23
**credibility** [2] - 7:10, 11:24
**credit** [1] - 156:18

**credits** [1] - 42:9
**crime** [3] - 53:1, 55:14, 63:16
**crimes** [2] - 39:9
**criminal** [6] - 30:21, 30:22, 31:4, 38:6, 46:10, 118:7
**Criminal** [1] - 69:21
**critical** [2] - 10:15, 91:18
**criticism** [2] - 92:21, 92:22
**CROSS** [2] - 28:8, 155:1
**cross** [13] - 16:10, 28:6, 52:7, 52:10, 55:10, 81:5, 132:9, 136:13, 139:18, 141:21, 149:13, 152:10, 152:16
**Cross** [1] - 3:3
**CROSS-EXAMINATION** [2] - 28:8, 155:1
**cross-examination** [9] - 16:10, 28:6, 52:7, 52:10, 55:10, 132:9, 139:18, 141:21, 152:10
**cross-examine** [2] - 81:5, 152:16
**CRR** [2] - 2:12, 157:6
**CSR** [1] - 2:12
**curious** [1] - 105:18
**current** [1] - 121:17
**customary** [1] - 33:2
**cut** [8] - 16:8, 42:8, 46:15, 63:3, 137:3, 137:4, 140:13, 148:4
**cuts** [1] - 17:6
**CV** [13] - 36:24, 37:7, 37:16, 37:21, 38:20, 39:7, 39:9, 40:2, 40:22, 41:17, 42:2, 49:9, 52:9
**cyber** [1] - 116:1

**D**

**DA's** [6] - 54:20, 56:3, 56:8, 56:23, 58:12, 66:10
**Dahmer** [1] - 38:12
**daily** [3] - 106:10, 119:10, 119:23
**Daniel** [1] - 122:15
**Darby** [21] - 9:7, 9:18, 11:21, 12:15, 13:3, 15:12, 18:8, 32:21, 45:2, 74:18, 75:4, 87:19, 89:12, 92:25, 94:22, 99:1, 119:14, 138:14, 141:10, 148:12, 151:22
**Darby's** [6] - 17:24, 19:13, 32:20, 44:19, 74:25, 148:12
**darby's** [1] - 77:13
**data** [6] - 74:22, 126:21, 138:18, 140:24, 153:14, 155:7
**DATE** [1] - 157:5
**date** [7] - 43:14, 56:19, 88:6, 115:16, 124:17, 132:24, 142:5
**dates** [2] - 43:20, 114:12
**dating** [1] - 114:8
**DaTscan** [2] - 143:9, 147:4
**Daubert** [2] - 67:13, 67:16
**DAY** [1] - 1:13
**days** [3] - 26:4, 33:14, 120:14
**DC** [1] - 1:22
**dead** [1] - 70:14

**deadly** [1] - 87:10
**deal** [2] - 18:3, 96:4
**dealt** [1] - 52:11
**debatable** [1] - 125:9
**deceived** [1] - 134:9
**December** [2] - 31:18, 105:2
**decide** [3] - 7:14, 130:9, 151:13
**decided** [5] - 16:5, 60:10, 106:17, 109:5, 122:8
**decides** [1] - 122:10
**deciding** [1] - 138:1
**decision** [5] - 61:9, 115:6, 122:21, 122:22, 152:23
**decisionmaking** [1] - 7:13
**decisions** [1] - 129:20
**deck** [3] - 19:13, 119:6, 146:25
**decline** [4] - 87:13, 113:4, 129:9, 131:5
**declined** [1] - 132:5
**decreasingly** [1] - 153:17
**deepened** [1] - 27:14
**DEFENDANT** [1] - 2:1
**defendant** [19] - 6:14, 6:17, 24:25, 25:3, 26:3, 26:9, 26:11, 29:13, 29:16, 34:8, 35:8, 35:13, 69:15, 78:12, 78:23, 129:6, 130:16, 144:14, 148:22
**Defendant's** [12] - 19:23, 36:17, 36:23, 54:11, 65:6, 72:15, 74:7, 102:1, 102:5, 108:1, 108:4, 108:5
**defendant's** [10] - 5:21, 7:24, 8:4, 20:10, 28:25, 30:22, 33:20, 37:2, 60:4, 73:2
**defendants** [2] - 39:8, 39:14
**defending** [1] - 35:10
**defense** [44] - 5:5, 5:9, 5:15, 5:20, 5:25, 6:13, 6:23, 7:22, 8:2, 8:16, 13:16, 13:23, 15:9, 15:20, 17:7, 23:8, 23:10, 23:16, 24:13, 24:14, 53:7, 53:17, 58:24, 67:4, 67:12, 71:4, 71:8, 71:14, 71:22, 78:10, 80:5, 86:2, 90:9, 124:1, 125:10, 125:17, 126:12, 128:25, 132:8, 132:10, 143:18, 145:23, 145:25, 147:23
**Defense** [7] - 11:15, 13:14, 70:4, 72:9, 78:15, 96:10, 107:22
**defense's** [5] - 35:2, 35:6, 61:24, 78:22, 79:1
**deficits** [2] - 112:22, 113:2
**definition** [1] - 51:22
**definitive** [1] - 111:23
**definitively** [1] - 95:19
**degree** [2] - 5:24, 132:5
**delirium** [12] - 86:13, 86:16, 87:6, 87:9, 87:10, 87:21, 121:20, 131:19, 147:8, 147:12, 147:15, 148:1
**delivery** [2] - 67:25, 68:11
**demand** [1] - 94:18
**demarcation** [1] - 141:20
**demented** [2] - 111:5, 129:1
**dementia** [39] - 8:8, 10:3, 19:19, 20:11, 20:14, 35:7, 35:8, 41:10, 41:14, 47:24, 48:3, 48:6, 48:18, 71:11, 71:17, 85:2,

85:4, 85:9, 85:12, 85:14, 85:15, 85:20, 90:4, 90:5, 90:6, 90:17, 104:19, 110:4, 110:15, 111:1, 111:9, 111:24, 112:7, 127:12, 132:6, 132:15, 148:15, 154:4
**dementias** [1] - 21:7
**Demeris** [2] - 106:19, 109:6
**demonstrate** [1] - 69:24
**demonstrating** [1] - 125:5
**demonstrative** [2] - 129:13, 146:19
**Denial** [1] - 56:19
**denied** [3] - 59:2, 66:5, 66:6
**Denney** [46] - 9:7, 13:3, 13:24, 14:1, 15:10, 15:25, 16:3, 16:4, 16:15, 17:1, 17:5, 17:11, 17:12, 18:5, 18:7, 75:12, 76:13, 76:21, 77:1, 77:23, 78:5, 81:5, 81:10, 82:11, 99:1, 120:17, 122:2, 122:8, 122:10, 122:22, 123:13, 124:12, 124:20, 124:22, 125:18, 126:4, 132:10, 137:19, 138:5, 138:8, 138:10, 141:9, 151:22, 155:3
**Denney's** [15] - 15:8, 16:8, 17:18, 17:20, 80:17, 81:2, 81:19, 82:9, 82:20, 121:3, 124:4, 124:8, 138:18, 139:18, 140:3
**denote** [1] - 105:3
**departing** [1] - 116:19
**Department** [4] - 1:20, 31:8, 31:21, 72:18
**depictions** [1] - 19:18
**deposition** [4] - 83:23, 84:6, 110:11, 132:20
**depositions** [4] - 5:17, 83:7, 83:12, 156:5
**depressed** [1] - 50:4
**depression** [5] - 50:10, 50:16, 51:6, 52:11, 52:17
**Derived** [1] - 68:18
**describe** [6] - 12:23, 27:6, 27:8, 53:23, 88:4, 112:17
**described** [2] - 7:23, 25:3
**describing** [1] - 15:8
**deserve** [2] - 80:12, 156:18
**deserved** [1] - 80:11
**designation** [1] - 97:6
**designed** [1] - 97:12
**despite** [3] - 21:24, 48:20
**detail** [2] - 31:24, 82:19
**detailed** [1] - 124:6
**details** [1] - 84:13
**detect** [1] - 95:4
**determination** [2] - 111:23, 130:4
**determinations** [1] - 11:24
**determine** [5] - 20:23, 65:23, 67:16, 114:11, 137:10
**develop** [1] - 135:11
**developed** [2] - 135:11, 138:22
**developing** [1] - 129:16
**development** [1] - 21:11
**deviancy** [1] - 39:10
**deviated** [1] - 91:11
**diagnose** [1] - 112:1

**diagnosed** [2] - 21:8, 143:5
**diagnoses** [3] - 71:21, 90:16, 100:15
**diagnosis** [20] - 5:16, 85:8, 85:19, 85:23, 91:15, 95:11, 98:20, 101:2, 101:3, 101:9, 110:3, 110:4, 110:25, 111:12, 111:13, 111:23, 143:3, 146:10, 146:12, 147:5
**diagnostic** [1] - 20:22
**Dick** [1] - 55:18
**diem** [1] - 31:25
**Dietz** [88] - 4:22, 5:11, 6:13, 12:20, 13:1, 13:22, 14:22, 15:18, 18:6, 18:16, 19:12, 23:4, 24:5, 24:24, 26:21, 27:22, 28:10, 28:23, 34:25, 36:22, 36:23, 37:8, 37:17, 41:18, 41:21, 44:6, 46:15, 54:14, 55:4, 58:11, 60:5, 60:8, 62:19, 65:3, 65:13, 65:22, 66:14, 69:2, 69:19, 69:20, 69:24, 70:8, 71:2, 72:14, 73:3, 73:16, 74:6, 86:3, 90:22, 91:21, 92:5, 93:3, 96:15, 104:13, 107:15, 108:10, 109:20, 110:9, 112:15, 113:13, 115:4, 117:9, 126:1, 127:10, 129:13, 130:6, 132:12, 132:14, 133:17, 136:2, 136:11, 136:14, 136:18, 137:2, 139:15, 140:15, 141:5, 146:24, 148:19, 149:17, 151:2, 152:7, 152:17, 154:9, 154:16, 154:22
**DIETZ** [8] - 3:2, 125:25, 126:2, 126:4, 126:15, 126:19, 126:23, 127:2
**difference** [2] - 16:14, 127:12
**differences** [1] - 20:2
**different** [27] - 4:23, 5:1, 6:3, 8:23, 10:15, 11:13, 14:10, 14:11, 14:12, 14:13, 15:2, 19:4, 40:8, 57:20, 67:22, 80:14, 85:23, 95:3, 107:20, 110:22, 110:23, 115:10, 120:14, 126:22, 137:24, 147:6
**differently** [1] - 92:11
**difficulties** [1] - 76:10
**difficulty** [1] - 88:24
**diminished** [1] - 131:21
**direct** [13] - 49:2, 49:18, 76:3, 79:5, 85:22, 110:16, 113:12, 119:5, 128:12, 137:17, 141:7, 151:8, 152:17
**DIRECT** [1] - 4:20
**Direct** [1] - 3:3
**directly** [1] - 63:17
**disability** [1] - 46:10
**disagree** [3] - 5:10, 15:7, 82:24
**disagreement** [1] - 46:16
**disagreements** [1] - 5:9
**discarding** [1] - 10:25
**discern** [1] - 22:5
**disciplined** [1] - 129:6
**disclosed** [2] - 23:15, 23:23
**disclosure** [1] - 150:5
**discredit** [1] - 53:7
**discrepancy** [3] - 7:23, 101:20, 154:7
**discuss** [4] - 6:18, 70:7, 99:13, 119:9
**discussed** [7] - 23:21, 52:9, 86:23, 87:8,

87:23, 120:18, 124:21
**discussion** [6] - 6:16, 64:17, 65:15, 99:17, 99:18, 141:12
**disease** [38] - 19:20, 21:11, 21:21, 35:4, 35:7, 36:9, 41:10, 41:13, 47:9, 47:15, 47:21, 47:24, 48:3, 48:6, 48:18, 48:23, 71:10, 71:11, 71:17, 85:15, 85:20, 90:3, 90:4, 94:6, 94:7, 104:17, 110:3, 110:21, 111:17, 112:1, 121:22, 128:19, 131:3, 134:2, 143:6, 147:5
**dismay** [1] - 151:3
**disorders** [1] - 47:4
**displayed** [1] - 7:20
**dispute** [4] - 15:7, 15:9, 19:2, 142:4
**disputed** [1] - 92:3
**distinction** [1] - 111:16
**DISTRICT** [3] - 1:1, 1:1, 1:12
**district** [1] - 122:13
**District** [3] - 55:8, 60:20, 69:5
**diverge** [1] - 99:16
**diverged** [1] - 46:5
**DIVISION** [1] - 1:2
**Division** [1] - 1:2
**doable** [1] - 153:8
**Doctor** [1] - 72:12
**doctor** [5] - 11:14, 18:4, 40:12, 40:14, 122:17
**doctors** [10] - 72:2, 84:15, 84:22, 96:4, 96:17, 99:2, 100:15, 100:17, 118:3, 135:17
**document** [6] - 25:6, 33:23, 88:3, 115:16, 150:11, 150:13
**documentaries** [2] - 42:20, 42:21
**documentary** [1] - 7:23
**documents** [4] - 89:3, 113:20, 114:6, 150:14
**DOJ** [2] - 31:23, 31:24
**Don** [1] - 119:20
**donations** [1] - 100:10
**done** [27] - 14:11, 14:12, 30:9, 40:17, 53:10, 65:24, 79:1, 79:7, 80:1, 80:25, 91:14, 91:15, 92:22, 93:2, 100:21, 107:9, 107:23, 124:17, 140:25, 145:4, 147:23, 154:5, 155:9, 156:11, 156:14
**doubt** [6] - 18:24, 33:23, 114:7, 129:10, 131:19, 143:11
**Douglas** [1] - 120:9
**down** [6] - 17:16, 43:11, 111:12, 132:25, 135:15, 135:23
**Dr** [267] - 4:22, 5:11, 6:13, 6:18, 7:1, 9:7, 9:22, 11:21, 11:24, 12:4, 12:5, 12:12, 12:15, 12:20, 13:1, 13:3, 13:22, 13:24, 14:1, 14:3, 14:5, 14:18, 14:22, 15:8, 15:10, 15:12, 15:18, 15:25, 16:3, 16:4, 16:8, 16:15, 16:19, 17:1, 17:5, 17:11, 17:12, 17:18, 17:20, 17:24, 18:5, 18:6, 18:7, 18:8, 18:16, 18:19, 19:12, 19:13, 19:17, 19:25, 20:7, 21:15, 22:9, 22:19, 22:21, 22:22, 23:1, 23:4, 23:8, 23:11, 24:5, 24:24, 24:25, 25:15, 26:3, 26:21,

27:6, 27:22, 28:10, 28:23, 32:20, 32:21, 34:25, 36:22, 36:23, 37:8, 37:17, 41:18, 41:21, 44:6, 44:19, 45:2, 46:15, 48:14, 48:15, 54:14, 55:4, 58:11, 60:5, 62:19, 65:3, 65:13, 66:14, 69:2, 69:19, 69:20, 69:24, 70:8, 71:2, 72:14, 73:3, 73:16, 74:6, 74:18, 74:25, 75:4, 75:12, 76:13, 76:21, 77:1, 77:13, 77:23, 78:5, 79:17, 80:17, 81:2, 81:5, 81:10, 81:19, 82:9, 82:11, 82:20, 82:21, 84:17, 84:18, 85:3, 85:6, 85:8, 85:11, 85:14, 85:18, 85:23, 86:3, 86:5, 87:19, 89:12, 89:17, 89:23, 90:13, 90:22, 91:2, 91:5, 91:11, 91:21, 92:5, 92:9, 92:21, 92:25, 93:3, 93:12, 93:17, 93:25, 94:22, 96:15, 96:19, 97:25, 98:1, 98:2, 99:1, 99:2, 100:2, 104:13, 107:15, 108:10, 109:20, 110:9, 112:15, 113:13, 114:17, 114:21, 115:4, 116:9, 117:4, 117:5, 117:8, 117:9, 117:14, 117:20, 117:21, 117:24, 117:25, 118:4, 118:5, 118:10, 118:18, 118:19, 118:20, 118:23, 118:24, 119:1, 119:14, 120:17, 121:3, 122:2, 122:8, 122:10, 122:15, 122:20, 122:22, 123:13, 124:4, 124:8, 124:12, 124:20, 124:22, 125:18, 126:4, 127:10, 129:13, 130:6, 132:10, 132:12, 132:14, 133:17, 136:2, 136:11, 136:14, 136:18, 137:2, 137:19, 138:5, 138:8, 138:10, 138:14, 138:18, 139:15, 139:18, 139:20, 140:3, 140:15, 141:5, 141:9, 141:10, 141:22, 142:6, 142:9, 142:20, 143:3, 143:5, 146:10, 146:24, 148:12, 148:19, 149:17, 151:2, 151:22, 152:7, 152:17, 154:9, 154:16, 154:22, 155:3
**DR** [6] - 125:25, 126:2, 126:4, 126:15, 126:19, 127:2
**drafts** [1] - 141:11
**draw** [1] - 16:15
**drawing** [1] - 16:15
**drawn** [1] - 16:16
**drive** [1] - 115:9
**dropped** [1] - 111:12
**drowned** [5] - 38:23, 49:24, 52:21, 55:13, 56:6
**drowning** [2] - 56:17, 63:15
**Drs** [1] - 9:18
**duping** [1] - 152:20
**duration** [1] - 75:6
**during** [11] - 16:9, 20:16, 24:24, 27:1, 52:7, 55:10, 64:4, 112:22, 116:15, 125:1
**duty** [2] - 29:4, 91:7
**Dylann** [1] - 38:12

