**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | NO. 4:21-CR-09 |
| | ) | |
| | ) | |
| VS. | ) | Houston, Texas |
| | ) | 1:41 p.m. to 7:24 p.m. |
| | ) | |
| ROBERT T. BROCKMAN | ) | NOVEMBER 23, 2021 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**COMPETENCY HEARING**

**AFTERNOON SESSION**

**BEFORE THE HONORABLE GEORGE C. HANKS, JR.**

**UNITED STATES DISTRICT JUDGE**

**DAY 7**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEARANCES:

FOR THE GOVERNMENT:

     Mr. Corey J. Smith
     Mr. Lee F. Langston
     Mr. Boris Bourget
     Mr. Christopher Magnani
     U.S. Department of Justice
     Tax Division
     150 M Street NE
     Room 2208
     Washington, DC 20002
     Tel:  202-514-9623
     Email: Corey.smith@usdoj.gov
          Lee.f.langston@usdoj.gov
          Boris.bourget@usdoj.gov
          Christopher.magnani@usdoj.gov

```
 1  FOR THE DEFENDANT:

 2        Mr. Jason Scott Varnado
          Jones Day
 3        717 Texas
          Suite 3300
 4        Houston, TX 77002
          Tel:  832-239-3694
 5        Email:  Jvarnado@jonesday.com

 6        Mr. James P. Loonam
          Ms. Kathryn Keneally
 7        Ms. Sarah Efronson
          Jones Day
 8        250 Vesey Street
          New York, NY 10281
 9        Tel:  212-326-3939
          Email: Jloonam@jonesday.com
10              Kkeneally@jonesday.com

11
    COURT REPORTER:
12
          Ms. Kathleen K. Miller, CSR, RMR, CRR
13        515 Rusk, Room 8004
          Houston, Texas  77002
14        Tel:  713-250-5087

15
    Proceedings recorded by mechanical stenography.
16
    Transcript produced by computer-assisted transcription.
17

18

19

20

21

22

23

24

25
```

INDEX

**CHRISTOPHER T. WHITLOW, M.D.**

    Continued Cross by Mr. Magnani          7

**MARC E. AGRONIN, M.D.**

    Direct by Mr. Varnado            37
    Cross by Mr. Magnani            132
    ReDirect by Mr. Varnado         199
    ReCross by Mr. Magnani        208

**PETER JOHN ROMATOWSKI**

    Direct by Mr. Loonam           211
    Cross by Mr. Magnani           245

01:58:03

**P R O C E E D I N G S**

NOVEMBER 23, 2021

(1:41 p.m. to 7:24 p.m.)

****************************************************************

01:41:23   5          THE CASE MANAGER:  All rise.

6          THE COURT:  Please be seated, everyone.

7 Counsel, give me just one second.  Let me get set up.

8          MR. BOURGET:  Your Honor, before we continue,

9 we just had a couple real quick things with the exhibits.

01:41:54  10 We wanted to clarify a couple things for the record.

11          THE COURT:  Okay.

12          MR. BOURGET:  So, from the government's side,

13 we just wanted to move to admit what has been marked as

14 Exhibit 116.  This is the December 2018 Reynolds video.

01:42:07  15          THE COURT:  Okay.

16          MR. BOURGET:  Move that into evidence.

17          THE COURT:  Any objection?

18          MR. LOONAM:  No objection, Your Honor.

19          THE COURT:  Without objection, it is admitted.

01:42:15  20          MR. BOURGET:  And then the second thing is, you

21 know, throughout the hearing we have used clips of these

22 videos, and, as far as I can tell, all the whole videos

23 have been admitted.  We just want to clarify, from the

24 government's side, all of the clips that we have played and

01:42:25  25 what they were marked and make sure those are all admitted

1  as well.

2          THE COURT:  Okay.

3          MR. BOURGET:  So, the first is 40-A.  That is a

4  clip from Dr. Darby's May examination.  The second group is

01:42:40  5  58-A through D.  These are clips from the first day of

6  Mr. Brockman's Kellogg Hansen deposition.

7              The second two are 59-A through B.  These

8  are clips from the second day of that deposition.  77 --

9  77-A, which is the clip of the video of Mr. Brockman's 2019

01:43:04  10  Reynolds and Reynolds speech.  91-A, which is an excerpt

11  from the Agronin July exam video.

12              And then 3-A and 116-A, which is a clip

13  from that, 116, December 2018 video I just mentioned.

14  So --

01:43:21  15          THE COURT:  Any objections?

16          MS. BLEUSTEIN:  No objection.

17          THE COURT:  Without objections, they are

18  admitted.

19          MR. BOURGET:  That is it from the government.

01:43:27  20          MS. BLEUSTEIN:  And from the defense side one

21  clarification as well about a specific video clip.  We had

22  previously identified and moved into evidence a video clip

23  from the October examination of Mr. Brockman by Dr. Dietz

24  and Dr. Denney that we had labeled as GX-93-A.

01:43:44  25              And to avoid confusion and overlap with

1  the government's list, we would just like to clarify for

2  the record that we will refer to this video clip as DX-75-C

3  on our updated exhibit list.

4                THE COURT:  Okay.

01:43:55    5                MS. BLEUSTEIN:  This video clip shows the

6  portion of the examination that appears on Page 28, Line

7  18, through Page 31, Line 9, of the transcript from this

8  examination.

9                THE COURT:  Okay.

01:44:06   10                MS. BLEUSTEIN:  Go ahead.

11                THE COURT:  Any objections?

12                MR. BOURGET:  No, Your Honor.

13                THE COURT:  Then, it is admitted just the way

14  you said.

01:44:12   15                MS. BLEUSTEIN:  Okay.  Thank you, Your Honor.

16                And then to -- in line with what the

17  government had said about the full videos and the video

18  clips that were played, we would also like that any clips

19  played that come from full videos that are in evidence

01:44:29   20  should also be admitted into evidence.

21                And from the defense side that includes

22  2-A, 3-A, 74-A, 75-A through C, and GX-4-A.

23                THE COURT:  Okay.

24                MS. BLEUSTEIN:  And there will also be some

01:44:49   25  additional clips played later today that we would also like

*CHRISTOPHER T. WHITLOW, M.D. - CROSS BY MR. MAGNANI*

1  admitted in the same way, please.

2              THE COURT:  Okay.  They're admitted.

3              MS. BLEUSTEIN:  Thank you, Your Honor.

4              THE COURT:  Thank you.  You may continue.

01:45:02  5              **CROSS-EXAMINATION (Continued)**

6  BY MR. MAGNANI:

7  **Q.**   Okay.  Good afternoon, Dr. Whitlow.

8  **A.**   Good afternoon.

9  **Q.**   All right.  So, I think the only thing left to talk

01:45:08  10  about, I think, is amyloid.

11  **A.**   Okay.

12  **Q.**   So, we're getting there.

13  **A.**   Okay.

14  **Q.**   So, what I would like to do is just pull up your

01:45:18  15  second report.  So, if it's easier for you --

16  **A.**   Sure.

17  **Q.**   -- you can look at the hard copy, but I am going to

18  put it on the screen.

19  **A.**   Okay.

01:45:24  20  **Q.**   And I have some highlighted portions.  I don't know

21  if you are able to see them on your screen.

22  **A.**   I can.  They're cut off a little bit, but that's okay

23  because I have got my report.

24  **Q.**   Well, can you please just read the highlighted

01:45:35  25  portion starting from "The patho" -- well, why don't you

1  read from --

2  **A.**   Yeah, I can.  I can see where you want me to begin.

3              "The pathophysiology of Alzheimer's

4  disease results in abnormal accumulation of proteins in

01:45:48   5  the brain, such as beta-amyloid, or Abeta, which cannot be

6  characterized by FDG PET.

7              The use of beta-amyloid PET imaging -- for

8  example, amyloid PET -- therefore, is used clinically to

9  look for this more specific evidence of abnormal

01:46:05   10  beta-amyloid accumulation that is one of hallmarks of

11  Alzheimer's disease."

12  **Q.**   And that's true, right?

13  **A.**   Yes.

14  **Q.**   Okay.  You go to the next page.  Now I am starting

01:46:18   15  from the top.  And, again, if you could please just read

16  the highlighted section starting from "Beta-amyloid..."

17  **A.**   Sure.  "Beta-amyloid PET scans serve as an adjunct to

18  other diagnostic valuations that together are used in the

19  assessment of Alzheimer's disease.

01:46:33   20              Specifically, beta-amyloid PET data are

21  combined with converging evidence from other brain imaging

22  -- for example, MRI assessment of volume and FDG PET

23  assessment of metabolism -- as well as performance on

24  assessments of cognitive function to better resolve, from

01:46:49   25  a clinical standpoint, the possible diagnosis of

*CHRISTOPHER T. WHITLOW, M.D. - CROSS BY MR. MAGNANI*

1   Alzheimer's disease."

2   **Q.**   Okay.   Then -- well, you don't have to keep reading.

3   But in this section here, I mean, is it -- is it fair to

4   say that you are saying the amyloid and FDG findings

01:47:01   5   support the conclusion that the defendant has Alzheimer's

6   disease?

7   **A.**   In this paragraph that you have up here now?

8   **Q.**   Yeah.   Is that -- I mean --

9   **A.**   Yeah.   Let's see.   I'll just read it really quickly.

01:47:22   10                Yes.

11   **Q.**   Okay.   And that's true also?   Actually, you know

12   what?   We've got to make this clear.

13                So, is it the case that what you're saying

14   here is that the amyloid PET and FDG PET findings combined

01:47:36   15   support the conclusion that he likely has Alzheimer's

16   disease in addition to Parkinson's disease?

17   **A.**   Yes.

18   **Q.**   Okay.

19   **A.**   Yes.

01:47:47   20   **Q.**   Okay.   And that's true also?

21   **A.**   That's true, that the combined imaging supports the

22   diagnosis of Alzheimer's disease.

23   **Q.**   And, so, is there something, though, that's -- you

24   know, we talked about before sometimes you will agree with

01:48:01   25   a radiologist's report, but sometimes you will add

CHRISTOPHER T. WHITLOW, M.D. - CROSS BY MR. MAGNANI

1   something extra?

2   **A.**   Sure.

3   **Q.**   Okay.  So, in here, all that stuff that we just went

4   over is true, right?

01:48:08   5   **A.**   Yes.

6   **Q.**   Okay.  But is there something that you think might be

7   missing that might be helpful in terms of diagnosing

8   Alzheimer's disease?

9   **A.**   I don't -- I don't think so.  Nothing that's within

01:48:19   10   the scope of the standard of care.

11   **Q.**   Well, putting aside the standard of care --

12   **A.**   Okay.

13   **Q.**   -- is there something else that might be important

14   for diagnosing Alzheimer's disease?

01:48:30   15   **A.**   I am not aware of any other -- like, for example, Tau

16   imaging, for example, is not routinely used to diagnose

17   Alzheimer's disease.

18               So, I would say that, no, there's really

19   nothing beyond the amyloid, the MRI and the FDG PET that

01:48:50   20   would be used to diagnose Alzheimer's disease.

21   **Q.**   So -- and this is just -- it's important to follow my

22   question because I am not asking what's normally done or

23   in the standard of care.  You did start talking about Tau.

24   **A.**   Yeah.

01:49:03   25   **Q.**   And that's because I suspect that you would agree

1  with me that a Tau PET would also -- would help solidify

2  an Alzheimer's disease diagnosis?

3  **A.**   I don't think so.  Because I think there's enough --

4  I think the amyloid positivity and the MRI findings and

01:49:22  5  the FDG have been shown repeatedly to be sufficient and --

6  you know, and very sensitive and specific for the

7  diagnosis.  So, I don't know that Tau would really add any

8  value in this diagnosis.

9  **Q.**   So, your testimony is that a Tau PET would not add

01:49:39  10  any value in diagnosing Alzheimer's disease?

11  **A.**   I don't think -- I don't think a Tau in this case

12  would -- would add any value; that the conclusions that we

13  have drawn, based upon the imaging that we have had --

14  that we have, is sufficient, and that the Tau would not

01:49:55  15  necessarily add any value.

16  **Q.**   Okay.  And just -- Doctor, I have to do this.  I know

17  it's annoying, but because you said "we" a lot in that

18  answer --

19  **A.**   Oh.  Sorry.

01:50:04  20  **Q.**   -- my question is going to be:  Can you answer that

21  question again but just give your opinion?

22  **A.**   Yes.  And -- sorry.  When I was saying "we" I meant

23  neuroradiologists in general, but me.  Me.  I -- I would

24  not -- I would not have to rely on Tau imaging to come to

01:50:21  25  this diagnosis.

1    Q.    And, so, a Tau PET would not give you anymore

2    certainty one way or another with respect to Alzheimer's?

3    A.    I don't think it -- I don't think it would.

4    Q.    Okay.  So, we talked about before -- and I just want

01:50:34    5    to go back to it -- about how amyloid can be pretty common

6    in older adults; is that right?

7    A.    It can be common in older adults -- in a disease

8    population it can be common.

9    Q.    Well, let's just talk about cognitively normal

01:50:51    10    adults.  Would you agree that about a third of people over

11    50 have amyloid positivity in their brain?

12    A.    I don't know that I can agree to that.  I would have

13    to, I guess, see what -- where that -- where that's coming

14    from, I guess.

01:51:08    15    Q.    Well, I mean, you're an expert.  So, I'm just asking

16    you:  Like population over 50, what's your ballpark for

17    what percentage of cognitively normal people would have

18    positive amyloid?

19    A.    As a scientist, as a neuroradiologist, as a

01:51:23    20    neuroscientist with training in population epidemiology, I

21    don't think we have a good basis for answering that

22    question, only because we have only looked at subsamples

23    of the population.  And I would say that, unfortunately,

24    some of our large trials, such as the Alzheimer's Disease

01:51:39    25    Research Initiative, ADRI, has data that is skewed for

1  white males and that we really haven't answered that

2  question in the breadth of humanity.

3              So, I don't think that we can accurately

4  answer the question that you are asking.

01:51:55  5  **Q.**   Are you concerned about the overrepresentation of

6  white males in the data having an impact on this case?

7  **A.**   Yes, I am.  In that Neuroreader report I don't really

8  know the distribution of race.

9  **Q.**   And, so, remember, we're talking about the Tau PET

01:52:11  10  now.  We're not talking about the Neuroreader, right?

11  **A.**   I know.  You said case, but yes.

12  **Q.**   So, are you familiar with the *Lancet Neurol* article

13  "Age-specific and Sex-specific Prevalence of Cerebral Beta

14  Amyloidosis"?

01:52:27  15  **A.**   It's possible that I have seen that, but it doesn't

16  specifically ring a bell.

17  **Q.**   Okay.  So, I am just going to hand you a copy so you

18  have time to familiarize yourself with it.

19  **A.**   Okay.

01:52:38  20  **Q.**   And I have my highlights on this, but it will help

21  you.

22              MR. MAGNANI:  Can I approach the witness, Your

23 Honor?

24              THE COURT:  You may approach.

01:52:45  25              THE WITNESS:  Thank you.

1          MR. MAGNANI:  And does Your Honor want a copy?

2          THE COURT:  Yes, I would.

3  BY MR. MAGNANI:

4  **Q.**    Doctor, just before I ask you a specific question:

01:52:57  5  Are you familiar with this study?

6  **A.**    Not this specific study.

7  **Q.**    Okay.  Well, so, you're not -- you're not familiar

8  with this specific study?

9  **A.**    I may have seen it, but it's -- this is from 2017.

01:53:13  10  So, I read hundreds of papers --

11  **Q.**    Okay.

12  **A.**    -- a year.  And so I don't recall specifically

13  reading this paper.

14  **Q.**    Okay.

01:53:22  15  **A.**    But -- so I don't know all of the -- I am not

16  familiar with all of the details that are included.

17  **Q.**    Sure.  So, but -- I mean, did you -- does this paper

18  help inform your opinion about this case?

19  **A.**    Well, I would have to read the paper and look at the

01:53:37  20  methods carefully and see how they came to the conclusions

21  that they drew based upon the paper.  So, as of right now,

22  I can't say that it necessarily informs me.  I would have

23  to have time to really dig into how they came to their

24  conclusions.

01:53:48  25  **Q.**    Okay.  Doctor, I am showing you the fifth page of

CHRISTOPHER T. WHITLOW, M.D. - CROSS BY MR. MAGNANI

1   your expert report, your first expert report.  You cite

2   three papers, and this is one of the three.  Is that

3   right?

4   **A.**   That's correct.

01:53:57   5   **Q.**   Okay.  But, so, now you're saying you can't talk

6   about this paper without review -- without reading again?

7   **A.**   Well, I just didn't recall that -- again, I read

8   hundreds of papers a month, and so -- so, yeah, I can -- I

9   can quickly review and -- and refresh my memory on the

01:54:15   10   details of the paper, but, again, you know, I don't -- I

11   don't keep every single detail of every paper in my mind.

12   And, so, I appreciate having this so that I can refresh.

13   **Q.**   And, yes, so, take your time.  I just -- I understand

14   you read a lot of papers in your job, but you only cited

01:54:30   15   three in both of your expert reports in this case.  So, I

16   mean, you'll forgive me if I -- I would like to talk to

17   you about this paper.

18   **A.**   Okay.

19   **Q.**   So, if you need a minute please take it.

01:54:38   20   **A.**   Sure.  Let me refresh myself on it.

21   **Q.**   Maybe what I will do, Doctor, is just in case it's an

22   easy question --

23   **A.**   Okay.

24   **Q.**   -- I will just ask my question first and then --

01:54:47   25   **A.**   Oh, yeah.  Yeah.  Please.

*CHRISTOPHER T. WHITLOW, M.D. - CROSS BY MR. MAGNANI*

1   **Q.**   So, my first question was about -- you know, whether

2   it's about a third of cognitively normal people have

3   positive amyloid.

4   **A.**   Uh-huh.

01:55:00   5   **Q.**   So -- and, by the way, just so it helps everybody

6   else, there is a table in this paper that shows the sample

7   population, and that's where we will mostly be working.

8            So, I am showing what's listed as Table 1.

9   I don't know if that helps you, Doctor.

01:55:29   10           And, actually, Doctor, I'll ask a

11   different question --

12   **A.**   Okay.

13   **Q.**   -- because I think it might just help to orient

14   everyone to this.

01:55:35   15           So, in this paper they are talking about a

16   new way to describe people with different biomarkers that

17   relate to Alzheimer's disease, right?

18   **A.**   Correct.

19   **Q.**   Okay.  And so it's been talked about different ways

01:55:48   20   in the past, but the way that this does it is it breaks

21   the population into eight categories, right?

22   **A.**   Correct.

23   **Q.**   And those eight categories represent the eight

24   possible combinations of presence of amyloid, presence of

01:56:03   25   Tau, and findings of neurodegeneration, right?

1    **A.**    Okay.

2    **Q.**    So, that's what we're looking at here, right, the

3    eight categories?

4    **A.**    That's correct.

01:56:12   5    **Q.**    And this study had about 500 people in it; is that

6    fair?

7    **A.**    It did.

8    **Q.**    And so at the top here I have highlighted the people

9    who have positive amyloid, and -- and I wonder, if looking

01:56:27   10   at those -- you know, the group of people that have

11   positive amyloid, can you -- is it --

12                    Am I making a mistake by adding up the

13   percentages to assume that the sum total of those four,

14   which is about 35 percent, is a rough estimate of the

01:56:44   15   population of over 50-year-olds with beta-amyloid in their

16   brain?

17   **A.**    Correct.  But the -- the flaw is that -- again, this

18   is from the MCSA study.  So, it's a population-based study

19   of cognitive aging for residents of Ulhmstead County

01:57:01   20   Minnesota.  So, it really doesn't reflect the diversity

21   issue I was talking about.

22                    And the reference to this paper was about

23   the temporoparietal meta-ROI.  So, that is why I

24   referenced this paper, not because of its content about

01:57:15   25   distribution of amyloid in the population, but, rather, to

CHRISTOPHER T. WHITLOW, M.D. - CROSS BY MR. MAGNANI

1   show that the temporoparietal meta-ROI is something that

2   is used now instead of hippocampus.

3   Q.   So, I understand why you referenced the paper --

4   A.   Uh-huh.

01:57:26   5   Q.   -- but can I assume that this paper is a reliable

6   paper?

7   A.   Oh, yeah.  I would say it's a reliable paper but not

8   without limitations.

9   Q.   Sure.  And I know that you referenced it for certain

01:57:37   10   things that you want to show --

11   A.   Uh-huh.

12   Q.   -- but, right now, I would like to talk about some

13   other things that the paper stands for.  Is that fair?

14   A.   Certainly.  Fair enough.

01:57:44   15   Q.   And so according to this study, which had about 500

16   participants -- and we have talked enough about how the

17   sample matters?

18   A.   Yes.

19   Q.   And you mentioned that this is, you know, perhaps not

01:57:53   20   broadly reflective of the United States, right?

21   A.   Right.  That's true.  That's true.

22   Q.   And this particular sample skews heavily towards

23   white men, right?

24   A.   Well, let me -- let me refresh myself to see if it's

01:58:06   25   skewed towards men, because I think they -- my

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*CHRISTOPHER T. WHITLOW, M.D. - CROSS BY MR. MAGNANI*

1    recollection is that they did include women, but I can't

2    remember the exact proportion.

3    **Q.**   Well, we can -- you made a comment about the

4    counties.

01:58:16   5    **A.**   Oh.

6    **Q.**   So, why don't you just describe what you meant by

7    that.

8    **A.**   Yeah.  Yeah.  Well, in that region of the world,

9    like, for example, in this part of Minnesota compared to,

01:58:24   10   for example, my area of the country and the southeast,

11   we -- there is not as much racial diversity and, also,

12   there's less socioeconomic diversity in addition to, you

13   know, many other kinds of, I guess, patient

14   characteristics that could affect things like brain volume

01:58:44   15   and things like amyloid deposition.

16   **Q.**   But you know Mr. Brockman's white, right?

17   **A.**   I do.

18   **Q.**   Do you have any big concerns about this study's lack

19   of non-white people?

01:58:53   20   **A.**   Well, you know, I don't -- I would have to go and,

21   again, look at all the characteristics of -- and which

22   they have -- which they have a lot of them -- and would --

23   would want to kind of review that and then -- and then

24   think about how this -- so, you know, in medicine, what we

01:59:08   25   do is we take literature and we try to see if our patient

*CHRISTOPHER T. WHITLOW, M.D. - CROSS BY MR. MAGNANI*

1    generalizes to what's in the paper.

2                        So, the exercise would be to see if

3    Mr. Brockman, you know, sufficiently generalized to the

4    population that's in the paper in order to make that

01:59:19    5    assessment.

6    **Q.**   So I started by asking you if it sounded right to

7    you, as an expert in the field, if about a third of the

8    population over 50 has amyloid.

9    **A.**   Yeah.

01:59:29   10    **Q.**   What is your best answer to that question?

11    **A.**   I would say that since 2017, there has been a big

12    emphasis on diversity, and understanding, you know, how

13    race in particular is represented within Alzheimer's

14    disease.

01:59:47   15                        And so, you know, again, most of what we

16    know is from the white male population, and so, you know,

17    I can't really necessarily answer a question about the

18    whole entire population.

19    **Q.**   Okay.  So -- and, again, I don't -- so is it your

02:00:01   20    testimony that you're just not comfortable ballparking

21    what percentage of over 50-year-olds have amyloid in their

22    brain?

23    **A.**   In the population, I would say, if you -- yeah.

24    Right.  In the general population that is made of

02:00:14   25    multi-ethnic diversity.

1    **Q.**    So, according to this sample, it was about 35

2    percent, right?

3    **A.**    That's correct.

4    **Q.**    What percentage would you ballpark of 80-year-olds

02:00:22   5    have amyloid in their brain, cognitively normal

6    80-year-olds?

7    **A.**    Yeah.  Again, you know, we're limited to what's been

8    established in the literature, and, again, I wouldn't,

9    based upon the direction of the field now, the emphasis on

02:00:36   10    collecting more data that includes diverse populations,

11    and I --

12    **Q.**    I'm sorry to cut you off, but if the answer is you

13    don't know or you're not comfortable estimating, you can

14    just say it.

02:00:46   15    **A.**    Yeah.  I don't feel comfortable estimating that.

16    **Q.**    So, this was a longitudinal study, right?

17    **A.**    Yes.

18    **Q.**    Okay.  And so it's measuring the same people at two

19    different points in time, right?

02:00:57   20    **A.**    Correct.

21    **Q.**    And you know that in this study --

22    **A.**    Well -- go ahead.  Sorry.  Go ahead.

23    **Q.**    So -- and in this study, they broke out the people --

24    remember, we talked about those eight categories of

02:01:12   25    biomarker combination?

1    **A.**    Yes.

2    **Q.**    So here they broke it out by 65-year-olds and

3    80-year-olds.  Do you see that?

4    **A.**    Let's see.  Yes.  Yes.  I see -- I see age 65, 68,

02:01:30    5    75, 79.  Yes, I see that.

6    **Q.**    So -- and this is Figure 3, for the record.

7    **A.**    I'm sorry.  I was on Table 1, Figure 3.

8    **Q.**    Oh, yeah.  Sorry.  If it is confusing, you can look

9    at the screen.

02:01:41    10    **A.**    Oh, yeah.  Yeah.  Here we go.  Figure 3.

11    **Q.**    So Figure 3 breaks out that same group of

12    participants in the study and now it is showing the

13    65-year-old versus the 80-year-olds, right?

14    **A.**    Yes.

02:01:53    15    **Q.**    And fair to say that between 65 and 80, the chance of

16    having amyloid in your brain goes way up?

17    **A.**    Correct.

18    **Q.**    And so the -- you know, the 65-year-olds, it is

19    roughly 17 percent of them have amyloid in their brain?

02:02:08    20    **A.**    In this population, correct.

21    **Q.**    And for 80-year-olds, it's about 53 percent that have

22    amyloid in their brain?

23    **A.**    Yes.  In the population they studied, that's correct.

24    **Q.**    And to be clear, this group that they studied is all

02:02:19    25    people who were cognitively normal, correct?

*CHRISTOPHER T. WHITLOW, M.D. - CROSS BY MR. MAGNANI*

1    **A.**    Yes.

2    **Q.**    Okay.  So, I would like to ask you another question,

3    and, again, if you are not comfortable, just say it.

4    **A.**    Okay.

02:02:32   5    **Q.**    That's it.  But of people -- we got over that amyloid

6    is pretty common even amongst cognitively normal

7    80-year-olds, would you agree?

8    **A.**    Repeat the question.

9    **Q.**    Sure.  Would you agree that the presence of amyloid

02:02:43   10   is fairly common even within cognitively normal

11   80-year-olds?

12   **A.**    I don't feel -- I don't feel comfortable saying that

13   that's true.

14   **Q.**    So you testified before that it is an abnormal

02:02:56   15   protein, correct?

16   **A.**    Correct.

17   **Q.**    And in medicine the term "abnormal" means something

18   different than it does in the real world, right?

19   **A.**    I am not aware that it does.

02:03:06   20   **Q.**    Well, let me ask you this question.  Obesity is

21   pretty common in America, right?

22   **A.**    Yes.

23   **Q.**    But it's an abnormal condition from a medical

24   standpoint, correct?

02:03:16   25   **A.**    It's an abnormal condition?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*CHRISTOPHER T. WHITLOW, M.D. - CROSS BY MR. MAGNANI*

1   **Q.**   You know what, let's just switch gears.

2   **A.**   Okay.

3   **Q.**   I have a different question for you.

4   **A.**   Sure.

02:03:23   5   **Q.**   Of people with amyloid in their brain, what

6   percentage of them do you think have dementia?

7   **A.**   With people with amyloid in their brain, what portion

8   have dementia?  Again, I -- I would feel a little

9   uncomfortable answering that, you know, without more data.

02:03:41   10   **Q.**   Can you ballpark?

11   **A.**   I wouldn't feel comfortable ballparking it.

12   **Q.**   Can you -- I mean, your opinion is better than some

13   guy on the street, so can you try?

14   **A.**   I would say that -- I would say that people who

02:03:56   15   have -- well, again, you know, are you talking about

16   amyloid alone?  Just amyloid with no other finding at all?

17   **Q.**   Okay.  I am going to ask you a different question.

18   **A.**   Okay.

19   **Q.**   Did you write a paper this year that was looking at

02:04:10   20   across a racial group of people having to do with -- I

21   mean, it was mostly about vascular issues, but where you

22   had a population of 159 people across races.  Does this

23   ring any bells?

24   **A.**   That sounds familiar.

02:04:21   25   **Q.**   Okay.  And in that paper, did you test whether people

25

1  had amyloid or not?

2  **A.**   I think we did.  I think we did.  If it's the one I

3  am thinking about, and we looked at CSF markers, and I

4  think we also looked at amyloid PET.

02:04:35  5  **Q.**   So when you looked at the amyloid in this sample of

6  about 150 people, did about a third of the people in your

7  sample have amyloid?

8  **A.**   I can't recall.  If you have the paper --

9  **Q.**   Yeah, yeah.

02:04:47  10  **A.**   Okay.  I mean, I would say that whatever the paper

11  says is correct.

12  **Q.**   No need to struggle on this one.  I have the paper --

13  **A.**   Okay.  Great.

14  **Q.**   -- and I can pass it around.

02:04:54  15  **A.**   Sure.

16          MR. MAGNANI:  You get a highlighted copy, clean

17  copies for you, Dr. Whitlow.

18          THE WITNESS:  Thank you.  Thank you very much.

19  BY MR. MAGNANI:

02:05:10  20  **Q.**   And so, again, kind of like that last paper, like

21  when we're talking about samples, there's usually a

22  handy-dandy table that shows the sample group.

23  **A.**   Yes.

24  **Q.**   And so this one, I am looking at page 5, and I will

02:05:22  25  put it up on the screen.

1          So the top where it says, "N equals," that

2    is your sample size, right?

3    **A.**   Yes.

4    **Q.**   And so of your sample -- well, I guess it's 159

02:05:33  5    people, 57 had amyloid, right?

6    **A.**   Yes.

7    **Q.**   Now, of this sample of people with amyloid, do you

8    see where it says their cognitive status below?

9    **A.**   Yes.

02:05:43  10   **Q.**   Okay.  So -- and according to your paper, 48 percent

11   of your amyloid population, they were cognitively normal,

12   right?

13   **A.**   Correct.

14   **Q.**   And according to your paper, 41 percent of your

02:05:59  15   amyloid positive sample had MCI, right?

16   **A.**   Correct.

17   **Q.**   And about 9 percent of your sample had dementia,

18   right?

19   **A.**   Yes.

02:06:07  20   **Q.**   Okay.  So, I think -- and I know this came up before,

21   I want to do it really briefly...

22          MR. MAGNANI:  Oh, and by the way, I am going to

23   mark these papers, and just make sure they're part of the

24   record.

02:06:18  25          So the first paper is going to be 172.

*CHRISTOPHER T. WHITLOW, M.D. - CROSS BY MR. MAGNANI*

1  And the second paper is going to be 173.  And I'll put the

2  stickers on the first pages.

3  BY MR. MAGNANI:

4  **Q.**   Okay.  So before, do you remember we were talking

02:06:35  5  about the timeline of when you decided to order this

6  amyloid PET?

7  **A.**   Yes.

8  **Q.**   And I think -- I think it was made clear that you --

9  the PET was ordered before that peer review call, correct?

02:06:51  10  **A.**   Correct.

11  **Q.**   So I just want to know, were you a part of the

12  decisionmaking process in deciding to order the amyloid

13  PET --

14  **A.**   Yes.

02:06:57  15  **Q.**   -- or not?

16             Okay.  And so that -- your contribution to

17  that decision was made in a call that is not listed in

18  your report?

19  **A.**   I believe that's correct.

02:07:09  20  **Q.**   Okay.  And, I mean, did you ever consider ordering a

21  Tau?

22  **A.**   No.  I never even considered it.

23  **Q.**   Right.  We're almost there, Dr. Whitlow.

24  **A.**   Yes.

02:07:20  25  **Q.**   I just want to sort of get back to the -- your top

CHRISTOPHER T. WHITLOW, M.D. - CROSS BY MR. MAGNANI

 1   line conclusions here.  So in your first report, and I am

 2   looking at page 4.  It's in the first full paragraph.

 3   **A.**   Yes.

 4   **Q.**   And -- well, and you write, "The confluence of the

02:07:47   5   multiple complimentary imaging findings across multiple

 6   imaging domains taken together represent objective data

 7   supportive of a diagnosis of dementia?"

 8   **A.**   Yes.

 9   **Q.**   Okay.  And that is your opinion?

02:08:00  10   **A.**   Yes.

11   **Q.**   So does that mean that if you looked at only the

12   imaging, you think the imaging would be most likely to be

13   of a dementia patient?

14   **A.**   Yeah.  So -- yes.  So if I -- if I looked -- if I

02:08:12  15   just looked at the data and I didn't know anything about

16   the patient, and I asked myself, you know, what category

17   would this person go in; would they go in a category of

18   dementia, would they go in a category of mild cognitive

19   impairment, or would they go into a category of

02:08:26  20   cognitively normal?  I would say this looks like a patient

21   with dementia.

22   **Q.**   Okay.  And then in your second report, I mean, I

23   don't -- I don't know how much your views change, but I am

24   looking at this -- I guess it's the second full

02:08:38  25   paragraph --

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*CHRISTOPHER T. WHITLOW, M.D. - CROSS BY MR. MAGNANI*

1    **A.**    Uh-huh.

2    **Q.**    -- which starts here.  And here you say, the -- you

3    know, basically the imaging findings are, "consistent with

4    demonstrated dementia on neuropsychological testing and

02:08:51    5    functional decline observed by those who interact with him

6    daily."

7    **A.**    Yes.

8    **Q.**    And is that -- that's your opinion?

9    **A.**    Yes.

02:09:00    10    **Q.**    Okay.  So, in other words, and I think you said it

11    this way in your other report, that, basically, the

12    imaging that you're looking at is what you would expect

13    based on the testing and based on people who observed the

14    defendant?

02:09:11    15    **A.**    Well, it's not just that.  It is also, independent of

16    the testing, if I have this imaging data set, I would be

17    thinking to myself, I would be highly concerned that this

18    patient, you know, that I am looking at, has dementia.

19    Even if I didn't know their cognitive status, but

02:09:26    20    certainly, it is also consistent with, you know, the

21    results that we had, yes.

22    **Q.**    I was trying to do it in pieces but, yes, we got it.

23    Okay.

24                So I know you reviewed in your first

02:09:37    25    report, you reviewed all those Baylor records that we

*CHRISTOPHER T. WHITLOW, M.D. - CROSS BY MR. MAGNANI*

1  talked about.

2  **A.**   Yes, correct.

3  **Q.**   By the way, was this like thousands of pages of

4  Baylor records or just some that that person at The

5  Forensic Panel sent you?

6  **A.**   I can't remember how many pages.  I just can't

7  remember how many pages it was.

8  **Q.**   And it all said you reviewed Dr. Denney's test data;

9  is that right?

10  **A.**   Say that again?

11  **Q.**   Dr. Denney's test data.

12  **A.**   Dr. Denney's test data.  Okay.  You know, if --

13  that -- if that was included in the material I was sent,

14  then I reviewed it.

15  **Q.**   Well, it says on your first report, this is Item 15

16  of the things --

17  **A.**   Uh-huh.

18  **Q.**   -- that you reviewed.  "Dr. Denney's test data, May

19  19th, 2021."

20  **A.**   Yes.

21  **Q.**   So did you review that?

22  **A.**   Yeah.  I think I -- I think I do -- if there was -- I

23  believe that was kind of a hand -- handwritten, like, a

24  test data from the defendant.

25  **Q.**   And so, I mean, do you understand that stuff?

*CHRISTOPHER T. WHITLOW, M.D. - CROSS BY MR. MAGNANI*

1    **A.**   I am not an expert in it, but -- but, you know, I

2    reviewed it, and -- in principle I understand.

3    **Q.**   So you know that the defendant -- and you have

4    reviewed these materials -- has been cognitively tested

02:10:45  5    from March 2019 all the way into the present, right?

6    **A.**   Yes.

7    **Q.**   Do you know what percentile he is in when it comes to

8    memory?

9    **A.**   No.

02:10:54  10   **Q.**   Do you know if his memory percentile has changed from

11   March 2019 and the present?

12   **A.**   I want -- my recollection is that it has.

13   **Q.**   Would it surprise you if it's remained under the

14   first percentile for that entire time?

02:11:09  15   **A.**   I -- that would be surprising.

16   **Q.**   So you also talk about, you know, we talked about

17   independently you think this looks like dementia, right?

18   **A.**   Uh-huh.  Uh-huh.  Yes.

19   **Q.**   And then you said, plus, you think it makes sense in

02:11:22  20   light of the test data and something else?

21   **A.**   Correct.

22   **Q.**   But I just want to understand, per the test data, are

23   you saying that when you look at the imaging it looks like

24   someone who has been scoring in the less than one

02:11:32  25   percentile for over two years?

CHRISTOPHER T. WHITLOW, M.D. - CROSS BY MR. MAGNANI

1    A.    Yeah.  It looks -- it looks like test data of someone

2    with dementia.

3    Q.    But people can have dementia and not be under the

4    first percentile?

02:11:43   5    A.    Right.  I would say it looks like someone that's more

6    than just early dementia.  Beyond that, it is really hard

7    to make that very kind of nuanced determination about

8    severity.

9    Q.    And when you talk about -- so the second thing that

02:11:57   10    you said this was consistent with was, "functional decline

11    observed by those who interact with him daily," is that

12    right?

13    A.    Functional decline by people observed.  Yes.

14    Q.    And so what was your source of information of what

02:12:10   15    people who interact with him daily observed?

16    A.    It seemed like -- it seemed like I recall some

17    information about talking about interactions at home, and

18    so I have a recollection of seeing that somewhere in the

19    materials, and it seemed like he was having a lot of

02:12:26   20    assistance at home and that sort of thing.

21    Q.    Well, could it be that you got this information from

22    the other defense expert reports?

23    A.    It also could be that this was discussed in the

24    context of peer review.

02:12:42   25    Q.    And is it your understanding that those other

1  experts, they did actually talk to people who reported on

2  the defendant's function in the real world?

3  **A.**   I -- I -- I would -- I would say that, you know,

4  they -- I don't know in detail what -- what they did, or

02:13:00  5  who they talked to beyond just sort of the conversations

6  we had.  Yeah.

7  **Q.**   So, is it fair to say that basically you were

8  informed that other people on the team talked to people,

9  and that those people, what?

02:13:13  10  **A.**   Yeah.  I mean, well, they are experts in the field,

11  who had reviewed similar sets of data that I had, and so

12  then we were coming all together to review the data, and

13  talk about opinions.

14  **Q.**   So I guess what I am wondering is, like could you --

02:13:26  15  could your opinion change if you learned that the

16  defendant was faking it on all those cognitive tests

17  starting in March 2019?

18  **A.**   I mean, I would definitely take that into

19  consideration, and had considered the possibility of

02:13:41  20  malingering, when I was looking at the data.

21          And all I can say is that just looking at

22  the data alone, though, based upon my clinical judgment

23  and my experience, when I look at that degree of volume

24  loss with the change over a short period of time, when I

02:13:57  25  look at the rapid change in metabolic hypometabolism, and

1    then I look at that in a patient with amyloidosis, not

2    knowing anything else, I would be very concerned that that

3    patient has dementia, and that that dementia would be more

4    than mild or early.

02:14:13   5    **Q.**   So my question was:  Could it change your opinion if

6    you learned that the defendant was faking it on all the

7    cognitive tests?

8    **A.**   I would say that -- here's how it would change --

9    yes, it could.  It could.

02:14:24   10   **Q.**   And then would it change your opinion -- could it

11   change your opinion if you learned that the defendant was

12   pretending to be more impaired than he was when he visited

13   doctors?

14   **A.**   It would change my opinion, but I would -- that --

02:14:38   15   but it would just be that here is a patient with dementia

16   who is malingering is how it would change my opinion.

17   **Q.**   Could it change your opinion if you learned that the

18   people, the other members of The Forensic Panel

19   interviewed, were purposefully misleading them?

02:14:53   20   **A.**   Would it change my opinion if they were purposefully

21   misleading them?  It wouldn't change my opinion about my

22   interpretation of the imaging study.  But -- but it -- so,

23   I -- yeah.  I guess when I sit back and think about it, if

24   we are talking about my opinion of the objective imaging

02:15:12   25   data itself, I still -- I would still be concerned about

CHRISTOPHER T. WHITLOW, M.D. - CROSS BY MR. MAGNANI

1    that patient, that they would fall into a category of

2    dementia that's more than early and mild.

3              Would it change if I knew that they were

4    purposefully trying to mislead me?  I don't think it would

02:15:29   5    necessarily change my perception of those imaging data.

6    Q.   Okay.  So, it is your testimony that if the defendant

7    was faking on all the tests, if he was feigning impairment

8    in front of the doctors, and if his friends and family

9    were purposefully misleading interviewers, none of that

02:15:48   10   would change your ultimate opinion because you think the

11   imaging evidence is that strong?

12   A.   I think the imaging evidence raises a lot of concern

13   for me, and that I would be concerned that here is a

14   patient with dementia, and perhaps there's some funny

02:16:04   15   business going on, as you mentioned, but it's -- and

16   again, you know, as we -- we talked about it, you know,

17   imaging is nonspecific in and of itself.

18              But, nonetheless, in my experience,

19   someone with that amount of volume change, someone with

02:16:20   20   that degree of hypometabolism, it raises concern in my

21   mind for neurodegeneration and Alzheimer's dementia.

22        MR. MAGNANI:  Your Honor, I would just move to

23   admit 172 and 173.

24        MR. LOONAM:  Are those the articles?

02:16:39   25        MR. MAGNANI:  Yeah.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO*

1           MR. MALONEY:  No objection.

2           MR. MAGNANI:  And with that, I have no further

3  questions of the witness.

4           THE COURT:  Okay.  Well, first of all, 172 and

02:16:45   5  173 are admitted.  Any redirect?

6           MR. MALONEY:  No, Your Honor.

7           THE COURT:  May the doctor be excused?

8           THE WITNESS:  Yes, sir.

9           THE COURT:  Thank you, Doctor.  Got you off the

02:16:53  10  stand.

11           THE WITNESS:  Thank you.  I appreciate it.

12  I'll wrap things up here and be on my way.

13           (Discussion off the record.)

14           MR. VARNADO:  May we proceed, Your Honor?

02:17:45  15           THE COURT:  You may proceed.

16           MR. VARNADO:  I have an eager witness.  Defense

17  calls Dr. Marc Agronin.

18           THE COURT:  Dr. Agronin, if you could just

19  raise your right hand, sir.

02:17:59  20              (Witness sworn.)

21           THE COURT:  Please have a seat.

22           MR. VARNADO:  May I proceed, Your Honor.

23           THE COURT:  You may proceed.

24           MR. VARNADO:  Thank you.

02:18:27  25              **MARC E. AGRONIN, M.D.,**

1  duly sworn, testified as follows:

2                    **DIRECT EXAMINATION**

3  BY MR. VARNADO:

4  **Q.**   Good afternoon, Dr. Agronin.

02:18:29   5  **A.**   Good afternoon.

6  **Q.**   I am not going to show you a single study, okay?

7  **A.**   Okay.

8  **Q.**   I am not going to show you a single image, or any

9  test results.  I would actually like to spend some time

02:18:39  10  this afternoon where you can talk to Judge Hanks about

11  your specialty in this case, which is geriatric

12  psychiatry.

13              So as we start off, could you please

14  introduce yourself, and spell your last name for the court

02:18:51  15  reporter?

16  **A.**   Sure.  My name is Marc Agronin, M-A-R-C,

17  A-G-R-O-N-I-N.

18  **Q.**   And please, as I already did, but tell the Court your

19  specialty in your work.

02:19:03  20  **A.**   Sure.  I am an adult and geriatric psychiatrist.  I

21  am board-certified in both specialties.

22  **Q.**   And tell us what does an adult and geriatric

23  psychiatrist do, each one of those, however you need to

24  explain it.

02:19:15  25  **A.**   Sure.  Well, general psychiatrist, as I am sure

1  everyone is aware is a medical physician, a specialist in

2  assessing and treating individuals with psychiatric

3  disorders.

4              My added specialty is working with older

02:19:32  5  individuals, geriatric population, usually defined as 50

6  to 65 and above, but nowadays, people are living a much

7  long lifespan, so typical patients are in their 80s and

8  90s.

9  Q.  And why is it important in the field of psychiatry to

02:19:48  10  have a specialty in geriatrics?

11  A.  There are a number of unique disorders that we see

12  more commonly in individuals in later life.  There are a

13  number of different important aging issues that need to be

14  taken into consideration.

02:20:04  15              So one of the goals of geriatric

16  psychiatry is to be able to have that sensitivity and that

17  understanding of those changes, and then to really

18  specialize in all of the different, both treatment and

19  pharmacologic issues, that would concern older

02:20:17  20  individuals.

21  Q.  So is it -- the brain of an 80 year old considered

22  different than the brain of a 40 year old, generally

23  speaking?

24  A.  Sure.  In many different respects, and this reflects

02:20:27  25  our own experiences, but also we know scientifically that

1     the aging brain changes in many ways.  Some ways for the

2     worse; some ways for the better.

3     Q.   Okay.  So I would like to talk a little bit about

4     your background, Dr. Agronin.

02:20:39   5     A.   Okay.

6     Q.   Can you tell us where you went to undergraduate

7     school and then medical school?

8     A.   Sure.  I have an undergraduate degree in psychology

9     and philosophy from Harvard University.  I graduated in

02:20:50   10     1987.  Then I got my medical degree at Yale University in

11     1991.

12     Q.   All right.  And then tell us where you did your

13     internship and residency and fellowship, please.

14     A.   Sure.  I did my internship and residency at Harvard

02:21:04   15     Medical School at Mount Auburn Hospital, but mostly at

16     McLean Hospital, which is a large psychiatric hospital in

17     Boston, one of Harvard's psychiatric facilities.  And I

18     did a chief residency in geriatric psychiatry my last

19     year.

02:21:21   20                    And then I went to the V.A. Medical Center

21     in Minneapolis, Minnesota.  I did a one-year fellowship in

22     geriatric psychiatry.  I completed that in 1996.

23     Q.   Okay.  So have you spent your entire career since

24     that time period focused on geriatric psychiatry?

02:21:37   25     A.   Yes.  And actually since medical school.  I always

1   had an interest in working with older individuals.  So

2   literally since almost the first week of medical school, I

3   started doing research in geriatrics.  I love working with

4   older individuals.  It's been my career and passion.

02:21:51   5   **Q.**   I think you've told us before, but just so the record

6   is clear right now.  Are you board-certified and in what?

7   **A.**   Yes.  I am board-certified in both adult and

8   geriatric psychiatry.  I have done two recertifications,

9   and so I am caught up with all that, yes.

02:22:03   10   **Q.**   And so do you have a role in any medical societies or

11   organizations that are relevant to some of the issues that

12   we're talking about in this matter?

13   **A.**   Sure.  I have been a member in what's called a

14   Distinguished Fellow of the American Psychiatric

02:22:16   15   Association.  I have also been a longstanding member of

16   the American Association for Geriatric Psychiatry, and I

17   am the president-elect starting my term in March of next

18   year.

19   **Q.**   Okay.  And how about just, you know -- because we're

02:22:29   20   proving you up as an expert here, honors in the field.

21   You don't need to be bashful, just some of the things you

22   have been recognized for in this particular field.

23   **A.**   Sure.  Well, both being a distinguished fellow of

24   both the American Psychiatric Association and the AAGP is

02:22:42   25   a particular honor.  It comes with time and experience in

MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO

1    making contributions to the field.

2                I won an award called "Clinician of the

3    Year Award" from the American Association of Geriatric

4    Psychiatry in 2008.  And I have, also, an award as an

02:22:57    5    educator and teacher from something called "LeadingAge,"

6    which is a major organization in the country focused on

7    long-term care facilities.

8    Q.    Okay.  Thank you.

9                So, let's talk about what you do today.

02:23:08    10    What's your primary occupation?  And then we are going to

11    talk about where you do those.

12    A.    Sure.  So, I basically have had the same jobs since

13    1999.  I work in Miami at a place called Miami Jewish

14    Health.  It's a long-term care campus.  I would describe

02:23:25    15    it for older individuals.

16                We have every level of care there from

17    independent living to assisted living to nursing home.

18    And so I oversee behavioral health for a campus.  We have

19    a very large community-based program, and so I oversee

02:23:34    20    mental behavior health for that.

21                In addition, when I started in 1999, I

22    founded a memory disorder center now called MIND Institute

23    of Miami Jewish Health.  So, most of my practice currently

24    is focusing on seeing outpatients with Alzheimer's disease

02:23:49    25    and a whole range of neurocognitive disorders.

1          And I also have a very busy clinical

2    trials program.  We do all the major studies looking at

3    Alzheimer's disease and associated conditions.

4    **Q.**    Okay.  And just so the record is clear, you said MIND

02:24:00   5    Institute, M-I-N-D?

6    **A.**    All caps M-I-N-D.  MIND Institute, yeah.

7    **Q.**    You're moving fast, so I am making sure our court

8    reporter is getting everything.  Maybe just slow down just

9    a little bit.

02:24:12   10   **A.**    I will.  I will.

11   **Q.**    In addition to -- anything else that you think -- we

12   are going to talk about some of the clinical trials in

13   just a moment --

14   **A.**    Sure.

02:24:20   15   **Q.**    -- but do you also do some amount of teaching as

16   well, as the roles you just described?

17   **A.**    I do.  I have a position as an adjunct associate

18   professor of psychiatry and neurology at the University of

19   Miami Miller School of Medicine.  So, I do some degree of

02:24:35   20   teaching.  I do a lot of lecturing both in the community,

21   around the country, a lot of teaching.

22          I also do a lot of writing.  I have a

23   lot of -- I enjoy writing both for the public, for

24   professionals; and, so, I have authored a number of books

02:24:49   25   and textbooks.  I do a lot of writing of articles on

1  age-related issues, and I have several books out for the

2  general public on aging.

3  Q.   Okay.  And since you have mentioned your publications

4  we will talk about a couple of those here.

02:25:02   5              I am holding up, first off, this book that

6  says *The Dementia Caregiver*.  Is this one of the books

7  that you have written?

8  A.   Yes.  That was written for the public, for caregivers

9  who are obviously working with someone, a loved one or

02:25:16  10  someone else with Alzheimer's disease or some other

11  related condition.

12  Q.   And then another book here that I am holding that you

13  have authored, *Alzheimer's Disease and Other Dementias*.

14  Can you describe this book for the Court?

02:25:26  15  A.   Sure.  This is the third edition of a book for

16  professionals, really talking about how to identify,

17  diagnose, treat Alzheimer's disease and other forms of

18  dementia and all the associated conditions that go along

19  with it.

02:25:41  20  Q.   And are some of those associated conditions what we

21  have been talking about here for seven days, of

22  neurocognitive disorders and diseases?

23  A.   Yes.  It covers most of what we have -- what's been

24  talked about in the Court here, so yeah.

02:25:55  25  Q.   So, of those two books, one's really for lay people,

MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO

1    other for -- for --

2    **A.**   Yes.

3    **Q.**   -- clinicians?

4    **A.**   That true.

02:26:01   5    **Q.**   Okay.  And then I'll just hold up this other book

6    here.  Can you tell us what the geriatric psychiatry book

7    is?

8    **A.**   Sure.  That's the second edition of a textbook called

9    *Principles and Practice of Geriatric Psychiatry*, and I

02:26:13   10   served as the main editor.  I developed the idea of it.  I

11   brought together the authors for it, worked with a

12   colleague to edit it.  And it's been one of the standard

13   textbooks in the field of geriatric psychiatry.

14   **Q.**   Okay.  And you mentioned clinical trials that you

02:26:28   15   have been a part of, and I know that's a vast array of

16   your experience, but could you -- could you give the Court

17   a little perspective on your role in those and the types

18   of clinical trials that would be germane to what we are

19   talking about here today?

02:26:39   20   **A.**   Sure.  Since roughly 1998, I have served mostly as a

21   principal investigator on clinical trials.  Most of them

22   have been looking at medication-related treatments,

23   investigational agents for Alzheimer's disease, to some

24   extent a few other forms of dementia, such as Lewy body

02:26:56   25   disease, and lots of studies looking at behavioral

1   disturbances associated with Alzheimer's disease and

2   psychosis.

3   **Q.**   Okay.

4           MR. VARNADO:  So, I would offer at this time

02:27:06   5   Mr. Agronin as an expert -- I'm sorry -- Dr. Agronin as an

6   expert in geriatric psychiatry.

7           THE COURT:  He is so received.

8   BY MR. VARNADO:

9   **Q.**   Dr. Agronin, I take it in addition to the activities

02:27:20   10   we have also talked about you also work with The Forensic

11   Panel?

12   **A.**   Yes.

13   **Q.**   And I'm just going to put on the screen what is in

14   evidence as Defense Exhibit 12, which -- first off, just

02:27:33   15   to show this to you in my handwriting without the exhibit

16   sticker, but is this the original report that you

17   submitted --

18   **A.**   Yes.

19   **Q.**   -- in this particular matter?  And did you submit a

02:27:43   20   total of two reports --

21   **A.**   Yes.

22   **Q.**   -- in this case?  Okay.  And I think on the fourth

23   page or so there's a list of sources of information much

24   like was, I think, just shown to Dr. Whitlow.

02:27:56   25           Does this contain a list of items of --

1   information you received in connection with your

2   engagement on this matter?

3   **A.**   Yes.

4   **Q.**   Okay.  And I am not going to go through chapter and

02:28:05   5   verse on that, but is it fair to say that among those

6   listed materials are court filings?

7   **A.**   Yes.

8   **Q.**   Personal health writings from Mr. Brockman?

9   **A.**   Yes.

02:28:13   10   **Q.**   Medical records from Mr. Brockman from both Baylor

11   and Houston Methodist and possibly other institutions?

12   **A.**   Yes.

13   **Q.**   Medical scans?

14   **A.**   Yes.

02:28:22   15   **Q.**   Materials from defense experts and government

16   experts?

17   **A.**   Yes.

18   **Q.**   Speeches given by Mr. Brockman from 2019 and before?

19   **A.**   Yes.

02:28:33   20   **Q.**   As well as depositions from that same time period?

21   **A.**   Yes.

22   **Q.**   Okay.  And, again, that work was done as part of The

23   Forensic Panel.  I think we have heard about that process.

24   The government can explore it more if they'd like to.

02:28:47   25                    But the reports that you have submitted in

1   this matter, are they your reports?

2   **A.**   Yes, absolutely.

3   **Q.**   Do you stand by the conclusions in those reports?

4   **A.**   Absolutely.

02:28:56   5   **Q.**   And we will talk more about those in just a little

6   bit.

7                   What is the hourly fee that you charge in

8   connection with your work on The Forensic Panel?

9   **A.**   $350.

02:29:05   10   **Q.**   And do you have an estimate, as you sit here today,

11   as to how much you have incurred in connection with your

12   work in this case?

13   **A.**   Sure.  I think I have been paid in the range of

14   $30,000.  I have billed through October probably about

02:29:20   15   another $10,000.  I have not submitted any billings for

16   November yet.

17   **Q.**   Okay.  All right.

18                   Okay.  So, we established you're,

19   obviously, a geriatric psychiatrist.  You're not

02:29:31   20   board-certified in forensic psychiatry, correct?

21   **A.**   No.

22   **Q.**   What experience do you have that you believe still

23   renders you a suitable person to be an expert in this

24   particular matter?

02:29:42   25   **A.**   Sure.  Well, this case, without question, requires

1   input from geriatric psychiatry.  The circumstances of the

2   case speak to the heart of what a geriatric psychiatrist

3   does.

4                     And, so, from that standpoint, from

02:30:00   5   needing to assess this individual to give an opinion, to

6   me, geriatric psychiatry needs to take a front and center

7   role.  And, so, that's my -- my entire career, my

8   experience, has been doing that.

9                     I also have experience working with

02:30:13   10   forensic cases and, so, I have an understanding of the

11   basic approaches.  And, you know, I do several cases a

12   year.  I have been involved with The Forensic Panel

13   before.  So, I certainly feel able and comfortable to

14   participate in that manner with this case.

02:30:28   15   Q.   So, while not a forensic psychiatrist, you have done

16   some amount of that work previously?

17   A.   I have, yes.

18   Q.   And what about your experience opining and rendering

19   opinions and decisions concerning competency?

02:30:39   20   A.   Sure.  Nearly every case I have done in a forensic

21   context has been looking at issues of capacity.  That

22   tends to be, especially with older patients, the most

23   common issue.

24                     I would add to that:  In terms of my daily

02:30:55   25   practice, I am asked to do capacity assessments every

1    single week for individuals, not necessarily in a legal

2    context but certainly decisions about what they're able to

3    do, can they stay in the hospital, do they -- are they

4    able to drive, things like that.  So, it's a very common

02:31:10    5    question that comes up in -- in geriatric psychiatry

6    practice.

7    **Q.**    So, while not a specific question on, you know, the

8    legal issue that Judge Hanks is going to decide, your

9    day-to-day practice involves making a determination on

02:31:21    10    people's cognitive capabilities and capacity, as you would

11    say?

12    **A.**    Every single day of my practice.  Yes.

13    **Q.**    But you do have testimony -- or you do have

14    experience testifying in at least one criminal case

02:31:32    15    previously?

16    **A.**    Sure.  Yeah.  I testified in the past in a criminal

17    case.  I was involved in terms of interviewing an

18    individual and writing a report for another criminal case.

19                    Most of the cases I have done concern

02:31:46    20    capacity for individuals having to do with financial

21    matters, wills, things like that.

22    **Q.**    Whether they can change a will or things like that?

23    **A.**    Yes.

24    **Q.**    And then, again, you're part of a broader team for

02:31:59    25    The Forensic Panel that brings different expertise to bear

1   on the overall question --

2   **A.**   Correct.

3   **Q.**   -- of Mr. Brockman's competence?

4   **A.**   Yes.

02:32:05   5   **Q.**   All right.  So, again, we -- I've referenced your two

6   expert reports.  I'll direct your attention again to

7   Defense Exhibit 12, which is your first report.  Do you

8   have those up there with you?

9   **A.**   I do.

02:32:14   10   **Q.**   We may not cover them page by page, but that report

11   is dated August 6.  Do you recall on or about when you

12   first interviewed Mr. Brockman?

13   **A.**   Sure.  I believe it was July 11th.

14   **Q.**   Okay.  And that interview took place after

02:32:33   15   Mr. Brockman had been hospitalized a month prior --

16   **A.**   Yes.

17   **Q.**   -- for urosepsis; is that correct?

18   **A.**   Yes.

19   **Q.**   Had he also undergone any kind of medical procedure

02:32:40   20   even after the hospitalization but before your interview?

21   **A.**   Sure.  I believe he had had the UroLift procedure

22   shortly before then.  That's my recollection.

23   **Q.**   Okay.  And then you have another report that is

24   entered into evidence already as Defense Exhibit 15.  And

02:32:56   25   that one is dated October 29th.  Do you have that in front

MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO

1   of you as well?

2   **A.**   Yes, I have that in front of me as well.

3   **Q.**   Okay.  And, so, again, both of those reports

4   underwent the peer review process that we have heard

02:33:11   5   about?

6   **A.**   Yes.

7   **Q.**   But are the conclusions in that report and the

8   content of that report based on your over 25 years of

9   geriatric psychiatry experience in treating elderly

02:33:20   10   patients with dementia and other neurocognitive diseases?

11   **A.**   Yes.

12   **Q.**   Before we get into your evaluation and interviews

13   with Mr. Brockman I wanted to just kind of spend a little

14   bit of time talking about dementia and maybe getting your

02:33:35   15   perspective as a geriatric psychiatrist.

16            MR. VARNADO:  And I have some slides, Your

17   Honor.  I may have one up, and I'll hand this to you.

18   BY MR. VARNADO:

19   **Q.**   Dr. Agronin, I just -- again, maybe as we kind of

02:33:51   20   start off, are these some slides that you had prepared in

21   advance of your testimony?

22   **A.**   Yes.

23   **Q.**   And prepared, at least in part, some of these.  I

24   have some others that we had more of a role in.

02:34:02   25            But, for this right here, "The Key

MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO

1    Principles of Dementia," just kind of as a background for

2    us, what -- what do you think is important for the Court

3    to know about where you're coming from and your

4    perspective on dementia?

02:34:16   5    **A.**    Sure.  The term "dementia" -- and we commonly today

6    use a term called a "major neurocognitive disorder," a

7    little bit of a change in terminology, but these are,

8    obviously, brain ailments.

9                    It's important to understand that these

02:34:30   10   are very complex disease states, different from many other

11   organ systems where you can draw a blood level, you can do

12   a tissue sample, we fundamentally are not able to do that

13   with the brain.  So, it adds to the complexity of

14   diagnosis.

02:34:48   15                   And the fact that the brain has so many

16   different components, it's such a complex organ, we still

17   don't understand fully.  So, that's -- that's one

18   important piece of information we need to think about with

19   dementia.

02:35:01   20                   These tend to be enduring.  So, from the

21   time they start they are usually progressive, and these

22   last for years, if not decades, for the rest of someone's

23   life for the most part.

24                   It's also important to indicate that

02:35:14   25   they're heterogenous.  So, you could have a number of

 1   different individuals who made the same diagnosis, but the

 2   presentations often will vary in many ways.

 3                    So, that's one of the most important

 4   components of assessment and treatment, is to be able to

 02:35:28   5   appreciate those differences and, hence, the essence of

 6   what a geriatric psychiatrist would do.

 7   **Q.**   Okay.  And so looking at some of the key principles

 8   of dementia, what -- where do we see impairment across the

 9   different intellectual domains?  What are those domains

 02:35:44  10   and how do they manifest themselves?

11   **A.**   Sure.  Originally, people often defined "dementia" as

12   a disorder of memory.  Sometimes we call them "memory

13   disorders."  But it's a lot more than that.

14                    And so the current diagnostic manual of

 02:35:58  15   mental disorders, the 5th Edition, that the American

16   Psychiatric Association comes out with defines "dementia"

17   as a syndrome where you have cognitive impairment across

18   these key domains:  learning and memory, language

19   function, perceptual motor skills, executive function,

 02:36:15  20   social cognition, and then what we call "complex

21   attention."  That has to do with multitasking.

22   **Q.**   And so are all of these different domains affected

23   the same or differently for an individualized --

24   **A.**   It's variable.

 02:36:29  25   **Q.**   Okay.

**A.**   Everyone who develops a dementia has different

strengths and vulnerabilities at baseline.  And, so, this

is the whole point of doing the assessment, doing testing,

looking at the context, is to understand what areas are

strengths, what areas are weaknesses, how do you balance

those out, how does this manifest in the person's

presentation.

**Q.**   Okay.  And we will talk about some of those

intellectual domains as we go forward.

How about in terms of making a diagnosis

of dementia?  Is there some -- some criteria or processes

that you would like to share on that front?

**A.**   Sure.  As I mentioned a few minutes ago, there's not

a single test or a singular way to make a diagnosis.  One

thing I love about being a geriatric psychiatrist is that

it's a lot of detective work.

You are looking at a mosaic to try to put

all the pieces together and to see what is emerging, what

patterns, what does this look like, and that's how you

approach diagnosis.

So, we look at the clinical history.  We

look at both medical and neurologic examination.  We do a

mental status examination.  We do neuropsychological

testing to get into more detail.

So you begin to see, as you bring all

*MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO*

1    these pieces together, it's essentially a clinical

2    diagnosis, meaning that it's based on your interactions,

3    your interview, your expertise in looking at what patterns

4    is emerging over time.

02:37:55    5            We certainly use, rely upon, different

6    biological tests.  Sometimes we call these "biomarkers."

7    So, maybe brain scans, as we have talked about, brain wave

8    scans, an EEG, blood tests.  You can look at spinal fluid.

9    And these elements can help to support a diagnosis, but,

02:38:11    10   in essence, what they're showing is what underlying

11   pathology is in the brain and so we use them as pieces of

12   data to try to have an understanding of what's going on.

13   Q.   Terrific.  We will talk about some of the imaging in

14   this case --

02:38:25    15   A.   Sure.

16   Q.   -- and all just sort of how it formed your opinion

17   here.

18            In terms of just the principles of

19   dementia course and presentation, there are some things

02:38:36    20   that you want to share there and maybe give us some

21   illustrative examples of some cases --

22   A.   Sure.

23   Q.   -- and situations you have observed either personally

24   or that you're aware of.

02:38:45    25   A.   I think it's essential to realize that these changes

1    tend to occur relatively slowly, they unfold over time and

2    they can go in different patterns, and certain conditions

3    like delirium, a medical condition, can make them

4    accelerate.

02:39:02    5          And they can be missed by individuals.  If

6    you don't know what you are looking for, if you don't have

7    training in it, you might not notice what's going on with

8    someone, and that's why specialized training is so

9    important.

02:39:16    10          On average, individuals who are developing

11    dementia, in particular Alzheimer's disease, can be up to

12    two or three years before they actually receive a

13    diagnosis, even from primary care physicians, just because

14    the understanding of this is not always there.

02:39:29    15    **Q.**   Do you see that in terms of general practitioners or

16    primary care physicians missing dementia diagnoses or

17    Alzheimer's diagnoses?

18    **A.**   I see this all the time.  I see individuals who come

19    in with a diagnosis that's not correct.  I see individuals

02:39:42    20    come in who have been misdiagnosed.  That's one of the

21    points of having a memory disorder center, to really get

22    to the next level, to get to that depth to understand

23    what's going on.  And especially now more people are

24    concerned at an earlier age about these changes.

02:39:56    25          So, that's where the context comes in,

MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO

1    where collateral reports are critical to understanding

2    what someone's baseline, what's the time course of change,

3    what's the overall pattern.  They can be helpful towards

4    that, but you have to always put a context to them.

02:40:12    5    **Q.**    Okay.  And then what about the third bullet you have

6    there about, you know, enduring abilities and strengths of

7    different people at different times?

8    **A.**    Sure.  So, this is -- the rule is that everyone comes

9    in with different strengths and different vulnerabilities.

02:40:29   10    Everyone has a different cognitive reserve, meaning that

11    the baseline stuff of the brain, both in terms of the

12    number of cells and their connections, in terms of one's

13    abilities, this is why individuals are differentially

14    affected by an evolving pathology in the brain.

02:40:45   15                    And, so, for someone's strengths, this is

16    where people can be fooled, because they can come across

17    in a certain way based on their strengths.  If you are not

18    testing them, if you are not stressing them in some way,

19    you might not see the changes emerge as clearly.  I think

02:41:00   20    the --

21    **Q.**    I think you had an example that we discussed and put

22    on your PowerPoint --

23    **A.**    Yes.  I think the best example of this is -- you

24    know, this has been all over the media -- is this singer

02:41:11   25    Tony Bennett.  If you sit and interview him, if you do

1   testing on him, he has an acknowledged diagnosis of

2   Alzheimer's disease, and, you know, quite severely

3   affected, and he would fail those tests, would do quite

4   poorly.

02:41:24   5              If you take him, you dress him up, you put

6   him in front of musicians, you play the music he knows so

7   well and you just watch him just in that context singing,

8   you might think he's perfectly normal.

9              And I see this all the time with

02:41:38  10   individuals who, when you -- when you play to their

11   strengths, when you put them in a situation where it's set

12   up in a way that their strengths emerge, they do well.

13             And, in fact, we use this principle to

14   come up with activities and programs for people, music

02:41:52  15   being one of them.  So --

16   Q.   To keep them engaged and to --

17   A.   To keep them engaged and to build their confidence,

18   to help them feel good about themselves, to promote

19   wellness, to get caregivers involved.  Because, remember,

02:42:06  20   these disorders don't unfold over a few months.  These are

21   over years, some people, decades.  So, it is so important

22   to be able to get them involved in meaningful activities.

23   Q.   I know you used the Tony Bennett -- or you mentioned

24   the Tony Bennett example.  That may be kind of on the

02:42:20  25   extreme side.  But do you see that even in your daily

1   practice?

2   **A.**   That's not on the extreme side.  To me, I see that

3   with everyone I work with.

4                   And just a quick example, that we do a lot

02:42:31   5   of art therapy with individuals, and these are individuals

6   who -- some spend time in either a bed or a wheelchair a

7   lot of the day, they are severely impaired, but if you put

8   them in the right context, you help them engage in art,

9   people can produce really extraordinary art that you

02:42:49   10   wouldn't imagine.

11                   Or there is a wonderful program called

12   Alive Inside where they brought iPods to individuals with

13   pretty severe impairment and you can see -- they show

14   videos of individuals who otherwise look very impaired and

02:43:00   15   they are impaired and you play music from their past so

16   they remember and suddenly they come alive, and they're

17   moving to the music and responding to it in ways that, if

18   you just watched that clip, you wouldn't fully appreciate

19   the degree of impairment that they have.

02:43:17   20   **Q.**   Okay.  Thank you, Doctor.

21                   We are going to talk about your

22   interviews.  You have had two different interviews with

23   Mr. Brockman, correct?

24   **A.**   Yes.

02:43:25   25   **Q.**   Okay.  And we are going to actually look at some of

1    the videos of those towards the end of your examination.

2                    But in terms of your evaluation of

3    Mr. Brockman, did you also -- in addition to just

4    conducting the interview with him, did you give him a

02:43:37    5    mental status examination test in each meeting?

6    A.    Yes.  Both times I saw him I did a mental status

7    examination.

8    Q.    And just in general, what's the type of test you

9    gave, just to describe for Judge Hanks?

02:43:48    10    A.    Well, part of the -- the interview itself is a mental

11    state examination --

12    Q.    Right.

13    A.    -- because you are observing what someone looks like,

14    how they move, how they appear, how they discuss things

02:43:57    15    with you.  So, really, from the moment you see someone to

16    the end, it's part of the examination.

17                    But, in particular, with the mental state

18    examination, it's -- we will query someone about how

19    they're thinking, their understanding of issues, how they

02:44:10    20    can reason and think about different elements that you

21    want to speak to them about.

22                    You ask questions about their mood,

23    whether they're having unusual perception.  So, a number

24    of questions you ask.

02:44:22    25                    And then we do something called a

1    "cognitive screen," which is a brief test to gauge in a

2    general way a degree of cognitive status and impairment.

3    So, something like the Mini Mental Status Examination.

4    There's something called the Montreal Cognitive Assessment

02:44:38    5    or the MoCA.  So, these are not necessarily diagnostic

6    instruments.  They give us a range where someone is at,

7    but we use them in terms of doing our assessments.

8    **Q.**    Okay.  So, for your role here -- and you were here

9    for Dr. Guilmette's testimony yesterday --

02:44:51    10    **A.**    Yes.

11    **Q.**    -- where we talked a lot about his testing and

12    validity testing.  That's not what you were doing,

13    correct?

14    **A.**    No.

02:44:57    15    **Q.**    But you did administer the Montreal Cognitive

16    Assessment, or the MoCA, to Mr. Brockman; is that --

17    **A.**    I did on both occasions.

18    **Q.**    And so do you recall how he scored on the first MoCA

19    that you administered to him?

02:45:09    20    **A.**    Sure.  So, the MoCA is a 30-point scale.  Usually

21    individuals -- in older individuals a normal range is

22    going to be in the range of 25, 26 and above.  You know,

23    anything below that, 20 above, 20 to 26, in a mildly

24    impaired range, once you get below 20, a moderately

02:45:28    25    impaired.  Below 10, more severely impaired.  That's the

1    general scheme.

2              So, my first interview with him he scored

3    9 out of 28 points.  I had inadvertently forgot to do one

4    -- 2 points, so I don't count that as a scoring, so he is

02:45:43    5    a 9 out of 28.

6    Q.   And that one didn't even have the full 30 range

7    because of the 2 points?

8    A.   Exactly.  Exactly.

9    Q.   Okay.  What about the second one?

02:45:50    10    A.   The second one, is he scored a 14 out of 30.

11    Q.   Okay.  And where does that place him just according

12    to the scoring --

13    A.   It's in the moderately impaired range, and that is

14    based on -- I mean, for me that performs -- I consider

02:46:03    15    moderately impaired, but it is also based on the

16    description of the MoCA, how they -- how they label that

17    particular range.

18    Q.   Okay.  And then in addition to that actual specific

19    test, you mentioned the entirety of your exam is querying

02:46:17    20    him and doing an actual, you know, assessment of his

21    abilities during the time period you are interviewing him?

22    A.   Definitely.  I wouldn't hinge my opinion based on a

23    single test like that.

24    Q.   Okay.  And in the time period that you're talking to

02:46:28    25    him and asking various questions, are you probing his

1   understanding of whether he can help his attorneys, what

2   his understanding is of the indictment, things of that

3   nature, among others?

4   **A.**   Sure.  Sure.  When I interviewed him, I attempted to

02:46:42   5   speak in more detail with that.  You know, he -- he didn't

6   want to get into that discussion.  His reason for that, I

7   noted in my report, was a misunderstanding of what he

8   thought his attorneys were telling him.

9            When I talked to him about his illness,

02:47:00   10   asked him really probing questions what he meant by many

11   things that he told me, is when I really made the

12   observations of what his thinking was like, how he was

13   able to stay on track or not.

14   **Q.**   Okay.

02:47:13   15   **A.**   How he was able to reason about that.

16   **Q.**   All right.  And I want to, you know, again, come back

17   to some of those videos.  I just want to play them at the

18   end, but you mentioned collateral interviews?

19   **A.**   Sure.

02:47:23   20   **Q.**   And that you conducted some of those in this

21   particular matter?

22   **A.**   I did.

23   **Q.**   I will just put them up on the screen, since we -- we

24   will just kind of go down the list.

02:47:33   25   **A.**   Okay.

1   Q.   Is Dorothy Brockman somebody that you spoke with on

2   more than one occasion?

3   A.   Yes.  I spoke to Dorothy at -- at the time of both

4   interviews.

02:47:42   5   Q.   Okay.

6   A.   But with Mr. Brockman, yes.

7   Q.   And, again, not -- I know some of this is

8   memorialized in your report, and we don't have to recite

9   what was in there.  Did you also make contemporaneous

02:47:53   10   notes with --

11   A.   I did.

12   Q.   -- for each these interviews?

13   A.   Yes.

14   Q.   Okay.

02:47:58   15   A.   And then I summarized that in my report.

16   Q.   And those notes have been separately produced --

17   A.   Yes.

18   Q.   -- to the government.  I think you saw one put up

19   there with Mr. Gutierrez yesterday?

02:48:05   20   A.   Yes, I did.

21   Q.   But so -- why would you want to talk with

22   Mrs. Brockman?

23   A.   She knows him the best.  She spends the most time

24   with him.  She's been married with him long enough to see

02:48:15   25   the changes over time.  She knows his baseline the best.

1    And so -- and she lives with him on a day-to-day basis so

2    to me she was going to be a very important informant in

3    terms of how he is doing.

4    **Q.**    And, again, because we're in a criminal case, the

02:48:29    5    word "informant" has a certain connotation, but this is

6    somebody who is informing you of Mr. Brockman's

7    conditions?

8    **A.**    Yeah.  You can call it collateral source --

9    **Q.**    Okay.

02:48:38    10    **A.**    -- but, yeah.

11    **Q.**    Great.  Maybe that is not better, but that is fine.

12    And then what about Mr. Gutierrez?  Why was he somebody

13    that you wanted to speak with?

14    **A.**    Mr. Gutierrez is the main caregiver for Mr. Brockman

02:48:52    15    as has been stated, and he wasn't present during the first

16    interview.  He was in the other room.  So I didn't have a

17    chance to speak to him then.

18            During the second interview, I spoke to

19    him after the interview to really get a sense for, on a

02:49:07    20    daily basis, what Mr. Brockman's life looks like, and what

21    Mr. Gutierrez sees in terms of caregiving for him.  I

22    thought that was really important to speak to his

23    functional abilities because it's -- you can do an

24    assessment of someone's cognition and see the degree of

02:49:27    25    change, but what you really also want to know is what does

MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO

1    that mean in the real world.  What can a person do or not

2    do?

3    **Q.**   And why is that important as to whether -- I mean, we

4    heard Mr. Gutierrez testify at length about assisting

02:49:38   5    Mr. Brockman with the bathroom, and getting dressed, and

6    those -- why is that important?

7    **A.**   Well, it speaks to the essence of someone's

8    abilities.  First of all, diagnostically, one's functional

9    decline is an important component of establishing dementia

02:49:55   10   as a diagnosis, and in particular, Parkinson's dementia,

11   that functional decline is really one of the most

12   important components.

13            But two, what we're really trying to

14   understand is, you can do all sorts of measurements of how

02:50:08   15   someone can perform on a -- on a cognitive test, but what

16   does that really mean in day-to-day life, you know, when

17   the rubber meets the road, what can someone do or not?

18            And if there are discrepancies, you really

19   want to be able to know about or identify that, but

02:50:24   20   watching, observing what someone can actually do on a

21   daily basis will give you that information, at least give

22   you a good source of it.

23   **Q.**   And I think you were here when Mr. Langston was

24   cross-examining Mr. Gutierrez and he put up your notes?

02:50:36   25   **A.**   Yes.

*MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO*

1    **Q.**   From interviewing Mr. Gutierrez, and you got the time

2    wrong in terms of how long Frank had been caring for Bob?

3    **A.**   Yeah.  In my notes, I inadvertently had thought that

4    Mr. Gutierrez had said he started working with him the

02:50:50    5    year before, and but -- the notes are out, and I realized

6    that.  In my report, I just referenced in the last year,

7    meaning, the year of 2021 he's worked with them.

8    **Q.**   Anything about the fact that Mr. Gutierrez has been

9    with Mr. Brockman now seven months versus, you know, that

02:51:06    10   additional time period --

11   **A.**   That is inconsequential.  I really -- what I am

12   focusing on in terms of contemporaneously how Mr. Brockman

13   is doing and so the reports on how Mr. Gutierrez is doing

14   for the last six months are what are most important.

02:51:21    15   **Q.**   Okay.  And then Dr. Stephen Slade, is that somebody

16   you also spoke with and why?

17   **A.**   Yes.  I was told that, one, he's a physician, so

18   he -- he has an understanding of medical illnesses.  That

19   he's known Mr. Brockman for a long time.  That he's spent

02:51:38    20   time with him in many different settings.  I thought that

21   would be important information, and, indeed, what he

22   described gave a fuller picture of the unfolding changes

23   with Mr. Brockman.

24   **Q.**   How so?

02:51:55    25   **A.**   He described back in 2014 and 2015 what he began

*MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO*

1    noticing in terms of changes with Mr. Brockman.  That he

2    was more -- this is -- a guy who normally, he said, was

3    sociable, you know, the -- you know, a very articulate

4    leader, and how in many experiences with him suddenly he

02:52:21  5    noticed that he is quieter.  He is more apathetic, not as

6    engaged.  I believe in my notes he talked about maybe

7    seeming more forgetful, more out of it, and he remembered

8    --

9             MR. MAGNANI:  Objection, Your Honor.  This

02:52:33  10   is all hearsay.  He is testifying about what somebody who

11   is on the defendant's witness list, and I expect will

12   testify told him about the defendant and how he was

13   getting through daily life.

14            THE COURT:  But this is an expert.  Experts are

02:52:45  15   allowed to testify based on hearsay.

16            MR. MAGNANI:  So if it is admitted for the

17   limited purposes of forming his opinion --

18            THE COURT:  Yes, I mean, experts are allowed to

19   form their opinions based on hearsay.  It's -- so, it's not

02:53:00  20   being offered for the truth -- it is not being accepted for

21   the truth of the matter asserted, it is being offered for

22   the basis of this witness' testimony.

23            MR. MAGNANI:  Thank you, Your Honor.

24   BY MR. VARNADO:

02:53:13  25   Q.   So please, go ahead.

MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO

1    **A.**   I was struck by Dr. Slade talked about he himself was

2    going through his own medical illness at the time, so he

3    remembers distinctly everything he was going through, and

4    how for that reason the changes that he began noticing in

02:53:26    5    Mr. Brockman were so striking to him.

6            You know, to me, what was important was

7    the timeline here, that he is describing these noticeable

8    changes in 2014 and 2015, which helps in my mind to

9    establish a timeline of change.

02:53:40    10   **Q.**   And did what -- you learned from that.  I mean, did

11   that comport with your experience, and sort of the

12   continuum and timeline of -- for dementia patients,

13   generally, or Alzheimer's patients?

14   **A.**   It certainly lended credence to the slowly unfolding

02:53:56    15   nature of dementia.  Now, again, that's one particular

16   piece of data we have to put within the context.  And so

17   obviously, it's not -- it is not a diagnostic test or

18   anything.  But it begins to show the story that we see of

19   this unfolding dementia over time.

02:54:12    20   **Q.**   Okay.  And then I'll just cover them at the same

21   time.  Ms. Keneally and Mr. Romatowski, those are defense

22   counsel for Mr. Brockman?

23   **A.**   Sure.  What I found relevant and compelling is that

24   they were describing their abilities working with, or

02:54:29    25   attempting to work with Mr. Brockman in terms of

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO

1    assembling the case and putting it together, which speaks

2    to the essence of his ability to assist his counsel and to

3    participate in his own defense as we say, you know, with a

4    reasonable degree of rational understanding.  And they --

02:54:47  5    they were very clear on what the problems and the

6    limitations were.

7    **Q.**    Okay.  And did you see some of what they described

8    manifested in your own interviews and interactions with

9    Mr. Brockman?

02:54:57  10   **A.**    Absolutely, yeah.

11   **Q.**    Okay.

12   **A.**    Yeah.  I purposefully spoke to them after I met with

13   him because I wanted to see for myself what was going on,

14   and -- and see if, you know -- anything thereafter would

02:55:11  15   either corroborate that or be consistent with that.

16   **Q.**    So you spoke with Mr. Brockman in advance of speaking

17   with Ms. Keneally and Mr. Romatowski?

18   **A.**    That is my recollection.

19   **Q.**    Yeah.  Okay.  And then the last one, you know, did we

02:55:22  20   provide you with some testimony from Tommy Barras, from

21   this -- this proceeding?

22   **A.**    Yes.  I did.  I did review a transcript of his

23   testimony.

24   **Q.**    And was Mr. Barras somebody who you had interviewed

02:55:34  25   as a collateral source?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO

1   **A.**   Yes.

2   **Q.**   And I take it you read his testimony where -- well,

3   you -- describe what you read, and then whether it impacts

4   your overall opinion one way or the other.

02:55:47   5   **A.**   Sure.  From what I read, he seemed to be very firm on

6   not wanting to admit or suggest that there were cognitive

7   changes with Mr. Brockman in the year that Mr. Barras

8   assumed the role of CEO.

9                   It seemed to me different from how he

02:56:06   10   characterized Mr. Brockman, some of the changes.  But to

11   me, the preponderance of everything I looked at, every one

12   I interviewed, it didn't make a difference whether I was

13   going to take what he said or not because he --

14   originally, what he told me was really just, again, some

02:56:23   15   of the changes noticed.

16                   He didn't fully understand really the

17   context of them, but it really fits within the whole

18   context of what other people were describing in the five

19   to ten years leading up to the current time.

02:56:35   20                   THE COURT:  Well -- and just I want to make

21   sure I understand.  So the test --  well, the interviews

22   you did with the individuals, they weren't under oath at

23   any time, were they?

24                   THE WITNESS:  No.

02:56:45   25                   THE COURT:  And when Mr. Barras testified, he

MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO

1  was under oath, under penalty of perjury, right?

2              THE WITNESS:  Yeah, I -- I would imagine.

3              MR. VARNADO:  The answer is yes.

4              THE WITNESS:  Yeah.  Yeah.

02:56:59  5              THE COURT:  Great.  You may continue.

6  BY MR. VARNADO:

7     Q.    And just to follow-up on that question, we provided

8     you with Mr. Barras's testimony so you could see if there

9     was any inconsistency with what he reported to you?

02:57:10  10    A.    Yeah.

11    Q.    Fair?  Did -- does that change your view of the

12    veracity of any of the other information you received from

13    the collateral reports of all the other individuals you

14    spoke with?

02:57:20  15    A.    No.  Not at all.

16              THE COURT:  And, Counsel, just for the record,

17  I agree with you that it's being offered not for the truth

18  of the matter asserted, but offered for the basis of this

19  expert's opinion, unless the witness has testified live in

02:57:34  20  trial under oath, then it's only being accepted for

21  purposes of this expert's opinion.

22              MR. MAGNANI:  And, Your Honor, I would be less

23  concerned.  Like, obviously, we called Mr. Barras, but,

24  like, Mr. Jackson has been removed from the witness list.

02:57:45  25  I don't know if Mr. Slade or Dr. Slade is going to testify,

*MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO*

1  and I just -- to the extent that these people are not going

2  to be on the witness list, I want to make sure that, you

3  know, the substance of their out-of-court statements are

4  not introduced for the truth of the matter for Your Honor's

02:57:59   5  consideration.

6          THE COURT:  You have preserved the issue.

7          MR. VARNADO:  Totally understood, Judge.

8  BY MR. VARNADO:

9  **Q.**   So, is it fair to say, Dr. Agronin, that your --

02:58:09   10  combination of your two reports really address these key

11  questions?

12  **A.**   Yes.

13  **Q.**   One, what's -- what diagnoses are reflected in the

14  recent history and other testing for Mr. Brockman?

02:58:21   15          Two, does the evidence reflect that

16  Mr. Brockman is malingering the cognitive deficit?

17          Three, does Mr. Brockman reflect the

18  mental stamina needed for a courtroom trial on the charges

19  he faces?

02:58:32   20          And, four, is Mr. Brockman able to assist

21  his counsel in defending his case?

22          Is that a fair way to sort of breakdown

23  your reports?

24  **A.**   Yes.

02:58:40   25  **Q.**   So we are going to hit each one of those questions,

1  starting with the diagnosis question.

2           THE COURT:  Counsel, we just need to take just

3  a quick recess.  So, maybe, about ten minutes.

4           MR. VARNADO:  Okay.  Very good, Judge.

03:09:36  5  (Proceedings recessed from 2:58 p.m. until 3:26 p.m.)

6           THE CASE MANAGER:  All rise.

7           THE COURT:  Please be seated, everyone.  You

8  may proceed, Mr. Varnado.

9           MR. VARNADO:  May I proceed, Your Honor?

03:26:31  10           Great, thanks.

11  BY MR. VARNADO:

12  Q.   Okay.  Dr. Agronin, based on the materials you

13  reviewed in this matter and your two psychiatric

14  evaluations of Mr. Brockman, did you form an opinion on --

03:26:44  15  to his various diagnoses that he -- that he currently

16  suffers from right now?

17  A.   Yes, I did.

18  Q.   I am going to put just a slide up here to guide our

19  discussion, and we will talk about each of these in order,

03:26:59  20  rather than covering them all at one time.

21           But do those fairly and accurately

22  represent the diagnoses --

23  A.   Yes.

24  Q.   -- that are in your combined reports?

03:27:07  25           I think the delirium, you might have

*MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO*

1   changed a little bit for the supplemental report, but we

2   will still talk about delirium.

3   **A.**   Okay.

4   **Q.**   So starting with the first diagnoses, what is your

03:27:16   5   primary diagnoses here of Mr. Brockman?

6   **A.**   The primary diagnoses would be Parkinson's disease

7   dementia in this case, with a number of different

8   associated neuropsychiatric conditions, such as

9   depression, anxiety, and psychosis, and also recently some

03:27:31   10   mild behavioral disturbances.

11   **Q.**   What is it that led you to conclude this was

12   Parkinson's disease dementia versus mild cognitive

13   impairment?

14   **A.**   Sure.  Well, based on the diagnostic criteria, he has

03:27:42   15   Parkinson's disease at baseline.  He has demonstrated

16   cognitive impairment that rises to the level of dementia,

17   and looking at other components of the history, it's also

18   consistent with a Parkinson's disease dementia, and then

19   my examination of him clearly was demonstrating a

03:28:06   20   sufficient degree of cognitive impairment that would meet

21   the level of what we call dementia.

22   **Q.**   Okay.  And in terms of the diagnostic criteria, is

23   there a particular, you know, set of criteria, or an --

24   accepted standards that are looked at in terms of

03:28:21   25   diagnoses, Parkinson's disease dementia?

1  A.   Sure.  I work with a tremendous number of individuals

2  who have Parkinson's disease, and inevitably, we know -- I

3  know from experience, we also know from the scientific

4  literature, that a majority of these individuals develop

03:28:37  5  some degree of cognitive impairment, up to 90 percent over

6  time, especially as they get older, develop frank

7  dementia.

8            And so with him, not only do we see the

9  degree of impairment consistent with that, but we also see

03:28:50  10  the functional impairment.  And when you look at the

11  criteria that were put forth by one of the main

12  organizations that have developed criteria for Parkinson's

13  disease dementia, called the Movement Disorder Society,

14  you know, one of the distinctions they make is not only do

03:29:08  15  you have Parkinson's disease at baseline, you have a

16  degree of neurocognitive impairment that rises to the

17  level of dementia, but you also see significant functional

18  impairment.

19            This is really what would distinguish the

03:29:17  20  mild cognitive impairment that we might see with

21  Parkinson's from actual dementia, when you see someone who

22  is struggling to the point that their daily function is

23  really impaired --

24  Q.   And when --

03:29:29  25  A.   -- when they cross the boundary into that, actual

1    diagnosing this as a dementia.

2    **Q.**    Thank you.  And I didn't mean to interrupt you.

3              Maybe we could just take it step-by-step.

4    You mentioned the Movement Disorder Society.  Is there a

03:29:39    5    sort of publication that has this criteria laid out that

6    you considered at least in part in making the diagnosis?

7    **A.**    Yes.  So -- and I cite that in my report.  This was

8    the criteria that they had developed, and so --

9    **Q.**    Then you can just walk us through, you know, just the

03:29:55    10    step-by-step, and I can kind of put the slides up.

11    **A.**    Sure.  So I put together this graph just to go

12    step-by-step through each criteria.  So the

13    first criteria -- so the first one is just a baseline of

14    having a diagnosis of Parkinson's disease, and that's been

03:30:08    15    acknowledged on both sides here, that Mr. Brockman has

16    Parkinson's disease.

17              Second, is that the Parkinson's disease is

18    at baseline, so we saw this prior to the development of

19    the dementia.  Now, in this case, it seemed to me that

03:30:24    20    there were some evolving cognitive changes, perhaps,

21    simultaneously with some of the motor changes, but

22    regardless, the main syndrome that was clearly emergent

23    was Parkinson's disease at baseline, so it would meet that

24    criterion.

03:30:40    25    **Q.**    Okay.  Put up the next one.

*MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO*

1    **A.**   The third one is that, as they put it, the

2    Parkinson's disease is associated with a decreased global

3    cognitive deficient -- deficiency.  Here, they speak about

4    the Mini Mental State Examination being below 26.

03:30:58   5              In this case, most of the scoring is on

6    the MoCA, which is similar to the Mini Mental, dropping

7    significantly below the level that would be equivalent to

8    a level on the Mini Mental, less than 26.  So I think it's

9    established that he has this degrees -- decreased global

03:31:14   10   cognitive deficiency.

11   **Q.**   Okay.  Then, what about the next step?

12   **A.**   And really, where we begin to distinguish between

13   more of a mild cognitive impairment from a dementia that

14   gets into more moderate to severe stages would be where

03:31:29   15   it's impairing his daily life.

16              And this is if you look at the -- his

17   daily function, that you can observe from collateral

18   reports, from testimony we have heard here from

19   Mr. Gutierrez who works with him on a daily basis, from

03:31:44   20   his physician, from medical records, everyone speaks to

21   the functional impairment that he has, that is -- that is

22   quite devastating to his daily life.

23   **Q.**   And there's a couple of acronyms in there, the ADLs,

24   and IADLs?

03:32:00   25   **A.**   Sure.  So when we do functional assessment we divide

1    it up into what are called activities of daily living;

2    basically, a person's ability to dress, to groom

3    themselves, to basically feed themselves, the most basic

4    activities we would do during the day.

03:32:16    5              Instrumental activities of daily living

6    are more complex, things like being able to prepare a

7    meal, use one's phone, manage one's daily schedule, drive,

8    things like that.

9    **Q.**    And did you have occasion to review some of the

03:32:31    10    testimony from Dr. Darby, one of the government experts --

11    **A.**    I did.

12    **Q.**    -- in this case?

13    **A.**    I did.

14    **Q.**    And do you agree with his assessment here about

03:32:39    15    whether there would be moderate to severe stage dementia

16    with what was put on the screen here that Mr. Brockman is

17    needing assistance with grooming, self care, using the

18    restroom, having difficulty remembering where he is, and

19    recognizing his own home?

03:32:55    20    **A.**    Yeah.  I think it is in this paragraph that the Dr.

21    Darby actually characterizes the functional decline with

22    Mr. Brockman quite well.

23    **Q.**    And I think he was asked a question, you know, what

24    would it need to be -- what would need to be evident for

03:33:10    25    there to be moderate to severe, and he gave this list of

MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO

1    criteria, and based on your observation of Mr. Gutierrez's

2    testimony, does that comport with what is listed here?

3    **A.**   Yes.

4    **Q.**   And I think there is just one last step here,

03:33:25    5    Dr. Agronin, just let you explain that last criteria.

6    **A.**   Sure.  So in the last criterion, they try to break

7    down the domains in which you want to see impairment.  And

8    they say two of the following domains:  Attention

9    executive function, visual constructive ability and

03:33:40   10    memory.  And we have seen throughout the testing, I saw

11    this in my own examinations with Mr. Brockman, through the

12    medical reports, that he clearly demonstrates impairment

13    across the board in every one of these domains.

14    **Q.**   Okay.  So -- and I guess, you know, I mentioned

03:33:56   15    Mr. Gutierrez's testimony, I will come back to that in a

16    minute.  Did you have occasion to also look at medical

17    records from Dr. Eugene Lai --

18    **A.**   Yes.

19    **Q.**   -- here in Houston?

03:34:04   20             And what -- did you -- have occasion to

21    see his October 7th, 2021 assessment of Mr. Brockman?

22    **A.**   I did review that.

23    **Q.**   And what did he conclude?  Or, what was his diagnosis

24    of Mr. Brockman?  Sorry.

03:34:16   25    **A.**   Sure.  He noticed the significant cognitive and

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1    functional decline since seeing him earlier this year.  He

2    diagnosed him at this point with Parkinson's disease

3    dementia.

4    **Q.**    Okay.  And does that impact your opinion, or

03:34:31    5    consistent with it, I take it?

6    **A.**    It's consistent with my opinion.

7    **Q.**    And then how about Mr. Gutierrez's testimony?  Is

8    that consistent with your opinion as well?

9    **A.**    It is.

03:34:46    10    **Q.**    Now, I'll just go back to the diagnoses since we just

11    covered the first one.

12              What's the second diagnosis that you had

13    for Mr. Brockman?

14    **A.**    Possible comorbid Alzheimer's disease.

03:34:57    15    **Q.**    And what does that mean?

16    **A.**    So what emerged this year, as we have heard a lot

17    about the neuroimaging, and there are two -- two

18    neuroimaging studies, in particular, one being the FDG PET

19    scan, the second being the amyloid PET scan, both of which

03:35:18    20    were read as potentially indicative of Alzheimer's

21    disease.  And so seeing the presence of this pathology,

22    which is consistent with Alzheimer's disease, is something

23    that we do see comorbid with Parkinson's disease, and so

24    it raises the possibility that he also does have

03:35:36    25    Alzheimer's disease.

MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO

1          If we look at the -- in addition, the

2    pattern of neurocognitive impairment, it could certainly

3    be consistent with Alzheimer's disease, so...

4    Q.   Okay.  And so, again, is that common or uncommon for

03:35:50  5    Alzheimer's disease to potentially coexist with

6    Parkinson's disease?

7    A.   We certainly see it.  You know, what -- common versus

8    not, I guess, it -- it depends how you define that, but it

9    certainly -- we certainly see people who have both.

03:36:03  10   Q.   And you list this as a possible diagnosis.  What's

11   the reason for that?

12   A.   Well, in this case, my feelings of Parkinson's

13   disease dementia best captures the clinical picture here,

14   and, you know, we do have the pathologic evidence, the

03:36:21  15   biomarkers indicative of Alzheimer's disease, so I

16   certainly think it's a -- it's a very strong possibility,

17   but, you know, in this case, I am putting Parkinson's

18   disease dementia as the primary diagnosis.

19   Q.   Okay.  And at the risk of setting you up for some

03:36:36  20   questions that Mr. Magnani might ask you quite a few, I'm

21   just going to keep it at a very high level.

22          What is your -- I mean, how did the

23   neuroimaging -- in this case, the MRIs, the FDG PET, the

24   amyloid PET, how does that influence your opinion on what

03:36:51  25   is -- Mr. Brockman's facing right now?

*MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO*

1   **A.**   Sure.  I am going to go back to the term I used

2   before.  We're looking at a mosaic.  And so as each piece

3   falls into place, consistently building a picture of this

4   type of dementia, when you see a clinical history of

03:37:09   5   progressive neurocognitive impairment and you have

6   collateral reports of that and you have supporting medical

7   diagnoses, and now you add along with this an FDG PET scan

8   that shows a pattern consistent with Alzheimer's disease,

9   and you add to that an amyloid PET scan that's at the

03:37:26   10   threshold above which is consistent with actual pathology

11   seen in Alzheimer's disease, it just is further supportive

12   of the diagnosis.

13   **Q.**   Okay.  And that last point, just to maybe elaborate a

14   little bit for everyone here, is it -- the amyloid PET,

03:37:43   15   just that there was some presence of amyloid or was it at

16   a certain threshold to trigger what you just referenced?

17   **A.**   In this case it's at a certain threshold.

18   And I, actually, a number of years ago was

19   part of a study in which we had individuals who had

03:37:57   20   end-stage -- some type of dementia, possibly Alzheimer's

21   disease.  This is before this particular Florbetapir

22   Amyvid came on the market.

23   And as part of the study the subjects

24   would have an amyloid-based PET scan, and then when they

03:38:13   25   passed away their brains were studied to see if what you

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO

 1   see in scan is corresponding with the actual pathology and

 2   we knew clinically how they were.

 3                        And what it indicates is that when they

 4   use a term "moderate to frequent plaques" it means you're

03:38:25   5   above a certain threshold.  You are not simply saying

 6   someone has amyloid in their brain.  You are saying they

 7   have a sufficient degree of amyloid that's consistent with

 8   the degree of pathology of amyloid plaque in the brain

 9   that we see in Alzheimer's disease.

03:38:36  10   Q.   And is that what we saw on the test here?

11   A.   Yes.  It was read as a positive scan.

12   Q.   Okay.

13   A.   When we do clinical trials, you don't get into a

14   clinical trial for Alzheimer's disease unless you're read

03:38:47  15   as moderate to frequent plaques.  So, that's the standard

16   threshold for getting admittance to most clinical trials

17   for Alzheimer's disease.

18   Q.   Okay.  Thank you.

19                        I want to talk about your third diagnosis,

03:38:59  20   which was delirium from a medical condition, and I think

21   this is in your original report right after -- or at least

22   reasonably close to after Mr. Brockman's

23   hospitalization --

24   A.   Sure.

03:39:09  25   Q.   -- is that correct?  And I don't -- have you modified

*MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO*

1  that for your second report or at least in some respects?

2  **A.**   Sure.  When I interviewed Mr. Brockman in July, I

3  thought clearly he was -- had a degree of delirium at the

4  time, some residual delirium which I thought was part of

03:39:27  5  the interview.  And he's had, I believe, three bouts of

6  delirium within the last six months.

7         When I saw him in October, he did not

8  appear at the moment delirious, but given the waxing and

9  waning nature of it, I figured -- and given his risk

03:39:44  10  factor for it, that -- I couldn't rule out entirely that

11  it hasn't been present in the recent past, but, at least

12  for the moment of that interview, he appeared to be in

13  partial remission of it.

14  **Q.**   And let's talk a little bit about that.

03:39:57  15         You mentioned the waxing and waning nature

16  of delirium.  Is that something that Mr. Brockman is

17  subject to being inflicted by or suffering on occasion?

18  **A.**   He's at a very high risk for recurrent delirium,

19  unfortunately, because --

03:40:12  20  **Q.**   Why is that?

21  **A.**   He has a history of urosepsis.  He has had recurrent

22  urinary tract infections, which has been -- so, that's one

23  risk factor.  Plus, with the baseline dementia, that in

24  itself is at high risk for recurrent delirium.

03:40:26  25         And, so, in the future it could be some

1    other medical condition or other cause of delirium, but he

2    remains very vulnerable because his brain is so weakened

3    and so vulnerable.

4                    So, he's at very high risk.  And, clearly,

03:40:41   5    the delirium itself has taken a significant toll on him as

6    well.

7    **Q.**   And what kind of toll?

8    **A.**   He's more impaired.  It seems to me that there is an

9    acceleration of his overall neurocognitive decline,

03:40:53   10   unfortunately.  And he's less functional, you know, both

11   from -- especially observations of individuals who are

12   with him on a daily basis.  They have noticed this change

13   significantly.

14                   And I think that's been clear in anyone

03:41:11   15   who has done an interview with them, that there has been

16   significant decline over the last six months.

17   **Q.**   And do you have any experience doing clinical studies

18   of delirium?

19   **A.**   Actually, the -- the very first research I ever did

03:41:25   20   my first semester of med school was actually with someone

21   by the name of Dr. Sharon Inouye.  At the time I didn't

22   realize she would go on to become, really, the leading

23   world expert on delirium, but --

24   **Q.**   And we have seen some of her papers, not while you

03:41:39   25   were here but last week sometime.

MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO

1   **A.**   Ah.  Okay.

2   **Q.**   So, that has been discussed.

3   **A.**   Yeah.  So, I actually was involved as the medical

4   student doing some of the initial assessments on

03:41:47   5   hospitalized patients.  So, it was something impressed

6   upon me deeply, the role and the real devastating toll

7   that delirium can take and it's part and parcel of the

8   type of assessments I do on a frequent basis.

9            And I authored several chapters on

03:42:02   10   clinical assessment, treatment of delirium for a standard

11   medical textbook.

12   **Q.**   And I think you -- you may hear of delirium in sort

13   of layman's terms where somebody, you know, gets the flu

14   and may have delirium or be delirious for a period of

03:42:15   15   time.

16            Is that what we're talking about or is

17   delirium that you're discussing something different?

18   **A.**   Yeah.  No.  No.  I mean, inevitably, when you see

19   delirium someone either has a significant underlying

03:42:28   20   medical condition or they have dementia.  The only other

21   time you might see it is, you know, young kids with very

22   high, high fever can get very briefly delirious.  But, you

23   know, in a healthy adult you are not going to see delirium

24   so easily as you will in an older individual who has a

03:42:43   25   baseline dementia.

MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO

1  Q.   Okay.  And can clear delirium be life-threatening?

2  A.   Absolutely.  Estimates set up the mortality rates of

3  up to 40 percent in individuals in the first year after

4  they have had a bout of delirium.

03:42:56  5  Q.   And Mr. Brockman has had three bouts of that in the

6  last six months?

7  A.   Yes.

8  Q.   All right.  Let's go to your next diagnosis, which is

9  apathy.  Can you tell us what "apathy" is?

03:43:07  10  A.   Sure.  "Apathy" is a brain syndrome in which you have

11  a lack of motivation for behaviors, for emotions, for

12  thinking.  I think's it's -- it's an under-appreciated

13  syndrome, but it's actually been described as the most

14  common neuropsychiatric syndrome that we see with

03:43:29  15  dementia, and it's something that I see every day in my

16  clinical practice.  Literally, the brain's ability to

17  motivate itself, to do things, to think, to emote, has

18  been compromised.  And it really has a devastating toll on

19  someone's daily life because then the individual is not

03:43:46  20  capable of initiating as readily and as quickly behaviors,

21  actions, thoughts, feelings.

22          Families often don't recognize it or see

23  it.  They think the individual has slowed down.  They

24  think that they are depressed.  But, really, it's just an

03:44:02  25  absence of that fire inside, that motivation to do things.

*MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO*

1    **Q.**   And you said you see this in your daily practice in

2    all of the different elderly people that you work with at

3    your --

4    **A.**   Yes.

03:44:15   5    **Q.**   -- Miami --

6    **A.**   It's one of the most common syndromes that I see in

7    the setting of dementia.

8    **Q.**   And so is there a correlation or, at least, a

9    relationship that you have seen between apathy and

03:44:24   10   dementia in terms of it being coexisting?

11   **A.**   Yeah, without question.  I would say that, you know,

12   many different forms of dementia have very high rates of

13   apathy and it's challenging.  It's difficult to really do

14   much about.

03:44:39   15   **Q.**   How would someone who has been diagnosed with

16   apathy -- how would that impact their ability to, for

17   example, assist their counsel in defense -- in their own

18   defense, in your opinion?

19   **A.**   There will be, to some extent, a lack of interest in

03:44:57   20   aspects of the case, a lack of urgency or appreciation for

21   issues that need to be attended to.  There will be a lack

22   of initiation in terms of proposing or getting involved in

23   different elements of the trial.

24           Clearly, if you want someone participating

03:45:14   25   in their own defense, you want them to be observing what's

1  going on and initiating thoughts and concerns and items to

2  address it, both in their own defense and working with

3  their counsel.

4            So --

03:45:27  5  **Q.**   So, in your opinion, does Mr. Brockman suffer from

6  this condition as opposed to being just disinterested in

7  his case?

8  **A.**   Without question there's evidence of apathy in his

9  presentation.  It's -- there is evidence of apathy in the

03:45:45  10  collateral descriptions of him.  There is evidence of

11  apathy in his performance, the way he approaches doing

12  testing.  And I think this is an incredibly important

13  component of his impaired ability to really participate in

14  his own defense.

03:46:05  15  **Q.**   Your next diagnosis.  Just explain -- you have

16  "insomnia with obstructive sleep apnea."  What is it that

17  we should glean from that diagnosis?  I would just have

18  you explain it to us.

19  **A.**   Whenever we do psychiatric assessment sleep is one of

03:46:20  20  the main issues we look at.  So, for sake of completeness,

21  I felt it was necessary to put in that there's a diagnosis

22  of insomnia.  The sleep study showed that he has

23  obstructive sleep apnea.  It can have important effects on

24  the brain as well.  So, it's -- it's an important

03:46:36  25  diagnosis to include in his overall clinical picture.

*MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO*

1  **Q.**   And if he is able to get a CPAP machine and maybe

2  address some of the obstructive sleep apnea is that going

3  to bring him back up to a higher cognitive functioning?

4  **A.**   No.

03:46:52  5  **Q.**   Okay.  Then -- I don't know on the possible REM sleep

6  behavior disorder, I don't want to eliminate anything, if

7  there is anything you want to share about that?

8  **A.**   I would just say, if you look through his clinical

9  history, there are descriptions of him acting on dreams,

03:47:08  10  which is a central behavior we see in REM sleep behavior

11  disorder.  It's something we see within the context of

12  Parkinson's disease and Lewy body disease.

13            He had a sleep study which didn't show it,

14  but the sleep study had a question of whether there is

03:47:22  15  sufficient REM sleep.  He also has been on Trazodone,

16  which has been prescribed to him to reduce the behaviors,

17  for some period of time he was on Klonopin.

18            So, my question was do we not see because

19  it's partially treated.  It doesn't really make a

03:47:38  20  difference.  It doesn't change or affect the diagnosis

21  here, but, here, again, for the sake of completeness, I

22  wanted to address all the different components of his

23  diagnosis.

24  **Q.**   Very good.  Thank you.

03:47:45  25            So, the second question that you had posed

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1    or that was in your report was does the evidence reflect

2    that Mr. Brockman is malingering cognitive deficits.  I

3    want to talk a little bit about that.

4              And I take it -- well, you have obviously

03:47:55    5    read Dr. Denney and Dr. Dietz's reports where they have

6    concluded that Mr. Brockman is malingering or exaggerating

7    the severity of his cognitive impairment.

8              What's your understanding of

9    "malingering"?

03:48:08    10    **A.**   Malingering would be where -- in this case, where

11    Mr. Brockman is believed to be exaggerating his symptoms

12    in order to feign his degree of neurocognitive impairment.

13    **Q.**   And for what reason?

14    **A.**   In order to be seen as not competent to stand trial.

03:48:28    15    **Q.**   And to obtain some sort of secondary benefit?  Are

16    you familiar with that term?

17    **A.**   Absolutely, yes.

18    **Q.**   And so do you, in the many patients that you see in

19    your practice and elderly patients -- do you have

03:48:41    20    experience with patients exaggerating their symptoms or

21    malingering?

22    **A.**   In the legal setting, no, because I work in a

23    clinical setting.  I have seen individuals who want to

24    minimize or hide their symptoms.  I have seen a few cases

03:48:57    25    where individuals want to play up symptoms more.  So, I

MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO

1   have seen elements of that but to a limited extent.

2   Q.   Right.  And, again, I -- I think Dr. Dietz or --

3   criticized your report to some degree for saying you

4   didn't take into consideration that Mr. Brockman is facing

03:49:17   5   criminal charges and might have a secondary motive to

6   feign the extent of his maladies.

7            Is that something you did take into

8   account in forming your opinion?

9   A.   Without question.  I mean, my purpose here was to try

03:49:30   10   to -- to meet him and determine what's going on.  You

11   know, what are the gravest symptoms, you know, to what

12   extent is the degree of it.  And so, obviously, that's

13   something I would take into consideration given the dire

14   circumstances that he is in.  But I did not find and see

03:49:48   15   any evidence that he actually was malingering in this

16   situation.

17   Q.   So, let me ask you this, Dr. Agronin.  Do you have an

18   opinion as to whether Mr. Brockman is malingering his

19   cognitive deficit?

03:50:01   20   A.   I don't believe he is.

21   Q.   Okay.  And why not?

22   A.   Dementia, as I described when we began, is an

23   incredibly complex disorder, and we are not talking about

24   dementia in general.  We are talking about a specific type

03:50:14   25   of dementia, Parkinson's disease dementia, and all the

1  elements of it.

2            We're also talking about a timeline that

3  goes back years.  We are talking about interviews with

4  multiple experts who have interviewed him and given

03:50:29  5  consistent diagnoses, and about functional changes.

6            We are not talking about a situation where

7  someone may be faking a -- potentially faking a symptom or

8  a cluster of symptoms.  We are talking about a complex

9  disease state that unfolds over years, and what we have

03:50:47  10  seen is a consistent pattern of unfolding of changes that

11  have been supported by an incredibly large array of

12  clinical data as well and interviewers who have seen him

13  all coming to the same conclusions.

14            So, to me, the idea that someone could

03:51:10  15  somehow over this number of years feign that seems

16  completely implausible.

17  Q.   And I know that -- well, I take it you're familiar

18  with Dr. Dietz' line in his second report where he could

19  not make a determination as to Mr. Brockman's competence

03:51:29  20  to stand trial, where he posited that "It's also possible

21  that this unusually intelligent and disciplined defendant

22  has intentionally and knowingly mislead his professional

23  and social circle to see him as more impaired than he

24  actually is by exaggerating the extent of his cognitive

03:51:46  25  decline.  This would, no doubt, be a herculean task, but

1    Mr. Brockman has previously accomplished herculean tasks."

2                       What came to mind for you when you read

3    that?

4    **A.**    To me, a herculean task is a mythic task because it

5    doesn't exist.  No one -- no one does what Hercules is

6    mythologized as doing.

7                       In this case, I would agree for someone to

8    be able to feign the complexity of -- of a dementia like

9    this over years in nearly every single setting to me is

10   completely implausible.  It is herculean in a sense that

11   it would be a mythic thing for someone to do.

12   **Q.**    And would it be, in your view, even more difficult to

13   do with someone who everyone acknowledges has some degree

14   of cognitive impairment?

15   **A.**    To me, that's an essential point as well,

16   because acknowledged by both sides that he has Parkinson's

17   disease, which we know is associated with such a high

18   degree of cognitive impairment, acknowledged on both sides

19   that he has a degree of cognitive impairment.  So, not

20   only would you presume that he's able to accomplish this

21   completely implausible herculean task, but now you add in

22   the disease -- the disease state, delirium, baseline

23   cognitive impairment, to also think he could somehow do

24   that, to me, makes it even more implausible.

25   **Q.**    I think the third question that you addressed is

1  whether Mr. Brockman reflects the mental stamina needed

2  for a courtroom trial on the charges he faces.  What's

3  your opinion on that aspect?

4  **A.**   So, my opinion is that he doesn't.

03:53:31   5           First of all, physically, he's weakened

6  and frail; and so, that's a limiting factor.  But, more

7  importantly, if you combine his slowed mental processing

8  speed and the neurocognitive impairment and the apathy,

9  it -- and you look at all of the expectations that you

03:53:51  10  would have in such a complex case, to me, I do not see him

11  having the stamina to sufficiently engage in that entire

12  process over time, especially with a process that is only

13  getting worse over time.

14  **Q.**   And we will address that question, as well as the

03:54:08  15  fourth question, with a series of video clips in just a

16  moment that I want to play for you --

17  **A.**   Okay.

18  **Q.**   -- and ask you some questions.

19           But, again, the last question addressed in

03:54:17  20  your reports is whether Mr. Brockman is able to assist his

21  counsel in defending this case, somewhat related to the

22  third question.  And, again, your view on that, and then

23  we will maybe dive into some of the video clips.

24  **A.**   Sure.  I don't believe he is able to, because across

03:54:35  25  multiple neurocognitive domains he's sufficiently impaired

MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO

1    not to be able to engage with his attorneys, recognize the

2    details of his defense, remember things, remember things

3    over time, consistently express his opinions to both take

4    in information, process it, engage in the process of his

03:55:00    5    defense over time.

6                His impairment, his apathy, put together,

7    make it impossible for him to do this with -- by the

8    standard, with, as we say, a reasonable degree of rational

9    understanding here.

03:55:17    10               This is -- your list to me from my report

11    sums up those particular areas where he has difficulty

12    doing that.  I can go through this if you want and --

13    Q.   Well, why don't we -- why don't we go through and

14    play you some video clips, and these are predominantly

03:55:33    15    your interviews but also some clips from Dr. Dietz and

16    Dr. Denney, and then we will talk about some of these

17    along the way.  There is not a clip for every single one,

18    but I think --

19    A.   Okay.

03:55:41    20    Q.   -- it would be a representative sample.

21               So, let me just ask you, Dr. Agronin.

22    It's fair to say there is hours and hours and hours of

23    videotape of Mr. Brockman being interviewed for purposes

24    of this competency proceeding, correct?

03:55:55    25    A.   Yes.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO

1 Q.   Okay.  And I'll just represent to you those have all

2 been entered into evidence for Judge Hanks' perusal at his

3 leisure.  So, it's too much to play today, but I do have

4 some video clips that I am going to play here, all from

03:56:12  5 the longer recordings that are already entered into

6 evidence.

7            And so I am going to call up three.  We

8 will go through them in order.  These are from your July

9 11th examination of Mr. Brockman and generally concerning

03:56:27 10 Mr. Brockman's understanding of the purpose of the

11 examination, just to orient everyone.

12            And so the first clip I would like to

13 play, Matt, is July 11, "Understanding the Purpose of the

14 Exam," No. 2, and I'll just represent to the government

03:56:41 15 this is from Defendant's Exhibit 10.

16            So, we will mark this clip for the record

17 as Defendant's Exhibit 10-A, and it's going to cover Page

18 11, Line 15 through Page 13, Line 14.

19                    **(Video played.)**

03:57:05 20            "DR. AGRONIN:  That's right.  You're from

21 Florida.  So, can you tell me, in your own words, my role

22 and the purpose of this interview?  What's your

23 understanding of that?

24            "MR. BROCKMAN:  I can't say that I have a

03:57:23 25 decent understanding.  That is a situation where I have

1  some good and some very highly compensated attorneys, and

2  they did whatever they do to make decisions on such

3  matters --

4          "DR. AGRONIN:  Yeah.

03:57:42  5          "MR. BROCKMAN:  -- and reached in and pulled

6  out a name and said, 'This is the person.'

7          "DR. AGRONIN:  And do you know why they made

8  that decision:

9          "MR. BROCKMAN:  (No response.)

03:57:57  10          "DR. AGRONIN:  Why did they want me to speak to

11  you today?

12          "MR. BROCKMAN:  I'm not quite sure of that, but

13  they said do it, and I said, 'Yes, sir.'

14          "DR. AGRONIN:  Okay.  So, do you have any idea

03:58:11  15  the purpose of my interview today?

16          "MR. BROCKMAN:  Not really.

17          "DR. AGRONIN:  Okay.  How about what -- what

18  type of doc -- what type of profession do I have?

19          "MR. BROCKMAN:  Well, I gather you are an

03:58:27  20  M.D. --

21          "DR. AGRONIN:  Okay.

22          "MR. BROCKMAN:  -- that your profession is to

23  be M.D.-like.

24          "DR. AGRONIN:  Okay.  And what does that mean?

03:58:40  25          "MR. BROCKMAN:  Well, it means that you came up

100

1  through a formal medical education.

2          "DR. AGRONIN:  Uh-huh.

3          "MR. BROCKMAN:  I've seen kids, friends of

4  family, stuff like that --

03:58:51    5          "DR. AGRONIN:  Yeah.

6          "MR. BROCKMAN:  -- you know, grown up and

7  thrive on it, and I've seen others not do so well.  And the

8  amount of stuff -- what I hear is just around the coffee

9  table.

03:59:05   10          "DR. AGRONIN:  Yeah.

11          "MR. BROCKMAN:  The amount of stuff that today

12  has to be memorized and has to be instantly available

13  and --

14          "DR. AGRONIN:  Sure.

03:59:14   15          "MR. BROCKMAN:  -- I don't know how that --

16  that works.  That appears to me to be huge."

17                  (Video stopped.)

18          MR. VARNADO:  Okay.  Thanks, Matt.  I will play

19  some more in just a minute.

03:59:24   20  BY MR. VARNADO:

21  **Q.**   So, just to make sure we're all oriented, that was a

22  clip -- and we are going to look at a couple more from

23  your July 11 exam, correct, Dr. Agronin?

24  **A.**   Yes.

03:59:33   25  **Q.**   And where did those -- where did that interview take

MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO

1    place, if you remember?

2    **A.**   It took make place in the conference room at the

3    Jones Day offices.

4    **Q.**   Okay.  And what were you probing there?  What were

03:59:43   5    you trying to do?

6                 And I'll just represent to you, and you

7    probably recognize that, that's at pretty early on in the

8    interview.  We are going to go through sequentially.

9    **A.**   Sure.

03:59:52   10   **Q.**   What were you attempting to elicit?

11   **A.**   So, I wanted to see could he remember who I was and

12   what I was doing, my purpose there.  Could he give detail

13   about it?  Did he have an understanding of why we're

14   there, what we're trying to accomplish?  What's the goal

04:00:06   15   of that?

16                And what I found is that he could not

17   remember clearly over time.  His answers were vague.  He

18   wandered, and he just wasn't able to grasp the essence of

19   that.  And I found that in that interview and also in my

04:00:27   20   follow-up interview with him as well.

21   **Q.**   Okay.  And were you asking the questions in a

22   particular way in terms of being open-ended?

23   **A.**   Yes.  What I didn't want to do is ask a question and

24   have him say "yes" or "no" and then move on.  I wanted to

04:00:42   25   make sure he -- I gave him an opportunity with an

MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO

1    open-ended question to describe in detail his

2    understanding of it.  So I -- I didn't want to just let it

3    go "yes," "no," and move on but to really see his thought

4    process.

04:01:00   5    Q.   Okay.  And did you see some differences in how, at

6    least at times, the government experts were asking

7    questions of Mr. Brockman in their examinations?

8    A.   Well, I thought a lot of it focused on remote

9    memories, which were quite intact.  And we know in nearly

04:01:16   10   every form of dementia remote memories last a long time,

11   and so someone can go on and on about remote memories and

12   have trouble with recent.  So, I wanted to have a little

13   more focus on right now, recent memories.

14              And at times I felt in some of the

04:01:30   15   interviews they really took a face value of what he said.

16   'Do you understand XYZ?'  'Yes.'  'Do you understand

17   this?'  'Yes.'  As opposed to saying, 'Well, what is your

18   understanding of it?  Tell us what you mean by that,' to

19   see does he really understand it other than just saying

04:01:45   20   "yes" or "no."

21   Q.   Okay.  Let me play you another clip from that same

22   interview just a little bit later.  We are going to mark

23   this as Defense Exhibit 10-B.  It's from Page 24, Line 3,

24   though Page 24, Line 23.  This is "Understanding the

04:01:59   25   Purpose of the Exam, 3."

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          MR. VARNADO:  Matt, thank you.

2                **(Video played as follows.)**

3          "DR. AGRONIN:  Okay.  Do you understand why I'm

4  here speaking with you?

04:02:11   5          "MR. BROCKMAN:  I would have to say somewhat.

6          "DR. AGRONIN:  Tell me.  What's your

7  understanding of my -- my role here, what I'm doing here?

8          "MR. BROCKMAN:  Well, your role is -- and

9  that's to interview me and, you know, reach conclusions

04:02:25  10  about me --

11          "DR. AGRONIN:  Yeah.

12          "MR. BROCKMAN:  -- and report them to third

13  parties, one of which is one of my arch enemy.

14          "DR. AGRONIN:  So, you think that I'm preparing

04:02:38  15  something to -- on behalf of an arch enemy or for them or

16  what?

17          "MR. BROCKMAN:  Yeah, on behalf.

18          "DR. AGRONIN:  On behalf?  And who is your arch

19  enemy?

04:02:48  20          "MR. BROCKMAN:  Somebody called CDK."

21  BY MR. VARNADO:

22  **Q.**    What did you observe there, Dr. Agronin?

23  **A.**    To me, this reflected his disorientation and lack of

24  memory of who I was, what I was doing there, and, you

04:03:01  25  know, it could have reflected some degree of paranoia

*MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO*

1    about what was going on.

2              But, again, it's -- really speaks to some

3    of the disorientation, the lack of understanding of who I

4    was, why I was there, consistently over time as we

04:03:17    5    proceeded through the interview.

6    **Q.**   And the video was a little darker there.  Did the

7    light go off in the conference room or something?  Or did

8    you guys pull a shade or something?

9    **A.**   Not that I recall.  Not that I recall.

04:03:27    10   **Q.**   I am going to play you another one just later in that

11   same interview from July 11.  We are going to mark this as

12   Defense Exhibit 10-C.  It is 101, line 7 through 101, Line

13   20.  If we could play, Understanding the Purpose of Exam

14   One.

04:03:41    15             **(Audio plays as follows:)**

16             "DR. AGRONIN:  Do you remember what my role is

17   here in the case?  What am I trying to do or why are we

18   here today?

19             "MR. BROCKMAN:  It looks to me like that the

04:03:56    20   chief part of your mission is, and that's to find out

21   exactly what's going on, and report to those that you

22   represent.

23             "DR. AGRONIN:  Okay.  Do you know who I

24   represent?

04:04:08    25             "MR. BROCKMAN:  You -- you say that it's not

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

*MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO*

1  the Justice Department, I think?

2             "DR. AGRONIN:  Correct.

3             "MR. BROCKMAN:  Therefore, I would expect that

4  you're engaged by my law firm."

5                    **(Audio concluded.)**

6  BY MR. VARNADO:

7  **Q.**   So, again, Dr. Agronin, this was late in the

8  interview and was Mr. Brockman still exhibiting some

9  amount of confusion about who you were and what you were

10 there for?

11 **A.**   Yes.

12 **Q.**   I want to shift topics from just sort of the purpose

13 of the exam, and play some clips that relate to your

14 questioning of Mr. Brockman as to whether he could assist

15 his attorneys.  Do you recall asking him some questions

16 along those lines?

17 **A.**   Yes.

18 **Q.**   And do you recall that Dr. Dietz and Dr. Denney asked

19 similar questions in their interviews?

20 **A.**   I recall that, yeah.

21 **Q.**   At least in part?

22 **A.**   Yeah.

23 **Q.**   So, I am going to play a clip from the May 20th

24 interview.  This is actually -- the entire video is in as

25 Government's Exhibit 4.  I am going to mark this

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  Defendant's Exhibit 83-A.

2                   This comes from Line 44 -- I'm sorry.

3   Page 44, Line 19 through Page 46, Line 24.

4                   MR. VARNADO:  And, Matt, the clip is the May

04:05:21  5  20th helping attorneys one.

6                   **(Audio played as follows:)**

7                   "DR. DENNEY:  What -- how can you -- and,

8   again, I'm not asking about specifics, details of your case

9   at all, I'm just saying in general, how can you help your

04:05:35  10  attorneys?  What sorts of things can you do that can be

11  helpful for your attorneys?

12                  "MR. BROCKMAN:  Well, the -- my attorneys,

13  as -- as sharp as they all are, and it's not just Kathy, I

14  mean, the whole crew.

04:05:52  15                  "DR. DENNEY:  Uh-huh.

16                  "MR. BROCKMAN:  They don't understand the

17  business, you know, what the company does, and why it does

18  it, you know, why is this product necessary, who buys them.

19  And this is -- it -- what the product is, is actually many

04:06:20  20  products that all live together, work together, integrate

21  together, and where -- they're all produced by a single

22  entity, which is Reynolds and Reynolds.

23                      "And, you know, a prospective customer, a

24  car dealership, will look at our systems and their

04:06:48  25  integration, and decide if that's the way he wants to run

1  his business where -- that's a central point of control,

2  where the computers control what gets done and report on

3  everything.

4              "And those are words, which if you say

04:07:09  5  them quick, are very believable to the attorneys, but you

6  got to make sure that they understand how it really works.

7              "DR. DENNEY:  Okay.  So, if I understand what

8  you're telling me correctly, that they don't necessarily

9  have -- they've got tremendous knowledge regarding tax law

04:07:29  10  and the Court process and all that sort of thing, but they

11  don't necessarily know your business?

12              "MR. BROCKMAN:  Uh-huh.

13              "DR. DENNEY:  Right?  Like you do, I'm sure.

14              "MR. BROCKMAN  Yeah.  Correct.

04:07:39  15              "DR. DENNEY:  And so you can help them --

16              "MR. BROCKMAN:  Well, I think they're smart

17  enough in the end, eventually they figure everything out.

18  But the fact that there's a person available that has

19  knowledge that they can call upon, certainly it cuts down

04:07:58  20  the amount of hours they bill.

21              "DR. DENNEY:  Got you.  So there are probably

22  facts, details, and points regarding your business and your

23  practices over the years and recent years, that may relate

24  to what they have charged you with, that you could be

04:08:18  25  helpful to your attorneys to understand?

MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO

1        "MR. BROCKMAN:  Correct."

2                      **(Audio concluded.)**

3   BY MR. VARNADO:

4   **Q.**    Dr. Agronin, is that one of the type of questions

04:08:25   5   that you sought to avoid, of just, you know, where all

6   Mr. Brockman had to do was say correct at the end there?

7   **A.**    Yeah.  And, I mean, this is a case where he goes off

8   on a tangent when he answers the question.  He is not

9   really answering the question to help his attorneys with

04:08:40   10   the case.  He falls back on his business, and the response

11   is rewording what he says to make it, as if it's relevant

12   to the case, but in this case, clearly, it's -- he wasn't

13   speaking to that.

14   **Q.**    Right.

04:08:50   15   **A.**    So --

16   **Q.**    Let me -- let me -- thank you for that.  And I'll set

17   it up a little better.

18                      Fair to say, that interview from May 20th,

19   by far, the best Mr. Brockman was able to perform on any

04:09:02   20   of these interviews?

21   **A.**    Compared to?

22   **Q.**    Well, to the other times --

23   **A.**    Yes.

24   **Q.**    -- when you met him on July 11th, and then later in

04:09:10   25   October, did you think he sort of appeared at least a

1 little more able to respond, even just physically, at that

2 point?

3 **A.**   He did seem more -- more articulate then.

4 **Q.**   Okay.

04:09:22  5 **A.**   He provided more detail, even though it still was at

6 times rambling and off track.

7 **Q.**   And that is, again, my next point.  You know, he --

8 he obviously delved into talking about Reynolds and

9 Reynolds, which has nothing to do with the tax case,

04:09:36  10 correct?

11 **A.**   That's my understanding.  Yes.

12 **Q.**   Okay.  And did you find that a common practice even

13 in your dealings with interviews with Mr. Brockman, where

14 he would sort of fall back on and retreat to discussing

04:09:48  15 Reynolds and Reynolds?

16 **A.**   Yes.

17 **Q.**   Okay.  And what do you attribute that to?  Is there

18 anything in the, you know, psychiatric world that we would

19 look to for what is going on there and in the world of his

04:10:01  20 cognitive deficit?

21 **A.**   Sure.  Well, I think this harkens back to what I

22 mentioned earlier, that he falls back on his strengths.

23 He's -- his language skills are more preserved than his

24 other cognitive skills.  He has a -- a well ingrained

04:10:16  25 knowledge base of his business.  It's an overlearned skill

MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO

1    for him to talk about his business and describe it and so

2    he often will fall back on that when he is trying to talk

3    and describe different things.

4    **Q.**   You know, as part of the materials you have reviewed

04:10:31  5    in connection with your work on this matter, we have

6    referenced early in your exam some transcripts from

7    depositions --

8    **A.**   Yes.

9    **Q.**   -- or interviews with the FTC.  Did you have a chance

04:10:42  10   to look at those videos?

11   **A.**   I did.  I watched the videos.  I read the transcript.

12   Yes.

13   **Q.**   And are those videos, for you, in your professional

14   opinion and practice, inconsistent with what you're

04:10:54  15   testifying to today and what you observed in your

16   interactions with Mr. Brockman?

17   **A.**   Not at all.  Not at all.

18   **Q.**   Explain to the Judge why.

19   **A.**   So, first of all, whether it's a birthday party he is

04:11:05  20   speaking at or a deposition, he -- first of all, we

21   don't -- these aren't cognitive tests, and so you can't

22   look at that and make a diagnosis or not make a diagnosis.

23   It is not a test.

24           And even if you wanted to, he's speaking

04:11:22  25   about something he knows well.  We don't know if

MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO

1    everything he says is correct or factually true.  And so,

2    you would have to even think about analyzing it in more

3    detail to know what's intact or not.

4                    But even putting it aside, he's speaking

04:11:35   5    about overlearned material.  He is doing something that he

6    does well.  His language skills are more -- are less

7    impaired than other things.  And so you are looking at

8    performances he is doing, which speak to his strengths.

9                    To me, really that analogy I gave before,

04:11:52   10   someone like Tony Bennett singing, you could say this was

11   his singing to some extent during 2019.

12                   I will also add that this is a time when

13   he had -- even when -- I -- I noticed, even from the

14   testimony, that you can see degrees of Parkinson's disease

04:12:04   15   in those, I would say even that's a stretch because you

16   don't know.  You know, maybe, you're observing changes in

17   motor function, could have been many different things.

18   That is why we do the testing.

19                   We do the rigorous exams like he had in

04:12:17   20   2019, because you are not going to rely on -- on that

21   information to make or not make a diagnosis.  You --

22   certainly it's information you could look at, and add to

23   the picture, but it is not going to make or not make a

24   diagnosis.

04:12:30   25                   And I would add also, this -- that is

MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO

1   Robert Brockman in 2019.  You know, right now, we're

2   dealing with Robert Brockman in 2021.  And so that was a

3   time when he certainly was in an earlier course of

4   Parkinson's disease impairment in areas was milder than it

04:12:45   5   is now.

6              So to me, to make a definitive opinion on

7   how he can defend himself now based on 2019 would not

8   speak to the -- the current Mr. Brockman.

9              THE COURT:  One quick question.  Doctor, you

04:13:01   10   saw the entire video, right?

11             THE WITNESS:  Yes.

12             THE COURT:  Okay.  In the video, is all the

13   video talking about things in the past, or was he also

14   talking about things that were relatively recent to the

04:13:13   15   deposition?  Do you remember?

16             THE WITNESS:  Yeah.  I think there was -- there

17   was somewhat of a combination of it.  There were some

18   things that -- but I think a lot of it anchored his work

19   and things he knows, or at least knew quite well at the

04:13:28   20   time.  And it really spoke to his strengths to that extent.

21             MR. VARNADO:  Thank you, Judge.

22   BY MR. VARNADO:

23   Q.   Okay.  So sticking with this topic of helping

24   attorneys.  I want to now shift to a couple of your

04:13:44   25   examinations.  We will go back to July 11th.  This is in

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1    evidence as Government's Exhibit 10.  I am going to mark

2    this as Clip 10-D.  It comes from Page 21, Line 13 through

3    Page 21, Line 25.  And it's July 11, Helping Attorneys

4    One.

04:14:07    5                    **(Audio plays as follows:)**

6                    "DR. AGRONIN:  And what does that mean when you

7    help your attorneys?  What sort of things would you help

8    them with?

9                    "MR. BROCKMAN:  Well, the world is very

04:14:19    10   complex, and while you might think that a computer system

11   for a car dealership would be kind of non-attractive, be

12   too small, but I believed for a long time, that with the

13   right software, everything will work.

14                    "And what the competition is always

04:14:46    15   interested in doing, is they want to have the qualities and

16   byproducts for the price that the competitor offers their

17   products."

18                    **(Audio concludes.)**

19   BY MR. VARNADO:

04:14:59    20   **Q.**   Was Mr. Brockman able to answer your question at all?

21   **A.**   No.  He went off on a tangent.  And, again, he fell

22   back on a territory that is very familiar for him.

23   **Q.**   I want to play another one from your October 3rd

24   examination.  That was your second exam, correct?

04:15:14    25   **A.**   Yes.

MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO

1  **Q.**   Was that also at Jones Day?

2  **A.**   Yes, it was.

3  **Q.**   All right.  And this comes from Defense Exhibit 13,

4  and we are going to mark this clip Defendant's Exhibit

04:15:24  5  13-A.  It is from Page 36, Line 14 through Page 38, Line

6  13.  This is October 3rd, Helping Attorneys One.

7                    **(Audio plays as follows:)**

8                    "DR. AGRONIN:  In general, how do you feel

9  that you could help your attorneys?

04:15:45  10                   "MR. BROCKMAN:  Well, they have more than

11  several interesting lawsuits underway involving big

12  dealerships, groups of dealerships, and some very complex

13  software.  And their demands that we do what needs to be

14  done to the software to make it exactly the way they like

04:16:28  15  it.

16                   "DR. AGRONIN:  And is that what you

17  feel you can help them with?

18                   "MR. BROCKMAN:  Yeah.  Because I've

19  been long term involved with this particular account, and I

04:16:46  20  know the players inside pretty well.  And the guys in this

21  dealership are basically big bullies, and that they insist

22  that such and such be done to the software or not be done

23  to the software, and they want to dictate, as much as you

24  would do if you had an in-house software department.

04:17:19  25                   "Well, we don't have any provision for

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO

1 that and so therefore -- and these guys show up about once

2 a year and they have a known pattern.  They say, Hurray,

3 glad everything's looking up, you know, we're going to make

4 great progress this year, so forth and so on.

04:17:45    5                "And then what happens, it's like you

6 started the record over again for an hour, two hours,

7 however it takes to kind of grind through their litany.

8                "At the end of the day, they're offering

9 nothing.  And therefore, we're going to do nothing, and

04:18:15   10 those are issues, which are really -- they're sales issues

11 in one regard, and then, you know, what do you do with a

12 large cantankerous customer that's trying to throw its

13 weight around.

14                "DR. AGRONIN:  So how can you help your

04:18:36   15 attorney with these cases?

16                "MR. BROCKMAN:  Well, right now, my

17 attorneys understand zero about this part of our business,

18 and they also know nothing about the history with this

19 particular account, which has been long and bloody.  And --

04:18:52   20 but if we were to build --"

21                **(Video stopped.)**

22 BY MR. VARNADO:

23  Q.   So, again, Dr. Agronin, you sort of just let

24  Mr. Brockman go on, but did you try to reorient him to the

04:19:12   25  actual question that you had began with?

1  **A.**   Sure.  I wanted to see if he could come back and give

2  him a number of opportunities to reorient himself, to try

3  to get back on track, and, you know, he kept falling back

4  to, you know, the same talk -- topic about his business.

04:19:27  5  **Q.**   I just want to play one more from this particular

6  interview on this same topic.

7          This, again, is from Government's

8  Exhibit -- I'm sorry -- Defense Exhibit 13.  I am going to

9  mark this as Defense Exhibit 13-B.  It's from Page 38,

04:19:41  10  Line 19 through Page 39, Line 13.  The October 3rd,

11  Helping Attorneys Two.

12                **(Audio plays as follows:)**

13          "DR. AGRONIN:  What have you been doing for

14  your own case lately?

04:19:53  15          "MR. BROCKMAN:  I think mainly it's been

16  going to the doctor, going through tests, you know, turning

17  over medical information, trying to, you know, follow-up

18  what my doctors want me to do, so that I can recover to

19  full strength.  I've never been sick like this.

04:20:24  20          "DR. AGRONIN:  Yeah.

21          "MR. BROCKMAN:  Ever before.

22          "DR. AGRONIN:  Are there things you can do

23  to get your health better?

24          "MR. BROCKMAN:  Yeah.  I call it walking.  I

04:20:32  25  call it treadmill.

*MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO*

1        "DR. AGRONIN:  Yeah.

2        "MR. BROCKMAN:  It's called, you know,

3  little two-pound dumbbells.

4        "DR. AGRONIN:  Have you been doing that?

5        "MR. BROCKMAN:  More.  Still not perfect.

6        "DR. AGRONIN:  Yeah.

7        "MR. BROCKMAN:  But it's -- fortunately,

8  it's very simple, and that's probably been very fortunate,

9  the fact that it's simple, is what I was able to tell my

10  wife about it and she understood, and so now she's the one

11  that's after me."

12            **(Audio concluded.)**

13  BY MR. VARNADO:

14  **Q.**   Dr. Agronin, did you experience anything with

15  Mr. Brockman in your examinations of him where his

16  performance would get worse over time or later in the day?

17  I don't know if that manifested itself at all in your

18  observations.

19  **A.**   Yeah.  I felt to some degree as the day wore on, he

20  seemed a little more tired, slower.  I thought that the

21  degree of impairment was pretty consistent throughout.

22  **Q.**   Okay.  I want to play you just a couple more.  This

23  is from Dr. Dietz and Dr. Denney's interview from just a

24  little over a month ago, October 20th.

25            This is in evidence, the entire video, as

MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO

1    Government's Exhibit 93.  We are going to mark this clip

2    as Defense Exhibit 75-D, and this comes from Page 26, Line

3    7 through Page 27, Line 6 of the transcript?

4            MR. VARNADO:  And, Matt, it's the video October

04:21:58    5    20, beginning of Dietz/Denney.

6                    **(Video played as follows:)**

7            "DR. DIETZ:  Do you know my name?

8            "MR. BROCKMAN:  I believe it's Dietz.

9            "DR. DIETZ:  Yes, it is.  And who is this?

04:22:10    10            "MR. BROCKMAN:  I'm sorry.  I don't

11    remember.

12            "DR. DIETZ:  So this is Dr. Denney, and do

13    you know what we're here to evaluate you about?

14            "MR. BROCKMAN:  You're here to evaluate my

04:22:27    15    competency to stand trial.

16            "DR. DIETZ:  That's right.  And what would

17    happen if the Court determined that you were competent to

18    stand trial?

19            "MR. BROCKMAN:  I would presume I would go

04:22:42    20    to trial.

21            "DR. DIETZ:  And what would happen if the

22    Court determined that you were not competent to stand

23    trial?

24            "MR. BROCKMAN:  I'm less clear as to what

04:22:58    25    would happen.  I probably -- my guess it would be, it would

1  be a long and involved process.

2                  "DR. DIETZ:  Would you need to go anywhere?

3                  "MR. BROCKMAN:  I don't know."

4                  **(Audio concluded.)**

04:23:17  5  BY MR. VARNADO:

6  **Q.**   So, Dr. Agronin, that was a clip early on in the

7  interview most recently with Dr. Dietz and Dr. Denney.

8  And I just want to now play you a clip from later in that

9  interview, and then ask you a few questions about it.

04:23:29  10                  This, again, is from the total video in

11  evidence as Government's Exhibit 93.  This is Defense

12  Exhibit 75-E.  It's a clip that's a little bit long,

13  Judge, but I am going to stop it in the middle, and ask

14  some questions.  But -- I mean, long like three minutes.

04:23:45  15                  THE COURT:  Not a problem.

16                  MR. VARNADO:  And it is from Page 55, Line 4

17  through Page 58, Line 15.  Matt, this is October 20th, End

18  of Dietz/Denney.

19                  **(Audio plays as follows:)**

04:23:59  20                  "DR. DIETZ:  There were a couple things I

21  wanted to ask you as we finish up.  Do you recall who we

22  are?

23                  "MR. BROCKMAN:  Yeah, but I" --

24                  **(Video paused.)**

04:24:19  25                  MR. VARNADO:  Let me pause it.  And I'll just

MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO

1  represent to you, this is the very end of the day, the very

2  end of the video we are going to play, a little bit of it,

3  and then kind of the remaining part.  Sorry.  Go ahead.

4              **(Video resumed as follows:)**

04:24:29  5      "MR. BROCKMAN:  I don't think I can say the

6  name.  I think it is -- it's a research firm.

7          "DR. DIETZ:  You think what?

8          "MR. BROCKMAN:  A research firm out in San

9  Francisco.

04:24:43  10         "DR. DIETZ:  A research firm out of San

11  Francisco?

12         "MR. BROCKMAN:  Yeah.  Where you -- you -- you

13  do contracts, projects such as the one you're on right now?

14         "DR. DIETZ:  Why do you think we were here

04:24:56  15  talking to you today?

16         "MR. BROCKMAN:  I think that you were

17  representing your client and asking questions.

18         "DR. DIETZ:  Who's our client?

19         "MR. BROCKMAN:  I believe, ultimately, it's --

04:25:14  20  it is -- its name originally was ADP, Automatic Data

21  Processing.  It now goes by a different name.

22         "DR. DIETZ:  Do you think we work for the

23  competition?

24         "MR. BROCKMAN:  The competition of Reynolds and

04:25:37  25  Reynolds?  Yes.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          "DR. DIETZ:  I'm not sure I'm hearing you

2   correctly.

3          "MR. BROCKMAN:  If you say "competition,"

4   meaning competition to Reynolds and Reynolds, I believe

04:25:52   5   that to be the case.

6          "MR. VARNADO:  Pause it.

7          **(Audio paused.)**

8   BY MR. VARNADO:

9   **Q.**   So, again, I think somewhat a familiar refrain we

04:26:01  10   have seen now of Mr. Brockman being confused about the

11   purpose of the exam, and who is there; is that fair?

12   **A.**   Yes.

13   **Q.**   Anything in your experience and knowledge in this

14   area -- what is your thoughts and impressions where

04:26:17  15   Mr. Brockman seemed more oriented at the beginning, but

16   isn't at the end?

17               Is there something that jumps out at you

18   at that, or is that indicia of malingering in your view?

19   **A.**   You know, in this case, it could be that as the day

04:26:31  20   goes on, there is more fatigue, his mental processing gets

21   even slower.  It becomes even more difficult for him to

22   orient himself.

23               Again, he falls back on, kind of, his

24   brain -- memories from the past, and becomes more confused

04:26:44  25   later in the day.  And, you know, there's some people get

MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO

1   more confused later in the day.  There is a term called

2   "sundowning" that is sometimes used, talking about more

3   confusion, sometimes agitation later in the day.  You

4   know, could this reflect that?

04:26:58   5              It's a possibility that it certainly

6   could, but clearly what we're seeing is just this

7   consistent vagueness, lack of full orientation, whether

8   it's in the beginning or the end, it seems to -- wanes as

9   the day goes on, which I think speaks to the issue of his

04:27:14   10   stamina in the trial.  But also, just to his overall

11   understanding of what is taking place around him.

12   Q.   Okay.  Now, I want to -- we are going to watch this

13   next piece of the clip here that sort of takes us through

14   the end of the interview, and you will notice that

04:27:27   15   Dr. Dietz and Dr. Denney pivot from some of these

16   questions to asking about the date, and some other things,

17   and I want to ask you some questions about this after we

18   play the remainder of this video.

19              **(Audio played as follows:)**

04:27:44   20              "DR. DIETZ:  Do you know what today's date is?

21   Do you know today's date?

22              "MR. BROCKMAN:  I think it's the 12th.

23              "DR. DIETZ:  The 12th of what?

24              "MR. BROCKMAN:  December.

04:27:55   25              "DR. DIETZ:  December?

*MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO*

1             "MR. BROCKMAN:  Uh-huh.

2             "DR. DIETZ:  What year?

3             "MR. BROCKMAN:  This year, 2051.

4             "DR. DIETZ:  20, what?

04:28:05   5             MR. BROCKMAN:  2051.

6             "DR. DIETZ:  2059?

7             "DR. DENNEY:  2051.

8             "DR. DIETZ:  2051.

9             "DR. DENNEY:  Did you say 2051?

04:28:14   10             "MR. BROCKMAN:  Uh-huh.

11             "DR. DIETZ:  And do you know who the president

12   of the United States is?

13             "MR. BROCKMAN:  Yes.  His name is Joe Biden.

14             "DR. DIETZ:  Are you able to spell the word

04:28:26   15   "world" backwards?

16             "MR. BROCKMAN:  D-L-R-O-W.

17             "DR. DIETZ:  And can you subtract threes from

18   20?

19             "MR. BROCKMAN:  Yes.

04:28:43   20             "DR. DIETZ:  Would you do that out loud,

21   please, starting with 20?

22             "MR. BROCKMAN:  I'm afraid I don't understand.

23             "DR. DIETZ:  Start with the number 20.

24             "MR. BROCKMAN:  Okay.

04:28:54   25             "DR. DIETZ:  And then subtract three at a time.

*MARC E. AGRONIN, M.D. – DIRECT BY MR. VARNADO*

1    "MR. BROCKMAN:  Okay.

2    "DR. DIETZ:  So what's the first answer?

3    "MR. BROCKMAN:  27.

4    "DR. DIETZ:  20 minus three equals 27?  Is that

04:29:12   5  what you said?

6    "MR. BROCKMAN:  I'm afraid it's late in the

7  day.

8    "DR. DIETZ:  It is late.

9    "DR. DENNEY:  It is.  If you were to start at

04:29:21  10  20 and then you subtract three, what would you get?

11    "MR. BROCKMAN:  27.  Again, it's late in the

12  day.

13    "DR. DIETZ:  Do you know who the governor of

14  Texas is?

04:29:42  15    "MR. BROCKMAN:  His name is Jeff.  I'm -- I'm

16  drawing a blank on that one.  Good guy, though."

17                    **(Audio concluded.)**

18  BY MR. VARNADO:

19  Q.    Dr. Agronin, you were not here in the courtroom, but

04:30:07  20  I believe you have seen Dr. Dietz' testimony, and there

21  was a discussion of -- about that video clip wasn't played

22  but a discussion of how Mr. Brockman said the year 2051,

23  but was nevertheless able to spell the "world" backwards,

24  as some indicia that this is all a big ruse and

04:30:30  25  Mr. Brockman's faking.

MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO

1           And in your experience as a geriatric

2  psychiatrist, the video clip you just watched, is that

3  consistent with what you see in dealing with people with

4  dementia?

04:30:43   5  **A.**   Sure.  I do many mental examinations every day.  This

6  is exactly what I often see in individuals who have

7  moderate impairment in the very least.  You know, they

8  will get the years mixed up.  2051, maybe he was trying to

9  say something that sounded like 2021.  It is hard to say,

04:31:02   10  but, you know, you will find someone, certain things, his

11  language function is relatively less impaired than others.

12  So spelling he was able to do with that, but the other

13  things he couldn't, I don't really see an inconsistency

14  with that.

04:31:15   15           THE COURT:  Just really quickly.

16           MR. VARNADO:  Please.

17           THE COURT:  I want to ask a question.

18           The fact that Mr. Brockman said, "It's

19  late in the day," does that have any significance to you or

04:31:25   20  is that just a comment?

21           Does that have any -- from a doctor's

22  standpoint, a psychiatrist standpoint, listening to

23  testimony, does that have any significance?

24           THE WITNESS:  I would wonder if he is just

04:31:40   25  exhausted at that point, just mentally exhausted and really

1 struggling to answer the questions.  That's what I would

2 wonder about if I heard someone say that to me.

3 BY MR. VARNADO:

4 **Q.**   And, Dr. Agronin, were you aware that before this

04:31:51  5 last video clip Mr. Brockman had tried to terminate the

6 exam but was urged to go on and continue?

7 **A.**   I know I watched that.  I don't remember the details

8 of that, but yeah.

9 **Q.**   Okay.  And did you see in the video Dr. Dietz and

04:32:06 10 Dr. Denney visibly reacting to the answers he was giving?

11          You saw Dr. Denney shoot straight up and

12 say "2051?  Did you say 2051?"  Could that have triggered

13 some of Mr. Brockman's reaction to respond that it's late

14 in the day?

04:32:21 15 **A.**   It's possible it could.  Again, you know, I wonder if

16 he is just so exhausted by that time he just was, you

17 know, struggling to answer.

18 **Q.**   Is there anything about that clip I just played you

19 that makes you think Mr. Brockman is faking it?

04:32:33 20 **A.**   Not at all.

21 **Q.**   Okay.  I am going to turn to just a few more topics,

22 Dr. Agronin.

23          Do you have an opinion as to whether the

24 stress and rigor of a trial will be difficult for

04:32:51 25 Mr. Brockman?

MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO

1    **A.**    I do think it will be quite difficult.  I think that

2    it would be mentally exhausting for him, and given the

3    neurocognitive impairment, given his apathy, I think it

4    will be difficult for him to engage, pay attention,

04:33:10    5    reason, participate in his defense, as would be necessary

6    and expected for him.

7    **Q.**    And thank you for giving a better answer than the

8    question I offered you, which was do you think he can do

9    it based on what you have observed?

04:33:25    10    **A.**    No.

11    **Q.**    Okay.  Are Mr. Brockman's physical conditions

12    permanent?

13    **A.**    Yes.

14    **Q.**    Are Mr. Brockman's cognitive conditions permanent?

04:33:35    15    **A.**    Yes.

16    **Q.**    Are Mr. Brockman's cognitive conditions progressive?

17    **A.**    Yes.

18    **Q.**    Are Mr. Brockman's physical conditions progressive?

19    **A.**    Yes.

04:33:48    20    **Q.**    Is there any treatment that can cure Mr. Brockman's

21    Parkinson's disease dementia?

22    **A.**    No.

23    **Q.**    Is there any treatment that's going to improve his

24    overall cognition generally?

04:34:01    25    **A.**    No, unfortunately not.

*MARC E. AGRONIN, M.D. - DIRECT BY MR. VARNADO*

1   **Q.**   In your opinion, would further neurocognitive

2   evaluations provide any greater diagnostic clarity on

3   Mr. Brockman's condition?

4   **A.**   No.

04:34:18   5   **Q.**   Do you, in fact, see their potential risk for further

6   imaging and other types of tests that he has undergone?

7   **A.**   I don't see that further imaging is going to clarify

8   the picture more than it is now.  My only -- my concern

9   would be that I think he has had almost five radiation

04:34:38   10   studies this year, which is well above and beyond what we

11   typically do; and, so, to incur more and get a higher

12   radiation exposure I would be concerned about.

13   **Q.**   Would incarcerating Mr. Brockman exacerbate his

14   mental condition?

04:34:57   15            MR. MAGNANI:  Objection.

16            THE COURT:  Okay.  What's the basis of the

17   objection?

18            MR. MAGNANI:  Relevance, Your Honor.

19   Incarceration is not something that's on the table here.

04:35:05   20   We are talking about competency to stand trial.

21            THE COURT:  Yeah.

22            MR. VARNADO:  Well, I'll set it up, Judge.

23   Dr. Dietz specifically asked, 'Would you have to go

24   somewhere if you're found not competent?'  And Dr. Dietz

04:35:16   25   has specifically suggested to the Court that the best

1  course of action, if Mr. Brockman is found not competent,

2  is that he be incarcerated.

3            THE COURT:  Okay.

4            MR. VARNADO:  And so I think it is relevant to

04:35:29  5  what the impact would be, according to Dr. Algorithm, who

6  is an expert in geriatric psychiatry and these conditions.

7            THE COURT:  Okay.  Response.

8            MR. MAGNANI:  So, there are phases of these

9  proceedings.  Right now we're in the phase to determine if

04:35:41  10 Mr. Brockman is competent to stand trial today.

11                 If he is found incompetent, the statute

12 requires that he be committed to the Bureau of Prisons for

13 a period of time to see if his competency can be restored.

14 That is not before us right now.  And to ask this witness

04:35:58  15 about it is inappropriate and not relevant to the question

16 of whether the man is competent today.

17            THE COURT:  Okay.

18            MR. MAGNANI:  So, I mean, Dr. Dietz is correct,

19 as a matter of law, that that is what the statute requires.

04:36:09  20 So, I don't understand the competence --

21            THE COURT:  Well, the issue is, if Dr. Dietz

22 talked about it, then why shouldn't this witness be allowed

23 to answer the same basic question?

24            MR. MAGNANI:  So Dr. Dietz, I believe, brought

04:36:21  25 it up -- and, frankly, I don't remember the context.

1          THE COURT:  I don't recall the context.

2          MR. MAGNANI:  It was on cross-examination.  So,

3 I mean, it's not relevant to whether or not -- the

4 procedural --

04:36:31  5          THE COURT:  Right.

6          MR. MAGNANI:  -- future of this case is not

7 relevant to whether he is competent today.

8          THE COURT:  I get it.  I just don't -- I'm

9 trying to -- Hold on just a second.  Let me check.

04:36:40 10          MR. VARNADO:  And, Judge, I can show you in

11 Dr. Dietz's second report where he offers this opinion.

12          THE COURT:  Okay.

13          MR. VARNADO:  "Based on the totality of the

14 evidence, if the Court were to find Mr. Brockman

04:36:50 15 incompetent to stand trial, the best available strategy to

16 determine whether competence is restorable would be a

17 period of inpatient observation within a facility of the

18 Bureau of Prisons, as contemplated by the statute."

19          THE COURT:  Right.  He says that, but it has no

04:37:05 20 bearing on what we're doing here, whether he says it or

21 not.

22                 So, respectfully, whether it's said by

23 this witness or Dr. Dietz, the Court isn't going to take

24 that into consideration.

04:37:14 25          MR. VARNADO:  Okay.  And we will just flag for

1 the Court we will have arguments about what, in fact, is

2 required under the statute and --

3        THE COURT:  But let me just make sure.  I have

4 done a number of competency proceedings.  We don't decide

04:37:28  5 what happens next until after the Court decides whether or

6 not the defendant is or is not competent.

7        MR. VARNADO:  I agree with that, Your Honor,

8 absolutely.  And if we need to hear from Dr. Agronin at

9 that stage we can certainly call him back.

04:37:39  10        THE COURT:  We can hear from him at that stage.

11        MR. VARNADO:  Okay.

12        THE COURT:  So, the bottom line is:  Regardless

13 whether Dr. Dietz said it in his report or this witness

14 testified about it, I am not going to consider that issue

04:37:52  15 at this time.

16        MR. VARNADO:  Fair enough, Judge.

17 BY MR. VARNADO:

18 **Q.**   Dr. Agronin, is it your expectation that Mr. Brockman

19 is at increased risk of urosepsis?

04:38:11  20 **A.**   (No response.)

21 **Q.**   I'm sorry.  Suffering another UTI and potentially

22 urosepsis, given his pattern for that?

23 **A.**   Sure.  Well, you know, I don't want to go out of my

24 medical expertise in psychiatry, but, you know, the fact

04:38:23  25 that he has had recurrent infections, I would say,

1  indicates an ongoing high risk of recurrent infections.  I

2  would say that.

3  **Q.**   Fair enough.

4  **A.**   Yeah.

04:38:32  5  **Q.**   And with that recurrent risk is there an attendant

6  risk for delirium?

7  **A.**   Sure.  I would say, regardless of the cause, without

8  question he's at a very, very high risk of recurrent

9  delirium and -- and ongoing worsening, given the delirium

04:38:50  10  he has already had and may still be brewing to some

11  extent.

12  **Q.**   Okay.

13         MR. VARNADO:  Thank you, Dr. Agronin.  I'll

14  pass the witness.

04:38:58  15         THE COURT:  Cross-examination?

16                     **CROSS-EXAMINATION**

17  BY MR. MAGNANI:

18  **Q.**   Good afternoon, Dr. Agronin.

19  **A.**   Good afternoon.

04:39:24  20  **Q.**   So we just watched a lot of video, right?

21  **A.**   (Nodding.)

22  **Q.**   Oh.  You have to say "yes."

23  **A.**   Yes.

24  **Q.**   And would you agree with me that the experts on both

04:39:31  25  sides sort of agree that, if you take the video at face

1   value, the defendant has dementia?

2   **A.**   I certainly believe that.  I don't want to represent

3   what the other experts have said above and beyond what

4   they have already said and written.

04:39:49   5   **Q.**   Okay.  But you are taking the video at face value,

6   right?

7   **A.**   What do you mean when you say "at face value"?

8   **Q.**   In other words, what you're seeing on the video you

9   believe is a genuine presentation, correct?

04:39:59   10   **A.**   I do, yes.

11   **Q.**   And, so, if the presentation was actually made up or

12   malingered, that could change your opinion?

13   **A.**   I don't believe that's the case.

14   **Q.**   But that's not my question.  Do you remember my

04:40:11   15   question?

16   **A.**   I do.  It's a hypothetical question.

17   **Q.**   And you are an expert witness, right?

18   **A.**   I am.

19   **Q.**   So, have you testified as an expert witness before?

04:40:18   20   **A.**   I have, yes.

21   **Q.**   And, so you understand you're allowed to answer

22   hypothetical questions.  Do you?

23   **A.**   I can attempt to, yes.

24   **Q.**   Well, if you don't feel comfortable doing it, I mean,

04:40:29   25   tell me.  I don't want to, you know, go beyond your

MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI

1    expertise.

2                        But my question is:  If you believed that

3    this was a put-on, the presentations that you're seeing in

4    these recorded interviews, could that affect your opinion?

04:40:41  5  **A.**   It could shape my opinion, yes.

6    **Q.**   And, I mean, you saw Dr. Whitlow testify, right?

7    **A.**   I did.

8    **Q.**   And the way you described your job is sort of as a

9    detective, right?

04:40:54  10  **A.**   Yes.  I did use that word.

11   **Q.**   And you used the phrase "mosaic," right?

12   **A.**   Yes.

13   **Q.**   So, there are a lot of pieces that you considered to

14   try to get to the truth?

04:41:01  15  **A.**   Yes.

16   **Q.**   And Dr. Whitlow basically said something different,

17   right?

18   **A.**   He was more focused in what he had talked about, yes.

19   **Q.**   I mean, Dr. Whitlow believes that the imaging sort of

04:41:10  20  conclusively decides this; is that fair?

21   **A.**   I don't think that's what he said.  That's not what I

22   took from it.

23   **Q.**   Well, did Dr. Whitlow say that, if the collateral

24   interview -- interviewees were being deliberately evasive

04:41:25  25  and if the presentation that the defendant puts on in a

1  doctor's room is malingerer and if the cognitive testing

2  was faked, didn't he say that wouldn't change his opinion

3  because of his -- because of the stock he puts in the

4  imaging?

04:41:42  5  **A.**   My recollection is he said it could affect it.  I

6  don't remember his exact words.

7  **Q.**   Well, I guess, yeah, putting aside -- we don't need

8  to sort of, you know, debate what Dr. Whitlow says.  I

9  guess what I am wondering is:  For you, do you put stock

04:41:55  10  in any one thing like that?

11  **A.**   Not in -- not in one thing.  I weigh everything

12  across the whole spectrum.

13  **Q.**   And, so, if pieces of this mosaic were to fall out of

14  place, maybe even just one piece, could that affect your

04:42:12  15  opinion?

16  **A.**   It would shape it, sure.

17  **Q.**   You -- you talked about on your direct examination

18  that Dr. Dietz described malingering in this case as a

19  Herculean task.  Do you remember that?

04:42:33  20  **A.**   Yes.  He said it would be a Herculean task, yes.

21  **Q.**   And that's a difficult task, right?

22  **A.**   I would call it a mythic task.

23  **Q.**   You did call it a mythic task?

24  **A.**   I did.  Hercules was not real, obviously.

04:42:44  25  **Q.**   Can you agree that the adjective that a person uses

MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI

1  to describe this isn't really what should be informing the

2  Court in this case?

3  **A.**   I don't understand what you mean by that.

4  **Q.**   In other words, the adjective that Dr. Dietz used in

04:42:55  5  his report has no bearing on the defendant's competency,

6  right?

7  **A.**   I think it speaks exactly to what's the issue here,

8  because he's suggesting that, for Mr. Brockman to malinger

9  this, it would be an incredibly -- I don't know exactly

04:43:14  10  when he used the term, but a Herculean task, something

11  that is quite extraordinary, I would say.

12              And he cited an example in his report of

13  someone -- an unknown person he worked with who appeared

14  to do that.  So --

04:43:28  15  **Q.**   I mean, my goal here is just not to, you know, sort

16  of play word games.  Okay?  So, what I am wondering is --

17              MR. VARNADO:  Object to that, Your Honor.  He

18  answered the question he asked.

19              THE COURT:  Yeah.  Objection sustained.

04:43:39  20  BY MR. MAGNANI:

21  **Q.**   So, what I just want to do is get your most accurate

22  estimation of the defendant's abilities.  Okay?

23  **A.**   Okay.

24  **Q.**   And what I am asking you is:  Does Dr. Dietz's choice

04:43:49  25  of a specific adjective have anything to do with your

1    opinion on competency in this case?

2    **A.**    I really don't understand what you're asking me on

3    that.

4    **Q.**    Does Dr. Dietz's choice of that adjective --

04:44:03    5    **A.**    Okay.

6    **Q.**    -- have any bearing on your opinion as to competency?

7    **A.**    Well, my opinion on Mr. Brockman's competency is

8    based on my own examination, and what I have talked about

9    today.  It's not -- it doesn't hinge on a word that

04:44:21    10    Dr. Dietz has used.

11    **Q.**    All right.  So, the answer to my question is, no, it

12    doesn't, right?

13    **A.**    My formulation of my opinion doesn't depend on a word

14    he uses, no.

04:44:30    15    **Q.**    Right.  And that was my question, whether it did.

16    **A.**    Okay.

17    **Q.**    So, the answer is -- Okay.

18                So, you testified that, if it were in fact

19    the case that this was a put-on or malingered

04:44:43    20    presentation, that could impact your opinion, right?

21    **A.**    It could shape my opinion.

22    **Q.**    Well, yeah, let's talk about that, because we do want

23    to -- if there is confusing words being used, why don't

24    you just tell us what do you mean?

04:44:55    25    **A.**    Well, as I said, I used the term "mosaic."  So, I

1    looked at all the different pieces of data.  If there is

2    something that -- you know, I always have to weigh the

3    context in which it is -- a collateral review, a study,

4    whatnot.  You look at everything in relationship to

5    everything else.  Everything doesn't rest on one single

6    piece of data.  It doesn't work that way.

7                        So, certainly, certain things could change

8    or fall out and that may or may not affect it.  It really

9    depends on what falls out and the degree to which it falls

10   out.

11   Q.   I think I understand what you're saying, but just

12   correct me if I am wrong.

13                       Are you saying it could impact your

14   opinion but not necessarily change the outcome of your

15   ultimate opinion?  Is that what you mean?

16   A.   That's not a bad characterization.

17   Q.   Well, if you think of a better one, just --

18   A.   Well, as I said, it would shape it; and, so, it may

19   be the same outcome but in a different shape, is what I am

20   saying.

21   Q.   So, let's go back to hypotheticals.

22                       So, if it were the -- if you were

23   persuaded that Brockman was putting on a performance in

24   doctors' offices going back to 2019, would that change

25   your -- I know it would -- you have said it would affect

MARC E. AGRONIN, M.D. – CROSS BY MR. MAGNANI

1   it or shape it, but would it change your ultimate

2   conclusion?

3   **A.**   It's hard to say.

4   **Q.**   Okay.  Now, if he --

04:46:14   5   **A.**   And I say that because there are different aspects to

6   his presentation.  There is the physical component.  There

7   is the cognitive component.  So --

8   **Q.**   Well, nobody disputes that the physical component is

9   genuine, fair?

04:46:27   10   **A.**   That's fair.

11   **Q.**   So, let's just focus on the cognitive, if you don't

12   mind.  Is that okay?

13   **A.**   Sure.  Well, in this case, I don't disentangle the

14   two, because Parkinson's disease, in my experience,

04:46:38   15   inevitably is woven up with changes in the brain as well

16   as cognition.  So, it's hard for me to separate out the

17   two.

18   **Q.**   Do you think that Mr. Brockman's ability to be

19   competent in this case has anything to do with his

04:46:51   20   physical impairments?

21   **A.**   The cognitive impairment, in my opinion, stems from

22   or is related to, is part and parcel of the physical

23   impairment.  That's by the nature of Parkinson's disease.

24   Because it's all taking place in the brain.

04:47:07   25   **Q.**   Right.  But different parts of the brain, right?

MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI

1   **A.**   To some extent, but some of the same -- the same

2   circuits.  The dopaminergic circuits in the brain that

3   affect movement are also intimately involved with

4   cognition, with perception.  And so that's why the same

04:47:22   5   medication that you use to treat Parkinson's disease to

6   improve the movements often impacts perception and

7   thinking as well.

8                      In fact, there's even evidence of that in

9   some of the medical records where Mr. Brockman talks about

04:47:36   10   how he feels on Sinemet.  So, it's a medication that can

11   have pervasive effects.

12   **Q.**   So, just -- hopefully, we can get by this.  But is it

13   your opinion that alpha synuclein started accumulating in

14   Mr. Brockman's basal ganglia before any other parts of the

04:47:55   15   brain?

16   **A.**   That would be consistent with Parkinson's disease.

17   **Q.**   And, so, is that what you think likely happened?

18   **A.**   Given the neuroimaging, to say that alpha synuclein

19   began depositing before amyloid, I'm not sure I could say

04:48:10   20   that.

21   **Q.**   Yeah.  I am not asking about amyloid here.

22   **A.**   So -- yeah.

23   **Q.**   I'm just asking about the Parkinson's -- and we

24   should just say the Parkinson's protein just to make it

04:48:18   25   easier.

MARC E. AGRONIN, M.D. – CROSS BY MR. MAGNANI

1   **A.**   It would be -- the presumption would be, with his

2   diagnosis of Parkinson's disease, that there was a

3   deposition of this Parkinson's protein, alpha synuclein,

4   at an early stage, yes.

04:48:30  5   **Q.**   Okay.  And starting in the basal ganglia, right?

6   **A.**   In that region of the brain, yes.

7   **Q.**   And that's why we start seeing those motor

8   impairments early on?

9   **A.**   Yes.

04:48:42  10   **Q.**   Okay.  But -- and I note you weren't here for -- but

11   there is some debate between the difference between

12   dementia with Lewy bodies and PDD?

13   **A.**   Yes.

14   **Q.**   Given this case -- I mean, can we put that aside?  Do

04:48:54  15   you think that's important?

16   **A.**   I do think it's important.

17   **Q.**   Well, let me ask you this:  Besides the timing of

18   when those proteins get to different parts of the brain,

19   is there much of a difference that we need to be concerned

04:49:04  20   about?

21   **A.**   There could be, yes.

22   **Q.**   Okay.  Well, basically, when those proteins get into

23   the cortex, you start having different problems, right?

24   **A.**   Yes.

04:49:12  25   **Q.**   And those problems aren't just motor function

1  problems, right?

2  **A.**    Exactly.

3  **Q.**    And people that have these protein depositions in

4  their brain start to experience REM sleep disorder?

04:49:24  5  **A.**    Some of them do.

6  **Q.**    Well, you tell me, Doctor.  What are the telltale

7  signs of someone with alpha synuclein getting into their

8  cortex, whether it's PDD or DLB?

9  **A.**    That's a very complex question.

04:49:39  10  **Q.**    Well, aren't there diagnostic criteria for these

11  diseases?

12  **A.**    The diagnostic criteria for Lewy body disease is --

13  it's a clinical diagnosis.  It is not based on the

14  underlying pathology.

04:49:49  15  **Q.**    Right.  But the clinical -- well, you can't

16  measure -- you can't measure alpha synuclein with any PET

17  scan?

18  **A.**    There is not a technology that I am aware on the

19  market that you can do that.  True.

04:50:01  20  **Q.**    So, that protein -- unlike amyloid and Tau, that can

21  only be measured after death, right?

22  **A.**    Yes.

23  **Q.**    Okay.  So --

24  **A.**    I will say that's my belief.  You know,

04:50:13  25  whether someone has developed an assay for a spinal fluid

1    I don't know.  It's not my area of expertise.

2    **Q.**    Sure.  But, I guess, you said it's diagnosed

3    clinically?

4    **A.**    Yes.

04:50:22    5    **Q.**    And aren't there a certain number of symptoms that

6    have to be -- that a clinician has to see to make the

7    diagnosis?

8    **A.**    For which?  For --

9    **Q.**    Dementia with Lewy bodies.

04:50:31    10    **A.**    Yes.  There's consensus guidelines for symptoms that

11    you should see to make a diagnosis of Lewy body disease.

12    Nonetheless, it can be a very difficult and challenging

13    diagnosis to make.

14    **Q.**    What are the telltale symptoms that we are talking

04:50:47    15    about here?

16    **A.**    Sure.  Well, number one is we see fluctuating degrees

17    of cognition and orientation.  People may have periods of

18    disorientation, almost delirium-like states that can wax

19    and wane.  That's probably one of the most common.

04:51:02    20                    We see vivid hallucinations.  That's

21    common.  We see the later onset of Parkinsonism; so,

22    muscle rigidity, slowing of movements.

23                    In some individuals we can see REM sleep

24    behavior disorder.

04:51:18    25                    We also frequently see a sensitivity to

MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI

1   anti-psychotic medications in particular, but, also, to

2   many other psychotropics and I have seen that in my

3   experience all the time.

4   **Q.**   So --

04:51:29   5   **A.**   But I want to add what's known about Lewy body

6   disease is that you can give deposition of alpha synuclein

7   in different parts.  So, you can get more cortical, more

8   subcortical, more transitional, and this will shape how it

9   presents.

04:51:46   10   **Q.**   And so those -- would it surprise you if I told you

11   you can Google that REM sleep disorder and visual

12   hallucinations are telltale signs of dementia with Lewy

13   bodies?

14   **A.**   You absolutely could Google that.

04:52:17   15   **Q.**   And these are sort of like -- I mean, is it fair to

16   describe them as Hallmark symptoms?

17   **A.**   For Lewy body disease?  What I described are -- is

18   the hallmark spectrum of symptoms that we see, yes.

19   **Q.**   So, now I guess what my question is:  How can you

04:52:31   20   diagnose a REM sleep disorder?

21   **A.**   Well, it's based on observations.  It's based on

22   doing a sleep study, an adequate sleep study, based on

23   clinical response to medication.

24   **Q.**   And so, when you say "observations," who is the

04:52:49   25   person that's typically giving the observations, in your

1   clinical experience?

2   **A.**   The bedmate.

3   **Q.**   Right.  And, so, if there was REM sleep disorder in

4   Mr. Brockman's medical records before he ever had a sleep

04:53:01   5   study, where do you think that came from?

6   **A.**   The reports, I remember from the record, came from

7   his wife, from Dorothy.

8   **Q.**   And this was something about -- Well, actually, I

9   just want to make sure you're clear.  Are you saying that

04:53:15   10   in the Baylor medical record?  Because Dorothy talked

11   about punching and kicking to the experts in this case,

12   right?

13   **A.**   What I am -- I recollect seeing it in some of the

14   Baylor records.  Outside of that, I don't recollect where

04:53:33   15   I saw their descriptions of it.  So -- I know when I spoke

16   to her she described some movements he's having in bed,

17   but it was --

18   **Q.**   Yeah.  I'm trying to go back to 2019 and before.

19   **A.**   Yeah.  Okay.

04:53:42   20   **Q.**   So, back then, do you know how it got in those

21   records?

22   **A.**   It -- it would have been from, I believe, Dorothy

23   telling the doctors.

24   **Q.**   And I understand you reviewed some transcript

04:53:55   25   testimony.  Did you have a chance to read James Pool's

MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI

1  testimony?

2  **A.**   No.

3  **Q.**   Okay.  So, we will --

4                So -- Visual hallucination is another one?

04:54:11   5  **A.**   Yeah.

6  **Q.**   Are you aware that Mr. Brockman experienced the

7  visual hallucination the first time he met Dr. York in

8  March of 2019?

9  **A.**   There's a somewhat vague description of maybe he saw

04:54:22  10  a bug on the floor.  It's hard for me to say that that

11  absolutely was a visual hallucination.

12  **Q.**   Well, it wasn't hard for Dr. York, was it?

13  **A.**   As I recall from the report, she suggested it could

14  be.

04:54:34  15  **Q.**   Yeah.

16  **A.**   So --

17  **Q.**   And as you recall from the materials, you know that

18  when the defense team came to the government and asked not

19  to indict Mr. Brockman, they said that his team at Baylor

04:54:44  20  diagnosed him with Lewy body dementia, are you aware of

21  that?

22  **A.**   I don't recall that, but I -- I know from the records

23  that that was a suggested diagnosis of Lewy body disease,

24  yes.

04:54:55  25  **Q.**   And did you know that Mr. Brockman e-mailed with his

1    friend, Dr. Stuart Yudnofsky, about different symptoms

2    that he Googled?

3    **A.**    I don't know that.  When you said the word that he

4    Googled, I don't know that.  I did see an e-mail that he

04:55:13    5    sent to Dr. Yudnofsky.  I don't know.

6    **Q.**    And when you say an e-mail that he sent to

7    Dr. Yudnofsky, are you talking about the 2017 e-mail?

8    **A.**    Yes.

9    **Q.**    Fair to say that that e-mail has been shown to you by

04:55:25    10    the defense team in this case?

11    **A.**    Yes.  I did see the e-mail, yes.

12    **Q.**    And -- well, but where did you get it?  Did you pull

13    it out of a box somewhere by luck, or was it made a point

14    of focus for you?

04:55:36    15    **A.**    It was part of just the general medical records that

16    I reviewed.

17    **Q.**    So, did anyone tell you the significance of that?

18    **A.**    No.  Other than, you know, I read it, and put it on

19    the general timeline that I -- when I was reviewing the

04:55:52    20    medical information.

21             MR. MAGNANI:  Just a second, Your Honor.

22             THE COURT:  Sure.

23    BY MR. MAGNANI:

24    **Q.**    So did you interview Ms. Kathy Keneally in this case?

04:56:10    25    **A.**    I did.

MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI

1  **Q.**  And you -- well, you interviewed her twice, right?
2  Oh, well, let me --
3  **A.**  I think once.
4  **Q.**  Just once.  All right.  And that was on July 28th,
04:56:18  5  2021?
6  **A.**  Yes.  That sounds right.
7  **Q.**  Okay.  And the first -- well, let me ask you -- I am
8  going to ask you some questions about this.
9  **A.**  Okay.
04:56:26  10  **Q.**  If you're comfortable answering from memory, that's
11  fine.  But if you are not, I have a copy of your notes if
12  that would helpful.
13  **A.**  Okay.
14  **Q.**  So just let me know.  So --
04:56:34  15         MR. VARNADO:  Your Honor, I would just ask that
16  he go ahead and give him the notes just to make this
17  proceed faster.
18         THE COURT:  Are you refreshing his
19  recollection, or are you impeaching him?
04:56:42  20         MR. MAGNANI:  I am not doing anything yet, Your
21  Honor.  I'm just asking this witness a question.
22         THE COURT:  Okay.
23         MR. MAGNANI:  I have never met this man before.
24         THE COURT:  Then, you may proceed.
04:56:49  25  BY MR. MAGNANI:

MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI

1  Q.   So -- and fair to say that you asked her when might

2  Mr. Brockman have suspected an investigation?  Do you

3  remember asking her that question?

4  A.   I may have.  I don't recall exactly, but --

04:57:03  5  Q.   You don't recall?  Okay.

6  A.   I don't recall.

7         MR. MAGNANI:  Now, at this point, I am going to

8  ask permission to approach the witness to hand him a copy

9  of these notes.

04:57:10  10         THE COURT:  Sure.  You may approach.

11         THE WITNESS:  Thank you.

12  BY MR. MAGNANI:

13  Q.   And so, I know you have testified before, Doctor, but

14  just so you know how this works, just look at the notes,

04:57:41  15  and then when your recollection has been refreshed, just

16  put them away and we can talk --

17  A.   Okay.

18  Q.   -- or you can go back if you need to.

19  A.   Okay.

04:57:47  20  Q.   You know what, let me ask a different question

21  actually, Doctor.  Can you just describe your process of

22  taking notes?  Like do you -- do you sort of type them as

23  you talk?

24  A.   Yes.  Yes.

04:58:00  25  Q.   Okay.  And so these are made at the time that you're

1  talking to Ms. Keneally?

2  **A.**   Yes.

3  **Q.**   Okay.  So, in these notes, there's a bunch of

4  questions.  Are these questions that you asked?

04:58:12  5  **A.**   Yes.

6  **Q.**   And is it fair to say since you're doing it as you

7  talk, you started with the top and got to the bottom?

8  **A.**   Yes.

9  **Q.**   Okay.  So one of the first -- I mean, I am sure there

04:58:22  10  was some chitchat and things like that, but the first

11  substantive question you asked was, When might

12  Mr. Brockman have suspected any investigation?

13  **A.**   Yes, that's what I have there.

14  **Q.**   And do you remember the answer?

04:58:31  15  **A.**   I have to look here.

16  **Q.**   Yeah.

17  **A.**   She said, The search of the lawyer's office, August

18  15, 2018, and then another search in September 2018.

19  **Q.**   Did you ask her when did he know he was under

04:58:51  20  investigation?

21  **A.**   Yes.

22  **Q.**   And what was the answer?

23  **A.**   Within days of the Kepke search, and how the Reynolds

24  and Reynolds counsel realizes he needed his own attorney,

04:59:07  25  around that same time.

1    Q.    So right after asking the two questions -- well, let

2    me just -- maybe this is obvious, but is the reason you're

3    asking these questions because the timing, when the

4    defendant learned of the investigation is relevant?

04:59:18   5    A.    I was curious when he knew what was going on, yes.

6    Q.    Well, I mean, these are your first questions, right?

7    A.    Yeah.  I was curious about that.  Yeah.

8    Q.    And fair to say that the next thing that happened

9    after that is, it says, RB e-mailed Dr. Yudnofsky in May

04:59:37   10   3rd and 4th, 2017?

11   A.    Yes.

12   Q.    So, in other words, you're asking her when did he

13   learn about the investigation.  She tells you about some

14   warrants in 2018, right?

04:59:48   15   A.    Yes.

16   Q.    And then after that, she tells you that he e-mailed

17   Dr. Stuart Yudnofsky in 2017?

18   A.    Yes.

19   Q.    So do you see what I'm asking, was this 2017 e-mail

04:59:58   20   with Dr. Yudnofsky, was it shown to you as something of

21   importance?

22   A.    She highlighted it, yes.

23   Q.    And she highlighted it right after you asked the

24   questions about when did you learn about the

05:00:10   25   investigation?

*MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI*

1   **A.**   Yes.

2   **Q.**   Okay.  What did she tell you about Dr. Stuart

3   Yudnofsky?

4   **A.**   I don't recall she telling me much about him.  I

05:00:17   5   don't have any notes on it, so --

6   **Q.**   Well, have you learned anything about Dr. Stuart

7   Yudnofsky?

8   **A.**   No.

9   **Q.**   Okay.  Because you -- you mentioned him in your

05:00:27   10   report.  Do you remember that?

11   **A.**   Yes.

12   **Q.**   Do you remember how you described him?

13   **A.**   I don't remember the words I used.  I can look.

14   **Q.**   Well, I mean --

05:00:35   15   **A.**   I mean, I know he is a prominent psychiatrist.

16   **Q.**   Have you heard anything about Dr. Yudnofsky in

17   relation to these proceedings?

18   **A.**   No.  I think I am aware that he is not coming as a

19   witness, but, otherwise, I don't know anymore details or

05:00:56   20   anything about that.

21   **Q.**   Did you try to interview Dr. Yudnofsky as a potential

22   collateral witness?

23   **A.**   I did ask about trying to meet with him.

24   **Q.**   Who did you ask?

05:01:07   25   **A.**   I believe I asked through the -- there is a case

1   manager at the forensic panel, who would help organize

2   interviews, and I think I asked her.  She had -- she would

3   have interaction with the attorneys at Jones Day, so it

4   could have gone through there, but I don't know.

05:01:25   5   **Q.**   So, did you ask because it seemed relevant to you?

6   **A.**   Yes.

7   **Q.**   And you asked that -- it sounds like you asked a

8   person at The Forensic Panel; is that right?

9   **A.**   Yes.

05:01:36   10   **Q.**   And then, basically, you don't know what happened

11   after that; is that fair?

12   **A.**   I just -- I remember I saw a note in my report that

13   he was not going to be available, so I recall being told

14   that, and --

05:01:48   15   **Q.**   Do you remember asking why he wasn't available?

16   **A.**   I don't recall asking why, no.  We were trying -- it

17   was a time when we had a timeline to get things in, and so

18   my feeling was, if someone was going to be available, I

19   wasn't even going have time to necessarily chase them

05:02:04   20   down.

21   **Q.**   And I know it's all a big mosaic, but what -- would

22   it matter if the reason was that he was just too busy?

23   Like, if he was just too busy, would that have any impact

24   on you?

05:02:16   25   **A.**   Not necessarily.

MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI

1    Q.   What if the reason was that he was worried that the

2    answers to your questions would implicate him in a crime?

3    A.   It wouldn't -- to me, it wouldn't change my report or

4    my conclusions.

05:02:29    5    Q.   Okay.  So, that one wouldn't change at all?

6    A.   No.

7    Q.   Okay.  So while we're on that subject, let me ask you

8    about Tommy Barras.

9    A.   Sure.

05:02:37   10    Q.   You testified on direct that basically, you just took

11   Tommy Barras's report and just sort of tossed it aside and

12   it's no longer part of your analysis, right?

13   A.   I don't believe I said that.

14   Q.   Well -- this -- you should explain yourself then.  I

05:02:51   15   am not --

16   A.   Sure.

17   Q.   - you tell me?

18   A.   Well, what I said is, that -- what I read from his

19   testimony seemed to be -- there is a shift in emphasis

05:03:01   20   from his descriptions to me, to some extent, and so, you

21   know, it suggests to me that there's -- I don't

22   understand, but other issues going on with him why he

23   would not be as forthcoming in his testimony as when he

24   spoke to me.  So -- I don't know more than that.

05:03:20   25   Q.   Okay.  But I don't -- well, let me ask you this:  Do

1  you remember when you interviewed Tommy Barras?

2  **A.**   I would have to look at the date.

3  **Q.**   Well, I mean --

4  **A.**   Sometime around July of this year.  I mean -- yeah,

05:03:35  5  it was right around the time when I first interviewed

6  Mr. Brockman.  I don't remember.  It could have been a few

7  days before or after.

8  **Q.**   So, here -- I can help here.

9  **A.**   Sure, tell me.

05:03:43  10  **Q.**   You interviewed Tommy Barras on July 7th, right?

11  **A.**   Okay.  That sounds right.

12  **Q.**   He was the first person that you interviewed, right?

13  **A.**   I believe so.

14  **Q.**   You did not interview another collateral source for

05:03:55  15  weeks after that, right?

16  **A.**   Well, I interviewed Dorothy Brockman the same day I

17  saw Mr. -- I interviewed Mr. Brockman.  I think that was

18  July 11th.

19  **Q.**   Well, so I am going to get you -- if you don't know

05:04:12  20  the answer, please just say you don't know, because I

21  don't know if that is right based on your notes.

22  **A.**   Okay.

23  **Q.**   So --

24  **A.**   I do know that I interviewed her right around -- in

05:04:21  25  fact, I do remember I spoke to her briefly the same day I

1  saw Mr. Brockman.  She was having tremendous pain and

2  couldn't really do a long interview.

3  **Q.**   Do you remember which day you --

4  **A.**   I think July 11th.

05:04:36   5  **Q.**   Okay.  Well, let me ask you this:  If -- I'm just

6  going to show you this on the screen to save some time.

7  **A.**   Okay.

8  **Q.**   This says you interviewed Dorothy Brockman on July

9  26th.

05:04:47   10  **A.**   Yeah.  That's when I did the detail.  I spoke very --

11  we started very briefly, but she had terrible pain and had

12  to stop, so then we postponed it to the 26th, yes.

13  **Q.**   You had no notes of that first interview?

14  **A.**   No, because, I mean, she really couldn't essentially

05:05:05   15  participate in it.

16  **Q.**   And I apologize.  There is some of my writing on

17  this.

18          MR. MAGNANI:  If you guys have an objection,

19  just let me know.  I am trying to save time.

05:05:09   20  BY MR. MAGNANI:

21  **Q.**   So you interviewed Tommy Barras on July 11th?

22  **A.**   Yes.

23  **Q.**   And it sounds like you tried to interview

24  Mrs. Brockman on the 11th, but you didn't get around to

05:05:20   25  actually doing the interview until the 26th, right?

 1   **A.**   True.

 2   **Q.**   So weeks went by between your interview with Tommy

 3   Barras and anyone else?

 4   **A.**   Yes.

05:05:29   5   **Q.**   Okay.  And the Tommy Barras is -- well, fair to say

 6   that you wrote more about your Tommy Barras interview than

 7   you did for any other of your interviews?

 8   **A.**   All of them were several pages.  I don't know that

 9   his is --

05:05:50   10   **Q.**   Well, let me ask a different question then.

 11   Hopefully it will be easier.  Should I take any

 12   significance from the fact that you interviewed him first

 13   and wrote a pretty long memo about it?

 14   **A.**   I don't know what significance you would take from

05:06:03   15   that.

 16   **Q.**   Well, let me ask you this:  Remember how we talked

 17   about whether or not that 2017 Stuart Yudnofsky e-mail was

 18   highlighted to you as something of importance?

 19             Really what I'm trying to ask you is, did

05:06:17   20   someone tell you, Hey, Tommy Barras was important?

 21   **A.**   He was presented to me as -- as -- a series of

 22   individuals as collaterals.  I don't recall being

 23   presented as more or less important than others.

 24   **Q.**   So in other words, we should attach no significance

05:06:29   25   to the fact that he was the first person you interviewed,

1   correct?

2   **A.**   From my perspective, no.

3   **Q.**   Yeah.  I mean, you're the one who knows.

4   **A.**   I mean, I was given a list, these are people to

5   interview.  I asked who is available, and he was one of

6   first that got scheduled.

7   **Q.**   So really what it is -- I am trying to be fair.  You

8   know, I can say, Oh, you interviewed him first, you didn't

9   interview anyone else for a long time, and you wrote so

10  much about him, he must have been really important.  But

11  I'm just asking you the truth.  Was he highlighted to you

12  as someone important or --

13  **A.**   No, not that I recall beyond anyone else, no.

14  **Q.**   When you interviewed him, that was after the

15  government filed their expert reports, right?

16  **A.**   I believe --

17  **Q.**   Do you remember the date?  So you interviewed him

18  July 7th, right?

19  **A.**   Yes.

20  **Q.**   Government expert reports were in June 21st?

21  **A.**   Yes.

22  **Q.**   Government expert reports talk about sworn deposition

23  testimony that Tommy Barras gave.  Do you remember that?

24  **A.**   I don't remember that.

25  **Q.**   So are you aware that Tommy Barras gave sworn

MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI

1   deposition testimony?

2   **A.**   I am not aware of that.  I don't recall that.

3   **Q.**   So, explain this again, then.  Why -- I mean, you

4   interviewed him first.  We are not going to put too much

05:07:49   5   emphasis on that like we said.  But, what happened?  You

6   talk about Tommy Barras a lot in your reports, and now you

7   are saying just throw him away?

8           MR. VARNADO:  Objection.  This is asked and

9   answered.

05:07:59   10           THE COURT:  Move it a long.  Respectfully,

11   overruled.

12   **A.**   As I recall, when we were given -- told it would be

13   -- we would have collaterals we could interview, that he

14   would be available.  My recollection was that he was going

05:08:17   15   out of town or out away -- going away, and so if I could

16   interview him that week, so I did.  It was one of several

17   collaterals.

18   BY MR. MAGNANI:

19   **Q.**   Yeah.  Sorry.  I know sometimes it is hard with

05:08:30   20   interruptions.  But I'm trying to figure out, like, you

21   put Mr. Barras in both your reports?

22   **A.**   Yes.

23   **Q.**   Fair?

24   **A.**   Yes.

05:08:36   25   **Q.**   And we are not going to say he was highlighted as

1  important to you, but you did think he was important?

2  **A.**   Yes.

3  **Q.**   And what I am asking is, you testified on direct that

4  now you just discount him.  And what I want to know is,

5  why?

6  **A.**   So I'm not saying I discount him.  What I am saying

7  is that, because in his testimony here, he was presenting

8  something with a different emphasis than what he told me,

9  that, given the context, I might not put as much emphasis

10 on -- on his report that year than other collaterals.

11 **Q.**   So were you here --

12 **A.**   But nonetheless, you know, he spoke about issues

13 going back to 2010, whereas, in his testimony that I read,

14 he was really focusing on 2021.  And, you know, whether

15 there is an inconsistency or not, I don't know, but again,

16 for that reason, I would just de-emphasize the focus on

17 him, but not throw it away, to use your words.

18 **Q.**   Yeah.  Fair.  Yeah.  You got to keep me honest,

19 right?

20           THE COURT:  One second.  Didn't the chart say,

21 "disregarded."  I mean, that's the word that is in the

22 chart, so let's use the words in the chart.  Ask the

23 witness about the words in the chart.

24           MR. MAGNANI:  I apologize, Your Honor.

25 BY MR. MAGNANI:

MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI

1   **Q.**   "Throw away," that is my bad, Doctor, and I am glad

2   you called me out on it.  But fair to say you disregarded

3   Tommy Barras's collateral interview?

4   **A.**   Yes.  Compared to the other collaterals, yes.

05:10:01   5   **Q.**   And in getting to the other point where you testified

6   on direct that you disregarded him, it sounds like you

7   read his testimony from this trial?

8   **A.**   I read part of it, yeah.  Whether it was the entirety

9   of it, I don't know, but I certainly read a part where he

05:10:13   10   spoke about Mr. Brockman in 2021 -- in 2020.

11   **Q.**   So you were not in the courtroom when he testified?

12   **A.**   No, I wasn't.

13   **Q.**   Who gave you the part of the transcript that you

14   read?

05:10:25   15          MR. VARNADO:  Your Honor, we stated in court

16   that we would, in fact, provide Dr. Agronin with

17   Mr. Barras's testimony because it was inconsistent with

18   what he told him.

19             I don't want the question to be that he is

05:10:38   20   impeaching him because we represented, Look, we didn't

21   believe Mr. Barras's testimony that's why we gave it to

22   Mr. Agronin -- or Dr. Agronin.

23          THE COURT:  I didn't think that was what was

24   implied at all.  I think he just wanted to find out what

05:10:50   25   was given to him and what his reaction to it was.

MARC E. AGRONIN, M.D. – CROSS BY MR. MAGNANI

1          So, respectfully, overruled.  You can ask

2  the question.

3  BY MR. MAGNANI:

4  **Q.**   Yeah.  Well, let me ask you this.  Did members of the

05:11:01   5  defense team tell you they did not believe Mr. Barras's

6  testimony?

7  **A.**   No.  They just told me they wanted me to look at it

8  and read it.

9  **Q.**   Okay.  And so they just gave it to you and told you

05:11:11   10  to look at it and read it, right?

11  **A.**   Yes.

12  **Q.**   And now, when I am asking you what you did with that,

13  you are not going to let it influence you that counsel

14  just stood up and said we don't believe it?  You are not

05:11:21   15  going to let that influence you, right?

16  **A.**   Well, I have to come to my own conclusions about it.

17  **Q.**   That's what I am hoping for.

18  **A.**   Yeah.

19  **Q.**   So, what is your own conclusion about the testimony?

05:11:30   20  **A.**   When he spoke to me, he talked about changes he

21  noticed over time, going back to 2010 with Mr. Brockman.

22  He didn't know what to attribute them to, he just noticed

23  changes.  He also told me he didn't learn about diagnoses

24  until later.

05:11:51   25          I saw in his testimony where he seemed to

1  be in -- in somewhat of a rigid way, described

2  Mr. Brockman still having a full role with his company in

3  2020.  So --

4  **Q.**   So, you're basically saying it's what he told you is

05:12:07  5  inconsistent from his testimony in court?

6  **A.**   Well, he -- with me, he focused more on 2010 going

7  forward, less on 2020.

8  **Q.**   And --

9  **A.**   So --

05:12:18  10  **Q.**   And fair to say that in your notes, you didn't

11  really -- I mean, you weren't asking him about how

12  Mr. Brockman performed as CEO in 2020, right?

13  **A.**   I would have to look in the notes.  I don't recall.

14  **Q.**   All right.  Give me a second.

05:12:40  15  **A.**   He did tell me that he was -- over time he was less

16  involved in decisionmaking, that is how he characterized

17  it.

18  **Q.**   Let me ask you this.  I think you said before that

19  when you talked to him on July 7, you were not aware --

05:12:52  20  well, I guess you saw it in the government's report, but

21  you had not actually read his March 2021 transcript,

22  right?

23  **A.**   I don't recall reading it.

24  **Q.**   And so you didn't ask him about that during the July

05:13:04  25  7th interview?

164

1   **A.**   I don't recall that I read it.

2   **Q.**   So, if you knew on July 7th that he had just a couple

3   months before he testified under oath about Mr. Brockman's

4   competency, would you have wanted to know that?

05:13:16  5   **A.**   It would have been some information, sure.  It would

6   have.

7   **Q.**   I know when you got here on the stand, you were just

8   saying we should disregard Mr. Barras's, you know, what he

9   told you.  But I guess what I am wondering is if we should

05:13:33  10  do a little bit more than that.

11              So my question is:  If it were the case

12  that he testified under oath in March 2021 that

13  Mr. Brockman was sharp enough to run the company until his

14  retirement, would that -- could that shape your opinion?

05:13:48  15  **A.**   It wouldn't, because I look at the preponderance of

16  everything else to me.  And to me, it would have

17  consequences on that.  It would not shape my opinion here.

18  **Q.**   So you don't think that if he testified under oath

19  that the man -- that he never suspected a problem with the

05:14:06  20  man, it wouldn't -- that wouldn't give you a problem if he

21  is telling you to your face about problems going back to

22  2010?

23  **A.**   It would be in contrast to every other piece of

24  information.  So, again, my context for what he said would

05:14:18  25  be to disregard it from that standpoint, or de-emphasize

1 it.

2 **Q.**   You worked with a bunch of other doctors on this

3 case, right?

4 **A.**   Yes.

05:14:31  5 **Q.**   And one of them was Tom Guilmette?

6 **A.**   Yes.

7 **Q.**   And Dr. Guilmette also did some collateral interviews

8 in this case?

9 **A.**   He did.

05:14:37  10 **Q.**   And you guys -- I mean, you guys reference each

11 other's reports, and is it fair to say that you guys

12 shared collateral interview notes?

13 **A.**   Yes, we did.

14 **Q.**   Okay.  So, do you remember who Reverend Jackson is?

05:14:48  15 **A.**   I remember, yes.

16 **Q.**   Okay.  Who is Reverend Jackson?

17 **A.**   He was a clergy who had a relationship, I believe,

18 with Mr. Brockman, maybe Mr. Barras, too, and to -- played

19 a role in doing some counseling, some involvement at

05:15:06  20 Reynolds and Reynolds, and then I believe was brought in

21 some sort of official capacity there.

22 **Q.**   So -- and by the way, Mr. Barras, do you remember his

23 education level?

24 **A.**   Mr. Barras's educational level?

05:15:17  25 **Q.**   Yeah.

1   **A.**   I don't recall.

2   **Q.**   Well, let me ask you this.  Did he strike you as a

3   highly educated man?

4   **A.**   I don't have an opinion on that.

05:15:24   5   **Q.**   Okay.

6   **A.**   He was an -- he was articulate and detailed in the

7   interview.  What his educational level was, I have no

8   idea.

9   **Q.**   Do you place any significance on the fact that

05:15:37   10   Mr. Barras and a Reverend were both appointed to the board

11   of Mr. Brockman's company, Reynolds and Reynolds?

12   **A.**   I have no context to know.

13   **Q.**   Well, is it -- does it strike you as unusual that

14   half the board of a billion dollar software company is a

05:15:54   15   Reverend?

16   **A.**   Not necessarily.

17   **Q.**   Okay.  And if you were to be persuaded that

18   Mr. Brockman selected these two men to be on the board, in

19   recognition of their loyalty to him, rather than their

05:16:12   20   merit, could that shape your opinion?

21   **A.**   I don't think so.

22   **Q.**   Now, fair to say that both Mr. Barras, when he talked

23   to you, and Reverend Jackson when he talked to

24   Dr. Guilmette, both of them gave descriptions that were

05:16:31   25   consistent with defendant's cognitive decline?

MARC E. AGRONIN, M.D. – CROSS BY MR. MAGNANI

1          Sorry.  I can do those one at a time.

2    Let's do one at a time.

3    **A.**    Okay.  So, my recollection from their notes is that

4    both of them did describe some cognitive changes with

05:16:47   5    Mr. Brockman.

6    **Q.**    I guess what I am wondering is, did you evaluate

7    whether they might be incentivized to try to help a man

8    who put them on the board of a giant company?

9    **A.**    I don't know that I thought about it in that way.  I

05:17:01  10    would just say that every collateral interview I take is

11    one data point.  Nothing falls or rises on a single data

12    point so -- or a set of data.

13    **Q.**    So, do you think that a person who appoints people to

14    the board of a company out of loyalty -- do you think that

05:17:20  15    that person -- this is a hypothetical -- might expect

16    something in return?

17    **A.**    I don't know.

18    **Q.**    You don't know?

19    **A.**    I don't know.  I would --loyalty, that's why he would

05:17:33  20    appoint them.  I would think that would be every company

21    you want loyal people.

22    **Q.**    Doctor, on direct you say you treat this job as being

23    a detective.

24    **A.**    Yes.

05:17:41  25    **Q.**    So, you don't attach any significance to the fact

MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI

1  that the defendant appointed loyal people to the board

2  even if they weren't the most qualified?

3  **A.**   I would like to consider myself a detective within

4  the psychiatric practice.  If you are asking me a question

05:17:55  5  having to do with the sociology of a business, it's beyond

6  my expertise.

7  **Q.**   Beyond your expertise.  Okay.  Well, let me ask you

8  something that is more pertinent, perhaps.

9         Do you think that Mr. Brockman may have

05:18:12  10  expected that Mr. Barras would talk to you in relation to

11  this competency hearing?

12  **A.**   I have no idea.

13  **Q.**   Do you think that he could have expected that

14  Reverend Jim Jackson would have played some involvement in

05:18:23  15  this competency hearing?

16  **A.**   I don't know that.

17  **Q.**   So you know that Reverend Jackson was on the witness

18  list in this case, right, for the defense?

19  **A.**   I didn't know that.

05:18:31  20  **Q.**   Did you know -- do you remember when Mr. Brockman

21  talked to Dr. Dietz about Mr. Jackson?

22  **A.**   I don't recall that.

23  **Q.**   Okay.  So, you don't remember when Mr. Brockman told

24  Dr. Dietz that Reverend Jackson, quote, has grown into

05:18:52  25  this director position because he is -- he's also -- has

1  the benefit of being and having a reputation of being

2  absolutely totally honest and straightforward?  That's not

3  something you remember --

4  **A.**   I don't -- I don't remember.

05:19:06   5  **Q.**   And why would you?  Maybe it didn't seem so important

6  at the time?

7  **A.**   I reviewed so much material I don't -- that

8  particular one, I don't know what that was from.

9  **Q.**   Do you think that a person who has a motivation to

05:19:19   10  malinger might try to build up the credibility of loyal

11  witnesses on his behalf?

12  **A.**   I suppose it's pos -- anything is possible.

13  **Q.**   Now anything is possible, but in your report, your

14  diagnosis, you use the term, quote, "medically certain,"

05:19:38   15  right?

16  **A.**   Yes.

17  **Q.**   And, so, is it fair to say that, with respect to your

18  PDD diagnosis, you think that's certain?

19  **A.**   Yes.

05:19:44   20  **Q.**   Okay.  So, anything is possible except the fact that

21  Mr. Brockman is cognitively normal?

22  **A.**   I do not believe he is cognitively normal.

23  **Q.**   Not possible?

24  **A.**   No.

05:19:54   25  **Q.**   Okay.  I want to just go and talk some more about

1   your opinions.

2              THE COURT:  Well, can I ask a question before

3   you go on?

4              MR. MAGNANI:  Yeah.

05:20:04   5              THE COURT:  While we're talking about

6   collateral witnesses, Doctor, I just wanted to make sure I

7   understood this.

8                   So, Dr. Yudnofsky is a psychiatrist,

9   correct?

05:20:12   10              THE WITNESS:  Yes.

11              THE COURT:  And if it is true that

12   Dr. Yudnofsky didn't want to talk to you about

13   Mr. Brockman's medical conditions and his observations

14   about his daily activities because he was afraid that it

05:20:25   15   might implicate him in criminal activity, that that would

16   have no bearing or shape on your opinion in this case.  Is

17   that true?

18              THE WITNESS:  I'd have to know what he would be

19   implicated for.  That would make a difference with that.

05:20:42   20              THE COURT:  Okay.

21   BY MR. MAGNANI:

22   Q.   So, we talked about two of the collateral witnesses

23   and, you know, we talk a little bit about Mr. Barras'

24   under-oath testimony.

05:20:53   25                   Do you think there is a difference

MARC E. AGRONIN, M.D. – CROSS BY MR. MAGNANI

1  between, you know, talking to you in a more relaxed

2  environment with your laptop and testifying under oath?

3  **A.**   Certainly.

4  **Q.**   Okay.  And do you believe that the fact that both

05:21:04  5  parties get the chance to examine a person is a rigorous

6  way of exploring the truth?

7  **A.**   It contributes to it, yes.

8  **Q.**   It's okay.  You can tell the truth if you think this

9  is all just not a good process, but --

05:21:17  10  **A.**   I --

11  **Q.**   You think it contributes to finding the truth?

12  **A.**   That what contributes to finding the truth?

13  **Q.**   Having two parties from different sides having the

14  opportunity to examine someone under oath?

05:21:28  15  **A.**   Sure.  Yeah.

16  **Q.**   So, in this case, do you know if Mr. Barras would

17  agree to meet with the government experts?

18  **A.**   I don't know.

19  **Q.**   Okay.  Would it surprise you to hear that he did not

05:21:38  20  agree?

21  **A.**   I don't know enough about his potential legal

22  situation to even offer a thought about that.

23  **Q.**   So, do you know if -- Well, let me ask you this.

24          MR. MAGNANI:  Sorry.  Just one second, Your

05:22:00  25  Honor.

1          THE COURT:  Counsel, we have been going a

2     little bit.  We just need to take a quick break, because we

3     are going to push until 7:00, and I need to make sure that

4     things are organized for tomorrow.

05:22:10  5          So, give me about ten minutes and then

6     we'll get started again.

7          MR. MAGNANI:  It will only streamline things.

8     So, that is great, Your Honor.

9          MR. LOONAM:  Your Honor, consistent with what

05:22:18  10   we have been doing, is it okay if Mr. Brockman is excused

11    for the balance of the day?

12         THE COURT:  Yes, I understand.

13              I mean, I know, Mr. Brockman, it's late.

14    We just don't have any choice but to go late, sir,

05:22:28  15   counsel --

16         MR. VARNADO:  Thank you, Your Honor.

17         THE COURT:  -- until we are done.

18         MR. LOONAM:  No.

19         MR. VARNADO:  Thank you, Your Honor.  Yes.

05:22:33  20   Thank you.

21         THE CASE MANAGER:  All rise.

22    (Proceedings recessed from 5:22 p.m. to 5:40 p.m.)

23         THE CASE MANAGER:  All rise.

24         THE COURT:  Please be seated, everyone.

05:39:53  25         Okay.  Mr. Magnani, we are continuing at

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

 1  this time.

 2              MR. MAGNANI:  Thank you, Your Honor.

 3  BY MR. MAGNANI:

 4  **Q.**   And good evening again, Dr. Agronin.

 5                        So, we were, you know, talking a little

 6  bit about how, you know, you evaluate the potential that a

 7  collateral source might be biased, and we talked about

 8  Mr. Barras.

 9                        Are you aware that when federal agents

10  went to interview Mr. Jackson -- do you know what he told

11  them?

12  **A.**   I don't know.

13  **Q.**   Okay.  Do you know what he told Mr. Barras as soon as

14  they left?

15  **A.**   I don't know.

16  **Q.**   Okay.  If as soon as the agents left, Reverend

17  Jackson e-mailed Tommy Barras and told him that he was

18  purposefully evasive with the federal agents and that he

19  did nothing that would hurt the defendant, would you agree

20  that that's a -- that is evidence of their bias?

21  **A.**   With respect to?

22  **Q.**   With respect to the fact that they will do -- they

23  will mislead federal agents to help the defendant?

24  **A.**   It's hard to say from that description.  I mean --

25  **Q.**   Okay.

MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI

1   A.   -- I don't have a larger context for it.

2   Q.   And sorry.  That's my fault.  I am going to try not

3   to talk over the witness.

4                    So, would it affect or -- sorry.  Your

05:41:19   5   word is "shape"?  "Shape"?

6   A.   "Shape."

7   Q.   Okay.  Would it shape your opinion, if immediately

8   after government agents went to talk to Mr. Barras

9   about -- sorry -- Reverend Jackson about this, he

05:41:31   10   immediately e-mailed Mr. Barras, saying, 'Don't worry.  I

11   was purposefully evasive with them'?

12   A.   Not necessarily.

13   Q.   Okay.  If when Mr. Barras got that e-mail, if he

14   immediately deleted it, could that shape your opinion?

05:41:45   15   A.   Not necessarily.

16   Q.   Okay.  You also -- did you say on direct -- was there

17   a doctor -- was there a doctor that you talked to?

18   A.   Dr. Slade?

19   Q.   Yeah.  Did you evaluate whether he might have any

05:42:04   20   potential bias?

21   A.   No.  Not in a formal way, no.

22   Q.   I think on direct you said something about how you

23   valued his opinion --

24   A.   Yes.

05:42:12   25   Q.   -- because he is a medical doctor.  Sorry.  If you

1   could just wait until I finish the question.  So, I am

2   just going to ask it again so it's clear.

3                      Did you say on direct that you valued his

4   opinion especially because he was a medical doctor?

05:42:24  5   **A.**   I took note of that, and, yes, I would -- in my mind,

6   would potentially give extra value to what he said.

7   **Q.**   Well, did you give extra value to it?

8   **A.**   I did, yes.

9   **Q.**   And, at the time, did you have any reason to know if

05:42:40  10  he perhaps had a bias in the outcome of this case?

11  **A.**   Not other than the fact that, if someone is an

12  acquaintance, a friend of someone, they know them in many

13  different ways.  And, so, again, things are possible, but

14  that's why, again, I don't put everything on one

05:43:00  15  particular person.  I take it all in aggregate.

16  **Q.**   Did you ask him if he maybe felt indebted to the

17  defendant?

18  **A.**   I did not ask him that.

19  **Q.**   Did it ever come up?

05:43:09  20  **A.**   Not that I recall.

21  **Q.**   When you talked to him, did he ever talk about if the

22  defendant made a multi-million-dollar donation on his

23  behalf?

24  **A.**   I don't recall.  I -- I don't recall that.  I would

05:43:24  25  have to look at my notes.

1  Q.   Well, let me ask you this.  If the defendant made a

2  multi-million-dollar donation -- Well, let me ask you

3  this.

4            Did you know if Dr. Slade had any of his

05:43:38  5  own personal medical problems in the past?

6  A.   Yes.  He described having either leukemia, or a

7  lymphoma, something along those lines, yeah.

8  Q.   He had pretty bad cancer?

9  A.   Yeah.

05:43:52  10  Q.   And you talked to him about that?

11  A.   He talked about it, because he talked about the

12  timeline being when he was undergoing treatment and

13  noticing some of the changes with Mr. Brockman.

14  Q.   Okay.  But he didn't note it that Mr. Brockman

05:44:05  15  donated millions of dollars on his behalf to get them the

16  best possible care?

17  A.   I don't recall that he mentioned that.

18  Q.   Well, is that something you might remember if he

19  mentioned it?

05:44:17  20  A.   Possibly.

21  Q.   Well, let me ask you this.  Would that strike you as

22  important, if the witness that you are talking to

23  received an enormous benefit that could potentially save

24  his life?

05:44:28  25  A.   It would speak to the closeness of their

1   relationship, absolutely.  But I work with people all the

2   time and collaterals who have -- are indebted to people

3   and -- and it doesn't necessarily mean they're biased;

4   and, if so, they could be biased in one way or the other.

05:44:47   5   So --

6   **Q.**   And you're getting -- Well, two questions.

7         The first:  The reason I was asking if it

8   was important is because I'm trying to understand, like,

9   is that the type of thing you might have written down if

05:44:57   10   he told you that?

11   **A.**   I may have written it down, if he told me that.  I

12   don't remember.

13   **Q.**   Okay.  And, so, you don't remember if he said that to

14   you?

05:45:06   15   **A.**   I don't recall.  If it's not in my notes --

16   **Q.**   It's not in your notes.

17   **A.**   -- it's not in my notes.

18   **Q.**   And you are saying but, to you, that's not really

19   indicative of bias, and you said that was, like, pretty

05:45:18   20   common or --

21   **A.**   Not -- well, when you say "bias" biased towards what?

22   **Q.**   Reflective of an interest in the outcome of your

23   evaluation.

24   **A.**   Not necessarily.

05:45:31   25   **Q.**   Okay.  So, Doctor, I know that you -- you're sticking

1    to your conclusion in your report that dementia is a

2    medical certainty, but in your report you don't -- you

3    don't give us like a flavor of the severity of dementia.

4                    Do you have an opinion on whether the

05:45:53  5    dementia is mild or severe or somewhere in between?  Are

6    those terms that you use in your clinical practice to

7    describe differing degrees of dementia?

8    **A.**    Yes.

9    **Q.**    So, you talked about this before.  We all understand

05:46:05  10   at this point -- we have been here a while -- that the

11   definition of "dementia" is when your cognitive impairment

12   starts affecting your functional independence.  But we

13   also understand by now that there is a big range from mild

14   to severe dementia.

05:46:16  15   **A.**    True.

16   **Q.**    Would you agree?

17   **A.**    I would agree with that.

18   **Q.**    And, so, it's not in your report, but could you do

19   your best to kind of tell us where you think the defendant

05:46:23  20   falls on the scale?

21   **A.**    Definitely.  On the balance, I feel he is moderately

22   impaired.

23   **Q.**    Well, is moderately impaired the same as saying

24   moderate dementia?

05:46:33  25   **A.**    You could say that, yes.

1    **Q.**   Well, yeah, I mean -- is that something you would say

2    or no?

3    **A.**   Yeah.  I sometimes in my description say someone has

4    a moderate dementia, moderate degree of dementia,

05:46:46   5    moderately impaired.  Those terms could be used

6    interchangeably, yes.

7    **Q.**   So, we talk about the Baylor records in this case.

8    And you are aware, I am assuming, that the defendant was

9    diagnosed with mild to moderate dementia in 2019.  Do you

05:46:59   10    remember that?

11    **A.**   Yes.

12    **Q.**   Do you think that was an accurate diagnosis?

13    **A.**   It struck me as accurate, yes.

14    **Q.**   Okay.  So, you think that between March of 2019 until

05:47:11   15    today, the defendant's dementia has progressed from the

16    "mild to moderate" to the "moderate"?

17    **A.**   Yes.  In certain areas mild; going back to 2019,

18    certain areas moderate.  "Moderate" is -- is a big space,

19    in terms of one can progress across it.

05:47:31   20            There are certain areas that I would say

21    it's bordering on "severe."  But, again, on the balance, I

22    would say "moderate."

23    **Q.**   Well, let's -- I know these terms can be pretty

24    loosey-goosey.  Is that right?

05:47:43   25    **A.**   Yes, they can, to some ex -- well, to some extent in

MARC E. AGRONIN, M.D. – CROSS BY MR. MAGNANI

1    certain context, they can.  But I would say in this

2    case -- and I am going to, you know, weigh on this, that,

3    generally speaking, I would describe him as moderately

4    demented.  Certain dimensions moderate to severe, certain

05:48:08    5    areas early moderate, but, yes, within that territory.

6    **Q.**   Okay.  So -- and correct me if I am wrong.  I don't

7    want to misstate you.  So, is it your testimony that you

8    believe the most accurate diagnosis for the defendant in

9    March 2019 is PDD, mild to moderate, and over the time he

05:48:26    10    still had the PDD and it has progressed to moderate today?

11    **A.**   Well, I didn't examine him at the time.  So, the

12    clinicians in 2019 described as mild to moderate.  I know

13    subsequently, when Dr. Lai saw him, described him as mild

14    up until recently when he described him as having

05:48:49    15    dementia.

16                So, you know, I can speak to when I saw

17    him what I think he is.  But, generally, based on what

18    they said in 2019, I think it's reasonable the conclusions

19    they came to.

05:48:59    20    **Q.**   Well, but what I am asking is:  You, here today,

21    with -- Well, let me ask this question.

22                Fair to say that the doctors at Baylor

23    back in March 2019, they didn't have as much information

24    as you do now.  Fair?

05:49:12    25    **A.**   True.

MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI

1   Q.   And so, really, you have the benefit of hindsight.

2   You have the benefit of lots of information.  You have the

3   benefit of transcripts in this hearing.

4   A.   Yes.

05:49:22   5   Q.   And what I am asking is not whether they, as good

6   doctors, made a reasonable diagnosis.  My question is:  Do

7   you, today, with the benefit of all of that, think that

8   the diagnosis was accurate?

9   A.   It was reasonably accurate back then, in 2019.

05:49:39  10   Q.   So, if you had to write an opinion today -- well, I'm

11   just going to ask you your opinion on the stand.  What --

12   did Bob Brockman have dementia -- have mild to moderate

13   dementia in March 2019?  What's your opinion?

14   A.   I would say that's -- reasonably that he did, yes.

05:49:57  15   Q.   Okay.  And I guess we can go back a little further,

16   then.

17             Do you think he had -- do you think he had

18   mild to moderate dementia when he first started meeting

19   with the Baylor team after the search warrant?

05:50:18  20   A.   Looking at the record in 2019, there is descriptions

21   of him having mild to moderate impairment, certain areas

22   mild, certain areas moderate.  I mean, you can get into

23   the weeds in terms of falling on exactly what it is.  Did

24   he have Parkinson's disease mild cognitive impairment

05:50:37  25   then?  Did he have mild to moderate dementia?  The terms

MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI

1  are not exact in terms of that.

2  **Q.**  We talked about already the term -- like, dementia

3  does have a real definition, right?

4  **A.**  It does.

05:50:50  5  **Q.**  So, what I am asking is:  Do you think he had

6  dementia when he was on his fishing trip in 2018?

7  **A.**  In 2018?

8  **Q.**  Yeah.

9  **A.**  There weren't assessments from 2018 that I could say

05:51:02  10  that.

11  **Q.**  I mean, in your report you talk about how, you know,

12  he sort of complained of memory going back a long way.  Do

13  you put a lot of stock in that?

14  **A.**  Well, it fits a -- I would say, the story of his

05:51:16  15  dementia, that there appeared to be evolving changes,

16  evolving cognitive impairment, dating back years before he

17  was diagnosed in 2019.  But his first formal neurologic

18  and then neuropsychological assessments were in 2019.  So,

19  I put most of the weight on those in terms of the

05:51:39  20  conclusions I came to.

21  **Q.**  But I'm just saying in your report, you talked about

22  him having the memory loss -- or the health loss going

23  back to 2004?

24  **A.**  Well, he had some subjective observations going back

05:51:49  25  to 2004, which seemed to be repeated over the years, but

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1    he was still quite functional.  So --

2    **Q.**    Do you know who Dr. Scott Lisse is?

3    **A.**    Yes.  I believe this was his internist for several

4    years.

05:52:04  5    **Q.**    And this was the internist until right up before the

6    Alaska fishing trip, right?

7    **A.**    I believe so, yes.

8    **Q.**    And have you reviewed his medical records?

9    **A.**    I don't think I had access to them.

05:52:16  10    **Q.**    Would it surprise you if in none of those medical

11    records did Dr. Scott Lisse note any memory problems?

12    **A.**    It would not surprise me.

13    **Q.**    Or other cognitive problems?

14    **A.**    Not surprise me, if he was not looking for it or not

05:52:29  15    measuring it.

16    **Q.**    Okay.  But after the fishing trip --

17    **A.**    Yeah.

18    **Q.**    And you understand that during that fishing trip,

19    there was a search warrant executed at Evatt Tamine's

05:52:42  20    house?

21    **A.**    You're talking about in 2018, correct?  I don't know

22    the date of the fishing trip.  So --

23    **Q.**    That's okay.  You understand that -- well, do you

24    understand that -- So, Mr. Brockman saw Scott Lisse and

05:52:51  25    his last appointment was on August of 2018.  Do you

*MARC E. AGRONIN, M.D. – CROSS BY MR. MAGNANI*

1   understand that?

2   **A.**   Yes.

3   **Q.**   And then, after that, he went to Alaska for a week

4   and a bit?

05:52:59   5   **A.**   Yeah.

6   **Q.**   And when he was in Alaska that search warrant

7   happened?

8   **A.**   Okay.

9   **Q.**   Do you know that?

05:53:05   10   **A.**   Based on what you're telling me in the timeline, I

11   believe that's so.

12   **Q.**   Okay.   It sounds right?   Okay.

13            And then, when he came back, he found a

14   new doctor, right?

05:53:15   15   **A.**   Was that Dr. -- well, I believe he saw Dr. Lerner --

16   **Q.**   Uh-huh.

17   **A.**   -- a urologist for followup.   He was having recurring

18   urinary tract infections.

19   **Q.**   But he got a new internist also, right?

05:53:27   20   **A.**   I think around the time he saw Dr. Pool, started

21   seeing him, yes.

22   **Q.**   So, I guess what I'm wondering is:   When he got back

23   and started Dr. Pool --

24   **A.**   Yeah.

05:53:35   25   **Q.**   -- we start seeing memory complaints in his medical

*MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI*

1   records, right?

2   **A.**   I believe so, around then.

3   **Q.**   And so what I am asking is:  When he first saw

4   Dr. Pool in late 2018 and was complaining about memory

05:53:46   5   problems, do you think he had dementia then?

6   **A.**   There wasn't an evaluation at the time to say whether

7   he had dementia or not.  So, there were -- I have to go

8   based on the report saying there are some memory problems.

9   What that meant at the time without seeing evaluation is

05:54:02   10   hard to say.

11   **Q.**   Okay.  But it sounds -- Okay.  So, do you -- you said

12   you watched -- We just talked about that you think it's

13   reasonably -- I mean, you said, your opinion is reasonably

14   that he did have mild to moderate dementia in March 2019,

05:54:21   15   right?

16   **A.**   Based on the reports, what they said, yeah.  What I

17   am saying is those are reasonable opinions, yes.

18   **Q.**   But do you remember that I said, 'I don't care if

19   those were reasonable opinions.  I want your opinion'?

05:54:31   20   **A.**   Yeah.

21   **Q.**   And I thought you said that your opinion was he

22   probably did?

23   **A.**   Well, I can only go on the reports.  I wasn't

24   evaluating him back then.  So --

05:54:40   25   **Q.**   Is there anything else you can go on besides the

MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI

1    reports to try to figure out how impaired he was in March

2    2019?

3    A.   Well, he had multiple reports that year.  He saw a

4    neurologist.  He saw a neuropsychologist.  He saw his

05:54:57    5    internist.  You know, they gathered collateral reports.

6    So, based on all the data they had and the testing, I

7    think they are reasonable diagnosis conclusions they came

8    to.

9    Q.   We're not understanding each other, Doctor.  It's

05:55:08    10    probably my fault.  Maybe I am asking bad questions.

11                 So, I am not asking about what the doctors

12    at that time had.  I am not asking if they made a

13    reasonable diagnosis with the information available to

14    them.

05:55:18    15                 I am asking if you, sitting here today --

16    I mean, you testified on direct that you watched the

17    entire January 2019 recorded deposition; and so, you had a

18    lot more information than them.  And what I am wondering

19    is:  If -- using all that information and as the geriatric

05:55:36    20    psychiatrist expert in this case, I am asking you to opine

21    on whether he had mild to moderate dementia in March 2019.

22    I thought you said yes, but now I am not so sure.

23    A.   Well, let me restate.  I was not there.  I did not

24    evaluate him.  And, so, I can't state my opinion based on

05:55:50    25    my evaluation.  I can only base it on the medical records

1    I reviewed and what they said at the time.

2                    And even taking into consideration all the

3    other information that I know now that maybe was not

4    accessible to the doctors, my opinion is that these

05:56:08    5    were -- their diagnoses of him at the time were

6    reasonable, yes.

7    **Q.**   So, are you saying that you can't give an opinion on

8    it or are you saying --

9    **A.**   Well, that is my opinion.

05:56:26    10   **Q.**   Yeah.  I know -- I mean, like, this is not a

11   malpractice case, right?  We are not talking about whether

12   the doctors at the time, you know, lived up to the

13   standard of care or whatever.  I'm just -- I mean, you

14   talked about how you viewed it as essential to having a

05:56:41    15   geriatric psychiatrist on this team.

16   **A.**   Yes.

17   **Q.**   And so you are the guy.  Well, I'm just asking:  Are

18   you able to give an opinion about whether Mr. Brockman had

19   mild to moderate dementia in March of 2019?  Are you able

05:56:53    20   to give that opinion or are you not able to?

21   **A.**   Well, my opinion is that the diagnoses that were

22   reached at the time were reasonable.  And, so, on that

23   basis that, yes, the doctors concluded that he had

24   dementia in a mild to moderate range, and I -- those are

05:57:13    25   plausible to me.  So, yes.

MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI

1    Q.   So plausible or -- I am asking about to you.  So, I

2    mean -- Look.  We don't want to be here all night.  I

3    mean, if you are not able to give your personal opinion

4    about it -- I don't want to know if the diagnoses that the

05:57:27   5    doctors did were reasonable or if they were plausible.

6    I'm asking if you have an opinion about whether that man

7    had dementia back then.

8    A.   Well, my opinion is that the conclusions they came to

9    made sense.  But, again, I have to go on the data that I

05:57:39   10   read from them at the time.

11              Based on my review of the data and what

12   they said, yes, I do believe that that -- those diagnoses

13   make sense.

14   Q.   But do you remember I was reminding you about some

05:57:47   15   other things that they didn't have at their disposal

16   that --

17   A.   Even taking those into consideration, is what I said.

18   Q.   So, let's do it this way.  Let's go back in time.  So

19   you believe that the defendant has dementia today,

05:57:58   20   moderate dementia today?

21   A.   Yes.

22   Q.   Okay.  When you met with him, was it a month or so

23   ago, you believed he had moderate dementia then?

24   A.   Yes, on October 3rd.

05:58:08   25   Q.   What about when you met with him in July?

1  **A.**   Yes.

2  **Q.**   So, in July you said you thought he had delirium,

3  right?

4  **A.**   Comorbid with dementia.

05:58:19   5  **Q.**   So, are you saying you are able to give an accurate

6  dementia diagnosis to a person who is experiencing

7  delirium during your examinations?

8  **A.**   Yes.

9  **Q.**   Okay.  So in July, your testimony is that you think

05:58:28   10  he had delirium, but you could also diagnose him as having

11  dementia?

12  **A.**   Yes.

13  **Q.**   And you didn't have any concerns that the things you

14  were seeing might be the delirium and not actual permanent

05:58:38   15  cognitive impairment?

16  **A.**   I saw both.

17  **Q.**   Okay.  So you can tell the difference -- when someone

18  presents as cognitively impaired, you can tell the

19  difference between which of that is from delirium, and

05:58:51   20  which of that is from permanent brain damage?

21  **A.**   That's what I do every day.

22  **Q.**   Okay.  Let's go back to May 2020 when Doctors Dietz

23  and Denney evaluated him.  Did you watch the entirety of

24  those videos?

05:59:04   25  **A.**   I believe I watched most of them.  Did I watch the

1    entirety?  I can't recall.

2    **Q.**    Do you have an opinion of whether the defendant had

3    moderate dementia then?

4    **A.**    In March of this year?

05:59:16  5    **Q.**    No.  I'm sorry.  Maybe I misspoke.  In May.

6    **A.**    In May of this year.  Yes, I believe so.

7    **Q.**    Sorry to just -- I want to be more precise.  May 18th

8    to 20th?

9    **A.**    Okay.  Yes.

05:59:26  10   **Q.**    And so when you say "yes," you mean you think he had

11   moderate dementia then?

12   **A.**    Yes.

13   **Q.**    Okay.  And in those videos, did you watch the part

14   where the doctors asked him about this case?

05:59:37  15   **A.**    I -- I recall questioning -- them questioning him

16   about the case, yes.

17   **Q.**    Okay.  And did you watch the part where they gave

18   him -- they were called, like, semistructured competency

19   evaluation?  Did you watch that part?

05:59:53  20   **A.**    I recall -- are you referring to when they asked if

21   he understood certain definitions?

22   **Q.**    Well, that's part of it.

23   **A.**    Yes.  I do recall seeing that, yes.

24   **Q.**    And fair to say that you -- well, nobody on the

06:00:04  25   defense team administered a, sort of, published competency

*MARC E. AGRONIN, M.D. - CROSS BY MR. MAGNANI*

1   test, right?

2   **A.**   Well, Dr. Guilmette administered --

3   **Q.**   So you think Dr. Guilmette gave a published

4   competency test to the defendant?

06:00:20   5   **A.**   When you say "published," I believe, these are all

6   published tests that he is doing, yes.

7   **Q.**   Okay.  That's what you think.  Okay.  So --

8   **A.**   I mean, when you say "published," I mean --

9   **Q.**   There are -- and I know that you don't -- well, and I

06:00:33   10   don't want -- you don't have as much forensic experience,

11   right?

12   **A.**   Compared to --

13   **Q.**   Well --

14   **A.**   -- Dr. Guilmette?

06:00:39   15   **Q.**   You said you have done one competency case before; is

16   that what you said?

17   **A.**   No.

18   **Q.**   Okay.  How many criminal competency evaluations have

19   you done?

06:00:47   20   **A.**   Two.  One -- well, one was more state of mind.  The

21   other was, I did an interview with someone.  That never

22   went to trial, but did prepare a report on someone about

23   their competency after they were criminally indicted.

24   **Q.**   So, state of mind is not competency, so is the answer

06:01:10   25   one?

1    **A.**   It would be one, yes.

2    **Q.**   Okay.  So -- are -- and if you are not aware, that's

3    okay, but are you aware that there are several published

4    semi -- semiformal structured -- they are called

06:01:20    5    instruments, that are used to evaluate competency?

6    **A.**   You're referring to performance validity measures?

7    **Q.**   No.  If you don't -- if you don't know, it's fine.

8    I'm just trying to --

9    **A.**   No.  You just have to be clear on what you're asking

06:01:34    10   me, if they're specific tests or whatnot.

11   **Q.**   I'll just ask a different question.

12   **A.**   Okay.

13   **Q.**   Is it fair to say that you and Dr. Guilmette -- is it

14   fair to say that none of the defendant's experts really

06:01:46    15   talked to the defendant about the facts of the case?

16   **A.**   I did ask him about aspects of the case, but he

17   declined to speak to me about it.

18   **Q.**   Did you ask him about the -- the nature of the

19   charges in the indictment?

06:01:58    20   **A.**   I attempted to ask him about it, aspects of it,

21   but he declined to talk about it.  He correctly stated

22   that he was advised not to.

23   **Q.**   And do you think that -- actually, you wrote about

24   that in your report, right, about him stating he was

06:02:18    25   advised not to?

1   **A.**   Yes.

2   **Q.**   And didn't you say that when he told that to the

3   government experts, you thought that they should have

4   followed up with the defense to see if they really gave

5   that instruction?

6   **A.**   Yes.

7   **Q.**   And it turns out the defense did not give that

8   instruction, right?

9   **A.**   No.  What they told him was the opposite.  They told

10  him he should be open and talk to us about it.

11  **Q.**   And so you drew significance from the fact that he

12  said his lawyers told him not to talk about the case, and

13  then cut off questioning, right?

14  **A.**   Yeah.  I thought that he misunderstood -- he wasn't

15  following their directions.

16  **Q.**   Yeah.  You thought he was misunderstanding his

17  lawyer's advice, right?

18  **A.**   Well, he certainly wasn't following it.

19  **Q.**   Well, can you think of another reason why someone who

20  is accused of a big crime might not want to talk about

21  their case on camera with government experts?

22  **A.**   I suppose there could be other reasons.

23  **Q.**   So -- and I want to get back to asking about that

24  part when he was talking about his case.  When he was

25  talking about his case with the defense experts, do you

 1   remember if he told them any defenses that he had for the

 2   case?

 3   **A.**   I don't recall.

 4   **Q.**   So you don't remember him telling Doctors Dietz and

06:03:31   5   Denney that the government cooperating witnesses lied to

 6   help themselves?

 7   **A.**   I don't recall that, those details.

 8   **Q.**   Do you remember when he told them that Evatt Tamine

 9   could have just made up all the e-mails?

06:03:46   10   **A.**   I don't recall him telling them that.  I mean,

 11   certainly could be there, it's just I don't remember.

 12   **Q.**   Do you remember when he told them that he did not

 13   have to file FBARs individually because he was separate

 14   from his trust?

06:03:58   15   **A.**   I don't recall him saying that.  No.

 16   **Q.**   So -- well, let me ask you:  You read the indictment,

 17   right?

 18   **A.**   Uh-huh.  Yes.

 19   **Q.**   And you're giving an opinion on whether he is able to

06:04:05   20   assist his lawyers in defending that indictment, right?

 21   **A.**   Yes.

 22   **Q.**   So can you tell me, what are some other defenses that

 23   possibly could come up in a case like this?

 24   **A.**   You're asking me to opine on some legal issues, that

06:04:20   25   I -- I think that's outside of my expertise here from

1    what I am hear to comment on.

2    **Q.**    You were asked to answer four questions.  And one of

3    them was, can a person assist their lawyer?  And I just

4    want to understand how you're equipped to evaluate that.

06:04:36    5    And I would have thought that one of the ways that you

6    would evaluate it is you would talk to the defendant about

7    the case and see if they raise obvious defenses.

8    **A.**    Well, in this case, my focus was on his ability to

9    reason in general, his mental status, for not just the

06:04:56    10    case but other issues as well.  What he has demonstrated,

11    whether I tried to talk to him about his illness or about

12    other aspects, that he just is not reasoning correctly

13    about it.  He has memory lapses, so I am applying --

14    **Q.**    Okay.

06:05:09    15    **A.**    -- that to other aspects as well.

16    **Q.**    So -- so -- but you still think he had moderate

17    dementia during the time in May 18th to 20th when he

18    interviewed with Dietz and --

19    **A.**    Yes.

06:05:22    20    **Q.**    Can I assume the same answer would be for when

21    Dr. Darby interviewed him in the beginning of May?

22    **A.**    Yes.

23    **Q.**    What about when he was still running Reynolds and

24    Reynolds in November 2020?

06:05:32    25    **A.**    Well, if he were to have a moderate degree of

1  dementia now, and we track back six months, I would say he

2  still was quite impaired at that point.  Maybe an earlier

3  degree of moderate.  I mean, moderate as I mentioned can

4  have a wide degree, but certainly quite impaired.

06:05:56  5  **Q.**   So, you think he was still running the company when

6  he was somewhere between mild and moderate dementia?

7  **A.**   Well, when you say "running the company," that can

8  mean many different things.  He was going to work, but the

9  descriptions is that, during all of this time that, and if

06:06:12  10  you look at the medical records as well, that he was

11  struggling in many, many different areas.  So I think when

12  you say "running" it, that's certainly not running it the

13  way he did in the past.

14  **Q.**   So when you say the descriptions of him going to

06:06:25  15  work, whose descriptions did you rely on to evaluate

16  whether he was effectively running his company in late

17  2020?

18  **A.**   Well, my focus was on his diagnosis, and his mental

19  state, currently to assist with his counsel.  If you are

06:06:46  20  asking me about his ability to run his business last year,

21  you know, that's an area where, again, I can talk about

22  his diagnosis, and the degree of impairment he had.  The

23  degree to which he was actually running the company, I

24  don't know.  That was not an area which I investigated.

06:07:03  25  **Q.**   But didn't you say that in your other work when

1  you're not doing criminal cases, that sometimes you are

2  trying to determine, you know, whether people should,

3  like, lose power of their finances or something?

4  **A.**   Sure.  So if I evaluated him last year during the

06:07:15  5  time when he was going to work, I could certainly give you

6  a more detailed answer to that.

7         MR. MAGNANI:  Can we pull up Exhibit 47,

8  please?  And if I could have the computer, again?  Thank

9  you.

06:07:24  10  BY MR. MAGNANI:

11  **Q.**   And, Doctor, let me know if you can't see it.  We are

12  going to try to make it so you can see it on the screen in

13  front of you.

14  **A.**   Okay.

06:07:51  15  **Q.**   And don't worry.  We will make it bigger, Doctor --

16  **A.**   Okay.  Good.

17  **Q.**   -- because I can't see it either.  Okay.  Can you see

18  this on the screen?

19  **A.**   Yes, I can.

06:07:58  20  **Q.**   Okay.  So this is an e-mail from October 10th, 2020

21  from Bob Brockman to Don Passmore.  Do you know who Don

22  Passmore is?

23  **A.**   No.

24  **Q.**   You don't know who he is?

06:08:08  25  **A.**   I don't.

*MARC E. AGRONIN, M.D. – REDIRECT BY MR. VARNADO*

1    **Q.**   Okay.  Well, I'll just let you read this e-mail,

2    Doctor.

3    **A.**   Okay.

4    **Q.**   And when you are done, my question is going to be if

06:08:15   5    whether you think Bob Brockman had mild to moderate

6    dementia when he wrote this e-mail?

7    **A.**   He could have.  I don't have a context for this

8    e-mail.  I don't know exactly that he wrote it.  I don't

9    know if someone helped him write it.  So, you know, there

06:08:28   10   is no way I can use this e-mail to opine on his diagnosis.

11   **Q.**   Okay.  Well, if that is your answer.  I don't have to

12   show you other e-mails, right?

13   **A.**   I don't think it would change my answer.

14   **Q.**   Okay.  Fair.

06:08:50   15           MR. MAGNANI:  Can I just have a moment?

16           THE COURT:  Oh, yes.  Yes.

17           MR. MAGNANI:  Yeah.  I have no further

18   questions.

19           THE COURT:  Okay.  Redirect.

06:09:11   20           MR. VARNADO:  Very briefly, Your Honor.

21                    **REDIRECT EXAMINATION**

22   BY MR. VARNADO:

23   **Q.**   Dr. Agronin, you were asked some questions about

24   Dr. Scott Lisse.  Do you recall that?

06:09:29   25   **A.**   Yes.

*MARC E. AGRONIN, M.D. – REDIRECT BY MR. VARNADO*

1   **Q.**   And you were also asked some questions about a search

2   warrant that took place on September 5th in 2018.  Do you

3   remember that?

4   **A.**   Yes.

06:09:37   5   **Q.**   I am going to show you what's already in evidence as

6   Government's Exhibit 95-B, which are some medical records

7   from Dr. Scott Lisse on August 31st of 2018, before the

8   fishing trip and the search warrant.  Do you see that?

9   **A.**   Yes.

06:09:56   10   **Q.**   And I'll represent to you that Mr. Brockman was

11   presenting to Dr. Lisse with a urinary tract infection at

12   this time, prior to the fishing trip.

13   **A.**   Okay.

14   **Q.**   All right.  And then, do you see here the reference

06:10:12   15   in Dr. Lisse's records of referrals for Mr. Brockman to

16   undertake in response to his visit to Dr. Lisse?

17   **A.**   Yes.

18   **Q.**   And who does it say to go see?

19   **A.**   See Dr. Lerner, urologist.

06:10:25   20   **Q.**   Are you aware that the defendant, or Mr. Brockman,

21   did go see Dr. Lerner, who referred him to Dr. Pool?

22   **A.**   Yes.

23   **Q.**   One record you weren't shown from Dr. Lisse is

24   Government's Exhibit 153, and these are documents that Dr.

06:10:43   25   Lisse provided to the government in advance, immediately

*MARC E. AGRONIN, M.D. – REDIRECT BY MR. VARNADO*

1   in advance of this hearing.

2            MR. MAGNANI:  Objection.  Counsel is

3   testifying.

4            THE COURT:  Right.  I mean --

06:10:50   5            MR. MAGNANI:  He is saying you didn't -- the

6   government didn't show you this, and let me tell you what

7   it is and where it came from.

8            THE COURT:  Right.  I mean -- well, let me hear

9   a response.  I guess the problem is that if the witness is

06:11:04   10  going to -- well --

11           MR. VARNADO:  I can rephrase, Your Honor.

12           THE COURT:  Okay.  If you can rephrase it --

13           MR. VARNADO:  Absolutely.

14           THE COURT:  -- because, I guess, the problem

06:11:12   15  is -- I guess I need to know if the witness is going to

16  assume that what the government is telling him is the truth

17  about the documents and the origin of the documents.  If he

18  is, then he can answer the question.

19           MR. VARNADO:  So these -- these records are in

06:11:29   20  evidence on behalf of the government, having been produced

21  by Scott Lisse.  I think that is clear for the record.

22  BY MR. VARNADO:

23   Q.   I'm just going to ask Dr. Agronin:  Have you seen a

24   record like this previously in your review of these -- the

06:11:40   25   case materials?

1  **A.**   I don't recall seeing this when I was preparing my

2  reports.

3  **Q.**   Let me just refresh your memory, and I can just

4  briefly.  Do you recall the personal health writings that

06:11:54  5  were -- in this particular matter?

6          MR. MAGNANI:  Again, he said he didn't

7  remember.  He is testifying, Your Honor.

8          THE COURT:  Yeah.

9          MR. MAGNANI:  He is coaching this witness.

06:12:02  10          MR. VARNADO:  Hold on.  Hold on.

11          THE COURT:  Here is the deal.  Either we

12  refresh the witness's recollection, or he is being

13  impeached.  One of the two.  The witness says:  I don't

14  remember this.  And then you have to ask him:  'Are there

06:12:13  15  any documents that' --

16          MR. VARNADO:  Yeah.

17          THE COURT:  -- 'you believe would help refresh

18  your memory?'

19                  'Yes.'

06:12:17  20                  'Like what?'

21          Instead of coaching him -- I mean, I am

22  not saying that anyone is being wrong, but let's follow the

23  procedure so that we don't get inappropriate hearsay

24  injected into the case.  So, we need to follow the

06:12:29  25  procedure for impeachment or refreshing.  Since this is

*MARC E. AGRONIN, M.D. – REDIRECT BY MR. VARNADO*

1  your witness, it is refreshing the witness's recollection.

2           MR. MAGNANI:  And this is just the second time

3  this improper refreshing has happened.  He is telling you,

4  'I know what to refresh you with, don't you want to look at

06:12:43  5  this?  I'll tell you what it is.'  And that is what is not

6  appropriate.

7           THE COURT:  I get it, but let's just move on.

8           MR. VARNADO:  Let me get through --

9           THE COURT:  Everybody is refreshing

06:12:51  10  recollections, everybody knows how to do it.  Let's just do

11  it.

12           MR. VARNADO:  To be very clear, I'm not --

13           THE COURT:  You're not impeaching.

14  BY MR. VARNADO:

06:13:00  15  **Q.**   I'm showing you what is in evidence as Defense

16  Exhibit 5, which is Dr. Dietz's paginated first report.

17  I'll just put it up there.  Did you see Dr. Dietz's

18  report --

19  **A.**   Yes.

06:13:11  20  **Q.**   -- from June 21?

21  **A.**   Yes.

22  **Q.**   Do you recall some references in Dr. Dietz's report

23  to personal health records that were written by the

24  defendant, that he references here, including as far back

06:13:23  25  as 2004 and 2005.  Do you recall that?

MARC E. AGRONIN, M.D. - REDIRECT BY MR. VARNADO

1   **A.**   Yes, to Dr. Obenour.  I think that was sent to them.

2   Yes.

3   **Q.**   Okay.  And -- and, in fact, I think Dr. Dietz's

4   report goes 2005, he quotes the personal health records

06:13:38   5   from 2007 and 2008 and 2009.

6   **A.**   Yes.

7   **Q.**   And do you recall that Dr. Dietz quotes these at

8   length where there is documentation about mental

9   processes --

06:13:49   10   **A.**   Yes.

11   **Q.**   -- in these personal health notes?

12   **A.**   Yes.

13   **Q.**   And I was just referencing Dr. Lisse's records, and

14   let me just ask you:  Having now seen the excerpt from

06:14:03   15   Dr. Dietz's report, including from -- bear with me -- the

16   reference from September of 2015 -- again, this is on page

17   10 of Dr. Dietz's report.  Can you see that?

18   **A.**   Yes.

19   **Q.**   And, again, with the beginning, "My job as chairman

06:14:22   20   and CEO," et cetera?

21   **A.**   Yes.

22   **Q.**   And then the mental decline?

23   **A.**   Yes.

24   **Q.**   Mental process is not as good.

06:14:28   25                   So, I am showing you the first page of

*MARC E. AGRONIN, M.D. – REDIRECT BY MR. VARNADO*

1   Government's Exhibit 163 from Dr. Lisse dated September of

2   2015.  Does that look like the same health record that was

3   reviewed and put in Dr. Dietz's report?

4   **A.**   Looks like the same sentence, the first one, yes.

06:14:44  5   **Q.**   Okay.  And then, again, just the same reference --

6               MR. MAGNANI:  We can stipulate, you know, that

7   it is a business record.

8               THE COURT:  Okay.  But it's Mr. Varnado's

9   examination.  He gets to conduct it the way he wants to,

06:14:54  10  Counsel.

11  BY MR. VARNADO:

12  **Q.**   So again, just referencing Government's Exhibit 153,

13  and, again, the date September 15th, do you see these

14  references to Mr. Brockman's mental processes and memory

06:15:07  15  decline --

16  **A.**   Yes.

17  **Q.**   -- at that time period?

18  **A.**   I do.

19  **Q.**   Okay.

06:15:15  20              THE COURT:  And I guess I am missing it.  So

21  what's the question that he is being -- his memory is being

22  refreshed on?

23              MR. VARNADO:  Oh, I was just --

24  BY MR. VARNADO:

06:15:24  25  **Q.**   Do you recall the stack of personal health records

*MARC E. AGRONIN, M.D. - REDIRECT BY MR. VARNADO*

1   from Mr. Brockman from '04 --

2   **A.**   Yes.

3   **Q.**   -- going back as far as '04, talking about memory

4   decline and concerns?

06:15:33   5   **A.**   Yes, I did review those.

6   **Q.**   You have testified about them earlier twice, I think?

7   **A.**   Yes.

8   **Q.**   I'm just asking him -- is that recall -- him placing

9   these in time, that he recalls this historical

06:15:45   10   identification of memory issues, that precede the search

11   warrant, or some fishing trip in Alaska?

12   **A.**   Yes.

13           THE COURT:   Okay.  Now I get where you're

14   going.  Okay.  Great.

06:15:57   15           MR. VARNADO:   Thank you, Judge.

16           THE COURT:   I don't think he is done yet.

17           MR. MAGNANI:   Oh, sorry.

18           THE COURT:   He just said, "Thank you, Judge,"

19   and is moving on to his next topic.

06:16:09   20           MR. VARNADO:   Right.

21   BY MR. VARNADO:

22   **Q.**   I want to be clear about some questions you were

23   asked about Mr. Barras and Mr. Jackson, and I want to make

24   sure that we were using the phrase "would it shape your

06:16:18   25   opinion correctly," because I want to ask Dr. Agronin if

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

MARC E. AGRONIN, M.D. - REDIRECT BY MR. VARNADO

1   there is a distinction between shaping your opinion about

2   the credibility of a collateral source versus your overall

3   opinion of Mr. Brockman -- Mr. Brockman's cognitive

4   situation right now.  And so if you are shown an e-mail --

5   wasn't shown to you -- but represented that Mr. Jack --

6   Reverend Jackson had said, 'I was evasive with the IRS and

7   I didn't tell the truth,' would that impact your view and

8   opinion as to the veracity of Mr. Jackson, but not impact

9   your overall assessment of Mr. Brockman's mental

10  condition?

11  **A.**    True.  It would not impact my assessment, my opinion

12  of Mr. Brockman's situation.

13  **Q.**    Okay.  And is that how you were answering that

14  question?

15  **A.**    Yes.

16  **Q.**    I just wanted to make sure that was clear.  Dr. Slade

17  was referenced, and there was a question about whether you

18  were aware if there was a donation, and maybe a suggestion

19  that even he personally benefited.  Were you aware -- are

20  you aware one way or the other if Mr. Brockman donated to

21  M.D. Anderson for medical research to treat doctor -- that

22  would assist in finding cures for Dr. Slade's condition?

23  **A.**    I'm not aware of that.

24  **Q.**    When Tommy Barras spoke to you, he said that he

25  observed Bob's decline -- pegged it back to 2010.  In

207

*MARC E. AGRONIN, M.D. - RECROSS BY MR. MAGNANI*

1   sworn testimony in this proceeding, he stated that he was

2   not aware prior to November 2020 of Bob's Parkinson's

3   diagnosis.  And you read that testimony?

4   **A.**   Yes.

06:18:05   5   **Q.**   Okay.  If, hypothetically speaking, Mr. Barras

6   received an e-mail in June of 2020 that clearly indicated

7   he knew of the Parkinson's diagnosis, what would you make

8   of that in terms of Mr. Barras's veracity?

9   **A.**   It would be -- I would question it.

06:18:27   10   **Q.**   And would that impact your view of Mr. Barras as a

11   collateral source, but perhaps not impact your overall

12   assessment of Mr. Brockman's cognitive condition?

13   **A.**   Yes, and that's what I meant.  It might shape the way

14   I put it together, but it would not change my opinion.

06:18:44   15   **Q.**   And your opinion of Mr. Brockman's cognitive

16   condition as we sit here today, not in 2018, not in 2019,

17   but in November of 2021, what is it?

18   **A.**   That he has moderate Parkinson's disease dementia,

19   that he is unable to assist in his defense and work with

06:19:10   20   his counsel with a reasonable degree of rational

21   understanding.

22           MR. VARNADO:  Pass the witness.

23           THE COURT:  Wait.  I know you guys are really

24   eager to get going, but why don't you give each other just

06:19:23   25   a chance to switch places.

1          MR. MAGNANI:  We're on the same team on getting

2  out of here early, Judge.

3          THE COURT:  Okay.

4                    **RECROSS-EXAMINATION**

06:19:32  5  BY MR. MAGNANI:

6  **Q.**    You were just shown those and I thought we talked

7  about it on cross, but those -- if I refer to them as

8  "personal writings," is that a term you're familiar with?

9  The 2004 to --

06:19:44  10  **A.**    Yes, I understand what you mean.

11  **Q.**    And so the one that Mr. Varnado showed you was from

12  2015, that was in Dr. Lisse's records?

13  **A.**    Yes.

14  **Q.**    And before he told you they were in Dr. Lisse's

06:19:53  15  records, did you know they were in Dr. Lisse's records?

16  **A.**    I don't recall that I did.

17  **Q.**    Don't worry.  They were.

18  **A.**    Okay.

19  **Q.**    I guess what I am wondering is, I thought on cross,

06:20:01  20  when we were talking before, I thought that you said -- I

21  thought you said that those did not really impact on your

22  opinion.  Did I misunderstand that?

23  **A.**    They were data points but, you know, my opinion was

24  based on a lot of other information.

06:20:17  25  **Q.**    Yeah.  I mean, would it be fair of me to characterize

*MARC E. AGRONIN, M.D. - RECROSS BY MR. MAGNANI*

1    those as -- I mean, you know, we looked at the example of,

2    you know, mental process not as good.  You know he talks

3    about he forgets names and it takes him longer to get

4    things done.

06:20:30    5    **A.**    Yeah.  They're subjective reports.  My only point is

6    that they are subjective points that long predate, you

7    know, in a more significant emergence of his Parkinson's

8    disease and dementia.  So --

9    **Q.**    Would you agree there is nothing remarkable about

06:20:44    10    those?  Well, I'll ask a different question.

11                    I mean, isn't it common and expected that,

12    you know, as we -- you know, you will start noticing some

13    slowing of memory function as you age into your 60s?

14    **A.**    Many people do.  And that's why subjective reports

06:21:00    15    like that can mean many different things.

16    **Q.**    But I guess what I am asking is:  Isn't it common

17    for -- you know, to notice some slowing of memory

18    functions as we get into our 60s?

19    **A.**    It is common.

06:21:11    20    **Q.**    And, typically, people feel that it takes a little

21    longer to remember names or process?

22    **A.**    Yes.

23    **Q.**    Okay.

24                    MR. MAGNANI:  No further questions, Your Honor.

06:21:18    25                    MR. VARNADO:  Nothing further, Judge.

1           THE COURT:  Okay.  May this witness be excused?

2           MR. VARNADO:  Yes.

3           THE COURT:  Thanks, Dr. Agronin.  I know it's

4 it's been a long day, sir.  Thank you.

06:21:27    5           THE WITNESS:  Thank you so much.

6           MR. LOONAM:  Your Honor, I know you said we are

7 going to 7:00.  I know when we ran up against that -- that

8 time period before, there perhaps was a little wiggle room

9 to get closer to 7:30, because that's when they absolutely

06:21:42   10 shut the building down.

11           THE COURT:  Well, it's just that it's hard to

12 get in and out and security leaves.  And --

13           MR. LOONAM:  I'll say this.  I think we're

14 prepared to extend the sports metaphor and call an audible

06:21:56   15 and perhaps call our last witness --

16           THE COURT:  Okay.

17           MR. LOONAM:  -- Mr. Pete Romatowski, who I

18 think I can do a pretty efficient direct on, and I think we

19 can hopefully wrap up today.

06:22:08   20           THE COURT:  Okay.  Well, we'll push -- I mean,

21 7:30.  If not, we can come back tomorrow.

22           MR. LOONAM:  Yes, sir.

23           THE COURT:  It's okay.  It's just that 7:30 is

24 kind of like the cutoff time and we have got to leave the

06:22:19   25 building.

1          MR. LOONAM:  Understood.  That's what I was

2    explaining.

3          THE COURT:  So, we can keep going to 7:30.

4    That's not a problem.

06:22:24   5          MR. LOONAM:  We call Mr. Pete Romatowski.

6          THE COURT:  Hi, Mr. Romatowski.  If you could

7    just step forward and be sworn in, sir.  I know it's late

8    in the day, but we're going to push to about 7:30.

9          THE WITNESS:  That's fine.

06:23:13   10          THE COURT:  If you could raise your hand, sir.

11              (Witness sworn.)

12          THE WITNESS:  I do.

13                    **PETER JOHN ROMATOWSKI,**

14    duly sworn, testified as follows:

06:23:26   15                    **DIRECT EXAMINATION**

16    BY MR. LOONAM:

17    **Q.**   Mr. Romatowski, could you state and spell your name

18    for the record.

19    **A.**   Peter John Romatowski.  First name Peter, P-E-T-E-R;

06:23:35   20    middle name John, J-O-H-N; and last name Romatowski,

21    R-O-M-A-T-O-W-K-S-I.

22    **Q.**   And what do you do for a living?

23    **A.**   I am a lawyer at the Washington office of Jones Day,

24    admitted to the bar in this court in the District of

06:23:58   25    Columbia, the states of Montana and New York, and various

1    other federal courts.

2    **Q.**   All right.  And -- and I ask this question at my own

3    peril, but at what stage of your career are you at?

4    **A.**   That -- I face that question from time to time these

06:24:20  5    days, Judge, and what it brings to mind for me is that

6    baseball broadcaster who once was reviewing the lineup

7    changes for a game and said, "And now we come to Andre

8    Dawson, who has got a hamstring pull, so he is

9    day-to-day."  And Vince Scully interrupted to say, "Aren't

06:24:38  10   we all?"

11              And, in my case, I am five years past

12   mandatory retirement at Jones Day, and so I regard myself

13   as day-to-day.

14   **Q.**   All right.  And will you give us -- just describe

06:24:51  15   your educational background.

16   **A.**   Post-secondary education was at Harvard College,

17   Cambridge, Massachusetts, where I graduated in 1972 from

18   the undergraduate college.  Then I attended Georgetown Law

19   School.  I graduated in 1975.

06:25:12  20              And as to career history, the summer

21   before third year of law school, I was an intern in the

22   U.S. Attorney's Office in the Southern District of New

23   York, and that became a career ambition of mine, but

24   they -- number one, they don't hire anybody right out of

06:25:30  25   law school.  And in the second half of the 1970s there was

PETER JOHN ROMATOWSKI - DIRECT BY MR. LOONAM

1    a federal government hiring freeze, government-wide, for

2    years.  So, there was no hiring anywhere.

3                    So, I was lucky to get a job at a Wall

4    Street law firm where -- as an associate attorney, where I

06:25:47  5    practiced about half time general corporate law and about

6    half time litigation, which was mostly civil, but some

7    criminal defense, supporting partners, former prosecutors

8    in that law firm who would take assigned cases under the

9    Criminal Justice Act, both at trial and on appeal.

06:26:11  10                    And after just about four years there, I

11    was sworn in in October of 1979 as an assistant U.S.

12    attorney in the Southern District of New York, where I

13    served six years, four months and a couple of days -- but

14    who's counting? -- and handled a wide variety of federal

06:26:38  15    criminal cases through prosecution, trial, and appeal, but

16    with an early focus and later emphasis on federal

17    securities law violations, to the point where during --

18    roughly the second half of my term I was doing almost

19    exclusively securities cases, including the last couple of

06:27:02  20    years of my service I was chief of what was then called

21    the Securities and Commodities Frauds Unit in the Southern

22    District of New York, which meant that, in addition to

23    carrying my own caseload, I supervised a group of

24    assistant United States attorneys and had -- had myself or

06:27:19  25    a shared responsibility for opening investigations,

PETER JOHN ROMATOWSKI - DIRECT BY MR. LOONAM

1    closing investigations, approving indictments,

2    disapproving indictments at times and so on.

3    Q.   And then just -- bullet point for us.  After you left

4    the U.S. Attorney's Office, you know, have you -- were

06:27:41    5    you in white collar criminal defense up until the present?

6    A.   White collar criminal defense and SEC enforcement

7    investigations and enforcement actions.

8    Q.   And just briefly can you give us a sense of the

9    complexity of the types of cases you have worked on during

06:27:59   10    your career?

11    A.   They range to, I am confident, the most complex sorts

12    of federal criminal violations that get tried.  And I have

13    handled those sorts of matters both as under investigation

14    as a prosecutor, under investigation as a defense lawyer,

06:28:22   15    and at trial.

16    Q.   And you represent Bob Brockman in this matter?

17    A.   With a very capable group of a supporting-cast

18    lawyers, yes.

19    Q.   Okay.  And when did you begin your representation of

06:28:38   20    Mr. Brockman?

21    A.   I first heard from Mr. Brockman in late August of

22    2018.  He called me on the phone.

23    Q.   Okay.  And since that time, since late August of

24    2018, to the present, approximately how many times do you

06:28:51   25    think you have met with Mr. Brockman face to face?

*PETER JOHN ROMATOWSKI – DIRECT BY MR. LOONAM*

1  **A.**   Well, in the course of these proceedings or

2  initiating these, we looked that up.  I would have only

3  had a rough estimate otherwise.  But I have counted up

4  eleven times that I met with Mr. Brockman in person before

5  the pandemic set in in March and we all locked down, and I

6  actually hadn't even seen him since.

7  **Q.**   And what was your first impression --

8  **A.**   In person.  I should say I haven't seen him in person

9  since.

10 **Q.**   Prior to this hearing?

11 **A.**   Correct.

12 **Q.**   Yeah.  And, then, what was your first impression of

13 Mr. Brockman when you first met him?

14 **A.**   A very, I would call -- I would say, courtly sort of

15 gentleman, very soft-spoken, gracious, measured, modest, I

16 would say, for someone of such accomplishments both as a

17 self-made, self-taught computer program and entrepreneur

18 building a business.

19 **Q.**   And when you first met Mr. Brockman, did you observe

20 any cognitive issues that you took note of?

21 **A.**   Not -- not that I recognized.  Certainly not at the

22 very start.  There -- but there did come a time the -- and

23 likely not the second meeting, but the third or fourth

24 meeting that we had with him, when we turned to matters

25 where his memory and his ability to analyze came to be

1    challenged.  It was puzzling.

2    **Q.**    All right.  And tell us about that.  Did your

3    perception of his cognitive abilities progress over time?

4    **A.**    It got, I'll call it, worse.  Yes.  I mean, the

06:30:47   5    limitations that I saw progressed in the wrong direction.

6    **Q.**    Okay.  And can you describe and without, you know --

7    without getting into specific communications with the

8    client, the types of problems you were encountering with

9    the -- the -- Mr. Brockman that you're describing?

06:31:08  10    **A.**    Well, without characterizing them as problems, there

11    were two aspects to his responses that were noteworthy to

12    me, one of which I was prepared for and ready to cope

13    with, the second of which was -- was problematic, was

14    troublesome.

06:31:26  15             I had defended a retired executive of a

16    national pharmaceutical company in a federal criminal

17    case, five-year investigation, one-month jury trial, for

18    alleged failure to disclose pharmaceutical test results to

19    the FDA.  And that was a retired executive, 66 years old

06:31:51  20    at the time, which from -- at 45 years old myself on that

21    side of the divide, it seemed real old to me at the time.

22    Now, five years past 65 myself, it doesn't seem so old.

23    But I came to recognize that client had a very serious

24    what I would call sort of age-related memory issues, it

06:32:14  25    seemed to me.  But, nevertheless -- and by contrast to

1    Mr. -- and so I saw that in Bob Brockman as well.

2                        But I was not daunted by that, because the

3    other -- the other thing you need from a client in order

4    to defend a criminal case, the previous client was fully

5    capable of doing, and that's where Bob faltered, and that

6    is in assisting you in investigating the case and

7    assembling the story, which is where the client's

8    participation in cases like this, to me, is just

9    indispensable.

10                       And I can best illustrate it by an example

11   that does not poach on privilege but describes in the

12   abstract.

13                       The lawyers will go out in the 5.5 million

14   pages of documents that have been already produced in this

15   case to us and find what we think matters toward

16   assembling the story, or some strand, some theme of the

17   story, and one by one we will take those and whittle them

18   down to a place where we need -- we think we know what's

19   going on and how the events progressed, but you come to

20   dead-ends, or forks in the road, and you can't tell from

21   the documents what happens next and the client's help

22   becomes indispensable.

23                       So, you collect such raw material, usually

24   in document form.  Sometimes it's information from

25   elsewhere that's not in document form.  And we would --

1  when we -- when we reached a critical mass of such

2  information, we would schedule another meeting with

3  Mr. Brockman.  And this began about the second, third time

4  that we met him at his -- at his home in -- here in

06:34:02  5  Houston.

6  And what you do is, when you take a

7  typical example, you'll have an e-mail string that's six

8  pages long, messages back and forth among a whole group of

9  participants, maybe including the client, maybe not.

06:34:19  10  And so you show this to the client,

11  explain how you got to this document, what you believe has

12  happened so far, and you're trying to figure out what

13  happened next.  And so you say to the client, if they show

14  up in the e-mail string, 'Well, do you remember this?  And

06:34:34  15  do you remember the meetings that are referred to here?'

16  And often the answer will be, 'No.'

17  But what I learned from another client

18  is -- that other client in the late 60s, is, well, that's

19  okay, because that's less than half of it.  And the fact

06:34:48  20  that he doesn't remember specific events is not -- is not

21  necessarily a disqualifying impediment from assisting

22  counsel in the defense, because what happens next is you

23  say, 'Well, look, Bob, we find in this e-mail string three

24  facts, A, B, C, that suggest events took a turn to the

06:35:12  25  left.  And we find three more facts, D, E, F, that suggest

1  instead it turned to the right.  Now, how about it from

2  what you read here?  Are we on to something or are we off

3  base?  What's happened?'

4          And my prior experience is the client will

5  say one of a number of things that advance the defense of

6  the case.  He will say, 'Well, you're right.  You got that

7  right.  And the first set of facts, the inference that you

8  draw from A, B, C, I think is the correct one.  For such

9  and such reasons, I think events took a course to the

10  left.  I think you are onto -- that is the right path.'

11          Or the client will say, you know, 'What

12  you say makes sense, but you're overlooking Facts 7 and 8

13  in this e-mail string that the lawyers don't recognize.

14  And what I' -- 'even though I don't remember these events,

15  I may not have participated in this e-mail conversation.

16  I can recognize facts that say events took a different

17  course completely than the ones you had expected.'

18          Or it can say, 'I can't choose between the

19  competing inferences, but if events took a course to the

20  left so-and-so eventually would have had to approve this,

21  would have had to authorize an expense, would have had to

22  assign resources or something.  Go ask so-and-so.  You

23  will learn the answer there.'

24          Or he will say, 'Once again, I can't

25  choose between the inferences that you rightly recognize

1   in these facts, but if you' -- 'if events took a turn to

2   the right, there will be records in such and such

3   department to reflect that.'

4                    And in one of those ways, often -- several

06:37:03   5   of those ways, the client is able to assist in the defense

6   by steering you in the right direction and you compile the

7   facts of the case.  That was my experience.  Universally,

8   that's been my experience in such cases.

9                    The -- and you just -- you simply can't do

06:37:25   10   without it.  In the case I have referred to before, that's

11   the way -- that last example, steering us toward records

12   was the way -- we found in a dusty basement storage room

13   in an old banker's box the smoking gun documents in our

14   favor that made that defense.

06:37:39   15                    So, that was very much on my mind and not

16   daunted by -- by simple -- it's wrong to call them simple.

17   They're not trivial.  But I wasn't daunted simply by

18   memory issues but by the inability -- as we learned Bob

19   suffered, from the inability to help us draw inferences,

06:38:02   20   to recognize facts that we couldn't see, to analyze the

21   documents.

22                    In fact, in some respects, it was worse

23   than that, because in his eagerness to help, when we would

24   take him through an e-mail string, in order to impress

06:38:20   25   him, we would point out, 'Well, here's so-and-so, name,

1   title, organizational affiliation,' and we would try to

2   prompt him with leading questions.  'Well, this suggests

3   to us that this person must have had such and such a role.

4   Is that the case?'

06:38:39   5   And increasingly over time -- and this did

6   progress in the wrong direction -- he simply would draw a

7   blank.

8   THE COURT:  Can I just ask you a quick

9   question, Mr. Romatowski?  Sort of where in the timeline

06:38:53   10   did you perceive this happening?  You said he contacted you

11   in 2018.  Was it immediately apparent or is it something

12   that showed after a couple of months?  I mean, where in the

13   timeline of your representation did you start to suspect or

14   see these problems?

06:39:11   15   THE WITNESS:  Meetings in the fourth quarter of

16   2018.

17   And, Your Honor, I -- I sort of recall

18   milestones that sort of orient me in this respect.  He

19   called in late August.  We met for the first time in

06:39:26   20   September.  We had a series of meetings -- I want to say

21   four or five of them -- until a meeting in July of 2019 at

22   his summer home in Austin -- in Aspen, Colorado.

23   And so the phenomenon I am describing

24   began at the second or third meeting.  A second meeting was

06:39:47   25   right at Halloween, I remember.  But we met another time or

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 two before the end of 2018.

2                      And it was puzzling the degree to which it

3 was difficult for him to engage in this respect, and he

4 would give -- he would give two kinds of answers.  He was

5 able -- At our very first meeting, it was a get-acquainted

6 session.  I don't think we had any raw material to use.

7 And like any such relationship, we were getting to know one

8 another and we heard his life history and broad history of

9 the company and so on.

10                      Later, when we were digging in on the

11 documents and so on, we had time -- we would get -- in his

12 eagerness to -- and pressing to help us, he would lapse

13 into repeating that history, even though it was not

14 responsive to any of the specifics.  We were well beyond

15 that sort of top-level generality.  That's one thing.

16                      The other thing is he had a mind like --

17 well, it's wrong to say this.  It's a colloquialism, to put

18 it that way.  But he had very firmly in mind Reynolds'

19 operations, Reynolds and Reynolds's operations.  It's a

20 software business, I am sure you understand, that services

21 car dealers.  It had nothing -- the operations of

22 Reynolds -- the ownership of Reynolds through a chain of

23 entities is very much relevant to us, but the operations of

24 Reynolds, its customer relationships, what it does for car

25 dealers, how difficult car dealers are to negotiate with,

1  they're the world's best negotiators and so on and so

2  forth, was useful background to hear once, but we -- he

3  would lapse into repeating those anecdotes.

4                      And, further, there was a customer

06:41:34  5  dispute -- pardon me -- a competitor dispute with this firm

6  CDK, and he could recite the history and details of that

7  competitor dispute.  And we would be talking about the A.

8  Eugene Brockman Children's Trust and trying to get him to

9  help us with these e-mail strings, raw material that we had

06:42:00  10  and somehow we would find ourselves diverted off into

11  hearing about CDK.

12                THE COURT:  Can I ask a quick question again?

13                      So -- I am not asking about

14  attorney-client privileged information, but these

06:42:13  15  discussions you're having where he couldn't -- where he had

16  problems helping you with like e-mails, were these e-mails

17  from like a year ago, or like two years ago, or three years

18  before that?

19                      I mean, because in this case there's been

06:42:28  20  testimony that -- at least the doctors have said that

21  Mr. Brockman has good memory of things in the past or

22  things that he has dealt with a lot.  So, I was trying to

23  find out the issues that you were having.  Were those with

24  things that happened far in the past or things that were

06:42:48  25  more recent.

1            THE WITNESS:  I would say both.  I mean, after

2   all, the -- this sprawling indictment, Your Honor, has

3   charged -- the history of this trust, it goes back 40

4   years.  Well, I -- for better or for worse -- and it's good

06:43:02   5   news and it's bad news -- there was no such thing as e-mail

6   until about the mid-90s.  So, there is nothing that goes

7   back that far.

8            And I can't -- thinking back on the raw

9   material that we had and without getting into privileged

06:43:15   10   issues, I cannot recall quite -- especially at the

11   beginning, the age of the materials that we had to work

12   from.  But some of it certainly concerned -- there was --

13   some of it was important to the investigation, and it's not

14   a secret to reveal it's important to the case now.

06:43:38   15            There was the acquisition of the Reynolds

16   and Reynolds company by Bob's companies in the mid-2000s,

17   and we had raw material to ask him about that.  So, that

18   was about 15 years distant.  There was raw material from

19   the more recent period, I want to say, you know, the --

06:43:56   20   perhaps five years.  I don't have it well in mind how it is

21   sorted out along that spectrum.  But the problems were

22   similar.  I don't -- I don't have in mind -- and I wasn't

23   watching for this at the time, so it didn't register in

24   that way -- quite the -- whether there was a difference in

06:44:13   25   the age of materials that made a difference.

1          There was the one subject matter, the CDK

2 dispute, that he would lapse into kind of as a default and

3 something familiar that he could tell us about.

4          And the other thing is to say he -- it was

06:44:31   5 worse than him not being able to do it in the sense that he

6 was very eager to help.  We later learned, when we get to

7 July, that he -- he was deeply embarrassed that he couldn't

8 be of more help.

9          And so you would find him -- we would, you

06:44:47  10 know, advance through our stack of documents and we would

11 get a half an hour down the road and reach another

12 dead-end, and then he would say, 'Well, but maybe this has

13 to do with so-and-so from the such-and-such organization.'

14 And we'd recognize that "so-and-so" was somebody who was in

06:45:10  15 the e-mail string 15 minutes ago, where he couldn't

16 remember and he drew a blank.  But the affiliation was

17 different.  He remembered the name but got wrong the

18 affiliation, and he was groping for that as maybe something

19 that would be helpful for us.

06:45:29  20          In other words, the way his mind was

21 working in his effort to find something to help us, was to

22 recall and regurgitate but distort information that had --

23 that he had just recently absorbed.  So, that was

24 self-defeating.  That not only wasn't helpful, it was

06:45:55  25 erroneous information, which, of course, doesn't contribute

1  to the...

2              And so I thought a lot about this.  I --

3  you know, this phenomenon I describe, that experience with

4  a document, whether a change of e-mails or other document,

06:46:10  5  that's -- to build a defense in a case like this, and for a

6  client to assist in the way that they must, a client -- the

7  lawyers and the clients have got to do that hundreds and

8  hundreds and hundreds of times, it is no exaggeration to

9  say, in order to gather the facts over months of time in

06:46:34  10  order to assemble the story.

11              You know, Your Honor, there's an

12  estimated -- there is the digital equivalent of what's

13  described to me as 5.5 million pages of documents produced

14  already in discovery in this case.  And the lawyers' job is

06:46:50  15  to whittle that down to the .1 percent, that is, one-tenth

16  of one percent, or, if you're really lucky, the .01, one

17  one-hundredth of a percent of documents that the client has

18  got to master and got to help you like that.

19              Well, if it's 5.5 million to start with,

06:47:13  20  that one-tenth of 1 percent, is 5,500 documents.  If you're

21  really lucky and it's only one one-hundredth of a percent,

22  it's 550 documents where the client has got to master those

23  and be able to explain and analyze and help you

24  investigate.

06:47:32  25              And where we got to with Mr. Brockman --

*PETER JOHN ROMATOWSKI – DIRECT BY MR. LOONAM*

1  regrettably, he can't even read and absorb and recall one

2  such document, much less help us the way he needs to with

3  the 550, not to mention the 5,500 such documents after

4  the -- after this capable group of lawyers find those

06:47:56  5  needles in the haystack for him to work from.

6            THE COURT:  Thank you.  I am sorry.  I didn't

7  mean to hijack your direct.

8            MR. LOONAM:  You didn't hijack it.  You sped it

9  up.

06:48:06  10  BY MR. LOONAM:

11  **Q.**    So that brings us to July?

12  **A.**    Yes.

13            THE COURT:  July of?

14  BY MR. LOONAM:

06:48:14  15  **Q.**    July of 2020?

16  **A.**    '19.

17  **Q.**    July of 2019.  Sorry.  July of 2019.

18            Do you meet with Mr. Brockman in July of

19  2019?

06:48:21  20  **A.**    Yes.

21  **Q.**    And what is the purpose of that meeting?

22  **A.**    Well, the meetings were two-fold.  They were not held

23  on a regular schedule.  Rather, they were held as needed

24  for two purposes:  One, when we had gathered sufficient

06:48:37  25  additional raw material to work from through the process I

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

PETER JOHN ROMATOWSKI – DIRECT BY MR. LOONAM

1    have described, and also when developments in the

2    investigation-related matters had advanced to a stage that

3    was enough to talk about on that side of the agenda.  And

4    so the format for such meetings was we would call and

06:48:57   5    arrange a meeting with Bob and fly to his home in Houston,

6    on the one occasion in Colorado, with our agenda, with

7    that agenda in mind.

8            And the -- the meeting scheduled for Aspen

9    was one in that -- in that pattern no different than

06:49:15   10   others in terms of what our -- what our plan and objective

11   was.

12            But Kathy Keneally and our associate

13   Georgina Druce had weather problems in New York and never

14   made it to the meeting.  I was coming from another

06:49:30   15   direction.  I can't remember where I was, but I did not

16   have weather delays.  And so I was there with Bob in

17   person and we got them on the phone.

18            And as -- as we began, Bob said, "Well,

19   before we start, there is something I want to bring to

06:49:46   20   your attention."  And I might say, by way of preface to

21   this, because it serves to explain what this conversation

22   was:  Along the way as this process continued and got to

23   be -- the difficulties more severe, Bob would ask us,

24   'Well, you know, can you give it to me in writing?"  Can

06:50:04   25   you, you know, tell me again?  And you have got to speak

PETER JOHN ROMATOWSKI – DIRECT BY MR. LOONAM

1   slowly for me' and so on.  He was grasping for ways to

2   help him be of better help to us.  That -- that was not

3   new in July.

4                    But in July he says, 'I got something I

06:50:24   5   want to talk to you about.'  And he had a small black

6   binder, loose-leaf binder, with him, and he said, 'I want

7   you to know that I have been seeing doctors and -- because

8   I have got -- I have had these memory issues, and I am

9   worried about my health.  And I want you to know I have

06:50:45   10   been told that' -- and I think he told us the diagnosis.

11   I think he said to us, 'I have been told I have got

12   Parkinson's disease and dementia, and here's -- here's the

13   detail.'

14                    And he said, 'you know, I just want you to

06:51:01   15   understand why it is I have been struggling this way, and,

16   you know, the doctors tell me there is a reason for it.

17   And I need for you to slow down and repeat things for me

18   and have patience because there are these issues.'

19                    Kathy and Georgie were listening on the

06:51:28   20   phone.  I opened the binder, described what I saw, which

21   were a number of tabs and reports of doctors.  I skimmed

22   the first paragraph and the last of each, thanked Bob for

23   that, said we would need to take it in, we would need to

24   understand better what this was all about.

06:51:53   25                    I made a decision not to take the binder

1  with me because I didn't know if it was his only copy, and

2  I wasn't confident, frankly, of whether he -- if I asked

3  him that question, I wasn't confident of the answer.

4           And I don't remember where I was headed

5  from Aspen, but if I wasn't going directly back to

6  Washington, I didn't want to be carrying this around,

7  especially if it proved to be his only copy.  So, I said,

8  'Bob, we are going to need to get back to you about this.

9  And thank you.  This is really helpful.'  And it was.  I

10 mean, for me, it was a light bulb going on.  'Very helpful

11 to understand.  We are going to try and do better.  Thank

12 you very much.'

13          I don't remember whether Kathy or Georgie

14 had questions about it.  Of course, they were at a

15 disadvantage because this was in the days before Zoom.

16 So, they were strictly on a conference call, and I

17 described for them roughly what I had, but they didn't --

18 didn't know any more than they could hear on the phone.

19          So, we put it to one side and we turned to

20 the business of the day, which I must say was yet another

21 meeting in the pattern I described but with a better

22 understanding, perhaps, of why it was so difficult.

23 Q.   And during the course of that meeting, was there any

24 discussion of -- or connecting Bob's health or diagnosis

25 to any potential defense of the investigation?

PETER JOHN ROMATOWSKI - DIRECT BY MR. LOONAM

1   **A.**   None whatsoever.  In fact, I was -- I was taken

2   aback.  Some it didn't -- it didn't even dawn on me, and

3   he certainly didn't raise it.  His -- his manner, and what

4   he expressed was, I'll call it, embarrassment and regret,

06:53:47  5   that he was unable to be of more help, and eagerness to

6   help us understand why that was, and to try to find a path

7   forward that would improve his ability to help us assemble

8   the facts.

9   **Q.**   And do you know whether Mr. Brockman, you know,

06:54:11  10   expressed any view that he thought he might get better,

11   you know, by -- by participating in certain activities, or

12   what his own view was about, you know, if he could -- if

13   he could help himself here?

14   **A.**   I can't -- you know, somewhere along the line -- and

06:54:29  15   I can't remember whether it was from Bob or someone

16   else -- that was a notion that, maybe, his medications,

17   because he was -- he had a regimen of medications he was

18   taking at the time, that maybe there was some adjustment

19   to his medications that might help, but I don't -- at the

06:54:49  20   moment, your question doesn't trigger a memory for me

21   otherwise.

22   **Q.**   Okay.  And then, so your -- so your -- you meet with

23   Bob in July.  You make a decision not to take the binder.

24   You have a new understanding of what you believe is

06:55:07  25   causing the difficulties you're having in working with

1  him.  What were the next steps that you took after

2  learning that -- that Bob had been diagnosed with

3  Parkinson's and with dementia?

4  **A.**   Well, of course, we -- especially, Kathy Keneally and

06:55:23  5  I discussed it, and discussed what to do, and without -- I

6  mean, trying to keep these things in the abstract and not

7  getting into privileged conversations.  The first thought

8  was, this client needs help, and we need -- we need him to

9  have help, in order to get through this.  And he needs the

06:55:50  10  help of his family, and his family -- and we recognized,

11  too, by that point that the matters under investigation

12  had legal implications for the legal rights of his wife,

13  his son, as well.  And my -- my strong personal view was

14  that he needed the help and support of those family

06:56:12  15  members.  And Kathy, I think, certainly agreed.

16              But, of course, his -- all of our dealings

17  with him are privileged and confidential in his behalf.

18  We couldn't act otherwise without his permission, and my

19  recollection is -- so, we -- we had a further meeting, I

06:56:39  20  think, in September with Bob by himself.  And added to our

21  usual agenda, I think was this issue about, okay, what do

22  we do about what you have been able to tell us about your

23  medical condition?

24              That lead to -- without, once again,

06:56:58  25  getting into the conversations, that lead to a

1    recommendation on our part that his wife and his son have

2    separate representation to advise them about the

3    implications of all these matters for the two of them, and

4    also to see to it that since, you know, those legal issues

06:57:23   5    overlapped, I mean, they, obviously, have distinct and

6    separate legal interest, but their legal interests

7    overlapped in the investigation.

8              It was our firm legal view that they were

9    eligible to meet together, and have their lawyers confer

06:57:43   10   on a common-interest-privilege basis over these matters.

11   And so with that understanding, in November, I believe it

12   was, we introduced -- we made a recommendation that

13   Mrs. Brockman and his son accepted to introduce them to

14   counsel, and we had a joint meeting, I think the first

06:58:03   15   time, in November.

16   **Q.**   And are -- did subsequent meetings with Mr. Brockman

17   include his family members?

18   **A.**   Some did; some not.

19   **Q.**   Okay.  And what was the goal of involving the family

06:58:23   20   members?

21   **A.**   It was two-fold, from my point of view.  One was, I

22   saw them as a source of support, and understanding for

23   him, and support in his effort to aid in our assembling

24   the facts, Number 1.

06:58:43   25              And Number 2, an effort to see to it that

1    they and their counsel were kept up-to-date, as

2    appropriate, for those portions of the progress of the

3    investigation that we anticipated might affect their legal

4    rights.

06:59:00    5    **Q.**    Okay.  And was there eventually the idea of raising

6    Bob's health issues and cognitive issues with the

7    Department of Justice?  Did that -- was that raised?

8    **A.**    Yes, but it's skipping a step.  I think -- without

9    getting into privileged conversations once again, I'll

06:59:25    10   tell you what my thought process -- and I think Kathy

11   shared this as expressed to me.  We have reports of Bob's

12   treating physicians.  They were in the business of trying

13   to make Bob Brockman well, to treat an illness, and

14   improve his health.

06:59:45    15                We recognized that these cognitive

16   limitations had a consequence, could have a consequence

17   for his capacity to stand trial, to face criminal charges.

18   And so we asked ourselves, Well, this is a body of medical

19   reports compiled for the treatment purpose, and what is

07:00:09    20   lacking here, in order to address the different question,

21   related but different question, Well, does this have

22   implications for his competence in the legal sense?  So we

23   asked ourselves that question.  We came to an interim

24   answer.  We discussed this issue with Bob, and I think

07:00:33    25   also with the family, and further medical tests were

1    scheduled.

2    **Q.**    All right.  For what purpose?

3    **A.**    For the purpose of making an assessment ourselves, in

4    the first instance, whether or not these -- these

07:00:50    5    cognitive limitations raised the competency issue.  And if

6    so, what to do with that information, if anything, while

7    this investigation is pending and underway.

8    **Q.**    And are you aware of whether, you know, documents,

9    letters from doctors, reports, were gathered in the event

07:01:06   10    you decided to bring this attention -- to the attention of

11    the Department of Justice?

12    **A.**    Yes.  And Kathy Keneally lead that effort.

13    **Q.**    Okay.  And -- and who -- after receiving those

14    documents, is there ultimately a decision to bring this

07:01:26   15    matter to the attention of the Department of Justice?

16    **A.**    Yes.

17    **Q.**    All right.  Who drove that decision?

18    **A.**    Well, I wouldn't use that verb.  It -- I would say it

19    was -- it was our recommendation that we do so.  We

07:01:44   20    discussed that in meetings with Bob.  I think also in

21    joint meetings with his family because my view -- it's

22    very much a family issue as well as a legal issue.  And

23    Bob accepted our recommendation, is the way I would put

24    it, rather than somebody, either side, drove decision.

07:02:10   25            I have to say, that on my part, it was

*PETER JOHN ROMATOWSKI - DIRECT BY MR. LOONAM*

1  with the greatest reluctance, because, I mean, it's the

2  last thing you want to do to defend a criminal case,

3  because there is the risk that if you go to the prosecutor

4  and say you have got a helpless client who can't defend

07:02:28  5  himself -- what we did was we -- there is a risk that --

6  that rather than investigate and vet that information, and

7  verify it separately themselves, they might just take

8  advantage of a client in that position.

9  **Q.**   So --

07:02:48  10  **A.**   So, we certainly didn't -- didn't drive what was such

11  a difficult decision.

12  **Q.**   No.  But, I guess, did the -- did the proposal

13  originate from Bob?

14  **A.**   No.

07:03:03  15  **Q.**   Or did the proposal --

16  **A.**   Oh, no.

17  **Q.**   -- originate from Jones Day?

18  **A.**   This was a Jones Day proposal.  The idea that we

19  needed to supplement treatment opinions -- or that we

07:03:20  20  first needed to compare the legal standards for competency

21  and the requirements to demonstrate whether or not a

22  client meets that, we needed to compare those requirements

23  with the -- the data collection that we had so far, which

24  were -- were treatment reports.

07:03:37  25              MR. LANGSTON:  Objection, Your Honor.  I think

 1  we're getting a little far afield as to Jones Day's

 2  thinking as to what they needed to do here.

 3          THE WITNESS:  It wasn't the client's idea, if

 4  that's the portion of the answer that --

07:03:49   5          MR. LANGSTON:  So Jones Day legal research as

 6  to, you know, the competency situation, I don't think --

 7  don't think it is relevant to this witness.  I think he is

 8  here to tell us his observations of Mr. Brockman, but in

 9  terms of Jones Day deliberations, I think puts us at risk

07:04:04  10  of not finishing today.

 11          MR. LOONAM:  Yeah, that's fine.  Yeah.  No,

 12  that's fine.  And I believe the April letter is already in

 13  evidence.

 14          MR. LANGSTON:  Yes, 82, or 81 and 82.

07:04:16  15          MR. LOONAM:  Yeah.  81 and 82.  No reason.

 16  BY MR. LOONAM:

 17  **Q.**   It's not marked, but do you recognize this,

 18  Mr. Romatowski?

 19  **A.**   Well --

07:04:24  20          THE COURT:  I think it is already in evidence.

 21  BY MR. LOONAM:

 22  **Q.**   It's already in evidence, so no need for foundation.

 23  **A.**   Yeah.  I remember the letter.  Sure.

 24  **Q.**   Okay.  And do you recall whether or not there was a

07:04:40  25  subsequent -- subsequent communication with the Department

1   of Justice lawyers after this letter goes in and an offer

2   is made to the Department of Justice?

3   **A.**   Yes.

4   **Q.**   Okay.  Tell us about that.

07:04:54   5   **A.**   Late April, we had a conference call.  I can't name

6   all the participants on either side, but they were

7   Justice, Tax Division, and U.S. Attorney's Office

8   participants, and the letter was presented and discussed.

9   Kathy lead the conversation, and as I remember it, our

07:05:11   10   offer was, Look, we will make available to you these

11   treating doctors who have reported in this fashion.

12             Bob will execute HIPAA waivers and

13   whatever else is required to make them freely available.

14   We would facilitate such interviews on the part of the

07:05:32   15   government, but agree to stand back.  We asked -- we

16   expressed that we would like to attend if they conducted

17   such interviews but did not insist on that.  Didn't make

18   it a condition.  In fact, we assured them that we would

19   not speak to the doctors in advance to prepare them in any

07:05:50   20   way for such interviews.  Rather, we would leave it to the

21   government to conduct such interviews without any

22   influence from us on the doctors.

23             And further, that we would make Bob

24   available for further examination by doctors of the

07:06:08   25   government's choosing.  All asking that they consider

PETER JOHN ROMATOWSKI – DIRECT BY MR. LOONAM

1    Bob's cognitive limitations, in our view, that he was not

2    competent, in reaching a charging decision.

3    Q.   When you are talking about the doctors that you

4    were -- that you invited DOJ to interview with HIPAA

07:06:30    5    waivers with or without Jones Day's presence, does that

6    include Dr. Pool?

7    A.   I believe so.  It was all the doctors from whom we

8    had reports to that point, and that we submitted to DOJ.

9    Q.   Okay.  Just quickly, Dr. Jankovek?

07:06:46   10    A.   Yes.

11    Q.   Dr. Yu?

12    A.   Yes.

13    Q.   Dr. York?

14    A.   Yes.

07:07:05   15    Q.   And to your knowledge, did DOJ avail itself of the

16    invitation to interview those doctors?

17    A.   We -- no.  We never -- we never got any notice that

18    DOJ had -- followed up in any respect.

19    Q.   And with respect to the second part of the offer, to

07:07:24   20    make Mr. Brockman available for an examination by doctors

21    of the government's choosing, did DOJ avail itself of that

22    opportunity?

23    A.   No.

24    Q.   And then Mr. Brockman was subsequently indicted?

07:07:43   25    A.   Yes.

PETER JOHN ROMATOWSKI - DIRECT BY MR. LOONAM

1   **Q.**   All right.  You have touched on this a bit with

2   respect to the documents, but in light of your experience,

3   can you just describe the complexity of the case here and

4   what is involved in defending a case like this?

07:07:55   5   **A.**   Well, Your Honor, the Justice Department press

6   release and press conference that they announced when this

7   document was unsealed, frankly, what happened was, we got

8   a call scheduling a phone call for a Saturday afternoon

9   about the first of October.  And having heard no response

07:08:17   10   whatever to the April letter and phone call, to say that

11   there -- that Mr. Brockman had been indicted.  It was

12   under seal.  They had scheduled a press conference for

13   Thursday morning and would Bob show up for arraignment on

14   Thursday morning on the indictment?

07:08:33   15            The indictment, the press release calls

16   this a $2 billion tax evasion.  The U.S. Attorney in his

17   press conference said this was the largest tax case ever

18   against a U.S. individual.  As to the scope of the

19   charges, you have seen the indictment yourself, of course.

07:08:52   20   It's the 40-year history of the A. Eugene Brockman

21   Charitable Trust to include the 15-year history of a $1

22   billion hedge fund, Vista; the $2.4 billion financing and

23   acquisition 15 years ago of the Reynolds and Reynolds

24   Corporation, to include $67 million in transactions in

07:09:19   25   Reynolds and Reynolds' debt securities.  All involving

1    dozens of entities, many of them offshore, six countries

2    named in the indictment, banks identified from Switzerland

3    to Singapore.  The scope is staggering.  It's -- for

4    the -- I am not a tax lawyer, but speaking as a 40 years

07:09:47    5    of federal securities law lawyer and securities fraud

6    prosecutor and defense lawyer, I have never seen anything

7    like this.

8                For this -- the scope of the -- the length

9    of time, 40 years, the scope of subject matter included,

07:10:03    10    it's -- it's like nothing I have ever seen.  And in part,

11    it is because -- I mean, largest tax case ever and all,

12    that is partly the DOJ PR, but ordinarily, in my

13    experience, prosecutors are -- for strategic reasons, show

14    restraint in the sense of shooting rifle shots rather than

07:10:23    15    shotgun blasts, because it's easier to manage, easier to

16    make a jury understand.  And here, by comparison, the

17    scope is extraordinary.  But that's the indictment we have

18    to deal with, and that's the plate -- that's the case

19    that -- for which, if we proceed, Bob Brockman has got to

07:10:43    20    help us in the respects we described to defend, and he

21    just can't.

22    Q.    And you -- you described some of the factual issues,

23    the memory, the inferences, and the reliability of

24    information when you're questioning him about, sort of,

07:11:00    25    the facts of the case, correct?

**A.**   Yeah.  I separate it into two parts.  One is memory,

and I can deal with that, and I have successfully, what

I'll call routine lapses of memory, because no human

memory is perfect in any case.  It's the ability to

analyze -- in the manner I described, is the other part of

it that is far more critical, and it's where we're lacking

here.

**Q.**   We're lacking with respect to Mr. Brockman?

**A.**   Yes.

**Q.**   What about strategy and judgment?

**A.**   Oh, goodness.  That's -- you know, and all of that is

simply assembling the case so that you have got a defense

to present.  Before you get to the strategic questions

that a criminal defendant has to face at trial, before you

get there, whether to compromise a case or seek a

compromise of a case.  Once indicted, and -- do you do

something about it at that stage?

          If you go to trial, do you insist on a

jury, or are you better off with a bench trial?  Who are

you going to call?  How are you going to cross-examine

their witnesses?  You know, I suppose I have got that

order reversed, don't I?  All of those strategic

decisions.  It's just -- my experience with Mr. Brockman,

especially as his condition has deteriorated today, just

says to me that it's hopeless to expect that he can assist

1  in all of that.

2  **Q.**   And --

3  **A.**   And it will get worse.  All the doctors said these

4  conditions -- and I don't think there is a dispute between

07:12:28  5  defense and government expert in this regard --

6            MR. LANGSTON:  Objection.  I don't think we

7  need this witness to summarize medical testimony about

8  things getting worse.

9            THE COURT:  Well, I don't --

07:12:40  10            MR. LANGSTON:  I don't think it is within this

11  witness's expertise.

12            MR. LOONAM:  We are happy to move on.

13  BY MR. LOONAM:

14  **Q.**   So have you -- in trying to engage with Mr. Brockman

07:12:49  15  and trying to get information out of him, have you tried

16  to do that since his multiple delirium bouts and

17  hospitalizations of this year?

18  **A.**   No.

19  **Q.**   And do you believe Bob Brockman could make the

07:13:06  20  decision whether to testify in his own defense?

21  **A.**   No.

22  **Q.**   And if he decided to testify in his own defense

23  somehow, do you think he is capable of doing it?

24  **A.**   No.

07:13:15  25            MR. LOONAM:  No further questions, Your Honor.

1              THE COURT:  Cross-examination?  And as I said,

2    I am here tomorrow.  I mean, it is just that we will talk

3    about this.  If we are going tomorrow, I am not going to be

4    able to start at 8:30.  It is going to be, like, 10:00

07:13:32   5    o'clock.  But we will -- but we can get through tomorrow?

6              MR. LANGSTON:  Sure, Judge.  I am happy -- you

7    can cut me off whenever you want.

8              THE COURT:  No.  No.  You have got 15 minutes

9    to get started, but I just want to tell you, it's okay,

07:13:46   10   because we will be here tomorrow.  I am here tomorrow.  I

11   just can't start at 8:30.

12             MR. LANGSTON:  I am seeing daggers behind me,

13   though, from both sides of the aisle.

14             THE COURT:  No.  This is, as you all know, a

07:13:57   15   very important hearing.  I am not cutting anyone off.  I am

16   not preventing anyone from putting on the testimony that

17   you need.  You have got my full attention, and we can go --

18   and we will, if necessary, go tomorrow.  It is not a

19   problem.

07:14:11   20             MR. LANGSTON:  So I'll go now, Judge, and --

21             THE COURT:  In 15 minutes, we will take a

22   break.

23             MR. LANGSTON:  You just tell me when you want

24   me to stop and I'll stop.

07:14:18   25             THE COURT:  Good deal.

**CROSS-EXAMINATION**

BY MR. LANGSTON:

Q.   Mr. Romatowski, it is fair to say you never met Mr. Brockman before the Kepke search warrant?

A.   Correct.

Q.   And I think we were just discussing the amounts of money involved in the indictment, but it is fair to say the amount doesn't necessarily make it more complex, right?

A.   It's an indicator.

Q.   If Vista, instead of making a billion dollars in profit, they just hadn't been quite as good on their investments and only made 100 million, it is not ten times less complex; is that fair?

A.   I am not sure you can either confirm or rule out a correlation of -- in that respect.  But --

Q.   I think you have talked a little bit about, you know, DOJ not taking you up on your very generous offer to examine Mr. Brockman in April of 2020; is that fair?

A.   I did.  We did discuss that, yes.

Q.   Okay.  What would you have done if the department had disagreed with you?

A.   The -- that's a hypothetical question I wish I had had the opportunity to consider in real life.

Q.   Okay.  Let me ask you this.  If you're a criminal

1   attorney, and you do not believe that your client is

2   capable of assisting in his defense, what is your ethical

3   responsibility?

4   **A.**   Well, the one time that's happened to me in my

07:15:38   5   career, this case, I don't think we got to it in -- in

6   terms of our ethical responsibility.  We concluded that it

7   was the necessary thing to do in the best interest of the

8   client to make him understand, as best we could, the

9   recommendation; and once we were satisfied we had a

07:15:57   10   knowing, understanding decision to go forward, that we

11   present it in the way that we did.

12   **Q.**   Okay.  So Mr. Brockman has a Sixth Amendment right to

13   essentially be able to participate in his own defense; is

14   that fair?

07:16:11   15   **A.**   And a Fifth Amendment due process guarantee --

16   **Q.**   Okay.

17   **A.**   -- that he may not be tried unless he can assist in

18   his defense --

19   **Q.**   Right.

07:16:17   20   **A.**   -- and understand the charges.

21   **Q.**   So, if you believed that Mr. Brockman was not capable

22   of assisting in his defense, that is something you have to

23   raise in front of the Court; isn't that true?

24   **A.**   Look, it goes in steps.  It's first and foremost a

07:16:32   25   client decision.  And in the event it -- events overtook

1  us, before there was ever any opportunity to consider

2  whether this ought to be made a matter for the Court,

3  because without regard to, and without taking us up on our

4  offer, what you did was indict him, and that got us before

07:17:00    5  a court.

6  **Q.**   And I understand that you're not happy about that.

7  But I guess my question for you is:  I'm just trying to

8  understand your testimony.  If the department had

9  disagreed with you after doing that analysis, your

07:17:12   10  testimony is that you would have just accepted that, and

11  then not raised it with the Court?

12  **A.**   I didn't say that.

13  **Q.**   Okay.  So you would have raised it with the Court

14  even if the department had disagreed with you?

07:17:22   15  **A.**   Well, hold on, now.  I don't understand the sequence

16  you're describing.  The department never expressed a view.

17  The department indicted Mr. Brockman.

18  **Q.**   So in your -- in your perfect world, the Department

19  of Justice takes you up on your offer; is that fair?

07:17:37   20  **A.**   Well, I don't think we need a perfect world for a

21  prosecutor to have made a balanced decision that this is

22  really something we ought to look at in an objective way

23  before we decide whether -- whether to charge a defendant

24  or not.

07:17:51   25  **Q.**   Sure.  And I guess what I'm asking --

PETER JOHN ROMATOWSKI - CROSS BY MR. LANGSTON

1    A.    I'm objecting to the perfect world characterization

2    in your loaded question.

3    Q.    Well, you have got three attorneys that can object on

4    your behalf, so why don't you answer the question, Mr.

07:18:04  5    Romatowski?

6    A.    Well, I'm objecting to the premise of your question

7    which posed the perfect world.

8    Q.    Okay.  In the world in which the department had

9    agreed to do an evaluation here -- are you with me so far?

07:18:14  10    A.    Okay.

11    Q.    And in that world, the department disagreed with your

12    belief that Mr. Brockman was not competent -- still with

13    me?

14    A.    Yes.

07:18:21  15    Q.    In that case, wouldn't you still have had an

16    obligation to raise that with the Court?

17    A.    I -- I don't follow your -- I don't follow your

18    question sufficiently to help you with an answer.  I don't

19    know.  You know, while we're --

07:18:38  20    Q.    Why don't we just move on if that was too complicated

21    for your, Mr. Romatowski.

22              THE COURT:  Wait a second.  No.  No.  You can't

23    talk over the witness.  Let Mr. Romatowski answer the

24    question, then you can ask another question.

07:18:48  25    A.    What would have been the bases for the disagreement?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1    What would have been the dialog that ensued?  What would

2    be the occasion and where would we have had a forum to go

3    to a court about it?  I don't know that the Fifth and

4    Sixth Amendment provide relief preindictment that affords

07:19:03  5    us a basis to go to court for some relief in that regard.

6    I am not aware that there is such an opportunity.

7    **Q.**   Okay.  So, let's say the department disagreed with

8    you, and they indicted Mr. Brockman anyway.  Now, you're

9    in court.

07:19:17  10   **A.**   Yes.

11   **Q.**   Wouldn't you still have raised it with the judge?

12   **A.**   Well, and we did.  We have.  Here we are.

13   **Q.**   I think I'm just going to move on, on that one.

14            Mr. Romatowski, it is fair to say you have

07:19:30  15   been off this case for a while?

16   **A.**   Wrong.

17   **Q.**   Okay.  You haven't entered an appearance here in

18   Houston?

19   **A.**   Correct.

07:19:36  20   **Q.**   You didn't enter an appearance in San Francisco?

21   **A.**   Correct.

22   **Q.**   You have not exchanged an e-mail with the government

23   since February of this year?

24   **A.**   I can't remember when I've ever e-mailed the

07:19:47  25   government, but if you say I did so in February, I'll

1   accept that.

2   **Q.**   Okay.   You weren't even copied on the e-mails

3   anymore?

4   **A.**   Likely so.   Yeah.   I don't routinely participate in

07:19:56  5   the correspondence back and forth between the tax division

6   and our defense.

7   **Q.**   This was a pretty crucial hearing in this case,

8   right?

9   **A.**   Certainly.

07:20:06  10   **Q.**   It could be dispositive?

11   **A.**   It -- it is certainly going to be dispositive of

12   certain issues.   It is --

13   **Q.**   You didn't attend this hearing --

14        THE COURT:   Well, let the witness answer before

07:20:17  15   your next question.

16   BY MR. LANGSTON:

17   **Q.**   Okay.

18   **A.**   I did -- I have not attended this hearing.   I am on

19   the witness list.

07:20:22  20   **Q.**   When did you get -- well, actually you weren't on the

21   witness list for this case, were you?

22   **A.**   I don't know.   I was told that I was, and so I

23   shouldn't attend.

24   **Q.**   So the defense filed a witness list in this case.

07:20:33  25   **A.**   Okay.

1    **Q.**   And --

2              MR. VARNADO:  He is on it.

3    **Q.**   -- you weren't on it.

4              MS. COLLINS:  Yes, he was.

07:20:41    5              MR. LANGSTON:  We can look at that, I

6    guess.

7              THE COURT:  I knew Ms. Keneally was on it.  I

8    just didn't know.

9              MR. VARNADO:  He is on it.

07:20:46   10              THE COURT:  Okay.  He is on yours.  I would

11   just have to look at the document.  But I guess the point

12   is, let's figure out where we're going with all this.

13   BY MR. LANGSTON:

14   **Q.**   Yes.  You didn't help prepare Mr. Brockman for this

07:20:58   15   hearing?

16   **A.**   No.

17   **Q.**   You -- and, okay.  You were the initial point of

18   contact for Mr. Brockman --

19   **A.**   Correct.

07:21:11   20   **Q.**   -- is that fair?

21              And you stopped -- the last time you have

22   seen him in person, prior to today, was March 20th -- was

23   March of 2020?

24   **A.**   I think it was February 2020.

07:21:22   25   **Q.**   Okay.  February of 2020.  And so you haven't seen him

1  since then?

2  **A.**    Correct.

3  **Q.**    And at some point, Ms. Keneally, she became the main

4  point of contact?

5  **A.**    Yes.

6  **Q.**    And she became the conduit of information to

7  Mr. Brockman?

8  **A.**    The principal -- principal conduit, yes.

9  **Q.**    And, in fact, the last time Mr. Brockman e-mailed you

10  personally was January of 2020?

11  **A.**    I can't remember when.  I can't -- I don't know.

12  **Q.**    Can you remember an e-mail that he sent to you after

13  January of 2020?

14  **A.**    I can't remember whether he did or not.  I don't

15  remember that he did.

16  **Q.**    Would it be consistent with your view of the case

17  that basically Ms. Keneally took over the contact of

18  information with Mr. Brockman?

19  **A.**    Well, took over -- I -- I can explain to you how this

20  relationship has evolved, if that is what you want to

21  hear.

22  **Q.**    Ms. Keneally was the main point of contact with

23  Mr. Brockman; is that fair?

24  **A.**    Certainly, by 2020.

25  **Q.**    Okay.

1   **A.**   And -- and before -- well --

2   **Q.**   Okay.  So by --

3   **A.**   And earlier.

4   **Q.**   By 2020, Ms. Keneally was the main point of contact

07:22:31   5   for Mr. Brockman?

6   **A.**   Correct.

7   **Q.**   She was the primary conduit of information for

8   Mr. Brockman?

9   **A.**   Correct.

07:22:36   10   **Q.**   So you were no longer the main point of contact,

11   right?  You are no longer the conduit of information?

12   **A.**   Right.  By design.  But that is right.

13   **Q.**   Okay.  Have you continued to bill on this case?

14   **A.**   Yes.

07:22:50   15   **Q.**   How many hours would you say you have billed on this

16   case since March of 2020?

17   **A.**   Oh, goodness.  I have no -- I have no estimate.

18   **Q.**   Okay.  Well, sadly, I think we are going to have to

19   come back tomorrow, so would you mind getting an estimate

07:23:04   20   tonight?

21   **A.**   I don't know if the data are available to me.

22   **Q.**   Your billing records are not available to you; is

23   that your testimony?

24   **A.**   At 8:23 p.m. Eastern on Tuesday before Thanksgiving,

07:23:14   25   by tomorrow morning, I can't -- I can't promise you.

254

1  **Q.**  Okay.

2  THE COURT:  And just for the record,

3  Mr. Romatowski is listed on the witness list, which you all

4  knew, but I just wanted make sure the record is clear.

07:23:33  5  MR. LOONAM:  Thank you, Your Honor.

6  BY MR. LANGSTON:

7  **Q.**  It is fair to say that Ms. Keneally has had more

8  contact with Mr. Brockman in the last two years?  Is that

9  fair?

07:23:41  10  **A.**  Yes, by design.

11  **Q.**  And so she probably has a better idea of his current

12  condition than you do?

13  **A.**  Yes.  She has more direct experience of his current

14  condition than I do.

07:23:55  15  MR. LANGSTON:  I think you said -- actually,

16  Your Honor, this might be a good stopping point.

17  THE COURT:  Okay.  Then everyone will break for

18  this evening.  If you can all be back here tomorrow at

19  10:00 o'clock, and we will get started a little bit later

07:24:06  20  and we will push through until we finish up.  Okay.  So we

21  will stand in recess until 10:00 o'clock tomorrow morning.

22  MR. LOONAM:  10:00 or 11:00, Your Honor?

23  THE COURT:  I'm sorry.  10:00.

24  MR. LOONAM:  10:00.

07:24:21  25  THE COURT:  I am going to try to work as fast

1  as I can tomorrow, so let's do 10:00.  And you all may be

2  excused.  I just need to pick up and get organized because

3  every day I am going through my notes.  So please feel free

4  to leave.  You're all excused.

07:24:35   5          MR. LOONAM:  Thank you, Judge.

6  (Recessed at 7:24 p.m.)

7                  COURT REPORTER'S CERTIFICATE

8

9      I, Kathleen K. Miller, certify that the foregoing is a

10  correct transcript from the record of proceedings in the

11  above-entitled matter.

12

13  DATE: 11/27/2021          /s/    _Kathleen K Miller_____

14                            Kathleen K. Miller, RPR, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25

## $

**$10,000** [1] - 47:15
**$30,000** [1] - 47:14
**$350** [1] - 47:9
**$67** [1] - 240:24

## '

**'04** [2] - 205:1, 205:3
**'19** [1] - 227:16
**'are** [1] - 201:14
**'Bob** [1] - 230:8
**'do** [2] - 102:16
**'even** [1] - 219:14
**'if** [1] - 220:1
**'like** [1] - 201:20
**'no** [1] - 218:16
**'once** [1] - 219:24
**'this** [1] - 99:6
**'very** [1] - 230:10
**'well** [8] - 102:17, 218:14, 218:23, 219:6, 220:25, 221:2, 225:12, 228:24
**'what** [1] - 219:11
**'would** [1] - 128:23
**'yes** [4] - 99:13, 102:16, 102:17, 201:19
**'you** [2] - 201:17, 229:14

## /

**/s** [1] - 255:13

## 0

**01** [1] - 226:16

## 1

**1** [6] - 16:8, 22:7, 226:15, 226:20, 233:24, 240:21
**10** [4] - 61:25, 98:15, 113:1, 203:17
**10-A** [1] - 98:17
**10-B** [1] - 102:23
**10-C** [1] - 104:12
**10-D** [1] - 113:2
**100** [1] - 245:13
**101** [2] - 104:12
**10281** [1] - 2:8
**10:00** [7] - 244:4, 254:19, 254:21, 254:22, 254:23, 254:24, 255:1
**10th** [1] - 197:20
**11** [5] - 98:13, 98:18, 100:23, 104:11, 113:3
**11/27/2021** [1] - 255:13
**116** [2] - 4:14, 5:13
**116-A** [1] - 5:12
**11:00** [1] - 254:22
**11th** [8] - 50:13, 98:9, 108:24, 112:25, 155:18, 156:4, 156:21, 156:24
**12** [2] - 45:14, 50:7

**12th** [2] - 122:22, 122:23
**13** [6] - 98:18, 113:2, 114:3, 114:6, 116:8, 116:10
**13-A** [1] - 114:5
**13-B** [1] - 116:9
**132** [1] - 3:5
**14** [3] - 62:10, 98:18, 114:5
**15** [10] - 30:15, 50:24, 98:18, 119:17, 150:18, 224:18, 225:15, 240:23, 244:8, 244:21
**15-year** [1] - 240:21
**150** [2] - 1:21, 25:6
**153** [2] - 199:24, 204:12
**159** [2] - 24:22, 26:4
**15th** [1] - 204:13
**163** [1] - 204:1
**17** [1] - 22:19
**172** [3] - 26:25, 35:23, 36:4
**173** [3] - 27:1, 35:23, 36:5
**18** [1] - 6:7
**18th** [2] - 190:7, 195:17
**19** [2] - 106:3, 116:10
**1970s** [1] - 212:25
**1972** [1] - 212:17
**1975** [1] - 212:19
**1979** [1] - 213:11
**1987** [1] - 39:10
**199** [1] - 3:6
**1991** [1] - 39:11
**1996** [1] - 39:22
**1998** [1] - 44:20
**1999** [2] - 41:13, 41:21
**19th** [1] - 30:19
**1:41** [2] - 1:5, 4:3

## 2

**2** [5] - 62:4, 62:7, 98:14, 233:25, 240:16
**2-A** [1] - 6:22
**2.4** [1] - 240:22
**20** [11] - 61:23, 61:24, 104:13, 118:5, 123:4, 123:18, 123:21, 123:23, 124:4, 124:10
**20002** [1] - 1:22
**2004** [4] - 182:23, 182:25, 202:25, 208:9
**2005** [2] - 202:25, 203:4
**2007** [1] - 203:5
**2008** [2] - 41:4, 203:5
**2009** [1] - 203:5
**2010** [5] - 160:13, 162:21, 163:6, 164:22, 206:25
**2014** [2] - 67:25, 69:8
**2015** [5] - 67:25, 69:8, 203:16, 204:2, 208:12
**2017** [7] - 14:9, 20:11, 147:7, 151:10, 151:17, 151:19, 157:17
**2018** [19] - 4:14, 5:13, 150:18, 151:14, 182:6, 182:7, 182:9, 183:21, 183:25, 185:4, 199:2, 199:7, 207:16, 214:22,

214:24, 221:11, 221:16, 222:1
**2019** [34] - 5:9, 31:5, 31:11, 33:17, 46:18, 111:11, 111:20, 112:1, 112:7, 138:24, 145:18, 146:8, 179:9, 179:14, 179:17, 180:9, 180:12, 180:18, 180:23, 181:9, 181:13, 181:20, 182:17, 182:18, 185:14, 186:2, 186:17, 186:21, 187:19, 207:16, 221:21, 227:17, 227:19
**202-514-9623** [1] - 1:22
**2020** [20] - 161:10, 163:3, 163:7, 163:12, 189:22, 195:24, 196:17, 197:20, 207:2, 207:6, 227:15, 245:19, 251:23, 251:24, 251:25, 252:10, 252:13, 252:24, 253:4, 253:16
**2021** [13] - 1:6, 4:2, 30:19, 67:7, 80:21, 112:2, 125:9, 148:5, 160:14, 161:10, 163:21, 164:12, 207:17
**2051** [9] - 123:3, 123:5, 123:7, 123:8, 123:9, 124:22, 125:8, 126:12
**2059** [1] - 123:6
**208** [1] - 3:6
**20th** [8] - 105:23, 106:5, 108:18, 117:24, 119:17, 190:8, 195:17, 251:22
**21** [3] - 113:2, 113:3, 202:20
**211** [1] - 3:8
**212-326-3939** [1] - 2:9
**21st** [1] - 158:20
**2208** [1] - 1:21
**23** [3] - 1:6, 4:2, 102:24
**24** [3] - 102:23, 102:24, 106:3
**245** [1] - 3:9
**25** [3] - 51:8, 61:22, 113:3
**250** [1] - 2:8
**26** [5] - 61:22, 61:23, 78:4, 78:8, 118:2
**26th** [3] - 156:9, 156:12, 156:25
**27** [4] - 118:3, 124:3, 124:4, 124:11
**28** [3] - 6:6, 62:3, 62:5
**28th** [1] - 148:4
**29th** [1] - 50:25
**2:58** [1] - 74:5

## 3

**3** [6] - 22:6, 22:7, 22:10, 22:11, 102:23, 102:25
**3-A** [2] - 5:12, 6:22
**30** [2] - 62:6, 62:10
**30-point** [1] - 61:20
**31** [1] - 6:7
**31st** [1] - 199:7
**3300** [1] - 2:3
**35** [2] - 17:14, 21:1
**36** [1] - 114:5
**37** [1] - 3:5
**38** [2] - 114:5, 116:9
**39** [1] - 116:10
**3:26** [1] - 74:5
**3rd** [5] - 113:23, 114:6, 116:10, 151:10, 188:24

## 4

**4** [3] - 28:2, 105:25, 119:16
**40** [5] - 38:22, 88:3, 224:3, 241:4, 241:9
**40-A** [1] - 5:3
**40-year** [1] - 240:20
**41** [1] - 26:14
**44** [2] - 106:2, 106:3
**45** [1] - 216:20
**46** [1] - 106:3
**47** [1] - 197:7
**48** [1] - 26:10
**4:21-CR-09** [1] - 1:3
**4th** [1] - 151:10

## 5

**5** [2] - 25:24, 202:16
**5,500** [2] - 226:20, 227:3
**5.5** [3] - 217:13, 226:13, 226:19
**50** [4] - 12:11, 12:16, 20:8, 38:5
**50-year-olds** [2] - 17:15, 20:21
**500** [2] - 17:5, 18:15
**515** [1] - 2:13
**53** [1] - 22:21
**55** [1] - 119:16
**550** [2] - 226:22, 227:3
**57** [1] - 26:5
**58** [1] - 119:17
**58-A** [1] - 5:5
**59-A** [1] - 5:7
**5:22** [1] - 172:22
**5:40** [1] - 172:22
**5th** [2] - 53:15, 199:2

## 6

**6** [2] - 50:11, 118:3
**60s** [3] - 209:13, 209:18, 218:18
**65** [4] - 22:4, 22:15, 38:6, 216:22
**65-year-old** [1] - 22:13
**65-year-olds** [2] - 22:2, 22:18
**66** [1] - 216:19
**68** [1] - 22:4

## 7

**7** [6] - 1:13, 3:3, 104:12, 118:3, 163:19, 219:12
**713-250-5087** [1] - 2:14
**717** [1] - 2:3
**74-A** [1] - 6:22
**75** [1] - 22:5
**75-A** [1] - 6:22
**75-D** [1] - 118:2
**75-E** [1] - 119:12
**77** [1] - 5:8
**77-A** [1] - 5:9
**77002** [2] - 2:4, 2:13
**79** [1] - 22:5

**7:00** [2] - 172:3, 210:7
**7:24** [3] - 1:5, 4:3, 255:6
**7:30** [5] - 210:9, 210:21, 210:23, 211:3, 211:8
**7th** [5] - 80:21, 155:10, 158:18, 163:25, 164:2

## 8

**8** [1] - 219:12
**80** [2] - 22:15, 38:21
**80-year-olds** [7] - 21:4, 21:6, 22:3, 22:13, 22:21, 23:7, 23:11
**8004** [1] - 2:13
**80s** [1] - 38:7
**81** [2] - 237:14, 237:15
**82** [3] - 237:14, 237:15
**83-A** [1] - 106:1
**832-239-3694** [1] - 2:4
**8:23** [1] - 253:24
**8:30** [2] - 244:4, 244:11

## 9

**9** [4] - 6:7, 26:17, 62:3, 62:5
**90** [1] - 76:5
**90s** [1] - 38:8
**91-A** [1] - 5:10
**93** [2] - 118:1, 119:11
**95-B** [1] - 199:6

## A

**A-G-R-O-N-I-N** [1] - 37:17
**AAGP** [1] - 40:24
**aback** [1] - 231:2
**Abeta** [1] - 8:5
**abilities** [8] - 57:6, 57:13, 62:21, 65:23, 66:8, 69:24, 136:22, 216:3
**ability** [12] - 70:2, 79:2, 80:9, 88:16, 89:16, 90:13, 139:18, 195:8, 196:20, 215:25, 231:7, 242:4
**able** [40] - 7:21, 38:16, 48:13, 49:2, 49:4, 52:12, 53:4, 58:22, 63:13, 63:15, 66:19, 73:20, 79:6, 91:1, 95:8, 95:20, 96:20, 96:24, 97:1, 101:18, 108:19, 109:1, 113:20, 117:9, 123:14, 124:23, 125:12, 187:18, 187:19, 187:20, 188:3, 189:5, 194:19, 220:5, 222:5, 225:5, 226:23, 232:22, 244:4, 246:13
**abnormal** [6] - 8:4, 8:9, 23:14, 23:17, 23:23, 23:25
**above-entitled** [1] - 255:11
**absence** [1] - 88:25
**absolutely** [12] - 47:2, 47:4, 70:10, 88:2, 92:17, 131:8, 144:14, 146:11, 169:2, 177:1, 200:13, 210:9
**absorb** [1] - 227:1
**absorbed** [1] - 225:23
**abstract** [2] - 217:12, 232:6

**accelerate** [1] - 56:4
**acceleration** [1] - 86:9
**accept** [1] - 250:1
**accepted** [6] - 68:20, 72:20, 75:24, 233:13, 235:23, 247:10
**access** [1] - 183:9
**accessible** [1] - 187:4
**accomplish** [2] - 95:20, 101:14
**accomplished** [1] - 95:1
**accomplishments** [1] - 215:16
**according** [6] - 18:15, 21:1, 26:10, 26:14, 62:11, 129:5
**account** [3] - 93:8, 114:19, 115:19
**accumulating** [1] - 140:13
**accumulation** [2] - 8:4, 8:10
**accurate** [7] - 136:21, 179:12, 179:13, 180:8, 181:8, 181:9, 189:5
**accurately** [2] - 13:3, 74:21
**accused** [1] - 193:20
**acknowledged** [4] - 58:1, 77:15, 95:16, 95:18
**acknowledges** [1] - 95:13
**acquaintance** [1] - 175:12
**acquainted** [1] - 222:5
**acquisition** [2] - 224:15, 240:23
**acronyms** [1] - 78:23
**act** [2] - 213:9, 232:18
**acting** [1] - 91:9
**action** [1] - 129:1
**actions** [2] - 88:21, 214:7
**activities** [8] - 45:9, 58:14, 58:22, 79:1, 79:4, 79:5, 170:14, 231:11
**activity** [1] - 170:15
**actual** [8] - 62:18, 62:20, 76:21, 76:25, 83:10, 84:1, 115:25, 189:14
**add** [13] - 9:25, 11:7, 11:9, 11:12, 11:15, 48:24, 83:7, 83:9, 95:21, 111:12, 111:22, 111:25, 144:5
**added** [2] - 38:4, 232:20
**adding** [1] - 17:12
**addition** [9] - 9:16, 19:12, 41:21, 42:11, 45:9, 60:3, 62:18, 82:1, 213:22
**additional** [3] - 6:25, 67:10, 227:25
**address** [6] - 73:10, 90:2, 91:2, 91:22, 96:14, 234:20
**addressed** [2] - 95:25, 96:19
**adds** [1] - 52:13
**adequate** [1] - 144:22
**adjective** [4] - 135:25, 136:4, 136:25, 137:4
**adjunct** [2] - 8:17, 42:17
**adjustment** [1] - 231:18
**ADLs** [1] - 78:23
**administer** [1] - 61:15
**administered** [3] - 61:19, 190:25, 191:2
**admit** [4] - 4:13, 35:23, 71:6
**admittance** [1] - 84:16
**admitted** [11] - 4:19, 4:23, 4:25, 5:18, 6:13, 6:20, 7:1, 7:2, 36:5, 68:16,

211:24
**ADP** [1] - 120:20
**ADRI** [1] - 12:25
**adult** [4] - 37:20, 37:22, 40:7, 87:23
**adults** [3] - 12:6, 12:7, 12:10
**advance** [7] - 51:21, 70:16, 199:25, 200:1, 219:5, 225:10, 238:19
**advanced** [1] - 228:2
**advantage** [1] - 236:8
**advice** [1] - 193:17
**advise** [1] - 233:2
**advised** [2] - 192:22, 192:25
**affect** [10] - 19:14, 91:20, 134:4, 135:5, 135:14, 138:8, 138:25, 140:3, 174:4, 234:3
**affected** [3] - 53:22, 57:14, 58:3
**affecting** [1] - 178:12
**affiliation** [3] - 221:1, 225:16, 225:18
**affords** [1] - 249:4
**afield** [1] - 237:1
**afraid** [2] - 123:22, 124:6, 170:14
**AFTERNOON** [1] - 1:10
**afternoon** [8] - 7:7, 7:8, 37:4, 37:5, 37:10, 132:18, 132:19, 240:8
**age** [8] - 13:13, 22:4, 43:1, 56:24, 209:13, 216:24, 224:11, 224:25
**age-related** [2] - 43:1, 216:24
**age-specific** [1] - 13:13
**agenda** [4] - 228:3, 228:6, 228:7, 232:21
**agents** [6] - 44:23, 173:9, 173:16, 173:18, 173:23, 174:8
**aggregate** [1] - 175:15
**aging** [4] - 17:19, 38:13, 39:1, 43:2
**agitation** [1] - 122:3
**ago** [8] - 54:13, 83:18, 117:24, 188:23, 223:17, 225:15, 240:23
**agree** [20] - 9:24, 10:25, 12:10, 12:12, 23:7, 23:9, 72:17, 79:14, 95:7, 131:7, 132:24, 132:25, 135:25, 171:17, 171:20, 173:19, 178:16, 178:17, 209:9, 238:15
**agreed** [2] - 232:15, 248:9
**Agronin** [37] - 5:11, 36:17, 36:18, 37:4, 37:16, 39:4, 45:5, 45:9, 51:19, 73:9, 74:12, 80:5, 93:17, 97:21, 100:23, 103:22, 105:7, 108:4, 115:23, 117:14, 119:6, 124:19, 126:4, 126:22, 131:8, 131:18, 132:13, 132:18, 161:16, 161:22, 173:4, 198:23, 200:23, 205:25, 210:3
**AGRONIN** [32] - 3:4, 36:25, 98:20, 99:4, 99:7, 99:10, 99:14, 99:17, 99:21, 99:24, 100:2, 100:5, 100:10, 100:14, 103:3, 103:6, 103:11, 103:14, 103:18, 104:16, 104:23, 105:2, 113:6, 114:8, 114:16, 115:14, 116:13, 116:20, 116:22, 117:1, 117:4, 117:6
**ahead** [6] - 6:10, 21:22, 68:25, 120:3, 148:16
**aid** [1] - 233:23

**ailments** [1] - 52:8
**aisle** [1] - 244:13
**Alaska** [4] - 183:6, 184:3, 184:6, 205:11
**algorithm** [1] - 129:5
**alive** [2] - 59:12, 59:16
**alleged** [1] - 216:18
**allowed** [4] - 68:15, 68:18, 129:22, 133:21
**almost** [5] - 27:23, 40:2, 128:9, 143:18, 213:18
**alone** [2] - 24:16, 33:22
**alpha** [6] - 140:13, 140:18, 141:3, 142:7, 142:16, 144:6
**Alzheimer's** [42] - 8:3, 8:11, 8:19, 9:1, 9:5, 9:15, 9:22, 10:8, 10:14, 10:17, 10:20, 11:2, 11:10, 12:2, 12:24, 16:17, 20:13, 35:21, 41:24, 42:3, 43:10, 43:13, 43:17, 44:23, 45:1, 56:11, 56:17, 58:2, 69:13, 81:14, 81:20, 81:22, 81:25, 82:3, 82:5, 82:15, 83:8, 83:11, 83:20, 84:9, 84:14, 84:17
**ambition** [1] - 212:23
**Amendment** [3] - 246:12, 246:15, 249:4
**America** [1] - 23:21
**AMERICA** [1] - 1:3
**American** [5] - 40:14, 40:16, 40:24, 41:3, 53:15
**amount** [8] - 35:19, 42:15, 48:16, 100:8, 100:11, 105:9, 107:20, 245:8
**amounts** [1] - 245:6
**amyloid** [55] - 7:10, 8:5, 8:7, 8:8, 8:10, 8:17, 8:20, 9:4, 9:14, 10:19, 11:4, 12:5, 12:11, 12:18, 16:3, 16:24, 17:9, 17:11, 17:15, 17:25, 19:15, 20:8, 20:21, 21:5, 22:16, 22:19, 22:22, 23:5, 23:9, 24:5, 24:7, 24:16, 25:1, 25:4, 25:5, 25:7, 26:5, 26:7, 26:11, 26:15, 27:6, 27:12, 81:19, 82:24, 83:9, 83:14, 83:15, 83:24, 84:6, 84:7, 84:8, 140:19, 140:21, 142:20
**amyloid-based** [1] - 83:24
**amyloid..** [1] - 8:16
**amyloidosis** [2] - 13:14, 34:1
**Amyvid** [1] - 83:22
**analogy** [1] - 111:9
**analysis** [2] - 154:12, 247:9
**analyze** [4] - 215:25, 220:20, 226:23, 242:5
**analyzing** [1] - 111:2
**anchored** [1] - 112:18
**Anderson** [1] - 206:21
**Andre** [1] - 212:7
**anecdotes** [1] - 223:3
**announced** [1] - 240:6
**annoying** [1] - 11:17
**answer** [35] - 11:18, 11:20, 13:4, 20:10, 20:17, 21:12, 72:3, 113:20, 124:2, 126:1, 126:17, 127:7, 129:23, 133:21, 137:11, 137:17, 150:14, 150:22, 155:20, 191:24, 195:2, 195:20, 197:6,

198:11, 198:13, 200:18, 218:16, 219:23, 230:3, 234:24, 237:4, 248:4, 248:18, 248:23, 250:14
**answered** [3] - 13:1, 136:18, 159:9
**answering** [5] - 12:21, 24:9, 108:9, 148:10, 206:13
**answers** [5] - 101:17, 108:8, 126:10, 154:2, 222:4
**anti** [1] - 144:1
**anti-psychotic** [1] - 144:1
**anticipated** [1] - 234:3
**anxiety** [1] - 75:9
**anyway** [1] - 249:8
**apathetic** [1] - 68:5
**apathy** [12] - 88:9, 88:10, 89:9, 89:13, 89:16, 90:8, 90:9, 90:11, 96:8, 97:6, 127:3
**apnea** [3] - 90:16, 90:23, 91:2
**apologize** [2] - 156:16, 160:24
**apparent** [1] - 221:11
**appeal** [2] - 213:9, 213:15
**appear** [2] - 60:14, 85:8
**appearance** [2] - 249:17, 249:20
**APPEARANCES** [1] - 1:16
**appeared** [4] - 85:12, 108:25, 136:13, 182:15
**applying** [1] - 195:13
**appoint** [1] - 167:20
**appointed** [2] - 166:10, 168:1
**appointment** [1] - 183:25
**appoints** [1] - 167:13
**appreciate** [4] - 15:12, 36:11, 53:5, 59:18
**appreciated** [1] - 88:12
**appreciation** [1] - 89:20
**approach** [5] - 13:22, 13:24, 54:20, 149:8, 149:10
**approaches** [2] - 48:11, 90:11
**appropriate** [2] - 202:6, 234:2
**approve** [1] - 219:20
**approving** [1] - 214:1
**April** [4] - 237:12, 238:5, 240:10, 245:19
**arch** [3] - 103:13, 103:15, 103:18
**area** [5] - 19:10, 121:14, 143:1, 196:21, 196:24
**areas** [11] - 54:4, 54:5, 97:11, 112:4, 179:17, 179:18, 179:20, 180:5, 181:21, 181:22, 196:11
**arguments** [1] - 131:1
**arraignment** [1] - 240:13
**arrange** [1] - 228:5
**array** [2] - 44:15, 94:11
**art** [3] - 59:5, 59:8, 59:9
**article** [1] - 13:12
**articles** [2] - 35:24, 42:25
**articulate** [3] - 68:3, 109:3, 166:6
**aside** [5] - 10:11, 111:4, 135:7, 141:14, 154:11
**aspect** [1] - 96:3

**aspects** [7] - 89:20, 139:5, 192:16, 192:20, 195:12, 195:15, 216:11
**Aspen** [3] - 221:22, 228:8, 230:5
**assay** [1] - 142:25
**assemble** [2] - 226:10, 231:7
**assembling** [5] - 70:1, 217:7, 217:16, 233:23, 242:12
**asserted** [2] - 68:21, 72:18
**assess** [1] - 48:5
**assessing** [1] - 38:2
**assessment** [19] - 8:19, 8:22, 8:23, 20:5, 53:4, 54:3, 61:4, 61:16, 62:20, 65:24, 78:25, 79:14, 80:21, 87:10, 90:19, 206:9, 206:11, 207:12, 235:3
**assessments** [7] - 8:24, 48:25, 61:7, 87:4, 87:8, 182:9, 182:18
**assign** [1] - 219:22
**assigned** [1] - 213:8
**assist** [14] - 70:2, 73:20, 89:17, 96:20, 105:14, 194:20, 195:3, 196:19, 206:22, 207:19, 220:5, 226:6, 242:25, 246:17
**assistance** [2] - 32:20, 79:17
**assistant** [2] - 213:11, 213:24
**assisted** [2] - 2:16, 41:17
**assisting** [5] - 66:4, 217:6, 218:21, 246:2, 246:22
**associate** [3] - 42:17, 213:4, 228:12
**associated** [7] - 42:3, 43:18, 43:20, 45:1, 75:8, 78:2, 95:17
**association** [4] - 40:15, 40:16, 40:24, 53:16
**Association** [1] - 41:3
**assume** [4] - 17:13, 18:5, 195:20, 200:16
**assumed** [1] - 71:8
**assuming** [1] - 179:8
**assured** [1] - 238:18
**attach** [2] - 157:24, 167:25
**attempt** [1] - 133:23
**attempted** [2] - 63:4, 192:20
**attempting** [2] - 69:25, 101:10
**attend** [3] - 238:16, 250:13, 250:23
**attendant** [1] - 132:5
**attended** [3] - 89:21, 212:18, 250:18
**attention** [9] - 50:6, 53:21, 80:8, 127:4, 228:20, 235:10, 235:15, 244:17
**attorney** [7] - 115:15, 150:24, 213:4, 213:12, 223:14, 240:16, 246:1
**attorney's** [2] - 212:22, 214:4, 238:7
**attorney-client** [1] - 223:14
**attorneys** [19] - 63:1, 63:8, 97:1, 99:1, 105:15, 106:5, 106:10, 106:11, 106:12, 107:5, 107:25, 108:9, 112:24, 113:7, 114:9, 115:17, 153:3, 213:24, 248:3
**Attorneys** [3] - 113:3, 114:6, 116:11
**attractive** [1] - 113:11
**attribute** [2] - 109:17, 162:22

**Auburn** [1] - 39:15
**audible** [1] - 210:14
**Audio** [5] - 104:15, 106:6, 108:2, 117:12, 124:17
**audio** [9] - 105:5, 113:5, 113:18, 114:7, 116:12, 119:4, 119:19, 121:7, 122:19
**August** [7] - 50:11, 150:17, 183:25, 199:7, 214:21, 214:23, 221:19
**Austin** [1] - 221:22
**authored** [3] - 42:24, 43:13, 87:9
**authorize** [1] - 219:21
**authors** [1] - 44:11
**automatic** [1] - 120:20
**avail** [2] - 239:15, 239:21
**available** [15] - 100:12, 107:18, 130:15, 153:13, 153:15, 153:18, 158:5, 159:14, 186:13, 238:10, 238:13, 238:24, 239:20, 253:21, 253:22
**average** [1] - 56:10
**avoid** [2] - 5:25, 108:5
**award** [3] - 41:2, 41:3, 41:4
**aware** [24] - 10:15, 23:19, 38:1, 55:24, 126:4, 142:18, 146:6, 146:20, 152:18, 158:25, 159:2, 163:19, 173:9, 179:8, 192:2, 192:3, 199:20, 206:18, 206:19, 206:20, 206:23, 207:2, 235:8, 249:6

## B

**background** [4] - 39:4, 52:1, 212:15, 223:2
**backwards** [2] - 123:15, 124:23
**bad** [5] - 138:16, 161:1, 176:8, 186:10, 224:5
**balance** [4] - 54:5, 172:11, 178:21, 179:21
**balanced** [1] - 247:21
**ballpark** [3] - 12:16, 21:4, 24:10
**ballparking** [2] - 20:20, 24:11
**banker's** [1] - 220:13
**banks** [1] - 241:2
**bar** [1] - 211:24
**Barras** [33] - 70:20, 70:24, 71:7, 71:25, 72:23, 154:8, 155:1, 155:10, 156:21, 157:3, 157:5, 157:6, 157:20, 158:23, 158:25, 159:6, 159:21, 165:18, 165:22, 166:10, 166:22, 168:10, 171:16, 173:8, 173:13, 173:17, 174:8, 174:10, 174:13, 205:23, 206:24, 207:5, 207:10
**Barras'** [1] - 170:23
**Barras's** [9] - 72:8, 154:11, 161:3, 161:17, 161:21, 162:5, 164:8, 165:24, 207:8
**basal** [2] - 140:14, 141:5
**base** [3] - 109:25, 186:25, 219:3
**baseball** [1] - 212:6
**based** [37] - 11:13, 14:21, 17:18, 21:9, 29:13, 33:22, 41:19, 51:8, 55:2, 57:17, 62:14, 62:15, 62:22, 68:15, 68:19,

74:12, 75:14, 80:1, 83:24, 112:7, 127:9, 130:13, 137:8, 142:13, 144:21, 144:22, 155:21, 180:17, 184:10, 185:8, 185:16, 186:6, 186:24, 188:11, 208:24
**baseline** [12] - 54:2, 57:2, 57:11, 64:25, 75:15, 76:15, 77:13, 77:18, 77:23, 85:23, 87:25, 95:22
**basement** [1] - 220:12
**bases** [1] - 248:25
**bashful** [1] - 40:21
**basic** [3] - 48:11, 79:3, 129:23
**basis** [13] - 12:21, 65:1, 65:20, 66:21, 68:22, 72:18, 78:19, 86:12, 87:8, 128:16, 187:23, 233:10, 249:5
**bathroom** [1] - 66:5
**Baylor** [9] - 29:25, 30:4, 46:10, 145:10, 145:14, 146:19, 179:7, 180:22, 181:19
**bear** [2] - 49:25, 203:15
**bearing** [4] - 130:20, 136:5, 137:6, 170:16
**became** [3] - 212:23, 252:3, 252:6
**become** [1] - 86:22
**becomes** [3] - 121:21, 121:24, 217:22
**bed** [2] - 59:6, 145:16
**bedmate** [1] - 145:2
**BEFORE** [1] - 1:11
**began** [8] - 67:25, 69:4, 93:22, 115:25, 140:19, 218:3, 221:24, 228:18
**begin** [4] - 8:2, 54:25, 78:12, 214:19
**beginning** [6] - 118:5, 121:15, 122:8, 195:21, 203:19, 224:11
**begins** [1] - 69:18
**behalf** [7] - 103:15, 103:17, 103:18, 169:11, 175:23, 176:15, 200:20, 232:17, 248:4
**behavior** [5] - 41:20, 91:6, 91:10, 143:24
**behavioral** [3] - 41:18, 44:25, 75:10
**behaviors** [3] - 88:11, 88:20, 91:16
**behind** [1] - 244:12
**belief** [2] - 142:24, 248:12
**believable** [1] - 107:5
**believes** [1] - 134:19
**bell** [1] - 13:16
**bells** [1] - 24:23
**below** [6] - 26:8, 61:23, 61:24, 61:25, 78:4, 78:7
**bench** [1] - 242:19
**benefit** [7] - 92:15, 169:1, 176:23, 181:1, 181:2, 181:3, 181:7
**benefited** [1] - 206:19
**Bennett** [4] - 57:25, 58:23, 58:24, 111:10
**best** [14] - 20:10, 57:23, 64:23, 64:25, 82:13, 108:19, 128:25, 130:15, 176:16, 178:19, 217:10, 223:1, 246:7, 246:8
**beta** [8] - 8:5, 8:7, 8:10, 8:16, 8:17, 8:20, 13:13, 17:15

**beta-amyloid** [6] - 8:5, 8:7, 8:10, 8:17, 8:20, 17:15
**beta-amyloid..** [1] - 8:16
**better** [16] - 8:24, 24:12, 39:2, 65:11, 108:17, 116:23, 127:7, 138:17, 224:4, 229:2, 229:24, 230:11, 230:21, 231:10, 242:19, 254:11
**between** [16] - 22:15, 78:12, 89:9, 141:11, 157:2, 171:1, 178:5, 179:14, 189:19, 196:6, 206:1, 219:18, 219:25, 243:4, 250:5
**beyond** [10] - 10:19, 32:6, 33:5, 128:10, 133:3, 133:25, 158:13, 168:5, 168:7, 222:14
**bias** [5] - 173:20, 174:20, 175:10, 177:19, 177:21
**biased** [4] - 173:7, 177:3, 177:4, 177:21
**Biden** [1] - 123:13
**big** [9] - 19:18, 20:11, 114:11, 114:21, 124:24, 153:21, 178:13, 179:18, 193:20
**bigger** [1] - 197:15
**bill** [2] - 107:20, 253:13
**billed** [2] - 47:14, 253:15
**billing** [1] - 253:22
**billings** [1] - 47:15
**billion** [5] - 166:14, 240:16, 240:22, 245:11
**binder** [5] - 229:6, 229:20, 229:25, 231:23
**biological** [1] - 55:6
**biomarker** [1] - 21:25
**biomarkers** [3] - 16:16, 55:6, 82:15
**birthday** [1] - 110:19
**bit** [21] - 7:22, 39:3, 42:9, 47:6, 51:14, 52:7, 75:1, 83:14, 85:14, 92:3, 102:22, 119:12, 120:2, 164:10, 170:23, 172:2, 173:6, 184:4, 240:1, 245:17, 254:19
**black** [1] - 229:5
**blank** [3] - 124:16, 221:7, 225:16
**blasts** [1] - 241:15
**BLEUSTEIN** [7] - 5:16, 5:20, 6:5, 6:10, 6:15, 6:24, 7:3
**blood** [2] - 52:11, 55:8
**bloody** [1] - 115:19
**board** [11] - 37:21, 40:6, 40:7, 47:20, 80:13, 166:10, 166:14, 166:18, 167:8, 167:14, 168:1
**board-certified** [4] - 37:21, 40:6, 40:7, 47:20
**Bob** [28] - 67:2, 181:12, 197:21, 198:5, 214:16, 217:1, 217:5, 218:23, 220:18, 228:5, 228:16, 228:18, 228:23, 229:22, 231:15, 231:23, 232:2, 232:20, 234:13, 234:24, 235:20, 235:23, 236:13, 238:12, 238:23, 240:13, 241:19, 243:19
**Bob's** [7] - 206:25, 207:2, 224:16, 230:24, 234:6, 234:11, 239:1
**bodies** [3] - 141:12, 143:9, 144:13

**body** [9] - 44:24, 91:12, 142:12, 143:11, 144:5, 144:17, 146:20, 146:23, 234:18
**book** [6] - 43:5, 43:12, 43:14, 43:15, 44:5, 44:6
**books** [4] - 42:24, 43:1, 43:6, 43:25
**bordering** [1] - 179:21
**Boris** [1] - 1:19
**boris.bourget@usdoj.gov** [1] - 1:24
**Boston** [1] - 39:17
**bottom** [2] - 131:12, 150:7
**boundary** [1] - 76:25
**BOURGET** [7] - 4:8, 4:12, 4:16, 4:20, 5:3, 5:19, 6:12
**Bourget** [1] - 1:19
**bout** [1] - 88:4
**bouts** [3] - 85:5, 88:5, 243:16
**box** [2] - 147:13, 220:13
**brain** [38] - 8:5, 8:21, 12:11, 17:16, 19:14, 20:22, 21:5, 22:16, 22:19, 22:22, 24:5, 24:7, 38:21, 38:22, 39:1, 52:8, 52:13, 52:15, 55:7, 55:11, 57:11, 57:14, 84:6, 84:8, 86:2, 88:10, 90:24, 121:24, 139:15, 139:24, 139:25, 140:2, 140:15, 141:6, 141:18, 142:4, 189:20
**brain's** [1] - 88:16
**brains** [1] - 83:25
**breadth** [1] - 13:2
**break** [4] - 80:6, 172:2, 244:22, 254:17
**breakdown** [1] - 73:22
**breaks** [2] - 16:20, 22:11
**brewing** [1] - 132:10
**brief** [1] - 61:1
**briefly** [6] - 87:22, 155:25, 156:11, 198:20, 201:4, 214:8
**briefly..** [1] - 26:21
**bring** [5] - 54:25, 91:3, 228:19, 235:10, 235:14
**brings** [3] - 49:25, 212:5, 227:11
**broad** [1] - 222:8
**broadcaster** [1] - 212:6
**broader** [1] - 49:24
**broadly** [1] - 18:20
**Brockman** [163] - 5:23, 20:3, 46:8, 46:10, 46:18, 50:12, 50:15, 51:13, 59:23, 60:3, 61:16, 64:1, 64:22, 65:14, 66:5, 67:9, 67:12, 67:19, 67:23, 68:1, 69:5, 69:22, 69:25, 70:9, 70:16, 71:7, 71:10, 73:14, 73:16, 73:17, 73:20, 74:14, 75:5, 77:15, 79:16, 79:22, 80:11, 80:21, 80:24, 81:13, 85:2, 85:16, 88:5, 90:5, 92:2, 92:6, 92:11, 93:4, 93:18, 95:1, 96:1, 96:20, 97:23, 98:9, 102:7, 105:8, 105:14, 108:6, 108:19, 109:13, 110:16, 112:1, 112:2, 112:8, 113:20, 115:24, 117:15, 121:10, 121:15, 124:22, 125:18, 126:5, 126:19, 126:25, 128:13, 129:1, 129:10, 130:14, 131:18, 136:8, 138:23, 140:9, 146:6, 146:19, 146:25,

149:2, 150:12, 155:16, 155:17, 156:1, 156:8, 156:24, 161:10, 162:21, 163:2, 163:12, 164:13, 165:18, 166:18, 167:5, 168:9, 168:20, 168:23, 169:21, 172:10, 172:13, 176:13, 176:14, 181:12, 183:24, 187:18, 197:21, 198:5, 199:10, 199:15, 199:20, 205:1, 206:3, 206:20, 214:16, 214:20, 214:21, 214:25, 215:4, 215:13, 215:19, 216:9, 217:1, 218:3, 223:8, 223:21, 226:25, 227:18, 231:9, 233:13, 233:16, 234:13, 237:8, 239:20, 239:24, 240:11, 240:20, 241:19, 242:8, 242:23, 243:14, 243:19, 245:4, 245:19, 246:12, 246:21, 247:17, 248:12, 249:8, 251:14, 251:18, 252:7, 252:9, 252:18, 252:23, 253:5, 253:8, 254:8
**brockman** [2] - 64:6, 155:6
**BROCKMAN** [67] - 1:6, 98:24, 99:5, 99:9, 99:12, 99:16, 99:19, 99:22, 99:25, 100:3, 100:6, 100:11, 100:15, 103:5, 103:8, 103:12, 103:17, 103:20, 104:19, 104:25, 105:3, 106:12, 106:16, 107:12, 107:14, 107:16, 108:1, 113:9, 114:10, 114:18, 115:16, 116:15, 116:21, 116:24, 117:2, 117:5, 117:7, 118:8, 118:10, 118:14, 118:19, 118:24, 119:3, 119:23, 120:5, 120:8, 120:12, 120:16, 120:19, 120:24, 121:3, 122:22, 122:24, 123:1, 123:3, 123:5, 123:10, 123:13, 123:16, 123:19, 123:22, 123:24, 124:1, 124:3, 124:6, 124:11, 124:15
**Brockman's** [31] - 5:6, 5:9, 19:16, 50:3, 65:6, 65:20, 82:25, 84:22, 94:19, 98:10, 124:25, 126:13, 127:11, 127:14, 127:16, 127:18, 127:20, 128:3, 137:7, 139:18, 140:14, 145:4, 164:3, 166:11, 170:13, 204:14, 206:3, 206:9, 206:12, 207:12, 207:15
**broke** [2] - 21:23, 22:2
**brought** [4] - 44:11, 59:12, 129:24, 165:20
**bug** [1] - 146:10
**build** [4] - 58:17, 115:20, 169:10, 226:5
**building** [4] - 83:3, 210:10, 210:25, 215:18
**bulb** [1] - 230:10
**bullet** [2] - 57:5, 214:3
**bullies** [1] - 114:21
**bunch** [2] - 150:3, 165:2
**Bureau** [2] - 129:12, 130:18
**business** [17] - 35:15, 106:17, 107:1, 107:11, 107:22, 108:10, 109:25, 110:1, 115:17, 116:4, 168:5, 196:20, 204:7, 215:18, 222:20, 230:20, 234:12
**busy** [3] - 42:1, 153:22, 153:23
**buys** [1] - 106:18
**BY** [53] - 7:6, 14:3, 25:19, 27:3, 37:3,

45:8, 51:18, 68:24, 72:6, 73:8, 74:11, 100:20, 103:21, 105:6, 108:3, 112:22, 113:19, 115:22, 117:13, 119:5, 121:8, 124:18, 126:3, 131:17, 132:17, 136:20, 147:23, 148:25, 149:12, 156:20, 159:18, 160:25, 162:3, 170:21, 173:3, 197:10, 198:22, 200:22, 202:14, 204:11, 204:24, 205:21, 208:5, 211:16, 227:10, 227:14, 237:16, 237:21, 243:13, 245:2, 250:16, 251:13, 254:6
**byproducts** [1] - 113:16

## C

**Cambridge** [1] - 212:17
**camera** [1] - 193:21
**campus** [2] - 41:14, 41:18
**cancer** [1] - 176:8
**cannot** [2] - 8:5, 224:10
**cantankerous** [1] - 115:12
**capabilities** [1] - 49:10
**capable** [7] - 88:20, 214:17, 217:5, 227:4, 243:23, 246:2, 246:21
**capacity** [6] - 48:21, 48:25, 49:10, 49:20, 165:21, 234:17
**caps** [1] - 42:6
**captures** [1] - 82:13
**car** [5] - 106:24, 113:11, 222:21, 222:24, 222:25
**care** [12] - 10:10, 10:11, 10:23, 41:7, 41:14, 41:16, 56:13, 56:16, 79:17, 176:16, 185:18, 187:13
**career** [8] - 39:23, 40:4, 48:7, 212:3, 212:20, 212:23, 214:10, 246:5
**carefully** [1] - 14:20
**caregiver** [2] - 43:6, 65:14
**caregivers** [2] - 43:8, 58:19
**caregiving** [1] - 65:21
**caring** [1] - 67:2
**carrying** [2] - 213:23, 230:6
**case** [118] - 9:13, 11:11, 13:6, 13:11, 14:18, 15:15, 15:21, 37:11, 45:22, 47:12, 47:25, 48:2, 48:14, 48:20, 49:14, 49:17, 49:18, 55:14, 65:4, 70:1, 73:21, 75:7, 77:19, 78:5, 79:12, 82:12, 82:17, 82:23, 83:17, 89:20, 90:7, 92:10, 95:7, 96:10, 96:21, 104:17, 106:8, 108:7, 108:10, 108:12, 109:9, 116:14, 121:5, 121:19, 130:6, 133:13, 135:18, 136:2, 137:1, 137:19, 139:13, 139:19, 141:14, 145:11, 147:10, 147:24, 152:25, 164:11, 165:3, 165:8, 168:18, 170:16, 171:16, 175:10, 179:7, 180:2, 186:20, 187:11, 190:14, 190:16, 191:15, 192:15, 192:16, 193:12, 193:21, 193:24, 193:25, 194:2, 194:23, 195:7, 195:8, 195:10, 200:25, 201:24, 212:11, 216:17, 217:4, 217:6, 217:15, 219:6, 220:7,

220:10, 221:4, 223:19, 224:14, 226:5, 226:14, 236:2, 240:3, 240:4, 240:17, 241:11, 241:18, 241:25, 242:4, 242:12, 242:15, 242:16, 246:5, 248:15, 249:15, 250:7, 250:21, 250:24, 252:16, 253:13, 253:16
**CASE** [4] - 4:5, 74:6, 172:21, 172:23
**caseload** [1] - 213:23
**cases** [13] - 48:10, 48:11, 49:19, 55:21, 92:24, 115:15, 197:1, 213:8, 213:15, 213:19, 214:9, 217:8, 220:8
**cast** [1] - 214:17
**categories** [4] - 16:21, 16:23, 17:3, 21:24
**category** [5] - 28:16, 28:17, 28:18, 28:19, 35:1
**caught** [1] - 40:9
**causing** [1] - 231:25
**CDK** [4] - 103:20, 223:6, 223:11, 225:1
**cells** [1] - 57:12
**Center** [1] - 39:20
**center** [3] - 41:22, 48:6, 56:21
**central** [2] - 91:10, 107:1
**CEO** [3] - 71:8, 163:12, 203:20
**cerebral** [1] - 13:13
**certain** [23] - 18:9, 56:2, 57:17, 65:5, 83:16, 83:17, 84:5, 125:10, 138:7, 143:5, 169:14, 169:18, 179:17, 179:18, 179:20, 180:1, 180:4, 181:21, 181:22, 190:21, 231:11, 250:12
**certainly** [13] - 18:14, 29:20, 48:13, 49:2, 55:5, 69:14, 82:2, 82:7, 82:9, 82:16, 107:19, 111:22, 112:3, 122:5, 131:9, 133:2, 138:7, 161:9, 171:3, 193:18, 194:11, 196:4, 196:12, 197:5, 215:21, 224:12, 231:3, 232:15, 236:10, 250:9, 250:11, 252:24
**certainty** [2] - 12:2, 178:2
**CERTIFICATE** [1] - 255:7
**certified** [4] - 37:21, 40:6, 40:7, 47:20
**certify** [1] - 255:9
**cetera** [1] - 203:20
**chain** [1] - 222:22
**chairman** [1] - 203:19
**challenged** [1] - 216:1
**challenging** [2] - 89:13, 143:12
**chance** [6] - 22:15, 65:17, 110:9, 145:25, 171:5, 207:25
**change** [36] - 28:23, 33:15, 33:24, 33:25, 34:5, 34:8, 34:10, 34:11, 34:14, 34:16, 34:17, 34:20, 34:21, 35:3, 35:5, 35:10, 35:19, 49:22, 52:7, 57:2, 65:25, 69:9, 72:11, 86:12, 91:20, 133:12, 135:2, 138:7, 138:14, 138:24, 139:1, 154:3, 154:5, 198:13, 207:14, 226:4
**changed** [2] - 31:10, 75:1
**changes** [25] - 38:17, 39:1, 55:25, 56:24, 57:19, 64:25, 67:22, 68:1, 69:4, 69:8, 71:7, 71:10, 71:15, 77:20, 77:21, 94:5, 94:10, 111:16, 139:15, 162:20,

162:23, 167:4, 176:13, 182:15, 212:7
**chapter** [1] - 46:4
**chapters** [1] - 87:9
**characteristics** [2] - 19:14, 19:21
**characterization** [2] - 138:16, 248:1
**characterize** [1] - 208:25
**characterized** [3] - 8:6, 71:10, 163:16
**characterizes** [1] - 79:21
**characterizing** [1] - 216:10
**charge** [2] - 47:7, 247:23
**charged** [2] - 107:24, 224:3
**charges** [7] - 73:18, 93:5, 96:2, 192:19, 234:17, 240:19, 246:20
**charging** [1] - 239:2
**Charitable** [1] - 240:21
**chart** [4] - 160:20, 160:22, 160:23
**chase** [1] - 153:19
**check** [1] - 130:9
**chief** [3] - 39:18, 104:20, 213:20
**Children's** [1] - 223:8
**chitchat** [1] - 150:10
**choice** [3] - 136:24, 137:4, 172:14
**choose** [2] - 219:18, 219:25
**choosing** [2] - 238:25, 239:21
**CHRISTOPHER** [1] - 3:2
**Christopher** [1] - 1:19
**christopher.magnani@usdoj.gov** [1] - 1:24
**circle** [1] - 94:23
**circuits** [2] - 140:2
**circumstances** [2] - 48:1, 93:14
**cite** [2] - 15:1, 77:7
**cited** [2] - 15:14, 136:12
**civil** [1] - 213:6
**clarification** [1] - 5:21
**clarify** [4] - 4:10, 4:23, 6:1, 128:7
**clarity** [1] - 128:2
**clean** [1] - 25:16
**clear** [17] - 9:12, 22:24, 27:8, 40:6, 42:4, 70:5, 86:14, 88:1, 118:24, 145:9, 175:2, 192:9, 200:21, 202:12, 205:22, 206:16, 254:4
**clearly** [11] - 57:19, 75:19, 77:22, 80:12, 85:3, 86:4, 89:24, 101:17, 108:12, 122:6, 207:6
**clergy** [1] - 165:17
**client** [26] - 120:17, 120:18, 216:8, 216:23, 217:3, 217:4, 218:9, 218:10, 218:13, 218:17, 218:18, 219:4, 219:11, 220:5, 223:14, 226:6, 226:17, 226:22, 232:8, 236:4, 236:8, 236:22, 246:1, 246:8, 246:25
**client's** [3] - 217:7, 217:21, 237:3
**clients** [1] - 226:7
**clinical** [26] - 8:25, 33:22, 42:1, 42:12, 44:14, 44:18, 44:21, 54:21, 55:1, 82:13, 83:4, 84:13, 84:14, 84:16, 86:17, 87:10, 88:16, 90:25, 91:8, 92:23, 94:12, 142:13, 142:15, 144:23,

145:1, 178:6
**clinically** [3] - 8:8, 84:2, 143:3
**clinician** [2] - 41:2, 143:6
**clinicians** [2] - 44:3, 180:12
**clip** [26] - 5:4, 5:9, 5:12, 5:21, 5:22, 6:2, 6:5, 59:18, 97:17, 98:12, 98:16, 100:22, 102:21, 105:23, 106:4, 113:2, 114:4, 118:1, 119:6, 119:8, 119:12, 122:13, 124:21, 125:2, 126:5, 126:18
**clips** [13] - 4:21, 4:24, 5:5, 5:8, 6:18, 6:25, 96:15, 96:23, 97:14, 97:15, 98:4, 105:13
**close** [1] - 84:22
**closeness** [1] - 176:25
**closer** [1] - 210:9
**closing** [1] - 214:1
**cluster** [1] - 94:8
**coaching** [2] - 201:9, 201:21
**coexist** [1] - 82:5
**coexisting** [1] - 89:10
**coffee** [1] - 100:8
**cognition** [6] - 53:20, 65:24, 127:24, 139:16, 140:4, 143:17
**cognitive** [61] - 8:24, 17:19, 26:8, 28:18, 29:19, 33:16, 34:7, 49:10, 53:17, 57:10, 61:1, 61:2, 61:4, 61:15, 66:15, 71:6, 73:16, 75:12, 75:16, 75:20, 76:5, 76:20, 77:20, 78:3, 78:10, 78:13, 80:25, 91:3, 92:2, 92:7, 93:19, 94:24, 95:14, 95:18, 95:19, 95:23, 109:20, 109:24, 110:21, 127:14, 127:16, 135:1, 139:7, 139:11, 139:21, 166:25, 167:4, 178:11, 181:24, 182:16, 183:13, 189:15, 206:3, 207:12, 207:15, 215:20, 216:3, 234:6, 234:15, 235:5, 239:1
**cognitively** [13] - 12:9, 12:17, 16:2, 21:5, 22:25, 23:6, 23:10, 26:11, 28:20, 31:4, 169:21, 169:22, 189:18
**collar** [2] - 214:5, 214:6
**collateral** [22] - 57:1, 63:18, 65:8, 70:25, 72:13, 78:17, 83:6, 90:10, 134:23, 138:3, 152:22, 155:14, 161:3, 165:7, 165:12, 167:10, 170:6, 170:22, 173:7, 186:5, 206:2, 207:11
**collaterals** [6] - 157:22, 159:13, 159:17, 160:10, 161:4, 177:2
**colleague** [1] - 44:12
**collect** [1] - 217:23
**collecting** [1] - 21:10
**collection** [1] - 236:23
**college** [2] - 212:16, 212:18
**COLLINS** [1] - 251:4
**colloquialism** [1] - 222:17
**Colorado** [2] - 221:22, 228:6
**Columbia** [1] - 211:25
**combination** [3] - 21:25, 73:10, 112:17
**combinations** [1] - 16:24
**combine** [1] - 96:7
**combined** [4] - 8:21, 9:14, 9:21, 74:24

**comfortable** [9] - 20:20, 21:13, 21:15, 23:3, 23:12, 24:11, 48:13, 133:24, 148:10
**coming** [6] - 12:13, 33:12, 52:3, 94:13, 152:18, 228:14
**comment** [3] - 19:3, 125:20, 195:1
**committed** [1] - 129:12
**commodities** [1] - 213:21
**common** [20] - 12:5, 12:7, 12:8, 23:6, 23:10, 23:21, 48:23, 49:4, 82:4, 82:7, 88:14, 89:6, 109:12, 143:19, 143:21, 177:20, 209:11, 209:16, 209:19, 233:10
**common-interest-privilege** [1] - 233:10
**commonly** [2] - 38:12, 52:5
**communication** [1] - 237:25
**communications** [1] - 216:7
**community** [2] - 41:19, 42:20
**community-based** [1] - 41:19
**comorbid** [3] - 81:14, 81:23, 189:4
**companies** [1] - 224:16
**company** [15] - 106:17, 163:2, 164:13, 166:11, 166:14, 167:8, 167:14, 167:20, 196:5, 196:7, 196:16, 196:23, 216:16, 222:9, 224:16
**compare** [2] - 236:20, 236:22
**compared** [4] - 19:9, 108:21, 161:4, 191:12
**comparison** [1] - 241:16
**compelling** [1] - 69:23
**compensated** [1] - 99:1
**competence** [5] - 50:3, 94:19, 129:20, 130:16, 234:22
**COMPETENCY** [1] - 1:9
**competency** [24] - 48:19, 97:24, 118:15, 128:20, 129:13, 131:4, 136:5, 137:1, 137:6, 137:7, 164:4, 168:11, 168:15, 190:18, 190:25, 191:4, 191:15, 191:18, 191:23, 191:24, 192:5, 235:5, 236:20, 237:6
**competent** [12] - 92:14, 118:17, 118:22, 128:24, 129:1, 129:10, 129:16, 130:7, 131:6, 139:19, 239:2, 248:12
**competing** [1] - 219:19
**competition** [5] - 113:14, 120:23, 120:24, 121:3, 121:4
**competitor** [3] - 113:16, 223:5, 223:7
**compile** [1] - 220:6
**compiled** [1] - 234:19
**complained** [1] - 182:12
**complaining** [1] - 185:4
**complaints** [1] - 184:25
**completed** [1] - 39:22
**completely** [4] - 94:16, 95:10, 95:21, 219:17
**completeness** [2] - 90:20, 91:21
**complex** [13] - 52:10, 52:16, 53:20, 79:6, 93:23, 94:8, 96:10, 113:10, 114:12, 142:9, 214:11, 245:8, 245:14
**complexity** [4] - 52:13, 95:8, 214:9,

240:3
**complicated** [1] - 248:20
**complimentary** [1] - 28:5
**component** [5] - 66:9, 90:13, 139:6, 139:7, 139:8
**components** [5] - 52:16, 53:4, 66:12, 75:17, 91:22
**comport** [2] - 69:11, 80:2
**compromise** [2] - 242:15, 242:16
**compromised** [1] - 88:18
**computer** [4] - 2:16, 113:10, 197:8, 215:17
**computer-assisted** [1] - 2:16
**computers** [1] - 107:2
**concern** [5] - 35:12, 35:20, 38:19, 49:19, 128:8
**concerned** [10] - 13:5, 29:17, 34:2, 34:25, 35:13, 56:24, 72:23, 128:12, 141:19, 224:12
**concerning** [2] - 48:19, 98:9
**concerns** [4] - 19:18, 90:1, 189:13, 205:4
**conclude** [2] - 75:11, 80:23
**concluded** [8] - 92:6, 105:5, 108:2, 117:12, 119:4, 124:17, 187:23, 246:6
**concludes** [1] - 113:18
**conclusion** [5] - 9:5, 9:15, 139:2, 162:19, 178:1
**conclusions** [14] - 11:12, 14:20, 14:24, 28:1, 47:3, 51:7, 94:13, 103:9, 154:4, 162:16, 180:18, 182:20, 186:7, 188:8
**conclusively** [1] - 134:20
**condition** [19] - 23:23, 23:25, 43:11, 56:3, 84:20, 86:1, 87:20, 90:6, 128:3, 128:14, 206:10, 206:22, 207:12, 207:16, 232:23, 238:18, 242:24, 254:12, 254:14
**conditions** [13] - 42:3, 43:18, 43:20, 56:2, 65:7, 75:8, 127:11, 127:14, 127:16, 127:18, 129:6, 170:13, 243:4
**conduct** [2] - 204:9, 238:21
**conducted** [2] - 63:20, 238:16
**conducting** [1] - 60:4
**conduit** [4] - 252:6, 252:8, 253:7, 253:11
**confer** [1] - 233:9
**conference** [7] - 101:2, 104:7, 230:16, 238:5, 240:6, 240:12, 240:17
**confidence** [1] - 58:17
**confident** [3] - 214:11, 230:2, 230:3
**confidential** [1] - 232:17
**confirm** [1] - 245:15
**confluence** [1] - 89:2
**confused** [3] - 121:10, 121:24, 122:1
**confusing** [2] - 22:8, 137:23
**confusion** [3] - 5:25, 105:9, 122:3
**connecting** [1] - 230:24
**connection** [4] - 46:1, 47:8, 47:11, 110:5
**connections** [1] - 57:12

**connotation** [1] - 65:5
**consensus** [1] - 143:10
**consequence** [2] - 234:16
**consequences** [1] - 164:17
**consider** [7] - 27:20, 62:14, 131:14, 168:3, 238:25, 245:24, 247:1
**consideration** [8] - 33:19, 38:14, 73:5, 93:4, 93:13, 130:24, 187:2, 188:17
**considered** [5] - 27:22, 33:19, 38:21, 77:6, 134:13
**consistent** [23] - 29:3, 29:20, 32:10, 70:15, 75:18, 76:9, 81:5, 81:6, 81:8, 81:22, 82:3, 83:8, 83:10, 84:7, 94:5, 94:10, 117:21, 122:7, 125:3, 140:16, 166:25, 172:9, 252:16
**consistently** [3] - 83:3, 97:3, 104:4
**constructive** [1] - 80:9
**contact** [7] - 251:18, 252:4, 252:17, 252:22, 253:4, 253:10, 254:8
**contacted** [1] - 221:10
**contain** [1] - 45:25
**contemplated** [1] - 130:18
**contemporaneous** [1] - 64:9
**contemporaneously** [1] - 67:12
**content** [2] - 17:24, 51:8
**context** [21] - 32:24, 48:21, 49:2, 54:4, 56:25, 57:4, 58:7, 59:8, 69:16, 71:17, 71:18, 91:11, 129:25, 130:1, 138:3, 160:9, 164:24, 166:12, 174:1, 180:1, 198:7
**continue** [4] - 4:8, 7:4, 72:5, 126:6
**Continued** [1] - 7:5
**continued** [3] - 3:3, 228:22, 253:13
**continuing** [1] - 172:25
**continuum** [1] - 69:12
**contracts** [1] - 120:13
**contrast** [2] - 164:23, 216:25
**contribute** [1] - 225:25
**contributes** [3] - 171:7, 171:11, 171:12
**contribution** [1] - 27:16
**contributions** [1] - 41:1
**control** [2] - 107:1, 107:2
**converging** [1] - 8:21
**conversation** [3] - 219:15, 228:21, 238:9
**conversations** [4] - 33:5, 232:7, 232:25, 234:9
**cooperating** [1] - 194:5
**cope** [1] - 216:12
**copied** [1] - 250:2
**copies** [1] - 25:17
**copy** [8] - 7:17, 13:17, 14:1, 25:16, 148:11, 149:8, 230:1, 230:7
**Corey** [1] - 1:18
**corey.smith@usdoj.gov** [1] - 1:23
**corporate** [1] - 213:5
**corporation** [1] - 240:24
**Correct** [1] - 245:5
**correct** [55] - 15:4, 16:18, 16:22, 17:4,

17:17, 21:3, 21:20, 22:17, 22:20, 22:23, 22:25, 23:15, 23:16, 23:24, 25:11, 26:13, 26:16, 27:9, 27:10, 27:19, 30:2, 31:21, 47:20, 50:2, 50:17, 56:19, 59:23, 61:13, 84:25, 97:24, 100:23, 105:2, 107:14, 108:1, 108:6, 109:10, 111:1, 113:24, 129:18, 133:9, 138:12, 158:1, 170:9, 180:6, 183:21, 215:11, 219:8, 241:25, 249:19, 249:21, 251:19, 252:2, 253:6, 253:9, 255:10
**correctly** [5] - 107:8, 121:2, 192:21, 195:12, 205:25
**correlation** [2] - 89:8, 245:16
**correspondence** [1] - 250:5
**corresponding** [1] - 84:1
**corroborate** [1] - 70:15
**cortex** [2] - 141:23, 142:8
**cortical** [1] - 144:7
**counsel** [20] - 4:7, 69:22, 70:2, 72:16, 73:21, 74:2, 89:17, 90:3, 96:21, 150:24, 162:13, 172:1, 172:15, 196:19, 200:2, 204:10, 207:20, 218:22, 233:14, 234:1
**counseling** [1] - 165:19
**count** [1] - 62:4
**counted** [1] - 215:3
**counties** [1] - 19:4
**counting** [1] - 213:14
**countries** [1] - 241:1
**country** [3] - 19:10, 41:6, 42:21
**county** [1] - 17:19
**couple** [12] - 4:9, 4:10, 43:4, 78:23, 100:22, 112:24, 117:22, 119:20, 164:2, 213:13, 213:19, 221:12
**course** [14] - 55:19, 57:2, 112:3, 129:1, 215:1, 219:9, 219:17, 219:19, 225:25, 230:14, 230:23, 232:4, 232:16, 240:19
**court** [12] - 37:14, 42:7, 43:14, 46:6, 73:3, 161:15, 163:5, 211:24, 247:5, 249:3, 249:5, 249:9
**COURT** [121] - 1:1, 2:11, 4:6, 4:11, 4:15, 4:17, 4:19, 5:2, 5:15, 5:17, 6:4, 6:9, 6:11, 6:13, 6:23, 7:2, 7:4, 13:24, 14:2, 36:4, 36:7, 36:9, 36:15, 36:18, 36:21, 36:23, 45:7, 68:14, 68:18, 71:20, 71:25, 72:5, 72:16, 73:6, 74:2, 74:7, 112:9, 112:12, 119:15, 125:15, 125:17, 128:16, 128:21, 129:3, 129:7, 129:17, 129:21, 130:1, 130:5, 130:8, 130:12, 130:19, 131:3, 131:10, 131:12, 132:15, 136:19, 147:22, 148:18, 148:22, 148:24, 149:10, 159:10, 160:20, 161:23, 170:2, 170:5, 170:11, 170:20, 172:1, 172:12, 172:17, 172:24, 198:16, 198:19, 200:4, 200:8, 200:12, 200:14, 201:8, 201:11, 201:17, 202:7, 202:9, 202:13, 204:8, 204:20, 205:13, 205:16, 205:18, 207:23, 208:3, 210:1, 210:3,

210:11, 210:16, 210:20, 210:23, 211:3, 211:6, 211:10, 221:8, 223:12, 227:6, 227:13, 237:20, 243:9, 244:1, 244:8, 244:14, 244:21, 244:25, 248:22, 250:14, 251:7, 251:10, 254:2, 254:17, 254:23, 254:25, 255:7
**Court** [18] - 37:18, 43:24, 44:16, 52:2, 107:10, 118:17, 118:22, 128:25, 130:14, 130:23, 131:1, 131:5, 136:2, 246:23, 247:2, 247:11, 247:13, 248:16
**courtly** [1] - 215:14
**courtroom** [4] - 73:18, 96:2, 124:19, 161:11
**courts** [1] - 212:1
**cover** [3] - 50:10, 69:20, 98:17
**covered** [1] - 81:11
**covering** [1] - 74:20
**covers** [1] - 43:23
**CPAP** [1] - 91:1
**credence** [1] - 69:14
**credibility** [2] - 169:10, 206:2
**crew** [1] - 106:14
**crime** [2] - 154:2, 193:20
**criminal** [20] - 49:14, 49:16, 49:18, 65:4, 93:5, 170:15, 191:18, 197:1, 213:7, 213:9, 213:15, 214:5, 214:6, 214:12, 216:16, 217:4, 234:17, 236:2, 242:14, 245:25
**criminally** [1] - 191:23
**criteria** [14] - 54:11, 75:14, 75:22, 75:23, 76:11, 76:12, 77:5, 77:8, 77:12, 77:13, 80:1, 80:5, 142:10, 142:12
**criterion** [2] - 77:24, 80:6
**critical** [3] - 57:1, 218:1, 242:6
**criticized** [1] - 93:3
**Cross** [3] - 3:3, 3:5, 3:9
**CROSS** [3] - 7:5, 132:16, 245:1
**cross** [8] - 66:24, 76:25, 130:2, 132:15, 208:7, 208:19, 242:20, 244:1
**cross-examination** [3] - 130:2, 132:15, 244:1
**CROSS-EXAMINATION** [3] - 7:5, 132:16, 245:1
**cross-examine** [1] - 242:20
**cross-examining** [1] - 66:24
**CRR** [2] - 2:12, 255:14
**crucial** [1] - 250:7
**CSF** [1] - 25:3
**CSR** [1] - 2:12
**cure** [1] - 127:20
**cures** [1] - 206:22
**curious** [2] - 151:5, 151:7
**current** [5] - 53:14, 71:19, 112:8, 254:11, 254:13
**customer** [4] - 106:23, 115:12, 222:24, 223:4
**cut** [4] - 7:22, 21:12, 193:13, 244:7
**cutoff** [1] - 210:24
**cuts** [1] - 107:19
**cutting** [1] - 244:15

# D

**D-L-R-O-W** [1] - 123:16
**daggers** [1] - 244:12
**daily** [20] - 29:6, 32:11, 32:15, 48:24, 58:25, 65:20, 66:21, 68:13, 76:22, 78:15, 78:17, 78:19, 78:22, 79:1, 79:5, 79:7, 86:12, 88:19, 89:1, 170:14
**damage** [1] - 189:20
**dandy** [1] - 25:22
**Darby** [3] - 79:10, 79:21, 195:21
**Darby's** [1] - 5:4
**darker** [1] - 104:6
**data** [37] - 8:20, 12:25, 13:6, 21:10, 24:9, 28:6, 28:15, 29:16, 30:8, 30:11, 30:12, 30:18, 30:24, 31:20, 31:22, 32:1, 33:11, 33:12, 33:20, 33:22, 34:25, 35:5, 55:12, 69:16, 94:12, 120:20, 138:1, 138:6, 167:11, 167:12, 186:6, 188:9, 188:11, 208:23, 236:23, 253:21
**DATE** [1] - 255:13
**date** [8] - 122:16, 122:20, 122:21, 155:2, 158:17, 183:22, 204:13, 234:1
**dated** [3] - 50:11, 50:25, 204:1
**dating** [1] - 182:16
**daunted** [3] - 217:2, 220:16, 220:17
**dawn** [1] - 231:2
**Dawson** [1] - 212:8
**DAY** [1] - 1:13
**Day's** [2] - 237:1, 239:5
**day-to-day** [5] - 49:9, 65:1, 66:16, 212:9, 212:13
**days** [6] - 43:21, 150:23, 155:7, 212:5, 213:13, 230:15
**DC** [1] - 1:22
**de** [2] - 160:16, 164:25
**de-emphasize** [2] - 160:16, 164:25
**dead** [2] - 217:20, 225:12
**dead-end** [1] - 225:12
**dead-ends** [1] - 217:20
**deal** [4] - 201:11, 241:18, 242:2, 244:25
**dealers** [3] - 222:21, 222:25
**dealership** [3] - 106:24, 113:11, 114:21
**dealerships** [2] - 114:12
**dealing** [2] - 112:2, 125:3
**dealings** [2] - 109:13, 232:16
**dealt** [1] - 223:22
**death** [1] - 142:21
**debate** [2] - 135:8, 141:11
**debt** [1] - 240:25
**decades** [2] - 52:22, 58:21
**December** [4] - 4:14, 5:13, 122:24, 122:25
**decent** [1] - 98:25
**decide** [4] - 49:8, 106:25, 131:4, 247:23
**decided** [2] - 27:5, 235:10, 243:22
**decides** [2] - 131:5, 134:20
**deciding** [1] - 27:12

**decision** [13] - 27:17, 99:8, 229:25, 231:23, 235:14, 235:17, 235:24, 236:11, 239:2, 243:20, 246:10, 246:25, 247:21
**decisionmaking** [2] - 27:12, 163:16
**decisions** [4] - 48:19, 49:2, 99:2, 242:23
**decline** [15] - 29:5, 32:10, 32:13, 66:9, 66:11, 79:21, 81:1, 86:9, 86:16, 94:25, 166:25, 203:22, 204:15, 205:4, 206:25
**declined** [2] - 192:17, 192:21
**decreased** [2] - 78:2, 78:9
**deeply** [2] - 87:6, 225:7
**default** [1] - 225:2
**defeating** [1] - 225:24
**defend** [5] - 112:7, 217:4, 236:2, 236:4, 241:20
**defendant** [32] - 9:5, 29:14, 30:24, 31:3, 33:16, 34:6, 34:11, 35:6, 68:12, 94:21, 131:6, 133:1, 134:25, 151:4, 168:1, 173:19, 173:23, 175:17, 175:22, 176:1, 178:19, 179:8, 180:8, 188:19, 190:2, 191:4, 192:15, 195:6, 199:20, 202:24, 242:14, 247:23
**DEFENDANT** [1] - 2:1
**defendant's** [7] - 33:2, 68:11, 136:5, 136:22, 166:25, 179:15, 192:14
**Defendant's** [4] - 98:15, 98:17, 106:1, 114:4
**defended** [1] - 216:15
**defending** [4] - 73:21, 96:21, 194:20, 240:4
**defense** [54] - 5:20, 6:21, 32:22, 36:16, 45:14, 46:15, 69:21, 70:3, 89:17, 89:18, 89:25, 90:2, 90:14, 97:2, 97:5, 102:23, 104:12, 114:3, 116:8, 116:9, 118:2, 119:11, 127:5, 146:18, 147:10, 162:5, 168:18, 190:25, 193:4, 193:7, 193:25, 202:15, 207:19, 213:7, 214:5, 214:6, 214:14, 218:22, 219:5, 220:5, 220:14, 226:5, 230:25, 241:6, 242:12, 243:5, 243:20, 243:22, 246:2, 246:13, 246:18, 246:22, 250:6, 250:24
**Defense** [2] - 50:7, 50:24
**defenses** [3] - 194:1, 194:22, 195:7
**deficiency** [2] - 78:3, 78:10
**deficient** [1] - 78:3
**deficit** [3] - 73:16, 93:19, 109:20
**deficits** [1] - 92:2
**define** [1] - 82:8
**defined** [2] - 38:5, 53:11
**defines** [1] - 53:16
**definitely** [3] - 33:18, 62:22, 178:21
**definition** [2] - 178:11, 182:3
**definitions** [1] - 190:21
**definitive** [1] - 112:6
**degree** [35] - 33:23, 35:20, 39:8, 39:10, 42:19, 59:19, 61:2, 65:24, 70:4, 75:20, 76:5, 76:9, 76:16, 84:7, 84:8, 85:3, 92:12, 93:3, 93:12, 95:13, 95:18, 95:19, 97:8, 103:25, 117:19, 117:21,

138:9, 179:4, 195:25, 196:3, 196:4, 196:22, 196:23, 207:20, 222:2
**degrees** [4] - 78:9, 111:14, 143:16, 178:7
**delays** [1] - 228:16
**deleted** [1] - 174:14
**deliberately** [1] - 134:24
**deliberations** [1] - 237:9
**delirious** [3] - 85:8, 87:14, 87:22
**delirium** [34] - 56:3, 74:25, 75:2, 84:20, 85:3, 85:4, 85:6, 85:16, 85:18, 85:24, 86:1, 86:5, 86:18, 86:23, 87:7, 87:10, 87:12, 87:14, 87:17, 87:19, 87:23, 88:1, 88:4, 95:22, 132:6, 132:9, 143:18, 189:2, 189:7, 189:10, 189:14, 189:19, 243:16
**delirium-like** [1] - 143:18
**delved** [1] - 109:8
**demands** [1] - 114:13
**demented** [1] - 180:4
**dementia** [122] - 24:6, 24:8, 26:17, 28:7, 28:13, 28:18, 28:21, 29:4, 29:18, 31:17, 32:2, 32:3, 32:6, 34:3, 34:15, 35:2, 35:14, 35:21, 43:6, 43:18, 44:24, 51:10, 51:14, 52:1, 52:4, 52:5, 52:19, 53:8, 53:11, 53:16, 54:1, 54:11, 55:19, 56:11, 56:16, 66:9, 66:10, 69:12, 69:15, 69:19, 75:7, 75:12, 75:16, 75:18, 75:21, 75:25, 76:7, 76:13, 76:17, 76:21, 77:1, 77:19, 78:13, 79:15, 81:3, 82:13, 82:18, 83:4, 83:20, 85:23, 87:20, 87:25, 88:15, 89:7, 89:10, 89:12, 93:22, 93:24, 93:25, 95:8, 102:10, 125:4, 127:21, 133:1, 141:12, 143:9, 144:12, 146:20, 178:1, 178:3, 178:5, 178:7, 178:11, 178:14, 178:24, 179:4, 179:9, 179:15, 180:15, 181:12, 181:13, 181:18, 181:25, 182:2, 182:6, 182:15, 185:5, 185:7, 185:14, 186:21, 187:19, 187:24, 188:7, 188:19, 188:20, 188:23, 189:4, 189:6, 189:11, 190:3, 190:11, 195:17, 196:1, 196:6, 198:6, 207:18, 209:8, 229:12, 232:3
**dementias** [1] - 43:13
**demonstrate** [1] - 236:21
**demonstrated** [3] - 29:4, 75:15, 195:10
**demonstrates** [1] - 80:12
**demonstrating** [1] - 75:19
**DENNEY** [9] - 106:7, 106:15, 107:7, 107:13, 107:15, 107:21, 123:7, 123:9, 124:9
**Denney** [11] - 5:24, 92:5, 97:16, 105:18, 118:12, 119:7, 122:15, 126:10, 126:11, 189:23, 194:5
**Denney's** [5] - 30:8, 30:11, 30:12, 30:18, 117:23
**Department** [9] - 1:20, 105:1, 234:7, 235:11, 235:15, 237:25, 238:2, 240:5, 247:18

department [10] - 114:24, 220:3, 245:21, 247:8, 247:14, 247:16, 247:17, 248:8, 248:11, 249:7
depositing [1] - 140:19
deposition [10] - 5:6, 5:8, 19:15, 110:20, 112:15, 141:3, 144:6, 158:22, 159:1, 186:17
depositions [3] - 46:20, 110:7, 142:3
depressed [1] - 88:24
depression [1] - 75:9
depth [1] - 56:22
describe [19] - 16:16, 19:6, 41:14, 43:14, 60:9, 71:3, 102:1, 110:1, 110:3, 136:1, 144:16, 149:21, 167:4, 178:7, 180:3, 212:14, 216:6, 226:3, 240:3
described [24] - 42:16, 67:22, 67:25, 70:7, 88:13, 93:22, 134:8, 135:18, 144:17, 145:16, 152:12, 163:1, 176:6, 180:12, 180:13, 180:14, 226:13, 228:1, 229:20, 230:17, 230:21, 241:20, 241:22, 242:5
describes [1] - 217:11
describing [6] - 69:7, 69:24, 71:18, 216:9, 221:23, 247:16
description [4] - 62:16, 146:9, 173:24, 179:3
descriptions [9] - 90:10, 91:9, 145:15, 154:20, 166:24, 181:20, 196:9, 196:14, 196:15
design [2] - 253:12, 254:10
detail [10] - 15:11, 33:4, 54:24, 63:5, 101:12, 102:1, 109:5, 111:3, 156:10, 229:13
detailed [2] - 166:6, 197:6
details [9] - 14:16, 15:10, 97:2, 106:8, 107:22, 126:7, 152:19, 194:7, 223:6
detective [4] - 54:16, 134:9, 167:23, 168:3
deteriorated [1] - 242:24
determination [3] - 32:7, 49:9, 94:19
determine [4] - 93:10, 129:9, 130:16, 197:2
determined [2] - 118:17, 118:22
devastating [3] - 78:22, 87:6, 88:18
develop [2] - 76:4, 76:6
developed [4] - 44:10, 76:12, 77:8, 142:25
developing [1] - 56:10
development [1] - 77:18
developments [1] - 228:1
develops [1] - 54:1
diagnose [5] - 10:16, 10:20, 43:17, 144:20, 189:10
diagnosed [7] - 81:2, 89:15, 143:2, 146:20, 179:9, 182:17, 232:2
diagnoses [17] - 56:16, 56:17, 73:13, 74:15, 74:22, 75:4, 75:5, 75:6, 75:25, 81:10, 83:7, 94:5, 162:23, 187:5, 187:21, 188:4, 188:12
diagnosing [4] - 10:7, 10:14, 11:10,

77:1
diagnosis [60] - 8:25, 9:22, 11:2, 11:7, 11:8, 11:25, 28:7, 52:14, 53:1, 54:10, 54:14, 54:20, 55:2, 55:9, 56:13, 56:19, 58:1, 66:10, 74:1, 77:6, 77:14, 80:23, 81:12, 82:10, 82:18, 83:12, 84:19, 88:8, 90:15, 90:17, 90:21, 90:25, 91:20, 91:23, 110:22, 111:21, 111:24, 141:2, 142:13, 143:7, 143:11, 143:13, 146:23, 169:14, 169:18, 179:12, 180:8, 181:6, 181:8, 186:7, 186:13, 189:6, 196:18, 196:22, 198:10, 207:3, 207:7, 229:10, 230:24
diagnostic [9] - 8:18, 53:14, 61:5, 69:17, 75:14, 75:22, 128:2, 142:10, 142:12
diagnostically [1] - 66:8
dialog [1] - 249:1
dictate [1] - 114:23
DIETZ [30] - 118:7, 118:9, 118:12, 118:16, 118:21, 119:2, 119:20, 120:7, 120:10, 120:14, 120:18, 120:22, 121:1, 122:20, 122:23, 122:25, 123:2, 123:4, 123:6, 123:8, 123:11, 123:14, 123:17, 123:20, 123:23, 123:25, 124:2, 124:4, 124:8, 124:13
dietz [2] - 130:23, 131:13
Dietz [23] - 5:23, 93:2, 97:15, 105:18, 117:23, 118:8, 119:7, 122:15, 126:9, 128:23, 128:24, 129:18, 129:21, 129:24, 135:18, 136:4, 137:10, 168:21, 168:24, 189:22, 194:4, 195:18, 203:7
Dietz' [2] - 94:18, 124:20
Dietz's [11] - 92:5, 130:11, 136:24, 137:4, 202:16, 202:17, 202:22, 203:3, 203:15, 203:17, 204:3
Dietz/Denney [2] - 118:5, 119:18
difference [10] - 71:12, 91:20, 141:11, 141:19, 170:19, 170:25, 189:17, 189:19, 224:24, 224:25
differences [2] - 53:5, 102:5
different [62] - 16:11, 16:16, 16:19, 21:19, 23:18, 24:3, 24:17, 38:13, 38:18, 38:22, 38:24, 49:25, 52:10, 52:16, 53:1, 53:9, 53:22, 54:1, 55:5, 56:2, 57:7, 57:9, 57:10, 59:22, 60:20, 67:20, 71:9, 75:7, 87:17, 89:2, 89:12, 89:23, 91:22, 110:3, 111:17, 120:21, 134:16, 138:1, 138:19, 139:5, 139:25, 141:18, 141:23, 144:7, 147:1, 149:20, 157:10, 160:8, 171:13, 175:13, 192:11, 196:8, 196:11, 209:10, 209:15, 219:16, 225:17, 228:9, 234:20, 234:21
differentially [1] - 57:13
differently [1] - 53:23
differing [1] - 178:7
difficult [12] - 89:13, 95:12, 121:21, 126:24, 127:1, 127:4, 135:21, 143:12,

222:3, 222:25, 230:22, 236:11
difficulties [2] - 228:23, 231:25
difficulty [2] - 79:18, 97:11
dig [1] - 14:23
digging [1] - 222:10
digital [2] - 226:12
dimensions [1] - 180:4
dire [1] - 93:13
Direct [2] - 3:5, 3:8
direct [13] - 50:6, 135:17, 154:10, 160:3, 161:6, 167:22, 174:16, 174:22, 175:3, 186:16, 210:18, 227:7, 254:13
DIRECT [2] - 37:2, 211:15
direction [5] - 21:9, 216:5, 220:6, 221:6, 228:15
directions [1] - 193:15
directly [1] - 230:5
director [1] - 168:25
disadvantage [1] - 230:15
disagreed [5] - 245:22, 247:9, 247:14, 248:11, 249:7
disagreement [1] - 248:25
disapproving [1] - 214:2
disciplined [1] - 94:21
disclose [1] - 216:18
discount [2] - 160:4, 160:6
discovery [1] - 226:14
discrepancies [1] - 66:18
discuss [2] - 60:14, 245:20
discussed [8] - 32:23, 57:21, 87:2, 232:5, 234:24, 235:20, 238:8
discussing [3] - 87:17, 109:14, 245:6
Discussion [1] - 36:13
discussion [5] - 63:6, 74:19, 124:21, 124:22, 230:24
discussions [1] - 223:15
disease [84] - 8:4, 8:11, 8:19, 9:1, 9:6, 9:16, 9:22, 10:8, 10:14, 10:17, 10:20, 11:2, 11:10, 12:7, 12:24, 16:17, 20:14, 41:24, 42:3, 43:10, 43:13, 43:17, 44:23, 44:25, 45:1, 52:10, 56:11, 58:2, 75:6, 75:12, 75:15, 75:18, 75:25, 76:2, 76:13, 76:15, 77:14, 77:16, 77:17, 77:23, 78:2, 81:2, 81:14, 81:21, 81:22, 81:23, 81:25, 82:3, 82:5, 82:6, 82:13, 82:15, 82:18, 83:8, 83:11, 83:21, 84:9, 84:14, 84:17, 91:12, 93:25, 94:9, 95:17, 95:22, 111:14, 112:4, 127:21, 139:14, 139:23, 140:5, 140:16, 141:2, 142:12, 143:11, 144:6, 144:17, 146:23, 181:24, 207:18, 209:8, 229:12
diseases [3] - 43:22, 51:10, 142:11
disentangle [1] - 139:13
disinterested [1] - 90:6
Disorder [1] - 77:4
disorder [13] - 41:22, 52:6, 53:12, 56:21, 76:13, 91:6, 91:11, 93:23, 142:4, 143:24, 144:11, 144:20, 145:3
disorders [7] - 38:3, 38:11, 41:25, 43:22, 53:13, 53:15, 58:20

**disorientation** [3] - 103:23, 104:3, 143:18
**disposal** [1] - 188:15
**dispositive** [2] - 250:10, 250:11
**dispute** [5] - 223:5, 223:7, 225:2, 243:4
**disputes** [1] - 139:8
**disqualifying** [1] - 218:21
**disregard** [2] - 164:8, 164:25
**disregarded** [3] - 160:21, 161:2, 161:6
**distant** [1] - 224:18
**distinct** [1] - 233:5
**distinction** [1] - 206:1
**distinctions** [1] - 76:14
**distinctly** [1] - 69:3
**distinguish** [2] - 76:19, 78:12
**Distinguished** [1] - 40:14
**distinguished** [1] - 40:23
**distort** [1] - 225:22
**distribution** [2] - 13:8, 17:25
**DISTRICT** [3] - 1:1, 1:1, 1:12
**District** [4] - 211:24, 212:22, 213:12, 213:22
**disturbances** [2] - 45:1, 75:10
**dive** [1] - 96:23
**diverse** [1] - 21:10
**diversity** [5] - 17:20, 19:11, 19:12, 20:12, 20:25
**diverted** [1] - 223:10
**divide** [2] - 78:25, 216:21
**DIVISION** [1] - 1:2
**division** [1] - 250:5
**Division** [2] - 1:20, 238:7
**DLB** [1] - 142:8
**doc** [1] - 99:18
**doctor** [26] - 11:16, 14:4, 14:25, 15:21, 16:9, 16:10, 36:7, 59:20, 112:9, 116:16, 142:6, 149:13, 149:21, 167:22, 170:6, 174:17, 174:25, 175:4, 177:25, 184:14, 186:9, 197:11, 197:15, 198:2, 206:21
**Doctor** [2] - 36:9, 161:1
**doctor's** [2] - 125:21, 135:1
**doctors** [28] - 34:13, 35:8, 116:18, 145:23, 165:2, 180:22, 181:6, 186:11, 187:4, 187:12, 187:23, 188:5, 190:14, 194:4, 223:20, 229:7, 229:16, 229:21, 235:9, 238:11, 238:19, 238:22, 238:24, 239:3, 239:7, 239:16, 239:20, 243:3
**Doctors** [1] - 189:22
**doctors'** [1] - 138:24
**document** [8] - 217:24, 217:25, 218:11, 226:4, 227:2, 240:7, 251:11
**documentation** [1] - 203:8
**documents** [18] - 199:24, 200:17, 201:15, 217:14, 217:21, 220:13, 220:21, 222:11, 225:10, 226:13, 226:17, 226:20, 226:22, 227:3, 235:8, 235:14, 240:2

**DOJ** [7] - 239:4, 239:8, 239:15, 239:18, 239:21, 241:12, 245:18
**dollar** [3] - 166:14, 175:22, 176:2
**dollars** [2] - 176:15, 245:11
**domains** [10] - 28:6, 53:9, 53:18, 53:22, 54:9, 80:7, 80:8, 80:13, 96:25
**Don** [2] - 197:21
**donated** [2] - 176:15, 206:20
**donation** [3] - 175:22, 176:2, 206:18
**done** [19] - 10:22, 40:8, 46:22, 48:15, 48:20, 49:19, 86:15, 107:2, 114:14, 114:22, 131:4, 172:17, 191:15, 191:19, 198:4, 205:16, 209:4, 245:21
**dopaminergic** [1] - 140:2
**Dorothy** [7] - 64:1, 64:3, 145:7, 145:10, 145:22, 155:16, 156:8
**doubt** [1] - 94:25
**down** [14] - 42:8, 63:24, 80:7, 88:23, 107:19, 153:20, 177:9, 177:11, 210:10, 215:5, 217:18, 225:11, 226:15, 229:17
**dozens** [1] - 241:1
**DR** [69] - 98:20, 99:4, 99:7, 99:10, 99:14, 99:17, 99:21, 99:24, 100:2, 100:5, 100:10, 100:14, 103:3, 103:6, 103:11, 103:14, 103:18, 104:16, 104:23, 105:2, 106:7, 106:15, 107:7, 107:13, 107:15, 107:21, 113:6, 114:8, 114:16, 115:14, 116:13, 116:20, 116:22, 117:1, 117:4, 117:6, 118:7, 118:9, 118:12, 118:16, 118:21, 119:2, 119:20, 120:7, 120:10, 120:14, 120:18, 120:22, 121:1, 122:20, 122:23, 122:25, 123:2, 123:4, 123:6, 123:7, 123:8, 123:9, 123:11, 123:14, 123:17, 123:20, 123:23, 123:25, 124:2, 124:4, 124:8, 124:9, 124:13
**Dr** [153] - 5:4, 5:23, 5:24, 7:7, 25:17, 27:23, 30:8, 30:11, 30:12, 30:18, 36:17, 36:18, 37:4, 39:4, 45:5, 45:9, 45:24, 51:19, 61:9, 67:15, 69:1, 72:25, 73:9, 74:12, 79:10, 79:20, 80:5, 80:17, 86:21, 92:5, 93:2, 93:17, 94:18, 97:15, 97:16, 97:21, 100:23, 103:22, 105:7, 105:18, 108:4, 115:23, 117:14, 117:23, 118:12, 119:6, 119:7, 122:15, 124:19, 124:20, 126:4, 126:9, 126:10, 126:11, 126:22, 128:23, 128:24, 129:5, 129:18, 129:21, 129:24, 130:11, 130:23, 131:8, 131:13, 131:18, 132:13, 132:18, 134:6, 134:16, 134:19, 134:23, 135:8, 135:18, 136:4, 136:24, 137:4, 137:10, 146:7, 146:12, 147:1, 147:5, 147:7, 151:9, 151:17, 151:20, 152:2, 152:6, 152:16, 152:21, 161:16, 161:22, 165:7, 166:24, 168:21, 168:24, 170:8, 170:12, 173:4, 174:18, 176:4, 180:13, 183:2, 183:11, 184:15, 184:20, 184:23, 185:4, 191:2, 191:3, 191:14,

192:13, 195:21, 198:23, 198:24, 199:7, 199:11, 199:15, 199:16, 199:19, 199:21, 199:23, 199:24, 200:23, 202:16, 202:17, 202:22, 203:1, 203:3, 203:7, 203:13, 203:15, 203:17, 204:1, 204:3, 205:25, 206:16, 206:22, 208:12, 208:14, 208:15, 210:3, 239:6, 239:9, 239:11, 239:13
**draw** [4] - 52:11, 219:8, 220:19, 221:6
**drawing** [1] - 124:16
**drawn** [1] - 11:13
**dreams** [1] - 91:9
**dress** [2] - 58:5, 79:2
**dressed** [1] - 66:5
**drew** [3] - 14:21, 193:11, 225:16
**drive** [3] - 49:4, 79:7, 236:10
**dropping** [1] - 78:6
**drove** [2] - 235:17, 235:24
**Druce** [1] - 228:13
**due** [1] - 246:15
**duly** [2] - 37:1, 211:14
**dumbbells** [1] - 117:3
**during** [14] - 62:21, 65:15, 65:18, 79:4, 111:11, 163:24, 183:18, 189:7, 195:17, 196:9, 197:4, 213:17, 214:9, 230:23
**dusty** [1] - 220:12
**DX-75-C** [1] - 6:2

## E

**e-mail** [26] - 147:4, 147:6, 147:7, 147:9, 147:11, 151:19, 157:17, 174:13, 197:20, 198:1, 198:6, 198:8, 198:10, 206:4, 207:6, 218:7, 218:14, 218:23, 219:13, 219:15, 220:24, 223:9, 224:5, 225:15, 249:22, 252:12
**e-mailed** [7] - 146:25, 151:9, 151:16, 173:17, 174:10, 249:24, 252:9
**e-mails** [6] - 194:9, 198:12, 223:16, 226:4, 250:2
**eager** [3] - 36:16, 207:24, 225:6
**eagerness** [3] - 220:23, 222:12, 231:5
**early** [11] - 32:6, 34:4, 35:2, 101:7, 110:6, 119:6, 141:4, 141:8, 180:5, 208:2, 213:16
**easier** [5] - 7:15, 140:25, 157:11, 241:15
**easily** [1] - 87:24
**eastern** [1] - 253:24
**easy** [1] - 15:22
**edit** [1] - 44:12
**edition** [3] - 43:15, 44:8, 53:15
**editor** [1] - 44:10
**educated** [1] - 166:3
**education** [3] - 100:1, 165:23, 212:16
**educational** [3] - 165:24, 166:7, 212:15
**educator** [1] - 41:5
**EEG** [1] - 55:8
**effectively** [1] - 196:16
**effects** [2] - 90:23, 140:11

**efficient** [1] - 210:18
**effort** [4] - 225:21, 233:23, 233:25, 235:12
**Efronson** [1] - 2:7
**eight** [5] - 16:21, 16:23, 17:3, 21:24
**either** [10] - 55:23, 59:6, 70:15, 87:19, 176:6, 197:17, 201:11, 235:24, 238:6, 245:15
**elaborate** [1] - 83:13
**elderly** [3] - 51:9, 89:2, 92:19
**elect** [1] - 40:17
**elements** [5] - 55:9, 60:20, 89:23, 93:1, 94:1
**eleven** [1] - 215:4
**elicit** [1] - 101:10
**eligible** [1] - 233:9
**eliminate** [1] - 91:6
**elsewhere** [1] - 217:25
**Email** [3] - 1:23, 2:5, 2:9
**embarrassed** [1] - 225:7
**embarrassment** [1] - 231:4
**emerge** [2] - 57:19, 58:12
**emerged** [1] - 81:16
**emergence** [1] - 209:7
**emergent** [1] - 77:22
**emerging** [2] - 54:18, 55:4
**emote** [1] - 88:17
**emotions** [1] - 88:11
**emphasis** [7] - 20:12, 21:9, 154:19, 159:5, 160:8, 160:9, 213:16
**emphasize** [2] - 160:16, 164:25
**encountering** [1] - 216:8
**End** [1] - 119:17
**end** [14] - 60:1, 60:16, 63:18, 83:20, 107:17, 108:6, 115:8, 120:1, 120:2, 121:16, 122:8, 122:14, 222:1, 225:12
**end-stage** [1] - 83:20
**ended** [2] - 101:22, 102:1
**ends** [1] - 217:20
**enduring** [2] - 52:20, 57:6
**enemy** [3] - 103:13, 103:15, 103:19
**enforcement** [2] - 214:6, 214:7
**engage** [7] - 59:8, 96:11, 97:1, 97:4, 127:4, 222:3, 243:14
**engaged** [4] - 58:16, 58:17, 68:6, 105:4
**engagement** [1] - 46:2
**enjoy** [1] - 42:23
**enormous** [1] - 176:23
**ensued** [1] - 249:1
**enter** [1] - 249:20
**entered** [4] - 50:24, 98:2, 98:5, 249:17
**entire** [9] - 20:18, 31:14, 39:23, 48:7, 96:11, 105:24, 112:10, 117:25, 186:17
**entirely** [1] - 85:10
**entirety** [4] - 62:19, 161:8, 189:23, 190:1
**entities** [2] - 222:23, 241:1
**entitled** [1] - 255:11
**entity** [1] - 106:22

**entrepreneur** [1] - 215:17
**environment** [1] - 171:2
**epidemiology** [1] - 12:20
**equals** [2] - 26:1, 124:4
**equipped** [1] - 195:4
**equivalent** [2] - 78:7, 226:12
**erroneous** [1] - 225:25
**especially** [10] - 48:22, 56:23, 76:6, 86:11, 96:12, 175:4, 224:10, 230:7, 232:4, 242:24
**essence** [5] - 53:5, 55:10, 66:7, 70:2, 101:18
**essential** [3] - 55:25, 95:15, 187:14
**essentially** [3] - 55:1, 156:14, 246:13
**establish** [1] - 69:9
**established** [3] - 21:8, 47:18, 78:9
**establishing** [1] - 66:9
**estimate** [5] - 17:14, 47:10, 215:3, 253:17, 253:19
**estimated** [1] - 226:12
**estimates** [1] - 88:2
**estimating** [2] - 21:13, 21:15
**estimation** [1] - 136:22
**et** [1] - 203:20
**ethical** [2] - 246:2, 246:6
**ethnic** [1] - 20:25
**Eugene** [3] - 80:17, 223:8, 240:20
**evaluate** [10] - 118:13, 118:14, 167:6, 173:6, 174:19, 186:24, 192:5, 195:4, 195:6, 196:15
**evaluated** [2] - 189:23, 197:4
**evaluating** [1] - 185:24
**evaluation** [8] - 51:12, 60:2, 177:23, 185:6, 185:9, 186:25, 190:19, 248:9
**evaluations** [3] - 74:14, 128:2, 191:18
**evasion** [1] - 240:16
**evasive** [4] - 134:24, 173:18, 174:11, 206:6
**Evatt** [2] - 183:19, 194:8
**evening** [1] - 173:4, 254:18
**event** [2] - 235:9, 246:25
**events** [9] - 217:19, 218:20, 218:24, 219:9, 219:14, 219:16, 219:19, 220:1, 246:25
**eventually** [3] - 107:17, 219:20, 234:5
**evidence** [31] - 4:16, 5:22, 6:19, 6:20, 8:9, 8:21, 35:11, 35:12, 45:14, 50:24, 73:15, 82:14, 90:8, 90:9, 90:10, 92:1, 93:15, 98:2, 98:6, 113:1, 117:25, 119:11, 130:14, 140:8, 173:20, 199:5, 200:20, 202:15, 237:13, 237:20, 237:22
**evident** [1] - 79:24
**evolved** [1] - 252:20
**evolving** [4] - 57:14, 77:20, 182:15, 182:16
**ex** [1] - 179:25
**exacerbate** [1] - 128:13
**exact** [3] - 19:2, 135:6, 182:1

**exactly** [11] - 62:8, 104:21, 114:14, 125:6, 136:7, 136:9, 142:2, 149:4, 181:23, 198:8
**exaggerating** [4] - 92:6, 92:11, 92:20, 94:24
**exaggeration** [1] - 226:8
**Exam** [1] - 104:13
**exam** [10] - 5:11, 62:19, 98:14, 100:23, 102:25, 105:13, 110:6, 113:24, 121:11, 126:6
**Examination** [1] - 78:4
**EXAMINATION** [7] - 7:5, 37:2, 132:16, 198:21, 208:4, 211:15, 245:1
**examination** [25] - 5:4, 5:23, 6:6, 6:8, 54:22, 54:23, 60:1, 60:5, 60:7, 60:11, 60:16, 60:18, 61:3, 75:19, 98:9, 98:11, 113:24, 130:2, 132:15, 135:17, 137:8, 204:9, 238:24, 239:20, 244:1
**examinations** [6] - 80:11, 102:7, 112:25, 117:15, 125:5, 189:7
**examine** [5] - 171:5, 171:14, 180:11, 242:20, 245:19
**examining** [1] - 66:22
**example** [16] - 8:8, 8:22, 10:15, 10:16, 19:9, 19:10, 57:21, 57:23, 58:24, 59:4, 89:17, 136:12, 209:1, 217:10, 218:7, 220:11
**examples** [1] - 55:21
**exams** [1] - 111:19
**except** [1] - 169:20
**excerpt** [2] - 5:10, 203:14
**exchanged** [1] - 249:22
**exclusively** [1] - 213:19
**excused** [5] - 36:7, 172:10, 210:1, 255:2, 255:4
**execute** [1] - 238:12
**executed** [1] - 183:19
**executive** [4] - 53:19, 80:9, 216:15, 216:19
**exercise** [1] - 20:2
**exhausted** [3] - 125:25, 126:16
**exhausting** [1] - 127:2
**Exhibit** [20] - 45:14, 50:7, 50:24, 98:15, 98:17, 105:25, 106:1, 113:1, 114:4, 116:8, 116:9, 118:1, 118:2, 119:11, 119:12, 199:6, 199:24, 204:1, 204:12
**exhibit** [8] - 4:14, 6:3, 45:15, 102:23, 104:12, 114:3, 197:7, 202:16
**exhibiting** [1] - 105:8
**exhibits** [1] - 4:9
**exist** [1] - 95:5
**expect** [5] - 29:12, 68:11, 105:3, 167:15, 242:25
**expectation** [1] - 131:18
**expectations** [1] - 96:9
**expected** [5] - 127:6, 168:10, 168:13, 209:11, 219:17
**expense** [1] - 219:21
**experience** [30] - 33:23, 35:18, 40:25, 44:16, 47:22, 48:8, 48:9, 48:18, 49:14,

51:9, 69:11, 76:3, 86:17, 92:20,
  117:14, 121:13, 125:1, 139:14, 142:4,
  144:3, 145:1, 191:10, 219:4, 220:7,
  220:8, 226:3, 240:2, 241:13, 242:23,
  254:13
**experienced** [1] - 146:6
**experiences** [2] - 38:25, 68:4
**experiencing** [1] - 189:6
**expert** [22] - 12:15, 15:1, 15:15, 20:7,
  31:1, 32:22, 40:20, 45:5, 45:6, 47:23,
  50:6, 68:14, 86:23, 129:6, 133:17,
  133:19, 158:15, 158:20, 158:22,
  186:20, 243:5
**expert's** [2] - 72:19, 72:21
**expertise** [9] - 49:25, 55:3, 131:24,
  134:1, 143:1, 168:6, 168:7, 194:25,
  243:11
**experts** [17] - 33:1, 33:10, 46:15, 46:16,
  68:14, 68:18, 79:10, 94:4, 102:6,
  132:24, 133:3, 145:11, 171:17,
  192:14, 193:3, 193:21, 193:25
**explain** [11] - 37:24, 80:5, 90:15, 90:18,
  110:18, 154:14, 159:3, 218:11,
  226:23, 228:21, 252:19
**explaining** [1] - 211:2
**explore** [1] - 46:24
**exploring** [1] - 171:6
**exposure** [1] - 128:12
**express** [1] - 97:3
**expressed** [5] - 231:4, 231:10, 234:11,
  238:16, 247:16
**extend** [1] - 210:14
**extent** [13] - 44:24, 73:1, 89:19, 93:1,
  93:6, 93:12, 94:24, 111:11, 112:20,
  132:11, 140:1, 154:20, 179:25
**extra** [3] - 10:1, 175:6, 175:7
**extraordinary** [3] - 59:9, 136:11, 241:17
**extreme** [2] - 58:25, 59:2

# F

**face** [10] - 102:15, 132:25, 133:5, 133:7,
  164:21, 212:4, 214:25, 234:17, 242:14
**faces** [2] - 73:19, 96:2
**facilitate** [1] - 238:14
**facilities** [2] - 39:17, 41:7
**facility** [1] - 130:17
**facing** [2] - 82:25, 93:4
**fact** [28] - 52:15, 58:13, 67:8, 107:18,
  117:9, 125:18, 128:5, 131:1, 131:24,
  137:18, 140:8, 155:25, 157:12,
  157:25, 161:16, 166:9, 167:25,
  169:20, 171:4, 173:22, 175:11,
  193:11, 203:3, 218:19, 220:22, 231:1,
  238:18, 252:9
**factor** [2] - 85:10, 85:23, 96:6
**facts** [14] - 107:22, 192:15, 218:24,
  218:25, 219:7, 219:12, 219:16, 220:1,
  220:7, 220:20, 226:9, 231:8, 233:24,
  241:25

**factual** [1] - 241:22
**factually** [1] - 111:1
**fail** [1] - 58:3
**failure** [1] - 216:18
**fair** [51] - 9:3, 17:6, 18:13, 18:14, 22:15,
  33:7, 46:5, 72:11, 73:9, 73:22, 97:22,
  108:18, 121:11, 131:16, 132:3,
  134:20, 139:9, 139:10, 144:15, 147:9,
  149:1, 150:6, 151:8, 153:11, 157:5,
  158:7, 159:23, 160:18, 161:2, 163:10,
  165:11, 166:22, 169:17, 180:22,
  180:24, 190:24, 192:13, 192:14,
  198:14, 208:25, 245:3, 245:7, 245:14,
  245:19, 246:14, 247:19, 249:14,
  251:20, 252:23, 254:7, 254:9
**fairly** [2] - 23:10, 74:21
**faked** [1] - 135:2
**faking** [7] - 33:16, 34:6, 35:7, 94:7,
  124:25, 126:19
**fall** [5] - 35:1, 109:14, 110:2, 135:13,
  138:8
**falling** [1] - 116:3, 181:23
**falls** [8] - 83:3, 108:10, 109:22, 121:23,
  138:9, 167:11, 178:20
**faltered** [1] - 217:5
**familiar** [11] - 13:12, 14:5, 14:7, 14:16,
  24:24, 92:16, 94:17, 113:22, 121:9,
  208:8, 225:3
**familiarize** [1] - 13:18
**families** [1] - 88:22
**family** [10] - 35:8, 100:4, 232:10,
  232:14, 233:17, 233:19, 234:25,
  235:21, 235:22
**far** [11] - 4:22, 108:19, 202:24, 205:3,
  218:12, 223:24, 224:7, 236:23, 237:1,
  242:6, 248:9
**fashion** [1] - 238:11
**fast** [2] - 42:7, 254:25
**faster** [1] - 148:17
**fatigue** [1] - 121:20
**fault** [2] - 174:2, 186:10
**favor** [1] - 220:14
**FBARs** [1] - 194:13
**FDA** [1] - 216:19
**FDG** [9] - 8:6, 8:22, 9:4, 9:14, 10:19,
  11:5, 81:18, 82:23, 83:7
**February** [4] - 249:23, 249:25, 251:24,
  251:25
**federal** [10] - 173:9, 173:18, 173:23,
  212:1, 213:1, 213:14, 213:16, 214:12,
  216:16, 241:5
**fee** [1] - 47:7
**feed** [1] - 79:3
**feelings** [2] - 82:12, 88:21
**feign** [4] - 92:12, 93:6, 94:15, 95:8
**feigning** [1] - 35:7
**fell** [1] - 113:21
**Fellow** [1] - 40:14
**fellow** [1] - 40:23
**fellowship** [2] - 39:13, 39:21

**felt** [4] - 90:21, 102:14, 117:19, 175:16
**fever** [1] - 87:22
**few** [8] - 44:24, 54:13, 58:20, 82:20,
  92:24, 119:9, 126:21, 155:6
**field** [8] - 20:7, 21:9, 33:10, 38:9, 40:20,
  40:22, 41:1, 44:13
**fifth** [1] - 14:25
**Fifth** [2] - 246:15, 249:3
**Figure** [1] - 22:6
**figure** [8] - 22:7, 22:10, 22:11, 107:17,
  159:20, 186:1, 218:12, 251:12
**figured** [1] - 85:9
**file** [1] - 194:13
**filed** [2] - 158:15, 250:24
**filings** [1] - 46:6
**finances** [1] - 197:3
**financial** [1] - 49:20
**financing** [1] - 240:22
**findings** [6] - 9:4, 9:14, 11:4, 16:25,
  28:5, 29:3
**fine** [6] - 65:11, 148:11, 192:7, 211:9,
  237:11, 237:12
**finish** [3] - 119:21, 175:1, 254:20
**finishing** [1] - 237:10
**fire** [1] - 88:25
**firm** [9] - 71:5, 105:4, 120:6, 120:8,
  120:10, 213:4, 213:8, 223:5, 233:8
**firmly** [1] - 222:18
**first** [71] - 5:3, 5:5, 15:1, 15:24, 16:1,
  26:25, 27:2, 28:1, 28:2, 29:24, 30:15,
  31:14, 32:4, 36:4, 40:2, 43:5, 45:14,
  50:7, 50:12, 61:18, 62:2, 65:15, 66:8,
  75:4, 77:13, 81:11, 86:19, 86:20, 88:3,
  96:5, 98:12, 110:19, 110:20, 124:2,
  146:7, 148:7, 150:9, 150:10, 151:6,
  155:5, 155:12, 156:13, 157:12,
  157:25, 158:6, 158:8, 159:4, 177:7,
  181:18, 182:17, 185:3, 202:16,
  203:25, 204:4, 211:19, 214:21, 215:7,
  215:12, 215:13, 215:19, 219:7,
  221:19, 222:5, 229:22, 232:7, 233:14,
  235:4, 236:20, 240:9, 246:24
**fishing** [8] - 182:6, 183:6, 183:16,
  183:18, 183:22, 199:8, 199:12, 205:11
**fits** [2] - 71:17, 182:14
**five** [7] - 71:18, 128:9, 212:11, 216:17,
  216:22, 221:21, 224:20
**five-year** [1] - 216:17
**flag** [1] - 130:25
**flavor** [1] - 178:3
**flaw** [1] - 17:17
**floor** [1] - 146:10
**Florbetapir** [1] - 83:21
**Florida** [1] - 98:21
**flu** [1] - 87:13
**fluctuating** [1] - 143:16
**fluid** [2] - 55:8, 142:25
**fly** [1] - 228:5
**focus** [7] - 102:13, 139:11, 147:14,
  160:16, 195:8, 196:18, 213:16

**focused** [5] - 39:24, 41:6, 102:8, 134:18, 163:6
**focusing** [3] - 41:24, 67:12, 160:14
**fold** [2] - 227:22, 233:21
**follow** [8] - 10:21, 72:7, 101:20, 116:17, 201:22, 201:24, 248:17
**follow-up** [3] - 72:7, 101:20, 116:17
**followed** [2] - 193:4, 239:18
**following** [3] - 80:8, 193:15, 193:18
**follows** [12] - 37:1, 103:2, 104:15, 106:6, 113:5, 114:7, 116:12, 118:6, 119:19, 120:4, 122:19, 211:14
**followup** [1] - 184:17
**fooled** [1] - 57:16
**FOR** [3] - 1:1, 1:17, 2:1
**foregoing** [1] - 255:9
**foremost** [1] - 246:24
**Forensic** [8] - 30:5, 34:18, 45:10, 46:23, 47:8, 48:12, 49:25, 153:8
**forensic** [6] - 47:20, 48:10, 48:15, 48:20, 153:1, 191:10
**forgetful** [1] - 68:7
**forgets** [1] - 209:3
**forgive** [1] - 15:16
**forgot** [1] - 62:3
**forks** [1] - 217:20
**form** [5] - 68:19, 74:14, 102:10, 217:24, 217:25
**formal** [3] - 100:1, 174:21, 182:17
**format** [1] - 228:4
**formed** [1] - 55:16
**former** [1] - 213:7
**forming** [2] - 68:17, 93:8
**forms** [3] - 43:17, 44:24, 89:12
**formulation** [1] - 137:13
**forth** [5] - 76:11, 115:4, 218:8, 223:2, 250:5
**forthcoming** [1] - 154:23
**fortunate** [1] - 117:8
**fortunately** [1] - 117:7
**forum** [1] - 249:2
**forward** [5] - 54:9, 163:7, 211:7, 231:7, 246:10
**foundation** [1] - 237:22
**founded** [1] - 41:22
**four** [6] - 17:13, 73:20, 195:2, 213:10, 213:13, 221:21
**fourth** [4] - 45:22, 96:15, 215:23, 221:15
**frail** [1] - 96:6
**Francisco** [3] - 120:9, 120:11, 249:20
**frank** [1] - 76:6
**Frank** [1] - 67:2
**frankly** [3] - 129:25, 230:2, 240:7
**fraud** [1] - 241:5
**frauds** [1] - 213:21
**free** [1] - 255:3
**freely** [1] - 238:13
**freeze** [1] - 213:1
**frequent** [3] - 84:4, 84:15, 87:8

**frequently** [1] - 143:25
**friend** [2] - 147:1, 175:12
**friends** [2] - 35:8, 100:3
**front** [8] - 35:8, 48:6, 50:25, 51:2, 54:12, 58:6, 197:13, 246:23
**FTC** [1] - 110:9
**full** [9] - 6:17, 6:19, 28:2, 28:24, 62:6, 116:19, 122:7, 163:2, 244:17
**fuller** [1] - 67:22
**fully** [4] - 52:17, 59:18, 71:16, 217:4
**function** [17] - 8:24, 33:2, 53:19, 76:22, 78:17, 80:9, 111:17, 125:11, 141:25, 209:13
**functional** [16] - 29:5, 32:10, 32:13, 65:23, 66:8, 66:11, 76:10, 76:17, 78:21, 78:25, 79:21, 81:1, 86:10, 94:5, 178:12, 183:1
**functioning** [1] - 91:3
**functions** [1] - 209:18
**fund** [1] - 240:22
**fundamentally** [1] - 52:12
**funny** [1] - 35:14
**future** [2] - 85:25, 130:6

# G

**game** [1] - 212:7
**games** [1] - 136:16
**ganglia** [2] - 140:14, 141:5
**gather** [2] - 99:19, 226:9
**gathered** [3] - 186:5, 227:24, 235:9
**gauge** [1] - 61:1
**gears** [1] - 24:1
**general** [15] - 11:23, 20:24, 37:25, 43:2, 56:15, 60:8, 61:2, 62:1, 93:24, 106:9, 114:8, 147:15, 147:19, 195:9, 213:5
**generality** [1] - 222:15
**generalized** [1] - 20:3
**generalizes** [1] - 20:1
**generally** [6] - 38:22, 69:13, 98:9, 127:24, 180:3, 180:17
**generous** [1] - 245:18
**gentleman** [1] - 215:15
**genuine** [2] - 133:9, 139:9
**GEORGE** [1] - 1:11
**Georgetown** [1] - 212:18
**Georgie** [2] - 229:19, 230:13
**Georgina** [1] - 228:13
**Geriatric** [1] - 41:3
**geriatric** [27] - 37:11, 37:20, 37:22, 38:5, 38:15, 39:18, 39:22, 39:24, 40:8, 40:16, 44:6, 44:9, 44:13, 45:6, 47:19, 48:1, 48:2, 48:6, 49:5, 51:9, 51:15, 53:6, 54:15, 125:1, 129:6, 186:19, 187:15
**geriatrics** [2] - 38:10, 40:3
**germane** [1] - 44:18
**get-acquainted** [1] - 222:5
**giant** [1] - 167:8
**given** [15] - 46:18, 85:8, 85:9, 93:13,

94:4, 127:2, 127:3, 131:22, 132:9, 140:18, 141:14, 158:4, 159:12, 160:9, 161:25
**glad** [2] - 115:3, 161:1
**glean** [1] - 90:17
**global** [2] - 78:2, 78:9
**goal** [3] - 101:14, 136:15, 233:19
**goals** [1] - 38:15
**goodness** [2] - 242:11, 253:17
**Google** [2] - 144:11, 144:14
**Googled** [2] - 147:2, 147:4
**goosey** [1] - 179:24
**government** [28] - 5:19, 6:17, 46:15, 46:24, 64:18, 79:10, 98:14, 102:6, 146:18, 158:15, 158:20, 158:22, 171:17, 174:8, 193:3, 193:21, 194:5, 199:25, 200:6, 200:16, 200:20, 213:1, 238:15, 238:21, 243:5, 249:22, 249:25
**GOVERNMENT** [1] - 1:17
**Government's** [9] - 105:25, 113:1, 116:7, 118:1, 119:11, 199:6, 199:24, 204:1, 204:12
**government's** [6] - 4:12, 4:24, 6:1, 163:20, 238:25, 239:21
**government-wide** [1] - 213:1
**governor** [1] - 124:13
**gracious** [1] - 215:15
**graduated** [3] - 39:9, 212:17, 212:19
**graph** [1] - 77:11
**grasp** [1] - 101:18
**grasping** [1] - 229:1
**gravest** [1] - 93:11
**great** [7] - 25:13, 65:11, 72:5, 74:10, 115:4, 172:8, 205:14
**greater** [1] - 128:2
**greatest** [1] - 236:1
**grind** [1] - 115:7
**groom** [1] - 79:2
**grooming** [1] - 79:17
**groping** [1] - 225:18
**group** [10] - 5:4, 17:10, 22:11, 22:24, 24:20, 25:22, 213:23, 214:17, 218:8, 227:4
**groups** [1] - 114:12
**grown** [2] - 100:6, 168:24
**guarantee** [1] - 246:15
**guess** [30] - 12:13, 12:14, 19:13, 26:4, 28:24, 33:14, 34:23, 80:14, 82:8, 118:25, 135:7, 135:9, 143:2, 144:19, 163:20, 164:9, 167:6, 181:15, 184:22, 200:9, 200:14, 200:15, 204:20, 208:19, 209:16, 236:12, 247:7, 247:25, 251:6, 251:11
**guide** [1] - 74:18
**guidelines** [1] - 143:10
**Guilmette** [7] - 165:5, 165:7, 166:24, 191:2, 191:3, 191:14, 192:13
**Guilmette's** [1] - 61:9
**gun** [1] - 220:13
**Gutierrez** [1] - 64:19, 65:12, 65:14,

65:21, 66:4, 66:24, 67:1, 67:4, 67:8, 67:13, 78:19
**Gutierrez's** [3] - 80:1, 80:15, 81:7
**guy** [4] - 24:13, 68:2, 124:16, 187:17
**guys** [8] - 104:8, 114:20, 115:1, 156:18, 165:10, 165:11, 207:23
**GX-4-A** [1] - 6:22
**GX-93-A** [1] - 5:24

## H

**half** [7] - 166:14, 212:25, 213:5, 213:6, 213:18, 218:19, 225:11
**Hallmark** [1] - 144:16
**hallmark** [1] - 144:18
**hallmarks** [1] - 8:10
**Halloween** [1] - 221:25
**hallucination** [3] - 146:4, 146:7, 146:11
**hallucinations** [2] - 143:20, 144:12
**hamstring** [1] - 212:8
**hand** [6] - 13:17, 30:23, 36:19, 51:17, 149:8, 211:10
**handled** [2] - 213:14, 214:13
**handwriting** [1] - 45:15
**handwritten** [1] - 30:23
**handy** [1] - 25:22
**handy-dandy** [1] - 25:22
**HANKS** [1] - 1:11
**Hanks** [3] - 37:10, 49:8, 60:9
**Hanks'** [1] - 98:2
**Hansen** [1] - 5:6
**happy** [3] - 243:12, 244:6, 247:6
**hard** [11] - 7:17, 32:6, 125:9, 139:3, 139:16, 146:10, 146:12, 159:19, 173:24, 185:10, 210:11
**harkens** [1] - 109:21
**Harvard** [3] - 39:9, 39:14, 212:16
**Harvard's** [1] - 39:17
**haystack** [1] - 227:5
**headed** [1] - 230:4
**health** [17] - 41:14, 41:18, 41:20, 41:23, 46:8, 116:23, 182:22, 201:4, 202:23, 203:4, 203:11, 204:2, 204:25, 229:9, 230:24, 234:6, 234:14
**healthy** [1] - 87:23
**hear** [10] - 87:12, 100:8, 131:8, 131:10, 171:19, 195:1, 200:8, 223:2, 230:18, 252:21
**heard** [10] - 46:23, 51:4, 66:4, 78:18, 81:16, 126:2, 152:16, 214:21, 222:8, 240:9
**HEARING** [1] - 1:9
**hearing** [13] - 4:21, 121:1, 168:11, 168:15, 181:3, 200:1, 215:10, 223:11, 244:15, 250:7, 250:13, 250:18, 251:15
**hearsay** [4] - 68:10, 68:15, 68:19, 201:23
**heart** [1] - 48:2
**heavily** [1] - 18:22
**hedge** [1] - 240:22

**held** [2] - 227:22, 227:23
**help** [47] - 11:1, 13:20, 14:18, 16:13, 55:9, 58:18, 59:8, 63:1, 106:9, 107:15, 108:9, 113:7, 114:9, 114:17, 115:14, 153:1, 155:8, 167:7, 173:23, 194:6, 201:17, 217:21, 220:19, 220:23, 222:12, 223:9, 225:6, 225:8, 225:21, 226:18, 226:23, 227:2, 229:2, 231:5, 231:6, 231:7, 231:13, 231:19, 232:8, 232:9, 232:10, 232:14, 241:20, 248:18, 251:14
**helped** [1] - 198:9
**helpful** [9] - 10:7, 57:3, 106:11, 107:25, 148:12, 225:19, 225:24, 230:9, 230:10
**helping** [3] - 106:5, 112:23, 223:16
**Helping** [1] - 113:3, 114:6, 116:11
**helpless** [1] - 236:4
**helps** [3] - 16:5, 16:9, 69:8
**hence** [1] - 53:5
**Herculean** [3] - 135:19, 135:20, 136:10
**herculean** [5] - 94:25, 95:1, 95:4, 95:10, 95:21
**Hercules** [2] - 95:5, 135:24
**heterogenous** [1] - 52:25
**hi** [1] - 211:6
**hide** [1] - 92:24
**high** [10] - 82:21, 85:18, 85:24, 86:4, 87:22, 89:12, 95:17, 132:1, 132:8
**higher** [2] - 91:3, 128:11
**highlighted** [10] - 7:20, 7:24, 8:16, 17:8, 25:16, 151:22, 151:23, 157:18, 158:11, 159:25
**highlights** [1] - 13:20
**highly** [3] - 29:17, 99:1, 166:3
**hijack** [2] - 227:7, 227:8
**himself** [7] - 69:1, 112:7, 116:2, 121:22, 231:13, 232:20, 236:5
**hindsight** [1] - 181:1
**hinge** [2] - 62:22, 137:9
**HIPAA** [2] - 238:12, 239:4
**hippocampus** [1] - 18:2
**hire** [1] - 212:24
**hiring** [2] - 213:1, 213:2
**historical** [1] - 205:9
**history** [15] - 54:21, 73:14, 75:17, 83:4, 85:21, 91:9, 115:18, 212:20, 222:8, 222:13, 223:6, 224:3, 240:20, 240:21
**hit** [1] - 73:25
**hold** [5] - 44:5, 130:9, 201:10, 247:15
**holding** [2] - 43:5, 43:12
**home** [7] - 32:17, 32:20, 41:17, 79:19, 218:4, 221:22, 228:5
**honest** [2] - 160:18, 169:2
**honor** [1] - 40:25
**Honor** [44] - 4:8, 4:18, 6:12, 6:15, 7:3, 13:23, 14:1, 35:22, 36:6, 36:14, 36:22, 51:17, 68:9, 68:23, 72:22, 74:9, 128:18, 131:7, 136:17, 147:21, 148:15, 148:21, 160:24, 161:15, 171:25, 172:8, 172:9, 172:16, 172:19,

173:2, 198:20, 200:11, 201:7, 209:24, 210:6, 221:17, 224:2, 226:11, 236:25, 240:5, 243:25, 254:5, 254:16, 254:22
**Honor's** [1] - 73:4
**HONORABLE** [1] - 1:11
**honors** [1] - 40:20
**hopefully** [3] - 140:12, 157:11, 210:19
**hopeless** [1] - 242:25
**hoping** [1] - 162:17
**Hospital** [1] - 39:15
**hospital** [3] - 39:16, 49:3
**hospitalization** [2] - 50:20, 84:23
**hospitalizations** [1] - 243:17
**hospitalized** [2] - 50:15, 87:5
**hour** [2] - 115:6, 225:11
**hourly** [1] - 47:7
**hours** [6] - 97:22, 107:20, 115:6, 253:15
**house** [2] - 114:24, 183:20
**HOUSTON** [1] - 1:2
**Houston** [7] - 2:4, 2:13, 46:11, 80:19, 218:5, 228:5, 249:18
**houston** [1] - 1:4
**huge** [1] - 100:16
**human** [1] - 242:3
**humanity** [1] - 13:2
**hundreds** [5] - 14:10, 15:8, 226:7, 226:8
**hundredth** [2] - 226:17, 226:21
**Hurray** [1] - 115:2
**hurt** [1] - 173:19
**hypometabolism** [2] - 33:25, 35:20
**hypothetical** [4] - 133:16, 133:22, 167:15, 245:23
**hypothetically** [1] - 207:5
**hypotheticals** [1] - 138:21

## I

**I'** [1] - 219:14
**IADLs** [1] - 78:24
**idea** [9] - 44:10, 94:14, 99:14, 166:8, 168:12, 234:5, 236:18, 237:3, 254:11
**identification** [1] - 205:10
**identified** [2] - 5:22, 241:2
**identify** [2] - 43:16, 66:19
**illness** [4] - 63:9, 69:2, 195:11, 234:13
**illnesses** [1] - 67:18
**illustrate** [1] - 217:10
**illustrative** [1] - 55:21
**image** [1] - 37:8
**imagine** [2] - 59:10, 72:2
**imaging** [25] - 8:7, 8:21, 9:21, 10:16, 11:13, 11:24, 28:5, 28:6, 28:12, 29:3, 29:12, 29:16, 31:23, 34:22, 34:24, 35:5, 35:11, 35:12, 35:17, 55:13, 128:6, 128:7, 134:19, 135:4
**immediately** [5] - 174:7, 174:10, 174:14, 199:25, 221:11
**impact** [13] - 13:6, 81:4, 89:16, 129:5, 137:20, 138:13, 153:23, 206:7, 206:8,

206:11, 207:10, 207:11, 208:21
**impacts** [2] - 71:3, 140:6
**impaired** [23] - 34:12, 59:7, 59:14, 59:15, 61:24, 61:25, 62:13, 62:15, 76:23, 86:8, 90:13, 94:23, 96:25, 111:7, 125:11, 178:22, 178:23, 179:5, 186:1, 189:18, 196:2, 196:4
**impairing** [1] - 78:15
**impairment** [42] - 28:19, 35:7, 53:8, 53:17, 59:13, 59:19, 61:2, 75:13, 75:16, 75:20, 76:5, 76:9, 76:10, 76:16, 76:18, 76:20, 78:13, 78:21, 80:7, 80:12, 82:2, 83:5, 92:7, 92:12, 95:14, 95:18, 95:19, 95:23, 96:8, 97:6, 112:4, 117:21, 125:7, 127:3, 139:21, 139:23, 178:11, 181:21, 181:24, 182:16, 189:15, 196:22
**impairments** [2] - 139:20, 141:8
**impeached** [1] - 201:13
**impeaching** [3] - 148:19, 161:20, 202:13
**impeachment** [1] - 201:25
**impediment** [1] - 218:21
**implausible** [4] - 94:16, 95:10, 95:21, 95:24
**implicate** [2] - 154:2, 170:15
**implicated** [1] - 170:19
**implications** [3] - 232:12, 233:3, 234:22
**implied** [1] - 161:24
**importance** [2] - 151:21, 157:18
**important** [37] - 10:13, 10:21, 38:9, 38:13, 52:2, 52:9, 52:18, 52:24, 53:3, 56:9, 58:21, 65:2, 65:22, 66:3, 66:6, 66:9, 66:12, 67:14, 67:21, 69:6, 90:12, 90:23, 90:24, 141:15, 141:16, 157:20, 157:23, 158:10, 158:12, 160:1, 169:5, 176:22, 177:8, 224:13, 224:14, 244:15
**importantly** [1] - 96:7
**impossible** [1] - 97:7
**impress** [1] - 220:24
**impressed** [1] - 87:5
**impression** [2] - 215:7, 215:12
**impressions** [1] - 121:14
**improper** [1] - 202:3
**improve** [4] - 127:23, 140:6, 231:7, 234:14
**IN** [1] - 1:1
**in-house** [1] - 114:24
**inability** [2] - 220:18, 220:19
**inadvertently** [2] - 62:3, 67:3
**inappropriate** [2] - 129:15, 201:23
**incarcerated** [1] - 129:2
**incarcerating** [1] - 128:13
**incarceration** [1] - 128:19
**incentivized** [1] - 167:7
**include** [6] - 19:1, 90:25, 233:17, 239:6, 240:21, 240:24
**included** [3] - 14:16, 30:13, 241:9
**includes** [2] - 6:21, 21:10
**including** [4] - 202:24, 203:15, 213:19,

218:9
**incompetent** [2] - 129:11, 130:15
**inconsequential** [1] - 67:11
**inconsistency** [2] - 72:9, 125:13, 160:15
**inconsistent** [3] - 110:14, 161:17, 163:5
**increased** [1] - 131:19
**increasingly** [1] - 221:5
**incredibly** [4] - 90:12, 93:23, 94:11, 136:9
**incur** [1] - 128:11
**incurred** [1] - 47:11
**indebted** [2] - 175:16, 177:2
**indeed** [1] - 67:21
**independence** [1] - 178:12
**independent** [2] - 29:15, 41:17
**independently** [1] - 31:17
**INDEX** [1] - 3:1
**indicate** [1] - 52:24
**indicated** [1] - 207:6
**indicates** [2] - 84:3, 132:1
**indicative** [3] - 81:20, 82:15, 177:19
**indicator** [1] - 245:10
**indicia** [2] - 121:18, 124:24
**indict** [2] - 146:19, 247:4
**indicted** [6] - 191:23, 239:24, 240:11, 242:16, 247:17, 249:8
**indictment** [11] - 63:2, 192:19, 194:16, 194:20, 224:2, 240:14, 240:15, 240:19, 241:2, 241:17, 245:7
**indictments** [2] - 214:1, 214:2
**indispensable** [2] - 217:9, 217:22
**individual** [6] - 48:5, 49:18, 87:24, 88:19, 88:23, 240:18
**individualized** [1] - 53:23
**individually** [1] - 194:13
**individuals** [34] - 38:2, 38:5, 38:12, 38:20, 40:1, 40:4, 41:15, 49:1, 49:20, 53:1, 56:5, 56:10, 56:18, 56:19, 57:13, 58:10, 59:5, 59:12, 59:14, 61:21, 71:22, 72:13, 76:1, 76:4, 83:19, 86:11, 88:3, 92:23, 92:25, 125:6, 143:23, 157:22
**inevitably** [3] - 76:2, 87:18, 139:15
**infection** [1] - 199:11
**infections** [4] - 85:22, 131:25, 132:1, 184:18
**inference** [1] - 219:7
**inferences** [4] - 219:19, 219:25, 220:19, 241:23
**inflicted** [1] - 85:17
**influence** [4] - 82:24, 162:13, 162:15, 238:22
**inform** [1] - 14:18
**informant** [2] - 65:2, 65:5
**information** [36] - 32:14, 32:17, 32:21, 45:23, 46:1, 52:18, 66:21, 67:21, 72:12, 97:4, 111:21, 111:22, 116:17, 147:20, 164:5, 164:24, 180:23, 181:2, 186:13, 186:18, 186:19, 187:3,

208:24, 217:24, 218:2, 223:14, 225:22, 225:25, 235:6, 236:6, 241:24, 243:15, 252:6, 252:18, 253:7, 253:11
**informed** [1] - 33:8
**informing** [2] - 65:6, 136:1
**informs** [1] - 14:22
**ingrained** [1] - 109:24
**initial** [2] - 87:4, 251:17
**initiating** [3] - 88:20, 90:1, 215:2
**initiation** [1] - 89:22
**initiative** [1] - 12:25
**injected** [1] - 201:24
**Inouye** [1] - 86:21
**inpatient** [1] - 130:17
**input** [1] - 48:1
**inside** [3] - 59:12, 88:25, 114:20
**insist** [3] - 114:21, 238:17, 242:18
**insomnia** [2] - 90:16, 90:22
**instance** [1] - 235:4
**instantly** [1] - 100:12
**instead** [4] - 18:2, 201:21, 219:1, 245:11
**Institute** [3] - 41:22, 42:5, 42:6
**institutions** [1] - 46:11
**instruction** [2] - 193:5, 193:8
**instrumental** [1] - 79:5
**instruments** [2] - 61:6, 192:5
**intact** [2] - 102:9, 111:3
**integrate** [1] - 106:20
**integration** [1] - 106:25
**intellectual** [2] - 53:9, 54:9
**intelligent** [1] - 94:21
**intentionally** [1] - 94:22
**interact** [3] - 29:5, 32:11, 32:15
**interaction** [1] - 153:3
**interactions** [4] - 32:17, 55:2, 70:8, 110:16
**interchangeably** [1] - 179:6
**interest** [6] - 40:1, 89:19, 177:22, 233:6, 233:10, 246:7
**interested** [1] - 113:15
**interesting** [1] - 114:11
**interests** [1] - 233:6
**interim** [1] - 234:23
**intern** [1] - 212:21
**internist** [4] - 183:3, 183:5, 184:19, 186:5
**internship** [2] - 39:13, 39:14
**interpretation** [1] - 34:22
**interrupt** [1] - 77:2
**interrupted** [1] - 212:9
**interruptions** [1] - 159:20
**interview** [54] - 50:14, 50:20, 55:3, 57:25, 60:4, 60:10, 62:2, 65:16, 65:18, 65:19, 85:5, 85:12, 86:15, 98:22, 99:15, 100:25, 101:8, 101:19, 101:20, 102:22, 103:9, 104:5, 104:11, 105:8, 105:24, 108:18, 116:6, 117:23, 119:7, 119:9, 122:14, 134:24, 147:24, 152:21, 155:14, 156:2, 156:13,

156:23, 156:25, 157:2, 157:6, 158:5, 158:9, 159:13, 159:16, 161:3, 163:25, 165:12, 166:7, 167:10, 173:10, 191:21, 239:4, 239:16

**interviewed** [26] - 34:19, 50:12, 63:4, 70:24, 71:12, 85:2, 94:4, 97:23, 148:1, 155:1, 155:5, 155:10, 155:12, 155:16, 155:17, 155:24, 156:8, 156:21, 157:12, 157:25, 158:8, 158:14, 158:17, 159:4, 195:18, 195:21

**interviewees** [1] - 134:24

**interviewers** [2] - 35:9, 94:12

**interviewing** [3] - 49:17, 62:21, 67:1

**interviews** [23] - 51:12, 59:22, 63:18, 64:4, 64:12, 70:8, 71:21, 94:3, 97:15, 102:15, 105:19, 108:20, 109:13, 110:9, 134:4, 153:2, 157:7, 165:7, 238:14, 238:17, 238:20, 238:21

**intimately** [1] - 140:3

**introduce** [2] - 37:14, 233:13

**introduced** [2] - 73:4, 233:12

**investigate** [2] - 226:24, 236:6

**investigated** [1] - 196:24

**investigating** [1] - 217:6

**investigation** [16] - 149:2, 150:12, 150:20, 151:4, 151:13, 151:25, 214:13, 214:14, 216:17, 224:13, 228:2, 230:25, 232:11, 233:7, 234:3, 235:7

**investigation-related** [1] - 228:2

**investigational** [1] - 44:23

**investigations** [3] - 213:25, 214:1, 214:7

**investigator** [1] - 44:21

**investments** [1] - 245:13

**invitation** [1] - 239:16

**invited** [1] - 239:4

**involved** [12] - 48:12, 49:17, 58:19, 58:22, 87:3, 89:22, 114:19, 119:1, 140:3, 163:16, 240:4, 245:7

**involvement** [2] - 165:19, 168:14

**involves** [1] - 49:9

**involving** [3] - 114:11, 233:19, 240:25

**iPods** [1] - 59:12

**IRS** [1] - 206:6

**issue** [13] - 17:21, 48:23, 49:8, 73:6, 122:9, 129:21, 131:14, 136:7, 232:21, 234:24, 235:5, 235:22

**issues** [28] - 24:21, 38:13, 38:19, 40:11, 43:1, 48:21, 60:19, 89:21, 90:20, 115:10, 154:22, 160:12, 194:24, 195:10, 205:10, 215:20, 216:24, 220:18, 223:23, 224:10, 229:8, 229:18, 233:4, 234:6, 241:22, 250:12

**Item** [1] - 30:15

**items** [2] - 45:25, 90:1

**itself** [9] - 34:25, 35:17, 60:10, 85:24, 86:5, 88:17, 117:17, 239:15, 239:21

## J

**Jack** [1] - 206:5

**Jackson** [14] - 72:24, 165:14, 165:16, 166:23, 168:14, 168:17, 168:21, 168:24, 173:10, 173:17, 174:9, 205:23, 206:6, 206:8

**James** [2] - 2:6, 145:25

**Jankovek** [1] - 239:9

**January** [2] - 186:17, 252:10, 252:13

**Jason** [1] - 2:2

**Jeff** [1] - 124:15

**Jewish** [2] - 41:13, 41:23

**Jim** [1] - 168:14

**jloonam@jonesday.com** [1] - 2:9

**job** [6] - 15:14, 134:8, 167:22, 203:19, 213:3, 226:14

**jobs** [1] - 41:12

**Joe** [1] - 123:13

**John** [2] - 211:19, 211:20

**JOHN** [3] - 3:7, 211:13, 211:20

**joint** [2] - 233:14, 235:21

**Jones** [13] - 2:2, 2:7, 101:3, 114:1, 153:3, 211:23, 212:12, 236:17, 236:18, 237:1, 237:5, 237:9, 239:5

**JR** [1] - 1:11

**Judge** [20] - 37:10, 49:8, 60:9, 73:7, 74:4, 98:2, 110:18, 112:21, 119:13, 128:22, 130:10, 131:16, 205:15, 205:18, 208:2, 209:25, 212:5, 244:6, 244:20, 255:5

**judge** [1] - 249:11

**JUDGE** [1] - 1:12

**judgment** [2] - 33:22, 242:10

**July** [35] - 5:11, 50:13, 85:2, 98:8, 98:13, 100:23, 104:11, 108:24, 112:25, 113:3, 148:4, 155:4, 155:10, 155:18, 156:4, 156:8, 156:21, 158:18, 163:19, 163:24, 164:2, 188:25, 189:2, 189:9, 221:21, 225:7, 227:11, 227:13, 227:15, 227:17, 227:18, 229:3, 229:4, 231:23

**jumps** [1] - 121:17

**June** [3] - 158:20, 202:20, 207:6

**jury** [3] - 216:17, 241:16, 242:19

**Justice** [10] - 1:20, 105:1, 234:7, 235:11, 235:15, 238:1, 238:2, 238:7, 240:5, 247:19

**justice** [1] - 213:9

**jvarnado@jonesday.com** [1] - 2:5

## K

**Kathleen** [4] - 2:12, 255:9, 255:13, 255:14

**Kathryn** [1] - 2:6

**Kathy** [10] - 106:13, 147:24, 228:12, 229:19, 230:13, 232:4, 232:15, 234:10, 235:12, 238:9

**keep** [8] - 9:2, 15:11, 58:16, 58:17,

82:21, 160:18, 211:3, 232:6

**Kellogg** [1] - 5:6

**Keneally** [14] - 2:6, 69:21, 70:17, 147:24, 150:1, 228:12, 232:4, 235:12, 251:7, 252:3, 252:17, 252:22, 253:4, 254:7

**Kepke** [2] - 150:23, 245:4

**kept** [2] - 116:3, 234:1

**key** [4] - 51:25, 53:7, 53:18, 73:10

**kicking** [1] - 145:11

**kids** [2] - 87:21, 100:3

**kind** [19] - 19:23, 25:20, 30:23, 32:7, 50:19, 51:13, 51:19, 52:1, 58:24, 63:24, 77:10, 86:7, 113:11, 115:7, 120:3, 121:23, 178:19, 210:24, 225:2

**kinds** [2] - 19:13, 222:4

**kkeneally@jonesday.com** [1] - 2:10

**Klonopin** [1] - 91:17

**knowing** [2] - 34:2, 246:10

**knowingly** [1] - 94:22

**knowledge** [5] - 107:9, 107:19, 109:25, 121:13, 239:15

**known** [2] - 67:19, 115:2, 144:5

**knows** [7] - 58:6, 64:23, 64:25, 110:25, 112:19, 158:3, 202:10

## L

**label** [1] - 62:16

**labeled** [1] - 5:24

**lack** [8] - 19:18, 88:11, 89:19, 89:20, 89:21, 103:23, 104:3, 122:7

**lacking** [3] - 234:20, 242:6, 242:8

**Lai** [2] - 80:17, 180:13

**laid** [1] - 77:5

**Lancet** [1] - 13:12

**LANGSTON** [15] - 236:25, 237:5, 237:14, 243:6, 243:10, 244:6, 244:12, 244:20, 244:23, 245:2, 250:16, 251:5, 251:13, 254:6, 254:15

**Langston** [2] - 1:18, 66:23

**language** [4] - 53:18, 109:23, 111:6, 125:11

**lapse** [3] - 222:12, 223:3, 225:2

**lapses** [2] - 195:13, 242:3

**laptop** [1] - 171:2

**large** [5] - 12:24, 39:16, 41:19, 94:11, 115:12

**larger** [1] - 174:1

**largest** [2] - 240:17, 241:11

**last** [30] - 25:20, 37:14, 39:18, 52:22, 67:6, 67:14, 70:19, 80:4, 80:5, 80:6, 83:13, 85:6, 86:16, 86:25, 88:6, 96:19, 102:10, 126:5, 183:25, 196:20, 197:4, 210:15, 211:20, 213:19, 220:11, 229:22, 236:2, 251:21, 252:9, 254:8

**late** [16] - 105:7, 124:6, 124:8, 124:11, 125:19, 126:13, 172:13, 172:14, 185:4, 196:16, 211:7, 214:21, 214:23, 218:18, 221:19, 238:5

**lately** [1] - 116:14
**law** [11] - 105:4, 107:9, 129:19, 212:18, 212:21, 212:25, 213:4, 213:5, 213:8, 213:17, 241:5
**lawsuits** [1] - 114:11
**lawyer** [6] - 195:3, 211:23, 214:14, 241:4, 241:5, 241:6
**lawyer's** [2] - 150:17, 193:17
**lawyers** [9] - 193:12, 194:20, 214:18, 217:13, 219:13, 226:7, 227:4, 233:9, 238:1
**lawyers'** [1] - 226:14
**lay** [1] - 43:25
**layman's** [1] - 87:13
**lead** [4] - 232:24, 232:25, 235:12, 238:9
**leader** [1] - 68:4
**leading** [3] - 71:19, 86:22, 221:2
**LeadingAge** [1] - 41:5
**leaf** [1] - 229:6
**learn** [4] - 151:13, 151:24, 162:23, 219:23
**learned** [10] - 33:15, 34:6, 34:11, 34:17, 69:10, 151:4, 152:6, 218:17, 220:18, 225:6
**learning** [2] - 53:18, 232:2
**least** [14] - 49:14, 51:23, 66:21, 77:6, 84:21, 85:1, 85:11, 89:8, 102:6, 105:21, 108:25, 112:19, 125:7, 223:20
**leave** [3] - 210:24, 238:20, 255:4
**leaves** [1] - 210:12
**lecturing** [1] - 42:20
**led** [1] - 75:11
**Lee** [1] - 1:18
**lee.f.langston@usdoj.gov** [1] - 1:23
**left** [7] - 7:9, 173:14, 173:16, 214:3, 218:25, 219:10, 219:20
**legal** [16] - 49:1, 49:8, 92:22, 171:21, 194:24, 232:12, 233:4, 233:6, 233:8, 234:3, 234:22, 235:22, 236:20, 237:5
**leisure** [1] - 98:3
**lended** [1] - 69:14
**length** [3] - 66:4, 203:8, 241:8
**Lerner** [3] - 184:15, 199:19, 199:21
**less** [14] - 19:12, 31:24, 72:22, 78:8, 86:10, 111:6, 118:24, 125:11, 157:23, 163:7, 163:15, 218:19, 227:2, 245:14
**letter** [5] - 237:12, 237:23, 238:1, 238:8, 240:10
**letters** [1] - 235:9
**leukemia** [1] - 176:6
**level** [13] - 41:16, 52:11, 56:22, 75:16, 75:21, 76:17, 78:7, 78:8, 82:21, 165:23, 165:24, 166:7, 222:15
**Lewy** [11] - 44:24, 91:12, 141:12, 142:12, 143:9, 143:11, 144:5, 144:12, 144:17, 146:20, 146:23
**lied** [1] - 194:5
**life** [12] - 38:12, 52:23, 65:20, 66:16, 68:13, 78:15, 78:22, 88:1, 88:19, 176:24, 222:8, 245:24

**life-threatening** [1] - 88:1
**lifespan** [1] - 38:7
**light** [4] - 31:20, 104:7, 230:10, 240:2
**likely** [5] - 9:15, 28:12, 140:17, 215:23, 250:4
**limitations** [6] - 18:8, 70:6, 216:5, 234:16, 235:5, 239:1
**limited** [3] - 21:7, 68:17, 93:1
**limiting** [1] - 96:6
**line** [26] - 6:6, 6:7, 6:16, 28:1, 94:18, 98:18, 102:23, 102:24, 104:12, 106:2, 106:3, 113:2, 113:3, 114:5, 116:10, 118:2, 118:3, 119:16, 119:17, 131:12, 231:14
**lines** [2] - 105:16, 176:7
**lineup** [1] - 212:6
**Lisse** [11] - 183:2, 183:11, 183:24, 198:24, 199:7, 199:11, 199:16, 199:23, 199:25, 200:21, 204:1
**Lisse's** [5] - 199:15, 203:13, 208:12, 208:14, 208:15
**list** [17] - 6:1, 6:3, 45:23, 45:25, 63:24, 68:11, 72:24, 73:2, 79:25, 82:10, 97:10, 158:4, 168:18, 250:19, 250:21, 250:24, 254:3
**listed** [5] - 16:8, 27:17, 46:6, 80:2, 254:3
**listening** [2] - 125:22, 229:19
**litany** [1] - 195:7
**literally** [2] - 40:2, 88:16
**literature** [3] - 19:25, 21:8, 76:4
**litigation** [1] - 213:6
**live** [2] - 72:19, 106:20
**lived** [1] - 187:12
**lives** [1] - 65:1
**living** [6] - 38:6, 41:17, 79:1, 79:5, 211:22
**loaded** [1] - 248:2
**locked** [1] - 215:5
**long-term** [2] - 41:7, 41:14
**longitudinal** [1] - 21:16
**longstanding** [1] - 40:15
**look** [49] - 7:17, 8:9, 14:19, 19:21, 22:8, 31:23, 33:23, 33:25, 34:1, 54:19, 54:21, 54:22, 55:8, 59:14, 59:25, 76:10, 78:16, 80:16, 82:1, 90:20, 91:8, 96:9, 100:22, 106:24, 109:19, 110:10, 110:22, 111:22, 138:4, 149:14, 150:15, 152:13, 155:2, 161:20, 162:7, 162:10, 163:13, 164:15, 175:25, 188:2, 196:10, 202:4, 204:2, 218:23, 238:10, 246:24, 247:22, 251:5, 251:11
**looked** [12] - 12:22, 25:3, 25:4, 25:5, 28:11, 28:14, 28:15, 71:11, 75:24, 138:1, 209:1, 215:2
**looking** [25] - 17:2, 17:9, 24:19, 25:24, 28:2, 28:24, 29:12, 29:18, 33:20, 33:21, 42:2, 44:22, 44:25, 48:21, 53:7, 54:4, 54:17, 55:3, 56:6, 75:17, 83:2, 111:7, 115:3, 181:20, 183:14
**looks** [10] - 28:20, 31:17, 31:23, 32:1,

32:5, 60:13, 65:20, 104:19, 204:4
**LOONAM** [25] - 4:18, 35:24, 172:9, 172:18, 210:6, 210:13, 210:17, 210:22, 211:1, 211:5, 211:16, 227:8, 227:10, 227:14, 237:11, 237:15, 237:16, 237:21, 243:12, 243:13, 243:25, 254:5, 254:22, 254:24, 255:5
**Loonam** [2] - 2:6, 3:8
**loose** [1] - 229:6
**loose-leaf** [1] - 229:6
**loosey** [1] - 179:24
**loosey-goosey** [1] - 179:24
**lose** [1] - 197:3
**loss** [3] - 33:24, 182:22
**loud** [1] - 123:20
**love** [2] - 40:3, 54:15
**loved** [1] - 43:9
**loyal** [3] - 167:21, 168:1, 169:10
**loyalty** [3] - 166:19, 167:14, 167:19
**luck** [1] - 147:13
**lucky** [3] - 213:3, 226:16, 226:21
**lymphoma** [1] - 176:7

**M**

**M-I-N-D** [1] - 42:6
**M.D** [5] - 3:2, 3:4, 36:25, 99:20, 206:21
**M.D.-like** [1] - 199:23
**machine** [1] - 91:1
**Magnani** [7] - 1:19, 3:3, 3:5, 3:6, 3:9, 82:20, 172:25
**MAGNANI** [57] - 7:6, 13:22, 14:1, 14:3, 25:16, 25:19, 26:22, 27:3, 35:22, 35:25, 36:2, 68:9, 68:16, 68:23, 72:22, 128:15, 128:18, 129:8, 129:18, 129:24, 130:2, 130:6, 132:17, 136:20, 147:21, 147:23, 148:20, 148:23, 148:25, 149:7, 149:12, 156:18, 156:20, 159:18, 160:24, 160:25, 162:3, 170:4, 170:21, 171:24, 172:7, 173:2, 173:3, 197:7, 197:10, 198:15, 198:17, 200:2, 200:5, 201:6, 201:9, 202:2, 204:6, 205:17, 208:1, 208:5, 209:24
**mail** [26] - 147:4, 147:6, 147:7, 147:9, 147:11, 151:19, 157:17, 174:13, 197:20, 198:1, 198:6, 198:8, 198:10, 206:4, 207:6, 218:7, 218:14, 218:23, 219:13, 219:15, 220:24, 223:9, 224:5, 225:15, 249:22, 252:12
**mailed** [7] - 146:25, 151:9, 151:16, 173:17, 174:10, 249:24, 252:9
**mails** [6] - 194:9, 198:12, 223:16, 226:4, 250:2
**main** [9] - 44:10, 65:14, 76:11, 77:22, 90:20, 252:3, 252:22, 253:4, 253:10
**major** [3] - 41:6, 42:2, 52:6
**majority** [1] - 76:4
**maladies** [1] - 93:6
**male** [1] - 20:16

**males** [2] - 13:1, 13:6
**malinger** [2] - 136:8, 169:10
**malingered** [2] - 133:12, 137:19
**malingerer** [1] - 135:1
**malingering** [12] - 33:20, 34:16, 73:16, 92:2, 92:6, 92:9, 92:10, 92:21, 93:15, 93:18, 121:18, 135:18
**MALONEY** [2] - 36:1, 36:6
**malpractice** [1] - 187:11
**man** [7] - 129:16, 148:23, 164:19, 164:20, 166:3, 167:7, 188:6
**manage** [2] - 79:7, 241:15
**MANAGER** [4] - 4:5, 74:6, 172:21, 172:23
**manager** [1] - 153:1
**mandatory** [1] - 212:12
**manifest** [2] - 53:10, 54:6
**manifested** [2] - 70:8, 117:17
**manner** [3] - 48:14, 231:3, 242:5
**manual** [1] - 53:14
**MARC** [3] - 3:4, 36:25, 37:16
**Marc** [2] - 36:17, 37:16
**March** [20] - 31:5, 31:11, 33:17, 40:17, 146:8, 163:21, 164:12, 179:14, 180:9, 180:23, 181:13, 185:14, 186:1, 186:21, 187:19, 190:4, 215:5, 251:22, 251:23, 253:16
**mark** [9] - 26:23, 98:16, 102:22, 104:11, 105:25, 113:1, 114:4, 116:9, 118:1
**marked** [3] - 4:13, 4:25, 237:17
**markers** [1] - 25:3
**market** [2] - 83:22, 142:19
**married** [1] - 64:24
**mass** [1] - 218:1
**Massachusetts** [1] - 212:17
**master** [2] - 226:18, 226:22
**material** [10] - 30:13, 111:5, 169:7, 217:23, 222:6, 223:9, 224:9, 224:17, 224:18, 227:25
**materials** [10] - 31:4, 32:19, 46:6, 46:15, 74:12, 110:4, 146:17, 200:25, 224:11, 224:25
**Matt** [2] - 106:4, 118:4
**matt** [4] - 98:13, 100:18, 103:1, 119:17
**matter** [20] - 40:12, 45:19, 46:2, 47:1, 47:24, 63:21, 68:21, 72:18, 73:4, 74:13, 110:5, 129:19, 153:22, 201:5, 214:16, 225:1, 235:15, 241:9, 247:2, 255:11
**matters** [10] - 18:17, 49:21, 99:3, 214:13, 215:24, 217:15, 228:2, 232:11, 233:3, 233:10
**MCI** [1] - 26:15
**McLean** [1] - 39:16
**MCSA** [1] - 17:18
**me'** [1] - 229:1
**meal** [1] - 79:7
**mean** [94] - 9:3, 9:8, 12:15, 14:17, 15:16, 24:12, 24:21, 25:10, 27:20, 28:11, 28:22, 30:25, 33:10, 33:18,

62:14, 66:1, 66:3, 66:16, 68:18, 69:10, 77:2, 81:15, 82:22, 87:18, 93:9, 99:24, 102:18, 106:14, 108:7, 113:6, 119:14, 129:18, 130:3, 133:7, 133:24, 134:6, 134:19, 136:3, 136:15, 137:24, 138:15, 141:14, 144:15, 150:9, 151:6, 152:14, 152:15, 155:3, 155:4, 156:14, 158:3, 158:4, 159:3, 160:21, 163:11, 165:10, 172:13, 173:24, 177:3, 179:1, 181:22, 182:11, 185:13, 186:16, 187:10, 187:13, 188:2, 188:3, 190:10, 191:8, 194:10, 196:3, 196:8, 200:4, 200:8, 201:21, 208:10, 208:25, 209:1, 209:11, 209:15, 210:20, 216:4, 221:12, 223:19, 224:1, 227:7, 230:10, 232:6, 233:5, 236:1, 241:11, 244:2
**meaning** [4] - 55:2, 57:10, 67:7, 121:4
**meaningful** [1] - 58:22
**means** [3] - 23:17, 84:4, 99:25
**meant** [6] - 11:22, 19:6, 63:10, 185:9, 207:13, 213:22
**measure** [1] - 142:16
**measured** [2] - 142:21, 215:15
**measurements** [1] - 66:14
**measures** [1] - 192:6
**measuring** [2] - 21:18, 183:15
**mechanical** [1] - 2:15
**med** [1] - 86:20
**media** [1] - 57:24
**Medical** [1] - 39:20
**medical** [48] - 23:23, 38:1, 39:7, 39:10, 39:15, 39:25, 40:2, 40:10, 46:10, 46:13, 50:19, 54:22, 56:3, 67:18, 69:2, 78:20, 80:12, 80:16, 83:6, 84:20, 86:1, 87:3, 87:11, 87:20, 100:1, 116:17, 131:24, 140:9, 145:4, 145:10, 147:15, 147:20, 170:13, 174:25, 175:4, 176:5, 178:2, 183:8, 183:10, 184:25, 186:25, 196:10, 199:6, 206:21, 232:23, 234:18, 234:25, 243:7
**medically** [1] - 169:14
**medication** [4] - 44:22, 140:5, 140:10, 144:23
**medication-related** [1] - 44:22
**medications** [4] - 144:1, 231:16, 231:17, 231:19
**Medicine** [1] - 42:19
**medicine** [2] - 19:24, 23:17
**meet** [8] - 75:20, 77:23, 93:10, 152:23, 171:17, 227:18, 231:22, 233:9
**meeting** [17] - 60:5, 181:18, 215:23, 215:24, 218:2, 221:21, 221:24, 222:5, 227:21, 228:5, 228:8, 228:14, 230:21, 230:23, 232:19, 233:14
**meetings** [8] - 218:15, 221:15, 221:20, 227:22, 228:4, 233:16, 235:20, 235:21
**meets** [2] - 66:17, 236:22
**member** [2] - 40:13, 40:15
**members** [5] - 34:18, 162:4, 232:15, 233:17, 233:20

**memo** [1] - 157:13
**memorialized** [1] - 64:8
**memories** [5] - 102:9, 102:10, 102:11, 102:13, 121:24
**memorized** [1] - 100:12
**memory** [36] - 15:9, 31:8, 31:10, 41:22, 53:12, 53:18, 56:21, 80:10, 103:24, 148:10, 182:12, 182:22, 183:11, 184:25, 185:4, 185:8, 195:13, 201:3, 201:18, 204:14, 204:21, 205:3, 205:10, 209:13, 209:17, 215:25, 216:24, 220:18, 223:21, 229:8, 231:20, 241:23, 242:1, 242:3, 242:4
**men** [3] - 18:23, 18:25, 166:18
**Mental** [3] - 78:4, 78:6, 78:8
**mental** [22] - 41:20, 53:15, 54:23, 60:5, 60:6, 60:10, 60:17, 61:3, 73:18, 96:1, 96:7, 121:20, 125:5, 128:14, 195:9, 196:18, 203:8, 203:22, 203:24, 204:14, 206:9, 209:2
**mentally** [2] - 125:25, 127:2
**mention** [1] - 227:3
**mentioned** [17] - 5:13, 18:19, 35:15, 43:3, 44:14, 54:13, 58:23, 62:19, 63:18, 77:4, 80:14, 85:15, 109:22, 152:9, 176:17, 176:19, 196:3
**merit** [1] - 166:20
**messages** [1] - 218:8
**met** [14] - 70:12, 108:24, 146:7, 148:23, 188:22, 188:25, 214:25, 215:4, 215:13, 215:19, 218:4, 221:19, 221:25, 245:3
**meta** [2] - 17:23, 18:1
**meta-ROI** [2] - 17:23, 18:1
**metabolic** [1] - 33:25
**metabolism** [1] - 8:23
**metaphor** [1] - 210:14
**Methodist** [1] - 46:11
**methods** [1] - 14:20
**Miami** [5] - 41:13, 41:23, 42:19, 89:5
**mid-2000s** [1] - 224:16
**mid-90s** [1] - 224:6
**middle** [2] - 119:13, 211:20
**might** [33] - 10:6, 10:7, 10:13, 16:13, 56:7, 57:19, 58:8, 74:25, 76:20, 82:20, 87:21, 93:5, 113:10, 149:1, 150:11, 160:9, 167:7, 167:15, 169:10, 170:15, 173:7, 174:19, 176:18, 177:9, 189:14, 193:20, 207:13, 228:20, 231:10, 231:19, 234:3, 236:7, 254:16
**mild** [27] - 28:18, 34:4, 35:2, 75:10, 75:12, 76:20, 78:13, 178:5, 178:13, 179:9, 179:16, 179:17, 180:9, 180:12, 180:13, 181:12, 181:18, 181:21, 181:22, 181:24, 181:25, 185:14, 186:21, 187:19, 187:24, 196:6, 198:5
**milder** [1] - 112:4
**mildly** [1] - 61:23
**milestones** [1] - 221:18
**Miller** [5] - 2:12, 42:19, 255:9, 255:13,

255:14
**million** [7] - 175:22, 176:2, 217:13, 226:13, 226:19, 240:24, 245:13
**millions** [1] - 176:15
**mind** [17] - 15:11, 35:21, 69:8, 95:2, 139:12, 175:5, 191:20, 191:24, 212:5, 220:15, 222:16, 222:18, 224:20, 224:22, 225:20, 228:7, 253:19
**MIND** [4] - 41:22, 42:4, 42:5, 42:6
**mine** [1] - 212:23
**mini** [1] - 61:3
**Mini** [3] - 78:4, 78:6, 78:8
**minimize** [1] - 92:24
**Minneapolis** [1] - 39:21
**Minnesota** [3] - 17:20, 19:9, 39:21
**minus** [1] - 124:4
**minute** [3] - 15:19, 80:16, 100:19
**minutes** [7] - 54:13, 74:3, 119:14, 172:5, 225:15, 244:8, 244:21
**misdiagnosed** [1] - 56:20
**mislead** [3] - 35:4, 94:22, 173:23
**misleading** [3] - 34:19, 34:21, 35:9
**missed** [1] - 56:5
**missing** [3] - 10:7, 56:16, 204:20
**mission** [1] - 104:20
**misspoke** [1] - 190:5
**misstate** [1] - 180:7
**mistake** [1] - 17:12
**misunderstand** [1] - 208:22
**misunderstanding** [2] - 63:7, 193:16
**misunderstood** [1] - 193:14
**mixed** [1] - 125:8
**MoCA** [6] - 61:5, 61:16, 61:18, 61:20, 62:16, 78:6
**moderate** [40] - 78:14, 79:15, 79:25, 84:4, 84:15, 125:7, 178:24, 179:4, 179:9, 179:16, 179:18, 179:22, 180:4, 180:5, 180:9, 180:10, 180:12, 181:12, 181:18, 181:21, 181:22, 181:25, 185:14, 186:21, 187:19, 187:24, 188:20, 188:23, 190:3, 190:11, 195:16, 195:25, 196:3, 196:6, 198:5, 207:18
**moderately** [7] - 61:24, 62:13, 62:15, 178:21, 178:23, 179:5, 180:3
**modest** [1] - 215:15
**modified** [1] - 84:25
**moment** [7] - 42:13, 60:15, 85:8, 85:12, 96:16, 198:15, 231:20
**money** [1] - 245:7
**Montana** [1] - 211:25
**month** [5] - 15:8, 50:15, 117:24, 188:22, 216:17
**months** [11] - 58:20, 67:9, 67:14, 85:6, 86:16, 88:6, 164:3, 196:1, 213:13, 221:12, 226:9
**Montreal** [2] - 61:4, 61:15
**mood** [1] - 60:22
**morning** [4] - 240:13, 240:14, 253:25, 254:21

**mortality** [1] - 88:2
**mosaic** [6] - 54:17, 83:2, 134:11, 135:13, 137:25, 153:21
**most** [25] - 20:15, 28:12, 41:23, 43:23, 44:21, 48:22, 49:19, 52:23, 53:3, 64:23, 66:11, 67:14, 78:5, 79:3, 84:16, 88:13, 89:6, 119:7, 136:21, 143:19, 168:2, 180:8, 182:19, 189:25, 214:11
**mostly** [5] - 16:7, 24:21, 39:15, 44:20, 213:6
**motivate** [1] - 88:17
**motivation** [3] - 88:11, 88:25, 169:9
**motive** [1] - 93:5
**motor** [5] - 53:19, 77:21, 111:17, 141:7, 141:25
**Mount** [1] - 39:15
**move** [11] - 4:13, 4:16, 35:22, 60:14, 101:24, 102:3, 159:10, 202:7, 243:12, 248:20, 249:13
**moved** [1] - 5:22
**movement** [2] - 76:13, 140:3
**Movement** [1] - 77:4
**movements** [3] - 140:6, 143:22, 145:16
**moving** [3] - 42:7, 59:17, 205:19
**MR** [248] - 4:8, 4:12, 4:16, 4:18, 4:20, 5:3, 5:19, 6:12, 7:6, 13:22, 14:1, 14:3, 25:16, 25:19, 26:22, 27:3, 35:22, 35:24, 35:25, 36:1, 36:2, 36:6, 36:14, 36:16, 36:22, 36:24, 37:3, 45:4, 45:8, 51:16, 51:18, 68:9, 68:16, 68:23, 68:24, 72:3, 72:6, 72:22, 73:7, 73:8, 74:4, 74:9, 74:11, 98:24, 99:5, 99:9, 99:12, 99:16, 99:19, 99:22, 99:25, 100:3, 100:6, 100:11, 100:15, 100:18, 100:20, 103:1, 103:5, 103:8, 103:12, 103:17, 103:20, 103:21, 104:19, 104:25, 105:3, 105:6, 106:4, 106:12, 106:16, 107:12, 107:14, 107:16, 108:1, 108:3, 112:21, 112:22, 113:9, 113:19, 114:10, 114:18, 115:16, 115:22, 116:15, 116:21, 116:24, 117:2, 117:5, 117:7, 117:13, 118:4, 118:8, 118:10, 118:14, 118:19, 118:24, 119:3, 119:5, 119:16, 119:23, 119:25, 120:5, 120:8, 120:12, 120:16, 120:19, 120:24, 121:3, 121:6, 121:8, 122:22, 122:24, 123:1, 123:3, 123:5, 123:10, 123:13, 123:16, 123:19, 123:22, 123:24, 124:1, 124:3, 124:6, 124:11, 124:15, 124:18, 125:16, 126:3, 128:15, 128:18, 128:22, 129:4, 129:8, 129:18, 129:24, 130:2, 130:6, 130:10, 130:13, 130:25, 131:7, 131:11, 131:16, 131:17, 132:13, 132:17, 136:17, 136:20, 147:21, 147:23, 148:15, 148:20, 148:23, 148:25, 149:7, 149:12, 156:18, 156:20, 159:8, 159:18, 160:24, 160:25, 161:15, 162:3, 170:4, 170:21, 171:24, 172:7, 172:9, 172:16, 172:18,

172:19, 173:2, 173:3, 197:7, 197:10, 198:15, 198:17, 198:20, 198:22, 200:2, 200:5, 200:11, 200:13, 200:19, 200:22, 201:6, 201:9, 201:10, 201:16, 202:2, 202:8, 202:12, 202:14, 204:6, 204:11, 204:23, 204:24, 205:15, 205:17, 205:20, 205:21, 207:22, 208:1, 208:5, 209:24, 209:25, 210:2, 210:6, 210:13, 210:17, 210:22, 211:1, 211:5, 211:16, 227:8, 227:10, 227:14, 236:25, 237:5, 237:11, 237:14, 237:15, 237:16, 237:21, 243:6, 243:10, 243:12, 243:13, 243:25, 244:6, 244:12, 244:20, 244:23, 245:2, 250:16, 251:2, 251:5, 251:9, 251:13, 254:5, 254:6, 254:15, 254:22, 254:24, 255:5
**MRI** [3] - 8:22, 10:19, 11:4
**MRIs** [1] - 82:23
**MS** [8] - 5:16, 5:20, 6:5, 6:10, 6:15, 6:24, 7:3, 251:4
**multi** [3] - 20:25, 175:22, 176:2
**multi-ethnic** [1] - 20:25
**multi-million-dollar** [2] - 175:22, 176:2
**multiple** [6] - 28:5, 94:4, 96:25, 186:3, 243:16
**multitasking** [1] - 53:21
**muscle** [1] - 143:22
**music** [4] - 58:6, 58:14, 59:15, 59:17
**musicians** [1] - 58:6
**must** [4] - 158:10, 221:3, 226:6, 230:20
**mythic** [4] - 95:4, 95:11, 135:22, 135:23
**mythologized** [1] - 95:6

# N

**name** [17] - 37:14, 37:16, 86:21, 99:6, 118:7, 120:6, 120:20, 120:21, 123:13, 124:15, 211:17, 211:19, 211:20, 220:25, 225:17, 238:5
**named** [1] - 241:2
**names** [2] - 209:3, 209:21
**national** [1] - 216:16
**nature** [6] - 63:3, 69:15, 85:9, 85:15, 139:23, 192:18
**NE** [1] - 1:21
**nearly** [3] - 48:20, 95:9, 102:9
**necessarily** [18] - 11:15, 14:22, 20:17, 35:5, 49:1, 61:5, 107:8, 107:11, 138:14, 153:19, 153:25, 166:16, 174:12, 174:15, 177:3, 177:24, 218:21, 245:8
**necessary** [5] - 90:21, 106:18, 127:5, 244:18, 246:7
**need** [32] - 15:19, 25:12, 37:23, 38:13, 40:21, 52:18, 74:2, 79:24, 89:21, 119:2, 131:8, 135:7, 141:19, 149:18, 172:2, 172:3, 200:15, 201:24, 217:3, 217:18, 229:17, 229:23, 230:8, 232:8, 237:22, 243:7, 244:17, 247:20, 255:2

**needed** [9] - 73:18, 96:1, 150:24, 227:23, 232:14, 236:19, 236:20, 236:22, 237:2
**needing** [2] - 48:5, 79:17
**needles** [1] - 227:5
**needs** [5] - 48:6, 114:13, 227:2, 232:8, 232:9
**negotiate** [1] - 222:25
**negotiators** [1] - 223:1
**neurocognitive** [13] - 41:25, 43:22, 51:10, 52:6, 76:16, 82:2, 83:5, 86:9, 92:12, 96:8, 96:25, 127:3, 128:1
**neurodegeneration** [2] - 16:25, 35:21
**neuroimaging** [4] - 81:17, 81:18, 82:23, 140:18
**Neurol** [1] - 13:12
**neurologic** [2] - 54:22, 182:17
**neurologist** [1] - 186:4
**neurology** [1] - 42:18
**neuropsychiatric** [2] - 75:8, 88:14
**neuropsychological** [3] - 29:4, 54:23, 182:18
**neuropsychologist** [1] - 186:4
**neuroradiologist** [1] - 12:19
**neuroradiologists** [1] - 11:23
**Neuroreader** [2] - 13:7, 13:10
**neuroscientist** [1] - 12:20
**never** [11] - 27:22, 116:19, 148:23, 164:19, 191:21, 228:13, 239:17, 241:6, 245:3, 247:16
**nevertheless** [2] - 124:23, 216:25
**New** [6] - 2:8, 211:25, 212:22, 213:12, 213:22, 228:13
**new** [5] - 16:16, 184:14, 184:19, 229:3, 231:24
**news** [2] - 224:5
**next** [17] - 8:14, 40:17, 56:22, 77:25, 78:11, 88:8, 90:15, 109:7, 122:13, 131:5, 151:8, 205:19, 217:21, 218:13, 218:22, 232:1, 250:15
**night** [1] - 188:2
**NO** [1] - 1:3
**nobody** [2] - 139:8, 190:24
**non** [2] - 19:19, 113:11
**non-attractive** [1] - 113:11
**non-white** [1] - 19:19
**none** [4] - 35:9, 183:10, 192:14, 231:1
**nonetheless** [3] - 35:18, 143:12, 160:12
**nonspecific** [1] - 35:17
**normal** [13] - 12:9, 12:17, 16:2, 21:5, 22:25, 23:6, 23:10, 26:11, 28:20, 58:8, 61:21, 169:21, 169:22
**normally** [2] - 10:22, 68:2
**note** [6] - 141:10, 153:12, 175:5, 176:14, 183:11, 215:20
**noted** [1] - 63:7
**notes** [25] - 64:10, 64:16, 66:24, 67:3, 67:5, 68:6, 148:11, 148:16, 149:9, 149:14, 149:22, 150:3, 152:5, 155:21, 156:13, 163:10, 163:13, 165:12,

167:3, 175:25, 177:15, 177:16, 177:17, 203:11, 255:3
**noteworthy** [1] - 216:11
**nothing** [13] - 10:9, 10:19, 109:9, 115:9, 115:18, 167:11, 173:19, 209:9, 209:25, 222:21, 224:6, 241:10
**notice** [4] - 56:7, 122:14, 209:17, 239:17
**noticeable** [1] - 69:7
**noticed** [7] - 68:5, 71:15, 80:25, 86:12, 111:13, 162:21, 162:22
**noticing** [4] - 68:1, 69:4, 176:13, 209:12
**notion** [1] - 231:16
**NOVEMBER** [2] - 1:6, 4:2
**November** [6] - 47:16, 195:24, 207:2, 207:17, 233:11, 233:15
**nowadays** [1] - 38:6
**nuanced** [1] - 32:7
**number** [19] - 38:11, 38:13, 42:24, 52:25, 57:12, 60:23, 75:7, 76:1, 83:18, 94:15, 116:2, 123:23, 131:4, 143:5, 143:16, 212:24, 219:5, 229:21, 233:24
**Number** [1] - 233:25
**nursing** [1] - 41:17
**NY** [1] - 2:8

## O

**o'clock** [3] - 244:5, 254:19, 254:21
**oath** [9] - 71:22, 72:1, 72:20, 164:3, 164:12, 164:18, 170:24, 171:2, 171:14
**Obenour** [1] - 203:1
**obesity** [1] - 23:20
**object** [2] - 136:17, 248:3
**objecting** [2] - 248:1, 248:6
**Objection** [1] - 68:9
**objection** [13] - 4:17, 4:18, 4:19, 5:16, 36:1, 128:15, 128:17, 136:19, 156:18, 159:8, 200:2, 236:25, 243:6
**objections** [3] - 5:15, 5:17, 6:11
**objective** [4] - 28:6, 34:24, 228:10, 247:22
**obligation** [1] - 248:16
**observation** [2] - 80:1, 130:17
**observations** [9] - 63:12, 86:11, 117:18, 144:21, 144:24, 144:25, 170:13, 182:24, 237:8
**observe** [3] - 78:17, 103:22, 215:19
**observed** [9] - 29:5, 29:13, 32:11, 32:13, 32:15, 55:23, 110:15, 127:9, 206:25
**observing** [4] - 60:13, 66:20, 89:25, 111:16
**obstructive** [3] - 90:16, 90:23, 91:2
**obtain** [1] - 92:15
**obvious** [2] - 151:2, 195:7
**obviously** [10] - 43:9, 47:19, 52:8, 69:17, 72:23, 92:4, 93:12, 109:8, 135:24, 233:5
**occasion** [7] - 64:2, 79:9, 80:16, 80:20, 85:17, 228:6, 249:2

**occasions** [1] - 61:17
**occupation** [1] - 41:10
**occur** [1] - 56:1
**October** [16] - 5:23, 47:14, 50:25, 80:21, 85:7, 108:25, 113:23, 114:6, 116:10, 117:24, 118:4, 119:17, 188:24, 197:20, 213:11, 240:9
**OF** [2] - 1:1, 1:3
**offer** [8] - 45:4, 171:22, 238:1, 238:10, 239:19, 245:18, 247:4, 247:19
**offered** [5] - 68:20, 68:21, 72:17, 72:18, 127:8
**offering** [1] - 115:8
**offers** [2] - 113:16, 130:11
**office** [5] - 150:17, 211:23, 212:22, 214:4, 238:7
**offices** [2] - 101:3, 138:24
**official** [1] - 165:21
**offshore** [1] - 241:1
**often** [8] - 53:2, 53:11, 88:22, 110:2, 125:6, 140:6, 218:16, 220:4
**old** [7] - 38:21, 38:22, 216:19, 216:20, 216:21, 216:22, 220:13
**older** [11] - 12:6, 12:7, 38:4, 38:19, 40:1, 40:4, 41:15, 48:22, 61:21, 76:6, 87:24
**once** [10] - 61:24, 115:1, 148:3, 148:4, 212:6, 223:2, 232:24, 234:9, 242:16, 246:9
**one** [129] - 4:7, 5:20, 8:10, 12:2, 15:2, 25:2, 25:12, 25:24, 31:24, 37:23, 38:15, 39:17, 39:21, 43:6, 43:9, 44:12, 49:14, 50:25, 51:17, 52:17, 53:3, 54:14, 56:20, 58:15, 62:3, 62:6, 62:9, 62:10, 64:2, 64:18, 66:11, 67:17, 69:15, 70:19, 71:4, 71:11, 73:13, 73:25, 74:20, 76:11, 76:14, 77:13, 77:25, 78:1, 79:10, 80:4, 80:13, 81:11, 81:18, 85:22, 89:6, 90:19, 95:5, 97:17, 103:13, 104:10, 106:5, 108:4, 112:9, 113:23, 115:11, 116:5, 117:10, 120:13, 124:16, 135:10, 135:11, 135:14, 138:5, 138:17, 143:16, 143:19, 146:4, 150:9, 154:5, 158:3, 158:5, 159:16, 160:20, 165:5, 167:1, 167:2, 167:11, 169:8, 171:24, 175:14, 177:4, 179:19, 191:15, 191:20, 191:25, 192:1, 195:2, 195:5, 199:23, 201:13, 204:4, 206:20, 208:11, 212:24, 216:12, 216:17, 217:17, 219:5, 219:8, 220:4, 222:7, 222:15, 225:1, 226:15, 226:16, 226:17, 226:20, 226:21, 227:1, 227:24, 228:6, 228:9, 230:19, 233:21, 242:1, 246:4, 249:13
**One** [3] - 104:14, 113:4, 114:6
**one's** [5] - 43:25, 57:12, 66:8, 79:7
**one-hundredth** [2] - 226:17, 226:21
**one-month** [1] - 216:17
**one-tenth** [2] - 226:15, 226:20
**one-year** [1] - 39:21

**ones** [1] - 219:17
**ongoing** [2] - 132:1, 132:9
**onset** [1] - 143:21
**open** [3] - 101:22, 102:1, 193:10
**open-ended** [2] - 101:22, 102:1
**opened** [1] - 229:20
**opening** [1] - 213:25
**operations** [4] - 222:19, 222:21, 222:23
**opine** [3] - 186:20, 194:24, 198:10
**opining** [1] - 48:18
**opinion** [90] - 11:21, 14:18, 24:12, 28:9, 29:8, 33:15, 34:5, 34:10, 34:11, 34:14, 34:16, 34:17, 34:20, 34:21, 34:24, 35:10, 48:5, 55:16, 62:22, 68:17, 71:4, 72:19, 72:21, 74:14, 81:4, 81:6, 81:8, 82:24, 89:18, 90:5, 93:8, 93:18, 96:3, 96:4, 110:14, 112:6, 126:23, 128:1, 130:11, 133:12, 134:4, 134:5, 135:2, 135:15, 137:1, 137:6, 137:7, 137:13, 137:20, 137:21, 138:14, 138:15, 139:21, 140:13, 164:14, 164:17, 166:4, 166:20, 170:16, 174:7, 174:14, 174:23, 175:4, 178:4, 181:10, 181:11, 181:13, 185:13, 185:21, 186:24, 187:4, 187:7, 187:9, 187:18, 187:20, 187:21, 188:3, 188:6, 188:8, 190:2, 194:19, 205:25, 206:1, 206:3, 206:8, 206:11, 207:14, 207:15, 208:22, 208:23
**opinion'** [1] - 185:19
**opinions** [8] - 33:13, 48:19, 68:19, 97:3, 170:1, 185:17, 185:19, 236:19
**opportunities** [1] - 116:2
**opportunity** [6] - 101:25, 171:14, 239:22, 245:24, 247:1, 249:6
**opposed** [2] - 90:6, 102:17
**opposite** [1] - 193:9
**order** [14] - 20:4, 27:5, 27:12, 74:19, 92:12, 92:14, 98:8, 217:3, 220:24, 226:9, 226:10, 232:9, 234:20, 242:22
**ordered** [1] - 27:9
**ordering** [1] - 27:20
**ordinarily** [1] - 241:12
**organ** [2] - 52:11, 52:16
**organization** [2] - 41:6, 225:13
**organizational** [1] - 221:1
**organizations** [2] - 40:11, 76:12
**organize** [1] - 153:1
**organized** [2] - 172:4, 255:2
**orient** [4] - 16:13, 98:11, 121:22, 221:18
**orientation** [2] - 122:7, 143:17
**oriented** [2] - 100:21, 121:15
**origin** [1] - 200:17
**original** [2] - 45:16, 84:21
**originally** [3] - 53:11, 71:14, 120:20
**originate** [2] - 236:13, 236:17
**otherwise** [5] - 59:14, 152:19, 215:3, 231:21, 232:18
**ought** [2] - 247:2, 247:22
**ourselves** [4] - 223:10, 234:18, 234:23,

235:3
**out-of-court** [1] - 73:3
**outcome** [4] - 138:14, 138:19, 175:10, 177:22
**outpatients** [1] - 41:24
**outside** [2] - 145:14, 194:25
**overall** [10] - 50:1, 57:3, 71:4, 86:9, 90:25, 122:10, 127:24, 206:2, 206:9, 207:11
**overlap** [1] - 5:25
**overlapped** [2] - 233:5, 233:7
**overlearned** [2] - 109:25, 111:5
**overlooking** [1] - 219:12
**overrepresentation** [1] - 13:5
**overruled** [2] - 159:11, 162:1
**oversee** [2] - 41:18, 41:19
**overtook** [1] - 246:25
**own** [23] - 38:25, 69:2, 70:3, 70:8, 79:19, 80:11, 89:17, 89:25, 90:2, 90:14, 98:21, 116:14, 137:8, 150:24, 162:16, 162:19, 176:5, 212:2, 213:23, 231:12, 243:20, 243:22, 246:13
**ownership** [1] - 222:22

## P

**p.m** [10] - 1:5, 4:3, 74:5, 172:22, 253:24, 255:6
**page** [27] - 6:6, 6:7, 8:14, 14:25, 25:24, 28:2, 45:23, 50:10, 98:17, 98:18, 102:23, 102:24, 106:3, 113:2, 113:3, 114:5, 116:9, 116:10, 118:2, 118:3, 119:16, 119:17, 203:16, 203:25
**pages** [8] - 27:2, 30:3, 30:6, 30:7, 157:8, 217:14, 218:8, 226:13
**paginated** [1] - 202:16
**paid** [1] - 47:13
**pain** [2] - 156:1, 156:11
**pandemic** [1] - 215:5
**panel** [1] - 153:1
**Panel** [8] - 30:5, 34:18, 45:11, 46:23, 47:8, 48:12, 49:25, 153:8
**paper** [29] - 14:13, 14:17, 14:19, 14:21, 15:6, 15:10, 15:11, 15:17, 16:6, 16:15, 17:22, 17:24, 18:3, 18:5, 18:6, 18:7, 18:13, 20:1, 20:4, 24:19, 24:25, 25:8, 25:10, 25:12, 25:20, 26:10, 26:14, 26:25, 27:1
**papers** [6] - 14:10, 15:2, 15:8, 15:14, 16:23, 86:24
**paragraph** [5] - 9:7, 28:2, 28:25, 79:20, 229:22
**paranoia** [1] - 103:25
**parcel** [2] - 87:7, 139:22
**pardon** [1] - 223:5
**Parkinson's** [42] - 9:16, 66:10, 75:6, 75:12, 75:15, 75:18, 75:25, 76:2, 76:12, 76:15, 76:21, 77:14, 77:16, 77:17, 77:23, 78:2, 81:2, 81:23, 82:6, 82:12, 82:17, 91:12, 93:25, 95:16,

111:14, 112:4, 127:21, 139:14, 139:23, 140:5, 140:16, 140:23, 140:24, 141:2, 141:3, 181:24, 207:2, 207:7, 207:18, 209:7, 229:12, 232:3
**Parkinsonism** [1] - 143:21
**part** [37] - 19:9, 26:23, 27:11, 44:15, 46:22, 49:24, 51:23, 52:23, 60:10, 60:16, 77:6, 83:19, 83:23, 85:4, 87:7, 104:20, 105:21, 110:4, 115:17, 120:3, 139:22, 147:15, 154:12, 161:8, 161:9, 161:13, 190:13, 190:17, 190:19, 190:22, 193:24, 233:1, 235:25, 238:14, 239:19, 241:10, 242:5
**partial** [1] - 85:13
**partially** [1] - 91:19
**participants** [5] - 18:16, 22:12, 218:9, 238:6, 238:8
**participate** [7] - 48:14, 70:3, 90:13, 127:5, 156:15, 246:13, 250:4
**participated** [1] - 219:15
**participating** [2] - 89:24, 231:11
**participation** [1] - 217:8
**particular** [24] - 18:22, 20:13, 40:22, 40:25, 45:19, 47:24, 56:11, 60:17, 62:17, 63:21, 66:10, 69:15, 75:23, 81:18, 83:21, 97:11, 101:22, 114:19, 115:19, 116:5, 144:1, 169:8, 175:15, 201:5
**parties** [3] - 103:13, 171:5, 171:13
**partly** [1] - 241:12
**partners** [1] - 213:7
**parts** [5] - 139:25, 140:14, 141:18, 144:7, 242:1
**party** [1] - 110:19
**pass** [3] - 25:14, 132:14, 207:22
**passed** [1] - 83:25
**passion** [1] - 40:4
**passmore** [1] - 197:21
**Passmore** [1] - 197:22
**past** [12] - 16:20, 49:16, 59:15, 85:11, 112:13, 121:24, 176:5, 196:13, 212:11, 216:22, 223:21, 223:24
**path** [2] - 219:10, 231:6
**patho** [1] - 7:25
**pathologic** [1] - 82:14
**pathology** [7] - 55:11, 57:14, 81:21, 83:10, 84:1, 84:8, 142:14
**pathophysiology** [1] - 8:3
**patience** [1] - 229:18
**patient** [11] - 19:13, 19:25, 28:13, 28:16, 28:20, 29:18, 34:1, 34:3, 34:15, 35:1, 35:14
**patients** [9] - 38:7, 48:22, 51:10, 69:12, 69:13, 87:5, 92:18, 92:19, 92:20
**pattern** [8] - 57:3, 82:2, 83:8, 94:10, 115:2, 131:22, 228:9, 230:21
**patterns** [3] - 54:19, 55:3, 56:2
**pause** [2] - 119:25, 121:6
**paused** [2] - 119:24, 121:7
**pay** [1] - 127:4

**PDD** [5] - 141:12, 142:8, 169:18, 180:9, 180:10
**peer** [3] - 27:9, 32:24, 51:4
**pegged** [4] - 206:25
**penalty** [1] - 72:1
**pending** [1] - 235:7
**people** [57] - 12:10, 12:17, 16:2, 16:16, 17:5, 17:8, 17:10, 19:19, 21:18, 21:23, 22:25, 23:5, 24:5, 24:7, 24:14, 24:20, 24:22, 24:25, 25:6, 26:5, 26:7, 29:13, 32:3, 32:13, 32:15, 33:1, 33:8, 33:9, 34:18, 38:6, 43:25, 53:11, 56:23, 57:7, 57:16, 58:14, 58:21, 59:9, 71:18, 73:1, 82:9, 89:2, 121:25, 125:3, 142:3, 143:17, 158:4, 167:13, 167:21, 168:1, 177:1, 177:2, 197:2, 209:14, 209:20
**people's** [1] - 49:10
**per** [1] - 31:22
**perceive** [1] - 221:10
**percent** [14] - 17:14, 21:2, 22:19, 22:21, 26:10, 26:14, 26:17, 76:5, 88:3, 226:15, 226:16, 226:17, 226:20, 226:21
**percentage** [4] - 12:17, 20:21, 21:4, 24:6
**percentages** [1] - 17:13
**percentile** [5] - 31:7, 31:10, 31:14, 31:25, 32:4
**perception** [5] - 35:5, 60:23, 140:4, 140:6, 216:3
**perceptual** [1] - 53:19
**perfect** [6] - 117:5, 242:4, 247:18, 247:20, 248:1, 248:7
**perfectly** [1] - 58:8
**perform** [2] - 66:15, 108:19
**performance** [5] - 8:23, 90:11, 117:16, 138:23, 192:6
**performances** [1] - 111:8
**performed** [1] - 163:12
**performs** [1] - 62:14
**perhaps** [10] - 18:19, 35:14, 77:20, 168:8, 175:10, 207:11, 210:8, 210:15, 224:20, 230:22
**peril** [1] - 212:3
**period** [13] - 33:24, 39:24, 46:20, 62:21, 62:24, 67:10, 87:14, 91:17, 129:13, 130:17, 204:17, 210:8, 224:19
**periods** [1] - 143:17
**perjury** [1] - 72:1
**permanent** [4] - 127:12, 127:14, 189:14, 189:20
**permission** [2] - 149:8, 232:18
**person** [25] - 28:17, 30:4, 47:23, 66:1, 99:6, 107:18, 135:25, 136:13, 144:25, 153:8, 155:12, 157:25, 167:13, 167:15, 169:9, 171:5, 175:15, 189:6, 195:3, 215:4, 215:8, 221:3, 228:17, 251:22
**person's** [2] - 54:6, 79:2
**personal** [10] - 46:8, 176:5, 188:3,

201:4, 202:23, 203:4, 203:11, 204:25, 208:8, 232:13
**personally** [3] - 55:23, 206:19, 252:10
**perspective** [4] - 44:17, 51:15, 52:4, 158:2
**persuaded** [2] - 138:23, 166:17
**pertinent** [1] - 168:8
**perusal** [1] - 98:2
**pervasive** [1] - 140:11
**PET** [26] - 8:6, 8:7, 8:8, 8:17, 8:20, 8:22, 9:14, 10:19, 11:1, 11:9, 12:1, 13:9, 25:4, 27:6, 27:9, 27:13, 81:18, 81:19, 82:23, 82:24, 83:7, 83:9, 83:14, 83:24, 142:16
**Pete** [2] - 210:17, 211:5
**PETER** [3] - 3:7, 211:13, 211:19
**Peter** [2] - 211:19
**pharmaceutical** [2] - 216:16, 216:18
**pharmacologic** [1] - 38:19
**phase** [1] - 129:9
**phases** [1] - 129:8
**phenomenon** [2] - 221:23, 226:3
**philosophy** [1] - 39:9
**phone** [7] - 79:7, 214:22, 228:17, 229:20, 230:18, 240:8, 240:10
**phrase** [2] - 134:11, 205:24
**physical** [6] - 127:11, 127:18, 139:6, 139:8, 139:20, 139:22
**physically** [2] - 96:5, 109:1
**physician** [3] - 38:1, 67:17, 78:20
**physicians** [3] - 56:13, 56:16, 234:12
**pick** [1] - 255:2
**picture** [6] - 67:22, 82:13, 83:3, 90:25, 111:23, 128:8
**piece** [7] - 52:18, 69:16, 83:2, 122:13, 135:14, 138:6, 164:23
**pieces** [7] - 29:22, 54:18, 55:1, 55:11, 134:13, 135:13, 138:1
**pivot** [1] - 122:15
**place** [12] - 41:13, 50:14, 62:11, 83:3, 101:1, 101:2, 122:11, 135:14, 139:24, 166:9, 199:2, 217:18
**places** [1] - 207:25
**placing** [1] - 205:8
**plan** [1] - 228:10
**plaque** [1] - 84:8
**plaques** [2] - 84:4, 84:15
**plate** [1] - 241:18
**plausible** [3] - 187:25, 188:1, 188:5
**play** [23] - 58:6, 58:10, 59:15, 63:17, 92:25, 96:16, 97:14, 98:3, 98:4, 98:13, 100:18, 102:21, 104:10, 104:13, 105:13, 105:23, 113:23, 116:5, 117:22, 119:8, 120:2, 122:18, 136:16
**played** [13] - 4:24, 6:18, 6:19, 6:25, 98:19, 103:2, 106:6, 118:6, 122:19, 124:21, 126:18, 165:18, 168:14
**players** [1] - 114:20
**plays** [5] - 104:15, 113:5, 114:7, 116:12, 119:19

**plus** [2] - 31:19, 85:23
**poach** [1] - 217:11
**point** [31] - 54:3, 76:22, 81:2, 83:13, 95:15, 107:1, 109:2, 109:7, 125:25, 147:13, 149:7, 161:5, 167:11, 167:12, 178:10, 196:2, 209:5, 213:17, 214:3, 220:25, 232:11, 233:21, 239:8, 251:11, 251:17, 252:3, 252:4, 252:22, 253:4, 253:10, 254:16
**points** [8] - 21:19, 56:21, 62:3, 62:4, 62:7, 107:22, 208:23, 209:6
**pool** [4] - 184:20, 184:23, 199:21, 239:6
**Pool** [1] - 185:4
**pool's** [1] - 145:25
**poorly** [1] - 58:4
**population** [20] - 12:8, 12:16, 12:20, 12:23, 16:7, 16:21, 17:15, 17:18, 17:25, 20:4, 20:8, 20:16, 20:18, 20:23, 20:24, 22:20, 22:23, 24:22, 26:11, 38:5
**population-based** [1] - 17:18
**populations** [1] - 21:10
**portion** [4] - 6:6, 7:25, 24:7, 237:4
**portions** [2] - 7:20, 234:2
**pos** [1] - 169:12
**posed** [2] - 91:25, 248:7
**posited** [1] - 94:20
**position** [3] - 42:17, 168:25, 236:8
**positive** [6] - 12:18, 16:3, 17:9, 17:11, 26:15, 84:11
**positivity** [2] - 11:4, 12:11
**possibility** [4] - 33:19, 81:24, 82:16, 122:5
**possible** [8] - 8:25, 13:15, 16:24, 81:14, 82:10, 91:5, 94:20, 126:15, 169:12, 169:13, 169:20, 169:23, 175:13, 176:16
**possibly** [4] - 46:11, 83:20, 176:20, 194:23
**post** [1] - 212:16
**post-secondary** [1] - 212:16
**postponed** [1] - 156:12
**potential** [6] - 128:5, 152:21, 171:21, 173:6, 174:20, 230:25
**potentially** [6] - 81:20, 82:5, 94:7, 131:21, 175:6, 176:23
**pound** [1] - 117:3
**power** [1] - 197:3
**powerPoint** [1] - 57:22
**PR** [1] - 241:12
**practice** [14] - 41:23, 44:9, 48:25, 49:6, 49:9, 49:12, 59:1, 88:16, 89:1, 92:19, 109:12, 110:14, 168:4, 178:6
**practiced** [1] - 213:5
**practices** [1] - 107:23
**practitioners** [1] - 56:15
**precede** [1] - 205:10
**precise** [1] - 190:7
**predate** [1] - 209:6
**predominantly** [1] - 97:14

**preface** [1] - 228:20
**preindictment** [1] - 249:4
**premise** [1] - 248:6
**prepare** [4] - 79:6, 191:22, 238:19, 251:14
**prepared** [4] - 51:20, 51:23, 210:14, 216:12
**preparing** [2] - 103:14, 201:1
**preponderance** [2] - 71:11, 164:15
**prescribed** [1] - 91:16
**presence** [6] - 16:24, 23:9, 81:21, 83:15, 239:5
**present** [8] - 31:5, 31:11, 65:15, 85:11, 214:5, 214:24, 242:13, 246:11
**presentation** [8] - 54:7, 55:19, 90:9, 133:9, 133:11, 134:25, 137:20, 139:6
**presentations** [2] - 53:2, 134:3
**presented** [3] - 157:21, 157:23, 238:8
**presenting** [2] - 160:7, 199:11
**presents** [2] - 144:9, 189:18
**preserved** [2] - 73:6, 109:23
**president** [2] - 40:17, 123:11
**president-elect** [1] - 40:17
**press** [5] - 240:5, 240:6, 240:12, 240:15, 240:17
**pressing** [1] - 222:12
**presume** [2] - 95:20, 118:19
**presumption** [1] - 141:1
**pretending** [1] - 34:12
**pretty** [13] - 12:5, 23:6, 23:21, 59:13, 101:7, 114:20, 117:21, 157:13, 176:8, 177:19, 179:23, 210:18, 250:7
**prevalence** [1] - 13:13
**preventing** [1] - 244:16
**previous** [1] - 217:4
**previously** [5] - 5:22, 48:16, 49:15, 95:1, 200:24
**price** [1] - 113:16
**primary** [7] - 41:10, 56:13, 56:16, 75:5, 75:6, 82:18, 253:7
**principal** [3] - 44:21, 252:8
**principle** [2] - 31:2, 58:13
**principles** [4] - 44:9, 52:1, 53:7, 55:18
**Prisons** [2] - 129:12, 130:18
**privilege** [2] - 217:11, 233:10
**privileged** [5] - 223:14, 224:9, 232:7, 232:17, 234:9
**probing** [3] - 62:25, 63:10, 101:4
**problem** [7] - 119:15, 164:19, 164:20, 200:9, 200:14, 211:4, 244:19
**problematic** [1] - 216:13
**problems** [16] - 70:5, 141:23, 141:25, 142:1, 164:21, 176:5, 183:11, 183:13, 185:5, 185:8, 216:8, 216:10, 221:14, 223:16, 224:21, 228:13
**procedural** [1] - 130:4
**procedure** [4] - 50:19, 50:21, 201:23, 201:25
**proceed** [9] - 36:14, 36:15, 36:22,

36:23, 74:8, 74:9, 148:17, 148:24, 241:19
**proceeded** [1] - 104:5
**proceeding** [3] - 70:21, 97:24, 207:1
**Proceedings** [2] - 74:5, 172:22
**proceedings** [4] - 2:15, 129:9, 131:4, 152:17, 215:1, 255:10
**process** [19] - 27:12, 46:23, 51:4, 96:12, 97:4, 102:4, 107:10, 119:1, 149:21, 171:9, 203:24, 209:2, 209:21, 227:25, 228:22, 234:10, 246:15
**processes** [3] - 54:11, 203:9, 204:14
**processing** [3] - 96:7, 120:21, 121:20
**produce** [1] - 59:9
**produced** [6] - 2:16, 64:16, 106:21, 200:20, 217:14, 226:13
**product** [2] - 106:18, 106:19
**products** [2] - 106:20, 113:17
**profession** [2] - 99:18, 99:22
**professional** [2] - 94:22, 110:13
**professionals** [2] - 42:24, 43:16
**professor** [1] - 42:18
**profit** [1] - 245:12
**program** [4] - 41:19, 42:2, 59:11, 215:17
**programs** [1] - 58:14
**progress** [5] - 115:4, 179:19, 216:3, 221:6, 234:2
**progressed** [4] - 179:15, 180:10, 216:5, 217:19
**progressive** [4] - 52:21, 83:5, 127:16, 127:18
**projects** [1] - 120:13
**prominent** [1] - 152:15
**promise** [1] - 253:25
**promote** [1] - 58:18
**prompt** [1] - 221:2
**proportion** [1] - 19:2
**proposal** [3] - 236:12, 236:15, 236:18
**proposing** [1] - 89:22
**prosecution** [1] - 213:15
**prosecutor** [4] - 214:14, 236:3, 241:6, 247:21
**prosecutors** [2] - 213:7, 241:13
**prospective** [1] - 106:23
**protein** [5] - 23:15, 140:24, 141:3, 142:3, 142:20
**proteins** [3] - 8:4, 141:18, 141:22
**proved** [1] - 230:7
**provide** [4] - 70:20, 128:2, 161:16, 249:4
**provided** [3] - 72:7, 109:5, 199:25
**proving** [1] - 40:20
**provision** [1] - 114:25
**psychiatric** [10] - 38:2, 39:16, 39:17, 40:14, 40:24, 53:16, 74:13, 90:19, 109:18, 168:4
**psychiatrist** [15] - 37:20, 37:23, 37:25, 47:19, 48:2, 48:15, 51:15, 53:6, 54:15, 125:2, 125:22, 152:15, 170:8, 186:20,

187:15
**psychiatry** [21] - 37:12, 38:9, 38:16, 39:18, 39:22, 39:24, 40:8, 40:16, 41:4, 42:18, 44:6, 44:9, 44:13, 45:6, 47:20, 48:1, 48:6, 49:5, 51:9, 129:6, 131:24
**psychology** [1] - 39:8
**psychosis** [2] - 45:2, 75:9
**psychotic** [1] - 144:1
**psychotropics** [1] - 144:2
**public** [3] - 42:23, 43:2, 43:8
**publication** [1] - 77:5
**publications** [1] - 43:3
**published** [6] - 190:25, 191:3, 191:5, 191:6, 191:8, 192:3
**pull** [5] - 7:14, 104:8, 147:12, 197:7, 212:8
**pulled** [1] - 99:5
**punching** [1] - 145:11
**Purpose** [1] - 104:13
**purpose** [13] - 93:9, 98:10, 98:13, 98:22, 99:15, 101:12, 102:25, 105:12, 121:11, 227:21, 234:19, 235:2, 235:3
**purposefully** [7] - 34:19, 34:20, 35:4, 35:9, 70:12, 173:18, 174:11
**purposes** [4] - 68:17, 72:21, 97:23, 227:24
**push** [4] - 172:3, 210:20, 211:8, 254:20
**put** [42] - 7:18, 25:25, 27:1, 45:13, 54:17, 57:4, 57:21, 58:5, 58:11, 59:7, 63:23, 64:18, 66:24, 69:16, 74:18, 76:11, 77:10, 77:11, 77:25, 78:1, 79:16, 90:21, 97:6, 134:3, 135:9, 137:19, 141:14, 147:18, 149:16, 159:4, 159:21, 160:9, 167:8, 175:14, 182:13, 182:19, 202:17, 204:3, 207:14, 222:17, 230:19, 235:23
**put-on** [2] - 134:3, 137:19
**puts** [3] - 134:25, 135:3, 237:9
**putting** [7] - 10:11, 70:1, 82:17, 111:4, 135:7, 138:23, 244:16
**puzzling** [2] - 216:1, 222:2

**Q**

**qualified** [1] - 168:2
**qualities** [1] - 113:15
**quarter** [1] - 221:15
**query** [1] - 60:18
**querying** [1] - 62:19
**questioning** [5] - 105:14, 190:15, 193:13, 241:24
**questions** [41] - 36:3, 60:22, 60:24, 62:25, 63:10, 73:11, 73:25, 82:20, 96:18, 101:21, 102:7, 105:15, 105:19, 108:4, 119:9, 119:14, 120:17, 122:16, 122:17, 126:1, 133:22, 148:8, 150:4, 151:1, 151:3, 151:6, 151:24, 154:2, 177:6, 186:10, 195:2, 198:18, 198:23, 199:1, 205:22, 209:24, 221:2, 230:14, 242:13, 243:25

**quick** [8] - 4:9, 59:4, 74:3, 107:5, 112:9, 172:2, 221:8, 223:12
**quickly** [5] - 9:9, 15:9, 88:20, 125:15, 239:9
**quieter** [1] - 68:5
**quite** [16] - 58:2, 58:3, 78:22, 79:22, 82:20, 99:12, 102:9, 112:19, 127:1, 136:11, 183:1, 196:2, 196:4, 224:10, 224:24, 245:12
**quote** [2] - 168:24, 169:14
**quotes** [2] - 203:4, 203:7

## R

**R-O-M-A-T-O-W-K-S-I** [1] - 211:21
**race** [2] - 13:8, 20:13
**races** [1] - 24:22
**racial** [2] - 19:11, 24:20
**radiation** [2] - 128:9, 128:12
**radiologist's** [1] - 9:25
**raise** [6] - 36:19, 195:7, 211:10, 231:3, 246:23, 248:16
**raised** [4] - 234:7, 235:5, 247:11, 247:13, 249:11
**raises** [3] - 35:12, 35:20, 81:24
**raising** [1] - 234:5
**rambling** [1] - 109:6
**ran** [1] - 210:7
**range** [12] - 41:25, 47:13, 61:6, 61:21, 61:22, 61:24, 62:6, 62:13, 62:17, 178:13, 187:24, 214:11
**rapid** [1] - 33:25
**rates** [2] - 88:2, 89:12
**rather** [8] - 17:25, 74:20, 166:19, 227:23, 235:24, 236:6, 238:20, 241:14
**rational** [3] - 70:4, 97:8, 207:20
**raw** [7] - 217:23, 222:6, 223:9, 224:8, 224:17, 224:18, 227:25
**RB** [1] - 151:9
**reach** [2] - 103:9, 225:11
**reached** [3] - 99:5, 187:22, 218:1
**reaching** [1] - 239:2
**reacting** [1] - 126:10
**reaction** [2] - 126:13, 161:25
**read** [35] - 7:24, 8:1, 8:15, 9:9, 14:10, 14:19, 15:7, 15:14, 71:2, 71:3, 71:5, 81:20, 84:11, 84:14, 92:5, 95:2, 110:11, 145:25, 147:18, 154:18, 160:13, 161:7, 161:8, 161:9, 161:14, 162:8, 162:10, 163:21, 164:1, 188:10, 194:16, 198:1, 207:3, 219:2, 227:1
**readily** [1] - 88:20
**reading** [4] - 9:2, 14:13, 15:6, 163:23
**ready** [1] - 216:12
**real** [9] - 4:9, 23:18, 33:2, 66:1, 87:6, 135:24, 182:3, 216:21, 245:24
**realize** [2] - 55:25, 86:22
**realized** [1] - 67:5
**realizes** [1] - 150:24
**really** [72] - 9:9, 10:18, 11:7, 13:1, 13:7,

14:23, 17:20, 20:17, 26:21, 32:6, 38:17, 43:16, 43:25, 56:21, 59:9, 60:15, 63:10, 63:11, 65:19, 65:22, 65:25, 66:11, 66:13, 66:16, 66:18, 67:11, 71:14, 71:16, 71:17, 73:10, 76:19, 76:23, 78:12, 86:22, 88:18, 88:24, 89:13, 90:13, 91:19, 99:16, 102:3, 102:15, 102:19, 104:2, 107:6, 108:9, 111:9, 112:20, 115:10, 125:13, 125:15, 125:25, 136:1, 137:2, 138:8, 156:2, 156:14, 157:19, 158:7, 158:10, 160:14, 163:11, 177:18, 181:1, 192:14, 193:4, 207:23, 208:21, 226:16, 226:21, 230:9, 247:22
**reason** [17] - 60:20, 63:6, 63:15, 69:4, 82:11, 92:13, 127:5, 151:2, 153:22, 154:1, 160:16, 175:9, 177:7, 193:19, 195:9, 229:16, 237:15
**reasonable** [12] - 70:4, 97:8, 180:18, 181:6, 185:17, 185:19, 186:7, 186:13, 187:6, 187:22, 188:5, 207:20
**reasonably** [5] - 84:22, 181:9, 181:14, 185:13
**reasoning** [1] - 195:12
**reasons** [3] - 193:22, 219:9, 241:13
**receive** [1] - 56:12
**received** [5] - 45:7, 46:1, 72:12, 176:23, 207:6
**receiving** [1] - 235:13
**recent** [8] - 73:14, 85:11, 102:12, 102:13, 107:23, 112:14, 223:25, 224:19
**recently** [4] - 75:9, 119:7, 180:14, 225:23
**recertifications** [1] - 40:8
**recess** [2] - 74:3, 254:21
**recessed** [3] - 74:5, 172:22, 255:6
**recite** [2] - 64:8, 223:6
**recognition** [1] - 166:19
**recognize** [10] - 88:22, 97:1, 101:7, 216:23, 219:13, 219:16, 219:25, 220:20, 225:14, 237:17
**recognized** [4] - 40:22, 215:21, 232:10, 234:15
**recognizing** [1] - 79:19
**recollect** [2] - 145:13, 145:14
**recollection** [13] - 19:1, 31:12, 32:18, 50:22, 70:18, 135:5, 148:19, 149:15, 159:14, 167:3, 201:12, 202:1, 232:19
**recollections** [1] - 202:10
**recommendation** [5] - 233:1, 233:12, 235:19, 235:23, 246:9
**record** [22] - 4:10, 6:2, 22:6, 26:24, 36:13, 40:5, 42:4, 72:16, 98:16, 115:6, 145:6, 145:10, 181:20, 199:23, 200:21, 200:24, 204:2, 204:7, 211:18, 254:2, 254:4, 255:10
**recorded** [3] - 2:15, 134:4, 186:17
**recordings** [1] - 98:5
**records** [30] - 29:25, 30:4, 46:10, 78:20,

80:17, 140:9, 145:4, 145:14, 145:21, 146:22, 147:15, 179:7, 183:8, 183:11, 185:1, 186:25, 196:10, 199:6, 199:15, 200:19, 202:23, 203:4, 203:13, 204:25, 208:12, 208:15, 220:2, 220:11, 253:22
**recover** [1] - 116:18
**ReCross** [1] - 3:6
**RECROSS** [1] - 208:4
**RECROSS-EXAMINATION** [1] - 208:4
**recurrent** [7] - 85:18, 85:21, 85:24, 131:25, 132:1, 132:5, 132:8
**recurring** [1] - 184:17
**redirect** [2] - 36:5, 198:19
**REDIRECT** [1] - 198:21
**ReDirect** [1] - 3:6
**reduce** [1] - 91:16
**refer** [2] - 6:2, 208:7
**reference** [5] - 17:22, 165:10, 199:14, 203:16, 204:5
**referenced** [8] - 17:24, 18:3, 18:9, 50:5, 67:6, 83:16, 110:6, 206:17
**references** [3] - 202:22, 202:24, 204:14
**referencing** [2] - 203:13, 204:12
**referrals** [1] - 199:15
**referred** [3] - 199:21, 218:15, 220:10
**referring** [2] - 190:20, 192:6
**reflect** [6] - 17:20, 73:15, 73:17, 92:1, 122:4, 220:3
**reflected** [3] - 73:13, 103:23, 103:25
**reflective** [2] - 18:20, 177:22
**reflects** [2] - 38:24, 96:1
**refrain** [1] - 121:9
**refresh** [8] - 15:9, 15:12, 15:20, 18:24, 201:3, 201:12, 201:17, 202:4
**refreshed** [2] - 149:15, 204:22
**refreshing** [5] - 148:18, 201:25, 202:1, 202:3, 202:9
**regard** [5] - 115:11, 212:12, 243:5, 247:3, 249:5
**regarding** [2] - 107:9, 107:22
**regardless** [3] - 77:22, 131:12, 132:7
**regimen** [1] - 231:17
**region** [2] - 19:8, 141:6
**register** [1] - 224:23
**regret** [1] - 231:4
**regrettably** [1] - 227:1
**regular** [1] - 227:23
**regurgitate** [1] - 225:22
**relate** [3] - 16:17, 105:13, 107:23
**related** [8] - 43:1, 43:11, 44:22, 96:21, 139:22, 216:24, 228:2, 234:21
**relation** [2] - 152:17, 168:10
**relationship** [6] - 89:9, 138:4, 165:17, 177:1, 222:7, 252:20
**relationships** [1] - 222:24
**relatively** [3] - 56:1, 112:14, 125:11
**relaxed** [1] - 171:1
**release** [2] - 240:6, 240:15

**relevance** [1] - 128:18
**relevant** [11] - 40:11, 69:23, 108:11, 129:4, 129:15, 130:3, 130:7, 151:4, 153:5, 222:23, 237:7
**reliability** [1] - 241:23
**reliable** [2] - 18:5, 18:7
**relief** [2] - 249:4, 249:5
**reluctance** [1] - 236:1
**rely** [4] - 11:24, 55:5, 111:20, 196:15
**REM** [8] - 91:5, 91:10, 91:15, 142:4, 143:23, 144:11, 144:20, 145:3
**remainder** [1] - 122:18
**remained** [1] - 31:13
**remaining** [1] - 120:3
**remains** [1] - 86:2
**remarkable** [1] - 209:9
**remember** [76] - 13:9, 19:2, 21:24, 27:4, 30:6, 30:7, 58:19, 59:16, 97:2, 101:1, 101:11, 101:17, 104:16, 112:15, 118:11, 126:7, 129:25, 133:14, 135:6, 135:19, 145:6, 149:3, 150:14, 152:10, 152:12, 152:13, 153:12, 153:15, 155:1, 155:6, 155:25, 156:3, 157:16, 158:17, 158:23, 158:24, 165:14, 165:15, 165:22, 168:20, 168:23, 169:3, 169:4, 176:18, 177:12, 177:13, 179:10, 185:18, 188:14, 194:1, 194:4, 194:8, 194:11, 194:12, 199:3, 201:7, 201:14, 209:21, 218:14, 218:15, 218:20, 219:14, 221:25, 225:16, 228:15, 230:4, 230:13, 231:15, 237:23, 238:9, 249:24, 252:11, 252:12, 252:14, 252:15
**remembered** [2] - 68:7, 225:17
**remembering** [1] - 79:18
**remembers** [1] - 69:3
**reminding** [1] - 188:14
**remission** [1] - 85:13
**remote** [3] - 102:8, 102:10, 102:11
**removed** [1] - 72:24
**rendering** [1] - 48:18
**renders** [1] - 47:23
**reorient** [2] - 115:24, 116:2
**repeat** [2] - 23:8, 229:17
**repeated** [1] - 182:25
**repeatedly** [1] - 11:5
**repeating** [2] - 222:13, 223:3
**rephrase** [2] - 200:11, 200:12
**report** [61] - 7:15, 7:23, 9:25, 13:7, 15:1, 27:18, 28:1, 28:22, 29:11, 29:25, 30:15, 45:16, 49:18, 50:7, 50:10, 50:23, 51:7, 51:8, 63:7, 64:8, 64:15, 67:6, 75:1, 77:7, 84:21, 85:1, 92:1, 93:3, 94:18, 97:10, 103:12, 104:21, 107:2, 130:11, 131:13, 136:5, 136:12, 146:13, 152:10, 153:12, 154:3, 154:11, 160:10, 163:20, 169:13, 178:1, 178:2, 178:18, 182:11, 182:21, 185:8, 191:22, 192:24, 202:16, 202:18, 202:22, 203:4, 203:15,

203:17, 204:3
**reported** [3] - 33:1, 72:9, 238:11
**REPORTER** [1] - 2:11
**reporter** [2] - 37:15, 42:8
**REPORTER'S** [1] - 255:7
**reports** [40] - 15:15, 32:22, 45:20, 46:25, 47:1, 47:3, 50:6, 51:3, 57:1, 67:13, 72:13, 73:10, 73:23, 74:24, 78:18, 80:12, 83:6, 92:5, 96:20, 145:6, 158:15, 158:20, 158:22, 159:6, 159:21, 165:11, 185:16, 185:23, 186:1, 186:3, 186:5, 201:2, 209:5, 209:14, 229:21, 234:11, 234:19, 235:9, 236:24, 239:8
**represent** [12] - 16:23, 28:6, 74:22, 98:1, 98:14, 101:6, 104:22, 104:24, 120:1, 133:2, 199:10, 214:16
**representation** [3] - 214:19, 221:13, 233:2
**representative** [1] - 97:20
**represented** [3] - 20:13, 161:20, 206:5
**representing** [1] - 120:17
**reputation** [1] - 169:1
**required** [2] - 131:2, 238:13
**requirements** [2] - 236:21, 236:22
**requires** [3] - 47:25, 129:12, 129:19
**research** [8] - 12:25, 40:3, 86:19, 120:6, 120:8, 120:10, 206:21, 237:5
**reserve** [1] - 57:10
**residency** [3] - 39:13, 39:14, 39:18
**residents** [1] - 17:19
**residual** [1] - 85:4
**resolve** [1] - 8:24
**resources** [1] - 219:22
**respect** [11] - 12:2, 169:17, 173:21, 173:22, 221:18, 222:3, 239:18, 239:19, 240:2, 242:8, 245:16
**respectfully** [3] - 130:22, 159:10, 162:1
**respects** [4] - 38:24, 85:1, 220:22, 241:20
**respond** [2] - 109:1, 126:13
**responding** [1] - 59:17
**response** [8] - 99:9, 108:10, 129:7, 131:20, 144:23, 199:16, 200:9, 240:9
**responses** [1] - 216:11
**responsibility** [3] - 213:25, 246:3, 246:6
**responsive** [1] - 222:14
**rest** [2] - 52:22, 138:5
**restate** [1] - 186:23
**restorable** [1] - 130:16
**restored** [1] - 129:13
**restraint** [1] - 241:14
**restroom** [1] - 79:18
**results** [4] - 8:4, 29:21, 37:9, 216:18
**resumed** [1] - 120:4
**retired** [2] - 216:15, 216:19
**retirement** [2] - 164:14, 212:12
**retreat** [1] - 109:14
**return** [1] - 167:16

**reveal** [1] - 224:14
**Reverend** [11] - 165:14, 165:16, 166:10, 166:15, 166:23, 168:14, 168:17, 168:24, 173:16, 174:9, 206:6
**reversed** [1] - 242:22
**review** [15] - 15:6, 15:9, 19:23, 27:9, 30:21, 32:24, 33:12, 51:4, 70:22, 79:9, 80:22, 138:3, 188:11, 200:24, 205:5
**reviewed** [16] - 29:24, 29:25, 30:8, 30:14, 30:18, 31:2, 31:4, 33:11, 74:13, 110:4, 145:24, 147:16, 169:7, 183:8, 187:1, 204:3
**reviewing** [2] - 147:19, 212:6
**rewording** [1] - 108:11
**Reynolds** [30] - 4:14, 5:10, 106:22, 109:8, 109:9, 109:15, 120:24, 120:25, 121:4, 150:23, 150:24, 165:20, 166:11, 195:23, 195:24, 222:19, 222:22, 222:24, 224:15, 224:16, 240:23, 240:25
**Reynolds'** [2] - 222:18, 240:25
**Reynolds's** [1] - 222:19
**rifle** [1] - 241:14
**rightly** [1] - 219:25
**rights** [2] - 232:12, 234:4
**rigid** [1] - 163:1
**rigidity** [1] - 143:22
**rigor** [1] - 126:24
**rigorous** [2] - 111:19, 171:5
**ring** [2] - 13:16, 24:23
**rise** [4] - 4:5, 74:6, 172:21, 172:23
**rises** [3] - 75:16, 76:16, 167:11
**risk** [15] - 82:19, 85:9, 85:18, 85:23, 85:24, 86:4, 128:5, 131:19, 132:1, 132:5, 132:6, 132:8, 236:3, 236:5, 237:9
**RMR** [2] - 2:12, 255:14
**road** [3] - 66:17, 217:20, 225:11
**ROBERT** [1] - 1:6
**Robert** [2] - 112:1, 112:2
**ROI** [2] - 17:23, 18:1
**role** [14] - 40:10, 44:17, 48:7, 51:24, 61:8, 71:8, 87:6, 98:21, 103:7, 103:8, 104:16, 163:2, 165:19, 221:3
**roles** [1] - 42:16
**Romatowski** [16] - 69:21, 70:17, 210:17, 211:5, 211:6, 211:17, 211:19, 211:20, 221:9, 237:18, 245:3, 248:5, 248:21, 248:23, 249:14, 254:3
**ROMATOWSKI** [2] - 3:7, 211:13
**Room** [2] - 1:21, 2:13
**room** [6] - 65:16, 101:2, 104:7, 135:1, 210:8, 220:12
**rough** [2] - 17:14, 215:3
**roughly** [4] - 22:19, 44:20, 213:18, 230:17
**routine** [1] - 242:3
**routinely** [2] - 10:16, 250:4
**RPR** [1] - 255:14
**rubber** [1] - 66:17

**rule** [3] - 57:8, 85:10, 245:15
**run** [3] - 106:25, 164:13, 196:20
**running** [7] - 195:23, 196:5, 196:7, 196:12, 196:16, 196:23
**ruse** [1] - 124:24
**Rusk** [1] - 2:13

## S

**sadly** [1] - 253:18
**sake** [2] - 90:20, 91:21
**sales** [1] - 115:10
**sample** [14] - 16:6, 18:17, 18:22, 21:1, 25:5, 25:7, 25:22, 26:2, 26:4, 26:7, 26:15, 26:17, 52:12, 97:20
**samples** [1] - 25:21
**San** [3] - 120:8, 120:10, 249:20
**Sarah** [1] - 2:7
**satisfied** [1] - 246:9
**Saturday** [1] - 240:8
**save** [3] - 156:6, 156:19, 176:23
**saw** [30] - 60:6, 64:18, 77:18, 80:10, 84:10, 85:7, 112:10, 126:11, 134:6, 145:15, 146:9, 153:12, 155:17, 156:1, 162:25, 163:20, 180:13, 180:16, 183:24, 184:15, 184:20, 185:3, 186:3, 186:4, 189:16, 216:5, 217:1, 229:20, 233:22
**scale** [2] - 61:20, 178:20
**scan** [8] - 81:19, 83:7, 83:9, 83:24, 84:1, 84:11, 142:17
**scans** [4] - 8:17, 46:13, 55:7, 55:8
**schedule** [3] - 79:7, 218:2, 227:23
**scheduled** [4] - 158:6, 228:8, 235:1, 240:12
**scheduling** [1] - 240:8
**scheme** [1] - 62:1
**School** [1] - 42:19
**school** [9] - 39:7, 39:15, 39:25, 40:2, 86:20, 212:19, 212:21, 212:25
**scientific** [1] - 76:3
**scientifically** [1] - 38:25
**scientist** [1] - 12:19
**scope** [6] - 10:10, 240:18, 241:3, 241:8, 241:9, 241:17
**scored** [3] - 61:18, 62:2, 62:10
**scoring** [4] - 31:24, 62:4, 62:12, 78:5
**Scott** [7] - 2:2, 183:2, 183:11, 183:24, 198:24, 199:7, 200:21
**screen** [11] - 7:18, 7:21, 22:9, 25:25, 45:13, 61:1, 63:23, 79:16, 156:6, 197:12, 197:18
**Scully** [1] - 212:9
**seal** [1] - 240:12
**search** [10] - 150:17, 150:18, 150:23, 181:19, 183:19, 184:6, 199:1, 199:8, 205:10, 245:4
**seat** [1] - 36:21
**seated** [3] - 4:6, 74:7, 172:24
**SEC** [1] - 214:6

**second** [37] - 4:7, 4:20, 5:4, 5:7, 5:8, 7:15, 27:1, 28:22, 28:24, 32:9, 44:8, 62:9, 62:10, 65:18, 77:17, 81:12, 81:19, 85:1, 91:25, 94:18, 113:24, 130:9, 130:11, 147:21, 160:20, 163:14, 171:24, 202:2, 212:25, 213:18, 215:23, 216:13, 218:3, 221:24, 239:19, 248:22
**secondary** [3] - 92:15, 93:5, 212:16
**secret** [1] - 224:14
**section** [2] - 8:16, 9:3
**securities** [6] - 213:17, 213:19, 213:21, 240:25, 241:5
**security** [1] - 210:12
**see** [106] - 7:21, 8:2, 9:9, 12:13, 14:20, 18:24, 19:25, 20:2, 22:3, 22:4, 22:5, 26:8, 38:11, 53:8, 54:18, 54:25, 56:15, 56:18, 56:19, 57:19, 58:9, 58:25, 59:2, 59:13, 60:15, 64:24, 65:24, 69:18, 70:7, 70:13, 70:14, 72:8, 76:8, 76:9, 76:17, 76:20, 76:21, 80:7, 80:21, 81:23, 82:7, 82:9, 83:4, 83:25, 84:1, 84:9, 87:18, 87:21, 87:23, 88:14, 88:15, 88:22, 89:1, 89:6, 91:10, 91:11, 91:18, 92:18, 93:14, 94:23, 96:10, 101:11, 102:3, 102:5, 102:19, 111:14, 116:1, 125:3, 125:6, 125:13, 126:9, 128:5, 128:7, 129:13, 143:6, 143:11, 143:16, 143:20, 143:21, 143:23, 143:25, 144:18, 147:4, 147:11, 151:19, 193:4, 195:7, 197:11, 197:12, 197:17, 199:8, 199:14, 199:18, 199:19, 199:21, 202:17, 203:17, 204:13, 220:20, 221:14, 233:4, 233:25
**seeing** [17] - 32:18, 41:24, 81:1, 81:21, 122:6, 133:8, 134:3, 141:7, 145:13, 184:21, 184:25, 185:9, 189:14, 190:23, 201:1, 229:7, 244:12
**seek** [1] - 242:15
**seem** [3] - 109:3, 169:5, 216:22
**seeming** [1] - 68:7
**sees** [1] - 65:21
**selected** [1] - 166:18
**self** [4] - 79:17, 215:17, 225:24
**self-defeating** [1] - 225:24
**self-made** [1] - 215:17
**self-taught** [1] - 215:17
**semester** [1] - 86:20
**semi** [1] - 192:4
**semiformal** [1] - 192:4
**semistructured** [1] - 190:18
**sense** [10] - 31:19, 65:19, 95:10, 188:9, 188:13, 214:8, 219:12, 225:5, 234:22, 241:14
**sensitive** [1] - 11:6
**sensitivity** [2] - 38:16, 143:25
**sent** [6] - 30:5, 30:13, 147:5, 147:6, 203:1, 252:12
**sentence** [1] - 204:4
**separate** [5] - 139:16, 194:13, 233:2,

233:6, 242:1
**separately** [2] - 64:16, 236:7
**September** [7] - 150:18, 199:2, 203:16, 204:1, 204:13, 221:20, 232:20
**sequence** [1] - 247:15
**sequentially** [1] - 101:8
**series** [3] - 96:15, 157:21, 221:20
**serious** [1] - 216:23
**serve** [1] - 8:17
**served** [3] - 44:10, 44:20, 213:13
**serves** [1] - 228:21
**service** [1] - 213:20
**services** [1] - 222:20
**session** [1] - 222:6
**SESSION** [1] - 1:10
**set** [10] - 4:7, 29:16, 58:11, 75:23, 88:2, 108:16, 128:22, 167:12, 215:5, 219:7
**sets** [1] - 33:11
**setting** [5] - 82:19, 89:7, 92:22, 92:23, 95:9
**settings** [1] - 67:20
**seven** [2] - 43:21, 67:9
**several** [9] - 43:1, 48:11, 87:9, 114:11, 157:8, 159:16, 183:3, 192:3, 220:4
**severe** [9] - 59:13, 78:14, 79:15, 79:25, 178:5, 178:14, 179:21, 180:4, 228:23
**severely** [3] - 58:2, 59:7, 61:25
**severity** [3] - 32:8, 92:7, 178:3
**sex** [1] - 13:13
**sex-specific** [1] - 13:13
**shade** [1] - 104:8
**shape** [18] - 134:5, 135:16, 137:21, 138:18, 138:19, 139:1, 144:8, 164:14, 164:17, 166:20, 170:16, 174:5, 174:6, 174:7, 174:14, 205:24, 207:13
**shaping** [1] - 206:1
**share** [3] - 54:12, 55:20, 91:7
**shared** [3] - 165:12, 213:25, 234:11
**Sharon** [1] - 86:21
**sharp** [2] - 106:13, 164:13
**shift** [3] - 105:12, 112:24, 154:19
**shoot** [1] - 126:11
**shooting** [1] - 241:14
**short** [1] - 33:24
**shortly** [1] - 50:22
**shotgun** [1] - 241:15
**shots** [1] - 241:14
**show** [18] - 18:1, 18:10, 37:6, 37:8, 45:15, 59:13, 69:18, 91:13, 115:1, 130:10, 156:6, 198:12, 199:5, 200:6, 218:10, 218:13, 240:13, 241:13
**showed** [3] - 90:22, 208:11, 221:12
**showing** [6] - 14:25, 16:8, 22:12, 55:10, 202:15, 203:25
**shown** [8] - 11:5, 45:24, 147:9, 151:20, 199:23, 206:4, 206:5, 208:6
**shows** [4] - 6:5, 16:6, 25:22, 83:8
**shut** [1] - 210:10
**sick** [1] - 116:19

**side** [11] - 4:12, 4:24, 5:20, 6:21, 58:25, 59:2, 216:21, 228:3, 230:19, 235:24, 238:6
**sides** [6] - 77:15, 95:16, 95:18, 132:25, 171:13, 244:13
**significance** [9] - 125:19, 125:23, 147:17, 157:12, 157:14, 157:24, 166:9, 167:25, 193:11
**significant** [6] - 76:17, 80:25, 86:5, 86:16, 87:19, 209:7
**significantly** [2] - 78:7, 86:13
**signs** [2] - 142:7, 144:12
**similar** [4] - 33:11, 78:6, 105:19, 224:22
**simple** [4] - 117:8, 117:9, 220:16
**simply** [5] - 84:5, 220:9, 220:17, 221:6, 242:12
**simultaneously** [1] - 77:21
**Sinemet** [1] - 140:10
**Singapore** [1] - 241:3
**singer** [1] - 57:24
**singing** [3] - 58:7, 111:10, 111:11
**single** [12] - 15:11, 37:6, 37:8, 49:1, 49:12, 54:14, 62:23, 95:9, 97:17, 106:21, 138:5, 167:11
**singular** [1] - 54:14
**sit** [4] - 34:23, 47:10, 57:25, 207:16
**sitting** [1] - 186:15
**situation** [8] - 58:11, 93:16, 94:6, 98:25, 171:22, 206:4, 206:12, 237:6
**situations** [1] - 55:23
**six** [8] - 67:14, 85:6, 86:16, 88:6, 196:1, 213:13, 218:7, 241:1
**Sixth** [2] - 246:12, 249:4
**size** [1] - 26:2
**skewed** [2] - 12:25, 18:25
**skews** [1] - 18:22
**skill** [1] - 109:25
**skills** [4] - 53:19, 109:23, 109:24, 111:6
**skimmed** [1] - 229:21
**skipping** [1] - 234:8
**Slade** [7] - 67:15, 69:1, 72:25, 174:18, 176:4, 206:16
**Slade's** [1] - 206:22
**sleep** [18] - 90:16, 90:19, 90:22, 90:23, 91:2, 91:5, 91:10, 91:13, 91:14, 91:15, 142:4, 143:23, 144:11, 144:20, 144:22, 145:3, 145:4
**slide** [1] - 74:18
**slides** [3] - 51:16, 51:20, 77:10
**slow** [2] - 42:8, 229:17
**slowed** [2] - 88:23, 96:7
**slower** [2] - 117:20, 121:21
**slowing** [3] - 143:22, 209:13, 209:17
**slowly** [3] - 56:1, 69:14, 229:1
**small** [2] - 113:12, 229:5
**smart** [1] - 107:16
**Smith** [1] - 1:18
**smoking** [1] - 220:13
**so-and-so** [5] - 219:20, 219:22, 220:25,

225:13, 225:14
**so..** [1] - 82:3
**sociable** [1] - 68:3
**social** [2] - 53:20, 94:23
**societies** [1] - 40:10
**Society** [1] - 76:13
**society** [1] - 77:4
**socioeconomic** [1] - 19:12
**sociology** [1] - 168:5
**soft** [1] - 215:15
**soft-spoken** [1] - 215:15
**software** [8] - 113:13, 114:13, 114:14, 114:22, 114:23, 114:24, 166:14, 222:20
**solidify** [1] - 11:1
**someone** [47] - 31:24, 32:1, 32:5, 35:19, 43:9, 43:10, 56:8, 60:13, 60:15, 60:18, 61:6, 66:15, 66:17, 66:20, 76:21, 84:6, 86:20, 87:19, 89:15, 89:24, 94:7, 94:14, 95:7, 95:11, 95:13, 102:11, 111:10, 125:10, 126:2, 136:13, 142:7, 142:25, 153:18, 157:20, 158:12, 171:14, 175:11, 175:12, 179:3, 189:17, 191:21, 191:22, 193:19, 198:9, 215:16, 231:15
**sometime** [2] - 86:25, 155:4
**sometimes** [10] - 9:24, 9:25, 53:12, 55:6, 122:2, 122:3, 159:19, 179:3, 197:1, 217:24
**somewhat** [6] - 96:21, 103:5, 112:17, 121:9, 146:9, 163:1
**somewhere** [6] - 32:18, 128:24, 147:13, 178:5, 196:6, 231:14
**son** [3] - 232:13, 233:1, 233:13
**soon** [2] - 173:13, 173:16
**sorry** [26] - 11:19, 11:22, 21:12, 21:22, 22:7, 22:8, 45:5, 80:24, 106:2, 116:8, 118:10, 120:3, 131:21, 159:19, 167:1, 171:24, 174:2, 174:4, 174:9, 174:25, 190:5, 190:7, 205:17, 227:6, 227:17, 254:23
**sort** [34] - 27:25, 32:20, 33:5, 55:16, 69:11, 73:22, 77:5, 87:12, 92:15, 105:12, 107:10, 108:25, 109:14, 113:7, 115:23, 122:13, 132:25, 134:8, 134:19, 135:8, 136:15, 144:15, 149:22, 154:11, 165:21, 182:12, 190:25, 215:14, 216:24, 221:9, 221:17, 221:18, 222:15, 241:24
**sorted** [1] - 224:21
**sorts** [4] - 66:14, 106:10, 214:11, 214:13
**sought** [1] - 108:5
**sounded** [2] - 20:6, 125:9
**sounds** [8] - 24:24, 148:6, 153:7, 155:11, 156:23, 161:6, 184:12, 185:11
**source** [9] - 32:14, 65:8, 66:22, 70:25, 155:14, 173:7, 206:2, 207:11, 233:22
**sources** [1] - 45:23
**southeast** [1] - 19:10
**SOUTHERN** [1] - 1:1

**Southern** [3] - 212:22, 213:12, 213:21
**space** [1] - 179:18
**speaking** [10] - 38:23, 70:16, 103:4, 108:13, 110:20, 110:24, 111:4, 180:3, 207:5, 241:4
**speaks** [4] - 66:7, 70:1, 78:20, 104:2, 122:9, 136:7
**specialist** [1] - 38:1
**specialize** [1] - 38:18
**specialized** [1] - 56:8
**specialties** [1] - 37:21
**specialty** [4] - 37:11, 37:19, 38:4, 38:10
**specific** [15] - 5:21, 8:9, 11:6, 13:13, 14:4, 14:6, 14:8, 49:7, 62:18, 93:24, 136:25, 192:10, 216:7, 218:20
**specifically** [5] - 8:20, 13:16, 14:12, 128:23, 128:25
**specifics** [2] - 106:8, 222:14
**spectrum** [3] - 135:12, 144:18, 224:21
**sped** [1] - 227:8
**speech** [1] - 5:10
**Speeches** [1] - 46:18
**speed** [1] - 96:8
**spell** [4] - 37:14, 123:14, 124:23, 211:17
**spelling** [1] - 125:12
**spend** [3] - 37:9, 51:13, 59:6
**spends** [1] - 64:23
**spent** [2] - 39:23, 67:19
**spinal** [2] - 55:8, 142:25
**spoken** [1] - 215:15
**sports** [1] - 210:14
**sprawling** [1] - 224:2
**stack** [2] - 204:25, 225:10
**stage** [8] - 79:15, 83:20, 131:9, 131:10, 141:4, 212:3, 228:2, 242:17
**stages** [1] - 78:14
**staggering** [1] - 241:3
**stamina** [4] - 73:18, 96:1, 96:11, 122:10
**stand** [15] - 36:10, 47:3, 92:14, 94:20, 118:15, 118:18, 118:22, 128:20, 129:10, 130:15, 164:7, 181:11, 234:17, 238:15, 254:21
**standard** [8] - 10:10, 10:11, 10:23, 44:12, 84:15, 87:10, 97:8, 187:13
**standards** [2] - 75:24, 236:20
**standpoint** [6] - 8:25, 23:24, 48:4, 125:22, 164:25
**stands** [1] - 18:13
**start** [17] - 10:23, 37:13, 51:20, 52:21, 123:23, 124:9, 141:7, 141:23, 142:4, 184:25, 209:12, 215:22, 221:13, 226:19, 228:19, 244:4, 244:11
**started** [14] - 20:6, 40:3, 41:21, 67:4, 115:6, 140:13, 150:7, 156:11, 172:6, 181:18, 184:20, 184:23, 244:9, 254:19
**starting** [9] - 7:25, 8:14, 8:16, 33:17, 40:17, 74:1, 75:4, 123:21, 141:5
**starts** [2] - 29:2, 178:12
**state** [9] - 60:11, 60:17, 94:9, 95:22,

186:24, 191:20, 191:24, 196:19, 211:17
**State** [1] - 78:4
**statements** [1] - 73:3
**states** [3] - 52:10, 143:18, 211:25
**States** [3] - 18:20, 123:12, 213:24
**STATES** [3] - 1:1, 1:3, 1:12
**stating** [1] - 192:24
**status** [8] - 26:8, 29:19, 54:23, 60:5, 60:6, 61:2, 61:3, 195:9
**statute** [4] - 129:11, 129:19, 130:18, 131:2
**stay** [2] - 49:3, 63:13
**steering** [2] - 220:6, 220:11
**stems** [1] - 139:21
**stenography** [1] - 2:15
**step** [10] - 77:3, 77:10, 77:12, 78:11, 80:4, 211:7, 234:8
**step-by-step** [3] - 77:3, 77:10, 77:12
**Stephen** [1] - 67:15
**steps** [2] - 232:1, 246:24
**sticker** [1] - 45:16
**stickers** [1] - 27:2
**sticking** [2] - 112:23, 177:25
**still** [19] - 34:25, 47:22, 52:16, 75:2, 105:8, 109:5, 117:5, 132:10, 163:2, 180:10, 183:1, 195:16, 195:23, 196:2, 196:5, 248:12, 248:15, 249:11
**stipulate** [1] - 204:6
**stock** [3] - 135:3, 135:9, 182:13
**stood** [1] - 162:14
**stop** [4] - 119:13, 156:12, 244:24
**stopped** [3] - 100:17, 115:21, 251:21
**stopping** [1] - 254:16
**storage** [1] - 220:12
**story** [6] - 69:18, 182:14, 217:7, 217:16, 217:17, 226:10
**straight** [1] - 126:11
**straightforward** [1] - 169:2
**strand** [1] - 217:16
**strategic** [3] - 241:13, 242:13, 242:22
**strategy** [2] - 130:15, 242:10
**streamline** [1] - 172:7
**street** [1] - 24:13
**Street** [3] - 1:21, 2:8, 213:4
**strength** [1] - 116:19
**strengths** [11] - 54:2, 54:5, 57:6, 57:9, 57:15, 57:17, 58:11, 58:12, 109:22, 111:8, 112:20
**stress** [1] - 126:24
**stressing** [1] - 57:18
**stretch** [1] - 111:15
**strictly** [1] - 230:16
**strike** [3] - 166:2, 166:13, 176:21
**striking** [1] - 69:5
**string** [6] - 218:7, 218:14, 218:23, 219:13, 220:24, 225:15
**strings** [1] - 223:9
**strong** [3] - 35:11, 82:16, 232:13

**struck** [2] - 69:1, 179:13
**structured** [1] - 192:4
**struggle** [1] - 25:12
**struggling** [5] - 76:22, 126:1, 126:17, 196:11, 229:15
**Stuart** [3] - 147:1, 151:17, 152:2, 152:6, 157:17
**student** [1] - 87:4
**studied** [3] - 22:23, 22:24, 83:25
**studies** [5] - 42:2, 44:25, 81:18, 86:17, 128:10
**study** [22] - 14:5, 14:6, 14:8, 17:5, 17:18, 18:15, 21:16, 21:21, 21:23, 22:12, 34:22, 37:6, 83:19, 83:23, 90:22, 91:13, 91:14, 138:3, 144:22, 145:5
**study's** [1] - 19:18
**stuff** [6] - 10:3, 30:25, 57:11, 100:4, 100:8, 100:11
**subcortical** [1] - 144:8
**subject** [4] - 85:17, 154:7, 225:1, 241:9
**subjective** [4] - 182:24, 209:5, 209:6, 209:14
**subjects** [1] - 83:23
**submit** [1] - 45:19
**submitted** [4] - 45:17, 46:25, 47:15, 239:8
**subsamples** [1] - 12:22
**subsequent** [3] - 233:16, 237:25
**subsequently** [2] - 180:13, 239:24
**substance** [1] - 73:3
**substantive** [1] - 150:11
**subtract** [3] - 123:17, 123:25, 124:10
**successfully** [1] - 242:2
**such-and-such** [1] - 225:13
**suddenly** [2] - 59:16, 68:4
**suffer** [1] - 90:5
**suffered** [1] - 220:19
**suffering** [2] - 85:17, 131:21
**suffers** [1] - 74:16
**sufficient** [6] - 11:5, 11:14, 75:20, 84:7, 91:15, 227:24
**sufficiently** [4] - 20:3, 96:11, 96:25, 248:18
**suggest** [3] - 71:6, 218:24, 218:25
**suggested** [3] - 128:25, 146:13, 146:23
**suggesting** [1] - 136:8
**suggestion** [1] - 206:18
**suggests** [2] - 154:21, 221:2
**suitable** [1] - 47:23
**Suite** [1] - 2:3
**sum** [1] - 17:13
**summarize** [1] - 243:7
**summarized** [1] - 64:15
**summer** [2] - 212:20, 221:22
**sums** [1] - 97:11
**sundowning** [1] - 122:2
**supervised** [1] - 213:23
**supplement** [1] - 236:19

**supplemental** [1] - 75:1
**support** [6] - 9:5, 9:15, 55:9, 232:14, 233:22, 233:23
**supported** [1] - 94:11
**supporting** [3] - 83:6, 213:7, 214:17
**supporting-cast** [1] - 214:17
**supportive** [2] - 28:7, 83:11
**supports** [1] - 9:21
**suppose** [3] - 169:12, 193:22, 242:21
**surprise** [6] - 31:13, 144:10, 171:19, 183:10, 183:12, 183:14
**surprising** [1] - 31:15
**suspect** [2] - 10:25, 221:13
**suspected** [3] - 149:2, 150:12, 164:19
**sustained** [1] - 136:19
**switch** [2] - 24:1, 207:25
**Switzerland** [1] - 241:2
**sworn** [9] - 36:20, 37:1, 158:22, 158:25, 207:1, 211:7, 211:11, 211:14, 213:11
**symptom** [1] - 94:7
**symptoms** [12] - 92:11, 92:20, 92:24, 92:25, 93:11, 94:8, 143:5, 143:10, 143:14, 144:16, 144:18, 147:1
**syndrome** [5] - 53:17, 77:22, 88:10, 88:13, 88:14
**syndromes** [1] - 89:6
**synuclein** [6] - 140:13, 140:18, 141:3, 142:7, 142:16, 144:6
**system** [1] - 113:10
**systems** [2] - 52:11, 106:24

**T**

**table** [6] - 16:6, 16:8, 22:7, 25:22, 100:9, 128:19
**tabs** [1] - 229:21
**talks** [2] - 140:9, 209:2
**Tamine** [1] - 194:8
**Tamine's** [1] - 183:19
**tangent** [2] - 108:8, 113:21
**task** [10] - 94:25, 95:4, 95:21, 135:19, 135:20, 135:21, 135:22, 135:23, 136:10
**tasks** [1] - 95:1
**Tau** [13] - 10:15, 10:23, 11:1, 11:7, 11:9, 11:11, 11:14, 11:24, 12:1, 13:9, 16:25, 27:21, 142:20
**taught** [1] - 215:17
**Tax** [1] - 1:20, 238:7
**tax** [7] - 107:9, 109:9, 240:16, 240:17, 241:4, 241:11, 250:5
**teacher** [1] - 41:5
**teaching** [3] - 42:15, 42:20, 42:21
**team** [10] - 33:8, 49:24, 146:18, 146:19, 147:10, 162:5, 181:19, 187:15, 190:25, 208:1
**technology** [1] - 142:18
**Tel** [4] - 1:22, 2:4, 2:9, 2:14
**telltale** [3] - 142:6, 143:14, 144:12
**temporoparietal** [2] - 17:23, 18:1

**ten** [4] - 71:19, 74:3, 172:5, 245:13
**tend** [2] - 52:20, 56:1
**tends** [1] - 48:22
**tenth** [2] - 226:15, 226:20
**term** [17] - 23:17, 40:17, 41:7, 41:14, 52:5, 52:6, 83:1, 84:4, 92:16, 114:19, 122:1, 136:10, 137:25, 169:14, 182:2, 208:8, 213:18
**terminate** [1] - 126:5
**terminology** [1] - 52:7
**terms** [34] - 10:7, 48:24, 49:17, 54:10, 55:18, 56:15, 57:11, 57:12, 60:2, 61:7, 65:3, 65:21, 67:2, 67:12, 68:1, 69:25, 75:22, 75:24, 87:13, 89:10, 89:22, 101:22, 178:6, 179:5, 179:19, 179:23, 181:23, 181:25, 182:1, 182:19, 207:8, 228:10, 237:9, 246:6
**terrible** [1] - 156:11
**terrific** [1] - 55:13
**territory** [2] - 113:22, 180:5
**test** [24] - 24:25, 30:8, 30:11, 30:12, 30:18, 30:24, 31:20, 31:22, 32:1, 37:9, 54:14, 60:5, 60:8, 61:1, 62:19, 62:23, 66:15, 69:17, 71:21, 84:10, 110:23, 191:1, 191:4, 216:18
**tested** [1] - 31:4
**testified** [19] - 23:14, 37:1, 49:16, 71:25, 72:19, 131:14, 133:19, 137:18, 149:13, 154:10, 160:3, 161:5, 161:11, 164:3, 164:12, 164:18, 186:16, 205:6, 211:14
**testify** [7] - 66:4, 68:12, 68:15, 72:25, 134:6, 243:20, 243:22
**testifying** [6] - 49:14, 68:10, 110:15, 171:2, 200:3, 201:7
**testimony** [45] - 11:9, 20:20, 35:6, 49:13, 51:21, 61:9, 68:22, 70:20, 70:23, 71:2, 72:8, 78:18, 79:10, 80:2, 80:15, 81:7, 111:14, 124:20, 125:23, 145:25, 146:1, 154:19, 154:23, 158:23, 159:1, 160:7, 160:13, 161:7, 161:17, 161:21, 162:6, 162:19, 162:25, 163:5, 170:24, 180:7, 189:9, 207:1, 207:3, 223:20, 243:7, 244:16, 247:8, 247:10, 253:23
**testing** [15] - 29:4, 29:13, 29:16, 54:3, 54:24, 57:18, 58:1, 61:11, 61:12, 73:14, 80:10, 90:12, 111:18, 135:1, 186:6
**tests** [12] - 33:16, 34:7, 35:7, 55:6, 55:8, 58:3, 110:21, 116:16, 128:6, 191:6, 192:10, 234:25
**TEXAS** [1] - 1:1
**Texas** [4] - 1:4, 2:3, 2:13, 124:14
**textbook** [2] - 44:8, 87:11
**textbooks** [2] - 42:25, 44:13
**thanked** [1] - 229:22
**Thanksgiving** [1] - 253:24
**that'** [2] - 201:15, 229:10
**THE** [146] - 1:1, 1:1, 1:11, 1:17, 2:1, 4:5,

4:6, 4:11, 4:15, 4:17, 4:19, 5:2, 5:15, 5:17, 6:4, 6:9, 6:11, 6:13, 6:23, 7:2, 7:4, 13:24, 13:25, 14:2, 25:18, 36:4, 36:7, 36:8, 36:9, 36:11, 36:15, 36:18, 36:21, 36:23, 45:7, 68:14, 68:18, 71:20, 71:24, 71:25, 72:2, 72:4, 72:5, 72:16, 73:6, 74:2, 74:6, 74:7, 112:9, 112:11, 112:12, 112:16, 119:15, 125:15, 125:17, 125:24, 128:16, 128:21, 129:3, 129:7, 129:17, 129:21, 130:1, 130:5, 130:8, 130:12, 130:19, 131:3, 131:10, 131:12, 132:15, 136:19, 147:22, 148:18, 148:22, 148:24, 149:10, 149:11, 159:10, 160:20, 161:23, 170:2, 170:5, 170:10, 170:11, 170:18, 170:20, 172:1, 172:12, 172:17, 172:21, 172:23, 172:24, 198:16, 198:19, 200:4, 200:8, 200:12, 200:14, 201:8, 201:11, 201:17, 202:7, 202:9, 202:13, 204:8, 204:20, 205:13, 205:16, 205:18, 207:23, 208:3, 210:1, 210:3, 210:5, 210:11, 210:16, 210:20, 210:23, 211:3, 211:6, 211:9, 211:10, 211:12, 221:8, 221:15, 223:12, 224:1, 227:6, 227:13, 237:3, 237:20, 243:9, 244:1, 244:8, 244:14, 244:21, 244:25, 248:22, 250:14, 251:7, 251:10, 254:2, 254:17, 254:23, 254:25
**the..** [1] - 226:1
**them'** [1] - 174:11
**theme** [1] - 217:16
**themselves** [6] - 53:10, 58:18, 79:3, 194:6, 236:7
**therapy** [1] - 59:5
**thereafter** [1] - 70:14
**therefore** [4] - 8:8, 105:3, 115:1, 115:9
**they've** [1] - 107:9
**think's** [1] - 88:12
**thinking** [8] - 25:3, 29:17, 60:19, 63:12, 88:12, 140:7, 224:8, 237:2
**third** [15] - 12:10, 16:2, 20:7, 25:6, 43:15, 57:5, 78:1, 84:19, 95:25, 96:22, 103:12, 212:21, 215:23, 218:3, 221:24
**thoughts** [3] - 88:21, 90:1, 121:14
**thousands** [1] - 30:3
**threatening** [1] - 88:1
**three** [16] - 15:2, 15:15, 56:12, 73:17, 85:5, 88:5, 98:7, 119:14, 123:25, 124:4, 124:10, 218:23, 218:25, 223:17, 248:3
**threes** [1] - 123:17
**threshold** [5] - 83:10, 83:16, 83:17, 84:5, 84:16
**thrive** [1] - 100:7
**throughout** [3] - 4:21, 80:10, 117:21
**throw** [4] - 115:12, 159:7, 160:17, 161:1
**Thursday** [2] - 240:13, 240:14
**timeline** [11] - 27:5, 69:7, 69:9, 69:12, 94:2, 147:19, 153:17, 176:12, 184:10,

221:9, 221:13
**timing** [2] - 141:17, 151:3
**tired** [1] - 117:20
**tissue** [1] - 52:12
**title** [1] - 221:1
**today** [29] - 6:25, 41:9, 44:19, 47:10, 52:5, 98:3, 99:11, 99:15, 100:11, 104:18, 110:15, 120:15, 129:10, 129:16, 130:7, 137:9, 179:15, 180:10, 180:20, 181:7, 181:10, 186:15, 188:19, 188:20, 207:16, 210:19, 237:10, 242:24, 251:22
**today's** [2] - 122:20, 122:21
**together** [14] - 8:18, 28:6, 33:12, 44:11, 54:18, 55:1, 70:1, 77:11, 97:6, 106:20, 106:21, 207:14, 233:9
**toll** [4] - 86:5, 86:7, 87:6, 88:18
**Tom** [1] - 165:5
**Tommy** [16] - 70:20, 154:8, 154:11, 155:1, 155:10, 156:21, 157:2, 157:5, 157:6, 157:20, 158:23, 158:25, 159:6, 161:3, 173:17, 206:24
**tomorrow** [13] - 172:4, 210:21, 244:2, 244:3, 244:5, 244:10, 244:18, 253:19, 253:25, 254:18, 254:21, 255:1
**tonight** [1] - 253:20
**Tony** [4] - 57:25, 58:23, 58:24, 111:10
**took** [16] - 50:14, 101:2, 102:15, 134:22, 154:10, 175:5, 199:2, 215:20, 218:24, 219:9, 219:16, 219:19, 220:1, 232:1, 252:17, 252:19
**top** [6] - 8:15, 17:8, 26:1, 27:25, 150:7, 222:15
**top-level** [1] - 222:15
**topic** [4] - 112:23, 116:4, 116:6, 205:19
**topics** [2] - 105:12, 126:21
**tossed** [1] - 154:11
**total** [3] - 17:13, 45:20, 119:10
**totality** [1] - 130:13
**totally** [2] - 73:7, 169:2
**touched** [1] - 240:1
**toward** [2] - 217:15, 220:11
**towards** [5] - 18:22, 18:25, 57:3, 60:1, 177:21
**town** [1] - 159:15
**track** [4] - 63:13, 109:6, 116:3, 196:1
**tract** [3] - 85:22, 184:18, 199:11
**training** [3] - 12:20, 56:7, 56:8
**transactions** [1] - 240:24
**transcript** [8] - 6:7, 70:22, 110:11, 118:3, 145:24, 161:13, 163:21, 255:10
**Transcript** [1] - 2:16
**transcription** [1] - 2:16
**transcripts** [2] - 110:6, 181:3
**transitional** [1] - 144:8
**Trazodone** [1] - 91:15
**treadmill** [1] - 116:25
**treat** [5] - 43:17, 140:5, 167:22, 206:21, 234:13
**treated** [1] - 91:19

**treating** [4] - 38:2, 51:9, 234:12, 238:11
**treatment** [9] - 38:18, 53:4, 87:10, 127:20, 127:23, 176:12, 234:19, 236:19, 236:24
**treatments** [1] - 44:22
**tremendous** [3] - 76:1, 107:9, 156:1
**trial** [26] - 72:20, 73:18, 84:14, 89:23, 92:14, 94:20, 96:2, 118:15, 118:18, 118:20, 118:23, 122:10, 126:24, 128:20, 129:10, 130:15, 161:7, 191:22, 213:9, 213:15, 214:15, 216:17, 234:17, 242:14, 242:18, 242:19
**trials** [8] - 12:24, 42:2, 42:12, 44:14, 44:18, 44:21, 84:13, 84:16
**tried** [6] - 126:5, 156:23, 195:11, 214:12, 243:15, 246:17
**trigger** [2] - 83:16, 231:20
**triggered** [1] - 126:12
**trip** [8] - 182:6, 183:6, 183:16, 183:18, 183:22, 199:8, 199:12, 205:11
**trivial** [1] - 220:17
**trouble** [1] - 102:12
**troublesome** [1] - 216:14
**true** [18] - 8:12, 9:11, 9:20, 9:21, 10:4, 18:21, 23:13, 44:4, 111:1, 142:19, 157:1, 170:11, 170:17, 178:15, 180:25, 206:11, 246:23
**Trust** [2] - 223:8, 240:21
**trust** [2] - 194:14, 224:3
**truth** [12] - 68:20, 68:21, 72:17, 73:4, 134:14, 158:11, 171:6, 171:8, 171:11, 171:12, 200:16, 206:7
**try** [19] - 19:25, 24:13, 54:17, 55:12, 80:6, 93:9, 115:24, 116:2, 134:14, 152:21, 167:7, 169:10, 174:2, 186:1, 197:12, 221:1, 230:11, 231:6, 254:25
**trying** [29] - 29:22, 35:4, 66:13, 101:5, 101:14, 104:17, 110:2, 115:12, 116:17, 125:8, 130:9, 145:18, 152:23, 153:16, 156:19, 157:19, 158:7, 159:20, 177:8, 192:8, 197:2, 218:12, 223:8, 223:22, 232:6, 234:12, 243:14, 243:15, 247:7
**Tuesday** [1] - 253:24
**turn** [3] - 126:21, 218:24, 220:1
**turned** [3] - 215:24, 219:1, 230:19
**turning** [1] - 116:16
**turns** [1] - 193:7
**twice** [2] - 148:1, 205:6
**two** [37] - 5:7, 21:18, 31:25, 40:8, 43:25, 45:20, 50:5, 56:12, 59:22, 66:13, 73:10, 73:15, 74:13, 80:8, 81:17, 115:6, 117:3, 139:14, 139:17, 151:1, 166:18, 170:22, 171:13, 177:6, 191:20, 201:13, 216:11, 222:1, 222:4, 223:17, 227:22, 227:24, 233:3, 233:21, 242:1, 254:8
**Two** [1] - 116:11
**two-fold** [2] - 227:22, 233:21

**two-pound** [1] - 117:3
**TX** [1] - 2:4
**type** [10] - 60:8, 83:4, 83:20, 87:8, 93:24, 99:18, 108:4, 149:22, 177:9
**types** [4] - 44:17, 128:6, 214:9, 216:8
**typical** [2] - 38:7, 218:7
**typically** [3] - 128:11, 144:25, 209:20

## U

**U.S** [7] - 1:20, 212:22, 213:11, 214:4, 238:7, 240:16, 240:18
**Ulhmstead** [1] - 17:19
**ultimate** [3] - 35:10, 138:15, 139:1
**ultimately** [2] - 120:19, 235:14
**unable** [2] - 207:19, 231:5
**uncomfortable** [1] - 24:9
**uncommon** [1] - 82:4
**under** [20] - 31:13, 32:3, 71:22, 72:1, 72:20, 88:12, 131:2, 150:19, 164:3, 164:12, 164:18, 170:24, 171:2, 171:14, 213:8, 214:13, 214:14, 232:11, 240:12
**under-appreciated** [1] - 88:12
**under-oath** [1] - 170:24
**undergoing** [1] - 176:12
**undergone** [2] - 50:19, 128:6
**undergraduate** [3] - 39:6, 39:8, 212:18
**underlying** [3] - 55:10, 87:19, 142:14
**understood** [5] - 73:7, 117:10, 170:7, 190:21, 211:1
**undertake** [1] - 199:16
**underway** [2] - 114:11, 235:7
**underwent** [1] - 51:4
**unfold** [2] - 56:1, 58:20
**unfolding** [4] - 67:22, 69:14, 69:19, 94:10
**unfolds** [1] - 94:9
**unfortunately** [4] - 12:23, 85:19, 86:10, 127:25
**unique** [1] - 38:11
**unit** [1] - 213:21
**UNITED** [3] - 1:1, 1:3, 1:12
**United** [3] - 18:20, 123:12, 213:24
**universally** [1] - 220:7
**University** [3] - 39:9, 39:10, 42:18
**unknown** [1] - 136:13
**unless** [3] - 72:19, 84:14, 246:17
**unlike** [1] - 142:20
**unsealed** [1] - 240:7
**unusual** [2] - 60:23, 166:13
**unusually** [1] - 94:21
**up** [76] - 4:7, 7:14, 9:7, 17:12, 22:16, 25:25, 26:20, 36:12, 40:9, 40:20, 43:5, 44:5, 49:5, 50:8, 51:17, 56:11, 58:5, 58:12, 58:14, 63:23, 64:18, 66:24, 71:19, 72:7, 74:18, 76:5, 77:10, 77:25, 79:1, 82:19, 88:2, 88:3, 91:3, 92:25, 97:11, 98:7, 99:25, 100:6, 101:20, 108:17, 115:1, 115:3, 116:17, 119:21,

125:8, 126:11, 128:22, 129:25, 133:11, 139:15, 162:14, 169:10, 175:19, 180:14, 183:5, 187:12, 193:4, 194:9, 194:23, 197:7, 202:17, 210:7, 210:19, 214:5, 215:2, 215:3, 218:14, 227:9, 234:1, 239:18, 240:13, 245:18, 247:3, 247:19, 254:20, 255:2
**up-to-date** [1] - 234:1
**updated** [1] - 6:3
**urged** [1] - 126:6
**urgency** [1] - 89:20
**urinary** [3] - 85:22, 184:18, 199:11
**UroLift** [1] - 50:21
**urologist** [2] - 184:17, 199:19
**urosepsis** [4] - 50:17, 85:21, 131:19, 131:22
**useful** [1] - 223:2
**uses** [2] - 135:25, 137:14
**usual** [1] - 232:21
**UTI** [1] - 131:21

## V

**V.A** [1] - 39:20
**vague** [2] - 101:17, 146:9
**vagueness** [1] - 122:7
**validity** [2] - 61:12, 192:6
**valuations** [1] - 8:18
**value** [10] - 11:8, 11:10, 11:12, 11:15, 102:15, 133:1, 133:5, 133:7, 175:6, 175:7
**valued** [2] - 174:23, 175:3
**variable** [1] - 53:24
**variety** [1] - 213:14
**various** [3] - 62:25, 74:15, 211:25
**VARNADO** [76] - 36:14, 36:16, 36:22, 36:24, 37:3, 45:4, 45:8, 51:16, 51:18, 68:24, 72:3, 72:6, 73:7, 73:8, 74:4, 74:9, 74:11, 100:18, 100:20, 103:1, 103:21, 105:6, 106:4, 108:3, 112:21, 112:22, 113:19, 115:22, 117:13, 118:4, 119:5, 119:16, 119:25, 121:6, 121:8, 124:18, 125:16, 126:3, 128:22, 129:4, 130:10, 130:13, 130:25, 131:7, 131:11, 131:16, 131:17, 132:13, 136:17, 148:15, 156:19, 161:15, 172:16, 172:19, 198:20, 198:22, 200:11, 200:13, 200:19, 200:22, 201:10, 201:16, 202:8, 202:12, 202:14, 204:11, 204:23, 204:24, 205:15, 205:20, 205:21, 207:22, 209:25, 210:2, 251:2, 251:9
**Varnado** [5] - 2:2, 3:5, 3:6, 74:8, 208:11
**Varnado's** [1] - 204:8
**vary** [1] - 53:2
**vascular** [1] - 24:21
**vast** [1] - 44:15
**veracity** [3] - 72:12, 206:8, 207:8
**verb** [1] - 235:18
**verify** [1] - 236:7

**verse** [1] - 46:5
**versus** [5] - 22:13, 67:9, 75:12, 82:7, 206:2
**Vesey** [1] - 2:8
**vet** [1] - 236:6
**video** [37] - 4:14, 5:9, 5:11, 5:13, 5:21, 5:22, 6:2, 6:5, 6:17, 96:15, 96:23, 97:14, 98:4, 98:19, 100:17, 103:2, 104:6, 105:24, 112:10, 112:12, 112:13, 117:25, 118:4, 118:6, 119:10, 119:24, 120:2, 120:4, 122:18, 124:21, 125:2, 126:5, 126:9, 132:20, 132:25, 133:5, 133:8
**Video** [1] - 115:21
**videos** [12] - 4:22, 6:17, 6:19, 59:14, 60:1, 63:17, 110:10, 110:11, 110:13, 189:24, 190:13
**videotape** [1] - 97:23
**view** [15] - 72:11, 95:12, 96:22, 121:18, 206:7, 207:10, 231:10, 231:12, 232:13, 233:8, 233:21, 235:21, 239:1, 247:16, 252:16
**viewed** [1] - 187:14
**views** [1] - 28:23
**Vince** [1] - 212:9
**violations** [2] - 213:17, 214:12
**visibly** [1] - 126:10
**visit** [1] - 199:16
**visited** [1] - 34:12
**vista** [2] - 240:22, 245:11
**visual** [5] - 80:9, 144:11, 146:4, 146:7, 146:11
**vivid** [1] - 143:20
**volume** [4] - 8:22, 19:14, 33:23, 35:19
**VS** [1] - 1:4
**vulnerabilities** [2] - 54:2, 57:9
**vulnerable** [2] - 86:2, 86:3

## W

**wait** [3] - 175:1, 207:23, 248:22
**waivers** [2] - 238:12, 239:5
**walk** [1] - 77:9
**walking** [1] - 116:24
**Wall** [1] - 213:3
**wandered** [1] - 101:18
**wane** [1] - 143:19
**wanes** [1] - 122:8
**waning** [2] - 85:9, 85:15
**wants** [2] - 106:25, 204:9
**warrant** [7] - 181:19, 183:19, 184:6, 199:2, 199:8, 205:11, 245:4
**warrants** [1] - 151:14
**Washington** [3] - 1:22, 211:23, 230:6
**watch** [7] - 58:7, 122:12, 189:23, 189:25, 190:13, 190:17, 190:19
**watched** [8] - 59:18, 110:11, 125:2, 126:7, 132:20, 185:12, 186:16, 189:25
**watching** [2] - 66:20, 224:23
**wave** [1] - 55:7

**wax** [1] - 143:18
**waxing** [2] - 85:8, 85:15
**ways** [11] - 16:19, 39:1, 39:2, 53:2, 59:17, 175:13, 195:5, 220:4, 220:5, 229:1
**weakened** [2] - 86:2, 96:5
**weaknesses** [1] - 54:5
**weather** [2] - 228:13, 228:16
**weeds** [1] - 181:23
**week** [5] - 40:2, 49:1, 86:25, 159:16, 184:3
**weeks** [2] - 155:15, 157:2
**weigh** [3] - 135:11, 138:2, 180:2
**weight** [2] - 115:13, 182:19
**wellness** [1] - 58:19
**whatnot** [2] - 138:4, 192:10
**whatsoever** [1] - 231:1
**wheelchair** [1] - 59:6
**whereas** [1] - 160:13
**white** [8] - 13:1, 13:6, 18:23, 19:16, 19:19, 20:16, 214:5, 214:6
**Whitlow** [9] - 7:7, 25:17, 27:23, 45:24, 134:6, 134:16, 134:19, 134:23, 135:8
**WHITLOW** [1] - 3:2
**whittle** [2] - 217:17, 226:15
**whole** [8] - 4:22, 20:18, 41:25, 54:3, 71:17, 106:14, 135:12, 218:8
**wide** [3] - 196:4, 213:1, 213:14
**wife** [4] - 117:10, 145:7, 232:12, 233:1
**wiggle** [1] - 210:8
**wills** [1] - 49:21
**wish** [1] - 245:23
**witness** [40] - 13:22, 36:3, 36:16, 36:20, 68:11, 72:19, 72:24, 73:2, 129:14, 129:22, 130:23, 131:13, 132:14, 133:17, 133:19, 148:21, 149:8, 152:19, 152:22, 160:23, 168:17, 174:3, 176:22, 200:9, 200:15, 201:9, 201:13, 202:1, 207:22, 210:1, 210:15, 211:11, 237:7, 243:7, 248:23, 250:14, 250:19, 250:21, 250:24, 254:3
**WITNESS** [19] - 13:25, 25:18, 36:8, 36:11, 71:24, 72:2, 72:4, 112:11, 112:16, 125:24, 149:11, 170:10, 170:18, 210:5, 211:9, 211:12, 221:15, 224:1, 237:3
**witness'** [1] - 68:22
**witness's** [3] - 201:12, 202:1, 243:11
**witnesses** [5] - 169:11, 170:6, 170:22, 194:5, 242:21
**women** [1] - 19:1
**won** [1] - 41:2
**wonder** [4] - 17:9, 125:24, 126:2, 126:15
**wonderful** [1] - 59:11
**wondering** [8] - 33:14, 135:9, 136:16, 164:9, 167:6, 184:22, 186:18, 208:19
**word** [9] - 65:5, 123:14, 134:10, 136:16, 137:9, 137:13, 147:3, 160:21, 174:5
**words** [14] - 29:10, 98:21, 107:4, 133:8,

135:6, 136:4, 137:23, 151:12, 152:13, 157:24, 160:17, 160:22, 160:23, 225:20
**wore** [1] - 117:19
**works** [4] - 78:19, 100:16, 107:6, 149:14
**world** [16] - 19:8, 23:18, 33:2, 66:1, 86:23, 109:18, 109:19, 113:9, 123:15, 124:23, 247:18, 247:20, 248:1, 248:7, 248:8, 248:11
**world's** [1] - 223:1
**worried** [2] - 154:1, 229:9
**worry** [3] - 174:10, 197:15, 208:17
**worse** [9] - 39:2, 96:13, 117:16, 216:4, 220:22, 224:4, 225:5, 243:3, 243:8
**worsening** [1] - 132:9
**woven** [1] - 139:15
**wrap** [2] - 36:12, 210:19
**write** [4] - 24:19, 28:4, 181:10, 198:9
**writing** [4] - 42:22, 42:23, 42:25, 49:18, 156:16, 228:24
**writings** [3] - 46:8, 201:4, 208:8
**written** [4] - 43:7, 43:8, 133:4, 177:9, 177:11, 202:23
**wrote** [6] - 157:6, 157:13, 158:9, 192:23, 198:6, 198:8

## X

**XYZ** [1] - 102:16

## Y

**Yale** [1] - 39:10
**year** [34] - 14:12, 24:19, 38:21, 38:22, 39:19, 39:21, 40:18, 41:3, 48:12, 67:5, 67:6, 67:7, 71:7, 81:1, 81:16, 88:3, 115:2, 115:4, 123:2, 123:3, 124:22, 128:10, 155:4, 160:10, 186:3, 190:4, 190:6, 196:20, 197:4, 212:21, 216:17, 223:17, 243:17, 249:23
**years** [34] - 31:25, 51:8, 52:22, 56:12, 58:21, 71:19, 83:18, 94:3, 94:9, 94:15, 95:9, 107:23, 125:8, 182:16, 182:25, 183:4, 212:11, 213:2, 213:10, 213:13, 213:20, 216:19, 216:20, 216:22, 223:17, 224:4, 224:18, 224:20, 240:23, 241:4, 241:9, 254:8
**yesterday** [2] - 61:9, 64:19
**York** [9] - 2:8, 146:7, 146:12, 211:25, 212:23, 213:12, 213:22, 228:13, 239:13
**you'** [1] - 220:1
**young** [1] - 87:21
**yourself** [4] - 13:18, 37:14, 154:14, 240:19
**Yu** [1] - 239:11
**Yudnofsky** [13] - 147:1, 147:5, 147:7, 151:9, 151:17, 151:20, 152:3, 152:7, 152:16, 152:21, 157:17, 170:8, 170:12

## Z

**zero** [1] - 115:17
**Zoom** [1] - 230:15