United States District Court
Southern District of Texas
**ENTERED**
May 23, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 4:21-CR-9 |
| | § | |
| ROBERT T. BROCKMAN | § | |

## MEMORANDUM OPINION AND ORDER

"The assessment of intellectual disability is a complicated task—one for which the typical judge, no more than an educated layperson in these matters, is perhaps not best equipped. But it is one that the law assigns us." *United States v. Pervis*, 937 F.3d 546, 558 (5th Cir. 2019). It is difficult to imagine a more complicated assessment than that of the current intellectual capabilities of the defendant in this case, Robert T. Brockman ("Brockman"). Brockman, as an extremely talented and innovative businessman, built a billion-dollar computer systems and software company and ran it for decades. Today, Brockman is 80 years old. Based on recent neuroimaging, Brockman has Parkinson's Disease, may have Alzheimer's Disease, and it cannot be reasonably disputed that he is suffering from some degree of age-related cognitive decline. However, the question is whether his intellectual capacities have declined to the point where he is no longer competent to stand trial.

On the one hand, Brockman's attorneys assert that his extremely poor cognitive testing results establish that Brockman has lost the ability to remember and process even the most rudimentary details and ideas necessary for his legal representation. They argue that Brockman suffers from dementia and that his cognitive test results are consistent with

his interactions with those now closest to him—his caretakers and attorneys—and his visibly frail and sometimes confused appearance in court.  On the other hand, the United States Government ("Government") asserts that there is much more than meets the eye with respect to Brockman's test results and outward appearance. The Government asserts that validity tests, designed to detect intentional exaggeration of an intellectual disability or malingering,[1] indicate that Brockman's poor cognitive test results stem from a deliberate attempt to perform poorly to avoid prosecution rather than from a genuine intellectual disability. Brockman's attorneys counter by arguing that the validity test results are flawed and unreliable because of, among other things, Brockman's advanced state of cognitive decline.

The Court has endeavored to "address[] its assigned task with care and commitment." *Id*. The Court held an eight-day evidentiary hearing and has carefully considered hundreds of pages of thorough briefing and thousands of pages of documents. The conclusions to be drawn from the validity test results and Brockman's past conduct consistent with these results cannot be ignored. Viewing the record in gestalt, the Court finds the Government's arguments and expert testimony regarding Brockman's competency to stand trial to be persuasive and supported by compelling evidence of Brockman's past malingering and sophisticated furtive behavior.  For the reasons given

---

[1] The American Psychiatric Association (2000) ("APA (2000)") defines "malingering" as the "intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives . . . ." American Psychiatric Association. (2000). *Diagnostic and statistical manual of mental disorders* (4th ed., text rev.), p. 739.

below, the Court finds that the Government has met its burden to show that Brockman is competent to stand trial.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Brockman's Cognitive Abilities

In May of 2017 Brockman first raised concerns about his cognitive abilities in an email to his friend, Dr. Stuart Yudofsky ("Dr. Yudofsky") a neuropsychiatrist at the Baylor College of Medicine ("Baylor"). *See* Northern District of California case number 3:20-CR-371 at docket entry 64, page 8. Brockman and Dr. Yudofsky had formed close personal and business ties over the years and Dr. Yudofsky was named by Baylor as the Chairman of the Scientific Advisory Board of the Brockman Medical Research Foundation. *See* Northern District of California case number 3:20-CR-371 at docket entry 69, pages 7–8. Over the next sixteen months neither Brockman nor Dr. Yudofsky took any action to address these concerns. *See* Northern District of California case number 3:20-CR-371 at docket entry 69, page 8.

On September 5, 2018, IRS agents and Bermudan police executed a search warrant for a raid in Bermuda on the home office of Evatt Tamine ("Tamine"), a lawyer who worked closely with Brockman for 14 years and who, according to the Government, helped Brockman illegally conceal assets offshore. *See* Northern District of California case number 3:20-CR-371 at docket entry 69, pages 5–8. This warrant provided significant evidence that Brockman had been engaged in a decades long scheme of tax evasion. On September 11, 2018, one day after returning from an Alaska fishing trip with Dr. Yudofsky, Brockman had an appointment with his urologist Dr. Seth Lerner ("Lerner"). At that

appointment Brockman told Dr. Lerner that he was concerned about his cognitive abilities and Dr. Lerner documented that Brockman was exhibiting symptoms of cognitive decline. *See* Northern District of California case number 3:20-CR-371 at docket entry 69, pages 5–8 and at docket entry 64, page 8.

Dr. Lerner referred Brockman to Dr. James Pool ("Dr. Pool"), who diagnosed Brockman with dementia in December 2018. *See* Northern District of California case number 3:20-CR-371 at docket entry 64, page 8. Dr. Pool then referred Brockman to two neurologists and a neuropsychologist, who evaluated Brockman in early 2019 and concluded that his cognitive impairment was consistent with either Parkinson's Disease or Lewy body dementia. *See* Northern District of California case number 3:20-CR-371 at docket entry 64, pages 8–9.

Even though Brockman was clinically diagnosed with dementia in late 2018 and early 2019 and was deemed incompetent by a neuropsychologist in 2019 and 2020, his behavior outside of clinical settings during that time period showed few, if any, signs of impairment. Brockman continued to run Reynolds as its CEO until late 2020. *See* Northern District of California case number 3:20-CR-371 at docket entry 69, pages 4, 9–11. Before he stepped down, Brockman regularly sent emails and memos evidencing that he had a firm grasp of the intricacies of his company and the industry in which it operated. *See* Northern District of California case number 3:20-CR-371 at docket entry 69, pages 9–11. In 2019, Brockman gave depositions in two separate complex antitrust cases and provided cogent testimony; neither Brockman, Brockman's civil attorneys, nor the attorneys

questioning Brockman had any concerns about Brockman's cognitive ability. *See* Northern District of California case number 3:20-CR-371 at docket entry 69, pages 9–10.

In July 2019 Brockman told his counsel in this criminal prosecution about his cognitive problems. *See* Northern District of California case number 3:20-CR-371 at docket entry 64, page 9. Brockman's counsel followed up with the neurologists and neuropsychologist, and the neuropsychologist performed forensic evaluations in December of 2019 and October of 2020 after which the neuropsychologist issued reports opining that Brockman was not competent to stand trial. *See* Northern District of California case number 3:20-CR-371 at docket entry 64, page 9.

On October 1, 2020, Brockman was charged in a 39-count indictment in the Northern District of California with a variety of financial crimes, including tax evasion; wire fraud affecting a financial institution; money laundering; failure to file Foreign Bank Account Reports; evidence tampering; and destruction of evidence. (Dkt. 2). The indictment was unsealed on October 15, 2020. *See* Northern District of California case number 3:20-CR-371 at docket entry 16, page 3. On November 5, 2020, Brockman stepped down as CEO of his company, Reynolds & Reynolds ("Reynolds"). (Dkt. 253 at p. 51).

On December 8, 2020, Brockman's counsel filed a motion requesting a competency hearing on the basis that Brockman "has dementia." *See* Northern District of California case number 3:20-CR-371 at docket entry 64, page 6. The Government conceded that Brockman had met the threshold for establishing the necessity of a competency hearing but requested that Government experts be given the opportunity to evaluate Brockman before the hearing. *See* Northern District of California case number 3:20-CR-371 at docket entry

69, pages 2, 12.   Both sides retained medical experts in various disciplines to assist the Court in determining Brockman's competency to stand trial. Brockman underwent extensive testing designed to both ascertain his cognitive ability and determine whether he was malingering or exaggerating symptoms of dementia to avoid prosecution.