---

## E

**E-C-S-T-R** [1] - 122:7

**e-mail** [13] - 7:24, 22:24, 26:23, 26:25, 27:2, 27:5, 28:12, 88:22, 88:24, 98:3, 116:18, 117:6, 149:25
**e-mails** [7] - 8:1, 83:9, 88:14, 88:19, 88:25, 106:10, 148:21
**earliest** [2] - 43:24, 88:6
**early** [8] - 21:19, 47:20, 90:2, 94:5, 121:22, 125:9, 128:19, 135:14
**easier** [1] - 108:13
**easily** [1] - 142:14
**ECST** [2] - 122:7, 122:17, 122:18, 122:23, 124:16, 124:23, 131:25
**ECST-R** [7] - 122:7, 122:17, 122:18, 122:23, 124:16, 124:23, 131:25
**editor** [1] - 41:2
**EEG** [3] - 77:12, 77:19, 77:20
**effect** [1] - 98:16
**effort** [2] - 10:18, 81:20
**Efronson** [2] - 2:7, 3:3
**EFRONSON** [1] - 105:22
**eight** [3] - 75:13, 76:14, 76:17
**eight-and-a-half** [1] - 75:13
**eighty** [1] - 11:8
**eighty-year-olds** [1] - 11:8
**either** [10] - 29:17, 55:24, 70:16, 75:19, 77:5, 90:3, 105:16, 121:2, 151:16, 153:4
**elaborate** [1] - 129:16
**electroencephalogram** [1] - 77:18
**electronic** [1] - 107:9
**electrophysiology** [1] - 77:16
**elements** [1] - 6:22
**Elliot** [1] - 60:8
**ELMO** [3] - 109:17, 119:7, 128:13
**elsewhere** [1] - 153:21
**Email** [3] - 1:23, 2:5, 2:9
**embedded** [1] - 23:11
**emphasis** [1] - 123:17
**employee** [1] - 25:21
**employees** [2] - 106:15, 109:13
**end** [7] - 80:19, 112:13, 125:19, 127:13, 130:7, 130:8, 137:7
**endlessly** [2] - 44:9, 92:17
**ends** [1] - 106:11
**energy** [2] - 6:19, 142:11
**engage** [3] - 35:22, 36:3, 45:8
**engaged** [10] - 29:12, 38:14, 39:3, 39:15, 39:17, 39:24, 40:9, 48:14, 48:23, 130:23
**engagement** [4] - 33:18, 33:22, 34:11, 51:5
**engagements** [2] - 35:14, 37:17
**enjoy** [1] - 155:20
**enormous** [1] - 129:15
**ensuing** [1] - 107:4
**entered** [2] - 16:11, 16:12
**entire** [3] - 93:9, 124:11, 124:15
**entirely** [1] - 21:23
**entirety** [1] - 124:14

**entitled** [1] - 157:4
**entries** [2] - 72:20, 75:14
**entry** [3] - 74:17, 74:20, 74:25
**episode** [22] - 50:11, 50:16, 52:17, 52:25, 53:11, 53:23, 55:19, 56:4, 56:11, 56:18, 56:19, 57:4, 58:16, 58:18, 63:7, 63:14, 63:24, 65:21, 86:17, 147:9, 147:13, 148:1
**episodes** [4] - 42:14, 52:11, 52:20, 121:20
**Epstein** [1] - 39:25
**Erie** [5] - 67:23, 68:5, 68:11, 68:19, 68:22
**error** [9] - 49:14, 49:17, 54:20, 58:12, 58:17, 62:14, 82:15, 139:6
**especially** [2] - 106:8, 142:12
**essays** [1] - 41:2
**essence** [2] - 133:11, 138:14
**essentially** [3] - 15:21, 44:23, 63:5
**evaluate** [6] - 5:20, 6:23, 7:10, 7:13, 126:5, 126:6
**evaluates** [1] - 98:23
**evaluation** [5] - 45:4, 92:15, 96:21, 98:8, 122:25
**evaluations** [1] - 6:1
**evasive** [1] - 27:10
**Evatt** [1] - 112:24
**evening** [3] - 144:7, 145:18, 155:20
**event** [4] - 49:14, 53:14, 106:8, 108:19
**events** [12] - 53:3, 68:8, 68:23, 72:25, 73:8, 74:12, 76:5, 76:6, 76:8, 116:8, 117:24, 118:9
**eventually** [1] - 60:11
**evidence** [48] - 7:14, 7:24, 8:4, 9:15, 10:7, 10:8, 10:16, 12:14, 16:8, 16:11, 16:12, 16:17, 16:22, 17:5, 17:6, 17:10, 24:10, 37:3, 83:13, 91:10, 91:19, 91:20, 91:22, 95:14, 100:2, 100:5, 102:4, 104:17, 104:18, 105:2, 109:24, 109:25, 111:11, 112:6, 121:21, 125:16, 128:16, 130:7, 130:22, 131:1, 131:3, 131:7, 131:10, 135:11, 145:23, 153:13, 153:20
**evident** [1] - 133:22
**exact** [5] - 43:14, 54:18, 104:4, 122:16, 150:18
**exactly** [8] - 14:23, 15:2, 18:15, 81:13, 93:7, 98:15, 101:5, 109:23
**exaggerating** [1] - 129:9
**exaggeration** [1] - 133:10
**exam** [2] - 132:20, 146:16
**examination** [16] - 16:10, 28:6, 52:7, 52:10, 55:10, 69:2, 69:14, 119:5, 123:8, 127:18, 128:12, 132:9, 139:18, 141:21, 152:10, 154:11
**EXAMINATION** [3] - 4:20, 28:8, 155:1
**Examination** [1] - 20:6
**examinations** [1] - 151:9
**examine** [5] - 59:19, 64:3, 81:5, 150:10, 152:16

**examined** [1] - 131:17
**examiner** [1] - 66:18
**examiners** [1] - 6:6
**example** [3] - 43:17, 85:3, 97:25
**examples** [1] - 111:20
**exams** [2] - 125:10, 125:11
**except** [1] - 74:3
**exception** [1] - 84:23
**excerpts** [1] - 109:20
**exciting** [1] - 103:22
**excluded** [2] - 70:8, 70:10
**excuse** [1] - 19:11
**excused** [2] - 152:6, 154:22
**execute** [1] - 71:25
**executive** [1] - 97:12
**exercising** [1] - 81:11
**Exhibit** [32] - 11:15, 13:14, 36:18, 36:23, 54:11, 60:3, 60:4, 65:6, 72:9, 72:15, 73:2, 74:7, 78:10, 78:16, 80:5, 86:3, 96:11, 102:1, 102:5, 107:22, 116:13, 118:12, 121:7, 125:16, 125:17, 137:16, 143:18, 145:24, 145:25, 149:5
**exhibit** [11] - 13:24, 19:11, 23:9, 25:7, 25:9, 25:10, 26:21, 90:9, 102:10, 126:12, 146:18
**exhibited** [1] - 23:9
**exhibits** [2] - 4:8, 4:11
**exist** [1] - 115:12
**existence** [1] - 30:11
**exited** [1] - 124:18
**expect** [3] - 21:21, 37:10, 132:22
**expectation** [1] - 133:16
**expense** [1] - 79:14
**expenses** [3] - 32:15, 32:18, 32:22
**experience** [9] - 18:24, 45:3, 46:9, 47:15, 47:17, 47:20, 48:1, 48:22, 140:19
**experiment** [1] - 92:14
**experiments** [1] - 92:18
**expert** [32] - 4:23, 5:6, 7:3, 7:6, 7:9, 12:6, 13:8, 15:11, 15:12, 15:14, 15:15, 15:21, 18:5, 18:17, 22:3, 30:7, 32:4, 35:22, 38:7, 39:13, 40:4, 48:24, 50:19, 51:14, 53:7, 67:17, 69:14, 69:18, 69:24, 115:4, 115:22
**expert's** [2] - 12:14, 147:24
**expertise** [7] - 12:8, 12:10, 12:14, 15:14, 18:20, 82:8, 154:4
**experts** [21] - 5:2, 5:10, 5:15, 5:20, 5:25, 6:13, 6:23, 7:22, 8:2, 8:16, 12:21, 13:5, 20:21, 22:21, 24:14, 41:23, 69:20, 69:25, 82:12, 99:5, 128:25
**explain** [8] - 8:8, 8:13, 9:21, 21:3, 70:13, 93:5, 133:12, 154:8
**explain-away** [1] - 93:5
**explained** [5] - 10:19, 12:20, 15:25, 56:8, 58:11
**explaining** [4] - 136:7, 152:8, 152:11, 152:13
**explains** [1] - 10:4

**explanation** [7] - 46:24, 56:23, 57:14, 64:16, 111:14, 113:18, 153:25
**explanations** [1] - 111:8
**explode** [1] - 68:1
**exploration** [1] - 6:21
**explore** [3] - 15:20, 15:24, 97:23
**exploring** [1] - 17:20
**express** [1] - 7:11
**expressed** [3] - 8:10, 28:3, 151:6
**expression** [1] - 111:19
**extent** [4] - 29:1, 29:4, 80:11, 129:9
**extreme** [1] - 111:9, 131:6
**extremely** [1] - 135:12

## F

**face** [1] - 98:9
**faces** [1] - 5:22
**facial** [1] - 111:19
**fact** [23] - 16:13, 35:21, 46:20, 50:16, 58:15, 59:3, 59:17, 59:19, 60:25, 61:10, 68:22, 69:7, 85:2, 92:25, 93:11, 95:17, 96:5, 110:19, 115:9, 115:17, 141:1, 143:8, 150:24
**factor** [1] - 115:6
**facts** [10] - 6:14, 6:16, 50:2, 50:7, 52:1, 55:19, 55:21, 94:25, 123:25, 153:25
**factual** [1] - 49:17
**factually** [1] - 49:13
**fail** [1] - 139:9
**failed** [1] - 45:22
**failing** [1] - 95:22
**fails** [3] - 139:5, 139:7, 139:11
**fair** [30] - 6:2, 8:13, 9:13, 19:17, 20:20, 32:19, 38:6, 39:14, 41:3, 41:20, 42:16, 43:1, 44:2, 46:23, 54:2, 75:17, 82:20, 83:21, 83:22, 83:25, 84:21, 85:1, 88:5, 97:21, 99:7, 99:22, 111:22, 113:19, 116:2, 136:25
**fairly** [2] - 44:9, 78:10
**fake** [2] - 67:10, 139:8
**faked** [1] - 111:7
**faking** [8] - 34:23, 34:24, 133:4, 133:6, 138:24, 139:14, 153:12
**fallible** [1] - 99:10
**false** [14] - 58:25, 61:1, 61:10, 61:14, 61:18, 62:12, 62:13, 63:8, 70:1, 82:4, 98:20, 153:5
**falsely** [1] - 61:10, 69:21, 139:8
**falsity** [2] - 54:1, 59:13
**familiar** [3] - 49:23, 67:18, 97:14
**family** [4] - 6:5, 10:1, 112:23, 113:3
**family's** [1] - 98:9
**far** [6] - 33:11, 70:25, 91:3, 91:22, 94:10, 114:22
**father's** [1] - 50:5
**FDG** [10] - 19:23, 20:22, 23:2, 48:17, 74:18, 79:18, 89:11, 93:16, 95:1, 95:2
**features** [1] - 88:9
**February** [2] - 86:5, 143:9

**fellowship** [2] - 47:11, 47:13
**felt** [1] - 142:10
**few** [9] - 28:17, 42:18, 101:18, 106:22, 106:23, 129:23, 141:14, 152:23, 155:16
**field** [3] - 12:21, 91:14, 93:10
**fifth** [1] - 50:15
**figure** [3] - 33:8, 54:3, 155:19
**figured** [1] - 42:1
**filed** [2] - 59:8, 99:13
**filicide** [1] - 55:22
**filings** [1] - 34:1
**film** [1] - 43:5
**filmography** [4] - 41:18, 42:11, 42:23, 43:2
**final** [3] - 59:12, 77:21, 151:23
**finalize** [1] - 141:13
**finally** [1] - 78:5
**findings** [11] - 23:1, 90:2, 90:5, 90:13, 90:15, 93:4, 93:14, 93:21, 121:8, 121:10, 121:23
**fine** [3] - 12:22, 128:22, 144:25
**Finish** [1] - 136:11
**finish** [9] - 124:23, 137:6, 140:12, 141:3, 144:8, 144:22, 152:13, 152:14, 155:19
**finished** [1] - 136:9
**firm** [1] - 34:22
**First** [3] - 60:20, 61:8, 62:10
**first** [40] - 8:5, 26:25, 27:4, 29:12, 29:24, 30:2, 30:3, 33:25, 50:21, 50:23, 50:25, 51:2, 51:14, 52:16, 53:6, 56:4, 56:5, 68:16, 73:7, 73:16, 74:17, 74:20, 84:22, 93:13, 96:4, 96:18, 101:1, 105:18, 106:14, 108:21, 111:10, 112:14, 113:9, 121:9, 131:10, 138:3, 140:6, 140:14, 141:17, 147:8
**Fisher** [8] - 89:17, 90:13, 91:2, 91:5, 91:11, 92:9, 92:21, 93:17, 93:25
**fisher** [2] - 89:23, 93:12
**fishing** [4] - 116:13, 116:14, 116:17, 116:25
**fit** [1] - 153:14
**fits** [3] - 10:4, 10:5, 153:25
**five** [5] - 33:14, 49:24, 81:8, 81:21, 139:19
**flawed** [1] - 19:6
**flight** [1] - 154:17
**flights** [1] - 119:17
**floor** [1] - 134:24
**flow** [1] - 143:14
**fly** [2] - 54:8, 119:17
**flying** [1] - 31:25
**focus** [5] - 8:9, 24:9, 73:15, 117:11, 156:12
**focused** [1] - 46:7
**follow** [2] - 12:11, 78:6
**follow-up** [2] - 12:11, 78:6
**followed** [3] - 22:24, 59:10, 117:20
**following** [2] - 25:21, 77:2

**follows** [4] - 102:10, 102:23, 125:24, 126:14
**fool** [3] - 153:6, 153:9, 153:10
**fooling** [1] - 133:10
**FOR** [3] - 1:1, 1:17, 2:1
**forced** [2] - 68:5, 127:20
**foregoing** [1] - 157:2
**foreknowledge** [3] - 90:16, 92:6, 92:8
**forensic** [12] - 7:3, 7:6, 28:24, 29:8, 42:15, 45:4, 45:15, 45:18, 46:18, 46:21, 48:24, 90:21
**forget** [1] - 25:24
**form** [3] - 36:11, 151:4, 151:23
**formal** [2] - 22:19, 23:14, 31:20, 31:22
**format** [1] - 54:18
**formation** [2] - 21:23, 23:4
**former** [1] - 30:11
**forming** [3] - 80:7, 149:1, 150:21
**formulated** [1] - 137:25
**formulating** [2] - 18:6, 18:8
**forth** [1] - 141:12
**fortunately** [1] - 109:9
**forward** [2] - 58:24, 120:24
**foundation** [1] - 12:20
**four** [6] - 22:18, 83:17, 106:9, 109:1, 139:9
**fourth** [1] - 50:3
**Fox** [1] - 41:24
**fragile** [1] - 133:16
**frail** [2] - 133:23, 134:4
**frailty** [5] - 133:13, 133:20, 133:21, 134:9, 135:3
**frame** [2] - 147:10, 147:14
**Francisco** [3] - 31:8, 33:22, 34:2
**frankly** [2] - 17:17, 73:10
**fraudulent** [1] - 100:14
**free** [4] - 28:24, 29:3, 34:18, 136:18
**Friday** [1] - 33:15
**friends** [1] - 45:25
**front** [3] - 106:5, 111:17, 116:21
**frontotemporal** [1] - 90:6
**fruitful** [1] - 24:19
**FTC** [1] - 84:2
**full** [7] - 6:21, 62:3, 105:13, 105:14, 108:14, 146:2, 154:12
**function** [5] - 6:11, 110:20, 112:22, 140:6, 142:1
**functional** [1] - 87:13
**functioning** [3] - 98:9, 128:17, 153:20
**functions** [3] - 87:14, 110:22, 112:10
**future** [3] - 86:20, 93:11, 118:7

## G

**gait** [1] - 111:19
**gathered** [1] - 74:23
**gathering** [3] - 9:2, 9:4, 104:2
**gatherings** [2] - 104:1, 106:6
**general** [5] - 84:14, 86:19, 87:2, 92:2,