   B.   *Cognitive Testing and Neuroimaging*

   —The Government's experts

   To evaluate Brockman, the Government retained Dr. Robert Denney ("Dr. Denney"), a forensic neuropsychologist; Dr. Ryan Darby ("Dr. Darby"), a neurologist; and Dr. Park Dietz ("Dr. Dietz"), a psychiatrist. Dr. Denney administered several tests to Brockman in May and October of 2021. Two of those tests, the Competency Assessment Inventory-Revised and the Evaluation of Competency to Stand Trial-Revised, were designed to assess Brockman's ability to understand the legal proceedings and assist his counsel. (Dkt. 236-1 at p. 3; Dkt. 249-1 at pp. 7–11). Additionally, Dr. Denney administered various cognition tests to Brockman while also administering validity tests designed to help detect malingering. (Dkt. 236-1 at pp. 3, 25–29, 42, 50–53). Dr. Dietz and Dr. Denney collaborated on forensic interviews of Brockman in May and October of 2021. (Dkt. 236-1 at pp. 2, 42). Dr. Darby performed a medical examination of Brockman in May of 2021. (Dkt. 236-6 at p. 2). Both Denney and Dietz have considerable, specific training and experience conducting forensic evaluations of criminal defendants where there is a concern regarding malingering or feigning dementia for potential secondary gain of the magnitude involved in this case—avoiding criminal prosecution and a potentially long prison term.

A fourth Government expert, Dr. Maria Ponisio, a neuroradiologist, reviewed Brockman's medical imaging and provided reports but did not examine or interview Brockman. (Dkt. 236-1 at pp. 95–112).

—Brockman's experts

Similarly, Brockman retained three experts who performed evaluations: Dr. Thomas Wisniewski ("Dr. Wisniewski"), a neurologist and neuropathologist; Dr. Marc Agronin ("Dr. Agronin"), a geriatric psychiatrist; and Dr. Thomas Guilmette ("Dr. Guilmette"), a forensic neuropsychologist. Dr. Agronin interviewed Brockman and administered cognition tests to him in July of 2021. (Dkt. 234-13 at pp. 20, 25–26). Dr. Guilmette performed forensic neuropsychological evaluations on Brockman in July and October of 2021 that included both cognition and validity tests. (Dkt. 234-18 at pp. 29–30; Dkt. 234-19 at pp. 9–11). Dr. Wisniewski performed a neurological examination of Brockman in October of 2021 that included cognition tests. (Dkt. 234-22 at pp. 5–9). Compared to Drs. Denney and Dietz, Drs. Guilmette, Agronin and Wisniewski have far less experience conducting forensic examinations where there is a concern regarding a criminal defendant's malingering or feigning dementia for potential secondary gain of the magnitude involved in this case.

A fourth expert, Dr. Christopher Whitlow, a neuroradiologist, reviewed Brockman's medical imaging and provided reports but did not examine or interview Brockman. (Dkt. 234-24; Dkt. 234-25).

—Imaging

In 2021, Brockman underwent two FDG-PET scans, two sleep studies, two MRI scans, an amyloid PET scan, an EEG scan, and a CT scan. (Dkt. 194 at p. 3). An FDG-PET scan (short for "fluorodeoxyglucose-positron emission tomography scan") evaluates brain function by measuring the metabolism of glucose in different areas of the brain. An MRI scan (short for "magnetic resonance imaging scan") can help to detect neurodegenerative diseases by measuring brain volume. An amyloid PET scan (short for "amyloid positron emission tomography scan") detects clusters of amyloid plaques in the brain; amyloid is one of the proteins associated with Alzheimer's Disease. An EEG (short for "electroencephalogram") detects abnormalities in the brain's electrical activity. A CT scan (short for "computed tomography scan") depicts the anatomical structure of the brain.

*C. Brockman's Hospitalizations*

In 2021, Brockman was hospitalized three times with urinary tract infections, once in March, once in late May and early June, and once in September. (Dkt. 250 at p. 47). Brockman suffered from delirium during all three hospitalizations and suffered from sepsis during the first two. (Dkt. 250 at p. 47). On June 24, 2021, Brockman underwent a UroLift procedure designed to stop the recurring urinary tract infections. (Dkt. 235-18 at pp. 23–25). In January 2022 Brockman was hospitalized with acute prostatis and toxic metabolic encephalopathy after contracting COVID-19. (Dkt. 259).

D.    *The Evidentiary Hearing*

The Court held an eight-day evidentiary hearing in November of 2021. During the hearing Dr. Yudofsky was subpoenaed by the Government to testify about his personal

knowledge regarding Brockman's competency to stand trial. Dr. Yudofsky moved to quash the subpoena, declining to testify and citing his right against self-incrimination under the United States Constitution. The Court held a sealed hearing on Dr. Yudofsky's assertion of this right and granted his motion to quash the Government's subpoena. Below are the Court's analysis of the evidence and factual findings.

## II.    THE LEGAL STANDARD

"When a court has reason to believe that a defendant may be incompetent, it must conduct a competency hearing[,]" as "[t]he conviction of a mentally incompetent defendant violates the Due Process Clause." *DeVille v. Whitley*, 21 F.3d 654, 656 (5th Cir. 1994). The question of competency is a mixed question of law and fact on which the Court sits as factfinder. *United States v. Makris*, 535 F.2d 899, 907–08 (5th Cir. 1976). The Government bears the burden of proving a defendant's competency by a preponderance of the evidence. *United States v. Hutson*, 821 F.2d 1015, 1018 (5th Cir. 1987). "A district court can consider several factors in evaluating competency, including, but not limited to, its own observations of the defendant's demeanor and behavior; medical testimony; and the observations of other individuals that have interacted with the defendant." *United States v. Simpson*, 645 F.3d 300, 306 (5th Cir. 2011).

"A defendant is deemed mentally competent when he has the present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceeding against him." *Dunn v. Johnson*, 162 F.3d 302, 305 (5th Cir. 1998) (quotation marks and brackets omitted) (citing *Dusky v. United States*, 362 U.S. 402 (1960) and *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir.

1980)). Conversely, "a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975).

## III.    <u>THE EVIDENCE</u>

### A.  *Validity Test Results: Brockman is Malingering*

The Court finds that Brockman's validity test results establish that he is exaggerating his symptoms of severe dementia and his cognitive abilities are not as poor as reflected by his cognitive test results. In other words, Brockman is malingering to avoid prosecution. Cognitive testing is the primary way for neuropsychologists and other medical experts in related fields to establish the severity of cognitive decline and impairment. However poor performance on cognitive testing does not always mean that an individual is truly impaired. While it is human nature to associate perceived physical frailty with a decline in cognitive functioning, this also may not always be true. [2]

Validity tests are tests designed to help determine whether the cognitive test results reflect genuine cognitive impairment or are the result of malingering for purposes of secondary gain, such as avoiding criminal prosecution and incarceration. Validity tests may be either embedded in the cognitive tests themselves or stand-alone tests administered separately. These tests are typically simple tasks that are easier than they appear to be and

---

[2] One of the best examples of this misperception is the life of Dr. Stephen Hawking, theoretical physicist and cosmologist. "Stephen Hawking." *Wikipedia*, Wikimedia Foundation, 22 May 2022, en.wikipedia.org/wiki/Stephen_Hawking.

on which a good performance is expected based on the fact that even individuals with established severe brain injury have been found capable of good performance. Based on that expectation, each validity test has an acceptable number of errors designed to make sure that the false positive rate is low, that is, the evidence of malingering is itself reliable.