147:17
**generally** [3] - 39:8, 43:2, 75:18
**genuine** [5] - 81:14, 132:18, 139:20, 139:23, 140:8
**genuinely** [1] - 132:5
**GEORGE** [1] - 1:11
**geriatric** [9] - 7:4, 35:18, 35:21, 36:1, 36:3, 45:8, 47:1, 48:10
**geriatrics** [1] - 47:3
**Germany** [1] - 63:18
**Ghislaine** [1] - 39:23
**Gibson** [5] - 62:23, 62:25, 63:3, 65:16, 65:20
**given** [7] - 32:4, 57:8, 70:1, 76:9, 146:17, 152:24, 152:25
**glowingly** [2] - 25:5, 26:10
**Government** [1] - 116:13
**GOVERNMENT** [2] - 1:17, 3:5
**government** [41] - 12:3, 22:20, 22:21, 23:22, 29:20, 30:3, 30:4, 32:2, 32:7, 32:9, 32:13, 33:3, 33:4, 45:7, 48:15, 61:25, 66:25, 69:12, 71:9, 71:14, 72:5, 79:13, 79:22, 89:1, 96:10, 96:13, 99:11, 99:12, 100:9, 108:13, 116:21, 120:6, 120:19, 136:4, 137:6, 141:6, 149:8, 150:3, 154:19, 154:21, 155:23
**government's** [9] - 23:20, 33:20, 34:8, 34:12, 74:14, 77:11, 78:12, 119:6, 144:12
**Government's** [9] - 37:2, 60:3, 65:5, 73:2, 118:12, 121:7, 125:16, 137:16, 149:4
**grain** [1] - 17:8
**Grand** [6] - 59:18, 59:23, 59:25, 60:10, 60:12, 66:10
**graphic** [4] - 141:5, 141:13, 146:25, 147:7
**great** [6] - 9:23, 44:10, 75:22, 102:9, 155:20, 156:2
**greater** [4] - 9:2, 9:4, 111:20, 139:12
**green** [4] - 81:23, 109:9, 139:20, 140:9
**grossly** [1] - 11:12
**group** [1] - 140:24
**grown** [1] - 109:13
**guard** [3] - 95:25, 99:6, 135:23
**guess** [3] - 20:20, 45:25, 54:5
**guessing** [1] - 127:23
**Guilmette** [2] - 82:11, 99:2
**Guilmette's** [1] - 82:21
**Gutierrez** [1] - 120:16
**guy** [1] - 68:11
**guys** [6] - 16:23, 102:2, 145:2, 152:16, 155:18
**gyrus** [1] - 21:18

## H

**half** [4] - 73:20, 75:13, 76:17, 135:17
**hand** [5] - 36:22, 37:12, 37:15, 72:8, 96:12

**handed** [3] - 65:5, 65:13, 72:14
**handle** [3] - 143:21, 143:25, 144:4
**handled** [1] - 16:3
**hands** [1] - 74:8
**HANKS** [1] - 1:11
**Hanks** [1] - 69:6
**happy** [2] - 65:2, 65:3
**hard** [3] - 106:16, 115:9
**harmful** [1] - 95:6
**Harris** [1] - 60:7
**haul** [1] - 145:3
**head** [2] - 56:7, 133:13
**health** [11] - 50:19, 97:7, 97:12, 112:16, 113:13, 113:16, 114:11, 114:23, 141:20, 141:22, 141:23
**Healthcare** [2] - 97:3, 97:8
**hear** [9] - 20:19, 29:24, 30:14, 45:4, 71:15, 120:8, 136:8, 137:23, 154:12
**heard** [12] - 45:2, 66:9, 79:17, 79:19, 81:5, 81:11, 106:12, 107:4, 110:11, 139:18, 148:12, 155:17
**hearing** [21] - 7:18, 8:23, 9:15, 20:17, 22:4, 22:9, 24:10, 26:21, 26:23, 27:1, 33:21, 36:7, 67:14, 67:16, 120:6, 127:2, 143:22, 144:3, 145:1, 155:17
**HEARING** [1] - 1:9
**hearsay** [3] - 13:6, 149:10, 149:14
**heavily** [1] - 16:1
**held** [1] - 69:20
**hell** [1] - 42:1
**hello** [1] - 74:6
**help** [6] - 9:19, 29:9, 88:25, 99:3, 102:18, 103:16
**helpful** [1] - 95:6
**Herculean** [13] - 129:10, 129:11, 129:14, 129:21, 130:18, 130:20, 130:24, 133:5, 133:9, 135:7, 136:7, 137:8, 152:11
**Hermann** [2] - 74:22, 77:9
**high** [3] - 38:8, 120:1, 138:24
**high-level** [1] - 120:1
**high-profile** [1] - 38:8
**higher** [2] - 153:20, 153:21
**highlighted** [2] - 128:15, 128:22
**himself** [3] - 25:22, 67:1, 130:17
**HIPAA** [1] - 71:25
**hired** [2] - 31:1, 67:9
**historical** [2] - 66:14, 75:25
**historically** [1] - 115:23
**history** [2] - 31:10, 38:9
**hobnobbed** [1] - 46:3
**hold** [1] - 152:8
**Hollywood** [1] - 41:21
**home** [7] - 27:7, 49:25, 112:24, 117:2, 117:13, 117:20, 141:19
**honest** [4] - 25:5, 26:11, 99:5, 130:13
**honestly** [2] - 136:18, 153:3
**Honor** [53] - 4:7, 4:14, 11:16, 13:5, 13:10, 13:15, 14:21, 15:6, 15:22,

18:13, 22:7, 22:17, 23:5, 24:1, 28:5, 28:7, 28:16, 36:19, 57:19, 64:20, 65:2, 72:10, 73:6, 73:23, 74:4, 96:12, 105:24, 107:24, 108:6, 108:12, 115:2, 134:17, 134:25, 136:16, 136:19, 136:25, 137:4, 143:24, 145:16, 145:21, 146:6, 146:15, 146:20, 149:10, 149:16, 152:5, 152:15, 154:14, 154:20, 154:23, 155:11, 156:1
**HONORABLE** [1] - 1:11
**hope** [2] - 29:6, 151:6
**hoped** [1] - 24:17
**hopefully** [2] - 8:12, 92:23
**hopes** [1] - 153:7
**Hopkins** [1] - 97:17
**hospital** [3] - 43:15, 86:17, 131:19
**hospitalization** [3] - 147:10, 147:14, 148:2
**hospitalizations** [2] - 86:10, 134:5
**hospitalized** [3] - 86:8, 86:12, 87:4
**hospitals** [2] - 94:17, 97:19
**host** [1] - 41:2, 149:17
**hour** [8] - 33:3, 33:4, 73:20, 75:5, 78:6, 124:23, 135:17
**hour-and-a-half** [1] - 73:20
**hourly** [4] - 32:25, 33:2, 33:3, 33:4
**hours** [15] - 10:12, 33:9, 33:11, 75:2, 75:13, 76:14, 76:18, 77:24, 134:11, 143:2, 144:4, 156:16
**house** [2] - 116:16, 142:16
**housekeeping** [1] - 145:22
**Houston** [16] - 2:4, 2:13, 39:2, 49:22, 49:25, 60:21, 61:9, 62:11, 64:3, 77:12, 85:18, 86:12, 89:14, 89:16, 100:13, 119:18
**HOUSTON** [1] - 1:2
**houston** [1] - 1:4
**human** [1] - 99:10
**hundred** [1] - 41:7
**hundreds** [1] - 41:5
**hypometabolism** [4] - 21:6, 21:11, 21:20, 95:5
**hypothesis** [3] - 92:4, 95:8, 111:4

## I

**I.D.S** [2] - 102:16, 103:15
**idea** [7] - 46:5, 62:1, 64:6, 64:7, 68:13, 68:19, 109:12
**ideal** [2] - 119:11, 119:13
**identification** [5] - 54:11, 60:3, 72:9, 74:7, 96:10
**identified** [1] - 89:2
**ignores** [1] - 17:5
**ill** [1] - 64:9
**illustrated** [1] - 22:22
**image** [1] - 128:17
**imaged** [2] - 115:9, 115:12
**images** [2] - 21:10, 83:5
**imagine** [2] - 102:20, 103:19

**imaging** [12] - 10:4, 20:18, 20:22, 21:4, 21:5, 21:6, 78:11, 93:12, 121:21, 138:14, 140:18, 153:9
**IMDb** [1] - 42:8
**impact** [1] - 98:25
**impaired** [16] - 36:15, 81:10, 81:20, 110:23, 125:14, 129:8, 131:22, 133:5, 133:15, 135:22, 136:1, 139:21, 139:23, 140:8, 141:2, 153:2
**impairment** [25] - 11:7, 11:9, 11:11, 36:12, 81:15, 84:25, 86:1, 87:1, 87:16, 104:19, 110:1, 110:4, 110:15, 110:21, 111:1, 111:11, 111:24, 112:7, 112:10, 131:6, 132:19, 133:8, 148:11, 148:15, 153:12
**impeach** [1] - 57:20
**impeachment** [2] - 57:22, 58:1
**imperfectly** [1] - 99:8
**implicated** [1] - 21:7
**imply** [1] - 100:19
**importance** [2] - 12:16, 16:5
**important** [12] - 16:7, 17:2, 28:23, 45:3, 52:15, 99:3, 111:16, 145:1, 148:25, 149:19, 150:13, 151:25
**impression** [2] - 9:24, 18:25
**impressionistic** [3] - 140:17, 140:18, 140:22
**impressions** [2] - 9:8, 90:1
**improper** [1] - 70:10
**IN** [1] - 1:1
**inaccuracy** [1] - 59:13
**inadvertently** [2] - 94:18, 98:16
**inappropriate** [4] - 13:4, 15:23, 100:16, 149:15
**incapable** [3] - 132:7, 132:8, 132:9
**incident** [2] - 25:21, 68:24
**include** [4] - 39:19, 75:20, 84:13, 85:2
**included** [4] - 22:24, 46:9, 85:9, 86:16
**includes** [5] - 32:15, 32:20, 42:20, 75:15, 112:10
**including** [7] - 42:21, 55:18, 82:14, 99:1, 101:22, 148:21
**incompetence** [4] - 34:9, 34:13, 118:6, 130:22
**incompetent** [3] - 67:5, 131:2, 131:22
**inconsistent** [4] - 11:11, 57:21, 57:23, 112:13
**incorrect** [2] - 55:9, 55:21
**independently** [1] - 151:18
**INDEX** [1] - 3:1
**indicate** [1] - 146:10
**indicated** [1] - 81:14
**indication** [1] - 79:25
**indications** [2] - 111:3, 111:18
**indicator** [1] - 128:24
**indicators** [1] - 112:2
**indicia** [2] - 93:14, 94:5
**indicted** [2] - 60:17, 72:5
**indictment** [4] - 59:20, 60:6, 60:19,

71:24
**individual** [1] - 31:10
**individual's** [1] - 92:13
**individuals** [4] - 41:9, 41:13, 97:13, 120:5
**indulgence** [1] - 24:21
**infection** [1] - 118:17
**infections** [1] - 86:20
**influence** [2] - 34:15, 101:12
**Influenced** [1] - 68:18
**influenced** [3] - 100:11, 100:20, 137:22
**inform** [1] - 9:19
**informants** [3] - 7:2, 7:17, 7:19
**information** [30] - 7:2, 7:21, 9:11, 12:21, 18:7, 21:15, 22:8, 22:25, 24:16, 24:17, 30:23, 31:5, 32:7, 32:13, 71:11, 73:9, 83:6, 98:5, 99:24, 108:24, 119:9, 121:16, 138:4, 138:14, 138:19, 149:18, 150:23, 151:7, 151:22, 151:24
**informed** [5] - 14:25, 53:22, 53:25, 60:14, 149:7
**informing** [1] - 12:15
**inherently** [1] - 92:15
**initial** [2] - 88:11, 146:16
**initiated** [1] - 34:11
**inner** [2] - 135:20, 135:24
**insane** [4] - 35:13, 52:22, 63:16, 67:5
**Insanity** [1] - 56:11
**insanity** [1] - 56:17
**insisting** [1] - 46:7
**instance** [3] - 60:15, 93:3, 93:13
**instances** [1] - 30:6
**instead** [5] - 15:13, 72:5, 99:18, 105:24, 122:23
**instructions** [1] - 10:22
**insufficient** [1] - 74:22
**insurance** [1] - 94:17
**intact** [2] - 76:4, 76:9
**intellect** [1] - 110:13
**intelligent** [1] - 129:6
**intended** [1] - 111:15
**intentionally** [1] - 129:7
**interaction** [1] - 128:9
**interactions** [1] - 127:15
**interest** [2] - 46:19, 128:6
**interested** [2] - 31:14, 31:15
**interferes** [1] - 124:19
**interpret** [3] - 12:8, 13:2, 95:8
**interpretation** [6] - 6:9, 12:23, 13:7, 90:14, 92:1, 99:18
**interpreted** [4] - 89:18, 89:23, 91:8, 155:3
**interpreter** [3] - 92:24, 95:18, 95:20
**interpreter's** [3] - 90:16, 92:6, 92:8
**interpreting** [1] - 91:10
**interprets** [1] - 90:24
**interrupt** [3] - 18:1, 82:8, 91:21
**interview** [18] - 7:8, 24:17, 24:24, 71:23, 75:1, 75:7, 75:24, 76:24, 84:6, 119:15,

119:22, 120:16, 122:8, 125:2, 125:18, 126:11, 127:13, 127:16
**interviewed** [7] - 51:1, 75:4, 75:12, 76:22, 77:1, 77:23, 119:14
**interviewing** [4] - 24:20, 120:13, 124:17, 125:4
**interviews** [19] - 6:14, 6:24, 8:15, 72:23, 73:16, 74:13, 75:10, 75:19, 76:18, 77:21, 78:11, 78:21, 80:5, 83:5, 119:3, 119:8, 119:12, 121:2, 122:1
**introduce** [1] - 70:13
**introducing** [1] - 92:2
**intrusive** [1] - 120:19
**invalid** [2] - 80:15, 82:16, 153:24
**invalidated** [1] - 80:23
**investigate** [1] - 60:11
**investigative** [1] - 84:6
**investments** [1] - 129:17
**investor** [1] - 129:19
**invited** [1] - 71:22
**involved** [4] - 30:19, 43:4, 43:12, 52:21
**involvement** [1] - 81:19
**involving** [4] - 39:10, 63:17, 67:22
**IRS** [1] - 27:7
**issue** [13] - 5:23, 7:9, 17:22, 41:25, 45:24, 46:12, 51:18, 67:24, 71:5, 82:23, 95:10, 137:13, 143:19
**issued** [5] - 11:18, 48:16, 60:25, 61:9, 130:15
**issues** [8] - 8:21, 43:16, 75:16, 82:14, 91:18, 95:3, 115:22, 120:1
**items** [2] - 80:4, 145:22, 147:6
**itinerary** [1] - 116:19

### J

**Jackson** [5] - 25:1, 25:15, 26:3, 27:3, 27:6
**James** [1] - 2:6
**January** [2] - 83:24, 143:6
**Jared** [1] - 38:13
**Jason** [1] - 2:2
**Jeffrey** [1] - 38:12
**Jim** [1] - 25:1
**jloonam@jonesday.com** [1] - 2:9
**job** [2] - 27:12, 135:25
**Johns** [1] - 97:17
**Johns-Hopkins** [1] - 97:17
**join** [1] - 128:25
**joining** [3] - 103:25, 105:10, 106:5
**Jones** [2] - 2:2, 2:7
**JR** [1] - 1:11
**judge** [4] - 69:4, 94:24, 123:23, 140:25
**Judge** [19] - 60:23, 61:8, 61:14, 69:6, 69:9, 69:12, 69:17, 70:4, 70:16, 103:1, 103:7, 123:19, 144:16, 144:20, 145:8, 155:12, 156:8
**JUDGE** [1] - 1:12
**judgment** [2] - 81:11, 99:5
**July** [7] - 125:3, 125:8, 125:11, 125:12,

131:17, 147:14, 147:24
**jump** [2] - 13:13, 109:4
**June** [10] - 66:19, 76:22, 77:3, 85:24, 85:25, 86:7, 86:15, 86:21, 147:18
**jury** [5] - 49:16, 61:24, 62:9, 123:18, 123:23
**Jury** [6] - 59:18, 59:23, 59:25, 60:10, 60:12, 66:11
**Justice** [3] - 1:20, 31:8, 31:21
**Justice's** [1] - 72:18
**jvarnado@jonesday.com** [1] - 2:5

### K

**Kathleen** [4] - 2:12, 157:2, 157:5, 157:6
**Kathryn** [1] - 2:6
**Kathy** [1] - 76:22
**Kaylynn** [1] - 63:20
**keep** [3] - 101:13, 135:25, 136:1
**keeps** [1] - 42:7
**Keith** [1] - 39:19
**Keneally** [3] - 2:6, 76:22, 120:25
**kept** [2] - 42:6, 46:7
**key** [1] - 82:14
**keystone** [1] - 80:18
**kicked** [1] - 59:25
**kids'** [1] - 53:2
**kill** [2] - 55:22, 62:1
**killed** [5] - 51:15, 63:14, 63:25, 64:6, 64:8
**kind** [12] - 18:20, 57:7, 72:20, 73:15, 74:11, 101:2, 106:10, 106:20, 109:2, 112:7, 145:19
**kinds** [2] - 8:1, 112:2
**kkeneally@jonesday.com** [1] - 2:10
**knowing** [5] - 51:22, 62:3, 98:24, 100:20, 152:22
**knowingly** [1] - 129:7
**knowledge** [7] - 15:25, 17:20, 27:20, 33:12, 51:9, 72:4, 88:18
**knowledgeably** [1] - 6:18
**known** [5] - 21:17, 59:15, 82:15, 90:17, 113:24
**knows** [1] - 22:14

### L

**LA** [1] - 58:21
**labels** [1] - 132:17
**lack** [5] - 8:14, 24:8, 24:12, 48:20, 48:21
**Lai** [3] - 85:18, 85:23, 86:5
**lake** [1] - 38:23
**Langston** [1] - 1:18
**LANGSTON** [1] - 156:3
**language** [1] - 110:20
**large** [4] - 23:10, 25:10, 43:3, 106:6
**largely** [1] - 75:25
**largest** [1] - 31:9
**last** [14] - 13:19, 26:4, 33:15, 43:11, 48:21, 77:24, 81:14, 85:5, 86:4, 106:1,