Here, the Court finds the testimony of Drs. Denney and Dietz and the results of the cognitive and validity testing performed by these experts to be clear, credible and reliable regarding Brockman's current competency to stand trial. As part of two assessments, in May and October of 2021, Dr. Denney administered several cognition and validity tests to Brockman. (Dkt. 236-1 at pp. 25–29, 50–55).   Dr. Denney ultimately concluded that Brockman "was intentionally exaggerating his cognitive impairment on the testing." (Dkt. 249-1 at pp. 47, 68). He found that Brockman's performance on the validity tests in both the May and the October assessment indicated that the "neurocognitive test results [we]re not a valid indication of [Brockman's] cognitive abilities." (Dkt. 236-1 at pp. 26, 53).

The test scores led Dr. Denney to this conclusion because Brockman failed at least two validity tests during each assessment; Dr. Denney testified "that when you have two or more validity test failures in a battery, even up to nine possible validity tests in that battery, two or more failed is a positive indicat[or for] overall test battery invalidity, meaning you cannot rely upon the clinical, cognitive testing as being a genuine reflection of the person's ability." (Dkt. 249-1 at pp. 67–68). There does not seem to be any disagreement about the two-failure standard among any of the experts who provided testimony to the Court: a consensus statement on validity assessment published by the

American Academy of Clinical Neuropsychology indicates that the two-failure standard is consistent with the neuropsychological literature.[3]

In May of 2021, Brockman failed three validity tests administered by Dr. Denney: the Word Memory Test ("WMT"); the Non-Verbal Medical Symptom Validity Test ("NV-MSVT"); and the Victoria Symptom Validity Test ("VSVT"). (Dkt. 236-1 at pp. 25–26).

On the WMT and the NV-MSVT, Brockman satisfied the mathematical algorithms for a "possible genuine memory impaired profile;" but Brockman's test score patterns were so atypical of the results seen in dementia patients, that Dr. Denney scored Brockman's performance on both tests as a failure. (Dkt. 236-1 at p. 25). Put another way, Brockman scored so poorly on the WMT and the NV-MSVT that he could possibly be cognitively impaired; but Dr. Denney concluded that the score patterns established by Brockman's performance on the discrete component parts of the tests demonstrated not true debilitating cognitive impairment but Brockman's "attempting to appear disingenuously more impaired than actually the case, particularly on memory related measures." (Dkt. 236-1 at pp. 25–26). Dr. Denney reached this conclusion by comparing Brockman's test scores to those of groups of dementia patients (as well as other comparator groups), and he testified that the comparison demonstrated that Brockman's scoring profile was "an atypical profile that makes [Dr. Denney] believe it's not a valid reflection of [Brockman's] genuine

---

[3] Dr. Guilmette, who testified on Brockman's behalf, agreed at the competency hearing that the two-failure standard is "generally the consensus" in the field. (Dkt. 236-16 at p. 40; Dkt. 256 at p. 168).

abilities" because Brockman's score patterns were not "consistent with what you see with genuine demented patients." (Dkt. 249-1 at pp. 27–28, 35).

To clarify his analysis, Dr. Denney graphed his scoring comparisons for the WMT and NV-MSVT. For instance, here is one graph showing a comparison of Brockman's WMT scores with those of groups of patients with varying degrees of dementia. (Dkt. 236-13 at p. 28). The numbers along the y axis represent the percentage of questions answered correctly by the test subject; the letters along the x axis represent the individual subtests that make up the WMT, such as immediate recognition ("IR") and delayed recognition ("DR"); the solid line represents Brockman's performance; and the dotted lines represent the performance of the comparator groups, with the least impaired (who answered the most questions right on the various subtests) on the top and the most impaired on the bottom. (Dkt. 249-1 at pp. 23–25).



Using this graph, Dr. Denney highlighted several points. Globally, Dr. Denney initially noted that Brockman's scores were lower than those of even "the most severely impaired dementia and amnestic patients on all aspects of the measure except consistency[;]" consistency is "CNS" on the graph. (Dkt. 236-1 at p. 25). Such low scores

were inconsistent with Brockman's "demonstrated cognitive performance" during the forensic interviews that Dr. Denney and Dr. Dietz conducted. (Dkt. 236-1 at p. 25). On a more granular level, Dr. Denney observed that Brockman's multiple-choice ("MC") and paired-associate ("PA") scores were identical, which was "a red flag" because, as the comparator groups' graph lines show, "the more impaired a person gets the worse they do on paired associate, compared to multiple choice." (Dkt. 249-1 at pp. 27–28). Dr. Denney further observed that the disparity between Brockman's scores on the "easy" parts of the test (IR, DR, CNS) and his scores on the "hard" parts of the test (MC, PA, FR[4]) was "much more extreme" than the like disparity in the scores of even the most impaired dementia patients. (Dkt. 249-1 at p. 28).

Dr. Denney also concluded that Brockman failed the VSVT. (Dkt. 236-1 at pp. 25–26). In the VSVT, the subject is shown a number on a screen; when that number disappears, two more numbers appear, one of which is the same as the first number shown, and the subject has to select the number that is the same as the first number shown. (Dkt. 249-1 at p. 36). Brockman's score was 8 out of 24; in his report, Dr. Denney wrote that "[r]esearch demonstrates that even when dementia is the issue of concern, scores below 11 are low enough to indicate poor task engagement." (Dkt. 236-1 at p. 25). Dr. Denney further clarified that Brockman's score "resulted in a binomial $p$ value of 0.0758." (Dkt. 236-1 at

---

[4] "FR" stands for "free recall." (Dkt. 249-1 at p. 26). As Dr. Denney described it, "I simply ask the examinee to tell me all of the word pairs originally presented on the computer. He can give them to me in pairs, one at a time, or in any order and just do your best. Then I keep track of how many he gives me." (Dkt. 249-1 at p. 26). Brockman got zero answers correct on the FR subtest. (Dkt. 249-1 at p. 26).

pp. 25–26). In his testimony, Dr. Denney cited research indicating that "in a forensic setting where there's potential for secondary gain"—here, the potential secondary gain for Brockman would be avoiding criminal charges—a binomial *p* value of less than 0.2 is "so low as to tell you the person intentionally chose the wrong answer." (Dkt. 236-1 at pp. 25–26; Dkt. 236-13 at p. 53; Dkt. 249-1 at pp. 40–41).

In October of 2021, Brockman failed three validity tests administered by Dr. Denney: the NV-MSVT; the Medical Symptom Validity Test ("MSVT"); and the Rey-15 Item Test ("Rey Test").

On the NV-MSVT and the MSVT, Brockman satisfied the mathematical algorithms for a possible genuine memory impaired profile, but Brockman's test score patterns were so atypical compared to severe dementia patients that Dr. Denney scored Brockman's performance on both tests as a failure. (Dkt. 236-1 at pp. 50–53; Dkt. 249-1 at pp. 50, 54). As he did with the May 2021 WMT and NV-MSVT tests, Dr. Denney graphed both Brockman's test scores and those of the comparator groups. (Dkt. 236-1 at pp. 51–52).