118:11, 127:15, 155:17
**lasted** [1] - 75:1
**late** [8] - 43:23, 86:21, 125:11, 127:12, 144:18, 147:18, 156:16
**lateral** [1] - 21:17
**latter** [1] - 19:22
**Laughter** [1] - 154:18
**Laura** [1] - 120:9
**law** [4] - 29:15, 46:8, 92:11, 92:12
**Law** [13] - 42:11, 42:13, 49:9, 52:2, 52:8, 52:10, 53:18, 53:22, 56:10, 58:18, 58:21, 63:14, 63:24
**lawyer** [1] - 70:6
**lawyers** [4] - 22:22, 30:23, 67:12, 95:21
**lay** [6] - 11:17, 11:22, 12:10, 13:6, 13:7, 20:1
**lead** [9] - 8:25, 9:11, 75:24, 87:13, 87:15, 91:18, 107:6, 118:6, 118:23
**leading** [1] - 129:4
**lean** [1] - 109:4
**learn** [4] - 21:14, 34:6, 34:7, 138:13
**learned** [5] - 11:22, 30:10, 34:4, 57:14, 63:12
**learning** [1] - 11:18
**least** [17] - 6:3, 11:1, 32:6, 48:2, 48:21, 61:2, 81:8, 81:21, 84:21, 88:4, 104:17, 109:24, 116:21, 117:5, 138:3, 141:22, 142:4
**Lee** [1] - 1:18
**lee.f.langston@usdoj.gov** [1] - 1:23
**left** [3] - 28:19, 37:25, 128:8
**leg** [3] - 133:13, 134:9, 135:5
**legal** [4] - 29:19, 60:13, 92:3, 95:15
**lend** [1] - 151:7
**length** [2] - 86:24, 87:9
**lengths** [2] - 137:20, 138:5
**Lerner** [10] - 116:9, 117:8, 117:14, 117:20, 117:21, 117:24, 118:4, 118:10, 118:20, 118:23
**less** [9] - 7:20, 15:13, 21:20, 24:15, 31:15, 67:3, 104:7, 110:20, 139:5
**lesser** [1] - 111:19
**letter** [13] - 35:2, 54:1, 54:5, 54:9, 54:19, 55:5, 56:2, 63:23, 64:4, 71:4, 71:9, 71:13, 71:19
**letters** [1] - 41:2
**level** [4] - 20:23, 120:1, 129:23, 153:20
**Lewy** [4] - 35:8, 71:17, 85:15, 90:4
**lie** [1] - 62:14
**lies** [1] - 22:5
**life** [2] - 53:2, 76:1
**light** [2] - 69:23, 121:19
**limits** [2] - 11:20, 138:13
**line** [6] - 12:1, 41:20, 77:14, 117:15, 141:18, 148:10
**lines** [4] - 19:25, 20:12, 20:14, 71:18
**link** [1] - 22:24
**linked** [1] - 103:4
**Lisse** [9] - 20:7, 118:11, 118:16, 118:18,

118:19, 141:22, 142:6, 142:9, 142:20
**Lisse's** [2] - 114:17, 118:19
**list** [8] - 23:9, 40:3, 40:22, 41:25, 69:19, 72:16, 119:19, 134:3
**listed** [4] - 37:25, 38:19, 80:4, 114:12
**listen** [1] - 55:18
**listening** [2] - 22:3, 44:9
**literally** [2] - 40:8, 41:5
**literature** [3] - 86:24, 100:25, 101:5
**litigation** [1] - 83:25
**live** [3] - 68:1, 102:15, 103:14
**lives** [4] - 44:10, 50:17
**locked** [1] - 68:2
**logic** [2] - 22:4, 154:4
**logical** [1] - 19:4
**longitudinally** [1] - 12:17
**Look** [2] - 55:20, 56:3
**look** [22] - 13:2, 22:2, 24:22, 34:24, 38:1, 54:19, 56:15, 58:4, 64:9, 72:19, 73:11, 73:12, 80:10, 113:5, 113:16, 120:24, 121:4, 130:22, 133:15, 135:22, 146:16, 148:9
**looked** [10] - 49:9, 64:2, 70:6, 80:6, 83:16, 115:5, 131:18, 141:24, 148:20, 153:19
**looking** [10] - 10:7, 18:25, 21:10, 37:23, 66:4, 82:18, 90:8, 110:10, 119:5, 136:1, 146:24, 149:23
**lookout** [1] - 135:4
**looks** [2] - 31:23, 121:7
**Loonam** [5] - 2:6, 13:23, 15:8, 23:18, 81:5
**LOONAM** [14] - 11:16, 13:4, 13:12, 14:21, 15:19, 16:24, 23:19, 73:4, 144:12, 144:16, 154:17, 155:12, 156:15, 156:19
**Lord** [2] - 102:12, 103:11
**lost** [1] - 71:12
**Loughner** [1] - 38:13
**lover** [1] - 70:15
**lower** [2] - 20:13, 112:14
**lunch** [2] - 78:4, 104:6
**lying** [1] - 67:2

---

# M

**M.D** [2] - 3:2, 40:11
**machines** [2] - 10:19, 14:11
**Magnani** [10] - 1:19, 30:2, 31:6, 35:1, 38:4, 39:1, 71:3, 79:5, 113:15, 144:21
**MAGNANI** [54] - 4:7, 4:14, 4:19, 4:21, 13:13, 13:18, 13:21, 15:6, 17:25, 18:13, 18:14, 19:9, 22:13, 23:5, 23:25, 24:4, 24:21, 24:23, 25:6, 25:13, 28:5, 28:19, 37:4, 54:21, 54:24, 57:18, 61:13, 64:20, 65:7, 65:10, 73:6, 78:17, 102:3, 102:7, 105:5, 105:12, 105:16, 105:18, 108:7, 108:12, 113:6, 113:9, 134:17, 134:21, 134:25, 136:16, 140:11, 143:13, 143:16, 146:2, 146:7,

149:10, 152:5, 154:20
**magnet** [1] - 100:22
**magnitude** [1] - 19:1
**maids** [1] - 142:15
**mail** [13] - 7:24, 22:24, 26:23, 26:25, 27:2, 27:5, 28:12, 88:22, 88:24, 98:3, 116:18, 117:6, 149:25
**mails** [7] - 8:1, 83:9, 88:14, 88:19, 88:25, 106:10, 148:21
**malinger** [3] - 5:21, 5:24, 154:1
**malingerer** [1] - 135:4
**malingering** [4] - 34:8, 34:13, 112:21, 133:25
**man** [8] - 9:23, 24:25, 26:14, 67:25, 98:24, 99:3, 131:18, 134:4
**MANAGER** [4] - 73:24, 74:1, 145:11, 145:13
**manager** [1] - 104:16
**March** [20] - 8:5, 48:16, 57:12, 74:17, 79:18, 86:12, 86:13, 89:12, 89:13, 89:20, 89:25, 93:13, 93:17, 94:1, 94:22, 95:2, 135:14, 147:9, 147:10, 148:10
**march** [1] - 74:11
**mark** [11] - 54:10, 60:3, 72:8, 91:19, 91:20, 91:22, 96:9, 107:22, 126:11, 143:15, 143:18
**marked** [6] - 13:14, 36:17, 65:5, 72:14, 74:7, 101:20, 105:8, 108:1, 143:14, 149:4
**marriage** [1] - 129:25
**Martell** [2] - 122:15, 122:20
**master** [1] - 46:11
**matches** [1] - 55:19
**material** [1] - 33:17
**materials** [1] - 23:15
**math** [1] - 33:8
**Matt** [2] - 107:13, 125:21
**matter** [21] - 13:8, 29:5, 29:12, 31:2, 32:1, 32:10, 33:1, 34:1, 34:12, 35:23, 36:4, 45:9, 48:9, 69:7, 115:14, 118:7, 149:14, 150:20, 151:12, 154:3, 157:4
**matters** [2] - 38:13, 92:3
**Maurine** [1] - 122:15
**Maxwell** [1] - 39:23
**May-July** [1] - 147:14
**mean** [25] - 7:7, 15:7, 23:19, 24:11, 25:15, 34:24, 37:2, 44:15, 46:15, 61:18, 73:10, 80:17, 91:21, 95:22, 100:18, 131:9, 134:14, 134:19, 136:12, 136:22, 142:5, 150:8, 152:8, 154:10, 155:18
**meaning** [4] - 9:5, 34:6, 127:4, 129:19
**means** [4] - 44:9, 130:25
**meant** [2] - 34:18, 152:12
**measurement** [1] - 10:19
**measures** [2] - 82:21, 82:22
**mechanical** [2] - 2:15
**media** [1] - 41:23
**medical** [21] - 10:3, 40:11, 66:18, 84:9,

86:24, 87:24, 92:3, 96:5, 96:19, 100:11, 100:14, 101:5, 110:25, 113:24, 114:4, 115:23, 116:9, 117:14, 134:3, 142:25, 146:12
**Medical** [2] - 96:7, 99:13
**medication** [1] - 50:5
**Medicine** [5] - 97:4, 98:7, 100:1, 100:4, 100:12
**meetings** [1] - 46:3
**members** [5] - 6:5, 10:2, 27:5, 112:24, 113:3
**memo** [1] - 149:5
**Memorial** [2] - 74:22, 77:9
**memorialized** [1] - 22:10
**memory** [29] - 49:13, 55:20, 57:5, 63:9, 65:15, 71:20, 72:22, 76:4, 76:7, 81:10, 81:14, 81:20, 86:2, 88:3, 112:14, 113:4, 121:19, 124:9, 125:5, 132:5, 139:21, 139:23, 140:8, 141:2, 141:22, 141:25, 142:1, 142:12, 142:19
**memory-impaired** [5] - 81:20, 139:21, 139:23, 140:8, 141:2
**mental** [3] - 9:17, 50:19, 127:18
**Mental** [1] - 20:6
**mentally** [2] - 64:9, 133:16
**mention** [2] - 7:25, 88:9
**mentioned** [19] - 4:22, 4:25, 8:22, 9:13, 39:1, 39:12, 44:22, 48:14, 63:7, 64:4, 66:8, 74:21, 75:23, 77:22, 84:22, 88:14, 89:11, 133:19, 137:24
**mess** [1] - 143:13
**message** [1] - 118:10
**met** [1] - 51:21
**metadata** [1] - 115:5
**Methodist** [5] - 77:13, 85:18, 86:12, 89:14, 89:16
**mid** [2] - 75:11, 77:8
**mid-August** [1] - 77:8
**mid-May** [1] - 75:11
**middle** [1] - 140:13
**midnight** [1] - 66:18
**might** [13] - 13:14, 18:20, 23:7, 23:13, 24:16, 30:23, 50:21, 92:5, 92:24, 93:1, 140:19, 149:13, 154:10
**mild** [8] - 21:19, 85:11, 85:25, 90:2, 90:15, 133:8, 148:11, 148:14
**Miller** [4] - 2:12, 157:2, 157:5, 157:6
**mind** [6] - 36:14, 56:4, 108:25, 125:5, 137:10, 151:18
**minds** [1] - 107:3
**mine** [1] - 19:1
**Mini** [1] - 20:6
**Mini-Mental** [1] - 20:6
**minimize** [1] - 16:5
**minimizes** [1] - 17:5
**minimum** [1] - 21:23
**minute** [2] - 13:15, 24:22
**minutes** [6] - 44:4, 77:3, 104:25, 143:22, 144:6, 155:16
**misheard** [1] - 93:21

**mislead** [2] - 62:9, 129:7
**misleading** [6] - 14:6, 14:8, 15:12, 15:15, 15:16, 16:21
**misled** [1] - 49:16
**mismatch** [1] - 153:16
**misplaced** [1] - 7:19
**missed** [2] - 44:24, 46:20
**missing** [1] - 141:16
**mistake** [2] - 54:4, 62:2
**mistaken** [2] - 62:5, 62:11
**mistrial** [3] - 58:25, 59:5, 59:13
**misunderstanding** [1] - 70:5
**misunderstood** [1] - 59:4
**MMSE** [2] - 20:5, 20:11
**moderate** [4] - 85:4, 85:12, 132:6, 132:15
**modified** [3] - 85:20, 113:25, 114:14
**modifying** [1] - 137:25
**moment** [3] - 49:10, 115:2, 129:13
**Monday** [3] - 27:3, 155:18, 156:8
**monitors** [1] - 106:9
**month** [2] - 77:24, 85:5
**months** [4] - 37:19, 68:23, 69:1, 72:6
**Morning** [4] - 62:21, 63:1, 64:15, 65:18
**Moss** [8] - 120:3, 149:6, 149:7, 149:23, 149:24, 150:4, 150:5, 150:8
**most** [18] - 9:14, 10:22, 11:2, 11:4, 20:22, 21:19, 28:3, 38:8, 39:11, 85:17, 87:4, 99:5, 128:16, 131:16, 135:24, 142:9, 148:2, 151:25
**mostly** [1] - 128:18
**mother** [2] - 38:21, 49:24
**motion** [2] - 33:20, 59:8
**motivated** [1] - 5:24
**motivation** [1] - 5:21
**motives** [1] - 70:14
**move** [13] - 4:16, 18:1, 23:25, 37:1, 58:24, 61:7, 73:1, 78:15, 105:2, 108:6, 136:8, 145:23, 146:1
**moved** [3] - 58:24, 59:5, 59:12
**movements** [1] - 111:18
**moves** [1] - 4:8
**moving** [1] - 46:19
**MR** [185] - 4:7, 4:10, 4:14, 4:19, 4:21, 11:16, 13:4, 13:12, 13:13, 13:18, 13:21, 14:21, 15:6, 15:19, 16:24, 17:25, 18:13, 18:14, 19:9, 22:7, 22:13, 23:3, 23:5, 23:19, 23:25, 24:4, 24:21, 24:23, 25:6, 25:13, 28:5, 28:7, 28:9, 28:16, 28:19, 28:21, 28:22, 36:19, 36:21, 37:1, 37:4, 37:6, 54:10, 54:17, 54:21, 54:23, 54:24, 54:25, 55:1, 57:18, 58:4, 58:9, 58:10, 61:13, 61:20, 64:20, 65:2, 65:4, 65:7, 65:9, 65:10, 65:11, 65:12, 72:10, 72:12, 72:13, 73:4, 73:6, 73:13, 73:14, 73:22, 74:4, 74:5, 78:15, 78:17, 78:19, 96:12, 96:14, 101:16, 101:17, 101:25, 102:3, 102:5, 102:7, 102:9, 102:11, 102:25, 103:4, 103:7, 103:10, 104:12, 104:23,

105:5, 105:9, 105:12, 105:14, 105:16, 105:17, 105:18, 105:21, 105:23, 106:1, 106:4, 107:13, 107:14, 108:5, 108:7, 108:9, 108:12, 108:19, 109:15, 109:18, 113:6, 113:8, 113:9, 113:10, 113:11, 115:2, 115:3, 125:20, 126:1, 126:3, 126:6, 126:10, 126:17, 126:20, 126:23, 126:25, 127:4, 127:9, 128:13, 128:14, 132:13, 134:17, 134:21, 134:25, 135:1, 136:10, 136:16, 136:25, 137:4, 137:5, 140:11, 143:13, 143:15, 143:16, 143:17, 143:24, 144:9, 144:12, 144:16, 144:20, 144:25, 145:5, 145:8, 145:16, 145:20, 146:2, 146:6, 146:7, 146:15, 146:19, 146:22, 146:23, 149:10, 149:16, 150:2, 150:10, 150:19, 152:2, 152:5, 154:17, 154:20, 154:23, 155:2, 155:8, 155:12, 155:23, 155:25, 156:3, 156:5, 156:7, 156:13, 156:15, 156:19
**MRI** [2] - 14:18, 91:14
**MRIs** [2] - 14:11, 15:14
**MS** [1] - 105:22
**multiple** [5] - 32:2, 114:18, 127:22, 134:5, 142:22
**must** [3] - 81:17, 97:24, 100:6

## N

**Nalley** [3] - 102:18, 103:16, 120:8
**name** [4] - 69:7, 125:25, 126:21, 126:22
**named** [3] - 24:25, 67:23, 89:16
**names** [5] - 106:25, 120:8, 142:13, 142:14, 142:18
**narratives** [1] - 131:4
**narrow** [1] - 5:8
**national** [2] - 46:3, 122:13
**nature** [3] - 42:16, 51:19, 123:1
**NE** [1] - 1:21
**near** [1] - 127:12
**necessarily** [1] - 94:15
**necessary** [1] - 116:3
**neck** [2] - 66:20, 68:2
**need** [6] - 7:12, 90:10, 117:21, 135:3, 135:16, 145:6
**needed** [2] - 34:24, 154:11
**needs** [3] - 7:9, 82:5, 149:23
**negative** [2] - 82:4, 82:5
**neighborhood** [1] - 42:13
**network** [1] - 129:16
**neurodegeneration** [1] - 20:24
**neurodegenerative** [4] - 47:4, 90:3, 94:6, 131:3
**neuroimaging** [1] - 9:5, 11:20, 11:23
**neurologist** [2] - 12:7, 15:13
**neurologists** [1] - 17:19
**neurology** [2] - 21:25, 47:13
**neuropsych** [1] - 10:5
**neuropsychological** [10] - 6:7, 9:3, 80:16, 80:22, 135:12, 137:20, 138:5,