Dr. Denney also concluded that Brockman failed the Rey Test. (Dkt. 236-1 at p. 53). In the Rey Test, which was perhaps the simplest validity test that the neuropsychologists explained to the Court, Dr. Denney began by showing Brockman a piece of paper containing 15 items for 30 seconds and then asking him to draw as many of the 15 items as he could. (Dkt. 249-1 at p. 55). To illustrate, here is the 15-item pattern (Dkt. 236-13 at p. 61):



Brockman correctly recalled one item, a circle, and made two other marks that were referred to as "intrusions" because they were not part of the pattern. (Dkt. 249-1 at p. 56). Dr. Denney testified that "[m]ost people, even with cognitive impairment can remember nine" of the items. (Dkt. 249-1 at p. 56).

After Brockman drew what he could recall of the 15-item pattern, Dr. Denney showed Brockman another piece of paper with 30 items on it and asked Brockman to circle the items that he remembered from the first page. (Dkt. 249-1 at p. 57). Brockman recognized seven items and circled four false positives (meaning items that were not part of the original pattern). (Dkt. 236-1 at p. 53). Dr. Denney subtracted the false positives

(four) from the correct answers (seven) on the second page, then subtracted the intrusions from the first page (two) from that total, giving Brockman a score of one. (Dkt. 236-1 at p. 53; Dkt. 249-1 at p. 58). Dr. Denney opined, based on recent literature, that a score of one constitutes "a positive finding for exaggeration even among dementia patients." (Dkt. 236-1 at p. 53).

In response to these test results and testimony, Dr. Guilmette testified that based on his cognitive and validity test results, Brockman's "neuropsychological test scores were valid and did not reflect evidence of malingering." (Dkt. 234-18 at p. 44; Dkt. 234-19 at pp. 18–19). He testified that the Court could not rely on the validity testing results from Drs. Denny and Dietz because Brockman's cognitive abilities have deteriorated to a point where "traditional [validity test] cutoff scores" generate false positives and cannot be used to establish malingering. (Dkt. 234-19 at p. 40). He also generally testified that the Court should not rely on the validity testing results because they are contradicted by the fact that none of Brockman's treating physicians ever found him to be malingering. As Dr. Guilmette asserts:

> Of multiple neuropsychological, neurologic, psychiatric, and primary care evaluations by Drs. York, Pool, Yudofsky, Jankovic, Lai, and Yu beginning in October 2018, none reported a suspicion that Mr. Brockman's cognitive complaints or symptoms were disingenuous. The first impression of malingering cognitive disorder was proposed by Drs. Denney and Dietz, in May 2021.
> Dkt. 234-19 at p. 40.

The Court finds Dr. Guilmette's testimony to be unreliable and unpersuasive for a number of reasons. While Dr. Guilmette vociferously complains about the cognitive and validity testing methods and scoring used by Drs. Denney and Dietz, it is undisputed that 1) Brockman failed at least two validity tests administered and scored by Dr. Guilmette himself using criteria and scoring methods he deemed acceptable, (Dkt. 256 at pp. 206, 215, 219)[5] and 2) Dr. Guilmette agreed that the consensus in the field of neuropsychology is that two failures in a battery of validity tests indicates intentionally poor effort. (Dkt. 256 at p. 168). As Dr. Guilmette concedes, Brockman received failing scores on at least six out of a total of 23 validity tests administered by the neuropsychologists in this case. (Dkt. 234-19 at p. 40; Dkt. 256 at pp. 246–47). Furthermore while Dr. Guilmette is experienced in conducting examinations in clinical settings, in comparison to Drs. Denney and Dietz, Dr. Guilmette has far less experience conducting forensic examinations. This is especially true where, as here, there is a significant concern regarding a criminal defendant's malingering for potential secondary gain of the magnitude involved in this case.

Next, the Court finds Dr. Guilmette's reliance on evaluations by Brockman's treaters prior to his indictment to refute the validity test results questionable at best, and at worst this reliance ignores evidence establishing that Brockman is malingering and deliberately misled his treaters.  The evidence establishes that while the treaters did not note any evidence of malingering, they saw Brockman in a clinical setting, in other words

---

[5] The Court finds Dr Guilmette's attempt to explain this fact by trying to draw a distinction between "actually fail[ing]" a test and "receiv[ing] failing marks" on a test to be unpersuasive. (Dkt. 256 at pp. 246-47.)

for treatment. With the possible exception of Dr. Yudofsky, these treaters were not aware that Brockman had any possible secondary motive for exaggerating his symptoms such as avoiding prosecution and a possible prison sentence. Nor was there any reason for his treaters to suspect such and evaluate him for malingering. According to the allegations by the Government that were not refuted, Brockman had contributed over $25 million to Baylor, the employer of all of Brockman's treaters, and was in Baylor's VIP patient program. Furthermore Dr. Guilmette's reliance ignores, as discussed in greater detail below, the significant inconsistencies and striking disconnect between Brockman's significant decline in cognitive abilities as reported by his treaters in a clinical setting and his superior cognitive abilities as observed in his day-to-day business and personal lives.

Any reliance on Dr. Yudofsky's notes or treatment of Brockman by Dr. Guilmette to refute the validity test results is especially questionable. This reliance ignores evidence that Dr. Yudofsky, as a neuropsychiatrist and close friend, assisted Brockman in malingering and creating a paper trial to support this effort by noting a concern of declining cognitive ability in 2017.[6] This the Court cannot do.

At the hearing Dr. Yudofsky was subpoenaed to specifically testify regarding his personal knowledge about Brockman's current cognitive ability, his notation of Brockman's concerns about suffering from dementia in 2017 and all conversations he had

---

[6] In fact, the Court received evidence that Dr. Yudofsky had such a close personal relationship to Brockman that, after Bermuda Commercial Bank froze Brockman's accounts and Tamine began to face increased scrutiny, Tamine and Brockman agreed that Tamine would no longer carry computers or telephones when he traveled to the United States and would instead keep such items at Dr. Yudofsky's office. *See* Northern District of California case number 3:20-CR-371 at docket entry 69, pages 7–8.

with Brockman regarding his dementia. Of particular interest to the Government were the conversations Dr. Yudofsky had with Brockman between the time he learned about the Government's seizure of potential evidence against him and his doctor's appointment several days later where he complained about symptoms of dementia and was referred to specialists for evaluation. Given the allegations of the close personal and financial ties between the two, it was expected that Dr. Yudofsky would have relevant testimony on these subjects. Surprisingly, on advice of counsel Dr. Yudofsky asserted his Fifth Amendment right against self-incrimination and refused to testify.[7] For all these reasons the Court will not rely on Dr. Guilmette's testimony in this matter.

### B. Evidence of Past Malingering

Perhaps the most telling evidence of Brockman's current exaggeration of his cognitive disability is the inconsistency between Brockman's performance during past cognitive evaluations and Brockman's contemporaneous, demonstrated superior business acumen and cognitive abilities outside of clinical settings. This inconsistency, which grew more striking over time, continued right up until it became clear that the Government had gathered considerable evidence to support Brockman's prosecution and he resigned from his corporate responsibilities.

---

[7] Before the hearing the Government specifically stated that it would not question Dr. Yudofsky regarding any of the underlying charges against Brockman and Dr. Yudofsky still insisted on asserting his right against self-incrimination.

—Evidence of past malingering: 2019

In January of 2019, Brockman gave a deposition in an ongoing antitrust case in which Reynolds is facing potential liability of over a billion dollars. (Dkt. 251 at p. 8). Reynolds's attorneys in the antitrust case asked to split the deposition into two half-days on account of concerns about Brockman's heart, but no one said that Brockman had any potential cognitive problems or any other health issues. (Dkt. 251 at pp. 13–14). The attorney who deposed Brockman, Michael Nemelka ("Nemelka"), testified at the competency hearing that, out of the nearly 100 depositions that he has taken, Brockman was in the "top five percent . . . in terms of preparation and skill as a witness." (Dkt. 251 at pp. 9–10). Nemelka testified that Brockman gave tactically shrewd and "clever" answers to questions and had "good recall" of past events, including pinpoint recall of an important conversation that he had had with the CEO of another company seven years before the deposition. (Dkt. 251 at pp. 22–30).