152:22, 153:10, 155:4
**neuropsychology** [2] - 82:12, 82:13
**neuroradiologist** [1] - 12:7
**neuroradiologists** [1] - 17:19
**neuroradiology** [1] - 18:17
**Neuroreader** [6] - 10:18, 10:24, 11:4, 16:24, 16:25, 17:1
**Neuroreader's** [1] - 12:16
**neuroreaders** [1] - 17:23
**neutral** [1] - 92:23
**neutrality** [1] - 98:17
**never** [16] - 6:21, 7:10, 16:11, 16:12, 23:3, 34:17, 45:21, 64:2, 66:9, 72:2, 106:11, 120:15, 133:19, 135:24, 136:14, 152:13
**nevertheless** [2] - 50:14, 133:9
**New** [1] - 2:8
**new** [5] - 32:3, 73:19, 121:21, 138:4, 142:14
**newly** [1] - 121:16
**news** [1] - 68:19
**next** [8] - 4:17, 26:7, 74:20, 74:25, 76:16, 116:3, 126:10, 140:1
**nicely** [1] - 38:10
**night** [1] - 118:11
**NO** [1] - 1:3
**nobody** [1] - 34:18
**none** [3] - 41:8, 41:12, 41:16
**nonetheless** [1] - 74:23
**normal** [4] - 10:24, 11:8, 37:16, 44:10
**norms** [1] - 11:4
**Northern** [1] - 69:5
**notable** [4] - 38:19, 39:6, 40:2, 43:2
**notations** [1] - 99:23
**note** [7] - 96:18, 134:7, 135:3, 142:8, 147:5, 147:8, 147:22
**notes** [8] - 28:20, 63:17, 64:1, 64:11, 118:15, 124:6, 124:8, 141:23
**nothing** [6] - 27:14, 91:24, 121:10, 121:14, 154:20, 155:13
**notice** [1] - 69:7
**notification** [1] - 150:3
**November** [12] - 6:12, 83:13, 83:14, 97:25, 98:1, 107:21, 108:11, 109:22, 110:2, 111:11, 137:14, 142:5
**NOVEMBER** [2] - 1:6, 4:2
**nowadays** [1] - 106:6
**nowhere** [4] - 133:25, 134:6, 134:10, 135:15
**Nuchia** [1] - 61:8
**number** [4] - 22:23, 82:16, 84:9, 148:19
**numerous** [1] - 51:12
**Nxivm** [3] - 30:17, 30:21, 39:20
**NY** [1] - 2:8

---

# O

**O.C** [6] - 66:15, 66:17, 67:21, 68:9, 68:17, 68:23
**oath** [1] - 149:12

**object** [8] - 11:16, 12:10, 12:19, 12:24, 15:4, 57:18, 102:8, 108:13
**objected** [3] - 12:1, 12:22, 41:23
**objection** [24] - 4:10, 4:11, 14:23, 15:3, 18:4, 18:11, 37:4, 37:5, 58:7, 61:13, 64:20, 78:17, 78:18, 105:4, 105:6, 108:7, 108:8, 134:17, 134:20, 134:21, 140:11, 146:3, 146:4, 149:10
**objective** [3] - 99:5, 101:21, 128:16
**observations** [1] - 101:22
**observe** [3] - 9:14, 112:8, 122:5
**observed** [3] - 111:16, 112:2, 153:3
**observer** [1] - 111:3
**observing** [1] - 8:20
**obtained** [1] - 67:13
**obviously** [7] - 23:20, 34:23, 34:25, 46:23, 48:9, 128:23, 134:15
**occasion** [1] - 6:17
**occasionally** [1] - 32:3
**occasions** [1] - 14:10
**occur** [2] - 119:16, 120:17
**occurred** [6] - 55:14, 68:23, 115:19, 115:21, 116:15, 117:2, 117:12, 137:18
**October** [27] - 27:23, 72:6, 77:22, 77:24, 78:7, 85:19, 86:4, 120:15, 122:3, 122:9, 123:1, 124:14, 124:16, 125:4, 125:9, 125:11, 125:17, 131:13, 131:18, 132:24, 136:3, 137:9, 143:4, 146:10, 151:4, 151:13, 151:19
**OF** [2] - 1:1, 1:3
**offenses** [2] - 58:17, 58:19
**offer** [4] - 12:9, 30:7, 70:24, 131:14
**offered** [6] - 49:14, 54:8, 70:9, 70:10, 70:18, 70:19
**offering** [2] - 11:17, 11:24
**offers** [1] - 97:11
**offhand** [1] - 33:2
**office** [6] - 30:10, 54:20, 56:3, 56:8, 56:23, 58:12
**offshore** [2] - 129:16, 129:18
**often** [1] - 21:19
**old** [3] - 37:18, 48:12, 106:15
**older** [2] - 46:1, 115:17
**olds** [1] - 11:8
**once** [5] - 17:14, 69:7, 80:22, 102:2, 104:2
**one** [93] - 6:17, 8:20, 8:24, 9:16, 10:10, 10:20, 10:21, 14:13, 19:22, 21:12, 28:20, 29:3, 29:4, 30:14, 30:22, 32:4, 33:25, 34:17, 35:3, 35:24, 37:18, 38:17, 39:2, 41:7, 41:19, 44:5, 44:24, 46:1, 46:11, 51:18, 52:20, 56:20, 57:8, 59:15, 62:22, 63:18, 66:13, 70:12, 77:2, 78:6, 80:23, 81:15, 82:3, 82:5, 85:2, 88:9, 89:1, 91:2, 92:12, 94:14, 94:24, 95:4, 98:17, 103:3, 104:14, 105:19, 105:20, 107:6, 108:20, 111:21, 112:20, 114:16, 114:20, 114:21, 115:2, 116:20, 117:12, 121:22, 123:3, 123:22, 125:20,

127:15, 127:22, 130:1, 131:14, 137:21, 138:3, 138:25, 139:25, 140:1, 140:14, 140:19, 140:23, 141:11, 142:15, 146:8, 147:3, 147:13, 151:16, 154:24
**One** [2] - 97:24, 100:6
**one's** [1] - 92:13
**ones** [6] - 62:22, 66:7, 76:7, 83:12, 114:7, 156:17
**ongoing** [3] - 117:6, 119:10, 119:23
**online** [2] - 31:12, 42:7
**onset** [2] - 86:20, 112:21
**opened** [2] - 135:21, 154:11
**opinion** [43] - 7:11, 9:12, 9:19, 11:17, 11:22, 12:8, 13:6, 14:5, 14:24, 14:25, 16:4, 17:3, 17:6, 18:9, 21:13, 22:4, 28:1, 28:3, 60:25, 61:15, 67:21, 68:9, 80:19, 83:18, 88:1, 96:16, 109:25, 112:21, 114:1, 114:14, 115:7, 121:11, 121:14, 124:25, 129:4, 130:15, 131:11, 131:14, 133:24, 137:25, 151:4, 151:23
**opinions** [11] - 15:20, 18:6, 20:16, 80:7, 89:7, 121:4, 121:8, 121:10, 121:23, 149:2, 150:21
**opportunities** [2] - 102:24, 103:21
**opportunity** [4] - 5:5, 9:14, 106:7
**opposed** [4] - 12:16, 30:4, 63:9, 94:11
**opposite** [1] - 101:7
**Order** [12] - 42:12, 42:14, 49:9, 52:2, 52:8, 52:10, 53:18, 53:22, 56:10, 58:18, 63:14, 63:24
**order** [5] - 81:17, 91:14, 93:1, 135:10, 141:3
**ordered** [6] - 74:18, 79:14, 79:22, 89:12, 94:16, 94:22
**orders** [1] - 18:25
**organization** [1] - 25:21
**orient** [1] - 108:10
**original** [7] - 89:7, 90:8, 90:12, 90:18, 109:21, 112:17, 114:10
**originally** [1] - 126:21
**otherwise** [3] - 62:16, 123:9, 124:13
**ought** [5] - 31:22, 46:6, 46:14, 95:13, 142:15
**out-of-court** [2] - 57:21, 57:25
**outset** [3] - 29:13, 34:16, 35:1
**outside** [3] - 12:10, 12:14, 13:8
**over-answering** [1] - 27:13
**overlaid** [1] - 147:6
**overlays** [2] - 147:2, 147:3
**overruled** [2] - 13:11, 58:8
**overruling** [2] - 18:4, 18:10
**overshot** [1] - 135:13
**overstate** [1] - 22:2
**overturned** [5] - 61:21, 61:23, 62:9, 62:20, 63:5
**Owmby** [2] - 63:18, 64:3
**Owmby's** [1] - 63:22
**own** [8] - 7:12, 15:14, 53:2, 132:10,

138:9, 138:17, 138:20, 140:3

# P

**p.m** [11] - 1:5, 4:3, 73:25, 144:11, 145:12, 156:21
**page** [12] - 25:11, 26:7, 26:8, 38:1, 65:13, 97:22, 113:5, 114:10, 114:16, 114:20, 114:21, 121:8
**pages** [9] - 37:22, 38:2, 40:4, 40:8, 40:23, 88:11, 90:10, 114:18
**paginated** [1] - 90:9
**panel** [1] - 60:24
**paperwork** [1] - 31:19
**paragraph** [2] - 56:22, 121:9
**paraphrase** [1] - 56:5
**pardon** [1] - 62:24
**PARK** [1] - 3:2
**Park** [1] - 60:8
**park** [1] - 69:19
**Parkinson's** [29] - 19:19, 35:4, 35:7, 36:9, 41:9, 47:9, 47:15, 47:18, 47:21, 47:24, 48:3, 48:23, 71:10, 71:11, 71:16, 85:15, 85:20, 90:4, 104:17, 109:24, 110:3, 110:21, 111:17, 112:1, 112:3, 134:2, 143:6, 143:11, 147:4
**part** [28] - 8:17, 21:14, 23:22, 43:3, 49:15, 52:18, 52:22, 56:7, 56:11, 56:17, 57:15, 83:18, 84:19, 87:25, 88:15, 90:24, 97:8, 113:12, 122:1, 122:2, 122:4, 123:8, 124:19, 128:21, 133:24, 135:20, 140:16, 140:22
**particular** [20] - 21:17, 33:1, 34:11, 45:9, 51:23, 53:1, 56:22, 60:15, 67:12, 68:10, 80:13, 97:12, 122:17, 123:17, 135:17, 135:18, 135:22, 146:24, 150:11, 150:12
**particularly** [4] - 25:5, 87:10, 115:14, 121:19
**parties** [1] - 104:13, 106:13, 154:15
**parts** [2] - 57:8, 107:19
**party** [9] - 29:9, 102:13, 103:12, 104:25, 105:2, 107:16, 108:21, 145:25, 146:1
**pass** [1] - 152:2
**passage** [1] - 142:22
**passing** [1] - 120:20
**Passmore** [1] - 119:21
**past** [4] - 30:14, 35:15, 46:2, 61:7
**paste** [1] - 42:8
**pastor** [2] - 25:16, 25:18
**patience** [2] - 144:1, 145:18
**patient** [5] - 48:10, 96:20, 97:6, 98:2, 99:23
**patients** [18] - 19:19, 20:11, 20:14, 40:15, 43:10, 43:13, 43:17, 43:19, 43:23, 44:7, 44:9, 47:15, 47:17, 47:18, 47:21, 48:2, 86:25, 110:20
**patterned** [2] - 68:10, 68:12
**pause** [1] - 102:25, 107:13, 109:15
**peers** [1] - 46:1

**pen** [1] - 56:20
**pending** [3] - 33:21, 34:1, 69:11
**Pennsylvania** [5] - 67:23, 68:6, 68:11, 68:19, 68:22
**people** [22] - 20:1, 24:16, 44:9, 45:25, 46:2, 49:22, 49:23, 55:22, 88:24, 104:9, 109:3, 119:9, 120:10, 130:3, 135:20, 142:13, 152:20, 153:2, 153:6, 153:15, 153:18
**peoples'** [1] - 107:3
**per** [2] - 31:25, 33:3
**percent** [2] - 139:3, 142:10
**percentile** [2] - 8:5, 112:14
**perfectly** [1] - 150:16
**perform** [2] - 110:13, 152:23
**performance** [7] - 5:16, 8:4, 128:23, 131:4, 135:14, 153:17
**performances** [1] - 5:19
**performed** [2] - 125:3, 152:24
**perhaps** [3] - 23:22, 94:12, 95:17
**period** [6] - 43:21, 75:11, 101:15, 114:9, 116:15
**periods** [1] - 104:24
**perjury** [1] - 59:20
**permanent** [1] - 87:15
**permit** [1] - 123:6
**permits** [1] - 123:11
**perpetuating** [1] - 133:10
**persist** [1] - 118:21
**person** [14] - 25:4, 26:12, 31:1, 35:17, 41:19, 70:24, 92:19, 95:7, 98:17, 111:5, 138:25, 139:4, 139:7, 139:11
**person's** [2] - 20:23, 95:22
**personal** [6] - 87:24, 88:13, 88:18, 112:16, 112:19, 114:13
**personally** [1] - 107:8
**perspective** [1] - 108:23
**persuaded** [3] - 115:24, 139:16, 153:23
**PET** [22] - 19:23, 20:22, 23:2, 48:17, 74:18, 78:23, 79:6, 79:10, 79:15, 79:18, 79:19, 89:12, 89:13, 89:18, 89:19, 90:24, 91:14, 93:11, 93:16, 95:1, 95:2, 147:23
**Pete** [1] - 77:1
**phase** [1] - 140:22
**phases** [1] - 140:1
**phenomenon** [2] - 90:17, 142:14
**philosophical** [3] - 46:16, 95:10, 95:13
**phlebotomist** [1] - 78:2
**phone** [1] - 64:1
**phrase** [2] - 61:3, 130:19
**phrased** [3] - 93:6, 137:23, 137:24
**phrasing** [1] - 139:1
**physical** [4] - 133:12, 133:20, 133:21, 134:8
**physically** [2] - 133:23, 134:4
**physician** [4] - 9:22, 21:24, 47:8, 47:10
**physicians** [4] - 71:24, 84:17, 91:3, 96:6
**pick** [2] - 127:22

**picture** [1] - 108:25
**pictures** [1] - 109:11
**pieces** [1] - 106:13
**pipe** [1] - 109:2
**piped** [1] - 106:21
**pizza** [2] - 67:25, 68:10
**place** [6] - 7:20, 8:18, 73:16, 97:16, 116:14, 135:23
**placed** [2] - 7:16, 87:2
**planning** [2] - 104:7, 144:17
**plans** [1] - 12:2
**plausible** [3] - 133:3, 148:13, 148:17
**play** [7] - 101:18, 101:25, 104:12, 107:23, 125:18, 126:10, 128:5
**played** [9] - 102:10, 102:23, 103:9, 105:8, 106:3, 108:1, 108:16, 109:19, 126:14
**plays** [1] - 125:24
**pleadings** [2] - 99:12, 99:17
**pleased** [1] - 108:20
**pleasure** [2] - 102:12, 103:11
**Plexiglas** [1] - 37:11
**plot** [2] - 62:3, 62:5
**pocket** [1] - 20:8
**podium** [1] - 28:20
**point** [15] - 11:14, 21:22, 27:22, 42:4, 59:4, 63:13, 90:10, 93:6, 93:9, 111:4, 122:17, 129:3, 131:21, 134:18, 143:11
**pointed** [1] - 146:9
**points** [1] - 22:23
**political** [1] - 45:24
**Polus** [1] - 115:5
**Ponisio** [10] - 21:15, 22:9, 22:19, 22:21, 22:22, 23:1, 23:8, 23:11, 48:14, 48:15
**pool** [10] - 84:17, 85:6, 96:19, 98:2, 100:2, 114:21, 118:5, 118:24, 119:1, 146:10
**Pool** [2] - 85:3, 117:25
**pool's** [2] - 97:25, 143:3
**poor** [2] - 129:2, 153:16
**poorer** [1] - 142:12
**poorly** [3] - 135:12, 152:23, 152:24
**portion** [4] - 121:9, 123:3, 123:4, 125:2
**portions** [1] - 128:15
**portrayed** [1] - 111:9
**position** [6] - 24:18, 34:8, 34:12, 35:3, 35:7, 87:11
**positive** [2] - 82:4
**possession** [1] - 67:1
**possibilities** [3] - 130:12, 133:3, 140:13
**possible** [18] - 29:1, 29:2, 49:16, 81:14, 81:18, 81:20, 82:1, 82:3, 82:5, 129:5, 130:23, 135:4, 139:22, 139:23, 140:7, 141:2, 141:4
**postpartum** [6] - 50:10, 50:16, 51:6, 52:11, 52:17, 55:13
**potential** [3] - 5:21, 61:24, 69:25
**potentially** [3] - 16:21, 133:9, 137:8
**powerful** [1] - 100:22

**PowerPoint** [3] - 19:13, 23:10, 113:14
**practice** [2] - 90:23, 92:2
**precise** [1] - 10:22
**precisely** [2] - 21:18, 27:11
**precuneus** [1] - 21:18
**preeminent** [1] - 97:17
**prefer** [1] - 136:19
**preindictment** [1] - 71:5
**prepare** [1] - 71:25
**prepared** [4] - 19:13, 109:8, 128:8, 146:25
**preparing** [2] - 63:19, 132:7
**preposterous** [1] - 64:7
**presence** [1] - 153:2
**present** [13] - 8:6, 8:22, 75:7, 76:13, 76:24, 78:8, 78:9, 122:2, 123:11, 124:13, 124:15, 124:21, 124:24
**presentations** [1] - 23:11
**presented** [3] - 53:11, 59:20, 60:6
**presenting** [1] - 123:25
**preserved** [6] - 123:9
**president** [1] - 128:4
**presidents** [2] - 46:2
**press** [2] - 31:7, 31:13
**presume** [6] - 29:13, 29:16, 29:17, 113:19, 113:21
**presumed** [1] - 92:8
**presumption** [1] - 29:19
**pretty** [4] - 38:6, 107:17, 142:19, 153:13
**prevented** [2] - 120:10, 120:12
**previous** [1] - 59:4
**previously** [3] - 16:6, 129:11, 129:14
**pried** [1] - 106:9
**primarily** [1] - 75:24
**principal** [1] - 14:9
**principles** [1] - 30:19
**private** [1] - 44:8
**privileges** [1] - 43:15
**probability** [2] - 82:15, 138:24
**probable** [2] - 139:20, 139:22
**problem** [9] - 16:18, 19:4, 73:13, 91:13, 91:17, 136:6, 136:21, 142:17, 144:15
**problems** [5] - 13:9, 27:14, 27:15, 49:4, 117:22
**procedure** [2] - 91:12, 147:17
**proceed** [2] - 4:13, 58:8
**proceeded** [1] - 59:3
**proceeding** [4] - 74:15, 78:13, 84:19, 86:24
**proceedings** [2] - 2:15, 95:15, 157:3
**Proceedings** [3] - 73:25, 144:11, 145:12
**process** [2] - 80:2, 133:14
**processing** [1] - 126:22
**proclaiming** [1] - 139:8
**produced** [1] - 2:16
**producers** [3] - 53:18, 53:21, 55:17
**producing** [1] - 114:6
**professional** [3] - 10:14, 90:24, 129:7
**professionals** [2] - 98:19, 100:12