As an example of Brockman's strategic acuity, Nemelka discussed Brockman's insistence that one particularly large client's difficulty switching from Reynolds's computer management system to a competitor's was created by a logistical error in the installation of the competitor's product, not by the design of Reynolds's product. (Dkt. 251 at pp. 16–22). During the deposition, Brockman gave a lengthy description of how the client had tried to standardize dealership-specific shorthand job codes called "op codes" while simultaneously installing the competitor's product; and Brockman explained why, in his opinion, the client's attempt to handle the two distinct tasks at the same time doomed the switch. (Dkt. 251 at pp. 16–22). Nemelka explained that the client that had tried to

switch was "one of the largest automotive groups in the nation," so "it was significant that the largest dealership group tried to change dealer management systems and failed. It shows how hard it is to switch." (Dkt. 251 at pp. 16–22). Nemelka argued that the difficulty that a large, sophisticated company had switching from Reynolds's product illustrated that Reynolds had intentionally created a "sticky product" that locked clients in. (Dkt. 251 at p. 16). Brockman refused to concede that point and, according to Nemelka, "had a clever answer, to say it wasn't because it was so hard to switch, but it was because they did these op codes at the same time." (Dkt. 251 at p. 22).

Yet in March of 2019, six weeks after giving hours of astute testimony in a billion-dollar antitrust case, Brockman, when asked during an assessment by a Baylor neuropsychologist to read the word "two" aloud, responded that he did not think that "two" was a word. (Dkt. 236-10 at p. 87). Intellectual functioning tests administered during that assessment estimated Brockman's IQ at "87, which is in the low average range." (Dkt. 236-10 at p. 87). The neuropsychologist, Dr. Michele York ("Dr. York"), evaluated Brockman on a referral from Dr. Pool; she diagnosed Brockman with "dementia of mild to moderate severity" and opined that Brockman's "pattern of cognitive impairments [wa]s consistent with Dementia with Lewy Bodies." (Dkt. 236-10 at pp. 85, 88–89). In his testimony, Dr. Denney noted that Dr. York's March 2019 assessment was clinical in nature and therefore less skeptical regarding performance on cognition tests than a forensic examination would have been. (Dkt. 249-1 at pp. 70–71). Indeed, Dr. York's March 2019 assessment report did not discuss any validity tests and specifically stated that the assessment "was conducted as a clinical evaluation and not as a forensic assessment[;]" and even Brockman's current

neuropsychological expert, Dr. Guilmette, agreed at the competency hearing that Dr. York's diagnosis of Dementia with Lewy Bodies was incorrect. (Dkt. 236-10 at pp. 85–90; Dkt. 256 at pp. 240–41).

The inconsistency between Brockman's performance during cognitive evaluations and his demonstrated cognitive ability outside of clinical settings became more remarkable as 2019 went on. On his own initiative, Brockman told his criminal counsel about his dementia diagnosis in July of 2019 and showed them a binder containing medical reports related to the diagnosis. (Dkt. 249-7 at pp. 21–22, 24–25, 34; Dkt. 257 at pp. 229–30). However, Brockman did not authorize his criminal counsel to disclose the diagnosis to the attorneys who were handling civil matters in which Brockman and Reynolds were involved. (Dkt. 249-7 at p. 34). One of Brockman's criminal attorneys testified that Brockman wanted the dementia diagnosis "closely held" and "did not authorize [his criminal counsel] to disclose it elsewhere." (Dkt. 249-7 at p. 34). Brockman's insistence on keeping the diagnosis secret from the civil attorneys was especially curious under the circumstances, as Brockman sat for another high-stakes deposition in September of 2019— six months after he was diagnosed with mild-to-moderate dementia, scored in the low-average range on an IQ test, and said that "two" was not a word.

The September 2019 deposition was part of an investigation by the Federal Trade Commission ("FTC") into possible collusion between Reynolds and a competitor. (Dkt. 249-3 at pp. 50–54). The FTC attorney who examined Brockman, Dana Abrahamsen ("Abrahamsen"), testified that no one told him before or during Brockman's deposition that Brockman had dementia, Parkinson's Disease, Lewy body dementia, or even mild

cognitive impairment. (Dkt. 249-3 at p. 58). Abrahamsen testified that Brockman was

deposed for two four-hour days without notes and showed "tremendous command" of the

intricate technical issues presented by the FTC investigation as well as "great command of

the history of, you know, his company and the other people in the industry." (Dkt. 249-3

at pp. 73, 91). On the stand, Abrahamsen discussed several examples of Brockman's firm

grasp of complex material, including a particularly illustrative one in which Brockman

cogently explained a sophisticated Reynolds program that Abrahamsen had never heard of.

While asking Brockman about an email sent to Brockman three years before the deposition,

Abrahamsen spelled out a word with which he was unfamiliar, leading to this exchange:

> [Abrahamsen:]   In the body of his e-mail to you at the top of the first page of [exhibit] 4459, the first word in the sentence is S-Y-S-C-H-E-C-K. What is that?
>
> [Brockman:]   Syscheck. I hope you'll bear with me because some of the explanation of necessity has got to be a little technical. The operating system that the DMS is built around is what's called a multi-user operating system. And what that means is that if you have a system that has 100 PCs attached to it, each one of those is a separate user as far as the operating system is concerned. And the operating system, to the extent that it is set up that way, can handle 100 different users pretty much simultaneously. Well, they are not exactly simultaneously. They are kind of close. Every minute of computer power that's available, it's used by many different users of the 100 that are out there.
>
> Now, that's really pretty cool except for the fact that people like in the accounting department that have big end-of-month reports they have to create, batch[8] reports

---

[8] Notably, Brockman had already given a clear description of what the term "batch" means earlier in the deposition:

are very different in their usage characteristics. If you have a terminal-based application, somebody that uses a terminal and then they won't, and that frees up computer power for all of the rest of the folks. Even if you have five or six people, they are not—each one of them isn't getting that big a bite of computer power.

But in the accounting world, we have big batch programs that run at the end of the month. Think of it like a machine gun. They just load in this infinite supply of ammunition and they take the trigger down and it just goes with no break. And what that does is you can actually—not theoretically, but it actually happens in practice where the accounting department with six or seven users can suck up all the computer power, which means people that run terminal applications like parts invoices or service repair orders or service invoices, they have to wait.

And this is a logic issue that is a little hard to get around, but we devised Syscheck. And what happens is Syscheck is a dipstick into the computer usage, and it knows—you can dipstick and say, okay, it's 85 percent consumed or 90 percent or 50 percent, but when it gets up fairly high, and I would say probably 85 or 90, it's smart enough that it suspends the batch programs and lets the other 90 users in the pile, it will get their answers quickly. Because the transaction base, what you hate is when you enter a bunch of data entry, hit the button and then you got to wait.

| | |
|---|---|
| [Abrahamsen:] | In the first part of the document, Section 1: List of Third Party Access Utilized, and then there's several entries. Extract Inventory Vehicles-Batch, what is this part of the contract referring to? |
| [Brockman:] | This would be they keep vehicle inventories in a separate area inside their database, and the access would be to—on a batch basis. And by batch, that's when you have a program that runs that copies records from one file into another file, and it does it without benefit of any screen interaction. That's why it's called batch.<br>Dkt. 236-2 at p. 149. |

> And of course, what that then leads to is users accuse the DMS provider of a defective system, you are forcing us to buy a bigger computer. And our only defense now, which is a pretty good defense, we turn on Syscheck and people that are wanting to do something, if the computer system is overloaded, they get a message on their screen that says, I'm sorry, the accounting department is doing you in. Anyway, that's what Syscheck is all about. Dkt. 236-2 at pp. 188–90.