**profile** [8] - 38:8, 81:10, 81:15, 81:21, 139:21, 139:23, 140:8, 141:4
**profiles** [1] - 141:2
**profiling** [1] - 70:11
**profoundly** [1] - 11:13
**prognosis** [1] - 129:2
**program** [2] - 64:15, 97:12
**progressed** [1] - 148:14
**progresses** [1] - 21:22
**progression** [1] - 142:23
**project** [1] - 106:10
**projects** [1] - 106:25
**prominent** [1] - 39:11
**prominently** [1] - 88:10
**promise** [1] - 83:1
**pronounced** [1] - 111:20
**proper** [3] - 29:8, 35:22, 57:22
**properly** [1] - 64:25
**proposed** [3] - 69:13, 69:19, 122:10
**proprietary** [1] - 123:7
**prosecution** [6] - 39:13, 53:6, 63:19, 65:21, 67:9, 69:22
**prosecutor** [4] - 63:18, 63:20, 70:12, 70:19
**prosecutors** [9] - 54:2, 59:22, 60:1, 61:25, 63:7, 63:18, 66:5, 71:23, 72:2
**protect** [1] - 29:4
**protocol** [1] - 124:19
**prove** [1] - 130:17
**proves** [1] - 11:10
**provided** [10] - 12:21, 40:3, 98:5, 99:19, 99:24, 128:17, 138:19, 142:9, 149:17, 150:4
**providing** [2] - 7:2, 21:15
**proving** [1] - 29:21
**proximal** [1] - 114:12
**psychiatric** [2] - 44:8, 48:24
**psychiatrist** [9] - 7:4, 21:25, 28:24, 29:8, 35:18, 35:22, 36:4, 45:8, 50:9
**psychiatrists** [2] - 36:1, 51:13
**psychiatry** [9] - 7:6, 45:13, 45:16, 45:19, 46:9, 46:10, 46:18, 46:21, 47:1
**psychologist** [1] - 15:11
**psychologists** [1] - 51:13
**psychology** [1] - 92:17
**psychotic** [2] - 35:14, 50:10
**publications** [4] - 40:22, 41:3, 41:6, 41:8
**publisher** [2] - 123:6, 123:11
**publishing** [1] - 123:7
**pull** [1] - 133:9
**purport** [1] - 89:3
**purporting** [2] - 149:5, 149:6
**purpose** [2] - 17:20, 70:11
**purposefully** [1] - 27:9
**purposely** [1] - 100:15
**purposes** [3] - 47:19, 62:8, 147:1
**put** [33] - 7:14, 7:15, 9:6, 12:22, 16:24, 17:9, 17:17, 17:19, 23:8, 25:7, 33:11,

36:7, 42:2, 42:10, 43:11, 54:6, 54:9, 55:6, 64:18, 75:17, 89:18, 90:11, 90:18, 90:19, 106:25, 116:21, 119:7, 119:19, 129:12, 137:7, 151:2, 151:16
**putting** [2] - 12:3, 116:18
**puzzled** [2] - 131:24, 131:25

**Q**

**qualitative** [3] - 12:17, 15:16, 18:22
**qualitatively** [1] - 19:6
**quality** [1] - 51:20
**quantitative** [8] - 10:18, 12:13, 16:1, 16:6, 17:2, 17:15, 17:21, 19:6
**questioned** [4] - 113:21, 113:23, 119:4, 150:2
**questioning** [2] - 12:2, 75:24
**questions** [26] - 9:10, 12:5, 14:1, 24:2, 24:3, 27:13, 28:5, 47:19, 48:5, 49:2, 114:2, 116:7, 116:10, 116:24, 117:15, 118:2, 124:7, 124:8, 126:18, 127:19, 127:20, 128:3, 136:18, 152:3, 154:16, 155:8
**quibble** [2] - 16:2, 16:13
**quick** [3] - 72:19, 136:2, 145:9
**quickly** [1] - 144:22
**quite** [4] - 33:23, 58:5, 88:7, 112:13
**quote** [11] - 29:7, 31:9, 49:17, 51:5, 51:9, 68:18, 88:10, 96:19, 98:2, 119:10
**quotes** [1] - 98:3
**quoting** [2] - 96:24, 101:21

**R**

**radiological** [1] - 90:13
**radiologist** [5] - 89:16, 90:25, 91:7, 94:11, 94:12
**radiology** [3] - 15:11, 90:20, 91:23
**raid** [2] - 112:24, 117:19
**raised** [5] - 71:4, 141:20, 141:23, 142:1, 142:3
**raising** [2] - 100:7, 142:20
**ran** [2] - 58:16, 58:18
**randomly** [1] - 10:11
**range** [2] - 11:8, 148:12
**Raniere** [1] - 39:20
**rape** [2] - 61:4, 61:6
**rate** [4] - 32:25, 33:2, 33:4, 107:5
**rates** [3] - 31:25, 82:16, 110:23
**rather** [2] - 15:20, 61:25
**RB** [1] - 125:21
**reach** [3] - 30:7, 30:25, 117:21
**reached** [2] - 30:3, 53:21
**reaching** [2] - 30:4, 117:20
**read** [12] - 33:17, 33:19, 33:24, 72:21, 90:1, 90:6, 92:4, 93:13, 98:10, 99:12, 128:22, 148:12
**reader** [2] - 92:9, 92:23
**readers** [1] - 94:19

**reading** [3] - 11:2, 91:12, 140:18
**ready** [4] - 4:6, 74:3, 145:3, 156:7
**real** [3] - 111:8, 112:3, 142:17
**reality** [2] - 79:22, 118:9
**realize** [1] - 26:7
**really** [20] - 40:17, 44:14, 46:14, 48:21, 80:15, 101:1, 101:4, 106:16, 108:20, 109:23, 133:5, 136:2, 137:18, 142:11, 144:22, 153:10, 153:16, 153:20, 156:11, 156:17
**Rearden** [1] - 122:15
**reason** [5] - 14:9, 71:13, 79:19, 114:6, 120:21
**reasons** [1] - 10:21
**recantation** [1] - 61:6
**recanting** [1] - 61:4
**receive** [1] - 97:13
**received** [10] - 23:4, 23:10, 30:1, 30:18, 32:7, 84:8, 115:4, 121:16, 150:3, 151:21
**recent** [8] - 10:22, 11:5, 26:4, 28:3, 37:19, 76:7, 121:20, 148:2
**recently** [4] - 85:17, 85:23, 87:4, 88:7
**recess** [1] - 143:23
**recessed** [4] - 73:25, 144:11, 145:12, 156:21
**recognizable** [1] - 120:2
**recognize** [5] - 36:23, 55:2, 60:6, 98:12, 141:7
**recollection** [5] - 63:22, 64:22, 64:25, 65:1, 68:7
**recommendation** [2] - 118:19, 147:24
**recommended** [1] - 45:7
**reconcile** [1] - 5:15
**reconstruct** [1] - 57:11
**record** [6] - 54:6, 54:9, 77:19, 86:11, 141:15, 157:3
**recorded** [8] - 2:15, 5:17, 5:19, 6:14, 83:21, 84:3, 84:5, 123:4
**records** [23] - 10:3, 84:9, 84:19, 87:23, 88:8, 96:6, 96:24, 97:7, 98:4, 99:23, 113:24, 114:4, 114:17, 114:18, 114:21, 115:7, 115:11, 115:13, 115:23, 116:4, 116:20, 142:25, 146:12
**redirect** [3] - 136:5, 144:21, 152:4
**reduce** [2] - 86:20, 139:9
**reduced** [1] - 111:18
**reduces** [2] - 139:6, 139:7
**refer** [3] - 26:11, 96:23, 118:24
**reference** [1] - 101:13
**referenced** [3] - 61:10, 96:19, 116:21
**referencing** [1] - 85:18
**referrals** [1] - 98:1
**referred** [2] - 26:9, 61:14, 140:16, 143:4
**referring** [4] - 23:4, 110:17, 129:20, 129:22
**refers** [1] - 117:24
**reflect** [1] - 77:19
**reflected** [1] - 77:9

**reflection** [1] - 23:17
**refresh** [3] - 64:24, 65:15, 86:2
**refreshes** [1] - 65:1
**refreshing** [1] - 64:22
**refuse** [1] - 45:20
**refused** [1] - 80:1
**regard** [1] - 21:4
**regarding** [2] - 17:22, 98:9
**regardless** [1] - 58:6
**rejected** [2] - 69:17, 82:21
**relate** [1] - 146:13
**related** [2] - 8:14, 96:2
**relates** [1] - 43:2
**relative** [2] - 24:8, 48:20
**relatively** [1] - 21:20
**release** [1] - 31:13
**relevant** [1] - 58:5
**reliability** [1] - 7:13
**reliable** [7] - 7:2, 11:2, 16:20, 17:14, 17:15, 17:16, 128:24
**reliably** [1] - 95:4
**reliance** [8] - 6:4, 6:5, 6:7, 6:8, 6:10, 7:7, 7:19, 49:17
**relied** [20] - 7:1, 9:4, 12:21, 15:16, 15:25, 17:1, 17:21, 18:22, 22:10, 24:13, 24:14, 61:24, 80:6, 80:10, 80:11, 80:12, 83:4, 84:9, 148:20, 150:21
**relies** [1] - 140:3
**rely** [9] - 14:19, 14:20, 14:24, 15:1, 64:2, 80:23, 121:3, 138:9, 138:18
**relying** [3] - 10:1, 12:15, 82:9
**remain** [2] - 28:24, 29:3
**remainder** [1] - 144:14
**remains** [1] - 28:3
**remarkable** [1] - 109:14
**remarks** [1] - 107:17
**remember** [30] - 14:17, 18:15, 20:4, 20:5, 25:3, 34:3, 44:14, 50:7, 50:11, 53:7, 56:14, 63:2, 64:19, 64:23, 66:20, 67:2, 67:7, 67:24, 68:2, 68:12, 70:3, 88:6, 89:22, 96:22, 99:20, 126:3, 142:14, 142:15, 150:9, 153:8
**remembering** [1] - 142:17
**remind** [1] - 25:8
**reminded** [1] - 30:10
**remote** [2] - 76:6, 76:8
**rendering** [1] - 35:8
**repeated** [1] - 8:7
**repetition** [1] - 107:16
**repetitive** [1] - 141:2
**rephrase** [1] - 94:4
**replaced** [1] - 25:17
**report** [68] - 4:25, 8:10, 9:8, 10:24, 11:19, 12:6, 13:8, 17:24, 18:8, 21:2, 22:10, 22:18, 23:14, 24:7, 28:4, 48:16, 48:18, 87:25, 88:10, 88:11, 89:7, 90:8, 90:12, 90:18, 94:16, 96:4, 96:18, 96:23, 97:21, 97:22, 98:12, 101:1,

101:23, 104:14, 104:20, 109:21, 112:17, 112:25, 113:5, 113:7, 113:9, 113:20, 114:9, 114:10, 115:4, 121:5, 121:9, 121:23, 122:1, 127:17, 128:8, 128:11, 130:7, 130:9, 131:10, 131:15, 132:3, 132:25, 133:17, 135:2, 135:6, 136:20, 136:22, 136:23, 137:13, 148:13, 151:3, 153:3
**reported** [4] - 112:23, 113:3, 153:21
**REPORTER** [1] - 2:11
**reporter** [1] - 104:15
**REPORTER'S** [1] - 157:1
**reporting** [1] - 68:19
**reports** [22] - 4:23, 5:3, 5:6, 5:13, 6:25, 9:6, 16:25, 17:1, 22:19, 23:9, 89:8, 98:9, 113:17, 115:6, 133:18, 134:1, 134:2, 134:7, 134:11, 153:5, 153:6
**represent** [7] - 39:14, 39:15, 72:24, 78:10, 86:3, 90:5, 102:1
**representation** [4] - 23:6, 23:20, 46:16, 72:15
**representations** [1] - 58:5
**representing** [3] - 30:18, 101:20, 126:18
**request** [9] - 69:17, 72:18, 74:14, 77:12, 77:13, 78:12, 78:22, 79:1, 146:13
**require** [1] - 121:19
**required** [2] - 12:8, 91:15
**requires** [1] - 152:22
**resolved** [3] - 9:1, 20:16, 27:24
**respect** [12] - 11:17, 11:25, 12:9, 12:15, 13:9, 20:18, 21:5, 23:2, 61:14, 82:10, 96:16, 120:25
**respectfully** [4] - 13:11, 18:4, 18:10, 58:7
**respectively** [2] - 19:20, 83:17
**respond** [2] - 136:15, 152:23
**responded** [2] - 44:7, 124:9
**respondent** [1] - 69:23
**responding** [1] - 92:16
**responds** [1] - 133:15
**response** [12] - 15:5, 26:5, 33:20, 44:4, 52:13, 53:25, 57:8, 58:3, 64:17, 66:1, 124:7, 152:10
**responses** [1] - 88:22
**responsibilities** [1] - 43:16
**responsibility** [1] - 58:12
**responsible** [1] - 107:8
**rest** [2] - 155:24, 155:25
**restaurant** [1] - 142:15
**RESTS** [1] - 3:5
**result** [5] - 61:21, 61:23, 89:18, 90:14, 93:5
**results** [12] - 7:24, 9:5, 80:5, 80:14, 80:18, 80:23, 82:17, 89:23, 94:21, 153:22, 153:23, 155:4
**resume** [1] - 74:6
**resumed** [1] - 76:16
**retained** [4] - 31:18, 32:4, 33:24, 38:7
**retainer** [1] - 31:20
**retains** [1] - 31:24

**retrial** [1] - 50:24
**retrospect** [2] - 104:18, 109:25
**return** [1] - 87:16
**returned** [1] - 78:5
**returning** [1] - 116:20
**reveal** [1] - 94:2
**revealed** [3] - 16:8, 16:9, 52:1
**revealing** [1] - 94:5
**revelations** [1] - 59:17
**Reverend** [2] - 25:1, 27:3
**reversed** [2] - 60:21, 61:11
**review** [2] - 5:5, 83:23
**reviewed** [7] - 9:7, 83:20, 84:8, 87:25, 88:15, 88:19, 96:5
**reviewer** [1] - 91:16
**reviews** [1] - 91:18
**revolver** [1] - 25:23
**Reynolds** [15] - 25:18, 25:19, 26:14, 26:15, 26:18, 27:6, 104:2, 105:1, 126:25, 127:1, 127:5
**ride** [1] - 64:4
**rise** [4] - 73:24, 74:1, 145:11, 145:13
**risk** [5] - 50:10, 87:1, 139:3, 139:6, 139:8
**RMR** [2] - 2:12, 157:6
**road** [1] - 135:21
**Rob** [2] - 102:18, 103:16
**rob** [2] - 68:5, 120:8
**robbed** [1] - 68:1
**ROBERT** [1] - 1:6
**Robert** [3] - 89:2, 120:3, 149:6
**role** [3] - 7:10, 29:8, 43:8
**rolled** [2] - 38:22
**Romatowski** [2] - 77:1, 121:1
**Ronald** [1] - 89:17
**Roof** [1] - 38:12
**room** [2] - 109:1, 124:18
**Room** [2] - 1:21, 2:13
**roughly** [8] - 32:9, 73:7, 75:13, 75:15, 75:21, 76:14, 77:24, 139:9
**rows** [1] - 19:18
**RPR** [1] - 157:6
**rule** [2] - 112:7, 112:9
**ruled** [1] - 70:16
**rules** [2] - 94:17, 152:23
**run** [1] - 54:12
**runaway** [1] - 59:25
**ruse** [2] - 117:13, 117:21
**rushing** [1] - 145:2
**Rusk** [1] - 2:13

## S

**safely** [1] - 135:23
**safer** [1] - 79:9
**salt** [1] - 17:8
**samples** [2] - 20:11, 78:4
**San** [3] - 31:8, 33:21, 34:2
**sane** [2] - 51:15, 51:23