The record also contains several emails that Brockman wrote months after his 2019 dementia diagnosis in which Brockman demonstrated a strong understanding of complex subjects and sometimes did so under circumstances that apparently required him to answer questions without having pertinent documents at his disposal. While Brockman was dove hunting in Argentina in October of 2019, his accountant asked him in an email about his investment in a company called Medical Adhesive Revolution, or MAR. Brockman's son, who was "d[igging] up . . . documents" for the accountant, was also part of the email chain. (Dkt. 236-13 at p. 17). Brockman wrote the following email to the accountant and copied his son:

> MAR was a first place prize winner in the Jones School Business Plan Competition. The prize is put up every year by the GOOSE group. Goose is the Grand Old Order of Successful Entrapreneurs. (sp)[9]
>
> The prize was $100K put up at $10K each—I believe that there were 10 members.

---

[9] This parenthetical comment was in Brockman's email; apparently, Brockman realized that he might be misspelling "entrepreneurs."

The prospective investment was so appealing, that the GOOSE Group at the time it was tripled to $300K with each member putting up $30K instead of $10K.

Therefore I believe that my initial basis was $30K.

There were then additional capital calls that increased the basis in MAR.

My son Robert is working on digging out the details on these additional contributions to the basis of the investment—as well as the returns to date. I am dove shooting in Argentina—be back this coming Thursday evening.

Love,

Dad

PS: Robert—this issue needs immediate attention as we are running out of time.
Dkt. 236-13 at p. 16.

In October of 2019, Brockman also sent the following email to Craig Moss ("Moss"), the CFO of Reynolds at the time, regarding the creation of board minutes to avoid an accumulated earnings tax on retained profits:

Craig,

We need to have minutes of the board of Directors of the companies that have lots of cash on hand—as follows.

It is our standard policy to accumulate earnings internally so as to have funds available for purchase of attractive acquisition opportunities.

Additionally it appears that the new vehicle sales are slowing as part of the typical historical sales cycles in the dealership industry.

The financial news indicates that a recession is potentially coming up soon.

> Therefore the board of directors is declaring this as an additional reason to accumulate funds rather than adopt a policy of making dividends.
>
> These steps are necessary to avoid being accused of accumulations of earnings.
>
> Please let me see the draft of this document before it is circulated for signing by Al Draton and myself.
>
> Bob

Dkt. 236-8 at p. 92.

But when Brockman saw Dr. York again in December of 2019, this time to fulfill Brockman's criminal attorneys' request for an explicitly forensic assessment of Brockman's competency to stand trial, Brockman and his wife told Dr. York that Brockman could no longer tie a tie, use a remote control, or unlock his telephone. (Dkt. 236-10 at p. 22). According to Dr. York, Brockman performed written math computation at a fifth- or sixth-grade level and thought that three times four was seven. (Dkt. 236-10 at p. 25). Dr. York's December 2019 report states that Brockman passed several validity tests, but the report does not contain any discussion of those tests. (Dkt. 236-10 at pp. 21–28). Dr. York reiterated her prior diagnosis of Dementia with Lewy Bodies and concluded that Brockman was "unable to participate and aid in his own defense." (Dkt. 236-10 at p. 28).

—Evidence of past malingering: 2020

The disconnect between Brockman's performance on cognitive evaluations and other evidence of his intellectual capabilities persisted in 2020. Even after Dr. York's December 2019 assessment deemed him incompetent to stand trial, Brockman continued to serve as CEO of Reynolds for almost a year; and Tommy Barras ("Barras"), a longtime

friend and employee of Brockman's who worked closely with Brockman and succeeded

him as CEO, testified that Brockman showed no sign of cognitive impairment during that

time. Numerous emails authored by Brockman in 2020 demonstrate an exhaustive

understanding of both the various sectors of Reynolds and the complex dynamics of the

relationships among its executive team, and Brockman wrote several of those emails either

just before or after Brockman's criminal counsel sent a letter to the Department of Justice

arguing that Brockman's cognitive abilities had deteriorated to the point where a criminal

prosecution against him would contravene the principles of due process.

Two helpful examples bookend the letter to the Justice Department. In March of

2020, Barras, who was Reynolds's executive vice president of software development at the

time, emailed Brockman regarding an internecine feud between two other Reynolds

executives, Robert Schaefer and Rudy Nieto. Barras advised Brockman not to intervene,

writing, "Do not fan the flame—ignore it and hopefully they will get the point." (Dkt. 236-

6 at p. 103). In response, Brockman outlined a thorough blueprint for mediating the dispute:

> Tommy,
>
> One of my concerns is that the key to keep the sales department from running
> over everyone else—is people like Schaefer and Agan before him.
>
> Management of sales decision making is one of the most complex things that
> I have to teach you about.
>
> It cannot be done quickly—as the education is focused on many, many
> situations—what is happening, what should the response be to the situation
> at hand?
>
> Right now Schaefer is the most knowledgeable about the above rules and
> policies.

Rudy is the most adept at trying to find a way around the rules—which is a source of friction between the two.

Unless the situation is that Schaefer is clearly not following my rules and policies—the decision must go Schaefer's way. Otherwise Schaefer will become "broken" and give up trying to keep a lid on sales people—which will cause Sales to run amok.

If sales doesn't like a decision—let them endeavor to make their case—in writing and only with you—Rudy should not be allowed to try to move Schaefer around on his own. Then it is an educational opportunity for you and me to discuss.

Right now Schaefer undoubtedly feel [sic] like a lonely soldier. He was assigned his task. He is following my orders and what I taught him. He is dug into his position quite correctly. For sure he wonders what is going on and what is happening to him. When there are different orders and rules, he will follow orders—unless it involves giving salesmen a free pass to do whatever they want—which in his heart he would believe that to be insanity.

Bob
Dkt. 236-6 at p. 102.

A month later, in April of 2020, Brockman's criminal attorneys sent this letter to the Department of Justice in which they contended "that a prosecution against Mr. Brockman under these circumstances would be in contradiction of the principles set out in the United States Justice Manual and the fundamental principles of due process" because "the evidence of Mr. Brockman's cognitive impairment is overwhelming and compelling." (Dkt. 236-10 at pp. 4, 16). The letter asserted that Brockman "has difficulty remembering significant information[,] cannot put his thoughts into written form, and cannot even recall how to spell common words." (Dkt. 236-10 at p. 3). The letter further stated that Brockman would "shortly step down as CEO and Chair" of Reynolds because he could "no longer effectively serve as the chief executive officer of Reynolds[.]" (Dkt. 236-10 at p. 3).

But in May of 2020, a month after Brockman's counsel sent that letter, a Reynolds executive named Chris Walsh sent an email requesting Brockman's advice on the appropriate selling price for a newsletter that Reynolds had taken over as part of its acquisition of a company named IMN:

> I was looking at margins for our newsletter and what sales thinks is the right selling point. Their suggestion is $399/month. When I look at our margins at that price it is around 10% GP. That doesn't seem worth it to me but I was curious what your thoughts would be. At $499/mo our margins jump to 23% which seems more acceptable to me.
>
> Do you have any guidance you can give me on this topic?
> Dkt. 236-8 at pp. 85–86; Dkt. 249-2 at pp. 72–73.