**Sarah** [1] - 2:7
**sat** [3] - 17:16, 45:21, 45:22
**satisfaction** [1] - 114:15
**satisfied** [1] - 116:3
**save** [1] - 12:11
**savvy** [1] - 129:19
**saw** [8] - 27:4, 86:4, 98:4, 102:21, 103:20, 118:11, 128:11, 131:17
**scan** [31] - 10:22, 18:25, 48:17, 74:18, 78:23, 79:6, 79:15, 79:18, 79:19, 89:12, 89:14, 89:18, 89:20, 89:23, 91:8, 91:10, 91:12, 92:1, 92:9, 92:23, 93:2, 93:16, 94:1, 94:4, 94:22, 95:1, 95:2, 95:8, 95:12, 122:23, 147:23
**scans** [17] - 6:9, 12:8, 12:9, 19:5, 19:23, 90:24, 91:14, 91:23, 92:3, 92:4, 92:22, 93:11, 94:2, 94:16, 94:21, 154:5
**scheduled** [3] - 119:17, 120:18, 144:3
**science** [2] - 92:11, 92:13
**sciences** [1] - 90:21
**scope** [1] - 13:8
**score** [3] - 20:10, 20:13, 123:12
**scored** [1] - 123:13
**scores** [1] - 123:12
**scoring** [2] - 123:15, 139:25
**Scott** [2] - 2:4, 115:5
**screen** [9] - 4:15, 20:2, 42:11, 55:6, 74:10, 78:3, 90:11, 103:6, 148:4
**search** [3] - 117:1, 117:12, 141:19
**searched** [1] - 116:16
**seated** [3] - 4:5, 74:2, 145:14
**second** [14] - 8:10, 8:18, 9:8, 11:19, 13:19, 21:2, 24:7, 52:20, 77:7, 122:8, 135:16, 140:16, 147:14, 153:1
**secondary** [1] - 21:24
**section** [3] - 38:20, 39:9, 41:17
**see** [31] - 13:22, 14:3, 17:11, 18:21, 19:16, 21:21, 23:17, 25:20, 26:22, 26:25, 38:2, 44:16, 50:8, 54:19, 56:19, 64:25, 65:13, 71:8, 81:17, 89:19, 108:20, 117:7, 117:8, 117:23, 118:20, 129:8, 134:10, 134:16, 148:5, 153:24
**seeing** [8] - 20:2, 21:16, 22:4, 73:6, 89:19, 89:22, 112:5, 118:16
**seek** [2] - 29:8, 117:14
**seeking** [2] - 22:5, 116:9
**seeks** [1] - 98:17
**seem** [1] - 5:23
**sees** [2] - 40:14, 103:3
**segment** [2] - 10:10, 107:21
**segments** [1] - 107:19
**selected** [3] - 10:11, 10:12
**self** [1] - 133:22
**self-evident** [1] - 133:22
**selling** [1] - 38:5
**sensationalistic** [1] - 38:8
**sense** [4] - 19:8, 26:2, 82:25, 120:11
**sent** [4] - 54:1, 54:20, 56:3, 118:10
**sentence** [3] - 63:13, 100:6, 130:25

**sentenced** [1] - 59:3
**sentencing** [1] - 53:17
**separate** [1] - 78:20
**sepsis** [1] - 134:5
**September** [12] - 77:11, 77:20, 83:13, 84:2, 87:5, 109:22, 116:17, 116:19, 116:20, 117:7, 118:10, 148:2
**sequence** [11] - 6:3, 21:10, 68:8, 68:23, 68:25, 72:24, 73:8, 74:12, 117:19, 117:24, 118:9
**sequencing** [1] - 116:8
**series** [6] - 42:14, 75:10, 104:12, 109:19, 116:24, 118:2
**serious** [2] - 5:22, 86:17
**serve** [3] - 69:13, 69:18, 109:5
**services** [6] - 30:7, 32:10, 32:16, 32:22, 33:6
**SESSION** [1] - 1:10
**session** [5] - 122:15, 139:5, 139:7, 139:12, 141:11
**set** [4] - 74:3, 94:6, 138:23, 139:2
**setting** [2] - 40:15, 43:12
**seven** [4] - 76:17, 77:24, 80:24, 80:25
**seven-and-a-half** [1] - 76:17
**severe** [3] - 85:4, 132:6, 132:15
**severely** [1] - 50:4
**sexual** [2] - 39:10, 70:13
**shape** [1] - 110:6
**share** [3] - 99:15, 102:17, 103:15
**shared** [4] - 138:15, 154:4, 155:6, 155:7
**sheets** [1] - 123:15
**short** [2] - 38:5, 121:19
**short-term** [1] - 121:19
**shortly** [5] - 52:25, 53:5, 58:16, 58:19, 63:16
**shot** [2] - 25:22, 82:13
**show** [30] - 6:11, 13:23, 15:12, 26:7, 26:20, 36:17, 44:15, 49:8, 52:3, 54:13, 55:12, 55:20, 58:20, 60:5, 62:2, 62:6, 62:22, 63:11, 64:6, 64:23, 65:18, 65:22, 66:8, 96:9, 104:23, 107:21, 125:15, 141:5, 153:7, 153:12
**showed** [5] - 10:24, 15:10, 15:13, 35:1, 71:3
**showing** [3] - 14:18, 149:4, 153:15
**shown** [2] - 9:10, 100:22
**shows** [2] - 58:22, 116:19
**shrinkage** [3] - 14:19, 18:23, 140:20
**shrunken** [1] - 11:12
**sic** [1] - 12:17
**side** [2] - 21:16, 111:21
**sides** [1] - 20:21
**sign** [1] - 130:8
**signature** [1] - 89:22
**significance** [1] - 31:14
**significant** [6] - 14:18, 17:13, 18:23, 38:6, 47:17, 99:4
**similar** [5] - 70:23, 84:5, 94:21, 104:24, 107:17

**simple** [2] - 115:14, 149:18
**simply** [2] - 118:23, 123:4
**single** [1] - 122:25
**sit** [4] - 36:6, 45:20, 116:4, 119:22
**sitting** [3] - 60:23, 106:18, 124:9
**situation** [4] - 59:19, 94:18, 98:15, 101:4
**six** [7] - 37:19, 72:5, 81:8, 81:21, 106:15, 139:19, 139:24
**size** [1] - 31:14
**skip** [2] - 56:16, 128:21
**sleep** [4] - 74:20, 74:21, 77:7, 80:13
**slice** [6] - 10:20, 14:12, 14:14, 15:1, 16:14, 19:4
**slide** [25] - 12:11, 13:2, 13:19, 13:23, 14:3, 14:5, 14:22, 14:23, 15:4, 15:10, 15:12, 15:19, 15:24, 16:16, 16:18, 16:20, 17:17, 19:13, 20:12, 113:14, 119:6, 119:7, 146:24, 148:5
**slides** [8] - 12:2, 12:3, 12:23, 13:19, 13:20, 17:10, 96:9, 146:8
**slow** [1] - 111:18
**slowly** [1] - 133:14
**smart** [1] - 52:13
**smart-aleck** [1] - 52:13
**Smith** [15] - 1:18, 3:3, 38:16, 38:21, 56:6, 56:11, 56:17, 66:15, 66:17, 66:22, 66:25, 67:21, 68:10, 68:17, 68:24
**SMITH** [4] - 58:4, 74:4, 155:25, 156:5
**Smith's** [1] - 67:4
**snack** [2] - 106:18, 107:3
**so..** [1] - 4:18
**social** [2] - 92:16, 129:8
**sole** [1] - 50:19
**solicit** [2] - 30:13, 30:16
**someone** [12] - 10:12, 15:13, 67:10, 87:10, 97:8, 100:20, 104:5, 110:12, 119:23, 133:7, 146:9, 153:12
**sometimes** [2] - 142:10, 142:23
**somewhat** [2] - 96:3, 104:3
**somewhere** [2] - 42:13, 109:10
**soon** [1] - 53:3
**sooner** [1] - 155:16
**sophisticated** [2] - 19:1, 115:15
**sorry** [28] - 13:14, 13:17, 13:24, 17:25, 20:19, 22:11, 25:25, 26:1, 37:2, 42:5, 57:18, 60:4, 65:6, 71:12, 73:2, 73:3, 82:7, 85:7, 105:23, 108:3, 113:8, 125:1, 126:3, 137:23, 139:1, 146:7, 154:10, 154:23
**sort** [20] - 5:8, 9:23, 19:18, 23:24, 39:10, 43:8, 51:8, 56:5, 56:12, 75:18, 76:3, 84:24, 98:19, 101:8, 123:7, 123:19, 125:19, 127:15, 129:4, 141:17
**sorted** [1] - 131:7
**sought** [1] - 120:15
**sound** [6] - 32:10, 32:23, 50:5, 83:14, 103:4, 103:5
**sounds** [2] - 44:24, 68:21

**source** [3] - 8:13, 42:7, 42:8
**sources** [4] - 7:8, 8:25, 10:3, 57:6
**South** [2] - 38:21, 56:7
**south** [1] - 38:23
**SOUTHERN** [1] - 1:1
**spared** [1] - 79:14
**speakers** [2] - 122:14, 122:16
**speaking** [2] - 62:25, 86:10
**special** [2] - 106:19, 108:20
**specialist** [2] - 35:19, 51:5
**specialize** [1] - 22:1
**specialized** [6] - 46:14, 47:3, 47:5, 47:9, 47:23, 48:22
**specialty** [1] - 46:25
**specific** [4] - 32:1, 32:21, 41:9, 142:19
**specifically** [2] - 33:19, 41:12
**specifics** [1] - 10:17
**spectacularly** [1] - 129:17
**spectrum** [1] - 46:8
**speech** [3] - 102:4, 104:25, 108:11
**speeches** [10] - 5:17, 83:7, 83:11, 83:16, 83:20, 101:14, 101:22, 107:16, 107:18, 153:19
**spell** [1] - 128:3
**spend** [2] - 37:7, 44:11
**spending** [2] - 54:3, 134:11
**spent** [3] - 24:19, 26:3, 44:6
**spoken** [1] - 11:21
**sponsored** [1] - 122:13
**staff** [2] - 145:3, 156:16
**stage** [2] - 21:13, 102:17, 103:15, 148:15
**stamp** [1] - 102:2
**stand** [22] - 6:22, 28:4, 28:13, 28:25, 29:14, 29:21, 71:16, 104:8, 106:22, 106:23, 121:18, 126:7, 130:10, 130:16, 132:16, 132:22, 134:8, 139:19, 143:21, 144:5, 149:11, 150:8
**stand-alone** [1] - 139:19
**standard** [3] - 51:21, 91:11, 124:7
**standpoint** [4] - 102:24, 103:21, 107:9, 108:23
**stands** [1] - 40:11
**start** [5] - 73:21, 125:20, 133:13, 144:6, 156:9
**started** [6] - 102:19, 103:18, 104:3, 141:18, 145:10, 155:15
**starting** [3] - 25:11, 27:22, 155:14
**State** [1] - 60:7
**state** [8] - 50:20, 66:18, 69:12, 86:25, 94:7, 95:14, 111:10, 121:10
**state's** [1] - 49:17
**statement** [8] - 31:13, 44:5, 44:12, 57:24, 63:6, 66:7, 94:9, 99:24
**statements** [9] - 57:21, 58:1, 61:2, 67:21, 83:21, 88:23, 96:3, 96:22, 97:23
**STATES** [3] - 1:1, 1:3, 1:12
**States** [1] - 4:8

**stating** [1] - 69:18
**Station** [2] - 102:15, 103:14
**statistical** [3] - 11:3, 138:17, 138:20
**statistically** [1] - 17:13
**Status** [1] - 20:6
**status** [2] - 101:4, 127:18
**stay** [2] - 145:4, 148:11
**stenography** [1] - 2:15
**stepped** [1] - 107:7
**steps** [4] - 81:14, 82:6, 112:4, 112:6
**stick** [4] - 50:23, 50:24, 91:23, 107:3
**sticking** [1] - 83:11
**sticky** [1] - 28:20
**still** [7] - 5:11, 5:13, 14:21, 24:11, 66:3, 89:7, 125:14
**stopped** [2] - 104:11, 105:11, 107:12
**story** [5] - 25:19, 31:12, 76:1, 106:13
**straight** [1] - 135:25
**straightforward** [2] - 26:12, 101:2
**strategy** [1] - 79:10
**streamline** [1] - 145:21
**streamlined** [1] - 144:23
**Street** [2] - 1:21, 2:8
**strike** [1] - 41:16
**strong** [1] - 51:9
**structure** [1] - 27:20
**Stuart** [1] - 84:18
**studied** [3] - 20:14, 21:25, 92:17
**studies** [3] - 9:10, 128:18, 155:6
**study** [5] - 74:20, 74:22, 74:23, 77:8, 80:14
**sub** [1] - 25:9
**sub-exhibit** [1] - 25:9
**subject** [6] - 13:7, 71:18, 94:19, 96:1, 98:25, 149:12, 156:3, 156:5
**subjective** [6] - 15:17, 81:11, 81:20, 82:20, 82:22, 140:17, 140:22
**subjectively** [1] - 18:21
**submitted** [3] - 131:15, 132:24, 134:7
**subsequent** [5] - 93:11, 94:21, 151:6, 151:21, 151:24
**subsequently** [2] - 53:21, 57:14
**substance** [2] - 54:19, 55:12
**substantial** [1] - 119:25
**subtle** [1] - 111:17
**succeeding** [1] - 129:15
**successful** [1] - 130:3
**suffered** [1] - 35:3
**suffering** [4] - 71:10, 84:24, 87:1, 110:14
**suffers** [2] - 132:6, 132:15
**sufficient** [1] - 82:16
**sugar** [1] - 101:2
**sugar-coated** [1] - 101:2
**suggest** [4] - 53:10, 100:18, 111:4, 116:25
**suggested** [3] - 35:24, 71:21, 92:25
**suggesting** [13] - 70:25, 98:18, 98:23, 100:10, 100:14, 111:22, 118:4, 118:8,

120:9, 120:12, 123:22, 131:4, 131:6
**suggestion** [5] - 100:8, 104:5, 116:12, 117:12, 122:11
**suggestive** [2] - 90:2, 94:5
**suggests** [1] - 82:1
**suicide** [1] - 50:4
**suitable** [1] - 69:24
**Suite** [1] - 2:3
**summarize** [1] - 84:14
**summation** [1] - 53:10
**summertime** [1] - 107:4
**sundowning** [1] - 127:11
**superior** [1] - 6:11
**supplemental** [8] - 18:8, 18:9, 121:5, 121:23, 127:17, 128:11, 132:3, 151:3
**support** [2] - 98:20, 111:13
**supported** [1] - 62:2
**supporting** [1] - 135:11
**supports** [1] - 110:3
**suppose** [1] - 111:8
**surgery** [2] - 86:19, 121:21
**surprise** [2] - 134:4, 134:6
**surprising** [2] - 76:6, 76:9
**surrounding** [2] - 91:19, 95:11
**Susan** [4] - 38:16, 38:21, 56:5, 56:17
**susceptible** [1] - 87:20
**suspected** [1] - 91:16
**sustaining** [1] - 129:25
**switch** [4] - 101:16, 104:15, 109:17, 125:22
**switched** [1] - 6:19
**symptoms** [2] - 111:9, 118:20
**sync** [2] - 102:22, 103:2
**synced** [1] - 105:19
**system** [1] - 97:7

**T**

**table** [2] - 109:1, 114:22
**tables** [2] - 16:17, 109:1
**Tamine's** [6] - 112:24, 116:15, 117:2, 117:13, 117:19, 141:19
**targeting** [1] - 155:15
**task** [11] - 9:25, 129:10, 129:21, 130:20, 130:24, 133:5, 133:9, 135:10, 136:7, 137:9, 152:11
**tasks** [4] - 129:11, 129:14, 130:18, 135:7
**Tau** [4] - 79:6, 79:10, 79:15, 79:19
**tax** [1] - 31:9
**Tax** [1] - 1:20
**team** [4] - 102:15, 103:15, 145:23, 146:25
**technical** [3] - 13:8, 42:15
**technology** [2] - 95:5, 95:15
**Tel** [4] - 1:22, 2:4, 2:9, 2:14
**telephone** [1] - 30:1
**television** [3] - 52:2, 53:11, 66:8
**ten** [1] - 88:11

**tend** [1] - 99:4
**term** [5] - 82:22, 92:10, 112:18, 121:19, 122:6
**terms** [9] - 39:6, 43:19, 56:15, 74:12, 99:11, 119:11, 124:3, 125:4, 142:3
**test** [22] - 45:22, 45:23, 75:1, 79:10, 80:5, 80:18, 80:22, 82:16, 89:25, 122:7, 122:24, 123:17, 124:3, 131:25, 138:18, 138:25, 139:12, 139:25, 140:6, 153:14, 153:22, 153:23
**tested** [2] - 77:23, 142:1
**tester** [1] - 153:11
**testified** [16] - 17:1, 24:6, 31:17, 51:13, 51:18, 53:15, 60:12, 61:10, 64:22, 66:10, 69:21, 80:17, 85:22, 135:5, 137:17, 151:8
**testifies** [1] - 146:14
**testify** [9] - 19:25, 22:9, 45:2, 51:15, 51:17, 67:9, 79:17, 133:19, 136:19
**testifying** [3] - 49:7, 115:19, 132:10
**testimony** [78] - 6:25, 9:15, 9:18, 10:10, 11:23, 11:25, 15:8, 16:2, 16:18, 17:8, 17:18, 19:14, 24:10, 30:16, 40:4, 44:20, 45:5, 49:12, 49:15, 49:18, 52:12, 52:18, 52:23, 53:6, 53:19, 53:23, 54:1, 55:12, 56:23, 57:9, 58:2, 58:5, 58:25, 59:10, 59:14, 59:18, 60:2, 61:1, 61:11, 61:15, 61:22, 62:4, 62:5, 62:11, 62:12, 62:13, 63:8, 67:13, 67:17, 68:9, 68:17, 70:1, 70:8, 70:13, 70:15, 70:24, 76:5, 79:4, 79:5, 79:11, 79:20, 81:2, 81:12, 83:24, 84:2, 84:5, 93:19, 110:11, 110:12, 110:24, 116:22, 120:24, 134:15, 147:1, 147:21, 149:24, 153:19
**testing** [33] - 6:7, 6:20, 7:24, 8:4, 9:3, 10:5, 15:11, 72:17, 72:22, 74:12, 75:19, 76:13, 76:18, 78:6, 78:11, 78:21, 80:16, 83:5, 101:21, 113:1, 122:2, 122:3, 124:12, 125:1, 131:5, 137:20, 138:6, 139:5, 139:7, 152:22, 153:16, 154:4, 155:4
**tests** [16] - 75:11, 81:6, 81:9, 81:22, 81:23, 82:18, 112:22, 124:17, 124:21, 135:13, 138:21, 139:2, 139:20, 140:9, 153:11
**TEXAS** [1] - 1:1
**Texas** [11] - 1:4, 2:3, 2:13, 51:21, 60:7, 60:8, 60:9, 69:20, 100:13, 104:25, 145:25
**thankfully** [1] - 94:20
**Thanksgiving** [1] - 155:21
**THE** [97] - 1:1, 1:1, 1:11, 1:17, 2:1, 4:5, 4:11, 4:17, 12:25, 13:11, 13:16, 15:5, 16:23, 18:3, 19:8, 22:11, 22:15, 22:17, 24:3, 28:6, 28:18, 36:20, 37:5, 54:16, 58:3, 58:7, 61:16, 72:11, 73:18, 73:24, 74:1, 74:2, 78:18, 102:22, 103:2, 103:5, 103:8, 105:4, 105:7, 105:25, 106:2, 107:25, 108:3, 108:8, 108:15,