In his response, Brockman outlined a plan to phase the newsletter out because he did not think that its profit margins, which he considered too low to justify continued investment, would improve:

> Chris,
>
> My guess is that our information on costs is not complete—and therefore our margins are somewhat overstated even now.
>
> This makes the 10% GP—probably right at zero. Therefore we need not to be doing that business which is a zero profit product offering. The surprises that can happen are always negative.
>
> A 23% margin is also not acceptable.
>
> We need to exit this business gracefully—saying nothing—just reducing overheads. Sales talent should be directed to some other product area where we can make some money. Obviously this word will get out—which will be as long as we can keep it under wraps.
>
> This period of time will likely be the most profitable part of our experience with newsletters—as this product dies. This the result of taking away semi-

fixed costs away in a more rapid manner that sales revenue from customers decrease.

Later when some significant project is needed (or the customer base gets too small), it will be the time to retreat further and ultimately completely shut it down.

This is unfortunately a process that continually occurs. The only danger is failure to recognize the situation for what it is—and take appropriate action. Wasting resources on a situation that cannot be made profitable—is worse than a waste of time. It creates an atmosphere of protecting revenue that is worthless.

Therefore we must continually innovate in order for the Company to prosper.

You have done well to bring this situation forward—so that what must be done—gets done.

Bob
Dkt. 236-8 at p. 85.

At the competency hearing, Moss, a former CFO of Reynolds who worked with Brockman for 29 years, testified that Brockman's analysis of the newsletter's profitability was "typical for our business. We had—we had, you know, margins in the hundreds of percentiles. So, for a software company that's—that's what [Brockman] required." (Dkt. 249-2 at pp. 60, 74). Moss further testified that Reynolds executives and personnel "[a]bsolutely" saw the newsletter phase-out as Brockman's call to make in May of 2020. (Dkt. 249-2 at p. 74).

Barras, the current CEO of Reynolds, worked with Brockman for even longer—45 years—than Moss did. (Dkt. 253 at pp. 34–35). Barras testified that he "had no doubts" about Brockman's cognitive abilities or Brockman's ability to run Reynolds at any time before Brockman stepped down as CEO on November 5, 2020. (Dkt. 253 at pp. 58–59,

66). Barras further testified that Brockman gave good advice and was involved in every important decision at Reynolds while he was serving as CEO in 2020. (Dkt. 253 at pp. 66, 73–74). And Barras said as much in an email that he sent to Dr. Jim Jackson ("Dr. Jackson"), a member of Reynolds's board of directors, in August of 2020:

> I assure you Bob is involved in EVERY important decision being made. We talk about ExCom[10] opinions and whether to allow feedback or not. These are frequent conversations.
> Dkt. 236-14 at p. 60.

In short, Brockman continued to run the billion-dollar Reynolds company—and, by all available evidence, run it well—for nearly a year after Dr. York's second examination declared him incompetent to stand trial and for seven months after his criminal attorneys told the Justice Department that he would be resigning because his cognitive abilities had declined to the point where prosecuting him would violate fundamental principles of due process. Moreover, it appears that Brockman only left Reynolds when he did because his indictment had just been unsealed three weeks before, on October 15, 2020. *See* Northern District of California case number 3:20-CR-371 at docket entry 16, page 3. At the competency hearing, one of Brockman's criminal attorneys admitted that Brockman's resignation "took longer than we all hoped" and that Brockman's "continuation in the role" of CEO for so long after the April 2020 letter to the Justice Department was "a puzzle in view of . . . our observation that he wasn't competent in other respects[.]" (Dkt. 249-7 at pp. 60–61). While it may be true that patients who suffer from Alzheimer's Disease may

---

[10] "ExCom" is shorthand for Reynolds's "executive committee." (Dkt. 253 at p. 73).

have better long-term than short-term memory, the Court agrees with the Government's experts that this fact cannot adequately explain the chasm between Brockman's clinical assessment and contemporaneous conduct described in detail above.

The Government has presented evidence showing that Brockman selectively exaggerated his cognitive impairment in 2019 and 2020 when it appeared advantageous to do so. The Court finds this evidence to be both relevant and compelling. In light of this evidence of prior malingering, the Court concludes that the results of the validity tests administered by Drs. Denney, Dietz and Guilmette indicate Brockman's continued malingering to this day.

### C.  Evidence of Sophisticated Furtive Behavior

The Government also presented evidence showing that in the years leading up to his indictment Brockman has demonstrated the ability to successfully engage in sophisticated furtive behavior to conceal his actions and enlist others in that conduct. The Court finds that this evidence is persuasive and supports the validity test results indicating that Brockman is misleading the Government and his treaters by exaggerating his disability to avoid prosecution.

Much of this evidence came from Evatt Tamine. Tamine is a lawyer who worked closely with Brockman for 14 years and who, according to the Government, helped Brockman conceal assets offshore. On September 5, 2018, Bermudan police and American IRS agents executed search warrants in Bermuda at Tamine's home office and a storage locker. (Dkt. 253 at pp. 18–22). The law enforcement agents seized more than 90 terabytes of data on about 20 devices, including laptops, desktops, external hard drives, network

storage devices, and mobile phones. (Dkt. 253 at pp. 20–21). The agents also seized an encrypted private email server, from which they obtained email communications between Tamine and Brockman. (Dkt. 249-2 at pp. 99–100; Dkt. 253 at pp. 22–25). Tamine testified that the materials seized pursuant to the warrants included "[e]very document that existed anywhere in relation to any of the entities" that he helped administer and maintain for Brockman, as well as 14 years of correspondence between him and Brockman. (Dkt. 249-2 at pp. 98–100).

Decrypted email conversations between Brockman and his business associates obtained in the Tamine raid discuss the falsification, backdating, concealment, and destruction of documents. For example, at one point Brockman wanted to investigate a possible management buyout of Reynolds. (Dkt. 249-2 at pp. 115–16). Reynolds was owned by a trust, and Tamine was the director of the trustee. (Dkt. 249-2 at pp. 95–97). Brockman sent an encrypted email instructing Tamine to send Brockman an unencrypted letter that was designed to make it appear as if the trustee had asked Brockman to investigate the possible buyout. (Dkt. 236-1 at pp. 153–57; Dkt. 249-2 at pp. 115–17). In effect, Brockman was obscuring his control of the trust with a fabricated letter from the trustee that Brockman himself dictated. (Dkt. 236-1 at pp. 153–57; Dkt. 249-2 at pp. 115–17).

Additionally, Brockman sent an email to Tamine and Don Jones ("Jones"), another person who managed and maintained offshore entities for Brockman, explaining how to circumvent machine identification codes and backdate documents. Brockman wrote that for "any document that is created for signature, we must be sure that we never use the

original that comes out of a laser printer." (Dkt. 236-1 at p. 169). Instead, such documents "need[ed] to be run through a standard copy machine first—and the copy used as an original as the copy machine does not have sufficient resolution to copy the encoded dots." (Dkt. 236-1 at p. 169). Brockman added:

> As a reminder—we need to also remember that all copy machine/laser printer paper has encoded into it the manufacturer of that paper as well as the year and month of manufacturer. [sic] For that reason I always set aside some packets of copy paper with dates on them—for potential future use.
> Dkt. 236-1 at p. 169.