132:12, 134:19, 134:23, 136:6, 136:12, 136:21, 137:1, 143:19, 143:25, 144:10, 144:15, 144:17, 144:24, 145:1, 145:6, 145:9, 145:11, 145:13, 145:14, 145:17, 146:4, 146:17, 146:21, 149:22, 150:7, 150:16, 150:18, 152:4, 152:7, 152:9, 152:10, 152:15, 152:16, 152:19, 154:2, 154:3, 154:6, 154:7, 154:9, 154:14, 154:15, 154:19, 154:22, 154:25, 155:9, 155:11, 155:13, 156:2, 156:9, 156:14, 156:17, 156:20
**thick** [1] - 37:12
**thickness** [6] - 10:20, 14:12, 14:14, 15:2, 16:14, 19:4
**thinking** [4] - 56:13, 80:13, 80:15, 149:24
**third** [6] - 4:25, 52:25, 135:19, 137:13, 140:23, 153:4
**thirdhand** [1] - 8:18
**Thousand** [2] - 141:18, 142:5
**thousand** [1] - 89:13
**thousands** [1] - 140:20
**thread** [1] - 71:12
**threatening** [1] - 68:1
**three** [15] - 4:22, 5:3, 16:19, 55:21, 56:15, 60:23, 75:2, 83:17, 112:12, 133:18, 134:6, 139:7, 140:6, 140:12, 141:1
**three-Judge** [1] - 60:23
**throw** [1] - 121:16
**timeline** [1] - 141:17
**timing** [1] - 116:8
**today** [14] - 9:19, 16:20, 24:11, 28:1, 32:8, 36:6, 58:2, 99:19, 102:17, 103:16, 103:24, 104:10, 126:16, 141:21
**together** [6] - 17:18, 17:19, 75:18, 76:17, 138:23, 139:4
**Tommy** [3] - 25:17, 26:19, 27:9
**tomorrow** [1] - 156:6
**tonight** [2] - 143:20, 144:18
**took** [13] - 17:8, 33:22, 50:17, 58:12, 63:17, 64:11, 80:17, 98:8, 107:10, 116:14, 134:7, 145:18, 149:11
**tool** [2] - 20:22, 91:19
**top** [5] - 13:9, 19:18, 20:12, 20:14, 147:6
**topic** [7] - 6:20, 71:1, 73:19, 83:1, 99:19, 119:4, 150:3
**topics** [1] - 9:17
**total** [1] - 32:14
**totally** [1] - 26:11
**toxicology** [1] - 78:3
**track** [2] - 42:6, 42:7
**tract** [2] - 86:20, 118:17
**tradition** [1] - 104:3
**traditional** [1] - 35:14
**tragic** [2] - 49:23, 53:4
**trained** [3] - 90:20, 90:21, 111:3
**training** [5] - 47:3, 47:5, 47:9, 47:23,

48:22
**Transcript** [1] - 2:16
**transcript** [3] - 25:12, 84:3, 157:3
**transcription** [1] - 2:16
**transcripts** [1] - 25:10
**transferred** [1] - 69:6
**treat** [1] - 106:19
**treating** [16] - 43:13, 43:19, 43:23, 44:7, 44:8, 47:15, 47:21, 47:24, 48:2, 48:22, 71:23, 84:16, 84:17, 91:2, 96:6, 99:2
**treatment** [2] - 43:18, 118:6
**trial** [25] - 6:22, 7:18, 28:4, 28:14, 28:25, 29:14, 29:21, 50:2, 50:21, 50:23, 50:25, 51:2, 51:14, 52:1, 52:6, 57:9, 71:16, 79:10, 121:18, 126:7, 129:2, 130:10, 130:16, 132:16, 132:22
**tried** [2] - 50:4, 51:23
**triggered** [1] - 81:10
**trip** [6] - 116:13, 116:15, 116:17, 116:25, 117:2, 117:5
**true** [21] - 33:7, 40:10, 43:6, 51:11, 57:14, 60:11, 64:5, 65:24, 82:3, 82:4, 92:24, 93:1, 106:8, 130:12, 131:2, 131:20, 132:21, 137:12, 140:21, 150:8, 153:7
**trust** [2] - 27:20, 44:17
**trusted** [2] - 135:20, 135:24
**trusts** [1] - 129:18
**truth** [4] - 22:5, 29:9, 36:13, 149:14
**try** [11] - 4:16, 30:14, 86:19, 91:5, 103:7, 119:1, 124:25, 141:13, 144:19, 144:22, 145:20
**trying** [7] - 15:18, 54:3, 57:19, 57:25, 117:11, 149:13, 154:12
**Tuesday** [2] - 155:18, 155:20
**turn** [3] - 43:7, 103:22, 121:8
**turned** [2] - 4:15, 111:21
**turns** [2] - 55:24, 153:10
**TV** [5] - 42:1, 49:8, 62:2, 62:5, 63:11
**twice** [1] - 139:5
**Two** [2] - 141:18, 142:5
**two** [39] - 9:16, 14:10, 16:17, 17:10, 19:18, 19:23, 20:12, 20:14, 21:17, 25:10, 26:4, 27:5, 28:20, 44:24, 51:18, 54:3, 55:7, 57:20, 57:25, 62:13, 68:8, 80:24, 81:14, 82:6, 83:17, 89:12, 95:3, 107:17, 107:19, 111:10, 120:14, 125:18, 130:11, 133:2, 137:18, 137:24, 139:4, 140:1, 142:17
**TX** [1] - 2:4
**type** [1] - 42:14
**typed** [2] - 88:18, 114:4
**types** [2] - 20:2, 124:20
**typo** [2] - 77:14, 77:20

**U**

**U.S** [3] - 1:20, 31:10, 38:8
**ultimate** [3] - 51:17, 132:2, 138:1
**ultimately** [3] - 122:22, 126:20, 131:14

**unable** [4] - 35:9, 130:12, 151:3
**unblinded** [1] - 91:17
**unblinds** [1] - 91:15
**uncertain** [2] - 27:10, 132:1
**uncertainties** [2] - 21:1, 27:24
**uncertainty** [4] - 8:9, 8:14, 9:1, 27:23
**under** [11] - 21:8, 42:11, 51:21, 86:19, 87:2, 110:13, 119:7, 121:8, 121:9, 147:17, 149:12
**undergone** [1] - 72:17
**understood** [1] - 131:7
**undertaken** [4] - 74:14, 78:12, 89:14, 89:25
**underwent** [8] - 74:21, 74:23, 77:8, 77:12, 77:16, 77:18, 78:21, 78:23
**unfortunately** [6] - 18:15, 38:22, 50:15, 53:2, 55:22, 142:9
**unibomber** [1] - 38:12
**unintentionally** [2] - 94:18, 98:16
**UNITED** [3] - 1:1, 1:3, 1:12
**United** [1] - 4:8
**University** [2] - 43:15, 43:22
**unless** [2] - 24:1, 66:3
**unlikely** [1] - 90:5
**unrelated** [1] - 124:17
**unsurprisingly** [1] - 76:4
**unusual** [1] - 97:16
**unusually** [2] - 51:9, 129:6
**up** [59] - 6:11, 11:15, 12:3, 12:11, 12:22, 16:22, 17:9, 22:24, 25:7, 25:14, 42:11, 42:12, 57:4, 57:5, 64:18, 72:8, 73:21, 74:10, 78:6, 88:4, 88:7, 89:8, 89:18, 90:11, 96:13, 101:8, 103:4, 104:8, 106:21, 106:22, 106:23, 106:25, 107:7, 109:2, 116:2, 116:18, 119:4, 119:7, 119:19, 129:12, 133:13, 134:9, 135:5, 137:6, 137:9, 140:7, 141:10, 142:2, 143:14, 143:20, 144:6, 144:22, 148:6, 151:2, 151:18, 153:14, 154:11, 155:19
**uphill** [1] - 130:4
**upper** [1] - 37:25
**ups** [1] - 121:3
**urinary** [2] - 86:20, 118:17
**urological** [1] - 117:22
**urologist** [2] - 117:23, 118:20
**urosepsis** [3] - 86:13, 147:10, 147:15
**useful** [2] - 25:20, 30:23
**uses** [1] - 153:11
**UTI** [1] - 87:5

**V**

**vague** [1] - 68:7
**valid** [2] - 7:2, 128:24
**validate** [1] - 44:13
**validity** [11] - 7:13, 80:20, 81:1, 81:6, 81:22, 82:18, 138:21, 138:25, 139:12, 139:20, 153:11
**value** [1] - 98:10

**variability** [2] - 10:19, 14:10
**various** [3] - 42:9, 88:23, 131:4
**Varnado** [15] - 2:2, 23:6, 28:19, 54:22, 54:24, 57:25, 65:8, 73:12, 102:3, 105:12, 113:6, 140:11, 140:13, 143:13, 145:15
**VARNADO** [99] - 4:10, 22:7, 23:3, 28:7, 28:9, 28:16, 28:21, 28:22, 36:19, 36:21, 37:1, 37:6, 54:10, 54:17, 54:23, 54:25, 55:1, 58:9, 58:10, 61:20, 65:2, 65:4, 65:9, 65:11, 65:12, 72:10, 72:12, 72:13, 73:13, 73:14, 73:22, 74:5, 78:15, 78:19, 96:12, 96:14, 101:16, 101:17, 101:25, 102:5, 102:9, 102:25, 103:4, 103:7, 104:12, 104:23, 105:14, 105:17, 105:21, 105:23, 106:1, 107:13, 107:14, 108:5, 108:9, 109:15, 109:18, 113:8, 113:10, 113:11, 115:2, 115:3, 115:20, 126:10, 127:9, 128:13, 128:14, 132:13, 135:1, 136:10, 136:25, 137:4, 137:5, 143:15, 143:17, 143:24, 144:9, 144:20, 144:25, 145:5, 145:8, 145:16, 145:20, 146:6, 146:15, 146:19, 146:22, 146:23, 149:16, 150:2, 150:10, 150:19, 152:2, 154:23, 155:2, 155:8, 155:23, 156:7, 156:13
**vast** [1] - 18:24
**vastly** [1] - 107:20
**verbal** [1] - 55:5
**verified** [2] - 137:21, 138:6
**verify** [1] - 146:15
**versions** [1] - 57:20
**Vesey** [1] - 2:8
**victim** [2] - 61:4, 61:6
**video** [29] - 10:13, 23:23, 101:16, 102:21, 102:22, 103:9, 103:20, 104:16, 104:21, 105:14, 106:3, 107:12, 108:14, 110:2, 110:6, 111:1, 111:2, 111:13, 111:25, 112:6, 112:8, 123:9, 124:5, 124:6, 125:22, 125:24, 126:8, 127:7, 146:1
**Video** [7] - 102:23, 104:11, 105:8, 105:11, 108:1, 108:16, 126:14
**videos** [10] - 10:10, 23:12, 101:19, 105:13, 108:14, 109:21, 110:10, 111:10, 112:12, 131:17, 146:2
**videotape** [1] - 22:25
**view** [13] - 21:16, 21:17, 34:15, 45:2, 95:1, 99:15, 99:16, 112:12, 113:25, 129:24, 130:2, 132:23, 135:13
**viewed** [5] - 7:18, 101:14, 104:18, 109:24, 112:13
**violent** [1] - 39:9
**VIP** [9] - 96:19, 96:20, 97:6, 98:2, 98:25, 99:23, 100:20, 101:4
**VIPs** [4] - 100:22, 100:24, 100:25, 101:1
**Virginia** [2] - 43:16, 43:22
**virtually** [1] - 124:11
**visit** [1] - 27:7
**visiting** [1] - 135:16

**volume** [2] - 10:25, 11:7
**volunteered** [1] - 52:11
**vote** [1] - 60:14
**VS** [1] - 1:4
**vs** [1] - 60:8

# W

**wait** [1] - 146:7
**waive** [1] - 144:13
**waivers** [1] - 71:25
**walk** [1] - 72:16
**wall** [1] - 106:24
**wants** [1] - 82:3
**warrant** [1] - 141:19
**Washington** [1] - 1:22
**watch** [1] - 124:19
**watched** [4] - 10:9, 10:13, 52:2, 105:19
**watching** [5] - 102:15, 103:14, 110:5, 111:1, 111:24
**ways** [3] - 62:13, 101:12, 155:18
**webinar** [1] - 122:13
**Wednesday** [1] - 155:22
**week** [7] - 4:18, 32:9, 33:13, 44:25, 116:3, 144:2, 156:11
**weekend** [4] - 32:8, 156:4, 156:10, 156:20
**weight** [5] - 7:15, 7:16, 7:21, 8:18, 123:21
**weird** [1] - 142:14
**welcome** [8] - 102:14, 103:13, 103:25, 105:9, 106:4, 106:6, 108:2, 152:9
**Wells** [3] - 67:23, 67:25, 68:4
**whatsoever** [1] - 124:5
**whine** [1] - 44:10
**whole** [4] - 20:19, 41:2, 133:10, 149:17
**wife** [2] - 75:5, 88:25
**Williford** [1] - 63:20
**willing** [1] - 36:2
**window** [1] - 6:12
**wins** [1] - 9:12
**wire** [1] - 66:19
**wished** [1] - 44:11
**Wisniewski** [14] - 7:1, 9:18, 9:22, 11:24, 12:4, 12:5, 12:12, 14:3, 14:18, 16:19, 18:19, 19:17, 19:25, 79:17
**Wisniewski's** [1] - 14:5
**witness** [27] - 7:11, 11:17, 12:10, 12:12, 13:7, 22:14, 23:12, 44:23, 57:20, 57:23, 61:15, 61:16, 64:22, 73:7, 73:10, 119:8, 119:11, 134:18, 134:22, 143:21, 144:8, 146:11, 149:11, 149:15, 150:12, 152:2, 152:6
**WITNESS** [9] - 22:17, 150:18, 152:9, 152:15, 152:19, 154:3, 154:7, 154:14, 155:11
**witness's** [2] - 12:6, 58:2
**witnesses** [9] - 6:8, 8:20, 9:16, 24:9, 24:13, 78:20, 89:2, 120:6, 132:9
**Wolfe** [1] - 55:18

**woman** [6] - 52:17, 52:21, 55:13, 56:6, 63:14, 63:24
**word** [5] - 37:24, 61:17, 107:10, 108:25, 124:4
**words** [4] - 106:22, 106:23, 111:7, 135:21
**worker's** [1] - 46:10
**world** [2] - 112:3, 128:3
**worry** [1] - 155:21
**worse** [3] - 110:6, 125:10, 131:18
**worst** [3] - 125:3, 125:8, 132:18
**wrapped** [1] - 66:19
**write** [11] - 54:5, 54:9, 93:4, 121:3, 127:17, 133:17, 133:18, 133:21, 147:13, 150:6, 150:14
**write-ups** [1] - 121:3
**writing** [3] - 58:11, 109:11, 119:20
**writings** [10] - 41:12, 87:24, 88:3, 88:13, 112:16, 112:19, 113:13, 114:11, 114:13, 114:23, 148:22
**written** [9] - 4:22, 41:6, 95:17, 113:17, 119:6, 149:21, 149:25, 150:24
**wrote** [10] - 5:2, 22:19, 24:7, 46:11, 56:22, 109:12, 131:11, 132:25, 142:8, 149:8

# Y

**y'all** [2] - 106:12, 108:21
**Yankovich** [3] - 84:18, 85:8, 143:5
**Yates** [20] - 39:1, 39:2, 42:21, 49:3, 49:21, 50:3, 51:1, 51:14, 51:15, 52:2, 53:1, 53:10, 53:14, 57:9, 58:16, 59:2, 59:18, 60:20, 64:3, 70:5
**Yates'** [3] - 60:21, 61:11, 62:20
**year** [15] - 11:8, 26:4, 27:23, 43:11, 85:19, 86:21, 89:13, 89:20, 90:1, 104:2, 104:4, 107:6, 108:11, 142:10, 147:15
**years** [16] - 40:20, 43:9, 48:12, 48:21, 83:17, 102:20, 103:19, 104:4, 106:15, 108:22, 110:7, 129:25, 140:19, 142:22, 142:25
**yesterday** [3] - 9:16, 64:21, 141:24
**York** [4] - 2:8, 84:17, 85:11, 98:1
**yourself** [3] - 43:4, 75:12, 120:14
**yu** [1] - 84:17
**Yu** [1] - 85:14
**Yudnofsky** [5] - 84:18, 84:23, 117:1, 117:4, 117:5