In another email chain, Brockman and Tamine discussed how Tamine would keep government officials, particularly United States customs officials, from seizing laptops and files relating to Tamine's work for Brockman that Tamine was moving from France to Bermuda. (Dkt. 236-1 at pp. 119–20; Dkt. 249-2 at pp. 102–04). Brockman expressed concern that the laptops would "get tied up in Customs" or "seized" and made sure that Tamine was not flying through the United States. (Dkt. 236-1 at p. 120). Tamine proposed that he use remote access software to transfer files from the drives that were in France to a drive in Bermuda and then wipe the drives that were in France before transporting them. (Dkt. 236-1 at p. 119). Brockman agreed with the idea and also suggested that Tamine "create two copies on a Mico SD chip that are the size of less than a postage stamp[,] carry one concealed somewhere in luggage[,] and . . . FED-X the other with some misc correspondence to [him]self in Bermuda." (Dkt. 236-1 at p. 119).

The emails seized in the Tamine raid further discuss the use of shell companies and trusts to hide money from regulators. After Bermuda Commercial Bank froze Brockman's

accounts and Tamine began to face increased scrutiny, Tamine sent an email to Brockman suggesting that they establish "shell companies" in an "escape jurisdiction[,]" as well as a "hidden fund" consisting of money held in trust by an Australian lawyer, to help "cover [their] tracks" so that they could avoid "disclosing where other accounts are held" and "alerting a regulator as to where they should seek to freeze money." (Dkt. 236-1 at pp. 148–49). Tamine further stated that, given the "fear of detention[,]" he could "never again" travel to the United States "with a computer or telephone" but that he "could keep all [he] need[ed] at [Dr.] Yudofsky's office including a phone." (Dkt. 236-1 at pp. 150–51). Brockman concurred with Tamine's suggestions. (Dkt. 236-1 at p. 145). The Court concludes that all of this evidence of past sophisticated furtive behavior is relevant and supports a finding that Brockman is malingering and is competent to stand trial.

### D.  Other medical evidence

Finally, the Court finds that despite Brockman's recent health problems, the Government has met its burden of establishing that Brockman is competent to stand trial. In 2021, Brockman was hospitalized three times with urinary tract infections, once in March, once in late May and early June, and once in September. (Dkt. 250 at p. 47). Brockman suffered from delirium during all three hospitalizations and suffered from sepsis during the first two. (Dkt. 250 at p. 47). On June 24, 2021, Brockman underwent a UroLift procedure designed to stop the recurring urinary tract infections. (Dkt. 235-18 at pp. 23–25). Since the competency hearing, Brockman's counsel has represented to the Court that Brockman was hospitalized in January of 2022 with acute prostatis and toxic metabolic encephalopathy after contracting COVID-19. (Dkt. 259).

Brockman's prior history of malingering and validity testing following his earlier hospitalizations leads the Court to conclude that Brockman has continued to malinger until today. Notably, Dr. Denney administered two tests, the Competency Assessment Inventory-Revised and the Evaluation of Competency to Stand Trial-Revised, that were specifically designed to assess Brockman's ability to understand the legal proceedings and assist his counsel. (Dkt. 249-1 at pp. 7–11). Although the Competency Assessment Inventory is "more of a guide to make sure you are asking the right questions[,]" the Evaluation of Competency to Stand Trial-Revised is scored, and Brockman passed it in October of 2021, after his 2021 hospitalizations. (Dkt. 249-1 at pp. 7–11).

The Government also provided other credible expert testimony opining, based on the most recent neuroimaging available, that Brockman continues to remain competent to stand trial through today. Dr. Darby, the Government's neurologist, testified that he was concerned that continued hospitalizations, such as those in 2021, could accelerate Brockman's neurodegeneration, particularly after he viewed a forensic evaluation of Brockman that Dr. Agronin and Dr. Guilmette conducted in July of 2021 in which Brockman appeared confused and impaired. (Dkt. 250 at pp. 10–11). However, Dr. Darby testified that FDG-PET scans conducted in March of 2021 and August of 2021 revealed only mild changes during that period and did not support a conclusion that Brockman's hospitalizations accelerated his neurodegeneration, leading Dr. Darby to suspect transient residual delirium as the cause of Brockman's impaired appearance in the July 2021 examination. (Dkt. 250 at pp. 20–22).

An EEG conducted in September of 2021 showed that Brockman was no longer delirious; and Brockman's cognitive performance, though still weaker than before the July 2021 examination, had improved when he was evaluated again by both Government and defense experts in October of 2021. (Dkt. 250 at pp. 24–30). In his report, Dr. Darby further noted that Brockman's MRI scans did not show significant brain atrophy and that, although Brockman had a positive amyloid PET scan result that could indicate Alzheimer's disease, cognitively normal subjects can also produce positive amyloid PET scans. (Dkt. 236-6 at pp. 25–27). Ultimately, Dr. Darby testified at the competency hearing that, "based on [Brockman's] most recent neuroimaging," he would expect Brockman to exhibit impairment "at the mild range of severity, so in the mild cognitive impairment range." (Dkt. 250 at p. 32).

The Court finds Dr. Darby's testimony regarding Brockman's "cognitive reserve" clear, credible and reliable in explaining why future hospitalizations may not result in Brockman no longer being competent to stand trial. Dr. Darby noted that Brockman, as a person of "superior intelligence[,]" had a high "cognitive reserve[.]" (Dkt. 249 at pp. 100–01). Differences in cognitive reserve, Dr. Darby explained, mean that "the same amount of damage in two different patients could lead to very different levels of cognitive impairment, because they're starting from different points. And so, in a patient who has a high level of intelligence, they're able to compensate for the same amount of brain damage, more than a person that would not have that level of intelligence." (Dkt. 249 at p. 100).

Dr. Dietz, the Government's psychiatrist, synthesized Dr. Darby's interpretations of Brockman's neuroimaging studies and Dr. Denney's neuropsychological findings and

added his own impressions of Brockman after two forensic interviews, one in May of 2021 and one in October of 2021. Dr. Dietz concluded that Brockman "most likely suffers from mild cognitive impairment or mild dementia" but "continues to malinger neurocognitive dysfunction." (Dkt. 236-13 at p. 10). In concluding that Brockman meets the *Dusky* standard—meaning that Brockman has the present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceeding against him—Dr. Dietz further highlighted "Brockman's motivation to avoid prosecution, the marked discrepancy between [Brockman's] early cognitive test results and his contemporaneous testimony and speeches, [and] the serious allegations of a remarkable pattern of deceptive conduct spelled out in the indictment." (Dkt. 236-13 at p. 10).

## IV.   <u>CONCLUSION</u>

The Court finds that the Government has met its burden of establishing that Defendant Robert T. Brockman is competent to stand trial. In so finding, the Court is very mindful that Brockman is an elderly person who has Parkinson's Disease, which is a neurodegenerative disorder, and has suffered from some degree of cognitive impairment. However, the evidence before the Court shows that Brockman is also an extremely intelligent person with both a high cognitive reserve and history of malingering for secondary gain. The Government has introduced compelling evidence showing that Brockman exaggerated his cognitive symptoms when he was being examined by medical professionals in the past; and Brockman's performance on validity tests—some of them administered by his own neuropsychological expert—indicates that he continues to

exaggerate impairment. Accordingly, the Court finds Defendant Robert T. Brockman competent to stand trial.

SIGNED at Houston, Texas on _____May 23_____ 2022.

_____
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE